ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

Colorado Outfitters Association et al v. Hickenlooper

Assigned to: Chief Judge Marcia S. Krieger

Referred to: Magistrate Judge Michael J. Watanabe

Case in other court:  USCA, 14–01290

USCA, 14–01292

Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/17/2013

Date Terminated: 06/26/2014

Jury Demand: None

Nature of Suit: 950 Constitutional – State Statute

Jurisdiction: Federal Question

**Defendant**

| | | |
|---|---|---|
| **Mesa County, Board of County Commissioners** | represented by | **David Robert Frankel**<br>Mesa County Attorney's Office<br>P.O. Box 20000<br>544 Rood Avenue<br>2nd Floor Annex<br>Grand Junction, CO 81502–5004<br>970–244–1612<br>Fax: 970–255–7196<br>Email: david.frankel@mesacounty.us<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Outfitters Association** | represented by | **Peter J. Krumholz**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6007<br>Fax: 720–904–6006<br>Email: pkrumholz@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard A. Westfall**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6010<br>Fax: 720–904–6020<br>Email: rwestfall@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Farm Bureau** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

279

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Shooting Sports Foundation**          represented by     **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Magpul Industries**          represented by     **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Youth Outdoors**          represented by     **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA Liberty Arms**          represented by     **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Outdoor Buddies, Inc.**                  represented by  **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Women for Concealed Carry**              represented by  **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Colorado State Shooting Association**    represented by  **Anthony John Fabian**
Anthony J. Fabian, P.C.
510 Wilcox Street
# C
Castle Rock, CO 80104
303–663–9339
Email: fabianlaw@qwestoffice.net
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Hamilton Family Enterprises, Inc.**      represented by  **Anthony John Fabian**
*doing business as*                        (See above for address)
Family Shooting Center at Cherry Creek     *ATTORNEY TO BE NOTICED*
State Park

<u>Plaintiff</u>

281

**David Strumillo**                          represented by  **David Benjamin Kopel**
                                                            Independence Institute
                                                            727 East 16th Avenue
                                                            Denver, CO 80203
                                                            303–279–6536
                                                            Fax: 303–279–4176
                                                            Email: david@i2i.org
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Bayne**                              represented by  **Peter J. Krumholz**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Richard A. Westfall**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dylan Harrell**                            represented by  **Peter J. Krumholz**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Richard A. Westfall**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rocky Mountain Shooters Supply**           represented by  **Jonathon Michael Watson**
                                                            (See above for address)
                                                            *TERMINATED: 02/12/2014*

                                                            **Marc F. Colin**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**2nd Amendment Gunsmith &Shooter**          represented by  **Jonathon Michael Watson**
**Supply, LLC**                                             (See above for address)
                                                            *TERMINATED: 02/12/2014*

                                                            **Marc F. Colin**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Burrud Arms Inc.**                         represented by  **Jonathon Michael Watson**
*doing business as*                                         (See above for address)
Jensen Arms                                                 *TERMINATED: 02/12/2014*

282

Marc F. Colin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Green Mountain Guns**                    represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry's Outdoor Sports**                 represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Specialty Sports &Supply**               represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Goods for the Woods**                    represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John B. Cooke**                          represented by    **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ken Putnam**                             represented by    **David Benjamin Kopel**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                                  represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                                  represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                                    represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                               represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                                  represented by  **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                         (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                                   represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                               represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                                    represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                              represented by  **David Benjamin Kopel**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **John W. Hickenlooper**<br>*Govenor of the State of Colorado* | represented by | **Daniel D. Domenico**<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway<br>Denver, CO 80203<br>720–508–6000<br>Fax: 720–508–6032<br>Email: dan.domenico@state.co.us<br>*ATTORNEY TO BE NOTICED* |

**David Christopher Blake**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: david.blake@state.co.us
*ATTORNEY TO BE NOTICED*

**John Tien Yau Lee**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jtlee@state.co.us
*ATTORNEY TO BE NOTICED*

**Jonathan Patrick Fero**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jon.fero@state.co.us
*ATTORNEY TO BE NOTICED*

**Kathleen L. Spalding**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: kit.spalding@state.co.us

285

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for
Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**                               represented by    **David Benjamin Kopel**
*Sheriff of Weld County, Colordo*                                (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**                                represented by    **David Benjamin Kopel**
*Sheriff of El Paso County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**                                represented by    **David Benjamin Kopel**
*Sheriff of Larimer County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**                             represented by    **David Benjamin Kopel**
*Sheriff of Douglas County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**                            represented by    **David Benjamin Kopel**
*Sheriff of Gilpin County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**                              represented by    **David Benjamin Kopel**
*Sheriff of Montezuma County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**                                   represented by    **David Benjamin Kopel**
*Sheriff of Moffat County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                         *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**                                represented by    **David Benjamin Kopel**
*Sheriff of Dolores County, Colorado*                            (See above for address)

*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Ensminger**                             represented by   **David Benjamin Kopel**
*Sheriff of Teller County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shayne Heap**                                represented by   **David Benjamin Kopel**
*Sheriff of Elbert County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Day**                                   represented by   **David Benjamin Kopel**
*Sheriff of Yuma County, Colorado*                              (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred D. McKee**                              represented by   **David Benjamin Kopel**
*Sheriff of Delta County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lou Vallario**                               represented by   **David Benjamin Kopel**
*Sheriff of Garfield County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Hosselkus**                             represented by   **David Benjamin Kopel**
*Sheriff of Mineral County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett L. Powell**                            represented by   **David Benjamin Kopel**
*Sheriff of Logan County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                        *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian E. Norton**                            represented by   **David Benjamin Kopel**
*Sheriff of Rio Grande County, Colorado*                        (See above for address)

*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirard**                          represented by   **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                            represented by   **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                           represented by   **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                       represented by   **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                            represented by   **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                            represented by   **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                            represented by   **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                             represented by   **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*                      (See above for address)

|  |  |
|---|---|
| *TERMINATED: 11/27/2013* | *LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Forrest Frazee**<br>*Sheriff of Kiowa County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Rick Dunlap**<br>*Sheriff of Montrose County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Ted B. Mink**<br>*Sheriff of Jefferson County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Fred Wegener**<br>*Sheriff of Park County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Bruce Newman**<br>*Sheriff of Huerfano County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Randy Peck**<br>*Sheriff of Sedgwick County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Dominic Mattivi, Jr.**<br>*Sheriff of Ouray County, Colorado*<br>*TERMINATED: 11/27/2013* | represented by | **David Benjamin Kopel**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **John Minor**<br>*Sheriff of Summit County, Colorado* | represented by | **David Benjamin Kopel**<br>(See above for address) |

*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**                          represented by   **David Benjamin Kopel**
*Sheriff of Jackson County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**                          represented by   **David Benjamin Kopel**
*Sheriff of Gunnison County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**                   represented by   **David Benjamin Kopel**
*Sheriff of Phillips County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**                             represented by   **David Benjamin Kopel**
*Sheriff of Lake County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**                       represented by   **David Benjamin Kopel**
*Sheriff of Arapahoe County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**                         represented by   **David Benjamin Kopel**
*Sheriff of Baca County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**                            represented by   **David Benjamin Kopel**
*Sheriff of Saguache County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**                            represented by   **David Benjamin Kopel**
*Sheriff of Costilla County, Colorado*                      (See above for address)

291

TERMINATED: 11/27/2013                          *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**                    represented by   **David Benjamin Kopel**
*Sheriff of Crowley County, Colorado*              (See above for address)
*TERMINATED: 11/27/2013*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**                 represented by   **David Benjamin Kopel**
*Sheriff of Bent County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**             represented by   **David Benjamin Kopel**
*Sheriff of Las Animas County, Colorado*           (See above for address)
*TERMINATED: 11/27/2013*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**                represented by   **David Benjamin Kopel**
*Sheriff of Routt County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                           *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**                represented by   **Jonathon Michael Watson**
*TERMINATED: 12/23/2013*                           (See above for address)
                                                   *TERMINATED: 02/12/2014*

                                                   **Marc F. Colin**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**                 represented by   **David Benjamin Kopel**
*Sheriff of Grand County, Colorado*                (See above for address)
*TERMINATED: 12/12/2013*                           *LEAD ATTORNEY*

| 06/18/2013 | 36 |  | SCHEDULING ORDER: Discovery due by 11/1/2013. Dispositive Motions due by 12/2/2013. By Magistrate Judge Michael J. Watanabe on 6/18/2013. (klyon, ) (Entered: 06/18/2013) |
| 06/20/2013 | 37 | 18 | BRIEF in Support of 29 MOTION for Preliminary Injunction filed by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth |

| | | | |
|---|---|---|---|
| | | | Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Colin, Marc) (Entered: 06/20/2013) |
| 06/21/2013 | 39 | 57 | REPLY to Response to 26 MOTION for Order to *Certify Questions to Colorado Supreme Court* filed by Defendant John W. Hickenlooper. (Domenico, Daniel) (Entered: 06/21/2013) |
| 06/24/2013 | 40 | 65 | BRIEF in Opposition to 29 MOTION for Preliminary Injunction filed by Defendant John W. Hickenlooper. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Fero, Jonathan) (Entered: 06/24/2013) |
| 06/27/2013 | 41 | 144 | REPLY to Response to 29 MOTION for Preliminary Injunction *on behalf of all Plaintiffs* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Attachments: # 1 Affidavit Exhibit A to Reply, # 2 Affidavit Exhibit B to Reply, # 3 Affidavit Exhibit C to Reply, # 4 Affidavit Exhibit D to Reply)(Krumholz, Peter) (Entered: 06/27/2013) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;
SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;

GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT CHERRY
CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BARRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY; and
GOODS FOR THE WOODS,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## CIVIL SCHEDULING ORDER

---

293B

## 1.  DATE OF CONFERENCE
## AND APPEARANCES OF COUNSEL

The Scheduling Conference occurred on June 10, 2013, at 10:30 a.m. before Magistrate Judge Michael J. Watanabe.

The following counsel appeared on behalf of the Plaintiffs:

1.      On behalf of the 55 Sheriffs and David Strumillo:

        David B. Kopel
        Independence Institute
        727 E. 16th Ave.
        Denver, CO 80203
        Phone: (303) 279-6536

2.      On behalf of Magpul Industries and the National Shooting Sports Foundation:

        Jonathan M. Anderson
        Douglas L.. Abbott
        Holland & Hart
        PO Box 8749
        Denver, CO 80201-8749
        Phone: (303) 295-8566

3.      On behalf of David Bayne, Dylan Harrell, Outdoor Buddies, Inc., the Colorado Outfitters Association, Colorado Farm Bureau, Women for Concealed Carry, and Colorado Youth Outdoors:

        Richard A. Westfall
        Peter J. Krumholz
        Hale Westfall, LLP
        1445 Market St., Suite 300
        Denver, CO 80202
        Phone: (720) 904-6022

4.      On behalf of Licensed Firearms Dealers USA Liberty Arms, Rocky Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms Inc. d/b/a Jensen Arms, Green Mountain Guns, Jerry's Outdoor Sports, Grand Prix Guns, Specialty Sports & Supply, and Goods for the Woods:

        Marc F. Colin
        Bruno Colin Jewell & Lowe PC
        1999 Broadway, Suite 3100
        Denver, CO 80202-5731
        Phone: (303) 831-1099

293C

5.     On behalf of Colorado State Shooting Association and Hamilton Family Enterprises,
Inc., d/b/a Family Shooting Center at Cherry Creek State Park:

    Anthony J. Fabian
    Law Offices of Anthony J. Fabian PC
    510 Wilcox St., Suite C
    Castle Rock, CO 80104
    Phone: (303) 663-9339

The following counsel appeared on behalf of Defendant John W. Hickenlooper:

    Daniel D. Domenico
    David Christopher Blake
    Jonathan Patrick Fero
    Matthew David Grove
    Office of the Colorado Attorney General
    Ralph L. Carr Colorado Judicial Center
    1300 Broadway, 10th Floor
    Denver, CO 80203
    Phone: (720) 508-6000

## 2. STATEMENT OF JURISDICTION

**Plaintiffs' Statement:**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States. This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

**Defendant's Statement**

The Governor does not concede that he is an appropriate defendant in this case or that this Court represents an appropriate forum for raising the claims asserted. The Governor reserves the right to assert immunity under the Eleventh Amendment or to seek federal court abstention from the interpretive questions relating to the challenged state laws. The Governor anticipates making a final evaluation of the immunity issue prior to the status conference set for June 10, 2013.

The Governor does not concede that the Sheriffs have Article III standing to challenge the constitutionality of a state law with which they disagree.

4

293D

### 3. STATEMENT OF CLAIMS AND DEFENSES

#### a.    Plaintiffs:

The Supreme Court, in *District of Columbia v. Heller*, 554 U.S. 570 (2008), held that the Second Amendment to the U.S. Constitution guarantees the right of individual citizens to keep and bear arms for all lawful purposes. 554 U.S. at 627.   The right to arms is fundamental, and self-defense is its "central component." 554 U.S. at 628.  In *McDonald v. Chicago*, 561 U.S. 3025 (2010), the Supreme Court held that the rights protected by the Second Amendment are incorporated by the Fourteenth Amendment and apply equally to the states.

On March 20, 2013, Governor Hickenlooper signed House Bills 13-1224 and 13-1229 ("HB 1224" and "HB 1229," respectively). HB 1224:

1. Bans all ammunition magazines sold or acquired after July 1, 2013, that hold more than 15 rounds of ammunition;
2. Bans magazines of any size that are "designed to be readily converted" to hold more than 15 rounds of ammunition;
3. Allows for "grandfathered" ownership of magazines but only if: (a) the magazines were owned prior to July 1, 2013; *and* (b) the owner maintains "continuous possession" of the magazine after July 1, 2013.

HB 1229 requires so-called "universal" background checks before sale or temporary transfer of a firearm, with only a few exceptions. As detailed below, HB 1224 and 1229 violate the Second and Fourteenth Amendments, Supreme Court precedent in *Heller* and *McDonald*, and the Americans with Disabilities Act ("ADA").

#### a.  *HB 1224 Violates the Second and Fourteenth Amendments because it Prohibits Magazines Larger than 15 Rounds.*

Many common and popular firearms, used for self-defense as well as target and sport shooting, come standard with magazine capacities larger than 15 rounds. *Heller* forbids the prohibition of arms which are "typically possessed by law-abiding citizens for lawful purposes." Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles plainly meet this standard.

Accordingly, the prohibition of such magazines is categorically forbidden by *Heller*.

#### b.  *HB 1224 Violates the Second and Fourteenth Amendments because it Prohibits Magazines of Any Size that are "Designed to be Readily Converted."*

Magazines for most handguns and many rifles are detachable box magazines, which often contain a removable base (floor) plate. The existence of removable base plates necessarily means that the magazine can be extended through commercially available extension products or readily available fabricated extensions. Instead of a detachable box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many fixed tube magazines have removable end caps, and so can be easily extended. As a result, nearly every magazine – for both handguns and rifles – can be converted to exceed the

5

293E

capacity limit set by HB 1224. Notably, HB 1224 bans magazines regardless of whether they have actually been converted to hold more than 15 rounds.

To the extent that HB 1224 bans some or all magazines of 15 rounds or less, it further violates the *Heller* standard against outlawing arms "typically possessed by law-abiding persons for lawful purposes." Plaintiffs intend to seek a preliminary injunction barring HB 1224"s prohibitions related to such magazines because it would make a very large fraction, perhaps a majority, of handguns and rifles unusable or illegal.

> c.  *HB 1224 Violates the Fourteenth Amendment Due Process Clause because it is Ambiguous and Vague Regarding Magazines of 15 Rounds or Less.*

Neither ordinary firearms owners, nor experts, for the Office of the Attorney General itself understand what is prohibited by HB 1224's ban on magazines that are "designed to be readily converted" to hold more than 15 rounds. The intent of the designer of any particular firearm magazine is beyond the ken of any of the Plaintiffs—and also of the Defendant.

The Attorney General's technical guidance says that a removable base/floor plate does not, in itself, make a magazine "designed to be readily converted." But no-one, including the Attorney General, has been able to specify what physical feature *does* make a magazine "designed to be readily converted."

The unconstitutional vagueness of the HB 1224 "designed" language chills the exercise of Second Amendment rights of all Plaintiffs. The vague language is an even more serious problem for Plaintiff Sheriffs, because they and their deputies are supposed to enforce the statute, but they have no way to knowing which small magazines are or not illegal contraband.

For these reasons, Plaintiffs intend to seek a preliminary injunction against this part of HB 1224 as well.

> d.  *HB 1224 Violates the Second and Fourteenth Amendments because it Requires the "Continuous Possession" of Magazines Owned on the Effective Date.*

HB 1224 contains a "grandfather" clause permitting an individual to retain a magazine larger than 15 rounds or any of indeterminate class of prohibited smaller magazines, if two requirements are both met: The magazine was owned prior to the effective date of HB 1224, **and** the magazine remains in the owner's individual's "continuous possession." The term "continuous possession" is undefined in HB 1224.

The Attorney General's technical guidance infers an exception to "continuous possession," so that the owner can allow someone else to possess the magazine, so long as the second person remains in the "continuous physical presence" of the owner. The technical guidance does not "and cannot change or replace the unequivocal language" of HB 1224. *See* Jordan v. Pugh, 504 F.Supp.2d 1109, 1118 (D. Colo. 2007). The technical guidance "can be withdrawn or further revised at any time." *Id.*

To whatever extent the technical guidance solves the unconstitutional vagueness of "continuous possession," the guidance demonstrates the violation of the Second Amendment. Under the guidance, all of the following are prohibited by HB 1224:

a) Loans to friends, family, spouses, and employees – regardless of the duration. For example, allowing one's spouse to use a firearm and its grandfathered magazine for lawful self-defense in the home while the owner is out of town.

b) General bailments to a friend or neighbor for safe storage while the owner is away from the home.

c) General bailments to a gunsmith for regular maintenance and repairs, if the owner does not remain in the "continuous physical presence" of the gunsmith throughout the days and weeks that are the typical turn-around time for arms repairs.

Therefore, HB 1224's "continuous possession" requirement violates the Second and Fourteenth Amendments. Plaintiffs intend to seek a preliminary injunction on this aspect of HB 1224 as well.

*e. HB 1224 Violates the Americans With Disabilities Act.*

The exercise of enumerated constitutional rights, including Second Amendment rights, is a "major life activity" under the Americans with Disabilities Act. Title II of the ADA prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132. Many disabled individuals, including the disabled Plaintiffs, have reduced mobility, so they cannot retreat or take cover as quickly as can able-bodied crime victims. Likewise, many disabled individuals, including the disabled Plaintiffs, cannot change magazines as quickly as able-bodied people can. Therefore, persons with relevant disabilities are entitled to a "reasonable accommodation" under the ADA so that they can own magazines larger than 15 rounds, for necessary self-defense.

*f. HB 1229 Violates the Second and Fourteenth Amendments because it Imposes Illegitimate Restrictions on the Private Sale of Firearms.*

HB 1229 requires that when private individuals (that is persons who are not engaged in the business of the retail sale of firearms--Federal Firearms Licensees), they must route the sale through a Federal Firearms Licensee (FFL). The FFL is supposed to contact the Colorado Bureau of Investigation for a background check of the gun buyer **and also** conduct the transfer as if he were selling a firearm out of his own inventory. The latter requirement means that the dealer and the transferee must jointly complete a three-page federal form, for which the dealer is at risk of civil and criminal liability for errors.

This regulatory scheme creates a *de facto* prohibition on private sales and thus violates the Second Amendment. The creation of a legal mandate with which persons cannot in practice comply violates the Due Process clause of the Second Amendment.

Further, for certain Plaintiffs, the multitude of background checks and the related expenses are highly oppressive. For example, HB 1229 mandates that when a non-natural person acquires a firearm, every natural person who may use the firearm must undergo a background check. Because many family farms and ranches in Colorado are LLCs or partnerships, this means that when the farm or ranch acquires a firearm, every family member, and every farm/ranch hand must undergo a background check.

7

293G

The per-person cost is $22. (The $10 fee to the FFL, allowed by HB 1229; plus the $12 fee to the CBI, which is imposed by a separate law, and which is not challenged in this lawsuit.) So a farm or ranch could have to spend $220 in fees in order to acquire a $140 gun. And of course every family member and farm/ranch hand would have to travel in person to the FFL, assuming that one could be found, in order to undergo the background check.

Plaintiffs take no position on the abstract issue of the constitutionality of background checks on private sales. Plaintiffs do contend that HB 1229 is so oppressive that it cannot pass any form of heightened scrutiny.

g.   *The Temporary Transfer Ban of HB 1229 Violates the Second and Fourteenth Amendments.*

HB 1229 also outlaws all temporary transfers of firearms, with certain exceptions. The right to own firearms includes the rights to use them for all legitimate activities. *Heller & McDonald, passim.* Legitimate uses of firearms include temporary transfers of firearms.

The HB 1229 exceptions are too narrow. For example, HB 1229 allows gifts or loans of firearms between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins.

Similarly, if a man and a woman are engaged but not married, and the man leaves his firearms with his fiancée while he is sent overseas for military duty, the fiancée must undergo a new background check every 30 days in order to possess and safely store the man's firearms.

HB 1229 will impact Colorado Youth Outdoors ("CYO") because its success is largely attributed to their fundraising. Because CYO's largest and most successful fundraiser involves target shooting and many of its members are new to shooting sports, CYO frequently loans firearms to participants for a period exceeding 72 hours. (HB 1229 allows 72-hour loans.) HB 1229's mandate requires that CYO conduct a background check on every individual it loans firearms to for fundraisers and other events. This requirement will have a chilling effect on CYO's business operations and is a violation of the Second Amendment.

Plaintiffs contend that at a minimum, the Second Amendment protects Colorado Youth Outdoors and other plaintiffs, who wish to temporarily transfer firearms for innocent and constructive reasons, from being treated as if they were selling guns to strangers in a parking lot. The Second Amendment does not allow temporary transfers to be  subject to the regulatory burden attendant to permanent sales.

Even if background checks could be required on temporary transfers, HB 1229 does not provide a mechanism by which Coloradoans can participate in a functional system. On top of the dearth of willing FFLs (described in paragraph f.), the CBI background check system, although called an "instant" check in the statute, often takes several hours or up to nine days in which to generate an approval. The delays often take so long that temporary transfers are in effect impossible. The *de facto* prohibition of temporary transfers for innocent purposes violates the Second Amendment. The nominal creation of a regulatory scheme which in fact makes it impossible to engage in the regulated activity is a violation of the Fourteenth Amendment.

> **b.    Defendant:**

House Bills 13-1224 and -1229 strike a constitutionally satisfactory balance between the individual right to self-defense, which the United States Supreme Court has held is protected by the Second Amendment, and the state's compelling need to protect the safety of its citizenry.    Assuming *arguendo* that magazine capacity is covered by the Second Amendment at all, there is a reasonable fit between H.B. 13-1224's limit of fifteen rounds and Colorado's public safety obligations. Thus, limiting magazine size to fifteen or fewer bullets in accordance with H.B. 13-1224 does not violate the Second Amendment (Count I).

Nor does H.B. 13-1224 "ban…the possession of a broad class of functional firearms." (Count II).  To the contrary, a reasonable interpretation of the bill ensures that residents of and visitors to Colorado may possess functional semi-automatic handguns and other firearms that are adequate for the purposes of self-defense, along with a wide variety of compatible ammunition magazines.

H.B. 13-1224 is not unconstitutionally vague or ambiguous with respect to the phrases "designed to be readily converted" or "continuous possession" (Counts III and IV). To the extent that these phrases may be vague or ambiguous, this Court should certify any interpretive questions to the Colorado Supreme Court rather than declaring their meaning as a matter of state law.

Because Title II of the Americans with Disabilities Act does not apply to state statutes such as H.B. 13-1224, Plaintiffs are not entitled to relief. (Count V).

H.B. 13-1229, which expands the background check requirement for gun transfers in Colorado, does not prohibit or substantially limit activity that is protected by the Second Amendment.  And even to the extent that the statute may do so, there is a reasonable fit between the regulation and the state's legitimate goal of limiting the availability of firearms for persons who are prohibited from gun possession or ownership by state or federal law.

## 4. UNDISPUTED FACTS

The parties anticipate conferring and agreeing to the undisputed facts, if any, at a later date.

## 5. COMPUTATION OF DAMAGES

Not applicable.

## 6. REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER FED.R.CIV.P. 26(f)

a.    The Rule 26(f) meeting was held at the offices of the Attorney General on June 5, 2013.

b.    Names of each participant and party he/she represented:

David Kopel, on behalf of the 55 Sheriffs and David Strumillo.

9

293I

Jonathan M. Anderson and Douglas L. Abbott, on behalf of Magpul Industries and the National Shooting Sports Foundation.

Richard A. Westfall and Peter J. Krumholz, on behalf of David Bayne, Dylan Harrell, Outdoor Buddies, Inc., the Colorado Outfitters Association, Colorado Farm Bureau, Women for Concealed Carry, and Colorado Youth Outdoors.

Marc F. Colin, on behalf of Licensed Firearms Dealers USA Liberty Arms, Rocky Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms Inc. d/b/a Jensen Arms, Green Mountain Guns, Jerry's Outdoor Sports, Grand Prix Guns, Specialty Sports & Supply, and Goods for the Woods.

The foregoing attorneys also appeared on behalf of Colorado State Shooting Association and Hamilton Family Enterprises, Inc., d/b/a Family Shooting Center at Cherry Creek State Park, in the absence of its counsel of record, Anthony J. Fabian.

Daniel D. Domenico, David Christopher Blake, Jonathan Patrick Fero, and Matthew David Grove on behalf of the Governor of the State of Colorado

c.     Statement as to when Rule 26(a)(1) disclosures were made or will be made.

Initial disclosures will be made on or before June 19, 2013.

d.     Proposed changes, if any, in timing or requirement of disclosures under Fed. R. Civ. P. 26(a)(1).

Not applicable.

e.     Statement concerning any agreements to conduct informal discovery:

Counsel for the Defendant has agreed to provide the legislative record of HB 1224 and HB 1229, including transcripts. Plaintiffs believe that the parties will continue to try to cooperate if they desire additional information within the time frames suggested by the Plaintiffs.

Defendants submit that the parties have agreed to discuss the possibility of informal interviews, rather than depositions, for certain non-testifying plaintiffs. The parties have agreed to conduct informal discovery where possible, including the good faith exchange of documents and information via informal requests where appropriate. The parties agree to respond to informal discovery requests within the 30 days authorized by the Rules of Civil Procedure unless objection is made or some other time is mutually agreed upon. By responding to informal discovery requests, the parties do not waive any objection they may have to the admissibility of evidence at trial.

f.     Statement concerning any other agreements or procedures to reduce discovery and other litigation costs, including the use of a unified exhibit numbering system.

293J

**Plaintiffs' position:**

The plaintiffs do not believe considerable discovery is needed in this case; they believe that extensive discovery will thwart the expeditious resolution of the case. Accordingly, after receiving the legislative history and Defendant's answer, Plaintiffs will serve one set of interrogatories, requests for admissions and/or request for production on the Defendant to fully understand how Defendant intends to meet his burden to establish a compelling state interest or some similar standard. Once full responses are received, Plaintiff intends to be ready to try the case.

**Defendant's position**:

Plaintiffs have challenged the constitutionality of two duly enacted state laws, and have made it clear that they expect the state to bear the factual burden of defending their validity. The parties have agreed that a ten-day trial is appropriate, yet the Plaintiffs maintain that very little discovery will be necessary. While the Governor does not anticipate seeking leave to exceed the presumptive limits for written discovery under Fed. R. Civ. P. 33, 34, and 36, the presumptive limits on written discovery apply to each plaintiff individually and not to each side as a whole.

The Governor anticipates objecting to the issuance of "contention" interrogatories.

g.   Statement as to whether the parties anticipate that their claims or defenses will involve extensive electronically stored information, or that a substantial amount of disclosure or discovery will involve information or records maintained in electronic form.

**Plaintiffs' position:**

The plaintiffs do not believe discovery of electronically stored information is necessary; they believe that extensive discovery will thwart the expeditious resolution of the case.

**Defendant's position:**

Upon receiving notice of the complaint in this case, the Governor took steps to ensure the preservation of electronically stored information, and notified the Plaintiffs of his expectation that they had done the same dating back to the date upon which they reasonably anticipated the commencement of litigation. The Governor anticipates that his defenses may involve the discovery of electronically stored information, and that a substantial amount of disclosure or discovery will involve information or records maintained in electronic form.

h.   Statement summarizing the parties' discussions regarding the possibilities for promptly settling or resolving the case.

The parties agree that there is no realistic possibility of a prompt settlement which would resolve the entire case.

11

293K

**Defendant's statement:**

As discussed at the May 30, 2013 status conference, the parties attempted to reach a stipulation regarding entry of an injunction. The Governor was and remains willing to stipulate to the entry of a preliminary injunction binding him to enforcement of H.B. 13-1224 consistent with the Technical Guidance, a copy of which was provided to the Court during the status conference.

## 7. CONSENT

All parties have not consented to the exercise of jurisdiction of a magistrate judge.

## 8. DISCOVERY LIMITATIONS

Limitations on depositions, interrogatories, requests for production and requests for admission:

Without leave of court, there shall be a limit 25 interrogatories, 10 requests for production of documents, and 10 requests for admission per party or party group.

Depositions shall be limited to 15 per side, inclusive of experts, without leave of court.

Depositions shall be limited to 7 hours unless a longer deposition is agreed to by the parties or ordered by the court.

d.      Other Planning and Anticipated Motions.

**Plaintiffs:**

Plaintiffs will file a motion for preliminary injunction on or before June 12, 2013.

Defendant shall file his response on or before June 24, 2013.

Plaintiffs shall file their reply on or before June 27, 2013.

Both parties will disclose witnesses called and exchange exhibits to be used at a preliminary injunction hearing by June 21, 2013.

**Defendant:**

The Governor will file a motion for certification of questions of law to the Colorado Supreme Court with respect to the Plaintiffs' vagueness challenges to H.B. 13-1224. The Governor would be amenable to the entry of a preliminary injunction during the pendency of any certified questions, in a form to be submitted contemporaneously with the motion for certification.

Defendant's motion for certification shall be filed on or before June 12, 2013.

Plaintiffs' shall file their response on or before June 14, 2013.

Defendant's shall fill his reply on or before June 21, 2013.

In the event that the Court denies the motion for certification or any questions are not accepted by the Colorado Supreme Court, the parties have discussed the possibility of presenting certain legal questions to the Court for resolution with the goal of potentially narrowing the factual scope of the case. The Governor remains willing to stipulate to the entry of a preliminary injunction, while such questions are pending, irrespective of the forum.

## 9. CASE PLAN AND SCHEDULE

a.   Deadline for Joinder of Parties and Amendment of Pleadings:

July 1, 2013.

b.   Discovery Cut-off:

November 1, 2013.

c.   Dispositive Motion Deadline:

December 2, 2013

d.   Expert Witness Disclosure:

1.   Anticipated fields of expert testimony:

**Plaintiffs** anticipate expert testimony in the fields of research concerning, among other things, the common and suitable use of firearms utilizing magazines of more than 15 rounds; the prevalence and nature of self-defense with firearms; the relative suitability of certain firearms for personal and home defense;.

**Defendants** anticipate expert testimony concerning, among other things, the relation between magazine size and both collective and individual self-defense needs, the correlation between magazine size and the number of casualties in mass shooting events, the efficacy of expanded background checks on the illegal transfer of firearms and possession by prohibited persons, and any effect of the challenged regulations on firearms markets.

2.   Limitations on the use or number of expert witnesses:

The parties will be limited to four experts per side without leave of Court.

13

293M

3.      The parties shall designate all experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before:

August 1, 2013.

4.      The parties shall designate all rebuttal experts and provide opposing counsel and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2) on or before:

September 3, 2013.

e.      Identification of Persons to Be Deposed:

**Plaintiffs' position:**

Plaintiffs do not believe that depositions are necessary in order to try this case. Given the July 1 effective date of the bills and the time-sensitive nature of these proceedings, plaintiffs believe that interrogatories will be sufficient for purposes of preparing for trial. Similarly, with respect to experts, the expert reports submitted under Fed. R. Civ. P. 26(a)(2)(B) should be sufficient to avoid the need for expert depositions.

**Defendant's position:**

The Governor maintains that, at a minimum, he should be permitted to depose every witness whom the Plaintiffs indicate will testify at trial.  With respect to non-testifying plaintiffs, the Governor is willing to conduct informal interviews to follow up on any questions remaining after responses to written discovery are received.

f.      Deadline for Interrogatories:

The last day to serve interrogatories is October 1, 2013.

g.      Deadline for Requests for Production of Documents and/or Admissions:

The last day to serve requests for production of documents and requests for admission is October 1, 2013.

## 10.  DATES FOR FURTHER CONFERENCES

a.      Status conferences will be held in this case at the following dates and times:

None scheduled at this time.

14

293N

*Chief Judge Krieger.*

b.      The date and time for a final pretrial conference will be set by the Court. A Final Pretrial Order shall be prepared by the parties and submitted to the court no later than seven (7) days before the final pretrial conference.

### 11.  OTHER SCHEDULING MATTERS

a.      There are no other scheduling matters at this time.

b.      The parties anticipate a ten-day trial to the court.

c.      All pretrial proceedings and trial will be held in the Alfred J. Arraj United States Courthouse.

### 12.  NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1D. by submitting proof that a copy of the motion has been served upon the moving attorney's client, all attorneys of record, and all *pro se* parties.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1A.

In addition to filing an appropriate notice with the clerk's office, a *pro se* party must file a copy of a notice of change of his or her address or telephone number with the clerk of the magistrate judge assigned to this case.

In addition to filing an appropriate notice with the clerk's office, counsel must file a copy of any motion for withdrawal, motion for substitution of counsel, or notice of change of counsel's address or telephone number with the clerk of the magistrate judge assigned to this case.

### 13.  AMENDMENTS TO SCHEDULING ORDER

This Scheduling Order may be altered or amended only upon a showing of good cause.

Dated June 18, 2013
Nunc Pro Tunc, June 10, 2013.

BY THE COURT:

MICHAEL J. WATANABE
U.S. MAGISTRATE JUDGE
DISTRICT OF COLORADO

15

2930

APPROVED:

For Plaintiffs:                          For Defendant:

s/David B. Kopel                         s/Daniel D. Domenico
David B. Kopel                           Daniel D. Domenico

s/Douglas L. Abbott                      s/ David Blake
Douglas L. Abbott                        David Blake

s/Richard A. Westfall                    s/ Matthew D. Grove
Richard A. Westfall                      Matthew D. Grove

s/Marc F. Colin                          s/ Jonathan P. Fero
Marc F. Colin                            Jonathan P. Fero

s/Anthony J. Fabian                      s/ Kathleen Spalding
Anthony J. Fabian                        Kathleen Spalding

6257550_1.DOCX

293P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado *et. al.*;

      Plaintiffs

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**SUPPLEMENTAL BRIEF REGARDING PLAINTIFF'S STANDING AND OTHER
ISSUES RAISED BY THE COURT**

---

      Plaintiffs, by and through their counsel, file this Supplemental Brief Regarding Plaintiff's

Standing and Other Issues Raised by the Court, and in support thereof states the following:

**I.**      **THECOURT CAN, AND SHOULD, ISSUE A TEMPORARY RESTRAINING
ORDER PENDING THE PRELIMINARY INJUNCTION HEARING ON
JULY 10, 2013.**

      At the Court's hearing on June 17, 2013, the Court requested the Plaintiffs to brief whether

FED. R. CIV. P. 65 may be invoked to request a temporary restraining order ("TRO") under the

circumstances presented, and without meeting the conditions listed in FED. R. CIV. P. 65(b). As

discussed below, this Court may issue a temporary restraining order against enforcement of HB

1224 until the Court's scheduled July 10, 2013 hearing, because the conditions in Rule 65(b) do

not apply where notice to the opposing party has been provided.  The Court should so issue a

TRO here to preserve the status quo and prevent the irreparable and immediate harm to the

Plaintiffs that will occur after HB 1224 takes effect on July 1, 2013.

1

The Court's hesitation to issue a TRO at the June 10, 2013 status conference may stem from the portion of FED. R. CIV. P. 65(b) that provides that a court may issue a TRO for a maximum of fourteen days *without notice* to the adverse party only under the following conditions:

(1)  the moving party must submit an affidavit or verified complaint clearly showing that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, FED. R. CIV. P. 65(b)(1)(A);

(2) the movant's attorney must certify in writing any efforts made to give notice to the adverse party, and the reasons why notice should not be required, FED. R. CIV. P. 65(b)(1)(B); and

(3)  Any TRO issued without notice must state the date and time it was issued and why the order was issued without notice, and describe the injury at issue and state why it is irreparable. FED. R. CIV. P. 65(b)(2).

However, when a party moves for a TRO, and the adverse party receives notice of the requested relief, the motion is to be evaluated under the same standard as a motion for a preliminary injunction. *Akbar v. Borgen*, 796 F. Supp. 1181, 1185 (E.D. Wis. 1992) (treating motion for a TRO as a motion for preliminary injunction); *Escobar v. Jones*, Civ. Action No. 09-cv-2207, 2012 WL 6212846 at *2 (D. Colo. Nov. 21, 2012) (—Where an opposing party has notice, the procedure and standards for issuance of a TRO mirror those for a preliminary injunction.").

In situations, such as this case, when the opposing party has notice of the requested TRO but no hearing has occurred, courts will typically apply the fourteen-day limitation for the TRO, but dispense with the other conditions for issuing a TRO without notice. *E.g., Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D.C. Del. 1987) (limiting the duration of the requested relief but otherwise treating the motion for a TRO the same as a motion for preliminary injunction); *Tracy v. Robbins*, 40 F.R.D. 108, 111 (D.S.C. 1966) (lack of proper verification of complaint was not fatal to TRO request because, in part, the opposing party received timely notice of the requested relief); *Burnette v. Haywood County Bd. of Educ.*, No.

06-1197, 2007 WL 2915413 at *2 (W.D. Tenn. Aug. 1, 2007) (Rule 65(b)'s requirements for issuing a TRO without notice were inapplicable because the opposing party's attorney was, in fact, served with a copy of the motion for a TRO).

Although motions for TRO's made with notice to the opposing party and motions for preliminary injunctions are evaluated under the same set of factors, the nature of the relief granted by TRO's is much more limited. TRO's under FED. R. CIV. P. 65 are an appropriate remedy where, as here, imminent and irreparable harm will occur to the moving party before the court can conduct a hearing on the motion for a preliminary injunction. ―Applicants for injunctive relief occasionally are faced with the possibility that irreparable injury will occur before the hearing for a preliminary injunction required by Rule 65(a) can be held." 11A FEDERAL PRACTICE & PROCEDURE: CIVIL § 2951 (2d ed. 1995). In such cases, the TRO is ―designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." *Id.*; *see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No 70*, 415 U.S. 423, 439 (1974) (TRO should be restricted to their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer); *Garcia v. Yonkers School Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (citation omitted) (a TRO is only intended to ―preserve an existing situation *in status quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction"). Thus, the relief afforded by TRO's is much more limited in scope than that afforded by preliminary injunctions, and may be granted by the court ―*with or without notice* to the adverse party." 11A FEDERAL PRACTICE & PROCEDURE: CIVIL § 2951 (2d ed. 1995) (emphasis added).

The Plaintiffs' requested TRO conforms to the purposes of FED. R. CIV. P. 65 and TRO's in general. The parties will not be able to argue the merits of the Plaintiffs' requested injunctive relief until July 10, 2013—ten days after HB 1224 goes into effect. Accordingly, as fully described in their Motion for Preliminary Injunction and Temporary Restraining Order (Doc. No. 29), the Plaintiffs will suffer immediate and irreparable injury before they have the opportunity to argue the merits of their Motion and this Court has the opportunity to rule on it. A TRO is necessary to preserve the status quo until the Court is given the opportunity to hear arguments from both sides and decide whether a preliminary injunction is appropriate.

Thus, FED. R. CIV. P. 65 gives the Court the authority to issue a TRO enjoining enforcement of HB 1224 until the parties can argue the merits of the Plaintiffs' requested injunctive relief at the Court's scheduled hearing on July 10, 2013. Because Defendant received notice of the Plaintiffs' requested relief and has the ability to contest the same, FED. R. CIV. P.'s 65(b)'s conditions for issuing TRO's without notice (verified complaint or supporting affidavit, attorney certification regarding lack of notice, etc.) are inapplicable. Moreover, the requested TRO will not exceed fourteen days, and will only apply from July 1 through July 10—the date of the hearing.

Accordingly, this Court should issue a temporary restraining order (in the manner set forth in Plaintiffs' motion) to preserve the status quo for ten days until the July 10, 2013, hearing. *See Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993) (The issuance of temporary restraining orders and other preliminary injunctive relief under FED. R. CIV. P. 65 is within the sound discretion of the court.). As will be more fully discussed below in Section II(b), Defendant is the proper party and a temporary restraining order against Defendant will properly restrain the enforcement of HB 1224.

## II.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY OF HB 1224.

Article III of the United States Constitution restricts the jurisdiction of federal courts to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To establish a case or controversy, a plaintiff bears the burden of demonstrating:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *see also Finstuen v. Crutcher*, 496 F.3d 1139, 1142-43 (10th Cir. 2007) (noting that "Article III standing … requires that a plaintiff establish injury-in-fact, causation, and redressability."). Essentially, the "[s]tanding doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court." *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1182 (10th Cir. 2012).

### a.   *Plaintiffs Have Suffered Injuries-In-Fact.*[1]

This is a pre-enforcement challenge to HB 1224. In general, Plaintiffs contend that certain provisions of HB 1224 are wholly incompatible with the Second Amendment and Supreme Court precedent. As noted in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Plaintiffs need not violate HB 1224 and risk prosecution in order to challenge it. *Ezell*, 651 F.3d at 695-96; *accord Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 198 (1979) ("When contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first

---

[1]  The claims of Plaintiffs Colorado Farm Bureau and Colorado Youth Outdoors' primarily involve HB 1229, which is not at issue in the Motion for Preliminary Injunction and Temporary Restraining Order.  Accordingly, the standing of those two organizations will not be addressed in this brief.

expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights.") (internal quotations omitted). Indeed, "[t]he very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Ezell*, 651 F. 3d at 696. (internal quotations and citations omitted).

As noted above, Plaintiffs injuries must be (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, to satisfy the "injury-in-fact" requirement. *See Friends of the Earth*, 528 U.S. at 180-81. Economic injury is the paradigmatic form of an injury-in-fact. *See e.g., Association of Data Proc. Serv. Org., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("Certainly, he who is likely to be financially injured, may be a reliable private attorney general to litigate the issues of the public interest ...") (internal quotations and citations omitted); *Schrader v. New Mexico*, 361 Fed.Appx. 971, 974 (10th Cir. 2010) ("Pecuniary injury is sufficient to confer standing."). All Plaintiffs, as detailed below, have suffered an injury-in-fact.

i.     Plaintiffs Licensed Firearms Dealers

HB 1224 causes Plaintiffs licensed firearms dealers injuries-in-fact in several ways. First, Plaintiffs suffer an injury-in-fact because each of them face a "credible threat" of criminal prosecution under HB 1224 that will immediately chill them from exercising their Second Amendment rights to buy, sell, and use the prohibited magazines. *See Association of Date Processing Service Orgs.*, 397 U.S.at 153-154 (recognizing that "aesthetic, conservational, and recreational" injury is sufficient for standing); *Bronson v. Swensen*, 500 F.3d 1099, 1107-1110 (10th Cir. 2007) (discussing the "credible threat" requirement). Currently, every Plaintiff licensed firearms dealer has in its inventory and on order multiple magazines which hold 15 or fewer rounds of ammunition, virtually all of which have removable base plates, which may

6

299

render these magazines and their associated firearms illegal after July 1, 2013. In order for these Plaintiffs' businesses to stay in operation, they must be able to continue to sell those magazines and associated firearms in their current inventories or which are on order. However, because virtually all semi-automatic handgun magazines have removable base plates and the intent of the designer of those magazines cannot be ascertained, in order to stay in business, these Plaintiff licensed firearms dealers must speculate as to the intent of every designer of a 15 round or less magazine and risk criminal prosecution should their speculation prove to be in error. Thus, the Plaintiff licensed firearms dealers are left with the Hobson's Choice of business failure or criminal prosecution.

Plaintiffs licensed firearms dealers also have an injury-in-fact because they have and will continue to suffer economic injury because HB 1224 prevents them from selling the bulk of their existing inventory, which includes both magazines with a capacity of 15 rounds or less with removable base plates and those capable of holding more than 15 rounds, as well as the firearms associated with both such magazines. As outlined in the First Amended Complaint, Plaintiffs licensed firearms dealers have invested substantial amounts of money in existing inventories of firearms with magazines of all sizes with removable base plates. *See* First Amended Complaint [Doc. No. 22], ¶ 136. HB 1224 will preclude the Plaintiff licensed firearms dealers from selling the majority of their firearm and magazine inventories which are their primary source of income. A prohibition which precludes the sale of more than 80% of the products upon which the Plaintiff licensed firearms dealers rely for the continued success of their business operations will be economically devastating.

The majority, if not all, of the Plaintiff licensed firearms dealers have received orders from customers for magazines and associated firearms in the Fall of 2012. These orders include

magazines and associated firearms which hold 15 rounds or less, but which also have a removable base plate, as well as those with greater magazine capacity. As noted in Plaintiffs' Amended Complaint (Doc. No. 22), because of HB 1224, manufacturers have refused to fill these purchase orders; thereby rendering the Plaintiff licensed firearms dealers unable to fill these orders and complete the sale of these arms. *See* Plaintiffs' Amended Complaint (Doc. No. 22), Para. 130-131. Because Plaintiff firearms dealers are unable to fill these purchase orders, HB 1224 has prevented them from gaining the revenue they would otherwise have received.

Finally, HB 1224's grandfather clause and "continuous possession" requirement also cause Plaintiffs licensed firearms dealers an injury-in-fact. In particular, HB 1224 contains no definition of, or direction as to, what it means to have "continuous possession." Therefore, these Plaintiffs will be forced to decipher that language on their own, and determine whether "continuous possession" exists (a) when one person finances the purchase of the firearms, but another physically possesses it, (b) when the firearms are locked in a storage compartment for safekeeping, and (c) when an employee is repairing a firearm or magazine within Plaintiff licensed firearms dealers' stores, among other things. Based on the nature of Plaintiff licensed firearms dealers businesses, they will instantly be in violation of HB 1224's "continuous possession" requirement.

Based on the foregoing, Plaintiff licensed firearms dealers have and will continue to suffer an injury-in-fact that is concrete, particularized, actual, and imminent, not conjectural or hypothetical, based on HB 1224's "designed to be readily converted" and "continuous possession" clauses.

       ii.    Plaintiff Magpul Industries, Inc.

As alleged in the First Amended Complaint, Magpul Industries Inc. ("Magpul") is a firearms accessories manufacturer that manufactures and sells firearm magazines in a variety of sizes. First Amended Complaint, (Doc. No. 22), ¶ 155. Magpul manufactures and sells magazines in sizes larger than fifteen rounds, including magazines with a thirty round capacity that are commonly supplied with new firearms. After July 1, 2013, by virtue of HB 1224, Magpul will no longer be able to sell those magazines in Colorado, losing the business associated with those sales.

Additionally, Magpul manufactures and sells magazines with a capacity of less than fifteen rounds. HB 1224's ambiguous prohibition of  magazines "designed to be readily converted" to hold more than fifteen rounds subjects Magpul and its customers to uncertainty as to which, if any, magazines it can sell in Colorado without risking criminal prosecution after July 1, 2013. All such magazines Magpul manufactures have removable base plates and are thus capable of being expanded to hold more than fifteen rounds of ammunition. *Id.* ¶¶ 156, 158. Apart from the constitutional ramifications of HB 1224's effect on Magpul, a literal reading of HB 1224 will effectively preclude Magpul from selling *any* magazines in Colorado because nearly all small capacity magazines can be converted to illegal large capacity magazines because of their inherent design. *Id.* ¶ 159.

Like the other Plaintiffs, Magpul also has an injury-in-fact because of the "credible threat" of criminal prosecution under HB 1224 that will immediately chill it from exercising its Second Amendment right to sell and distribute the prohibited magazines. *See Bronson*, 500 F.3d at 1107-1110 (discussing the "credible threat" requirement). Thus, based on the foregoing, Plaintiff Magpul has already and will continue to suffer injuries that are concrete, particularized, and imminent.

iii.    Plaintiff David Strumillo

David Strumillo is a retired police officer. He owns and possesses many magazines and firearms that would be outlawed by HB 1224. If HB 1224 goes into effect, then it will immediately chill Plaintiff Strumillo's Second Amendment constitutional rights to own, possess, and transfer nearly every firearm and magazine because it could be "designed to be readily converted" to hold greater than 15 rounds.

One of Plaintiff Strumillo's friends is currently serving in the United States Armed Forces, overseas. Before leaving Colorado, the friend gave Mr. Strumillo his magazines, because the friend will be away from Colorado for a long period of time. The friend chose Mr. Strumillo as bailee because he considered Mr. Strumillo to be a conscientious and responsible guardian, who would carefully store the magazines and ensure that they did not fall into the wrong hands, and that the magazines would be properly stored to protect from rust or other damage. The magazines hold more than 15 rounds.

On July 1, 2013, Mr. Strumillo and his friend will automatically become criminals under HB 1224. The possessor of the magazines (Mr. Strumillo) will be in Colorado. The owner of the magazines will be on another continent. Hence, the owner will not be in "continuous possession" of the magazines. In violation of the Attorney General's guidance Letter, the owner will certainly not be in the "continual physical presence" of Mr. Strumillo, and the owner will not have "the expectation that [the magazines] will be promptly returned."

A preliminary injunction or temporary restraining order would provide relief. With the elimination of the "continuous possession" language, Mr. Strumillo can continue to store the magazines for the owner. With the elimination of the "transfers" ban, Mr. Strumillo can return the magazines to the owner when the owner returns to Colorado.

10

303

iv.  Plaintiffs David Bayne and Dylan Harrell

There is no question that each of the individual disabled plaintiffs will suffer a concrete, particularized harm if HB 1224 is enforced against them. *Ezell*, 651 F.3d 684, 695 (7th Cir. 2011) ("We note . . . that the district court did not address the individual plaintiffs' standing, probably because it is not in serious doubt."). Messrs. Bayne and Harrell will suffer injury because the enforcement of HB 1224 will mean that they will be unable to determine whether their existing magazines of 15 rounds or less are covered by the phrase "designed to be readily converted," thus chilling their Second Amendment rights to use handguns for common and lawful purposes, including self-defense in their homes. Moreover, as disabled persons who have and need magazines using more than 15 rounds, the restrictions placed on them by HB 1224 (i.e., what constitutes "continuous possession") impair any reasonable ownership of such magazines., Finally, Messrs. Bayne and Harrell will be injured by the enforcement of HB 1224 because it will impact their ability to use certain magazines for target shooting and hunting.

v.  Plaintiff Outdoor Buddies, Inc.

The "continuous possession" requirement of HB 1224's "grandfather" clause presents a serious problem for Outdoor Buddies, because firearms are frequently loaned to individuals in connection with the programs and activities of Outdoor Buddies. In addition, HB 1224's magazine ban will affect the types of firearms that Outdoor Buddies can use for its activities, including firearms with magazines of 15 rounds or fewer, based on the vague phrase "designed to be readily converted" contained in HB 1224. In short, Outdoor Buddies will suffer a concrete and particularized harm if HB 1224 goes into effect on July 1, 2013.

vi.  Plaintiff Family Shooting Center ("FSC")

Plaintiff Hamilton Family Enterprises, Inc, d/b/a Family Shooting Center at Cherry Creek State Park incorporates by reference herein the law pertaining to the legal standards for standing in this matter cited by Plaintiff Magpul Industries, Inc, *supra*.

As alleged in the First Amended Complaint, Plaintiff Hamilton Family Enterprises, Inc, is a Colorado corporation which owns the concession authorizing the operation of the shooting facility at Cherry Creek State Park known as Family Shooting Center at Cherry Creek State Park ("Family Shooting Center" or "FSC").   Family Shooting Center is a multi-discipline shooting facility that includes a rifle range, pistol range, law-enforcement range, sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range.   FSC is the largest public outdoor shooting facility on the Front Range in Colorado; over 64,000 shooters used the facility in 2012, and that number has grown each year since 2004.   Nearly all persons who shoot at FSC pay some form of use fee at either individual or group rates, which is the primary source of revenue for Hamilton Family Enterprises.

In addition to operation, supervision and maintenance of the shooting facilities, FSC also makes available for use by qualified members of the public firearms that are equipped with magazines of standard issue having capacities of more than fifteen rounds or that have smaller magazines that may be convertible to more than 15 rounds.   FSC also sells firearms equipment and accessories, which includes standard magazines for many firearms whose capacities exceed fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.   A large number of rifle and pistol magazines sold and/or in use at FSC prior to July 1, 2013 will be illegal to transfer after that date.   Historically, 20-30% of gross FSC revenues have been the sales of equipment, accessories and ammunition.   Sales this year of equipment and accessories has

grown to nearly half of FSC's gross revenues.  HB 1224 will drastically reduce these sales/revenues.

Per contract requirements of its concession, FSC is currently in the process of adding a "move-and-shoot" pistol range which will permit law enforcement, private security and civilians with concealed carry permits to engage in more dynamic practical firearms practice and training. This new range constitutes a significant capital investment by Hamilton Family Enterprises.  The new laws will have a significant impact on the viability of this new range in that nearly all shooters who are expected to utilize this particular range frequently use firearms that accept magazines with capacities of greater than fifteen rounds.

FSC hosts all type and manner of firearms use, training and practice.  In addition to hosting recreational shooters in all disciplines (rifle, pistol, shotgun), FSC is utilized by law enforcement and firearms instructors for all types and levels of training, hunter safety education handling and live-fire practice, fundraisers and competitive matches in all shooting disciplines, including those for disabled and/or handicapped shooters , e.g. Wounded Warrior Project and the National Veterans Wheelchair Games.  The majority of shooters who use FSC facilities, whether informally or competitively, own and shoot firearms that use, as standard equipment, magazines whose capacities exceed fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.

Since enactment of the statutes in question, the operators of FSC have been frequently contacted by current and potential patrons of their facilities regarding the legality of the use of standard firearms that accept or use magazines exceeding fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.  Many have expressed apprehension in bringing their firearms to FSC after July 1, 2013.  These shooters do not want to risk inadvertently

running afoul of the law, particularly because the range is known to have a frequent and substantial presence of law enforcement personnel who would be compelled to enforce the new magazine laws. The vagueness and uncertainly of the laws pertaining to magazine capacities and transfer prohibitions have made it unnecessarily and unreasonably unclear as to how FSC should guide/direct its clientele and/or modify its rules, operations and monitoring of its shooting ranges in order to avoid both civil and criminal liability.

Just as Plaintiff Magpul Industries injuries are concrete, particularized, and imminent, so are FSC's injuries, which are attributable to the Defendant's action of signing HB 1224 into law. A favorable decision for the Plaintiffs will redress these injuries by allowing FSC to legally expand and operate its business without unreasonable uncertainty and concern for the legal operation of their facilities and its legal use by its patrons.

  b.  *Plaintiffs' Injuries Are Traceable to Defendant Governor Hickenlooper.*

There is no question that the Governor is the proper defendant in a declaratory judgment action seeking to hold a state statute unconstitutional under the United States Constitution. The principal of causation for constitutional standing requires a plaintiff's injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (internal quotations omitted). "It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007).

The issue was determined definitively in *Ainscough v. Owens*, 90 P.3d 851 (Colo. 2004). In *Ainscough*, the Colorado Supreme Court made a broad inquiry into the role of the Governor in

14

defending litigation directed against the State of Colorado, statutes passed by the General

Assembly, and actions by the Executive Branch of Colorado's government. In part, the Court

stated:

> The Governor of Colorado is unique in that he is the "supreme executive," and it
> is his responsibility to ensure that the laws are faithfully executed. Colo. Const.
> art IV, § 2 ("The supreme executive power of the state shall be vested in the
> governor, who shall take care that the laws be faithfully executed."). Therefore,
> when a party sues to enjoin or mandate enforcement of a statute, regulation,
> ordinance, or policy, it is not only customary, but entirely appropriate for the
> plaintiff to name the body ultimately responsible for enforcing that law.
> Moreover, when that body is an administrative agency, or the executive branch of
> government, or even the state itself, the Governor, in his official capacity, is a
> proper defendant because he is the state's chief executive. For litigation purposes,
> the governor is the embodiment of the state.

*Ainscough v. Owens*, 90 P.3d 851, 858 (Colo. 2004). Surveying a number of cases involving

challenges to state law, including the federal equal protection challenge to the citizen initiative

involving restrictions on the rights of persons based upon their sexual orientation, in *Romer v.

Evans*, 517 U.S. 620 (1996), the Colorado Supreme Court held that "[t]his case and the many

others like it clearly demonstrate that when challenging the constitutionality of a statute  . . . ,

the Governor is an appropriate defendant due to his constitutional responsibility to uphold the

laws of the state and to oversee Colorado's executive agencies."  *Id*. at 858.

Because Defendant Governor Hickenlooper is the state's chief executive and he is charged

with ensuring that Colorado laws are faithfully executed, Plaintiffs injuries are traceable to him

and they satisfy the second prong for standing. *See Sportsmen's Wildlife Defense Fund v. U.S.

Dept. of the Interior*, 949 F. Supp. 1510, 1514-15 (D. Colo. 1996) (finding that based on the

Colorado Constitution, the plaintiff's injury is fairly traceable to the Governor and he is a proper

party).

    *c.*    *Plaintiffs' Injuries Will Be Redressed by a Preliminary Injunction.*

Similar to the causation requirement, there can be no question that a temporary restraining order and preliminary injunction issued by this Court against Defendant Governor Hickenlooper would be effective statewide and bind all local law enforcement officers. The Tenth Circuit has stated that "the requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010). "[W]here a plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in the complaint." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011). "It must be the effect of the court's judgment on the defendant that redresses the plaintiff's injury, whether directly or indirectly." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005).

In *American Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999), the Tenth Circuit rejected an attempt by local district attorneys in New Mexico to avoid being bound by an injunction issued in a case brought against the Governor and the Attorney General of New Mexico to invalidate a state criminal statute as being unconstitutional.  Upholding the injunction against enforcement of the criminal statute, the Tenth Circuit noted: "To the extent district attorneys would attempt to enforce [the enjoined statute], an injunction against the governor and attorney general prohibiting such enforcement binds those attorneys."  *Id.* at 1163.

Accordingly, the Governor is a proper defendant in this case, and a temporary restraining order and preliminary injunction against him would be effective throughout the State of Colorado.

> d.  *Plaintiffs NSSF, CSSA, Outdoor Buddies, Women for Concealed Carry , and Colorado Outfitters Association Have Standing to Bring This Action by Virtue of Their Representational Standing.*

16

The National Shooting Sports Foundation ("NSSF"), the Colorado State Shooting Association ("CSSA"), Outdoor Buddies, Women for Concealed Carry, and Colorado Outfitters Association also have standing to bring this action against the Defendant because of their "representational standing." An organization may have representational standing by virtue of the standing of its individual members under certain circumstances. Specifically, an organization has representational standing "only if: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Save our Snowplanes v. Salazar*, 333 Fed. Appx. 355, 359 (10th Cir. 2009).

NSSF is a national trade association for firearms, ammunition, and the hunting and shooting sports industries. First Amended Complaint, Doc. No. 22 ¶ 113. Its membership includes federally licensed firearms manufacturers, distributors, and retailers; companies manufacturing, distributing, and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges, gun clubs; publishers; and individuals, with more than 300 members residing and conducting business in Colorado. *Id.* ¶ 114. Each of its members' business interests, livelihoods, and fundamental Constitutional rights will be adversely affected by HB 1224. *Id.* ¶ 115.

Similarly, as previously alleged, CSSA is the oldest state-wide shooting and firearms association in Colorado, established in 1926. *Id.* ¶ 139. It has approximately 1,500 dues-paying members, as well as twenty businesses and club members with approximately 20,000 associated members. *Id.* ¶ 140. Its membership includes hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention

310

advocates, firearms and equipment dealers and wholesalers, and other Second Amendment advocates. *Id.* ¶ 140. CSSA membership is *required* to compete in any sanctioned state and regional competitive firearms matches in Colorado. *Id.* ¶ 145. CSSA alleges that each of its members' business interests, livelihoods, and fundamental constitutional rights will be adversely affected by HB 1224. *See, e.g., Id.* ¶¶ 190, 203, 219, 226, 228, 233, 241, 244.

Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it due to various physical disabilities. Outdoor experiences provided through Outdoor Buddies include, among other things, hunting and target shooting. *Id.* ¶ 160. Outdoor Buddies has approximately 760 individual members, approximately two-thirds of whom are disabled member of the community who need special assistance with the use of firearms. Each of the members of Outdoor Buddies, including Plaintiffs David Bayne and Dylan Harrell, will be adversely affected by HB 1224, in violation of their Second Amendment rights. *E.g., id.* ¶ 227.

Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224, thereby violating their Second Amendment rights as defined under *Heller*. *Id.* ¶ 231, 234, 241, 244.

The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and

camping outfitters and guides based in Colorado. *Id.* ¶ 163. The chilling effect of the potential

legal perils for non-resident hunters caused by HB 1224, particularly in not knowing which

magazines are "designed to be readily converted," harms all Colorado outfitters.

The Plaintiffs' First Amended Complaint thoroughly details the myriad of constitutional

violations and financial burdens that implementation of HB 1224 will impose on the general

public, including the individual members of NSSF, CSSA, Outdoor Buddies, Women for

Concealed Carry, and Colorado Outfitters Association. *See, e.g. id.* ¶¶ 217-19, 224-28, 230-35,

240-44. These members all have standing to sue in their own right. Indeed, approximately half of

the Plaintiff licensed firearms dealers are members of NSSF, and they undoubtedly have standing

to bring this action based on HB 1224's imminent damage to their livelihoods and constitutional

rights. Similarly, all 55 Plaintiff Sheriffs, as well as the Family Shooting Center, are members of

CSSA and, as discussed in this brief, they all have individual standing to bring this action based

on HB 1224's imminent damage to their law enforcement duties, livelihoods, and constitutional

rights. Plaintiffs David Bayne and Dylan Harrell are members of Outdoor Buddies, and as

discussed above, there is no doubt that they have standing to bring their claims in this action.

Even assuming *arguendo* that NSSF,CSSA, Outdoor Buddies, Women for Concealed Carry,

and the Colorado Outfitters Association will not directly suffer injuries from the enforcement of

HB 1224, all of these organizations still have standing by virtue of the constitutional and

financial injuries that their members will suffer from HB 1224's enforcement *See Sierra Club v.

Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1084 (D. Colo. 2001) (an organization has

standing to sue even if it has not been injured itself so long as the association's members satisfy

the constitutional minimums of Article III). For example, the manufacturer and retailer members

of NSSF are injured because they will not be permitted to sell magazines, or firearms so

equipped, larger than 15 rounds in Colorado.  Those same members will face uncertainty and risk criminal prosecution and further reduced sales because the designed to be ―readily converted language‖ may prohibit sales of nearly all magazines of any size.

Further, the interests that these Plaintiffs seek to protect (namely Second and Fourteenth Amendment protections) are clearly germane to their purposes. The NSSF‗s purpose, among other things, is to promote, protect, and preserve hunting and shooting sports on behalf of its members and the general public. The CSSA‗s purpose, among other things, is to provide shooting opportunities for law-abiding Colorado residents, to provide a united voice to all levels of government to defend the shooting sports, and to protect the Constitution of the United States. The interests Outdoor Buddies seeks to protect – the Second Amendment rights of its members – is germane to its organizational purpose, which is to provide outdoor experiences to disabled individuals, including hunting and target shooting. The self-defense interests that Women for Concealed Carry seeks to protect in this lawsuit is germane to its organizational purpose, which is to support women‗s rights to effective self-defense. Finally, in bringing this lawsuit, the Colorado Outfitters Association seeks to protect the interests of Colorado outfitters and the outfitting industry, which is its core organizational purpose.

Neither the claims asserted nor the relief requested require the participation of each and every member of NSSF, CSSA, Outdoor Buddies, Women for Concealed Carry, and Colorado Outfitters Association.  Their requested relief will remedy the injuries of its members attributable to the Defendant‗s enforcement of HB 1224. *See Sierra Club*, 176 F. Supp. 2d at 1084. Thus, NSSF, CSSA, Outdoor Buddies, Women for Concealed Carry, and Colorado Outfitters Association all have associational standing to be named Plaintiffs in this action.

      e.    *Plaintiffs 55 Colorado Sheriffs Have Standing to Challenge HB 1224*

e.  *Plaintiffs 55 Colorado Sheriffs Have Standing to Challenge HB 1224*

i.    The Sheriffs' Individual Second and Fourteenth Amendment Rights

Every Sheriff in this case is a law-abiding citizen of the United States of America. As such, every Sheriff has an individual Second Amendment right to keep and bear arms, and an individual Fourteenth Amendment right not to be subject to vague laws which chill the exercise of the Second Amendment rights.

While the individual Sheriffs do keep and bear arms pursuant to their duties as Sheriffs, and in compliance with their Offices' established rules about which firearms may be used during the course of official duties, the individual Sheriffs **also** own and use firearms and magazines personally. Like the other plaintiffs in this case, they do so for a wide variety of lawful purposes of arms ownership, all such purposes being protected by *Heller* and *McDonald*. *District of Columbia v. Heller*, 554 U.S. 570, 577, 620, 624, 625, 628, 630 (2008) ("lawful purpose" or "lawful purposes"); *McDonald v. Chicago*, 130 S.Ct. 3020, 3023, 3030, 3036, 3044 (2010) (same).

Sheriffs are particularly interested in personally exercising the "core" Second Amendment right lawful self-defense, of "hearth," "home," and "family." *Heller*, 554 U.S. at 573-75, 577, 615-16, 625, 628-630, 632, 634-36. *McDonald v. Chicago*, 130 S.Ct. at 3026-27, 3036, 3039, 3041, 3044, 3047, 3049-50. Sheriffs are often away from their home. Disgruntled or mentally ill persons sometimes come to their homes and threaten family members. Such threats to family members also materialize away from home. One reason the Sheriffs wish to personally own firearms and magazines is to share them with family members who need them for self-defense.

Especially in lower-population communities, it is impossible for out-of-uniform Sheriffs or their families to blend into the background. Everyone knows who they are and where they live.

21

314

Credible threats to the families are common, including within the last year. One Sheriff drives 40 minutes each way every Sunday in order at attend church in a different, highly-populated county, where he can be somewhat anonymous; he fears that attending church in his own county could endanger the other parishioners, if a dangerous local person decided to attack the Sheriff while he was at church.

Moreover, all of the Sheriffs know that they will eventually retire from their positions as law enforcement officers. At that time, they will possess no law enforcement duty arms, and none of the law enforcement exemptions of HB 1224 or 1229 will apply to them. Yet for the rest of the lives they and their families will continue to face the danger of retaliation from the many criminals whom they have arrested, or from any other person who may bear a grudge. Their current public service in law enforcement makes their present and post-retirement needs for armed self-defense particularly acute.

In regards to the preliminary injunction, the Sheriffs, like other plaintiffs, suffer the irreparable injuries of not knowing what magazines are legal for them to purchase, possess, or transfer for personal and family use, being prohibited from allowing family members or close friends to use their magazines for lawful self-defense, and not being able to leave their personal magazines with gunsmiths for repair.

In short, as American citizens the Sheriffs have and assert the same individual constitutional rights as do the other plaintiffs, except that they do so with particular acuity in light of the present and future risks that they and their families face because of the Sheriffs' public service. The Sheriffs and their families have already made substantial sacrifices for the public interest. It is in the public interest that they not be forced to face even greater risks by being disarmed on July 1 from using the magazines that they have decided are the best for family protection.

ii.      The Sheriffs in their Official Capacity

Besides having standing as individual American citizens, the Sheriffs also have standing in their official capacity. Their office, and their direct election by the People, is established by the Colorado Constitution. Colo. Const. Art. XIV, § 8. The election of Sheriffs is one of the oldest elements of our tradition of ordered liberty, lauded by Blackstone, and dating back to Saxon times.[2] To Thomas Jefferson, "the office of sheriff" was "the most important of all the executive officers of the county."[3]

iii.      Damage to Law Enforcement Efficiency

Unless temporary or preliminary relief is granted, then beginning in July 2013, the Sheriffs will have to divert resources from enforcing Colorado's present laws which enhance public safety, and begin enforcing the unconstitutionally vague and/or facially unconstitutional provisions of HB 1224. The diversion of resources will immediately impair the operational efficiency of the Sheriffs' Offices. Sheriffs have standing to challenge a statute which may distract them from the performance of their duties.

The United States Supreme Court decision, *Printz v. United States*, involved challenges by Sheriffs to a federal statute which ordered the Sheriffs to carry out background checks on handgun buyers. 521 U.S. 898 (1997). The Sheriffs argued that they did not wish to perform the

---

[2] W. BLACKSTONE, 1 COMMENTARIES, ch. 13, para. 3 (1765-69): In Saxon times, "sheriffs were elected: following that still old fundamental maxim of the Saxon constitution, that when any officer was entrusted with such power, as if abused might tend to the oppression of the people, that power was delegated to him by the vote of the people them selves."

[3] Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), http://www.let.rug.nl/usa/presidents/thomas-jefferson/letters-of-thomas-jefferson/jefl246.php. Kercheval was a Virginia attorney and historian. An excerpt from the cited letter appears in a panel on the Jefferson Memorial. "Quotations on the Jefferson Memorial," Official Monticello website, http://www.monticello.org/site/jefferson/quotations-jefferson-memorial.

checks, in part, because doing so would distract them from other law enforcement duties which they considered to be more important.

The *Printz* case was the culmination of a number of Sheriff lawsuits on the same issue, filed in a variety of states. In those cases, the defendant repeatedly attacked the Sheriffs' standing, and repeatedly lost. *See* Koog/McGee v. United States, 79 F.3d 452, 458-459 (5th Cir. 1996) (standing because the federal statute substantively enlarged the duties and authority given to the Sheriffs without the States' permission), rev'g *Koog v. United States*, 852 F. Supp. 1376, 1380 (W.D. Tex. 1994) (Sheriff Koog had standing because he would be required to perform certain acts which he believed to be unconstitutional), and aff'g *McGee v. United States*, 863 F. Supp. 321, 325 (because Sheriffs may be sued in civil rights actions, it would be unfair to deny them the same access to the courts when they suffer an actual injury), earlier proceeding 849 F. Supp. 1147 (S.D. Miss. 1994); *Mack v. United States*, 66 F.3d 1025, 1029-1030 (9th Cir. 1995), rev'g 856 F. Supp. 1372, 1377 (D. Ariz. 1994) (federal statute forced Sheriff to violate his oath) and rev'g *Printz v. United States*, 854 F.Supp. 1503, 1508-1509 (D. Mont. 1994) (forced reallocation of resources; violation of oath); *Romero v. United States*, 883 F.Supp. 1076, 1080 (W.D.La. 1995) (diversion of resources; compelled enforcement of a statute that the Sheriff and his constituents considered unconstitutional); Frank v. United States, 78 F.3d 815, 823 (2d Cir. 1996) (discussed *infra*), rev'g 860 F.Supp. 1030 (D.Vt. 1994) (standing existed because the Sheriff was forced to enforce laws he believed were unconstitutional).

The Second Circuit held:

> It is this administrative burden added to the sheriff's regular workload that permits plaintiff to maintain his Tenth Amendment challenge. Interference with the functions of a local unit of government is an injury that may give a litigant standing. For standing purposes, the _slender' burden on the Sheriff was _sufficient for constitutional purposes.' The harm, _need not be monumental.'

*Frank v. United States*, 78 F.3d 815, 823-24 (2d Cir. 1996), judgment vacated on other grounds, 521 U.S. 1114 (1997).

The D.C. Circuit adhered to *Printz* in *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002). There, the Circuit Court pointed out that in *Printz*, ―the Court reached the merits of a Tenth Amendment challenge to the Brady Act in cases brought by county sheriffs. Neither the majority opinion nor the opinions of the five Justices who wrote separately questioned the sheriffs' standing to sue." *Id.* Therefore, to require state authorization for a federal lawsuit by a Chief Law Enforcement Officer ―would be to depart from our decision in the *FOP* case, and perhaps the Supreme Court's disposition of *Printz*." *Id.* at 13-14.

As noted above, because of the breadth and uncertainty of HB 1224, for the Plaintiff Sheriffs to enforce it they will have to divert a large portion of resources, which will distract them from their other important duties. Accordingly, Sheriffs, like other Chief Law Enforcement Officers (CLEOs), have standing to sue in federal court regarding gun control laws.

The 55 Colorado Sheriffs do not seek the particular preliminary relief here because enforcement time will be huge. They seek relief because any amount of enforcement time will be poisonous.

Sheriffs depend on good community relations. People who trust the Sheriffs will call in tips, and are cooperative witnesses. Arrest just one person in a county because he left a magazine in a repair shop overnight? The trust and respect of many citizens would be forfeited in an instant. A Temporary Restraining Order is necessary to prevent even a single occurrence of such an event.

―It is the duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties…." C.R.S. § 30-10-516. To be peace-keepers, to enforce ordered

liberty, to deserve the trust of the citizens, Sheriffs must not be compelled to enforce irrationally harsh laws such as "continuous possession."

        iv.     Third Party Standing

Law enforcement executives have third-party standing to raise the constitutional rights of other persons. The foundational case is *Fraternal Order of Police v. United States*, 152 F.3d 998, 1001–1002 (D.C. Cir. 1998) (*FOP I*), on rehearing of merits, 173 F.3d 898 (1999) (*FOP II*). The Fraternal Order of Police is a private association whose members include Chief Law Enforcement Officers, as well as rank and file officers. Plaintiffs in *FOP* argued that a 1996 federal statute prohibiting gun possession by anyone convicted of misdemeanor domestic violence was unconstitutional. Essentially, the basis for the plaintiffs' challenge was that the misdemeanor disarmament law also applied to the duty weapons of law enforcement officers, while a federal statute against gun possession by convicted *felons* had an exception for law enforcement officers.

The CLEOs asserted the Equal Protection rights of subordinate officers, and argued that a gun ban for misdemeanants but not for felons failed the rational basis test. On the merits, the argument was not successful, but the D.C. Circuit concluded that the CLEOs had standing for two reasons. First, *FOP I* held that CLEOs had a sufficient relationship with their subordinates such that the CLEOs had third party standing to assert the Equal Protection rights of the subordinates. *FOP I*, 152 F.3d at 1002.

Then, *FOP II* added that the CLEOs were directly injured by being unable to choose the subordinates whom they considered to be well-suited for carrying firearms; so the CLEOs had standing to raise a Tenth Amendment claim. *FOP II*, 173 F.3d at 904-05.

Like the plaintiffs in *Fraternal Order of Police*, the Sheriffs here are complaining about the particular injury of the disarmament of persons whom they wish to be armed. Under Colorado law, Sheriffs have the authority to appoint ―non-certified‖ persons as deputies. At the Sheriff's discretion, the appointments may be for a limited time or for a particular task. *See* C.R.S. §§ 16-2.5-103(2); 30-10-506. Because of HB 1224, such deputies appointed by the Sheriffs will be deprived of possessing and using the magazines which may be most effective for law enforcement needs.

This is a paradigm of the Court's two-element rule for third-party standing in *Singleton v. Wulff*, 428 U.S. 106 (1976). First, ―[i]f the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue.‖ Second, whether ―the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.‖ *Id.* at 113-114.

Both elements are present here. The activity the Sheriffs wish to pursue (calling on temporary deputies) is inextricably bound up with the public's enjoyment of the Second Amendment right to bear arms. Further, Sheriffs are a particularly ―effective a proponent of the right.‖ With their perspectives of the possibilities of natural or man-made disasters, they are strong proponents of the Second Amendment rights of citizens as a defense of law and order in case of emergency.

More broadly, the Sheriffs believe that effective law enforcement is supported when law-abiding citizens who wish to be armed can do so, including with magazines of the particular sizes which are best-suited for each citizen's needs and capabilities. When the public is disarmed, victims are less able to protect themselves; so the Sheriffs' jobs are that much harder.

The Sheriffs have been elected to represent the public safety interests of all the People. Thus, the Sheriffs are especially suited for third-party standing, in support of the law-abiding gun owners of their counties.

> v.   Colorado State Court Precedent

In 1990, the Colorado General Assembly enacted a statute which set training requirements for Sheriffs. This violated the Colorado Constitution, because ―the office of county sheriff was created by the Colorado Constitution, which establishes the qualifications for holding this office. See Colo. Const. art. XIV, §§ 8, 10.‖ *Jackson v. State*, 966 P.2d 1046, 1051 (Colo. 1998). Sheriff Richard Jackson filed suit, and argued that the state statute was unconstitutional. The state district court agreed with him, and on direct appeal, so did the unanimous Colorado Supreme Court.

As *Jackson* demonstrates, County Sheriffs have standing to sue in Colorado on constitutional issues in Colorado state courts. In contrast, county officials who only perform ministerial duties do not. *Board of County Commissioners of Boulder County v. The Fifty-First General Assembly of the State of Colorado*, 198 Colo. 302, 307, 599 P.2d 887 (1979). *Lamm v. Barber*, 192 Colo. 511, 565 P.2d 538 (1977) (County Assessor); *Ames v. People*, 26 Colo. 83, 90, 56 P. 656, 658 (1899) (County Assessors). These cases are irrelevant to the Sheriffs, for the duties of Sheriffs and their Deputies are ―highly discretionary.‖ *Nichols v. Hurley*, 921 F.2d 1101, 1109 (10th Cir., 1990)

> vi.   Political Subdivision Doctrine

Pursuant to the political subdivision doctrine, federal courts often refuse to hear cases in which a state‗s political subdivision raises a federal constitutional challenge to a state government action. There are three reasons why this general rule does not control the present

case. First, a Sheriff is not a "political subdivision." Second, even if the individual Sheriffs were "political subdivisions," they have a "personal stake" in the case that provides standing even for employees of political subdivisions. Third, even if the Court finds that the Sheriffs are political subdivisions and have no personal stake, Tenth Circuit precedent allows political subdivisions to raise structural constitutional claims.

Moreover, because the Sheriffs certainly have standing as individual citizens asserting their Second Amendment rights (Part II.e.1) and because other plaintiffs have standing for every claim involving the motion (Part II.a-d.) it is not necessary for this Court to delve into the unresolved questions of political subdivision standing as applied to the Sheriffs.

I.    A Sheriff is not a "political subdivision" and Sheriffs have a "personal stake"

The instant case is brought in the name of the Sheriffs, and not of the Sheriffs' Offices. The latter might involve a political subdivision, but the former does not. *Cf. Freedom Colorado Information, Inc. v. El Paso County Sheriff's Dept.*, 196 P.3d 892, 892 (Colo. 2008) (plaintiff sued the "El Paso County Sheriff's Department; and Terry Maketa, in his official capacity as the El Paso County Sheriff, an elected official of El Paso County, Colorado, a political subdivision.").

In the Sixth Circuit Court of Appeals, an individual Sheriff acting in his official capacity claimed that he was a "political subdivision," for a case under the Securities Litigation Uniform Standards Act. He supported his claim by pointing out that he was bringing a class action suit on behalf of the Sheriff's Department's employees. The Court observed that it "may strain" the statute's language to call an individual Sheriff a political subdivision. Because the case could be resolved without deciding the issue, the Sixth Circuit did not determine whether the statute could bear such a strain. *Demings v. Nationwide Life Ins. Co.*, 593 F.3d 486, 491-92 (6th Cir. 2010).

No class action is involved in the instant case; however doubtful the notion of an individual Sheriff as a political subdivision was in Demings, it more doubtful here.

A political subdivision has standing when there is a "personal stake." In *Board of Education v. Allen*, two local school boards (certainly political subdivisions) brought a First and Fourteenth Amendment challenge to a New York State statute requiring the boards to provide free textbooks to private school students. 392 U.S. 236 (1968). The New York State courts were closely divided on the issue of standing, but the U.S. Supreme Court was not. Justice White's majority opinion stated:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step -- refusal to comply with § 701 -- that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation. *Baker v. Carr*, 369 U.S. 186, 204 (1962).

392 U.S. 236, 242 n.5 (1968). Neither Justice Harlan's concurrence nor the three dissents disagreed with the majority about standing.

In the instant case, the Sheriffs also wish to adhere to their constitutional oath of office. Like the School Boards, the Sheriffs too face the diminution of their resources for serving the public. Each of the Plaintiff Sheriffs has the primary obligation to obey and enforce the United States Constitution as well as the Constitution of the State of Colorado. The Sheriffs, therefore, cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado. As such, just like in *Allen*, *supra*, these Sheriffs have a "personal stake in the outcome of this litigation" and the political subdivision doctrine does not preclude them from bringing claims.

*Allen* did not say that the risk of losing a job is the *only* interest that can give rise to political subdivision standing. Rather, *Allen* cited the ordinary rule that standing requires a "personal

stake in the outcome." *Id.* In the Tenth Circuit's most recent case on the political subdivision doctrine, the Court distinguished *Allen*. After quoting the relevant *Allen* text, a divided panel wrote: "This passage makes clear that the situation in *Allen* is very different from the situation here. In *Allen*, standing was based on the individual board members' personal stake in losing their jobs." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011).

The Sheriffs meet the highly restrictive standard of *Hugo*. The *Hugo* Court recognized if the plaintiffs *had* been in danger of losing their jobs, the plaintiffs would have had standing under the political subdivision doctrine.

A death in the family is worse than losing a job. As detailed in Part II.e.1, HB 1224 aggravates the already-present risks to the lives of the Sheriffs and their families. The Sheriffs have an enormous "personal stake," and therefore have standing under the Tenth Circuit's interpretation of *Allen*.

II.   The Constitutional provisions at issue are distinct from those which have been decided by the Tenth Circuit.

If it were decided that an individual Sheriff is a political subdivision, and that mortal peril to one's family does not constitute a sufficient "personal stake," the next question would be whether the constitutional claims raised by the Sheriffs are foreclosed by the Tenth Circuit's precedents on political subdivision standing.

The Tenth Circuit has decided several cases on whether a political subdivision has standing to invoke a particular constitutional provision. The results are: Equal Protection: No. *City of Herriman v. Bell,* 590 F.3d 1176 (10th Cir. 2010); *City of Moore, Oklahoma v. Atchison, Topeka, & Santa Fe Ry. Co.,* 699 F.2d 507, 511-12 (10th Cir. 1983). Supremacy Clause: Yes. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998). Dormant Commerce Clause: No. *Hugo*, *supra*.

31

324

The cases have some broad statements do not have to be treated as absolute rules. The Tenth Circuit's political subdivision methodology favors such a reading. As the Panel wrote in *Branson*, ―Despite the sweeping breadth" of an opinion's language about political subdivision standing, one should follow the opinion's ―limited proposition." *Branson*, 161 F.3d at 628.

Suppose that instead follows the broadest language of *Hugo* and *Branson*, that ―a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights." A political subdivision may only bring actions based on ―collective or structural rights." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir., 2011). If so, the Sheriffs in their official capacity have standing to raise structural constitutional rights.

### a.   Fourteenth Amendment

The first such structural right is the Fourteenth Amendment's Due Process prohibition on vague laws.

To be sure, the right not to be subject to vague laws is an individual right; all the other plaintiffs have raised that right, and as individual American citizens, the Sheriffs assert that same right. However, the Sheriffs in their official capacities also raise a separate type of right, for which standing is not foreclosed by *Hugo* and its ancestors. The Sheriffs' claim in this regard is not ―don't make me obey that law," nor is the claim ―I don't want to enforce that law." Rather, their claim is ―I don't know what ‗law' I am supposed to enforce."

It is axiomatic that in a nation governed by the Rule of Law, the law enforcement officers must know what law they are supposed to enforce. This is a structural right of the deepest kind. The Fourteenth Amendment protects political subdivisions by ensuring that the laws which they must enforce are clear and not vague. This is absolutely necessary to the legitimate existence of

political subdivisions and all levels of government in nations which are governed by the Rule of Law.

Without a clear Rule of Law to enforce, a political subdivision ceases to exist in a legitimate sense, and degenerates into arbitrary force. The Fourteenth and Fifth Amendment prohibitions of vague —laws" are essential to the Rule of Law. Therefore, the Sheriffs have standing to assert the structural Due Process guarantee that law enforcers must be able to know what the law is.

### a.   Second Amendment

The Second Amendment right to keep and bear arms is an individual right belonging to all Americans for all lawful purposes, like the First Amendment freedom of speech and other fundamental rights. *Heller*, *supra*; *McDonald*, *supra*. In addition, the Second Amendment formally announces an intended third-party beneficiary: the state militias. Before *Heller*, some lower courts misread the Second Amendment, and thought that the individual Second Amendment right exists *only* when it is in direct service of state militias. *Heller* corrects this error, and affirms the traditional American understanding that the Second Amendment right to keep and bear arms is for all law-abiding citizens, **and** that an intended beneficiary of that right is the state militia system. Article I of the Constitution makes it clear that the militias exist for the benefit of the both the states and the federal government, and are subject to the overlapping control of both. U.S. Const., art. I, § 8, cl. 15-16. Thus, the Second Amendment is partly (although not exclusively) a —structural" right enacted for the benefit of state and local governments.

Besides the militia, there is another beneficiary of the Second Amendment: the *posse comitatus*. For at least the last millennium in our legal system, Sheriffs have had the authority to summon armed able-bodied citizens to assist law enforcement. *See*, *e.g. Filarsky v. Delia*, 132

S.Ct. 1657, 1664 (2012); *In re Moyer*, 35 Colo. 159, 166-67, 85 P. 190 (Colo. 1904) ("the sheriff of a county, aided by his deputies or posse comitatus in suppressing a riot.").[4]

This long-standing authority of Sheriffs is given modern protection in statutes such as C.R.S. §§ 16-3-202(1) ("A peace officer making an arrest may command the assistance of any person who is in the vicinity."); 18-8-107 (A class 1 petty offense for anyone "unreasonably refuses or fails to aid the peace officer in effecting or securing an arrest or preventing the commission by another of any offense.")

The *posse comitatus* was well-known to the Founders. In *Federalist no. 29*, Alexander Hamilton addressed a then-current controversy about the proposed Constitution: that the federal government would have the power to call forth the militia, but not to summon the *posse comitatus*.

When James Madison was Secretary of State, he sent written instructions ordering an official to "call for the assistance of the good citizens of the district, as the posse comitatus" to enforce the terms of the Louisiana Purchase. *Livingston v. Dorgenois*, 11 U.S. (7 Cran.) 577, 579 (1813).

The Second Amendment names an intended beneficiary: the militia. Creating the conditions for a well-regulated, functional militia also has the obvious and inescapable benefit of ensuring a strong and vigorous *posse comitatus*. A well-armed population fosters both.

---

[4] *See also In re Quarles*, 158 U.S. 532 (1895) ("It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country"); *Cunningham v. Neagle*, 135 U.S. 1, 65 (1890) ("marshals of the United States, with a posse comitatus properly armed and equipped"); 1866 Civil Rights Act § 5, 14 Stat. 28 (Empowering federal civil rights commissioners to appoint "suitable persons… to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty."); Joanne Eldridge, *County Sheriffs In Colorado: Beyond the Myth*, COLO. LAWYER *19 (Feb. 2009).

Like the Second Amendment, the Colorado Constitution's right to arms has a dual nature: It is the right ―to keep and bear arms in defense of his home, person and property, **or** in aid of the civil power when thereto legally summoned." Colo. Const., art. II, § 13.

A deep analysis of the multi-faceted nature of the right to keep and bear arms is an interesting academic question; it is a necessary question to resolve if one must decide whether the Sheriffs' assertion of the Second Amendment is prohibited by *Hugo*'s political subdivisions doctrine. To even get to the *Hugo* question, one must first decide whether a Sheriff is a political subdivision, and whether mortal peril does or does not count as a ―personal stake" under *Hugo*'s reading of *Board of Education v. Allen*.

> vii.   The Issue of Sheriffs' Standing is Irrelevant

Because sufficient plaintiffs clearly have standing to raise all the claims at issue in the Motion, this Court need not decide whether additional plaintiffs, such as the Sheriffs, have standing.

In 2010, a large number of Attorneys General, including the Colorado Attorney General, filed a lawsuit challenging the individual mandate in the Affordable Care Act. Defendants argued that the Attorneys General did not have standing to challenge the individual mandate. The Attorney General responded with a brief arguing that his standing was irrelevant, since other plaintiffs had standing. Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, State of Florida, by and through Bill McCollum, Attorney General of the State of Florid et al., *Florida ex rel. Bondi v. U.S. Dept. of Health and Human Services*, 780 F.Supp.2d 1256 (N.D. Fla. 2011), 2010 WL 3163990.

The District Court agreed:

> This eliminates the need to discuss the standing issue with respect to the other state plaintiffs, or the other asserted bases for standing. *See Watt v. Energy Action Educ.*

*Found.,* 454 U.S. 151, 160 (1981) (–Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264 n. 9 (1977) (–Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); *see also Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996) (if standing is shown for at least one plaintiff with respect to each claim, –we need not consider the standing of the other plaintiffs to raise that claim").

780 F.Supp.2d at 1274.

The District Court granted relief to the Attorney General on the individual mandate. On appeal, the Attorney General again urged the court not to consider standing. Opening / Response Brief of Appellee/Cross-Appellant States of Florida, by and through Pam Bondi, Attorney General of the State of Florida et al., *Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services*, 648 F.3d 1235 (11th Cir., 2011) (Nos. 11-11021, 11-11067), 2011 WL 1944107, *67.

The Eleventh Circuit agreed:

Although the question of the state plaintiffs' standing to challenge the individual mandate is an interesting and difficult one, in the posture of this case, it is purely academic and one we need not confront today. The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing. Because it is beyond dispute that at least one plaintiff has standing to raise each claim here—the individual plaintiffs and the NFIB have standing to challenge the individual mandate, and the state plaintiffs undeniably have standing to challenge the Medicaid provisions—this case is justiciable, and we are permitted, indeed we are obliged, to address the merits of each. Accordingly, we turn to the constitutionality of the Act.

648 F.3d at 1243-44.

Importantly, in *Ezell v. City of Chicago*, the Seventh Circuit noted this rule of law when considering the organizational plaintiffs' standing to challenge the constitutionality of a city ordinance that mandated fire-range training as a prerequisite to lawful gun ownership, but prohibited all firing ranges in the City. *See Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir.

2011). There, the court stated: ―[t]he district court's emphasis on the organizational plaintiffs' standing us puzzling. As we have noted, it's clear that the individual plaintiffs have standing. Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not. *Ezell*, 651 F.3d at 696, n.7. (internal quotations omitted).

A core principle of federal standing is that federal courts do not spend time deciding abstract questions that will not determine the outcome of the case. As detailed *supra*, there can be no serious dispute that at least some of the plaintiffs have standing to challenge the language at issue in the preliminary injunction motion. Therefore, this Court should not consider the Attorney General's theories about the Sheriffs' standing in their official capacity. As to the Sheriffs' standing in their individual capacity, as citizens and gun owners, there cannot be an argument that they have any less standing than do the other plaintiff individual gun owners and plaintiff associations which include gun owners.

**CONCLUSION**

For the reasons set forth herein and above, Plaintiffs have standing to challenge the constitutionality of HB 1224. Moreover, the Court has the authority to issue a temporary restraining order pursuant to Fed.R.Civ.P. 65.

Dated this 20th day of June, 2013.

Respectfully submitted,


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**


Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY**

38

331

Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.,*

Plaintiffs,

v.

JOHN W. HICKENLOOPER
in his official capacity as Governor of the State of Colorado,

Defendant.

## GOVERNOR'S REPLY IN SUPPORT OF MOTION TO CERTIFY QUESTIONS TO THE COLORADO SUPREME COURT

Plaintiffs argue that certification to the Colorado Supreme Court is inappropriate for three reasons:

- According to the Plaintiffs, HB 13-1224 is "open to an indefinite number of interpretations," and certification will therefore not serve any useful purpose.  Doc. 32 at 8.

- Certification would, Plaintiffs contend, amount to an invitation to the Colorado Supreme Court to "rewrite an overbroad and vague bill."  Doc. 32 at 10.

- Certification is inappropriate because it could delay federal court proceedings.  Doc. 32 at 10–11.

None of these concerns is availing.  In fact, much of Plaintiffs' reasoning establishes precisely the reasons that certification is not only appropriate, but is the best option in this case.

333

At the threshold, Plaintiffs' choice to file their lawsuit in federal court and to name the governor raises important questions about the scope of relief that this Court could grant and who would be bound by any such order.  It is axiomatic that a federal court cannot definitively interpret state law.  *See, e.g.*, *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("[T]he views of [a] state's highest court with respect to state law are binding on the federal courts.").  The certification process exists for these exact reasons, so that a federal district court can have the benefit of a legal interpretation from the only court that can issue a definitive ruling on state law.

Plaintiffs' basic approach in this case is to construct a strawman—an extreme and untenable interpretation of the challenged statute that would, in Plaintiffs' estimation, ban virtually all magazines.  Thus, they argue, answering the proposed certified questions "will not be determinative in any sense," because the challenged statutes would still suffer from "substantial vagueness and uncertainty" absent a rewrite by the Colorado Supreme Court.  Doc. 32 at 7, 10.

The difficulty with Plaintiffs' position is that it advocates an interpretation of the statute that the Defendant has already definitively rejected.  In short, "the State will decline to defend a statute if it is read" in the manner that Plaintiffs advocate, *i.e.* as banning *all* magazines with removable baseplates.  *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 396 (1988).  And because "the nature and substance of plaintiffs' constitutional

challenge is drastically altered if the statute is read" in the manner that the Governor has advocated, it is "essential that [the Court] have the benefit of the law's authoritative construction from the [state] Supreme Court." *Id.*

Plaintiffs' motion for a preliminary injunction amply demonstrates that their assertions of vagueness in HB 1224 turn almost exclusively on what the statute means.  But as the Governor's response to the PI motion will demonstrate, the parties "fundamentally disagree on the scope of the challenged statute" and resolution of their disagreement will materially change the scope of this litigation.  *Am. Booksellers Found. v. Strickland*, 560 F.3d 443, 447 (6th Cir. 2009).  "Rather than speculate, the better course . . . is to provide the Supreme Court of [Colorado] with the opportunity to interpret the scope of [the statute]."  *Id.*

Nor would certification in this case amount to an invitation to rewrite the challenged statute.  Plaintiffs' strawman notwithstanding, this is not a case where "the possibility of a limiting construction appears remote." *Erznoznik v. Jacksonville,* 422 U.S. 205, 217 (1975).  The Governor has *never*, even before this lawsuit was filed, "offer[ed] several distinct justifications for the ordinance in its broadest terms."  *Id.*  Rather, the Governor's efforts to inform the public of the inaccuracy of the Plaintiffs' claims, among others, have been remarkably consistent.  As his signing statement and the Technical Guidance demonstrate, the Governor has advocated for a narrow

construction that carefully balances the clear public interests at stake, the General Assembly's intent, and the constitutional rights of gun owners.

Whether HB 1224 is "readily susceptible" to a narrowing construction is "the test for determining the appropriateness of employing the certification procedure." *Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir. 1988). Here, the challenged is "readily susceptible" to the narrowing construction proffered by the Governor. The Attorney General and the Department of Public Safety have, at the Governor's request, issued Technical Guidance, which is an official written interpretation of state law proffering at least one "narrowing construction" of HB 1224. (Doc. 26-2). "Surely a court cannot be expected to ignore these authoritative pronouncements in determining the breadth of a statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 618 (1973). So, even if "the Attorney General does not bind the state courts or local law enforcement authorities," and the court is "unable to accept [his] interpretation of the law as authoritative," *Am. Booksellers*, 484 U.S. 383, the alternative and entirely reasonable interpretation contained in the Technical Guidance at a minimum illustrates why this case is appropriate for certification.

That the proposed questions do not precisely track the Technical Guidance or the precise terms used in HB 13-1224 is of little importance. The proposed questions were carefully crafted to permit the Colorado Supreme Court to directly answer the substantive vagueness challenges using the language that Plaintiffs employed in their complaint to describe the

alleged problems.  But because certification is generally discretionary, *Pino v. United States*, 507 F.3d 1233, 1235–36 (10th Cir. 2007), this Court would be free to further refine or refocus any certified questions that it eventually opted to submit.

Nor is undue delay of the federal court proceedings a major concern. Most significant, the Governor has repeatedly stated that he is willing to enter into a stipulated preliminary injunction to obviate Plaintiffs' most pressing concerns.  Plaintiffs have rejected these overtures, seeking instead to attempt to expand the injunction to include local and federal law enforcement agents—neither of whom are parties to this case—and narrow the statute more than the Technical Guidance.

Moreover, the case that Plaintiffs cite for the proposition that certification is disfavored due to concerns about delay says just the opposite. In *Kansas Judicial Review v. Stout,* 519 F.3d 1107, 1118–19 (10th Cir. 2008), the Court expressed concerns that applying *Pullman* abstention could cause delay that "could prolong the chilling effect on speech."  The Tenth Circuit's solution to this problem is precisely what the Governor has proposed here. Certifying questions rather than abstaining entirely from them follows the preferences of the Supreme Court, which has noted that the process has the advantages of "reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response."  *Id.* (citing *Arizonans for Official English v. Arizona,* 520 U.S. 43, 76 (1997)).

That said, discovery and trial preparation could move forward in this Court on the issues that will not be resolved by the certified questions: whether the Second Amendment includes a right to a firearm with a capacity of more than 15 rounds; whether the disabled Plaintiffs are entitled to an exemption from the large-capacity magazine ban under federal disability law; and whether HB 1229, the background check statute, is susceptible to Plaintiffs' claims. Although doing so might negate some of the efficiency gained by certifying the threshold legal questions to the Colorado Supreme Court, the Governor desires an expeditious ruling in this case and would not object to moving the case forward on two tracks simultaneously.

In sum, because the interpretation of the challenged statute is unsettled and potentially dispositive of at least a substantial portion of the Plaintiffs' complaint, because the statute is reasonably subject to an interpretation that would obviate many, if not all, of Plaintiffs' concerns about vagueness, and because the Colorado Supreme Court is the only judicial body that may provide such a definitive interpretation, certification is appropriate in this case. The Governor respectfully requests that the Court grant his motion and certify the questions proposed.

Respectfully submitted this 21st day of June, 2013.

**Counsel for Defendant:**
JOHN W. SUTHERS
Attorney General

*/s/ Daniel D. Domenico*
DAVID C. BLAKE*
Deputy Attorney General
Email:  david.blake@state.co.us
DANIEL D. DOMENICO*
Solicitor General
Email:  dan.domenico@state.co.us
KATHLEEN L. SPALDING*
Senior Assistant Attorney General
Email: kit.spalding@state.co.us
MATTHEW D. GROVE*
Assistant Attorney General
Email: matt.grove@state.co.us
JONATHAN P. FERO*
Assistant Solicitor General
Email: jon.fero@state.co.us

Attorneys for Secretary of State
1300 Broadway
Denver, Colorado  80203
Telephone:  720-508-6000
*Counsel of Record

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2013 I served a true and complete copy of the foregoing GOVERNOR'S REPLY IN SUPPORT OF MOTION TO CERTIFY QUESTIONS TO THE COLORADO SUPREME COURT upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                        _s/  Debbie Bendell_____

340

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.,*

Plaintiffs,

v.

JOHN W. HICKENLOOPER
in his official capacity as Governor of the State of Colorado,

Defendant.

---

### GOVERNOR'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
### [DOCS. 29 AND 37]

---

Defendant, Governor John W. Hickenlooper, by and through undersigned

counsel, responds as follows to Plaintiffs' motion for a temporary restraining order

and preliminary injunction.

### INTRODUCTION

During the 2013 legislative session the Colorado General Assembly adopted

several firearms regulation measures, two of which—a limitation on the capacity of

certain magazines (House Bill 13-1224) and an expansion of the background check

requirement for firearms purchases (House Bill 13-1229)—are the subject of this

lawsuit.  Plaintiffs, a confederation of county sheriffs, firearms dealers, gun owners

and others, filed suit against the Governor, asking this Court to declare both

provisions unconstitutional and enjoin their enforcement.

Plaintiffs filed the instant motion less than three weeks before the legislation's effective date of July 1, 2013, seeking a preliminary injunction and a temporary restraining order against the enforcement of three provisions in the large-capacity magazine bill.  They supplemented their motion on June 20, 2013.

Plaintiffs' motion is somewhat narrower than the relief sought in the First Amended Complaint.  It does not challenge the core of HB 1224, which as of July 1, 2013 prohibits the new acquisition of magazines that can hold more than fifteen bullets. Nor does the motion challenge HB 1229, which expands the background check requirement for firearms purchases. The great bulk of Colorado's new gun control laws will therefore take effect, as planned, on July 1 regardless of the outcome of these preliminary proceedings.

Plaintiffs' motion for a preliminary injunction instead asserts that the following provisions of HB 1224 are unconstitutionally vague: 1) the prohibition on magazines that are "designed to be readily converted" to hold more than fifteen rounds; 2) the grandfather clause of HB 1224; and 3) the ban on "transfers" of large-capacity magazines after July 1, 2013.  Plaintiffs also contend that these three provisions, when read broadly, violate the Second Amendment.

Firearms regulation became the subject of intense national debate in the wake of the mass murders in Aurora, Colorado, and Newtown, Connecticut in 2012. During legislative debate in Colorado, the bills challenged here were widely discussed and publicly criticized by, among others, many of the Plaintiffs in this case.  Much of the rhetoric mirrored the allegations that now appear in the

Plaintiffs' complaint and preliminary injunction motion—which argue, for example, that HB 1224's prohibition on magazines that are "designed to be readily converted" to hold more than fifteen rounds amounts to a ban on virtually all functional semi-automatic firearms.  To clear up this sort of widespread misconception about the intent and scope of HB 1224, the Governor's signing statement rejected a broad interpretation of the bill, instead maintaining "that the large capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the 14th Amendment." *See* Ex. A.  The Governor went on to request that the Colorado Department of Public Safety, in consultation with the Attorney General, issue "Technical Guidance on how the law should be interpreted and enforced in Colorado."  *Id.*

The Attorney General released his official written interpretation of HB 1224 in the form of the Technical Guidance requested by the Governor the day before Plaintiffs filed this lawsuit.  *See* Ex. B.  The Technical Guidance directly addressed the two provisions of HB 1224 challenged here.  Noting that "[t]he phrase 'designed to be readily converted to accept more than fifteen rounds of ammunition' has prompted questions regarding the scope of the definition," the Technical Guidance acknowledged that there is a distinction between a magazine that *is capable* of being expanded to more than fifteen rounds, for example by the purchase of additional parts, and one whose objective features demonstrate that it has been *designed* for quick and ready expansion.  Thus, the Technical Guidance rejected the notion Plaintiffs' claims depend on: that a magazine meets the "designed"

requirement "simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds." *Id.* Such magazines, which constitute the bulk of those Plaintiffs worry about, do not fall within the scope of the law as interpreted by the Governor, the Attorney General, and the Department of Public Safety.

The Technical Guidance also addressed the grandfather clause of HB 1224, which permits one who "owns" a large-capacity magazine before July 1, 2013, to continue to keep and use it, provided that he or she "maintains continuous possession" of it thereafter. The Attorney General stated that the bill could not be reasonably construed as "barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee," and that "an owner should not be considered to have 'transferred' a large-capacity magazine or lost 'continuous possession' of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned." *Id.*

Colorado law protects an individual from criminal liability for prohibited conduct if the conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." Colo. Rev. Stat. § 18-1-504(2)(c). The guidance is the official written interpretation of not only the Attorney General and the Colorado Department of Public Safety, but also the

Governor—whom Plaintiffs have identified as being "the proper defendant" due to his constitutional responsibility "to ensure that all laws of the state are faithfully executed." 1st Am. Compl. [Doc. 22], at ¶ 172.  Thus, by the plain terms of subsection 18-1-504(2)(c), the Technical Guidance *is* binding.  Moreover, this Court is in a position to ensure that it will remain so by virtue of the Governor's proposal to stipulate to the entry of a preliminary injunction that is consistent with Technical Guidance's interpretation of the challenged law. *See* Def.'s Mot. for Certification of Questions of Law to Colo. Sup. Ct. [Doc. 26].

Thus, in the Governor's view, the preliminary injunction that the Plaintiffs request—one that depends on an unjustifiably broad reading of HB 1224 that no party to this case agrees is appropriate—is unnecessary.

## ARGUMENT

### I.  Issuing a Temporary Restraining Order Would Be Inappropriate and Inequitable.

As a preliminary matter, Plaintiffs maintain in their supplemental brief that the Court may issue a temporary restraining order.  Yet Plaintiffs acknowledge that Federal Rule of Civil Procedure 65(b)(1)(A) requires them to submit either "an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result."  Pls.' Suppl. Br. Regarding Pls.' Standing & Other Issues Raised By the Court [Doc. 37], at 2. Since they have done neither, no evidence supports their request and the Court cannot issue a temporary restraining order.  Nor does applying the label of "preliminary injunction" rather than "TRO" excuse the Plaintiffs from having to provide adequate evidence in support of their

motion.  Plaintiffs "must present more than mere allegations" in order to secure provisional injunctive relief.  *See Kansas City, Kansas Fraternal Order of Police, Lodge No. 4 v. Kansas City,* 620 F. Supp. 752, 768 (D. Kan. 1984).  Although Plaintiffs need not "present all of their evidence" at this stage, *Valdez v. Applegate,* 616 F.2d 570, 572 (10th Cir. 1980), "[t]he burden is, of course, on the movant to establish his right to such relief," *Penn v. San Juan Hosp., Inc.* 528 F.2d 1181, 1185 (10th Cir. 1975).

In addition, Plaintiffs' reliance on out-of-Circuit authority highlights that Rule 65(b) only provides for the issuance of temporary restraining orders without notice to the other side.  When notice is afforded, Rule 65(a) only provides for the issuance of a preliminary injunction.  Thus, the plain language of the Rule indicates that temporary restraining orders are appropriate at the earliest possible stage to prevent "immediate and irreparable injury, loss, or damage . . . before the adverse party can be heard."  Fed. R. Civ. P. 65(b)(1)(A).  Here, the Defendant will have been heard upon the filing of this responsive brief, and there is no possible injury to Plaintiffs until HB 1224 takes effect on July 1, 2013.

That nine days will pass until this Court's docket allows for a hearing is a consequence of Plaintiffs' own making.  HB 1224 was signed by the Governor on March 20, 2013, *see* Exhibit A, and the Plaintiffs announced their plans to file this lawsuit shortly thereafter.  *See* Tom McGhee, "Colorado Sheriffs Planning Lawsuit to Block New Gun Laws," Denver Post (Apr. 9, 2013), *available at* http://www.

denverpost.com/breakingnews/ci_22988195/colorado-sheriffs-planning-lawsuit-block-new-gun-laws.  Yet they did not file their complaint until May 17, 2013, and then waited until June 12, 2013 to move for an injunction and restraining order. *See RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1211 (10th Cir. 2010) (noting that "delay in seeking preliminary relief cuts against finding irreparable injury").

## II.     Plaintiffs Have Failed to Clearly and Unequivocally Show Entitlement to the Extraordinary Remedy of a Preliminary Injunction.

The dispute at issue in this preliminary stage is actually quite narrow and dependent on the interpretation of state law.  *See generally* Doc. 26.  Plaintiffs are attacking a straw man—a legal interpretation of HB 1224 that no one, and certainly not the Defendant or anyone under his control, is taking.  Indeed, the Defendant has already officially adopted and continues to advocate a narrow, reasonable interpretation of HB 1224.  Plaintiffs' motion does not assert that this narrower reading of Colorado law violates the Constitution; instead, the Motion asks the Court to reject that narrower reading and instead adopt a broad, unconstrained reading of HB 1224 that turns on its head the judiciary's "duty to construe statutes in a constitutional manner, and to save a statute, if possible, rather than strike it down."  *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1121 (10th Cir. 2008).

Given that the Defendant (as well as the Attorney General) has already bound himself to such an interpretation, Plaintiffs' assertions of harm, as well as

their chances of prevailing on the merits, are inadequate to meet the exceptionally high burden required for an injunction of this sort.[1]

## A.     Standards for injunctive relief.

Because a preliminary injunction is an extraordinary remedy, Plaintiffs must show that their right to this form of relief is clear and unequivocal. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Plaintiffs, as movants, bear the burden of establishing that (1) they will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs damage the proposed injury may cause the opposing party; (3) the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits. *Id.*

It is the Plaintiffs' burden to establish that each of the first three factors tips in their favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003). As Plaintiffs point out, in some cases where the moving party has established that the first three facts "tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed." *Id.* at 1189.

This approach does not apply, however, in cases like this one, involving a pre-enforcement challenge to a state statute. As the Tenth Circuit has held, a party attempting to enjoin governmental action taken in the public interest pursuant to a

---

[1] The Court asked the parties to specifically address whether an injunction could bind the State of Colorado and all of its agents, see Fed. R. Civ. P. 65(d)(2)(B), when the Governor is the only named defendant. Plaintiffs cite dispositively to *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999), for the proposition that an injunction against the Governor of New Mexico would bind that state's district attorneys. It is worth noting that the holding in *Johnson* is in tension with Plaintiffs' argument that the stipulated injunction already proposed by the Governor fails to protect them from rogue prosecutions.

statutory or regulatory scheme must satisfy the more rigorous "substantial likelihood of success" requirement regardless of the determination of the first three factors. *Id.* This is consistent with the Supreme Court's longstanding skepticism of preliminary injunctions that restrain the enforcement of state statutes. *See Cavanaugh v. Looney,* 248 U.S. 453, 456 (1919); *Ex Parte Young,* 209 U.S. 123, 166–67 (1908). Here, Plaintiffs seek to enjoin a statute that was duly adopted by the Colorado General Assembly and signed by the Governor. Although they argue that the Court should apply a "fair ground for litigation" standard to the merits prong of their motion, Doc. 29 at 4, a heightened standard in fact applies. This Court should not issue a preliminary injunction unless Plaintiffs are able to establish that their right to an injunction is "reasonably free from doubt," and that they will suffer a "great and irreparable injury" unless it is issued. *Ex Parte Young,* 209 U.S. at 166–67.

## B.   Standard of review and burden of proof.

Plaintiffs raise facial vagueness challenges to HB 1224, arguing that "designed to be readily converted" could be interpreted as referring to features common to a large majority of magazines that are compatible with semi-automatic handguns and rifles, and that as a consequence, Plaintiffs will not know which magazines are legal and which are not. Attempting to import the concept of "chilling" from First Amendment vagueness jurisprudence, Plaintiffs argue that implementation of the challenged language will result in the *de facto* prohibition of virtually all semi-automatic magazines, thereby also violating the Second

Amendment because, due to concerns about the statute's asserted vagueness, prospective owners will allegedly refrain from acquiring any magazines at all after the effective date.

In a similar manner, Plaintiffs facially challenge the "continuous possession" provision of the grandfather clause, complaining that "HB 1224 provides absolutely no guidance as to what 'continuous possession' actually *does* mean," and offering a parade of horribles intended to highlight alleged ambiguities in the statute and Technical Guidance. Doc. 29 at 18, 21–23.

"Facial challenges are strong medicine," and for that reason the Tenth Circuit Court of Appeals has cautioned that courts "must be vigilant in applying a most exacting analysis to such claims." *Ward v. Utah*, 398 F.3d 1239, 1246–47 (10th Cir. 2005). Vagueness challenges can take two forms: 1) claims that a law "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or 2) claims that a law encourages arbitrary or discriminatory enforcement. *Doctor John's v. City of Roy,* 465 F.3d 1150, 1158 (10th Cir. 2006) (citing *Hill v. Colo.,* 530 U.S. 703, 732 (2000)). Arbitrary or discriminatory enforcement claims, however, cannot be brought as part of a pre-enforcement challenge at all. *See Gonzales v. Carhart,* 550 U.S 124, 150 (2007). Pre-enforcement challenges such as this one, by definition do not involve evidence that the challenged law has been, or could be "enforced in a discriminatory manner or with the aim of inhibiting [constitutionally protected conduct]." *Hoffman Estates v. Flipside, Inc.,* 455 U.S. 489, 503 (1982). Thus, only the first type of claim is at issue

here.  But to succeed, Plaintiffs must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that "vagueness permeates the text of [the] law." *Ward,* 398 F.3d at 1246–47 (citing *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)).

### C.   Plaintiffs have not shown that the asserted harm to them outweighs the State's powerful interest in assuring the safety of Colorado's citizens.

Plaintiffs argue that the balance of harms tips in their favor because, they allege, enforcement of the challenged provisions would: 1) require sheriffs "to make arrests or otherwise investigate possible crimes based on vague or facially unconstitutional language"; 2) cause dealers and other businesses to operate without certainty as to what magazines are legal; and 3) prevent owners of large-capacity magazines from treating those magazines as they always have in the past.

Plaintiffs claim that maintaining the status quo will not injure the state's interests at all.  But an injunction against a duly enacted state law frustrates the will of the citizens of that state, as expressed through their duly elected representatives.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J.) (denying application for stay as Circuit Justice, and noting state "suffers a form of irreparable injury" any time it "is enjoined by a court from effectuating statutes enacted by representatives of its people").

The will of Colorado's voters was expressed by the General Assembly in favor of protecting public safety.  The State has a "*duty* under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and

welfare of the people." *People v. Blue*, 544 P.2d 385, 390–91 (Colo. 1975) (emphasis added) (citing cases).  The General Assembly passed the ban on high-capacity magazines in the wake of a mass shooting in Aurora, Colorado, in which the shooter used one or more high capacity magazines to kill 12 people and wound 58 more.  Later that year, the shooter in Newtown, Connecticut also used a rifle equipped with large-capacity magazines to kill 26 people, 20 of whom were 6- and 7-year-old children. To be sure, the debate on HB 1224 was vigorous, and Plaintiffs plainly disagree that the bill appropriately addresses the public safety concerns that motivated its passage.  But no matter how vehemently Plaintiffs disagree, HB 1224 is the judgment of the individuals and institutions that have the constitutional power to make policy judgments about how to protect the safety of Colorado's citizens.  The injury to the public interest if an injunction is issued would substantially outweigh the injuries that Plaintiffs assert they will suffer if the challenged provisions go into effect as the legislature intended.

**D. Plaintiffs will not suffer irreparable injury if the Court declines to enjoin the challenged portions of HB 1224.**

In their initial motion, Plaintiffs suggest three types of harm they fear if HB 1224 goes into effect: *per se* harm caused by alleged injury to their Second Amendment rights; "incalculable financial burdens" to the plaintiffs whose business interests will be affected by the law; and harm caused to the plaintiff sheriffs by their confusion about what the law asks them to do.  In their supplemental brief, Plaintiffs provide further detail about these alleged harms, although they generally

hew to the three broad categories identified in the original motion. Plaintiffs'

additional allegations of harm include claims that:

- Licensed firearms dealers and Magpul (a manufacturer of magazines) face a credible threat of prosecution that will chill their exercise of their rights to buy and sell large capacity magazines, which for the dealers will be economically devastating. Doc. 37 at 6–9.

- Individual plaintiff David Strumillo currently owns large-capacity magazines, and will suffer a "chilling" effect as a result of the legislation, and will also be subject to criminal liability on July 1st because he is holding large-capacity magazines for a friend deployed overseas. *Id.* at 10.

- Individual plaintiffs David Bayne and Dylan Harrell will be unable to determine if their existing 15-round or less capacity magazines will be prohibited or if they will be able to purchase magazines of any size, thereby chilling their right to use firearms for home self-defense, target shooting, and hunting. *Id.* at 11.

- Plaintiff Outdoor Buddies will be unable to continue its practice of loaning firearms to individuals because it is unsure whether the magazines that it apparently loans along with those firearms qualify as large capacity magazines. *Id.*

- Plaintiff Hamilton Family Enterprises will lose revenue from magazine sales and a planned new range that may no longer be economically viable. *Id.* at 12–13.

- In their Supplemental Brief, the plaintiff sheriffs now announce that they are actually suing in both their official and personal capacities, and not, as the First Amended Complaint suggests, in their official capacities alone. *Id.* at 21. The Sheriffs thus claim that they are doubly injured, first by their purportedly conflicting obligations to follow both the Constitution and state statute, and second by the adverse effect that HB 1224 will allegedly have on their ability to effectively defend themselves and their families from the heightened threats inherent in their occupation. *Id.* at 21–22, 26.

Notably, all of these fears—at least to the extent that they rely on the statute's ostensible vagueness—depend on ignoring or rejecting the possibility of a reasonable narrowing interpretation of the law, as has already been undertaken by the Technical Guidance. In other words, the harms alleged by Plaintiffs in their preliminary injunction motion would exist[2] only if this Court were to adopt Plaintiffs' untenable interpretation of HB 1224. Any decision to adopt Plaintiffs' interpretation that nearly all magazines and therefore nearly all firearms are

---

[2] Plaintiffs have not asserted any actual threats by any other entity to enforce the law in a manner inconsistent with the Guidance or otherwise in line with the extremely broad reading they offer up. In fact, many of the Plaintiffs are sworn law enforcement officers who have publicly announced that the challenged provisions are unenforceable in practice, and that in any event they will *refuse* to enforce them.

prohibited would by necessity require both rejection of the Technical Guidance and refusal to exercise judicial interpretive authority, either directly or through the certification process. The Technical Guidance, which interprets the phrase "designed to be readily converted" and explains the "continual physical presence" requirement, strikes a reasonable middle ground and draws a bright line rule that offers substantial certainty to high-capacity magazine owners and potential borrowers trying to comply with the law.

Moreover, even accepting the assertion that the impact on the business plaintiffs will be "incalculable," such harms are not only speculative, but are quantifiable and therefore do not qualify as irreparable. *See Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989). Those plaintiffs who are claiming that HB 1224 will harm their business interests surely track sales and inventory. Even assuming that a quantified loss in sales would occur, and even if it did, assuming that it would somehow amount to an injury at all, the fact that the business plaintiffs may not be able to predict with certainty what will happen after July 1 does not mean that any such injuries are irreparable or even difficult to calculate.[3] Moreover, because the dealers claim only

---

[3] Of course, it appears that the plaintiff dealers have actually enjoyed a substantial windfall from the legislation's impending effective date. *See, e.g.*, Kim Bhasin, "Top Ammo Supplier Sells 3 1/2 Years Worth of Assault Rifle Magazines in 72 Hours," Business Insider (Dec. 26, 2012), *available at* http://www.businessinsider.com/ brownells-magazine-sales-2012-12 (reporting online retailer's "unprecedented" sales jump following Sandy Hook massacre). Moreover, even leaving that windfall aside, HB 1224 may very well lead to an *increase* in magazine sales for the dealers over the long term. Once the law goes into effect, if a gun owner wants to carry more

an economic impact, and cannot assert a direct Second Amendment infringement, this Court should apply the "less strict vagueness test" outlined in *Hoffman Estates,* 455 U.S. at 498 (noting that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action").

With respect to the alleged Second Amendment harms, Plaintiffs conflate the first prong of the preliminary injunction analysis with the last, claiming in essence that irreparable injury exists because the challenged portions of HB 1224 will violate their constitutional rights if implemented, thereby resulting in *per se* irreparable injury.  Doc. 29 at 7.  Even assuming that a deprivation of Second Amendment rights, however slight, can amount to a *per se* irreparable injury,[4] Plaintiffs' preliminary injunction motion fails to establish that the challenged

---

than 15 rounds of ammunition for his or her firearm, he or she will now have to buy multiple magazines instead of one.

[4] This is far from a settled question.  Although a deprivation of certain enumerated constitutional rights often is considered irreparable harm (most commonly under the First Amendment), courts around the country have consistently declined to import First Amendment equitable concepts wholesale into Second Amendment cases.  *See, e.g., Kachalsky v. County of Westchester,* 701 F.3d 81, 92 (2nd Cir. 2012) ("[I]t would be . . . imprudent to assume that the principles and doctrines developed in connection with the **First Amendment** apply equally to the Second.").  This distinction has extended to the preliminary injunction context, in which courts have declined to conclude that a deprivation of asserted Second Amendment rights, standing on its own, automatically amounts to an irreparable harm.  *See, e.g. Plastino v. Koster,* 2013 WL 1769088, at *9 (E.D. Mo. April 24, 2013); *but see Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011).  And for good reason—a state's interest in protecting public safety is fundamentally different from its role in regulating speech.

language will cause any harm to their Second Amendment rights at all. Indeed, the core of the Second Amendment—the right to individual self-defense in the home—is not compromised at all by reasonable limitations on magazine size. *See Heller v. Dist. of Columbia,* 670 F.3d 1244, 1262 (D.C. Cir. 2011) (*Heller II*) (affirming, under intermediate scrutiny, a ten-round limitation on magazine size). A magazine is not a firearm, and with the exception of a few antiques, the Defendant is unaware of any gun necessary for self-defense that can only be fired with a magazine with a capacity greater than 15 rounds. Indeed, Plaintiffs do not even seek to preliminarily enjoin HB 1224's outright ban on magazines that accept over 15 rounds at all. And in any event, there remain many handguns and other options for home defense that do not raise even the theoretical risk that Plaintiffs assert they fear.[5]

Even if the Second Amendment guaranteed a right to possess and use magazines holding more than fifteen rounds, there can be no dispute it is a personal right tied at its core to the defense of home and hearth. *See Dist. of Columbia v. Heller,* 554 U.S. 570, 635 (2008). The corporate plaintiffs, even assuming they enjoy the right to bear arms on equal footing with individual persons, allege the use and sale of high-capacity magazines for purposes other than direct self-defense. The

---

[5] For example, some firearms such as revolvers do not utilize magazines to hold and advance ammunition into the firing chamber, and most such weapons accept fewer than 15 rounds. Moreover, not all magazines have removable baseplates that would possibly allow conversion to higher capacities. In any event, the Technical Guidance permits Coloradans to purchase semi-automatic firearms and use them with magazines that have removable baseplates. As Plaintiffs admit, this amounts to a huge proportion of commercially available magazines.

Second Amendment offers no guarantee to corporations a particular business market in firearms leisure, training, or enthusiasm.  Absent is any allegation that HB 1224 would utterly eradicate any individual plaintiff's ability to obtain either the firearms or training necessary to defend himself.

If it is large-capacity magazines they prefer, every individual plaintiff in this case, including the sheriffs, may possess them after July 1st, provided that they obtained them before that date and maintain continuous possession of them thereafter.  The grandfather clause of HB 1224 eliminates the possibility of any irreparable harm to any individual plaintiff who currently owns or desires to own magazines with a capacity greater than 15 rounds.  *Cf. Salt Lake Tribune Publ. Co. v. AT&T Corp.,* 320 F.3d 1081, 1106 (10th Cir. 2003) (holding that self-inflicted harm is not irreparable).  Simply being prohibited from purchasing and transferring large capacity magazines months after HB 1224 was enacted is not irreparable harm.

Plaintiffs also claim that "law enforcement," including the sheriffs, will suffer irreparable harm due to their alleged confusion about what the law means and their obligation "to commit facially unconstitutional acts, such as arresting someone who has left a magazine at a gunsmith for repair or cleaning." Doc. 29 at 8–9.  Not only does this conflate the question of irreparable injury with the merits, it demonstrates a misunderstanding of sheriffs' authority to enforce duly enacted statutes, Colo. Rev. Stat. § 16-2.5-103(1), while fulfilling their duty to "keep and preserve the peace," Colo. Rev. Stat. § 30-10-516.  HB 1224 is not a ban on all firearms or an

entire class of guns; it is a limitation on magazine capacity.  As interpreted by the Technical Guidance, HB 1224 draws bright-line rules for law enforcement that could only be made vague by creating an absolute conflict with the Second Amendment that just does not exist.

Moreover, to the extent that Plaintiffs suggest that law enforcement might be financially liable for "commit[ting] facially unconstitutional acts" when complying with the statute, they not only ignore the protections available to them under principles of qualified immunity, but also the fact that any such damages, although exceptionally unlikely, would be compensable and therefore do not qualify as irreparable injury.  "The doctrine of qualified immunity provides that [w]hen government officials are performing discretionary functions, they will not be held liable for their conduct unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell v. Maynard*, 80 F.3d 1433, 1447 (10th Cir. 1996) (internal quotation marks and citations omitted).  As discussed in detail below, HB 1224 is similar to many other provisions that have passed muster in other jurisdictions.  Simply put, enforcement of the statute as written would come nowhere near to violating clearly established statutory or constitutional rights of which a reasonable person in the sheriffs' position would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Finally, the supplemental allegation that individual plaintiff Strumillo will become subject to criminal liability on July 1st because he is storing high-capacity magazines for a non-plaintiff friend fails to establish any irreparable injury.  Doc.

37 at 10.  To avoid criminal liability, Strumillo does not require an injunction; he has a number of options.  Among other things, he could purchase or dispose of the magazines before July 1st, put them into a safety deposit box that the owner controls, or return the magazines to the owner's spouse, if any.  According to the allegation, Strumillo has no ownership interest in the stored magazines. Consequently, the only potential injury would be to his standing as perceived by his friend, which hardly calls for an injunction.[6]

   **E.    Plaintiffs are unlikely to succeed on their facial challenge to the three provisions of HB 1224 that they seek to preliminarily enjoin.**

   Plaintiffs make two arguments to support their asserted likelihood of success on the merits on their facial challenges to HB 1224. First, they assert that the terms "designed to be readily converted" and "continuous possession" are unconstitutionally vague on their face.  Second, they assert that those two phrases, as well as HB 1224's prohibition on "transfers" of large-capacity magazines, facially violate the Second Amendment.  They have failed, however, to meet their burden of showing either argument has the requisite likelihood of success.

_____

[6] The Court has asked the parties to address the standing of any party for whom a harm is identified in conjunction with the motion for preliminary injunction.  While the Governor has serious reservations about the Article III standing of several plaintiffs (particularly the sheriffs, who in their official capacities are subdivisions of the state, *see, e.g.*, *Romer v. Bd. of County Comm'rs,* 956 P.2d 566, 574 (Colo. 1998)), he does not contest that at least one or more of the remaining plaintiffs has made a sufficient allegation of Article III standing to warrant the Court's exercise of subject matter jurisdiction at this early stage of the case.  Because, as argued above, no plaintiff has established the type of harm that is a prerequisite to the issuance of a preliminary injunction, this Court need not reach the question of the Plaintiffs' standing at this time.

1.    **The challenged provisions of HB 1224 are not facially vague.**

To succeed in their facial vagueness claim, Plaintiffs must show, at a minimum, that HB 1224 would "be vague in the vast majority of its applications." *Doctor John's*, 465 F.3d at 1157.  The law need not be free from any hint of ambiguity to survive Plaintiffs' facial vagueness challenge.  "[A] statute with some arguably vague elements is not automatically vague on its face in violation of the Fourteenth Amendment." *Dias v. City & County of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009); *see also Hejira Corp. v. MacFarlene*, 660 F.2d 1356, 1367 (10th Cir. 1981) ("We acknowledge that it is not necessary for reasonable men to consistently reach the same conclusion in applying objective standards to a given factual situation. Thus, the fact that different minds may reach different results when seeking to determine whether a given object falls within the statutory definition of drug paraphernalia does not render the statute void for vagueness.").

Plaintiffs' likelihood-of-success argument relies on the misplaced assumption that this Court (and, for that matter, any court that might apply HB 1224) will adopt extreme interpretations of HB 1224 that the Governor, the Colorado Department of Public Safety, and the Attorney General have formally rejected.  For example, Plaintiffs assert that "[HB 1224] effectively outlaws or disables 82% of currently-manufactured handguns and a large fraction of rifles"[7] because it makes

---

[7] As explained below, this conflates regulation of magazines, which can be replaced, with the weapons themselves.  Many handguns and rifles do, indeed, accept magazines, and many of those magazines do, indeed, have removable baseplates. But magazines can be and are made that do not have removable baseplates, so even under Plaintiffs overly broad interpretation of the magazine restrictions, there is no

unlawful *any* magazine with a removable base plate.  Doc. 29 at 20.  They further reject a "reasonable, every-day" reading of "continuous possession" that would allow gun owners to temporarily transfer their grandfathered large-capacity magazines for lawful purposes such as repair or target practice.  *Id.* at 17.  This unjustified position ignores that federal and state courts have "a duty to construe statutes in a constitutional manner, and to save a statute, if possible, rather than strike it down." *Stout*, 519 F.3d at 1121; indeed, it depends on this Court doing just the opposite.  A reasonable reading of HB 1224—like the one embodied in the Technical Guidance— would allow gun owners to reasonably use their firearms with a variety of commercially-available magazines.  Plaintiffs cannot earn an injunction by foisting an untenable interpretation of HB 1224 on the public, Colorado law enforcement officials, and this Court.  *See United States v. McGarity*, 669 F.3d 1218, 1235 (11th Cir. 2012) ("[T]he defendants' purportedly absurd constructions of [the statute] do not require us to invalidate the statute wholesale.").

> a)   **"Designed to be readily converted" is not vague in the vast majority of its applications, and the Supreme Court has held that the term "designed" can constitutionally define unlawful conduct.**

Plaintiffs assert that "'[d]esigned to be readily converted' is a term that does not exist in Colorado statutes," and "HB 1224 provides no hint about what the term means."  Doc. 29 at 13.  Federal and state courts, however, routinely encounter

---

reason that *any* handgun or rifle that accepts removable magazines will be outlawed or disabled.  The only types of weapons that actually would be effectively disabled are those that cannot take new magazines.  Defendant believes that these are few, and Plaintiffs have not asserted claims about any of them.  And as noted, even these are not outlawed or disabled—only their sale or transfer is.  *See supra* n.5.

statutory terms that are not specifically defined.  The response is to engage in the routine task of statutory interpretation, not to invalidate undefined terms, even those that may contain some ambiguous potential applications.  *See, e.g., United States v. Graham,* 305 F.3d 1094, 1101-03 (10th Cir. 2002) (applying rules of statutory construction to undefined terms in federal firearms statute).  In the context of a facial vagueness challenge, this surgical approach must prevail over Plaintiffs' blunt method of doing away entirely with legislatively-enacted language simply because a troublesome interpretation could be imagined.  *See Stout*, 519 F.3d at 1121; *see also Robertson v. City & County of Denver,* 874 P.2d 325, 334 (Colo. 1994).  Exercising caution of this type is consistent with the Supreme Court's traditional skepticism of facial challenges.  For example, in *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008), the court declined the plaintiffs' invitation to facially invalidate the statute, holding:

> In determining whether a law is facially invalid,  we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases. The State has had no opportunity to implement I-872, and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions. Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

*Id.* at 449-50.  The federal circuits have taken a similar approach. *See, e.g. Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 580 (5th Cir.

2012) ("As we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.' Our analysis therefore cannot focus upon the marginal cases in which an ordinarily plain statutory command can nonetheless yield some mote of uncertainty.") (quoting *Hill*, 530 U.S. at 733); *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) ("[O]ur task is not to dream scenarios in which a regulation might be subject to a successful vagueness challenge. The Supreme Court has instructed that 'speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.'") (quoting *Hill*, 530 U.S. at 733).

Using traditional tools of statutory interpretation, the phrase "designed to be readily converted" is much narrower than Plaintiffs assert it to be, and it certainly does not, under any reasonable reading, ban all "box and tube magazines [that] contain removable base plates and end caps." Doc. 29, at 2.

### (1)   "Designed"

"A principal meaning of 'design' is '[to] fashion according to a plan.'" *Hoffman Estates*, 455 U.S. at 501 (quoting *Webster's New Int'l Dictionary of the English Language* 707 (2d ed. 1957)). "Designed is clear in its meaning, which is that the item is predetermined for a particular use." *Hejira Corp.*, 660 F.2d at 1362. Moreover, in applying this definition, an item must be judged "by virtue of its objective features, *i.e.*, features designed by the manufacturer." *Hoffman Estates*, 455 U.S. at 501.

Plaintiffs' argument mirrors that of the decision reversed by the Supreme

Court in *Hoffman Estates*:

> "The Court of Appeals objected that 'designed . . . for use' is ambiguous with respect to whether items must be inherently suited only for drug use; whether the retailer's intent or manner of display is relevant; and whether the intent of a third party, the manufacturer, is critical, since the manufacturer is the 'designer' . . . . [W]e conclude that this language is not unconstitutionally vague on its face.
>
> The Court of Appeals' speculation about the meaning of 'design' is largely unfounded.

*Id.* at 500.

In *Hoffman,* the Court recognized that it is not the intent of the

manufacturer that governs the analysis, but the objective features of the regulated

item that control.  The Court explained that it is "plain that the standard

encompasses at least an item that is principally used with illegal drugs by virtue of

its objective features, *i.e.,* features designed by the manufacturer" and that this

objective standard would not cover "items which are principally used for nondrug

purposes, such as ordinary pipes, are not 'designed for use' with illegal drugs."  *Id.*

at 501.  The same reasoning applies here, where it is plain that items whose

features show they are principally meant to be readily converted into larger-

capacity magazines are within the standard, while those that are typically included

for other purposes, such as removable baseplates, are not.

"The crux" of Plaintiffs vagueness argument "is that [HB 1224] requires

ordinary citizens and Sheriffs to know the intent of a magazine's designer."  Doc. 29

at 14.  This might indeed be troubling, if it were true.  Happily, it is not.  "Designed"

is a not uncommon term in the law, and it has been upheld against vagueness

challenges repeatedly, including in some cases involving language very similar to

that challenged here.

For example, in *Richmond Boro Gun Club v. City of New York,* 97 F.3d 681

(2d Cir. 1996), the plaintiff organization challenged a New York City ordinance that

criminalized the possession or transfer of assault weapons within the city, arguing

in part that the ordinance's definition of "assault weapon" was unconstitutionally

vague.  The challenged portion of the statute defined an "assault weapon" as "[a]ny

part, or combination of parts, *designed or redesigned or intended to readily convert* a

rifle or shotgun into an assault weapon." *Id.* at 683 (quoting ordinance) (emphasis

added).  The plaintiffs contended that "a rifle manufacturer's intent in designing a

gun may not easily be discernible from the mere appearance of a weapon."  *Id.* at

685.  Relying on the Supreme Court's opinion in *Hoffman Estates,* however, the

Second Circuit held that "the 'designed' standard," in the context of drug

paraphernalia, encompassed "at least an item that is principally used with illegal

drugs by virtue of its objective features."  *Richmond Boro Gun Club,* 97 F.3d at 685

(quoting *Hoffman Estates,* 455 U.S at 501).  The Second Circuit then affirmed the

trial court's opinion that the evidence in the record demonstrated that "the objective

features of at least some of these firearms clearly bring them within the 'designed'

standard" of the challenged ordinance.  *Richmond Boro Gun Club,* 97 F.3d at 686.

The court thus rejected the plaintiffs' facial vagueness challenge.

A similar phrase is also used to define "machine gun" for purposes of federal law.  The statute defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  28 U.S.C. § 5845(b).  The language of that definition, along with similar language found in several other closely related federal statutes that use similar language, has been upheld against vagueness challenges.  *See, e.g.*, *United States v. M-K Specialties Model M-14 Machinegun Serial #1447797*, 424 F. Supp. 2d 862, 872 (N.D. W. Va. 2006) ("The claimants, however, have cited no case that strikes down any such provision in § 5845 as unconstitutionally vague. . . . .  Section 5845(b) provides fair notice to a person of ordinary intelligence that certain conduct is forbidden by the statute.  Therefore, the Court finds that the phrase 'can be readily restored' is not unconstitutionally vague.").

In light of this case law, the Colorado General Assembly cannot be said to have intended that the term "designed" must rest on the intent of some unknown manufacturer.  Indeed, that is the thrust of Colorado law.  Relying on *Hoffman Estates*, the Colorado Supreme Court has held that the term "designed" *cannot* be judged based on the intent of a third party; the objective characteristics of a particular item govern the inquiry.  *See High Gear & Toke Shop v. Beacom*, 689 P.2d 624, 632 (Colo. 1984).  The Colorado Supreme Court has adhered to this point in the context of firearm regulation, rejecting the notion that an ordinary person could be expected to intuit or research the "design history" of a particular gun in

27

367

order to independently assess whether it was prohibited by the challenged city ordinance. *Robertson,* 874 P.2d at 334.

The Colorado General Assembly is presumed to be aware of these cases. *See e.g.*, *Thompson v. People*, 510 P.2d 311, 313 (Colo. 1973), and the state Legislature intends to pass laws that comply with the Colorado and United States Constitutions, Colo. Rev. Stat. § 2-4-201(1)(a). Thus, while Plaintiffs are generally correct that a statute requiring individuals to discern another's subjective intent can be vague, as a matter of law, it is beyond dispute that this is not what the Colorado General Assembly can be assumed to have intended.

### (2)  "Readily converted"

"Readily," meanwhile, means "in a prompt manner" or "in a manner indicating or connoting ease." *Am. Heritage Dictionary* 1159 (4th ed. 2004). "[M]ost notably," the term connotes "speed, ease, and efficiency." *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421 (6th Cir. 2006) (quoting *Webster's Third New Int'l Dictionary* 1889 (1981)).

Finally, "converted" means "to change (something) from one use, function, or purpose to another." *Am. Heritage Dictionary* 313.

### (3)  "Designed to be readily converted"

Thus, the entire phrase "designed to be readily converted" means a magazine that, judged by its objective features, reveals that it is typically used in a way that is quickly, easily, and efficiently changed from accepting 15 rounds or fewer to more

than 15 rounds. Applied to specific ammunition magazines, this legal standard

easily distinguishes between those that are prohibited and those that are lawful:

- **Telescoping Magazine** (*see* Ex. C): An expandable magazine that with the depression of a single tab, telescopes to a larger-capacity configuration would be a "large capacity magazine" if the magazine accepted more than 15 rounds of ammunition in its telescoped state.[8]

- **20-Round AR-15 Magazine with Removable Limiter** (*see* Ex. E): A 20-round magazine with a removable limiter that temporarily prevents it from accepting more than 15 rounds is a "large capacity magazine." This is because the only reason to remove the limiter would be to increase the capacity of the magazine. Judged objectively, a removable limiter is designed to enable the magazine to be readily converted from a 15-round to a 20-round configuration.

- **30-Round AR-15 Magazine with Permanently-Affixed Limiter** (*see* Ex. F): A similar limiter that has been welded or epoxied to the frame of the 30-round magazine such that the limiter cannot be removed is not a "large capacity magazine." Not only is this magazine not "designed to be readily converted to accept more than 15 rounds of ammunition"; it has been "permanently altered" to comply with HB 1224.

- **Standard Box Magazine with Removable Baseplate** (*see* Ex. G): The type of magazine that Plaintiffs most fear would be rendered illegal by HB 1224 is a standard magazine with a removable base plate that accepts 15 or fewer rounds. These types of magazines are *not* large capacity magazines. The baseplates themselves do not enable the magazines to be

---

[8] The Governor is not aware of a magazine currently in production that telescopes from a less-than-15-round configuration to a greater-than-15-round configuration. HB 1224, however, was written to ensure that future innovations in the market could not easily circumvent the 15-round limit on ammunition magazines. *See Exotic Coins, Inc. v. Beacom,* 699 P.2d 930, 945 (Colo. 1985) (explaining that although statute must define criminal offense with sufficient definiteness to give fair warning of prohibited conduct, it must also be general enough to address problem under varied circumstances and during changing times). Experience in other states has shown that some retailers and purchasers will try to exploit any actual or perceived loophole in such regulations. *See* Ex. D (San Francisco City Attorney press release announcing lawsuit against importers of large-capacity magazine "repair" kits).

expanded, and they serve functions aside from expansion—notably, they allow the magazine to be cleaned and repaired.  To actually convert them to higher capacity, one must purchase additional equipment or permanently alter their operation mechanically.  Unless so altered, they are not prohibited.

- **Magazine coupler** (*see* Ex. H): A coupler that physically attaches two magazines together (an effect that could be accomplished just as easily with a few inches of duct tape), and "allows the user to attach two magazines together for more efficient speed reloads," would not create a single large-capacity magazine.  Because the second magazine must be inserted into the firearm separately—and only after the first magazine has been exhausted—this accessory does not convert two complying magazines into one non-compliant magazine.

Plaintiffs' baseless assumption that HB 1224 is broad enough to prohibit not just large-capacity magazines, but "82% of currently-manufactured *handguns*," Doc. 29 at 20 (emphasis added), illustrates how unreasonably they have interpreted the statute's language.[9]  *See Heller II*, 670 F.3d at 1262 ("[T]he prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves.").  First, many magazines are interchangeable and replaceable; it does not follow from the prohibition of a particular magazine that any firearm to which it may be attached is also prohibited.  The law may "contain ambiguities," but a "person of ordinary intelligence" still has a "reasonable opportunity to know what is prohibited," and

---

[9] Plaintiffs also unreasonably read the Technical Guidance.  They first claim that "a person may not be aware" that a particular feature of a magazine was designed to allow ready expansion.  *Id.* at 15.  Under the framework described above, a person of "ordinary intelligence" would be able to fairly distinguish between a magazine objectively "designed" for use with more than 15 rounds and one not so designed.  *Cf. Hoffman Estates*, 455 U.S. at 500–02.  Second, they claim that "[n]either the gun-owning public nor law enforcement have any means of discerning the designer's specific intent."  Doc 29 at 15.  As explained above, "the designer's specific intent" is irrelevant; the test turns on the objective features of a particular magazine.

the danger of "arbitrary and discriminatory enforcement" is minimized. *Hoffman Estates*, 455 U.S. at 498 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)); *see also Hejira Corp.*, 660 F.2d at 1367.  And in the unlikely event that the purported ambiguities remained after applying the rules of statutory construction, any danger that HB 1224 would lead to unpredictable and unjust convictions would be virtually eliminated by: 1) application of the affirmative defense in Colo. Rev. Stat. § 18-1-504(2)(c); 2) the availability of an as-applied challenge; or 3) as a last resort, application of the rule of lenity, which ensures that ambiguities in a criminal statute must be interpreted in favor of the defendant.  *See, e.g.*, *People v. Thoro Products Co.,* 70 P.3d 1188, 1198 (Colo. 2003).

> ### b) "Continuous Possession" is not vague in the vast majority of its applications, and Plaintiffs cannot prevail by rejecting common-sense interpretations of the term.

Plaintiffs similarly claim that because HB 1224 "provides absolutely no guidance as to what 'continuous possession' actually *does* mean, the phrase is unconstitutionally vague."  Doc. 29 at 18.  They again make little attempt to define the term, preferring it to be struck down rather than reasonably construed.  While they proffer several allegedly "reasonable, every-day interpretations," which would "not require [a large capacity magazine owner] to maintain literally continuous possession of the property" or to "physically possess the [magazine] at every moment of every day," Doc. 29 at 16–17 (citing Colo. Rev. Stat. §§ 39-26-102, -713(1)(a); *Martini v. Smith*, 18 P.3d 776, 781 (Colo. App. 2000)), Plaintiffs dismiss them out of hand,  This Court need not and should not do so.

There is nothing vague about the "continuous possession" requirement.  The chief definition of "possession" is "the fact of having or holding property in one's power; the exercise of dominion over property."  *Black's Law Dictionary* 1281 (9th ed. 2009).  "Continuous" simply means "uninterrupted in time, sequence, substance, or extent."  *Am. Heritage Dictionary* 310.

Applying these principles to avoid the horribles paraded by Plaintiffs has already been done.  The Technical Guidance creates a bright line rule—and a safe harbor until the meaning of the provision is definitively determined by Colorado courts—that offers substantial certainty to large-capacity magazine owners (and borrowers) who wish to comply with the law.  Under the guidance, if a person remains in the physical presence of the magazine, or ensures that the magazine is secured while the individual is absent, the "continuous possession" requirement is satisfied.  Merely holding or even firing bullets from another's magazine in that person's physical presence is not a transfer and does not break the owner's continuous possession.  Nor can there be any genuine confusion about use of grandfathered magazines by a spouse.  *See* Colo. Rev. Stat. 14-10-113 (defining "marital property" and providing that anything acquired during marriage other than inheritance or gift is property of both people in marriage); *see also* Colo. Rev. Stat. § 14-15-107(5)(a) (importing definition of "marital property" to civil unions).  The Governor, meanwhile, asks that the Court, faced with this broad-based constitutional challenge, follow the normal course: construe the law in a way that ensures it will be applied constitutionally.  The Court's role is not to strike down HB

1224 if there is a possibility that it can be interpreted to be consistent with the Constitution. *See People v. Longoria*, 862 P.2d 266, 270 (Colo. 1993) ("when reviewing a statute upon a challenge of unconstitutionality due to vagueness, the duty of the reviewing court is to construe the statute so as to uphold its constitutionality whenever a reasonable and practical construction may be applied to the statute"); *Stout*, 519 F.3d at 1121. Instead, when evaluating a statute that is subject to several interpretations, the Court must select the one that best harmonizes both legislative intent and constitutional requirements. *See People v. R.M.D.,* 829 P.2d 852, 853 (Colo. 1992).

The question at this stage is whether Plaintiffs have met their heavy burden to show that "continuous possession," in the vast majority of its applications, is so vague that it simply cannot be enforced. Plaintiffs have failed to do so. They are not entitled to a preliminary injunction striking down the "continuous possession" requirement of HB 1224 as unconstitutionally, and facially, vague.

> **2.    The Second Amendment does not prevent reasonable restrictions on the size of ammunition magazines.**

Plaintiffs' second argument is that three provisions of HB 1224— "designed to be readily converted," "continuous possession," and "transfer"—are so onerous that they will prevent gun owners from exercising their Second Amendment right to defend their homes. Again, Plaintiffs reach this conclusion by reading HB 1224 unreasonably, transparently seeking to invalidate the statute rather than to find ways to apply it in a constitutional manner. At least for the purposes of their motion, they do not challenge the statute otherwise.

### a)   HB 1224 does not "ban" small magazines.

The mere existence of a removable base plate does not change a less-than-16-round magazine into a "large-capacity" magazine.  As explained above, the term "designed to be readily converted" contemplates design features specifically intended to increase magazine capacity, not features that may exist for purposes such as maintenance.  Yet Plaintiffs insist that HB 1224 "outlaws or disables 82% of currently-manufactured handguns" because it prohibits "some or most magazines of 15 rounds or fewer."  Doc. 29 at 20.

If, like the law struck down in *Heller*, the intent and effect of HB 1224 were to absolutely *ban* a large majority of handguns and make them entirely unusable for self-defense, HB 1224 would likely violate the Second Amendment.[10]  *See Heller*, 554 U.S. at 628–29 ("The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family' would fail constitutional muster.") (internal citations and footnotes omitted).

---

[10] The Governor does not concede that regulation of ammunition magazines always triggers the Second Amendment, nor does he concede that HB 1224's narrow restrictions do so.  But he agrees that a state may not circumvent the Second Amendment by regulating magazines and ammunition in such a way as to make guns completely unusable for home defense.  *Cf. Ezell,* 651 F.3d at 711–13 (Rovner, J., concurring).

But no party to this lawsuit claims that HB 1224 could or will be applied in that manner.[11]  As already noted, because plentiful ammunition options exist for virtually every semi-automatic firearm, banning a certain magazine – or even, applying Plaintiffs' untenable approach, a large subset of what is commercially available – would come nowhere near rendering the firearm itself useless.  In any event, the Governor has repeatedly offered to stipulate to an injunction that would memorialize, and make judicially binding on him and his agents, a more reasonable interpretation of the law that would be available to individuals as an affirmative defense against any rogue prosecution.  This interpretation would allow individuals to purchase and possess a wide range of commercially-available magazines that accompany many firearms used for self-defense, including those at issue in *Heller*.

A facial challenge is not a license to indiscriminately strike down a statute duly passed by a state legislature and signed by a state's governor.  Nothing about HB 1224 suggests an intent on the part of the legislature to prevent the use of firearms for home and self defense.  Plaintiffs have failed to establish that HB 1224 "is incapable of valid application." *Dias*, 567 F.3d at 1179–80.  Their facial Second Amendment claim does not establish the likelihood of success necessary to justify a preliminary injunction.

---

[11] And indeed, Plaintiffs have not made any allegation that any law enforcement source anywhere believes the law should be so interpreted and applied.

    **b)**    **The "continuous possession" requirement and the prohibition on "transfers" of large-capacity magazines do not infringe the Second Amendment right of self-defense.**

Plaintiffs' Second Amendment challenge to the terms "continuous possession" and "transfer" in HB 1224 likewise fail to justify the extreme remedy of a preliminary injunction.  As an initial matter, Plaintiffs have not, at this stage, sought to enjoin the application of HB 1224 to magazines that are currently capable of accepting more than 15 rounds of ammunition.  On July 1, individuals will be unable to purchase, and the plaintiff dealers will be unable to sell, new magazines that accept over 15 rounds absent after-market alteration.  These preliminary proceedings, as framed by Plaintiffs, will not change that fact.

Plaintiffs have instead chosen to attack the grandfather clause of HB 1224, a provision that seeks to *accommodate* the use of large-capacity magazines for those who owned them before the law's effective date.  The General Assembly could have chosen to ban large capacity magazines entirely, as the District of Columbia did in a statute passed in the wake of the Supreme Court's decision in *Heller*.  That law prohibits, without any exceptions and without a grandfather clause, magazines that accept more than ten rounds of ammunition, D.C. Code § 7-2506.01, and as noted above, was recently upheld by the D.C. Circuit in *Heller II*.

Yet Plaintiffs claim that HB 1224, a much more modest statute, "ban[s] functional firearms in the home."  Doc. 29 at 23.  They allege a number of hypothetical situations that they claim would violate the "continuous possession" requirement and run afoul of HB 1224's prohibition on "transfers" of large capacity

magazines.  These, they say, illustrate a "widespread criminalization of the most innocuous and otherwise lawful transfers and uses of ordinary firearms and firearm magazines."  *Id.* at 23.

This is hyperbole.  Nothing in HB 1224 bans "functional firearms."  Those who own a firearm with a large-capacity magazine, and wish to transfer it to a friend or family member without triggering HB 1224 at all, may simply purchase a magazine that accepts 15 or fewer rounds.  Indeed, Plaintiffs may purchase as many 15-round magazines as they please, and transfer each of them to a friend or family member along with the firearm that goes with them.  Alternatively, Plaintiffs may "permanently alter" their large-capacity magazines to ensure they accept no more than 15 rounds of ammunition and then transfer them without restraint.  Plaintiffs do not allege that all of their firearms will not "function" with a 15-round magazine—nor could they credibly do so.  Plaintiffs cannot invalidate a statute simply because it attempts to *accommodate* their desire to own large-capacity magazines.  *Cf. Heller*, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution.  The Constitution leaves the District of Columbia a variety of tools for combating that problem . . . .") (emphasis added); *Heller II*, 670 F.3d at 1268 n.** ("[A] number of states and municipalities, representing over one fourth of the Nation's population, ban semi-automatic rifles or assault weapons, and these bans are by no means 'significantly narrower' than the District's ban.").

In any event, Plaintiffs again seek to invalidate HB 1224 rather than suggest an interpretation of it that would address their purported Second Amendment objections.  Even if the "continuous possession" requirement and the prohibition on "transfers" did amount to a "ban" on "functional firearms" under Plaintiffs' expansive reading, Plaintiffs fail to explain why a narrower reading would not save the statute.

## CONCLUSION

For the reasons stated and authorities cited above, the Defendant requests that this Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 24th day of June, 2013.


JOHN W. SUTHERS
Attorney General


*s/ Matthew D. Grove*
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Matthew D. Grove***
Assistant Attorney General
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on <u>June 24</u>, <u>2013</u> I served a true and complete copy of the foregoing GOVERNOR'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                                   david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com
Douglas Abbott                               DAbbott@hollandhart.com

Richard A. Westfall                          rwestfall@halewestfall.com
Peter J. Krumholz                            pkrumholz@halewestfall.com

Marc F. Colin                                   mcolin@bcjlpc.com

Anthony J. Fabian                           fabianlaw@qwestoffice.net


                                   <u>s/ Matthew D. Grove</u>

STATEMENT OF GOVERNOR JOHN W. HICKENLOOPER

ISSUED MARCH 20, 2013 UPON THE SIGNING OF HB13-1224

In signing HB13-1224, we acknowledge that some have expressed concerns about the vagueness of the law's definition of "large-capacity magazine." By its terms, the law does make illegal any magazine manufactured or purchased after July 1, 2013 that is capable of accepting, or is designed to be readily converted to accept, more that fifteen rounds of ammunition. Similar language is used in other states' statutes limiting large-capacity magazines. We know that magazine manufacturers have produced and sell magazines that comply with these other state laws that limit large-capacity magazines and we are aware of no successful legal challenges to those laws. And when a Colorado-based magazine manufacturer came to us to share their concerns about the vagueness of the definition of "large-capacity magazine" contained in the original version of the bill, we worked with the bill's sponsors to fine-tune the definition to make it more precise.

We also have heard concerns about the requirement in the law that a person who owns a large-capacity magazine prior to the law's enactment may legally possess that magazine only as long as he or she "maintains continuous possession" of it. We do not believe a reasonable interpretation of the law means that a person must maintain continuous "physical" possession of these items. Responsible maintenance and handling of magazines obviously contemplates that gun owners may allow others to physically hold and handle them under appropriate circumstances. We are confident that law enforcement and the courts will interpret the statute so as to effectuate the lawful use and care of these devises.

In considering the language of HB13-1224, we have consulted with the Office of the Attorney General and we concur with its advice that the large-capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the Fourteenth Amendment. We have signed HB13-1224 into law based on the understanding that it will be interpreted and applied narrowly and consistently with these important constitutional provisions.

To this end, today we are directing the Colorado Department of Public Safety to consult with the Office of the Attorney General and others, as necessary, with respect to the interpretation of HB13-1224's large-capacity magazine ban, and then to draft and issue, to law enforcement agencies in the State of Colorado, technical guidance on how the law should be interpreted and enforced. This work should be done by July 1, 2013, the law's effective date.

Exhibit A

380



John W. Suthers
Attorney General

Cynthia H. Coffman
Chief Deputy Attorney General

Daniel D. Domenico
Solicitor General

**STATE OF COLORADO
DEPARTMENT OF LAW**

Office of the Attorney General

Ralph L. Carr
Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

May 16, 2013

Colorado Department of Public Safety
Executive Director James H. Davis
700 Kipling Street, 3rd Floor
Denver CO 80215

RE:     Technical Guidance on the Interpretation and Application of House Bill 13-
1224, Large-Capacity Magazine Ban

Dear Executive Director Davis:

House Bill 13-1224, which was passed during this year's legislative session and
becomes effective July 1, 2013, prohibits the sale, transfer, and possession of "large-
capacity ammunition magazines." On March 20, 2013, in a statement issued at the
time he signed HB 13-1224 into law, Governor Hickenlooper instructed "the
Colorado Department of Public Safety to consult with the Office of the Attorney
General and others, as necessary . . . and then to draft and issue, to law
enforcement agencies in the State of Colorado, technical guidance on how the law
should be interpreted and enforced."

This letter sets forth the technical guidance requested by the Governor.

### Introduction

This technical guidance, issued at the request of the Governor, is meant to assist
Colorado law enforcement agencies in understanding and applying portions of
House Bill 13-1224, which regulates the sale, transfer, and possession of "large
capacity magazines." Although this guidance is not binding on the courts, it is based
upon existing legal principles and represents a fair and accurate reading of the
legislation.

### Definition of "Large Capacity Magazine"

Under House Bill 1224, the term "large capacity magazine" is defined, in part, as
follows: "a fixed or detachable magazine, box, drum, feed strip, or similar device
capable of accepting, or that is designed to be readily converted to accept, more than
fifteen rounds of ammunition."

Page 2

The phrase "designed to be readily converted to accept more than fifteen rounds of ammunition" has prompted questions regarding the scope of the definition, particularly because some ammunition magazines include features, such as removable baseplates, that can be removed and replaced, or otherwise altered, so that the magazine accepts more than fifteen rounds.

The term "designed," when used as a modifier, denotes a feature that meets a specific function. This suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition. The features of a magazine must be judged objectively to determine whether they were "designed to be readily converted to accept more than fifteen rounds."

Under this reading of the definition, a magazine that accepts fifteen or fewer rounds is not a "large capacity magazine" simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds. On many magazines, that design feature is included specifically to permit cleaning and maintenance. Of course, a magazine whose baseplate is replaced with one that does, in fact, allow the magazine to accept more than fifteen rounds would be a "large capacity magazine" under House Bill 1224.

### "Possession" of Large-Capacity Magazines and Application of the Grandfather Clause of House Bill 1224

House Bill 1224 also places limitations on when and how a large-capacity magazine may be sold, transferred, or possessed. In particular, the bill's grandfather clause permits possession of a large-capacity magazine on or after July 1, 2013 by an individual who "owns" such a magazine on that date and "maintains continuous possession" of it thereafter. However, the bill prohibits the owner of a large-capacity magazine from selling or transferring it after July 1, 2013, and also prohibits an individual who as of July 1 did not own and since then has not continuously possessed a particular large-capacity magazine to possess it after July 1, 2013.

Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that these provisions cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law. For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned. Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine

Page 3

so long as he or she remains in the owner's physical presence. However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.

For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. Proper storage of a large-capacity magazine, such as in a gun safe in the owner's home or in a secure carrying case in the trunk of an automobile, is entirely consistent with the bill's intent of limiting the acquisition and permanent transfer of large-capacity magazines after the effective date of July 1, 2013.

Sincerely,

JOHN W. SUTHERS
Colorado Attorney General

cc:     Governor John Hickenlooper
        Jack Finlaw, Chief Legal Counsel to Governor Hickenlooper



 SEARCH FOR A PRODUCT  >

MAGAZINES   CAPACITY LAWS   ABOUT   CUSTOMER SERVICE   DEALER INQUIRIES   CONTACT



# AR-180 - 30/45

## $29.95

**Shipping:**
Calculated at checkout

**Quantity:**

[  1    ‡ ]

[ ADD TO CART 🛒 ]    **Add to wishlist**



PRODUCT DESCRIPTION

30 round black Zytel Nylon magazine expanding to Optional 45 capacity for AR-180

FIND SIMILAR PRODUCTS BY CATEGORY

PRODUCT REVIEWS

CUSTOMERS WHO VIEWED THIS PRODUCT ALSO VIEWED









AR-180 - 30          AR-15/M-16 - 30-MAGAZINE          SC/10/223          MC-SC-M-16/AR15

Exhibit C   384

+You    Search    Images    Maps    Play    YouTube    News    Gmail    Drive    Calendar    More

dcblake966@gmail.com

Patents

Find prior art    Discuss this patent    View PDF    Download PDF

# Telescoping magazine
## US 4472900 A

### ABSTRACT

A telescoping magazine for holding and feeding cartridges to a firearm. The magazine has a fixed portion which itself comprises a firearm-engaging section and a skirt. The firearm-engaging section and the skirt are each provided with a plurality of ribs for holding two parallel offset rows of cartridges. A slide slides within the skirt and comprises slots adapted to receive ribs of the skirt. The magazine also has a follower biased by a spring.

| | |
|---|---|
| **Publication number** | US4472900 A |
| **Publication type** | Grant |
| **Application number** | 06/452,400 |
| **Publication date** | Sep 25, 1984 |
| **Filing date** | Dec 22, 1982 |
| **Priority date** | Dec 22, 1982 |
| **Inventors** | William J. Howard |
| **Original Assignee** | Howard; William J |

Patent Citations (10), Referenced by (19), Classifications (8)

**External Links:** USPTO, USPTO Assignment, Espacenet

### IMAGES



### DESCRIPTION

Referring now to the drawings in general and in particular to FIG. 1, there is shown a telescoping magazine 10 comprising a fixed portion 12 and a slide 14. The fixed portion 12 comprises a firearm-engaging section 16 attached to a skirt 18.

Referring now to FIG. 3, there is shown a cutaway view of the fixed portion 12 comprising its firearm-engaging section 16 and its skirt 18. Within the fixed portion 12 is shown a single representative cartridge 20. The cartridge 20 comprises a projectile 21 crimped into a neck 22. The neck 22 is connected to a shoulder 23 which, in turn, is connected to the body 24. The body 24 terminates in a base 25 having an extractor recess 26 and a rim 27. The cartridges, such as the representative cartridge 20, are stacked in the magazine in two parallel offset rows (see FIG. 6. See FIG. 4 of Ardolino.). The two rows are parallel to each other because the planes defined by the center lines of the respective cartridges are parallel. The two rows are offset because the cartridges in one row seek to rest in the space between adjacent cartridges of the adjacent row.

The firearm-engaging section 16 is provided with three pairs of ribs, only one rib of each pair being visible in FIG. 3. The rear pair of ribs, of which the rib 30 is one, contacts the adjacent row of cartridges on the body 24 of the cartridge 20 near its base 25. The intermediate pair of ribs, such as the rib 32, contacts the adjacent row of cartridges, such as the cartridge 20, on the body 24 of the cartridge 20 midway between the base 25 and the neck 22. The front pair of ribs, such as the

### CLAIMS

I claim:

1. A telescoping magazine for holding and feeding cartridges to a firearm; said magazine comprising:

2. The magazine of claim 1 wherein the skirt is equipped with a pair of front ribs and a pair of rear ribs.

3. The magazine of claim 1 wherein the slide is equipped with a tongue terminating in a lug adapted to fit into a lower hole in the skirt thus preventing the spring from forcing the slide from the skirt.

4. The magazine of claim 1 wherein the slide is equipped with a tongue terminating in a lug adapted to fit into an upper hole in the skirt in order to provide maximum compression of the spring.

5. The magazine of claim 1 having a length sufficient to hold thirty cartridges with the slide pushed in.

6. The magazine of claim 1 having a length sufficient to hold forty-five cartridges with the slide extended.

7. The magazine of claim 1 wherein the spring is a coil spring wherein the coil is rectangular in form.

8. The magazine of claim 1 wherein the spring is made of wire having a

Exhibit C

385

rib 34, contacts the adjacent row of cartridges, such as the cartridge 20, on the neck 22 of each cartridge.

The firearm-engaging section 16 of the fixed portion 12 of the magazine 10 is fixedly attached to a skirt 18. The skirt 18 has a rear pair of ribs, such as the rib 36, the rib 36 is substantially colinear with the rib 30. The pair of ribs 36,37 (see FIG. 6) contact the parallel offset row of cartridges on the body of each cartridge in the adjacent row in a manner similar to the function performed by the rib 30.

The skirt 18 is also equipped with a front pair of ribs 38,39 (see FIG. 6). The front pair of ribs 38,39 contact the parallel offset row of cartridges on the neck of each cartridge in the adjacent row in a manner similar to the ribs, such as the rib 34. The rib 38 is substantially colinear with the rib 34. The front wall 40 and the rear wall 42 are curved, such that adjacent cartridges are in contact with one another throughout the length of their bodies. The skirt 18 is provided with an upper lug-receiving hole 44 and a lower lug-receiving hole 46, the purpose and function of which is more completely described below. The lug-receiving hole 46 is near the lower extremity 48 of the skirt 18. The external surface of the skirt 18 is equipped with a plurality of circumferential bands, such as the bands 50,51,52,53. The bands 50,51,52,53 provide reinforcement for the skirt 18 and also provide a slip-resistant hand grip.

Referring now to FIGS. 4 and 5, there is shown the slide 14 useful in the magazine 10 of the present invention. The slide 14 is provided with a pair of rear slots, such as the slot 56, defined by parallel juxtaposed walls 58,60. The slot 56 has a width slightly greater than the rib 37 (see FIG. 6) and is adapted to slidingly receive the rib 37.

The slide 14 is also equipped with a pair of front slots, such as the slot 62. The slot 62 is defined by the walls 64,66. The width of the slot 62 is slightly larger than the width of the rib 39 (see FIG. 6) and is adapted to slidingly receive the rib 39.

The slide 14 is also equipped with a tongue 68 terminating in a lug 70. The lug 70 is adapted to fit into the lug-receiving holes 44,46 in the skirt 18 (see FIG. 3). The tongue 68 is outwardly biased to cause the lug 70 to engage either the hole 46 or the hole 44. When the lug 70 is engaged in the hole 46, the spring 84 is prevented from forcing the slide 14 from the skirt 18. Maximum compression of the spring 84 is provided by engaging the lug 70 in the hole 44. The slide 14 is also fitted with a spring-resisting bottom 72.

Referring now to FIG. 7, it can be seen that the slide 14 is equipped with a rear pair of ribs 74,76. The distance between the ribs 74,76 is equal to the distance between the ribs 36,37 of the skirt 18 (see FIG. 6). The slide 14 is also equipped with a front pair of ribs 78,80. The rib 80 is adjacent to the front slot 62. The distance between the ribs 78,80 is substantially equal to the distance between the ribs 38,39 (see FIG. 6).

Additionally, the slide 14 is equipped with an intermediate pair of ribs 86,88. This intermediate pair of ribs 86,88 contacts the adjacent row of cartridges, such as cartridge 20, on the body 24 of the cartridge 20 midway between the base 25 and the neck 22.

A rectangular coil spring (not shown in any of FIGS. 4, 5, 6, or 7) rests on the bottom 72 of the slide 14 and extends within the slide 14 between the ribs 74,76 and between the ribs 78,80 and is connected on its lower end to a follower 82 (see FIG. 3). Preferred structure for the follower is shown in Howard et al, U.S. Pat. No. 4,139,959. The structure of the follower there shown is ideally suited for the follower 82 of the present invention. The follower 82 is urged toward the cartridge 20 by the spring 84. The follower 82 is adapted to receive upward pressure from below caused by the spring 84. The spring 84 rests on the bottom 72 of the slide 14 and biases the follower 82 toward the cartridge 20 and the firearm (not shown). In the magazine 10 of the present invention, the spring 84 is prevented from snaking by contact of the spring 84 with the ribs 30, 32, 34, 36, 37, 38, 39, 74, 76, 78 and 80.

The telescoping magazine 10 of the present invention can be constructed of metal, plastic, or other material, but is preferably constructed of plastic. A wide variety of plastics can be employed if they have the proper physical properties of strength, resilience, and toughness. Plastics such as polyesters, polyamides and polyolefins are potential candidates. The preferred material is a fiber-filled nylon sold by the Dupont Chemical Company under the tradename ZYTEL. In a preferred embodiment of the present invention, the fixed portion 12 comprising the firearm engaging portion 16 and the skirt 18 are formed from a

circular cross-section

9. The magazine of claim 1 wherein the spring contacts the ribs of the skirt and is prevented from snaking by contact therewith

10. The magazine of claim 1 wherein the external surface of the skirt is equipped with a plurality of circumferential bands which provide reinforcement for the skirt and also provide a slip-resistant hand grip

11. The magazine of claim 1 wherein the skirt and slide are curved such that adjacent cartridges are in contact with one another throughout the length of their bases

12. The magazine of claim 1 wherein the fixed portion, the slide and the follower are all constructed of thermoplastic

13. The magazine of claim 1 wherein the fixed portion comprising the firearm engaging portion and the skirt are formed from a single injection-molded piece of thermoplastic

14. A telescoping magazine for holding and for serially feeding forty-five cartridges to a firearm

Exhibit C

386

single, injection-molded piece of thermoplastic.

To assemble the telescoping magazine 10 of the present invention, the spring 84 is attached to the follower 82 whereupon the spring 84 and the follower 82 are placed within the fixed portion 12 of the magazine 10 as shown in FIG. 3. The slide 14 is inserted into the bottom of the skirt 18 until the lug 70 catches on the hole 46 whereupon the magazine 10 has the appearance shown in FIG. 1. To disassemble the magazine 10, the lug 70 is forced from the hole 46 whereupon pressure exerted by the spring 84 on the bottom 72 of the slide 14 causes the slide 14 to be pushed from the skirt 18.

Magazine 10 of the present invention is loaded in a conventional manner by serially forcing cartridges, such as the cartridge 20, into the top of the firearm-engaging section 16. The first cartridge contacts the follower 82 whereupon subsequent cartridges align themselves in two parallel offset rows as is well known in the art. The telescoping magazine 10 of the present invention can be loaded with as many as thirty cartridges and stored for indefinite periods of time without weakening the spring 84 as long as the slide 14 is extended as shown in FIG. 1. When the magazine 10 contains less than about thirty cartridges, the slide 14 can be pushed fully in as shown in FIG. 2. In this configuration, the lug 70 seats itself in the hole 44 maintaining compression on the spring 84. The telescoping magazine 10 of the present invention can be employed in the configuration shown in FIG. 2 if the marksman is carrying the firearm in confined locations, if the spring 84 is weak or for any other reason. On the other hand, the magazine 10 of the present invention, with the slide 14 extended as shown in FIG. 1, can hold as many as forty-five cartridges and will feed them rapidly and reliably to the firearm.

Although the invention has been described in considerable detail with reference to a preferred embodiment thereof, it will be apparent to those skilled in the art that the present invention can be modified without departing from the spirit and scope of the invention as described above and as defined in the appended claims.

Additional objects and advantages of the present invention will be apparent to those of ordinary skill in the art by reference to the following detailed description and drawings wherein:

FIG. 1 is a side view of a telescoping magazine of the present invention with its slide extended; and

FIG. 2 is a side view of a telescoping magazine of the present invention with its slide in the uppermost position; and

FIG. 3 is a sectional view of the fixed portion of a telescoping magazine of the present invention; and

FIG. 4 is an end view of a slide to be used with the telescoping magazine of the present invention; and

FIG. 5 is a side view of the slide of FIG. 4; and

FIG. 6 is an enlarged sectional view taken along Line 6–6 of FIG. 3; and

FIG. 7 is a sectional view taken along Line 7-7 of FIG. 5; and

FIG. 8 is a sectional view of the spring useful in the present invention which sectional view is taken along Line 8–8 of FIG. 3.

Telescoping magazines for holding and feeding cartridges to a firearm are well known. The telescoping magazines generally comprise a container for two parallel offset rows of cartridges. The lowermost cartridge rests on a follower which is urged toward the firearm by a spring. Many attempts have been made to provide magazines that can be stored loaded with cartridges. See, for example, Ardolino, U.S. Pat. No. 3,443,334. However, such prior attempts suffer from a number of disadvantages. One disadvantage is that the spring weakens in storage. This weakening of the spring causes subsequent unreliable feeding of the cartridges from the magazine to the firearm. To overcome this disadvantage, modification in the structure and form of springs has been suggested. See Musgrave, U.S. Pat. No. 3,964,199. However, the springs of Musgrave are expensive and ineffective. They are ineffective because it requires as much as fifteen pounds of pressure to compress the spring. It is difficult or impossible to apply this pressure with the human hand alone.

Another problem in prior telescoping magazines is the tendency of the spring to depart from a straight line. This departure from a straight line is sometimes referred to as "snaking". Snaking of the spring causes uneven pressure on the cartridges and results in unreliable feeding of the cartridges from the magazine to the firearm.

Another problem is that prior magazines in general contain only twenty or at most twenty-five cartridges.

Accordingly, it is an object of the present invention to provide an improved telescoping magazine substantially free of one or more of the disadvantages of prior telescoping magazines.

Another object is to provide a telescoping magazine wherein the spring does not weaken on storage even when the magazine

Exhibit C
387

is stored with cartridges loaded in the magazine.

Another object is to provide a telescoping magazine which can employ an inexpensive coil spring.

Still another object of the present invention is to provide an improved telescoping magazine which requires far less than fifteen pounds of pressure to load cartridges into the magazine.

Still another object of the present invention is to provide an improved telescoping magazine free of spring snaking.

Still another object of the present invention is to provide an improved telescoping magazine capable of holding and reliably feeding forty-five cartridges.

## PATENT CITATIONS

| Cited Patent | Filing date | Publication date | Applicant | Title |
|---|---|---|---|---|
| US1044983 * | Feb 20, 1912 | Nov 19, 1912 | Milton W. H. Brown | Box-magazine for firearms |
| US3440751 * | Jun 30, 1967 | Apr 29, 1969 | Colt'S Inc | Firearm box magazine with straight end and intermediate arcuate portions |
| US3443334 * | Aug 28, 1967 | May 13, 1969 | Edward J. Ardolino | Cartridge magazine with a spring whose force against the cartridge may be selectively increased |
| US3453762 * | Jun 19, 1967 | Jul 8, 1969 | Colt'S Inc. | Disposable magazine having a protective cover and follower retaining means |
| US3603020 * | Mar 27, 1970 | Sep 7, 1971 | Army Usa | Magazine assembly with expendable cartridge container unit |
| US3619929 * | Mar 13, 1969 | Nov 16, 1971 | Colt'S Inc. | Magazine with anti-double-feed indentations in the side walls |
| US3726038 * | Oct 12, 1971 | Apr 10, 1973 | D Us Bredbury | Rectilinear magazine |
| US3964199 * | Jun 2, 1975 | Jun 22, 1976 | Musgrave; Daniel D. | Adjustable spring assembly |
| US4139959 * | May 13, 1977 | Feb 20, 1979 | Harvey; William A. | Cartridge magazine |
| DE747658C * | Feb 8, 1942 | Oct 9, 1944 | | Patronenmagazin fuer Schusswaffen, bestehend aus zwei teleskopisch ineinander verschiebbaren Gehaeuseteilen |

* Cited by examiner

## REFERENCED BY

| Citing Patent | Filing date | Publication date | Applicant | Title |
|---|---|---|---|---|
| US4777752 * | Jun 9, 1987 | Oct 18, 1988 | Howard; William J. | Blank magazine |
| US4831761 * | Jun 9, 1988 | May 23, 1989 | Kulakow, Eric M | Gun magazine and spring assembly |
| US4888900 * | Mar 9, 1988 | Dec 26, 1989 | Howard; William J. | Magazine |
| US4901463 * | Oct 29, 1987 | Feb 20, 1990 | Chesnut; M. Gaines | Cartridge magazine having a single piece magazine head |
| US5113605 * | Jul 13, 1990 | May 19, 1992 | Dae Sam Co., Ltd. | Length-variable magazine |
| US5149897 * | Dec 6, 1991 | Sep 22, 1992 | Howard; William J | See-through magazine |
| US7497044 * | Jan 11, 2006 | Mar 3, 2009 | Cammenga Corporation | Firearm magazine |
| US7533483 * | Jun 21, 2005 | May 19, 2009 | The United States Of America As Represented By The Secretary Of The Army | Composite magazine for chambering ammunition in a firearm |
| US7621063 * | Feb 9, 2006 | Nov 24, 2009 | Magpul Industries Corp. | Self-leveling follower for ammunition magazine |
| US7806293 * | Jun 30, 2009 | Oct 5, 2010 | Altieri Daniel P | Shotgun shell storing and dispensing device |
| US8225541 * | Jan 12, 2010 | Jul 24, 2012 | Okay Industries, Inc | Magazine for a firearm |
| US20110167694 * | Jan 12, 2010 | Jul 14, 2011 | Okay Industries, Inc. | Magazine for a firearm |
| DE19706778A1 * | Feb 20, 1997 | Nov 6, 1997 | Arthur North Miami Beach Fla. Us Vanmoor | Magazine for firearm |
| DE19706778C2 * | Feb 20, 1997 | Aug 29, 2002 | Arthur Vanmoor | Magazinanordnung für Schußwaffen |
| EP0253230A2 * | Jul 3, 1987 | Jan 20, 1988 | William J. Howard | Magazine charger |

Exhibit C

388

| EP0937666A1 | Feb 15, 1999 | Aug 25, 1999 | G.D Societa' Per Azioni | Transmission for product transfer unit |
| WO1988010404A1 * | Jun 24, 1988 | Dec 29, 1988 | Anthony Charles Blackshaw | Magazine assembly for firearm |
| WO1992012393A1 * | Jan 9, 1991 | Jul 23, 1992 | Robert D. Switzer | Cartridge clip |
| WO2007081354A2 * | Feb 17, 2006 | Jul 19, 2007 | Robert M. Austin | Firearm magazine |
| * Cited by examiner | | | | |

## CLASSIFICATIONS

| | |
| --- | --- |
| U.S. Classification | 42/50 |
| International Classification | F41A9/00, F41A9/69, F41A9/65 |
| Cooperative Classification | F41A9/69, F41A9/65 |
| European Classification | F41A9/69, F41A9/65 |

Exhibit C

389



## City Attorney Dennis Herrera News Release

For Immediate Release:
June 10, 2013
Contact: Matt Dorsey
(415) 554-4662

# Herrera sues over high-capacity ammo gun 'repair kits' intended to skirt California law

*Three gun accessories companies, gun show promoter named in suit for attempting 'clever end-run' by selling disassembled but fully functional high-capacity magazines*

SAN FRANCISCO (June 10, 2013)—City Attorney Dennis Herrera today filed suit against three gun accessories companies and a gun show promoter for selling disassembled high-capacity magazines in California in violation of a state law that prohibits the sale, manufacture, or import of gun ammunition feeding devices that accept more than 10 rounds.  Ostensibly marketed as gun magazine "repair kits" in a barely-disguised attempt to skirt a 14-year-old California gun safety law, the disassembled equipment is intended for easy reassembly by purchasers into complete, fully functional high-capacity magazines that dramatically enhance the lethality of otherwise lawful firearms.

High-capacity magazines, which are designed to allow shooters to fire multiple rounds without stopping to reload, are a favored gun accessory among mass murderers who have relied on the devices' destructive firepower to perpetrate such high-profile massacres as those at Virginia Tech University in 2007, which resulted in 32 deaths; at an Aurora, Colo. movie theater in 2012, which killed 12 people; and at a Newtown, Conn. elementary school last December, which claimed the lives of 20 children and six adult staff members.  Herrera's civil complaint filed in San Francisco Superior Court this morning alleges that three online gun equipment distributors and one prominent gun show organizer knowingly aid and abet illegal conduct in the state by marketing "California only" disassembled magazine parts, which at least one defendant wrongly represents as "100% legal."

"The gun businesses we've sued today think they've devised a clever end-run around California law by selling fully functional high-capacity magazines that have simply been disassembled into a few easily-reassembled parts," said Herrera.  "Our litigation intends to prove otherwise.  California lawmakers enacted smart gun safety precautions to prohibit devices that serve no sporting

[MORE]

Exhibit D

390

**City Attorney Dennis Herrera—Page 2**

purpose, and are clearly inappropriate for non-military uses.  Our common sense laws balance public safety imperatives with the constitutional rights of responsible gun owners, and they deserve to be aggressively enforced."

The State of California enacted its prohibition on the sale, manufacture, or import of large-capacity magazines in 1999, declaring the devices to be public nuisances.  Lawmakers at the time expressly grandfathered owners of large-capacity magazines possessed before the prohibition took effect on Jan. 1, 2000, allowing for the lawful repair and maintenance of magazines by licensed dealers and gunsmiths.  According to Herrera's complaint filed in San Francisco Superior Court this morning, the defendants' marketing makes clear that their sales of disassembled but brand new magazine parts is an effort to evade California law, wrongly informing consumers in some cases that their products are "100% legal repair/rebuild kits."

Online vendors named as defendants in Herrera's civil action are: Harbor, Ore.-based 44Mag Distributing LLC, which operates www.44mag.com; Dallas, Texas-based Exile Machine, LLC, which operates www.exilemachine.com; and Pitsburg, Ohio-based Copes Distributing, Inc., which operates www.copesdistributing.com.  Herrera also sued Kaysville, Utah-based B & L Productions, Inc., which hosts gun shows throughout California as "Crossroads of the West Gun Show," including at the Cow Palace in Daly City, Calif., where large-capacity magazine "repair kits" are typically available for purchase.

Herrera's lawsuit was investigated and filed by his office's Consumer Protection Unit, which pursues civil actions under California's Unfair Competition Law to protect consumers and law-abiding competing businesses from unlawful, unfair, and fraudulent business practices.  The unit's actions are funded by civil recoveries under the provisions of Proposition 64, which California voters enacted in 2004 to direct monetary penalties recovered by government prosecutors to the enforcement of consumer protection laws.  If successful, Herrera's action could result in a court-ordered injunction to immediately prohibit further unlawful conduct by the companies, together with civil penalties of up to $2,500 for each act of unfair competition and legal costs.

The case is: *People of the State of California v. 44MAG Distributing LLC et al.*, San Francisco Superior Court, No. CGC-13-531982, filed June 10, 2013.  A PDF copy of the complaint and accompanying exhibits is available on the S.F. City Attorney's website at http://www.sfcityattorney.org/.

# # #

Exhibit D

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  OWEN J. CLEMENTS, State Bar #141805
   Chief of Complex & Special Litigation
3  KRISTINE POPLAWSKI, State Bar #160758
   CHRISTINE VAN AKEN, State Bar #241755
4  Deputy City Attorneys
   1390 Market Street, 7th Fl.
5  San Francisco, California 94102-5408
   Telephone:    (415) 554-3878
6  Facsimile:    (415) 554-3985
   E-Mail:      kristine.poplawski@sfgov.org
7  E-Mail:      christine.van.aken@sfgov.org

8
   Attorneys for Plaintiff
9  THE PEOPLE OF THE STATE OF CALIFORNIA
   Ex rel. San Francisco City Attorney Dennis J. Herrera
10

11
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
12
                         COUNTY OF SAN FRANCISCO
13
                         UNLIMITED JURISDICTION
14

15  THE PEOPLE OF THE STATE OF          Case No. **CGC - 13 - 531982**
    CALIFORNIA, ex rel. San Francisco City
16  Attorney Dennis J. Herrera,          **COMPLAINT FOR INJUNCTIVE RELIEF
                                         AND CIVIL PENALTIES FOR VIOLATIONS
17          Plaintiff,                   OF BUSINESS AND PROFESSIONS CODE
                                         SECTIONS 17200 AND 17500**
18          vs.

19  44MAG DISTRIBUTING LLC d/b/a
    44MAG.COM, an Oregon limited liability
20  company; EXILE MACHINE, LLC, d/b/a
    EXILEMACHINE.COM, a Texas limited
21  liability company; COPES DISTRIBUTING,
    INC., an Ohio corporation; and B & L
22  PRODUCTIONS, INC., a Utah corporation,
    d/b/a CROSSROADS OF THE WEST GUN
23  SHOWS, and DOES 1 through 50, inclusive.

24          Defendants.

25

26

27

28

ENDORSED
FILED
San Francisco County Superior Court

JUN 10 2013

CLERK OF THE COURT
By: _____ KEITH D. TOM
                    Deputy Clerk

Plaintiff, the People of the State of California, acting by and through San Francisco City Attorney Dennis Herrera, is informed and believes and alleges as follows:

## INTRODUCTION

1.  In California, it is unlawful to sell, manufacture, or import a magazine that accepts more than 10 rounds of ammunition.  And for good reason.  These devices, known as large-capacity magazines, multiply the destructive power of firearms by allowing a shooter to fire many rounds without stopping to reload.  They have been used in many recent, high-profile mass shootings, such as the 2007 Virginia Tech shooting, which killed 32 people; the 2012 Aurora, Colorado shooting, which killed 12 people; and the 2012 Newtown, Connecticut shooting, where 20 children were killed alongside several of their teachers.  Indeed, a researcher investigating the 1994 federal ban on large-capacity magazines and assault weapons determined that attacks with semiautomatics equipped with large-capacity magazines resulted in more shots fired, more persons hit, and more wounds inflicted per victim than attacks with other firearms.

2.  Because these devices are so lethal, the State of California enacted its prohibition on the sale, manufacture, or import of large-capacity magazines in 1999, and indeed it declared them to be public nuisances.  In an effort to balance the state's public safety needs against the interests of gun owners, however, California did not prohibit the continued possession of large-capacity magazines by people who owned them before the sale/manufacture/import prohibition took effect on January 1, 2000.  California also made express provision for these grandfathered owners of pre-ban large-capacity magazines to repair their magazines by taking them to licensed dealers and gunsmiths for upkeep and repair.  But these grandfathered owners, and all other residents of the state who are not law enforcement officers or otherwise exempt, are not permitted to acquire new large-capacity magazines.

3.  Each of the Defendants in this case has flouted California's public safety mandate for its own profit.  Defendants 44Mag, Exile Machine, and Copes ("Online Defendants") all ship brand-new large-capacity magazines to customers throughout California in the guise of "repair kits."  These "repair kits" are not individual magazine parts to replace, say, a worn-out spring or a cracked baseplate in a lawfully possessed magazine.  Instead they are *disassembled large-capacity magazines* that are readily reassembled by purchasers into brand-new, fully functional large-capacity magazines.  The

1  Online Defendants are or should be fully aware that assembling new large-capacity magazines is

2  precisely the purpose for which all or the overwhelming majority of their customers purchase them.

3  And that is precisely how the Online Defendants market them: as new magazines that can readily be

4  assembled.  The fact that the Online Defendants intend for Californians to use their products not to

5  repair lawfully owned magazines but instead to assemble new magazines is apparent from the fact that

6  the Online Defendants target sales of these "repair kits" only to residents of states that restrict or ban

7  large-capacity magazines, including specifically California.  The Online Defendants do not promote

8  the sale of these "repair kits" to residents of states that do not restrict the capacity of firearms

9  magazines—demonstrating that their true purpose is not to sell repair kits but to subvert and

10  circumvent California law.  By their unlawful and unfair conduct, they profit at the expense of public

11  safety in California.

12       4.       Defendant Crossroads of the West operates gun shows in California—including at the

13  Cow Palace, which is in San Francisco's backyard.  At these gun shows, with the knowledge,

14  authorization, and encouragement of Crossroads of the West, retailers import into California and sell

15  disassembled large-capacity magazines, also on the pretense that they are "repair kits."  Crossroads of

16  the West, too, knowingly profits from this unlawful arms trade.

17       5.       These are unlawful and/or unfair and fraudulent business practices that compromise

18  California's public safety objectives, make a mockery of the State's laws, and knowingly or

19  intentionally aid and abet the unlawful purchase, importation and/or manufacture of large-capacity

20  magazines by California residents.  This Court should enter an injunction to stop these practices and

21  should order the Defendants to pay civil penalties for their past acts of unfair competition.

22                              **PARTIES**

23       6.       Plaintiff the People of the State of California, by and through San Francisco City

24  Attorney Dennis J. Herrera ("People"), prosecutes this action pursuant to Business and Professions

25  Code §§ 17200 and 17500.

26       7.       Defendant 44Mag Distributing LLC, d/b/a 44mag.com ("44Mag"), is an Oregon

27  limited-liability company with its principal offices at 18709 Ranch Road in Harbor, Oregon.  44Mag

28  operates a website that sells wholesale rifle and pistol magazines over the internet and is doing

PEOPLE v. 44MAG DISTRIB'G. LLC, ET AL.     COMPLAINT                    n:\cpu\li2013\131020\00852044

Exhibit D     394

business in California.  In particular, 44Mag targets California customers to sell them large-capacity

magazine "repair kits."  See Exhibit A hereto (44Mag.com webpage,

http://www.44mag.com/product/california_large_capacity_magazine_repair_parts_kits/s, last visited

June 7, 2013), which is incorporated herein by reference.  44Mag's internet site advertising these

wares is accessible in San Francisco, and 44Mag has sold or intends to sell its "repair kits" to San

Francisco consumers.

       8.    Defendant Exile Machine, LLC, d/b/a exilemachine.com ("Exile Machine") is a Texas

limited-liability company with its principal offices in Dallas, Texas.  Exile Machine operates a website

which sells firearms accessories and is doing business in California.  In particular, Exile Machine

targets California customers to sell them large-capacity magazine "repair kits," and also offers, for a

fee, to disassemble and ship to California residents as repair/rebuild kits those large-capacity

magazines that California customers have purchased from another source which refuses to disassemble

the magazine or ship it to California.  See Exhibits B-1 (Exile Machine webpage,

https://www.exilemachine.net/shop/pages/we-ship-to-ca-9.html, last visited June 7, 2013) and B-2

(Exile Machine webpage, https://www.exilemachine.net/shop/ca-magazine-disassembly-service-

508.html, last visited June 7, 2013) hereto, which are incorporated herein by reference. Exile

Machine's internet site advertising these wares is accessible in San Francisco, and Exile Machine has

sold or intends to sell its "repair kits" and its magazine disassembly service to San Francisco

consumers.

       9.    Defendant Copes Distributing, Inc. ("Copes") is an Ohio corporation with its principal

offices in Pitsburg, Ohio.  Copes operates a website which sells firearms and firearms-related products

and is doing business in California. In particular, Copes targets California customers to sell them

large-capacity magazine "repair kits."  See Exhibit C hereto (Copes webpage at:

http://www.copesdistributing.com/bcalifornia-magazine-repair-p-2488.html, last visited June 7, 2013),

which is incorporated herein by reference.  Copes' internet site advertising these wares is accessible in

San Francisco, and Copes has sold or intends to sell its "repair kits" to San Francisco consumers.

       10.    Defendant B & L Productions, Inc. is a Utah corporation, doing business as Crossroads

of the West Gun Show ("Crossroads"), with its principal place of business in Kaysville, Utah.

PEOPLE v. 44MAG DISTRIB'G. LLC, ET AL.      COMPLAINT                n:\cpu\li2013\131020\00852044

Exhibit D   395

1   Crossroads hosts gun shows regularly in California and is doing business in California.  Upon

2   information and belief, San Francisco consumers have purchased large-capacity magazine "repair kits"

3   from vendors at Crossroads gun shows, particularly those occurring at the Cow Palace in Daly City,

4   and large-capacity magazine "repair kits" purchased from Crossroads gun shows are readily

5   transported into San Francisco.

6       11.    Plaintiff the People is not aware of the true names and capacities of Defendants sued

7   herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names.

8   Each fictitiously named Defendant is responsible in some manner for the violations of law alleged.

9   The People will seek leave of court to amend this complaint to allege their true names and capacities

10  when that information is ascertained.  Whenever reference is made in this Complaint to "Defendants"

11  or "Online Defendants," such reference shall include DOES 1 through 50 as well as the named

12  Defendants.

13  **JURISDICTION AND VENUE**

14      12.    The Superior Court has jurisdiction over this action.  The Online Defendants and

15  Crossroads are conducting unfair and/or unlawful and fraudulent business practices in California, and

16  the City Attorney has the right and authority to prosecute these cases on behalf of the People.

17      13.    Venue is proper in this Court because some of the injuries of which the People

18  complain have occurred in San Francisco and because injunctive relief is necessary to stop all of the

19  Defendants, and each of them, from delivering large-capacity magazines to San Francisco or

20  marketing and selling them to San Francisco residents.

21  **UNFAIR AND/OR UNLAWFUL AND FRAUDULENT BUSINESS PRACTICES**

22      14.    With few exceptions, California Penal Code §§ 32310 *et seq.* prohibits any person in

23  California, after January 1, 2000, from manufacturing, importing, selling, giving, or lending any large-

24  capacity magazine.  The prohibition on importing large-capacity magazines has no exception for

25  importing additional large-capacity magazines to cannibalize for parts.

26      15.    Notwithstanding this prohibition, 44Mag, Exile Machine, and Copes ship disassembled

27  large-capacity magazines to California consumers who order them, including to San Francisco

28  consumers, under the guise that these disassembled magazines are "repair kits."  This is a fig leaf.

1    There is no exception in the Penal Code which allows the importation of large-capacity magazines in

2    disassembled form by people who owned large-capacity magazines before they were prohibited on

3    January 1, 2000.  And even if there were such an exception, these Online Defendants know or should

4    know that at least some of their customers do not own grandfathered large-capacity magazines, and are

5    instead merely unlawfully importing the magazines they purchase from the Online Defendants.  The

6    Online Defendants are therefore aiding and abetting violations of California penal law, and making a

7    mockery of this law solely for their own profits.

8        16.    The fact that the Online Defendants know that they are aiding and abetting, and intend

9    to aid and abet, illegal conduct by the California purchasers of their large-capacity magazine "repair

10   kits" is apparent from the facts that their "repair kits" do not include only the parts that a grandfathered

11   magazine owner needs to make any particular repair, and that the kits are not limited to the parts of a

12   magazine that need repair most frequently such as the spring.  Instead, the Online Defendants' "repair

13   kits" contain an entire magazine, disassembled into three or four separate parts.  Indeed, many of the

14   Online Defendants are careful to assure their California customers that when they order a "repair kit,"

15   they are actually receiving an entire magazine.  For instance, 44Mag states that the kit "includes all the

16   parts of a magazine."  See Exhibit A hereto, which is incorporated herein by reference.  Exile Machine

17   tells California customers that if they "purchase magazines which hold more than 10 rounds, [Exile

18   Machine] will automatically disassemble them into 100% legal repair/rebuild kits."  See Exhibit B-1

19   hereto, which is incorporated herein by reference.  Copes advertises that for "California only," "High

20   capacity Rifle and Pistol magazines can be disassembled into rebuild kits for shipment," and charges a

21   $1.00 "disassembly fee" for each large-capacity magazine that a California customer orders.  See

22   Exhibit C hereto, which is incorporated herein by reference.

23       17.    The fact that the Online Defendants know they are aiding and abetting, and intend to

24   aid and abet, illegal conduct by the California purchasers of their large-capacity magazine "repair kits"

25   is also apparent from the fact that the Online Defendants offer the "repair kits" only to residents of

26   states that restrict or ban large-capacity magazines.  Indeed, they discourage the purchase of the

27   "repair kits" by residents of states that do not restrict the capacity of firearms magazines.  For instance,

28   44Mag has a "frequently asked questions" page that states, "[Q.] I live in a state that doesn't have

PEOPLE v. 44MAG DISTRIB'G. LLC, ET AL.     COMPLAINT                    n:\cpu\li2013\131020\00852044

Exhibit D
397

1   magazine restrictions can I order a repair parts kit?  [A.] No, you can order the complete magazine so

2   it would be silly to pay the extra fee for the exact same parts just in unassembled form."  See Exhibit

3   A hereto, which is incorporated herein by reference.  In other words, it is "silly" to repair a large-

4   capacity magazine by purchasing another complete but disassembled magazine; the only sensible

5   purpose for the Online Defendants' "repair kits" is to assemble them into prohibited ammunition

6   devices.  And that is precisely what the Online Defendants flagrantly encourage and assist California

7   residents to do.

8          18.    The fact that the Online Defendants know that they are aiding and abetting, and intend

9   to aid and abet, illegal conduct by the California purchasers of their large-capacity magazine "repair

10  kits" is apparent from the fact that the Online Defendants are aware that many other sellers of large-

11  capacity magazines refuse to ship them in disassembled form to California residents.  For example, in

12  addition to selling large-capacity magazine repair/rebuild kits to California residents, Exile Machine

13  also offers a "CA Magazine Disassembly" service "For California Customers Only," whereby, for a

14  charge of $5.56, Exile Machine will disassemble and ship to California a magazine with capacity

15  greater than 10 rounds that a California resident has purchased from another source which refuses to

16  disassemble and ship the magazine to California.  That Exile Machine does not expect the California

17  purchasers of these disassembled magazines to use them for repair is also demonstrated by its

18  requirement of a minimum order of 10 such magazine disassemblies – indicating that Exile Machine

19  expects and encourages California residents to make bulk purchases of large-capacity magazines, not

20  simply a single set of parts for use in repairing an existing lawfully owned pre-ban large capacity

21  magazine.   See Exhibit B-2 hereto, which is incorporated herein by reference.

22         19.    The fact that the Online Defendants know that they are aiding and abetting, and intend

23  to aid and abet, illegal conduct by the California purchasers of their large capacity magazine "repair

24  kits" is also apparent from the fact that it is not necessary for a California resident who lawfully owns

25  a pre-ban large-capacity magazine to purchase an entire, new large-capacity magazine in order to

26  repair the device.  Section 32425 of the Penal Code expressly provides that the prohibition against

27  transfer of a large-capacity magazine does not apply to the transfer of the device to a gunsmith for

28  maintenance, repair, or modification.

20.     None of the Online Defendants conditions its sale of "repair kits" to California customers on a customer's assurance that he or she actually owns a lawful, grandfathered large-capacity magazine, or is a person who is otherwise entitled to own large-capacity magazines under the Penal Code.  And some of the Online Defendants make their illicit intentions even more plain.  Exile Machine has a webpage that states: "**California customers:** If you purchase magazines which hold more than 10 rounds, we will automatically disassemble them into 100% legal repair/rebuild kits for compliance with CA law."  See Exhibit B-1 hereto, which is incorporated herein by reference.

21.     By offering large-capacity magazine "repair kits" for sale on their websites, each of the Online Defendants also falsely represents that California consumers may lawfully purchase disassembled large-capacity magazines as "repair kits."  Some of the Online Defendants are even more explicit in representing that disassembled magazines may be imported into California.  For instance, Exile Machine advertises that its "repair kits" are "100% legal" under California law.  See Exhibit B-1 hereto, which is incorporated herein by reference.  These Online Defendants are therefore misrepresenting the law to Californians, and openly and flagrantly assisting them in circumventing the law.

22.     Crossroads holds gun shows at venues throughout California, including several shows each year at the Cow Palace in Daly City, at which many of its customers are California residents.  Crossroads has the right and ability to control the wares sold and displayed at its gun shows, as evidenced by its decision to ration ammunition sales at some of its shows to prevent vendors from running out of ammunition.  Crossroads allows vendors at its California gun shows to import, display for sale, and sell disassembled large-capacity magazines, and allows California residents to purchase disassembled large-capacity magazines as "repair kits" without even offering an assurance, much less proof, that the purchaser lawfully possesses a large-capacity magazine to repair.  Crossroads knows or should know that the true purpose of many of these sales is for Californians to unlawfully acquire large-capacity magazines.  It nonetheless flagrantly facilitates this illegal conduct, in service of its own profits.  These practices are aiding and abetting sales of large-capacity magazines in California in violation of the Penal Code, and they are unfair and/or unlawful business practices.

## CAUSE OF ACTION FOR
### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200
### AGAINST ALL DEFENDANTS

23.   The People incorporate by reference paragraphs 1 through 22 inclusive.

24.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair or fraudulent business act or practices."  Each of the Defendants has engaged in unlawful, unfair and/or fraudulent business acts and practices in violation of section 17200 as follows:

a.   Each of the On-Line Defendants has, with knowledge or constructive knowledge, aided and abetted violations of California's laws concerning large-capacity magazines by selling disassembled large-capacity magazines to California consumers.

b.   Crossroads has, with knowledge or constructive knowledge, aided and abetted violations of California's laws concerning large-capacity magazines by allowing vendors at its California gun shows to import, display for sale, and to sell disassembled large-capacity magazines, and by allowing California residents at its California gun shows to purchase disassembled large-capacity magazines as "repair kits."

c.   The Online Defendants have engaged in fraudulent business practices by overtly or impliedly advertising that California consumers' purchases of disassembled large-capacity magazines are lawful.  Crossroads has engaged in fraudulent business practices by permitting vendors at its California gun shows to offer disassembled large-capacity magazines for sale as purportedly legal "repair kits."  These advertisements and business practices are likely to deceive reasonable California consumers about the legality of purchasing such magazines.

d..   The Defendants' business practices, as described in this Complaint, constitute unfair business practices because they offend established public policy, and because the harm they cause to consumers and to public safety in California greatly outweighs any benefits associated with those practices.

## PRAYER FOR RELIEF

The People pray for judgment against the Defendants, and each of them, as follows:

1.    An order by which the Court enjoins each of the Defendants from performing or proposing to perform or aiding and abetting any acts of unfair competition in California;

2.    An order that Defendants pay $2,500.00 in civil penalties for each of their acts of unlawful and/or unfair competition;

3.    Costs of suit; and

4.    For such further and additional relief as the Court deems proper.

Dated:  June 10, 2013

                        DENNIS J. HERRERA
                        City Attorney
                        OWEN J. CLEMENTS
                        Chief of Special Litigation
                        KRISTINE POPLAWSKI
                        CHRISTINE VAN AKEN
                        Deputy City Attorneys

                    By: _____
                        KRISTINE A. POPLAWSKI
                        Attorneys for Plaintiff
                        THE PEOPLE OF THE STATE OF CALIFORNIA, ex rel. San Francisco City Attorney Dennis J. Herrera

How To Order | Your Account | Order Status | Contact Us | Wishlist

Enter keyword    **SEARCH**

**CATEGORIES**

1911 Pistol
AK Magazines
AR15 & M16
Armalite
ASC Magazines
Beretta Magazines
Black Dog Machine
Browning
Check-Mate Industries
Cobray
Colt
CZ
D&H Industries
DPMS
FNH USA
Glock
GSG
Heckler & Koch
Kel-Tec
M1 Carbine
M1 Garand
M1A & M14
M3 Greasegun
Magpul Industries
Mec-Gar
Mossberg
NHMTG
Ruger
Sako
Sig Sauer
SKS
Smith & Wesson
Springfield XD
Surefire
Tactical Innovations
VCI Bags
Closeouts

## California Large Capacity Magazine Repair Parts Kits

**California Large Capacity Magazine Repair Parts Kits**

44Mag.com offers large capacity magazine repair parts kits for sale to California customers. These are sometimes also referred to as rebuild kits. **A magazine parts kit includes all of the parts of a magazine but the parts are not assembled into a magazine.** The cost of a kit is the cost of a complete magazine plus an additional service charge usually about $1.49. California DOJ has specifically stated that these kits are legal for sale in California. **Please read all of the following information before placing an order.**

California defines "large-capacity magazines" as those which hold more than 10 rounds. Since January 1, 2000 California residents have been unable to purchase or transfer any magazines with capacities over 10 rounds. The law allows residents to keep magazines that they owned prior to the law taking effect so **there are still millions of legally owned magazines over 10 rounds in California.**

Magazines are one of the most wear prone parts of a firearm and will of course need to be repaired over time. The millions of legally owned magazines in California are no exception. In 2005 the California Dept of Justice issued a letter (**link to .pdf copy**) clarifying that it was legal for Californians to purchase replacement parts to repair or rebuild their existing legally owned magazines.

Any and all parts of the existing magazine can be replaced. The old parts do not need to be retained. It is not illegal to possess all of the parts to manufacture a new large-capacity magazine, as long as you do not manufacture the magazine in the state of California. Additionally it is legal to use the parts from a large capacity magazine repair parts kit to manufacture a magazine that holds ten rounds or less. This modification must be permanent.

To purchase large capacity magazine repair parts kits simply select the parts kit check box when adding the item to your cart. An additional service charge will apply that varies depending on which kit is purchased.

**Frequent questions:**

**I don't live in CA but my state has magazine capacity restrictions can I order a repair parts kit?**
No, unless your state also issues a letter clarifying repair parts kit legality we will not be able to ship kits to any states besides CA.

**I live in a state that doesn't have magazine restrictions can I order a repair parts kit?**
No, you can order the complete magazine so it would be silly to pay the extra fee for the exact same parts just in unassembled form.

**Where can I get more information on CA magazine restrictions?**
We suggest **Calguns Foundation Wiki.**

It is the responsibility of the buyer to ascertain and obey all applicable local, state, and federal laws in regard to the possession, use, and sale of any item or parts purchased from 44Mag Distributing LLC.



Ordering repair kits is easy! Check the repair kit box when adding an item to your cart.



Example of a Glock repair parts kit.



Example of a Magpul PMAG repair parts kit.

SIGN UP FOR EMAIL SPECIALS    Enter E-mail Address

**SIGN UP**

Shipping Info | Returns | F

© Copyright 2000-2013 44MAG Distributing LLC, Po Box 3321 I

Exhibit D

402



Home   Log In

🛒Shopping Cart 0 item(s) - $0.00

WE SHIP TO NYS      WE SHIP TO CA      CREDIT CARD CUSTOMERS PLEASE NOTE

Enter search keywords here  🔍

Accessories  Airguns  Ammunition  AR Pistol  Handgun  Legal Compliance  Less Lethal  Magazines  Optics  Rifle  Services  Shotgun

### Categories

Accessories->
Airguns
Ammunition->
AR Pistol->
Handgun->
Legal Compliance
Less Lethal
Magazines->
Optics->
Rifle->
Services
Shotgun->

Specials ...
New Products ...
Featured Products ...
All Products ...

### Manufacturers

Please Select ▼

### Reviews  [more]



The HammerHead is awesome for those of us behind enemy...



### Information

Shipping Policy
Privacy Notice
Terms & Conditions
Contact Us

### More Information

About Us

Home :: WE SHIP TO CA

## WE SHIP TO CA



*Our CEO lived and worked in California on & off over the last 40 years. We've got your back, California!*

### Yes, we gladly ship to California customers!

If you purchase magazines which hold more than 10 rounds, we will automatically disassemble them into 100% legal repair/rebuild kits for compliance with CA law.  We do not charge extra for this service. **Your invoice will clearly state (in ALL CAPS & BOLD) that you are receiving disassembled repair/rebuild kits.** Note that a few types of magazines are welded shut and can not be disassembled.

PLEASE NOTE: CA-Legal Magazine Repair / Rebuild Kits are considered USED the minute we open and disassemble them, and for that reason incur a significant restock fee if returned for any reason. Please research carefully to ensure the disassembled magazines you are purchasing will work with your weapon. We take special care during the disassembly process but parts of certain models of magazine repair/rebuild kits may exhibit scuffing or scraping or minor tool marks as a natural consequence of the disassembly process.  We provide no warranty on magazine parts kits. Warranty claims must be made with the magazine manufacturer. Note that you may have no warranty rights if the manufacturer refuses to deal with a California customer. We can offer no instructions or assistance with reassembly or repair of your existing magazines.

### Yes, Magazine Rebuild Kits are LEGAL in CA!

If you are concerned about the legality of purchasing disassembled magazines, please read this letter from the CA Department of Justice. (689k PDF)

Of course large capacity magazines are only part of the equation in CA. Aerosol self defense sprays > 2.5 oz per can are verboten but we'll ship you the smaller cans no problem. Non aerosol sprays are a no-go (e.g., Pepperblaster).

Proceeds from the sales of most items on this store go toward the development and production of California compliance devices, such as our Hammerhead AR-15 grip.

We're all hoping for the quick overturning of the CA semiautomatic rifle ban and the other crazy restrictions. We want everyone in this great country to enjoy shooting as we do here in Texas. Until then we'll be happy to get you everything we can legally ship to you.

### What about the other Restricted States?

We do sell into the other ban states as well, but their laws are different from California's laws and so we do not sell postban high capacity mags or disassembled magazines for example to DC, HI (no high cap pistol mags, high cap rifle mags are OK), MA, MD, NJ, NY, and certain specific jurisdictions in IL, and any other place they are prohibited by state or local laws.  Other products are restricted in the various states and these restrictions may not all be noted on the product page. Be sure you know the laws in your area before purchasing.

Home

VISA  MasterCard  DISCOVER

Copyright © 2013 Exile Machine LLC.

Exhibit D



Home  Log In

🛒 Shopping Cart 0 item(s) - $0.00

WE SHIP TO NYS    WE SHIP TO CA    CREDIT CARD CUSTOMERS PLEASE NOTE

Enter search keywords here 🔍

Accessories  Airguns  Ammunition  AR Pistol  Handgun  Legal Compliance  Less Lethal  Magazines  Optics  Rifle  Services  Shotgun

### Categories

Accessories->
Airguns
Ammunition->
AR Pistol->
Handgun->
Legal Compliance
Less Lethal
Magazines->
Optics->
Rifle->
Services
Shotgun->

Specials ...
New Products ...
Featured Products ...
All Products ...

### Manufacturers

Please Select ▼

### Reviews [more]



Write a review on this product.

### Information

Shipping Policy
Privacy Notice
Terms & Conditions
Contact Us

### More Information

About Us

Home :: Legal Compliance :: CA MAGAZINE DISASSEMBLY SERVICE

Legal Compliance

Item 2 of 19

[Previous]  [Listing]  [Next]

## CA MAGAZINE DISASSEMBLY SERVICE

**$5.56**

### Disassembly of a Magazine (>10 rounds) into a repair/rebuild kit

#### Service for magazines you are going to purchase elsewhere

larger image

WE NEVER CHARGE A FEE TO TAKE APART THE MAGS WE SELL. This **service** is ONLY for mags we do not stock that you are purchasing elsewhere (gunbroker, mail-order dealer, private party etc.) and the seller refuses to break them down for you.

### INSTRUCTIONS

1. PLACE YOUR DISASSEMBLY SERVICE ORDER from this page for the number of mags you are having sent for us to disassemble. The quantity of this service ordered must equal or exceed the quantity of magazines you are having shipped here. **In the order comments, you must write the name and location of your seller and the types of magazines you are having disassembled, e.g., Jake's Pawn Shop, Abilene TX, QTY 10 Galil/Golani 30 rd mags P/N GG1234.**
2. WAIT FOR OUR APPROVAL EMAIL (this is not the same as the automated order confirmation email)
3. PLACE YOUR MAGAZINE ORDER WITH YOUR SELLER
   - If the seller won't even take your order, please stop reading and contact us at sales@exilemachine.com.
4. YOUR SELLER SHIPS MAGS HERE. The package *MUST* be addressed as follows:

   **EXILE MACHINE LLC**
   ORDER # XXXXX <<-- (Your Exile Machine order # from Step 1 above goes here)
   400 E ROYAL LN, STE 290 BLDG 3
   IRVING TX 75039

   Packages not addressed in this manner will be returned to your seller. It is *extremely* important that the seller put our company name on the package.
5. WE DISASSEMBLE AND SHIP. When your mags arrive here we will break them down into CA legal rebuild kits and then ship to you.

### PLEASE NOTE:

- **MAGAZINES ONLY.** Do not have the seller ship any other products or promotional items to us but the specific magazines you need to be disassembled. Any other products included with the order will be billed under our legal parts brokering service and the entire order will be held pending payment of that service.
- Handgun, rifle, shotgun mags OK. Mix and match magazine brands and types OK. Drums OK.
- One shipment from one vendor per disassembly order. For each different shipment or vendor, please place a new order from this page.
- This service is not applicable if we have the same brand and model of mags in stock on our store.
- FOR CALIFORNIA CUSTOMERS ONLY
- We are NOT an FFL so please do not have any guns shipped here, just mags.
- We provide no warranty passthrough on the original product. Warranty claims must be made with the seller of the magazines. Note that you may have no warranty rights at all if the seller refuses to deal with a CA customer.
- Transactions incomplete after 45 days will be cancelled and will forfeit the purchase price for this service. Any mag shipments received after the cutoff date will be refused.
- Actual shipping charges apply without regard to any shipping promotions that may be in effect on our store.
- We do not provide any assistance or instructions for: reassembly of the kits, blocking the kits to 10 rounds, or repair of your existing mags.
- We insure the first $100 of your order value at no extra charge. If you are having more than $100 worth of magazines disassembled, please purchase additional shipment insurance to cover loss or damage during shipment. This insurance only covers shipment from our facility. We do not cover shipment or insurance from your seller to us.

Add to Cart:  10
Min:  10
[Add to Cart]

Part Number: #CA_MAGAZINE_DISASSEMBLY_SERVICE
99111 Available
Manufactured by: Exile Machine LLC

[Tell a Friend]

Exhibit D
404

Appellate Case: 14-1290 Document: 01019711404 Date Filed: 03/18/2016 Page: 143

**Customers who bought this product also purchased...**



LEGAL FIREARM PARTS BROKERING
SERVICE



PROMAG SAIGA 308WIN 24RD BLK



AZOOM SNAP CAPS 308WIN 2/PK



GLOCK MAG EXT PLUS TWO 9/40/357



MAGAZINE GLOCK 22/35 40S&W 15RD



MAGAZINE GLOCK 22 40SW 22RD

Home

Copyright © 2013 Exile Machine LLC.

Appeal Case 3:19-cv-01662-BEN-MDD Document 40-4 Filed 06/24/03 Page 157 of 18

Shipping & Returns    Advanced Search    Create an Account    Log in

HOME    FEATURED    TOP SELLERS    SPECIALS    BRANDS    REVIEWS    CONTACT US

CART: 0 items

Site Search

FIREARMS    AMMUNITION    MAGAZINES    ACCESSORIES    SUPPLIES    GEAR    SPORTING GOODS    EMERGENCY FOOD    MISC    COPE'S APPAREL

Top » Catalog » Accessories » Rifle Accessories » AK47 Rifle Parts » SERVICE

SHOPPING CART

New in your cart  0 items

NOTIFICATIONS



Notify me of updates to

CALIFORNIA Hi Cap Magazine Repair Kit

SHARE PRODUCT

0

MANUFACTURER INFO

- Other products

TAG CLOUD

PREVIOUS          Product 91 of 133          NEXT

This product was added to our catalog on Thursday 22 April, 2010.

## CALIFORNIA Hi Cap Magazine Repair Kit
[SERVICE]

Price: **$1.00**

## CALIFORNIA ONLY

*NO STATE OTHER THAN CALIFORNIA ALLOWS ITS RESIDENTS TO PURCHASE REPAIR PARTS FOR MAGAZINES THAT ARE ALREADY OWNED BY ITS RESIDENTS*

**REPAIR KITS ARE <u>NON-REFUNDABLE AND NON-RETURNABLE</u> - PLEASE ALLOW UP TO 48 HOURS EXTRA TIME REGARDLESS OF DELIVERY SERVICE TYPE. They are for REPAIR parts for legally owned Magazines ONLY.**

**CHOOSE THIS FOR EACH MAG YOU PURCHASE IF YOU WANT IT AS REPAIR PARTS.**
High capacity Rifle and Pistol magazines can be disassembled into rebuild kits for shipment. There is a $1.00 PER MAGAZINE charge for EACH MAG disassembly. NOTE: Some mags cannot be disassembled and shipped as a rebuild kit Such As 10/22 mags. Magazines may recieve minor scratches or abrasions during disassembly. (If you order 3 Mags-you will need to enter 3 in the quantity box and then click UPDATE)

REVIEWS (0)          ADD TO CART

CUSTOMERS WHO BOUGHT THIS PRODUCT ALSO PURCHASED



ECWCS GEN III LEVEL 3 S-SHORT Fleece Jacket (NEW)

$49.99

ADD TO CART



Pachmayr 357 Mag Azoom Snap Caps 6 Rounds

$15.51

ADD TO CART



Allen Padded Endura Rifle Sling (85)

$4.99

ADD TO CART



NobelSport 12Ga Due Trap 24 2.75" #7.5 Lead 7/8 Ounce 250rd Case

$69.99

ADD TO CART

it D    406

ADD TO CART

... 



PRODUCTS    INNOVATION    DEALERS    PROPAGANDA    SUPPORT    CONTACT

UNFAIR ADVANTAGE

LOG IN | CREATE AN ACCOUNT    VIEW CART    0

SEARCH

### SHOP MAGPUL

### PRODUCT CATEGORIES

**PMAG® MAGAZINES»**

PMAG® ACCESSORIES»
MBUS® RIFLE SIGHTS»
BUTTSTOCKS»
RIFLE GRIPS»
HAND GUARDS & FORENDS»
RAILS & ACCESSORIES»
MAGAZINE ENHANCEMENTS»
SLINGS & SLING MOUNTS»
SHOTGUN ACCESSORIES»
THEORY BASED PRODUCTS»
MISCELLANEOUS ACCESSORIES»
MOE® PRODUCTS
MAGPUL ORIGINAL EQUIPMENT»
TRAINING VIDEOS»
PROPAGANDA ITEMS»
MAGPUL APPAREL»
IPHONE CASES»

SHIPPING & RETURNS
PRIVACY NOTICE
CONDITIONS OF USE
CONTACT US

HOME / PMAG® MAGAZINES / PMAG® 20 AR/M4 GEN M3, 5.56X45 MAGAZINE

### PMAG® 20 AR/M4 GEN M3, 5.56x45 Magazine



   

PLEASE ORDER FROM DEALERS & DISTRIBUTORS

SPECS    RELATED INFO

The next-generation PMAG 20 GEN M3 is a 20-round 5.56x45 NATO (.223 Remington) polymer magazine for AR15/M4 compatible weapons. Along with expanded feature set and compatibility, the GEN M3 incorporates new material technology and manufacturing processes for enhanced strength, durability, and reliability to exceed rigorous military performance specifications.

Modified internal and external geometry also permits operation with a wide range of non Colt-spec platforms such as the HK® 416 and MR556A1, M27 IAR, British SA-80, FN® SCAR™ MK 16/16S, and others. A redesigned bolt catch notch in the rear of the magazine provides increased bolt catch clearance, while an over-travel stop on the spine helps ensure the magazine will not over-insert on compatible weapons.

The PMAG 20 GEN M3 features a long-life USGI-spec stainless steel spring for commonality, four-way anti-tilt follower and constant-curve internal geometry for reliable feeding, and simple tool-less disassembly to ease cleaning. In addition, an included pop-off Impact/Dust Cover can optionally be used to minimize debris intrusion and protect against potential damage during storage and transit. Low profile ribs and new aggressive front and rear texture gives positive control of the GEN M3 in all environments, and a paint pen dot matrix has been added to the bottom panel of the body to allow easy marking by the end user for identification. The new, easy to disassemble flared floorplate aids extraction and handling of the magazine while providing improved drop protection, but is slightly slimmer than before for better compatibility with tight double and triple magazine pouches.

Made in U.S.A.

**ITAR**
**International Traffic in Arms Regulations Controlled Product**

### RELATED PRODUCTS

  

**MINUS 5 ROUND LIMITER – PMAG® AR/M4 GEN M3, 3 PACK**

The PMAG Minus 5 Round Limiter installs in 10, 20, or 30 round GEN M3 PMAG...

**PMAG® RANGER PLATE™ – AR/M4 GEN M3, 3 PACK**

The Magpul PMAG Ranger Plate is a floorplate replacement for the 5.56x45 PMAG...

**MINUS 10 ROUND LIMITER – PMAG® AR/M4 GEN M3, 3 PACK**

The PMAG Minus 10 Round Limiter installs in 20 or 30 round GEN M3

Exhibit E    408



PRODUCTS   INNOVATION   DEALERS   PROPAGANDA   SUPPORT   CONTACT

LOG IN | CREATE AN ACCOUNT    VIEW CART 🛒 0

SEARCH

## SHOP MAGPUL
### PRODUCT CATEGORIES

PMAG® MAGAZINES »
MBUS® RIFLE SIGHTS »
BUTTSTOCKS »
RIFLE GRIPS »
HAND GUARDS & FORENDS »
RAILS & ACCESSORIES »
**MAGAZINE ENHANCEMENTS »**
  **PMAG® ACCESSORIES »**
  THE ORIGINAL MAGPUL® »
  POLYMER DUMMY ROUNDS – USGI 5.56X45 »
SLINGS & SLING MOUNTS »
SHOTGUN ACCESSORIES »
THEORY BASED PRODUCTS »
MISCELLANEOUS ACCESSORIES »
MOE® PRODUCTS
MAGPUL ORIGINAL EQUIPMENT »
TRAINING VIDEOS »
PROPAGANDA ITEMS »
MAGPUL APPAREL »
IPHONE CASES »

SHIPPING & RETURNS
PRIVACY NOTICE
CONDITIONS OF USE
CONTACT US

HOME / MAGAZINE ENHANCEMENTS / PMAG® ACCESSORIES / MINUS 5 ROUND LIMITER – PMAG® AR/M4 GEN M3, 3 PACK

### Minus 5 Round Limiter – PMAG® AR/M4 GEN M3, 3 Pack



PLEASE ORDER FROM
DEALERS &
DISTRIBUTORS

DESCRIPTION | SPECS | RELATED INFO

The PMAG Minus 5 Round Limiter installs in 10, 20, or 30 round GEN M3 PMAG bodies, reducing the magazine capacity by five rounds. Designed for sporting and hunting applications, installation of the Limiter is simple, tool-less, and requires no permanent modification of the magazine body.

Made in U.S.A.

NOTE: Will NOT make a banned magazine legal! This product is intended for TEMPORARY capacity reduction of PMAG AR/M4 GEN M3 magazines. This product does not constitute a permanent capacity reduction. The user is responsible for knowing applicable laws in any jurisdiction the restricts magazines based on capacity or regulates magazine capacity for hunting. Please check all laws and regulations of your state and locality to determine the legality of your host ammunition magazines.

**ITAR**
International Traffic in Arms Regulations Controlled Product

## RELATED PRODUCTS

   

**PMAG® 30 AR/M4 GEN M3, 5.56X45 MAGAZINE**
The next-generation PMAG 30 GEN M3 is a 30-round 5.56x45 NATO (.223...

**PMAG® 30 AR/M4 GEN M3 WINDOW, 5.56X45 MAGAZINE**
The next-generation PMAG 30 GEN M3 Window is a 30-round 5.56x45 NATO (.223...

**PMAG® 10 AR/M4 GEN M3, 5.56X45 MAGAZINE**
The PMAG 10 GEN M3 is a 10-round 5.56x45 NATO (.223 Remington) polymer...

**PMAG® 20 AR/M4 GEN M3, 5.56X45 MAGAZINE**
The next-generation PMAG 20 GEN M3 is a 20-round 5.56x45 NATO (.223...

DESIGNED, MANUFACTURED AND ASSEMBLED IN COLORADO, USA

   

SIGN UP FOR THE MAGPUL NEWSLETTER

© Copyright 2013 Magpul. All Rights Reserved.

Shipping & Returns | Privacy Notice | Conditions of Use | Contact Us





MAGBLOCK
www.MAGAZINEBLOCKS.com

Welcome to MagazineBlocks.com

My Account | My Wishlist | My Cart | Checkout | Log In

HOME PRODUCTS FAQ DISTRIBUTORS LINKS CART CONTACT US

Home > Products > **Pmag 10/30 Magazines**

## Our Products

- Products
  - Magblocks
  - 10 Round Magazines
  - Magazine Accessories
  - Rifle Accessories
  - Services
  - Clearance

## My Cart

You have no items in your shopping cart.

## Compare Products

You have no items to compare.

## Popular Tags

Gen Gen3 GenM3 3

View All Tags

## Newsletter

Double click on above image to view full picture

MORE VIEWS

# Pmag 10/30 Magazines

Like You like this. Sign Up to see what your friends like.

1 Review(s) | Add Your Review

Email to a Friend Wishlist Compare

Availability: In stock

$29.99

Buy 2 for **$24.95** each and ***save 17%***

## Quick Overview

**Magpul Pmag 10/30 with Magblock installed.**

**Magpul PMAG 30 round 5.56mm magazine converted to hold only 10 rounds using our exclusive Magblock.**

**- Block comes epoxied to the spring for a permanent modification unless requested as a rebuild kit from the drop down menu.**

**- Floor plates can also be epoxied upon request using the drop down menus.**

**- The original Magpul lower spring attachment is included. Our block replaces this part.**

***Color** * Required Fields

Choose an Option...

**Options (If none selected block comes epoxied to the spring)**

- [x] Epoxy Floor plate closed
- [x] Add Ultimate Bullet Button Tool +**$2.00**

**Add Ranger Plate**

- None
- Add Magpul Ranger Plate +**$4.95**
- Add Ranger Plate and Ultimate Bullet Button Tool +**$6.95**

$29.99

**Qty:** Add to Cart

Exhibit F 410

Sign up for our newsletter
**Sign Up for Our Newsletter:**

0

Wishlist
Compare

Product Description     Additional Information     Product Tags

The MagPul Gen 4 PMag AR-15 Magazine is constructed from advanced polymers exhibiting superior impact resistance and light weight. The 10/30-round magazine features a constant curve interior profile for enhanced feeding of cartridges. An anti-tilt follower and high quality stainless steel spring ensure reliable feeding, while the textured magazine body and flared floorplate improve handling over conventional metal-bodied magazines. The Pmag is designed to lock into place reliably on a closed bolt with a full 10 rounds, unlike standard magazines which are generally down-loaded. The snap-on Impact Cover protects the feed lips from impacts and debris while in storage or during transport, and allows fully loaded magazines to be stored long-term (over 1 year) without compromising the integrity of their feed lips. The design of the floor plate is simple to disassemble using the impact cover or an improvised punch for ease of cleaning and maintenance. Will accept all MagPul PMag accessories, such as Maritime Floor Plates and PMag Ranger Plates. Available in four molded-in colors: Black, Flat Dark Earth, Foliage Green and Olive Drab. Technical Information: 4th Generation 10/30 Configuration. 10 Round Magazine. Available in Black, Flat Dark Earth, Foliage Green and Olive Drab Anti-Tilt Follower and Stainless Steel Spring Impact Cover stores on bottom of magazine (with standard floorplate installed) Slim Body Ribs for snag free use in double and triple mag pouches Accepts PMag Ranger Plates and PMag Maritime Floor Plates Magpul PMAG 30 round 5.56mm magazine converted to hold only 10 rounds using our exclusive Magblock.

Site Map    Search Terms    Advanced Search    Orders and Returns    Contact Us    About Us    Returns / Exchange Policy    Privacy Policy
© 2012 Magblock, LLC. All Rights Reserved.

Exhibit F    411

HKPARTS.NET
FOR ALL YOUR HK PARTS & ACCESSORY NEEDS

**HK Pistol Parts**
- Accessories
- Magazines

**MP5**
- HK 94
- MP5 SD
- MP5 Clones

**HK .22lr Rifles**
- HK MP5, HK416
- GSG 5

**MP5K**
- SP89, MP5K-N
- MP5K PDW

**MP5 40**
- MP5 10
- MP5 .357

**HK 91**
- HK G3
- PTR 91
- CETME
- G3K, PTR PDW

**HK 93**
- HK 33
- HK 53
- Vector Arms V53 V93
- C93

**HK 416, HK 417**
- HK MR556
- MR762
- MP7 A1

**HK G36**
- HK G36K
- HK G36C
- HK SL8

**HK USC Carbine**
- HK UMP 45
- HK UMP 40
- HK UMP 9mm

**PSG1**
- MSG90

**HK 21**
- HK 21E
- HK 23E
- HK 11

**HK Apparel**
- Shirts
- Hats

**HK Knives**
- Benchmade

**HK 300**
- HK G41
- HK SL6

**HK Firearms**
- Pistols
- Rifles
- Custom Builds

New HK Products
Pre-owned HK Products
Glock Magazines
AR-15, AK-47, Glock Parts
Clipped & Pinned Services
Emergency Preparedness
Browse Catalog
Gift Certificates

Search for Parts & Accessories [Search]

# HK USP .40 S&W 13 Round Magazine

**Our Products - HK Pistol Parts > HK USP 40 Parts**

HK USP Full Size .40 S&W 13 Round Magazine. New HK German USP full size Magazine. Fits all HK USP full size pistols such as the following:

- USP .40 Full Size
- USP .40 Tactical
- USP .40 Elite/Expert

Please note: Does not fit USP Compacts or P2000

**SKU: HKN20069**
Brand: **Heckler & Koch**
Type: **Magazine**
Origin: **German**
Condition: **New**
Caliber: **40 S&W**
Magazine Capacity: **13**
Magazine Type: **Magazine**
MPN: 214097S

**In Stock**

**Price: $49.95**

1 Add to Cart
Add to Wishlist

*(Click to see larger image and other views)*

Previous Item | Next Item

**Related Products:** | **Reviews:**

**Related Items Others Found Useful.**

Check the check boxes next to the additional products that you would like to add to the shopping cart, then click on the "Add to Cart" button above. A check box is not shown if a product requires that you select an option or fill out a field. (*) indicates a required accessory.

**HK USP 40 S&W 10 Round Magazine**
Price $49.95
Add to Cart

**Magazine Spring For USP & USPC Magazines**
Price $8.95
Add to Cart

**USP Full Size 9mm & .40 Cal Floor Plate**
Price $8.95
Out of Stock

**Your Account:**
Home
Login
Advanced Search
View Cart

**Customer Service:**
Create New Account
Privacy Policy
Customer Resources
Returns & Exchanges
FFL Requirements
Notify Me
About HKParts
@ Contact Us

**Our Network:**
Heckler & Koch
Twitter
Facebook
Youtube HKParts Channel
HKParts Blog
HKPro.com

Exhibit G
412

(801) 987-3494 - Adam Webber - HKParts.net Copyright 2010 All Rights Reserved

Exhibit G    413

# HK USP Operators Manual

### USP 9mm x 19mm • USP Caliber .40 S&W
### USP Caliber .45 ACP



In a world of compromise, some don't.

**Including USP Tactical and USP Expert**

**MAGAZINE DISASSEMBLY**

**CAUTION:**Beware of the spring tension exerted by the magazine spring while removing and installing the magazine floor plate. Keep the base of the magazine pointed in a safe direction (away from the face and eyes) at all times during disassembly.

Different  types of USP magazines are in use, depending on model, caliber, and after the Fall of 1994: whether the magazines were produced for civilian or military/law enforcement use.

**Disassembly of Law Enforcement/Military restricted use magazines and magazines produced before October 1994.**

1. Using a blunt pointed instrument depress the locking detente located in the floor plate and hold it there (see Figure 34).
2. Place a portion of either hand over the base of the magazine to control the release of the magazine spring and locking plate.
3. Slowly slide the floor plate forward off of the magazine housing.



**Figure 34**

4. Gradually allow the locking plate and magazine spring to expand out of the magazine housing.
5. Remove the locking plate, magazine spring and magazine follower from the magazine housing.

**Disassembly of magazines produced after October 1994 for U.S. civilian use.**

1. Using a blunt pointed instrument depress the locking insert detente located in the floor plate and hold it there  (see Figure 34).
2. Place a portion of either hand over the base of the magazine to control the release of the magazine spring and locking insert.
3. With the locking detente still depressed, squeeze the floor plate locking tabs located on the right and left

34

Exhibit G

415

sides of the magazine.



**Figure 35A**

4. Gradually allow the locking insert and magazine spring to expand out of the magazine housing. (see Figure 35A)
5. Remove the locking insert, magazine spring and magazine follower from the magazine housing.



**Figure 35B Restricted Use Magazine**



**Figure 35C 10 round Civilian Magazine**

35

Exhibit G

416

**MAGAZINE ASSEMBLY**



**Figure 36**

1. Place the magazine follower onto the magazine spring with the end of the spring positioned on the left of the follower. (See Figure 37)

2. Insert the follower and magazine spring into the magazine housing as depicted in Figure 36.

3. Place the locking plate, or locking insert on US civilian magazines, onto the protruding end of the magazine spring so that the rounded corners face towards the front of the magazine.

4. Push the locking plate down into the magazine housing against the pressure of the magazine spring and **hold it there.**

5. **On 10-round magazines,** push the floor plate up onto the base of the magazine housing until the locking tabs engage in the sides of the housing. Check to see if the locking tabs on the floor plate are securely locked into the housing and the locking detente on the locking plate fits within the hole in the floor plate.

**On restricted use magazines,** push the floor plate over the base of the magazine housing and the locking plate from front to rear. Make sure the floor plate is fully seated on the magazine housing and the locking detente on the locking plate fits within the hole in the floor plate.

**On all magazines,** check the magazine for proper assembly by insuring that the follower slides up and down freely within the magazine housing and with spring tension. Also check that the magazine follower rises within the magazine housing to be nearly flush against the bottom of the magazine lips.

36

Exhibit G

417



**Figure 37**
**"Civilian use" 10-round magazine (left), Law**
**Enforcement/Military "restricted use" magazine**
**(right)**

37

Exhibit G

418



PRODUCTS    INNOVATION    DEALERS    PROPAGANDA    SUPPORT    CONTACT

LOG IN | CREATE AN ACCOUNT    VIEW CART 🛒 0

SEARCH

## SHOP MAGPUL

### PRODUCT CATEGORIES

PMAG® MAGAZINES»
MBUS® RIFLE SIGHTS»
BUTTSTOCKS»
RIFLE GRIPS»
HAND GUARDS & FORENDS»
RAILS & ACCESSORIES»

**MAGAZINE ENHANCEMENTS»**

  PMAG® ACCESSORIES»

  THE ORIGINAL MAGPUL® »

  POLYMER DUMMY ROUNDS – USGI
  5.56X45»

SLINGS & SLING MOUNTS»
SHOTGUN ACCESSORIES»
THEORY BASED PRODUCTS»
MISCELLANEOUS ACCESSORIES»
MOE® PRODUCTS
MAGPUL ORIGINAL EQUIPMENT»
TRAINING VIDEOS»
PROPAGANDA ITEMS»
MAGPUL APPAREL»
IPHONE CASES»

SHIPPING & RETURNS
PRIVACY NOTICE
CONDITIONS OF USE
CONTACT US

HOME / MAGAZINE ENHANCEMENTS / PMAG® ACCESSORIES / MAGLINK™ MAGAZINE COUPLER – PMAG® 30 GEN M2 MOE/GEN M3

### MagLink™ Magazine Coupler – PMAG® 30 GEN M2 MOE/GEN M3



PLEASE ORDER FROM A
DEALER OR
DISTRIBUTOR

OVERVIEW    SPECS    RELATED INFO

The MagLink is a coupler for PMAG 30 AR/M4 GEN M2 MOE and GEN M3 magazines which allows the user to attach two magazines together for more efficient speed reloads, and to keep an additional 30 rounds of ammunition accessible on the weapon at all times. The MagLink features a two-piece bolt on design and durable, lightweight reinforced polymer construction.

Black only. Made in U.S.A.

  

### RELATED PRODUCTS

   

**PMAG® 30 AR/M4 GEN M2 MOE® WINDOW, 5.56X45 MAGAZINE**
Magpul Original Equipment (MOE) is a line of firearm accessories designed to...

**PMAG® 30 AR/M4 GEN M3, 5.56X45 MAGAZINE**
The next-generation PMAG 30 GEN M3 is a 30-round 5.56x45 NATO (.223...

**PMAG® 30 AR/M4 GEN M3 WINDOW, 5.56X45 MAGAZINE**
The next-generation PMAG 30 GEN M3 Window is a 30-round 5.56x45 NATO (.223...

**PMAG® 30 AR/M4 GEN M2 MOE®, 5.56X45 MAGAZINE**
Magpul Original Equipment (MOE) is a line of firearm accessories designed to...

DESIGNED, MANUFACTURED AND ASSEMBLED IN COLORADO, USA

      

SIGN UP FOR THE MAGPUL NEWSLETTER

© Copyright 2013 Magpul. All Rights Reserved.

Shipping & Returns | Privacy Notice | Conditions of Use | Contact Us



Exhibit H    419