ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

Colorado Outfitters Association et al v. Hickenlooper
Assigned to: Chief Judge Marcia S. Krieger
Referred to: Magistrate Judge Michael J. Watanabe
 Case in other court:  USCA, 14–01290
                       USCA, 14–01292
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/17/2013
Date Terminated: 06/26/2014
Jury Demand: None
Nature of Suit: 950 Constitutional – State
Statute
Jurisdiction: Federal Question

**Defendant**

| | | |
|---|---|---|
| **Mesa County, Board of County Commissioners** | represented by | **David Robert Frankel**<br>Mesa County Attorney's Office<br>P.O. Box 20000<br>544 Rood Avenue<br>2nd Floor Annex<br>Grand Junction, CO 81502–5004<br>970–244–1612<br>Fax: 970–255–7196<br>Email: david.frankel@mesacounty.us<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Outfitters Association** | represented by | **Peter J. Krumholz**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6007<br>Fax: 720–904–6006<br>Email: pkrumholz@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard A. Westfall**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6010<br>Fax: 720–904–6020<br>Email: rwestfall@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Farm Bureau** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

420

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Shooting Sports Foundation**          represented by    **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Magpul Industries**          represented by    **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Youth Outdoors**          represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA Liberty Arms**          represented by    **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Outdoor Buddies, Inc.**                  represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Women for Concealed Carry**              represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado State Shooting Association**    represented by   **Anthony John Fabian**
Anthony J. Fabian, P.C.
510 Wilcox Street
# C
Castle Rock, CO 80104
303–663–9339
Email: fabianlaw@qwestoffice.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hamilton Family Enterprises, Inc.**      represented by   **Anthony John Fabian**
*doing business as*                                         (See above for address)
Family Shooting Center at Cherry Creek                      *ATTORNEY TO BE NOTICED*
State Park

**Plaintiff**

422

| | | |
|---|---|---|
| **David Strumillo** | represented by | **David Benjamin Kopel**<br>Independence Institute<br>727 East 16th Avenue<br>Denver, CO 80203<br>303–279–6536<br>Fax: 303–279–4176<br>Email: david@i2i.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **David Bayne** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Dylan Harrell** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Rocky Mountain Shooters Supply** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014*<br><br>**Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **2nd Amendment Gunsmith &Shooter Supply, LLC** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014*<br><br>**Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Burrud Arms Inc.**<br>*doing business as*<br>Jensen Arms | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014* |

Marc F. Colin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Green Mountain Guns**                     represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry's Outdoor Sports**                  represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Specialty Sports &Supply**                represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Goods for the Woods**                     represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John B. Cooke**                           represented by    **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ken Putnam**                              represented by    **David Benjamin Kopel**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                                    represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                                    represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                                      represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                                 represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                                    represented by    **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                                            (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                                     represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                                 represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                                      represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                                represented by    **David Benjamin Kopel**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**John W. Hickenlooper**                          represented by    **Daniel D. Domenico**
*Govenor of the State of Colorado*                                 Colorado Attorney General's Office
                                                                   Ralph L. Carr Colorado Judicial Center
                                                                   1300 Broadway
                                                                   Denver, CO 80203
                                                                   720–508–6000
                                                                   Fax: 720–508–6032
                                                                   Email: dan.domenico@state.co.us
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **David Christopher Blake**
                                                                   Colorado Attorney General's Office
                                                                   Ralph L. Carr Colorado Judicial Center
                                                                   1300 Broadway
                                                                   Denver, CO 80203
                                                                   720–508–6000
                                                                   Fax: 720–508–6032
                                                                   Email: david.blake@state.co.us
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **John Tien Yau Lee**
                                                                   Colorado Attorney General's Office
                                                                   Ralph L. Carr Colorado Judicial Center
                                                                   1300 Broadway
                                                                   Denver, CO 80203
                                                                   720–508–6000
                                                                   Fax: 720–508–6032
                                                                   Email: jtlee@state.co.us
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jonathan Patrick Fero**
                                                                   Colorado Attorney General's Office
                                                                   Ralph L. Carr Colorado Judicial Center
                                                                   1300 Broadway
                                                                   Denver, CO 80203
                                                                   720–508–6000
                                                                   Fax: 720–508–6032
                                                                   Email: jon.fero@state.co.us
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Kathleen L. Spalding**
                                                                   Colorado Attorney General's Office
                                                                   Ralph L. Carr Colorado Judicial Center
                                                                   1300 Broadway
                                                                   Denver, CO 80203
                                                                   720–508–6000
                                                                   Fax: 720–508–6032
                                                                   Email: kit.spalding@state.co.us

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for
Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**
*Sheriff of Weld County, Colordo*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**
*Sheriff of El Paso County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**
*Sheriff of Larimer County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**
*Sheriff of Douglas County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**
*Sheriff of Gilpin County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**
*Sheriff of Montezuma County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**
*Sheriff of Moffat County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**
*Sheriff of Dolores County, Colorado*

represented by **David Benjamin Kopel**
(See above for address)

428

*TERMINATED: 11/27/2013*                                              *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Ensminger**                           represented by   **David Benjamin Kopel**
*Sheriff of Teller County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shayne Heap**                              represented by   **David Benjamin Kopel**
*Sheriff of Elbert County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Day**                                 represented by   **David Benjamin Kopel**
*Sheriff of Yuma County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred D. McKee**                            represented by   **David Benjamin Kopel**
*Sheriff of Delta County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lou Vallario**                             represented by   **David Benjamin Kopel**
*Sheriff of Garfield County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Hosselkus**                           represented by   **David Benjamin Kopel**
*Sheriff of Mineral County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett L. Powell**                          represented by   **David Benjamin Kopel**
*Sheriff of Logan County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian E. Norton**                          represented by   **David Benjamin Kopel**
*Sheriff of Rio Grande County, Colorado*                      (See above for address)

429

*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirad**                          represented by   **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                           represented by   **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                          represented by   **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                      represented by   **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                           represented by   **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                           represented by   **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                           represented by   **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                            represented by   **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*                      (See above for address)

430

*TERMINATED: 11/27/2013*                         *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Forrest Frazee**                    represented by   **David Benjamin Kopel**
*Sheriff of Kiowa County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Dunlap**                       represented by   **David Benjamin Kopel**
*Sheriff of Montrose County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ted B. Mink**                       represented by   **David Benjamin Kopel**
*Sheriff of Jefferson County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Wegener**                      represented by   **David Benjamin Kopel**
*Sheriff of Park County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Newman**                      represented by   **David Benjamin Kopel**
*Sheriff of Huerfano County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Peck**                        represented by   **David Benjamin Kopel**
*Sheriff of Sedgwick County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dominic Mattivi, Jr.**              represented by   **David Benjamin Kopel**
*Sheriff of Ouray County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Minor**                        represented by   **David Benjamin Kopel**
*Sheriff of Summit County, Colorado*                   (See above for address)

431

*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**                    represented by   **David Benjamin Kopel**
*Sheriff of Jackson County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**                    represented by   **David Benjamin Kopel**
*Sheriff of Gunnison County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**             represented by   **David Benjamin Kopel**
*Sheriff of Phillips County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**                       represented by   **David Benjamin Kopel**
*Sheriff of Lake County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**                 represented by   **David Benjamin Kopel**
*Sheriff of Arapahoe County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**                   represented by   **David Benjamin Kopel**
*Sheriff of Baca County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**                      represented by   **David Benjamin Kopel**
*Sheriff of Saguache County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**                      represented by   **David Benjamin Kopel**
*Sheriff of Costilla County, Colorado*                (See above for address)

432

TERMINATED: 11/27/2013                        *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**                 represented by    **David Benjamin Kopel**
*Sheriff of Crowley County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                        *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**              represented by    **David Benjamin Kopel**
*Sheriff of Bent County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                        *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**          represented by    **David Benjamin Kopel**
*Sheriff of Las Animas County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                        *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**            represented by    **David Benjamin Kopel**
*Sheriff of Routt County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                        *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**           represented by    **Jonathon Michael Watson**
*TERMINATED: 12/23/2013*                        (See above for address)
                                               *TERMINATED: 02/12/2014*

                                               **Marc F. Colin**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**           represented by    **David Benjamin Kopel**
*Sheriff of Grand County, Colorado*                    (See above for address)
*TERMINATED: 12/12/2013*                        *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 06/27/2013 | 41 | | REPLY to Response to 29 MOTION for Preliminary Injunction *on behalf of all Plaintiffs* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Attachments: # 1 Affidavit Exhibit A to Reply, # 2 Affidavit Exhibit B to Reply, # 3 Affidavit |

433

| | | | Exhibit C to Reply, #_4_ Affidavit Exhibit D to Reply)(Krumholz, Peter) (Entered: 06/27/2013) |
|---|---|---|---|
| 07/01/2013 | 42 | 24 | ORDER: Having reviewed the briefing found at 29 , 37 , 40 , and 41 , and upon the current showing, the Court declines to impose an injunction until the parties have an opportunity to present evidence at the hearing scheduled for July 10, 2013. By Chief Judge Marcia S. Krieger on 07/01/2013. Text Only Entry (msklc3, ) (Entered: 07/01/2013) |
| 07/01/2013 | 43 | 16 | Unopposed MOTION to Amend/Correct/Modify *Amended Complaint* by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: #_1_ Proposed Document Second Amended Complaint)(Kopel, David) (Entered: 07/01/2013) |
| 07/08/2013 | 53 | 26 | STIPULATION *of Undisputed Facts* by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Colorado Youth Outdoors, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Krumholz, Peter) (Entered: 07/08/2013) |
| 07/09/2013 | 56 | 33 | WITHDRAWN − Stipulated MOTION for Preliminary Injunction *and Withdrawal of Plaintiffs' Motion for Preliminary Injunction* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff, Defendant John W. Hickenlooper. (Attachments: #_1_ Proposed Order (PDF Only), #_2_ Exhibit Attachment 1)(Fero, Jonathan) Modified on 7/11/2013 to withdraw pursuant to Minutes dated 7/10/2013 (klyon, ). (Entered: 07/09/2013) |
| 07/10/2013 | 57 | 42 | MINUTE ENTRY for hearing held before Chief Judge Marcia S. Krieger on 7/10/2013. 56 Stipulated Motion for Preliminary Injunction is WITHDRAWN. For the reasons stated on the record, there will be no hearing on the Motion for Preliminary Injunction (Doc. #29). Court Reporter: Terri Lindblom. (mskcd) (Entered: 07/10/2013) |

434

| 07/10/2013 | 58 | 46 | ORDER granting 43 Motion to Amend/Correct/Modify Amended Complaint. By Chief Judge Marcia S. Krieger on 07/10/2013. Text Only Entry(msklc3, ) (Entered: 07/10/2013) |
|---|---|---|---|
| 07/11/2013 | 59 | 15 | MOTION to Withdraw Document re 29 MOTION for Preliminary Injunction by Plaintiffs Magpul Industries, National Shooting Sports Foundation. (Attachments: #1 Exhibit)(Abbott, Douglas) (Entered: 07/11/2013) |
| 07/12/2013 | 60 | 48 | ORDER granting 59 Motion to Withdraw Document. The Motion to Withdraw is GRANTED, and 29 Motion for Preliminary Injunction is hereby WITHDRAWN. The Clerk of Court shall amend the docket accordingly. By Chief Judge Marcia S. Krieger on 07/12/2013. Text Only Entry(msklc3, ) (Entered: 07/12/2013) |
| 07/17/2013 | 61 | 50 | ORDER denying 26 Motion for Order for Certification of Questions to the Colorado Supreme Court. The Defendant requests that two questions be certified to the Colorado Supreme Court, seeking an interpretation of HB−1224: (1) does the bills definition of large−capacity magazine amount to a ban on functional magazines for most handguns and many rifles, or does it apply only to magazines that are principally used with extensions or devices that increase the combined capacity to more than 15 rounds, and (2) does the grandfather clause contained in HB 13−1224, which applies when an owner maintains continuous possession of a large capacity magazine after July 1, 2013, apply when the owner allows another person to temporarily hold, use, or share it for lawful purposes? This Court may, in its discretion, certify questions to the Colorado Supreme Court under Colorado Appellate Rule 21.1. The rule permits certification if there is involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court. Colo.R.App.P. 21.1. The Court recognizes that there are unsettled questions of law at issue in this case. However, the Court declines to certify these questions. In light of the nature of the challenges brought and the context of the case as a whole, the Court finds that clarification by the Colorado Supreme Court on the specific questions posed will not be outcome−determinative of the case. Accordingly, 26 Motion for Certification of Questions of Law to the Colorado Supreme Court is DENIED. by Chief Judge Marcia S. Krieger on 7/17/2013. Text Only Entry(msk, ) (Entered: 07/17/2013) |

| 07/18/2013 | 62 | 52 | Second AMENDED COMPLAINT for Declaratory and Injunctive Relief against John W. Hickenlooper, filed by Ted B. Mink, Rick Dunlap, Hamilton Family Enterprises, Inc., Jim Beicker, Jerry's Outdoor Sports, Dennis Spruell, James Crone, Larry Kuntz, Grand Prix Guns, Brett L. Powell, Rod Fenske, Colorado Outfitters Association, Si Woodruff, Goods for the Woods, National Shooting Sports Foundation, Women for Concealed Carry, Duke Schirard, Mike Ensminger, Forrest Frazee, Fred Wegener, Shayne Heap, Amos Medina, Tom Nestor, David Bayne, David Encinias, John Minor, David Strumillo, Magpul Industries, Chad Day, Peter Gonzalez, Fred Hosselkus, James (Jim) Casias, Outdoor Buddies, Inc., Colorado Farm Bureau, Specialty Sports &Supply, Grayson Robinson, Dylan Harrell, Brian E. Norton, Colorado State Shooting Association, Douglas Darr, Rocky Mountain Shooters Supply, Green Mountain Guns, 2nd Amendment Gunsmith &Shooter Supply, LLC, James Faull, Terry Maketa, John B. Cooke, Stan Hilkey, Donald Krueger, Tom Ridnour, Scott Fischer, Colorado Youth Outdoors, Lou Vallario, USA Liberty Arms, Burrud Arms Inc., Miles Clark, Fred Jobe, Garrett Wiggins, Rick Besecker, Ronald Bruce, David Campbell, Chris S. Johnson, Fred D. <br><br> McKee, Ken Putnam, Bruce Newman, Justin Smith, Sue Kurtz, Jerry Martin, Mike Norris, Tim Jantz, Dominic Mattivi, Jr, David A. Weaver, Dave Stong, Randy Peck, Charles "Rob" Urbach, Bruce W. Hartman.(klyon, ) (Entered: 07/18/2013) |
| 08/01/2013 | 64 | 110 | MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* by Defendant John W. Hickenlooper. (Attachments: #1 Exhibit A)(Grove, Matthew) (Entered: 08/01/2013) |

436

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

　　　Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

　　　Defendant.

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND TEMPORARY RESTRAINING ORDER**

---

## INTRODUCTION

The Defendant's response avoids any acknowledgement of the Second Amendment rights at issue, the degree of infringement on them, or the requirement that Defendant meet some heightened standard of scrutiny to justify any infringement.  Instead, Defendant attempts to transform this case into one involving a traditional exercise of police power with the corollary deferential standard of review.  Just as the Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), rejected the City of Chicago's attempt to recast the nature of the dispute – and its failure to meet its burden to justify the infringements on Second Amendment rights – this Court should reject Defendant's similar attempt here.  *Ezell*'s two-step Second Amendment analysis, overlaid on the traditional preliminary injunction elements, demonstrates why injunctive relief is appropriate in this case.

Defendant incessantly invokes the "Technical Guidance" as a talisman, and he posits new arguments to show how "designed to be readily converted" and "continuous possession" actually

mean something in yet another attempt to stave off HB 1224's patent Fourteenth Amendment vagueness problems. However, Defendant's latest attempt to provide certainty fails, as explained in Part III of this reply.

Plaintiffs will first discuss why this Court has the power to issue a TRO and why Defendant's opposition to this point is entirely baseless. Next, Plaintiffs' will focus on *Ezell*, Defendant's refusal to address the essential points under the Second Amendment, and why injunctive relief is appropriate. Finally, Plaintiffs will show why Defendant did not, and cannot, fix the Fourteenth Amendment vagueness and related Second Amendment problems with HB 1224's "designed to be readily converted" and "continuous possession" language.

## ARGUMENT

### I.   THIS COURT CAN ISSUE A TRO PENDING THE PRELIMINARY INJUNCTION HEARING

Defendant argues that a temporary restraining order ("TRO") is inappropriate because Rule 65 does not permit TROs when the adverse party has received notice, and that a TRO is inequitable because the ten-day gap between the implementation of HB 1224 and the injunction hearing is the result of Plaintiffs' delay. Resp. at 5-7. Neither of these arguments has merit.

First, Defendant summarily concludes that Plaintiffs are not entitled to a TRO because Plaintiffs did not submit an affidavit or verified complaint in accordance with Rule 65(b)(1)(A) and therefore "no evidence supports [Plaintiffs'] request and the Court cannot issue a temporary restraining order." Resp. at 5. This argument ignores the plain language of the Rule and the

Court's ability to fashion appropriate injunctive relief when circumstances so require (as they do here).[1]

Rule 65(b)(1) states that a court may only issue a TRO without written or oral notice when specific facts in a verified complaint or affidavit demonstrate that immediate and irreparable injury will result to the movant "before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1). Because the remedy granted by ex parte TROs is "so drastic and may have such adverse consequences," the authority to issue ex parte restraining orders must be "carefully hedged in Rule 65(b) by protective provisions." *Pan Am. World Airways v. Flight Engineers' Intern. Ass'n*, 306 F.2d 840, 843 (2d Cir. 1962). These protective provisions (apart from the Rule's limitation on the duration of TROs) are simply not applicable when the adverse party has been given notice and the opportunity to contest the requested relief.[2] *See Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D. Del. 1987).

---

[1] To the extent that Defendant's complaint regarding the absence of a Verified Complaint or supporting affidavits has merit, which it does not, such concerns are resolved by the attached Declarations incorporated herein as Exhibits A through D.

[2] Defendants' assertion that a TRO cannot be issued with notice is contrary to case law. *E.g., H-D Mich., LLC v. Hellenic Duty Free Shops*, 694 F.3d 827, 844 (7th Cir. 2012) ("the language of Rule 65(b)(2) and the great weight of authority support the view that 28 days is the outer limit for a TRO without the consent of the enjoined party, ***regardless of whether the TRO was issued with or without notice***") (emphasis added); *Vaughan v. Bank of America, NA*, 2010 WL 3273052, at *2 (Aug. 18, 2010) (denying motion for TRO without notice, but ordering a hearing on plaintiff's motion for TRO with notice); *Nutrasweet Co. v. Vit-Mar Enterprises, Inc.*, 112 F.3d 689, 692 (3d Cir. 1997) ("The most prevalent view is that a temporary restraining order, ***even if issued with notice***, cannot be continued beyond the periods prescribed in Fed.R.Civ.P. 65(b) . . . .") (emphasis added); *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp.2d 581, 598 (W.D. Pa. 2009) (contemplating issuance of TROs with notice); *Casa Editrice Bonechi S.R.L. v. Irving Weisdorf & Co.*, 1995 WL 731633, at *2 (S.D.N.Y. Dec. 8, 1995) ("There is no indication in Rule 65(b) that temporary restraining orders ***granted with notice*** to the defendant also must expire after ten days.") (emphasis added).

Here, the Defendant has full notice, and a verified complaint or affidavits are not required.  If the adverse party has notice, courts will simply analyze the request under the same standards as a motion for preliminary injunction.  *Escobar v. Jones*, 2012 WL 6212846, at *2 (D. Colo. Nov. 21, 2012) ("Where the opposing party has notice, the procedure and standards for issuance of a temporary restraining order mirror those for a preliminary injunction." (citation omitted)).  However, the fact that the adverse party has notice of the TRO motion does not automatically convert the motion into a motion for preliminary injunction because a TRO and a preliminary injunction *are two distinct remedies*.  The sole purpose of a TRO is to preserve the status quo and prevent irreparable harm just so long as necessary to hold a hearing, and no longer.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).  Conversely, a preliminary injunction may be unlimited in duration and may require action or inaction beyond merely preserving the status quo.  *See Prudential Ins. Co. v. Inlay*, 728 F.Supp.2d 1022, 1027 (N.D. Iowa 2010).  Thus, Defendant's argument that the Court can only issue a preliminary injunction under Rule 65 because he received notice of Plaintiffs' requested TRO is legally erroneous.

Lastly, Defendant's reliance on *RoDa Drilling Co. v. Siegal* to assert that the irreparable harm that will result from HB 1224's implementation between July 1, 2013 and July 10, 2013 "is a consequence of Plaintiffs' own making" is flawed.  *See* Resp. at 6-7.  First, *RoDa Drilling Co.* discussed the propriety of a preliminary injunction, not a TRO.  552 F.3d 1203, 1205-06 (10th Cir. 2009).  Second, while the court recognized that delay in seeking preliminary relief cuts against finding irreparable injury, the court noted that "delay is but one factor in the irreparable harm analysis, and in *Kansas Health Care Association*, we held that a ***three-month delay*** in

4

filing did not defeat a claim of irreparable injury when the delay was attributable to plaintiff's attempts to negotiate and the need for further documentation of the harm." *Id.* at 1211 (emphasis added) (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1544 (10th Cir. 1994)). Following *Kansas Health Care Association*, the court concluded that the moving party's delay did not warrant a finding of no irreparable harm because the delay in filing the complaint and seeking injunctive relief arose from attempts to resolve the dispute. *Id.* at 1212.

Here, Plaintiffs' requested TRO is not inequitable because of any supposed delay attributable to Plaintiffs. Between the time Plaintiffs filed their complaint on May 17, 2013 and subsequently filed their motion for preliminary injunction and TRO on June 12, 2013, the parties were discussing a stipulation regarding how HB 1224 should be interpreted and enforced. Moreover, the selection of the July 10 hearing date was not within Plaintiffs' control. Further, Plaintiffs filed their motion for preliminary injunction and TRO a mere 26 days after they filed their complaint. Thus, the ten-day gap between when HB 1224 goes into effect and when this Court can hear the merits of Plaintiffs' motion for preliminary injunction is not the result of any inexcusable delay attributable to Plaintiffs, and the details set out in Plaintiffs' motion and in the attached declarations establish irreparable harm to support a TRO.

## II.   DEFENDANT FAILS TO ACKNOWLEDGE THE APPROPRIATE TESTS FOR ASSESSING PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

Throughout the beginning of his brief, Defendant goes to great lengths to try to convert this Second Amendment challenge into one involving a typical challenge of a State's exercise of its police power not involving either a fundamental constitutional right or, relatedly, heightened

scrutiny.  The Defendant's attempt here mirrors the City of Chicago's attempt to avoid issuance

of a preliminary injunction in *Ezell*, and should be rejected.

## A.      Defendant, Not Plaintiffs, Must Meet a Heightened Standard

Defendant asserts that because this case involves an enactment by the Colorado General

Assembly, "a heightened standard [that Plaintiffs must meet] applies."   Resp. at 9.   The

Defendant then argues that a "most exacting analysis" must be applied to Plaintiffs' claims of

facial unconstitutionality, *id.* at 10, and that the "powerful interest in assuring the safety of

Colorado's citizens" necessarily "outweigh[s] the injuries that Plaintiffs' assert they will suffer if

the challenged provisions go into effect as the legislature intended."  *Id.* at 12.

In *Ezell*, the Seventh Circuit rejected such an approach.  Noting that "[i]t's true that

Second Amendment litigation is new," and that the Chicago ordinance at issue banning shooting

ranges "is unlike any firearms law that has received appellate review since *Heller*," the court

explained that it was not "without a framework for how to proceed."  651 F.3d at 700.  Taking

into account the well-established structures from First Amendment analysis, the Seventh Circuit

adopted a basic two-part inquiry.  First, does the prohibition/regulation at issue involve the

Second Amendment at all?  Some prohibitions and regulations simply do not infringe Second

Amendment rights and Second Amendment scrutiny ends there.  *Id.* at 702-03.  Second, "*[i]f the

government cannot establish this*," that is, that no Second Amendment right is implicated, or the

inquiry is "inconclusive," or it is "***not*** categorically unprotected," "then there must be a second

inquiry into the strength of the government's justification for restricting or regulating the

exercise of Second Amendment rights."  *Id.* at 703 (first emphasis added, second in original).

The second step "requires the court to evaluate the regulatory means the government has chosen

6

and the public benefits end it seeks to achieve.  Borrowing from the Court's First Amendment

doctrine, the rigor of this judicial review will depend on how close the law comes to the core of

the Second Amendment right and the severity of the law's burden on the right."  *Id.*

As for the appropriate standard, the Seventh Circuit stated that "broadly prohibitory laws

restricting . . . core Second Amendment right[s] . . . are categorically unconstitutional. . . . For all

other cases, however, we are left to choose an appropriate standard of review from among the

heightened standards of scrutiny the Court applies to governmental actions alleged to infringe

enumerated constitutional rights; the answer to the Second Amendment 'infringement' question

depends on ***the government's ability*** to satisfy whatever standard of means-end scrutiny is held

to apply."  *Id.* (emphasis added).

It is Defendant, not Plaintiffs, who must demonstrate in the first instance that the specific

prohibitions and restrictions do not involve Second Amendment rights or that any restrictions on

such rights satisfy heightened scrutiny.

**B.    Defendant Cannot Meet His Burden to Show No Infringement**

Defendant does not even attempt to demonstrate that there is no infringement on

Plaintiffs' Second Amendment rights. Rather, Defendant appears to suggest either that no rights

exist or that any infringement would be trivial because the "Technical Guidance" solves all

problems.  The "Technical Guidance" is discussed below.  In any event, Defendant has failed to

demonstrate that the specific restrictions in this case ("designed to be readily converted" and

"continuous possession") do not infringe on Plaintiffs' Second Amendment rights.  Defendant's

failure rests on a profound misunderstanding of the Second Amendment.

###### 1.      Individual Plaintiffs, Including the Sheriffs

According to Defendant, he has not violated the Second Amendment because HB 1224 does not "***utterly eradicate*** any individual plaintiff's ability to obtain either the firearms or training necessary to defend himself." Resp. at 18 (emphasis added). The *Heller* decision rejects such a standard.   In *Heller*, as Petitioner the District of Columbia pointed out, the handgun prohibition did not prevent people from engaging in self-defense with rifles or shotguns. To the *Heller* Court, this fact was irrelevant.  *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).

Here, magazines are integral to the use of firearms, and magazines of 16 rounds or more are integral to the firearms that many of the Plaintiffs use to protect themselves, their families, and their property.  *Compare Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").  The "designed to be readily converted" language outlaws or chills ownership and use of magazines of 15 rounds or less, and the "continuous possession" limitation on ownership and use of magazines of 16 rounds or more makes the "grandfather" right next to meaningless.[3]  Defendant wholly fails to meet his burden to address these infringements.

---

[3]   The Defendant makes the following bald statement: "The grandfather clause of HB 1224 ***eliminates*** the possibility of any irreparable harm to any individual plaintiff who currently owns or desires to own magazines with a capacity greater than 15 rounds." Resp. at 18.  This statement is typical of the Defendant's categorical, conclusory assertions that do not even attempt to address the actual harms described by Plaintiffs or the Defendant's burden to justify them under *Heller*, *McDonald* and, inter alia, *Ezell*.

   2.      **FFL Plaintiffs and Magpul**

Defendant suggests that the FFL Plaintiffs and Magpul have no Second Amendment
rights themselves, that any injury is simply economic, and, accordingly, they cannot possibly
suffer an irreparable injury.  Defendant's theory is that businesses whose core activity involves a
constitutional right actually have no rights themselves; only their customers do.  This would not
be true in a First Amendment context. *See American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d
323 (7th Cir. 1985) (booksellers brought successful First Amendment challenge to ordinance
prohibiting them from selling certain sexually-themed materials), *aff'd*, 475 U.S. 1001 (1986). It
would not be true in an abortion rights context. *See Planned Parenthood v. Danforth*, 428 U.S.
52, 62 (1976) (abortion provider doctors had standing to sue against statute controlling how they
provided abortions).

In a Second Amendment context, businesses also have their own constitutional rights
which they can invoke. *See Ezell*, 651 F.3d at 696 ("Action Target, as a supplier of firing-range
facilities, is harmed by the firing-range ban and is also permitted to 'act[ ] as [an] advocate[ ] of
the rights of third parties who seek access to' its services."); *see also United States v.
Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (If laws restricting commercial sale of arms
were not subject to heightened scrutiny, "it would follow that there would be no constitutional
defect in prohibiting the commercial sale of firearms. Such a result would be untenable under
*Heller*."); *City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972) (Ordinance violated state
constitutional right to arms. "As an example, we note that this ordinance would prohibit
gunsmiths, pawnbrokers and sporting goods stores from carrying on a substantial part of their

9

445

business. Also, the ordinance appears to prohibit individuals from transporting guns to and from such places of business.").

Of course FFLs, like bookstores, also have third-party standing on behalf of their customers. *See Ezell*, 651 F.3d at 696; *Kole v. Village of Norridge*, -- F.Supp.2d --, 2013 WL 1707951, at \*7 (N.D. Ill. Apr. 19, 2013); *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (standing to mount pre-enforcement challenge).

Defendant also contends that the economic damages HB 1224 will cause Plaintiff licensed firearms dealers and Magpul are "not only speculative, but are quantifiable and therefore do not qualify as irreparable." Resp. at 15. Thus, Defendant argues that because the impact on the "business Plaintiffs" is, in part, an economic injury, they have not satisfied the irreparable harm element for a preliminary injunction. This position, however, is contrary to Tenth Circuit authority.

"Under the Eleventh Amendment, states are generally immune from suits brought in federal court by their own citizens, by citizens of other states, by foreign sovereigns, and by Indian tribes." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010); *see also* U.S. CONST. amend. XI. Moreover, C.R.S. § 24-10-106 provides that the State of Colorado is immune from suits that lie in tort or could lie in tort except for the limited areas in which sovereign immunity is explicitly waived. The State of Colorado has not waived sovereign immunity for instances such as this where a plaintiff in a pre-enforcement challenge to the implementation of a new state statute suffers significant economic and other damages as a result of the enactment of the state statute. *See* C.R.S. § 24-10-106(1)(a)-(h). As such, Plaintiff licensed firearms dealers and Magpul will be unable to recover for the significant economic injury HB

446

1224 has and will continue to cause because the Eleventh Amendment and Colorado's statutory grant of sovereign immunity preclude a suit for money damages against the State of Colorado.

As noted by the Tenth Circuit in *Crowe & Dunlevy, P.C. v. Stidham*, "[w]hile economic loss is usually insufficient to constitute irreparable harm, the imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." 640 F.3d 1140, 1157 (10th Cir. 2011) (internal quotations and citations omitted); *see also, e.g., Chamber of Commerce*, 594 F.3d at 770-71; *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). Accordingly, because Plaintiff licensed firearms dealers and Magpul will be unable to recover the economic damages caused by HB 1224 from Defendant, they satisfy the irreparable harm requirement.

In sum, Defendant has not even attempted to show that the challenged provisions at issue do not infringe on Plaintiffs' Second Amendment rights. Instead, Defendant invents his own constitutional standard that he can do whatever he wants as long as he does not "utterly eradicate" the Second Amendment right of individuals. And Defendant considers economic harm suffered by the FFL Plaintiffs and Magpul to be essentially irrelevant. Defendant has failed to meet the first prong of the two-part *Ezell* test to demonstrate there is no injury to Plaintiffs' Second Amendment rights.

### C. Defendant Has Offered No Justification Warranting Infringement on Plaintiffs' Constitutional Rights

Defendant here does not directly acknowledge the existence of Second Amendment rights in this case, nor the infringement on those rights caused by "designed to be readily converted" and "continuous possession," nor Defendant's own duty to meet some heightened level of scrutiny. Again, *Ezell* is instructive. There, the City of Chicago, like Defendant here,

tried to belittle the injuries to the plaintiffs and did not try to justify the actual infringements. The Seventh Circuit described the City's burden: "[T]he City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified." 651 F.3d at 709. The Seventh Circuit then explained why the City failed to meet its burden, warranting issuance of a preliminary injunction: "At this stage of the proceedings, the City has not come close to satisfying this standard. In the district court, the City presented no data or expert opinion to support the range ban." *Id.*

Similarly, Defendant here posits a series of state interests and legal arguments that he insists justifies any (unacknowledged) harms caused by HB 1224. These asserted interests and legal argument do not come close to satisfying Defendant's burden.

### 1.   Defendant's General Statements About Public Interest are Insufficient

Defendant makes two general arguments on the public interest which purport to justify the infringements at issue. First, Defendant says that the General Assembly has the authority to create laws for public safety. This is true, but equally true as a general proposition is that any exercise of the police power must comply with the United States Constitution. Defendant's platitude does not carry his burden of proof.

Second, Defendant repeatedly invokes the Newtown and Aurora murders as the public interest against preliminary relief. At trial, Plaintiffs will show that the entirety of HB 1224 is deadly and dangerous. But the present motion is very narrow. Defendant's assertions of Newtown-Aurora public interests would, if valid at all, only relate to the ban on magazines greater than 15 rounds. In the next several weeks until a full trial on the merits can be had, there

12

448

is **no** public interest in preventing grandfathered owners from having their magazines repaired, or from loaning those magazines to other law-abiding persons for lawful self-defense.  Moreover, there is **no** public interest in enforcing the completely unintelligible prohibition on magazines "designed to readily converted." As detailed in Plaintiffs' original motion, in Plaintiffs' response to the motion to certify, and below, Defendant keeps changing his mind about what the "designed" phrase means. Until he can at least settle on something, the public interest strongly favors protecting the people of Colorado from criminal prosecution under an extremely vague bill.

### 2.     Defendant's Vagueness Defense Misses the Point

Defendant attempts to treat persons who exercise Second Amendment rights as if they were illegal drug users. He ignores that the United States Constitution does not guarantee a right to possess drug paraphernalia. The Constitution does expressly guarantee the right to possess two items which are essential to ordered liberty: "Arms" and a "press." U.S. CONST., amends. I-II.

Defendant places heavy reliance on the drug paraphernalia case, *Hoffman Estates v Flipside*, 455 U.S. 489 (1982). Even if "Arms," like "drug paraphernalia," were not in the Constitution, *Flipside* would be inapposite to the motion. The ordinance enacted by Hoffman Estates only applied to the commercial sale of certain items, not to their possession. Thus, the Court found that the ordinance's "designed" language was not unconstitutionally vague *for commercial businesses*. *See* 455 U.S. at 501 "(A business person of ordinary intelligence)". "[E]conomic regulation is subject to a ***less strict vagueness test***. . . . This ordinance simply regulates business behavior . . ." *Id.* at 498, 499 (emphasis added).  In contrast, HB 1224 goes much further, and criminalizes the possession of items by ordinary citizens.

13

449

Moreover, in the context of a business regulation claim raised only by a business, the *Flipside* court minimized the issue of standards of enforcement: "In reviewing a business regulation for facial vagueness, however, the principal inquiry is whether the law affords fair warning of what is proscribed," rather than whether enforcement standards are vague. 455 U.S. at 503. But in the instant case, the Sheriffs are directly raising the problem that was not at issue for the business-only facial challenge in *Flipside*: HB 1224 "provides insufficient standards for enforcement." *Id.*

Besides that, the *Flipside* court rejected the drug paraphernalia vendor's facial challenge because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495. As the briefing in the instant case has detailed, nothing is "clearly proscribed" by "designed to be readily converted." Even if that language did clearly proscribe some magazines (discussed *infra*), many of the Plaintiffs, including the Sheriffs and almost all the rest of non-FFL Plaintiffs, do not own such magazines.

Defendant cites two cases which did not find statutory language with "designed" to be unconstitutionally vague in the context of a gun control statute. Both cases were decided under the lower standard of review when a law's possible vagueness does not affect a constitutional right.

In *Richmond Boro Gun Club*, the Second Circuit in 1996 was reviewing a challenge to a New York City gun control ordinance. The court's reasoning was explicitly premised on the plaintiffs' concession that no fundamental right was involved:

> They concede that the local law does not infringe upon a fundamental
> constitutional right. Courts rarely invalidate a statute on its face because of

> alleged vagueness if the statute does not relate to a fundamental constitutional
> right (usually first amendment freedoms) and if the statute provides "minimally
> fair notice" of what the statute prohibits.

*Richmond Boro Gun Club v. City of New York*, 97 F.3d 681, 684 (2d Cir. 1996) (citation

omitted).   Following *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), it is

indisputable that the Second Amendment is a fundamental right, and the relatively loose

approach of the *Richmond Boro* case is not applicable.

For the same reason, *United States v. M-K Specialties Model M-14 Machinegun*, 424

F.Supp.2d 862 (N.D.W.Va. 2006), also cited by Defendant, does not support Defendant's

argument. Like *Richmond Boro*, the *M-K Specialties* case was decided under a standard that did

not involve fundamental constitutional rights. This was correct, because machine guns are not

among the "arms" that are protected by the Second Amendment. *See Heller*, 554 U.S. at 627.

Defendant's citations to cases using a weak standard of review of vagueness not affecting

constitutional rights are inapposite. Again, Defendant has failed to meet his burden of heightened

scrutiny.

### III.   DEFENDANT MISCHARACTERIZES THE TECHNICAL GUIDANCE, WHICH DOES NOT MEET THE DEFENDANT'S BURDEN NOT TO INFRINGE SECOND AMENDMENT RIGHTS; NOR DO DEFENDANT'S LATEST ITERATIONS OF "DESIGNED TO BE READILY CONVERTED" AND "CONTINUOUS POSSESSION" MEET DEFENDANT'S BURDEN

Defendant's brief is replete with reliance on the "Technical Guidance" and superlative

characterizations of it. *E.g.*, Resp. at 14 ("a reasonable narrowing interpretation of the law"); 15

("strikes a reasonable middle ground and draws a bright line rule that offers substantial

certainty"); 19 ("draws bright-line rules for law enforcement").  What Defendant's brief lacks is

any showing that the "Technical Guidance" in fact provides a "bright-line rule" that offers "substantial certainty."

A.     **"Designed to Be Readily Converted"**

As noted in Plaintiffs' TRO/preliminary injunction motion and in their response to the motion to certify questions to the Colorado Supreme Court, nowhere is there any suggested clear definition of "designed to be readily converted."   Defendant's response, discussed more fully below, offers yet new interpretations which still fail to provide any certainty.

Before turning to Defendant's continued shortcomings, one point should be squarely addressed: Defendant flatly asserts that "Plaintiffs' motion does not assert that this narrower reading of Colorado law violates the Constitution." Resp. at 7.  It most certainly does.  Motion for Temporary Restraining Order and Preliminary Injunction at 3, 5-6, 14-15, 17, 21.

Plaintiffs have raised the issue that "designed to be readily converted" can be read to outlaw all magazines, regardless of size, which have a removable base plate (a/k/a "floor plate"). Defendant scoffs, characterizes the Plaintiffs' argument as a "straw man," and as an interpretation made "unreasonably" and by "no one." Actually, it is the interpretation of HB 1224's prime sponsor.

*Prime Sponsor's Intent*

A few days before the Governor signed HB 1224, KUSA News reported on the base plate issue, and interviewed HB 1224 prime sponsor Rep. Rhonda Fields.

KUSA: So you're viewing this as a relatively broad interpretation of that clause; if it's capable of having its capacity increased at all above 15, it's out?

Rep. Fields: It will be illegal.

452

Later in the interview, she added "I'm not envisioning changing that [her bill] because of a little plate you can pull out." *See True Scope of Gun Bill Questioned*, KUSA.com, Mar. 14, 2013, http://www.9news.com/rss/story.aspx?storyid=323800 (the segment with Rep. Fields begins at about 1:40).

The opponents of HB 1224 agreed with Rep. Fields about its meaning. On Second Reading on the Senate floor, five senators spoke at length and in detail about the sweeping scope of "designed to be readily converted." Senator Lundberg even held up a magazine, and attached an extender which he had built with a 3-D printer. Minority Leader Cadman disassembled a magazine, showing how the base plate is removed. No supporter of HB 1224, including the Senate sponsor, said anything to contradict the five Senators' explanations of "readily converted."[4]

While Rep. Fields, the prime sponsor of HB 1224, had a clear idea of what magazines would be banned (nearly all of them), Defendant has now offered three different interpretations.

---

[4] Colorado State Senate, audio recording of the Senate floor, Mar. 8, 2013, at 7:47:50 (Sen. Lundberg) (demonstration of adding an extender) (HB 1224 bans "virtually all magazines regardless of what their original manufactured capacity is because you can convert them and add an extender so that they are."); 8:42:55 (Sen. Lundberg) (bans "virtually every magazine"); 9:39:25 (Sen. Cadman) (demonstration of removal of base plate) ("If you can clean them so you can keep using them they are now illegal"); 10:21:00 (Sen. Lundberg) (demonstration of removal of base plate on a 10-round magazine, and adding an extension he made with a 3D printer) ("They're all illegal, that's the way 1224 works. . . . Don't fool me with some rhetoric that small magazines are acceptable, they are not."); 10:41:01 (Sen. Lambert) ("The way the bill reads, the PMAG 10 is illegal because it is readily converted."); 12:13:44 (Sen. Brophy) ("you won't be able to purchase any new ones after July 1st of this year because they are all readily convertible"); 13:12:10 (Sen. Cadman) ("now that no new magazines can be sold in Colorado. That's what this bill is saying."), *available at* http://coloradoga.granicus.com/MediaPlayer.php?view_id =42&clip_id=3229.  Plaintiffs would have preferred to provide this Court with a printed transcript of the Senate debate; Defendant's counsel promised Magistrate Judge Watanabe on May 30 that they would provide Plaintiffs with the legislative record.  As of this filing, it has not yet been provided.

The "Technical Guidance" says that magazines with removable base plates would not be deemed prohibited by this language "simply because" of the base plate.  Each magazine would be subject to an "objective test" to see whether the magazine was "designed to be readily converted." No further information was provided about what "objective" features of a magazine made it "designed to be readily converted."[5]

Three weeks later, in Defendant's June 10 motion for certification, Defendant posited that the "designed" language covered "magazines that are *principally* used with *extensions or devices that increase the combined capacity* to more than 15 rounds." Motion to Certify at 6 (emphasis added). Defendant did not suggest how anyone, let alone an ordinary citizen, was supposed to know whether a magazine is "principally" used with extenders to "increase the combined capacity." According to the certification motion, "designed" was really about addition. The prohibited magazines were ones that were "principally" used to grow too big (13 + 3 = 16), whereas the legal magazines were not "principally" used with extensions, and presumably generally remained at their original size.

Defendant now appears to have come to the realization that Plaintiffs were correct in their Complaint, Motion and Supplemental Brief: there is no objective physical feature on any box

---

[5] The Attorney General's Technical Guidance is dated "May 16," but was not announced to the public until after Plaintiffs filed their lawsuit. The Guidance has never been sent to the Sheriffs by the Attorney General. There is no indication that it has been sent to any of Colorado's numerous municipal or other local law enforcement agencies. Finding it on the Attorney General website requires working backwards through several pages of press releases, until one arrives at May 17. The Guidance does *not* appear to website users who search for keywords such as "magazine" or "continuous." That is because the Attorney General uploaded only an image of the Technical Guidance, rather than a file in which the words are searchable.

magazine with a removable base plate which makes it more or less extendible than any other box magazine with a removable base plate.

### New Definition in Response Brief

Now, Defendant's latest theory, as articulated in his Response Brief, is that "designed to be readily converted" never had anything to do with extenders. The "extensions or devices" language that Defendant wanted to certify to the Colorado Supreme Court appears nowhere in the Response Brief. Instead, according to Defendant, everyone has always known all along that the "Technical Guidance" is really about limiters. Whereas the Defendant on June 10 was certain that the "Technical Guidance" was about addition, the Defendant now appears certain that the "Technical Guidance" is and always has been about subtraction – the removal of a limiter. Resp. at 29

### Magazines with limiters

In some States, for some types of hunting, a firearm must be temporarily limited to a certain capacity. A "limiter" can be used for this purpose. (For a shotgun, the limiter is called a "plug.") In the small number of States which restrict magazine capacity in general, manufacturers commonly sell magazines with limiters. For example, a 17-round magazine may have a 2-round limiter, in order to comply with a 15-round limit in a certain state.

Defendant now says that "designed to be readily converted" applies to magazines with limiters, and the test is how the limiter is attached to magazine:

- If the limiter is unattached, simply sitting on the base plate, then the magazine is illegal, according to Defendant.

- On the other hand, if the limiter is epoxied or welded, then the magazine is "not designed to be readily converted," according to Defendant. Resp. at 29.

Defendant has apparently not decided what the rule is if the limiter is attached by a pin. This in fact is how limiters are typically attached, for sale in the few states that restrict magazine capacity. But of course punching out a pin is easy to do. Is a magazine with a limiter attached by a pin "designed to be readily converted"? Defendant remains discreetly silent.

Defendant uses epoxy and welding as his obvious examples of what is lawful. He says that such a magazine has been "permanently altered" so that it cannot accept more than 15 rounds.  Resp. at 29, 37.  This is true if "permanently" means "a few hours." Soaking an epoxied item in paint strippers such as acetone and toluene removes the epoxy.  Besides that, as long as the epoxied limiter is left in place, the magazine cannot be disassembled for cleaning and repair. As detailed in Plaintiffs' Motion, the Second Amendment includes the right to clean and repair arms, and magazines are "arms."

As for welding, one of the cases cited by Defendant casts serious doubt on his theory that welding immunizes an arm from the "designed" language. In *United States v. M-K Specialties Model M-14 Machinegun*, 424 F.Supp.2d 862, the issue was statutory language about a gun being "designed to shoot" automatically. The gun in question did not actually shoot automatically, until a federal law enforcement employee went to work, "by drilling out and grinding down the welding that had been placed on the defendant receiver by MK Specialties and utilizing the existing design features of the receiver." *Id.* at 868. The district court thus held that because a gun could be changed from status A (not automatic) to status B (automatic) by machine shop work that involved "grinding down the welding" that had been emplaced by the defendant, the defendant's gun was "designed to shoot" automatically.  Thus, Defendant's notion

that welding a limiter onto a magazine is a safe harbor from prosecution is incorrect—at least according to the case cited by Defendant.

Coloradans who currently own or in the future buy magazines with an unattached limiter are now apparently under the obligation to weld or epoxy it in place. Welding is impossible for magazines with plastic components, and the average gun owner possesses neither the tools nor the skills to perform welding of metal magazines. As for epoxy, smearing a bunch of liquid adhesive into a mechanical device stands a good chance of accidentally destroying the device. (For example, if some of the epoxy gets onto the magazine spring.)

Defendant's Response Brief describes two other items:

*Telescoping magazine*

This was patented three decades ago. Defendant is aware of only a single magazine ever commercially sold which can telescope. He admits that there are no such magazines on the market which can telescope from 15 rounds or less to 16 rounds or more. Hypothesizing that such magazines existed, they would be straightforwardly outlawed by the direct language of HB 1224, because they are "capable of accepting" more than 15 rounds.

By analogy, if a statute outlawed cars that can drive more than 15 miles an hour, a car which can drive 10 miles an hour *and* can drive 20 miles an hour would be directly outlawed. This is true even if the driver had to push a button or move a lever (e.g., to change gears) in order to make the car drive 20 miles per hour.

*Magazine coupler*

Defendant now says that coupling two legal 10-round magazines together does not turn them into an illegal 20-round magazine. Hence, magazines which can be joined via couplers (or

duct tape) are not prohibited by "designed to be readily converted." Defendant refused weeks ago to make this concession but now offers it to try to defend "designed to be readily converted" from an injunction.

Moreover, Defendant's statement in his Response Brief about couplers is actually an interpretation of the meaning of "capable of accepting" more than fifteen rounds of ammunition. It is *not* an interpretation of the term "designed to be readily converted."

Every substantive statement by Defendant about "designed to be readily converted" (the Technical Guidance, the Motion for Certification, the Brief in Opposition) has offered new interpretations of what Defendant thinks the phrase means. Every one of those new interpretations also remains unconstitutionally vague.

### B.   "Continuous Possession"

As with "designed to be readily converted, Defendant has developed a variety of interpretations about what "continuous possession" means.[6]  The latest interpretation, from the Response Brief, in fact flatly contracts the "Technical Guidance."

---

[6] Defendant's brief supplies a dictionary definition of the individual words in each phrase.  Resp. at 24, 28, 32. Merely quoting the dictionary does not solve a vagueness problem:

> The Government's supplemental briefing raises two additional major arguments in favor of its definition of "compounding": (i) "compounding" is a "term of art," having a clear and uniform meaning understood both by the FDA . . . and those in the pharmacy industry . . . ; and (ii) that the term "compounding" has a "common and ordinary meaning," ascertainable from dictionaries, and that Congress intended to adopt that common meaning. The Court has carefully considered these arguments, but finds them to be without merit . . . . [I]t is incumbent upon Congress to state its understanding of the terms it uses and improper for a court to speculate as to its intentions, especially where there is none evident in the legislative history and Congress as well as the FDA deferred to the states in regulation of the practice.

According to the "Technical Guidance," a "grandfathered" owner is allowed "temporary transfers" only if both of two conditions are met: the magazine must remain in the "continual physical presence" of the owner, and the owner must have the "expectation that it will be promptly returned."

Defendant's motion for certification offered another meaning of "continuous possession": that is, it is not illegal to allow "another person to temporarily hold, use, or share [a magazine] for lawful purposes."

The Response Brief offers still yet another interpretation. "Under the guidance, if a person remains in the physical presence of the magazine, or ensures that the magazine is secured while the individual is absent, the 'continuous possession' requirement is satisfied." Resp. at 32. This is *not* what the "Technical Guidance" instructs.

The "Technical Guidance" requires "continual physical presence" *and* the "expectation that it will be promptly returned." Neither of those is required by the Response Brief's new standard. Instead, transfers are allowed if either one of two conditions are met: "physical presence" *or* "the magazine is secured while the individual is absent."

Defendant's three different, contradictory interpretations of the meaning of "continuous possession" are conclusive proof that "continuous possession" is unconstitutionally vague.

Plaintiffs in their Motion and Supplemental Brief have presented an extensive list of examples showing clearly unconstitutional restrictions on ownership and use of "grandfathered" magazines arising from the "continual physical presence" mandate in the "Technical Guidance."

---

*United States v. Bader*, 2009 WL 2219258, at *10 (D. Colo. Jul. 23, 2009). The two phrases at issue in the instant case are certainly not terms of art in firearms regulation or the firearms industry. As detailed in the Motion, they are novelties.  Motion at 13, 16-17.

Most importantly, under the "Technical Guidance," it is illegal to loan a magazine to a family member who does not remain in the owner's "continual physical presence" and does not "promptly" return the magazine. The same rules of the "Technical Guidance" also outlaw leaving a magazine for repair with a gunsmith overnight or for several weeks. Defendant tacitly admits that such prohibitions are unconstitutional; that is why his Response Brief now propounds a brand-new interpretation of "continuous possession," which might mitigate some of the more egregious infringements on Second Amendment rights.[7]

That the new interpretation of "continuous possession" in the Response Brief is not meant to be taken seriously is demonstrated by the brief itself. Plaintiffs' Supplemental Brief had detailed the plight of David Strumillo, who is storing magazines for a friend who is currently serving overseas in the Armed Forces. As of July 1, the owner and Mr. Strumillo will become criminals, because the owner (who is on another continent) will not be in "continuous possession." (No physical presence, and no expectation of prompt return, according to the "Technical Guidance.") *See* Ex. A (Declaration of David Strumillo).

The Response Brief offers Mr. Strumillo a variety of useless solutions. *E.g.*, Mr. Strumillo can buy the magazines—which would result in Mr. Strumillo buying magazines for guns he does not own, and the serviceman losing the magazines for the guns that he does own.

---

[7] Even then, serious problems remain. If an individual's handgun and its 17-round magazine are stolen and later recovered, the Sheriffs can apparently return the handgun to the crime victim, but cannot return the magazine. When a thief interrupts the owner's "continuous possession," the owner does not "ensure[] that the magazine is secured while the individual is absent"—since the thief never promised to keep the magazine "secured." This problem will be frequent for the Sheriffs.

If the new standard of the Response Brief actually meant anything, the Response Brief could instead have argued that everything is fine, because the serviceman ensured that "the magazine is secured while the individual is absent." But of course this new interpretation invented for page 32 of the Response Brief is binding on no-one, not even on page 20 of that same brief.

Defendant also proposes the marital property statute as the solution of family members being forbidden to lend each other magazines because of the "continuous possession" requirement. Resp. at 32. Even if Defendant's marital property theory were correct, it does nothing to alleviate HB 1224's ban on a magazine owner lending her magazine to her children, parents, siblings, or a neighbor who is in particular danger. The marital property rule does not change the fact that if a Sheriff's adult daughter arms herself with the Sheriff's duty handgun and its 17-round magazine while the Sheriff is out of town at a conference for a week, the Sheriff and the daughter are criminals, according to the Technical Guidance's interpretation of "continuous possession."

Defendant is correct that a magazine is subject to the ordinary marital property laws of Colorado. If the assets of divorcing spouses included a $50 magazine which the wife had acquired during the course of the marriage, then the husband would be entitled to $25 worth of other marital property, such as cash. Defendant apparently does not realize that gun control statutes and regulations about who can or cannot legally possess an arm do not always mirror marital property laws. For example, according to advisory opinions from the Bureau of Alcohol, Tobacco, Firearms & Explosives, if a husband with a felony conviction is prohibited from owning guns, his wife with whom he lives may still possess firearms, so long as she secures

them in a manner such that he does not have access to them. *See* STEPHEN P. HALBROOK, FIREARMS LAW DESKBOOK 2012-2103 EDITION § 2:19, at 214-15 (2012) (quoting the advisory opinions).

Thus, it is simplistic to assert that general rules of marital property can always by themselves determine the legal rights and duties of persons who own and possess arms.

Regardless, a marital exception to "continuous possession" does not cure the Technical Guidance's unconstitutional prohibition on lending magazines to other family members for lawful purposes, including self-defense in the home.

## **CONCLUSION**

The Court should grant Plaintiffs' motion for temporary restraining order until the July 10 hearing. The Court, at the hearing, should issue a preliminary injunction as described in the Motion.

Respectfully submitted this 27th day of June, 2013.

<div style="margin-left:40%">

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com
ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

</div>

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEY FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2013, I have e-mailed a true and correct copy of the foregoing to the following e-mail addresses:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |

s/Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

    Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

    Defendant.

---

## DECLARATION OF DAVID STRUMILLO

---

Pursuant to 28 U.S.C. § 1746, I, David Strumillo, do hereby declare as follows:

    1. I reside at 925 Wuthering Heights Drive, Colorado Springs, Colorado, and am a citizen of the United States.

    2. I served as a police officer in the Town of Parker, Colorado Police Department from 1994 through 1999, when I was medically retired following an injury in the line of duty.

1

EXHIBIT A

3. I am authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, I am required to requalify each year using the firearms I carry.

4. I own and carry firearms for lawful self-defense for myself and my family. Some of the firearms I carry use magazines larger than 15 rounds.

5. From personal experience and practice, I know that these particular magazines function well with my particular guns, and are unlikely to cause misfeeds, jams, or other problems.

6. If the "continuous possession" language of HB 1224 goes into effect, I will be prevented from lending my firearms containing those magazines to my family members.

7. If the "continuous possession" language of HB 1224 goes into effect, I will also be legally barred from leaving those magazines with a gunsmith for repair, cleaning, or maintenance.

8. I also own magazines which are smaller than 16 rounds and which have removable base plates.

9. I have read the Attorney General's Technical Guidance.

10. Having done so, I do not understand which of my magazines smaller than 16 rounds are "designed to be readily converted" and which are not.

2

EXHIBIT A

466

11. If the "designed to be readily converted" language of HB 1224 goes into effect, I will not know which of my magazines under 16 rounds I can legally sell or transfer to other persons. This includes transfer to family members for self-defense, and transfer to gunsmiths for repair.

12. One of my friends is currently serving in the United States Armed Forces, overseas. His wife and children are living overseas with him. Before leaving Colorado to serve overseas, my friend and his wife gave me much of their personal property to store, including his magazines.

13. I believe that my friend chose me to store the magazines because he considered me to be a conscientious and responsible guardian.

14. I am carefully storing the magazines to ensure that they do not fall into the wrong hands, and to protect them from rust or other damage. The magazines hold more than 15 rounds.

15. On July 1, 2013, my friend and I may become in violation of the law subject to prosecution under HB 1224. The possessor of the magazines (me) will be in Colorado. The owner of the magazines will be on another continent. Hence, the owner will not be in "continuous possession" of the magazines. My friend will not be in the "continual physical presence" of me; and my friend will not have the expectation that the magazines will be promptly returned.

16. A temporary restraining order against the "continuous possession" language would allow me to continue to lawfully store the magazines for the owner.

3

EXHIBIT A

467

17. A preliminary injunction against the "transfers" ban would allow me to return the magazines to my friend if he returns to Colorado during the period the preliminary injunction is in effect.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 26, 2013.

David Strumillo

EXHIBIT A

468

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## DECLARATION OF GARRETT WIGGINS

---

Pursuant to 28 U.S.C. § 1746, I, Garrett Wiggins, do hereby declare as follows:

   1.  I make this Declaration in my capacity as an individual citizen of the United States of America and of Colorado, and in my official capacity as the Routt County Sheriff.

   2. I have been in the law enforcement profession for approximately 26 years and have served in positions which have caused deep hatred toward me personally by many individual criminals involved in organized criminal enterprises as well as

EXHIBIT B

469

individuals involved in independent criminal activity. Many of these individuals have served long prison sentences due to my direct involvement. Not only have I received death threats, but on occasion threats have been directed toward members of my family. As a police officer, a deputy sheriff, an undercover narcotics investigator and later as the Task Force Commander for the All Crimes Enforcement Team, I have investigated individual drug dealers, Mexican Cartel organizations and a plethora of other criminals who I have had to testify against. Some of these individuals and organizations have a history of violence and or retaliation against law enforcement officials and their families.

3. I have many firearms in my residence stored in a safe and prudent manner always readily available for self-defense. Many of these firearms have standard magazines with a capacity of more than 15 rounds. These firearms are legal for me to use under current law. But in an unpredictable circumstance where a family member had to resort to the use of one of these firearms in a self-defense situation, I fear they could be in violation of HB 1224.

4. Due to the nature of my profession, there are many times I am away from home and unable to provide protection for my family. In my absence, I want my family to have the ability to protect themsevles from an imminent threat. It is my understanding that HB 1224 requires me to have continuous possession of the magazines I already own, and that if any family members who used one of my

2

firearms with its standard magazine for self-defense in my absence, they and I could be subject to criminal prosecution.

5. From the perspective as it relates to my official position as the Sheriff of Routt County, these new laws are perceived by many of the citizens I serve and by me to violate our Second and Fourteenth Amendment rights. I have taken an oath on several occasions to "uphold and protect the Constitution of the United States of America and the Constitution of the State of Colorado". Both Constitutions speak to the right to bear arms and that this right shall not be infringed or questioned. This oath also states that "I will faithfully perform the duties of Sheriff to the best of my ability". Enforcing the laws of the state of Colorado is a major duty of performing those responsibilities.

6. HB 1224 and 1229 create a direct conflict between upholding the US Constitution and the Colorado Constitution while at the same time performing the duties of the office of Sheriff (enforcing the laws) to the best of my ability. This conflict prevents me from honoring the full scope of my oath. If I or members of my staff enforce these new laws, then it is believed by many of my constituents and me that I have violated my oath of office by not upholding and protecting the U.S. or Colorado Constitutions. If I fail to enforce the laws, then I have failed to honor my oath of office by not performing the duties (enforcing the law) to the best of my

EXHIBIT B

471

ability. Either direction possibly violates my oath of office and therefore places my in peril regarding my sworn oath.

7. This conflicting situation has created harm to me personally and professionally while serving in my official capacity as Sheriff of Routt County. The lack of clarity and the vague wording of these new laws make a clear understanding of these new laws subject to individual interpretation which is inconsistent from individual to individual. One law enforcement professional interprets the laws with one narrowly focused interpretation and another will see it completely different. There is no uniformity in the understanding of how the law should be enforced between police chiefs, sheriffs and other law enforcement leaders creating a lot of confusion. If enforce HB 1224 one way, and another Sheriff or Chief of Police does so in another way, the public will perceive all of us as being arbitrary and unfair, even though all us may be doing our best to apply the HB 1224's vague wording

8. I have read the Attorney General's Technical Guidance. Having done so, I do not understand which magazines are or are not "designed to be readily converted" under HB 1224.

9. Part of my job is to help develop guidelines and procedures to implement new laws. At this time, I am unable to give clear and concise direction to my staff about what magazines are legal or illegal or how to enforce the continuous possession

4

EXHIBIT B

472

requirement. There is a sense of urgency in providing clarity regarding these laws as I must be given the ability to provide factual direction to my staff.

10. If even one of my Deputies were to make a single arrest for some of the activities which are illegal under HB 1224 and the Attorney General's Technical Guidance (such as allowing a family member to borrow a magazine when the owner is not physically present), the harm to law enforcement in my County would be very serious. Even one incident would strongly alienate a very significant fraction of the County's population from the Sheriff's Office. The inevitable result would be fewer trips, fewer cooperative crime witnesses, reduced trust in the Sheriff's Office as protector of the public, and increased fear of the Office and its employees by good people.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 27, 2013.

Garrett Wiggins

5

EXHIBIT B

473

## Declaration of Douglas G. Hamilton, Sr.

I, **Douglas G. Hamilton, Sr**, declare under penalty of perjury that the following is true and correct:

I am the President and CEO/CFO of Hamilton Family Enterprises, Inc, d/b/a Family Shooting Center at Cherry Creek State Park under contract with the State of Colorado.  As such, I am responsible for the overall day-to-day operations, financial viability and future physical development of this Colorado State Parks Concession.

Family Shooting Center at Cherry Creek State Park ("Family Shooting Center" or "FSC") is a multi-discipline shooting facility that includes a rifle range, pistol range, law-enforcement range, sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is the largest public outdoor shooting facility on the Front Range in Colorado; over 64,000 shooters used the facility in 2012, and that number has grown each year since 2004. Nearly all persons who shoot at FSC pay some form of use fee at either individual or group rates, which is the primary source of revenue for Hamilton Family Enterprises.

In addition to operation, supervision and maintenance of the shooting facilities, FSC also makes available for use by qualified members of the public firearms that are equipped with magazines of standard issue having capacities of more than fifteen rounds or that have smaller magazines that may be convertible to more than 15 rounds. FSC also sells firearms equipment and accessories, which includes standard magazines for many firearms whose capacities exceed fifteen rounds and smaller magazines that may be convertible to more than 15 rounds. A large number of rifle and pistol magazines sold and/or in use at FSC prior to July 1, 2013 will be

illegal to transfer after that date. Historically, 20-30% of gross FSC revenues have been the sales of equipment, accessories and ammunition. Sales this year of equipment and accessories has grown to nearly half of FSC's gross revenues. HB 1224 will drastically reduce, if not outright end, these sales/revenues. A similar claim can be made for all revenues of FSC as most of its business stems from shooter participation, which as discussed below is expected to greatly decline due to the new laws.

Per contract requirements of its concession, FSC is currently in the process of adding a "move-and-shoot" pistol range which will permit law enforcement, private security and civilians with concealed carry permits to engage in more dynamic practical firearms practice and training. This new range constitutes a significant capital investment by Hamilton Family Enterprises. The new laws will have a significant impact on the viability of this new range in that nearly all shooters who are expected to utilize this particular range frequently use firearms that accept magazines with capacities of greater than fifteen rounds.

FSC hosts all type and manner of firearms use, training and practice. In addition to hosting recreational shooters in all disciplines (rifle, pistol, shotgun), FSC is utilized by law enforcement and firearms instructors for all types and levels of training, hunter safety education handling and live-fire practice, fundraisers and competitive matches in all shooting disciplines, including those for disabled and/or handicapped shooters , e.g. Wounded Warrior Project and the National Veterans Wheelchair Games. The majority of shooters who use FSC facilities, whether informally or competitively, own and shoot firearms that use, as standard equipment, magazines whose capacities exceed fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.

Since enactment of the statutes in question, my staff has been frequently contacted by current and potential patrons regarding the legality of the use of standard firearms that accept or use magazines exceeding fifteen rounds and smaller magazines that may be convertible to more than 15 rounds. Many have expressed apprehension in bringing their firearms and/or magazines to FSC after July 1, 2013. These shooters have expressed serious concern of inadvertently running afoul of the new laws, particularly because FSC is known to have a frequent and substantial presence of law enforcement personnel who would be compelled to enforce the new laws. Further, my staff and myself are unable to provide any clear guidance or information regarding what types of equipment or conduct is or is not in compliance with the new laws. We are the people to whom our clientele looks for guidance/direction on the legal use of firearms at FSC and we are unable to provide that guidance/direction because we ourselves are unclear as to the meaning, interpretation and/or effect of the new laws.

The vagueness and uncertainly of the laws pertaining to magazine capacities and transfer prohibitions have made it unnecessarily and unreasonably unclear as to how FSC should modify, if at all, its rules, operations and monitoring of its shooting ranges in order to avoid both civil and criminal liability. Under the new laws, I have determined that it would be imprudent, if not outright contrary to law, to continue many of the current common practices and operations of FSC, including the sale of magazines/accessories and the rental of firearms, all of which fall under the purview of the new laws. Additionally, it would be completely impractical, if not impossible, to monitor all conduct on the premises to ensure the legal use of most of the firearms brought to FSC given the myriad of ways in which the new laws can or should be interpreted. Simply put, if my staff or myself cannot ascertain what equipment or conduct is in compliance

with state law, we will be forced to err on the side of caution and severely curtail, if not entirely terminate, the operation of our facility. Should the "designed to be readily converted" and "continuous possession" provisions of HB 1224 remain effective, I am dubious as to the ability of FSC to continue operations to the extent it can remain economically viable. Each of the individual disciplines of the shooting ranges tends to supplement the others in revenue and profits, depending on the season. Losing one or two of the profitable disciplines due to the perceptions of restrictions mandated by the new laws will cause loss of economic viability in the other disciplines. I cannot operate FSC on a severely-restricted basis and maintain the economic viability necessary to comply with the requirements of my total concession contract obligations with the State of Colorado to fully develop and operate FSC.

Executed on this, the 26th day of June, 2013.

Douglas G. Hamilton, Sr.

### Declaration of Timothy Brough

I, Timothy Brough, declare under penalty of perjury that the following is true and correct.

I am a licensed firearms dealer located in the State of Colorado. My business is named Rocky Mountain Shooters Supply and I buy and sell many firearms and associated magazines that will be outlawed by House Bill 13-1224 ("HB 1224"). Nearly 99% of my business revenue is generated by customers within the State of Colorado.

Due to the passage of HB 1224, I have already suffered a significant economic injury. Based on my customers' orders, I have attempted to obtain over $500,000 worth of inventory from various manufacturers. Unfortunately, because of the language contained in HB 1224, many manufacturers are refusing to deliver the requested merchandise. Therefore, I have been forced to return my customers' payment and have lost the associated revenue.

Also, based on my review of my business's past sales records as well as our projections for 2013, I anticipate the following lost revenue due to HB 1224's "designed to be readily converted" and "grandfather" clauses:

1. Loss of sales at the firing range associated with my business because of the uncertainty of what magazines and firearms are legal to own and possess: $50,000; and

2. Loss of handgun sales and accessories with magazines that carry 15 or fewer rounds and include a detachable floor plate: $550,000.

In addition to the above economic injuries I will suffer due to HB 1224, I currently possess over $350,000 in merchandise that will be illegal to sell or transfer after HB 1224 goes into

effect. Because of the lost revenue caused by HB 1224, I expect that I will have to cut my workforce by 20-25%.

Finally, aside from the economic losses my business will suffer due to HB 1224, I am deeply concerned about my personal criminal exposure. Because of the language used in HB 1224, I am uncertain as to exactly which firearms and associated magazines are unlawful and what exactly it means to be in "continuous possession" of a grandfathered magazine. Thus, I am forced to choose between either selling firearms and the associated magazines that may be unlawful under HB 1224, or risk the viability of my business. A restraining order prohibiting enforcement of the "designed to be readily converted" and "grandfather" clauses of HB 1224 would allow me to continue to operate my business without the fear of prosecution until they can be further litigated.

Executed on this, the 26th day of June, 2013.

Timothy Brough

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Message-Id:4077651@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Cooke et al v. Hickenlooper Order
```
Content–Type: text/html

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 7/1/2013 at 3:07 PM MDT and filed on 7/1/2013

| | |
|---|---|
| **Case Name:** | Cooke et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 42(No document attached) |

**Docket Text:**
**ORDER: Having reviewed the briefing found at [29], [37], [40], and [41], and upon the current showing, the Court declines to impose an injunction until the parties have an opportunity to present evidence at the hearing scheduled for July 10, 2013. By Chief Judge Marcia S. Krieger on 07/01/2013. Text Only Entry (msklc3, )**

**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin  mcolin@brunolawyers.com, cmaulin@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Kathleen L. Spalding  kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall  rwestfall@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel  david@i2i.org

Douglas L. Abbott  dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz  pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian  fabianlaw@qwestoffice.net

Jonathan Michael Anderson  jmanderson@hollandhart.com

Matthew David Grove  matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico  dan.domenico@state.co.us, laura–jane.weimer@state.co.us

Jonathan Patrick Fero jon.fero@state.co.us

David Christopher Blake david.blake@state.co.us, carol.gall@state.co.us, laura−jane.weimer@state.co.us

**1:13−cv−01300−MSK−MJW Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

---

Plaintiffs respectfully petition this Court for leave to file a Second Amended Complaint, pursuant to Fed. R. Civ. P. 15(a)(2). In support, Plaintiffs state as follows:

**Certification.** Pursuant to D.C.COLO.LCivR 7.1(A), undersigned counsel has conferred with counsel for Defendant concerning the substance of this motion. Defendant has consented to the filing of the Second Amended Complaint, via an email from Solicitor General Dan Dominico to David Kopel, sent at 3:05 p.m. on June 28, 2013.

1. The Second Amended Complaint does not in any way affect the Motion for a Preliminary Injunction and TRO, or the July 10 hearing on the Motion. The change in paragraph 207 (discussed below) relates to language in House Bill 1224 which is not challenged in the Motion ("capable of accepting"). The second change, in

482

paragraph 105, provides more explicit information about the Sheriffs' interests in the case a whole. Defendant is not challenging the Sheriffs' standing in regards to the Preliminary Injunction hearing. Defendant's Response, at 14.

2. Rule 15(a)(2) provides that a district court should freely grant a plaintiff leave to amend a pleading "when justice so requires." Thus, the "Court should freely grant leave to amend absent good reason not to do so." *Rigg v. City of Lakewood*, 896 F. Supp. 2d 978, 981 (D. Colo. 2012).

3. "Good reason" to deny leave to amend includes undue delay, bad faith, or dilatory motive on the party of the movant, repeated failures to cure deficiencies by previously allowed amendments, undue prejudice to the opposing party, or futility. *York ex rel. York v. Cherry Creek Sch. Dist. No. 5*, 232 F.R.D. 648, 649-50 (D. Colo. 2005) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

4. Here, Plaintiffs seek leave to amend the First Amended Complaint for two reasons.

5. First, paragraph 207 of the First Amended Complaint raises the problem of vagueness because of rifle cartridges of different lengths. This is not an issue involving "designed to be readily converted" (which is a subject of the Preliminary Injunction Motion). Instead, this involves the separate language outlawing magazines "capable of accepting" more than 15 rounds. The example given in paragraph 207 was incorrect; tube magazines for rimfire ammunition are exempted by HB 1224. Plaintiffs seek leave to amend paragraph 207 to provide an accurate example involving centerfire ammunition.

6.  Second, in the First Amended Complaint, the Sheriffs, as members of the category of the Plaintiffs in general, and as members of the category of individual Plaintiffs, had raised their personal Second and Fourteenth Amendment rights as American citizens. See First Amended Complaint, ¶¶ 95, 137, 158, 187, 207, 214, 217, and 231.

7.  Defendant, in his Response Brief, expressed surprise that the Sheriffs are asserting their individual rights. Response at 14.

8.  Therefore, in the interest of absolute clarity, Plaintiffs seek to amend paragraph 105, in the section on the Plaintiff Sheriffs' interests, to further state the Sheriffs' individual rights and interests, even though those rights and interests had already been repeatedly stated in the First Amended Complaint.

9.  These amendments will not cause undue delay and are not motivated by bad faith or dilatoriness on the part of Plaintiffs. Nor will the granting of Plaintiffs' motion cause Defendant any undue prejudice. Accordingly, this Court should grant Plaintiffs leave to amend the First Amended Complaint in the ways described herein.

10. Plaintiffs are conditionally submitting their Second Amended Complaint herewith.

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order granting Plaintiffs' Motion for Leave to File an Amended Complaint, and accepting the attached Second Amended Complaint for filing pursuant to Fed. R. Civ. P. 15(a)(2).

Respectfully submitted this 1st day of July, 2013.

s/David B. Kopel
Independence Institute
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
**Attorney for Sheriffs and David Strumillo**

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com
**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY**

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

s/Marc F. Colin

BRUNO COLIN JEWELL & LOWE PC

1999 Broadway, Suite 3100

Denver, CO 80202-5731

Phone: (303) 831-1099

Fax: (303) 831-1088

mcolin@bcjlpc.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

s/Anthony J. Fabian

LAW OFFICES OF ANTHONY J. FABIAN PC

510 Wilcox Street, Suite C

Castle Rock, CO 80104

Phone: (303) 663-9339

Fax: (303) 713-0785

fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2013, I served a true and complete copy of the foregoing Motion for Leave to File an Amended Complaint and of the Second Amended Complaint upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado. I further certify that on July 1 I directly emailed a copy of this Motion and the Complaint to the same persons.

| | |
|---|---|
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |

s/David B. Kopel
Independence Institute
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

487

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;

SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
RODNEY JOHNSON, Sheriff of Grand County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

    Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

    Defendant.

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Peace officers and peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are 55 Colorado elected sheriffs, retired law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

### I.    OVERVIEW

1.    On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2.    House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013 that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3.      The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4.      The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5.      Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6.      Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7.      The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8.      Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.     The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14. The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15. In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16. Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.     Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.     HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.     The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

## HB 1229

20.     House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common, temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26.     Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27.     There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28.     Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29.     The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30.     An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31.     Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32.      HB 1224 and HB 1229 violate these principles.

## II.   JURISDICTION AND VENUE

33.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34.      This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III.   PARTIES

**A.   Plaintiffs**

**1.   The Sheriffs of 55 Colorado Counties**

37.      Each of the following Sheriffs of 55 Colorado counties ("the Sheriffs") has the primary obligation to obey the Constitution of the United States of America. The Sheriffs bring this case pursuant to this primary obligation, which is supreme over any other purported enactment.

38.      John B. Cooke is the Sheriff of Weld County, Colorado.

39.      Terry Maketa is the Sheriff of El Paso County, Colorado.

40.      Justin Smith is the Sheriff of Larimer County, Colorado.

41.      David A. Weaver is the Sheriff of Douglas County, Colorado.

42.      Bruce W. Hartman is the Sheriff of Gilpin County, Colorado.

43.     Ken Putnam is the Sheriff of Cheyenne County, Colorado.

44.     Dennis Spruell is the Sheriff of Montezuma County, Colorado.

45.     Tim Jantz is the Sheriff of Moffat County, Colorado.

46.     Jerry Martin is the Sheriff of Dolores County, Colorado.

47.     Mike Ensminger is the Sheriff of Teller County, Colorado.

48.     Shayne Heap is the Sheriff of Elbert County, Colorado.

49.     Chad Day is the Sheriff of Yuma County, Colorado.

50.     Fred D. McKee is the Sheriff of Delta County, Colorado.

51.     Lou Vallario is the Sheriff of Garfield County, Colorado.

52.     Fred Hosselkus is the Sheriff of Mineral County, Colorado.

53.     Brett L. Powell is the Sheriff of Logan County, Colorado.

54.     James Faull is the Sheriff of Prowers County, Colorado.

55.     Larry Kuntz is the Sheriff of Washington County, Colorado.

56.     Brian E. Norton is the Sheriff of Rio Grande County, Colorado.

57.     Duke Schirard is the Sheriff of La Plata County, Colorado.

58.     Jim Beicker is the Sheriff of Fremont County, Colorado.

59.     Ronald Bruce is the Sheriff of Hinsdale County, Colorado.

60.     Chris S. Johnson is the Sheriff of Otero County, Colorado.

61.     Fred Jobe is the Sheriff of Custer County, Colorado.

62.     Donald Krueger is the Sheriff of Clear Creek County, Colorado.

63.     James Crone is the Sheriff of Morgan County, Colorado.

64.     Si Woodruff is the Sheriff of Rio Blanco County, Colorado.

65.     Tom Ridnour is the Sheriff of Kit Carson County, Colorado.

66.     Tom Nestor is the Sheriff of Lincoln County, Colorado.

67.     Stan Hilkey is the Sheriff of Mesa County, Colorado.

68.     Forrest Frazee is the Sheriff of Kiowa County, Colorado.

69.     Rick Dunlap is the Sheriff of Montrose County, Colorado.

70.     Ted B. Mink is the Sheriff of Jefferson County, Colorado.

71.     Dave Stong is the Sheriff of Alamosa County, Colorado.

72.     Fred Wegener is the Sheriff of Park County, Colorado.

73.     Bruce Newman is the Sheriff of Huerfano County, Colorado.

74.     Randy Peck is the Sheriff of Sedgwick County, Colorado.

75.     Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado.

76.     John Minor is the Sheriff of Summit County, Colorado.

77.     Scott Fischer is the Sheriff of Jackson County, Colorado.

78.     Peter Gonzalez is the Sheriff of Archuleta County, Colorado.

79.     Rick Besecker is the Sheriff of Gunnison County, Colorado.

80.     Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado.

81.     Rod Fenske is the Sheriff of Lake County, Colorado.

82.     Grayson Robinson is the Sheriff of Arapahoe County, Colorado.

83.     David D. Campbell is the Sheriff of Baca County, Colorado.

84.     Mike Norris is the Sheriff of Saguache County, Colorado.

85.     Amos Medina is the Sheriff of Costilla County, Colorado.

86.     Miles Clark is the Sheriff of Crowley County, Colorado.

87.     David Encinias is the Sheriff of Bent County, Colorado.

88.     Sue Kurtz is the Sheriff of San Juan County, Colorado.

89.     James (Jim) Casias is the Sheriff of Las Animas County, Colorado.

90.     Garrett Wiggins is the Sheriff of Routt County, Colorado.

91.     Douglas N. Darr is the Sheriff of Adams County, Colorado.

92.     Rodney Johnson is the Sheriff of Grand County, Colorado.

93.     HB 1224 and 1229 violate the Constitution of the United States. The Sheriffs cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado.

94.     For reasons detailed *supra* and *infra*, HB 1224 and 1229 are utterly unenforceable, even if the Sheriffs wished to violate the U.S. Constitution.

95.     After HB 1229 becomes effective, every citizen of Colorado can legally possess a "large capacity" magazine that holds more than 15 rounds so long as they owned it prior to the effective date and maintain "continuous possession" of it after the effective date. This includes both magazines that hold more than 15 rounds, and smaller magazines with removable floor plates or end caps. At least hundreds of thousands of Colorado citizens, including the individual Plaintiffs and members of Plaintiff associations, will lawfully own hundreds of thousands (or more) of such magazines.

96.     The Sheriffs have limited resources and limited public funds to spend on investigations. They cannot expend those resources to conduct investigations that would be necessary to monitor compliance with the new magazine restrictions.

No documentation has ever been required for the retail or private purchase of magazines, making it a practical impossibility for the Sheriffs to determine whether one of the many magazines already in existence was obtained after the effective date.

97.    It would be similarly impossible to determine whether a magazine was in the "continuous possession" of its owner after July 1, 2013.

98.    With very few exceptions, magazines manufactured in other states are not required to bear date stamps, making it impossible to determine their date of manufacture. The Sheriffs will have no means to determine whether a magazine possessed by an individual in Colorado was manufactured before or after July 1, 2013, with the exception of those manufactured in Colorado after July 1, 2013 that are required by the bill to bear a date stamp.

99.    The foregoing presumes that it is clear what the bill prohibits. But the Sheriffs' enforcement obstacles become insurmountable if they must also resolve ambiguities in the bill. If the bill does not prohibit every magazine with a removable floor plate and end cap, but only those that were intentionally "designed" for the purpose of expanding capacity, the Sheriffs are given no tools to make that determination. They cannot know the intent of the designer.

100.    Likewise, each Sheriff will have to determine what constitutes "continuous possession," since the statute provides no guidance. They will have to make individual decisions whether continuous possession allows for temporary loans to others and, if so, for what duration.

101.    In addition to the core infringement on a fundamental right inherent in any enforcement of these provisions, the result of the many ambiguities will be varying individual decisions and inconsistent enforcement across jurisdictions. Effective law enforcement depends on close and supportive relations between the public and law enforcement. Unconstitutional, vague laws which are inconsistently enforced poison that relationship, and make it significantly more difficult for the Sheriffs to receive the witness cooperation, tips, and other forms of public support which are necessary to effective law enforcement in a free society.

102.    Sheriffs have the common law power to request the armed assistance of able-bodied adults in their County. This is known as the "posse comitatus." One well-known use of the posse in Colorado was in June 1977, when Pitkin County citizens with their own guns responded to a request to help with the search for escaped mass murderer Theodore Bundy.

103.    Sheriffs also have the authority to appoint deputies who are not certified peace officers. The "non-certified" deputies may be appointed for a limited period of time, or for specific tasks. C.R.S. §§ 16-2.5-103(2); 30-10-506. Particularly in rural parts of Colorado, Sheriffs utilize the authority to deputize individuals to augment law enforcement efforts in times of disturbances and natural disasters.

104.    When those Sheriffs deputize, they do not have a cache of firearms to issue. Moreover, a person who is deputized in an emergency will be safer and more effective using his or her personal firearm, with which he or she is already familiar.

105.     HB 1224 seriously impedes the ability of Sheriffs to call upon armed citizen assistance during emergencies and natural disasters because it prevents citizens from having the types of magazines which the Sheriffs and their ordinary deputies have determined to be most effective for the preservation of public safety. As described in paragraphs 95, 137, 158, 187, 207, 214, 217, and 231, the Sheriffs, like all Plaintiffs, are injured by the infringements of their individual rights under the Second and Fourteenth Amendments. The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.

### 2.     Colorado Farm Bureau

106.     Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

107.     Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

108.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

109.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in connection with their farming or ranching operations, they do not acquire them as "natural persons."

110.    Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

111.    HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

a.    it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

b.    it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

c.    even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

504

112.     Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

### 3.     Firearms Industry Trade Association

113.     The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

114.     As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

115.     The NSSF's members in Colorado  provide lawful commerce in firearms to law-abiding Coloradans.  Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

505

### 4.   Retired Law Enforcement Officers

116.   David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

117.   Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

118.   Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

### 5.   Disabled Citizens

119.   David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

120.    Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

121.    Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

122.    First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

123.    Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits Mr. Harrell's mobility and  severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The

limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

124.    Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or re-position himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

125.    If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

**6.    Licensed Firearms Dealers**

126.    USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

127.    Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

128.    2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on

inventory in firearms and magazines that will be rendered illegal on July 1, 2013.
2nd Amendment will suffer significant losses in its overall sales if it cannot sell
firearms or magazines over 15 rounds or with removable floor plates or end caps if
HB 1224 becomes effective.

129.   Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with
its principal place of business in Loveland, Colorado. Jensen Arms is a retail
firearms dealer in business since 1994 that serves customers throughout much of
Colorado. To serve its customers, Jensen Arms has invested millions of dollars in
magazines and firearms inventory that utilizes magazines that will be prohibited
under HB 1224. Customers have already expressed confusion about what
magazines will be legal, and Jensen Arms will suffer significant losses in sales.

130.   Green Mountain Guns is a Colorado corporation with its principal
place of business in Lakewood, Colorado. Green Mountain Guns has been in
business for 35 years, and will lose approximately $2 million in sales after HB 1224
becomes effective because the majority of firearms and magazines that it sells will
be rendered illegal on July 1, 2013, including many smaller magazines that have
removable floor plates or end caps.

131.   Smith & Wesson has already informed Green Mountain Guns that it
will no longer ship merchandise to Green Mountain Guns because of the
uncertainty caused by HB 1224 and confusion about what firearms and firearm
accessories will be illegal after HB 1224 goes into effect.

509

132.     Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

133.     Grand Prix Guns is a Colorado corporation with its principal place of business in Littleton, Colorado. Grand Prix Guns anticipates that it may suffer as much as an 80% loss in revenue if HB 1224 renders the majority of the firearms and magazines it sells illegal.

134.     Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

135.     Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

136.     The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment

will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

137.    The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

138.    In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.    Shooting Association and Shooting Ranges and Clubs

139.    The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

140.    CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

141.    Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of

511

such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

142.    The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

143.    CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

144.    CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

145.    CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-created program that fosters firearms marksmanship through competitive matches and clinics.

146.    The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

147.     Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

148.     FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

149.     FSC is the largest public outdoor shooting facility on the Front Range in Colorado. The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

150.     In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

151.     Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-convertible to more than 15 rounds.

152.    Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

153.    FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

154.    Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system. The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

## 8.    Firearms Accessories Manufacturer

155.    Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

156.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to

distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

157.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

158.    For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

159.    If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions that interpret the statute as a complete ban on magazines with a removable floor plate.

### 9.    Nonprofit Representing Disabled Outdoor Enthusiasts

160.    Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it,

regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

161.   There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

162.   The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

**10.   Nonprofit Representing Colorado's Outfitters**

163.   The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

164.    The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of millions of dollars in the next few years.  Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

### 11.    Nonprofit Representing Women's Right to Self-Defense

165.    Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224.

### 12.    Nonprofit Representing Colorado Families and Communities

166.    Colorado Youth Outdoors ("CYO") is a nonprofit organization whose mission is to serve Colorado communities by providing families with opportunities to build healthy relationships through traditional outdoor recreation. One of the many disciplines in CYO's program is shooting sports.

517

167.    As part of its programming, CYO provides a curriculum for firearm safety, as well as a program to introduce families to sport shooting, including wildlife management through hunting. These programs stress the lawful, responsible and safe use of firearms.

168.    Fundraising is an extremely important aspect of CYO's ongoing mission to serve Colorado communities and families. Its most successful fundraiser each year is a weekend event involving target shooting.

169.    Because most of the participants in CYO's programs are new to shooting sports, CYO frequently loans hunting and sporting firearms to participants, sometimes for periods exceeding 72 hours. HB 1229 will render this aspect of CYO's programming illegal. Similarly, CYO loans firearms to participants at its annual fundraiser, which is held at a for-profit "dude ranch" specializing in hosting private events. HB 1229 will have a significant impact on this important fundraiser and consequently on CYO's ability to pursue its mission.

170.    CYO makes additional firearm loans to other qualified non-profits who do not have the resources to own firearms but who occasionally have special programs or events requiring the use of firearms. These loans sometimes exceed 72 hours. Loaning resources and collaboration between non-profits is critical in non-profit business operations.

171.    Constraining laws with narrowing margins for lawful use make it more difficult to find qualified board members willing to navigate through vague and uncertain firearm legislation. HB 1229 adds another burden to those in

leadership roles of organizations which own firearms, which will have devastating effects on CYO's board membership.

## B. Defendant

172. Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.   ADDITIONAL SUPPORT FOR ALLEGATIONS

### A.   The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment

173. The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

174. Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

175. The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do

not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

176.    The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." Third, "laws imposing conditions and qualifications on the ***commercial*** sale of firearms." *Id.* at 626-27 (emphasis added).

177.    HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

178.    In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

179.    The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3044, 3050.

180.    By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

181.    The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed

both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

182.    The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

183.    Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

184.    Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

185.    The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as

follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

186.    Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

187.    In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

188.    The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training,

repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

189.    The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

190.    HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

191.    Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose, let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for

saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

192.   Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans,* 517 U.S. 620 (1996); *Lawrence v. Texas,* 539 U.S. 558 (2003).

193.   HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

194.   HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

195.   Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily

broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing *Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

196.    Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

197.    *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

198.    If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

199.    Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System,

and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229, which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

**B.   The Bills Are Unconstitutionally Vague**

200.   The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

201.   The long-established rule is that "the terms of a penal statue creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

202.   A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

203.   The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

204.   Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

205.   Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

206.   If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law

enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

207.   HB 1224 is also vague in its ban on anything "capable of accepting . . . more than fifteen rounds of ammunition. Rifle cartridges of a particular diameter have varying lengths. For example, Uberti manufactures an exact replica of the 1875 Colt Lightning pump action rifle. The tube magazine will accept 13 rounds in .357 magnum caliber. Cartridges in .38 caliber a fully usable in .357 firearm; the same Uberti rifle will also accept 18 rounds of .38 Special wadcutter ammunition. An owner of this Uberti rifle might think that he has a legal 13-round magazine; but in fact, such a rifle could be illegal under HB 1224. The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 2003.

208.   HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days. Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

209.   For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

210.   Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

### FIRST CLAIM FOR RELIEF

**(HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)**

211.   Paragraphs 1 through 202 are re-alleged and incorporated herein.

212.   HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

213.   Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

530

214.   Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

215.   Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

216.   Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

217.   Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

218.   The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

219.   Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.

## SECOND CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")

220.   Paragraphs 1 through 211 are re-alleged and incorporated herein.

221.   In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

222.   Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

223.   Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

224.   HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

225.   Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

226.   Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the

statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

227.   The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

228.   A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF

### (HB 12-1224 – Violation of Fourteenth Amendment Right to Due Process Based on Ambiguity of Language Regarding Magazines 15 Rounds or Smaller)

229.   Paragraphs 1 through 220 are re-alleged and incorporated herein.

230.   HB 1224 is unconstitutionally vague in violation of the Fourteenth Amendment right to Due Process.

231.   Plaintiffs cannot determine whether a magazine with a removable floor plate or end cap to facilitate maintenance and cleaning was "designed to be readily convertible" to hold more than 15 rounds. Plaintiffs cannot possibly know the intent of the designers of all the magazines for the firearms which Plaintiffs own.

232.   Law enforcement officers, including the Plaintiff Sheriffs, likewise have no means to determine the intent of magazine designers. Enforcement of the provision will be difficult, if not impossible, and will result in differing interpretations of the meaning of HB 1224 in different jurisdictions.

233.   Licensed firearms retailers are likewise unable to ascertain design intent, and therefore do not know which magazines can be sold without risk of criminal prosecution.

234.   Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, individuals are chilled in the exercise of their Second Amendment rights.

235.   A statute that is so vague that a person cannot clearly determine what conduct may result in criminal prosecution, or that will result in inconsistent application, thereby chilling the exercise of another constitutional right, violates the Fourteenth Amendment guarantee of Due Process of law.

## FOURTH CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

236.   Paragraphs 1 through 227 are re-alleged and incorporated herein.

237.   HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

238.   The term "continuous possession" is undefined.

239.   Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

240.   "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

241.   "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

242.   Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

243.   Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

244.   HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

## FIFTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

245.   Paragraphs 1 through 236 are re-alleged and incorporated herein.

246.   Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

247.   States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

248.   Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

249.   HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

250.     Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

251.     HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

252.     The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

### SIXTH CLAIM FOR RELIEF

### (HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)

253.     Paragraphs 1 through 244 are re-alleged and incorporated herein.

254.     HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

255.     For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

256. Similarly, many temporary transfers are limited to 72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

257. The prohibition of non-commercial, temporary transfers is an infringement of the Second Amendment.

258. Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

259. In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

## RELIEF REQUESTED

Plaintiffs pray that this Court:

A. Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the

Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.    Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.    Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.    Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.    Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this 1st day of July, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**


s/Jonathan M. Anderson
Jonathan M. Anderson
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**


s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO**

FARM BUREAU, WOMEN FOR CONCEALED
CARRY, AND COLORADO YOUTH OUTDOORS

s/Marc. F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS
DEALERS

s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE
SHOOTING ASSOCIATION AND HAMILTON
FAMILY ENTERPRISES, INC. D/B/A FAMILY
SHOOTING CENTER AT CHERRY CREEK
STATE PARK

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

545

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## STIPULATION OF UNDISPUTED FACTS

The parties stipulate and agree that the following facts are undisputed:

1.    Subject to certain exceptions, Colorado House Bill 13-1224 ("HB 1224") criminalizes the sale, transfer, and possession of "large capacity magazines."

2.    HB 1224 defines "large capacity magazine" as, among other things, "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition." According to HB 1224, "'large capacity magazine' does not mean," among other things, "a feeding device that has been permanently altered so that it cannot accommodate more than fifteen rounds of ammunition."

3.    HB 1224 provides that "a person may possess a large capacity magazine if he or she: (I) owns the large capacity magazine on" July 1, 2013, "and (II) maintains continuous possession of the large capacity magazine." "Continuous possession" is not defined in HB 1224.

4.    Plaintiffs Dylan Harrell and David Bayne are disabled individuals who are confined to wheelchairs. They own firearms for self-defense in the home, with detachable magazines of more than 15 rounds.

5.    Plaintiff David Strumillo is a retired police officer. He is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. Mr. Strumillo owns and

carries firearms for self-defense.  Some of the firearms are equipped with detachable magazines of more than 15 rounds.

6.      Defendant John Hickenlooper is the Governor of the State of Colorado. The Colorado Constitution vests in the governor "the supreme executive power of the state," and requires the governor to "take care that the laws be faithfully executed."

7.      On March 20, 2013, Governor Hickenlooper signed HB 1224 into law. HB 1224 took effect July 1, 2013. In a statement issued at the time he signed HB 1224, Governor Hickenlooper stated that "the large-capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the 14th Amendment."  Through that statement, he "direct[ed] the Colorado Department of Public Safety to consult with the Office of the Attorney General and others, as necessary, with respect to the interpretation of HB13-1224's large-capacity magazine ban, and then to draft and issue, to law enforcement agencies in the State of Colorado, technical guidance on how the law should be interpreted and enforced.  This work should be done by July 1, 2013, the law's effective date."

8.      On May 16, 2013, the Attorney General of Colorado issued a letter to James H. Davis, Executive Director of the Colorado Department of Public Safety. The letter sets forth the technical guidance requested by the Governor.

9.      With respect to the phrase "designed to be readily converted to accept more than fifteen rounds of ammunition," the letter explains that the term "designed," when used as a modifier, "denotes a feature that meets a specific function," and "suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition."  Thus, the letter explains that "[t]he features of a magazine must be judged objectively to determine whether they were 'designed to be readily converted to accept more than fifteen rounds'": "a magazine that accepts fifteen or fewer rounds is not a 'large capacity magazine' simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds.  On many magazines, that design feature is included specifically to permit cleaning and maintenance."

10.     The letter further explains that with respect to the phrase "maintains continuous possession" in the grandfather clause of HB 1224, "[r]esponsible maintenance, handling, gun safety practices, as well as constitutional principles, dictate that these provisions cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee . . . ."  In addition, the

letter explains that HB 1224's "requirement that an owner must maintain 'continuous possession' in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. Proper storage of a large-capacity magazine, such as in a gun safe in the owner's home or in a secure carrying case in the trunk of an automobile, is entirely consistent with the bill's intent of limiting the acquisition and permanent transfer of large-capacity magazines after the effective date of July 1, 2013."

11.     Mr. Strumillo is the bailee of magazines of more than 15 rounds on behalf of a friend who is currently serving overseas in the United States Armed Forces.

12.     Multiple types of magazines are manufactured in the United States and available for purchase in the State of Colorado.  These include detachable box magazines, as well as tube or fixed magazines fixed to a firearm.

13.     Magazines may be purchased independently of firearms.

14.     Magazines are integral to the use of many types of firearms, including semiautomatic handguns and rifles.

15.     Not all magazines function with the same level of effectiveness or reliability.

16.     Most box magazines contain base plates (also known as floor plates).

17.     Magazines capable of accepting more than fifteen rounds of ammunition are manufactured in the United States and are typically used for lawful purposes by Americans, including citizens of Colorado.

18.     Gun owners routinely leave their firearms with licensed gunsmiths for repair and maintenance.

19.     Necessary repair and maintenance of firearms is an important aspect of responsible gun ownership.

20.     Plaintiff firearms dealers currently have existing inventories of magazines with removable base plates and end caps.

21.     Magazines capable of accepting no more than fifteen rounds of ammunition are manufactured in the United States and are available for purchase in the State of Colorado.

22.    Plaintiff Magpul manufactures magazines that hold ten rounds and have removable baseplates.

23.    Components such as limiters that can decrease the capacity of magazines are manufactured in the United States.

24.    There are magazines manufactured to accommodate no more than fifteen rounds of ammunition that can be converted to accept additional ammunition.

25.    Base and floor plates and end caps may be either removable or permanently affixed. However, most magazines contain removable base and floor plates or end caps.

26.    Removable base and floor plates allow for cleaning and maintenance.

27.    A removable base or floor plate or end cap alone does not increase a magazine's capacity.

28.    Magazines with removable base or floor plates or end caps may accept additional components, such as extensions, that increase capacity.

29.    Components that can increase the capacity of magazines are manufactured in the United States.

30.    Magazines that have not been converted to accept additional ammunition are in use.

DATED this 8th day of July, 2013.

Counsel for Plaintiffs:

s/David B. Kopel
David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
Email: david@i2i.org
ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

s/Douglas L. Abbott
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
Email: jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS
FOUNDATION

s/Richard A. Westfall
Richard A. Westfall
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
Email: rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO
OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, WOMEN FOR CONCEALED
CARRY, AND COLORADO YOUTH OUTDOORS

s/Marc F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
Email: mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS


s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net


ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK

**Counsel for Defendant:**
JOHN W. SUTHERS
Attorney General

s/Jonathan P. Fero
DANIEL D. DOMENICO*
Solicitor General
Email:  dan.domenico@state.co.us
DAVID C. BLAKE*
Deputy Attorney General
Email:  david.blake@state.co.us
KATHLEEN L. SPALDING*
Senior Assistant Attorney General
Email:  kit.spalding@state.co.us
JONATHAN P. FERO*
Assistant Solicitor General
Email:  jon.fero@state.co.us
MATTHEW D. GROVE*
Assistant Attorney General
Email:  matt.grove@state.co.us

Attorneys for Governor John W. Hickenlooper
1300 Broadway, 10th floor
Denver, Colorado  80203
Telephone:  720-508-6000
*Counsel of Record

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.,*

Plaintiffs,

v.

JOHN W. HICKENLOOPER
in his official capacity as Governor of the State of Colorado,

Defendant.

---

**STIPULATED MOTION TO ENTER PRELIMINARY INJUNCTION
AND WITHDRAW PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

---

The parties stipulate and jointly move for the entry of a preliminary

injunction in the form of the proposed order attached hereto as Exhibit A.

The parties stipulate and jointly move to withdraw Plaintiffs'

Motion for Temporary Restraining Order and Preliminary Injunction [Doc.

29].

Accordingly, the parties stipulate and jointly move to vacate the

scheduled preliminary injunction hearing scheduled for tomorrow

morning, July 10, 2013, at 9 a.m.

**Counsel for Plaintiffs:**

*s/ David B. Kopel*
David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Avenue

Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
Email: david@i2i.org
ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

_s/ Douglas L. Abbott_
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
Email: jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION

_s/ Richard A. Westfall_
Richard A. Westfall
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
Email: rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, WOMEN FOR CONCEALED CARRY, AND COLORADO YOUTH OUTDOORS

_s/ Marc F. Colin_
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
Email: mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS

_s/ Anthony S. Fabian_
Anthony J. Fabian
  LAW OFFICES OF ANTHONY J. FABIAN PC
  510 Wilcox Street, Suite C

Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND
HAMILTON FAMILY ENTERPRISES, INC. d/b/a FAMILY SHOOTING CENTER AT
CHERRY CREEK STATE PARK

**Counsel for Defendant:**

JOHN W. SUTHERS
Attorney General

_s/ Daniel D. Domenico_
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Matthew D. Grove***
Assistant Attorney General

Attorneys for Governor John W. Hickenlooper
1300 Broadway, 10th floor
Denver, Colorado  80203
Telephone:  720-508-6000
*Counsel of Record

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

  Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

  Defendant.

---

### STIPULATED PRELIMINARY INJUNCTION

---

1. Upon signing HB 13-1224 into law, the Governor requested the Colorado Attorney General and the Colorado Department of Public Safety to provide to all law enforcement agencies in the State of Colorado official written guidance on how HB 13-1224 is to be interpreted and applied in Colorado. That official guidance is attached to this Order as Attachment 1 ("Technical Guidance").

2. The Governor is the chief executive of the State of Colorado, and the Attorney General is the chief legal officer and law enforcement official of the state. *See* Colo. Const., art. IV § 2 ("The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed."); Colo. Rev. Stat. § 24-31-101(1)(a) ("The attorney general of the state shall be the legal counsel and advisor of each department, division, board, bureau, and agency of the state government other than the legislative branch. . . . He . . . shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor . . . .").

3. The Technical Guidance is an "official written interpretation" of HB13-1224. It has been adopted by the Governor and the Colorado Department of Public Safety. Official written interpretations of criminal laws are binding and create an affirmative defense for individuals charged under those laws. *See* Colo. Rev. Stat. § 18-1-504(2)(c) (providing an affirmative defense to criminal

prosecutions contrary to "official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting" it).

4. Pursuant to Fed. R. Civ. P. 65(d), and pursuant to the agreement of the parties, the Court hereby issues a preliminary injunction binding the Governor, and any of his officers, agents, servants, employees, and attorneys, as follows:

   a. Consistent with the Technical Guidance, a magazine that accepts fifteen or fewer rounds may not be considered a "large capacity magazine" simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds.

   b. Magazines with a capacity of 15 or fewer rounds are not large capacity magazines as defined in HB 13-1224 whether or not they have removable base plates. The baseplates themselves do not enable the magazines to be expanded, and they serve functions aside from expansion—notably, they allow the magazines to be cleaned and repaired. To actually convert them to higher capacity, one must purchase additional equipment or permanently alter their operation mechanically. Unless so altered, they are not prohibited.

   c. The grandfather clause in HB 13-1224 may not be construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law.

   d. The phrase "continuous possession" in HB 1224 shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent. "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous physical possession of the

magazine. "Continuous possession" is only lost by a voluntary relinquishment of dominion and control.

5. This preliminary injunction shall remain in force until this Court reaches a decision on the merits in this case.

6. Accordingly, the Court GRANTS Plaintiffs' Stipulated Motion to Dismiss the Motion for Preliminary Injunction [Doc. 29].

DATED this _____ day of July, 2013.

_____
United States District Judge

| John W. Suthers | **STATE OF COLORADO** | Ralph L. Carr |
|---|---|---|

**John W. Suthers**
Attorney General
**Cynthia H. Coffman**
Chief Deputy Attorney General
**Daniel D. Domenico**
Solicitor General

**STATE OF COLORADO**
**DEPARTMENT OF LAW**

**Office of the Attorney General**

**Ralph L. Carr**
**Colorado Judicial Center**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

May 16, 2013

Colorado Department of Public Safety
Executive Director James H. Davis
700 Kipling Street, 3rd Floor
Denver CO 80215

RE:   Technical Guidance on the Interpretation and Application of House Bill 13-
1224, Large-Capacity Magazine Ban

Dear Executive Director Davis:

House Bill 13-1224, which was passed during this year's legislative session and
becomes effective July 1, 2013, prohibits the sale, transfer, and possession of "large-
capacity ammunition magazines." On March 20, 2013, in a statement issued at the
time he signed HB 13-1224 into law, Governor Hickenlooper instructed "the
Colorado Department of Public Safety to consult with the Office of the Attorney
General and others, as necessary . . . and then to draft and issue, to law
enforcement agencies in the State of Colorado, technical guidance on how the law
should be interpreted and enforced."

This letter sets forth the technical guidance requested by the Governor.

**Introduction**

This technical guidance, issued at the request of the Governor, is meant to assist
Colorado law enforcement agencies in understanding and applying portions of
House Bill 13-1224, which regulates the sale, transfer, and possession of "large
capacity magazines." Although this guidance is not binding on the courts, it is based
upon existing legal principles and represents a fair and accurate reading of the
legislation.

**Definition of "Large Capacity Magazine"**

Under House Bill 1224, the term "large capacity magazine" is defined, in part, as
follows: "a fixed or detachable magazine, box, drum, feed strip, or similar device
capable of accepting, or that is designed to be readily converted to accept, more than
fifteen rounds of ammunition."

Attachment 1
559

Page 2

The phrase "designed to be readily converted to accept more than fifteen rounds of ammunition" has prompted questions regarding the scope of the definition, particularly because some ammunition magazines include features, such as removable baseplates, that can be removed and replaced, or otherwise altered, so that the magazine accepts more than fifteen rounds.

The term "designed," when used as a modifier, denotes a feature that meets a specific function. This suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition. The features of a magazine must be judged objectively to determine whether they were "designed to be readily converted to accept more than fifteen rounds."

Under this reading of the definition, a magazine that accepts fifteen or fewer rounds is not a "large capacity magazine" simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds. On many magazines, that design feature is included specifically to permit cleaning and maintenance. Of course, a magazine whose baseplate is replaced with one that does, in fact, allow the magazine to accept more than fifteen rounds would be a "large capacity magazine" under House Bill 1224.

## "Possession" of Large-Capacity Magazines and Application of the Grandfather Clause of House Bill 1224

House Bill 1224 also places limitations on when and how a large-capacity magazine may be sold, transferred, or possessed. In particular, the bill's grandfather clause permits possession of a large-capacity magazine on or after July 1, 2013 by an individual who "owns" such a magazine on that date and "maintains continuous possession" of it thereafter. However, the bill prohibits the owner of a large-capacity magazine from selling or transferring it after July 1, 2013, and also prohibits an individual who as of July 1 did not own and since then has not continuously possessed a particular large-capacity magazine to possess it after July 1, 2013.

Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that these provisions cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law. For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned. Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine

Page 3

so long as he or she remains in the owner's physical presence. However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.

For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. Proper storage of a large-capacity magazine, such as in a gun safe in the owner's home or in a secure carrying case in the trunk of an automobile, is entirely consistent with the bill's intent of limiting the acquisition and permanent transfer of large-capacity magazines after the effective date of July 1, 2013.

Sincerely,

JOHN W. SUTHERS
Colorado Attorney General

cc:    Governor John Hickenlooper
       Jack Finlaw, Chief Legal Counsel to Governor Hickenlooper

561

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CHIEF JUDGE  MARCIA S. KRIEGER**

| | |
|---|---|
| Courtroom Deputy:   Patricia Glover | Date:  July 10,  2013 |
| Court Reporter:       Terri Lindblom | |

Civil Action No. 13-cv-01300-MSK-MJW

*Parties*:                                                    *Counsel Appearing:*

**JOHN B. COOKE, Sheriff of Weld County, Colorado;**          David Kopel
**TERRY MAKETA, Sheriff of El Paso County,
Colorado;**
**JUSTIN SMITH, Sheriff of Larimer County, Colorado;**
**DAVID A. WEAVER, Sheriff of Douglas County,
Colorado:**
**BRUCE W. HARTMAN, Sheriff of Gilpin County,
Colorado;**
**KEN PUTNAM, Sheriff of Cheyenne County,
Colorado;**
**DENNIS SPRUELL, Sheriff of Montezuma County,
Colorado;**
**TIM JANTZ, Sheriff of Moffat County, Colorado;**
**JERRY MARTIN, Sheriff of Dolores County,
Colorado;**
**MIKE ENSMINGER, Sheriff of Teller County,
Colorado;**
**SHAYNE HEAP, Sheriff of Elbert County, Colorado;**
**CHAD DAY, Sheriff of Yuma County, Colorado;**
**FRED D. MCKEE, Sheriff of Delta County, Colorado;**
**LOU VALLARIO, Sheriff of Garfield County,
Colorado;**
**FRED HOSSELKUS, Sheriff of Mineral County,
Colorado;**
**BRETT L. POWELL, Sheriff of Logan County,
Colorado;**
**JAMES FAULL, Sheriff of Prowers County, Colorado;**
**LARRY KUNTZ, Sheriff of Washington County,
Colorado;**
**BRIAN E. NORTON, Sheriff of Rio Grande County,
Colorado;**

562

**DUKE SCHIRARD, Sheriff of La Plata County, Colorado;**
**JIM BEICKER, Sheriff of Fremont County, Colorado;**
**RONALD BRUCE, Sheriff of Hindsdale County, Colorado;**
**CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;**
**FRED JOBE, Sheriff of Custer County, Colorado;**
**DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;**
**JAMES CRONE, Sheriff of Morgan County, Colorado;**
**SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;**
**TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;**
**TOM NESTOR, Sheriff of Lincoln County, Colorado;**
**STAN HILKEY, Sheriff of Mesa County, Colorado;**
**FORREST FRAZEE, Sheriff of Kiowa County, Colorado;**
**RICK DUNLAP, Sheriff of Montrose County, Colorado;**
**TED B. MINK, Sheriff of Jefferson County, Colorado;**
**DAVE STONG, Sheriff of Alamosa County, Colorado;**
**FRED WEGENER, Sheriff of Park County, Colorado;**
**BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;**
**RANDY PECK, Sheriff of Sedgwick County, Colorado;**
**DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;**
**JOHN MINOR, Sheriff of Summit County, Colorado;**
**SCOTT FISCHER, Sheriff of Jackson County, Colorado;**
**PETER GONZALEZ, Sheriff of Archuleta County, Colorado;**
**RICK BESECKER, Sheriff of Gunnison County, Colorado;**
**CHARLES "ROB' URBACH, Sheriff of Phillips County, Colorado;**
**ROD FENSKE, Sheriff of Lake County, Colorado;**
**GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;**
**DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;**

**MIKE NORRIS, Sheriff of Saguache County, Colorado;**
**AMOS MEDINA, Sheriff of Costilla County, Colorado;**
**MILES CLARK, Sheriff of Crowley County, Colorado;**
**DAVID ENCINIAS, Sheriff of Bent County, Colorado;**
**SUE KURTZ, Sheriff of San Juan County, Colorado;**
**JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;**
**GARRETT WIGGINS, Sheriff of Routt County, Colorado;**
**DOUGLAS N. DARR, Sheriff of Adams County, Colorado;**
**COLORADO OUTFITTERS ASSOCIATION;**
**COLORADO FARM BUREAU;**
**NATIONAL SHOOTING SPORTS FOUNDATION;**
**MAGPUL INDUSTRIES;**
**USA LIBERTY ARMS;**
**OUTDOOR BUDDIES, INC.;**
**WOMEN FOR CONCEALED CARRY;**
**COLORADO STATE SHOOTING ASSOCIATION;**
**HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK;**
**DAVID STRUMILLO;**
**DAVID BAYNE;**
**DYLAN HARRELL;**
**ROCKY MOUNTAIN SHOOTERS SUPPLY;**
**2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;**
**BURRUD ARMS INC. D/B/A JENSEN ARMS;**
**GREEN MOUNTAIN GUNS;**
**JERRY'S OUTDOOR SPORTS;**
**GRAND PRIX GUNS;**
**SPECIALTY SPORTS & SUPPLY; and**
**GOODS FOR THE WOODS;**

Richard Westfall

Marc Colin

Anthony Fabian

       Plaintiffs,

v.

**JOHN W. HICKENLOOPER, Governor of the State of Colorado,**

       Defendant.

Jonathan Fero
Kathleen Spalding
Daniel Domenico
David Blake

564

Courtroom Minutes
Chief Judge Marcia S. Krieger
Page 4

Matthew Grove

---

### COURTROOM MINUTES

---

HEARING:      Evidentiary

**9:05 a.m.       Court in session.**

The Court addresses the parties' Stipulated Motion for Preliminary Injunction (**Doc. #56**).

Statements from counsel Domenico, Kopel, Westfall, Colin.

**9:31 a.m.       Court in recess**
**9:52 a.m.       Court in session**

Further statement from counsel Westfall.  Oral motion to withdraw Stipulated Motion for Preliminary Injunction and Withdrawal of Plaintiffs' Motion for Preliminary Injunction (**Doc. #56**).

**ORDER:**      Based on the parties' agreement, the request to withdraw the Stipulated Motion
               for Preliminary Injunction (**Doc. #56**) is **GRANTED**.  The Motion is
               **WITHDRAWN.**  A revised motion to withdraw will be filed incorporating the
               agreement between the parties. For the reasons stated on the record, there will be
               no hearing on the Motion for Preliminary Injunction (**Doc. #29**)

**9:55 a.m.       Court in recess.**

**Total Time:    29 minutes.**
**Hearing concluded.**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circl0.dcn
Message-Id:4089026@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Cooke et al v. Hickenlooper Order on Motion
to Amend/Correct/Modify
```
Content–Type: text/html

<div align="center">

### U.S. District Court

### District of Colorado

</div>

**Notice of Electronic Filing**

The following transaction was entered on 7/10/2013 at 1:51 PM MDT and filed on 7/10/2013

| | |
|---|---|
| **Case Name:** | Cooke et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 58(No document attached) |

**Docket Text:**
 **ORDER granting [43] Motion to Amend/Correct/Modify Amended Complaint. By Chief Judge Marcia S. Krieger on 07/10/2013. Text Only Entry(msklc3, )**

**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin mcolin@brunolawyers.com, cmaulin@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Kathleen L. Spalding kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall rwestfall@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel david@i2i.org

Douglas L. Abbott dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian fabianlaw@qwestoffice.net

Jonathan Michael Anderson jmanderson@hollandhart.com

Matthew David Grove matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico dan.domenico@state.co.us, laura–jane.weimer@state.co.us

Jonathan Patrick Fero jon.fero@state.co.us

David Christopher Blake david.blake@state.co.us, carol.gall@state.co.us, laura–jane.weimer@state.co.us

**1:13–cv–01300–MSK–MJW Notice has been mailed by the filer to:**

Appellate Case: 14-1290   Document: 01019371745   Date Filed: 01/16/2015   Page: 149

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;

Appellate Case: 14-1290   Document: 01019371745   Date Filed: 01/16/2015   Page: 150

SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT
CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BARRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY; and
GOODS FOR THE WOODS,

       Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

**UNOPPOSED MOTION TO WITHDRAW PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

---

Pursuant to the Court's July 10, 2013 Courtroom Minutes (Dkt. 57), the Plaintiffs file this

Motion to Withdraw Plaintiffs' Motion for Preliminary Injunction. Counsel for Defendant has

consented to the filing of this motion.

The Court allowed the parties to withdraw their earlier motion to withdraw the Plaintiffs'

Motion for Temporary Restraining Order and Preliminary Injunction (Dkt 56) to allow for filing

this motion. This revised motion to withdraw is to incorporate the agreement of the parties

regarding the withdrawal of the request for a preliminary injunction.

The Defendant Governor, through the Attorney General, agreed to issue additional

guidance on the interpretation and application of the two provisions of House Bill 13-1224 that

were the subject of Plaintiffs' Preliminary Injunction Motion. The Governor and Attorney

General have issued that additional guidance, which is attached hereto as Exhibit A.

With respect to ammunition magazines with a capacity of 15 or fewer rounds, the State's

interpretation is as follows:

> Magazines with a capacity of 15 or fewer rounds are not large
> capacity magazines as defined in HB 13-1224 whether or not they
> have removable base plates. The base plates themselves do not
> enable the magazines to be expanded, and they serve functions
> aside from expansion — notably, they allow the magazines to be
> cleaned and repaired. To actually convert them to higher capacity,

3

one must purchase additional equipment or permanently alter their
operation mechanically.  Unless so altered, they are not prohibited.

With respect to the phrase continuous possession in HB 1224, the State's interpretation is

as follows:

> The phrase 'continuous possession' in HB 1224 shall be afforded
> its reasonable, every-day interpretation, which is the fact of having
> or holding property in one's power or the exercise of dominion
> over property that is uninterrupted in time, sequence, substance, or
> extent.  'Continuous possession' does not require a large-capacity
> magazine owner to maintain literally continuous physical
> possession of the magazine.  'Continuous possession' is only lost
> by a voluntary relinquishment of dominion and control.

Based on the Governor's and Attorney General's issuance of this guidance, the Plaintiffs

move to withdraw Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction (Dkt. 29).

Dated this 11th day of July, 2013.

Respectfully submitted,


COUNSEL FOR PLAINTIFFS:

s/Douglas L. Abbott
Douglas L. Abbott
Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8192
Fax: (303) 975-5408
dabbott@hollandhart.com
jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

s/ David B. Kopel
David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone:  (303) 279-6536
Fax:  (303) 279-4176
Email:  david@i2i.org

ATTORNEYS FOR SHERIFFS AND DAVID STRUMILLO

*s/ Richard A. Westfall*
Richard A. Westfall
Hale Westfall LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone:  (720) 904-6022
Fax:  (720) 904-6020
Email:  rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR
BUDDIES, INC., THE COLORADO OUTFITTERS
ASSOCIATION, COLORADO FARM BUREAU, WOMEN
FOR CONCEALED CARRY, AND COLORADO YOUTH
OUTDOORS

*s/ Marc F. Colin*
Marc F. Colin
Bruno Colin Jewell & Lowe PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone:  (303)831-1099
Fax:  (303) 831-1088
mcolin@bcjlpc.com

ATTORNEYS FOR LICENSED FIREARMS DEALERS

*s/ Anthony S. Fabian*
Anthony J. Fabian
Law Office of Anthony J. Fabian PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone:  (303) 663-9339
Fax:  (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEYS FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY ENTERPRISES,
INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY
CREEK STATE PARK

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2013, I served a true and correct copy of the foregoing by

electronic transmission to the parties on electronic file:

Daniel D. Domenico, Esq.
dan.domenico@state.co.us

David C. Blake, Esq.
david.blake@state.co.us

Jonathan P. Fero, Esq.
jon.fero@state.co.us

Kathleen L. Spalding, Esq.
kit.spalding@state.co.us

Matthew D. Grove, Esq.
matt.grove@state.co.us

Anthony J. Fabian, Esq.
fabianlaw@qwestoffice.net

David B. Kopel, Esq.
david@i2i.org

Richard A. Westfall, Esq.
Peter J. Krumholz, Esq.
rwestfall@halewestfall.com
pkrumholz@halewestfall.com

Marc F. Colin, Esq.
mcolin@bcjlpc.com

s/Judi Marsh
Judi Marsh, Assistant to Douglas L. Abbott

6295536_1.DOCX



<table>
<tr><td>

**John W. Suthers**
Attorney General

**Cynthia H. Coffman**
Chief Deputy Attorney General

**Daniel D. Domenico**
Solicitor General

</td><td>

**STATE OF COLORADO**
**DEPARTMENT OF LAW**

Office of the Attorney General

</td><td>

Ralph L. Carr
Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado  80203
Phone (720) 508-6000

</td></tr>
</table>

July 10, 2013

Colorado Department of Public Safety
Executive Director James H. Davis
700 Kipling Street, Suite 1000
Denver CO 80215

RE:   Additional Technical Guidance on the Interpretation and Application of
       House Bill 13-1224, Large-Capacity Magazine Ban

Dear Executive Director Davis:

As discussed in my letter to you of May 16 this year, House Bill 13-1224, which
regulates the sale, transfer, and possession of "large capacity magazines," was
passed during this year's legislative session and became effective July 1, 2013. We
continue to review the law and "provide technical guidance on how the law should
be interpreted and enforced."

This letter sets forth the additional technical guidance requested today by the
Governor.

      1)     Magazines with a capacity of 15 or fewer rounds are not large capacity
magazines as defined in HB 13-1224 whether or not they have removable base
plates. The baseplates themselves do not enable the magazines to be expanded, and
they serve functions aside from expansion—notably, they allow the magazines to be
cleaned and repaired. To actually convert them to higher capacity, one must
purchase additional equipment or permanently alter their operation
mechanically. Unless so altered, they are not prohibited.

      2)     The phrase "continuous possession" in HB 1224 shall be afforded its
reasonable, every-day interpretation, which is the fact of having or holding property
in one's power or the exercise of dominion over property, that is uninterrupted in
time, sequence, substance, or extent. "Continuous possession" does not require a

large-capacity magazine owner to maintain literally continuous physical possession
of the magazine. "Continuous possession" is only lost by a voluntary relinquishment
of dominion and control.


Sincerely,


JOHN W. SUTHERS
Colorado Attorney General


cc:    Governor John Hickenlooper
       Jack Finlaw, Chief Legal Counsel to Governor Hickenlooper

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circl0.dcn
Message-Id:4092576@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Cooke et al v. Hickenlooper Order on Motion
to Withdraw Document
```
Content–Type: text/html

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 7/12/2013 at 9:53 AM MDT and filed on 7/12/2013

| | |
|---|---|
| **Case Name:** | Cooke et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 60(No document attached) |

**Docket Text:**

**ORDER granting [59] Motion to Withdraw Document. The Motion to Withdraw is GRANTED, and [29] Motion for Preliminary Injunction is hereby WITHDRAWN. The Clerk of Court shall amend the docket accordingly. By Chief Judge Marcia S. Krieger on 07/12/2013. Text Only Entry(msklc3, )**


**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin mcolin@brunolawyers.com, cmaulin@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Kathleen L. Spalding kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall rwestfall@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel david@i2i.org

Douglas L. Abbott dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian fabianlaw@qwestoffice.net

Jonathan Michael Anderson jmanderson@hollandhart.com

Matthew David Grove matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico dan.domenico@state.co.us, laura–jane.weimer@state.co.us

577

Jonathan Patrick Fero jon.fero@state.co.us

David Christopher Blake david.blake@state.co.us, carol.gall@state.co.us, laura–jane.weimer@state.co.us

**1:13–cv–01300–MSK–MJW Notice has been mailed by the filer to:**

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Message-Id:4099582@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Cooke et al v. Hickenlooper Order on Motion
for Order
```
Content–Type: text/html

<div align="center">

**U.S. District Court**

**District of Colorado**

</div>

**Notice of Electronic Filing**


The following transaction was entered on 7/17/2013 at 12:47 PM MDT and filed on 7/17/2013

| | |
|---|---|
| **Case Name:** | Cooke et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 61(No document attached) |

**Docket Text:**

 **ORDER denying [26] Motion for Order for Certification of Questions to the Colorado Supreme Court. The Defendant requests that two questions be certified to the Colorado Supreme Court, seeking an interpretation of HB–1224: (1) does the bills definition of large–capacity magazine amount to a ban on functional magazines for most handguns and many rifles, or does it apply only to magazines that are principally used with extensions or devices that increase the combined capacity to more than 15 rounds, and (2) does the grandfather clause contained in HB 13–1224, which applies when an owner maintains continuous possession of a large capacity magazine after July 1, 2013, apply when the owner allows another person to temporarily hold, use, or share it for lawful purposes? This Court may, in its discretion, certify questions to the Colorado Supreme Court under Colorado Appellate Rule 21.1. The rule permits certification if there is involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court. Colo.R.App.P. 21.1. The Court recognizes that there are unsettled questions of law at issue in this case. However, the Court declines to certify these questions. In light of the nature of the challenges brought and the context of the case as a whole, the Court finds that clarification by the Colorado Supreme Court on the specific questions posed will not be outcome–determinative of the case. Accordingly, [26] Motion for Certification of Questions of Law to the Colorado Supreme Court is DENIED. by Chief Judge Marcia S. Krieger on 7/17/2013. Text Only Entry(msk, )**


**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin  mcolin@brunolawyers.com, cmaulin@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Kathleen L. Spalding  kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall  rwestfall@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel david@i2i.org

Douglas L. Abbott dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian fabianlaw@qwestoffice.net

Jonathan Michael Anderson jmanderson@hollandhart.com

Matthew David Grove matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico dan.domenico@state.co.us, laura−jane.weimer@state.co.us

Jonathan Patrick Fero jon.fero@state.co.us

David Christopher Blake david.blake@state.co.us, carol.gall@state.co.us, laura−jane.weimer@state.co.us

**1:13−cv−01300−MSK−MJW Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;

SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
RODNEY JOHNSON, Sheriff of Grand County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

     Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Peace officers and peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are 55 Colorado elected sheriffs, retired law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

### I. OVERVIEW

1. On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2. House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013 that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3.     The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4.     The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5.     Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6.     Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7.     The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8.     Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.     The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14. The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15. In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16. Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.     Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.     HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.     The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

**HB 1229**

20.     House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common, temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26.     Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27.     There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28.     Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29.     The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30.     An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31.     Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32. HB 1224 and HB 1229 violate these principles.

## II. JURISDICTION AND VENUE

33. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34. This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III. PARTIES

A. **Plaintiffs**

1. **The Sheriffs of 55 Colorado Counties**

37. Each of the following Sheriffs of 55 Colorado counties ("the Sheriffs") has the primary obligation to obey the Constitution of the United States of America. The Sheriffs bring this case pursuant to this primary obligation, which is supreme over any other purported enactment.

38. John B. Cooke is the Sheriff of Weld County, Colorado.

39. Terry Maketa is the Sheriff of El Paso County, Colorado.

40. Justin Smith is the Sheriff of Larimer County, Colorado.

41. David A. Weaver is the Sheriff of Douglas County, Colorado.

42. Bruce W. Hartman is the Sheriff of Gilpin County, Colorado.

43.    Ken Putnam is the Sheriff of Cheyenne County, Colorado.

44.    Dennis Spruell is the Sheriff of Montezuma County, Colorado.

45.    Tim Jantz is the Sheriff of Moffat County, Colorado.

46.    Jerry Martin is the Sheriff of Dolores County, Colorado.

47.    Mike Ensminger is the Sheriff of Teller County, Colorado.

48.    Shayne Heap is the Sheriff of Elbert County, Colorado.

49.    Chad Day is the Sheriff of Yuma County, Colorado.

50.    Fred D. McKee is the Sheriff of Delta County, Colorado.

51.    Lou Vallario is the Sheriff of Garfield County, Colorado.

52.    Fred Hosselkus is the Sheriff of Mineral County, Colorado.

53.    Brett L. Powell is the Sheriff of Logan County, Colorado.

54.    James Faull is the Sheriff of Prowers County, Colorado.

55.    Larry Kuntz is the Sheriff of Washington County, Colorado.

56.    Brian E. Norton is the Sheriff of Rio Grande County, Colorado.

57.    Duke Schirard is the Sheriff of La Plata County, Colorado.

58.    Jim Beicker is the Sheriff of Fremont County, Colorado.

59.    Ronald Bruce is the Sheriff of Hinsdale County, Colorado.

60.    Chris S. Johnson is the Sheriff of Otero County, Colorado.

61.    Fred Jobe is the Sheriff of Custer County, Colorado.

62.    Donald Krueger is the Sheriff of Clear Creek County, Colorado.

63.    James Crone is the Sheriff of Morgan County, Colorado.

64.    Si Woodruff is the Sheriff of Rio Blanco County, Colorado.

65.     Tom Ridnour is the Sheriff of Kit Carson County, Colorado.

66.     Tom Nestor is the Sheriff of Lincoln County, Colorado.

67.     Stan Hilkey is the Sheriff of Mesa County, Colorado.

68.     Forrest Frazee is the Sheriff of Kiowa County, Colorado.

69.     Rick Dunlap is the Sheriff of Montrose County, Colorado.

70.     Ted B. Mink is the Sheriff of Jefferson County, Colorado.

71.     Dave Stong is the Sheriff of Alamosa County, Colorado.

72.     Fred Wegener is the Sheriff of Park County, Colorado.

73.     Bruce Newman is the Sheriff of Huerfano County, Colorado.

74.     Randy Peck is the Sheriff of Sedgwick County, Colorado.

75.     Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado.

76.     John Minor is the Sheriff of Summit County, Colorado.

77.     Scott Fischer is the Sheriff of Jackson County, Colorado.

78.     Peter Gonzalez is the Sheriff of Archuleta County, Colorado.

79.     Rick Besecker is the Sheriff of Gunnison County, Colorado.

80.     Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado.

81.     Rod Fenske is the Sheriff of Lake County, Colorado.

82.     Grayson Robinson is the Sheriff of Arapahoe County, Colorado.

83.     David D. Campbell is the Sheriff of Baca County, Colorado.

84.     Mike Norris is the Sheriff of Saguache County, Colorado.

85.     Amos Medina is the Sheriff of Costilla County, Colorado.

86.     Miles Clark is the Sheriff of Crowley County, Colorado.

87.     David Encinias is the Sheriff of Bent County, Colorado.

88.     Sue Kurtz is the Sheriff of San Juan County, Colorado.

89.     James (Jim) Casias is the Sheriff of Las Animas County, Colorado.

90.     Garrett Wiggins is the Sheriff of Routt County, Colorado.

91.     Douglas N. Darr is the Sheriff of Adams County, Colorado.

92.     Rodney Johnson is the Sheriff of Grand County, Colorado.

93.     HB 1224 and 1229 violate the Constitution of the United States. The Sheriffs cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado.

94.     For reasons detailed *supra* and *infra*, HB 1224 and 1229 are utterly unenforceable, even if the Sheriffs wished to violate the U.S. Constitution.

95.     After HB 1229 becomes effective, every citizen of Colorado can legally possess a "large capacity" magazine that holds more than 15 rounds so long as they owned it prior to the effective date and maintain "continuous possession" of it after the effective date. This includes both magazines that hold more than 15 rounds, and smaller magazines with removable floor plates or end caps. At least hundreds of thousands of Colorado citizens, including the individual Plaintiffs and members of Plaintiff associations, will lawfully own hundreds of thousands (or more) of such magazines.

96.     The Sheriffs have limited resources and limited public funds to spend on investigations. They cannot expend those resources to conduct investigations that would be necessary to monitor compliance with the new magazine restrictions.

No documentation has ever been required for the retail or private purchase of magazines, making it a practical impossibility for the Sheriffs to determine whether one of the many magazines already in existence was obtained after the effective date.

97.    It would be similarly impossible to determine whether a magazine was in the "continuous possession" of its owner after July 1, 2013.

98.    With very few exceptions, magazines manufactured in other states are not required to bear date stamps, making it impossible to determine their date of manufacture. The Sheriffs will have no means to determine whether a magazine possessed by an individual in Colorado was manufactured before or after July 1, 2013, with the exception of those manufactured in Colorado after July 1, 2013 that are required by the bill to bear a date stamp.

99.    The foregoing presumes that it is clear what the bill prohibits. But the Sheriffs' enforcement obstacles become insurmountable if they must also resolve ambiguities in the bill. If the bill does not prohibit every magazine with a removable floor plate and end cap, but only those that were intentionally "designed" for the purpose of expanding capacity, the Sheriffs are given no tools to make that determination. They cannot know the intent of the designer.

100.    Likewise, each Sheriff will have to determine what constitutes "continuous possession," since the statute provides no guidance. They will have to make individual decisions whether continuous possession allows for temporary loans to others and, if so, for what duration.

101.    In addition to the core infringement on a fundamental right inherent in any enforcement of these provisions, the result of the many ambiguities will be varying individual decisions and inconsistent enforcement across jurisdictions. Effective law enforcement depends on close and supportive relations between the public and law enforcement. Unconstitutional, vague laws which are inconsistently enforced poison that relationship, and make it significantly more difficult for the Sheriffs to receive the witness cooperation, tips, and other forms of public support which are necessary to effective law enforcement in a free society.

102.    Sheriffs have the common law power to request the armed assistance of able-bodied adults in their County. This is known as the "posse comitatus." One well-known use of the posse in Colorado was in June 1977, when Pitkin County citizens with their own guns responded to a request to help with the search for escaped mass murderer Theodore Bundy.

103.    Sheriffs also have the authority to appoint deputies who are not certified peace officers. The "non-certified" deputies may be appointed for a limited period of time, or for specific tasks. C.R.S. §§ 16-2.5-103(2); 30-10-506. Particularly in rural parts of Colorado, Sheriffs utilize the authority to deputize individuals to augment law enforcement efforts in times of disturbances and natural disasters.

104.    When those Sheriffs deputize, they do not have a cache of firearms to issue. Moreover, a person who is deputized in an emergency will be safer and more effective using his or her personal firearm, with which he or she is already familiar.

105.    HB 1224 seriously impedes the ability of Sheriffs to call upon armed citizen assistance during emergencies and natural disasters because it prevents citizens from having the types of magazines which the Sheriffs and their ordinary deputies have determined to be most effective for the preservation of public safety. As described in paragraphs 95, 137, 158, 187, 207, 214, 217, and 231, the Sheriffs, like all Plaintiffs, are injured by the infringements of their individual rights under the Second and Fourteenth Amendments. The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.

### 2.    Colorado Farm Bureau

106.    Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

107.    Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

108.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

109.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in connection with their farming or ranching operations, they do not acquire them as "natural persons."

110.    Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

111.    HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

        a.    it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

        b.    it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

        c.    even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

112.    Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

### 3.    Firearms Industry Trade Association

113.    The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

114.    As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

115.    The NSSF's members in Colorado   provide lawful commerce in firearms to law-abiding Coloradans.  Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

598

### 4.   Retired Law Enforcement Officers

116.   David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

117.   Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

118.   Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

### 5.   Disabled Citizens

119.   David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

120.     Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

121.     Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

122.     First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

123.     Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits Mr. Harrell's mobility and  severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The

limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

124.    Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or re-position himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

125.    If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

**6.    Licensed Firearms Dealers**

126.    USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

127.    Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

128.    2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on

inventory in firearms and magazines that will be rendered illegal on July 1, 2013. 2nd Amendment will suffer significant losses in its overall sales if it cannot sell firearms or magazines over 15 rounds or with removable floor plates or end caps if HB 1224 becomes effective.

129.   Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with its principal place of business in Loveland, Colorado. Jensen Arms is a retail firearms dealer in business since 1994 that serves customers throughout much of Colorado. To serve its customers, Jensen Arms has invested millions of dollars in magazines and firearms inventory that utilizes magazines that will be prohibited under HB 1224. Customers have already expressed confusion about what magazines will be legal, and Jensen Arms will suffer significant losses in sales.

130.   Green Mountain Guns is a Colorado corporation with its principal place of business in Lakewood, Colorado. Green Mountain Guns has been in business for 35 years, and will lose approximately $2 million in sales after HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

131.   Smith & Wesson has already informed Green Mountain Guns that it will no longer ship merchandise to Green Mountain Guns because of the uncertainty caused by HB 1224 and confusion about what firearms and firearm accessories will be illegal after HB 1224 goes into effect.

132.     Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

133.     Grand Prix Guns is a Colorado corporation with its principal place of business in Littleton, Colorado. Grand Prix Guns anticipates that it may suffer as much as an 80% loss in revenue if HB 1224 renders the majority of the firearms and magazines it sells illegal.

134.     Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

135.     Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

136.     The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment

will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

137.     The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

138.     In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.     Shooting Association and Shooting Ranges and Clubs

139.     The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

140.      CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

141.     Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of

such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

142.    The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

143.    CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

144.    CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

145.    CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-created program that fosters firearms marksmanship through competitive matches and clinics.

146.    The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

147.    Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

148.    FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

149.    FSC is the largest public outdoor shooting facility on the Front Range in Colorado. The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

150.    In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

151.    Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-convertible to more than 15 rounds.

152.    Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

153.    FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

154.    Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system. The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

**8.    Firearms Accessories Manufacturer**

155.    Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

156.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to

distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

157.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

158.    For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

159.    If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions that interpret the statute as a complete ban on magazines with a removable floor plate.

### 9.    Nonprofit Representing Disabled Outdoor Enthusiasts

160.    Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it,

regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

161.    There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

162.    The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

### 10.    Nonprofit Representing Colorado's Outfitters

163.    The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

164.    The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of millions of dollars in the next few years.   Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

**11.    Nonprofit Representing Women's Right to Self-Defense**

165.    Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224.

**12.    Nonprofit Representing Colorado Families and Communities**

166.    Colorado Youth Outdoors ("CYO") is a nonprofit organization whose mission is to serve Colorado communities by providing families with opportunities to build healthy relationships through traditional outdoor recreation. One of the many disciplines in CYO's program is shooting sports.

167.    As part of its programming, CYO provides a curriculum for firearm safety, as well as a program to introduce families to sport shooting, including wildlife management through hunting. These programs stress the lawful, responsible and safe use of firearms.

168.    Fundraising is an extremely important aspect of CYO's ongoing mission to serve Colorado communities and families. Its most successful fundraiser each year is a weekend event involving target shooting.

169.    Because most of the participants in CYO's programs are new to shooting sports, CYO frequently loans hunting and sporting firearms to participants, sometimes for periods exceeding 72 hours. HB 1229 will render this aspect of CYO's programming illegal. Similarly, CYO loans firearms to participants at its annual fundraiser, which is held at a for-profit "dude ranch" specializing in hosting private events. HB 1229 will have a significant impact on this important fundraiser and consequently on CYO's ability to pursue its mission.

170.    CYO makes additional firearm loans to other qualified non-profits who do not have the resources to own firearms but who occasionally have special programs or events requiring the use of firearms. These loans sometimes exceed 72 hours. Loaning resources and collaboration between non-profits is critical in non-profit business operations.

171.    Constraining laws with narrowing margins for lawful use make it more difficult to find qualified board members willing to navigate through vague and uncertain firearm legislation. HB 1229 adds another burden to those in

leadership roles of organizations which own firearms, which will have devastating effects on CYO's board membership.

## B.     Defendant

172.     Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.     ADDITIONAL SUPPORT FOR ALLEGATIONS

## A.     The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment

173.     The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

174.     Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

175.     The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do

not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

176. The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." Third, "laws imposing conditions and qualifications on the ***commercial*** sale of firearms." *Id.* at 626-27 (emphasis added).

177. HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

178. In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

179.    The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3044, 3050.

180.    By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

181.    The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed

both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

182.   The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

183.   Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

184.   Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

185.   The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as

follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

186.   Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

187.   In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

188.   The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training,

repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

189.   The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

190.   HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

191.   Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose, let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for

saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

192.   Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans,* 517 U.S. 620 (1996); *Lawrence v. Texas,* 539 U.S. 558 (2003).

193.   HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

194.   HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow,* 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

195.   Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily

broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing *Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

196.   Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

197.   *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

198.   If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

199.   Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System,

619

and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229, which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

## B.   The Bills Are Unconstitutionally Vague

200.   The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

201.   The long-established rule is that "the terms of a penal statue creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

202.    A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

203.    The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

204.    Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

205.    Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

206.    If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law

enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

207.   HB 1224 is also vague in its ban on anything "capable of accepting . . . more than fifteen rounds of ammunition. Rifle cartridges of a particular diameter have varying lengths. For example, Uberti manufactures an exact replica of the 1875 Colt Lightning pump action rifle. The tube magazine will accept 13 rounds in .357 magnum caliber. Cartridges in .38 caliber a fully usable in .357 firearm; the same Uberti rifle will also accept 18 rounds of .38 Special wadcutter ammunition. An owner of this Uberti rifle might think that he has a legal 13-round magazine; but in fact, such a rifle could be illegal under HB 1224. The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 2003.

208.   HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days. Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

209.    For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

210.    Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

## FIRST CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)

211.    Paragraphs 1 through 202 are re-alleged and incorporated herein.

212.    HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

213.    Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

214.    Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

215.    Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

216.    Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

217.    Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

218.    The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

219.    Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.

## SECOND CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")

220.   Paragraphs 1 through 211 are re-alleged and incorporated herein.

221.   In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

222.   Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

223.   Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

224.   HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

225.   Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

226.   Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the

statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

227. The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

228. A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF

### (HB 12-1224 – Violation of Fourteenth Amendment Right to Due Process Based on Ambiguity of Language Regarding Magazines 15 Rounds or Smaller)

229. Paragraphs 1 through 220 are re-alleged and incorporated herein.

230. HB 1224 is unconstitutionally vague in violation of the Fourteenth Amendment right to Due Process.

231. Plaintiffs cannot determine whether a magazine with a removable floor plate or end cap to facilitate maintenance and cleaning was "designed to be readily convertible" to hold more than 15 rounds. Plaintiffs cannot possibly know the intent of the designers of all the magazines for the firearms which Plaintiffs own.

232.   Law enforcement officers, including the Plaintiff Sheriffs, likewise have no means to determine the intent of magazine designers. Enforcement of the provision will be difficult, if not impossible, and will result in differing interpretations of the meaning of HB 1224 in different jurisdictions.

233.   Licensed firearms retailers are likewise unable to ascertain design intent, and therefore do not know which magazines can be sold without risk of criminal prosecution.

234.   Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, individuals are chilled in the exercise of their Second Amendment rights.

235.   A statute that is so vague that a person cannot clearly determine what conduct may result in criminal prosecution, or that will result in inconsistent application, thereby chilling the exercise of another constitutional right, violates the Fourteenth Amendment guarantee of Due Process of law.

## FOURTH CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

236.   Paragraphs 1 through 227 are re-alleged and incorporated herein.

237.   HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

238.    The term "continuous possession" is undefined.

239.    Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

240.    "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

241.    "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

242.    Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

243. Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

244. HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

## FIFTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

245. Paragraphs 1 through 236 are re-alleged and incorporated herein.

246. Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

247. States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

248. Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

249. HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

250.    Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

251.    HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

252.    The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

### SIXTH CLAIM FOR RELIEF

**(HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)**

253.    Paragraphs 1 through 244 are re-alleged and incorporated herein.

254.    HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

255.    For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

630

256.   Similarly, many temporary transfers are limited to 72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

257.   The prohibition of non-commercial, temporary transfers is an infringement of the Second Amendment.

258.   Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

259.   In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

## RELIEF REQUESTED

Plaintiffs pray that this Court:

A.   Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the

Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.    Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.    Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.    Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.    Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this 1st day of July, 2013.

633

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

s/Jonathan M. Anderson
Jonathan M. Anderson
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO**

FARM BUREAU, WOMEN FOR CONCEALED
CARRY, AND COLORADO YOUTH OUTDOORS

s/Marc. F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS
DEALERS

s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE
SHOOTING ASSOCIATION AND HAMILTON
FAMILY ENTERPRISES, INC. D/B/A FAMILY
SHOOTING CENTER AT CHERRY CREEK
STATE PARK

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

636

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

Appellate Case: 14-1290   Document: 01019371745   Date Filed: 01/16/2015   Page: 219

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

John B. Cooke, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**MOTION TO DISMISS PLAINTIFFS' CLAIMS TWO, THREE, AND FOUR, AND TO DISMISS SHERIFFS AS PLAINTIFFS ACTING IN THEIR OFFICIAL CAPACITY.**

---

      **COMES NOW** Defendant, Governor John Hickenlooper, by and through undersigned counsel, moves to dismiss Plaintiffs' Second, Third, and Fourth Claims for Relief in the Second Amended Complaint for Declaratory and Injunctive Relief for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1). In addition, the Governor moves to dismiss the 55 Colorado Sheriffs[1] as Plaintiffs for lack of standing in their official capacity.

---

[1] John B. Cooke, Terry Maketa, Justin Smith, David A. Weaver, Bruce W. Hartman, Ken Putnam, Dennis Spruell, Tim Jantz, Jerry Martin, Mike Ensminger, Shayne Heap, Chad Day, Fred D. McKee, Lou Vallario, Fred Hosselkus, Brett L. Powell, James Faull, Larry Kuntz, Brian E. Norton, Duke Schirard, Jim Beicker, Ronald Bruce, Chris S. Johnson, Fred Jobe, Donald Krueger, James Crone, Si Woodruff, Tom Ridnour, Tom Nestor, Stan Hilkey, Forrest Frazee, Rick Dunlap, Ted B. Mink, Dave Stong, Fred Wegner, Bruce Newman, Randy Peck, Dominic Mattivi, Jr., John Minor, Scott Fischer, Peter Gonzalez, Rick Besecker, Charles "Rob" Urbach, Rod Fenske, Grayson Robinson, David D. Cambell, Mike Norris, Amos Medina, Miles

Defendant certifies that, pursuant to D.C. Colo. L. Civ. R. 7.1(A), counsel discussed the grounds for this motion and the relief requested on July 31, 2012. Plaintiffs object to this motion and the relief requested herein.

## INTRODUCTION

In the 2013 session, the Colorado General Assembly adopted a limitation on the capacity of certain magazines (HB 13-1224) and additional background check requirements for firearm purchases (HB 13-1229). Plaintiffs, a coalition of county sheriffs, firearm dealers, gun owners and others, filed suit against the Governor, asking this Court to declare both provisions unconstitutional and to enjoin their enforcement. While most of Plaintiffs' claims raise substantive constitutional challenges to the statutory restrictions, Claims Two, Three, and Four in the Second Amended Complaint rest on vagueness challenges. In addition, while all of the Plaintiffs bring suit as private citizens, the 55 Colorado Sheriffs also assert standing based on their official capacities. As to those two grounds, Defendant moves to dismiss.

## BACKGROUND

The Second Amended Complaint alleges six causes of action: (i) HB 1224 violates the Second and Fourteenth Amendments based on its prohibition of magazines larger than fifteen rounds; (ii) HB 1224 violates the Second and Fourteenth Amendments because its prohibition of magazines "designed to be

Clark, David Encinas, Sue Kurtz, James (Jim) Casias, Garret Wiggins, Douglas N. Darr, and Rodney Johnson ("the 55 Colorado Sheriffs").

640

readily converted" to hold more than fifteen rounds has the effect of banning the possession of a broad class of firearms; (iii) HB 1224 violates the Fourteenth Amendment right to Due Process because its use of the language "designed to be readily convertible" is vague; (iv) HB 1224 violates the Second and Fourteenth Amendments because its use of the term "continuous possession" is vague; (v) HB 1224 and 1229 violate the Americans with Disabilities Act; and (vi) HB 1229 violates the Second and Fourteenth Amendment by restricting firearms sales and temporary transfers between individuals.

On June 12, 2013, Plaintiffs filed a motion requesting a temporary restraining order and preliminary injunction asserting that the following provisions of HB 1224 are unconstitutionally vague: 1) the prohibition on magazines that are "designed to be readily converted" to hold more than fifteen rounds; 2) the grandfather clause of HB 1224; and 3) the ban on "transfers" of large-capacity magazines after July 1, 2013. Pls.' Mtn. for Temporary Restraining Order and For Preliminary Injunction [Doc. 29]. Following a hearing, Plaintiffs' withdrew the motion. Pls.' Unopposed Motion to Withdraw Pls.' Motion for Preliminary Injunction [Doc. 59]. The motion explained that the Governor, through the Attorney General, agreed to "issue additional guidance on the interpretation and application of the two provisions of House Bill 13-1224 that were the subject of Plaintiffs' Preliminary Injunction Motion." *Id.*, at 3. The additional Technical Guidance has previously been filed with the Court, at Docket No. 59-1 (a copy is also attached as Exhibit A).

## ARGUMENT

I.  **The Second, Third, and Fourth Claims in the Second Amended Complaint Should Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(1).**

A.  **Standard of Review**

Article III, section 2 of the Constitution limits the jurisdiction of federal courts to the adjudication of "cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37–38 (1976). By its own terms, the Declaratory Judgment Act also limits its reach to "case[s] of actual controversy." 28 U.S.C. § 2201; *Aetna Life Ins. Co. of Hartford Conn.* v. *Haworth*, 300 U.S. 227, 239–40 (1937) (holding that the Declaratory Judgment Act "manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense."); *Rector v. City & County of Denver*, 348 F.3d 935, 946 (10th Cir. 2003) ("[i]t is well established that the Declaratory Judgment Act is remedial and does not itself confer jurisdiction on federal courts . . . and that plaintiffs must establish an Article III case or controversy as a prerequisite for declaratory relief.") (citations omitted).

"When a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007). In reviewing a factual attack, the court does not "presume the truthfulness of the complaint's factual allegations" and "has wide discretion to allow affidavits, other

documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995). A plaintiff has the burden to establish standing, and without it, this Court has no jurisdiction to hear the claim. *Opala v. Watt*, 454 F.3d 1154, 1157 (10th Cir. 2006).

### B.    Law and Analysis

To establish standing, Plaintiffs must prove that (1) they have suffered an injury-in-fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bronson v. Swensen*, 500 F.3d 1099, 1106, 1109 (10th Cir. 2007) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). Accordingly, when a plaintiff fails to establish "that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Nat'l Counsel for Improved Health v. Shalala*, 122 F.3d 878, 884 (10th Cir. 1997) (quoting *Babbit v. United Farm Worker's Nat'l Union*, 442 U.S. 289, 298–99 (1979)). Plaintiffs have not established standing.

1.  **Plaintiffs have not proven that they have suffered an injury-in-fact that is actual or imminent.**

In Claims Two, Three, and Four of the Second Amended Complaint, Plaintiffs rest their claim for standing on the contention that they face a "credible threat" of prosecution.[2] In so doing, they fail to state a claim because no such threat exists.

An injury-in-fact does not occur by "[t]he mere presence on the statute books of an [allegedly] unconstitutional statute . . . even if [plaintiffs] allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). "Where a law has yet to be enforced against the plaintiff, the plaintiff is further required to show a 'credible threat' of enforcement." *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1156 (10th Cir. 2006); *see also Dias v. City & County of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009) (to obtain prospective relief, a plaintiff must show a "credible threat of future prosecution").

In the Plaintiffs' view, HB-1224 is "so vague that a person cannot clearly determine what conduct may result in criminal prosecution." 2nd Am. Compl. [Doc. 62], at ¶ 235. In particular, Plaintiffs' Second and Third claims assert that HB-1224's restriction of magazines that are "designed to be readily convertible" to

---

[2] Although Claims Three and Four expressly assert vagueness, Claim Two does not. Still, as Claim 1 challenges the statute's prohibition of magazines that hold more than 15 rounds, in order to constitute a separate claim, Claim Two appears to assert that the "designed to be readily converted" phrase is vague because it could be applied to magazines that hold 15 rounds or less.

accept more than 15 rounds is vague because "[m]ost magazines 15 rounds or
smaller are manufactured with a removable floor plate" that "can be readily
converted to hold more than 15 rounds." *Id.*, at ¶ 221. In a similar vein, Plaintiffs'
Fourth Claim challenges the "continuous possession" language used in the statute's
grandfather clause, arguing that the term is "undefined and vague, and owners of a
magazine cannot clearly determine what is required of them to maintain
'continuous possession.'" *Id.*, at ¶ 241. Accordingly, though Plaintiffs also cast their
injury-in-fact on their contention that HB-1224 "chills" their exercise of their
Second Amendment right, that claim turns on their supposition that the
requirements "chill[] individuals' Second Amendment rights by subjecting them to
the threat of criminal prosecution." *Id.*, at ¶ 244.

   A  plaintiff fails to meet the "'credible threat' test" when there are affirmative
assurances of non-prosecution from a governmental actor responsible for enforcing
the challenged statute.  Such assurances prevent a "threat" of prosecution from
maturing into a "credible" one. *Bronson*, 500 F.3d at 1109. In *Bronson*, plaintiffs'
alleged fear of prosecution was "belied by the policy statement of the Utah Attorney
General's Office that it has decided to focus law enforcement efforts" elsewhere. *Id.*
Similarly, plaintiffs have been found to lack standing when a county prosecutor
issued an affidavit in which he stated it was "doubtful that Utah County would
bring" charges against the plaintiff, *D.L.S.*, 374 F.3d at 974, when a district
attorney authored a "No File" letter disavowing intent to prosecute under

challenged criminal-libel statute, *Mink*, 482 F.3d at 1253-55, when the plaintiff "received assurances from the District Attorney that the flag-abuse statute [would] not be enforced against him," *Wisness*, 433 F.3d at 733, and based on a prosecutor's "determination that [the plaintiff] was not violating the [challenged] posting ordinance," *Faustin*, 268 F.3d at 948.

In each of the foregoing cases, the plaintiff lacked standing because he could not establish a credible fear of prosecution. *See Mink*, 482 F.3d at 1255. In *Mink*, that was so even though the district attorney's "No File" letter "conceivably [would not] bind other district attorneys." *Id.* On the contrary, "the 'possibility' of future enforcement need not be 'reduced to zero' to defeat standing . . . [because] it is 'not necessary for defendants [] to refute and eliminate all possible risk that the statute might be enforced' to demonstrate a lack of a case or controversy." *Id.* (quoting *Wisness*, 433 F.3d at 733). Accordingly, even an assertion that a prosecutor has "threatened to prosecute them generally is not enough to confer standing." *Phelps v. Hamilton*, 122 F.3d 1309, 1327 (10th Cir. 1997).

The same considerations control here. The Governor and the Attorney General have fully addressed the concerns raised by Plaintiffs in their second, third, and fourth claims for relief *See Mink*, 482 F.3d at 1255 (explaining "[b]y jumping the gun and filing a complaint for prospective relief, a plaintiff cannot retain standing where the [defendant] immediately concludes" the statute does not apply to the challenged conduct). In particular, as part of the Plaintiffs' decision to

withdraw their request for a preliminary injunction, the Governor, through the
Attorney General, "agreed to issue additional guidance on the interpretation and
application of the two provisions of House Bill 13-1224." Doc. 59, at 3. The
additional Technical Guidance directly addressed the two provisions of HB 13-1224
challenged in Plaintiff's Second, Third, and Fourth Claims. The additional
Technical Guidance acknowledged that "[m]agazines with a capacity of 15 or fewer
rounds are not large capacity magazines as defined in HB 13-1224 whether or not
they have removable base plates." [Doc. 59-1]. To "convert them to higher capacity,
one must purchase additional equipment or permanently alter their operation
mechanically." *Id.* In addition, the phrase "continuous possession" in the
grandfather clause of the statute "does not require large-capacity magazine owners
to maintain literally continuous possession of the magazine." *Id.* Instead, affording
the phrase "continuous possession" its "reasonable, everyday interpretation,"
possession of a large capacity magazine is "only lost by a voluntary relinquishment
of dominion and control." *Id.*

Nothing in Plaintiffs' Second, Third, and Fourth Claims suggest an
ambiguity or concern not covered by the Technical Guidance. *See Mink*, 482 F.3d at
1255 ("The government should be encouraged, not dissuaded, from assuring citizens
that it will not pursue prosecutions . . . ."). Plaintiffs have never asserted that they
have been informed that they face a threat of prosecution or criminal penalties.
Plaintiffs have only asserted that the Governor has "publicly confirmed that HB

1224 bans all magazines with removable floor plates." Doc. 62, at ¶ 9. But that assertion was not only inaccurate at the outset of this case, but also entirely ignores the additional Technical Guidance that was released eight days *before* the filing of their Second Amended Complaint. *See Mink*, 482 F.3d at 1255 (finding when plaintiff filed amended complaint after district attorney disclosed his intent not to prosecute, any threat against plaintiff "at that time was 'hypothetical,' not 'actual and imminent.'").

In addition, Plaintiffs have not established an injury-in-fact because they have not shown that the Governor can or would be likely to enforce the challenged provisions of the statute against them. *See Bronson*, 500 F.3d at 1109 (finding no injury-in-fact when plaintiffs failed to demonstrate that the Clerk for Salt Lake County had the power or was likely to enforce the criminal law against them).

Even if Plaintiffs had asserted that they faced a threat of prosecution, any such threat could not be credible. In Colorado, an individual is relieved from criminal liability (via the availability of an affirmative defense) for prohibited conduct if the person engaged in that conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." Colo. Rev. Stat. § 18-1-504(2)(c).

Plaintiffs have not established an injury-in-fact and Claims Two, Three, and Four of the Amended Complaint should be dismissed.

> **2.    Plaintiffs cannot show that the relief requested in Claims Two, Three, and Four against the Governor would redress the alleged injury.**

Even if Claims Two, Three, and Four could be read to establish injury, that still would not be enough to establish standing. The Article III jurisdictional requirement of a "case in controversy" limits standing to cases where the plaintiff's alleged injury is fairly traceable to the challenged action of the defendant, and not the result of the action of some third party not before the court. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005).

Besides showing a cognizable injury that is traceable to the defendant, Article III also requires that the plaintiff show that the relief requested would redress a discrete alleged injury. *Id.* Accordingly, in an action seeking injunctive or declaratory relief against a government agency, the plaintiff's burden of showing redressability cannot be met when it seeks to remedy what is beyond the authority of the defendant to grant. *Bronson*, 500 F.3d at 1111–12. ("The absence of a nexus between Swensen's enforcement powers and the challenged criminal provisions renders ineffectual plaintiffs' requested prospective relief.").

Here, Plaintiffs never assert that local law enforcement authorities in fact will not follow the Governor's additional Technical Guidance. Plaintiffs only assert that such guidance "is not legally binding on all state and local law enforcement

officers and prosecutors throughout Colorado." Doc. 62, at ¶ 210. Accordingly, the Second Amended Complaint fatally fails to allege any redressable injury-in-fact. *See, e.g., Gandy*, 416 F.3d at 1158 (a "plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury.").

Even if this Court entertained the possibility that other unnamed entities may attempt to apply the law based on an interpretation different than what is provided in the original or additional Technical Guidance, this case would not redress that injury as a matter of law. Plaintiffs have chosen not to name local law enforcement authorities in their case. They chose only to sue the Governor.

In Colorado, district attorneys are independent from other governmental officers under Colorado law. In Colorado, when enforcing laws, the district attorney "represents the people of the state of Colorado, and nothing within this section shall be construed to create an attorney-client relationship between the district attorney and any party, other than the people of the state of Colorado . . ." Colo. Rev. Stat. § 20-1-102(3); *People v. Spykstra*, 234 P.3d 662, 666 (Colo. 2010) (recognizing District Attorney is "the attorney for the People in a criminal proceeding"). The Second Amended Complaint does not assert, nor could it establish, that district attorneys in Colorado are bound by the Governor's authority. Rather, as the district attorneys are independent from the Governor, they are not "officers, agents, servants, employees, [nor] attorneys" for the Governor, and a permanent injunction or declaratory judgment against the Governor would not extend to the district

attorneys. *Cf. Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999)

(holding under Fed. R. Civ. P. 65 an injunction against Governor of New Mexico and

Attorney General could extend to district attorneys because under New Mexico law,

district attorneys' only statutory duty is to "prosecute criminal cases on behalf of

the State") (quoting *State v. Session*, 91 N.M. 381, 574 P.2d 600, 601 (N.M. Ct. App.

1978)).

As such, Plaintiffs have failed to show that this Court could fashion relief

sufficient to redress its alleged injuries asserted in Claims Two, Three, and Four.

*See Bronson*, 500 F.3d at 1110–11; *cf. Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th

Cir. 2001) (per curiam) (holding that "plaintiffs lack standing to contest the statutes

authorizing private rights of action" in part "because any potential dispute plaintiffs

may have with future private plaintiffs could not be redressed by an injunction

running only against public prosecutors"). The claims should be dismissed. *See

Warth v. Seldin*, 422 U.S. 490, 501–02 (1975) ("If . . . the plaintiff's standing does

not adequately appear from all materials of record, the complaint must be

dismissed.").

## II.   The Sheriffs Lack Standing In Their Official Capacity to Sue Their Parent State.

### A.   Standard of Review

The essence of standing is whether the plaintiff is entitled to have the court

decide the merits of the dispute. *See United States v. Ramos*, 695 F.3d 1035, 1046

(10th Cir. 2012). When the opposing party challenges the jurisdiction of the court as

a matter of law based on the face of the complaint pursuant to Fed. R. Civ. P.

12(b)(1), the court must accept all of the facts pleaded in a complaint as true and

determine whether those facts state a claim over which the court has jurisdiction.

*E.g.*, *McDonald v. Kinder Morgan, Inc.*, 287 F.3d 997 (10th Cir. 2000). However, a

plaintiff bears the burden of establishing standing. *Opala*, 454 F.3d at 1157.

### B.    Law and Analysis

"The focus of any inquiry into standing 'is whether the litigant is entitled to

have the court decide the merits of the dispute or of particular issues." *Hous. Auth.*

*of Kaw Tribe v. Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991) (quoting *Warth*,

422 U.S. at 498). Under the doctrine of political subdivision standing, federal courts

lack jurisdiction over certain controversies between political subdivisions and their

parent states. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir.

1998). As this Circuit recently explained, there is not "a single case in which the

Supreme Court or a court of appeals has allowed a political subdivision to sue its

parent state under a substantive provision of the Constitution." *City of Hugo v.*

*Nichols*, 656 F.3d 1251, 1253–54 (10th Cir. 2011). Instead, courts have allowed such

suits only when Congress has enacted statutory law specifically providing rights to

political subdivisions. *Id.* at 1254.

Sheriffs are Colorado "county officers." Colo. Const. Art. XXIV, Sec. 8.

Counties are political subdivisions of the state and have only such powers as are

granted to them by the Colorado Constitution or delegated to them by the general

assembly. *Beaver Meadows v. Bd. of County Comm'rs*, 709 P.2d 928, 932 (Colo.

1985); *Pennobscot, Inc. v. Bd. of County Comm'rs*, 642 P.2d 915, 918 (Colo. 1982);

*Colo. State Bd. of Social Services v. Billings*, 175 Colo. 380, 384, 487 P.2d 1110, 1112

(1971). The 55 Sheriffs' alleged injury depends on the Fourteenth Amendment.

Accordingly, they lack standing to bring suit in their official capacity and therefore

must be dismissed.[3] *See, e.g., City of New York v. Richardson*, 473 F.2d 923, 929 (2d

Cir. 1973) (ruling that political subdivisions of state may not challenge the validity

of a state statute under the Fourteen Amendment); *Amato v. Wilentz*, 952 F.2d 742

(3d Cir. 1991) (finding that county did not have standing to bring action against

Chief Justice of the New Jersey State Supreme Court); *Delta Special Sch. Dist. v.

State Bd. of Educ.*, 745 F.2d 532, 533 (8th Cir. 1984) ("A political subdivision of the

state cannot invoke the protection of the [F]ourteenth [A]mendment against the

state."); *Palomor Pornerado Health Syst. v. Belshe*, 180 F.3d 1104, 1107–08 (9th Cir.

1999) (holding that a political subdivision of the state lacks standing to bring a

cause of action against the state in federal court); *Moore v. Atchison, T., & S.F.R.

Co.*, 699 F.2d 507, 511–12 (10th Cir. 1983) (holding a city had no standing to

challenge a state statute on Fourteenth Amendment grounds); *United States v.

Alabama*, 791 F.2d 1450, 1455–56 (11th Cir. 1986) ("ASU [a state school] thus has

no standing to sue or to seek to enjoin the Alabama state board of education under

Section 1983 and the Fourteenth Amendment.").

---

[3] Defendants do not contend that the sheriffs lack standing in their individual
capacities.

## CONCLUSION

For the reasons and authorities stated above, Defendant asks this Court to dismiss Claims Two, Three, and Four in Plaintiffs' Second Amended Complaint. Defendant also asks this Court to dismiss the 55 Sheriffs as Plaintiffs in their official capacity.

Respectfully submitted,

JOHN W. SUTHERS
Attorney General

*s/ John T. Lee*
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Kathleen Spalding***
Senior Assistant Attorney General
**Matthew D. Grove***
Assistant Attorney General
*Counsel of Record
**John T. Lee***
Assistant Attorney General
*Counsel of Record

Attorneys for Governor John W. Hickenlooper
1300 Broadway, 10th floor
Denver, Colorado  80203
Telephone:  720-508-6000
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on  August 1        , 2013 I served a true and complete copy of the foregoing MOTION TO DISMISS upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                        *s/ Debbie Bendell*



John W. Suthers
Attorney General

Cynthia H. Coffman
Chief Deputy Attorney General

Daniel D. Domenico
Solicitor General

**STATE OF COLORADO**
**DEPARTMENT OF LAW**

Office of the Attorney General

Ralph L. Carr
Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

July 10, 2013

Colorado Department of Public Safety
Executive Director James H. Davis
700 Kipling Street, Suite 1000
Denver CO 80215

RE:   Additional Technical Guidance on the Interpretation and Application of
House Bill 13-1224, Large-Capacity Magazine Ban

Dear Executive Director Davis:

As discussed in my letter to you of May 16 this year, House Bill 13-1224, which
regulates the sale, transfer, and possession of "large capacity magazines," was
passed during this year's legislative session and became effective July 1, 2013. We
continue to review the law and "provide technical guidance on how the law should
be interpreted and enforced."

This letter sets forth the additional technical guidance requested today by the
Governor.

1)     Magazines with a capacity of 15 or fewer rounds are not large capacity
magazines as defined in HB 13-1224 whether or not they have removable base
plates. The baseplates themselves do not enable the magazines to be expanded, and
they serve functions aside from expansion—notably, they allow the magazines to be
cleaned and repaired. To actually convert them to higher capacity, one must
purchase additional equipment or permanently alter their operation
mechanically. Unless so altered, they are not prohibited.

2)     The phrase "continuous possession" in HB 1224 shall be afforded its
reasonable, every-day interpretation, which is the fact of having or holding property
in one's power or the exercise of dominion over property, that is uninterrupted in
time, sequence, substance, or extent. "Continuous possession" does not require a

656

Page 2

large-capacity magazine owner to maintain literally continuous physical possession of the magazine. "Continuous possession" is only lost by a voluntary relinquishment of dominion and control.


Sincerely,



JOHN W. SUTHERS
Colorado Attorney General


cc:     Governor John Hickenlooper
        Jack Finlaw, Chief Legal Counsel to Governor Hickenlooper