ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

Colorado Outfitters Association et al v. Hickenlooper
Assigned to: Chief Judge Marcia S. Krieger
Referred to: Magistrate Judge Michael J. Watanabe
 Case in other court:   USCA, 14–01290
                    USCA, 14–01292
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/17/2013
Date Terminated: 06/26/2014
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

**Defendant**

| | | |
|---|---|---|
| **Mesa County, Board of County Commissioners** | represented by | **David Robert Frankel**<br>Mesa County Attorney's Office<br>P.O. Box 20000<br>544 Rood Avenue<br>2nd Floor Annex<br>Grand Junction, CO 81502–5004<br>970–244–1612<br>Fax: 970–255–7196<br>Email: david.frankel@mesacounty.us<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Outfitters Association** | represented by | **Peter J. Krumholz**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6007<br>Fax: 720–904–6006<br>Email: pkrumholz@halewestfall.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>Hale Westfall, LLP<br>1600 Stout Street<br>Suite 500<br>Denver, CO 80202<br>720–904–6010<br>Fax: 720–904–6020<br>Email: rwestfall@halewestfall.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Farm Bureau** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Shooting Sports Foundation**         represented by   **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Magpul Industries**         represented by   **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Youth Outdoors**         represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA Liberty Arms**         represented by   **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Outdoor Buddies, Inc.**                    represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Women for Concealed Carry**                represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado State Shooting Association**      represented by    **Anthony John Fabian**
Anthony J. Fabian, P.C.
510 Wilcox Street
# C
Castle Rock, CO 80104
303–663–9339
Email: fabianlaw@qwestoffice.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hamilton Family Enterprises, Inc.**        represented by    **Anthony John Fabian**
*doing business as*                                           (See above for address)
Family Shooting Center at Cherry Creek                        *ATTORNEY TO BE NOTICED*
State Park

**Plaintiff**

660

| | | |
|---|---|---|
| **David Strumillo** | represented by | **David Benjamin Kopel**<br>Independence Institute<br>727 East 16th Avenue<br>Denver, CO 80203<br>303–279–6536<br>Fax: 303–279–4176<br>Email: <u>david@i2i.org</u><br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **David Bayne** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Dylan Harrell** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Rocky Mountain Shooters Supply** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014*<br><br>**Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **2nd Amendment Gunsmith &Shooter Supply, LLC** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014*<br><br>**Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Burrud Arms Inc.**<br>*doing business as*<br>Jensen Arms | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014* |

661

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Green Mountain Guns                    represented by   **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Jerry's Outdoor Sports                 represented by   **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Specialty Sports &Supply              represented by   **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Goods for the Woods                    represented by   **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

John B. Cooke                          represented by   **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ken Putnam                             represented by   **David Benjamin Kopel**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                          represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                          represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                            represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                       represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                          represented by   **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                                 (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                           represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                       represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                            represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                      represented by   **David Benjamin Kopel**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**John W. Hickenlooper**                 represented by    **Daniel D. Domenico**
*Govenor of the State of Colorado*                        Colorado Attorney General's Office
                                                          Ralph L. Carr Colorado Judicial Center
                                                          1300 Broadway
                                                          Denver, CO 80203
                                                          720–508–6000
                                                          Fax: 720–508–6032
                                                          Email: dan.domenico@state.co.us
                                                          *ATTORNEY TO BE NOTICED*

                                                          **David Christopher Blake**
                                                          Colorado Attorney General's Office
                                                          Ralph L. Carr Colorado Judicial Center
                                                          1300 Broadway
                                                          Denver, CO 80203
                                                          720–508–6000
                                                          Fax: 720–508–6032
                                                          Email: david.blake@state.co.us
                                                          *ATTORNEY TO BE NOTICED*

                                                          **John Tien Yau Lee**
                                                          Colorado Attorney General's Office
                                                          Ralph L. Carr Colorado Judicial Center
                                                          1300 Broadway
                                                          Denver, CO 80203
                                                          720–508–6000
                                                          Fax: 720–508–6032
                                                          Email: jtlee@state.co.us
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jonathan Patrick Fero**
                                                          Colorado Attorney General's Office
                                                          Ralph L. Carr Colorado Judicial Center
                                                          1300 Broadway
                                                          Denver, CO 80203
                                                          720–508–6000
                                                          Fax: 720–508–6032
                                                          Email: jon.fero@state.co.us
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kathleen L. Spalding**
                                                          Colorado Attorney General's Office
                                                          Ralph L. Carr Colorado Judicial Center
                                                          1300 Broadway
                                                          Denver, CO 80203
                                                          720–508–6000
                                                          Fax: 720–508–6032
                                                          Email: kit.spalding@state.co.us

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**
*Sheriff of Weld County, Colordo*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**
*Sheriff of El Paso County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**
*Sheriff of Larimer County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**
*Sheriff of Douglas County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**
*Sheriff of Gilpin County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**
*Sheriff of Montezuma County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**
*Sheriff of Moffat County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**
*Sheriff of Dolores County, Colorado*

represented by **David Benjamin Kopel**
(See above for address)

*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Ensminger**                          represented by   **David Benjamin Kopel**
*Sheriff of Teller County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shayne Heap**                             represented by   **David Benjamin Kopel**
*Sheriff of Elbert County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Day**                                represented by   **David Benjamin Kopel**
*Sheriff of Yuma County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred D. McKee**                           represented by   **David Benjamin Kopel**
*Sheriff of Delta County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lou Vallario**                            represented by   **David Benjamin Kopel**
*Sheriff of Garfield County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Hosselkus**                          represented by   **David Benjamin Kopel**
*Sheriff of Mineral County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett L. Powell**                         represented by   **David Benjamin Kopel**
*Sheriff of Logan County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian E. Norton**                         represented by   **David Benjamin Kopel**
*Sheriff of Rio Grande County, Colorado*                    (See above for address)

667

*TERMINATED: 11/27/2013*
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirard**                                represented by    **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                                  represented by    **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                                 represented by    **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                             represented by    **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                               (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                                  represented by    **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                              (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                                  represented by    **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                                  represented by    **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                          *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                                   represented by    **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*                             (See above for address)

668

*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Forrest Frazee**                          represented by    **David Benjamin Kopel**
*Sheriff of Kiowa County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Dunlap**                             represented by    **David Benjamin Kopel**
*Sheriff of Montrose County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ted B. Mink**                             represented by    **David Benjamin Kopel**
*Sheriff of Jefferson County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Wegener**                            represented by    **David Benjamin Kopel**
*Sheriff of Park County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Newman**                            represented by    **David Benjamin Kopel**
*Sheriff of Huerfano County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Peck**                              represented by    **David Benjamin Kopel**
*Sheriff of Sedgwick County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dominic Mattivi, Jr.**                    represented by    **David Benjamin Kopel**
*Sheriff of Ouray County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Minor**                              represented by    **David Benjamin Kopel**
*Sheriff of Summit County, Colorado*                         (See above for address)

669

*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**                          represented by   **David Benjamin Kopel**
*Sheriff of Jackson County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**                          represented by   **David Benjamin Kopel**
*Sheriff of Gunnison County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**                   represented by   **David Benjamin Kopel**
*Sheriff of Phillips County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**                             represented by   **David Benjamin Kopel**
*Sheriff of Lake County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**                       represented by   **David Benjamin Kopel**
*Sheriff of Arapahoe County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**                         represented by   **David Benjamin Kopel**
*Sheriff of Baca County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**                            represented by   **David Benjamin Kopel**
*Sheriff of Saguache County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**                            represented by   **David Benjamin Kopel**
*Sheriff of Costilla County, Colorado*                      (See above for address)

TERMINATED: 11/27/2013                              *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**                        represented by   **David Benjamin Kopel**
*Sheriff of Crowley County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**                     represented by   **David Benjamin Kopel**
*Sheriff of Bent County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**                 represented by   **David Benjamin Kopel**
*Sheriff of Las Animas County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**                    represented by   **David Benjamin Kopel**
*Sheriff of Routt County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**                    represented by   **Jonathon Michael Watson**
*TERMINATED: 12/23/2013*                                (See above for address)
                                                        *TERMINATED: 02/12/2014*

                                                        **Marc F. Colin**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**                     represented by   **David Benjamin Kopel**
*Sheriff of Grand County, Colorado*                     (See above for address)
*TERMINATED: 12/12/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/01/2013 | 65 | 17 | ANSWER to 62 Amended Complaint,,,,,, by John W. Hickenlooper.(Grove, Matthew) (Entered: 08/01/2013) |
| 08/22/2013 | 69 | 75 | RESPONSE to 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by |

671

| | | | |
|---|---|---|---|
| | | | Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Jerry's Outdoor Sports, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Rocky Mountain Shooters Supply, Specialty Sports &Supply, USA Liberty Arms, Women for Concealed Carry. (Attachments: # 1 Exhibit Exhibit A to Response, # 2 Exhibit Exhibit B to Response)(Krumholz, Peter) (Entered: 08/22/2013) |
| 08/22/2013 | 70 | | BRIEF in Opposition to 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: # 1 Exhibit Sheriff Bruce interrogatory, # 2 Exhibit Sheriff Woodruff interrogatory, # 3 Exhibit Sheriff Crone interrogatory, # 4 Exhibit Sheriff Stong interrogatory, # 5 Exhibit Sheriff Campbell interrogatory, # 6 Exhibit Sheriff Jobe interrogatory, # 7 Exhibit Sheriff Nestor interrogatory, # 8 Exhibit Sheriff Logan interrogatory, # 9 Exhibit Sheriff Spruell interrogatory, # 10 Exhibit Sheriff Faull interrogatory, # 11 Exhibit Sheriff Smith interrogatory, # 12 Exhibit Sheriff McKee interrogatory, # 13 Exhibit Sheriff Weaver interrogatory, # 14 Exhibit Sheriff Casias interrogatory, # 15 Exhibit Sheriff Beicker interrogatory, # 16 Exhibit Legislative testimony, # 17 Exhibit Ayoob expert report)(Kopel, David) (Entered: 08/22/2013) |
| | | 128 | *Main Document* |
| | | 178 | Attachment # 1 *Exhibit Sheriff Bruce interrogatory* |
| | | 186 | Attachment # 2 *Exhibit Sheriff Woodruff interrogatory* |
| | | 194 | Attachment # 3 *Exhibit Sheriff Crone interrogatory* |
| | | 204 | Attachment # 4 *Exhibit Sheriff Stong interrogatory* |
| | | 211 | Attachment # 5 *Exhibit Sheriff Campbell interrogatory* |
| | | 219 | Attachment # 6 *Exhibit Sheriff Jobe interrogatory* |
| | | 227 | Attachment # 7 *Exhibit Sheriff Nestor interrogatory* |
| | | 235 | Attachment # 8 *Exhibit Sheriff Logan interrogatory* |
| | | 242 | Attachment # 9 *Exhibit Sheriff Spruell interrogatory* |
| | | 251 | Attachment # 10 *Exhibit Sheriff Faull interrogatory* |

672

| | | 258 | Attachment # 11 *Exhibit Sheriff Smith interrogatory* |
|---|---|---|---|
| | | 270 | Attachment # 12 *Exhibit Sheriff McKee interrogatory* |
| | | 277 | Attachment # 13 *Exhibit Sheriff Weaver interrogatory* |
| | | 286 | Attachment # 14 *Exhibit Sheriff Casias interrogatory* |
| | | | Attachment # 15 *Exhibit Sheriff Beicker interrogatory (Not Attached)* |
| | | | Attachment # 16 *Exhibit Legislative testimony (Not Attached)* |
| | | | Attachment # 17 *Exhibit Ayoob expert report (Not Attached)* |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado
TERRY MAKETA, Sheriff of El Paso County, Colorado
JUSTIN SMITH, Sheriff of Larimer County, Colorado
DAVID A. WEAVER, Sheriff of Douglas County, Colorado
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado
KEN PUTNAM, Sheriff of Cheyenne County, Colorado
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado
TIM JANTZ, Sheriff of Moffat County, Colorado
JERRY MARTIN, Sheriff of Dolores County, Colorado
MIKE ENSMINGER, Sheriff of Teller County, Colorado
SHAYNE HEAP, Sheriff of Elbert County, Colorado
CHAD DAY, Sheriff of Yuma County, Colorado
FRED D. McKEE, Sheriff of Delta County, Colorado
LOU VALLARIO, Sheriff of Garfield County, Colorado
FRED HOSSELKUS, Sheriff of Mineral County, Colorado
BRETT L. POWELL, Sheriff of Logan County, Colorado
JAMES FAULL, Sheriff of Prowers County, Colorado
LARRY KUNTZ, Sheriff of Washington County, Colorado
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado
DUKE SCHIRARD, Sheriff of La Plata County, Colorado
JIM BEICKER, Sheriff of Fremont County, Colorado
RONALD BRUCE, Sheriff of Hinsdale County, Colorado
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado
FRED JOBE, Sheriff of Custer County, Colorado
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado
JAMES CRONE, Sheriff of Morgan County, Colorado
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado
TOM RIDENOUR, Sheriff of Kit Carson County, Colorado
TOM NESTOR, Sheriff of Lincoln County, Colorado
STAN HILKEY, Sheriff of Mesa County, Colorado
FORREST FRAZEE, Sheriff of Kiowa County, Colorado
RICK DUNLAP, Sheriff of Montrose County, Colorado
TED B. MINK, Sheriff of Jefferson County, Colorado
DAVE STRONG, Sheriff of Alamosa County, Colorado
FRED WEGENER, Sheriff of Park County, Colorado
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado
RANDY PECK, Sheriff of Sedgwick County, Colorado
DOMINIC MATTIVI JR., Sheriff of Ouray County, Colorado
JOHN MINOR, Sheriff of Summit County, Colorado

SCOTT FISCHER, Sheriff of Jackson County, Colorado
PETER GONZALEZ, Sheriff of Archuleta County, Colorado
RICK BESECKER, Sheriff of Gunnison County, Colorado
CHARLES "ROB" URBACH, Sheriff of Phillips County, Colorado
ROD FENSKE, Sheriff of Lake County, Colorado
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado
MIKE NORRIS, Sheriff of Saguache County, Colorado
AMOS MEDINA, Sheriff of Costilla County, Colorado
MILES CLARK, Sheriff of Crowley County, Colorado
DAVID ENCINIAS, Sheriff of Bent County, Colorado
SUE KURTZ, Sheriff of San Juan County, Colorado
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado
GARRETT WIGGINS, Sheriff of Routt County, Colorado
DOUGLAS N. DARR, Sheriff of Adams County, Colorado
RODNEY JOHNSON, Sheriff of Grand County, Colorado
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC. d/b/a FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. d/b/a JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

## ANSWER TO SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

JOHN W. HICKENLOOPER, Governor of the State of Colorado ("the Governor"), hereby submits the following Answer to the "SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF" ("Complaint"):

### I. OVERVIEW

1. The Governor denies the allegation in paragraph number one (1).

2. With respect to the allegations of paragraph number two (2) of the Complaint, the Governor affirmatively states that allegations in the first sentence call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations. The Governor denies the allegations in the second sentence of paragraph two.

3. With respect to the allegations of paragraph number three (3) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

4. With respect to the allegations of paragraph number four (4) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

5. With respect to the allegations of paragraph number five (5) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

6. With respect to the allegations of paragraph number six (6) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

7. The Governor admits that an appendix attached to the complaint contains diagrams of firearms magazines.

8. With respect to the allegations of paragraph number eight (8) of the Complaint, the Governor is without knowledge or information sufficient

to form a belief as to the truth of the allegations and therefore the
Governor denies them.

9. With respect to the allegations paragraph number nine (9) of the
Complaint the Governor is without knowledge or information sufficient
as to form a belief as to the truth of the allegations concerning "the chief
sponsor of HB 1224."  The Governor denies the remaining allegations in
paragraph nine.

10. With respect to the allegations of paragraph number ten (10) of the
Complaint, the Governor affirmatively states that allegations call for
legal conclusions to which no response is required; but insofar as a
response is required, the Governor is without knowledge or information
sufficient to form a belief as to the truth of the allegations and therefore
the Governor denies them.

11. With respect to the allegations of paragraph eleven (11), the Governor
affirmatively states that allegations call for legal conclusions to which no
response is required; but insofar as a response is required, the Governor
denies the allegations.

12. With respect to the allegations of paragraph number twelve (12) of the
Complaint, the Governor affirmatively states that House Bill 13-1224 is
a writing that speaks for itself.

13. With respect to the allegations of paragraph number thirteen (13) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

14. With respect to the allegations of paragraph number fourteen (14) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

15. With respect to the allegations of paragraph number fifteen (15) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore the Governor denies them.

16. With respect to the allegations of paragraph number sixteen (16) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore the Governor denies them.

17. With respect to the allegations of paragraph number seventeen (17) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first

sentence of the paragraph, and therefore the Governor denies them. The allegations in the second sentence of paragraph seventeen call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

18. With respect to the allegations of paragraph number eighteen (18) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

19. The Governor denies the allegations in paragraph nineteen (19). To the extent the allegations of paragraph number nineteen (19) of the Complaint call for legal conclusions, no response is required; but insofar as a response is required, the Governor denies the allegations.

20. With respect to the allegations of paragraph number twenty (20) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

21. With respect to the allegations of paragraph number twenty-one (21) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore

the Governor denies them.  The Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.

22. With respect to the allegations of paragraph number twenty-two (22) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

23. With respect to the allegations of paragraph number twenty-three (23) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

24. With respect to the allegations of paragraph number twenty-four (24) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

25. With respect to the allegations of paragraph number twenty-five (25) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

26. With respect to the allegations of paragraph number twenty-six (26) of the Complaint, the Governor affirmatively states that the allegations

call for legal conclusions to which no response is required; but insofar as
a response is required, the Governor denies the allegations.

27. With respect to the allegations of paragraph number twenty-seven (27)
of the Complaint, the Governor affirmatively states that allegations call
for legal conclusions to which no response is required; but insofar as a
response is required, the Governor denies the allegations.

28. With respect to the allegations of paragraph number twenty-eight (28)
of the Complaint, the Governor affirmatively states that allegations call
for legal conclusions to which no response is required; but insofar as a
response is required, the Governor denies the allegations.

29. With respect to the allegations of paragraph number twenty-nine (29) of
the Complaint, the Governor affirmatively states that the allegations
call for legal conclusions to which no response is required; but insofar as
a response is required, the Governor denies the allegations.

30. With respect to the allegations of paragraph number thirty (30) of the
Complaint, the Governor affirmatively states that the allegations call
for legal conclusions to which no response is required; but insofar as a
response is required, the Governor denies the allegations.

31. With respect to the allegations of paragraph number thirty-one (31) of
the Complaint, the Governor affirmatively states that the allegations

call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

32. With respect to the allegations of paragraph number thirty-two (32) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## II.    JURISDICTION AND VENUE

33. With respect to the allegations of paragraph number thirty-three (33) of the Complaint, the Governor denies the allegations.

34. With respect to the allegations of paragraph number thirty-four (34) of the Complaint, the Governor denies the allegations.

35. The Governor denies the allegations in paragraph number thirty-five (35).

36. With respect to the allegations of paragraph number thirty-six (36) of the Complaint, the Governor admits the allegations.

## III.    PARTIES

37. With respect to the allegations of paragraph number thirty-seven (37) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

38. The Governor admits the allegations described in paragraph thirty-eight (38) of the Complaint.

39. The Governor admits the allegation described in paragraph thirty-nine (39) of the Complaint.

40. The Governor admits the allegation described in paragraph forty (40) of the Complaint.

41. The Governor admits the allegation described in paragraph forty-one (41) of the Complaint.

42. The Governor admits the allegation described in paragraph forty-two (42) of the Complaint.

43. The Governor admits the allegation described in paragraph forty-three (43) of the Complaint.

44. The Governor admits the allegation described in paragraph forty-four (44) of the Complaint.

45. The Governor admits the allegation described in paragraph forty-five (45) of the Complaint.

46. The Governor admits the allegation described in paragraph forty-six (46) of the Complaint.

47. The Governor admits the allegation described in paragraph forty-seven (47) of the Complaint.

48. The Governor admits the allegation described in paragraph forty-eight (48) of the Complaint.

49. The Governor admits the allegation described in paragraph forty-nine (49) of the Complaint.

50. The Governor admits the allegation described in paragraph fifty (50) of the Complaint.

51. The Governor admits the allegation described in paragraph fifty-one (51) of the Complaint.

52. The Governor admits the allegation described in paragraph fifty-two (52) of the Complaint.

53. The Governor admits the allegation described in paragraph fifty-three (53) of the Complaint.

54. The Governor admits the allegation described in paragraph fifty-four (54) of the Complaint.

55. The Governor admits the allegation described in paragraph fifty-five (55) of the Complaint.

56. The Governor admits the allegation described in paragraph fifty-six (56) of the Complaint.

57. The Governor admits the allegation described in paragraph fifty-seven (57) of the Complaint.

58. The Governor admits the allegation described in paragraph fifty-eight (58) of the Complaint.

59. The Governor admits the allegation described in paragraph fifty-nine (59) of the Complaint.

60. The Governor admits the allegation described in paragraph sixty (60) of the Complaint.

61. The Governor admits the allegation described in paragraph sixty-one (61) of the Complaint.

62. The Governor admits the allegation described in paragraph sixty-two (62) of the Complaint.

63. The Governor admits the allegation described in paragraph sixty-three (63) of the Complaint.

64. The Governor admits the allegation described in paragraph sixty-four (64) of the Complaint.

65. The Governor admits the allegation described in paragraph sixty-five (65) of the Complaint.

66. The Governor admits the allegation described in paragraph sixty-six (66) of the Complaint.

67. The Governor admits the allegation described in paragraph sixty-seven (67) of the Complaint.

68. The Governor admits the allegation described in paragraph sixty-eight (68) of the Complaint.

69. The Governor admits the allegation described in paragraph sixty-nine (69) of the Complaint.

70. The Governor admits the allegation described in paragraph seventy (70) of the Complaint.

71. The Governor admits the allegation described in paragraph seventy-one (71) of the Complaint.

72. The Governor admits the allegation described in paragraph seventy-two (72) of the Complaint.

73. The Governor admits the allegation described in paragraph seventy-three (73) of the Complaint.

74. The Governor admits the allegation described in paragraph seventy-four (74) of the Complaint.

75. The Governor admits the allegation described in paragraph seventy-five (75) of the Complaint.

76. The Governor admits the allegation described in paragraph seventy-six (76) of the Complaint.

77. The Governor admits the allegation described in paragraph seventy-seven (77) of the Complaint.

78. The Governor admits the allegation described in paragraph seventy-eight (78) of the Complaint.

79. The Governor admits the allegation described in paragraph seventy-nine (79) of the Complaint.

80. The Governor admits the allegation described in paragraph eighty (80) of the Complaint.

81. The Governor admits the allegation described in paragraph eighty-one (81) of the Complaint.

82. The Governor admits the allegation described in paragraph eighty-two (82) of the Complaint.

83. The Governor admits the allegation described in paragraph eighty-three (83) of the Complaint.

84. The Governor admits the allegation described in paragraph eighty-four (84) of the Complaint.

85. The Governor admits the allegation described in paragraph eighty-five (85) of the Complaint.

86. The Governor admits the allegation described in paragraph eighty-six (86) of the Complaint.

87. The Governor admits the allegation described in paragraph eighty-seven (87) of the Complaint.

88. The Governor admits the allegation described in paragraph eighty-eight (88) of the Complaint.

89. The Governor admits the allegation described in paragraph eighty-nine (89) of the Complaint.

90. The Governor admits the allegation described in paragraph ninety (90) of the Complaint.

91. The Governor admits the allegation described in paragraph ninety-one (91) of the Complaint.

92. The Governor admits the allegation described in paragraph ninety-two (92) of the Complaint.

93. With respect to the allegations of paragraph number ninety-three (93) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

94. With respect to the allegations of paragraph number ninety-four (94) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

95. With respect to the allegations of the first two sentence of paragraph number ninety-five (95) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response

is required; but insofar as a response is required, the Governor denies the allegations. With respect to the allegations of the last sentence of paragraph number ninety-five (95) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

96. With respect to the allegations of paragraph number ninety-six (96) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

97. With respect to the allegations of paragraph number ninety-seven (97) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

98. With respect to the allegations of paragraph number ninety-eight (98) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

99. With respect to the allegations of paragraph number ninety-nine (99) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required, and contains factual allegations that the Governor lacks sufficient knowledge to

answer and therefore denies; insofar as a response is required, the Governor denies the allegations.

100.   With respect to the allegations of paragraph number one hundred (100) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

101.   With respect to the allegations of paragraph number one hundred-one (101) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

102.   With respect to the allegations of paragraph number one hundred-two (102) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

103.   With respect to the allegations of paragraph number one hundred-three (103) of the Complaint, the Governor affirmatively states that

C.R.S. 16-2.5-101, et seq. and C.R.S. 30-10-501, et seq. are writings that speak for themselves. With respect to all other allegations of paragraph number one hundred-three (103) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

104.    With respect to the allegations of paragraph number one hundred-four (104) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

105.    With respect to the allegations of paragraph number one hundred-five (105) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

106.    With respect to the allegations of paragraph number one hundred-six (106) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

107.    With respect to the allegations of paragraph number one hundred-seven (107) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

108.     With respect to the allegations of paragraph number one hundred-eight (108) of the Complaint, the Governor affirmatively states that House Bill 13-1229 is a writing that speaks for itself.

109.     With respect to the allegations of paragraph number one hundred-nine (109) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

110.     With respect to the allegations of paragraph number one hundred-ten (110) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

111.     With respect to the allegations of all parts of paragraph number one hundred-eleven (111) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

112.     With respect to the allegations of paragraph number one hundred-twelve (112) of the Complaint, the Governor affirmatively states that

allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

113.    With respect to the allegations of paragraph number one hundred-thirteen (113) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

114.    With respect to the allegations of paragraph number one hundred-fourteen (114) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

115.    With respect to the allegations of paragraph number one hundred-fifteen (115) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

116.    With respect to the allegations of paragraph number one hundred-sixteen (116) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

117. With respect to the allegations of paragraph number one hundred-seventeen (117) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

118. With respect to the allegations of paragraph number one hundred-eighteen (118) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

119. With respect to the allegations of paragraph number one hundred-nineteen (119) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

120. With respect to the allegations of paragraph number one hundred-twenty (120) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

121.    With respect to the allegations of paragraph number one hundred-twenty-one (121) of the Complaint, the Governor denies the allegations.

122.    With respect to the allegations of paragraph number one hundred-twenty-two (122) of the Complaint, the Governor denies the allegations.

123.    With respect to the allegations of paragraph number one hundred-twenty-three (123) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

124.    With respect to the allegations of paragraph number one hundred-twenty-four (124) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

125.    With respect to the allegations of paragraph number one hundred-twenty-five (125) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

126.    With respect to the allegations of paragraph number one hundred-twenty-six (126) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

127.    With respect to the allegations of paragraph number one hundred-twenty-seven (127) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

128.    With respect to the allegations of paragraph number one hundred-twenty-eight (128) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

129.    With respect to the allegations of paragraph number one hundred-twenty-nine (129) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

130.    With respect to the allegations of paragraph number one hundred-thirty 130) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

131.     With respect to the allegations of paragraph number one hundred-thirty-one (131) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

132.     With respect to the allegations of paragraph number one hundred-thirty-two (132) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

133.     With respect to the allegations of paragraph number one hundred-thirty-three (133) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

134.     With respect to the allegations of paragraph number one hundred-thirty-four (134) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

135.     With respect to the allegations of paragraph number one hundred-thirty-five (135) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

136.    With respect to the allegations of paragraph number one hundred-thirty-six (136) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

137.    With respect to the allegations of paragraph number one hundred-thirty-seven (137) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

138.    With respect to the allegations of paragraph number one hundred-thirty-eight (138) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

139.    With respect to the allegations of paragraph number one hundred-thirty-nine (139) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

140.    With respect to the allegations of paragraph number one hundred-forty (140) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

141.    With respect to the allegations of paragraph number one hundred-forty-one (141) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

142.    With respect to the allegations of paragraph number one hundred-forty-two (142) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

143.    With respect to the allegations of paragraph number one hundred-forty-three (143) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

144.    With respect to the allegations of paragraph number one hundred-forty-four (144) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

145.    With respect to the allegations of paragraph number one hundred-forty-five (145) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

146.    With respect to the allegations of paragraph number one hundred-forty-six (146) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

147.    With respect to the allegations of paragraph number one hundred-forty-seven (147) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

148.    With respect to the allegations of paragraph number one hundred-forty-eight (148) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

149.    With respect to the allegations of paragraph number one hundred-forty-nine (149) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

150.    With respect to the allegations of paragraph number one hundred-fifty (150) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

151.    With respect to the allegations of paragraph number one hundred-fifty-one (151) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

152.    With respect to the allegations of paragraph number one hundred-fifty-two (152) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

153.    With respect to the allegations of paragraph number one hundred-fifty-three (153) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

154.    With respect to the allegations of paragraph number one hundred-fifty-four (154) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

155.    With respect to the allegations of paragraph number one hundred-fifty-five (155) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

156.    With respect to the allegations of paragraph number one hundred-fifty-six (156) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

157.    With respect to the allegations of paragraph number one hundred-fifty-seven (157) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

158.    With respect to the allegations of paragraph number one hundred-fifty-eight (158) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

159.    With respect to the allegations of paragraph number one hundred-fifty-nine (159) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the
allegations and therefore the Governor denies them.

160.    With respect to the allegations of paragraph number one hundred-
sixty (160) of the Complaint, the Governor is without knowledge or
information sufficient to form a belief as to the truth of the allegations
and therefore the Governor denies them.

161.    With respect to the allegations of paragraph number one hundred-
sixty-one (161) of the Complaint, the Governor is without knowledge or
information sufficient to form a belief as to the truth of the allegations
and therefore the Governor denies them.

162.    With respect to the allegations of paragraph number one hundred-
sixty-two (162) of the Complaint, the Governor is without knowledge or
information sufficient to form a belief as to the truth of the allegations
and therefore the Governor denies them.

163.    With respect to the allegations of paragraph number one hundred-
sixty-three (163) of the Complaint, the Governor is without knowledge
or information sufficient to form a belief as to the truth of the
allegations and therefore the Governor denies them.

164.    With respect to the allegations of paragraph number one hundred-
sixty-four (164) of the Complaint, the Governor affirmatively states that
the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor is without

knowledge or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

165.    With respect to the allegations of paragraph number one hundred-

sixty-five (165) of the Complaint, the Governor affirmatively states that

allegations call for legal conclusions to which no response is required;

but insofar as a response is required, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

166.    With respect to the allegations of paragraph number one hundred-

sixty-six (166) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

167.    With respect to the allegations of paragraph number one hundred-

sixty-seven (167) of the Complaint, the Governor is without knowledge

or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

168.    With respect to the allegations of paragraph number one hundred-

sixty-eight (168) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

169.    With respect to the allegations of paragraph number one hundred-sixty-nine (169) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

170.    With respect to the allegations of paragraph number one hundred-seventy (170) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

171.    With respect to the allegations of paragraph number one hundred-seventy-one (171) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

172.    With respect to the allegations in paragraph one-hundred seventy-two (172) the Governor admits that he is the Governor of the State of Colorado. To the extent a response is required, Colo. Const. art. IV, § 2, speaks for itself.  To the extent a response is required to the last sentence of paragraph 172, the Governor denies the allegations.

173.    With respect to the allegations of paragraph number one hundred-seventy-three (173) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

174.    With respect to the allegations of paragraph number one hundred-seventy-four (174) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

175.    With respect to the allegations of paragraph number one hundred-seventy-five (175) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

176.    With respect to the allegations of paragraph number one hundred-seventy-six (176) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

177.    With respect to the allegations of paragraph number one hundred-seventy-seven (177) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

178.    With respect to the allegations of paragraph number one hundred-seventy-eight (178) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

179.    With respect to the allegations of paragraph number one hundred-seventy-nine (179) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

180.    With respect to the allegations of paragraph number one hundred-eighty (180) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

181.   With respect to the allegations of paragraph number one hundred-eighty-one (181) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

182.   With respect to the allegations of paragraph number one hundred-eighty-two (182) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

183.   With respect to the allegations of paragraph number one hundred-eighty-three (183) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

184.   With respect to the allegations of paragraph number one hundred-eighty-four (184) of the Complaint, the Governor lacks knowledge sufficient to admit or deny that that handguns are used in the majority of homicides in the United States, but with respect to the remainder of the allegations of paragraph number one hundred-eighty-four (184) of the Complaint, the Governor affirmatively states that the allegations

call for legal conclusions to which no response is required; but insofar as

a response is required, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations

and therefore the Governor denies them.

185.   With respect to the allegations of paragraph number one hundred-

eighty-five (185) of the Complaint, the Governor affirmatively states

that the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor is without

knowledge or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

186.   With respect to the allegations of paragraph number one hundred-

eighty-six (186) of the Complaint, the Governor affirmatively states that

the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor is without

knowledge or information sufficient to form a belief as to the truth of the

allegations and therefore the Governor denies them.

187.   The Governor lacks knowledge sufficient to admit or deny the

allegations of paragraph one hundred-eighty-seven (187), and therefore

denies them.

188.   With respect to the allegations of paragraph number one hundred-

eighty-eight (188) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

189.    With respect to the allegations of paragraph number one hundred-eighty-nine (189) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

190.    The Governor denies the allegations in paragraph number one hundred-ninety (190) of the Complaint.

191.    With respect to the allegations of paragraph number one hundred-ninety-one (191) of the Complaint, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

192.    The Governor denies the allegations in paragraph number one hundred-ninety-two (192) of the Complaint.

193.    The Governor denies the allegations in paragraph one hundred-ninety-three (193) of the Complaint.

194.    The Governor denies the allegations in the first sentence of

paragraph one hundred ninety-four (194) of the Complaint.  With

respect to the remaining allegations of paragraph number one hundred-

ninety-four (194) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

195.    With respect to the allegations of paragraph number one hundred-

ninety-five (195) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

196.    With respect to the allegations of paragraph number one hundred-

ninety-six (196) of the Complaint, the Governor affirmatively states that

allegations call for legal conclusions to which no response is required;

but insofar as a response is required, the Governor denies the

allegations.

197.    With respect to the allegations of paragraph number one hundred-

ninety-seven (197) of the Complaint, the Governor affirmatively states

that allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

198.    With respect to the allegations of paragraph number one hundred-

ninety-eight (198) of the Complaint, the Governor affirmatively states

that the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

199.    With respect to the allegations of paragraph number one hundred-

ninety-nine (199) of the Complaint, the Governor affirmatively states

that House Bill 13-1229 is a writing that speaks for itself.  With respect

to the remainder of the allegations of paragraph number one hundred-

ninety-nine (199) of the Complaint, the Governor affirmatively states

that the allegations call for legal conclusions to which no response is

required; but insofar as a response is required, the Governor denies the

allegations.

200.    With respect to the allegations of paragraph number two hundred

(200) of the Complaint, the Governor affirmatively states that the

allegations call for legal conclusions to which no response is required;

but insofar as a response is required, the Governor denies the

allegations.

201.    With respect to the allegations of paragraph number two hundred-one (201) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

202.    With respect to the allegations of paragraph number two hundred-two (202) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

203.    With respect to the allegations of paragraph number two hundred-three (203) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

204.    With respect to the allegations of paragraph number two hundred-four (204) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

205.    With respect to the allegations of paragraph number two hundred-five (205) of the Complaint, the Governor lacks knowledge sufficient to admit or deny the allegations, and therefore denies them.

206.    With respect to the allegations of paragraph number two-hundred-six (206) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies them.

207.    With respect to the allegations of paragraph number two hundred-seven (207) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

208.    With respect to the allegations of paragraph number two hundred-eight (208) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

209.    The Governor denies the allegations in paragraph number two hundred-nine (209) of the Complaint.

210.    With respect to the allegations of paragraph number two hundred-ten (210) of the Complaint, the Governor admits that he issued a signing statement requiring interpretive guidance regarding House Bill 13-1224 and House Bill 13-1229 be issued, that the Department of Law issued such guidance on May 16, 2013, and that the guidance has been made publicly available.  With respect to the remaining allegations of paragraph number two hundred-ten (210) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## FIRST CLAIM FOR RELIEF

211.    With respect to the allegations of paragraph number two hundred-eleven (211), the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred-ten (210) of this answer were set forth in full in this paragraph.

212.    With respect to paragraph number two hundred-twelve (212) of the Complaint, the Governor admits that he signed HB 1224 on or about March 20, 2013.  With respect to the remaining allegations, the Governor affirmatively states that the statute speaks for itself.

213.    The Governor lacks information sufficient to admit or deny the allegations in paragraph 213, and therefore denies them.

214.    With respect to the allegations of paragraph number two hundred-fourteen (214) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

215.    With respect to the allegations of paragraph number two hundred-fifteen (215) of the Complaint, the Governor lacks information sufficient to admit or deny the allegations, and therefore denies them.

216.    With respect to the allegations of paragraph number two hundred-sixteen (216) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

217.    With respect to the allegations of paragraph number two hundred-seventeen (217) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

218.    With respect to the allegations of paragraph number two hundred-eighteen (218) of the Complaint, the Governor is without knowledge or

information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

219.  With respect to the allegations of paragraph number two hundred-nineteen (219) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## SECOND CLAIM FOR RELIEF

220.  With respect to the allegations of paragraph number two hundred-twenty (220) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Second Claim for Relief.  No response to the allegations contained in paragraph 220 or the Second Claim for Relief is required at this time.

221.  With respect to the allegations of paragraph number two hundred-twenty (221) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Second Claim for Relief.  No response to the allegations contained in paragraph 221 or the Second Claim for Relief is required at this time.

222.     With respect to the allegations of paragraph number two hundred-twenty-two (222) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Second Claim for Relief.  No response to the allegations contained in paragraph 222 or the Second Claim for Relief is required at this time.

223.     With respect to the allegations of paragraph number two hundred-twenty-three (223) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Second Claim for Relief.  No response to the allegations contained in paragraph 223 or the Second Claim for Relief is required at this time.

224.     With respect to the allegations of paragraph number two hundred-twenty-four (224) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Second Claim for Relief.  No response to the allegations contained in paragraph 224 or the Second Claim for Relief is required at this time.

225.     With respect to the allegations of paragraph number two hundred-twenty-five (225) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to

dismiss the Second Claim for Relief.  No response to the allegations

contained in paragraph 225 or the Second Claim for Relief is required at

this time.

226.   With respect to the allegations of paragraph number two hundred-

twenty-six (226) of the Complaint, in a motion to dismiss filed

contemporaneously with this answer, the Governor has moved to

dismiss the Second Claim for Relief.  No response to the allegations

contained in paragraph 226 or the Second Claim for Relief is required at

this time.

227.   With respect to the allegations of paragraph number two hundred-

twenty-seven (227) of the Complaint, in a motion to dismiss filed

contemporaneously with this answer, the Governor has moved to

dismiss the Second Claim for Relief.  No response to the allegations

contained in paragraph 227 or the Second Claim for Relief is required at

this time.

228.   With respect to the allegations of paragraph number two hundred-

twenty-eight (228) of the Complaint, in a motion to dismiss filed

contemporaneously with this answer, the Governor has moved to

dismiss the Second Claim for Relief.  No response to the allegations

contained in paragraph 228 or the Second Claim for Relief is required at

this time.

## THIRD CLAIM FOR RELIEF

229.    With respect to the allegations of paragraph number two hundred twenty-nine (229) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief.  No response to the allegations contained in paragraph 229 or the Third Claim for Relief is required at this time.

230.    With respect to the allegations of paragraph number two hundred thirty (230) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief.  No response to the allegations contained in paragraph 230 or the Third Claim for Relief is required at this time.

231.    With respect to the allegations of paragraph number two hundred-thirty-one (231) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief.  No response to the allegations contained in paragraph 231 or the Third Claim for Relief is required at this time.

232.    With respect to the allegations of paragraph number two hundred-thirty-two (232) of the Complaint, in a motion to dismiss filed

contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief. No response to the allegations contained in paragraph 232 or the Third Claim for Relief is required at this time.

233.   With respect to the allegations of paragraph number two hundred-thirty-three (233) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief. No response to the allegations contained in paragraph 233 or the Third Claim for Relief is required at this time.

234.   With respect to the allegations of paragraph number two hundred-thirty-four (234) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief. No response to the allegations contained in paragraph 234 or the Third Claim for Relief is required at this time.

235.   With respect to the allegations of paragraph number two hundred-thirty-five (235) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Third Claim for Relief. No response to the allegations

contained in paragraph 235 or the Third Claim for Relief is required at this time.

## FOURTH CLAIM FOR RELIEF

236.    With respect to the allegations of paragraph number two hundred thirty-six (236) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations contained in paragraph 236 or the Fourth Claim for Relief is required at this time.

237.    With respect to the allegations of paragraph two hundred thirty-seven (237), in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief. No response to the allegations contained in paragraph 237 or the Fourth Claim for Relief is required at this time.

238.    With respect to the allegations of paragraph two hundred thirty-eight (238), in a motion to dismiss filed contemporaneously with this Answer, the Governor has moved to dismiss the Fourth Claim for Relief. No response to the allegations contained in paragraph 238 or the Fourth Claim for Relief is required at this time.

239.    With respect to the allegations of paragraph number two hundred thirty-nine (239) of the Complaint, in a motion to dismiss filed

contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations contained in paragraph 239 or the Fourth Claim for Relief is required at this time.

240.    With respect to the allegations of paragraph number two hundred forty (240) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations contained in paragraph 240 or the Fourth Claim for Relief is required at this time.

241.    With respect to the allegations of paragraph number two hundred forty-one (241) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations contained in paragraph 241 or the Fourth Claim for Relief is required at this time.

242.    With respect to the allegations of paragraph number two hundred-forty-two (242) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations

contained in paragraph 242 or the Fourth Claim for Relief is required at this time.

243.    With respect to the allegations of paragraph number two hundred forty-three (243) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations contained in paragraph 243 or the Fourth Claim for Relief is required at this time.

**244.**    With respect to the allegations of paragraph number two hundred forty-four (244) of the Complaint, in a motion to dismiss filed contemporaneously with this answer, the Governor has moved to dismiss the Fourth Claim for Relief.  No response to the allegations contained in paragraph 244 or the Fourth Claim for Relief is required at this time.

**FIFTH CLAIM FOR RELIEF**

245.    With respect to the allegations of paragraph number two hundred forty-five (245) of the Complaint, the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred forty-four (244) of this answer were set forth in full in this paragraph.

246.    With respect to the allegations of paragraph two hundred forty-six (246), the Governor affirmatively states that Title II of the Americans with Disabilities Act (ADA) is a writing that speaks for itself.

247.    With respect to the allegations of paragraph two hundred forty-seven (247), the Governor affirmatively states that definitions contained within the ADA are writings that speak for themselves.

248.    With respect to the allegations of paragraph number two hundred-forty-eight (248) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor lacks knowledge sufficient to admit or deny the allegations, and therefore denies them.

249.    With respect to the allegations of paragraph number two hundred-forty-nine (249) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

250.    With respect to the allegations of paragraph number two hundred-fifty (250) of the Complaint, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

251.   The Governor denies the allegations in paragraph number two hundred-fifty-one (251) of the Complaint.

252.   With respect to the allegations of paragraph number two hundred-fifty-two (252) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## SIXTH CLAIM FOR RELIEF

253.   With respect to the allegations of paragraph number two hundred fifty-three (253) of the Complaint, the Governor responds as if the answers set forth in paragraphs numbers one (1) through two hundred fifty-two (252) of this answer were set forth in full in this paragraph.

254.   With respect to the allegations of paragraph two hundred fifty-four (254), the Governor affirmatively states that HB 1229 is a writing that speaks for itself.

255.   With respect to the allegations of paragraph number two hundred-fifty-five (255) of the Complaint, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

256.    With respect to the allegations of paragraph number two hundred-
fifty-six (256) of the Complaint, the Governor affirmatively states that
the allegations call for legal conclusions to which no response is
required; but insofar as a response is required, the Governor denies the
allegations.

257.    With respect to the allegations of paragraph number two hundred-
fifty-seven (257) of the Complaint, the Governor affirmatively states
that the allegations call for legal conclusions to which no response is
required; but insofar as a response is required, the Governor denies the
allegations.

258.    With respect to the allegations of paragraph number two hundred-
fifty-eight (258) of the Complaint, the Governor is without knowledge or
information sufficient to form a belief as to the truth of the allegations
and therefore the Governor denies them.

259.    The Governor denies the allegations in paragraph number two
hundred-fifty-nine (259) of the Complaint.

260.    The Governor denies all allegations contained in the Complaint not
specifically admitted in this answer.


**RELIEF REQUESTED**

261.   The Governor denies that Plaintiffs are entitled to the relief they

request, including their requests for declaratory relief, injunctive relief,

attorney fees and costs.

## AFFIRMATIVE DEFENSES

1.   Plaintiffs have failed to state claims for relief.

2.   Plaintiffs' claims may be barred because Plaintiffs lack a private

right of action.

3.   Plaintiffs' claims may be barred by Eleventh Amendment immunity.

4.   Plaintiffs' claims may be barred because some or all Plaintiffs lack

the standing to assert them.

5.   Plaintiffs have been afforded all the rights, privileges, and

immunities granted by the United States Constitution, the Colorado

Constitution, and state and federal law.

6.   The Governor is not a proper party to some or all of Plaintiffs'

claims.

7.   This court lacks subject matter jurisdiction over Plaintiffs' claims.

8.   Plaintiffs have not been excluded from participation in the benefits

and programs of a public entity.

9.   The Governor reserves the right to assert additional affirmative

defenses or rescind affirmative defenses after further investigation and

discovery.

Wherefore, the Governor requests this Court to enter judgment in their favor and additionally request attorney fees and any other relief this Court deems just and proper.

JOHN W. SUTHERS
Attorney General


s/ *Kathleen Spalding*
**Daniel D. Domenico\***
Solicitor General
**David C. Blake\***
Deputy Attorney General
**Jonathan P. Fero\***
Assistant Solicitor General
**Matthew D. Grove\***
Assistant Attorney General
**John T. Lee\***
Assistant Attorney General
**Kathleen Spalding\***
Senior Assistant Attorney General

\*Counsel of Record

730

## CERTIFICATE OF SERVICE

I hereby certify that on  August 1, 2013, I served a true and complete copy of the foregoing ANSWER TO SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

*s/ Matt Grove*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado *et. al.*,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

---

For the reasons set forth below, the Court should deny the Governor's effort to dismiss three of Plaintiffs' constitutional challenges to HB-1224.[1]

### INTRODUCTION

Defendant seeks to dismiss Plaintiffs' second, third, and fourth claims based on an unprecedented and peculiar proposition: that the Governor, by instructing his Attorney General to issue non-binding "technical guidance" opining on the meaning of a state statute, can strip this Court of its jurisdiction to rule on the constitutionality of that statute. Put another way, Defendant contends that an Attorney General's non-binding guidance is an acceptable substitute for a federal court ruling on the constitutionality of a state statute. It is not. *Cf. Cooper v. State of Utah*, 684 F. Supp. 1060, 1068 (D. Utah 1987) ("Manifestly, only a court of law by judicial decree, and not the Attorney General by issuance of an opinion, effectively can render a

---

[1] Defendant's Motion to Dismiss also seeks dismissal of the 55 Sheriffs in their official capacities. The 55 Sheriffs are filing a separate response to address that portion of Defendant's motion.

legislative enactment unconstitutional."). Accepting Defendant's proposition would allow States to evade federal constitutional challenges to their statutes by issuing "technical guidance" that is binding on no one and subject to change at any time.

As discussed below, the Attorney General's inconsistent "technical guidance" does not eliminate Plaintiffs' standing to challenge HB 1224 on vagueness grounds. Plaintiffs still face a credible threat of prosecution, and this Court therefore retains jurisdiction to rule upon Plaintiffs' second, third, and fourth claims for relief.

Defendant also asserts that a ruling from this Court will not redress Plaintiffs' injuries, because Plaintiffs have named only the Governor as a defendant. Defendant apparently assumes that when a federal court declares a statute unconstitutional, that ruling is binding only on the named defendant. That has never been the law, and is nonsensical on its face. A statute is either unconstitutional or it is not – it cannot be unconstitutional as to some but not others. Therefore, a ruling by this Court that HB 1224 is unconstitutionally vague on its face would apply to every law enforcement agency in Colorado that might seek to enforce it, and remove forever the uncertainty of its meaning and the attendant uncertainty of prosecution. This, the technical guidance does not, and cannot, do.

Finally, to the extent Defendant's argument is actually premised on mootness rather than standing, that argument fails as well. The technical guidance letter issued on July10, 2013 ("the Second Technical Guidance Letter") does not even address certain aspects of those claims, and, in any event, the voluntary cessation exception to the mootness doctrine applies where, as here, the defendant remains free to reverse course at any time.

In essence, the Defendant's position is that a ruling by this Court would make no difference because the technical guidance cures the defects in the statute and removes any risk of prosecution. But in conceding that the guidance binds none of the hundreds of local jurisdictions that may enforce it, the Defendant's solution to cure a constitutionally defective statute essentially is to say "trust us, we do not think anybody will actually enforce this." As a fallback, the Defendant asks the citizens to take comfort in knowing that they have an affirmative defense to prosecution. Courts are the place where citizens can go to have their constitutional rights declared with certainty. If a right exists, its exercise cannot depend upon trusting that others will see it the same way, or by resort to an affirmative defense if they do not. That is no right at all. A declaration by this Court will make all the difference.

## **ARGUMENT**

## I.   **THE TECHICAL GUIDANCE DOES NOT REMOVE A CREDIBLE THREAT OF PROSECUTION.**

Defendant asserts that Plaintiffs have not demonstrated a "credible threat" of prosecution because, by virtue of the technical guidance letters, Plaintiffs have received "affirmative assurances of non-prosecution." Motion to Dismiss [Doc. No. 64], at p. 7. But the letters say no such thing, even as it relates to the Governor or those within his direct control. Moreover, the letters *cannot* provide any such assurance with respect to local law enforcement. An affirmative defense to a prosecution by definition cannot be an "assurance of non-prosecution." Thus, those letters do not constitute assurances at all, and cannot satisfy Defendant's heavy burden of establishing a lack of credible threat to succeed on his Motion to Dismiss.

"The conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of

Art. III." *Diamond v. Charles*, 476 U.S. 54, 64 (1986). A plaintiff is not required to expose himself to actual arrest or prosecution, and a plaintiff has standing to challenge the constitutionality of a statute so long as the plaintiff's fear of prosecution is not "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-99 (1979). In other words, if a plaintiff alleges that prosecution is even "remotely possible," then a finding of standing is appropriate. *Id.* Moreover, the "evidentiary bar to establish standing is low." *Pacific Frontier, Inc. v. City of St. George*, No. 2:04-CV-780-TC, 2005 WL 3334749 at *4 (D. Utah Dec. 7, 2005).

Indeed, courts assume a credible threat of prosecution in the absence of compelling contrary evidence. *Id.* (citing *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). The lack of enforcement of a particular statute alone does not automatically preclude standing. *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987). For example, in *Babbitt*, even though the defendants noted that no criminal penalties had ever been levied under the statute at issue and averred that none "might" ever be imposed, the Supreme Court nonetheless found a credible threat of prosecution because the plaintiffs had engaged in the criminalized activities in the past and professed an intent to engage in the same activities going forward. *Babbitt*, 442 U.S. at 301-02. Similarly, in *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), the Court held that plaintiffs had standing to challenge a statute prohibiting the commercial display of sexual materials harmful to juveniles. In so holding, the Court rejected the defendant's argument that there was no credible threat of prosecution because the challenge was filed before the statute became effective. *Id.* at 392. The Court held that the injury-in-fact requirement was met "as the law is aimed directly at plaintiffs,

who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution."[2] *Id.*

Here, Plaintiffs have alleged sufficient facts to demonstrate that a credible threat of prosecution exists under HB 1224. *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (for purposes of ruling on a motion to dismiss for want of standing, the trial court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party). Under the text of HB 1224, any manufacture, sale, or purchase of magazines that can conceivably be converted into "large capacity magazines" as that term is defined in the bill will subject Plaintiffs to potential criminal prosecution because of the vague nature of the statute. *See, e.g.*, Second Am. Compl. [Doc. No. 62], ¶¶ 224, 231-34. Moreover, any innocuous transfer of grandfathered magazines for lawful purposes, such as cleaning and repair, will subject Plaintiffs to criminal prosecution based on HB 1224's vague "continuous possession" provisions. *Id.* ¶¶ 237-44. Because of the sweeping breadth of HB 1224's prohibitions, it is inevitable that Plaintiffs, and firearm-owning Coloradans at large, will continue to engage in conduct that is potentially criminalized under HB 1224 and subject to prosecution under the same. *See, e.g., id.* ¶ 226 (vast majority of small-capacity magazines are capable of being readily converted to large-capacity magazines and sale or purchase of the same will potentially be illegal); ¶ 239-40 (any routine transfer of grandfathered magazines is potentially subject to criminal penalties).

Defendant's technical guidance letters cannot wash away the credible threat of prosecution that exists and continues to exist while HB 1224 remains in force because, although

---

[2] The Court further observed that the "alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Id.* at 393. Similarly, here Plaintiffs have alleged that the vagueness of certain provisions in HB 1224 will chill their exercise of Second Amendment rights.

entitled to respect, formal attorney general opinions are **not** binding upon the courts or law enforcement in general. *See, e.g., Colorado Common Cause v. Meyer*, 758 F.2d 153, 159 (Colo. 1988); *Regents of Univ. of Colo. v. Students for Concealed Carry on Campus*, 271 P.3d 496, 502 n.4 (Colo. 2012) (unanimously rejecting a reading of the concealed carry statute contained in Attorney General Opinion).

Further, the technical guidance letters do not contain the sort of affirmative assurances of non-prosecution that courts have relied on to find a lack of credible threat of prosecution. *See, e.g.*, *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (finding no credible threat when the prosecutor affirmatively stated that it would not prosecute the plaintiff or anyone else for the proscribed conduct). The letters are simply the Attorney General's own personal (and different) interpretations of HB 1224 which, as the Plaintiffs have repeatedly alleged, is subject to multiple reasonable interpretations and therefore may be enforced inconsistently. They are not even binding on Defendant as he can change it at any time, as he has already demonstrated. They are not binding on state or local law enforcement and only create an affirmative defense to prosecution, which may or may not be deemed sufficient. They are not binding on the courts. Far from being an "assurance" that no prosecution will happen, the Governor has given no indication that he will intervene on any party's behalf if a prosecution is brought. Finally, they may be repealed or modified at any time by the current Attorney General or a future attorney general.

Absent a ruling from this Court, there is simply no way for Plaintiffs to know whether their routine purchases or sales of firearm magazines or lawful transfers of the same will subject them to criminal liability. Thus, the technical guidance letters do not constitute the sort of

"compelling evidence" necessary to overcome a finding of standing for purposes of motions to dismiss under F.R.C. P. 12(b)(1).

> A.  **HB 1224 Is Not Moribund, Which Mitigates in Favor of a Finding of Standing.**

The fact that HB 1224 has only been in effect for approximately seven weeks mitigates in favor of finding a credible threat of prosecution. "Where a statute is recently enacted and is not moribund, its existence alone may create a threat that is credible enough to create standing." *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) (citing *Babbitt*, 442 U.S. at 301-02). In *Brown*, the court determined that Utah's anti-bigamy statute was, in fact, moribund and that the plaintiffs were therefore required to demonstrate that the government took additional threatening activities against them in order to establish the existence of a credible threat. *Id.* at 1249; *cf. New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) ("[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.").

There is no question that HB 1224 is not moribund, and the sheer uncertainty of present and future interpretations of the statute and prosecutions under the same weighs in favor of finding standing for Plaintiffs' second, third, and fourth claims for relief.

**B.      Defendant's Authorities Are Readily Distinguishable.**

The cases Defendant cites in support of his argument are distinguishable, largely because they involved longstanding laws that, while still valid, were very rarely enforced or otherwise moribund. Moreover, persons charged with enforcing those laws had unequivocally stated that they would not prosecute the plaintiffs for conduct prohibited under the statutes. No such factors are present here.

For example, *Bronson v. Swenson* involved Utah's criminal statute prohibiting bigamy, which had not been enforced in recent memory. 500 F.3d 1099, 1102 (10th Cir. 2007). The Utah Attorney General had also explicitly stated the state would not enforce the statute in cases where the prohibited conduct was between consenting adults. *Id.* Tellingly, nothing in the technical guidance letters states explicitly that HB 1224 will not be enforced against owners of magazines of 15 rounds or less with removable base plates.

Likewise, *D.L.S. v. Utah* involved a long-standing sodomy prohibition, and the Utah County prosecutor provided an affidavit stating that from 1987 to 2004, the county had never prosecuted anyone solely for sodomy under the statute.  374 F.3d 971, 974 (10th Cir. 2004). The prosecutor also unequivocally stated that Utah County had no intention of prosecuting the plaintiff under the statute. *Id.*; *see also Winsness*, 433 F.3d at 732 (District Attorney expressly stated that it would not prosecute either the plaintiff or anyone else under the state's flag-abuse statute). Further, the sodomy statute at issue had already been declared unconstitutional by the Supreme Court. *D.L.S.*, 274 F.3d at 974-75. There have been no similar assurances by any government agency in this case, and there has been no ruling on the constitutionality of HB 1224; *D.L.S.* is inapposite.

In *Mink v. Suthers*, prior to filing an answer to the plaintiff's original complaint, the Attorney General expressly admitted that he could not constitutionally prosecute the plaintiff under Colorado's criminal libel statute for the plaintiff's admitted conduct. 482 F.3d 1244, 1255 (10th Cir. 2007). Additionally, both the office of Attorney General and District Attorney changed hands while the case was still pending, further solidifying the conclusion that Colorado had no intention of specifically enforcing the criminal libel statute against the plaintiff. *Id.* Here, neither the Attorney General nor Defendant has admitted that enforcement of HB 1224 as written is unconstitutional.

Similarly, in *Faustin v. City & County of Denver*, the finding of no credible threat was based on the city prosecutor's determination that the plaintiff did not, in fact, violate the city's sign-posting ordinance. 268 F.3d 942, 948 (10th Cir. 2001). There has been no similar determination in this case.

At the preliminary injunction hearing on July 10, 2013, this Court referred the parties to *Dias v. City & County of Denver*, 567 F.3d 1169 (10th Cir. 2009), which Defendant then cited in his Motion to Dismiss. *Dias*, however, is also distinguishable and illustrates the type of situation, not present here, where a party may be deprived of standing. In that case, the plaintiffs challenged Denver's "pit bull ordinance" on vagueness grounds. *Id.* at 1173. The plaintiff dog owners feared their dogs could be seized or destroyed pursuant to the ordinance. *Id.* at 1174. However, the court held that the plaintiffs lacked standing "because they have not alleged a credible threat of future prosecution under the Ordinance." *Id.* at 1176. The court so held because "none of the plaintiffs currently resides in Denver and ***none has alleged an intent to return***." *Id.* (emphasis added). Thus, in *Dias*, in sharp contrast to the situation here, there was no credible

threat of prosecution because prosecution was a factual impossibility. Plaintiffs here are all Colorado residents or maintain their principal places of business in Colorado, and prosecution remains a distinct possibility.

Finally, Plaintiffs are aware of this Court's July 25, 2013 order regarding standing in *Grider v. City & County of Denver*, --- F.Supp.2d ---, 2013 WL 3851046 (D. Colo. July 25, 2013). In part, *Grider* involved an Americans with Disabilities Act ("ADA") claim brought by pit bull owners in Denver who sought an accommodation to have service pit bulls despite Denver's ban on pit bulls. After the plaintiffs in *Grider* brought suit, the City and County of Denver issued a written policy modifying its procedures for enforcing the pit bull ban and formally providing that it would not impound pit bulls that are identified by their handlers as service dogs. *Id.* at *3. This Court stated that "to whatever extent any of the Plaintiffs allege that they cannot go to Denver out of fear that their dog will be impounded, those allegations do not permit an inference that they are under any real and immediate threat of future injury." *Id.* Based on Denver's policy modification, this Court held that "none of the Plaintiffs have standing to seek prospective relief against Denver." *Id.*

*Grider*, again, presents a distinctly different situation than that presented by the Governor's technical guidance. Under the State Administrative Procedures Act, agencies have the authority to promulgate two types of rules: substantive rules, which have the force of law, and interpretative rules, which do not. *Sanchez v. American Standard Insurance Company of Wisconsin*, 89 P.3d 471, 475-76 (Colo. App. 2003). Similarly, the City and County of Denver has its own Administrative Procedures Act that allows promulgation of substantive rules that have the force of law within the City and County. *Denver Colorado Code of Ordinances*, Title II, Ch.

24, Art. VIII, Secs. 24-261 – 268. In *Grider*, Denver's policy modification was a substantive rule carrying the force of law which directed the City's law enforcement and prosecuting officials as to how the City's municipal pit bull ordinance was to be applied and enforced. The policy therefore had the force of law and plaintiffs could rely on it to protect them from the credible threat of prosecution. In contrast, the Governor in this case issued "guidance," which at best is an interpretative rule. It therefore lacks the force of law and binds no enforcement official, prosecutorial entities, or courts of law in the enforcement of HB 1224. Thus, Plaintiffs continue to face a credible threat of prosecution.

HB 1224 has only been in effect for roughly seven weeks. There has been no lapse of time and concomitant lack of prosecution that led the Tenth Circuit to find no credible threat in the cases cited by Defendant. More importantly, while the technical guidance letters offer the Attorney General and Defendant's own "interpretation" of what HB 1224 actually prohibits, Plaintiffs have received *no* concrete assurances that they will not be prosecuted for engaging in the conduct outlined in their Complaint – specifically buying and selling magazines which, by virtue of their design, can be converted to hold more than fifteen rounds, or failing to maintain "continuous possession" of grandfathered magazines. In addition, there is absolutely no guarantee that the next Attorney General will follow the current Attorney General's non-binding Technical Guidance or otherwise decline to prosecute the various classes of Plaintiffs for the otherwise constitutional conduct alleged in the Complaint. *See Mink*, 482 F.3d at 1255 (continued non-enforcement of statute after a change in the office of Attorney General solidified lack of credible threat).  Thus, Defendant's reliance on the cases cited in his Motion to Dismiss is misplaced and those authorities are inapplicable to this particular case.

### C.     C.R.S. § 18-1-504(2)(c) Does Nothing to Eliminate the Plaintiffs' Demonstrated Credible Threat of Prosecution.

Defendant summarily concludes that the affirmative defense afforded by C.R.S. § 18-1-504(2)(c) eliminates any concerns that threats of prosecution under HB 1224 are "credible."[3] Motion to Dismiss [Doc. No. 64], at p. 10. The Governor cites no authority for this proposition.

Defendant's interpretation of the sort of threatened injuries that can give rise to standing is far too narrow. Defendant essentially argues that if an affirmative defense exists against conviction under an otherwise unconstitutional statute, there is no credible threat of injury. However, the "credible threat" test relates to potential *prosecution*, not conviction. *See Babbitt*, 442 U.S. at 298 (it is not necessary for a plaintiff to subject himself to actual arrest or prosecution to be entitled to challenge a statute as unconstitutional); *Ward*, 321 F.3d at 1267 (plaintiff generally has standing if he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest and there exists a credible threat of prosecution thereunder). Section 18-1-504(2)(c) does nothing to resolve the actual and threatened injuries that Plaintiffs will suffer if prosecuted under HB 1224. *Id.* (plaintiff who challenges statute must only demonstrate a realistic danger of sustaining a *direct injury* as a result of the statute's operation or enforcement).

Even assuming that C.R.S. § 18-1-504(2)(c) provides an ironclad affirmative defense for prosecutions under HB 1224 that deviate from the Technical Guidance letters, the persons

---

[3] "A person is not relieved of criminal liability for conduct because he engages in that conduct under a mistaken belief that it does not, as a matter of law, constitute an offense, unless the conduct is permitted by one or more of the following: . . . An official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." C.R.S. § 18-1-504(2)(c).

prosecuted under HB 1224 will still suffer the embarrassment, stress, financial costs, and emotional hardship that go hand in hand with any unjustified criminal prosecution. "No one should have to go through being arrested for a felony, publicly shamed, and pay for a defense only to have a court find that the newly enacted statute is unconstitutional." *Cyberspace Comm'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 745-46 (E.D.Mich. 1999)*, quoted in Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1154-55 (10th Cir. 1999). In addition, the fact of arrest itself constitutes a significant harm. An arrest, regardless of the ultimate disposition, shows up in national criminal databases used in law enforcement. *See* Testimony of Sheriff Hartman on HB-1224, at 115 (Feb. 12, 2013) (attached as Ex. A). The harmful implications are obvious, particularly for anyone employed in the law enforcement community or whose job requires a security clearance. Thus, the potential injuries that will be sustained by the Plaintiffs extend beyond criminal conviction and Defendant's arguments regarding an affirmative defense lack merit.

    **D.    In Any Case, Defendant Ignores that Have Satisfied the Injury-in-Fact Requirement Based on Economic Injury.**

    Finally, Defendant's argument ignores that there are other ways to show injury-in-fact.[4] Economic injury, for example, is the paradigmatic form of an injury-in-fact. *See e.g., Schrader v. New Mexico*, 361 Fed. Appx. 971, 974 (10th Cir. 2010) ("Pecuniary injury is sufficient to confer standing."). Several Plaintiffs, including the licensed firearms dealers, Family Shooting Center

---

[4] Though it is not pertinent to the specific issues raised in Defendant's motion, information and argument pertaining to each individual Plaintiffs' injuries-in-fact can be found in Plaintiffs' Supplemental Brief Regarding Plaintiffs' Standing and Other Issues Raised by the Court [Doc. No. 37], which was filed on June 20, 2013.

("FSC"), and others, satisfy the injury-in-fact requirement because HB 1224 has already caused them substantial economic injury.

The Plaintiff licensed firearms dealers received orders from customers for magazines and associated firearms in the Fall of 2012. These orders include magazines and firearms which hold 15 rounds or less, but which also have a removable base plate, as well as those with greater magazine capacity. As noted in Plaintiffs' Second Amended Complaint, because of HB 1224, certain manufacturers have refused to fill these purchase orders, thereby rendering the Plaintiff licensed firearms dealers unable to fill the orders and complete the sale of these arms. *See* Second Am. Compl. [Doc. No. 62], ¶ 130-131. Because Plaintiff firearms dealers are unable to fill these purchase orders, HB 1224 has and continues to cause them a real and immediate economic injury.

In addition, Plaintiffs licensed firearms dealers, FSC, and others have already suffered economic injuries caused by HB 1224 because on beginning on July 1, 2013, in order to avoid prosecution for a violation of HB 1224, they refrained from buying, selling, renting, or loaning firearms with magazines of 15 rounds or less and removable base plates. The fact that the Second Technical Guidance Letter, issued on July 10, 2013, has temporarily abated those economic injuries makes them no less actual. These injuries have already been suffered as a result of HB 1224's vagueness. Moreover, Plaintiffs will suffer additional economic injury if the Court does not enter an order declaring HB 1224 unconstitutional. Accordingly, several Plaintiffs have suffered a direct economic injury attributable to the vagueness of HB 1224, and therefore, satisfy the injury-in-fact element of standing.

**II.     A RULING BY THIS COURT WOULD REDRESS PLAINTIFFS' INJURIES.**

Defendant asserts that a declaratory judgment or permanent injunction against the Governor "would not redress [Plaintiffs' injuries] as a matter of law [because] Plaintiffs have chosen not to name local law enforcement authorities in their case." Motion to Dismiss [Doc. No. 64], at p. 12. Defendant argues that because "district attorneys are independent from the Governor, they are not 'officers, agents, servants, employees, nor attorneys' for the Governor, and a permanent injunction or declaratory judgment against the Governor would not extend to the district attorneys." *Id.* at pp. 12-13.

Defendant appears to argue, presumably in earnest, that if this Court were to issue a declaratory judgment declaring HB 1224 unconstitutionally vague as a facial matter, that ruling would not apply to anyone beyond the named parties in this lawsuit. That is absurd. A finding of facial unconstitutionality would be binding upon everyone within the limits of this Court's jurisdiction. Otherwise, thousands of Colorado gun owners "would have a cognizable injury until [he or she] filed and won what would become a parade of lawsuits." *Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 619 (6th Cir. 2013) (rejecting argument that because only the governor, and not the Attorney General or local prosecutors, was named in a prior case which enjoined enforcement of an unconstitutional statute, there remained a live issue to be resolved in future cases). Contrary to Defendant's assertion, a plaintiff need not name *all* Colorado District Attorneys as defendants when he or she brings a pre-enforcement challenge to a penal statute.

Defendant's position is also contrary to established Tenth Circuit authority. Defendant cites *American Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999), in support of his argument that Plaintiffs were required to name all Colorado District Attorneys as defendants

in this action. Motion to Dismiss [Doc. No. 64], at p. 13. This case, previously cited by Plaintiffs to this Court, supports Plaintiffs' position, not Defendant's.

In *Johnson*, the Tenth Circuit considered the defendants' argument that the district court erred in including New Mexico's district attorneys within the scope of its preliminary injunction order against the governor and attorney general of New Mexico. 194 F.3d at 1163. The court noted that "[t]he district attorney is the law officer of the district and is to prosecute criminal cases on behalf of the state." *Id.* (internal quotations and citations omitted). With this in mind, the court held that "[t]o the extent district attorneys would attempt to enforce [the challenged statute], an injunction against the governor and attorney general prohibiting such enforcement binds those attorneys." *Id.*

Contrary to Defendant's Motion, *Johnson* demonstrates that a declaratory judgment and permanent injunction in this case would redress Plaintiffs' injuries. In the State of Colorado, as in New Mexico, district attorneys are members of the executive branch who are charged with prosecuting cases on behalf of the State. C.R.S. § 20-1-102(1) ("Every district attorney shall appeal on behalf of the state and the several counties of his district."); *see e.g., People v. C.V.*, 64 P.3d 272, 274 (Colo. 2003) ("Colorado requires its district attorneys to prosecute cases on behalf of the state and the counties within his or her district."); *People v. District Court*, 527 P.2d 50, 52 (Colo. 1974) (en banc) (district attorneys are members of the executive branch of government). As the supreme executive power in Colorado, Defendant cannot plausibly argue that subordinate members of the executive branch (including local district attorneys) may continue to execute and enforce statutes declared unconstitutional when he himself cannot do so. *See* COLO. CONST. ART. IV, § 2 (vesting supreme executive power in the governor). Thus, as in *Johnson*, a declaratory

judgment and permanent injunction against Defendant will bind all district attorneys and therefore redress Plaintiffs' alleged injuries.

In *Ainscough v. Owens*, 90 P.3d 851 (Colo. 2004), the Colorado Supreme Court examined the role of the Governor in defending litigation directed against the State of Colorado, statutes passed by the General Assembly, and actions by Colorado's Executive Branch. The Court stated:

> The Governor of Colorado is unique in that he is the "supreme executive," and it is his responsibility to ensure that the laws are faithfully executed. Colo. Const. art IV, § 2 . . . . Therefore, when a party sues to enjoin or mandate enforcement of a statute, regulation, ordinance, or policy, it is not only customary, but entirely appropriate for the plaintiff to name the body ultimately responsible for enforcing that law. Moreover, when that body is an administrative agency, or the executive branch of government, or even the state itself, the Governor, in his official capacity, is a proper defendant because he is the state's chief executive. For litigation purposes, the governor is the embodiment of the state.

*Id.* at 858. The Court further held that "[t]his case and the many others like it clearly demonstrate that when challenging the constitutionality of a statute . . . the governor is an appropriate defendant due to his constitutional responsibility to uphold the laws of the state and to oversee Colorado's executive agencies." *Id.*

Defendant Governor Hickenlooper is the State's chief executive and he is charged with ensuring that Colorado laws are faithfully executed. Accordingly, Plaintiffs' injuries are traceable to him.  *See Sportsmen's Wildlife Defense Fund v. U.S. Dept. of the Interior*, 949 F. Supp. 1520, 1514-15 (D. Colo. 1996) (finding that based on the Colorado Constitution, the plaintiff's injury is fairly traceable to the Governor and he is a proper party).

### III. PLAINTIFFS' SECOND, THIRD, AND FOURTH CLAIMS WERE NOT RENDERED MOOT BY THE SECOND TECHNICAL GUIDANCE LETTER.

Although Defendant couches his argument in terms of standing, the essence of Defendant's argument is that Plaintiffs' second, third, and fourth claims are moot. "[C]oncepts of mootness and standing are closely related, but not coextensive." *Trudeau v. Bockstein*, No. 05-cv-1019, 2008 WL 541158 at *5 (N.D.N.Y. Feb. 25, 2008); *see also, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 703-04 (2000) ("The Constitution's case-or-controversy limitation on federal judicial authority, Art. III, § 2, underpins both our standing and our mootness jurisprudence, but the two inquiries differ."). Plaintiffs' second, third, and fourth claims were not rendered moot by the Second Technical Guidance Letter.

Moot cases are those in which "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Geraghty*, 445 U.S. at 396. "The crucial question is whether granting a present determination of the issues offered … will have some effect in the real world." *Id.* (internal quotations and citation omitted). Defendant's position appears to be that the Second Technical Guidance Letter eliminated a "live case or controversy" with respect to claims two, three, and four, and that those claims should therefore be dismissed as moot. Those claims, however, are not moot because there remain issues raised by those claims that were not addressed by the Second Technical Guidance Letter, and because the voluntary cessation exception to the mootness doctrine applies.

#### A. The Second Technical Guidance Letter Does Not Address Several Issues Raised by the Second, Third and Fourth Claims.

The Attorney General's first Technical Guidance Letter attempted to address certain shortcomings of HB 1224, but left a significant delta between Defendant's position and

Plaintiffs' second, third, and fourth claims. The Second Technical Guidance Letter was the result of hard-fought briefing on both sides concerning Plaintiffs' motion for preliminary injunctive relief. Defendant, on the eve of the preliminary injunction hearing, offered a Second Technical Guidance Letter which closed the delta enough for Plaintiffs to agree to forego the time and expense of an all-day preliminary injunction hearing. The Second Technical Guidance Letter, however, did not resolve Plaintiffs' claims entirely. There remains a delta, and Plaintiffs' claims are therefore not mooted.

First, the Second Technical Guidance does not make the phrase "designed to be readily converted" any less confusing. The Second Technical Guidance Letter concedes that the mere fact that a box magazine has a removable base plate does not render it "designed to be readily converted." However, as one of Plaintiffs' designated experts has noted, if the determination to be made "is based *not* on whether a detachable box magazine is capable of being . . . converted to accept more than 15 rounds . . . but instead, [on whether] it has objective features that are specifically designed to make it readily convertible, I cannot discern from HB 1224 what those objective features are, if they are not the removable base plate and outside flanges." Expert Report of Michael Shain at 8-9 (attached as Ex. B).[5] Indeed, Mr. Shain further observed that "[w]ith all the experience in the firearms industry and access to reference and research materials that I have, I cannot find a single example of a pistol magazine that has any extraordinary design features that clearly distinguish it as a magazine that is intentionally 'designed to be readily converted' to accept more than 15 rounds of ammunition." *Id.* at 9.

---

[5] "A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (internal citations omitted).

Second, the Second Technical Guidance Letter makes the "designed to be readily converted" provision very difficult to enforce. No law enforcement officer can know, simply by observing a particular magazine, whether it exceeds a 15-round capacity. For example, Colorado citizens who render a standard 20- or 30-round magazine legal by permanently installing a blocking device to limit the magazine to 15 rounds, could still be arrested for violating HB 1224 because the blocking component will not be visible from the outside of the magazine. Shain Report, at 11.

Moreover, without any standards in HB 1224 establishing how such blocking components should be installed and secured, law enforcement officers responsible for enforcing the law have no means of determining whether a particular altered magazine is in compliance. For example, Defendant's contention that welding a blocker to the magazine will immunize a citizen from prosecution is contradicted by the cases that Defendant cites. Defendant does not know, and does not say, whether attaching a blocker with a pin or bolt will or will not make the citizen liable for prosecution. Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction, at 19-21. The Second Technical Guidance Letter does absolutely nothing to solve the vagueness problems involving blocking devices; it addresses base plates, and has nothing to do with blockers.

Third, the Second Technical Guidance Letter does not address an important aspect of Plaintiffs' Second Amended Complaint. As Plaintiffs have pointed out, the phrase "capable of accepting . . . more than 15 rounds of ammunition" is also vague. One reason is that rifle cartridges of a particular diameter vary in length. Second Am. Compl. [Doc. No. 62], ¶ 207. Thus, in some firearms, a tube magazine that will accept 13 rounds of one caliber may also

accept 18 rounds of a compatible shorter caliber. "The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 20[13]." *Id.*; Shain Report at 11-12.

As applied to box magazines, "capable of accepting" is vague, and may be difficult or impossible for law enforcement officers, including the Sheriffs' deputies, to enforce in the field. Small differences in manufacturing tolerances sometimes make it possible to fit 16 rounds into what is nominally a 15 round magazine. Shain Report at 11-12. The Second Technical Guidance Letter does nothing to address these vagueness problems.

Finally, the Second Technical Guidance Letter concedes that "continuous possession" in HB 1224's grandfather clause cannot mean that Colorado citizens must literally have their magazines in their physical possession, or remain in the physical presence of the magazine, at all times. *See* Exhibit A to Motion to Dismiss [Doc. No. 64-1]. This concession was sufficient for Plaintiffs to forego the need for a preliminary injunction. However, the Second Technical Guidance Letter states that "'[c]ontinuous possession' is only lost by a voluntary relinquishment of dominion or control." *Id.* This does not address the problem, described in the Second Amended Complaint and in other pleadings, of a grandfathered magazine owner who leaves the state and entrusts the magazine to a friend or neighbor for safe storage,[6] or an owner who shares a magazine with another person at a shooting event in which both were participating. *See* Second Am. Compl. [Doc. No. 62], ¶ 239-40. Moreover, the word "dominion" "implies both title ***and***

---

[6] Indeed, Plaintiffs submitted the declaration of Plaintiff David Strumillo, who averred that a friend currently serving overseas in the United States Armed Forces gave Mr. Strumillo much of his personal property for safe-keeping, including magazines of more than 15 rounds. Even under the Second Technical Guidance Letter, it is far from clear that Mr. Strumillo's friend has not "relinquish[ed] dominion or control."

*possession*," Black's Law Dictionary at 486 (6th ed. 1990) (emphasis added), which renders the Second Technical Guidance Letter somewhat circular and fails to address completely the very vagueness concerns described in Plaintiffs' Second Amended Complaint.

In short, the Second Technical Guidance Letter does not render Plaintiffs' second, third, and fourth claims moot because it does not address certain vagueness concerns raised by those claims.

> **B.     Even Assuming that the Second Technical Guidance Letter Mooted the Issues Raised by the Second, Third, and Fourth Claims, the Voluntary Cessation Exception Applies.**

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth*, 528 U.S. at 189 (internal quotations and citation omitted). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* (internal quotations and citation omitted). "The rule that voluntary cessation of a challenged practice rarely moots a federal case traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Jordan v. Sosa*, 654 F.3d 1012, 1037 (10th Cir. 2011). "In other words, this exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct." *Id.* "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189.

Here, Defendant revised his interpretation of HB 1224 multiple times and now attempts to use his latest revision as grounds for dismissal.[7] While the Second Technical Guidance Letter did not resolve all of Plaintiffs' concerns, Defendant's offer was sufficient to alleviate enough of them to cause Plaintiffs to agree to avoid the time and expense of a full-day preliminary injunction hearing – particularly in the context of an expedited pre-trial procedure and trial. Notably, in foregoing the preliminary injunction hearing, Plaintiffs never conceded that the Second Technical Guidance Letter resolved the full merits of their claims in any way. Further, as this Court is aware, no injunction or other order was entered memorializing the terms on which the parties agreed to forego a full-day hearing. Accordingly, Defendant is free to alter his interpretation of HB 1224 yet again at any point in the future.[8] Thus, to dismiss Plaintiffs' second, third, and fourth claims for lack of subject matter jurisdiction based on the Second Technical Guidance Letter would be to "leave the Defendant free to return to his old ways." *See Friends of the Earth*, 528 U.S. at 189. As such, this Court has subject matter jurisdiction of Plaintiffs' second, third, and fourth claims pursuant to the voluntary cessation exception.

Defendant may argue that this case does not fall into the voluntary cessation exception because it is analogous to cases in which courts have found that a legislative change to the challenged statute renders the case moot. A statutory change may be sufficient to moot a case even though the legislature possesses the power to reinstate the allegedly invalid law after the

---

[7] In a six week period, Defendant offered three different, contradictory interpretations of "designed to be readily converted" and three different, contradictory, interpretations of "continuous possession." *See* Plaintiffs' Reply Brief in Support of Motion for a Preliminary Injunction, at 19-24.

[8] Plaintiffs in no way question the good faith of the Governor or his counsel. There may be, however, political events that overtake even the most sincere efforts of Defendant.

lawsuit is dismissed. *See, e.g., Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1118 (10th Cir. 2010) ("Even when a legislative body has the power to re-enact an ordinance or statute, ordinarily an amendment or repeal of it moots a case challenging the ordinance or statute.").

This case, however, is not analogous to a statutory change. The Defendant's interpretation of HB 1224 as outlined in the Second Technical Guidance Letter is issued at the complete discretion of Defendant; it is not a legislative change, but rather a unilateral and subjective interpretation issued by Defendant's counsel at the Defendant's request. Neither of the technical guidance letters required a legislative process nor any process whatsoever beyond drafting and publishing[9] Defendant's opinion. The technical guidance letters are not binding, and are little more than an informal assertion that this is the way the Governor interprets the challenged statute. *Compare Rio Grande Silvery Minnow*, 601 F.3d at 1118 ("We are not here presented with a mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease.").

The instant case is similar to *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565 (2d. Cir. 2003). There, a communal boarding house for recovering alcoholics and drug addicts brought an action against the City of West Haven and the West Haven Fire District alleging that the Fire District's enforcement of certain provisions of the Connecticut Fire Safety Code violated the Fair Housing Act and the Americans with Disabilities Act. *Id.* at 570-72. The question of

---

[9] The lack of any significant publication of the Second Technical Guidance Letter undermines the Defendant's attempt to rely upon it as a basis for his "no credible threat of prosecution" argument. It is not even published on the Defendant's website, and can only be found on the Attorney General's website by paging through press release archives. Indeed, the prerequisites for Defendant's argument are wholly lacking in this case.

mootness arose when, subsequent to the commencement of legal proceedings, the Fire District adopted a new interpretation of the Fire Safety Code under which the boarding house could be considered a single-family dwelling, thereby exempting it from the safety requirements applicable to "lodging and rooming" establishments. *Id.* at 572-73. Relying on the principle that the voluntary cessation of unlawful activities does not moot a case, the Second Circuit held that the case was not moot because "the interpretation of the code might change again – for example, upon a change in the State Fire Marshal's administration." *Id.* at 574. Just like in *Tsombanidis*, the Defendant may change his interpretation of HB 1224 anytime at his discretion, or it may change upon the election of a new Governor or a new Attorney General. Accordingly, the voluntary cessation exception applies and claims two, three, and four should not be dismissed for lack of subject matter jurisdiction.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that Defendant's Motion to Dismiss should be denied.

Respectfully submitted this 22d day of August, 2013.

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com
ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR
BUDDIES, INC. THE COLORADO OUTFITTERS
ASSOCIATION, COLORADO FARM BUREAU, AND
WOMEN FOR CONCEALED CARRY

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEY FOR LICENSED FIREARMS DEALERS

26

757

Appellate Case: 14-1290   Document: 01019371746   Date Filed: 01/16/2015   Page: 101

s/Anthony J. Fabian

LAW OFFICES OF ANTHONY J. FABIAN PC

510 Wilcox Street, Suite C

Castle Rock, CO 80104

Phone: (303) 663-9339

Fax: (303) 713-0785

fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

758

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2013, I served via email a true and complete copy of the foregoing pleading upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| David B. Kopel | david@i2i.org |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |

s/Peter J. Krumholz

1

 1   CITY AND COUNTY OF DENVER

 2   STATE OF COLORADO

 3   JUDICIAL COMMITTEE MEETING

 4   HELD ON FEBRUARY 12, 2013

 5   HOUSE BILL 13-1224

 6   -------------------------------------------------------

 7                  REPORTER'S TRANSCRIPT

 8   -------------------------------------------------------

 9

10           This transcript was taken from an audio

11   recording by Angela Smith, Professional Reporter and

12   Notary Public.

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT**

**A**

1    come to the table so we have a comprehensive plan.

2    That didn't occur, and that's fine, but I think you

3    find that some of the questions -- and term it

4    resistance if you want -- is these aren't going to

5    make us safer.

6              The deputies are going to be in the

7    middle of a heck of a decision-making process.  And

8    it's even in here that the prosecution has to prove

9    it.

10             I think there are better ways to

11   address the issue.  The problem with the violence

12   didn't occur overnight or at Sandy Hook.  It's been

13   decades in building.  We can't fix it overnight

14   either.  And everybody wants to help address that

15   problem, but I don't believe the bills I've seen are

16   going to be an effective means for that.

17             THE CHAIRMAN:  Thank you, Sheriff

18   Hartman.

19             Are there questions for Sheriff

20   Hartman?

21             THE CHAIRMAN:  Representative

22   McLachlan.

23             REPRESENTATIVE McLACHLAN:  Thank you,

24   Mr. Chairman.

25             Sheriff Hartman, I'm actually going to

1   ask a question that I should have raised earlier

2   when Sheriff Smith was testifying regarding the

3   information available to a deputy on the street.

4   And it's been a long time since I was an assistant

5   district attorney, so I need to be refreshed on

6   this.

7           Are we saying that the sheriffs on the

8   street don't have access to NCIC to determine

9   whether or not someone who's in possession of a

10  rapid shooter should not have that?

11          BRUCE HARTMAN:   They do have full -- I

12  apologize.

13          THE CHAIRMAN:   It's just easier for

14  the people listening online if they know who's

15  speaking.   So please go ahead, Sheriff Hartman.

16  Thank you, sir.

17          BRUCE HARTMAN:   Thank you, sir.

18          They do have access to the NCIC, CCI

19  database through dispatch or mobile data terminals

20  in their cars.   The problems are dispositions of

21  prior arrests.   We can say, yep, it shows an arrest

22  for a felony two or three years ago, six weeks ago,

23  but there's no disposition, so we don't know if they

24  are in fact a prohibited person.

25          And I would second Sheriff Smith's

Cooke, et al., v. Hickenlooper
United States District Court for the District of Colorado

Report and Opinions
Concerning Colorado HB 13-1224 and 13-1229

August 1, 2013

Michael Shain

Michael Shain

EXHIBIT

B

763

## I.   Printed or Electronic Materials Consulted

The following materials and information support my opinions and conclusions reflected in this report.  Additional information discovered or revealed during the course of this case may result in supplemental opinions and conclusions.

Complaint

Motion for Temporary Restraining Order and Preliminary Injunction

Plaintiffs' Reply in Support of Motion for Preliminary Injunction

Governor's Brief In Opposition to Plaintiffs' Motion For Temporary Restraining Order and Preliminary Injunction

Supplemental Brief Regarding Plaintiffs' Standing and Other Issues Raised by The Court

May 16, 2013 Technical Guidance on the Interpretation and Application of House Bill 13-1224, Large Capacity Magazine Ban, State of Colorado Office of the Attorney General

July 10, 2013 Additional Technical Guidance on the Interpretation and Application of House Bill 13-1224, Large Capacity Magazine Ban, State of Colorado Office of the Attorney General

Colorado Legislature House Bill 13-1224

Colorado Revised Statutes 18-12-301 & 12-18-302

United States Center for Disease Control (CDC), Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws (11/3/2003)

National Research Council, Priorities for Research to Reduce the Threat of Firearm-Related Violence (4/2013)

United States Department of Justice, Bureau of Justice Statistics Special Report: Firearm Violence, 1993-2011 (5/2013)

National Criminal Justice Reference Service Publication Abstract: Armed and Considered Dangerous; A Survey of Felons and Their Firearms. (Wright & Rossi)

United State Department of Justice, Federal Bureau of Investigation, Handgun Wounding Factors and Effectiveness (7/1989)

National Institute of Justice, Research Brief, Guns in America: National Survey on Private Ownership and Use of Firearms. (5/1997)

Department of Justice, Federal Bureau of Investigation, Defensive Systems Unit
Ballistic Research Facility; Officer Involved Shooting: Pennsylvania Police
Department. (11/2006)

United States Department of Justice, Bureau of Justice Statistics Report: Crime
Against Persons with Disabilities, 2009-2011 (12/2012)

New York City Police Department Annual Firearms Discharge Report 2011

Cato Institute "Guns and Self Defense" interactive incident map,
http://www.cato.org/guns-and-self-defense

Federal Firearms Licensee Plaintiffs Survey of Practices

Colorado Springs man invokes Make My Day Law after break-in.
Man shoots two intruders.
Lindsay Watts, Target 13 Reporter, KRDO television
POSTED: 01:33 PM MST Jan 30, 2013


## II.  Case Summary

On March 20, 2013 Colorado Governor John Hickenlooper signed into law House Bill
13-1224.

The bill creates a prohibition against the sale, transfer or possession of "large-capacity
magazines."

"Large-capacity magazines," as described and included in the Bill 1224 and as the focus
for the purposes of this report, are those detachable box style magazines commonly
associated with modern semi-automatic pistols and rifles commonly manufactured,
imported, sold, owned and used in the State of Colorado and throughout  the United
States of America.

The capacity determined to be "large" are those magazines that accept more than 15
individual rounds of ammunition.

By HB 1224's definition, detachable magazines that will accept more than 15 individual
rounds of ammunition became unlawful on July 1, 2013, unless said magazine(s) were
owned on or before July 1, 2013 and the owner maintains continuous possession of the
"large-capacity magazine"(s).

### III. **My Experience and Expertise**

Based on my early experience as a competition shooter on the UCLA Match Pistol Team in the mid-1970s; and extensive law enforcement experience testing, evaluating and training on law enforcement semi-automatic pistols, rifles and sub-machine guns, all designed to use detachable box magazines; and my subsequent 20-plus years of private sector firearm use, examination, evaluation, testing, and training; together with the experience of designing and manufacturing firearms modifications and accessories, I have had in-depth opportunities to study and observe the development of modern firearms and their magazines.

In addition, as a Federally Licensed Firearms Dealer and Manufacturer, I have extensive exposure to and experience with manufacturing, wholesale, and dealer operations within the firearms industry, and also with products and accessories common to the industry.

Working as an expert witness in firearms product liability cases for more than 15 years, I have learned to follow standard industry procedures for examining and documenting firearms components, including making exact dimensional measurements, creating working drawings, using stereo microscopy and optical comparators, and creating advanced technical drawings and technically accurate animations.

The national industry standards for testing have magazine specifications or feeding reliability requirements, and/or testing protocols for magazines. National standards are set by organizations such as the Sporting Arms and Ammunitions Manufacturers Institute, (SAAMI); the U.S. Department of Justice, National Institute of Justice's performance standards for auto-loading pistols; the Federal Bureau of Investigation's RFP and testing procedure for pistols; and the California Department of Justice standards for handgun certification.

As a manufacturer of firearm accessories and components and as a factory trained warranty technician and armorer instructor, I have developed experience and expertise in the areas of dimensional tolerances as they relate to the fit, finish and function of firearms and firearms components. I have also developed expertise in the processes involved in firearms and firearms component manufacturing, including machine tools, extrusions, injection molding, finishing, and quality control.

Through the standard process of visually and physically examining, disassembling, reassembling, and comparing components and designs, in addition to using, maintaining and repairing firearm magazines, I have developed an intimate understanding of how magazines are used, how they function, how they are configured and how they are manufactured.

The following analysis is based on a detailed review of the materials described above, as well as past and current magazine design, construction, use, and applications, applying the standards described above.

I am charging a fee for $200 per hour for my expert report on this case.

## IV. Opinions

**Background on detachable box magazines:** Detachable box magazines have been an integral design characteristic associated with highly portable hand-held or shoulder-fired semi-automatic firearms since their inception. The separate ammunition magazine component is a critical element in the function of this style of firearm.

The concept of a detachable, removable, replaceable ammunition source for a portable firearm is often considered one of the pinnacles of modern forearms design ingenuity.

The semi-automatic firearm with the detachable box magazine design characteristic has become so ubiquitous that many earlier designs (e.g., revolvers, lever and pump actions with fixed tubular magazines) are sometimes perceived as "old school," old technology and less effective as defensive tools.

The common and overwhelming current popularity of semi-automatic firearms with detachable magazines is the natural progression of a technology that has greater design flexibility and provides far superior capabilities for defensive use.

Box magazine capacity has always varied based on the size and use of the firearm. Box magazines' early evolution produced the staggered or double stack magazine as a design characteristic that enabled a user to essentially double the capacity of the firearm without doubling the amount of space necessary for the magazine itself. The larger capacity magazine design is part and parcel of the modern semi-automatic pistol design.

### A. Virtually all modern detachable magazines share design characteristics that will allow them to be altered, but may not have been originally "designed to be readily converted to accept more than 15 rounds of ammunition."

Commonly available modern detachable box magazines manufactured from plastic/polymers evolved from early stamped and folded sheet metal magazines. The improvement in magazine design stemmed from a need to produce a magazine that could withstand impacts and abuse and continue to provide reliable function.

The earliest sheet metal pistol and rifle magazines were prone to damage from dropping onto hard surfaces; the resulting improvement was the addition of a rubber base pad attached to the metal base plate. This early iteration gave way to a newer one piece plastic base plate that could withstand the abuse, but necessitated a design change in the way it attached to the body of the magazine. The change was an external flange that provided enough strength to the new style assembly and also allowed for "tool less" disassembly for maintenance and repair.

As technology advanced, magazine design advanced and manufacturing technology incorporated newer polymer blends that allowed the entire magazine body to be made

767

from an injection molding process. As a result, magazines had decreased weight, increased strength and improved reliability.

The lion's share of currently manufactured modern detachable box magazines, whether for pistols or rifles, have adopted this design characteristic: the outside flange on the magazine body mating with the grooves in the removable base plate. This design allows the magazine body to be injection molded in one piece; and for the likewise injection molded base plate to be robust enough to protect the magazine flanges and also provide the strength necessary to prevent failure from impact damage.

Only an extremely limited number of current box magazines utilize a fixed or sealed base in today's market. One is a relatively primitive 1911 magazine design made from sheet metal with a welded steel base plate. (The magazine is for the Colt pistol that was invented in 1911; the Colt also accepts modern magazines.) The others are inexpensive .22 caliber clear plastic magazines that are manufactured from two halves and joined together in a clamshell fashion, permanently capturing the spring and follower.

The welded base plate 1911 magazine has a capacity of 7 rounds and is generally considered of low quality and less than optimal design; the plastic .22 caliber magazines are considered a recreational product

The suggestion in the Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction that "*not all magazines have removable baseplates that would possibly allow conversion to higher capacities*" (page 17 footnote 5) and "*But magazines can be and are made that do not have removable baseplates*" (page 21 footnote 7), is misleading because the industry standard for modern detachable box magazines is the design that incorporates a separate base plate component that can be removed. The exception, and a very small one, is the fixed base magazine, and I know of no modern polymer magazines that utilize permanently fixed base plates.

The design characteristics of these modern and most common magazines are predicated on simplicity of design and cost and efficiency of manufacturing, reliability of performance, ease of maintenance, interchangeability of components when repairs are necessary, and to some extent aesthetic appeal.

The modern detachable box magazine design has been universally adopted by virtually every major firearms manufacturer and a removable base plate is considered an industry standard feature. This is because as semi-automatic firearms have evolved and become a mainstay of defensive firearms users, the reliability of the magazine was recognized as a critical factor in the overall reliability of the firearm. The need to design and manufacture magazines that were simple and easy for the ordinary user to disassemble facilitates and encourages the maintenance process and thus provides ongoing reliability for the user.

This is especially true of modern polymer magazines that are designed to be robust enough to withstand many thousands of cycles of use as well as exposure to extreme temperatures, ultraviolet light, solvents, abusive handling and dirt and debris and still retain their serviceability. These modern removable base plate magazines have a reliable

use lifespan of many generations due in large part to the design characteristics that allow them to be easily disassembled.

In fact, certain semi-automatic firearms incorporate the existing design and specifications of these types of magazines into the development of their new firearms designs so that the new firearm will be backwards compatible with an existing magazine product that is already successfully being manufactured and used.

This style of magazine design predates the aftermarket, third party "pinky extensions" and capacity extensions that have been designed to be "retrofitted" to other manufacturers' "factory magazine"; but because of the demand for larger capacity pistol magazines and popularity of "pinky extensions" many pistol manufactures have taken advantage of this common modern magazine design and now offer extensions for their "factory" pistol magazines.

Although the capacity intent of the design of magazines, specifically semi-automatic rifle magazines, that are manufactured to hold a specific number of rounds of ammunition, is clearly communicated by their original capacity limits, pistol magazine extensions have become commonplace. "Pinky extensions" are now available in types that allow additional ammunition capacity. Not all pinky extensions add ammunition capacity; some simply provide a longer surface for the hand to fit on the grip of the handgun. When pinky extensions are installed, the ones that add capacity may appear identical to those that do not.

The development of a standard modern detachable magazine design that utilizes the external flange feature has provided the opportunity for accessory designs that were not possible with earlier sheet metal magazines with internal flanges. This design characteristic does in fact allow for the addition of an extension. The phrase "designed to be readily converted" as used in HB13-1224 can be construed to mean that standard magazines are in fact designed in such a way that they can be readily converted, regardless of the original designer's intent.

The common features or design characteristics of magazines that are designed in such a way that they may be readily converted to accept more than 15 rounds of ammunition are the outside flange and the removable base plate. What other objective characteristics are necessary to determine whether these magazines are in violation or not in violation of HB 13-1224?

Magazine design evolved from mechanical and manufacturing necessity, a design desire to improve the performance, reliability and life of the magazine and technological advances in material capabilities. There is no evidence that current and commonplace magazine design is based in any way on the ability to "be readily converted to accept" more than 15 rounds of ammunition and yet the nature of the common design can be interpreted to be "readily converted."

The term "readily converted" has many possible subjective interpretations based on the level of expertise, training, and experience of the observer. An ordinary person may or may not be qualified to recognize or assess the design characteristics of a magazine as

they relate to what might be "readily converted."   This expertise will be influenced by how much or how little knowledge of and/or exposure to magazines fitted with extensions that an ordinary person might have.

I am currently aware of only one manufacturer of a rifle magazine that is specifically designed to expand and accept various amounts of ammunition: Thermold of Sandy Springs, Georgia.  And it must be noted that even their lone "expandable" magazine design is not intended to be modified or "converted" to accept more rounds of ammunition; it is sold as a complete unit designed to simply slide open or closed and needs no "conversion."

The lack of clarity, definition and the inherent subjectivity as to what "readily" is in the context of this law opens the door to arbitrary and multiple interpretations.

For example, for a person with access to a machine tools and the mechanical ability to construct a magazine extension, today's commonly manufactured magazines may be "readily converted."  For persons with some engineering and or technical drafting knowledge and access to a 3-D printer, also known as a rapid prototyping device, designing and creating a magazine extension many be as simple as a half hour at their computer.

The expertise necessary to determine what is or is not "readily converted" is not described or contained in the law, and from a practical perspective makes it impossible to enforce fairly and consistently in the field, if at all.

Under HB 1224, enforcement activities will be determined by the individual subjective assessment of those thousands of individual officers who may or may not have any firearms expertise.  Given the sheer volume of detachable magazine and firearm manufacturers, it would be very difficult, or impossible, for any one officer to have the requisite expertise to recognize and independently determine that a particular design can be "readily converted."

### 1.   There is no objective criteria HB 13-1224 that ordinary citizens can understand and rely on to determine compliance.

The ambiguity of the law leaves ordinary individuals without any specific identifiable feature that objectively cancels out the ubiquitous removable base plate and outside flange design.  Just the ability to remove a base plate is the indicator that something else can be substituted for the factory base plate.  That something may be an aftermarket cosmetic accessory or it could be an extension.  How will an ordinary person determine which magazine is "readily convertible" and which is not?

If the determination to be made, as the Governor's Brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction suggests, is based *not* on whether a detachable box magazine is capable of being of being converted to accept more than 15 rounds of ammunition, but instead, that it has objective features that are specifically designed to make it readily convertible, I cannot discern from HB 13-

1224 what those objective features are, if they are not the removable base plate and outside flanges.

A typical detachable box magazine has only 4 or sometimes 5 components in total: the body, the base plate, the follower and the spring (and in some cases a detent plate or tab to secure the base plate to the body).  In most magazines, only three of these are visible without disassembly: the body, the base plate and the follower. (Some magazines have witness holes or windows in the sides of the magazine that allow the spring to also be seen on close inspection.  Some magazines are translucent and allow all of the components to seen).

With all the experience in the firearms industry and access to reference and research materials that I have, I cannot find a single example of a pistol magazine that has any extraordinary design features that clearly distinguish it as a magazine that is intentionally "designed to be readily converted" to accept more than 15 rounds of ammunition. I have found only one rather unusual rifle magazine that expands.

The Defendant also indicates that the characteristic that would definitely identify a magazine in violation of HB 13-1224 is one that has been converted, one that has been combined with additional components that allow it to accept more than 15 rounds of ammunition.  This severely contradicts the language of HB 13-1224 and demonstrates the confusing problem with the language of this section of HB 13-1224 in describing what constitutes a "large-capacity" magazine.

What the Defendant apparently seeks to prohibit, based on his post-implementation interpretation, are actually the components that attach to a magazine that would allow it to accept more than 15 rounds of ammunition, and he apparently only seeks to prohibit them when they are actually attached and functioning.  This is exactly what is not described by HB 13-1224.

### 2.   Enforcement of HB 13-124's "designed to readily converted" language will be difficult and confusing for Colorado Law Enforcement.

The uncertain and contradictory aspects of HB 13-1224 will play out in a confusing and detrimental way during enforcement activities.

In the event of strict adherence to the original language of HB 13-1224, the officer in the field must somehow imagine the original intent of the engineer or inventor of the particular magazine he or she is looking at and enforce accordingly.  I cannot imagine how I would teach, train or supervise an officer in the field to perform this function.

In the event of construing the language to mean that any magazine that is designed in such a way that it can be converted, all removable base plate magazines, no matter what their actual capacity, will become prohibited, if obtained after July 1, 2013.  This will effectively prohibit all semi-automatic firearms that utilize a detachable magazine.

Interpreting the law to mean, as the Defendant now indicates, only magazines that have been combined with other independent components, that when combined allow the magazine to contain more than 15 rounds of ammunition, are prohibited, will present additional uncertainty and problems for compliance and enforcement.

In the event a suspect magazine is encountered by law enforcement, this field investigation will require an extensive knowledge of magazine component design, construction and the original capacity of the magazine.  It will also require some kind of verification or determination that the magazine was not configured in its discovered form before July 1, 2013 (see Grandfathered and Continuous Possession sections below).  In other words; how will any officer know, simply by observing an extended magazine, that the magazine was extended before or after July 1, 2013?

Aftermarket magazines may not have an imprinted round count or total capacity marking.  The extension is almost always a solid enclosure that will not obviously reveal its capacity.  An extension, as described above, may or may not be one that allows additional capacity.

In the best case, the original magazine will at least have a factory capacity marking, but the capacity of the extension will not be so obvious.  It will require disassembly and inspection and the expertise to determine if it does in fact allow additional capacity and if so how much.

A modification of the magazine that increases its overall length in order to increase its capacity will necessarily require the substitution of a longer spring.  The additional length of the spring, because of the additional coils, will correspondingly take up more room in the base of the magazine when compressed. Aftermarket followers may also be longer than the factory originals. Each of these replacement components aggravates the capacity verification problem, because any change in the dimensions of the components may affect the space left for overall capacity.  Every law enforcement officer is not necessarily a firearms expert; a modified magazine will likely be made up of components that field law enforcement officers are not familiar with, leaving them facing an untenable enforcement situation.

It will necessitate that some form of verification of actual capacity be conducted in the field.  This will typically require 16 dimensionally correct dummy rounds (inert ammunition) to be inserted into the suspect magazine and will require every law enforcement officer to have access to 16 dummy rounds of every common pistol and rifle caliber and the expertise to identify the correct caliber for that particular magazine.

Different calibers have different diameters. Based on the design of the magazine, ammunition may be staggered inside the magazine at different angles from one model magazine to the next.  Therefore, no simple measurement of the exterior of the magazine will definitively confirm actual capacity.

Add to this dilemma the fact that every different model of magazine may use a different shape and depth of follower and different wire size and coil design for the spring; the

complexity of determining the actual capacity becomes quite steep, as does the possibility of error.

Because of HB 1224, many forms of internal magazine blocks will be employed to facilitate compliance with the restricted capacity requirement while utilizing existing "large-capacity" magazine bodies.  This is especially predictable because there is no currently manufactured 15 round capacity magazine for modern sporting rifles, the most popular rifle in use today.  Starting with 10 round capacity, these types of magazines come in capacity multiples of 10, with the standard capacity at 30 rounds.  Users who wish to comply and who also wish to take advantage of the full 15 rounds of capacity allowed by HB 1224 will employ 20 or 30 round magazine bodies that are modified with internal blocking devices that limit capacity to 15 rounds of ammunition.

These blocking components will not be visible from the outside of the magazine and will require expertise in disassembly of the suspect magazine and technical verification that the blocking device, which is part of the magazine, is not "designed to be readily converted."  Since there are no standard engineering, design or construction criteria enumerated in HB 13-1224 for how these blocks shall be constructed and secured, how will law enforcement determine what is in violation and how will ordinary users know what complies?

> **B.  "Capable of Accepting" is a problematic and impractical concept because it subjects firearms owners to criminal liability that may have been caused by the manufacturer if the magazine unintentionally holds more ammunition than the manufacturer specifies or that the user is able to recognize.**

It has been my experience that certain magazines of a stated capacity will actually, when forced, accept one extra round of ammunition.  This can result from manufacturing tolerance differences that unintentionally allow a little bit too much room for the magazine spring to compress within the body of the magazine.  Many magazines manufacturers also intentionally design in some additional room in the bottom of the magazine to prevent the spring from being crushed against itself and thereby causing deformation that will lead to malfunctions.

Retailers who order and receive bulk or pre-packaged shipments of magazines do not individually test or necessarily have the expertise to test each magazine to insure that their mechanical specifications only allow the magazine to accept the stated capacity of ammunition.  Prepackaged magazines often come in heat sealed blister packaging that does not allow casual access prior to sale.

It would be naive to believe that every magazine manufacturer and wholesaler distributor has a perfect quality control and product identification control system. Mistakes happen, and as stated above, small incremental tolerance discrepancies can allow a magazine that is stated to hold 15 rounds of ammunition to actually be "capable of accepting" 16 rounds.

Tubular magazines of some pump action rifles, such as the Uberti Goldrush or the Taurus Thunderbolt will accept two different lengths of ammunition cartridges.  When one or the

other length of ammunition is used, or a combination of both, the actual capacity of the magazine will be different.  An ordinary user or even seller or buyer of the firearm may not be aware of this design characteristic.

The question of  private party transfers under HB 13-1229 has ramifications related to the flawed application of "capable of accepting" because not every Federal Firearms Licensee has expertise in every firearm and every magazine.   Will FFL dealers that are required to perform background checks for private party transfers be responsible and criminally and civilly liable if they do not physically verify that magazines included in the transfers are not "capable of accepting" more than 15 rounds of ammunition?

From a purely technical perspective, the law is so intrinsically ambiguous and confusing that it is impossible for me to see any way for the ordinary citizen to understand all the technical nuances and possible configurations of magazines, and equally difficult for me to envision how law enforcement will be able to conduct enforcement fairly and consistently.

### C.  The requirement that the owner of the magazine(s) "maintains continuous possession of the large-capacity magazine" is unrealistic in ordinary practice and for compliance and enforcement.

Colorado Revised Statutes section 18-12-302 (II) provides an exemption for a person who "maintains continuous possession of the large-capacity magazine."

Merriam-Webster's Collegiate Dictionary, 2009, definition of CONTINUOUS:
*1 : marked by uninterrupted extension in space, time, or sequence*

This requirement of HB 13-1224 appears to describe a requirement that the owner of a "large capacity" magazine, which he legally possesses, must physically maintain possession of that magazine on his person or in his immediate control at all times in order to comply with this law.

This requirement is impractical and incongruous from both compliance and enforcement standpoints.

There are myriad circumstances where, even if an owner wanted to comply and maintain continuous possession of a large capacity magazine, it would be impossible. For example: when traveling on an airline, in a Federal or State government facility, in a private facility that prohibits firearms, when hospitalized, when unconscious.

Many firearms owners legally possess many of what HB1324 calls "large-capacity magazines," for several different firearms systems.  Are they to carry all the magazines on their person at all times?   I am personally aware of magazine owners who have dozens of legally owned magazines that have a capacity of more than 15 rounds of ammunition.

The continuous possession requirement also prohibits the loaning on a temporary basis of "large capacity" magazines, even to family members.  The continuous possession

requirement prohibits shipping "large capacity" magazines to oneself or packing them in a moving box and allowing a third party to transport them to another location in the State.

In fact, the continuous possession requirement prohibits storing and leaving the "large capacity" magazine while traveling on vacation or business, prohibits giving the "large capacity" magazine to a gunsmith while he services the firearm it goes with, and would criminalize military personnel who store or leave their "large capacity" magazine behind when serving their country.

In actual practice, both physically and logistically, diligent compliance with this requirement will be beyond the capabilities of ordinary citizens.

The implementation of enforcement activity is equally flawed because in the case of a field enforcement activity, the activity itself (such as a traffic violation, a traffic accident, an investigatory stop) will often lead to the separation of the owner and the magazine. The simple act of getting out of one's vehicle and leaving the magazine behind is a violation. Should a traffic accident victim be transported to the hospital and the magazine be left in the towed away vehicle, it is a violation.

A more relaxed interpretation of the term "Continuous Possession" has been construed in the May 16, 2013, Technical Guidance document authored by the Colorado Attorney General to mean general custody and control, inferring that maintaining possession on your own property, in your own vehicle, or within your immediate control would be in compliance.

Unfortunately, many of the same inherent inabilities to comply with these parameters will exist as with the stricter iteration.

As an example: in much of rural Colorado, unincorporated counties allow residents to legally discharge firearms on their own property. As a result, informal shooting ranges on privately owned properties are not uncommon. An ordinary citizen, who may have a relative or a guest join him for recreational shooting on his own property, would risk being in violation if he were to leave them alone, even though they remained on his own property while they were temporarily using his "large capacity" magazine, because he would not be in physical proximity to the temporary user of the magazine.

HB 13-1229, the Background Check provision that also was implemented on July 1, 2013, allows a temporary transfer of a firearm under some circumstances, such as if it "occurs while in the home of the unlicensed transferee and the transferee is not prohibited from possessing firearms and the unlicensed transferee reasonably believes that possession of the firearm is necessary to prevent imminent death or serious bodily injury to the unlicensed transferee." But under the continuous possession requirement of HB 13-1224, a "large capacity" magazine, which may be the original factory-provided magazine for that firearm, may not be allowed outside the custody and control of the owner.

In the event that such a temporary transfer were to be necessary to prevent imminent death or serious bodily injury and all that was available for the temporary transfer was a firearm equipped with a "large capacity" magazine, the owner of the firearm would not

be able to facilitate the defensive need of the person in danger because it would violate the continuous possession requirement. It would also place the "unlicensed transferee" into violation of the prohibited possession of "large capacity" magazines provision of HB 13-1224.

Continuous possession will also affect firearms owners' ability to have their firearms repaired or customized. The custom shop that I operate primarily caters to out-of-state clients, but a regular stream of local gun owners contact me to make an appointment to bring a firearm into my shop for repair or customization.

The proper function and reliability of semi-automatic firearms that utilize detachable magazines, as discussed above, are inexorably tied to the function and reliability of their magazines. The magazine is an integral part of the semi-automatic firearm feeding system and many functional repairs require the use of those magazines to diagnose malfunctions and to confirm the firearm's proper function after repair or customization.

A firearm that is brought into my shop for repair may be inspected while the customer waits, if time permits. And if the cause of the problem is obvious and simple to remedy, I will do so; but typically the firearm and the magazines must be left with me for at least a week and frequently longer. During this time the owner cannot maintain continuous possession.

The effect will be that defensive firearms will not be brought to gunsmiths for repair for fear of violating the continuous possession provision of HB 13-1224. Those defensive firearms that are not brought in for repairs may malfunction during actual defensive use or may be discarded in lieu of some other less suitable and/or less capable firearm resulting in the degradation of the owner's ability to defend him or herself.

In the event of the owner's death or incapacity, the heirs or subsequent trustees will immediately be in criminal violation simply by mere possession, made worse by the reality that most estates take time to resolve and the discovery and subsequent possession of the prohibited magazines may be not be realized or recognized at all. So someone who legally owns a "large capacity" magazine, will, upon their death, effectively make someone else a criminal under this provision, because there are no compliance exceptions for involuntary possession.

   **D. The sale and transfer of legally owned firearms that were originally designed and sold with magazines with a capacity of more than 15 rounds of ammunition, for which there are currently no smaller capacity magazines, are the subject of a de facto ban.**

The question of the sale and/or transfer of a legally owned firearm that came from the manufacturer equipped with "large capacity" magazines is also relevant because under this provision, the magazines may not be legally transferred with the firearm. Currently there are a number of semi-automatic pistols that are manufactured with "large capacity" magazines as standard equipment for which there are no commercially available magazines with a capacity of 15 rounds or less available.

This essentially renders those firearms useless and valueless in the State of Colorado. Without magazines, these semi-automatic pistols cannot function. There is no market for modern pistols that cannot function. (Non-functional antiques may have some value.)

This has huge ramifications not only for individual sellers, but for Colorado firearms retailers and distributors, because any inventory of pistols that they may have had on the shelves or in pending orders from manufacturers or wholesale distributors, for which there are no available magazines that comply with HB 13-1224, have become worthless as a retail commodity.

As part of my preparation of this report, I queried the Plaintiff retailers. One retailer detailed 47 different models of pistols that had to be removed from his shelves because magazines with a capacity of 15 rounds or less that would function in those 47 different models were either back ordered for months or longer, or were simply not produced.

These affected pistols included multiple models from the following mainstream manufacturers: Beretta, CZ, FNH, Glock, Keltec, Smith & Wesson, Springfield Armory and Sturm Ruger.

Most of the other retailers indicated they also do not have 15 rounds or less magazines for pistols that came from the factory designed for magazines with a capacity of more than 15 rounds.

The effect of HB 13-1224 on these firearms retailers is a detrimental financial impact on their businesses. The retailers that depend on the defensive pistol customers to come through their doors have reported a significant drop in their business. These same retailers reported that their handgun business is based overwhelmingly on semi-automatic pistol sales and that is exactly what has been impacted by HB 13-1224.

For the individuals who are seeking a pistol for defensive use, this severely curtails their ability to meet that need. Defensive pistol users that are forced to buy alternative handguns with inferior capabilities will be placed at a disadvantage when defending themselves.

> **E. The provision that "A person may possess a large-capacity magazine if he or she: owns the large-capacity magazine on the effective date of this section" (July 1, 2013) will have serious unintended consequences.**

So-called "large-capacity" magazines, those detachable magazines that will accept more than 15 rounds of ammunition, which were legally owned prior to July 1, 2013, are not dated or serialized.

"Large capacity" magazines that are manufactured outside the State of Colorado cannot be required by Colorado law to be dated or serialized.

A "large capacity" magazine found in the possession of a private citizen in the State of Colorado after July 1, 2013, cannot, from any outward appearance or feature, be

definitively dated nor can the acquisition of said magazine be dated.  This can only be a self-enforcement criminal law.

Although HB 1224 creates criminal acts that may be enforced, the question is how.

I am aware that the pending implementation of this new law caused many Colorado citizens to buy "large capacity" magazines.  Many purchased magazines for firearms they did not actually own.  For several reasons, modern sporting rifles had become difficult to obtain and expensive, so in anticipation or "just in case" the time came when the consumer could obtain and/or afford one, these people purchased multiple "large capacity" magazines because they were about to become unavailable

I too purchased a quantity of 30 round AR15 magazines from various wholesale sources. The new magazines are sealed in the manufacturer's packaging.

Based on my experience in law enforcement, I can imagine a scenario where a year or two or three down the road, someone who had pre-purchased "large capacity" magazines before the July 1, 2013, date, later purchases a brand new rifle, perhaps one that is a new model not manufactured prior to July 1, 2013, and places the previously owned, still in the manufacturer's packaging "large capacity" magazine with the brand new, still in the box, rifle in the back seat of this or her vehicle.

During a routine traffic stop only a few miles from one of the seven contiguous states, none of which have magazine restriction laws, the officer from one of the hundreds of law enforcement agencies in Colorado observes what he recognizes as a brand new rifle and several "brand new"-looking "large capacity" magazines with it.  Although only a misdemeanor, this give the officer probable cause to believe a crime is being committed. This probable cause can be acted on and an arrest effected; the vehicle may be searched for additional evidence of the crime, the firearm and magazine seized as evidence, the vehicle impounded pursuant to arrest.

Section 18-12-302 (b) states: "If a person is alleged to have violated subsection (1) of this section asserts that he or she is permitted to legally possess a large-capacity magazine pursuant to paragraph (a) of this subsection (2), the prosecution has the burden of proof to refute the assertion."

There is nothing in this section that would prevent a zealous law enforcement officer from making an arrest.  In fact the above language is conspicuously obtuse, because our legal system is already supposed to consider those accused innocent until proven guilty and the prosecution always bears the burden of that proof.  There is no special relief or comfort in section (b) above.  In fact it explicitly states that the allegations can be made.

Where there is probable cause, the arrest is always valid, regardless of the subsequent decision to prosecute or the result at trial.   In the meantime, the arrestee has lost his freedom, has had his vehicle impounded and his property seized.  He must now make bail, appear in court, and retain legal representation.

There will undoubtedly be severe and unintended consequences as the result of the situations created by the passage of this law.

The seven contiguous states mentioned above that do not have restrictions on the sale of "large capacity" magazines will be a source for those Colorado citizens who choose to travel to those states, buy "large capacity" magazines and bring them back to Colorado in violation of Colorado law.

Although reputable dealers and wholesalers in other parts of the country will certainly refuse to ship "large capacity" magazines to individual Colorado citizens after July 1, 2013, unscrupulous mail-order dealers and private citizens are likely to do so.  There is no magazine sniffing dog that can root out illicit magazine shipments.  The Internet will facilitate a black market for those willing to violate the law.

## V. __Analysis and Summary__

HB 13-1224 creates a prohibition of "large capacity" magazines by attempting to designate and distinguish prohibited magazines by their design, specifically that they are "designed to be readily converted."  Unfortunately, that designation is so technically incorrect and inadequate, that when examined in light of the design characteristics shared by most modern detachable magazines, it either means all magazines with a removable base plate, or it means none of them.

The "continuous possession" requirement of HB 13-1224, apparently intended to prevent the loaning of "large capacity" magazines, is demonstrably impractical to comply with and enforce.

Equal or greater confusion exists in the "Grandfather" portion of the law because of the lack of any technically verifiable method of dating a suspect magazine or establishing in the field the date of acquisition.

## VI. __Conclusion__

HB 13-1224 is deeply flawed because of incoherent and incorrect technical language and the fact that it simply does not comport with any firearms industry standards that can be recognized and enforced.

The operation of this law unintentionally creates criminal liability in situations that ordinary citizens would consider normal and lawful use.

Firearms professionals and ordinary citizens cannot effectively and confidently comply with laws that ostensibly address highly technical issues, and law enforcement cannot fairly and consistently enforce technical firearms laws when those laws are ambiguous because of their technical inaccuracies and inadequacies.

779

Appellate Case: 14-1290     Document: 01019371746     Date Filed: 01/16/2015     Page: 123

The facts and opinions expressed above are accurate to a reasonable degree of professional certainty.  I reserve the right to supplement or modify this report in the event that pertinent additional information or evidence comes to my attention.

**Michael Shain**

Curriculum Vitae

### *Experience*

*July 1994:*   *President & General Manager, AIMPRO Tactical, LLC*

Operate firearms manufacturing, custom gunsmith services, training and consulting firm. Design and manufacture firearms accessories, provide custom and performance shop work for individual firearm clients, customize firearms for dealer direct wholesale orders and develop custom product design concepts for manufacturers. Provide training, testing, comprehensive assessments and evaluations, consultations and expert witness testimony for manufacturers, distributors and dealers. Conduct law enforcement and civilian firearms training, including basic and advanced firearms handling techniques and tactics and concealed carry courses. Provide technical advice and hands on training for firearms industry and non-firearms industry clients. Clients include UCLA Medical Center, Cedars Sinai Medical Center, Brinks International, Sturm Ruger, Beretta U.S.A., Heckler & Koch, Sig Arms, Smith & Wesson, Springfield Armory, Bersa, Weatherby, Touchstone Pictures, Icon Entertainment, and Warner Brothers. Conduct national law enforcement training and operate national law enforcement service center for O.F. Mossberg & Sons, Inc. Clients include military, federal, state and local law enforcement personnel and civilian students.

*April 1994:*   *Adjutant to the Acting Chief of Police, UCLA Police Dept*

Directed and managed all Internal Affairs investigations and coordinated Personnel matters with Human Resources. Developed training documentation, trouble shot and coordinated maintenance for department's computer aided dispatch and records management system. Developed and implemented new policies. Planned and directed special event field operations.

*December 1993:*   *Commander Patrol Division*

   *O.I.C. Internal Affairs Division, UCLA Police Dept*

Directed all uniformed services to a community of approximately 65,000. Supervised seven Patrol Sergeants/Watch Commanders and approximately 40 Police Officers. Managed Patrol Division resources, including vehicle fleet, emergency response equipment and computer support systems. Evaluated and approved training. Assigned, reviewed and conducted Internal Affairs investigations.

*March 1992:*   *Lieutenant*

Promoted after placing third on a Statewide qualified candidate list. Commander of the Medical Center Division. Directed all Police, Security and Community Services to the largest medical complex in the Western United States. Administered a budget of approximately $850,000 and a staff of eight sworn and twenty five civilian personnel, including mid-level managers and clerical staff. Supervised two full time investigators, all investigative follow-ups, crime prevention services and community service programs. Co-chaired departmental policy committee.

*October 1990:*   *Sergeant, Patrol Division, UCLA Police Dept*

Field Supervisor/Watch Commander. Conducted roll call and field training, deployed personnel and directed field operations. Special projects included Internal Affairs investigations, background investigations and extensive revision of the department's policy manual.

*April 1988:*   *Sergeant, Records and Communications Division,*
   *UCLA Police Dept*

19

781

Supervised 15 civilian personnel in addition to sworn staff.  Supervised the selection, training and evaluation of staff.  Coordinated the acquisition and directed the installation of a comprehensive records management system and computer aided dispatch system.

### *January 1985:* Rangemaster/Principal Firearms Instructor, UCLA Police Dept

(In addition to Detective duties)  Developed and administered department weapons training program, including department transition to autoloaders.  Managed quarterly firearms qualifications for seventy plus sworn personnel.  Evaluated weapons and force related incidents and policies, recommended and provided remediation.  Evaluated, tested and approved duty, off-duty and back-up firearms and ammunition.

### *April 1985:* Detective, UCLA Police Dept

Assigned to "Crimes Against Persons" desk.  Conducted investigations, follow-ups and District/City Attorney criminal filings of all death investigations, robberies, sex crimes, assaults and weapon violations.  Acted as Intelligence Liaison to outside agencies.

### *October 1983:* Patrol Officer, UCLA Police Dept

General Law Enforcement duties, including responding to calls for service, preliminary investigation of crimes, apprehension of suspects, protection of life and property.  Deployed as part of L.A. Olympic Games multi-agency athlete protection detail.

### *July 1983* Police Officer – Trainee

U.C.L.A. Police Department.  Attended Orange County Peace Officers Academy.


## Qualifications

Possess *Basic, Intermediate*, *Advanced*, *Supervisory* and *Management* P.O.S.T Certificates

Completed P.O.S.T approved Supervisory School

Completed P.O.S.T Certificated Management School

Completed P.O.S.T Certificated Narcotics Investigation (*Course taught by DEA and LA County Sheriffs*) and Sexual Assault Investigation Schools *(taught by CA DOJ and San Jose PD)*

Completed L.A. County Sheriff's Department Homicide Investigator Training Program.

Completed L.A. County Sheriff's Department Automatic Weapons Training Program *(M-16, H&K MP5)*

Completed F.B.I. Certificated Firearms Instructor School

Completed L.A. County Sheriff's Department Autoloader Transition School

Completed Alameda County Advanced Officer's Tactics School

Completed L.A. County Sheriff's Laser Village I & II Schools

Completed P.O.S.T. approved Internal Affairs Investigator School

Completed C.S.T.I. Civil Emergency Management School *(San Louis Obispo)*

Completed D.O.J. Visual Investigative Analysis Training

Former Member of the California Peace Officers' Association
Former Member of the California Sexual Assault Investigator Association
Former Member of the California Narcotics Officers Association

Member of the California Rangemasters Association
Member of the National Shooting Sports Foundation
Member of the National Association of Shooting Ranges
Member of the International Association of Law Enforcement Firearms Instructors
Member of the International Defensive Pistol Association

*Additional qualifications are listed at the end of the c.v.*

## Expert Witness Experience

(Deposition, Court Testimony or Federal Court Report)

Nelson v. Glock, United States District Court, District of Oklahoma, 2013

Arbogast v. Jerry's Sports Inc., Lackawanna County Superior Court, 2012

Mantooth v. Glock, United States District Court, Eastern District of Michigan, 2011

Hayden v. Glock, Santa Clara Superior Court, 2011

Stoklund v. Thompson/Center, United States District Court, District of North Dakota, 2007

West v. NAA, United States District Court, District of Alaska, 2005

Smith v. Austin & Halleck, United States District Court, District of Oregon, 2005

Paderez v. SIGARMS, San Fernando Superior Court, 2004

Adams v. Beretta, Cook County Superior Court, 2004

Beauchamp v. Bersa, United States District Court, District of Colorado, 2004

Ryan v. Smith & Wesson, United States District Court, District of Pennsylvania, 2003

California Municipal Firearms Litigation, San Diego Superior Court, 2002

Stotts v. Heckler & Koch, United States District Court, Western District of Tennessee, 2002

Maxfield v. Bryco, Alemeda Superior Court, 2002

Grunow v. Valor, Palm Beach Superior Court, 2001

Jewell v. Jackson Arms, Alemeda Superior Court, 2002

Pinkerton v. Esber, Los Angeles Superior Court, 2001

Robinson v. Ryan, Orange County Superior Court, 2001

Atkien v. Heckler & Koch, United States District Court, District of Pennsylvania, 2001

McMahon v. Manning, Santa Barbara Superior Court, 2000

Huber v. Smith, Los Angeles Superior Court, 2000

Mathieu v. Beretta, United States District Court, District of Massachusetts, 1999

783

Dix v. Beretta, Alameda Superior Court, 1998, 2003, 2004

## *Qualifications* (Expanded)

1977   UCLA Match Pistol Team

1983   Orange County Peace Officers Academy - P.O.S.T approved Basic academy,  successful
completion is qualification for employment in any police agency in CA.  Staff instructors from
Huntington Beach PD, Santa Anna PD, Brea PD, La Habra PD, LAPD & Anaheim PD.  Cadet
classmates included Bell Gardens PD, Anaheim PD, Brea PD, La Habra PD, Newport Beach PD,
Huntington Beach PD, Irvine PD, Santa Anna PD.

1984   Assigned to Olympic Village Athlete Protection Detail (Special response team, counter terrorism
task force deployment.)

1985   Assigned to LAPD Pacific Division, Mid-Watch Patrol (8UC49L)
Patrolled housing projects in Mar Vista and Venice areas of Los Angeles, received calls for
service and made crime broadcasts over LAPD frequency.  Attended roll calls and briefings at
LAPD Pacific Division.  Booked arrests in LAPD stations and jail facilities.

1985   Worked joint foot patrol program with LAPD.

1989   Served on selection panel for Santa Monica Police Department recruitment of new rangemaster.
Other panel members included U.S. Secret Service and Santa Monica PD.

2001   Speaker at American Bar Association Conference on Gun & Media Violence, Beverly Hills, CA
Panel on "Designs and Warnings" in relation to firearms. Explained design and manufacturing
defects, authorized user technology, chamber loaded indicators and magazine disconnects.

2003   Teach and coordinate national armorers schools and develop tactical training program for O.F.
Mossberg & Sons, Inc. (Guest instructor at the Ohio Peace Officers Training Academy,
Alpharetta Public Safety Training Center, Tucson Public Safety Academy and Post certified
instructor by the Missouri Department of Public Safety.)

2003   Federal Firearms License – Dealer.

2004   Member Rocky Mountain 3 Gun Association  (National rifle, pistol and shotgun
competitions.)

2004   Attended International Association for Law Enforcement Firearms Instructors Annual Training
Conference (including 24 hours of advanced instructor training).

2005   Guest Instructor – International Association for Law Enforcement Firearms Instructors Annual
Training Conference.  (Tactical Shotgun for Instructors.)

2009   Member, Board of Directors, Camp Fickes Shooting Range.

2010   Federal Firearms License – Manufacturer.

2011   Guest Instructor, International Association of Law Enforcement Firearms Instructors, Master
Law Enforcement Instructor Program.  (Co-Instructed Master Law Enforcement Firearms
Instructor Course, Colorado and California)

2013   Consultant, private shooting range development, Conifer, CO.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado; et al.

Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

**FIFTY-FIVE COLORADO SHERIFFS' RESPONSE BRIEF TO DEFENDANT'S MOTION TO DISMISS THEM IN THEIR OFFICIAL CAPACITIES**

---

Fifty-five Colorado Sheriffs, by and through their counsel, file this Response Brief to Defendant's motion to dismiss them from the case in their official capacities.[1]


**SUMMARY OF ARGUMENT**

Under the Tenth Circuit's precedents on the political subdivision doctrine, the 55 Sheriffs have standing because they have "a personal stake" in the case. As will be described below, the personal stake includes the apprehension of criminals who have murdered a Sheriff. This did happen in 1994, and if HB 1224 had been in effect then, the murderers could have escaped.

---

[1] For the reasons set forth in the separate Response filed by the other Plaintiffs, which the 55 Sheriffs also join, this Court should deny Defendant's motion to dismiss the second, third, and fourth claims for relief.

The Sheriffs also have a personal stake in HB 1229, which makes every Sheriff into a criminal simply for conducting the ordinary operations of his or her Office by temporarily transferring firearms to deputies.

The Sheriffs, in their official capacities, also have a personal stake because HB 1224 has made it difficult or impossible for the Sheriffs and their deputies to obtain standard magazines for their duty firearms. (By "standard," the Sheriffs mean magazines of the standard size supplied by the manufacturer for a firearm. For example, for the Glock 17 pistol, the standard magazine is 17 rounds; for AR-15 type carbines, the standard magazine is 30 rounds.)

Further, the Sheriffs have a personal stake, as well as third-party standing for every armed citizen who comes to the aid of law enforcement. These citizens include the members of the Sheriffs' posses and the members of the Colorado Mounted Rangers, both of whom provide critical, armed assistance to the Sheriffs. These private citizens are not political subdivisions of the state, and so the Sheriffs' third-party standing to defend the Second Amendment rights of those citizens is in no way limited by the political subdivision doctrine.

Sheriffs in their official capacity also have standing to assert the rights of their deputies who are prevented from buying appropriate magazines for their duty arms, because of HB 1224.

An individual Sheriff is not a "political subdivision." Sheriffs are independent of the county government, and not a political subdivision thereof. More fundamentally, the Supreme Court's foundational rule for the political subdivision doctrine asks

whether the political entity was "created by a state." In Colorado, the office of Sheriff was not created by the General Assembly or by the State itself. Rather, the Sheriffs—like the General Assembly and like the State—were created directly by the People, in the State Constitution.

When the other parties in a case have standing to raise all the claims for relief, courts need not decide whether other plaintiffs also have standing. This was precisely the position which the Attorney General himself successfully argued during his participation in the lawsuits against the Affordable Care Act.

## ARGUMENT

### I. The Issue of Sheriffs' Standing is Irrelevant.

Because sufficient plaintiffs clearly have standing to raise all the claims at issue in the motion, this Court need not decide whether the Sheriffs have standing in their official capacity.

In 2010, a large number of Attorneys General, including the Colorado Attorney General, filed a lawsuit challenging the individual mandate in the Affordable Care Act. Defendants argued that the Colorado Attorneys General did not have standing to challenge the individual mandate. The Colorado Attorney General responded with a brief arguing that his standing was irrelevant, since other plaintiffs had standing. Plaintiffs' Mem. in Opp. to Defendants' Mot. to Dismiss, State of Florida, by and through Bill McCollum, Att'y Gen. of the State of Florida et al., *Florida ex*

*rel. Bondi v. U.S. Dept. of Health & Human Servs.*, 780 F.Supp.2d 1256 (N.D. Fla. 2011), 2010 WL 3163990, at *10-16.

The District Court agreed:

> This eliminates the need to discuss the standing issue with respect to the other state plaintiffs, or the other asserted bases for standing. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264 n. 9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); *see also Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996) (if standing is shown for at least one plaintiff with respect to each claim, "we need not consider the standing of the other plaintiffs to raise that claim").

780 F.Supp.2d at 1274.

The District Court granted relief to the Colorado Attorney General on the individual mandate. On appeal, he again urged the Court not to consider standing. Opening/Response Br. of Appellee/Cross-Appellant States, by and through Pam Bondi, Att'y Gen. of the State of Florida et al., *Florida ex rel. Atty. Gen. v. U.S. Dept. of Health & Human Servs.*, 648 F.3d 1235 (11th Cir., 2011) (Nos. 11-11021, 11-11067), 2011 WL 1944107, at *67.

The Eleventh Circuit agreed:

> Although the question of the state plaintiffs' standing to challenge the individual mandate is an interesting and difficult one, in the posture of this case, it is purely academic and one we need not confront today. *The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing.* Because it is beyond dispute that at least one plaintiff has standing to raise each claim here—the individual plaintiffs and the NFIB have standing to challenge the individual mandate, and the state plaintiffs undeniably

> have standing to challenge the Medicaid provisions—this case is justiciable, and we are permitted, indeed we are obliged, to address the merits of each. Accordingly, we turn to the constitutionality of the Act.

648 F.3d at 1243-44 (emphasis added).

In *Ezell v. City of Chicago*, the Seventh Circuit relied on this rule when a variety of plaintiffs challenged the city's prohibition on firing ranges within city limits. There, the court stated: "[t]he district court's emphasis on the organizational plaintiffs' standing is puzzling. As we have noted, it's clear that the individual plaintiffs have standing. Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011) (internal quotations omitted).

A core principle of federal standing is that federal courts do not spend time deciding abstract questions that will not determine the outcome of the case. The Attorney General himself publicly stated, while his motion to dismiss was pending, that the dismissal of the Sheriffs in their official capacities would not affect the case. Charles Ashby, *Top cop: Sheriffs can't sue over guns*, Grand Junction Sentinel, Aug. 16, 2013, http://www.gjsentinel.com/news/articles/top-cop-sheriffs-cant-sue-over-guns ("Still, removing the sheriffs won't stop the suit from going forward, Suthers said. 'There's plenty of other (plaintiffs), such as the gun shops, that clearly have standing,' he said.")

In the instant case, the Attorney General has already put the Sheriffs through thousands of hours of work in responding to discovery related solely to their official

duties. One Sheriff had to reprogram his data management system in order to provide complete answers to a particular interrogatory question. Another Sheriff Office devoted literally hundreds of hours to responding to the interrogatories, including by creating and conducting a formal survey of over 200 employees. The smaller Offices worked very hard, with quite limited resources, to dig through a decades' worth of records.

The courts in the Affordable Care Act case were not presented with any new factual information about the individual mandate as a result of the Colorado Attorney General's participation in that case. In contrast, the participation of the 55 Sheriffs in their official capacities will provide important information to this Court about the practical effects on public safety of HB 1224 and 1229.

## II. Political Subdivisions Have Standing When They Have a Personal Stake.

Defendant does not dispute that the 55 Sheriffs have standing, in their official capacity, under the standard tripartite standing rules. *See* Def.'s Mot. to Dismiss 14-15. Instead, Defendant invokes the doctrine that political subdivisions sometimes do not have federal standing for a constitutional challenge to a state statute. *Id.* Defendant recites a collection of generalities about the doctrine, but does not engage the doctrine's particular rules.

A political subdivision has standing when it has a "personal stake." In *Board of Education v. Allen*, two local school boards (certainly political subdivisions) brought a First and Fourteenth Amendment challenge to a New York State statute

requiring the boards to provide free textbooks to private school students. 392 U.S.

236 (1968). The New York State courts were closely divided on the issue of standing,

but the U.S. Supreme Court was not. Justice White's majority opinion stated:

> Appellees do not challenge the standing of appellants to press their
> claim in this Court. Appellants have taken an oath to support the
> United States Constitution. Believing § 701 to be unconstitutional,
> they are in the position of having to choose between violating their
> oath and taking a step -- refusal to comply with § 701 -- that would be
> likely to bring their expulsion from office and also a reduction in state
> funds for their school districts. There can be no doubt that appellants
> thus have a "personal stake in the outcome" of this litigation. *Baker v.
> Carr*, 369 U.S. 186, 204 (1962).

392 U.S. at 242 n.5. Neither Justice Harlan's concurrence nor the three dissents

disagreed with the majority about standing.

The Tenth Circuit of course adheres to the Supreme Court's *Allen* rule. The

Tenth Circuit's most recent case on the political subdivision doctrine quoted the

above *Allen* text. The Panel then distinguished *Allen*: "This passage makes clear

that the situation in *Allen* is very different from the situation here. In *Allen*,

standing was based on the individual board members' personal stake in losing their

jobs." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011).

*Allen* pointed to issues involving the School Board members, each of which has

relevance for the instant case: adherence to the oath of office; loss of a job; and

reduction of funds available to perform the work of the political subdivision. 392

U.S. at 242 n.5.

Defendant relies heavily on a statement from *Hugo*: "[W]e have not found, and

the dissent has not cited, a single case where a court of appeals or the Supreme

Court has expressly allowed to proceed a claim by a municipality against its parent

state premised on a substantive provision of the Constitution." 656 F.3d at 1259. This is true for municipalities, but it is certainly not true for political subdivisions in general. The Supreme Court's *Allen* case itself allowed a claim by a political subdivision based on the Establishment Clause of the First Amendment, as incorporated by the Fourteenth Amendment's Due Process clause.

### A. The Oath of Office is a personal stake, according to the Supreme Court.

The Colorado Constitution mandates that Sheriffs "subscribe an oath or affirmation to support the constitution of the United States." COLO. CONST., art. XII, § 8. In order for a citizen to hold elective office responsibly, the citizen must never deviate from his or her Oath of Office.

For the Rule of Law to exist, constitutional officers must be rigorously scrupulous about their oaths. This is of especially great importance when the oath is sworn by the chief law enforcement officer of a county. *See Frank v. United States*, 78 F.3d 815, 823 (2d Cir. 1996) (standing existed because the Sheriff was forced to enforce a background check statute he believed to be unconstitutional).

Pursuant to *Allen*, fidelity to the oath *always* allows political subdivisions to have standing. As detailed in the Second Amended Complaint, the Sheriffs believe that HB 1224 and 1229 force them to violate their oath of office, because both bills violate the Constitution of the United States. Second Am. Complaint [Doc.  No. 62], at ¶¶ 26, 180-82, 190, 194, 199, 206-208.

**B. The existence of an effective *posse comitatus*, and of a well-armed citizenry, is a personal safety stake for Sheriffs, and a personal stake in carrying out their duties.**

### 1. Posse Comitatus Law

The *posse comitatus* is the deeply-rooted power of Sheriffs and Federal Courts to call upon the aid of armed citizens in order to enforce the law.[2] For example, United States Magistrate Judges may appoint persons to serve warrants and process, and

> these persons so appointed shall have authority to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged.

42 U.S.C. § 1989.

The Colorado Sheriffs' *posse comitatus* power is reinforced by state statute, which codifies the traditional

> duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots, and unlawful assemblies and insurrections. For that purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they, and every coroner, *may call to their aid such person of their county as they may deem necessary*.

C.R.S. § 30-10-516 (emphasis added); *see also* C.R.S. §§ 16-3-202(1) ("A peace officer making an arrest may command the assistance of any person who is in the vicinity."); 18-8-107 (A class 1 petty offense if one "unreasonably refuses or fails to

---

[2] "Posse comitatus" is Latin for "The power or force of the county. The entire population of the county above the age of fifteen, which a sheriff may summon to his assistance, in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc. Williams v. State, 253 Ark. 973, 490 S.W.2d 117, 121." BLACK'S LAW DICTIONARY 1046 (5th ed. 1979); *see also* BLACK'S LAW DICTIONARY (9th ed. 2009) ("A group of citizens who are called together to help the sheriff keep the peace or conduct rescue operations. — Often shortened to posse.").

aid the peace officer in effecting or securing an arrest or preventing the commission by another of any offense.").

For at least the last millennium in our legal system, Sheriffs have had the authority to summon armed able-bodied citizens to assist law enforcement. *See*, *e.g.* *Filarsky v. Delia*, 132 S.Ct. 1657, 1664 (2012); *In re Moyer*, 35 Colo. 159, 166-67, 85 P. 190 (Colo. 1904) ("the sheriff of a county, aided by his deputies or posse comitatus in suppressing a riot.").[3]

The *posse comitatus* was well-known to the Founders. *See*, *e.g.*, THE FEDERALIST No. 29 (Alexander Hamilton) (addressing then-current controversy that proposed federal government would have the power to call forth the militia, but not to summon the *posse comitatus*); *Livingston v. Dorgenois*, 11 U.S. (7 Cran.) 577, 579 (1813) (quoting former Secretary of State James Madison's written order that a

---

[3] *See also In re Quarles*, 158 U.S. 532 (1895) ("It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country"); *Cunningham v. Neagle*, 135 U.S. 1, 65 (1890) ("marshals of the United States, with a posse comitatus properly armed and equipped"); 1866 Civil Rights Act § 5, 14 Stat. 28 (Empowering federal civil rights commissioners to appoint "suitable persons... to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty."); Joanne Eldridge, *County Sheriffs In Colorado: Beyond the Myth*, COLO. LAWYER *19 (Feb. 2009); WILLIAM L. MURFEE, A TREATISE ON THE LAW OF SHERIFFS AND OTHER MINISTERIAL OFFICERS 21 (1884) ("For a thousand years the sheriff has been the principal conservator of the peace in his county, with full power to command, whenever necessary, the power of the county.")

At least according to the understanding at the time the Colorado Constitution was adopted, the Sheriff's option to use the *posse comitatus* is indefeasible. *Id.* at 22 ("It is competent for the state legislature to impose upon him new duties growing out of public policy and convenience, but it cannot strip him of his time-honored and common-law functions and devolve them upon the incumbents of other offices created by legislative authority.").

French official "call for the assistance of the good citizens of the district, as the posse comitatus" to enforce the terms of the Louisiana Purchase).

The preservation of civil order is one of the purposes of the right to arms. Colorado's Constitution says so expressly:

> The right of no person to keep and bear arms in defense of his home, person and property, *or in aid of the civil power when thereto legally summoned*, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

COLO. CONST., art II, § 13 (emphasis added).

The two clauses of the Second Amendment similarly intertwine the purposes of personal defense and defense of civil order in a republic. In the Second Amendment, "The phrase 'security of a free state' meant 'security of a free polity,' not security of each of the several States." *District of Columbia v. Heller*, 554 U.S. 570, 598-99 (2008). That is why the Second Amendment applies in the District of Columbia (and other federal areas) and not just in the 50 States. The principle is that *all* of the polities in the United States are supposed to be secure in their freedom. Secure freedom includes a polity's ability to resist invasion or suppress insurrection. *Id*. This includes Sheriffs' ability to carry out their duty to "suppress all affrays, riots, and unlawful assemblies and insurrections." C.R.S. § 30-10-516. As Lord Coke put it, the Sheriff's keeping the peace "is the life of common wealth."[4]

---

[4] The Sheriff is custodian of "*vitae republicae*; he is *principalis conservator pacis* within the countie, which is the life of common wealth, *vitae republicae pax*." COKE UPON LITTLETON 168(a) (Book 3, ch.1, § 248) (Charles Butler ed.) (1ˢᵗ Am. Edition, from the 19th London edition, 1853) (1628). *Coke upon Littleton* is the first volume

## 2. *The Sheriffs and their Posses*

In response to Defendant's interrogatories about use of the *posse comitatus*, Hinsdale County Sheriff Ron Bruce described the events of November 1994, when the Hinsdale County Sheriff requested the assistance of a non-certified deputy, a member of his posse, at what was expected to be a dangerous traffic stop:

> [T]he sheriff was shot and killed. The non-certified deputy fired 17 rounds from his Beretta Model 92 9mm pistol at the suspects when they fled. One of the bullets struck the tire of the vehicle forcing the suspects to retreat on foot. The suspects fled into the mountains and were discovered dead around 30 days later. The male had shot the female and himself with the same .44 magnum that was used to kill the sheriff.
>
> During the manhunt for these two suspects, over 100 local citizens were sworn in to assist the approximately 200 law enforcement officers in conducting the search. Several hundred buildings and the surrounding land mass was searched without a single shot being fired. There is no information on the firearms and magazines since they ran the gamut of nearly anything available at the time.

Hinsdale County Sheriff Ron Bruce, Response to Interrogatories at 4 (Aug. 13, 2013), attached to this brief as Exhibit A.[5]

Seventeen rounds were fired, rather than 15 rounds: If HB 1224 had been the law in 1994, the citizen backing up the Sheriff would have had only 15 rounds. Even

---

of Coke's *Institutes of the Lawes of England*. Prior to Blackstone, it was the foundational text for Anglo-American courts, lawyers, and law students.

[5] "A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (internal citations omitted).

The Sheriffs stand ready to comply with "the trial court's power to allow or require the plaintiff to supply, by amendment to the complaint or by affidavits, further particular allegations of fact deemed supportive of plaintiff's standing," if the Court would consider it to be helpful. *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

for an expert, the magazine change would have taken a second or two, while the murderers' car sped away.

Thwarting the escape of one's own murderer is an enormous "personal stake." The Sheriffs have "a personal stake" in challenging a statute which experience indicates would allow the escape of persons who murder a Sheriff.

Armed citizens come of the aid of law enforcement in other ways. Rio Blanco County Sheriff Si Woodruff recounted that on Sept. 8, 2003, he deputized two armed citizens to search for criminals who had sped away from a traffic stop in a stolen car.

> We had hired a plane to search and we were out of personnel….These men were selected because they were known by me and other staff members as very experienced pistol and rifle shooters. I believe that the men had Glock .40 calibers, AR-15's, shotguns, and perhaps other arms. They patrolled the highway with us, in the vehicle, and operated the Thermal vision.

Rio Blanco County Sheriff Si Woodruff, Response to Interrogatories at 5 (Aug. 12, 2013) (Exhibit B).

The availability of well-armed citizens to assist law enforcement certainly affects the effective operation of a Sheriff's Office. But for the Sheriffs, it is even more personal.

Morgan County Sheriff Jim Crone recalls:

> I was involved in a specific incident in March of 1985 where I was in pursuit of a stolen vehicle from Texas. The vehicle left the roadway and went cross-county into Adams County, and we were unable to pursue due to having no four-wheel drive vehicles. A local rancher offered himself and his pickup so he and I could follow the vehicle's tracks through the snow (in the middle of a blizzard at night). Locating the pickup, the rancher pursued it back into Morgan County.

> We went across country for several minutes and went back into Adams
> County. After the stolen pickup rammed us and I fired a shot into the
> front of the pickup, it stopped shortly thereafter. I gave the rancher my
> shotgun and had him cover me while I arrested both occupants of the
> pickup. The rancher fired no shots but stood armed, in view of the
> suspects, as my backup. I made the arrests alone in a remote area in
> which road signs were covered with snow and my radio could not reach
> out to the other cars looking for us.

Morgan County Sheriff Jim Crone, Response to Interrogatories at 5 (Aug.14, 2013)

(Exhibit C).

Under HB 1224, if Sheriff Crone had given that good Samaritan rancher a patrol

rifle, such as an AR-15 type carbine with its standard 30 round magazine, both the

Sheriff and the citizen would have been criminals.

Sheriff Crone also noted the more common scenarios in which armed

> citizens, usually local farmers or ranchers, back us up when involved
> with a combative suspect, a felony stop or a crime in progress. In these
> instances, the citizens had told us they had ready access to a firearm
> (inside the house, vehicle, or on their person), if so needed. When
> searching a private residence or a business where a burglar alarm has
> gone off, I have had instances where an armed home/business/property
> owner has accompanied me, while armed with a handgun, when I had
> no backup close at hand.

*Id.*

So when Sheriff Crone has been the only law enforcement officer at crime scenes,

and he had to clear a building, not knowing whether he will encounter violent

criminals waiting to ambush him, the Sheriff has been backed up by armed citizens,

carrying their personal handguns.

Will the next citizen who is backing up the Sheriff have a standard capacity

magazine for his own handgun? Or will the citizen who is protecting the Sheriff

have to do so with a lesser magazine? As the events in Hinsdale County demonstrated, the answer can make a tremendous difference.

In *Allen*, the risk of the loss of one's job was sufficient for standing. The instant case involves the far greater personal stake of the protection of one's life, or the apprehension of the criminals who have taken that life.

As detailed in the answers to interrogatories, the following Sheriffs currently have operational posses consisting of volunteer citizens who are not POST-certified law enforcement officers, and who at least sometimes provide their own arms when assisting the Sheriff in maintaining the peace, performing search and rescue, and so on: Alamosa Sheriff Dave Stong (Exhibit D, at 5); Baca Sheriff Dave Campbell (Exhibit E, at 4-5); Custer Sheriff Fred Jobe (Exhibit F, at 4-5); Hinsdale Sheriff Ron Bruce (Exhibit A, at 4-6) (with posse members sometimes providing their own 30 or 60 round magazines for their carbines); Lincoln Sheriff Tom Nestor (Exhibit G, at 4-5); Logan Sheriff Brett L. Powell (Exhibit H, at 4) (posse program began in approximately 1960); Montezuma Sheriff Dennis Spruell (Exhibit I, at 5-6) (including court security and public event security); Morgan Sheriff Jim Crone (Exhibit C, at 7) (posse program currently being revised so that posse members may bear arms); and Prowers Sheriff Jim Faull (Exhibit J, at 5) (sometimes issues .40 Glock handguns to posse).

In addition: Larimer Sheriff Justin Smith was prepared to call out the *posse comitatus* during High Park Fire in the summer of 2012. The Colorado National Guard was only able to provide limited assistance. "However, the weather changed

quickly and the fire was contained before armed citizens were necessary." (Exhibit K, at 8). Besides have the duty to keep the peace, the Sheriff is also the fire warden of his or her county. C.R.S. § 30-10-512.

Sheriff Smith has heard that the *posse comitatus* was used "to assist in maintaining order and assisting in recovery following the July 31, 1976, Big Thompson River flood." But because none of the Office's current personnel know of this first-hand, and because the then-Sheriff is deceased, the Big Thompson events cannot be stated with certainty. *Id.*

Delta Sheriff Fred McKee considered using the *posse comitatus* for protection of infrastructure in his county after the September 11 terrorist attacks, although he ultimately determined it was not necessary under the circumstances. (Exhibit L, at 5). The Douglas County Sheriff's Office used an armed posse until 1983, but does not presently do so. (Exhibit M, at 5-6). The Las Animas County Sheriff's Office had a posse program until 2007. (Exhibit N, at 5).

### C. The 55 Sheriffs have a personal stake because HB 1229 criminalizes their common activities.

Because of House Bill 1229, the Sheriffs can function in their jobs only by violating the law. *Allen* holds that the risk of losing one's job is sufficient for a political subdivision to have standing. 392 U.S. at 241 n.5. *A fortiori*, a political subdivision has standing to challenge a statute which criminalizes remaining in one's present job.

HB 1224 (magazines) and HB 1229 (transfer restrictions and registration) both had the same sponsor in their house of origin. House Bill 1224 has three exemptions, including an exemption for employees of law enforcement agencies. C.R.S. § 18-12-302(3)(a), (b), (c).[6] House Bill 1229 has nine exemptions, and has no exemptions for law enforcement. C.R.S § 18-12-112(6).[7]

Sheriffs transfer firearms all the time during the course of their normal duties, and they do so without going down to a gun store with the transferee in order to wait hours or days for approval via a background check initiated by the firearms dealers, as HB 1229 mandates.

Significantly, HB 1229 does not simply mandate a criminal records check, which the Sheriffs have the ability to initiate on their own. Rather, HB 1229 demands that

---

[6] The exemptions are (a) Colorado manufacturers that sell magazines over 15 rounds to certain types of customers; (b) an employee of certain government agencies "who bears a firearm in the course of his or her official duties"; and (c) an agent of a Colorado manufacturer who possess the magazine solely to transport it to an out-of-state entity.

[7] The exemptions are: (a) antiques/curios/relics; (b) among certain family members; (c) inheritance/bequest/operation of law; (d) temporary transfers in the home of the transferee, when in danger of imminent death or serious bodily injury; (e) temporary transfers at target ranges/competitions, or while hunting in the field; (f) for repair or maintenance; (g) temporary transfers where the owner remains in "the continuous presence"; (h) temporary transfers up to 72 hours; (i) to certain family members by armed services members who are being deployed outside the United States.

Exception (c) is for "A transfer that occurs by operation of law or because of the death of a person for whom the prospective transferor is an executor or administrator of an estate or a trustee of a trust created in a will." C.R.S § 18-12-112(6)(c). The "operation of law" language is by its context a reference to judicial and similar judgments, such as those adjudicating a dispute over ownership of a firearm, or ordering the forfeiture of a firearm pursuant to a statute. The vast majority of the Sheriffs' firearms transfers detailed below (e.g., giving an additional gun to a deputy, taking temporary custody of a firearm possessed by the unconscious victim of a traffic accident) are not required by operation of law.

the background check on temporary transfers may only be processed by a licensed firearms dealer, and that the "the licensed gun dealer shall comply with all state and federal laws, including 18 U.S.C. sec. 922, as if he or she were transferring the firearm from his or her inventory to the prospective transferee." C.R.S. § 18-12-112(2)(b). Federal law requires that when a FFL performs a transfer between private parties, both of the private parties (that is, two parties who are not Federal Firearms Licensees) must be physically present in the FFL's business premises. The FFL must take physical custody of the gun, log the firearm into his Acquisition and Disposition record book, record the serial number in the record book, and then log the disposition of the firearm to the transferee. "Record-keeping and background check requirements for facilitation of private party firearms transfers," ATF Proc. 2013-1 (Mar. 15, 2013).

The FFL may not perform this service at a Sheriff's Office. FFLs may only transfer firearms at the single business premises specified on their license, or at a gun show. 18 U.S.C. § 923(d)(E) & (j); 27 CFR § 478.100.

At trial, Larimer County Justin Smith, or another Sheriff, is ready to offer testimony about the following ways in which Larimer County Sheriff's Office and other Offices normally transfer firearms in violation of HB 1229:

1.  Deputies assigned a firearm by the agency will be required to undergo an FFL background check prior to issuance. The same is required in reverse when the deputy returns the firearm to the property section.

2.  Deputies assigned to the Honor Guard need to check out Office rifles for their Honor Guard missions. If those happen to last more than 72 hours, they will need to undergo an FFL background check and again, the same will need to occur when they are returned.

3. The cars assigned to reserve deputies contain shotguns and rifles for their use. At any given time, a reserve deputy may be given custody of a patrol car and the firearms in it for an undetermined amount of time. If a reserve deputy is possession of the patrol rifle or shotgun for more than 72 hours, the deputy is required to undergo a background check.

4. When deputies take a firearm as evidence of a crime and log it into evidence, the evidence custodian will have possession of the firearm for more than 72 hours. Under HB 1229, this requires a background check of the evidence custodian every time a gun is taken into custody.

5. Sheriffs provide training firearms to deputies for periods exceeding 72 hours. By HB 1229, the deputies will need a background check if the training period exceeds 72 hours.

6. Regional Crime Labs employ firearms experts. When a Sheriff's Office brings in a firearm for forensic examination, the Lab's expert must undergo a background check if he or she will have possession of the firearm for more than 72 hours. Also, when a Sheriff's Office donates a firearm to the expert's firearms library, the expert will need a background check.

7. When a deputy is involved in shooting, the deputy's personally-owned duty firearm(s) must be taken as evidence. The Sheriff's Office will almost always have possession of the firearms for more than 72 hours. HB 1229 requires a background check when the Office takes custody of the firearm, and when the firearm is later returned to the deputy. When the deputy's firearm is in custody for evidence, the Sheriff's Office or another deputy loans the deputy a firearm in the interim. There will have to be a background check for the deputy to receive the loaner firearm, and for the deputy to later return the firearm to its owner.

8. An officer under investigation, placed on leave, is typically required to surrender all Office-issued firearms. Again, an FFL background check is required when those firearms are taken by the Office, and then (after the deputy has been cleared by the investigation) when the firearms are returned to the deputy.

803

9. When the Office takes a weapon into custody, either as potential evidence of a crime or for safekeeping (e.g., when there is a firearm in the automobile of a person who is taken to the hospital after a traffic accident), HB 1229 requires a background check for the deputy who receives the firearm. This is not possible if the accident does not take place near a gun store, or takes place at night when gun stores are closed, or the owner is in the hospital and cannot go to the gun store to play his mandatory role in the transfer. Alternatively, when a firearm is taken from a person who has been arrested, the person will not be willing to accompany the deputy to a gun store to participate in the transfer.

10. In the scenarios in paragraph 9, the deputy who seized the firearm from the vehicle of the accident victim, or from the arrestee, would be unable to transfer the firearm to the Sheriff's Office property custodian, because the deputy is not the lawful owner of the firearm, and thus could not comply with the federal law requiring that for private-to-private transfers conducted by an FFL, the owner must be present at the FFL's business premises.

11. When a Sheriff's Office evidence custodian leaves the office for more than 72 hours (e.g., for vacation), a backup person will takes custody of all the evidence in the Office's possession. HB 1229 requires a background check for the transfer of the custody of the firearms from the custodian to the backup custodian. Because the transfer can *only* be performed at the business premises of the FFL, all the firearms in the property room would have to be transported to the FFL's store.

12. Crime victims whose stolen firearm was recovered by a Sheriff's Office may not have the property returned unless the Sheriff's property custodian and the victim both go to a gun store to process the transfer of the firearm.

It is irrelevant whether the Sheriffs and their deputies face a credible threat of criminal prosecution for violating HB 1229. A Sheriff's Office is, by definition, supposed to be model of law-abiding behavior, an example for the general public. It

is contrary to the Rule of Law for the Sheriffs' Offices (and other law enforcement agencies) to enforce HB 1229 against ordinary citizens when HB 1229 itself has forced the Sheriffs' Offices, like the other agencies, to violate HB 1229 thousands of times a year.

House Bills 1224 and 1229 were rushed from introduction to the Defendant's signature in 41 days. Three-and-half-months later, the Colorado Bureau of Investigation sent an email PDF attachment to Police Chiefs and Sheriffs. The attachment was resent on August 6, and copied to Matt Grove, counsel for Defendant.

The PDF is not on CBI letterhead. The bare page reads as follows:

> The Colorado Bureau of Investigation has received inquiries from Law Enforcement Agencies as to whether such agencies must conduct background checks through CBI when providing firearms to POST Certified Peace Offices employed by the agency for purposes of official use. Extensive background checks are already undertaken upon the hire of all POST Certified Peace Officers. In addition, law enforcement agencies engage in on-going monitoring of POST Certified Peace Officers designed to ensure that they are not prohibited to possess a firearm. Given this context, *CBI believes that it is unnecessary* for a Law Enforcement Agency to conduct an additional NICS[8] background check by an FFL before transferring a firearm to a POST Certified Peace Office employed by the agency for official use. As always, *agencies may wish to seek guidance from their legal advisor.*

(Emphasis added.)

Notably, the news that CBI has purported to invent an ad hoc exemption from HB 1229 has not been published to the public. The CBI website was visited on

---

[8] National Instant Criminal Background Check System. 18 U.S.C. 922(t).

August 16. In the site's section on "2013 Firearms Legislation," there is no mention the CBI has decided to create an important exemption to the law.

The CBI email may or may not have any legal effect. That is an issue for this Court to determine at some future point. In the meantime, the 55 Sheriffs still have a personal stake in challenging a statute whose actual language makes their common activities illegal.

If CBI's non-public *ipse dixit* did have the force of law, the pronouncement only applies to the transfer of Sheriff's Office firearms to POST-certified deputies. The *ipse dixit* does not solve the criminalization of transfers of firearms that have been seized as evidence or taken for safekeeping from unconscious persons, such as victims of auto accidents.

Nor does the CBI's email cover the transfer of firearms to non-certified deputies. Many Sheriffs' Offices hire full-time non-certified deputies as jail and/or transport deputies, and sometimes these deputies are provided with arms from the Office armory.

Law enforcement officers have a personal stake in challenging a statute which criminalizes their ordinary law enforcement activities.

### D. The Sheriffs have a personal stake in the effective performance of their official duties and in the resources therefor.

*Allen* held that the political subdivision plaintiffs had "a personal stake" because of "a reduction in state funds for their school districts." The Sheriffs have a personal stake, and thus standing under the political subdivision doctrine, because HB 1224

and HB 1229 are presently robbing resources from the Sheriffs' Offices. House Bill 1224 interferes with the *posse comitatus*. *See* Part II.B., above. House Bill 1229 mandates that the Sheriffs spend their financial resources on background check fees, which amount to $20 per firearms transfer, or else become criminals.[9] *See* Part II.C., above. As will be described in Part III, below, HB 1224 also seriously interferes with the volunteer resources—worth literally millions of dollars—which are provided by the Colorado Mounted Rangers.

It is well-established that Sheriffs have standing to challenge a statute that even slightly interferes with the performance of their official duties. The United States Supreme Court decision *Printz v. United States* involved challenges by Sheriffs to a federal statute which ordered the Sheriffs to carry out background checks on handgun buyers. 521 U.S. 898 (1997). The Sheriffs argued that they did not wish to perform the checks, in part, because doing so would distract them from other law enforcement duties which they considered to be more important.

In the Supreme Court, the Sheriffs won 5-4 on the merits, and all nine Justices recognized that the Sheriffs had standing. In the various lower court cases that culminated in *Printz*, the decisions were varied on the merits; but regarding standing, the courts were unanimous. The defendant attacked standing in *every* case and lost in every District Court decision and every Circuit Court of Appeals decision. *See Koog/McGee v. United States*, 79 F.3d 452, 458-459 (5th Cir. 1996),

---

[9] The Colorado Bureau of Investigation is allowed to set its own fees for conducting firearms background checks. C.R.S. § 24-33.5-424(3.5). The fee is currently $10. On top of this, HB 1229 allows the FFL to charge a fee of up to $10 for his or her services in processing each transfer. C.R.S. § 18-12-112(2)(d).

*rev'g Koog v. United States*, 852 F. Supp. 1376, 1380 (W.D. Tex. 1994), and *aff'g*

*McGee v. United States*, 863 F. Supp. 321, 325, earlier proceeding 849 F. Supp. 1147

(S.D. Miss. 1994); *Mack v. United States*, 66 F.3d 1025, 1029-1030 (9th Cir. 1995),

*rev'g* 856 F. Supp. 1372, 1377 (D. Ariz. 1994), and *rev'g Printz v. United States*, 854

F.Supp. 1503, 1508-1509 (D. Mont. 1994); *Romero v. United States*, 883 F.Supp.

1076, 1080 (W.D.La. 1995); *Frank v. United States*, 78 F.3d 815, 823 (2d Cir. 1996),

*rev'g* 860 F.Supp. 1030 (D.Vt. 1994).

The Second Circuit held:

> It is this administrative burden added to the sheriff's regular workload
> that permits plaintiff to maintain his Tenth Amendment challenge.
> Interference with the functions of a local unit of government is an
> injury that may give a litigant standing. For standing purposes, the
> "slender" burden on the Sheriff was "sufficient for constitutional
> purposes." The harm…"need not be monumental."

*Frank v. United States*, 78 F.3d 815, 824 (2d Cir. 1996), *judgment vacated on other*

*grounds*, 521 U.S. 1114 (1997).

The D.C. Circuit adhered to *Printz* in *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir.

2002). There, the Circuit Court pointed out that in *Printz*, "the Court reached the

merits of a Tenth Amendment challenge to the Brady Act in cases brought by

county sheriffs. Neither the majority opinion nor the opinions of the five Justices

who wrote separately questioned the sheriffs' standing to sue." *Id.* Therefore, to

require state authorization for a federal lawsuit by a Chief Law Enforcement Officer

"would be to depart from our decision in the *FOP* case [discussed in Part III, *infra*],

and perhaps the Supreme Court's disposition of *Printz*." *Id.* at 13-14.

As the *Printz* cases demonstrate, there is no requirement that Sheriffs face a credible threat of prosecution in order to challenge statutes which force them to use their limited resources to enforce statutes which they believe to be unconstitutional and to diminish their resources.

The diminution of agency resources was a "personal stake" that conferred standing on a political subdivision in *Allen*. 392 U.S. at 242 n.5. HB 1224 diminishes the resources usable by Sheriffs' Offices by preventing posse members from having standard capacity magazines which can be brought to service. HB 1229 diminishes resources by preventing Sheriffs from temporarily transferring an Office firearm to a posse member for more than 72 hours, unless the Sheriff and the posse member go to a gun store and wait hours or days for the Colorado Bureau of Investigation to conduct a background check. This is highly impractical, especially in rural areas, and during the emergency situations when a firearms transfer might be most necessary. Even though posse members often provide their own arms, depending on the circumstances, a posse member might need a particular type of Office firearm (e.g., a long-distance .308 rifle or a specially colored patrol shotgun pre-loaded with less-than-lethal ammunition).

### III. The Sheriffs Have a Personal Stake, and Third-Party Standing, regarding All Law-abiding Persons who Aid Law Enforcement, including for Sheriffs' Deputies and Posses, and the Colorado Mounted Rangers.

#### A. Doctrine of third-party standing

##### 1. Law enforcement cases

Law enforcement executives have third-party standing to raise the constitutional rights of other persons. The foundational case is *Fraternal Order of Police v. United States*, 152 F.3d 998, 1001–1002 (D.C. Cir. 1998) (*FOP I*), on rehearing of merits, 173 F.3d 898 (1999) (*FOP II*). The Fraternal Order of Police is a private association whose members include Chief Law Enforcement Officers, as well as rank and file officers. Plaintiffs in *FOP* argued that a 1996 federal statute prohibiting gun possession by anyone convicted of misdemeanor domestic violence was unconstitutional. Essentially, the basis for the plaintiffs' challenge was that the misdemeanor disarmament law also applied to the duty weapons of law enforcement officers, while a federal statute against gun possession by convicted *felons* had an exception for law enforcement officers.

The CLEOs asserted the Equal Protection rights of subordinate officers. On the merits, the argument was not successful, but the D.C. Circuit concluded that the CLEOs had standing for two reasons. First, *FOP I* held that CLEOs had a sufficient relationship with their subordinates such that the CLEOs had third party standing to assert the Equal Protection rights of the subordinates. *FOP I*, 152 F.3d at 1002.

Then, *FOP II* added that the CLEOs were directly injured by being unable to choose the subordinates whom they considered to be well-suited for carrying

firearms; so the CLEOs had standing to raise a Tenth Amendment claim. *FOP II*, 173 F.3d at 904-05.

Like the plaintiffs in *Fraternal Order of Police*, the Sheriffs here are complaining about the particular injury of persons whom they wish to be armed; HB 1224 deprives them of the arms that may be the safest ones for them to have.

### 2. *Supreme Court doctrine*

The Sheriffs' third party claim on behalf of armed citizens is a paradigm of the Court's core rules for third-party standing in *Singleton v. Wulff*, 428 U.S. 106 (1976). First, "[i]f the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." Second, whether "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 113-114.

Both elements are present here. The activity the Sheriffs wish to pursue (calling on armed citizens, including non-POST-certified deputies) is inextricably bound up with the public's enjoyment of the Second Amendment right to bear arms. Further, Sheriffs are a particularly "effective … proponent of the right." The Sheriffs are the chief law enforcement officers of their counties. Thus, the Sheriffs are especially suited for third-party standing in support of the law-abiding gun owners of their counties. As detailed in Part II, the better-armed the law-abiding public is, the *personally* safer the Sheriffs are. Likewise, a well-armed public facilitates the operation of the Sheriffs' Office, by deterring or stopping criminal attacks, and by coming to the aid of the Sheriff and his certified deputies.

### 3. *Tenth Circuit doctrine*

The Tenth Circuit requires that there be a "hindrance" or "inability" of the third party to pursue his or her own claims or interests, and requires that the party asserting the right must have a "close" relation to the third party. *Aid for Women v. Foulston*, 441 F.3d 1101, 1111 (10th Cir 2006); *Terrell v. INS*, 157 F.3d 806, 809 (10th Cir 1998).

"The concern behind the 'close relationship' element is whether 'the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal.'" *Foulston* at 1113, quoting *Secretary of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). The "close" relationship "must allow the third-party plaintiff to operate 'fully, or very nearly, as effective a proponent,' of the potential plaintiff's rights as would the plaintiff himself." *Foulston* at 1113. An example is "professional contexts, where the rights of the potential plaintiff and third-party plaintiff neatly align." *Id*.

The Sheriffs believe that the record of their litigation in this case demonstrates their proper framing of third-party issues, and their adversarial zeal in presenting them. Indeed, the Sheriffs have always considered their participation in this case to be an extension of their primary official duty: "to keep and preserve the peace" by defending and protecting all persons from unlawful invasions of their rights to personal security. In the professional context of the Sheriffs in their official capacities, and the law-abiding armed citizens who aid the Sheriffs, the rights of both are necessarily aligned.

What is the "hindrance" to hundreds of thousands, or millions, of Coloradoans suing in Federal Court to vindicate the right of armed citizens who would come to the aid of the Sheriffs? The hindrance is the difficulty of litigating a class action on behalf of a million or more people.

Is there a "close" relation between the Sheriffs and those citizens? Yes. Each stands ready to come to the armed defense and aid of the other.

When a political subdivision meets the standard tests for third-party standing, the rule against political subdivision standing does not apply. *See E. Liverpool v. Columbiana Cty. Budget Comm*., 114 Ohio St.3d 133, 870 N.E.2d 705 (Ohio 2007) (City's "direct injury to its own treasury" was "intertwined with the injury" to "the equal protection interest of East Liverpool's citizens." There was "a close relationship" because "The city and its citizens have an interdependent interest in the city's treasury."); *Sanchez v. City of Modesto*, 145 Cal.App.4th 660, 676, 51 Cal.Rptr.3d 821, 834-35 (Cal. App. 5th Dist. 2006) ("Although a local government has no equal protection rights of its own to assert against the state, there is no reason why it cannot act as a mouthpiece for its citizens, who unquestionably have those rights, where the third-party-standing doctrine would allow it."); *Central Delta Water Agency v. State Water Resources Control Bd*. (1993) 17 Cal.App.4th 621, 21 Cal.Rptr.2d 453 (1993) (water boards' duty to supply water was inextricably bound up with citizens' equal protection rights regarding discharge fees); *Selinger v. City Council*, 216 Cal.App.3d 259, 271, 264 Cal.Rptr. 499, 264 Cal.Rptr. 499, 506

(Cal. App. 4th Dist. 1989) (city's standing interest in reviewing subdivision application was "inextricably bound up" with citizens' due process rights to notice).

### B. Colorado Mounted Rangers

Some armed citizens have long-running, close relationships with the Sheriffs to provide aid. One such group is the Colorado Mounted Rangers (also known as the Colorado Rangers).

Fremont County Sheriff James L. Beicker writes:

> Since January 1, 2004 I have requested the assistance of the Colorado Mounted Rangers "J Troop." The majority of these individuals are not POST certified peace officers, but my understanding is that a few members of their organization are.
>
> I have used their assistance on four wildfires in my county: Duckett Fire/ Park Fire/ Wetmore Fire/ Royal Gorge Fire. On these incidents they were assigned to road closures, manning road blocks for evacuated areas.
>
> They were allowed, but not required to carry firearms for this duty. I have no documented evidence of who did carry or did not carry during these events.
>
> The Fremont County Sheriff's Office has also utilized the J Troop Rangers for some annual community events…

Fremont County Sheriff James L. Beicker, Answer to Interrogatories, at 6-7 (Aug. 12, 2013) (Exhibit O).

This summer, the Colorado Mounted Rangers provided forest roadblock support for the Douglas and Jefferson County Sheriffs' Offices during the Lime Gulch Fire. (Exhibit M, Sheriff Weaver interrog.,at 8).

814

The Colorado Mounted Rangers were founded in 1861, and for many decades were the only statewide law enforcement organization. They were recently recognized in state statute. C.R.S. § 24-33.5-222 (specifically authorizing law enforcement agencies to enter into memoranda of understanding with the Colorado Mounted Rangers); Colo. Sen. Bill 12-072.

The Sheriffs are prepared to demonstrate at trial that the Colorado Mounted Rangers provide approximately 50,000 hours of community service during a typical year. This amounts to a contribution of over two million dollars of law enforcement resources, at no cost to the taxpayer. The diminution of these resources which Sheriffs use in support of their official duties is a "personal stake" which confers standing on political subdivisions. *Allen*, 392 U.S. at 242 n.5.

The Sheriffs also have third-party standing on behalf of the Colorado Mounted Rangers. The hindrance to the Colorado Mounted Rangers bringing suit is that they are an unpaid, volunteer organization. Colorado Mounted Rangers, "Organization," available at https://www.coloradoranger.org/index.php/organization. An all-volunteer organization may have difficulty in participating in major constitutional litigation, due to burdens such as the time needed to respond to discovery.

The close relation between some of the Sheriffs and the Colorado Mounted Rangers is that there are Memoranda of Understanding between them, with the Rangers ready to provide armed support to the Sheriffs.

The Colorado Mounted Rangers currently have Memoranda of Understanding to provide support to the following:

Sheriff's Offices:
- Archuleta County SO
- Crowley County SO
- Douglas County SO
- Fremont County SO
- Kiowa County SO
- La Plata County SO
- Weld County SO

Police Departments:
- Ault PD
- Durango PD
- Elizabeth PD
- Fairplay PD
- Fort Lupton PD
- Fowler PD
- Green Mountain Falls Marshal
- Manitou Springs PD
- Rocky Ford PD
- Salida PD
- Windsor PD

County Governments:
- Adams County Office of Emergency Management
- Teller County

Town / City Governments:
- Town of Bayfield
- Town of Monument
- Town of Ordway
- Town of Palmer Lake

Fire Protection / Other:
- Canon City Area Fire Protection District
- Community College of Aurora

Colorado       Mounted       Rangers/Colorado       Rangers,       website       home       page,

https://www.coloradoranger.org/.

HB 1224's magazine prohibition exempts "a law enforcement officer employed by

any department, agency, or political subdivision of the state of Colorado." C.R.S. §

816

18-12-302(3)(b)(II). The Colorado Mounted Rangers, though, are not "employed" by any law enforcement agency. They are members of a private volunteer organization.

Many of the Colorado Mounted Rangers, and especially the female Rangers, carry the Glock 17 as their service firearm. The 9mm handgun is very controllable for persons with smaller bodies. Most female Rangers strongly prefer the Glock 17. It is has less recoil than larger-caliber handguns, and is thus easier for them to shoot accurately. Because the 9mm cartridge is less powerful than larger calibers, the 17 round magazine is particularly important.

Many certified law enforcement officers, including certified deputies, also carry the Glock 17 9mm pistol. Commonality of arms among the certified and the non-certified makes everyone safer, allowing interchangeability of magazines in a critical incident.

For the same reason that the Glock 17 9mm is popular with many Rangers, so is the Springfield XD 9mm, whose magazine carries 19 rounds. There are no magazines for this firearm that are smaller than 16 rounds. So HB 1224's magazine ban has the effect of banning the gun itself.

As in all 55 Sheriff Offices, the AR-15 type carbine with a magazine larger than 15 is the standard patrol rifle for the Colorado Mounted Rangers.

The Colorado Mounted Rangers regularly use AR-15 carbines with 30 round magazines on search & rescue missions as well as back-country patrol operations when requested by agencies.

The Rangers go deep into Colorado's 24 million acres of forest, where they are subject to bear, mountain lion and coyote attacks and other extremely dangerous conditions. Often, the Rangers are beyond any radio communication, their patrol rifle their only protection. HB 1224 makes being a Ranger more dangerous. During an animal attack, there is rarely time to change magazines; the attack is often complicated by low (or no) light conditions—the conditions common during rescue missions.

During the, House Judiciary Committee hearing on HB 1224, the problem of the Colorado Mounted Rangers was brought to the Committee's attention. Testimony of Lou Reedy, House Judiciary Comm., Feb. 12, 2013, at 157 (Exhibit P).

The prohibition of magazines larger than 15 rounds causes considerable difficulty for the Colorado Mounted Rangers with respect to training[10] and to replacement of worn magazines. The prohibition also harms new Rangers who were not grandfathered by HB 1224.

The Sheriffs have direct standing and they have third-party standing to challenge the prohibition of magazines for the Colorado Mounted Rangers.

## C. Blocking the purchase of magazines by Sheriffs and their deputies

The Sheriffs in their official capacity are proper plaintiffs to raise claims about the disarmament of Sheriffs and of the Sheriffs' POST-certified deputies. HB 1224

---

[10] The Rangers' firearms training is a modified version of the Colorado State Patrol Academy course.

is currently interfering with the armament of certified, sworn law enforcement officers.

HB 1224 bans the sale of magazines over 15 rounds; there are some exceptions, but no exception allows firearms businesses to sell magazines to law enforcement officers, or to possess magazines for potential sale to law enforcement officers.

Nominally, HB 1224 allows the purchase of new standard capacity magazines by the employees of "a department, agency, or political subdivision of the State of Colorado." C.R.S. § 18-12-302(3)(b)(II).

But there is no corresponding exemption for retailers to sell to law enforcement. Rather, HB 1224's only exemption for retailers is: "a firearms retailer for the purpose of firearms sales conducted outside the state." C.R.S. § 18-12-302(3)(a)(III).

HB 1224 comprehensively criminalizes any "person who sells, transfers, or possesses a large-capacity magazine." *Id.* at (1)(a). The bill contains an exemption for *Colorado* manufacturers who sell to certain types of customers. *Id* at (3)(a). There is no exemption under any circumstances for an out-of-state manufacturer who ships standard magazines *to* a Colorado retailer.

As the Plaintiffs will demonstrate at trial, HB 1224 continues to causes massive confusion and fear (including a chilling effect) among retailers, wholesalers, and manufacturers of magazines. Many manufacturers and wholesalers simply will not ship to Colorado, and many retailers will not sell the magazines even to law enforcement. This is quite understandable, since HB 1224's prohibition of possession, sale, and transfer does not exempt retailers who provide magazines to

law enforcement, nor out-of-state manufacturers who sell magazines to such retailers.

Accordingly, many Sheriffs and their deputies are finding their normal sources of magazines cannot or will not sell them standard capacity magazines, as Garfield County Sheriff Lou Vallario and other Sheriffs are prepared to testify. Finding a standard capacity magazine for a duty handgun may now require a day-long trip to one of the rare outlets still selling them, if the magazine can be found at all.

The 55 Sheriffs each have a personal stake in being able to obtain standard capacity magazines for their personal duty arms. The Sheriffs have a personal stake, and third-party standing on behalf of, the acquisition of such magazines by their deputies. The personal stake is the efficient operation of their offices, and the better protection which well-armed law enforcement officers provide to each other.

The hindrance to the deputies bringing a lawsuit is the difficulty of litigating a suit involving thousands of individual plaintiffs. Litigating a suit brought by 55 Sheriffs is much more efficient, and is viable.

The close relation of the Sheriffs and the deputies is that the former have hired them and work with them daily in order keep the peace.

To whatever extent standard capacity magazines can be purchased somewhere in the state, the burden of long-distance travel within Colorado or to another state to purchase the magazine is sufficient for standing. As a practical matter, the travel burden will delay the acquisition of such magazines until the Sheriff or deputy has time to make a long-distance trip. In the interim, the Sheriffs and their deputies

will be at greater personal risk of death or injury because they will not have the appropriate magazines for their firearms.

The Sheriffs also have third-party standing for retired deputies, who are directly prohibited by HB 1224 from possessing standard magazines. The hindrances to a lawsuit by retired deputies are the same logistical problems involving a lawsuit by the active deputies. The close relation is honorable retirement following peace officer service for the Sheriff.

## IV. Individual Sheriffs are Not Political Subdivisions for Purposes of Standing.

### A. The political subdivision doctrine applies only to offices created by the state, not to offices created by the people.

The Tenth Circuit traces the political subdivision standing doctrine to *City of Trenton v. New Jersey*, 262 U.S. 182 (1923). *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011).

In *Trenton*, the city raised a contract impairment claim about a new state statute which reduced how much water the city could draw from the Delaware River. The Court pointed out that under New Jersey law, Trenton's ability to draw *any* water was purely derivative of the state's power: "The only way the city could acquire the right to take the water of the Delaware river was by grant from the state or by authorized purchase or condemnation from one to whom the right had been granted by the state." 262 U.S. at 185. The Court pointed out that "The city is a political subdivision of the state, created as a convenient agency for the exercise of

such of the governmental powers of the state as may be intrusted to it." *Id.* at 185-86. The Court observed that "Power to own, maintain and operate public utilities, such as waterworks…is frequently conferred by the states upon their cities and other political subdivisions." *Id.* at 186. In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state.

The Court in *Trenton* was careful to lay out the reasons why Trenton, in regards to water rights, was a mere proxy of the state.

The other major early case, according to the Tenth Circuit, was *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933). *Hugo*, at 1255-56. There, Justice Cardozo explained: "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams*, 289 U.S. at 40. The *Williams* description of the municipal plaintiff was accurate: the Maryland Constitution's article about the City of Baltimore expressly allows the state legislature to over-ride terms of the article, and declares that the municipal corporation is in no way "independent of, or free from the control" of the legislature.[11]

---

[11] MARYLAND CONST., art. XI (imposing various rules for the operations of the Baltimore city government, expressly giving the General Assembly the power to alter those rules, and providing that "this Article shall not be so construed, or taken as to make the political corporation of Baltimore independent of, or free from the control, which the General Assembly of Maryland has over all such Corporations in this State.").

The *ratio decidendi* of the political subdivision doctrine is for federal courts not to adjudicate disputes against the creator (e.g., Maryland) by the created (e.g., the City of Baltimore). The Tenth Circuit so recognizes. *See Hugo*, at 1255, 1256, 1259 (quoted with approval creator/created language from other cases); *Branson Sch. Dist. RE-82 v. Romer*," 161 F.3d 619, 627-30 (10th Cir. 1998) (limited circumstances when a created subdivision may file suit against the creator); Housing *Auth. of Kaw Tribe of Indians v. Ponca City*, 952 F.2d 1183, 1188 (10th Cir. 1991) ("against its creating state").

There are many local government entities in Colorado which have been created by the General Assembly. Any or all of these entities could be abolished tomorrow by the General Assembly. The *Williams* doctrine applies to them. *See City of New Orleans v. New Orleans Water Works Co.*, 142 U.S. 79 (1891) (no standing because city's charter can be "abolished at the will of the legislature"); *Housing Auth. of Kaw Tribe*, 952 F.2d. at 1188-89 (municipal corporations can be destroyed by the state "without the consent of the citizens"). Of course even then, the *Allen* exception for cases with "a personal stake," and the exception for third-party standing would still apply.

In Colorado, school boards (the litigants in *Branson*) are created by the state. The Colorado Constitution requires the General Assembly to provide for the organization of school districts "in each of which shall be established a board of education." COLO. CONST., art. IX, § 15.

Colorado Sheriffs were not "created" by the State. The Sheriffs were created by the same power which created the General Assembly and the State itself: the People of Colorado. The Colorado Constitution proceeds solely and directly from the People. Through the Constitution, the People have created the State of Colorado, the General Assembly, and the Office of Sheriff. *See* COLO. CONST., pmbl. (creating the State of Colorado), art. I (fixing the boundaries of the State), art. V (creating the legislative department), art. XIV, § 8 (creating the Office of Sheriff, mandating that it be popularly elected).[12] Under the Colorado Constitution, the General Assembly's attempt to impose additional qualifications on the Office of Sheriff was voided, until a subsequent constitutional amendment granting that power was enacted. *See Jackson v. State*, 966 P.2d 1046 (Colo. 1998) (also holding that Sheriff in his official capacity had a valid claim under the Fourteenth Amendment).

Since the 1933 *Williams* decision, the case's rule has often been described as the "political subdivision" doctrine. Terms such as "political subdivision" or "firearm"

---

[12] The provision for the popular election of Sheriffs is part of the original Colorado Constitution, which is available on the website of the Colorado State Archives. http://www.colorado.gov/dpa/doit/archives/constitution/1876.pdf

The election of Sheriffs is one of the oldest elements of our tradition of ordered liberty, lauded by Blackstone, and originating in Saxon times. W. BLACKSTONE, 1 COMMENTARIES, ch. 13, para. 3 (1765-69) ("[S]heriffs were elected: following that still old fundamental maxim of the Saxon constitution, that when any officer was entrusted with such power, as if abused might tend to the oppression of the people, that power was delegated to him by the vote of the people them selves.") To Thomas Jefferson, "the office of sheriff" was "the most important of all the executive officers of the county." Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), http://www.let.rug.nl/usa/presidents/thomas-jefferson/letters-of-thomas-jefferson/jefl246.php. An excerpt from the cited letter appears in a panel on the Jefferson Memorial. "Quotations on the Jefferson Memorial," Official Monticello website, http://www.monticello.org/site/jefferson/quotations-jefferson-memorial.

can have different legal meanings depending on the particular legal context.[13] The phrase "political subdivision" is often used in the context of torts and contracts. In the context of the *Trenton/Williams* line of cases for federal court standing, a "political subdivision" is by definition *only* an entity which has been "created" by state. The logic and language of *Trenton* and *Williams* require attention to the identity of the Creator.

### B. Sheriffs are County Officers, but they are not employees of a political subdivision.

Defendant writes that "Sheriffs are Colorado 'county officers.' Colo. Const. Art. XXIV, sec. 8." The cited section of the state constitution does not really support defendant's point, but instead guarantees that the old age pension fund shall remain inviolate.

However, the Colorado Constitution does contain the subhead "County Officers" which introduces sections 6 et seq. of Article XIV.[14] Article XIV, section 8 requires for the popular election of Sheriffs. Sheriffs being Constitutional Officers who are elected by the people of a county, it is tautological that they are "County Officers."

---

[13] Regarding "firearm," there is one meaning in the dictionary. WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (2003) ("a weapon from which shot is discharged by gunpowder – usually used only of small arms"). There is another meaning in the federal Gun Control Act. 18 U.S.C. § 921(a)(3), (16) (applying to any explosive, not just gunpowder). And there is a third meaning in the National Firearms Act. 26 U.S.C. § 5845 (The vast majority of guns are not NFA "firearms." A NFA "firearm" is a machine gun, short shotgun, short rifle, or various other things—such as grenades, which are not really a "firearm" in ordinary usage).

[14] Individual sections of the actual Colorado Constitution do not typically have headings. Some publishers place headings on each section, for the convenience of the reader, but these headings are not part of the actual Constitution.

This does not mean that they work for the county government, which is directed by the County Commissioners.

To the contrary, while the county commissioners have great control over the various departments of the county government, their relationship with Sheriff's Office is strictly circumscribed. The commissioners can approve or reject what the Sheriff has chosen to be the salaries of the Undersheriff and the deputies, but the commissioners cannot themselves propose the salaries. C.R.S. § 30-2-106.

The Sheriff has plenary authority over the hiring, firing, and retention of deputies, and the county commissioners have none. County personnel policies do not apply to the Sheriff's Office. *See* C.R.S. § 30-10-506; *Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002); *Jackson v. Johns*, 714 F. Supp. 1126, 1130 (D. Colo. 1989); *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650, 651-52 (Colo. App. 2000); *Seeley v. Bd. of County Comm'rs*, 771 P.2d 21, 22 (Colo. App. 1989), *aff'd* 791 P.2d 696 (Colo. 1990). Accordingly, the mere fact that a Sheriff is a constitutional County Officer does not prove that the Sheriff himself, in his official capacity, is an employee of the political subdivision which is run by the County Commissioners.

That Sheriffs are elected by the People of a county does not automatically make the Sheriffs into a "political subdivision." *See French v. Village of Walnut, Ill.*, 2012 WL 2175758, at *6 (C.D. Ill. June 14, 2012) ("the Bureau County Sheriff's Department" is not "a political subdivision of the county" because "In Illinois, sheriffs are 'independently elected officials not subject to the control of the

826

county.'"); *Muth v. Anderson*, 2012 WL 2525574, at *4 n.4 (D. Idaho Jun. 29, 2012) ("The claim against the Ada County Sheriff's Department will also be dismissed. Idaho law permits tort claims against 'political subdivisions' which includes cities and counties, but not sheriff's departments."). In other states, a Sheriff's Office is considered a political subdivision. *E.g.*, *Cozzo v. Tangipahoa Parish Council--President Government*, 279 F.3d 273, 282 (5th Cir. 2002) ("the Louisiana statutes and case law can fairly be read to stand for the proposition that sheriffs are political subdivisions").

In Colorado state law, there is no statute or precedent which declares elected Sheriffs to be political subdivisions. To the extent that Sheriffs and political subdivisions appear in state statute, they are not necessarily the same thing. C.R.S. § 19-2-308(7) ("There shall be cooperation of boards of county commissioners, county sheriffs, and political subdivisions in helping to establish work programs.").

A recent case from the United States District Court of the District of Colorado distinguishes a "political subdivision" from a Sheriff acting in his official capacity. In a case brought by *pro se* plaintiffs complaining that they had been improperly arrested, Magistrate Judge Mix recommended that the case be recaptioned so as to identify the defendants as "DELTA COUNTY BOARD OF COUNTY COMMISSIONERS, a political subdivision of the State of Colorado, UNKNOWN DELTA SHERIFF, in his individual and official capacities,...." *Cabral v. Seventh Judicial District et al.*, 2011 WL 3471237, at *23 (D. Colo. Aug. 8, 2011). The Board

of County Commissioners was captioned a "political subdivision" and the Sheriff himself was not.

Precedent does hold that "The Denver Sheriff Department is a political subdivision of the City and County of Denver." *Podboy v. Fraternal Order of Police, Denver Sheriff Lodge 27*, 94 P.3d 1226, 1230 (Colo. App. 2004). The Denver Sheriff Department is headed by a mere appointee of an appointee of the Mayor. The Denver Sheriff is not constitutionally elected by the people, and is not in any way independent of the Mayor. Denver City Charter § 2.6.4 ("Sheriff Department" is a part of the Mayor's Department of Public Safety.) Unlike elected Sheriffs, the Denver Sheriff is not the chief law enforcement officer or fire warden of a county.

## V. Americans with Disabilities Act

While Defendant's brief hardly engages with the particular rules of political subdivision doctrine, defendant does acknowledge that a political subdivision always has standing when a federal statute expressly creates the right to sue. Mot. at 14. In the instant case, that statute is in the Americans with Disabilities Act. 42 U.S.C. § 12133 (enforcement procedures for § 12132 ban on state government discrimination).

Sheriffs and their deputies sometimes become disabled in the line of duty. Some retired employees of the Sheriff's Offices are presently disabled. Some present employees of the Sheriffs' Office, such as clerical employees, are presently disabled. Almost all of the 55 Sheriffs and their current employees will become disabled in the future, for disabilities are common among the elderly. As the Sheriffs and other

plaintiffs will demonstrate at trial, the HB 1224 ban on standard capacity standard magazines is particularly harmful to persons with disabilities. *See* Expert Report of Massad Ayoob, at 2-6 (Aug. 1, 2013) (Exhibit Q).

Third-party standing exists for ADA claims. *See United States v. Chicago of Charlotte*, 904 F. Supp. 482, 486 (W.D.N.C. 1995) (builder of group homes for the disabled had standing assert ADA rights of the persons who would live there).

Regarding the retired or present Office employees who are currently disabled, their hindrance or inability is first of all the complexity of organizing and participating litigation that could have several hundred or more plaintiff, and who have no pre-existing records of each other's name or contract information. For some of the disabled, the disability itself may hinder participation in litigation. A Sheriff in his or her official capacity "has a close relation" with disabled retired and current employees. All the present Sheriffs hope to one day be retired, and Sheriffs have a strong interest in protecting the rights of present and retired employees of the Office. The official capacity of the Sheriff is self-evidently an ideal plaintiff to litigate in support of disabled past and present employees of the Sheriff's Office.

The existence of standing is an issue separate from the final decision on the merits. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). But at the outset, it may be noted that States have no *per se* Eleventh Amendment immunity from suits under Title II of the ADA. *Tennessee v. Lane*, 541 U.S. 509, 517-18 (2004). This is all the more so when the only relief sought is injunctive and declaratory. *See*

*Miller v. King*, 384 F.3d 1248, 1263-64, 1275-76 (11th Cir. 2004), *vacated on other grounds* 449 F.3d 1149 (11th Cir. 2006) (paraplegic inmate in state prison; ADA suit allowed for injunctive relief but not for damages).

State statutes are covered by the ADA. *See TP v. DuBois*, 843 F. Supp. 775 (D. Mass. 1993) (state statute violates ADA Title II); *TEP & KJC v. Leavitt*, 840 F. Supp. 110, 111 (D. Utah 1993) (permanently enjoining state statute which violated Title II); *State ex rel. McCormick v. Burson*, 894 S.W.2d 739 (Tenn. Ct. App. 1994) (finding that on the merits, the particular state statute did not violate Title II).

The legislative record contains an explanation of how HB 1224 harms the disabled. At the Feb. 12, 2013, hearing of the House Judiciary Committee, the following testimony was presented:

> SAM MYRANT: My name is Sammy Myrant, and I represent myself and my family…
>
> My loss goes on every day. The man who committed 16 felony counts of rape, child abuse on this child gets out of prison this year. So there are times when we're going to need a magazine of high capacity.
>
> He's a member of the Aryan Brotherhood, and he gets out of prison this year. And he has sworn to kidnap her and us, rape her again in front of us, then kill us in front of her.
> …
> REPRESENTATIVE SALAZAR: I'm so sorry for your loss, and I'm concerned that the gentleman who committed this crime is coming out this year. Just a question for you. How many -- how many rounds do you think that you would need to be able to protect yourself? . . .
>
> SAM MYRANT: Well, first of all, I am disabled, so I can't put a clip in and out very quickly. I drop them, even when I'm practicing at the range. So I want to have as many in my Glock 17 that I can have. And I carry 17 in there all the time. …

> REPRESENTATIVE SALAZAR: Okay. So then that answers my question that, it's not the 10 that you think -- or that's written in the legislation right now, that you feel that the 17 that you might have might get you there, that you'd feel a little better with that.
>
> SAM MYRANT: That's the capacity -- I'm sorry. That's the capacity. Or if I feel like -- if I saw him out -- I have a 30-round clip that I can put into my Glock. If I felt that that's what I needed to carry, I would.

Hearing on HB 1224, Colorado State House Judiciary Committee, at 124-25 (Feb. 12, 2013) (Exhibit P).

State actions which amplify the risk that disabled persons will be victimized by criminals are within the scope of the ADA. *See Ferguson v. City of Phoenix*, 931 F. Supp. 688 (D. Ariz. 1996) (city violated ADA because its TDD/911 emergency communications services failed to respond properly to reports of crimes in progress,); *cf. Civil Ass'n of Deaf of New York City v. Giuliani*, 915 F. Supp. 622, 625 (S.D.N.Y. 1996) (fire alarm call boxes), 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (granting injunction in part).

A statute can violate 42 U.S.C. § 12132 without being facially discriminatory. For example, a statutory prohibition on the sale, transfer, or possession of wheelchairs would (in a numerical sense) affect far more hospital patients (who are not disabled) than it would affect people with disabilities. Almost everyone has used in a wheelchair in a hospital at some time, but most people are not disabled. Persons with mobility-related disabilities would still have the right to bring an ADA claim against the wheelchair ban. "A plaintiff need not show the defendant's action was based on any discriminatory intent." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).

Defendant may assert that he is entitled to an exemption from the ADA because allowing disabled persons, including Sheriffs' disabled present and retired employees, to possess the standard magazines which are particularly necessary for their self-defense would constitute a "fundamental alteration" of his prohibition statute. *See* 28 C.F.R. § 35.130(b)(7). If this defense is applicable, Defendant bears the burden of demonstration and proof, and it is impossible for him to carry that burden in a motion to dismiss. *See* 28 C.F.R. § 35.150(a)(3) ("a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens.").

The Sheriffs in their official capacities are asserting the ADA right of disabled retired and present employees who have a disability-related need to possess standard capacity magazines, rather than restricted capacity magazines.

## CONCLUSION

For the reasons set forth herein and above, the 55 elected Sheriffs have standing to challenge the constitutionality of HB 1224 and 1229, and to challenge violation of the Americans with Disabilities Act.

Dated this 22d day of August, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR 55 SHERIFFS AND DAVID
STRUMILLO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2013, I uploaded this brief and all exhibits to this Court's ECF system, which will deliver a copy to all counsel of record listed below.

Jonathan M. Anderson        jmanderson@hollandhart.com

Douglas Abbott              dabbott@hollandhart.com

Marc F. Colin              mcolin@bcjlpc.com

Anthony J. Fabian          fabianlaw@qwestoffice.net

Matthew Grove              matt.grove@state.co.us

Kathleen Spalding          kit.spalding@state.co.us

Jonathan Fero              jon.fero@state.co.us

David Blake                david.blake@state.co.us

Daniel D. Domenico         dan.domenico@state.co.us

<div style="margin-left:40%">

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR 55 SHERIFFS AND DAVID STRUMILLO

</div>

834

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

## RESPONSE OF HINSDALE COUNTY SHERIFF RON BRUCE TO DEFENDANT'S INTERROGATORIES

      Sheriff Bruce, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Bruce before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Sheriff Bruce's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Bruce reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Sheriff Bruce makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Bruce makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Bruce uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Bruce in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Bruce gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Bruce does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Bruce objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**  The Hinsdale County Sheriff's Office has not responded to any home invasions or robberies in the home since January 1, 2004.

b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Bruce objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection: Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff Bruce objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection:

Our deputies have no record of any officer involved shootings outside of those that are related to animals. Our deputies have discharged various firearms, while on duty, for the purposes of hazing wildlife, putting down injured wildlife or domestic animals. This has happened countless times each year and no specific documentation has been kept regarding those circumstances.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Bruce objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection: Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:** Since I have taken office, which was in January of 2007, there has been no use of a posse comitatus or able-bodied adults.

However, in November of 1994, the Hinsdale County Sheriff requested the assistance of a non-certified deputy who was a retired Air Force Lieutenant Colonel. During the dangerous traffic stop, the sheriff was shot and killed. The non-certified deputy fired 17 rounds from his Beretta Model 92 9mm pistol at the suspects when they fled. One of the bullets struck the tire of the vehicle forcing the suspects to retreat on foot. The suspects fled into the mountains and were discovered dead around 30 days later. The male had shot the female and himself with the same .44 magnum that was used to kill the sheriff.

During the manhunt for these two suspects, over 100 local citizens were sworn in to assist the approximately 200 law enforcement officers in conducting the search. Several hundred buildings and the surrounding land mass was searched without a single shot being fired. There is no information on the firearms and magazines since they ran the gamut of nearly anything available at the time.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a

magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  An unknown number of bullets were fired at the Sheriff from a .44 magnum. The non-certified deputy that had been assisting the sheriff fired 17 rounds from his Beretta Model 92 9mm handgun. The sheriff was shot at the scene. The suspect driver then shot the female that he was with and shot himself.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  The sheriff was shot and killed by the suspect driver. The female suspect was also shot and killed by the suspect driver. Later, the suspect driver killed himself with a self-inflicted gunshot.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**  I cannot state specific dates or numbers regarding non-certified deputies. However, Hinsdale County Sheriff's Office does utilize a total of eight non-certified deputies. Six of these individuals have been utilized at various times for law enforcement details and were bestowed with temporary powers of arrest have been bestowed. Those activities have included roadblocks, security patrols around hunting season and around private lands, backing up sworn officers, search and rescue operations and back county ranger patrols.

During my tenure as sheriff, none of those parties has had to discharge their authorized firearms in the line of duty. However, they have, at various times, been issued patrol carbines with either a 30 or 60 round magazine. In some cases, they have provided their own carbine with the same capacity magazines.

Hinsdale County is approximately 1,100 square miles of some of the most rugged terrain in the lower 48 states.  The United States Geological Survey declared out county to be the most remote in those 48 states, about eight years ago.  I have four full-time sworn officers including myself, one sworn part-time deputy, one sworn

reserve deputy and eight non-sworn deputies.  The reserve and non-sworn are all volunteers.  As stated before we all train and shoot together.  The volunteers get the same in-house training that my sworn staff get.  Our nearest expected back-up agencies are at least one hour away.  We do not have the luxury of waiting for help; my non-sworn staff go a long way to plug that resource gap.

We issue and train with standard capacity magazines for our carbines and select-fire firearms, up to and including 60 round magazines.  These, on occasion, are issued to my non-sworn staff in times of need.  Most of them also personally own such firearms, including select-fire firearms (BATFE licensed).  96% of our county is public land (USFS – Uncompahgre, Gunnison, Rio Grande and San Juan and BLM) and we receive a very large number of the public coming here to recreate and about 65% of our home owners are 2nd home owners, largely from Texas and Oklahoma.  The demands on our small Sheriff's Office are great and we must be prepared to handle almost anything that lands in our laps.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Bruce objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection:

I am not aware of any personnel, sworn or otherwise, having had to use a firearm in self-defense of home, property or other third party individuals. However, I can state that all of these individuals are encouraged to respond to a knock at their door with a firearm readily available. All these individuals are also strongly encouraged to carry a firearm at all times that they are legally able to do so. All of my non-sworn staff have concealed carry permits. All of the non-sworn deputies also qualify and tactically train with our sworn staff.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:** Please see the response to question three for details to this question.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** Please see the response to question three for details to this question.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Please see the response to question three for the details to this question.

**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Ron Bruce, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 13th day of August, 2013.

_____
s/Sheriff Ron Bruce

842

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

     Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

## RESPONSE OF RIO BLANCO COUNTY SHERIFF SI WOODRUFF TO DEFENDANT'S INTERROGATORIES

     Sheriff Woodruff, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

     Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Woodruff before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

     Sheriff Woodruff's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.   Sheriff Woodruff reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

     Sheriff Woodruff makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and

Definitions" and that are specifically referred to in that particular individual response.

Sheriff Woodruff makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Woodruff uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Woodruff in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Woodruff gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Woodruff does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Woodruff objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

August 8, 2012 - 3 deputies with the Rio Blanco County Sheriff's Office were asked to assist the Rangely Police Department in the arrests of two individuals involved with an armed home invasion and assault.

Earlier that evening two men, Kellen Kuck and Derek Muisner, forcibly entered into an apartment located at 125 Darius Ave. in Rangely. Upon entering the

residence the two males physically assaulted a single male occupant by striking him on the back of the head with a large caliber revolver. Afterwards, the two males forced the barrel of the revolver into the mouth of the victim and threatened his life. They then asked for the whereabouts of two other males that lived in the apartment. After a short time the two males exited the residence and while doing so fired a single round into the floor of the residence.

A sergeant from the Rangely Police Department and a deputy from the Rio Blanco Sheriff's Office assisted in the arrest and search of the suspect's residence. Another deputy assisted with the transport of Kuck. Both subjects were taken out of the residence at gunpoint.

> b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Woodruff objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

The deputy and the officer both displayed their guns while arresting and removing the suspects from the residence. The only shot fired was fired by one of the suspects as indicated above.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable. No one was shot or killed.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Woodruff objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection:

December 10, 2004 -  A woman called to report that Everett Link had "gone ballistic." He had been drinking and had fired two shots at his girlfriend. He had also choked a second person, and threatened to kill her with a gun. Everyone had escaped the residence, leaving Link still there.

The second person reported to the Sheriff's Office that Link possessed four shotguns, one 7mm rifle, two 25-'06 rifles, one .223 rifle, and one 9mm handgun. She also reported that Link had said that all of his weapons were loaded and ready to go.

Nine law enforcement officers went to the house. Details of the incident are in a Dec. 28, 2005, District Attorney report, which is submitted in response to the request for production of documents.

Link attempted to escape in his pickup truck and a police pursuit ensued. The incident took place near the intersection of Colorado Highway 64 and Rio Blanco County Road 5, within the County of Rio Blanco.

Link exited the truck and began bringing his Remington SP-10 magnum shotgun (one shell in the chamber and two in the magazine) towards a patrol car.

The one and only deputy to shoot the Link shot 15 times, emptying his handgun magazine and then reloading, although he did not fire from the second magazine. The deputy shot in self-defense and to protect other deputies and police officers.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Woodruff objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection:

The firearm used by the deputy was a Glock .40 caliber with a magazine that held 15 rounds. In this instance, 15 shots were fired and the magazine was emptied. The officer then loaded another 15 round magazine.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

846

**Response:**  The individual shot was Everett Alan Link and he was killed during the shooting. According to a postmortem examination, 10 rounds hit Link. Several of these rounds had apparently ricocheted off another object, or had struck another object before hitting Link. Of the 10 hits, six were "not immediately fatal or incapacitating"; three were "not immediately fatal"; and one was "rapidly fatal."

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

Two individuals have been deputized to assist us in catching a suspect for running from law enforcement after a traffic stop. Both men were deputized and armed. The date was September 8, 2003. The deputy attempted to stop a car for speeding. The two occupants parked the car and ran away. The car was stolen from a car lot in Grand junction. I deputized them to work with me the same night so the deputies could get some rest. The person with me I believe carried a Glock .40; he has moved from Meeker and I have called his cell phone to attempt to obtain further information. We had hired a plane to search and we were out of personnel. The intent was to start again in the morning.

These men were selected because they were known by me and other staff members as very experienced pistol and rifle shooters.  I believe that the men had Glock .40 calibers, AR-15's, shotguns, and perhaps other arms. They patrolled the highway with us, in the vehicle, and operated the Thermal vision. The second suspect was located the next morning and arrested w/o any problems, tired, cold and hungry. The first subject was found the first day.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a

magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** No shots were fired by these men and no individuals were injured.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

Currently we have 15 P.O.S.T. Certified personnel. We are authorized for 17, we are down a Patrol Sergeant and a Patrol Deputy.

We currently have only one P.O.S.T. Certified person in the jail. We currently have only two people who are authorized to carry weapons on-duty in the jail. At one point we had up to 60% of the jail staff was authorized (Non-Certified) to carry on-duty in the jail. Currently we have nine people in the jail with one open/vacant position. 1 is certified and 1 of the non-certified is authorized to carry on-duty.

All Non-Certified Deputies who want to carry On-Duty are required to go through a training program which is part classroom and part actual time on the range. Then they are required to qualify with the Certified Deputies each range day. Once they get qualified through the training program, they are required to go through the same quarterly training and qualification course that all Certified Deputies are required to go through.

We do not require Deputies (Jail) to go through the program and carry, it is their choice.

848

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**

We have never had any accidental discharges in either the Jail or Patrol and we have never had a Jail deputy discharge a firearm in the course of their duties.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.


5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Sheriff Woodruff objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection: I have no information that any predecessor, sheriff, deputy or family member has fired or displayed a gun in defense of self, home or family in the given time period.


6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were

deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  No armed citizen request has been made during this time period.


b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.



**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Si Woodruff, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.


_____
s/Sheriff Si Woodruff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

## RESPONSE OF MORGAN COUNTY COUNTY SHERIFF JIM CRONE TO DEFENDANT'S INTERROGATORIES

Sheriff Crone, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Crone before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

Sheriff Crone's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Crone reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Sheriff Crone makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

1

Sheriff Crone makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Crone uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Crone in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Crone gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Crone does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Crone objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

March 1, 2009, Hwy 34, Morgan County – Two unknown male suspects forced their way into a private residence and assaulted the victim. It is possible that one of the suspects struck the victim with an unknown make and model handgun. No shots were fired and no other weapons were used or displayed.

March 7, 2009, Rd 23, Morgan County – An ex-husband broke into a home with the intent of killing his ex-wife. After being scared off by the home alarm system, he

2

852

fled, firing two shots from a 9mm handgun with an 8 round magazine. No one was hit. The suspect was seen in his garage at a later time by his neighbor. The suspect then took his girlfriend hostage inside his home. The suspect subsequently surrendered and no shots were fired.

March 10, 2009, Hwy 34, Morgan County – Two unknown male suspects entered the home of the elderly homeowner. Upon entering, the suspects assaulted the victim by punching and kicking him. The suspects then stole the victim's wallet. No firearms were displayed or discharged.

April 28, 2009, Rd 19, Morgan County – Two male suspects broke into a home and assaulted the homeowner. They then ran to another residence, broke in and assaulted the residents. Before fleeing, the suspects stole bottled water and soda. One suspect was armed with a broom handle, but no firearms were displayed or discharged.

November 15, 2009, Rd 17.6, Morgan County – One male and one female suspect knocked on an elderly man's door. When the victim answered, the suspects assaulted him with a handgun and stole his wallet and money. No shots were fired and no other firearms were used or displayed.

June 17, 2011, Hwy34, Morgan County – Two male and one female suspect unlawfully entered a private residence armed with baseball bats. Upon entering, the suspects threatened the residents and stole a number of their belongings. They then fled the scene. No firearms were displayed or discharged.

> b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Crone objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection:

March 1, 2009 – The suspect displayed and potentially struck the victim with an unknown make and model handgun. No shots were fired.

March 7, 2009 – The suspect fired two shots from an unknown make and model 9mm handgun with an 8 round magazine. No one was shot.

November 15, 2009 – The suspects displayed an unknown make and model handgun but no shots were fired.


c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  None.


2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Crone objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection:

July 3, 2005, City of Lochbuie, Weld County – Two deputies and two Wiggins police officers were involved in a high speed chase with two suspects driving the stolen vehicle of a missing elderly woman. Officers believed that the elderly woman had been murdered in Orange County, California. When one of the deputies attempted a PIT maneuver on the suspect's car, the suspect fired at the police. The police were forced to fire back at the suspects and hit both of them.

June 17, 2011, Hwy 34, Morgan County – Two deputies were responding to a domestic violence call when they were approached by the suspect with a knife. After requesting that the suspect put down the knife, the suspect refused and told the deputies to shoot him. The suspect then entered the home when the deputies attempted to deploy a taser twice without success. The suspect proceeded to advance upon the officers with the knife when the officers fired at him and wounded him.


b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Crone objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection:

July 3, 2005 – The suspect fired 7 rounds from a shotgun with an extended magazine. He did not hit anyone. One deputy fired several rounds from an AR-15 in .223 caliber with a 20 round magazine. The other deputy fired 16 rounds from his .40 caliber handgun with a 15 round magazine. One police officer also fired several rounds. The suspect in the passenger seat was believed to have been killed by a bullet from the AR-15. The suspect driver was hit by the Wiggins police officer.

June 17, 2011 – The deputy fired 2 rounds from his .45 caliber handgun with an 8 round magazine. The suspect was hit once in the torso and once in the arm but survived.


c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

July 3, 2005 – One suspect was killed by a deputy and one suspect was wounded by the police officer.

June 17, 2011 – One suspect was wounded by the deputy.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

I have been a member of the Morgan County Sheriff's Office since 1977, with 33 years as a deputy sheriff, investigator or sheriff.  The other years I was a member of the sheriff's office dive team and always maintained close relationships with deputies at the agency.  I was also a cadet for the Morgan County Sheriff's Office for 2 years in high school before being hired.

I was involved in a specific incident in March of 1985 where I was in pursuit of a stolen vehicle from Texas. The vehicle left the roadway and went cross-county into Adams County, and we were unable to pursue due to having no four-wheel drive vehicles. A local rancher offered himself and his pickup so he and I could follow the vehicle's tracks through the snow (in the middle of a blizzard at night). Locating the pickup, the rancher pursued it back into Morgan County.

We went across country for several minutes and went back into Adams County. After the stolen pickup rammed us and I fired a shot into the front of the pickup, it stopped shortly thereafter. I gave the rancher my shotgun and had him cover me while I arrested both occupants of the pickup. The rancher fired no shots but stood armed, in view of the suspects, as my backup. I made the arrests alone in a remote area in which road signs were covered with snow and my radio could not reach out to the other cars looking for us.

Since 1975, I cannot say I know of any other specific incidents where the sheriff or any deputies specifically requested assistance from an "able-bodied adult," either already armed or given a firearm by a deputy, for the specific purpose of enforcing the law, preservation of the peace, or protecting the sheriff or deputy. However, I am sure I am not the only deputy who has had citizens, usually local farmers or ranchers, back us up when involved with a combative suspect, a felony stop or a crime in progress. In these instances, the citizens had told us they had ready access to a firearm (inside the house, vehicle, or on their person), if so needed.

When searching a private residence or a business where a burglar alarm has gone off, I have had instances where an armed home/business/property owner has accompanied me, while armed with a handgun, when I had no backup close at hand.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** None to my knowledge.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** None to my knowledge.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**  The Morgan County Sheriff's Office does not have, nor utilize, any non-POST certified deputy sheriffs except those who are assigned to the Jail Operations Division.

The Morgan County Sheriff's Office has utilized armed non-POST certified deputy sheriffs for many years in our Jail Operations Division. These deputies receive the same training in firearms and use of force as our Field Operations deputies and POST-certified deputy sheriffs in the jail. The Morgan County Sheriff's Office utilizes a six week, in house "Jail Academy" which consists of three weeks in the classroom and three weeks of skills training. The skills training involves firearms, driving and arrest control.

Our non-certified deputies wear the same uniform, carry all the same equipment and perform all the same tasks as the certified deputies in the jail. This includes court security and mental health and prisoner transports. We also utilize one (soon to be two) non-certified jail deputies as patrol support deputies. These deputies drive a marked agency vehicle and their duties include service of certain civil processes, animal calls, VIN inspections and other service type calls.

Our non-certified deputies have the choice of being issued an agency Glock .40 caliber firearm with a 15 round magazine, or a personally owned firearm that is approved by the policy and command staff.

Our non-certified deputies are not allowed to carry concealed while off-duty as a deputy, but they may apply for a concealed carry permit.

The Morgan County Sheriff's Office also has a posse program for civilians who have no POST certification. Currently those posse members do not carry a firearm as part of their uniform but we are in the process of rewriting our policies and procedures to allow the carrying and use of a firearm by posse members. They would be required to complete the same type of training listed above.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:** None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Crone objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection:

I am not aware of any specific instance where a deputy sheriff or member of their family has used, displayed or discharged a firearm in defense of self, home or family. I will tell you that being a law enforcement officer in this county for thirty-plus years, and having lived nearly all of my career in the county, I have had numerous people show up at my house at all hours of the night or day to talk to me about an issue, make a complaint, or report an emergency, knowing that I was a deputy sheriff, or the county sheriff.

I have walked out the door on many occasions to meet people or vehicles in my yard or drive, gun in hand, though many never knew I had it. I am not a paranoid man, but I am prepared, and our aggressive drug and other criminal enforcement have certainly raised the ire of many of our criminal element.

8

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**

Having been County Sheriff since 1999, I have not, nor am I aware of any specific instance where one of our deputy sheriffs, has ever requested armed citizen assistance for any emergency or natural disaster, in the specified time period, except as described above.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

9

**AS TO OBJECTIONS:**

<u>s/David B. Kopel</u>
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Jim Crone, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 14th day of August, 2013.

_____
s/Sheriff Jim Crone

10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

## RESPONSE OF ALAMOSA COUNTY SHERIFF DAVE STONG TO DEFENDANT'S INTERROGATORIES

Sheriff Stong, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Stong before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery. To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

Sheriff Stong's discovery responses are also made subject to the ongoing discovery and trial preparation in this case. These discovery responses are made based on the best information, including facts available as of the date of such responses. Sheriff Stong reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Sheriff Stong makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Stong makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Stong uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Stong in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Stong gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Stong does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Stong objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:** No residential robberies or burglaries have taken place during this time period.

b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Stong objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection: Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff Stong objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection:

Nov. 28, 2010: After a high speed chase on Colorado Highway 160 in Alamosa County, several law enforcement officers, including a deputy from Alamosa County, pinned the suspect's car. Knowing the suspect was intoxicated, possibly mentally ill and carrying two large knives, officers drew their weapons and ordered the suspect to put both of his hands out his window. The suspect refused to obey the orders and began ramming his truck into the law enforcement vehicles. As the suspect did this, he also attempted to hit the Alamosa County deputy, after which the deputy fired his gun in an attempt to stop the suspect.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from

which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Stong objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection: The deputy from Alamosa County and the deputy from Costilla County both fired at the suspect with their duty issued firearms. The deputy from Alamosa County fired approximately 4 rounds from a Glock Model 21 .45 Auto. The deputy from Costilla County fired approximately 5 shots from a Sig Sauer P220 .45. Neither law enforcement nor the suspect were hit, and the suspect did not fire a weapon.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** None.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:** No such request was made during this time period.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**  Non-certified deputies regularly volunteer to be part of the posse and reserve division. Their length of time in these positions is dependent upon their desire to remain a volunteer. Such volunteers are necessary in assisting with the day to day operations of the sheriff's office. Once these non-certified individuals are fully trained and qualified, they are required to carry a firearm of their own. No firearms are provided for any non-certified individual. No non-certified volunteer has discharged their firearm in the line of duty.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the

firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Sheriff Stong objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection: To my knowledge, no such event has occurred.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  No such request was ever made.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR SHERIFFS AND DAVID
STRUMILLO

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Dave Stong, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____

s/Sheriff Dave Stong

867

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

## RESPONSE OF BACA COUNTY SHERIFF DAVE CAMPBELL TO DEFENDANT'S INTERROGATORIES

      Sheriff Campbell, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Campbell before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Sheriff Campbell's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Campbell reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

      Sheriff Campbell makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these

1

responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Campbell makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Campbell uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Campbell in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Campbell gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Campbell does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Campbell objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:** The list below provides the data available at this time:

2

There have been two such incidents.

**CONFIDENTIAL:**

████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████

███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████

      b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Campbell objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

The Baca County Sheriff's Office does not information beyond what is stated above.

      c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

Apparently none.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff Campbell objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection: The Baca County Sheriff's Office has not been involved in an incident that required any deputy to discharge their firearm during this time frame.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Campbell objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection: Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:** The Baca County Sheriff's Office has a posse that is typically made up of 12-20 volunteer members. At the current time, there are 15 active members. The Baca County Sheriff's Posse's primary purpose is to support the Baca County Sheriff's Office during large public events, natural disasters, and incidents where the Baca County Sheriff's Office alone may be unable to provide the level of security

4

or safety the public requires. The Baca County Posse most frequently assists in yearly road closures for winter storms requiring manned road closures and during road closures due to large scale fires. During these events, their goal is to keep the public out of the area and provide scene security. The Baca County Posse operates under the direction of the Baca County Sheriff's Office. Posse members are required to be armed, and they provide their own firearms.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** None.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:** The Baca County Sheriff's Office detention staff consists of two regular full time employees and three part time employees. The detention staff has hands on contact with all our inmates on either an individual basis or in a group setting. The jail staff performs all intakes, inmate transports, medication passes, trustee supervisions, aids with crowd control, and road closures. Those who are qualified to use a firearm and choose to carry a firearm are required to maintain the same training requirements as the Baca County Sheriff's Office deputies.

The Baca County Sheriff's Office also employs one full time and one part time non-certified peace officer for court house security. The court house security staff are

5

qualified to use firearms and must also maintain the same training requirements as the Baca County Sheriff's Office deputies.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**  None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Sheriff Campbell objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection: The Baca County Sheriff's Office does not know of any incident where a sheriff, deputy, or family member used, displayed or discharged a firearm in defense of self, family or home.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and

natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:** During certain emergencies, the Baca County Sheriff's Office may request the assistance of the Sheriff's Posse. During these events, and when the posse is utilized, they are armed while providing the necessary services.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

7

874

**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Dave Campbell, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____

s/Sheriff Dave Campbell

8

875

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## RESPONSE OF CUSTER COUNTY SHERIFF FRED JOBE TO DEFENDANT'S INTERROGATORIES

---

      Sheriff Jobe, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Jobe before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Sheriff Jobe's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.   Sheriff Jobe reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

      Sheriff Jobe makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses

1

entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Jobe makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Jobe uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Jobe in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Jobe gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Jobe does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Jobe objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**  The Custer County Sheriff's Office has no records of home invasions or robberies during this time frame.

2

b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Jobe objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection: Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Jobe objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection:

April 16, 2010 – A Custer County Sheriff's deputy responded to a call from a restaurant about a disturbed individual who refused to leave, Upon arriving, the deputy witnessed the suspect leave in a black SUV with the hatch up thus stopping the officer from noting the license plate number. The deputy turned on his emergency lights and the suspect stopped one block down the road. After the stop was initiated, the suspect and officer both got out of their vehicles. The officer pulled out a baton when the suspect refused to remove his hands from his pockets. The suspect then removed his hands from his pockets and withdrew a knife. At this point the deputy dropped the baton and drew his Glock .40 caliber semi-automatic pistol with a 15 round magazine. As the suspect lunged at the deputy, the deputy fired two shots, hitting the suspect in the torso and killing him.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from

which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Jobe objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection: Two bullets were fired by the deputy from a Glock .40 caliber with a 15 round magazine.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** The suspect died at the scene from being shot twice by the deputy.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

The Custer County Sheriff's Posse was established on April 2, 2003, as a volunteer organization to assist the Custer County Sheriff's Office. The posse assists with parades, traffic control, crowd control, road closures, searches, inmate transfers and detention detail. There is a limit of 40 members, and currently 25 are certified to carry handguns while 16 are certified to carry shotguns.

Posse members receive firearms training from the Custer County Sheriff's Office; they are not required to be POST-certified.

Below is a list of some of the events or incidents where the posse was utilized. For a complete list, please see the Posse Background and Custer County Sheriff's Posse Policies and Procedures handbook, which were included in the production of documents.

July 21-22, 2004 – Six posse members assisted the Custer County Sheriff's Office in locating several inmates who had escaped.

April 30, 2005 – One posse member assisted the Sheriff's Office with the searching of a house.

July 29, 2005 – One posse member assisted with watching inmates.

March 30-31, 2006 – Three posse members assisted with drug surveillance at a local apartment complex.

August 16-17, 2006 – One posse member assisted the deputies in their search for a homicide suspect.

November 27, 2006 – Three posse members assisted deputies with a search warrant regarding a teen suicide.

November 9-11, 2007 – Four posse members assisted deputies who were investigating an animal cruelty case.

July 4, 2008 – One posse member assisted deputies in executing a search warrant and arresting an individual.

September 9, 2008 & September 12, 2008 – Three posse members assisted in the search for a fugitive.

October 13, 2008 – Three posse members assisted with a hostage situation where someone had barricaded themselves in a house.

October 23, 2008 – Four posse members guarded the home of a teacher who had received death threats.

March 3, 2009 – Two posse members assisted in the investigation of a break in that occurred at a local school.

May 10, 2010 – Two posse members assisted a woman who had been locked in a campground.

July 3-4, 2011 – Three posse members provided assistance in watching over the bodies and evidence at a plane crash site.

January 21, 2012 – Two posse members assisted in the search for a missing child.

February 16, 2012 – Two posse members assisted with the search for an 80 year old man who suffered from dementia.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  None.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response: W**e have 5 non-certified jail deputies who also do transports, and they are armed at the times of transporting inmates. They all supply their own weapons. None have had to discharge their weapons.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:** None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

6

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Jobe objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection: To my knowledge, no sheriff, deputy or family member has had to display or discharge a firearm in order to protect themselves, their family or their home.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  No such request has been made, other than as described in question set 3.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

7

882

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Fred Jobe, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 13th day of August, 2013.

_____
s/Sheriff Fred Jobe

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

## RESPONSE OF LINCOLN COUNTY SHERIFF TOM NESTOR TO DEFENDANT'S INTERROGATORIES

Sheriff Nestor, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Nestor before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery. To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

Sheriff Nestor's discovery responses are also made subject to the ongoing discovery and trial preparation in this case. These discovery responses are made based on the best information, including facts available as of the date of such responses. Sheriff Nestor reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Sheriff Nestor makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Nestor makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Nestor uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Nestor in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Nestor gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Nestor does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Nestor objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:** We have had no home invasions reported since 2004. We have covered 102 residential burglaries of which the occupants were not at the residence and 119 commercial burglaries since that date.

b. if a firearm was fired or otherwise used or displayed by any person,
identify who used, displayed, or discharged the firearm, the manner in which
they did so, whether the firearm used a magazine, the capacity of any
magazines from which bullets were fired, the number of rounds fired by each
individual, and whether any person was shot;

**Response:** Sheriff Nestor objects to this interrogatory on the ground that the
phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and
without waiving this objection: In each of these burglaries no firearms were shown
or used

c. if any person was shot, identify the individuals who inflicted and suffered any
gunshot injuries and state whether any individual was killed.

**Response:**  There were no gunshots or injuries related to gunshots reported in that
time frame.

2. With respect to each and every occasion when you, your predecessor(s) in office,
or a sheriff's deputy has discharged a firearm in the course of duty since January 1,
2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the
date, location (by city and county), the reason for the firearm discharge, and
whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Nestor objects to this interrogatory on the ground that it is
overbroad and not reasonably calculated to lead to the discovery of admissible
evidence.  Subject to and without waiving this objection:

In January 2011 I (Sheriff Tom Nestor) pursued a domestic violence suspect from a
neighboring jurisdiction.  At the conclusion of the pursuit the suspect jumped out of
his stolen truck and pointed a snub nose revolver at me and the Undersheriff.  I
shot at the suspect 4 times with my department issued .40 caliber handgun.  The
suspect received minor injuries and was transported to the hospital.  The suspect
did not fire his weapon. He is currently serving 16 years in prison.

On March 9th, 2011, Deputy Josh Morrison and Deputy Albert Leach entered into a
residence with Limon Police Sgt. Russell Lengel and Limon Officer Jay Sheridan.
The officers were looking for a wanted fugitive from the US Marshals service.  The
officers encountered the suspect in a back bedroom and he fired several rounds in
the direction of the officers.  Officer Jay Sheridan was killed at the scene from the

suspect.  Deputy Leach and Sgt. Lengel were pinned down in a bathroom for several hours.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Nestor objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection:

During the January 2011 event I was the only one who fired my department issued Smith and Wesson 4006 with a magazine.

During the March 9, 2001 incident no officers fired their weapons.  The suspect was shooting a .45 caliber pistol with a magazine.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Officer Jay Sheridan died at the scene and had a vest on at the time of his death.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**  My predecessor had never requested an armed response from the citizens.  I too have not requested such a response.  However, it is not uncommon for our citizens in rural areas to watch for vehicles or offenders from an incident.  Many of our citizens are concealed weapons holders.

I started a posse in 2007 for the purposes of events, evidence searches and missing person searches.  Since I started the 20 person posse, they have only been deployed

on three occasions and all deployments were for evidence searches. The posse has also been deployed for gate security at the annual Lincoln County Fair.

I don't require, but I do authorize my posse to carry an approved handgun as long as they have been through concealed carry training.  We also offer them additional training through a simulator.  The posse members are authorized for ride-alongs with certified deputies.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  There have been no shots fired or discharged firearms in relation to the posse.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  There have been no gunshot injuries.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**  In Lincoln County we rely on non-certified personnel to run and operate our jail facility.  With lower pay and advances associated with rural sheriff's offices it is very hard to get enough certified deputies to operate the jail. Non-certified deputies do courtroom security and prisoner transport as well. I currently have 12 deputies assigned to the jail with only 5 being certified.  In the recent past we have had no certified deputies working inside the jail system for Lincoln County. It is virtually impossible to send non-certified deputies to academies to get certified. Non-certified deputies are required to take firearms training with our range instructor.  Non-certified deputies carry guns at times in the courtrooms and on

prisoner transports. Firearms are not provided to any jail deputies, Any firearms they do have must meet the department's policies and be approved by the department range officer.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:** We have had no discharge of firearms by non-certified deputies.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** There have been no individuals injured or killed by gunshots in relation to non-certified deputies.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Nestor objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection, I am not aware of any incidents since 2004 of any of my sheriff's deputies or family members displaying or using a firearm at home.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  Both my predecessor and I have had many natural disasters such as tornadoes. Citizens all come to help in these situations and we rely on them to watch over damaged businesses and homes. I only have 4 patrol deputies and 3 command staff. Without the assistance of citizens I could not possibly watch everything. Earlier this year one of my deputies lost an individual during a pursuit. I searched a house side by side with an armed citizen who I knew had a concealed weapon permit. However, I am not aware of a request specifically that a citizen be armed since 2004.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  There were no shots fired.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  There were no injuries or deaths from gunshots by an armed citizen response.

**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

 Pursuant to 28 U.S.C. § 1746, I, Tom Nestor, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

 Dated this 12th day of August, 2013.

_____
s/Sheriff Tom Nestor

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## RESPONSE OF LOGAN COUNTY SHERIFF BRETT L. POWELL TO DEFENDANT'S INTERROGATORIES

---

      Sheriff Powell, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Powell before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Sheriff Powell's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Powell reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

      Sheriff Powell makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and

Definitions" and that are specifically referred to in that particular individual response.

Sheriff Powell makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Powell uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Powell in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Powell gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Powell does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Powell objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

No home invasions or robberies in the home in which shots were fired since 2004.

   b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which

they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Powell objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection,

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff Powell objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection,

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Powell objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection,

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your

3

predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

The Logan County Sheriff's Office currently has a 15 member Posse. The Logan County Sheriff's Posse has been in existence since approximately 1960. The current Captain is a certified Peace Officer; however, he is not an employee of the county. The posse's duties are to perform security for local sports activities, county fair, occasional medical security on an inmate, or any other duties assigned to them by the Sheriff. They are required to go through firearms training and qualify quarterly.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

There have been no discharges by these members since 2004.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a

firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

I currently have 6 non-certified deputies whose duties are to perform transports and court security. They are put through the same firearms course that certified deputies are put through, and they are required to requalify quarterly.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**

There have been no firearms discharges by these deputies since 2004.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Powell objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection:

I am not aware of any such discharges or displays since 2004.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**


b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**


**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Brett Powell, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____
s/Sheriff Brett Powell

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

        Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

        Defendant.

---

## RESPONSE OF MONTEZUMA COUNTY SHERIFF DENNIS SPRUELL TO DEFENDANT'S INTERROGATORIES

Sheriff Spruell, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Spruell before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

Sheriff Spruell's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.   Sheriff Spruell reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Sheriff Spruell makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and

1

Definitions" and that are specifically referred to in that particular individual response.

Sheriff Spruell makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Spruell uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Spruell in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Spruell gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Spruell does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Spruell objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:** Between January 1, 2004 and July 31, 2013 there were a total of 564 burglaries. During this same time period, there were 30 home invasions, two of which involved guns.

September 29, 2007, Montezuma County – During a home invasion, the suspect used a Marlin .22LR Model 60 rifle to threaten and strike the victim homeowner. The rifle was found later to be empty, and no shots were fired.

November 1, 2009, Montezuma County – A suspect entered into the victim homeowner's residence and pointed a gun at him. The suspect then struck the victim, but the victim could not tell if the strike was done with a fist or the gun. No shots were fired during this incident.

There are no documented instances, in any of the 30 home invasions, of shots being fired by any suspect or victim.

> b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Spruell objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

September 29, 2007 – The suspect displayed a Marlin .22LR Model 60 rifle to the victim and then struck the victim with the gun.

November 1, 2009 – The suspect displayed and possibly struck the victim with an unknown make and model firearm.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  None.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Spruell objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection:

For specific details regarding the following events, please refer to the document production.

August 26, 2007, Montezuma County, City of Cortez – After officers and deputies were attacked by the suspect, 2 deputies fired 1 round each from their duty firearm.

August 24, 2009, Montezuma County, City of Lewis – After the suspect robbed a liquor store at gunpoint, the Montezuma Sheriff's Office obtained search and arrest warrants for the suspect. Having heard that the suspect threatened to kill any police officers who attempted to arrest him, the sheriff called upon the SWAT team to surround the home. The SWAT team is made up of various deputies. The SWAT team launched gas into the suspect's home and attempted to contact him via a PA system and by telephone. The suspect refused to respond or obey orders. After some time, the suspect fired at the officers and struck one deputy. The deputies returned fire. The standoff lasted until the next morning when the suspect died from a self-inflicted gunshot wound.

December 15, 2010, Montezuma County, City of Cortez – Police in Cortez had recently reported a stolen brown F-350 that was seen days later in Montezuma County. After police, deputies and troopers engaged the suspect in what appeared to be the stolen vehicle, the suspect initiated a high speed chase. The suspect reached speeds of up to 115 mph. During this pursuit, the suspect entered a field where a deputy was able to drive alongside him. The deputy drew his .40 caliber Glock duty weapon and fired at the truck's tires.

March 19, 2011, Montezuma County, City of Cortez – A Cortez City police officer and Montezuma County deputy responded to a call regarding an intoxicated male who was stumbling as he walked down the street. Upon confronting the suspect, the officer and deputy were met with some resistance. As the suspect began fumbling through his clothes, the police slowly backed away. The officer and deputy drew their weapons when they saw the suspect produce a weapon. The suspect fired, then his gun jammed. At the same time, the officer and deputy fired at the suspect. The suspect then ran and police fired at him again, taking him down but not killing him.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Spruell objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection

August 26, 2007 – The two deputies fired one shot each from their Glock Model 22, .40 caliber handguns that held 15 round magazines. The officers each had a total of three magazines. No one was shot.

August 24, 2009 – Both the suspect and officers at the scene exchanged fire. The gun recovered from the suspect was a Remington Model 722 in .222 caliber. The officers' guns are not described in the police report. No specific magazines are reported in the police report.

December 15, 2010 – The deputy fired two shots from his .40 caliber Glock duty weapon at the tires of the suspect's vehicle. One bullet struck the dirt and the other hit the wheel well. No one was shot.

March 19, 2011 – The officer and deputy fired their service weapon several times. The deputy fired a Glock Model 22 in .40 caliber. The suspect had a Llama single action 9mm pistol with 1 loaded magazine containing 9 rounds with one jammed. The suspect also had an extra magazine and box of 9mm ammunition. The suspect was able to fire a shot before his gun jammed. The suspect was hit several times but survived.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

August 24, 2009 – The suspect died as a result of a self-inflicted gun shot wound.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:** The Montezuma County Sheriff's Office has had a Sheriff's Posse since 1968. They have assisted the Montezuma County Sheriff's Office with law enforcement and search and rescue missions since their inception. The posse is called out by the Sheriff to do security for community events, guard crime scenes, and have in the past assisted with court security and the transportation of inmates.

They are utilized as auxiliary or supplemental assistance to regular activities of the Montezuma County Sheriff's Office. Such posse members may carry a firearm as permitted or required by the sheriff.

Each posse member is required to complete a mandatory basic firearms training course. Any firearm that is carried, when permitted, must be supplied by the posse member themselves. Below is a list of some of the duties that posse members are responsible for. For an extensive list, please refer to the document production.

2005 – Various posse members provided court security, security for the county fair, and conducted inmate transfers.

2007 – Various posse members provided security at the local dog show and Ag Expo.

2008 – Various posse members provided security for the Home and Garden Show, Fourth of July show, a stock car race, and assisted with a home that had burned.

2009 – Various posse members provided security for the local dog show, a teen maze, and a wrestling event.

2011 – Various posse members provided security for a local dog show, MC Fair Races, the Ag Expo, and the Home and Garden Show.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** None.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified

deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

I have 30 full time Jail Deputies who are not certified.  The Office has 10 .40 caliber Glocks for some of them.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**  There have been no instances where a firearm has been discharged by a non-certified deputy while on duty.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Sheriff Spruell objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

The Montezuma County Sheriff's Office has reached out to all agency employees requesting information regarding instances where they had used a firearm in defense of self, family or home. Thus far, two have come forward stating that they have.

In the first incident, the officer displayed a firearm, but no shots were fired. In the second instance, an officer used a firearm to get a suspect under control and into handcuffs. This officer did not fire his weapon either. Both instances occurred due to attempted break-ins at the homes of the officers.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  I do use the Sheriff's Posse which is a volunteer group.  We have 29 Posse members.  I have attached a  Special Deputy SOP (for armed Sheriff's Posse assignments)  They furnish their own firearms in accordance with Office standards, and they qualify via the Sheriff's Office.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

**AS TO OBJECTIONS:**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Dennis Spruell, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 14th day of August, 2013.

_____

s/Sheriff Dennis Spruell

9

907

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

     Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

## RESPONSE OF PROWERS COUNTY SHERIFF JIM FAULL TO DEFENDANT'S INTERROGATORIES

     Sheriff Faull, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

     Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Faull before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

     Sheriff Faull's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Faull reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

     Sheriff Faull makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses

1

entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Faull makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Faull uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Faull in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Faull gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Faull does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Faull objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**  On June 7, 2007 at 5365 CR HH.7 (approximately one and one half mile northwest of Lamar, Prowers County) three unarmed perpetrators entered the home of an individual uninvited. A confrontation began over money owed to one of the perpetrators.  A fight then took place over a shotgun and the individual shot one of the perpetrators.

b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Faull objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection: The victim perpetrator, Raul Munoz, and the home owner fought over a shotgun owned by the home owner. The home owner was able to pull the shotgun away from Munoz and then shot him twice. Munoz was shot once in the chest and once in the face resulting in his death.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  The home owner fired a shotgun and killed Munoz.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Faull objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection:

None.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Faull objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection:

None.

3

910

c. if any person was shot, identify the individuals who inflicted and suffered any
gunshot injuries and state whether any individual was killed.

**Response:** None.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint
(doc. #22), describe every instance since January 1, 1973 in which you or your
predecessors in office requested the armed assistance of able-bodied adults ("posse
comitatus"). In your response, state in detail the circumstances surrounding each
such request, including:

a. the reason for the request, the number of individuals who responded to the
request, whether such individuals were law enforcement officers or were deputized
for the purposes of participating, and whether these individuals were required by
you or your predecessors to carry firearms in connection with their participation;

**Response:** One of my predecessors on July 1, 1980 called for assistance from the
Lamar Police Department and the Colorado State Patrol to help apprehend a
suspect that had shot at a Colorado State Patrol Trooper and the Baca County
Undersheriff 12.5 miles north of Springfield on Highway 287. From what I can tell
from the report, two police officers, two state troopers and two deputies responded
to the call.  All law enforcement officers were armed at the time.

b. whether any individual who responded to the request to assist law enforcement
or any individual(s) they encountered while assisting law enforcement discharged a
firearm. If shots were fired, state the circumstances surrounding the discharge of
the firearm(s), including: who discharged a firearm, whether the firearm(s) used a
magazine, the capacity of any magazines from which bullets were fired, the number
of rounds fired, and whether any person was shot;

**Response:**  Regarding the 1980 incident: The Prowers County Undersheriff and the
perpetrator both discharged their firearms. Both weapons fired were six shot
revolvers. The perpetrator was being pursued by law enforcement when he started
to fire his weapon. The perpetrator fired his weapon three times and the
Undersheriff fired his weapon five times. The perpetrator was shot twice.

c. if any person was shot, identify the individuals who inflicted and suffered any
gunshot injuries and state whether any individual was killed.

**Response:**  The Undersheriff shot the perpetrator, Earl Armstrong, twice which
resulted in his death.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**  Prowers County currently has 15 non-certified deputies who work at the county jail.  These deputies are expected to carry county provided firearms during transports and court security.

My posse has four certified "reserve" member and eleven non-certified members. All are non paid private citizens who volunteer their time. Posse members may be issued a Glock .40 handgun.

No civilians have been appointed deputies except posse members prior to training.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:** There have been no firearm discharges from non-certified deputies.

No posse member has discharged a firearm.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the

individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Sheriff Faull objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection,

None.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  No request has been made for assistance from armed citizens for emergencies or natural disasters.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.


**AS TO OBJECTIONS:**

913

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Jim Faull, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____
s/Sheriff Jim Faull

7

914

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## RESPONSE OF LARIMER COUNTY SHERIFF JUSTIN SMITH TO DEFENDANT'S INTERROGATORIES

      Sheriff Smith, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Smith before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Sheriff Smith's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Smith reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

      Sheriff Smith makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Smith makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Smith uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Smith in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Smith gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Smith does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Smith objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

    a.  describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

July 25, 2005 – One suspect removed the air conditioner from a residence and entered the home in unincorporated Larimer County. When the suspect was inside, he was confronted by the victim/homeowner. The homeowner displayed a handgun, after which the suspect fled. No shots were fired.

February 18, 2006 – One suspect forced his way into a residence, pointed a handgun at the resident and insisted that another resident owed the suspect money. This took place in Fort Collins, Colorado in Larimer County. No shots were fired.

November 2, 2008 – Two suspects forced a victim back into their home and stole drugs, a generator and other items. One of the suspects displayed a handgun during the theft. This crime took place in Wellington Colorado in Larimer County. No shots were fired.

March 12, 2010 – Four to seven suspects broke into a residence through the front window in unincorporated Larimer County. Once the suspects were inside, they tied up the two victims and stole drugs, guns and a car. One of the suspects hit one of the victims with the butt of a shotgun, but no shots were fired.

March 29, 2010 – Four suspects were invited into a home to conduct a drug deal. While inside, the four suspects stole the drugs and attempted to flee. When the victim attempted to pursue the suspects, one of the suspects fired a single shot from a handgun wounding the suspect. This took place in unincorporated Larimer County.

October 5, 2010 – Six suspects were charged with felony menacing at a trailer in unincorporated Larimer County. Two of the suspects displayed handguns during the incident which included four victims. No shots were fired.

April 4, 2011 – While in Fort Collins in Larimer County, the suspect grandson cut the lock to his grandmother's cabin and entered. Upon getting inside, the grandson fired numerous shots from an AR-15, a .45 caliber semi-automatic handgun, a .308 caliber bolt action rifle and a .38 caliber revolver. No one was shot or injured.

December 24, 2011 – The suspect ex-husband attempted to enter the residence of his wife through a window. This was a violation of the restraining order against him. Upon entering the home, the victim fired two shots at him before her gun jammed. No one was injured. This took place in Loveland within Larimer County.

June 18, 2012 – In Timnath, inside Larimer County, one suspect entered a residence through an unlocked door and then sat in a vehicle after he was told to leave. When the owner confronted the suspect again, the suspect pointed a handgun at him. No shots were fired.

November 29, 2012 – In Wellington, inside Larimer County, two suspects entered a residence through an unlocked door. Once inside, the victim resident fired at the suspects with an AK-47 type rifle with a 30 round magazine. The suspects were able to get the gun from the victim and beat him with it. No one was shot.

March 20, 2013 – In unincorporated Larimer County, an estranged husband entered the home of his ex-wife, pointed a rifle or shotgun at her and stole her necklace. No shots were fired and no one was injured.

May 2, 2013 – In Fort Collins, inside Larimer County, one suspect entered the residence of another and confronted the victim. The suspect displayed a handgun and demanded money. The victim was able to obtain their .357 magnum and fired a single shot. No one was not or injured.

A table provided along with these answers supplements the narrative above, and provides additional information responsive to all the questions in interrogatory 1.

     b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Smith objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

March 29, 2010 – One of the suspects shot at the victim wounding him with his handgun.

December 24, 2011 – The ex-wife/victim fired two shots at her ex-husband but no one was hit.

November 29, 2012 – Resident of a home that had been broken into fired one shot at the two suspects with his AK-47 with a 30 round magazine. No one was hit.

May 2, 2013 – The suspect displayed a handgun upon breaking into the resident's home and the resident then fired a single shot from a .357 magnum.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

March 29, 2010 – One of the suspects shot at the victim wounding him with his handgun.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff Smith objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection:

May 4, 2004 – During a pursuit in Fort Collins, inside Larimer County, the suspect wielded a simulated weapon. The deputy fired a single shot with a Glock Model 22 with a 15 round magazine. No one was injured.

August 25, 2004 – In Loveland, inside Larimer County, a suicidal individual fired a single shot from a .30-30 lever action shotgun. Deputies responded by firing 5 shots from an AR-15 with a 30 round magazine. The suspect was killed but no deputies were harmed.

November 2, 2004 – In Wellington, inside Larimer County, a suspect with an SKS loaded with a 20 round magazine was eluding police. The suspect did not fire, but deputies fired a single round from a Remington 700 bolt action rifle. The suspect was killed but no deputies were harmed.

August 18, 2005 – In Bellvue, inside Larimer County, a single suspect was wanted for menacing. The suspect fired 1 shot from a pump action shotgun. Deputies responded by firing 1 round from an AR-15 with a 20 round magazine and 1 round from a Colt 1911 with an 8 round magazine. The suspect was killed but no deputies were harmed.

January 12, 2005 – In Berthoud, in Larimer County, a suspect was wanted for a bank robbery and eluding. The suspect only had a simulated weapon. Deputies were forced to fire at the suspect with 4 rounds from a Colt 1911 with a 9 round magazine and 7 rounds with a Colt 1911 with an 8 round magazine. The suspect was killed but no deputies were harmed.

November 9, 2010 – There was a domestic violence issue in Berthoud inside Larimer County. The suspect fired 2 rounds from a .30-30 lever action shotgun. Deputies responded by firing 4 rounds from a Colt M4 with a 30 round magazine, 1

919

round from another Colt M4 with a 30 round magazine, and 5 rounds from another Colt M4 with a 30 round magazine. The suspect was killed and no deputies were injured.

October 20, 2012 – In Livermore, inside Larimer County, a suicidal suspect was menacing. He fired 1 round from an unknown pistol. Deputies responded by firing 1 round from an AR-15 with a 20 round magazine. The suspect committed suicide.

June 3, 2013 – Some neighbors had an issue in Livermore inside Larimer County. The suspect involved fired 11 rounds from an SKS with a 30 round magazine. Deputies responded by firing 5 rounds at the suspect from an AR-15 with a 30 round magazine. The suspect was killed and no deputies were injured.

A table provided along with these answers supplements the narrative above, and provides additional information responsive to all the questions in interrogatory 1.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Smith objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection:

May 4, 2004 – The deputy fired a single shot with a Glock Model 22 with a 15 round magazine. No one was shot.

August 25, 2004 – The suspect fired a single shot from a .30-30 lever action shotgun. The deputies fired 5 shots from an AR-15 with a 30 round magazine. The suspect was killed but no deputies were harmed.

November 2, 2004 – The deputies fired a single round from a Remington 700 bolt action rifle. The suspect was killed but no deputies were harmed.

August 18, 2005 – The suspect fired 1 shot from a pump action shotgun. Deputies fired 1 round from an AR-15 with a 20 round magazine and 1 round from a Colt 1911 with an 8 round magazine. The suspect was killed but no deputies were harmed.

January 12, 2005 – Deputies fired at the suspect with 4 rounds from a Colt 1911 with a 9 round magazine and 7 rounds with a Colt 1911 with an 8 round magazine. The suspect was killed but no deputies were harmed.

November 9, 2010 – The suspect fired 2 rounds from a .30-30 lever action shotgun. Deputies fired 4 rounds from a Colt M4 with a 30 round magazine, 1 round from another Colt M4 with a 30 round magazine, and 5 rounds from another Colt M4 with a 30 round magazine. The suspect was killed and no deputies were injured.

October 20, 2012 – The suspect fired 1 round from an unknown pistol. Deputies fired 1 round from an AR-15 with a 20 round magazine. The suspect committed suicide.

June 3, 2013 – The suspect fired 11 rounds from an SKS with a 30 round magazine. Deputies fired 5 rounds from an AR-15 with a 30 round magazine. The suspect was killed and no deputies were injured


c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

May 4, 2004 – Suspect was killed by a deputy.

August 25, 2004 – Suspect was killed by a deputy.

November 2, 2004 – Suspect was killed by a deputy.

August 18, 2005 – Suspect was killed by deputies.

January 12, 2005 – Suspect was killed by deputies.

November 9, 2010 – Suspect was killed by deputies.

October 20, 2012 – Suspect committed suicide.

June 3, 2013 – Suspect was killed by deputy.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

We do not have records available to fully respond to this request. However, it is believed that armed citizens were called to assist in maintaining order and assisting in recovery following the July 31, 1976, Big Thompson River flood. However, the sheriff during that time, Bob Watson, died in office on January 5, 1979. We have no one with the agency who was involved in those decisions to be able to verify this claim.

During last year's High Park Fire, we were able to utilize the assistance of the Colorado National Guard to assist us in providing armed security of evacuated areas. However, their ability to deploy was limited and they had to demobilize before the fire was fully contained. At that time (late June, early July 2012), I was prepared to exercise my powers to call armed citizens to our aid to secure these areas. However, the weather changed quickly and the fire was contained before armed citizens were necessary.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:** Given this information, we have no record of shots being fired by individuals as described.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

The Larimer County Sheriff's Office utilizes the authority to appoint non-certified deputies routinely in the hiring of deputies assigned to the jail division. Many of these deputies undergo firearms training and are authorized to carry a firearm in the performance of their duties. All jail deputies are authorized to make arrests, detain inmates and use force as authorized by law.

We do not have access to the historical records of how many were sworn in such capacity during a given year, but we can report the total number of non-certified deputies we had on our roles on those given years.

| Year | Non-Certified Jail Deputies |
|------|-----------------------------|
| 2004 | 45 |
| 2005 | 56 |
| 2006 | 54 |
| 2007 | 54 |
| 2008 | 67 |
| 2009 | 67 |
| 2010 | 66 |
| 2011 | 63 |
| 2012 | 84 |
| 2013 | 76 |

Our agency requires deputies to purchase their own firearm. They are able to choose between several different handguns with varying standard magazine capacities, so we are not able to report, in a historical manner, what handguns these individuals carried. In some cases we cannot determine who was authorized to carry a firearm in the performance of their duties. We also do not have records of the capacities of the magazine(s) used by those deputies. Additionally, non-certified deputies routinely apply for and receive concealed handgun permits, so that they can continue to carry concealed weapons off-duty for self-defense.  As you are aware, CRS 18-12-206 prohibits sheriffs from releasing the specifics of their concealed handgun permit records, except for specific criminal justice purposes.

Additionally, since I took office in 2011, every employee of the Sheriff's Office has been administered an oath of office and is considered to be a limited deputy for the performance of their duties within the Sheriff's Office. However, these individuals

are not granted arrest authority, nor are they authorized to carry a firearm in any official capacity. Some chose to exercise their right to carry a permitted concealed weapon.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:** I have no record of a non-certified deputy discharging a firearm in the course of their duties since 2004.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Smith objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection:

This information is all but impossible to ascertain. We do not have formal records of these events unless they are duty related and that information has already been supplied in response to item 2.

The majority of our employees do not live within the unincorporated areas of Larimer County, instead choosing to live within towns or cities in our county or surrounding counties. Some also live in unincorporated areas of other counties. In those cases, we are not holders of those records.

For those who live within our primary response area, we have no way to flag them in our records system as being a deputy sheriff or being related to any employee of our office.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**
To the best of our knowledge, since 2004, we have not had an instance when the Sheriff had to deputize a non-law enforcement citizen and request them to arm themselves in our assistance as permitted by CRS 30-10-506 and defined under CRS 16-2.5-103

However, that does not preclude incidents where armed or unarmed citizens have come to the assistance of a deputy in need either because they were commanded by an officer per CRS 16-3-202 or because they were acting under the authority granted all citizens to make a citizen's arrest as authorized under CRS 16-3-201.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

925

**AS TO OBJECTIONS:**

s/David B. Kopel

INDEPENDENCE INSTITUTE

727 E. 16th Avenue

Denver, CO 80203

Phone: (303) 279-6536

Fax: (303) 279-4176

david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Justin Smith, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____

s/Sheriff Justin Smith

926

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

### RESPONSE OF DELTA COUNTY SHERIFF FRED MCKEE TO DEFENDANT'S INTERROGATORIES

---

Sheriff McKee, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff McKee before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery. To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

Sheriff McKee's discovery responses are also made subject to the ongoing discovery and trial preparation in this case. These discovery responses are made based on the best information, including facts available as of the date of such responses. Sheriff McKee reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Sheriff McKee makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and

Definitions" and that are specifically referred to in that particular individual response.

Sheriff McKee makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff McKee uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff McKee in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff McKee gives ordinary words and phrases their ordinary meaning.  By making this written response, Sheriff McKee does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff McKee objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

The following reported incidents occurred from August 2008 when the current records management system was instituted. During this time frame Delta Sheriff's Office has not investigated a home invasion where shots were fired.

On 11-24-08 (SO8-1659) Delta County Sheriff's Office investigated an armed robbery at a residence there were no shots fired and no injuries. (Report included) The Sheriff's Office has investigated 78 other residential burglaries during this time.

> b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff McKee objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection, there were no incidents with shots fired from the period of August 2008 to the present. In the incident described in 1.a. above, the suspect said he possessed a .45 handgun; one unspent round of .45 caliber ammunition was found at the scene. The victims had barricaded themselves in a bathroom, and they had a .45 handgun with spare magazines.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff McKee objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection:

9-24-2006(2006604)/ Deputies contact intoxicated domestic violence suspect who pointed a handgun at them. Deputy fired one round hitting subject in hand causing serious injury. Documents from the incident are produced.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff McKee objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection:

One deputy fired a beanbag round from a shotgun. The shotgun was our standard patrol shotgun, and contains an integral magazine. The magazine is less than 28 inches long, the Remington 870, and so is not affected by HB 1224.

Another deputy fired a slug from a shotgun. The shotgun was our standard patrol shotgun, the Remington 870, and contains an integral magazine. The magazine is less than 28 inches long, and so is not affected by HB 1224.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

The perpetrator's hand was seriously injured by the slug.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

Checking back thirty years no one can recall any instance where armed citizens were sought or appointed.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of

the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

I have been associated with the Delta County Sheriff's Office since 1991 and cannot remember any instance when we appointed non certified personnel as Deputy Sheriffs. I also checked with my predecessor, Bill Blair and a thirty year veteran, Ed Neil with our Reserve Program they could not recall any situation where non certified personnel were appointed.

After the 9-11 terrorist attack we considered deputizing non certified personnel to provide security for infrastructure in our county, mines, railroad, dams etc. Considered but not acted upon.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**

None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff McKee objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection, the Office does not have records of such events.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**

None.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of

the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

**AS TO OBJECTIONS:**

                    s/David B. Kopel
                    INDEPENDENCE INSTITUTE
                    727 E. 16th Avenue
                    Denver, CO 80203
                    Phone: (303) 279-6536
                    Fax: (303) 279-4176
                    david@i2i.org

                    **ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

        Pursuant to 28 U.S.C. § 1746, I, Fred McKee, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

        Dated this 12th day of August, 2013.

                    _____

                    s/Sheriff Fred McKee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## RESPONSE OF DOUGLAS COUNTY SHERIFF DAVID WEAVER TO DEFENDANT'S INTERROGATORIES

---

    Sheriff Weaver, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

    Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Weaver before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

    Sheriff Weaver's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Weaver reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

    Sheriff Weaver makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and

1

934

Definitions" and that are specifically referred to in that particular individual response.

Sheriff Weaver makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Sheriff Weaver uses words or phrases that Defendant has purported to define, those words and pshrases should be given either (a) the meaning set out by Sheriff Weaver in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery.  In his responses, Sheriff Weaver gives ordinary words and phrases their ordinary meaning.  By making this written response, Sheriff Weaver does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs."  Sheriff Weaver objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

    a.  describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

We object to the questions in Interrogatory 1 and to the related request for production of documents. The Douglas County Sheriff's Office has records for 3,419 burglaries during the relevant time period. We have no means of identifying which of those involved firearms use, by suspects or victims, without reading every

incident report page by page. This would be unduly burdensome, and significantly interfere with the Office's law enforcement duties.

Based on discussions with commissioned staff, one incident was recalled:

2013-00073838. August 9, 2013. About 2118 hours, dispatch aired a kidnapping in progress at (Open Investigation). The victim was taken out of his house at gun point and forced to drive to an unknown location off (Open Investigation) Road. The victim was then released and drove back home where he called the Sheriff's Office.

He had been awakened to a loud bang followed by three to four men all dressed in black with black bandanas covering their faces wearing latex gloves standing in his bedroom. Two men had hand guns and one had a rifle. They started yelling at him as they were looking for someone and where was the money? The gun men ordered him to put on his clothes then took him and son to his car parked in the driveway. He was ordered to drive the car as one gunman sat in the front passenger seat and one sat behind him. At one point the two gun men exited his car and got into the SUV and the Mercedes and sped off. He went home and called the Sheriff's office.

> b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Weaver objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection:

As described and answered above.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None known.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Weaver objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection,

CONFIDENTIAL:

| Type of person | Name | Incident date | Gun type | Caliber | Shots fired | Results/notes | Location |
|---|---|---|---|---|---|---|---|
| ██ | ████ | ███ | ███ | ██ | █ | █████ | ████ |
| | ███ | | | | | | |
| | █████ | | | | | | |
| ███ | ███ | | ███ | ██ | ██ | █████ | |
| ███ | ███ | | | | | █████ | |
| | | | | | | █████ | |
| | | | | | | ██████ | |
| ███ | ██ | ██ | ████ | ██ | █ | ██████ | ███ |
| ███ | ██ | | | | | | |
| | ███ | | | | | ██████ | |
| ██ | █ | ███ | | | █ | ███ | █████ |
| | | | | | | ████ | |
| | | | | | | ████ | |
| | ███ | | | | | ████ | |
| | ███ | ██ | | ██ | | ████ | |
| | ████ | | ██ | | | | |
| | ████ | | ██ | ██ | | | |
| | ████ | | | | | | |
| | ████ | | | | | | |
| ███ | ████ | | ████ | ██ | █ | █████ | |
| ███ | ████ | ███ | | ██ | █ | | ████ |
| | ████ | | | | | | █ |
| | ██ | | | | | | |
| ███ | | | | ██ | █ | ████ | |
| | | | | | | ████ | |
| | | | | | | ████ | |
| | | | | | | ████ | |
| ███ | ████ | ███ | ███ | ██ | █ | █████ | █████ |



Explanation of document production:

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Weaver objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection:

The answers are provided in the chart above.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

The answers are provided in the chart above.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

We were not able to gather any specific case reports regarding a posse.

As told to me by Lt. Larry Noble of the Douglas County Sheriff's Office and member since 1975:  In 1975, we had a "reserve organization" and "Special Deputies" which were both reserves but different groups.  The "Special Deputies" would sometimes

5

938

be called out in the middle of the night.  They were used for backup on a call if needed.  At the time we only had 1 deputy working the road (patrol) per shift.  The reserves at the time were ranchers and most of them had horses.  Douglas County Sheriff's Office also had a "posse", which was an organized group mostly used for events.  So at the time there were three groups of reserve type deputies.
One recollection was that the posse was called out once for a search and rescue in the mountains because the posse were also ranchers who had horses and could search by horseback.

During Sheriff McKinster's (1972-1982) third term, Sheriff Miller at Arapahoe Sheriff's Office did away with the reserves.  Sheriff McKinster of Douglas County created another group of reserves who drove four wheel drive vehicles. These were the reserve deputies from Arapahoe County Sheriff's Office that still wanted to serve.  These reserve deputies used their own vehicle and fuel.  They mostly patrolled the river area.

All of these reserve type deputies provided their own vehicle, fuel, firearm, ammunition.  The firearm most used was either a .38 or .357,

When Sheriff Zotos (1983-2002) became Sheriff the posse was dissolved.  The special deputies group and the four wheel drive group all dissolved.  Sheriff Zotos created just one group which was called  "Reserve Deputies" that is still in place today.  The reserve deputies are commissioned.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

We do not have records or knowledge of such incidents.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

We do not have records or knowledge of such incidents.

**Response:**

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

Since 2004 all Douglas County Sheriff's Office Reserve Deputies are required to be Reserve P.O.S.T. Certified or fully P.O.S.T. Certified.

All of our Reserve Deputies are required to carry the same equipment. All Reserve Deputies are required by Colorado State Statute to be certified in firearms proficiency with the same frequency and subject to the same requirements as a full-time deputies in the Sheriff's Office.

We currently have 7 Reserve Deputies. There is no end date to their appointment to be a Reserve with Douglas County.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**

None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has

7

940

discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Sheriff Weaver objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

We have no records or knowledge of any display or use of a firearm by a sheriff, deputy, or family member in defense of self, home, or other family members


6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**

We have not specifically requested armed citizen assistance for emergencies or natural disasters.

The Colorado Mounted Rangers provided road block assistance to the Douglas and Jefferson County Sheriff's Offices on the forest service roads during the Lime Gulch Fire. They are strictly a volunteer organization.  They are not directly under the Douglas County Sheriff's Office.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

**AS TO OBJECTIONS:**

s/David B. Kopel

INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, David Weaver, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 21st day of August, 2013.

_____

s/Sheriff David Weaver

<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

</div>

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## RESPONSE OF LAS ANIMAS COUNTY SHERIFF JAMES CASIAS TO DEFENDANT'S INTERROGATORIES

---

      Sheriff Casias, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

<div align="center">

**GENERAL OBJECTIONS**

</div>

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Casias before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Sheriff Casias's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Casias reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

      Sheriff Casias makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these

responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Sheriff Casias makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Casias uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Casias in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Casias gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Casias does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Casias objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

    a.  describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:** We have never had a call for a home invasion. The following is a breakdown of the burglaries this county has had since 2004:

2004:

Cold Reports: 41
In Progress: 4 (suspects were gone upon arrival)

2005:
Cold Reports: 41
In Progress: 1 (suspect gone upon arrival)

2006:
Cold Reports: 146
In Progress: 12 (suspects gone upon arrival)

2007:
Cold Reports: 23
In progress: 4 (suspect gone upon arrival)

2008:
Cold Reports: 40
In Progress 5 (suspects gone upon arrival)

2009:
Cold Reports: 29
In Progress: 4 (suspects gone upon arrival)

2010:
Cold Reports: 32
In Progress: 3 (suspects gone upon arrival)

2011:
Cold Reports: 30
In Progress: 6 (suspects gone upon arrival)

2012:
Cold Reports: 11
In Progress: 5 (suspects gone upon arrival)

2013:
Unavailable


      b. if a firearm was fired or otherwise used or displayed by any person,
identify who used, displayed, or discharged the firearm, the manner in which
they did so, whether the firearm used a magazine, the capacity of any

945

magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Casias objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection: Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Not applicable.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:** Sheriff Casias objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection:

2005 – Two deputies were responding to a call regarding a fire when they were approached by an armed rancher. One deputy was carrying a Glock pistol and the other deputy was carrying a Ruger pistol. The rancher had drawn a loaded revolver and had a rifle in his truck. The deputies were forced to shoot and kill the rancher.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:** Sheriff Casias objects to this interrogatory on the ground that the word "event" is vague. Subject to and without waiving this objection:

2005 – During the altercation with the rancher, one deputy fired 5 rounds and the other deputy fired 1. The rancher was shot.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  In the 2005 altercation the rancher was shot and killed.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**  We had a Sheriff's Posse program until 2007 but there was never any incident in which a firearm was used. There is currently a Reserve Officers program in place but it has never been involved in an incident where firearms were displayed or discharged.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**  We have two detention officers and two court house security guards. All of these individuals are required to follow agency policy and procedures. This includes following a shooting lesson plan. Each deputy is required to provide his own weapon and Las Animas County provides ammunition. If any non-certified deputy wishes to carry a firearm while on duty, they must qualify under our policies and procedures.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

948

**Response:**  Sheriff Casias objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection:

There are a number of threats made against the Sheriff and his deputies and thus extra patrols are requested and everyone is told to be aware of their surroundings. There have been no firearms displayed or discharged in response to these threats.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**  None.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**  Not applicable.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**  Not applicable.

**AS TO OBJECTIONS:**

949

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, James Casias, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____

/s/ Sheriff James Casias

950