ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

Colorado Outfitters Association et al v. Hickenlooper

Assigned to: Chief Judge Marcia S. Krieger

Referred to: Magistrate Judge Michael J. Watanabe

Case in other court:  USCA, 14–01290

USCA, 14–01292

Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/17/2013

Date Terminated: 06/26/2014

Jury Demand: None

Nature of Suit: 950 Constitutional – State Statute

Jurisdiction: Federal Question

**Defendant**

| | | |
|---|---|---|
| **Mesa County, Board of County Commissioners** | represented by | **David Robert Frankel** |

Mesa County Attorney's Office
P.O. Box 20000
544 Rood Avenue
2nd Floor Annex
Grand Junction, CO 81502–5004
970–244–1612
Fax: 970–255–7196
Email: david.frankel@mesacounty.us
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Outfitters Association** | represented by | **Peter J. Krumholz** |

Hale Westfall, LLP
1600 Stout Street
Suite 500
Denver, CO 80202
720–904–6007
Fax: 720–904–6006
Email: pkrumholz@halewestfall.com
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
Hale Westfall, LLP
1600 Stout Street
Suite 500
Denver, CO 80202
720–904–6010
Fax: 720–904–6020
Email: rwestfall@halewestfall.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Farm Bureau** | represented by | **Peter J. Krumholz** |

(See above for address)
*ATTORNEY TO BE NOTICED*

951

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**National Shooting Sports Foundation**    represented by    **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Magpul Industries**    represented by    **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Colorado Youth Outdoors**    represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**USA Liberty Arms**    represented by    **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Outdoor Buddies, Inc.**                represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Women for Concealed Carry**            represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado State Shooting Association**  represented by    **Anthony John Fabian**
Anthony J. Fabian, P.C.
510 Wilcox Street
# C
Castle Rock, CO 80104
303–663–9339
Email: fabianlaw@qwestoffice.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hamilton Family Enterprises, Inc.**    represented by    **Anthony John Fabian**
*doing business as*                                        (See above for address)
Family Shooting Center at Cherry Creek                     *ATTORNEY TO BE NOTICED*
State Park

**Plaintiff**

953

| | | |
|---|---|---|
| **David Strumillo** | represented by | **David Benjamin Kopel**<br>Independence Institute<br>727 East 16th Avenue<br>Denver, CO 80203<br>303–279–6536<br>Fax: 303–279–4176<br>Email: david@i2i.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **David Bayne** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Dylan Harrell** | represented by | **Peter J. Krumholz**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard A. Westfall**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Rocky Mountain Shooters Supply** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014* |
| | | **Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **2nd Amendment Gunsmith &Shooter Supply, LLC** | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014* |
| | | **Marc F. Colin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Burrud Arms Inc.**<br>*doing business as*<br>Jensen Arms | represented by | **Jonathon Michael Watson**<br>(See above for address)<br>*TERMINATED: 02/12/2014* |

                                                       **Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Green Mountain Guns            represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

                                                       **Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Jerry's Outdoor Sports        represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

                                                       **Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Specialty Sports &Supply      represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

                                                       **Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Goods for the Woods          represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

                                                         **Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

John B. Cooke                  represented by    **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ken Putnam                    represented by    **David Benjamin Kopel**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                                      represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                                      represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                                        represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                                   represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                                      represented by   **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                                              (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                                       represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                                   represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                                        represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                                  represented by   **David Benjamin Kopel**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **John W. Hickenlooper**<br>*Govenor of the State of Colorado* | represented by | **Daniel D. Domenico**<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway<br>Denver, CO 80203<br>720–508–6000<br>Fax: 720–508–6032<br>Email: dan.domenico@state.co.us<br>*ATTORNEY TO BE NOTICED* |

**David Christopher Blake**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: david.blake@state.co.us
*ATTORNEY TO BE NOTICED*

**John Tien Yau Lee**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jtlee@state.co.us
*ATTORNEY TO BE NOTICED*

**Jonathan Patrick Fero**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jon.fero@state.co.us
*ATTORNEY TO BE NOTICED*

**Kathleen L. Spalding**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: kit.spalding@state.co.us

957

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for
Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**                                    represented by   **David Benjamin Kopel**
*Sheriff of Weld County, Colordo*                                     (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**                                     represented by   **David Benjamin Kopel**
*Sheriff of El Paso County, Colorado*                                 (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**                                     represented by   **David Benjamin Kopel**
*Sheriff of Larimer County, Colorado*                                 (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**                                  represented by   **David Benjamin Kopel**
*Sheriff of Douglas County, Colorado*                                 (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**                                 represented by   **David Benjamin Kopel**
*Sheriff of Gilpin County, Colorado*                                  (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**                                   represented by   **David Benjamin Kopel**
*Sheriff of Montezuma County, Colorado*                               (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**                                        represented by   **David Benjamin Kopel**
*Sheriff of Moffat County, Colorado*                                  (See above for address)
*TERMINATED: 11/27/2013*                                             *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**                                     represented by   **David Benjamin Kopel**
*Sheriff of Dolores County, Colorado*                                 (See above for address)

*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Ensminger**                          represented by    **David Benjamin Kopel**
*Sheriff of Teller County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shayne Heap**                             represented by    **David Benjamin Kopel**
*Sheriff of Elbert County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Day**                                represented by    **David Benjamin Kopel**
*Sheriff of Yuma County, Colorado*                            (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred D. McKee**                           represented by    **David Benjamin Kopel**
*Sheriff of Delta County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lou Vallario**                            represented by    **David Benjamin Kopel**
*Sheriff of Garfield County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Hosselkus**                          represented by    **David Benjamin Kopel**
*Sheriff of Mineral County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett L. Powell**                         represented by    **David Benjamin Kopel**
*Sheriff of Logan County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian E. Norton**                         represented by    **David Benjamin Kopel**
*Sheriff of Rio Grande County, Colorado*                      (See above for address)

960

*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirard**                                   represented by   **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*                               (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                                     represented by   **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*                                (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                                    represented by   **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*                               (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                                represented by   **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                                  (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                                     represented by   **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                                 (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                                     represented by   **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                                     represented by   **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*                             (See above for address)
*TERMINATED: 11/27/2013*                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                                      represented by   **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*                                (See above for address)

961

*TERMINATED: 11/27/2013*                          *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Forrest Frazee**                  represented by   **David Benjamin Kopel**
*Sheriff of Kiowa County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Dunlap**                     represented by   **David Benjamin Kopel**
*Sheriff of Montrose County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ted B. Mink**                     represented by   **David Benjamin Kopel**
*Sheriff of Jefferson County, Colorado*              (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Wegener**                    represented by   **David Benjamin Kopel**
*Sheriff of Park County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Newman**                    represented by   **David Benjamin Kopel**
*Sheriff of Huerfano County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Peck**                      represented by   **David Benjamin Kopel**
*Sheriff of Sedgwick County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dominic Mattivi, Jr.**            represented by   **David Benjamin Kopel**
*Sheriff of Ouray County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                             *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Minor**                      represented by   **David Benjamin Kopel**
*Sheriff of Summit County, Colorado*                 (See above for address)

*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**                         represented by    **David Benjamin Kopel**
*Sheriff of Jackson County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**                         represented by    **David Benjamin Kopel**
*Sheriff of Gunnison County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**                  represented by    **David Benjamin Kopel**
*Sheriff of Phillips County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**                            represented by    **David Benjamin Kopel**
*Sheriff of Lake County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**                      represented by    **David Benjamin Kopel**
*Sheriff of Arapahoe County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**                        represented by    **David Benjamin Kopel**
*Sheriff of Baca County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**                           represented by    **David Benjamin Kopel**
*Sheriff of Saguache County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                   *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**                           represented by    **David Benjamin Kopel**
*Sheriff of Costilla County, Colorado*                     (See above for address)

*TERMINATED: 11/27/2013*                                              *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**                          represented by   **David Benjamin Kopel**
*Sheriff of Crowley County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**                       represented by   **David Benjamin Kopel**
*Sheriff of Bent County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**                   represented by   **David Benjamin Kopel**
*Sheriff of Las Animas County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**                      represented by   **David Benjamin Kopel**
*Sheriff of Routt County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**                      represented by   **Jonathon Michael Watson**
*TERMINATED: 12/23/2013*                                  (See above for address)
                                                          *TERMINATED: 02/12/2014*

                                                          **Marc F. Colin**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**                       represented by   **David Benjamin Kopel**
*Sheriff of Grand County, Colorado*                       (See above for address)
*TERMINATED: 12/12/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/22/2013 | 70 | | BRIEF in Opposition to 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, |

| | | | |
|---|---|---|---|
| | | | James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: #_1 Exhibit Sheriff Bruce interrogatory, #_2 Exhibit Sheriff Woodruff interrogatory, #_3 Exhibit Sheriff Crone interrogatory, #_4 Exhibit Sheriff Stong interrogatory, #_5 Exhibit Sheriff Campbell interrogatory, #_6 Exhibit Sheriff Jobe interrogatory, #_7 Exhibit Sheriff Nestor interrogatory, #_8 Exhibit Sheriff Logan interrogatory, #_9 Exhibit Sheriff Spruell interrogatory, #_10 Exhibit Sheriff Faull interrogatory, #_11 Exhibit Sheriff Smith interrogatory, #_12 Exhibit Sheriff McKee interrogatory, #_13 Exhibit Sheriff Weaver interrogatory, #_14 Exhibit Sheriff Casias interrogatory, #_15 Exhibit Sheriff Beicker interrogatory, #_16 Exhibit Legislative testimony, #_17 Exhibit Ayoob expert report)(Kopel, David) (Entered: 08/22/2013) |
| | | | *Main Document (Not Attached)* |
| | | | Attachment # 1 *Exhibit Sheriff Bruce interrogatory (Not Attached)* |
| | | | Attachment # 2 *Exhibit Sheriff Woodruff interrogatory (Not Attached)* |
| | | | Attachment # 3 *Exhibit Sheriff Crone interrogatory (Not Attached)* |
| | | | Attachment # 4 *Exhibit Sheriff Stong interrogatory (Not Attached)* |
| | | | Attachment # 5 *Exhibit Sheriff Campbell interrogatory (Not Attached)* |
| | | | Attachment # 6 *Exhibit Sheriff Jobe interrogatory (Not Attached)* |
| | | | Attachment # 7 *Exhibit Sheriff Nestor interrogatory (Not Attached)* |
| | | | Attachment # 8 *Exhibit Sheriff Logan interrogatory (Not Attached)* |
| | | | Attachment # 9 *Exhibit Sheriff Spruell interrogatory (Not Attached)* |
| | | | Attachment # 10 *Exhibit Sheriff Faull interrogatory (Not Attached)* |
| | | | Attachment # 11 *Exhibit Sheriff Smith interrogatory (Not Attached)* |
| | | | Attachment # 12 *Exhibit Sheriff McKee interrogatory (Not Attached)* |
| | | | Attachment # 13 *Exhibit Sheriff Weaver interrogatory (Not Attached)* |
| | | | Attachment # 14 *Exhibit Sheriff Casias interrogatory (Not Attached)* |
| | | 18 | Attachment # 15 *Exhibit Sheriff Beicker interrogatory* |
| | | 26 | Attachment # 16 *Exhibit Legislative testimony* |
| | | 34 | Attachment # 17 *Exhibit Ayoob expert report* |
| 09/05/2013 | 75 | 51 | REPLY to Response to_64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* |

| | | | |
|---|---|---|---|
| | | | filed by Defendant John W. Hickenlooper. (Lee, John) (Entered: 09/05/2013) |
| 11/01/2013 | 92 | 73 | SURREPLY re 64 MOTION to Dismiss *Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in their Official Capacities* filed by Defendant John W. Hickenlooper. (Lee, John) (Entered: 11/01/2013) |
| 11/27/2013 | 96 | 82 | Opinon and ORDER granting in part and denying in part Defendant's 64 Motion to Dismiss. The Defendant's Motion to Dismiss is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to all claims asserted by the Sheriffs. The claims are DISMISSED without prejudice. Any Sheriff shall have 14 days from the date of this Order in which to seek to join the action in an individual capacity. The motion is GRANTED with respect to the Plaintiffs' claim that the phrase "designed to be readily converted," found in § 18–12–301(2)(a)(I), is unconstitutionally vague, and the claim is DISMISSED. The claims proceeding in this case are (1) Second Amendment challenges to §§ 18–12–301 et seq. and § 18–12–112; (2) a claim for unconstitutional vagueness as to the phrase "continuous possession," § 18–12–302(2)(a)(II); and (3) the ADA claims. By Chief Judge Marcia S. Krieger on 11/27/2013.(klyon, ) (Entered: 11/27/2013) |
| 12/09/2013 | 102 | 107 | Unopposed MOTION to Amend/Correct/Modify 96 Order on Motion to Dismiss,,, by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Jim Beicker, Rick Besecker, Ronald Bruce, Burrud Arms Inc., David Campbell, James (Jim) Casias, Miles Clark, Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Jerry's Outdoor Sports, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, National Shooting Sports Foundation, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Outdoor Buddies, Inc., Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Rocky Mountain Shooters Supply, Duke Schirard, Justin Smith, Specialty Sports &Supply, Dennis Spruell, Dave Stong, David Strumillo, USA Liberty Arms, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Women for Concealed Carry, Si Woodruff. (Krumholz, Peter) (Entered: 12/09/2013) |
| 12/11/2013 | 104 | 115 | MOTION for Joinder , MOTION for Leave to *File 3d Amended Complaint* by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, |

| | | | |
|---|---|---|---|
| | | | Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: #_1 Exhibit 3d Am. Complaint, with strikethroughs, #_2 Deposition Excerpts Exhibit C. Wagner deposition, #_3 Exhibit Exhibit D. AG response to FFL discovery, #_4 Exhibit Exhibit E. AG response to Sheriffs discovery, #_5 Exhibit Exhibit F. CBI documents, #_6 Deposition Excerpts Exhibit G. Sloan deposition, #_7 Exhibit Exhibit H. AG response to 2d non−profit discovery, #_8 Exhibit Exhibit I. AG response to 1st non−profit discovery)(Kopel, David) (Entered: 12/11/2013) |
| 12/11/2013 | 109 | 299 | Exhibits in Support of_62 Amended Complaint, by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Jerry's Outdoor Sports, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Rocky Mountain Shooters Supply, Specialty Sports &Supply, David Strumillo, USA Liberty Arms, Women for Concealed Carry. (Public Entry for_106 Restricted Document – Level 1) (Text only entry) (klyon, ) (Entered: 12/12/2013) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

  Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

  Defendant.

---

## RESPONSE OF FREMONT COUNTY SHERIFF JAMES L. BEICKER TO DEFENDANT'S INTERROGATORIES

---

  Sheriff Beicker, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

  Where no objection is interposed, the responses below reflect all responsive information and documents identified by Sheriff Beicker before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Sheriff objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

  Sheriff Beicker's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Sheriff Beicker reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

  Sheriff Beicker makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and

968

Definitions" and that are specifically referred to in that particular individual response.

Sheriff Beicker makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery. When Sheriff Beicker uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Sheriff Beicker in his responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in his discovery. In his responses, Sheriff Beicker gives ordinary words and phrases their ordinary meaning. By making this written response, Sheriff Beicker does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses. Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified in the request.

Defendant purported to define "you" and "your" to include "counsel for Plaintiffs." Sheriff Beicker objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product immunity, or any other privilege or immunity.

**RESPONSES**

1. With respect to each and every home invasion or "robbery in the home" to which your department has responded since January 1, 2004, please:

   a. describe the circumstances surrounding the home invasion/robbery in the home, including: the date and location (by city and county), the number of perpetrators involved, whether or not the perpetrator(s) carried firearms, and whether or not the perpetrator(s), victim(s), or others fired any shots;

**Response:**

We have only one case of home invasion or robbery/ burglary since January 1, 2004. It is a current and ongoing investigation. Because this information involves an open case with an ongoing prosecution, it is privileged from discovery. The incident did not involve more than 16 shots fired.

b. if a firearm was fired or otherwise used or displayed by any person, identify who used, displayed, or discharged the firearm, the manner in which they did so, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Beicker objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous.  Subject to and without waiving this objection, the only incident is the one described in 1.a. above.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

2. With respect to each and every occasion when you, your predecessor(s) in office, or a sheriff's deputy has discharged a firearm in the course of duty since January 1, 2004 (not including firearm practice or training), please:

a. describe the circumstances surrounding the firearm discharge, including the date, location (by city and county), the reason for the firearm discharge, and whether you, your predecessor(s), or deputy were fired upon;

**Response:**  Sheriff Beicker objects to this interrogatory on the ground that it is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving this objection: With the research I conducted and to my knowledge, there have been no occasion in which myself or past or current officers have discharged their firearms in the line of duty since January 1, 2004.

b. if a firearm was fired by any person involved in the event, identify who fired the firearm, whether the firearm used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired by each individual, and whether any person was shot;

**Response:**  Sheriff Beicker objects to this interrogatory on the ground that the word "event" is vague.  Subject to and without waiving this objection: With the research I conducted and to my knowledge, there have been no occasion in which

myself or past or current officers have discharged their firearms in the line of duty since January 1, 2004.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

3. With respect to the allegations of paragraph 102 of the First Amended Complaint (doc. #22), describe every instance since January 1, 1973 in which you or your predecessors in office requested the armed assistance of able-bodied adults ("posse comitatus"). In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms in connection with their participation;

**Response:**

I was unable to make contact with any of the previous Sheriffs of Fremont County, to my knowledge and with research I was unable to find any evidence that past Sheriffs have requested the help of civilians for any emergency or law enforcement related matter. I myself have not requested the help of civilians to date and have been Sheriff of Fremont County since January 2003.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

I was unable to make contact with any of the previous Sheriffs of Fremont County, to my knowledge and with research I was unable to find any evidence that past Sheriffs have requested the help of civilians for any emergency or law enforcement related matter. I myself have not requested the help of civilians to date and have been Sheriff of Fremont County since January 2003.

971

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

I was unable to make contact with any of the previous Sheriffs of Fremont County, to my knowledge and with research I was unable to find any evidence that past Sheriffs have requested the help of civilians for any emergency or law enforcement related matter. I myself have not requested the help of civilians to date and have been Sheriff of Fremont County since January 2003.

4. With respect to the allegations of paragraph 103 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 when you or your predecessors appointed deputies who were not certified peace officers. In your response, state in detail:

a. the date and duration of each individual's appointment, the circumstances surrounding the need for the "non-certified" deputy, whether the non-certified deputy was required to carry a firearm, whether the "non-certified" deputy carried a firearm he/she supplied or a firearm supplied by the sheriff's office, and whether any non-certified deputy ever discharged a firearm;

**Response:**

Since being elected in January of 2003 I have never appointed any deputy that was not a certified peace officer in Colorado, other than Detention deputies.

b. the circumstances surrounding the discharge of the non-certified deputy's firearm, including: the date and location of the event, whether the non-certified deputy was fired upon, the number of rounds fired by the non-certified deputy, the number of rounds fired by others involved in the event, the capacities of magazines from which bullets were fired, and whether any individual was shot;

**Response:**

None.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

5. Describe every occasion since January 1, 2004 when you, your predecessor sheriff(s), a sheriff's deputy, or a family member living with these individuals has discharged or otherwise used or displayed a firearm in defense of self, home, or other family members. In your response, describe the circumstances surrounding each event, including: the events leading to the use, display, or discharge of the firearm, the number of rounds fired by you or others, and the capacity of magazines used by firearms that were discharged. If any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:** Sheriff Beicker objects to this interrogatory on the ground that the phrase "otherwise used or displayed" is vague and ambiguous. Subject to and without waiving this objection: In my research I can find no incidents where deputies or family members that discharged or displayed or used a firearm of any kind in defense of home or self since January 1, 2004.

6. With respect to the allegations of paragraph 105 of the First Amended Complaint (doc. #22), describe every instance since January 1, 2004 in which you or your predecessors in office requested armed citizen assistance for emergencies and natural disasters. In your response, state in detail the circumstances surrounding each such request, including:

a. the reason for the request, the number of individuals who responded to the request, and whether such individuals were law enforcement officers or were deputized for the purposes of participating, and whether these individuals were required by you or your predecessors to carry firearms;

**Response:**

Since January 1, 2004 I have requested the assistance of the Colorado Mounted Rangers" J Troop." The majority of these individuals are not POST certified peace officers, but my understanding is that a few members of their organization are.

I have used their assistance on four wildfires in my county: Duckett Fire/ Park Fire/ Wetmore Fire/ Royal Gorge Fire. On these incidents they were assigned to road closures, manning road blocks for evacuated areas.

They were allowed, but not required to carry firearms for this duty. I have no documented evidence of who did carry or did not carry during these events.

The Fremont County Sheriff's Office has also utilized the J Troop Rangers for some annual community events: Canon City Music and Blossom Festival/ Penrose Apple Days. Once again they were authorized to carry weapons for these events, but I have no documentation or records of how many Rangers were assigned or who they were individually.

I have also used the Colorado Department of Corrections personnel to assist in locating wanted persons in my County. The personnel assigned to these situations have been the search and tracking teams and the SORT team personnel. These staff are considered level II peace officers in Colorado and are acting under the color of duty for the Director of the Colorado Department of Corrections. They are authorized to carry firearms, and there have been no reports of the use of firearms during any of these events.

b. whether any individual who responded to the request to assist law enforcement or any individual(s) they encountered while assisting law enforcement discharged a firearm. If shots were fired, state the circumstances surrounding the discharge of the firearm(s), including: who discharged a firearm, whether the firearm(s) used a magazine, the capacity of any magazines from which bullets were fired, the number of rounds fired, and whether any person was shot;

**Response:**

There are no known incidents of the use of firearms during any of these events.

c. if any person was shot, identify the individuals who inflicted and suffered any gunshot injuries and state whether any individual was killed.

**Response:**

None.

**AS TO OBJECTIONS:**

974

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, James Beicker, do hereby verify under penalty of perjury that the foregoing responses to Defendant's Interrogatories are true and correct to the best of my information and belief.

Dated this 12th day of August, 2013.

_____
s/Sheriff James Beicker

975

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado; et al.

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**LEGISLATIVE TESTMIONY OF LEE REEDY AND SAM MYRANT.
EXHIBIT P OF SHERIFFS' RESPONSE TO MOTION TO DISMISS**

---

**Exhibit P**

      1

1  CITY AND COUNTY OF DENVER

2  STATE OF COLORADO

3  JUDICIAL COMMITTEE MEETING

4  HELD ON FEBRUARY 12, 2013

5  HOUSE BILL 13-1224

6  ------------------------------------------------------

7        REPORTER'S TRANSCRIPT

976

8  ------------------------------------------------------

9

10          This transcript was taken from an audio

11  recording by Angela Smith, Professional Reporter and

12  Notary Public.

…..

**Testimony of Lee Reedy**

             155

24    Sir, state your name for the record,

25   please.  Tell us who you represent.

             156

1          LEE REEDY:  My name is Lee Reedy.  I

2  represent my wife and myself.

3          THE CHAIRMAN:  Fantastic.  Welcome,

4  sir.  Thank you for waiting so long.  Please proceed

5  with your testimony.

6          LEE REEDY:  To much of America, a

7  firearm is a symbol that you are a citizen, a

8  responsible person who can be trusted with an

9  instrument of considerable power that enables you to

10  protect yourself, your family, and your property.

11          To the elite, a firearm is a symbol of

12  barbarism and a lack of trust in their fellow

13   citizens and reliance on government.

14          I would agree that violence is rarely

15   the answer, as we've heard before in this testimony,

16   but when it is, it becomes only the answer.  That is

17   to say, at that point, the number one priority is to

18   survive, and the focus has got to be on taking away

19   the attacker's ability to continue and resume -- or

20   continue or resume the attack.

21          I's oppose HB13-1224 for a number of

22   reasons, but I'd like to bring up a couple of things

23   that I haven't heard yet.

24          There's no exemption that I can tell

25   for entities like security companies, who rely on

                     157

1   having duty weapons like the Glock 22, Glock 23.

2   They typically have 13 or 15 rounds.

3          There's no exemption for statutorily

4   authorized agencies that are not actually employees.

5   And to this, I refer to the Colorado Mounted

6   Rangers.  They are an all-volunteer organization and

7   yet they are not covered in the exemptions of this

8   bill.

9          There are no exemptions for school

10   resource officers who would be in the most and best

11   place to make the changes or to effect a defense of

978

12  children.

13       And I don't think the committee really

14  realized it or not, but when you entertained an

15  amendment to okay Magpul as a manufacturer of

16  products, it kind of sounded like what you said was,

17  oh, it's okay to manufacture them here, you just

18  can't have them here.  And that really sounded

19  hypocritical.

20       And, you know, I don't mean it to

21  sound accusatory, but it really kind of sounded like

22  the focus was, oh, we want the taxes and we want the

23  manufacturing and the jobs, but we don't want the

24  magazines, God forbid.

**Testimony of Sam Myrant**


                123

10       THE CHAIRMAN:  And we'll proceed

11  through our witnesses, if we can.  Let's see.  We

12  have Sam Myrant.  Sam Myrant.

13       Mr. Myrant, welcome.  Please tell us

14  your name, who you represent and proceed with your

15  testimony, sir.

16       SAM MYRANT:  My name is Sammy Myrant,

17  and I represent myself and my family.  And first of

18  all, I'd like to -- I earlier expressed my

19   condolences to Representative Fields on her loss.

20        My loss goes on every day.  The man

21   who committed 16 felony counts of rape, child abuse

22   on this child gets out of prison this year.  So

23   there are times when we're going to need a magazine

24   of high capacity.

25        He's a member of the Aryan

                    124

1   Brotherhood, and he gets out of prison this year.

2   And he has sworn to kidnap her and us, rape her

3   again in front of us, then kill us in front of her.

4        And is he going to obey your new law

5   of 10-round capacity.  Because when he gets out, the

6   law is going to be passed.  So is he going to obey

7   the law?  Being a member of the Aryan Brotherhood,

8   do you think he's going to be able to find some sort

9   of weapons illegally?  Yes, he is.

10        So my point is, the only person that

11   can protect my family and myself is myself.  My

12   wife, who had never shot a gun in her life, went out

13   and got a concealed weapons permit and learned how

14   to shoot.  Because how would she feel -- how would

15   any of you feel if your daughters or granddaughters

16   were attacked and you said, oh, it's illegal for me

17   to carry this high-capacity gun, so go ahead, kill

18  my granddaughter, kill my daughter.

19           Is that the object for this committee

20  of this law?  Who's going to protect us?  The police

21  can't protect us.  It's a personal responsibility.

22  We are responsible for our own protection.

23           I have many police officer friends.

24  Bruce Vanderjack was a friend of mine.  We worked

25  together as security officers.  There is no one who

                    125

1  is responsible for your protection but yourself.

2           So what's going to happen when it

3  comes down to when these animals are going to come

4  get us?  Who's going to protect us?  Are you all

5  going to be there to protect me?

6           Police officers will tell you -- every

7  one of these sheriffs will tell you they cannot be

8  there.  And so if I'm not allowed to protect myself

9  with this high-capacity ammo, what do you guys say,

10  oops?

11           THE CHAIRMAN:  Representative Salazar.

12           REPRESENTATIVE SALAZAR:  I'm so sorry

13  for your loss, and I'm concerned that the gentleman

14  who committed this crime is coming out this year.

15           Just a question for you.  How many --

16  how many rounds do you think that you would need to

17  be able to protect yourself?

18          And I sincerely -- this isn't a

19  sarcastic question.  I really am asking that

20  question.  How many rounds do you think that you

21  need, to be able to protect yourself, in a magazine?

22          THE CHAIRMAN:  Mr. Myrant.

23          SAM MYRANT:  Well, first of all, I am

24  disabled, so I can't put a clip in and out very

25  quickly.  I drop them, even when I'm practicing at

                        126

1  the range.  So I want to have as many in my Glock 17

2  that I can have.  And I carry 17 in there all the

3  time.  My wife carries 15 in hers.

4          And I don't want to kill anybody, but

5  I have to be responsible.  I have to be able to

6  protect my family, and so I need that many.

7          THE CHAIRMAN:  Representative Salazar.

8          REPRESENTATIVE SALAZAR:  Okay.  So

9  then that answers my question that, it's not the 10

10  that you think -- or that's written in the

11  legislation right now, that you feel that the 17

12  that you might have might get you there, that you'd

13  feel a little better with that.

14          SAM MYRANT:  That's the capacity --

15  I'm sorry.  That's the capacity.  Or if I feel

16   like -- if I saw him out -- I have a 30-round clip

17   that I can put into my Glock.  If I felt that that's

18   what I needed to carry, I would.

19          REPRESENTATIVE SALAZAR:  Thank you.

# Expert Report of Massad Ayoob

PO Box 1477
Live Oak, FL 32064
(386) 688-1932
*massadayoob@aol.com*

Massad Ayoob
August 1, 2013

### I.      Background and Qualifications

My name is Massad Ayoob. My CV is attached, but briefly, I have been a firearms instructor since 1972, author in the firearms press since 1971, and competitive shooter since the late 1960s. I have served as Handgun Editor of *Guns* magazine for more than 30 years, as Law Enforcement Editor for *American Handgunner* magazine for a like period, and am the author of some fourteen books on firearms and self-defense.

I served for nineteen years as chair of the firearms committee for the American Society of Law Enforcement Trainers, and the last ten years on the advisory board of the International Law Enforcement Educators and Trainers Association. I have served as an expert witness for the courts since 1979 in areas related to weapons, weapons training, use of force training standards, and dynamics of violent encounters.

I have been asked by Plaintiffs' counsel to explain some of the impacts that a magazine capacity limitation law has on law-abiding firearms owners who are afflicted by various disabilities.

I am providing this expert report pro bono.

### II.      Impact on Persons with Disabilities

Over the years, I have trained thousands of police and citizen shooters, of all levels of ability. I have had occasion to train many physically challenged shooters. These include paraplegic and partially quadriplegic firearms users, a broad range of amputees, many people suffering from birth defects, as well as persons who have limited physical abilities due to the effects of aging.

I can say to a definite degree of scientific certainty that there are a great many people in this situation whose ability to defend themselves and other innocent persons will be severely and negatively impacted by a magazine capacity limitation.

### A. Missing or shortened fingers

Handguns are designed for normal hands, and historically, for average or larger-than-average male hands.  People with shorter-than-average fingers (or fewer than five fingers) suffer particularly in this respect.

Dwarves, "Thalidomide babies" in adulthood, and those who have suffered traumatic amputation of thumbs or fingers are particularly affected by reduced cartridge capacity.  The thumb of the firing hand normally presses the magazine release button to eject the spent magazine from an empty semiautomatic pistol to begin the loading process, and the index finger of the right-handed shooter does the same on the popular AR15 rifle.  When these digits are shorter than average, or indeed are not present, it becomes extremely slow, awkward, and sometimes even impossible for such a legitimate user to perform this operation.

With the full capacity magazines which are legal in all but a few states, the shooter would not run out of ammunition so quickly, and would not have to reload at all.

### B. Missing hand or arm

The situation becomes even more difficult for the user who has only one hand or arm. I have worked with a number of students who were in this situation due to birth defect, traumatic amputation, post-polio syndrome, etc.  For them to reload one-handed, they have to eject the magazine one-handed and then secure the pistol in a holster, waistband, between the knees, etc. These manipulations are awkward, time consuming, and potentially dangerous even in training, let alone in conditions of life-threatening stress.  Moreover, a homeowner awakened from sleep by a home invasion in the night is unlikely to have time to put on pants, let alone a holster, prior to grabbing the defensive firearm. Nor are they likely to have time to grab spare magazines, even if they had a place to carry such on their person.

### C. Disabilities associated with aging

Other physical limitations can prejudice the lawfully armed citizen in this regard.  It is common for senior citizens to suffer from arthritis and related ailments.

986

These weaken the hands, making a reload even more difficult. Range of movement of hands, wrists, and fingers are deleteriously affected. Another age-related issue can be hand tremors. These make it extremely difficult for the user to press the small magazine release button, to grasp the fresh magazine, and insert that next magazine into the small receptacle within the firearm. The shooter then has to activate a small slide release or bolt release lever to bring the first cartridge from the fresh magazine into the firing chamber and resume shooting.

This past winter, I had occasion to do refresher training with a student from decades before, now in his mid-eighties. While mentally as sharp as ever, this student was affected by weakened and palsied hands. He was no longer able to qualify on a police-type course with his preferred semiautomatic pistol because, while he was able to hit the target, he was unable to perform the required reloads within the standard time constraints. By simply replacing the lower capacity magazines with higher capacity ones, he was able to get his shots on target within the required time limit. Such a man would be profoundly harmed by a magazine capacity limit.

Therefore, we see that the magazine capacity limit also has a particularly harmful impact on the elderly.

### D. Lower body disabilities

Legitimate firearms users with lower body movement limitations are also impacted in this regard. As recently as this year, I have trained Wounded Warriors who returned from the current conflict unable to walk. One had lost both legs above the knee and part of one hand in an IED explosion; the other had lost one leg and lost the use of the other. Both were able to shoot and even reload effectively, and the latter was actually top shot in his class competing from the wheelchair against able-bodied classmates. However, in a real world situation neither would have been able to maneuver his wheelchair to a position of cover safely, the way an able-bodied shooter could, firing while moving.

The wheelchair-bound defender is trapped in place. Such a citizen has all the more need for a higher capacity firearm, because trapped in the open against opposing fire or direct assault, they would have no practical way to move to cover

during the critical, vulnerable seconds it would take them to reload a lower-capacity firearm that had run empty.

## III. Perspective on shootouts

While high volume shootouts are the exception rather than the norm in legitimate armed self-defense cases, they do occur.  Capt. Richard Wemmer (ret.), the famed officer survival expert from LAPD, documented multiple gunfights in which police officers emptied their service pistols and both of the spare magazines customarily worn on police uniform duty belts, and had not yet won the gunfights. A similar incident was documented not long ago in Illinois, involving a lone officer with three 15-shot pistol magazines against a single well-ensconced and heavily armed offender.  The officer was out of ammunition and still in deadly danger when additional responding officers arrived and neutralized the would-be cop-killer who was shooting at him.  While these were law enforcement incidents, it must always be remembered that many private citizens own their guns to protect themselves from the very same criminals that society arms our police to deal with.

Over the years, high-volume gunfights have indeed been known to occur in which it was imperative for armed citizens to sustain fire to contain or neutralize the threat. For example, Lance Thomas, a watch repairman in Los Angeles, was over the course of years forced to shoot it out multiple times with multiple armed robbers.  Thomas won the gunfights only because he kept several loaded guns in his work area and was able to transition to another gun when the first ran dry. Had he not been able on one occasion to transition between more than two guns, he almost certainly would have been murdered. (The Thomas incidents are described in my article, "An urban gunfighter: The lessons of Lance Thomas," American Handgunner, Mar. 1, 2002, available at 2002 WLNR 14052078.)

In another well-known case, the Beverly Hills Jewelry Store robbery in Richmond, VA, store owners shot it out with multiple armed members of the Dixie Mafia. They prevailed only because over a dozen loaded guns had been staged every three feet behind the counters, and one owner was able to move between guns, transitioning to a fresh weapon when the last went dry. (Reports of the robbery can be found at Associated Press, Owner Offers No Regrets Over Killing Robbers Inside Store," Virginia Pilot and Ledger-Star (Norfolk, VA), Dec. 6, 1994,  1994

WLNR 1880234; Mark Bowes, "A 'Dixie Mafia' Man's Life, Death Robber's Record Stretches To '42,"  Richmond Times Dispatch, Dec. 28, 1994,  1994 WLNR 989704; Associated Press, "2 Masked Men Shot To Death In Gunfight With Store Clerks The Shots Were Fired At A Jewelry Store In A Richmond Suburb," Virginian-Pilot & Ledger Star (Norfolk Va.), Dec. 3, 1994, 1994 WLNR 1893020.)

This strategy is not practical in the American home, or in public with a citizen licensed to carry a concealed handgun.  However, a higher capacity firearm – a Springfield XDM 9mm with 19 rounds in the magazine and a 20th in the firing chamber, or some of the 30-shot rifles available today – would give such a citizen (especially one with a disability) more of a fighting chance to survive such violent, armed criminal assaults.

## IV. Conclusion

It is clear to a strong degree of scientific certainty that the magazine capacity limitation in Colorado will have a harmful impact on the disabled/physically challenged individual, and on the elderly as well.

# *Curriculum Vitae,* **Massad F. Ayoob**

**Areas of Expertise**

Dynamics of violent encounters, training standards for safe weapons handling (law enforcement/civilian), training standards of firearms and use of force (police/civilian), homicide/use of force investigation, personal and professional security, weapon retention/disarming, law enforcement internal investigation/discipline.

**Teaching Experience**

Director, Massad Ayoob Group, 2009-present.

Director, Lethal Force Institute, 1981-2009.

Chair of firearms committee, American Society of Law Enforcement Trainers (ASLET), 1987-2007.  Also served on Ethics Committee.  Led annual Panel of Experts on firearms/deadly force issues at ASLET's international seminars.

Special Instructor, Chapman Academy of Practical Shooting, 1981-88. Defensive Combat Shooting; Judicious Use of Deadly Force; Advanced Officer Survival Tactics.

International Instructor, PR-24 baton; has lectured several times at annual international seminar. Trains other instructors and trainers of instructors.

Advisory Board member, International Law Enforcement Educators' and Trainers' Association. Have lectured there on investigation and management of police use of force cases at all Annual Meetings since the organization's inception in 2003.

National Instructor, Weapon Retention & Disarming, National Law Enforcement Training Center. Trains other instructors and trainers of instructors. 1990-2009.
Assistant professor teaching weapons and chemical agents, Advanced Police Training Program of New Hampshire, 1974-77.

Co-instructor (w/former world pistol champion Ray Chapman) of Advanced Officer Survival Seminars for the Police Marksman Association.

International Instructor, Persuader Mini-Baton, certified by Joe Truncale.

Instructor, Kubotan self-defense, certified by Soke Takayuki Kubota.

National Instructor, Telescoping baton, certified by CASCO (baton manufacturer).

990

Instructor, straight baton, certified by COPSTK (baton manufacturer).
Has taught for national, international, and regional seminars of

> FBI. Albuquerque Office. Use of force/Survival. 2012.

> International Association of Law Enforcement Firearms Instructors. Numerous annual meetings.

> Regional seminars for CLE credit on defending deadly force cases (NACDL; Mass. CDL Assn.).

> International Homicide Investigators' Seminar. Investigation of officer-involved shootings and characteristics of self-defense shootings.

> McGill University School of Medicine. Visiting lecturer on medico-legal aspects of gunshot and knife wounds.

> Officer survival tactics taught at:  DEA National Academy; Ordnance Expo, Los Angeles; National Tactical Invitational; New England SWAT Seminar; Metro-Dade Police Academy; DEA/Miami.

**Personal Training**

Smith & Wesson Academy:  Advanced Combat Shooting (1st in class), Instructor course; Instructor Update (twice); Officer Survival Course (1st in class); Weapon Retention instructor course; advanced revolver shooting course.

Glock:  Glock Instructor Course; Glock Armorer Course.

Firearms Instructor Courses: National Rifle Association.

Ordnance Expo: Firearms and Ballistic Evidence; Officer Involved Shooting Investigation; Advanced Officer Involved Shooting Investigation; Officer Survival; Management of Barricaded Suspects.

International Police Academy: Defensive Tactics (Unarmed Combat and Restraint) Instructor Course, rated Master Instructor by sensei James Morell.

NYPD: "Hostage Negotiation for Supervisors", "Post Shooting Tactics", "House Clearing Techniques", "Off Duty Confrontation Tactics", "Summary of Violent Encounter Patterns", "Police Shotgun Program."

Advanced Homicide Investigation. By Vern Geberth, NYPD Ret., author of "Practical Homicide Investigation."

International Homicide Investigators' Seminar (2 occasions).

Medical/Legal Death Investigation (Dade County Medical Examiner's Office).

Americans for Effective Law Enforcement : "Police Civil Liability Seminar."

American Society of Law Enforcement Trainers. "PPCT: Pressure Point Control Tactics  ," taught by Bruce Siddle.

Federal Law Enforcement Training Center: BOSS program including officer survival, intelligence briefings on outlaw bike gangs, booby traps, counter-ambush tactics, arrest techniques.

Escrima (stick- and knife-fighting), Grandmaster Remy Presas.

Knife/Counter-Knife courses: Master Paul Vunak, Hank Renhardt, Sensei Jim Maloney, Michael de Bethencourt.

Has studied personally with world handgun champions Ray Chapman, Rob Leatham, Jerry Miculek, and Frank Garcia in advanced shooting programs.

**Has studied special units and their training on-site, including:**

NYPD Firearms & Tactics Unit, Emergency Services Unit, Armed Robbery Stakeout Unit.

LAPD SWAT, Firearms Training Unit.

FBI Firearms Training Unit.

Metro-Dade Police Firearms/SWAT Training Unit

Illinois State Police Ordnance Section.

NH State Police SWAT, EVOC, Firearms Training.

Kentucky State Police, Firearms Training and SRT Training.

Arizona Highway Patrol Firearms Training.

London, England Metropolitan Police firearms training and special services unit (D.11, PT-17, SO-19).

Has reviewed or audited numerous other law enforcement firearms training programs.

**Publication Credits**

***Books:***

"Fundamentals of Modern Police Impact Weapons," Charles C. Thomas, Publishers, 1978.

"In the Gravest Extreme: the Role of the Firearm in Personal Protection," Police Bookshelf, 1979.

"Hit the White Part," Police Bookshelf, 1982.

"The Truth About Self Protection," Bantam, 1983.

"StressFire," Police Bookshelf, 1984.

"StressFire II," Advanced Combat Shotgun," Police Bookshelf, 1992.

"The Semiautomatic Pistol in Police Service and Self Defense," Police Bookshelf, 1988.

"Ayoob Files: the Book," Police Bookshelf, 1995.

"Complete Book of Handguns," Volume 10 (1993) with completely new volume produced annually through 2009, Harris Publications.

"Gun Digest Book of Combat Handgunnery, Fifth Edition," Krause Publications, 2002.

"Gun Digest Book of SIG-Sauer Pistols," Krause Publications, 2004.

"Gun Digest Book of Beretta Pistols," Krause Publications, 2005.

"Gun Digest Book of Combat Handgunnery, Sixth Edition," Krause Publications, 2007.

"Gun Digest Book of Concealed Carry," Krause Publications, 2008.

"Massad Ayoob's Greatest Handguns of the World," Krause Publications, 2010.

"Gun Digest Book of Concealed Carry," Second Edition, Krause,  2012

"Combat Shooting With Massad Ayoob," Krause, 2011

"Complete Book of Handguns," annual editions now through 2013

**Monographs:**

"Gunproof Your Children," Police Bookshelf/Potshot Press

"Handgun Primer," Police Bookshelf/Potshot Press.

"The Police View of Gun Control," Second Amendment Foundation.

"Armed and Alive," Second Amendment Foundation.

**Forewords for Authoritative Texts:**

"The Newhall Incident," by Mike Wood

"Armed: The Essential Guide to Concealed Carry," by Dr. Bruce Eimer

"The Gun Digest Book of the Revolver," by Grant Cunningham

"Mu Tau: The Modern Greek Karate" by James Arvanitis

"Realistic Defensive Tactics" by John Peters

"Modern Centerfire Handguns" by Stanley Trzoniec

"You Can't Miss" by John Shaw

"MasterTips" by Jon Winokur

"Effective Defense" by Gila May-Hayes

"In Self Defense" by Michael Izumi

"The Tactical Pistol" by David Lauck

"The Tactical Rifle" by David Lauck

"Personal Defense for Women" by Gila Hayes

"Lessons From Armed America" by Mark Walters and Kathy Jackson

"Armed Response" by Dave Kenik

"Rule the Night/Win the Fight" by Ed Santos

994

***Periodicals:***

Handgun Editor, *Guns* magazine

Law Enforcement Editor, *American Handgunner* magazine

Contributing Editor, *Shooting Industry* magazine

Contributing Editor, *On Target* magazine

Firearms Editor, *Backwoods Home* magazine

Associate Editor, *Combat Handguns* magazine

Associate Editor, *Guns & Weapons for Law Enforcement* magazine

Associate Editor, *Gun Week*

Have published thousands of articles in various professional journals and newsstand periodicals, the overwhelming majority related to law enforcement, weaponry, martial arts and personal defense.  Firearms articles have appeared in *Guns, American Handgunner, Handguns, GUNsport, Handgunner, Home Defense, Glock Annual, Colt Annual, Magnum, Gun World, Combat Handguns,* and others.  Martial arts/unarmed combat articles have appeared in *Black Belt, Official Karate, Inside Kung-fu, Inside Karate, Warriors, Fighting Stars,* and other such publications. Law enforcement articles have been published in *American Police Beat, Law & Order, Police, Police Product News, Sentinel, Trooper, Patrolman, Police Marksman, Guardian, Guns & Weapons for Law Enforcement, Guns & Ammo Law Enforcement Annual,* and other police professional journals and law enforcement related periodicals.  Has also been published in *Car & Driver, Gentlemen's Quarterly, Man's Magazine, Modern Jeweler, New Hampshire Outdoorsman, New Hampshire Times, Prism, Sexology, Sports Afield,* and assorted other general interest publications.

***Training Films***

"Massad Ayoob on Concealed Carry," Panteao Productions, 2013

"Massad Ayoob on Home Defense," Panteao Productions, 2011

"StressFire Handgun," 2002

"StressFire Shotgun," 2002

"StressFire Rifle," 2002

"Deadly Force Cases," ALI-ABA, 2001

"Judicious Use of Deadly Force," 1990

"Post Violent Event Trauma," 1990

"LFI Handgun Safety," 1990

"Off Duty Survival," 1993

"Shoot to Live," 1986

"How Close is Too Close," 1986

"Cute Lawyer Tricks," 1986

"Physio-Psychological Aspects of Violent Encounters," 1981

Has appeared in various other training films.

***Quoted as authoritative reference in:***

FBI Journal

"Law Enforcement Handgun Digest" (Grennell)

"Gun Digest Book of Combat Handgunnery, 1st edition (Lewis & Mitchell), 2nd and 3rd editions (Karwan)

"Shooting Schools: An Analysis" (Winter)

"Street Survival: Tactics for Armed Encounters," (Adams, McTernan, Remsberg)

"Tactical Edge: Tactics for High Risk Patrol" (Remsberg)

"Handgun Retention System" (Lindell)

"The Street Smart Gun Book" (Farnam)

"Police Handgun Manual" (Clede)

"Police Shotgun Manual" (Clede)

996

"High Tech SWAT Weapons" (Bane)

"PR-24 Baton Manual" (Starrett)

"Police Officers Guide" (Clede)

Cited as authoritative reference in numerous other publications.

**Career Accomplishments**

Voted Outstanding American Handgunner of the Year, 1998.

Winner of first annual National Tactical Advocate Award, 1995, awarded by American Tactical Shooting Association.

Winner of the Roy Rogers Award for promotion of firearms safety.

Winner of first George C. Nonte Award for excellence in firearms journalism, 1978.

**Firearms Qualifications and Awards**

Combat Master, NRA Police Revolver

First 5-gun Master, International Defensive Pistol Association

Master, Revolver, National Marksman Sports Society

Master, Automatic, National Marksman Sports Society

Class A, International Practical Shooting Confederation

Grand Mastershot, UK Practical Shooting Association

Master Blaster, Second Chance

Expert, NRA Action Shooting

Honorary Distinguished Expert, Federal Law Enforcement Training Center

Several times top shooter in statewide NH police combat matches, 1973-2003

Five times New England Regional champion in various handgun disciplines

997

Co-winner with daughter Justine, National Champion Parent/Child Team, National Junior Handgun Championships, 1998

Has won numerous individual/local combat shooting tournaments, has competed successfully in five countries.

**Law Enforcement Experience**

Hooksett (NH) Police Dept.: 1972-73, auxiliary policeman. 1973-1980, fully sworn Police Officer. Duties under four chiefs included patrol, firearms training, community relations and crime prevention assignments, dept. firearms instructor for most of this period. Served in part time capacity with full police authority.

Deerfield (NH) Police Dept.: 1982-1990.  Fully sworn officer, rank of Sergeant ('82-'84) in charge of all police training, and Lieutenant ('84-'90), in charge of police training and crime prevention activities. Served in part time capacity with full police authority.

Grantham (NH) Police Dept.: 1990-present.  Fully sworn Captain and Police Prosecutor. Training, research, and other administrative functions.  Served in part time capacity with full police authority.

998

**Massad Ayoob case list**

| CASE | LOCALE | ALLEGATION | RETAINED BY |
|---|---|---|---|
| Littleton v. Belmont County | OH | Wrongful Death | Defendant |
| Florida v. Hecksel | FL | Manslaughter | Defendant |
| Favor v. Walgreen | TX | Wrongful Death | Defendant |
| Texas v. Hubbard | TX | Murder | Defendant |
| Wemouth v. Brunswick | ME | Wrongful Death | Defendant |
| Allen v. Leal | TX | Wrongful Death | Plaintiff |
| California v. Karlson | CA | Murder | Defendant |
| Minick v. County of Sacramento | CA | Wrongful Death | Defendant |
| Jones v. Norwalk | CT | Wrongful Death | Defendant |
| CA v. Matthews | CA | Assault | Defendant |
| Maxim v. Livingstone | FL | Wrongful Shooting Injury | Plaintiff |
| Florida v. Bonenfant | FL | Aggravated Assault | Defendant |
| Cangealose v. Janet Reno & FBI | Wash DC | Wrongful Termination | Plaintiff |
| Null v. Murfreesboro | TN | Wrongful Termination | Plaintiff |
| Missouri v. Beeler | MO | Murder | Defendant |
| Nordlund v. American Armor | NE | Product Liability | Defendant |
| House v. Lawco | UT | Product Liability | Defendant |
| Saldana v. Weitzel | WI | Wrongful Death | Defendant |
| Messing v. Oak Creek | WI | Wrongful Death | Defendant |
| Palmquist v. Selvik | IL | Wrongful Death | Defendant |
| NY v. Gill | NY | Gun Permit Hearing | Defendant |
| Michigan v. Budzyn | MI | Murder | Defendant |
| Wallen v. County of El Dorado | CA | Wrongful Death | Defendant |
| FL v. Jimmy Hecksel | FL | Manslaughter | Defendant |
| Paderez v. Blocker | CA | Product liability | Defendant |
| Blanford v. County of Sacramento | CA | Wrongful Death | Defendant |
| MA v. Robert Tessitore | MA | Manslaughter | Defendant |
| Kulesza v. Marina Bay | MA | Failure to protect | Plaintiff |
| MS v. Patrick Champagne | MS | Manslaughter | Defendant |
| Gorey v. Foley | MI | Wrongful Death | Defendant |
| Tim Alessi v. State of FL | FL | PCR | Appellant |
| TN v. Robert Barnes | TN | Murder | Defendant |
| FL v. Plana | FL | Murder | Defendant |
| Webster & Castle v. Orange County | FL | Wrongful Shooting | Defendant |
| Oxendine v. SRMC | NC | Wrongful Death | Defendant |
| FL v. Ed Michael | FL | Aggravated Assault | Defendant |
| TX v. Terry Graham | TX | Homicide | State |

| NM v. Billy Anders | NM | Manslaughter | Defendant |
|---|---|---|---|
| MD v. Der and Kifer | MD | Manslaughter | Defendants |
| CO v. Larry Lindsey | CO | Aggravated Assault | Defendant |
| WA v. Jay Olsen | WA | Aggravated Assault | Defendant |
| Chambers v. Graham | TX | Wrongful Death | Defendant |
| FL v. Tim Alessi | FL | Murder (appeal) | Defendant |
| CA v. Thomas Mun & Chad Marshall | CA | Homicide (grand jury level) | State |
| FL v. William Wilkerson | FL | Murder | Defendant |
| FL. V. Ronald Robbins | FL | Manslaughter | Defendant |
| WA v. Jay Olsen | WA | Aggravated Assault | Defendant |
| Chambers v. Graham | TX | Wrongful Death | Defendant |
| Arizona v. Larry Hickey | AZ | Aggravated Assault | Defendant |
| Olevarria v. Couture | VA | Wrongful Death | Defendant |
| Aguilar v. ICE | NY | Excessive Force | Defendant |
| Atkinson v. Tulare County | CA | Wrongful Death | Defendant |
| Gutierrez v. Yolo County | CA | Wrongful Death | Defendant |
| WV v. Jonathan Ferrell | WV | Murder | Defendant |

1000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

John B. Cooke, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CLAIMS
TWO, THREE, AND FOUR, AND TO DISMISS SHERIFFS AS PLAINTIFFS
ACTING IN THEIR OFFICIAL CAPACITIES.**

---

      **COMES NOW** Defendant, Governor John Hickenlooper, by and through

undersigned counsel, states as follows in support of his Motion to Dismiss Plaintiffs'

Claims Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in Their

Official Capacities [Doc. 69] (filed on 8/22/13):

## INTRODUCTION

      This is not a Court of general jurisdiction. In order to invoke federal

jurisdiction, Plaintiffs must establish standing under the Article III, section II

prerequisite of case or controversy. In their responses, Plaintiffs propose an

extraordinarily inclusive view of standing. Plaintiffs ask this Court to adjudicate

Claims Two, Three, and Four because this Court must *assume* they face a credible

threat of prosecution. They also insist that the Governor's affirmative assurance

regarding the reach of the challenged legislation, issued through the Additional

Technical Guidance, stops short of overcoming that presumption. In so doing,

Plaintiffs get the law backwards. Plaintiffs bear the burden of establishing

standing. And as explained in detail in the Motion to Dismiss, Plaintiffs have not

done so here. This Court should dismiss Claims Two, Three, and Four.

Plaintiffs' argument that Sheriffs should not be dismissed through their

official capacities under the political subdivision doctrine fares no better. Plaintiffs

strain to dissuade this Court from reaching the issue by arguing that it will have no

practical effect on the litigation. But that argument ignores that the political

subdivision doctrine is jurisdictional and must therefore be considered. On the legal

merits, Sheriffs assert that the political subdivision doctrine does not apply because

they have a "personal stake" through their official capacities. The Tenth Circuit has

already rejected that argument. Therefore, because Sheriffs are a political

subdivision of the State of Colorado, this Court should dismiss Sheriffs from this

case to the extent they are acting through their official capacities.

## ARGUMENT

I.    **Plaintiffs have not established a real and immediate
      threat of prosecution to merit standing on Claims Two,
      Three, and Four.**

Plaintiffs have not established a credible threat of prosecution. As explained

in the Motion to Dismiss, Plaintiffs' claim of a real and immediate threat of

prosecution is far too speculative for the Court to allow Plaintiffs to seek declaratory

relief. And even if Plaintiffs assert more than a conjectural fear of prosecution, the Governor's Additional Guidance has resolved the issue. This Court should dismiss Claims Two, Three, and Four.

### A.   Plaintiffs effectively concede they are unable to establish a credible threat of prosecution.

Although "standing for retrospective relief may be based on past injuries, ... claims for prospective relief require a continuing injury." *PeTA v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002). In particular, "[t]o have standing, [a plaintiff] must show a real and immediate threat that [he or she] will be prosecuted under [the challenged statute] in the future." *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001).

Quite apart from establishing that they face a real and immediate threat of prosecution, Plaintiffs instead insist that "courts assume a credible threat of prosecution in the absence of compelling contrary evidence." Pls.' Resp. to Def.'s Mot. to Dismiss [Doc. 69], at 4. According to Plaintiffs, "[t]he lack of enforcement of a particular statute alone does not automatically preclude standing." Doc. 69, at 4. In their view, therefore, "if a plaintiff alleges that prosecution is even 'remotely possible,' then a finding of standing is appropriate." Doc. 69, at 4. Precedent rejects Plaintiffs' position at every turn.

At the outset, Plaintiffs' argument ignores their burden. "One of the most important doctrines within" the case or controversy requirement is the doctrine of standing, which "focuses upon whether a particular litigant is entitled to have a

federal court decide the merits of the particular dispute." *Raiser v. United States*, 325 F.3d 1182, 1183 (10th Cir. 2002). Indeed, "[t]o have standing, *a plaintiff bears the burden* of showing that (1) he suffered an injury in fact that is (a) concrete and particularized and (b) actual and imminent, not merely conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision is likely to redress his alleged injuries." *Hammer v. Sam's E., Inc.*, No. 12-cv-2618-CM, 2013 U.S. Dist. LEXIS 98707, at **4–5 (D. Kan. Jul. 16, 2013) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000)) (emphasis added).

Second, Plaintiffs' focus on the statute's age only serves to highlight the fundamental deficiency with their position: they are unable to meet their threshold burden of establishing a credible threat. Plaintiffs contend that because "HB 1224 has only been in effect for approximately seven weeks [it] mitigates in favor of finding a credible threat of prosecution." Doc. 69, at 7. That argument is beside the point. What matters is that Plaintiffs have never been arrested or threatened with arrest.

Third, Plaintiffs wrongly persist that if "a plaintiff alleges that prosecution is even 'remotely possible,' then a finding of standing is appropriate." Doc. 69, at 4 (citing *Babbit v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)). Although Plaintiffs seize on dictum, the full line from *Babbit* does not go that far. Instead, it simply states that "[w]hen plaintiffs 'do not claim that they have ever been threatened with

prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). Worse still, Plaintiffs' argument ignores that in *Younger*, the Court reversed the district court's judgment that a state law was unconstitutionally vague because plaintiffs lacked standing in part because "of the relative remoteness of the controversy." 401 U.S. at 53.

Fourth, Plaintiffs err in relying on *Babbit* and *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988). Doc. 69, at 4. Both cases involved suits invoking First Amendment rights and, as *Booksellers* explained, criminal statutes infringing on First Amendment rights leads to "self-censorship, a harm that can be realized even without an actual prosecution." 484 U.S. at 393; *see Babbit*, 442 U.S. at 301 (explaining that the plaintiffs sought standing on the ground that "they must curtail their consumer appeals, and thus forgo full exercise of what they insist are their First Amendment rights"). Therefore, in both cases, the plaintiffs were able to demonstrate an actual injury *without* establishing a credible threat of prosecution. *See Am. Booksellers Ass'n.*, 484 U.S. at 393; *Babbit* 442 U.S. at 303 (reasoning plaintiffs demonstrated an injury for standing purposes because "it is clear that appellees desire to engage at least in consumer publicity campaigns prohibited by the Act").

Accordingly, nothing in *Babbit* or *Booksellers* helps Plaintiffs establish standing. At first cut, the standing requirements used in First Amendment cases

only apply to cases invoking First Amendment rights. *NRA of Am. v. Magaw*, 132

F.3d 272, 294 (6th Cir. 1997) ("Except for cases involving core First Amendment

rights, the existence of a chilling effect has never been considered a sufficient basis,

in and of itself, for prohibiting government action.") (internal quotation marks and

citation omitted)); *see also D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)

(refusing to review under the standing standards for First Amendment claims

because plaintiff "has not established such an injury"). Regardless, even assuming

that a plaintiff may establish standing outside the First Amendment context by

alleging that a criminal statute has chilled constitutionally protected conduct,

Plaintiffs fail to meet that test in this case. Plaintiffs do not assert that the alleged

vagueness in the statute has chilled their Second Amendment right. To the

contrary, Plaintiffs explicitly state that they "*will continue to engage* in the conduct

that is potentially criminalized under HB 1224 and subject to prosecution under the

same." Doc. 69, at 5 (emphasis added).

In the end, therefore, Plaintiffs' claim that they "will continue to engage in

the conduct that is potentially criminalized" only serves to belie their claim that

they face a credible threat of prosecution. Doc. 69, p. 5. Rather, Plaintiffs' request

"to anticipate whether and when these [plaintiffs] will be charged with crime . . .

takes [the Court] into the area of speculation and conjecture." *O'Shea v. Littleton*,

414 U.S. 488, 497 (1974). As Plaintiffs have not demonstrated any credible threat of

prosecution, they lack Article III standing to assert Claims Two, Three, and Four even without considering the Additional Technical Guidance.

### B.   Plaintiffs' attempt to manufacture factual disputes where there are none under the Additional Technical Guidance fail.

As explained in the Motion to Dismiss, the Additional Technical Guidance was issued as a compromise to directly resolve and address the grounds raised in Plaintiffs' request for a temporary injunction that are identical to those they assert in their request for declaratory relief. Doc. 69, at 3. To obtain a preliminary injunction, a moving party must establish that they will suffer irreparable injury unless the injunction issues. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Considering the Technical Guidance obviated Plaintiffs' concern that the legislation would create irreparable injury, there is no basis to reason that the Technical Guidance does not also satisfy the lesser standard of actual injury required for standing.

Surprisingly, Plaintiffs now assert for the first time that the Additional Technical Guidance "left a significant delta between defendant's position and Plaintiffs' second, third, and fourth claims." Doc. 69, at 18–19. Plaintiffs argue that the Additional Technical Guidance fails to resolve four remaining issues. Doc. 69, at 19–21. They are wrong.

Initially, Plaintiffs assert that the statute's ban on magazines designed to be "readily converted" to hold 15 or more bullets could be ambiguous for magazines

that hold less than 15 bullets because "if the determination to be made is based not on whether a detachable box magazine is capable of being . . . converted to accept more than 15 rounds . . . but instead, [on whether] it has objective features that are specifically designed to make it readily convertible . . ." Doc. 69, at. 19 (internal citation omitted). Plaintiffs fail to explain how that makes the law vague. Regardless, Plaintiffs' alleged ambiguity is resolved by the Additional Technical Guidance, because it expressly provides that "[m]agazines with a capacity of 15 or fewer rounds are not large capacity magazines as defined" in the legislation "[w]hether or not they have removable base plates." Doc. 59, at 1.

Next, Plaintiffs assert that *under* the Additional Technical Guidance, HB 1224 will be "very difficult to enforce." Doc. 69, at 20 (emphasis added). Although Plaintiffs argue it is practically difficult for a law enforcement officer to determine whether a magazine—despite its marking—actually holds more than 15 rounds of ammunition, there is nothing vague about the statute's prohibition of magazines holding more than 15 rounds of ammunition. Rather, to the extent Plaintiffs are correct that law enforcement will have difficult time enforcing HB 1224 under the Additional Technical Guidance, their argument only demonstrates that the Additional Technical Guidance clearly defines the law.

Plaintiffs also assert that the Additional Technical Guidance fails to cure the alleged ambiguity prohibiting magazines "capable of accepting" more than 15 rounds because some rifles "will accept 13 rounds of one caliber may accept 18

rounds of a compatible shorter caliber." Doc. 69, at 20–21. But Plaintiffs only highlight that the statute is not vague. Indeed, they precisely identify what they believe the law prohibits.

Last, in regards to HB 1224's grandfather clause, Plaintiffs baldly submit that the Additional Technical Guidance fails to cover "the problem, described in the Second Amended Complaint and in other pleadings, of a grandfathered magazine owner who leaves the state and entrusts the magazine to a friend or neighbor for safe storage, a magazine with another person at a shooting event in which both were participating." Doc. 69, at 21. Yet under the Additional Technical Guidance, "continuous possession" is "only lost by a voluntary relinquishment of dominion and control." Doc. 59, at 2. Therefore, Plaintiffs' hypothetical owner who leaves a magazine in the control of a friend or shooting participant but without relinquishing dominion would not forfeit the Grandfather clause under the Additional Technical Guidance.

In sum, none of Plaintiffs' alleged ambiguities equate to a credible threat of prosecution, let alone any threat at all.

> **C.** **Plaintiffs offer no reason why this Court should not credit Tenth Circuit precedent and hold that the Additional Technical Guidance forecloses any credible threat of prosecution.**

Plaintiffs alternatively argue that even if the Additional Technical Guidance covers their concerns, it "cannot wash away the credible threat of prosecution that

exists and continues to exist while HB 1224 remains in force because, although entitled to respect, formal attorney general opinions are not binding upon the court or law enforcement in general." Doc. 69, at 6. But that argument simply ignores controlling Tenth Circuit precedent. In the context of an affirmative assurance, "the 'possibility' of future enforcement need not be 'reduced to zero' to defeat standing . . . [because] it is 'not necessary for defendants [] to refute and eliminate all possible risk that the statute might be enforced' to demonstrate a lack of a case or controversy." *Mink v. Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007) (quoting *Winsness v. Yocom*, 433 F.3d 727, 731 (10th Cir. 2006)).

Plaintiffs also fail to offer a persuasive response to this Circuit's cases holding that a plaintiff fails to meet the credible threat requirement when there are affirmative assurances of non-prosecution from a governmental actor responsible for enforcing the challenged statute. *See Bronson v. Swensen*, 500 F.3d 1099, 1111–12 (10th Cir. 2007); *D.L.S.*, 374 F.3d 971; *Mink*, 482 F.3d 1244. Plaintiffs argue that *Bronson* and *D.L.S.* are distinguishable because the defendants expressly stated that the challenged statues would not be enforced against the plaintiffs. Doc. 69, at 8. In a similar vein, Plaintiffs contend *Mink* is inapplicable because the plaintiff in that case "admitted that he could not constitutionally prosecute the plaintiff." Doc. 69, at 9. But an assurance, such as here, that a statute does not apply to the conduct at all, is more compelling than an assurance that a person will not be prosecuted for conduct that is covered by a statute. Indeed, as even Plaintiffs

acknowledge in *Faustin*, the Tenth Circuit has found no credible threat "based on the city's prosecutor's determination that the plaintiff did not, in fact, violate the city's sign-posting ordinance." Doc. 69, at 9 (citing 268 F.3d 942, 948 (10th Cir. 2001)).

Additionally, as explained in the Motion to Dismiss, the Additional Technical Guidance provides for an affirmative defense. *See* Colo. Rev. Stat. § 18-1-504(2)(c). Plaintiffs' argument that the affirmative defense has no bearing on whether they face a credible threat of "potential prosecution" misunderstands Colorado law. Doc. 69, at 12. In Colorado, an affirmative defense "becomes an additional element" of the crime and the prosecution must "prov[e] beyond a reasonable doubt that the affirmative defense is inapplicable." *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011). Thus, Plaintiffs are undoubtedly wrong in arguing that the affirmative defense created by the Additional Technical Guidance is irrelevant to the question of whether Plaintiffs face a credible threat of prosecution. Under state law, a person acting in compliance with the Additional Technical Guidance would not meet the elements of the crime now set forth in HB 1224.

### D. Plaintiffs' attempt to assert standing based on past or future economic loss is unavailing.

Plaintiffs also fail to save their vagueness claims by invoking alleged economic losses of the firearms dealers and the Family Shooting Center. As explained in detail above, Plaintiffs have failed to establish that they face any credible threat of prosecution. For the same reasons, therefore, the firearm dealers

and the Family Shooting Center are foreclosed from arguing that they will suffer economic harm because their customers will not buy or use their services in fear of a credible threat of prosecution that does not exist.

In any event, Defendant does not challenge the standing of these or any Plaintiffs other than the 55 Sheriffs through their official capacities, to challenge HB 1224's prospective prohibition of magazines holding *more* than fifteen rounds. The only economic loss that could constitute an injury-in-fact for the challenged vagueness claims would be future lost sales of magazines capable of accepting no more than 15 rounds. Yet Plaintiffs concede the Second Technical Guidance Letter has "abated those economic injuries." Doc. 69, at 14.

To the extent that Plaintiffs argue they have standing because they have *already* suffered economic loss, past economic loss is not a continuing injury. *Rasmussen*, 298 F.3d at 1202 (holding that claims for prospective relief "require a continuing injury"). Plaintiffs also do not seek damages. As such, the declaratory judgment they seek would in no way redress any of their past economic losses, and Plaintiffs have not established standing. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n.20 (1978) (in order to satisfy the "redressability" requirement for standing, a plaintiff must show that there is at least a "'substantial likelihood' that the relief requested will redress the injury claimed . . . ."); *accord Baca v. King*, 92 F.3d 1031, 1036 (10th Cir. 1996).

### E.   In the event this Court agrees with Plaintiffs that the Additional Technical Guidance does not apply to law enforcement, Plaintiffs necessarily establish that their claims are not redressable.

Plaintiffs do not seriously engage Defendant's argument that to the extent they stake their claim for standing on the notion that law enforcement agencies are not bound by the Governor's Additional Technical Guidance, Plaintiffs should have included those agencies in this suit. *See Bronson,* 500 F.3d 1099. Instead, Plaintiffs simply proclaim that under *ACLU v. Johnson*, 194 F.3d 149 (10th Cir. 1999), a declaratory injunction against Defendant "will bind all district attorneys and therefore redress Plaintiffs' alleged injuries." Doc. 69, at 17. In *Johnson*, the Tenth Circuit determined that an injunction against the Governor and the Attorney General of New Mexico could extend to the state district attorneys. 194 F.3d at 1163.

*Johnson* necessarily holds that New Mexico's district attorneys are either officers, agents, servants, employees, or attorneys of their governor, or are in active concert or participation with him. *Id.* (quoting Fed. R. Civ. P. 65(d)). While Defendant maintains that Colorado's district attorneys exercise independent authority, Plaintiffs nonetheless lack standing. There cannot exist both a credible threat of prosecution and an injury fairly traceable to and redressable against this particular Defendant. An injunction or declaratory judgment against the Governor only could bind Colorado's district attorneys and local law enforcement agencies if,

as in New Mexico, those entities are the Governor's officers, agents, servants, employees, or attorneys, or are in active concert or participation with him. The Governor's additional Technical Guidance, then, would foreclose any credible threat of prosecution. Plaintiffs cannot escape this reality. Either the district attorneys and local law enforcement agencies are bound, or they are not. If they are, the Governor's Technical Guidance controls and there is no actual and imminent injury. If they are not bound, the Governor as the only named Defendant cannot redress Plaintiffs' alleged injury.

## II.    The Political Subdivision doctrine applies here.

The rule is that a political subdivision may not challenge the validity of an act by a fellow political subdivision. While Sheriffs present a flood of arguments contending they have standing, those arguments ignore that those inquiries are irrelevant if the political subdivision doctrine applies. Because Sheriffs are a political subdivision, and considering that the political subdivision doctrine applies to this case, this Court should bar the 55 Sheriffs from bringing suit through their official capacities.

### A.    The political subdivision doctrine is jurisdictional and must be considered.

In an attempt to avoid the application of the political subdivision doctrine, Sheriffs argue that "this Court need not decide whether Sheriffs have standing through their official capacity," because other plaintiffs "clearly have standing to raise all the claims at issue." Pls.' Opp. to Def.'s Mot. to Dismiss [Doc. 70], at 3. To

support its argument, Sheriffs point to the Colorado Attorney General's Brief in the

Affordable Care Act litigation arguing that Colorado's standing "was irrelevant,

since other plaintiffs had standing." Doc. 70, at 3.

That analogy offers no help to Sheriffs' argument. As a factual matter, unlike

the instant case, the State of Colorado was not a political subdivision of the Federal

Government in the Affordable Care Act litigation. Regardless, the political

subdivision doctrine is independent from prudential standing inquiries. *See, e.g.,*

*Bd. of County Comm'rs v. Geringer*, 297 F.3d 1108, 1112–13 (10th Cir. 2002).

"Under the doctrine of political subdivision standing, federal courts lack jurisdiction

over certain controversies between political subdivisions and their parent states."

*City of Hugo v. Nichols*, 656 F.3d 1251, 1255 (10th Cir. 2011) (citing *Branson Sch.*

*Dist. RE-82 v. Romer*, 161 F.3d 619, 623 (10th Cir. 1998)). Therefore, as an initial

matter, this Court must consider whether the political subdivision doctrine bars

Sheriffs from bringing suit through their official capacities.

### B.   A political subdivision does not have standing simply by having a personal stake.

The majority of Sheriffs' standing arguments turn on their contention that

the political subdivision doctrine does not apply when a political subdivision

establishes a "personal stake." Relying on what they term the "*Allen* rule," Doc. 70,

at 7, Sheriffs assert they have standing through their official capacities because

they have a personal stake in:  (1) adhering to their oath of office; (2) preserving

*posse comitatus*; (3) not having to do background checks before transferring

weapons; and (4) effectively performing the duties of their office. Doc. 70, at 7, 8–15, 16–21, 22–25, 26–37. In a footnote in *Board of Education v. Allen*, 392 U.S. 236, 242 n.5 (1968), the majority explained that though there was no challenge to the standing of the school board member Appellees (presumably a political subdivision), they had standing because "they are in the position of having to choose between violating their oath and taking a step—refusal to comply with [the challenged statute]—that would be likely to bring their expulsion from office and also a reduction of funds for their school districts. 392 U.S. at 242 n.5.

As a factual matter, nowhere in the opinion is the political subdivision doctrine ever mentioned. Thus, it is by no means clear that the *Allen* court intended to carve out an exception to the political subdivision doctrine. More fundamentally, *Allen* never stated that the school board members had standing through their *official capacities*. Plaintiffs' reliance on *Allen* to argue that they have standing through their official capacity is entirely misplaced.

Regardless, Plaintiffs' argument fails on the already-invalidated reading of *Allen* they rely upon. Recently, the Tenth Circuit determined that standing in *Allen* was based on "the individual board members' personal stake in losing their jobs." *Hugo,* 656 F.3d at 1256; *see* Doc. 70, at 7 (acknowledging same). As Sheriffs cannot, and have not, asserted that compliance with HB 1224 and HB 1229 will result in their termination from office, Sheriffs' laundry list of "personal stake" claims do nothing to stop the application of the political subdivision doctrine.

### C.   Sheriffs are political subdivisions of the state.

Sheriffs also attempt to brush aside the political subdivision doctrine by arguing that they are not a political subdivision of the state. Counties are political subdivisions of the state. Although Sheriffs insist they are not an officer of the county because a "Sheriff [and not the county] has plenary authority over the hiring, firing, and retention of deputies," Doc. 70, at 42, the Colorado Constitution lists sheriffs as county officers. Colo. Const. Art. XIV, § 8 Under Colorado law, counties are political subdivisions of the state. *Beaver Meadows v. Bd. of County Comm'rs*, 709 P.2d 928, 932 (Colo. 1985); *Pennobscot, Inc. v. Bd. of County Comm'rs*, 642 P.2d 915, 918 (Colo. 1982); *Colorado State Bd. of Social Services v. Billings*, 487 P.2d 1110, 1112 (1971). And under the Colorado Constitution, a Sheriff's salary is to be paid by "fees, perquisites and emoluments of their respective offices, or from the general county fund." Colo. Const. Art. XIV, § 8.

Sheriffs also err in asserting they are not political subdivisions of the state because their offices were created by the People of Colorado. Doc. 70, at 40. Sheriffs have not explained, nor is Defendant able to determine, under what exact official capacity Sheriffs seek to bring their claims if they are not officers of the state. That argument ignores the principle that the political subdivision doctrine applies not only to a subdivision that is directly subject to another political subdivision, but a "political subdivision of a state may not challenge the validity of an act by a *fellow* political subdivision . . . ." *Housing Authority of Kaw Tribe of Indians v. Ponca City*,

952 F.2d 1183, 1190 (10th Cir. 1991) (emphasis added). Regardless, the People of Colorado, through the Colorado Constitution, *are* the State of Colorado. Colo. Const. Art. II, § 1 ("[a]ll political power is vested in and derived from the people; all government, of right, originates from the people . . ."); Colo. Const. Art. II, § 2 ("The people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state . . . ."). Thus, Sheriffs' argument presents no distinction at all. The political subdivision doctrine applies.

## D.   Sheriffs remaining claims of third-party standing are not properly before the Court and are without legal foundation.

In a last-ditch attempt to save standing through their official capacities, Sheriffs insist they have third-party standing. Specifically, Sheriffs argue that they have third-party standing to assert claims for the: (1) Colorado mounted rangers and potential posse members; (2) sheriffs and deputies who wish to purchase large capacity magazines; and (3) current and former Sheriffs who are disabled under the Americans with Disabilities Act. Doc. 70, at 30–37, 44–48. Those arguments fail as a matter of logic, procedure, and law.

As an initial matter, Sheriffs claim for third-party standing ignores that Defendant has not moved to dismiss Sheriffs through their individual capacities. Doc. 64, at 15 n.3. Defendant has never disputed that Sheriffs can bring the claims through their individual capacities. As such, the question of whether they have

third-party standing is irrelevant to whether they can bring suit through their official capacities.

Sheriffs' argument for third-party standing is further precluded as a procedural matter. Unlike a factual attack[1], a facial attack may not rely on documentary evidence outside the complaint. *See Paper, Allied-Industrial, Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292–93 (10th Cir. 2005). In the Second Amended Complaint, Sheriffs never mentioned the Colorado mounted rangers, the rights of posse members to be in a posse, or that sheriffs and their deputies would experience difficulty in purchasing standard capacity magazines. Sheriffs also never asserted that they were bringing claims on behalf of current and former employees that are disabled. The third-party interests Sheriffs raise for the first time in their Opposition to the Motion to Dismiss are not properly before the Court. *Compare* Doc. 62, ¶ 102–05 (asserting first-party standing for *posse comitatus*), *with, e.g.,* Doc. 62, ¶ 65 (asserting third-party standing on behalf of Women for Concealed Carry).

In any event, Sheriffs' claims are also readily divorced from the law. With respect to their claim for third-party standing on behalf of the Colorado mounted rangers and the employees of Sheriffs' departments who are purportedly having difficulty purchasing large capacity magazines, Sheriffs contend that "[w]hen a political subdivision meets the standard tests for third-party standing, the rule

[1] As expressly explained, the Defendant's argument requesting dismissal claims 2, 3, and 4 is brought as a factual attack. Doc. 64, p. 4.

against political subdivision standing does not apply." Doc. 70, at 29. But in support

of that claim, Sheriffs only cite *state cases* from California and Ohio addressing

whether the political subdivision doctrine applied as a matter of state law. Doc. 70,

at 29–30; *see*, e.g., *City of E. Liverpool v. Columbiana County Budget Comm'n*, 870

N.E.2d 705, 711–12 (Ohio 2007). But in Federal Court, political subdivisions may

not sue because the Fourteenth Amendment "was written to protect individual

rights, as opposed to collective or structural rights." *Branson*, 161 F.3d at 628.

Likewise, Sheriffs attempt to assert third-party standing under the American

with Disabilities Act and for potential posse members is missing the necessary legal

premise. "Third-party standing requires not only an injury in fact and a close

relation to the third party, but also a hindrance or inability of the third party *to

pursue his or her own claims*." *Terrell v. INS*, 157 F.3d 806, 809 (10th Cir. 1998)

(emphasis added). Here, several disabled Plaintiffs and the non-profit group

Outdoor Buddies are *already* plaintiffs in the suit. Doc. 62, at 19–12, 28–29. Thus,

as disabled plaintiffs are part of the suit, Sheriffs have not established that third-

party disabled citizens face a hindrance or inability to pursue their own claims. To

the extent Sheriffs belatedly assert they have third-party standing on behalf of

potential posse members, that argument suffers from the same defect: individual

citizens are plaintiffs in this case, and Sheriffs do not explained why they did not, or

could not have, raise that claim.

## CONCLUSION

For the reasons and authorities stated above, Defendant asks this Court to dismiss Claims Two, Three, and Four in Plaintiffs' Second Amended Complaint. Defendant also asks this Court to dismiss the 55 Sheriffs as Plaintiffs in their official capacities.

Respectfully submitted,

JOHN W. SUTHERS
Attorney General

*s/ John T. Lee*
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Kathleen Spalding***
Senior Assistant Attorney General
**Matthew D. Grove***
Assistant Attorney General
*Counsel of Record
**John T. Lee***
Assistant Attorney General
*Counsel of Record
**Molly Moats***
Assistant Attorney General
*Counsel of Record

Attorneys for Governor John W. Hickenlooper
1300 Broadway, 10th floor
Denver, Colorado  80203
Telephone:  720-508-6000
*Counsel of Record

**CERTIFICATE OF SERVICE**

I hereby certify that on  August 5 , 2013 I served a true and complete copy of the foregoing REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CLAIMS TWO, THREE, AND FOUR, AND TO DISMISS SHERIFFS AS PLAINTIFFS ACTING IN THEIR OFFICIAL CAPACITIES upon all counsel of record including those listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                        s/ Jonathan P. Fero

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

     Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## GOVERNOR'S REPLY TO *AMICUS* BRIEF OF BOARD OF COUNTY COMMISSIONERS OF MESA COUNTY

---

**COMES NOW** Defendant, Governor John Hickenlooper, by and through undersigned counsel, states as follows in response[1] to the *Amicus* brief submitted by the Board of County Commissioners of Mesa County [Doc. 68-1] (filed on 8/22/13):

### INTRODUCTION

Nothing in the Board of County Commissioners of Mesa County's ("Board") amicus brief diminishes the contradiction between the Sheriffs' attempt to bring suit in their official capacities and the Board's position that the Sheriffs are not political subdivisions of the State. The only reasonable reading

---

[1] On October 10, 2013, the Court granted leave to file an *Amicus* Brief to the Board of County Commissioners of Mesa County and permitted Defendant fourteen days in which to respond. On October 25, 2013, the Court granted the Defendant's request for an extension of time, to and including, November 1, 2013.

of the Colorado Constitution and Colorado law is that the Sheriffs are political subdivisions of the State.

Likewise, the Board's attempt to argue that the Sheriffs have standing because they suffer a direct injury fails as a matter of law and is procedurally improper. The claim that the Sheriffs do not fall within HB 1224's express exemption because they cannot be classified as a department, agency, or political subdivision of the State has never been asserted by the Sheriffs; moreover, it is plain that in practice the Sheriffs consider themselves and their deputies to be exempt from Colorado's limitation on magazine capacity. The Sheriffs' understanding that they are exempt is undoubtedly correct. Colorado case law confirms that the Sheriffs enjoy civil protection under the substantially similar classification necessary to benefit from State governmental immunity. As such, this Court should dismiss the Sheriffs to the extent they are bringing suit in their official capacities.

## ARGUMENT

### A. An officer suing in an official capacity on behalf of a political subdivision— as the sheriffs have done in this case—have no greater standing to maintain a lawsuit than a political subdivision.

There is no dispute that counties are political subdivisions of the State. *See* Doc. 68-1, at 2. Under the doctrine of political subdivision standing, federal courts lack jurisdiction over certain controversies between political subdivisions and their parent states. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628

(10th Cir. 1998). According to the Board, the Sheriffs are not political subdivisions because they are independent from both their respective counties and the State. The Colorado Constitution belies their claims.

Article XIV of the Colorado Constitution establishes counties in the State of Colorado and sets forth their organization. In particular, that Article creates a number of officers for each county, including the "sheriff." Colo. Const. Art. XIV, § 8.[2] The Colorado Constitution further directs that county officers' salaries are to be paid from county funds. Colo. Const. Art. XIV, § 8. The authority to determine the qualifications and salaries for the Sheriffs is also delegated to the General Assembly. *See* Colo. Const. Art. XIV, § 8.5; Colo. Const. Art. XIV, § 15. Under the Constitution, therefore, the Sheriffs are arms of the counties and subject to the authority of the General Assembly. *See, e.g.*, Colo. Rev. Stat. § 30-10-504 (requiring that "the salaries of the undersheriff and deputy sheriff shall be fixed by the sheriff, *with the approval of the board of county commissioners*"); *see also Skidmore v. O'Rourke*, 383 P.2d 473, 474 (Colo. 1963) (in case decided under art. XIV, 8, holding that "the powers and duties of [elected county officials] are prescribed by the Constitution or by statute, or both").

Alternatively, the Board insists that the Sheriffs are not a political subdivision of the State because they are bringing suit as elected officials and not as "entities." *See* Doc. 68-1, at 3 ("Cases argued by the State in its Motion to

---

[2] In addition to the sheriff, elected county officers include the clerk and recorder, the coroner, the treasurer, the county surveyor, and the county assessor.  Colo. Const. art. XIV, § 8.

Dismiss Sheriffs as Plaintiffs Acting in Their Official Capacity are directed towards entities and not toward individual officers and/or officials"). However, "[i]t is illogical to presume that an officer suing in an official capacity on behalf of a political subdivision might have greater standing to maintain a lawsuit than would the political subdivision that official represents." *Williams v. Corbett*, 916 F. Supp. 2d 593, 598 (M.D. Pa. 2013); *cf. City of Hugo v. Nichols*, 656 F.3d 1251, 1255 n.5 (10th Cir. 2011) (the principle of the political subdivision doctrine "applies equally to suits against state officials in their official capacity . . ."). Accordingly, considering that the Board correctly recognizes that a county office is barred from suing its parent state, so too are county officers precluded from suing on behalf of their county offices.

Indeed, the various statutes cited by the Board highlight that the Sheriffs are political subdivisions of the State. *See, e.g.*, *United States v. Alabama*, 791 F.2d 1450, 1454-55 (11th Cir. 1986) ("creatures of the state have no standing to invoke certain constitutional provisions in opposition to the will of their creator"). As the Board admits, State statutes outline the Sheriffs' duties, Colo. Rev. Stat. § 30-10-516, grant the Sheriffs the authority to appoint undersheriffs and deputy sheriffs, Colo. Rev. Stat. § 30-2-106, and mandate that a Sheriff must meet all the standard imposed by the Peace Officers Standard and Training Board, Colo. Rev. Stat. § 16-2.5-102. Therefore, far from supporting the Board's contention that the Sheriffs are independent from the State, the fact

that the Sheriffs' duties, salaries, and training are all determined by the General Assembly confirm that the Sheriffs are political subdivisions of the State.

In any event, even granting the Board's premise that constitutional officers are not responsible to the State, the result in this case would be the same. Like the Sheriffs, the Governor is a constitutional officer. Colo. Const. Art. IV, § 1. If, as the Board claims, constitutional officers are independent from the State, a suit against the Governor would not redress their alleged claims. Thus, accepting the test that the Board proposes would mean that the Governor is the wrong defendant and would require dismissal of the entire action.[3] *Cf. Peterson v. Martinez,* 707 F.3d 1197, 1206-07 (10th Cir. 2013) (dismissing claim on Eleventh Amendment grounds against state official who did not have statutory authority to enforce the challenged statute).

### B. The Board's attempt to raise a new claim of injury on behalf of the Sheriffs is barred as a procedural matter and irreconcilable with the applicable facts and law.

The Board's remaining factual argument is no more persuasive than their legal argument and entirely ignores the allegations in the complaint. The Board argues that the Sheriffs have standing in their official capacity because they do not fit under the exemption set forth in HB 1224. Doc. 68-1, at 5-6. The large capacity magazine ban challenged in this case exempts "[a]n employee of any of the following agencies who bears a firearm in the course of his or her official

---

[3] The Governor has asserted Eleventh Amendment immunity, *see* Doc. 65 at p. 56, and intends to raise that issue at the summary judgment stage.

duties," including  (II) A department, agency, or political subdivision of the State

of Colorado . . ."  Colo. Rev. Stat. § 18-12-302(3)(b).

At the outset, the Board's argument ignores that the Governor has not

moved to dismiss the Sheriffs through their individual capacities. *See* Doc. 64, at

15 n.3. The Governor has never argued that the Sheriffs are barred from

bringing suit in their individual capacities. As a result, the argument that the

Sheriffs do not fall under the HB 1224's law enforcement exception is inapposite.

The Board's claim also fails as a procedural matter. Unlike a factual

attack, a facial attack may not rely on documentary evidence outside the

complaint. *See Paper, Allied-Indust., Chem. & Energy Workers Int'l Union v.*

*Cont'l Carbon Co.*, 428 F.3d 1285, 1292-93 (10th Cir. 2005). The Sheriffs have

never argued that they are not a department, agency, or political subdivision of

the State of Colorado. The Board is foreclosed from raising a claim of injury

never presented in the complaint.

Regardless, Colorado case law confirms that the Sheriffs are political

subdivisions of the State and fit within HB 1224's exception. In Colorado, absent

express exceptions, "sovereign immunity shall be a bar to any action against a

public entity for injury which lies in tort or could lie in tort regardless of whether

that may be the type of action or the form of relief chosen by a claimant." Colo.

Rev. Stat. § 24-10-108. Colorado law defines "public entity" as including "any

county" and any "kind of district, agency, instrumentality, or political

subdivision thereof organized pursuant to the law." Colo. Rev. Stat. § 24-10-

103(5). Colorado courts have repeatedly concluded that Colorado Sheriffs are "public entities" as defined in the Governmental Immunity Act. Therefore, under Colorado law the Sheriffs should also be classified as a "department, agency, or political subdivision of the State of Colorado" for the purposes of HB 1224's law enforcement exception. *See, e.g.*, *Corsentino v. Cordova*, 4 P.3d 1082, 1087 (Colo. 2000) (analyzing whether *under* the exceptions to the Governmental Immunity Act, a sheriff waived immunity); *Young v. Jefferson County Sheriff*, 292 P.3d 1189, 1191-92 (Colo. App. 2012) (same); *Cordova v. Pueblo West Metro. Dist.,* 986 P.2d 976, 979-80 (Colo. App. 1998) (same).

This conclusion finds substantial support in the simple fact that Sheriffs are subject to both county and State authority. For example, although the Board correctly points out that the Sheriff has authority to appoint deputies and fix their salaries, a Sheriff's budget is subject to his county commissioners' "exclusive power to adopt the annual budget for the operation of the county government[.]" § 30-11-107, C.R.S. (2013). And State statutes not only set qualifications for election to office, but also impose many other duties on the sheriff of each county. As the Board points out, there are a host of statutes that bind, empower, protect and apply to Sheriffs, all of which are "set out, inter alia, and without limitation, in Titles 13, 16, 17, 18, 19, 24, 29, 30, and 42 of the Colorado Revised Statutes." *Amicus Brief*, p. 2.

## CONCLUSION

Based on the foregoing reasoning and authorities, this Court should reject the Board's suggestion that the Sheriffs are not barred from maintaining their suit by the political subdivision doctrine, and dismiss the Sheriffs in their official capacities pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

Respectfully submitted,

JOHN W. SUTHERS
Attorney General

*s/ John T. Lee*

**David C. Blake***
Deputy Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Kathleen Spalding***
Senior Assistant Attorney General
**Stephanie Scoville***
Senior Assistant Attorney General
**Matthew D. Grove***
Assistant Attorney General
**John T. Lee***
Assistant Attorney General
**Molly Moats***
Assistant Attorney General

Attorneys for Governor John W. Hickenlooper
1300 Broadway, 10th floor
Denver, Colorado  80203
Telephone:  720-508-6000
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2013 I served a true and complete copy of the foregoing **Governor's Reply to *Amicus* Brief** upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                     david@i2i.org

Jonathan M. Anderson               jmanderson@hollandhart.com

Richard A. Westfall                rwestfall@halewestfall.com
Peter J. Krumholz                  pkrumholz@halewestfall.com

Marc F. Colin                      mcolin@bcjlpc.com

Anthony J. Fabian                  fabianlaw@qwestoffice.net


                                   *s/  John T. Lee*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado:
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hindsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;
SCOTT FISCHER, Sheriff of Jackson County, Colorado;

**PETER GONZALEZ, Sheriff of Archuleta County, Colorado;**
**RICK BESECKER, Sheriff of Gunnison County, Colorado;**
**CHARLES "ROB' URBACH, Sheriff of Phillips County, Colorado;**
**ROD FENSKE, Sheriff of Lake County, Colorado;**
**GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;**
**DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;**
**MIKE NORRIS, Sheriff of Saguache County, Colorado;**
**AMOS MEDINA, Sheriff of Costilla County, Colorado;**
**MILES CLARK, Sheriff of Crowley County, Colorado;**
**DAVID ENCINIAS, Sheriff of Bent County, Colorado;**
**SUE KURTZ, Sheriff of San Juan County, Colorado;**
**JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;**
**GARRETT WIGGINS, Sheriff of Routt County, Colorado;**
**DOUGLAS N. DARR, Sheriff of Adams County, Colorado;**
**COLORADO OUTFITTERS ASSOCIATION;**
**COLORADO FARM BUREAU;**
**NATIONAL SHOOTING SPORTS FOUNDATION;**
**MAGPUL INDUSTRIES;**
**USA LIBERTY ARMS;**
**OUTDOOR BUDDIES, INC.;**
**WOMEN FOR CONCEALED CARRY;**
**COLORADO STATE SHOOTING ASSOCIATION;**
**HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT**
**CHERRY CREEK STATE PARK;**
**DAVID STRUMILLO;**
**DAVID BAYNE;**
**DYLAN HARRELL;**
**ROCKY MOUNTAIN SHOOTERS SUPPLY;**
**2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;**
**BURRUD ARMS INC. D/B/A JENSEN ARMS;**
**GREEN MOUNTAIN GUNS;**
**JERRY'S OUTDOOR SPORTS;**
**GRAND PRIX GUNS;**
**SPECIALTY SPORTS & SUPPLY; and**
**GOODS FOR THE WOODS;**

  **Plaintiffs,**

**v.**

**JOHN W. HICKENLOOPER, Governor of the State of Colorado,**

  **Defendant.**

## OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART
## DEFENDANT'S MOTION TO DISMISS

**THIS MATTER** comes before the Court on the Defendant Governor John W.

Hickenlooper's (hereafter referred to as "the State") Motion to Dismiss (**#64**). The Plaintiffs

filed two Responses[1] to the motion (**#69, 70**), and the State replied (**#75**).

## I. Background

The Colorado General Assembly recently enacted new gun regulations. At issue in this

lawsuit are two statutes — C.R.S. §§ 18-12-112 and 18-12-302.

The first statute, § 18-12-112, imposes mandatory background checks for the transfer of

guns in private transactions, subject to certain exceptions. The law mandates that before a

person (who is not a gun dealer) can transfer ownership of a gun to someone else, the transferor

must require that the transferee obtain a background check by a licensed gun dealer, and the

transferor must obtain approval of the transfer from the Colorado Bureau of Investigation.

§ 18-12-112(1). An individual who violates the law is guilty of a crime. § 18-12-112(9).

Although challenged in this lawsuit, § 18-12-112 is not the subject of the State's instant motion

to dismiss.

The second statute, § 18-12-302, prohibits the possession, sale, or transfer of large-

capacity ammunition magazines. Section 18-12-301(2) defines "large-capacity magazine" to

---

[1] The Response found at Docket #69 was filed by Colorado Outfitters Association, Colorado
Farm Bureau, National Shooting Sports Foundation, Magpul Industries, USA Liberty Arms,
Outdoor Buddies, Inc., Women for Concealed Carry, Colorado State Shooting Association,
Hamilton Family Enterprises, Inc., David Strumillo, David Bayne, Dylan Harrell, Rocky
Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms
Inc., Green Mountain Guns, Jerry's Outdoor Sports, Grand Prix Guns, Specialty Sports &
Supply, and Goods for the Woods. The remaining Plaintiffs, county Sheriffs from across
Colorado, joined in the first response and also filed a separate Response at Docket #70.

include magazines that are capable of accepting, or are "designed to be readily converted to accept," more than fifteen rounds of ammunition.  Under the statute, a person who sells, transfers, or possesses a large-capacity magazine is guilty of a crime.  § 18-12-302(1).  However, the statute contains a grandfather clause that allows a person to possess a large-capacity magazine if he or she (1) owned the magazine as of July 1, 2013 (the effective date of the statute), and (2) has maintained "continuous possession" of the magazine thereafter.          § 18-12-302(2).  Only §§ 18-12-301 and -302 are at issue in the context of this motion.  Since these statutes were enacted, a number of relevant events have occurred.  The facts with regard to these events are undisputed and are recounted generally here.  To the extent further detail is required, the Court will elaborate in its analysis.

On May 16, 2013, the Colorado Attorney General, at the request of Governor Hickenlooper, sent a "Technical Guidance" letter to the Executive Director of the Colorado Department of Public Safety.  The letter was intended to assist Colorado law enforcement agencies in understanding and applying portions of the statute prohibiting large-capacity magazines.  The Technical Guidance addressed the scope of the phrase "designed to be readily converted to accept more than fifteen rounds of ammunition," and set forth the Attorney General's interpretation of the "continuous possession" requirement of the grandfather clause.

Soon after the Technical Guidance was issued, the Plaintiffs initiated this action. Their claims are currently stated in a Second Amended Complaint (**#62**).  They assert six claims, five of which challenge the constitutionality of various provisions of the new statutes.

The Plaintiffs assert that:

(1) the prohibition on the sale, transfer, or possession of magazines with a capacity larger than fifteen rounds of ammunition, §§ 18-12-301 and -302, violates the Second Amendment of the United States Constitution;[2]

(2) the prohibition on the sale, transfer, or possession of magazines that are "designed to be readily converted" to accept more than fifteen rounds of ammunition, §§ 18-12-301 and -302, violates the Second Amendment of the United States Constitution;[3]

(3) the phrase "designed to be readily converted," found in § 18-12-301(2)(a)(I), is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment;

(4) the phrase "continuous possession," found in the grandfather clause of § 18-12-302(2)(a)(II), is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment;

(5) §§ 18-12-301 *et seq.* and § 18-12-112 violate Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, because they discriminate against disabled persons; and

(6) the restrictions imposed on the transfer of firearms between private individuals under § 18-12-112 violates the Second Amendment of the United States Constitution.

A month after filing their initial Complaint (and just two weeks before the statute prohibiting large-capacity magazines was set to go into effect), the Plaintiffs requested a preliminary injunction to stop the statute from taking effect. The parties were able to resolve

---

[2] The provisions of the Second Amendment to the United States Constitution are made applicable to state laws by virtue of the Fourteenth Amendment to the United States Constitution. *See McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

[3] Although the Plaintiffs' first two claims appear to present separate challenges, the Court understands these two claims to actually be one claim challenging the constitutionality of §§ 18-12-301 *et seq.*, as a whole, under the Second Amendment.

1036

such motion without the Court's involvement due, in part, to the State's agreement to issue

further guidance on the statutes. The Colorado Attorney General issued a second Technical

Guidance letter, providing additional guidance with regard to the definition of "large-capacity

magazine" and as to the "continuous possession" requirement of the grandfather clause.

Citing to Fed. R. Civ. P. 12(b)(1),[4] the State now moves to dismiss particular claims in

the Second Amended Complaint. The State requests that the Court dismiss the Plaintiffs' claims

that the language found in §§ 18-12-301(2)(a)(I) and -302(2)(a)(II) is unconstitutionally vague

and all claims asserted by the Sheriffs[5] in their official capacity. The State contends that the

Court lacks subject matter jurisdiction over these claims because the Plaintiffs do not have

standing to assert them.

---

[4] Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take one of two forms. The moving party may (1) facially attack the complaint's allegations as to the existence of jurisdiction, or (2) go beyond the allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests. *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003).

     Under a facial attack, the movant merely challenges the sufficiency of the complaint, requiring the Court to accept the allegations in the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). On the other hand, in a factual attack, the movant goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends. In such situations, the Court must look beyond the complaint and has wide discretion to allow documentary and even testimonial evidence to resolve disputed jurisdictional facts. *Id.* In the course of a factual attack under Rule 12(b)(1), the Court's reference to evidence outside the pleadings does not convert the motion into a motion for summary judgment under Rule 56. *Id.*

     The State presents both kinds of challenges under Rule 12(b)(1) — a factual attack as to the Plaintiffs' ability to establish standing to assert their vagueness claims and a facial attack as to the standing of the Sheriffs to bring claims in their official capacities.

[5] For the sake of clarity in identifying various groups of Plaintiffs, the Court notes that it uses the term "Plaintiffs" only when collectively referring to all of the Plaintiffs involved in this lawsuit. The group of Plaintiffs comprised of individuals identified as county Sheriffs is referred to as "the Sheriffs." The remaining non-sheriff Plaintiffs (including individuals and entities) are referred to by name where appropriate.

## II.  Jurisdiction

The issues presented in the State's motion to dismiss concern whether the Court has subject matter jurisdiction over certain claims.  The Court may exercise jurisdiction over this matter so that it may determine its own jurisdiction.  *See Dennis Garberg & Associates, Inc. v. Pack-Tech Intern. Corp.*, 115 F.3d 767, 773 (10th Cir. 1997).

## III.  Analysis

Before beginning its legal analysis, the Court pauses to address a preliminary matter. Recognizing that this case is one of great public concern and interest, it is important to identify what the Court is *not* doing and *not* considering.

Determination of this motion to dismiss has nothing to do with the merits of the Plaintiffs' claims.  The Court is  not be determining whether the new laws are good, bad, wise, unsound, or whether they are the subject of legitimate concern.  Indeed, at this juncture, the Court is not even considering whether the challenged portions of the laws are constitutional. This ruling determines only whether the Court *can* consider particular claims (that is, the Court's jurisdiction ).

A court's "jurisdiction" is a broad concept.  For purposes of the matters addressed herein, jurisdiction  means a court's power or authority to interpret and apply the law.

All federal courts are courts of "limited jurisdiction," meaning that they possess only that power given to them by the United States Constitution and federal statutes.[6]  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  Article III of the United States Constitution restricts the authority of federal courts to adjudicating actual "cases" and

---

[6] This is in contrast to the state courts.  Typically courts of general jurisdiction, state courts are presumed to have the power to hear virtually any claim arising under federal or state law, except those which Congress or the United States Constitution  specifies can be heard only by federal courts.

1038

"controversies." U.S. Const. art. III, § 2, cl.1; *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008). Limitation of the jurisdiction of federal courts to cases and controversies is crucial to maintaining the "tripartite allocation of power" set forth in the United States Constitution. Indeed, no principle is more fundamental to the judiciary's proper role in our system of government. *See Valley Forget Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982); *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

A case or controversy can only be brought by a person with "standing" to sue. This means that a plaintiff must have a right or interest that has been, is being, or will be affected by the challenged act or statute. *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984). In other words, to invoke federal court jurisdiction, a plaintiff must demonstrate that he or she "has a stake" in the outcome at the time the suit is filed. Thus, unlike doctrines which restrain federal courts from exercising jurisdiction based on the characteristics of the claims themselves (*e.g.* doctrines of abstention or grants of exclusive jurisdiction), the question of standing focuses on the *party* who seeks relief rather than on the issues that he or she wants adjudicated. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). In addition, a plaintiff must demonstrate standing for each claim he or she asserts and for each form of relief that is sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

If there is no plaintiff with standing to assert a particular claim, federal courts lack jurisdiction to consider it. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009). Parties who invoke federal jurisdiction, here the Plaintiffs, bear the burden of establishing a court's jurisdiction. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998). Thus, it is the Plaintiffs who must establish their standing to proceed with the claims in the Second Amended Complaint.

To establish standing, a plaintiff must show that: (1) he or she has suffered an "injury in fact" that is concrete and particularized, and actual or imminent (not merely conjectural or hypothetical); (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

The "injury in fact" requirement is satisfied differently depending on what kind of relief a plaintiff seeks. A plaintiff may seek retrospective relief (typically in the form of an award of money damages) when he or she wants to be compensated for a past injury. In contrast, a plaintiff may seek prospective relief (usually in the form of a declaratory judgment or an injunction) when he or she believes that he or she will be injured in the future and wants to prevent the injury from happening. Here, the Plaintiffs do not claim that they have suffered any past injuries due to prior enforcement of the new statutes. Instead, they seek prospective relief by asking the Court to enjoin the State from enforcing the statutes in the future.

To have standing to seek prospective relief, a plaintiff must establish that he or she is suffering a continuing injury from the challenged act, or that he or she is under a real and immediate threat of being injured by that act in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). The threatened injury must be "certainly impending" and not merely speculative. *Laidlaw*, 528 U.S. at 190. When, as here, the constitutionality of a criminal statute is challenged based on the prospect of future enforcement, a plaintiff must show that "there exists a credible threat of [future] prosecution" of the plaintiff under the statute. *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).

**B.  Do any of the Plaintiffs have standing to assert that §§ 18-12-301 and -302 are unconstitutionally vague?**

The Plaintiffs claim that certain language found in §§ 18-12-301 and -302 is unconstitutionally vague under the Due Process clause of the 14th Amendment to the United States Constitution.  The State argues that these claims must be dismissed because no Plaintiff has, or can, show a "credible threat" that he, she, or it will be prosecuted under the statutes because the Technical Guidance letters have adequately clarified the statutory terms.  This is a factual challenge to the Plaintiffs' standing.  Accordingly, the Court does not presume the truthfulness of the factual allegations in the Second Amended Complaint and has wide discretion to consider affidavits, other documents, and evidence.  *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).

As noted above, to have standing, a plaintiff who challenges the prospective enforcement of a criminal statute must show a "real and immediate threat" of future prosecution under the statute.  *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007).  This requirement has been characterized as a "credible" threat of prosecution, meaning that is arises from an "objectively justified fear of real consequences."  *Id.* (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).  In *Bronson*, the Tenth Circuit explained that the credible threat test operates as a continuum, along which the degree of likelihood of enforcement must be assessed.  At the "credible threat" end of the spectrum are cases in which the plaintiff has been explicitly threatened with arrest or prosecution.  *See, e.g., Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1156 (10th Cir. 2006).  At the "no credible threat" end of the spectrum are cases in which there was an affirmative assurance by a government actor responsible for enforcing the challenged statute that there will be no prosecution.  *Bronson*, 500 F.3d at 1108.  Such

assurances prevent a "threat" of prosecution from maturing into a "credible" one.  *See, e.g., Mink v. Suthers*, 482 F.3d 1244, 1253-55 (10th Cir. 2007); *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006); *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001).

Here, the Colorado Attorney General's two Technical Guidance letters specify how the statutes should be interpreted and enforced.  The State argues that the Technical Guidance letters act as assurances that there will be no prosecution contrary to their terms.  The Plaintiffs argue that the Technical Guidance letters are insufficient to act as "assurances" of non-prosecution because they are not binding on state or local law enforcement and they do not explicitly state that there will be no prosecution.

The Court rejects the Plaintiffs' argument.  Although the letters do not explicitly state that these Plaintiffs will not be prosecuted under the statutes, the Technical Guidance letters advise the Plaintiffs of the conduct that is permissible (for example, possession of magazines accepting fewer than fifteen rounds but with removable base plates), and therefore the Plaintiffs are assured that they will not be prosecuted for such conduct.  Indeed, C.R.S. § 18-1-504(2)(c) provides an affirmative defense to criminal liability if a defendant engages in conduct under a mistaken belief that the conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense."   In addition, the question is whether there is a credible threat of *prosecution*, not simply *arrest*.  The Plaintiffs have not provided any evidence to suggest that any District Attorney will prosecute in variance to the directive of the Attorney General.  The idea that a rogue District Attorney might choose to prosecute a Plaintiff for conduct explicitly permitted under the terms of the Technical Guidance is purely speculative.

Recognizing a spectrum of likelihood of prosecution, the Tenth Circuit has also held that the "possibility" of future enforcement need not be "reduced to zero" to defeat standing.  *Mink*,

482 F.3d at 1255 (quoting *Winsness*, 433 F.3d at 733). Thus, a defendant need not contend or show that there is no possibility of prosecution. Instead, a plaintiff must demonstrate an "actual or imminent, not conjectural or hypothetical" threat that the statute will be enforced against him, her, or it. *Winsness*, 433 F.3d at 733. Accordingly, the Court finds that the Technical Guidance letters are sufficient to act as assurances by the State that prosecution will be subject to the clarifications provided by the Technical Guidance letters.

In light of the Technical Guidance letters, to show a credible threat of prosecution, a Plaintiff must show that his, her or its intended behavior falls afoul of *both* the statute(s) *and* the Technical Guidance letters. It is not necessary for every Plaintiff to show a credible threat of prosecution for the claims to proceed. If any Plaintiff can show standing, the claim may proceed (albeit only as to that Plaintiff). *See American Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1114 (10th Cir. 2010) (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)).

The Court notes that the Plaintiffs have brought separate vagueness claims as to specific phrases found in §§ 18-12-301 and -302. Thus framed, the Court focuses on *each challenged phrase* as interpreted by the Technical Guidance. To recap, the Plaintiffs claim that the phrases "designed to be readily converted," found in § 18-12-301(2)(a)(I), and "continuous possession," found in § 18-12-302(2)(a)(II), are unconstitutionally vague. In determining whether any Plaintiff has standing to assert these claims, the Court has considered all of the pleadings and factual showings made by the Plaintiffs as to how the new statutes might affect them.

1. "designed to be readily converted"

Section 18-12-302 prohibits the possession, sale, or transfer of large-capacity ammunition magazines. Section 18-12-301(2) defines "large-capacity magazine" as including "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is

10

1043

designed to be readily converted to accept, more than fifteen rounds of ammunition." The first Technical Guidance letter set forth guidance as to how this phrase should be interpreted and enforced:

> [t]he term "designed," when used as a modifier, denotes a feature that meets a specific function. This suggests that design features that fulfill more than one function, and whose function is not specifically to increase the capacity of a magazine, do not fall under the definition. The features of a magazine must be judged objectively to determine whether they were "designed to be readily converted to accept more than fifteen rounds."
>
> Under this reading of the definition, a magazine that accepts fifteen or fewer rounds is not a 'large capacity magazine simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds. On many magazines, that design feature is included specifically to permit cleaning and maintenance. Of course, a magazine whose baseplate is replaced with one that does, in fact, allow the magazine to accept more than fifteen rounds would be a "large capacity magazine" under House Bill 1224.

The second Technical Guidance letter provided additional guidance with regard to magazines with removable base plates:

> [m]agazines with a capacity of 15 or fewer rounds are not large capacity magazines as defined in [§ 18-12-301] whether or not they have removable base plates. The baseplates themselves do not enable the magazines to be expanded and they serve functions aside from expansion — notably, they allow the magazines to be cleaned and repaired. To actually convert them to higher capacity, one must purchase additional equipment or permanently alter their operation mechanically. Unless so altered, they are not prohibited.

Thus, to establish standing to challenge the phrase "designed to be readily converted," at least one Plaintiff must show that he, she, or it intends to sell, transfer, or possess a magazine that accepts fifteen rounds or less, but which has a design feature other than a removable base plate that makes it capable of accepting more than fifteen rounds.

Nothing in the Second Amended Complaint or elsewhere in the record to establishes that any Plaintiff is under a credible threat of prosecution under § 18-12-302 for selling, transferring, or possessing a magazine that is "designed to be readily converted" to accept more than fifteen rounds of ammunition.  Several firearm dealer Plaintiffs, including 2nd Amendment Gunsmith & Shooter Supply, LLC; Green Mountain Guns; Jerry's Outdoor Sports; and Magpul Industries, indicate that they own and intend to sell magazines that have removable "floor plates" or "end caps" (which the Court understands to be equivalent to the "base plates" mentioned in the Technical Guidance letters).  However, in accordance with the Technical Guidance, possession or transfer of magazines that could potentially accept more than 15 rounds by virtue of removable floor plates or end caps alone is not precluded.  The letters expressly state that such magazines are not considered to be "designed to be readily converted" into large-capacity magazines for purposes of enforcement of the statute.

No other Plaintiff has alleged that they intend to sell, transfer, or possess magazines that have a design feature, other than a removable base plate, that allows the magazine to accept more than fifteen rounds.[7]  Accordingly, the Court finds that no Plaintiff has alleged sufficient facts to show a credible threat of prosecution for violation of § 18-12-301 based on the possession, sale, or transfer of a magazine that is "designed to be readily converted" to accept more than 15 rounds.  The State's motion to dismiss this claim is therefore GRANTED, and the claim that this portion of the statute is unconstitutionally vague is dismissed.

---

[7] Several Plaintiffs who are organizations and associations, including the National Shooting Sports Foundation, Colorado State Shooting Association, Outdoor Buddies, Colorado Outfitters Association, and Women for Concealed Carry, assert that they are suing on behalf of their members.  However, these Plaintiffs have not asserted that their individual members intend to sell, possess, or transfer a magazine that is designed to be readily converted to accept more than fifteen rounds by virtue of something other than a removable base plate.  Because these Plaintiffs have not established that their members would have standing to sue in their own right, they have not established their standing to sue on behalf of their members.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000).

2. "continuous possession"

As noted, section 18-12-302 prohibits the possession, sale, or transfer of large-capacity magazines, subject to a grandfather clause.  The grandfather clause protects a person who possesses a large-capacity magazine if he, she, or it (1) owned the magazine as of July 1, 2013 (the effective date of the statute), and (2) maintains "continuous possession" of the magazine thereafter.  § 18-12-302(2).

The first Technical Guidance letter explains:

> Responsible maintenance, handling, and gun safety practices, as well as constitutional principles, dictate that [§ 18-12-302(2)(a)(II)] cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law.  For example, an owner should not be considered to have "transferred" a large-capacity magazine or lost "continuous possession" of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned.  Likewise, a gunsmith, hunting partner, or acquaintance at a shooting range who acquires temporary physical custody of a large-capacity magazine from its owner should not be considered in "possession" of the magazine so long as he or she remains in the owner's physical presence.  However, it would be unreasonable to construe the bill or this guidance to exempt a temporary transfer of a large-capacity magazine in connection with criminal activity.
>
> For similar reasons, the bill's requirement that an owner must maintain "continuous possession" in order to ensure the application of the grandfather clause cannot reasonably be read to require continuous physical possession. . . .

The second Technical Guidance letter provides additional explanation:

> The phrase "continuous possession" in [§ 18-12-302(2)] shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent.  "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous

physical possession of the magazine.  "Continuous possession" is only lost by a voluntary relinquishment of dominion and control.

In light of the Technical Guidance, to establish standing with regard to the phrase "continuous possession," a Plaintiff must establish that he, she, or it is subject to a credible threat of prosecution for possessing a large-capacity magazine and is not protected by the grandfather clause.  In other words, a Plaintiff must show that he, she or it acquired a large-capacity magazine before July 1, 2013, but that he, she, or it does not fall within the grandfather clause because he, she, or it intends to give up "continuous possession" of the magazine.

Plaintiff David Strumillo, a retired police officer, submitted a declaration in which he states that he owns firearms that use large-capacity magazines.  He asserts that under the new statute, he will be "prevented from lending [his] firearms containing [the large-capacity magazines] to [his] family members."

The Court finds that Mr. Strumillo's intended conduct of "lending" his large-capacity magazines to family members subjects him to a credible threat of criminal prosecution under § 18-12-302.  The second Technical Guidance letter states that "continuous possession" is lost only by a "voluntary relinquishment of dominion and control."  A reasonable interpretation of Mr. Strumillo's use of the word "lending" suggests that Mr. Strumillo intends to give up his dominion and control over the magazines for a period of time, and that the magazine will later be returned to him.  Thus, although Mr. Strumillo owned his magazines as of July 1, 2013, the grandfathering clause does not protect him because he intends to give up "continuous possession" of the magazines.

The State further contends that even if there is a Plaintiff who establishes a potential injury, that such Plaintiff lacks standing because the relief sought (an injunction against enforcement) will not redress the injury.  It argues that because the Plaintiffs sued the Governor,

14

1047

any injunction against enforcement of the statute or declaratory relief deeming the statute unconstitutional would not bind the local District Attorneys who carry out the actual enforcement of the statute.

The Court is not persuaded. The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." Colo. Const. Art. IV, § 2. Colorado has long recognized the practice of naming the governor, in his *official role as the state's chief executive*, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008). The Court finds that the Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute. Thus, the relief sought is against the Governor in his official capacity, and therefore would redress injury to Mr. Strumillo.

Accordingly, the Court finds that at least one Plaintiff has established standing to assert a claim that the phrase "continuous possession," § 18-12-302(2), is unconstitutionally vague. The State's motion to dismiss this claim is therefore DENIED.

**C. Do the Sheriffs have standing to sue the State of Colorado?**

The State also request dismissal of all claims brought by Plaintiffs who are county sheriffs because they have no standing to sue the State in their "official capacity". The State relies upon the political subdivision doctrine which teaches that a political subdivision of a state may not sue its parent state under certain provisions of the United States Constitution.

To understand the State's argument, it is important to distinguish between claims brought by a person in an "official capacity" and those brought in a personal/individual capacity.

15

Generally, a government official (whether elected or appointed) can assert rights in two different

capacities.  One pertains to the office in which the official serves.  In that capacity, the official

acts on behalf of, and is the representative of, the office that he or she holds.  That role continues

until the person no longer serves in the office, at which point, the official's successor assumes

that role.  An "official capacity" claim is one that is brought by or against the person acting as

the representative of, or as substitute for, the office or agency.  In other words, in an official

capacity claim, one can readily replace the named individual with the name of the office itself.

For example, an official capacity claim brought by "John Cooke, Sheriff of Weld County," is

actually a claim being brought by the Weld County Sheriff's Office.[8]  *See Hafer v. Melo*, 502

U.S. 21, 25 (1991).

A government official can also assert rights that he or she has as an ordinary, private

citizen.  Following the prior example, a claim brought by Sheriff Cooke in an individual capacity

is actually one by Mr. Cooke as a private citizen.

A government official can be involved in a lawsuit either in his or her official capacity

(that is, as a representative of the office itself) or as an individual, or both.[9]  Here, the Court

understands the parties to agree that the claims asserted by the Sheriffs in the Second Amended

Complaint are all intended to be brought as official capacity claims.  *See generally* Docket # 70

(repeatedly arguing that the "Sheriffs have standing, in their official capacity," in various

---

[8] It is in this same sense that the Court has referred to the Defendant in this case — nominally, Mr. Hickenlooper — as simply "the State," as all claims are brought against Mr. Hickenlooper in his official capacity as the Governor of Colorado.

[9] The issue presented here is the relatively unusual question of whether *plaintiffs* are bringing claims in their official or individual capacities.  The more common question — whether a claim is brought against a *defendant* in an official or individual capacity — is not at issue here.  *See generally Watson v. Polland*, 2009 WL 1328316 (D. Colo. May 8, 2009) (slip op.) (discussing the difference between official and individual capacity claims brought against a defendant).

respects, but never contending that the Sheriffs have standing "in their individual capacity"). Thus, these are claims brought by the Sheriffs' offices of each of the respective county.

The State argues that under the doctrine of political subdivision standing, the Sheriff's Offices in each county are barred from suing the State because a county Sheriff's Office is a political subdivision of the State of Colorado. Consideration of this argument requires application of both federal and state law.

Turning first to federal law, political subdivisions of states, such as cities and counties, are recognized as subordinate governmental instrumentalities created by a state to assist in carrying out state governmental functions. *See Reynolds v. Sims*, 377 U.S. 533, 575 (1964). Under the doctrine of political subdivision standing, a political subdivision of a state cannot sue its parent state for alleged violations of the Fourteenth Amendment. This is because that amendment was written to protect individual rights, as opposed to protecting collective or structural rights.[10] *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 628 (10th Cir. 1998). Indeed, the Tenth Circuit has observed that there is not "a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution." *City of Hugo v. Nichols*, 656 F.3d 1251, 1253-54 (10th Cir. 2011).

This doctrine is an important limitation on the power of the federal government. It guarantees that a federal court will not resolve certain disputes between a state and local government. A political subdivision may seek redress against its parent state for violation of a

---

[10] The Tenth Circuit has expressed some doubt as to whether the issue of a political subdivision suing its parent state is properly regarded as a question of standing or a substantive determination that the Constitution does not afford rights to political subdivisions as against their states. *See City of Hugo v. Nichols*, 656 F.3d 1251, 1255 n.4 (19th Cir. 2011). Nevertheless, in an earlier decision, *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 628 (10th Cir. 1998), the Tenth Circuit cast the issue as one of jurisdictional standing. Thus, this Court treats it as such.

state Constitution, but the political subdivision cannot invoke (nor can a federal court impose) the protections of the United States Constitution for individuals against a state. *See Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933). With regard to its own subdivisions, the power of the state is unrestrained by the Fourteenth Amendment. *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923).

Turning to Colorado law, a county in Colorado is undisputedly a political subdivision of the State of Colorado. *See Bd. of Cnty. Com'rs of Douglas Cnty. v. Bainbridge, Inc.*, 929 P.2d 691, 699 (Colo. 1996). The Colorado Constitution creates an office of Sheriff for each county and lists the Sheriff as a county officer. Colo. Const. Art. XIV, § 8. The Sheriff's Office functions as a department of the county, charged with enforcing State laws within the county limits. As such, it is an extension of the county in which it is situated. Thus, an official capacity claim asserted by a county Sheriff's Office is a claim asserted by a political subdivision of the State.

The Sheriffs argue that they are not a political subdivision of the State because the Office of Sheriff was created by the People of Colorado, through the Colorado Constitution, rather than being created by state law. This argument is not persuasive. The Sheriffs are correct that that the People of Colorado acted through the Colorado Constitution, but in doing so they created and empowered the State of Colorado and its subdivisions. Colo. Const. Art. II, § 1 ("[a]ll political power is vested in and derived from the people; all government, of right, originates from the people . . . ."); Colo. Const. Art. II, § 2 ("The people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state . . . ."). In the Colorado Constitution, the People of the State of Colorado created the structure of the state government,

making counties and county Sheriff's Offices part of it – a political subdivision of the State of Colorado.

Alternatively, the Sheriffs argue that the Supreme Court in *Board of Education v. Allen*, 392 U.S. 236 (1968), carved out an exception to the political subdivision doctrine if the plaintiff has a "personal stake in the outcome" of the litigation. In *Allen*, a local Board of Education sued to stop enforcement of a New York statute requiring public school authorities to lend free textbooks to students at parochial schools. In a footnote, the Supreme Court noted that the Board's standing had not been challenged. However, the Court went on to observe that the "[plaintiffs] have taken an oath to support the United States Constitution. Believing [the statute] to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step — refusal to comply with [the statute] — that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that [the plaintiffs] thus has a 'personal stake in the outcome' of this litigation." *Allen*, 392 U.S. at 241 n.5 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). The Sheriffs argue that, like the members of the Board of Education, they are compelled by their oath to enforce both the U.S. Constitution and state law, yet believe that the state law they are required to enforce violates the U.S. Constitution, giving them the same "personal stake" in the outcome.

The Tenth Circuit addressed this aspect of *Allen* in *City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011). In that case, the Tenth Circuit specifically considered *Allen* in the context of the political subdivision doctrine. The Tenth Circuit explained that in *Allen*, standing was based on the *individual* board members' personal stake in losing their jobs. 656 F.3d at 1260. In other words, the board members were asserting individual claims, rather than "official capacity" claims. Thus, even if members of the Board of Education in *Allen* did not have standing to bring

an official capacity claim, its members could bring a claim as individuals who were at risk of losing their jobs if they adhered to the oath they took. .

The same is true in this case.  If individual sheriffs wish to protect individual rights or interests they may do so.  In the Second Amended Complaint, however, the Sheriffs have confused their individual rights and interests with those of the county Sheriff's Office.  They each assert that they have a  stake in the outcome of this litigation because (1) they desire to adhere to their oath of office, (2) must preserve their ability to use *posse comitatus*,[11] (3) it would be burdensome to do background checks before transferring weapons in the routine execution of Sheriff duties (*e.g.* issuing Sheriff's Office-owned firearms to deputies, collecting and maintaining firearms seized as evidence, etc.), and (4) it would compromise the performance  of their office by diverting time and financial resources away from higher law-enforcement priorities.

The latter three interests are all incident to the functioning of a Sheriff's Office, but are not individual rights of the person who serves as Sheriff.  In other words, Mr. Cooke does not have an individual ability to invoke *posse comitatus* or to issue Sheriff's Office firearms to deputies or to direct use of Sheriff Office resources.  Thus, any injuries affecting these rights are suffered by the Sheriff's Office, not Mr. Cooke.  Because such injury is to a political subdivision of the State, they are not the type of injury  to the individual interests of a government official as contemplated in *Allen* and *Hugo*.

The remaining injury identified by the Sheriffs — the duty to avoid violating their oath of office — is a type of "personal stake" or potential injury that is acknowledged in *Allen*.

---

[11] Essentially, the power of law enforcement authorities to call upon the general citizenry for assistance in keeping the peace.  Black's Law Dictionary, 7th Ed. at 1183.  The Sheriffs' argument is thus that a citizenry dispossessed of certain weapons due to the operation of the statutes offers the Sheriffs a less effective "posse."

However, in *Allen*, the Supreme Court characterized this "personal stake" as the dilemma of "choos[ing] between violating their oath and taking a step . . . that would be likely to bring their expulsion from office." 392 U.S. at 241 n. 5. Similarly, the Court in *Hugo* understood standing under *Allen* to be "based on the individual board members' personal stake in losing their jobs." 656 F.3d at 1260. Perhaps there are individual Sheriffs who desire to bring claims in their individual capacities like that asserted in *Allen*. But no individual claims have been asserted in the Second Amended Complaint.[12]

Finally, the Sheriffs contend that they have third-party standing on behalf of (1) the Colorado mounted rangers and their *posse comitatus*, (2) sheriffs and deputies who wish to purchase large-capacity magazines, and (3) current and former Sheriffs who are disabled under the ADA. This argument presents many problems.

First, the Second Amended Complaint makes no mention of the third parties whose rights the Sheriffs seek to vindicate. Third-party standing is asserted for the first time in the Sheriffs' response to the motion to dismiss. Second, for the reasons discussed above, the Sheriff's Office cannot sue the State under substantive provisions of the United States Constitution. And finally, "third-party standing" requires not only an injury in fact and a close relation to the third-party, but also a hindrance or inability of the third-party to pursue his or her own claims." *Terrell v. INS*, 157 F.3d 806, 809 (10th Cir. 1998). The Sheriffs have not explained why the third-parties did not, or cannot, raise the claims on their own.

Accordingly, the Court finds the doctrine of political subdivision standing applies to the Sheriffs' claims in their official capacity. The Sheriffs, in their official capacities, cannot sue the

---

[12] The Court offers no opinion as to whether the Sheriffs could rejoin the lawsuit by seeking to amend the Second Amended Complaint to assert individual capacity claims, nor what specific facts they must assert to successfully state a claim in which they would have such individual standing.

State under the Fourteenth Amendment to the United States Constitution.  With regard to the ADA claims asserted in this case, the Court also finds that the Sheriffs cannot assert them in an official capacity.  The statutory provisions under which the claims are asserted  protect individual rights, and do not specifically provide rights to political subdivisions.  *See City of Hugo*, 656 F.3d at 1257 (the Supreme Court and courts of appeals have allowed a political subdivision to sue its parent state only when Congress has enacted statutory law specifically providing rights to municipalities).

Accordingly, all claims asserted by the Sheriffs in the Second Amended Complaint are DISMISSED for lack of standing.

## IV.  Conclusion

For the forgoing reasons, the Defendant's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** with respect to all claims asserted by the Sheriffs.  The claims are **DISMISSED** without prejudice.  Any Sheriff shall have 14 days from the date of this Order in which to seek to join the action in an individual capacity.

The motion is **GRANTED** with respect to the Plaintiffs' claim that the phrase "designed to be readily converted," found in § 18-12-301(2)(a)(I), is unconstitutionally vague, and the claim is **DISMISSED**.

22

1055

The claims proceeding in this case are (1) Second Amendment challenges to §§ 18-12-301 *et seq.* and § 18-12-112; (2) a claim for unconstitutional vagueness as to the phrase "continuous possession," § 18-12-302(2)(a)(II); and (3) the ADA claims.

Dated this 27th day of November, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

23

1056

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

**PLAINTIFFS' UNOPPOSED MOTION TO ALTER OR AMEND
ORDER (#96) ON MOTION TO DISMISS**

---

Pursuant to Fed. R. Civ. P. 59(e) and 60(a), Plaintiffs move this Court to correct one aspect of its Order (#96) on Defendant's motion to dismiss.  In particular, Plaintiffs respectfully request this Court to amend the Order to clarify that the Plaintiff Sheriffs have already asserted claims in their respective individual capacities in the Second Amended Complaint, and that they remain in this case as Plaintiffs in their individual capacities only.

**Certification.**  Pursuant to D.C.COLO.LCivR 7.1(A), undersigned counsel certifies that he has conferred with counsel for Defendant concerning the relief sought in this motion.  Defendant's counsel has stated that Defendant does not oppose this motion to seek clarification of the Court's Order.

**BACKGROUND**

In its Opinion and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("Order"), this Court granted Defendant's motion with respect to the Plaintiff Sheriffs, holding that they do not have standing in their official capacities to sue the State of Colorado.

1

Order, at 21-22.  In the course of reaching that conclusion, this Court's order contained two statements that indicate a misunderstanding concerning the Sheriffs' claims.  Page 16 of the Order stated:  "Here, the Court understands the parties to agree that the claims asserted by the Sheriffs in the Second Amended Complaint are all intended to be brought as official capacity claims."  Similarly, at page 21, the Order stated that "no individual claims have been asserted in the Second Amended Complaint."

Based on the premise that the Sheriffs had not asserted individual claims in this action, and indeed that all the parties agreed that they had not done so, this Court held that Defendant's motion to dismiss the Sheriffs in their official capacities was granted "with respect to **all** claims asserted by the Sheriffs."  Order at 22.  The Order gave the Sheriffs 14 days from the date of the Order in which to seek to join in the action in their individual capacities.  *Id.*

As further discussed below, the Sheriffs have already asserted individual claims in the Second Amended Complaint.  Indeed, all the parties, including Defendant and his counsel, understood that pursuant to the Second Amended Complaint, the Sheriffs had asserted claims in both their official and individual capacities.  Accordingly, Plaintiffs respectfully request that this Court amend its Order to state that while the Sheriffs' official claims are dismissed for the reasons detailed by this Court, they remain in the case in their individual capacities only.

## **ARGUMENT**

Rule 59(e) of the Federal Rules of Civil Procedure allows for a motion to alter or amend a judgment.  Since specific grounds for such a motion are not listed in the rule, this Court enjoys considerable discretion in whether to grant such a motion.  11 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE, § 2810.1 (3d ed.).  In addition, Rule 60(a) states that "[t]he

court may correct . . . a mistake arising from oversight or omission whenever one is found in a

judgment, order, or other part of the record."[1]  Here, a correction or alteration of the record is

warranted because the Sheriffs had asserted individual claims in the Second Amended

Complaint, and therefore should remain in this case for purposes of asserting their own

individual Second Amendment rights.

On July 1, 2013, Plaintiffs filed a motion for leave to file a Second Amended Complaint.

Doc.43.  In that motion, Plaintiffs explained that the Sheriffs in the First Amended Complaint

had asserted claims premised on their personal Second and Fourteenth Amendment rights:

> 6.     [I]n the First Amended Complaint, the Sheriffs, as members of the
> category of the Plaintiffs in general, and as members of the category of individual
> Plaintiffs, had raised their personal Second and Fourteenth Amendment rights as
> American citizens. See First Amended Complaint, ¶¶ 95, 137, 158, 187, 207, 214,
> 217, and 231.

> 7.     Defendant, in his Response Brief, expressed surprise that the
> Sheriffs are asserting their individual rights. Response at 14.

> 8.     Therefore, in the interest of absolute clarity, Plaintiffs seek to
> amend paragraph 105, in the section on the Plaintiff Sheriffs' interests, to further
> state the Sheriffs' individual rights and interests, even though those rights and
> interests had already been repeatedly stated in the First Amended Complaint.

*Id.* ¶¶ 6-8.  Because Defendant's counsel had indicated surprise that the Sheriffs were asserting

rights in their individual capacities, Plaintiffs sought to amend the complaint to clarify and

"further state the Sheriffs' individual rights and interests, even though those rights and interests

had already been repeatedly stated in the First Amended Complaint."  *Id.* ¶ 8.  Defendant's

---

[1]  Although Rule 60(b)(1) also contemplates motions for relief from a final order for, among
other things, mistake or inadvertence, there is some doubt concerning the circumstances under
which relief can be sought for an error of the court  WRIGHT, ET AL., § 2858.1

counsel were fully aware that this was one of Plaintiffs' purposes in filing the Second Amended

Complaint, and indeed Defendant's counsel did not oppose the motion.

Paragraph 105 of the Plaintiffs' proposed Second Amended Complaint, which this Court

subsequently accepted for filing on July 10, 2013 (#58), contains the following pertinent

allegations:

> As described in paragraphs 95, 137, 158, 187, 207, 214, 217, and 231, **the
> Sheriffs, like all Plaintiffs, are injured by the infringements of their individual
> rights under the Second and Fourteenth Amendments**. The infringements of the
> Sheriffs' rights are particularly harmful because of the heightened danger that the
> Sheriffs and their families presently face and will continue to face after retirement
> as the result of the Sheriffs' public service.

Second Amended Complaint, ¶ 105 (emphasis added).  Thus, the Second Amended Complaint

explicitly contained an assertion by the Sheriffs of violations of their own individual rights under

the Second and Fourteenth Amendments.

The fact that all parties agreed that the Sheriffs had asserted claims in both their official

and personal capacities was later illustrated in Defendant's Motion to Dismiss Plaintiffs' Claims

Two, Three, and Four, and to Dismiss Sheriffs as Plaintiffs Acting in Their Official Capacity

(#64).  At footnote 3 of that motion, Defendant stated as follows:  "Defendants [sic] do not

contend that the sheriffs lack standing in their individual capacities."  Doc.64 at 15 n.3.  Of

course, that assurance only made sense if the Sheriffs had in fact asserted claims in their

individual capacities – which they had.

Defendant in his Reply Brief for his Motion to Dismiss (#75), at 18, emphatically restated

that the Sheriffs would remain in the case in their individual capacities: "As an initial matter,

Sheriffs [sic] claim for third-party standing ignores that Defendant has not moved to dismiss

Sheriffs through their individual capacities.  Defendant has never disputed that Sheriffs can bring

the claims through their individual capacities." (Internal citation omitted.)  Similarly, in an e-mail sent on July 31, 2013 (attached as Ex. A), Assistant Attorney General David Blake acknowledged:  "We are not moving to remove sheriffs *in their personal capacity* . . . ." (Emphasis added.)

The Sheriffs' briefing has always been consistent with the Sheriffs' dual capacities. In response to Defendant's Motion "To Dismiss Sheriffs As Plaintiffs Acting In Their Official Capacity" the Sheriffs of course addressed only issues of official capacity, since those were the only issues relevant to the Motion.

Previously, when this Court asked the Plaintiffs for supplemental briefing on Plaintiffs' standing for the preliminary injunction motion, the Plaintiffs filed a joint brief in which one section was titled "The Sheriffs' Individual Second and Fourteenth Amendment Rights." The next section of the brief was captioned "The Sheriffs in their Official Capacity," and began, "Besides having standing as individual American citizens, the Sheriffs also have standing in their official capacity." Plaintiffs' Supplemental Brief Regarding Plaintiff's Standing and Other Issues Raised by the Court (#37), at 21-22.

Not only have the parties documented their understanding that the Sheriffs were proceeding in their individual and official capacities, but discovery proceeded on the common understanding of the parties that the Sheriffs were asserting both individual and official capacity claims. In every Sheriff's deposition, Defendant's counsel questioned the Sheriffs at length concerning purely personal issues, including questions relating to, among other things, every single firearm in their personal collections, the shooting ability of their spouses and children,

their experience as hunters, their recreational use of firearms, and any personal home defense situations the Sheriffs and their family members had faced.

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully request this Court to amend its Order to clarify that while the Sheriffs have been dismissed in their official capacities for the reasons stated in the order,[2] they remain Plaintiffs in this case as parties asserting their own individual rights.

Dated this 6th day of December, 2013.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

---

[2] By this motion, it is not Plaintiffs' intention to waive for appellate purposes the issue of the Sheriffs' standing in their official capacities.

1062

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEY FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

7

1063

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2013, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | Stephanie.Scoville@state.co.us |
| John Lee | jtlee@state.co.us |

s/Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020

1064

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## MOTION FOR JOINDER AND FOR LEAVE TO FILE AMENDED COMPLAINT

---

1. Pursuant to this Court's instructions in its Opinion of November 27, 2013 (#96), fifty-five Sheriffs, in their personal, individual capacities as American citizens, request joinder and leave for filing a Third Amended Complaint. FED. R. CIV. PRO. 20(a)(1).

2. The Sheriffs request that the Court consider this Motion only if the Court denies the Plaintiffs' Motion to Amend/Correct/Modify (#102). That Motion suggests that the Sheriffs had always been parties to the case in part in dual

capacities: official and personal. Therefore, that Motion requests that the

Opinion and Order (#96) be modified to state that the Sheriffs are dismissed

in their official capacities, and remain in the case in their individual

capacities.

3. If the Court grants the Motion to Amend/Correct/Modify, the Sheriffs will

immediately withdraw the instant Motion.

4. Pursuant to D.C.COLO.LCivR 7.1(a), counsel has conferred telephonically

with Defendant's attorneys Matthew Grove, David Blake, and Kathleen

Spalding regarding this Motion. Counsel explained that the Sheriffs would be

filing this Motion, and described the contents of the proposed Third Amended

Complaint. Defendant's counsel does not presently declare a position

regarding this Motion, and Defendant reserves the right to oppose this

Motion, following review of the proposed Third Amended Complaint.

5. Pursuant to D.C.COLO.LCivR 15.1(b), a copy of the proposed Third Amended

Complaint is attached to this Motion, as an exhibit, with strike-throughs and

underlines to indicate the removal or addition of text.

6. The only changes from the Second to the Third Amended Complaints are as

follows:

a. In the caption, removal of the Sheriff's Office and County (e.g., "Sheriff of

Weld County, Colorado").

b. Replacing section III.A.1 of the Complaint in its entirety. This section

describes the identities and interests of the individual Sheriff plaintiffs.

c. Changing the date of the Complaint.

7. Granting of this Motion for Joinder/Amendment will prejudice no party, nor

will it delay the case. "Prejudice is the 'most important [ ] factor in deciding a

motion to amend the pleadings.'" *Mohammed v. Holder*, 2013 WL 4949282, *6

(D. Colo., 2013), *quoting Minter v. Prime Equipment Co.*, 451 F.3d 1196, 1207

(10th Cir.2006). As detailed in the Plaintiffs' Motion to

Amend/Correct/Modify, all parties have proceeded for the last half-year on

the shared understanding that the Sheriffs were participating in this case in

the dual capacities of official and personal.

8. Accordingly, extensive discovery has been completed regarding the Sheriffs'

personal capacities, including depositions which have inquired in great depth

about the Sheriffs' personal firearms collections, their personal hunting and

recreational target shooting, their families, and threats/violence against them

and their families. Excerpts from those depositions accompany the proposed

Third Amended Complaint, as Exhibit A.

9. During the discovery phase, six Sheriffs were disclosed as possible witnesses

at trial, and each of them was deposed. These six Sheriffs remain the ones

who would be witnesses at trial.

10. The Third Amended Complaint raises no new claims.

11. While the Third Amended Complaint does provide additional details about some topics, all of the topics are ones which have previously been identified in the case, and which have been topics of discovery. The Third Amended Complaint includes citations to the relevant discovery.

12. Joinder would promote judicial economy, because claims could be resolved in a single case, rather than in separate cases.

13. The Sheriffs' claims arise from the same transaction as do the claims of the other plaintiffs, namely the enactment of HB 1224 and HB 1229. FED. R. CIV. PRO. 20(a)(1)(A). The questions of law are identical, with the exception that the Sheriffs also address the scope of the law enforcement employee exemption in HB 1224. FED. R. CIV. PRO. 20(a)(1)(B).

14. The questions of fact are also nearly identical. FED. R. CIV. PRO. 20(a)(1)(B). Whatever state interests could be said to justify HB 1224 and 1229 would be the same or very similar for all plaintiffs, including the Sheriffs.

15. Likewise, the interests of the Sheriffs as individual gun owners are similar to the interests of individual gun owners who are already plaintiffs, either as named plaintiffs or as individual members of various organizations. Of course no two individuals are identical, but the interests of the Sheriffs as gun owners, in wishing to acquire, use, lend, and sell their own firearms and magazines are identical or similar to the interests of other individual gun owners.

1068

16. Because all of the Sheriffs have already been part of the case, and thorough discovery has already taken place regarding their personal capacities, no additional discovery is necessary.

17. The proposed Third Amended Complaint has nine exhibits—designated "Exhibit A" through "Exhibit I." Exhibits A and B are being filed separately, with a Motion For Leave To Restrict.

Respectfully submitted, this 11th day of December, 2013.

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

1069

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2013, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

Jonathan M. Anderson     jmanderson@hollandhart.com

Douglas Abbott           dabbott@hollandhart.com

Marc F. Colin            mcolin@bcjlpc.com

Anthony J. Fabian        fabianlaw@qwestoffice.net

Matthew Grove            matt.grove@state.co.us

Kathleen Spalding        kit.spalding@state.co.us

Jonathan Fero            jon.fero@state.co.us

David Blake              david.blake@state.co.us

Daniel D. Domenico       dan.domenico@state.co.us

Stephanie Scoville       Stephanie.Scoville@state.co.us

John Lee                 jtlee@state.co.us


/s/David B. Kopel
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado;
TERRY MAKETA, Sheriff of El Paso County, Colorado;
JUSTIN SMITH, Sheriff of Larimer County, Colorado;
DAVID A. WEAVER, Sheriff of Douglas County, Colorado;
BRUCE W. HARTMAN, Sheriff of Gilpin County, Colorado;
KEN PUTNAM, Sheriff of Cheyenne County, Colorado;
DENNIS SPRUELL, Sheriff of Montezuma County, Colorado;
TIM JANTZ, Sheriff of Moffat County, Colorado;
JERRY MARTIN, Sheriff of Dolores County, Colorado;
MIKE ENSMINGER, Sheriff of Teller County, Colorado;
SHAYNE HEAP, Sheriff of Elbert County, Colorado;
CHAD DAY, Sheriff of Yuma County, Colorado;
FRED D. MCKEE, Sheriff of Delta County, Colorado;
LOU VALLARIO, Sheriff of Garfield County, Colorado;
FRED HOSSELKUS, Sheriff of Mineral County, Colorado;
BRETT L. POWELL, Sheriff of Logan County, Colorado;
JAMES FAULL, Sheriff of Prowers County, Colorado;
LARRY KUNTZ, Sheriff of Washington County, Colorado;
BRIAN E. NORTON, Sheriff of Rio Grande County, Colorado;
DUKE SCHIRARD, Sheriff of La Plata County, Colorado;
JIM BEICKER, Sheriff of Fremont County, Colorado;
RONALD BRUCE, Sheriff of Hinsdale County, Colorado;
CHRIS S. JOHNSON, Sheriff of Otero County, Colorado;
FRED JOBE, Sheriff of Custer County, Colorado;
DONALD KRUEGER, Sheriff of Clear Creek County, Colorado;
JAMES CRONE, Sheriff of Morgan County, Colorado;
SI WOODRUFF, Sheriff of Rio Blanco County, Colorado;
TOM RIDNOUR, Sheriff of Kit Carson County, Colorado;
TOM NESTOR, Sheriff of Lincoln County, Colorado;
STAN HILKEY, Sheriff of Mesa County, Colorado;
FORREST FRAZEE, Sheriff of Kiowa County, Colorado;
RICK DUNLAP, Sheriff of Montrose County, Colorado;
TED B. MINK, Sheriff of Jefferson County, Colorado;
DAVE STONG, Sheriff of Alamosa County, Colorado;
FRED WEGENER, Sheriff of Park County, Colorado;
BRUCE NEWMAN, Sheriff of Huerfano County, Colorado;
RANDY PECK, Sheriff of Sedgwick County, Colorado;
DOMINIC MATTIVI, JR., Sheriff of Ouray County, Colorado;
JOHN MINOR, Sheriff of Summit County, Colorado;

SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH, Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR, Sheriff of Adams County, Colorado;
RODNEY JOHNSON, Sheriff of Grand County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

        Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

## ~~SECOND~~ THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Peace officers and peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are 55 Colorado elected sheriffs, retired law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

### I.   OVERVIEW

1.   On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2.   House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013 that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3. The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4. The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5. Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6. Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7. The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8. Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.     The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14. The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15. In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16. Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.     Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.     HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.     The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

### HB 1229

20.     House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common, temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26.     Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27.     There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28.     Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29.     The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30.     An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31.     Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32.     HB 1224 and HB 1229 violate these principles.

## II.     JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34.     This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III.     PARTIES

### A.     Plaintiffs

### ~~1.     The Sheriffs of 55 Colorado Counties~~

37.     ~~Each of the following Sheriffs of 55 Colorado counties ("the Sheriffs") has the primary obligation to obey the Constitution of the United States of America. The Sheriffs bring this case pursuant to this primary obligation, which is supreme over any other purported enactment.~~

38.     ~~John B. Cooke is the Sheriff of Weld County, Colorado.~~

39.     ~~Terry Maketa is the Sheriff of El Paso County, Colorado.~~

40.     ~~Justin Smith is the Sheriff of Larimer County, Colorado.~~

41.     ~~David A. Weaver is the Sheriff of Douglas County, Colorado.~~

42.     ~~Bruce W. Hartman is the Sheriff of Gilpin County, Colorado.~~

43. ~~Ken Putnam is the Sheriff of Cheyenne County, Colorado.~~

44. ~~Dennis Spruell is the Sheriff of Montezuma County, Colorado.~~

45. ~~Tim Jantz is the Sheriff of Moffat County, Colorado.~~

46. ~~Jerry Martin is the Sheriff of Dolores County, Colorado.~~

47. ~~Mike Ensminger is the Sheriff of Teller County, Colorado.~~

48. ~~Shayne Heap is the Sheriff of Elbert County, Colorado.~~

49. ~~Chad Day is the Sheriff of Yuma County, Colorado.~~

50. ~~Fred D. McKee is the Sheriff of Delta County, Colorado.~~

51. ~~Lou Vallario is the Sheriff of Garfield County, Colorado.~~

52. ~~Fred Hosselkus is the Sheriff of Mineral County, Colorado.~~

53. ~~Brett L. Powell is the Sheriff of Logan County, Colorado.~~

54. ~~James Faull is the Sheriff of Prowers County, Colorado.~~

55. ~~Larry Kuntz is the Sheriff of Washington County, Colorado.~~

56. ~~Brian E. Norton is the Sheriff of Rio Grande County, Colorado.~~

57. ~~Duke Schirard is the Sheriff of La Plata County, Colorado.~~

58. ~~Jim Beicker is the Sheriff of Fremont County, Colorado.~~

59. ~~Ronald Bruce is the Sheriff of Hinsdale County, Colorado.~~

60. ~~Chris S. Johnson is the Sheriff of Otero County, Colorado.~~

61. ~~Fred Jobe is the Sheriff of Custer County, Colorado.~~

62. ~~Donald Krueger is the Sheriff of Clear Creek County, Colorado.~~

63. ~~James Crone is the Sheriff of Morgan County, Colorado.~~

64. ~~Si Woodruff is the Sheriff of Rio Blanco County, Colorado.~~

65. Tom Ridnour is the Sheriff of Kit Carson County, Colorado.

66. Tom Nestor is the Sheriff of Lincoln County, Colorado.

67. Stan Hilkey is the Sheriff of Mesa County, Colorado.

68. Forrest Frazee is the Sheriff of Kiowa County, Colorado.

69. Rick Dunlap is the Sheriff of Montrose County, Colorado.

70. Ted B. Mink is the Sheriff of Jefferson County, Colorado.

71. Dave Stong is the Sheriff of Alamosa County, Colorado.

72. Fred Wegener is the Sheriff of Park County, Colorado.

73. Bruce Newman is the Sheriff of Huerfano County, Colorado.

74. Randy Peck is the Sheriff of Sedgwick County, Colorado.

75. Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado.

76. John Minor is the Sheriff of Summit County, Colorado.

77. Scott Fischer is the Sheriff of Jackson County, Colorado.

78. Peter Gonzalez is the Sheriff of Archuleta County, Colorado.

79. Rick Besecker is the Sheriff of Gunnison County, Colorado.

80. Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado.

81. Rod Fenske is the Sheriff of Lake County, Colorado.

82. Grayson Robinson is the Sheriff of Arapahoe County, Colorado.

83. David D. Campbell is the Sheriff of Baca County, Colorado.

84. Mike Norris is the Sheriff of Saguache County, Colorado.

85. Amos Medina is the Sheriff of Costilla County, Colorado.

86. Miles Clark is the Sheriff of Crowley County, Colorado.

87.    ~~David Encinias is the Sheriff of Bent County, Colorado.~~

88.    ~~Sue Kurtz is the Sheriff of San Juan County, Colorado.~~

89.    ~~James (Jim) Casias is the Sheriff of Las Animas County, Colorado.~~

90.    ~~Garrett Wiggins is the Sheriff of Routt County, Colorado.~~

91.    ~~Douglas N. Darr is the Sheriff of Adams County, Colorado.~~

92.    ~~Rodney Johnson is the Sheriff of Grand County, Colorado.~~

93.    ~~HB 1224 and 1229 violate the Constitution of the United States. The Sheriffs cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado.~~

94.    ~~For reasons detailed *supra* and *infra*, HB 1224 and 1229 are utterly unenforceable, even if the Sheriffs wished to violate the U.S. Constitution.~~

95.    ~~After HB 1229 becomes effective, every citizen of Colorado can legally possess a "large capacity" magazine that holds more than 15 rounds so long as they owned it prior to the effective date and maintain "continuous possession" of it after the effective date. This includes both magazines that hold more than 15 rounds, and smaller magazines with removable floor plates or end caps. At least hundreds of thousands of Colorado citizens, including the individual Plaintiffs and members of Plaintiff associations, will lawfully own hundreds of thousands (or more) of such magazines.~~

96.    ~~The Sheriffs have limited resources and limited public funds to spend on investigations. They cannot expend those resources to conduct investigations that would be necessary to monitor compliance with the new magazine restrictions.~~

No documentation has ever been required for the retail or private purchase of magazines, making it a practical impossibility for the Sheriffs to determine whether one of the many magazines already in existence was obtained after the effective date.

97.    It would be similarly impossible to determine whether a magazine was in the "continuous possession" of its owner after July 1, 2013.

98.    With very few exceptions, magazines manufactured in other states are not required to bear date stamps, making it impossible to determine their date of manufacture. The Sheriffs will have no means to determine whether a magazine possessed by an individual in Colorado was manufactured before or after July 1, 2013, with the exception of those manufactured in Colorado after July 1, 2013 that are required by the bill to bear a date stamp.

99.    The foregoing presumes that it is clear what the bill prohibits. But the Sheriffs' enforcement obstacles become insurmountable if they must also resolve ambiguities in the bill. If the bill does not prohibit every magazine with a removable floor plate and end cap, but only those that were intentionally "designed" for the purpose of expanding capacity, the Sheriffs are given no tools to make that determination. They cannot know the intent of the designer.

100.    Likewise, each Sheriff will have to determine what constitutes "continuous possession," since the statute provides no guidance. They will have to make individual decisions whether continuous possession allows for temporary loans to others and, if so, for what duration.

101. ~~In addition to the core infringement on a fundamental right inherent in any enforcement of these provisions, the result of the many ambiguities will be varying individual decisions and inconsistent enforcement across jurisdictions. Effective law enforcement depends on close and supportive relations between the public and law enforcement. Unconstitutional, vague laws which are inconsistently enforced poison that relationship, and make it significantly more difficult for the Sheriffs to receive the witness cooperation, tips, and other forms of public support which are necessary to effective law enforcement in a free society.~~

102. ~~Sheriffs have the common law power to request the armed assistance of able-bodied adults in their County. This is known as the "posse comitatus." One well-known use of the posse in Colorado was in June 1977, when Pitkin County citizens with their own guns responded to a request to help with the search for escaped mass murderer Theodore Bundy.~~

103. ~~Sheriffs also have the authority to appoint deputies who are not certified peace officers. The "non-certified" deputies may be appointed for a limited period of time, or for specific tasks. C.R.S. §§ 16-2.5-103(2); 30-10-506. Particularly in rural parts of Colorado, Sheriffs utilize the authority to deputize individuals to augment law enforcement efforts in times of disturbances and natural disasters.~~

104. ~~When those Sheriffs deputize, they do not have a cache of firearms to issue. Moreover, a person who is deputized in an emergency will be safer and more effective using his or her personal firearm, with which he or she is already familiar.~~

105. ~~HB 1224 seriously impedes the ability of Sheriffs to call upon armed citizen assistance during emergencies and natural disasters because it prevents citizens from having the types of magazines which the Sheriffs and their ordinary deputies have determined to be most effective for the preservation of public safety. As described in paragraphs 95, 137, 158, 187, 207, 214, 217, and 231, the Sheriffs, like all Plaintiffs, are injured by the infringements of their individual rights under the Second and Fourteenth Amendments. The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.~~

**1. Plaintiff Sheriffs, in the personal capacities**

**a.    Background of Sheriff Plaintiffs**

106.    The Fifty-five Plaintiffs are individual citizens who are career law enforcement officers and who are presently elected Sheriffs. The aforesaid Plaintiffs are suing in their individual capacities as American citizens with individual rights under the Second and Fourteenth Amendments. Because all of them happen to be, at this time, elected Sheriffs, this Complaint refers to them as "the Sheriffs" for concision.

107.    John B. Cooke has served nearly 35 years in law enforcement. He has five years of experience with the Breckenridge Police Department, and has served 29 years and 8 months with the Weld County Sheriff's Office, including 11 as Sheriff. Because of term limits, he will complete his law enforcement career in January 2015. Like several other Sheriffs, Cooke and his family have been the

victims of identifiable threats; those threats are described in Exhibit A (at 4-6) to this Complaint. All Exhibits to this Complaint are incorporated by reference.

108.    Terry Maketa is the Sheriff of El Paso County, Colorado. He has 26 years of law enforcement experience, all of them with the El Paso County Sheriff's Office. He is the first person in the Office's history to rise all the way through every rank and then become Sheriff.

109.    Justin Smith is the Sheriff of Larimer County, Colorado. He has 27 years law enforcement experience, 13 of them in command ranks. If he continues to be re-elected, his law enforcement service will end in January 2019.

110.    David A. Weaver is the Sheriff of Douglas County, Colorado. He has over 32 years of law enforcement experience, and has worked in nearly every area of police administration.

111.    Bruce W. Hartman is the Sheriff of Gilpin County, Colorado. He is currently serving his fifth term as Sheriff and was originally elected in 1992.

112.    Ken Putnam is the Sheriff of Cheyenne County, Colorado. He has 18 years of law enforcement experience, and will finish his service as Sheriff in January 2015.

113.    Dennis Spruell is the Sheriff of Montezuma County, Colorado. He has 33 years in law enforcement, with 27 years as a Supervisor, including as a K-9 Officer and director of a multijurisdictional drug task force. Sheriff Spruell has been Sheriff for three years and will be term limited in 2021, if he is re-elected.

114.    Tim Jantz is the Sheriff of Moffat County, Colorado. He has 33 years of law enforcement, 14 of them at the supervisory level.

115.    Jerry Martin is the Sheriff of Dolores County, Colorado. He has 27 years of law enforcement experience, and his serving his sixth term as Sheriff.

116.    Mike Ensminger is the Sheriff of Teller County, Colorado. He retired from the San Diego County Sheriff's office in 1987, and moved to Colorado. From 1988 to 2010, he was a Professor of Criminal Justice at Pikes Peak Community College. He was elected Sheriff in 2010.

117.    Shayne Heap is the Sheriff of Elbert County, Colorado. He has 12 years in law enforcement, three of them as Sheriff. He is a member of the Elizabeth C-1 School Safety Board.

118.    Chad Day is the Sheriff of Yuma County, Colorado. He has 11 years of law enforcement experience.

119.    Fred D. McKee is the Sheriff of Delta County, Colorado. He has 31 years of law enforcement experience, including 10 as Sheriff. If he is re-elected in 2014, he plans to retire after the end of his term in January 2019.

120.    Lou Vallario is the Sheriff of Garfield County, Colorado. He has 26 years of law enforcement experience, and served with the Glenwood Springs Police Department before being elected Sheriff.

121.    Fred Hosselkus is the Sheriff of Mineral County, Colorado. He was first elected in 2006, and previously served as a deputy in the Office.

122.     Brett L. Powell is the Sheriff of Logan County, Colorado. He has 17 years of law enforcement experience.

123.     James Faull is the Sheriff of Prowers County, Colorado. He has 37 years of law enforcement experience—14 as Sheriff, and 23 years with a police department (15 of those in command positions). He plans on retiring at the end of his term in January 2015.

124.     Larry Kuntz is the Sheriff of Washington County, Colorado. He will retire in January 2015 at the completion of his third term. He has 36 years of law enforcement experience, including as a city police officer and a Sheriff's deputy. Part of the reason for his retirement is regulatory changes that he feels put citizens in jeopardy, and that endanger law enforcement officers. These changes include HB 1224's de facto prevention of law enforcement officers and citizens, including himself, from acquiring standard capacity magazines holding 16 or more rounds.

125.     Brian E. Norton is the Sheriff of Rio Grande County, Colorado. He has 26 years of law enforcement experience, including nine as Undersheriff and 11 as Sheriff.

126.     Duke Schirard is the Sheriff of La Plata County, Colorado. He has 39 years of law enforcement experience, including as Sheriff's deputy, police officer, town marshal, and Sheriff.

127.     Jim Beicker is the Sheriff of Fremont County, Colorado. He has 27 years of law enforcement experience, including 10 as Sheriff.

128.     Ronald Bruce is the Sheriff of Hinsdale County, Colorado. He joined the Arizona Department of Public Safety – Highway Patrol Bureau in 1974, and retired therefrom on October 31, 2002. His wife retired as an Arizona Trooper that same day, after 22 years of service. He was elected Sheriff of Hinsdale County in 2006.

129.     Chris S. Johnson is the Sheriff of Otero County, Colorado. He has 35 years of law enforcement experience, and has been Sheriff for 11 years.

130.     Fred Jobe has been the Sheriff of Custer County, Colorado, for 28 years, and he has 39 years of law enforcement experience. He plans to retire at the end of his current term, in January 2015.

131.     Donald Krueger is the Sheriff of Clear Creek County, Colorado. He has 25 years of full-time law enforcement experience, plus 14 years as a reserve officer. He has been Sheriff for 19 years and will retire at the end of his term in January 2015.

132.     James Crone is the Sheriff of Morgan County, Colorado. He has served as Sheriff for 15 years, and had 19 years of law enforcement experience before that.

133.     Si Woodruff is the Sheriff of Rio Blanco County, Colorado. He has 39 years of law enforcement experience, as Police officer, Senior patrol officer, Chief of Police, and then Sheriff.

134.   <u>Tom Ridnour is the Sheriff of Kit Carson County, Colorado. He has previously served as an investigator for the Colorado Department of Corrections as well as a police officer for the City of Burlington.</u>

135.   <u>Tom Nestor is the Sheriff of Lincoln County, Colorado.  He has been with the Lincoln County Sheriff's Office for 24 years. He previously served as Undersheriff.</u>

136.   <u>Stan Hilkey is the Sheriff of Mesa County, Colorado. He has 27 years of law enforcement experience. He is term limited, and his final term ends in January 2015.</u>

137.   <u>Forrest Frazee is the Sheriff of Kiowa County, Colorado. After retiring from a long career in the U.S. Navy, he was elected Sheriff in 2006.</u>

138.   <u>Rick Dunlap is the Sheriff of Montrose County, Colorado. He has 23 years of law enforcement experience, including seven as Sheriff. If he is re-elected in 2014, his service as Sheriff will end in January 2019.</u>

139.   <u>Ted B. Mink is the Sheriff of Jefferson County, Colorado. He will complete his final term as Sheriff in January 2015. Before being appointed Sheriff in July 2003, he had served as Undersheriff in Jefferson County. He was an officer with the Arvada Police Department from September 1977 until January 2003, and had been Deputy Chief of Police since 1998.</u>

140.   <u>Dave Stong is the Sheriff of Alamosa County, Colorado. He has 40 years law enforcement experience, 20 of them as Sheriff. He will retire in January 2015.</u>

141.    <u>Fred Wegener is the Sheriff of Park County, Colorado. He has been in law enforcement for 26 years, and prior to that was a military police officer for six years.</u>

142.    <u>Bruce Newman is the Sheriff of Huerfano County, Colorado. He has 26 years law enforcement experience, including a year at the federal Supermax.</u>

143.    <u>Randy Peck is the Sheriff of Sedgwick County, Colorado. He has been Sheriff for three years, and before that had 20 years of experience as a Deputy sheriff, Sergeant, and Undersheriff.</u>

144.    <u>Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado. He was first elected in 2002, and before that was a deputy in the Office.</u>

145.    <u>John Minor is the Sheriff of Summit County, Colorado. He has served in law enforcement since 1990. His service includes four months as Acting Chief of Police in Silverthorne. He has been Sheriff since 2004. If he is re-elected in 2014, term limits will bring his service to an end in January 2019.</u>

146.    <u>Scott Fischer is the Sheriff of Jackson County, Colorado. He has 16 years of law enforcement experience, including as State Trooper and Undersheriff.</u>

147.    <u>Peter Gonzalez is the Sheriff of Archuleta County, Colorado. He has 42 years of law enforcement experience, including six years as Chief of Police in Ignacio, Colorado. He will retire in January 2015, after completing eight years of service as Sheriff.</u>

148.    Rick Besecker is the Sheriff of Gunnison County, Colorado. He has 41 years of law enforcement experience divided between the Saguache County Sheriff's Office, the Gunnison Police Department and Gunnison County Sheriff's Office.

149.    Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado. He joined the Office in 2002. He previously served in the Summit County Sheriff's Office.

150.    Rod Fenske is the Sheriff of Lake County, Colorado. He has 29 years of law enforcement experience, including as Police Chief.

151.    Grayson Robinson is the Sheriff of Arapahoe County, Colorado. His law enforcement career began with the Littleton Police Department in 1972, and he became a Division Commander in 1979. In 1992, he joined the Arapahoe County Sheriff's Office. He became Undersheriff in 1995, and was elected Sheriff in 2002.

152.    David D. Campbell is the Sheriff of Baca County, Colorado.

153.    Mike Norris is the Sheriff of Saguache County, Colorado. Previously, he served as Undersheriff, and before that as a deputy.

154.    Amos Medina is the Sheriff of Costilla County, Colorado. He has 23 years of experience with the Office, and was elected in 2010.

155.    Miles Clark is the Sheriff of Crowley County, Colorado. He was first elected in 2005, and had previously served as Undersheriff.

156.    David Encinias is the Sheriff of Bent County, Colorado. He has over 29 years of experience in law enforcement.

157.     Sue Kurtz is the Sheriff of San Juan County, Colorado. She has 31 years of law enforcement experience, as Sheriff, Undersheriff, Deputy sheriff, and District Attorney investigator. She will retire at the end of her current term in January 2015.

158.     James (Jim) Casias is the Sheriff of Las Animas County, Colorado. He has 30 years of law enforcement experience, including as Undersheriff, Acting Chief of Police for the City of Trinidad, and other positions with the Las Animas Sheriff's Office and City of Trinidad Police Department.

159.     Garrett Wiggins is the Sheriff of Routt County, Colorado. He began his law enforcement career on January 1, 1986, in Florida, at age 19. He worked for the Quincy Police Department full time for approximately 8.5 years and part-time on the reserve for approximately one year. During the past 15 years he has worked for the Steamboat Springs Police Department and for the Routt County Sheriff's Office. During five of his years with Steamboat, he was the Taskforce Commander for the All Crimes Enforcement Team as a supervisor and undercover narcotics investigator.

160.     Douglas N. Darr is the Sheriff of Adams County, Colorado. He took office in January 2003, and will complete his service as Sheriff in January 2015.

161.     Rodney Johnson is the Sheriff of Grand County, Colorado. He has 29 years of law enforcement experience.

162.     While the individual Sheriffs do keep and bear arms pursuant to their duties as Sheriffs, the individual Sheriffs also own and use firearms and

magazines personally. Moreover, almost all of the Sheriffs' duty firearms and magazines are personally owned by the Sheriffs. Like the other plaintiffs in this case, the Sheriffs keep and bear arms for a wide variety of lawful purposes of arms ownership, all such purposes being protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 577, 620, 624, 625, 628, 630 (2008) ("lawful purpose" or "lawful purposes"); *McDonald v. Chicago*, 130 S.Ct. 3020, 3023, 3030, 3036, 3044 (2010) (same). Every Sheriff in this case is a law-abiding citizen of the United States of America. As such, every Sheriff has an individual Second Amendment right to keep and bear arms, and an individual Fourteenth Amendment right not to be subject to vague laws which chill the exercise of the Second Amendment rights. The Sheriffs, like all Plaintiffs, are injured by the infringements of their individual rights under the Second and Fourteenth Amendments. The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.

### b. Threats to Sheriffs

163.    Sheriffs have a particularly great personal need to exercise the "core" Second Amendment right of lawful self-defense, "hearth," "home" and "family." *Heller*, 554 U.S. at 573-75, 577, 615-16, 625, 628-630, 632, 634-36; *McDonald*, 130 S.Ct. at 3026-27, 3036, 3039, 3041, 3044, 3047, 3049-50. Sheriffs are often away from their home. Disgruntled or mentally ill persons sometimes come to their homes and threaten family members. Such threats to family members also materialize away from home. One reason the Sheriffs wish to personally own firearms and

magazines is to share them with or permanently give them to family members who need them for self-defense. Credible threats to the families are common, including within the last year

164.   Especially in lower-population communities, it is impossible for out-of-uniform Sheriffs or their families to blend into the background. Almost everyone knows who they are and where they live.

165.   Moreover, all of the Sheriffs know that they will eventually retire from their positions as law enforcement officers. At that time, the limited law enforcement exemption of HB 1224 will not apply to them. Yet for the rest of the lives they and their families will continue to face the danger of retaliation from the many criminals whom they have arrested, or from any other person who may bear a grudge. Their current public service in law enforcement makes their and their families' present and post-retirement needs for armed self-defense particularly acute.

166.   The Sheriffs and their families have already made substantial sacrifices for the public interest. It is in the public interest that they not be forced to face even greater risks by being disarmed from using the magazines and firearms that they have decided are the best for family protection.

167.   Additional information about threats to certain Sheriffs and their families, and the defensive firearms and magazines used by the Sheriffs and their families, is detailed in Exhibits A and B to this Complaint. For personal safety reasons for the Sheriffs and their families, Exhibits A and B have been filed

separately, accompanying a Motion for Leave to Restrict, Level 1. Exhibit A is excerpted from confidential portions of Defendant's depositions of six Sheriffs, in which Defendant's counsel asked the Sheriffs many personal questions about their firearms collections, hunting experience, personal history of gun use, and about personal threats against the Sheriffs and their families. Exhibit B contains Declarations from several other Sheriffs about personal threats to them and their families, and some of the defensive firearms and magazines owned by those Sheriffs. *See also* Declaration of Sheriff Garrett Wiggins, paras. 2-4 (Exhibit B to Plaintiffs' Reply Brief for Preliminary Injunction (#41)).

### c.   Sheriffs' personal firearms and magazines

168.   All of the Sheriffs and their families personally own firearms. They believe that law enforcement officers and all other law-abiding citizens should fully and equally enjoy the same Second and Fourteenth Amendment rights. Exhibits A (deposition excerpts) and B (declarations) to this Complaint provide details about some of the firearms and magazines owned by some of the individual Sheriffs, including magazines affected by HB 1224.

169.   Except for Rick Dunlap, Jim Faull, Scott Fischer, Peter Gonzalez, and Tom Ridenour, all of the Sheriffs and their families personally own magazines for self-defense which accept more than 15 rounds. All of the Sheriffs and their families personally own magazines which accept 15 or fewer rounds. All the Sheriffs wish to be able to buy magazines of more than 15 rounds, now and in the future.

170.     Some of the firearms and magazines which the Sheriffs and their families own were purchased in part for use in law enforcement duties; others were acquired and are used purely for personal reasons.

### i.     Magazines of greater than 15 rounds

171.     All of the Sheriffs know that as they continue to age, their physical capabilities will change. They know that their reaction speeds, mobility, fine motor skills, and upper body strength will decline. As a statistical certainty, some the Sheriffs will become disabled. As detailed in the expert report of Massad Ayoob, older persons and the disabled have a particularly strong need for magazines which hold more than 15 rounds. Ayoob Report at 3-4 (Exhibit 17 to #70).

172.     All the Sheriffs wish to be able to possess, purchase, own, loan, and sell 16-round and larger magazines over the course of their entire lives, including the portions of those lives which follow retirement from law enforcement. They wish to do so based on their individual determinations that such magazines are often the best choice for lawful self-defense for themselves and their families, based on individual circumstances now and in the future.

173.     At present, the Sheriffs wish to be able to purchase additional magazines holding more than 15 rounds for their personal use in their law enforcement duties, and for other purposes. Their ability to do so is entirely thwarted, or significantly impaired; HB 1224's general prohibition on the sale of banned magazines contains no exceptions allowing a store to possess or sell such magazines within Colorado to Colorado law enforcement employees. *See* Sheriffs'

Response Brief on Motion to Dismiss at 34-37 (#70); Lou Vallario deposition (Exhibit A, at 67-69). Nor does HB 1224 contain any exemption allowing common carriers to transport such magazines to Colorado stores for sale in Colorado.

174.     HB 1224 does not appear to allow Sheriffs to acquire magazines for purely personal use. There is an exemption in HB 1224 for:

(b) An employee of any of the following agencies who bears a firearm in the course of his or her official duties:

(I) a branch of the armed forces of the United States; or

(II) a department, agency, or political subdivision of the State of Colorado, or of any other state, or of the United States government.

If the exemption means that such persons may acquire magazines for personal use, then every private at Fort Carson can acquire personal magazines without limit and without need for authorization from a superior officer. Conversely, if the exception is read narrowly, to apply only to magazines for use in official duties, then the Sheriffs are currently prohibited from acquiring magazines for all of their firearms, except for the handguns that they carry on duty, and the long guns they keep in their official vehicles.

175.     Any banned magazine which a Sheriff acquires after July 1, 2013, will instantly become criminal contraband on the day that the Sheriff retires from law enforcement. This is because the Sheriff will no longer qualify for the government employee exemption, and because grandfathering only applies to

magazines which were owned before July 1, 2013. The Sheriffs wish to retain such magazines for personal use after retirement.

176.     HB 1224 includes a section punishing anyone who "sells, transfers, or possesses." The section exempts many government employees. C.R.S. § 18-12-302(1)(a), (3)(b)(II). HB 1224 contains a separate section mandating that "A large-capacity magazine that is manufactured in Colorado" must have a date stamp. The section provides criminal penalties for violations. There is no government employee exemption. C.R.S. § 18-12-303. Some Sheriffs add extenders to their magazines, thus "manufacturing" a magazine which can accept more than 15 rounds. *See, e.g.*, Exhibit A at 7-8, 11, 15, 46-47, 52-54; MERRIAM-WEBSTER.COM ("manufacture" definition 3, "the act or process of producing something"), http://www.merriam-webster.com/dictionary/manufacture; OXFORD ENGLISH DICTIONARY ("manufacture" defn. 2a, "to work up as or *convert into a specified product*") (emphasis added).

**ii. Fifteen-round magazines**

177.     Some Sheriffs, including Ronald Bruce, Jim Faull, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Fred McKee, Brian Norton, Brett Powell, Ken Putnam, Justin Smith, Dennis Spruell, Lou Vallario, and Garrett Wiggins own one or more magazines with a nominal capacity of 15 rounds. They wish to be able to acquire such magazines in the future. As detailed in the expert report of Michael Shain, some nominally 15-round magazines are in fact "capable of accepting" 16 rounds; due to variations in manufacturing tolerances, some springs for 15-round magazines are so compressible that 16 rounds will fit in the magazine. Shain expert report at 11-12, Opinion B (#69, Exhibit B). This is confirmed by the

deposition of Defendant's witness Scott Wagner. (Filed as Exhibit C to this Amended Complaint, at 153-56, 192-95.) Defendant says he has no knowledge of this matter. Defendant's Response to Discovery from FFLs et al., at 23. (Attached to this Complaint as Exhibit D). (As previously stated, all exhibits to this Complaint are incorporated by reference.) Such magazines are outlawed by HB 1224 ("capable of accepting…more than fifteen rounds of ammunition"). Sheriffs Bruce, Kuntz, Maketa, Norton, Powell, and Wiggins own 15 round magazines which do in fact accept 16 rounds. (For Maketa, Exhibit A at 28.)

178.    The very act of testing a 15-round magazine to see if it will accept 16 rounds instantly makes the magazine owner into a criminal in possession of contraband, if the magazine is discovered to accept 16 rounds. The mere possession of an untested 15 round magazine which actually could accept 16 rounds is also a crime. Accordingly, it is legally perilous to acquire a new a 15 round magazine. Magazines are often sold in circumstances which do allow the buyer to pretest the capacity. Moreover, stores which sell magazines have no way to test the capacity of every magazine prior to purchasing them at wholesale. (Shain report at 11-12, Opinion B [#69, exhibit B]; Wagner deposition at 177-78 [Ex. C. to this Complaint].) The Sheriffs wish to own such magazines, now and after they retire from law enforcement. They also wish to sell and/or temporarily transfer such magazines, on a short-term or long-term basis, to family members, friends, and other persons.

### iii. Sales and other transfers of personally-owned prohibited magazines

179.    Except for Sue Kurtz, all the Sheriffs wish to have the ability to make long-term loans of magazines to friends and family members. At present, Bruce Hartman, Fred Jobe, Terry Maketa, Jerry Martin, Bruce Newman, and Dave Stong currently have made, do make, or would make loans which are contrary to what is allowed by the Attorney General's July 10, 2013, "Technical Guidance" as interpreted by this Court. Donald Krueger would like to make such loans of his 17-round magazines after he retires in January 2015.

180.    The Sheriffs wish to transfer ownership of their magazines either now or in the future, by sale, gift, and bequest. HB 1224 forbids such sales, gifts, and bequests for prohibited magazines. Under HB 1224, when a Sheriff dies, his magazines instantly become contraband, and HB 1224 immediately criminalizes whoever is the owner, custodian, or executor of the Sheriff's property.

181.    All of the things that the Sheriffs wish to do with magazines of 16 rounds or more they also wish to do with magazines holding fewer than 16 rounds.

### iv. Sales and other transfers of firearms

182.    The Sheriffs wish to be able to sell, give, or lend handguns and long guns to persons of all races, ages, and nationalities, of both sexes (to persons who may lawfully possess such arms). The Sheriffs wish to make such sales, gifts, or loans under conditions that are unconstitutionally prohibited or restricted by HB 1224 and HB 1229. These include lending firearms for more than a 72 hour period, and giving firearms as gifts to persons who are not immediate family members. The Sheriffs further wish to be able to sell firearms to family members and to be able to

purchase firearms from family members; HB 1229's family exemption irrationally applies only to "bona fide gifts and loans," but not to sales.

183.     HB 1229's requirement that temporary transfers of firearms—which are part of the ordinary use of a firearm—be treated as if they were gun sales violates the Second Amendment.

184.     The dysfunctional system created by HB 1229 (requiring the use of a Federal Firearms Licensee [FFL], while capping the FFL's fee at $10) often makes it extremely burdensome, and sometimes impossible, for law-abiding citizens, including the Sheriffs, to consummate a private sale or a temporary transfer.

### v.     Prohibitions of firearms

185.     The Sheriffs wish to have the option, now as well as after they retire from law enforcement, of personally purchasing firearms for which there are no magazines which accept 15 or fewer rounds. These firearms include full-size Springfield Armory XD handguns in 9mm and .40 caliber, the Kel-Tec PMR .22 caliber pistol, and the SRM Arms model 1216 shotgun (a pump action shotgun with four tubes that each hold four rounds).  Without a magazine, none of these firearms are functional. Accordingly, HB 1224 amounts to a prohibition on such arms. Defendant admits that there are no commercially available magazines for the Springfield Armory and Keltec pistols. Defendant's Answers to Discovery from Sheriffs and Strumillo, at 9-10, interrog. 12 (Exhibit E to this Complaint.). There is self-evidently no alternative magazine for the SRM shotgun, since the magazine is integral to the shotgun.

186.     Defendant asserts that such firearms are not de facto prohibited because an individual can "permanently alter" the magazines for these firearms. Defendant's Answers to Discovery from FFLs et al., at 21-22 (Exhibit D to this Complaint); HB 1224 ("permanently altered so that it cannot accommodate more than fifteen rounds of ammunition"). This is incorrect. Notably, the possession of such a magazine, prior to alteration, is a crime. HB 1224 has no exemption for banned magazines which a person intends to alter. Further, according to Defendant's witness Scott Wagner, every method for limiting the capacity of a magazine can be undone in no more than a half hour, and more typically in just "a matter of minutes" or "a couple minutes." Scott Wagner deposition at 171-77, 187-89. (Exhibit C to this Complaint.) Finally, Defendant refuses to say whether a common means of attaching a limiter—with a pin—does or does not count at a permanent alteration. Defendant's Answers to Sheriffs and Strumillo Discovery, at 6, interrog. 7 (Exhibit E to this Complaint).

**d.    Sheriffs' inability to comply with HB 1224 and 1229**

187.     The Sheriffs, like the other Plaintiffs, wish to know how to comply with HB 1224 and 1229. During the discovery process, it has become clear that when citizens have questions about how to comply with HB 1224 or HB 1229, the Colorado Bureau of Investigation refers such questions to the Attorney General. The Attorney General then refuses to answer, or refers the citizens back to the Colorado Bureau of Investigation. The citizen may be sent copies of Defendant's signing statement, and of the Attorney General's two Technical Guidance letters.

*See* CBI document production at CBI 00031-33, CBI 00071, CBI 00074-75, CBI 000124-26 (attached to this Complaint as Exhibit F); CBI Director Ronald Sloan deposition at 55-58 (attached to this Complaint as Exhibit G) (CBI will only answer citizen questions for which the black letter law answer is obvious).

188.   There are many questions about how to comply with HB 1224 and 1229 which are in no way addressed by Defendant's signing statement or by the Technical Guidance. Indeed, these documents do not even address HB 1229. Regarding HB 1224, they only address two particular issues ("designed to be readily converted" and "continuous possession.") During discovery, the Plaintiffs asked Defendant various questions about the meaning of HB 1224 and HB 1229. Defendant refused to answer. Regardless of whether some or any of Defendant's refusals might be sanctionable, the refusals underscore the fact that *no-one* in the Colorado State government can or will provide citizens with answers about how citizens, including the Sheriffs, are supposed to comply HB 1224 and 1229. Among the issues for which there is no answer are the following, all of which are taken verbatim from Plaintiffs' discovery requests to Defendant:

- If an individual privately transfers a firearm to another individual, and a background check is performed pursuant to HB 1229, would you consider that background check sufficient to cover any subsequent transfers of the same firearm between the same two individuals?

- If an employer loans an employee a firearm for more than 72 hours and conducts the necessary background check pursuant to HB 1229, would you

require the employee to conduct another background check upon returning the firearm to his or her employer?

- Please describe the process for conducting a background check under HB 1229 when the transferee of the firearm is not a natural person, such as a limited liability company or corporation.

- If a farm or ranch employee utilizes a vehicle owned by his or her employer for more than 72 hours, and the vehicle contains a firearm, do you interpret HB 1229 to require a background check to be performed on the employee even if he or she never touches the firearm?

- Admit that with respect to HB 1229 there is no exception for farmers or ranchers who, for a period of more than 72 hours, loan firearms to employees for defense of livestock and crops.

- Admit that there is no exemption in HB 1229 for firearms training conducted under the auspices of a nonprofit organization other than at a shooting range under C.R.S. § 18-12-112(6)(e)(I).

- Admit that no licensed gun dealer in Colorado is required to perform a background check when requested to do so by two individuals conducting a private sale or transfer of a firearm.

- What recourse does a person have under HB 1229 or any other laws of the State of Colorado if he or she wants to transfer a firearm but cannot find a Federal Firearms Licensee ("FFL") either available or willing to perform the required background check?

- Admit that HB 1224's exceptions pertaining to lawful possession of banned magazines after July 1, 2013, do not include any provision allowing retailers to possess banned magazines for the purposes of selling such magazines to law enforcement officers within Colorado.

- Admit that HB 1229 contains no exception pertaining to the permanent acquisition of firearms by law enforcement officers for law enforcement purposes.

- Admit that HB 1229 contains no exception pertaining to the temporary acquisition of firearms by law enforcement officers for law enforcement purposes.

- Admit that HB 1229 forbids the return of a stolen firearm to the rightful owner, unless the return is processed by a FFL pursuant to HB 1229's requirement for background check and for FFL record-keeping.

- Admit that HB 1229 forbids law enforcement officers from taking a citizen's firearm for temporary safe-keeping for more than 72 hours, unless the transfer is processed by a FFL pursuant to HB 1229's requirement for background check and for FFL record-keeping. By way of illustration, this question includes a situation in which a citizen is the victim of a crime or accident, is therefore unconscious, and is therefore unable to safeguard a firearm which the citizen was carrying or transporting.

- Admit that HB 1224 contains no exemption for long-haul truckers transporting banned magazines from another state through Colorado for delivery to another state.

- Admit that HB 1224 contains no exception for travelers passing through Colorado who possess a banned magazine which was acquired on or after July 1, 2013.

*See* Defendant's Second Answer to Discovery from Non-Profits and Disabled Individuals, at 3-6; Defendant's First Answer to Discovery from Non-Profits and Disabled Individuals, interrog. 10; Defendant's Answer to Discovery from Sheriffs and David Strumillo at 10-13) (Exhibits H, I & E to this Complaint). Most of these unanswered, unknown vagaries of HB 1224 and 1229 relate to infringements of the Sheriffs' personal ability to personally acquire, transfer, and use magazines and firearms—on-duty, off-duty, or after retirement; or to the personal decisions that Sheriffs must make regarding firearms and magazines that they personally handle in the course of their employment.

### 2.   Colorado Farm Bureau

189.   Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

190.    Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

191.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

192.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in connection with their farming or ranching operations, they do not acquire them as "natural persons."

193.    Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

194.    HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

a.    it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

b. it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

c. even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

195. Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

**3. Firearms Industry Trade Association**

196. The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

197. As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs;

publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

198.    The NSSF's members in Colorado   provide lawful commerce in firearms to law-abiding Coloradans.  Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

### 4.    Retired Law Enforcement Officers

199.    David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

200.    Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

201.    Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

### 5.    Disabled Citizens

202.    David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a

wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

203.    Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

204.    Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

205.    First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

206.    Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits

1112

Mr. Harrell's mobility and  severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

207.    Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or re-position himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

208.    If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

**6.    Licensed Firearms Dealers**

209.    USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

210.    Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

211.    2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on inventory in firearms and magazines that will be rendered illegal on July 1, 2013. 2nd Amendment will suffer significant losses in its overall sales if it cannot sell firearms or magazines over 15 rounds or with removable floor plates or end caps if HB 1224 becomes effective.

212.    Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with its principal place of business in Loveland, Colorado. Jensen Arms is a retail firearms dealer in business since 1994 that serves customers throughout much of Colorado. To serve its customers, Jensen Arms has invested millions of dollars in magazines and firearms inventory that utilizes magazines that will be prohibited under HB 1224. Customers have already expressed confusion about what magazines will be legal, and Jensen Arms will suffer significant losses in sales.

213.    Green Mountain Guns is a Colorado corporation with its principal place of business in Lakewood, Colorado. Green Mountain Guns has been in business for 35 years, and will lose approximately $2 million in sales after HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

214.    Smith & Wesson has already informed Green Mountain Guns that it will no longer ship merchandise to Green Mountain Guns because of the uncertainty caused by HB 1224 and confusion about what firearms and firearm accessories will be illegal after HB 1224 goes into effect.

215.    Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

216.    Grand Prix Guns is a Colorado corporation with its principal place of business in Littleton, Colorado. Grand Prix Guns anticipates that it may suffer as much as an 80% loss in revenue if HB 1224 renders the majority of the firearms and magazines it sells illegal.

217.    Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

218.    Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of

firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

219.    The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

220.    The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

221.    In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.    Shooting Association and Shooting Ranges and Clubs

222.    The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

223.    CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime

prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

224.   Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

225.   The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

226.   CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

227.   CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

228.   CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-

created program that fosters firearms marksmanship through competitive matches and clinics.

229.    The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

230.    Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

231.    FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

232.    FSC is the largest public outdoor shooting facility on the Front Range in Colorado. The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

233.    In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard

magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

234. Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-convertible to more than 15 rounds.

235. Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

236. FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

237. Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system. The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

## 8. Firearms Accessories Manufacturer

238. Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and

sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

239.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

240.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

241.    For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

242.    If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions

that interpret the statute as a complete ban on magazines with a removable floor plate.

### 9.    Nonprofit Representing Disabled Outdoor Enthusiasts

243.    Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it, regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

244.    There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

245.    The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

### 10.    Nonprofit Representing Colorado's Outfitters

246.    The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services

provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

247.    The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of millions of dollars in the next few years.  Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

## 11.    Nonprofit Representing Women's Right to Self-Defense

248.    Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right.

1122

Members of the organization use and carry magazines which would be banned under HB 1224.

### 12.   Nonprofit Representing Colorado Families and Communities

249.   Colorado Youth Outdoors ("CYO") is a nonprofit organization whose mission is to serve Colorado communities by providing families with opportunities to build healthy relationships through traditional outdoor recreation. One of the many disciplines in CYO's program is shooting sports.

250.   As part of its programming, CYO provides a curriculum for firearm safety, as well as a program to introduce families to sport shooting, including wildlife management through hunting. These programs stress the lawful, responsible and safe use of firearms.

251.   Fundraising is an extremely important aspect of CYO's ongoing mission to serve Colorado communities and families. Its most successful fundraiser each year is a weekend event involving target shooting.

252.   Because most of the participants in CYO's programs are new to shooting sports, CYO frequently loans hunting and sporting firearms to participants, sometimes for periods exceeding 72 hours. HB 1229 will render this aspect of CYO's programming illegal. Similarly, CYO loans firearms to participants at its annual fundraiser, which is held at a for-profit "dude ranch" specializing in hosting private events. HB 1229 will have a significant impact on this important fundraiser and consequently on CYO's ability to pursue its mission.

253.    CYO makes additional firearm loans to other qualified non-profits who do not have the resources to own firearms but who occasionally have special programs or events requiring the use of firearms. These loans sometimes exceed 72 hours. Loaning resources and collaboration between non-profits is critical in non-profit business operations.

254.    Constraining laws with narrowing margins for lawful use make it more difficult to find qualified board members willing to navigate through vague and uncertain firearm legislation. HB 1229 adds another burden to those in leadership roles of organizations which own firearms, which will have devastating effects on CYO's board membership.

## B.    Defendant

255.    Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.    ADDITIONAL SUPPORT FOR ALLEGATIONS

## A.    The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment

256.    The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be

unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

257. Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

258. The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

259. The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." Third, "laws imposing conditions and qualifications on the ***commercial*** sale of firearms." *Id.* at 626-27 (emphasis added).

260. HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various

categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

261.  In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

262.  The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3044, 3050.

263.  By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

264.   The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

265.   The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

266.   Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

267.   Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United

States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

268.   The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

269.   Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

270.   In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the

Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

271.   The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training, repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

272.   The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

273.   HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

274.   Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose,

let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

275.   Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans,* 517 U.S. 620 (1996); *Lawrence v. Texas,* 539 U.S. 558 (2003).

276.   HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

277.   HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow,* 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question

effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

278.   Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing *Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

279.   Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

280.   *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

281.   If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns

are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

282.   Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System, and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229, which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

## B.   The Bills Are Unconstitutionally Vague

283.   The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

284.   The long-established rule is that "the terms of a penal statue creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in

1132

terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

285.   A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

286.   The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

287.   Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

288.   Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

289.    If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

290.    HB 1224 is also vague in its ban on anything "capable of accepting . . . more than fifteen rounds of ammunition. Rifle cartridges of a particular diameter have varying lengths. For example, Uberti manufactures an exact replica of the 1875 Colt Lightning pump action rifle. The tube magazine will accept 13 rounds in .357 magnum caliber. Cartridges in .38 caliber a fully usable in .357 firearm; the same Uberti rifle will also accept 18 rounds of .38 Special wadcutter ammunition. An owner of this Uberti rifle might think that he has a legal 13-round magazine; but in fact, such a rifle could be illegal under HB 1224. The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 2003.

291.   HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that

occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days. Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

292.    For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

293.    Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

## FIRST CLAIM FOR RELIEF

**(HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)**

294.    Paragraphs 1 through 202 are re-alleged and incorporated herein.

295.   HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

296.   Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

297.   Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

298.   Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

299.   Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

300.   Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

301.   The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

302.   Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.


## SECOND CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")

303.   Paragraphs 1 through 211 are re-alleged and incorporated herein.

304.   In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

305.   Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

306.   Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

307.   HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

308.   Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

309.   Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

310.   The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

311.   A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF

### (HB 12-1224 – Violation of Fourteenth Amendment Right to Due Process Based on Ambiguity of Language Regarding Magazines 15 Rounds or Smaller)

312.   Paragraphs 1 through 220 are re-alleged and incorporated herein.

313.   HB 1224 is unconstitutionally vague in violation of the Fourteenth Amendment right to Due Process.

314. Plaintiffs cannot determine whether a magazine with a removable floor plate or end cap to facilitate maintenance and cleaning was "designed to be readily convertible" to hold more than 15 rounds. Plaintiffs cannot possibly know the intent of the designers of all the magazines for the firearms which Plaintiffs own.

315. Law enforcement officers, including the Plaintiff Sheriffs, likewise have no means to determine the intent of magazine designers. Enforcement of the provision will be difficult, if not impossible, and will result in differing interpretations of the meaning of HB 1224 in different jurisdictions.

316. Licensed firearms retailers are likewise unable to ascertain design intent, and therefore do not know which magazines can be sold without risk of criminal prosecution.

317. Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, individuals are chilled in the exercise of their Second Amendment rights.

318. A statute that is so vague that a person cannot clearly determine what conduct may result in criminal prosecution, or that will result in inconsistent application, thereby chilling the exercise of another constitutional right, violates the Fourteenth Amendment guarantee of Due Process of law.

## FOURTH CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

319.    Paragraphs 1 through 227 are re-alleged and incorporated herein.

320.    HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

321.    The term "continuous possession" is undefined.

322.    Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

323.    "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

324.   "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

325.   Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

326.   Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

327.   HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

### FIFTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

328.   Paragraphs 1 through 236 are re-alleged and incorporated herein.

329.   Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

330.   States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

331.    Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

332.    HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

333.    Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

334.    HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

335.    The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

### SIXTH CLAIM FOR RELIEF

**(HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)**

336.    Paragraphs 1 through 244 are re-alleged and incorporated herein.

337. HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

338. For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

339. Similarly, many temporary transfers are limited to 72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

340. The prohibition of non-commercial, temporary transfers is an infringement of the Second Amendment.

341. Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

342.    In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

## RELIEF REQUESTED

Plaintiffs pray that this Court:

A.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to

accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.   Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.   Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.   Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.   Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this ~~1st~~ 11th day of ~~July~~ December, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

s/Jonathan M. Anderson
Jonathan M. Anderson
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO**

FARM BUREAU, WOMEN FOR CONCEALED
CARRY, AND COLORADO YOUTH OUTDOORS

s/Marc. F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS
DEALERS


s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE
SHOOTING ASSOCIATION AND HAMILTON
FAMILY ENTERPRISES, INC. d/b/a FAMILY
SHOOTING CENTER AT CHERRY CREEK
STATE PARK

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

## Exhibit C – Scott Wagner Deposition

**1**

1   IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

2

3   Case No.:  13-CV-1300-MSK-MJW

4   ------------------------------------------------------

5        DEPOSITION OF SCOTT WAGNER

October 30, 2013

6   ------------------------------------------------------

7   JOHN B. COOKE, Sheriff of Weld County, Colorado, et

al.,

8

Plaintiffs,

9   vs.

10   JOHN W. HICKENLOOPER, Governor of the State of

Colorado,

11

Defendant.

12   ------------------------------------------------------

13   APPEARANCES:

14   FOR THE PLAINTIFFS COLORADO STATE SHOOTING

ASSOCIATION and FAMILY ENTERPRISES:

15

    DAVID B. KOPEL

16     Independence Institute

    727 E. 16th Avenue

17     Denver, Colorado  80203

    David@i2i.org

18

19 FOR THE DEFENDANT:

20     JONATHAN P. FERO, ESQ.

    State of Colorado

21     Colorado Department of Law

    State Services

22     Public Officials and Education

    1300 Broadway, 6th Floor

23     Denver, Colorado  80203

    jon.fero@state.co.us

24

25

**2**

1     PURSUANT TO WRITTEN NOTICE, the

2 deposition of SCOTT WAGNER, called for examination

3 by the Plaintiffs, was taken in the conference room

4 at the offices of the State of Colorado, Colorado

5 Department of Law, 1300 Broadway, 6th Floor,

6 Denver, Colorado, on the 30th day of October 2013,

7   at the hour of 9:06 a.m., before Laurie Heckman, a

8   Notary Public in and for the State of Colorado and

9   a Registered Professional Reporter.

. . .


### 153

21   A   Correct.

22       Q   Okay.

23       A   The Section B, which would be the

24   one, two, third paragraph, full paragraph, on page

25   11, he describes capable accepting, in quotes, as a

### 154

1   problematic and impractical concept because it

2   subjects firearms owners to criminal liability that

3   may have been caused by the manufacturer if the

4   magazine is unintentionally capable of holding more

5   ammunition than the manufacturer specifies or that

6   the user is able to recognize.

7           Again, that's overgeneral.  Some --

8   some magazines you can put more rounds in than the

9   indicator holes on the side of the magazine.

10       Q   Right.

11       A   But other magazines, that's not the

12   case, and other magazines it's actually less.  For

13   instance, new Glock magazines, you can't, many

14   times when you first get them, can't put the

15   suggested amount in them because the springs are

16   too tight and the fitting is too tight, things like

17   that.

18        So I think to -- to talk about that

19   being impractical or problematic, you know, I could

20   put too much gas in my gasoline tank too and have

21   it spill out, and technically that's an EPA

22   violation.  That seems like that's grasping at

23   straws and seems to be somewhat overgeneral.

24        Q   Well, I just want to get to the

25   specifics on this.  I'm just trying to see where

**155**

1   the two of you agree and where you disagree.

2        A   Uh-huh.

3        Q   So if you have a 15 -- tell me if I

4   characterize what you just said accurately.  If you

5   have a 15-round magazine, often it will hold 15

6   rounds.  Sometimes, because of differences in

7   manufacturing tolerances for the spring or spring

8   wear or whatever, it might hold 16.  And also,

9   alternatively, another 15-round magazine,

10   especially a brand-new one, might only hold 14

11   because the spring is so springy?

12      A   Correct.

13      Q   Okay.

14          MR. FERO:  Object to form.

15      Q   (By Mr. Kopel)  Now, so tell me

16  where -- so -- and I think my guess is if he were

17  here, he would say the same thing factually we just

18  agreed on.  So tell me where the disagreement is.

19      A   Well, that's not what he says here.

20  If he were here, he might say that, but that's

21  not -- that's not what he's saying here.  He's

22  saying it's problematic and that this is an issue

23  that will come up, and the implication is that it

24  will be -- that it's impractical because it

25  subjects owners to criminal liability, when, in

                    **156**

1  fact, I think that's an overgeneral statement.  I

2  don't think that that's the case.

3      Q   Okay.

4      A   Okay.

5      Q   But that people would get prosecuted

6  and convicted for that.

7      A   Correct.

8      Q   But you're in agreement with him

9  that some amount of the time you can put 16 into a

10  thing that's nominally 15?

11      A   Yes.  Some of this -- I mean, some

12   of this document exceeds what I believe I bring to

13   the table as far as testimony and so forth.

. . .

**171**

20   Q   So for the limiters you saw, tell me

21   about the different types you saw.

22      A   I saw the fixed-in magazine from the

23   manufacturer.

24      Q   Describe how that works, if you

25   could.

**172**

1      A   Well, they actually alter the shape

2   of the magazine to limit its ability to be loaded

3   with any more rounds than --

4      Q   And how do they do that?

5      A   Sometimes they'll machine in a set

6   of ears to where the floor plate won't go any

7   lower.

8      Q   Okay.

9      A   Or allow any more ammunition than 10

10   rounds.

11      Q   Okay.

12      A   Or whatever the set was.  At that

13   time it was 10 rounds.

14      Q   Can somebody open up the magazine

15   and take a little hacksaw and take off the ears?

16      A   Sure.

17      Q   And the magazine would still

18   function properly?

19      A   If they did a good job.

20      Q   Sure, okay.  So we've got the

21   machined-in ears.  What's another way of limiting?

22      A   The follower in the magazine.

23   Several manufacturers just made a longer follower.

24   Instead of the follower being this thick, they

25   added material to it to make it longer, so that

**173**

1   when the spring was compressed, the follower

2   stopped the downward progression or the compression

3   of the spring at 10 rounds.

4      Q   And are those easy to take out and

5   just replace with a standardized follower?

6      A   Yeah, any work on a magazine is

7   fairly easy.

8      Q   So we've got the machined ears,

9   we've got the followers.  What else?

10      A   And then baseplates that were -- the

11   same way you can extend, make a baseplate

12   extension, you could also make a baseplate limiter.

13  So you build the baseplate up and as it fits into

14  the gun and then slides on, it's got some sort of a

15  stoppage that keeps the magazine spring and the

16  follower from going clear to the floor of the

17  magazine.

18      Q   And is that something that's easy to

19  switch out by just putting in a normal baseplate?

20      A   Yes.

21      Q   Okay.  Baseplate, anti-extender or

22  something?

23      A   A limiter.

24      Q   Okay.  What other types of limiters

25  did you have experience with?

**174**

1      A   Those are pretty much it.  There's

2  just not a lot of other options, as far as -- as

3  far as limiting the magazines but still keeping

4  them the same so that they will work in the guns

5  that they were designed to work in.

6      Q   Is there a way to make a limiter

7  more permanent by, say, attaching it with a pin?

8      A   You could.

9      Q   And would it be easy to punch the --

10  did you ever see one of those?

11      A   I never saw one from a manufacturer.

1158

12      Q   Okay.

13      A   I saw some people that tried to

14   limit their magazine, their magazines to be

15   compliant with competitions.

16      Q   Yeah.

17      A   But I never saw any -- I never saw

18   any from the manufacturer that had a pin in them.

19      Q   And these were maybe not quite

20   shade-tree gunsmiths but people who had some

21   ability to work on their guns and they put it in?

22      A   Right.

23      Q   And was it something if you wanted

24   to remove the limiter, you could take a punch and

25   knock out the pin?

**175**

1      A   Depending on how it was put in,

2   yeah.

3      Q   Okay.

4      A   I've seen welded pins, I've seen

5   driven pins, I've seen tight fit, or just the hole

6   is just real tight for the pin to fit in.  I forget

7   what they call it, a compression fit, but not from

8   manufacturers.

9      Q   Can you punch out a compression fit

10   pin with a little effort?

Appellate Case: 14-1290   Document: 01019371747   Date Filed: 01/16/2015   Page: 210

11        A   Yes.

12            MR. FERO:  Object to form.

13        Q   (By Mr. Kopel)  If you -- how about

14   welded, you saw people who actually welded a

15   limiter into place?

16        A   Yes.

17        Q   And did they have a pin and then

18   they welded the pin?  Tell me how they did that.

19        A   I've seen it with pins.  I've seen

20   it with ears, on a steel magazine a weld in the

21   ears inside the magazine, the body.

22        Q   Did you -- did you ever know of

23   anybody, in your experience, know of gunsmiths who

24   provided that as a service to people?

25        A   Gunsmiths will pretty much do

                        **176**

1   anything you ask them to do, so to say that -- if I

2   walk in and hand a gunsmith the magazines, I can

3   say, yeah, and he'll do that for me.

4        Q   But you didn't personally know of

5   that?

6        A   It's not a service I ever saw listed

7   on a web site or on a menu of services at their

8   facility.

9        Q   Now, what if one of these guys who

10   had a welded magazine because he had to in 2003 and

11   then the ban expired, what could he do to reverse

12   the weld?

13      A   He could grind those off.

14      Q   And is that something a home guy can

15   do?

16         MR. FERO:  Object to form.

17      A   Anybody with a dremel tool.

18      Q   (By Mr. Kopel)  Okay.

19      A   Or, you know, if you want to do it

20   right, or any other grinding tool.

21      Q   But, yeah, dremel -- well, could you

22   explain what a dremel tool is?

23      A   It's a handheld grinder, a rotary

24   tool, you put it in drill bits or grinders or

25   stones or polishers or --

**177**

1      Q   Okay.  And how long do you think

2   would it take to use the dremel tool to undo the

3   weld?

4      A   A matter of minutes.

5      Q   Okay.  Page 11, under Heading B, the

6   second paragraph, at the end of that he says,

7   "Prepackaged magazines often come in heat sealed

8   blister packaging that does not allow casual access

9  prior to sale." Do you agree?

10      A   No.

11      Q   Elaborate.

12      A   Let's say, okay, often.  I think

13  that's an overgeneral statement.  Sometimes they

14  do, sometimes they don't.  More often than not,

15  they come in a clamshell fit case which can easily

16  be opened and reclosed.

17      Q   By clamshell do you mean there's

18  cardboard and then some plastic stuff that kind of

19  goes around it and there's a lip, and then you can

20  take it off the lip, remove the lip?

21      A   No, I'm talking about two pieces of

22  plastic that are designed to fit together like

23  Tupperware, only not that durable.

24      Q   Okay.

25      A   And that Glock manufacturers put

                    **178**

1  theirs in those, Smith & Wesson puts theirs in

2  those, their extra magazines.  I've also seen the

3  plastic formed where the cardboard back slides into

4  the plastic and slides out.

5      Q   That latter thing is what I was

6  trying to describe.  I'm not doing a good job.

7      A   I've seen them many ways, but to say

1162

8   often is actually probably incorrect.  You can go

9   find both kinds out on the shelf.  You can also

10   find the kind that are packaged in a clear

11   cellophane or plastic baggy with a cardboard piece

12   at the top stapled to the bag.

13        Q   Would it be accurate to say that all

14   the different forms you just described, including

15   the heat sealed blister packaging, would each of

16   them be common?

17        A   Yes.

. . .

**187**

11   Q   Mr. Kopel was asking you about

12   limiters.  Do you recall that?

13        A   Yes.

14        Q   And I believe he was restricting it

15   to what you'd seen and observed out in your

16   experience?

17        A   Yes.

18        Q   You were talking about pins and

19   different ways that limiters could be affixed

20   within a magazine.  Is that a fair

21   characterization?

22        A   Yes.

23        Q   Okay.  Is it possible to make -- to

24   permanently affix limiters to magazines?

25        A   Well, if you weld a pin, that's a

**188**

1   pretty permanent -- anything can be altered.

2        Q   Okay.

3        A   So if you were to put one in, and I

4   guess you could epoxy one into a -- something.

5   Anything is possible, but to get it out, then you

6   would have to destroy the magazine or it would not

7   be removable.  But I would think that you could

8   pretty much remove anything if you have the right

9   tools and enough desire to take it out.

10        Q   When you were talking about using a

11   dremel tool, for example, to break the welds, do

12   you recall that?

13        A   Yes.

14        Q   How long would that take?

15        A   A couple of minutes.

16        Q   But you would need a power supply?

17        A   Oh, a power supply and a dremel tool

18   with the right tip and gear and a little bit of

19   know-how.

20        Q   Are there ways that limiters are

21   secured that would take longer to sort of break or

22   alter?

23      A    Yes.

24      Q    Than just a couple minutes?

25      A    If you epoxyed one in, you'd have a

                    **189**

1  much more difficult time getting it out.

2      Q    Have you had experience with that?

3      A    No.

4      Q    Do you have any knowledge as to how

5  long it would take to break the epoxy seal or

6  remove it?

7      A    Just, I can guesstimate it just

8  because I've worked on other things that were

9  epoxyed, but as far as attack on an epoxyed limiter

10  in a magazine, I've never done that.

11      Q    What would your estimate be, based

12  on your experience?

13      A    Well, probably close to 30 minutes

14  to get it out and clean it up to where it was

15  functional.

16      Q    What kind of equipment would you

17  need or materials?

18      A    A dremel tool with a number of

19  different tips.  You might be able to do it with

20  a -- some sort of a saw or Sawzall, or something

21  like that.  There's any number of tools that you

22  could cut with or grind with to get that -- to get

23  something that was epoxyed out.

. . .

**192**

11   Q   Mr. Wagner, do you recall when

12  Mr. Kopel was asking you on page 11 of Mr. Shain's

13  report about somehow fitting 16 bullets in a

14  15-round magazine?

15        A   Yes.

16        Q   Can you give a specific example of a

17  magazine that is marked for 15 rounds that you know

18  and you've tried or you've seen will accept another

19  bullet?

20        A   A lot of the after-markets are

21  quickly thrown together, and they're not as high

22  quality and they will sometimes accept a 16th round

23  or won't accept a 15th round if they're marked 15,

24  either side of that, just because of manufacturing

25  differences and the tolerances.  I specifically

**193**

1  have seen Mecgar magazines.  Mecgar is an

2  after-market manufacturer and they consistently

3  will hold one more than what they're currently

4  marked for.

5        MR. KOPEL:  Could you spell Mecgar?

6       A   M-e-c-g-a-r.  There are a number of

7   .22 semiautomatic magazines out on the market.  I'm

8   trying to think of the name.  There's a

9   manufacturer that makes .22 magazines, and they're

10   everything from drums to long sticks to flippers,

11   and they regularly will hold one or two or

12   sometimes even three more than what they're -- what

13   the packaging says that they'll hold.

14       Q   (By Mr. Fero)  Just for purposes of

15   right now, if you think about that Mecgar magazine

16   that you were talking about, do you have any

17   concerns as to the quality of those magazines?

18       A   Oh, absolutely.

19       Q   What is that?

20       A   Any after-market magazine is going

21   to be less quality probably than what the gun comes

22   with from a reliable manufacturer, from a reputable

23   manufacturer, such as Smith, Colt, Glock, Sig,

24   those kind of things.  The reason that they have a

25   market for those is magazines are expensive, and so

**194**

1   after-market magazines tend to be, you know,

2   slightly shorter or lesser value, lesser quality

3   than what you would get when you would buy the

4   name-brand magazine for the weapon.  So that's

5   their appealability on the market.  And so because

6   they're cheaper, they tend to be less quality; and

7   because they tend to be less quality, they tend to

8   not be as reliable, they tend to be not as useable

9   as what the gun comes with.

10        Q   Do you have any knowledge as to

11  whether Mecgar, those magazines were designed by

12  the -- by Mecgar to accept an additional bullet

13  than what they marked on the side of the magazine?

14        A   No, they're not.

15        Q   Why do you say that?

16        A   Because if they were, they would put

17  that on there.  That's also a selling point.  If

18  you can make a magazine that will hold 16

19  consistently, then you would put on the packaging

20  it holds 16, because that's a selling point.  So

21  they're not intentionally doing that.  If they

22  drill 15 cycles so that you can see it's a fully

23  loaded magazine, that's what they are intended for

24  it to be.  And if it happens to hold 16, well,

25  that's a bonus.  I think it's going to hurt

                    **195**

1   reliability in the long-run, but if they had

2   intended it to be that, they would have drilled 16

3   holes or 17, or whatever it was they intentionally

4   made it to produce.

5       Q   Why do you say that's a marketing

6   point?

7       A   Because people want more capacity in

8   their guns.  There's a reason for double-stack

9   versus single-stack.  That's why the technology

10   went to the double-stackability.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

**GOVERNOR'S RESPONSES TO FEDERAL LICENSED FIREARMS DEALERS, MAGPUL INDUSTRIES, COLORADO STATE SHOOTING ASSOCIATION, AND HAMILTON FAMILY ENTERPRISES FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION, AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

---

Defendant John W. Hickenlooper, in his official capacity as Governor of the State of Colorado, by and through undersigned counsel, hereby submits his responses to the interrogatories, requests for admission, and requests for production propounded by the Plaintiff federal licensed firearms dealers, Magpul Industries, Colorado State Shooting Association, and Hamilton Family Enterprises.

### AUTHENTICATION

The names and positions of each and every person who assisted in answering these requests for admission are as follows:

    (a) Kathleen Spalding, Senior Assistant Attorney General
    (b) Stephanie Scoville, Senior Assistant Attorney General
    (c) Matthew Grove, Assistant Attorney General
    (d) Jack Finlaw, Chief Legal Counsel, Office of the Governor

### GENERAL OBJECTIONS AND RESPONSES

The Governor makes the following general objections and responses to the non-profit and individual Plaintiffs' first set of requests for admission:

1.     The Governor objects to each Discovery Request to the extent that it:

    (a)  is overly broad and/or unduly burdensome;

    (b)  is vague, ambiguous, and/or fails to describe with reasonable particularity the information sought;

    (c)  seeks information that exceeds the scope of, or is inconsistent with permissible discovery;

    (d)  seeks information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence; and/or

    (e)  contains undefined terms which are ambiguous and/or prejudicial.

2.     The above-captioned written discovery requests do not, by their terms, exclude privileged or protected communications from production.  The Governor therefore objects to each discovery request to the extent that it seeks the disclosure of any information that is privileged or protected for any reason, including but not limited to information protected by the attorney-client privilege, the work product doctrine, the deliberative process privilege, and any other applicable privileges or protections.

3.     The Governor objects to each request for admission to the extent it seeks the disclosure of information gathered and/or documents prepared by or for the Governor or the Governor's attorneys in anticipation of litigation or in preparation for trial that contains or discloses the theories, mental impressions, or litigation strategy of the Governor's attorneys.

4.     The Governor objects to each request for admission to the extent it requests information not in the Governor's possession, custody or control.  The Governor further objects to each request for admission to the extent that it seeks information in the possession, custody, or control of others.  More specifically, Plaintiffs purport to define the terms "you," "your" and "defendant" to include all persons and departments within the executive branch of Colorado state government.  This definition inaccurately reflects the scope of this litigation.  Plaintiffs have sued the Governor in his official capacity.  The Court has recognized that for the purposes of this litigation, the Governor's Office does not include either executive departments or the thousands of state employees who work in those departments.  The Governor objects to the definition of "you," "your," and "defendant" to the extent that the definition purports to require the disclosure of

information or documents from entities or persons who are not within the Governor's Office and not within the custody or control of the Governor's Office.

5.     The Governor objects to each request for admission to the extent it seeks the disclosure of any confidential information, and will seek an appropriate protective order prior to disclosing any such information (to the extent that the current protective order does not encompass such information).  However, attorney-client privileged communications and work product will not be disclosed.

6.     The Governor responds to the instant discovery requests as required by the Federal Rules of Civil Procedure and applicable case law.  The Governor therefore objects to each request for admission to the extent it seeks to impose obligations on the Governor other than those authorized by the Federal Rules of Civil Procedure and applicable case law.  Any purported instructions, definitions, requirements, or requests to the contrary are disregarded.

7.     By disclosing information and/or materials responsive instant discovery requests, the Governor does not stipulate or otherwise admit that any such information and/or materials is authentic, relevant, or admissible.  The Governor expressly reserves all objections to the admission of such information and/or materials as provided by the rules of procedure and evidence.

8.     The Governor's general objections and responses to the instant discovery requests shall be deemed continuing as to each Discovery Request and are not waived or in any way limited by the following specific objections and responses to each request for admission.  Further, the Governor's general objections and responses shall be deemed incorporated into the following specific objections and responses to each request for admission.

9.     The Governor's responses to the instant discovery requests are based upon information presently available and specifically known to the Governor in his official capacity.  The Governor is aware of his obligation under Fed.R.Civ.P. 26(e), and consistent therewith, will timely supplement any specific response with additional or corrective information if the Governor learns that in some material respect the original response was incomplete or incorrect.

10.     Defendant objects to Plaintiffs' interrogatories to the extent they request all facts or information upon which Defendant may rely. Defendant's

responses are made subject to the ongoing discovery and trial preparation in this case and are based on the best information presently available.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES, REQUESTS FOR ADMISSION, AND REQUESTS FOR PRODUCTION

**Interrogatory 1:** Are you aware of any occasions since 1993 to present, when individuals, law enforcement agencies, courts, or any other person or organization has violated or taken action contrary to a Technical Guidance, including any Guidance issued to clarify or provide an interpretation of Colorado legislation, regardless of whether it was styled "Technical Guidance" (hereinafter "Guidance") including but not limited to the Guidances issued relating to HB 1224 and HB 1229? If so, please describe:

> (a) The Guidance that was violated;
> (b) The date of the violation;
> (c) The events and circumstances surrounding the violation; and
> (d) How the violation was addressed by the Governor, Colorado Attorney General, law enforcement agencies, and/or other individual(s).

***Objection*:** Defendant objects to this Interrogatory on the ground that it seeks twenty years of data, the majority of which predate Defendant's administration, and therefore is overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory on the ground that it seeks information relating to "individuals, law enforcement agencies, courts, or any other person or organization," and therefore, is overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant similarly objects to this Interrogatory on the ground that it asks "How the violation was addressed by the Governor, Colorado Attorney General, law enforcement agencies, and/or other individual(s)" and therefore, is overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory on the ground that a request for information relating to "any other person or organization" or "other individual(s)" is too vague and ambiguous to permit a meaningful response, and is also overbroad and unduly burdensome and oppressive.

***Response***:  Subject to and without waiving the foregoing general and specific objections, the Governor is aware of no such occasions during his administration.

**Request for Production 1:** Produce any and all documents utilized in answering Interrogatory 1.

***Objection***:  The Governor hereby incorporates the objections to Interrogatory 1.

***Response***: The Governor has no documents responsive to this request.

**Interrogatory 2:** Identify every instance in which any Colorado Governor, Colorado Attorney General, or anyone at their direction, has issued Guidance since 1993 to present.

***Objection***: Defendant objects to this Interrogatory on the ground that it seeks twenty years of data, the majority of which predate Defendant's administration, and therefore is overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory on the ground that it seeks information relating to "any Colorado Governor, Colorado Attorney General, or anyone at their direction" and therefore, is overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this Interrogatory on the ground that a request for information relating to "anyone at their direction" is too vague and ambiguous to permit a meaningful response, and is also overbroad and unduly burdensome and oppressive. The Governor objects further because this interrogatory seeks information that is subject to the attorney-client privilege, work product privilege, and deliberative process privilege, and because it seeks information outside the custody and control of the Governor's office.

***Response***:  Subject to and without waiving the foregoing general and specific objections the Governor's office has not issued any Technical Guidance during the current administration.  Consistent with the Governor's signing statement, the Attorney General issued Technical Guidance concerning HB 1224 on May 17, 2013, and July 10, 2013. The Governor has no knowledge of whether previous administrations or other state agencies have issued Technical Guidance on any occasion since 1993.

**Request for Production 2:** Produce any and all documents related to any Guidance identified in your response to Interrogatory 2, including copies of the Guidance.

    ***Objection:*** The Governor hereby incorporates the objections to Interrogatory 2.

    ***Response*:**  The Governor's signing statement for HB 1224 and the Technical Guidance letters of May 17 and July 10, 2013, are submitted herewith.  To the extent that Request for Production 2 seeks documents that are subject to the attorney-client privilege, work product privilege, deliberative process privilege, or any other applicable privilege, such documents will not be produced.

**Interrogatory 3:** Identify any and all occasions when a Guidance has been modified, removed, or altered, as well as the occasions when more than one Guidance has been issued for the same legislation.

    ***Objection*:** This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence. Because there is no temporal limitation on this interrogatory, it is also overbroad, unduly burdensome and oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.

    ***Response*:** The Governor's office has no knowledge of an occasion upon which "a Guidance has been modified, removed, or altered" during his administration, and is aware of only one occasion during his administration upon which "more than one Guidance has been issued for the same legislation."  The Attorney General's office issued two Technical Guidance letters relating to HB 1224.

**Request for Production 3:** Produce any and all documents related to any Guidances identified in your response to Interrogatory 3, including copies of the Guidance.

    ***Objection*:** The Governor hereby incorporates the objections to Interrogatory 3.

    ***Response*:**  The Governor's signing statement for HB 1224 and the Technical Guidance letters of May 17 and July 10, 2013, are submitted herewith.  To the extent that Request for Production 2 seeks documents that are subject to the attorney-client privilege, work product privilege, deliberative process privilege, or any other applicable privilege, such documents will not be produced.

**Interrogatory 4:** Identify any and all alleged governmental interests served by HB 1224's 15-round limitation on the capacity of magazines and describe in detail how the 15-round limitation serves or addresses that interest.

    ***Objection:*** This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory. *See, e.g., Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, \*6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face"). It is also a premature contention interrogatory.

    ***Response:*** Subject to and without waiving the foregoing general objections, the governmental interests served by HB 1224 are the protection of public safety and public health. The manner in which limiting magazine size achieves that governmental interest is, without limitation, identified in the following documents:

- The expert report of Jeffery Zax, Ph.D., submitted August 2, 2013, and publications cited therein.
- The supplemental expert report of Jeffery Zax, Ph.D., submitted September 13, 2013, and publications cited therein.
- The rebuttal expert report of Douglas S. Fuchs, submitted September 6, 2013, and publications cited therein.
- The rebuttal expert report of John Cerar, submitted September 5, 2013, and publications cited therein.
- Legislative history for H.B. 1224.
- Testimony of Laurence Tribe before the Senate Judiciary Committee, February 2013.
- Christopher S. Koper, An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003, Report to the National Institute of Justice, June 2004.
- Christopher S. Koper, America's Experience with the Federal Assault Weapons Ban, 1994-2004, Key Findings and Implications, in Reducing Gun Violence in America, D. Webster and J. Vernick, eds., Johns Hopkins University Press (2013).
- David S. Fallis and James V. Grimaldi, In Virginia, High-Yield Clip Seizures Rise, Washington Post, January 23, 2011, page A-1.
- David S. Fallis, High-capacity magazines saw drop during ban, data indicate, Washington Post, January 13, 2013, page A-4.
- Richmond T, Branas C, Cheney R, Schwab C. The case for enhanced data collection of gun type. J Trauma, 2004; 57(6):1356-1360.
- Reedy DC, Koper CS. Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. Inj. Prev., 2003; 9(2):151-155.
- Firearm Injury in the U.S., Firearm & Injury Center at Penn (Version 2011).

- Wintemute GJ. The relationship between firearm design and firearm violence. Handguns in the 1990s. JAMA, 1996; 275(22):1749-53.
- Gotsch KE, Annest JL, Mercy JA, Ryan GW. Surveillance for fatal and nonfatal firearm-related injuries—United States, 1993-1998. MMWR, 2001; 50(SS-2): 1-34.
- Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. JAMA, 1996; 275(1):42-5.

**Request for Production 4:** Provide any and all documents, information, or other evidence that supports your claimed governmental interests outlined in your response to Interrogatory 4.

***Objection***:  The Governor hereby incorporates the objections to Interrogatory 4.

***Response***: Subject to and without waiving the foregoing specific and general objections, copies of the documents identified in response to Interrogatory 4 have either been previously disclosed or are provided herewith.

**Request for Admission 1:** Admit that HB 1224's 15-round limitation on the capacity of magazines is not narrowly tailored and/or substantially related to meet the governmental interests you identified in Interrogatory 4.

***Objection***: In the event that a trial is necessary, and assuming that a fifteen-round limit on magazine capacity implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1224 is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1224 does not impose any burden on core Second Amendment protections, much less a severe burden.

***Response***:  Denied.

**Interrogatory 5**: If you deny Request for Admission 1, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224's 15-round limitation on the capacity of magazines is narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 4.

***Objection***: This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.  In the

event that a trial is necessary, and assuming that a fifteen-round limit on magazine capacity implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1224 is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1224 does not impose any burden on core Second Amendment protections, much less a severe burden.

**_Response_**: Subject to and without waiving the foregoing general and specific objections, there is, at a minimum, a substantial relationship between the magazine capacity limit and the state's interest in ensuring public safety and public health. This relationship will be demonstrated through the expert testimony of Jeffery Zax, Douglas Fuchs, and John Cerar, whose conclusions are outlined in their previously disclosed expert and rebuttal reports.  The expert testimony will be supported by extensive testimony from civilians, witnesses associated with law enforcement, and the submission of various studies relating to the allegations in the complaint.

**Request for Production 5**: Provide any and all documents, information, legislative records, or other materials and evidence that supports your response to Interrogatory 5.

**_Objection_:** The Governor hereby incorporates the objections to Interrogatory 5 and RFA 1.

**_Response_**:  Subject to and without waiving the foregoing general and specific objections, see the documents identified and provided in response to Interrogatory 4 and RFP 4.

**Interrogatory 6:** Identify any and all alleged governmental interests served by HB 1224's prohibition of magazines "designed to be readily converted" to hold greater than 15 rounds and describe in detail how the prohibition serves or addresses that interest.

**_Objection_:** This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.

**_Response_**: See Response to Interrogatory 4.

**Request for Production 6:** Provide any and all documents, information, or other evidence that supports your claimed governmental interests outlined in your response to Interrogatory 6.

**_Objection_**: The Governor hereby incorporates the objections to Interrogatory 6.

**_Response_**: See Response to RFP 4.

**Request for Admission 2:** Admit that HB 1224's prohibition of magazines "designed to be readily converted" to hold greater than 15 rounds is not narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 6.

**_Objection_**: In the event that a trial is necessary, and assuming that a fifteen-round limit on magazine capacity implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1224 is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1224 does not impose any burden on core Second Amendment protections, much less a severe burden.

**_Response_**: Denied.

**Interrogatory 7:** If you deny Request for Admission 2, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224's prohibition of magazines "designed to be readily converted" to hold greater than 15 rounds is narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 6.

**_Objection_**: This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory. *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face"). It is also a premature contention interrogatory. In the event that a trial is necessary, and assuming that a fifteen-round limit on magazine capacity implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1224 is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1224 does not impose any burden on core Second Amendment protections, much less a severe burden.

**Response**:  Subject to and without waiving the foregoing general and specific objections, magazines that are "designed to be readily converted" to hold more than fifteen cartridges implicate the same public safety and health concerns as magazines that hold more than fifteen cartridges.  *See* Response to Interrogatory 5.

**Request for Production 7:** Provide any and all documents, information, legislative records, or other materials and evidence that supports your response to Interrogatory 7.

**Objection**:  The Governor hereby incorporates the objections to Interrogatory 7.

**Response**:  Subject to and without waiving the foregoing general and specific objections, see the documents identified and provided in response to Interrogatory 4 and RFP 4.

**Interrogatory 8:** Identify any and all alleged governmental interests served by HB 1224's continuous possession clause and describe in detail how the clause serves or addresses that interest.

**Objection**: This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.

**Response**: Subject to and without waiving the foregoing general and specific objections, HB 1224's "continuous possession" requirement, as construed by the May 17, 2013 and July 10, 2013 Technical Guidance documents, provides that the owner of a grandfathered LCM must maintain dominion or control of the magazine in order to maintain its grandfathered status.

**Request for Production 8:** Provide any and all documents, information, or other evidence that supports your claimed governmental interests outlined in your response to Interrogatory 7.

**Objection**:  The Governor hereby incorporates the objections to Interrogatory 7.

**Response**: Subject to and without waiving the foregoing general and specific objections, see the documents identified and provided in response to Interrogatory 4 and RFP 4.

**Request for Admission 3:** Admit that HB 1224's continuous possession clause is not narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 8.

**Objection**:  In the event that a trial is necessary, and assuming that a fifteen-round limit on magazine capacity implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1224 is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1224 does not impose any burden on core Second Amendment protections, much less a severe burden.

**Response**: Denied.

**Interrogatory 9:** If you deny Request for Admission 3, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224's continuous possession clause is narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 8.

**Objection**: This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory. Assuming that a fifteen-round limit on magazine capacity implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1224's continuous possession clause is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1224 does not impose any burden on core Second Amendment protections, much less a severe burden.

**Response**: Subject to and without waiving the foregoing general and specific objections, in the event that a trial is necessary, there is, at a minimum, a substantial relationship between the continuous possession requirement, as interpreted by the Technical Guidance issued on May 17, 2013, and July 10, 2013, and the state's interest in ensuring public safety and public health.  In short, the continuous possession requirement is necessary to safeguard the integrity of the

grandfather clause and to ensure that grandfathered magazines will not be transferred. This relationship will be demonstrated through the expert testimony of Jeffery Zax, Douglas Fuchs, and John Cerar, whose conclusions are outlined in their previously disclosed expert and rebuttal reports. The expert testimony will be supported by extensive testimony from civilians, witnesses associated with law enforcement, and the submission of various studies relating to the allegations in the complaint.

**Request for Production 9:** Provide any and all documents, information, legislative records, or other materials and evidence that supports your response to Interrogatory 9.

**_Objection_:** The Governor hereby incorporates the objections to Interrogatory 9.

**_Response_**: Subject to and without waiving the foregoing general and specific objections, see the documents identified and provided in response to Interrogatory 4 and RFP 4.

**Interrogatory 10:** Identify and any all alleged governmental interests served by HB 1229's restriction of firearms sales and temporary transfers between individuals, and describe in detail how the restrictions serve or address those interests.

**_Objection_**: This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory. *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face"). It is also a premature contention interrogatory.

**_Response_**: HB 1229 does not place "restriction[s]" on firearms sales. It has always been illegal for an individual who is prohibited by law from owning or possessing a firearm to purchase one. HB 1229 does not extend these prohibitions, but instead extends existing background check requirements to private sales in an effort to ensure compliance with already-existing state and federal prohibitions on firearm ownership and possession. There are many exceptions to HB 1229's background check requirement that amply protect any Second Amendment rights that may be affected by the expansion of the background check requirement, including, without limitation, among family members, temporary transfers within the home, while hunting, and for any reason for a period of up to 72 hours.

Universal background check requirements enhance public safety by, among other things, ensuring compliance with existing prohibitions on firearm acquisition by individuals who are prohibited by state or federal law. This is described more completely in the expert report of Daniel Webster.

**Request for Production 10:** Provide any and all documents, information, or other evidence that supports your claimed governmental interests outlined in your response to Interrogatory 10.

*__Objection__*: The Governor hereby incorporates the objections to Interrogatory 10.

*__Response__*: Subject to and without waiving the foregoing general and specific objections, see the documents identified and provided in response to Interrogatory 4 and RFP 4.  See also:

- The expert report of Daniel Webster, Sc.D., MPH, submitted August 1, 2013, and publications cited therein.
- Documents provided by the Colorado Bureau of Investigation InstaCheck unit in response to the Plaintiffs' subpoena duces tecum.

**Request for Admission 4:** Admit that HB 1229's restriction on firearms sales and temporary transfers between individuals is not narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 10.

*__Objection__*:  Assuming that the implementation of a background check requirement for private sales implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that such requirement is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1229 does not impose any burden on core Second Amendment protections, much less a severe burden.

*__Response__*: Denied.

**Interrogatory 11:** If you deny Request for Admission 4, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1229's restriction of firearms sales and temporary transfers between individuals is narrowly tailored and/or substantially related to meet the governmental interests you identified in response to Interrogatory 10.

*__Objection__*: This interrogatory is an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory. Assuming that requiring background checks for all private sales implicates Second Amendment protections at all, the Governor will not bear the burden of demonstrating that HB 1229 is "narrowly tailored and/or substantially related" to the government's interest in ensuring public safety and public health because HB 1229 does not impose any burden on core Second Amendment protections, much less a severe burden.

*__Response__*: Subject to and without waiving the foregoing general and specific objections, in the event that a trial is necessary, the evidence at trial will show that universal background check requirements enhance public safety and health by, among other things, making firearms more difficult for prohibited persons to acquire.  Expert testimony from Daniel Webster will establish the effectiveness of universal background check requirements in reducing rates of violent crime and/or homicide. Testimony from James Spoden and/or Ronald Sloan will establish that HB 1229 has, in fact, prevented many transfers to a prohibited individual in a private sale from taking place.

**Request for Production 11:** Provide any and all documents, information, legislative records, or other materials and evidence that supports your response to Interrogatory 11.

*__Objection__*: The Governor hereby incorporates the objections to Interrogatory 11.

*__Response__*: Subject to and without waiving the foregoing general and specific objections, see the documents identified and provided in response to Interrogatory 4 and RFP 4.  See also:

- The expert report of Daniel Webster, Sc.D., MPH, submitted August 1, 2013, and publications cited therein.
- Documents provided by the Colorado Bureau of Investigation InstaCheck unit in response to the Plaintiffs' subpoena duces tecum.

**Interrogatory 12:** Provide annual totals for calendar years 2004-2012, citing the reasons for insta-check denials that are listed in the Colorado Bureau of Investigation's reports under the category "Other."

    ***Objection***: This request seeks information outside the Governor's custody and control.  It is therefore unduly burdensome and oppressive.

    ***Response***: To the extent that this information exists, it has been produced by CBI in response to Plaintiffs' subpoena duces tecum.

**Interrogatory 13:** Provide monthly sales totals for hunting licenses from January 2004 to the present. As part of your response to this Interrogatory, please report the sales for Colorado residents and non-residents separately. Also, please include in your response to this Interrogatory the type of licenses provided, e.g., small game, antelope, elk, etc.

    ***Objection***: This request seeks information outside the Governor's custody and control.

    ***Response***: To the extent that this information exists, it has been produced by CBI in response to Plaintiffs' subpoena duces tecum.

**Request for Admission 5:** Admit that Defendant was aware prior to July 1, 2013 that HB 1224 would have an adverse economic impact on Magpul Industries and the Licensed Firearms Dealer Plaintiffs.

    ***Objection***:  The Governor is not required to respond to this request for admission because it calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

**Interrogatory 14:** If you deny Request for Admission 5, explain the basis for your denial and identify any and all attempts you made prior to July 1, 2013 to determine if HB 1224 would have an adverse economic impact on Magpul Industries and the Licensed Firearms Dealer Plaintiffs as well as the results of those attempts.

    ***Objection***:  The Governor is not required to respond to this Interrogatory because it is not reasonably calculated to lead to the discovery of admissible

evidence, and calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

**Request for Admission 6:** Admit that HB 1224 and HB 1229 apply to all classes of people in Colorado.

***Objection***: This request for admission is vague, ambiguous, and uncertain. The meaning of "all classes of people in Colorado" cannot be ascertained from the plain language of the question, its context, or the definitions accompanying this set of written discovery. *Carmichael Lodge No. 2103, Benevolent & Protective Order of Elks of the United States of Am.*, No. 07-2665 LKK GGH, 2009 U.S. Dist. LEXIS 39223, 2009 WL 1118896, at *5 (E.D. Cal. Apr. 23, 2009) (a party is not required to speculate about a request for admission that contains genuinely vague or ambiguous statements). The phrase "all classes" is also overbroad.

***Response***: Without waiving the foregoing general and specific objections, and to the extent a response is required, the language of HB 1224 and 1229 speaks for itself.

**Interrogatory 15:** If you deny Request for Admission 6, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224 and HB 1229 apply to a narrow class of persons within the Colorado population, not all classes of people in Colorado.

***Objection***: This interrogatory cannot be answered because Request for Admission 6 is too vague, ambiguous, and uncertain to admit or deny.

***Response***: Without waiving the foregoing general and specific objections, and to the extent a response is required, the language of HB 1224 and 1229 speaks for itself.

**Request for Admission 7:** Admit that you have previously interpreted HB 1224's "designed to be readily converted" clause to outlaw at least some magazines that accept fewer than 16 rounds and have removable base plates.

***Objection***: This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence.  It also calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB

1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

**_Response_**: Without waiving the foregoing general and specific objections, the request for admission is denied.

**Interrogatory 16:** If you deny Request for Admission 7, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that you have not previously interpreted HB 1224's "designed to be readily converted" clause to outlaw at least some magazines that accept fewer than 16 rounds and have removable base plates.

**_Objection_**: This interrogatory requests the Governor to prove a negative and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.  It also calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

**_Response_**: Subject to and without waiving the foregoing general and specific objections, see the Governor's signing statement and the Technical Guidance issued on May 17, 2013, and July 10, 2013.

**Request for Production 12:** Provide any and all documents, information, or other materials and evidence that supports your response to Interrogatory 16.

**_Objection_**: The Governor hereby incorporates the objections to Interrogatory 16.

**_Response_**: Subject to and without waiving the foregoing general and specific objections, see the Technical Guidance issued on May 17, 2013, and July 10, 2013.

**Request for Admission 8:** Admit that HB 1224 imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

**_Response_**: Denied.

1188

**Interrogatory 17:** If you deny Request for Admission 8, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224 does not impose a burden on conduct falling with the scope of the Second Amendment's guarantee.

**_Objection_:** This interrogatory calls for a legal conclusion.  It is also an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.

**_Response_:** Subject to and without waiving the foregoing general and specific objections, a large-capacity magazine is not an "arm" that is protected by the Second Amendment.  It is an accessory.

**Request for Production 13:** Provide any and all documents, information, or other materials and evidence that supports your response to Interrogatory 17.

**_Objection_:** The Governor hereby incorporates the objections to Interrogatory 17.

**_Response_:** The Governor anticipates presenting legal argument on this point.

**Request for Admission 9:** Admit that HB 1229 imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

**_Response_:** Denied.

**Interrogatory 18:** If you deny Request for Admission 9, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1229 does not impose a burden on conduct falling with the scope of the Second Amendment's guarantee.

**_Objection_:** This interrogatory calls for a legal conclusion.  It is also an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.

**_Response_:** The Governor anticipates presenting legal argument on this point.

**Request for Admission 10:** Admit that HB 1224 is not based on longstanding and historical regulations to the Second Amendment.

**_Response_:** Denied.

**Interrogatory 19:** If you deny Request for Admission 10, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224 is based on longstanding and historical regulations to the Second Amendment, including, specifically, which longstanding regulations HB 1224 is based.

**_Objection_:** This interrogatory calls for a legal conclusion.  It is also an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.  This interrogatory also calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

**Request for Production 14:** Provide any and all documents, information, or other materials and evidence that supports your response to Interrogatory 19.

**_Objection_:** The Governor hereby incorporates the objections to Interrogatory 19.

**Request for Admission 11:** Admit that HB 1229's restrictions on temporary transfers of firearms are not based on longstanding and historical regulations to the Second Amendment.

**_Response_:** Denied.

**Interrogatory 20:** If you deny Request for Admission 11, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1229's restrictions on temporary transfers of firearms are based on longstanding and historical regulations to the Second Amendment, specifically, which long standing regulations this section of HB 1229 is based.

*Objection*:  This interrogatory calls for a legal conclusion.  It is also an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.  This interrogatory also calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

**Request for Production 15:** Provide any and all documents, information, or other materials and evidence that supports your response to Interrogatory 20.

*Objection*: The Governor hereby incorporates the objections to Interrogatory 20.

**Request for Admission 12:** Admit that HB 1224 prohibits the possession of certain handguns.

*Objection*:  The term "certain" is too vague and ambiguous to permit a meaningful response.

*Response*: Denied.

**Interrogatory 21:** If you deny Request for Admission 12, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that HB 1224 does not prohibit the possession of any handguns, specifically, those handguns that are only compatible with magazines that hold greater than 15 rounds.

*Objection*:  The Governor hereby incorporates the objections to RFA 12.  It is also an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776838, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.

*Response*: Subject to and without waiving the foregoing general and specific objections, HB 1224 applies to detachable magazines, not handguns, and therefore

by definition does not "prohibit the possession of any handguns."  Magazines that were possessed prior to July 1, 2013, are not affected by HB 1224.  Assuming that there are in fact any models of handguns that are incompatible with a commercially manufactured magazine that holds 15 or fewer rounds, such commercially manufactured magazines of a higher capacity could be permanently altered to comply with the capacity limitations of Colorado law.

**Request for Production 16:** Provide any and all documents, information, or other materials and evidence that support your response to Interrogatory 21.

*__Response__:* *See* Shooter's Bible, 105th Edition; Lee, Jerry, 2013 Standard Catalog of Firearms, 23rd Ed; HB 13-1224.

**Request for Admission 13:** Admit that HB 1224's 15-round limitation on the capacity of magazines completely bans the possession, purchase, sale, and ownership of some firearms and related magazines that are commonly used for lawful purposes, such as self-defense, hunting, and sport shooting.

*__Objection__*: Whether a particular firearm or magazine is "commonly used for lawful purposes" is a legal conclusion.

*__Response__*: Denied.

**Interrogatory 22:** If you deny Request for Admission 13, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that that HB 1224's 15-round limitation on the capacity of magazines does not completely ban the possession, purchase, sale, and ownership of some firearms and related magazines that are commonly used for lawful purposes.

*__Objection__*: The Governor hereby incorporates the objections to RFA 13.  It is also an overly broad and unduly burdensome "blockbuster" interrogatory.  *See, e.g. Bat v. A.G. Edwards & Sons, Inc.,* 2005 U.S. Dist LEXIS 47995, 2005 WL 6776848, *6-7 (D. Colo. 2005) (holding interrogatory that seeks "each and every fact" supporting party's position "overbroad and burdensome on its face").  It is also a premature contention interrogatory.

*__Response__*: Subject to and without waiving the foregoing general and specific objections, HB 1224 does not ban the possession or ownership of any magazine or firearm that was acquired prior to July 1, 2013.  HB 1224 does ban the purchase or sale of large-capacity magazines after its effective date, unless such large-capacity magazines are permanently altered to hold 15 rounds or fewer.  It does not ban the purchase or sale of any firearm because even those rare firearms with internal (non-

detachable) magazines that hold 16 or more rounds may be permanently altered to reduce their capacity to hold 15 or fewer rounds.

**Request for Production 17:** Provide any and all documents, information, or other materials and evidence that support your response to Interrogatory 22.

*__Response__*: *See* Shooter's Bible, 105th Edition; Lee, Jerry, 2013 Standard Catalog of Firearms, 23rd Ed,; HB 13-1224.

**Request for Admission 14:** Admit that magazines are often capable of holding one more round than it is advertised as holding. For example, a 15-round magazine may be capable of holding 16 rounds, even though it is advertised as only a 15-round magazine.

*__Objection__*: The terms "often," "capable," and "advertised" are too vague, ambiguous, and uncertain to permit a response. In addition, this is the subject of Plaintiffs' expert testimony in this case and is outside the scope of the Governor's knowledge.  This RFA is therefore unduly burdensome and oppressive.

**Interrogatory 23:** If you deny Request for Admission 14, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that a magazine is not capable of holding one more round than it is advertised as holding.

*__Objection__*: This interrogatory calls for speculation because, in part, it is based on a request for admission that is vague, ambiguous, and uncertain.  "As a general rule, a party is not required to answer interrogatories calling for speculation."  10A Fed. Proc. L. Ed. § 26:581; *see also American Oil Co. v. Penn. Petroleum Prod. Co.,* 23 F.R.D. 680 (D.R.I. 1959); *Gregg v. Local 305 IBEW*, 2010 WL 556526, at *4 (N.D. Ind. Feb 9, 2010).  This is also the subject of Plaintiffs' expert testimony in this case and is outside the scope of the Governor's knowledge. This interrogatory is therefore unduly burdensome and oppressive.

*__Response__*:  Because Request for Admission 14 was too vague, ambiguous and uncertain to answer, no response is required to this interrogatory.

**Request for Production 18:** Provide any and all documents, information, or other materials and evidence that supports your response to Interrogatory 23.

*__Response__*: The Governor hereby incorporates the objections to Interrogatory 23.

**Request for Admission 15:** Admit that any "blocking" or "limiting" device that may be attached to a magazine to limit the number of rounds it is capable of holding may not be visible from the outside of the magazine.

    **_Objection_:** The term "any" and the phrase "may not be visible from the outside of the magazine" are vague, ambiguous, and uncertain, and are the subject of expert testimony that is outside the scope of the Governor's knowledge.

    **_Response_:** Denied.

**Interrogatory 24:** If you deny Request for Admission 15, explain the basis for your denial and identify any and all evidence you intend to use at trial to establish that "blocking" or "limiting" devices that may be attached to a magazine to limit the number of rounds it is capable of holding is visible from the outside of the magazine.

    **_Objection_:** This interrogatory calls for speculation because, in part, it is based on a request for admission that is vague, ambiguous, and uncertain. "As a general rule, a party is not required to answer interrogatories calling for speculation." 10A Fed. Proc. L. Ed. § 26:581; _see also American Oil Co. v. Penn. Petroleum Prod. Co.,_ 23 F.R.D. 680 (D.R.I. 1959); _Gregg v. Local 305 IBEW_, 2010 WL 556526, at *4 (N.D. Ind. Feb 9, 2010).

    **_Response_:** Subject to and without waiving the foregoing objections, the Governor admits that some blockers or limiters may not be visible from outside the magazine, although it depends on the design of the magazine, whether the magazine is attached to a firearm, whether the magazine is loaded, whether any special equipment is used to make the observations, and whether the permanent installation of a blocker or limiter would also modify the external characteristics of the magazine in question.

**Request for Production 19:** Provide any and all documents, information, or other materials and evidence that support your response to Interrogatory 24.

    **_Objection_:** The Governor hereby incorporates the objections to Interrogatory 24.

    **_Response_:** The Governor is not in possession of any responsive documents.

1194

**AS TO OBJECTIONS:**

JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*

DANIEL D. DOMENICO
Solicitor General*
DAVID C. BLAKE*
Deputy Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
JONATHAN P. FERO*
Assistant Solicitor General
JOHN T. LEE*
Assistant Attorney General
MOLLY MOATS*
Assistant Attorney General
Attorneys for Governor John W. Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Jack Finlaw, do hereby verify under penalty of perjury under the laws of the United States of America that the foregoing responses to the Non-Profit and Individual Disabled Plaintiffs' First Set of Requests for Admission are true and correct to the best of my information and belief.

Dated this 30th day of October, 2013.

s/ Jack Finlaw_____
Chief Legal Counsel
Office of the Governor
State of Colorado

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>  October 30</u>, 2013 I served a true and complete copy of the foregoing Discovery Responses upon all counsel of record including those listed below via email:

David B. Kopel                    david@i2i.org

Jonathan M. Anderson              jmanderson@hollandhart.com
Douglas L. Abbott                 dabbot@hollandhart.com

Richard A. Westfall               rwestfall@halewestfall.com
Peter J. Krumholz                 pkrumholz@halewestfall.com

Marc F. Colin                     mcolin@brunolawyers.com
Jonathan Watson                   jwatson@brunolawyers.com

Anthony J. Fabian                 fabianlaw@qwestoffice.net


                          *s/Matthew Grove*

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado *et al.*,

Plaintiffs v.

JOHN W. HICKENLOOPER, Governor of the State of

Colorado, Defendant.

## DEFENDANT'S RESPONSES TO PLAINTIFF 55 SHERIFFS AND DAVID STRUMILLO DISCOVERY REQUESTS TO DEFENDANT

Defendant John W. Hickenlooper, in his official capacity as Governor of the State of Colorado, by and through undersigned counsel, hereby submits his responses to the interrogatories and requests for admission propounded by the Plaintiff sheriffs and David Strumillo.

## AUTHENTICATION

The names and positions of each and every person who assisted in answering these requests for admission are as follows:

(a) Kathleen Spalding, Senior Assistant Attorney General
(b) Stephanie Scoville, Senior Assistant Attorney General
(c) Matthew Grove, Assistant Attorney General
(d) Jack Finlaw, Chief Legal Counsel, Office of the Governor

## GENERAL OBJECTIONS AND RESPONSES

The Governor makes the following general objections and responses to the instant discovery requests:

1.    The Governor objects to each Discovery Request to the extent that it:

(a) is overly broad and/or unduly burdensome;

1198

(b) is vague, ambiguous, and/or fails to describe with reasonable
particularity the information sought;

(c) seeks information that exceeds the scope of, or is inconsistent with
permissible discovery;

(d) seeks information that is neither relevant to the subject matter  of
this action, nor reasonably calculated to lead to the discovery of
admissible evidence; and/or

(e) contains undefined terms which are ambiguous and/or prejudicial.

2.     The above-captioned written discovery requests do not, by their terms,
exclude privileged or protected communications from production.  The Governor
therefore objects to each discovery request to the extent that it seeks the disclosure of
any information that is privileged or protected for any reason, including but not
limited to information protected by the attorney-client privilege, the work product
doctrine, the deliberative process privilege, and any other applicable privileges or
protections.

3.     The Governor objects to each discovery request to the extent it seeks the
disclosure of information gathered and/or documents prepared by or for the Governor
or the Governor's attorneys in anticipation of litigation or in preparation for trial that
contains or discloses the theories, mental impressions, or litigation strategy of the
Governor's attorneys.

4.     The Governor objects to each discovery request to the extent it requests
information not in the Governor's possession, custody or control.  The Governor
further objects to each request for admission to the extent that it seeks information in
the possession, custody, or control of others.  More specifically, Plaintiffs purport to
define the terms "you," "your" and "defendant" to include all persons and departments
within the executive branch of Colorado state government.  This definition
inaccurately reflects the scope of this litigation.  Plaintiffs have sued the Governor in
his official capacity.  The Court has recognized that for the purposes of this litigation,
the Governor's Office does not include either executive departments or the thousands
of state employees who work in those departments.  The Governor objects to the
definition of "you," "your," and "defendant" to the extent that the definition purports
to require the disclosure of information or documents from entities or persons who are
not within the Governor's Office and not within the custody or control of the
Governor's Office.

5.     The Governor objects to each discovery request to the extent it seeks the disclosure of any confidential information, and will seek an appropriate protective order prior to disclosing any such information (to the extent that the current protective order does not encompass such information).  However, attorney-client privileged communications and work product will not be disclosed.

6.     The Governor responds to the instant discovery requests as required by the Federal Rules of Civil Procedure and applicable case law.  The Governor therefore objects to each request for admission to the extent it seeks to impose obligations on the Governor other than those authorized by the Federal Rules of Civil Procedure and applicable case law.  Any purported instructions, definitions, requirements, or requests to the contrary are disregarded.

7.     By disclosing information and/or materials responsive instant discovery requests, the Governor does not stipulate or otherwise admit that any such information and/or materials is authentic, relevant, or admissible.  The Governor expressly reserves all objections to the admission of such information and/or materials as provided by the rules of procedure and evidence.

8.     The Governor's general objections and responses to the instant discovery requests shall be deemed continuing as to each Discovery Request and are not waived or in any way limited by the following specific objections and responses to each request for admission.  Further, the Governor's general objections and responses shall be deemed incorporated into the following specific objections and responses to each request for admission.

9.     The Governor's responses to the instant discovery requests are based upon information presently available and specifically known to the Governor in his official capacity.  The Governor is aware of his obligation under Fed.R.Civ.P. 26(e), and consistent therewith, will timely supplement any specific response with additional or corrective information if the Governor learns that in some material respect the original response was incomplete or incorrect.

10.     Defendant objects to Plaintiffs' interrogatories to the extent they request all facts or information upon which Defendant may rely. Defendant's responses are made subject to the ongoing discovery and trial preparation in this case and are based on the best information presently available.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES AND REQUESTS FOR ADMISSION

**Interrogatory No. 1:**  Explain how, in the absence of comprehensive registration of firearms, HB 1229 can be enforced. Your answer should specifically address how law enforcement officers in the field will be able to tell whether a firearm was unlawfully privately transferred or sold after July 1, 2013.

Objection:  Defendant objects to this Interrogatory based on the Court's order of October 28, 2013 [Dkt. #91], which stated, "Governor Hickenlooper has no direct enforcement role."  As a result, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome and oppressive.

Response:  Without waiving and subject to this objection, Defendant refers Plaintiffs to the Technical Guidance letters dated May 17, 2013, and July 10, 2013.

**Interrogatory No. 2:**  Explain how, in the absence of comprehensive registration of magazines, HB 1224's ban on the possession of magazines can be enforced. Your answer should specifically address how law enforcement officers in the field will be able to tell whether a magazine is covered by the grandfather provision of HB 1224.

Objection:  Defendant objects to this Interrogatory based on the Court's order of October 28, 2013 [Dkt. #91], which stated, "Governor Hickenlooper has no direct enforcement role."  As a result, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome and oppressive.

Response:  Without waiving and subject to this objection, Defendant refers Plaintiffs to the Technical Guidance letters dated May 17, 2013, and July 10, 2013.

**Interrogatory No. 3:**  Explain why you refused on March 4, 2013, to meet with any of the approximately 30 Sheriffs who had come to the State Capitol to express their concerns about HB 1224 and HB 1229.

Objection:  Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.  As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged

legislation … meets constitutional standards…" As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 4:** On March 14, 2013, Larimer County Sheriff Justin Smith sent your office a letter requesting that you meet with Sheriffs to discuss the pending firearms bills. Please explain why you refused to meet with the Sheriffs.

> <u>Objection</u>: Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…" As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 5:** Identify every instance in which you have sought input from any Sheriff regarding magazine bans.

> <u>Objection</u>: The Governor is not required to respond to this Interrogatory because it calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975). Defendant also objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…" As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 6:** Identify every instance in which you have sought input from any Sheriff regarding background checks on private transfers or sales of firearms.

> <u>Objection</u>: The Governor is not required to respond to this Interrogatory because it calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229. This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *NLRB v. Sears, Roebuck &*

*Co.,* 421 U.S. 132, 150 (1975). Defendant also objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…" As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 7:** Does HB 1224 outlaw magazines which were manufactured to accept more than 15 rounds, and whose capacity has been reduced by the insertion of a limiter if the limiter is attached to the magazine via a pin? If the answer depends on specifically how the pin is attached, please specify which forms of attachment make the magazine legal

Objection: Defendant objects to this Interrogatory on the grounds that the phrase "via a pin" is too vague and ambiguous to permit a meaningful response. In addition, this is the subject of expert testimony in this case and is outside the scope of the Governor's knowledge. This Interrogatory is, therefore, unduly burdensome and oppressive.

**Interrogatory No. 8:** On July 22, 2013, you made the following statement to CNN regarding the Aurora theater murders:

JOHN HICKENLOOPER: …. And, you know, if it wasn't one weapon, it would have been another. I mean, he was diabolical. If you look at what he had in his apartment and what his intentions were, I mean even now it makes the hair on the back of my neck stand up. . . .

CANDY CROWLEY: What I hear from you is that you would be open to people who want to suggest a gun law or something that might prevent this sort of thing, but at the moment, you can't imagine what that would be.

JOHN HICKENLOOPER: Yeah. I mean, I'm happy to look at anything. But, it's -- again, this person if we had, if there were no assault weapons available, and no this or no that, this guy is going to find something, right. He's going to know how to create a bomb. He's going to -- I mean, who knows where his mind would have gone clearly very intelligent individual, however twisted. (Transcript available at 2012 WLNR 23824286.) Do your comments indicate that additional gun laws would not have prevented the Aurora murders? If this is not true, please explain what you meant.

Objection: Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal

thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…"  As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 9:** On Dec. 16, 2012, you made the following statement to CNN regarding the Aurora theater and Newtown murders:

CANDY CROWLEY: And I think we talked that time [referring to your July 22 conversation] about the culture of guns and kind of the culture that we live in now and that there's very little you can do to stop a determined person. Do you still feel that way?

JOHN HICKENLOOPER: Well, unfortunately, I think that's true. I mean, and you can't really argue those facts. What you can do is expand your capacity, your framework within a state or within the country to have more people paying attention and trying to detect folks that are unstable, on the verge of real trouble, trying to catch them at a sooner level.  (Transcript is available at 2012 WLNR 27125174.) Do your comments indicate that additional gun laws would not have prevented the Aurora and Newtown murders? If this is not true, please explain what you meant.

Objection: Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.  As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…"  As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 10:** At a press conference, on Sept. 11, 2013, you stated: "I was never as fired up on the magazine checks." (See Denver Post article on the press conference,  at http://www.denverpost.com/breakingnews/ci_24070521/gov-hickenlooper- disappointed-by-outcome-recalls-democrats?IADID=Search-www.denverpost.com-www.denverpost.com.) Please detail all reasons why you were never so fired up.

Objection: Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.  As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…"  As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 11:**  At a press conference, on Sept. 11, 2013, you stated that between 31% and 41% of magazines used in the killings of police officers in the last decade involved magazines of more than 15 rounds.  (See press conference video at http://www.denverpost.com/breakingnews/ci_24070521/gov-hickenlooper-disappointed-by-outcome-recalls-democrats?IADID=Search-www.denverpost.com-www.denverpost.com at 5:53). Please provide the source(s) for your assertion.

> Objection:  Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.  As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…"  As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 12:**  On April 4, 2013, on the Mike Rosen Show, on KOA 850 AM radio, the following exchange took place:

> MIKE ROSEN: So what kind of a magazine then would be...uh...illegal?

> JOHN HICKENLOOPER: Well there are certain magazines that are actually, uh, designed and have uh, uh, specific holes and attachments to be, to be extended and those specific magazines, uh, where there's, uh, a, certain level of design specifically just for extension rather than just cleaning. Uh...but that's not very many of them. Most of them...they may just have a slot which something could slide in and out, but again, that's not something that's specifically designed. And by using the narrow construction, by making sure that we have that in a letter coming out of the governor's office...uh...we felt that there was a good way of...that that was a good way of protecting people's rights to hold on to these things right, and even new ones that were designed properly.  (The audio is available on the KOA website, in the Mike Rosen Show archives.) Please explain what "specific holes and attachments" are part of "a certain level of design specifically just for extension."

> Objection:  Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.  As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…"  As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 13:** On the same radio program referenced in Interrogatory 12, the following exchange took place:

MIKE ROSEN: There was additional wording in that bill that said the original owner of the magazine must keep it in continuous possession. So for example, if you died and your wife now has your magazines, she wasn't the original owner, if you're dead and it isn't buried with you, you won't be in continuous possession. How in the world is that going to be enforced? Somebody had said well that means the wife will have to call the sheriff or police and hand over that magazine.

JOHN HICKENLOOPER: Right...I...I think that would be very hard to enforce. I'm not going to argue that. It would be close to impossible to enforce.

MIKE ROSEN: Which is why some people have said that with these weaknesses in the bill why not veto it?

JOHN HICKENLOOPER: Because they...I think ultimately the...and this was certainly not my favorite bill...uh...in any session...uh...you know, there is...uh...an issue...uh...for a lot of people, especially in urban and suburban areas about...uh...these large capacity magazines and even though it may be very difficult or impossible to enforce, setting a law does put some constraints on things. Please specify the "constraints on things" which you believe to be created by the provisions in HB 1224 which you consider to be very difficult or impossible to enforce.

Objection: Defendant objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. As the Court's order of October 28, 2013 [Dkt. #91] stated, the Governor's "personal thoughts, opinions, and beliefs, including any post-enactment statements, have no bearing on the ultimate questions of law on whether the challenged legislation … meets constitutional standards…" As a result, the Interrogatory is irrelevant, and unduly burdensome and oppressive.

**Interrogatory No. 14:** What information, if any, leads you believe that magazines of 15 or fewer rounds are commercially available for any of the following semi-automatic handguns.
   a. FNH FN 5.7 model 3868929120.
   b. Keltec PMR 30.
   c. Ruger SR9 models 3301 and 3331
   d. Sig Sauer model 226Tac Ops in .40S&W.
   e. Springfield Armory models XDM95259, XDM9389, XDM9211, XDM9201, XDM9202, and XDM95254.

Response:

a. According to the Shooter's Bible, 105th Edition, the FNH USA FN 5.7 model semi-automatic pistol is sold with 10 or 20 round magazines. Information provided in the Shooter's Bible, 105th Edition is corroborated by 2013 Standard Catalog of Firearms, 23rd Edition. See attached.

b. A commercially manufactured 15 cartridge or less magazine cannot be identified for the Kel-Tec PMR 30. The PMR 30 is specifically designed and marketed as a .22 semi-automatic pistol with a high-capacity 30 round magazine. To produce a model with a magazine holding less than 30 rounds is apparently a market decision made by Kel-Tec. However, the Kel-Tec PMR 30 is sold in New York with permanently altered magazines that hold only 10 rounds.

c. According to the Ruger website (http://www.ruger.com/products/sr9/models.html) the SR9 model 9mm semi-automatic pistol is sold directly by the manufacturer with either a 17 cartridge capacity magazine or a 10 cartridge capacity magazine.

d. According to the Sig Sauer website(http://www.sigsauer.com/CatalogProductDetails/p226-tactical-operations.aspx)the p226 Tac Ops, in both .40 and 9mm is sold from the manufacturer with either 10 and 15 round cartridge capacities. See attached.

e. A commercially manufactured 15 cartridge or less magazine cannot be identified for the XDM series semi-automatic pistol manufactured by Springfield Armory. Again, this model pistol is marketed to hold high-capacity magazines. To produce a model with a magazine holding less than 15 rounds is apparently a market decision made by Springfield Armory. However, there are commercially available magazine 10 and 15 cartridge capacity limiters available for the XDM 9mm model series. See attached.

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Admit that HB 1224's exceptions pertaining to lawful possession of banned magazines after July 1, 2013, do not include any provision allowing retailers to possess banned magazines for the purposes of selling such magazines to law enforcement officers within Colorado.

Objection: The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion. Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the

other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 2:**  Admit that HB 1224's exceptions pertaining to lawful possession of magazines after July 1, 2013, do not include any provision allowing Coloradoans to purchase banned magazines for the purposes of sending them to relatives who are serving overseas in the United States Armed Forces, and who wish to acquire such magazines for their military duties.

Objection:  The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion.  Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion.  *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 3:**  Admit that HB 1229 contains no exception pertaining to the permanent acquisition of firearms by law enforcement officers for law enforcement purposes.

Objection:  The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion.  Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion.  *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 4:**  Admit that HB 1229 contains no exception pertaining to the temporary acquisition of firearms by law enforcement officers for law enforcement purposes.

Objection:  The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion.  Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion.  *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am.*

*Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 5:** Admit that HB 1229 forbids the return of a stolen firearm to the rightful owner, unless the return is processed by a FFL pursuant to HB 1229's requirement for background check and for FFL record-keeping.

Objection: The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion. Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 6:** Admit that HB 1229 forbids Chief Law Enforcement Officers from transferring agency firearms to a law enforcement officer for more than 72 hours, unless the transfer is processed by a FFL pursuant to HB 1229's requirement for background check and for FFL record-keeping.

Objection: The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion. Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 7:** Admit that HB 1229 forbids law enforcement officers from taking a citizen's firearm for temporary safe-keeping for more than 72 hours, unless the transfer is processed by a FFL pursuant to HB 1229's requirement for background check and for FFL record-keeping. By way of illustration, this question includes a situation in which a citizen is the victim of a crime or accident, is therefore unconscious, and is therefore unable to safeguard a firearm which the citizen was carrying or transporting.

Objection: The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion. Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash.*

*Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 8:** Admit that HB 1224 contains no exemption for long-haul truckers transporting banned magazines from another state through Colorado for delivery to another state.

<u>Objection</u>: The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion. Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**Request for Admission No. 9:** Admit that HB 1224 contains no exception for travelers passing through Colorado who possess a banned magazine which was acquired on or after July 1, 2013.

<u>Objection</u>: The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion. Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

**AS TO OBJECTIONS:**

JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*

DANIEL D. DOMENICO
Solicitor General*
DAVID C. BLAKE*
Deputy Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
JONATHAN P. FERO*
Assistant Solicitor General
JOHN T. LEE*
Assistant Attorney General
MOLLY MOATS*
Assistant Attorney General
Attorneys for Governor John W. Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Jack Finlaw, do hereby verify under penalty of perjury under the laws of the United States of America that the foregoing responses to the Non-Profit and Individual Disabled Plaintiffs' First Set of Requests for Admission are true and correct to the best of my information and belief.

Dated this 1st day of November, 2013.

*s/ Jack Finlaw*    

Chief Legal Counsel
Office of the Governor
State of Colorado

## CERTIFICATE OF SERVICE

I hereby certify that on   November 1, 2013 I served a true and complete copy of the foregoing Discovery Responses upon all counsel of record including those listed below via email:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com
Douglas L. Abbott                       dabbot@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@brunolawyers.com
Jonathan Watson                         jwatson@brunolawyers.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                _s/ Matthew Grove_

1213

**STATE OF
COLORADO**

# Refered to you by AG of Colorado

**Spoden - CDPS, James** <james.spoden@state.co.us>                    Thu, Jun 6, 2013 at 1:01 PM
To: titanium68@yahoo.com
Cc: Paula Williams - CDPS <paula.williams@state.co.us>, Bob Brown - CDPS <robertd.brown@state.co.us>

Dear Sir,

Thank you for contacting the Colorado Bureau of Investigation. I can confirm that by transporting your firearms in the manner described below there would not be a conflict with state law. However, due to a new high capacity magazine law that will become effective in Colorado on July 01, 2013, I cannot confirm how this new law may apply to your magazines that have a capacity of more than 15 rounds.

As this law is currently subject to litigation, I am unable to provide an interpretation of how this may impact your trip. Currently we are directing these questions to the Attorney Genera's Office and the Colorado Governor's signing statement related to the high capacity magazine law.

Please have a safe and enjoyable trip!

**James Spoden**
**Supervisor InstaCheck/CHP Unit**
**Colorado Bureau of Investigation**
**Ph:** (303) 239-5850
**Fax:** (303) 239-5848
**Email:** James.Spoden@state.co.us

From: **Victor Huntley** <titanium68@yahoo.com>
Date: Wed, Jun 5, 2013 at 12:41 PM
Subject: Refered to you by AG of Colorado
To: cdps_cbi_denver@state.co.us

Traveling with Personal Firearms?

Dear Sir / Madam,
I be embarking on a cross country road trip that is scheduled to leave Florida in early July and be out for at least 3 months, and planning to visit nearly all of the Continental US, several National Parks and parts of Canada. While on my trip I was hoping to visit a couple of the premier shooting academies across the US, there for I will be transporting several different firearms. The list is as follows:
AR-15 with 4-30 round magazines, 12 Gauge Pump action shotgun, Ruger 280 Bolt action rifle, 22 Caliber Semi-Automatic rifle with 2-25 round magazines and a Taurus 40 Cal Semi-automatic pistol with 2-10 round magazines.
I have been doing some research and found that while the federal law is pretty clear on how I go about transporting these firearms, State and Local laws very. So as a solution, I would like to verify that if I disassemble these firearms (essentially, transporting firearm components) during my

CBI-00031

Case 1:13-cv-01300-MSK-MJW   Document 104-5   Filed 12/11/13   Page 2 of 11
10/24/13                                      State.co.us Executive Branch Mail - Refered to you by AG of Colorado
Appellate Case: 14-1290     Document: 01019371747     Date Filed: 01/16/2015     Page: 265

travels and ONLY reassemble them at the appropriate locations for various
classes. This should meet the letter of the law and abide by and State or
Local jurisdictions requirements.
Please let me know if there are any additional requirements that I need to
be concerned with or any additional persons I need to contact. Thank you
in advance for your time and consideration.
Sincerely,
William "Victor" Huntley
7415 W. Lemonade Lane
Dunnellon, Florida 34433


From: **Victor Huntley** <titanium68@yahoo.com>
Date: Wed, Jun 5, 2013 at 12:41 PM
Subject: Refered to you by AG of Colorado
To: cdps_cbi_denver@state.co.us


Traveling with Personal Firearms?

Dear Sir / Madam,
I be embarking on a cross country road trip that is scheduled to leave
Florida in early July and be out for at least 3 months, and planning to
visit nearly all of the Continental US, several National Parks and parts of
Canada. While on my trip I was hoping to visit a couple of the premier
shooting academies across the US, there for I will be transporting several
different firearms. The list is as follows:
AR-15 with 4-30 round magazines, 12 Gauge Pump action shotgun, Ruger 280
Bolt action rifle, 22 Caliber Semi-Automatic rifle with 2-25 round
magazines and a Taurus 40 Cal Semi-automatic pistol with 2-10 round
magazines.
I have been doing some research and found that while the federal law is
pretty clear on how I go about transporting these firearms, State and Local
laws very. So as a solution, I would like to verify that if I disassemble
these firearms (essentially, transporting firearm components) during my
travels and ONLY reassemble them at the appropriate locations for various
classes. This should meet the letter of the law and abide by and State or
Local jurisdictions requirements.
Please let me know if there are any additional requirements that I need to
be concerned with or any additional persons I need to contact. Thank you
in advance for your time and consideration.
Sincerely,
William "Victor" Huntley
7415 W. Lemonade Lane
Dunnellon, Florida 34433

CBI-00032



**STATE OF
COLORADO**

---

## High Capacity Magazines

---

**Spoden - CDPS, James** <james.spoden@state.co.us>                Thu, Jun 6, 2013 at 12:07 PM
To: Bob Brown - CDPS <robertd.brown@state.co.us>

Bob,

Here's the situation, the last direction we had was to refer all questions to the AG's office regarding HCM (and Universal Background Checks as well). However, what is happening is the AG's office is directing them to contact CBI and they get sent right back to us.

Do we have any information regarding "the direction" we were to receive on this issue?
Can we please get a phone number that we can provide to callers with questions on HCM?


**James Spoden**
**Supervisor InstaCheck/CHP Unit**
**Colorado Bureau of Investigation**
**Ph:** (303) 239-5850
**Fax:** (303) 239-5848
**Email:** James.Spoden@state.co.us

10/24/13
Case 1:13-cv-01300-MSK-MJW   Document 104-5   Filed 12/11/13   Page 4 of 11
State.co.us Executive Branch Mail - HB-1224 & 1229

Appellate Case: 14-1290    Document: 01019371747    Date Filed: 01/16/2015    Page: 267



**STATE OF
COLORADO**

# HB-1224 & 1229

**Spoden - CDPS, James** <james.spoden@state.co.us>                    Fri, May 17, 2013 at 3:31 PM
To: CDPS_CBI_Instacheck_All_Users@state.co.us
Cc: Bob Brown - CDPS <robertd.brown@state.co.us>, Karl Wilmes - CDPS <karl.wilmes@state.co.us>, Ron Sloan - CDPS <ron.sloan@state.co.us>

**Attention all personnel, specifically those employees who assist in covering the Unit Hot Line or answering either the appeals or CHP phones, please review the following information related to our handling of questions concerning HB13-1224 and HB13-1229. Please contact your supervisor if you have any questions.**

**James Spoden
Supervisor InstaCheck/CHP Unit
Colorado Bureau of Investigation
Ph:** (303) 239-5850
**Fax:** (303) 239-5848
**Email:** James.Spoden@state.co.us


**\*Effective Immediately: 05/17/13: Anyone having questions regarding technical guidance, interpretation and/or implementation of HB-1224 High Capacity Magazines will be directed to review the Governors Signing Statement issued on March 20, 2013 (see below) and/or to the Attorney General's Office for and additional information. The CBI is unable to provide legal interpretation regarding this bill, to include possible CBI rule making noted in the bill as well.**

➢ **Calls from the public:**        **Refer to Gov. signing statement and/or AGs Office.**

➢ **Calls from FFLs:**          **Refer to Gov. signing statement and/or AGs Office.**

➢ **Calls from LEAs:**          **Refer to Contact their appropriate departmental legal advisors.**

**\*Effective Immediately: 05/17/13: CBI will not be providing interpretation and/or technical guidance for HB-1229 Universal Background Checks. Please advise anyone with questions that they will need to contact the Attorney General's Office for additional information, interpretation or technical guidance related to this bill. This includes questions from the public, FFLs and LEAs.**

➢ **Calls from the public:**        **Refer to AGs Office.**

➢ **Calls from FFLs:**          **Refer to AGs Office.**

➢ **Calls from LEAs:**          **Refer to AGs Office and/or their own departmental legal advisors.**


**The following HB13-1224 signing statement is being provided for your information only, it is the responsibility of whoever is questioning the bill, to research and/or review this information themselves.**

**STATEMENT OF GOVERNOR JOHN W. HICKENLOOPER**

**ISSUED MARCH 20, 2013 UPON THE SIGNING OF HB13-1224**

In signing HB13-1224, we acknowledge that some have expressed concerns about the vagueness of the law's definition of "large-capacity magazine." By its terms, the law does make illegal any magazine manufactured or purchased after July 1, 2013, that is capable of accepting, or is designed to be readily converted to accept, more than 15 rounds of ammunition. Similar language is used in other states' statutes limiting large-capacity magazines. We know that magazine manufacturers have produced and sell magazines that comply with these other state laws that limit large-capacity magazines and we are aware of no successful legal challenges to those laws. And when a Colorado-based magazine manufacturer came to us to share their concerns about the vagueness of the definition of "large-capacity magazine" contained in the original version of the bill, we worked with the bill's sponsors to fine-tune the definition to make it more precise.

We also have heard concerns about the requirement in the law that a person who owns a large-capacity magazine prior to the law's enactment may legally possess that magazine only as long as he or she "maintains continuous possession" of it. We do not believe a reasonable interpretation of the law means that a person must maintain continuous "physical" possession of these items. Responsible maintenance and handling of magazines obviously contemplates that gun owners may allow others to physically hold and handle them under appropriate circumstances. We are confident that law enforcement and the courts will interpret the statute so as to effectuate the lawful use and care of these devices.

In considering the language of HB13-1224, we have consulted with the Office of the Attorney General and we concur with its advice that the large-capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the 14th Amendment. We have signed HB13-1224 into law based on the understanding that it will be interpreted and applied narrowly and consistently with these important constitutional provisions.

To this end, today we are directing the Colorado Department of Public Safety to consult with the Office of the Attorney General and others, as necessary, with respect to the interpretation of HB13-1224's large-capacity magazine ban, and then to draft and issue, to law enforcement agencies in the State of Colorado, technical guidance on how the law should be interpreted and enforced. This work should be done by July 1, 2013, the law's effective date.

Case 1:13-cv-01300-MSK-MJW   Document 104-5   Filed 12/11/13   Page 6 of 11
10/24/13                  State.co.us Executive Branch Mail - Questions Regarding New Firearm Legislation
Appellate Case: 14-1290     Document: 01019371747     Date Filed: 01/16/2015     Page: 269



**STATE OF
COLORADO**

# Questions Regarding New Firearm Legislation

**Spoden - CDPS, James** <james.spoden@state.co.us>           Wed, Jun 26, 2013 at 12:37 PM
To: CDPS_CBI_Instacheck_All_Users@state.co.us, Ron Sloan - CDPS <ron.sloan@state.co.us>, Karl Wilmes -
CDPS <karl.wilmes@state.co.us>

Please see the attached memo regarding current procedure(s) on how to answer questions or
direct calls related to the recently passed firearm statutes: HB13-1224, HB13-1228 and HB-1229.

We will also be covering this as an agenda item during our Unit meeting on July 1st, 2013.

If you have any questions you may contact a supervisor or ask them at the meeting on Monday
morning.

Thank you!

**James Spoden**
**Supervisor InstaCheck/CHP Unit**
**Colorado Bureau of Investigation**
**Ph:** (303) 239-5850
**Fax:** (303) 239-5848
**Email:** James.Spoden@state.co.us

 **Unit Memo 2013.docx**
18K

## Attention All Personnel.

Effective immediately, we will no longer be referring any calls regarding Large Capacity Magazines, Brady Fee or Universal Background checks to the Attorney General's Office <u>for any reason.</u>

We will instead be providing the following direction and/or information regarding any questions or calls received regarding there three firearm laws.  Please see each law listed below and the basic information or steps that we will take in answering questions.

<u>HB13-1224-</u> Large Capacity Magazines- Effective July 1st, 2013 those magazines that are capable of holding more than 15 rounds are illegal in CO; however the statute does contain exceptions to this law that they want to review.

1) Law Enforcement Agency:
- Refer them to the technical guidance posted on the CDPS web site.
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own agency legal counsel for further interpretation of the law, exceptions, definitions, enforcement...etc.
- Refer to supervisor if necessary.
2) FFL:
- Refer them to the technical guidance posted on the CDPS web site.
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
- Refer them to their local law enforcement agency for questions pertaining to actual enforcement of the law.
- Refer to supervisor if necessary.
3) Public:
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
- Refer them to their local law enforcement agency for questions pertaining to actual enforcement of the law.
- Refer to supervisor if necessary.

<u>HB13-1228-</u> Effective March 20, 2013 a $10.00 fee will be assessed to any Brady check submitted by an FFL to CBI. It is the responsibility of the FFL to collect the fee from the buyer and remit payment to the Bureau on a monthly basis.

1) Law Enforcement Agency:
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.

- Refer to supervisor if necessary.
2) FFL:
    - Refer them to the Financial Section, 303-239-5728.
    - Refer them to the Colorado General Assembly's web site to review the actual law.
    - Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
    - Refer to supervisor if necessary.
3) Public:
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
- Refer to supervisor if necessary.

**HB13-1229-** Effective July 1st, 2013 Universal background checks will be required on both private and dealer firearm sales in the state of CO. Gun dealers will charge a $10.00 Brady fee for the transaction and, if they so choose, may charge an additional $10.00 fee for administrative costs associated with the processing of a private firearm transaction.

1) Law Enforcement Agency:
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
- Refer to supervisor if necessary.
2) FFL:
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
- Refer to supervisor if necessary.
3) Public:
- Refer them to the Colorado General Assembly's web site to review the actual law.
- Refer them to their own legal counsel for further interpretation of the law, exceptions, definitions...etc.
- Refer to supervisor if necessary.



**STATE OF
COLORADO**

# Fwd: FW: Magazine transfers between Police Officers

**Williams - CDPS, Paula** <paula.williams@state.co.us>                    Wed, Aug 21, 2013 at 9:45 AM
To: James Spoden - CDPS <james.spoden@state.co.us>

———— Forwarded message ————
From: **Allen, Terrance** <tallen@auroragov.org>
Date: Wed, Aug 21, 2013 at 9:41 AM
Subject: FW: Magazine transfers between Police Officers
To: "cdps_cbi_denver@state.co.us" <cdps_cbi_denver@state.co.us>

——Original Message——
From: Attorney General [mailto:Attorney.General@state.co.us]
Sent: Wednesday, August 21, 2013 9:34 AM
To: Allen, Terrance
Subject: RE: Magazine transfers between Police Officers

This issue can be more appropriately addressed by the Colorado Bureau of Investigations (CBI). For your
convenience we are including the contact information for CBI.

    Colorado Bureau of Investigation
    690 Kipling Street, Suite 3000
    Denver, Colorado 80215
    **Phone Number:** (303) 239 - 5850
    **Website:** http://cbi.state.co.us

——Original Message——
From: Allen, Terrance [mailto:tallen@auroragov.org]
Sent: Wednesday, August 21, 2013 8:26 AM
To: Attorney General
Subject: Magazine transfers between Police Officers

Good Morning,

We are seeking some guidance on transferring/selling/trading high capacity magazines with fellow officers.
No one here wants to make a mistake or violate the law.
Please advise if this is possible under HB13-1224.

Your response is appreciated.

Respectfully,

Detective Terrance Allen
Aurora Police Department
Traffic Investigations

CBI-00124

1222/3

Case 1:13-cv-01300-MSK-MJW   Document 104-5   Filed 12/11/13   Page 10 of 11
10/24/13                    State.co.us Executive Branch Mail - Fwd: FW: Magazine transfers between Police Officers
Appellate Case: 14-1290      Document: 01019371747      Date Filed: 01/16/2015      Page: 273

15001 E. Alameda Pkwy.
Aurora, CO 80012
303-739-6351 **Office**
303-739-6685 **Fax**
tallen@auroragov.org

—

**Paula Williams**
**Colorado Bureau of Investigation**
**690 Kipling St, Denver, CO 80215**
**office: 303-239-4202 fax: 303-235-0568**
**email: paula.williams@state.co.us**

---

**Spoden - CDPS, James** <james.spoden@state.co.us>                    Wed, Aug 21, 2013 at 10:15 AM
To: Bob Brown - CDPS <robertd.brown@state.co.us>

For your review and response. We should meet to discuss.

**James Spoden**
**Supervisor InstaCheck/CHP Unit**
**Colorado Bureau of Investigation**
**Ph:** (303) 239-5850
**Fax:** (303) 239-5848
**Email:** James.Spoden@state.co.us

[Quoted text hidden]

---

**Brown - CDPS, Bob** <robertd.brown@state.co.us>                    Wed, Aug 21, 2013 at 10:29 AM
To: "Spoden - CDPS, James" <james.spoden@state.co.us>

I sent this to Karl for review and feedback. The AG was to no longer forward these calls to us. But...........we
have another one.
[Quoted text hidden]

—

   **Robert Brown**

   **Agent in Charge**

   State of Colorado, Colorado Bureau of Investigation

   690 Kipling Street, Lakewood, CO 80215

   office: 303.239-4212 | cell: 303.912-1207 | fax: 303.239-5848

   email: robertd.brown@state.co.us

   **\*Please note: As of Oct. 8, 2012, my email changed to robertd.brown@state.co.us Please update your
address book accordingly. Thank you!**

---

**Spoden - CDPS, James** <james.spoden@state.co.us>                    Wed, Aug 21, 2013 at 10:41 AM

Understood,

James Spoden
Supervisor InstaCheck/CHP Unit
Colorado Bureau of Investigation
Ph: (303) 239-5850
Fax: (303) 239-5848
Email: James.Spoden@state.co.us

[Quoted text hidden]

CBI-00126

## Exhibit H – Ronald Sloan Deposition Excerpt

1

1    IN THE UNITED STATES DISTRICT COURT

    FOR THE DISTRICT OF COLORADO

2

3  Civil Action No. 13-cv-1300-MSK-MJW

4  JOHN B. COOKE, Sheriff of Weld County,

   Colorado, et al.,

5

    Plaintiffs,

6

  vs.

7

   JOHN W. HICKENLOOPER, Governor of the

8  State of Colorado,

9    Defendant.

10

11  _____

12    DEPOSITION OF RONALD C. SLOAN

13      October 28, 2013

. . .

     **55**

3  Q.  Let's take a look at the one that's page CBI

4   00017.

5   A.  Okay.

6   Q.  What's the date and time on that e-mail?

7   A.  It is Friday, May 17th, 2013, at 3:31 p.m.

8   Q.  Okay.  And is this -- to save time, I'll try

9   characterizing what is in there, and you can tell me

10  if that's accurate, or not.  Is this an e-mail from

11  James Spoden to the InstaCheck unit, and also CCed to

12  the CBI chain of command, including you?

13  A.  It is.

14  Q.  And is the gist of the message that,

15  starting immediately, CBI should stop answering

16  questions about the meaning of House Bill 1224 and

17  House Bill 1229?

18  A.  I don't know that it says we should stop it.

19  I believe there were questions about whether or not

20  we should do it, and this basically is giving

21  direction on what we should do, as opposed to

22  stopping doing anything.

23  Q.  So is what you should do, for example, when

24  you get calls from the public -- what does it say

25  that CBI should do with calls from the public?

                    **56**

1   A.  It is the same for -- it's a little bit

2   different on the various bills that are articulated

3   in here.  The first one is related to House Bill

4   1224, high capacity magazines.  Calls from the public

5   referred to governor's signing statement and/or AG's

6   office.

7       On House Bill 1229, calls from the public

8   referred to the attorney general's office, the AG's

9   office.  And then there is a copy of the House

10  Bill 13-1224 signing statement, statement of

11  governor, that's attached to that, and that's on the

12  next page, 00018.

13      Q.  I asked Mr. Spoden why he wrote this memo,

14  and he said it was at the request or someone in his

15  chain of command, but he didn't remember who in

16  particular.  Was it you?

17      A.  We had the discussion, and it probably

18  didn't come directly from me.  It probably came from

19  his supervisor.

20      Q.  Okay.  And is there any significance to why

21  this was issued on May 17th?

22      A.  I don't know that there's any specific

23  significance to May 17th.  I know that when we

24  started getting more requests for interpretation of

25  various and sundry circumstances from individuals

**57**

1   calling in to InstaCheck, there was the question,

2   What should we do regarding giving them direction on

3   interpreting and trying to assist these folks?  And

4   we had to make some decisions about what was prudent

5   for CBI to do in terms of both of these bills, in

6   particular, that we were getting questions on, 1224

7   and 1229.

8      Q.  And elaborate on the decision of why you

9   decided that the instructions in here were the

10   prudent thing to do?

11      A.  Well, it's the same with any statutory

12   interpretation of particularly new laws, but any

13   laws, in particular, where you can have any number of

14   different scenarios.  And it is very difficult for

15   our folks to advise what the intent of the law was.

16   And the scenarios run the gamut.  And it was our

17   decision that it wasn't really our place to offer

18   interpretation of either of these statutes.

19         It was our place to conduct the background

20   checks on 1229, as indicated in the law, and on 1224

21   we really had no responsibility over background

22   checks, or anything else related to that, other than

23   we had -- it was permissible for us to engage in rule

24   making related to that, but we did not do that.

25      Q.  Okay.

1228

58

1      A. So we were not in a position to interpret or

2   give opinions on what people should do in these wide

3   ranging scenarios that were being postured before our

4   personnel.  We took the position through the

5   governor's signing statement and the information that

6   was put together by the attorney general's office

7   that that would be the best route for folks to take,

8   to refer to the opinion of the attorney general's

9   office and to seek their own legal counsel on those

10  issues.

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado *et al.*,

    Plaintiffs v.

JOHN W. HICKENLOOPER, Governor of the State of

    Colorado, Defendant.

## DEFENDANT'S RESPONSES TO NON-PROFIT AND INDIVIDUAL DISABLED PLAINTIFFS' SECOND SET OF INTERROGATORIES AND REQUESTS FOR ADMISSION

Defendant John W. Hickenlooper, in his official capacity as Governor of the State of Colorado, by and through undersigned counsel, hereby submits his responses to the second set of interrogatories and requests for admission propounded by the non-profit and individual plaintiffs.

## AUTHENTICATION

The names and positions of each and every person who assisted in answering these requests for admission are as follows:

    (a) Kathleen Spalding, Senior Assistant Attorney General
    (b) Stephanie Scoville, Senior Assistant Attorney General
    (c) Matthew Grove, Assistant Attorney General
    (d) Jack Finlaw, Chief Legal Counsel, Office of the Governor

## GENERAL OBJECTIONS AND RESPONSES

The Governor makes the following general objections and responses to the non-profit and individual Plaintiffs' second set of interrogatories and requests for admission:

1.    The Governor objects to each Discovery Request to the extent that it:

    (a)  is overly broad and/or unduly burdensome;
    (b)  is vague, ambiguous, and/or fails to describe with reasonable particularity the information sought;

(c)   seeks information that exceeds the scope of, or is inconsistent with
permissible discovery;

(d)   seeks information that is neither relevant to the subject matter of
this action, nor reasonably calculated to lead to the discovery of
admissible evidence; and/or

(e)   contains undefined terms which are ambiguous and/or prejudicial.

2.      The above-captioned written discovery requests do not, by their terms,
exclude privileged or protected communications from production.  The Governor
therefore objects to each discovery request to the extent that it seeks the disclosure
of any information that is privileged or protected for any reason, including but not
limited to information protected by the attorney-client privilege, the work product
doctrine, the deliberative process privilege, and any other applicable privileges or
protections.

3.      The Governor objects to each interrogatory request for admission to the
extent it seeks the disclosure of information gathered and/or documents prepared by
or for the Governor or the Governor's attorneys in anticipation of litigation or in
preparation for trial that contains or discloses the theories, mental impressions, or
litigation strategy of the Governor's attorneys.

4.      The Governor objects to each interrogatory or request for admission to
the extent it requests information not in the Governor's possession, custody or
control.  The Governor further objects to each request for admission to the extent
that it seeks information in the possession, custody, or control of others.  More
specifically, Plaintiffs purport to define the terms "you," "your" and "defendant" to
include all persons and departments within the executive branch of Colorado state
government.  This definition inaccurately reflects the scope of this litigation.
Plaintiffs have sued the Governor in his official capacity.  The Court has recognized
that for the purposes of this litigation, the Governor's Office does not include either
executive departments or the thousands of state employees who work in those
departments.  The Governor objects to the definition of "you," "your," and
"defendant" to the extent that the definition purports to require the disclosure of
information or documents from entities or persons who are not within the
Governor's Office and not within the custody or control of the Governor's Office.

5.      The Governor objects to each interrogatory or request for admission to
the extent it seeks the disclosure of any confidential information, and will seek an
appropriate protective order prior to disclosing any such information (to the extent

that the current protective order does not encompass such information). However, attorney-client privileged communications and work product will not be disclosed.

6.     The Governor responds to the instant discovery requests as required by the Federal Rules of Civil Procedure and applicable case law. The Governor therefore objects to each request for admission to the extent it seeks to impose obligations on the Governor other than those authorized by the Federal Rules of Civil Procedure and applicable case law. Any purported instructions, definitions, requirements, or requests to the contrary are disregarded.

7.     By disclosing information and/or materials responsive instant discovery requests, the Governor does not stipulate or otherwise admit that any such information and/or materials is authentic, relevant, or admissible. The Governor expressly reserves all objections to the admission of such information and/or materials as provided by the rules of procedure and evidence.

8.     The Governor's general objections and responses to the instant discovery requests shall be deemed continuing as to each Discovery Request and are not waived or in any way limited by the following specific objections and responses to each request for admission. Further, the Governor's general objections and responses shall be deemed incorporated into the following specific objections and responses to each request for admission.

9.     The Governor's responses to the instant discovery requests are based upon information presently available and specifically known to the Governor in his official capacity. The Governor is aware of his obligation under Fed.R.Civ.P. 26(e), and consistent therewith, will timely supplement any specific response with additional or corrective information if the Governor learns that in some material respect the original response was incomplete or incorrect.

10.     Defendant objects to Plaintiffs' interrogatories to the extent they request all facts or information upon which Defendant may rely. Defendant's responses are made subject to the ongoing discovery and trial preparation in this case and are based on the best information presently available.

## INTERROGATORIES

1. If an individual privately transfers a firearm to another individual, and a background check is performed pursuant to HB 1229, would you consider that

background check sufficient to cover any subsequent transfers of the same firearm between the same two individuals?

> Objection: Defendant objects to this Interrogatory based on the Court's order of October 28, 2013 [Dkt. #91], which stated, "Governor Hickenlooper has no direct enforcement role." As a result, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome and oppressive.

2. If an employer loans an employee a firearm for more than 72 hours and conducts the necessary background check pursuant to HB 1229, would you require the employee to conduct another background check upon returning the firearm to his or her employer?

> Objection: Defendant objects to this Interrogatory based on the Court's order of October 28, 2013 [Dkt. #91], which stated, "Governor Hickenlooper has no direct enforcement role." As a result, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome and oppressive.

3. Please describe the process for conducting a background check under HB 1229 when the transferee of the firearm is not a natural person, such as a limited liability company or corporation.

> Objection: Defendant objects to this Interrogatory based on the Court's order of October 28, 2013 [Dkt. #91], which stated, "Governor Hickenlooper has no direct enforcement role." As a result, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome and oppressive.

4. Please provide any reliable estimates you have of the number of existing magazines in Colorado whose capacity is greater than 15 without modification.

> Objection: The Governor objects to the term "reliable" as vague.

> Response: Subject to and without waiving the foregoing general and specific objections, the Governor is aware of no such estimates.

5. If a farm or ranch employee utilizes a vehicle owned by his or her employer for more than 72 hours, and the vehicle contains a firearm, do you interpret HB 1229 to require a background check to be performed on the employee even if he or she never touches the firearm?

<u>Objection</u>:  Defendant objects to this Interrogatory based on the Court's order of October 28, 2013 [Dkt. #91], which stated, "Governor Hickenlooper has no direct enforcement role."  As a result, the Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome and oppressive.

## REQUESTS FOR ADMISSION

1. Admit that with respect to HB 1229 there is no exception for farmers or ranchers who, for a period of more than 72 hours, loan firearms to employees for defense of livestock and crops.

<u>Objection</u>:  The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion.  Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion.  *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

2. Admit that there is no exemption in HB 1229 for firearms training conducted under the auspices of a nonprofit organization other than at a shooting range under C.R.S. § 18-12-112(6)(e)(I).

<u>Objection</u>:  The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion.  Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion.  *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).

3. Admit that no licensed gun dealer in Colorado is required to perform a background check when requested to do so by two individuals conducting a private sale or transfer of a firearm.

<u>Objection</u>:  The Governor objects to Request for Admission No. 1 because it calls for an improper legal conclusion.  Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion.  *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing*

*Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458
(D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413,
2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007).


**AS TO OBJECTIONS:**

JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*
_____
DANIEL D. DOMENICO
Solicitor General*
DAVID C. BLAKE*
Deputy Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
JONATHAN P. FERO*
Assistant Solicitor General
JOHN T. LEE*
Assistant Attorney General
MOLLY MOATS*
Assistant Attorney General
Attorneys for Governor John W. Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Jack Finlaw, do hereby verify under penalty of perjury under the laws of the United States of America that the foregoing responses to the Non-Profit and Individual Disabled Plaintiffs' First Set of Requests for Admission are true and correct to the best of my information and belief.

Dated this 1st day of November, 2013.

*s/ Jack Finlaw*

Chief Legal Counsel
Office of the Governor
State of Colorado

1236

## CERTIFICATE OF SERVICE

I hereby certify that on __November 1__, 2013 I served a true and complete copy of the foregoing Discovery Responses upon all counsel of record including those listed below via email:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com
Douglas L. Abbott                       dabbot@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@brunolawyers.com
Jonathan Watson                         jwatson@brunolawyers.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


*s/Matthew Grove*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

### GOVERNOR'S RESPONSES TO NON-PROFIT AND INDIVIDUAL DISABLED PLAINTIFFS' FIRST SET OF INTERROGATORIES

---

Defendant Governor Hickenlooper, by and through counsel and pursuant to Fed.R.Civ.P. 33(b), submits the following Responses to the Non-Profit and Disabled Plaintiffs' First Set of Interrogatories.

## AUTHENTICATION

The names and positions of each and every person who assisted in answering these requests for admission are as follows:

(a) Kathleen Spalding, Senior Assistant Attorney General
(b) Stephanie Scoville, Senior Assistant Attorney General
(c) Matthew Grove, Assistant Attorney General
(d) Jack Finlaw, Chief Legal Counsel, Office of the Governor
(e) Stephanie Donner, Senior Deputy Legal Counsel, Office of the Governor

## GENERAL OBJECTIONS

Plaintiffs purport to define the terms "you," "your" and "defendant" to include all persons and departments within the executive branch of Colorado state government. This definition inaccurately reflects the scope of this litigation. Plaintiffs have sued the Governor in his official capacity. The Court has recognized that for the purposes of this litigation, the Governor's Office does

1238

not include either executive departments or the thousands of state employees who work in those departments.  The Governor objects to the definition of "you," "your," and "defendant" to the extent that the definition purports to require the disclosure of information or documents from entities or persons who are not within the Governor's Office and not within the custody or control of the Governor's Office.

Defendant objects to Plaintiffs' interrogatories to the extent they request all facts or information upon which Defendant may rely. Defendant's responses are made subject to the ongoing discovery and trial preparation in this case and are based on the best information presently available.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

1.      Identify every person or entity to whom you have sent the May 16, 2013, Technical Guidance.  If you have sent it to any person or entity, specify the date(s) on which you did so.

***Response***:  The Governor's office forwarded the May 16, 2013 Technical Guidance to the Colorado Department of Public Safety on or about May 16, 2013.

2.      Identify every person or entity to whom you have sent the July 10, 2013, Technical Guidance.  If you have sent it to any person or entity, specify the date(s) on which you did so.

***Response***:  The Governor's Office forwarded the July 10, 2013 Technical Guidance to the Colorado Department of Public Safety on or about July 10, 2013.

3.      Describe in detail what you would do, or request to have done, if any law enforcement agency or officer sought or attempted to enforce HB 1224 in a manner contrary to the May 16, 2013, Technical Guidance or the July 10, 2013, Technical Guidance.

***Objection***:  This interrogatory calls for speculation.  "As a general rule, a party is not required to answer interrogatories calling for speculation."

10A Fed. Proc. L. Ed. § 26:581; *see also American Oil Co. v. Penn. Petroleum Prod. Co.,* 23 F.R.D. 680 (D.R.I. 1959); *Gregg v. Local 305 IBEW,* 2010 WL 556526, at *4 (N.D. Ind. Feb 9, 2010).

**_Response:_**  Subject to and without waiving the foregoing general and specific objections, the Governor's Office has no role in the enforcement of HB 1224.

4.    Describe in detail what you would do, or request to have done, if any law enforcement agency or officer arrested and/or prosecuted an individual for conduct described as lawful in the May 16, 2013 Technical Guidance or the July 10, 2013 Technical Guidance.

**_Objection_**:  This interrogatory calls for speculation.  "As a general rule, a party is not required to answer interrogatories calling for speculation." 10A Fed. Proc. L. Ed. § 26:581; *see also American Oil Co. v. Penn. Petroleum Prod. Co.,* 23 F.R.D. 680 (D.R.I. 1959); *Gregg v. Local 305 IBEW,* 2010 WL 556526, at *4 (N.D. Ind. Feb 9, 2010).

**_Response_**: See response to interrogatory # 3.

5.    Identify any documents (including studies, trade materials, reports, and articles) on which you relied in creating the First or Second Technical Guidance.

**_Response_**:  Subject to and without waiving the foregoing general objections, neither the First Technical Guidance nor the Second Technical Guidance was created by the Governor's office.  The Governor's Office is therefore unable to identify any documents responsive to this interrogatory.

6.    Identify every instance known to you in which harm inflicted by an assailant armed with a firearm may have been reduced as a result of that person having to change the firearm's magazines.

**_Objection_**:  Defendant objects to this interrogatory on the grounds that the terms "harm inflicted" and "reduced" are vague and ambiguous.

Defendant further objects to the interrogatory on the grounds that a search for all incidents in which "harm may have been reduced" as the result of a shooter changing magazines is overly burdensome.

**_Response_**:  Subject to and without waiving the foregoing general and specific objections, the required pause to change magazines has provided an opportunity for bystander intervention and escape in a number of mass shooting incidents, including but not limited to:

- Long Island Railroad shooting, December 7, 1993.
- Springfield, Oregon, May 21, 1998.
- Tucson, Arizona, January 8, 2011.
- Aurora, Colorado, July 20, 2012.
- Newtown, Connecticut, December 14, 2012.

7.    Describe in detail each benefit to public safety that you believe may result in HB 1224's 15-round limitation on firearm magazine capacity.

**_Response_**:  Subject to and without waiving the foregoing general objections, benefits to public safety associated with a limitation on firearm magazine capacity are, without limitation, identified in the following documents:

- The expert report of Jeffery Zax, Ph.D., submitted August 2, 2013.
- The supplemental expert report of Jeffery Zax, Ph.D., submitted September 13, 2013.
- The rebuttal expert report of Douglas S. Fuchs, submitted September 6, 2013.
- The rebuttal expert report of John Cerar, submitted September 5, 2013.
- Legislative history for H.B. 1224.
- Testimony of Laurence Tribe before the Senate Judiciary Committee, February 2013.
- Christopher S. Koper, _An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003_, Report to the National Institute of Justice, June 2004.

- Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004, Key Findings and Implications,* in Reducing Gun Violence in America, D. Webster and J. Vernick, eds., Johns Hopkins University Press (2013).
- David S. Fallis and James V. Grimaldi, *In Virginia, High-Yield Clip Seizures Rise,* Washington Post, January 23, 2011, page A-1.
- David S. Fallis, *High-capacity magazines saw drop during ban, data indicate,* Washington Post, January 13, 2013, page A-4.
- Richmond T, Branas C, Cheney R, Schwab C. The case for enhanced data collection of gun type. *J Trauma,* 2004; 57(6):1356-1360.
- Reedy DC, Koper CS.  Impact of handgun types on gun assault outcomes:  a comparison of gun assaults involving semiautomatic pistols and revolvers.  *Inj. Prev.,* 2003; 9(2):151-155.
- *Firearm Injury in the U.S.,* Firearm & Injury Center at Penn (Version 2011).
- Wintemute GJ. The relationship between firearm design and firearm violence. Handguns in the 1990s. *JAMA,* 1996; 275(22):1749-53.
- Gotsch KE, Annest JL, Mercy JA, Ryan GW. Surveillance for fatal and nonfatal firearm-related injuries—United States, 1993-1998. *MMWR,* 2001; 50(SS-2): 1-34.
- Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. *JAMA,* 1996; 275(1):42-5.


8.     Identify all studies, reports, articles, or other documents or information which you believe support that there are public safety benefits to limiting magazine capacity to 15 rounds.

   **<u>Response</u>**: Subject to and without waiving the foregoing general objections, see Defendant's response to Interrogatory No. 7.


9.     Describe in detail your basis for believing that there are public safety benefits resulting from HB 1229's requirements for the processing of temporary firearms transfers (when the transfer time exceeds 72 hours) for the following situations:

a. Farmers and ranchers providing firearms to their employees as part of their work on the farm or ranch.

b. Non-profit organizations loaning firearms to shooting program participants.

c. Leaving firearms with a friend or family member not included in C.R.S. § 18-12-112(6)(b) or (i) to accommodate a military assignment, move, or storage.

d. Loaning of firearms to a hunter for a hunting trip but where the transfer occurs days prior to and/or after the trip itself (i.e. not technically "while hunting").

e. Loaning a firearm to someone else who lives in the same residence for personal protection when there is no threat of "imminent death or serious bodily injury."

**_Response_**: Subject to and without waiving the foregoing general objections, benefits to public safety associated with background checks are, without limitation, identified in the legislative hearings conducted on HB 1229.  Copies of the legislative proceedings on both HB 1224 and HB 1229 have been provided to Plaintiffs' counsel.

10.     What recourse does a person have under HB 1229 or any other laws of the State of Colorado if he or she wants to transfer a firearm but cannot find a Federal Firearms Licensee ("FFL") either available or willing to perform the required background check?

**_Objection_**:  This is a hypothetical that calls for speculation. "As a general rule, a party is not required to answer interrogatories calling for speculation."  10A Fed. Proc. L. Ed. § 26:581; _see also American Oil Co. v. Penn. Petroleum Prod. Co.,_ 23 F.R.D. 680 (D.R.I. 1959); _Gregg v. Local 305 IBEW,_ 2010 WL 556526, at *4 (N.D. Ind. Feb 9, 2010).

***Response***: Subject to and without waiving the foregoing general and specific objections, the provisions of HB 1229 speak for themselves.

11.    Identify the laws – including statutes, regulations, or case law – of any other State on which HB 1224 and HB 1229 are based, in whole or in part.

*Objection:*  This interrogatory calls for information concerning the role of the Governor's Office, if any, in deliberations concerning the ultimate content of HB 1224 and HB 1229.  This information is protected from discovery by the deliberative process privilege, "which covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated."  *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975).

12.    Identify all communications between you (which as defined in instruction 3, includes inter alia, the Colorado Bureau of Investigation and the Colorado Department of Natural Resources) and any governmental entity concerning how those entities should apply HB 1224 or HB 1229.

***Objection***: Communications between and among executive agencies are not within the custody and control of the Governor's Office.  This interrogatory may seek information that is protected by the attorney-client privilege and the work product doctrine.

***Response***: Subject to and without waiving the foregoing general and specific objections, see responses to interrogatories 1 and 2 and letters dated August 21, 2013 and July 10, 2013 from Stephanie Donner to Loveland city council members and Mayor Cecil Gutierrez, attached hereto.

13.    Identify all FFLs who have conducted background checks for private sales or non-sale transfers pursuant to HB 1229 from July 1, 2013 to the present day.

***Objection***: The information requested is not within the custody and control of the Governor's Office.

**_Response_**: Subject to and without waiving the foregoing general and specific objections, the Governor's Office is unable to identify any documents responsive to this interrogatory.

14.     Identify and describe in detail your bases for why a physically disabled person should not be allowed to possess a magazine with a capacity of 16 rounds or more for personal protection.

**_Response_**:  Subject to and without waiving the foregoing general objections, benefits to public safety associated with a limitation on firearm magazine capacity are, without limitation, identified in the documents cited in response to Interrogatory #7.

**AS TO OBJECTIONS:**

JOHN W. SUTHERS
Attorney General

s/ _Kathleen Spalding_
_____
DANIEL D. DOMENICO
Solicitor General*
DAVID C. BLAKE*
Deputy Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
JONATHAN P. FERO*
Assistant Solicitor General
JOHN T. LEE*
Assistant Attorney General
MOLLY MOATS*
Assistant Attorney General
Attorneys for Governor John W.
   Hickenlooper

*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

**AS TO RESPONSES:**

Pursuant to 28 U.S.C. § 1746, I, Jack Finlaw, do hereby verify under penalty of perjury under the laws of the United States of America that the foregoing responses to the Non-Profit and Individual Disabled Plaintiffs' First Set of Interrogatories are true and correct to the best of my information and belief.

Dated this 25th day of October, 2013.

s/  *Jack Finlaw*
Chief Legal Counsel
Office of the Governor
State of Colorado

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on October 25, 2013 I served a true and complete copy of the foregoing **GOVERNOR'S RESPONSES TO NON-PROFIT AND INDIVIDUAL DISABLED PLAINTIFFS' FIRST SET OF INTERROGATORIES** upon all counsel of record including those listed below via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| | |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas L. Abbott | dabbot@hollandhart.com |
| | |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| | |
| Marc F. Colin | mcolin@brunolawyers.com |
| Jonathan Watson | jwatson@brunolawyers.com |
| | |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

                      *s/Kathleen Spalding*

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Message-Id:4305428@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Colorado Outfitters Association et al v.
Hickenlooper Exhibits
```
Content–Type: text/html

**U.S. District Court**

**District of Colorado**

**Notice of Electronic Filing**

The following transaction was entered on 12/12/2013 at 3:18 PM MST and filed on 12/11/2013

| | |
|---|---|
| **Case Name:** | Colorado Outfitters Association et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | 2nd Amendment Gunsmith &Shooter Supply, LLC |
| | David Bayne |
| | Burrud Arms Inc. |
| | Colorado Farm Bureau |
| | Colorado Outfitters Association |
| | Colorado State Shooting Association |
| | Colorado Youth Outdoors |
| | Goods for the Woods |
| | Grand Prix Guns |
| | Green Mountain Guns |
| | Hamilton Family Enterprises, Inc. |
| | Dylan Harrell |
| | Jerry's Outdoor Sports |
| | Magpul Industries |
| | National Shooting Sports Foundation |
| | Outdoor Buddies, Inc. |
| | Rocky Mountain Shooters Supply |
| | Specialty Sports &Supply |
| | David Strumillo |
| | USA Liberty Arms |
| | Women for Concealed Carry |
| **Document Number:** | 109(No document attached) |

**Docket Text:**
 **Exhibits in Support of [62] Amended Complaint, by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, Goods for the Woods, Grand Prix Guns, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Jerry's Outdoor Sports, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Rocky Mountain Shooters Supply, Specialty Sports**

**&Supply, David Strumillo, USA Liberty Arms, Women for Concealed Carry. (Public Entry for [106] Restricted Document – Level 1) (Text only entry) (klyon, )**

**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin    mcolin@brunolawyers.com, aduran@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Maurice L. Dechant    lyle.dechant@mesacounty.us, mcatty@mesacounty.us

Kathleen L. Spalding    kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall    rwestfall@halewestfall.com, blillis@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel    david@i2i.org

Douglas L. Abbott    dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz    pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian    fabianlaw@qwestoffice.net

Stephanie Lindquist Scoville    stephanie.scoville@state.co.us, sally.ott@state.co.us

Molly Allen Moats    molly.moats@state.co.us

Jonathan Michael Anderson    jmanderson@hollandhart.com

Matthew David Grove    matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico    dan.domenico@state.co.us, laura–jane.weimer@state.co.us

Jonathan Patrick Fero    jon.fero@state.co.us, debbie.bendell@state.co.us

John Tien Yau Lee    jtlee@state.co.us, jtlee888@gmail.com

David Christopher Blake    david.blake@state.co.us, carol.gall@state.co.us, laura–jane.weimer@state.co.us

Jonathon Michael Watson    jwatson@brunolawyers.com, aduran@brunolawyers.com, mbrock@brunolawyers.com

**1:13–cv–01300–MSK–MJW Notice has been mailed by the filer to:**