ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

Colorado Outfitters Association et al v. Hickenlooper
Assigned to: Chief Judge Marcia S. Krieger
Referred to: Magistrate Judge Michael J. Watanabe
 Case in other court:  USCA, 14–01290
                              USCA, 14–01292
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 05/17/2013
Date Terminated: 06/26/2014
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

**Defendant**

**Mesa County, Board of County Commissioners**

represented by **David Robert Frankel**
Mesa County Attorney's Office
P.O. Box 20000
544 Rood Avenue
2nd Floor Annex
Grand Junction, CO 81502–5004
970–244–1612
Fax: 970–255–7196
Email: david.frankel@mesacounty.us
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Outfitters Association**

represented by **Peter J. Krumholz**
Hale Westfall, LLP
1600 Stout Street
Suite 500
Denver, CO 80202
720–904–6007
Fax: 720–904–6006
Email: pkrumholz@halewestfall.com
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
Hale Westfall, LLP
1600 Stout Street
Suite 500
Denver, CO 80202
720–904–6010
Fax: 720–904–6020
Email: rwestfall@halewestfall.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Farm Bureau**

represented by **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

1251

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Shooting Sports Foundation**        represented by    **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Magpul Industries**        represented by    **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Youth Outdoors**        represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA Liberty Arms**        represented by    **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Outdoor Buddies, Inc.**                  represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Women for Concealed Carry**              represented by   **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado State Shooting Association**    represented by   **Anthony John Fabian**
Anthony J. Fabian, P.C.
510 Wilcox Street
# C
Castle Rock, CO 80104
303–663–9339
Email: fabianlaw@qwestoffice.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hamilton Family Enterprises, Inc.**      represented by   **Anthony John Fabian**
*doing business as*                                         (See above for address)
Family Shooting Center at Cherry Creek                      *ATTORNEY TO BE NOTICED*
State Park

**Plaintiff**

1253

**David Strumillo**                                 represented by **David Benjamin Kopel**
                                                    Independence Institute
                                                    727 East 16th Avenue
                                                    Denver, CO 80203
                                                    303–279–6536
                                                    Fax: 303–279–4176
                                                    Email: david@i2i.org
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**David Bayne**                                     represented by **Peter J. Krumholz**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Richard A. Westfall**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Dylan Harrell**                                   represented by **Peter J. Krumholz**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Richard A. Westfall**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Rocky Mountain Shooters Supply**                  represented by **Jonathon Michael Watson**
                                                    (See above for address)
                                                    *TERMINATED: 02/12/2014*

                                                    **Marc F. Colin**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**2nd Amendment Gunsmith &Shooter**                 represented by **Jonathon Michael Watson**
**Supply, LLC**                                     (See above for address)
                                                    *TERMINATED: 02/12/2014*

                                                    **Marc F. Colin**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Burrud Arms Inc.**                                represented by **Jonathon Michael Watson**
*doing business as*                                 (See above for address)
Jensen Arms                                         *TERMINATED: 02/12/2014*

1254

Marc F. Colin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Green Mountain Guns**                    represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry's Outdoor Sports**                represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Specialty Sports &Supply**              represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Goods for the Woods**                   represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John B. Cooke**                         represented by    **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ken Putnam**                            represented by    **David Benjamin Kopel**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                                                  represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                                                 represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                                                   represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                                              represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                                                 represented by    **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                                                            (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                                                  represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                                              represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                                                   represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                                             represented by    **David Benjamin Kopel**
                                                                                    (See above for address)
                                                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **John W. Hickenlooper**<br>*Govenor of the State of Colorado* | represented by | **Daniel D. Domenico**<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway<br>Denver, CO 80203<br>720–508–6000<br>Fax: 720–508–6032<br>Email: dan.domenico@state.co.us<br>*ATTORNEY TO BE NOTICED* |

**David Christopher Blake**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: david.blake@state.co.us
*ATTORNEY TO BE NOTICED*

**John Tien Yau Lee**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jtlee@state.co.us
*ATTORNEY TO BE NOTICED*

**Jonathan Patrick Fero**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jon.fero@state.co.us
*ATTORNEY TO BE NOTICED*

**Kathleen L. Spalding**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: kit.spalding@state.co.us

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**                                        represented by    **David Benjamin Kopel**
*Sheriff of Weld County, Colordo*                                          (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**                                        represented by    **David Benjamin Kopel**
*Sheriff of El Paso County, Colorado*                                     (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**                                        represented by    **David Benjamin Kopel**
*Sheriff of Larimer County, Colorado*                                     (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**                                     represented by    **David Benjamin Kopel**
*Sheriff of Douglas County, Colorado*                                     (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**                                    represented by    **David Benjamin Kopel**
*Sheriff of Gilpin County, Colorado*                                      (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**                                      represented by    **David Benjamin Kopel**
*Sheriff of Montezuma County, Colorado*                                   (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**                                           represented by    **David Benjamin Kopel**
*Sheriff of Moffat County, Colorado*                                      (See above for address)
*TERMINATED: 11/27/2013*                                                   *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**                                        represented by    **David Benjamin Kopel**
*Sheriff of Dolores County, Colorado*                                     (See above for address)

TERMINATED: 11/27/2013                                    LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Mike Ensminger**                        represented by   **David Benjamin Kopel**
*Sheriff of Teller County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Shayne Heap**                           represented by   **David Benjamin Kopel**
*Sheriff of Elbert County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Chad Day**                              represented by   **David Benjamin Kopel**
*Sheriff of Yuma County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Fred D. McKee**                         represented by   **David Benjamin Kopel**
*Sheriff of Delta County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Lou Vallario**                          represented by   **David Benjamin Kopel**
*Sheriff of Garfield County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Fred Hosselkus**                        represented by   **David Benjamin Kopel**
*Sheriff of Mineral County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Brett L. Powell**                       represented by   **David Benjamin Kopel**
*Sheriff of Logan County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                  LEAD ATTORNEY
                                                         ATTORNEY TO BE NOTICED

**Plaintiff**

**Brian E. Norton**                       represented by   **David Benjamin Kopel**
*Sheriff of Rio Grande County, Colorado*                  (See above for address)

*TERMINATED: 11/27/2013*                          *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirard**                    represented by   **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*              (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                      represented by   **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*               (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                     represented by   **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*              (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                 represented by   **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                      represented by   **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                      represented by   **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*            (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                      represented by   **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*            (See above for address)
*TERMINATED: 11/27/2013*                            *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                       represented by   **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*               (See above for address)

*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Forrest Frazee**                       represented by    **David Benjamin Kopel**
*Sheriff of Kiowa County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Dunlap**                          represented by    **David Benjamin Kopel**
*Sheriff of Montrose County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ted B. Mink**                          represented by    **David Benjamin Kopel**
*Sheriff of Jefferson County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Wegener**                         represented by    **David Benjamin Kopel**
*Sheriff of Park County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Newman**                         represented by    **David Benjamin Kopel**
*Sheriff of Huerfano County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Peck**                           represented by    **David Benjamin Kopel**
*Sheriff of Sedgwick County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dominic Mattivi, Jr.**                 represented by    **David Benjamin Kopel**
*Sheriff of Ouray County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Minor**                           represented by    **David Benjamin Kopel**
*Sheriff of Summit County, Colorado*                      (See above for address)

*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**                          represented by   **David Benjamin Kopel**
*Sheriff of Jackson County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**                          represented by   **David Benjamin Kopel**
*Sheriff of Gunnison County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**                   represented by   **David Benjamin Kopel**
*Sheriff of Phillips County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**                             represented by   **David Benjamin Kopel**
*Sheriff of Lake County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**                       represented by   **David Benjamin Kopel**
*Sheriff of Arapahoe County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**                         represented by   **David Benjamin Kopel**
*Sheriff of Baca County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**                            represented by   **David Benjamin Kopel**
*Sheriff of Saguache County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**                            represented by   **David Benjamin Kopel**
*Sheriff of Costilla County, Colorado*                      (See above for address)

*TERMINATED: 11/27/2013*                                              *LEAD ATTORNEY*
                                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**                              represented by  **David Benjamin Kopel**
*Sheriff of Crowley County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**                           represented by  **David Benjamin Kopel**
*Sheriff of Bent County, Colorado*                           (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**                       represented by  **David Benjamin Kopel**
*Sheriff of Las Animas County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**                          represented by  **David Benjamin Kopel**
*Sheriff of Routt County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**                          represented by  **Jonathon Michael Watson**
*TERMINATED: 12/23/2013*                                     (See above for address)
                                                             *TERMINATED: 02/12/2014*

                                                             **Marc F. Colin**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**                           represented by  **David Benjamin Kopel**
*Sheriff of Grand County, Colorado*                          (See above for address)
*TERMINATED: 12/12/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/12/2013 | 107 | 17 | ORDER denying 102 Motion to Amend/Correct/Modify. Having reviewed the Second Amended Complaint, the Court finds that under the standards of Ashcroft v. Iqbal, 556 U.S. 663 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), there is no plausible claim stated by any individual currently serving as sheriff. Therefore, no further clarification or |

1264

| | | | |
|---|---|---|---|
| | | | modification of the Courts November 27, 2013, Order 96 on the Motion to Dismiss is appropriate. The motion is DENIED. By Chief Judge Marcia S. Krieger on 12/12/2013. Text Only Entry(msklc3, ) (Entered: 12/12/2013) |
| 12/18/2013 | 112 | 19 | RESPONSE to 104 MOTION for Joinder MOTION for Leave to *File 3d Amended Complaint* filed by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 12/18/2013) |
| 12/18/2013 | 113 | 34 | REPLY to Response to 104 MOTION for Joinder MOTION for Leave to *File 3d Amended Complaint and Motion for Leave to File Substitute Third Amended Complaint* filed by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, James Crone, Douglas Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Stan Hilkey, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff. (Attachments: # 1 Exhibit Substitute 3d Amended Complaint)(Kopel, David) (Entered: 12/18/2013) |
| 12/19/2013 | 115 | 112 | MINUTE ENTRY for Law and Motion Hearing held before Chief Judge Marcia S. Krieger on 12/19/2013. 104 Motion for Joinder is GRANTED in part and DENIED in part; 105 Motion for Leave to Restrict is DENIED, but the exhibits will remain under restriction. Proposed Pretrial Order due by 1/31/2014; Final Pretrial Conference set for 2/20/2014 03:00 PM; Bench Trial (10 days) set for 3/31/2014 – o4/04/14 and 04/07/2014 – 04/11/2014 at 08:30 AM in Courtroom A 901 before Chief Judge Marcia S. Krieger. Other matters addressed or deadlines imposed are set forth in the Minutes. Court Reporter: Terri Lindblom. (mskcd) (Entered: 12/20/2013) |
| 12/23/2013 | 116 | 115 | AMENDED COMPLAINT *(Fourth)* against All Defendants, filed by Hamilton Family Enterprises, Inc., Jerry's Outdoor Sports, Larry Kuntz, Colorado Outfitters Association, Goods for the Woods, National Shooting Sports Foundation, Women for Concealed Carry, David Bayne, David Strumillo, Peter Gonzalez, Magpul Industries, Outdoor Buddies, Inc., Colorado Farm Bureau, Dylan Harrell, Specialty Sports &Supply, Colorado State Shooting Association, Douglas Darr, Rocky Mountain Shooters Supply, Green Mountain Guns, 2nd Amendment Gunsmith &Shooter Supply, LLC, James Faull, John B. Cooke, Stan Hilkey, Donald Krueger, Colorado Youth Outdoors, Burrud Arms Inc., USA Liberty Arms, Fred Jobe, Ken Putnam, Sue Kurtz, Dave Stong.(Kopel, David) (Entered: 12/23/2013) |
| 01/03/2014 | 117 | 173 | *Objections and* ANSWER to 116 Amended Complaint,, by John W. Hickenlooper.(Grove, Matthew) (Entered: 01/03/2014) |
| 01/15/2014 | 118 | 217 | Joint MOTION to Strike *Expert Opinions Per FRE 702* by Plaintiffs 2nd Amendment Gunsmith &Shooter Supply, LLC, David Bayne, Burrud Arms Inc., Colorado Farm Bureau, Colorado Outfitters Association, Colorado State Shooting Association, Colorado Youth Outdoors, John B. Cooke, |

| | | | |
|---|---|---|---|
| | | | Douglas N. Darr, James Faull, Peter Gonzalez, Goods for the Woods, Green Mountain Guns, Hamilton Family Enterprises, Inc., Dylan Harrell, Stan Hilkey, Jerry's Outdoor Sports, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Magpul Industries, National Shooting Sports Foundation, Outdoor Buddies, Inc., Ken Putnam, Rocky Mountain Shooters Supply, Specialty Sports &Supply, Dave Stong, David Strumillo, USA Liberty Arms, Women for Concealed Carry, Interested Party Board of County Commissioners for Mesa County Colorado. (Watson, Jonathon) (Entered: 01/15/2014) |
| 01/31/2014 | 119 | 233 | Proposed Pretrial Order *filed jointly by all parties* by Plaintiffs John B. Cooke, Douglas N. Darr, James Faull, Peter Gonzalez, Stan Hilkey, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Ken Putnam, Dave Stong, David Strumillo. (Attachments: # 1 Exhibit Addendum A. Witness list, # 2 Exhibit Addendum B. Exhibit list)(Kopel, David) (Entered: 01/31/2014) |

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circl0.dcn
Message-Id:4304649@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Colorado Outfitters Association et al v.
Hickenlooper Order on Motion to Amend/Correct/Modify
```
Content–Type: text/html

## U.S. District Court

## District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 12/12/2013 at 11:36 AM MST and filed on 12/12/2013

| | |
|---|---|
| **Case Name:** | Colorado Outfitters Association et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 107(No document attached) |

**Docket Text:**
 **ORDER denying [102] Motion to Amend/Correct/Modify. Having reviewed the Second Amended Complaint, the Court finds that under the standards of Ashcroft v. Iqbal, 556 U.S. 663 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), there is no plausible claim stated by any individual currently serving as sheriff. Therefore, no further clarification or modification of the Courts November 27, 2013, Order [96] on the Motion to Dismiss is appropriate. The motion is DENIED. By Chief Judge Marcia S. Krieger on 12/12/2013. Text Only Entry(msklc3, )**

**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin    mcolin@brunolawyers.com, aduran@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Maurice L. Dechant    lyle.dechant@mesacounty.us, mcatty@mesacounty.us

Kathleen L. Spalding    kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall    rwestfall@halewestfall.com, blillis@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel    david@i2i.org

Douglas L. Abbott    dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

Peter J. Krumholz    pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian    fabianlaw@qwestoffice.net

Stephanie Lindquist Scoville    stephanie.scoville@state.co.us, sally.ott@state.co.us

Molly Allen Moats    molly.moats@state.co.us

Jonathan Michael Anderson    jmanderson@hollandhart.com

Matthew David Grove    matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico    dan.domenico@state.co.us, laura−jane.weimer@state.co.us

Jonathan Patrick Fero    jon.fero@state.co.us, debbie.bendell@state.co.us

John Tien Yau Lee    jtlee@state.co.us, jtlee888@gmail.com

David Christopher Blake    david.blake@state.co.us, carol.gall@state.co.us, laura−jane.weimer@state.co.us

Jonathon Michael Watson    jwatson@brunolawyers.com, aduran@brunolawyers.com, mbrock@brunolawyers.com

**1:13−cv−01300−MSK−MJW Notice has been mailed by the filer to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC. d/b/a FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. d/b/a JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**DEFENDANT'S RESPONSE TO MOTION FOR JOINDER AND FOR LEAVE
TO FILE AMENDED COMPLAINT**

---

      Defendant John W. Hickenlooper, in his official capacity as Governor of

the State of Colorado, responds as follows to Plaintiffs' motion to join the

Sheriffs in their individual capacities, and for leave to file an amended complaint (Doc. 104).

1.   The Governor opposes Plaintiffs' motion for joinder and for leave to once again amend their complaint.  Although Defendant would not oppose joinder of the Sheriffs in their individual capacities consistent with the Court's prior orders, Defendant must oppose Plaintiffs' extensive amendments and additions to the complaint at this late date.  Plaintiffs' proposed Third Amended Complaint not only introduces substantial new factual allegations that have not heretofore been offered in this litigation, but also attempts to resurrect claims that this Court has already dismissed.  Because Plaintiffs are unable to satisfy the standards for a late amendment under Fed. R. Civ. P. 16 and 15, and because the Governor would be prejudiced by the proposed joinder and amendments, this Court should deny Plaintiffs' motion.  In the alternative, this Court should amend the scheduling order to reopen discovery, and shift the costs associated with re-deposing the sheriffs to Plaintiffs.

## FACTUAL BACKGROUND

2.   Plaintiffs filed this lawsuit on May 17, 2013, naming as parties in their official capacities 54 of Colorado's elected sheriffs. Doc. 1.  Plaintiffs added one more sheriff when they amended their complaint for the first time. Doc. 22.

3. On June 10, 2013, the Court issued its scheduling order, setting July 1, 2013, as the deadline for joinder of parties and amendment of pleadings. Doc. 36, p. 13.

4. Plaintiffs amended their complaint for a second time on July 1, 2013, adding cursory language to ¶ 104 indicating that the Sheriffs wished to pursue individual capacity claims in addition to the official capacity claims that had already been asserted.  Doc. 43-0, 43-1.  The Governor did not oppose this motion, and the Court granted it shortly thereafter.  Doc. 58.

5. The Governor moved to dismiss parts of the Second Amended Complaint, challenging the Sheriffs' official capacity standing and arguing that several of Plaintiffs' claims did not allege a cognizable injury-in-fact.  Doc. 64. The motion to dismiss was focused on the Sheriffs' official capacity claims rather than their standing as private individuals because the political subdivision question has ramifications beyond the claims in this particular case.  Defendant has not conceded that any Sheriff (or any other party) has personal capacity Article III standing, nor could he, since this is a jurisdictional issue.

6. On November 27, 2013, this Court issued an order dismissing the Sheriffs from the suit in both their official and personal capacities. Doc. 96. Plaintiffs sought clarification of the Court's order with respect to the Sheriffs; this Court confirmed the Sheriffs' personal capacity dismissal, noting that the

Second Amendment complaint did not contain a "plausible claim stated by any

individual currently serving as sheriff."  Doc. 107.

 7. The Court's order of November 27, 2013 gave the Sheriffs 14 days

"in which to seek to join the action in an individual capacity."  Doc. 96. at p. 22.

Notably, the Court's order did not waive the requirements of Fed. R. Civ. P. 15

and 16, which together govern a plaintiff's attempt to amend a complaint outside

the time contemplated by the scheduling order.

 8. The Sheriffs have now sought the Court's leave to rejoin.  Docs.

104-0, 104-1.  The Sheriffs have submitted a proposed Third Amended

Complaint that includes 82 paragraphs of new factual allegations spread over

nearly 22 pages.

 9. A hearing is scheduled for Thursday, December 19, 2013 at 3:00

p.m. on Plaintiffs' request for leave to rejoin.

## ARGUMENT

 10. Because Plaintiffs seek to join parties and amend their complaint

well after the deadline set by the Scheduling Order, this Court should employ a

two-step analysis, first determining whether Plaintiffs have shown "good cause"

to modify the Scheduling Order under Rule16(b), then evaluating whether

Plaintiff has satisfied the standard for amendment of pleadings under Rule

15(a).[1] *Carskadon v. Diva Int'l, Inc.*, 2013 U.S. Dist. LEXIS, Case No. 12-cv-01886-MSK-KMT (D. Colo. May 3, 2013) (Tafoya, J.).

> *Plaintiffs have not shown good cause to amend the Scheduling Order.*

11.    The "good cause" standard requires the moving party to show that despite its diligent efforts, it could not have reasonably met the scheduled deadline. *Pumpco, Inc., the Concrete Pumping Co. v. Schenker Int'l, Inc.* 204 F.R.D. 667, 668 (D. Colo. 2001).  "Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Colorado Visionary Academy v. Medtronic, Inc.,* 194 F.R.D. 684, 687 (D. Colo. 2000) (internal quotation omitted).

12.    "In determining whether there is good cause to permit an amendment of a pleading after the deadline for amendments established in the scheduling order has passed, the court must consider four factors: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and

---

[1] Tenth Circuit precedent on the applicability of Rule 16 standards to amendments sought after the deadline set by the scheduling order is "in a state of flux." *Ross v. Colo. Dept. of Transportation,* 2012 WL 7700140 (D. Colo. August 22, 2012).  The Tenth Circuit has considered the question only once, and declined to reach it because it had not been raised in the trial court. *Bylin v. Billings*, 568 F.3d 1224, 1231-32 (10th Cir. 2009).  Nonetheless, Magistrate Judge recommendations in two cases before this Court have applied the two-step test in *Pumpco, Inc., the Concrete Pumping Co. v. Schenker Int'l, Inc.* 204 F.R.D. 667, 668 (D. Colo. 2001).  *Carskadon, supra; Schneider v. City of Grand Junction,* 2011 U.S. Dist. LEXIS 97421, Case No. 10-cv-01719-MSK-KLM (D. Colo. April 25, 2011).

(4) the availability of a continuance to cure the prejudice." 3-16 Moore's Fed.

Practice – Civil § 16.14. Plaintiffs do not – and cannot – justify their delay under

any of these factors.

13.     First, Plaintiffs' untimely amendment was not prompted by a

change in circumstances, but instead by the facial insufficiency of their Second

Amended Complaint.  Although it contains a number of new factual allegations

that would require additional discovery, neither the motion nor the proposed

amended complaint suggests that Plaintiffs only recently discovered these facts.

Nor does either pleading explain why Plaintiffs omitted these allegations of fact

from their previous iterations.  Plaintiffs have failed to adequately explain these

material omissions that were known from the outset of the litigation or, for that

matter, clarify why this level of precision was seemingly unimportant when

Plaintiffs moved to amend with the express purpose of adding the Sheriffs in

their individual capacities.

14.     Second, the Sheriffs' participation in their personal capacities is of

little importance as the case moves forward.  None of Plaintiffs' legal or factual

claims are unique to the Sheriffs.  In fact, the Sheriffs' participation in their

individual capacities is likely to confuse matters due to the potential

applicability of the law enforcement exemption in C.R.S. § 18-12-302(3)(b). *See*

Doc. 104-1, ¶¶ 173-176, 188.

15.     Third, permitting the Sheriffs to rejoin as proposed will prejudice Defendant in a number of ways.

16.     Written and oral discovery taken from the Sheriffs was tailored to the allegations made in the Second Amended Complaint.  The proposed amendments contain a number of allegations for which the prior complaints provided no notice.

a. For example, the Sheriffs have never previously alleged that they wish to make long-term loans of magazines to friends and family. Doc. 104-1, ¶¶ 179-180.  Moreover, the Sheriffs making those allegations were not deposed based on Plaintiffs' representation that they would not testify.

b. Another example is the new factual allegation about certain firearms that the Sheriffs "wish to have the option...[to] personally purchas[e]," including the "Springfield Armory XD handguns in 9mm and .40 caliber, the Kel-Tec PMR .22 caliber pistol, and the SRM Arms model 1216 shotgun[.]"  Doc. 104-1, ¶ 185.  However, the Sheriffs' depositions did not cover in detail the Sheriffs' alleged desire to purchase and own any specific firearms because none of the previous complaints made any allegations to that effect.

c. Plaintiffs' previous complaints suggested only in passing that HB 1229 was vague, and did not contain any claim of vagueness with

respect to HB 1229 in the claims for relief. Doc. 62, ¶¶ 208, 253-259. But Plaintiffs now offer a number of hypotheticals that are intended to suggest that HB 1229, along with HB 1224, is vague and unenforceable. These allegations assert an entirely new legal theory, and one which defense counsel has had no opportunity to explore in discovery.

d. Plaintiffs submit no fewer than 12 affidavits from various Sheriffs that posit those Sheriffs' enhanced need for self-defense in their personal capacities. The factual allegations in these affidavits are entirely new. Even more troubling, however, is that all 12 of the Sheriffs who have submitted affidavits are among the group that the parties had agreed would neither testify nor be deposed.

17.    In some instances, the allegations attempt to resuscitate claims that this Court has already dismissed.

a. For example, Plaintiffs assert that "unanswered, unknown vagaries of HB 1224 and 1229," will interfere with the Sheriffs' activities "on-duty," and will affect "the personal decisions that Sheriffs must make regarding firearms and magazines that they personally handle *in the course of their employment.*" Doc. 104-1, ¶ 188 (emphasis added). The Sheriffs' concerns about how either statute

affects them in their official capacities are no longer at issue in this

litigation.

b. Likewise, many of the hypotheticals that Plaintiffs claim remain

unanswered relate directly to the Sheriffs' official capacity use or

possession of large-capacity magazines.  For example, the Sheriffs

complain that they have no answer to the following request for

admission:  "Admit that HB 1229 forbids law enforcement officers

from taking a citizen's firearm for temporary safe-keeping for more

than 72 hours, unless the transfer is processed by a FFL pursuant

to HB 1229's requirement for background check and for FFL record-

keeping. By way of illustration, this question includes a situation in

which a citizen is the victim of a crime or accident, is therefore

unconscious, and is therefore unable to safeguard a firearm which

the citizen was carrying or transporting."  Doc. 104-1, ¶ 188.  Such

allegations are irrelevant to the Sheriffs' participation in their

individual capacities, and serve only to further confuse the

remaining issues before the Court.

c. In addition to attempting to re-raise official capacity claims,

Plaintiffs also make an effort to revive their challenge to the

"designed to be readily converted" language in HB 1224.  They do so

by asserting that "some nominally 15-round magazines are in fact

'capable of accepting' 16 rounds; due to variations in manufacturing tolerances, some springs for 15-round magazines are so compressible that 16 rounds will fit in the magazine." Doc. 104-1, ¶ 177.  Plaintiffs now claim that it is "legally perilous to acquire a new a [sic] 15 round magazine," and suggest that the Sheriffs are impacted by this circumstance because they "wish to own such magazines, now and after they retire from law enforcement." Doc. 104-1, ¶ 178.

    d.  That Plaintiffs' proposed amendments attempt to resuscitate claims that have been dismissed is demonstrated by their failure to amend their claims for relief.  This Court dismissed Plaintiffs' second and third claims for relief, which asserted that HB 1224's "designed to be readily converted" language was vague and effectively banned all magazines.  Yet these claims remain unaltered in the proposed amended complaint.  Doc. 104-1, ¶¶ 303-311, 312-318.

18.    Defendant would be prejudiced both by the assertion of new factual allegations and the revival of claims for relief that this Court has already dismissed.  While a continuance for additional discovery would be theoretically possible, it would be inconsistent with Plaintiffs' insistence that this case move forward to a disposition as quickly as possible.  The Governor concurs that a speedy resolution of this dispute is desirable, and thus would oppose a

continuance for the purpose of reopening discovery to allow for Plaintiffs'

attempt to raise new claims and revive old ones.

*Plaintiffs cannot show that they should be granted leave to amend under Rule 15.*

19.     Assuming *arguendo* that Plaintiffs are able to establish good cause

for modifying the scheduling order, they must also satisfy the requirements of

Rule 15(a) for amending the pleadings.  Under Rule 15(a), a court should allow a

party to amend its pleadings "when justice so requires."  Fed.R.Civ. P. 15(a).

Denying leave to amend is proper if the proposed amendments are unduly

delayed, unduly prejudicial, futile, or sought in bad faith.  *Frank v. U.S. West,*

*Inc.,* 3 F.3d 1357, 1365 (10th Cir. 1993).

20.     In the Tenth Circuit, untimeliness alone may be a sufficient basis

for deny a party leave to amend.  *Duncan v. Manager, Dep't of Safety,* 397 F.3d

1300, 1315 (10th Cir. 2005); *Hayes v. Whitman,* 264 F.3d 1017, 1026 (10th Cir.

2001). The important inquiry is not simply whether a plaintiff has delayed, but

whether such a delay is undue.  *Minter v. Prime Equip. Co.,* 451 F.3d 1196, 1206

(10th Cir. 2006).  Delay is undue "when the party filing the motion has no

adequate explanation for the delay." *Frank,* 3 F.3d at 1365-66.

21.     Denial of an amendment is also appropriate when "the party

seeking amendment knows or should have known of the facts upon which the

proposed amendment is based but fails to include them in the original

complaint." *Las Vegas Ice & Cold Storage Co. v. Far West Bank,* 893 F.2d 1182,

1185 (10th Cir. 1990) (quoting *State Distribs., Inc. v. Glenmore Distilleries Co.,*
738 405, 416 (10th Cir. 1984)); *see also Federal Ins. Co. v. Gates Learjet Corp.,*
823 F.2d 383, 387 (10th Cir. 1987) ("Courts have denied leave to amend in
situations where the moving party cannot demonstrate excusable neglect. For
example, courts have denied leave where the moving party was aware of facts on
which the amendment was based for some time prior to the filing of the motion
to amend." (citations omitted).

22.   Here, Plaintiffs do not assert that their proposed amendments are
based on newly discovered facts, and offer no explanation as to why they did not
allege those facts in previous versions of their complaint.  Their delay is
therefore undue.

23.   As outlined above, Defendant will suffer substantial prejudice if the
proposed amendments are permitted.  The parties invested significant time and
resources to conduct extensive discovery on the allegations in the Second
Amended Complaint on a very expedited basis.  In all, the parties conducted 38
depositions in the span of less than two months.  Discovery closed in this case
more than six weeks ago, and counsel for Defendant has invested considerable
amounts of time researching and drafting a dispositive motion based on the
evidence adduced during the discovery period.  Unless discovery is reopened,
Defendant will have no opportunity to test Plaintiffs' new theories and
allegations prior to trial.

24.     Reopening discovery, however, would not only increase the already substantial costs of litigating this case, but also would delay the proceedings further.

25.     Accordingly, Defendant respectfully requests that this Court deny Plaintiffs' motion to amend their complaint.

26.     In the alternative, in the event that the Court grants Plaintiffs' motion in whole or in part, Defendant respectfully requests that the Court permit additional discovery with respect to the proposed amendments.  The need for additional written discovery would likely depend on the scope of the amendment permitted, but any reopened discovery period should certainly include an opportunity to depose any and all witnesses who intend to testify or otherwise provide evidence in support of the new allegations.

27.     In the event that the proposed amendments are accepted and discovery is reopened, Defendant respectfully requests that the Court require the Sheriffs bear the costs of additional depositions.

28.     In conclusion, Defendant understood the Court's order allowing the Sheriffs to seek leave to rejoin the suit individually as contemplating a simple amendment that would specifically incorporate and connect the factual allegations that Defendant had notice of and was able to explore in discovery to the individual capacity Sheriffs.  The Governor would not have opposed such an amendment.  Rather than submitting an amendment that is limited in scope,

however, Plaintiffs have taken advantage of the opportunity to add dozens of new factual allegations (many from witnesses whom the parties already agreed would not submit evidence), to resurrect claims that this Court has already dismissed, and to shoehorn additional factual allegations into the claims that were not dismissed. Permitting the Plaintiffs to amend their complaint in this fashion at this late date would change the nature of this litigation, impose substantial additional costs on the parties, and prejudice Defendant's ability to defend the constitutionality of a duly adopted state statute.  Accordingly, Defendant respectfully requests that this Court deny the Plaintiffs' motion for joinder and to amend the complaint.

Respectfully submitted this 18th day of December, 2013.

JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*
DANIEL D. DOMENICO
Solicitor General*
DAVID C. BLAKE*
Deputy Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
JONATHAN P. FERO*
Assistant Solicitor General
JOHN T. LEE*
Assistant Attorney General
MOLLY MOATS*

Assistant Attorney General
Attorneys for Governor John W.
  Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

## CERTIFICATE OF SERVICE

    I hereby certify that on December 18, 2013 I served a true and complete copy of the foregoing RESPONSE TO MOTION FOR JOINDER AND LEAVE TO FILE AMENDED COMPLAINT upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

*s/  Matthew D. Grove*

1283

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.*,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**REPLY TO RESPONSE RE MOTION FOR JOINDER AND FOR LEAVE TO FILE AMENDED COMPLAINT, AND MOTION FOR LEAVE TO FILE SUBSTITUTE THIRD AMENDED COMPLAINT**

---

1. Pursuant to D.C.COLO.LCivR 7.1(a), counsel has conferred telephonically with Defendant's attorneys Matthew Grove, Kathleen Spalding, and Stephanie Scoville regarding this filing.

2. Defendant's Response to the Motion for Joinder stated: "In conclusion, Defendant understood the Court's order allowing the Sheriffs to seek leave to rejoin the suit individually as contemplating a simple amendment that

would specifically incorporate and connect the factual allegations that Defendant had notice of and was able to explore in discovery to the individual capacity Sheriffs. *The Governor would not have opposed such an amendment*." (#112 at 28) (emphasis added).

3. In the spirit of expeditious resolution of the case, the Sheriffs have acceded to each and every objection raised by Defendant in his Response to the Motion for Joinder. The Sheriffs delivered to Defendant at 3:30 p.m. on Wednesday, Dec. 18, 2013, a copy of a proposed Substitute Third Amended Complaint, as described in the conferral earlier this afternoon. Defendant has not at this time taken a position on the Substitute Third Amended Complaint.

4. As the original Third Amended Complaint had demonstrated with copious citations to the Discovery, everything alleged by the Sheriffs in the original Third Amended Complaint involved "factual allegations that Defendant had notice of and was able to explore in discovery." (Quoting #112, at 27.) Nevertheless, to expedite the case, the Sheriffs file a Substitute Third Amended Complaint, which is attached to this Reply as Exhibit A.

5. The following paragraphs explain how the Sheriffs have addressed every concern raised by Defendant in Defendant's Response (#112).

6. Defendant has stated that the original Third Amended Complaint contains "82 paragraphs of new factual allegations spread over nearly 22 pages." (#112, para. 8).  It should be noted that 55 of those 82 paragraphs were simple biographical descriptions of each of the 55 individual Sheriffs. Other than the biographical paragraphs, the Substitute Third Amended Complaint contains only 16 paragraphs (162-177) and 4 ½ pages concerning the Sheriffs.

7. Defendant objected to paragraphs 179-80 of the original Third Amended Complaint, involving Sheriffs who wished to make long-term loans of magazines. (#112, para. 16a). Those paragraphs are stricken from the Substitute Third Amended Complaint.

8. Defendant objected to paragraph 185 of the original Third Amended Complaint, involving HB 1224's de facto prohibition of certain models of firearms. (#112, para. 16b). This paragraph and the related following paragraph are stricken from the Substitute Third Amended Complaint.

9. Defendant objected to the inclusion of certain examples of how HB 1229 is vague and unclear, and to the allegations that the Sheriffs in the personal lives (for most of these examples) and when personally handling firearms on the job (a few examples) do not know how to comply with HB 1229. (#112, at 7-9). The relevant paragraph, number 188, is stricken from the Substitute Third Amended Complaint.

10.  Defendant objected to Exhibit B to the original Third Amended Complaint, which contained Declarations from 12 Sheriffs about the firearms and magazines they own, and about the particular threats they and their families have faced. (#112, para. 16d). That Exhibit is not included in the Substitute Third Amended Complaint.

11. Defendant objected to discussion of the problem of magazines which are nominally 15 rounds, but which do in fact hold 16, due to variances in the springs used by the manufacturer. (#112, para. 17c). The relevant paragraphs (177-78) have been removed from the Substitute Third Amended Complaint. (These paragraphs did not involve the "designed to be readily converted" vagueness claim, but rather the straightforward claim against the prohibition of magazines which hold 16 or more rounds.)

12. Defendant had objected to discussion of the problem that the government employee exemption in HB 1224 does in fact prevent individuals who are law enforcement employees from acquiring new magazines holding 16 or new rounds. (#112, para. 14). The relevant paragraphs have been removed from the Substitute Third Amended Complaint. .

13. Pursuant to D.C.COLO.LCivR 15.1(b), a copy of the proposed Substitute Third Amended Complaint is attached to this Reply and Motion, as an exhibit, with strike-throughs and underlines to indicate the removal or addition of text.

14. The only changes from the Second Amended Complaint to the Substitute
Third Amended Complaints are as follows:

a. In the caption, removal of the Sheriff's Office and County (e.g., "Sheriff of
Weld County, Colorado").

b. Replacing section III.A.1 of the Complaint in its entirety. This section
describes the identities and interests of the individual Sheriff plaintiffs.

c. Striking the Third Claim regarding "Designed to be readily converted." As
explained in a footnote, the strikethrough is in conformity with the Court's
Order of Nov. 27, 2013, and is not intended to waive the appealability of
issues regarding that Claim.

d. Changing the date of the Complaint.

15. The Substitute Third Amended Complaint raises no new Claims. It
introduces no new witnesses. All six of the disclosed Sheriff witnesses
have already been deposed in depth about their personal firearms and
magazine collections, their personal hunting and recreational target
shooting, their families, and threats/violence against them and their
families. Excerpts from those depositions accompany the Substitute Third
Amended Complaint, as Exhibit A. (Previously filed as exhibit #1 to #104.
All other Exhibits to the Substitute Third Amended Complaint have been
filed as attachments to #104.)

16. Should Defendant raise new objections to the Substitute Third Amended

Complaint, the Sheriffs are ready, with leave of this Court, to instantly

and rapidly work with Defendant to produce a Complaint which will

obtain Defendant's consent.


Respectfully submitted, this 18th day of December, 2013.


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org


ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

1289

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2013, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | Stephanie.Scoville@state.co.us |
| John Lee | jtlee@state.co.us |

/s/David B. Kopel
_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, ~~Sheriff of Weld County, Colorado;~~
TERRY MAKETA, ~~Sheriff of El Paso County, Colorado;~~
JUSTIN SMITH, ~~Sheriff of Larimer County, Colorado;~~
DAVID A. WEAVER, ~~Sheriff of Douglas County, Colorado;~~
BRUCE W. HARTMAN, ~~Sheriff of Gilpin County, Colorado;~~
KEN PUTNAM, ~~Sheriff of Cheyenne County, Colorado;~~
DENNIS SPRUELL, ~~Sheriff of Montezuma County, Colorado;~~
TIM JANTZ, ~~Sheriff of Moffat County, Colorado;~~
JERRY MARTIN, ~~Sheriff of Dolores County, Colorado;~~
MIKE ENSMINGER, ~~Sheriff of Teller County, Colorado;~~
SHAYNE HEAP, ~~Sheriff of Elbert County, Colorado;~~
CHAD DAY, ~~Sheriff of Yuma County, Colorado;~~
FRED D. MCKEE, ~~Sheriff of Delta County, Colorado;~~
LOU VALLARIO, ~~Sheriff of Garfield County, Colorado;~~
FRED HOSSELKUS, ~~Sheriff of Mineral County, Colorado;~~
BRETT L. POWELL, ~~Sheriff of Logan County, Colorado;~~
JAMES FAULL, ~~Sheriff of Prowers County, Colorado;~~
LARRY KUNTZ, ~~Sheriff of Washington County, Colorado;~~
BRIAN E. NORTON, ~~Sheriff of Rio Grande County, Colorado;~~
DUKE SCHIRARD, ~~Sheriff of La Plata County, Colorado;~~
JIM BEICKER, ~~Sheriff of Fremont County, Colorado;~~
RONALD BRUCE, ~~Sheriff of Hinsdale County, Colorado;~~
CHRIS S. JOHNSON, ~~Sheriff of Otero County, Colorado;~~
FRED JOBE, ~~Sheriff of Custer County, Colorado;~~
DONALD KRUEGER, ~~Sheriff of Clear Creek County, Colorado;~~
JAMES CRONE, ~~Sheriff of Morgan County, Colorado;~~
SI WOODRUFF, ~~Sheriff of Rio Blanco County, Colorado;~~
TOM RIDNOUR, ~~Sheriff of Kit Carson County, Colorado;~~
TOM NESTOR, ~~Sheriff of Lincoln County, Colorado;~~
STAN HILKEY, ~~Sheriff of Mesa County, Colorado;~~
FORREST FRAZEE, ~~Sheriff of Kiowa County, Colorado;~~
RICK DUNLAP, ~~Sheriff of Montrose County, Colorado;~~
TED B. MINK, ~~Sheriff of Jefferson County, Colorado;~~
DAVE STONG, ~~Sheriff of Alamosa County, Colorado;~~
FRED WEGENER, ~~Sheriff of Park County, Colorado;~~
BRUCE NEWMAN, ~~Sheriff of Huerfano County, Colorado;~~
RANDY PECK, ~~Sheriff of Sedgwick County, Colorado;~~
DOMINIC MATTIVI, JR., ~~Sheriff of Ouray County, Colorado;~~
JOHN MINOR, ~~Sheriff of Summit County, Colorado;~~

SCOTT FISCHER, Sheriff of Jackson County, Colorado;
PETER GONZALEZ, Sheriff of Archuleta County, Colorado;
RICK BESECKER, Sheriff of Gunnison County, Colorado;
CHARLES "ROB" URBACH , Sheriff of Phillips County, Colorado;
ROD FENSKE, Sheriff of Lake County, Colorado;
GRAYSON ROBINSON, Sheriff of Arapahoe County, Colorado;
DAVID D. CAMPBELL, Sheriff of Baca County, Colorado;
MIKE NORRIS, Sheriff of Saguache County, Colorado;
AMOS MEDINA, Sheriff of Costilla County, Colorado;
MILES CLARK, Sheriff of Crowley County, Colorado;
DAVID ENCINIAS, Sheriff of Bent County, Colorado;
SUE KURTZ, Sheriff of San Juan County, Colorado;
JAMES (JIM) CASIAS, Sheriff of Las Animas County, Colorado;
GARRETT WIGGINS, Sheriff of Routt County, Colorado;
DOUGLAS N. DARR , Sheriff of Adams County, Colorado;
RODNEY JOHNSON, Sheriff of Grand County, Colorado;
COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
GRAND PRIX GUNS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;

     Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

    Defendant.

---

## ~~SECOND~~ THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Peace officers and peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are 55 Colorado elected sheriffs, retired law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

### I.    OVERVIEW

1.    On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2.    House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013 that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3.     The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4.     The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5.     Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6.     Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7.     The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8.     Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.     The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14.    The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15.    In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16.    Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.     Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.     HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.     The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

## HB 1229

20.     House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common, temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26. Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27. There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28. Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29. The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30. An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31. Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32.     HB 1224 and HB 1229 violate these principles.

## II.     JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34.     This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III.     PARTIES

A.     **Plaintiffs**

     1.     ~~The Sheriffs of 55 Colorado Counties~~

37.     ~~Each of the following Sheriffs of 55 Colorado counties ("the Sheriffs")~~ ~~has the primary obligation to obey the Constitution of the United States of America.~~ ~~The Sheriffs bring this case pursuant to this primary obligation, which is supreme~~ ~~over any other purported enactment.~~

38.     ~~John B. Cooke is the Sheriff of Weld County, Colorado.~~

39.     ~~Terry Maketa is the Sheriff of El Paso County, Colorado.~~

40.     ~~Justin Smith is the Sheriff of Larimer County, Colorado.~~

41.     ~~David A. Weaver is the Sheriff of Douglas County, Colorado.~~

42.     ~~Bruce W. Hartman is the Sheriff of Gilpin County, Colorado.~~

43.   ~~Ken Putnam is the Sheriff of Cheyenne County, Colorado.~~

44.   ~~Dennis Spruell is the Sheriff of Montezuma County, Colorado.~~

45.   ~~Tim Jantz is the Sheriff of Moffat County, Colorado.~~

46.   ~~Jerry Martin is the Sheriff of Dolores County, Colorado.~~

47.   ~~Mike Ensminger is the Sheriff of Teller County, Colorado.~~

48.   ~~Shayne Heap is the Sheriff of Elbert County, Colorado.~~

49.   ~~Chad Day is the Sheriff of Yuma County, Colorado.~~

50.   ~~Fred D. McKee is the Sheriff of Delta County, Colorado.~~

51.   ~~Lou Vallario is the Sheriff of Garfield County, Colorado.~~

52.   ~~Fred Hosselkus is the Sheriff of Mineral County, Colorado.~~

53.   ~~Brett L. Powell is the Sheriff of Logan County, Colorado.~~

54.   ~~James Faull is the Sheriff of Prowers County, Colorado.~~

55.   ~~Larry Kuntz is the Sheriff of Washington County, Colorado.~~

56.   ~~Brian E. Norton is the Sheriff of Rio Grande County, Colorado.~~

57.   ~~Duke Schirard is the Sheriff of La Plata County, Colorado.~~

58.   ~~Jim Beicker is the Sheriff of Fremont County, Colorado.~~

59.   ~~Ronald Bruce is the Sheriff of Hinsdale County, Colorado.~~

60.   ~~Chris S. Johnson is the Sheriff of Otero County, Colorado.~~

61.   ~~Fred Jobe is the Sheriff of Custer County, Colorado.~~

62.   ~~Donald Krueger is the Sheriff of Clear Creek County, Colorado.~~

63.   ~~James Crone is the Sheriff of Morgan County, Colorado.~~

64.   ~~Si Woodruff is the Sheriff of Rio Blanco County, Colorado.~~

65. ~~Tom Ridnour is the Sheriff of Kit Carson County, Colorado.~~

66. ~~Tom Nestor is the Sheriff of Lincoln County, Colorado.~~

67. ~~Stan Hilkey is the Sheriff of Mesa County, Colorado.~~

68. ~~Forrest Frazee is the Sheriff of Kiowa County, Colorado.~~

69. ~~Rick Dunlap is the Sheriff of Montrose County, Colorado.~~

70. ~~Ted B. Mink is the Sheriff of Jefferson County, Colorado.~~

71. ~~Dave Stong is the Sheriff of Alamosa County, Colorado.~~

72. ~~Fred Wegener is the Sheriff of Park County, Colorado.~~

73. ~~Bruce Newman is the Sheriff of Huerfano County, Colorado.~~

74. ~~Randy Peck is the Sheriff of Sedgwick County, Colorado.~~

75. ~~Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado.~~

76. ~~John Minor is the Sheriff of Summit County, Colorado.~~

77. ~~Scott Fischer is the Sheriff of Jackson County, Colorado.~~

78. ~~Peter Gonzalez is the Sheriff of Archuleta County, Colorado.~~

79. ~~Rick Besecker is the Sheriff of Gunnison County, Colorado.~~

80. ~~Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado.~~

81. ~~Rod Fenske is the Sheriff of Lake County, Colorado.~~

82. ~~Grayson Robinson is the Sheriff of Arapahoe County, Colorado.~~

83. ~~David D. Campbell is the Sheriff of Baca County, Colorado.~~

84. ~~Mike Norris is the Sheriff of Saguache County, Colorado.~~

85. ~~Amos Medina is the Sheriff of Costilla County, Colorado.~~

86. ~~Miles Clark is the Sheriff of Crowley County, Colorado.~~

87.    ~~David Encinias is the Sheriff of Bent County, Colorado.~~

88.    ~~Sue Kurtz is the Sheriff of San Juan County, Colorado.~~

89.    ~~James (Jim) Casias is the Sheriff of Las Animas County, Colorado.~~

90.    ~~Garrett Wiggins is the Sheriff of Routt County, Colorado.~~

91.    ~~Douglas N. Darr is the Sheriff of Adams County, Colorado.~~

92.    ~~Rodney Johnson is the Sheriff of Grand County, Colorado.~~

93.    ~~HB 1224 and 1229 violate the Constitution of the United States. The Sheriffs cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado.~~

94.    ~~For reasons detailed *supra* and *infra*, HB 1224 and 1229 are utterly unenforceable, even if the Sheriffs wished to violate the U.S. Constitution.~~

95.    ~~After HB 1229 becomes effective, every citizen of Colorado can legally possess a "large capacity" magazine that holds more than 15 rounds so long as they owned it prior to the effective date and maintain "continuous possession" of it after the effective date. This includes both magazines that hold more than 15 rounds, and smaller magazines with removable floor plates or end caps. At least hundreds of thousands of Colorado citizens, including the individual Plaintiffs and members of Plaintiff associations, will lawfully own hundreds of thousands (or more) of such magazines.~~

96.    ~~The Sheriffs have limited resources and limited public funds to spend on investigations. They cannot expend those resources to conduct investigations that would be necessary to monitor compliance with the new magazine restrictions.~~

~~No documentation has ever been required for the retail or private purchase of magazines, making it a practical impossibility for the Sheriffs to determine whether one of the many magazines already in existence was obtained after the effective date.~~

97.   ~~It would be similarly impossible to determine whether a magazine was in the "continuous possession" of its owner after July 1, 2013.~~

98.   ~~With very few exceptions, magazines manufactured in other states are not required to bear date stamps, making it impossible to determine their date of manufacture. The Sheriffs will have no means to determine whether a magazine possessed by an individual in Colorado was manufactured before or after July 1, 2013, with the exception of those manufactured in Colorado after July 1, 2013 that are required by the bill to bear a date stamp.~~

99.   ~~The foregoing presumes that it is clear what the bill prohibits. But the Sheriffs' enforcement obstacles become insurmountable if they must also resolve ambiguities in the bill. If the bill does not prohibit every magazine with a removable floor plate and end cap, but only those that were intentionally "designed" for the purpose of expanding capacity, the Sheriffs are given no tools to make that determination. They cannot know the intent of the designer.~~

100.   ~~Likewise, each Sheriff will have to determine what constitutes "continuous possession," since the statute provides no guidance. They will have to make individual decisions whether continuous possession allows for temporary loans to others and, if so, for what duration.~~

101.    ~~In addition to the core infringement on a fundamental right inherent in any enforcement of these provisions, the result of the many ambiguities will be varying individual decisions and inconsistent enforcement across jurisdictions. Effective law enforcement depends on close and supportive relations between the public and law enforcement. Unconstitutional, vague laws which are inconsistently enforced poison that relationship, and make it significantly more difficult for the Sheriffs to receive the witness cooperation, tips, and other forms of public support which are necessary to effective law enforcement in a free society.~~

102.    ~~Sheriffs have the common law power to request the armed assistance of able-bodied adults in their County. This is known as the "posse comitatus." One well-known use of the posse in Colorado was in June 1977, when Pitkin County citizens with their own guns responded to a request to help with the search for escaped mass murderer Theodore Bundy.~~

103.    ~~Sheriffs also have the authority to appoint deputies who are not certified peace officers. The "non-certified" deputies may be appointed for a limited period of time, or for specific tasks. C.R.S. §§ 16-2.5-103(2); 30-10-506. Particularly in rural parts of Colorado, Sheriffs utilize the authority to deputize individuals to augment law enforcement efforts in times of disturbances and natural disasters.~~

104.    ~~When those Sheriffs deputize, they do not have a cache of firearms to issue. Moreover, a person who is deputized in an emergency will be safer and more effective using his or her personal firearm, with which he or she is already familiar.~~

105.   ~~HB 1224 seriously impedes the ability of Sheriffs to call upon armed citizen assistance during emergencies and natural disasters because it prevents citizens from having the types of magazines which the Sheriffs and their ordinary deputies have determined to be most effective for the preservation of public safety. As described in paragraphs 95, 137, 158, 187, 207, 214, 217, and 231, the Sheriffs, like all Plaintiffs, are injured by the infringements of their individual rights under the Second and Fourteenth Amendments. The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.~~

**1. Plaintiff Sheriffs, in the personal capacities**

**a.   Background of Sheriff Plaintiffs**

106.   <u>The Fifty-five Plaintiffs are individual citizens who are career law enforcement officers and who are presently elected Sheriffs. The aforesaid Plaintiffs are suing in their individual capacities as American citizens with individual rights under the Second and Fourteenth Amendments. Because all of them happen to be, at this time, elected Sheriffs, this Complaint refers to them as "the Sheriffs" for concision.</u>

107.   <u>John B. Cooke has served nearly 35 years in law enforcement. He has five years of experience with the Breckenridge Police Department, and has served 29 years and 8 months with the Weld County Sheriff's Office, including 11 as Sheriff. Because of term limits, he will complete his law enforcement career in January 2015. Like several other Sheriffs, Cooke and his family have been the</u>

victims of identifiable threats; those threats are described in Exhibit A (at 4-6) to this Complaint. All Exhibits to this Complaint are incorporated by reference.

108.     Terry Maketa is the Sheriff of El Paso County, Colorado. He has 26 years of law enforcement experience, all of them with the El Paso County Sheriff's Office. He is the first person in the Office's history to rise all the way through every rank and then become Sheriff.

109.     Justin Smith is the Sheriff of Larimer County, Colorado. He has 27 years law enforcement experience, 13 of them in command ranks. If he continues to be re-elected, his law enforcement service will end in January 2019.

110.     David A. Weaver is the Sheriff of Douglas County, Colorado. He has over 32 years of law enforcement experience, and has worked in nearly every area of police administration.

111.     Bruce W. Hartman is the Sheriff of Gilpin County, Colorado. He is currently serving his fifth term as Sheriff and was originally elected in 1992.

112.     Ken Putnam is the Sheriff of Cheyenne County, Colorado. He has 18 years of law enforcement experience, and will finish his service as Sheriff in January 2015.

113.     Dennis Spruell is the Sheriff of Montezuma County, Colorado. He has 33 years in law enforcement, with 27 years as a Supervisor, including as a K-9 Officer and director of a multijurisdictional drug task force. Sheriff Spruell has been Sheriff for three years and will be term limited in 2021, if he is re-elected.

114.     Tim Jantz is the Sheriff of Moffat County, Colorado. He has 33 years of law enforcement, 14 of them at the supervisory level.

115.     Jerry Martin is the Sheriff of Dolores County, Colorado. He has 27 years of law enforcement experience, and his serving his sixth term as Sheriff.

116.     Mike Ensminger is the Sheriff of Teller County, Colorado. He retired from the San Diego County Sheriff's office in 1987, and moved to Colorado. From 1988 to 2010, he was a Professor of Criminal Justice at Pikes Peak Community College. He was elected Sheriff in 2010.

117.     Shayne Heap is the Sheriff of Elbert County, Colorado. He has 12 years in law enforcement, three of them as Sheriff. He is a member of the Elizabeth C-1 School Safety Board.

118.     Chad Day is the Sheriff of Yuma County, Colorado. He has 11 years of law enforcement experience.

119.     Fred D. McKee is the Sheriff of Delta County, Colorado. He has 31 years of law enforcement experience, including 10 as Sheriff. If he is re-elected in 2014, he plans to retire after the end of his term in January 2019.

120.     Lou Vallario is the Sheriff of Garfield County, Colorado. He has 26 years of law enforcement experience, and served with the Glenwood Springs Police Department before being elected Sheriff.

121.     Fred Hosselkus is the Sheriff of Mineral County, Colorado. He was first elected in 2006, and previously served as a deputy in the Office.

122.     Brett L. Powell is the Sheriff of Logan County, Colorado. He has 17 years of law enforcement experience.

123.     James Faull is the Sheriff of Prowers County, Colorado. He has 37 years of law enforcement experience—14 as Sheriff, and 23 years with a police department (15 of those in command positions). He plans on retiring at the end of his term in January 2015.

124.     Larry Kuntz is the Sheriff of Washington County, Colorado. He will retire in January 2015 at the completion of his third term. He has 36 years of law enforcement experience, including as a city police officer and a Sheriff's deputy. Part of the reason for his retirement is regulatory changes that he feels put citizens in jeopardy, and that endanger law enforcement officers.  These changes include HB 1224's de facto prevention of law enforcement officers and citizens, including himself, from acquiring standard capacity magazines holding 16 or more rounds.

125.     Brian E. Norton is the Sheriff of Rio Grande County, Colorado. He has 26 years of law enforcement experience, including nine as Undersheriff and 11 as Sheriff.

126.     Duke Schirard is the Sheriff of La Plata County, Colorado. He has 39 years of law enforcement experience, including as Sheriff's deputy, police officer, town marshal, and Sheriff.

127.     Jim Beicker is the Sheriff of Fremont County, Colorado. He has 27 years of law enforcement experience, including 10 as Sheriff.

128.     Ronald Bruce is the Sheriff of Hinsdale County, Colorado. He joined the Arizona Department of Public Safety – Highway Patrol Bureau in 1974, and retired therefrom on October 31, 2002. His wife retired as an Arizona Trooper that same day, after 22 years of service. He was elected Sheriff of Hinsdale County in 2006.

129.     Chris S. Johnson is the Sheriff of Otero County, Colorado. He has 35 years of law enforcement experience, and has been Sheriff for 11 years.

130.     Fred Jobe has been the Sheriff of Custer County, Colorado, for 28 years, and he has 39 years of law enforcement experience. He plans to retire at the end of his current term, in January 2015.

131.     Donald Krueger is the Sheriff of Clear Creek County, Colorado. He has 25 years of full-time law enforcement experience, plus 14 years as a reserve officer. He has been Sheriff for 19 years and will retire at the end of his term in January 2015.

132.     James Crone is the Sheriff of Morgan County, Colorado. He has served as Sheriff for 15 years, and had 19 years of law enforcement experience before that.

133.     Si Woodruff is the Sheriff of Rio Blanco County, Colorado. He has 39 years of law enforcement experience, as Police officer, Senior patrol officer, Chief of Police, and then Sheriff.

134.   Tom Ridnour is the Sheriff of Kit Carson County, Colorado. He has previously served as an investigator for the Colorado Department of Corrections as well as a police officer for the City of Burlington.

135.   Tom Nestor is the Sheriff of Lincoln County, Colorado.  He has been with the Lincoln County Sheriff's Office for 24 years. He previously served as Undersheriff.

136.   Stan Hilkey is the Sheriff of Mesa County, Colorado. He has 27 years of law enforcement experience. He is term limited, and his final term ends in January 2015.

137.   Forrest Frazee is the Sheriff of Kiowa County, Colorado. After retiring from a long career in the U.S. Navy, he was elected Sheriff in 2006.

138.   Rick Dunlap is the Sheriff of Montrose County, Colorado. He has 23 years of law enforcement experience, including seven as Sheriff. If he is re-elected in 2014, his service as Sheriff will end in January 2019.

139.   Ted B. Mink is the Sheriff of Jefferson County, Colorado. He will complete his final term as Sheriff in January 2015. Before being appointed Sheriff in July 2003, he had served as Undersheriff in Jefferson County. He was an officer with the Arvada Police Department from September 1977 until January 2003, and had been Deputy Chief of Police since 1998.

140.   Dave Stong is the Sheriff of Alamosa County, Colorado. He has 40 years law enforcement experience, 20 of them as Sheriff. He will retire in January 2015.

141.    Fred Wegener is the Sheriff of Park County, Colorado. He has been in law enforcement for 26 years, and prior to that was a military police officer for six years.

142.    Bruce Newman is the Sheriff of Huerfano County, Colorado. He has 26 years law enforcement experience, including a year at the federal Supermax.

143.    Randy Peck is the Sheriff of Sedgwick County, Colorado. He has been Sheriff for three years, and before that had 20 years of experience as a Deputy sheriff, Sergeant, and Undersheriff.

144.    Dominic Mattivi, Jr., is the Sheriff of Ouray County, Colorado. He was first elected in 2002, and before that was a deputy in the Office.

145.    John Minor is the Sheriff of Summit County, Colorado. He has served in law enforcement since 1990. His service includes four months as Acting Chief of Police in Silverthorne. He has been Sheriff since 2004. If he is re-elected in 2014, term limits will bring his service to an end in January 2019.

146.    Scott Fischer is the Sheriff of Jackson County, Colorado. He has 16 years of law enforcement experience, including as State Trooper and Undersheriff.

147.    Peter Gonzalez is the Sheriff of Archuleta County, Colorado. He has 42 years of law enforcement experience, including six years as Chief of Police in Ignacio, Colorado. He will retire in January 2015, after completing eight years of service as Sheriff.

148.     Rick Besecker is the Sheriff of Gunnison County, Colorado. He has 41 years of law enforcement experience divided between the Saguache County Sheriff's Office, the Gunnison Police Department and Gunnison County Sheriff's Office.

149.     Charles "Rob" Urbach is the Sheriff of Phillips County, Colorado. He joined the Office in 2002. He previously served in the Summit County Sheriff's Office.

150.     Rod Fenske is the Sheriff of Lake County, Colorado. He has 29 years of law enforcement experience, including as Police Chief.

151.     Grayson Robinson is the Sheriff of Arapahoe County, Colorado. His law enforcement career began with the Littleton Police Department in 1972, and he became a Division Commander in 1979. In 1992, he joined the Arapahoe County Sheriff's Office. He became Undersheriff in 1995, and was elected Sheriff in 2002,

152.     David D. Campbell is the Sheriff of Baca County, Colorado.

153.     Mike Norris is the Sheriff of Saguache County, Colorado. Previously, he served as Undersheriff, and before that as a deputy.

154.     Amos Medina is the Sheriff of Costilla County, Colorado. He has 23 years of experience with the Office, and was elected in 2010.

155.     Miles Clark is the Sheriff of Crowley County, Colorado. He was first elected in 2005, and had previously served as Undersheriff.

156.     David Encinias is the Sheriff of Bent County, Colorado. He has over 29 years of experience in law enforcement.

157.     Sue Kurtz is the Sheriff of San Juan County, Colorado. She has 31 years of law enforcement experience, as Sheriff, Undersheriff, Deputy sheriff, and District Attorney investigator. She will retire at the end of her current term in January 2015.

158.     James (Jim) Casias is the Sheriff of Las Animas County, Colorado. He has 30 years of law enforcement experience, including as Undersheriff, Acting Chief of Police for the City of Trinidad, and other positions with the Las Animas Sheriff's Office and City of Trinidad Police Department.

159.     Garrett Wiggins is the Sheriff of Routt County, Colorado. He began his law enforcement career on January 1, 1986, in Florida, at age 19.  He worked for the Quincy Police Department full time for approximately 8.5 years and part-time on the reserve for approximately one year. During the past 15 years he has worked for the Steamboat Springs Police Department and for the Routt County Sheriff's Office. During five of his years with Steamboat, he was the Taskforce Commander for the All Crimes Enforcement Team as a supervisor and undercover narcotics investigator.

160.     Douglas N. Darr is the Sheriff of Adams County, Colorado.  He took office in January 2003, and will complete his service as Sheriff in January 2015.

161.     Rodney Johnson is the Sheriff of Grand County, Colorado. He has 29 years of law enforcement experience.

162.     While the individual Sheriffs do keep and bear arms pursuant to their duties as Sheriffs, the individual Sheriffs also own and use firearms and

magazines personally. Moreover, almost all of the Sheriffs' duty firearms and magazines are personally owned by the Sheriffs. Like the other plaintiffs in this case, the Sheriffs keep and bear arms for a wide variety of lawful purposes of arms ownership, all such purposes being protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 577, 620, 624, 625, 628, 630 (2008) ("lawful purpose" or "lawful purposes"); *McDonald v. Chicago*, 130 S.Ct. 3020, 3023, 3030, 3036, 3044 (2010) (same). Every Sheriff in this case is a law-abiding citizen of the United States of America. As such, every Sheriff has an individual Second Amendment right to keep and bear arms, and an individual Fourteenth Amendment right not to be subject to vague laws which chill the exercise of the Second Amendment rights. The Sheriffs, like all Plaintiffs, are injured by the infringements of their individual rights under the Second and Fourteenth Amendments. The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.

### b. Threats to Sheriffs

163.    Sheriffs have a particularly great personal need to exercise the "core" Second Amendment right of lawful self-defense, "hearth," "home" and "family." *Heller*, 554 U.S. at 573-75, 577, 615-16, 625, 628-630, 632, 634-36; *McDonald*, 130 S.Ct. at 3026-27, 3036, 3039, 3041, 3044, 3047, 3049-50. Sheriffs are often away from their home. Disgruntled or mentally ill persons sometimes come to their homes and threaten family members. Such threats to family members also materialize away from home. One reason the Sheriffs wish to personally own firearms and

magazines is to share them with or permanently give them to family members who need them for self-defense. Credible threats to the families are common, including within the last year

164.     Especially in lower-population communities, it is impossible for out-of-uniform Sheriffs or their families to blend into the background. Almost everyone knows who they are and where they live.

165.     Moreover, all of the Sheriffs know that they will eventually retire from their positions as law enforcement officers. At that time, the limited law enforcement exemption of HB 1224 will not apply to them. Yet for the rest of the lives they and their families will continue to face the danger of retaliation from the many criminals whom they have arrested, or from any other person who may bear a grudge. Their current public service in law enforcement makes their and their families' present and post-retirement needs for armed self-defense particularly acute.

166.     The Sheriffs and their families have already made substantial sacrifices for the public interest. It is in the public interest that they not be forced to face even greater risks by being disarmed from using the magazines and firearms that they have decided are the best for family protection.

167.     Additional information about threats to certain Sheriffs and their families, and the defensive firearms and magazines used by the Sheriffs and their families, is detailed in Exhibit A to this Complaint. For personal safety reasons for the Sheriffs and their families, Exhibit A has been filed separately, accompanying a

Motion for Leave to Restrict, Level 1, or in the alternative, a request for redaction. Exhibit A is excerpted from confidential portions of Defendant's depositions of six Sheriffs, in which Defendant's counsel asked the Sheriffs many personal questions about their firearms collections, hunting experience, personal history of gun use, and about personal threats against the Sheriffs and their families. *See also* Declaration of Sheriff Garrett Wiggins, paras. 2-4 (Exhibit B to Plaintiffs' Reply Brief for Preliminary Injunction (#41)).

### c.      Sheriffs' personal firearms and magazines

168.    All of the Sheriffs and their families personally own firearms. They believe that law enforcement officers and all other law-abiding citizens should fully and equally enjoy the same Second and Fourteenth Amendment rights. Exhibits A provides details about some of the firearms and magazines owned by some of the individual Sheriffs, including magazines affected by HB 1224.

169.    Except for Rick Dunlap, Jim Faull, Scott Fischer, Peter Gonzalez, and Tom Ridenour, all of the Sheriffs and their families personally own magazines for self-defense which accept more than 15 rounds. All of the Sheriffs and their families personally own magazines which accept 15 or fewer rounds. All the Sheriffs wish to be able to buy magazines of more than 15 rounds, now and in the future.

170.    Some of the firearms and magazines which the Sheriffs and their families own were purchased in part for use in law enforcement duties; others were acquired and are used purely for personal reasons.

### i.      Magazines of greater than 15 rounds

171.     All of the Sheriffs know that as they continue to age, their physical capabilities will change. They know that their reaction speeds, mobility, fine motor skills, and upper body strength will decline. As a statistical certainty, some the Sheriffs will become disabled. As detailed in the expert report of Massad Ayoob, older persons and the disabled have a particularly strong need for magazines which hold more than 15 rounds. Ayoob Report at 3-4 (Exhibit 17 to #70).

172.     All the Sheriffs wish to be able to possess, purchase, own, loan, and sell 16-round and larger magazines over the course of their entire lives, including the portions of those lives which follow retirement from law enforcement. They wish to do so based on their individual determinations that such magazines are often the best choice for lawful self-defense for themselves and their families, based on individual circumstances now and in the future.

173.     Any banned magazine which a Sheriff acquires after July 1, 2013, will instantly become criminal contraband on the day that the Sheriff retires from law enforcement. This is because the Sheriff will no longer qualify for the government employee exemption, and because grandfathering only applies to magazines which were owned before July 1, 2013. The Sheriffs wish to retain such magazines for personal use after retirement.

### ii. Sales and other transfers of firearms

174.     The Sheriffs wish to be able to sell, give, or lend handguns and long guns to persons of all races, ages, and nationalities, of both sexes (to persons who may lawfully possess such arms). The Sheriffs wish to make such sales, gifts, or

loans under conditions that are unconstitutionally prohibited or restricted by HB 1224 and HB 1229. These include lending firearms for more than a 72 hour period, and giving firearms as gifts to persons who are not immediate family members. The Sheriffs further wish to be able to sell firearms to family members and to be able to purchase firearms from family members; HB 1229's family exemption irrationally applies only to "bona fide gifts and loans," but not to sales.

175.   HB 1229's requirement that temporary transfers of firearms—which are part of the ordinary use of a firearm—be treated as if they were gun sales violates the Second Amendment.

176.   The dysfunctional system created by HB 1229 (requiring the use of a Federal Firearms Licensee [FFL], while capping the FFL's fee at $10) often makes it extremely burdensome, and sometimes impossible, for law-abiding citizens, including the Sheriffs, to consummate a private sale or a temporary transfer.

177.   The Sheriffs join in all the Claims for Relief, stated below, except that they do not claim standing for the Americans with Disabilities Act claim.

**2.   Colorado Farm Bureau**

178.   Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

179.    Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

180.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

181.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in connection with their farming or ranching operations, they do not acquire them as "natural persons."

182.    Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

183.    HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

        a.    it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

     b.     it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

     c.     even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

184.     Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

### 3.    Firearms Industry Trade Association

185.     The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

186.     As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs;

publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

187.   The NSSF's members in Colorado  provide lawful commerce in firearms to law-abiding Coloradans.  Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

### 4.   Retired Law Enforcement Officers

188.   David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

189.   Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C. § 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

190.   Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

### 5.   Disabled Citizens

191.   David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a

wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

192.    Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

193.    Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

194.    First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

195.    Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits

Mr. Harrell's mobility and  severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

196.     Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or re-position himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

197.     If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

**6.     Licensed Firearms Dealers**

198.     USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

199.    Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

200.    2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on inventory in firearms and magazines that will be rendered illegal on July 1, 2013. 2nd Amendment will suffer significant losses in its overall sales if it cannot sell firearms or magazines over 15 rounds or with removable floor plates or end caps if HB 1224 becomes effective.

201.    Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with its principal place of business in Loveland, Colorado. Jensen Arms is a retail firearms dealer in business since 1994 that serves customers throughout much of Colorado. To serve its customers, Jensen Arms has invested millions of dollars in magazines and firearms inventory that utilizes magazines that will be prohibited under HB 1224. Customers have already expressed confusion about what magazines will be legal, and Jensen Arms will suffer significant losses in sales.

202.    Green Mountain Guns is a Colorado corporation with its principal place of business in Lakewood, Colorado. Green Mountain Guns has been in business for 35 years, and will lose approximately $2 million in sales after HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

203.     Smith & Wesson has already informed Green Mountain Guns that it will no longer ship merchandise to Green Mountain Guns because of the uncertainty caused by HB 1224 and confusion about what firearms and firearm accessories will be illegal after HB 1224 goes into effect.

204.     Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

205.     Grand Prix Guns is a Colorado corporation with its principal place of business in Littleton, Colorado. Grand Prix Guns anticipates that it may suffer as much as an 80% loss in revenue if HB 1224 renders the majority of the firearms and magazines it sells illegal.

206.     Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

207.     Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of

firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

208.    The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

209.    The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

210.    In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.    Shooting Association and Shooting Ranges and Clubs

211.    The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

212.    CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime

prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

213.     Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

214.     The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

215.     CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

216.     CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

217.     CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-

created program that fosters firearms marksmanship through competitive matches and clinics.

218.    The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

219.    Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

220.    FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

221.    FSC is the largest public outdoor shooting facility on the Front Range in Colorado. The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

222.    In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard

magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

223.    Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-convertible to more than 15 rounds.

224.    Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

225.    FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

226.    Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system. The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

**8.    Firearms Accessories Manufacturer**

227.    Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and

sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

228.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

229.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

230.    For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

231.    If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions

that interpret the statute as a complete ban on magazines with a removable floor plate.

### 9.   Nonprofit Representing Disabled Outdoor Enthusiasts

232.   Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it, regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

233.    There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

234.   The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

### 10.   Nonprofit Representing Colorado's Outfitters

235.   The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services

provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

236.   The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of millions of dollars in the next few years.  Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

### 11.    Nonprofit Representing Women's Right to Self-Defense

237.   Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right.

Members of the organization use and carry magazines which would be banned under HB 1224.

### 12.   Nonprofit Representing Colorado Families and Communities

238.   Colorado Youth Outdoors ("CYO") is a nonprofit organization whose mission is to serve Colorado communities by providing families with opportunities to build healthy relationships through traditional outdoor recreation. One of the many disciplines in CYO's program is shooting sports.

239.   As part of its programming, CYO provides a curriculum for firearm safety, as well as a program to introduce families to sport shooting, including wildlife management through hunting. These programs stress the lawful, responsible and safe use of firearms.

240.   Fundraising is an extremely important aspect of CYO's ongoing mission to serve Colorado communities and families. Its most successful fundraiser each year is a weekend event involving target shooting.

241.   Because most of the participants in CYO's programs are new to shooting sports, CYO frequently loans hunting and sporting firearms to participants, sometimes for periods exceeding 72 hours. HB 1229 will render this aspect of CYO's programming illegal. Similarly, CYO loans firearms to participants at its annual fundraiser, which is held at a for-profit "dude ranch" specializing in hosting private events. HB 1229 will have a significant impact on this important fundraiser and consequently on CYO's ability to pursue its mission.

242.   CYO makes additional firearm loans to other qualified non-profits who do not have the resources to own firearms but who occasionally have special programs or events requiring the use of firearms. These loans sometimes exceed 72 hours. Loaning resources and collaboration between non-profits is critical in non-profit business operations.

243.   Constraining laws with narrowing margins for lawful use make it more difficult to find qualified board members willing to navigate through vague and uncertain firearm legislation. HB 1229 adds another burden to those in leadership roles of organizations which own firearms, which will have devastating effects on CYO's board membership.

## B.   Defendant

244.   Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.   ADDITIONAL SUPPORT FOR ALLEGATIONS

## A.   The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment

245.   The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be

unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

246.   Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

247.   The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

248.   The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and government buildings." Third, "laws imposing conditions and qualifications on the ***commercial*** sale of firearms." *Id.* at 626-27 (emphasis added).

249.   HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various

categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

250.    In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

251.    The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3044, 3050.

252.    By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

253.   The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

254.   The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

255.   Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

256.   Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United

States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

257.   The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

258.   Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

259.   In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the

Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

260.   The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training, repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

261.   The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

262.   HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

263.   Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose,

let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

264.    Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans,* 517 U.S. 620 (1996); *Lawrence v. Texas,* 539 U.S. 558 (2003).

265.    HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

266.    HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question

effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

267.   Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing *Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

268.   Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

269.   *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

270.   If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns

are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

271.    Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System, and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229, which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

## B.    The Bills Are Unconstitutionally Vague

272.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

273.    The long-established rule is that "the terms of a penal statue creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in

terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

274.    A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

275.    The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

276.    Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

277.    Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

278.    If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

279.    HB 1224 is also vague in its ban on anything "capable of accepting . . . more than fifteen rounds of ammunition. Rifle cartridges of a particular diameter have varying lengths. For example, Uberti manufactures an exact replica of the 1875 Colt Lightning pump action rifle. The tube magazine will accept 13 rounds in .357 magnum caliber. Cartridges in .38 caliber a fully usable in .357 firearm; the same Uberti rifle will also accept 18 rounds of .38 Special wadcutter ammunition. An owner of this Uberti rifle might think that he has a legal 13-round magazine; but in fact, such a rifle could be illegal under HB 1224. The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 2003.

280.    HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that

occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days. Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

281.   For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

282.   Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

## FIRST CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)

283.   Paragraphs 1 through 202 are re-alleged and incorporated herein.

284.   HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

285.   Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

286.   Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

287.   Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

288.   Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

289.   Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

290.   The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

291.    Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.

## SECOND CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")

292.    Paragraphs 1 through 211 are re-alleged and incorporated herein.

293.    In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

294.    Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

295.    Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

296.    HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

297.   Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

298.   Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

299.   The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

300.   A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

~~**THIRD CLAIM FOR RELIEF**~~

~~**(HB 12-1224 – Violation of Fourteenth Amendment Right to Due Process Based on Ambiguity of Language Regarding Magazines 15 Rounds or Smaller)**~~

301.   ~~Paragraphs 1 through 220 are re-alleged and incorporated herein.~~ [1]

_____

[1] The strikethrough of the Third Claim for Relief is in conformity with the Court's Opinion of Nov. 27, 2013, and to make it clear that this Third Amended Complaint does not attempt to revive this claim. The strikethrough is not intended to waive

302.   ~~HB 1224 is unconstitutionally vague in violation of the Fourteenth Amendment right to Due Process.~~

303.   ~~Plaintiffs cannot determine whether a magazine with a removable floor plate or end cap to facilitate maintenance and cleaning was "designed to be readily convertible" to hold more than 15 rounds. Plaintiffs cannot possibly know the intent of the designers of all the magazines for the firearms which Plaintiffs own.~~

304.   ~~Law enforcement officers, including the Plaintiff Sheriffs, likewise have no means to determine the intent of magazine designers. Enforcement of the provision will be difficult, if not impossible, and will result in differing interpretations of the meaning of HB 1224 in different jurisdictions.~~

305.   ~~Licensed firearms retailers are likewise unable to ascertain design intent, and therefore do not know which magazines can be sold without risk of criminal prosecution.~~

306.   ~~Because of the ambiguity in the language and the likelihood of inconsistent interpretation and enforcement, individuals are chilled in the exercise of their Second Amendment rights.~~

307.   ~~A statute that is so vague that a person cannot clearly determine what conduct may result in criminal prosecution, or that will result in inconsistent~~

the appealability of any issues involving the Third Claim for Relief. The Second Claim for Relief does not have strikethrough, because "the Court understands these two claims to actually be one claim challenging the constitutionality of §§ 18-12-301 et seq., as a whole, under the Second Amendment." (#96, at 3 n.3)

~~application, thereby chilling the exercise of another constitutional right, violates the~~

~~Fourteenth Amendment guarantee of Due Process of law.~~

## FOURTH CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

308.   Paragraphs 1 through 227 are re-alleged and incorporated herein.

309.   HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

310.   The term "continuous possession" is undefined.

311.   Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

312.   "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

313.   "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

314.   Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

315.   Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

316.   HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

## FIFTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

317.   Paragraphs 1 through 236 are re-alleged and incorporated herein.

318.   Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

319.   States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

320.   Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

321.   HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

322.   Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

323.   HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

324.   The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

### SIXTH CLAIM FOR RELIEF

**(HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)**

325.   Paragraphs 1 through 244 are re-alleged and incorporated herein.

326.   HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

327.   For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

328.   Similarly, many temporary transfers are limited to 72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

329.   The prohibition of non-commercial, temporary transfers is an infringement of the Second Amendment.

330.   Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

331.   In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

**RELIEF REQUESTED**

Plaintiffs pray that this Court:

A.   Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.   Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.   Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.   Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to

accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.   Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.   Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.   Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.   Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this ~~1st~~ 18th day of ~~July~~ December, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

s/Jonathan M. Anderson
Jonathan M. Anderson
Douglas L. Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO**

FARM BUREAU, WOMEN FOR CONCEALED
CARRY, AND COLORADO YOUTH OUTDOORS

s/Marc. F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS
DEALERS


s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE
SHOOTING ASSOCIATION AND HAMILTON
FAMILY ENTERPRISES, INC. D/B/A FAMILY
SHOOTING CENTER AT CHERRY CREEK
STATE PARK

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CHIEF JUDGE  MARCIA S. KRIEGER**

Courtroom Deputy:  Patricia Glover        Date:  December 19, 2013
Court Reporter:    Terri Lindblom

Civil Action No. 13-cv-01300-MSK-MJW

| *Parties*: | *Counsel Appearing:* |
|---|---|
| COLORADO OUTFITTERS ASSOCIATION; | Peter Krumholz |
| COLORADO FARM BUREAU; | |
| NATIONAL SHOOTING SPORTS FOUNDATION; | |
| MAGPUL INDUSTRIES; | Douglas Abbott |
| USA LIBERTY ARMS; | Jonathon Watson |
| OUTDOOR BUDDIES, INC.; | |
| WOMEN FOR CONCEALED CARRY; | |
| COLORADO STATE SHOOTING ASSOCIATION; | Anthony Fabian |
| HAMILTON FAMILY ENTERPRISES, INC., d/b/a | |
| FAMILY SHOOTING CENTER AT CHERRY CREEK | |
| STATE PARK; | |
| DAVID STRUMILLO; | David Kopel |
| DAVID BAYNE; | |
| DYLAN HARRELL; | |
| ROCKY MOUNTAIN SHOOTERS SUPPLY; | |
| 2ND AMENDMENT GUNSMITH & SHOOTER | |
| SUPPLY, LLC; | |
| BURRUD ARMS INC. D/B/A JENSEN ARMS; | |
| GREEN MOUNTAIN GUNS; | |
| JERRY'S OUTDOOR SPORTS; | |
| GRAND PRIX GUNS; | |
| SPECIALTY SPORTS & SUPPLY; and | |
| GOODS FOR THE WOODS; | |

         Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of
Colorado,

        Defendant.

Matthew Grove
Kathleen Spalding
Molly Moats
John Lee
Stephanie Scoville

---

### COURTROOM MINUTES

---

HEARING:   Law and Motion

**3:06 p.m.      Court in session.**

The Court addresses Motion for Joinder (**Doc. #104**)

Argument.

Statements from plaintiffs' and defendant's counsel.

**ORDER:**      Motion for Joinder (**Doc. #104**) is **GRANTED** in part and **DENIED** in part for the reasons set forth in the record.  The 11 individuals named may join the lawsuit as plaintiffs and the Complaint may be amended to add the paragraphs that specifically deal with them as recited by the Court.  No new claims may be asserted, no new attachments to the Complaint may be submitted.  The case will be framed as it currently is, subject to the ruling made with regard to the motion to dismiss.  The 11 individuals may be added to the case caption.

The Court addresses the filing of dispositive motions.

Argument.

**ORDER:**      No dispositive motions will be filed.  The Motion for Extension to file same ( **Doc. #97**)  is **DENIED.**  Ten day bench trial is set **March 31-April 11, 2014.** Trial will begin at 8:30 a.m. on March 31 and will run on all consecutive weekdays for the weeks of March 31 and April 7, 2014 to be concluded no later than April 11, 2014.  The parties are allotted 30 hours each to use however they wish for openings/closings, evidence presentation, argument.  That time will be tracked on a chess clock by the Courtroom Deputy.  The final pretrial order will be filed by **January 31, 2014**.  Joint 702 motions will be filed by **January 15, 2014**.  Final pretrial conference is set on **February 20, 2014 at 3:00 p.m.**  The parties do not need to appear at the final pretrial conference. The Fourth Amended Complaint will be filed by **December 23, 2013.**  The Answer will be filed by **January 3, 2014.**

Courtroom Minutes
Chief Judge Marcia S. Krieger
Page 3

The Court addresses Motion for Leave to Restrict Document (**Doc #105**)

**ORDER:**     Motion for Leave to Restrict Document (**Doc. #105**) is **DENIED**, but the exhibits
               will remain under restriction.

**4:07 p.m.**     **Court in recess.**

**Total Time:   1 hour 1 minute. .**
**Hearing concluded.**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;
JOHN B. COOKE;
KEN PUTNAM;
JAMES FAULL;
LARRY KUNTZ;
FRED JOBE;
DONALD KRUEGER;
STAN HILKEY;
DAVE STONG;
PETER GONZALEZ;
SUE KURTZ;
DOUGLAS N. DARR;

      Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

   Defendant.

## FOURTH AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Peaceable citizens join together to bring this action in defense of public safety, the Second and Fourteenth Amendments of the Constitution of the United States, and the Americans with Disabilities Act. Plaintiffs are retired and retiring law enforcement officers, disabled individuals, civil rights and disability rights organizations, licensed firearms dealers, associations of law-abiding gun owners, hunting outfitters, and the firearms industry, and a manufacturer of firearm accessories.

### I.   OVERVIEW

1.   On March 20, 2013, Colorado Governor John Hickenlooper signed two measures that severely restrict citizens' rights to own, use, manufacture, sell, or transfer firearms and firearms accessories.

### HB 1224

2.   House Bill 13-1224 ("HB 1224") bans outright all ammunition magazines sold or acquired after July 1, 2013, that hold more than 15 rounds of ammunition. HB 1224 also bans most other magazines of any size because it prohibits smaller magazines that are "designed to be readily converted" to hold more than 15 rounds of ammunition.

3.      The magazines for most handguns and for many rifles are detachable box magazines. The very large majority of magazines contain a removable floor plate. The removable floor plate allows the user to clear ammunition jams, clean the inside of the magazine, and perform maintenance on the internal mechanics of the magazine.

4.      The fact that a magazine floor plate can be removed inherently creates the possibility that the magazine can be extended through commercially available extension products or readily fabricated extensions. As a result, nearly every magazine can be readily converted to exceed the capacity limit set by HB 1224.

5.      Some rifles have fixed box magazines, which are permanently attached to the rifle. Many of these also have removable floor plates.

6.      Instead of a box magazine, some rifles have fixed tube magazines, which lie underneath the rifle barrel. Many tube magazines have removable end caps for cleaning to which extenders can be added. A ban on certain types of fixed magazines is necessarily a ban on the rifles to which they are fixed.

7.      The Appendix to this Complaint contains diagrams showing the parts of a detachable box magazine and a fixed tube magazine.

8.      Magazine capacity can be increased in many other ways, such as snipping the spring inside the magazine so that there is more space to accommodate additional rounds, using a coupler so that a second box magazine is attached (upside down) to the bottom of another, or simply using duct tape instead of a coupler.

9.     The chief sponsor of HB 1224 and Governor Hickenlooper have both publicly confirmed that HB 1224 bans all magazines with removable floor plates.

10.     By outlawing most box and tube magazines, HB 1224 outlaws an essential component of many common firearms. Eighty-two percent of handguns and at least one-third of rifles currently manufactured in the United States are semi-automatic, which means that most of them store their ammunition in detachable box magazines. Rifles which use box or tube magazines are not limited to semi-automatics, but also include pump action, bolt action, and lever action rifles. (HB 1224 exempts lever action guns which use tube magazines, but not lever action guns which use box magazines; the bill also exempts rimfire rifles which use tube magazines, but does not exempt such rifles that use box magazines.)

11.     Thus, the magazine ban amounts to a ban on having a functional, operating unit for most handguns and a very large fraction of rifles – a patent violation of the Second and Fourteenth Amendments under *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

12.     As detailed *infra*, HB 1224 allows the possession of grandfathered magazines only if two separate requirements are satisfied: First, they must be owned on July 1, 2013. Second, the owner must maintain "continuous possession" of the magazine.

13.     The requirement for "continuous possession" makes it impossible for firearms to be used or shared in ordinary and innocent ways, such as a gun owner loaning his or her firearm with the magazine to a spouse, family member, or friend;

entrusting it to a gunsmith for repair; a military reservist leaving firearms and their associated magazines with a spouse when he or she is called into service away from home; or even temporarily handing a firearm with its magazine to a firearms safety instructor so that the owner can be shown by the instructor how to better grip, aim, or otherwise use the firearm.

14. The requirement of "continuous possession" prohibits the grandfathered owner from ever allowing anyone to hold or use his firearm if the firearm is in a functional state (with a magazine inserted) – an extreme infringement of Second Amendment rights.

15. In *Heller*, the Supreme Court adopted a rule enforcing the Second Amendment that prohibited the banning of arms "typically possessed by law-abiding citizens for lawful purposes." The ban against all magazines holding more than 15 rounds violates this rule. Rifles with magazines larger than 15 rounds are so commonplace that many models are supplied in a *standard* 30-round configuration. Indeed, one such rifle is the AR-15 and its many variants, which has for years been one of the best-selling types of firearms in the United States and of which there are at least four million in the United States today. The number of other models of Modern Sporting Rifles is likewise in the millions, which are also often sold with magazines holding more than 15 rounds.

16. Similarly, many popular handguns are sold with magazines with 16 to 20-round capacities. Many gun owners own several magazines for each firearm. The

number of magazines in the United States which are of the size directly outlawed by HB 1224 is in the tens of millions.

17.     Disabled citizens, whose disabilities often make it difficult to change magazines quickly, are acutely harmed by HB 1224. This is a particularly grave violation of their Second Amendment rights, especially their right to self-defense in the home.

18.     HB 1224 also violates Title II of the Americans with Disabilities Act ("ADA"). Even assuming that HB 1224 is constitutional, all persons with relevant disabilities are entitled to an accommodation under the ADA so that they may possess and acquire the magazine in the sizes they need.

19.     The effect of HB 1224's various provisions is the widespread ban on functional firearms. The prohibition of so many box and tube magazines of any size, and the prohibition of magazines greater than 15 rounds, directly and gravely harm the ability of law-abiding citizens to use firearms for lawful purposes, especially self-defense.

## HB 1229

20.     House Bill 13-1229 ("HB 1229") requires "universal" background checks before any sale or transfer of a firearm can occur, with some exceptions. HB 1229, even considering the exceptions, prohibits a wide range of common temporary, or permanent transfers or loans of firearms between law-abiding citizens in violation of the Second Amendment.

21.     As a practical matter, it will be impossible for citizens to comply with HB 1229. The bill requires that when one individual sells or loans a firearm to another, that "transfer" must be conducted through a Federal Firearms Licensee ("FFL," a licensed gun dealer). The FFL is required to process the transfer as if he or she is selling a firearm out of his or her own inventory. HB 1229 allows the FFL to charge a fee of no more than $10 for conducting the transfer.

22.     Many FFLs in Colorado, including FFL Plaintiffs, are unwilling to conduct the transfer under such conditions. Accordingly, it will be extremely difficult, if not impossible, for many Coloradans to find a FFL to conduct the transfers, even if the buyer and seller are both willing and able to drive long distances to do so.

23.     To conduct the transfer pursuant to HB 1229, the FFL must complete the same paperwork as if he or she were selling from his or her own inventory. This means that for each firearm transferred, a three-page federal form (ATF Form 4473) must be filled out. Some parts of the form are filled out by the customer, and some by the FFL. FFLs are liable for errors on a Form 4473 and subject to license revocation and even federal felony charges.

24.     FFLs must monitor the transferor and transferee for as long as it takes to complete the transaction. The "instant check" which is conducted by the Colorado Bureau of Investigation often takes hours, and sometimes days, to complete.

25.     Currently, when FFLs are asked to conduct a background check for a firearm, not involving a profitable sale from the FFL's actual inventory, the fee

charged may be $50. A fee cap of $10 will likely result in very few, if any, FFLs being willing to perform the services which are necessary for transfers under HB 1229, making compliance with HB 1229 next to impossible in many private transfer situations.

26.     Moreover, setting aside the myriad problems with compliance with HB 1229, the scope of HB 1229's regulation, which impacts a vast array of innocent and lawful temporary transfers among friends and members of various hunting and shooting organizations, unconstitutionally infringes the Second Amendment rights of tens of thousands of Coloradans.

### The Supreme Court's Landmark Decisions: *Heller* and *McDonald*

27.     There are certain indisputable legal principles announced by the United States Supreme Court against which HB 1224 and HB 1229 must be judged.

28.     Under *Heller*, the Second Amendment to the United States Constitution guarantees the right of individual citizens to keep and bear commonly-used firearms for all lawful purposes.

29.     The individual right to employ commonly-used firearms for self-defense is "the central component" of the Second Amendment guarantee.

30.     An individual's Second Amendment rights, including the right to self-defense, are fundamental rights.

31.     Under *McDonald*, the rights protected by the Second Amendment apply equally to the states, including Colorado, through the Fourteenth Amendment to the United States Constitution.

32.     HB 1224 and HB 1229 violate these principles.

## II.     JURISDICTION AND VENUE

33.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and statutes of the United States.

34.     This Court has jurisdiction to grant the declaratory relief sought pursuant to 18 U.S.C. § 2201, and additional relief pursuant to 18 U.S.C. § 2202.

35.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 because this action involves a deprivation of federal constitutional rights by those acting under color of state law.

36.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## III.     PARTIES

A.     **Plaintiffs**

**1. Eleven law enforcement officers who will soon be retiring**

37.     The eleven Plaintiffs are individual citizens who are career law enforcement officers, and who will be retiring imminently. The aforesaid Plaintiffs are suing in their individual capacities as American citizens with individual rights under the Second and Fourteenth Amendments. They believe that all law-abiding citizens are entitled to the full enjoyment of such rights, regardless of whether the citizens are employed in law enforcement, and regardless of whether the citizens are employed or retired.

38.     John B. Cooke, of Weld County, has served nearly 35 years in law enforcement. He has five years of experience with the Breckenridge Police

Department, and has served 29 years and 8 months with the Weld County Sheriff's Office, including 11 as Sheriff. Because of term limits, he will complete his law enforcement career in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition. He wishes to be able to possess, purchase, own, loan, and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines. At present, he would like to loan his 30-round magazines to his son for long periods of time, but he may not do so because of HB 1224 and the Attorney General's "Technical Guidance."

39.     Ken Putnam, of Cheyenne County, has 18 years of law enforcement experience, and will retire from his service as Sheriff in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, magazines which accept 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition. He wishes to be able to possess, purchase, own, loan (short-term and long-term), donate, and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines.

40.     James Faull, of Prowers County, has 37 years of law enforcement experience—14 as Sheriff, and 23 years with a police department (15 of those in command positions). He plans on retiring at the end of his term in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of

ammunition, magazines which hold 15 rounds, and a magazine which holds more than 15 rounds. He wishes to be able to possess, purchase, own, loan (short-term and long-term), donate and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines.

41. Larry Kuntz, of Washington County, will retire in January 2015 at the completion of his third term. He has 36 years of law enforcement experience, including as a city police officer and a Sheriff's deputy. Part of the reason for his retirement is regulatory changes that he feels put citizens in jeopardy, and that endanger law enforcement officers. These changes include HB 1224's de facto prevention of law enforcement officers and citizens, including himself, from acquiring standard capacity magazines holding 16 or more rounds. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, magazines which nominally accept 15 rounds of ammunition (some of which actually accept 16), and magazines which accept more than 16 rounds or more of ammunition (including 30-round magazines). He wishes to be able to possess, purchase, own, loan, donate and sell 15 round, 16-round and larger magazines, now and after retirement. Upon retirement, he would like to lend his magazines in all sizes to his two sons as well as to his brother-in law who will be ranching with him. Mr. Kuntz also wishes to be able to manufacture magazines of more than 15 rounds by adding extenders to smaller magazines.

42.     Fred Jobe, of Custer County, has 39 years of law enforcement experience, including 28 as Sheriff. He plans to retire at the end of his current term, in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition (including 30 round magazines). He wishes to be able to possess, purchase, own, loan, donate and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines. He would like to loan to his son for long periods of time some of his magazines which hold more than 15 rounds, but he may not do so because of HB 1224 and the Attorney General's "Technical Guidance."

43.     Donald Krueger, of Clear Creek County, has 25 years of full-time law enforcement experience, plus 14 years as a reserve officer. He has been Sheriff for 19 years and will retire at the end of his term in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, magazines which accept 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition. He wishes to be able to possess, purchase, own, loan, donate and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines. He would like to loan his 17-round magazines to his son-in-law for long periods of time after he retires in January 2015, but may not do so because of HB 1224 and the Attorney General's "Technical Guidance."

44.     Stan Hilkey, of Mesa County, has 27 years of law enforcement experience. He is term-limited, and his final term ends in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition (including 30-round magazines). He wishes to be able to possess, purchase, own, loan (short-term and long-term), donate and sell 15-round, 16-round and larger magazines, now and after retirement.

45.     Dave Stong, of Alamosa County, has 40 years of law enforcement experience, 20 of them as Sheriff. He will retire in January 2015. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition (including 30-round magazines). He wishes to be able to possess, purchase, own, loan (short-term and long-term), donate and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines. At present, he would make long term loans of his magazines but is prevented from doing so by HB 1224 and the Attorney General's "Technical Guidance."

46.     Peter Gonzalez, of Archuleta County, has 42 years of law enforcement experience, including six years as Chief of Police in Ignacio, Colorado. He will retire in January 2015, after completing eight years of service as Sheriff. He personally owns firearms, magazines which accept fewer than 15 rounds of ammunition, and magazines which accept more than 15 rounds. He wishes to be

able to possess, purchase, own, loan (short-term and long-term), donate and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines.

47.     Sue Kurtz, of San Juan County, has 31 years of law enforcement experience, as Sheriff, Undersheriff, Deputy Sheriff, and District Attorney Investigator. She will retire at the end of her current term in January 2015. She personally own firearms, magazines which accept fewer than 15 rounds of ammunition, magazines which accept 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition. She wishes to be able to possess, purchase, own, donate and sell 15-round, 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines.

48.     Douglas N. Darr, of Adams County, took office in January 2003, and will retire from his service as Sheriff in January 2015. He personally own firearms, magazines which accept fewer than 15 rounds of ammunition, magazines which accept 15 rounds of ammunition, and magazines which accept more than 15 rounds of ammunition. He wishes to be able to possess, purchase, own, loan (short-term and long-term), donate and sell 16-round and larger magazines, now and after retirement. He also wishes to be able to manufacture such magazines by adding extenders to smaller magazines.

## 2.    Colorado Farm Bureau

49.    Colorado Farm Bureau is a Colorado nonprofit corporation. It was founded in 1919 by a group of Colorado farmers, ranchers, veterinarians, rural doctors, shopkeepers and tradesmen. The Farm Bureau's mission includes enhancing Colorado's agricultural industry; promoting, protecting, and representing the interests of farmers, ranchers, and their communities; and protecting individual freedom and opportunity.

50.    Colorado Farm Bureau's membership now comprises 23,000 Coloradans, including Colorado farmers, ranchers, and other Colorado families and residents who have an interest in maintaining a strong agricultural industry in this State and in promoting and advancing the interests of Colorado farmers and ranchers.

51.    Section (1)(b) of HB 1229 requires that if a transferee of a firearm is not a natural person, "then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check . . . before taking possession of the firearm."

52.    The vast majority of Colorado farms, including family farms, operate as incorporated businesses. Thus, when most Colorado farmers acquire firearms in connection with their farming or ranching operations, they do not acquire them as "natural persons."

Appellate Case: 14-1290   Document: 01019371748   Date Filed: 01/16/2015   Page: 130

53.     Colorado farmers and ranchers often operate their businesses in rural and remote areas of the State. Firearms are a necessity for farming and ranching for protecting crops and livestock, as well as for self-defense.

54.     HB 1229 places substantial burdens on the Second Amendment rights of Colorado farmers and ranchers because:

a.      it will often be very difficult to identify each and every natural person associated with the farm or ranch who may possess the firearm;

b.      it will be very difficult to find FFLs able and willing to perform the necessary checks in many, if not most, of the rural areas in which farms and ranches are located;

c.      even when FFLs are available, able, and willing to perform the necessary checks, paying a fee for each check for each natural person who may possess a firearm places a significant financial burden on the farm or ranch acquiring the firearm.

55.     Setting aside problems with initial acquisitions of firearms, HB 1229 places an enormous burden on farmers and ranchers to police firearm possession as time passes. If farms or ranches do not routinely "audit" new farm and ranch hands, they face significant criminal exposure (and being prohibited from owning any firearm for at least two years) if a new hand obtains possession without a check being performed first, as well as joint and several civil liability if an accident or misuse involving the firearm occurs.

### 3.  Firearms Industry Trade Association

56.  The National Shooting Sports Foundation ("NSSF") is a national trade association for the firearms, ammunition, and hunting and shooting sports industry based in Newtown, Connecticut.

57.  As a non-profit, tax-exempt corporation, NSSF has a membership of over 9,500 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers and individuals.  More than 300 of these members reside and conduct business in Colorado.

58.  The NSSF's members in Colorado provide lawful commerce in firearms to law-abiding Coloradans.   Each of these members' business interests and livelihoods will be adversely and unconstitutionally affected by HB 1224 and HB 1229.

### 4.  Retired Law Enforcement Officers

59.  David Strumillo resides in Colorado Springs, Colorado, and is a citizen of the United States. Mr. Strumillo served as a police officer in the Parker, Colorado Police Department from 1994 through 1999, when he was medically retired following an injury in the line of duty.

60.  Mr. Strumillo is authorized to carry a concealed firearm in all states and U.S. territories pursuant to the Law Enforcement Officers Safety Act, 18 U.S.C.

§ 926B, 926C. In order to comply with federal law, Mr. Strumillo is required to re-qualify each year using the firearms he carries.

61.     Mr. Strumillo also carries firearms for his personal safety to respond to threats made against himself and his family. The firearms Mr. Strumillo carries use magazines larger than 15 rounds. The members of the Plaintiff Associations also include retired law enforcement officers.

**5.     Disabled Citizens**

62.     David Bayne is a resident of Thornton, Colorado, and a citizen of the United States. Mr. Bayne is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms, several of which accept magazines capable of holding more than 15 rounds. Mr. Bayne uses these firearms for target shooting, shooting competitions, and the defense of his home.

63.     Dylan Harrell is a resident of Frederick, Colorado, and a citizen of the United States. Mr. Harrell is paralyzed from the chest down and confined to a wheelchair. He holds a concealed carry permit issued by the Adams County Sheriff's Office, which is valid in the State of Colorado. He owns several firearms which will accept magazines capable of holding more than 15 rounds. He uses these firearms for hunting, target shooting, and defense of his home.

64.     Messrs. Bayne and Harrell ("the Disabled Plaintiffs") are deprived of their fundamental right of self-defense in multiple ways.

65.     First, because firearms that use magazines larger than 15 rounds and those with removable floor plates or end caps are in common use, their Second Amendment right to self-defense pursuant to *Heller* is violated regardless of any disability because they may be unable to purchase replacement magazines of any size, and particularly of the standard 30-round size, which are essential to a disabled person.

66.     Second, disabilities make it difficult to quickly change magazines under the stress of a home invasion. For example, Plaintiff Dylan Harrell is wheelchair bound and has two small children in his home. The wheelchair limits Mr. Harrell's mobility and severely restricts his ability to quickly place himself in the best position to repel a home invasion, as well as his ability to place himself behind barriers or use objects in his home as a means to steady his firearm. Thus, he is even more dependent on immediate firearms defense than able-bodied people, who might be able to flee the house or buy time by running to another room. The limits on Mr. Harrell's ability to quickly re-position himself also severely limit his ability to retreat quickly and effectively in order to allow him the time necessary to change magazines. Eliminating his ability to use magazines with a capacity larger than 15 rounds has a corresponding impact on his ability to exercise his constitutional right to defend himself, his home, and his children.

67.     Like Mr. Harrell, Plaintiff David Bayne is confined to a wheelchair and faces the same challenges. Mr. Bayne has limited ability to retreat or re-

position himself effectively or safely during a home invasion in order to most effectively aim and discharge his firearm, or to safely change magazines.

68.     If the ban on smaller magazines that can be readily converted is not a total prohibition, but applies only after a determination of the intent of the designer, the Disabled Plaintiffs have no ability to resolve that ambiguity and cannot discern what magazines are allowed and what magazines may subject them to criminal penalties.

### 6.     Licensed Firearms Dealers

69.     USA Liberty Arms is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

70.     Rocky Mountain Shooters Supply is a Colorado corporation with its principal place of business in Fort Collins, Colorado.

71.     2nd Amendment Gunsmith & Shooter Supply, LLC ("2nd Amendment"), is a Colorado corporation with its principal place of business in Loveland, Colorado. 2nd Amendment has expended significant resources on inventory in firearms and magazines that will be rendered illegal on July 1, 2013. 2nd Amendment will suffer significant losses in its overall sales if it cannot sell firearms or magazines over 15 rounds or with removable floor plates or end caps if HB 1224 becomes effective.

72.     Burrud Arms Inc. d/b/a Jensen Arms is a Colorado corporation with its principal place of business in Loveland, Colorado. Jensen Arms is a retail firearms dealer in business since 1994 that serves customers throughout much of

Colorado. To serve its customers, Jensen Arms has invested millions of dollars in magazines and firearms inventory that utilizes magazines that will be prohibited under HB 1224. Customers have already expressed confusion about what magazines will be legal, and Jensen Arms will suffer significant losses in sales.

73.     Green Mountain Guns is a Colorado corporation with its principal place of business in Lakewood, Colorado. Green Mountain Guns has been in business for 35 years, and will lose approximately $2 million in sales after HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

74.     Smith & Wesson has already informed Green Mountain Guns that it will no longer ship merchandise to Green Mountain Guns because of the uncertainty caused by HB 1224 and confusion about what firearms and firearm accessories will be illegal after HB 1224 goes into effect.

75.     Jerry's Outdoor Sports is a Colorado corporation with its principal place of business in Grand Junction, Colorado. Jerry's Outdoor Sports has been in business for 28 years, and will lose the majority of its sales if HB 1224 becomes effective because the majority of firearms and magazines that it sells will be rendered illegal on July 1, 2013, including many smaller magazines that have removable floor plates or end caps.

76.     Specialty Sports & Supply is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Specialty Sports & Supply

anticipates that it will lose more than $1 million annually in firearms sales. The store currently has 4,000 to 5,000 magazines in stock which it will not be able to sell after July 1, 2013, and it will be unable to order and sell additional supplies.

77.     Goods for the Woods is a Colorado corporation with its principal place of business in Durango, Colorado. Goods for the Woods has a current inventory of firearms and magazines that will be rendered illegal as of July 1, 2013, and it will also be unable to sell existing and future orders, significantly reducing revenue.

78.     The Plaintiff firearms dealers have invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds and in magazines of all sizes with removable floor plates and end caps. That investment will be lost without compensation if that inventory cannot be sold. In some cases, the continued existence of the business may be threatened.

79.     The licensed dealers face the same conundrum as all Plaintiffs if they are forced to guess at the unknown intent of designers of smaller magazines, and are subject to the whims of local law enforcement as they try to enforce an ambiguous statute.

80.     In addition, in light of the fee caps described in Paragraph 21 above, each of the Licensed Firearms Dealers will be unwilling or financially unable to provide the services necessary for transfers under HB 1229, making compliance with HB 1229 impossible in many private transfer situations.

### 7.  Shooting Association and Shooting Ranges and Clubs

81.    The Colorado State Shooting Association ("CSSA") is the oldest statewide shooting and firearms organization in Colorado, established in 1926.

82.    CSSA has nearly 1,500 individual dues-paying members, and over 20 business and club members that collectively add more than 20,000 associated members. These members include hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention advocates, firearms and equipment dealers and wholesalers, and people interested in preserving Second Amendment rights. The membership includes many who have physical disabilities.

83.    Many CSSA members own and use firearms with a capacity exceeding 15 rounds, and many of the CSSA sanctioned events require the use of such firearms. Many CSSA members also own magazines (and associated firearms) with removable floor plates or end caps.

84.    The CSSA provides shooting opportunities for law-abiding Colorado residents by uniting shooters, hunters, sportsmen and collectors, as well as all other types of law-abiding firearms enthusiasts, to promote the safe and responsible use of firearms.

85.    CSSA promotes the development of shooting sports and related facilities and speaks on behalf of its membership to defend shooting sports, hunting rights, and firearms ownership.

86.     CSSA also promotes and organizes firearms safety programs and hunter safety education, supports the training of NRA-certified firearms instructors, and organizes and supports state regional competitive matches.

87.     CSSA is the official NRA-delegated sanctioning body for all state and regional competitive firearms matches in Colorado, and CSSA membership is required for Colorado shooters to participate in any such matches. CSSA is also the official state association for the Civilian Marksmanship Program, a congressionally-created program that fosters firearms marksmanship through competitive matches and clinics.

88.     The members of the Colorado State Shooting Association engage in every form of lawful activity with firearms and magazines, including each and every activity mentioned in this Complaint.

89.     Hamilton Family Enterprises, Inc. d/b/a Family Shooting Center at Cherry Creek State Park ("FSC") is a Colorado corporation that is designated as the Cherry Creek State Park concessionaire for operating recreational shooting facilities located at the Cherry Creek State Park in Arapahoe County, Colorado.

90.     FSC is a multi-discipline shooting facility covering approximately 120 acres of Cherry Creek State Park and includes a rifle range, a pistol range, a law-enforcement range, a sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range. FSC is currently adding a "move-and-shoot" pistol range which will double the number of pistol shooting positions available to the public.

91.     FSC is the largest public outdoor shooting facility on the Front Range in Colorado. The usage of these facilities has increased each year since FSC began concession operations in 2004, and over 64,000 shooters used the facilities at FSC in 2012.

92.     In addition to the operation, supervision and maintenance of the shooting facilities at Cherry Creek State Park, FSC also makes available for use by qualified members of the public firearms that are equipped with standard magazines having capacities of more than 15 rounds or are equipped with smaller magazines that are readily convertible to more than 15 rounds.

93.     Moreover, FSC sells firearms equipment and accessories, which include magazines with capacities exceeding 15 rounds or are otherwise readily-convertible to more than 15 rounds.

94.     Approximately fifty percent of FSC's gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition.

95.     FSC's patrons have already expressed concerns over the impact that HB 1224 and HB 1229 will have on their ability to legally utilize FSC's facilities or purchase goods and equipment from FSC, and many have signified their intent that they will not return to FSC after July 1, 2013 for fear of running afoul of the new laws. Thus, both proposed laws have already adversely impacted FSC's business and income and will continue to do so in the future.

96.     Approximately six percent of all of FSC's revenue, not including Colorado sales taxes, are remitted to the State and Colorado's state park system.

The significant and inevitable decline in revenue that will result from the implementation of HB 1224 and HB 1229 will significantly impact the already handicapped budget of Colorado's state park system.

### 8.    Firearms Accessories Manufacturer

97.    Plaintiff Magpul Industries is a Colorado corporation founded in 1999 with its principal place of business in Erie, Colorado. Magpul manufactures and sells a wide variety of firearms accessories, including firearm magazines in a variety of sizes.

98.    Magpul has approximately 200 employees in Colorado, and approximately 90% of its magazine suppliers are located in Colorado. Magpul will be unable to distribute magazines with capacities more than 15 rounds to its network of Colorado retailers and faces uncertainly as to whether it can continue to distribute any magazines to Colorado retailers based on the vague provisions of HB 1224.

99.    Magpul manufactures magazines in 10, 20, and 30 round sizes for sale to the public. Magpul has existing commitments to sell magazines through its distribution network to retailers in Colorado. Magpul may have to modify those commitments for magazines larger than 15 rounds, and lose the value of those sales.

100.    For magazines smaller than 15 rounds, Magpul faces the same uncertainty as all of the Plaintiffs in determining which, if any, magazines with a removable floor plate can be sold. If all smaller magazines with removable floor

plates are banned by HB 1224, then Magpul effectively cannot sell any magazines in Colorado.

101. If the prohibition of smaller magazines is resolved only by law enforcement's interpretation of each designer's intent, Magpul cannot predict how each of the Colorado law enforcement jurisdictions will resolve the ambiguity in the statute, and faces the uncertain prospect of criminal prosecution in jurisdictions that interpret the statute as a complete ban on magazines with a removable floor plate.

**9.     Nonprofit Representing Disabled Outdoor Enthusiasts**

102. Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it, regardless of race, creed, religion, or sex, and with no fees to the participant. Outdoor experiences provided through Outdoor Buddies include hunting, target shooting, fishing, boating, camping, and education in the use of the outdoors for recreational activities.

103. There are approximately 760 individual members of Outdoor Buddies. Approximately two-thirds of the membership is composed of mobility-disabled members of the community who need special assistance to experience the outdoors. Approximately one-third of the membership is composed of able-bodied members of the community who serve as volunteers. The membership includes many wounded

warriors and other disabled veterans from World War II through the most recent military conflicts in Iraq and Afghanistan.

104.    The Disabled Plaintiffs, David Bayne and Dylan Harrell, are members of Outdoor Buddies.

### 10.    Nonprofit Representing Colorado's Outfitters

105.    The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and camping outfitters and guides based in Colorado. Colorado's outfitters are registered, bonded, and insured to operate in Colorado and have permits to operate on public lands. The Association represents Colorado's outfitters in a wide range of policy areas affecting Colorado outfitters and their clients.

106.    The chilling effect of the potential legal perils for non-resident hunters caused by HB 1224 and 1229 has led many non-resident hunters to shun Colorado, which will cost the outfitters, local businesses which cater to hunters (e.g., restaurants and stores), the State, and various local taxing jurisdictions tens of millions of dollars in the next few years.  Moreover, HB 1229's requirements for background checks for transfers could significantly impact the ability of outfitters and their clients to share weapons in the field given the narrowness of HB 1229's exceptions and the unavailability of FFL's to perform the necessary background checks.

### 11.   Nonprofit Representing Women's Right to Self-Defense

107.   Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224.

### 12.   Nonprofit Representing Colorado Families and Communities

108.   Colorado Youth Outdoors ("CYO") is a nonprofit organization whose mission is to serve Colorado communities by providing families with opportunities to build healthy relationships through traditional outdoor recreation. One of the many disciplines in CYO's program is shooting sports.

109.   As part of its programming, CYO provides a curriculum for firearm safety, as well as a program to introduce families to sport shooting, including wildlife management through hunting. These programs stress the lawful, responsible and safe use of firearms.

110.   Fundraising is an extremely important aspect of CYO's ongoing mission to serve Colorado communities and families. Its most successful fundraiser each year is a weekend event involving target shooting.

111.   Because most of the participants in CYO's programs are new to shooting sports, CYO frequently loans hunting and sporting firearms to

participants, sometimes for periods exceeding 72 hours. HB 1229 will render this aspect of CYO's programming illegal. Similarly, CYO loans firearms to participants at its annual fundraiser, which is held at a for-profit "dude ranch" specializing in hosting private events. HB 1229 will have a significant impact on this important fundraiser and consequently on CYO's ability to pursue its mission.

112.    CYO makes additional firearm loans to other qualified non-profits who do not have the resources to own firearms but who occasionally have special programs or events requiring the use of firearms. These loans sometimes exceed 72 hours. Loaning resources and collaboration between non-profits is critical in non-profit business operations.

113.    Constraining laws with narrowing margins for lawful use make it more difficult to find qualified board members willing to navigate through vague and uncertain firearm legislation. HB 1229 adds another burden to those in leadership roles of organizations which own firearms, which will have devastating effects on CYO's board membership.

**B.    Defendant**

114.    Defendant John Hickenlooper is the Governor of the State of Colorado, and is required to ensure that all laws of the state are faithfully executed. COLO. CONST. art. IV § 2. As Colorado's Chief Executive, Governor Hickenlooper is the proper defendant to actions to enjoin or invalidate a state statute. *Developmental Pathways v. Ritter,* 178 P.3d 524, 529 (Colo. 2008).

## IV.   ADDITIONAL SUPPORT FOR ALLEGATIONS

**A.   The Restrictions on Firearms Use in the Bills Is Greater Than That Already Determined to Violate the Second Amendment**

115.   The effects of these bills on commonly-used firearms are far more overreaching than laws in other locations that have already been determined to be unconstitutional. In *District of Columbia v. Heller,* the Supreme Court addressed a prohibition on the possession of handguns in the District of Columbia.

116.   Significantly for this case, the *Heller* Court concluded that the "inherent right of self-defense has been central to the Second Amendment right." 554 U.S. at 628.

117.   The individual right to keep and bear arms and to use those arms for self-defense extends to all firearms that are "in common use at the time." *Id.* at 627. The Court emphasized that the Second Amendment does protect firearms which are "typically possessed by law-abiding citizens for lawful purposes." Firearms which do not meet this standard may be banned if they are "dangerous and unusual weapons." The paradigmatic examples of the latter category are sawed-off shotguns and machine guns. *Id.* at 625, 627.

118.   The Court noted that like all constitutional rights, the Second Amendment is not absolute in every respect. The Court described three particular types of gun controls as "presumptively constitutional": First, the long-standing prohibitions against possession of firearms by felons and the mentally ill. Second, laws forbidding the carrying of firearms in "sensitive places such as schools and

government buildings." Third, "laws imposing conditions and qualifications on the **commercial** sale of firearms." *Id.* at 626-27 (emphasis added).

119.   HB 1224 and 1229 do not fit within any of the "presumptively constitutional" gun control categories described by the *Heller* Court. The bills do not amend Colorado's long-standing laws forbidding gun possession by various categories of persons who have proven themselves to be dangerous. They do not affect the carrying of guns in "sensitive places." They do not set "conditions or qualifications" on the "commercial sale" of arms. HB 1229 applies only to non-commercial transfers, and to short term-transfers which do not involve any type of sale.

120.   In *McDonald v. Chicago*, the Supreme Court addressed a ban similar to that in *Heller* that was in place in Chicago and the suburb of Oak Park. The *McDonald* Court held that the Second Amendment right enunciated in *Heller* applies with equal force to the States through the Fourteenth Amendment.

121.   The *McDonald* Court reiterated that the right to self-defense is "deeply rooted in this nation's history and tradition," and that the "ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3036, 3042. The *McDonald* Court reiterated the holding in *Heller* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and held that "the Fourteenth

Amendment incorporates the Second Amendment right recognized in *Heller.*" *Id.* at 3044, 3050.

122.   By outlawing the larger and smaller magazines which are necessary components of the large majority of handguns and of a very large number of rifles, HB 1224 is a gun ban even more sweeping than the handgun-only ban which was ruled unconstitutional in *Heller*.

123.   The *Heller* Court pointed out that the D.C. handgun ban was "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self-defense. 554 U.S. at 628. The prohibition was so facially unconstitutional that the *Heller* Court found it unnecessary to use the traditional three-tiered system of scrutiny. Responding to Justice Breyer's attempt to apply a balancing test to the D.C. ban, the *Heller* Court stated that the handgun ban failed "any of the standards of scrutiny the Court has applied to enumerated constitutional rights." 554 U.S. at 571. Thus, the handgun ban would have failed both strict scrutiny and intermediate scrutiny, and the result was so obvious that the *Heller* Court did not need to discuss the prongs of the two tests.

124.   The HB 1224 ban on most handguns and many rifles (accomplished by banning the large majority of magazines) is thus even more obviously unconstitutional.

125.   Magazines of 16-20 rounds for handguns, and 16-30 rounds for rifles, easily satisfy the "common use" and "typically possessed" standards in *Heller*. Under *Heller*, their prohibition is thus *per se* unconstitutional. The Constitution is

clear, and the balancing has already been done by the enactment of the Second and Fourteenth Amendments themselves. Firearms and accessories which are typically owned by law-abiding citizens for lawful purposes may not be prohibited.

126.    Even if it were proper to apply strict or intermediate scrutiny (which it is not), the fact that a handgun ban cannot even pass intermediate scrutiny resolves the instant case. Handguns are used in the majority of homicides in the United States, and in over two hundred thousand violent crimes annually. The number of crimes (including multiple victim homicides) in which handguns are used dwarfs the number of such crimes involving magazines that hold more than 15 rounds. Because a handgun ban cannot survive intermediate scrutiny, the HB 1224 magazine ban cannot survive strict scrutiny.

127.    The banned magazines and associated firearms are also lawful in Colorado for hunting. While many states specify no magazine limitations for hunting, Colorado is among the group that has some limitations. These are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds – otherwise, no limit.

128.    Regardless of limits while in the field, hunters at their hunting camp in isolated areas, or who are driving to or from a hunting trip, may wish to have a fully functioning defensive firearm with a fully loaded magazine. This defensive arm might be their hunting gun, or it might be another firearm.

129. In certain types of big game hunting (e.g., elk or deer) it would be rare for a hunter to get more than two shots at an animal. In other types of hunting (e.g., prairie dogs or a pack of coyotes) a significant number of consecutive shots at different animals in a group would be common. When Colorado hunters take their guns and magazines to go hunting in other states (as many Plaintiffs do, especially the members of the Colorado Outfitters Association and the members of the Colorado State Shooting Association), hunters may fire a significant number of quick shots at game such as wild boars, which are notoriously hardy and ferocious. Even the big game hunter who only plans one or two shots for the trophy deer may want a firearm with larger capacity in case of attack by bears, mountain lions, other large predators, or criminals.

130. The requirement of "continuous possession" for grandfathered magazines prevents owners of affected firearms from engaging in safety training, repair, temporary loans for sporting purposes, and temporary loans for lawful self-defense. This self-defense prohibition flatly contradicts *Heller* and *McDonald*.

131. The ban on repair and the crippling of defensive instruction violates *McDonald*, which quoted with approval the Tennessee case of *Andrews v. State*, 50 Tenn. 165 (1871), which in turn affirmed that the right to keep and bear arms includes the right to have firearms repaired and to practice their safe use. A law which impedes safe instruction and practice in the use of firearms (as HB 1224 and HB 1229 do) is subject to a heightened level of scrutiny which the Defendant cannot meet in this case. *See Ezell v. Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (enjoining

municipal ban on gun ranges, the use of which are ancillary to the exercise of core Second Amendment rights).

132.   HB 1224 is facially unconstitutional as a ban on common arms and accessories and as a ban on temporary transfers for self-defense.

133.   Putting aside the facial unconstitutionality, if heightened scrutiny were to be applied, HB 1224 does not serve any legitimate governmental purpose, let alone the "important" or "compelling" purpose which is necessary under heightened scrutiny. To the contrary, the chief House sponsor and the chief Senate sponsor of HB 1224 both stated, repeatedly, that the "only" purpose of magazines of more than 15 rounds was to kill a large number of people quickly. The fact that tens of millions of such magazines are owned by peaceable citizens – and that such magazines are chosen by many of the Plaintiff Sheriffs and their Deputies for saving lives and for the lawful defense of self and others – demonstrates beyond any doubt the falsity of the sponsors' assertions.

134.   Based on the statements of the sponsors themselves, HB 1224 is the product of animus – the invidious prejudice that is the quintessence of an *illegitimate* purpose. *Romer v. Evans,* 517 U.S. 620 (1996); *Lawrence v. Texas,* 539 U.S. 558 (2003).

135.   HB 1224's ban on the very magazines which a vast number of Sheriffs, other law enforcement, and law-abiding citizens choose as the best tools for the lawful defense of self and others substantially harms public safety. The ban is

therefore the opposite of a "necessary" or "substantial" relation to enhancing public safety.

136.    HB 1229 is unconstitutionally overbroad. The 1971 Colorado Supreme Court case *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972), addressed a similarly sweeping gun control ordinance. Citing United States Supreme Court precedent, the *Pillow* Court held that a law is unconstitutional if there are "activities . . . entirely free of any criminal culpability yet the ordinance in question effectively includes them within its prohibitions." 501 P.2d at 745 (citing *Shuttlesworth v. Birmingham*, 382 U.S. 87 (1965); *Winters v. New York*, 333 U.S. 507 (1948)).

137.    Under *Pillow*: "A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id.* at 745 (citing *Zwickler v. Koota*, 389 U.S. 241 (1967); *Aptheker v. Secretary of State*, 378 U.S. 500 (1963); *NAACP v. Alabama*, 377 U.S. 288 (1964)).

138.    Moreover: "Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* (citing *Aptheker*, 378 U.S. 500; *Shelton v. Tucker*, 364 U.S. 479 (1960)).

139.    *Pillow* has been followed by several other courts, including in cases analyzing excessively intrusive gun control statutes. *E.g.*, *Benjamin v. Bailey*, 662

A.2d 1226, 1234 (Conn. 1995); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988).

140.    If strict or intermediate scrutiny are applicable, Defendant must prove that HB 1224 and 1229 are "necessary" or have a "substantial" relation to a "compelling" or "important" government purpose. HB 1229, which in practice may be nearly impossible to comply with, has no necessary or substantial relation to anything. It bans temporary transfers for replacement guns for people whose guns are being repaired for a week at the gunsmith, for hunters who go on a trip of more than 72 hours, for some persons who are being instructed in gun safety, and for some other persons who temporarily need guns for self-defense. This ban harms public safety rather than furthering it.

141.    Sections 2-7 of HB 1229 contain various provisions for providing existing data to the FBI's National Instant Criminal Background Check System, and revisions of related laws. Section 2-7 is severable from Section 1 of HB 1229, which discusses private temporary transfers and private sales. Section 1 is void *in toto*. To be even arguably constitutional, Section 1 of HB 1229 would have to contain temporary transfer exceptions which were deliberately excluded from the bill and would also have to set up a functional system of background checks for private sales which private individuals could reasonably use. Such language might be created by the legislature, but cannot be created by a court. A law covering the same subject as Section 1 of HB 1229 might be constitutional in some applications, but Section 1 of HB 1229 as written is unconstitutional.

## B.   The Bills Are Unconstitutionally Vague

142.   The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties.

143.   The long-established rule is that "the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement . . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). What conduct is lawful cannot be left to conjecture. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393.

144.   A statute is also unconstitutionally vague if it may result in arbitrary enforcement based on the personal predilections of individual law enforcement officers or jurisdictions. Vague statutes are subject to particularly rigorous scrutiny when they impact the exercise of constitutional rights.

145.   The "continuous possession" and "designed to be readily convertible" provisions of HB 1224 are both vague, and both severable.

146.   Any contention that HB 1224's ban on all magazines "designed to be readily converted" somehow does not prohibit smaller magazines with a removable floor plate or end cap only highlights the defects in the bill. HB 1224 provides no

definition of "readily converted," and the fact is that the large majority of magazines can be converted to hold more than 15 rounds.

147.   Conversions to magazines using aftermarket extenders are particularly easy to accomplish. Ordinary gun owners cannot be expected to monitor the vast world of aftermarket products in order to know whether an extender is currently commercially available for their magazines.

148.   If the "designed to be readily converted" language does not mean what the sponsor and the Governor said it did (a ban on all magazines with removable floor plates), the language is unconstitutionally vague. If the ban is somehow limited by the intent behind how the magazine was "designed," then HB 1224 is unconstitutionally vague because citizens have no means to discern how a product was designed. Neither gun owners nor licensed firearms dealers nor law enforcement officers have a clear guide as to which small magazines are legal and which are not, and local law enforcement interpretations will inevitably vary.

149.   HB 1224 is also vague in its ban on anything "capable of accepting . . . more than fifteen rounds of ammunition. Rifle cartridges of a particular diameter have varying lengths. For example, Uberti manufactures an exact replica of the 1875 Colt Lightning pump action rifle. The tube magazine will accept 13 rounds in .357 magnum caliber. Cartridges in .38 caliber a fully usable in .357 firearm; the same Uberti rifle will also accept 18 rounds of .38 Special wadcutter ammunition. An owner of this Uberti rifle might think that he has a legal 13-round magazine; but in fact, such a rifle could be illegal under HB 1224. The ordinary gun owner

plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 2003.

150.   HB 1224's unconstitutional requirement that a grandfathered magazine be in "continuous possession" of the owner mirrors similar language in HB 1229. Both bills had the same House of Representatives sponsor. HB 1229 exempts from the background check requirement "(g) any temporary transfer that occurs while in the continuous presence of the owner of the firearm." Obviously, this means that the owner of the firearm must be present at all times in the exact place where the transferee is holding the gun. The requirement of "continuous presence" would obviously not be satisfied if the owner left for half an hour or for a few days. Accordingly, "continuous possession" is likewise broken if it is interrupted for half an hour or for a few days.

151.   For the reasons stated in paragraphs 13-14, this is a direct violation of the Second Amendment. If any argument is offered that "continuous possession" means something else, the argument demonstrates that "continuous possession" is void for vagueness.

152.   Governor Hickenlooper, when signing HB 1224 and 1229, promised that "guidance" would be created for their implementation. Such "guidance" is not legally binding on all state and local law enforcement officers and prosecutors throughout Colorado. Nor can there be any assurance that "guidance" which is written in one year will not be changed in a future year. To the extent that the guidance suggests that law enforcement refrain from enforcing the actual statutory

language of HB 1224 and 1229 in certain situations, the guidance would amount to an admission that the actual text of those bills is an unconstitutional infringement of Second or Fourteenth Amendment rights.

## FIRST CLAIM FOR RELIEF

### (HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines Larger Than 15 Rounds)

153.   Paragraphs 1 through 152 are re-alleged and incorporated herein.

154.   This claim is brought by all Plaintiffs.

155.   HB 1224 was signed by Governor Hickenlooper on March 20, 2013. It explicitly prohibits all magazines with a capacity of larger than 15 rounds that are bought, sold or transferred after July 1, 2013.

156.   Many common and popular firearms come standard with magazines with a capacity larger than 15 rounds.

157.   Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the "central component" of Plaintiffs' Second Amendment rights.

158.   Disabled persons, including the Disabled Plaintiffs, are at a particular disadvantage in exercising their right of self-defense because their physical infirmities or confinement to a wheelchair means they can less effectively defend themselves or their families with fewer available rounds of ammunition, and are unable to quickly and safely change magazines.

159.   Firearms with magazines larger than 15 rounds are commonly used for other lawful purposes, including sport shooting and target shooting.

160.   Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged.

161.   The Plaintiffs Federal Firearm Licensees and Magpul will be unable to sell many popular magazines or sell firearms in their standard configuration as supplied by the manufacturers.

162.   Prohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*, and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald*.


### SECOND CLAIM FOR RELIEF

**(HB 13-1224 – Violation of Second and Fourteenth Amendments Based on Prohibition of Magazines "Designed to Be Readily Converted")**

163.   Paragraphs 1 through 162 are re-alleged and incorporated herein.

164.   This claim is brought by all Plaintiffs.

165.   In addition to the explicit prohibition on all magazines larger than 15 rounds, HB 1224 prohibits magazines of any size that are "designed to be readily converted" to hold more than 15 rounds.

166.   Most magazines 15 rounds or smaller are manufactured with a removable floor plate (box magazines) or end cap (tube magazines) to facilitate maintenance and cleaning.

167.    Magazines with a removable floor plate or end cap can be readily converted to hold more than 15 rounds. Even box magazines whose floor plate cannot be removed can be converted to hold more than 15 rounds, simply by duct taping two such magazines end to end.

168.    HB 1224 bans magazines regardless of whether they actually have been converted to hold more than 15 rounds. A ten-round magazine is prohibited by HB 1224 even when it is used only by itself.

169.    Tens of millions of rifles and handguns in common use for self-defense and other lawful purposes use magazines of various sizes that contain removable floor plates or end caps.

170.    Many common rifles and handguns will be rendered effectively useless by the magazine prohibition. Replacing a magazine after the effective date of the statue will be prohibited, even where an individual wishes to change to a smaller magazine. Especially for firearms that are not in current production, it may be impossible for citizens to obtain a replacement magazine that complies with HB 1224.

171.    The prohibition on most magazines puts disabled individuals, including the Disabled Plaintiffs, at particular risk because they will have far less ability to meaningfully defend themselves and their families, and far fewer firearms from which to choose.

172.    A ban on the possession of a broad class of functional firearms, as specifically addressed by the Supreme Court in *Heller,* violates the Second Amendment as incorporated in the Fourteenth Amendment.

### THIRD CLAIM FOR RELIEF

### (HB 12-1224 – Violation of the Second and Fourteenth Amendments; Requirement for "Continuous Possession" of Magazines Owned on the Effective Date)

173.    Paragraphs 1 through 172 are re-alleged and incorporated herein.

174.    This claim is brought by Colorado Outfitters Association; Colorado Farm Bureau; National Shooting Sports Foundation; Colorado Youth Outdoors; Outdoor Buddies, Inc.; Women for Concealed Carry; Colorado State Shooting Association; Hamilton Family Enterprises; David Strumillo; David Bayne; Dylan Harrell; John B. Cooke; Ken Putnam; James Faull; Larry Kuntz; Fred Jobe; Donald Krueger; Stan Hilkey; Dave Stong; Peter Gonzalez; and Douglas N. Darr.

175.    HB 1224 permits an individual to retain a magazine larger than 15 rounds or any prohibited smaller magazine that was owned prior to the effective date of July 1, 2013, so long as the magazine remains in that individual's "continuous possession." The statute thus explicitly prohibits the sale or temporary transfer of such magazines.

176.    The term "continuous possession" is undefined.

177.    Most magazines are essential to the operation of a firearm. HB 1224 prohibits any loan, even for a short period of time, of a firearm using a grandfathered magazine, including temporary loans among family members (such

as allowing one's spouse to use a firearm for self-defense – either while the owner is home, or while the owner is away from home), or loaning a magazine and the associated firearm to disabled neighbors or friends.

178.   "Continuous possession" would also prohibit innocuous, routine bailments or breaks in the chain of custody of a grandfathered magazine, including leaving a magazine with neighbors or friends for safe storage while the owner is out of town, or sharing the magazine with another person who is also engaged in a shooting event in which the owner was participating.

179.   "Continuous possession" is undefined and vague, and owners of a magazine cannot clearly determine what is required of them to maintain "continuous possession" and what conduct may subject them to criminal penalties.

180.   Law enforcement officials will and do find it impossible to enforce this provision because it is impossible to determine whether a magazine was in possession of the owner on the statute's effective date. Law enforcement offices have limited resources, and no reasonable investigation can determine the chain of custody for every magazine.

181.   Because the term "continuous possession" is undefined and vague, enforcement will be inconsistent and subject to local interpretation and the predilections of individual officers or offices.

182.   HB 1224's "continuous possession" requirement chills individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution

for routine, lawful sharing of firearms with covered magazines arising from varying interpretations of HB 1224 and inconsistent enforcement.

## FOURTH CLAIM FOR RELIEF

### (HB 1224 and 1229 – Violation of the Americans With Disabilities Act)

183.    Paragraphs 1 through 182 are re-alleged and incorporated herein.

184.    This Claim is brought by David Bayne, Dylan Harrell, Outdoor Buddies, and the Colorado State Shooting Association, on behalf of its disabled members.

185.    Title II of the Americans With Disabilities Act ("ADA") prohibits public entities from subjecting persons with disabilities to discrimination because of their disabilities. 42 U.S.C. § 12132.

186.    States, including the State of Colorado, are included within the ADA definition of public entity. 42 U.S.C. § 12131(1)(A).

187.    Disabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons. Specifically, they are unable to change magazines as quickly, and unable to retreat to positions of safety where a magazine can be changed.

188.    HB 1224 puts disabled persons in acute danger in the event of a home invasion or other confrontation requiring them to exercise their fundamental right to self-defense.

189.    Persons with disabilities also routinely temporarily transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense.

190.    HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights.

191.    The right to self-defense is a fundamental right under the Second Amendment, and is applied to the states through the Fourteenth Amendment. The ADA prohibits states from engaging in such discrimination against disabled persons, particularly where it prevents the meaningful exercise of a fundamental right.

### FIFTH CLAIM FOR RELIEF

### (HB 13-12-1229 – Violation of the Second and Fourteenth Amendments Based on Restrictions of Firearms Sales and Temporary Transfers - Individuals)

192.    Paragraphs 1 through 191 are re-alleged and incorporated herein.

193.    This claim is brought by Colorado Outfitters Association; Colorado Farm Bureau; National Shooting Sports Foundation; Magpul Industries; Colorado Youth Outdoors; USA Liberty Arms; Outdoor Buddies, Inc.; Women For Concealed Carry; Colorado State Shooting Association; Hamilton Family Enterprises, Inc., D/B/A Family Shooting Center at Cherry Creek State Park; David Strumillo; David Bayne; Dylan Harrell; Rocky Mountain Shooters Supply; 2nd Amendment Gunsmith & Shooter Supply, LLC; Burrud Arms Inc. D/B/A Jensen Arms; Green

Mountain Guns; Jerry's Outdoor Sports; Specialty Sports & Supply; and Goods For The Woods.

194.   HB 1229 requires background checks prior to many temporary and non-commercial transfers of firearms between private individuals.

195.   For example, the statute allows gifts or loans between some family members, but excludes many common family relationships, such as former spouses, other partners, stepchildren, and second cousins. Therefore, a person may not loan or give a firearm to a former spouse, even when the former spouse has temporary or permanent custody of the couple's children and needs the firearm for protection of the children.

196.   Similarly, many temporary transfers are limited to 72 hours. Therefore, no person may loan a gun for legitimate purposes for longer than three days, such as for a disabled person to use while participating in a hunting or a sanctioned shooting event; or for a week-long loan to an individual to keep in her home when she is criminally threatened but has not yet had time to go to a gun store and begin the process of waiting three days (or sometimes longer) for the Colorado Bureau of Investigation to approve her purchase of a retail gun.

197.   The prohibition of non-commercial, temporary transfers is an infringement of the Second Amendment.

198.   Because of the reluctance of home-based Federal Firearms Licensees to do business with strangers, and the reluctance of storefront FFLs to perform a $50 service for the statutory maximum fee of $10, individuals who wish to sell or

temporarily transfer firearms will find it impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of a FFL.

199.    In practice, therefore, HB 1229 amounts to a prohibition, rather than a regulation, of the covered sales and temporary transfers. As such, it is a violation of the Second Amendment right to bear arms, which includes the right to sell or temporarily transfer such arms.

## RELIEF REQUESTED

Plaintiffs pray that this Court:

A.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. § 18-12-301, that prohibit the sale, transfer or possession of magazines with larger than a 15-round capacity are a violation of the Second and Fourteenth Amendments of the United States Constitution, and are therefore void.

B.    Enter a declaratory judgment that the provisions of House Bill 13-1224, to be codified at C.R.S. §§ 18-12-301 *et. seq.,* that ban the sale, transfer or possession of magazines of less than a 15-round capacity violates the Second and Fourteenth Amendments to the United States Constitution, and are therefore void.

C.    Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, that requires continuous possession of magazines acquired before the effective date of the provision violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

D.      Enter a declaratory judgment that the provision of House Bill 13-1224, to be codified at C.R.S. § 18-12-302, prohibiting the sale, transfer, or possession of magazines smaller than 15 rounds that are "designed to be readily converted to accept more than 15 rounds" is vague, fails to give adequate notice of the conduct that may result in criminal penalties, may result in inconsistent enforcement, and prevents free exercise of Second Amendment rights in violation of Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution.

E.      Enter a declaratory judgment that HB 1224 and HB 1229 violate Title II of the Americans With Disabilities Act.

F.      Enter a declaratory judgment that HB 1229 violates the Second and Fourteenth Amendments to the United States Constitution, and is therefore void.

G.      Issue preliminary and permanent injunctions enjoining Defendant John Hickenlooper and any officers, agents, and employees of the State of Colorado from administering or enforcing any provisions of HB 1224 and 1229 found to violate the United States Constitution or the Americans With Disabilities Act.

H.      Award Plaintiffs attorneys' fees and costs and grant other such relief as the Court deems proper.

Dated this 23d day of December, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM, JAMES FAULL, LARRY KUNTZ, FRED JOBE, DONALD KRUEGER, STAN HILKEY, DAVE STONG, PETER GONZALEZ; SUE KURTZ, DOUGLAS N. DARR, AND DAVID STRUMILLO**

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC., THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, WOMEN FOR CONCEALED CARRY, AND COLORADO YOUTH OUTDOORS**

1416

s/Marc. F. Colin
Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**


s/Anthony J. Fabian
Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

s/Jonathan M. Anderson
Jonathan M. Anderson
Douglas L. Abbott
Holland & Hart llp
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION

# Appendix

Diagram A. Detachable box magazine



This is a detachable box magazine for the Ruger Mini-14 rifle. Parts are as follows:

32 = the shell. This is the box in which the ammunition is contained.

28 = floor plate. Sometimes called the "magazine bottom," "base plate," or "foot plate". This Complaint uses "floor plate."

29 = floor plate retainer. The retainer (29) holds the floor plate (28) onto the shell (32). There are many other ways to attach the floor plate to the magazine shell. For example, a pin might hold the floor plate in place; or the floor plate might fit into slots on the magazine shell.

30 = spring. When the magazine is fully loaded, the spring is fully compressed. When the firing chamber in the gun is empty, the spring pushes upward, so that the top round of ammunition in the magazine is pushed into the firing chamber.

31 = follower. The follower sits on top of the spring, and underneath the ammunition. It provides a solid base for seating of the ammunition. When the magazine is loaded, several rounds of ammunition sit in a vertical stack on top of follower. The follower is on top of the spring, and the spring sits on the floor plate.

Diagram B. Tube magazine.



This is a schematic for the Remington Model 14. It is a pump-action rifle, first produced in 1912. The magazine parts are highlighted with color.

49 = magazine tube, which contains the ammunition.

44 = end cap. May also be called "magazine plug" or "removable plug." Similar in function to the floor plate in the detachable box magazine. Can be removed for disassembly and cleaning of the magazine. Can be replaced by an extender, which increases the ammunition capacity of the magazine.

45 = end cap screw (a/k/a "magazine plug screw"). Holds the end cap onto the magazine tube, and holds the front of the assembled magazine onto the front of the rifle barrel.

48 = spring. As ammunition is loaded into the magazine, the spring compresses. The spring is firmly seated on the end cap. After the shooter has fired a round by pressing the trigger, the user pumps the fore-end (35) forward and then back. This cycles the "action" of the pump-action gun, so that the empty shell is ejected from the firing chamber; then a fresh shell is pushed by the spring from the magazine and into the firing chamber.

43 = magazine follower. Same function as the follower in the box magazine. The ammunition is stacked in a horizontal line, with one round of ammunition touching the follower. The spring pushes the follower, which pushes the ammunition.

46 = magazine ring. Holds the middle of the magazine onto the middle of the rifle barrel.

The back of the magazine tube has threads so that the tube can be screwed into connection with the action bar (1), which fits inside the "receiver" (9).

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2013, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | Stephanie.Scoville@state.co.us |
| John Lee | jtlee@state.co.us |

/s/David B. Kopel

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC. d/b/a FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. d/b/a JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;
JOHN B. COOKE;
KEN PUTNAM;
JAMES FAULL;
LARRY KUNTZ;
FRED JOBE;
DONALD KRUEGER;
STAN HILKEY;
DAVE STONG;
PETER GONZALEZ;
SUE KURTZ;
DOUGLAS N. DARR;

          Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

Defendant.

---

**ANSWER AND OBJECTIONS TO FOURTH AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

JOHN W. HICKENLOOPER, Governor of the State of Colorado ("the

Governor"), hereby submits the following Answer to the "FOURTH AMENDED

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF"

("Complaint"):

## I.  OVERVIEW

1.      With respect to the allegations in paragraph 1, the Governor

admits that he signed HB 13-1224 and HB 13-1229 on March 20, 2013.  The

Governor denies the remaining allegations of paragraph 1.

2.      The Governor denies the allegations in paragraph 2.  The Governor

affirmatively states that "in accordance with the Technical Guidance" issued by

the Colorado Attorney General, "possession or transfer of magazines that could

potentially accept more than 15 rounds by virtue of removable floor plates or

end caps alone is not precluded" by HB 1224. Doc. 96 at 12.

3.      The Governor admits the allegations in paragraph 3.

Appellate Case: 14-1290   Document: 01019371748   Date Filed: 01/16/2015   Page: 175

4.     The allegations in paragraph 4 call for legal conclusions to which no response is required; to the extent a response is required, the Governor denies the allegations in paragraph 4.

5.     The Governor admits the allegations in the first sentence of paragraph 5.  The term "many" in the second sentence of paragraph 5 is too ambiguous to permit a response, but to the extent a response is required, the Governor denies the allegations in the second sentence of paragraph 5.

6.     The Governor admits the allegations in the first sentence of paragraph 6.  The term "many" in the second sentence of paragraph 6 is too ambiguous to permit a response, but to the extent a response is required, the Governor denies the allegations in the second sentence of paragraph 6.  The Governor denies the remaining allegations in paragraph 6.

7.     With respect to the allegations in paragraph 7, the Governor admits that an appendix attached to the complaint contains diagrams of firearms magazines.

8.     With respect to the allegations in paragraph 8, the Governor admits that it is possible to physically alter a magazine and thereby increase its capacity.  The Governor is without knowledge or information sufficient to form a belief as to the efficacy of the specific alterations described in paragraph 8, and therefore the Governor denies those allegations.

9.     With respect to the allegations in paragraph 9, the Governor lacks knowledge or information sufficient to form a belief as to public statements of "[t]he chief sponsor of HB 1224," and therefore denies the allegations.  The Governor denies having "publicly confirmed that HB 1224 bans all magazines with removable floor plates."  To the extent that the allegations in paragraph 9 call for legal conclusions, no response is required.  To the extent a response is required, the Governor denies the allegations in paragraph 9.

10.     The Governor denies the allegations in the first sentence of paragraph 10.  The Governor lacks knowledge or information sufficient to form a belief as to the allegations in the second and third sentences of paragraph 10.  The final sentence of paragraph 10 contains allegations that call for legal conclusions to which no response is required.

11.     The Governor denies the allegations in paragraph 11.

12.     With respect to paragraph 12, the Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.

13.     The Governor denies the allegations in paragraph 13.

14.     The Governor denies the allegations in paragraph 14.

15.     With respect to the first two sentences of paragraph 15, the Governor states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies them.  With respect to the third sentence in paragraph 15, the Governor admits

that some rifles are sold with 30-round magazines, but affirmatively states that all such rifles are compatible with magazines that hold 15 or fewer rounds. The Governor lacks knowledge sufficient to admit or deny the allegations in the fourth sentence of paragraph 15, and therefore denies them. With respect to the fifth sentence of paragraph 15, the phrase "Modern Sporting Rifles" is undefined and too vague to permit a response; to the extent a response is required, the Governor lacks information sufficient to admit or deny the allegations in the fifth sentence of paragraph 15, and therefore denies them.

16. With respect to the allegations in paragraph 16, the term "many" in the first and second sentences is too vague to permit a response; to the extent a response is required, the Governor denies the allegations in the first two sentences of paragraph 16. With respect to the allegations in the third sentence of paragraph 16, the Governor admits that there are tens of millions of magazines holding more than fifteen rounds in the United States today, but denies the remaining allegations.

17. The Governor denies the allegations in paragraph 17.

18. The Governor denies the allegations in paragraph 18. To the extent the allegations of paragraph 18 call for legal conclusions, no response is required; but insofar as a response is required, the Governor denies the allegations.

19.     The Governor denies the allegations in paragraph 19.  To the extent the allegations of paragraph 19 call for legal conclusions, no response is required; but insofar as a response is required, the Governor denies the allegations.

20.     With respect to the allegations of paragraph 20, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

21.     The Governor denies the allegations in the first sentence of paragraph 21.  With respect to the remaining allegations of paragraph 21, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.  The Governor affirmatively states that House Bill 13-1224 is a writing that speaks for itself.

22.     The meaning of the term "many" in the first sentence of paragraph 22 is too vague to permit a response; to the extent a response is required, the Governor denies the allegations in the first sentence of paragraph 22.  The Governor denies the remaining allegations in paragraph 22.

23.     With respect to paragraph 23, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

24.     The meaning of the term "monitor" in the first sentence of paragraph 24 is too vague to permit a response; to the extent a response is required, the Governor denies the allegations in the first sentence of paragraph 24. The Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 24 and therefore the Governor denies them.

25.     The meaning of the phrases "profitable sale" and "the fee charged may be $50" in the first sentence of paragraph 25 are too vague to permit a response; to the extent a response is required, the Governor denies the allegations in the first sentence of paragraph 25. The Governor denies the remaining allegations in paragraph 25.

26.     The Governor denies the allegations in paragraph 26.

27.     With respect to the allegations of paragraph 27, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

28.     With respect to the allegations of paragraph 28, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

29.     With respect to the allegations of paragraph 29, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

30.     With respect to the allegations of paragraph 30, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

31.     With respect to the allegations of paragraph 31, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required.  To the extent a response is required, the Governor admits the allegations in paragraph 31.

32.     With respect to the allegations of paragraph 32, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## II.     JURISDICTION AND VENUE

33.     The Governor denies the allegations in paragraph 33.  The Governor affirmatively states that the Plaintiffs have failed to present a justiciable case and controversy, that one or more of their claims is not ripe, and

that one or more of the Plaintiffs lacks standing under Article III of the United States Constitution.

34.   The Governor denies the allegations in paragraph 34.

35.   The Governor denies the allegations in paragraph 35.

36.   The Governor admits the allegations in paragraph 36.

### III.   PARTIES

37.   With respect to the allegations of the first sentence of paragraph 37, the Governor admits that eleven of the Plaintiffs are law enforcement officers, but denies that they will be "retiring imminently."  With respect to the second sentence of paragraph 37, the Governor admits that the eleven Plaintiffs identified are suing in their individual capacities.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations and in paragraph 37 and therefore the Governor denies them

38.   The Governor admits that John Cooke is presently the sheriff of Weld County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 38, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously

set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's December 19, 2013 order. The Governor therefore objects to the assertion of new allegations and claims in sentences 5, 6 and 7 of paragraph 38.

39.    The Governor admits that Ken Putnam is the sheriff of Cheyenne County. The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 39, and therefore the Governor denies them. OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes. The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order. The Governor therefore objects to the assertion of new allegations and claims in sentences 3 and 4 of paragraph 39.

40.    The Governor admits that James Faull is the sheriff of Prowers County. The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 40, and therefore the Governor denies them. OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes. The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.

The Governor therefore objects to the assertion of new allegations and claims in sentences 4 and 5 of paragraph 40.

41.    Governor admits that James Faull is the sheriff of Prowers County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 40, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order. The Governor therefore objects to the assertion of new allegations and claims in sentences 6, 7, and 8 of paragraph 41.

42.    The Governor admits that Fred Jobe is the sheriff of Custer County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 42, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.

The Governor therefore objects to the assertion of new allegations and claims in sentences 3, 4 and 5 of paragraph 42.

43.     The Governor admits that Donald Krueger is the sheriff of Clear Creek County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 43, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.  The Governor therefore objects to the assertion of new allegations and claims in sentences 4, 5, and 6 of paragraph 43.

44.     The Governor admits that Stan Hilkey is the sheriff of Mesa County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 44, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.

The Governor therefore objects to the assertion of new allegations and claims in the last sentence of paragraph 44.

45.     The Governor admits that Dave Stong is the sheriff of Alamosa County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 45, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.  The Governor therefore objects to the assertion of new allegations and claims in sentences 3, 4, and 5 of paragraph 45.

46.     The Governor admits that Peter Gonzalez is the sheriff of Archuleta County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 46, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.

Appellate Case: 14-1290   Document: 01019371748   Date Filed: 01/16/2015   Page: 186

The Governor therefore objects to the assertion of new allegations and claims in sentences 4 and 5 of paragraph 46.

47.    The Governor admits that Sue Kurtz is the sheriff of San Juan County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 47, and therefore the Governor denies them.   OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order. The Governor therefore objects to the assertion of new allegations and claims in sentences 4 and 5 of paragraph 47.

48.    The Governor admits that Douglas Darr is the sheriff of Adams County.  The Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 48, and therefore the Governor denies them.  OBJECTION: The Court granted Plaintiffs leave to amend their complaint with the condition that Plaintiffs would assert no new claims and that the case would be framed "as it currently is." Doc. #115, Courtroom Minutes.  The assertion of new claims not previously set forth in Plaintiffs' Second Amended Complaint exceeds and violates the Court's order.

The Governor therefore objects to the assertion of new allegations and claims in sentences 3 and 4 of paragraph 48.

49.     The Governor admits the allegations in the first sentence of paragraph 49.  With respect to the allegations of paragraph 49, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

50.     With respect to the allegations of paragraph 50, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

51.     With respect to the allegations of paragraph 51, the Governor affirmatively states that House Bill 13-1229 is a writing that speaks for itself.

52.     With respect to the allegations of paragraph 52, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

53.     With respect to the allegations of paragraph 53, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

54.     The Governor denies the allegations in paragraph 54.

55.     With respect to the allegations of paragraph 55, the Governor affirmatively states that the allegations call for legal conclusions to which no

response is required; but insofar as a response is required, the Governor denies the allegations.

56.     The Governor admits the allegations in paragraph 56.

57.     With respect to the allegations of paragraph 57, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

58.     The Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 58 and therefore denies them. The Governor denies the remaining allegations in paragraph 58.

59.     With respect to the allegations of paragraph 59, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

60.     With respect to the allegations of paragraph 60, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

61.     With respect to the allegations of paragraph 61, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

62.     With respect to the allegations of paragraph 62, the Governor denies that David Bayne is a resident of Colorado.  Mr. Bayne currently resides

in Georgia, and he has stated under oath that he has no plans to move back to Colorado.  He therefore lacks standing to assert any claims in this case.  With respect to the remaining allegations of paragraph 62, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

63.     With respect to the allegations of paragraph 63, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

64.     The Governor denies the allegations in paragraph 64.  Also, the Governor affirmatively asserts that Plaintiff Bayne, a resident of Georgia, lacks standing to assert any claim in this case.

65.     With respect to the allegations of paragraph 65, the Governor denies the allegations.  Also, the Governor affirmatively asserts that Plaintiff Bayne, a resident of Georgia, lacks standing to assert any claim in this case.

66.     With respect to the allegations of paragraph 66, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies them.  Also, the Governor affirmatively asserts that Plaintiff Bayne, a resident of Georgia, lacks standing to assert any claim in this case.

67.     The Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 and

therefore denies them.  The Governor affirmatively asserts that Plaintiff Bayne, a resident of Georgia, lacks standing to assert any claim in this case.

68.    The Governor denies the allegations in paragraph 68.  The Governor affirmatively asserts that Plaintiff Bayne, a resident of Georgia, lacks standing to assert any claim in this case.

69.    With respect to the allegations of paragraph 69, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

70.    With respect to the allegations of paragraph 70, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

71.    With respect to the allegations of paragraph 71, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

72.    With respect to the allegations of paragraph 72, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

73.    With respect to the allegations of paragraph 73, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

74.    With respect to the allegations of paragraph 74, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

75.    With respect to the allegations of paragraph 75, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

76.    With respect to the allegations of paragraph 76, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

77.    With respect to the allegations of paragraph 77, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

78.    With respect to the allegations of paragraph 78, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

79.    With respect to the allegations of paragraph 79, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

80.     With respect to the allegations of paragraph 80, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

81.     With respect to the allegations of paragraph 81, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

82.     With respect to the allegations of paragraph 82, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

83.     With respect to the allegations of paragraph 83, the Governor is without knowledge or information sufficient to form a belief as to whether "[m]any CSSA members own and use firearms with a capacity exceeding 15 rounds."  The Governor denies that "many of the CSSA sanctioned events require the use of such firearms."  The Governor lacks information sufficient to admit or deny the remaining allegations in paragraph 83, and therefore denies them.

84.     With respect to the allegations of paragraph 84, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

85.     With respect to the allegations of paragraph 85, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

86.     With respect to the allegations of paragraph 86, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

87.     With respect to the allegations of paragraph 87, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

88.     With respect to the allegations of paragraph 88, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

89.     With respect to the allegations of paragraph 89, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

90.     With respect to the allegations of paragraph 90, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

91.     With respect to the allegations of paragraph 91, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

92.    With respect to the allegations of paragraph 92, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

93.    With respect to the allegations of paragraph 93, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

94.    With respect to the allegations of paragraph 94, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

95.    With respect to the allegations of paragraph 95, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

96.    With respect to the allegations of paragraph 96, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

97.    With respect to the allegations of paragraph 97, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

98.    With respect to the allegations in the first sentence of paragraph 98, the Governor is without knowledge or information sufficient to form a belief

as to the truth of the allegations and therefore denies them.  The Governor denies the remaining allegations in paragraph 98.

99.    With respect to the allegations of paragraph 99, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

100.    The Governor denies the allegations in paragraph 100.

101.    The Governor denies the allegations in paragraph 101.

102.    With respect to the allegations of paragraph 102, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

103.    With respect to the allegations of paragraph 103, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

104.    With respect to the allegations of paragraph 104, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

105.    With respect to the allegations of paragraph 105, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

106.    The Governor denies the allegations in paragraph 106.

107.   With respect to the allegations in the first two sentences of paragraph 107, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.  With respect to the remaining allegations of paragraph 107, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

108.   With respect to the allegations of paragraph 108, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

109.   With respect to the allegations of paragraph 109, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

110.   With respect to the allegations of paragraph 110, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

111.   With respect to the allegations  of paragraph 111, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

112.    With respect to the allegations of paragraph 112, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

113.    With respect to the allegations of paragraph 113, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

114.    With respect to the allegations in paragraph 114, the Governor admits that he is the Governor of the State of Colorado. To the extent a response is required, Colo. Const. art. IV, § 2, speaks for itself.  The Governor denies the allegations in the last sentence of paragraph 114.

115.    The Governor denies the allegations in the first sentence of paragraph 115.  With respect to the remaining allegations of paragraph 115, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

116.    With respect to the allegations of paragraph 116, the Governor affirmatively states that the *Heller* decision is a writing that speaks for itself.

117.    With respect to the allegations of paragraph 117, the Governor affirmatively states that the allegations call for legal conclusions to which no

response is required; but insofar as a response is required, the Governor denies the allegations.

118.    With respect to the allegations of paragraph 118, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

119.    With respect to the allegations of paragraph 119, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

120.    With respect to the allegations of paragraph 120, the Governor affirmatively states that the *McDonald* decision is a writing that speaks for itself.

121.    With respect to the allegations of paragraph 121, the Governor affirmatively states that the *McDonald* decision is a writing that speaks for itself.

122.    The Governor denies the allegations in paragraph 122.

123.    With respect to the allegations of paragraph 123, the Governor affirmatively states that the *Heller* decision is a writing that speaks for itself.

124.    With respect to the allegations of paragraph 124, the Governor affirmatively states that the allegations call for legal conclusions to which no

response is required; but insofar as a response is required, the Governor denies the allegations.

125.   With respect to the allegations of paragraph 125, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

126.   With respect to the allegations of paragraph 126, the Governor lacks knowledge sufficient to admit or deny that that handguns are used in the majority of homicides in the United States, but with respect to the remainder of the allegations of paragraph 126, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

127.   With respect to the allegations of paragraph 127, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

128.   The Governor lacks knowledge sufficient to admit or deny the allegations of paragraph 128 and therefore denies them.

129.    The Governor lacks knowledge sufficient to admit or deny the allegations of paragraph 129 and therefore denies them.

130.    With respect to the allegations of paragraph 130, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

131.    With respect to the allegations of paragraph 131, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

132.    With respect to the allegations of paragraph 132, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

133.    The Governor denies the allegations in the first sentence of paragraph 133.  With respect to the remaining allegations of paragraph 133, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

134.    The Governor denies the allegations of paragraph 134.

135.    The Governor denies the allegations of paragraph 135.

136.    The Governor denies the allegations in the first sentence of paragraph 136. With respect to the remaining allegations of paragraph 136, the Governor affirmatively states that the *Pillow* decision is a writing that speaks for itself.

137.    With respect to the allegations of paragraph 137, the Governor affirmatively states that the *Pillow* decision is a writing that speaks for itself.

138.    With respect to the allegations of paragraph 138, the Governor affirmatively states that the *Pillow* decision is a writing that speaks for itself.

139.    With respect to the allegations of paragraph 139, the Governor affirmatively states that the cases cited are writings that speak for themselves.

140.    With respect to the allegations of paragraph 140, the Governor affirmatively states that allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations. The Governor denies the allegations contained in the last sentence of paragraph 140.

141.    With respect to the allegations of paragraph 141, the Governor affirmatively states that House Bill 13-1229 is a writing that speaks for itself. With respect to the remainder of the allegations of paragraph 141, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

142.    With respect to the allegations of paragraph 142, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

143.    With respect to the allegations of paragraph 143, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

144.    With respect to the allegations of paragraph 144, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

145.    With respect to the allegations of paragraph 145, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.  The Governor affirmatively asserts that the Court has determined that the "designed to be readily converted" language in HB 1224 is not unconstitutionally vague. Doc. 96 at p. 24.

146.    With respect to the allegations of paragraph 146, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies

the allegations.  The Governor affirmatively asserts that the Court has determined that the "designed to be readily converted" language in HB 1224 is not unconstitutionally vague. Doc. 96 at p. 24.

147.    The Governor lacks knowledge sufficient to admit or deny the allegations of paragraph 147 and therefore denies them.

148.    With respect to the allegations of paragraph 148, the Court has determined that the "designed to be readily converted" language in HB 1224 is not unconstitutionally vague and does not constitute a ban on all magazines with removable base plates. Doc. #96 at pp. 14, 24.  To the extent that a response to these allegations is necessary, the Governor affirmatively states that allegations in paragraph 148 call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

149.    With respect to the allegations of paragraph 149, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

150.    With respect to the allegations of paragraph 150, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor is

without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

151.    The Governor denies the allegations of paragraph 151.

152.    With respect to the allegations of paragraph 152, the Governor admits that he issued a signing statement requiring the development and circulation of interpretive guidance regarding House Bill 13-1224 and House Bill 13-1229, that the Department of Law issued such guidance on May 16, 2013 and on July 10, 2013, and that the guidance has been made publicly available. With respect to the remaining allegations of paragraph 152, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## FIRST CLAIM FOR RELIEF

153.    With respect to the allegations of paragraph 153, the Governor responds as if the answers set forth in paragraphs numbers one through 152 of this answer were set forth in full in this paragraph.

154.    With respect to the allegations of paragraph 154, the Governor affirmatively states that the allegations are a statement of Plaintiffs' intentions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

155.    With respect to paragraph 155, the Governor admits that he signed HB 1224 on or about March 20, 2013.  With respect to the remaining allegations, the Governor affirmatively states that the statute speaks for itself.

156.    The meaning of the phrase "come standard" in paragraph 156 is too vague to permit a response; to the extent a response is required, the Governor denies the allegations of paragraph 156.

157.    With respect to the allegations of paragraph 157, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

158.    The Governor denies the allegations of paragraph 158.

159.    With respect to the allegations of paragraph 159, the Governor admits that firearms with magazine capacities greater than 15 rounds are used for sport shooting and target shooting.  The remaining allegations in paragraph 159 call for legal conclusions to which no response is required; in the event that a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 159 and therefore denies them.

160.    With respect to the allegations of paragraph 160, the Governor affirmatively states that the allegations call for legal conclusions to which no

Appellate Case: 14-1290   Document: 01019371748   Date Filed: 01/16/2015   Page: 206

response is required; but insofar as a response is required, the Governor denies the allegations.

161.   With respect to the allegations of paragraph 161, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

162.   With respect to the allegations of paragraph 162, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

## SECOND CLAIM FOR RELIEF

163.   With respect to the allegations of paragraph 163, the Governor responds as if the answers set forth in paragraphs numbers one through 162 of this answer were set forth in full in this paragraph.

164.   With respect to the allegations of paragraph 164, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 164 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor affirmatively states that the allegations are a statement of Plaintiffs' intentions to which no response is required; the Governor is without knowledge or information

sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

165.    With respect to the allegations of paragraph 165, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 165 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor affirmatively states that HB 1224 is a writing that speaks for itself.

166.    With respect to the allegations of paragraph 166, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 166 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor admits the allegations of paragraph 166.

167.    With respect to the allegations of paragraph 167, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 167 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

168.    With respect to the allegations of paragraph 168, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 168 or the Second Claim for Relief is

required.  Insofar as a response is required, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

169.    With respect to the allegations of paragraph 169, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 169 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor admits that many rifles and handguns use magazines with removable floor plates or end caps. Insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 169 and therefore denies them.

170.    With respect to the allegations of paragraph 170, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 170 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

171.    With respect to the allegations of paragraph 171, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 171 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor affirmatively states

that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

172.    With respect to the allegations of paragraph 172, the Governor filed a motion to dismiss that was granted by the Court, and no response to the allegations contained in paragraph 172 or the Second Claim for Relief is required.  Insofar as a response is required, the Governor denies that HB 1224 imposes "a ban on the possession of a broad class of firearms" or that that the provisions of HB 1224 violate the Second and Fourteenth Amendments.

## THIRD CLAIM FOR RELIEF

173.    With respect to the allegations of paragraph 173, the Governor responds as if the answers set forth in paragraphs numbers one through 172 of this answer were set forth in full in this paragraph.

174.    With respect to the allegations of paragraph 174, the Governor affirmatively states that the allegations are a statement of Plaintiffs' intentions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

175.    With respect to the allegations of paragraph 175, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

Appellate Case: 14-1290   Document: 01019371748   Date Filed: 01/16/2015   Page: 210

176.   With respect to the allegations of paragraph 176, the Governor affirmatively states that the provisions of HB 1224 are writings that speak for themselves.

177.   The allegations in the first sentence of paragraph 177 are too vague to permit a response; to the extent a response is required the Governor denies the allegations in the first sentence of paragraph 177.  With respect to the remaining allegations of paragraph 177, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

178.   With respect to the allegations of paragraph 178, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

179.   With respect to the allegations of paragraph 179, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

180.   With respect to the allegations of paragraph 180, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

181.    With respect to the allegations of paragraph 181, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore the Governor denies them.

182.    The Governor denies the allegations of paragraph 182.

### FOURTH CLAIM FOR RELIEF

183.    With respect to the allegations of paragraph 183, the Governor responds as if the answers set forth in paragraphs numbers one through 182 of this answer were set forth in full in this paragraph.

184.    With respect to the allegations of paragraph 184, the Governor affirmatively states that the allegations are a statement of Plaintiffs' intentions to which no response is required; but insofar as a response is required, the Governor is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

185.    With respect to the allegations of paragraph 185, the Governor affirmatively states that Title II of the Americans with Disabilities Act (ADA) is a writing that speaks for itself.

186.    With respect to the allegations of paragraph 186, the Governor affirmatively states that definitions contained within the ADA are writings that speak for themselves.

187.    With respect to the allegations of paragraph 187, the Governor lacks knowledge sufficient to admit or deny the allegations in the second

sentence of the paragraph and therefore denies these allegations.  The Governor

denies the remaining allegations of paragraph 187.

188.    The Governor denies the allegations of paragraph 188.

189.    With respect to the allegations of paragraph 189, the Governor is

without knowledge or information sufficient to form a belief as to the truth of

the allegations and therefore the Governor denies them.

190.    The Governor denies the allegations of paragraph 190.

191.    With respect to the allegations of paragraph 191, the Governor

affirmatively states that the allegations call for legal conclusions to which no

response is required; but insofar as a response is required, the Governor denies

the allegations.

## FIFTH CLAIM FOR RELIEF

192.    With respect to the allegations of paragraph 192, the Governor

responds as if the answers set forth in paragraphs numbers one through 191 of

this answer were set forth in full in this paragraph.

193.    With respect to the allegations of paragraph 193, the Governor

affirmatively states that the allegations are a statement of Plaintiffs' intentions

to which no response is required; but insofar as a response is required, the

Governor is without knowledge or information sufficient to form a belief as to

the truth of the allegations and therefore denies them.

194.    With respect to the allegations of paragraph 194, the Governor affirmatively states that HB 1229 is a writing that speaks for itself.

195.    With respect to the allegations of paragraph 195, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

196.    With respect to the allegations of paragraph 196, the Governor affirmatively states that the allegations call for legal conclusions to which no response is required; but insofar as a response is required, the Governor denies the allegations.

197.    The Governor denies the allegations of paragraph 197.

198.    The Governor denies the allegations of paragraph 198.

199.    The Governor denies the allegations of paragraph 199.

200.    The Governor denies all allegations in Plaintiffs' Fourth Amended Complaint for Declaratory and Injunctive Relief that are not specifically admitted in this Answer.

## RELIEF REQUESTED

The Governor denies that Plaintiffs are entitled to the relief they request, including their requests for declaratory relief, injunctive relief, attorney fees and costs.

## AFFIRMATIVE DEFENSES

1.     Plaintiffs have failed to state claims for relief.

2.     Plaintiffs' claims may be barred because Plaintiffs lack a private right of action.

3.     Plaintiffs' claims may be barred by Eleventh Amendment immunity.

4.     Some or all of Plaintiffs' claims may be barred because they are not ripe.

    a.     Some or all Plaintiffs lack standing.

5.     Plaintiffs have been afforded all the rights, privileges, and immunities granted by the United States Constitution, the Colorado Constitution, and state and federal law.

6.     The Governor is not a proper party to some or all of Plaintiffs' claims.

7.     This court lacks subject matter jurisdiction over some or all of Plaintiffs' claims.

8.     Plaintiffs have not been excluded from participation in the benefits and programs of a public entity.

9.     The Governor reserves the right to assert additional affirmative defenses or rescind affirmative defenses after further investigation and discovery.

Wherefore, the Governor requests this Court to enter judgment in their favor and additionally request attorney fees and any other relief this Court deems just and proper.

JOHN W. SUTHERS
Attorney General


s/ *Matthew D. Grove*
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Matthew D. Grove***
Assistant Attorney General
**John T. Lee***
Assistant Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Stephanie Scoville***
Senior Assistant Attorney General

*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on _January 3_____ 2014, I served a true and complete copy of the foregoing ANSWER AND OBJECTIONS TO FOURTH AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                        _s/ Matthew D. Grove_____

1466

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER
AT CHERRY CREEK STATE PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;
JOHN B. COOKE;
KEN PUTNAM;
JAMES FAULL;
LARRY KUNTZ;
FRED JOBE;
DONALD KRUEGER;
STAN HILKEY;
DAVE STONG;
PETER GONZALEZ;
SUE KURTZ;
DOUGLAS N. DARR;

    Plaintiffs,

1

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

### JOINT FED.R.EVID. 702 MOTION TO STRIKE EXPERT OPINIONS

---

The parties, through their undersigned counsel, hereby request a determination regarding the admissibility of opinion testimony by Defendant's experts Douglas S. Fuchs and John C. Cerar[1], as well as Plaintiffs' experts Kevin Davis, Massad Ayoob, Dr. Gary Kleck, and Michael Shain.

### PLAINTIFFS' CHALLENGES TO DEFENDANT'S EXPERT OPINIONS

**I.**    **Douglas S. Fuchs**

**Opinion 1**

Public safety is compromised when civilians not trained to counteract the stress of an assault respond to an armed assailant by firing as many rounds as their magazine holds.

**Objection to Opinion 1**

Mr. Fuchs lacks the knowledge, skill, experience, training, or expertise to express this opinion. Also, this opinion is not based upon sufficient facts or data. Finally, Mr. Fuchs did not use reliable principles or methodologies when generating this opinion.

**Opinion 2**

Limiting magazines to 15 rounds provides victims in mass shooting situations with an opportunity to escape or overcome a shooter.

---

[1] Defendant has offered expert opinions from Douglas S. Fuchs, John C. Cerar, Jeffrey S. Zax, and Daniel W. Webster. Plaintiffs only object to the admissibility under Rule 702 of select opinions from Douglas S. Fuchs and John C. Cerar.

**Objection to Opinion 2**

Mr. Fuchs lacks the knowledge, skill, experience, training, or expertise to express this opinion. Also, this opinion is not based upon sufficient facts or data. Finally, Mr. Fuchs did not use reliable principles or methodologies when generating this opinion.

**Opinion 3**

Magazines carrying 15 or fewer rounds are sufficient for self-defense. Magazines carrying more than 15 rounds are not necessary for self-defense.

**Objection to Opinion 3**

Mr. Fuchs lacks the knowledge, skill, experience, training, or expertise to express this opinion. Also, this opinion is not based upon sufficient facts or data. Finally, Mr. Fuchs did not use reliable principles or methodologies when generating this opinion.

**II.    John C. Cerar**

**Opinion 1**

The use of large capacity magazines will not lead to a better outcome in gunfight self-defense situations.

**Objection to Opinion 1**

Plaintiffs do not object to Opinion 1 under Rule 702.

**Opinion 2**

Magazines carrying 15 or fewer rounds are sufficient for self-defense. Magazines carrying more than 15 rounds are not necessary for self-defense.

**Objection to Opinion 2**

Plaintiffs do not object to Opinion 2 under Rule 702.

**Opinion 3**

The availability of large capacity magazines encourages a "spray and pray" mentality that can result in harm to innocent bystanders.

**Objection to Opinion 3**

Mr. Cerar lacks the knowledge, skill, experience, training, or expertise to express this opinion. Also, this opinion is not based upon sufficient facts or data. Finally, Mr. Cerar did not use reliable principles or methodologies when generating this opinion.

**Opinion 4**

Limiting magazines to 15 rounds or less will not negatively impact the self-defense capabilities of female shooters or individuals with limited strength and/or dexterity.

**Objection to Opinion 4**

Mr. Cerar lacks the knowledge, skill, experience, training, or expertise to express this opinion. Also, this opinion is not based upon sufficient facts or data. Finally, Mr. Cerar did not use reliable principles or methodologies when generating this opinion.

**Opinion 5**

Limiting magazine capacity to 15 rounds or less will likely reduce the number of people killed or wounded in mass shooting events.

**Objection to Opinion 5**

Plaintiffs do not object to Opinion 5 under Rule 702.

**Opinion 6**

Limiting magazine capacity to 15 rounds or less will not reduce the efficacy of rifles or handguns for self-defense.

1470

**Objection to Opinion 6**

Plaintiffs do not object to Opinion 6 under Rule 702.

### DEFENDANT'S CHALLENGES TO PLAINTIFFS' EXPERT OPINIONS

**Kevin R. Davis**

**Opinion No. 1**

Semi-automatic pistols or rifles with a magazine capacity greater than 15 rounds have become a common choice for defensive use over the last several decades.

**Objection to Opinion No. 1**

The Defendant does not object to Opinion 1 under Rule 702.

**Opinion No. 2**

Semi-automatic rifles and handguns with greater than 15 rounds capacity are more effective at incapacitating an assailant due to the number of hits that may be required to physically incapacitate a person.

**Objection to Opinion No. 2**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 3**

Semi-automatic handguns and rifles with a capacity greater than 15 rounds provide citizens with a capability to more effectively neutralize a deadly threat due to the high incidents of misses and other circumstances in self-defense shootings.

**Objection to Opinion No. 3**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 4**

Semi-automatic rifles and handguns with greater than 15 rounds capacity allows citizens to more effectively defend themselves because of the greater response time required in a threat situation.

**Objection to Opinion No. 4**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 5**

Semi-automatic rifles and handguns with a capacity greater than 15 rounds allow citizens to more effectively defend themselves because of physiological changes in threat situations because of the sympathetic nervous system response to danger.

**Objection to Opinion No. 5**

Mr. Davis lacks the knowledge, skill, experience, training, or education to express this opinion. Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 6**

Semi-automatic rifles and handguns with a capacity greater than 15 rounds are more effective at responding to threats from multiple attackers.

**Objection to Opinion No. 6**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 7**

Semi-automatic rifles and handguns with a capacity greater than 15 rounds allow citizens a greater opportunity to defend themselves in threat situations until assistance arrives, which may be delayed in many situations.

**Objection to Opinion No. 7**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 8**

A magazine capacity limitation that compels a defensive shooter to exchange magazines in the midst of a life threating situation adversely impacts the citizen's ability to defend himself because of the time needed to complete a magazine exchange which could otherwise be utilized to continue defensive firing.

**Objection to Opinion No. 8**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 9**

Older, female, infirm, injured or disabled shooters can more effectively defend themselves with semi-automatic rifles and handguns with a capacity greater than 15 rounds.

**Objection to Opinion No. 9**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 10**

Retired law enforcement officers are better able to protect and defend themselves with semi-automatic rifles and handguns with a capacity greater than 15 rounds with which they became familiar during their careers.

**Objection to Opinion No. 10**

Mr. Davis' opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 11**

Semi-automatic rifles with a capacity greater than 15 rounds allows citizens to defend themselves more effectively based on increased accuracy and extended ranges, increased capacity, increased ballistic performance, and an enhanced intimidation factor.

**Objection to Opinion No. 11**

To the extent that the opinion relates to the increased capacity or enhanced intimidation factor of rifles with a capacity greater than 15 rounds, Mr. Davis' opinion is

not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Massad Ayoob**

**Opinion No. 1**

The ability of disabled persons to defend themselves or others would be negatively impacted by magazine capacity restrictions.

**Objection to Opinion No. 1**

Mr. Ayoob lacks the knowledge, skill, experience, training, or education to express this opinion. Mr. Ayoob's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 2**

The category of individuals who will be negatively impacted due to their inability to quickly change magazines or move to positions of safety during a confrontation include those with missing or shortened fingers, those missing a hand or arm, those with age-related disabilities, and those with lower body disabilities, as well as law-abiding citizens in general.

**Objections to Opinion No. 2**

Mr. Ayoob lacks the knowledge, skill, experience, training, or education to express this opinion. Mr. Ayoob's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 3**

While high volume shootouts are the exception rather than the norm in legitimate armed self-defense cases, they do occur.

**Objections to Opinion No. 3**

Mr. Ayoob lacks the knowledge, skill, experience, training, or education to express this opinion. Mr. Ayoob's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 4**

In high volume shootout situations, a magazine capacity limitation will harm law-abiding citizens in general, and have an even greater adverse impact on persons with disabilities.

## Objections to Opinion No. 4

Mr. Ayoob lacks the knowledge, skill, experience, training, or education to express this opinion.  Mr. Ayoob's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Gary Kleck, Ph.D.**

## Opinion No. 1

Criminals rarely fire large numbers of rounds during the commission of a crime.

## Objection to Opinion No. 1

The Defendant does not object to Opinion 1 under Rule 702.

## Opinions No. 2

Mass shootings are extremely rare, and shooters rarely need magazines of 16 or more rounds to injure or kill their victims.  Limiting magazine capacity has only a hypothetical potential for reducing harm or improving public safety because the need for magazines of 16 or more rounds by criminals to inflict a large number of casualties is a rare subset of a rare event.

## Objection to Opinion No. 2

Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

## Opinion No. 3

Limits on magazine capacity will impair the ability of citizens to engage in lawful self-defense.  Self defense may require a larger number of rounds being fired either because of multiple adversaries and/or because the citizen will not fire optimally under stressful conditions.

## Objection to Opinion No. 3

Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 4**

The number of incidents in which citizens need or have needed more than 15 rounds to effectively defend themselves is likely larger than the number of crimes in which the use of a large magazine caused a larger number of casualties.  The number of criminal uses of such magazines is small, and the total number of defensive uses of firearms by crime victims (without regard to magazine capacity or rounds fired) is far larger than the total number of crimes committed using guns.

**Objection to Opinion No. 4**

Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 5**

Although some citizens may acquire a larger number of smaller magazines as a substitute for magazines banned by HB 1224, some victims will be unable to make effective use of multiple smaller magazines in self defense due to emotional stress and/or disabilities.

**Objection to Opinion No. 5**

Dr. Kleck lacks the knowledge, skill, experience, training, or education to assert this opinion.  Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 6**

Violations of magazine capacity limits are likely to occur at a higher rate among criminals than among non-criminals.

**Objection to Opinion No. 6**

Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 7**

HB 1224's 15- round magazine capacity limit will reduce incidences of self-defense use in situations where a more than 15 rounds is required more than it will reduce criminal attacks in which offenders need  magazines of 16 or more rounds to inflict massive casualties.

**Objection to Opinion No. 7**

Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 8**

Defensive use of firearms by crime victims is generally effective, and makes it less likely that the victim will be killed, injured, or lose property.  Any law which obstructs or impairs defensive gun use by victims increases the likelihood of them suffering bodily injury or property loss.

**Objection to Opinion No. 8**

The Defendant does not object to Opinion No. 8 under Rule 702.

**Opinion No. 9**

The magazine capacity restriction in HB 1224 will do more harm than good because it will reduce the harm-preventing effects in defensive uses more than it will reduce the rare harm-causing effects of criminal use of magazines holding 16 or more rounds.

**Objection to Opinion No. 9**

Dr. Kleck's opinion is not based on sufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Michael Shain**

**Opinion No. 1**

HB 1224 may prohibit many magazines that are designed and advertised to hold 15 rounds because design tolerances or different cartridge lengths allow them to hold 16 rounds.

**Objection to Opinion No. 1**

Mr. Shain lacks the knowledge, skill, experience, training, or education to express this opinion.

**Opinion No. 2**

Firearms for which no magazine smaller than 15 rounds are available are subject to a de facto ban.

**Objections to Opinion No. 2**

Mr. Shain lacks the knowledge, skill, experience, training, or education to express this opinion. Mr. Shain's opinion is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 3**

HB 1224's requirement that the owner of magazines banned by HB 1224 maintains "continuous possession" of those magazines is unrealistic in ordinary practice and for compliance and enforcement.

**Objections to Opinion No. 3**

Mr. Shain's opinion is based upon insufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 4**

The acquisition date of a magazine cannot be determined from any outward appearance or feature on the magazine itself.

**Objections to Opinion No. 4**

Mr. Shain's opinion is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 5**

Continuous possession prohibits the loaning of lawfully owned magazines banned by HB 1224 to friends and family members; it prohibits storing and leaving such lawfully owned magazines while traveling; and it prohibits giving such lawfully owned magazines to a gunsmith for maintenance.

**Objections to Opinion No. 5**

Mr. Shain lacks the knowledge, skill, experience, training, or education to express this opinion. Mr. Shain's opinion is based upon insufficient facts or data, is not the product of reliable principles or methodologies, and is not the product of the reliable application of principles or methodologies to the facts and data obtained.

**Opinion No. 6**

Detachable box magazines have been an integral design characteristic associated with highly portable hand-held or shoulder-fired semi-automatic firearms since their inception.

**Objection to Opinion No. 6**

The Defendant does not object to Opinion 6 under Rule 702.

**TIME REQUESTED FOR HEARING**

As discussed at the December 19, 2013 hearing, the parties request that the Court consider the issues raised in this Joint Fed.R.Evid. 702 Motion to Strike Expert Opinions during the trial on the merits, now set to begin March 31, 2014. Such an approach is in the interests of judicial economy and would aid in the speedy and inexpensive determination of this action. *See* Fed.R.Civ.P. 1.

Dated this 15th day of January, 2014.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
ATTORNEY FOR DAVID STRUMILLO, JOHN B. COOKE, KEN PUTNAM, JAMES FAULL, LARRY KUNTZ, FRED JOBE, DONALD

13

1479

KRUEGER, STAN HILKEY, DAVE STRONG, PETER GONZALEZ, SUE KURTZ, AND DOUGLAS N. DARR

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION

s/Marc F. Colin
Jonathon M. Watson
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEYS FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK

1480

JOHN W. SUTHERS

s/*Matthew D. Grove*
DAVID C. BLAKE*
Deputy Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE*
Assistant Attorney General
STEPHANIE SCOVILLE*
Senior Assistant Attorney General
LEEANN MORRILL*
First Assistant Attorney General
Attorneys for Governor John W.
Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000

1481

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2014, I served via email a true and complete copy of the foregoing JOINT FED.R.EVID. 702 MOTION TO STRIKE EXPERT OPINIONS upon all counsel of record listed below via email:

| | |
|---|---|
| Matthew Groves | matt.groves@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| John T. Lee | john.lee@state.co.us |
| Molly Moats | molly.moats@state.co.us |
| David Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbot | dabbot@hollandhart.com |
| Richard Westfall | rwestfall@halewestfall.com |
| Peter Krumholz | pkrumholz@halewestfall.com |
| Marc F. Colin | mcolin@brunolawyers.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

_s/ Marla A. Brock_____

Marla A. Brock, Paralegal
Bruno, Colin  & Lowe, P.C.

1482

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION *et al.*,

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## PROPOSED FINAL PRETRIAL ORDER

      The parties, by and through their undersigned counsel, hereby file this Proposed Final Pretrial Order, and state as follows:

## 1. DATE AND APPEARANCES

      A final pretrial conference was held in this matter on February 20, 2014 at 3 p.m.

The following counsel appeared on behalf of Plaintiffs:

    1.  On behalf of Licensed Firearms Dealers USA Liberty Arms, Rocky Mountain Shooter Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms Inc. d/b/a Jensen Arms, Green Mountain Guns, Jerry's Outdoor Sports, Specialty Sports & Supply, and Goods for the Woods:

        Marc F. Colin
        Jonathon M. Watson
        Bruno, Colin & Lowe, P.C.
        1999 Broadway, Suite 3100
        Denver, CO 80202-5731
        Phone: (303) 831-1099

    2.  On behalf of Magpul Industries and the National Shooting Sports Foundation:

        Douglas L. Abbott

    Holland & Hart, LLP
    PO Box 8749
    Denver, CO 80201-8749
    Phone: (303) 295-8566

3. On behalf of David Bayne, Dylan Harrell, Outdoor Buddies, Inc., the Colorado

    Outfitters Association, Colorado Farm Bureau, Women for Concealed Carry, and

    Colorado Youth Outdoors:

    Richard A. Westfall
    Peter J. Krumholz
    Hale Westfall, LLP
    1600 Stout St. Suite 500
    Denver, CO 80202
    Phone: (720) 904-6022

4. On behalf of Colorado State Shooting Association and Hamilton Family

    Enterprises, Inc., d/b/a Family Shooting Center at Cherry Creek State Park:

    Anthony J. Fabian
    Law Offices of Anthony J. Fabian PC
    510 Wilcox St., Suite C
    Castle Rock, CO 80104
    Phone: (303) 663-9339

5. On behalf of David Strumillo, John B. Cooke, Ken Putnam, James Faull, Larry

    Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey, Dave Strong, Peter Gonzalez,

    Sue Kurtz, and Douglas N. Darr:

    David B. Kopel
    Independence Institute
    727 E. 16th Ave.
    Denver, CO 80203
    Phone: (303) 279-6536

The following counsel appeared on behalf of Defendant John W. Hickenlooper:

    Matthew D. Grove
    Kathleen Spalding
    Stephanie Scoville
    LeeAnn Morrill

Office of the Colorado Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000

## 2. JURISDICTION

**Plaintiffs' statement**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 42 U.S.C. § 1983 because the claims arise under the Constitution and statutes of the United States.

**Defendant's Statement:**

Defendant denies that this Court has jurisdiction over Counts I, II, and III of the Fourth Amended Complaint because none of the Plaintiffs have suffered, nor are they at risk of suffering, a concrete and particularized injury to their Second Amendment rights due to the implementation of HB 1224.

Defendant also denies that the following Plaintiffs have standing to pursue any claims in the Fourth Amended Complaint: David Bayne, USA Liberty Arms; Rocky Mountain Shooters Supply; 2nd Amendment Gunsmith & Shooter Supply, LLC; Burrud Arms Inc. d/b/a/ Jensen Arms; Green Mountain Guns; Jerry's Outdoor Sports; Specialty Sports & Supply; Goods for the Woods; and Magpul.

## 3. CLAIMS AND DEFENSES

### A.    Plaintiffs' Claims

**Claim 1:** *C.R.S. § 18-12-302 (HB 1224) – Prohibition of the Possession, Sale, or Transfer of Magazines Violates the Second and Fourteenth Amendments of the United States Constitution.*

1.      This claim is brought by all Plaintiffs.

2.    **Elements to be proved:**

a.    Plaintiffs have the burden to establish that Section 18-12-302 burdens conduct falling within the scope of the Second Amendment's guarantee.

Plaintiffs' Evidence:

This burden is met by the following: (1) magazines, are now, and historically have been, integral to the operation of firearms (Testimony of Michael Shain, Massad Ayoob, Elisa Dahlberg, and David Bayne and stipulations 10, 12, 14, 15, 19, and 20); (2) Section 18-12-302 restricts firearms and magazines that are commonly possessed by law-abiding citizens for lawful purposes (Testimony of Timothy Brough, John Burrud, Dylan Harrell, David Bayne, Elisa Dahlberg, Michael Shain, Shane Heap, Terry Maketa, John Cooke, Justin Smith, Lou Vallario, Jim Crone, Doug Hamilton, David Gill, and Ronald Abrams and stipulations 1, 2, 3, 6, 8, 10, 12, 14, 15, 17, 19-23, 25, 26, 38-40, and Exhibits 1, 2, 3, 4, 5, 6, 16-35, 45-46).

Defendant's Evidence:

Defendant agrees that Plaintiffs bear the burden of establishing that the challenged legislation burdens conduct falling within the scope of the Second Amendment's guarantee, but does not agree with Plaintiffs' formulation of the required test. Plaintiffs bear the burden of establishing that a large-capacity magazine is an "arm" within the meaning of the Second Amendment, and that the magazine sizes restricted by the challenged legislation are in "common use." Whether a magazine is an "arm" is a legal question.

Defendant will demonstrate that Plaintiffs cannot meet their burden of showing that large-capacity magazines are in "common use"—that is, that large numbers of

rounds are commonly necessary for self-defense (testimony from Plaintiffs' witnesses, Daniel Montgomery, Lorne Kramer, Jennifer Longdon, Jeffery Zax, Douglas Fuchs, John Cerar, John Cook, Andrew Logan, and Cheryl Ann Wilson; and via FRE 1006 exhibits, and the factual stipulations).

### Plaintiffs' Statement

> b.   Defendant must establish a close fit between the magazine ban and the actual public interest it serves, if any, and also that the state's interests are strong enough to justify the substantial encumbrance on individual Second Amendment rights.

### Defendant's Statement

> b.   Plaintiff bears the burden of establishing that the magazine capacity limitation imposes a substantial burden on their Second Amendment rights. In the absence of a substantial burden, Plaintiffs must show that the statute is irrational or arbitrary and that it cannot conceivably further a legitimate government interest. If Plaintiffs are able to establish a substantial burden, Defendant must show that the magazine capacity limitation is substantially related to its important goal of protecting public safety.

Defendant's Evidence:

The Defendant's evidence will show that Plaintiffs cannot establish that the challenged limitation on magazine capacity imposes any burden, much a less substantial one, on the individual right to self-defense (testimony from Plaintiffs' witnesses, Daniel Montgomery, Lorne Kramer, Jennifer Longdon, Jeffery Zax, Douglas Fuchs, John Cerar, Andrew Logan, Cheryl Ann Wilson, Michael Jones, Ernest Moore; FRE 1006 exhibits; stipulations).

Defendant will present evidence establishing a substantial relationship between the limitation on magazine capacity and the state's important goal of protecting public

safety (testimony from Daniel Montgomery, Lorne Kramer, Jennifer Longdon, Jeffery Zax, Douglas Fuchs, John Cerar, Andrew Logan, Cheryl Ann Wilson, Daniel Oates, Ernest Moore, Roger Salzgeber, Patricia Maisch; FRE 1006 exhibits).

Plaintiffs' Evidence:

Plaintiffs will present evidence that any state interest proffered by the Defendant in the legislative history of HB 1224 is not sufficient to justify Section 18-12-302's substantial encumbrance on individual Second Amendment rights. (Excerpts from the legislative history and testimony from Ronald Abrams). Plaintiffs will further present evidence that the Defendant cannot establish a close fit between the magazine ban and the public interest it purportedly serves. (Excerpts from the legislative history and testimony from Dr. Gary Kleck, Massad Ayoob, Kevin Davis, and Michael Shain, exhibits associated with these witnesses, and via FRE 1006 exhibits and stipulations.).

**Claim 2**[1]: *C.R.S. § 18-12-302 (HB 1224) – Grandfather Clause Permitting Possession of Magazines With a Capacity Greater than 15 Rounds Only if the Magazine was (1) Owned as of July 1, 2013; and (2) the Individual has Maintained "Continuous Possession" of the Magazine Violates the Second and Fourteenth Amendments of the United States Constitution.*

1.     This claim is brought by the following Plaintiffs: Colorado Outfitters Association; Colorado Farm Bureau; National Shooting Sports Foundation; Colorado Youth Outdoors; Outdoor Buddies, Inc.; Women

---

[1] Plaintiffs recognize that the Fourth Amended Complaint lists the substantive Second Amendment claim and Fourteenth Amendment vagueness claim against Section 18-12-302's grandfather clause together as claim 3. *See* Fourth Amended Complaint, [Doc. 116], p. 45. For clarity and because they are two legally distinct claims, they are listed separately here, as Claim 2 and Claim 3.

for Concealed Carry; Colorado State Shooting Association; Hamilton Family Enterprises; David Strumillo; David Bayne; Dylan Harrell; John B. Cooke; Ken Putnam; James Faull; Larry Kuntz; Fred Jobe; Donald Krueger; Stan Hilkey; Dave Stong; Peter Gonzalez; and Douglas N. Darr.

2.  **Elements to be proved:**

    a.  Plaintiffs have the burden to establish that Section 18-12-302 burdens conduct falling within the scope of the Second Amendment's guarantee.

Plaintiffs' Evidence:

Plaintiffs will present evidence regarding the integral nature of the magazine to firearms and commonality of magazines as outlined in Claim 1. Also, this element will be established through evidence that Section 18-12-302 restricts the ability of a lawful owner to loan magazines to other law-abiding citizens for lawful purposes (Testimony of Justin Smith, Terry Maketa, John Cooke, Lou Vallario, Shane Heap, Jim Crone, Ronald Abrams, Doug Hamilton, Dylan Harrell, David Bayne, David Gill, and Elisa Dahlberg).

Defendant's Evidence:

Defendant will establish that Plaintiffs have not met their burden of showing that the "continuous possession" requirement burdens conduct falling within the scope of the Second Amendment's guarantee. Defendant will demonstrate that the "continuous possession" requirement does not prevent any Plaintiff from possessing a fully functional semi-automatic firearm, much less impose a substantial burden, on the individual right to self-defense (testimony from Plaintiffs' witnesses, Daniel Montgomery, Lorne Kramer, Jennifer Longdon, Jeffery Zax, Douglas Fuchs, John Cerar, Andrew Logan, and Cheryl Ann Wilson). Defendant will present legal argument establishing that the Second

Amendment does not guarantee the right to loan large-capacity magazines to other persons.

### Plaintiffs' Statement

    b.   Defendant must establish a close fit between the magazine ban and the actual public interest it serves, if any, and also that the state's interests are strong enough to justify the substantial encumbrance on individual Second Amendment rights.

### Defendant's Statement

    b.   Plaintiff bears the burden of establishing that the "continuous possession" of the magazine capacity limitation imposes a substantial burden on their Second Amendment rights. In the absence of a substantial burden, Plaintiffs must show that the statute is irrational or arbitrary and that it cannot conceivably further a legitimate government interest. If Plaintiffs are able to establish a substantial burden, Defendant must show that the magazine capacity limitation is substantially related to its important goal of protecting public safety.

Defendant's Evidence:

The Defendant's evidence will show that Plaintiffs cannot establish that the "continuous possession" requirement imposes any burden, much a less substantial one, on the individual right to self-defense (testimony from Plaintiffs' witnesses, Daniel Montgomery, Lorne Kramer, Jennifer Longdon, Jeffery Zax, Douglas Fuchs, John Cerar, Andrew Logan, Cheryl Ann Wilson, Michael Jones, Ernest Moore; FRE 1006 exhibits; stipulations).

Defendant will present evidence establishing a substantial relationship between the "continuous possession" requirement and the state's important goal of protecting public safety (testimony from Daniel Montgomery, Lorne Kramer, Jennifer Longdon,

Jeffery Zax, Douglas Fuchs, John Cerar, Andrew Logan, Cheryl Ann Wilson, Daniel

Oates, Ernest Moore, Roger Salzgeber, Patricia Maisch; FRE 1006 exhibits).

Plaintiffs' Evidence:

Plaintiffs will present evidence that any state interest proffered by the Defendant

in the legislative history of HB 1224 is not sufficient to justify Section 18-12-302's

substantial encumbrance on individual Second Amendment rights. (Excerpts from the

legislative history and testimony from Ronald Abrams, and from the evidence in part a.

of this claim). Plaintiffs will further present evidence that the Defendant cannot establish

a close fit between the magazine ban and the public interest it purportedly serves.

(Excerpts from the legislative history and testimony from Dr. Gary Kleck, Massad

Ayoob, Kevin Davis, and Michael Shain, their associated exhibits, and FRE 1006

exhibits).

**Claim 3:** *C.R.S. § 18-12-302 (HB 1224) – Grandfather Clause Permitting Possession of Magazines With a Capacity Greater than 15 Rounds Only if the Magazines were (1) Owned as of July 1, 2013; and (2) the Individual has Maintained "Continuous Possession" of the Magazine is Unconstitutionally Vague Under the Fourteenth Amendment of the United States Constitution.*

1. This claim is brought by the following Plaintiffs: Colorado Outfitters Association; Colorado Farm Bureau; National Shooting Sports Foundation; Colorado Youth Outdoors; Outdoor Buddies, Inc.; Women for Concealed Carry; Colorado State Shooting Association; Hamilton Family Enterprises; David Strumillo; David Bayne; Dylan Harrell; John B. Cooke; Ken Putnam; James Faull; Larry Kuntz; Fred Jobe; Donald Krueger; Stan Hilkey; Dave Stong; Peter Gonzalez; and Douglas N. Darr.

2. Plaintiffs have the burden of proof by a preponderance of the evidence.

3. **Elements to be proved:**

    a. <u>Whether a facial vagueness challenge is appropriate under these circumstances.</u>

<u>Plaintiffs' Evidence:</u>

Plaintiffs will present evidence that Section 18-12-302 threatens to chill constitutionally protected conduct by preventing law-abiding citizens from loaning, storing, and transferring possession of their firearms and magazines for maintenance and repair, as well as for other lawful purposes. (Testimony from Michael Shain, Timothy Brough, John Burrud, Doug Hamilton, Ronald Abrams, Terry Maketa, Justin Smith, John Cooke, Lou Vallario, Shayne Heap, Jim Crone, Elisa Dahlberg, Dylan Harrell, David Bayne, and David Gill, and Exhibits 4 and 6-8). Further, a facial vagueness challenge is appropriate under these circumstances because Plaintiffs seek declaratory judgment on a pre-enforcement review. (Fourth Amended Complaint, [Doc. 116]).

<u>Defendant's Evidence:</u>

Defendant will present argument that a facial vagueness challenge is inappropriate in this case because Plaintiffs' claim of "chilling" is based on an unreasonable interpretation of the challenged legislation.

    b. <u>The Court must next consider the strictness of the vagueness test required and the degree of vagueness the Constitution tolerates.</u>

<u>Plaintiffs' Evidence:</u>

Plaintiffs will present evidence that a high degree of specificity is required because (1) Section 18-12-302 is a criminal statute; (2) Section 18-12-302 contains no scienter requirement; (3) Section 18-12-3022 is not a regulatory statute governing business activities; and (4) Section 18-12-302 threatens to inhibit constitutionally

protected conduct. (Testimony from Michael Shain, Ronald Abrams, Terry Maketa, Justin Smith, John Cooke, Jim Crone, Lou Vallario, and Shayne Heap, and Exhibits 4 and 6-8).

Defendant's Evidence:

Defendant will present argument concerning the appropriate interpretation of the challenged statute under Colorado law, and that Plaintiffs have not met their burden of demonstrating that a "high degree of specificity is required."

c.   Whether Section 18-12-302 provides fair notice.

Plaintiffs' Evidence:

Plaintiffs will present evidence that Section 18-12-302 does not define the criminal offense with sufficient definiteness such that ordinary people can understand what conduct is prohibited (Testimony from Michael Shain, Timothy Brough, John Burrud, Doug Hamilton, Ronald Abrams, Terry Maketa, Justin Smith, John Cooke, Shayne Heap, Lou Vallario, Jim Crone, Elisa Dahlberg, Dylan Harrell, David Bayne, and David Gill, James Spoden, Ronald Sloan, and Exhibits 4 and 6-8).

Defendant's Evidence:

Defendant will present evidence and argument concerning the appropriate interpretation of the "continuous possession" requirement, including the Governor's signing statement for HB 1224 and first and second Technical Guidance letters issued in response to that signing statement.

d.   Adequacy of Section 18-12-302's enforcement standards

Plaintiffs will establish that Section 18-12-302 does not include adequate enforcement standards and authorizes and encourages arbitrary and discriminatory enforcement that allows policeman, prosecutors, and juries to pursue their personal predilections (Testimony from Michael Shain, Timothy Brough, John Burrud, John Cooke, Terry Maketa, Doug Hamilton, Ronald Abrams, John Cooke, Terry Maketa, Justin Smith, Shayne Heap, Lou Vallario, Jim Crone, David Gill, James Spoden, Ronald Sloan, and exhibits 4 and 6-8).

Defendant's Evidence:

Defendant will present evidence and argument concerning the appropriate interpretation of the "continuous possession" requirement, including the Governor's signing statement for HB 1224 and first and second Technical Guidance letters issued in response to that signing statement.

**Claim 4:** *C.R.S. §§ 18-12-112 and 18-12-302 (HB 1224 & 1229) Violate the Americans with Disabilities Act.*

1.      This claim is brought by the following Plaintiffs: David Bayne; Dylan Harrell; Outdoor Buddies; and the Colorado State Shooting Association, on behalf of its disabled members.

2.      Plaintiffs have the burden of proof by a preponderance of the evidence.

3.      **Elements to be proved:**

    a.      Plaintiffs are qualified individuals with a disability.

Plaintiffs' Evidence:

Plaintiffs will present evidence that Dylan Harrell and David Bayne have sustained spinal cord injuries, as a result of which they are confined to wheelchairs

(Testimony of Dylan Harrell and David Bayne). Plaintiffs will also testify that they are members of Outdoor Buddies, and that there are many other members of Outdoor Buddies who have similar disabilities. (Testimony of Dylan Harrell and David Bayne).

Defendant's Evidence:

Defendant will present evidence that neither of Dylan Harrell nor David Bayne is a "qualified individual with a disability" because they have made no claim that they have attempted to receive services or participate in public programs or activities provided by a public entity but been denied from the receipt of those services or participation in the public activity by virtue of their disability (testimony of Dylan Harrell and David Bayne).

          b.    Plaintiffs' Second Amendment right to self-defense, including self-defense in the home, are disparately impacted by HB 1224 and HB 1229.

Plaintiffs' Evidence:

Plaintiffs will present evidence that the ban on magazines of greater than 15 rounds impairs their ability to defend themselves because their disabilities make it appreciably more difficult to change magazines in self-defense situations, and they lack the mobility necessary to retreat to positions of safety where such magazine changes can be done. (Testimony of David Bayne, Dylan Harrell, and Massad Ayoob). Plaintiffs will also present evidence that their disabilities result in their having to temporarily transfer firearms, and that HB 1229's restrictions on private transfers disparately interfere with their exercise of Second Amendment rights. (Testimony of David Bayne, Dylan Harrell, and Massad Ayoob).

Defendant's Evidence:

Defendant will present evidence that limitations on magazine capacity have no adverse impact on Mr. Bayne's and Mr. Harrell's ability to engage in self-defense (testimony of David Bayne, Dylan Harrell, and Massad Ayoob). Defendant will present evidence that universal background check requirements have no disparate impact on either Mr. Bayne or Mr. Harrell.

c.   The discriminatory effect of HB 1224 and HB 1229 stems from Plaintiffs' disabilities.

Plaintiffs' Evidence:

Plaintiffs will present evidence that the sole reason for the disparate impact described in connection with the second element is their status as qualifying disabled individuals. (Testimony of Dylan Harrell, David Bayne, and Massad Ayoob; Exhibit 183).

Defendant's Evidence:

Plaintiffs will present evidence that the challenged statute has no disparate impact on either Mr. Bayne or Mr. Harrell (testimony of Dylan Harrell and David Bayne).

**Claim 5:** *C.R.S. § 18-12-112 (HB 1229) – Restrictions on Firearm Sales and Temporary Transfers Violate the Second and Fourteenth Amendments of the United States Constitution.*

1.   This claim is brought by the following Plaintiffs: Colorado Outfitters Association; Colorado Farm Bureau; National Shooting Sports Foundation; Magpul Industries; Colorado Youth Outdoors; USA Liberty Arms; Outdoor Buddies, Inc.; Women For Concealed Carry; Colorado State Shooting Association; Hamilton Family Enterprises, Inc., D/B/A Family Shooting Center at Cherry Creek State Park; David Strumillo;

David Bayne; Dylan Harrell; Rocky Mountain Shooters Supply; 2nd Amendment Gunsmith & Shooter Supply, LLC; Burrud Arms Inc. D/B/A Jensen Arms; Green Mountain Guns; Jerry's Outdoor Sports; Specialty Sports & Supply; and Goods For The Woods.

2. **Elements to be proved:**

a. <u>Plaintiffs have the burden to establish that Section 18-12-112 burdens conduct falling within the scope of the Second Amendment's guarantee.</u>

<u>Plaintiffs' Evidence:</u>

This burden is shown by the following: (1) evidence that Section 18-12-112 severely restricts the temporary transfer of all firearms (Testimony from Bob Hewson, Elisa Dahlberg, Timothy Brough, John Burrud, J. Paul Brown, Terry Maketa, Shayne Heap, Jim Crone, John Cooke, Justin Smith, Lou Vallario, Ronald Abrams, and Michelle Eichler, and Exhibits 3, 9, and 37-40); (2) evidence that Section 18-12-112 has caused many federal licensed firearms dealers to refuse to conduct background checks, which results in law-abiding citizens being unable to privately sell, purchase, or temporarily transfer firearms (Testimony from Bob Hewson, Elisa Dahlberg, Timothy Brough, John Burrud, J. Paul Brown, Michelle Eichler, Nick Colglazier, James Spoden, Terry Maketa, Shayne Heap, Jim Crone, John Cooke, Justin Smith, Lou Vallario, Ronald Abrams, and Ron Sloan, and Exhibits 5, 10-14, 41, 141-42).

<u>Defendant's Evidence:</u>

Defendant will present evidence and argument that private firearms sales do not fall within the scope of the Second Amendment, and that § 18-12-112 has not prevented any Plaintiff from acquiring or possessing a firearm for any lawful purpose (testimony

from Plaintiffs, James Spoden, Andy Logan, Lorne Kramer, Daniel Montgomery, and Ron Sloan).

**Plaintiffs' Statement**

    b.  Defendant must establish a close fit between the required background checks and the actual public interest it serves, if any, and also that the state's interests are strong enough to justify the substantial encumbrance on individual Second Amendment rights.

**Defendant's Statement**

    b.  Plaintiff bears the burden of establishing that requiring background checks for private firearms transfer imposes substantial burden on their Second Amendment rights. In the absence of a substantial burden, Plaintiffs must show that the statute is irrational or arbitrary and that it cannot conceivably further a legitimate government interest. If Plaintiffs are able to establish a substantial burden, Defendant must show that the private background check requirement is substantially related to its important goal of protecting public safety.

Defendant's Evidence:

    Defendant will present evidence that the expansion of background check requirements is substantially related to the state's goal of protective public safety, because requiring background checks for private sales will make it more difficult for prohibited persons to acquire firearms, reduce firearms trafficking and illegal diversion, and reduce firearms homicide rates (testimony of Daniel Webster, James Spoden, Ronald Sloan, Daniel Oates, Daniel Montgomery, Lorne Kramer, Ernest Moore).

Plaintiffs' Evidence:

    Plaintiffs will present evidence that any state interest proffered by the Defendant in the legislative history of HB 1229 is not sufficient to justify Section 18-12-112's substantial encumbrance on individual Second Amendment rights. (Excerpts from the

legislative history). Moreover, background checks in the format required by Section 18-12-112 and during the course of private sales and temporary transfers do not serve any public benefit. Further, Plaintiffs will present evidence that Defendant has not established a close fit between the particular requirements of Section 18-12-112 and the public interest it is supposed to serve. (Testimony from Bob Hewson, Elisa Dahlberg, Timothy Brough, John Burrud, J. Paul Brown, Michelle Eichler, Nick Colglazier, James Spoden, and Ron Sloan, and Exhibits 6, 10-14, 37-41, 141-42).

**B.     Defendant's Affirmative Defenses**

Defendant raises the following affirmative defenses with respect to the claim raised under the Americans with Disabilities Act:

1.     The statutes are justified by a legitimate, non-discriminatory purpose (legislative history);

2.     The statute is not a program, service, or activity and therefore falls outside the scope of Title II of the ADA;

3.     Plaintiffs are not qualified individuals with a disability (testimony of David Bayne and Dylan Harrell);

4.     The requested modification would fundamentally alter the nature of the law (legal argument);

5.     The modification of the law plaintiffs propose is unreasonable and would fundamentally change the nature of the law (legal argument).

## 4. STIPULATIONS

1.     Firearms have been lawfully and privately owned in the United States since before the adoption of the Second Amendment to the United States Constitution, and at all times since.

2.     Most firearm owners own more than one firearm.  The full extent of private ownership is unknown, but half or more of all households claim that they do not own a firearm.

3.     Since 2004, manufacturing of all types of handguns and rifles in the United States for sale to the non-military market has increased annually from approximately 2.35 million in 2004 to 5.49 million in 2011. In 2011, 224,000 rifles and handguns were exported, and 2.72 million were imported. Source: Bureau of Alcohol Tobacco, Firearms & Explosives, *Firearms Commerce in the United States, Annual Statistical Update 2013*, Exhibits 1-3.

4.     The total number of handguns, rifles or shotguns in Colorado or the United States is not known.

5.     There are hundreds of different firearm manufacturers, but the majority of firearms are produced by several dozen American and foreign manufacturers. There are thousands of different models of firearms, and often numerous variations of a given model. For example, the Ruger SR9 is a model of 9mm semi-automatic pistol that has at least four variants: 3301, 3309, 3312, 3321. The specifications on all four are the same, except the 3301 comes with a 17 round magazine in a brushed stainless finish; the 3309 comes with a 10 round magazine in a brushed stainless finish; the 3312 comes with a 10

round magazine in a black nitride finish; the 3321 comes with a 17 round magazine in a black nitride finish.

6.      Handguns predominantly include semi-automatic pistols and revolvers. No currently-manufactured revolvers hold more than 15 rounds. There are also other less popular styles of handguns, such as derringers, and other handguns with a one or two shot capacity. In its data reporting, the ATF classifies these guns as "other" and excludes them from "pistols" and "revolvers," and none currently manufactured has a capacity greater than 15 rounds.

7.      Long guns are rifles or shotguns. Some shotguns are single shot and some are double-barreled. Neither has an ammunition capacity of greater than 15. Some shotguns are pump action, lever action, bolt action, or semi-automatic.  Most shotguns have one or two fixed magazine tubes each of 28 inches or less, and are not affected by HB 1224.  A few shotgun models have magazine tubes longer than 28 inches and a few others models use detachable box magazines which can store more than 8 rounds of ammunition. These latter two types of shotguns are subject to the restrictions in HB 1224.

8.      Rifles may be single shot, bolt action, lever action, pump action, or semi-automatic. There are numerous models of semi-automatic rifles, including those based on the popular AR-15 platform.

9.      Bolt action rifles do not use magazine tubes that hold more than 15 rounds. Some bolt action rifles use detachable box magazines of various sizes, but most hold less than 10 rounds. As with any detachable box magazine, such magazines may be of any size. Lever action rifles typically use tube magazines. Lever action rifles with tube

magazines are exempt from HB 1224. Additionally, rifles with tube magazines that can hold more than 15 rounds and that use .22 rimfire ammunition are exempt under HB 1224

10.     More than 300,000,000 firearms are lawfully owned in the United States. A significant percentage of firearms privately owned are semi-automatic, most of which utilize a detachable box magazine. Although the total number is not known, the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions.

11.     After July 1, 2013, thousands of models and variants of firearms with detachable box magazines remain available for lawful purchase and use for home defense in Colorado. With very few exceptions, every gun that was available before July 1, 2013, is compatible with magazines holding 15 or fewer rounds. Similarly, after July 1, 2013 many models and variants of magazines designed to hold 15 or fewer rounds remain available for lawful purchase and use for home defense in Colorado.

12.     Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. In 2011, AR-15 platform rifles accounted for approximately 18% of all rifles made in the United States for the domestic market. Many of these are used by law enforcement officers in the line of duty and many are used by private citizens. There are a large number of other models of semi-automatic rifles, including from companies such as Ruger and Marlin, which use detachable box magazines and which have been lawfully purchased and used in the United States and Colorado.  An unknown number of AR-15 platform and other semi-automatic rifles have been transferred or obtained unlawfully or used for unlawful purposes.

13.     The number of AR-15 platform or other semi-automatic rifles in Colorado is not known. The number of AR-15 platform or other semi-automatic rifles in Colorado equipped with magazines of more than 15 rounds is not known, but is less than the total.

14.     All AR-15 platform rifles are semi-automatic and all utilize a detachable box magazine.

15.     In states without laws regulating magazine capacity, AR-15 platform rifles are usually sold at retail with a detachable box magazine capable of holding up to 30 rounds. In states without laws regulating magazine capacity, the majority of owners of AR-15 platform rifles use magazines with a capacity of 20 and/or 30 rounds.

16.     All AR-15 platform rifles are capable of accepting and functioning properly with magazines of 15 or fewer rounds.

17.     In 2011, the most recent year for which data is available, more than 2.5 million pistols were manufactured nationally; more than 500,000 revolvers were manufactured nationally.

18.     HB 1224 does not prevent a manufacturer from shipping to Colorado a semi-automatic rifle or pistol without any magazine, or with a magazine that complies with HB 1224.

19.     Semi-automatic firearms equipped with detachable box magazines with a capacity greater than 15 rounds are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home.

20.     Semi-automatic pistols and rifles cannot function as designed without a magazine. Semi-automatic firearms are designed to discharge a bullet for each pull of the

trigger, automatically extract and eject the spent cartridge case from the firing chamber, re-cock the firing mechanism, and load a new cartridge into the firing chamber so it can be fired again with another pull of the trigger.

21.     Detachable magazines can be purchased independently of firearms, including for use with semi-automatic rifles and semi-automatic pistols. The most widely utilized firearm magazine is a detachable box magazine. Detachable box magazines come in a wide variety of capacities.

22.     Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15, for example the Glock 17, which is one of the most popular handguns sold in the United States. The Glock 17 is often used by law enforcement personnel. Nine millimeter handguns come with a variety of magazine sizes, including 15 or fewer rounds. Compacts and sub-compact handguns are sold at retail with magazines of 15 or fewer rounds.

23.     Most semi-automatic pistols in calibers of .40 or larger are not sold at retail with magazines capable of holding more than 15 rounds. Some owners of such handguns use extenders which add 1, 2, or 3 rounds of capacity.

24.     No semi-automatic pistols in calibers of .45 are sold at retail with magazines capable of holding more than 15 rounds.

25.     Although the total number of magazines of any size in the United States is not known, the number of large capacity magazines is in the tens of millions. There are also tens of millions of magazines in sizes of 15 rounds or less.

26.     Although the total number of magazines of any size in Colorado is not known, the number of large capacity magazines is in the millions. There are also millions of magazines in sizes of 15 rounds or less.

27.     With some exceptions, manufacturers of semi-automatic pistols that have standard magazines that hold more than 15 rounds also manufacture magazines with a capacity of 15 rounds or less. Aftermarket manufacturers also make and sell magazines with a capacity of 15 rounds or less. In the current market, for semi-automatic pistols and rifles for which the standard magazine is greater than 15 rounds and for which a substitute magazine is available, the substitute magazine's capacity is often 10 rounds. Fifteen round magazines also are commercially available for AR-15 platform rifles and some pistols.

28.     Magazines with a capacity of 15 or fewer rounds are manufactured in the United States and are available for purchase in Colorado.

29.     Many law enforcement agencies, including the Colorado State Patrol and the Federal Bureau of Investigation, issue handguns as duty weapons that have magazines containing 15 or fewer rounds. Some officers in these agencies are authorized to carry semi-automatic rifles with large capacity magazines in addition to the sidearm issued by their employers.

30.     Firearm magazines can become non-operational due to normal wear and tear or other damage. The lifespan of any firearm magazine cannot be known and varies based on materials, design, maintenance and use, as well as several other factors. As with any mechanical device, magazines can become non-functional over time. Depending upon use and maintenance, magazines may operate properly for decades or more.

31.     Components such as limiters that can decrease the capacity of magazines are manufactured and are available for purchase in the United States.

32.     There are magazines manufactured to accommodate no more than fifteen rounds of ammunition that can be converted to accept additional ammunition.

33.     Base and floor plates (on box magazines) and end caps (on tube magazines) may be either removable or permanently affixed. However, most magazines contain removable base and floor plates or end caps.

34.     Removable base and floor plates and end caps allow for cleaning and maintenance and repair.

35.     A removable base or floor plate or end cap alone does not increase a magazine's capacity.

36.     Magazines with removable base or floor plates or end caps may accept additional components, such as extensions, that increase capacity.

37.     Components that can increase the capacity of magazines are manufactured in the United States.

38.     After July 1, 2013, the following models of Magazines manufactured by Magpul may not be sold to individuals in Colorado: MAG557 – 30 rounds; MAG556 – 30 rounds; MAG570 – 30 rounds; MAG571 – 30 rounds; MAG560 – 20 rounds; MAG555 – 30 rounds; MAG291 – 20 rounds; MAG234 – 30 rounds; MAG241 – 30 rounds; MAG292 – 25 rounds.

39.     Magpul has lost the revenue associated with the inability to sell the model magazines listed in No. 38 above to customers in Colorado after July 1, 2013.

40.     Because Magpul principally sells to distributors, it does not know the precise number of magazines that it manufactures that are sold in Colorado and therefore cannot know the actual amount of lost sales revenue. Magpul also sells through direct Internet sales, and sold at least 500,000 magazines to Colorado residents in 2013 before the effective date of HB 1224. Sales in Colorado in 2013 were inflated by increased demand to purchase Magpul magazines prior to the effective date of HB 1224.

41.     Magpul has more than $100 million in total sales annually. Magpul had more than $7.5 million in sales of magazines to Colorado alone in 2013. Magpul had a Colorado "spend" of $46 million in 2012 and expected to have a Colorado spend of $85 million during 2013.

42.     Between 20% and 50% of Magpul total magazine sales are to government entities (International, Federal, and State) depending on numerous variables, such as troop deployments. For example, in 2010, Magpul entered a 4-year contract with the British Army to deliver 1,000,000 thirty-round magazines.

43.     In 2013, Magpul sold more magazines in Colorado than in any prior year.

44.     Colorado law enforcement officers and agencies may acquire and possess the Magpul magazines listed in No. 1 above. Pursuant to HB 1224, any Colorado FFL or distributor may still purchase the Magpul model magazines listed in No. 38 above to sell the magazines out of state or in any other manner permitted by law.

45.     In December 2012, Magpul announced new magazines with a 10-cartridge capacity -- the MAG559 and MAG290. The magazines began shipping in April 2013.

Both models are sold direct to individuals in Colorado. Both models are manufactured with the same materials and are tested to be just as functional and reliable as Magpul magazines of higher capacity. The MAG559 and MAG290 are marketed by Magpul as being "Perfect for hunting applications, depending on local hunting laws, and also for states where overall capacity is limited."

46.     Magpul manufactures nearly 500 products for sale worldwide.

47.     Magpul manufactures and sells dozens of products for AR styled semi-automatic firearms unaffected by HB1224, including stocks, slings, grips and sights.

48.     Magpul manufactures magazine accessories – many designed to facilitate changing magazines of any size – including magazine couplers, magazine loops and speed plates.

49.     Magpul manufactures and sells magazine limiters in all states in 5 and 10 round configurations.

50.     To date, Magpul has not chosen to manufacture a 15 round magazine.

51.     Magpul does not manufacture a product to extend any of its magazines to hold a larger capacity. Magpul does not manufacture a product designed to extend the capacity of any semi-automatic magazine made by any manufacturer.

52.     All of Magpul's magazines feature a removable baseplate. This design feature allows for ease of access to the magazine's internal parts for cleaning and maintenance.

53.     Magpul designs and manufactures high-quality magazines, many of which meet or exceed military grade standards.

54.   Magpul has not modified its standard magazines in order to sell them into states that have enacted magazine capacity restrictions.

55.   Magpul does not design its magazines or magazine components to function with other companies' accessories.

56.   Magpul gave away thousands of magazines in Colorado in June 2013. Certain promotional magazines were manufactured with different imprinted logos, including "Boulder Airlift", "Free Colorado" and "1999 2013."

57.   Since at least 2007, Magpul has manufactured all its magazines with a manufacturing date stamp.

58.   Magpul is currently operating in Colorado. As reported in multiple outlets, Magpul plans to relocate operations outside of Colorado.

59.   Between March 1 and June 30, 2013, Magpul gave Colorado residents priority in ordering magazines with 20- or 30-round capacity.

60.   Magpul describes firearm magazines in its literature as follows: "We ask a lot from this little box, without which our firearms become far less useful. This 'simple' feeding device can easily be taken for granted…until it doesn't work."

61.   Since July 1, 2013, Magpul has and will continue to sell or donate magazines to law enforcement agencies located in Colorado as well as law enforcement agencies in other states.

62.   Richard Fitzpatrick, Doug Smith, Libardo Jimenez, Jessica Johnson, and Tara Heller are all current employees of Magpul.

## 5. PENDING MOTIONS

There are currently a total of six FRE 702 motions pending before this court, relating to some or all of the expert opinions of Kevin Davis, Michael Shain, Massad Ayoob, Gary Kleck, John Cerar, and Douglas Fuchs.

In addition, the parties request leave from the Court to file trial briefs prior to the March 31, 2014, trial on the merits. Trial briefs will frame and present argument on the legal issues surrounding the appropriate legal standards to be applied to the Second Amendment claims, the Fourteenth Amendment vagueness claim, the claim raised under the Americans with Disabilities Act, and other issues that may require resolution. Determination of the applicable legal standards is highly important to the resolution of this matter, and the parties recognize that the Proposed Final Pretrial Order is not the appropriate venue for such argument.

## 6.  WITNESSES

A single joint list of all witnesses is appended hereto as ***Addendum A***.

## 7. EXHIBITS

a.      A single joint Exhibit List is appended hereto as ***Addendum B***.

b.      Copies of listed exhibits must be provided to opposing counsel and any *pro se* party no later than 30 days before trial.  The objections contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later than 14 days after the exhibits are provided.

### 8. DISCOVERY

Discovery has been completed, with the exception of a few agreed upon depositions that will be taken prior to trial.

### 9. SPECIAL ISSUES

This case involves Second and Fourteenth Amendment challenges to Colorado's gun legislation. In many ways, the law surrounding Second Amendment and Fourteenth Amendment vagueness challenges is unsettled. As noted above in Section 5, the determination of the legal standards applied to Plaintiffs' claims is essential to the resolution of this matter. Consequently, the parties propose that they file trial briefs prior to the March 31, 2014, trial on the merits containing argument on the appropriate law and legal standards to be applied.

**Defendant's Statement:**

i.       The parties disagree as to the continued viability of Claim 2 in the Fourth Amended Complaint (Doc. 116) in the wake of the Court's order on the Governor's motion to dismiss. (*See* Doc. 96, fn. 3). Defendant anticipates seeking the Court's permission to file a motion *in limine* concerning this claim, related opinions proffered by Plaintiffs' expert Michael Shain, and Plaintiffs' identification of previously undisclosed Exhibits 16-34, 45-46 and related testimony.

ii.      Defendant anticipates offering testimony from Aurora Police Chief Daniel Oates concerning the mass shooting that took place in Aurora, Colorado, on July 20, 2012, and testimony from Reading, Connecticut Police Chief Douglas Fuchs concerning the mass shooting that occurred in Newtown, Connecticut, on December 14,

2012. The prosecution in the Aurora shooting is seeking the death penalty against defendant James Holmes, and the judge in that case has issued a gag order to limit pretrial publicity. While Chief Oates' testimony is not prohibited by that gag order, any testimony about the Aurora shooting will be widely reported, and therefore has the potential to adversely impact the pending criminal trial. For those portions of Chief Oates' testimony that touch on the events of July 20, 2012, Defendant respectfully requests closure of the courtroom.

Defendant may request a similar remedy for the portion of Chief Fuchs' testimony that relates to the Newtown shooting. While there is no pending criminal trial as a result of that shooting, publicity associated with testimony describing the events could potentially result in the disclosure of information that has been heretofore kept confidential by Connecticut authorities.

## 10.  SETTLEMENT

Because this case involves facial challenges to the constitutionality of a state law, settlement is not a possibility.

## 11.  OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 12.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

a.      Trial of the claims is to the Court.

b.      Estimated trial time is 10 days – 30 hours per side, time to be kept by the Court.

c.      Trial is to be held before the Honorable United States District Court Judge Marcia S. Krieger, United States District Court, District of Colorado.

d.      Any other orders pertinent to the trial proceedings: None.


DATED this _____day of _____, 20_____.


BY THE COURT:


_____
Marcia S. Krieger
United States District Judge


APPROVED:

1513

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Case No. <u>13-CV-01300-MSK-MJW</u>                Date: January 31, 2014

Case Title: *Colorado Outfitters Association, et al. v. Hickenlooper*

**ADDENDUM A**
**JOINT WITNESS LIST**

| <u>WITNESS</u> | <u>TIME ESTIMATED FOR EXAMINATION</u> |
|---|---|
| Timothy Brough | 105 minutes (60/45) |
| John Burrud | 105 minutes (60/45) |
| Shayne Heap | 75 minutes (60/15) |
| Terry Maketa | 75 minutes (60/15) |
| Major Ronald Abrams | 105 minutes (75/30) |
| Elisa Dahlberg | 90 minutes (60/30) |
| Bob Hewson | 105 minutes (75/30) |
| Dylan Harrell | 60 minutes (45/15) |
| Nick Colglazier | 90 minutes (60/30) |
| Doug Hamilton | 105 minutes (60/45) |
| James Spoden | 75 minutes (60/15) |
| Ron Sloan | 60 minutes (45/15) |
| Daniel Oates | 90 minutes (75/15) |
| Daniel Montgomery | 45 minutes (30/15) |
| Lorne Kramer | 45 minutes (30/15) |
| Roger Salzberger | 60 minutes (45/15) |

| | |
|---|---|
| Ernest Moore, MD | 90 minutes (60/30) |
| Jennifer Longdon | 45 minutes (30/15) |
| Expert Kevin L. Davis | 150 minutes (75/75) |
| Expert Massad Ayoob | 225 minutes (105/120) |
| Expert Dr. Gary Kleck, Ph.D. | 225 minutes (105/120) |
| Expert Michael Shain | 225 minutes (135/90) |
| Expert Dr. Jeffrey Zax, Ph.D. | 180 minutes (120/60) |
| Expert Daniel Webster | 180 minutes (120/60) |
| Expert Douglas Fuchs | 210 minutes (120/90) |
| Expert John Cerar | 210 minutes (120/90) |
| Plaintiff John Cooke | 60 minutes (45/15) |
| Justin Smith | 60 minutes (45/15) |
| Lou Vallario | 60 minutes (45/15) |
| Jim Crone | 60 minutes (45/15) |
| Michelle Eichler | 80 minutes (50/30) |
| J. Paul Brown | 85 minutes (55/30) |
| David Bayne | 75 minutes (45/30) |
| David Gill | 75 minutes (45/30) |
| Michael Jones | 45 minutes (30/15) |
| Andrew Logan | 60 minutes (30/30) |
| Cheryl Ann Wilson | 45 minutes (30/15) |
| Patricia Maisch | 45 minutes (30/15) |

Randy Hampton_____          _____25 minutes (25/10)_____

Any witnesses required for authentication of any exhibit

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger


Case No.   Civil Action No. 13-CV-1300-MSK-MJW _____

Date: January 31, 2014

Case Title: *Colorado Outfitters Association*, *et al.*, Plaintiffs v. *John W. Hickenlooper, Governor of the State of Colorado*, Defendant

**ADDENDUM B**
**JOINT EXHIBIT LIST**

| Exhibit | Witness | Brief Description | Stipulation | Offered | Admitted | Refused | Court Use Only |
|---|---|---|---|---|---|---|---|
| 1 | Proposed stipulation, or Rule 1006, by Smith Cooke, Heap, Vallario, Maketa, or Crone | Sheriffs Offices' Firearms Policies | | | | | |
| 2 | Proposed stipulation | Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report to the National Institute of Justice, June 2004. | | | | | |
| 3 | Proposed stipulation | Defendant's Response to Non-Profits and Individual Disabled Plaintiffs' 1st Requests for Admission. | | | | | |
| 4 | Proposed stipulation | Defendant's Response to Sheriffs and Strumillo's Discovery Requests. | | | | | |
| 5 | Proposed stipulation | Cabela's ATF Compliance, by Falcon Communication. | | | | | |
| 6 | Proposed stipulation | Defendant's Responses to Plaintiffs FFL, Magpul, CSSA, and Hamilton Family Enterprises' First Set of Discovery. | | | | | |
| 7 | Proposed stipulation, or | Colorado Bureau of Investigation emails, bates | | | | | |

| | Sloan or Spoden | labeled as CBI 00033, 00071-00075, 00125, 000126. | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Proposed stipulation, or other witness as needed | Previous Colorado Attorney General Technical Guidance | | | | | |
| 9 | Proposed stipulation | ATF Procedure 2013-1 | | | | | |
| 10 | Proposed stipulation, or Sloan or Spoden | Colorado Bureau of Investigation InstaCheck Firearm Statistics: Comparison of calendar year 2012 and calendar year 2013. | | | | | |
| 11 | Proposed stipulation, or Sloan or Spoden | Colorado Bureau of Investigation Private Sales July-September 2013, CBI 00001-00009 | | | | | |
| 12 | Proposed stipulation, or Sloan or Spoden | Colorado list of federally licensed firearms dealers | | | | | |
| 13 | Proposed stipulation, or Sloan or Spoden | Colorado Bureau of Investigation InstaCheck Firearms Statistics from September 19, 2013; CBI 00016-00019. | | | | | |
| 14 | Proposed stipulation, or Sloan or Spoden | Colorado Bureau of Investigation Unit: Reasons for Denial for Dealer/FFL and Private Firearm Transactions for the Months of July, August, September, October, and November 2013; CBI 00021-00030. | | | | | |
| 15 | John Burrud/Timothy Brough | Data compilations and summaries under FRE 1006 regarding federally licensed firearms Plaintiffs' sales and inventories. | | | | | |
| 16 | Michael Shain | ROBERT W.D. BALL, MAUSER MILITARY RIFLES OF THE WORLD. | | | | | |
| 17 | Michael Shain | Clayton E. Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE LAW REVIEW 699 (2008). | | | | | |
| 18 | Michael Shain | JAMES B. GARRY, WEAPONS OF THE LEWIS AND CLARK EXPEDITION | | | | | |
| 19 | Michael Shain | S.P. FJESTAD, BLUE BOOK OF GUN VALUES | | | | | |
| 20 | Michael Shain | NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES | | | | | |
| 21 | Michael Shain | GEORGE B. JOHNSON, INTERNATIONAL ARMAMENT | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 22 | Michael Shain | JERRY LEE, STANDARD CATALOG OF FIREARMS | | | | | | |
| 23 | Proposed stipulation, or Michael Shain | JERRY LEE, GUN DIGEST | | | | | | |
| 24 | Michael Shain | GEORGE MADIS, THE WINCHESTER HANDBOOK | | | | | | |
| 25 | Michael Shain | PHILLIP PETERSON, STANDARD CATALOG OF MILITARY FIREARMS | | | | | | |
| 26 | Michael Shain | JOHN PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING | | | | | | |
| 27 | Michael Shain | ARTHUR PIRKLE, WINCHESTER LEVER ACTION REPEATING FIREARMS | | | | | | |
| 28 | Michael Shain | W.H.B. SMITH, GAS, AIR, AND SPRING GUNS OF THE WORLD | | | | | | |
| 29 | Michael Shain | JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER, THE ILLUSTRATED HISTORY OF FIREARMS | | | | | | |
| 30 | Michael Shain | JIM SUPICA AND RICHARD NAHAS, STANDARD CATALOG OF SMITH & WESSON | | | | | | |
| 31 | Michael Shain | JOHN WALTER, RIFLES OF THE WORLD | | | | | | |
| 32 | Michael Shain | DOUG WICKLUND, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM | | | | | | |
| 33 | Michael Shain | HAROLD F. WILLIAMSON, WINCHESTER THE GUN THAT WON THE WEST | | | | | | |
| 34 | Michael Shain | LEWIS WINANT, FIREARMS CURIOSA | | | | | | |
| 35 | Rule 1006, by Smith Cooke, Heap, Vallario, Maketa, or Crone, or proposed stipulation | County Sheriffs' Responses to Defendant's Requests for Written Discovery. | | | | | | |
| 36 | Daniel Webster | Daniel Webster deposition transcript from case *New York v. A-1 Jewelry and Pawn* | | | | | | |
| 37 | Bob Hewson | Letter from Tommy Knappich to Bob Hewson dated Jan. 31, 2014 | | | | | | |
| 38 | Bob Hewson | Letter from Lynn A. Hammond to Bob Hewson dated Aug. 14, 2013 | | | | | | |
| 39 | Bob Hewson | Letter from Stephanie Donner to Mayor of Loveland and Loveland City Council dated July | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 10, 2003 | | | | | |
| 40 | Bob Hewson | Letter from Loveland City Council to John W. Hickenlooper dated July 2, 2013 | | | | | |
| 41 | Nick Colglazier | Chart Reflecting FFL Responses Regarding Willingness to Conduct 1229 Background Checks | | | | | |
| 42 | Proposed stipulation | ATF's Annual Firearms Manufacturers and Export Reports | | | | | |
| 43 | Proposed stipulation | ATF's Firearms Commerce in the United States Annual Statistical Update 2012 | | | | | |
| 44 | Proposed stipulation | ATF's Firearms Commerce in the United States, Annual Statistical Update 2013 (and 2014 update if it becomes available) | | | | | |
| 45 | Michael Shain | A.F. STOEGER, THE SHOOTERS BIBLE | | | | | |
| 46 | Michael Shain | JEAN-NOEL MOURET, PISTOLS AND REVOLVERS | | | | | |
| 47 | Daniel Webster | Daniel Webster deposition transcript from case *Illinois Assoc. of Firearms Retailers v. Chicago Pawn* | | | | | |
| 48 | Patricia Maisch and Roger Salzberger | New York Times news article dated January 9, 2011. | | | | | |
| 49 | Patricia Maisch | Patricia Maisch legislative testimony regarding HB 1224. | | | | | |
| 50 | Patricia Maisch | State of Patricia Maisch before the Senate Subcommittee on Crime and Terrorism, dated November 15, 2011. | | | | | |
| 51 | Ronald Abrams | Troop Organizational Chart and other charts | | | | | |
| 52 | Ronald Abrams | Colorado Mounted Rangers Firearms Policy | | | | | |
| 53 | Ronald Abrams | Colorado Mounted Rangers Policy & Procedure Manual, Version VI, October 2013 | | | | | |
| 54 | Ronald Abrams | CMR Memoranda of Understanding | | | | | |
| 55 | Nick Colglazier | State Resolutions Committee Report | | | | | |
| 56 | Cooke | Press Release, "Burglary in Progress Suspects Arrested" 6/29/11 | | | | | |
| 57 | Cooke | Press Release, "Three Arrested on Burglary | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Charges" 10/6/11 | | | | | |
| 58 | Cooke | Oath | | | | | |
| 59 | Cooke | Weld County Zoning Ordinance, Ch. 23: Zoning | | | | | |
| 60 | Proposed Stipulation | 5/16/13 Technical Guidance | | | | | |
| 61 | Proposed Stipulation | 7/10/13 Technical Guidance | | | | | |
| 62 | Dahlberg | The Armed Citizen: A Five Year Analysis | | | | | |
| 63 | Dahlberg | Photo of firearm with 50-round magazine | | | | | |
| 64 | Dahlberg | Photo of firearm with 25-round magazine | | | | | |
| 65 | Dahlberg | Photo of firearm with 100-round magazine | | | | | |
| 66 | Proposed Stipulation | April 1998 Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles | | | | | |
| 67 | Hamilton | Hamilton Family Enterprises, Inc. Family Shooting Center data, 2009-2013, with updates | | | | | |
| 68 | Kleck or Zax | "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun" | | | | | |
| 69 | Kleck or Zax | Questionnaire used in the National Self-Defense Survey | | | | | |
| 70 | Kleck | Do criminals go to the hospital when they are shot? | | | | | |
| 71 | Kleck | Firearm violence: 1993-2011 | | | | | |
| 72 | Kleck | Policy Lessons from Recent Gun Control Research | | | | | |
| 73 | Kleck | Impact of handgun types on gun assault outcomes | | | | | |
| 74 | Kleck | The case for enhanced data collection of gun type | | | | | |
| 75 | Kleck | Victim resistance and offender weapon effects in robbery | | | | | |
| 76 | Kleck | JAMA 1/3/1996, Characteristics of Firearms Involved in Fatalities | | | | | |
| 77 | Moore | Curriculum Vitae | | | | | |

| 78 | Moore | Mortality by Year | | | | |
| 79 | Moore | Epidemiology of Trauma Deaths: A Reassessment | | | | |
| 80 | Moore | Publication in the JAMA | | | | |
| 81 | Oates | Aurora theater photos | | | | |
| 82 | Oates | Aurora theater 911 recording | | | | |
| 83 | Spoden | CBI Instacheck statistics | | | | |
| 84 | Ayoob | Curriculum vitae | | | | |
| 85 | Shain | Curriculum vitae | | | | |
| 86 | Davis | Curriculum vitae | | | | |
| 87 | Kleck | Curriculum vitae | | | | |
| 88 | Ayoob | Answering some well asked questions | | | | |
| 89 | Ayoob | CNN article re Giffords shooting | | | | |
| 90 | Ayoob | The Ayoob Files | | | | |
| 91 | Ayoob | AZ Central article on Maisch shooting | | | | |
| 92 | Ayoob | Wheelchair articles | | | | |
| 93 | Ayoob | The View from the Chair | | | | |
| 94 | Ayoob | Wounded Heroes | | | | |
| 95 | Ayoob | Women and guns | | | | |
| 96 | Ayoob | Do older folks need different handguns | | | | |
| 97 | Ayoob | Concealed carry article | | | | |
| 98 | Ayoob | Lance Thomas article | | | | |
| 99 | Ayoob | Lead & Diamond article | | | | |
| 100 | Spoden | FFL Colorado map | | | | |
| 101 | Webster | Missouri article and accompanying charts | | | | |
| 102 | Webster | 2009 J. Urb. Health article and accompanying charts | | | | |
| 103 | Webster | Statistical analsysi | | | | |
| 104 | Zax | Firearm Injury Trends 1985-1995 | | | | |

| 105 | Zax | Handguns in the 1990s | | | | |
| 106 | Zax | Injury Prevention 2003 | | | | |
| 107 | Zax | JAMA 01-1996 | | | | |
| 108 | Zax | Journal of Trauma 12-2004 | | | | |
| 109 | Zax | Koper 2013 | | | | |
| 110 | Zax | Lethality of Firearm Injuries | | | | |
| 111 | Zax | MMWR 4/13/2001, Surveillance for Fatal and Nonfatal Firearm-Related Injuries, US 1993-1998 | | | | |
| 112 | Zax | MMWR 9/3/2004, Surveillance for Fatal and Nonfatal Injuries, US 2001 | | | | |
| 113 | Zax | Semi-Automatic Handguns | | | | |
| 114 | Zax | UPenn Firearm Inj in the US 2011 | | | | |
| 115 | Zax | WaPo 1-13-13 | | | | |
| 116 | Zax | WaPo 1-23-11 | | | | |
| 117 | Zax | FRE 1006 Exhibits re Sheriff data | | | | |
| 118 | Zax | Demonstrative charts re LCM use in mass shootings | | | | |
| 119 | Zax | Demonstrative charts re effect of LCM ban | | | | |
| 120 | Zax | Demonstrative charts re defensive shots fired | | | | |
| 121 | Zax | Wintemute New Eng. J. Med. (2010) | | | | |
| 122 | Fuchs | Sandy Hook police reports | | | | |
| 123 | Fuchs | Articles on intervention/escape while changing magazines | | | | |
| 124 | Hampton | 2013 Big Game Brochure | | | | |
| 125 | Hampton | 2013 Big Game Corrections Brochure | | | | |
| 126 | Hampton | 2013 Mountain Lion EFLIP Brochure | | | | |
| 127 | Hampton | 2013 Sheep and Goat Brochure | | | | |
| 128 | Hampton | 2013 Small Game Brochure | | | | |
| 129 | Hampton | 2013 Turkey Brochure | | | | |

| 130 | Hampton | 2013 Waterfowl Brochure | | | |
|---|---|---|---|---|---|
| 131 | Hampton | Elk University Chap. 1, Lesson 12 | | | |
| 132 | Brough | Gunbroker web page re Search the FFL Holder Network | | | |
| 133 | Burrud | Gunbroker web page re Smith & Wesson M&P | | | |
| 134 | Burrud | Gunbroker web page re DPMS SASS .308 | | | |
| 135 | Burrud | Gunbroker web page re Core 15 MOE M4 .300 | | | |
| 136 | Burrud | Emails from Bill Binet | | | |
| 137 | Davis | Hood/Davis email string | | | |
| 138 | Davis | Tactical-Life.com: Lifesaving Backup Guns | | | |
| 139 | Davis | New York Times: 11 Years of Police Gunfire in Painstaking Detail | | | |
| 140 | Hewson | Colorado Youth Outdoors website "The Maverick" | | | |
| 141 | Brown | ATF FFL guide | | | |
| 142 | Brown | 18 U.S.C. § 922 | | | |
| 143 | Brown | H2A visa information | | | |
| 144 | Proposed stipulation or authentication witness | Bass Pro Shops documents produced | | | |
| 145 | Proposed stipulation | FFL discovery responses | | | |
| 146 | Proposed stipulation | Sheriffs' discovery responses | | | |
| 147 | Proposed stipulation | David Bayne discovery responses | | | |
| 148 | Proposed stipulation | CSSA discovery responses | | | |
| 149 | Proposed stipulation | Strumillo discovery responses | | | |
| 150 | Proposed stipulation | Farm Bureau discovery responses | | | |
| 151 | Proposed stipulation | Hamilton discovery responses | | | |
| 152 | Proposed stipulation | Nonprofit discovery responses | | | |
| 153 | Proposed stipulation | Women for Concealed Carry discovery responses | | | |
| 154 | Proposed stipulation or authentication witness | CACP Position Statement | | | |

| | | | | | |
|---|---|---|---|---|---|
| 155 | Proposed stipulation or authentication witness | CACP Testimony re background checks | | | |
| 156 | Proposed stipulation or authentication witness | CACP Final 2013 Session Report | | | |
| 157 | Proposed stipulation or authentication witness | CACP Testimony re HB1224 (030413) | | | |
| 158 | Proposed stipulation or authentication witness | CACP Testimony re HB1229 | | | |
| 159 | Proposed stipulation or authentication witness | CACP Testimony re HB1224 (021213) | | | |
| 160 | Proposed stipulation | CBC White Paper Final Report 022013 | | | |
| 161 | Proposed stipulation | ATF FFL Procedures (Part 478) | | | |
| 162 | Proposed stipulation | ATF study on the importability of certain shotguns, Jan. 2011, and July 2012 | | | |
| 163 | Shain | Federal Firearms Licensee Plaintiffs Survey of Practices | | | |
| 164 | Massad Ayoob | Article on Lance Thomas, 2002 WLNR 14052078 | | | |
| 165 | Massad Ayoob | Various articles on Richmond, Vir., jewelry store robbery | | | |
| 166 | Kevin Davis | Tom Aveni, Officer-Involved Shootings: What We Don't Know Has Hurt Us, The Police Policy Studies Council | | | |
| 167 | Gary Kleck | National Crime Victimization Survey | | | |
| 168 | Gary Kleck | Geller, William A. and Michael S. Scott. 1993. *Deadly Force: What We Know*. Washington, D.C.: Police Executive Research Forum. | | | |
| 169 | Gary Kleck | Southwick, Lawrence. 2000. "Self-defense with guns: The consequences." *Journal of Criminal Justice* 28:351-370. | | | |
| 170 | Gary Kleck | Kleck, Gary. 1997. TARGETING GUNS: FIREARMS AND THEIR CONTROL. NY: Aldine de Gruyter. | | | |
| 171 | Gary Kleck | Kleck, Gary. 2001. "The frequency of defensive gun use: evidence and disinformation." Chapter | | | |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  | 6 in ARMED, by Gary Kleck and Don B. Kates. NY: Prometheus Books. |  |  |  |
| 172 | Gary Kleck | Kleck, Gary. 2001. "The nature and effectiveness of owning, carrying, and using guns for self-protection." Chapter 7 in ARMED, by Gary Kleck and Don B. Kates. NY: Prometheus Books. |  |  |  |
| 173 | Gary Kleck | McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Angood, P.B. 1993. "Urban firearm deaths: a five-year perspective." *The Journal of Trauma* 35:532-537. |  |  |  |
| 174 | Gary Kleck | Tark, Jongyeon, and Gary Kleck. 2004. "Resisting crime: the effects of victim action on the outcomes of crimes." *Criminology* 42:851-908. |  |  |  |
| 175 | Gary Kleck | Study of mass shootings. Appendix to expert report. |  |  |  |
| 176 | Michael Shain | United States Center for Disease Control (CDC), Evaluating the Effectiveness of Strategies for Preventing Violence: Firearms Laws (11/3/2003) |  |  |  |
| 177 | Michael Shain | National Research Council, Priorities for Research to Reduce the Threat of Firearm-Related Violence (4/2013) |  |  |  |
| 178 | Michael Shain | United States Department of Justice, Bureau of Justice Statistics Special Report: Firearm Violence, 1993-2011 (5/2013) |  |  |  |
| 179 | Michael Shain | Armed and Considered Dangerous; A Survey of Felons and Their Firearms. (Wright & Rossi) |  |  |  |
| 180 | Michael Shain | United State Department of Justice, Federal Bureau of Investigation, Handgun Wounding Factors and Effectiveness (7/1989) |  |  |  |
| 181 | Michael Shain | National Institute of Justice, Research Brief, Guns in America: National Survey on Private Ownership and Use of Firearms. (5/1997) |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| 182 | Michael Shain | Department of Justice, Federal Bureau of Investigation, Defensive Systems Unit Ballistic Research Facility; Officer Involved Shooting: Pennsylvania Police Department. (11/2006) | | | |
| 183 | Michael Shain | United States Department of Justice, Bureau of Justice Statistics Report: Crime Against Persons with Disabilities, 2009-2011 (12/2012) | | | |
| 184 | Michael Shain | New York City Police Department Annual Firearms Discharge Report | | | |
| 185 | Michael Shain | Cato Institute "Guns and Self Defense" interactive incident map, http://www.cato.org/guns-and-self-defense | | | |
| 186 | Zax | Reedy, D. C. / Koper, C. S. Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. 2003. | | | |
| | | | | | |
| | | | | | |
| | | | | | |