ALLMTN,APPEAL,TERMED

# U.S. District Court
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:13–cv–01300–MSK–MJW

| | |
|---|---|
| Colorado Outfitters Association et al v. Hickenlooper | Date Filed: 05/17/2013 |
| Assigned to: Chief Judge Marcia S. Krieger | Date Terminated: 06/26/2014 |
| Referred to: Magistrate Judge Michael J. Watanabe | Jury Demand: None |
| Case in other court:  USCA, 14–01290 | Nature of Suit: 950 Constitutional – State Statute |
| USCA, 14–01292 | Jurisdiction: Federal Question |
| Cause: 28:1331 Federal Question: Other Civil Rights | |

**Defendant**

| | | |
|---|---|---|
| **Mesa County, Board of County Commissioners** | represented by | **David Robert Frankel** |
| | | Mesa County Attorney's Office |
| | | P.O. Box 20000 |
| | | 544 Rood Avenue |
| | | 2nd Floor Annex |
| | | Grand Junction, CO 81502–5004 |
| | | 970–244–1612 |
| | | Fax: 970–255–7196 |
| | | Email: david.frankel@mesacounty.us |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Outfitters Association** | represented by | **Peter J. Krumholz** |
| | | Hale Westfall, LLP |
| | | 1600 Stout Street |
| | | Suite 500 |
| | | Denver, CO 80202 |
| | | 720–904–6007 |
| | | Fax: 720–904–6006 |
| | | Email: pkrumholz@halewestfall.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Richard A. Westfall** |
| | | Hale Westfall, LLP |
| | | 1600 Stout Street |
| | | Suite 500 |
| | | Denver, CO 80202 |
| | | 720–904–6010 |
| | | Fax: 720–904–6020 |
| | | Email: rwestfall@halewestfall.com |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado Farm Bureau** | represented by | **Peter J. Krumholz** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

1528

**Richard A. Westfall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Shooting Sports Foundation**    represented by    **Jonathan Michael Anderson**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
Suite 3200
Denver, CO 80201–8749
303–295–8566
Fax: 303–672–6508
Email: jmanderson@hollandhart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
Holland &Hart, LLP–Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201–8749
303–295–8000
Fax: 295–8261
Email: dabbott@hollandhart.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Magpul Industries**    represented by    **Jonathan Michael Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas L. Abbott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Youth Outdoors**    represented by    **Peter J. Krumholz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA Liberty Arms**    represented by    **Jonathon Michael Watson**
Sherman &Howard, L.L.C.–Denver
633 17th Street
Suite 3000
Denver, CO 80202–3622

303–297–2900
Fax: 303–298–0940
Email: jwatson@shermanhoward.com
*TERMINATED: 02/12/2014*

**Marc F. Colin**
Bruno Colin &Lowe, P.C.
1999 Broadway
Suite 3100
Denver, CO 80202
303–831–1099
Fax: 303–831–1088
Email: mcolin@brunolawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Outdoor Buddies, Inc.** | represented by | **Peter J. Krumholz** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Richard A. Westfall** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Women for Concealed Carry** | represented by | **Peter J. Krumholz** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Richard A. Westfall** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Colorado State Shooting Association** | represented by | **Anthony John Fabian** |
| | | Anthony J. Fabian, P.C. |
| | | 510 Wilcox Street |
| | | # C |
| | | Castle Rock, CO 80104 |
| | | 303–663–9339 |
| | | Email: fabianlaw@qwestoffice.net |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Hamilton Family Enterprises, Inc.** | represented by | **Anthony John Fabian** |
| *doing business as* | | (See above for address) |
| Family Shooting Center at Cherry Creek State Park | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **David Strumillo** | represented by | **David Benjamin Kopel** |
| | | Independence Institute |
| | | 727 East 16th Avenue |
| | | Denver, CO 80203 |
| | | 303–279–6536 |
| | | Fax: 303–279–4176 |
| | | Email: david@i2i.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **David Bayne** | represented by | **Peter J. Krumholz** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Richard A. Westfall** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Dylan Harrell** | represented by | **Peter J. Krumholz** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Richard A. Westfall** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Rocky Mountain Shooters Supply** | represented by | **Jonathon Michael Watson** |
| | | (See above for address) |
| | | *TERMINATED: 02/12/2014* |
| | | |
| | | **Marc F. Colin** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **2nd Amendment Gunsmith &Shooter Supply, LLC** | represented by | **Jonathon Michael Watson** |
| | | (See above for address) |
| | | *TERMINATED: 02/12/2014* |
| | | |
| | | **Marc F. Colin** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Burrud Arms Inc.** | represented by | **Jonathon Michael Watson** |
| *doing business as* | | (See above for address) |
| Jensen Arms | | *TERMINATED: 02/12/2014* |

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Green Mountain Guns                    represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Jerry's Outdoor Sports                 represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Specialty Sports &Supply              represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Goods for the Woods                   represented by    **Jonathon Michael Watson**
(See above for address)
*TERMINATED: 02/12/2014*

**Marc F. Colin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

John B. Cooke                         represented by    **David Benjamin Kopel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ken Putnam                            represented by    **David Benjamin Kopel**
(See above for address)

1532

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Faull**                                   represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Larry Kuntz**                                   represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Jobe**                                     represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Krueger**                                represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stan Hilkey**                                   represented by **David Benjamin Kopel**
*TERMINATED: 05/08/2014*                          (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dave Stong**                                    represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peter Gonzalez**                                represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sue Kurtz**                                     represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Douglas N. Darr**                               represented by **David Benjamin Kopel**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **John W. Hickenlooper**<br>*Govenor of the State of Colorado* | represented by | **Daniel D. Domenico**<br>Colorado Attorney General's Office<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway<br>Denver, CO 80203<br>720–508–6000<br>Fax: 720–508–6032<br>Email: dan.domenico@state.co.us<br>*ATTORNEY TO BE NOTICED* |

**David Christopher Blake**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: david.blake@state.co.us
*ATTORNEY TO BE NOTICED*

**John Tien Yau Lee**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jtlee@state.co.us
*ATTORNEY TO BE NOTICED*

**Jonathan Patrick Fero**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: jon.fero@state.co.us
*ATTORNEY TO BE NOTICED*

**Kathleen L. Spalding**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: kit.spalding@state.co.us

1534

*ATTORNEY TO BE NOTICED*

**LeeAnn Morrill**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: leeann.morrill@state.co.us
*ATTORNEY TO BE NOTICED*

**Matthew David Grove**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: matt.grove@state.co.us
*ATTORNEY TO BE NOTICED*

**Molly Allen Moats**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: molly.moats@state.co.us
*ATTORNEY TO BE NOTICED*

**Stephanie Lindquist Scoville**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720–508–6000
Fax: 720–508–6032
Email: stephanie.scoville@state.co.us
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Board of County Commissioners for
Mesa County Colorado**

represented by **David Robert Frankel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maurice L. Dechant**
Maurice L. Dechant, Attorney at Law
1940 10 Road
Mack, CO 81525
970–216–0941

Email: lyledechant@gmail.com
*TERMINATED: 03/03/2014*

**Plaintiff**

**John B. Cooke**
*Sheriff of Weld County, Colordo*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Maketa**
*Sheriff of El Paso County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Justin Smith**
*Sheriff of Larimer County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Weaver**
*Sheriff of Douglas County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Hartman**
*Sheriff of Gilpin County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Spruell**
*Sheriff of Montezuma County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Jantz**
*Sheriff of Moffat County, Colorado*
*TERMINATED: 11/27/2013*

represented by **David Benjamin Kopel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Martin**
*Sheriff of Dolores County, Colorado*

represented by **David Benjamin Kopel**
(See above for address)

*TERMINATED: 11/27/2013*
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Ensminger**                    represented by   **David Benjamin Kopel**
*Sheriff of Teller County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shayne Heap**                       represented by   **David Benjamin Kopel**
*Sheriff of Elbert County, Colorado*                   (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Day**                          represented by   **David Benjamin Kopel**
*Sheriff of Yuma County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred D. McKee**                     represented by   **David Benjamin Kopel**
*Sheriff of Delta County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lou Vallario**                      represented by   **David Benjamin Kopel**
*Sheriff of Garfield County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Hosselkus**                    represented by   **David Benjamin Kopel**
*Sheriff of Mineral County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett L. Powell**                   represented by   **David Benjamin Kopel**
*Sheriff of Logan County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                               *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brian E. Norton**                   represented by   **David Benjamin Kopel**
*Sheriff of Rio Grande County, Colorado*               (See above for address)

*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Duke Schirard**                          represented by   **David Benjamin Kopel**
*Sheriff of La Plata County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Beicker**                            represented by   **David Benjamin Kopel**
*Sheriff of Fremont County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Bruce**                           represented by   **David Benjamin Kopel**
*Sheriff of Hinsdale County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chris S. Johnson**                       represented by   **David Benjamin Kopel**
*Sheriff of Otero County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Crone**                            represented by   **David Benjamin Kopel**
*Sheriff of Morgan County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Si Woodruff**                            represented by   **David Benjamin Kopel**
*Sheriff of Rio Blanco County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Ridnour**                            represented by   **David Benjamin Kopel**
*Sheriff of Kit Carson County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tom Nestor**                             represented by   **David Benjamin Kopel**
*Sheriff of Lincoln County, Colorado*                       (See above for address)

1538

*TERMINATED: 11/27/2013*                                      *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Forrest Frazee**                          represented by   **David Benjamin Kopel**
*Sheriff of Kiowa County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Dunlap**                             represented by   **David Benjamin Kopel**
*Sheriff of Montrose County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ted B. Mink**                             represented by   **David Benjamin Kopel**
*Sheriff of Jefferson County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Wegener**                            represented by   **David Benjamin Kopel**
*Sheriff of Park County, Colorado*                          (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce Newman**                            represented by   **David Benjamin Kopel**
*Sheriff of Huerfano County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy Peck**                              represented by   **David Benjamin Kopel**
*Sheriff of Sedgwick County, Colorado*                      (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dominic Mattivi, Jr.**                    represented by   **David Benjamin Kopel**
*Sheriff of Ouray County, Colorado*                         (See above for address)
*TERMINATED: 11/27/2013*                                     *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Minor**                              represented by   **David Benjamin Kopel**
*Sheriff of Summit County, Colorado*                        (See above for address)

*TERMINATED: 11/27/2013*                          *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Fischer**                    represented by   **David Benjamin Kopel**
*Sheriff of Jackson County, Colorado*                 (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rick Besecker**                    represented by   **David Benjamin Kopel**
*Sheriff of Gunnison County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles "Rob" Urbach**             represented by   **David Benjamin Kopel**
*Sheriff of Phillips County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rod Fenske**                       represented by   **David Benjamin Kopel**
*Sheriff of Lake County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grayson Robinson**                 represented by   **David Benjamin Kopel**
*Sheriff of Arapahoe County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Campbell**                   represented by   **David Benjamin Kopel**
*Sheriff of Baca County, Colorado*                    (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike Norris**                      represented by   **David Benjamin Kopel**
*Sheriff of Saguache County, Colorado*                (See above for address)
*TERMINATED: 11/27/2013*                              *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amos Medina**                      represented by   **David Benjamin Kopel**
*Sheriff of Costilla County, Colorado*                (See above for address)

*TERMINATED: 11/27/2013*                                *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miles Clark**                          represented by   **David Benjamin Kopel**
*Sheriff of Crowley County, Colorado*                     (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Encinias**                       represented by   **David Benjamin Kopel**
*Sheriff of Bent County, Colorado*                        (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James (Jim) Casias**                   represented by   **David Benjamin Kopel**
*Sheriff of Las Animas County, Colorado*                  (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Garrett Wiggins**                      represented by   **David Benjamin Kopel**
*Sheriff of Routt County, Colorado*                       (See above for address)
*TERMINATED: 11/27/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Grand Prix Guns**                      represented by   **Jonathon Michael Watson**
*TERMINATED: 12/23/2013*                                  (See above for address)
                                                          *TERMINATED: 02/12/2014*

                                                          **Marc F. Colin**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodney Johnson**                       represented by   **David Benjamin Kopel**
*Sheriff of Grand County, Colorado*                       (See above for address)
*TERMINATED: 12/12/2013*                                  *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/07/2014 | <u>133</u> | 17 | MOTION to Dismiss *Count I and Certain Plaintiffs for Lack of Standing* by Defendant John W. Hickenlooper. (Attachments: #<u>1</u> Exhibit A, #<u>2</u> Exhibit B, #<u>3</u> Exhibit C, #<u>4</u> Exhibit D, #<u>5</u> Exhibit E, #<u>6</u> Exhibit F, #<u>7</u> Exhibit G, #<u>8</u> Exhibit H)(Grove, Matthew) (Entered: 03/07/2014) |

| 03/14/2014 | <u>134</u> | 65 | RESPONSE to <u>133</u> MOTION to Dismiss *Count I and Certain Plaintiffs for Lack of Standing* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) (Entered: 03/14/2014) |
|---|---|---|---|
| 03/14/2014 | <u>135</u> | 83 | TRIAL BRIEF by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 03/14/2014) |
| 03/14/2014 | <u>136</u> | 127 | TRIAL BRIEF by Plaintiffs John B. Cooke, Douglas N. Darr, James Faull, Peter Gonzalez, Stan Hilkey, Fred Jobe, Donald Krueger, Larry Kuntz, Sue Kurtz, Ken Putnam, Dave Stong, David Strumillo. (Kopel, David) (Entered: 03/14/2014) |
| 03/19/2014 | <u>137</u> | 193 | MOTION in Limine *or, in the Alternative, Forthwith Motion for Bifurcation and Continuance With Respect to Plaintiffs' Fifth Claim for Relief* by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 03/19/2014) |
| 03/21/2014 | <u>138</u> | 203 | RESPONSE to <u>137</u> MOTION in Limine *or, in the Alternative, Forthwith Motion for Bifurcation and Continuance With Respect to Plaintiffs' Fifth Claim for Relief* filed by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) (Entered: 03/21/2014) |
| 03/21/2014 | <u>139</u> | 209 | REPLY to Response to <u>137</u> MOTION in Limine *or, in the Alternative, Forthwith Motion for Bifurcation and Continuance With Respect to Plaintiffs' Fifth Claim for Relief* filed by Defendant John W. Hickenlooper. (Grove, Matthew) (Entered: 03/21/2014) |
| 03/21/2014 | 140 | 214 | ORDER on <u>137</u> Motion in Limine, the Plaintiffs' Response, and the Defendant's Reply. Having considered the parties' joint final pretrial order, and the Plaintiffs' trial brief, specifically footnote 5 and pages 18–20, the Court finds that the trial brief asserts a new contention that C.R.S.§ 18–12–112 is unconstitutional. The new contention pertains to Colorado citizens aged 18–20 years old, and the interplay of §18–12–112 with applicable federal law. Such contention was not disclosed in any of the five versions of the Plaintiffs' complaint, nor was it disclosed in the final pretrial order found at Docket #119, which was approved by this Court. Whether such contention is construed as a claim or theory, it exceeds the scope of the arguments and evidence to be tried beginning March 31, 2014. In the exercise of the Court's discretion, see Hullman v. Bd. of Trustees, 950 F.2d 665, 668 (10th Cir. 1999), the Court GRANTS the Defendant's Motion in Limine and excludes all evidence pertinent thereto. By Chief Judge Marcia S. Krieger on 3/21/2014. Text Only Entry(msklc3, ) (Entered: 03/21/2014) |
| 04/07/2014 | <u>150</u> | 216 | MOTION in Limine *to Exclude Untimely Disclosed Expert Opinion Testimony* by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry. (Westfall, Richard) (Entered: 04/07/2014) |
| 06/26/2014 | <u>159</u> | 223 | Findings of Fact, Conclusions of Law, and Order by Chief Judge Marcia S. Krieger on 6/26/14: <u>133</u> Motion to Dismiss is denied, <u>118</u> Joint Motion to Strike Expert Opinions Per FRE 702 is granted in part and denied in part, and Colorado Revised Statutes § 18–12–112 and § 18–12–302 are compliant with the provisions of the Second and Fourteenth Amendments to the United States Constitution. (dkals, ) (Entered: 06/26/2014) |

| 06/26/2014 | 160 | 273 | JUDGMENT in favor of Defendant John W. Hickenlooper and against all Plaintiffs with costs, pursuant to 159 Findings of Fact, Conclusions of Law, and Order, by Chief Judge Marcia S. Krieger on 6/26/14. (dkals, ) (Entered: 06/26/2014) |
|---|---|---|---|
| 07/28/2014 | 164 | 275 | NOTICE OF APPEAL as to 159 Order on Motion to Strike,, Order on Motion to Dismiss, 160 Judgment by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Filing fee $ 505, Receipt Number 1082–3976471) (Westfall, Richard) (Entered: 07/28/2014) |
| 07/28/2014 | 165 | 279 | NOTICE OF APPEAL as to 127 Order on Motion for Leave to Restrict,, Pretrial Conference – Final, 96 Order on Motion to Dismiss,,, 159 Order on Motion to Strike,, Order on Motion to Dismiss, 107 Order on Motion to Amend/Correct/Modify,, 160 Judgment, 115 Order on Motion for Joinder,,, Order on Motion for Leave,,, Order on Motion for Leave to Restrict,,, Motion Hearing,,, Set/Reset Deadlines/Hearings,, by Plaintiffs Jim Beicker, Rick Besecker, Ronald Bruce, David Campbell, James (Jim) Casias, Miles Clark, John B. Cooke, John B. Cooke, James Crone, Douglas N. Darr, Chad Day, Rick Dunlap, David Encinias, Mike Ensminger, James Faull, Rod Fenske, Scott Fischer, Forrest Frazee, Peter Gonzalez, Bruce W. Hartman, Shayne Heap, Fred Hosselkus, Tim Jantz, Fred Jobe, Chris S. Johnson, Rodney Johnson, Donald Krueger, Larry Kuntz, Sue Kurtz, Terry Maketa, Jerry Martin, Dominic Mattivi, Jr, Fred D. McKee, Amos Medina, Ted B. Mink, John Minor, Tom Nestor, Bruce Newman, Mike Norris, Brian E. Norton, Randy Peck, Brett L. Powell, Ken Putnam, Tom Ridnour, Grayson Robinson, Duke Schirard, Justin Smith, Dennis Spruell, Dave Stong, David Strumillo, Charles "Rob" Urbach, Lou Vallario, David A. Weaver, Fred Wegener, Garrett Wiggins, Si Woodruff (Filing fee $ 505, Receipt Number 1082–3975866) (Kopel, David) (Entered: 07/28/2014) |
| 07/28/2014 | 166 | 283 | Amended NOTICE OF APPEAL as to 96 Opinon and Order, 159 Order on Motion to Strike,, Order on Motion to Dismiss, 160 Judgment by Plaintiffs David Bayne, Colorado Farm Bureau, Colorado Outfitters Association, Dylan Harrell, Outdoor Buddies, Inc., Women for Concealed Carry (Westfall, Richard) Modified on 7/29/2014 to add text (dkals, ). (Entered: 07/28/2014) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.*

     Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

**GOVERNOR'S MOTION TO DISMISS COUNT I AND CERTAIN
PLAINTIFFS FOR LACK OF STANDING**

---

     **COMES NOW** Defendant John W. Hickenlooper, in his official capacity as the Governor of the State of Colorado, and moves for the dismissal of the Plaintiffs' first claim for relief with respect to all Plaintiffs for lack of standing.[1]  In addition, the Governor seeks dismissal of the following Plaintiffs, with respect to all claims, for lack of standing:

- USA Liberty Arms

- Rocky Mountain Shooters Supply

- 2nd Amendment Gunsmith & Shooter Supply, LLC

- Burrud Arms d/b/a Jensen Arms

---

[1] The Governor's motion to dismiss [Doc. 64] challenged Plaintiffs' standing to raise what are now denominated as Counts II and III of the Fourth Amended Complaint. In its order on the motion to dismiss [Doc. 96], the Court ruled that Plaintiffs had standing on the third claim and that the first and second claims were merely alternative ways of challenging § 18-12-301 under the Second Amendment.  The Governor maintains that Counts II and III are not justiciable, but acknowledges the Court's previous order and will not re-raise those arguments here.

- Green Mountain Guns

- Jerry's Outdoor Sports

- Specialty Sports and Supply

- Goods for the Woods

- Hamilton Family Shooting Center

- David Bayne

This brief will address standing of all Plaintiffs with respect to Counts I before turning to the standing of the individual Plaintiffs listed above.

## I. Count I should be dismissed because no Plaintiff has demonstrated standing to raise it.

Plaintiffs' first claim for relief challenges the constitutionality of C.R.S. § 18-12-301, which prohibits the new acquisition or transfer of large-capacity ammunition magazines – generally defined as magazines "capable of accepting, or…designed to be readily converted to accept, more than fifteen rounds of ammunition" – within the State of Colorado after July 1, 2013.

Before reaching the merits of this claim at trial, the Court should first consider whether it is properly justiciable under Article III. *See, e.g., Awad v. Ziriax*, 670 F.3d 1111, 1120 (10th Cir. 2012)*; Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004). A case "cannot proceed on the merits in the absence of . . . [a] case or controversy" under Article III of the U.S. Constitution. *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1223 (10th Cir. 2008). That showing requires a plaintiff to establish "injury in fact, causation, and redressability." *Id.* at 1224.

Plaintiffs assert that banning large-capacity magazines amounts to a "[p]rohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes," and that such a prohibition "is specifically prohibited by the Second Amendment pursuant to [*District of Columbia v.*] *Heller*, [554 U.S. 570 (2008)] and the incorporation of the Second Amendment right into the Fourteenth Amendment under *McDonald* [*v. City of Chicago*, 130 S.Ct. 3020 (2010)]." Doc. 116, ¶ 162.

### A. No Plaintiff is able to demonstrate any injury-in-fact associated with the limitation on magazine capacity.

Section 18-12-301 prohibits the acquisition and transfer of large-capacity magazines in the State of Colorado after July 1, 2013. Plaintiffs have not met their burden of demonstrating an injury in fact associated with this provision, and would be unable to establish any such injury at trial.

This is not to say that Plaintiffs fail to *allege* that § 18-12-301 injures them. Rather, the Governor maintains that Plaintiffs are unable to *prove* it. Plaintiffs claim that the limitation on magazine capacity injures them in two ways. First, the individual Plaintiffs[2] contend that they will be "unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged" (individual claim) Doc. 116, ¶ 160. According to Plaintiffs, they use the grandfathered large capacity magazines for lawful purposes, including self-defense, sport shooting, and hunting. *Id.* at ¶ 159. Critically, however, no

[2] This group includes the Sheriffs, David Strumillo, David Bayne, Dylan Harrell, and the organizational Plaintiffs who assert associational standing on behalf of their members.

individual Plaintiff has ever alleged that § 18-12-301 has impaired his or her *current* ability to engage in self-defense. Rather, due to the statute's grandfather clause all individual Plaintiffs may continue to equip firearms with LCMs that they owned before July 1, 2013.

Second, the business Plaintiffs[3] assert an economic injury. *Id.* at ¶ 78-80. According to these plaintiffs, the "Federal Firearm Licensees…will be unable to sell many popular magazines or sell firearms in their standard configuration supplied by the manufacturers" (economic claim) *Id.* at ¶ 161. Noticeably missing from either of these groups' allegations or evidence is a concrete and cognizable injury to their Second Amendment rights that flows from the statutory prohibition on future acquisitions and transfers of magazines holding 16 or more rounds.

### A. Elements and Burden

"Plaintiffs bear the burden of proving standing with the manner and degree of evidence required at the particular stage of the litigation." *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000) (quotation omitted). Discovery has been completed in this case. Thus, this motion should be evaluated as would be a Fed. R. Civ. P. 56 motion for summary judgment. To prevail, Plaintiffs must establish that there "exists no genuine issue of material fact as to justiciability, and mere allegations of injury, causation, and redressability are insufficient." *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002) (quotation omitted), *cert. denied*, 123 S. Ct. 411 (2002).

---

[3] This group includes the federal firearms licensees and Hamilton Family Enterprises.

At "an irreducible constitutional minimum," a plaintiff must prove that he or she: (1) suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical;' (2) of a causal connection between the injury and the complained-of conduct; and (3) that a favorable decision will likely redress the alleged injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An "injury in fact does not automatically occur by [t]he mere presence on the statute books of an unconstitutional statute . . . , even if [plaintiffs] allege an inhibiting effect on constitutionally protected conduct prohibited by the statute.'" *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1155-56 (10th Cir. 2006) (quoting *Winness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006)).  The "complainant must allege an injury to himself that is 'distinct and palpable,' as opposed to merely 'abstract,' and the alleged harm must be actual or imminent**,** not 'conjectural' or 'hypothetical.'" *Finstuen v. Crutcher*, 496 F.3d 1139, 1143 (10th Cir. 2007) (quoting *Whitemore v. Arkansas*, 495 U.S. 149, 155 (1990).  When a law does not apply to a party, that party has suffered no invasion of a legally protected interest and may not question the law's constitutionality.  *See Warth v. Seldin*, 422 U.S. 490, 504 (1975) (reasoning that plaintiffs lacked standing to challenge ordinance because among other reasons, "none is himself subject to the ordinance's strictures").

**B. Plaintiffs have not proven that they have or will suffer an actual and imminent injury of a protected right.**

**1. Plaintiffs have not asserted that they are currently suffering an actual injury to their Second Amendment right to self-defense.**

The challenged statute sets forth several exceptions to its prohibition of magazines that hold more than fifteen rounds. "A person may possess a large capacity magazine if he or she: (I) owns the large capacity magazine on" July 1, 2013, "and (II) maintains continuous possession of the large capacity magazine." C.R.S. § 18-12-302(2)(a). Although Plaintiffs contest this provision on vagueness grounds, they do not dispute that they may continue to legally own grandfathered high capacity magazines. *See* Doc. 116, ¶ 160. Plaintiffs have never alleged, and cannot prove, that HB 1224 *currently* violates their Second Amendment right to engage in self-defense. Significantly, Plaintiffs have never asserted that any member of their lawsuit, or anyone else, for that matter, does not already own one or more LCMs. On the contrary, various witnesses have alleged and/or admitted under oath that they are well-equipped with an adequate supply of grandfathered magazines:

Dylan Harrell: Mr. Harrell owns two 17-round magazines for a 9mm handgun, two 40-round magazines, thirteen 30-round magazines, and one 20-round magazine for his sporting rifles, and .22 caliber rifle with a large-capacity internal magazine. Exhibit A, Response to Interrogatory No. 4.

David Bayne: Mr. Bayne owns an AR15, and has "approximately four magazines that have a 30-cartridge capacity and three that have a 20-cartridge capacity." Exhibit B, Response to Interrogatory No. 4.

David Strumillo: Mr. Strumillo alleges that he carries firearms for his personal safety, and that those firearms "use magazines larger than 15 rounds."

Doc. 116, ¶ 61.  Mr. Strumillo confirmed this statement in his interrogatory responses, stating that he "owns several magazines of more than 15 rounds for [his] AR-15 type rifles and for the Glock 17." Exhibit C, Response to Interrogatory No. 4 (responses marked "confidential" by Mr. Strumillo redacted).

Women for Concealed Carry:  Women for Concealed Carry alleges that its members currently "use and carry magazines which would be banned under HB 1224.  Doc. 116, ¶ 107.  The four "directors of WCC" – which comprise the group's entire membership – own two pistol magazines with 17-round capacity, two AR-15 magazines with 40-round capacities, fifty-four AR-15 magazines with 30-round capacities; three S&W 9mm magazines with 17-round capacities; two USP magazines with 18-round capacities, four Mini 14 magazines with 20-round capacities; and two M1 magazines with 16-round capacities.  Exhibit D, Responses to Interrogatories 1 and 4 (irrelevant material redacted).

John B. Cooke:  Mr. Cooke alleges that "he personally owns…magazines that accept more than 15 rounds of ammunition." Doc. 116, ¶ 38.  At his deposition, Mr. Cooke confirmed that he owns "four or five...30-round magazines." Exhibit E, Cooke Dep. 19:12-13 (testimony marked "confidential" by counsel during deposition redacted).

Remaining Sheriffs:  The remaining Plaintiff sheriffs were not deposed pursuant to agreement of the parties.  However, each of them has admitted through the allegations in the Fourth Amended Complaint that he or she currently owns one

or more magazines accepting more than 15 rounds of ammunition. Doc. 116, ¶¶ 39-48.

Nor has any Plaintiff alleged or established that Colorado's law has prevented them from acquiring or possessing magazines that they currently deem necessary for self-defense. *See generally* Doc. 116 (Fourth Amended Complaint). As already noted, grandfathered magazines are legal to possess; moreover, all of the Sheriffs are currently exempt from restrictions on LCM purchases and will remain so as long as they remain in office or are otherwise employed by a law enforcement agency. C.R.S. § 18-12-302(3)(b)(II). And anyone can purchase unlimited numbers of magazines that hold fifteen rounds or fewer.

The Second Amendment does not protect a right to carry "any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 570 U.S. at 626. Rather, *Heller* focused on the right to personal self-defense, the core of which is the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Reese,* 627 F.3d 792, 800 (10th Cir. 2010). Even if the Court were to credit Plaintiffs' claim that LCMs are necessary for self-defense as a general matter, the undisputed evidence in this case establishes that Colorado's limitation on magazine capacity for future acquisition and transfer has had no *present* impact on any of the individual Plaintiffs' ability to defend themselves. Whether this condition will continue into the foreseeable future – that is, whether Plaintiffs' alleged injury is concrete and imminent – is thus the operative question.

>   **2. Plaintiffs' claims that § 18-12-301 will violate their Second Amendment rights rest on several steps of attenuation that are too speculative to merit standing.**

Standing "is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 486 (1982). Rather, the standing requirement focuses on whether "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* at 472.  Therefore, a "threatened injury must be 'certainly impending' to constitute injury in fact." *Nova Health Systems v. Gandy,* 416 F.3d 1149, 1155 (10th Cir. 2005); (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (2005)); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005).

Because they all currently own grandfathered LCMs that they have admitted are sufficient for their self-defense needs, the individual Plaintiffs stake their individual challenges to § 18-12-301 on an assertion that they will be "unable to legally replace magazines that they owned prior to the effective date of HB 1224, as those magazines wear out, break, or are damaged." Doc. 116, ¶ 160.  That claim creates an insufficient basis for standing as a matter of law.  While the Supreme Court has recognized that a plaintiff "does not have to await the consummation of threatened injury to obtain preventative relief," *Pennsylvania v. West Virginia,* 262 U.S. 553, 593 (1923), this does not relieve a plaintiff of his burden of establishing an imminent injury in fact.  *Gandy,* 416 F.3d at 1155.  While imminence is "a

somewhat elastic concept," it is nevertheless a necessary showing in order "to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is 'certainly impending.'" *Lujan*, 504 U.S. at 564 n.2.  What is required is a showing that an injury *will* occur at a certain time in the future.

Plaintiffs lack standing to raise their first claim because it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted).  The number of large capacity magazines in Colorado is in the millions (Doc. 119, p.22, ¶ 26), and each of the individual Plaintiffs has admitted to possessing an adequate current supply of them.  *See supra,* pp.6-8.  While magazine parts could conceivably wear out over time, it is undisputed that magazines can be repaired.  Exhibit F (Deposition of Plaintiffs' expert Michael Shain), 196:15-24.  Accordingly, even taking the Plaintiffs' allegations at face value, they will only suffer an injury to their self-defense right in the event that they lose or irreparably break the magazines that they already possess.  In the meantime, the individual Plaintiffs are free to use the magazines that they have.

While it could be imagined that one or more Plaintiffs may run out of their current stock of grandfathered LCMs at some point in the future, the manifestation of that injury – even assuming that it would amount to a constitutional injury at all – is at this point speculative and conjectural.  As Plaintiffs have admitted, "[t]he lifespan of any firearm magazine cannot be known."  Doc. 119, p.23, ¶ 30.  Indeed, "[d]epending upon use and maintenance, magazines may operate properly for

decades or more." *Id*. Without more, even those individual Plaintiffs who are not currently exempt from § 18-12-301 due to their status as law enforcement officers are unable to establish an invasion of the interest protected by the Second Amendment. *See, e.g., Colorado Interstate Gas Co. v. FERC*, 83 F.3d 1298, 1300 (10th Cir. 1996) (refusing to find standing because court unwilling to base its "exercise of jurisdiction on speculation regarding what may or may not occur in future rate-making proceedings.").

Plaintiffs may point to the amended allegations of the Sheriffs that they wish to "purchase…16-round and larger magazines, now and after retirement." Doc 116 (4th Amended Complaint), ¶¶ 38-48. Because these allegations were newly introduced as part of the 4th Amended Complaint, the Governor had no opportunity to conduct discovery on them. Nonetheless, the prohibition on the acquisition of new LCMs after July 1, 2013, cannot on its own injure the Second Amendment rights of a plaintiff who – by his own admission – is already adequately equipped for self-defense. Even assuming *arguendo* that a large-capacity magazine qualifies as an "arm," and therefore falls within the scope of the Second Amendment's guarantee, the Second Amendment does not protect an individual's right to purchase a specific firearm or even a specific type of firearm. *See, e.g. Walters v. Wolf,* 660 F.3d 307, 317-18 (8th Cir. 2011) (plaintiff not entitled to return of seized firearm under Second Amendment because the city seized only one of his firearms, and "did not prohibit Walters from retaining or acquiring other firearms"); *Robertson v. City & County of Denver,* 874 P.2d 325, 333 (Colo. 1994) (upholding ban

on assault weapons because "there are literally hundreds of alternative ways in which citizens may exercise the right to bear arms in self-defense");  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L.Rev. 1443, 1486 (2009) ("Not all restrictions on the use of some devices to exercise a constitutional right are unconstitutional burdens on that right. And it's likewise possible to forbid certain kinds of guns without running a substantial risk of materially interfering with the ability to use arms in self-defense.")

Even assuming the truth of Plaintiffs' allegation that LCMs are necessary in order for them to adequately engage in their constitutional right of self-defense, the individual Plaintiffs cannot establish that they face an imminent injury associated with Colorado's restriction on capacity for magazines acquired after July 1, 2013. The Governor is thus entitled to judgment on Count 1.  *See Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (agreeing with the proposition that "purely speculative harm does not amount to irreparable injury" and holding "that a plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative").

### 3. The business Plaintiffs' economic claims fail to confer standing because it does not present an injury to a legally protected interest.

The FFLs and the shooting range lack standing because their asserted injury is grounded in alleged injury to their businesses.  But the Second Amendment protects the individual right to self-defense; it does not recognize or protect the right

of corporations or other business entities to sell firearms or accessories.  Indeed, no

case has held that the Second Amendment encompasses a right to sell a firearm, let

alone LCMs.  At the outset, "*Heller* said nothing about extending Second

Amendment protection to firearm manufacturers or dealers.  If anything, *Heller*

recognized that firearms manufacturers and dealers are properly subject to

regulation . . . ." *Mont. Shooting Sports Ass'n v. Holder*, CV-09-147-DWM-JCL, 2010

U.S. Dist. LEXIS 104301, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010),

*adopted by* CV-09-147-DWM-JCL, 2010 U.S. Dist. LEXIS 104286, 2010 WL

3909431, at *1 (D. Mont. Sept. 29, 2010). As the Fourth Circuit explained when it

addressed the alleged right to sell a firearm, there is no authority "that remotely

suggests that, at the time of its ratification, the Second Amendment was understood

to protect an individual's right to sell a firearm." *United States v. Chafin*, 423 F.

App'x 342, 344 (4th Cir. 2011) (unpublished).  Drawing from First Amendment law,

the Fourth Circuit in *Chafin* cited the Supreme Court's decision in *United States v.*

*12 200-Foot Reels of Super 8mm. Film* for the proposition that "the protected right

to possess obscene material in the privacy of one's home does not give rise to a

correlative right to have someone sell or give it to others." 413 U.S. 123, 128 (1973).

Likewise, an individual's ability to *sell* a certain type of magazine does not directly

bear on the individual's capacity to possess operable firearms in their own right. *See*

*Teixeira v. County of Alameda*, 2013 U.S. Dist. LEXIS 128435 (N.D. Cal. 2013);

*United States v. Conrad*, 923 F. Supp. 2d 843, 2013 U.S. Dist. LEXIS 19145, 2013

WL 546373, at *7-8 (W.D. Va. Feb. 13, 2013).

The business Plaintiffs may counter that they should be permitted to assert the Second Amendment rights of their customers.  But they have never asserted that they are attempting to do so in this case.  Rather, the FFLs and Hamilton complain only that the magazine capacity limitations will hurt their businesses:

- The FFLs allege that they have "invested significant money in existing inventories of firearms with standard magazines larger than 15 rounds," and that "that investment will be lost without compensation if that inventory cannot be sold."  Doc. 116, ¶ 78.

- Hamilton makes a similar claim, asserting that "approximately fifty percent of [its] gross revenue currently derives from the sale of firearms equipment, accessories, and ammunition," and that the limitation on magazine capacity has "already adversely impacted [its] business and income and will continue to do so in the future."  Doc. 116 ¶ 94-95. Hamilton also claims that its customers "have already expressed concerns over the impact that HB 1224 and HB 1229 will have" on their ability to patronize the establishment "for fear of running afoul of the new laws."[4]  Doc. 116 ¶ 95.

[4] Even if this could be construed as an attempt to assert its customers' rights, rather than a forecast of lost profits, it would be inadequate to establish Hamilton's standing.  "Generally, a party cannot challenge laws or regulations that burden someone else's rights."  *Trans-High Corp. v. State of Colorado,* 2014 U.S. Dist. LEXIS 19378 (D. Colo. Feb. 14, 2014) at * 6.  While some courts have recognized a limited exception to this general rule arising in the First Amendment context, *see Penny Saver Publications, Inc. v. Village of Hazel Crest,* 905 F.2d 150, 153-54 (7th Cir. 1990), it has never been applied in a Second Amendment case.  In any event, Hamilton is the only business Plaintiff who even remotely references its customers'

The business Plaintiffs may also attempt to assert that the ruling in *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 2014 WL 31339 (N.D. Ill., Jan. 6, 2014) ("*IAFR*"), establishes that a corporation's loss of business due to firearms regulation could amount to an injury-in-fact in the Second Amendment context. But *IAFR,* which considered a challenge by "[t]hree Chicago residents and an association of Illinois firearms dealers" to the City of Chicago's outright ban on "virtually all sales and transfers of firearms inside the City's limits," does not support this contention.   The opinion did not explicitly address standing at all, and the only injury identified by the court was an infringement on a law-abiding citizen's Second Amendment right to acquire a firearm. *Id.* at *30 (noting the under the challenged ordinance, "any new would-be gun owners cannot exercise their right to acquire a gun for self-defense within Chicago itself. This is a serious burden on that right.").  Indeed, nothing in the opinion suggests that the plaintiff retail association asserted any economic injury on behalf of its members.  In any event, nothing in the opinion supports the notion that a business or trade group could assert standing under the Second Amendment based on an allegation of economic injury cause by a regulatory requirement on commercial sales. *Cf. Heller*, 554 U.S. at 626-27 ("nothing in our opinion should be taken to cast doubt on…laws imposing conditions and qualifications on the commercial sale of arms").

Even if the Court were to hold that the individual Plaintiffs had standing on Count I, a ruling that the business Plaintiffs lacked standing with respect to the

asserted rights.  The remainder of the FFL Plaintiffs simply complain that the limitation on magazine capacity will hurt their businesses.

same claim would streamline the trial consistent with Fed. R. Civ. P. 1 by affirming the irrelevance of the business Plaintiffs' assertions of economic injury. Because the business Plaintiffs stake their first claim for relief solely on the alleged financial impacts caused by Colorado's limit on magazine capacity, they failed to establish an injury in fact that is cognizable under the Second Amendment. Because none of the Plaintiffs have standing with respect to Count I, this Court should enter judgment in favor of the Governor.

## II. Several Plaintiffs lack standing to assert any claim in this case, and should be dismissed entirely.

Several Plaintiffs have asserted no cognizable injury and should be dismissed from the case outright prior to trial.

### A. Licensed firearms dealers and Hamilton Family Shooting Center.

For the reasons outlined *supra*, the licensed firearms dealers[5] and Hamilton Family Shooting Center cannot prove that the magazine capacity limitation burdens any conduct falling within the scope of what the Second Amendment guarantees to them as business entities. Accordingly, because they have not suffered an injury-in-fact to a legally protected interest, they do not have standing under Article III. *Lujan*, 504 U.S. at 560.

The business Plaintiffs are also included in Count V, which challenges the constitutionality of Colorado's expanded background check requirement. Plaintiffs

---

[5] Although they have not sought an order under Fed. R. Civ. P. 41(a), the Plaintiffs have dropped Grand Prix Guns from the caption and body of the Fourth Amended Complaint. However, Grand Prix Guns was identified as a Plaintiff in the Court's most recent order. Doc. 127 at 1.

assert that FFLs are "reluctan[t]" to conduct private background checks, but they assert no injury at all, economic or otherwise, associated with the implementation of § 18-12-112.  Indeed, the FFL Plaintiffs cannot, by definition, be injured by the expanded background check requirement for two reasons.  First, an FFL's decision to perform (or decline to perform) background checks for private sales is entirely voluntary.  Section 18-12-112 does not oblige an FFL to participate if it does not wish to do so.  An FFL may oppose the expanded background check requirement in principle, or may conclude that providing checks would be inconsistent with its business model.  But neither of these reasons could amount to an injury-in-fact at all, much less one that is cognizable under the Second Amendment.

Second, the challenged statute explicitly exempts licensed gun dealers.  § 18-12-112(1)(a).  In other words, Colorado FFL may acquire a firearm from a private seller or other type of transferor without first having to conduct a background check.

The exemption for FFLs does not apply to the Family Shooting Center, which is not a licensed firearms dealer.  Nonetheless, the Family Shooting Center has expressly disclaimed that it has suffered any injury associated with the expanded background check requirement.  As its representative testified during his deposition: "the transfer of firearms...as it relates to 1229, is not something that we really get involved with[.]"  Exhibit G, Hamilton Dep. 48:10-12.

Accordingly, neither the licensed firearms dealers nor the Family Shooting Center are able to demonstrate an injury-in-fact with respect to any of the claims

for relief in the Fourth Amended Complaint.  They therefore lack standing to remain as Plaintiffs in this litigation.  Representatives of Hamilton Family Shooting Center, Burrud Arms d/b/a Jensen Arms, and Rocky Mountain Shooters' Supply have all been listed by the Plaintiffs as witnesses at trial, and Plaintiffs have indicated their intent to introduce voluminous lists regarding, among other things, "Plaintiffs' sales [and] inventories."  Doc. 125 (Exhibit 15). The dismissal of these entities as Plaintiffs would be consistent with Rule 1 insofar as it will streamline the trial by affirming that the Plaintiff business entities cannot demonstrate a Second Amendment injury by presenting evidence about lost profits and any effect of the challenged legislation on Plaintiffs' businesses.

### B.  David Bayne

During his deposition, Plaintiff David Bayne revealed that he no longer lives in Colorado and has no plans to return.  Exhibit H, Bayne Dep., 7:9-20; 8:7-12. Because he does not currently reside in the State of Colorado and has no intent to return, Mr. Bayne is under no credible threat of future prosecution, and must be dismissed as a Plaintiff.  *Dias v. City and County of Denver,* 567 F.3d 1169, 1176 (10th Cir. 2009).

### CONCLUSION

Based on the foregoing reasoning and authorities, the Governor respectfully requests that the Court dismiss Count I of the Fourth Amended Complaint for lack of standing by any Plaintiff to assert it, and to dismiss the FFLs and Hamilton Family Shooting Center from this action entirely.

Respectfully submitted this 7th day of March, 2014.

JOHN W. SUTHERS
Attorney General


s/ *Matthew D. Grove*

**Matthew D. Grove***
Assistant Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Stephanie Scoville***
Senior Assistant Attorney General
**LeeAnn Morrill***
First Assistant Attorney General

*Counsel of Record


## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2014, I served a true and complete copy of the foregoing **MOTION TO DISMISS COUNT I AND CERTAIN PLAINTIFFS FOR LACK OF STANDING** upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


*s/ Matthew D. Grove*

1562

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

## PLAINTIFF DYLAN HARRELL'S RESPONSES
## TO DEFENDANT'S FIRST SET OF INTERROGATORIES

      Plaintiff Dylan Harrell, by and through his counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by Dylan Harrell before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery. To the extent the discovery purports to require more, Mr. Harrell objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Mr. Harrell's discovery responses are also made subject to the ongoing discovery and trial preparation in this case. These discovery responses are made based on the best information, including facts available as of the date of such responses. Mr. Harrell reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

interrogatory on the ground that it seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Mr. Harrell states as follows: I own a number of firearms. They include eight rifles, three shotguns, and five pistols. Five of my eight rifles have removable magazines and can be used with magazines of fewer than 16 rounds. Three of my pistols use removable magazines, and they can all be used with magazines of fewer than 16 rounds. Seven of my rifles, and all three of my shotguns, are used for hunting and recreation. (My remaining rifle is never used at all for any purpose.) I also use one of my rifles and one of my shotguns for personal safety. My pistols are used for target shooting, recreation, and personal safety. I also use one of my pistols, a revolver, for hunting.

2.      Do you possess or own magazines that you have modified to accept greater than 15 rounds? If so, state the number of such magazines, how you modified each magazine, why you modified each such magazine, and describe the firearms you own or possess that use these magazines.

RESPONSE:  No.

3.      If you contend that you own or possess a firearm that can be used only with magazines that contain greater than 15 rounds, please describe the firearm in detail, explain the use you make of the firearm (e.g., hunting, recreational shooting, or personal safety) and explain why you contend the firearm requires a magazine containing greater than 15 rounds.

RESPONSE:  I own a .22 rifle with a tube magazine that accepts up to 21 .22 short rounds. This magazine is not removable. I use this firearm for target shooting and varmint shooting. I do not have any other firearms that require larger magazines or cannot use something smaller than 16 rounds.

4.      Do you possess magazines that without modification have capacities of greater than 15 rounds? If so, state the number of such magazines and describe the weapons you own or possess that use these magazines.

RESPONSE:  Yes. I own or possess the following magazines that without modification have capacities of greater than 15 rounds:

    a.   2x17 rounds for 9mm handgun
    b.   1x30 rounds for .22 long rifle
    c.   2x40 rounds for sporting rifles
    d.   13x30 rounds for sporting rifles
    e.   1x20 rounds for sporting rifles

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

      Plaintiffs,


v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## PLAINTIFF DAVID BAYNE'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

---

      Plaintiff David Bayne, by and through his counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

      Where no objection is interposed, the responses below reflect all responsive information and documents identified by David Bayne before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery. To the extent the discovery purports to require more, Mr. Bayne objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

      Mr. Bayne's discovery responses are also made subject to the ongoing discovery and trial preparation in this case. These discovery responses are made based on the best information, including facts available as of the date of such responses. Mr. Bayne reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

**RESPONSE:**  No.

3.      If you contend that you own or possess a firearm that can be used only with magazines that contain greater than 15 rounds, please describe the firearm in detail, explain the use you make of the firearm (e.g., hunting, recreational shooting, or personal safety) and explain why you contend the firearm requires a magazine containing greater than 15 rounds.

**RESPONSE:**  For the firearms I use primary for self-defense, I elect to employ magazines with a capacity of 16 rounds or greater when feasible.

4.      Do you possess magazines that without modification have capacities of greater than 15 rounds? If so, state the number of such magazines and describe the weapons you own or possess that use these magazines.

**RESPONSE:**  Yes.  I own magazines for my AR15 that have a capacity of 30 and 20 cartridges.  I have approximately four magazines that have a 30-cartridge capacity and three that have a 20-cartridge capacity.

5.      Describe in detail how your disability effects [sic] your ability to use the firearms you own, possess, or use firearms, including any difficulty you have using a specific firearm.

**RESPONSE:**  Mr. Bayne objects to this interrogatory on the ground that it is confusing and unclear.  Subject to and without waiving this objection, Mr. Bayne states as follows:

I am a paraplegic, T2/T3 with full dexterity.  The challenges I face in a self-defense situation is that I am significantly limited in my ability to flee and seek cover as a result of being in a wheel chair.

6.      Have you or others modified any firearm you own, possess, or use in order to accommodate your disability? If so, please describe the firearm, the modification, when the modification was made, and the purpose of the modification.

**RESPONSE:**  No.

7.       Describe in detail every instance in which you have fired or displayed a firearm for self-defense or the defense of others. In your response:

a.      state the date of any such incident;

b.      describe the firearms you used, including a description of the magazine and the capacity of the magazine you used;

c.      state whether you or others involved in the incident fired any shots;

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, et al.

Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado, Defendant.

---

## DAVID STRUMILLO'S ANSWERS TO DEFENDANT'S INTERROGATORIES

David Strumillo, by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories as follows:

### GENERAL OBJECTIONS

Where no objection is interposed, the responses below reflect all responsive information and documents identified by Mr. Strumillo before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery. To the extent the discovery purports to require more, Mr. Strumillo objects on the grounds that (a) the discovery seeks to compel him to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

Mr. Strumillo's discovery responses are also made subject to the ongoing discovery and trial preparation in this case. These discovery responses are made based on the best information, including facts available as of the date of such responses. Mr. Strumillo reserves the right to amend, supplement, or change these discovery responses as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Mr. Strumillo makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and

EXHIBIT C

7.     Do you possess magazines that without modification have capacities of greater than 15 rounds?  If so, state the number of such magazines and describe the weapons you own or possess that use these magazines.

**Response:**

First question: Yes.

**Response:**

Second question:

Mr. Strumillo objects to these questions on the grounds that they are vexatious, constitute an intrusion into his and his family's privacy, and are not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection:

PURSUANT TO SEPT. 26, 2013, AGREEMENT BETWEEN COUNSEL FOR MR. STRUMILLO AND FOR DEFENDANT, THE ANSWERS BELOW WILL BE CONSIDERED TO SATISFY QUESTION SET 7.

Mr. Strumillo owns several magazines of more than 15 rounds for the AR-15 type rifles and for the Glock 17.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.*

　　　　Plaintiffs,


v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

　　　　Defendant.

---

**PLAINTIFF WOMEN FOR CONCEALED CARRY'S RESPONSES
TO DEFENDANT'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION**

---

　　　　Plaintiff Women for Concealed Carry, by and through its counsel, and pursuant to Fed. R. Civ. P. 33(b), hereby responds to Defendant's Interrogatories and Requests for Production as follows:

## <u>GENERAL OBJECTIONS</u>

　　　　Where no objection is interposed, the responses below reflect all responsive information and documents identified by Women for Concealed Carry before the date of the responses, pursuant to a reasonable and diligent search and investigation conducted in connection with this discovery.  To the extent the discovery purports to require more, Women for Concealed Carry objects on the grounds that (a) the discovery seeks to compel it to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure, and (b) compliance with the discovery would be oppressive, and would impose an undue burden or expense.

　　　　Women for Concealed Carry's discovery responses are also made subject to the ongoing discovery and trial preparation in this case.  These discovery responses are made based on the best information, including facts available as of the date of such responses.  Women for Concealed Carry reserves the right to amend, supplement, or change these discovery responses

as permitted or required under the Federal Rules of Civil Procedure based on additional information obtained through the discovery and trial preparation process.

Women for Concealed Carry makes each individual response subject to and without waiving the conditions and objections that are stated in the sections of these responses entitled "General Objections" and "Objections to Instructions and Definitions" and that are specifically referred to in that particular individual response.

Women for Concealed Carry makes each individual response without adopting in any way (unless otherwise stated) the terms and phrases that Defendant purports to define in his discovery.  When Women for Concealed Carry uses words or phrases that Defendant has purported to define, those words and phrases should be given either (a) the meaning set out by Women for Concealed Carry in its responses, or in its objections to the specific definitions, or (b) the ordinary meaning of such words or phrases.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Defendant has purported to define several terms used in its discovery.  In its responses, Women for Concealed Carry gives ordinary words and phrases their ordinary meaning.  By making this written response, Women for Concealed Carry does not (a) adopt any purported definition, (b) waive or limit its objections to Defendant's purported definitions, or (c) concede the applicability of any such definition to any term or phrase that might be contained in written responses.  Wherever these words are used in Defendant's interrogatories, these objections and these clarifications are incorporated, unless otherwise specified.

Defendant purported to define "you" and "your" to include "counsel for Plaintiff." Women for Concealed Carry objects to this definition to the extent that it purports to require the disclosure of information, communications, or documents protected from disclosure by the attorney-client privilege, work product doctrine, or any other privilege or immunity.

### Interrogatories

1.     With respect to the allegations contained in paragraph 165 of the Second Amendment Complaint, list all magazines used and carried by members of Women for Concealed Carry that you contend are "banned under HB 1224," and with respect to each such magazine, explain in detail why you believe the magazine is banned.

**RESPONSE:**  Women for Concealed Carry objects to this interrogatory to the extent it calls for a legal conclusion.  Subject to and without waiving this objection, Women for Concealed Carry responds as follows:

All magazines with removable base plates, including those with a capacity of less than 16 rounds, are banned under the terms of HB 1224. The following magazines are owned and used or carried (or both) by the directors of WCC, and are banned by HB 1224 because they contain removable base plates or have capacities of more than 15 rounds:

| Used with which firearm? | Capacity |
|---|---|
| Ruger LCP .380 | 6 |
| Ruger LCP .380 | 6 |
| Ruger LCP .380 | 6 |
| Sig Sauer SP 2022 | 17 |
| Sig Sauer SP 2022 | 17 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |

| | |
|---|---|
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| Sig Sauer SP 2022 | 15 |
| AR-15 | 40 |
| AR-15 | 40 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |

| | |
|---|---|
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| S&W Bodyguard | 6 |
| S&W Bodyguard | 6 |
| S&W Bodyguard | 6 |
| S&W Bodyguard | 6 |
| S&W 9mm | 17 |
| S&W 9mm | 17 |
| S&W 9mm | 17 |
| Glock 23 | 15 |
| Glock 23 | 15 |
| Glock 23 | 13 |
| Glock 23 | 13 |
| Glock 23 | 10 |
| AR-15 | 30 |
| AR-15 | 30 |

| | |
|---|---|
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |

| | |
|---|---|
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| AR-15 | 30 |
| USP | 18 |
| USP | 18 |
| Mini 14 | 20 |
| Mini 14 | 20 |
| Mini 14 | 20 |
| Mini 14 | 20 |
| M1 | 16 |
| M1 | 16 |
| .45 Cal | Standard |
| .45 Cal | Standard |
| .45 Cal | Standard |
| .45 Cal | Standard |
| .45 Cal | Standard |
| .45 Cal | Standard |

| | |
|---|---|
| .45 Cal | Standard |
| .40 Cal | Standard |
| .40 Cal | Standard |
| .40 Cal | Standard |

4.     Without identifying your members by name, list the firearms owned by each member of Women for Concealed Carry, and with respect to each firearm that uses a magazine, state:

　　　　　a.     the purpose for which the firearm is used;

      b.     what size (capacity) magazine(s) the owner uses with the firearm;

      c.     whether the firearm is capable of using a magazine carrying fewer than 16 rounds;

      d.     whether the owner owns magazines carrying greater than 15 rounds.

**RESPONSE:**  Women for Concealed Carry objects to this interrogatory on the grounds that it is vague and confusing, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and notwithstanding these objections, Women for Concealed Carry answers that the directors of WCC own the following firearms:

| Make | Model | Uses a magazine? | Purpose(s) for which firearm is used? | Capacity of magazines used? | Can firearm be used with a magazine capacity less than 16? |
|---|---|---|---|---|---|
| Ruger | LCP .380 | Yes | Self-defense, home defense, target shooting and recreational enjoyment, CC | 6 | Yes |
| Sig Sauer | SP 2022 | Yes | Self-defense, home defense, target shooting and recreational enjoyment, CC | 15, 17 | Yes |
| Palmetto State Armory | AR-15 | Yes | Home defense, target shooting and recreational enjoyment | 30, 40 | Yes |
| Smith & Wesson | Bodyguard .380 | Yes | Self Defense, home defense, target shooting, | 6 | Yes |

|  |  |  | CC |  |  |
|---|---|---|---|---|---|
| Smith & Wesson | M&P 9mm Handgun | Yes | Home Defense, Self Defense, target shooting, CC | 17 | Yes |
| Smith & Wesson (2) | M&P 15 Rifle | Yes | Home defense, target shooting. | 30, 40 | Yes |
| Glock | 23 | Yes | Self Defense, home defense, target shooting, CC | 15, 13,10 | Yes |
| Mossberg | 500 (Shotgun) | No | Target shooting, home defense |  |  |
| Winchester | Shotgun | No | Target shooting, home defense |  |  |
| Henry | Golden Boy | No | Target shooting |  |  |
| Mossberg | Plinkster | No | Target shooting |  |  |
| Glock | 26 9mm | Yes | Self Defense, home defense, target shooting, CC. | 14 | Yes |
| Glock | 27 9mm | Yes | Self Defense, home defense, target shooting, CC | 14 | Yes |
| Glock | 30 .45 cal | Yes | Self Defense, CC |  | Yes |
| Glock | 21 .45 cal | Yes | Self Defense, CC |  | Yes |
| Glock | 22 .40 cal | Yes | Self Defense, CC |  | Yes |
| Weatherby | .300 | No | Hunting |  |  |

Appellate Case: 14-1290   Document: 01019371749   Date Filed: 01/16/2015   Page: 53

|  | Shotgun |  |  |  |  |
|---|---|---|---|---|---|
| Benelli | Shotgun | No | Self defense, hunting |  |  |
| Bushmaster | AR-15 | Yes | Home defense, target shooting | 30 | Yes |
| HK | USP | Yes | Home defense, target shooting/recreation | 18 | Not sure |
| Bushmaster | AR-15 | Yes | Home defense, target shooting | 30 | Yes |
| Ruger | Mini 14 | Yes | Home defense, recreation | 20 | Not sure |
| Garand | M1 | Yes | Self defense, home defense, recreation, CC | 16 | Yes |

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Case 1:13-cv-01300-MSK-MJW   Document 133-5   Filed 03/07/14   Page 1 of 2

Appellate Case: 14-1290    Document: 01019371749    Date Filed: 01/16/2015    Page: 54
Cooke  v. Hickenlooper      SHERIFF JOHN B. COOKE           10/23/2013

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-1300-MSK-MJW

_____

DEPOSITION OF:  SHERIFF JOHN B. COOKE
October 23, 2013
(CONTAINS CONFIDENTIAL MATERIAL)

_____

JOHN B. COOKE, et al.,

Plaintiff,

v.

JOHN W. HICKENLOOPER, Governor of the State of
Colorado,

Defendant.

_____

PURSUANT TO NOTICE, the deposition of
SHERIFF JOHN B. COOKE was taken on behalf of the
Defendant at 727 16th Avenue, Denver, Colorado 80203,
on October 23, 2013, at 8:07 a.m., before Teresa
Coogle, Registered Professional Reporter, Certified
Realtime Reporter, and Notary Public within Colorado.

Cooke  v. Hickenlooper       SHERIFF JOHN B. COOKE              10/23/2013

                                                        Page 19

```
 7          Q.   Do you own any magazines that hold more

 8     than 15 rounds of ammunition?

 9          A.   Yes.

10          Q.   I don't know if it's a lot of them.  If

11     it's a few, if you can list them.

12          A.   I own four -- four or five, I think, of

13     30-round magazines.

14
```

Cooke  v. Hickenlooper          MICHAEL SHAIN                    10/31/2013

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-1300-MSK-MJW
_____

DEPOSITION OF:  MICHAEL SHAIN - October 31, 2013
_____

JOHN B. COOKE, et al.,

Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of
Colorado,

Defendant.

_____

        PURSUANT TO NOTICE, the deposition of
MICHAEL SHAIN was taken on behalf of the Defendant at
727 East 15th Avenue, Denver, Colorado 80203, on
October 31, 2013 at 9:04 a.m., before Tracy R. Doland,
Certified Realtime Reporter, Registered Professional
Reporter and Notary Public within Colorado.

Cooke   v. Hickenlooper          MICHAEL SHAIN                    10/31/2013

                                                        Page 196

1    still functional.  I want to match this up.  Will you

2    order me three more like this.

3           Q.   About how many of those do you see a

4    year?

5           A.   Like I say, I can't remember having one

6    in 2012.  I can remember getting a couple of

7    semi-automatic firearms with magazines that had

8    malfunctions and we had to have the magazines with

9    them.  But just the magazine, I don't remember any in

10   2012.

11          Q.   What about previous years?

12          A.   In previous years, like I said, there

13   have been periodically folks that say I have a problem

14   with a magazine.

15          Q.   Sounds like it's not a regular stream of

16   business for you?

17          A.   No, because people usually, because of

18   the construction of magazines, because of the way

19   they're designed and constructed to be disassembled by

20   the enduser, most people are able to replace a spring

21   or replace a follower, disassemble the magazine and

22   clean it and maintain it on their own without the --

23   without needing to bring it into a gunsmith to have

24   that done.

25          Q.   How about the first six months of this

Cooke  v. Hickenlooper          MICHAEL SHAIN                 10/31/2013

                                                         Page 197

 1    year, did you see any magazines capable of accepting

 2    more than 15 rounds for repair?

 3          A.   No.

 4          Q.   Did you see any firearms in the first

 5    six months of this year that were equipped with

 6    magazines capable of more than 15 rounds for repair?

 7          A.   Yes.

 8          Q.   How many?

 9          A.   Three that I can think of.

10          Q.   Have you seen any since July 1?

11          A.   No.

12          Q.   Do you have any knowledge as to how

13    other gunsmiths in Colorado would answer these

14    questions?

15               MR. COLIN:  Which questions?

16          Q.   (BY MR. FERO)  About how many people are

17    bringing in -- how many magazines or firearms equipped

18    with magazines holding more than 15 rounds are being

19    brought to them for repair.

20          A.   We could ask them.

21          Q.   Well, okay.  Fair enough.  But have

22    you -- do you have any knowledge as to that?

23          A.   I haven't asked them.

24          Q.   Okay.  So that would be no?

25          A.   (Deponent nodded head up and down.)

Doug Hamilton

1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2

3    Civil Action No. 13-cv-1300-MSK-MJW

4    JOHN B. COOKE, et al,

5         Plaintiffs,

6    v.

7    JOHN H. HICKENLOOPER, Governor of the State of Colorado,

8         Defendant.

9    _____

10                 DEPOSITION OF DOUG HAMILTON

11                      November 4, 2013

12   _____

13

14         PURSUANT TO NOTICE, the deposition of

15   DOUG HAMILTON was taken on behalf of the Defendant at

16   727 East 16th Avenue, Denver, Colorado, on

17   November 4, 2013, at 8:51 a.m. before Karen Bucklin,

18   Registered Professional Reporter and Notary Public within

19   the state of Colorado.

20

21

22

23

24

25
```

Doug Hamilton

47

1  legislation?

2      A.   I only know what they tell me.  Most of the

3  time the conversation on the phone does not relate to a

4  specific named individual.  Just, "I'm calling for

5  information from the Family Shooting Center" is what they

6  address.

7          So we tell them what we know, and as this

8  states, we do not give legal advice.  We can only tell

9  them what we understand and how we are operating.

10     Q.   So you don't know, then, if any of the people

11  who have called, whether those people ended up coming or

12  did not end up coming?

13     A.   I have no true knowledge of the answer to that

14  question.

15     Q.   When people called in and you had these

16  conversations with them, did they specify which law they

17  were concerned most about?

18     A.   Some would.  And some just were asking general

19  questions.

20          The ignorance of the public with respect to

21  the law is quite varied.  Some people call in with some

22  pretty off-the-wall questions, and some people are

23  calling in with a specific -- there's a variety.

24     Q.   Did you have any sense whether people were

25  more concerned about House Bill 1224 and the magazine

1172a9f7-c0c3-4ec1-9f8d-682b57282c29

Doug Hamilton

48

```
 1    capacity law or whether they were more concerned with the
 2    background-check law?
 3        A.   We do not sell firearms.  I have an FFL
 4    gentleman who works for me.  When people used to transfer
 5    a firearm, whether they are shipping one in-state from
 6    out of state or they are buying or whether it's just
 7    transferring their own personal firearms as somebody
 8    moving into the state, we will refer that person to my
 9    FFL.
10             So the transfer of firearms, therefore, as it
11    relates to 1229, is not something that we really get
12    involved with per se.
13             Some of your interrogatories were with respect
14    to how many firearms we have sold and such and thus, and
15    it's not applicable to us.
16        Q.   Okay.
17        A.   So our main concern is with the magazine law
18    1224 and what -- and how that relates to how we operate,
19    which then becomes, curiously, the transfer of a firearm
20    between people.
21        Q.   Did any of the people with whom you spoke
22    about the law, did they express a particular way in which
23    they were concerned they would be violating 1224?
24        A.   Not a particular way.  Again, it's
25    interpretation of what they hear on the news, talking
```

1

1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2

3
      JOHN B. COOKE, et al.,            )
4                        )
           Plaintiffs,        )
5                         )
                          )
6    vs.                 ) CIVIL ACTION NO.
                          ) 13-cv-1300-MSK-
7                         ) MJW
     JOHN W. HICKENLOOPER, Governor   )
8     of the State of Colorado,        )
                          )
9            Defendant.        )
     _____)

10

11

12        The Telephonic Deposition of DAVID BAYNE,

13   VI, taken by counsel for the Defendant, pursuant to

14   Notice and by agreement of counsel, under the Federal

15   Rules of Civil Procedure, reported by Linda E. Cheek,

16   RMR, CCR-A-752, at the offices of McKee Court

17   Reporting, 106 Montgomery Street, Savannah, Georgia,

18   on Thursday, October 24, 2013, commencing at 2:05

19   p.m.

20
     _____

21   Transcript Prepared By:

22        McKEE COURT REPORTING, INC.
               P.O. Box 9092
23        Savannah, Georgia 31412-9092
              (912) 238-8808

19   trouble making you out over the phone.  Could you

20   repeat the question?

21      Q.   Sure.  I just turned up my volume, hope

22   that will help.

23         Do you have any conditions that would

24   impair your ability to give accurate answers to any

25   of my questions today?


                              7


1      A.   No.

2      Q.   Do you have anything that would prohibit

3   you from answering any of my questions truthfully?

4      A.   No.

5      Q.   Mr. Bayne, what is your date of birth?

6      A.   I'm sorry, say again, please.

7      Q.   What is your date of birth?

8      A.   March 12th, 1974.

9      Q.   And what is your current address?

10     A.   Current address is 20 Teachers Row,

11   Richmond Hill, Georgia, 31324.

12     Q.   Have you ever lived in Colorado?

13     A.   Yes.

14     Q.   And when did you move from Colorado?

15     A.   Approximately one and a half months ago.

16     Q.   How long did you live in Colorado?

17     A.   About 12 years.

18    Q.   Do you have plans to move back to Colorado

19   at any point?

20    A.   Undecided at this point.

21    Q.   And why did you move to Georgia?

22    A.   Real estate market more so than anything.

23    Q.   Is your career involved in the real estate

24   market?

25    A.   No.


8


1    Q.   The price of living, are you saying that

2   the price of living in Georgia was better than in

3   Colorado?

4    A.   You can obtain substantially more real

5   estate wise here for your money than what you can in

6   Colorado.

7    Q.   Again, you don't know whether or not you

8   plan to return to Colorado; correct?

9    A.   One more time, please.

10    Q.   That's okay.  You don't know whether or

11   not you plan to move back to Colorado?

12    A.   Correct.

13    Q.   Are there magazine capacity limitations

14   where you live?

15    A.   Not to my knowledge, although I have not

16   researched it.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et. al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

### PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT 1 AND CERTAIN PLAINTIFFS FOR LACK OF STANDING

---

     Plaintiffs, by and through their respective counsel, respectfully submit their response to Defendant's Motion to Dismiss Count 1 of the Plaintiffs' Fourth Amended Complaint (Dkt. No. 116) and Certain Plaintiffs for Lack of Standing.

## <u>INTRODUCTION</u>

     At the final pretrial conference, the Court granted Defendant's request to file a standing motion, but had previously denied Defendant's request to file a summary judgment motion. What Defendant filed instead is a motion to dismiss the central claim in the case on the theory that no Plaintiff has standing to bring it, and has interlaced its brief with arguments that turn on the ultimate issue to be decided.  Among other things, Defendant argues that Plaintiffs lack "standing" because the magazines at issue are not subject to Second Amendment protection. That is not a standing argument. That is a compressed version of the summary judgment brief Defendant had ready but was precluded from filing.  Moreover, Defendant's motion to dismiss

1

Count 1 is directly contrary the Court's ruling that soon-to-retire sheriffs have standing. The Court should decline to entertain Defendant's motion at this late date, but if the Court does address the merits, it will find that motion has none for the reasons set out below.

Similarly, Defendant's argument that firearms retailers have no standing based on proven financial losses caused by the ban is directly contrary to well-established law. Those same retailers likewise have standing to challenge the structure of HB 1229's requirements for FFL processing of all private-party sales and many temporary private-party transfers.

For the reasons set out below, the Court should deny Defendant's motion.

## <u>ARGUMENT</u>

I.    **THE MAGAZINE BAN IS CURRENTLY IN EFFECT, THUS ITS EXISTING INFRINGEMENT OF SECOND AMENDMENT RIGHTS IS NOT SPECULATIVE OR CONTINGENT ON FUTURE EVENTS.**

Defendant moves to dismiss Count 1, which alleges that the ban on the purchase and ownership of magazines with a capacity greater than 15 rounds after July 1, 2013 is an infringement of the Second Amendment right to own and use common arms and accessories for all lawful purposes. Defendant's basic proposition is a simple one: The Second Amendment right is restricted  to self-defense, and since the Plaintiffs challenging the magazine ban unsurprisingly already own the same kind of magazines, they have no standing to challenge the ban until such time as all of their current magazines wear out, or are lost, stolen or destroyed. Dkt. 133 at 10. In the meantime, the logic goes, Plaintiffs are free to defend themselves, and thus can exercise their full Second Amendment rights, and have no claim. In other words, a Plaintiff who can currently defend himself does not have a claim until after that ability is lost,

and, once standing is finally achieved, must await the outcome of a lengthy legal process, hoping that the need for defense does not arise in the meantime.

This remarkable proposition is not only legally wrong, but is a transparent attempt to make the current motion parallel to the Court's rationale for the earlier dismissal of Count 3.   In dismissing Count 3, the Court found that injury was not sufficiently imminent because the State's "Technical Guidance Letters" removed any threat of prosecution until such unknown future time when a rogue District Attorney might seek to prosecute despite the letters. Dkt. 96 at 12.  In other words, the threat was not imminent because it depended on speculative, future events in the Court's view.   But no such parallel can be drawn here for several reasons, and the Second Amendment right is not so narrow.

First, Defendant ignores this Court's December 19, 2013, ruling regarding the standing of the eleven individual Plaintiffs who were formerly Plaintiffs in their official capacity as Colorado sheriffs.   The Court found that those sheriffs who were soon to retire had standing because they would lose the law-enforcement exemption in C.R.S. § 18-12-302(3)(a)(II) upon retirement.  Their injury impending on the date certain of their retirement from office in January, 2015 is "imminent enough" in the words of the Court.[1]  The Court did not impose an additional, post-retirement waiting period until their current magazines disintegrated.  Those retiring sheriffs in January, 2015 will be in the same position as is today every other Plaintiff who owns a magazine, but cannot buy another.  They have equal standing.

Defendant's theory is that if a person currently has functional arms for self-defense, the person has no standing when he or she is prevented from acquiring additional or better arms. An

---

[1] In fact, Defendant's argument is directly contrary to the Courts ruling, as he contends that those same sheriffs lack standing at least until after they retire. Dkt. 133 at 8,11.

individual who owns one handgun would have no standing to challenge a handgun ban which prevented her from purchasing a second handgun (as a backup), or an improved handgun. The same points can be made about magazines.

Second, Defendant's motion depends on repetition of a false construct about the scope of the Second Amendment right.  After acknowledging that Plaintiffs' claim is about all lawful uses, including self-defense, Defendant nonetheless thereafter misconstrues the right as only self-defense eleven times, and then bases its entire argument on that false proposition.  Dkt. 133 at pp. 3-6, 8-12. Although self-defense is indisputably a core component of the right, it does not define the boundaries.  The Second amendment guarantees law-abiding citizens the right to "keep and bear arms" for all lawful purposes.  The Supreme Court in *Heller* defined the right to include all firearms that are in common use.  *District of Columbia v. Heller*, 554 U.S. 570, 620, 624-25 (2008) ("bearing arms for a lawful purpose"; "arms 'in common use at the time' for lawful purposes like self-defense"; "typically possessed by law-abiding citizens for lawful purposes").  That magazines with a capacity greater than 15 rounds are in common use cannot be seriously disputed, as established both in Defendant's motion and the joint stipulations of the parties that there are tens of millions of such magazines nationally and at least millions in Colorado.  Dkt. 133 at 10; Dkt. 119, at 22-23 ¶¶ 25-26.  One reason is that they are standard components of many popular firearms.

Thus, unlike the condition precedent that the Court found was necessary for standing to assert Count 3, there is no such condition here.  A commonly-used component necessary for the operation of commonly used firearms has been banned in Colorado since July 1, 2013.  The banned magazines are per se illegal to purchase or possess yesterday, today, and tomorrow.

That is neither conjectural nor hypothetical, but is the actual injury the law finds sufficient. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  It is far more than the imminent harm that is also sufficient, because it already exists and has for nearly nine months.   The other two elements necessary for standing—that the injury is causally connected to the implementation of the statutory ban, and that a favorable decision striking down the ban will redress the injury—do not appear to be disputed and require no further discussion.

Finally, Defendant strays even further from arguments about standing, and makes what amounts to a summary judgment argument on the ultimate issue—which the Court specifically precluded Defendant from doing.   Defendant argues that Plaintiffs cannot prove an injury because the restriction on ownership of magazines may be constitutional.  Dkt. 133 at 11-12 (Second Amendment does not grant a right to own a specific type of firearm).   Whether the Plaintiffs have a constitutional right to own the banned magazines is the issue that the Court will decide.  It is circular to presume the outcome, and argue the Plaintiffs have no standing because they may not prevail.   Standing has no such requirement.

## II.    THE "BUSINESS PLAINTIFFS" HAVE STANDING TO CHALLENGE HB 1224'S PROHIBITION ON THE SALE OR TRANSFER OF MAGAZINES.

The Defendant contends that the FFLs and the Family Shooting Center at Cherry Creek State Park ("Family Shooting Center")[2] (collectively "the business plaintiffs") lack standing to challenge HB 1224 because they cannot allege a legally-protected interest under the Second Amendment harmed by HB 1224.  These arguments lack merit and defy common sense.

---

[2]While the Family Shooting Center is not an FFL, it nonetheless earns significant revenue from the sale of firearm accessories, including magazines that can hold more than 15 rounds. *See* Dkt. 116 ¶ 94. Accordingly, the arguments in Section II of this response apply just as forcefully to the Family Shooting Center as they do to the other FFL plaintiffs.

A.   **The Business Plaintiffs Have Alleged Legally Protected Interests Harmed by HB 1224.**

The Defendant's primary argument against the standing of the business plaintiffs is that neither the Second Amendment nor the *Heller* decision recognize an individual's right to sell firearms and, therefore, the business plaintiffs do not have a Second Amendment right harmed by HB 1224.  Dkt. 133 at 12-13.  In other words, according to the Defendant, an FFL could never challenge the validity of a ban against the sale of certain firearms or firearm accessories because the ban only impacts the customer's right to purchase and own such firearms and firearm accessories.  However, the authorities cited by the Defendant are wholly distinguishable and contrary to established law that vendors who sell goods or services that implicate fundamental rights under the Constitution have standing to challenge restrictions on the sale of such goods or services.

First, it is absurd to argue that HB 1224 will not logically result in economic harm to the business plaintiffs based on their inability to sell LCMs.  In *National Rifle Association of America v. Magaw*, the Court of Appeals for the Sixth Circuit found that an outright ban on certain rifles and magazines unequivocally harmed the plaintiff manufacturers and FFLs and that they had Article III standing to challenge the ban under the Commerce Clause and the Equal Protection Clause.  "In sum, the manufacturers and dealers, who must comply with the Act as a condition of functioning in an intensely regulated industry, illustrate that they have suffered economic harm from the impact of passage of the Act, which has restricted the operation of their businesses in various ways—either forcing them to 'stop production,' 'decline work,' and to 'refrain from sales and marketing,' or imposing the need to redesign and relabel products." *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 281 (6th Cir. 1997).  The business plaintiffs

1597

have alleged exactly this sort of harm resulting from the passage of HB 1224.  *See* Dkt. No. 116

¶¶ 69-101, 161    Therefore, the only question is whether this harm to the business plaintiffs is to

a legally protected interest under the Second Amendment.

Despite the Defendant's surprising statements to the contrary, the ruling in *Illinois*

*Association of Firearms Retailers v. City of Chicago* does in fact support the proposition that the

sale of firearms is a legally protected interest under the Second Amendment for standing

purposes.  *See* Dkt. 133 at 15.  In that case, the city imposed a ban on the sale and transfer of

firearms within city limits that would even apply to sales by federally licensed firearms dealers.

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, -- F. Supp. 2d --, 2014 WL 31339 at *1

(N.D. Ill. 2014).  The plaintiffs included an association of Illinois firearms dealers.  *Id.*  The

court immediately noted in its summary that the city's ban "goes too far in outright banning legal

buyers **and legal dealers from engaging in** lawful acquisitions and **lawful sales of firearms**."

*Id.* (emphasis added).  The court also noted that since the plaintiff association was composed, in

part, of firearms retailers, the association had associational standing to pursue the challenge as a

named plaintiff.  *Id.* n.3.  It was plainly incorrect for the Defendant to assert that "[t]he opinion

did not explicitly address standing at all, and the only injury identified by the court was an

infringement on a law-abiding citizen's Second Amendment right to acquire a firearm."  Dkt.

133 at 15.

Implicit in the court's opinion expressly declaring the associational standing of the trade

association was the finding that the firearms dealers *themselves* would have had standing to

challenge the city's ban.  *Id.* at *16 n.7 (plaintiffs "assuredly have standing to contest" the

prohibition of legitimate firearms sales); *see Hunt v. Washington State Apple Advertising Com'n*,

432 U.S. 333, 343 (1977) (an association has standing to bring suit on behalf of its members when, among other things, "*its members would otherwise have standing to sue in their own right.*" (emphasis added)).   Thus, *Illinois Association of Firearms Retailers* supports the argument that the business plaintiffs have standing to challenge HB 1224 based on its impact on their legally protected interest under the Second Amendment to sell magazines with capacities greater than 15 rounds, and the Defendant's arguments regarding the same are simply incorrect.

      B.    **The Business Plaintiffs Have Standing to Advocate the Rights of Its Customers Whose Second Amendment Rights Are Burdened by HB 1224's Restrictions.**

      Even assuming that the Defendant is right in that the Second Amendment does not protect the business plaintiffs' right to sell firearms and firearm accessories, the Defendant cannot reasonably argue that HB 1224 does not expressly place a burden on an *individual's* right to purchase and own magazines with a capacity of more than 15 rounds, and that this burden must be evaluated by the Court to see whether it passes constitutional muster.  *See District of Columbia v. Heller*, 554 U.S. 570, 626 -27 (2008) (Second Amendment protects the individual right to keep and carry arms in common use at the time); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("putting the government through its paces" to prove the constitutionality of a categorical ban on firearm possession for certain persons was necessary); *Koll v. Village of Norridge*, 941 F. Supp. 2d 933, 943 (N.D. Ill. 2013) (laws imposing restrictions on the commercial sale of arms are presumptively lawful, but they must still survive constitutional scrutiny).   Accordingly, the question becomes whether firearms dealers and manufacturers have standing to advocate the Second Amendment rights of those individuals who seek access to their goods and services.

1599

Under established precedent in a variety of Constitutional contexts, the answer is undeniably "yes."   Regarding the Second Amendment, in *Ezell v. City of Chicago*, the city attempted to ban all firing ranges within city limits.  *Ezell v. City of Chicago*, 651 F.3d 684, 689-90 (7th Cir. 2011).  One of the plaintiffs, Action Target, designed, built, and furnished firing ranges.  *Id.* at 692.  The court noted that the individual plaintiffs' standing was "not in serious doubt" because they were all Chicago residents who wanted to maintain firearm proficiency by practicing at a target range.  *Id.* at 695.  However, the city argued that Action Target lacked standing because the Second Amendment only protects individual rights, rather than organizational rights.  *Id.* at 696.  The court expressly disagreed: "Action Target, as a supplier of firing-range facilities, is harmed by the firing range ban and is also permitted to 'act[] as [an] advocate[] of the rights of third parties who seek access to' its services."  *Id.* (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)).   Thus, like Action Target, the business plaintiffs have standing to advocate both their own rights and the rights of customers whose Second Amendment rights are impacted by the passage of HB 1224.  *See also Koll*, 941 F. Supp. 2d at 945 (discussing *Ezell* in-depth and concluding that "even if the Second Amendment does not protect the sale of firearms directly, [FFL Plaintiffs] can still pursue a claim that the Agreement and Revised Ordinance infringe their customers' personal right to keep and bear arms.").

The Tenth Circuit has favorably cited *Ezell* for the very issue of corporate standing of firearms businesses: "Several cases have held, in other contexts, that an inhibition on a person's ability to perform work constitutes an injury-in-fact.  *See . . . Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir.2011) (concluding "supplier of firing-range facilities" possessed standing to

challenge city's ban on such facilities)." *Kerr v. Hickenlooper*, -- F.3d --, 2014 WL 889445 at *3 (10th Cir. Mar. 7, 2014).

Other cases outside of the Second Amendment context have similarly concluded that vendors and manufacturers have standing to challenge laws that impact the fundamental constitutional rights of their customers. *See Craig v. Boren*, 429 U.S. 190, 195 (1976) (beer vendor had standing to challenge alcohol regulation based on its customers' equal protection rights); *Planned Parenthood v. Danforth*, 428 U.S. 52, 62 (1976) (abortion provider doctors had standing to challenge statute controlling how they provided their services); *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 327 (7th Cir. 1985) (booksellers had standing to challenge ordinance prohibiting them from selling sexually-explicit materials). Thus, the business plaintiffs have standing to challenge the burdens placed on their customers' ability to keep and bear arms under the Second Amendment.

## C.    The Remaining Authorities Cited by the Defendant Are Distinguishable.

The other authorities relied on by the Defendant are either distinguishable or inapplicable. *Montana Shooting Sports Association v. Holder* challenged certain applications of federal firearms laws as being beyond the scope of Congress's interstate commerce power. As the Magistrate Judge wrote, "Plaintiffs have not pled a Second Amendment claim in this case." *Montana Shooting Sports Ass'n v. Holder*, 2010 WL 3926029 at *22 (D. Mont. Aug. 31, 2010). The Magistrate Judge did make the statement quoted by Defendant (Dkt. 133 at 13), but dicta from a proposed recommendation is not persuasive authority.

*United States v. Chafin* is an unpublished decision and is therefore not binding precedent. 423 Fed. Appx. 342, 344 (4th Cir. 2011) (citing Fourth Circuit Rule 32.1). Chafin had standing

10

1601

to pursue his Secnod Amendment claim, and lost under the application of the two-part test.  *Id.* at 344.  Similarly, in *United States v. Conrad*, the court rejected Conrad's Second Amendment argument, but never asserted that Conrad lacked standing.  923 F. Supp. 2d 843, 852 (W.D. Va. 2013).

The word "standing" does not appear in *Teixeira v. County of Alameda*, 2013 WL 707043 (N.D. Cal. Feb. 26, 2013).  The court held that a zoning ordinance prohibiting gun stores within 500 feet of schools and residences was a presumptively valid restriction under *Heller*'s express creation of a presumption in favor of the validity of conditions and qualifications on the commercial sale of firearms.  The court declined to "decide what level of constitutional scrutiny to apply to the (as yet unarticulated) right to sell or purchase guns because as a threshold matter, there are simply no allegations sufficient to rebut the presumption of validity established in *Heller*."  *Id.* at *6.  The gun store owners lost on the Second Amendment merits, not because they lacked standing.

None of these authorities apply here.  The business plaintiffs are not arguing—as the Defendant seems to suggest—that the Second Amendment precludes any burdens on the sale of firearms or firearm accessories.  The business plaintiffs are simply arguing that the actual burden imposed by HB 1224, when weighed against HB 1224's stated justifications, is unconstitutional under the Second Amendment and that the business plaintiffs have legally protected interests burdened by HB 1224, as more fully outlined in the operative complaint.  Further, under established Supreme Court precedent, the business plaintiffs have standing to advocate the rights of their customers whose Second Amendment rights are unquestionably implicated by HB 1224's restrictions on their right to keep and bear arms.  Thus, the Defendant's arguments

regarding the business plaintiffs' lack of standing to challenge HB 1224 as unconstitutional under the Second Amendment lack merit.

### III.   THE BUSINESS PLAINTIFFS HAVE STANDING TO CHALLENGE HB 1229, AS ALLEGED IN COUNT 5 OF THE COMPLAINT.

The Defendant now contends, without any authorities, that the business plaintiffs lack standing to challenge HB 1229 because the FFLs are not required to process private firearm sales or loans under HB 1229.   Further, the Defendant contends that the business plaintiffs lack standing because section (1)(a) of HB 1229 excludes licensed firearm dealers from its requirements.  Both arguments are flawed.

### A.   The Business Plaintiffs Have Standing to Challenge HB 1229 Because HB 1229 Gives Them the Unlawful Choice of Either Refusing to Facilitate Lawful Firearm Transfers or to Lose Business Revenue.

The Defendant's focus on the "voluntary" aspect of FFL background checks to facilitate private firearm transfers misses the point.  HB 1229 unequivocally *requires* any private citizen transferring a firearm to another private citizen to have a transfer processed by a licensed gun dealer.  C.R.S. § 18-12-112(2)(a) ("A prospective firearm transferor who is not a licensed gun dealer *shall* arrange for a *licensed gun dealer* to obtain the background check *required* by this section." (emphasis added)).  This requirement makes FFLs the sole gatekeeper for legal and valid firearm transfers between private parties under HB 1229.  If an FFL elects to assist a private citizen with a firearm transfer, it must create and maintain all the same paperwork as is required for a sale from the FFL's inventory, and then conduct and record the background check in accordance with all state and federal laws.  The FFL must perform these processes either free of charge or for a maximum of ten dollars.  C.R.S. § 18-12-112(2)(b-d).

The Plaintiffs have repeatedly alleged that the ten dollar fee cap is completely impracticable given the obligations and time constraints inherent with fully complying with HB 1229's requirements. *See* Dkt. No. 116, ¶¶ 20-26, 198-99. The law, as written now, gives FFLs like the business plaintiffs the choice of either 1) refusing to facilitate the lawful transfer of a firearm from one citizen to another, effectively denying the transferee of his or her right to keep and bear arms under *Heller* and the Second Amendment, or; 2) subsidizing the transfer out of the FFLs' own funds, which they may or may not be able to do from a business standpoint. The Plaintiffs have already established that vendors and business owners who provide goods and services implicating fundamental rights have the ability to advocate on behalf of their customers whose rights are unconstitutionally burdened. *See Craig*, 429 U.S. at 195; *Ezell*, 651 F.3d at 696; *Koll*, 941 F. Supp. 2d at 945. This situation is no different. The General Assembly, by virtue of HB 1229, has made background checks and other processing requirements via FFLs a mandatory procedural step for any legal transfer of firearms. If the law regulating this essential step is fundamentally dysfunctional and impracticable, then the business plaintiffs have a vested interest in challenging that dysfunctionality based on their own economic interests and as advocates for the rights of their customers under the Second Amendment.

Moreover, the dilemma faced by the business plaintiffs is analogous to that faced by newspaper publishers in *Grosjean v. American Press Co., Inc.* In that case, the State of Louisiana imposed a two percent tax on newspaper publishers with circulations of over 20,000 readers who printed advertisements in their publications. *Grosjean v. American Press Co.*, 297 U.S. 233, 240 (1936). Failure to pay or report the tax constituted a misdemeanor. *Id.* at 241. The Supreme Court found that the effect of the tax gave the publishers the choice of either taking

a loss on advertising revenue or restricting circulation of newspapers to the public in order to avoid the 20,000 reader threshold required by the tax. *Id.* at 244-45. Based on these facts, the Court found that the statute was "a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of constitutional guarantees," namely the First Amendment's guarantee of freedom of the press. *Id.* at 250. The Court therefore found the tax unconstitutional under the First Amendment. *Id.* at 250-51.

HB 1229's background check requirements via FFLs and its arbitrary ten dollar cap on background check fees are the sort of invidious and calculated devices intended to prevent the lawful transfers of firearms from one citizen to another, as guaranteed by the Second Amendment. Like in *Grosjean*, HB 1229's practical effect is to freeze such lawful transfers by giving FFLs the unreasonable choice of refusing to facilitate transfers or paying for most of the cost of processing those transfers out of their own pockets. Likewise, it gives private citizens the choice of searching in vain for FFLs who are willing to subsidize their firearm transfers or of transferring the firearms illegally without the required FFL processing. Just as the publishers in *Grosjean* had standing to challenge the State of Louisiana's unconstitutional tax designed to inhibit freedom of the press, the business plaintiffs have standing to challenge HB 1229's transparent attempt to inhibit their Second Amendment rights and the rights of their customers.

**B.    HB 1229's Exclusion of Licensed Gun Dealers as Transferees for Purposes of Mandatory Background Checks is Irrelevant.**

The Defendant then makes the novel argument that since FFLs may receive a firearm from another person or entity without having to be subjected to a background check, the business plaintiffs have no injury in fact and, therefore, no standing. Dkt. No. 133 at *17 ("In other words, Colorado FFL may acquire a firearm from a private seller or other type of transferor

without first having to conduct a background check.").  The Defendant is essentially arguing that

the business plaintiffs have no standing because a person transferring a firearm to an FFL does

not need to use a third-party FFL to conduct a background check on the transferee FFL.

This lack of a third-party FFL background check for transferee FFLs is completely beside

the point.  The unconstitutionality of HB 1229 arises from the fact that transfers between private

citizens *must* be done *solely* through FFLs, and the law as-written expressly chills such transfers.

Whether an FFL may give or take a firearm from a private citizen without having to have a

background check conducted on it under HB 1229 has utterly no relevance to the injuries alleged

by the Plaintiffs, as more fully described above.  Thus, the Defendant's arguments regarding the

business plaintiffs' exclusion from HB 1229's background check requirements are a red herring.

## IV.   DAVID BAYNE HAS STANDING TO CHALLENGE HB 1224 AND HB 1229.

Defendant argues that Plaintiff David Bayne should be dismissed as a plaintiff because,

as of September of last year, he no longer resides in Colorado.  Defendant seems to assume that

no out-of-state resident ever has standing to challenge Colorado's laws.  That, of course, is

nonsense.  Even the Tenth Circuit's *Heller* precedent, fledgling as it is, demonstrates that out-of-

state residents have standing to challenge Colorado gun laws.  *E.g., Peterson v. Martinez*, 707

F.3d 1197, 1207-12 (10th Cir. 2013) (ruling on the merits of Washington resident's Second

Amendment challenge to Colorado gun legislation).  Mr. Bayne may not reside in Colorado, but

he is still an active member of Outdoor Buddies and has every intention of traveling to Colorado

on business and for hunting opportunities.  Surely, Defendant does not mean to suggest that

when Mr. Bayne travels here for the purpose of exercising his Second Amendment rights, he will

not be subject to the requirements of HB 1224 and HB 1229.  Since he assuredly will be subject

to those requirements when he travels here, he has standing to challenge them.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.

Dated this 14th day of March, 2014.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR
BUDDIES, INC. THE COLORADO OUTFITTERS
ASSOCIATION, COLORADO FARM BUREAU, AND
WOMEN FOR CONCEALED CARRY

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM,
JAMES FAULL, LARRY KUNTZ, FRED JOBE,
DONALD KRUEGER, STAN HILKEY, DAVE STONG,
PETER GONZALEZ; SUE KURTZ, DOUGLAS N.
DARR, AND DAVID STRUMILLO

16

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION**

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK**

1608

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

s/Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020

1609

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.,*

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## GOVERNOR'S TRIAL BRIEF

During the 2013 legislative session, in the wake of mass shootings in Aurora, Colorado, Newtown, Connecticut, and countless other episodes of gun violence, the Colorado General Assembly adopted legislation designed to enhance public safety by preventing prohibited individuals from acquiring firearms and by reducing the firepower wielded by mass shooters and other criminals. *See* Colo. Rev. Stat. § 18-12-112 (requiring background checks for most private firearms transfers); § 18-12-301 through -303 (prohibiting transfers and new acquisition of ammunition feeding devices capable of accepting, or designed to be readily converted to accept, more than fifteen rounds of ammunition ("large-capacity magazines," or "LCMs")).

Colorado's enactment of this legislation was not unique either with respect to its own history or to the remainder of the country. In 2000, in the wake of the mass shooting at Columbine High School, the people of the State of Colorado approved a ballot initiative that expanded background check requirements to cover private

1610

transfers at gun shows.  *See* Colo. Rev. Stat. § 12-26.1-101.  Section 18-12-112

expanded Colorado's background check requirements further, to cover most other

transfers of firearms between private individuals.  Colorado is presently one of

sixteen states, along with the District of Columbia, that requires background checks

for at least some private transfers.

Limits on magazine capacity have likewise been a feature of the legal

landscape for generations.  Prohibition-era laws in at least three jurisdictions

placed restrictions on the contemporary equivalent of large-capacity magazines

("LCMs"). The federal assault weapons ban prohibited the manufacture of

magazines holding more than ten rounds nationwide from 1994 through 2004.

Presently, Colorado is one of nine states, together with the District of Columbia and

a handful of local jurisdictions, with limits on magazine capacity.  With a limit of 15

rounds, rather than 10, and a grandfathering provision that exempts magazines

owned before the statute's effective date, Colorado's law is substantially more

permissive than both the prior federal law and existing restrictions in most

jurisdictions that limit magazine capacity.  Yet every court to consider a challenge

to magazine capacity has held that a limit of 10 rounds passes muster under the

Second Amendment, even when those laws contain no grandfather clause at all.

*See Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) (merits

ruling); *Fyock v. City of Sunnyvale,* Case No. C-13-5807-RMW (N.D. Cal. March 5,

2014) (denying motion for preliminary injunction); *San Francisco Veteran Police*

*Officers Ass'n v. City & County of San Francisco,* Case No. 13-cv-05351-WHA, 2014

WL 644395 at *7 (N.D. Cal. Feb. 19, 2014) (denying motion for preliminary

injunction); *Shew v. Malloy,* Case No. 13-cv-00739-AVC, 2014 WL 346859 (D. Conn.

Jan. 30, 2014) (merits ruling); *NY State Rifle & Pistol Ass'n, Inc. v. Cuomo,* Case

No. 13-cv-00291-WMS, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013) ("*NYSRPA*")

(merits ruling); *Tardy v. O'Malley*, Case. No. CCB-13-2841 (D. Md. Oct. 1, 2013)

(denying motion for preliminary injunction).

While the Supreme Court's landmark decisions in *District of Columbia v.*

*Heller,* 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010),

established that the Second Amendment protects an individual right to keep and

bear arms for the purpose of self-defense, they shed scant light on the manner in

which lower courts should structure and analyze Second Amendment challenges to

regulations on firearms ownership, use, and related matters.  Unlike the

restrictions challenged in *Heller* and *McDonald*, the laws at issue here have no

effect on who can possess a firearm, what general types of firearms are

permissible,[1] the purposes for which a firearm may be used, or where and how it

can be carried.  Thus, in contrast to laws that restrict who can possess a firearm

---

[1] Aside from a handful of rather obscure exceptions, (including some firearms with large-capacity internal magazines), the restriction on LCMs has no bearing on the specific model of firearm that can be carried, either.  And even those few exceptions are either grandfathered, and thus remain legal for those who owned them before July 1, 2013, or could be permanently altered or equipped with permanently altered magazines if their owners wished to transfer them. § 18-12-301(2)(b)(I).  This stands in marked contrast to bans on assault weapons, which, in any event, have also consistently been upheld after *Heller.  See, e.g., Kampfer v. Cuomo*,  2014 WL 49961 (W.D.N.Y. Jan 7, 2014) (noting that because the New York SAFE Act's assault weapon law "do[es] not create a categorical ban on an entire class of weapons," it "only minimally affect[s]" the Second Amendment right and is therefore not subject to heightened scrutiny).

and where they can carry it, § 18-12-112 and § 18-12-302 are on the "periphery of

the Second Amendment right." *Fyock, supra,* at *2. Building on the emerging

framework still under case-by-case development by the federal courts, this brief

delineates a workable approach for laws at the margins of the Second Amendment

that remains consistent with the mandates established by Supreme Court

precedent.

> **I.    Analytical framework and standards of review for Counts I, II, and V.**

Plaintiffs raise facial challenges to Colorado's magazine capacity limit and

expanded background check requirement. They cannot prevail on these claims

unless they are able show that the statutes are unconstitutional in at least a vast

majority of their applications under the appropriate standard of review.

> **A.  To prevail on their facial constitutional challenges, Plaintiffs must show that § 18-12-112 and § 18-12-302 are unconstitutional in at least a vast majority of potential applications.**

At the threshold, although Plaintiffs offer various hypothetical scenarios

under which either § 18-12-112 or § 18-12-302 could affect their constitutional

rights, they have neither alleged, nor are they able to prove, any specific instance in

which either statute has been applied in a manner that violates their constitutional

rights. Thus, Counts I, II, and V of the Fourth Amended Complaint raise only facial

constitutional challenges to Colorado's magazine capacity limitation and expanded

background check requirement.

A facial constitutional challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself, rather than focusing on a particular unconstitutional application of the statute or regulation. *United States v. Frandsen,* 212 F.3d 1231, 1235 (11th Cir. 2000). Because a facial challenge seeks such broad relief, it requires a plaintiff to make a correspondingly broad showing of unconstitutionality in order to succeed. *See Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008) ("a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications"), *quoting United States v. Salerno,* 481 U.S. 739, 745 (1987).

To date, the Tenth Circuit has followed a somewhat more lenient approach to facial challenges than the standard articulated by the Supreme Court in *Salerno*. *See Hernandez-Carrera v. Carlson,* 547 F.3d 1237, 1255-56 (10th Cir. 2008) ("While we have left undecided whether a plaintiff making a facial challenge must establish that no set of circumstances exists under which the Act would be valid, it is clear a litigant cannot prevail in a facial challenge to a regulation or statute unless he at least can show that it is invalid in the vast majority of its applications.") (internal quotations and citations omitted). This approach appears to be consistent with the Supreme Court's lingering uncertainty about which standard to apply. *See Washington State Grange,* 552 U.S. at 449 ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'"), *quoting Washington v. Glucksberg,*

521 U.S. 702, 740 n.7 (1997) (Stevens, J. concurring in the judgment); *United States v. Stevens,* 130 S.Ct. 1577, 1587 (2010) (noting difference between standards articulated in *Salerno* and *Glucksberg,* and stating that "[w]hich standard applies in a typical case is a matter of dispute that we need not and do not address").

Accordingly, for their facial constitutional challenges to succeed, Plaintiffs must at a minimum demonstrate that the § 18-12-112 and § 18-12-302 are "invalid in the vast majority of [their] applications." *Carlson,* 547 F.3d at 1256. In other words, they must show that the challenged provisions violate the Second Amendment in nearly every case to which they could apply. Absent such a showing, Plaintiffs' Second Amendment challenges must fail.

> **B. To prevail, Plaintiffs must show that the challenged statutes burden their Second Amendment rights. If they do, Plaintiffs must show that the statutes destroy the core Second Amendment right or, alternatively, satisfy means-end scrutiny.**

*Heller* and *McDonald* addressed the constitutionality of outright bans on handgun possession, laws that the Supreme Court held amounted to a "severe restriction" on the core right of self-defense that were comparable to "[f]ew laws in the history of our Nation." *Heller,* 554 U.S. at 627. The Court held that restrictions of this type – which effectively "destroy" the right to keep and bear arms for the purposes of self-defense, are categorically unconstitutional. *Id.* at 618; *see also Peruta v. County of San Diego,* __F.3d__, 2014 U.S. App. LEXIS 2786, at \*63 (9th Cir. Feb. 13, 2014). Put another way, laws that effectively prevent lawful self-defense with a handgun cannot survive any level of constitutional scrutiny; the

Supreme Court has declared that such a severe infringement on the core Second Amendment right cannot be justified by any legitimate governmental interest.

Outside of that context, however – where the challenged regulation does not even infringe upon, much less destroy, the core Second Amendment right – *Heller* and *McDonald* provide meager guidance. The federal circuit courts, including the Tenth Circuit Court of Appeals, have universally adopted a two-step approach under which a reviewing court must first determine whether the law burdens conduct falling within the scope of the Second Amendment's guarantee. *See Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010). If it does not, then the "inquiry is complete." *Peterson,* 707 F.3d at 1208, *quoting United States v. Marzzarella,* 614 F.3d 85, 89 (4th Cir. 2010).

If the challenged regulation does burden conduct falling within the scope of the Second Amendment's guarantee, then the court "must proceed to the second part of the analysis and evaluate [it] under some form of means-end scrutiny." *Reese*, 627 F.3d at 801. Although all the federal circuits are in accord with this general statement, they diverge on the type of means-end scrutiny to apply. In general, however, the courts have agreed that the second step involves either tiered scrutiny or a sliding-scale approach, under which "the rigor of judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the burden on that right." *Peterson,* 707 F.3d at 1218 (Lucero, J., concurring separately), *quoting Ezell v. City of Chicago,* 651 F.3d 684, 703 (7th Cir.

2011).  Some courts have set a baseline of intermediate scrutiny, concluding that if the challenged regulation places any burden on the Second Amendment right, the burden automatically shifts to the government to demonstrate a substantial relationship between the regulation and its important objective of ensuring public safety.  *See, e.g., NRA of America, Inc. v. BATFE,* 700 F.3d 185, 194 (5th Cir. 2012). Other courts have hewed more closely to traditional constitutional analysis, requiring the party challenging the law's constitutionality to demonstrate that it substantially burdens the Second Amendment right before applying any type of heightened scrutiny.  *See United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Heller II,* 670 F.3d at 1253.  No appellate court has applied strict scrutiny, although some courts have come close—applying "not quite strict scrutiny" when evaluating laws that are invidiously designed to prevent the effective exercise of the core rights associated with lawful firearm ownership.  *See, e.g., Ezell*, 651 F.3d at 708 ("[t]he City's firing-range ban is not merely regulatory; it *prohibits* the law-abiding, responsible citizens of Chicago from engaging in target practice").

*Peterson*, *Reese*, and *United States v. Huitron-Guizar,* 678 F.3d 1164 (10th Cir. 2012), are the most prominent Second Amendment opinions issued by the Tenth Circuit in the post-*Heller* era.  *Peterson* addressed only the first step of the two-part test after concluding that the challenged statute did not burden conduct falling within the scope of the Second Amendment's guarantee.  707 F.3d at 1212. The remaining cases applied intermediate scrutiny because the burden imposed by the pertinent statutes was substantial.  *See Reese*, 627 F.3d at 802 (prohibition on

firearm possession for those convicted of domestic abuse imposed substantial burden on those disarmed, but survived intermediate scrutiny because prohibition applied to narrow class of persons who posed increased risk of violent behavior); *Huitron-Guizar*, 678 F.3d at 1169 (applying intermediate scrutiny to prohibition on firearm possession by illegal aliens despite the fact that the "law here not only burdens but eliminates the right by placing, on a class of perhaps millions, a total prohibition upon possessing any type of gun for any reason").

To be sure, *Reese* pointed out that the *Heller* majority refused to apply the rational basis test to such a substantial infringement on the Second Amendment right, and based on the *Heller* opinion concluded that it was bound to "apply some level of heightened scrutiny" in that case. 627 F.3d at 801. Thus, had *Reese* addressed a law similar in kind to those challenged here, the opinion would represent binding precedent with respect to the applicable burden of establishing a law's constitutionality. But *Reese,* like *Heller* before it, evaluated a regulation that was completely different in scope, intent, and effect from the laws challenged here— namely, one that resulted in complete disarmament for an entire class of people. While the *Heller* majority dictated that an "interest balancing" approach could not be applied to such a restriction for law-abiding citizens, 554 U.S. at 635, the effect of compelled disarmament on *non*-law-abiding citizens – irrespective of its justifications – places precisely the same burden on those to whom such a restriction applies.

Notwithstanding the *Heller* majority's dismissal of "interest balancing" for restrictions so onerous that they "destroy" the Second Amendment right of law-abiding citizens, lower courts have in fact regularly applied "interest balancing" approaches to less severe restrictions. For example, intermediate scrutiny involves interest balancing by definition, but was appropriate in *Reese* and *Huitron-Guizar* because the challenged laws did not disarm "law-abiding citizens." Although the Tenth Circuit held that disarmament was a substantial burden irrespective of an individual's legal status, it held in both cases that prohibitions of this type can be, and were, adequately justified by governmental concerns over public safety. Thus, heightened scrutiny is appropriate for any law that substantially burdens the right to self-defense, and once such a showing is made, the burden should shift to the government to explain adequately the reasons for imposing it.

A different analysis should apply to regulations that, like § 18-12-112 and § 18-12-302, do not disarm anyone. Laws of this type have only a "*de minimis* effect,*" Heller II,* 670 F.3d at 1253, or impact only the "periphery of the Second Amendment right,*" Fyock, supra,* at *2, and should thus be subject to a lesser degree of scrutiny. The Supreme Court has certainly taken this approach with other fundamental rights. In the First Amendment context, for example, the Supreme Court has applied the same type of sliding-scale analysis endorsed by the Tenth Circuit, holding that "election laws trigger strict scrutiny only where the rights to vote and associate are subject to severe restrictions." *Burdick v. Takushi,* 504 U.S 428, 432 (1992). On the other hand, "reasonable, nondiscriminatory

restrictions" that impose less substantial burdens are generally justified by the state's "important regulatory interests," *id.* at 434, an approach that, like the second half of *Reese*'s two-part test, has been described as a "sliding scale." *Lee v. Keith,* 463 F.3d 763, 768 (7th Cir. 2006); *Citizens for Tax Reform v. Deters,* 518 F.3d 375, 383 (6th Cir. 2008). For example, the Supreme Court has approved regulations that have the "effect of increasing the cost or decreasing the availability" of abortions, *Planned Parenthood v. Casey,* 505 U.S. 833, 873 (1992), applying rational basis review absent an "undue burden" on the right. *Gonzales v. Carhart,* 550 U.S. 124, 146 (2007).

Thus, this Court should apply the following framework to the constitutional claims in this case:

- Plaintiffs must first establish the challenged regulation imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

- If Plaintiffs are able to show that government regulation not only falls within the Second Amendment's scope, but also destroys the core Second Amendment right, the law should be declared unconstitutional.

- If Plaintiffs are unable to make such a showing, then they must establish that the burden on the core right of self-defense imposed by the regulation is a substantial one. If they are unable to make such a showing, Plaintiffs' claim fails.

- If, on the other hand, Plaintiffs are able to establish the existence of a substantial burden, then the burden shifts to the government to satisfy intermediate scrutiny.

## II.   Neither statute imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

Plaintiffs' constitutional claims fail at the threshold because they cannot establish that either the magazine capacity limitation or the private background check requirement falls within the scope of the Second Amendment's core guarantee.[2]

### A.   Large-capacity magazines are not "arms," and therefore do not fall within the scope of the Second Amendment.

*Heller* struck down a District of Columbia law that imposed a "complete prohibition" on the possession of handguns in the home.  554 U.S. at 629.  The Supreme Court focused closely on the text and history of the Second Amendment, concluding that it codified a preexisting, individual right that was not dependent on militia service.  *Id.* at 592.  *Heller* left the contours of the Second Amendment largely undefined, focusing instead on the individual guarantee of "law-abiding citizens to use arms in defense of hearth and home."  *Id.* at 635.

While the *Heller* Court declined to map the boundaries of the right protected by the Second Amendment, it did stress that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

---

[2] The Governor maintains, as he has argued in previous briefing, that no plaintiff has standing to assert Count 1, and that several individual plaintiffs are unable to demonstrate an injury-in-fact to a legally protected interest with respect to either statute.  Doc. 133.

purpose." *Id.* at 626.  The Court proceeded to outline a non-exhaustive list of

"presumptively reasonable regulatory measures" that fall outside the Second

Amendment, specifically identifying laws prohibiting concealed carry, barring

certain classes of people from firearm possession, limiting carrying of firearms in

sensitive places, and regulating the commercial sales of arms. [3] *Id.* at 626-27 & n.26.

Acknowledging "the historical tradition of prohibiting the carrying of 'dangerous

and unusual weapons,'" *Id*. at 627 (*quoting* 4 Blackstone, Commentaries on the

Laws of England, 148-49 (1769)), the Court explained "that the sorts of weapons

protected were those 'in common use at the time.'"  *Id., quoting United States v.*

*Miller,* 307 U.S. 174, 179 (1939).

Plaintiffs have suggested that *Heller*'s reference to "common use" is the

touchstone for evaluating the constitutionality of modern firearms regulation.  Doc.

116 (Fourth Amended Complaint), ¶ 162 (alleging that a "[p]rohibition on a class of

firearms or their accessories that are in common use for self-defense and other

lawful purposes is specifically prohibited by the Second Amendment pursuant to

*Heller*").  They build on this assertion by claiming that magazines holding more

than fifteen rounds are in common use.  Therefore, Plaintiffs claim, *Heller* prohibits

a state from regulating them at all.

---

[3] Academic opinion consistently suggests that *Heller*'s categorical exceptions indeed
fall outside the scope of the Second Amendment.  As one commentator has written,
"it is hard to imagine the Court invalidating [the "presumptively lawful" measures]
in a future case.  For all practical purposes, these issues have been decided – and
decided in favor of constitutionality."  Carlton F.W. Larson, *Four Exceptions in
Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60
Hastings L.J. 1371 (2009).

The meaning of "common use" is addressed *infra,* but whatever it may ultimately be taken to mean, Plaintiffs almost certainly overstate its importance. Constitutionality is not now, and never has been, a popularity contest. Rather, the threshold question is whether a large-capacity magazine qualifies as an "arm," and thus whether it falls within the scope of the Second Amendment at all. Plaintiffs incorrectly assume that it does.

The historical meaning of the term "arms" under *Heller* "is no different from the meaning today": "weapons of offence, or armour of defence." 554 U.S. at 581, *quoting* 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978). Another contemporary legal dictionary defined arms as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike at another." *Id., quoting* 1 A New and Complete Law Dictionary. A magazine is not itself a "weapon[] of offence;" that is the firearm receiver. Nor is a magazine a thing worn for defense, like body armor, or a thing used "to cast at or strike another," like ammunition.[4] Instead, a magazine is merely a container used to load a firearm with ammunition. The dictionary definition captures this distinction: a magazine is not a gun, but is instead "a chamber for holding a supply of cartridges to be fed automatically to the breech of a gun." *Oxford English Dictionary* (*available at* oxforddictionaries.com).

---

[4] Note that *Heller*'s reference to common use mentioned "weapons," and not "arms," suggesting that to the extent that common use does dictate constitutionality, such a test would cover somewhat narrower ground than the Second Amendment.

State and federal laws mirror this understanding.  Background checks are not required for magazine purchases, for example, and federal prohibitions on firearm ownership for certain high-risk individuals extend to ammunition but make no mention of magazines.  18 U.S.C. § 922(g).  Likewise, Colorado law prohibits persons subject to protection orders from possessing firearms and ammunition, but does not bar the same individuals from possessing magazines.  § 13-14-102(22)(a)(I)(B); § 18-1-1001(9)(a)(I)(B).

This is not to say that a state could simply regulate functional semi-automatic firearms out of existence by barring ownership of all magazines, rather than just LCMs.  *Heller* made clear that the Second Amendment guarantees that a law-abiding citizen may keep a "firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635.  Laws designed to circumvent that guarantee have received unfavorable treatment from the courts, as well they should.  *See Ezell, supra.*  But § 18-12-302 does not ban ownership of all, or even most, magazines; rather, it merely forbids new acquisitions of only those magazines with a capacity exceeding 15 rounds.  Some Plaintiffs may prefer LCMs, but they do not allege and cannot prove that any category of semi-automatic firearms is incompatible with lower-capacity detachable magazines, or that lower-capacity magazines are inadequate for self-defense.  Colorado law thus does not come anywhere near to an outright ban on firearms that are "operable for the purpose of immediate self-defense."  554 U.S. at 635.

As Plaintiffs in this case have admitted, "After July 1, 2013, thousands of models and variants of firearms with detachable box magazines remain available for lawful purchase and use for home defense in Colorado.  With very few exceptions, every gun that was available before July 1, 2013, is compatible with magazines holding 15 or fewer rounds."  Doc. 119, p.20, ¶ 11 (Stipulations).  At the same time, "[c]omponents such as limiters that can decrease the capacity of magazines are manufactured and are available for purchase in the United States." *Id.*, p.24, ¶ 31.  Therefore, even without considering the grandfather clause, Colorado does not prohibit the useful possession of any firearm.

In fact, § 18-12-302 does not limit possession or utility of a firearm in any sense.  The law does not limit how many rounds or arms a person can possess.  It does not restrict the number of magazines that a person may carry, or how many defensive shots he or she can fire, even in the unlikely event that such shots are required.  Because the law creates no categorical ban, Plaintiffs have failed to establish that their challenge raises a cognizable Second Amendment claim. *See Hightower v. City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) (noting that "large capacity weapons" – in that case, those able to carry "more than ten rounds" – are not "of the type characteristically used to protect the home"); *cf. Peterson*, 707 F.3d at 1201 ("[i]n light of our nation's extensive practice of restricting citizens' freedom to carry firearms in a concealed manner, we hold that this activity does not fall within the scope of the Second Amendment's protections"); *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) (concluding that the district court "correctly determined

that the requirement that applicants demonstrate a 'justifiable need' to publicly carry a handgun for self-defense does not burden conduct within the scope of the Second Amendment's guarantee").

### B. LCMs may be regulated regardless of how many are in circulation.

Plaintiffs may argue that LCMs are in "common use" – and thus untouchable under *Heller* – simply because there are large numbers of them in circulation.  If this theory is correct, then there is no need for a trial on § 18-12-302.  There are millions of magazines with capacities exceeding 15 rounds in Colorado, and tens of millions nationwide.  Doc. 119, p.25 ¶ 25; p.26, ¶ 26 (Stipulations).  But Plaintiffs' position falls short on two counts.  They not only misapprehend the meaning of "common use," but they also place too much weight on the numerosity question.

### 1. Numerosity does not exempt an arm from regulation.

*Heller*'s historical analysis states that "the sorts of weapons protected were those 'in common use at the time,'" 554 U.S. at 627, although the opinion neither identifies the relevant "time," what sort of "use" might be involved, or how "common" that use should be.  Nor does it suggest that "common use" somehow exempts a firearm or an accessory such as an LCM from regulation.  Rather, *Heller* says the exact opposite—that the Second Amendment extends no protection at all to arms that are not "in common use at the time." *Id.*  Accordingly, *Heller*'s reference to "common use" suggests, at the most, that a government's attempt to regulate an arm that is in common use would implicate Second Amendment protections.  554 U.S. at 627, *see also Shew*, 2014 WL 346859 at *16 (finding that assault weapons

and LCMs were in 'common use,' and therefore applying means-end scrutiny to regulations).

Because commercial markets and consumer preferences cannot dictate constitutional norms, "common use" cannot simply be based on the number of LCMs in circulation. Indeed, under the Plaintiffs' approach the constitutionality of regulating a new product would depend largely on how quickly such a regulation was enacted after the product was placed into the stream of commerce. This would create a perverse race to achieve popularity before the government could enact regulations. Manufacturers and distributors of a new product – perhaps a particularly deadly bullet, or an all-polymer firearm undetectable by a magnetometer – would attempt to flood the market to ensure wide circulation, perhaps by lowering prices or giving the product away for free for a period of time after its introduction. Market releases could be timed to coincide the adjournment of state legislatures, some of which convene only biannually. At the same time, regulators would have incentives to prohibit any potentially dangerous new firearms technology as soon as it is developed without waiting to evaluate its true effects, lest it become too widespread to be regulated.

### 2.  "Common use" does not simply refer to the number of magazines in circulation.

The number of LCMs in current circulation does not control the analysis for the additional reason that Plaintiffs cannot prove LCMs are in "common use" for self-defense. In elucidating the Second Amendment right "to keep and bear arms," the *Heller* Court determined that the phrase "bear arms" refers "to carrying [arms]

for a particular purpose – confrontation." 554 U.S. at 584. Consistent with that understanding, the Court struck down a District of Columbia law that effectively banned handguns entirely, and required residents to keep their lawfully-owned firearms unloaded and dissembled or bound by a trigger lock or similar device. *Id.* at 575. The Court held that banning the possession of immediately operable firearms "makes it impossible for citizens *to use them for the core lawful purpose of self-defense* and is hence unconstitutional." *Id.* at 630 (emphasis added).

Given the importance of the *Heller* decision, one must assume that the majority selected its language carefully. For example, the court suggested that "use" and "possession" mean two different things by stating that "the Second Amendment does not protect those weapons not *typically possessed* by law-abiding citizens for lawful purposes[.]" 554 U.S. at 624 (emphasis added). On the other hand, the opinion also emphasized several times citizens' use of arms for the core lawful purpose of self-defense, which denotes action. *Id.* at 635 ("whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to *use arms in defense of hearth and home*" (emphasis added); *see also id.* at 636 (concluding that the Second Amendment precludes "the absolute prohibition of handguns *held and used for self-defense* in the home.") (emphases added).

That "use" suggests action is consistent with the dictionary definition: to "take, hold or deploy (something) as a means of accomplishing or achieving a result; employ." *Oxford English Dictionary* (*available at* oxforddictionaries.com). The noun

form simply incorporates the verb: "the action of using something or the state of being used for some purpose." *Id.* Accordingly, the Court's emphasis on the "use" of firearms implies more than possession alone. Plaintiffs' claim that mere numerosity and "common use" are identical concepts must thus be rejected. To prevail on their theory of "common use," Plaintiffs must prove that large numbers of rounds are commonly employed for self-defense.

### C. Assuming *arguendo* that a magazine qualifies as an "arm," the 15-round magazine capacity limit is nonetheless presumptively reasonable because it qualifies as a longstanding regulatory requirement.

A conclusion that magazines are not "arms" would end the inquiry under *Reese.* However, even if magazines do qualify as "arms," § 18-12-302 does not necessarily implicate conduct within the scope of the Second Amendment's guarantee. To the contrary, Colorado's statutory limitation on magazine size also passes muster because it is the sort of historical regulation that *Heller* and *McDonald* acknowledged that the Second Amendment will countenance. *See United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (finding that second step of the constitutional test is only necessary "[i]f the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood"). Limitations like those imposed by § 18-12-302 have a long history in American law and, therefore, are at a minimum "presumptively lawful" under *Heller,* 554 U.S. at 627, n.26. *See also McDonald,* 140 S.Ct. at 3027 ("repeat[ing] those assurances… [that] incorporation does not imperil every law regulating firearms").

For instance, restrictions on access to ammunition, which also would have a direct effect on the number of shots that could be fired in rapid succession, date back to the time of ratification.  In the founding era a number of statutes severely restricted access to ammunition, apparently without any meaningful popular objection premised on the right to keep and bear arms.  For example, Philadelphia, New York, and Boston, among other cities, regulated "the storage of gunpowder, a necessary component of an operational firearm."  *Heller*, 554 U.S. at 684-85 (Breyer, J., dissenting).  Although the primary intent of these laws was fire safety, their effect was to restrict the number of rounds that could be fired in defense of one's home or person.  *Id*. at 683-87.  That restriction, of course, was over and above the already substantial limit on rates of fire imposed by the technology of the day.  Although the *Heller* majority found such laws inapposite to the complete handgun ban at issue in that case, *id*. at 631-32, they were far more restrictive than the law at issue here, which does not ban or restrict ammunition or any other mechanism that is necessary to the operation of a firearm.  And even as to those laws that actually restricted access to or use of gunpowder—a necessary component for the operation of any founding era firearm— the *Heller* majority held that they did not "remotely burden the right of self-defense as much as an absolute ban on handguns."  *Id*. at 632.  Given this founding-era context, there is no basis to conclude that § 18-12-302 burdens conduct protected by the Second Amendment as historically understood.

Highly portable handheld semiautomatic firearms featuring detachable box magazines were not popularized until the turn of the twentieth century. The absence of laws specifically addressing magazine capacity during the founding era is thus unsurprising. But this does not mean that this type of regulation is of recent vintage. Concerns over rising gun violence during the Prohibition era led to stricter regulation for short-barreled shotguns and machine guns. *See* National Firearms Act, 26 U.S.C. § 5845 (1934). During the same era, some jurisdictions passed laws that included limitations on magazine size for semi-automatics. In 1932, for example, Congress banned in the District of Columbia "any firearm which shoots…semiautomatically more than twelve shots without reloading." Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (emphasis added). Other states had similar provisions. *See* Mich. Acts 1931, ch. 37 (banning "firearm which can be fired more than sixteen times without reloading"); R.I. Acts 1927, ch. 1052 (defining "machine gun" in part as "any weapon which shoots more than twelve shots semiautomatically without reloading," and establishing enhanced penalty for crime committed with such weapon).

Laws like those adopted in Prohibition-era Michigan, Rhode Island, and the District of Columbia demonstrate that restrictions on magazine capacity are not unprecedented. Indeed, laws tending to limit the number of shots that can be fired by a gun owner have been features of the regulatory landscape for centuries. Consistent with *Heller*, they qualify as "presumptively lawful regulatory measures." 554 U.S. at 570, n.26.

*Heller*, of course, does not say whether a "presumptively lawful" regulation is simply exempt from the Second Amendment or whether the phrase connotes that some altered, less demanding standard of review should apply. At a bare minimum, however, *Heller* suggests that a challenger to a regulation with historical precedent bears the burden of rebutting its presumptive lawfulness. Plaintiffs will be unable to do so at trial.

### D. Expanded background checks requirements do not burden conduct falling within the scope of the Second Amendment's guarantee.

This Court should reject Plaintiffs' challenge to § 18-12-112 at the threshold because Plaintiffs have not complained that it prevents them from engaging in any conduct that falls within the scope of the Second Amendment's guarantee. *Heller* and *McDonald* make clear that the Second Amendment protects a law-abiding citizen's right to "possess" handguns for the purposes of self-defense. *Heller,* 554 U.S. at 592. Some jurisdictions have concluded that this right is accompanied by at least some ancillary protections such as the right to purchase firearms and ammunition, or the right to keep lawfully possessed firearms in an operable state. *See, e.g. Herrington v. United States,* 6 A.3d 1237 (D.C. App. 2010) (holding that right to keep and bear arms extends to possession of handgun ammunition in the home); *Andrews v. State,* 50 Tenn. 165, 178-79 (1871) (holding under Tennessee constitution that "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair"). More

recently, the Seventh Circuit acknowledged the existence of rights that are corollary to the "central component" of the Second Amendment. *Ezell,* 651 F.3d at 704 ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and experience that make it effective").

Whatever the scope of these correlative Second Amendment protections may be, however, nothing in *Heller*, *McDonald*, or any other authority suggests that they confer a right to privately transfer a firearm to an individual without first ensuring that the transferee may legally possess it. Notably, this is the only "infringement" that the Plaintiffs have alleged or for which they have attempted to offer factual support. A review of the Fourth Amended Complaint reveals that none of the Plaintiffs allege that they have attempted to acquire a firearm via a private transfer and have failed due to Colorado's private background check requirements.[5] Instead, they complain only that sellers and businesses will be injured by the law.

Such a complaint simply does not pertain to the self-defense right that formed the core of the *Heller* opinion. However broadly the Second Amendment may protect personal rights, it surely does not guarantee the profitability of a

---

[5] The Governor does not concede that such an allegation, were it advanced or proven in this case, would fall within the scope of the Second Amendment's protections. To the contrary, even an outright ban on private sales would be unlikely to have any practical effect on a lawful purchaser's ability to acquire a firearm for defensive use. Evidence at trial will show that there are more than 1,500 FFLs in Colorado, virtually any one of whom could conduct either a private background check or a commercial sale. This Court need not reach that question here, however, because Plaintiffs have failed to allege or demonstrate that any prospective *transferee* of a firearm offered by a private transferor has been unable to acquire that firearm due to the background check requirement for private sales.

business that relies in whole or in part on firearm sales, nor does it protect the private right to sell a firearm to an individual who may be prohibited by federal or state law from owning one.  Yet these are the only injuries that Plaintiffs allege.

 Moreover, even if a core right were at issue here, Plaintiffs would be unable to satisfy the threshold inquiry of the two-step test because Colorado's expanded background check law is an example of a public safety regulatory requirement, which *Heller* explicitly approved.

Federal law has long prohibited private transfers to persons whom the transferor "know[s] or ha[s] reasonable cause to believe…is prohibited from receiving or possessing firearms under Federal law," such as felons, certain individuals with mental illness, and persons subject to a protective order. 18 U.S.C. § 922(d).  Federal statutes likewise prohibit loaning or renting a firearm to a person whom the transferor knows or has reasonable cause to believe is prohibited.  18 U.S.C. § 922(a)(5).  Colorado bars additional types of transfers.  *See* Colo. Rev. Stat. § 18-12-108.7 (generally prohibiting transfers of firearms to juveniles); Colo. Rev. Stat. § 18-12-111 (prohibiting straw purchase on behalf of individual who purchaser knows to be prohibited to possess firearm).  By passing § 18-12-112, Colorado has done nothing more than create a mechanism to ensure that firearm transfers between private parties comply with these longstanding restrictions.

Governmental entities have long overseen large portions of the private firearms market.  Federal law, for example, limits transfers between private individuals who reside in different states.  18 U.S.C. § 922(a)(5); 27 C.F.R. § 478.30.

The Gun Control Act of 1968 and corresponding ATF regulations require private interstate transfers to be processed through an FFL who performs a background check before relinquishing the firearm to the transferee.  27 C.F.R. § 478.30.  As noted previously, Colorado statutes have required background checks for private sales at gun shows since 2000.  Like background checks under § 18-12-112, background checks for private sales at gun shows must be initiated by an FFL, which may charge a fee "not to exceed ten dollars."  Colo. Rev. Stat. § 12-26.1-103.

Plaintiffs may counter by pointing to the fact that the *Heller* opinion stated that "nothing in our opinion should be taken to cast doubt on… laws imposing conditions and qualifications on the *commercial* sale of arms," 554 U.S. at 626 (emphasis added), as proof that *private* transfers fall within the scope of the Second Amendment's protections.  But *Heller* painted its list of presumptively lawful regulations with a broad brush – indeed, the opinion explicitly stated that it did "not purport to be exhaustive."  *Id.* at 626, n.26; *cf. id.* at 588 (noting that "the fact that the phrase ["bear arms"] was used in a particular context does not show that it is limited to that context").  And expanded background check requirements are certainly the same type of public safety regulation, with precisely the same goals, as those that *Heller* explicitly approved.  They are also closely related to, and designed to effectuate, longstanding federal regulations, which have limited who may purchase firearms since the 1930s, *see* Federal Firearms Act of 1938, 52 Stat. 1250 (former 15 U.S.C. § 901(3)), a long enough period to qualify as "longstanding" under *Heller*.  *See BATFE*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be

deemed 'longstanding' even if it cannot boast a precise founding-era analogue. . . . *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage.") (citations omitted); *see also United States v. McCane,* 573 F.3d 1037, 1047-49 (10th Cir. 2009) (Tymkovich, J., concurring).

So long as they are not designed to, and do not in fact, impede an eligible individual from acquiring firearms for legitimate purposes, regulations designed to enhance public safety by preventing prohibited individuals from acquiring firearms do not impinge on the Second Amendment rights of current or prospective law-abiding gun owners. Because the expansion of background checks is consonant with the broad regulatory latitude that *Heller* acknowledged governments possess for the purpose of public safety, Plaintiffs cannot demonstrate that § 18-12-112 "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Reese,* 627 F.3d at 800-01. Colorado's expansion of the background check requirement to cover private sales is a prime example of the type of widespread, and historically grounded, regulatory measure, which *Heller* suggested is presumptively reasonable. It therefore falls outside the scope of the protections associated with the Second Amendment.

### III.   Assuming *arguendo* that Plaintiffs' claims qualify for intermediate scrutiny, this Court should apply a "time, place, and manner" analysis.

As already discussed, Plaintiffs' claims fail at the threshold unless they can show that the challenged statutes infringe on their Second Amendment rights, and

that they do so substantially.  Conversely, Plaintiffs should prevail if they show that

§ 18-12-112 or § 18-12-302 destroys the core Second Amendment right to engage in

self-defense.  If the evidence at trial, however, shows the existence of a substantial

burden that nonetheless falls short of destroying Plaintiffs' core right to self-

defense, then intermediate scrutiny should apply.

Intermediate scrutiny as articulated by the Tenth Circuit requires the

government to bear the burden "of demonstrating that its objective is an important

one and that its objective is advanced by means substantially related to that

objective."  *Reese,* 627 F.3d at 802.  Colorado's goal with respect to both statutes is

the same: ensuring public safety.  This objective is not simply an important one, it is

the central reason that government exists.  *See Huitron-Guizar,* 678 F.3d at 1170

("[t]he bottom line is that crime control and public safety are indisputably

'important' interests").

Many courts evaluating regulations on the types of firearms that may be

carried have looked to the "time, place, and manner" analysis adopted by the

Supreme Court's protected speech cases.  *See Ward v. Rock Against Racism,* 491

U.S. 781, 791 (1989).  The Fourth Circuit's decision in *Marzzarella,* 614 F.3d 85,

was one of the first to adopt this approach, and it has been cited favorably more

than one hundred times since it was issued, including by all three Tenth Circuit

opinions.  As the *Marzzarella* court put it, intermediate scrutiny "is articulated in

several different forms," common to which are three requirements: 1) The

governmental end must be more than just legitimate, either significant, substantial,

or important; 2) there must be a reasonable, not perfect, fit between the challenged

regulation and the asserted objective; and 3) the regulation need not be the least

restrictive means of serving the interest, but may not burden more conduct than is

reasonably necessary. *Id.* at 98.

The key inquiry under the third step of this analysis is whether the

restriction at issue "leave[s] open ample alternative channels" for exercise of the

right. *Heller II*, 670 F.3d at 1262, *quoting* Eugene Volokh, *Implementing the Right*

*to Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56

UCLA L.Rev. 1443, 1471.  If it does, then the burden is modest and the Court

should apply a "mild form of intermediate scrutiny" under which it gives

"substantial deference to the predictive judgments of the legislature." *Heller II,* 670

F.3d at 1259, 1262, *quoting Turner Broadcasting Systems, Inc. v. FCC*, 520 U.S.

180, 195 (1997).  Applying this approach in *Heller II,* the court concluded that, due

to the availability of a wide variety of firearms that were unaffected by the District

of Columbia's regulations, "the prohibition of semiautomatic rifles and large-

capacity magazines does not effectively disarm individuals or substantially affect

their ability to defend themselves." *Id.*  This approach is consistent with other

courts considering the constitutionality of magazine capacity limitations.  *See*

*NYSRPA,* 2013 WL 6909955, at *42-44 (SAFE Act "does not totally disarm New

York's citizens; and it does not meaningfully jeopardize their right to self-defense");

*cf. Robertson v. City and County of Denver,* 874 P.2d 325, 335 (Colo. 1995)

(upholding municipal ordinance banning assault weapons and magazines holding

more than 20 rounds because it was not an "onerous restriction on the right to bear arms…[because] there are literally hundreds of alternative ways in which citizens may exercise the right to bear arms in self-defense").

Assuming *arguendo* that either § 18-12-112 and § 18-12-302 burdens Second Amendment rights at all, both statutes leave open ample alternative channels for the exercise of the right to self-defense.  This Court should thus apply, at most, a "mild form of intermediate scrutiny" to Plaintiffs' claims. *Heller II*, 670 F.3d at 1262.

**IV.    Assuming that Plaintiffs' facial vagueness challenge can be reviewed on the merits at all, it should still fail because the "continuous possession" requirement is not unconstitutionally vague.**

Count III of the Fourth Amended Complaint raises a facial vagueness challenge to the "continuous possession" component of the grandfather clause in § 18-12-302(2)(a).   This Court should not reach the merits of that challenge, but even if it does, Plaintiffs' claim fails on the merits.

**A.    Plaintiffs' facial vagueness challenge to the "continuous possession" requirement of § 18-12-302 must fail because facial vagueness cannot be raised outside the First Amendment context.**

Count III of the Plaintiffs' Fourth Amended Complaint raises a vagueness challenge to the grandfather clause of § 18-12-302(2)(a), which provides that "a person may possess a large-capacity magazine if he or she: (I) Owns the large-capacity magazine on July 1, 2013; and (II) Maintains continuous possession of the large-capacity magazine."  Plaintiffs confirmed in the final pretrial order that their

challenge is facial in nature.  Doc. 119 at 9-12.  Plaintiffs contend that the ostensibly vague statutory language provides inadequate notice of what constitutes prohibited conduct, thereby raising the possibility of arbitrary and discriminatory enforcement and "chill[ing] individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution[.]"  Doc. 116, ¶ 182; *see also* Doc. 119 at 9-12.

This Court should not reach the merits of this claim because Tenth Circuit precedent makes clear that facial vagueness challenges are not permitted outside of the First Amendment context.  In *United States v. Reed*, for example, the Tenth Circuit affirmed a district court's rejection of a facial vagueness challenge to a statute forbidding drug users from being in possession of a firearm.  114 F.3d 1067, 1069 (10th Cir. 1997).  The appellate court held: "[T]he [vagueness] doctrine is limited when invoked in a context such as this which does not implicate First Amendment values.  A vagueness challenge in this context cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged."  *Id.*  This ruling marked a shift from the Tenth Circuit's prior approach, under which facial vagueness challenges outside the First Amendment context were merely disfavored.  *See United States v. Moesser*, 2010 WL 4811945 at *26-27 (D. Utah Nov. 19, 2010) (unpublished) (noting shift).  And the Tenth Circuit has subsequently confirmed that "[w]here a vagueness challenge does not implicate First Amendment freedoms, our review is limited to the

'application of the statute to the particular conduct charged.'" *United States v. Michel,* 446 F.3d 1122, 1135 (10th Cir. 2006), *quoting Reed,* 114 F.3d at 1070.

Accordingly, because Plaintiffs raise only a facial vagueness challenge to the "continuous possession" provision of § 18-12-302(2), and because their challenge falls outside of the First Amendment context, this Court should reject their claim without reaching the merits.

### B. The "continuous possession" requirement is not unconstitutionally vague on its face.

Even if a facial vagueness challenge were permissible here, Plaintiffs' claim fails on the merits. The grandfather clause in general, and the "continuous possession" requirement in particular, plainly prohibits on the one hand, and allows on the other, some of the core conduct in which Plaintiffs wish to engage. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497 (1982). That fact alone should terminate their facial claim, because it demonstrates that the "continuous possession" requirement is not "incapable of valid application." *Dias v. City and County of Denver,* 567 F.3d 1169, 1179-80 (10th Cir. 2009).

"Facial challenges are strong medicine." *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005). As the Supreme Court has explained, "[a]lthough passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004). Accordingly, "a statute with some arguably vague elements is not automatically vague on its face in violation of the Fourteenth Amendment." *Dias,* 567 F.3d at

1180; *see also Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1367 (10th Cir. 1981). Rather, to fail a facial vagueness challenge, the statute must be "utterly devoid of a standard of conduct so that it 'simply has no core' and cannot be validly applied to any conduct." *High Ol' Times v. Busbee,* 673 F.2d 1225, 1228 (11th Cir. 1982), *quoting United States v. Powell,* 423 U.S. 87, 92 (1975); *see also United States v. Gaudreau,* 860 F.2d 357, 364 (10th Cir. 1988).

When construing a statute under Colorado law, as Plaintiffs' challenge requires, "the duty of the reviewing court is to construe the statute so as to uphold its constitutionality whenever a reasonable and practical construction may be applied to the statute." *See People v. Longoria*, 862 P.2d 266, 270 (Colo. 1993); *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1121 (10th Cir. 2008). When evaluating a Colorado statute that is subject to several interpretations, Colorado's rules of statutory construction require selection of the interpretation that best harmonizes both legislative intent and constitutional requirements. *See People v. R.M.D.,* 829 P.2d 852, 853 (Colo. 1992). While a court cannot rewrite a statute, it may read in a *mens rea* requirement if one is consistent with statutory intent. *See* § 18-1-503(2) ("Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such a culpable mental state"); *see also People v. Moore,* 674 P.2d 354 (Colo. 1984) (requisite mental state may be implied from the statute).

The public debate surrounding the passage of § 18-12-302 was particularly intense, and resulted in widespread misconception about the intent and scope of the bill.  In response to concerns that the statute was a backdoor attempt to ban all magazines and that the grandfather clause was laden with traps for the unwary, the Governor's signing statement rejected an expansive interpretation of the bill, instead stating "that the large capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the 14th Amendment." *See* Doc. 40-1.  The Governor went on to request that the Colorado Department of Public Safety, in consultation with the Attorney General, issue "Technical Guidance on how the law should be interpreted and enforced in Colorado." *Id.*

The Attorney General subsequently issued two Technical Guidance letters, the second of which was negotiated with the Plaintiffs just prior to the preliminary injunction hearing in this case.  *See* Doc. 29-2, Doc. 59-1.  Both were signed by the Attorney General and issued at the Governor's request.  *See* Colo. Rev. Stat. § 24-31-101(b).  Under Colorado law they are "entitled to respectful consideration as a contemporaneous interpretation of the law by a governmental official charged with the responsibility of such interpretation." *Colorado Common Cause v. Meyer*, 758 P.2d 153, 159 (Colo. 1988); *see also Phelps v. Hamilton*, 59 F.3d 1058, 1070 (10th Cir. 1995) ("Among the statutory construction tools available to us are…to some degree…the interpretation of the statute given by those charged with enforcing it").

The first letter stated in pertinent part that the bill could not be reasonably construed as "barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee." Doc. 29-2. Further, "an owner should not be considered to have 'transferred' a large-capacity magazine or lost 'continuous possession' of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned." *Id*. The second letter provided additional detail, stating that:

> The phrase 'continuous possession' in HB 1224 shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent. "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous physical possession of a magazine. "Continuous possession" is only lost by a voluntary relinquishment of dominion and control."

Doc. 59-1.

Colorado law protects an individual from criminal liability for prohibited conduct if such conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." § 18-1-504(2)(c). The Governor is the only defendant in this case, and the two Technical Guidance letters, along with the signing statement, are his official written interpretation of § 18-12-302. This Court's review of Plaintiffs' facial challenge

should account for this binding effect under Colorado law.[6]  *See* Colo. Rev. Stat.

§ 18-1-504(2)(c).

The analysis in the Technical Guidance parallels criminal cases that have

analyzed and applied similar concepts in the double jeopardy context.  For example,

in *United States v. Jones,* 533 F.2d 1387 (6th Cir. 1976), the defendant was charged

with five counts of unlawful possession of a firearm, based on his possession of the

same firearm on five separate occasions.  On appeal, he argued that he had

"committed only one offense because of his continuous and uninterrupted possession

of the same weapon."  *Id.* at 1390.  The Sixth Circuit agreed, holding that

"[p]ossession is a course of conduct, not an act; by prohibiting possession Congress

intended to punish as one offense all of the acts of dominion which demonstrate a

continuing possessory interest in the firearm."  *Id.* at 1391.

More recent cases, including one unpublished decision from the Tenth

Circuit, have followed this approach.  *See United States v. Martin*, 2000 U.S. App.

LEXIS 616, 2000 WL 33526 (10th Cir. Jan. 18, 2000).  *Martin* adopted the "course of

conduct" analysis, and favorably cited *United States v. Horodner,* 993 F.2d 191 (9th

Cir. 1993), in which the court vacated one of two separate convictions for being a

---

[6] The extent to which Plaintiffs still maintain that the "designed to be readily
converted" language in § 18-12-301(2)(a)(I) is unconstitutionally vague or somehow
effectively bans all magazines that are equipped with a removable baseplate is
unclear.  The two Technical Guidance letters reject this interpretation.  As the
second letter states: "Magazines with a capacity of 15 or fewer rounds are not large
capacity magazines as defined in HB 13-1224 whether or not they have removable
base plates."  Doc. 59-1.  As with the "continuous possession" requirement, this
interpretation is binding on the Governor and should guide this Court's
interpretation of the law.

felon in possession of a single firearm over the course of several months.  Evidence

at trial in *Horodner* established at least one break in physical custody, a ten-day

period in which the defendant left his shotgun with a gunsmith for repair.  *Id.* at

193.  The Ninth Circuit vacated the second conviction because during this period

the defendant "retained the right to possess and control" the shotgun.  *Id.*  "In

short," the court held, "he retained constructive possession" and his "possession was

one uninterrupted course of conduct."  *Id.*

The Attorney General's Technical Guidance letters employ similar reasoning,

and indicate that the "continuous possession" requirement of the grandfather clause

connotes a course of conduct, rather than actual, physical possession at all times.

This interpretation demonstrates that the statute has an easily discernible core,

under which the course of conduct associated with "continuous possession" can be

interrupted by "voluntary relinquishment of dominion and control."  Doc. 59-1.

Thus, "continuous possession" would be unequivocally interrupted if the owner sold,

gifted, or indefinitely leased an LCM to someone else.  But the owner would not

voluntarily give up dominion and control by leaving a magazine with a gunsmith, or

by storing it at his home, in a locker at the gun range, or in his neighbor's safe.

This is not to say that the language of the grandfather clause would be

simple to apply under every hypothetical circumstance.  But facial vagueness does

not follow from the possibility that there may be difficult cases at the margins.

"A statute challenged for vagueness does not depend on whether the challengers can

posit some obscure and difficult application of the legislation which causes

confusion.  It is doubtful whether any criminal statute could survive such scrutiny."
*Coalition of N.J. Sportsmen v. Whitman*, 44 F.Supp.2d 666, 682 (D.N.J. 1999).

Moreover, although the lack of an express scienter requirement does not, on its own, demonstrate vagueness, this Court may read a mental state into a statute under Colorado law in order to preserve its constitutionality.  *See* § 18-1-503(2); *see also Gorman v. People*, 19 P.3d 662, 665 (Colo. 2000) ("legislative silence on the element of intent in a criminal statute is not to be construed as an indication that no culpable mental state is required.  Rather, the requisite mental state may be implied from the statute.").  A "course of conduct" analysis, especially when considered together with the Technical Guidance's reference to "voluntary relinquishment of dominion and control," suggests that loss of "continuous possession" would require, at a minimum, knowing conduct.[7]  Nonetheless, with or without this requirement, Plaintiffs are unable to satisfy the demanding standard of proof associated with a claim of facial vagueness.  This Court should rule in the Governor's favor on Count III as a matter of law.

---

[7] To the extent that Plaintiffs continue to allege vagueness as to other aspects of § 18-12-302, implying a scienter requirement remains an option where necessary to preserve the statute's constitutionality.  *See Gorman,* 19 P.3d at 665.  Plaintiffs have asserted, for example, that due to differing spring tolerances, it is sometimes possible to force a sixteenth round into a fifteen-round magazine, thereby making the magazine a large-capacity magazine by virtue of the fact that it is "capable of accepting" more than fifteen rounds.  *See* Doc. 116, ¶ 41.  Consistent with the Governor's signing statement and the Attorney General's Technical Guidance, holding the new purchaser of a magazine strictly liable for the purchase would represent exactly the type of trap for the unwary that the Governor's signing statement sought to avoid.  Rather than casting doubt on the constitutionality of the statute as a whole, however, these hypothetical scenarios suggest that a culpable mental state of "knowing" should be implied in order to discount this possibility.

### V.   Plaintiffs' ADA claims fail as a matter of law.

Finally, Plaintiffs' novel claims under the Americans with Disabilities Act ("ADA") should fail as a matter of law because they are not cognizable under Title II of the ADA.

Plaintiffs claim that "[d]isabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons."  Doc. 116, ¶ 187.  Plaintiffs also assert that "[p]ersons with disabilities also routinely transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense," and that "HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights."  *Id.* ¶¶ 189, 190.  Thus, Plaintiffs claim that § 18-12-112 and § 18-12-302 violate Title II of the ADA.

A claim for relief under Title II of the ADA requires a plaintiff to establish that: 1) he is a qualified individual with a disability; 2) due to the disability, he was denied the benefits of government operations; 3) there is a reasonable accommodation that could have been made by the governmental entity that would permit him to enjoy such benefits; and 4) that he has sought that accommodation from the governmental entity and has been denied.  *Grider v. City of Aurora,* 2013 WL 3927661 (D. Colo. July 20, 2013) at *2, *citing Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 578-79 (2d Cir. 2003).

Title II of the ADA provides that "no disabled person shall, by reason of his disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA does not define "service, program, or activity."  While a few courts have construed this phrase broadly – as "anything a public entity does," *see, e.g., Barden v. City of Sacramento,* 292 F.3d 1073, 1077 (9th Cir. 2002) – the Tenth Circuit is not one of them.  Indeed, in *Elwell v. Okla. Ex rel. Bd. of Regents of the University of Okla.*, 693 F.3d 1303, 1306 (10th Cir. 2012), the Tenth Circuit explicitly rejected the broad approach, holding instead that "an agency's services, programs and activities refer to the 'outputs' it provides some public constituency."  *Id.*  The *Elwell* panel relied on the dictionary and standard rules of statutory interpretation to develop more precise definitions for each category, concluding that: 1) "services" are acts done for the benefit of another; 2) "'programs of a government entity' refers to its 'projects or schemes'"; and 3) "the placement of the term 'activity' suggests an effort to capture all the *outputs* the public entity provides to the public it serves."  *Id.* at 1306-07 (emphasis added).  The court took care to emphasize that, although the term "activities" could be read very broadly in isolation, a better reading would account for context and thereby ensure that it does not "rope in everything the public entity does."  *Id.* at 1307.

The opinion in *Elwell* focused on whether Title II of the ADA covers employment, but its reasoning is consistent with that of other courts, which have placed limits on what constitutes a "public service, program, or activity" under the

Act. *Aswegan v. Bruhl,* 113 F.3d 109 (8th Cir. 1997), analyzed a prison inmate's complaint that his cell's lack of cable television reception violated the ADA. Reversing a district court's ruling in the inmate's favor, the Eighth Circuit Court of Appeals held that "the cable television sought by Aswegan is not a public service, program, or activity within the contemplation of the ADA," and that the relief he sought was thus "not covered by [42 U.S.C.] § 12132." *Id.* at 110. Courts in other circuits have reached similar conclusions in a variety of different settings. *See, e.g. Rosen v. Montgomery County,* 121 F.3d 154, 157 (4th Cir. 1997) (rejecting claim that the act of arrest is a governmental "service, program, or activity"); *Filusk v. Town of Weston*, 266 F.Supp.2d 322, 328 (D. Conn. 2003) (finding that personnel and equipment engaged by municipality to provide services such as public education, public transportation, or law enforcement are not services or programs within meaning of Title II of the ADA, rather they are conduits used by public entity to provide services, programs, and activities); *S.G. v. Barbour County Dept. of Human Resources*, __So.3d__, 2013 WL 5861500 (Ala. Civ. App. 2013) (proceeding to terminate parental rights is not a governmental service, program, or activity).

Nor does the second phrase of § 12132 – "or be subjected to discrimination by any such entity" – operate as a "catch-all" that stretches the ADA's coverage beyond governmental outputs. *Elwell*, 693 F.3d at 1308. Rather, a contextual review of the ADA as a whole "unambiguously demonstrates that Congress intended Title II to be confined to the context of public services." *Canfield v. Isaacs*, 523 F.Supp.2d 885, 890 (N.D. Ind. 2007). The ADA applies to "qualified individual[s] with a disability."

42 U.S.C. § 12131.  To bring an actionable claim under Title II, an individual "*must*
*meet the essential requirements for the receipt of services or the participation in*
*programs or activities provided by a public entity.*"  42 U.S.C. § 12131 (2) (emphasis
added).  The statute assumes a relationship between a public entity, on the one
hand, and a member of the public, on the other.  *Zimmerman v. Oregon DOJ*, 170
F.3d 1169, 1176 (9th Cir. 1999).  The former *provides* an output that the latter
*participates in or receives. Id.*  The phrase "qualified individual with a disability"
makes clear that Title II applies only "to people who receive the services of, or
participate in the programs or activities of, a public entity[.]"  *Canfield*, 523
F.Supp.2d at 890.  Thus, "the first clause precludes an agency from discriminatorily
'exclud[ing]' or 'den[ying] benefits' to disabled persons who are eligible for the
services, programs or activities the agency provides to the public.  The second does
distinctly additional work by prohibiting the agency from engaging in other forms of
discrimination against those same individuals."  *Elwell,* 693 F.3d at 1308.

Under *Elwell*, neither § 18-12-112 nor § 18-12-302 implicates Title II of the
ADA.  Plaintiffs have not alleged that either statute provides or relates to a
governmental service, program, or activity.  For good reason: they do not.  Rather, §
18-12-302 simply limits the capacity of ammunition magazines.  As a public safety
regulation, the statute is not itself a governmental service, program or activity.

Similar reasoning applies to Colorado's background check requirements.
Section 18-12-112 does, indirectly, involve government activity – the state's
management of background checks.  But Plaintiffs make no claim and have offered

no evidence to support a conclusion that any disabled individual would have extra difficulty initiating a background check for a private sale due to a disability.  And even if they had made that claim, any such problem would arise from the pre-existing background check system itself, rather than its expansion to cover private sales.  Nor do Plaintiffs allege or offer any evidence suggesting that the various exceptions to § 18-12-112 affect them in some way that differs from able-bodied individuals.[8]  Accordingly, Plaintiffs' ADA claims fail as a matter of law.

## CONCLUSION

The Court should rule in favor of the Defendant, uphold the constitutionality of § 18-12-112, § 18-12-302, and reject Plaintiffs' ADA claim

Respectfully submitted this 14th day of March, 2014.

JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*

KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
STEPHANIE SCOVILLE*
Senior Assistant Attorney General
LEEANN MORRILL*
First Assistant Attorney General
Attorneys for Governor John W. Hickenlooper

---

[8] In any event, in interpreting language similar to Title II found in the Rehabilitation Act, the Supreme Court has held that a facially neutral governmental restriction does not deny "meaningful access" to the disabled simply because disabled persons are more likely to be affected by it.  *Alexander v. Choate,* 469 U.S. 287, 303–04 (1985) (ceiling on number of inpatient hospital days paid for by Medicaid program did not deny meaningful access to Medicaid services).

*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014 I served a true and complete copy of the foregoing TRIAL BRIEF upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                        david@i2i.org

Jonathan M. Anderson                  jmanderson@hollandhart.com

Richard A. Westfall                   rwestfall@halewestfall.com
Peter J. Krumholz                     pkrumholz@halewestfall.com

Marc F. Colin                         mcolin@bcjlpc.com

Anthony J. Fabian                     fabianlaw@qwestoffice.net


                            *s/  Matthew D. Grove*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## PLAINTIFFS' TRIAL BRIEF

---

**I.     INTRODUCTION**

The Tenth Circuit follows the two-step analysis most circuits have adopted for Second Amendment challenges to state and local regulations of firearms in the wake of *Heller* and *McDonald*. The Court first should consider whether the regulation burdens Second Amendment rights. If it does, then the burden shifts to the government to justify the restriction based upon a sliding scale.

If the burden is severe (such as the handgun ban in *Heller*) then strict scrutiny applies. As the Supreme Court noted, the handgun ban at issue there failed any level of scrutiny applicable to enumerated rights, including strict scrutiny. If the burden is significant and the persons affected are law-abiding citizens, then heightened scrutiny is in order such as that used in *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011) ("The City must establish a close fit between the range ban and the actual public interest it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights."). If the Second Amendment burden is on persons other than law-abiding citizens, or if the burden is not substantial, then, generally, intermediate scrutiny is applied. *See United States v. Reese*, 627

F.3d 792, 802-03 (10th Cir. 2010) (upholding firearms restrictions on persons adjudicated as domestic abusers; restrictions imposed must be "substantially related to an important government objective"). This methodology for analyzing Second Amendment claims was recently reaffirmed by the Ninth Circuit in *Peruta v. County of San Diego*, -- F.3d --, 2014 WL 555862 (9th Cir. Feb. 13, 2014), in an opinion that categorically rejects the approach urged by the Defendant here to essentially defer to the rationale adopted by the Colorado General Assembly in adopting the challenged legislation.

HB 1229 and HB 1224 substantially burden Second Amendment rights. HB 1229 burdens far more than private sales. It requires in-person background checks between the transferor and the transferee for the most routine temporary loaning of firearms for day-to-day gun ownership and use. Any loan of more than 72 hours is covered. Even loans within the 72-hour timeframe impose additional liability by making the transferor jointly and severally liable for damages "proximately caused by the transferee's unlawful use." For the vast number of Coloradans living in rural areas, in-person background checks are prohibitively difficult to obtain. Many Federal Firearm Licensees ("FFLs") are an hour or more drive-time away from rural Coloradans, including the farmers and ranchers who are members of plaintiff Colorado Farm Bureau. Even if someone wanted to make the drive, many, if not most, rural FFLs are refusing to perform the checks (which impose potential liability on the FFL) for the $10 maximum fee allowed under the statute. The Defendant cannot meet his burden to justify these restrictions. Defendant can offer no evidence that ***any*** public benefit is derived from such an onerous scheme, and indeed the State's own data indicate that the number of background checks has actually ***decreased*** since HB 1229 became effective.

HB 1224 represents a categorical ban dissimilar from *Heller* only in degree. Common firearms used by law-abiding citizens for self-defense are protected under the Second Amendment. Rifles using 20- and 30-round magazines and the magazines themselves number in the millions. Handguns using 17-round magazines are equally as common. The 15-round cut-off adopted by the Colorado General Assembly is wholly arbitrary and outlaws common firearms based upon little more than speculation.

This Trial Brief is broken down as follows. First, Plaintiffs will address the appropriate legal standards for Second Amendment cases in this Circuit. Next, they will discuss why the Defendant should be precluded from introducing after the fact novel arguments, justifications, expert opinions and data not considered by the General Assembly in an attempt to justify the measures after the fact. Following that, Plaintiffs will address HB 1229, discuss its harm on Second Amendment rights and why the Defendant cannot meet his burden to justify 1229's restrictions, especially on the routine loaning of firearms. Next, Plaintiffs will discuss why HB 1224 violates the Second Amendment. Plaintiffs will finish with sections on the Americans with Disabilities Act and their vagueness challenge.

## II.   THE LEGAL STANDARD FOR ASSESSING SECOND AMENDMENT CLAIMS IN THE TENTH CIRCUIT

The Tenth Circuit uses a two-step test to analyze Second Amendment issues. *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) ("In *United States v. Reese* . . . this court adopted a 'two pronged approach' to Second Amendment claims.").

### A.   The First Step: Identify Burdens on Second Amendment Rights

The first step is for the reviewing court to ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does, the

court must then evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid. *Reese*, 627 F.3d at 800-01.

"[T]o determine whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee, we first ask whether the Second Amendment provides a right to [do the prohibited conduct]." *Peterson*, 707 F.3d at 1209. The Tenth Circuit "agree[s] with the Fifth Circuit that in applying the two-step approach to Second Amendment claims, we consider at the first step 'whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee.'" *Id.* at 1211 (quoting *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). As the Ninth Circuit forcefully reiterated in *Peruta*, an historical assessment is very important to understanding the scope of the Second Amendment rights at issue. As the Ninth Circuit noted: "In short, the meaning of the Second Amendment is a matter not merely of abstract dictionary definitions but also of historical practice." *Peruta*, 2014 WL 555862, at *4.

Application of the two-step process in this Circuit follows *Heller*. In *Peterson*, an out-of-state plaintiff who could not obtain a Colorado concealed carry permit, and who was not prohibited by state law from carrying a handgun openly, failed "step one of [the] two-step analysis [because] the Second Amendment does not confer a right to carry concealed weapons." *Peterson*, 707 F.3d at 1209.[1] (The *Heller* court repeatedly and favorably cited state court cases which had upheld the right to carry, while allowing the legislature to prohibit the mode of **concealed** carry. *Heller*, 554 U.S. at 629.)

---

[1] For whatever reason, Mr. Peterson did not challenge Denver's ban on open carry, which was actually the cause of Mr. Peterson's problem. *Peterson*, 707 F.3d at 1208. It should be noted that the *Heller* court repeatedly and favorably cited state court cases which had upheld the right to carry, while allowing the legislature to prohibit the mode of **concealed** carry. *Heller*, 554 U.S. at 629.

In contrast, the statute at issue in *Reese* prohibited certain people (domestic violence misdemeanants) from possessing arms. The Second Amendment burden on adjudicated domestic abusers, nevertheless, easily passed step one: "there is little doubt that the challenged law . . . imposes a burden on conduct, i.e. [plaintiff's] possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment." *Reese*, 627 F.3d at 801. Similarly, the federal statute banning gun possession by illegal aliens also passed step one. *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168-69 (10th Cir. 2012).

**B.      Step Two: Apply the Appropriate Means/Ends Test**

"The Supreme Court did not specify in *Heller* precisely what level of scrutiny a reviewing court must apply to the challenged law." *Reese*, 627 F.3d at 801. "Instead, the Court indicated only that the rational basis test is not appropriate for assessing Second Amendment challenges to federal laws." *Id.* (citing *Heller*, 554 U.S. at 628 n.27).[2]

In step two, the court must apply "some level of heightened scrutiny and, in so doing, must look to analogous cases for guidance in precisely what level to apply." 627 F.3d at 801; *see also Ezell*, 651 F.3d at 706-08. In *Reese*, the Court cited with approval a Third Circuit case for the proposition that "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second

---

[2] Despite the Supreme Court's admonition in *Heller* that heightened scrutiny applies to Second Amendment challenges, the Second Circuit has refused to adopt this approach, arguing that "where the burden imposed by a regulation on firearms is a marginal, incremental *or even appreciable restraint* on the right to keep and bear arms, it will not be subject to heightened scrutiny." *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013) (internal quotations and citations omitted; emphasis added).

Amendment restriction at issue." 627 F.3d at 801 (quoting *U.S. v. Marzzarella*, 614 F.3d 85, 97 (3rd Cir. 2010) (internal quotations omitted)).[3]

*Reese* and *Huitron-Guizar* did not involve *Heller*'s paradigmatic "law-abiding citizens." To the contrary, *Reese* was about "people who have been judicially determined to pose a credible threat to the physical safety of a family member, or who have been ordered not to use, attempt to use, or threaten to use physical force against an intimate partner or child that would reasonably be expected to cause bodily injury." *Reese*, 627 F.3d at 802 (internal quotations omitted). After recounting data related to the recidivism rate of domestic violence offenders, the court stated that "[n]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners." *Id.* at 803. Accordingly, the Tenth Circuit in *Reese* applied intermediate scrutiny.

Using intermediate scrutiny, the Tenth Circuit found that the challenged statute is substantially related to its stated objective in plaintiff's case and is consistent with the government's intended purpose in implementing the statute and thus satisfied intermediate scrutiny. *Id.* at 803-04. Similarly, the Tenth Circuit held that the prohibition on gun possession by illegal aliens also satisfied intermediate scrutiny; by definition, an illegal alien is neither "law-abiding" nor a "citizen." *Huitron-Guizar*, 678 F.3d at 1170 (citing *Reese*, 627 F.3d at 802)).

More is required when the regulation at issue encumbers the Second Amendment rights of law-abiding citizens. The Tenth Circuit in *Reese* relied upon, inter alia, the Seventh Circuit's decision in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), which dealt with an analogous

---

[3] The Tenth Circuit has also observed that the Supreme Court methodology is "to consider the rarity of state enactments in determining whether they are constitutionally permissible." *Kerr v. Hickenlooper*, slip op. at 40 (10th Cir. Mar. 7, 2014) (citing and quoting *Heller*, 554 U.S. at 629). As will be detailed infra, state enactments such as HB 1224 and 1229 are rare. Even for the small minority of states which have enactments on the same subject, HB 1224 and 1229 are more severe than most of them.

statutory prohibition on firearms possession. *See Reese*, 627 F.3d at 802 (discussing *Skoien* and noting statutes at issue in two cases "prohibit the possession of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in domestic violence"). The Seventh Circuit subsequently expounded further on step two of the Second Amendment's analysis where the prohibitions at issue affect "law-abiding, responsible citizens." *Ezell*, 651 F.3d at 708. In this context, "a more rigorous showing than that applied in *Skoien* should be required." *Id.* Per the Seventh Circuit: "The City must establish a close fit between the [challenged law] and the actual public interest it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Id.* In light of the impacts HB 1229 and HB 1224 have on the Second Amendment rights of law-abiding citizens, if the Court does not believe that strict scrutiny is called for, at a minimum, the Court should apply *Ezell's* "close-fit" test.

As set forth in the Final Pretrial Order, the Defendant is urging this Court to adopt an intermediate scrutiny test that in actual application is demonstrably flawed. To the extent there are decisions from other circuits that offer some support for this view, the recently decided *Peruta* decision explains why such an approach is erroneous:

> First, the analysis in the Second, Third, and Fourth Circuit decisions is near-identical to the freestanding "interest-balancing inquiry" that Justice Breyer proposed – and the majority explicitly rejected – in *Heller*. *See Heller*, 554 U.S. at 689-90 (Bryer, J. dissenting) (proposing that in Second Amendment cases the court should "ask[] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important government interests"); *see also id.* at 634-35 (majority opinion) (rejecting a "judge-empowering 'interest-balancing inquiry'" as a test for the constitutionality of Second Amendment regulations because "no other enumerated right [had its] core protection . . . subjected to [such] a freestanding" inquiry).

*Peruta*, 2014 WL 555862, at *27. Also, as the Ninth Circuit pointed out, the circuits purporting to apply intermediate scrutiny along the lines suggested by the Defendant erred because of the

"high degree of deference they afforded the state legislatures' assessments of the fit between the challenged regulations and the asserted government interest they served." *Id.* at *28.

The Ninth Circuit in *Peruta* required the government to engage in "sufficient narrow tailoring" that involved requiring the government to demonstrate that the regulatory measures at issue in fact would advance the stated public benefit. *Id.* at *28-29 (citing cases). Under this test, the government is required "to prove that the statute [does] not burden the right 'substantially more . . . than is necessary to further [the government's legitimate] interests.'" *Id.* at *28 (quoting *Turner Broadcasting Systems, Inc. v. FCC (Turner II)*, 520 U.S. 180, 214 (1997)). The Ninth Circuit's analysis tracks the test adopted in *Ezell*. The Court should follow these cases and not resort to either what in fact is an interest-balancing standard, or defer to the conclusory reasoning of the Colorado General Assembly, discussed below.

## III.   THE DEFENDANT IS BOUND BY THE DATA AND TESTIMONY BEFORE THE GENERAL ASSEMBLY AT THE TIME THE BILLS WERE ENACTED

No matter the level of scrutiny deemed appropriate, in order to uphold these measures the Court must find a nexus between the new limitations on firearms ownership and use, and the stated purpose of increasing public safety. Over the course of seven days of hearings on HB 1224 and eleven days of hearings on HB 1229, which fill more than 2,000 combined pages, the House and Senate heard many references to well-known mass shootings, and some less frequent references to studies or data cited for the proposition that previous limits or bans had reduced crime, or that background checks keep guns out of the hands of criminals. But the minimal data cited was disputed, and left many legislators asking whether the bills would save lives, or were only to give the appearance of action in the face of tragedy: "Show me somewhere where we have data that says that a magazine with 10 or 12, or for that matter the amendment, the 15, will

have an impact on lives saved . . . ***Because it makes a difference whether we legislate on facts*** or legislate just to legislate." LH, 2/15/13 at 87-88 (1224) (emphasis added).

The Defendant's plan at trial is to dwarf what the General Assembly actually considered with new information the General Assembly never saw. After the measures were challenged, the Defendant went out in search of data that could justify them after the fact. That is not permissible. The General Assembly enacted the bills, and the question is whether the General Assembly found a sufficient nexus based on what it considered. The opinion of defense experts in a litigation context based on newly-developed analysis or information the legislature never considered cannot answer that question. The Court should not permit the Defendant to shift the focus away from what the General Assembly did to what Defendant's experts have done since. Under either strict or intermediate scrutiny, the reasonableness of HB 1224 and HB 1229 and the General Assembly's enactment of the same must be evaluated in the context of the facts and record before the General Assembly at the time the laws were enacted.

### A.      Strict Scrutiny

Plaintiffs contend the correct analysis is strict scrutiny. The Federal Circuit's opinion in *Rothe Development Corporation v. Department of Defense* provides the framework for disallowing new history in that context. In that case, plaintiff Rothe challenged an Air Force contract award to a competing company. *Rothe Dev't Corp. v. Department of Defense*, 413 F.3d 1327, 1330 (Fed. Cir. 2005). Rothe contended that a federal statute, 10 U.S.C. § 2323, which was designed to make socially and economically disadvantaged businesses more competitive, was a violation of its right to equal protection. *Id.* Rothe argued that because the law presumed businesses run by certain racial and ethnic minorities to be part of the protected class, the law

was facially discriminatory and there was insufficient evidence to support its discriminatory provisions. *Id.*

Rothe contended that evidence that was not presented to Congress should either be stricken from the record or given no weight. Agreeing with Rothe, the Federal Circuit expressed clearly the evidentiary standard in this regard:

> Thus, to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification. Although these statistical studies predate the present reauthorization of section 1207 in 2002, their relevance is unclear because it is uncertain that they were ever before Congress in relation to section 1207. ***Without a finding that these studies were put before Congress prior to the date of the present reauthorization in relation to section 1207 and to ground its enactment, it was error for the district court to rely on the studies***.

413 F.3d at 1338 (emphasis added).

Other decisions have agreed with the *Rothe* court's analysis in holding that the strict scrutiny standard must be applied to the knowledge and facts before legislatures at the time the legislatures pass the challenged laws at issue. *See Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) (any institution that makes a racial distinction must have a strong basis in evidence to conclude that remedial action is necessary before implementing the distinction); *Miller v. Johnson*, 515 U.S. 900, 921 (1995) (under a strict scrutiny analysis, a state must have "convincing evidence" that remedial action is necessary ***before*** implementing affirmative action statutes).

## B.     Heightened or Intermediate Scrutiny

Even if the Court determines that heightened or intermediate scrutiny is warranted in this case, the evidence considered to justify HB 1224 and HB 1229 should be limited to that which was before the General Assembly at the time of their enactment. *See, e.g., Turner Broadcasting System v. F.C.C. (Turner I)*, 512 U.S. 622, 662 (1994) (applying intermediate scrutiny in First Amendment case). A court must "assure that, in formulating its judgments, [the legislature] has

drawn reasonable inferences *based on substantial evidence*." *Id.* at 666 (emphasis added). The Colorado General Assembly drew no inferences whatsoever from the bulk of the Defendant's proposed evidence because it never considered it.

This aspect of *Turner I* has been relied on by both circuit and district courts when analyzing Second Amendment issues. *See Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) ("Thus, our role is only 'to assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence.'"); *Shew v. Malloy*, -- F. Supp. 2d --, 2014 WL 346859 at *8 (D. Conn. Jan. 30, 2014) ("Accordingly, the court must only 'assure that, in formulating its judgments, [Connecticut] has drawn reasonable inferences based on substantial evidence.'"). Implicit in the concept of drawing reasonable inferences based on substantial evidence is that the evidence is actually presented to the legislature for its consideration prior to the enactment of the statute at issue.[4]

Other courts have held that under an intermediate scrutiny standard (and even under a lower standard), the reasonableness of a legislature's conduct must be evaluated based on the evidence before it at the time the challenged law is enacted. *See Hughes v. Oklahoma*, 441 U.S. 322, 338 n.20 (1979) (under intermediate scrutiny, the State cannot rely on its lawyers to sift through the legislative record and provide post-hoc rationalizations for statutory restrictions on fundamental rights); *United States v. Carolene Products Co.*, 304 U.S. 144, 154 (1938) ("such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it"); *Hutchins v. D.C.*, 188 F.3d 531, 567 (D.C. Cir. 1999) (under intermediate scrutiny, a

---

[4] The Second Amendment analysis employed by *Kachalsky* and *Shew* was flawed for the reasons explained in *Peruta*, 2014 WL 555862, at *27, but even these courts correctly considered only the evidence that was before the legislatures at the time of enactment.

court must independently examine "the evidence before the legislature to determine whether an adequate foundation justified the challenged burdens").

Defendant is also precluded from alleging that certain public policies justify infringements of fundamental rights when those policies were never considered by the legislature in the first place. In *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150, 169 (2002) (Breyer, J., concurring) (invalidating on First Amendment grounds ordinance prohibiting canvassing activities without a permit), Justice Breyer noted in his concurrence that the city's "crime prevention" justification for the ordinance was "not a strong one" because there was no indication that the city considered this justification when passing the ordinance. "In the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given." *Id.* at 170. Per Justice Breyer, if the city actually thought that preventing burglaries or violent crimes was an important justification for the ordinance at issue, "it would have said so." *Id.* Similarly, any additional public policy considerations raised by Defendant *after* the passage of HB 1224 and HB 1229 should not be given any weight.

Thus, Defendant should be precluded from introducing new evidence, testimony, or novel public policy considerations beyond the legislative record at the time HB 1224 and HB 1229 were enacted by the General Assembly to meet his burden to justify encumbrances on the Second Amendment rights at issue here.

## IV.   HB 1229 VIOLATES THE SECOND AMENDMENT

### A.   HB 1229 Substantially Burdens Core Second Amendment Rights

It is important to clarify what Plaintiffs are ***not*** challenging regarding HB 1229. Colorado's law requiring background checks for the commercial, retail sale of firearms is "presumptively" constitutional because it "impos[es] conditions and qualifications on the

*commercial* sale of firearms." *Heller*, 554 U.S. at 626 (emphasis added). Further, its serves the constitutionally legitimate purpose of preventing possession of firearms by felons and the mentally ill. *Id.* Nor do Plaintiffs base their claim on a theory that background checks on ***private*** firearm sales are necessarily unconstitutional.

Plaintiffs' claim involves the non-commercial sale and loans of firearms, by persons who are not engaged in the firearms business, which is outside *Heller*'s comment about commercial sales. Plaintiffs challenge imposing background checks on private sales to the extent the means chosen by the General Assembly are arbitrary, dysfunctional, and fail to satisfy the appropriate least restrictive alternative standard.[5]

HB 1229 substantially harms important Second Amendment rights. Acquiring firearms is essential to the core right to use firearms in lawful self-defense, as is the right to acquire the items necessary to exercise the right. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687-89 (1977); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Loaning of firearms, like private sale of firearms, is an essential aspect of firearm acquisition and is long established as a typical activity for which Americans do not need to seek prior government permission.

Consistent with *Ezell*, which involved access to firing ranges for target practice, routine loaning of firearms is a necessary part of the right to keep and bear arms. For Colorado Youth Outdoors, routine loaning is essential for teaching young persons the basics of firearm use and safety, so HB 1229 imposes substantial burdens on CYO. Similarly, farmers and ranchers routinely loan firearms to hands and to one another, and HB 1229 substantially encumbers their

---

[5] HB 1229 does not ban firearms purchases, with one exception: its *de facto* prohibition on 18- to 20-year-olds purchasing handguns, which is described below.

normal, everyday use of firearms to protect themselves, their livestock and their property. Finally, Plaintiffs routinely transfer firearms to friends, fellow shooters, fellow members of shooting organizations, etc., as part of routine keeping and bearing of arms. The "exceptions" do not come close to entailing all of the common loan situations and the 72-hour restriction is especially harmful.

### B.   Defendant Cannot Justify 1229's Encumbrances on Plaintiffs' Second Amendment Rights

In *Ezell*, the standard of review was "not quite 'strict scrutiny,'" and the defendant did "not come close to satisfying this standard" because the defendant "presented no data or expert opinion." *Id.* at 709. In the instant case, Defendant will offer data and expert opinion in support of background checks on private *sales*.[6] Defendant has, however, presented no data and expert opinion about *loans*, and certainly no data on constricting such loans to only 72 hours.

HB 1229 plainly fails whatever means test this Court chooses to apply, for several reasons.

***First***: HB 1229 is ineffective. HB 1229 resulted in a ***decrease*** in background checks on private sales.

***Second***: HB 1229 makes background checks difficult to obtain. To illustrate, one may contrast C.R.S. § 24-33.5-424 (background check system for retail sales) against HB 1229 (private loans or sales). The background check system for retail sales requires no additional travel by any party. As with any retail storefront, the customer must come to the store. The background check will take place at the store at the time of purchase, and so does not burden the customer with extra travel.

---

[6] As discussed above, Defendant should not be permitted to present data that was not presented the General Assembly.

In contrast, the loans and transfers covered by HB 1229 involve people who are not at a store. When a rancher wants to loan a gun to her neighbor, both of them can meet can be close to home. Under HB 1229 they would have to travel to consummate the loan, often an hour or more each way. No Coloradan should have to spend the better part of a day to obtain a background check to loan a firearm to a neighbor or a friend for a few days or weeks.

*Third:* HB 1229's FFL fee cap wholly debilitates 1229's regulatory scheme. The cap of $10 for private sales is far below an FFL's practical cost of processing the paperwork, and risks felonies for paperwork errors. Accordingly, the fee cap greatly reduces the number of FFLs who are willing to process private sales. Fewer than 365 of 1,698 FFLs in Colorado processed even a single private sale or loan in Colorado in July-September, according to CBI data.[7] Contrast HB 1229's fee cap with the situation in a retail sale from the FFL's own inventory in which the FFL charges whatever price he or she wishes, to cover all the costs associated with the sale.

The situation is the same for private sales at a gun show, in effect since 2000. C.R.S. § 12-26.1-101. There is no extra travel burden on either party because they are both at the gun show. There also is no "burden" on the FFL who processes the background check. Pursuant to C.R.S. § 12-26.1-101(2), a gun show operator must hire a FFL to process private sales. The gun show background check statute sets no restrictions on the terms of the contract between the gun show operator and the FFL who will provide the service, so the FFLs performing the checks can insure that they are appropriately compensated.

For non-1229 background checks, FFLs can set the price for the service of guiding a buyer through filling out the Federal Form 4473, and then contacting CBI for a background

---

[7] Total Colorado FFL figure from Defendant's "0113-ffl-list-Colorado.xlsx" spreadsheet, produced during discovery. Numbers of private transactions processed by individual FFLs from CBI document production, nos. CBI 00002-00009.

check. The evidence will show this is usually between $30 to $50. When the FFL is selling from his own inventory, the price is implicitly taken into account in the mark-up of the firearm. When the FFL is **not** selling out of his or her own inventory (for example, processing mail-order sale of a handgun from a private seller in Illinois to a private buyer in Colorado), then the $30-50 fee is charged directly to the Colorado buyer.

Defendant's own exhibits demonstrate that the large majority of Colorado FFLs are **not** performing background checks for private sales, let alone private temporary loans.[8] Of the minority of FFLs which are doing private background checks, the vast majority have processed only a handful – suggesting that they are performing a money-losing favor for long-time customers.

The legislative record contains numerous claims that 40% of gun sales are private sales. If 60% of gun sales are FFL inventory sales, and 40% are private sales, then the number of background checks should increase by about two-thirds (since 40% private is about two-thirds of the 60% of sales which are FFL inventory sales). Accordingly, the number of background checks should have increased by much more than two-thirds, especially when one considers that HB 1229 applies not only to sales, but also to loans exceeding 72 hours. But instead, **checks on private sales have declined**.[9] HB 1229 wholly fails the "means" prong of any form of heightened scrutiny. If the means is empirically counterproductive, extreme, and a major burden on day-to-day usage of firearms in this State, then the means cannot pass any form of heightened scrutiny.

---

[8] The CBI chose not to keep separate data on background checks for private sales vs. private transfers, so the data is necessarily limited in determining the efficacy of HB 1229. Setting this aside, this data is not relevant, for the reasons identified in Section III, above.

[9] From July through December 2012, CBI performed 3,854 checks on private transfers that did not take place at gun shows. For July through December 2013, CBI performed 3,838 such checks. CBI Instacheck Unit (Feb. 28, 2014), CBI document production, no. 00200. To be sure, the decline of 16 checks is a small number, but there should have been a very large increase, if HB 1229's means were not counterproductive to its ends.

### C.    The Means of HB 1229 Are Extreme

Forty-three states do not require government permission before the private sale or temporary transfer of firearms. Of those that do, sweep far less broadly than HB 1229: they apply only to certain types of guns (handguns, and sometimes also to a subset of long guns), or they have broad exemptions (e.g., transferees who have a concealed carry permit; loan periods much longer than Colorado's 72 hours).

Requiring government permission for the private sale of all long guns has not been part of the historic tradition of gun ownership in America. Only five states in addition to Colorado (New York, Connecticut, Delaware, California, and Rhode Island) have enacted such requirements, three of which did so only last year. 2013 NY ALS 1; 2013 Ct. ALS 3; 2013 Del. Laws Ch. 20 (H.B. 35). Accordingly, HB 1229 in its application to long guns is a novelty.

Two other states require permission for private sales only for some types of firearms. MD Code, Public Safety, §§ 5-101(p), (r), (t), 5-124 (only handguns and "assault weapons"); 18 Pa. Cons. Stat. Ann. §§ 6102, 6111(f)(2) (handguns and certain short rifles and shotguns).

In addition, in other states, the burden of the requirement for government permission for private individual sales is substantially mitigated by various exemptions, which are absent or very constricted in HB 1229. For example, in California, loans of up to 30 days are allowed "between persons who are personally known to each other." Cal. Pen. Code § 27880. HB 1229 only allows loans for 72 hours. In California, a long gun may be loaned to a licensed hunter for the entire "duration of the hunting season for which the firearm is to be used." Cal. Pen. Code § 27950. HB 1229 only allows hunting loans to take place while both parties are actually out in the field hunting, not even at a hunting camp. C.R.S. § 18-12-112(6)(e)(III). Californians can loan their guns indefinitely to target ranges or gun clubs as long as the gun is used on the

premises and stored there. Cal. Pen. Code § 27910. Similarly, Delaware allows loans for up to 14

days "by the owner of said firearm to a person known personally to him or her," DEL. CODE ANN

tit. 11 § 1448B(b)(2)a, and Pennsylvania allows loans of an indefinite period in one's dwelling or

place of business, as long as the firearm stays there, and indefinite loans to a person with a

concealed carry permit. 18 Pa. Cons. Stat. Ann. § 6115(b)(1)(i) & (b)(3).

### D.      HB 1229 Violates the Second Amendment Rights of 18- to 20-Year-Olds by Prohibiting Them from Acquiring Handguns

Subsection (2)(b) of HB 1229 requires that when an FFL conducts a background check

on a private transfer, the FFL "shall comply with all state and federal laws, including 18 U.S.C. §

922, as if he or she were transferring the firearm from his or her inventory to the prospective

transferee." The effect of this requirement is to prohibit Coloradans aged 18 to 20 from acquiring

handguns. This prohibition violates the Second Amendment.

### 1.      Subsection (2)(b) prohibits FFLs from conducting background checks for private transfers of handguns to 18- to 20-year-olds

Subsection (2)(b) incorporates by reference the requirements of 18 U.S.C. § 922, and

directs FFLs to abide by those requirements. The express terms of section 922 prohibit FFLs

from selling or delivering a handgun to anyone under the age of 21. Subsection 922(b)(1) states

that it is unlawful for any FFL to "sell or deliver" any firearm, other than a shotgun or rifle, "to

any individual who the licensee knows or has reasonable cause to believe is less than twenty-one

years of age." Subsection 922(c)(1) further provides that if an FFL sells a handgun to a person

who does not appear in person (e.g., by mail order, internet, etc.), the transferee must submit a

sworn statement to the FFL that he or she is 21 or more years of age.

Because subsection (2)(b) of HB 1229 requires FFLs to handle background checks for

private transfers subject to the requirements of subsections 922(b)(1) and 922(c)(1), and further

requires FFLs to conduct such checks "as if he or she were transferring the firearm from his or her inventory," the effect of HB 1229 is to prohibit FFLs from conducting background checks for the transfer of a handgun to any adult between the ages of 18 and 20.

Thus, the interplay of state and federal law prohibits 18- to 20-year-olds from purchasing handguns FFLs at retail, and further prohibits them from acquiring handguns via private sales or loans. HB 1229, therefore, prohibits any 18- to 20-year-old from legally obtaining a handgun from anyone other than as a gift from an immediate family member.

### 2. The prohibition on transfers of handguns to 18- to 20-year-olds burdens conduct falling with the scope of the Second Amendment

The Tenth Circuit's decision in *Reese* illustrates that any prohibition on gun possession by a certain category of citizens passes step one of the *Heller* analysis.[10] *Reese*, 627 F.3d at 801; *Huitron-Guizar*, 678 F.3d at 1169.

### 3. Regardless of the level of scrutiny applicable at the second step, Defendant cannot carry his burden because the legislative record is devoid of any justification for prohibiting 18- to 20-year-olds from acquiring handguns

Even assuming, as the Fifth Circuit has suggested,[11] that a lower level of heightened scrutiny applies to the prohibition on acquisition of handguns by 18- to 20-year-olds, Defendant still cannot carry his burden. This is because "[i]n the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given." *Watchtower Bible*, 536

---

[10] The Fifth Circuit has addressed this question and suggested that the historical evidence indicates that laws prohibiting 18- to 20-year-olds from purchasing handguns does not implicate the Second Amendment. *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012). The court nonetheless acknowledged the "institutional challenges in conducting a definitive review of the relevant historical record," and proceeded to step two of the analysis. *Id.* at 204.

[11] *National Rifle Ass'n*, 700 F.3d at 205. The Fifth Circuit's decision upholding the federal laws prohibiting *retail* sales of handguns to 18- to 20-year-olds has no application in this case, where the effect of section 18-12-112 is to eliminate virtually *all* means of acquisition.

U.S. at 170 (Breyer, J., concurring). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Here, the legislative record is devoid of any justification whatsoever for prohibiting 18- to 20-year-olds from acquiring handguns. The issue is not even mentioned, much less justified. Thus, any reasons supplied by Defendant for the prohibition are necessarily *post hoc* and unworthy of consideration. Defendant cannot carry his burden on step two of the analysis, and the prohibition therefore constitutes a violation of the Second Amendment.

## V.   HB 1224 VIOLATES THE SECOND AMENDMENT

Because of the length of this section, a brief introductory comment is in order. As the Ninth Circuit just noted in *Peruta*, "the meaning of the Second Amendment is a matter not merely of abstract dictionary definitions but also of historical practice." 2014 WL 555862 at *4. The ban at issue in this case relates to a type of arm: handguns and rifles with magazines that hold 16 or more rounds. Under *Heller*, the arms that law-abiding citizens have a Second Amendment right to "keep and bear" are those "in common use at the time." 554 U.S. at 627. In our time, tens of millions of magazines banned by HB 1224 are "[t]ypically possessed by law-abiding citizens for lawful purposes." *Id*. at 625. "At the time" of adoption of the Second Amendment, such magazines were the finest arms. At the time of the Fourteenth Amendment, such magazines were common. The original understanding of the Second and Fourteenth Amendments carries forward to our time, forbidding prohibition of the arms that are chosen by the American people "in defense of hearth and home" today. *See Heller*, 554 U.S. at 635; *Peruta*, 2014 WL 555862 at *7-18; *Ezell*, 651 F.3d at 705 ("As we have noted, the most relevant historical period for questions about the scope of the Second Amendment as applied to the States is the period leading up to and surrounding the ratification of the Fourteenth Amendment.").

Firearms that were in "common use at the time," as explained by the Supreme Court in *Heller*, are the flipside of "dangerous and unusual weapons." 554 U.S. at 627. The former are protected by the Second Amendment. The latter can be heavily regulated.

This section of the Trial Brief will start with the American history and tradition of arms and show that magazines which can accept at least 16 rounds are more than 400 years old, and they are venerable in the history and tradition of how Americans exercise their right to keep and bear arms. For a broad array of arms in common use, magazines holding at least 16 rounds have also been in common use as part of Americans exercising their Second Amendment rights. Turning to the second part of the *Reese* test, Plaintiffs will demonstrate why the ban at issue here should be struck down under any form of scrutiny. HB 1224 substantially burdens the Second Amendment rights of typical law-abiding citizens, and Defendant cannot meet his correspondingly great burden to legitimate it.

**A.      HB 1224 Substantially Burdens Core Second Amendment Rights**

**1.      The History of Magazines Reflects That They Have Been "In Common Use" Since the Adoption of the Second Amendment to Today**

Guns with magazines holding more than 15 rounds are older than the Second Amendment. As early as 1580 to 1590 a single barrel firearm was developed that would fire sixteen shots without reloading.[12]

At the time that the Second Amendment was being ratified, the state-of-the-art for guns with magazines of at least 16 rounds was the Girandoni air rifle, with a 20- or 22-shot magazine

---

[12] This was accomplished through superposed loads (each load stacked on top of previous loads in the same barrel), and was fired through the use of two wheel locks and one matchlock mounted on the gun. LEWIS WINANT, FIREARMS CURIOSA 168-70 (2009)(1st pub. 1954). For a survey of some early multishot guns, Clayton E. Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716-18 (2008) (noting that such guns were first issued to the British army in 1658).

capacity. Merriweather Lewis carried one on the Lewis & Clark expedition. At the time, air guns were ballistically equal to powder guns, firing large bullets at a velocity similar to powder guns. The .46 and .49 caliber Girandoni rifles had been invented around 1779 for use in European armies, and was employed by elite units. One shot could penetrate a one-inch wood plank, or take an elk.[13]

"It is clear that the goal of multi-shot firearms was on the mind of gunsmiths, inventors, and shooters in 1791. Rudimentary repeating firearms existed, as did magazine-fed firearms. Faster, more secure and weather-resistant ignition technology was being pursued at the time of the drafting of the federal Bill of Rights. . . . Guns were in hand and getting better with every generation."[14]

The most popular multi-shot firearms of the Early Republic were "pepperbox" handguns. These handguns had several barrels, each of which could be preloaded with a round. Most pepperboxes held eight or fewer rounds,[15] but some more European pepperbox guns held 16 or more rounds.[16]

Leading up to the adoption of the Fourteenth Amendment, from 1836 to 1873, there were 120 patents issued for magazine-based guns.[17] Some of the inventors of rifles with more than 15

---

[13] JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 91-103 (2012); JOHN PLASTER, THE HISTORY OF SNIPING & SHARPSHOOTING 69-70 (2008); Girandoni Air Rifle, http://en.wikipedia.org/wiki/Girandoni_Air_Rifle; JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[14] Cramer & Olson, 44 WILLAMETTE L. REV. at 721.

[15] See generally LEWIS WINANT, PEPPERBOX FIREARMS (2001 reprint ed.).

[16] SUPICA, TREASURES at 33, 250 (Marietta 18 shot model); JACK DUNLAP, AMERICAN, BRITISH AND CONTINENTAL PEPPERBOX FIREARMS 148-49, 167 (1964) (three European 18 shot models, and one 24 shot model); WINANT, FIREARMS CURIOSA 250 (24 shot pepperbox).

[17] HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST at 6 (1952) (citing V.D. STOCKBRIDGE, DIGEST OF PATENTS RELATING TO BREECH-LOADING SMALL ARMS (EXCEPT REVOLVERS) GRANTED IN THE UNITED STATES FROM 1836 TO 1873 INCLUSIVE 173-76 (1963)).

rounds achieved much more commercial success during the latter part of the 19th century than did their counterparts who were designing handguns of similar capacities.

In 1851, the Turret Rifle was introduced, with a 30-round ammunition magazine (a canister) mounted above the action.[18] A more commercially successful innovation from the 1850s was from a spin-off of Smith & Wesson: the Volcanic Repeating Arms Company's production of lever-action rifles with 20, 25, and 30 round magazines.[19] An 1859 advertisement bragged that the guns could be loaded and fire 30 shots is less than a minute.[20]

In 1862, the Volcanic evolved into the 15-round Henry lever action rifle.[21] The Henry then was improved to become the Winchester Model 1866. The Winchester M1866 lever action rifles came in .38 or .44 caliber, with a standard magazine tube of 17 rounds for the full-length rifle, or 12 for the shorter carbine version.[22] A Winchester advertisement touted the Model 1866 for defense against "sudden attack, either from robbers or Indians."[23] According to advertising, the M1866 "can be fired thirty times a minute."[24] Or with 17 in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds."[25] The gun was a particularly

---

[18] NORM FLAYDERMAN, FLAYDERMAN'S GUIDES TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 716 (9th ed. 2007) (about 1,250 made). According to James S. Hutchins, Historian Emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman is a "revered expert in antique American arms and a vast range of other Americana for half a century." James S. Hutchins, Foreword, in NORM FLAYDERMAN, THE BOWIE KNIFE 7 (2004).

[19] WILLIAMSON, WINCHESTER at 13, 25; FLAYDERMAN at 304. Oliver Winchester had an ownership interest in Volcanic, and acquired the company in 1857. FLAYDERMAN at 300.

[20] WILLIAMSON at 25.

[21] FLAYDERMAN at 304-06.

[22] ARTHUR PIRKLE, 1 WINCHESTER LEVER ACTION REPEATING ARMS: THE MODELS OF 1866, 1873 & 1876, at 44 (1994); LOUIS A. GARAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 124 (1985). The Winchester Model 1866 was produced until 1898. GFLAYDERMAN at 306.

[23] R.L. WILSON, THE WINCHESTER: AN AMERICAN LEGEND 11, 32 (1991).

[24] WILLIAMSON, WINCHSTER, at 49.

[25] GARAGLIA & WORMAN, at 128-29.

big seller in the American West, including in Denver.[26] There were over 170,000 Model 1866s produced.[27]

Next came the Winchester M1873, "The gun that won the West." There were many configurations in its long production run, including with magazines of more than 15 rounds.[28] Modern versions of the Winchester 1873 are produced today by the Italian company Uberti, which specializes in high-quality reproductions of Western firearms.[29]

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873. The innovative rotary helical magazine in the buttstock held 34 rounds.[30] It was commercially successful for a while, although not at Winchester's levels. Over 12,000 copies were produced.[31]

One of iconic rifles of the latter 19th century was the pump action Colt Lightning rifle. Modern reproductions of this rifle (from Uberti and Taurus) are now illegal in Colorado under HB 1224, depending on the particular model.[32]

---

[26] WILSON at 34.

[27] FLAYDERMAN at 306.

[28] *Id.* at 307-09. The Model 1873 was Pa Cartwright's gun on the 1959-1973 television series *Bonanza*. SUPICA, TREASURES at 108. The calibers for which magazine capacity was greater than 15 were two versions of .22. About 19,500 of these particular models were manufactured. FLAYDERMAN at 307.

[29] 2014 STANDARD CATALOGUE OF FIREARMS, at 1237, 1240-41 (Jerry Lee ed. 2013). This annually-published guide was relied on by *Kirkland v. District of Columbia*, 70 F.3d 629, 636 n.3 (D.C. Cir. 1995) (citing the 1995 5th edition).

[30] DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS 294-95 (rev. ed) (Friends of the Maine State Museum, 1997). A later iteration of the rifle held 25 or 28 rounds in the buttstock. *Id.* at 331; FLAYDERMAN at 694. The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns. DEMERITT at vi.

[31] FLAYDERMAN at 694; DEMERITT at 332.

[32] The Uberti is a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1887 and 1904. The original Colt held up to 15 rounds, in calibers of .32-20, .38-40, and .44-40. FLAYDERMAN at 122-23. The Uberti replica uses the modern caliber which is the closest equivalent, namely .357/.38 Special. A gun which is chambered for .357 can also fire .38 Special. A gun which can use .38 Special (1.55 inches long) can also

HB 1224 exempts lever action guns with tubular magazines, but does not exempt pump action, slide action, or bolt action guns with tubular magazines. The distinction is wholly irrational.

During the second half of the 19th century, efforts were also underway to improve multi-shot handguns, although nothing from that period achieved the popularity of rifles with standard magazines of 16 or greater.

Pin-fire revolvers with capacities of more than 15 entered the market in the 1850s; they were produced for the next half century, but were significantly more popular in Europe than in America.[33] For revolvers with other firing mechanisms, there were some models with more than 16 rounds.[34] The 20-round Josselyn belt-fed chain pistol introduced in 1866, and various other chain pistols had even greater capacity.[35] Chain pistols did not win much market share, perhaps because the large dangling chain was such an impediment to carrying the gun.

---

use .38 Long Colt (1.26 inches long). FRANK BARNES, CARTRIDGES OF THE WORLD 275, 499 (9th ed. 2000) ("The 38 Long Colt cartridge can be fired in a 38 Special revolver, but not vice versa…Any 357 Magnum revolver will also shoot the 38 Special."). The Uberti replicas have a magazine capacity of 13 rounds in .357/.38 Special. See Uberti, *1873 Winchester Rifle and Carbine*, models 342720 & 342750, http://www.uberti.com/1873-rifle-and-carbine. Simple math shows that a magazine which can accept 13 rounds of .38 Special (1.55 inches each) will accept 16 rounds of .38 Long Colt (1.26 inches each).

Another, less popular, modern rifle with the same problem is the Taurus Thunderbolt. It is a reproduction of the Colt Lightning large frame, which was much less popular than the medium frame. FLAYDERMAN at 122-23. The Thunderbolt is also available in .357/.38. 2014 STANDARD CATALOGUE OF FIREARMS 1210. The Taurus Thunderbolt in .38 has a capacity of 14 rounds of .38 Special. *Taurus Owner's Manual* 22 (2006), http://www.taurususa.com/pdf/thunderbolt-manual.pdf. Thus, the gun can accept 17 rounds of .38 Long Colt.

[33] WINANT, FIREARMS CURIOSA at 60-61, 63, 67-71 (16, 18, and 20 shot European revolvers are on pages 67-71); SUPICA, TREASURES, at 48-49 (21-shot Belgian).

[34] WINANT, FIREARMS CURIOSA 62, 64-65 (.22 cal.; 18 shots from one cylinder); 207-08 (Enouy "Ferris Wheel" revolver; 42 shots from 7 cylinders). *Cf. id.* at 250 (Beals prototype 24 shot revolver).

[35] WINANT, FIREARMS CURIOSA at 204-08 (Guycot 25 shot chain pistol and 100 shot chain rifle).

The first handgun to use a detachable box magazine was the 10-round Jarre harmonica pistol, patented in 1862.[36] It would take until the 1890s before box magazines for handguns became a significant commercial success.

### a.        Semi-automatic handguns

The semi-automatic firearm and its detachable box magazine were invented before the turn of the century. It was the latest success in the centuries-old effort to improve the reliability and capacity of multi-shot guns.

In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s, with nearly a million sold to civilians worldwide. The most common configuration was in 10-round capacity, but there were a variety of models with capacities as low as six, or as high as 20. The latter was the Cone Hammer pistol, with 20-round box magazine.[37]

The Luger semi-automatic pistol was brought to the market in 1899 (although it is commonly known as the 1900). Through many variants, it was very popular for both civilians

---

[36] WINANT, FIREARMS CURIOUSA at 244-45; SUPICA, TREASURES at 33. The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never caught on.

[37] 2014 STANDARD CATALOGUE OF FIREARMS at 708-09; JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 23, 30-31, 38-39, 54-55, 272 (1967). At least during 1896-1905, Mauser's direct sales to the U.S. were small. *Id.* at 266-67. Spain's Astra brought out its own versions of the Mauser, with several models having 20 round magazines starting in 1928. But these do not appear to have had much distribution in the U.S. BREATHED at 208, 211-12; Astra Model 900, Wikipedia, http://en.wikipedia.org/wiki/Astra_Model_900.

and the military markets, and remained in production for nearly a century.[38] The most common magazines were 7 or 8 rounds, but there was also a 32 round drum magazine available.[39]

The Spanish Gabilondo 20-round "Plus Ultra" was introduced in 1925.[40] Spain's Arostegui, Eulogio brought out the Azul—a semi-automatic with standard magazines of 10, 20 and 30—in 1935.[41] The Spanish developments illustrate the progress of firearms design, but few were sold in the United States.

Handguns with 16 or more rounds had been around for a long time, but 1964 was the year that one become a notable success in the American market. The Plainfield Machine Company's "Enforcer" was a pistol version of the M1 carbine (discussed below), with a 30-round magazine.[42]

A tremendous commercial success was the Beretta model 92, a 9mm pistol with a 16-round magazine, which entered the market in 1976.[43] In various configurations (currently the Beretta 92F), the Beretta is one of the most popular of all modern handguns.[44] In the early years in the American market, Beretta faced, and beat, high-quality European competitors with similar guns: Austria's L.E.S. P-18 (18 rounds), and Germany's Heckler & Koch VP 70Z (also 18).[45]

---

[38] Among the many models was the 1906 American Eagle. 2014 STANDARD CATALOGUE at 464-66. George Luger's invention was licensed to many companies, including Mauser (Germany) and Vickers (England). The gun was never manufactured under Luger's own name. *Id.* at 464.

[39] JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126-27 (1993); SUPICA, TREASURES at 86.

[40] 2014 STANDARD CATALOGUE at 464-66 (manufactured 1925-33).

[41] 2014 STANDARD CATALOGUE at 72-73 (manufactured 1935-40); BREATHED, at 216-17.

[42] GUN DIGEST 1965, 19TH ANNIVERSARY DELUXE EDITION 229 (John T. Amber ed. 1964).

[43] 2014 STANDARD CATALOGUE at 121.

[44] 2014 STANDARD CATALOGUE at 121-26. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm.

[45] GUN DIGEST 34TH ANNIVERSARY 1980 DELUXE EDITION, at 297-98 (Ken Warner ed., 1979). L.E.S. was the American partner of Austria's Steyr. The following courts have relied on one of the annual issues of *Gun Digest*: *A. Uberti and C. v. Leonardo*, 892 P.2d 1354, 1364 (Ariz. 1995) (when certain guns were available for sale to Arizona residents); *Citizens for a Safer Community*

Today, the variety of handguns with standard magazines of at least 16 rounds is enormous, from companies such as Beretta, Glock, Ruger, Smith & Wesson, and many others.[46]

### b.   Tubular magazine rifles

Since the late 1890s, the Savage Repeating Arms Company has been one of the classic American firearms manufacturers. In 1911, the company introduced their bolt action Model 1911, a 20-shot repeater with a tubular magazine in .22 Short. The rifle was popular for boys, and for shooting galleries.[47]

By the 1930s, the classic American manufacturers were producing a slew of tubular magazine rifles in .22 caliber. The following rifles could all use any of the three most popular .22 caliber cartridges: .22 short, .22 long, and .22 long rifle. These firearms are classic rifles for "plinking" (casual target shooting), especially for young people. Based on firearms catalogues

---

*v. City of Rochester*, 627 N.Y.S.2d 193, 203 n.5 (N.Y.Sup., 1994); *Sturm, Ruger & Co. Inc. v. Arcadia Mach. & Tool Inc.*, 1988 WL 391514 *2 (C.D. Cal. 1988) (influence of a particular model on Ruger's recognition by consumers); *Couplin v. State*, 378 A.2d 197 205 n.2 (Md. App. 1977) (examples of a particular type of gun).

[46] The 2014 *Gun Digest* lists the following models current available: Armscor/ Rock Island Armory, 1911A2 - .22 TCM (17 round capacity) , MAP1 & MAPP1 (16 round capacity); Auto-Ordnance TA5 (30 round); Baer H.C. 40 (18); Beretta, PX4 Storm (17), Bersa Thunder 9 Ultra Compact/40 Series (optional 17); Bushmaster Carbon 15 .223 (30); CZ 75 B (16), P-07 (16), P-09 Duty (19), 75 Tactical Sport (16 or 20), SP-01 (19), SP-01 Phantom (19), 75 TS Czechmate (20), 75 Tactical Sports (17-20), 85 Combat (16); Dan Wesson, Havoc (21), Mayhem (18), Titan (21); EAA, Witness Full Size (18), Witness Elite Gold Team (18); FN, FNS Series (17), FNX Series (17); Glock, 17/17C (17/19/33), 19/19C (15/17/19/33), 22/22C (15 or 17), 23/23C (13/15/17), 26 (10/12/15/17/19/33), 27 (9/11/13/15/17), 31/31C (15 or 17), 32/32C (13/15/17 round capacities), 33 (9/11/13/15/17), 34 (17/19/33), 35 (15 or 17); KEL-TEC, PLR-22 (26), PMR-30 (30); Ruger, SR9 (17), SR9C Compact (10 or 17); Sig Sauer, 250 Compact (16); Smith & Wesson, M&P (12/15/17), Pro Series Model M&P9 (17), Model SD9 (10/14/16), Enhanced Sigma Series DAO (10 or 16); Taurus, Model 800 Series (17), Model 92 (10 or 17), Model 90 (10/12/17); Walther, PPX (14 or 16). Gun Digest 2014, 68th Edition 383-84, 387-88, 390-91, 393, 395-97, 403, 412, 414, 418-19, 422-23, 426, 428-29 (Jerry Lee ed. 2013).

[47] Jim Perkins, American Boys' Rifles 1890-1945, at 191-92 (1976). Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended magazine that held twenty-five .22 shorts. Roy Marcot, Remington, America's Oldest Gun Maker 149 (1998) (official company history).

from 1936-1971, there are over 20 such firearms models from major American manufacturers with magazines of 16-30 rounds in one of more of the calibers.[48]

### c.        Semiautomatic rifles to 1979

The Remington Model Eight (introduced in 1906) offered an optional 20-round magazine, but that magazine did not become common.[49] The first centerfire semi-automatics with magazines above 15 rounds to enjoy some commercial success were the Auto-Ordnance 1927 rifles, which are still in production, and used 30-round or larger magazines.[50]

---

[48] *Shooter's Bible 1936*: Remington Model 34 bolt action, Remington Model 121 slide action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens Model 76 semi auto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, Winchester Model 61 slide action. STOEGER SHOOTER'S BIBLE TREASURY REPRODUCTION OF 1936 CATALOG 108-09, 112, 123, 124, 126, 127, 140 (1960).

Some additional models appearing in a 1948 hunting magazine: A 1949 catalog from the gunsmithing supplier Brownell's lists some additional models: Stevens Model 87 bolt action, Remington 550 semi-auto, Mossberg Model 46B bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semi-automatic, Marlin 39 A lever action, Marlin Model 81 DL bolt action. BROWNELL INDUSTRIES INC. THE GUNSMITH MART NO. 2 1949-1950, at 212, 214, 216, 218, 221 (reprinting article from *Hunting & Fishing*, Oct. 1948).

The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list. THE "SHOOTER'S BIBLE" NO. 50, 1959, at 103 (1959). *See id.* at 80, 87, 91, 101 for some of the models previously mentioned.

Histories of Savage and Stevens firearms includes the following not listed above: Stevens No. 66 bolt action, Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G slide action. JAY KIMMEL, SAVAGE AND STEVENS ARMS 49, 53, 79, 102, 165, 167-68, 177 (5th ed. 1990); BILL WEST, SAVAGE AND STEVENS ARMS 11-12, 13-8, 14-44, 15-10, 16-10 (1971) (page numbering recommences in each chapter). Savage purchased Stevens in 1920.

For use of *The Shooter's Bible* by the courts, *see United States v. Olson*, 1995 WL 746177 at * 1 (9th Cir. Dec. 15, 1995) (book was properly used as a source for ATF agent's expert opinion); *United States v. Precise Import Corp.*, 458 F.2d 1376, 1377 (Cust. & Pat. App., 1972) (record reflects district court's admission of pages from the 1967 edition as an exhibit); *United States v. Fisher*, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (noting that experts had relied on the book); *Potter v. United States* 167 Ct. Cl. 28, 80 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms).

[49] Sixty thousand were produced from 1906-36. STANDARD CATALOGUE 2014 at 869-70.

[50] 2014 STANDARD CATALOGUE at 84.

The M-1 carbine was invented for the citizen solider of World War II. The M-1 carbine has been a popular rifle in America for over half a century. The United States government's Civilian Marksmanship Program put nearly a quarter-million of these guns into the hands of law-abiding American citizens, starting in 1963, at steeply discounted prices. The Plainfield Machine Company and Iver Johnson cumulatively manufactured over two hundred thousand for the civilian market, and about a dozen other companies also made M1 carbines for civilians, starting in the late 1950s. The standard magazines are 15 and 30 rounds.[51]

Today, the most popular rifle in the United States is the AR-15 platform, a semi-automatic rifle with standard magazines of 20 or 30 rounds. See Stipulation 12 ("Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. In 2011, AR-15 platform rifles accounted for approximately 18% of all rifles made in the United States for the domestic market. Many of these are used by law enforcement officers in the line of duty and many are used by private citizens . . . .").

The AR-15 was brought to the market in 1963, with a then-standard magazine of 20; the 30-round standard magazine was developed a few years later.[52] By 1969 there was also the

---

[51] BRUCE N. CANFIELD, COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163, 165, 167, 206-08, 279 (2d ed. 2010); M1 Carbines Incorporated website, http://www.m1carbinesinc.com/ (on company-specific pages, the largest producers were Plainfield's 112,000 from 1962-78; and Iver Johnson's 96,700 from 1978-92). The U.S. government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. Thereafter, the program (then known as "DCM"—Director of Civilian Marksmanship), sold M1s to Americans from the supply of WWII M1 carbines that had been exported to allied nations, and subsequently returned to the U.S. when the allied nation switched to a newer type of rifle. As of 2014, the CMP's supply of carbines for sale has been exhausted. See Civilian Marksmanship Program, Carbine Sales, http://www.thecmp.org/Sales/carbine.htm.

[52] PATRICK SWEENEY, GUN DIGEST BOOK OF THE AR-15 104 (2005). About this time, the Cetme-Sport semi-auto rifle with optional 20-round detachable box mag magazine came on the market. GUN DIGEST 22ND ANNIVERSARY 1968 DELUXE EDITION, at 335 (John T. Amber ed. 1967); H.B. Young, *The CETME—Military to Sporter*, GUNS (Nov. 1967): 26-27, 57-58

Armalite-180 (20-round optional magazine), the J&R 68 carbine (30 rounds), the Eagle Apache carbine (30 rounds).[53]

Springfield Armory brought out the M1A semi-automatic rifle in 1974, with a 20-round detachable box magazine.[54] The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard 5-, 10-, or 20-round detachable magazines.[55] Both the M1A and the Mini-14 are very popular to this day.[56]

By 1979, all of the above guns faced competition in the American market from high quality European imports such as the Belgian FN-FAL Competition rifle (optional 20-round magazine), the German Heckler & Koch HK-91 & HK 93 rifles (20 rounds), the Swiss SIG AMT rifle (20 rounds), and the Finnish Valmet M-71S rifle (30 rounds).[57]

As with handguns, the variety of modern rifles which come with standard manufacturer magazines of at least 16 rounds is tremendous. Manufacturers are venerable companies such as Colt, Marlin, Ruger, and Smith & Wesson., as well as many new ones.[58]

---

[53] GUN DIGEST 24TH ANNIVERSARY 1970 DELUXE EDITION 294 (John T. Amber ed. 1969).

[54] 2014 STANDARD CATALOG at 1102; "M1A," Wikipedia, http://en.wikipedia.org/wiki/M1A_rifle (year of introduction).

[55] 2104 STANDARD CATALOGUE at 1173.

[56] Another gun introduced in 1975 also used magazines larger than 15. The Bingham company (from Norcross, Georgia) brought out the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of 50 or 29 rounds. 2104 STANDARD CATALOG at 164. The PPS-50 is currently manufactured by Mitchell's Mausers. http://www.mauser.org/pps-50-22/. That the gun is still in production four decades later is impressive, but the PPS-50 never entered the pantheon of American rifles, as did the M1A and the Mini-14.

[57] GUN DIGEST 1980, at 319-21 (1979). Also on the market were the Commando Arms carbine (5, 15, 30 or 90 rounds), and the Wilkinson Terry carbine (31 rounds). *Id.* at 319, 322.

[58] From *Gun Digest 2014*: Bushmaster, ACR (30 round standard magazine), 6.8 SPC (26), 11.5" barrel carbine (30), Modular Carbine (30), Carbon 15 Flat-Top (30), Gas Piston (30), Target (30), M4A3 (30), Pit Viper 3-Gun Competition (20), A2/A3 Target (30); Century International, AES-10 (30), GP WASR (30), WASR-2 (30), M70AB2 (30); Colt, Carbine (9/10/20/30); DMPS, Prairie (30), Panther REPR 19); Excel X-5.7R (10 or 20); Les Baer LR 300S (30); Marlin, 39A Golden Lever-Action (19/21/26 depending on caliber); Olympic Arms, K3B series (30), Plinker

Today tens of millions on magazines which hold 16 or more rounds are in the hands of typical law-abiding American citizens. See Stipulation 10 ("the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions"). Americans today continue the practice of owning such magazines, a practice which has always been part of the American tradition of gun ownership.

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791. The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[59] But even if *Heller* had created such a rule, magazines of more than 15 rounds are older than the Second Amendment. By the era of the Fourteenth Amendment, the exercise of Second Amendment rights by owning magazines of more than 15 rounds was widespread.

The quality, reliability, and durability of guns and magazines have improved significantly since 1791 or 1868. Yet today's firearms do essentially the same thing that their Winchester, Girandoni, and other ancestors did: allow the user to fire 16-30 times without having to reload. Firearms with the capacity to fire more than 16 rounds without reloading have been "in common

___

Plus (30), SM Servicematch (30), UM Ultramatch (30), Multimatch (30), Targetmatch 7 or 30); Ruger SR-556 (10 or 30); Remington, Model 552 (15/17/20 depending on caliber); Ruger Mini-14 Ranch (5 or 20); Ruger Mini-Thirty (optional 30); SIG, 556 (30); SIG-SAUER SIG516 (30); Smith & Wesson, M&P 15 (30), M&P VTAC (30), M&P15-22 (10 or 25); Stag Arms, Model 1 (30); Taurus, G2 carbine (34, in 9mm); Umarex, Colt Tactical M4 OPS (10 or 30), M4 (10 or 30), M16 (10 or 30), M16 SPR (10 or 30), 416-22 (10 or 20), Mp5 A5 (10 or 25); Wilson Combat, Tactical (20). GUN DIGEST 2014, at 456-62, 490-95, 497. There are many more rifles in *Gun Digest 2014* whose picture clearly indicates a magazine of more than 15. But we have listed only models for which the text expressly states the magazine size. The first pages listed are for centerfire rifles, and the second set is for rimfire.

[59] *Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

use at the time," whether that time is measured at the adoption of the Second Amendment, or the adoption of the Fourteenth Amendment, or today.

### 2.   Magazine Prohibitions Are Not Presumptively Constitutional

The Supreme Court in *Heller* identified certain firearm regulations that are presumptively constitutional under the Second Amendment, for example, regulation of the commercial sale of firearms, proscription of bearing arms in "sensitive places," and keeping arms from dangerous persons such as convicted felons or the insane. 554 U.S. at 626-27. Magazine restrictions enjoy no such presumption. To the contrary, all federal circuit courts which have reviewed magazine bans agree that a challenge to a ban passes their circuit's equivalent of this Circuit's *Reese* step one: all of these courts recognize that magazine bans encumber Second Amendment rights. *See, e.g., Heller II* 670 F.3d at 1260 (we "are not aware of evidence that prohibitions in either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity").

Magazine bans exist in only a few States, and before New Jersey's 1990 statute, no state restricted magazines.[60] The only national restrictions on magazine size were from 1994-2004. 18

---

[60] N.J. Stat. Ann. § 2C:39-1 (only applies to semi-automatics). All other state laws which clearly violate the Second Amendment are even more recent. Haw. Laws 1992, ch. 286 (only applies to handguns); Md. Criminal Law Code § 4-305 (enacted 1994; bans only sale and manufacture; no ban on possession or loans); Cal. Sen. Bill 23 (enacted 1999, effective 2000); 2000 Sess. Laws of N.Y. Ch. 189 (S. 8234, A. 11535).

An Ohio statute defines "dangerous ordnance" in such a way as to encompass a semiautomatic firearm into which a magazine holding 32 or more rounds has been inserted. Ohio Rev. Code Ann. §§ 2923.11, 2923.17. The statute is apparently interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *See, e.g.,* Bud's Gun Shop, Ohio Restrictions, http://www.Budsgunshop.com/catalog/feeds/state_reg/ohio_restrictions.pdf.; *see also* Gander Mountain Website, http://www.gandermountain.com/ (allowing on-line customers to arrange for pick-up of a "SureFire 60-Round High-Capacity Magazine MAG5-60 Item #447625" at any of 9 Ohio stores). Plaintiffs have carefully limited their Complaint on Second Amendment issues to cover

U.S.C. § 921(a)(31)(A), 922(w)(2) (pre-ban magazines were freely transferable) (expired). Notably, when Congress passed the ban in 1994, Congress included a 10-year sunset, and required the Department of Justice (DOJ) to conduct a study of the effects of the ban. Attorney General Reno's DOJ chose the researchers, who provided interim reports, and then a final report in 2004. The DOJ report, which will be discussed in detail below, found there was no evidence that the restrictions had saved lives, reduced the number of shots fired in shoot-outs, or led to any other actual benefit. Christopher S. Koper, America's Experience with the Federal Assault

only magazines which indisputably pass *Heller*'s "common use" test, and they do not argue that the Ohio law is unconstitutional.

During Prohibition, Rhode Island and Michigan enacted statutes similar to the Ohio statute, although with lower numbers. Mich. Acts 1931, ch. 37 ("more than sixteen times without reloading"); R.I. Acts 1927, ch. 1052 (more than 12 shots semi-automatically). These statutes have long since been repealed. Notably, like the Ohio statute, they apparently did not actually ban any magazines. These isolated acts do not establish an American history and tradition of magazine bans. They are better evidence of legislatures acting in during a period notable for unsuccessful repression, and later restoring civil liberty. When the D.C. Circuit looked through American history for the record of basic handgun registration, it found a half-dozen states with laws from 1881-1927. *Heller v. District of Columbia*, 670 F.3d 1244 (*Heller II*) (D.C. Cir. 2011). Notably, those laws were still in effect a century later.

The one enduring magazine restriction in American history is in the District of Columbia, which is not exactly a role model of respect for the Second Amendment. The D.C. ordinance also dates to Prohibition, having been enacted by Congress in 1932. (Notably, Congress did not choose to use the National Firearms Act of 1934 to extend the restriction nationally.)

When D.C. achieved home rule in 1975, it did not choose to repeal the law, but instead promptly enacted the unconstitutional bans on handguns and on self-defense with any gun in the home which were later ruled unconstitutional by the Supreme Court in *Heller*.

D.C. also did interpreted the law so that it outlawed all magazines and all semi-automatic handguns. (In contrast to the state approach, discussed above.) *See* Vivian Chu, Cong. Res. Svc., *DC Gun Laws and Proposed Amendments* (2011) ("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot ... semiautomatically, more than 12 shots without manual reloading.' [citing DC Code § 7-2501.01(10)(B) (2008)]. By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun, and prohibited from being registered. It appears under the District's old definition, registration of a pistol was largely limited to revolvers.")

The definition of "machine gun" was later amended to conform to the federal definition. The current D.C. Code provision on magazines outlaws all magazines which can accept more than 10 rounds of ammunition (except for .22 tubular magazines). D.C. Code, § 7-2506.01(b).

Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003, Report for the National Institute of Justice, June 2004. This was undoubtedly one reason why Congress chose to let the ban sunset.

Thus, in the 223 years since the Second Amendment was ratified, free availability of magazines of every size has been the norm of national law for 213 of those years.

### 3.   HB 1224 Wholly Outlaws a Number of Popular Firearms

Another reason that the challenge to HB 1224 passes *Reese* step one is because the magazine ban also bans several firearms that use tubular magazines. These include modern replicas of the 19th-century Colt Lightning (discussed above) as well as modern Springfield Amory and Kel-Tec handguns. Defendant's Responses to Plaintiff 55 Sheriffs and David Strumillo Discovery Requests to Defendant, at 9-10.

### 4.   The Ban at Issue Regulates an Essential Part of the Firearm

Magazines are an integral part of firearms. They are not just "accessories" as suggested by Defendant. Regulating magazines is regulating the firearms themselves. HB 1224 defines "magazine" to include a "fixed or detachable magazine, box, drum, feed strip, or similar device." C.R.S. § 18-12-301(2)(A)(I). This covers an integral component of every gun ever made, with the exception of single-shot guns. Magazines (including fixed or detachable; box, tubular, cylinder, or other) are part of Second Amendment "arms" for the same reason that ink fountains are part of a First Amendment "press." Banning magazines is thus no different than banning a broad class of firearms.

### B.   Defendant Cannot Justify the Burden on Second Amendment Rights

### 1.   The ban at issue here is not dissimilar to the handgun ban at issue in *Heller* and fails under any form of scrutiny

The Supreme Court in *Heller* did not engage in a balancing test.[61] In *Heller*, the only fact that was necessary for plaintiff to win was mass possession of the firearms at issue (handguns) commonly used for self-defense in the home. What mattered in *Heller* was that handguns are "chosen by American society." 554 U.S. at 628. When tens of millions of arms are kept for lawful purposes by law-abiding citizens, such arms reside at the core of the Second Amendment and their prohibition fails any form of scrutiny.

In *Heller*, the Court seemingly took judicial notice of the social fact of the commonness of handguns, without needing to cite social science data. In the instant case, judicial notice is not required. The parties have stipulated to the requisite facts:

> 10.     . . . Although the total number is not known, the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions.

> 12.     Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. In 2011, AR-15 platform rifles accounted for approximately 18% of all rifles made in the United States for the domestic market. Many of these are used by law enforcement officers in the line of duty and many are used by private citizens. . . .

> 15.     In states without laws regulating magazine capacity, AR-15 platform rifles are usually sold at retail with a detachable box magazine capable of holding up to 30 rounds. In states without laws regulating magazine capacity, the majority of owners of AR-15 platform rifles use magazines with a capacity of 20 and/or 30 rounds.

> 19.     Semi-automatic firearms equipped with detachable box magazines with a capacity greater than 15 rounds are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home.

---

[61] *See* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. REV. 375, 380 (2009) (''Rather than adopting one of the First Amendment's many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage.''); *id.* at 405 (*Heller* ''neither requires nor permits any balancing beyond that accomplished by the Framers themselves.'').

20.    Semi-automatic pistols and rifles cannot function as designed without a magazine. Semi-automatic firearms are designed to discharge a bullet for each pull of the trigger, automatically extract and eject the spent cartridge case from the firing chamber, re-cock the firing mechanism, and load a new cartridge into the firing chamber so it can be fired again with another pull of the trigger.

22.    Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15, for example the Glock 17, which is one of the most popular handguns sold in the United States. . . .

Under *Heller*, HB 1224 should fail any form of scrutiny. HB 1224 imposes a similar absolute prohibition of firearms and magazines which are commonly possessed by the tens of millions. They are approximately as numerous as handguns, and they are a vastly smaller part of the violent crime problem than are handguns. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family . . . would fail constitutional muster." 554 U.S. at 628-29 (quotations and citations omitted). Even if strict scrutiny were to be applied, nothing uncovered in discovery or suggested in the Final Pretrial Order even hints that Defendant can establish a compelling state interest to justify the ban.

Defendant wishes this Court to consider his speculative predictions about the benefits of HB 1224. Indulging in sociological speculation is beyond the judicial function. As the Seventh Circuit observed: "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. *Moore*, 702 F.3d at 939.

The *Heller* Court was certainly aware of the frequent and lethal use of handguns in violent crime. Amicus briefs in favor of the District of Columbia ban marshaled a large array of social science data which described the very widespread misuse of handguns. *See*, *e.g.*, Brief of the American Academy of Pediatrics et al. as Amici Curiae in Support of Petitioners, 2008 WL 157189 (Jan. 11, 2008); Brief for American Public Health Association et al. as Amici Curiae in

Support of Petitioners 2008 WL 157191 (Jan. 11, 2008). Given that handguns are "typical" and "common" for home defense, the Supreme Court determined that prohibition was impermissible.

The Seventh Circuit held a state statute which banned the defensive carrying of handguns in public was categorically unconstitutional. *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("[O]ur analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states."). The Ninth Circuit made a similar holding assessing a local government's interpretation of the "good cause" requirement in the state handgun carry licensing statute, when a local official's interpretation made it impossible for typical law-abiding citizens to obtain a carry permit. *Peruta*, 2014 WL 555862; *Ezell*, 651 F.3d 684 (Supreme Court rejected the notion that prohibition on common arms could satisfy any form of scrutiny).[62]

The *Heller* Court repeatedly emphasized how often law-abiding American citizens choose to *possess* handguns for self-defense. 554 U.S. at 629. The Court did not address whether citizens actually shoot handguns for self-defense. When a citizen keeps a firearm that is ready for self-defense, or lawfully bears the firearm at home or in public, the citizen is using the firearm. Law enforcement officers very rarely *shoot* their duty arms, except during target practice, but they *use* their guns every day. They use their firearms by possessing them in a manner so that they can be fired in the unlikely event of an emergency is a use of the firearm. Indeed, by using

---

[62] As Judge Kavanaugh noted:

> The Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered. Cf. Tr. of Oral Arg. at 44, Heller, 554 U.S. 570 (No. 07-290) (Chief Justice Roberts: ''Well, these various phrases under the different standards that are proposed, 'compelling interest,' 'significant interest,' 'narrowly tailored,' none of them appear in the Constitution. . . . I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up.'').

*Heller II*, 670 F.3d at 1273 n.5 (Kavanaugh, J., dissenting).

firearms as an available deterrent, law enforcements officers reduce the need to fire their guns. The same is true for ordinary citizens. People use the firearms which they possess in many ways for self-defense, and most of these uses do not involve pulling a trigger against a violent attacker.

Nowhere in the Court's opinion does the Court even consider whether handguns are empirically superior for self-defense. Similarly, the Court does not inquire as to the social science about the benefits and harms of handgun prohibition. What mattered to the *Heller* majority was the choice of the American people about what guns to own. The Supreme Court in *Heller* did not second-guess the American people about the people's choices. Handguns were the most popular choice of arm for self-defense in the home. Accordingly, and by definition, handgun prohibition was unconstitutional.

Here, magazines of 16-30 rounds are owned by the tens of millions, by law-abiding American citizens for lawful purposes. That should be the end of the case if *Heller* is followed.

> **2.     Even if this Court adopts *Ezell's* "close fit" test or even intermediate scrutiny, appropriately applied, Defendant cannot meet his burden**

Under heightened scrutiny, "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." Nor can a government rely upon "overbroad generalizations." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

As a general matter, protecting the public from violent crime is a compelling state interest. *See e.g., United States v. Salerno*, 481 U.S. 739, 745 (1987) (federal government has "compelling interests in public safety"); *Schall v. Martin*, 467 U.S. 253, 264 (1984). Defendant is eager to present his arguments about the general use of magazines in self-defense and violent crime. Such justifications, however, are not part of the legislative history and should not be considered by this Court.

The legislative history has three bases: First, frequent reference to the mass murders in Newtown, Aurora, and Tucson. Proponents asserted that the perpetrators there were impeded because their magazines ran out of ammunition and had to be changed. None of these examples are true, as the evidence at trial will show.

Second, proponents asserted that magazines over 15 rounds are not needed for hunting. This is true for some types of hunting (e.g., waterfowl) but not for others.[63] If this were a genuine reason rather than a pretext, it could have been accomplished simply by changing the hunting regulations, or by a statutory enactment limited to hunting.

Third, HB 1224 is in fact, an expression of animus and prejudice against firearms and their owners, as many statements by proponents indicate. The lead sponsors in each house, and other supporters, announced that the only reason that someone would want a magazine of more than 15 rounds (or of 10 rounds, when the bill was introduced) was to kill a lot of people quickly.[64] This was the opposite of a legitimate rationale for legislative action. [65] The

---

[63] The State hunting regulations are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds. Colo. Hunting Regulations W-2 #203 (big game: semiautomatic rifle may have no more than six rounds in magazine and chamber combined; shotguns, may fire only a single slug; handguns or other rifle action types, no limit); W-3 #303 (furbearers and small game, except for migratory birds: for shotguns, three rounds; no limit on rifle or handguns); W-5 #502 (migratory birds: three rounds for shotguns; other firearms not permitted).

[64] *See, e.g.*, LH Feb. 12, 2013 at 5:22-24, 6:5-8, 21:10-12, 36:7-10, 36:16-21, 37:3-4; Feb. 15, 2013 at 32:19-23, 62:14-18, 64:1-25; Mar. 4, 2013 at 7:13-16, 51:14-21, 57:14-19, 59:2-5, 59:19 – 60:5. The preceding list covers the committee hearings in the House and Senate, plus Second Reading in the House. If we added Third Reading, in the House, Second and Third Readings in the Senate, plus the Conference Committee and House and Senate floor debates related to the Conference, the list would be significantly longer.

[65] Even if the law is written in a manner which is facially neutral, courts should inquire into legislative motive based on prejudice or animus. For example, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), a city council enacted an ordinance which banned some particular killings of animals. Although the ordinance was facially neutral, the

stipulations acknowledge that the banned magazines "are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home." Stipulations para. 19.

Another argument for HB 1224 was a feeling that passage of bill would be an emotionally positive response to the Aurora and Newtown murders. Emotions are not a legitimate basis for infringing First Amendment or other constitutional rights.[66]

While not appropriate in this case, even if the Court were to employ intermediate scrutiny, Defendant would still fail to meet his burden if the standard is appropriately applied. "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective *is advanced* by means substantially related to that objective." *Reese*, 627 F.3d at 802 (emphasis added). The standard is not "might be advanced." Under intermediate scrutiny, a government defendant must demonstrate "a substantial government interest that *would be achieved* less effectively absent the regulation, and the means chosen are not substantially broader than *necessary* to achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989) (emphasis added). Under the "means" prong for even the weakest form of intermediate scrutiny (commercial speech), the government's burden is not satisfied by "mere speculation or conjecture. The government must demonstrate that the harms it recites are real and that *its restriction will in fact alleviate them to a material degree*." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (emphasis added).

---

Supreme Court struck it down as a violation of the Free Exercise Clause, because the legislative history plainly showed that the purpose of the ordinance was to suppress the practice of the Santeria religion. *Id.* at 534-35.

[66] *See*, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

Under this lowest (and, in this case, inappropriate) standard, Defendant fails. First, Defendant himself has publicly admitted that HB 1224 is "very difficult or impossible to enforce."[67]

Second, Defendant's expert witness Jeffery Zax will speculate about what a state-only magazine ban **might accomplish**. These speculations are outweighed by the evidence of what a national ban **did accomplish**, which was nothing. As noted above, Congress in 1994 enacted a 10-year restriction on new magazines, and required that Attorney General chose researchers to conduct a study and issue a report. The final report, with researchers selected by General Reno's DOJ, found no evidence of any benefits to public safety. Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report for the National Institute of Justice, June 2004. The statistical evidence did not show any meaningful effect on murders perpetrated with firearms. There was no evidence of a reduction in the number of shots-per-incident fired by criminals. There was no evidence of a reduction in multiple-victim gun homicides. There was no evidence that whether or not a criminal had a magazine of 10 or fewer rounds (the 1994 limit), the fatality or injury rates for victims were affected.

Third, while Jeffrey Zax and other experts will attempt to opine on how, statistically, no one, including Plaintiffs and the persons represented by Plaintiff organizations, actually **needs** a

---

[67] In response to a question about the "continuous possession" clause, Governor Hickenlooper answered, "Right...I...I think that would be very hard to enforce. I'm not going to argue that. It would be close to impossible to enforce....and this was certainly not my favorite bill...uh...in any session...uh...you know, there is...uh...an issue...uh...for a lot of people, especially in urban and suburban areas about...uh...these large capacity magazines and even though it may be very difficult or impossible to enforce, setting a law does put some constraints on things." The Mike Rosen Show, Apr. 4, 2013, 10 a.m. segment, available at http://www.850koa.com/media/podcast-mike-rosen-podcast-shows_rosen/rosen-replay-04042013-10am11am-23058975/. The quoted discussion begins at 21:57.

firearm with a capacity of 16 rounds or more, the same statistical evidence can be used to eviscerate the bases for the prohibition in the first place. As noted above, the incidences of handguns used in violent crimes completely dwarfs any examples of violent crimes being committed by so-called "large capacity magazines." Yet, handguns are categorically legal to possess under *Heller*.

From 1999 through 2010, there were 1,765 deaths from firearms in the District of Columbia.[68] Violent crime and homicides with handguns are frequent. Multiple homicides are certainly a serious problem, but they are extremely rare compared to handgun homicides. Compare the 1,765 gun deaths in a single city in 12 years, versus the 547 deaths from multi-person shootings in the entire United States from 1983 to 2012. Congressional Research Service, Jerome P. Bjelopera et al., *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy* (7-5700, R43004, Mar. 18, 2013), http://www.fas.org/sgp/crs/misc/R43004.pdf.

Homicides in which three or more people are killed are fewer than 1% of homicide deaths. *See* Pew Research Center, *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, at 4 (May 2013) http://www.pewsocialtrends.org/2013/05/07/gun-homicide-rate-down-49-since-1993-peak-public-unaware/. (This report and its appendices provide two decades of detailed data on guns and crime, based on federal government statistics.) *See also* J. Reid Meloy, et al., *A Comparative Analysis of North American Adolescent and Adult Mass Murders*, 22 BEHAVIORAL SCI. & THE L. 291, 307 (2004) ("very low-frequency and high intensity events").

---

[68] The data can be obtained from the CDC Wonder site. "About Underlying Cause of Death, 1999-2010." http://wonder.cdc.gov/ucd-icd10.html. In the data request form, for choice "6." Select cause of death," choose "Injury Intent and Mechanism." Then on the submenus that will appear, for "Injury Intent," select "All Causes of Death." For "Injury Mechanism," select "Firearm."

Under *Heller*, social science cannot trump the rule against the prohibition of the common arms chosen by typical law-abiding citizens. Social science, however, demonstrates one unassailable fact that is devastating to Defendant in meeting his burden, even if the Court were to consider social science here: handguns cause exponentially more illegal deaths than firearms using magazines with 16 rounds or more. Defendant's evidence attempting to link mass shootings to magazine size has major shortcomings.[69] However, even if such evidence were true, prohibiting an entire class of firearms based upon a few dozen incidents over ***decades*** is patently unconstitutional when, under *Heller*, handguns are used in homicides involving ***thousands*** of deaths ***each year***.

In sum, Defendant cannot meet his burden to justify the encumbrances on Second Amendment rights caused by HB 1224.

### 3.    This Court should not follow *Heller II*

All opinions in federal courts upholding magazine bans rely on the D.C. Circuit's opinion in *Heller v. District of Columbia*, 670 F.3d 1244 (*Heller II*) (D.C. Cir. 2011). As dissenting Judge Kavanaugh pointed out, the majority seemed to have lost sight of the fact that Justice Breyer's opinion in *Heller* was for the dissent: "It is ironic . . . that Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*; that the Heller majority flatly rejected that *Turner Broadcasting*-based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on *Turner Broadcasting*." *Id.* at 1280 (Kavanaugh, J., dissenting). Because Justice Breyer's argument was expressly rejected by the *Heller* majority, *Turner Broadcasting* is by definition not a legitimate precedent on which to

---

[69] For example, Defendants will attempt to refer to a number of mass shootings and note that the need to change magazines reduced the "lethality" of these shootings due to the need to change magazines. This "evidence" is wholly unreliable and inadmissible, even setting aside it is inherently irrelevant under *Heller*, as well as demonstrably false in at least some instances.

build a decision upholding a prohibition on Second Amendment arms. *See also Peruta*, 2014 WL 555862 at *27.

The *Heller II* decision, and its progeny in some district courts, rely heavily on analogy to the First Amendment's "alternative channels of communication" doctrine. The reliance is defective for several reasons. First, alternative channels is a theory about the medium used in communication in ***public***. *See Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 648 (1981). The alternative channels doctrine can allow leafleting to be limited at a state fair on public property, *see id.* at 650; it is not a doctrine allowing the criminalization of the possession of leaflets within one's own home.

Second, the First Amendment's alternative channels doctrine mandates a serious inquiry into the adequacy of those alternative channels, and strong evidence that the alternative channels are (at least) nearly as effective as whatever channel is being restricted. A government cannot ban political advertising on the radio merely by pointing out that a candidate's supporters can try to engage random strangers in conversation at public parks. Or that television and Internet ads can reach almost all the same people who would be reached by radio.

The D.C. Circuit failed to engage in the serious analysis required by the alternative channels doctrine. Instead, the *Heller II* opinion merely cited to the opinion of the D.C. police chief, and to the legislative testimony of a gun prohibition lobbyist, as evidence that self-defense with other firearms and smaller magazines would be just as effective. *Heller II*, 670 F.3d at 1259. To say the least, it was clearly erroneous for the D.C. Circuit to treat such highly contested assertions as conclusive at the summary judgment stage.

More fundamentally, the casual invocation of alternative-channels-type arguments is contrary to how *Heller* itself addresses such argument. The last time a Second Amendment case

from the D.C. Circuit was affirmed by the Supreme Court was the *Heller* case. Judge Silberman rejected the District's argument that "since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).

At the Supreme Court, the same argument was raised by the District, and by some of the District's amici, who presented evidence about why long guns were considered by some to be superior for home defense. *See Heller*, 554 U.S. at 710 (Breyer, J., dissenting). The Supreme Court responded: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." The Court then listed some common sense reasons why "a citizen may prefer a handgun for home defense." The key point was that "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. Again, the American people's choice of their common arms is protected by the Second Amendment, notwithstanding a government's insistence that the government can take away the people's choices for their own good.

Notably, the common sense reasons which *Heller* listed as among the reasons why Americans so often choose handguns for defense also apply to magazines of 16 or more rounds:

- "It is easier to store in a location that is readily accessible in an emergency." 554 U.S. at 629. It is easier to store and keep track of one magazine than several, and to keep it away from small children or other unauthorized persons. It is much easier to access one

magazine in an emergency than to access several. "Access" includes having the magazine on one's person, ready for use in an emergency. "Access" also includes not having to change magazines while under criminal attack.

- "[I]t cannot easily be redirected or wrestled away by an attacker." *Id.* The magazine that is already in the gun is easier to control than the magazine that might be dropped or snatched during an exchange.

- "[I]t is easier to use for those without the upper-body strength to lift and aim a long gun." *Id.* Likewise, a standard magazine is easier for persons with limited upper body strength to use than is manipulating several smaller magazines. As will be adduced at trial, standard capacity magazines have many advantages for persons who suffer from various physical limitations, including persons whose limitations do not legally constitute a disability.

- "[I]t can be pointed at a burglar with one hand while the other hand dials the police." *Id.* If the defender has several rounds left in the magazine, even after shots have been fired, it is easier to keep the assailant(s) under control while waiting for help to come.

The *Heller II* majority's analysis is subject to numerous flaws as pointed out by the dissent. It should not be followed.

### 4.    There are less restrictive and more effective means

In *Peruta*, the Ninth Circuit employed the less restrictive means test in striking down the public carry ban at issue there. *See* 2014 WL 555862 at *28 (noting test and criticizing sister circuits for not recognizing that in those other cases upholding regulations in the face of Second Amendment challenges "the government failed to show that the gun regulations did not burden

'substantially more' of the Second Amendment right than was necessary to advance its aim of public safety"); *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (strict scrutiny case; "least restrictive means among available, ***effective*** alternatives" (emphasis added)); *Madsen v. Women's Health Center*, 512 U.S. 753, 765 (1994) (intermediate scrutiny; "burden no more speech than necessary to serve a significant government interest"); *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (inquiring whether statute "burden[s] substantially more speech that is necessary" to advance the government interest).

In Colorado, the doctrine has been applied to the right to arms in the 1972 Colorado Supreme Court decision in *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972). The Lakewood city council was concerned about gun crime, and responded by enacting a broad ban on many forms of carrying or transporting firearms. The Colorado Supreme Court unanimously struck down the ban. Citing First Amendment precedent, the Court explained:

> A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

*Id.* at 745. The above quote closely tracks *Shelton v. Tucker*, 364 US 479, 488 (1960). *Pillow* has been followed by courts in several other states.[70]

---

[70] *See* Benjamin v. Bailey, 662 A.2d 1226, 1234 (Conn. 1995); *Winters v. Concentra Health Services, Inc.*, 2008 WL 803134, at *3 (Conn. Super. Ct. Mar. 5, 2008) (refusing to strike plaintiff's claim that he was illegally discharged for lawful carry of a firearm at work, when the company had no policy against firearms in the workplace, and the state constitution protected the right to carry handguns); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979) (relying on *Pillow* to void a city ordinance against handgun carrying); *Bowers v. State*, 389 A.2d 341, 347 (Md. 1978) (citing *Pillow* for the proposition that "more rigorous standard of vagueness review is triggered whenever an ill-defined penal statute is alleged to infringe upon any of the fundamental freedoms protected under the Bill of Rights," but upholding the child abuse law

HB 1224 is far more burdensome than necessary. HB 1224 applies to all types of firearms, except for lever action rifles. (That is, it applies to semi-automatic action, pump action, slide action, and bolt action firearms.) New Jersey's statute is only for semi-automatics. N.J. Stat. § 2C:39-1y. Hawaii's statute is only for handguns. Haw. Rev. Stats. § 134-8(c). Ohio's law is only for semi-automatics of 32 or more rounds. Ohio Rev. Code Ann. 2923.11(E). Ohio also exempts all .22 caliber. Massachusetts has no ban, but rather requires a "Class A" license, for which "any person" may apply. Mass. Gen. Laws 140 §§ 121, 131. About five out six firearms licenses in Massachusetts are Class A, allowing possession of a magazine of any size.[71]

Another alternative which is much less burdensome and restrictive to "typical law-abiding citizens," and which is far *more* effective than HB 1224, is to develop a crisis services program for identification and treatment of mental illness.

For the Aurora shooting that was a stated major reason for HB 1224 and HB 1229, the cumulative effect of those statutes, assuming that they worked perfectly, would be that the next James Holmes could buy two handguns—since Holmes repeatedly passed background checks.

because it would pass strict scrutiny); *People v. Swint*, 572 N.W.2d 666, 673 n.8 (Mich. Ct. App. 1997) (upholding felon-in-possession law, and noting Colorado courts had done the same because *Pillow* involved a non-felon); *Arnold v. Cleveland*, 616 N.E.2d 163, 176 (Ohio 1993) (Hoffman, J., concurring and dissenting) (stating that because "[e]xercise of the police power may not be achieved by a means which sweeps unnecessarily broadly," the Cleveland "assault weapon" ban should be declared unconstitutional); *City of Seattle v. Riggins*, 818 P.2d 1100, 1104 (Wash. Ct. App. 1991) (stating that *Pillow* is not applicable because carrying a dangerous knife within city limits is not an innocent activity); *Perito v. County of Brooke*, 597 S.E.2d 311, 316 (W. Va. 2004) (stating that *Pillow* is consistent with ban on firearms possession by convicted felons); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988) (finding that discretionary statute licensing for concealed handguns is unconstitutional); *State v. Hamdan*, 665 N.W.2d 785, 817 (Wis. 2003) (Crooks, J., concurring and dissenting) (stating that because the concealed carry law was "unnecessarily broad" it should be declared unconstitutional, rather than, as the majority held, only declared unconstitutional in certain applications).

[71] Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, Boston Globe, Jan. 24, 2013, http://www.boston.com/yourtown/specials/snapshot/massachusetts_snapshot_gun_licenses_2012

And the next Holmes could purchase numerous 15-round and smaller magazines. That would be all the equipment necessary to perpetrate the worst firearms murder in U.S. history.

At Virginia Tech in 2007, the perpetrator used 10-round magazines and 15-round magazines. With his pair of handguns, no one was able to tackle him during a magazine exchange. No one was able to escape during a magazine exchange. He murdered 33 unarmed victims, finally killing himself when he heard the sounds of armed responders approaching.[72] HB 1224 will let the next Holmes into the next theater or school with the same equipment as used by the Virginia Tech killer.

There is a better, enforceable alternative to HB 1224. Dr. Lynn Fenton, the treating psychologist for James Holmes, apparently broke patient confidentiality in order to warn the University of Colorado about Holmes.[73] Such a violation of patient confidentiality is permissible only when the patient manifests a serious danger to commit violent harm.

Shortly thereafter, Holmes withdrew from the University, and University officials apparently failed to warn anyone else. Had law enforcement been informed, Holmes could have been involuntarily committed for observation. If there was any legal obstacle to longer-term commitment for Holmes, it was only in the Colorado statute requiring that in a civil commitment for dangerousness, the danger must be "imminent." C.R.S. § 27-65-105(1)(a)(I). Holmes expressed his murderous desires in May, but did not murder anyone until late July. It would have

---

[72] The official law enforcement report on incident stated that "10-round magazines…would not have made a difference." *Report of the Virginia Tech Review Panel* 74 (Apr. 16, 2007) https://web.archive.org/web/20130423135032/http://www.governor.virginia.gov/TempContent/t echPanelReport-docs/FullReport.pdf. According to the review panel, even revolvers with speed loaders could have been equally deadly in the circumstances. *Id.*

[73] Arthur Kane, Tak Landrock & John Ferrugia, *Did CU Officials Consider James Holmes 'High Risk' For Violence?*, 7 NEWS DENVER, Aug. 16, 2012, http://www.thedenverchannel.com/news/31363132/detail.html,

been simple for the legislature to clarify the meaning of "imminent," or simply to remove that word from the statute.

Even a 72-hour observation commitment would have prevented Holmes from legally purchasing firearms, since records of such commitment are transmitted by Colorado to the FBI's National Instant Check System, and function as disqualifiers for firearms purchase for a period of three years from the date of the 72-hour commitment. Defendant can speculate about the effect of magazine sizes, but the certainty is that if Holmes had been prevented from acquiring firearms, he would not have been able to shoot anyone.

After the Virginia Tech murders, the Virginia legislature revised state law to allow the involuntary hospitalization of individuals, such as the perpetrator, who have when there is a "substantial likelihood" of serious physical harm to self or others. The new standard does not require "imminent" danger, but also applies to danger "in the near future," when there is evidence of recent behavior attempting or threatening harm. Va. Code, § 37.2-808A. Instead of enacting sweeping legislation against gun owners, or against the mentally ill, the Virginia legislature focused on the small subset of the seriously mentally ill who are dangerous. Such a simple change in the law is not only the less restrictive alternative, more importantly, it is the more effective alternative.

### 5.      In sum

The ban at issue here should fail any form of scrutiny. If the Court does apply some level of heightened scrutiny, Defendant will fail it. The legislative history does not come close to providing concrete evidence that HB 1224 will have *any* positive affect on public safety. The speculations that Defendant will attempt to introduce should be rejected. Even if it is considered, they offers no proof that HB 1224 will enhance public safety.

## VI.   HB 1224 VIOLATES THE ADA

The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The remedies include the injunctive and declaratory relief.[74] 42 U.S.C. § 12133.

Associations (such as Outdoor Buddies) have standing to bring ADA claims if one of their members (such as Board of Directors member Dylan Harrell or member David Bayne) suffers injury in fact. *Raver v. Capital Area Transit*, 887 F. Supp. 96, 97-98 (M.D. Pa. 1995); *Medical Soc'y v. Jacobs*, 1993 WL 413016, at *3 (D.N.J. Oct. 5, 1993). Plaintiffs must prove: (1) they are qualified individuals with a disability; (2) they have been discriminated against by reason of such disabilities; and (3) by a public entity.

### A.   Plaintiffs are qualified individuals with a disability

A disability is a "physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(1)(A). A physical impairment is "[a]ny physiological disorder or condition . . . or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal . . . ." 28 C.F.R. § 35.104. "Major life activities" include "performing manual tasks, [such as] walking." 28 C.F.R. § 35.104. "Substantially limits" includes loss of the ability to stand or walk. 56 Fed. Reg. 35,696, 35,699 (July 26, 1991) (preamble to DOJ regulations for Title II, for § 35.104) ("a person who is a paraplegic is substantially limited in the major life activity of walking").

---

[74] This section incorporates by reference the injunction authority of section 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). That in turn incorporates by reference the remedies of the Civil Rights Act of 1964.

Many members of Outdoor Buddies, including Plaintiffs David Bayne and Dylan Harrell, are paraplegics, or have other ADA-covered physical disabilities. Plaintiffs are also "qualified individuals" because they "meet the essential eligibility requirements." 42 U.S.C. § 12131(2). They are competent, responsible, law-abiding, qualified firearms users who would use and possess magazines of greater than 15 rounds, but for HB 1224.

**B.      Plaintiffs Have Been Discriminated Against by Reason of Such Disabilities**

      **1.      Disparate impact**

Disparate impact is sufficient for an ADA Title II claim. *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 859-860 (10th Cir. 2003) ("Congress sought with § 504 – and consequently with Title II of the ADA – to remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination."), *overruled on other grounds by Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012); *Barber ex rel. Barber v. Colorado Dep't of Revenue*, 2005 WL 2657885 at *3 (D. Colo. Oct. 17, 2005) (disparate impact is a viable claim under Title II).

It is not necessary to prove discriminatory intent; what matters is the effect. *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012) ("Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination. . . . To prove a case of disparate impact discrimination, the plaintiff must show that 'a specific policy caused a significant disparate effect on a protected group.'") (quoting *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007)); *see also Grider v. City & Cnty. of Denver*, 2011 WL 721279 at *4 (D. Colo. Feb. 23, 2011).

Plaintiffs must offer more than a "simple, anecdotal showing" that they were affected by the policy. *Id.* at *4. They must provide the "analytical mechanism to determine disproportionate impact." *Id.* (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576 (2d Cir. 2003)).

According to Bureau of Justice Statistics:

- In 2011, the average annual age-adjusted rate of serious violent victimization for persons with disabilities (22 per 1,000) was more than three times higher than that for persons without disabilities (6 per 1,000).

- The rate of violent victimization (serious and lesser) for males with disabilities was 42 per 1,000 in 2011, compared to 22 per 1,000 for males without disabilities.

- For females with disabilities, the rate of violent victimization (serious and lesser) was 53 per 1,000 in 2011, compared to 17 per 1,000 for females without disabilities.[75]

Plaintiffs will provide additional evidence of disparate impact at trial.

After Plaintiffs meet this burden, the burden shifts to Defendant "to show that the practice furthered a legitimate governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* (citing *Tsombanidis*, 352 F.3d at 575).

### 2.    In addition, the legislative record shows discriminatory intent

In the Tenth Circuit, actual discriminatory intent is present when there is a showing of "deliberate indifference." *Barber ex rel. Barber v. Colorado Dept. of Rev.*, 562 F.3d 1222, 1228-29 (10th Cir. 2009) ("[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."). The legislative record shows deliberate indifference. At the Feb. 12, 2013, hearing of the House Judiciary Committee, Sammy Myrant testified:

---

[75] United States Department of Justice, Bureau of Justice Statistics, *Crime Against Persons with Disabilities, 2009-2011* at 3, 5 (NCJ 240299 Dec. 2012).

> I am disabled, so I can't put a clip in and out very quickly. I drop them, even when I'm practicing at the range. . . . [t]he man who committed 16 felony counts of rape, child abuse on this child gets out of prison this year. So there are times when we're going to need a magazine of high capacity. He's a member of the Aryan Brotherhood, and he gets out of prison this year. And he has sworn to kidnap her and us, rape her again in front of us, then kill us in front of her.

LH, 2/12/13 at 124-25 (1224). Asked how many rounds he would want for self-defense, he responded "30." *Id.* at 125. More such stories likely would have been presented if the legislative leadership had not limited public testimony.

Some of Defendant's witnesses have stated that they do not believe that disabled people should defend themselves with AR-15 rifles or with guns that use detachable box magazines. ADA Title II is intended to outlaw discrimination based on "patronizing attitudes, fears, and stereotypes about individuals with disabilities." *See* 56 Fed. Reg. 35,694, 35,703 (July 26, 1991) (regarding 28 C.F.R. § 35.130). "Qualified individuals" who are disabled have the right to make personal decisions about their own safety.

### C.    The Discrimination was by a Public Entity

Defendant's asserts the affirmative defense that "Plaintiffs have not been excluded from participation in the benefits and programs of a public entity." However, ADA Title II is not just about the "services, programs, or activities of a public entity." Title II additionally protects any covered person "subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Title II applies "to anything a public entity does," including "activities of the legislative" branch of State and local government. It covers "all actions of State and local governments." 56 Fed.Reg. 35,694, 35,696, (July 26, 1991) (preamble to DOJ regulations for Title II, for §§ 35.102 & .103). Hence, Title II applies to state statutes. *See Thompson v. Cooke*, 2007 WL 891364 at *5 (D. Colo. Mar. 22, 2007) (state statute on fees for handicapped parking permits violated ADA Title II regulation in 28 C.F.R. § 35.130(f)); *T.E.P.& K.J.C. v. Leavitt*, 840 F. Supp. 110, 111 (D.

Utah 1993) (permanently enjoining state statute against marriage by HIV-positive persons as a violation of Title II); *T.P. v. DuBois*, 843 F. Supp. 775, 776 (D. Mass. 1993) (state statute violates ADA Title II).

Any contrary rule would be absurd; otherwise, a state could enact a statute forbidding the physically disabled to leave their homes after dark. The public safety purpose of the statute might arguably pass the rational basis test, but the statute would certainly violate Title II.

### D.  Reasonable Accommodation

"Courts have recognized that a claim implicating the public entity's failure to make reasonable accommodation of disabled people is a freestanding claim which does not require a showing of either the discriminatory state of mind of the disparate treatment claim or the class-based evidence of disparate impact." *Grider*, 2011 WL 721279 at *5 (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276–77 (2d Cir. 2003)).

Governments have an obligation to make reasonable accommodation for the disabled. *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007) ("To effectuate Title II's mandate, the regulations require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'") (quoting 28 C.F.R. § 35.130(b)(7)). That a generally applicable government policy might have to be modified to comply with the ADA is the point of the ADA, which "contemplates that different or separate benefits or services be provided if they are 'necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others.'" *Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach*, 846 F. Supp. 986, 991 (S.D. Fla. 1994) (quoting 28 C.F.R. §35.130(b)(1)(iv)).

Although the burden to identify a reasonable accommodation "is 'not a heavy one,' the plaintiff must nevertheless identify a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' If the plaintiffs carry their burden, the public entity bears the burden of showing that the requested accommodation is unreasonable in some way – e.g., that it would 'fundamentally alter the nature of the activity' in question, or that it would 'impose an undue hardship.'" *Grider*, 2011 WL 721279 at *5 (quoting *Henrietta D.*, 331 F.3d at 280-81).

A reasonable modification to the magazine ban would be to allow an exemption for persons who have been formally diagnosed as having a covered ADA disability which impairs their ability to defend themselves: physical disabilities which eliminate or significantly reduce an individual's mobility to retreat or the dexterity to change a magazine quickly.

The legislature could have enacted a reasonable modification that the disabled person undergo a background check before purchasing a magazine. This would not violate the ADA, as long as the person was not charged a fee. 28 C.F.R. § 35.130(f). Given that the CBI did not charge any firearms buyer a fee until 2013, the necessary spending for magazine background checks for disabled persons would be reasonable, and could be paid from general revenues, as § 35.130(f) requires.[76]

Even if this Court were to uphold the constitutionality of HB 1224, a reasonable accommodation under the ADA can include limited exemptions from a generally applicable law of unquestionable constitutionality, and which was enacted with no discriminatory intent. For example, the Ninth Circuit ruled that Hawaii's requirement of a 120-day quarantine for dogs had

---

[76] Unlike the instant case, in *Grider*, the plaintiffs wanted to repeal the entire ordinance. Their accommodation would require that the local government create a process for "case-by-case analysis" of individual dogs. That might be an "undue burden." *Grider*, 2011 WL 721279 at *5 n.5. Here, a case-by-case system already exists – the background check systems for firearms.

to be modified for the benefit of vision-impaired people who use guide dogs. *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).

### E.   Defenses

#### 1.   Fundamental alteration or undue burden

"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Fundamental alteration, however, is an affirmative defense. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 606 (1999) (Stevens, J., concurring) (describing fundamental alteration as an affirmative defense); *see also Kerr v. Heather Gardens Ass'n*, 2010 WL 3791484 at *2 (D. Colo. Sept. 22, 2010) (same).

Defendant has raised various defenses, but not fundamental alteration/undue burden. Accordingly, Defendant has waived the affirmative defense. F.R.C.P. 8(c); *Stafne v. Unicare Homes*, 266 F.3d 771, 779 (8th Cir. 2001).

#### 2.   Sovereign immunity

Defendant has not raised sovereign immunity, but the defense has not been waived, because he has not shown "unequivocal intent to do so." *Guttman v. Khalsa*, 669 F.3d 1101, 1110 (10th Cir. 2012).

It does not matter. The Tenth Circuit is very explicit that ADA plaintiffs may seek claims for injunctive relief against a state official:

> An individual can bring an *Ex parte Young* claim against a state official in federal court for an ADA or § 1983 violation. In *Garrett*, 531 U.S. at 374 n.9, the Supreme Court reaffirmed that an *Ex parte Young* ADA claim can proceed even if the state defendants are protected by sovereign immunity. Although *Garrett* involved a suit brought under Title I of the ADA, there is no relevant difference

between Title I and Title II as far as the availability of prospective injunctive relief is concerned.

*Guttman*, 669 F.3d at 1127 (internal citations omitted).[77]

## VII.  HB 1224'S "CONTINUOUS POSSESSION" PROVISIONS ARE VOID FOR VAGUENESS

The void-for-vagueness doctrine is a subset of the Due Process clause. Criminal laws must give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden. *U.S. v. Lovern*, 590 F.3d 1095, 1003 (10th Cir. 2009). Similarly, a penal statute must specify what is prohibited in a way that does not encourage arbitrary and discriminatory enforcement. *Dias v. City & County of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009). While the Supreme Court has opined that the second concern is more important, it continues to analyze each element separately. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).

There are two preliminary inquiries for vagueness challenges in the Tenth Circuit. First, a court must determine if the challenge is appropriate under the circumstances. *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988). Then, the court must consider the strictness of the test to be applied to the challenge. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). If the Court finds that a challenge is appropriate and determines the strictness to be applied, then it considers whether the challenged law provides sufficient notice and whether it encourages arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Kolender*, 461 U.S. at 357.

### A.    A Facial Vagueness Challenge Is Appropriate

---

[77] Several other circuits are in accord. *See Koslow v. Pennsylvania*, 302 F.3d 161, 179 (3d Cir. 2002); *McCarthy ex rel. Travis v. Hawkings*, 381 F.3d 407, 413-414 (5th Cir. 2004); *Klinger v. Director, Dept. of Rev.*, 281 F.3d 776, 777 (8th Cir. 2002); *Carten v. Kent State Univ.*, 282 F.3d 391, 396.

Facial challenges are proper in two circumstances. First, a statute may be challenged when it threatens to chill constitutionally protected conduct. *Gaudreau*, 860 F.2d at 360. Second, a facial challenge to the constitutionality of a statute may be appropriate on pre-enforcement review. *Id.*

Plaintiffs' challenge here is appropriate under both preliminary tests. HB 1224's continuous possession clause threatens to chill the constitutionally protected conduct of loaning firearms with a capacity of 16 or more rounds (or the magazines themselves) to family members and friends for lawful purposes. Also, under the second consideration, a vagueness challenge is appropriate in this circumstance because the challenge is pre-enforcement. *See* Fourth Amended Complaint for Declaratory and Injunctive Relief (Doc. 46).

### B.     A high degree of specificity is required for HB 1224 to overcome Plaintiffs' Fourteenth Amendment facial vagueness claim

The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depend in part on the nature of the enactment. *Murphy v. Matheson*, 742 F.2d 564, 570 (10th Cir. 1984). Courts consider four factors when determining the degree of specificity required to overcome the vagueness challenge. *See Gaudreau*, 860 F.2d at 360; *Flipside*, 455 U.S. at 498. First, criminal statutes must be more precise because the consequences of vagueness are more severe. *Gaudreau*, 860 F.2d at 360. Further, a scienter requirement may mitigate a criminal law's vagueness by ensuring that it punishes only those who are aware their conduct is unlawful. *Id.* Also, regulatory statutes governing business activities may be less precise because the conduct prescribed is usually in a narrow category and the business may be able to obtain clarification from an administrative agency. *Id.* Finally, the Constitution demands more clarity of laws that threaten to inhibit constitutionally protected conduct, especially conduct protected by the First Amendment. *Id.*

Here, all four factors counsel in favor of requiring a high degree of specificity. First, HB 1224 is a penal statute and the consequence of its vagueness is criminal prosecution and loss of the right to possess an arm. Next, HB 1224 has no scienter requirement. Indeed, HB 1224 has no mens rea requirement whatsoever and will subject citizens to criminal punishment even if they violate the statute inadvertently. Third, HB 1224 does not involve the regulation of business activities but the exercise of a fundamental right. Finally, HB 1224 inhibits the constitutionally protected conduct of loaning firearms and magazines for lawful purposes. Consequently, a high degree of specificity is required for HB 1224 to overcome Plaintiffs' Fourteenth Amendment pre-enforcement facial vagueness challenge.

**C.      HB 1224 does not provide fair notice as to what acts are unlawful**

HB 1224 does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited. "Continuous possession" is not defined anywhere. Thus, no one knows with any certainty what "continuous possession" means. Nor can even a lawyer opine with certainty what would constitute a "voluntary relinquishment of dominion and control" as set out in the July 10, 2013, Technical Guidance. The vagueness and lack of notice in HB 1224's phrase "continuous possession" is further amplified by the fact that HB 1224 does not contain a scienter or mens rea requirement, exposing citizens to criminal penalties for unknowingly violating HB 1224.

**D.      Adequacy of HB 1224's enforcement standards**

A statute also cannot authorize or encourage arbitrary and discriminatory enforcement by establishing a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections. *Kolender*, 461 U.S. at 357-58; *Gaudreau*, 860 F.2d at 363-64. A vague

law is one in which the enforcement is "completely subjective" and enforceable "at the whim of any officer." *Firth v. Shoemaker*, 2010 WL 882505 at *10 (D. Colo. Mar. 8, 2010).

Here, HB 1224 contains no enforcement standards. For example, HB 1224 is silent on how law enforcement officers are to determine if a magazine was purchased prior to or after July 1, 2013. Magazines purchased before or after are identical, with the exception of the few that are date-stamped. With no way to determine whether particular magazines were acquired prior to July 1, 2013, HB 1224 permits arbitrary and discriminatory enforcement.

Moreover, HB 1224's phrase "continuous possession" is undefined and open to interpretation by individual law enforcement officers, prosecutors, judges, and juries. The Technical Guidances relied upon by Defendant are not widely distributed, nor is there evidence that law enforcement has been trained on what "continuous possession" means, leaving each department or officer are free to interpret it as they see fit. HB 1224 is unconstitutionally vague under the Fourteenth Amendment.

### E.    The "No Set of Circumstances" Test

Plaintiffs expect that Defendant will advocate for the "no set of circumstances" test derived from *United States v. Salerno*, 481 U.S. 739, 745 (1987). That test generally requires that the challenger establish that "no set of circumstances exist under which the Act would be valid." *Salerno*, 481 U.S. at 745. Although some courts have adopted this test, the Tenth Circuit has specifically rejected the notion that the test applies in pre-enforcement facial vagueness challenges. *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012), considered the defendant city's argument (based on *Salerno*) that "in a facial vagueness challenge a court . . . must simply determine whether it can imagine hypothetical situations in which the ban could possibly be constitutionally applied. 667 F.3d at 1123. The court found that, "[c]ontrary to the

1715

City's position, it has not been established that the 'no set of circumstances' test applies to facial vagueness challenges ***not based on overbreadth***." *Id.* (emphasis in original). Moreover, the court stated that "[t]he idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority." *Id.* at 1124 (collecting cases). Instead, the court stated that "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Id.* at 1123.

## <u>CONCLUSION</u>

HB 1224 and HB 1229 are contrary to the supreme Law of the Land: the Second and Fourteenth Amendments to the United States Constitution, and the Americans with Disabilities Act, which was enacted in pursuance thereof. This court should so declare, and enjoin these enactments, as defined in this trial brief and as Plaintiffs have outlined in the Final Pretrial Order.


Dated this 14th day of March, 2014.

Respectfully submitted,


<u>s/Richard A. Westfall</u>
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM,
JAMES FAULL, LARRY KUNTZ, FRED JOBE,
DONALD KRUEGER, STAN HILKEY, DAVE STONG,
PETER GONZALEZ; SUE KURTZ, DOUGLAS N.
DARR, AND DAVID STRUMILLO


s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION


s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEY FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY

ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

<u>s/David B. Kopel</u>
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, et al.

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**DEFENDANT'S MOTION IN LIMINE
OR IN THE ALTERNATIVE
FORTHWITH MOTION FOR BIFURCATION AND CONTINUANCE WITH
RESPECT TO PLAINTIFFS' FIFTH CLAIM FOR RELIEF**

---

Defendant John W. Hickenlooper, in his official capacity as Governor of the State of Colorado, hereby moves to exclude evidence and argument related to the newly asserted claim contained at footnote 5 and pages 18-20 of the Plaintiffs' Trial Brief (Doc. 136). This claim asserts that "HB 1229 violates the Second Amendment rights of 18- to 20-year-olds by prohibiting them from acquiring handguns." *Id.* at 18. This argument was not raised in any of the five versions of Plaintiffs' complaint, at any point during discovery, or in the final pretrial order. As explained below, allowing Plaintiffs to raise it at the eleventh hour as part of their trial brief would substantially prejudice the Governor and would be contrary to the interests of justice.

1.    _Duty to confer_:  Undersigned counsel has conferred with counsel for Plaintiffs concerning this motion. Plaintiffs indicate that they oppose the relief requested herein.

2.    Plaintiffs' fifth claim for relief asserts that § 18-12-112, which expands background check requirements for firearms transfers, violates the Second Amendment because: a) its exceptions for loans and other temporary transfers are allegedly too limited (Doc. 116, ¶¶ 195-97); and b) the fee cap for private transfers will make it "impossible, or nearly so, to comply with HB 1229's requirement to obtain the services of an FFL." _Id._ at ¶ 198.

3.    This claim has remained virtually unchanged throughout this litigation, including in each of the Plaintiffs' five different complaints. _See_ Doc. 1, ¶¶ 246-251; Doc. 22, ¶¶ 253-259; Doc. 43, ¶¶ 253-259; Doc. 113, ¶¶ 325-331; Doc. 116, ¶¶ 192-199.

4.    Plaintiffs' description of their fifth claim for relief in the Final Pretrial Order is consistent with the articulation contained in each of their five complaints. Plaintiffs stated that they would carry their burden by showing: "(1) evidence that Section 18-12-112 severely restricts the temporary transfer of all firearms…; (2) evidence that Section 18-12-112 has caused many federal licensed firearms dealers to refuse to conduct background checks, which results in law-abiding citizens being unable to privately sell, purchase, or temporarily transfer firearms[.]" Doc. 119 at 15.

5.      In their Trial Brief, Plaintiffs have attempted to raise an entirely new

claim: that "HB 1229 violates the Second Amendment rights of 18- to 20-year-olds

by prohibiting them from acquiring handguns" due to the Bureau of Alcohol,

Tobacco, Firearms, and Explosives' interpretation of 18 U.S.C. § 922(b).   *Id.* at 18.

Because the Plaintiffs have never before raised this argument in any form,

including in the complaint or in the final pretrial order, this Court should decline to

consider it, and should preclude Plaintiffs from offering evidence or argument at

trial to support it.

6.      The pretrial order "measures the dimensions of the lawsuit." *Hullman*

*v. Board of Trustees*, 950 F.2d 665, 668 (10th Cir. 1991).  It "control[s] the

subsequent course of this action and the trial, and may not be amended except by

consent of the parties and approval by the court or by order of the court to prevent

manifest injustice."  Doc. 119.

7.      "Since the whole purpose of Rule 16 is to clarify the real nature of the

dispute at issue, attorneys at a pre-trial conference must make a full and fair

disclosure of their views as to what the real issues of the trial will be." *Rios v.*

*Bigler,* 67 F.3d 1543, 1549 (10th Cir. 1995) (internal citation and quotation

omitted).  Full and fair disclosure is critical "[b]ecause the parties rely on the

pretrial conference to inform them precisely what is in controversy," and because

the order "establishes the issues to be considered at trial."  *Gorlikowksi v. Tolbert,*

52 F.3d 1439, 1443 (7th Cir. 1995).

8.     As such, "[t]he final pretrial order should state claims specifically and clearly in order to inform the parties and the court what issues remain for trial," *BP Amoco Chem. Co. v. Flint Hills Res., LLC,* 697 F.Supp.2d. 1001, 1040 (N.D. Ill. 2010), and an issue that is not included in the pretrial order is "not part of the case before the district court." *Gowan v. U.S. Dep't of Air Force*, 148 F.3d 1182, 1192 (10th Cir. 1998). "The district court has discretion to exclude from trial issues and claims not set forth in the pretrial order." *Id., citing Hullman v. Bd. of Trustees,* 950 F.2d 665, 668 (10th Cir. 1991).

9.     Plaintiffs may counter by arguing that their new claim is simply another way of asserting that § 18-12-112 violates the Second Amendment.  But they cannot evade their obligation of full and fair disclosure by adding, at the eleventh hour, an entirely new theory of relief to a preexisting claim. To the contrary, "'all the circuits that have reached this issue agree that a trial court may properly exclude evidence ***or theories*** not raised in a pretrial order absent an abuse of discretion.'" *Rios,* 67 F.3d at 1549, *quoting Gorlikowksi* 52 F.3d at 1444 (emphasis added).

10.     At a minimum, Plaintiffs' argument is a new "theory," one that has never been previously identified in this litigation.  Nor would it be enough to argue that Plaintiffs' new assertions about 18-20 year-olds are simply part of their "overarching claims" related to § 18-12-112. *Rios*, 67 F.3d at 1549.  They have never previously been identified, and as the Tenth Circuit stated in *Rios*, broad, "plain

vanilla" assertions of injury do not suffice to alert a defendant of the plaintiffs' "specific theor[ies]." *Id.*

11.   Moreover, even if Plaintiffs had asserted it in any version of their complaint, the omission of Plaintiffs' new theory from the final pretrial order would itself operate to waive this claim for the purposes of trial. *See Long v. City of Leawood, Kansas*, 6 F.Supp.2d 1249, 1252 n.3 (D. Kan. 1998) (omission of entire theory from pretrial order constitutes waiver even where it was asserted in complaint). But Plaintiffs did not simply omit their argument about the effect of § 18-12-112 on 18-21 year-olds from the Final Pretrial Order. To the contrary, they have never asserted it at all until filing their Trial Brief a mere two weeks before the date of trial. This is not just a question of waiver. It is more importantly a question of fair notice and due process to the defense. *Cf. Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir. 2002) (assertion for the first time in the pretrial order of "claims or defenses not contained in the pleadings...deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice"); *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1314 (11th Cir. 2004) (liberal pleading standard "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage");

12.   Plaintiffs' failure to announce their new argument until two weeks before trial has deprived the Governor of fair notice of the need to defend it. This lack of notice is substantially prejudicial to the defense, particularly in light of the

factually intensive review that would be associated with ruling on such a challenge under the Second Amendment.  For example, in *NRA v. BATFE,* 700 F.3d 185 (5th Cir. 2012), the Fifth Circuit Court of Appeals considered a related challenge to § 18 U.S.C. § 922(b)(1), which prohibits federal firearms licensees from transferring a handgun to an individual who is under 21 years of age.  In a lengthy opinion that ultimately upheld the regulation, the court "summarized *considerable evidence* that burdening the conduct at issue – the ability of 18- to 20- year-olds to purchase handguns from FFLs – is consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment."  *Id.* at 203 (emphasis added).  The court proceeded to apply intermediate scrutiny "in an abundance of caution," where it thoroughly analyzed the Congressional record, official reports, and detailed statistical data (much of which was outside of the legislative history) to conclude that there was a reasonable fit between the challenged statute and Congress' goal of reducing "violent crime associated with the trafficking of handguns from FFLs to young adults."  *Id.* at 211.

13.    In order to effectively respond to Plaintiffs' new claim in this case, the defense would need to marshal similar evidence, potentially including expert historians, statisticians, and gun policy researchers.  While it is impossible to forecast the contours of a defense against such a new claim at this early stage, an expert historian would likely be needed to opine on the history of the federal statute (18 U.S.C. § 922) implicated by Plaintiffs' claim. A statistician would likely be needed to analyze firearm violence trends among individuals in the allegedly

affected age range in order to demonstrate the government's public safety interest. A gun policy researcher would provide evidence as to the likely impact of such a policy on a statewide basis. Because BATFE's interpretation of the relevant federal statute is central to the validity of Plaintiff's claim, that agency would likely need to be joined as a co-defendant.

14.     And, of course, the strength of Plaintiffs' claims would need to be tested in discovery. Among other things, Plaintiffs' complete omission of their new theory from any version of their complaint raises serious questions about their standing under Article III. But discovery closed months ago, expert opinions have already been disclosed and challenged under Fed. R. Civ. P. 702, and trial is just over a week away. It is far too late to add new claims now. Plaintiffs' attempt to do so violates their responsibility to make at the final pretrial conference "a full and fair disclosure of their views as to what the real issues of the trial will be." *Rios* 67 F.3d at 1549.

15.     Accordingly, the Governor respectfully requests that this Court preclude Plaintiffs from introducing evidence or presenting argument pertaining to their new claim that § 18-12-112 violates the Second Amendment by operating as a *de facto* ban on the acquisition of handguns by 18-20 year-olds.

16.     In the alternative, if this Court determines that Plaintiffs should be permitted to raise their new claim, it should bifurcate the proceedings by severing the Plaintiffs' fifth claim for relief from the remainder of the issues in the Fourth Amended Complaint and proceeding to trial on the remaining claims. *See* Fed. R.

Civ. P. 16(b)(1) (permitting amendments to the pleadings to conform to the evidence, but providing that "[t]he court may grant a continuance to enable the objecting party to meet the evidence").

17.     In the event that the Court were to entertain Plaintiffs' new claim, severing the fifth claim for relief and bifurcating the proceedings would be the only fair way to proceed and keep the scheduled trial date of March 31, 2014. Bifurcation would enable a proper vetting of the legal and factual questions raised by Plaintiffs' new claim.  Any assertions of prejudice on the part of Plaintiffs should be disregarded, because the delay would be entirely attributable to Plaintiffs' own tardiness in advancing their new theory.

18.     If the fifth claim for relief is severed, the Defendant respectfully requests that the Court fully reopen discovery in order to permit depositions, the identification of new expert witnesses, and dispositive motions with respect to Plaintiffs' standing to assert their new claim as well the merits of their argument. Because the correct interpretation and application of 18 U.S.C. § 922(2)(b) would be central to such a claim, the Defendant may also seek leave to join the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives as a defendant pursuant to Fed. R. Civ. P. 19(a).

WHEREFORE, the Governor respectfully requests that this Court preclude the Plaintiffs from offering evidence or argument in support of their newly asserted claim related to the effect of § 18-12-112 on 18-20 year-olds.  In the alternative, the Governor respectfully requests that the Plaintiffs' fifth claim for relief be severed

from the remainder of the Fourth Amended Complaint, and that the Court issue an

order reopening discovery, permitting joinder of additional necessary parties, and

allowing for the submission of dispositive motions in due course following the

conclusion of the trial on the remaining issues.

Respectfully submitted this 19th day of March, 2014.


JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*
_____
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
STEPHANIE SCOVILLE*
Senior Assistant Attorney General
LEEANN MORRILL*
First Assistant Attorney General
Attorneys for Governor John W. Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2014 I served a true and complete copy of the foregoing **FORTHWITH MOTION IN LIMINE OR IN THE ALTERNATIVE MOTION FOR BIFURCATION AND CONTINUANCE WITH RESPECT TO PLAINTIFFS' FIFTH CLAIM FOR RELIEF** upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                     david@i2i.org

Jonathan M. Anderson               jmanderson@hollandhart.com

Richard A. Westfall                rwestfall@halewestfall.com
Peter J. Krumholz                  pkrumholz@halewestfall.com

Marc F. Colin                      mcolin@bcjlpc.com

Anthony J. Fabian                  fabianlaw@qwestoffice.net


                                   *s/  Matthew D. Grove*

1729

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.*,

    Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

    Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION IN LIMINE OR IN THE
ALTERNATIVE FORTHWITH MOTION FOR BIFURCATION AND CONTINUANCE
WITH RESPECT TO PLAINTIFFS' FIFTH CLAIM FOR RELIEF**

---

Plaintiffs hereby respond to Defendant's Motion in Limine or in the Alternative Forthwith Motion for Bifurcation and Continuance with Respect to Plaintiffs' Fifth Claim for Relief (hereafter, "the Motion").

**1.    Defendant's Motion for Bifurcation and Continuance**

Although counsel for the Defendant represented to this Court that he conferred with Plaintiffs' counsel concerning the Motion, Defendant's counsel did not confer with the undersigned concerning Defendant's proposed motion for bifurcation and continuance. Having had the opportunity now to consider Defendant's suggestion that the issue of HB 1229's de facto prohibition on acquisition of handguns by 18- to 20-year-olds be bifurcated and held in abeyance until the remainder of this case is tried, Plaintiffs are in complete agreement that bifurcation and continuance is the most efficient and sensible approach.

As to Defendant's suggestion, however, that re-opening discovery will be necessary, Plaintiffs disagree. The necessity for discovery can be re-visited later, but it is worth pointing out

that when Plaintiffs submitted discovery to Defendant concerning the issue of 18- to 20-year olds, Defendant refused to provide any substantive response. In any case, the parties presumably can stipulate to the fact that several of the plaintiff organizations, including Colorado State Shooting Association, Outdoor Buddies, Inc., and Colorado Farm Bureau, have members who are between the ages of 18 and 20. That is the only fact necessary for this Court to address the issue of whether HB 1229 violates the Second Amendment rights of 18- to 20-year-old Colorado citizens.

### 2.     Motion to Dismiss

Plaintiffs oppose Defendant's motion in limine.  As discussed above, Defendant was on notice of this issue in light of Plaintiffs' request for admission submitted to Defendant as follows: "Admit that law-abiding citizens aged 18 and up have the Second Amendment right to purchase handguns." Defendant's response was as follows:

> *Objection*: The Governor objects to Request for Admission No. 2 because it calls for an improper legal conclusion. *See, e.g., NRA of America, Inc. v. Bureau of Alcohol, Tobacco, and Firearms,* 700 F.3d 185 (5th Cir. 2012) (rejecting Second Amendment challenge to federal prohibition on handgun purchases from FFLs by 18-20 year-olds). Requests for admissions seeking legal conclusions are not proper, and a party may not demand that the other party admit the truth of a legal conclusion. *Disability Rights Council v. Wash. Metro Area,* 234 F.R.D. 1, 3 (D.D.C. 2006), *citing Lakehead Pipeline Co. v. Am. Home Assurance Co.,* 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Utley v. Wray,* 2007 U.S. Dist. LEXIS 68413, 2007 WL 2703094 at *3 (D. Kan. Sept. 14, 2007). Declaring the scope and extent of Second Amendment rights calls for a legal conclusion. The request for admission is thus improper and the Governor is not required to answer it.

Defendant's protestation that the issue is not one he or his counsel has ever heard is therefore simply not true.

More importantly, Defendant is completely wrong in describing the issue as a "new claim."     Plaintiffs' complaint contained the claim that HB 1229 is unconstitutional because it violated the Second Amendment rights of Colorado citizens. The issue of 18- to 20-year-olds being stripped of the ability to acquire a handgun is one legal argument in support of that claim. This is therefore no different from many of the arguments in Defendant's trial brief, which make new legal arguments in support of existing defenses. For example, Defendant argues that the magazine limit in HB 1224 is a "longstanding regulatory requirement," which is not an issue Defendant had ever mentioned before in this case, including in the Pretrial Order.

**Conclusion**

For the foregoing reasons, Plaintiffs agree with Defendant that bifurcation of the 18- to 20-year-old issue can be bifurcated and held in abeyance pending the outcome of the trial that begins on March 31. Defendant's motion in limine, which in any case is without merit, can thus be denied as moot.

Dated this 21st day of March, 2014.

Respectfully submitted,


s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR
BUDDIES, INC. THE COLORADO OUTFITTERS
ASSOCIATION, COLORADO FARM BUREAU, AND
WOMEN FOR CONCEALED CARRY


 s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org


ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM,
JAMES FAULL, LARRY KUNTZ, FRED JOBE,
DONALD KRUEGER, STAN HILKEY, DAVE STONG,
PETER GONZALEZ, SUE KURTZ, DOUGLAS N.
DARR, AND DAVID STRUMILLO


s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK

1734

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

s/Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, et al.

     Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION IN LIMINE
OR IN THE ALTERNATIVE
FORTHWITH MOTION FOR BIFURCATION AND CONTINUANCE WITH
RESPECT TO PLAINTIFFS' FIFTH CLAIM FOR RELIEF**

---

Defendant John W. Hickenlooper, in his official capacity as Governor of the State of Colorado, submits the following reply in support of his motion in limine (Doc. 137).

     1.    At the threshold, Plaintiffs' response (Doc. 136) correctly points out that undersigned counsel's conferral was incomplete.  Although the parties did confer with respect to the motion to preclude Plaintiffs' presentation of argument and evidence on their new theory, the alternative relief requested was a later addition and was not brought to the attention of Plaintiffs' counsel before the motion was filed. The undersigned apologizes for the oversight.

     2.    With respect to the motion in limine, Plaintiffs miss the point entirely. The pertinent consideration is not whether a single question tucked away among

the Plaintiffs' voluminous written discovery may have obliquely addressed the new

theory that they now raise.  Rather, it is whether the Plaintiffs provided fair notice

of their intent to raise their new theory anywhere in the final pretrial order.[1]

Plaintiffs do not contend that they did so, nor do they even argue that the Governor

could have fairly been put on notice of their new theory in any of the five iterations

of the complaint.  They instead sidestep the issue, thereby tacitly conceding they

failed at the pre-trial conference to "make a full and fair disclosure of their views as

to what the real issues of the trial will be."  *Rios v. Bigler,* 67 F.3d 1543, 1549 (10th

Cir. 1995) (internal citation and quotation omitted).  They cannot rely on their

"plain vanilla" delineation of their position – "that HB 1229 is unconstitutional

because it violated the Second Amendment rights of Colorado citizens," Doc. 138 at

3 – as being sufficient to alert the defense of their "specific theor[ies]," particularly

when those theories have never previously been articulated and Plaintiffs have

failed to even suggest that they have standing to pursue them. *Rios,* 67 F.3d at

1549.

     3.     Nonetheless, to the extent that the Court determines that Plaintiffs

adequately raised this claim and permits it to proceed, Plaintiffs' response makes it

clear that they *do* oppose the alternative relief requested.  Plaintiffs misconstrue

the Governor's alternative request as simply proposing a continuance for the

---

[1] Plaintiffs compare their own omission to the fact that the Defendant did not invoke the apparently talismanic phrase "longstanding historical regulation" in his own contribution to the final pretrial order.  Even assuming that Plaintiffs and Defendant are similarly situated in this regard, any assertion that Plaintiffs were unaware of this argument is belied by the fact that they directly and thoroughly addressed it in their trial brief. Doc. 136 at 33-35.

purpose of additional stipulations and briefing.  As the Governor's motion in limine
made clear, Plaintiffs' new theory is not simply a legal question that could be
resolved with stipulations about the Plaintiffs' standing.[2]  Rather, it would involve a
factually intensive inquiry about the relationship between the Second Amendment
right and the restrictions on firearms sales set by federal (not state) law.  Even
assuming that Plaintiffs' assertions about the scope of the Second Amendment right
and the meaning of 18 U.S.C. § 922 are correct, facts such as those outlined in the
Governor's motion in limine would need to be developed in order to evaluate
whether the asserted right: 1) falls within the scope of the Second Amendment's
guarantee, and if so; 2) can be restricted consistent with the applicable tier of
means-end scrutiny.  Because their claim would hinge on the correct interpretation
of federal law, the agency in charge of applying and interpreting that law would
likely need to be joined as a necessary party.

4.     Thus, the Governor's alternative request for bifurcation and a
continuance is premised entirely on the need to develop a factual record that will
permit the Court to properly evaluate Plaintiffs' new theory of why § 18-12-112
violates the Second Amendment.  The Governor's motion makes this clear, but to
the extent that it could be construed as simply seeking additional time to consider
stipulations and submit legal briefs, the Governor hereby withdraws the request for
alternative relief.

---

[2] The fact that Plaintiffs even need to suggest that stipulations would be necessary
to establish their standing to assert their new theory demonstrates that it has never
before been raised, and that Plaintiffs have never made the showing necessary to
establish that it is justiciable.

WHEREFORE, the Governor respectfully requests that the Court proceed to trial on all claims, but preclude Plaintiffs from presenting evidence or argument on their new theory that § 18-12-112 unconstitutionally bars 18-20 year-olds from acquiring handguns.  In the alternative, the Governor respectfully requests that the Court bifurcate the proceedings and reopen discovery in order to permit for evaluation of Plaintiffs' standing and to permit the Governor to marshal the appropriate evidence and ensure the presence of the appropriate parties in order to decide Plaintiffs' new theory on the merits.

Respectfully submitted this 21st day of March, 2014.


JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*
KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
STEPHANIE SCOVILLE*
Senior Assistant Attorney General
LEEANN MORRILL*
First Assistant Attorney General
Attorneys for Governor John W. Hickenlooper
*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2014 I served a true and complete copy of the foregoing **REPLY IN SUPPORT OF MOTION IN LIMINE OR IN THE ALTERNATIVE MOTION FOR BIFURCATION AND CONTINUANCE WITH RESPECT TO PLAINTIFFS' FIFTH CLAIM FOR RELIEF** upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                          david@i2i.org

Jonathan M. Anderson                    jmanderson@hollandhart.com

Richard A. Westfall                     rwestfall@halewestfall.com
Peter J. Krumholz                       pkrumholz@halewestfall.com

Marc F. Colin                           mcolin@bcjlpc.com

Anthony J. Fabian                       fabianlaw@qwestoffice.net


                                        *s/  Matthew D. Grove*

```
MIME-Version:1.0
From:COD_ENotice@cod.uscourts.gov
To:COD_NEF@coddb.cod.circ10.dcn
Message-Id:4436664@cod.uscourts.gov
Subject:Activity in Case 1:13-cv-01300-MSK-MJW Colorado Outfitters Association et al v.
Hickenlooper Order on Motion in Limine
```
Content–Type: text/html

## U.S. District Court

### District of Colorado

**Notice of Electronic Filing**


The following transaction was entered on 3/21/2014 at 5:03 PM MDT and filed on 3/21/2014

| | |
|---|---|
| **Case Name:** | Colorado Outfitters Association et al v. Hickenlooper |
| **Case Number:** | 1:13–cv–01300–MSK–MJW |
| **Filer:** | |
| **Document Number:** | 140(No document attached) |

**Docket Text:**

**ORDER on [137] Motion in Limine, the Plaintiffs' Response, and the Defendant's Reply. Having considered the parties' joint final pretrial order, and the Plaintiffs' trial brief, specifically footnote 5 and pages 18–20, the Court finds that the trial brief asserts a new contention that C.R.S.§ 18–12–112 is unconstitutional. The new contention pertains to Colorado citizens aged 18–20 years old, and the interplay of §18–12–112 with applicable federal law. Such contention was not disclosed in any of the five versions of the Plaintiffs' complaint, nor was it disclosed in the final pretrial order found at Docket #119, which was approved by this Court. Whether such contention is construed as a claim or theory, it exceeds the scope of the arguments and evidence to be tried beginning March 31, 2014. In the exercise of the Court's discretion, see Hullman v. Bd. of Trustees, 950 F.2d 665, 668 (10th Cir. 1999), the Court GRANTS the Defendant's Motion in Limine and excludes all evidence pertinent thereto. By Chief Judge Marcia S. Krieger on 3/21/2014. Text Only Entry(msklc3, )**


**1:13–cv–01300–MSK–MJW Notice has been electronically mailed to:**

Marc F. Colin    mcolin@brunolawyers.com, aduran@brunolawyers.com, mbrock@brunolawyers.com, slarson@brunolawyers.com

Kathleen L. Spalding    kit.spalding@state.co.us, mary.brown@state.co.us, terrie.sandoval@state.co.us

Richard A. Westfall    rwestfall@halewestfall.com, blillis@halewestfall.com, cmcnicholas@halewestfall.com

David Benjamin Kopel    david@i2i.org

Douglas L. Abbott    dabbott@hollandhart.com, IntakeTeam@HollandHart.com, jmarsh@hollandhart.com, mmarrow@hollandhart.com

David Robert Frankel    david.frankel@mesacounty.us, deanna.gohn@mesacounty.us

Peter J. Krumholz     pkrumholz@halewestfall.com, cmcnicholas@halewestfall.com

Anthony John Fabian     fabianlaw@qwestoffice.net

Stephanie Lindquist Scoville     stephanie.scoville@state.co.us, sally.ott@state.co.us

Molly Allen Moats     molly.moats@state.co.us

Jonathan Michael Anderson     jmanderson@hollandhart.com

Matthew David Grove     matt.grove@state.co.us, bernie.buescher@state.co.us, debbie.bendell@state.co.us, fred.yarger@state.co.us, leeann.morrill@state.co.us

Daniel D. Domenico     dan.domenico@state.co.us, laura−jane.weimer@state.co.us

Jonathan Patrick Fero     jon.fero@state.co.us, debbie.bendell@state.co.us

John Tien Yau Lee     jtlee@state.co.us, jtlee888@gmail.com

LeeAnn Morrill     leeann.morrill@state.co.us, debbie.bendell@state.co.us

David Christopher Blake     david.blake@state.co.us, carol.gall@state.co.us, laura−jane.weimer@state.co.us

**1:13−cv−01300−MSK−MJW Notice has been mailed by the filer to:**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et. al.*,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE UNTIMELY DISCLOSED EXPERT OPINION TESTIMONY

---

Plaintiffs, by and through their respective counsel, respectfully submit this Motion *in Limine* to exclude untimely disclosed expert opinion testimony. In support thereof, Plaintiffs state as follows:

**Certification**. Pursuant to D.C.COLO.LCivR. 7.1(a), Plaintiffs' counsel has conferred with Defendant's counsel concerning this motion. Defendant opposes the motion.

1.      On January 2, 2014, counsel for the Defendant disclosed to Plaintiffs' counsel via e-mail a series of spreadsheets acquired by Defendant's designated expert, Professor Jeffrey Zax. The spreadsheets contain firearms data which Professor Zax obtained from Virginia.

2.      On January 30, 2014, counsel for the Defendant e-mailed Plaintiffs' counsel a five-page supplemental expert report from Professor Zax, which purports to be a regression analysis of the Virginia firearms data, and arriving at an expert opinion based on that analysis.

3.     The discovery deadline in this case was November 1, 2013; the expert report deadline was August 1, 2013, and the rebuttal expert report deadline was September 13, 2013. Defendant through his counsel submitted an "Expert Report of Jeffrey Zax" on August 2, 2013. Although the report was one day after the deadline, Plaintiffs' counsel had agreed as a courtesy to allow Professor Zax an extra day in which to submit the report. Defendant later timely submitted a "Supplemental Report of Jeffrey S. Zax." Neither of these reports mentions anything about the Virginia firearms data or a regression analysis of that data.

4.     In his e-mail on January 2, 2014, Defendant's counsel represented that Professor Zax had acquired the Virginia data "after his deposition." In a short deposition held on March 19, 2014, Professor Zax confirmed that he had obtained the data in November. Zax Dep. at 9:5-15. He also confirmed that he completed the five-page supplemental report in December:

Q.     Can you identify Exhibit 8?

A.     Yes.

Q.     What is it?

A.     This is the report that I prepared based on my analysis of the data that I obtained from the Virginia Firearms Clearinghouse.

Q.     Did you prepare this, Professor, specifically for this case?

A.     Yes.

Q.     When did you complete it?

A.     Sometime in December, I believe.

*Id.* at 9:5-15. In his January 30, 2014 e-mail, Defendant's counsel did not explain the month-long delay in providing the five-page report. Moreover, there is no indication that the Virginia firearms data could not have been found before the end of discovery. In fact, the data has been

available to the public at least since January 2011, when the Washington Post published a story about it.

5.      Having listened to the cross-examination of Professor Gary Kleck last week, it appears that Defendant's counsel has every intention of presenting testimony by Professor Zax about his regression analysis of the Virginia data and his opinions drawn therefrom – despite the fact that Professor Zax completed his report on that analysis long after the applicable deadlines, and despite the fact that Defendant's counsel did not disclose it to the Plaintiffs until three months after the close of discovery.

6.      Rule 26(a)(2) requires parties to produce a written report by each expert witness that includes "a complete statement of all opinions to be expressed and the basis and reasons therefor." The report must be produced by the court-ordered deadline. *Cook v. Rockwell Internat'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006). "A party that fails to disclose expert testimony in compliance with these rules may not present the expert's testimony at trial unless the failure to disclose was substantially justified or harmless." *Id.* Although Rule 26(e)(1) requires that an expert supplement his report and disclosures in certain limited circumstances, "'[t]his provision is not intended to provide an extension of the expert designation and report production deadlines,' and may not be used for this purpose." *Id.* (quoting *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir.1998)).

7.      Counsel for the Defendant may argue that the late disclosure was substantially harmless because Defendant made Professor Zax available for a short deposition concerning the information contained in that late disclosure. That argument is without merit. Professor Zax's regression analysis, and the spreadsheets on which it is based, are different in kind from anything

that appeared in the two reports that were timely submitted. Had Defendant disclosed the regression analysis in a timely fashion, Plaintiffs would have designated their own econometrics expert who could have reviewed Professor Zax's regression analysis and provided a rebuttal report concerning it. A short supplemental deposition is an unacceptable substitute for a rebuttal expert who could have helped in developing a fuller evidentiary record for this Court to consider.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court to exclude from trial any testimony by Professor Zax concerning the Virginia firearms data and his late-disclosed regression analysis and report concerning that data.

Dated this 7th day of April, 2014.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue

Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM, JAMES FAULL, LARRY KUNTZ, FRED JOBE, DONALD KRUEGER, STAN HILKEY, DAVE STONG, PETER GONZALEZ; SUE KURTZ, DOUGLAS N. DARR, AND DAVID STRUMILLO**

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that on April 7, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

<div align="right">

<u>s/Peter J. Krumholz</u>
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020

</div>

1749

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT
CHERRY CREEK COLORADO PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;
JOHN B. COOKE;
KEN PUTNAM;
JAMES FAULL;
LARRY KUNTZ;
FRED JOBE;
DONALD KRUEGER;
DAVE STRONG;
PETER GONZALEZ;
SUE KURTZ; and
DOUGLAS N. DARR,

  Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

  Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court following a bench trial on the Plaintiffs' claims under the Second and Fourteenth Amendments to the United States Constitution, and under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et seq.* Having considered the evidence presented and the parties' arguments, the Court finds and concludes as follows.

### I. Factual Background

In 2013, in the wake of a mass shooting at a movie theater in Aurora, Colorado, the Colorado General Assembly enacted gun control legislation that included two new criminal statutes: (1) C.R.S. § 18-12-302, banning the sale, possession, and transfer of "large-capacity magazines," as that term is statutorily-defined; and (2) C.R.S. § 18-12-112, expanding mandatory background checks to recipients of firearms in some private transfers.

This action was initiated before the statutes became effective. The Plaintiffs — individuals who own guns, associations and organizations of gun owners and advocates, and businesses that manufacture or sell magazines and/or firearms — challenge these statutes and seek to permanently enjoin their enforcement. Many of the Plaintiffs opposed the legislation before the General Assembly, and iterate the arguments they made during the legislative process here. The named Defendant is the Governor of the State of Colorado, sued in his official capacity.[1] Thus, all future references to the Defendant will be to Colorado.[2]

---

[1]     *See Kentucky v. Graham*, 473 U.S. 166 (1985).

[2]     Generally, the Eleventh Amendment to the United States Constitution shelters a state from private suits brought without its consent under the doctrine of sovereign immunity. *Ellis v. Univ. of Kansas Medical Center*, 163 F.3d 1186, 1195 (10th Cir. 1998). However, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a narrow "exception" to states' sovereign immunity to allow private litigants to seek an injunction in federal court against a state

A number of claims were dismissed prior to trial.  The issues at trial were: (1) whether §
18-12-302 and § 18-12-112 violate the Second Amendment[3] of the United States Constitution,
which guarantees the people's right to "keep and bear arms;" (2) whether the phrase "continuous
possession" in the grandfather clause of § 18-12-302 is so vague as to violate the people's right
to Due Process under the Fourteenth Amendment of the United States Constitution; and (3)
whether the statutes violate Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §
12132.[4]

## II.  The Scope of this Decision

The issue of gun control is controversial.  It is the subject of vigorous and passionate
debate in legislatures, the media, and innumerable public and private discussions across the

---

official, in order to prohibit the official from enforcing a state statute claimed to violate federal
law.  *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011).  The
doctrine rests on the premise — or rather, legal fiction — that when a federal court commands a
state official to do nothing more than refrain from violating federal law, the official is not the
state for sovereign-immunity purposes.  *Virginia Office for Protection and Advocacy v. Stewart*,
131 S.Ct. 1632, 1638 (2011).  In other words, such a suit is not technically against the state, but
rather against an individual who has been "stripped of his official or representative character"
because of his unlawful conduct.  *Ex parte Young*, 209 U.S. at 159-60.  For such exception to
apply, the named state official must have a duty to "enforce" the statute in question and have
demonstrated a willingness to exercise that duty.  *Prairie Band Potawatomi Nation v. Wagnon*,
476 F.3d 818, 828 (10th Cir. 2007).  Given the duties of the Governor of Colorado to ensure that
the laws of Colorado are enforced, Colo. Const. art IV, § 2, the Court finds that the *Ex parte
Young* exception applies here.

[3]   By inference, the Plaintiffs also invoke the Fourteenth Amendment, which makes the
Second Amendment applicable to the states.

[4]   Also pending before the Court are the parties' Joint Motion to Strike Expert Opinions Per
Fed. R. Evid. 702 (**#118**) and the Defendant's second Motion to Dismiss (**#133**).  The Court's
findings of fact and conclusions of law set forth herein implicitly adjudicate the Rule 702
motion, and the Court will not otherwise address it separately.  The Court's ruling on the Motion
to Dismiss is incorporated into this opinion.

country.  The subject triggers both fear[5] and deeply-held societal values that conflict in varying degrees: the desire for physical safety, concerns about government intrusion into matters of individual liberty, the availability of mental health treatment for those disposed to violence, the effectiveness of existing law enforcement protection, and so on.  In crafting gun control laws, it is the role of the legislature to carefully examine each of these concerns, to weigh them against each other, and to create social policy in the form of legislation (or, indeed, to elect not to do so).

When the constitutionality of a state law is challenged, however, a court does not engage in the same process.  Judicial review of laws for constitutional compliance focuses on only a small sliver of the issues that the legislature considers.  A court does not act as a super-legislature to determine the wisdom or workability of legislation.  Instead, it determines only whether legislation is constitutionally permissible.  A law may be constitutional, but nevertheless foolish, ineffective, or cumbersome to enforce.

The limited role of the court grows out of the separation of powers among the executive, legislative, and judicial branches of government.  A legislature, being a body directly elected by the citizenry, is granted the broadest power to act for and by the people.  The judiciary acts only as a check on the exercise of that collective power, not by substitution of the personal opinion of a judge as to what he or she believes public policy should be.  The judge must only compare the public policy adopted by the legislature against the constitutional minimums that protect individual rights.

Constitutionality is a binary determination: either a law is constitutional, or it is not.  This Court will not express a qualitative opinion as to whether a law is "good" or "bad," "wise" or

---

[5]      Mass shootings are particularly frightening because they are unpredictable, occur in places one ordinarily expects to be safe, are horrendously violent, and there is no general consensus as to how to prevent them.

"unwise," "sound policy" or a "hastily-considered overreaction." Similarly, this Court will not assess what alternatives the legislature could have chosen, nor determine whether the enacted laws were the best alternative. Such decisions belong to the people acting through their legislature. Put another way, in determining whether a law is constitutional, this decision does not determine whether either law is "good," only whether it is constitutionally permissible.

## III. The Laws at Issue

### A. Prohibition of Large-Capacity Magazines

Colorado Revised Statute § 18-12-302(1) makes it a crime for a person to possess or transfer a large-capacity magazine after July 1, 2013. The statute defines a "large-capacity magazine" as including, "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition." C.R.S. § 18-12-301(2)(a)(I). Persons who possessed such magazines on July 1, 2013 may be protected by a so-called "grandfather clause," which states that a person can possess large-capacity magazines if: (1) the magazines were acquired before July 1, 2013, and (2) if the person has maintained (and continues to maintain) "continuous possession" of the magazines. C.R.S. § 18-12-302(2)(a). The statute also contains a handful of specifically-defined exceptions permitting the possession of large-capacity magazines by, among others, certain narrow classes of firearm manufacturers, firearm dealers, and government officials who carry weapons as part of their official duties.

### B. Mandatory Background Checks for Private Firearm Transfers

Colorado has long required background checks for those acquiring firearms at gun shows or from firearm dealers.[6] Such background checks must be performed by a licensed gun dealer

---

[6]    *See* C.R.S. § 24-33.5-424 (firearm sales), and C.R.S. § 12-26.1-101 (gun shows).

as defined in C.R.S. § 12-26.1-106(6).  Prior to transfer of the firearm, a search must be

performed by, and approval obtained from, the Colorado Bureau of Investigation in accordance

with C.R.S. § 24-33.5-424.

The 2013 law, Colorado Revised Statute § 18-12-112, expands the background check

requirement to certain private transfers of firearms.  It makes it a crime for both the person

transferring possession (the transferor) and person taking possession of a firearm (the transferee)

to transfer possession of the firearm in a private transfer without first obtaining a background

check for the transferee.  In addition, the statute makes the transferor liable for any injury caused

by the transferee's use of the firearm if no background check was obtained.  C.R.S. § 18-12-

112(5).  The process for obtaining the background check is the same as that required for retail

sales, but the fee that can be charged by the gun dealer performing the check is limited to ten

dollars.  C.R.S. § 18-12-112(2)(d).  If the firearm is transferred to an entity rather than a living

person, then a background check is required for each living person who will possess it.  C.R.S. §

18-12-112(1)(b).

The statute specifies certain types of private transfers for which no background check is

required, including, among others: (1) gifts or loans between certain specifically-identified

family members; (2) temporary transfers, made in the transferee's home, when the transferee

reasonably believes that possession is necessary to prevent his or her imminent death or serious

bodily injury; (3) temporary transfers of possession at shooting ranges, during target firearm

shooting competitions, or while legally hunting, fishing, target shooting, or trapping; and (4)

temporary transfers for no longer than seventy-two hours.  C.R.S. § 18-12-112(6).

## IV. Jurisdiction

The Plaintiffs invoke the Court's jurisdiction under 28 U.S.C. § 1331. Colorado, however, contends that the Court lacks jurisdiction to determine the constitutionality of either statute because no Plaintiff has shown standing to assert such claim.

The Plaintiffs' standing has been a persistent and problematic issue in this case. Colorado filed two motions seeking to dismiss claims on that basis. In ruling on Colorado's first Motion to Dismiss (**#96**), the Court set out the legal standards that guided its analysis.[7] The Court adopts that explication as if fully set out herein, but expands its reasoning in this ruling, as necessary.

Summarized briefly, for a federal Article III court to have jurisdiction to determine a matter, there must be a "claim or controversy" that is "justiciable." For a claim or controversy to be justiciable, at least one plaintiff must have standing to assert the claim. To have standing, a plaintiff must show that he, she, or it has been or is being injured, that the challenged law causes the injury, and that the lawsuit will provide relief for the injury. *See Lujan v. Defenders of*

---

[7]   Colorado's Second Motion to Dismiss (**#133**), was filed shortly before trial. It seeks dismissal of the challenge to the constitutionality of C.R.S. § 18-12-302 arguing that no Plaintiff has shown standing. Alternatively, it seeks dismissal of claims by certain Plaintiffs. As to § 18-12-112, it addresses standing in a footnote, "maintaining that [the claims] are not justiciable," but not expressly "re-raising arguments" it previously made in its first Motion to Dismiss. Both this Motion and the Plaintiffs' Response at (**#134**) rely on discovery responses and other documents prepared before trial. The Court has an independent duty to assure that jurisdiction is secure, and therefore this opinion will not necessarily follow the arguments of the parties. *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996); *PeTA v. Rasmussen*, 298 F3d 1198, 1202 (10th Cir. 2002); *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). In addition, because standing is determined in conjunction with the trial in this matter, the Court limits its consideration to the evidence presented at trial, rather than using the standard for pre-trial consideration of standing issues that indulges "well-pled" allegations and affidavits with the presumption that the facts contained therein will ultimately be proven. *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).

*Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury must be actual and concrete, rather than anticipated, hypothetical, or speculative.

When a plaintiff seeks to enjoin the enforcement of a criminal statute on grounds that it abridges a constitutional right, it is not necessary for the plaintiff to violate the statute in order to show an injury.  Instead, the law recognizes that the mere existence of a criminal statute can prevent or chill a plaintiff's desire to exercise conflicting constitutional rights.  *See Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).  Thus, the law deems a plaintiff to suffer a continuing injury sufficient for standing if it can be shown that: (1) the plaintiff genuinely intends to engage in a course of conduct that is constitutionally protected but is proscribed by the challenged statute, and (2) if the plaintiff engaged in such conduct, there exists "a credible threat" that the plaintiff would be prosecuted under the statute.  *See Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298-299 (1979); *Dias v. City and County of Denver*, 567 F.3d 1169, 1176-77 (10th Cir. 2009) (citing *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)).  To be "credible," the threat of prosecution must be more than imaginary or speculative.  *Younger v. Harris*, 401 U.S. 37, 42 (1971); *Golden v. Zwickler*, 394 U.S. 103 (1969).

Both § 18-12-302 and § 18-12-112 are criminal statutes.  No Plaintiff has been charged with violating either statute nor specifically threatened with prosecution.  Thus, no Plaintiff has suffered an actual past injury.  Instead, the Plaintiffs bring facial challenges to these statutes[8] and seek prospective injunctive relief.  For these claims to be justiciable, the evidence at trial must show that at least one Plaintiff intends to engage in a course of constitutionally protected conduct

---

[8]     Challenges to the constitutionality of statutes can take two forms.  There can be a challenge as to how the law has actually been applied to a plaintiff (an "as-applied" challenge) or, there can be a challenge based solely on its language and anticipated applications (a "facial" challenge).  Here, because the statutes have not been enforced against any Plaintiff, only facial challenges have been asserted.

that would violate the statute and that there is a "credible threat" of prosecution should the Plaintiff do so.  *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996).

### A.  Standing for Challenges to § 18-12-302

The Plaintiffs challenge this statute on two grounds: (1) that it violates rights protected by the Second (and by inference, the Fourteenth) Amendment to the United States Constitution; and (2) that the "grandfather clause" is so vague that it denies due process under the Fourteenth Amendment to the United States Constitution.  For these claims to be justiciable, the evidence must show that at least one Plaintiff[9] either: (1) possesses a large-capacity magazine that he or she acquired after July 1, 2013, in violation of the statute (in other words, not subject to any of the statutory exceptions); (2) intends to acquire a new large-capacity magazine in violation of the statute; or (3) intends to transfer or sell a large-capacity magazine, owned as of July 1, 2013, in violation of the statute.  In addition, such Plaintiff must show that there is a "credible threat of prosecution" for such violations.

### 1.  Individual Plaintiffs

The Court turns first to the individual Plaintiffs.  At trial, evidence was presented only as to three individual Plaintiffs — David Bayne, Dylan Harrell, and John Cooke.  No evidence shows that any of these Plaintiffs meet the requirements of standing discussed above.

Mr. Bayne lived in Thornton, Colorado when this action was initiated, but has since moved to Georgia.  He did not testify that he intends to return to Colorado, much less that he

---

[9]     No evidence was presented to demonstrate the standing of the following Plaintiffs: National Shooting Sports Foundation; USA Liberty Arms; 2nd Amendment Gunsmith & Shooter Supply, LLC; Green Mountain Guns; Jerry's Outdoor Sports; specialty Sports & Supply; Goods for the Woods; David Strumillo; Ken Putnam; James Faull; Larry Kuntz; Fred Jobe; Donald Krueger; Dave Strong; Peter Gonzalez; Sue Kurtz; and Douglas N. Darr.

would return with his large-capacity magazines.  Thus, there is no evidence that he is likely to be subject to the statute in the future.

Mr. Harrell owns large-capacity magazines that were purchased before July 1, 2013.  There is no evidence that suggests that Mr. Harrell's continued possession would not be protected by the grandfather clause, thus he is not currently in violation of the statute or subject to a risk of prosecution.  Mr. Harrell did not testify about any intention to acquire additional large-capacity magazines in the future, nor did he express an intention to transfer the large-capacity magazines currently in his possession, nor otherwise testify about future conduct that would place him at risk of prosecution.  Accordingly, Mr. Harrell lacks standing to challenge the statute.

Mr. Cooke currently serves as the Sheriff of Weld County and will be retiring in 2015.  There was no evidence as to whether he currently possesses large-capacity magazines.  His testimony strictly related to a "survey" he conducted of his employees (none of whom are Plaintiffs).  Even assuming that Mr. Cooke does possess large-capacity magazines, his current possession is exempted from the prohibition (due to his status as a law enforcement employee), and there was no testimony that, upon his retirement, he intends to transfer such magazines or intends to acquire more in violation of the statute.  Thus, on this record, the Court finds that no individual Plaintiff has shown standing to challenge § 18-12-302.

### 2. Plaintiffs that are Entities

The Court then turns to the Plaintiffs that are entities.  They fall roughly into two groups: associations of gun enthusiasts/advocates and firearm businesses.  The associations are Colorado Youth Outdoors, Women for Concealed Carry, Outdoor Buddies, Colorado State Shooting Association, Colorado Farm Bureau, and Colorado Outfitters Association.  The firearm

10

businesses are Rocky Mountain Shooter Supply and Burrud Arms, Inc. (both licensed firearm

dealers), Hamilton Family Enterprises, Inc. (a shooting range operator), and Magpul Industries (a

manufactures of magazines).

As to the associational entities, the Court begins by examining whether these entities can

assert associational standing on behalf of their members.  "Associational standing" is recognized

if an organization can establish that: (1) its members would otherwise have standing to sue in

their own right; (2) the members' interests that the association seeks to protect are germane to the

organization's purpose; and (3) neither the claim asserted nor the relief requested requires the

participation of the individual members in the lawsuit.  *Chamber of Commerce of U.S. v.

Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010).  With regard to the first element, the entity

Plaintiffs must show, through specific facts, that at least one of its members would be directly

affected by the statute.  *See Lujan*, 504 U.S. at 563 (citing *Sierra Club v. Morton*, 405 U.S. 727,

735, 739 (1972), and *Hunt v. Washington Colorado Apple Advertising Comm'n*, 432 U.S. 333,

343 (1977)).

At trial, Elisa Dahlberg, a member of Women for Concealed Carry, testified that Women

for Concealed Carry is a nonprofit organization committed to providing information to women

who choose to carry a concealed weapon as a form of self-defense.  She further testified that she

owns two semiautomatic carbine-style rifles and a 9mm semiautomatic handgun, each of which

are equipped with a large-capacity magazine.  She testified that she uses these firearms for home

defense and target shooting, among other things.  It appears to be undisputed that Ms. Dahlberg's

current possession of large-capacity magazines is permitted by the statute's grandfather clause,

and the parties agree that all large-capacity magazines will wear out or become unusable at some

point in time.  Considering this, Ms. Dahlberg stated that, due to § 18-12-302, she will be unable to replace her large-capacity magazines once they no longer function.

The question of whether Ms. Dahlberg is suffering a continuing injury is a close one, because it is not clear when Ms. Dahlberg's magazines are likely to need replacement and whether, at that indeterminate point in future, she will desire to replace them with magazines of similar type.  Notwithstanding her current interests, with the passage of time, Ms. Dahlberg's desire to carry large-capacity magazines may change.[10]  If that happened, this statute would not affect her.

Nevertheless, in an attempt to find standing for some Plaintiff, the Court will assume that, in the absence of evidence as to the age of Ms. Dahlberg's existing large-capacity magazines and the functioning life of those magazines, Ms. Dahlberg may need to replace a large-capacity magazine in the very near future and that she will desire to replace it with another large-capacity magazine.  If that were the case, the restrictions of § 18-12-302 would nevertheless prevent her from acquiring and possessing the replacement large-capacity magazine.  Thus, the first element necessary for associational standing for Women for Concealed Carry is, arguably, satisfied.

The second element is also satisfied because the interests that Women for Concealed Carry ostensibly seek to protect — providing information to and engaging in advocacy on behalf of women who are interested in carrying concealed weapons for self-defense purposes — are "germane" to the interests that Ms. Dahlberg could assert on her own behalf.

Finally, because this claim is a facial challenge and the relief requested is prospective, it does not require the personal participation of the individual members of Women for Concealed

---

[10]      The inability to predict *when* Ms. Dahlberg may need to replace magazines and *what* her desires might be at that time is illustrative of how speculative a pre-enforcement, facial challenge to a criminal statute can be.

Carry in the lawsuit.  *See Warth v. Seldin*, 422 U.S. 490, 515 (1975).  Whether the statute

violates constitutional standards turns on the statute's plain language and its general operation,

not on the particular circumstances for which Ms. Dahlberg or a specific member of Women for

Concealed Carry possesses large-capacity magazines.  Thus, the personal participation of

Women for Concealed Carry's members is not essential.

Accordingly, with the benefit of some generous assumptions, the Court finds that Women

for Concealed Carry has associational standing to assert the Second Amendment challenge to §

18-12-302.[11]  Accordingly, the Court has jurisdiction to determine these challenges to the statute

on their merits.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264

(1977); *Colorado of Utah v. Babbitt*, 137 F.3d 1193, 1215 n.36 (10th Cir. 1998).

### B.  Standing for the Challenge to § 18-12-112

The Plaintiffs assert a single challenge to § 18-12-112: that it violates the Second (and by

inference, the Fourteenth) Amendment to the United States Constitution.  Following the same

analytical pattern used with regard to § 18-12-302, in order for the Court to consider this claim,

at least one Plaintiff must establish a continuing injury by showing that he or she intends to

engage in conduct protected by the Second Amendment but which violates § 18-12-112, and that

if the Plaintiff engaged in such conduct, there is a credible threat that he or she would be

prosecuted.

---

[11]     The status of Women For Concealed Carry's standing to assert a vagueness challenge
with regard to the "grandfather clause" of § 18-12-302 is a bit more murky, as it is not clear that
Ms. Dahlberg's current possession of her grandfathered large-capacity magazines subjects her to
a risk of future prosecution, nor that other members of Women For Concealed Carry similarly
face such a risk.  Nevertheless, for purposes of completeness of the Court's decision, the Court
will assume that Women for Concealed Carry has associational standing to pursue this claim as
well.

As noted above, § 18-12-112 requires that a background check be performed on the individual transferee(s) who take possession of a firearm through certain private transfers. The statute requires a licensed gun dealer to perform certain actions, retain certain records, and charge no more than ten dollars for the background check. The failure to obtain such a background check exposes both the transferor and transferee to criminal liability.

To establish a continuing injury sufficient to challenge § 18-12-112, the evidence must show either: (1) a Plaintiff intends to transfer or acquire a firearm, through a private sale not otherwise exempt under the statute, without first conducting a background check on the transferee; or (2) a Plaintiff who is a licensed gun dealer intends not to comply with the requirements for conducting the background check or other specified responsibilities. Further, either types of Plaintiff must also show that there is a "credible threat of prosecution" for this conduct.

### 1. Individual Plaintiffs

The Court begins its analysis of standing with the same three individual Plaintiffs discussed above, finding that none have demonstrated a continuing injury.

Mr. Bayne is not subject to prosecution under § 18-12-112 because he no longer lives in Colorado and does not intend to return.

Mr. Cooke did not provide any testimony with regard to his personal firearms, much less his intention to transfer them to others or to acquire new ones via private transfer, with or without a background check.

Mr. Harrell's circumstances are bit more complicated. He testified that, in the past, he has installed scopes on, or "sighted," firearms for friends and neighbors. On occasion, he kept the firearm for longer than 72 hours. Initially, the Court has some doubt that a person's taking

temporary possession of another person's firearm for the purpose of installing a scope or

"sighting" it is within the Second Amendment's protection of an individual right to "keep and

bear arms" for the purpose of self-defense.  But, assuming (without deciding), that it is, there is

no evidence that the transfer to Mr. Harrell is a private transfer requiring a background check.

Temporary transfers for up to 72 hours are exempt from the background check requirement, and

although there was testimony that Mr. Harrell sometimes retained the firearm for more than 72

hours, it was not clear that he did so out of necessity rather than convenience.  Assuming Mr.

Harrell could regularly perform the scoping or sighting of the firearm within the 72-hour period

and return the weapon, he would suffer no injury from the operation of the statute.  In addition,

assuming that he kept a firearm for longer than 72 hours with the owner's permission while

performing maintenance duties on it, he has not shown any credible threat that he would be

prosecuted for not first obtaining a background check.  Accordingly, the evidence does not

establish Mr. Harrell's standing.

### 2.  Plaintiffs that are Entities

As noted earlier, there are two groups of entity Plaintiffs.  With regard to this statute, the

Court begins with the firearm businesses — Rocky Mountain Shooter Supply, Burrud Arms,

Hamilton Family Enterprises, Inc., and Magpul Industries.

The Court has some doubt that these entities can have standing to bring a Second

Amendment challenge.  As discussed in greater detail below, rights granted under the Second

Amendment are *individual* rights premised upon an inherent natural right of self-defense.

Although businesses such as these might have standing to challenge a statute under some other constitutional theory, it does not appear that they are protected by the Second Amendment.[12]

Assuming, however, that a business entity *could* assert a Second Amendment challenge, the trial record does not show evidence of continuing injury to any of the Plaintiff business entities. Rocky Mountain Shooter Supply and Burrud Arms are licensed firearm dealers. Transfers by these Plaintiffs are not governed by § 18-12-112, and neither of these parties perform private background checks subject to the statute. Hamilton Family Enterprises, Inc. operates a shooting range and lends firearms to those who use the range. It sells firearm accessories including magazines, but does not sell firearms themselves, nor is it a licensed firearm dealer. It appears that the only transfers made by Hamilton Family Enterprises are in the nature of loans that do not exceed 72 hours and are for the purpose of target shooting. Such transfers are expressly exempt from the statute's requirements. According to the parties' stipulated facts, Magpul Industries designs and manufactures high-quality magazines and magazine accessories. There is no evidence that it intends to be a transferor or transferee of a firearm in private sales, nor a licensed firearm dealer subject to § 18-12-112.

Next, the Court looks to the Plaintiff associations: Outdoor Buddies, Colorado Farm Bureau, Colorado Outfitters Association, Women for Concealed Carry, Colorado Youth Outdoors, and Colorado State Shooting Association. Based on the evidence presented, it does not appear that any of these entities can bring a Second Amendment claim based on associational standing.

---

[12]     *Cf. United States v. Chafin*, 423 Fed.Appx. 342, 344 (4th Cir. 2011) (finding no authority to suggest that the Second Amendment protects a right to sell a firearm); *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 3926029, *21 (D.Mont. 2010) (recognizing that *Heller* did not extend Second Amendment protection to manufacturers and dealers seeking to sell firearms); *Teixeira v. Cnty. of Alameda*, 2013 WL 4804756, *6 (N.D.Cal. 2013) (same).

Outdoor Buddies is a non-profit organization with over 800 members, a third of whom are disabled. Its mission is to "get disabled individuals active in the outdoors." It lends highly specialized firearms to members for 3-day hunts. Because these transfers are temporary and incident to legal hunting activities, they are exempt under § 18-12-112. The evidence reflects that, sometimes, transferees keep a firearm for a period before or after the hunt, which time might exceed 72 hours. But the record does not clearly establish that this is necessary (as opposed to convenient), or that any member would decline to participate if he or she could not retain the firearm for more than 72 hours beyond the time of a hunt. As a consequence, the record does not reflect that either Outdoor Buddies or its members are at risk of prosecution under § 18-12-112.

The Colorado Farm Bureau (CFB) is a federation with 24,000 members, 5,800 of whom are active farmers and ranchers. Its mission is to promote agriculture and protect agricultural values. Nicholas Colgazier testified as its Director of Public Policy, and Michele Eichler testified as a member. Mr. Colgazier works as an in-house lobbyist who brings pending legislation to the attention of the "board" for development of policy positions. He did so with regard to § 18-12-112, then lobbied against it based on the requests of some members who opposed the background check requirement due to inconvenience and expense. He did not offer testimony as to whether or how many of the CFB members would be transferors (or, arguably, transferees) in transfers subject to the statute, whether any would forego such transfers or intended to ignore the background check requirement, or otherwise testify as to facts demonstrating any "credible threat of prosecution." Ms. Eichler testified that it would be inconvenient to have to obtain a background check in order to transfer a firearm to a ranch or farm hand. She particularly worried that the gun kept in her farm truck (for predator control)

would inadvertently be in the possession of a ranch hand if the family left town for longer than 72 hours. However, she acknowledged that there had never been an occasion when her ranch hand had possession of the gun for longer than 72 hours. The Court finds that the evidence as to potential violations of the statute by CFB members to be speculative. Moreover, even assuming that CFB's members would themselves have standing to challenge the statute, it is not clear that challenging firearms laws is within the scope of CFB's mission of promoting "agricultural values." Finally, the Court finds that CFB has not shown that there is a "credible threat of prosecution" of its members for the conduct described at trial.

Ms. Eichler also testified as a member of Colorado Outfitters, but offered no evidence as to that association's organization, membership, or mission. She testified that she and her husband run an outfitting business that takes between 100-150 clients on hunts each year. In the past, if a client did not have a firearm, the Eichlers would loan the client one of their personal firearms for use during the hunt. Hunts are usually five days, but may last longer if successful. It would appear that the type of transfers described by Ms. Eichler would be exempt under C.R.S. § 18-12-112(6)(e)(III). But in any event, the lack of evidence about Colorado Outfitter's membership or mission requires a conclusion that it has not shown the requirements for associational standing.

Three associations — Women for Concealed Carry, Colorado Youth Outdoors, and Colorado State Shooting Association — each testified (through representatives) that they regularly "loan" firearms to their members for various purposes, sometimes for longer than 72 hours, without conducting background checks. If these associations were individuals, with

clearly established Second Amendment rights,[13] they might have standing to assert a Second

Amendment challenge to the statute.[14]  However, because they are entities rather than human

beings, the question of whether they are protected by the Second Amendment is less than clear.

As noted, the Second Amendment protects a fundamental *individual* right, and it is not clear that

entities have any rights protected by the Second Amendment.  Such questions stretch the outer

boundaries of current Second Amendment jurisprudence, and the parties have not specifically

addressed these issues.

Thus, although the Court has profound reservations as to whether any Plaintiff has

standing to challenge § 18-12-112, in the interests of providing a complete ruling, both for the

guidance of the parties and the inevitable review by the Court of Appeals, the Court will assume

that Women for Concealed Carry, Colorado Youth Outdoors, or the Colorado State Shooting

Association have standing, in their own right, to challenge § 18-12-112 under the Second

Amendment.

## V.  Analysis

### A.  History and Analytical Framework for Second Amendment Challenges

The Second Amendment to the United States Constitution provides**:**

> A well regulated Militia being necessary to the security of a free
> State, the right of the people to keep and bear Arms, shall not be
> infringed.

---

[13]      It is not necessarily evident that that the Second Amendment's guarantee of a "right to keep and bear arms" extends to also guarantee the right of an owner of a firearm to lend that weapon to another (or to guarantee the right of a non-owner to borrow a firearm).  The parties have not addressed this question, and the Court does not consider it.

[14]      The Court rejects the notion that these associations have associational standing to bring claims on behalf of their members who might wish to engage in private transfers without conducting background checks.  The testimony by the representatives of these associations focused on the transfer of weapons ostensibly belonging to the associations themselves, not on private transfers that individual members intended to make involving their own, personally-owned weapons.

Until 2008, most courts did not construe the Second Amendment to protect an individual's right to possess and use firearms.  Courts were guided by the Supreme Court's decision in *United States v. Miller*, 307 U.S. 174, 179 (1939), which held that a right protected by the Second Amendment required "some reasonable relationship to the preservation or efficiency of a well regulated militia."  *See, e.g., United States v. Haney*, 264 F.3d 1161, 1164-66 (10th Cir. 2001); *Gillespie v. Indianapolis*, 185 F.3d 693, 710-11 (7th Cir. 1999); *Stevens v. United States*, 440 F.2d 144, 149 (6th Cir. 1971); *but see United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

In 2008, the legal landscape with regard to the Second Amendment shifted.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court considered a District of Columbia ban on the possession of usable handguns.  The Court concluded that the Second Amendment "confer[s] an individual right to keep and bear arms."  554 U.S. at 595.  To reach that conclusion, it de-linked the Second Amendment's prefatory clause — "a well regulated militia, being necessary to the security of a free state" — from its operative clause — "the right of the people to keep and bear Arms, shall not be infringed" — and explained that although the prefatory clause states the purpose for the right, it does not limit the right to own or use firearms to circumstances of militia service.[15]  *Id.* at 577.  Instead, the Court identified the core Second Amendment right as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," and defined the right to "keep and bear arms" as the ability to acquire, use, possess, or carry lawful firearms for *the purpose of self-defense*.  *See, e.g.*, *id.* at 599 ("self-

---

[15]     This reasoning was extended to state statutes by virtue of the Fourteenth Amendment in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

defense . . . was the *central component* of the right itself") (emphasis in original), at 628 ("the inherent right of self-defense has been central to the Second Amendment right").

As profound as *Heller* is, it does not stand for the proposition that there can be no permissible regulation of firearms or their use.  To the contrary, the Court explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose."  *Id.* at 626.  And the Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," among others.  *Id.* at 626-27 & n.26.

The Supreme Court did not specify in *Heller* what analytical framework should be used in testing laws challenged under the Second Amendment.  This was, in part, because it found that that the ban it was considering (a law effectively prohibiting the possession of functional handguns inside or outside of the home) would fail all recognized tests for constitutionality.  *Id.* at 628.  Since *Heller*, Second Amendment jurisprudence has continued to evolve, particularly with regard to the analytical standards to be applied.  Many Circuit Courts of Appeal, including the Tenth Circuit, have adopted a two-step approach.  *See United States v. Reese*, 627 F.3d 792 (10th Cir. 2010);[16] *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013);

---

[16]    The two-step process was also applied in *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012), and in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013).

*Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

In the two-step approach, a court must make a threshold determination of whether the challenged law burdens conduct falling within the Second Amendment's protection.  As part of this determination, the Court may consider whether the challenged law impacts firearms or firearm use, whether the affected firearms are currently in "common use," whether the affected firearms are used for self-defense inside or outside of the home, and whether the restriction is akin to restrictions that were historically imposed and customarily accepted.[17]  If the challenged law does not burden a right or conduct protected by the Second Amendment, then the inquiry is over.

If the challenged law burdens conduct protected by the Second Amendment, then a court must determine what level of constitutional scrutiny to apply.  Generally, constitutional scrutiny takes one of three forms.  *See United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938).  The least rigorous and most deferential standard is the "rational basis" test, which is used when a local, commercial, or economic right, rather than a fundamental individual constitutional right, is infringed.  *See Armour v. City of Indianapolis, Ind.*, 132 S.Ct. 2073, 2080 (2012).  More rigorous

---

[17]     Although this is a threshold determination, some circumstances may require a comparison of the burden imposed to "longstanding prohibitions" that have been generally accepted.  These include, but are not limited to: the possession of firearms by felons and the mentally ill; laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings; or laws imposing conditions and qualifications on the commercial sale of arms.  *Heller*, 554 U.S. at 625 & 627 n.26; *see also Jackson v. City and Cnty. of San Francisco*, 2014 WL 1193434, *4 (9th Cir. 2014).  In *Peterson*, the Tenth Circuit held that the Second Amendment did not confer a right to carry concealed weapons because such bans were long-standing.  *Peterson*, 707 F.3d at 1197.  In *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), Judge Tymkovich presaged the possibility that reliance on the long-standing restriction exception to categorically exclude certain conduct from protection under the Second Amendment might circumvent constitutional scrutiny of current restrictions.

is "intermediate scrutiny" review, which applies to laws that infringe upon, but do not substantially burden, fundamental individual rights, such as content-neutral restrictions on speech.  For a challenged law to satisfy intermediate scrutiny, it must be substantially related to an important governmental interest.  *Reese*, 678 F.3d at 802 (citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012).  Laws that substantially burden fundamental individual rights (*e.g.*, laws embodying racial discrimination or content-based restrictions on speech) are subject to "strict scrutiny."  To satisfy strict scrutiny, a law must be narrowly-tailored to further a compelling government interest.  *See Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002).

Recognizing that the Second Amendment protects fundamental individual rights, *Heller* instructed that the rational basis test should not be applied,[18] but it gave no instruction as what heightened level of scrutiny — intermediate, strict, or something in between — should apply.  In subsequent cases, courts have analogized conduct protected under the Second Amendment to other fundamental individual rights such as those protected by the First Amendment (speech, religion, assembly, and petition).[19]  Most courts have concluded that no single standard is applicable to all challenges under the Second Amendment.  Rather, the level of scrutiny to be

---

[18]      *See* 554 U.S. at 628 n.27.

[19]      In free-speech cases, the standard of judicial review depends on the nature and degree of governmental burden on the First Amendment Right.  For example, content-based regulations and laws that burden political speech are subject to strict scrutiny, whereas "time, place, and manner" regulations need only be "reasonable" and "justified without reference to the content of the regulated speech."  *See Ezell*, 651 F.3d at 706-08 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)); *Chovan*, 735 F.3d at 1138.  Firearm regulations that leave open alternative channels for self-defense are less likely to severely burden the Second Amendment right than those that do not.  *See Jackson*, WL 1193434 at *4; *see also Marzzarella*, 614 F.3d at 97.

applied depends, in part, on the type of restriction being challenged and the severity of its burden

on the "core" Second Amendment right. *See, e.g., Marzzarella*, 614 F.3d at 96-97; *Reese*, 627

F.3d at 802; *Ezell*, 651 F.3d at 703; *Chovan*, 735 F.3d at 1138. The Tenth Circuit has joined

many other courts in applying intermediate scrutiny to Second Amendment challenges. *See, e.g.*,

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *United States v. Huitron-Guizar*, 678 F.3d

1164 (10th Cir. 2012).[20]

## B.  Application to § 18-12-302

Under the two-step test, the first question is whether § 18-12-302 impacts a right or

conduct protected by the Second Amendment. The Plaintiffs argue that by limiting magazines to

15 rounds or less, this statute impairs an individual's Second Amendment "right of self-defense."

Colorado reflexively responds that because people can still defend themselves, no Second

Amendment right is impaired.

Both positions are slightly off-base. They reflect a common confusion between the right

that is protected by the Second Amendment — that is, "to keep and bear arms" — and the

---

[20]     In *Reese* and *Huitron-Guizar*, the court applied the standard intermediate scrutiny test,
and *Reese* expressly declined to impose a strict scrutiny standard. *See Reese*, 627 F.3d at 804
n.4. It appears that the Tenth Circuit relied heavily on a Seventh Circuit line of cases, beginning
with *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010). In *Skoien*, the Seventh Circuit
determined that another federal gun restriction, 18 U.S.C. § 922(g)(9), was constitutional based
upon a "strong showing" that the statute was substantially related to an important government
interest. *Id.* at 641. In selecting that test, the Seventh Circuit cited both to a First Amendment
case, *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 202-04 (1999), and to
a gender-classification equal protection case, *Heckler v. Mathews*, 465 U.S. 728, 744-51 (1984).
        Interestingly, some courts that analogize Second Amendment rights to First Amendment
rights apply a more rigorous test than that adopted in *Skoien*, *Reese*, and *Huitron-Guizar*. Some
have required a showing of a "tight fit" between the means and the ends, meaning that the statute
is "narrowly tailored" to achieve the desired objective. *See, e.g., Heller II*, 670 F.3d at 1258
(citing *Bd. of Trustees v. Fox*, 492 U.S. 469 (1989), and *Ward v. Rock Against Racism*, 491 U.S.
781(1989)); *see also Marzzarella*, 614 F.3d at 97-98. Because it falls between the standard
intermediate scrutiny and strict scrutiny, one might call it "intermediate scrutiny plus."

purpose of that right — "for defense of self and home."  Although *Heller* sometimes uses

shorthand phrases such as "a natural right of self-defense," 554 U.S. at 612, or the "inherent right

of self- defense," 554 U.S. at 612, it is clear that *Heller* does not extend the boundaries of the

Second Amendment to guarantee "self-defense" as a right in and of itself.  Nothing in *Heller* can

be read to guarantee an individual right to possess whatever firearm he or she subjectively

perceives to be necessary or useful for self-defense, nor any firearm for a purpose other than self-

defense.  To the contrary, the Supreme Court expressly stated that the rights embodied by the

Second Amendment have not historically been understood to be "a right to keep and carry any

weapon whatsoever." *Id.* at 626.  And the Supreme Court conceded that its interpretation of the

Second Amendment could authorize the prohibition of civilian possession of certain weapons

commonly used in military service, such as "M-16 rifles[21] and the like." *Id.* at 628.  *Heller* also

acknowledged the historical validity of "prohibitions on carrying concealed weapons." *Id.* at

626.  Such comments illustrate that the Supreme Court does not equate the Second Amendment

"right to keep and bear arms" to guarantee an individual the "right to use any firearm one

chooses for self-defense."

Instead, *Heller* describes the Second Amendment "right to keep and bear arms" rather

narrowly: the right to possess those weapons that are "in common use" for "self-defense"

purposes.  *See id.* at 624-25 ("the Second Amendment's operative clause furthers the purpose

announced in its preface" by guaranteeing access to the type of arms "in common use at the time

for lawful purposes like self-defense"), at 627 ("the sorts of weapons protected were those in

---

[21]      The M-16 rifle mentioned by the Court is a military version of the AR-15 rifle, a rifle that
several witnesses in this case testified that they possess for their own self-defense purposes.  If,
as *Heller* implies, the M-16 rifle can legally be prohibited without violating the Second
Amendment, it seems to follow that other weapons such as the AR-15 may also be prohibited,
notwithstanding the fact that some individuals believe that such weapon is important, or even
essential, to their self-defense.

common use at the time"). *Heller* concluded that handguns were in common use because they are a "class of arms that is overwhelmingly chosen by American society for that lawful purpose [of self-defense]" and they are "the quintessential self-defense weapon." *Id.* at 628-29. Thus, the Court's first inquiry is whether § 18-12-302 burdens the right of individuals to possess commonly-used weapons, such as handguns, for self-defense.

Section 18-12-302 is interesting in that it does not directly regulate firearms at all; it regulates only the size of a magazine. Simply put, a "magazine" is nothing more than a container that holds multiple rounds of ammunition. Magazines are designed to feed a bullet into the firing chamber of a firearm with each cycle of the action, allowing multiple shots to be fired rapidly, either semi-automatically (that is, with a single shot fired each time the trigger is pulled) or automatically (with shots being fired continually so long as the trigger is held).[22] Here, the Plaintiffs are concerned primarily with semiautomatic firearms. Such firearms can operate without a magazine, but each round must be individually loaded.

The capacity of the magazine determines how frequently a firearm must be reloaded if the shooter wishes to keep firing. For example, a handgun or rifle using a 15-round magazine must be reloaded twice as frequently as one using a 30-round magazine. Because § 18-12-302 regulates only the number of rounds in a magazine, it does not affect whether the semiautomatic

---

[22]    Certain firearms are not designed to use magazines at all. Single-shot firearms, including bolt-action and muzzle-loading rifles, shotguns, and some handguns, require the user to manually load each new round. Other firearms, such as revolvers, use a cylinder, rather than a magazine, to load each round.
    Magazines may be integral to a weapon or, more commonly in modern weapons, detachable. Detachable magazines allow a user to pre-load and carry multiple magazines, making it possible for the user to quickly swap out an empty magazine from the weapon and replace it with a full one. For all practical purposes, the discussion of "magazines" in this case refers to detachable magazines.

firearm can be used, or even whether it can be used in a semiautomatic mode.  It only affects how often it must be reloaded.

The parties agree that semiautomatic firearms are numerous and widespread.  They stipulate that lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions, although the exact number subject to regulation in Colorado is unknown.  They also agree that semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense.  Because § 18-12-302 affects the use of firearms that are both widespread and commonly used for self-defense, the Court concludes that, at the first step of the analysis, the statute burdens the core right protected by the Second Amendment.

The second analytical step requires that the Court to determine the level of constitutional scrutiny to apply.  Similar to their prior arguments, the Plaintiffs argue that the Court should apply strict scrutiny because the statute severely restricts a person's "right to self-defense," which the Court understands to be the ability to successfully defend him or herself.  Colorado contends that the impact is not severe because, despite the magazine size limitation, people can adequately defend themselves.

As noted, § 18-12-302 bans possession of all magazines capable of holding more than 15 rounds (except for magazines subject to the grandfather clause).  Other than those specifically excepted in the statute, this ban applies to every person in Colorado, in every venue, and for every use, including self-defense inside and outside of the home.  It impacts a large number of semiautomatic firearms, both handguns and rifles.  Viewed in this light, the *scope* of the statute is broad, and it touches the *core* of an individual right guaranteed by Second Amendment — the right to keep and bear (use) firearms for the purpose of self and home defense.

27

1776

Despite such broad scope, however, the statute's impact on a person's ability to keep and bear (use) firearms for the *purpose* of self-defense is not severe.  Unlike the restriction considered in *Heller*, this statute does not ban any firearm nor does it render any firearm useless. Semiautomatic weapons can be used for self-defense in and outside of the home. The parties agree that semiautomatic weapons that use large-capacity magazines will also accept compliant magazines (*i.e.*, 15 rounds or fewer), and that compliant magazines can be obtained from manufacturers of large-capacity magazines.  Thus, this statute does not prevent the people of Colorado from possessing semiautomatic weapons for self-defense, or from using those weapons as they are designed to function.  The only limitation imposed is how frequently they must reload their weapons.

By requiring users to reload every 15 rounds, the statute impacts both the "offensive" and "defensive" use of semiautomatic weapons.  Most of the time when a weapon is used "offensively," it is for unlawful purposes — *i.e.* the mass shooting scenario.  (The significance of the statute with regard to offensive firearm use is discussed below.  Needless to say, no party here is complaining of the effects of the challenged statute on the offensive use of large-capacity magazines.)  The Plaintiffs' primary concern here focuses on the "defensive" use of a firearm — that is, to protect the user or others against an attacker.  The effect of magazine size limitations on defensive use of a weapon is important in assessing whether and to what degree a citizen's lawful ability to defend him or herself is compromised.

No evidence presented here suggests that the general ability of a person to defend him or herself is seriously diminished if magazines are limited to 15 rounds.  Despite more than 40 years instructing individuals and law enforcement in defensive firearm use, the Plaintiffs' expert witness, Massad Ayoob, identified only three anecdotal instances in which individuals engaging

28

in defensive use of firearms fired more than 15 rounds, and not all of these successful defensive

actions involved semiautomatic weapons.[23]   Of the many law enforcement officials called to

testify, none were able to identify a single instance in which they were involved where a single

civilian fired more than 15 shots in self-defense.[24]   (Indeed, the record reflects that many law

enforcement agencies, including the Colorado State Patrol, the Federal Bureau of Investigation,

and the New York City Police Department equip their officers with 15-round or smaller

---

[23]      The first incident involved a gun shop owner who lived next door to the shop.  One night, carloads of people drove through his storefront to steal guns.  In defending his property, the shop owner used a fully automatic M-16 and a fully automatic 9mm submachine gun to fire over 100 rounds.  One perpetrator was killed, others were injured, and all were captured and convicted.  The second incident involved a man who owned a watch shop in Los Angeles and who had been involved in a series of "gun fights."  (Presumably, he had been robbed repeatedly.) The shop owner began keeping multiple pistols hidden in his shop.  Mr. Ayoob recalled that at least one of the gun fights "went beyond" 17 or 19 shots before the last of the multiple perpetrators was down or had fled.  The third incident involved a Virginia jewelry store that was robbed by "two old gangster type guys."  The two brothers who owned the store successfully defended themselves and their property using multiple revolvers (not semiautomatic weapons) that were kept behind the counter.  Mr. Ayoob did not specify how many rounds were fired in that incident.

[24]      These witnesses include John Cerar, Douglas Fuchs, Lorne Kramer, and Daniel Montgomery.  Mr. Cerar spent 26 years with the New York City Police Department, beginning in 1973.  Over the course of his career, he was responsible for training NYC police officers in firearms and tactics, and also oversaw the evaluation and testing of firearms, ammunition, armor, and police equipment in order to determine appropriateness of use for the department.  He also served on the firearms discharge review board, which reviews all police involved shootings in New York.  Mr. Cerar currently serves as a consultant to various police agencies where high profile shootings have taken place.
     Mr. Fuchs currently serves as the Chief of Police in Redding, Connecticut.  He has served in that role for the past 12 years, following lengthy periods in other police agencies.  Throughout his career, Mr. Fuchs has received thousands of hours of training in law, defensive tactics, firearms, and practical skills, such as magazine reloading and tactical reloading.
     Mr. Kramer joined the Los Angeles Police Department in 1963 and served there for nearly 28 years.  In 1991, he became the Chief of Police in Colorado Springs, Colorado, where he served for 11 years.
     Mr. Montgomery began his law enforcement career in 1962 in California.  In 1971, he was recruited to the police department in Lakewood, Colorado, where he served for 12 years and attained the rank of captain.  In 1982, he became the Chief of Police in Westminster, Colorado, a role in which he served until his retirement in 2007.

magazines.)  Anecdotal testimony from the Plaintiff's lay witnesses was corroborative.
Although they possessed large-capacity magazines, none had ever had the occasion to fire more
than 15 rounds in an instance of self-defense.

There are myriad reasons for this phenomenon.  First, the defensive purpose of firearms
is often achieved without shots being fired whatsoever.  Mr. Avoob testified that, often, merely
the defensive display of a firearm is sufficient to defuse the threat.  Similarly, when shots are
fired in self-defense, the deterrent purpose is often achieved simply by the firing of a round or
two, regardless of whether those shots find their target (in other words, a "warning shot,"
intentional or otherwise, is often sufficient to deter the attacker).  In these types of circumstances,
a restriction on magazine size in no way diminishes the ability of the firearm user to defend him
or herself.

Circumstances in which an attack is halted by a defensively-shooting civilian disabling
the attacker are comparatively rare.  Even then, the purpose is not to fire as many shots as
possible, only as many shots as necessary.  The detrimental effect of a limitation on magazine
capacity in such situations is very difficult to measure because it is affected by a wide array of
external variables: the nature and characteristics of the attacker(s), the competence of the
defensive user, environmental circumstances, the timeliness of intervention by others or by law
enforcement, etc.  For example, a highly-trained firearm user might be able to disable an attacker
by firing only a relatively small number of rounds.  For these users, the statute poses no
impediment to effective self-defense.[25]  Adverse environmental circumstances that may be

---

[25]     There is a curious paradox here: the more competent the defensive firearm user, the more
likely he or she is to hit her target with fewer shots, and thus, the less likely that user is to need a
large-capacity magazine for defensive purposes.  By contrast, the less competent or confident the
user, the greater the number of rounds the user perceives he or she needs.  One wonders how

common in mass shootings — large numbers of bystanders, poor lines of sight, or darkness, for example — or circumstances where a law enforcement response is imminent, may make the firing of large numbers of defensive rounds by a civilian ill-advised.  In these instances, the restriction on magazine size again poses no discrete impairment to the ability of effective self-defense.

Even in the relatively rare scenario where the conditions are "ideal" for defensive firing, there is no showing of a severe effect on the defensive shooter.  As previously stated, the limitation on the size of magazines merely affects how many rounds can be fired before a reload is necessary.  Assuming that the defensive firearm user has fired all 15 rounds in his or her initial magazine, and yet failed to neutralize the threat, the user need simply replace his or her magazine or firearm to resume firing.  Admittedly, the defensive user cannot fire during the time it takes to complete a reload or access another weapon, but the length of that period, again, varies greatly with the circumstances, such as the defensive user's preparation and skills.  The testimony at trial was that persons skilled in firearms use can replace a magazine in a matter of a few seconds, whereas less skilled users may take longer periods of time.  At most, then, the statute's burden on the exercise of self-defense is this: in the relatively rare circumstances in which sustained defensive fire is appropriate, the statute forces a brief pause to reload or access another weapon. The evidence presented does not establish that such circumstances occur frequently, affect very many, or that the pause to reload adversely affects one's success in self-defense.[26]  On the record

---

these perceptions are affected by exposure to military grade weaponry in news and entertainment.

[26]     The Plaintiffs make a secondary argument that magazines with no more than 15 rounds are generally less reliable than large capacity magazines.  Although some witnesses testified about their dislike of certain compliant magazines, there was no evidence as to general unreliability of such magazines, particular as compared to large-capacity magazines.  Indeed, the

presented, the Court finds that although § 18-12-302 burdens the operation of semiautomatic weapons, the burden is not severe because it does not materially reduce the ability of a person to use a semiautomatic firearm for self-defense, nor does it reduce the effectiveness of self-defensive efforts.  As a result, the Court will examine the statute under the intermediate scrutiny test.

For § 18-12-302 to survive intermediate scrutiny, Colorado must prove that its objective in enacting § 18-12-302 was "important" — that is, that that the statute was based on "reasoned analysis," *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) — and that the provisions of § 18-12-302 are "substantially related" to its stated objective.[27]

According to Colorado, the General Assembly's objective in passing § 18-12-302 was to reduce the number and magnitude of injuries caused by gun violence, specifically in mass shootings.  The legislative record reflects that members of the General Assembly were acutely aware of the Aurora Theater shooting in 2012, as well as other mass shootings inside and outside Colorado.  The General Assembly considered evidence that mass shootings occur with alarming frequency and often involve use of large-capacity magazines.  It considered testimony that when a shooter using a large-capacity magazine intends to kill, the shooter usually fires continuously until he runs out of ammunition, which leads to greater numbers of injuries and deaths.  With regard to general gun violence, the General Assembly also considered statistics drawn from several cities that large-capacity magazines were used in 14-26% of all gun crimes and in 31-

---

parties stipulated that 10-round magazines produced by Plaintiff Magpul are just as functional and reliable as Magpul's higher-capacity magazines.

[27]    The Plaintiffs urge the Court to limit its consideration of the evidence to the legislative history for § 18-12-302.  As to a determination of the General Assembly's objective and whether it is important, the Court has done so.

41% of fatal police shootings. This legislative history demonstrates that the General Assembly considered relevant evidence in determining that the use of large-capacity magazines in gun violence poses a serious threat to public safety. To prevent the effects caused by the use of large-capacity magazines is undoubtedly an important governmental purpose.

Even with an important purpose, however, Colorado must prove that the 15-round limitation in § 18-12-302 is substantially related to an anticipated reduction in the number and magnitude of injuries caused by the use of large-capacity magazines. *See Peterson v. Martinez*, 707 F.3d 1197, 1222 (10th Cir. 2013) (Lucero, J., concurring) (citing *Michael M. v. Superior Court*, 450 U.S. 464, 473 (1981) (plurality opinion)). The Court finds that Colorado has demonstrated this relationship.

The evidence[28] shows that large-capacity magazines are frequently used in gun violence and mass shootings, and that often a shooter will shoot continuously until a weapon jams or the shooter runs out of ammunition. Interestingly, most experts agree that the size of a magazine correlates to the number of rounds that are fired in both an offensive and defensive capacity. Dr. Jeffery Zax testified that there is a direct positive correlation between the firearm ammunition capacity and the average number of shots fired during criminal aggression. Mr. Ayoob agreed that this is true in defense, as well. He testified that when training individuals to use high-capacity semiautomatic weapons, his students frequently feel the need to "spray and pray," meaning that they believe that they should fire all of their rounds in the hope that at least one shot will hit the intended target. Mr. Ayoob sees his job as training them not to empty their

---

[28]     In determining whether there is a substantial relation between the statute and the Colorado's asserted purpose, the Court does not limit itself to the legislative history. *See Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994) (citing *Contractors Ass'n v. Philadelphia*, 6 F.3d 990, 1003-04 (3d Cir. 1993)).

magazines, and instead to shoot as if they were using a magazine with fewer rounds.  Mr. Cerar
testified to having a similar experience in training New York City Police Department Officers.

There is no dispute that when a shooter pauses to reload a weapon or shift to another
weapon, there is pause.  Mr. Cerar and Mr. Fuchs call this the "critical pause" because it gives
potential victims an opportunity to hide, escape, or attack the shooter.  This pause also gives law
enforcement or other armed individuals an opportunity to act.  They point to several shooting
incidents, including those that took place at the Aurora theater, at a Safeway in Tucson, Arizona,
and at an elementary school in Sandy Hook, Connecticut, when a pause allowed a shooter to be
overcome, law enforcement to intercede, or potential victims to flee.  In each incident, the pause
was created either by the shooter reloading their weapon, or there being a malfunction of their
firearm.

Plaintiffs accurately observe that a weapon malfunction or jam can be as effective as
mandatory reloading in creating a critical pause.  However, one cannot predict whether or when
a firearm will malfunction.  The limitation on magazine size makes the critical pause mandatory
because continued use of the gun requires reloading or switching to another gun.

Plaintiffs also accurately observe that skilled shooters can reload more quickly than can
unskilled shooters, which would reduce the duration of the critical pause.  That is undoubtedly
true, but also largely irrelevant.  A pause, of any duration, imposed on the offensive shooter can
only be beneficial, allowing some period of time for victims to escape, victims to attack, or law
enforcement to intervene.  The pause compelled by the limitation on magazines also could
temporarily impair a defensive shooter, but beyond acknowledging that fact, there are too many
external variables to permit a conclusion that pauses effectively compelled on both sides are
necessarily better or worse than having no such pauses on either side.  In cases involving skilled

defensive shooters and inexperienced offensive shooters, the pause is necessarily favorable. Where the situation is reversed, it may be that the offensive shooter gains an advantage, or it may be that the asymmetry of the offensive shooter and defensive shooter's goals nevertheless negate some or all of that advantage. The mere fact that the legislature's decision might raise the risk of harm to the public in some circumstances, while clearly diminishing it in others does not defeat the conclusion that the legislature's decision was substantially related to an important governmental interest.

Finally, the Plaintiffs argue that criminals who are intent on committing gun violence will not obey the magazine restriction and will nevertheless unlawfully obtain large-capacity magazines. Hypothetically, this may be true, but the Court declines to speculate about the subjective intentions and means of unspecified criminals involved in unspecified gun violence. The Court accepts the unrebutted opinion of Dr. Zax, who testified that the magazine size restriction will reduce the overall number of large-capacity magazines available in Colorado and his testimony about the effects of federal firearms regulation in Virginia. Thus, although it may be impossible to completely eliminate access to large-capacity magazines, it is reasonable to infer that the restriction will, at a minimum, reduce the ready availability of large-capacity magazines to both criminals and law-abiding citizens.

It is clear from the legislative history that the General Assembly adopted the 15-round restriction in the effort to balance the ability of individuals to lawfully use semiautomatic weapons in self-defense, while limiting the capability of unlawful shooters to fire repeatedly. It considered a more restrictive limit of 12 rounds, but rejected that at the request of citizens and law enforcement officials. Instead, it chose the 15-round limit based on evidence that officers of

the numerous state and federal law enforcement agencies all successfully use magazines with 15 or fewer rounds.

Whether adoption of a fifteen-round magazine limit is a sound public policy or a perfect fit with the General Assembly's objective to improve public safety is not the question before this Court. The fit may not be perfect, but the evidence establishes both an important governmental policy and a substantial relationship between that policy and the restriction of § 18-12-302. The provisions of § 18-12-302 are permissible under the Second Amendment.

### C. Application to § 18-12-112

Subject to multiple exceptions, § 18-12-112 extends the mandatory background check required in gun sales by dealers and at gun shows to transferees who take possession of a firearm in a private transfer. Plaintiffs do not argue that requiring background checks for the private sale of firearms is unconstitutional. Rather, they focus their challenge on the effect of the statute on *temporary* transfers, when ownership of the firearm does not change. Essentially, they argue that the Second Amendment protects an individual's right to borrow a firearm for lawful purposes, including for self-defense, and that such right is infringed by the statute's requirements.

First, the Court must determine whether § 18-12-112 impacts conduct protected by the Second Amendment. As repeatedly noted, the Second Amendment guarantees an individual's right to keep and bear arms for the core purpose of defense of self and home. However, it is not at all clear that the Second Amendment prevents the government from restricting the ability of persons to acquire firearms via temporary loans from others. Notably, *Heller* acknowledged the historical permissibility of "laws imposing conditions and qualifications on the commercial sale of arms." 544 U.S. at 626-27. Logically, if the government can lawfully regulate the ability of persons to obtain firearms from commercial dealers, that same power to regulate should extend

36

1785

to non-commercial transactions, lest the loophole swallow the regulatory purpose.  Thus, the

Court has grave doubt that a law regulating (as opposed to prohibiting) temporary private

transfers of firearms implicates the Second Amendment's guarantee at all.

Nevertheless, the Court will assume that, arguably, the right to "keep and bear" firearms

implies some protection of the right to acquire firearms in the first place.  *Cf. Ezell*, 651 F.3d at

704.  And the Court will assume that, if the acquisition of firearms is protected to some extent,

that protection will include acquisition via loan.  Thus, if the Court were to conclude that the

Second Amendment protects an individual's right to acquire firearms for the purpose of self-

defense by temporarily borrowing them, the Court would find that § 18-12-112 impacts that right

by requiring a background check before such transfer can occur.[29]

Contrary to the Plaintiffs' position, however, the burden imposed on the right is no more

severe than the law already provides with regard to firearm sales.  Colorado already requires a

background check to be conducted on the buyer in a commercial firearm sale, and thus, the

operation of § 18-12-112 does nothing more than impose the same restrictions on acquisition by

loan.  It does not prevent a person otherwise permitted to obtain a firearm from acquiring one,

nor subject that person to any greater burdens than he or she would face if acquiring the weapon

commercially.  Nothing in the Second Amendment can be read to suggest that a permissible

burden on commercial sales of firearms cannot similarly be extended to apply to those acquiring

firearms by loan.

---

[29]     Arguably, however, a Second Amendment right focused on acquisition of a firearm
would extend only to the transferee of the firearm.  It is difficult to imagine how a firearm
owner's Second Amendment rights are impaired by prohibiting him or her from loaning a
firearm to another.  However, as the preceding discussion concerning standing observes, the
Plaintiffs here are the parties intending to *lend* the weapons, not the parties borrowing them.
This further highlights the dubious issue of standing in this case.

The Plaintiffs argue that the burden is severe because it will be difficult for individuals to actually obtain the background checks from a federally licensed firearms dealer.  They argue that firearm dealers may be unavailable in areas where individuals need background checks, that the checks could take a long time, or that the dealers may be unwilling to perform the checks due to the limit on fees they can charge.

The evidence presented does not entirely support the Plaintiffs' argument.  Plaintiffs' witnesses provided anecdotal evidence of experiences they have had where a dealer refused to perform a background check for one reason or another.  They also testified as to how it would be inconvenient for them to locate a dealer and obtain a check before the need to execute a transfer.  However, there is no evidence that all, or even most, firearms dealers refuse to perform private background checks, or that it would be impossible for many, or most, who would receive a weapon to obtain a background check.  Rather, the evidence shows that there are more than 600 firearms dealers in Colorado that are actively performing private checks, and that, currently, it takes an average of less than fifteen minutes for a check to be processed by the Colorado Bureau of Investigation.  Although the statute may result in logistical difficulties or inconveniences for some individuals who want to privately borrow a firearm for more than 72 hours, it does not facially infringe their Second Amendment right to do so.[30]  In the context of the facial challenge presented here, the Court finds that § 18-12-112 does not severely impact the Second Amendment right.  Accordingly, intermediate scrutiny is appropriate.

The Court first looks to Colorado's asserted objective in passing § 18-12-112.  Colorado asserts that the objective in passing the statute was to ensure public safety and aid in crime

---

[30]    This is not to say that there may be instances where individuals do not comply with the requirement for a background check and are prosecuted for their noncompliance.  Such circumstances can be addressed through an as-applied challenge.

prevention by closing a loophole in the background check statutes applicable to gun sales by dealers and at gun shows.  The General Assembly considered evidence that almost 40% of gun purchases are made through private sales, in person or over the internet; 62% of private sellers on the internet agree to sell to buyers who are known not to be able to pass a background check; and 80% of criminals who use guns in crime acquired one through a private sale.  The General Assembly also considered evidence that a high percentage of gun crimes are committed by individuals with prior arrests or convictions, which would trigger a denial in a background check, and that closure of the loophole would reduce the number of firearms that are easily passed into the trafficking market and made more accessible for use in crime.  The Court finds that the General Assembly used reasoned analysis in concluding that it was necessary and beneficial to require background checks for private transfers of firearms to help prevent crime and improve public safety, both important governmental interests.

The next question is whether the provisions of § 18-12-112 are substantially related to these objectives.  Colorado presented evidence showing that private background checks will make it more difficult for prohibited individuals to acquire firearms, reduce the rate of diversion of firearms from legal commerce into the trafficking market, and reduce the firearm homicide rate.  Dr. Daniel Webster testified that most firearms used in crime are obtained from a dishonest licensed dealer or from a trusted friend or family member.  Ronald Sloan, the Director of the Colorado Bureau of Investigation, testified that background checks on private transfers are denied at a rate as high as, if not higher than, the denial rate of sales at retail or gun shows.  Further, Dr. Webster opined that imposition of accountability on law-abiding citizens who are tempted to transfer a firearm to a prohibited individual deters diversion of firearms into the trafficking market.  Decreasing diversion ultimately impacts the availability of firearms to

criminals.  Dr. Webster also testified that, based on his research and studies, when measures of accountability for private transfers are taken away, the rates of firearm homicide grow substantially.  Thus, by imposing such measures, the General Assembly could reasonably expect the rates of criminal gun trafficking and use to decrease.

Plaintiffs argue that the evidence shows that private background checks are not happening at the frequency expected, and thus the public interest is not actually being served.  However, for purposes of determining constitutionality — particularly via facial challenge — arguments about whether the statute has been successful are not relevant.  Colorado is not required to show that the statute has already achieved success if its rationale for imposing the law is substantially related to an important purpose.

In addition, Plaintiffs argue that the 72-hour exemption to the background check requirement is unreasonable.  They contend that there was no basis for limiting the exemption to 72 hours, and that more reasonable options include extending the exemption to thirty days, allowing an exemption for individuals with concealed carry permits, or implementing a system that would not require parties to a transfer to physically go to a firearms dealer.

The Court perceives this argument to be one of preferred policy.  The Court's role in this case is to determine whether § 18-12-112 impermissibly burdens protected Second Amendment rights.  What the legislature chooses to *exempt* from the statute's requirements is a determination that is left solely to the legislature.  The legislature was free to conclude, as it did, that 72 hours would be an adequate period of time to permit transfers without background checks while ensuring that sham loans would not occur beyond that timeframe.  Whether or not the legislature's policy decision was wise or warranted is not a question properly presented to this Court.

Accordingly, the Court concludes that § 18-12-112 is constitutionally permissible under the Second Amendment.

## VI.  Vagueness Challenge

Returning to § 18-12-302, the Court considers the Plaintiffs' challenge to the statute's grandfather clause as being unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.  Section 18-12-302(2)(a) provides that a person may possess a large-capacity magazine if he or she: (1) owned the large-capacity magazine on July 1, 2013, and (2) has maintained "continuous possession" of the magazine since that date.  The Plaintiffs seek to invalidate the second requirement, arguing that because the phrase "continuous possession" is undefined in the statute, it fails to put the public on notice of prohibited conduct or provide any enforcement standards.

A law runs afoul of the Due Process Clause if it is "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted).  The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.  *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  This means that a statute can be impermissibly vague for either of two independent reasons: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or (2) if it authorizes or even encourages arbitrary and discriminatory enforcement.  *Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  In this case, the Plaintiffs challenge the statute on both grounds.

41

In assessing the sufficiency of statutory language, the court is guided by venerated authority that "we can never expect mathematical certainty from our language" and that a statute's terms may be "marked by flexibility and reasonable breadth, rather than meticulous specificity." *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Thus, a statute is not vague if it is clear what the statute as a whole prohibits. *Id.*

As a preliminary matter, Colorado contends that the Court should not reach the merits of this claim. Relying on *United States v. Reed*, 114 F.3d 1067 (10th Cir. 1997), and *United States v. Michel*, 446 F.3d 1122 (10th Cir. 2006), Colorado argues that facial vagueness claims are permitted only when the challenged statute prohibits protected First Amendment activity. The Court rejects that argument, as these cases are not analogous. Both actions sought post-enforcement review of the statute under which the individuals were prosecuted. *See Reed*, 114 F.3d at 1070; *Michel*, 446 F.3d at 1135.

The Tenth Circuit has held that facial vagueness challenges are proper in two circumstances. First, when an individual has been prosecuted under an arguably vague statute, he or she is permitted to facially attack the statute, in addition to bringing an as-applied challenge, if the statute threatens to "chill" constitutionally protected conduct, especially that protected by the First Amendment. *See Dias,* 567 F.3d at 1179-80; *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988). The reasoning for permitting a facial challenge in this circumstance is that when a statute is arguably so vague that it can reasonably be interpreted to prohibit constitutionally protected speech, individuals may refrain from speaking rather than risk criminal prosecution. Thus, when an individual *is* prosecuted under the statute, he or she is permitted to bring a facial challenge in order to vindicate the rights of others who may be chilled from speaking at all.

The second circumstance where a facial challenge is appropriate is upon pre-enforcement review of a statute.  In a declaratory judgment action where no one has been charged under the challenged statute, the court cannot evaluate the statute as applied.  Thus, the only claim to be brought is a facial challenge.  In these circumstances, the challenger may facially attack the statute as "vague in all of its applications."  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982); *see also Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  If the statute is vague in all of its applications, then it will necessarily be vague as applied in every case, and the statute is therefore void on its face.  *Gaudreau*, 860 F.2d at 361.

As noted, § 18-12-112 has not been enforced against any Plaintiff.  This is a declaratory judgment action in which the Plaintiffs seek pre-enforcement review of the statute.  Thus, a facial challenge that asserts that the statute is necessarily vague in all of its applications is appropriate.  The Supreme Court has cautioned that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

First, the Plaintiffs argue that a person of ordinary intelligence could not understand whether his or her conduct fell within § 18-12-302(2)(a) because "continuous possession" is not defined.  Pointing to hypothetical situations where § 18-12-302(2)(a) may or may not apply, the Plaintiffs argue that "no one knows with any certainty what 'continuous possession' means." The Plaintiffs further argue that the lack of notice is amplified due to the fact that the statute does not contain a scienter requirement.

The Court is unpersuaded.  Because the statute fails to provide an explicit definition for "continuous possession," it is possible that the "continuous possession" requirement may not be

clear in every application.  However, the existence of close cases does not render the statute

unconstitutionally vague.  Indeed, "[c]lose cases can be imagined under virtually any statute."

*United States v. Williams*, 553 U.S. 285, 306 (2008).  What renders a statute vague is the

inability to determine what the necessary facts *are* under wholly subjective standards.  *Id.*  For

example, the Supreme Court has struck down statutes that tied criminal culpability to whether

the defendant's conduct was "annoying" or "indecent."  *See, e.g.*, *Coates v. Cincinnati*, 402 U.S.

611, 614 (1971); *Reno v. ACLU*, 521 U.S. 844, 870-71 & n.35 (1997).

    Such is not the case here.  The grandfather clause actually is an exception to the law.  It

does not describe criminal conduct, but instead describes conduct that is not criminal.  The two

operative words, "possession" and "continuous" are in common usage and have readily defined

meanings.  *See, e.g.*, Merriam-Webster's Collegiate Dictionary, 10th Ed. at 250 (defining

"continuous" as "marked by uninterrupted extension in space, time, or sequence"), at 906

(defining "possession" as "the act of having or taking into control").  Indeed, it is not difficult to

conceive of many situations where the statute's application would be clear: an owner who loaned

out his or her magazine to another after July 1, 2013 would clearly not have maintained

"possession" of it; a person who pawned a magazine after July 1, 2013, only to redeem and

reacquire it later might currently have possession of the magazine, but that possession has not

been "continuous" since July 1, 2013.  Accordingly, the Court finds that despite the lack of a

precise statutory definition for "continuous possession," it is clear what conduct the statute as a

whole prohibits and permits.

    The Plaintiffs also contend that the grandfather clause is unduly vague because it lacks an

express scienter requirement.  The Tenth Circuit has explained that the presence of a scienter

requirement can save an otherwise vague statute by mitigating a law's vagueness and thus

making the law constitutional.  *Ward v. Utah*, 398 f.3d 1239, 1252 (10th Cir. 2005).  This

principle does not imply, however, that every statute lacking a scienter requirement is necessarily

vague.  *Id.*  Because the Court finds that § 18-12-302(2)(a) is not otherwise vague, its lack of an

express scienter requirement does not render the statute unconstitutional.

Plaintiffs also argue that the statute does not contain any enforcement standards and

therefore permits arbitrary and discriminatory enforcement.  Again, the Plaintiffs point out that

"continuous possession" is undefined.  They argue that, as a result, it will be left open to

interpretation by "individual law enforcement officers, prosecutors, judges, and juries."  The

Court disagrees.  "As always, enforcement requires the exercise of some degree of police

judgment."  *Grayned*, 408 U.S. at 114.  The Court finds that the degree of judgment required in

enforcing § 18-12-302(2)(a) is not unacceptably delegated to the whim of individual prosecutors.

Although there may be edge cases where the application of the clause is debatable, the

"continuous possession" requirement as a whole is sufficiently clear that reasonable people can

understand what general types of conduct are authorized.

Further, when evaluating a facial challenge to a Colorado law, a federal court must

"consider any limiting construction that a Colorado court or enforcement agency has proffered."

*Hoffman Estates*, 455 U.S. at 494 n.5; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 795

(1989).  Here, the Attorney General has issued two "technical guidance letters" to the Colorado

Department of Public Safety regarding how § 18-12-302(2)(a) should be interpreted and

enforced.  The letters provide that "continuous possession" shall be interpreted as "having or

holding property in one's power or the exercise of dominion over property, that is uninterrupted

in time, sequence, substance, or extent."  Further, "continuous possession" does not require

"literally continuous physical possession" — instead, "continuous possession" is only lost by a

"voluntary relinquishment of dominion and control." The technical guidance acknowledges that "[r]esponsible maintenance, handling, and gun safety practices . . . dictate that [§ 18-12-302(2)(a)] cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law." The Plaintiffs have not provided any evidence demonstrating a reason to believe that § 18-12-302(2)(a) will not be enforced in accordance with the interpretation provided by the Attorney General. The guidance therefore serves to further limit the discretion of law enforcement officers when applying the grandfather clause. In light of the forgoing, the Court finds that the statute does not authorize or encourage arbitrary or discriminatory enforcement. Because the Plaintiffs have failed to sustain their burden of establishing that § 18-12-302(2)(a) is unconstitutionally vague in all applications, the Court finds the statute permissible under the Fourteenth Amendment to the United States Constitution.

### VII.  Claims under Title II of the ADA

Finally, certain disabled Plaintiffs contend that § 18-12-302 and § 18-12-112 violate 42 U.S.C. § 12132 of the ADA under a disparate impact theory. [31] The Plaintiffs argue that the statutes disproportionately burden disabled individuals in their ability to defend themselves as compared to able-bodied individuals and they are therefore at a greater risk of harm.[32]

---

[31]   In closing argument, the Plaintiffs' counsel appeared to argue that they were also asserting an ADA claim for denial of a request for reasonable accommodation. However, no claim of reasonable accommodation was presented in the final pretrial order (Docket #119). The Court therefore deems such claim to be waived.

[32]   The Court notes that some of the evidence presented with regard to the constitutionality of § 18-12-302 could be construed to suggest that some disabled persons may have greater need for large-capacity magazines for self-defense than more able-bodied persons. Whether there are

Title II of the ADA provides that "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA seeks to "remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination." *Chaffin v. Kansas Colorado Fair Bd.*, 348 F.3d 850, 859-60 (10th Cir. 2003) (overruled on other grounds as recognized by *Muscogee (Creek) Nation v. Pruit*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012)). To prove a case of disparate impact discrimination, a plaintiff must show that "a specific policy caused a significant disparate effect on a protected group." *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012). This is generally shown by statistical evidence identifying relevant comparators to the plaintiff group, examining the relative outcomes of the two groups, and establishing a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors. *Id.* (citation omitted).

Colorado argues that the Plaintiffs' claims under the ADA fail as a matter of law because the Plaintiffs have failed to prove how § 18-12-112 and § 18-12-302 deprive disabled individuals of the "services, programs, or activities of a public entity." The Plaintiffs respond that Title II is not limited to a denial of government services, programs, or activities. They argue that the second clause of § 12132, which provides that a qualified individual shall not "be subjected to discrimination by any [public entity]," extends to any and all actions taken by a public entity. Thus, they argue, by simply enacting statutes that disparately impact disabled individuals, Colorado committed discrimination against disabled individuals in violation of Title II.

---

more viable claims than those brought here to address that concern is a matter upon which the Court does not speculate.

This issue was addressed by the Tenth Circuit in *Elwell v. Oklahoma*, 693 F.3d 1303 (10th Cir. 2012).  In *Elwell*, the issue before the Tenth Circuit was whether a governmental employee could bring a claim of employment discrimination against his public employer under Title II of the ADA (rather than under Title I of the ADA, which specifically addresses employment discrimination).  In its analysis, the court acknowledged that § 12132 of Title II has two primary clauses.  The first clause prevents a qualified individual from being "excluded from participation in or be[ing] denied the benefits of the services, programs, or activities of a public entity."  Thus, the question was whether "employment" could be fairly described as a "service, program, or activity" of a public entity.  The court held that it could not, explaining that "an agency's services, programs, and activities refer to the 'outputs' it provides some public constituency."  693 F.3d at 1306.  Employment, on the other hand, is an "input" required to make an agency's services, programs, and activities possible.  *Id.*

The second clause prevents a qualified individual from being "subjected to discrimination by any [public entity]."  The plaintiff in *Elwell* argued that this clause is a "catch-all" that prohibits all discrimination by a public entity, regardless of whether it occurs in a service, program, or activity the entity provides or in some other way or function.  The Tenth Circuit disagreed, holding that the second clause also refers to discrimination in the context of government-provided services, programs, and activities.  *Id.* at 1308-09.  The Tenth Circuit explained that § 12132 must be read in concert with the definition of "qualified individual with a disability," 42 U.S.C. § 12131(2), which states that a "qualified individual with a disability" is an "individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  Thus, the first clause of §12132 precludes an agency from baldly "exclud[ing]" or "deny[ing] benefits" to

qualified individuals, while the second clause does additional work by addressing more subtle (though equally inequitable) acts of discrimination, such as by making it disproportionately more difficult for qualified individuals to participate in programs or activities, unfairly disadvantaging them compared to others, or "otherwise discriminating against them in the manner the agency provides its services, programs, and activities."  *Id.* at 1308.

The Tenth Circuit in *Elwell* went onto explain what the terms "services," "programs," and "activities" are understood to mean.  "Services" are ordinarily understood as acts done by the government for the benefit of another, whereas the term "program" refers to a government's projects or schemes, such as social security or a foreign exchange program.  *Id.* at 1306.  The term "activity" has a broader meaning, encompassing all outputs the public entity provides to the public it serves.  However, the term does "not necessarily rope in everything the entity does."  *Id.* at 1307.

Applying the principles of *Elwell* here, the Court finds that the Plaintiffs have failed to prove that § 18-12-112 and § 18-12-302 disproportionately impact disabled individuals with respect to a Colorado "service, program, or activity."  The statutes at issue do not create any governmental "output" which disabled persons are less able to access.  Rather, the statutes merely embody a criminal prohibition on conduct generally applicable to all persons.  Thus, the Plaintiffs' claims fail to establish a violation of Title II of the ADA.

Assuming, however, that the statutes *did* constitute a government service, program, or activity, the Court would nevertheless find that the evidence is insufficient to establish a disparate impact.  The Plaintiffs presented significant evidence tending to show that *some* disabled individuals: (1) feel that large-capacity magazines are necessary for their self-defense because they have decreased mobility and/or ability to reload quickly during confrontation, and

(2) wish to borrow firearms, some of which are specifically equipped to aid their disabilities, from various organizations without having to undergo a background check. Such anecdotal evidence, in the absence of meaningful statistical analysis comparing the effect of the statute on the Plaintiffs and able-bodied comparators is insufficient to carry the Plaintiffs' burden of demonstrating that the statutes cause any disparate effect. Accordingly, the Court finds that the Colorado is entitled to judgment in its favor on the Plaintiffs' claims under the ADA.

## VIII.  Conclusion

For the forgoing reasons, the Court **ORDERS** as follows:

- Colorado's Motion to Dismiss (**#133**) is **DENIED**;

- The parties' Joint Motion to Strike Expert Opinions Per FRE 702 (**#118**) is **GRANTED, in part, and DENIED, in part** consistent with the findings contained herein;

- Colorado Revised Statutes § 18-12-112 and § 18-12-302 are compliant with the provisions of the Second and Fourteenth Amendments to the United States Constitution.

- The Clerk of the Court is directed to enter **JUDGMENT IN FAVOR OF THE DEFENDANT** on all claims and to close this case.

Dated this 26th day of June, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT
CHERRY CREEK COLORADO PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;
JOHN B. COOKE;
KEN PUTNAM;
JAMES FAULL;
LARRY KUNTZ;
FRED JOBE;
DONALD KRUEGER;
DAVE STRONG;
PETER GONZALEZ;
SUE KURTZ; and
DOUGLAS N. DARR,

      Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**JUDGMENT**

---

Pursuant to the Court's June 26, 2014, Findings of Fact, Conclusions of Law, and Order,

and the proceedings to date, **JUDGMENT IS HEREBY ENTERED** in favor of the Defendant,

John W. Hickenlooper, against all Plaintiffs with costs pursuant to Fed. R. Civ. P. 54(d)(1).

Dated this 26th day of June, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et. al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

**PLAINTIFFS' NOTICE OF APPEAL**

---

Notice is hereby given that Plaintiffs Colorado Outfitters Association, Colorado Farm Bureau, National Shooting Sports Foundation, Magpul Industries, Colorado Youth Outdoors, USA Liberty Arms, Outdoor Buddies, Inc., Women for Concealed Carry, Colorado State Shooting Association, Hamilton Family Enterprises, Inc., d/b/a Family Shooting Center at Cherry Creek State Park, David Bayne, Dylan Harrell, Rocky Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms Inc. d/b/a Jensen Arms, Green Mountain Guns, Jerry's Outdoor Sports, Specialty Sports & Supply, and Goods for the Woods, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the following orders: (1) this Court's Findings of Fact, Conclusions of Law, and Order, as well as the corresponding and separate Judgment, both of which were entered in this action on June 26,

2014[1]; and (2) this Court's Opinion and Order Granting in Part and Denying in Part Defendant's

Motion to Dismiss, which was entered in this action on November 27, 2013.

Dated this 28th day of July, 2014.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DYLAN HARRELL, DAVID BAYNE,
OUTDOOR BUDDIES, INC. THE COLORADO
OUTFITTERS ASSOCIATION, COLORADO FARM
BUREAU, AND WOMEN FOR CONCEALED CARRY

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

---

[1] *See McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1104 (10th Cir. 2002) ("[A] notice of
appeal which names the final judgment is sufficient to support review of all earlier orders that
merge in the final judgment."

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR ROCKY MOUNTAIN SHOOTERS
SUPPLY, 2ND AMENDMENT GUNSMITH &
SHOOTER SUPPLY, LLC, BURRUD ARMS INC. D/B/A
JENSEN ARMS, GREEN MOUNTAIN GUNS, JERRY'S
OUTDOOR SPORTS, SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

1804

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                david@i2i.org

Jonathan M. Anderson          jmanderson@hollandhart.com

Douglas Abbott                dabbott@hollandhart.com

Marc F. Colin                 mcolin@bcjlpc.com

Anthony J. Fabian             fabianlaw@qwestoffice.net

Matthew Grove                 matt.grove@state.co.us

Kathleen Spalding             kit.spalding@state.co.us

Jonathan Fero                 jon.fero@state.co.us

David Blake                   david.blake@state.co.us

Daniel D. Domenico            dan.domenico@state.co.us

Stephanie Scoville            stephanie.scoville@state.co.us

John Lee                      jtlee@state.co.us

LeeAnn Morrill                leeann.morrill@state.co.us

<div style="margin-left: 40%;">

s/Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020

</div>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et. al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## PLAINTIFF SHERIFFS AND DAVID STRUMILLO NOTICE OF APPEAL

---

Notice is hereby given that Plaintiffs David Strumillo, Jim Beicker (Sheriff of Fremont County), Rick Besecker (Sheriff of Gunnison County), Ronald Bruce (Sheriff of Hinsdale County), David D. Campbell (Sheriff of Baca County), James (Jim) Casias (Sheriff of Las Animas County), Miles Clark (Sheriff of Crowley County), John B. Cooke (Sheriff of Weld County), James Crone (Sheriff of Morgan County), Douglas N. Darr (Sheriff of Adams County), Chad Day (Sheriff of Yuma County), Rick Dunlap (Sheriff of Montrose County), David Encinias (Sheriff of Bent County), Mike Ensminger (Sheriff of Teller County), James Faull (Sheriff of Prowers County), Rod Fenske (Sheriff of Lake County), Scott Fischer (Sheriff of Jackson County), Forrest Frazee (Sheriff of Kiowa County), Peter Gonzalez (Sheriff of Archuleta County), Bruce W. Hartman (Sheriff of Gilpin County), Shayne Heap (Sheriff of Elbert County), Fred Hosselkus (Sheriff of Mineral County), Tim Jantz

(Sheriff of Moffat County), Fred Jobe (Sheriff of Custer County), Chris S. Johnson (Sheriff of Otero County), Rodney Johnson (Sheriff of Grand County), Donald Krueger (Sheriff of Clear Creek County), Larry Kuntz (Sheriff of Washington County), Sue Kurtz (Sheriff of San Juan County), Terry Maketa (Sheriff of El Paso County), Jerry Martin (Sheriff of Dolores County), Dominic Mattivi, Jr. (Sheriff of Ouray County), Fred D. McKee (Sheriff of Delta County), Amos Medina (Sheriff of Costilla County), Ted B. Mink (Sheriff of Jefferson County), John Minor (Sheriff of Summit County), Tom Nestor (Sheriff of Lincoln County), Bruce Newman (Sheriff of Huerfano County), Mike Norris (Sheriff of Saguache County), Brian E. Norton (Sheriff of Rio Grande County), Randy Peck (Sheriff of Sedgwick County), Brett L. Powell (Sheriff of Logan County), Ken Putnam (Sheriff of Cheyenne County), Tom Ridnour (Sheriff of Kit Carson County), Grayson Robinson (Sheriff of Arapahoe County, ret.), Duke Schirard (Sheriff of La Plata County), Justin Smith (Sheriff of Larimer County), Dennis Spruell (Sheriff of Montezuma County), Dave Stong (Sheriff of Alamosa County), Charles "Rob" Urbach (Sheriff of Phillips County), Lou Vallario (Sheriff of Garfield County), David A. Weaver (Sheriff of Douglas County), Fred Wegener (Sheriff of Park County), Garrett Wiggins (Sheriff of Routt County), and Si Woodruff (Sheriff of Rio Blanco County), hereby appeal to the United States Court of Appeals for the Tenth Circuit from the following orders: (1) this Court's Findings of Fact, Conclusions of Law, and Order, as well as the corresponding and separate Judgment, both of which were entered in this action on June 26, 2014; (2)

this Court's Opinion and Order Granting in Part and Denying in Part Defendant's

Motion to Dismiss, which was entered in this action on November 27, 2013; (3) this

Court's Denial of Plaintiffs' unopposed Motion to Amend/Correct/Modify the

aforesaid Order, which was entered in this action on December 12, 2013; (4) this

Court's Granting in Part and Denying in Part of Plaintiffs' Motion for Joinder and

for Leave to File an Amended Complaint, which was entered in this action on

December 19, 2013; and (5) this Court's instruction to the Plaintiffs at the Feb. 20,

2014, Final Pretrial Conference that evidence regarding standing should not be

presented at trial. An appeal from a judgment allows judicial review of all the prior

rulings in the case. *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099 (10th Cir.

2002). Nevertheless, items (2), (3), (4), and (5) are specifically listed in an

abundance of caution.

      Dated this 28th day of July, 2014.


Respectfully submitted,




                    /s/David B. Kopel
                    INDEPENDENCE INSTITUTE
                    727 E. 16th Avenue
                    Denver, CO 80203
                    Phone: (303) 279-6536
                    Fax: (303) 279-4176
                    david@i2i.org

                    ATTORNEY FOR SHERIFFS AND DAVID
                    STRUMILLO

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2014, I have served the foregoing Notice of Appeal via the CM/ECF system for the United States District Court for the District of Colorado, and that the system will deliver the Notice to:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

/s/David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, Colorado 80203
Phone: (303) 279-6536
Fax: (303) 279-4116
david@i2i.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et. al.*,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

## PLAINTIFFS' AMENDED NOTICE OF APPEAL

---

Notice is hereby given that Plaintiffs Colorado Outfitters Association, Colorado Farm Bureau, National Shooting Sports Foundation, Magpul Industries, Colorado Youth Outdoors, USA Liberty Arms, Outdoor Buddies, Inc., Women for Concealed Carry, Colorado State Shooting Association, Hamilton Family Enterprises, Inc., d/b/a Family Shooting Center at Cherry Creek State Park, David Bayne, Dylan Harrell, Rocky Mountain Shooters Supply, 2nd Amendment Gunsmith & Shooter Supply, LLC, Burrud Arms Inc. d/b/a Jensen Arms, Green Mountain Guns, Jerry's Outdoor Sports, Specialty Sports & Supply, and Goods for the Woods, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the following orders: (1) this Court's Findings of Fact, Conclusions of Law, and Order, as well as the corresponding and separate Judgment, both of which were entered in this action on June 26,

2014[1]; (2) this Court's Opinion and Order Granting in Part and Denying in Part Defendant's

Motion to Dismiss, which was entered in this action on November 27, 2013, and (3) this Court's

verbal order at the February 20, 2014 Pretrial Conference that no evidence concerning standing

should be presented at trial.

Dated this 28th day of July, 2014.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

ATTORNEYS FOR DYLAN HARRELL, DAVID BAYNE,
OUTDOOR BUDDIES, INC. THE COLORADO
OUTFITTERS ASSOCIATION, COLORADO FARM
BUREAU, AND WOMEN FOR CONCEALED CARRY

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

---

[1] *See McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1104 (10th Cir. 2002) ("[A] notice of
appeal which names the final judgment is sufficient to support review of all earlier orders that
merge in the final judgment."

1811

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR ROCKY MOUNTAIN SHOOTERS
SUPPLY, 2ND AMENDMENT GUNSMITH &
SHOOTER SUPPLY, LLC, BURRUD ARMS INC. D/B/A
JENSEN ARMS, GREEN MOUNTAIN GUNS, JERRY'S
OUTDOOR SPORTS, SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

1812

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

s/Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020