1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

2

    Civil Action No. 13-CV-1300-MSK-MJW

3

    COLORADO OUTFITTERS ASSOCIATION,
4   COLORADO FARM BUREAU,
    NATIONAL SHOOTING SPORTS FOUNDATION,
5   MAGPUL INDUSTRIES,
    COLORADO YOUTH OUTDOORS,
6   USA LIBERTY ARMS,
    OUTDOOR BUDDIES, INC.,
7   WOMEN FOR CONCEALED CARRY,
    COLORADO STATE SHOOTING ASSOCIATION,
8   HAMILTON FAMILY ENTERPRISES, INC.,
    d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
9   DAVID STRUMILLO,
    DAVID BAYNE,
10  DYLAN HARRELL,
    ROCKY MOUNTAIN SHOOTERS SUPPLY,
11  2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
    BURRUD ARMS INC. D/B/A JENSEN ARMS,
12  GREEN MOUNTAIN GUNS,
    JERRY'S OUTDOOR SPORTS,
13  SPECIALTY SPORTS & SUPPLY,
    GOODS FOR THE WOODS,
14  JOHN B. COOKE,
    KEN PUTNAM,
15  JAMES FAULL,
    LARRY KUNTZ,
16  FRED JOBE,
    DONALD KRUEGER,
17  STAN HILKEY,
    DAVE STONG,
18  PETER GONZALEZ,
    SUE KURTZ,
19  DOUGLAS N. DARR,

20      Plaintiffs,

21  vs.

22  JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23      Defendant.
    _____

24
                    **REPORTER'S TRANSCRIPT**
25                 TRIAL TO COURT – DAY ONE
    _____

 1          Proceedings before the HONORABLE MARCIA S. KRIEGER,

 2   Judge, United States District Court for the District of

 3   Colorado, commencing at 8:38 a.m., on the 31st day of March,

 4   2014, in Courtroom A901, United States Courthouse, Denver,

 5   Colorado.

 6

 7                          **APPEARANCES**

 8          RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
     at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
 9   Denver, Colorado, 80202, appearing for the Plaintiffs.

10          DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
     555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11   for the Plaintiffs.

12          MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
     P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13   appearing for the Plaintiffs.

14          ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
     Street, Castle Rock, Colorado, 80104, appearing for the
15   Plaintiffs.

16          DAVID BENJAMIN KOPEL, Attorney at Law, Independence
     Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17   appearing for the Plaintiffs.

18          MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
     SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19   General, Colorado Attorney General's Office, Ralph L. Carr
     Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20   80203, appearing for the Defendant.

21

22

23

24              THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

```
 1              P R O C E E D I N G S

 2          THE COURT:  Court is convened this morning in Case No.

 3  13-cv-1300.  This is encaptioned Colorado Outfitters

 4  Association, et al. v. Hickenlooper.  The matter is set down

 5  for a trial.

 6          Could I have entries of appearance, please.

 7          MR. WESTFALL:  Good morning, Your Honor.  My name is

 8  Richard Westfall of the law firm Hale Westfall.  With me is

 9  Peter Krumholz at the counsel table behind us.  We also have a

10  couple of client representatives today in the courtroom, two of

11  whom will be testifying.  We have Mr. Bob Hewson, who is the

12  executive director of Colorado Youth Outdoors, and then we have

13  two women representing Women for Concealed Carry, Katherine

14  Whitney and Elisa Dahlberg.

15          Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. KOPEL:  Good morning, Your Honor.  David B. Kopel

18  representing David Strumillo, John B. Cooke, Ken Putnam, James

19  Faull, Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey,

20  Dave Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

21  Thank you.

22          THE COURT:  Good morning.

23          MR. COLIN:  Good morning, Your Honor.  Mark Colin

24  representing the licensed firearms dealers in this case, Green

25  Mountain Guns, Jensen Arms, Jerry's Outdoor Sports -- I'm
```

```
 1  trying to remember them -- Rocky Mountain Shooters Supply.  I

 2  think I've covered it -- U.S.A. Liberty Arms.

 3           THE COURT:  Thank you.

 4           MR. ABBOTT:  Good morning, Your Honor.  I'm Doug

 5  Abbott and I represent plaintiffs Magpul Industries and the

 6  National Shooting Sports Foundation.

 7           THE COURT:  Thank you.

 8           MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian

 9  representing Colorado State Shooting Association and Hamilton

10  Family Enterprises.

11           THE COURT:  Thank you.

12           MR. GROVE:  Matthew Grove on behalf of the Governor.

13  With me at counsel table are Stephanie Scoville, LeeAnn

14  Morrill, and Kathleen Spalding.

15           THE COURT:  Thank you.  And good morning to everyone.

16           Are you all ready to proceed.

17           MR. WESTFALL:  We are, Your Honor.

18           MR. GROVE:  Yes, Your Honor.

19           THE COURT:  Thank you.

20           All right.  We'll proceed with opening statements.

21                       OPENING STATEMENT

22           MR. WESTFALL:  Thank you, Your Honor.

23           Good morning.  I'm Richard Westfall.  I'll be making

24  the opening statement on behalf of all the plaintiffs this

25  morning.
```

1    My comments this morning will focus on the Second

2   Amendment evidence to be produced.  We will address the

3   vagueness and ADA claims in our closing argument.  While I

4   would touch briefly on certain legal principles, we will

5   reserve the bulk of our discussion of the law until closing

6   argument.

7    Our case boils down to two very simple principles.

8   First, these two bills were passed with almost no evidence or

9   data upon which to conclude that they would actually be

10  effective in accomplishing their stated purpose, whether the

11  means would accomplish the end.  In fact, the legislature

12  considered so little data that the defendants will barely

13  mention it in the next few weeks.  Instead, he had to go out

14  and find other experts and other witnesses the legislature

15  never heard to justify them after the fact.  This is not

16  permissible, in our view, as we said in our trial brief.

17    Second, in passing these bills based on emotion and

18  not data, the legislature had even less regard to the impact

19  these laws would have on the Second Amendment rights of

20  law-abiding citizens.  As a result, we have a prohibition of a

21  commonly used and essential part of popular firearms used for

22  self-defense and a background check system that is

23  unenforceable, unwieldily, and prevents many types of common

24  uses.

25    The legislative history reveals that House Bill 1229

1    and House Bill 1224 are little more than an exercise of trying

2    to do something, to legislate for the sake of legislating, in

3    the wake of the Aurora theater shooting.  Repeatedly,

4    legitimate objections were either silenced or brushed aside.

5            Discussing the -- before discussing the bills, there

6    is one observation that I need to make about defendant's trial

7    brief.  The defendant's trial brief reveals two particularly

8    telling things.  First, the defendant refuses to even address

9    the legislative history of the bills, let alone describe how it

10   justifies the burdens they place on the Second Amendment rights

11   of law-abiding citizens.  Almost everything in their case is

12   new, as I said.  Secondly, the defendant goes to extreme

13   lengths to try to explain why the defendant does not even have

14   a burden to justify the burdens the bills do place on the

15   Second Amendment rights of Colorado citizens.

16           The trial brief contains lots of discussion on why

17   there is no burden or why, if there is a burden, it is slight.

18   There is little to no discussion of what evidence exists to

19   justify the burdens -- the bills do in fact create.  Defendant

20   cannot meet his burden with regard to either bill.

21           Let's start with the legislative history.  It is

22   unclear whether defendant will even try to show this court how

23   the legislative history supports the prohibitions and

24   restrictions at issue here.  Based upon discovery and pretrial

25   practice, it is clear that almost all of what defendant relies

1    on is well beyond what the legislature ever considered.  We are

2    here to consider if the legislature was justified in passing

3    these bills, not whether the defendant can think of a

4    justification now.

5         The reliance on all new material is tantamount to an

6    admission that the legislature's analysis was flawed.  Looking

7    at everything the defendant will attempt to present to this

8    court, it falls far short of justifying even a minimal burden

9    on Second Amendment rights.

10        Let's look at the justification for 1229, submitted by

11   the Governor.  Regarding by the -- regarding 1229, there is

12   virtually no legislative history to support the extreme

13   imposition of background checks on private loans.  Nowhere in

14   the legislative history is there any justification for

15   mandating that a background check be done every time a firearm

16   is loaned to a farmhand or an employee or to an extended family

17   member or to a trusted friend when a family must flee their

18   home due to a fire or flood.  There is no justification for

19   such a burden, particularly because this statute does not even

20   work.  The evidence that does exist demonstrates that House

21   Bill 1229 is wholly failing to accomplish its even stated

22   objectives.  There can be no bigger failure of means and

23   scrutiny than if a measure fails to accomplish its most basic

24   goals.

25        Here, the basic fundamental gateway item that they

1    want to suggest, background checks on private transfers, as

2    shown in Exhibit 24, from July 1, which is one of their

3    documents -- as shown in Exhibit 24 from July 1 to December 1,

4    2012, there were 3,854 background checks on private sales.

5    This is in 2012.  Primarily checks required by federal law

6    since 1968 for interstate private sales.

7           Given 1229's massive expansion of the scope of the FFL

8    background check requirement to include all temporary loans

9    exceeding 72 hours, as well as all private intrastate sales,

10   one would expect a massive increase in FFL background checks.

11   The data for July 1, to December 1, 2013, the first six months

12   after House Bill 1229 became effective, shows a slight decrease

13   in private background checks.  This is a failure by any

14   measure.  Plaintiffs respectfully urge this Court to look

15   beyond what defendant will likely rely upon, that background

16   checks on the actual sales of firearms may have some utility in

17   some circumstances.

18          From the day the original Complaint was filed in this

19   case, plaintiffs have never argued that background checks on

20   private sales are necessarily unconstitutional.  Our case is

21   1229 in particular; not background checks in general.  1229

22   fails any form of means and scrutiny because its onerous

23   scheme, especially its requirement that gun shows -- gun stores

24   must be used to justify a loan of a firearm for a few days, has

25   no support in the legislative history or otherwise.

1       Let's look at the justification for 1224.  What is the
2   evidence to support 1224's prohibition of tens of millions of
3   standard magazines?  As the Court knows, common usage is a key
4   factor in determining whether a firearm is constitutionally
5   protected.  That is not even in dispute in this case.  We have
6   a stipulation that tens of millions of magazines over 15 rounds
7   exist.  It is apparent, looking at the legislative history that
8   does exist, that the legislators who supported 1224 were moved
9   by high-profile mass shootings.  But a careful analysis of the
10  facts of such crimes shows that 1224 is a symbolic gesture that
11  does not improve public safety.

12      The question here is whether the magazine ban will
13  actually have any positive impact on public safety at any
14  level, let alone the level that would be required to justify
15  the burden it places or core Second Amendment rights of
16  personal protection in a confrontation situation.

17      Defendant will attempt to introduce an array of
18  speculative social science about so-called large-capacity
19  magazines.  Little, if any, of this evidence was actually
20  considered in the legislative history.  Again, the defendant's
21  evidence is all new and should not be allowed.

22      But even setting this aside, plaintiffs respectfully
23  submit that none of this evidence offers any real proof that
24  the magazine ban under 1224 will have any effect whatsoever on
25  mass shootings.

1    *THE COURT:*  Mr. Westfall, I'm going to interrupt you

2    at this juncture.  This is not evidence.  I need to know what

3    evidence it is you intend to present.  Could you focus on that,

4    please.

5    *MR. WESTFALL:*  Your Honor, I'm focusing on -- we are

6    going to actually introduce evidence on both the actual means

7    that the state has chosen and put the means up to a test and

8    subject to our cross-examination.  And we'll also be putting on

9    evidence to show our burden, and.  That's something we feel

10   like we have to actually do in an evidentiary context in the

11   nature of a Second Amendment case.

12   *THE COURT:*  Would you tell me what evidence, please,

13   you intend to present.

14   *MR. WESTFALL:*  We were going to be introducing expert

15   testimony regarding how firearms operate, why the magazines

16   that are prohibited are standard magazines.  We're going to be

17   introducing extensive evidence on -- from people who actually

18   need and believe that they need, in a self-protection

19   situation, 16 plus magazines to protect themselves and defend

20   their home and property.  We'll be introducing extensive

21   evidence to show that the multitude of private transfers that

22   take place on a day-to-day basis in the context of normal

23   firearm usage and allowing people to acquire firearms, that

24   it -- that the restrictions that are placed -- the background

25   check requirement wholly makes it impossible for them in most

1   circumstances to loan and acquire a firearm in a temporary

2   context to exercise their Second Amendment rights.  And those

3   are all the witnesses that we plan on introducing as part of

4   our case.

5          THE COURT:  All right.

6          MR. WESTFALL:  Let me see if I can cut through my

7   opening statement and see if there is anything else hopefully

8   the Court would like to hear.

9          This is something I do think is important that was

10  part of my prepared remarks, Your Honor.  And this gets to our

11  burden to establish that the burdens that are created by these

12  statutes are severe.

13         With respect to 1229, 1229 is not a simple background

14  checks bill, as the evidence will show.  It places an enormous

15  burden on the day-to-day use of firearms, which include

16  temporary loans in a myriad of situations, that we'll get into.

17  Some examples, a farmer in a rural area who loans a firearm to

18  a neighbor or to a farmhand to protect livestock or property.

19  We will have a representative of Farm Bureau testify, Your

20  Honor.

21         A woman who loans a firearm to a friend to deal with

22  the threat of an abusive husband who has threatened her life.

23  We will have testimony from a representative of Women for

24  Concealed Carry, who will mention that and say that was one of

25  the reasons why the organization came out against House Bill

```
 1   1229.

 2              A woman who lost her home in a fire or flood,

 3   responsibly stores her firearm in the home of a friend.  I

 4   believe we'll have expert testimony and other testimony talking

 5   about that situation and how just -- that 1229 makes it very,

 6   very difficult, if not impossible, to make that loan in the

 7   context, going out and actually finding an FFL licensee to do

 8   this background check for this temporary loan.

 9              And the first witness that we will be introducing this

10   morning, Your Honor, will be the testimony of Mr. Bob Hewson of

11   Colorado Youth Outdoors.  And he will testify about the impact

12   1229 has on his program, which is designed to introduce

13   citizens, including and especially our young citizens to

14   firearms.  1229's scheme criminalizes what has been the routine

15   practice of Colorado Youth Outdoors and other organizations

16   like his, as he's going to testify to.  Many of these

17   organizations are going to have to either dramatically change

18   the way they do business or cease operations, with a major

19   negative impact on responsible firearm ownership in the state.

20              We will introduce expert testimony to talk about that

21   magazines are an integral part of semiautomatic firearms.

22   These semiautomatic firearms that use 16 or more rounds of

23   ammunition are common and are commonly used for the core

24   protected rights of defense of home, person, and property.

25              This is something I think we really -- I hope we're --
```

1   the Court can grasp that we're going to introduce testimony

2   from folks that have disabilities, or have difficulty,

3   including expert testimony on this point, that the class of

4   firearms at issue here is -- are particularly important to

5   law-abiding persons with disabilities.  And especially this --

6   for those people who find themselves in the unfortunate

7   situation to actually encounter a life-threatening situation.

8          Forcing law-abiding citizens to reload in a

9   life-threatening situation, you will hear expert testimony on.

10  And you will get lay testimony on this point, Your Honor.

11  Forcing law-abiding citizens to reload in a life-threatening

12  situation temporarily disarms them.  Under *Heller*, a person has

13  a core Second Amendment right to access to an operable firearm

14  in a confrontation situation, the very core of the Second

15  Amendment right itself.  Forcing someone to reload in such a

16  situation -- we'll get testimony on this -- especially someone

17  with a disability, making reloading more difficult, denies that

18  person the right to an operable firearm when that person needs

19  it the most.  It can make the difference between life and

20  death.

21         In sum, this court should look at the evidence to be

22  produced to it in the next two weeks and ask itself, do 1229

23  and 1224 accomplish their stated purpose?  Are they based on

24  sound decision making, or who do these bills burden?

25  Criminals, their purported focus, or law-abiding citizens?

1        As I noted earlier, the defendant went to great

2   lengths in his trial brief to argue he has no burden --

3        THE COURT:  Counsel, I read the trial briefs.  This is

4   not an extension of argument in the trial briefs.

5        MR. WESTFALL:  I am --

6        THE COURT:  This is just opening statement.

7        MR. WESTFALL:  I am at the end of my opening

8   statement, Your Honor.  And unless the Court has any further

9   questions at this time, we're ready to proceed.

10        THE COURT:  Great.  Thank you.

11        MR. WESTFALL:  Thank you, Your Honor.

12                    **OPENING STATEMENT**

13        MR. GROVE:  May it please the Court.  In July 2012,

14   tragedy struck Colorado just a few miles from here when a

15   shooter using a gun equipped with a magazine that held 100

16   rounds killed 12 people and injured 58 more during a midnight

17   movie screening.

18        In December of that same year, the nation again was

19   shaken by the massacre of 26 people, including 20 children, at

20   Sandy Hook Elementary School in Newtown, Connecticut.

21        Colorado, of course, was no stranger to what firearms

22   violence can do, stretching back not only to the summer of

23   violence in 1993, but also to mass shootings in Columbine High

24   School in 1999, New Life Church in Colorado Springs in 2007,

25   and others equally devastating.

1    In response to these events, Colorado's elected

2    representatives made a policy decision and passed two pieces of

3    legislation designed to appropriately balance our state's

4    public safety concerns with respect to the Second Amendment

5    rights of its citizens.

6    The first applies to ammunition magazines holding 16

7    or more rounds.  It doesn't take these items away from those

8    who already own them, it does not restrict their lawful use,

9    and does not limit the choices of firearms that Coloradans may

10   carry.  Rather, it simply prohibits the new acquisition and

11   transfer of large-capacity magazines.

12   The second ensures that laws prohibiting dangerous

13   persons from possessing firearms will also be applied to

14   dangerous persons who are attempting to acquire them.  By

15   closing the private sale loophole, the law simply expands the

16   preexisting background check requirement to cover transfers

17   between private individuals.

18   Like the magazine capacity limitation, it imposes no

19   new restrictions on who may acquire a firearm or where or how

20   it may be legally used.  As the evidence will show, neither of

21   these laws burden the core Second Amendment right as defined by

22   the United States Supreme Court.

23   To be sure, the Court has recognized that law-abiding

24   citizens have a constitutional right to possess firearms for

25   the purpose of self-defense.  But acknowledging the right is

1   not the same thing as saying that it cannot be regulated --

2            THE COURT:  Counsel, I'm going to interrupt you, too.

3   This is not an opportunity to make an argument.  I've read your

4   trial briefs.  I need to know what evidence you intend to

5   present.

6            MR. GROVE:  Even if a restriction on large-capacity

7   magazines does fall within the scope of the Second Amendment,

8   the evidence will show that Colorado's law does not

9   substantially burden Colorado citizens' core Second Amendment

10  rights.

11           The parties have stipulated to the fact that an

12  exceedingly wide variety and large number of firearms remain

13  widely available for purchase and use.  Likewise, many choices

14  of detachable box magazines remain available after the law's

15  adoption.  And with only a few rare exceptions, all

16  semiautomatic firearms today are compatible with lower-capacity

17  magazines.  Even those few firearms that are impacted by the

18  Bill may easily be modified with a limiting device to fit the

19  requirements of the law.

20           Plaintiffs will argue that large-capacity magazines

21  are necessary for self-defense.  They will be unable to prove

22  it.  The evidence in this case will show three key points:

23  First, the use of firearms in self-defense is rare.  Second,

24  firearms equipped with Colorado-compliant magazines are

25  effective for self-defense uses.  And third, civilians have

1   virtually never, if ever at all, required more than 15 rounds

2   to effectively defend themselves.

3          On the other side of the ledger, limiting magazine

4   capacity will make a difference in gun violence.  The evidence

5   will show that bullets 16, 17, and 18, and so on were used to

6   deadly effect in recent mass shootings.

7          Again, the evidence, much of it undisputed, will

8   establish four additional facts.  First, Colorado's law will

9   reduce the number of large-capacity magazines that are used in

10  crime.  Second, even when large numbers of rounds are not

11  fired, magazine capacity matters when it comes to firearms

12  discharge.  Equipping crime guns with large-capacity magazines

13  results in more shots being fired, more victims being shot, and

14  more lethal injuries than would result from gun crimes

15  involving smaller capacity magazines.  Third, restricting

16  magazine capacity will have particular benefits for law

17  enforcement.  And, finally, in mass shooting situations,

18  limiting the number of rounds available to a perpetrator of gun

19  violence forces a gunman to reload more often.  Reloading

20  creates a crucial window of opportunity for victims to escape

21  or disarm the gunman.  Instances where this happens are more

22  frequent than one might expect.

23         Colorado's General Assembly heard and weighed each of

24  these rationales before adopting a limit on magazine capacity.

25  But I'm going to save argument on the admissibility of

1    post-enactment evidence until the appropriate time.

2        As outlined in the Governor's trial brief, plaintiffs

3    cannot show that large-capacity magazines, a ban on them,

4    severely burdens their core Second Amendment right to

5    self-defense.  But even if plaintiffs can show that their

6    rights are substantially burdened by 18-12-302, the evidence

7    will show that the balance of interest at stake in this case

8    favors the General Assembly's decision to enact a ban on these

9    weapons.

10        First, there can be no serious dispute that the State

11    has a strong interest in public safety.  And, second, the

12    evidence will show that Section 302 addresses this interest by

13    limiting the circulation of weapons of violence and weapons

14    that are particularly lethal when used in mass shootings.

15        The second piece of legislation closed a loophole that

16    existed for years in the system that the state uses for

17    background checks for firearm possession.  Background checks

18    have been required for the retail purchase of a firearm under

19    federal law for more than 20 years.  Individuals must pass a

20    background check to purchase a firearm and are disqualified if

21    they meet certain criteria, such as a prior felony conviction,

22    an outstanding for their arrest, or certain mental health

23    adjudications.

24        Colorado narrowed the loophole for private sales by

25    enacting a system of private sale background checks at gun

 1 │ shows after the Columbine shootings in 1999.  But narrowing the

 2 │ loophole did not eliminate it.  Purely private transfers after

 3 │ that law still did not require a background check and left an

 4 │ enormous gap in the state system to prevent prohibited persons

 5 │ from obtaining firearms.

 6 │         The balance of the evidence in this case will show

 7 │ that Section 112 does not substantially restrict the

 8 │ plaintiffs' Second Amendment rights.  The statute includes a

 9 │ number of reasonable exceptions to permit the lawful transfer

10 │ of firearms among law-abiding citizens, including an exception

11 │ for short-term loans.  The evidence will show that obtaining a

12 │ background check is quick, easy, and inexpensive.  And contrary

13 │ to plaintiffs' arguments, we do not anticipate that the actual

14 │ evidence will show that it is difficult to find a licensed

15 │ firearm dealer who will do a check for private transfer.

16 │         Moreover, the evidence -- again, much of it

17 │ undisputed -- will show that background checks work in several

18 │ ways.  Unrebutted expert testimony will establish three key

19 │ points.  First, expansion of background check requirements

20 │ makes it more difficult for prohibited persons to acquire

21 │ firearms.  Second, Colorado's law will reduce the rate of

22 │ firearm trafficking and illegal diversion in the state.  And,

23 │ third, perhaps most importantly, expansion of background check

24 │ requirements to cover private transfers is likely to lead to a

25 │ reduction of firearm homicide rates in the state.

 1          Based on this evidence, Section 18-12-112 should

 2    withstand any level of scrutiny.

 3          Plaintiffs have raised a facial challenge to the

 4    constitutionality of these laws.  This means that they must

 5    show at a minimum that the law is unconstitutional in the vast

 6    majority of its applications.  The evidence will not sustain

 7    such a showing in this case.  As a result, the State will be

 8    asking for judgment to be entered in its favor at the

 9    conclusion of the evidence.

10          *THE COURT:*  Thank you.

11          Please call your first witness.

12          *MR. WESTFALL:*  Thank you, Your Honor.

13          For plaintiffs' first witness, we'd call Mr. Bob

14    Hewson to the stand.

15          *THE COURT:*  Thank you.  Please step up and be sworn.

16            (**ROBERT HEWSON, PLAINTIFFS' WITNESS, SWORN**)

17          *COURTROOM DEPUTY:*  Please be seated.

18          Please state your name and spell your first and last

19    name for the record.

20          *THE WITNESS:*  Robert William Hewson, R-O-B-E-R-T,

21    H-E-W-S-O-N.

22          *THE COURT:*  Thank you.

23          Please proceed.

24          *MR. WESTFALL:*  Thank you, Your Honor.

25

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | *BY MR. WESTFALL:* |
| 3 | *Q.*  Mr. Hewson, where do you live? |
| 4 | *A.*  I live at 713 Colt Drive, Loveland, Colorado, 80537. |
| 5 | *Q.*  How are you employed? |
| 6 | *A.*  I'm employed as executive director for Colorado Youth |
| 7 | Outdoors. |
| 8 | *Q.*  What is your education background? |
| 9 | *A.*  I received a bachelor of science degree from Colorado State |
| 10 | University. |
| 11 | *Q.*  Please describe, if you will, your work history. |
| 12 | *MS. MORRILL:*  Objection, Your Honor.  It appears the |
| 13 | witness has something at the podium with him. |
| 14 | *THE WITNESS:*  I do. |
| 15 | *MR. WESTFALL:*  He does have his handwritten notes. |
| 16 | Counsel is perfectly free to look at them. |
| 17 | *THE COURT:*  Well, witnesses don't testify from notes. |
| 18 | Please give your notes to Ms. Glover. |
| 19 | Thank you. |
| 20 | If you need to refresh your recollection, there is a |
| 21 | process for that. |
| 22 | *THE WITNESS:*  Thank you, Your Honor. |
| 23 | *BY MR. WESTFALL:* |
| 24 | *Q.*  Please describe your -- did you state for the record your |
| 25 | educational background?  Please do that again, please.  Maybe |

```
 1  I --
 2  A.   Sure.  I received a bachelor of science degree in
 3  industrial technologies from Colorado State University.
 4  Q.   And what's your work history, Mr. Hewson?
 5  A.   I -- after leaving Colorado State University, I worked for
 6  a company called -- named Hach Company.  I worked for them for
 7  approximately sixteen years.  Began as a mechanical engineer,
 8  and left in 2003 as a director of engineering services.
 9  Q.   How about your experience with Colorado Youth Outdoors,
10  when did that start?
11  A.   Colorado Youth Outdoors was founded in 2001, and I have
12  worked for Colorado Youth Outdoors from that time to present.
13  Q.   How did Colorado Youth Outdoors get started?
14  A.   Colorado Youth Outdoors was founded by my brother and I,
15  again, in 2001.
16  Q.   What is Colorado Youth Outdoors?
17  A.   Colorado Youth Outdoors is a nonprofit, a 501(c)(3)
18  nonprofit.
19  Q.   Would you please describe its mission.
20  A.   The mission for Colorado Youth Outdoors is to assist in
21  building healthy relationships between parents and their
22  children using traditional outdoor recreation.
23  Q.   Are firearms important to Colorado Youth Outdoors' mission?
24  A.   Firearms are important within the mission of Colorado Youth
25  Outdoors.
```

1    *Q.*  How?  Please describe to the Court.

2    *A.*  Well, again, with our mission being centered around using

3    traditional outdoor recreation, the shooting sports are one of

4    those programs that are threaded throughout the curriculum of

5    Colorado Youth Outdoors.  We have -- within Colorado Youth

6    Outdoors, it's -- our core program, being a twelve-week

7    program, several weeks are part of -- are youth shooting sports

8    as part of that recreation.

9          We also have firearms within our advanced programming,

10   which is called our adventure series.  And that's where our

11   participants could go on to learn how to -- if they want to

12   engage in the hunting recreation and sport, or if they wanted

13   to further their proficiency in going on and trying to --

14   learning target shooting.

15   *Q.*  Is Colorado Youth Outdoors a way people are introduced to

16   firearms for their very first time?

17   *A.*  Yes.  We -- well, that's not the mission of Colorado Youth

18   Outdoors.  We -- we, being the staff and myself, find ourselves

19   surprised many times at how many participants find our

20   programming as their first opportunity to learn about firearms

21   and experience firearms.  Definitely in a safe and -- within

22   the mission, hopefully a rewarding opportunity to have their

23   first time in using firearms.

24   *Q.*  Can you describe generally the results of Colorado Youth

25   Outdoors firearm programs with youth and with parents.

1  *A.*   Sure.   It's definitely a very important aspect within the

2  mission of Colorado Youth Outdoors.   It -- as a matter of fact,

3  we survey our participants at the conclusion of their program,

4  their twelve-week program.   And within that survey, we ask

5  about the experiences that they've had through their twelve

6  weeks.   And the firearm piece of our program -- programming

7  turns out to be the most sought after and the most rewarding

8  part of that -- within that survey.

9         We were fortunate to hear stories and situations,

10  examples about how that particular piece of our program helps

11  us within the mission of building healthy relationships between

12  parents and kids.

13  *Q.*  Can you just give the Court just a couple of examples, and

14  then we'll move on.

15         *MS. MORRILL:*  Objection to the extent it calls for

16  hearsay.

17         *THE COURT:*  Response.

18         *MR. WESTFALL:*  Not offering it to prove the truth of

19  the matter asserted with respect to any issue of consequence in

20  this case, but I'm merely providing background of the program

21  itself and some of the benefits that derive from the program.

22         I think Mr. Hewson's eminently capable of talking

23  about that and the fact that he can characterize the results

24  without giving a specific out-of-court statement in -- in

25  person, but he can give what he found out as a result of the

1    surveys.  And that's certainly within the scope of his

2    testimony and is not hearsay.

3            *THE COURT:*  Would you give a proffer, please.

4            *MR. WESTFALL:*  I think Mr. Hewson will testify that

5    there are specific instances where he is aware that people had

6    a very positive result as a result of participating in the

7    Colorado Youth Outdoor program --

8            *THE COURT:*  He's testified to --

9            *MR. WESTFALL:*  -- and the firearm usage component of

10   Colorado Youth Outdoors.

11           *THE COURT:*  He's testified to that already.  What is

12   it that you're going to be asking him to testify to now?  You

13   wanted specific examples.  What is it you want him to testify

14   to?

15           *MR. WESTFALL:*  I believe he would say the specific

16   example of a mother who does not have a father -- a child that

17   does not have a father, just has a mother.  The mother

18   participated in the program.  It was very, very successful.

19   And also another father-son example.

20           *THE COURT:*  I sustain the objection.

21           Please move on.

22   *BY MR. WESTFALL:*

23   *Q.*  What specific programs does Colorado Youth Outdoors have

24   that involve firearms?

25   *A.*  Well, as I stated, firearms are kind of woven throughout

1    the programming of Colorado Youth Outdoors in many ways.  But

2    possibly the best way to do that is, maybe put those into --

3    put the firearm related parts of our program into some

4    categories, maybe.

5            So, obviously, first, our core programming, which is

6    the twelve-week program, and then the adventure series.  But it

7    goes beyond that with the fact that, you know, owning a large

8    facility, outdoor education center, we have opportunities for

9    firearms safety curriculum.  We also have the opportunity for

10   our participants to go through hunter education; so that might

11   be, maybe another opportunity or category.  Another category

12   would be that there are other related events within our -- the

13   organization of Colorado Youth Outdoors.  Those are events that

14   we potentially are hosting at our property.  They may be even

15   using some of our curriculum, other entities, other nonprofits.

16           Another category would be -- well, we definitely use

17   firearms in our major fundraiser.  It's called the Maverick.

18   And then I might create an other category, I guess, in the fact

19   that there are firearms that are used in some of our

20   cooperations and collaborations with other entities, other

21   organizations, outside of use of our facility.

22   Q.  Thank you, Mr. Hewson.  We'll come back to these in a

23   moment and the impact that 1229 has on those programs, but I

24   want to have a few other -- get a few other facts out on the

25   record first.

 1          What firearms does Colorado Youth Outdoors own?

 2  *A.*  We own two -- mainly, two types of firearms, shotguns and

 3  rifles.  We own twenty-two shotguns, and we own fourteen

 4  rifles.

 5  *Q.*  Who exactly owns these firearms?

 6  *A.*  The ownership of the firearms is something that we discuss.

 7  To be up front -- I'm not really sure who owns -- you asked me

 8  who owns the firearms.  I might say or one might say that I own

 9  the firearms, as executive director.  I -- I certainly sign for

10  all the firearms upon purchase of the firearms, but it's the

11  organization that pays for the firearms -- Colorado Youth

12  Outdoors has these firearms on their -- their books.  They're

13  assets of Colorado Youth Outdoors.  But potentially, it may be

14  unclear as to the term "ownership."

15  *Q.*  Mr. Hewson, I'd like to have before you House Bill 1229,

16  which I believe is Exhibit 4 in the notebook.

17          May the witness be presented the notebook.

18          *COURTROOM DEPUTY:*  Certainly.

19  *BY MR. WESTFALL:*

20  *Q.*  I know we've had a lot of moving parts over the last couple

21  of days, so hopefully we've got this right.

22          Would you please turn to Exhibit 4.  And is that in

23  fact House Bill 1229?

24  *A.*  I may struggle here to try to find Exhibit 4.

25          *THE COURT:*  What notebook is it in?  I'm not showing

```
 1    those on my notebooks either.
 2            MR. COLIN:  Your Honor, it's in notebook 3.
 3            THE COURT:  Thank you.
 4            Thank you.  Maybe at a break we can mark these
 5    exhibits as to which exhibits are in which notebooks.  The
 6    spines are showing notebook 3 of 5, but it doesn't tell me what
 7    exhibits are in those.  And maybe someone --
 8            MR. COLIN:  Your Honor, just for the Court's ease, the
 9    first two notebooks are the legislative histories for 1224 and
10    1229.  So the exhibits that will mostly be referred to during
11    the trial start with notebook 3 and move forward from there.
12    And I'll get you specifics for the record.
13            THE COURT:  Thank you.
14            MR. WESTFALL:  I thank my colleague for pointing that
15    out.  Thank you, Mr. Colin.
16            THE WITNESS:  I'm sorry, what --
17    BY MR. WESTFALL:
18    Q.  Should be Exhibit 4, tab 4 in notebook 3.  Do you have it?
19    A.  I'm there.
20    Q.  Is that in fact House Bill 1229?
21    A.  It is.
22    Q.  I just want to make sure you have it available to you in
23    responding to some of the questions I'm about to ask you.
24    A.  Okay.
25    Q.  Under House Bill 1229, do you know with certainty who is
```

 1  the owner, the transferor, or the transferee of the firearms

 2  that you've just described?

 3        MS. MORRILL:  Objection.  Calls for improper legal

 4  conclusion.

 5        THE COURT:  Response.

 6        MR. WESTFALL:  I think Mr. Hewson, as the executive

 7  director of the organization, who has tried to work through

 8  1229 and has tried to comply with it, can testify as a

 9  layperson about what he has done to try to comply with the law

10  and any questions that he has with the law.  I'm not asking for

11  a legal conclusion.  I'm asking for his interpretation of the

12  law and the impact that that interpretation may or may not have

13  on his potential program.

14        THE COURT:  Thank you.

15        Reply.

16        MS. MORRILL:  Your Honor, I think it's improper for

17  Mr. Hewson as a layperson, who has clearly testified that he

18  has no legal education or background whatsoever, to testify to

19  anything other than what he as the executive director of

20  Colorado Youth Outdoors and his organization may have done

21  before the laws went into effect and what they may do now,

22  after the laws are now in effect.

23        THE COURT:  I overrule the objection.  This witness

24  can testify as to what he has done and what he understands.

25  This is a trial to the Court.  Any legal interpretation that is

1  going to be made, I will make.

2        *MR. WESTFALL:*  Thank you, Your Honor.

3  *BY MR. WESTFALL:*

4  *Q.*  Looking at House Bill 1229, if you need to.  Under 1229, do

5  you know with certainty who is the owner, who is the

6  transferor, or who is the transferee?

7  *A.*  No.  If -- if I could read -- I'm reading from section 1B.

8  *Q.*  Which page of House Bill --

9  *A.*  This is page 2.

10  *Q.*  Okay.  Thank you.

11  *A.*  Page 2 of the law reads, "As used in this section, unless

12  the context requires otherwise, transferee means a person who

13  desires to receive or acquire a firearm from a transferor.  If

14  transferee is not a natural person, then each natural person

15  who is authorized by the transferee to possess a firearm after

16  the transfer shall undergo a background check as described in

17  paragraph A of this subsection, subsection 1, before taking

18  possession of the firearm."

19        Now, I know you asked me about ownership.  And I don't

20  see the word "ownership" here, but I would assume that

21  ownership refers to transferor, which would be me, back to the

22  person who signs the FFL clearly would be myself in purchase of

23  the firearms, original purchase of the firearms.  But this

24  description goes on to say that if transferee is not a natural

25  person -- so --

1   Q.  Colorado Youth Outdoors is not a natural person, correct?

2   A.  Well -- as I -- as I understand it.  But, again --

3   Q.  Please go ahead.  I didn't mean to interrupt you.

4   A.  No.  So -- yes, so if the ownership is under Colorado Youth

5   Outdoors, if they truly own the firearms -- which, again, is

6   very unclear about ownership, but -- so either I am being

7   held -- being described here, or it's our organization.  And if

8   it's the organization, then I would have to read that -- then

9   each natural person who is authorized by the transferee to

10  possess a firearm after transfer shall undergo a background

11  check.  So I would assume -- it seems pretty clear to me that

12  that would be at least our directors and officers, that -- the

13  board members, but it also may include, and may seem pretty

14  clear that this is also our staff.

15          And the -- one of the real challenges here is, if it

16  says authorized by the transferee to possess a firearm after

17  the transfer shall undergo background check, that --

18  potentially, I guess, that could be one of our participants,

19  anybody in the program.  So it's -- my answer was no, it's not

20  clear.  And that would be an example of the ambiguity of this,

21  is that -- and, quite honestly, we spend a lot of time here.

22  We, as an organization.  This is very important, about who owns

23  the firearms or who it's referring to here as the transferee.

24          Now, it also states the transferor, which I assume we

25  make that shift, that I -- either I or the organization would

1   make that shift as soon as we were now transferring to the next

2   entity.  But -- so my answer is, no, it's not clear.

3   Q.  Does this issue of ownership and what you've just described

4   impact Colorado Youth Outdoor's ability to acquire and loan

5   firearms?

6   A.  Certainly.  Again, for the reasons that I stated.  So I --

7   I described the fact that we own firearms today.  We have a

8   purchase that we have not taken ownership of -- we paid for,

9   but it's sitting with the entity that we typically purchase

10  through.  And one of the very reasons is this.  I'm not so sure

11  that the transferor, being a licensed FFL, at this point can

12  actually make that transfer to me knowing that if the ownership

13  is Colorado Youth Outdoors, then one might have to understand

14  that that would mean that our board, our staff, a very large

15  body of people, would be asked to go through -- have to perform

16  the background check.

17         I -- that part of it is very unclear, and, yes,

18  complicates our matters.  But it also, as you'll -- as we

19  described today, 1B is a very challenging portion of this law

20  and what effects the rest of the law has on us a consequence --

21  I think you might understand that this is either about me

22  personally or the whole organization, that, you know,

23  definitely the board of directors and potentially most likely

24  staff members.  I'm not sure where that boundary is, I guess is

25  what I'm describing.

1   Q.  Thank you, Mr. Hewson.  Are you familiar with House Bill

2   1229?  You've just been talking about it.

3   A.  I am familiar with House Bill 1229.

4   Q.  Have you studied it?

5   A.  I have studied it.

6   Q.  Have you discussed it with law enforcement?

7   A.  We have discussed it with law enforcement.

8   Q.  Have you discussed it with your attorneys, not me?

9   A.  I have discussed it outside of this with legal counsel.

10  Q.  Have you discussed it with your insurance broker?

11  A.  I have.

12  Q.  Have you discussed it with your board of directors?

13  A.  At length, as we just talked about -- as you can imagine,

14  we spend a significant amount of time prior to, during, and to

15  date about this.

16  Q.  I'd like to discuss the impacts that 1229 has on Colorado

17  Youth Outdoors.  And I'd like to do this by addressing -- I

18  believe you identified five categories of the firearms related

19  programs that make up Colorado Youth Outdoors.  The first one

20  you identified, Mr. Hewson, I think you characterized as core

21  curriculum, part of your core program.  Would you describe for

22  the Court what that entails.

23  A.  Yes.  So a brief overview about the fact that we're --

24  again, our mission is about, you know, helping parents and kids

25  bond through traditional outdoor recreation.  So to do that,

1   the main element is time, time spent between parents and kids,

2   and hopefully learning about great skills that they can take on

3   for the rest of their life.

4         The core curriculum is offered several times through

5   the year, and -- but it -- so within -- there is twelve weeks

6   of curriculum, but it also has the opportunity to go beyond

7   that, should they want to -- they could sign up again, or they

8   could go on to our adventure series.

9         So within the core curriculum, whether they're at our

10  facility up northeast in the Fort Collins-Loveland area or our

11  program down in the southeast, the Colorado Springs area, they

12  receive, at a minimum, twelve weeks of instruction, both for

13  the youth and their parents.  The parents attend the full

14  session every time.

15  Q.  So the core program is in two geographic areas, northeast

16  and southeast, I believe you testified?

17  A.  Yes.  Our larger profile is in the -- what we call the

18  northeast region, where we manage our organization under a

19  regional context.  And the northeast region is -- it serves the

20  Loveland, Fort Collins, Greeley area for the large cities, and

21  all the smaller communities in between.  But our southeast

22  program is designed to serve the community of Colorado Springs.

23  Q.  How many participants per year in your core program?

24  A.  So, our core program -- again, this is the full -- you

25  know, the twelve-week program that they would sign onto.  There

1    are approximately 300 participants -- 150 families on an annual

2    basis that go through the full program.  The majority of those

3    are in the northeast.  We're a larger program in the northeast,

4    but -- so the balance out of the southeast program.

5    Q.  While we're talking about numbers, before we continue with

6    the discussion about your core program, how many other people

7    does Colorado Youth Outdoors serve in some capacity in its

8    various firearm-related programs?

9    A.  Sure.  So, I just commented about the core program.  But,

10   yes, the question is, are there others that we -- within our --

11   the organization of Colorado Youth Outdoors that use our

12   facility, our programs?  It's over 10,000 annually.

13   Q.  What concerns do you have, Mr. Hewson, regarding House Bill

14   1229 as relates to the core program that you have just

15   described for the Court?

16   A.  Well, within our core program, I said that, you know, the

17   shooting sports are a -- one of the most sought after parts of

18   our curriculum.  Again, we come by that by virtue of surveys.

19   And then -- but, you know, we talk about it often with our

20   participants.

21          But -- so through -- the question might be, what --

22   what are those shooting related recreations and curriculums?

23   But I said that we own shotguns and rifles.  So it's either

24   through -- trapshooting is one of our core curriculums, or

25   small bore, and/or small-bore rifles.  And the new law, the

1    transfers that occur within our core program -- unfortunately,

2    this law does not give us exemptions -- does not list

3    exemptions --

4    Q.  While we're on exceptions, where are the exceptions that

5    are contained in House Bill 1229, if you know?

6    A.  Yes.  I'm referring to the exemptions made right after --

7    I'm sorry, they begin on -- in the law that reads, "the

8    provisions of this section do not apply," and that's section

9    6 --

10   Q.  Subsection --

11   A.  Subsection 6.

12   Q.  Subsection 6?

13   A.  Correct.

14   Q.  Okay.  Please continue.

15   A.  So, the -- within our organization, within our core

16   programming, the word "transfer" and the action -- you know,

17   the activity or action of transferring firearms from one

18   individual to another is commonplace.  And don't think I need

19   to describe that, but -- and, so, in the law, there are

20   exemptions that make potentially an attempt to exempt our

21   program from those transfers.  And so if it -- it might be best

22   if I look at these and -- or just quickly identify why -- which

23   ones we don't see apply, which are all of them, but we could

24   commend on each one.

25          But if I start at (6)(a), for example -- and they go

1  through (a) through (i), it appears, or (h).  But (a) is a

2  transfer of an antique firearm, and that's not our business.

3  (b) is a transfer that is bona fide gift or loan between

4  immediate family members.  That's not us.  A transfer that

5  occurs by operation of law or because of death of a person.

6  That's not us.  So now I'm on to (d), a transfer that is

7  temporary and occurs while in the home of the unlicensed -- we

8  don't perform our program at home.  And then under that is (I)

9  and (II), but I don't think that they, obviously, since that

10 doesn't exempt us.

11           (e), I'm on (e).  (e) is a temporary transfer of

12 possession without transfer of ownership or title to ownership

13 which transfer take place.  And then there is three subsections

14 of (e).  And subsection (I) would be, "At a shooting range

15 located in or on premises owned or occupied by a duly

16 incorporated organization, organized for conservation purposes

17 or to foster proficiency in firearms."

18           So we -- that exemption doesn't qualify us.  One might

19 see us -- see our organization as an organization that maybe

20 has a shooting range.  Obviously, we have a safe region within

21 our outdoor education center.  That area is used for

22 trapshooting, but it definitely is not a public shooting range,

23 by any means.

24           But that -- and we also are not organized for

25 conservation purposes or to foster proficiency in firearms.  It

1   just so happens that we use firearms as one of many different

2   curriculums, but our organization -- we are organized for the

3   purposes of helping parents and kids come together, and so I --

4   we do not believe that we are exempted by (I).

5           (II) is "At a target firearm shooting competition

6   under the auspices of or approved by a state agency or a

7   nonprofit organization."  Clearly, we are a nonprofit

8   organization, but we -- we're not in the business of competing

9   as -- as a matter of fact, within our organization and, as a

10  matter of fact, at our location, we couldn't even hold an ATA

11  competition or NSCA -- ATA, being American Trap Association, or

12  NSCA, being National Supporting Clays Association.  We wouldn't

13  qualify.  Our type of facility is temporary in nature with

14  battery-powered machines.  We're not a -- we are not an

15  operation for competition.  So we would not -- that does not

16  exempt us, unfortunately.

17          And then (III) is -- (III) reads, "While hunting,

18  fishing, target shooting, or trapping, if" -- and we can get

19  into ifs, but on (III), just -- even there we don't fit.  Well,

20  certainly, we have the opportunity to educate about the hunting

21  sports, target shooting.  But while hunting and while

22  fishing -- I'm not sure why that's in there.  But while target

23  shooting and while trapping, so much of our education is -- and

24  our transfers are outside of this bounds.  As a matter of fact,

25  it's a significant amount.  The majority of the time is spent

1   learning about firearms.  I mean, obviously, we want to be as

2   safe as possible within the organization -- within the time

3   frames that we have for our participants.  So it's very

4   important that it's a safe environment, that it's a rewarding

5   environment.  But we would not do that while we are hunting,

6   and we would not do that while we are actually target shooting.

7   And, again, that's -- even though fishing is a big part of our

8   program, we wouldn't do it while we're fishing.  And trapping

9   is not part of our program.

10          So I don't know if it's necessary to go through (A)

11  and (B) of that, but (III) does not exempt us either.

12          If I could go to -- then I'd jump to (f).  (f) is, "A

13  transfer of a firearm that is made to facilitate the repair or

14  maintenance of the firearm, except that, paragraph (f) does not

15  apply unless all parties who possess the firearm as a result of

16  the transfer may legally possess a firearm."

17          Certainly, we repair our firearms.  We have volunteers

18  that help us with cleaning and some level of maintenance.  But

19  sometimes they need repair for a licensed repair entity that

20  you would assume is licensed, or has that ability.

21          So, you know, certainly, during that -- I understand

22  that during that time, this would exempt the transfer, I guess,

23  while it's with that person.  But as you can imagine, just to

24  get to that point, there is transfers prior to that -- that

25  happen -- it could be for -- you know, time frames could be

1    days before that.  We make a transfer to a volunteer who is

2    going to make -- you know, help us gain understanding whether

3    this firearm needs to go beyond, go to an actual repair house.

4    So I really question whether or not that one would be -- we

5    would even be exempted during that specific time.

6          (g) reads, "Any temporary transfer that occurs while

7    in the continuous presence of the owner of the firearm."  Well,

8    I guess that would get back to your question earlier about

9    ownership.  But let's assume that I'm the owner.  Again, it

10   could be our whole board and all of that.  But if I'm the

11   owner, this says that I'm -- Colorado Youth Outdoors or I'm

12   exempted while I'm there.  That continuous presence means that

13   the executive director would need to be with the program at all

14   times, any time that there is a firearm.

15         My job is -- I love being part of the program, I love

16   being part of the curriculum, but I am not and cannot be at all

17   programs where firearms are present within Colorado Youth

18   Outdoors.  As a matter of fact, some of these temporary

19   transfers occur.  And that's exactly why it's transfers,

20   because I'm not with the firearm.  I -- making that transfer

21   even to, like, our Colorado Springs program.  So, clearly, I

22   cannot be in the presence all the time -- continuous presence.

23         So that would take me to (h), "A temporary transfer

24   for not more than 72 hours."  So they're saying, if the

25   transfer is not for more than 72 hours, "a person who transfers

1  a firearm pursuant to this paragraph (h) may be jointly and

2  severally liable for damages proximately caused by the

3  transferee's subsequent unlawful use of the firearm."

4         So, here, it's my understanding that they're giving

5  the --

6  Q.  Please talk about that section and why that may give you

7  some concerns under the 72-hour provision.

8  A.  Well, it -- as I read it, it's saying that our organization

9  or myself would be exempted as long as this transfer would be

10  less than three days -- 72 hours.  And -- but it doesn't stop

11  there.  It says, within those three days, I, our organization,

12  may be jointly and severally liable for damages proximately

13  caused by the transferee's subsequent unlawful use of the

14  firearm.  So I would have to read that as -- and our board

15  interprets that, and our legal advice has been, that I -- to be

16  honest with you, I didn't know what jointly and severally meant

17  exactly.  But it has been told to me that we share this -- we

18  share any damage proximately caused by the transferee's

19  subsequent unlawful use of the firearm.

20         So while (h) may be an exemption for 72 hours, it's

21  further burdened -- within the exemption, you're adding this --

22  this law adds a burden that I -- you know, we can't -- I mean,

23  that's a tough one there.  I -- our board, I, we are not

24  interested in sharing damages -- I assume this means civil

25  damages, which, you know, could be hefty fines, could be -- you

1  know, if we have to go to court or we get sued, something

2  happens -- as easy as an accidental discharge in a home from a

3  loaned firearm --

4  Q.  I was going to say, talk about the unlawful use provision

5  for a moment.  Does that provide some additional protection for

6  you or a suitable limitation?

7        MS. MORRILL:  Objection to the extent it calls for a

8  narrative answer.  And, again, just renewing the objection to

9  improper legal conclusion.

10        THE COURT:  Noted.  He may answer.

11  BY MR. WESTFALL:

12  Q.  Please continue.

13  A.  So, sure.  You know -- let's talk -- a brief example would

14  be that, should we make a transfer of a firearm?  And it's

15  within the 72 hours.  And say that we know that this person is

16  going to take the firearm home and bring it back within the

17  stated time period.  But should an accident occur -- may be

18  unintended, but if they take it home, and an accidental

19  discharge -- you know, we pray that it would never be harmful

20  to another person, but it just may be personal property damage

21  that occurs.  As we read this, we are -- we would be jointly

22  and severally liable for that transfer -- for that damage, for

23  the -- that -- that's quite burdensome.  To the point of, I

24  don't know how we'd make -- how we're going to perform these

25  transfers.  And that would be even if something were to happen,

1   just in a transfer -- within the program right at our facility,

2   while (h) gives us 72 hours to perform these transfers, but it

3   goes on to burden it to the point where it really is not much

4   of an exemption at all for our organization.

5   Q.  How about -- does -- with respect to your core program, do

6   you do transfers occur that go outside 72 hours?

7   A.  Most certainly.  You know, in the core program, at any one

8   of our facilities or within the program, you know, there is

9   plenty of transfers that happen within the firearm curriculum.

10  But -- well, you know, when I described the fact that we have

11  two different facilities or two different programs in different

12  locations of the state, unfortunately, many of our transfers

13  have to be over 72 hours.

14  Q.  Let's talk about that for a moment.  Last fall, after the

15  effective date of the House Bill 1229, did any transfers occur

16  between the northeast program and the southeast program?

17  A.  Indeed, they did.  They -- we -- again, part of our --

18  that's just part of our process -- part of our program is to --

19  you know, we don't -- we don't own firearms in both locations.

20  As a matter of fact, we don't own a host of equipment.  Whether

21  it's fly rods, spinning rods, archery equipment, and definitely

22  firearms, we don't have the luxury of owning at both locations

23  or wherever they go.  So, it's typical for our organization to

24  make a transfer of the firearms from our northeast facility

25  down to our southeast facility.  And the specifics on that is,

1  you know, we typically try to meet in the middle with our

2  instructors and make the transfer somewhere in this location.

3  You know, to be specific, at -- it usually happens at a parking

4  lot off of -- near the Sheraton Hotel.

5  Q.  What happened this last fall?

6  A.  Well, as we better understood the law and read the law, we

7  were beyond curious about.  We were very challenged to figure

8  out how this transfer was going to occur, knowing that there --

9  there could be some real complications.  Beyond the 72 hours,

10  is a serious issue, and so didn't really know what to do.  But

11  we reached out to our governing body -- the Sheriff's

12  Department -- our facility is in Larimer County, and their

13  program is in El Paso County.  Sheriff -- I believe it's

14  sheriff Maketa in El Paso County and Sheriff Smith in Larimer

15  County.  So, I reached out to them asking for some advice about

16  what we should be doing.

17      MS. MORRILL:  Objection to the extent the witness is

18  now going be to testifying about hearsay.

19      THE COURT:  This is a bench trial.  I'm going to take

20  some of these objections just in the course of noting them.

21  The evidence that I decide to exclude will comport with the

22  rules of evidence.  This particular objection, I'll note.

23  BY MR. WESTFALL:

24  Q.  Please continue describing what happened.

25  A.  So the -- because the firearms were heading down to

 1    Colorado Springs, the Colorado Springs sheriff had

 2    instructed -- had asked that our instructor there make attempts

 3    to perform the background checks, try to -- just go with

 4    what -- what we felt was being asked of us, to perform this

 5    transfer.

 6         So it -- in order to satisfy the law, it appears that

 7    we needed to have a background check performed on our

 8    instructor before I could transfer the CYO firearms to him.

 9    And so I called a firearms -- actually, I called the company

10    that we usually use for our transfers, that I actually -- when

11    we purchase firearms, and that's Rocky Mountain Shooter Supply.

12    And they informed me that they would not perform a

13    person-to-person private loan, if you will, or transfer.  This

14    wasn't a sale of a firearm, and that they -- they just didn't

15    have that process -- they weren't going to perform that process

16    for us.

17         So, from there, the very next day, I went to

18    Sportsman's Warehouse.  We have a Sportsman's Warehouse in

19    Loveland.  I thought it might be convenient because they have a

20    Sportsman's Warehouse in Colorado Springs.  But, unfortunately,

21    in meeting with them, they described that they, too, do not

22    perform this service.

23         *MS. MORRILL:*  Your Honor, at this time the Governor

24    would make a Rule 37(c)(1) motion to exclude further testimony

25    from this witness on all of these facts, occasions,

1    occurrences, conversations with entities and individuals, on

2    the basis that they have not been previously disclosed by

3    plaintiffs prior to this date.

4          At his deposition, the plaintiff testified that he did

5    not know about the status of background checks attempted to be

6    obtained by his organization.  They failed to supplement, to

7    identify any of these individuals who have knowledge and

8    information of their organization's struggle with complying

9    with the law.  And the Governor is prejudiced by this.

10          MR. WESTFALL:  Your Honor, I can't imagine that

11   Mr. Hewson is in any way testifying in any way contrary to the

12   scope of the deposition.  The questions that were asked of him

13   were very -- were very narrow and did not in any way -- I don't

14   think he's in any way testifying inconsistent with his

15   deposition.  Happy to take a recess to see if she can actually

16   point something out to me that his testimony today is

17   inconsistent.  I'm not aware of it, Your Honor.

18          THE COURT:  Well, the question is not whether it is

19   inconsistent.  The question is whether it was disclosed.

20          MR. WESTFALL:  He's a lay witness, Your Honor.  We

21   noted him, that he was going to be testifying about the impacts

22   on his program.  And they were free at -- at his deposition to

23   ask him any questions about what the impacts were on his

24   program.  We were quite clear that he was going to testify

25   about the impacts House Bill 1229 has on Colorado Youth

 1  | Outdoors.  If they didn't ask the question, I don't see how
 2  | we're in any way responsible for that.
 3  |         THE COURT:  All right.
 4  |         MR. WESTFALL:  He's a lay witness.  He's not an
 5  | expert.
 6  |         THE COURT:  Thank you.
 7  |         We'll take a brief recess at this time.  I'm going to
 8  | ask you to look at the deposition transcript and verify whether
 9  | or not a question that would encompass the scope of this
10  | questioning was asked.
11  |         We'll stand in recess until 10 o'clock.  If you need
12  | more time, please let me know -- or, actually, please let our
13  | courtroom deputy know, and we'll extend the recess so you have
14  | enough time to look at the deposition transcript.
15  |         MR. WESTFALL:  Thank you, Your Honor.
16  |         (Recess at 9:51 a.m.)
17  |         (In open court at 10:10 a.m.)
18  |         THE COURT:  Did you get the matter resolved?
19  |         MR. WESTFALL:  Not yet, Your Honor.  But I'm willing
20  | to explain at least our position on the matter.
21  |         THE COURT:  All right.
22  |         MR. WESTFALL:  With respect to this line of inquiry,
23  | at Mr. Hewson's deposition at page 55, the question was asked.
24  |         "Okay.  How often does Colorado Youth Outdoors
25  |      loan its participants firearms for more than three

1       days in a given year?"

2              Answer:  "Less than 30."

3              Question:  "Where firearms are loaned to

4       participants for more than three days, or 72 hours,

5       has Colorado Youth Outdoors as of July 2013 requested

6       a licensed firearms dealer to conduct a background

7       check for the private transfer of the firearm?"

8               Answer:  "Yes."

9              Question:  "How many times has it done that?"

10              Answer:  "Several."

11             Question:  "Okay.  Could you quantify that.

12      Would it be five times, ten times?"

13             Answer:  "Less than ten."

14             Question:  "Did the licensed firearm dealer

15      conduct the background check?"

16             Answer:  "No."

17             Question:  "Why not?"

18             Answer:  "I'm not sure."

19             Question:  "So each of the ten times or

20      approximate ten times -- okay.  Let me rephrase this.

21      Less than ten times Colorado Youth Outdoors has

22      requested a licensed firearm dealer to conduct a

23      background check for the private transfer of a

24      firearm, correct?"

25             Answer:  "Yes."

```
 1              Question:  "And that's less than ten times since
 2        July 1, 2013?"
 3              Answer:  "Yes."
 4        MS. MORRILL:  If I may respond?
 5        THE COURT:  You may.
 6        MS. MORRILL:  Where counsel just left off at page 56
 7   of Mr. Hewson's deposition, he again confirms at lines 16
 8   through 23:
 9              "And each of those times, the licensed firearms
10        dealer did not end up conducting the background check;
11        is that what you're saying?"
12              "Yes."
13              "And you don't know why in each of those ten times
14        the licensed firearm dealer did not conduct the background
15        check?"
16              "Yes."
17              So at the time at the time of his deposition, which
18   occurred in October of 2013 -- specifically, October 16, 2013,
19   the plaintiff -- the representative of the plaintiff, Colorado
20   Youth Outdoors, clearly testified that he did not have
21   knowledge or understanding about the -- what transpired during
22   the background check process, why it wasn't completed, and he
23   just didn't know the answer to those questions.  And now he is
24   testifying about contacts with several entities.  He has listed
25   individuals in the form of Sheriff Cooke, Maketa, and Heap, as
```

1   well as entities, including Rocky Mountain Shooter Supply and

2   Sportsman's Warehouse.  And the Governor represents and is

3   willing to proffer plaintiffs' 26(a)(1) disclosures that none

4   of these individuals or entities were ever disclosed as such as

5   having knowledge and information about youth outdoors

6   plaintiffs.

7           THE COURT:  Thank you.

8           Sounds like to me that the plaintiffs' counsel is

9   seeking to impeach his own witness.  Is that what you're

10  intending to do?

11          MR. WESTFALL:  I'm just -- I just wanted Mr. Hewson to

12  describe, trying -- what happened, trying to get a background

13  check at.  The time of his deposition, he said he did not know.

14  He's obviously gone back -- I'm sure Ms. Morrill is free to ask

15  on cross-examination how he knows what he knows today, as

16  compared to what he knew in his deposition.  I think that's

17  proper fodder for cross-examination and not proper fodder for

18  disallowing this line of testimony.

19          THE COURT:  I think it's appropriate fodder for

20  consideration of the witness's credibility.  And, therefore,

21  you may proceed.

22          You may inquire on cross-examination.

23  BY MR. WESTFALL:

24  Q.  Please continue your discussion of what happened with

25  respect to why -- what happened with regards to trying to get a

1  background check regarding the transfers between regions, post

2  July 1, 2013.

3  *A.*  So I believe that I communicated -- left off where, you

4  know, we asked Sportsman's Warehouse about performing the

5  background check, and they would not -- they refused to do the

6  background check.  And the -- then I asked them at that time,

7  do you know of an entity that I could get this -- have this

8  performed?  And I asked specifically about Cabela's.  We have

9  Cabela's new in town, or in that region.  And they said that

10  they communicated that -- they being Sportsman's Warehouse --

11  communicated they have a policy not to perform the desired

12  background check.

13  *Q.*  I think we've covered the core curriculum.  Let's move to

14  the next area, firearm safety and hunter education.  Describe

15  what you mean by that, Mr. Hewson.

16  *A.*  So, this is another opportunity within Colorado Youth

17  Outdoors that, should the parents and kids want to go on to get

18  their hunter education, we -- we can do that.  We -- we work

19  through the state outline of hunter education.  And, obviously,

20  firearms components -- you know, the learning about firearms,

21  safe handling is a significant portion of hunter education.

22  And so it -- it's not hard to imagine how much time is spent

23  handling and transferring firearms within that part of our

24  offering.

25          There is other events at our facility that -- with

```
 1   this facility being such a community facility, many public
 2   school programs are provided out there, one of which is our BB
 3   gun -- well, we have a firearms safety component that we use BB
 4   guns, not firearms, in that component.  Should it be a public
 5   school that wants to have this as part of their curriculum, we
 6   can't use firearms.  But what they do authorize us to do is to
 7   demonstrate and have the participants handle a shotgun and
 8   a .22.  And we do those for the matter -- we're using BB guns
 9   for safe handling of a gun.  It's a BB gun, but demonstrated
10   that like it's a firearm.  But to show different actions, we
11   usually use the firearms and transfer those to our participants
12   so they can see, for example, the difference between a break
13   open action or a bolt action.
14          So we provide those programs.  You know, they're not
15   within our core program, but definitely within the organization
16   of Colorado Youth Outdoors.
17   Q.  And what are the concerns that Colorado Youth Outdoors has
18   with regards to 1229 related to your firearms safety and hunter
19   education program?
20   A.  Well, similar to what I just described -- earlier described
21   about, you know, the -- we do not believe that these
22   exemptions -- that we fit into these exemptions.  And, again, I
23   could go line item, but probably the ones that potentially
24   would help us, but they don't, is, you know --
25          MS. MORRILL:  Asked and answered.  The witness has
```

1    gone over his position on why his organization doesn't meet the

2    exemptions listed in 1229.

3              *THE COURT:* Overruled.

4    *BY MR. WESTFALL:*

5    *Q.* Please continue, Mr. Hewson.

6    *A.* So, as we described, the -- we are not a shooting range.

7    And, as a matter of fact, some of these -- you know, many of

8    these curriculums are in a variety of areas. Some of which,

9    like hunter education, for example, takes place and the

10   transfers for that actually take place -- we don't have an

11   indoor facility, so we rent a facility up the road to do our --

12   that's where a lot of the transfer occurs. Our BB gun area on

13   our -- at our facility is, you know, in different areas. So,

14   again, the transfers occur -- not only are they not -- we not a

15   shooting range, but even in an area where we typically shoot

16   trap, these transfers are occurring in a different location.

17   It's not a competition; it's not while hunting; it's not while

18   target shooting, fishing, or trapping. I don't see an

19   exemption here. I don't see the words within the exemptions

20   for -- like, for education or for, you know, safe handling.

21   And so -- I guess those -- those are our impacts.

22   *Q.* Thank you.

23            Let's go to the next category, firearm-related events.

24   What do you mean by that? Would you describe those for the

25   Court.

1    *A.*  So firearm-related event -- firearm-related events, they

2    could be events that we either, again, host or provide.  So

3    these may be complementary organizations that want to use our

4    facility and our equipment.  And they may be holding an

5    event -- it may be one of our events.  For example, I guess

6    would be that the -- it's called the Wild Safari.  It has been

7    known as the Poudre Rendezvous.  It's where we collaborate with

8    many different organizations.  And the interest is to help --

9    to give the gift to the community, families, a kind of a

10   sampling of all the different recreations that are connected

11   with what Colorado Youth Outdoors does.  And so these events,

12   they do include firearms, and -- they can include firearms, and

13   most of them do.

14          And, again, it's a fabulous opportunity for us to

15   provide, you know, firearm safety and education.  And, you

16   know, I guess it would be, like, a gateway for folks to gain an

17   understanding about the opportunities in the out-of-doors that

18   involve firearms.

19   *Q.*  And 1229 concerns regarding your firearm-related events

20   that you just described.

21   *A.*  Pretty much the same stuff.  I don't see an exemption here

22   that would exempt those behaviors, those curriculums, those

23   opportunities.

24   *Q.*  How about the Maverick fundraiser, Item No. 4 of the list

25   that you gave.  Describe that for the Court.

1   *A.*   Okay.   The Maverick fundraiser, this is our premier

2   fundraiser.   Being a 501(c)(3), nonprofit, obviously having

3   fund-raising opportunities is core -- is central to how our

4   organization functions.   This just happens to be -- we have one

5   fundraiser, really, for the organization.   Our organization

6   budget is right around $400,000.   The Maverick brings in over

7   half of those funds on an annual basis.   It's a weekend event.

8   It's typically the first weekend in May.   And what it is, is,

9   we have a company out of San Antonio, Texas, comes up and puts

10  a sporting clays course together at a dude ranch, a local dude

11  ranch, and we invite guests to come and spend the day.   It's

12  usually their clients and people, that they pay a significant

13  amount of money to come and participate in a fundraiser shoot.

14        They -- so sporting clays is a -- if you're unfamiliar

15  with that is -- I guess the best association, it's like golf

16  with a shotgun.   I know that sounds kind of flippant, but it's

17  where you have stations, and you ride in golf carts, and you go

18  station to station, and you shoot each station -- shoot the

19  clays at a station.   And so we provide that.   We're very

20  fortunate that we have such a premier event, a fun event, and

21  satisfying to our participants, who travel, actually,

22  internationally, quite honestly.   We have folks that come out

23  of Mexico, but for the most part, it's national, but from all

24  over the nation.   We're very, very privileged to have that

25  fundraiser.

1   *Q.* In the past, have additional guns been loaned to Colorado

2   Youth Outdoors as part of this Maverick fund-raising event?

3   *A.* So, the answer is yes. We -- to pull off that type of

4   event, that size of event, where we may have over 200 guests on

5   any given day, we do not have -- we don't own enough firearms

6   for that. We -- so we ask for loans for firearms. And

7   we're -- historically, we transfer firearms with folks who help

8   us, ensure that we can pull off this event efficiently. And so

9   the answer is, yes, we typically ask for loans of firearms, and

10  then, of course, make those transfers and those loans within

11  the event itself.

12  *Q.* What impact does House Bill 1229 have on the Maverick

13  fundraiser?

14  *A.* Well, again, I would say that -- there is not an exemption

15  for that. Actually, this is very -- we're very fearful of

16  this, and that -- I -- article 2 -- or (e)(II) reads, at a

17  target firearms shooting competition under the auspices of --

18  and, again, we're a nonprofit organization, so we're a

19  nonprofit, and -- but, unfortunately, it's not a competition.

20  It's the fundraiser shoot. It -- well, I use the analogy of

21  golf, that might be -- to stay on that, you know, is that --

22  you know, so, while some folks elect to keep score and -- but

23  just like in golf, you self-score, if you want to keep score.

24  If you want to -- if there is competition within a certain

25  team, it's a foursome, clearly, you could do that.

1    But, again, it's not sanctioned by -- well, the

2    sanctioning body would be NSCA, National Sporting Clays

3    Association.  We have no relationship with that entity, nor do

4    we play by their rules, I guess if the best way to say it.

5    If your question is, how does it impact?  If -- while

6    there is no exemption, one would argue that it has significant

7    impact in the fact that -- you know, we can't afford to not

8    have the Maverick.  We simply cannot afford not to have it.

9    It's half of our funds on an annual basis.

10   Q.  Traditionally, in the past, have there been loaning of

11   firearms involving greater than 72 hours?

12   A.  With the Maverick?

13   Q.  With the Maverick, Yes.

14   A.  Yes, there has.  As you can imagine, again, when we take on

15   loans of firearms, we -- there is a process of ensuring that

16   the firearms that we -- that we're bringing in, you know, meet

17   the -- they're clean, they're safe in handling, that -- and

18   these loans -- you know, we can't -- during the Maverick time,

19   we can't afford to be doing this the day of.  And, so,

20   typically, we would have the firearms come in a week prior,

21   possibly, and even, maybe, longer.  But, anyways, prepare

22   ourselves for this giant event.  You know, this is a very

23   large-scale event, and so we would take in, transfer those

24   firearms, and then post the event.  We would definitely have

25   the same courtesy, sending them back, cleaning, verifying that

1  we didn't -- nothing happened to those firearms, and then --

2        But those are -- you know, there is also these

3  transfers of our own firearms that are taking place.  They

4  leave our facility, known as Swift Ponds, that's our outdoor

5  education center, and they're heading to this dude ranch where

6  we're -- this is where the Maverick is performed.  You know, it

7  has been for many years.

8  Q.  Now, about these other activities that you -- I think it

9  was kind of a catchall.  What are you talking about?  Describe

10  the examples for the Court, to give the Court some idea of what

11  you're talking about here.

12  A.  Yeah, the bucket -- I use other, and it's, you know,

13  obviously very generic.  But just making sure that we cover the

14  fact that it's complicated now, and the fact that -- as being a

15  nonprofit, we -- nonprofits work together -- you know, the most

16  efficient nonprofits work together.  As a matter of fact, many

17  of our grants that we apply to ask us about how often we're

18  found to collaborate with other organizations.  They want to

19  know that their money is being well served in -- so if it's

20  facilities or equipment, we try to compliment one another.

21  Q.  So can you give us specific examples?

22  A.  Yeah.  An example might be -- we have a fabulous

23  relationship with Pheasants Forever.  That's a conservation

24  organization.  They're all about the habitat of quail --

25  pheasants, quail.  They have youth components, where -- and

1  they don't own the same firearms we own.  So we share back and

2  forth, both organizations.  As a matter of fact, sometimes

3  they'll -- we'll host some of their events.

4        But many times, it's on -- you know, it's off

5  location, it's off our outdoor education center.  It could

6  be -- you know, our -- in our organization, we reach out -- it

7  could be a faith-based organization.  It could be a church that

8  is doing a father-son cast and blast event, and their

9  organization doesn't own firearms.  We're happy to make this

10 loan, transfer, if you will.  And it -- you know, kind of in

11 the other bucket is that it could be Colorado Parks and

12 Wildlife.  We work with them.  And we've traded firearms back

13 and forth, just making sure that programs were prepared,

14 were -- had the necessary equipment.

15       So, yeah, other -- I apologize -- I know others is a

16 big deal.  Those are kind of examples I would give you.

17 Q.  Okay.  Are there -- what 1229 concerns -- I think you may

18 have touched upon, but can you give some specific examples of

19 how 1229 could impact what you just described?

20 A.  Yes, for -- you know, the same reasons, but the other

21 bucket is another complication, another level of complication,

22 in fact, that loans typical within that category would be --

23 you know, potentially those are over 72 hours.  More -- may be

24 more apt to be over 72 hours than the earlier described.

25       Even though many of those categories I described

1    earlier -- you know, we see it -- it's felt -- we see this law

2    as having two components, if you will, within the 72 hours and

3    outside the 72 hours.  I know it's not that, but it -- you

4    know, there is -- we try to find a fit within.  And it really

5    doesn't matter, either way, it's a very, very threatening and

6    challenging position we're in.

7    Q.  With respect to these other activities, can you come up

8    with an example where there was a loan of firearms that

9    exceeded 72 hours and you attempted to do a background check?

10   A.  Well, yeah, we had -- we had an interesting situation

11   that -- after the law was in effect, and we weren't real

12   clear -- you know, it -- there is a lot -- a lot of

13   discrepancies -- people just haven't digested the law.  And I

14   should -- we had not digested the law, and I'm not so sure

15   we're at full absorption of it.  But, anyway, recently -- very

16   near to when the law was enacted, we found ourselves in a

17   situation -- this is in one of those other buckets, I guess,

18   where the categories -- that our local, City of Loveland Police

19   Department -- who, again, we do these other events or transfers

20   with.  And it could be an event that they want to hold at our

21   facility or that we're helping them perform somewhere else.

22          So they needed -- they were looking for some firearms

23   that we had that they didn't for an event that was outside of

24   what we were doing.  And we knew -- you know, we made the loan,

25   we made the transfer.  In particular, I believe it was nine

1  firearms.  And so a sergeant came and handled -- I was there,

2  so I was present.  But I made the transfer, and then they took

3  it to their location, where they were training.  And it dawned

4  on me -- I mean, this is a very -- this is a tough situation,

5  because, you know, quite honestly, the law was enacted.  And I

6  had made this transfer and realized that what was going on,

7  that we were going to be -- this one went beyond 72 hours.

8          And so -- it was more than a week that we were -- we

9  got the firearms back.  The same sergeant brought the firearms

10  back.  And I had recognized the fact that we may really have a

11  situation here.  And so I communicated that to the sergeant,

12  that by virtue of him forwarding -- transferring --

13          MS. MORRILL:  Objection, hearsay as to what the

14  witness communicated out of court to a third party.

15          THE COURT:  Noted.

16          MS. MORRILL:  Your Honor, I completely respect the

17  Court's preference to note objections that have been made.  But

18  I would make a formal request on behalf of the Governor for

19  preservation of the record that we do request a contemporaneous

20  ruling on all of our objections at trial.

21          THE COURT:  The request is denied.

22  BY MR. WESTFALL:

23  Q.  Please continue, Mr. Hewson, about the Loveland situation.

24  And if you can, just tell -- give the Court -- tell the Court

25  what eventually happened.

1  *A.*   Okay.

2  *Q.*   And so how it resolved itself, if at all.

3  *A.*   Sorry.  So bottom line is, they -- we both understood

4  quickly that we -- this is a tough situation.  And I asked if

5  there was a way at least -- you know, I already had made that

6  transfer; so, potentially, I was in a tough situation.  But to

7  try to help the matter for him to make the transfer back to

8  me -- because I was going to have them for more than 72 hours,

9  now he's the transferor, I'm the transferee, I asked him if it

10 would be good for him to perform a background check on me at

11 that time.

12        And while a police officer can make -- do a background

13 check, what he communicated to me was, he could not perform a

14 background check at the level of an FFL, which I -- I'm not

15 real sure what those differences are.  But bottom line is, the

16 law, as he read it, said that it has to be performed by a

17 licensed FFL dealer.  And he could not perform -- he could look

18 me up to make sure I didn't -- you know -- well, I don't know

19 the difference.  Bottom line is, I made the decision -- we made

20 the decision to go ahead and bring those back into CYO.  We --

21 we both agreed that he would go to the chief of police, explain

22 the situation.  You know, I was very interested -- I was very

23 concerned that, you know, we both might be in -- you know,

24 held -- well, it's an interesting situation.

25        So -- and then chief of police went to the -- took the

 1  matter to the District Attorney's Office.  And I was informed

 2  by that sergeant that the district attorney understood the

 3  circumstances, and we just were -- that was a tough position to

 4  be in.

 5  Q.  You have the notebook in front of you, which I understand

 6  is notebook No. 3; is that correct?

 7       COURTROOM DEPUTY:  Yes, I believe so.

 8  BY MR. WESTFALL:

 9  Q.  I think it's -- I think the exhibit I'd like to refer you

10  to is in there.  Call your attention to tab 32.

11       THE COURT:  32 is not in 3.

12       COURTROOM DEPUTY:  32 in volume No. --

13       MR. WESTFALL:  I'm sorry.  That's why Mr. Colin was

14  handing me this, and I should have been paying more attention.

15       It should be notebook 4.

16       THE WITNESS:  Tab 32.

17  BY MR. WESTFALL:

18  Q.  Yes, should be Exhibit 32.

19  A.  Yes.

20  Q.  What I'm looking for, it should be a letter from the City

21  of Loveland, City Council, addressed to John W. Hickenlooper,

22  Governor.  Is that Exhibit 32?

23  A.  I have that.

24  Q.  Good, okay.  What is Exhibit 32?  I don't want you to talk

25  about the content.  I just want you to describe what it is.

1        *MS. MORRILL:*  The Governor objects to this witness's

2    ability to lay the foundation for this.  There is no

3    stipulation as to authenticity.

4        *THE COURT:*  I'm sorry.  I can't hear you.  Can you

5    pull a microphone close to you.

6        *MS. MORRILL:*  I said, the Governor objects to this

7    witness's ability to lay the foundation for this document.  We

8    do not stipulate to the authenticity of it.  We also object on

9    hearsay grounds.

10       *THE COURT:*  I sustain the objection.  There has been

11   no foundation laid that this witness has any personal knowledge

12   of this.

13       *MR. WESTFALL:*  I was just starting to establish

14   foundation, Your Honor.

15       *THE COURT:*  Counsel, you can't ask him what this is

16   until and unless you establish his personal knowledge that

17   would be the basis for that.

18       *MR. WESTFALL:*  I understand your point, Your Honor.

19   So noted.

20   *BY MR. WESTFALL:*

21   *Q.*  Mr. Hewson, have you ever seen Exhibit 32 before?

22   *A.*  I have.

23   *Q.*  How did you see it?

24   *A.*  The clerk of the council for city of Loveland forwarded me

25   this letter after the city council meeting that I was part of.

1   *Q.*  Did you participate in a city council meeting that gave

2   rise to this letter?

3   *A.*  I did.

4   *Q.*  And you received this letter directly -- this letter -- let

5   me ask you this:  The letter that you recall receiving from the

6   city clerk, is what you have before you, Exhibit 32, an

7   accurate copy of a letter that you received from the city clerk

8   of the City of Loveland?

9   *A.*  It is.  It's -- reads to me the same letter as what I

10  received.

11       MR. WESTFALL:  Now, I have to ask one more question, a

12  foundation, Your Honor, I believe, to establish relevance.

13  *BY MR. WESTFALL:*

14  *Q.*  This letter was sent to the Governor, was it not?

15       MS. MORRILL:  Objection, foundation.  The witness's

16  testimony has established how he came to have this letter, not

17  any basis for his knowledge of what the City of Loveland may or

18  may not have done with it.

19       THE COURT:  Sustained.

20  *BY MR. WESTFALL:*

21  *Q.*  As a result of your participation in the city council

22  meeting, are you personally aware that the City sent a letter

23  that looks like Exhibit 32 to the Governor to seek

24  clarification about impact of House Bill 1229 on your program

25  and Pheasants Forever?

 1  *A.*  I received notice that this letter was sent to the

 2  Governor.  And what I also received notice was -- is that

 3  governor's response for -- and I believe it refers to this

 4  letter.  So I hope I'm answering the question -- that I

 5  believed this letter was sent to the Governor.  If you're

 6  asking me how I feel confident it was, that the Governor made a

 7  response -- the Governor's office made a response that was

 8  associated with this letter, probably -- I believe it actually

 9  says that it was this letter.  So I hope -- I'm not clear what

10  the question was.

11  *Q.*  We're dealing with foundation --

12          Your Honor, to see if I can head off at the pass

13  Ms. Morrill's next objection.

14          You're given -- I'm somewhat surprised that we're

15  having this discussion, but since we are, I would ask that this

16  exhibit be conditionally admitted with the condition being that

17  I get a certified copy from the city clerk of the City of

18  Loveland, because -- and -- to establish the foundation, then,

19  the foundation -- the relevance, excuse me.

20          The relevance is that the Governor did in fact respond

21  to the city council and try to address the concerns that were

22  raised in this letter.  The Governor's letter is clearly an

23  admission and clearly admissible.  This letter -- the relevance

24  of this letter is only to establish the context of which the

25  Governor's response to the city council exhibit.

1    *MS. MORRILL:* Your Honor, if I may respond.

2 Plaintiffs have been in possession of Exhibit -- I'm sorry, is

3 this 32?

4    *THE COURT:* 32.

5    *MS. MORRILL:* -- 32 on everyone's notebook for months.

6 And the time to obtain the certification was before trial and

7 to provide notice under Rule of Evidence 903(11), and they have

8 failed to do so. This witness simply cannot lay a foundation

9 for the authenticity of Exhibit 32, nor can he testify about

10 it, because it is hearsay.

11    *MR. WESTFALL:* Your Honor, maybe I just blew this

12 portion of evidence, but I thought I needed some evidence under

13 oath sufficient to sustain a finding that it is what it

14 purports to be.

15    *THE COURT:* And this witness is not competent to do

16 so.

17    *MR. WESTFALL:* If he was --

18    *THE COURT:* I sustain the objection to the admission

19 of this exhibit.

20    *MR. WESTFALL:* Even if he in fact can testify under

21 oath that he received a copy of this exact letter from the city

22 clerk?

23    *THE COURT:* He can't testify as to its authenticity.

24    *MR. WESTFALL:* Okay, Your Honor. Thank you.

25 *BY MR. WESTFALL:*

1  *Q.*  Turn your attention to Exhibit 31, Mr. Hewson.  Have you

2  seen Exhibit 31?

3  *A.*  I have.

4  *Q.*  And the "re" line reads, "Impact of House Bill 131229 on

5  Colorado Youth Outdoors and Pheasants Forever."  Do you see

6  that?

7  *A.*  Yes.  It reads, "Impact of HB 13-1229 on Colorado Youth

8  Outdoors and Pheasants Forever."

9  *Q.*  And the letter does in fact describe -- this is a letter

10  from the Governor's office?  In fact, up on the upper left-hand

11  corner of Exhibit 31 it says Office of the Governor?

12  *A.*  It's a copy of the -- yeah, seal of the Office of the

13  Governor.

14      *MR. WESTFALL:*  Your Honor, I believe there is no

15  authenticity objection.  I would move Exhibit 31 at this time.

16      *THE COURT:  Voir dire* or objection?

17      *MS. MORRILL:*  Yes, Your Honor.  It is true that the

18  Governor has stipulated to the authenticity of this document.

19  He does, however, object on the basis of hearsay, not only that

20  it is an out-of-court statement, that he would like this

21  witness, who has no knowledge of how the statements came to be

22  or what the basis was for them, to testify about.  And,

23  additionally, on the basis of double hearsay, to the extent

24  that this -- admission of this letter will also implicate

25  Exhibit 32, which it is going to be purportedly expressed to be

1   a response to, which has not been admitted into this court.

2           There is simply -- this witness has no ability to

3   testify knowledgeably based on his personal knowledge about the

4   correspondence between these two independent entities.

5           MR. WESTFALL:  Your Honor, on this one, I hope I get

6   this one right.  I don't believe admissions are by definition

7   hearsay.

8           THE COURT:  What is it you contend is an admission

9   here?  Simply because the Governor's office writes a letter

10   doesn't make the contents of the letter an admission.

11           MR. WESTFALL:  Your Honor, we have just covered the

12   impact that House Bill 1229 has on Colorado Youth Outdoors

13   programs, various programs.  Mr. Hewson participated in a city

14   council meeting with the city of Loveland and the mayor, and

15   expressed concerns about House Bill 1229's impact on

16   Mr. Hewson's program.  The city -- the mayor of the City of

17   Loveland and the Loveland City Council all signed a letter to

18   the Governor and said, we are expressing our concerns about the

19   impact House Bill 1229 has on Colorado Youth Outdoors' programs

20   and the programs -- similar programs of Pheasants Forever.  And

21   the Governor's response describing why 1299 does or does not

22   impact Colorado Youth Outdoors' programs is highly relevant to

23   this particular proceeding, Your Honor.

24           THE COURT:  Well, but that wasn't my question.  My

25   question wasn't whether Exhibit 31 is relevant.  It's what in

```
 1    31 is an admission?

 2         MR. WESTFALL:  It's a statement by the Governor on the

 3    impact, or lack thereof, of House Bill 1229.  That is an

 4    admission.  That's a statement by a party opponent related to a

 5    core issue -- core issues in this case.  Those are admissions,

 6    Your Honor.

 7         THE COURT:  Okay.  I'm not trying to make this hard.

 8    What is it in this letter that you contend is an admission?

 9         MR. WESTFALL:  The mischaracterization in the first

10    paragraph; the mischaracterization that's in the second

11    paragraph --

12         THE COURT:  Wait a minute.  That doesn't help me.  The

13    first paragraph reads, "Thank you for your July 2, 2013

14    letter."

15         MR. WESTFALL:  I'm sorry, my mistake.  The second

16    paragraph, Your Honor.

17         THE COURT:  So what is it here that is a statement of

18    fact that would constitute an admission?

19         MR. WESTFALL:  The statement related to the Governor's

20    description and, I would take it, understanding of the scope of

21    Section (6)(a) of House Bill 1229 and the degree to which that

22    does or does not address impacts 1229 places on Colorado Youth

23    Outdoors and pheasants forever.

24         THE COURT:  So you're --

25         MR. WESTFALL:  He's specifically identifying a
```

1    specific section under (6)(a) of House Bill 13-1229 and making

2    a statement to the City Council of Loveland and the mayor of

3    Loveland that (6)(a) does such and such a thing.  And I want to

4    get through Mr. Hewson's testimony that shows that the

5    statement by the Governor is false.

6         *THE COURT:*  Again, you're talking about relevance.

7    I'm talking about exceptions to hearsay.  I'm not sure there is

8    a statement of fact here that is being offered for the truth of

9    the matter asserted; I'm not sure that the hearsay rule is

10   applicable; and therefore, I'm not sure that the exception to

11   the hearsay rule and admission is applicable either.

12        What is the fact being stated in this letter?

13        *MR. WESTFALL:*  That (6)(a) -- I will see -- I'll do my

14   best to see if I can articulate this.  That (6)(a) provides

15   protection for Colorado Youth Outdoors, because under (6)(a)

16   there is an exception for transfers between immediate family

17   members.  Under -- and the -- in the third paragraph of the

18   letter, there is a statement by the Governor's office that

19   (6)(e)(III) creates an additional exception for temporary

20   transfers that occur while hunting, fishing, target shooting,

21   or trapping.

22        And so the statement by the Governor is that that

23   exception, "while hunting, fishing, target shooting, or

24   trapping," provides protection to Colorado Youth Outdoors and

25   Pheasants Forever in response to the inquiry about -- of same

1    by the mayor of the City of Loveland and the City Council of

2    City of Loveland.

3         And under the fourth paragraph of Exhibit 31, there is

4    an explicit statement by the Governor that, finally, under

5    Section (6)(h) of House Bill 1229, firearms can be transferred

6    and returned without a background check to anyone, "for any

7    reason" for 72 hours.  That's a statement of the Governor's

8    interpretation of the law as it impacts Colorado Youth Outdoors

9    and Pheasants Forever.  And I believe that statement,

10   whether --

11        *THE COURT:*  I believe legal interpretation --

12        *MR. WESTFALL:*  -- it's certainly a statement that is

13   relevant and probative.

14        *THE COURT:*  That's not the issue.

15        *MR. WESTFALL:*  Okay.

16        *THE COURT:*  The issue is not relevance, and the issue

17   is not whether it helps your case.  The question is whether

18   this is a statement of fact or this is a statement of legal

19   interpretation.  I understand you to be saying, this was a

20   legal interpretation and that that is the fact; is that

21   correct.

22        *MR. WESTFALL:*  It's actually in the context -- in the

23   vernacular, if you will, of more of an appellate practice, it's

24   actually a mixed question of law, in fact, because you're

25   talking about applying House Bill 1229, which is statutory

 1 | language, to a specific factual scenario, in this case, the

 2 | programs of Colorado Youth Outdoors and Pheasants Forever.

 3 |      *THE COURT:*  All right.  Let me ask the Governor's

 4 | counsel here:  Is there a dispute that this letter was written

 5 | by an authorized agent of the Governor?

 6 |      *MR. WESTFALL:*  That is not the basis of our dispute.

 7 |      *THE COURT:*  I understand that; but that's not what I

 8 | asked, whether this is the basis of your dispute.

 9 |      *MS. MORRILL:*  No.

10 |      *THE COURT:*  Okay.  Is there a dispute that this was

11 | the position taken by the office of the Governor?

12 |      *MS. MORRILL:*  This was the legal position taken by the

13 | Governor, through his counsel, Senior Deputy Legal Counsel

14 | Stephanie Donner.

15 |      *THE COURT:*  All right.  Then I will receive Exhibit 31

16 | a reflection of the policy and legal interpretation taken by

17 | the Government as of July 10, 2013.

18 |      *MS. MORRILL:*  Your Honor, the Governor would ask that

19 | the witness be precluded from testifying about the contents of

20 | the letter, especially to the extent that it relates to the

21 | earlier letter that was not admitted.

22 |      *THE COURT:*  Well, Exhibit 32 is not relevant.  How

23 | this letter that the Governor issued came to be issued is not

24 | relevant; and therefore, we're not going to go back to what

25 | happened before the City of Loveland, that generated a letter

1    to the Governor.  What is relevant is what the Governor

2    interpreted here.  And there seems to be no dispute as to the

3    authenticity of this document; and therefore, I'm going to

4    receive it.

5             MR. WESTFALL:  Thank you, Your Honor.

6             (Exhibit 31 admitted.)

7    BY MR. WESTFALL:

8    Q.  Looking at the first paragraph -- I'm mean, excuse me, the

9    second paragraph of Exhibit 31 -- do you have that in front of

10   you, Mr. Hewson?

11   A.  I do.

12   Q.  It's the paragraph that begins "first."  And I'll see if we

13   can make this shorter.

14   A.  Thank you.

15   Q.  If I cross the line and get into leading, I'll be happy to

16   back off, and we'll do it more non-leading, if you will.  But

17   the first paragraph -- the first section, paragraph 2, refers

18   to the Section (6)(a) and the exception related to transfers

19   involving gifts or loans between immediate family members; is

20   that a fair assessment?

21   A.  Yes.

22   Q.  Does that -- does that section provide protection for

23   Colorado Youth Outdoors for its programs --

24   A.  No.

25   Q.  -- for its programs that you just briefly testified about?

1    *A.*   No.  I have no idea why they referred back to that (h).

2    That is not an exemption that --

3    *Q.*  Well, can you give a very brief explanation on why?

4    *A.*  Well, this exemption, as I read -- if I just read the first

5    sentence -- first, the provisions of HB 1229 do not apply to

6    transfers or loans of firearms between family members.  I'm not

7    arguing -- this isn't the challenge for us.  We're not a

8    family -- there definitely are families within the

9    organization, parents of kids, but I -- this exemption is -- it

10   doesn't do our organization any good.  We're not -- we're not

11   all family, is that --

12   *Q.*  Okay.  Let's move to the second one.  Excuse me.  Third

13   paragraph, this paragraph that begins second, Section (e)(3)

14   creates an additional exception for temporary transfers of

15   firearms that occur "while hunting, fishing, target shooting,

16   or trapping."  Why doesn't that provide some protection to

17   Colorado Youth Outdoors?

18   *A.*  Well, as I stated before, much of our -- the majority of

19   our transfers occur outside of while hunting, while fishing,

20   while target shooting, or while trapping.  We're, again --

21   we -- firearm safety and proper handling should not -- in our

22   opinion, should not take place while you're hunting in --

23   again, wouldn't happen while you're fishing.  But it shouldn't

24   happen while you're actually target shooting.  These are --

25   again, this exemption does not fit for us.

1    Q.  And then the last one, it says, top of page 2 of Exhibit --

2    of that exhibit, it says, "Finally, under Section (6)(h),

3    firearms can be transferred and returned without a background

4    check to anyone for any reason for 72 hours."  Why does that --

5    do you have any -- what's your response to that statement about

6    impact on your program?

7    A.  Well, first of all, it -- the law doesn't have -- I'm not

8    sure what was added -- who added the "for any reason."  But

9    what's interesting is, they added "for any reason for 72

10   hours," but they seem to have -- well, it didn't include the

11   fact that -- I would assume -- I would have said -- I would

12   have expected them to say, but let us remind you that within

13   that 72 hours, you're jointly and severally liable for damages.

14   That's the part that is unacceptable.  And, again, I -- I'm not

15   sure -- I mean, if this is legal advice from our -- from our

16   governor's office, I just -- I didn't see for any reason in the

17   law.

18   Q.  Okay.  That's fine.

19        What happens if Colorado Youth Outdoors or you are

20   involved in a transfer of a firearm without a background check

21   and a subsection (6) exception doesn't apply?

22   A.  I think I -- is the law in here?  I'd like to refer to it.

23   Q.  Oh, yes.  I'm sorry.

24        May the witness please have notebook 3.

25   A.  Is it in here?

```
 1   Q.  It will be a different notebook.

 2          COURTROOM DEPUTY:  If you want to direct him to the

 3   appropriate exhibit number.  I don't know what it is.

 4          MR. WESTFALL:  I'm sorry.

 5          COURTROOM DEPUTY:  He's asking for the exhibit number.

 6   I don't know what it is.

 7          MR. WESTFALL:  I'm sorry.  It's Exhibit No. 4.

 8          THE WITNESS:  I'm there.

 9          MS. MORRILL:  Your Honor, I would note for the record

10   that Exhibit 4 has been stipulated to and when -- request that

11   counsel move its admission before asking --

12          MR. WESTFALL:  We stipulate to its admission, Your

13   Honor.

14          THE COURT:  So someone's going to offer it now.

15          MR. WESTFALL:  I'm offering it, Your Honor.

16          THE COURT:  All right.  I'm receiving it.

17          MR. WESTFALL:  Your Honor, I offer Exhibit 4 into

18   evidence.

19          THE COURT:  I'm receiving it.  Please remember to

20   offer it; otherwise, it doesn't get into the record even though

21   you may have agreed it's admissible.

22          MR. WESTFALL:  Point well taken, Your Honor.  Thank

23   you.

24          (Exhibit 4 admitted.)

25   BY MR. WESTFALL:
```

```
 1  Q.  Referring to Exhibit 4, what happens to Colorado Youth

 2  Outdoors or you if you were involved in a transfer of a firearm

 3  without a background check and a subsection (6) exception

 4  doesn't apply?

 5  A.  Well, it's our understanding, there is two areas of the law

 6  that read to this.  First is, Section (5), that reads, "a

 7  person who transfers a firearm in violation of the provisions

 8  of this section may be jointly and severally liable for any

 9  civil damages proximately caused by the transferee's subsequent

10  use of the firearm."  I think we talked a little about that.

11          But above and beyond that, I communicated that above

12  72 hours, if we -- if we look at (9)(a), it says, "a person who

13  violates a provision of this section commits a Class 1

14  misdemeanor and shall be punished in accordance with Section

15  18-1.3-501.  The person shall also be prohibited from

16  possessing a firearm for two years beginning on the date of his

17  or her conviction."  I would -- your question was, what would

18  happen?

19  Q.  Uh-huh.

20  A.  This is what we believe would happen.

21  Q.  What would banning firearm ownership for two years do to

22  the program?

23  A.  Clearly, it would remove our firearm portion of our

24  projects.  Clearly, it would not allow us to perform our major

25  fundraiser.  If this were enacted on -- if this -- this means
```

1    that the person, whether that's me or that expanded body, our

2    board, that just would -- an example, one of our board members,

3    you know, owns a business that relies on firearms.  It's an

4    armored transport service.  I would hate to think that this

5    would ever be imposed on his organization, him.  But if he's an

6    owner, that would clearly take him through that course.

7          But -- so to not have funding through the Maverick not

8    being performed, to not have our number one curriculum

9    represented within our program, to not be able to service, you

10   know, the needs of the community through nonprofits that we

11   loan, and then if this was for me, personally -- I mean, to not

12   be able to take my son or daughter out because, you know, we

13   can't possess firearms, it's just a -- it's a real punishment.

14   It's beyond -- it's -- it probably would take our business --

15   our organization down.

16   Q.  Mr. Hewson, there was some other areas I think we planned

17   on covering, but in the interest of time, we're going to stop

18   right here.

19         Thank you very much for your testimony.

20         THE COURT:  Thank you.

21         Cross-examination.

22         MS. MORRILL:  Thank you, Your Honor.

23

24

25

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | *BY MS. MORRILL:* |
| 3 | *Q.*  Good morning.  You stated on direct exam that Colorado |
| 4 | Youth Outdoors is a 501(c)(3) organization; that's correct? |
| 5 | *A.*  Correct. |
| 6 | *Q.*  That status was granted by the Internal Revenue Service? |
| 7 | *A.*  Correct. |
| 8 | *Q.*  Your organization is also known as a charitable trust? |
| 9 | *A.*  Correct.  We are a 501(c)(3) charitable trust. |
| 10 | *Q.*  Right.  Meaning that the assets of the organization are |
| 11 | held within that charitable trust -- within a charitable trust |
| 12 | known as Colorado Youth Outdoors? |
| 13 | *A.*  I -- the assets would -- are owned by -- is that what |
| 14 | you're asking me? |
| 15 | *Q.*  Are held within the trust? |
| 16 | *A.*  They are an asset of the trust, yes. |
| 17 | *Q.*  Okay.  That's all I'm trying to establish. |
| 18 | *A.*  Okay. |
| 19 | *Q.*  So, for example, you talked about your property, |
| 20 | specifically -- you host your outdoor curriculum, the |
| 21 | twelve-week core program you referred to several times in your |
| 22 | direct testimony, at the Swift Ponds location; is that correct? |
| 23 | *A.*  We host some of our program at Swift Ponds and some of it |
| 24 | at -- we don't have Swift Ponds for our southeast region. |
| 25 | *Q.*  I understand.  So that would be the Loveland region, is |

1   where Swift Ponds is located?

2   *A.*   Loveland, Fort Collins, yeah.

3   *Q.*   Okay.  And the Swift Ponds location is approximately

4   240 acres?

5   *A.*   Correct.

6   *Q.*   Okay.  I want to talk to you a little bit about your

7   organization and how it's run.  First of all, you have a board

8   of directors?

9   *A.*   We do, board of trustees.

10  *Q.*   A ten-person board of trustees?

11  *A.*   I'm sorry?

12  *Q.*   Is it -- it's a ten-person board of trustees?

13  *A.*   Yes, currently, it is.

14  *Q.*   And it was so at the time of your deposition in October of

15  2013?

16  *A.*   I believe so.

17  *Q.*   Okay.  And there have been no changes in membership to the

18  board since you were deposed?

19  *A.*   There has been a change.

20  *Q.*   Okay.  What was that change?

21  *A.*   We had at least one board member leave and have brought on

22  a new board member.

23  *Q.*   Okay.  So the actual number of board members has not

24  changed since your deposition?

25  *A.*   Correct.

1   *Q.*  Okay.  And the actual number of board members has not

2   changed since House Bill 1229 went into effect?

3   *A.*  I -- I'm not sure if that's correct.  Again, I don't

4   remember at the time of the deposition exactly how many were on

5   the board, but ten seems like a reasonable number.  It may have

6   been -- so if I can help answer the question, we have had two

7   board members leave in the past calendar year.  I know that we

8   backfilled a board member, so depending on when the

9   deposition -- what that deposition number is, I just want to be

10  sure that ten is what I used at deposition.

11  *Q.*  Would looking at a copy of your deposition help you

12  remember?

13  *A.*  If ten was in the deposition, I'm agreeing that, today, ten

14  is the number.

15  *Q.*  Okay.  So you agree today that ten was the number at the

16  time you were deposed; is that correct?

17  *A.*  Could you tell me what the deposition said?  If it says

18  ten, I'm good with that.

19  *Q.*  I'll represent to you that you did.

20  *A.*  Okay.

21  *Q.*  Are you willing to accept that representation and adopt it

22  as your own, or would you like to see your deposition?

23          *THE COURT:*  Counsel, why does it matter how many

24  people are on the board of trustees?

25          *MS. MORRILL:*  The relevance, Your Honor, is that the

 1 | Colorado Youth Outdoors has alleged an injury in its ability to
 2 | retain board members.
 3 |        *THE COURT:* I didn't hear any testimony about that.
 4 |        *MS. MORRILL:* I'm having --
 5 |        *THE COURT:* You're limited to the scope of the direct
 6 | examination here.  Would you please move on to something that
 7 | falls within the scope of direct.
 8 |        *MS. MORRILL:* Yes.
 9 | *BY MS. MORRILL:*
10 | *Q.* So going back to your facility, the Swift Ponds location,
11 | specifically, that is a 240-acre urban outdoor education
12 | facility; is that an accurate description?
13 | *A.* Sure.
14 | *Q.* And it's where your -- many of your participants in your
15 | programs come to complete portions of the curriculum you offer?
16 | *A.* Correct.
17 | *Q.* Okay.  And at that facility, in Swift Ponds, you have a
18 | shooting range; is that correct?
19 | *A.* We have a trapshooting area.
20 | *Q.* And you also have an archery shooting range?
21 | *A.* We have an archery area.
22 | *Q.* And in that area, that is in fact where people engage in
23 | target shooting; is that accurate?
24 | *A.* Trapshooting.  And you mentioned archery, yeah, archery
25 | target shooting, yes.

1    Q.  So in the area where target shooting occurs -- there is an

2    area in Swift Ponds where target shooting occurs, is all I'm

3    trying to establish.

4    A.  That is correct.

5    Q.  Okay.  You've talked quite a bit today about the transfers

6    that your organization engages in with respect to firearms, and

7    I believe you outlined a couple of different buckets.  And one

8    of those buckets is the transfer of firearms to participants;

9    is that accurate?

10   A.  Yes.

11   Q.  So when participants come onto your organization's property

12   to participate in the curriculum, you will occasionally

13   transfer firearms to those participants?

14   A.  Yes.

15   Q.  Okay.  And some of those transfers, I believe you

16   testified, last in excess of 72 hours.

17   A.  That is correct.

18   Q.  Okay.  And that's because you actually allow participants

19   to take the firearm off of your property to go engage in things

20   like guided hunting trips?

21   A.  Could be a guided hunting trip.

22   Q.  So you agree that's one example?

23   A.  One example.

24   Q.  Okay.  So prior to July 1, 2013, explain what, if anything,

25   your organization did to facilitate that transfer for the

1   purpose of taking the firearm off of your property and using it

2   and -- returning it at a later date.

3   A.  So, we have been very -- make sure I understand the

4   question.  You're asking me, what is different today than what

5   happened in 2013 -- 2012?

6   Q.  I'm actually trying to figure out how you did it before the

7   law went into effect.

8   A.  Okay.  Well, before the law went into effect, we did not

9   have -- there was not a heightened awareness or question, the

10  opportunity to make that transfer.  So we would make that

11  transfer, they were okay to have that firearm.  Today, we have

12  to communicate that we're unable to make that transfer unless

13  we go through the process of a loaned firearm background check.

14  Q.  So, is that in fact your testimony here today, that your

15  organization no longer temporarily transfers firearms to

16  participants, to other nonprofits; is that your testimony

17  today?

18  A.  No, I don't think I said that we don't temporarily transfer

19  firearms.  We -- I mean, we have to make these temporary

20  transfers within our program.

21  Q.  Let me be clear.  My question is not internal transfers.

22  I'm not talking about the movement of firearms that you

23  testified were assets of Colorado Youth Outdoors from your

24  Loveland location to your Colorado Springs location.  I'm

25  talking about the transfer of such firearms to participants for

1    the purpose of taking off your property or to the other

2    nonprofits, for their use off site of your facility.

3    *A.*   So -- I apologize if I'm not fully understanding, but let

4    me answer this way:  So, if the question is, are we -- have we

5    made a transfer -- so, for instance, if somebody was going

6    hunting or wanted to go out and go target shoot or something

7    somewhere other than CYO -- if that's your question.

8    *Q.*   That's correct.

9    *A.*   It -- I'm not -- I don't know that we made that transfer

10   this year post-July 1.  I don't know of the instances where we

11   have made that transfer beyond 72 hours.  Was that what you're

12   asking?

13   *Q.*   Yeah, I'm trying to figure out --

14   *A.*   Yeah, I don't know that we've made those transfers with the

15   new law in effect.

16   *Q.*   Okay.  And when you talk about "this year," that's the

17   fiscal year that your organization is on?

18   *A.*   That's correct.  I apologize.  Our fiscal year begins

19   September 1, and our -- but our program year -- program year

20   and fiscal year are two different things.

21   *Q.*   But when you've been referring to "year" in your answers,

22   so far, it's been to fiscal year?

23   *A.*   Yes.

24   *Q.*   Okay.  So you just said it started September 1?

25   *A.*   Our fiscal year begins September 1.

1   *Q.*  Yes.  Okay.

2   *A.*  And our program year is typically the second or third week

3   of August, for our fall session.  There is overlap.

4   *Q.*  I'm trying to make sure I'm understanding your testimony

5   correctly.  Since July 1, 2013, when 1229 went into effect --

6   *A.*  Uh-huh.

7   *Q.*  -- has Colorado Youth Outdoors been transferring firearms

8   to participants for the purpose of allowing those participants

9   to take the firearms off of their property and use them for

10  various hunting activities?

11  *A.*  So you're using the word "participant."  I just want to be

12  clear that -- I think I just testified to the fact that we've

13  made these transfers.  I would not -- so, transfer to

14  participants in our southeast region.  I think I clearly

15  described the process that those participants are using our

16  loaned firearms.  Is that -- am I correct?

17  *Q.*  Sir, my question is specific to firearms loaned to

18  individuals who are, then, allowed to take those firearms off

19  of CYO property.  So not your Loveland property, not your

20  Colorado Springs property.  Do you allow participants to take

21  them off your property today.

22  *A.*  There would be instances where we would -- where we would

23  like to have them take them off the property, if that --

24          *THE COURT:*  Counsel, please approach.

25          (Hearing commenced at the bench.)

```
 1              THE COURT:  We may have a Fifth Amendment problem

 2    here.  Do you want to give an advisement?  Do you want me to

 3    give an advisement?

 4              MR. WESTFALL:  I'd be happy to do it, or I'd be happy

 5    for you to do it.

 6              THE COURT:  All right.  I'll give the advisement.

 7    Thank you.

 8              (Hearing continued in open court.)

 9              MR. WESTFALL:  Thank you, Your Honor, for bringing

10    that up.

11              THE COURT:  Thank you.

12              I advise the witness that some questions that may be

13    posed to you may require you to answer by giving information

14    that could be used to incriminate you.  And as a consequence,

15    you are entitled under the United States Constitution to assert

16    your rights under the Fifth Amendment.  If you would like to

17    confer with your counsel with regard to the pending question,

18    we will take a brief recess so that you can do so.

19              What is your pleasure?

20              THE WITNESS:  I would like to meet with my counsel,

21    please.

22              THE COURT:  All right.  Then we will take a brief

23    recess so that counsel and the witness can confer.  We'll stand

24    in recess for five minutes or so.  If you need longer than

25    that, Mr. Westfall, please let me know.
```

1          MR. WESTFALL:  Thank you very much.

2          THE COURT:  We'll stand in recess.

3          (Recess at 11:16 a.m.)

4          (In open court at 11:28 a.m.)

5          MR. WESTFALL:  Thank you for the break, Your Honor.

6   May I address the Court?

7          THE COURT:  Sure.

8          MR. WESTFALL:  Your Honor, Mr. Hewson has already

9   testified about two specific instances that occurred

10  post-July 1, 2013 regarding transfers that exceeded 72 hours

11  and what happened with that.  If Ms. Morrill has any questions

12  about the testimony that has already been offered, certainly, I

13  believe she's entitled to cross-examine on that.  With regard

14  to any question designed to elicit an answer that says, what

15  transfers have either you, Mr. Hewson, have done or any

16  transfers that CYO has done that exceeded 72 hours, that did

17  not involve a background check post-July 1, 2013, I'm

18  instructing my witness not to answer, Your Honor, on the basis

19  of the ground that it could potentially incriminate him under

20  the Fifth Amendment.

21         THE COURT:  Thank you, Mr. Westfall.  That will be a

22  right that your client will have to assert.

23         MR. WESTFALL:  Okay.  I'll try to do my best to

24  make -- stand up and see if we can make sure I give him the

25  appropriate prompt at the appropriate time.

```
 1              THE COURT:  All right.  Thank you.

 2              MR. WESTFALL:  Do you understand what we just talked

 3    about in court, Mr. Hewson?

 4              THE WITNESS:  Not clear.  How would I -- I'm not

 5    sure --

 6              MR. WESTFALL:  If you believe the question that

 7    Ms. Morrill is posing to you asks for you to give factual

 8    information about a transfer that did -- would have in fact

 9    occurred post-July 1, 2013, I want -- I'm instructing you now,

10    as the judge is pointing out, you need to assert this on your

11    own.  And I'll do what I can to assist in that regard, but you

12    need to assert itself, to say, I refuse to answer on the

13    grounds it may incriminate me.

14              THE WITNESS:  Okay.  Understood.

15              MR. WESTFALL:  I think Your Honor is right, that that

16    is the appropriate procedure in this context.

17              THE COURT:  Do you want to start with a new question,

18    or do you want to have the question read back.

19              MS. MORRILL:  If I could have the question read back,

20    please.

21              THE COURT:  Thank you.  Would you read the question

22    back, please.

23              (Question read back as follows:  "Sir, my question is

24    specific to firearms loaned to individuals who are, then,

25    allowed to take those firearms off of CYO property.  So not
```

1  your Loveland property, not your Colorado Springs property.  Do

2  you allow participants to take them off your property today?"

3          *MR. WESTFALL:*  And I would object based upon just

4  the -- the context of what you're dealing with, because that

5  question is vague and undefined of copy of time.

6          *THE COURT:*  It said "today."  I overrule the

7  objection.

8  *BY MS. MORRILL:*

9  *Q.*  Please answer the question.

10 *A.*  I am unaware of any firearms being loaned outside of CYO

11 property.

12 *Q.*  Prior to July 1, 2013, Mr. Hewson, it was the practice of

13 CYO to loan participants firearms in excess of 72 hours and

14 allow those individuals to take them off the property for use

15 in hunting trips; is that correct?

16 *A.*  That would be an example, yes.

17 *Q.*  Is it a correct example?

18 *A.*  That would be a correct example.

19 *Q.*  And when CYO did so in the past, before the law went into

20 effect, it didn't check to determine whether the individual to

21 whom it was loaning the firearm had been convicted of any

22 felonies?

23 *A.*  We do not have a process in CYO to find out if they are a

24 felon or not.

25 *Q.*  Prior to July 1, 2013?

```
 1   A.   Correct.
 2   Q.   And the participants, you've testified, in your program
 3   include adults; is that correct?
 4   A.   That is correct.
 5   Q.   And children as long as they are 13 or above?
 6   A.   In our core program, that is correct.
 7   Q.   And so for these transfers of firearms pre-1229, when CYO
 8   was -- would transfer its firearms to individuals to take --
 9   for the specific purpose of taking off the organization's
10   property, using -- out of sight of your staff and your
11   volunteers, CYO didn't inquire as to whether any of these
12   individuals had been adjudicated mentally incompetent?
13   A.   I do not believe we have a process to identify whether they
14   are mentally competent.
15   Q.   Nor did you have any process to determine whether the
16   individuals were fugitives from justice?
17   A.   So from justice, meaning, are they a felon, is that --
18   Q.   They're a fugitive, meaning --
19   A.   Oh, they're a fugitive.  No, I would not know that.
20   Q.   You don't know if you had a process, or you didn't have a
21   process?
22   A.   Oh, I'm sorry.  I don't believe our process would know
23   that.
24   Q.   So your process didn't ask for that information; is that
25   accurate?
```

 1   *A.*   Yes.

 2   *Q.*   Okay.  And your process didn't ask whether the individuals

 3   had substance abuse problems?

 4   *A.*   I would have to review our waiver form.  It may ask or

 5   state that they are not in use of substance or -- our process

 6   does not ask if they are a substance abuser.  But it may, and

 7   I -- I'm not -- I don't have a waiver form in front of us.  We

 8   do have them sign a waiver, and it may ask them or have them

 9   sign that they are not using alcohol or substance, but I'm not

10   100 percent -- I don't know for sure.

11   *Q.*   So the answer to my question is, you don't know whether

12   your organization inquired of individuals to whom it loaned

13   firearms prior to July 1, 2013, as to whether or not they were

14   substance abusers?

15   *A.*   I don't know.

16   *Q.*   Your process didn't inquire or determine whether the

17   individuals to whom firearms were being loaned were subject to

18   any restraining orders?

19   *A.*   It does not ask about restraining orders.

20   *Q.*   Okay.  So it doesn't ask about felonies?  I need a verbal

21   answer, please.

22   *A.*   I thought you were stating it.  It does not ask about

23   felonies.

24   *Q.*   That's correct?

25   *A.*   Today it does.

1   *Q.*  I'm not asking about --

2   *A.*  Yeah, okay, that is correct.  Pre-1229, it did not ask if

3   they are felons.

4   *Q.*  You testified on district exam, sir, that your organization

5   loans firearms with -- from its assets of -- you know, its

6   collection of firearms to other nonprofits to take off of CYO

7   property, once again, and to use for events that they might be

8   hosting but for which they don't have either any or a

9   sufficient number of firearms.  Did I understand you correctly?

10  *A.*  Yes.

11  *Q.*  Okay.  And you did that prior to July -- July 1, 2013?

12  *A.*  That is correct.

13  *Q.*  That was a common practice of your organization?

14  *A.*  That is correct.

15  *Q.*  Does your organization do that today?

16  *A.*  We do not.

17  *Q.*  And the reason that you do not, because there is a policy

18  that's been implemented by the board to discontinue that

19  practice?

20  *A.*  No, there is -- the new law -- we recognize that there is a

21  new law that would -- that would prevent us from doing so

22  without additional processes that may or may not work for us.

23  *Q.*  Now, if I'm understanding -- I just want to make sure the

24  record is clear.  It's very clear that CYO can host and conduct

25  shooting activities on its property; that's right?

1   A.  I'm not sure what you're referring to, that it's very clear

2   that we can host and -- shooting activities.

3   Q.  Sure.  I'll ask you a better question.  CYO's curriculum

4   today involves shooting programs --

5   A.  Shooting programs -- yeah, today we have a shooting

6   curriculum in our program.

7   Q.  Okay.  That's what I'm trying to --

8   A.  Okay.

9   Q.  Today when you host shooting programs for participants, you

10  allow them to bring their own firearms for use at those

11  programs; is that correct?

12  A.  They can -- yes, they could use our firearm, or if they

13  have one, they may bring them.

14  Q.  Okay.  And that was true prior to July 1, 2013, you also

15  allowed program participants to bring their own firearms for

16  use in shooting sports and other activities involving shooting?

17  A.  That is correct.

18  Q.  You spoke about target shooting as one of the types of

19  shooting activities that your organization hosts; is that

20  correct?

21  A.  Yes.  I may have said target shooting, trapshooting, yes.

22  Q.  Trapshooting and clay shooting, those are both forms of

23  target shooting; is that accurate?

24  A.  The clay is the target, so, yes.

25  Q.  So there is a missile that is launched, and somebody shoots

1   at it?

2   A.  Yeah, projectile towards the clay.

3   Q.  And all of your target shooting activities occur at

4   locations where it is legal to engage in target shooting?

5   A.  Yes.

6   Q.  And, similarly, you testified that your organization loans

7   firearms to individuals for the purpose of participating in

8   hunting activities; is that correct?

9   A.  That is correct.

10  Q.  Does CYO allow hunting on its property?

11  A.  It does.

12  Q.  Okay.  And that -- that is a legal place for individuals to

13  hunt, is on CYO's property?

14  A.  Yes, it is.

15  Q.  Okay.  And you testified that your organization also loans

16  firearms to individuals for the purpose of taking them on

17  guided hunting trips; is that accurate?

18  A.  That is accurate.

19  Q.  Okay.  And those guided hunting trips would occur on

20  non-CYO properties?

21  A.  Yes, it can.

22  Q.  Okay.  And all of the places where non-CYO property guided

23  hunting trips occur, are those legal places for individuals to

24  engage in hunting?

25  A.  As I understand, yes.

1    *Q.* And to the extent that hunting activities require a permit

2    or a license for each participant, CYO assists its participants

3    with obtaining the necessary permission?

4    *A.* Yes, they have the opportunity to get their hunter

5    education through us.  We don't issue the license; we just give

6    them the opportunity to apply -- yeah, to obtain a license.

7    *Q.* But, in fact, CYO requires individuals who want to engage

8    in hunting activities organized through CYO to have the

9    appropriate license or permit?

10   *A.* Yes.

11   *Q.* And that was true before 1229 went into effect?

12   *A.* That is correct.

13   *Q.* And it remains true today?

14   *A.* For hunting purposes, yes.

15   *Q.* And just so -- my earlier questions, when I asked you about

16   target shooting occurring in locations where it's legal to do

17   so, that is as of today?

18   *A.* That is correct.

19   *Q.* Your answer -- I'm sorry, to be clear, it's current through

20   today?

21   *A.* Yes, I agree, today you can shoot clay targets legally on

22   our property.

23   *Q.* Okay.  And today, anyplace, whether on your property or off

24   your property, where individuals would engage in hunting

25   activities organized through CYO, those, too, are legal places

1  to engage in hunting?

2  *A.*  As I understand, yes.

3  *Q.*  So I want to talk to you about your organization's efforts

4  since July 1, 2013, to obtain background checks for the loans

5  of firearms to participants for more than 72 hours.  First of

6  all, you agree that since July 1, 2013, your organization has

7  attempted to obtain background checks for such transfers?

8  *A.*  Can I ask about your question?  It sounds like you just

9  asked me before July 1, 2013.

10  *Q.*  No, sir I think -- my question was intended to be

11  post-1229.

12  *A.*  Okay.

13  *Q.*  Again, it's limited to transfers of firearms to individuals

14  in excess of 72 hours, regardless of where they're using it.

15  *A.*  Okay.

16      *MR. WESTFALL:*  And I would ask my client to properly

17  invoke his Fifth Amendment right against self-incrimination, to

18  the extent it goes beyond the two -- you have to say it

19  yourself.

20      *THE WITNESS:*  Yes.  I testified on two instances that

21  I'm aware of.

22  *BY MS. MORRILL:*

23  *Q.*  And those two instances involved the -- correct me if I'm

24  wrong, Cabela's, is that one of the instances?

25  *A.*  No, ma'am.

1    Q.  Which incident was it?

2    A.  Two instances.  One was with the Loveland Police

3    Department.

4    Q.  Uh-huh.

5    A.  And the other one was to our program -- to our instructor,

6    our program in our southeast region.

7    Q.  Okay.  You didn't state when those incidences occurred in

8    your direct testimony.  Was that before your deposition in

9    October 2013 or after your deposition?

10   A.  While I'm not -- I believe it was before our deposition,

11   because I believe I made mention of it in the deposition.

12   Q.  Well, that's what I'm trying to figure out is if we're

13   talking about the same incident, because you definitely did

14   discuss your organization's efforts to obtain background checks

15   for certain transfers.  But my representation to you is that

16   those transfers were for firearms loaned to participants for

17   more than 72 hours.  Is that consistent with the two incidents

18   that you testified about on direct?

19   A.  I believe I only testified on two instances.  Those are the

20   two that I know of.

21   Q.  Right.  And at your deposition -- so neither of the two

22   incidents you testified about on direct involved the loan to an

23   individual participants.  One was your instructor; is that

24   correct?

25   A.  That is correct.

1   Q.  And the other was to who?

2   A.  The police department example I gave you.

3   Q.  Okay.  So neither of those involved participants.  Isn't it

4   true that after July 1, 2013, your organization has attempted

5   to obtain background checks for transfers of firearms to

6   participants in excess of 72 hours?

7   A.  I would say, no comment.  It's unclear enough that I don't

8   feel comfortable --

9   Q.  Are you invoking your Fifth Amendment right against

10  self-incrimination?

11  A.  Yes.

12         MS. MORRILL:  Your Honor, I would ask that the Court

13  draw the negative inference in favor of the Governor on that

14  question.

15         THE COURT:  Thank you.  Move on.

16  BY MS. MORRILL:

17  Q.  Let's talk a bit about shooting competitions.  Shooting

18  competitions account for about 10 percent of Colorado Youth

19  Outdoors' activities; is that correct?

20  A.  That -- the 10 percent competition?  I'm not sure that -- I

21  wouldn't agree that we have competition within the Colorado

22  Youth Outdoors program.

23  Q.  I have in my notes, sir, on direct exam you testified that,

24  specifically, the Maverick is not a competition; was that

25  accurate?

```
 1   A.   Yes.
 2   Q.   Okay.  That was your testimony today.  Isn't it true, in
 3   fact, that the Maverick is a shooting competition?
 4   A.   We do not label it as a shooting competition.
 5        MS. MORRILL:  Your Honor, at this point I would ask
 6   Ms. Glover to approach the witness with his sealed deposition
 7   transcript.
 8   BY MS. MORRILL:
 9   Q.   Do you have it in front of you, sir?
10   A.   I do.
11   Q.   Okay.  I'd ask you to turn to page 52.
12        MR. WESTFALL:  Your Honor, may I ask for the Court's
13   indulgence to just allow my little iPad to load up to that page
14   so I can follow along.  Would that be okay?  It should take
15   just a moment.  Looks like it's almost downloading.
16        Which page?
17        MS. MORRILL:  52 -- I'm sorry, 63.
18        THE WITNESS:  I'm sorry?
19        MS. MORRILL:  63.
20        MR. WESTFALL:  6-3?
21        MS. MORRILL:  Yes.
22        THE WITNESS:  Mine says -- goes to 58.  Am I
23   missing --
24   BY MS. MORRILL:
25   Q.   Sir, you want to look at the page numbers embedded --
```

1    actually, I don't know what you're looking at, because I don't

2    have exactly what you have in front of me.  First of all, on

3    the front, does it identify it as the deposition transcript of

4    Robert Hewson?

5         *COURTROOM DEPUTY:*  Those are the exhibits, sir.

6         *THE WITNESS:*  I apologize.

7         All right.  Page 63, I'm there.

8    *BY MS. MORRILL:*

9    *Q.*  Thank you.  I'm going to ask you to read along silently,

10   and I'll read out loud, and then I'll ask you some questions.

11   Before I do that, just preliminarily, you were deposed in this

12   matter on October 16, 2013; is that correct?

13   *A.*  That's correct.

14   *Q.*  Okay.  And at the outset of your deposition, before any

15   questions were asked of you, you swore an oath to tell the

16   truth?

17   *A.*  Yes.

18   *Q.*  Okay.  And you did tell the truth at your deposition?

19   *A.*  I did.

20   *Q.*  Let's look at page 63, beginning on lines 24 and 25,

21   carrying over onto page 64, line 1.

22         Question:  "Okay.  Does the Maverick fundraiser

23   involving target shooting competition?"

24         Answer:  "Yes."

25         I did read that correctly?

103

1    A.    Yes.

2    Q.    Turning to page 52 of your deposition, sir.

3    A.    I'm there.

4    Q.    Beginning at the bottom of the page, near line 23.

5             Question:  "Okay.  When you say Colorado Youth

6    Outdoors offers target shooting, does this involve any type of

7    target shooting competitions?"

8             Continue on to page 53.

9             Answer:   "Sometimes."

10            "Okay.  Does Colorado Youth Outdoors loan its

11   participants firearms for the purpose of target shooting

12   competitions?"

13            Answer:   "Sometimes."

14            Did I read those questions correctly?

15   A.    You did.

16   Q.    Did I read your answers correctly?

17   A.    You did.

18   Q.    And carrying on to page 54, beginning at line 2.

19            "Okay.  So what percentage" -- what percent --

20            I'm sorry, I'll begin over.

21            Question:  "Okay.  So what percentage of -- what

22   percentage of Colorado Youth Outdoors' activities involving

23   target shooting competitions?"

24            Answer:   "10 percent."

25            Did I read that correctly?

```
 1 │ A.  Yes.
 2 │ Q.  At this time I'd ask you to put aside your deposition and
 3 │ turn to Exhibit 41, which is volume 4.
 4 │         Do you have that exhibit in front of you?
 5 │ A.  I do.
 6 │         MS. MORRILL:  Your Honor, I'd move admission of
 7 │ Exhibit 41.  It's been stipulated to by the parties.
 8 │         THE COURT:  Voir dire or objection?
 9 │         MR. WESTFALL:  Your Honor, it's my understanding 41 is
10 │ stipulated to, so we do not object.
11 │         THE COURT:  41 is received.
12 │         (Exhibit 41 admitted.)
13 │ BY MS. MORRILL:
14 │ Q.  Mr. Hewson, let's look at Exhibit 41.  You recognize this
15 │ document, correct?
16 │ A.  Correct.
17 │ Q.  Okay.  It's a screenshot of your organization's website?
18 │ That's a question.
19 │ A.  It appears it's a screenshot of our website.
20 │ Q.  Yes.  And you can see in the upper right-hand corner, there
21 │ is a little sticker that indicates exhibit, Hewson, and then
22 │ the number 2 in a circle.  Do you see that?
23 │ A.  Yes.
24 │ Q.  Okay.  And in fact, you discussed this Exhibit 41 during
25 │ your deposition; is that correct?
```

```
 1  A.  Yes.  I -- I believe we did.

 2  Q.  And I'd ask you to turn to page 4 of 7.  Let me know when

 3  you're there, please.

 4  A.  Yes, I'm there.

 5  Q.  And just so the record is clear, Exhibit 41, you agree,

 6  contains information about the Maverick fundraiser that your

 7  organization holds on an annual basis; is that right?

 8  A.  That is correct.

 9  Q.  Okay.  And this particular piece of information is related

10  to the 2013 Maverick shooting event.

11  A.  Last year's event?

12  Q.  Yes.

13  A.  Yes.

14  Q.  That's correct?

15  A.  That is correct.

16  Q.  Okay.  And on page 4 of the description, it indicates,

17  looking at the -- approximately the third paragraph, "Sunday of

18  the Maverick is for this year's participants in Colorado Youth

19  Outdoors.  Parents and youth enjoy the course and vie for the

20  state flurry championship."  Is that accurate, did I read that

21  correctly?

22  A.  That's correct.

23  Q.  Championship means that there is a winner of the state

24  flurry championship?

25  A.  Sure.
```

1    Q.  Okay.  And if you go down and you look at some of the other

2    descriptions, describing what a sponsor would get if it decided

3    to participate in the Maverick, you see there is a reference to

4    the word "team"; is that right?

5    A.  That is correct.

6    Q.  Okay.  There is also a reference to awards.

7    A.  Sure.

8    Q.  Right.  And, in fact, your organization does give awards to

9    the winner of the state flurry championship at the Maverick

10   event?

11   A.  We do recognize the state flurry championship -- champion.

12   Q.  With an award?

13   A.  I'm not sure that we give an award for that particular

14   piece.  But there are awards throughout the fundraiser shoot.

15   Q.  And just so we're clear, the Colorado Youth Outdoors

16   organizes the Maverick annual fundraiser; is that correct?

17   A.  We do.

18   Q.  And the board of directors for the organization approves

19   the event on an annual basis before it occurs?

20   A.  Yes.

21   Q.  Okay.  And the youth outdoors -- I'm sorry, I just wanted

22   before we move on from 41.  The 2013 Maverick event was held in

23   May, that's correct?

24   A.  That is correct.

25   Q.  Okay.  And it's a three-day event?

```
 1 │ A.   Typically.
 2 │ Q.   It was a three-day event in May of 2013?
 3 │ A.   It was.
 4 │ Q.   By three-day event, I mean participants and sponsors come
 5 │ and participate in the shooting competition over a three-day
 6 │ period; is that right?
 7 │         MR. WESTFALL:  Objection.
 8 │         THE WITNESS:  I did not --
 9 │         MR. WESTFALL:  Form of the question.
10 │         THE COURT:  I'll allow the witness to answer, but it
11 │ is repetitive of prior questions.
12 │ BY MS. MORRILL:
13 │ Q.   And I'm just about done.
14 │ A.   Well, you said it -- they participate in the competition.
15 │ I didn't agree to that, that this is a competition -- they
16 │ participate in the fundraiser shoot, absolutely.
17 │ Q.   Which is a three-day event --
18 │ A.   That is -- there is specific days for each -- our
19 │ participants aren't there for all three days.
20 │ Q.   I'm not implying that they must be.
21 │ A.   Okay, just trying to clear --
22 │ Q.   But it's a three-day event?
23 │ A.   It is.
24 │ Q.   Thank you.  And the youth outdoors is hosting the Maverick
25 │ again this year; is that correct?
```

 1  │ *A.*  Colorado Youth Outdoors is hosting this event.

 2  │ *Q.*  Yes.  You're, actually, right now, in the process of

 3  │ organizing and preparing for that event?

 4  │ *A.*  Yes, we are.

 5  │ *Q.*  That event is going to be held in May of 2014?

 6  │ *A.*  It is.

 7  │ *Q.*  Okay.  And you're going to be able to host that event over

 8  │ three days again this year?

 9  │ *A.*  We will.

10  │ *Q.*  Okay.  And the Maverick event for 2014 is going to be the

11  │ same -- substantially the same -- maybe not exactly the same

12  │ people, the same participants, that sort of thing, but it's

13  │ going to be the same type of event as the Maverick 2013?

14  │ *A.*  The event will be similar to past years.

15  │ *Q.*  Thank you.

16  │        May I have one moment, Your Honor?

17  │        *THE COURT:*  Sure.

18  │        *MS. MORRILL:*  Thank you.

19  │        Thank you, Your Honor.  Nothing further.

20  │        *THE COURT:*  Thank you.

21  │        Thank you, sir, you may step down at this juncture.

22  │ We're going to take a noon recess.  I'd like the attorneys to

23  │ remain in the courtroom, however, so that we can address a

24  │ couple of issues before our afternoon session.

25  │        You may step down.  And those folks who are here in

 1   the courtroom are free to go for recess.  We'll reconvene at

 2   1:30 this afternoon.

 3        Counsel, would you please just remain here in the

 4   courtroom.

 5        Counsel, if I can have your attention, please.

 6        I think there are several things we might touch on

 7   here by way of housekeeping that will make the afternoon and

 8   the rest of the trial go a little more smoothly.

 9        First of all, thank you for the additions of the

10   labels on the notebooks so that we can get to the exhibits

11   easily.

12        Let me inquire as to why counsel were referring to

13   house bills rather than portions of the Colorado Revised

14   Statutes.

15        *MR. WESTFALL:*  Since, Your Honor, I was the one that

16   did that to this point the most, I believe I should respond.

17   To me, because I've been referring to them in my own

18   vernacular, working with my witnesses, as 1229 and 1224,

19   consistently.  I've never -- I personally over the last --

20   since the time we filed our Complaint have never referred to

21   them in anything other than 1224 and 1229.

22        *THE COURT:*  But you would agree that they are now

23   enacted Colorado law?

24        *MR. WESTFALL:*  I'm not in any way disputing that, Your

25   Honor.

 1          *THE COURT:*  I'm going to ask all of you to refer to

 2     the appropriate sections of enacted Colorado law, not house

 3     bills.  We -- that's what I'm considering, is enacted law, not

 4     house bills.

 5          And while we're talking about that, we have an exhibit

 6     that you've all stipulated into the record, which is Exhibit 4.

 7     It is a copy of a House Bill, and it looked to me as if it was

 8     a draft because it had interlineation in portions of the bill.

 9     I'm happy to take judicial notice of the statutes as enacted if

10     you would like.

11          Do we have copies of the statutes, or would you like

12     me to take judicial notice of them?

13          *MR. WESTFALL:*  Your Honor, I think I would -- and if

14     I'm -- I know you'll correct me, Your Honor, if you disagree.

15     But we -- I've just looked at the exhibits, Exhibit 3 and

16     Exhibit 4, and they are the Acts as enacted by the general --

17     and signed by the Governor, and they are -- that's the way they

18     come out if you go online and go to House Bill 1224 and House

19     Bill 1229.  And I believe that's what we -- both sides have

20     been operating under, and that's why they're stipulated to,

21     they are in the exhibit notebook in the manner in which they

22     are.

23          I'm happy -- I understand the Court's point about

24     referring to them as a law, but they're also as an act.  And as

25     far as preparing the witnesses and preparing the testimony,

1   it's all based upon the Acts as they appear in Exhibit 3 and

2   Exhibit 4.

3          *MR. GROVE:*  Your Honor, I would agree that these are

4   the final versions.  To the extent there are interlineations --

5   and there are towards the end -- they're for portions of the

6   larger bill that are not at issue in this case.  Section

7   13-9-123 isn't going to be a topic of discussion, nor is

8   anything else.  That said, if Your Honor would prefer, I'm sure

9   we can get a more final version of this.

10         *THE COURT:*  I can look at the Colorado Revised

11  Statute.

12         *MR. GROVE:*  We also would be fine of you taking

13  judicial notice of that, as well.

14         *THE COURT:*  All right.  If you want to use these

15  exhibits for purposes of examination because that's how you

16  prepared, that's fine, because I don't want to cause a greater

17  problem for you in your presentation.  But I'm not going to be

18  referring to senate bills.  I'm -- house bills.  I'm going to

19  referring to enacted statutes.  And it probably would make a

20  cleaner record if we refer to the enacted statutes.

21         The second thing is, is that I know there has been

22  much discussion about this for purposes of motion practice.

23  But if I understand correctly, really, the defendant here,

24  although nominally the Governor, is the state of Colorado.

25  And -- I'm seeing nodding heads here, so that the record

1   reflects I think the folks representing the defendant agree.

2   And I think we should be referring to the state of Colorado.

3   It is the State's enacted statutes that are at issue.  This is

4   not about Mr. Hickenlooper, and it's really not about the

5   Governor.  It is about the state of Colorado.  And if -- I'm

6   happy to hear argument with regard to that, but that's my

7   understanding of the issue that we're addressing.

8        *MR. GROVE:*  Your Honor, we're fine with it -- with the

9   general reference to the state of Colorado and this being a

10  challenge to the statutes.  However, our attorney-client

11  privilege in this case flows to the Governor's office, and the

12  Governor's office alone.  We don't represent the entire state

13  for the purpose of this litigation.  We represent our client.

14  So to the extent that folks would like to refer to the state of

15  Colorado or the statutes or whatever being at issue, that's

16  fine, as long as there is no misunderstanding about who we

17  represent in this case.

18       *THE COURT:*  I think if there is an issue of privilege

19  that comes up, you'll have an opportunity to assert that.

20       We're also likely to have, if the testimony continues

21  along the same line as what we had this morning, the situation

22  of needing to advise witnesses with regard to their Fifth

23  Amendment rights.  Now, that came sort of as a surprise in the

24  course of examination.  But in order to prepare for that, I'm

25  going to ask plaintiffs' counsel to do a number of things.

2043

1          First of all, determine whether or not you represent

2     the individual witness and you are providing individual legal

3     advice.  Representation of an entity, if it is not also

4     representation of the individual, may require appointment of

5     counsel to -- for the witness in order to advise the witness as

6     to his or her constitutional rights.

7          Secondly, if you represent the witness, please give

8     the appropriate advisement to the witness before the testimony

9     begins.  It will be up to the witness to invoke the Fifth

10    Amendment right.  Although I stopped the proceedings here

11    because I had concerns that the question called for a response

12    that might fall within the Fifth Amendment, I will be -- I will

13    not be monitoring the questions for that purpose.  That is

14    something that attorneys for each witness should be aware of.

15         If the witness invokes the right, I will inquire

16    without causing a waiver of the right, unless I can tell from

17    the nature of the question that the invocation is appropriate.

18    But in each circumstance, I'll make a determination as to

19    whether invocation is justified or not.

20         I urge counsel for the defendant to think about

21    whether there are ways to ask questions that might avoid this

22    kind of problem and still accomplish your objectives.

23         Are there any other issues that you would like to

24    address that would make things easier for presentation

25    purposes?

1           MR. GROVE:  Not quite along those lines, Your Honor.

2    But --

3           THE COURT:  Okay.

4           MR. GROVE:  We would move for sequestration of

5    non-party lay witnesses for the remainder of trial.  Hasn't

6    been a big deal this morning; but as we get into more

7    substantive testimony, we'd ask that.

8           THE COURT:  All right.

9           Any objection?

10          MR. KOPEL:  None.

11          THE COURT:  Then non-party lay witnesses will be

12   sequestered.  Ms. Glover will post-that sequestration order on

13   the door to the courtroom.  However, counsel, you are the

14   guardians of that.  Because we have a number of things posted

15   on those courtroom doors, and it may be that some of those

16   witnesses don't read everything that is posted there.  So

17   you're going to have to monitor whether or not you have

18   witnesses here in the courtroom that shouldn't be here.  I rely

19   on you to police that particular order.

20          Anything else?

21          MR. WESTFALL:  One other question, Your Honor.  And

22   that relates to --

23          One other question, Your Honor.  I take it from the

24   way in which Mr. Hewson's testimony concluded, there was a

25   couple of brief questions I wanted to inquire on redirect, but

```
 1   it was only -- it was less than five minutes.  I -- I don't
 2   want to read tealeaves, but -- I think, has the Court heard all
 3   the testimony that the Court would like to hear from
 4   Mr. Hewson?  If, so I'd ask he be excused.  I'd -- I do have
 5   probably certainly less than five minutes -- maybe two or three
 6   questions I was going to pose to him on redirect.
 7           THE COURT:  I didn't make any determination with
 8   regard to that.  I simply recessed for the noon hour.
 9           MR. WESTFALL:  I'm sorry.  I misunderstood, Your
10   Honor.
11           THE COURT:  I presume that Mr. Hewson will retake the
12   stand.  If you want to engage in redirect, you're more than
13   welcome to.
14           MR. WESTFALL:  I just wanted to clarify.
15           THE COURT:  There is no recross, however, unless there
16   is a new area opened in redirect.  That is often the case in
17   state court, that we have recross and re-redirect and
18   re-recross until everyone runs out of questions, but not here.
19   So please be sure and ask all the questions that you have when
20   you have the opportunity.
21           MR. WESTFALL:  Thank you, Your Honor.
22           THE COURT:  All right.  Well, then, anything else
23   before we recess?
24           MR. COLIN:  One thing, Your Honor.
25           THE COURT:  Yes.
```

1          MR. COLIN:  I'm willing to offer all of the stipulated

2    admitted exhibits at this time, if the Court --

3          THE COURT:  I have no stipulated or admitted exhibits.

4          MR. COLIN:  We have agreed to admission of roughly ten

5    exhibits in advance.

6          THE COURT:  You need to proffer them at this point.

7    If you'd like to read the list, I'm happy to hear the list.

8          MR. COLIN:  All right.

9          THE COURT:  Yep.

10          MR. COLIN:  Exhibits 1, 2, 3, 4, 5, 6, 22, 23, 24, 25,

11    25, 26, 27, 28, 37, and 40.

12          41 has already been admitted.  Those are all of the

13    stipulated admitted exhibits, so I would proffer them at this

14    time.

15          THE COURT:  Any objection?

16          MR. GROVE:  No, Your Honor.

17          THE COURT:   Those exhibits are received.

18          (Exhibits 1-6, 22-28, 37, and 40 admitted.)

19          Thank you very much.  We'll stand in recess.

20          (Recess at 12:11 p.m.)

21          (In open court at 1:40 p.m.)

22          THE COURT:  Redirect.

23          MR. WESTFALL:  Thank you, Your Honor.

24

25

1        **REDIRECT EXAMINATION**

2    *BY MR. WESTFALL:*

3    *Q.*   Just a few questions for you, Mr. Hewson.   First of all,

4    you were asked a number of questions comparing your deposition

5    testimony concerning shooting competitions as compared to your

6    testimony here today regarding shooting competitions.   Would

7    you explain the difference or explain why you testified as you

8    did here in court today?

9    *A.*   Yes.   The shooting competition I was referring to in the

10   deposition was the fact that a very small percentage of our

11   Maverick event, it could even be qualified as shooting

12   competition.   Very similar to -- again, I'd use the analogy of

13   golf.   You're out golfing in a foursome, and I couldn't say

14   that there isn't competition within a foursome.   I'm sure there

15   is some folks who like to keep their score against each other,

16   so I found it important in deposition to announce that.   And --

17   but I think today, I may have said there isn't competition.   I

18   thought possibly that meant, is the event a competition?   The

19   state flurry shoot, that's simply, at the end of the day of the

20   parents-kids event, we get everybody together, and they go into

21   what is called a flurry cage.   Kind of a fun event.   Again,

22   because we have a southeast and northeast event, we

23   self-identify it as the state flurry shoot.   It's just kind of

24   a fun end-of-the-day game that we label state flurry shoot.

25   *Q.*   Why do you believe that what you described today in court

1  as a -- I think you looked at subsection (6) and said what CYO

2  does is not a shooting competition.  What's your explanation

3  for that?

4  A.  Well, again, there is no sanctioning of this event.  I

5  mean, if it was a competitive event, we most likely -- or

6  would, you know, put it under the authority or the confines

7  of -- it would be under NSCA, National Sporting Clays

8  Association, for a competitive event.  We've, again, never been

9  affiliated with that organization and don't follow any of their

10  guidelines.

11  Q.  Now, you were asked some questions about changes --

12  potential changes in what you do now for the Maverick and what

13  you did prior to July 1, 2013.  One specific question I want to

14  ask:  Were you loaned firearms prior to July 1, 2013, that

15  you're not being loaned today as a result of House Bill --

16  excuse me, as a result of 1229?

17  A.  Specific to the Maverick?

18  Q.  Yes.

19  A.  So the Maverick, no, we were unable to make these loans and

20  transfers.

21  Q.  My question was, did someone who loaned you firearms prior

22  to July 1, 2013, cease loaning you firearms?

23  A.  The answer is yes.

24  Q.  Okay.  Prior to July 1, 2013, are you aware of any crime

25  having been committed by anyone using a Colorado Youth Outdoors

1    firearm, including those loaned to any individuals?

2    *A.*  No.

3    *Q.*  How many such loans have you made since the beginning of

4    Colorado Youth Outdoors?

5    *A.*  From 2001?

6    *Q.*  Yes.

7    *A.*  Many.  I don't even know -- we don't keep count,

8    necessarily.  I mean, it's -- many, to different -- between

9    different organizations and participants.  And at the

10   Maverick --

11   *Q.*  Okay.

12   *A.*  Sorry, I'm not sure I have a number.

13          *MR. WESTFALL:*  I have no further questions, Your

14   Honor.  Thank you.

15          *THE COURT:*  Thank you.

16          Can this witness step down and be excused?

17          *MR. WESTFALL:*  I would respectfully request that the

18   witness be excused.

19          *MS. MORRILL:*  No objection, Your Honor.

20          *THE COURT:*  Thank you, sir.  You may step down.  You

21   are excused.

22          Please call your next witness.

23          *MR. COLIN:*  Plaintiff would call Michael Shain, Your

24   Honor.

25          May I go get him?

```
 1                THE COURT:  No, Ms. Glover will.

 2                MR. COLIN:  Thank you.

 3                THE COURT:  Please step up and be sworn.

 4                (MICHAEL SHAIN, PLAINTIFFS' WITNESS, SWORN)

 5                COURTROOM DEPUTY:  Please be seated.

 6           Please state your name and spell your first and last

 7   name for the record.

 8                THE WITNESS:  Michael Shain, S-H-A-I-N.

 9                          DIRECT EXAMINATION

10   BY MR. COLIN:

11   Q.  Good afternoon, Mr. Shain.

12   A.  Good afternoon.

13   Q.  Mr. Shain, you're a retained expert, are you not?

14   A.  I am.

15   Q.  Can you describe for the Court the terms of your retention

16   in this case.

17   A.  I was asked to examine various materials and offer opinions

18   about the issues at question.

19   Q.  Are you being compensated?

20   A.  I am.

21   Q.  Can you tell the Court the amount of your compensation,

22   hourly basis?

23   A.  Hourly is $200 an hour.

24   Q.  And you have worked on this case since approximately when?

25   A.  I think I was retained in July of last year.
```

1   Q.  Can you describe the general areas in -- that you were

2   asked to render opinions on.

3   A.  I was asked to render opinions concerning magazines,

4   magazine capacity, the clauses in Section -- I believe it's

5   18-12-301 and 302 of the revised statutes that have to do with

6   continuous possession, magazines being able to accept more than

7   15 rounds -- forgive me, I'm trying to think of all of the

8   different things that are contained therein.  The effect that

9   the magazine limitation has on the sale of semiautomatic

10  firearms, essentially, the *de facto* ban that has resulted from

11  it.  And I'm sure I've missed something.

12  Q.  We'll try to pick it up as we go.

13  A.  Okay.

14  Q.  You've essentially described three or four areas in which

15  you have rendered opinions.  And before we get to those

16  opinions, I'd like to walk you through your training,

17  experience, and background that allows you to render opinions

18  in the areas you've just described, okay.

19  A.  Of course.

20  Q.  You've indicated you have offered opinions in the area of

21  the shorthand, unenforceability, if you will, of continuous

22  possession language and the grandfather clause associated with

23  that; is that fair?

24  A.  Yes, that's correct.

25  Q.  Have you had in your training, experience, and background

1   occasion to interpret and apply statutory provisions?

2   *A.*  Yes, of course.

3   *Q.*  In what context would that have been?

4   *A.*  Well, I spent over eleven years in California law

5   enforcement.  So starting with my basic police academy, where

6   we were trained to read statutes and interpret those statutes

7   and apply them to enforcement activities and investigations in

8   the field, which, of course, I then implemented when I became a

9   patrol officer.  During my tenure with the UCLA Police

10  Department, I worked patrol, where we used those same

11  approaches, that is, you know, reading statutes, interpreting

12  them, applying them to situations in the field to determine

13  probable cause, determine if evidence existed.  I went on from

14  there to work investigations.  Over the course of my career, I

15  was a formally trained homicide investigator.  I promoted to

16  sergeant, where I supervised officers in the field and trained

17  them in how to interpret and apply statutes to investigations

18  in the field.  I supervised officers as a sergeant, later as a

19  lieutenant.

20  *Q.*  In addition to supervising officers with regard to the

21  interpretation and application of statutes, did you have any

22  occasion to instruct in that area?

23  *A.*  Oh, absolutely.  Recruit officers and even tenured officers

24  required instruction.  Training sessions were kind of a regular

25  thing, whether it was roll call or formal training.  And over

1  the years, of course, I attended -- as I rose through the

2  ranks, I attended a number of advanced training programs and

3  schools, supervisory and management schools that addressed more

4  specifically the nature of training officers and recruits in

5  the area of, you know, interpreting statutes and applying them

6  to investigations in the field.

7  Q.  In your general description of the areas in which you've

8  rendered opinions, you've also mentioned an area that I

9  associate with the operation and function of a firearm and the

10  associated magazine; is that fair?

11  A.  Yes.

12  Q.  Can you describe your training and experience in the UCLA

13  Police Department that might have provided background in the

14  area of firearms functioning, how it works as a mechanism --

15  how magazines work associated with firearms.

16  A.  Absolutely.  Well, of course, you know, starting with the

17  basic police academy, there is a block of basic firearms

18  training that takes place.  Later on, as a patrol officer and

19  as an investigator, sergeant, lieutenant, working in and out of

20  uniform, I had to employ a firearm as part of my daily duties.

21  In 1985 I was selected to become the department armorer and

22  firearms instructor and was tasked with developing a semiauto

23  pistol transition program for my department.  So I spent a

24  great deal of time researching, examining, testing, and later

25  training, maintaining, purchasing, supplying, detachable

1   magazines and semiautomatic firearm systems for my department.

2   *Q.* When you left the UCLA Police Department, what rank did you

3   hold?

4   *A.* Lieutenant.

5   *Q.* And what year did you leave your employment with the UCLA

6   Police Department?

7   *A.* 1994.

8   *Q.* And have you engaged in any additional work, training that

9   has furthered your education in firearms operation,

10  maintenance, and design?

11  *A.* Sure. After leaving the police department, I established

12  the company that I now run, AIMPRO, also known as AIMPRO

13  Tactical, primarily as a training company. And I have engaged

14  in law enforcement and civilian firearms training all these

15  many years, not only when I was in law enforcement, but since

16  then, and certainly since 1994 when I started AIMPRO.

17          In addition to the training kind of branch of the

18  company, I also fell into doing a great deal of litigation work

19  for the firearms industry, where I was really exposed to a

20  whole new level of technical expertise that had to do with

21  firearms, detachable box magazines, and the like.

22          *THE COURT:* Sir, I'm going to interrupt you for a

23  minute.

24          It appears that someone has some electronic device on

25  that is playing. Would you please turn it off.

```
 1              You may proceed.

 2              THE WITNESS:  Thank you, Your Honor.

 3              I'm sorry.

 4   BY MR. COLIN:

 5   Q.  I'm lost too.

 6   A.  I lost my --

 7   Q.  Could you read back?

 8              THE COURT:  We'll ask our court reporter to read back

 9   the last statement.

10              (Question read back by reporter.)

11   A.  Thank you.

12   Q.  Can you describe the primary emphasis of the firearms

13   litigation in which you've been involved as an expert over the

14   last 20 years?

15   A.  Primarily been product liability.  But there have been a

16   number of wrongful death and shooting cases that I have done.

17   And the product liability cases all involve fairly technical

18   examinations that have to do with design characteristics,

19   alterations to firearms, design features, which could, you

20   know, have contributed to an injury.  There have been a great

21   deal of examinations of small parts, disassemblies of firearms,

22   and the like.

23   Q.  All associated with your role as an expert in products

24   liability cases?

25   A.  Yes, sir.
```

1   Q.  And in those cases, for the most part, fair to say you

2   represented the firearms industry?

3   A.  Yes.  Like I say, with the exception of a few cases that

4   were wrongful death cases, where I may have represented, you

5   know, somebody who could have been a plaintiff in a case.

6   Q.  Okay.  In connection with your work in products liability

7   litigation for the firearms industry, it sounds like you have

8   gained some fairly detailed knowledge regarding the mechanical

9   functioning of a firearm; is that accurate?

10  A.  Yes, absolutely.

11  Q.  I think you mentioned that when you were with UCLA PD, you

12  were an armorer; is that correct?

13  A.  Well, I was.  Part of my responsibilities when I became the

14  principal firearms instructor and was working on the selection

15  of semiautomatic firearms, was that when we transitioned to

16  those semiautomatic pistols, it was necessary to have a

17  certified armorer within the agency to service them, maintain

18  them, examine them, test them, so on.  So I was trained

19  formally trained as an armorer by several different

20  manufacturers.

21  Q.  You just gave us a list of various things you did as an

22  armorer.  Do you still continue to do those things today, 25

23  years later?

24  A.  I do.  In addition to that, since I've been in the private

25  sector, I've also been retained and trained by two

1   manufacturers to an armorer instructor; so I actually train

2   armorers now.  Back then, I was an armorer -- in other words, I

3   was trained to do those tasks that I described to you.  Now I

4   teach law enforcement officers how to do those tasks.

5   Q.  I think you mentioned in your response a moment ago that

6   you were -- you were actually a certified armorer instructor

7   for some firearms manufacturers; is that accurate?

8   A.  Yes.

9   Q.  Who are they?

10  A.  I'm no longer doing the SIG Sauer work, but I was trained

11  by them and did work for them for some time.  Ever since 19 --

12  excuse me, 2002 or 2003, I have been the Mossberg  law

13  enforcement instructor, the national law enforcement

14  instructor.  So I continue to teach those classes to law

15  enforcement all over the country.

16  Q.  Do you do any certified warranty work for any firearms

17  manufacturers?

18  A.  I do.  It's also for Mossberg, O.F. Mossberg & Sons.  I'm

19  the only authorized warranty center for law enforcement in the

20  United States, and I've been doing that since -- I want to say

21  2005.  I may be off a year there.

22  Q.  So you've described firearm training both as a law

23  enforcement officer and that which you provide for AIMPRO.

24  You've talked about armorer training.  Is an armorer a

25  gunsmith; is that the same thing?

 1  │ *A.*  No, no.

 2  │ *Q.*  What's the difference?

 3  │ *A.*  Let me clarify.  An armorer is a person that is trained to

 4  │ do some basic maintenance, diagnose malfunctions, identify

 5  │ parts that may need to be replaced, do maintenance.  It's much

 6  │ more detailed that what an end user, commercial or civilian

 7  │ user, would do.  But a gunsmith is a person that would alter

 8  │ parts, machine parts, fabricate parts, modify a firearm, that

 9  │ sort of thing.

10  │ *Q.*  Are you a gunsmith?

11  │ *A.*  I am.

12  │ *Q.*  We've heard mention in an earlier witness of the term FFL.

13  │ Do you know what that is?

14  │ *A.*  I do.

15  │ *Q.*  What is it?

16  │ *A.*  It refers to federal firearms licensee.  And I have both

17  │ been a federal firearms licensee as a dealer, which I think I

18  │ got back in 2002 or 2003, and then in 2010, I was able to

19  │ become licensed as a federal firearms licensee manufacturer,

20  │ which I currently am still qualified to do.

21  │ *Q.*  And what do you do as a firearm -- licensed firearms

22  │ manufacturer?

23  │ *A.*  Well, a licensed firearms manufacturer is authorized to

24  │ fabricate firearms from scratch, all the way up to doing the

25  │ gunsmithing work, and that's inclusive of being a dealer.  So I

1   didn't give up my dealer authorization; it's just kind of

2   rolled into that same license.  So the Federal Bureau of

3   Alcohol, Tobacco, Firearms and Explosives has authorized me and

4   licensed me to manufacture firearms from scratch if I choose to

5   do so, or anything up to that.

6   Q.   Does that include manufacture of firearms components?

7   A.   Yes.

8   Q.   Do you manufacture magazines?

9   A.   I don't.

10  Q.   Have you manufactured magazines?

11  A.   No, but I've altered and modified magazines.

12  Q.   All right.  And can you describe for the Court what you

13  have done in the context of working on designing, altering,

14  repairing magazines.

15  A.   Well, because magazines are so ubiquitous currently,

16  magazines are something I handle on a daily basis.  Ordinarily,

17  magazines will come in with a customer's gun when there is a

18  question about performance or reliability.  And the magazine,

19  of course, is an integral part of that system.  So a magazine

20  may require a repair, it may require replacement, the magazine

21  may need to be rebuilt, it may need to be refinished, it may

22  need to be welded.  In certain cases, we've attached -- I have

23  attached magazine extensions, replaced base plates, put in

24  after-market followers, straightened magazine lips, and tested

25  magazines for function, especially fit and function.

1   *Q.*  You indicated that you also have an FFL dealers license; is

2   that accurate?

3   *A.*  It's kind of combined.

4   *Q.*  Okay.

5   *A.*  I originally had a stand-alone dealers license.  But when

6   you move up to a manufacturing license, it's inclusive of the

7   dealer status.

8   *Q.*  I took you off on a magazine side trip.  But in terms of

9   firearms components, have you actually manufactured firearms

10  from scratch?

11  *A.*  Well, technically --

12  *Q.*  I'm envisioning MacGyver and a toaster oven.

13  *A.*  No, it doesn't work quite like that.  The short answer is

14  yes, and there are some technical definitions that the ATF uses

15  to describe what they mean when they say manufacturing.  Have I

16  taken a single billet of steel and turned it into a firearm?

17  No.  Have I taken what the ATF considers firearm components and

18  made them into a working firearm that qualifies as

19  manufacturing?  Yes, I have.

20  *Q.*  Have you engaged -- and I'm sorry if I don't remember the

21  correct word.  It sounded like you actually -- what I would

22  call machine parts.

23  *A.*  Well, I do with accessories and components.  I've designed

24  and we do machine accessories and components from scratch, just

25  not the part of the firearm that is considered the serialized

1   part.

2   Q.  You certainly indicated that you -- you touch, you deal

3   physically with magazines every day.

4   A.  Yes, sir.

5   Q.  And you've been doing that for 30 years?

6   A.  Unfortunately, I would have to say so.  It's been at least

7   that long.

8   Q.  You also mentioned having experience, background, and

9   training in -- again, if I'm using the wrong term, correct

10  me -- the design tolerances for firearms, firearms components;

11  is that right?

12  A.  Yes.

13  Q.  Does that include magazines?

14  A.  Yes.

15  Q.  And can you explain what that means, please.

16  A.  Well, design tolerances really have to do with the fit and

17  function and the consistency of manufacturing.  The

18  manufacturing technique has something to do with it, how the

19  magazine is designed and manufactured, all of those things go

20  into fit and function.  And design tolerances are about the

21  overall measurements and how the components of the magazine fit

22  together, how interchangeable they are, and ultimately how

23  reliable they will be in that firearm system.

24  Q.  And are those issues with which you have worked for the

25  past 20 years?

1    *A.*  Oh, yeah.  They're pretty critical with working with any

2    semiautomatic firearms system, any system that uses a

3    detachable box magazine.

4    *Q.*  While you were a law enforcement officer, did you receive

5    specialized training in the area of the mechanical functioning

6    of firearms as well as learning how to shoot them?

7    *A.*  Yes.

8    *Q.*  And can you describe that, please.

9    *A.*  Well, some of that has to do with the armorer training I

10   received.  But when I was selected to become the department

11   firearms instructor and range master, I was sent to an FBI

12   firearms instructor school.  And a portion of that school dealt

13   with the mechanics of firearms, how they function,

14   specifically, what you're looking for in terms of problems,

15   malfunctions, how to select, you know, components.  Because

16   when you're selecting that type of thing for law enforcement

17   applications, the context is life and death circumstances.  So

18   we spent some time doing that.

19        And in addition to that, during the semiauto

20   transition program that I mentioned earlier, I spent a great

21   deal of time in the selection and testing process with a large

22   agency in Southern California, the Los Angeles County Sheriff's

23   Department, because they were in the process of selecting

24   semiauto pistols for their department, transitioning from

25   revolvers to semiautomatic pistols.  And that process was an

1  in-depth, kind of painstaking testing process for reliability

2  and durability issues.

3  Q.  And you were working with the Los Angeles County Sheriff's

4  Department?

5  A.  Yeah.  I was one of several departments that was allowed to

6  participate in that testing process so we could piggyback our

7  selections based on that overall testing process.

8  Q.  Just so I understand correctly, essentially, you and other

9  departments were working with LASO in trying to decide what the

10  most reliable firearm, semiautomatic firearm would be for this

11  transition that you were talking about, from revolvers to

12  semiautomatics?

13  A.  Yes.

14  Q.  And when did this transition take place in the Los Angeles

15  area?

16  A.  I want to say that it was mid to late 1980.  If I were

17  going to pick a year, I would say it was right about 1986,

18  1987, and a lot of agencies on the West Coast were starting to

19  look at transitioning from revolvers to semiautomatic pistols.

20  Q.  Just make sure I heard correctly.  You said in the western

21  United States, that transition was taking place in the late

22  1980s, essentially?

23  A.  Yes.

24  Q.  Okay.  I want to complete -- briefly come back to your

25  testimony as an expert.  You said that you've been retained in

1  products liability cases, a wrongful death case or two, a few

2  other areas, but predominantly products liability.  Can you

3  estimate how many cases you have testified as an expert in over

4  the past 25, 30 years?

5  A.  I would guess approximately 30.

6  Q.  Have you had occasion to be qualified by a court as an

7  expert in the areas that you've just described?

8  A.  Yes, several times.

9  Q.  I'd like to now direct your attention to the design

10  tolerance issue with regard to magazines that you indicated

11  that you had rendered opinions on at the outset of your

12  testimony today.  All right.

13  A.  Yes, sir.

14  Q.  Specifically, what opinion do you have regarding the design

15  tolerances of magazines and the capacity of a magazine

16  vis-a-vis a design tolerance?

17  A.  Well, the opinion relates to the fact that the design

18  tolerances of magazines will allow magazines that are

19  designated for maximum capacity of 15 rounds to actually accept

20  a 16th round.  And that has to do with what we discussed

21  earlier, the fit and function of the magazine.  But it has to

22  do with the magazine construction, what materials it's made out

23  of, the diameter of the magazine spring, the number of coils,

24  the design of the follower, the design of the baseplate, the

25  design of the detent, all of those things working together in

1    kind of what we refer to as tolerant stacking, and the overall

2    design of the magazine.  Because magazines are designed to have

3    space at the bottom of them for the spring to compress without

4    binding or damaging the spring or the magazine.  I hope that

5    makes sense.

6    Q.   It does.  I think maybe you got a little bit ahead of me.

7    A.   I'm sorry.

8    Q.   I'll try not to duplicate your testimony too much.  I want

9    to go back and talk a little bit about the training,

10   background, and experience to which you've testified that you

11   feel allows you to opine in this area.  Can you describe to the

12   Court the background, training, and experience that you've

13   already touched upon briefly that allows you to testify

14   regarding -- as an expert regarding design tolerances of

15   magazines and the springs and the followers and all the things

16   that you just mentioned in that list.

17   A.   Okay.  Going back to my law enforcement experience.  During

18   the time that I was tasked with developing a semiauto

19   transition program for the department, one of the biggest

20   concerns that we had was reliability in those semiautomatic

21   firearms as police officer were carrying them in the

22   performance of their duties.  And what I discovered during that

23   process was that the detachable box magazine was an essential,

24   critical component in the reliability and function of

25   semiautomatic firearms.  So it was important to look very

1    closely at the design, the performance, the fit and finish, and

2    the compatibility and consistency of magazines.

3         So right at the very beginning of my, I'll call it a

4    relationship, with semiautomatic firearms, the magazine is a

5    very prominent and important part of that system that had to be

6    evaluated almost as a separate component in the system.

7    Because if the magazine doesn't work, the firearm doesn't work.

8         And then as a trainer, of course, it was my

9    responsibility to examine officers' equipment, determine,

10   diagnose if a firearm was malfunctioning, if it had something

11   to do with the magazine, because that was a common occurrence.

12   As the armorer, I was responsible for maintaining the

13   magazines, repairing them, replacing them, determining when

14   they were no longer serviceable, ordering new magazines.  And

15   continuing through my training, on dealing with civilians and

16   law enforcement, students that are carrying firearms with the

17   detachable box magazines.  So I'm handling them, I'm doing the

18   same type of evaluations where malfunctions occur.

19        And then in my civilian -- well, I'll call my private

20   sector life, since leaving law enforcement, the products

21   liability cases have taken me into an area where I'm looking

22   very carefully at design specifications, manufacturer

23   specifications that have to do with exact tolerances of

24   manufacturing techniques, machining tolerances, for example.

25   During those products cases, those tolerances are extremely

1  | important to determining whether or not a product was
2  | contributing to an injury.
3  |        In addition to that, I'm working on guns as a
4  | gunsmith.  I'm producing and manufacturing parts and
5  | accessories that require me to look very carefully, if not in
6  | fact design those parts, including manufacturing
7  | specifications.  So I think all of that really informs my
8  | opinion about the issue of 15-round magazines being able to
9  | accept 16 rounds of ammunition.
10 | Q.  And is your experience in examining, testing, doing all of
11 | the things that you've just described, limited to semiautomatic
12 | pistols?
13 | A.  No.  I spent a great deal of time with semiautomatic rifles
14 | and submachine guns as well.
15 | Q.  I may recall incorrectly.  Have you done work as an armorer
16 | or warranty tech for Colt?
17 | A.  I was a trained armorer with Colt, but I don't do any
18 | warranty work for them.
19 | Q.  Okay.  Understood.  Have you worked with Colt what I'll
20 | call carbine or rifle systems?
21 | A.  I have.  Specifically, during the 1984 Olympics, I was
22 | assigned to a counterterrorism task force, and I was assigned
23 | an M-16 rifle.  We also went through a selection process for
24 | our agency to select submachine guns.  We originally looked at
25 | the Heckler & Koch MP5.  We then moved on to a Beretta

1  submachine gun.  We ultimately selected a Colt, I think that

2  you're referring to, a Colt referred to as the subgun.  It's a

3  9 millimeter submachine gun.  It's on the same pattern as the

4  AR–15 and 16 gun.

5  Q.  Do you work on those firearm systems now as an armorer,

6  manufacturer, dealer?

7  A.  I do on the AR–15.  The M–16 and the Colt subguns are Class

8  3 firearms that are civilian restricted.

9  Q.  So AR–15 platform weapons?

10  A.  Yes.

11  Q.  Okay.  And I'm not a firearms guy, but my understanding is

12  that different manufacturers make different kinds of weapons

13  that are built on this AR platform; is that an accurate

14  statement?

15  A.  Well, the AR platform is probably the best way to describe

16  it.  The Colt patent ran out some time ago, and it became kind

17  of open source.  So anybody that wants to make one can make

18  one.  The blueprints and specifications are available.  So

19  you're correct, there are many different manufacturers that are

20  making an AR platform rifle.

21  Q.  When you say you work on ARs, that would include ARs

22  manufactured by all of the different manufacturers?

23  A.  Sure.  They could be Smith & Wesson, they could be Colt,

24  they could be Lewis Machine & Tool, they could be Stag Arms,

25  the list goes on and on.  They're all, essentially, the same

1   design.

2   Q.  Now, you kind of listed this pretty quickly at the

3   beginning of this area of inquiry, but I want to go back to

4   your testimony regarding magazines specifically.  What factors

5   do you consider in determining the reliability of an ammunition

6   feeding system, a detachable box magazine in this particular

7   case?

8   A.  As I said -- I apologize if I went too quickly.  I look at

9   the overall construction of the magazine.  In other words, what

10  material is it made out, or materials; the design of the

11  magazine itself; the design of the follower; the design of the

12  spring and what materials are used; the design of the

13  baseplate; the design of the detent.  And all of those things

14  together, you can evaluate as a whole, as the component

15  performs in terms of its fit and finish.

16  Q.  What do you mean by "fit and finish"?  Just what you

17  said --

18  A.  Design tolerances, you know, the overall consistency and

19  quality of that -- of that magazine.  And all the other

20  magazines that come from the same manufacturer, do they all

21  conform to that same level of quality and consistency?

22  Q.  Why is that important in determining reliability?

23  A.  Because the magazine is the heart and soul of a

24  semiautomatic firearm system.

25  Q.  All right.

1    *A.*   If the magazine isn't reliable, if it doesn't perform

2    correctly in the firearm, then the firearm won't perform

3    correctly.  So that compatibility, the ability to fire multiple

4    magazines out of the same manufacturer, out of the same firearm

5    with reliability and/or the ability to take those magazines and

6    put them into another like kind, make, and model pistol and

7    have them work reliably, extremely important.

8    *Q.*   Can you explain how the magazine is designed to work within

9    a firearms feeding system?  Isn't it possible to fire a

10   semiautomatic pistol without a magazine?

11   *A.*   It is possible.  It's not advisable.  In fact, there are

12   many manufacturers that advise against it.  I mean, if

13   absolutely necessary, you can fire -- drop a single round into

14   a semiauto pistol and close the slide over it.  But

15   semiautomatic firearms are designed to be magazine fed.  And

16   what that means is, the magazine is designed to be inserted

17   into the firearm when the bolt is closed or the slide is

18   closed, and then the slide or the bolt opened and allowed to

19   close.  And when it does, it picks up the first round off the

20   top of the magazine, ramps it into the chamber, chambers it,

21   and the bolt of the slide closes behind it.  And as that's

22   happening, the cartridge is sliding up the bolt face and

23   underneath the extractor hook.  I may be getting in the weeds,

24   here, a little bit.

25          But the extractor hook is kind of like a little hand.

1    And this is why it's not advisable to single load a

2    semiautomatic firearm, is that when the round slides under the

3    extractor, that's the proper way to load that gun.  When you

4    have the single round -- a single round in the gun and the

5    extractor closes over it, you're risking damage to the

6    extractor or damage to the rim of the case that could result in

7    a malfunction.

8         So the magazines are designed to have a little bit of

9    give.  I think I touched on this earlier when I was talking

10   about the overall design of the magazine.  So as you seat the

11   magazine in, let's say, a semiautomatic pistol, the top round

12   has to have some room to move downward in the magazine so that

13   it's resting under spring pressure underneath the slide.

14   Because as the slide moves backward, the round comes up

15   slightly, so that when the slide closes, the face of the bolt

16   catches the back of the cartridge and pulls it off the top of

17   the magazine.  Without that little bit of give in the magazine,

18   you have, essentially, a locked magazine that wouldn't move at

19   all.  The firearm wouldn't function.

20   Q.  Before we get into how that affects your opinion, I want to

21   go back and just touch very briefly upon some of the work that

22   you've done as an expert in these products liability cases.

23   Did that involve any laboratory testing of magazines and

24   firearms?

25   A.  Yes, it did.

1    Q.  And can you describe the laboratory side of the design

2    specifications and tolerances that you talked about earlier?

3    A.  Sure, absolutely.  I think I made a comment about being

4    exposed to a whole new level of technical expertise.

5    Q.  You did.

6    A.  That's really what I was referring to.  In many of the

7    products liability cases that I work on, we examine the

8    firearms under laboratory conditions.  And it's given me the

9    opportunity to work side by side with design engineers, test

10   engineers, metallurgists, toolmark experts.  And we're doing

11   things in laboratories, for example, radiography, where we're

12   documenting firearms conditions through, essentially, X ray.

13   We're looking at materials in terms of what their metallurgy

14   is, doing hardness testing.  We're looking at them under a

15   microscope, even under an electron microscope.  We're using

16   optical comparators to evaluate differences and dimensions

17   between two like kind parts to determine whether or not one has

18   been altered or one was manufactured incorrectly.

19          So there is a whole bunch of kind of hypertechical

20   stuff that we do in the laboratory settings, and I've been

21   lucky enough to participate in quite a few of those over the

22   years in laboratories all over the United States.

23   Q.  Can you estimate how many magazines you've handled,

24   disassembled, loaded, tested over the past 30 years?

25   A.  Thousands, maybe 10,000.

1   *Q.*  In your experience, do manufacturers design a particular

2   magazine to hold a certain type of ammunition?

3   *A.*  Oh, yes, of course.

4   *Q.*  And can you explain that, please.

5   *A.*  Well, magazines are firearm specific, and the firearm is

6   caliber specific.  So the magazine has to be designed to hold a

7   specific caliber of ammunition.

8   *Q.*  To match the firearm it's going to be fired from?

9   *A.*  Oh, yeah, absolutely.  Well, the magazine is designed to

10  fit in the firearm it's designed to fit into.  And then the

11  magazine also has to be designed to accommodate the correct

12  ammunition that that firearm is chambered for.

13  *Q.*  So does the type of ammunition impact the capacity of a

14  magazine?

15  *A.*  Oh, yes.

16  *Q.*  Can you explain how that happens.

17  *A.*  Well, semiautomatic firearm ammunition -- I'll just talk

18  about for a moment pistol ammunition -- is different diameter,

19  depending on the caliber of the ammunition.  Obviously,

20  .22 caliber ammunition is much smaller in diameter than

21  .45 caliber ammunition.  You can tell just by the numerical

22  designation.  So the -- depending on the diameter, the outside

23  diameter of that ammunition, the magazine is designed to

24  accommodate that ammunition, whether it be a single stack, in

25  other words, a straight row of ammunition, or a double stack,

1  which would be a staggered two rows of ammunition.  And that is

2  specific to the diameter of that ammunition and the caliber and

3  the overall, you know, length and design of the magazine and

4  the firearm into which it's designed to fit.

5  *Q.*  So the size of the magazine also has an impact on capacity?

6  *A.*  Oh, yes.

7  *Q.*  So do manufacturers design specific magazines to hold a

8  certain number of rounds?

9  *A.*  Yes.

10  *Q.*  And can you explain that, please.

11  *A.*  Well, in the -- in the development of a firearm, the

12  designer makes a decision that -- of how he wants to configure

13  the firearm.  And the ultimate design includes the capacity of

14  the magazine.  So the magazine is designed to hold X number of

15  rounds.  And that was the design intent of that firearm,

16  firearms manufacturer and designer.  If it was designed to hold

17  17 rounds, the magazine, it's got to be constructed pursuant to

18  that designer's specifications, so that when that caliber

19  ammunition is inserted into the magazine, it allows 17 rounds

20  of ammunition to go in.

21  *Q.*  So how can someone without your training, knowledge,

22  experience, and expertise determine, if they can, by looking at

23  a magazine what the capacity of that magazine is supposed to

24  be?

25  *A.*  Well, most modern magazines have some type of a witness

1  hole or slot or some type of a window that lets you visualize

2  the ammunition in the magazine.  If they don't -- sometimes

3  even if they do, they may also have a stamping, a numerical

4  stamping, sometimes in increments and sometimes just maximum

5  capacity, numerical stamp of some kind on the magazine to tell

6  you what the intended capacity of the magazine is.

7  Q.  So I could look at magazines with the stamps that you've

8  described, and it will tell me, this is a 15-round capacity

9  magazine?

10  A.  In most cases, yes.

11  Q.  Is the fact that a magazine is designed for a stated

12  capacity, does that mean that the stated capacity is correct,

13  that that's the maximum number of rounds that a given magazine

14  might hold?

15  A.  No, absolutely not.  And that's the problem.

16  Q.  Why not?

17  A.  As I indicated earlier, the overall design of the magazine,

18  the dimensions of the components, the overall dimensions of the

19  magazine can allow -- must allow for some movement.  Let's say

20  it's a magazine that is intended for 15 rounds, the 15th round

21  has to have some movement so that it can fit into the firearm

22  it's designed for when the bolt or the slide is closed without

23  binding up the magazine or the firearm.  In addition, there has

24  to be room in the bottom of the magazine for the spring to

25  compress.  And depending on the design of the baseplate and the

1  follower, there may be enough room when you add up all of these

2  different, you know, design characteristics and tolerances for

3  an additional round to be inserted into the magazine.  So even

4  though the magazine may say 15 rounds, it's -- it's very

5  possible you could get 16 rounds into it.

6  *Q.*  So does that create any issues with regard to magazine

7  capacity limits in 18-12-302?

8  *A.*  Of course, it does.

9  *Q.*  Why do you say that?

10  *A.*  Because 18-12-302 says, magazines which, I believe -- I may

11  be misquoting slightly, magazines which can accept -- are

12  capable of accepting more than 15 rounds.  So it might be

13  unintentional, a person might either, you know, inadvertently,

14  unintentionally, or maybe intentionally squeeze that 16th round

15  into that magazine because the design characteristics have to

16  allow for that extra little bit of space in there, and they

17  would be in violation.

18           There is no intent written into the law.  In other

19  words, a person doesn't have to intend to put more than 15

20  rounds, or the manufacturer doesn't intend that the magazine

21  should accept 15 -- more than 15 rounds, but that -- but it is

22  physically possible to get 16 rounds in there.  That person --

23  that magazine and that person would be in violation of

24  18-12-302.

25  *Q.*  Consequence of being in violation?

1  | *A.*  It's --

2  | *Q.*  Is there a consequence?

3  | *A.*  It's violation of law.  I believe it's an arrestable

4  | offense.

5  | *Q.*  I'd like to turn now to your opinion regarding continuous

6  | possession and the grandfather clause.  You mentioned at the

7  | outset of your testimony that you have an opinion regarding the

8  | enforceability of the continuous possession and grandfather

9  | language in Section 18-12-302; is that accurate?

10 | *A.*  Yes.

11 | *Q.*  Could you state your opinion, please.

12 | *A.*  That it's not, it's not enforceable.

13 | *Q.*  You testified at some length earlier about your training

14 | and experience, your background in your employment in

15 | interpreting and applying laws in the field, so to speak.

16 | *A.*  Yes, sir.

17 | *Q.*  Is that a fair assessment of your history?

18 | *A.*  Yes.

19 | *Q.*  Did the instruction that you received and provided include

20 | instruction on how and under what circumstances a statute could

21 | be enforced?

22 | *A.*  Yes, absolutely.

23 | *Q.*  Would evaluating and reaching your opinion in regard to

24 | 18-12-302, did you apply those principles to the evaluation

25 | process that you utilized when you reviewed the statute?

1    *A.*  I did.

2    *Q.*  Describe what you did, please.

3    *A.*  What I did was to look at the statute, kind of also looked

4    at the two technical guidance letters that came later, and

5    tried to apply the training and experience that I had as a law

6    enforcement officer and as a law enforcement trainer to that

7    statute.  In other words, what would a law enforcement officer

8    need in order to enforce the statute?  How would they interpret

9    it?  How would they develop probable cause?  And how would they

10   ultimately determine what evidence existed in order to support

11   a violation, ultimately, an arrest.

12   *Q.*  And when you did that, when you made this evaluation, did

13   you review the statutes in their original form as house bills?

14   *A.*  I did.

15   *Q.*  Did you review any other correspondence, letters,

16   explanations regarding how those statutes were to have been

17   interpreted?

18   *A.*  The technical guidance letters that were issued by the

19   Attorney General's Office.  I think one was in May and one was

20   in July.

21   *Q.*  I'd like you to take a look in, I believe it's notebook No.

22   3.  I believe it's on the witness stand next to you.  And

23   direct your attention to Exhibits 3, 5, and 6 in that notebook.

24   *A.*  3 appears to be the original House Bill 13-1224.  Did you

25   say 5 and 6?

1    *Q.*  5 and 6.

2    *A.*  5 is the May 6th of 2013 technical guidance letter from the

3    Attorney General's Office.  And 6 is the July 10 technical

4    guidance letter from the Attorney General's Office.

5    *Q.*  And you reviewed those items for what purpose?

6    *A.*  Again, to try and evaluate how law enforcement officer

7    would interpret and apply 18-12-302 in the field to a situation

8    involving a violation or potential violation of this section.

9    *Q.*  So you reviewed 18-12-301(2)(a), was that included in your

10   review process?

11   *A.*  Yes, I'm sorry, 18-301 and 302.

12   *Q.*  And I think you used the term "capable of accepting"

13   earlier; is that right?

14   *A.*  Yes.

15   *Q.*  Can you recall the context in which that phrase is utilized

16   in this legislation?

17   *A.*  Yes.  Give me just a second, I'll find you the exact

18   section.

19          It's 18-12-301(2)(a), a fixed or detachable magazine,

20   box drum, feed strip, or similar device capable of accepting or

21   that is designed to be readily converted to accept more than 15

22   rounds of ammunition.

23   *Q.*  That's the definition of what?

24   *A.*  That's the definition of the prohibited magazine.

25   *Q.*  Large-capacity magazine?

```
 1    A.   Large-capacity magazines, yes.

 2    Q.   We've already talked about your concerns with the capable

 3    of accepting language in the context of magazine capacity.

 4    A.   Yes.

 5    Q.   Your earlier opinion, right?

 6    A.   Yes.

 7    Q.   Let's move on, then, to your concerns with regard to the

 8    continuous possession language and why you believe it to be

 9    problematic for both law enforcement and citizens of the state

10    of Colorado.  Can you explain that, please.

11    A.   Sure.  The --

12             MS. MORRILL:  Objection, Your Honor, to the -- based

13    on the relevance to the extent that he's opining on law

14    enforcement claims.  The sheriffs were dismissed in their

15    official capacity, based on their enforcement concerns.

16             THE COURT:  I'm going to overrule your objection.  The

17    question does not call for the opinions of someone else.  It

18    calls for this witness's opinion.

19    BY MR. COLIN:

20    Q.   You may answer.

21    A.   The continuous possession part of the section is

22    problematic and unenforceable for the following reasons:  When

23    I looked at the section and applied this same method,

24    methodology to it -- in other words, how would a law

25    enforcement officer in the field interpret the section and
```

1    apply it to law enforcement activity in the field -- what I

2    found was that the -- the description of continuous

3    possession -- in other words, if you possess the magazine on

4    July 1 of 2013, the definition of continuous possession is

5    something that a police officer in the field could not verify.

6    There is no objective, independent, or technically accurate way

7    for them to determine whether or not that person that they're

8    looking at that has that large-capacity magazine possessed it

9    or did not possess it prior to July 1 of 2013.

10   Q.  So the first challenge for a law enforcement officer is

11   date of acquisition, when did the, quote unquote, suspect

12   acquire the magazine, was it before July 1 or after?

13   A.  Correct.  And --

14   Q.  And how does one determine that, as a law enforcement

15   officer?

16   A.  Well, there really is no way to determine it, with one

17   exception.  I don't know of any manufacturer or distributor or

18   retailer that marks a magazine with the date of sale, which

19   would be the date of acquisition.  So there is no information

20   available, as far as that goes.

21        Magpul does put a date of manufacture on their

22   magazine.  They're the only manufacturer that I know of that

23   does that.  And, of course, the date of manufacture and the

24   date of acquisition are really two different things.

25        But, say, for the sake of argument that the date of

1  manufacture was after July 1 of 2013 on a Magpul magazine, then

2  you would have a violation.  Clearly, that would be an example

3  where an officer in the field has some definitive, empirical

4  evidence in front of them that they could determine there is a

5  violation.  But absent that very kind of rare circumstance, all

6  the other manufacturers, all the other magazines made in the

7  United States, and, for that matter, offshore, have no such

8  marking on them.  So there would be no objective way for that

9  officer to make that determination.

10         So even if he developed probable cause, what I looked

11  at was, how would a police officer, once they -- let's say they

12  could articulate probable cause.  There are a number of

13  scenarios that maybe they could.  Then they have to make this

14  determination, okay, when was the date of acquisition?  And I

15  tried to find a way, if I were going to instruct an officer to

16  do this, that I would instruct them to obtain that evidence or

17  develop that information, and there simply isn't any.  There is

18  no way to obtain that information.

19  Q.  Absent an admission against interest by the person?

20  A.  Well, yeah.  If the suspect makes a spontaneous statement

21  or, essentially, confession outside of Miranda, then, sure that

22  could happen.

23  Q.  You also mentioned a second concern with the language in

24  the continuous possession statute.

25  A.  Right.  So now you have the date of acquisition, the

1  problem with that.  And the continuous possession language was

2  clarified to some extent by the second technical guidance, but

3  not in a way that really cleared it up for law enforcement

4  officers in the field.

5        And the notion that you have to give up dominion and

6  control -- or control and dominion, I can't remember what order

7  they're in.  I could refer to it if you'd like.  But the notion

8  that a police officer, a law enforcement officer in the field

9  could somehow determine standing there at the scene with the

10 suspect in front of him whether or not sometime in the prior X

11 number of months or years from January -- July 1 to whatever

12 date they are standing out at the side of the road with that

13 suspect, if that person had somehow relinquished dominion and

14 control of their magazines, and then got them back again,

15 again, there is no objective, technical -- there is no standard

16 way to determine that for a law enforcement officer.  There is

17 no standard way for an officer to determine the acquisition

18 date, and there is no standard way for them to determine that

19 continuous possession part of the statute.

20        So it becomes unenforceable on its face for that

21 officer in the field.  Again, absent that spontaneous

22 confession.

23 Q.  You mentioned a concern with the words "dominion and

24 control" and whether someone has given up dominion and

25 control -- excuse me, dominion and control and then gotten it

1  back.  Do you have any other concerns with regard to dominion

2  and control and its application in the context that you've just

3  described?

4  *A.*  Well, certainly, from a law enforcement standpoint, there

5  is no identifiable definition of what that means.  So how long

6  is too long to be -- to have that magazine or those magazines

7  out of your control before you give up dominion?  There is a

8  suggestion that it has to do with a voluntary relinquishment of

9  dominion and control.  What about involuntary relinquishment?

10  You know, how long can you loan the magazine before it becomes

11  involuntary?  If I give you my magazines, and you say, Mike,

12  you know, you broke my snowblower, and I'm going to keep your

13  magazines until you pay for the repairs, I think I've

14  relinquished unvoluntarily dominion and control over those

15  magazines, because you wouldn't give them back to me.  But

16  there is no guidance for the police officers, the law

17  enforcement officers, on how to make those kind of

18  determinations.  How will they ever know again, absent, again,

19  an admission by the person who possesses them?

20  *Q.*  Well, the reality is, though, you've read the statutes, you

21  indicated, isn't there affirmative defense -- an affirmative

22  defense in the statute that takes care of that?

23  *A.*  Yes, but the affirmative defense that is offered up in the

24  section is only applicable when that person is prosecuted.  So

25  you'd literally have to be at trial before you could offer that

1   up.  It doesn't do you any good on the side of the road when

2   the officer may take you into custody, he may incarcerate you,

3   he may tow your car, he may seize your property.  At that time

4   your affirmative defense is pretty useless.  It really doesn't

5   come into play according to the statute until you're actually

6   being prosecuted, and it's at that time that you can offer that

7   defense.

8   Q.  In your experience, s there a potential expense associated

9   with defending yourself from an arrest or a charge?

10  A.  So I'm told by the people that I I've taken to jail.

11  Q.  All right.  Let's move on to your third opinion.  I think

12  you summarized it as -- I think you used the term *"de facto*

13  ban."  Do you recall what I'm talking about?

14  A.  Yes, sir.

15  Q.  What's your opinion in the context of the effect of

16  18-12-302 creating a *de facto* ban of some kind?

17  A.  Well, the magazine ban affects a number of firearms that

18  either don't have a magazine made for them of less than 15 or

19  15 rounds or less, or firearms to which those magazines are

20  simply unavailable because of supply issues.  So those

21  firearms, whether they're on the dealer shelves and cannot be

22  sold, or they could be in private party hands -- they could

23  have been previously legally sold to a private party who now

24  wants to transfer them or resell them and cannot because there

25  are no available magazines, those guns, essentially, become

1   useless.  They really can't even be sold.

2   *Q.*  Can you describe the methodology that you applied in

3   reaching this opinion.

4   *A.*  Well, I originally looked at some of the responses from

5   some of the plaintiffs, some of the discovery responses, some

6   of the correspondence between the plaintiffs and manufacturers

7   that they were trying to get magazines from.  I also looked at

8   a variety of other sources for data, including manufacturers'

9   websites.  I looked at industry publications, like *Standard*

10  *Catalog of Firearms*.  I looked at the California Department of

11  Justice website; there is an approved handgun list on there.

12  And the reason that that's significant is because California

13  was, really, the first state to use a -- a magazine limitation

14  restriction, to limit semiautomatic firearms to ten rounds.  So

15  manufacturers that are not making guns for California are

16  ordinarily not making reduced capacity magazines for those guns

17  that would ordinarily have more than 15 rounds.

18        I also queried some of the FFLs with a survey to

19  inquire what kind of magazine -- you know, availability issues

20  they had, what kind of firearms they could no longer sell.  As

21  I recall, I got half a dozen or so responses to those.

22  *Q.*  When you said you were looking at all of these things, DOJ

23  website and the manufacturers' guidelines, what are you looking

24  for?

25  *A.*  I'm looking to see -- I'm sorry, the availability of

1    magazines, reduced capacity magazines for firearms that came

2    from the manufacturer or were designed by the manufacturer to

3    have more than 15 rounds.  In other words, firearms that are

4    supplied from the manufacturer with magazines of more than 15

5    rounds which could no longer be sold in Colorado because of

6    that, were there available magazines that could be used to --

7    you know, substitute magazines, that could be used in those

8    firearms so that they would be viable for sale.

9    Q.  So just see if I understand you right.  Two categories, one

10   category is that somebody might be making them, but they make

11   so few of them you can't find them and get them.  And then the

12   other category is, no manufacturer is making these reduced

13   capacity magazines to fit firearms that are already -- that

14   already are on the market, not compatible; is that fair?

15   A.  Right.  Exactly.  And that's a good word, compatible.

16   Compatible and compliant are two good words to describe what I

17   was looking for, were there magazines that were compatible and

18   compliant.  The first category is, maybe somebody makes them,

19   but there just simply aren't enough out there.  And there are

20   very few states that have magazine limitation restrictions.  So

21   manufacturers, you know, are not in a big hurry and a great

22   rush to produce magazines specific for state regulations.  So

23   those magazines are very difficult to come by.  Now, you may be

24   able to find some in small quantities on the internet, but

25   that's a whole different story from finding thousands of them

1    for all the FFLs and dealers in the state of Colorado to supply

2    those firearms.

3            And the second category is, those firearms that are

4    made specifically with magazines that hold more than 17 rounds,

5    for which the manufacturer just hasn't made a replacement

6    magazine that is less than 15 rounds or less.

7    Q.  All right.  Just briefly, with regard to the first

8    category, the magazines that -- I'm sorry, the second category,

9    where there are no compatible magazines which exist, what's

10   wrong with just taking a prior magazine that was compatible and

11   sticking a block in it?  Won't that work?  Isn't that a way to

12   reduce the capacity of a magazine and make it compliant?

13   A.  It could be.  But there is no technical specificity about

14   how to do that, what's permanent, what's non-permanent, what

15   can be altered, what can't be altered.  And the bottom line is

16   that I have yet to see -- having been in California during the

17   imposition of the original magazine restriction, a variety of

18   different contrivances to do what you're describing.  And I've

19   yet to come across one that isn't reversible.  There really --

20   in the technical world of gunsmithing and firearms

21   manufacturing, there is really no such thing as a permanent

22   alteration to a magazine.

23   Q.  All right.  So can you tell the Court, based on all of the

24   research that you've described that you undertook, can you

25   identify some firearms for which there are no compatible

 1   compliant magazines that are being manufactured today?

 2          *MR. WESTFALL:*  There are a couple that I can think of.

 3   There are very few, but a couple that I can think of that are

 4   very popular, one of them is a Kel-Tec, and I believe the other

 5   one is a Springfield XD or XDM.  And the manufacturers simply

 6   don't make one.  They don't make any, and there aren't any

 7   after-market manufacturers that are making them.  So those guns

 8   are, essentially, unsalable, they're unusable, they cannot be

 9   transferred.

10   *Q.*  They can be fired as a musket, one shot?

11   *A.*  As I said earlier, that's not a great idea.  Especially

12   with an expensive firearm, you don't want to risk malfunction

13   or damage to the gun.

14   *Q.*  All right.  You also researched, as I understood it,

15   firearms for which there are no -- I want to get it right --

16   I'm blanked on the word, sorry.

17   *A.*  Commercially available --

18   *Q.*  No, the fit -- compatible, there we go -- no compatible

19   compliant magazines -- sorry.  I'm an old guy.  I lose track of

20   my thoughts sometime.  That there are no compatible compliant

21   magazines available.  And I'm referring now to the ones that

22   you just can't get; not that aren't manufactured, but are --

23   not manufactured in sufficient quantities to render them

24   available here in Colorado.  Can you describe some firearms

25   that are affected by that problem.

1   *A.*   There are a whole bunch of them that fall into that

2   category.  Most of the major manufacturers fall into that

3   category.  So, Glock, Springfield, Smith & Wesson, FM, Kel-Tec,

4   Kahr.  Boy, the list goes on.  And you hit the nail on the

5   head, the compliant and compatible magazines just aren't

6   available in sufficient quantities.

7         As I said earlier, you may be able to find a few of

8   them on the internet, but that doesn't help the dealer who

9   wants to do the volume of sales that is required, you know, by

10  their business.

11  *Q.*  Ultimately, what's the effect, if you can't acquire

12  compatible, compliant magazines for these firearms?

13  *A.*  You can't sell the firearm.  It's useless in the state of

14  Colorado.

15  *Q.*  The last opinion that I'd like to talk to you about is your

16  opinion, "Detachable box magazines have been an integral design

17  characteristics associated with highly portable hand-held or

18  shoulder-fired automatic firearm since their inception."  Is

19  that your opinion?

20  *A.*  Yes, sir.

21  *Q.*  What does it mean?

22  *A.*  Well, it means that the evolution of semiautomatic firearms

23  has been all about providing as much available ammunition to

24  the operator without the need to reload.  That's kind of it in

25  a nutshell.

1   Q.  Within the context of the opinion, I quoted the term

2   "integral design characteristic."  What does that mean?

3   A.  It means that the firearm cannot function without it.  It

4   means that the -- the magazine as the source of ammunition for

5   that firearm is part and parcel of the design.  That capacity

6   of the magazine and the performance and capability of the

7   firearm are all married together.  So it's integral, and one is

8   not the same without the other.

9   Q.  So what's the purpose that is served by a detachable box

10  magazine as integrated within the firearm for which it's

11  designed to be used?

12  A.  It's to supply a stream of ammunition to the operator

13  without the need for reloading.

14  Q.  Is this a recent development?

15  A.  No, it's not.

16  Q.  How long have firearms manufacturers attempted to address

17  the issue that you've just described, providing more ammunition

18  without the need to reload?

19        MS. MORRILL:  Objection, Your Honor, to the extent

20  that they're now mis -- well, they're modifying Opinion No. 6.

21  The confines of the opinion are very clear that it's detachable

22  box magazines, not detachable box magazines of a certain

23  capacity.  It's morphing into, large-capacity magazines have

24  been an integral design characteristic of semiautomatic

25  magazines since their inception.  And that's not a fairly

 1  | disclosed opinion of Mr. Shain's.

 2  | THE COURT: Thank you. Response.

 3  | MR. COLIN: I'm simply not sure that that was my

 4  | question. I'm asking him to touch upon the portion of his

 5  | opinion to lay the foundation for when we move into the

 6  | detachable box magazine. His opinion is that these integral

 7  | design characteristics associated with detachable box magazines

 8  | have been part of highly portable hand-held or shoulder-fired

 9  | semiautomatic firearms since their inception. So I'm trying to

10  | go back to the inception and talk about what was available then

11  | and what is available now and are there really any differences?

12  | THE COURT: Well, I think you can inquire into that.

13  | But the opinion anticipates that detachable box magazines are

14  | part of the integral design characteristics associated with

15  | highly portable hand-held or shoulder-fired semiautomatic

16  | firearms, not that detachable box magazines have integral

17  | design characteristics.

18  | MR. COLIN: I apologize. It was a poorly phrased

19  | question.

20  | THE COURT: Anything further?

21  | MS. MORRILL: I think -- I just want to confirm. I

22  | have a slightly different reading based on the 702 -- joint 702

23  | motion.

24  | THE COURT: That's what I'm reading from.

25  | MR. COLIN: To which I would point out there was no

1   objection made by the Attorney General's Office for this

2   opinion.

3        MS. MORRILL:  There was a contemporaneous objection on

4   the second deposition of Mr. Shain, which revealed the

5   plaintiffs were trying to expand this.  I think we have no

6   objection, as long as they stick to detachable box magazines

7   are the integral design characteristic that have been

8   historically part of semiautomatic firearms since their

9   inception.

10       The Governor has no objection to that limited, narrow

11  opinion.  However, Mr. Shain is now opining about the capacity

12  of those detachable box magazines, with the suggestion that

13  large-capacity magazines have been integral in the design of

14  semiautomatic weapons.  And that is not fairly encompassed in

15  his opinion as stated.

16       THE COURT:  Thank you.

17       I'm going to ask counsel to stick closely to the

18  opinion that has been disclosed in the Rule 702 motion.

19       MR. COLIN:  Certainly.

20       THE COURT:  I'm not, however, concerned about what

21  objections were made at depositions.  We're here at trial.  The

22  scope of the testimony that I'm considering is that presented

23  here at trial, subject to the objections made in the 702

24  motion.

25       MS. MORRILL:  Yes, Your Honor.  I would just let the

1    Court know that this deposition where the objection occurred,

2    occurred after the 702 motions were filed.  And that's --

3            THE COURT:  Why does that matter?

4            MS. MORRILL:  Just because it was only after the 702

5    motion was filed encompassing Mr. Shain's opinion as it was

6    just read by the Court that they tried to morph it.

7            THE COURT:  Well, I'm not concerned about whether they

8    tried to morph it.  I'm concerned about the opinion as it has

9    been delineated.  I'm not concerned about your deposition or

10   what happened at your deposition.

11           Please proceed.

12           MR. COLIN:  Thank you.  Can I have a moment, Your

13   Honor?  I want to make sure I stick within the Court's

14   direction.

15   BY MR. COLIN:

16   Q.   In the context of the opinion that we have all read here in

17   the last few minutes, one of the terms that you used was "since

18   their inception."

19   A.   Yes.

20   Q.   Let's talk about that.  What was the inception of the

21   concept of the detachable -- when was the inception of the

22   concept of the detachable box magazine?

23           MS. MORRILL:  Objection to the extent that it doesn't

24   relate to the inception of the detachable box magazine in

25   semiautomatic weapons, specifically.

1          THE COURT:  Overruled.

2          THE WITNESS:  The detachable box magazine concept

3    really dates back to the early 1800s.  There were a variety of

4    contrivances, I'll call them, designed by various firearms

5    manufacturers that were the early stages -- for example, the

6    harmonica gun was truly a detachable box magazine.  There is a

7    turret gun made in the 1800s that had a 30-round canister that

8    fit on the gun that was a detachable magazine.  There were

9    chain guns that used belts, where the magazine was actually a

10   fabric belt that was separate from the gun.  So there are a

11   number of examples going back and into that period where

12   firearms designers and manufacturers were kind of struggling

13   with a way to provide more ammunition to the operator, to the

14   shooter, without the need to reload and --

15   BY MR. COLIN:

16   Q.  Stop there.  What's the problem with the need to reload?

17   A.  Because at the moment --

18          MS. MORRILL:  Objection, Your Honor.  This testimony

19   is not fairly encompassed within the scope of Opinion No. 6.

20          THE COURT:  I'm viewing it as such.

21          MR. COLIN:  Thank you.

22          Is it all right if he responds?

23          THE COURT:  He may.

24          MR. COLIN:  Thank you.

25          THE WITNESS:  The -- the problem with reloading is,

1    that's when the operator, the shooter, is most vulnerable.

2    That's the moment of vulnerability, at the time required to

3    reload.  And so all firearms design and the focus of firearms

4    design going back to the 1800s and earlier was about that

5    issue.  And in fact, LeMat in 19 -- excuse me, 1856,

6    specifically addressed that issue in a very explicit way by

7    designing a firearm that had two different barrels built into

8    it.  It had a nine-shot cylinder and a single-shot second

9    barrel, specifically for the purpose of defending that person

10   during the time of reloading.

11            So it's clear that the -- that the history of this

12   issue, of this concern -- in other words, trying to provide as

13   much ammunition to defend yourself without the need to

14   reload -- was about being temporarily defenseless at the -- at

15   the time you need to reload.  That's the moment of greatest

16   danger.

17   *BY MR. COLIN:*

18   *Q.*  So how common were firearms with the capacity to hold 15 or

19   more rounds of ammunition in the mid 1800s, about the time the

20   Fourteenth Amendment was adopted?

21   *A.*  They became quite common, especially with Winchester,

22   originally, the Volcanic rifle, which ultimately became the

23   Winchester lever action.

24   *Q.*  Is the Winchester commonly available to American citizens?

25   *A.*  Yes, it was.

1          MS. MORRILL:  Objection.  There is no qualification of

2    this witness on the grounds of historical firearms and their

3    uses in the United States.

4          THE COURT:  Sustained.

5    BY MR. COLIN:

6    Q.  Let's move to present day, then.  Can you provide more

7    recent examples where firearms manufacturers were attempting to

8    address this design characteristic to which you've testified.

9    A.  Are you referring to the design characteristic that would

10   enable the user of the gun to fire more rounds without having

11   to reload?

12   Q.  Precisely.

13   A.  Okay.  The thrust of much of the modern-day development of

14   especially semiautomatic handguns has been in the direction of

15   higher capacity and additional capabilities.  So over the last,

16   you know, certainly, 25 years, the semiautomatic handgun has

17   undergone the kind of development where most of the major

18   manufacturers have attempted to increase the capacity within

19   the same envelope, in terms of the size of the firearm, because

20   increased capacity means increased capability.  It means the

21   ability to shoot more rounds without having to reload, without

22   having to be at that, you know, moment of temporarily disarmed

23   when you're reloading.

24          And, you know, I can name a variety of manufacturers

25   that have done that.  Smith & Wesson, Springfield Armory, SIG

```
 1   Sauer, Kel-Tec.  Now I'm blanking on major manufacturers, FM,
 2   HK, and the list does go on.
 3         THE COURT:  Mr. Colin we're getting close to afternoon
 4   recess.
 5         MR. COLIN:  I've got one more question.
 6         THE COURT:  Okay.
 7         MR. COLIN:  It may end up being two, but it's going to
 8   be very short.
 9         THE COURT:  Okay.
10   BY MR. COLIN:
11   Q.  So within the context of this issue about reloading and
12   getting more rounds on target, why -- does it make a difference
13   between having a 30-round magazine versus three 10-round
14   magazines?
15         MS. MORRILL:  Objection, Your Honor.  The witness has
16   not laid a foundation for why he would know what difference
17   that would make.
18         THE COURT:  Response.
19         MR. COLIN:  Well, Your Honor, this witness has
20   testified to an extensive background, training, and experience
21   in the area of both civilian and law enforcement training.  He
22   teaches law enforcement and civilians how to select what kind
23   of firearms and magazines they need to use for particular
24   purposes.
25         I think within the confines of this particular
```

1    opinion, which is, essentially, that firearms development has

2    been focused on getting more rounds available without the need

3    to reload, this is simply his explanation for that opinion.

4           *THE COURT:*  I think I can take judicial notice of the

5    fact that there is a difference between using three magazines

6    and using one.

7           *MR. COLIN:*  Then I have no further questions, Your

8    Honor.

9           *THE COURT:*  All right.  We'll take our afternoon

10   recess.  It's just about 3 o'clock.  We'll stand in recess

11   until 3:15.

12          (Recess at 3:01 p.m.)

13          (In open court at 3:19 p.m.)

14          *THE COURT:*  Cross-examination.

15          *MS. MORRILL:*  Thank you, Your Honor.

16                        **CROSS-EXAMINATION**

17   *BY MS. MORRILL:*

18   *Q.*  Hello, Mr. Shain.

19   *A.*   Hello.

20   *Q.*  I just want to clarify for you -- and I talked to your

21   counsel on the break and for the Court -- that the order in

22   which the counsel elicited your opinions varied slightly from

23   the order as they were expressed in the joint 702 motion the

24   parties submitted.  And that's nothing to concern you about,

25   but just to let you know that when I refer to an opinion

1  number, I'm doing it based on the number your opinion was

2  listed in the motion, not as you testified on direct exam.

3  But, of course, I will through my questions let you know which

4  opinion we're talking about.

5          If there is any confusion, just let me know.  But I

6  will attempt to make it clear what opinion I'm asking you

7  about.  But the numbering might be different, is all I'm

8  saying.

9  A.  Okay.

10  Q.  Okay.  So with that, I want to turn to your first opinion,

11  which has been expressed as, "House Bill 1224 may prohibit many

12  magazines that are designed and advertised to hold 15 rounds

13  because design tolerances or different cartridge lengths allow

14  them to hold 16 rounds.  That is your first opinion; you agree?

15  A.  Yes.

16  Q.  I want to talk to you now about your special knowledge,

17  skill, experience, training, and education to express opinion

18  1.  So, first of all, your first opinion is based on -- in part

19  on your professional experience as a federally licensed

20  firearms dealer and manufacturer; is that correct?

21  A.  Yes.

22  Q.  Okay.  And I wasn't clear from your direct exam.  Have you

23  ever been a gun retailer or firearms retailer?

24  A.  Well, the short answer is yes, but I don't have a

25  storefront.

1    Q.  I see.

2    A.  But I have sold retail, to retail customers.

3    Q.  And are you more -- do you consider yourself more of a

4    manufacturer or a retailer with respect to your federal

5    firearms license?

6    A.  You know, a little bit of both.

7    Q.  Okay.

8    A.  The custom shop that I run is a big part of our operation,

9    and manufacturing is -- is kind of another spoke of that wheel.

10   But we -- we do receive, you know, quite a few retail orders;

11   but we also do a lot of wholesale orders, sales.

12   Q.  And this is what I'm trying to get after:  Is the majority

13   of your work as a firearms retailer, is it custom work?

14   A.  The majority, yes.

15   Q.  And by that I mean, you're not ordering a fully fashioned,

16   informed, and finished firearm from a wholesaler and then

17   selling it as a retailer to a member of the public; is that

18   correct?

19   A.  No, that's not correct.

20   Q.  Okay.  So --

21   A.  I am ordering a fully -- sorry, I didn't get your

22   terminology -- fashioned and formed firearm?

23   Q.  Uh-huh.

24   A.  And we will have customers, local customers, that ask us to

25   order what I would call a stock firearm for them and do the

1    background check and the transfer for them.  We do that on an

2    appointment only basis.  But we also order fully formed and

3    fashioned firearms for the purpose of modifying them.  And

4    then -- because a customer has ordered it modified, so we buy

5    the new firearm, we modify it, and then we may ship it to an

6    out-of-state customer, or we might sell it to an in-state

7    customer.

8    Q.  That's helpful.  Thank you.

9         So what I -- I'm going to focus on your manufacturing

10   experience with respect to firearms.  So, specifically, as a

11   manufacturer of firearm accessories and components and factory

12   trained warranty technician and an armorer instructor, that's

13   the basis in your professional experience for why you

14   understand dimensional tolerances and design tolerances of

15   magazines; is that accurate?

16   A.  No, those are not the only reasons.  The law enforcement

17   experience that I enumerated earlier also contributes to my

18   knowledge and understanding of magazine tolerances and design.

19   Q.  Sure.  And I just meant that -- I'm focusing on the

20   manufacturing bases, not on the training instructing, just for

21   now.

22   A.  Okay.

23   Q.  So it's the armorer -- certified armorer, factory warranty

24   technician, and manufacturer, those are your hands on,

25   assembling, disassembling, credentials and experience with

1  || magazines and firearms?

2  || A.  I'm confused, counselor.  I apologize.  Because you said

3  || manufacturing, but the armorer, armorer training, armorer

4  || functions, and then the warranty service, those are some things

5  || that separate and apart from the manufacturing function that I

6  || did.  Is that what you meant?

7  || Q.  Yes.  I'm just more focused on your hands-on experience

8  || with firearms, their designs, their tolerances, that's all I'm

9  || trying to get to.  I'm not saying that's the only basis for

10 || your experience.

11 || A.  Okay.

12 || Q.  But you agree that those are bases that you are relying on?

13 || A.  Yes.

14 || Q.  Okay.  So let's break this opinion, as you've expressed it,

15 || Opinion No. 1, down into two categories of magazines.  And the

16 || first one we'll talk about is magazines with design tolerances

17 || that allowed stated capacity to be exceeded by at least one

18 || round.  Do you understand what I'm after there?

19 || A.  Yes.

20 || Q.  Okay.  It has been your experience that certain magazines

21 || of a stated capacity will actually, when forced, accept one

22 || extra round of ammunition; is that correct?

23 || A.  If I used the word "forced," that's not universally true.

24 || Sometimes you won't even know that you put that extra 16th

25 || round into the magazine.  Sometimes you do have to force it,

2104

 1   but sometimes you do not.

 2   Q.   Okay.  So the act itself isn't always intentional; it could

 3   be unintentional.  But in some cases, you concede, it is an

 4   intentional act?

 5   A.   Yes.

 6   Q.   Okay.  And, specifically, certain magazines that come from

 7   the manufacturer labeled to accept 15 rounds, but, in fact, the

 8   design construction of the magazine may allow them to accept 16

 9   rounds if the last one is -- I'll just say put in, and that

10   implies both intentionally and unintentionally.  Is that

11   accurate?  That's your opinion as it relates to this case --

12   A.   Yes.

13   Q.   -- that you -- I'm sorry, I didn't hear you.

14   A.   Yes.

15   Q.   And you have personally observed this phenomenon?

16   A.   Yes, I've done it many times.

17   Q.   And in your experience, the phenomenon is not uncommon?

18   A.   Yes.

19   Q.   Okay.  Let's talk about the actual experiences you've had

20   with this phenomenon.  And I want to focus first on experiences

21   that you brought with you to this case.  Meaning, not

22   experiences you might have gained because you were asked to try

23   and put a 16th round into a 15-round magazine.  Do you

24   understand that?

25   A.   Yes.

```
1   Q.  Okay.  So you have personally observed that it is common

2   for a person who loads a 30-round magazine to put at least one

3   extra round into the magazine?

4   A.  In 30-round magazines?  I've seen it happen.  I've done it

5   myself many times.

6   Q.  So you agree that it's common with 30-round magazines?

7   A.  I'm not sure what you mean by "common," but I have seen it.

8   It's not uncommon.

9   Q.  Okay.  You've also personally observed that there are what

10  are known as 1911 style magazines that are designed to hold

11  seven rounds but have design tolerances that permit an eighth

12  or even ninth round to be loaded; is that correct?

13  A.  I don't know about nine rounds, but there are -- I've seen

14  some that will accept an eighth round.

15  Q.  And by "some," you are -- you agree that those would be

16  1911 style magazines that were designed to hold seven rounds,

17  for this example?

18  A.  Right.  1911 magazines originally were designed to hold

19  seven rounds.  Subsequently, many manufacturers went to eight

20  rounds.  They frequently use the same magazine body for both

21  their seven- and eight-round versions, and so some of those

22  magazines will allow an eighth round to be inserted into them

23  under certain circumstances.

24  Q.  In this case, though, would you agree that we are not

25  concerned with design tolerances that allow magazines with
```

1    stated capacities of 16 or more rounds to be exceeded?

2    A.   I'm sorry, I -- could you rephrase that question.

3    Q.   Sure.  Colorado's statute prohibits magazines that hold 16

4    or greater rounds; is that correct?

5    A.   Yes.

6    Q.   And so if a magazine already holds 16 or greater rounds,

7    such as a 30-round magazine, we're not concerned with the

8    ability to insert an extra round over the stated design

9    capacity; is that accurate?

10   A.   Sure.

11   Q.   Okay.  And the same thing with the example of a magazine

12   that is designed to hold seven rounds.  The fact that a design

13   tolerance in that style of magazine would enable an eighth

14   round to be loaded doesn't impact Colorado's magazine

15   restriction as it is currently stated in the law; is that

16   right?

17   A.   Yes.

18   Q.   So the design tolerance that we're concerned about in this

19   case is the one that allows a 15-round magazine to accept at

20   least 16 rounds?

21   A.   Yes.

22   Q.   So going back to your -- not your manufacturing experience,

23   your -- still your professional experience I'm talking about --

24   there was an incident during a range class you instructed that

25   involved this phenomenon; is that -- do you recall that?

1   *A.* I can recall it happening a number of times during classes

2   that I've taught.

3   *Q.* Specifically, this incident occurred during the summer of

4   2013, while you were instructing a range class.  And it was the

5   qualification of fire portion of your range class; is this --

6   are you recalling this?

7   *A.* I believe you're referring to a CCW class, concealed carry

8   permit class, that I did.  I don't think -- was it '13?

9   *Q.* It may have been 2012.  You said the summer of last year.

10  *A.* I believe it might have been closer to 2012.  The memories

11  of those classes kind of run together.  They're all very

12  similar.  I do recall a student that I believe had a 15-round

13  magazine and was kind of delighted to find out that they could

14  get an extra round in there.  But from a functional standpoint,

15  that's not a good idea; but it is possible.  And I've seen it

16  happen not only on that occasion; but going back to my law

17  enforcement career, commonly happened with law enforcement

18  magazines that were rated for 15 rounds and could hold 16.

19  *Q.* But I want to focus on the specific incident that you

20  described during your deposition, the one concerning the range

21  class, where during -- at the end of the qualification, the

22  fire portion of the class, when you were scoring the targets,

23  there was an extra round in the target?

24  *A.* I do -- now that you refresh my memory, yes.

25  *Q.* And in that qualification exercise, you required your

1    students to use two 15-round magazines; is that correct?

2    *A.*  Right.  I usually one a 30-round course of fire during that

3    qualification.

4    *Q.*  That's right.  And you also require them to wait to

5    chamber -- load their guns until after the first 15-round

6    magazine was loaded into the pistol?

7    *A.*  Right.  Because if your pistol is already chamber loaded,

8    you end up with 16 rounds in the gun, and it throws off the

9    scoring, and you end up shooting an extra round.  So we start

10   with an empty pistol and two 15-round magazines for those

11   students that have 15-round magazines.

12   *Q.*  And that way you know that each of your students is working

13   with the exact same number of rounds, in the exact same

14   configuration, two magazines, and you require one reload of a

15   fresh magazine during the qualification portion?

16   *A.*  Yes.  They, essentially, run the gun dry, slide locks back,

17   they drop their empty magazine, they insert their fresh

18   magazine, they close the slide over it, and then continue the

19   course of fire.

20   *Q.*  So, in this particular incident that you described, you

21   discovered at the end that there was a 31st round in one of the

22   student's targets; is that correct?

23   *A.*  As I recall, yes.

24   *Q.*  Which means that one of the 15-round magazines had a design

25   tolerance that enabled it to carry 16 rounds, not both.  You

1   agree?

2   *A.*  I don't recall checking both, so I can't say definitively

3   that both did not.  I really don't know.  I know at least one

4   did, but I don't know that I recall actually physically

5   checking the other one.

6   *Q.*  And so you did -- as your testimony alludes, you did check

7   one of the two magazines, and it did accept a 16th round?

8   *A.*  I think that I had the student reload the magazine, at

9   least one of the magazines, and it did accept 16 rounds.

10  *Q.*  The students in your course that day, they had firearms and

11  magazines from a number of different manufacturers; is that

12  correct?

13  *A.*  Right.  Many of the students have their own firearms, they

14  bring them to class, and they want to qualify with them as part

15  of the course.  Some don't.  We provide students with firearms

16  that request us to do so.  But I believe that was a personally

17  owned firearm.  I could be mistaken.

18  *Q.*  As you sit here today, you cannot say for certain which

19  manufacturer's magazine had the design tolerance that allowed

20  the stated capacity to be exceeded?

21  *A.*  No, I don't recall what manufacturer firearm that was.

22  *Q.*  After this incident that we've just discussed occurred,

23  you're not aware of any other instances with design tolerances

24  that you personally observed with specifically a 15-round

25  magazine that could accept at least 16 rounds?

1   A.  You mean, subsequent to that class?  Specifically, the time

2   between that class and now?

3   Q.  And today, that's correct.

4   A.  No, I haven't since that time.

5   Q.  Okay.  And after that incident and -- I'm sorry.  After the

6   incident we're discussing that occurred during your range

7   course and before you started working with the plaintiffs on

8   this case, you did not personally go out and obtain 15-round

9   magazines from different manufacturers to determine whether any

10  of them could be overloaded?

11  A.  I didn't have to.

12  Q.  Well, I'm not asking whether you had to; I'm asking whether

13  you did.  And the question is that you did not?

14  A.  I did not.

15  Q.  Okay.  And after you started working on this case and you

16  were retained by plaintiffs as an expert and you formed Opinion

17  No. 1, you did not go out personally and obtain 15-round

18  magazines or -- magazines that were designed and advertised as

19  holding 15 rounds and personally attempt to insert a 16th round

20  into those?

21  A.  No, I did not.

22  Q.  Let's talk briefly about the second type of magazine that

23  forms the basis for Opinion No. 1.  And that's a magazine with

24  a capacity that can vary, because they are designed to accept

25  different cartridge lengths.  Do you agree that's the second

```
 1    type of magazine?
 2    A.  No, I'm not understanding that.  You're saying that an
 3    individual magazine can accept different calibers of
 4    ammunition?
 5    Q.  Well, that's --
 6    A.  I don't believe I ever opined anything like that, because
 7    that's not technically possible.
 8    Q.  Well, that's --
 9    A.  I'm sorry.  Unless you're talking about a tubular magazine.
10    Q.  That's correct.
11    A.  I'm sorry.  I thought you said detachable magazine.
12          MR. COLIN:  Your Honor, I object.  It's beyond the
13    scope.
14          THE COURT:  Sustained.
15          MR. COLIN:  Thank you.
16    BY MS. MORRILL:
17    Q.  In the event that the Court accepts your first opinion,
18    let's talk a little bit about the substance of that opinion.
19    A.  Okay.
20    Q.  First of all, your opinion, number one, acknowledges that
21    magazines are designed to hold a stated capacity.
22    A.  Yes.
23    Q.  Your opinion also acknowledges that magazines are
24    advertised to hold a stated capacity?
25    A.  Yes.
```

1   *Q.* And I believe you alluded in your direct exam that some
2   magazines actually have a round count imprinted on the exterior
3   of the magazine?
4   *A.* That's correct.
5   *Q.* And other magazines have other design characteristics that
6   would enable, through visual inspection of the exterior of the
7   magazine, to determine the number of rounds that the magazine
8   was designed to hold, even absent the round count appearing on
9   the exterior?
10  *A.* That's not exactly correct. Let me clarify. The witness
11  hole will let you visualize the cartridges in the magazine, or
12  let you see the back of the cartridge case, usually. Sometimes
13  the side. But there is usually a corresponding number that
14  tells you how many are in there. And it's usually, you know,
15  in increments, you know, five, ten, fifteen, whatever it might
16  be. They usually go together. Sometimes they do not. I mean,
17  there are instances -- but it's not like you can look into the
18  magazine and count, one, two, three, four -- it doesn't work
19  quite like that. Usually, there is a witness hole at five,
20  there is another one at ten, at fifteen. So you can get a
21  sense of how many rounds are left in the magazine or when the
22  magazine is fully loaded.
23  *Q.* Okay. So to get 16 rounds in a magazine that was designed
24  to hold 15 rounds, the person who loaded the magazine would
25  have had to accomplish that phenomenon; do you agree with that?

1   *A.* Well, I think that mischaracterizes my earlier testimony,

2   because I think I said it can be accomplished, but it can be

3   done inadvertently, without knowing whether you've done it.

4   *Q.* My question wasn't whether the act itself was intentional

5   or unintentional. My question was the user, an affirmative act

6   by the user to put that 16th round into a magazine designed to

7   hold 15 rounds.

8   *A.* Somebody has to put the rounds in the magazine, so, yes.

9   *Q.* And as you testified, that act can be intentional, although

10  not advisable, in your opinion?

11  *A.* Well, it can being intentional. If you, for example, do it

12  inadvertently and discover that you can get a 16th round in

13  there, then I would say the next time you were to do that would

14  be intentional. You know it can be -- yeah, it's capable of

15  accepting 16, and you want 16 in there, that would be an

16  intentional act.

17  *Q.* Opinion No. 1 states that based on design tolerance in

18  magazine capacity -- I'm sorry, based on the effect of design

19  tolerances on magazine capacity, that Colorado's statutory

20  restriction on magazines that hold more than 16 rounds may

21  actually prohibit magazines that hold 15 rounds.

22  *A.* My concern is that, as a law enforcement officer, applying

23  the statute in the field, having personal knowledge that there

24  are 15-round magazines that will accept 16 rounds, every

25  15-round magazine will now be suspect. And the only way to

1    determine if that magazine is in violation is to seize it and

2    test it, and test it by inserting -- you know, counting, one,

3    two, three, up to fifteen or sixteen.  And that's -- that's the

4    problem with the language of the law.

5    *Q.*  Because, in your view, that couldn't -- the fact that a

6    15 -- a magazine designed to hold 15 rounds that is capable of

7    accepting a 16th round may be prohibited by Colorado's law?

8    *A.*  Well, it would be.  If I were a law enforcement officer and

9    I had personal knowledge or I came to know through training or

10   some other fashion that 15-round magazines could in fact accept

11   16 rounds, I think that would give me probable cause to seize

12   your 15-round magazine and see if it would take 16 rounds.

13            So that would, essentially -- you know, that -- the

14   effect is for law enforcement and for the average citizens,

15   well, now 15-round magazines may be prohibited, if they could

16   potentially accept 16.  Because the law says "capable of

17   accepting."  It has no intent -- back to your earlier question

18   that somebody has to load it up or is it an intentional or

19   unintentional act, none of that stuff is discussed in the

20   section.  It just says that the magazine itself is capable, not

21   whether or not somebody put the rounds in there intentionally

22   or unintentionally.  So simply possessing a magazine that by

23   virtue -- and to your earlier point about the fact that they're

24   advertised or stamped at a certain capacity, that's not a

25   defense to the crime.  You can't tell the police officer, well,

1   the magazine was advertised to only hold 15 rounds.  Because

2   the section, 18-12-301, 302 says that as long as the magazine

3   has the capability of accepting 16 rounds, it's in violation.

4   There are no mitigating factors as far as law enforcement is

5   concerned.

6   Q.  You would agree, however, that officers in the field are

7   required to have reasonable articulable suspicion in order to

8   make a stop and engage with an individual, correct?

9   A.  They may have made the stop for some other unrelated

10  reason.

11  Q.  I'm --

12  A.  In plain sight there may be a magazine that they believe is

13  a 15-round magazine, and they can be able to articulate

14  probable cause to seize that magazine.

15  Q.  That wasn't my actual question.  My actual question was

16  simply that law enforcement officers are required to have

17  reasonable articulable suspicion to make a stop; is that

18  correct?

19  A.  No, it's not correct.  A police officer could stop a

20  vehicle for a vehicle code violation.  That doesn't -- it is

21  after the officer has already decided that a violation has

22  occurred.  They don't need probable cause.

23  Q.  At that time, when they make the violation, they have a

24  reasonable suspicion to pull the person over.

25  A.  No, I'm sorry.  I must disagree.  It's not a suspicion.

1   They've observed a violation; they know that the violation has

2   occurred; they stopped the vehicle in order to issue a

3   citation; and during that stop, they see something in the car

4   that they then believe might give them probable cause to go

5   further into that vehicle.

6   Q.  In that scenario, if an officer were to observe a 15-round

7   magazine, they wouldn't have probable cause to assume that that

8   15-round magazine was not compliant with Colorado law, if it

9   had a 15-round count on the outside?

10  A.  If they were aware that 15-round magazines could accept 16

11  rounds, I could articulate why I have probable cause to believe

12  that magazine might be in violation of 18-12-301 and 302.  I --

13  Q.  Yes, but you, Mr. Shain, have significantly different

14  qualifications in terms of understanding magazine design

15  tolerances than the average patrolman; you would agree?

16  A.  I would agree.

17  Q.  And you bring that expertise to this case.  But the average

18  patrolman may not.  And the average patrolman who looks at a

19  15-round magazine sitting -- a person he pulled over for

20  running a red light, on the passenger seat of the car, does not

21  have a basis through observation, through normal, ordinary

22  patrol techniques, to think that there is anything wrong with

23  that, in terms of the capacity of the magazine; is that fair?

24  A.  You used the word "may not."  They may not have that.

25  Q.  And --

```
 1    A.   But they may have that.
 2    Q.   That's right.  And that goes also to your law enforcement
 3    training, Mr. Shain.  You would agree that law enforcement
 4    agencies follow a top-down hierarchy; is that right?
 5    A.   Yes.
 6    Q.   I mean -- meaning, there is structure where policy and
 7    decision making and interpretations of how laws would be
 8    executed and enforced are developed at a high level and
 9    transmitted down through the ranks to the officers who go into
10    the field and implement those policies; is that accurate, in
11    your experience?
12    A.   Theoretically.  It doesn't always work that way in real
13    life.
14    Q.   I'm asking you, that's how the structures are organized?
15    A.   Well, police departments are structured in kind of a
16    paramilitary organization.
17    Q.   That's exactly what I'm alluding to, paramilitary.
18    A.   Rank and file, correct.
19    Q.   Correct.  And the -- would it be the rank or the file?  I'm
20    not as well versed in my military.  Is it the rank that are the
21    many?
22    A.   It's the file that are the many.
23    Q.   The file are the many.  So it's the rank that set the
24    policy, and it's the file that follow the policy, at least
25    according to the way the structure is supposed to work.
```

1   *A.*   Theoretically, I'll agree with you.

2   *Q.*   Okay.  So Opinion No. 1 assumes that rogue patrol officers

3   in the field might make enforcement decisions based on design

4   tolerances that they may know nothing about, instead of on the

5   number of rounds that a magazine was actually designed and

6   advertised to hold?

7   *A.*   I take exception with the use of the word "rogue."  Just

8   because I have a great deal of experience and expertise in this

9   particular area doesn't mean that patrol officers may not have

10  experienced the same thing that I have when I was in law

11  enforcement, and that is magazines that are stamped 15 rounds

12  that will accept 16 rounds.  The other thing that my experience

13  in law enforcement, as a law enforcement officer and

14  supervisor, tell me is it doesn't take long before information

15  gets around to the file.  Information along these lines is

16  shared freely between agencies and between officers.  It's

17  communicated at briefings, at the start of watch.  These are

18  the kinds of things that officers -- I hate to say it, they

19  live for.  They're looking for ways to make arrests.  They want

20  to enforce the law.

21         So if you're suggesting that officers just simply are

22  not going to enforce it or are somehow not going to be informed

23  at some point that 15-round magazines are capable of accepting

24  16 rounds, I find that unrealistic and not --

25  *Q.*   That's not what I'm suggesting.  Let me correct you right

```
 1    there.  What I'm suggesting --
 2           THE COURT:  Counsel, I think we've worn out this
 3    topic.
 4           MR. COLIN:  Thank you.
 5           THE COURT:  Let's move on.
 6    BY MS. MORRILL:
 7    Q.  Let's talk about Opinion No. 2 as you've expressed it.
 8    "Firearms for which no magazine smaller than 15 rounds are
 9    available are subject to a de facto ban."  I want to talk to
10    you about your special knowledge, skill, experience, training,
11    or education to express this opinion.
12           So, you testified on direct exam that this second
13    opinion is based in part on the results of a written survey
14    that you conducted of certain federal firearms licensees; is
15    that correct?
16    A.  Yes.
17    Q.  Okay.  And you received responses -- let me just say that,
18    you issued that survey to the -- I will call them FFLs, as long
19    as we're clear on that term.  It seems like a shorter mouthful.
20    You issued that survey before you issued your expert report in
21    this case on August 1, is that correct, of 2013?
22    A.  Yes.  I think that's correct.
23    Q.  Okay.  And the survey responses you received informed
24    Opinion No. 2 as it was expressed in your expert report dated
25    August 1, 2013.
```

1   *A.*   Yes.

2   *Q.*   Okay.  So let's talk about your educational qualifications

3   to conduct surveys.  You attended college at UCLA?

4   *A.*   Yes.

5   *Q.*   You completed three years of college there?

6   *A.*   That's correct.

7   *Q.*   Okay.  You left college before completing any undergraduate

8   degree?

9   *A.*   That's correct.

10  *Q.*   Okay.  Since leaving UCLA, you have not received an

11  undergraduate degree from any other academic institution?

12  *A.*   That's correct.

13  *Q.*   You took one statistics class in high school?

14  *A.*   As I recall.

15  *Q.*   Okay.  Since high school, you have not completed any

16  additional coursework in statistics?

17  *A.*   That's correct.

18  *Q.*   Okay.  You do not have any special knowledge or education

19  on how the sample size can affect survey results, do you?

20          *MR. COLIN:*  Your Honor, excuse me.  I'm going to

21  object.  We didn't get into a formal survey.  It's beyond the

22  scope.

23          *THE COURT:*  Sustained.

24  *BY MS. MORRILL:*

25  *Q.*   You testified that in your opinion, Colorado's restriction

1  on magazines with greater -- that will hold 16 rounds or more

2  leads to a *de facto* ban on the sale of firearms for which no

3  smaller magazine is available.  That's the substance of your

4  second opinion?

5  *A.*  Yes.

6  *Q.*  You -- you don't -- you have not completed any courses in

7  economics, have you?

8  *A.*  Not that I recall.

9  *Q.*  How about accounting?

10  *A.*  No.

11  *Q.*  You don't have any special education or knowledge on how to

12  calculate lost profits at a fixed point in time?

13  *A.*  No.

14  *Q.*  Or how to calculate projected lost profits over a period in

15  the future?

16  *A.*  No.

17  *Q.*  Your second opinion is also based on your personal

18  knowledge and experience with firearms designed to be used with

19  magazines that hold 16 or more rounds; is that correct?

20  *A.*  Yes.

21  *Q.*  Okay.  Specifically, you did some research for this case

22  that discovered several, what I'll call relatively new firearm

23  models for which there are no lower-capacity magazines

24  currently available?

25  *A.*  Yes, that's correct.

1   Q.  And your personal knowledge was gained by looking at what

2   are known as manufacture cut sheets?

3   A.  That's what I call them, yes.

4   Q.  And a cut sheet contains the manufacturer specifications

5   for firearms and their related components?

6   A.  Yes.

7   Q.  And a cut sheet would also contain information about the

8   different types of magazines and other components available for

9   that particular firearm?

10  A.  Ordinarily, the manufacturer specifies everything that is

11  related to the firearm that they make.

12  Q.  Because, in general, firearms are highly customizable?

13  A.  I would agree with that.

14  Q.  And as are components and magazines?

15  A.  I would agree with that.

16  Q.  Right.  You can extend a magazine, correct?

17  A.  It is possible to extend a magazine.

18  Q.  And you can block or limit a magazine; that's also correct?

19  A.  Yes.

20  Q.  So based on the cut sheet information that you unearthed,

21  you concluded that several pistols with detachable box

22  magazines are effectively banned from sale in the state of

23  Colorado because 15-round-or-less magazines were unavailable at

24  that time?

25  A.  Yes.

1    Q.  You also concluded that any such firearms that meet that

2    same description that are already in the hands of Colorado

3    residents are, essentially, worthless, because they would have

4    to be sold without the magazines, in your opinion?

5    A.  Yes.

6    Q.  Based on your professional experience as a firearms

7    manufacturer and armorer, and as I think you just agreed with

8    me, you are aware that techniques exist for reducing the

9    capacity of detachable box magazines?

10   A.  No, none of them are permanent.

11   Q.  These techniques are commonly known as plugs?  That's one

12   term?

13   A.  Plugs, blocks.

14   Q.  Fillers?

15   A.  Limiters.

16   Q.  I'll refer to them as blocks in my remaining question.  But

17   a block is a device that is placed inside a magazine to limit

18   the capacity?

19   A.  Yes.

20   Q.  And in fact, you agree that internal blocks will be used to

21   facilitate compliance with Colorado law while utilizing

22   existing large-capacity magazine bodies?

23   A.  Yes.  I would agree.

24   Q.  Okay.  In addition to the actual physical block, which is

25   set internally in the magazine, rivets, pins, and epoxy can be

1  used to hold the magazine block in place?

2  *A.*  Yes, they can.

3  *Q.*  Okay.  And you personally have seen magazines that utilize

4  a combination of a physical block with pins and epoxy to keep

5  the limiter in place?

6  *A.*  Yes, I have.

7  *Q.*  Okay.

8          Your Honor, at this point I would ask for Ms. Glover

9  to hand the witness what has been identified as Demonstrative

10  Exhibit 86.

11          *COURTROOM DEPUTY:*  It's in the book?

12          *MS. MORRILL:*  No.

13          *COURTROOM DEPUTY:*  What is it?

14          *MS. MORRILL:*  It's a magazine.

15          *MR. COLIN:*  I've already seen it.  Thank you.

16          *THE WITNESS:*  Thank you.

17          *MS. MORRILL:*  If I could ask, Your Honor, could we

18  mark the magazine for identification purposes so --

19          *THE COURT:*  Has it been marked?

20          *MS. MORRILL:*  No, ma'am.

21          *THE COURT:*  All right.

22          Ms. Glover, would you please mark it.

23          In the future, please premark these.

24          *MS. MORRILL:*  Yes, Your Honor.

25          *COURTROOM DEPUTY:*  What exhibit do you want this to

1   be?

2         MS. MORRILL:  No. 86.

3         COURTROOM DEPUTY:  I'll put it on the bag.

4         THE WITNESS:  Thank you.

5   BY MS. MORRILL:

6   Q.  Ms. Glover has handed you what has been marked for

7   identification as Exhibit 86.  For the record, you would agree

8   that this is a PMAG 30-round magazine?

9   A.  No, actually, this appears to be a 45-round magazine as

10  it's marked -- no, I'm sorry.  I'm looking at the caliber.

11  This is a PMAG 30, yeah.  It's a generation 3, I believe.

12  Q.  And do you recognize what's been marked as Exhibit 86 as an

13  example of a magazine that has been limited through a

14  combination of the techniques that we discussed?  And feel free

15  to handle it --

16  A.  Without -- without 30 dummy rounds, there is really no way

17  for me to verify what the capacity would be, whether it's been

18  limited or not been limited.

19        MS. MORRILL:  Your Honor, at this point I'd ask

20  Ms. Glover to approach the witness with another demonstrative

21  exhibit.

22        COURTROOM DEPUTY:  Is it marked?

23        MS. MORRILL:  No, but I will mark it for you.

24        COURTROOM DEPUTY:  Is it 87?

25        MS. MORRILL:  Yes, ma'am.

```
 1              MR. COLIN:  87 is already in the book as a survey.

 2              COURTROOM DEPUTY:  86 is actually marked as something

 3   too.  86 is identified as photo exemplars of magazine.

 4              MS. MORRILL:  That is correct, that is 86.

 5              I would like this marked at 92.

 6              Would you like to see it, counsel?

 7              MR. COLIN:  No, I've gotten to see it.  Thank you.

 8   BY MS. MORRILL:

 9   Q.  Mr. Shain, before we actually look at -- well, you can look

10   at it if you can do two things at once.  I sometimes have

11   problems with that.  But just looking at the magazine itself --

12   if you look at the base of the magazine, you'll observe that

13   there appear to be pins placed within the base?  And I do

14   apologize.  I find them very small and don't have a magnifying

15   glass, but --

16   A.  Well, my eyes aren't what they used to be.  I'm not seeing

17   any pins, unless they've been obscured by these two points that

18   have been melted here in an attempt to lock them into place.

19   They may be underneath those two marks.

20   Q.  You're referring, for the record, to what appears to be

21   heat stamps?

22   A.  Yes.

23   Q.  Okay.  To confirm whether or not it is in fact blocked or

24   the block is held in place -- as I will represent to you that

25   that magazine is limited, but we will get to that in a moment.
```

```
 1  │ Please try to take off the baseplate, if you can.
 2  │ A.   It's hard to do without any tools or a pen or something,
 3  │ but I'll give it a try.  And I'm finding that the baseplate is
 4  │ not sliding off, as usual.
 5  │ Q.   And looking at what has been marked as Exhibit 92.
 6  │         COURTROOM DEPUTY:  That is 92.
 7  │ BY MS. MORRILL:
 8  │ Q.   Looking at what has been marked for identification as
 9  │ Exhibit 92, do you know what those are?
10  │ A.   They're dummy rounds.
11  │ Q.   And looking at the dummy rounds, are they the correct size
12  │ for that particular PMAG 30 magazine that is Demonstrative
13  │ Exhibit 86?
14  │ A.   Yes, they are.
15  │ Q.   Okay.  I'd like you to load the magazine, please.
16  │ A.   You want me to -- I'm sorry?
17  │ Q.   Load the magazine.
18  │ A.   Load the magazine?  With the dummy rounds?
19  │ Q.   Yes.  If you could count the number of dummy rounds before
20  │ you do so, please.
21  │ A.   Count the dummy rounds.  Looks like there is 16.
22  │ Q.   Okay.  Please attempt to load all of them into the
23  │ magazine.  When you get to the 16th round, I'm happy to do a
24  │ drum role.
25  │ A.   This is the last round I have, and it won't go in.
```

1    *Q.* Thank you, Mr. Shain.

2            Now, having confirmed for yourself through this

3    exercise, you would agree and recognize Exhibit --

4    Demonstrative Exhibit 86 as a 30-round magazine that has been

5    limited through a combination of the techniques we discussed

6    earlier to hold only 15 rounds?

7    *A.* Yes.

8    *Q.* And Exhibit 86 is a fair and accurate representation of the

9    type of magazine block, in combination with some form of rivets

10   or epoxy that we just discussed?

11   *A.* Yes, apparently so.

12   *Q.* I'm sorry?

13   *A.* I said apparently so.

14           *MS. MORRILL:* Your Honor, I would move the admission

15   of Exhibit 86.

16           *MR. COLIN:* No objection.

17           *THE COURT:* 86 is received.

18           (Exhibit 86 admitted.)

19   *BY MS. MORRILL:*

20   *Q.* So to remove the block from Exhibit 86, Mr. Shain, would

21   require time, it would take some time?

22   *A.* Not much.

23   *Q.* Sure. I'm not asking how much, but it would take some time

24   to do so?

25   *A.* Sure.

 1  *Q.*  And it would require some know-how?

 2  *A.*  Basic, yes.

 3  *Q.*  And the correct tools?

 4  *A.*  Yes.

 5  *Q.*  Using epoxy sonic welding would likely result in the

 6  average person being unable to remove the limiter without

 7  damaging the magazine; do you agree with that?

 8  *A.*  I'm sorry.  You say the average person?

 9  *Q.*  That's correct.

10  *A.*  I'm not sure what the average person knows in the way of,

11  you know, mechanics, what kind of tools they have, what -- you

12  know, what access to resources they might have.  But you know,

13  the magazine, you know, could be disassembled.  And damage to

14  it, I suppose there might be some; that doesn't necessarily

15  render it non-functional.

16  *Q.*  Sure.  Let's assume the average layperson, who has no

17  special expertise with firearms, their components, their

18  design, their manufacture, their disassembly, the person who

19  walks in, obtains a magazine off the shelf, takes it home,

20  doesn't have special tools -- that's what I mean by average

21  person.  Assume those facts, the use of epoxy sonic welding

22  would likely result in the average person being unable to

23  remove a limiter from a magazine without damaging the magazine?

24          *MR. COLIN:*  Foundation, speculation.

25          *THE COURT:*  Response.

1          MS. MORRILL:  Your Honor, he is an expert.  He's

2    allowed to speculate, he's allowed to hypothesize.  I've asked

3    him to assume certain facts and give an assumption, and I would

4    like an answer.

5          THE COURT:  I'm sure you want an answer.  Most

6    attorneys who ask questions do want answers.  The question is

7    whether the question is appropriate.  Any reply?

8          MR. COLIN:  You're inviting me to reply to her

9    response?

10          THE COURT:  Right.

11          MR. COLIN:  All right.  I think we've gone far afield

12    of the scope of direct examination in this area.  She is now

13    asking him to speculate as to a fictional average person who is

14    dealing with firearms and magazines, but apparently this

15    average person has never touched one, seen one, and has no idea

16    how to operate one.  I think the speculation, based upon the

17    foundation of an average person, makes this question

18    inappropriate.

19          THE COURT:  Thank you.  Question is okay.  The witness

20    can answer.  What weight I give it remains to be seen.

21          MR. COLIN:  Thank you.

22          THE COURT:  You may answer.

23          THE WITNESS:  I really don't know, is the answer.  I

24    really don't know what an average person could do and whether

25    it would result in damage or not.  I think every case is going

 1  │  to be different, and how much damage is going to be different,

 2  │  from person to person.  So I really don't know how to answer

 3  │  that.  I'm sorry.

 4  │  *BY MS. MORRILL:*

 5  │  *Q.*  Okay.  Mr. Shain, is it your testimony as you sit here

 6  │  today, is that you don't know whether the average person would

 7  │  be able to remove a limiter without damaging the magazine if

 8  │  epoxy sonic welding had been used?

 9  │  *A.*  Let me clarify.  I think that an average person could

10  │  remove the magazine block.  I don't know how long it would take

11  │  them.  I don't know how much damage they would inflict.

12  │  *Q.*  For the record, what is epoxy sonic welding?

13  │  *A.*  It's ultrasonic waves that are used to actually melt the

14  │  plastic together.

15  │  *Q.*  Makes it sound like it takes some special tools.

16  │  *A.*  Well, to perform that process, the welding process, yes, it

17  │  does.

18  │  *Q.*  Uh-huh.

19  │  *A.*  Not all plastics are susceptible to it, but some are.

20  │  *Q.*  And all I'm trying to establish is whether you agree that

21  │  the average person would be likely to be able to remove a block

22  │  held in place with epoxy sonic welding without likely damaging

23  │  the magazine.

24  │        *MR. COLIN:*  Cumulative.

25  │        *THE COURT:*  I'm sorry?

1           MR. COLIN:  Cumulative.  Asked and answered.

2           THE COURT:  Sustained.

3  BY MS. MORRILL:

4  Q.  Before you were retained by plaintiffs in this case,

5  Mr. Shain, you didn't personally go out and obtain 30-round

6  magazines and attempt to limit them in a permanent way?

7  A.  I'm sorry, did you say after I was retained?

8  Q.  Before you were retained.

9  A.  Oh, I played with some magazines in California that -- when

10 the California ban went into effect.  I looked at a number of

11 different limiters and blocks and techniques, because that was

12 one of the flaws in the California law as well.  I did quite a

13 bit of work in ensuing years to clarify that.

14          That was the beginning of the inquiry of this process,

15 is it possible to do it in a permanent way?  And the answer

16 that I came up with at that time was, no, and there hasn't been

17 any technological advances that would change my opinion about

18 that.

19 Q.  All right.  Let's talk about since you've been retained as

20 an expert by the plaintiffs in this case.  For the specific

21 purpose of this litigation, did you go out and obtain 30-round

22 magazines and attempt to permanently limit them to 15 rounds or

23 less?

24 A.  No, I did not.

25 Q.  Let's talk about your application of the facts and data

1  that you obtained through your survey to Opinion No. 2.  You

2  did testify earlier that Opinion No. 2 is based in part on the

3  responses you received to your survey; is that correct?

4  A.   That was part of what I applied, yes.

5  Q.   Right.  In part.  And, specifically, the responses were to

6  question 7 of your survey; is that right?

7  A.   I frankly don't recall what number it was on the -- if I

8  could refer to it, I could tell you -- I could confirm whether

9  that's correct or not.  I don't recall the actual numbering of

10  those questions.

11  Q.   Why don't I share the question itself with you and see if

12  that was the one --

13  A.   Okay.

14  Q.   Instead of the number of the question, I'll share the

15  actual question itself.

16  A.   Thank you.

17  Q.   "For pistols that come equipped from the factory with

18  magazines that have capacity for 15 or more rounds of

19  ammunition, do you stock any separate stand-alone magazines for

20  those pistols that have a capacity that is less than the

21  factory capacity magazine?"

22        Does that sound right?

23  A.   Yes, it does.

24  Q.   Earlier in your testimony today, you agreed that in this

25  case, where concern with magazines -- I'm sorry, that we are

1    not concerned with magazines that hold 16 rounds or more.

2    A.   Yes.

3    Q.   Okay.   The cutoff that we're concerned about here is the

4    one between the 15th round and the 16th round; is that correct?

5    A.   Yes.

6    Q.   Okay.   But your question included magazines that have a

7    capacity for 15 or more rounds of ammunition; is that right?

8    A.   That question did, yes.

9    Q.   Okay.   So by virtue of including in your survey 15-rounds

10   capacities, you were sweeping in more magazines than may

11   actually be subject to, or at least the stated magazine round

12   restriction in Colorado's law?

13   A.   The -- clarify that.   The issue was, are there firearms

14   that have become unsalable because you're not able to get

15   magazines for them that are 15 rounds or less?   So it wasn't --

16   it's not just a 15 and 16 rounds.   I think we're -- I'm a

17   little confused by what we're mixing up here -- maybe I'm

18   mixing it up.

19   Q.   Sure.   And that's -- that's the point of this question, is

20   that the survey question was not, are magazines available that

21   are smaller capacity for these firearms?   The question was

22   specifically to the FFLs, do you stock any separate stand-alone

23   magazines for those pistols that have a capacity that is less

24   than the factory capacity magazine?   Is that correct?

25   A.   Yes.

1   *Q.*  So what an FFL might stock is -- his or her answer to what

2   he or she may stock is not the answer to what is in fact

3   available; is that correct?

4   *A.*  I think the answers to the survey kind of speak for

5   themselves.  And I think the answers were more informative than

6   what the question was, because the answers were kind of -- you

7   know, each individual FFL responded in their own way, with an

8   explanation about why they did or did not stock those things.

9   So the nature of the question was to try and elicit whatever

10  information I could get.

11  *Q.*  Sure.  But, in fact, one of the survey responses was, I do

12  now, correct?

13  *A.*  As I recall, I believe that was correct, yes.

14  *Q.*  Right.  And that was one response.  And then there was

15  another response where the individual didn't answer whether he

16  stocked any magazine -- lower-capacity magazines for firearms

17  that come standard with 16 or more; but, instead, he gave you a

18  list of guns that he believed he could no longer sell in his

19  store.  Is that accurate?

20      *MR. COLIN:*  Your Honor, I have several objections.

21  First, I have a hearsay objection if she's seeking information

22  supplied by someone outside of Mr. Shain.  This is all in an

23  exhibit that was objected to by the Attorney General.  It's

24  Exhibit 87.  The questions and the answers are there.  So in

25  lieu of this line of questioning, I would simply ask to offer

 1   Exhibit 87, and then the Court can see what questions were

 2   asked and what answers were given.

 3           *THE COURT:*  What is Exhibit 87?

 4           *MR. COLIN:*  It is the survey that she's referring to

 5   with all of the answers of the various FFLs.

 6           *THE COURT:*  Which I previously held was outside the

 7   scope of the direct.

 8           *MR. COLIN:*  I understand.  I wasn't going to get into

 9   it, except for what has occurred at this point.  So it seems to

10   me that if we're going to get into this area, the best evidence

11   of what information was asked of the FFLs, what information --

12   the information provided in response is the exhibit itself.

13           *MS. MORRILL:*  May I respond, Your Honor?

14           *THE COURT:*  You may.

15           *MS. MORRILL:*  Thank you.  This -- this line of

16   questioning is for impeachment only.  The witness clearly

17   testified both on direct and earlier in his cross-exam that the

18   survey responses he received from certain FFLs formed the basis

19   for his second opinion.  And I am attempting to establish that

20   his application of his methodology -- I'm sorry, the facts and

21   data received from the survey was not reliable.  And that is

22   within the scope of the Governor's objection to this opinion.

23   And I don't want the exhibit in.  I don't think it's -- I mean,

24   that is -- that is in violation of Rule 703.  And the purpose

25   is solely for impeachment of this questioning.

```
 1         THE COURT:  Well, I haven't heard a direct
 2   inconsistency yet that would constitute impeachment.  What I've
 3   heard is a lot of questioning about this survey.  And either
 4   the survey is going to come in, if the survey is relevant, or
 5   we need to move off this topic.
 6         What's your pleasure, counsel?  You're doing the
 7   cross-examination.
 8         MS. MORRILL:  I'm happy to move on.
 9         THE COURT:  Okay.
10   BY MS. MORRILL:
11   Q.  Mr. Shain, let's talk about the assumptions you made when
12   applying facts and data obtained through the survey.  So these
13   are your assumptions after you took the survey results and
14   then -- they informed your Opinion No. 2.
15         So you assumed that licensed firearm retailers in
16   Colorado cannot purchase firearms with large-capacity
17   magazines, which I -- when I use that term, I'm referring to a
18   magazine that holds 16 or more rounds -- after July 1, 2013.
19   A.  I think you're mischaracterizing what I said in my opinion.
20   I'm not assuming; I concluded that.  But, yes, go ahead.
21   Q.  Well, Opinion No. 2 is that there is a de facto ban on
22   these magazines.  So my question is, your -- in reaching that
23   conclusion, you're assuming that retailers cannot -- licensed
24   firearm retailers in Colorado cannot purchase firearms with
25   magazines that hold 16 or more rounds after the date of
```

1  Colorado's law.

2  *A.*  I don't believe I said that -- that firearm dealers cannot

3  purchase them.  I believe I said that they can't sell them,

4  that they're unsalable.  They can't sell firearms that have

5  magazines that -- with a capacity of more than 16 rounds

6  pursuant to 18-12-301, 302.

7  *Q.*  The opinion itself just says a *de facto* ban --

8  *A.*  *De facto* --

9  *Q.*  -- on firearms.  Not on the sale, not on the purchase, *a de*

10  *facto* ban on firearms that hold 16 or more rounds, correct?

11  *A.*  Well, *de facto* -- I guess my intent was that it was a *de*

12  *facto* ban on the sale of those firearms.  In other words,

13  nobody could acquire those.  Private citizens in Colorado could

14  no longer acquire those firearms.

15        Now, as a dealer, I've been asked to sign a waiver so

16  that I can acquire as a dealer firearms that have magazine

17  capacities of more than 16 rounds, but only for sale out of

18  state, or transfer out of state.  So there is no reason for me

19  to purchase those firearms, you know, for local Colorado

20  customers.  The only customers I could sell those to would be

21  out of state.

22        Now, in my business, that might be viable for some of

23  my customers.  But for a business that is a brick and mortar

24  business that has a storefront that sells to local Colorado

25  customers, they're effectively banned from selling those

```
 1 │ firearms.
 2 │ Q.  Right.  And when you make that conclusion, you're assuming
 3 │ that Colorado firearms retailers with brick and mortar stores
 4 │ do not sell to out-of-state residents, such as over the
 5 │ internet.
 6 │ A.  Well, it's my understanding from reading the correspondence
 7 │ from the FFLs in some of the discovery documentation, that that
 8 │ was exactly their predicament, that they are not set up to sell
 9 │ over the internet.  They're brick and mortar storefront
10 │ operations, and the core of their business is based on walk-in
11 │ Colorado sales.
12 │ Q.  Your second opinion also assumes that --
13 │       MR. COLIN:  Your Honor, if he could be allowed to
14 │ finish his answer.
15 │ BY MS. MORRILL:
16 │ Q.  I'm sorry.  I thought you were done.  If you're not, please
17 │ continue.
18 │ A.  As I was saying, the core of their business is based on
19 │ walk-in Colorado sales to local customers.  But the loss of
20 │ that business because of this ban has affected them, you know,
21 │ severely.  It's a detriment and a disadvantage to them not to
22 │ be able to sell.  On the other side, it's a disadvantage to the
23 │ citizens who want to be able to purchase those firearms.
24 │       But the ban is a de facto ban, because if you have a
25 │ business model where you purchase things wholesale and then you
```

1  sell them retail, and suddenly the law says you can no longer
2  sell this portion of those goods anymore, I don't know what
3  else to call it but a ban.
4  Q.  Sure.  Maybe this is a better way to ask the question:  You
5  would agree that if a Colorado firearms retailer does in fact
6  conduct internet sales, that it is not -- that Colorado's new
7  magazine restriction is not a *de facto* ban on their sale of
8  those firearms to residents out of state over the internet?
9  A.  Yes, I would agree that that's true.  If they have a
10 business model that they are selling out of state by the
11 internet, then -- but it's a *de facto* ban on Colorado sales.
12 Q.  I understand that.  But your opinion as expressed is not
13 limited to Colorado sales, and that's just based -- that's the
14 substance of my question to you.
15 A.  I know, but --
16 Q.  So another example would be a Colorado retailer who has
17 another brick and mortar store outside of Colorado.  You would
18 agree that that is not a *de facto* ban on the sale of those
19 firearms for that retailer?
20 A.  I apologize, because I thought when I was writing that
21 report that I was -- I intended it to be specifically about
22 Colorado.  I didn't -- I didn't intend to -- that the opinion
23 would extend to -- you know, across state lines or
24 internationally or anything else.  So you have me, counselor.
25 That's true.

1   *Q.*  That's all I'm trying to establish.

2   *A.*  Absolutely.

3   *Q.*  We can keep moving through.  So, similarly, if a Colorado

4   licensed retailer is able to -- is still able after July 1,

5   2013, to sell firearms that come standard with magazines that

6   hold 16 rounds or more to law enforcement officials, that it is

7   not a *de facto* wholesale ban; you would agree with that?

8   *A.*  I would agree with that, yes.

9   *Q.*  Okay.  And the same for retailers who are able to sell to

10  branches of the U.S. armed forces.

11  *A.*  Yes.

12  *Q.*  Okay.

13  *A.*  And so --

14  *Q.*  And the same with retailers who are able to sell to

15  authorized foreign national governments?

16  *A.*  That's correct.

17  *Q.*  Okay.  So there is a market -- all I'm trying to establish

18  is that there is a market outside of Colorado, in certain

19  contexts where firearms over -- that hold 16 rounds or more can

20  be sold by Colorado FFLs?

21  *A.*  That's correct.  And, again, I want to apologize, because I

22  should have made that clearer, that I was referring

23  specifically to Colorado sales and to retail commercial

24  civilian customers.

25  *Q.*  And your second opinion by the nature of a *de facto* ban,

1 | its reference to a *de facto* ban, assumes that manufacturers of
2 | firearms and their components will not design and produce
3 | Colorado-compliant magazines in the future.
4 | *A.* I -- I can only say what my experience is with bans in
5 | other states. And I referenced California earlier because they
6 | were the first. And in subsequent states where magazine
7 | restrictions have become law, manufacturers have not rushed to
8 | produce state-specific magazines or firearms packages for those
9 | states. And that's why I referenced earlier, if a manufacturer
10 | is not making it for Colorado, they're likely not making it for
11 | anybody else -- in California, they're not making it for
12 | anybody else. What happens in the future is -- your guess is
13 | as good as mine.
14 | *Q.* You agree that if firearms magazine manufacturers were to
15 | start manufacturing Colorado-compliant magazines, that it would
16 | not be a *de facto* ban on those firearms?
17 |    *MR. COLIN:* Speculative.
18 |    *THE COURT:* The witness can answer.
19 |    *THE WITNESS:* Again, I don't know what is going to
20 | happen in the future. But my experience is, based on my
21 | knowledge of what manufacturers do and how they do it, this is
22 | a very small portion of their business. It's very difficult
23 | for them to focus an entire manufacturing operation on just a
24 | few states.
25 | *BY MS. MORRILL:*

1  *Q.* And I'm not --

2  *A.* So I don't know -- I'm not hopeful that the future will

3  bring manufacturers to the point where they will start

4  developing Colorado-specific magazines.

5  *Q.* Right. And all I'm asking you is, if we get there, there

6  is no longer a *de facto* ban in place.

7      *THE COURT:* This has been covered. Let's move on.

8  *BY MS. MORRILL:*

9  *Q.* Let's talk about your third opinion, which is that "House

10  Bill 1224's requirement that the owner of magazines banned by

11  House Bill 1224 maintains continuous possession of those

12  magazines is unrealistic in ordinary practice and for

13  compliance and enforcement." Is that your third opinion?

14  *A.* Yes.

15  *Q.* I want to talk to you about the quantity of facts and data

16  you considered in forming Opinion No. 3. First of all, Opinion

17  No. 3 is based on your evaluation of the language of the law?

18  *A.* That's partially true.

19  *Q.* It's also based on your understanding of the physical

20  requirements for continuous possession?

21  *A.* Yes.

22  *Q.* And in evaluating the language of the law, you relied on

23  the following definition of the word "continuous" in

24  Merriam-Webster's collegiate dictionary from 2009.

25  "Continuous, marked by uninterrupted extension in space, time

1 │ or sequence."

2 │ *A.*   Yes.

3 │ *Q.*   Based on this definition, you concluded that there is a

4 │ temporal physical requirement to continuous possession under

5 │ Colorado law.

6 │ *A.*   That's correct.

7 │ *Q.*   Specifically, that a person must physically maintain

8 │ possession of that large-capacity magazine on his or her person

9 │ or in his -- or her immediate control at all times in order to

10 │ comply with the law.

11 │ *A.*   Subject to the July 10 technical guidance issue by the

12 │ Attorney General's Office, which sought to clarify that

13 │ definition, expand it a little bit.

14 │ *Q.*   You then applied this construction of the law to various

15 │ factual scenarios to demonstrate -- demonstrate your overall

16 │ conclusion that the law is unrealistic in terms of compliance

17 │ and enforcement.

18 │ *A.*   What I did was apply my experience as a firearms -- as a

19 │ law enforcement officer and law enforcement trainer, on my

20 │ training and experience in interpreting and applying statutes

21 │ to enforcement activities, and that's how I came up with that

22 │ opinion.

23 │ *Q.*   Some examples of your application include an individual

24 │ traveling on a commercial airline could not comply with the

25 │ continuous possession requirement?

1   *A.*   That falls into that question of, what is continuous

2   possession?  When do you give up dominion and control?  At what

3   point have you lost dominion?  Is it when it's in a third

4   party's hands, you no longer know the fate of it, you can't

5   guarantee that you're ever going to get it back, then you do,

6   you may; so, yes, that's correct.

7   *Q.*   Right.  You rely on the example of an individual traveling

8   on an commercial airline and concluded they could not comply

9   because they're prohibited from carrying their large-capacity

10  magazines with them.

11  *A.*   Well, they cannot guarantee that continuous possession.

12  *Q.*   Similarly, an individual entering a federal or state

13  government facility that prohibits firearms could not comply?

14  *A.*   Right.  You would be directed to divest yourself of the

15  firearm and magazines for an unspecified period of time.

16  *Q.*   As would an individual entering a private facility that

17  prohibits firearms?

18  *A.*   The same is true.

19  *Q.*   You opine that in the case of an individual who legally

20  owns dozens of large-capacity magazines, he or she would be

21  required to carry all the magazines on his or her person at all

22  times.

23  *A.*   This was an extreme example based on the original language

24  of the law.

25  *Q.*   You served as a law enforcement officer in the state of

1   California for just under eleven years?

2   *A.*  A little over eleven years.

3   *Q.*  A little over eleven years, I'm sorry.  Since joining the

4   public sector in 1994, you have continued to work with law

5   enforcement officials throughout the nation in your capacity as

6   a firearms training instructor?

7   *A.*  Yes.

8   *Q.*  As a result, you have extensive contacts in the law

9   enforcement sector?

10  *A.*  I do.

11  *Q.*  Including here in Colorado?

12  *A.*  Some, yes.

13  *Q.*  And until the Court dismissed them from this case in late

14  November 2013, a number of county sheriffs were named

15  plaintiffs in this case.

16  *A.*  Yes, I recall.

17  *Q.*  Okay.  Colorado's large-capacity magazine restriction went

18  into effect on July 1, 2013.

19  *A.*  Yes.

20  *Q.*  You issued your expert report in this case on August 1,

21  2013?

22  *A.*  Yes.

23  *Q.*  And that report contains Opinion 3, as we've just

24  discussed?

25  *A.*  Yes.

1    *Q.*   Okay.  In the month prior to issuing your report, you did

2    not collect any facts or data about enforcement of this law

3    from any Colorado law enforcement agency?

4    *A.*  I don't recall doing that specifically, although I may have

5    had a conversation with a law enforcement person in Colorado or

6    two about this issue.

7    *Q.*  In the nearly four months between when you issued your

8    report in this case and the Court's order of dismissal for the

9    sheriffs, you did not collect any facts or data about

10   enforcement of this law from any of the county sheriff

11   plaintiffs?

12   *A.*  No.

13   *Q.*  So you didn't do what you did with the FFLs, you didn't

14   conduct a survey of enforcement?

15   *A.*  No, I did not.

16   *Q.*  And the same is true for the four-month period after the

17   county sheriffs were dismissed as plaintiffs, you didn't

18   collect facts or data from them after they were dismissed out

19   of this case about how they're enforcing Colorado's

20   large-capacity magazine restriction?

21   *A.*  That's correct.

22   *Q.*  Specifically, the continuous possession component of that

23   restriction.

24   *A.*  That's correct.

25   *Q.*  Let's talk briefly about the methodology you relied on in

1  forming Opinion No. 3.  The first thing you did was read the

2  law?

3  A.  Yes.

4  Q.  Then you interpreted the law.

5  A.  Well, like I say, I applied my training and experience as a

6  law enforcement officer in reading and interpreting statutes;

7  but that's correct.

8  Q.  And once you had interpreted the law, you applied your

9  interpretation of the law to factual scenarios?

10  A.  Again, I -- what I tried to do is imagine a scenario where

11  a law enforcement officer in the field could apply and enforce

12  the statute.  And I came up with no viable scenario that would

13  work.

14  Q.  And just so we're clear, at the time you were in law

15  enforcement in California, you did not have the opportunity to

16  enforce a large-capacity magazine restriction with a continuous

17  possession component, did you?

18  A.  That's correct.  There wasn't such code at that time in

19  California.

20  Q.  In fact, at the time that you were in law enforcement in

21  California, you didn't have the opportunity to enforce any

22  large-capacity magazine restriction?

23  A.  That's correct.

24  Q.  And you have never been a member of Colorado law

25  enforcement?

1   *A.*  I have not.

2   *Q.*  Okay.  So you've never officially enforced any laws in the

3   state of Colorado?

4   *A.*  That's true.

5   *Q.*  And just going back briefly to your educational

6   qualifications, you have not obtained a law degree from any

7   academic institution, have you?

8   *A.*  No, I have not.

9   *Q.*  Okay.  And it's rare, but in some states, individuals can

10  practice law without a law degree if they can successfully sit

11  for the bar.  You're not currently licensed to practice law in

12  any state in the United States?

13  *A.*  No.

14  *Q.*  Okay.  You can count yourself lucky for that.

15        Let's talk about your fourth opinion.  Your fourth

16  opinion is, "the acquisition date of a magazine cannot be

17  determined from any outward appearance or feature on the

18  magazine itself."  Is that correct?

19  *A.*  That's correct, with the exception of the Magpul magazine

20  that has a date stamp.

21  *Q.*  And -- and that's correct.  So your original opinion as I

22  just read it was absolute.

23  *A.*  Well, I made a mistake.  Because at the time when I

24  inquired, I was unaware that Magpul was date stamping at that

25  time.

1   Q.  And, in fact, if you would pick up Exhibit 86, which has

2   been admitted into the record.  If you're -- hopefully you're

3   capable of seeing that tiny print.  But you would agree that

4   there is a manufacturer's date stamp on that magazine?

5   A.  Well, it's some kind of a stamp.  You'd need a microscope

6   to read it.  There is a stamp.  My understanding is, it's got a

7   year, and then the arrow points to a month or could be vice

8   versa.  Could be the month and then the arrow points to the

9   year.  I'm not sure which one, because I literally can't read

10  it.  I'm sorry.

11  Q.  You can't read the two numbers in there?

12  A.  I can't read the numbers in there.  I used to be

13  nearsighted, and I thought I had pretty good vision up close,

14  but this one is absolutely microscopic.

15  Q.  It really is.  It's no fault of your own, because I've

16  tried myself.

17       But in any event, you agree it has some type of

18  manufacturing stamp.  It appears to be a date stamp, although

19  we can't confirm the date?

20  A.  Yes.

21  Q.  You now agree that your original opinion was too absolute?

22  A.  Sure.  This is the only exception that I've come across to

23  that opinion that nobody date stamps their magazines.

24  Q.  If a law enforcement officer were to encounter Exhibit 86

25  in the field, assuming that the date stamp indicated it was

1   manufactured after July 1, 2013, you would agree that that

2   officer would be able to determine whether that person was in

3   violation of Colorado's law?

4   A.   Yes, as I said during the direct, that's the one exception.

5   If the date stamp is after July 1, that would be the one

6   situation where the officer could confirm that that's clearly a

7   violation.

8   Q.   And, again, going back to your experience in California --

9   I'm sorry -- did I say California or Colorado?

10  A.   You said California.

11  Q.   Okay, good.  California imposed a large-capacity magazine

12  restriction of its own; that's correct?

13  A.   Yes.  I don't remember what year it was, but, yes.

14  Q.   And that restriction was based on magazines that hold --

15  eleven or greater rounds?

16  A.   Yes.  I believe the magazine restriction is ten rounds,

17  yes.

18  Q.   On so ten is the maximum?

19  A.   Yes.

20  Q.   That an individual can lawfully have in California?

21  A.   Yes.

22  Q.   Okay.  And then after California's ban went into effect,

23  you agree that there are a wide variety of magazines on the

24  market that are deliberately marketed as California compliant?

25  A.   Yes.

1   *Q.* You testified on direct exam that in your opinion, magazine

2   capacity restrictions are rare, that there aren't very many

3   states that have them; if I recall your testimony correctly.

4   *A.* I don't know that I used the word "rare," but they're the

5   exception, not the rule.

6   *Q.* You would agree, in addition to California and now

7   Colorado, that Connecticut also has a magazine capacity

8   restriction?

9   *A.* Yes.  So does New York and New Jersey.

10  *Q.* As well as Massachusetts?

11  *A.* I think they do as well.

12  *Q.* And Maryland?

13  *A.* I will accept your -- if you say that they do.  I know they

14  have some restrictions, I don't know if it's a magazine

15  capacity restriction, but I have no reason to doubt that you're

16  wrong.

17  *Q.* As does Hawaii?

18  *A.* I'm not aware of Hawaii.

19  *Q.* What about the District of Columbia?

20  *A.* D.C. has a firearms restriction, in general.

21  *Q.* And if you were to add up the population of all of the

22  states and territories that have some form -- not all the same,

23  of course, but some form of a magazine capacity restriction,

24  that would account for over 70 million people in the United

25  States?

1 | *A.* I don't know, but I think --

2 | *MR. COLIN:* Objection, counsel is testifying.

3 | *THE COURT:* Sustained.

4 | *BY MS. MORRILL:*

5 | *Q.* Let's talk about your fifth opinion, which is that

6 | "continuous possession prohibits the loaning of lawfully owned

7 | magazines banned by House Bill 1224 to friends and family

8 | members. It prohibits storing and leaving such lawfully owned

9 | magazines while traveling, and it prohibits giving such

10 | lawfully owned magazines to a gunsmith for maintenance." Is

11 | that an accurate restatement of your fifth opinion?

12 | *A.* Yes, that's correct.

13 | *Q.* Okay. And we've already discussed the facts and data you

14 | relied on and the methodology used in forming your

15 | interpretation of Colorado's continuous possession requirement.

16 | And we've also discussed your -- I think we've also discussed

17 | your qualifications, which, I believe, is the only basis for

18 | the Governor's objection -- other objection -- well, there are

19 | several, but --

20 | If you'll just give me a moment, Your Honor, to review

21 | my notes and see if I have any further questions.

22 | *THE COURT:* Sure.

23 | *MS. MORRILL:* Thank you.

24 | Thank you, Your Honor. No further questions.

25 | *THE COURT:* Thank you.

```
 1              Is there any redirect of this witness?
 2              MR. COLIN:  May I have just a moment?  I'm consulting
 3    with co-counsel.
 4              THE COURT:  Sure.
 5              MR. COLIN:  Thank you.
 6              No questions, Your Honor.
 7              THE COURT:  Can this witness step down and be excused?
 8              MR. COLIN:  He may, Your Honor.
 9              THE COURT:  Thank you.  Any objection by Colorado?
10              MS. MORRILL:  No, Your Honor.
11              THE COURT:  Thank you, sir.  You may step down.  You
12    are excused.
13              THE WITNESS:  Thank you, Your Honor.
14              THE COURT:  All right.  The court clock is showing
15    about 20 minutes before 5:00.  Do you want to start with a new
16    witness at this time, or do you want to recess for the
17    afternoon?
18              MR. KOPEL:  Your Honor, we have one witness who we
19    hope will be very fast.
20              THE COURT:  So you'd like to proceed?
21              MR. KOPEL:  Yes, Your Honor.
22              THE COURT:  All right.  Call your next witness,
23    please.
24              MR. KOPEL:  Your Honor, the plaintiffs would like to
25    call Mr. Shayne Heap, who is a sequestered witness and
```

 1 │ hopefully outside.

 2 │       *THE COURT:*  Please step up and be sworn.

 3 │            (**SHAYNE HEAP, PLAINTIFFS' WITNESS, SWORN**)

 4 │       *COURTROOM DEPUTY:*  Please be seated.

 5 │       Please state your name and spell your first and last

 6 │ name for the record.

 7 │       *THE WITNESS:*  Shayne Heap, S-H-A-Y-N-E, H-E-A-P, as in

 8 │ Paul.

 9 │       *THE COURT:*  Please proceed.

10 │                    **DIRECT EXAMINATION**

11 │ *BY MR. KOPEL:*

12 │ *Q.*  Are you currently employed?

13 │ *A.*  I am.

14 │ *Q.*  Who is your employer?

15 │ *A.*  I'm the Sheriff of Elbert County.

16 │ *Q.*  How long have you been with that employer?

17 │ *A.*  2002.

18 │ *Q.*  Always in same position, or different positions?

19 │ *A.*  No, I started as a detentions deputy there.

20 │ *Q.*  What guns do you personally own and use for self-defense?

21 │ *A.*  I have a Kimber 1911, which is a handgun; I have a

22 │ snub-nosed .38, which is a handgun; I have a Remington 870,

23 │ which is a shotgun; I have an M1 Garand, which is a rifle;

24 │ several other shotguns and long guns as well.

25 │ *Q.*  Any other rifles in that category of personal self-defense

```
 1  arms?

 2  A.  No, sir.

 3  Q.  Any other handguns you personally own for self-defense?

 4  A.  No, sir.

 5  Q.  Do you have any firearms that have magazines of 16 or more

 6  rounds -- do you have any magazines of 16 or more rounds?

 7  A.  I do.

 8  Q.  What firearms do those go for?

 9  A.  Glock 20 pistol.  I think I neglected to say that one the

10  first time through.  A .40 caliber Glock 20 pistol.

11  Q.  Okay.  Any -- do you have any rifle magazines?

12  A.  I do.  I have AR-15 magazines as well.

13  Q.  Okay.  Do you personally own an AR-15 now?

14  A.  I don't.

15  Q.  Do you plan to buy an AR-15 for yourself, personally?

16  A.  Yes.  The one I use right now is owned by the department.

17  Q.  Do you plan to use that AR-15 for self-defense?

18  A.  Yes.

19  Q.  How big are the Glock magazines for the Glock .40 caliber?

20  A.  They're fifteen with two-round extenders.

21  Q.  Okay.  How many of those Glock magazines do you have?

22  A.  Five, six.

23  Q.  And how many of the AR-15 magazines do you have?

24  A.  Are we talking personal?

25  Q.  That you personally own.
```

1   A.  That I personally own, six or seven.

2   Q.  How do you use your firearms and magazines for self-defense

3   at home?

4   A.  I have handguns in our -- in a handgun safe in my walk-in

5   closet.  There is a lever-action 30-30 over the front door of

6   my home, on the inside, of course.  Several other guns

7   throughout the house.

8   Q.  Have you had any training in the defensive use of firearms?

9   A.  I have.

10   Q.  Are you -- was that in your -- on the job?

11   A.  Correct.

12   Q.  Do these training experiences on the job have any relevance

13   to you in your personal life, outside of work?

14   A.  Absolutely.

15   Q.  In what way?

16   A.  Everything from muzzle control to defensive thinking, you

17   know, knowing your target and beyond, safety, tactics.

18   Q.  In the use of force training you've had, what is the most

19   forceful use of force you've been taught?

20   A.  That would be taking someone's life.

21   Q.  And then at the other end of the spectrum, what would be

22   the least useful -- least forceful, least violent, use of a

23   firearm for self-defense that you have been taught?

24   A.  I would say that would be simply showing up in uniform with

25   a weapon.

 1  Q.  Could you describe what training you've had in the use of

 2  firearm for self-defense.

 3  A.  My training started in the Sheriffs Training Institute,

 4  which is in Douglas County.  In addition to that class,

 5  quarterly classes, certifications, probably in the -- somewhere

 6  in the neighborhood of 7-, 800 hours of training.

 7  Q.  Have you taken any training for SWAT?

 8  A.  I have, I took a SWAT emergent force at the Air Force

 9  Academy.

10  Q.  Are you currently certified for SWAT?

11  A.  I am.

12  Q.  How often does one have to train to be certified for SWAT?

13  A.  I would train monthly for SWAT.

14  Q.  Do you have any personal experience training citizens?

15  A.  I do.  I teach defensive thinking classes.

16  Q.  About how many times have you taught that?

17  A.  I'd say a dozen or so.

18  Q.  Have you passed any tests which certify your proficiency as

19  a defensive shooter?

20  A.  We're required through the office to be certified

21  quarterly.

22  Q.  Could you describe that test?

23  A.  It's POST, Police Officer Standard Training, certification.

24  Would you like me to describe --

25  Q.  Please go through the --

1    A.  Basically, there is nine courses of fire, 25 rounds.  The

2    first course starts at about the 3-yard line.  It's two shots,

3    take a step back, one to the head.  Then you move back

4    throughout the courses of fire, moving and shooting, reloading,

5    clearing jams, things of that type.

6    Q.  What's the furthest distance you shoot at?

7    A.  25 yards with a handgun.

8    Q.  Does this include daytime and nighttime conditions?

9    A.  It does.

10   Q.  Does it include moving while shooting?

11   A.  It does.

12   Q.  What is the standard for passing this test?

13   A.  With our office, you cannot throw a round off a silhouette.

14   Q.  Does that mean you have to hit every shot?

15   A.  It does.

16   Q.  Okay.  Have you had any -- you mentioned sheriffs -- your

17   qualifications quarterly.  Do you have any testing for SWAT

18   certification?

19   A.  We test SWAT the same time that the regular certifications

20   are done.

21   Q.  Okay.  Have you competed in any shooting events in the last

22   year?

23   A.  I did, I competed in an event with -- at the sheriffs

24   conference last year.

25   Q.  About how many people did you compete against?

1    A.  There was 40 some people, sheriffs, undersheriffs and some

2    others.

3    Q.  What guns were used in this competition?

4    A.  It was a three-gun shoot.  We shot handguns, AR-15 or MP5,

5    and then shotguns.

6    Q.  About how many shots did you fire?

7    A.  Probably 25 or so with the handguns, 15 to 20 with the MP5

8    and ARs, and I think there was just 5 with a shotgun.

9    Q.  Did you miss any shots?

10   A.  Yes.

11   Q.  How many?

12   A.  Two or three, with my handgun.

13   Q.  What was your finish in this competition?

14   A.  I finished second.

15   Q.  Have you ever used a firearm by pulling a trigger on

16   someone?

17   A.  I haven't discharged my firearm.

18   Q.  I'm sorry, you have?

19   A.  I have not discharged my firearm in the line of duty.

20   Q.  Have you ever used a firearm for personal defense against

21   an imminent threat?

22   A.  I have.

23   Q.  When was that?

24   A.  May 30, last year.

25   Q.  What happened then?

```
1   A.   It was shortly after 10 o'clock in the evening.  My wife
2   and I were in bed.  And I heard the hatch of my wife's SUV open
3   in the driveway.  I went and looked and didn't immediately see
4   anybody.  I grabbed my Glock and went out the front door
5   quietly.  And there were multiple voices.  I don't know how
6   many people were there, but that were moving east from my
7   house.
8   Q.   So what did you do after that?
9   A.   Made it about halfway down -- we have a very long driveway.
10  Made it about halfway down the driveway and decided it would be
11  better for me to stay with my family, so I didn't pursue them.
12  Q.   What was the size of the magazine in the Glock that you
13  took outside that night?
14  A.   It 15 plus 2 plus 1 in the tube.
15  Q.   Was that a 17-round magazine?
16  A.   Seventeen-round magazine.
17  Q.   Why did you choose that particular gun and magazine out of
18  the plenitude of self-defense guns in your home?
19  A.   Boy, there is a lot of reasons.  I had no idea I was
20  getting into.  I didn't know how many assailants or attackers I
21  had.  At the time I had nothing on but a pair of shorts and
22  tennis shoes, when I went outside.  I -- like I said, I didn't
23  know how many people were there.  I don't know what their
24  training is.  I don't know what their physical capabilities
25  are.  I don't know what their body armor is, if any.  I don't
```

1   know if they're intoxicated or under the influence of drugs.  I

2   have no idea.  So I took that, because I -- it was my best

3   chance at winning.

4   *Q.*  Okay.  Thank you.

5           No further questions.

6           *THE COURT:*  Thank you.  Cross-examination.

7                      **CROSS-EXAMINATION**

8   *BY MS. SPALDING:*

9   *Q.*  Good afternoon, Sheriff Heap.

10  *A.*  Good afternoon, ma'am.

11  *Q.*  Let me see if I understand all the firearms you have.  You

12  went through that pretty quick, so . . .

13  *A.*  Sure.

14  *Q.*  You have a .38, correct?

15  *A.*  I do.

16  *Q.*  What capacity magazine is that -- does that firearm take?

17  *A.*  .38 doesn't have a magazine, ma'am.  It has a chamber, and

18  it holds five.

19  *Q.*  I'm sorry.  And you said you had a Glock .40, correct?

20  *A.*  Correct.

21  *Q.*  And that has what size magazine that comes standard?

22  *A.*  Standard is 15.

23  *Q.*  Okay.  You also have magazines for an AR, but you don't own

24  an AR or AR-style weapon personally, correct?

25  *A.*  Personally, I do not.

```
 1   Q.  Then you have a shotgun, I think, a Remington?

 2   A.  I have a Remington 870.

 3   Q.  And another shotgun as well?

 4   A.  Yeah, I have a 20 gauge shotgun.

 5   Q.  Did I miss anything?

 6   A.  I have other -- I have other guns, but those are the ones

 7   we went over, yes.

 8   Q.  Okay.  Those are the weapons that you've designated as

 9   self-defense weapons; is that accurate?

10   A.  Yes.

11        MR. KOPEL:  Objection, asked and answered.

12        THE COURT:  Overruled.

13   BY MS. SPAULDING:

14   Q.  Are those all the weapons that you have that you use for

15   self-defense -- or that you feel are self-defense weapons?

16   A.  No, ma'am we also talked about initially a Remington 30-30

17   lever action and an M1 Garand.  I believe that was the end of

18   the list.

19   Q.  The M1 Garand, what kind of firearm is that?

20   A.  It's a rifle.

21   Q.  Does that carry a magazine?

22   A.  It can.

23   Q.  Okay.  Does yours?

24   A.  It could.

25   Q.  Okay.  Explain to me how you use your Garand.
```

 1   *A.*  My Garand has a solid plate on the bottom that has internal

 2   magazine, if you will, that has like -- I want to say it's -- I

 3   want to say it's a seven-round clip, instead of a magazine,

 4   that's internal to the weapon.  But you can remove the bottom

 5   plate and put a magazine on the bottom of it.

 6   *Q.*  Okay.  And so I'm gathering from what you're telling me

 7   that your Garand has a seven-round clip; is that accurate?

 8   *A.*  Just the internal, yes, ma'am.

 9   *Q.*  All right.  And the Remington you mentioned, I'm sorry,

10   what kind of weapon is that?

11   *A.*  That's a shotgun.

12   *Q.*  All right.  You've indicated that you -- you've been with

13   the Sheriff's Department in Elbert County since 2002 I think;

14   is that right?

15   *A.*  Correct.

16   *Q.*  Did you live in Elbert County prior to that time?

17   *A.*  No.

18   *Q.*  In the time that you've lived in Elbert County, have you

19   ever had to fire your weapon in self-defense?  I'm talking

20   about you personally.

21   *A.*  I haven't discharged my weapon in self-defense, no, ma'am.

22   *Q.*  Okay.  And you're not aware, are you, of any civilian --

23   that is, non-law enforcement person -- firing more than 15

24   rounds in self-defense during the time that you've been in

25   Elbert County, correct?

1          MR. KOPEL:  Objection, beyond the scope.

2          THE COURT:  I think you opened the door.  I overrule

3   the objection.

4          THE WITNESS:  Can you repeat the question, ma'am.

5   BY MS. SPAULDING:

6   Q.  Yes.  During the time that you've lived in Elbert County,

7   you're not aware, are you, of any non-law enforcement person

8   firing more than 15 rounds in self-defense, are you?

9   A.  Not that I'm aware of.

10  Q.  Okay.  How about ten rounds in self-defense?

11  A.  I couldn't answer that.

12  Q.  Would you agree with me that it's uncommon for an

13  individual to discharge a firearm -- that is, a non-law

14  enforcement individual, to discharge a firearm in self-defense?

15  To your knowledge.

16  A.  I wouldn't agree that it's uncommon for an individual to

17  discharge a firearm in self-defense.  If you want to talk about

18  specific number of rounds, I think that's a different issue.

19  Q.  Okay.  Let's say more than five rounds in self-defense.

20  Would be it uncommon for a non-law enforcement person, in your

21  personal experience, to discharge more than five rounds in

22  self-defense?

23  A.  Are we talking Elbert County, in the state, in the nation?

24  Q.  To your personal knowledge.

25  A.  I don't think I could give you a fair representation of

 1 │ that.

 2 │ Q.  You don't know?

 3 │ A.  No, I don't know.

 4 │ Q.  Okay.  You -- I'm getting from your testimony, Sheriff,

 5 │ that you have large-capacity magazines -- and by that I mean a

 6 │ magazine that has a capacity of more than 15 rounds -- for all

 7 │ the weapons that you possess that use those kinds of magazines;

 8 │ is that correct?

 9 │ A.  I'm not clear on your question.

10 │ Q.  Okay.  I'm sorry.  You indicated that you have some weapons

11 │ that carry standard magazines that has a capacity greater than

12 │ 15 rounds, correct?

13 │ A.  Correct.

14 │ Q.  Okay.  And for any weapon that you possess that has a

15 │ magazine -- that can take a magazine of greater than 15 rounds

16 │ as a standard magazine, you have those magazines, right?

17 │ A.  Yes.

18 │ Q.  Okay.  As Sheriff, you are currently exempt from the

19 │ magazine law; is that correct?  That is, you can purchase

20 │ large-capacity magazines if you so desire, correct?

21 │ A.  Correct.

22 │ Q.  Have you done that since July 1 of 2013?

23 │ A.  No.  I did it beforehand.

24 │ Q.  I'm sorry?

25 │ A.  I did it beforehand.  Quite a few.

1  Q.  I'm sorry, sir.  Just one moment.

2  A.  Sure.

3  Q.  The incident that you described to Mr. Kopel of hearing

4  intruders outside your home, was this at night, did you say?

5  A.  Shortly after 10 o'clock in the evening, yes.

6  Q.  Okay.  You heard some noise, you heard your wife's car's

7  hatch being raised, I think is the way you said it, correct?

8  A.  Correct.

9  Q.  Okay.  What weapons do you commonly have available to you

10  for self-defense in a home defense type situation?

11  A.  Pistols, rifles, shotguns.

12  Q.  Okay.  And when you grabbed that weapon, was that because

13  it was just close to you, or is there some particular reason

14  for it?

15  A.  No, that's -- gave me my best chance, my best shot.  Pardon

16  the pun.

17  Q.  Okay.  When you went outside, did you actually see people,

18  or did you just hear them?

19  A.  No, I just heard voices moving east.

20  Q.  Okay.  So since it was dark, is it fair to assume that

21  those folks didn't see you or what you were carrying?

22  A.  There is no way I could answer that.

23  Q.  Okay.  You didn't fire a shot, then, did you?

24  A.  No.

25  Q.  Okay.

1          MS. SPALDING:  I have no more questions.  Thank you.

2          THE COURT:  Thank you.

3          Redirect.

4          MR. KOPEL:  Your Honor, we have no further questions,

5     and we'd ask that the witness be excused.

6          THE COURT:  Thank you, sir.  You may step down.

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  You are excused, unless there is some

9     reason that the State would like to retain him?

10          MS. SPALDING:  No, Your Honor.

11          THE COURT:  Okay.  Thank you very much.

12          That will conclude the presentation of evidence today.

13     We'll reconvene tomorrow morning at 8:30 a.m.  We'll stand in

14     recess until then.

15          (Recess at 5:00 p.m.)

16                    REPORTER'S CERTIFICATE

17

18          I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter.
19

20          Dated at Denver, Colorado, this 22nd day of May, 2014.

21                              s/Therese Lindblom

22                    _____

23                    Therese Lindblom,CSR,RMR,CRR

24

25

1                                    **INDEX**

2    **Item**                                                           **Page**

3    OPENING STATEMENTS

4        By Mr. Westfall                                                5
         By Mr. Grove                                                  15
5
         ROBERT HEWSON
6            Direct Examination By Mr. Westfall                        22
             Cross-examination By Ms. Morrill                          80
7            Redirect Examination By Mr. Westfall                     117
         MICHAEL SHAIN
8            Direct Examination By Mr. Colin                          121
             Cross-examination By Ms. Morrill                         170
9        SHAYNE HEAP
             Direct Examination By Mr. Kopel                          226
10           Cross-examination By Ms. Spalding                        233

11

12                                 EXHIBITS

13   Exhibit        Offered  Received  Refused  Reserved  Withdrawn

14
     86                       199
15   31                        75
     4                         78
16   41                       105
     37,40                    117
17   22-28                    117
     1-6                      117
18

19

20

21

22

23

24

25