```
 1  ||              THE UNITED STATES DISTRICT COURT
    ||                FOR THE DISTRICT OF COLORADO
 2  ||
    ||  Civil Action No. 13-CV-1300-MSK-MJW
 3  ||
    ||  COLORADO OUTFITTERS ASSOCIATION,
 4  ||  COLORADO FARM BUREAU,
    ||  NATIONAL SHOOTING SPORTS FOUNDATION,
 5  ||  MAGPUL INDUSTRIES,
    ||  COLORADO YOUTH OUTDOORS,
 6  ||  USA LIBERTY ARMS,
    ||  OUTDOOR BUDDIES, INC.,
 7  ||  WOMEN FOR CONCEALED CARRY,
    ||  COLORADO STATE SHOOTING ASSOCIATION,
 8  ||  HAMILTON FAMILY ENTERPRISES, INC.,
    ||  d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
 9  ||  DAVID STRUMILLO,
    ||  DAVID BAYNE,
10  ||  DYLAN HARRELL,
    ||  ROCKY MOUNTAIN SHOOTERS SUPPLY,
11  ||  2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
    ||  BURRUD ARMS INC. D/B/A JENSEN ARMS,
12  ||  GREEN MOUNTAIN GUNS,
    ||  JERRY'S OUTDOOR SPORTS,
13  ||  SPECIALTY SPORTS & SUPPLY,
    ||  GOODS FOR THE WOODS,
14  ||  JOHN B. COOKE,
    ||  KEN PUTNAM,
15  ||  JAMES FAULL,
    ||  LARRY KUNTZ,
16  ||  FRED JOBE,
    ||  DONALD KRUEGER,
17  ||  STAN HILKEY,
    ||  DAVE STONG,
18  ||  PETER GONZALEZ,
    ||  SUE KURTZ,
19  ||  DOUGLAS N. DARR,
    ||
20  ||      Plaintiffs,
    ||
21  ||  vs.
    ||
22  ||  JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,
    ||
23  ||      Defendant.
    ||  _____
24  ||
    ||                  REPORTER'S TRANSCRIPT
25  ||                 TRIAL TO COURT - DAY THREE
    ||  _____
```

2408

1    Proceedings before the HONORABLE MARCIA S. KRIEGER,

2  Judge, United States District Court for the District of

3  Colorado, continuing at 8:42 a.m., on the 2nd day of April,

4  2014, in Courtroom A901, United States Courthouse, Denver,

5  Colorado.

6

7                               **APPEARANCES**

8         RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
   at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9  Denver, Colorado, 80202, appearing for the Plaintiffs.

10        DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
   555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11 for the Plaintiffs.

12        MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
   P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13 appearing for the Plaintiffs.

14        ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
   Street, Castle Rock, Colorado, 80104, appearing for the
15 Plaintiffs.

16        DAVID BENJAMIN KOPEL, Attorney at Law, Independence
   Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17 appearing for the Plaintiffs.

18        MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
   SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19 General, Colorado Attorney General's Office, Ralph L. Carr
   Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20 80203, appearing for the Defendant.

21

22

23

24               THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

```
 1                    P R O C E E D I N G S

 2           THE COURT:  We're convened this morning in Case No.

 3    13-cv-1300.  I'm sorry for our delay in starting.  We had some

 4    IT issues that were going on, and we've gotten those resolved,

 5    I believe.

 6           Could I have entries of appearance for today's

 7    proceedings, which are our third day of trial.

 8           MR. WESTFALL:  Good morning, Your Honor.  I'm Richard

 9    Westfall.  With me at counsel table is Mr. Peter Krumholz.

10    We're appearing here on behalf of Mr. Bayne, Mr. Harrell,

11    Outdoor Buddies, Colorado Youth Outdoors Outfitters

12    Association, Colorado Farm Bureau, Women for Concealed Carry,

13    and Colorado Youth Outdoors.

14           I would also like to respectfully request that the

15    Court excuse Mr. Colin's absence for a portion of this

16    morning's proceedings.

17           THE COURT:  He's free to come and go as he chooses.

18           MR. WESTFALL:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           MR. KOPEL:  Good morning, Your Honor.  David B. Kopel

21    on behalf of David Strumillo, John B. Cooke, Ken Putnam, James

22    Faull, Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey,

23    Dave Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

24           THE COURT:  Thank you.

25           MR. ABBOTT:  Good morning, Your Honor.  Doug Abbott on
```

1    behalf of Magpul Industries and the National Shooting Sports

2    Foundation.

3             THE COURT:  Thank you.

4             MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian

5    on behalf of Colorado State Shooting Association and Hamilton

6    Family Enterprises.

7             THE COURT:  Thank you.

8             MR. GROVE:  Matthew Grove, Your Honor, on behalf of

9    the defendant.  With me at counsel stable is Stephanie

10   Scoville, Kathleen Spalding, LeeAnn Morrill, and advisory

11   witness for today, Jeffrey Zax.

12            THE COURT:  Good morning.

13            Are you all ready to proceed?

14       MR. KOPEL:  Yes, Your Honor.

15            THE COURT:  Please call your first witness.

16            MR. KOPEL:  Your Honor, the plaintiffs would like to

17   call Professor Gary Kleck.

18            THE COURT:  Please step up and be sworn.

19            (**GARY KLECK, PLAINTIFFS' WITNESS, SWORN**)

20       COURTROOM DEPUTY:  Please be seated.

21            Please state your name and spell your first and last

22   name for the record.

23            THE WITNESS:  Gary Kleck, G-A-R-Y, K-L-E-C-K.

24            THE COURT:  You may proceed.

25

1              **DIRECT EXAMINATION**

2    *BY MR. KOPEL:*

3    *Q.*  Good morning, Professor Kleck.

4    *A.*  Good morning.

5    *Q.*  Are you a retained expert in this case?

6    *A.*  Yes, I am.

7    *Q.*  What is your fee arrangement?

8    *A.*  $350 an hour.

9    *Q.*  Thank you.  Do you have a job?

10   *A.*  Yes.

11   *Q.*  What is that job?

12   *A.*  I am a professor of criminology and criminal justice at

13   Florida State University.

14   *Q.*  How long have you been there?

15   *A.*  Since 1978.

16   *Q.*  Has your scholarship focused on any particular issues?

17   *A.*  Yes, it's primarily focused on the relationship between

18   firearms and gun control and violence.

19   *Q.*  Have you written any books on the subject?

20   *A.*  Yes, I've written four books.  *Point Blank*, *The Great*

21   *American Gun Debate*, *Targeting Guns*, and *Armed*.

22   *Q.*  Have any of these books won any awards?

23   *A.*  Yes.  *Point Blank* won the Michael J. Hindelang award of the

24   American Society of Criminology, which is awarded for the book

25   of the past several years that made the most outstanding

1   contribution to research in criminology.

2   Q.  Do you happen to recall if any of your books have been

3   cited by any courts?

4   A.  Yes, they've been cited by the D.C. Circuit Court of

5   Appeals twice, in two cases; the Second District Court of

6   Appeals; the Western District of New York; the --

7   Q.  Professor Kleck, if I could just clarify my question.  That

8   was only about your books being cited.  I think you're,

9   perhaps --

10  A.  I'm sorry.  The books.  Yeah, there was one case, I think

11  it was Calivera versus somebody.  I couldn't recall the court

12  it was cited in.

13  Q.  Okay.

14  A.  Might have been the New Jersey Supreme Court, but I'm

15  guessing on that.

16  Q.  Okay.  Have you published any article in scholarly

17  journals?

18  A.  Yes.

19  Q.  About how many?

20  A.  I published 49, including two that are in press right now.

21  Q.  Okay.  Are these articles peer reviewed?

22  A.  Most of them are.  The only exceptions would be articles

23  published in law reviews, where usually you don't have peer

24  reviewing.  Although some are combination law reviews and

25  social science journals, like the *Journal of Criminology and*

1  *Criminal Justice,* that would be an exception where they did do

2  peer review.

3  *Q.*  Okay.  That's --

4  *A.*  *Journal of Criminal Law and Criminology*, that's the name of

5  it.

6  *Q.*  Perfect.

7  *A.*  Sorry.

8  *Q.*  Were any of your articles published in leading journals in

9  their field?

10  *A.*  Yes, I published four articles in the number one journal in

11  criminology, which is called *Criminology*.  That's the name of

12  the journal.  I've published -- my Ph.D. is in sociology, so

13  the leading journals in that field are the *American*

14  *Sociological Review*, *The American Journal of Sociology*, *Social*

15  *Forces*, and *Social Problems*.  And I published in all four of

16  those.

17  *Q.*  Okay.  Have you served as a consultant to any national

18  government research organizations?

19  *A.*  Yes.  Be a little shaky on exactly what their names are,

20  because they're very, very lengthy.  Most recently, I was a

21  member of the National Institute of Medicine and National

22  Research Council County Committee to Establish a Research

23  Agenda -- blah, blah.  It's something very long.  Basically,

24  its purpose was to set a research agenda for doing research on

25  guns and violence.

1          I was also a member of the United States Sentencing

2   Commission's task force on drugs and violence.  I was a member

3   of National Research Council -- not a member, I'm sorry.  A

4   consultant to the National Research Council panel on the

5   understanding and prevention of violence.  And one other that

6   I'm not recollecting right now.  So, maybe, four panels,

7   committees slash task forces.

8   *Q.*  Okay.  You mentioned these were United States government

9   organizations --

10  *A.*  Yes, all of those would be federal government.

11  *Q.*  How about any -- anything outside the United States?

12  *A.*  Well, yeah, I'm a consultant to the Department of Justice

13  of Canada.

14  *Q.*  Okay.  And do you serve as a grants consultant for any

15  national research organizations?

16  *A.*  Yes, I've been a grants consultant for the National Science

17  Foundation, the National Institute of Justice, and probably

18  some others, but I'm not remembering right now.

19  *Q.*  Have you been chosen to serve as a referee for any

20  scholarly journals?

21  *A.*  Yes, probably dozens that I serve as a referee for.  Most

22  recently, I just completed a review for probably the number two

23  journal in criminology, which is *Justice Quarterly*.  But I've

24  also reviewed for *Criminology; Journal of Research in Crime and

25  Delinquency; Crime and Delinquency*, which is a different

1  journal; *American Sociological Review; American Journal of*

2  *Sociology; Social Forces; Social Problems*, and many, many

3  others.

4  *Q.* Okay. Have you testified as an expert witness -- now, not

5  talking about depositions, but actually testified in court and

6  been accepted as an expert witness in any prior cases?

7  *A.* In the past 30 years, I think I've testified in four cases.

8  And I could remember some of them, but I doubt I could remember

9  all of though. Grunow v. Valor is one I remember. That was in

10 Palm Beach, Florida. Wolf v. Colt in Texas, way back in I

11 think 1983, which was a products liability case. NAACP v. --

12 I'm not sure who the defendants were in that one, and that was

13 in federal court in Brooklyn. And that was a negligent

14 distribution case. A total of four, although I'm a little hazy

15 on what the case names were.

16 *Q.* Okay. Do you teach any classes on research methods?

17 *A.* Yes, I teach doctoral students how to do statistical

18 analysis, including multiple regression, multivariate analyses

19 of data. I teach them how to do surveys, a survey research

20 class. I teach research design, which is how to set up a basic

21 strategy of a research project to maximize your ability to

22 infer that one thing causes another. And, currently, I'm

23 teaching a course on assessing evidence, which is a course in

24 how to evaluate the quality of other people's research so you

25 can make a judgment as to which of conflicting studies might be

1  the one you should be most reliant on.

2  Q.  Okay.  Now, putting aside the case -- the four cases you

3  said you testified in as an expert, in the last year, have you

4  submitted an expert report?

5  A.  Yes, I have.

6  Q.  And -- what cases besides this one?

7  A.  Oh, besides this one?  Possibly one in Connecticut, I

8  think, in connection with a challenge to the assault weapons

9  ban.  That might have been in the past year.

10  Q.  Okay.

11  A.  I'm not sure about that one.

12  Q.  Let's make it the past two years.

13  A.  Yeah, then that one.  A case in San Francisco, also a

14  challenge to I think a large -- a magazine capacity limitation

15  case.  One in Sunny Vail -- I'm not sure if I submitted an

16  expert report on that.  That's one separate from the San

17  Francisco one, kind of combined together.  Let's see.  That's

18  all I'm recollecting right now.

19  Q.  Okay.  Let's turn to your opinions here.  I'd like to put

20  up Opinion No. 4.  Is that coming through okay?

21  A.  Not yet.  There it is.

22  Q.  Could you please read Opinion No. 4.

23  A.  "The number of incidents in which citizens need or have

24  needed more than 15 rounds to effectively defend themselves is

25  likely larger than the number of crimes in which the use of a

1    large magazine caused a larger number of casualties.  The

2    number of criminal uses of such magazines is small, and the

3    total number of defensive uses of firearms by crime victims,

4    without regard to magazine capacity or rounds fired, is far

5    larger than the total number of crimes committed using guns."

6    Q.  Thank you.  Have you conducted a study on this subject?

7    A.  Yes.  I've done a number of studies that address different

8    parts of that opinion.  I've done a survey on how frequent

9    defensive gun use is in America.

10   Q.  Let's stop and let's just talk about that.

11   A.  Okay.

12   Q.  That study of the frequency of defensive gun use, was that

13   published?

14   A.  Yes, that was published in the *Journal of Criminal Law and*

15   *Criminology* in 1995.

16   Q.  Can you recall if the study has been cited by any courts?

17   A.  Yes.  That one I know was cited in Heller v. District of

18   Columbia and in another D.C. case, might be Parker v. District

19   of Columbia*,* I'm guessing on that one.  And one or two of the

20   other cases I mentioned, it's been cited in connection with

21   defensive gun use.

22   Q.  Okay.  Who is Marvin Wolfgang?

23   A.  At the time I did that survey and he commented on it, he

24   was probably the most famous and most distinguished

25   criminologist in America.  He had done groundbreaking work in

 1 | many, many different fields, including criminal homicide, the
 2 | measurement of crime severity, and crime over the life course.
 3 | And he was at various times president of the American Society
 4 | of Criminology.  So he probably would be the number one
 5 | criminologist in America at the time.
 6 | Q.  So you said he wrote a response to your study.  Where was
 7 | that response -- his -- Professor Wolfgang's response to your
 8 | study published?
 9 | A.  He was asked to write a reaction to all of the pieces that
10 | appeared in that issue, which concerned various aspects of the
11 | gun issue.  But he devoted considerable attention to my
12 | article, article with Marc Gertz.  And he starts out the -- his
13 | comment by saying, I hate guns.  And if it were up to me, I'd
14 | get rid of every last one of them.  And then goes on to say,
15 | well, what disturbed me was the article by Kleck and Gertz.
16 | And he said, you know, it's a clear-cut case of methodological
17 | soundness, and I could no longer challenge the methodological
18 | soundness of this research.  And that was the survey that
19 | indicated 2 1/2 million defensive gun uses per year.  So it's
20 | why he was disturbed by it, basically.
21 | Q.  Okay.  Well, let's talk about the methodology.  Could you
22 | please fully describe the methodology you used in conducting
23 | the study.
24 | A.  It used standard survey research methodology to select a
25 | sample.  At the time -- keeping in mind this was before cell

 1  phones.  This was done in the spring of '93 -- random digit

 2  dialing was the usual way you selected people to be in a

 3  telephone survey.  So this was a national telephone survey in

 4  which we generated a representative sample of residential

 5  telephone numbers, so that, basically, every household in the

 6  U.S. that had a phone had an equal chance of being picked.

 7       And we would call up these numbers.  Our staff would

 8  ask people some sort of throat-clearing questions, where it's

 9  just a matter of, kind of easing into the real topic of the

10  survey, of the interview, which was defensive gun use.  So

11  maybe the fourth question in, we asked the respondents, the

12  people who answered the phone, In the past five years, have you

13  used a gun for self-protection, except -- excluding uses in

14  connection with the military or police or as a security guard?

15       And we would then follow up with a long series of

16  questions, I think approximately 18, getting at details of the

17  incident.  So we were looking to establish, was it against a

18  human or an animal?  Because we were going to count uses

19  against humans.  We established whether or not there was a

20  direct confrontation with the offender, rather than, you know,

21  somebody just investigating a suspicious noise and finding no

22  one there.  We asked people what exactly they did with the gun,

23  did they actually do something to threaten the offender.

24  Because we didn't consider defensive gun use merely because

25  people carried the gun for protection or possessed it for that

1    purpose.  They had to at minimum threaten the offender that

2    they confronted with the gun, although they might have also

3    actually attacked them.

4         We asked them questions about whether they were

5    injured.  We asked them questions about, well, what crime they

6    thought was being committed against them when they used the gun

7    for self-protection.  And we asked where the incident occurred.

8    So all sorts of standard questions about the circumstances of

9    the crime.

10   Q.  How did you address the risk that somebody -- the

11   respondent might be pro gun and want to make up a good story of

12   defensive gun use within those narrow definitions you have of

13   face-to-face confrontation?

14   A.  Of course, that's always possible.  You can't rule it out.

15   If somebody is really, really quick on their feet and

16   imaginative, it's possible.  But you have to remember, these

17   were calls that came out of nowhere.  Nobody was told in

18   advance they were going to be contacted, so nobody had time to

19   cook up a story like that.  And then they had to give us 18

20   internally consistent responses to these questions, all kind of

21   fired at them rapid fire.

22        Occasionally, we did get a person who started out

23   trying to do that.  You know, they'd start out giving us

24   some -- they'd say, yes, I had that kind of an experience, and

25   then two or three questions in, they gave up the effort because

1  they'd say, I'm kidding, I didn't really have that.  So it
2  certainly indicates people might be motivated to do that, but
3  it's really hard to do that.
4  Q.  Do you think there were also people who might have
5  genuinely had a defensive gun use but wouldn't talk about it to
6  a stranger on the phone?
7  A.  Oh, yes, there is no doubt about that.  Part of the way we
8  got at that was simply debriefing our interviewers after the
9  fact.  Because our interviewers had the benefit of hearing
10  people's voices, hearing pauses when they took a long time to
11  answer.  And so, in other words, things that aren't in the raw
12  data.  And there was -- at the end of each interview in which a
13  defensive gun use was alleged, the interviewers were supposed
14  to say -- did they think either of two things were going on,
15  did they think people were withholding a defensive gun use
16  experience, or did they think they were making up a phony one
17  or distorting one.

18        And that would be, admittedly, subjective.  It's based
19  on things like, they took a long time to answer the initial
20  opening question and then said, no.  You know, like, why would
21  you have to think about it a long time before you said no, I
22  haven't used a gun for self-protection unless you were
23  concealing one.  Not definitive information by any means.  But,
24  basically, we found out that cases where the interviewers
25  thought they were withholding a defensive gun use were far more

1  frequent than cases where they suspected they were making one

2  up.

3  *Q.*  Okay.  Before we -- I'd like to come back to that in a

4  second.

5  *A.*  Let me back up.  I want to give you the full background to

6  my answer.

7        There is also a rich literature in the survey research

8  field on response errors, which means, people giving erroneous

9  answers to questions in surveys.  And a lot of it is relevant,

10  although not directly relevant to the issue of defensive gun

11  use in particular.  But we know from prior experiments that

12  people will withhold the fact that they possess guns.  They'll

13  be asked, do you possess guns?  But unbeknownst to the

14  respondents, the researchers were using a list of people who

15  had recently registered their guns.  So it was known that every

16  last one of them was a gun owner, and the purpose of asking the

17  question was just to see whether they'd admit it.

18  *Q.*  Do you recall where that study was published?

19  *A.*  I'm not sure.  One of the authors was Arthur Kellerman.  It

20  was published in a medical journal.

21  *Q.*  Would that be cited in either of your books, *Targeting Guns*

22  or *Point Blank*?

23  *A.*  Yes.  It indicated, basically, one in eight people who were

24  known to be legal gun owners did not -- deny having a gun.

25  They claimed they didn't possess a gun.  Well, it's relevant

 1 | because possessing a gun is one of the logical elements that

 2 | has to be there in order to do a defensive gun use.  So any

 3 | reluctance to report possessing a report would obviously feed

 4 | into a reluctance to report a defensive gun use.

 5 | We also know from methodological tests done by the

 6 | U.S. Census Bureau that people underreport victimization

 7 | experiences, which is another logical element necessary in

 8 | order to report a defensive gun use.

 9 | And they did a similar kind of study, where they start

10 | out with a bunch of people they knew were crime victims because

11 | they had reported crimes to the police.  But even within this

12 | pool of people who were willing to tell the police about it,

13 | when they were asked in the context of a survey, large numbers

14 | of them still denied it.  You know, they were giving a false

15 | negative, saying, no, I haven't been a victim of a crime when

16 | in fact they were.

17 | Finally, a lot of defensive gun uses we discovered

18 | occurred in public places where it would be illegal to possess

19 | a gun unless you had a carry permit.  And since only a couple

20 | of percent of the population -- at that time, remember, this is

21 | '93 -- had a permit, that would mean that in the course of

22 | doing a defensive gun use, which might have been legitimate and

23 | lawful in and of itself, they were committing a crime of

24 | unlawful possession of a firearm in this public place.  So kind

25 | of a third element that is necessary for those people to admit

1  to a defensive gun use would be, they have to be willing to

2  admit to possessing a gun in a public place.

3        Once they had said where the event occurred, they

4  couldn't say, I used a gun defensively, without also admitting,

5  yeah, I possessed a gun in a public place.  And if they didn't

6  have a carry permit, that was a crime.

7        So we know people are reluctant to report their own

8  criminal acts, they're reluctant to report victimization

9  experiences, and they're reluctant to report possession of a

10  gun.  All of that builds a pretty strong case that almost

11  certainly people were failing to tell us when they had a

12  defensive gun use, which obviously entails all three elements.

13  *Q.*  How were the -- who conducted the interviews?  Was it

14  Florida State volunteers, or a research firm, or --

15  *A.*  It's the employees of the Research Network, which was a

16  survey research organization owned by a colleague of mine, who

17  is also the co-author of that article, Mark Gertz, and his

18  brother, they co-owned it.  And the people who did the

19  interviews were their employees.  Some -- not all, but probably

20  most of them were Florida State students.  Not criminology

21  students, necessarily, maybe one or two, but for the most part

22  they were a scatter of the kind of students who would be

23  available in a college town for that kind of part-time

24  intermittent work.

25  *Q.*  They were hired by this professional polling firm, survey

1   firm?

2   *A.*   That's correct.  They kind of picked out their very best

3   interviewers for the survey, you know, because, basically, the

4   boss was invested in this being a good survey, so they picked

5   out the ones that were the most skilled.

6   *Q.*   So the Research Network survey firm, what kind of other

7   work did they do?

8   *A.*   Their bread and butter work was totally unrelated to crime.

9   It was doing surveys for cable companies.  So, you know, like,

10  customer satisfaction surveys, that sort of thing.  But

11  beginning right around the time that Mark Gertz had them do

12  this survey, they were starting to do surveys for other faculty

13  members at Florida State in the College of Criminology and

14  Criminal Justice.  So they did a bunch of surveys on a variety

15  of crime-related topics by that time.  Nothing else related to

16  guns, though.

17  *Q.*   You mentioned this before, but I just want to be clear.  In

18  your study that we're talking about, how did you define a

19  defensive gun use?  What was the requirements of that?

20  *A.*   Had to be face-to-face confrontation between victim and

21  offender; had to involve a crime that the victim believed was

22  being committed against them, they could articulate some kind

23  of crime; the victim had to actually do something with the gun

24  beyond just possessing it.  That is, at minimum, they had to

25  threaten the offender with the gun, or they might have actually

 1    attacked them in the form of shooting at them.  But at minimum,

 2    they had to threaten them with it.

 3    Q.  Okay.  Before we get into the details of your results, I'd

 4    like to talk about how this fits into the context of other

 5    surveys on defensive gun use.  Including your own, how many

 6    surveys are there of defensive gun use -- of the numerosity of

 7    defensive gun use in the United States?

 8    A.  There were 18 national surveys that I know of that asked

 9    the question about defensive gun use.

10    Q.  What --

11    A.  -- including mine.

12    Q.  Okay.  What's the time range of when those were conducted?

13    A.  I think they were done as early as the late '70s.  And the

14    last one, oddly enough, was done in 2000.  I've searched, and

15    I've not been able to find a single one in the last 14 years,

16    since 2000.  I think the *Washington Post* did the last one back

17    in 2000.

18    Q.  Of these 18 studies, what's the lowest number,

19    approximately, for annual defensive gun uses they found?

20    A.  The lowest would be about 600,000 times a year.

21    Q.  Okay.  And what would be the highest number that any of

22    these 18 found?

23    A.  The highest would probably be in the vicinity of 4 million.

24    Q.  Do you remember --

25    A.  That was the *Los Angeles Times* survey.

1  | *Q.*  Why do you think there is such a range?

2  | *A.*  Well, a lot of it has to do with just different years in

3  | which they were done.  Since they were done in many, many

4  | different years, the crime rates were different.  And, of

5  | course, the number of times people use a gun for self-defense

6  | is a function of how many times they have occasions to defend

7  | themselves against a crime.  So that has a lot to do with it.

8  | Our survey was done in 1993, which was a peak crime

9  | year.  Other surveys were done in more lower crime rate years.

10 | That's part much it.  Part of it was they weren't asking about

11 | the same subset of defensive gun uses.  We asked about

12 | defensive gun uses involving any type of gun, but other surveys

13 | had only asked about those involving handguns.  Still other

14 | surveys would limit it in other ways.  They asked about uses

15 | only in the home, and others asked about uses in public places,

16 | and so on.

17 | They were never quite asking the same thing; and, so,

18 | you know, they're going to vary a lot because of these factors.

19 | Just due to crime alone, that one would result in one survey

20 | having an estimate twice as large as another, because crime is

21 | twice as high.

22 | *Q.*  Okay.  You mentioned your study did not include defensive

23 | gun uses against animals.

24 | *A.*  Yes and no.  We asked an initial question about any

25 | defensive gun use in the past five years, and then we had a

1   follow-up question as to whether it was against a human or an

2   animal.  I don't think we ever did anything with people's

3   responses other than to exclude the uses against animals.  But

4   you could go back in the data and find out how many have been

5   used against animals.

6   Q.  But you haven't done that.  You don't have a rough estimate

7   of animals?

8   A.  No.

9   Q.  You mentioned these 18 studies.  Does your count of 18

10  include the annual reports from the National Crime

11  Victimization Survey conducted by the Census Bureau?

12  A.  No.  I was only including surveys that specifically asked

13  about defensive gun use.  That one doesn't.  It only asks a

14  sort of generic open-ended question, Did you do anything for

15  self-protection during -- while the incident was going on?  And

16  then if a person was to report a defensive gun use, they would

17  have to sort of volunteer that specific character of the

18  defensive use of the self-protective action.

19  Q.  But one could read, say, a national crime victimization

20  survey from, let's say, 1998.  And if you read the whole thing,

21  you would find the -- the number of people who had said -- who

22  had volunteered that --

23  A.  Yes.

24  Q.  -- who had volunteered in that detail?

25  A.  That's correct.

1  Q.  Okay.  Have you ever heard of the National Opinion Research

2  Center?

3  A.  Yes.

4  Q.  Is it respected among social scientists?

5  A.  Yes.  It's one of the most highly respected survey

6  organizations in America.  It's housed at the University of

7  Chicago.  And it's probably been used to generate literally

8  thousands of scholarly articles based on NRC data.

9  Q.  Do you know of a Tom Smith associated with that center?

10  A.  Tom Smith is a long-term research director of the National

11  Opinion Research Center.

12  Q.  Does he have a good reputation?

13  A.  Yes, he would be a leading expert in survey research.

14  Q.  Did Mr. Smith write an essay about your defensive gun use

15  study?

16  A.  Yes.  Two years after the initial publication of an

17  article, they had kind of a follow-up -- part of an issue was

18  devoted to being a follow-up.  He was asked for his reaction to

19  critics of our survey, plus our survey.  And I think he was

20  trying to be Mr. Sweetness and Light.  He ended up, basically,

21  splitting the difference between what critics claimed was a

22  defensive gun use, which was the one based on the NCBS, which

23  doesn't actually directly ask about defensive gun use.  And

24  that generates an estimate of maybe 100,000.  Ours estimated an

25  estimate of 2.5 million in -- just before '93 per year.  So he

1   split the difference; he said it's plausible that the true

2   figure is 1.2 million.

3   Q.  Okay.  Did he have -- in that -- do you recall where he

4   published that -- his article?

5   A.  That was in the same journal, the *Journal of Criminal and*

6   *Criminology,* 1995.

7   Q.  Are you sure about the year on that?

8   A.  Pretty sure.  But once you ask, am I sure about it, then

9   I'm not so sure.  I thought it was '95 --

10  Q.  Okay.

11  A.  I'm sorry, '97.  Because the original article was '95, so

12  two years after that was '97.

13  Q.  Does he express an opinion on whether the National Crime

14  Victimization Survey could produce an accurate number by asking

15  for volunteers?

16  A.  Yes.  He was quite clear, it can't.  You know, and he said,

17  if you don't specifically ask about the particular phenomenon

18  but only about a broader category with which that phenomenon

19  falls, then you cannot get a usable estimate of how often that

20  occurs.

21  Q.  Now, I think you said for your study, which was published

22  in '95 based on a survey in '93, you had estimated 2.5 million

23  defensive uses annually?

24  A.  Right.

25  Q.  Was that a midpoint estimate -- maybe I'm not using the

1   right word.  What was the range of what you found?

2   *A.*  I didn't think of it in those terms.  It wasn't averaging

3   other estimates, if that's what you mean.  It was what I regard

4   as the technically soundest estimate.  We had estimates that

5   varied in all sorts of ways.  For example, you could base your

6   estimate on households.  You could take what percent of

7   households had a defensive gun use and multiply that by the

8   total number of households in the U.S., that would be one

9   estimate.  Or another way to do it is to rely on what

10  individual people told us about their own individual

11  experiences.

12          Well, the latter is more reliable.  It doesn't depend

13  on, you know, dad reporting mom's experiences or mom reporting

14  dad's experiences, which a household-based estimate would.  So

15  the person-based estimates were preferable, because it was all

16  based on the direct experience of the person being questioned.

17          We also had both estimates of experiences in the

18  previous five years versus just those in the past year.  The

19  past year estimates are invariably regarded as better because

20  there is less recall failure.  There is also less of another

21  problem called forward telescoping.  But there is, basically,

22  less error in people responding to questions that pertain to

23  the relatively recent past than, you know, a much longer period

24  of time in the past.

25          So the 2.5 million was person-based estimates based on

1    the past year experiences of respondents.

2    Q.  Let's -- taking into account your study among those 18

3    surveys for -- which took place for a variety of different

4    years, looking at each of those 18 individually, how many of

5    them found that the number of defensive gun uses in their

6    particular year, however they measured it, was larger than the

7    number of criminal gun uses in that particular year?

8    A.  If you use the National Crime Victimization Survey to

9    estimate total number of criminal uses, which is the standard

10   way it's done, 16 out of the 18 surveys indicated there were

11   more defensive gun uses than criminal uses.  The two surveys

12   that indicated more -- it wasn't statistically significant

13   more, because there is a big plus or minus margin of error in

14   surveys.  And so even those were, basically, statistically the

15   same.  So none of the 18 indicated there are more criminal uses

16   than defensive uses.  I mean, significantly more, I should say,

17   to be precise.

18   Q.  So your study came up with an estimate of the number of

19   defensive gun uses, but you also asked follow-up questions.

20   Did you -- did those provide details about the nature of

21   defensive gun use?

22   A.  Yes.  We would ask about where it occurred and what kind of

23   crimes were involved and what exactly people did with their

24   guns.  Like, did they fire the gun?  If they fired it, were

25   they trying to shoot the offender?  If they were trying to

1  shoot the offender, did they in fact -- do they believe they

2  wounded the offender, and so on.

3  Q.  Let's ask that one.  In how many of the defense gun uses,

4  which you defined as a face-to-face confrontation against what

5  the victim perceived to be a violent felony attack -- in how

6  many of those did the defender, the defensive gun user, pull

7  the trigger?

8  A.  They pulled the trigger trying to shoot the offender, you

9  know, excluding warning shots, in about 17 percent of the

10  cases.  Something like one in six, something like that.

11  Q.  Do you remember what percentage was warning shots?

12  A.  If you include warning shots, really, I don't recollect

13  that offhand.

14  Q.  Okay.  Was that smaller than the number of actual trying to

15  shoot --

16  A.  Yes, it was.

17  Q.   -- the attacker.

18  A.  Yes, it was.

19  Q.  Okay.  Where did your study find the defensive gun uses

20  take place?

21  A.  About 35 percent occurred in the defender's home; around

22  another 32, 33 percent, near their home; and the rest in

23  various other locations.  Like, 4 percent in other private

24  locations, but the -- other than the person's home, and then

25  the rest would be public locations of one sort or another.

 1  Q.  So that the 4 percent would be somebody else's home?

 2  A.  Somebody else's home, that kind of private location.

 3  Q.  So -- you said near the home.  What does that mean, for

 4  about a third --

 5  A.  We use the same definition that is used in the Census

 6  Bureau's National Crime Victimization Survey.  For somebody who

 7  lives in a free-standing house, it basically means their yard,

 8  driveway, an open carport, and the street adjacent --

 9  immediately adjacent to the house.  So, like, even if it's just

10  one door down, that's not considered near the home.  But if

11  it's the street right in front of that person's house, that

12  would be considered adjacent, and that's near the home.  For a

13  person who lives in an apartment, it could include the

14  apartment hallway, you know, like, that kind of immediately

15  adjacent but not in the person's apartment location.

16  Q.  Would it -- in the apartment, would that include common

17  areas, the laundry room and the basement?

18  A.  It's my impression that, yes.  I'm basing this on, you

19  know, the instructions that are given to Census Bureau

20  interviewers who work on the NCVS.  So that's my understanding.

21  Q.  Okay.  Did your data show any information about how many

22  shots were fired in self-defense?

23  A.  No, we didn't think to ask that.  I wish I had, but we

24  didn't.

25  Q.  Are there any published studies in peer-reviewed journals

 1  or, for that matter, any other scholarly journals which report

 2  data on the number of defensive shots by citizens?

 3  A.  I'm not aware of any.

 4  Q.  What did your study indicate about the number of gunfights

 5  annually, by which I'm meaning, shots were fired in both

 6  directions?

 7  A.  It's pretty unusual.  You know, there is only a few percent

 8  of these incidents where there is shooting going in both

 9  directions.  So you start with only, maybe, you know,

10  17 percent where the defender is shooting, and in very few of

11  the cases was the offender also shooting.  So it really works

12  out to, like, I don't know, maybe 3 or 4 percent or something

13  like that, where both parties were shooting.  These are almost

14  never gunfights in that sense.

15  Q.  Okay.  So 3 or 4 percent of 2 1/2 million would be

16  something like 80,000 for 1993?

17  A.  Right around 75,000, if I'm recollecting the 3 percent

18  figure correctly.

19  Q.  Okay.  Has the overall crime rate changed since 1993?

20  A.  It's almost dropped in half, yes, by the most recent year

21  for which we have data for 2012.  It was a little over half of

22  what it was back in '93, when we did the survey.

23  Q.  Do you believe that defensive gun use frequency has dropped

24  by about that same amount?

25  A.  Yes.  That would be the reasonable assumption that, you

1  know, if you have half as many crimes where people have

2  occasion to use defensive gun use, you have roughly half as

3  many guns being used for self-protection.

4  Q.  So from 2 1/2 million --

5  A.  1.2 million as a ballpark estimate.  Sure.

6  Q.  Okay.

7  A.  I wish we had actual data rather than a ballpark estimate,

8  but that's a reasonable one.

9  Q.  About how many criminal gun uses were there in the most

10  recent year for which there is data?

11  A.  The most recent NCVS data pertained to 2008.  And they

12  indicate around 303,000 violent crimes committed by an offender

13  possessing a gun.

14  Q.  Now, I wanted to ask you one final question.  So you're

15  relying on the NCVS, for example, on how many criminal gun uses

16  they were.  But you didn't think -- you didn't use them for how

17  many defensive gun uses there were.  Can you explain why you

18  like it one time and not the other.

19  A.  Well, there weren't enough people saying, I had a defensive

20  gun use experience, based on our expectations from the other 18

21  surveys.  Plus, there is, you know, Tom Smith's generic

22  observation of survey research experts that you're just not

23  going to get enough people talking about a particular

24  phenomenon when you only ask about a broader category of

25  experiences that happened to encompass that specific phenomenon

 1 | you're interested in.
 2 | Q.  Is the National Crime Victimization Survey, is it designed
 3 | to and does it ask direct questions about actual victimization,
 4 | were you robbed, were you robbed at gunpoint, things like that?
 5 | A.  Yes.  It asked plenty of questions about victimization, and
 6 | that's what it was designed to do.  It's a very good survey for
 7 | that purpose.  But it was never designed to estimate how many
 8 | people used a gun for self-protection, or else they almost
 9 | certainly would have, then, had specific questions asking about
10 | that particular form of self-protection.
11 | Q.  Okay.  Let's move on to another opinion of yours.
12 |         Could you please read that opinion.
13 | A.  Defensive use of firearms by crime victims is generally
14 | effective and makes it less likely that the victim will be
15 | killed, injured, or lose property.  Any law which obstructs or
16 | impairs defensive gun use by victims increases the likelihood
17 | of them suffering bodily injury or property loss.
18 | Q.  What is the basis for this opinion?
19 | A.  Well, that's based on the other use I made of the National
20 | Crime Victimization Survey, which was to take the incidents
21 | where people did report a defensive gun use, they were willing
22 | to report it -- there weren't enough of them to estimate how
23 | many defensive gun uses occur in the U.S., but they do provide
24 | a substantial sample of people from a nationally representative
25 | sample of crime victims who could tell us about what happened

1   when they did use a gun for self-protection.  And then we could

2   compare them with people who adopted any one of the other 15

3   forms of self-protection that the NCVS asks about.

4   *Q.*  Okay.  And was that study ever published?

5   *A.*  Well, there is not just one study, there is a series of

6   three studies.  One, a very general study, kind of an

7   introduction to the topic, published in 1988 in *Social*

8   *Problems*.  And then another one specifically focusing on

9   robberies, published in the *Journal of Quantitative Criminology*

10  in '93.  And then probably the most sophisticated one,

11  published in I think 2007 or so, in *Criminology*, with one of my

12  doctoral students, Jongyeon Tark.  And --

13  *Q.*  Now, all three of those studies you mentioned, you were the

14  author or co-author of those?

15  *A.*  I was the sole author of the *Social Problems* article, the

16  first of two authors on the *Journal of Quantitative Criminology*

17  article, and the second of two authors on the *Criminology*

18  article.

19          *THE COURT:*  I'm going to interrupt at this point,

20  please.

21          I've lost Bridge.  Could we re-establish that, please.

22          You may proceed.

23  *BY MR. KOPEL:*

24  *Q.*  Thank you, Your Honor.

25          So you said the study you did with -- the Tark and

1 | Kleck study in *Criminology* was the most thorough one on the

2 | subject in the U.S.?

3 | *A.* Yes.

4 | *Q.* Let's talk about that one. Did you get data from the

5 | National Crime Victimization Survey for one year or for more

6 | than one year?

7 | *A.* No, it covered all of the most recent years. There might

8 | have been something like 12 or 14 years worth of data. But we

9 | used a lot of the years rather than just one or two.

10 | *Q.* And so I understand, the National Crime Victimization

11 | Survey has lots of questions. And then for people who did

12 | indicate they were victim of a violent crime, they are asked

13 | the question, well, did you do anything in response? And

14 | that's a free-form answer. And you analyzed that; is that

15 | correct?

16 | *A.* Yes. Once people offered some specific detail about

17 | exactly what they did for self-protection, we would be able to

18 | compare them with people who mentioned other kinds of forms of

19 | self-protection, and see how it was related to whether or not

20 | they were injured and whether or not they lost property. So

21 | those were the outcome measures or dependent variables, that is

22 | to say, the sorts of things we were trying to explain. And we

23 | were trying to see the influences of using various forms of

24 | self-protection on those outcomes.

25 | *Q.* Do you recall approximately the sample size that you were

1   looking at there?

2   *A.*  Might have been 27,000, but I'm -- you know, I'm really not

3   all that confident.  The total sample is in the many, many

4   thousands, certainly.

5   *Q.*  Okay.  So could you drill down and continue to tell us

6   about the detail -- you have these 27,000 answers of people

7   indicated -- answered what they did in response to the criminal

8   attack.  And then you had 27,000 answers, what did you do with

9   that?

10  *A.*  Well, we had two technical problems we had to solve, one of

11  which is, what happened first?  If somebody did something for

12  protection -- self-protection and then was injured, it might be

13  the case that that self-protective action did affect or

14  contribute to the -- them being injured.  Maybe it provoked the

15  offender into attacking them.  But if they were injured first

16  and then adopted some form of self-protection, then, obviously,

17  that's impossible.  Causation can't run backwards in time.  And

18  the benefit of the data we were using in contrast to the data

19  used in earlier studies was that the NCVS in its later form

20  established what happened first.  They established -- they

21  asked people about the sequence.

22          And so we found that when people were both injured and

23  had used a gun for self-protection, 90 percent of the time they

24  had gotten injured first.  So it was injury provoking them to

25  use a gun for self-protection rather than self-protection with

1   a gun somehow influencing the offender to attack and injure

2   them.  So that was the issue is of what happened first.  We

3   basically treat a case of injury as possibly being attributable

4   to the self-protective action if it occurred after the -- you

5   know, the self-protective action occurred, so it was defensive

6   action followed by injury.

7        And the other problem we had to establish was whether

8   or not the outcome, being injured or not, losing property or

9   not, was really attributable to what people did for

10  self-protection versus all of the other characteristics of the

11  crime experience that might influence that.  So, for example --

12  examples of those factors would be, how many offenders were

13  there relative to how many victims?

14       So we had to control for, you know, that numerical

15  advantage of offenders over victims.  We controlled for whether

16  or not there was a gender-based advantage, like male

17  offender/female victim.  Whether there was an age-related

18  advantage to the offenders, like they were in their physical

19  prime, let's say between 16 and 34, and the victims were either

20  small children or elderly people.  Also circumstances like, was

21  it night or day, did it occur in the victim's home, on and on

22  and on.  We basically control for every other attribute of the

23  crime incident that was measured in the NCVS to rule out the

24  possibility that it was really some of those other factors that

25  were affecting the outcome.  So that made -- we were better

1    able to isolate the effect of the self-protective action

2    itself, apart from the effect of those other factors.

3    Q.  Is that what is called a multiple regression study?

4    A.  Yes.

5    Q.  Could you explain what that is.

6    A.  This specific variety was called a logistic regression

7    analysis.  It's used when you have a binary outcome, that is,

8    an either/or sort of outcome, injured/not injured, lose

9    property/don't lose property.  But generally speaking, multiple

10   regression is a statistical procedure that allows you to see

11   how strongly two factors are associated with one another,

12   controlling for many other factors.  That's where the multiple

13   part comes in, because there are multiple variables taken

14   account of.

15        So it's basically used to isolate the association of

16   the variable you're interested in and the outcome measure

17   leaving aside or controlling for the influences of all the

18   other factors.

19   Q.  And so if I -- if I follow correctly, you're saying, in the

20   multiple regression study, you would -- you have -- the base

21   sort of answer was, did the victim take X type of protective

22   action?  And then, was the victim injured, yes or no?  And was

23   it serious injury, yes or no?  And then what makes it multiple

24   regression is, you're then mathematically controlling for the

25   fact, that, well, the attacker was this age, and the victim was

1 | that age, or the attack was at home or was not, all of those

2 | things?

3 | *A.* Yes. You need to control for those other factors because

4 | many of them also affect the outcome.

5 | For example, we basically learned as a result of this

6 | research that the people who used guns for self-protection were

7 | basically using them in circumstances that were much more

8 | dangerous or disadvantaged -- disadvantageous to the victim,

9 | leaving aside their use of a gun. In short, they used sort of

10 | the most serious defensive action only in the toughest

11 | circumstances, the circumstances that were most dangerous and

12 | disadvantageous to the victim.

13 | *Q.* Could you --

14 | *A.* If you didn't control for that, it would make it look like

15 | these people were really suffering badly, and maybe it's

16 | attributable to the defensive gun use itself.

17 | *Q.* Could you elaborate on that some, the circumstances?

18 | *A.* Well, for example, they were more likely to be facing

19 | multiple offenders. They were more likely to be outnumbered.

20 | They were more likely to already have been injured by the time

21 | that they were using the gun for self-protection. And,

22 | presumably, an injured person is not in the same shape as an

23 | uninjured person.

24 | They were more likely to be facing offenders who

25 | themselves had weapons and more likely specifically to be

1  facing offenders who had guns.  So the tougher and more

2  dangerous the circumstances got in those ways, the more likely

3  it is you were to see somebody using a defensive gun use.  We

4  interpreted that as an indication that people had to be pushed

5  into what they otherwise would have been reluctant to do.

6  Q.  So that the category of people who are using defensive --

7  guns defensively is a sub -- is a sort of distinct subset from

8  the people who were crime victims in general, in the sense that

9  they are under more serious multiple attacks, they've already

10 been injured, and so on; is that what you were saying?

11 A.  Yes.

12 Q.  So what did your study find about the efficacy of defensive

13 gun use?

14 A.  It found that, first of all, people who use guns for

15 self-protection are virtually never injured after doing so.  In

16 fact, in some years of the NCVS, there weren't any cases like

17 that.  As I said before, if they were injured in an incident

18 where they used guns for self-protection, the injury had

19 occurred first and, therefore, couldn't possibly have been

20 caused by or influenced by the victim's defensive gun use.

21        And relative to other forms of self-protection --

22 there were a total of 16 or 18, I forget which, taken into

23 account in the NCVS -- the form of self-protection that had the

24 strongest impact in avoiding serious injury was use of a gun.

25 Q.  So you said that that had the lowest -- resulted in the

 1 | lowest frequency of injury.

 2 | *A.* Yes, other things being equal, it drove down the risk of

 3 | injury more than any other self -- form of self-protection.

 4 | *Q.* Did it -- did you study -- besides injury in general, did

 5 | you also have a separate category for serious injury?

 6 | *A.* Yes. The NCVS asks about the specific nature of the

 7 | injuries. And they consider things like broken bones and loss

 8 | of consciousness and any gunshot wound as serious injuries;

 9 | whereas, minor cuts and bruises, they classify as minor

10 | injuries. So --

11 | *Q.* What was the result --

12 | *A.* The minor injuries are really minor. And so when you talk

13 | about serious injury in the NCVS, it's pretty serious.

14 | *Q.* Okay. You said you found that defensive gun use reduces

15 | the frequency of injury in general, compared to other

16 | protective methods?

17 | *A.* Yes.

18 | *Q.* Is that also compared to going along with the criminal,

19 | just submitting?

20 | *A.* Yes. That's one of the adaptations -- it probably

21 | surprises people to hear that is a self-protective strategy,

22 | but it is a strategy, not resisting. That is one of the NCVS

23 | self-protective categories. And, yes, it was more effective in

24 | avoiding injury. Although, that's a clear case of where you

25 | really have to control for those other circumstances, because

1  in a case where people didn't resist, it's often -- they

2  weren't pushed into resisting by, you know, nasty, dangerous,

3  threatening circumstances.  And so if you don't control for

4  those circumstances, you'll sort of miss that.

5  Q.  Okay.  So you found less frequent injury, in general.  Did

6  you find less frequent serious injury?

7  A.  Yes.

8  Q.  Okay.  Did it affect the results in terms of loss of

9  property?

10  A.  Yes.

11  Q.  And what -- how did it affect the results?

12  A.  It made it less likely to -- that the victim would lose

13  property.  So that basically means, it was less likely to be a

14  completed robbery, for example.  Most commonly, where there is

15  property at stake, it's either sort of a disrupted burglary or

16  a robbery.  And so what that means is, it's less likely the

17  criminal got away with the victim's property.

18  Q.  Okay.  How often did it happen that the victim's gun was

19  taken away by the criminal?

20  A.  Well, you can kind of indirectly get at that with the NCVS,

21  because they also ask if the person lost any property.  And

22  they specifically code whether or not the person reports losing

23  a gun.  And, basically, that just doesn't happen.  That is,

24  people who use guns for self-protection don't also report

25  having lost a gun in the incident, which presumably would have

1    to be the result of the offender taking it away from them.

2    *Q.*  Could it happen once in a while?

3    *A.*  Sure.  I mean, you know, it could happen once in a while.

4    Once in a blue moon it happens with police officers, even.

5    Although the difference between that and police officers is

6    that when police officers lose their guns to an offender, it's

7    almost always when they were not using it for self-protection,

8    that is, it's snatched out of their holster.  They didn't have

9    it in their hands, threatening an offender or shooting an

10   offender.  Rather, it was not being used for self-defense and

11   it was in their hand; whereas, the cases of self-protection

12   that I'm talking about with a gun almost invariably would

13   involve the victim having the gun in their hand.  So it's,

14   obviously, fundamentally a different set of circumstances.

15   *Q.*  You said besides the forms of self-protection that people

16   engaged in, the study I think you said 16, about, varieties,

17   one was not resisting, another was defensive gun use.  Do you

18   remember what some of the other defensive strategies were?

19   *A.*  One would be calling the police.  One would be trying to

20   talk the offender out of it or arguing with them.  One would be

21   running away.  The victim might also defend themselves with

22   force, but without a weapon.  Or they could defend themselves

23   with a weapon, but not a gun, like, with a knife or a club or

24   whatever.  So just about everything you can imagine a person

25   doing in response to a victimization experience is separately

 1  coded in great detail in the NCVS.

 2  *Q.*  Now, you're not saying that as a blanket rule it's always

 3  best to use a gun for self-defense against a violent crime, and

 4  everybody should follow that rule?

 5  *A.*  No.  All we can say is what happens when people actually

 6  did do so.  But it's possible people are making smart

 7  decisions, and they're not doing so when it would be foolish

 8  and counterproductive to do so.  So, you can't say anything

 9  about the incidents where people might have but didn't actually

10  use a gun for self-protection.  We can only say what happened

11  when they did.

12  *Q.*  And it seems like you're saying that sometimes the, just

13  give them your wallet, might have been the right strategy on

14  the less serious attacks?

15  *A.*  Could be.  There is no way to tell, because, of course, all

16  that would show up in the NCVS is that the person didn't

17  resist.

18  *Q.*  And --

19  *A.*  They don't ask, by the way, whether the victim possessed a

20  gun.  So you don't know whether they had that option; you only

21  know what they actually did.

22  *Q.*  Okay.  And I believe you were saying, defensive gun uses

23  seemed to happen in the more extreme violent crimes, multiple

24  offenders, victim already injured, and so on?

25  *A.*  Yes.  Although I don't mean to claim that I've controlled

 1  for all aspects of the dangerousness of the circumstances.  We

 2  could only control for the ones that were measured in the NCVS.

 3  For example, we can't control for how much physically larger or

 4  stronger the offenders were than the victims.  That would be

 5  great if you could do that too.

 6  Q.  Okay.  According to the FBI, how many justifiable homicides

 7  are there annually reported in the uniform crime reports, not

 8  including ones by law enforcement officers?

 9  A.  It's in the low to mid hundreds.  I mean, it would be like

10  300, 400, 500 in a typical year where there are civilian

11  justifiable homicides.

12  Q.  So Professor Zax, here, says, you're wrong about everything

13  because you have that number, just a couple of hundred

14  defensive homicides by civilians, citizens, every year.  So

15  where do you get all this 2 1/2 million, and guns are so good

16  for protection, that kind of stuff, contradicting, as he says,

17  what the FBI says?

18  A.  Well, there isn't any contradiction.  It simply

19  indicates -- first of all, there is a flaw in the data.  The

20  kind of minor response to that is, the FBI doesn't actually

21  count all defensive homicides.  And they make that clear in

22  their uniform crime reporting handbook.  They only report one

23  kind of civilian homicide -- defensive homicide.  It's a

24  justifiable, which means, to them -- and believe me, I'm no

25  legal expert on this -- but the way they define it, it's, in

1    effect, a defensive -- well, it's an act of self-defense that

2    involves some other felony besides just the attack.

3         So when they give examples of what they're willing to

4    count as a civilian justifiable homicide, it would include

5    something like a guy attempts a robbery, and then the victim

6    shoots and kills the robber.  So there is that additional

7    felony of the robbery.  But as an example they explicitly offer

8    as one they wouldn't count as a civilian justifiable homicide,

9    one guy just attacks another one, you know, bully beats up on

10   little guy, little guy pulls out a gun and shoots him, that is

11   not counted.

12        So the first response to that is, the FBI doesn't even

13   claim this is a count of all defensive homicides by civilians.

14   It's a count of one subset.

15        I've estimated, using local data, that probably the

16   total number of defensive homicides is probably roughly triple

17   the number of justifiable homicides.

18   Q.  If --

19   A.  That's based on local samples.  We don't know if it applies

20   nationally.

21   Q.  If we could just follow up on that particular issue.

22   The -- are the FBI uniform crime reports figures, are those

23   based on the police -- arrest data, or are they based on the

24   disposition of cases in the courts, or on something else?

25   A.  They're always based on what they knew at the time of the

1   arrest of the suspect.  They don't follow up to see how a court

2   ruled in the case; they don't see whether a prosecutor dropped

3   the charges; they don't see whether or not, you know, the court

4   changed their mind about how to classify it legally.  It's

5   basically what the cops know at the time of the incident,

6   that's the way they classify it.

7   Q.  So if an officer -- you're saying, if an officer did an

8   arrest because he saw there was a dead body and a guy with a

9   gun, that -- and he did the arrest, so the officer is not

10  treating it as a justifiable homicide, then -- but later the

11  criminal justice system, whether it's the prosecutor or the

12  grand jury or the jury or Court of Appeals or whatever, decides

13  it was justifiable, is that an example of what --

14  A.  That's correct, that's correct.

15  Q.  That's how --

16  A.  The FBI data take no account of those later proceedings.

17  Q.  Okay.  And then based on the local -- you described what

18  you did on that -- the local data that found that discrepancy.

19  A.  Well, we kind of searched through the research literature

20  for where people had fairly detailed breakdowns of homicides

21  and where they made all of these fine distinctions between

22  types of homicides, some criminal, some noncriminal.  The

23  noncriminal ones break down into excusable and justifiable.

24  And even the excusable one says -- this is maybe antiquated

25  terminology, but in some jurisdictions, they would use the term

 1  excusable to describe a defensive homicide.  But in other

 2  cases, they'd use it to describe accidental shootings.  So you

 3  kind of had to look for local bodies of data, where they made

 4  really detailed breakdowns like this, so you could get some

 5  sense of how many total defensive homicides there were relative

 6  to how many that would be classified as justifiable, as in the

 7  FBI data.

 8         And most data sources were not that good.  But the

 9  ones that were, indicate roughly three times as many total

10  defensive homicides as there were homicides classified as

11  justifiable by the police.

12  Q.  Now, you mentioned local data.  What localities are we

13  talking about?

14  A.  Places like Philadelphia, for example.  It would be a city,

15  I think in all but one or two of the cases.  Occasionally it

16  would be a county, but usually a city.  Sometimes it would be

17  police data.  Sometimes it would be data from a medical

18  examiner.

19  Q.  This is research you conducted?

20  A.  No, this is my review of other people's research.

21  Q.  Okay.

22  A.  That had already been done.

23  Q.  Is that review of the research published on this particular

24  topic, published in any of your books or articles?

25  A.  Yes.  That's published in *Point Blank*, and I think it may

1   also be in *Targeting Guns*.

2   *Q.*  Okay.  Have any other scholars researched the efficacy of

3   defensive gun use?

4   *A.*  Yes.

5   *Q.*  Who?

6   *A.*  Lawrence Southwick also did a study similar to mine, in

7   2000, published in the *Journal of Criminal Justice*.  And he

8   confirmed our findings.  He basically found that a defensive

9   gun use was effective in the sense that victims who used guns

10  for self-protection were less likely to be injured or lose

11  property.

12  *Q.*  Now, was he investigating all crimes, or just robbery, or

13  just some other particular crime?

14  *A.*  My recollection is, it was all crimes.  I don't think it

15  was limited to one subtype.

16  *Q.*  Okay.  Have any -- have -- do you know of any other

17  scholarship that has specifically investigated the efficacy of

18  defensive gun use, besides yours and Professor Southwick's?

19  *A.*  Besides those four studies, no, I can't think of any

20  offhand.  The topic seemed to cease to be of interest after,

21  you know, the best available data had been kind of thoroughly

22  dredged to the bottom.  There wasn't much more to look at.

23  There are no larger more representative of crimes to study than

24  the NCVS.  And we pretty much exhausted the possibility of

25  multivariate analysis of those data.

1   Q.  So you're staying nobody -- has anybody disputed, any

2   scholars or, for that matter, anybody else, disputed your

3   findings on the efficacy of defensive gun use?

4   A.  I don't know of any published scholarly literature that

5   disputes it, but there is always people on blogs who will,

6   basically, offer their opinions and so on.  So it's not like

7   nobody with a Ph.D. has said, I don't want to believe that, or

8   whatever.  I'm sure there is plenty of people like that.  But

9   no published scholarly journals where, let's say, they provide

10  new data or better data or whatever.

11  Q.  Because I think you were saying that, as far as the

12  existing data, it currently exists, you've gone as far as

13  anybody can with what there is?

14  A.  Yeah.  And the findings are, essentially, unanimous.  There

15  really isn't any dispute or variation on findings on the issue

16  of effectiveness.

17  Q.  Have any other scholars studied the efficacy of use of a

18  weapon in general?  Not just guns, but did you use any weapon

19  for self-defense?

20  A.  Ziegenhagen and a scholar did that.  And they found that --

21  again, without being specific about defensive gun use, they

22  found that victim resistance was generally effective.  And I

23  believe they also found resistance with a weapon was effective.

24          I also did a study like that which was on rape.  And

25  there are virtually no cases in the victim surveys of women

1  using guns for self-protection, but there are a few cases where

2  they use some kind of a weapon.  And that research indicated

3  that defensive use of a weapon was also effective in reducing

4  the likelihood of the rape being completed.  That is, instead

5  of being an attempted rape, the sexual act was completed.  And

6  found that it didn't have any effect one way or another on the

7  result of additional injury besides the rape itself.

8  *Q.*  Okay.  Thank you.  By the way, you mentioned, I think, that

9  the Ziegan and Hagen study.  Do you remember how -- could you

10  spell the names for the benefit of the court reporter?

11  *A.*  No.  I'll take a shot at Ziegenhagen, maybe is like,

12  Z-I-E-G-E-N-H-A-G-N.  It might be that.  Without a document to

13  refresh my recollection, that's --

14  *Q.*  Okay.

15  *A.*  Shot in the dark.

16  *Q.*  Do you remember where that was published?

17  *A.*  That was *Criminology*, I'm pretty sure.

18  *Q.*  About what year?

19  *A.*  Oh, gosh.  '80s sometime.  I think 1980s.

20  *Q.*  Do you know about any other studies besides the Ziegenhagen

21  study, on weapon use in general?  There was yours and the other

22  two.  Any others?

23  *A.*  I'm not recollecting any offhand as I sit here now.

24  *Q.*  So doesn't your study on the efficacy of defensive gun use

25  suffer from the problem that -- the people who talk to the

1  National Crime Victimization Survey, you study them, you

2  multiply regress all of them.  And it looks like, given the

3  circumstances of the especially serious attacks thereunder,

4  they're definitely better off having a gun and using it.  But

5  the ones who have the gun and ended up dead aren't in the

6  National Crime Victimization Survey, so they can't answer it.

7  *A.*  Right.  We directly addressed that in the Tark and Kleck

8  article in *Criminology*.  And we basically computed the

9  probability of that happening.  And we presupposed, let's

10  assume that we could include those cases where the victim was

11  killed in our analysis of the NCVS data.  Of course, the NCVS

12  data are based on interviews with victims, so there is no

13  homicide victims to talk to.  But we took the number of cases

14  that could have been like that.  You know, imagine the scenario

15  in which they could have included in the NCVS.  And it couldn't

16  have changed any of the results, because those incidents are

17  simply too rare, where people are killed in response to, you

18  know, something they did for self-protection.

19      So you could make very generous assumptions about

20  adding in those kinds of really terrible outcomes from attempts

21  to use a gun for self-protection, and it wouldn't materially

22  change any of the results.

23  *Q.*  So you were saying, if you took the assumption that

24  everybody who died was -- if you're saying that every

25  defendant -- all the people you couldn't talk to because they

1  were dead, in every case, it was because of their defensive gun

2  use, that even then, your figures hold up?

3  *A.*  Right.

4  *Q.*  Because --

5  *A.*  The numbers are just too small.  You know, like in

6  connection with -- I don't know, robbery, you know, maybe

7  15 percent of homicides in a typical year might be connected

8  with a robbery.  Typical year there might be 15,000 homicides,

9  so now you're talking about, you know, maybe 2,200 robbery

10  homicides a year.  And the NCVS, on the other hand, is a survey

11  estimating that, you know, there is tens of millions of crime

12  victimizations and millions of violent victimizations.  And so,

13  you know, the magnitude of the number of homicides, even if all

14  of them were attributable to the victim resisting in some way,

15  just pales in comparison -- it's negligible in comparison to

16  the total number of non-fatal violent incidents.

17  *Q.*  Right.  But just to be clear, you said millions of violent

18  victimizations.  That would be a cumulative figure --

19  *A.*  Right, because we were analyzing many years of data.

20      *MR. KOPEL:*  Your Honor, this is a good stopping point.

21  Would it be okay to have the morning break now?

22      *THE COURT:*  All right.  We'll take our morning recess.

23  The court clock is showing 5 minutes to 10:00.  We'll reconvene

24  at 10 minutes after the hour.  We'll stand in recess until

25  then.

```
1              (Recess at 9:54 a.m.)

2              (In open court at 10:18 a.m.)

3              THE COURT:  You may proceed.

4              MR. KOPEL:  Thank you, Your Honor.  If we could -- I

5    have conferred with counsel on all sides, and we have a

6    request, if possible, if we could have a short lunch today.

7    The reason is, Professor Kleck has a full day of teaching

8    tomorrow at Florida State in Tallahassee, which is not the

9    easiest place to get to from here.  The latest and only flight

10   out of Denver is at 4:30.  And defense counsel has indicated

11   they have a lengthy and thorough cross-examination planned.  So

12   we were hoping to make it possible for him to catch his flight

13   today.

14             If he can't -- if the defendant is not able to finish

15   by the time Professor Kleck needs to leave, I believe Professor

16   Kleck would attempt to come back on Friday so defendant could

17   finish the cross-examination.

18             THE COURT:  I'd love to accommodate the defendant's

19   cross-examination; unfortunately, Wednesday is the day we are

20   scheduled to have the judges meeting over the noon hour.  As a

21   consequence, I cannot cut this short, and we will have an hour

22   and a half recess over the noon hour.

23             MR. KOPEL:  Certainly, Your Honor.  If the defendant

24   is not able to complete his cross-examination, would we be able

25   to recess on that and have Professor Kleck return on Friday?
```

```
 1            THE COURT:  Of course.

 2            MR. KOPEL:  Thank you, Your Honor.

 3    BY MR. KOPEL:

 4    Q.  Professor Kleck, let's talk about another one of your

 5    opinions.

 6            Could you please read that opinion.

 7    A.  Mass shootings are extremely rare, and shooters rarely need

 8    magazines of 16 or more rounds to injure or kill their victims.

 9    Limiting magazine capacity has only a hypothetical potential

10    for reducing harm or improving public safety, because the need

11    for magazines of 16 or more rounds by criminals to inflict a

12    large number of casualties is a rare subset of a rare event.

13    Q.  Have you conducted a study of this subject?

14    A.  Yes, I have.

15    Q.  In that study, how did you define mass shooting?

16    A.  A shooting in which more than six people were shot, fatally

17    or non-fatally, in a single incident.  That would exclude -- at

18    least was intended to exclude cases where people shot some

19    people at one location and then some at another location and so

20    on and accumulated to a total of more than six.  But I think in

21    the expert report I provided, I accidentally included what

22    turned out to be three spree killings.  Strictly speaking, they

23    should have been excluded.

24    Q.  Okay.

25    A.  But the definition was more than six shot in one location.
```

1    *Q.*  Okay.  Killed, not fatally necessarily.  Killed or wounded?

2    *A.*  Correct.

3    *Q.*  But it has to be a single -- broadly defined --

4    *A.*  Single incident, yes.

5    *Q.*  Okay.  What was the time period covered?

6    *A.*  It covered from January 1, 1994, through July 13, 2013,

7    which is when I began the study.

8    *Q.*  Okay.  Could you talk about the methodology of how you

9    found the articles.

10   *A.*  I relied on news reports, mostly newspaper articles,

11   sometimes magazines, sometimes websites of broadcast news

12   outlets.  Relied on multiple sources, typically, to provide all

13   of the information.  A legal intern, basically, did the initial

14   search for articles, using my specifications, where to look and

15   what to look for; and then I read through the news accounts

16   that he generated.  He -- he got all the information he could

17   on each of the requisite details of the incidents.  Things

18   like, how many guns and what guns did the shooters possess?

19   How many magazines did they have?  How big was the largest

20   capacity gun?  How many were killed, how many were injured, and

21   so on.  If possible, how many shots were fired, and how long

22   was the duration of shooting.

23          And once he had this collection of articles, I read

24   the articles, went through the information he had, corrected

25   any errors I saw.  And then I looked for additional cases that

1  he might not have captured using the online news databases that

2  he searched through.  And I used maybe five other sources.

3  They were basically compilations of mass shootings that had

4  been done by other organizations, like -- one of the better

5  ones was *Mother Jones* magazine did a very detailed study.  Also

6  based, ultimately, on news media accounts for the most part.

7  In fact, all of these sources really used that as their basic

8  kind of information.

9       Another one I checked was the Violence Policy Center's

10  compilation of cases that were mass shootings that involved

11  large-capacity magazines.

12  Q.  If I could interrupt you a second.  I think we all know

13  what -- maybe not everyone knows.  What is *Mother Jones*?

14  A.  *Mother Jones* magazine is a liberal political magazine.

15  Q.  Okay.  And what is the Violence Policy Center?

16  A.  It's basically a pro gun control advocacy organization.

17  It's funded by private foundations, and they periodically issue

18  reports on the gun issue.

19  Q.  Okay.  So you mentioned you looked at those two sources.

20  Please continue with the other supplemental sources you looked

21  at.

22  A.  The Mayors Against Illegal Guns is another pro gun control

23  organization.  And they have a website where they provided a

24  compilation of mass shootings and details about them.

25       Another one was -- there was a report issued by the

 1  Congressional Research Service on public mass shootings.  And

 2  there was another one done by the Citizens Crime Commission of

 3  New York.  And so I basically could supplement any cases that

 4  had been initially missed with cases that had been discovered

 5  by these other entities, and I -- my assumption was, as pro gun

 6  control organizations, for the most part, aside from the

 7  Congressional Research Service, they were well motivated to

 8  find relevant cases that were out there.  Of course, I can't be

 9  certain I've gotten all of them.  There is no doubt that you

10  can't know what you don't know, but it is the most

11  comprehensive compilation of which I'm aware.

12  Q.  Okay.  What -- Citizens Crime Commission of New York, does

13  that have any ideology, that organization?

14  A.  Really don't know anything about them.

15  Q.  Okay.  What did you do if information from different

16  sources conflicted?

17  A.  Well, I tried to look at what the most reliable sources

18  indicated.  And I usually think of the good gray *New York Times*

19  as the most reliable.  So if there was any conflict, I'd rely

20  on that source.  But there really was little conflict,

21  basically because, everybody's drawing from the same well.

22  They're all getting their information from the police.  And so

23  whatever the police say, correct or not correct, is pretty much

24  what everybody else is consistently reporting.

25          About the only kind of inconsistencies that show up

1   is, you can't rely on early news accounts of casualty counts,

2   because they'll always be changing.  But, you know, after a few

3   days, that settles down, and all the sources pretty much agree

4   on all the numbers killed and injured.

5   Q.  Even -- you sometimes find even after the initial flurry of

6   news, that there is still conflicts sometimes?

7   A.  Yeah, there is always bits of information that nobody quite

8   knows about.  And it's not like the news media are being

9   incompetent or anything; they are reporting the information

10  that is genuinely inconsistent from different sources.

11          Like, if different eyewitnesses have different

12  accounts about the details of a mass shooting, then it's -- the

13  inconsistency is not really something produced by the news

14  outlets.  They're just accurately reporting these differing

15  viewpoints.  And victims in mass shooting incidents that

16  survive are often, understandably enough, rather traumatized.

17  It's kind of difficult for them to accurately remember what

18  happened.

19  Q.  Did you also look at official government reports?

20  A.  We did when they were -- when they were publicly available.

21  We looked at the official reports on Columbine, for example,

22  and Virginia Tech, and a few others.  Normally, the official

23  reports are not publicly available; and they're not always

24  accurate, by the way.  But --

25          Oh, another one we did was on the Newtown, Connecticut

1  shootings.  It was an official report on that.  So I wouldn't

2  always regard it as the correct source; it's just another

3  source.

4  Q.  Okay.  How many incidents did you find?

5  A.  Initially I had found, I think, 55 mass shootings.  And

6  after the report that I submitted as an expert report, I kind

7  of adjusted that -- no, I'm sorry, it was 59.  And then I later

8  adjusted it to 58, because some of the initial incidents, as I

9  mentioned before, were spree killings.  I shouldn't have been

10  counting them as mass shootings.

11  Q.  Let's stick --

12  A.  We'll stick with 59.

13  Q.  Don't count the ones that you shouldn't have counted,

14  because they didn't meet the definition.  Stick to the

15  incidents that are in your September report.

16  A.  Right.

17  Q.  So, in how many of those incidents did the criminals have

18  multiple guns?

19  A.  They had multiple guns in 37 of the 59 cases.

20  Q.  Okay.  And how many incidents were they -- did you find

21  where the criminals were known to possess a single gun?

22  A.  For this kind of detail, could I refresh my recollection

23  with my expert report?

24  Q.  Certainly.

25  A.  Is that permissible?

1    *Q.*  I believe the defendant has asked to have that be an

2    exhibit, and that's Exhibit No. 44, I believe.

3            *THE COURT:*  There needs to be appropriate foundation

4    laid before there is any refreshment of recollection.

5            *MR. KOPEL:*  Okay.

6            *THE COURT:*  And the defense needs an opportunity to

7    object if they would like, not just simply the agreement

8    between witness and attorney.

9            *MR. KOPEL:*  Okay.

10           *THE COURT:*  So could you lay the appropriate

11   foundation, please.

12           *MR. KOPEL:*  Certainly.

13   *BY MR. KOPEL:*

14   *Q.*  So the report you've just mentioned, was that -- could you

15   tell me the circumstances under which you provided that.  Was

16   that an expert report?

17   *A.*  Yes, it was an expert report for this case, provided to you

18   and the other attorneys.

19   *Q.*  And do you remember approximately when that was presented,

20   when you filed that report?

21   *A.*  I think it was August or September of last year.

22   *Q.*  Okay.  And you used the methodology we just described in

23   that?

24   *A.*  Yes.

25   *Q.*  Okay.  And are you having trouble recalling the details?

1  *A.*  I might be off by one on these numbers, because it's

2  confusing, because there is both the more recent data and the

3  original expert report, so it's -- I want to be accurate.

4  *Q.*  So it would be helpful if you have the report in front of

5  you?

6  *A.*  Yes.

7        *THE COURT:*  Mr. Kopel, what is it you would like this

8  witness to recall?

9        *MR. KOPEL:*  The precise numbers of various categories

10  of things and -- or details in the incidents he describes in

11  the expert report.

12        *THE COURT:*  Okay.  And let me ask the witness, what is

13  it that you cannot recall?

14        *THE WITNESS:*  The exact numbers, for example, of

15  incidents in which there was multiple guns, incidents in which

16  there were multiple magazines, incidents in which there -- the

17  shooters reloaded.  And, also, it's difficult to remember the

18  numbers that fall into two distinct categories, numbers where

19  we knew that didn't happen, and cases where we didn't know one

20  way or another.  That's hard to remember.  There is a lot of

21  numbers.

22        *THE COURT:*  What is it that would refresh your

23  recollection?

24        *THE WITNESS:*  It's the pages in the expert report that

25  refer to those numbers regarding mass shootings.  So they would

 1  be the Opinion No. 2 supporting evidence.

 2          *THE COURT:* All right.

 3          *THE WITNESS:* There is, like, a one- or two-page

 4  section of the report.

 5          *THE COURT:* I assume, Mr. Kopel, that you would like

 6  those particular pages given to the witness in order to refresh

 7  his recollection; is that correct?

 8          *MR. KOPEL:* Yes, Your Honor.  Thank you for your

 9  guidance.

10          *THE COURT:* Is there any objection?

11          *MR. GROVE:* No objection.

12          *THE COURT:* Thank you.

13          Could you please identify those pages so that

14  Mr. Keech can give those pages to the witness in order to

15  refresh his recollection.

16          *MR. KOPEL:* I believe that -- I believe that is -- the

17  pages that Professor Kleck is referring to are not the Exhibit

18  44, which is the list of incidents.

19          But I believe, Professor, you're referring to the

20  actual narrative section of Opinion 2.

21          *THE WITNESS:* That's correct.

22          *MR. KOPEL:* Okay.  And I believe that would be in your

23  initial expert report, pages 4 and 5.

24          *THE COURT:* Do you have a copy of that?

25          *MR. KOPEL:* Yes, indeed, we do, yes.

```
 1            THE COURT:  Would you please give it to Mr. Keech.

 2            MR. KOPEL:  And we have multiple copies for the

 3    defense and the Court as well.

 4            THE COURT:  Are there any other pages that Mr. Keech

 5    has to have?

 6            Just the one page that Mr. Keech needs to have?

 7            MR. KOPEL:  I believe, yes, his opinions -- he's

 8    asking for recollections on pages 4 and 5 of his expert report.

 9            THE COURT:  All right.

10            Mr. Keech, would you please present those to the

11    witness.

12            I'll ask the witness -- I don't need a copy.  I'll ask

13    the witness to read it over.  And when you've finished reading

14    it, would you please return the document to Mr. Keech.

15            THE WITNESS:  Well, it really doesn't have the numbers

16    I was hoping it had, so maybe they were not in this.

17            THE COURT:  So it doesn't refresh your recollection,

18    sir?

19            THE WITNESS:  No.  Unfortunately, no.

20            THE COURT:  I'm sorry.

21            Mr. Kopel, would you please continue.

22            MR. KOPEL:  Certainly.

23    BY MR. KOPEL:

24    Q.  And taking into account, Professor, the -- your answers

25    might be off by -- I'll ask you the questions approximately.
```

1  *A.*  Yeah.

2  *Q.*  In approximately how many of the incidents did the

3  criminals have multiple guns?

4  *A.*  I believe 37 of the 59 mass shootings.

5  *Q.*  And approximately how many, then, did the criminals have a

6  single firearm?

7  *A.*  A what?

8  *Q.*  Just only one gun.

9  *A.*  Oh, that's one of the numbers I'm not sure about.  Because

10  there is a distinction between cases where we could know they

11  didn't have multiple guns, or they definitely only had one, and

12  cases where we didn't know one way or the other.  So I'm not

13  sure about that.

14  *Q.*  Okay.  In how many instances did the criminals have -- were

15  the criminals known to have multiple detachable magazines?

16  *A.*  I believe they had multiple detachable magazines in 28 of

17  the cases, approximately.

18  *Q.*  Okay.  And in how many of the incidents were they known to

19  have only a single magazine?

20  *A.*  Again, I would have to give you the same answer as to the

21  last one.

22  *Q.*  Okay.

23  *A.*  I'm not really sure the distinction, how many were in the

24  we-didn't-know category, versus we-know-they-only-had-one.

25  *Q.*  Do you remember if the we-know-they-had-only-one category,

1  compared to the we-don't-know category, were they equal, or one

2  larger or smaller than the other?

3  A.  My best guess would be that the we-don't-know would be more

4  numerous, because this is one of the kind of details that news

5  media were often short on.

6  Q.  Okay.  Do you remember in how many of the incidents were

7  the criminals known to have reloaded their firearms?

8  A.  I believe they were known to have reloaded in 23 of the 59

9  incidents.

10  Q.  And do you remember how many of these incidents they were

11  known not to have reloaded in?

12  A.  Again, same answer to that.  The distinction between we

13  didn't know versus we knew they did not reload, I couldn't tell

14  you reliably.

15  Q.  Could you again say the magnitude of one's larger or

16  smaller --

17  A.  I think the cases where we didn't know is probably more

18  numerous; because, again, it's one of those details that the

19  news accounts often had nothing to say on.

20  Q.  Okay.  Did you find any incidents in which the criminal was

21  thwarted because he had to reload a detachable magazine for a

22  semiautomatic firearm?

23  A.  I know one case that is reasonably clear.  None of the

24  cases are certain, but there is one case where I'd say the bulk

25  of the evidence suggests that did happen.  That was the Kip

1   Kinkel shooting in Springfield, Oregon, in which he went to his

2   high school and shot a large number of people.  And in that

3   incident, at least the consensus among eyewitnesses seems to be

4   that he was trying to reload, and then two brothers who were on

5   the wrestling team tackled him.

6        Other people, though, gave conflicting testimony.

7   It's often common among eyewitnesses in these stressful events.

8   And so some people claimed he had already reloaded, which means

9   he was ready to fire, and it was all the more brave of those

10  individuals to tackle him.

11  *Q.*  And --

12  *A.*  Then there is other cases where it's even more dubious.

13  You know, I put them in the possible category.  Congresswoman

14  Gabrielle Giffords was one of the victims in a shooting in

15  Arizona.  And some eyewitnesses gave almost every possible

16  permutation of sequence you can imagine.  Some said he was

17  reloading, and then that's when he was tackled by bystanders.

18  Other people said, no, he wasn't reloading, he was wrestling

19  with a defective magazine.  Because it was later found a spring

20  had failed in it, and it wasn't feeding ammunition.  And still

21  other people again said he had already reloaded when they

22  tackled him.  So that's a really uncertain one as to whether he

23  was tackled while reloading.  So that's, you know, one likely

24  case, one possible case, I would say.

25  *Q.*  Now, you mentioned the study you were talking about right

1   now was -- covered 1994 to 2013.  Have you ever studied this

2   same subject previously?

3   *A.*  Yes.  I had done a study covering the preceding ten-year

4   period, where I used the same definition of mass shooting,

5   involving over six victims.  And that was published in

6   *Targeting Guns*.  And it covered the period immediately

7   preceding it, so it was, like, 1984 through '93, inclusive.

8   *Q.*  Did you find any -- in that ten-year period for your

9   previous study, the one in *Targeting Guns*, did you find any

10  incident in which a criminal was interrupted, stopped,

11  thwarted, defeated because the criminal was reloading a

12  semiautomatic detachable magazine?

13  *A.*  Yes and no.  The one case that would probably qualify would

14  be the Colin Ferguson shooting in 1993 on a Long Island

15  commuter train.  According to most reports, what happened is,

16  he emptied -- he had a 9 millimeter pistol with a 15-round

17  magazine.  He emptied the magazine, reloaded another 15-round

18  magazine, emptied that one too, and then started -- according

19  to some people, he reloaded in some sense, but there is

20  conflict as to whether that meant he reloaded a loaded 15-round

21  magazine or was hand loading individual rounds.

22          And the difference, of course, is that there is a lot

23  more opportunity for bystanders to tackle the person if they're

24  handling one round at a time.  They can't quickly shove the

25  magazine in the gun and be able to shoot anybody who tried to

1  stop them.  And so I'd say that's a probable too, a probable

2  case in which bystanders managed to tackle the person while

3  they were reloading.  Certainly, they were reloading in one

4  sense, but not exactly reloading in the sense of shoving

5  another fully loaded magazine in the gun.

6  *Q.*  So Ferguson was -- according to some of the witnesses and

7  reports, was putting one round of ammunition at a time into an

8  empty magazine?

9  *A.*  That's my understanding.  That is one version of it.  But,

10  again, there is nothing that is absolute gospel on this.  The

11  truth is that witnesses are understandably in an emotionally

12  fraught state of mind, so the information they provide is not

13  always consistent across witnesses.

14        *MR. GROVE:*  I just want to object to Dr. Kleck

15  commenting on what the witnesses may or may not perceive.  The

16  foundation hasn't been laid for his expertise to that.

17        *THE COURT:*  Thank you.  I don't hear that as an expert

18  opinion, but I can take judicial notice of the fact that often

19  eyewitnesses have different recollections of what happened.

20        *MR. GROVE:*  That's fair, Your Honor.

21  *BY MR. KOPEL:*

22  *Q.*  Let's now -- Professor Kleck, let's return to your study of

23  the '94 to 2013 period.  In that period, did you find any

24  incidents in which the criminal possessed at least one magazine

25  which holds 16 or more rounds?

 1 | *A.*  Sixteen or more rounds?  Yes, yes, I did.

 2 | *Q.*  Do you recall approximately in that 20-year study period

 3 | about how many incidents there were in that category?

 4 | *A.*  I would need *Targeting Guns* to refresh my memory.

 5 | *Q.*  I'm sorry, we're not talking about the -- not the *Targeting*

 6 | *Guns* study, which was -- your study in *Targeting Guns* was the

 7 | ten years ending in '93.  Let's shift and now go back to the

 8 | study you conducted in August and September.

 9 | *A.*  I understand.

10 | *Q.*  So, now, covering that study, did you find any incidents in

11 | which criminals used a handgun -- a magazine holding 16 or more

12 | rounds?

13 | *A.*  Yes.  There were 16 cases where it was known that they had

14 | used a large capacity -- a magazine with a capacity over 15

15 | rounds.

16 | *Q.*  So that was approximately a third of the total incidents

17 | you found?

18 | *A.*  Right.

19 | *Q.*  Okay.

20 | *A.*  Well, less than that.  You know --

21 | *Q.*  Okay.

22 | *A.*   -- closer to a quarter.

23 | *Q.*  I believe you said it was 54, 57, something like that was

24 | the number of total incidents you had?

25 | *A.*  Sixteen out of fifty-nine.

1 | Q. You're right, less than a third.

2 | A. Sixteen out of fifty-nine.  Whatever.

3 | Q. I stand corrected.  In those 16 incidents -- and we're just

4 | talking about the ones where the criminal had a magazine of 16

5 | or more rounds -- how did those 16 incidents -- about how many

6 | did the criminal possess more than one gun?

7 | A. He possessed more than one gun in 13 of the 16 incidents.

8 | Q. Okay.

9 | A. Was known to have possessed --

10 | Q. Okay.

11 | A. -- more than one.

12 | Q. In those 16 incidents, in how many did the criminal possess

13 | more than one detachable magazine?

14 | A. He was known to have possessed more than one in 14 of the

15 | 16 incidents.

16 | Q. Okay.  In how many of those 16 incidents did the criminal

17 | possess either multiple detachable magazines or multiple guns?

18 | A. All 16 of those.

19 | Q. Okay.  How does that fact affect your -- is that fact the

20 | basis of your expert opinion?  And if so, why?

21 | A. Yes, it's partially the basis for my opinion.  And I infer

22 | from that fact that in incidents where the person had a

23 | large-capacity magazine, it was, essentially, irrelevant,

24 | because they could continue firing simply because they had

25 | multiple guns, with, basically, no perceptible interruption, or

1  they could continue firing with only a very brief interruption

2  for reloading detachable magazines in the few cases where they

3  didn't have multiple guns.

4      And it's kind of supplemented by other information I

5  had on the rate of fire, because --

6  *Q.*  Sure.

7  *A.*  Should I go on about that or --

8  *Q.*  Well, in -- yeah, let's go ahead.  Tell us about the rate

9  of fire.

10 *A.*  Rate of fire is relevant because some people who support

11 limitations on magazine capacities argue that additional

12 people -- additional victims or potential victims could escape

13 because the shooter's rate of fire is slowed by the necessity

14 to change magazines.  If you don't have a bigger magazine and

15 only have smaller ones, you would have to reload more often.

16 And the argument is, during those interruptions, more victims

17 would escape than otherwise would have been the case without

18 those reload instances.

19      But what I found when I looked at the rate of fire is,

20 in all but a handful of mass shootings, the rate of fire is

21 very slow anyway.  The shooters are not firing anywhere near as

22 fast as the gun would permit, as mechanically possible.  So the

23 interruption of two to four seconds to reload a detachable

24 magazine is no more of a gap between shots than normally

25 occurs, you know, when he's not reloading.  So his rate of fire

1  in most instances is not even affected by that pause to reload

2  a detachable magazine.

3  *Q.*  So you said you'd calculated this.  Could you describe how

4  you studied the rate of fire from these incidents.

5  *A.*  Well, we were able to define 21 of the incidents where they

6  had information on both the duration of the shooting from the

7  first shot fired to the last and also had information on how

8  many rounds were fired.  Sometimes these were approximations,

9  sometimes fairly precise, but in any case, 21 cases where we

10  had information on both of these characteristics of the

11  shootings.  So you could calculate an average rate of fire.  It

12  doesn't say what the rate of fire is at any moment within that

13  span of shooting, but it establishes, basically, how --

14  overall, how rapidly the shooter was firing his weapon or

15  weapons.

16       And so you divide the time by the number of shots, and

17  that's the number of seconds per shot taken.  And out of the 16

18  cases -- I'm sorry, out of the 21 cases where we had this

19  information, there were two cases where the shooter was taking

20  under two seconds per round.  Meaning, they were firing they

21  rapidly, less than a two-second gap between shots.  Two seconds

22  is what somebody who is pretty good at it and practices could

23  reload a detachable magazine.  Four seconds is what, you know,

24  your average person could probably do.  And we found all of

25  five cases where the rate of fire was less than four seconds

1   per shot between shots.

2         And so depending on which of those cutoffs you use,

3   it's conceivable that a reload could have slowed the rate of

4   fire in two cases at minimum, maybe five cases maximum.

5   Q.  Okay.  But you -- and that was out of 21 for which you were

6   able to obtain the rate of fire and --

7   A.  That's correct.

8   Q.  But you would agree that there are -- within that interval

9   between the first shot and the last shot, there might be spaces

10  where the criminal is shooting at a fast -- a faster rate, even

11  if it's overall rate of fire is slower?

12  A.  Yes, undoubtedly.  I mean, it's an average.  So at some

13  points, they're firing slower than that; some points, they're

14  firing faster; some points they're not firing at all,

15  obviously.

16  Q.  Okay.  Did your research find anything about the stress

17  levels -- the speed of which mass shooters go about their

18  crimes?  You mentioned the rate of fire, but I'm wondering if

19  you have other -- your research found other information about

20  that.

21  A.  Well, the news media accounts will often give sort of

22  descriptions of what to eyewitnesses appeared to be the mood of

23  the shooter, and then they'll use terms in the news article to

24  summarize it.  For example, after the Colin Ferguson shooting,

25  the *New York Times* -- that was the case in which the shooter

1   killed people on a commuter train, he was going down the aisle

2   shooting one person after another.  And the *New York Times*

3   described him going about his business as methodically as if he

4   were taking tickets.  That's the way the eyewitnesses were

5   describing.

6         And that word "methodical" or that word "deliberate"

7   comes up again and again.  In other words, rather than people

8   being in kind of a hysterical frame of mind, eyewitnesses were

9   struck by how calm they were and how they seemed to be

10  deliberate in taking aim, they seemed to be deliberate in their

11  gaps between shots.  They were taking their time.

12  *Q.*  In your study, did you find any exceptions to that?

13  *A.*  Yes.  Certainly there are brief passages of very rapid

14  shooting.  Certainly, in the Aurora, Colorado, movie theater

15  shootings, there were some points at which there was very rapid

16  fire.  And they had been caught in, I think, some sort of audio

17  recording, possibly a 911 call.  So you could actually tell it

18  was very rapid fire.

19  *Q.*  What was that rate, like, a second per shot, something like

20  that?

21  *A.*  Something in that ballpark, yeah.

22  *Q.*  Okay.  You had mentioned that the mass shooters were

23  typically deliberate and methodical.  Did you find evidence

24  about their mood or stress level or anything like that?

25  *A.*  Beyond what I've told you, we really didn't consistently

1   look for that sort of thing.

2   *Q.*  Okay.

3   *A.*  So we didn't have any way of deriving that from news

4   accounts.  We could only go on the kind of information that

5   would be reported in the news accounts.

6   *Q.*  Sure.  Did the deliberation suggest to you that they were

7   calm, typically?

8           *MR. GROVE:*  Objection, foundation.  The witness just

9   testified there is no data on that, in what he reviewed.

10          *MR. KOPEL:*  I'll withdraw the question.

11          *THE COURT:*  Thank you.

12  *BY MR. KOPEL:*

13  *Q.*  Do the Columbine murders fit the general patterns you found

14  in your research?

15  *A.*  In most ways, yes.  It's exceptional in the fact that there

16  were two shooters rather than one, and there is really only a

17  few of the mass shootings that involved multiple shooters.  But

18  they're certainly typical with respect to having multiple guns,

19  for example.  Each of the two shooters had two guns, so they

20  had a total of four guns.  They had many magazines, I think

21  over a dozen magazines between the two of them.  And they

22  certainly were shooting very slowly, very deliberately at some

23  points, and overall, had a very slow average rate of fire.  So

24  they were nowhere near firing as fast as the gun would permit,

25  had they wanted to fire as quickly as possible.

1  Q.  Eric Harris, one of the criminals in Columbine, do you

2  recall if his magazines would be legal under a 15-round limit?

3  A.  Yes, he had a large number of ten-round magazines, so they

4  would be legal under Colorado law.

5  Q.  And the other criminal at Columbine, Dylan Klebold, do you

6  know if he had magazines which would be illegal under

7  Colorado --

8  A.  Yes.

9  Q.  -- the 15-round limit?

10  A.  He had three magazines of something like 28 rounds, 32

11  rounds, and 52-round capacity, so quite large magazine

12  capacities.

13  Q.  So Harris, the criminal with the smaller number -- the

14  smaller magazines, do you remember -- know how many shots he

15  fired, approximately?

16  A.  He fired 121 rounds.

17  Q.  And Klebold, the one with the larger magazines, about how

18  many shots did he fire?

19  A.  He fired 67 rounds.

20  Q.  Okay.  Do you know what the deadliest mass shooting in

21  United States history was?

22  A.  Yes.  The Virginia Tech killings were the worst.  They were

23  the worst mass shooting.  Not exactly the worst mass murder,

24  but the worst mass shooting.

25  Q.  Right.  So the Oklahoma City bombing and others were more

1    people dead, 9/11.  In terms of mass shootings, how many people

2    were killed in Virginia Tech?

3    A.  I believe 32.

4    Q.  Do you remember about how many were wounded?

5    A.  I believe it was 17 wounded by gunfire; and there were

6    others that suffered related injuries, I think.

7    Q.  What do you mean by the related injuries?

8    A.  I think there were some people injured where a bullet would

9    hit a wall, and then people would be injured by the flying

10   debris from the wall.

11   Q.  So one could call those a gunshot injury as well,

12   indirectly?

13   A.  Sure.

14   Q.  Do you know what size magazines the Virginia Tech killer

15   used?

16   A.  He had two magazines of 15 rounds and 10-round capacity.

17   Q.  Did he only have two magazines total, or multiple

18   magazines, lots of magazines?

19   A.  I don't know how many of each of those he had.  I know the

20   largest one was 15 rounds, and he also had at least one

21   10-round magazine.

22   Q.  How many shots did he fire?

23   A.  I can't recall that at this point.  A large number, because

24   he shot over a very long period of time, and he had the

25   capacity of shooting many rounds.  But I couldn't tell you as I

 1 | sit here how many rounds were fired.

 2 | *Q.* Okay. Do mass shooters gain a practical advantage by using

 3 | magazines of more than 15 rounds?

 4 |    *MR. GROVE:* Objection, Your Honor.

 5 | *BY MR. KOPEL:*

 6 | *Q.* Based on your research.

 7 |    *MR. GROVE:* Objection, Your Honor, foundation.

 8 |    *THE COURT:* Response.

 9 | *BY MR. KOPEL:*

10 | *Q.* Has your research led you to have any opinion as --

11 | including expressed in Opinion No. 2, on whether or not

12 | magazine capacity affects mass shootings?

13 | *A.* Yes.

14 | *Q.* Could you please describe that.

15 |    *MR. GROVE:* Same objection, Your Honor.

16 |    *THE COURT:* Response.

17 |    *MR. KOPEL:* May I confer with co-counsel for a minute,

18 | please, Your Honor?

19 |    *THE COURT:* Sure.

20 |    (Off-the-record discussion between counsel.)

21 |    *MR. KOPEL:* Thank you, Your Honor. I find myself

22 | baffled by the idea that this has not had foundation laid, but

23 | let me ask Professor Kleck a question.

24 | *BY MR. KOPEL:*

25 | *Q.* Professor, have you studied whether mass shootings are

1  affected by magazine capacity?

2  *A.*  Yes.

3  *Q.*  What was the study you conducted of that?

4  *A.*  The study I just described.

5  *Q.*  Did that study lead you to have --

6  *A.*  Or the two studies I just described, I guess I should say.

7  *Q.*  And what did you find?

8        *MR. GROVE:*  Objection, Your Honor, foundation.

9        *THE COURT:*  I'm going to overrule the objection.  The

10  witness has designated the basis for the opinion as being what

11  he has just described as his study.  He may answer the

12  question.

13        Do you need to have it read back?

14        *THE WITNESS:*  Yes, please.

15        *THE COURT:*  Would you read back the question, please.

16        (Question read back by the reporter.)

17        *THE WITNESS:*  Well, I found that the -- first of all,

18  all mass shootings, only about a quarter of them were known to

19  have involved a large-capacity magazine; and, therefore,

20  possession of a large-capacity magazine by definition was

21  irrelevant to the other three-quarters of the incidents.  And

22  in the 16 cases where it was known a magazine with a capacity

23  over 15 rounds had been used, without exception, the shooters

24  always had multiple guns or multiple magazines, which means

25  they either didn't have to interrupt their shooting at all or

1    only very briefly to continue firing.  And that with rare

2    exceptions, they did not have to even slow their rate of fire

3    as a result of those changes in magazines.

4         And I inferred from that, that, therefore, possession

5    of the magazine of that capacity didn't contribute to how many

6    people were shot.  It would have been perfectly possible to

7    kill just as many people and injure just as many people had the

8    person had magazines of smaller capacity and simply changed

9    magazines or simply switched from one gun to another.

10   *BY MR. KOPEL:*

11   *Q.*  Have you studied whether mass murderers typically engage in

12   preparatory projects?

13   *A.*  Yes.  Again, the news media accounts will typically have

14   something on that.  They'll mention -- Columbine is sort of the

15   prime example, but somewhat unusual in that the length of the

16   planning was so long.  They had been planning to kill large

17   numbers of people for over a year.  But almost all of these

18   killings were planned to some degree in the sense that there is

19   evidence that they were taking days or weeks to accumulate guns

20   and ammunition.  In some cases, they may also practice their

21   shooting.  But they almost had a prolonged period of days or

22   weeks, sometimes months, in which they acquired multiple guns

23   or multiple magazines or both or just large quantities of

24   ammunition, even as separate cartridges.

25   *Q.*  So you mentioned days, weeks, months, one situation of over

1    a year.  Did you find anywhere where there was a shorter

2    period, maybe of just an hour, or something like that?

3    *A.*  No, I'm not aware of any case like that that would qualify

4    as a mass shooting.

5    *Q.*  Did you find anywhere where it was less than a day?

6    *A.*  No, I'm not aware of any cases like that either.

7    *Q.*  Did you study whether people who perpetrate mass shootings

8    plan their crime sufficiently far in advance in order to buy

9    items in a neighboring state?

10   *A.*  Yes.  The time intervals were all ample to do that.  I

11   mean, I actually looked up how long it would take somebody to

12   get a larger-capacity magazine if we left from here,

13   according -- and went to Cheyenne, Wyoming.  According to

14   Google Maps it takes, I think -- a round trip is, like, three

15   hours, ten minutes on the interstate.  So that plus the time it

16   would take to buy the gun or buy the magazine is basically the

17   time it would take to acquire a larger-capacity magazine, if

18   you were willing to break the law.

19   *Q.*  Thank you.  Let's move on to your Opinion No. 3.

20        Could you please read that.

21   *A.*  "Limits on magazine capacity will impair the ability of

22   citizens to engage in lawful self-defense.  Self-defense may

23   require a larger number of rounds being fired either because of

24   multiple adversaries and/or because the citizen will not fire

25   optimally under stressful conditions."

1  Q.  Based on your research, where is the need for self-defense

2  most acute?

3  A.  The rate of victimization is highest in public places, away

4  from people's homes.

5  Q.  And what is your source of information on that?

6  A.  The National Crime Victimization Survey, which not only

7  estimates victimization rates, but also has information on the

8  locations of the crimes, including locations of violent crimes.

9  Q.  Is your research -- do you have any -- besides the NCVS,

10  any other data sources you rely on for that?

11  A.  Well, certainly, police-based data.  The offense reports

12  will routinely have information about the location where a

13  violent crime occurs as well.

14  Q.  What fraction of violent crimes take place in a home?

15  A.  Well, I would say it's something on the order like a

16  quarter of homicides, but much less than that, a robbery.

17  Robbery is predominantly committed in public places on the

18  street; whereas, homicide is more likely to be committed in the

19  home.  But still, it's a minority.  It's on the order of a

20  quarter of homicides are committed in the home.

21  Q.  Okay.  And you said less for other violent crimes, a lower

22  percentage?

23  A.  It would be similar for assaults, and then intermediate for

24  sexual assaults and rapes.

25  Q.  And how about the category of near the home, what percent

1  of violent crimes take place there, based on your research and

2  expert knowledge?

3  *A.*  I wouldn't be prepared to tell you that.  I couldn't recall

4  what that is right now.

5  *Q.*  Okay.  Now, I guess I'm a little confused, because on the

6  one hand you were saying –– your research, the defensive gun

7  use study you were talking about, said that most defensive gun

8  uses happened –– about a third of defensive gun uses happened

9  in the home and about another third happened near the home.

10  And yet you just said –– even though that's where the defensive

11  gun uses happened, you said that the need for self-defense is

12  most acute in public places.  How –– could you reconcile that,

13  if possible.

14  *A.*  Yes.  It's because, in order to have a defensive gun use,

15  you've got to have access to a gun, as well as being

16  victimized.  One or the other is not sufficient.  And people

17  are most likely to possess their guns in their homes.  And if

18  they want to, they can retrieve a gun from their home and also

19  get to a place that is near their home, like, you know, the

20  yard outside their home or the hallway outside their apartment.

21  So that's the simple explanation.

22  *Q.*  Okay.  What fraction of violent criminal attacks involve

23  multiple assailants?

24  *A.*  About 17 percent, in the last year for which we have data,

25  which would be 2008.

1  Q.  Okay.  That would be two or more attackers?

2  A.  Correct.

3  Q.  Okay.  So about how many violent multiple-assailant attacks

4  were there in the last year for which data are available?

5  A.  The NCVS estimated that there were about 800,000 multiple

6  offender violent crime victimizations in 2008.

7  Q.  Thank you.  Let's take a look at Opinion No. 6.  Could you

8  please read that one.

9  A.  "Violations of magazine capacity limits are likely to occur

10  at a higher rate among criminals than among non-criminals."

11  Q.  If a person has committed some crime, does that affect the

12  likelihood that the person will commit more crime?

13  A.  Well, it's certainly positively correlated.  I wouldn't

14  have phrased it that way, that it affects it, although it may

15  do that as well, but it's positively correlated.  Meaning, a

16  person who has committed any one type of crime is more likely

17  than average to have committed other types of crimes.

18  Q.  What's the explanation for this, or the evidence?

19  A.  Well, the standard understanding among criminologists is,

20  this an illustration of what they call the generality of

21  deviance.  Deviance just being rule breaking in general.  It

22  encompasses criminal behavior, but it could be, you know, like,

23  lying to your wife or being rude to people, you know, violating

24  moral rules, not necessarily criminal acts.

25          And what researchers have repeatedly confirmed is that

1 | almost all of these deviant acts, deviant behaviors, are
2 | positively correlated with one another, even though they may be
3 | otherwise very dissimilar in character.  But the only thing
4 | they have in common is that they're violation of a moral rule.
5 | And so the generality of deviance concept is that the reason
6 | for this -- this positive correlation is because there are
7 | common causes underlying all of those behaviors.  They may have
8 | their distinct causes as well, but what underlies all of them
9 | is what is sometimes referred to as low self-control, or other
10 | times psychologists would refer to it as an antisocial
11 | personality.

12 |        But the characteristics of a person with a personality
13 | syndrome is, basically, they're impulsive, they prefer
14 | immediate gratification to delayed gratification, they tend to
15 | discount long-term consequences, and they emphasize the
16 | short-run rewards.  And so they do more of this rule-breaking
17 | behavior because the rewards are usually immediate and obvious,
18 | and any downside to doing them is delayed.  Like, you know,
19 | getting caught for a crime.  You'll rarely be caught the first
20 | time you do it; you do it many times, you'll eventually get
21 | caught.  But that's a long time down the road.  So people with
22 | this sort of personality will simply discount that or give it
23 | very little weight.  All they're thinking about is sort of the
24 | immediate consequences, which is going ahead and breaking the
25 | rule.  So that would encompass everything from mass murder on

1  down to, you know, speeding or littering.

2  *Q.*  Have you studied the -- are you aware of any national ban

3  on magazines that formerly existed?

4  *A.*  Yes.  From 1994 to 2004, a federal ban on magazines with a

5  capacity over ten rounds was in place.

6  *Q.*  And you said that was -- became law in 1994?

7  *A.*  Yes, I think so.

8  *Q.*  When did that end?

9  *A.*  It expired September of 2004.  So it began in September of

10  '94 and ended in September of 2004.

11  *Q.*  Have you studied that as a scholar?

12  *A.*  Only -- only very indirectly.  I mean, I -- I haven't

13  published anything on it.  I did an unpublished study, which I

14  really don't rely on for my testimony here.  I've just read

15  what other people have done on the subject.

16  *Q.*  Sure.  Did you -- is that -- is some of that information

17  summarized in any of your -- the other people's research?  Have

18  you written about that in some of your scholarship?

19  *A.*  Yes.

20  *Q.*  Based on your expert knowledge of crime and criminals,

21  would the Colorado ban be easier to evade or harder to evade or

22  the same compared to the national ban in 1994?

23        *MR. GROVE:*  Objection, Your Honor, foundation.

24        *THE COURT:*  Response.

25  *BY MR. KOPEL:*

 1  │ Q.  Have you studied the ease in which criminals can evade

 2  │ state or national laws in the course of your scholarship; have

 3  │ you read about that, have you researched it, have you read the

 4  │ scholarship of other people?

 5  │        MR. GROVE:  Objection, Your Honor.  Vague, "evade."

 6  │        THE COURT:  Sustained.

 7  │ BY MR. KOPEL:

 8  │ Q.  As a professional criminologist, have you studied when

 9  │ criminals violate the law and the circumstances under which

10  │ they do so?

11  │ A.  Yes.

12  │ Q.  Has part of this research and study that you've conducted

13  │ included the circumstances that make it easier or more

14  │ difficult for criminals to evade laws?

15  │ A.  Yes.

16  │ Q.  Based on that, do you have an opinion on whether a Colorado

17  │ magazine ban -- on the ease of violation of a Colorado magazine

18  │ ban --

19  │        MR. GROVE:  Objection, foundation.

20  │        THE COURT:  Sustained.

21  │        MR. KOPEL:  May I confer with my co-counsel for a

22  │ minute?

23  │        THE COURT:  Sure.

24  │        MR. KOPEL:  Thank you, Your Honor.

25  │        (Off-the-record discussion between counsel.)

1  *BY MR. KOPEL:*

2  *Q.*  Professor Kleck, do you have an opinion about the ease of

3  which -- about how easy or difficult it would be to violate the

4  Colorado magazine ban?  I'm just asking, yes or no, whether you

5  have an opinion.

6  *A.*  Yes.

7  *Q.*  Thank you.  What is the basis of your opinion?

8  *A.*  The basis of my opinion would be the reading of the

9  accumulated research on the impact of gun control laws on

10  violent crime rates.

11        *MR. GROVE:*  Objection, Your Honor.  He hasn't

12  testified that he's even read the Colorado law.  Foundation.

13        *THE COURT:*  Well, first of all, your objection is

14  untimely.  He's answered the question.  Secondly, he's just

15  simply stated what the basis of his opinion is.  That didn't

16  require foundation.  It is the response that lays foundation.

17  So I overrule the objection.

18  *BY MR. KOPEL:*

19  *Q.*  Do you have an opinion about whether -- for gun control

20  laws overall, state laws -- just answer the question yes or

21  no -- state laws or federal laws are more or less difficult for

22  a criminal to violate?

23  *A.*  Yes.

24  *Q.*  What is the basis of that opinion?

25  *A.*  The basis is the professional consensus that federal -- I'm

1    sorry.  I'll just say, the consensus among scholars who have

2    written on the effective gun control laws on violent crime.

3    Q.  Have you read this scholarship yourself?

4    A.  Yes.

5    Q.  And what is the -- does that consensus say?

6    A.  Well, the consensus is that the whole rationale for having

7    federal controls was that there was a problem with guns -- with

8    leakage of guns and with people evading state measures by going

9    to other states.  So there is a literature on how gun smugglers

10    supposedly get guns from states that have relatively lenient

11    laws, smuggle them into places which have stricter laws.  And

12    so much of the motivation for federal controls was to eliminate

13    that problem.  People couldn't just go to another state to

14    evade the restriction; they would be facing the exact same

15    restrictions regardless of where they went within the United

16    States.

17    Q.  Now, some people who argue in favor of the disputed

18    efficacy of the laws, such as magazine bans or others, rely on

19    firearms tracing data from the Bureau of Alcohol, Tobacco,

20    Firearms and Explosives.  Have you published any articles on

21    firearms tracing?

22    A.  Yes.  I published two articles on the topic, one in the St.

23    Louis Public Law Review, and one in the UCLA Law Review.

24    Q.  Do you know if your articles on firearms tracing have ever

25    been cited by any federal courts?

1    *A.*  Yes, they have; and please don't ask me which ones.  I

2    won't be able to remember.  But, yes, they definitely have

3    been.

4    *Q.*  Is ATF firearms trace data a good source of information

5    about the nature of gun crime in general, based on your own

6    research?

7    *A.*  No.  It's, essentially, useless.

8    *Q.*  Could you explain why.

9    *A.*  Well, a number of reasons.  The gun tracing system was

10   developed for law enforcement purposes.  It was never developed

11   for scholarly purposes or research purposes.  And as a result,

12   it's not really designed, for example, to yield representative

13   samples of crime guns.  So if you study guns that have been

14   selected for tracing, you can't draw any valid conclusions

15   about crime guns in general, or even those that have been

16   recovered by police.  They're not representative samples.

17   Rather, they just reflect which guns police thought would be

18   worth tracing, or were especially interested in tracing.  So

19   there is the problem of representativeness of the samples and

20   be able to generalize to crime guns in general.

21        There is also the problem that the data don't provide

22   information about how guns get from their first point of sale

23   to the hands of a criminal who uses them in a crime, or at

24   least has the gun seized from them by the police.  But people

25   act as if they can sort of infer something about that -- the

1   path by which the gun got from first retail sale when it was

2   new to the criminal's hands.  There is nothing in the data that

3   allow people to do that.  Instead, it's -- you know, it's just

4   linked by guesswork, for the most part.

5   Q.  Have you read ATF trace reports?

6   A.  Yes.

7   Q.  So they're -- in what form are the ATF trace reports

8   presented these days to the public?

9   A.  Well, a lot of them are on the web now.

10  Q.  Okay.

11  A.  In fact, probably most of them appear on the website, but

12  not all of them.

13  Q.  At least for recent years, are they all on the website?

14  A.  I couldn't say all of them; but certainly many of them are,

15  yes.

16  Q.  And are they available at a state-by-state level?

17  A.  Yes.

18  Q.  Does the ATF website, which you've read, take a position on

19  what you just said?

20  A.  Yes.

21  Q.  And what is that?

22  A.  They, in effect, repeat what I just said, which is that you

23  cannot treat the traced guns as a representative sample of

24  crime guns or any subset thereof, and you can't infer how guns

25  got into criminals hands from trace data.

1  Q.  Based on your research, have you ever found situations in
2  which ATF trace data were actually contrary to some other known
3  fact about crime guns in general?
4  A.  Yes.
5  Q.  Could you -- what was that -- tell us about that, please.
6  A.  Well, when the federal assault weapons ban was being
7  debated, there was a lot of discussion about how common assault
8  weapons were among crime guns, because you hear about in the
9  news media all the time.  But you, obviously, couldn't judge,
10  you know, just from how often a news story reported on them as
11  to frequency of their use in crime.  And so people turned to
12  trace data, and they treated their -- their conclusions only
13  made sense if they were assuming, this is a representative
14  sample of crime guns, rather than guns that were carefully
15  selected by police for tracing.

16          And the trace data, according to some sources,
17  indicated that 12 percent of crime guns were assault weapons,
18  by the definition of -- proposed in the 1994 assault weapons
19  ban.  But when people examined complete sets of all of the guns
20  that had been recovered by the police, not just the ones that
21  had been selected for tracing, again and again, one sample
22  after another, would indicate it was more like 1 or 2 percent
23  of the crime guns police had recovered.  So it was clear that
24  police were tracing -- they were, in effect, overselecting
25  assault weapons to be traced, to submit for tracing with ATF.

1  *Q.*  Professor Zax has written about a *Washington Post* study

2  which found that firearms which have magazines of more than ten

3  rounds, traces in Virginia increased after the expiration of

4  the magazine ban.

5        Do you have -- are you aware of that *Washington Post*

6  article?

7  *A.*  Yes.  There were, actually, two articles published a year

8  apart that reported on that -- basically the same data.

9  *Q.*  Do you have an opinion on that?

10 *A.*  Yes.

11 *Q.*  What is that?

12 *A.*  Well, the second article revealed that roughly a quarter of

13 the guns were missing data.  That is, they really didn't know

14 whether they were equipped with large-capacity magazines.  It's

15 one of those examples where, theoretically, law enforcement

16 personnel were required to provide certain information, but in

17 fact did not.  So many law enforcement agencies in Virginia,

18 which is what the database referred to, didn't submit the data.

19 So the problem is, you still have the same potential for sample

20 bias as you did with the trace data, which is that people may

21 have, in effect, overrepresented weapons with large-capacity

22 magazines, perhaps because they were, you know, of special

23 political interest at the time.

24 *Q.*  Why --

25 *A.*  So --

1  | *Q.*  Why would they be of special political interest in 2004?

2  | *A.*  Because in 2004, the federal assault weapons ban was

3  | sunsetting, it was going out of effect.  So people that

4  | supported that objected to that.  They wanted it extended.  And

5  | so they were, you know, concerned about whether its sunsetting

6  | would result in increased use of large-capacity magazines in

7  | crime.  And so, you know, just as people were extra concerned

8  | about assault weapons when the federal assault weapons ban was

9  | being debated when it was going to be passed, then when it was

10 | sunsetting, they had kind of the mirror image concern.  Maybe

11 | now that it goes away, we'll have more of the problem that it

12 | was intended to introduce.

13 | *Q.*  Now, there are scholars, such as Professor Webster, who

14 | would say, even notwithstanding that disclaimer on every ATF

15 | trace publication that, actually, you can use trace data at

16 | least in some sense because there are many cities where the

17 | police chief or mayor has said, every time we seize a gun,

18 | we're sending it to the ATF for tracing.  So that would, at

19 | least in that city, be the entire universe for seized guns,

20 | wouldn't it?

21 | *A.*  Yes, it would, if they actually what did what they promised

22 | to do.  The problem was, when ATF actually surveyed the

23 | agencies that were participating in the program where they

24 | promised to submit all of their recovered guns to be traced,

25 | they found out it wasn't actually going on in more than one or

1    two cities.  There were one or two cities where maybe were

2    tracing all, or essentially all -- I won't quibble over a

3    couple of percent -- but where they were tracing all or nearly

4    all the guns that they recovered from criminals.

5         And so, for the most part, as far as ATF could tell,

6    people were not in fact doing comprehensive tracing.  They had

7    promised to do it, but mostly were not.  So they were back at

8    the old problem of picking and choosing some guns to be traced

9    and not others.

10   Q.  Now, there are some scholars who disagree with you on the

11   tracing issue, such as Professor Webster, who would say, even

12   taking into the account the caveats that you've mentioned, at

13   least you can tell things from when, say, Missouri, tracing

14   changes from 2007 to 2008 to 2009, for example, in what some

15   people call the time to crime or the time to recover.  How

16   long -- what's the interval between when a gun was sold and

17   when it was recovered by the police?

18        MR. GROVE:  Objection, Your Honor.  This is outside

19   the scope of Dr. Kleck's professed opinions.

20        MR. KOPEL:  Certainly, it's not.  It's based on -- it

21   is his opinion on whether violent criminals -- gun crime --

22   excuse me, let's go back to what Opinion 6 is.

23        THE COURT:  Actually, counsel, there is no question.

24   There has been some speechifying, but there is no question.

25        MR. KOPEL:  Okay.

 1           I would suggest, Your Honor, that Opinion 6, the trace

 2  data is essential to Opinion 6, because it is precisely how one

 3  tells --

 4           THE COURT:  Counsel, you need to pose a question to

 5  the witness.

 6           MR. KOPEL:  Okay.  Sorry, Your Honor, I apologize.

 7  BY MR. KOPEL:

 8  Q.  Professor Kleck, is time to crime a valid measure of

 9  anything useful about firearms, guns, and crime?

10           MR. GROVE:  Same objection, Your Honor.

11           THE COURT:  I'm not finding your original objection.

12  Could you restate it for the record, please.

13           MR. GROVE:  The original objection, Your Honor, is

14  that this is outside the scope of Dr. Kleck's opinions, to the

15  extent that he's attempting to rebut forthcoming testimony from

16  Dr. Webster on -- on the use of trace data with respect to the

17  universal background check law that is at issue here.

18           THE COURT:  What you're saying is, this is not a

19  disclosed opinion; is that right?

20           MR. GROVE:  It's that, and also this has nothing to do

21  with Opinion No. 6.  But it's primarily the first, yes.

22           THE COURT:  Well, no one has been raising relevance

23  objections here, so we have a lot of information that may not

24  be ultimately relevant.  But I'm going to treat this as an

25  objection that the opinion that has been asked here was not

1   previously disclosed.

2         Mr. Kopel.

3         *MR. KOPEL:*  Yes.  And the response to that, Your

4   Honor, is it is extensively disclosed in Dr. Kleck's rebuttal

5   expert report that was filed in September, which was all about

6   the claims of persons such as Professor Zax or others regarding

7   what can be inferred about magazine reduction among criminals

8   based on trace data.

9         *THE COURT:*  But that's not what you asked.  What you

10  asked was, "Professor Kleck, is time to crime a valid measure

11  of anything useful about firearms, guns, and crime?"  That's

12  what you asked.  Was the opinion you're seeking something that

13  was disclosed?

14        *MR. KOPEL:*  Yes, we believe that the entire -- the

15  subject of Dr. Kleck's critique of trace data is extensively

16  disclosed in -- not in what's -- in that opinion itself, but in

17  his rebuttal report filed in September.

18        *MR. GROVE:*  To the extent Dr. Kleck is attempting to

19  rebut what Dr. Zax used in terms of trace data, with -- that

20  applies to large-capacity magazines, that's fine.  I agree.

21  There has been discussion of Dr. Webster, for whom Dr. Kleck

22  has not issued any sort of rebuttal report.  That's my concern.

23        *THE COURT:*  All right.  This is not -- this question

24  doesn't necessarily, at least to my mind, pertain to

25  Dr. Webster.  Now, maybe because you all know more about what

1  was in the reports, it does pertain to Dr. Webster.  But I'm

2  not looking at reports, and I'm not focused on what rebuttal

3  opinions were disclosed.  So perhaps you could advise me as to

4  how this question seeking this opinion pertains to various

5  rebuttal opinions.

6       *MR. GROVE:*  Mr. Kopel will probably have to provide

7  more detail on that.  My concern is only where I foresee this

8  going based on the questions in which Dr. Webster's opinions

9  were brought into play.  So as long as Mr. Kopel is going to

10  steer clear of that, I will sit down.

11       *THE COURT:*  Mr. Kopel.

12       *MR. KOPEL:*  The word "Webster" will not cross my lips

13  for the rest of this morning.

14  *BY MR. KOPEL:*

15  *Q.*  Professor Kleck, in general, what can be learned from ATF

16  data about what is sometimes called time to crime, the interval

17  between when a firearm is seized and when it was sold?

18       *MR. GROVE:*  Same objection, Your Honor.  Dr. Zax did

19  not rely on time to crime in any of his studies.  We can put

20  him on the stand to say that if you'd like.

21       *MR. KOPEL:*  Thank you.  I will skip the topic.  Move

22  to a new topic.

23  *BY MR. KOPEL:*

24  *Q.*  Professor Kleck, I just want to go back to one thing on

25  your defensive gun use opinions, which we had omitted.  Based

1  on your own research and your scholar -- your studies of other

2  people's scholarship, do you have an estimate for how often

3  firearms are used defensively in the home against burglars?

4  *A.*  Against burglars specifically?  Well, as mentioned before,

5  it's about 38 percent of all defensive gun uses in the home.

6  And, overall, regardless of location, it's maybe a third that

7  are connected with burglary -- a third of all defensive gun

8  uses are connected with burglary.  So the fraction that have

9  both of those attributes, burglary and it's in the home

10  location -- the vast majority of the burglaries would be home

11  burglaries, as distinct from, like, you know, commercial

12  burglaries, burglaries of stores.  So probably a little under

13  30 percent.

14  *Q.*  Are you aware any study done by the Centers for Disease

15  Control on this subject?

16  *A.*  Of which subject?

17  *Q.*  Of defensive gun use against burglaries.

18  *A.*  Yes.

19  *Q.*  Could you tell us about that, please.

20  *A.*  They did a national survey in which they asked about a very

21  narrow subset of defensive gun uses.  And they asked about it

22  in, you know, sort of a unique way.  They asked people, have

23  you ever retrieved a gun in response to an intruder in your

24  home, something like that.  You know, basically describing

25  something like illegal entry.  And they don't get into any

1  further detail about what retrieving the gun meant. That's all

2  they say. They estimated there were a million incidents a year

3  in which someone retrieved a gun in response to an intruder in

4  their home.

5  Q. And do you recall the time period for that study, what they

6  were -- what year they were asking about?

7  A. I think it was in the 1990s, but I don't know whether I

8  could be very specific about that.

9  Q. Okay. And do you recall whether that study had any further

10  information, such as whether there was a face-to-face

11  confrontation?

12  A. No, I don't think it did.

13  Q. Okay.

14      Your Opinions No. 7 and 9, would you please read those

15  opinions.

16  A. "HB 1224's 15-round-magazine-capacity limit will reduce

17  incidences of self-defense use in situations where more than 15

18  rounds is required more than it will reduce criminal attacks in

19  which offenders need magazines of 16 or more rounds to inflict

20  massive casualties."

21      Opinion 9, "The magazine capacity restriction in HB

22  1224 will do more harm than good because it will reduce the

23  harm-preventing effects in defensive uses more than it will

24  reduce the rare harm-causing effects of criminal use of

25  magazines holding 16 or more rounds."

1  *Q.*  What is your basis for these opinions?

2  *A.*  Well, I don't quite know the legal distinctions as to when

3  it's a separate opinion.  But for the most part, these are,

4  basically, logical conclusions from the previous opinions.  So

5  Opinion 7, in particular, is saying -- it's based on the

6  previous assertion that criminals are more likely to violate

7  the magazine capacity limit than non-criminals.  And so

8  non-criminals' uses of guns for self-defense as crime victims

9  will be proportionally reduced more than criminal uses.  So

10  that's just based on the -- the unanimous conclusion of

11  criminological research that one kind of criminal behavior is

12  positively correlated with or predicts other kinds of criminal

13  behaviors.

14        And it's also based on Opinion No. 2, which

15  established that in a typical year, there aren't any incidents

16  in which it's clear that a magazine capacity of 16 or more

17  rounds contributed to the number of deaths and injuries.  There

18  is maybe one case in some years; but in a typical year, as far

19  as we know, it's zero.  So it's almost inevitable that the

20  number of defensive uses where the defender needed more than 15

21  rounds would have to be larger, unless it's exactly zero.

22        And you asked about both opinions.  So Opinion No. 9

23  is also sort of a logical inference from the previous -- the

24  premises established in the previous premises.  It will do more

25  harm than good, because, as stated in Opinion 7, you're

1  reducing beneficial defensive uses more than you're going to

2  reduce uses by criminals.  The latter being, essentially, zero.

3  They're, essentially, zero in a typical year.  Zero incidents

4  in which the offenders needed magazines of more than 15 rounds

5  to inflict the number of deaths and injuries they inflicted.

6  Q.  Thank you very much.

7        That concludes my direct examination.

8        And I'm just wondering, would you like to take a

9  2-minute break to use the rest room or get a drink of water or

10  anything?

11  A.  No, I'm fine.

12        MR. KOPEL:  Super.

13        THE COURT:  Cross-examination.

14        MR. GROVE:  Can I have just a moment, Your Honor?

15        THE COURT:  Sure.

16                    **CROSS-EXAMINATION**

17  BY MR. GROVE:

18  Q.  Good morning, Dr. Kleck.

19  A.  Good morning.

20  Q.  You testified some about trace data during direct, correct?

21  A.  Yes.

22  Q.  And you testified also about studies indicating that guns

23  tend to go from states with weak laws to states with strong

24  laws, correct?

25  A.  From studies claiming that.

1   *Q.* And you relied on that -- the conclusion of those studies,

2   correct?

3   *A.* I relied on it only for the fact that that's a claim that

4   people make, but it's a claim that I dispute.

5   *Q.* Those studies are based on trace data, correct?

6   *A.* Yes.

7   *Q.* And you don't necessarily believe trace data, because you

8   don't believe it's reliable, correct?

9   *A.* I'm not sure what "reliable" means.  It's not a matter of

10  reliability or unreliability of the information.  It's that

11  they don't have information at all that's needed to establish

12  the conclusions that scholars who use that data use it for.

13  *Q.* Well, your concern is that guns are only selectively

14  traced, correct?

15  *A.* Could you repeat the question, please.

16  *Q.* Your concern is that guns that are subject to tracing are

17  only selectively traced.

18  *A.* Yes.  In other words, law enforcement people select some

19  and not others to be traced, yes.

20  *Q.* There generally aren't laws that require police officer to

21  submit a crime gun for tracing?

22  *A.* There generally are or are not?

23  *Q.* Are not.

24  *A.* I'm not sure about that.  I think there may be a law or two

25  here and there that does require that.

1    Q.   In any event, the use of trace data in your view can lead

2    to unreliable conclusions?

3    A.   Yes.

4    Q.   And inaccurate results as well?

5    A.   Correct.

6    Q.   That principle that selective use of data can lead to

7    unreliable results, that can be applied to more than just trace

8    data, correct?

9    A.   Sure.

10   Q.   In fact, when you're gathering empirical data in order to

11   test a hypothesis, you need to gather a sufficient amount

12   regardless of the topic, right?

13   A.   There is no absolute standard of sufficient amount.  More

14   is better.  That's about all you can really say.

15   Q.   Okay.  So in the *Washington Post* article that you mentioned

16   on direct, you said that up to a quarter of the data that the

17   *Washington Post* relied on was missing, right?

18   A.   Correct.

19   Q.   And that raised red flags for you, correct?

20   A.   Correct.

21   Q.   But you wouldn't quibble over a couple of percent, right?

22   A.   I don't understand the question.

23   Q.   Well, you mentioned on direct -- and I'm quoting you,

24   sir -- that you wouldn't quibble over a couple of percent if a

25   few items amounting to a couple of percent --

```
 1   A.  Oh, I see.  You mean the percent of guns traced, whether it

 2   was 100 versus 99 or 98.  That's what I meant by that.

 3   Q.  Sure.

 4   A.  I wouldn't quibble over that, no.

 5   Q.  So if you missed a quarter of the data, that might be a

 6   problem, right?

 7   A.  Yes.

 8   Q.  If you only missed a couple of percent, that wouldn't

 9   really be a problem?

10   A.  It would certainly be less of a problem, yeah.

11   Q.  And part of the problem with trace data, right, is picking

12   and choosing among the law enforcement officers who might

13   collect it?

14   A.  Yes, that is part of the problem.

15   Q.  So they might see an assault rifle, and say, oh, I read a

16   lot about assault rifles, and these are really interesting, so

17   I'm going to submit this to ATF for trace data.  For a trace?

18   A.  Yes.

19   Q.  For a trace?

20   A.  Yes.

21   Q.  But if they were actually collecting all of this, all guns,

22   including all assault rifles, you wouldn't have the same

23   concerns?

24   A.  Not those same concerns, no.

25   Q.  And relying on trace data is generally a poor methodology,
```

1  because in your view, trace data is an unreliable source,

2  right?

3  *A.*  Well, again, my response would be the same as to your

4  earlier question.  It's not exactly unreliable.  It's often

5  reliable for what it measures, but it doesn't measure the

6  things that -- it doesn't allow you to infer the things that

7  some scholars infer from it.

8  *Q.*  So trace would be unrepresentative, in general, of the

9  entire universe of crime guns; is that your view?

10 *A.*  Yes, traced guns would be unrepresentative of the entire

11 universe.  Or to put it another way, there is no -- there is no

12 formal basis for it being representative.  And in some cases,

13 it's known to be unrepresentative.

14 *Q.*  And if you wanted to use trace data for something, you'd be

15 wise also to use another source to verify the accuracy of the

16 results that the trace data suggested, correct?

17 *A.*  It would help if the other source of information was more

18 reliable.

19 *Q.*  And that's generally true for research, right?  Two

20 resources is better than one?

21 *A.*  Other things being equal, if they are reliable, yeah.

22 *Q.*  Now, you've personally done two separate studies on

23 large-capacity magazine use in mass shootings, correct?

24 *A.*  Yes.

25 *Q.*  And --

1    *A.*  Could you repeat the question?  I want to make sure I

2    understood it.

3    *Q.*  You've done two separate studies on large-capacity magazine

4    use in mass shootings, correct?

5    *A.*  Yes.

6    *Q.*  And the first was in your first book, *Targeting Guns*?

7    *A.*  Yes.

8    *Q.*  And the second was for this case?

9    *A.*  Yes.

10   *Q.*  We'll get to how you did that work in a little bit.  But

11   for now, I'd just like to confirm, you submitted that study as

12   part of an expert report in this case, correct?

13   *A.*  Which one, the second one?

14   *Q.*  Yes.  I'm sorry, the second one.

15   *A.*  Yes.

16   *Q.*  We're going to focus today on the second one only, for

17   future reference.

18          And you've also submitted it as an expert report in

19   several other cases, right?

20   *A.*  Yes.

21   *Q.*  And one of those was a Fyock v. Sunnyvale case in

22   California, right?

23   *A.*  Yes.

24   *Q.*  San Francisco Veteran Police Officers Association v. San

25   Francisco?

1    *A.* Yes.

2    *Q.* And Tardy v. O'Malley in Maryland?

3    *A.* Yes.

4    *Q.* And Shew v. Malloy in Connecticut?

5    *A.* Yes, although I want to make sure it's clear, when you say

6    "that report," as time went on, the report evolved. In a

7    sense, it's not one report, because each time I learned

8    something new, of course, I took that into account in improving

9    the data and the analysis as well. So I wanted that qualifier

10   in.

11   *Q.* How did you learn new things as you went?

12   *A.* As I mentioned before, I used other sources of information

13   besides the initial search for news media outlets. So I went

14   to those websites that had the compilations done by the Mayors

15   Against Illegal Gun Violence -- Illegal Guns, the Violence

16   Policy Center, and so forth, Congressional research and so on.

17   So in some cases I learned about incidents that I hadn't been

18   aware of.

19         In other cases, I learned about cases I already knew

20   about, but I learned something additional that told me, no,

21   this should not be in the study because it's not -- it doesn't

22   qualify. And that was primarily cases where -- it turned out

23   they were spree shootings. And once you found out that the

24   shootings had occurred in multiple locations, you found there

25   weren't more than six victims in any one location. Plus, there

 1   was one case where the source had misreported it as to the

 2   number of victims.  They said it was seven, but they were

 3   including the suicide of the shooter himself, and so that

 4   didn't qualify based on number of victims.

 5   Q.  I'm not quite through the list of cases in which you've

 6   been an expert recently on this issue, so let me just confirm.

 7   Also, in addition to the four I discussed already, you were

 8   also an expert using this data in New York State Pistol and

 9   Rifle Association v. Cuomo in New York?

10   A.  Correct.

11   Q.  Also Wilson v. Cook County in Illinois?

12   A.  Correct.

13   Q.  Are there any more?

14   A.  No, none that I can recall at this point.

15   Q.  And you've been deposed in at least some of those cases,

16   right?

17   A.  Yes.  Well, actually, I'm not absolutely certain.  I think

18   I've been deposed in connection with the Cook County case, I

19   think.

20   Q.  And Maryland also?

21   A.  It could be.  I'm -- yes, because that was done in D.C.,

22   yes.  So, yeah, that other one too.

23   Q.  And during some of those depositions, you've learned of

24   some of the errors in your previous report, or omissions,

25   correct?

1   A.  Yes, then I just corrected them.

2   Q.  So you feel pretty comfortable that you've got a more

3   comprehensive list at this point?

4   A.  More comprehensive, but not necessarily totally

5   comprehensive even now.  It's impossible to know that.

6   Q.  What could you do to ensure that it was more comprehensive

7   than it is now?

8   A.  Use still other sources.  That's about the only thing you

9   could do.  If somebody brings additional cases to my attention,

10  I can include them in the database as well.

11  Q.  Other than the two studies that you've discussed in this

12  case, the one that was in *Targeting Guns* and the one we're

13  talking about now, you've not done any additional studies that

14  look at the issue of the use of large-capacity magazines?

15  A.  No, none that I can recall right now.

16  Q.  In fact, there is not a whole lot of scholarly research out

17  there at all analyzing magazine capacity in the context of gun

18  violence, is there?

19  A.  I agree with that assessment.

20  Q.  You'd agree that Chris Koper from George Mason has

21  published the most in this area, correct?

22  A.  No, I don't know that to be the case.  He's mostly an

23  expert on the impact of something related to that, which was

24  the ban on not only assault weapons, but large-capacity

25  magazines.  But he's -- I don't think he's published any

 1  significant amount of research on mass shootings, analogous to

 2  what you're alluding to, the two studies I did.

 3  Q.  Well, let me narrow my question for you, sir.  Dr. Koper

 4  has published, you would say, more on the topic of

 5  large-capacity magazines, period, outside of the context of

 6  mass shootings, or perhaps including them, than anyone else in

 7  the criminological world?

 8  A.  Possibly, yeah.  That's possibly true.

 9  Q.  That works includes the -- I think you referred to it

10  earlier, although not by name -- the report for the National

11  Institute of Justice on the effect of the 1994 federal assault

12  weapons ban.

13  A.  Which was by Koper, yes.

14  Q.  And you're familiar with that study?

15  A.  Yes.

16  Q.  And you actually cited it as an expert report in this case?

17  A.  That's correct.

18  Q.  And Dr. Koper updated that study in 2013, right?

19  A.  Sort of.  I mean, he didn't update it in terms of the

20  content of the data and evidence.  He kind of updated it in

21  terms of the spin he put on the evidence.  It was, shall we

22  say, a more optimistic assessment of the assault weapons ban.

23  Q.  Well, you cited the 2013 update in your expert report in

24  this case, right?

25  A.  Yes.

1  *Q.*  And you also cited another of Dr. Koper's studies called

2  "Impact of Handgun Types on Gun Assault Outcomes"?

3  *A.*  Yes, I did.

4  *Q.*  That was published in the Journal of Injury Prevention in

5  2003?

6  *A.*  That's correct.

7  *Q.*  As a scholar, you would only cite sources that you believe

8  to be reliable authorities, correct?

9  *A.*  It's not a relevant way of framing the issue.  You rely on

10  the best available evidence.  Some is less reliable than

11  others, but you always try to use the most reliable information

12  available.

13  *Q.*  In general, you're more comfortable citing a source that

14  you consider to be reliable, right?

15  *A.*  Well, of course.

16  *Q.*  And you consider Dr. Koper's work to be reliable?

17  *A.*  And the reading in Koper studying, then, of 2003 that

18  you're referring to, yes, as far as I know, that's reliable

19  information.

20  *Q.*  And that's also the case with the two studies that we

21  talked about, the 2004 and 2013 reports on the effect of the

22  federal assault weapons ban; you relied on them in your expert

23  report, correct?

24  *A.*  I think I cited Koper's conclusions.  I'm not sure that

25  means I relied on them, but I certainly cited his conclusions.

 1  In connection with the 2013 article, I would say -- the main

 2  thing I would say is just to repeat what I previously said,

 3  which is, he's just putting a different spin on it.  So I

 4  wouldn't regard it as having a reliable foundation for a more

 5  optimistic conclusion.  Rather, I would cite it as an instance

 6  of drawing, justified or not, a more optimistic conclusion

 7  about whether the assault weapons ban was effective.

 8  Q.  Generally speaking, you would consider Koper's work on the

 9  effect of the large-capacity magazine ban as a function of the

10  1994 federal assault weapons ban to be the most comprehensive

11  look of this in the criminological field, correct?

12  A.  Yes.

13  Q.  In that study, the 2004 study on the federal assault

14  weapons ban and the 2013 update, the purpose of that work was

15  to analyze the effects of the federal law, correct?

16  A.  Correct.

17  Q.  And the first installment was -- was issued just as the law

18  was coming up for renewal?

19  A.  I don't know what that means, first installment.

20  Q.  In 2004.

21  A.  The NIJ report, you're referring to?

22  Q.  The 2004 Koper report on the effect of the assault weapons

23  ban.

24  A.  I'm going to have to hear the whole question again.  Sorry.

25  Q.  It was issued just as that law was coming up for renewal?

 1  *A.*  Yes.

 2  *Q.*  In June of 2004.

 3  *A.*  Yes, well, I don't know about June, but certainly 2004.

 4  *Q.*  And the law took effect in 1994, correct?

 5  *A.*  Yes.

 6  *Q.*  And the sunset was in September 2004?

 7  *A.*  Correct.

 8  *Q.*  And that law included provisions about magazines?

 9  *A.*  It did.

10  *Q.*  It prohibited the new manufacture of magazines that held

11  more than ten rounds of ammunition?

12  *A.*  Correct.

13  *Q.*  Magazines that were manufactured before 1994, though, were

14  exempt from the ban?

15  *A.*  That's correct.

16  *Q.*  And they could be purchased at retail after the ban went

17  into effect?

18  *A.*  Correct.

19  *Q.*  They could be transferred between private parties?

20  *A.*  Correct.

21  *Q.*  They could be repaired if they broke?

22  *A.*  Yes, if they were pre-'94.

23  *Q.*  And that reported estimated that there were approximately

24  25 million large-capacity magazines.  And when I say

25  "large-capacity magazines," I'm referring to those that hold 11

1    or more rounds of ammunition as defined by the federal law, in

2    circulation as of 1995, correct?

3    A.   I'll take your word on that.  I don't recall the number.

4    But it was a big number, let's say that.

5    Q.   And it was permissible to transfer these magazines from

6    individual to individual?

7    A.   Correct.

8    Q.   And in fact, ATF authorized importation of millions of

9    grandfathered magazines from abroad during the first several

10   years of the ban, correct?

11   A.   That's my understanding, yes.

12   Q.   And the total between 1995 and 2000 that were actually

13   imported was 4.7 million; is that correct?

14   A.   Again, I don't recall the number; but that sounds like a

15   reasonable number.

16   Q.   Well, would you like to look at Dr. Koper's study to

17   refresh your recollection?

18   A.   Yeah, if you could bookmark the page so I don't delay the

19   proceedings for a long time to get it.

20   Q.   It's Exhibit 5, sir.

21            We'd offer this exhibit, Your Honor.

22            THE COURT:  Voir dire or objection?

23            MR. KOPEL:  May I see it?

24            MR. GROVE:  Sure.

25            COURTROOM DEPUTY:  Your Honor, I show Exhibit 5 was

1 | received on March 31.

2 |    *THE COURT:*  All right.  Then it's been received.

3 |    *MR. GROVE:*  I'm sorry, 7, Your Honor.  My fault.

4 |    *THE COURT:*  Oh.

5 |    *MR. GROVE:*  I relied on an unreliable source for that.

6 | I apologize.

7 |    *MR. KOPEL:*  No objection, Your Honor.

8 |    *THE COURT:*  Exhibit 7 is received.

9 |    (Exhibit 7 admitted.)

10 |    *THE WITNESS:*  I have 5 here.

11 |    *MR. KOPEL:*  We're trying to -- we're both thinking, I

12 | think, July 2004 document.

13 |    *THE WITNESS:*  I have it.

14 | *BY MR. GROVE:*

15 | *Q.*  Are we on the same page?

16 | *A.*  Yeah.

17 | *Q.*  Let's literally get on the same page, 66 of that report,

18 | please.

19 | *A.*  Okay.

20 | *Q.*  And my question was -- in fact, it's 4.8 million.  If you

21 | could take a look at page 66 of that report and refresh your

22 | recollection as to the number of pre-ban large-capacity

23 | magazines that were imported to the United States before the

24 | year 2000.

25 |    Did looking at that refresh your recollection, sir?

1    A.  One moment, please.  I don't see anything about imports

2    here.  Can you point to where on page -- I'm sorry, I'm not

3    even looking at the table.  It's in the table, correct.

4         Yes, it says about 4.8 million between '94 and 2000,

5    imported.

6    Q.  And ATF authorized importation of tens of millions of more

7    pre-ban large-capacity magazines, correct?

8    A.  Yes.

9    Q.  And do you know how many more?

10   A.  The table says 47.2 million.

11   Q.  Do you have any reason to dispute that?

12   A.  No.  I'm not sure what "approval" means, though, because it

13   doesn't correspond to number imported.  But approved, for what

14   it's worth, was 47.2 million.

15   Q.  We know, at least from this table, as I said before, there

16   were approximately 25 million large-capacity magazines in

17   circulation before the ban went into effect, correct?

18   A.  Yes.

19   Q.  And that at least 4.8 million more were imported during the

20   first six years that the ban was in effect, correct?

21   A.  Correct.

22   Q.  That's an increase of 20 percent?

23   A.  Yes, almost 20 percent.

24   Q.  You would agree that the federal ban on large-capacity

25   magazines had some loopholes, right?

1    *A.*  Yes.

2    *Q.*  In fact, it was riddled with loopholes?

3    *A.*  You mean, would I characterize that as riddled with?  It's

4    too subjective.  I would just say it had loopholes, definitely.

5    Because it grandfathered in preexisting magazines, pre-'94

6    magazines.

7    *Q.*  Despite the loopholes that you acknowledge existed, in your

8    opinion, we should have started to see some effects on the

9    number of large-capacity magazines in circulation toward the

10    end of the ten-year period, correct?

11    *A.*  I'd go beyond that.  I think you should have started to see

12    at least small effects almost immediately, because there still

13    should have been, despite the loopholes -- despite the

14    preexisting guns, there should have been a reduction in the

15    inflow.  In fact, there should have been a total stop in the

16    inflow immediately after it was implemented in September of

17    '94.  So you should have seen small effects -- if there were

18    any, small effects initially almost from the beginning, getting

19    larger and larger throughout the effective period.

20    *Q.*  I thought you just agreed with me, sir, that there were

21    4.8 million, that the stock of large-capacity magazines

22    increased between 1994 and 2000.

23    *A.*  I did.  But you're asking about the impact of the ban.

24    What is the impact of the ban?  In other words, you're

25    contrasting with the ban versus what it would have been without

1  the ban.  You're making a different contrast.  You're making a

2  contrast with what actually happened.  So you're trying to

3  hypothetically imagine, when would the effect be evident?  When

4  would we have fewer guns than otherwise -- sorry,

5  large-capacity magazines than otherwise would have been

6  available?  And I'm saying you should have seen fewer than

7  otherwise would have been available, taking account of not only

8  preexisting magazines, but also imported magazines.

9  *Q.*  You would agree that we saw more, in an absolute sense,

10 between 1994 and 2000.  The absolute stock of large-capacity

11 magazines increased in the United States between 1994 and 2000,

12 correct?

13 *A.*  It probably did, but even -- we don't even know that,

14 because there are losses, that are probably small.  So if you

15 only count additions, it's bound to grow.  It's inevitable,

16 just by virtue of the way you're counting.  If you don't --

17       *THE COURT:*  Sir, we can't hear you because you're not

18 using the microphone.

19       *THE WITNESS:*  It's inevitable that there be an

20 increase in the numbers if you only count additions and don't

21 take account of deletions.  So, you know, there are probably

22 some magazines that are seized and destroyed by police

23 departments, the same as we know they do with guns.  But I

24 would acknowledge that, probably, given the magnitude of the

25 number of imports, that the absolute number of large-capacity

 1  magazines did go up.

 2  *BY MR. GROVE:*

 3  *Q.*  In fact, magazines are quite reliable, aren't they?  They

 4  last a long time?

 5  *A.*  Durable, yes.

 6  *Q.*  We heard testimony yesterday from Doug Hamilton, I believe,

 7  that they have 430 magazines in stock and that they -- let me

 8  withdraw that and put it another way.  That he runs a shooting

 9  range, and that they rent guns with large-capacity magazines

10  regularly, and that they only go through two or three on an

11  annual basis that they need to replace due to them wearing out.

12  Does that sound like a reasonable assessment of how long

13  lasting a magazine might be?

14         *MR. KOPEL:*  Objection.  Beyond the scope.  Professor

15  Kleck is not a firearms design and durability expert.

16         *THE COURT:*  Sustained.

17         And this is probably a good time for us to recess for

18  the noon hour.

19         We're showing just a couple of minutes before noon on

20  the court clock, and we'll stand in recess until 1:30.  We'll

21  reconvene at that time.

22         (Recess at 11:58 a.m.)

23         (In open court at 1:38 p.m.)

24         *THE COURT:*  Please proceed.

25         *MR. KOPEL:*   Good afternoon, Your Honor.

1          We were hoping we could work on some scheduling issues

2     with you right now.  Because Professor Kleck had his 4 o'clock

3     flight to catch, the defendant had said that he could wrap

4     up -- find a convenient stopping point on cross-examination

5     between 2:00 and 2:15.  And Professor Kleck made reservations

6     so he'll be coming through Cleveland tomorrow night and be

7     ready for continuation of the cross-examination on Friday

8     morning.

9          We are now in a position where we find ourselves a

10    little ahead of schedule, partly because of defendant's

11    decision not to cross-examine Mr. Ayoob.  We have two witnesses

12    on deck for this afternoon, Mr. Colglazier and Mr. Bayne.  And

13    our estimate is, jointly, that the pair of them would probably

14    take about two hours.  And we were wondering if all this comes

15    true, when we finish at 4 o'clock, would it be permissible to

16    end today's court session?

17         If not, we have a witness who is driving down right

18    now.  Would be ideal if we could not put that witness through

19    the two-hour trip.

20         THE COURT:  That's fine.  But we're keeping track of

21    your time by chess clock.  And if you don't use the time, you

22    lose it.

23         MR. KOPEL:  So if we stopped at 4:00, we would have

24    the one hour lost penalty time?

25         Certainly, Your Honor, we'll know that, and I think

1   we'll then likely continue.  And I'll turn it over to Mr. grove

2   for continued examination.

3        *THE COURT:*  Okay.

4   *BY MR. GROVE:*

5   *Q.*  Dr. Kleck, when we left off, we were discussing the federal

6   assault weapons ban and the large-capacity magazine component

7   of that ban.  Do you recall that?

8   *A.*  Yes.

9   *Q.*  And we were discussing that -- your opinion, that despite

10  the loopholes in the ban, that we should have seen some sort of

11  dropoff in the number of large-capacity magazines in

12  circulation at some point during that ten-year period, correct?

13  *A.*  Yes.

14  *Q.*  Now, because of the grandfathering and the continued

15  importation of pre-banned large-capacity magazines, it would

16  have been less likely that we would see effects during the

17  early years of the ban, correct?

18  *A.*  I think so.

19  *Q.*  And so we would have seen effects, if there were any, to

20  start accelerating toward the end of that period?

21  *A.*  That would be my expectation.

22  *Q.*  And I think we went over this before.  I apologize if we

23  did.  But Dr. Koper issued that report on the ban in June of

24  2004; is that right?

25  *A.*  I have to take your word on that.  I think it was around

1   then, certainly.

2   Q.  In any event, it was before the expiration of the ban,

3   right?

4   A.  Probably.  Unless it was late September through December;

5   but, yeah, it's more than likely it was before the end of the

6   expiration.

7   Q.  Let's just get it in.  If you could turn to the first page

8   of Exhibit 7.

9   A.  Yes.

10  Q.  June 2004, correct?

11  A.  July 2004.

12  Q.  I'm sorry.  It's actually the second page, I'm sorry.

13  A.  Yes, that says June.

14  Q.  Okay.  And that was before the expiration of the ban, which

15  is in September?

16  A.  Correct.

17  Q.  And the data sets that Dr. Koper relied on, therefore,

18  stopped, by definition, before June 2004, correct?

19  A.  Correct.

20  Q.  For example, he examined large-capacity magazine use in

21  several cities and trends in those cities, correct?

22  A.  Yes.

23  Q.  And one of those cities was Milwaukee?

24  A.  Yes.

25  Q.  And we can turn to this page, but I'll just ask you until

 1  you tell me you don't remember.  And his data set for Milwaukee

 2  continued only through 1998; is that correct?

 3  A.  You anticipated that I will have to turn to that page.

 4  Q.  76.

 5         THE COURT:  When you're talking about page 76, you've

 6  got a couple of different numbers at the bottom of these pages

 7  on my copy.

 8         MR. GROVE:  And so one is the Bates number.  And I'm

 9  talking about the page number of the report, which is just

10  above the Bates number.

11         THE COURT:  Great.  Thank you.

12         MR. GROVE:  Just above and to the left.

13         THE COURT:  Uh-huh.

14         THE WITNESS:  All right.  I'm there.  And the question

15  was?  Could you repeat it, please.

16  BY MR. GROVE:

17  Q.  The data set that Dr. Koper considered when he was

18  analyzing large-capacity magazine use during the ban period for

19  Milwaukee extended only through 1998?

20  A.  That's correct.

21  Q.  And he also examined large-capacity magazine use in

22  Louisville over this period of time, correct?

23  A.  Again, could I have a page number?

24  Q.  Next page.  77.  And, actually, 78 as well.

25         Just let me know when you're ready to talk about that.

1  A.  Yeah, for that one, they apparently have data through 2000.

2  Q.  So that data set is only through 2000?

3  A.  Correct.

4  Q.  In fact, none of the city-level data that Dr. Koper

5  analyzed extended through the end of the ban, correct?

6  A.  Right.

7  Q.  That means that his analysis didn't cover any potential

8  effects during the last few years of the ban?

9  A.  That's correct.

10  Q.  He also didn't have any data that would have extended past

11  when the ban expired, correct?

12  A.  Yes.

13  Q.  And that's because his report was issued before the ban

14  expired?

15  A.  Right.

16  Q.  And so he couldn't consider whether large-capacity

17  magazines -- sorry, withdrawn.  He couldn't consider whether

18  circulation of large-capacity magazines increased after the ban

19  expired, correct?

20  A.  Correct.

21  Q.  You previously highlighted the statement in the 2004 Koper

22  study that the large-capacity magazine provision of the federal

23  assault weapons ban had -- this is a quote from the Koper

24  study -- no discernible reduction in the lethality and

25  injuriousness of gun violence during the post-ban years; is

 1 | that right?

 2 | *A.*  Yes.

 3 | *Q.*  And you agree with that statement?

 4 | *A.*  Yes.

 5 | *Q.*  And you agree with that statement because Dr. Koper is a

 6 | reliable source in this field, correct?

 7 | *A.*  I think so, yes.

 8 | *Q.*  I'd like to read a couple of other statements from

 9 | Dr. Koper's 2004 and 2013 papers.

10 | And, Your Honor, I'd like to offer these under

11 | 803(18).

12 | *THE COURT:*  Response.

13 | *MR. KOPEL:*  No objection, Your Honor.

14 | *THE COURT:*  Okay.  Well, we need to have an

15 | identification of what it is you're offering.  What exhibits?

16 | *MR. GROVE:*  Well, the first statement will be from

17 | Exhibit 7, where we currently are; and then the next will be

18 | from Exhibit 8, which I'll get to in a moment.

19 | *THE COURT:*  Okay.  And what is it, specifically for

20 | the record, the whole exhibit or a page out of the exhibit?

21 | *MR. GROVE:*  No, I'm just going to read a couple of

22 | sentences from each into the record.

23 | I think I know where you're going here.

24 | *THE COURT:*  I'm having problems with the idea of

25 | reading from something into the record and having counsel read

 1   from something into the record when you want that to be

 2   evidence to be considered and you're invoking that under an

 3   exception to the hearsay rule.  So help me out here.  What is

 4   it you're trying to do?

 5        MR. GROVE:  Well, I was going to use a learned

 6   treatise exception to try to highlight a couple of provisions

 7   from these.  But since they're -- since at least 7 is already

 8   in evidence --

 9        THE COURT:  Right, you don't need to offer it again.

10        MR. GROVE:  Fine.

11        THE COURT:  Since it's in evidence.  Is there some

12   other exhibit you want to offer?

13        MR. GROVE:  Well, for now, 8, yes.

14        THE COURT:  Okay.  And I understand there is no

15   objection to 8 being admitted?

16        MR. KOPEL:  Let me double-check, Your Honor.

17        No, Your Honor, there is not.

18        THE COURT:  Okay.  Then I'll receive 8, and that

19   should take care of your problem.

20        MR. GROVE:  Sounded like a good idea in my head.

21        (Exhibit 8 admitted.)

22   BY MR. GROVE:

23   Q.  So one of Dr. Koper's conclusions in his -- both his 2004

24   and 2013 papers was that the data set that he was relying on

25   was not complete enough to provide a reliable basis for forming

1  an opinion about the effect of the large-capacity magazine

2  component of the federal assault weapons ban, correct?

3  *A.* He certainly said something like that, although he might

4  also have said it's not as good as we would like, something to

5  that effect, which is subtly different. You know, there is no

6  absolutes here. There is no evidence that kind of goes past a

7  magic point where, yes, I can definitely draw a conclusion,

8  and, then just before that, you couldn't draw any conclusion at

9  all. It's just that as the evidence gets better, you can draw

10  more reliable conclusions.

11  *Q.* And his conclusion was that the evidence wasn't sufficient

12  enough to draw a reliable conclusion yet?

13  *A.* Well, I think the conclusion was, it wasn't as good as he

14  would like to draw a conclusion. I don't know if there is any

15  absolute binary decision, though, reliable or not reliable.

16        *MR. GROVE:* Could I have just a moment, Your Honor?

17        *THE COURT:* You may.

18  *BY MR. GROVE:*

19  *Q.* So if you could turn to page 2 of Exhibit 7.

20  *A.* You said page 7?

21  *Q.* Page 2 of Exhibit 7.

22  *A.* Oh, okay.

23  *Q.* At the bottom header it says, "It is premature to make

24  definitive assessments of the ban's impact of gun crime." Do

25  you see that?

1    *A.*   Yes.

2    *Q.*   Going on -- let me know if I read this correctly.  "Because

3    the ban has not yet reduced the use of large-capacity magazines

4    in crime, we cannot clearly credit the ban with any of the

5    nation's recent drop in gun violence.  However, the ban's

6    exemption of millions of pre-ban assault weapons and

7    large-capacity magazines ensured that the effects of the law

8    would occur only gradually.  Those effects are still unfolding

9    and may not be fully felt for several years in the future,

10    particularly if foreign pre-ban large-capacity magazines

11    continue to be imported into the U.S. in large numbers."  Did I

12    read that correctly?

13    *A.*   You did.

14    *Q.*   We talked about, earlier, the Reedy and Koper study from

15    2003.  And you're familiar with that study, right?

16    *A.*   Yes.

17    *Q.*   You relied on that as well in your report?

18    *A.*   I did.

19    *Q.*   That was the study of handgun attacks in Jersey City, New

20    Jersey that occurred during the 1990s?

21    *A.*   Not just attacks.  It would have been handgun crimes, so it

22    would also include threats.

23         *MR. KOPEL:*  Objection, Your Honor.  Beyond the scope

24    of direct examination.

25         *THE COURT:*  The objection is untimely.

1   *BY MR. GROVE:*

2   *Q.*  You relied on the study that we're discussing in reaching

3   your conclusions in this case, correct?

4   *A.*  Yes, I did.

5   *Q.*  On average, semiautomatic pistols have a higher capacity

6   than revolvers, correct?

7   *A.*  Correct.

8   *Q.*  And you were also of the opinion that criminals fairly fire

9   large numbers of rounds during commission of crime?

10  *A.*  Yes.

11  *Q.*  And to reach this opinion, one of your primary sources is

12  that Reedy and Koper study from 2003, correct?

13  *A.*  It is.

14  *Q.*  And by "large numbers of rounds" -- we should just define

15  what that means.  Let's say 15, since that's what the number

16  is, really, at issue in this case.  Is that fair?

17  *A.*  Over 15, right.

18  *Q.*  Okay.  And you're aware of some crimes in which criminals

19  have actually fired large numbers of rounds, correct?

20  *A.*  Certainly.

21  *Q.*  Those would include events like mass shootings?

22  *A.*  Yes.

23  *Q.*  You're familiar with the mass shooting in Aurora, in the

24  theater, in 2012, correct?

25  *A.*  Yes.

1   Q.  And the shooter in that case used an assault rifle equipped

2   with 100-round drum magazine?

3   A.  I believe so, yes.

4   Q.  And he fired more than 15 times?

5   A.  Certainly.

6   Q.  And you're familiar with the mass shooting that occurred in

7   Newtown, Connecticut?

8   A.  Yes.

9   Q.  And that shooter fired more than 150 times, correct?

10  A.  I believe so.

11  Q.  He was equipped with an AR-15 and 30-round magazines,

12  correct?

13  A.  I'm not certain about that, but I find that perfectly

14  reasonable.

15  Q.  And in Dr. Koper's study, in the 2003 study, he reported

16  some incidents in which the perpetrators fired more than 15

17  rounds, correct?

18  A.  Could you repeat that, please.

19  Q.  In his 2003 study, he reported some incidents -- and this

20  is the 2003 Dr. Koper and Reedy study that we've been

21  discussing.

22  A.  Yes.

23  Q.  That study reported some incidents in which the

24  perpetrators fired for than 15 rounds?

25  A.  Yes.

1    *Q.* And those weren't mass shootings, were they?

2    *A.* No.

3    *Q.* And in those incidents in which 15 or more rounds were

4    fired, the injury rate was 100 percent, correct?

5    *A.* That, I don't recall one way or the other. Sorry.

6    *Q.* Well, you would agree, generally, that, holding other

7    factors constant, a shooter is more likely to hit his target

8    with, say, ten bullets than two?

9    *A.* The reason I pause is, I'm not sure you can hold everything

10   else constant. Because if in a given period of time you fire

11   more rounds, you're bound to impair your accuracy. So there --

12   it's -- what is happening is moving in two different

13   directions. The number of rounds per se -- maybe this is what

14   you're getting at. If you could also -- and it's a big "if."

15   If you could hold the accuracy of the shooting constant, then

16   your conclusion would be correct, then you would expect fewer

17   injuries.

18   *Q.* If someone were shooting at you, Dr. Kleck, would you

19   prefer that they shoot two bullets or ten?

20   *A.* Two.

21   *Q.* And why is that?

22   *A.* Because I think it would be less likely they hit me.

23   *Q.* With two?

24   *A.* With two.

25   *Q.* And, in general, you would agree as well that the more

1  times a victim is shot, the less likely his chances of survival

2  are?

3  A.  Other things being equal, yes, I think so.

4  Q.  In Koper's 2003 study, the authors found that gun attackers

5  using semiautomatic pistols tended to fire more shots than

6  attackers using revolvers, correct?

7  A.  Yes.

8  Q.  And you agree that he found a correlation between the

9  capacity of the firearm and the number of shots fired in a

10  particular incident?

11  A.  That, I'm not sure of.  I would not be surprised if he had

12  drawn that conclusion, though.

13  Q.  So is that -- do you agree, or do you disagree?

14  A.  I think it's a reasonable thing to expect, certainly.  I

15  just don't recall that detail of that study that well.  Again,

16  if I had the copy of the article to refresh my memory, I would

17  certainly be happy to look at it.

18       MR. GROVE:  If I may refresh the witness's

19  recollection?

20       THE COURT:  You may.

21  BY MR. GROVE:

22  Q.  The courtroom deputy has handed you the copy of the article

23  in question.  Please let me know when you've had a chance to

24  look at it.

25  A.  All right.

 1          *THE COURT:*  Mr. Keech, you may retrieve the article.

 2          *THE WITNESS:*  Well, in that case, maybe I ought to

 3    look at it longer.

 4          *THE COURT:*  It's there to refresh your recollection,

 5    not to aid your testimony.

 6          *THE WITNESS:*  I need a lot more refreshing than most

 7    people.

 8          All right.  Judge.

 9    *BY MR. GROVE:*

10    *Q.*  Do you remember the question, or shall I repeat it?

11    *A.*  Please repeat it.

12    *Q.*  Do you agree that this study found the correlation between

13    the capacity of the firearm and the number of shots fired in a

14    particular incident?

15    *A.*  I only see the distinction between semiautomatic and

16    revolver, but no distinction between semiautomatic with larger

17    capacities versus semiautomatic with smaller capacities.

18    *Q.*  You would agree, though, and I think you just testified,

19    that on average, semiautomatic pistols have a larger capacity

20    than revolvers?

21    *A.*  Correct.

22    *Q.*  And the correlation was that perpetrators using

23    larger-capacity weapons, that is semiautomatics, fired more

24    shots on average than perpetrators using smaller-capacity

25    weapons, correct?

1   *A.*  Yes.  But, you know, you're confounding two different

2   things at the same time.  What he really compared was

3   semiautomatics, regardless of capacity, with revolvers,

4   regardless of capacity.  And, while, on average semiautomatic

5   pistols do, indeed, as I said, have a higher capacity, you

6   necessarily confound the effect of it being a semiautomatic

7   pistol with the effect of it having a larger capacity, which

8   wasn't directly measured in those data.

9   *Q.*  Is that a yes or a no?

10  *A.*  That was a you-can't-tell-from-those-data answer.

11  *Q.*  So my question, sir, was, the correlation was the

12  perpetrators using larger-capacity weapons fired more shots on

13  average than perpetrators using smaller-capacity weapons?

14          *MR. KOPEL:*  Objection, asked and answered.

15          *THE COURT:*  Overruled.  That was the problem.

16          *THE WITNESS:*  Well, my answer would be the same.  You

17  can't tell.  And if you can't tell, you can't provide a yes or

18  a no answer.  I mean, I don't know how else to phrase it.  You

19  know, if you don't know, you don't know.

20  *BY MR. GROVE:*

21  *Q.*  Dr. Kleck, do you recall being deposed in this case?

22  *A.*  Yes.

23  *Q.*  And I came to Tallahassee to do that, correct?

24  *A.*  Correct.

25          *COURTROOM DEPUTY:*  I hand the witness Volume I of his

 1   deposition taken October 5, 2013.

 2          *THE WITNESS:*  Thank you.

 3   *BY MR. GROVE:*

 4   *Q.*  And you gave an oath before giving that deposition?

 5   *A.*  I did.

 6   *Q.*  And you swore to tell the truth?

 7   *A.*  I did.

 8   *Q.*  And you did in fact tell the truth?

 9   *A.*  I did.

10   *Q.*  Please turn to page 75 in the document I just handed you.

11   *A.*  All right, I'm there.

12   *Q.*  Starting at line 21.

13          Question:  "Would you agree that there is correlation

14   here between magazine size and the number of shots fired in a

15   particular incident?"

16          Answer:  "Yes."

17          Question:  "And what is that correlation?"

18          Answer:  "It's a positive correlation -- well,

19   depending on how you coded semiautomatic.  If semiautomatic is

20   the larger -- gets the larger value, then it would be a

21   positive correlation."

22          Did I read that correctly, sir?

23   *A.*  You did.  But the issue is whether you could tell it from

24   the Koper's 2003 study.

25   *Q.*  I'm sorry.  There is no question pending, sir.

1          MR. GROVE:  This is a good breaking point, Your Honor.

2          THE COURT:  Good breaking point for the examination of

3    this witness?

4          MR. GROVE:  For Dr. Kleck's departure.

5          THE COURT:  Okay.  Great.

6          Then, sir, I release you for the day.

7          THE WITNESS:  Thank you.

8          THE COURT:  I direct that you not discuss your

9    testimony, however, with any other person other than counsel

10   during the intervening time period.

11         I wish you safe travel.  Look forward to having you

12   back on Friday.

13         THE WITNESS:  Thank you, Your Honor.

14         MR. WESTFALL:  Your Honor, may we have just a tiny,

15   like, 60-second recess among counsel?

16         THE COURT:  Sure.

17         MR. WESTFALL:  Thank you very much.

18         (Off-the-record discussion between counsel.)

19         MR. WESTFALL:  Your Honor, I thank the Court for its

20   indulgence.

21         THE COURT:  You're welcome.

22         Would you call your next witness.

23         MR. WESTFALL:  I will, Your Honor.  The plaintiffs

24   call Mr. Nick Colglazier, who is waiting in the witness room.

25         THE COURT:  Please step up and be sworn.

```
 1              (NICHOLAS COLGLAZIER, PLAINTIFFS' WITNESS, SWORN)

 2              COURTROOM DEPUTY:  Please be seated.

 3              Please state your name and spell your first and last

 4    name for the record.

 5              THE WITNESS:  My name is Nicholas Colglazier,

 6    N-I-C-H-O-L-A-S, and last name, C-O-L-G-L-A-Z-I-E-R.

 7                           DIRECT EXAMINATION

 8    BY MR. WESTFALL:

 9    Q.  Where do you live, Mr. Colglazier?

10    A.  Currently, I reside in Parker, Colorado.

11    Q.  How are you currently employed?

12    A.  Currently, I am employed as the director of public policy,

13    state affairs for Colorado Farm Bureau.

14    Q.  Please describe your education background.

15    A.  In 1999, I graduated from Holyoke High School.  And after

16    that I attended Colorado State University, where I graduated

17    with a bachelor's of science in soil and crop science and

18    agricultural business management.

19    Q.  Where did you grow up?

20    A.  I grew up in a small farming community in northeast

21    Colorado, called Holyoke.

22    Q.  Pleas describe for the Court your work background.

23    A.  Yes.  Well, growing up in a family farm out in Holyoke, my

24    work background started quite early, around the age of 10,

25    actually, where I started becoming involved in some of the
```

1    operations on the family farm.  Back then, it was pretty

2    simple, take care of the summer fallow in fields, summer till,

3    where you try and knock down the weeds to conserve moisture for

4    the next year's crop and farmland.  When I got older, I --

5    Q.  Mr. Colglazier, if I could ask that you slow down just a

6    little bit, the court reporter would greatly appreciate it.

7    A.  My apologies.

8    Q.  Pleas go ahead.

9    A.  After I that, as I got older, I took on more

10   responsibilities on the family farm.  Age of 12 or so, I

11   started running the flood irrigation around our home.  And a

12   couple of years, I was actually in charge of managing that.

13   And then became more involved in different operations of the

14   farm, cultivating, fertilizing, spraying.  I even was, by the

15   time I was 16, 17, driving the semis to and from the field to

16   the elevator.  So just continued to become more and more

17   involved in the family farm until I graduated from high school.

18   And as I was in college, during breaks and during the summer

19   recess, I'd come home and work on the farm as well.

20   Q.  During college, did you have a job?

21   A.  I had some pretty unique experiences.  One year I actually

22   took a year off of college to complete my year as a state FFA

23   officer.  During this year I actually had --

24   Q.  What is FFA?

25   A.  Oh, my apologies.  FFA is also known as the Future Farmers

1   of America, the national FFA organization.  It is an

2   organization for high school youth that teaches them about

3   agriculture.  Its kind of motto is to promote personal growth,

4   premier leadership, and career success through agricultural

5   education.

6          As a state FFA officer, I traveled around the state

7   basically from corner to corner, border to border, where I got

8   to interact with many families and many family farms in a very

9   diverse array of agriculture.  And I got to go into the

10  agricultural classrooms and talk about agriculture, teach about

11  agriculture, and develop their leadership potential with

12  workshops.  And, so, it was a great opportunity for me to gain

13  more knowledge about the industry I had been in since I could,

14  basically, walk, and to -- to broaden my understanding and

15  scope and knowledge of the industry.

16  Q.  After college, what jobs did you have?

17  A.  After college, I graduated and went back home to Holyoke

18  and started my own farm.  I found some land to rent in

19  Nebraska, about 500 or so irrigated acres.  I grew mainly

20  irrigated corn on those, but I also grew some irrigated wheat

21  and corn as well.

22  Q.  What did you do after you had your own farm in Nebraska?

23  A.  After about four years of farming in Nebraska, I had the

24  opportunity to traverse across the state to Palisade, where I

25  was hired on as the production manager in an orchard.  Through

1    this, I worked in the fields, I would help the crews out, I was

2    responsible for maintaining equipment, things of this nature.

3    And hopefully -- I was hoping to run the packing shed, but,

4    unfortunately, we lost 75 to 80 percent of the peaches that

5    year from a freeze and all of the cherries, so I didn't get to

6    stick around as long as I hoped.

7    Q.   What did you do after that?

8    A.   After that, I was hired on by Colorado Farm Bureau in the

9    form of a regional manager.  Prior to that, I had actually been

10   very involved as a member.  I was on their state young farmer

11   rancher committee, and I was actually slated to be the chair

12   the following year before they hired me on as regional manager.

13   As regional manager I acted as a liaison between the county

14   farm bureaus and the state office.  I helped them enact their

15   activities, get them the information that they needed, because

16   as a federation that we are -- we are a federation in our

17   structure, and we're also a grass roots organization, so

18   everything starts with the counties, whether it be membership,

19   and comes up through the federation -- federated ranks.  So it

20   starts with the counties, goes to the state, and maybe so on to

21   the American Farm Bureau.

22   Q.   What was your position after that?

23   A.   My position after that is where I'm currently at, as the

24   director of public policy, state affairs for Colorado Farm

25   Bureau.

1   *Q.*  And that's the position you hold today?

2   *A.*  That's correct.

3   *Q.*  What are your current duties?

4   *A.*  I have a few duties as the director of public policy.  One

5   of the first ones is to monitor legislation at the capitol.  I

6   am the in-house lobbyist for Colorado Farm Bureau, so I am

7   underneath the golden dome for the first part of the year,

8   monitoring all legislation, all bills that go through the

9   capitol, analyzing them to see if they impact agriculture or

10  rural Colorado in any way.  If they do, I take them to my

11  board, and we use our policy, which was developed by our

12  members in a grass roots fashion, to decide what type of

13  position we should take on that, whether it be a monitor,

14  oppose, or support position.

15        After the board votes and decides what position we're

16  taking, I go on, and if we oppose it, I try and stop the bill

17  from progressing.  And if we support the bill, I try and help

18  it along its way in the legislative process.  If we're

19  monitoring, we make sure it stays in a form that is benign to

20  agricultural and rural values.

21        We also look at -- through the lens of the regulatory

22  and rule-making aspects.  I'm in charge of following all of

23  those rule-making proceedings, regulation proceedings.  So

24  we've done a lot of work with the Colorado Oil and Gas

25  Conservation Commission, done work with the Colorado Department

1  of Health and Environment when they promulgate rules on various

2  issues that affect agriculture.  So we participate in that

3  facet as well.

4       And, then, lastly, but not least at all, is our

5  internal policy development, which I am in charge of

6  overseeing, where we use our grass roots -- where we use

7  grassroots to develop policy.  So as we go through our policy

8  development process, a member will come up with an idea, he'll

9  take that idea to his county, and that county will then look at

10  it and go, this is a good idea, or they might massage it a

11  little bit, say, let's add to it.

12       From there, the county sends it to the state office,

13  which would be under my purview.  We compile them all, put them

14  into a report.  We then have the state resolutions committee

15  that looks at every policy that has been sent in by the

16  counties.  They look at duplicative policies, make sure that

17  they're condensed down into one grammar, the very -- kind of

18  making things cleaned up for the eventual annual meeting, where

19  delegates from across the state, from every county we have a

20  Farm Bureau, comes, looks at this, debates our policy, and then

21  votes whether to put it in or keep it out of our policy book.

22  Q.  When was the last annual meeting that policy determinations

23  were made by the Farm Bureau?

24  A.  The last annual meeting was, I believe, November 21 through

25  the 22nd or 3rd, but late part of November.

```
 1    Q.   Thank you.  Describe the Colorado Farm Bureau.

 2    A.   The Colorado Farm Bureau is the state's largest grassroots

 3    general agricultural organization.  I always like to say that

 4    we cover everything from agriculture to zucchinis.  We cover

 5    large farms, we cover small farms, organic, conventional, and

 6    everything in between.  Basically, as a general agricultural

 7    organization, we don't focus on one commodity, and so that is

 8    why we always say that we are the Colorado voice of

 9    agriculture.

10    Q.   What is the mission of the Colorado Farm Bureau?

11    A.   The mission of the Colorado Farm Bureau is to promote and

12    protect agriculture and rural values.

13    Q.   Describe the membership of the Colorado Farm Bureau.

14    A.   Currently, Colorado Farm Bureau has about 24,000 members

15    throughout the state.  And of that, about 5,800 are active

16    farmers and ranchers.

17    Q.   Are you here testifying today on behalf of the Colorado

18    Farm Bureau?

19    A.   I am.

20    Q.   Are you familiar with firearms?

21    A.   I am.

22    Q.   Explain your background and your familiarity.

23    A.   Of course.  Growing up on a farm, you learn very quickly

24    that firearms are an integral part of the operation.  Very

25    young, around 6 or 7, my dad actually gave me my very first Red
```

 1  | Ryder BB gun.  That's every kid's dream, you go out there, and
 2  | plink cans and pop bottles and things of that nature.

 3  |          And as I grew older and I was showing my dad that I
 4  | could take on that responsibility and I learned to respect them
 5  | as the tools that they are, he would let me take on larger
 6  | calibers and more powerful firearms.  You know, progress to a
 7  | simple lever-action 22.  And then when I was 11, I was able to
 8  | take my hunter safety course, pass that.  And then he gave me a
 9  | bolt-action 410 to go out hunting with him for the very first
10  | time for game birds.

11  |          Ever since then, I enjoy hunting, I enjoy firearms.
12  | They are something that intrigue me and that I enjoy.  So I
13  | became more involved.  As I got older, I went out, and I got a
14  | 20-gauge shotgun.  Had a little bit more power, got a little
15  | bigger, I could actually carry it.  From there, I bought a
16  | high-powered rifle so that I could go big game hunting.  And
17  | then my interest has just increased since then.
18  | Q.  What firearms do you own?
19  | A.  I own all sorts of firearms, rifles, shotguns, handguns,
20  | all the sorts.
21  | Q.  Describe the types of firearms that were used on your
22  | family farm when you grew up.
23  | A.  On our family farm, we had all sorts of firearms.  We had
24  | pistols, we had shotguns, we had rifles, all the various gauges
25  | and calibers.

 1  │  Q.  How were the firearms used on the family farm?
 2  │  A.  You know, there is a variety of uses for them on the family
 3  │  farm.  One of them is to protect, you know, persons and
 4  │  property, you know, self-defense.  The other is defense of
 5  │  livestock, defense of crops.  And, you know, last -- and also
 6  │  we used them for entertainment, so we could go out and do some
 7  │  target shooting, or plinking, shooting blue rock.  And, of
 8  │  course, hunting, we used them for that as well.
 9  │  Q.  On the farm where you grew up, were firearms loaned?
10  │  A.  Yes.
11  │  Q.  How frequently?
12  │  A.  I would say very frequently.  We had them in the office,
13  │  and we stored them in a gun rack or in our gun case or in the
14  │  safe.  And if I needed to use one or my brother needed to use
15  │  one, we were able to come in and grab one.  Or if the hired man
16  │  needed to take one with him for work, he would be able to come
17  │  in and take one as loaned out to him as well.
18  │  Q.  What was the universe, or who were the folks that could --
19  │  who would receive firearm loans, when there would be loans to?
20  │  A.  Well, it was primarily myself and my brother, and my dad
21  │  was there, and then we'd have some hired hands that could come
22  │  in as well, one or two, that were completely unrelated to the
23  │  family.
24  │  Q.  Do you have general knowledge about how firearms were used
25  │  on your neighbors' farms?

1    *A.* I do. As -- growing up in a small community and farming in

2    a small community, you work alongside your neighbors, you visit

3    their operations. As a kid, I can remember actually going to

4    my friends' farms and my friends' ranches, and that is where I

5    learned how -- how -- that is where I learned how firearms are

6    used on farms and ranches besides my own family's. Learned

7    that they are used for very similar purposes, you know, for

8    defense of life and property, defense of livestock and crops.

9    You know, it also had an entertainment value on theirs as well,

10   for target shooting and for hunting.

11          So, you know, you learned that -- I learned that as a

12   very young kid, interacting with my friends, going over to

13   their farms, running around, having fun. But we always usually

14   were involved in some aspect of agriculture, so that's where I

15   learned that. Working alongside neighbors, that's where you

16   learn how they use their firearms, what kind of firearms they

17   have as well. You know, it's a very close-knit, very tight

18   community, and you learn about each other. That's --

19   *Q.* Did you gain any knowledge about farms when you -- the year

20   that you were an FFA officer -- Future Farmer of America

21   officer?

22   *A.* I did. When I had the ability to run around the state and

23   stay with many families and on many family farms, we had a lot

24   of conversations, we had the opportunity to even see them. To

25   save a little money, we actually would, you know, stay with a

1  lot of these families whenever we went and visited a chapter in

2  a different school.  And so I had the opportunity, as I said,

3  to visit with many families, many family farms, and see many

4  family farm operations and how they used firearms and what they

5  were used for.  And if they weren't, you know, sitting there in

6  a safe, or if they weren't in a gun rack, or in the back of

7  their pickup in a gun rack, they were a topic of conversation

8  of what they had, how they used them, what they were used for.

9  And it was very closely -- it was very close, if not almost the

10 exact same reasons, why we had them on our farm and why our

11 neighbors and my friends had them on theirs.

12 Q.  Now, I'd like to turn to your Nebraska farm experience.

13 First of all, did you use firearms on your Nebraska farm?

14 A.  Yes.

15 Q.  Can you describe how you used them, if there were any

16 examples that you can think of.

17 A.  When I farmed in Nebraska, we -- well, it was the exact

18 same, it was for defense of property and life, self-defense,

19 defense of livestock.  When my -- when my landlord rented the

20 stocks out for pasture, for cattle, we'd always go out there

21 and be working on sprinklers during the winter when we didn't

22 actually have crops there, so it was very similar, if not

23 exactly the same to what we would do on the family farm.

24       But there was one example that I remember, where I was

25 extremely glad that I was able to have a firearm.  It was

1  during season where corn was in the ground, it was growing, we

2  were fertilizing the crops.  And we use anhydrous ammonia.  And

3  anhydrous ammonia tanks, you go to the co-op, and you pick them

4  up.  They're very large, and you --

5  Q.  Could I ask you -- I have old man ears, so I need you to

6  slow down and speak a little bit clearer, if you would,

7  Mr. Colglazier.

8  A.  Sorry.  And so these are thousands of pounds of tanks.  And

9  so you have to get ahead of where they're fertilizing or else

10 the operator is going be standing idle, and that's wasting time

11 and valuable money.  And so what you do is you front-end load

12 your fields with full anhydrous tanks so that when he empties

13 one, he can hook up to the next, and go on.  As they empty, you

14 know, I would grab the empty ones and haul them back to the

15 co-op.  While I was -- as I was grabbing some tanks, I pulled

16 up.  I went into the co-op and spoke with the employees that

17 were overseeing that office and was chatting with them.

18         And a gentleman that none of us recognized -- I know I

19 didn't recognize, which is not a common thing in that area,

20 because you work with these people.  These are -- we're a small

21 community, it's a small industry, so you know who is working

22 there, and you know why they're there and what they're coming

23 in for, because we're all coming in at the same time.  And he

24 happened to ask a very peculiar question that made red flags go

25 up in my mind.  And so -- it apparently made it go up in their

 1 | mind as well, because they asked the gentleman to leave.  So I
 2 | continued hauling tanks to front load that supply for my
 3 | operator.

 4 | And later that day, I saw him cruising around my field
 5 | and scoping out these anhydrous tanks.  So one thing that we
 6 | know is that, while anhydrous ammonia is a great fertilizer for
 7 | crops, it's also used in the manufacturing of methamphetamines.
 8 | And that is something that we do worry about, is people trying
 9 | to take that and steal anhydrous ammonia from our fields and
10 | from our co-ops and from our facilities that provide this
11 | fertilizer.  And so I noticed that -- and it was one of those
12 | times where I was glad I was able to have a firearm by my side
13 | in case it was needed.
14 | Q.  Did you also use firearms at the orchard that you testified
15 | about?
16 | A.  We did use firearms at the orchard, for all the same
17 | reasons that we did at our family farm, you know, for
18 | protection of property, for protection of -- self-defense, and
19 | for protection the crops.  But the orchard actually added a
20 | new twist, where we were packaging fresh fruit for consumption
21 | by our consumers.  And one thing that we had issues with was
22 | pigeons.  We did everything we possibly could to stop them from
23 | roosting around the packing shed.  In the packing shed, we put
24 | up mesh wire, we put up everything we could, but they're very
25 | clever creatures, and they could find every nook and cranny

1   that you had not sealed up.

2          And so for the protection of our product and a food

3   safety issue, we had to try to get rid of the pigeons,

4   unfortunately.  So we would use shotguns to try and deter them,

5   to try and get rid of them.  Unsuccessfully, I might add.

6   Q.  Did you learn about -- did you learn more about firearm use

7   on farms generally as a Colorado Farm Bureau field director?

8   A.  Yes.  As a regional manager, you're actually out there with

9   our farmers and ranchers.  You're interacting with them in

10  their communities, sometimes even on their farms, and so you

11  learn about them.  You see the guns -- sometimes they carry

12  guns or firearms in the back of their pickups, but you don't

13  actually see that.  You know, it's a topic of conversation, of,

14  you know, we have --

15         THE COURT:  Excuse me.  We'll take our afternoon

16  recess to give Ms. Lindblom an opportunity to work with her

17  machine to see if she can get it working again.  The court

18  clock is showing 2:25, and I don't know how long this recess

19  will be, because it will depend on how quickly we can get the

20  machine up and operating again.

21         So, Mr. Keech, I would ask you remain in the courtroom

22  and let folks know and let me know once we get the machine up

23  and running.  Thank you.

24         We'll stand in recess.

25         MR. WESTFALL:  Thank you, Your Honor.

```
 1           (Recess at 2:25 p.m.)

 2           (In open court at 2:39 p.m.)

 3           THE COURT:  Please retake the witness seat.  You

 4   remain under oath.

 5           MR. WESTFALL:  Your Honor, I've been informed by the

 6   court reporter that I need to start with "killing pigeons."

 7           THE COURT:  That's what I understand.

 8   BY MR. WESTFALL:

 9   Q.  Mr. Colglazier, if I could -- I think that was the --

10   involving the orchard.  Could you sort of finish your -- sort

11   of complete your description of use of firearms in the orchard.

12   A.  Absolutely.

13   Q.  I think it involved killing pigeons somewhere in there.

14   A.  We attempted.  We actually were unsuccessful.  But I was

15   mentioning that on the orchard, we used firearms in much the

16   same manner as I have noticed on most family farms and most

17   farms across the state of Colorado, where it was for, you know,

18   defense of property and self-defense, defense of the crops.

19   And in this instance, we added safety of our product.

20           So with pigeons, as I was mentioning -- I don't know

21   if this is on the record.  But I mentioned, you know, they

22   would roost in the packing shed, and they are a huge safety

23   concern with contamination regards.  And so we would have to

24   try and do everything we could to keep them out.  But they are

25   very clever creatures, and they are able to find places to nest
```

1  and roost, so we had to try to get rid of them.  And we would

2  use firearms, specifically, a shotgun, to try and do that.  As

3  I mentioned, we were spectacularly unsuccessful.

4  Q.  In your role as Colorado Farm Bureau field director, did

5  you gain any additional knowledge about farmers' use of

6  firearms in Colorado?

7  A.  Yes, I did.  As the regional manager, I was actually out

8  there with our members, with the farmers and ranchers of

9  Colorado that are Colorado Farm Bureau members.  And in our

10  meetings, we'd actually would be in their communities --

11  actually, on their farms.  And you would see their firearm in

12  the rack of the pickup, or you could even maybe see them, you

13  know, in their house every now and then when we visited them.

14  Or they would just become topics of conversation on what kind

15  of firearms they had, on how they used them, what they were

16  used for, that they were used for hunting purposes, that, you

17  know, they were glad they had them there for self-defense of

18  their home, of their property, of the family, and definitely in

19  defense of their livestock and crops.

20  Q.  Last year when 1224 and 1229 were pending in the

21  legislature, did the Farm Bureau receive input from its members

22  on those two bills?

23  A.  Absolutely.  We actually had an outcry from our members

24  when these two bills were introduced.  They -- they contacted

25  our office, they called us, they asked us all types of

1  questions --

2          *MS. SCOVILLE:*  Objection, Your Honor.  Hearsay.  I

3  don't know that it's being offered for the truth of the matter

4  asserted; but to the extent it is, we object.

5          *THE COURT:*  Doesn't appear to me that it is an

6  out-of-court statement being offered for the truth of what the

7  statement says.  And as a consequence, I overrule the

8  objection.

9          *THE WITNESS:*  So --

10 *BY MR. WESTFALL:*

11 *Q.*  Please continue.

12 *A.*  So we received, you know, numerous phone calls asking about

13 the specifics of the bills, what does House Bill 1229 do?  What

14 is it going to require of me?  If I have this firearm, do I

15 have to go through a background check if I give it to my

16 employee?  If I have this -- if I have this firearm and I have

17 it in my pickup and the employee takes the pickup, do I have to

18 go through a background check before they can take the pickup

19 out?  You know, if I own an LLC or if the firearm is owned by a

20 trust, do we have to go through background checks if we loan

21 that firearm out or if anybody takes possession of that

22 firearm?

23          These were all questions that our members posed to us

24 when these bills were eventually -- were introduced, went

25 through the process, and eventually signed into law.  And these

1  are questions that our members constantly asked us.  We tried

2  to find, you know, clarification.  We tried to do our best in

3  reading and analyzing the bill to the best of my knowledge.

4  And this is where our members outcried for it so much that

5  when -- we took a position on it, we saw these bills, we saw

6  they affected some policy that we have.  We actually have

7  policy regarding the right to bear arms in our policy book

8  developed by our members through the grassroots process.  And

9  when we saw this and we saw the outcry from our members, I went

10 to the board of directors saying, here is these bills, that

11 included 1229 and other of the gun bills, and said, we have

12 policy against this.  The board of directors voted to oppose

13 these, and from that we went forward in an opposed position.

14         And we've sent out alerts.  We have messages sent

15 from -- we have messages sent about these bills to legislators.

16 There was a substantial amount of communication between us and

17 our members.

18 Q.  And so the Farm Bureau did take a position on House Bill

19 1229?

20 A.  Yes, we took an opposed position.

21 Q.  Testifying in court today, why is Colorado Farm Bureau

22 challenging 1229 today?

23 A.  Colorado Farm Bureau is challenging House Bill 1229 and the

24 fact that it is the law, in that it will impact Colorado

25 farmers' and ranchers' ability in regards to the transferring

 1 | of firearms, it will impact their ability to run their

 2 | day-to-day operations.

 3 |        MR. WESTFALL:  If I may ask the clerk to give to the

 4 | witness Volume 3 of the exhibits.

 5 | BY MR. WESTFALL:

 6 | Q.  Mr. Colglazier, once you have notebook 3 in front of you, I

 7 | want you to turn to Exhibit 4, tab 4, if you would.

 8 |        Mr. Colglazier, do you have Exhibit 4 in front of you?

 9 | A.  I do.

10 | Q.  What is Exhibit 4?

11 | A.  Exhibit 4 is the Act, House Bill 1229, that was signed into

12 | law by Governor John Hickenlooper.

13 | Q.  What specifically does the Colorado Farm Bureau find

14 | objectionable in 1229?

15 | A.  Well, what the Colorado Farm Bureau finds objectionable --

16 | let's start at the very beginning, where it says, "On and after

17 | July 1 of 2013, except as described in subsection (6)" -- which

18 | is some exceptions that are written into this bill for the

19 | transfer and loan of firearms -- "before any person who is not

20 | a licensed gun dealer" -- and that part is defined.  They

21 | define that in Section 12-26.1-106, subsection (6) of the

22 | Colorado Revised Statutes, which actually defines what a gun

23 | dealer is.  Our farmers and ranchers don't qualify under that

24 | -- "transfers or attempts to transfer possession of a

25 | firearm" -- so this means our farmers and ranchers will have to

1    attempt this before they transfer a firearm.

2         You go to roman numeral I, it says, "require that a

3    background check, in accordance with section 24-33.5-424 of the

4    Colorado Revised Statutes, be conducted of the prospective

5    transferee."  It is these two sections that we believe requires

6    our farmers and ranchers, who do not meet any of the exceptions

7    in subsection (6), to go through an FFL dealer for a transfer

8    of a firearm for more than 72 hours.

9    Q.  What are the Farm Bureau's concerns with having to do an

10   FFL background check before loaning a firearm?

11   A.  Colorado Farm Bureau has significant concerns with having

12   to use a FFL to transfer firearms.  There is the aspect of

13   driving, of time.  Many of our farmers and ranchers live in the

14   country.  They live miles away from town.  So both the farmer

15   and the potential transferee must both go to an FFL to transfer

16   this weapon or to transfer this firearm.

17        This is going to take miles, so you're actually going

18   to be driving, you're going to be putting wear and tear on a

19   vehicle, you're expending fuel.  Probably more importantly,

20   you're going to be taking opportunity costs of having two

21   people who work on that operation not doing work.  And there

22   are many times of the year, throughout the year, almost, where

23   you cannot take time away during the busy part of the day.

24   You're needing to work probably more than sunup to sundown.

25   Q.  Do you have some examples, while you're on that?

1    *A.* Yeah. You know, we have ranchers when they're calving,

2    they need to be out there watching their herds. You have

3    planting season; you have fertilizing season; you have

4    monitoring of sprinklers during irrigation seasons; you have

5    harvest. There are multiple times a year where you are very,

6    very busy. And if you need to transfer a firearm during those

7    times of year, you do not have time to pull away and go and

8    actually get a background check from an FFL at that time of

9    year.

10           So we have a significant concern that is going to take

11   that time away from actual production and actual work on the

12   farm or ranch.

13           And secondly is finding an FFL. Now, that is going to

14   be one of the hard things of actually getting from the farm to

15   an FFL dealer, finding one that is going to do it. And

16   Colorado Farm Bureau knows that there are many FFLs in rural

17   areas that are not conducting these background checks. And

18   this is going to significantly burden our members' ability to

19   transfer a firearm.

20   *Q.* Now, you mentioned, Mr. Colglazier, subsection (6) as the

21   exception. Would you turn to that briefly, Mr. Colglazier.

22   *A.* Yes, sir. Just a second.

23           All right.

24   *Q.* Mr. Colglazier, subsection (6) of 1229 contains a list of

25   exceptions. And are you familiar with them?

1  | *A.*  I am.

2  | *Q.*  Do they solve the Farm Bureau's concerns?

3  | *A.*  For the vast majority of -- for almost everything, no.

4  | *Q.*  Please briefly describe for the Court why not.

5  | *A.*  We'll just go through these very quickly.  I don't want to

6  | take up too much time.  A, we're not dealing with antique

7  | firearms, so that does not qualify for us on farms and ranches.

8  |        B, a bona fide gift that includes spouses, parents,

9  | children, siblings.  You know, that covers, you know, family.

10 | And we are family farms, but many of our family farms have

11 | employees that we treat like family, but they're not related.

12 | It also has -- doesn't include stepchildren that would work on

13 | the family farm; it doesn't include in-laws.  So there are some

14 | protections here, but we don't believe that they're broad

15 | enough to cover all aspects of agriculture, all aspects of

16 | farming and ranching.

17 |        Let's go to C, transfer that occurs by operation of

18 | law because of death or prospective transfers of executive

19 | administration.  This is very limited.  This deals with a death

20 | and a will or a trust.  It doesn't happen to do with the

21 | everyday activities of farmers and ranchers on their

22 | operations.

23 |        D, a transfer that is temporary and occurs while in --

24 | unlicensed transferee in a home.  This has some very, very

25 | strict parameters on it.  You know, first and foremost, I would

1   believe that the transferee reasonably believes that they need

2   this firearm because they are in danger of -- imminent danger

3   of death or serious bodily injury.  That puts a very

4   restrictive -- that makes this very restrictive for the

5   transfer.  And, quite frankly, almost all of the operations

6   that farmers and ranchers do are conducted outside of the home.

7   They're in our shops, they're in our barns, they're in our

8   quonsets, they're out in the fields, they're out on tractors.

9   So that does not cover hardly anything that we are concerned

10  with.

11       E, temporary transfer or possession without transfers

12  of ownership when it takes place at a shooting range.  We are

13  not shooting ranges.  We're ranchers, we're farmers.  It's

14  fields, it's pastures.  We're not putting on shooting

15  competitions, so those two are out.

16       Roman numeral III, while hunting, fishing, and target

17  shooting, then there is some qualifiers under that as well.

18  This is while you're actually hunting and fishing and target

19  shooting, and you have to have the license that is -- you have

20  to be licensed for that and actually in the pursuit and engaged

21  in that.  This gives us some protections when it is -- for that

22  specific instance; but that's a very, very small portion.  It's

23  actually not a portion of what we do as work, when it comes to

24  farming and ranching.  We're out checking cattle, we're out

25  checking sprinklers or running tractors.  We're not hunting or

 1  fishing or target shooting or trapping in those instances.  So,

 2  while that provides a little bit of protection, it's not really

 3  anything that covers agriculture.

 4       F, transfer that is made to facilitate or maintain for

 5  repair or maintenance.  We're not gunsmiths.  We're not

 6  repairing or maintaining firearms.  We're farming and ranching.

 7       G, a temporary transfer that occurs while in the

 8  continuous presence of the owner of the firearm.  This does not

 9  cover us at all, because that defeats the purpose of

10  transferring the weapon to our hired man.  If we have to tag

11  along with them, there is no point in us hiring them.  We could

12  just go do that job ourselves.  And so we hire them because

13  they are -- they're good at what they do, and they work very

14  hard for us.  And so if we have to tag along or be in

15  continuous presence of that firearm, it does us no good.  So

16  that one doesn't cover us at all.

17       And, H, temporary transfer of not more than 72 hours.

18  While this seems like it should help when it comes to, you

19  know, a very brief transfer of a firearm, if you look in here,

20  the firearm -- the person who transfers the firearm, the

21  farmer, the rancher, may be jointly and severally liable for

22  damages that are caused by this firearm and its unlawful use.

23       Now, with firearms, there can be accidents.  I mean,

24  that's just the nature of life.  There is accidents on the

25  farm.  There could be accidents with firearms.  This would open

1    up our farmers and ranchers for liability jointly and severally

2    if it's an under 72-hour loan.  So while it may help expedite

3    some things, there is still a lot of liability and concern at

4    that point.

5          Then letter I, not pertaining to Farm Bureau -- or

6    Colorado Farm Bureau and farmers and ranchers.

7    Q.  Back on the 72 hours and this idea of unlawful use, is

8    trespass unlawful, Mr. Colglazier?

9    A.  It is.

10   Q.  In the farming community, especially the community you

11   live, up in the Holyoke area, is it easy to end up finding

12   yourself on another property that's not -- you're not

13   authorized to be on, and you wouldn't even really know it?

14   A.  It is very easy.  Especially if you're out there hunting,

15   like, game birds.  We don't have fences around all of our

16   properties.  So we have this wonderful program, the walk-in

17   program, where people can buy a license, buy a stamp -- I don't

18   even believe you have to buy a stamp anymore.  I believe it

19   comes with your small game license.  People sign up for this,

20   and it allows people to come out, hunt on your land without

21   actually asking for permission.  A lot of times I know I have

22   had to confront people who have inadvertently trespassed onto

23   our land because they just kept walking because it's this

24   native red switch grass, it keeps on going.  And they

25   inadvertently cross the property line, and that would be

 1 | unlawful trespass.  So that does happen.
 2 | Q.  Now, you covered the exceptions, Mr. Colglazier.  If an
 3 | exception does not apply, must a farmer or rancher obtain a
 4 | federal firearms licensee background check before loaning a
 5 | firearm?
 6 | A.  We believe they would.
 7 | Q.  Has the Farm Bureau sought clarification on 1229?
 8 | A.  Yes.  With many of the questions that we had coming in from
 9 | our members about, I do this practice, I loan firearms to my
10 | employees to go check cattle, I loan firearms to them to -- to
11 | go -- when they go watch our sheep, we loan -- we put them in
12 | the back of pickups, and sometimes they take them for an
13 | extended period of time.  You know, we -- we wanted some
14 | clarity on this, much like there was some -- there was some
15 | clarity that was given on 1224, but there was no clarity on
16 | 1229.  And so we thought it would be prudent to through our
17 | counsel ask for some clarity on these questions that our
18 | members were asking us in regards to 1229.
19 |         MR. WESTFALL:  If I may ask the clerk to turn the --
20 | to help the witness get to tab 10 -- actually --
21 |         THE COURT:  I think he can find it.
22 |         MR. WESTFALL:  Thank you, Your Honor.
23 | BY MR. WESTFALL:
24 | Q.  I stand corrected.  You can find tab 10 in that notebook,
25 | can't you?

1    *A.*  I can.

2    *Q.*  All right.  Thank you.

3         What is tab 10?

4    *A.*  Tab 10 would be the defendant's response to nonprofit and

5    individual disabled plaintiffs' second set of interrogatories

6    and request for admission.

7         MR. WESTFALL:  Your Honor, I understand it's been

8    stipulated to with respect to authenticity, but not

9    admissibility.

10        THE COURT:  Ordinarily, we do not admit discovery

11   requests or responses at trial.  What is it you want to do with

12   this?

13        MR. WESTFALL:  I was trying to establish, Your Honor,

14   that we did in fact try to obtain clarification on the scope of

15   1229 with respect to farmers and ranchers --

16        THE COURT:  Is that disputed?

17        MR. WESTFALL:    -- very similar to the exhibit that we

18   were using with respect to Mr. Hewson on Monday.  And here

19   is -- we have a situation where you have the technical

20   guidances that were offered on 1224.  The kind of questions

21   that were framed to the Governor and the discovery were

22   designed to elicit very similar clarification on the scope of

23   these statutes as it specifically related to farmers and

24   ranchers.

25        Request for admission 1 specifically deals with

 1  farmers and ranchers.  Interrogatory 5 specifically deals with

 2  practices related to farmers and ranchers.  And I was merely

 3  trying to have introduced into evidence the fact that a request

 4  was made of some very simple, easy to understand, should be

 5  non-objectionable questions on clarification to either say,

 6  yes, this is covered or, no, it is not.  And no clarification

 7  was provided.  And that's the proffer that I'm making, Your

 8  Honor.

 9          THE COURT:  All right.  Counsel, please approach.

10          (Hearing commenced at the bench.)

11          THE COURT:  Why is that relevant?

12          MR. WESTFALL:  It's relevant to show there have been a

13  number of questions designed to elicit there is a gray area,

14  that somehow the law could be enforced in such a way so that

15  it's great and that some of this not really terribly illegal

16  type activity can be looked aside, that it's not really as

17  strict as it pretends to be.  And we made a request that if it

18  in fact is as strict and as harsh as it's intended to be, we

19  made a specific request to clarify, and that's been denied.

20  It's highly relevant to show that it's as strict as we say it

21  is.

22          THE COURT:  Mr. Westfall, it is what it is.  This

23  isn't about conduct through this lawsuit.  The law that I am

24  looking at says what it says.  It doesn't say what witnesses

25  say it says; it doesn't say what they think it means; it says

 1   what it says.  So I don't understand what element of what claim

 2   this particular inquiry pertains to.

 3          MR. WESTFALL:  Establishes to the degree to which

 4   these -- the terms are really strictly to be interpreted, that

 5   adds to the burden that it places on -- in this case, farmers

 6   and ranchers in Colorado, because the law is so strict -- 1224,

 7   again, for me, the relevance comes in and turn and contrasting

 8   to the technical guidance on 1224.

 9          THE COURT:  Will the State of Colorado stipulate that

10   there were no technical guidances or other clarification with

11   regard to this statute?

12          MS. SCOVILLE:  Certainly, I don't think it's

13   necessary, because there is no vagueness challenge to 1229.

14          THE COURT:  Don't tell me the reason why.

15          MS. SCOVILLE:  Absolutely.

16          THE COURT:  That establishes your fact.

17          MR. WESTFALL:  We'll stop these questions.

18          (Hearing continued in open court.)

19          MR. WESTFALL:  Should I read the stipulation for the

20   record, Your Honor?

21          THE COURT:  No, it's already in the record.

22          MR. WESTFALL:  I'm sorry.  Never mind.

23   BY MR. WESTFALL:

24   Q.  Has the Farm Bureau taken a position with respect to

25   private sales?

 1   *A.*  We have.  This last -- this last annual meeting, there was

 2   policy put forth by our counties and made it up through the

 3   process -- the grassroots process that I discussed earlier,

 4   mostly spurred by the legislation that went through the 2013

 5   session.  And during this, there was no objection to any of it

 6   being added.  And it was added that we oppose background checks

 7   for private sales and transfers.

 8   *Q.*  Are you personally aware of some way in which background

 9   checks could be performed on private sales that would be less

10   onerous than having to go through an FFL?

11         *MS. SCOVILLE:*  Objection, foundation.

12         *THE COURT:*  Response.

13         *MR. WESTFALL:*  The question is, simply, is he

14   personally aware?  And he either is personally aware, or he's

15   not personally aware.  And I'm happy to ask one further

16   question, how are you personally aware, if that would help.

17         *THE COURT:*  Well, the problem here is that the

18   question is vague.  You've asked, "Are you personally aware of

19   some way in which background checks could be performed on

20   private sales that would be less onerous than having to go

21   through an FFL?"

22         What you -- you have many undefined terms there.

23         *MR. WESTFALL:*  You're -- your observations about the

24   contingencies in my question are well noted, Your Honor.  Let's

25   see if I can ask a better question.

1          THE COURT:  Okay.

2    BY MR. WESTFALL:

3    Q.  Mr. Colglazier, is there a less -- is there a method for

4    doing background checks for private sales that does not involve

5    use of an FFL?

6          MS. SCOVILLE:  Same objection.

7          THE COURT:  The witness can answer if he knows.

8          THE WITNESS:  I believe so.  I was actually -- I

9    actually did this.  And there is an option of being able to use

10   the Colorado Bureau of Investigation's website to run a self

11   background check on yourself.  I did this a while ago.  It's

12   very simple, actually.

13         I went to Google and simply typed in "CBI background

14   check," and it took me straight to their website.  And it has

15   very easy laid out instructions.  It's very inexpensive.  It's,

16   I believe, $6.85.  You put in your personal information.  I put

17   in my name, Nicholas John Colglazier, my date of birth, and my

18   Social Security number.  And they are able to look at the

19   Colorado Bureau of Investigation's databases and come out with

20   if you've had any prior arrests.  My background check showed

21   that I have not, which I believe is a good thing.  But -- but

22   this is something that you can then --

23   BY MR. WESTFALL:

24   Q.  Lucky.

25   A.  This is something you can then print out, it has a time

 1 | stamp of a date that you went and checked this, and lists out

 2 | that you -- that -- what you would have on your criminal record

 3 | on the databases that the Colorado Bureau of Investigation

 4 | syncs this background check up to.

 5 |     MR. WESTFALL:  Your Honor, I have no further questions

 6 | of this witness on direct.

 7 |     THE COURT:  Thank you.  Cross-examination.

 8 | **CROSS-EXAMINATION**

 9 | BY MS. SCOVILLE:

10 | Q.  Good afternoon, Mr. Colglazier.

11 | A.  Good afternoon.  It's been a while.

12 | Q.  The Colorado Farm Bureau does not keep information about

13 | the average number of firearms owned on a Colorado farm or

14 | ranch, right?

15 | A.  Not in any formal statistical data, no.

16 | Q.  And you couldn't speculate about the number of firearms

17 | that might be owned on each farm or ranch, on average?

18 | A.  Through my experiences, whenever I have visited a farm or

19 | ranch, to my knowledge, I didn't visit one that did not have a

20 | firearm.

21 | Q.  But beyond that, you couldn't say how many firearms the

22 | average farm or ranch might have?

23 | A.  No.

24 | Q.  Colorado Farm Bureau also has not collected information

25 | from its members showing the estimated cost of Section

1    18-12-112, which is House Bill 1229, right?

2    *A.* Could you repeat that?

3    *Q.* Sure. Colorado Farm Bureau has not collected information

4    from its members showing the estimated costs of Section

5    18-12-112, or House Bill 1229, right?

6    *A.* With the limited implementation of this law, we haven't had

7    a chance to even see this out of our membership yet, so we do

8    not have that data at this point.

9    *Q.* And the Farm Bureau to this date hasn't done anything to

10   try and collect that information, right?

11   *A.* No, we have not.

12   *Q.* You mentioned your family farm. And I believe that the

13   full-time employees on your family farm currently are your

14   father, your brother, and one hired hand, correct?

15   *A.* Correct.

16   *Q.* And so transfers with your father and your brother would be

17   covered by the family member exception, right?

18   *A.* Correct.

19   *Q.* And so there is one employee that would require a check,

20   being the hired hand, right?

21   *A.* Correct.

22   *Q.* And any transfers to the hired hand of less than 72 hours

23   would be exempt from 18-12-112, or House Bill 1229, right?

24   *A.* They would, but they still have the several and joint

25   liability tied to them.

1    Q.   And there has been only one instance in which the hired

2    hand on your family's farm has required a firearm for more than

3    72 hours, right?

4    A.   One that I can think of at this point. The -- we really

5    haven't documented these things, because it's a practice that

6    was common on our farm.  We didn't know that this was something

7    that we would have to document, that we'd have to log in and

8    log out what firearm our hired man had at what times and when.

9    You know, this --

10   Q.   But sitting here today, right now, you can only think of

11   one instance in which your hired hand on your family's farm

12   required a transfer for greater than 72 hours, correct?

13   A.   I can think of one instance for sure.  There may be others,

14   though.

15   Q.   Now, you mentioned that when you worked in the orchard,

16   there was a firearm available for you and another employee to

17   use when you needed to shoot at pigeons, right?

18   A.   Correct.

19   Q.   During your time on the orchard, you only used the firearm

20   a couple of times, right?

21   A.   Correct.

22   Q.   And you only used it for about a half an hour at any point

23   in time, correct?

24   A.   Correct.

25   Q.   Do you know whether prior to the passage of Section

 1   18-12-112, or House Bill 1229, if an employer had loaned a gun

 2   to an employee and the employee had unlawfully used the gun,

 3   whether the employer could have been sued for that?

 4   A.  I'm not a lawyer.  That is an expert in criminal law

 5   especially that refers to these.

 6   Q.  So the answer is no?

 7   A.  The answer is, I don't know.

 8   Q.  Okay.

 9   A.  There very well may be laws on the books that allow

10   liability for someone who loans a gun that -- and is misused,

11   but I don't know that for sure.

12   Q.  The Colorado Farm Bureau is not aware of any farmers or

13   ranchers who have attempted to do a background check and had

14   trouble finding an FFL who would do the check for a private

15   transfer, right?

16   A.  Due to the limited extent of the implementation of this

17   law, we haven't heard of anybody who has tried this.  But with

18   this being a practice that has -- it was used on our farm and

19   other farms, from what our members have said, there is probably

20   a high probability that people are still loaning or

21   transferring firearms without going through these background

22   checks, and we just haven't heard of any complications or we

23   haven't heard of anybody who has actually tried to do this yet.

24   Q.  And the Colorado Farm Bureau is not aware of any Colorado

25   farmers or ranchers who have gone to an FFL to get a background

1   check for a private transfer and had the FFL refuse to do the

2   check, correct?

3   *A.* We haven't had any members who have let us know that

4   they've tried and been denied, no.

5   *Q.* Your counsel asked you on direct examination about

6   incidents in which you had been glad that you had your firearm,

7   and you described the incident with someone casing your field

8   and fertilizer, correct?

9   *A.* Correct.

10  *Q.* In that incident, you never had to display your weapon,

11  right?

12  *A.* No, but I was glad that I was able to have it.

13  *Q.* And you never had to fire your weapon, correct?

14  *A.* No.

15  *Q.* When you did the online background check with the Colorado

16  Bureau of Investigation, do you know which databases that

17  background check searched?

18  *A.* I don't know exactly which ones they searched for this.  I

19  do know that it's not an extensive list of the background

20  check -- of the databases that the CBI does have.  But through

21  either law or rule making or maybe executive order, these

22  background checks could be -- these databases could be

23  expanded -- or the background check could be expanded to

24  include other databases that have more data in them, more

25  criminal records, more criminal history.

1   *Q.*  Well, my question was, do you know which databases were

2   searched?

3   *A.*  No.

4   *Q.*  Do you know whether the CBI online check that you did

5   searched for whether you had any misdemeanor domestic violence

6   convictions?

7   *A.*  That, I don't know.

8   *Q.*  Do you know whether the CBI online background check that

9   you did indicated if you were a fugitive from justice, that is,

10   whether you had any outstanding warrants?

11   *A.*  That, I don't know.

12   *Q.*  Do you know whether it would have showed if you were

13   dishonorably discharged from the military?

14   *A.*  That, I don't know.

15           *MS. SCOVILLE:*  Thank you.  No further questions.

16           *THE COURT:*  Thank you.

17           Redirect?

18           *MR. WESTFALL:*  Thank you, Your Honor.  We have no

19   further questions of the witness on redirect, and we would ask

20   that the witness be excused.

21           *THE COURT:*  Any objection?

22           *MS. SCOVILLE:*  No, Your Honor.

23           *THE COURT:*  Thank you.  Thank you, sir.  You are

24   excused.

25           *THE WITNESS:*  Thank you.

```
 1            THE COURT:  Call your next witness.
 2            MR. WESTFALL:  Your Honor, the plaintiffs call Mr.
 3    David Bayne.
 4            THE COURT:  Thank you.
 5               (DAVID BAYNE, PLAINTIFFS' WITNESS, SWORN)
 6            COURTROOM DEPUTY:  Please state your name and spell
 7    your first and last name for the record.
 8            THE WITNESS:  Full name is David Bayne, VI.  First
 9    name David, D-A-V-I-D, B-A-Y-N-E, numeral 6, abbreviated VI.
10                        DIRECT EXAMINATION
11    BY MR. WESTFALL:
12    Q.  Mr. Bayne, I have old person ears, so if you would do two
13    things for me.  Number one, speak slowly; and, number two,
14    speak into the microphone, I would greatly appreciate it.
15    A.  Understood.
16    Q.  Thank you, Mr. Bayne.
17            At the time of filing the Complaint, Mr. Bayne, in
18    this case, where did you live?
19    A.  At the time I lived in Thornton, Colorado.
20    Q.  Where do you live now?
21    A.  I currently reside in Richmond Hill, in Georgia.
22    Q.  Describe your educational background.
23    A.  I hold --
24            MS. MORRILL:  Objection, relevance.
25            THE COURT:  Response.
```

1          MR. WESTFALL:  It's background, trying to get his

2    education.

3          THE COURT:  Why is his educational background

4    relevant?

5          MR. WESTFALL:  I believe some of his education will

6    touch upon a background that will give rise to authoritative

7    knowledge about use of firearms.

8          THE COURT:  All right.  I'll allow the witness to

9    answer the question.

10         THE WITNESS:  I hold a master's degree which has a

11   double major.  I did that at Regis University here in Colorado.

12   I also hold a bachelor's of science from Southern Illinois

13   University, also has a double major.  I have a liberal arts

14   degree, a degree in criminal justice.

15   BY MR. WESTFALL:

16   Q.  Would you describe your work history, Mr. Bayne.

17   A.  Certainly.  My adult career path started off in the

18   military.  I was a military police officer.  During the course

19   of that job role, I also started on my criminal justice degree.

20   And in the course of that, I had the opportunity to operate as

21   an intelligence analyst for the U.S. Marshals in the capacity

22   of an intern.  A separate internship, I also had the

23   opportunity to operate as a communications analyst for local

24   law enforcement.

25             After my tenure in the military and criminal justice

1    related activities were complete, I moved on into high-tech,

2    and I have since worked for StorageTek.  It was headquartered

3    here in Colorado.  I managed their relationship worldwide --

4    OEM service relationship with Sun Microsystems.  Sun

5    Microsystems at the time also had a major office here in

6    Colorado.

7              At Sun, I had -- held multiple roles, one of which was

8    operating as the global program supplier manager for their

9    multi-vendor services program, amongst other things.  Later,

10   Sun was acquired by Oracle, which is who I work for currently.

11   And currently I manage their worldwide service business

12   relationship with their largest hardware technology partner, a

13   group located overseas.

14   Q.  Mr. Bayne, are you proficient with firearms?

15   A.  I am.

16   Q.  What firearms do you own?

17   A.  Long arms, shotguns, rifles, sidearms, pistols.

18   Q.  Do you have a concealed carry permit?

19   A.  I do.  In fact, I currently hold a concealed carry permit

20   in Georgia, previously held a concealed carry permit in

21   Colorado, as well as in Utah.

22   Q.  Do you own firearms that have -- that use magazines with a

23   capacity of more than 15 rounds?

24   A.  I do.

25   Q.  What firearms?

1   *A.*  The firearm I have that does utilize magazines which I own

2   that have a capacity greater than 15 cartridges would be my

3   AR-15.

4   *Q.*  What is the capacity of your AR-15?

5   *A.*  I have 30-round magazines, as well as 20-round magazines.

6   *Q.*  How do you use the AR-15?

7   *A.*  I use the AR-15 for multiple purposes, one of which being

8   defense of my home.  I also utilize it for hunting purposes,

9   competition, as well as target practice.  It's a weapons

10  platform I'm very, very familiar with.

11  *Q.*  Do you shoot the AR-15 very much?

12  *A.*  As far as long arms go, I shoot it more often than any

13  other long arm that I own.  So, yes, I do shoot it quite

14  frequently.

15  *Q.*  Why do you use the AR-15 for self-defense?

16  *A.*  Capacity is a major factor, especially given some of the

17  limitations that I have.  The other thing would be, being

18  familiar with that platform, just with the experience I have

19  with it, I can operate it literally in the dark if it comes

20  down to that.  It's manageable.  It's a weapons platform that I

21  can still balance proficiently, and I'm accurate with it.

22  *Q.*  What do you mean by balance?  Can you describe that?

23  *A.*  Given the fact that I'm a T-2/T-3 paraplegic, some of the

24  heavier full-sized long arms, I have a hard time balancing

25  those without, the aid of, say, a shooting stick or bipod and a

1  bench, whereas with carbine style platform or handguns, balance
2  is not necessarily a factor.
3  *Q.*  What are the principal magazines you use with the AR-15?
4  *A.*  My principal magazines especially for defense purposes
5  would be the 30-round Magpul magazines.
6  *Q.*  Why do you use those?
7  *A.*  I use the Magpul magazines, the 30-round Magpul magazines,
8  for several reasons.  One, superior reliability; two, the
9  material that they're made from is simply more suitable for
10 this magazine; and equally as important is the design of the
11 Magpul magazine.  They have anti-tilt followers in them, which
12 helps limit the possibility that you're going to have feeding
13 issues.

14        Also, they have a dust cover.  And the way that
15 functions is, when you have a loaded magazine, this dust cover
16 snaps over the top of the magazine.  And it basically does two
17 things.  One, it depresses the cartridges inside the magazine
18 further down into the magazine; and it also, basically, retains
19 the lips of the magazine.  The reason why that is important is,
20 if you have magazines in storage that are fully loaded, the
21 pressure coming upward onto the lips of the magazine could
22 cause deformation.  That is prevented by the dust cover.  The
23 other nice thing about the dust cover, obviously, is that it
24 keeps dust out of the ammunition.  So, again, that just goes
25 back to reliability.

1   Q.  Do you have other magazines besides the Magpul magazines

2   for the AR-15?

3   A.  I do.

4   Q.  Why do you use the Magpul magazines?

5   A.  As I stated previously, for reliability.  They're just in

6   all aspects, a better design.  You know, these magazines, the

7   platform has been around since the early '60s.  So with

8   research and time, you know, you're going to have evolution, is

9   basically what it comes down to.  And at this point in my

10  opinion, the Magpul magazines are probably some of the best, if

11  not the best, on the market as far as reliability goes.

12  Q.  Are magazines important to a firearm?

13  A.  They are critical.

14  Q.  Why?

15  A.  Without the magazines, the platform becomes, in essence, a

16  single-shot firearm.

17  Q.  Where do you keep the AR-15 with the 30-round magazine in

18  your home?

19  A.  In my home for self-defense, I keep it between my bedstand

20  and my bed.  The logic there is, it's within arm's reach.

21  Given my situation, I'm not able to jump up and get out of bed

22  and run across the room to grab it, so it's within arm's reach.

23  Secondly, it's held captive because it's dependent on three

24  sides.  You have the nightstand, the wall behind it, and then

25  the bed to the other side.  It's unlikely if I reached for it,

 1   I would knock it over and not be able to get it into position

 2   of operation.

 3   Q.  Is your disability a factor in your use of the AR -- excuse

 4   me, stop a moment.

 5          Is your disability a factor in your home defense --

 6   let me try this again.  I did a very bad job of writing my own

 7   question here.  Is your disability a factor in your use of the

 8   30-round magazine in the AR-15 for home defense?

 9   A.  It's a factor so far as it makes that choice for me

10   personally optimal.  Obviously, I'm going to have a limited

11   ability to flee; so my options, should it come down to it, as

12   far as defense goes, is to make an effective stand.

13   Recognizing, of course, if I were ever in a situation like

14   that, the adrenaline is going to be flowing, your dexterity --

15   you may be shaking, so it bodes well for you simply to have

16   more ammunition at your disposal.  Having to do a magazine

17   change in a stressful situation is certainly not an optimal

18   situation to be in, especially if you can avoid it.  That's

19   exactly what I do with the 30-round magazines.

20   Q.  Mr.  Bayne, are you proficient in firearm maintenance and

21   repair?

22   A.  Indeed, I am.

23   Q.  Do you have any certificates in this area?

24   A.  I am currently in the process of completing the required

25   credentialing to become a master gunsmith.  There is actually

 1  four major exams through the schooling I'm going through right

 2  now.  The first one I have completed in its entirety; the

 3  second one, I have about 98 percent complete.  In addition to

 4  that, I have completed a little bit more than a year's worth of

 5  training in precision machining, which I intend to use that

 6  skill set for the purposes of gunsmithing.

 7  *Q.*  Do you personally know of, or do you have any experience

 8  with standard-capacity magazines of 16 or more rounds that use

 9  limiters to reduce magazine size?

10      *MS. MORRILL:*  Objection, Your Honor.  I believe that

11  the plaintiffs are trying to elicit expert testimony from this

12  witness, who has not been disclosed to the defendant as an

13  expert.  And he was only disclosed to the defendant on

14  plaintiffs' ADA claims.

15      *THE COURT:*  I think we're locked up again.

16      We're going to take a brief recess so that Ms.

17  Lindblom can retrieve another machine.  I think it will be five

18  minutes or so until she can get set up.

19      (Recess at 3:27 p.m.)

20      (In open court at 3:37 p.m.)

21      *THE COURT:*  Please continue.  Sadly, we can't read

22  back your last question.  Please ask the last question that you

23  asked.

24      *MR. WESTFALL:*  And I --

25      (Question and initial portion of objection read back

 1 | by the court reporter.)

 2 |         *MS. MORRILL:*  That the plaintiffs are attempting to

 3 | lay the foundation and begin questioning this -- eliciting

 4 | expert testimony from this witness on the reliability of

 5 | limited magazines, which is not the purpose for which he has

 6 | ever been disclosed to the defendant through discovery either

 7 | as an expert or in their 26(a)(1) disclosures for this witness.

 8 |         I do want to correct an earlier representation that I

 9 | made to the Court before we took the brief recess, which is

10 | that I had believed at that time that Mr. Bayne had been -- was

11 | a plaintiff only on the ADA claim.  But, in fact, he is

12 | challenging the large-capacity magazine restriction generally,

13 | which is claim 1, as well as the universal background check

14 | requirement.  But the Governor maintains his objection that

15 | this witness' knowledge about the reliability of limited

16 | magazines has never been disclosed in discovery, and that it is

17 | calling for expert testimony which exceeds this Court's

18 | requirements that the parties choose four and stick to them.

19 |         *THE COURT:*  Response.

20 |         *MR. WESTFALL:*  Your Honor, we identified him as a

21 | witness who was going to be providing testimony on claim 1, and

22 | in addition to the ADA elements under claim 4.

23 |         *THE COURT:*  All right.  He cannot present any expert

24 | testimony.

25 |         *MR. WESTFALL:*  And I am not --

 1    THE COURT:  -- unless -- excuse me, sir.  He cannot

 2  express any expert opinions, because such were not disclosed.

 3    MR. WESTFALL:  I understand, Your Honor.  And I'm not

 4  going to ask for his opinion once in any of my questioning.

 5    THE COURT:  Okay.

 6    MR. WESTFALL:  All of my questions will be designed to

 7  elicit only information related to his personal knowledge or

 8  his personal experience with respect to magazines.

 9  Everything --

10    THE COURT:  Please proceed.

11    MR. WESTFALL:  Thank you, Your Honor.

12  BY MR. WESTFALL:

13  Q.  Now I lost my place.

14    Would you please read the question back one more time

15  for the witness.

16    (Question read back by the reporter.)

17  A.  I do.

18  Q.  What are the types of such limiters?

19  A.  The ones that I am aware of, I view them falling into two

20  categories, manufacturer produced or original equipment

21  manufacturer produced magazines that are designed to be limited

22  capacity.  Secondly, you have aftermarket limiters that you can

23  install into a preexisting magazine.  As far as the actual

24  types of limiters, most common would a magazine lock attached

25  to the follower in the magazine.  The way that's really

```
 1   designed to work is you have --
 2          MS. MORRILL:  Objection to the extent that the
 3   witness's testimony is based on special education, knowledge,
 4   or training in firearms and magazines design.
 5          THE COURT:  Response.
 6          MR. WESTFALL:  Your Honor, that would be an important
 7   predicate for offering opinion testimony under the rules of
 8   evidence, if I were speaking to offer opinion testimony.  I am
 9   only seeking to offer, albeit, acknowledgedly sophisticated,
10   lay testimony that relates to only the personal knowledge of
11   this particular witness.
12          THE COURT:  All right.  Then you're going to have to
13   lay a foundation under Rule 701.
14   BY MR. WESTFALL:
15   Q.  Mr. Bayne, I asked you the question of, do you personally
16   know or have you experienced with standard-capacity magazines
17   of 16 or more rounds that use limiters to reduce magazine size.
18   Please describe your knowledge and how you have such knowledge,
19   Mr. Bayne.
20   A.  I do have knowledge in this area.  This information which
21   I'm about to describe is also available on the web, in addition
22   to my having handled several magazine types that do contain
23   limiters.
24          MR. WESTFALL:  One moment, Mr. Bayne.
25          Your Honor, may I get -- respectfully request a
```

 1  clarification.  Rule 701 is opinion testimony by a lay witness.

 2          THE COURT:  Uh-huh.

 3          MR. WESTFALL:  Again, I'm not asking the witness of

 4  any opinion.  I'm only asking with respect to his personal

 5  knowledge and based upon his personal experience.  I do not

 6  plan --

 7          THE COURT:  Why don't you make a proffer of what it is

 8  you want this witness to testify to.

 9          MR. WESTFALL:  Your Honor, this witness is personally

10  knowledgeable, because of his -- all of his work with being --

11  gunsmithing, to know that there are various types of --

12          THE COURT:  I'm not asking for an argument.  I'm

13  asking for a proffer.

14          MR. WESTFALL:  Yes, okay.  I'll try to --

15          He will testify that -- as he started to, that there

16  are two general categories of limiters that are used, one is

17  manufactured -- one is by a manufacturer, one is after market.

18  Of that, there are certain types that he is personally aware

19  of, has personally worked with, and has personal knowledge or

20  experience with, to describe those types of limiters.  He will

21  then testify about how easy these limiters are to remove, which

22  is relevant to the issue of capable of receiving and the

23  question of permanent alteration under 1224, which are aspects

24  of our 1224 claim.

25          THE COURT:  Is there an objection to this testimony?

 1        MS. MORRILL:  Yes, Your Honor.  This is substantially

 2   the same to Mr. Shain's testimony.  It would be cumulative of

 3   that.  We've already heard about the methods for limiting

 4   magazines and the removal of limiters through plaintiffs' own

 5   expert in this case.

 6        Additionally, I think the witness has clearly

 7   testified that his foundation for being able to offer this

 8   testimony is from having received trainings and certifications

 9   on firearms repair and gunsmithing.  And in order to meet the

10   Court's instructive requirement that this fall within Rule 701,

11   lay opinion testimony, the third requirement of that rule is

12   that it not be based on special training, knowledge, or

13   information that would fall within the scope of Rule 702.  So

14   we do maintain our objection to this testimony from this

15   witness.

16        THE COURT:  Thank you.

17        Any further argument?

18        MR. WESTFALL:  It's not 701.  I'm not asking for

19   opinion.  I'm only asking based upon his personal knowledge and

20   personal experience.

21        THE COURT:  I don't think it's 701 testimony.  It's

22   702 testimony that you're seeking here.  And it's 702 testimony

23   because you're seeking to elicit testimony about how something

24   works, based upon this witness's experience.

25        Now, how something works is an explanation that can be

1    in the nature of 702 testimony.  702 testimony is not limited

2    to opinions.  There can be general testimony as to how things

3    work or what might happen under ordinary circumstances or under

4    particular circumstances that fall within that rule as well.

5    And the rule allows that kind of testimony based upon

6    experience, as well as specialized training, education,

7    knowledge, or skill.

8         The difference between Rule 701 and 702, as I

9    understand the Tenth Circuit guiding authority, is that 701

10   governs those kinds of observations that are not observations

11   related to particular experience, skill, or training.  And

12   here, you are building this testimony off of this witness's

13   particular experience in dealing with magazine limiters.  That

14   required a disclosure of an expert opinion.  None was made.

15   Therefore, this witness cannot testify as -- based on his

16   experience.

17        *MR. WESTFALL:*  Thank you for the ruling, Your Honor.

18        And I would just only note that the reason I did not

19   feel it was required, because he's a party, and he had the

20   personal experience himself.  He wasn't being retained, if you

21   will, to be an expert witness.  And that was my call on that,

22   and I obviously was wrong.

23        Thank you, Your Honor.

24        And I have no further questions of this witness on

25   direct.

```
 1              THE COURT:  Thank you.

 2              Cross-examination.

 3              MS. MORRILL:  Thank you, Your Honor.

 4                      CROSS-EXAMINATION

 5   BY MS. MORRILL:

 6   Q.  Good afternoon, Mr. Bayne.

 7   A.  Good afternoon.

 8   Q.  You used to live in Colorado; is that correct, sir?

 9   A.  Correct, approximately 12 years.

10   Q.  And you currently live in Richmond Hill, Virginia -- I'm

11   sorry, Georgia?

12   A.  Georgia, correct.

13   Q.  And you have lived there since approximately the middle of

14   August of 2013?

15   A.  Approximately.

16   Q.  I want to talk to you, sir, about your use of weapons for

17   self-defense.  First of all, I believe you testified that you

18   currently have a concealed carry permit in Georgia; is that

19   right?

20   A.  I do.

21   Q.  Okay.  And you would agree that you are subject to

22   Georgia's restrictions, if any, on firearms and magazines when

23   you are carrying concealed in Georgia; is that correct?

24   A.  When I carry concealed in Georgia, I do have to abide by

25   their laws in Georgia, yes.
```

1   Q.   Right.  So when you're carrying concealed in Georgia, you

2   are not subject to Colorado's laws?

3   A.   Correct.

4   Q.   Okay.  And I believe you also testified on direct that when

5   you lived in Colorado, you also had a concealed carry permit;

6   is that right?

7   A.   That is accurate, yes.

8   Q.   Okay.  And I believe you did in fact carry concealed

9   regularly when you resided in Colorado.

10   A.   Yes.

11   Q.   Okay.  And you carried one semiautomatic pistol; is that

12   correct?

13   A.   Correct.

14   Q.   And you would frequently carry a second non-semiautomatic

15   handgun; is that right?

16   A.   That is incorrect.

17   Q.   I thought I understood that you carried a second weapon for

18   concealed carry in Colorado.

19   A.   Not frequently.

20   Q.   Okay.  Occasionally, I'm sorry?

21   A.   Occasionally.

22   Q.   Was that a revolver?

23   A.   No.  That was typically a semiautomatic.

24   Q.   Okay.  But -- am I correct that when you carried concealed

25   in Colorado, whether it was one firearm or two, neither of them

1   had a magazine with a capacity in excess of 15 rounds?

2   A.  That is correct.

3   Q.  I want to talk to you now about your weapons for

4   self-defense in the home.  I believe you testified that you use

5   an AR-15 at home for self-defense.

6   A.  That is correct.

7   Q.  Okay.  And you owned that same AR-15 when you lived in

8   Colorado; is that accurate?

9   A.  I did.

10  Q.  Okay.  And you used it here for the same purpose?

11  A.  Same purpose.

12  Q.  Okay.  And when you used it here for self-defense in the

13  home, you had both 30- and 20-round magazines that you used it

14  with?

15  A.  I owned both at the same time.  I used the 30-round

16  capacity magazines for the purpose of self-defense.

17  Q.  I see.  And those are what you continue to use while -- now

18  that you live in Georgia?

19  A.  Correct.

20  Q.  Okay.  And you have -- in fact, those are the same

21  magazines you now use in Georgia that you used to use in

22  Colorado?

23  A.  They are.

24  Q.  Okay.  So if you were to one day move back to Colorado, you

25  would still have those magazines for your AR-15 weapon?

1   *A.*  Presumably, yes.

2   *Q.*  And you agree where you live now in Georgia, you're not

3   limited in any way from purchasing additional magazines for

4   your AR–15 for use in –– for home defense in Georgia?

5   *A.*  To the best of my knowledge, that is correct.

6   *Q.*  Prior to moving to Georgia, when you resided in Colorado,

7   sir, it's true that you never had to display your concealed

8   carry firearm or firearms for self–defense in public; isn't

9   that correct?

10  *A.*  That is correct.

11  *Q.*  Nor did you have to use any of your weapons in the home for

12  self–defense when you resided in Colorado?

13  *A.*  I'm happy to say that's correct as well.

14  *Q.*  And since you've moved to Georgia, it's also correct that

15  you have never had the occasion to display any of your

16  concealed carry firearms for the purpose of self–defense?

17  *A.*  That is correct.

18  *Q.*  Or to fire them?

19  *A.*  Not in self–defense, correct.

20  *Q.*  And the same is true of your weapons for self–defense in

21  the home, now that you live in Georgia, you've not had the

22  occasion to use those weapons for self–defense purposes in the

23  home?

24  *A.*  Correct.

25          *MR. WESTFALL:*  Objection, form.

1           *THE COURT:*  Untimely.

2    *BY MS. MORRILL:*

3    *Q.*  And your answer overlapped.  Correct?

4    *A.*  Correct.

5    *Q.*  Thank you.  You testified on direct exam, sir, that you

6    also use your AR–15 for hunting.

7    *A.*  I do.

8    *Q.*  And you did that when you lived in Colorado as well?

9    *A.*  I did.

10   *Q.*  Okay.  And when you used and continue to use it -- well,

11   let's talk about Colorado, because that's where this lawsuit is

12   located.  But when you used your AR–15 for hunting in Georgia,

13   it was -- you would only load your magazine with four rounds;

14   is that correct?

15   *A.*  I haven't used it in Georgia for hunting yet.

16   *Q.*  I'm sorry, I meant to say Colorado.  I'll restart and ask

17   the question so the record is clear.  When you used your AR–15

18   firearm for hunting purposes in Colorado, you would only load

19   four rounds into a magazine to go hunting; is that accurate?

20   *A.*  On public lands, that is accurate.

21   *Q.*  That's because Colorado law limited you to the use of four

22   rounds, even though your firearm was capable of accepting many

23   more?

24   *A.*  For the purposes of hunting on public lands, correct.

25   *Q.*  I want to talk to you just a little bit, sir, about your

1    use of magazines for your firearms.  It's true, sir, that when

2    you carry for concealed purpose in Colorado, that you would

3    always carry an extra loaded magazine with you; is that

4    accurate?

5    A.  That is accurate.

6    Q.  Okay.  And if you are not trying to move your wheelchair at

7    the same time, sir, you can switch out a spent magazine with a

8    fresh magazine in approximately 1.5 seconds?

9    A.  If it's readily available, 1.5 seconds would be about

10    average.

11         MS. MORRILL:  Your Honor, may I have a moment?

12         THE COURT:  You may.

13         MS. MORRILL:  Thank you.  I have no further questions.

14         Thank you, sir.

15         THE COURT:  Redirect.

16         MR. WESTFALL:  Just one question, Your Honor.

17                   **REDIRECT EXAMINATION**

18    BY MR. WESTFALL:

19    Q.  Mr. Bayne, do you actually have to discharge a firearm to

20    use it for self-defense?

21    A.  No, I don't believe that you do.  I think that quite often,

22    the presence of the firearm could be enough deterrent to

23    prevent an otherwise bad situation.

24         MR. WESTFALL:  I have no further questions.

25         THE COURT:  Thank you.

```
 1              Can this witness be excused?

 2              Counsel.

 3              MR. WESTFALL:  I'm sorry, Your Honor.  May the witness

 4    be excused?

 5              MS. MORRILL:  No objection.

 6              THE COURT:  Thank you.

 7              Thank you, sir.  You are excused.

 8              MR. WESTFALL:  May I have a brief moment to consult

 9    with my co-counsel as to where we are today?

10              THE COURT:  You may.

11              MR. WESTFALL:  Before discussing it with the Court.

12    Thank you.

13              (Off-the-record discussion between counsel.)

14              MR. WESTFALL:  Your Honor, I'll let Mr. Colin take

15    over from here.

16              THE COURT:  Thank you.

17              MR. COLIN:  Good afternoon.

18              THE COURT:  Good afternoon.

19              MR. COLIN:  Your Honor, we have spent the last 24

20    hours consulting among ourselves, consulting with advisers who

21    have been in the courtroom.  We've been trying to figure out

22    whether or not we need to call Kevin Davis, and we have

23    determined now that the testimony of Mr. Davis would -- given

24    Mr. Ayoob's testimony yesterday, would be mostly cumulative of

25    what Mr. Ayoob testified to, and so we are not going to call
```

1  | Mr. Davis.

2  |      That means that tomorrow we have four witnesses,

3  | Burrud, Brough, Eichler, and Abramson, and potentially a fifth

4  | witness, chrome, and then we will be resting.

5  |      THE COURT:  Do you think you can get through all of

6  | them tomorrow?

7  |      MR. COLIN:  Yes.  I would suspect, having just spent

8  | some time with Mr. Burrud and Mr. Brough, I think they'll each

9  | take about an hour to an hour and a half for both cross and

10 | direct.

11 |      Eichler and Abramson I can't estimate, but no more

12 | than another two hours combined, I can't imagine.  And crone, I

13 | don't know.

14 |      THE COURT:  So what do you want to do today?

15 |      MR. COLIN:  We have no further witnesses to present

16 | today, and so -- my understanding is that Mr. Kleck didn't get

17 | finished, and we're going to call him out of order on Friday

18 | morning.  Is that being accurate?

19 |      THE COURT:  Actually, wouldn't be out of order,

20 | necessarily.

21 |      MR. COLIN:  Well, that's true.

22 |      THE COURT:  Still part of the plaintiffs' case.

23 |      MR. COLIN:  Yes.  I didn't understand whether or not

24 | tomorrow afternoon, if we -- if we rest at 2:30 or something,

25 | whether or not the defense would want to call any witnesses.

 1  That was my reference to "out of order."

 2         THE COURT:  All right.  Let me inquire of counsel for

 3  the State.

 4         MR. GROVE:  I think we should probably take tomorrow

 5  afternoon off.

 6         THE COURT:  I always like to take the afternoon off,

 7  but I usually like to know in advance so that I can schedule

 8  some other hearings during that time.

 9         MR. GROVE:  We're going to have difficulty -- we can

10  have witnesses here Friday afternoon, but Thursday afternoon

11  would pose some difficulties for our scheduling.  And so our

12  thought is that, obviously, we handle whatever they're going to

13  bring on Thursday, finish up with Dr. Kleck on Friday.  But

14  tomorrow afternoon, depending on how long their four or five

15  witnesses take, we would not have anybody else to fill that

16  space in.

17         THE COURT:  Is it possible for you to get your

18  witnesses here?

19         MR. GROVE:  Not the out of town ones.  We can talk

20  about the other ones.  I'm just not sure at this point.  Two

21  that come to mind both work for the Colorado Bureau of

22  Investigation, but that would leave us with a hole on Friday.

23  The difficulty is, we have a number of out-of-town witnesses

24  that have teaching schedules or flight that are booked or are

25  law enforcement officers.

1      *THE COURT:*  I understand that the out-of-state or

2  out-of-town witnesses would have difficulty being here.  But if

3  you have witnesses that are located locally, I think we need to

4  fill the afternoon.  If you don't have any local witnesses,

5  then, obviously, we'll have to end short tomorrow.

6      *MR. GROVE:*  Well, I think that the choice probably

7  needs to be made between ending short tomorrow or ending short

8  Friday, because we will not be able -- we can probably bring

9  the CBI folks in tomorrow afternoon, although I'd have to

10  check.  I don't know.  But we're not going to be able to bring

11  anybody that is scheduled for next week in on Friday if we did

12  that.

13      *THE COURT:*  So you only have local witnesses

14  sufficient for an hour or two of testimony; is that right?

15      *MR. GROVE:*  That don't -- well, we have other local

16  witnesses, many of whom have very limited availability, and

17  it's already set for next week.  The folks that are flexible,

18  we think, at this point, although we'd have to confirm that

19  would, would be the two CBI witnesses, and they may be

20  available tomorrow afternoon.  They would probably take a

21  couple of hours on direct.  I don't know what cross would be.

22  I also don't know how long -- I mean, plaintiffs are proposing

23  five witnesses tomorrow.  That may take a good chunk of the

24  day.

25      *THE COURT:*  All right.  What we're going to do, then,

1   is this:  You need to have some witnesses for tomorrow in case

2   we run out of time.

3         *MR. GROVE:*  We'll do our best.

4         *THE COURT:*  And please tell your witnesses that

5   although we like to work around witnesses' schedules, witness

6   schedules don't dictate what we're going to be doing in this

7   lawsuit.  So those are local, that you need to call, need

8   to be here so they can testify.  If you -- if the plaintiff

9   rests tomorrow at, say, 2:00 or 2:30, then you're going to need

10  to have witnesses here to testify.  On Friday morning, we're

11  going to start with the cross -- go back to cross-examination

12  of Dr. Kleck.  And Dr. Kleck is coming in from out of town.  We

13  will complete his testimony, and you should have witnesses,

14  then, for Friday afternoon.

15        *MR. GROVE:*  We'll do our best.

16        *THE COURT:*  If you don't, the time counts against you.

17        *MR. GROVE:*  Okay.

18        *THE COURT:*  And I have to tell you that I would

19  appreciate you telling your witnesses that they need to be

20  ready to testify when we're ready to go.  They may have planned

21  on a different time, but they need to change their schedules.

22        *MR. GROVE:*  Thank you, Your Honor.

23        *THE COURT:*  Okay.

24        Then that completes what we can do today.  I'm sorry

25  for the interruption on the mechanical side; but, as it turns

1  out, it probably didn't matter.

2       *MR. KOPEL:*  Your Honor, I had one question going

3  forward.  With our five plaintiff groups here, would it be

4  permissible at all if one of defendant's witnesses or, perhaps,

5  more than one, were cross-examined by more than one attorney?

6       *THE COURT:*  No.

7       *MR. KOPEL:*  Okay, thank you.

8       *THE COURT:*  The ground rules for this were set out at

9  the pretrial conference.  One attorney to examine, one attorney

10 to cross-examine.

11      *MR. KOPEL:*  Thank you, Your Honor.

12      *THE COURT:*  Now, you can divide that up among you as

13 to who you want to have do that; but we're not going to have

14 multiple cross-examinations.

15      Any need for clarification or further explanation?

16      *MR. COLIN:*  Not from the plaintiffs, Your Honor.

17      *THE COURT:*  All right.  Then thank you very much.

18 We'll stand in recess.

19      (Recess at 4:06 p.m.)

20

21

22

23

24

25

1              **INDEX**

2   **Item**                                                        **Page**

3     GARY KLECK
          Direct Examination By Mr. Kopel                       482
4         Cross-examination By Mr. Grove                        578
      NICHOLAS COLGLAZIER
5         Direct Examination By Mr. Westfall                    614
          Cross-examination By Ms. Scoville                     645
6     DAVID BAYNE
          Direct Examination By Mr. Westfall                    651
7         Cross-examination By Ms. Morrill                      665
          Redirect Examination By Mr. Westfall                  670

8

9                          EXHIBITS

10  Exhibit      Offered  Received  Refused  Reserved  Withdrawn

11  7                        592
    8                        603
12                    REPORTER'S CERTIFICATE

13

14      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

15

16      Dated at Denver, Colorado, this 25th day of May, 2014.

17                              s/Therese Lindblom

18                      _____

19                      Therese Lindblom,CSR,RMR,CRR

20

21

22

23

24

25