```
 1              THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
       Civil Action No. 13-CV-1300-MSK-MJW
 3
       COLORADO OUTFITTERS ASSOCIATION,
 4     COLORADO FARM BUREAU,
       NATIONAL SHOOTING SPORTS FOUNDATION,
 5     MAGPUL INDUSTRIES,
       COLORADO YOUTH OUTDOORS,
 6     USA LIBERTY ARMS,
       OUTDOOR BUDDIES, INC.,
 7     WOMEN FOR CONCEALED CARRY,
       COLORADO STATE SHOOTING ASSOCIATION,
 8     HAMILTON FAMILY ENTERPRISES, INC.,
       d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
 9     DAVID STRUMILLO,
       DAVID BAYNE,
10     DYLAN HARRELL,
       ROCKY MOUNTAIN SHOOTERS SUPPLY,
11     2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
       BURRUD ARMS INC. D/B/A JENSEN ARMS,
12     GREEN MOUNTAIN GUNS,
       JERRY'S OUTDOOR SPORTS,
13     SPECIALTY SPORTS & SUPPLY,
       GOODS FOR THE WOODS,
14     JOHN B. COOKE,
       KEN PUTNAM,
15     JAMES FAULL,
       LARRY KUNTZ,
16     FRED JOBE,
       DONALD KRUEGER,
17     STAN HILKEY,
       DAVE STONG,
18     PETER GONZALEZ,
       SUE KURTZ,
19     DOUGLAS N. DARR,

20         Plaintiffs,

21     vs.

22     JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23         Defendant.
       _____
24
                       REPORTER'S TRANSCRIPT
25                    TRIAL TO COURT - DAY FOUR
       _____
```

1          Proceedings before the HONORABLE MARCIA S. KRIEGER,

2     Judge, United States District Court for the District of

3     Colorado, continuing at 8:43 a.m., on the 3rd day of April,

4     2014, in Courtroom A901, United States Courthouse, Denver,

5     Colorado.

6

7                          **APPEARANCES**

8          RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
      at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9     Denver, Colorado, 80202, appearing for the Plaintiffs.

10         DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
      555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11    for the Plaintiffs.

12         MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
      P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13    appearing for the Plaintiffs.

14         ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
      Street, Castle Rock, Colorado, 80104, appearing for the
15    Plaintiffs.

16         DAVID BENJAMIN KOPEL, Attorney at Law, Independence
      Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17    appearing for the Plaintiffs.

18         MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
      SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19    General, Colorado Attorney General's Office, Ralph L. Carr
      Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20    80203, appearing for the Defendant.

21

22

23

24              THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

2609

```
 1                      P R O C E E D I N G S
 2          THE COURT:  We're reconvened in Case No. 13-cv-1300.
 3          Could I have entries of appearance for today's
 4    proceedings, which is the fourth day of trial in this case.
 5          MR. COLIN:  Good morning, Your Honor.  Mark Colin
 6    appearing on behalf of the licensed firearm dealer plaintiffs.
 7          THE COURT:  Good morning.
 8          MR. WESTFALL:  Good morning, Your Honor.  Richard
 9    Westfall on behalf of David Bayne, Dylan Harrell, Outdoor
10    Buddies, Colorado Outfitters Association, Colorado Farm Bureau,
11    Women for Concealed Carry, and Colorado Youth Outdoors.
12          THE COURT:  Good morning.
13          MR. KOPEL:  Good morning, Your Honor.  David Kopel on
14    behalf of David Strumillo, John B. Cooke, Ken Putnam, James
15    Faull, Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey,
16    Dave Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.
17          THE COURT:  Good morning.
18          MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian
19    on behalf of Colorado State Shooting Association and Hamilton
20    Family Enterprises.
21          THE COURT:  Good morning.
22          MR. GROVE:  Matthew Grove, Stephanie Scoville, LeeAnn
23    Morrill, and Kathleen Spalding on behalf of defendant, Your
24    Honor.
25          THE COURT:  Good morning.
```

1           Are you all ready to proceed?

2           *MR. COLIN:*  Plaintiffs are ready.

3           *THE COURT:*  Please call your next witness.

4           *MR. COLIN:*  Plaintiffs would call Timothy Brough.

5           *THE COURT:*  Please step up and be sworn.

6           (**TIMOTHY BROUGH, PLAINTIFFS' WITNESS, SWORN**)

7           *COURTROOM DEPUTY:*  Please be seated.

8           Please state your name and spell your first and last

9    name for the record.

10          *THE WITNESS:*  My name is Timothy Brough,

11   T-I-M-O-T-H-Y, B-R-O-U-G-H.

12                     **DIRECT EXAMINATION**

13   *BY MR. COLIN:*

14   *Q.*  Good morning, Mr. Brough.

15   *A.*  Good morning.

16   *Q.*  Are you a Colorado resident?

17   *A.*  Yes, sir.

18   *Q.*  What do you do for a living?

19   *A.*  I'm engaged in -- actively, retail sales of firearms,

20   shooting ranges, and hunting operations.

21   *Q.*  Do you have a business?

22   *A.*  Yes, sir.

23   *Q.*  Can you identify that business, please.

24   *A.*  The business is Rocky Mountain Shooters Supply, is my

25   primary source of income.  That is located in Fort Collins,

```
 1   Colorado.
 2   Q.  Is that a for-profit corporation?
 3   A.  Yes, sir, it is.
 4   Q.  What type of corporate entity is it?
 5   A.  It is an LLC.
 6   Q.  Are there any other principals or owners in Rocky Mountain
 7   Shooter Supply?
 8   A.  Yes, sir, just myself and my wife.
 9   Q.  Do you and your wife have a division of responsibilities?
10   A.  Yes, sir, we do.
11   Q.  Can you describe your primary responsibilities in the
12   operation of Rocky Mountain Shooter Supply, please.
13   A.  Yes.  My responsibilities primarily are more of the
14   high-altitude view.  I'm responsible for direction of the
15   company, I set policy for the company, I'm involved in the
16   hiring of staff, firing of staff, training of staff, financial
17   responsibilities, of course.  That being said, I'm also very
18   involved in the day-to-day activities of our store.  I do the
19   routine work, sometimes of receiving, sometimes stocking
20   shelves, I get involved with selling of guns, I get involved
21   with the transfer operation of guns and the paperwork following
22   that.  My wife is primarily administrative tasks.
23   Q.  Is yours a brick and mortar operation?
24   A.  We are, yes, sir.
25   Q.  I think you mentioned it in the initial description of your
```

1   business, that in addition to a firearms retail outlet, you

2   also provide other services associated with shooting?

3   *A.*  We do.  We have an indoor shooting range.  Our facility is

4   approximately 12,000 square feet.  4,000 square feet of that

5   associated with the indoor range, and then the other

6   8,000 square feet associated with retail sales.  A small

7   portion of the building is dedicated to a gunsmith area.

8   *Q.*  So you provide gunsmith services as well?

9   *A.*  Yes, sir.

10  *Q.*  Are you a gunsmith?

11  *A.*  I am not, no, sir.

12  *Q.*  Does Rocky Mountain Shooter Supply do a significant amount

13  of business over the internet?

14  *A.*  We do not, very little.

15  *Q.*  I didn't hear the last part.

16  *A.*  I said very little.  One or two guns a year, maybe.

17  *Q.*  Can you explain for the Court briefly your background in

18  firearms and shooting.

19  *A.*  Certainly.  Twenty-nine years -- personally and

20  professionally, both.  I've been shooting since I was a 9- or

21  10-year-old child.  Professionally, since I got out of college,

22  which now is 29 years, I've been involved in the shooting

23  sports industry, which would include shooting ranges,

24  hunting/guiding operations, and most recently in retail sales.

25  *Q.*  Does your knowledge include detailed knowledge regarding

 1  the types of firearms commonly used by your customers, the
 2  types and capacities of magazines that they prefer, those kind
 3  of things?
 4  *A.* Certainly.
 5  *Q.* Fair to say, you have good general knowledge of firearms
 6  and firearms operations, if not detailed knowledge of firearms
 7  mechanics?
 8  *A.* Yes, certainly.
 9  *Q.* You said Rocky Mountain Shooter Supply was a for-profit
10  enterprise.  How does it make its money?  What are your profit
11  centers, if you would?
12  *A.* We basically have two profit centers, one being the service
13  side of our business, which would be primarily the indoor
14  shooting range, where we charge for range time, and we have
15  rental guns that we charge folks to use the guns.  The other
16  side of it would be the retail sales, where we sell firearms,
17  the components that make them work, and firearms accessories,
18  related apparel, things like that.
19  *Q.* Prior to July 1, 2013 did Rocky Mountain Shooter Supply
20  offer for sale, magazines with a capacity greater than 15
21  rounds?
22  *A.* Yes, sir, we did.
23  *Q.* In the year prior to the magazine restriction going into
24  effect on July 1, 2013, can you estimate Rocky Mountain Shooter
25  Supply's gross revenue from the sale of such magazines?

1           MS. MORRILL:  Objection, Your Honor.  Foundation.

2           THE COURT:  Response.

3           MR. COLIN:  Your Honor -- let me build the foundation.

4           THE COURT:  Okay.

5           MR. COLIN:  I'll explore it a little bit further.

6    BY MR. COLIN:

7    Q.  Do you have personal knowledge regarding the sales of

8    magazines by Rocky Mountain Shooter Supply?

9    A.  I do.

10   Q.  Can you describe the scope of that knowledge, please.

11   A.  Can I describe --

12   Q.  The scope of that knowledge.  What information do you have

13   regarding the nature of magazines sold by Rocky Mountain

14   Shooter Supply in the year prior to July 1, 2013?

15   A.  I would have information regarding the number of magazines

16   purchased, the number that would have been in inventory at

17   certain times, and the number we sold.

18   Q.  Do you personally get involved in the purchase of the

19   magazines?

20   A.  Yes, sir, I do.

21   Q.  And do you get involved in the records keeping regarding

22   moving them out of stock, meaning, moving them out of

23   inventory, your sales records?

24   A.  I do.

25   Q.  Are you personally familiar with the approximate number of

1 ║ magazines of 16 plus capacity that Rocky Mountain Shooter

2 ║ Supply sold in the year prior to July 1, 2013?

3 ║ *A.* Yes, sir.

4 ║ *Q.* Can you estimate your gross revenue and the gross revenue

5 ║ of Rocky Mountain Shooter Supply from such sales?

6 ║ *A.* I can, yes, sir. That would be approximately 1 1/2 percent

7 ║ of our gross revenue, maybe 70,000 -- all magazines would

8 ║ entail 1 1/2 percent of our gross revenue. The magazines

9 ║ greater than 16 rounds would be about 25 percent of that total.

10 ║ *Q.* And does Rocky Mountain Shooter Supply still offer

11 ║ magazines with a capacity of 16 or greater rounds for sale in

12 ║ Colorado?

13 ║ *A.* We do not.

14 ║ *Q.* Are there any exceptions to that policy?

15 ║ *A.* Law enforcement or military.

16 ║ *Q.* So after July 1, 2013, was Rocky Mountain Shooter Supply

17 ║ left with what I'm going to refer to as a dead inventory of

18 ║ magazines with a capacity greater than 15 rounds?

19 ║ *A.* Yes, sir.

20 ║ *Q.* Can you estimate the amount of that dead inventory?

21 ║ *A.* I believe on July 1, we had roughly 1,450 magazines that

22 ║ would fall in that category.

23 ║ *Q.* If we could hand the witness notebook -- exhibit notebook

24 ║ 5, please.

25 ║            Mr. Brough, I direct your attention to tab 90 in that

1  exhibit notebook.

2  *A.*  Okay.

3  *Q.*  Do you recognize that document?

4  *A.*  Yes, sir, I do.

5  *Q.*  What is it?

6  *A.*  It's a document I prepared for this trial that lists the

7  individual magazines we had in inventory that held greater than

8  15 rounds as of July 1, 2013.

9  *Q.*  And how did you prepare this list?

10  *A.*  Myself and another staff member, maybe two, looked at both

11  inventory lists from our point of sale system and did physical

12  counts as well.

13  *Q.*  And you were able to verify your physical count using your

14  inventory point of sale system?

15  *A.*  We used the inventory as a guideline.  I know it's not

16  accurate, so we did a physical count at that time as well.

17  *Q.*  All right.  So you physically inventoried every magazine in

18  the care, custody, and control of Rocky Mountain Shooter Supply

19  on July 1, 2013, that had a capacity greater than 15 rounds?

20  *A.*  Yes, sir, we did.

21  *Q.*  And that is the basis for the list that appears as Exhibit

22  90?

23  *A.*  It is.

24       *MR. COLIN:*  I would offer Exhibit 90 at this time.

25       *THE COURT:*  *Voir dire* or objection.

1    MS. MORRILL:  Your Honor, we do object, that the

2    underlying documents relating to this exhibit have not been

3    disclosed to the defendant.

4         THE COURT:  I'm not sure what underlying documents

5    you're talking about.

6         MS. MORRILL:  This purports to be a summary of

7    business records, and those business records that underlie the

8    summary were not disclosed to the defendant.

9         THE COURT:  Response.

10        MR. COLIN:  My response is that they were.  The backup

11    documentation from which this exhibit was prepared was provided

12    along with Rocky Mountain Shooter Supply responses for

13    production of documents.  I believe this list is simply a

14    compilation of the information that was previously provided.

15        THE COURT:  Reply.

16        MS. MORRILL:  Your Honor, I'm happy to *voir dire* the

17    witness.

18        THE COURT:  Well, that's not the issue.  *Voir diring*

19    the witness is not going to resolve the issue.  Either you got

20    the underlying documents or you didn't get the underlying

21    documents.

22        MS. MORRILL:  If counsel could explain which ones he

23    believes were responsive.  I don't believe we have the cost

24    information -- we don't have any information to arrive at the

25    total value of approximately 5,600.

1    MR. COLIN:  I'll move that that part of the exhibit be
2    stricken.

3    THE COURT:  So you would like to modify the exhibit in
4    order to remove that information?

5    MR. COLIN:  That's my request, Your Honor.

6    THE COURT:  Does that address your concern?

7    MS. MORRILL:  Additionally, we asked for date
8    information relating to the acquisition of any of that stock,
9    whether it occurred -- the acquisition occurred prior to
10   July 1, 2013, as long -- and we also asked for specifically
11   when, because the law went into effect -- I'm sorry, it was
12   signed on March 20, 2013, so we were interested in whether or
13   not the plaintiff FFLs continued to acquire inventory after the
14   law was signed but before it went into effect.  That
15   information was not produced.

16        So for the quantities listed in the left-hand column
17   of Exhibit 90, the Governor has no information about when Rocky
18   Mountain Shooter Supply obtain that particular stock, even
19   though we asked for that in discovery.

20   THE COURT:  All right.  This is not a time to deal
21   with discovery issues.  Was that information supplied?

22   MR. COLIN:  Your Honor, I would have to ask for a
23   short break to look.  I don't have the memory -- in my memory
24   whether or not that level of detail was provided.  What I can
25   tell the Court is, this information is authenticated by the

1   person who prepared this document.  And the questions that

2   Ms. Morrill has, she can ask of this witness in

3   cross-examination.  Doesn't have anything to do with whether or

4   not this document is an admissible record, based upon the

5   preparation of an inventory by this particular witness.

6           THE COURT:  All right.  This is what we're going to

7   do:  You can move on to a different topic.  I'll reserve ruling

8   as to the admission of this exhibit.  On the morning recess,

9   please go over what documents were supplied by the plaintiffs

10  to the defense and refine your positions as to whether or not

11  this exhibit is admissible.

12          MR. COLIN:  I would simply add, Your Honor, that

13  Mr. Brough was deposed by Mr. Grove, Ms. Spalding, and

14  Mr. Blake --

15          THE COURT:  Irrelevant.

16          MR. COLIN:  They had the opportunity to explore these

17  issues.

18          THE COURT:  Mr. Colin, it is irrelevant at this point.

19          MR. COLIN:  Okay.

20          THE COURT:  In order to submit a summary, all of the

21  underlying documents must be produced.

22          MR. COLIN:  I understand.

23          THE COURT:  The question is whether they were

24  produced.

25          MR. COLIN:  I'll verify that over the break.

1    THE COURT:  Okay.  Please move on to another topic.

2  BY MR. COLIN:

3  Q.  What has Rocky Mountain Shooter Supply done with its dead

4  inventory of magazines that you testified to?

5  A.  A portion of those have been moved to a store which we

6  opened in Wyoming.  The balance is still in inventory in a

7  storage room and/or warehouse.

8  Q.  Have you been successful at selling these magazines with

9  capacity greater than 15 rounds?  Has Rocky Mountain Shooter

10  Supply been --

11    MS. MORRILL:  Objection, Your Honor.  And this is just

12  for the record.  I believe it is similar to an objection that

13  Ms. Scoville raised.  But the defendant wants to note that we

14  have challenged the plaintiffs' standing to allege economic

15  injury -- I'm sorry, the FFL plaintiffs' standing to allege

16  economic injury.  So I would just make a relevance objection to

17  any testimony related to lost profits, just for the record.

18    THE COURT:  Thank you.  Noted.

19  BY MR. COLIN:

20  Q.  Thank you.  Want me to repeat my question?

21  A.  Please.

22  Q.  Has Rocky Mountain Shooter Supply been successful at moving

23  the inventory of magazines it had in his possession on July 1,

24  2013, in the months -- nine months or so since that?

25  A.  I would consider it relatively unsuccessful.  We've sold 10

 1  to 20 percent of the inventory.

 2  *Q.*  So I -- you gave me an estimate earlier of the number of

 3  magazines that would be 16 plus variety that you had in your

 4  inventory as of July 1.  Can you repeat that for me, please?

 5  *A.*  That estimate was about 1,450 magazines in inventory.

 6  *Q.*  So 10 or 20 percent of 1,450 has moved since then?

 7  *A.*  That would be accurate.

 8  *Q.*  What are you doing with the remainder of that inventory?

 9  *A.*  Hoping to move it in the next ten years.

10  *Q.*  You said that you don't do a lot of internet business with

11  regard to firearms.  Does Rocky Mountain Shooter Supply do a

12  significant amount of business via internet regarding the sale

13  of magazines?

14  *A.*  We do no sale of magazines via the internet.

15  *Q.*  Prior to July 1, 2013, did your customers regularly

16  purchase magazines of greater than 15 rounds?

17  *A.*  They did.

18  *Q.*  What were the most popular magazines sold by Rocky Mountain

19  Shooter Supply prior to July 1, 2013?

20          *MS. MORRILL:*  Objection, relevance.

21          *THE COURT:*  Response.

22          *MR. COLIN:*  Well, the commonality and popularity of

23  the magazines at issue here are relevant to the *Heller*

24  analysis, Your Honor.  And we believe that the -- this

25  witness's experience as the owner of Rocky Mountain Shooter

1   Supply, vis-a-vis the most common and popular 16-plus magazines

2   that were sold by Rocky Mountain Shooter Supply prior to this

3   law passing are relevant to the *Heller* issue with regard to the

4   commonality of the magazines.

5           THE COURT:  Well, let's be a little more focused than

6   this.

7           MR. COLIN:  Okay.

8           THE COURT:  What portion of the, quote, *Heller*

9   analysis, do you think this goes to.

10          MR. COLIN:  This goes to?

11          THE COURT:  Yeah.

12          MR. COLIN:  Commonality, common use.

13          THE COURT:  What portion of the *Heller* analysis?  In

14  other words, in reading *Heller*, there is no question that

15  Justice Scalia espoused views with regard to commonality in

16  finding that there was a constitutional right to be protected

17  under the Second Amendment.  We are beyond *Heller*.  So what is

18  it in this case, this court should be looking at with regard to

19  your challenge under the Second Amendment that pertains to this

20  particular testimony?

21          MR. COLIN:  Your Honor, my understanding of the *Heller*

22  analysis is that one of the initial prongs or steps that needs

23  to be part of the ultimate Second Amendment analysis are

24  whether or not the firearm -- or in this case, the component of

25  the firearm, was in common use by law-abiding citizens for

1   lawful purposes.  We are simply trying to address the common

2   use element to that point.

3          *THE COURT:*  All right.  I read *Heller* differently than

4   you do.

5          Response.

6          *MS. MORRILL:*  Yes, Your Honor.  I would just note that

7   the parties have stipulated in the Final Pretrial Order, No.

8   26, that although the total number of magazines of any size in

9   Colorado is not known, the number of large-capacity magazines

10  is in the millions.  There are also millions of magazines in

11  sizes of 15 rounds or less.  And we believe that this is

12  cumulative and not relevant to the Court's inquiry under

13  *Heller*.

14         *THE COURT:*  Well, the moment at which you stipulated

15  to that, you made it relevant.  And as a consequence, I'm going

16  to overrule your objection and allow this witness to answer the

17  question.

18         *MS. MORRILL:*  So, we would just lodge a new objection

19  that this line of questioning is cumulative in light of the

20  stipulation.

21         *THE COURT:*  Thank you.

22         I understand that the plaintiffs read *Heller*

23  differently than I do.  As a consequence, I'll allow this

24  witness to answer the question.

25         Do you need to have it read back?

```
 1              THE WITNESS:  Please.

 2              THE COURT:  All right.  Would you read it back,

 3    please.

 4              (Question read back by the reporter.)

 5              THE WITNESS:  I believe part of the question was also

 6    that they contained more than 16 rounds?

 7              THE COURT:  Sir, just limit yourself to the question

 8    that she read to you.

 9              THE WITNESS:  The most popular magazines sold prior to

10    July 1, 2013, would have have encompassed magazines both above

11    and below 16 rounds that came common to the guns that we sold,

12    and those would be of a dozen various models under several

13    manufacturers.

14    BY MR. COLIN:

15    Q.  That -- is that the end?  I don't want to interrupt you.

16    A.  Yeah, that's the end.  I'm sure that I -- I guess I

17    answered that question.

18    Q.  I understand.  And then let me ask the question that you

19    thought I had asked, which is, of those magazines sold by Rocky

20    Mountain Shooter Supply prior to July 1, 2013, can you identify

21    those with the capacity of greater than 15 rounds that were the

22    most popular?

23    A.  The magazines that would have been greater than 15 rounds

24    that were most popular pertain to, specifically, Springfield

25    Arms XDM series of guns, CZ series of guns in the 9 millimeter
```

1    caliber, Kel-Tec PMRs, and a lot of -- we talked -- I think

2    we're talking magazines in general, so that would include rifle

3    magazines that came standard with AR-styled guns and AK-styled

4    guns.

5    Q.  Is Rocky Mountain Shooter Supply able to sell those guns

6    any -- magazines any longer in the State of Colorado?

7    A.  We are able to sell the guns; we are not able to sell the

8    magazines currently.

9    Q.  Has there been a general trend in Rocky Mountain Shooter

10   Supply business over the past year relating to the sale of

11   lower-capacity magazines for use with firearms designed to be

12   utilized with higher-capacity magazines?

13   A.  Certainly.  It's a very small portion of what we do.  Most

14   folks do not want a lower-capacity magazine if the gun was made

15   standard with a higher-capacity magazine.

16   Q.  Does Rocky Mountain Shooter Supply continue to sell

17   firearms that were originally designed for use with magazines

18   with the capacity greater than 15 rounds?

19   A.  Yes, we do.

20   Q.  And can you describe how you addressed the prohibitions in

21   18-12-301 to 303 when you do that.

22   A.  Typically, if we have a compliant magazine available, we

23   will put it with the gun.  We will take out the non-compliant

24   magazine, put it in our inventory, put a compliant magazine

25   with the gun, when that's available.  However, most of the time

1  that's not available to us to do that, so we will sell the

2  firearm without a magazine at all.  And the consumer, then, is

3  on his own to purchase a magazine somewhere else.

4  *Q.*  Prior to -- how would your sales of the firearms that you

5  just described -- Rocky Mountain Shooter Supply sales of the

6  firearms that you just described, those designed originally for

7  use with a magazine with the capacity greater than 15 rounds,

8  how have your sales been since July 1, 2013, of those firearms?

9  *A.*  They're substantially lower than they were prior to that.

10  *Q.*  Prior to July 1, 2013, was there a different trend,

11  relating to those specific firearms?

12  *A.*  Prior to July 1, those were some of our best selling

13  categories.

14  *Q.*  Can you estimate the total decrease in sales between

15  pre-July 1 and post-July 1 to date?

16        *MS. MORRILL:*  Objection, Your Honor.  Vague, how far

17  before and after.

18        *MR. COLIN:*  Okay.

19  *BY MR. COLIN:*

20  *Q.*  Can you estimate the total decrease in sales between

21  July 1, 2013, and February 2014?

22  *A.*  I can, yes, sir.

23  *Q.*  Could you please do that.

24  *A.*  Be approximately 30 percent of what we'd done prior.

25  *Q.*  Do you attribute this impact on your business to the

1  enactment of the magazine ban?

2  *A.*  We have seen it.

3  *Q.*  I'm sorry?

4  *A.*  Yes, sir we have seen an impact.  It has been slower sales

5  since July 1.

6  *Q.*  Is there any other change in your business operations to

7  which you can attribute a decrease in sales of these firearms?

8  Meaning, have you changed your hours, have you changed the way

9  your products are displayed, anything like that, in the past

10  nine months?

11  *A.*  We've done nothing in our business different since July 1,

12  other than follow the law.  And that seems to be the trend

13  within the state.

14  *Q.*  Meaning what?

15  *A.*  The downward trend in sales seems to be a state-wide issue,

16  not just --

17      *MS. MORRILL:*  Objection to the foundation for this

18  response.

19      *THE COURT:*  Well, we don't object to responses.  Only

20  to questions.

21      *MS. MORRILL:*  Or to this question.

22      *THE COURT:*  Overruled.

23  *BY MR. COLIN:*

24  *Q.*  Would you have been in business -- I guess I didn't ask you

25  this.  I apologize.  When did you become involved in Rocky

1  Mountain Shooter Supply?

2  *A.*  I purchased that store in 2005.

3  *Q.*  So you've been in business about eight years?

4  *A.*  Be nine years this month.

5  *Q.*  Seen ups and downs in businesses -- in your business

6  before?

7  *A.*  Mostly, ups in our business.  We've had almost no downturn

8  prior to this.

9  *Q.*  So, from 2005 to 2013, your business revenues consistently

10  increased?

11  *A.*  On the average, we're at 20 percent increase per year

12  during that time period, at least from 2007 on.

13  *Q.*  And your losses since July 1, have they equaled your gains?

14  *A.*  No, sir, they have not.

15  *Q.*  To what do you attribute the losses that Rocky Mountain

16  Shooter Supply has experienced?  If you can give us a breakdown

17  of the various ways in which you believe it has affected your

18  business.

19  *A.*  I can only attribute our decline in sales since July 1 to

20  the new laws that were enacted on July 1.  There is -- nothing

21  else has changed in our industry, nothing has changed in my

22  business.  That is the only thing that is new to our operation.

23  *Q.*  You testified regarding magazines that were the most

24  popular magazines of capacity greater than 15 rounds at Rocky

25  Mountain Shooter Supply sold prior to July 1 of 2013.  Can you

1  identify the firearms that were associated with those

2  magazines, meaning, the firearms that Rocky Mountain Shooter

3  Supply routinely sold prior to July 1, 2013, that were the most

4  common and popular.

5      MS. MORRILL:  Objection.  No foundation for the part

6  about routinely sold firearms prior to July 1, 2013.

7      THE COURT:  Response.

8      MR. COLIN:  Well, I think this witness has already

9  established the foundation for his response to that question.

10  I'm happy to build a further foundation.

11      THE COURT:  No.  What I'd like you to do is identify

12  for the record what you think the foundation is.

13      MR. COLIN:  Oh, sure.  This witness has previously

14  testified that he does the purchasing for Rocky Mountain

15  Shooter Supply, he does the sales inventory, keeps track of the

16  sales inventory for Rocky Mountain Shooter Supply, that he is

17  directly personally involved in selecting the firearms to be

18  sold, which includes identifying those which are the most

19  popular to his customers.  And then he keeps track of whether

20  or not he was right, whether or not the firearms that he

21  purchased actually were the most popular and did, indeed,

22  result in sales.  So this witness has already laid the

23  foundation for his knowledge on the popularity or the most

24  popular firearms that were sold by Rocky Mountain Shooter

25  supply prior to July 1 of 2013.

 1          THE COURT:  Reply.

 2          MS. MORRILL:  Your Honor, I've heard testimony

 3   specific to magazines, but I don't recall the same testimony

 4   about firearms.

 5          THE COURT:  All right.  I'm going to allow the witness

 6   to answer.  I overrule your objection.

 7          THE WITNESS:  Prior to July 1, 2013, we sell a large

 8   amount of handguns.  That's probably 50 percent of our total

 9   firearms sales.  Of that, a quarter of those handguns would

10   have magazines standard with them over 16 rounds.  Our rifle

11   category is approximately 30 percent of our firearms sales.

12   And within that category of rifles, AR-15 models, or variants

13   thereof, are about 30 percent of that.

14   BY MR. COLIN:

15   Q.  I'd like to focus your attention back to the semiautomatic

16   pistol inventory and the most popular semiautomatic pistols

17   that Rocky Mountain Shooter Supply sold prior to July 1, 2013.

18   Can you identify those, please.  Specifically, I'm speaking to

19   those pistols with capacity greater than 15 rounds.

20   A.  With the higher capacity, yes.  Springfield in their XDM

21   models, certain models of CZ and 9 millimeter, Kel-Tec, PMRs,

22   FN Five-sevens, and one model of Glocks, full-sized tactical

23   models.

24   Q.  Are those still the most popular firearms sold by Rocky

25   Mountain Shooter Supply?

1  *A.*  They are certainly within our top ten sellers, yes.

2  *Q.*  Have the sales of those firearms by Rocky Mountain Shooter

3  Supply increased or decreased since July 1, 2013?

4  *A.*  They have decreased since July 1.

5  *Q.*  Does Rocky Mountain Shooter Supply perform transfers

6  involving out-of-state FFLs shipping guns to a Colorado buyer?

7  *A.*  We do.

8  *Q.*  Can you describe that process, please.

9  *A.*  A purchaser, a buyer, within the state of Colorado would

10  make a deal for a gun from outside state boundaries, that gun

11  would be shipped in to us, received by us.  We would put it in

12  our bound book according to ATF guidelines.  We would then take

13  an ID from the person, have them complete a 4473, which is the

14  ATF background check.  We would then charge them for that.  We

15  have to review that form, we have to submit that information to

16  CBI to get an approval.  Once the paperwork is done, approval

17  from CBI is done, then the person is free to take the gun once

18  they pay the fee.

19  *Q.*  All right.  And I want to explore a little bit certain

20  aspects of your answer for just a minute.  But before I do, is

21  the process that you described moments ago the same process you

22  would use if a customer came into your brick and mortar store

23  and wanted to buy a gun?

24  *A.*  It is exactly the same except for the sales pitch.

25  *Q.*  Okay.  All right.  Well, let's focus, then, on a couple of

1   words that you used to make sure we understand what they are.

2   You mentioned something about a bound book.  Can you describe

3   what that is, please.

4   *A.*  ATF requires that we keep a bound book for all transfers of

5   guns that physically come into our store.  So when a gun

6   arrives at the store, we physically write in that bound book

7   the make -- the make of the gun, the manufacturer of the gun,

8   the caliber of the gun, the type of action it is, and who that

9   gun came from.  That's half of the book, the incoming side of

10  the book.

11       The other half of that page is the outgoing side of

12  the page.  And that is completed once the buyer or transferee

13  takes the gun away.  That side of the page would entail who

14  took it and the documentation that we record for that.

15  *Q.*  You indicated in your prior testimony that there is a

16  charge that Rocky Mountain Shooter Supply imposes for

17  performing these tasks; is that accurate?

18  *A.*  On guns that we sell out of our inventory, we only charge a

19  $10 fee, which is what the state charges us now.  On guns that

20  are not part of our inventory, that we're just a transfer agent

21  for, that are coming from out of state, coming from an

22  out-of-state seller to an in-state buyer, we charge an

23  additional $40.  So their fee is 50, total.

24  *Q.*  10 to the state that is a pass-through, and 40 for the

25  services you provide?

```
 1   A.   Correct.

 2   Q.   How did you arrive at that figure?

 3   A.   The $40 came about several years ago.  When internet sales

 4   and transfers became a bigger portion of our business, I needed

 5   to know what it cost me to transfer a gun in and out of the

 6   store.  I look at my overhead for the building, I looked at

 7   payroll, insurance, maintenance, total overhead divided by

 8   number of forms that we sold throughout the year, and came up

 9   with a figure very close to $40.  I wanted to charge more, but

10   I didn't think the market would bear it.

11   Q.   Okay.  Does Rocky Mountain Shooter Supply perform

12   private -- I'm sorry, perform background checks for private

13   transfers?

14   A.   From two parties within the state of Colorado?  No, sir.

15   Q.   Correct.

16   A.   No, sir.

17   Q.   Why not?

18   A.   It's a money losing proposition for us.  As I've stated, it

19   costs us almost $40 to move that gun.  The State mandates that

20   the most I can charge is $10 for that transaction, of which

21   they collect that 10 from me.  And there is an associated risk.

22   The more forms I do, the more likely I am to make a mistake in

23   my bound book, that the ATF requires.  The more mistakes I have

24   in my bound book, the more likely I am to not get my license

25   renewed upon renewal.
```

1   *Q.* Any other potential consequences that could cause you to

2   refrain from performing --

3   *A.* Certainly.

4          *MS. MORRILL:* Objection. Calls for speculation.

5          *THE COURT:* Response.

6          *MR. COLIN:* Well, until he answers, I don't know what

7   the -- we can establish that it's speculative, but I can

8   certainly ask him another foundational question. Please allow

9   me to do that.

10         *THE COURT:* Well, I'm going to sustain the objection

11  at this moment. But it's a premature objection as well,

12  because the question hasn't been finished. So let's hear the

13  whole question. We'll hold that objection in abeyance until I

14  can hear the whole question.

15         *MS. MORRILL:* Sorry, Your Honor.

16         *THE COURT:* That's okay.

17         *MR. COLIN:* Thank you.

18         *THE COURT:* What's the question?

19  *BY MR. COLIN:*

20  *Q.* You mentioned earlier in your testimony that there was an

21  administrative risk associated with performing the functions

22  necessary for a background check. Are you personally aware as

23  the owner of a licensed firearms dealership of whether there

24  are any criminal or civil consequences that can attach for

25  mistakes associated with performing background checks?

1      THE COURT:  I'm going to ask you not to answer that

2  question right now so I can see if there is an objection.

3      MS. MORRILL:  Objection.  Foundation and calls for

4  speculation.

5      THE COURT:  All right.  Response.

6      MR. COLIN:  I'm not asking him to describe any

7  specific exposure.  I'm simply asking him as the owner of a

8  business that does firearms -- licensed firearms sales, whether

9  he's aware of the potential consequences that can flow from an

10 improper background check performance, whether they are

11 administrative, civil, or criminal.  And he's touched upon one

12 area of potential exposure.  I just want him to testify as to

13 his personal knowledge of other areas of exposure that have

14 caused him to refrain from performing private transfer

15 background checks.

16      THE COURT:  I'm going to sustain the objection in

17 part, and I'm going to overrule it in part.  There has been a

18 lot of testimony by a lot of witnesses about what they think

19 the law says and how it might apply to them.  I have not heard

20 that testimony as being a legal opinion.  In fact, none of

21 those witnesses can express a legal opinion.  Indeed, even the

22 expert witnesses cannot express a legal opinion, consonant with

23 the provisions of *Specht v. Jensen*, at 853 F.2d 805, a Tenth

24 Circuit opinion in 1988.

25      So I hear this testimony as being simply testimony as

1   to what this witness fears may be a consequence.  And viewed in

2   that light, he can testify as to what he is concerned about.

3           MR. COLIN:  Thank you.

4           THE WITNESS:  I believe even in the current law that

5   was just printed, if we do not process that paperwork

6   correctly, we are held liable for any acts that the purchaser

7   of the gun would do illegally down the road.  I believe there

8   is also a civil liability there as well.

9   BY MR. COLIN:

10  Q.  Thank you.  Aren't you worried as the owner of Rocky

11  Mountain Shooter Supply that by refraining from doing these

12  private transfer background checks, you're giving up this book

13  of business to other firearms dealers in the state?

14  A.  No, I'm not worried about that at all.  I don't believe any

15  FFLs, including Cabela's, the box stores, mom and pop shops, I

16  don't think anybody is doing private party background checks.

17  Q.  Are you familiar that there are at least a few FFLs doing

18  private transfer background checks?

19  A.  I don't know if any are.  I've had customers come to me

20  saying, you're my second, third stop --

21          MS. MORRILL:  Objection, hearsay.  I believe the

22  original question called for the witness to answer --

23          THE COURT:  Overruled.  The question calls for a yes

24  or no answer.

25          You may answer the question.  Do you you want me to

```
 1  read that back for you?

 2         THE WITNESS:  Let's read that one back.

 3         THE COURT:  Are you familiar that there are at least a

 4  few FFLs doing private transfer background checks?

 5         THE WITNESS:  I do not know of any specific FFLs that

 6  are doing it, no, sir.

 7  BY MR. COLIN:

 8  Q.  From your own personal knowledge?

 9  A.  From personal knowledge, from knowledge of customers

10  walking in the store, I've not had anybody say, I'll go to such

11  and such and get it done if you won't do it.  They've all left

12  saying, we can't get it done.

13  Q.  Does Rocky Mountain Shooter Supply process for purchasing

14  of a firearm by an in-state customer -- well, I'm sorry.  I've

15  already asked this.  It would be cumulative.

16         Can you discuss your business operations relating to

17  the acquisition of firearms and magazines by Rocky Mountain

18  Shooter Supply for sale to the retail customer.  Meaning, when

19  do you purchase them, how do you purchase them, when are they

20  delivered?  Give us a general understanding of the process that

21  you utilize to identify firearms that you want to buy for

22  future retail, when you get them, how you order them, that

23  process.

24  A.  Typically, October through early part of February is what I

25  call the buy season.  We go to shows.  We have to make our
```

1   early orders with manufacturers to meet minimum purchases.  So

2   we'll order very heavily October through February for

3   approximately half of our inventory that we expect to see in

4   the next 12 to 18 months.  And then we have fill-in orders that

5   we do routinely throughout the year, of course.

6   Q.  So you're ordering 12 to 18 months in advance?

7   A.  That is correct.

8   Q.  And is that how deliveries take place?  Meaning, when you

9   buy them, do you immediately get what you purchased, or is

10  there a process that's involved in receiving it by Rocky

11  Mountain Shooter Supply?

12  A.  Deliveries will come as the manufacturer has them

13  available.  So they will scatter out for as long as two

14  years -- pretty common to see them scattered over six to nine

15  months.

16  Q.  Did Rocky Mountain -- you said Rocky Mountain Shooter

17  Supply on average experienced an annual increase in gross sales

18  of about 20 percent from 2005, when you purchased it, through

19  2012; is that accurate?

20  A.  It would be, actually, 2007 to 2012.

21  Q.  I'm sorry, I got the date wrong.  From 2007 to 2012?

22  A.  Correct.

23  Q.  Did Rocky Mountain Shooter Supply experience a significant

24  increase in sales during the last portion of 2012 and the early

25  part of 2013?

```
 1            MS. MORRILL:  Objection.

 2            THE WITNESS:  Yes.

 3            MS. MORRILL:  Vague.

 4            THE COURT:  Overruled.

 5            THE WITNESS:  Yes, we did see an increased number of

 6   sales starting right around the -- President Obama's election,

 7   so end of October, first part of November.  You started seeing

 8   a little bit of ramp-up then.  The Sandy Hook shooting took

 9   place in, I want to say early December or mid December.  Right

10   after that, the politicians started their grandstanding about

11   new firearms laws or whatever, so we see a ramp-up then.  And

12   then in January, February, when the state politicians started

13   talking firearms regulations, we had a continual ramp-up.  So

14   it was a steady rampup for about six months.

15   BY MR. COLIN:

16   Q.  So the conversation around the nation and in Colorado

17   regarding potential firearms bans or magazine limitations

18   actually improved your business?

19   A.  Sure, for a six-month period.

20   Q.  Have the additional profits that your business earned

21   during that six-month period offset the losses that you've

22   experienced since July 1, 2013?

23            MS. MORRILL:  Objection.  Foundation.  There has been

24   no quantification, no basis for a comparison.

25            THE COURT:  Response.
```

1          MR. COLIN:  He's previously testified, once again, he

2   is the individual who tracks the sales of firearms and

3   magazines for Rocky Mountain Shooter Supply.  He is certainly

4   able to testify as to whether or not the total gross sales in

5   the six months prior to July 1 have been offset -- have offset

6   the losses that he's experienced in the nine months since then.

7          THE COURT:  Reply.

8          MS. MORRILL:  Your Honor, I -- the gross sales would

9   include everything, not just the limited -- the firearms that

10  he may be prohibited from selling in state or the magazines

11  that don't as well.  There has been no breakdown for the point

12  B comparison with the point A.  And I think --

13         THE COURT:  That sounds like an issue to be raised in

14  cross-examination.  I overrule the objection.

15         THE WITNESS:  No.  The six-month time period has not

16  compensated us for the losses since.

17  BY MR. COLIN:

18  Q.  You mentioned earlier, when you were responding to another

19  question, that when you purchase firearms from a manufacturer,

20  distributor, they are delivered with magazines.  Is that

21  accurate?

22  A.  That is correct.

23  Q.  All right.  So when Rocky Mountain Shooter Supply purchased

24  firearms from a manufacturer, distributor, are they typically

25  delivered with the magazine component that is -- that the

1   firearm is designed to be utilized with?

2   *A.*   Yes.   They -- they come complete with all of the components

3   that they're designed to be fired with, ready to shoot,

4   assembled, with the magazine that it's designed with.   If it

5   was designed to hold 22 rounds, that's the magazine they ship

6   it with.

7   *Q.*   Obviously, you bought -- let me ask you, did Rocky Mountain

8   Shooter Supply purchase from manufacturers and distributors in

9   the fall of 2012 firearms that were subsequently delivered

10   after July 1, 2013?

11   *A.*   We would have placed orders in 2012, September time frame.

12   And, yes, some of those firearms would have been delivered

13   later in the summer of 2013.

14   *Q.*   Once the legislation at issue was passed in March of 2013,

15   did you engage in any efforts to either cancel those orders

16   involving firearms and associated magazines with a capacity of

17   more than 15 rounds or to return those products that you

18   received?

19   *A.*   Generally speaking, we can't cancel our orders.   Some

20   manufacturers may let you, at a harm to your future business

21   with them.   They put you on a list that says, this guy orders

22   and doesn't follow through, so . . .

23   *Q.*   So canceling an order is not an option?

24   *A.*   It's very counterproductive.

25   *Q.*   Did you attempt as the owner of Rocky Mountain Shooter

1   Supply to convince the manufacturers or distributors from whom

2   you purchased these firearms or magazines that I'm describing,

3   those with a capacity of greater than 15 rounds, did you ask

4   your manufacturers or distributors to replace the

5   higher-capacity magazines, those with a capacity of greater

6   than 15 rounds that would normally be delivered with those

7   firearms, with compatible compliant magazines?

8            MS. MORRILL:  Objection.  Calls for hearsay.

9            THE COURT:  Response.

10           MR. COLIN:  I asked the witness whether or not --

11           THE COURT:  I know what you asked.

12           MR. COLIN:   -- he made the request.

13           THE COURT:  Would you please respond to the objection.

14           MR. COLIN:  I don't think it calls for a hearsay

15   response.  I'm simply asking him whether or not he asked a

16   question of -- or made a request of the distributor or

17   manufacturer.  I haven't even asked him what the answer is.

18           MS. MORRILL:  Reply?

19           THE COURT:  Reply.

20           MS. MORRILL:  Yes, Your Honor.  The answer to that

21   question calls for an out-of-court statement that is being

22   offered for the truth of the matter asserted.

23           THE COURT:  Overruled.

24           MR. COLIN:  Thank you.

25   BY MR. COLIN:

```
1   Q.  Have you asked manufacturers and distributors to substitute

2   compliant compatible magazines?

3   A.  In many cases, yes.

4   Q.  Has Rocky Mountain Shooter Supply been successful in

5   convincing manufacturers and distributors to provide Rocky

6   Mountain Shooter Supply with compatible compliant magazines

7   with their firearms that are designed for use with more than 15

8   rounds?

9        MS. MORRILL:  Objection.  Calls for hearsay.

10       THE COURT:  Overruled.

11       THE WITNESS:  I would say we've not been successful

12  convincing them, because they typically don't have them.  Even

13  though I ask for them, they wouldn't have them in their

14  inventory to send to me.

15  BY MR. COLIN:

16  Q.  So what effect does that have on Rocky Mountain Shooter

17  Supply's ability to tell those firearms?

18  A.  Those firearms, then, have to be sold without a magazine.

19  Not many people want to buy a firearm without a magazine.

20  Q.  Has that resulted in a loss to Rocky Mountain Shooter

21  Supply?

22  A.  Certainly.  As that individual customer leaves the store

23  because they couldn't take a firearm away with the components

24  necessary to use it.

25  Q.  Did I understand your previous testimony to say that when
```

1    you get a firearm that comes with a non-compliant magazine, one

2    with a capacity of more than 15 rounds, you remove that from

3    the delivery case and replace it with a ten-round magazine, or

4    some other magazine that is compatible with the firearm?

5    A.   If we have one available, yes.

6    Q.   All right.  Do you add a charge to the customer for giving

7    them a magazine out of your inventory of compliant compatible

8    magazines?

9    A.   We do not, no.

10   Q.   And did I understand you to say that those magazines that

11   you removed from the delivery case that were -- that have a

12   capacity of more than 15 rounds would go to your Wyoming store?

13   A.   Either our Wyoming store or in storage.

14   Q.   And you could still sell those to law enforcement and

15   military; is that accurate?

16   A.   That is correct.

17   Q.   So that's the limit of your market now for those magazines,

18   at least in Colorado?

19   A.   Within the state of Colorado.

20   Q.   Understood.  We talked earlier about semiautomatic pistols

21   designed to operate with magazines with a capacity greater than

22   15 rounds.  And I think you identified four or five of those

23   semiautomatic pistols for us that were the most popular for

24   your customers before July 1.  Do you recall that?

25   A.   Yes.  Correct.

1   Q.  Can you estimate what percentage of gross annual sales for

2   Rocky Mountain Shooter Supply involve the sale of semiautomatic

3   pistols in general, first of all?

4   A.  Semiautomatic pistols in general is about 50 percent of our

5   firearm sales.  Firearm sales make up 60 percent of our overall

6   sales.

7   Q.  We're going to get down to the weeds a little bit.  So

8   semiautomatic pistols come in a variety of sizes, if you will;

9   is that the right word?

10  A.  Correct.

11  Q.  Can you describe the -- I'm probably not using the term of

12  art, but the different sizes that you can purchase -- that you

13  sell semiautomatic pistols in.

14  A.  Sure.  Primarily there is three sizes.  Large size, which

15  would be called tactical, frequently; the mid size, which is

16  what used call a compact; and then the smallest size would be a

17  subcompact.

18  Q.  Do subcompact pistols typically have associated firearms --

19  I'm sorry, associated magazines with a capacity of greater than

20  15 rounds?

21  A.  There are a few that I would put in the compact category

22  that would carry more than 15 rounds.

23  Q.  Any subcompacts that fall into that category?

24  A.  No subcompacts would come standard that way.

25  Q.  All right.  So is it true, then, that this magazine

1  limitation would generally not impact Rocky Mountain Shooter

2  Supply sales of subcompact pistols?

3  *A.*  That's correct.

4  *Q.*  Would have some impact on Rocky Mountain Shooter Supply

5  sales of compact pistols?

6  *A.*  A small impact.

7  *Q.*  And what is the impact on Rocky Mountain Shooter Supply

8  sale of tactical or full-frame semiautomatic pistols that fall

9  into that category?

10 *A.*  Sales in that category are about 30 percent of what they

11 were prior.

12 *Q.*  Thank you.  Can you tell us what types of semiautomatic

13 pistols were the most affected.

14 *A.*  Would be the full-sized Springfield XDM and XDs, one model

15 of Glock, several models of CZ in the 9 millimeters, FN

16 Five-sevens, Kel-Tec, PMRs, that would be the ones for us that

17 are most affected in the semiautomatic pistol category.

18 *Q.*  Aren't those the same firearms that you said were the most

19 popular sellers?

20 *A.*  Certainly amongst our best sellers.

21 *Q.*  With regard to the semiautomatic pistols -- and we can

22 limit our conversations to tactical or full-frame pistols --

23 has Rocky Mountain Shooter Supply succeeded in selling any of

24 those firearms with compatible compliant magazines since

25 July 1?

1  A.  There are some available with compatible magazines, that we

2  can get compatible magazines for, that are compliant.  We've

3  sold very few of them, but we've sold some of them.

4  Q.  Prior to July 1, did you sell more?

5  A.  Prior to July 1, we would sell none with what are currently

6  compliant magazines.

7  Q.  Why?

8  A.  The customer would want the -- the original magazine that

9  came with it in the larger capacity.

10  Q.  Have you experienced any difficulty as the owner/operator

11  of Rocky Mountain Shooter Supply in finding magazines that are

12  both compatible and Colorado compliant for your semiautomatic

13  firearms, including pistols and carbines?

14  A.  Yes.  We've had a great deal of trouble obtaining those

15  items.

16  Q.  And can you describe the reasons for that?  Are they being

17  made; are they made but not available?

18          MS. MORRILL:  Objection, foundation.

19          THE COURT:  Response.

20  BY MR. COLIN:

21  Q.  Have you --

22          MR. COLIN:  Allow me to lay a further foundation.

23          THE COURT:  Okay.

24          MR. COLIN:  Thank you.

25  BY MR. COLIN:

1  *Q.*  Have you inquired -- have you sought these magazines,

2  meaning Colorado compliant magazines, that are compatible with

3  the firearms that are in your inventory?

4  *A.*  I'm sorry, did you say sought or bought?

5  *Q.*  Sought.

6  *A.*  Yes, we have sought to purchase those magazines.

7  *Q.*  And have you been able to purchase those magazines for the

8  most part?

9  *A.*  For the most part, no.

10  *Q.*  And --

11  *A.*  A limited number; but for the most part, no.

12  *Q.*  I think you just started to answer the next question, which

13  is, why not?

14      *MS. MORRILL:*  Objection, foundation.

15      *THE COURT:*  Response.

16      *MR. COLIN:*  Once again, this is the individual who is

17  tasked with obtaining Colorado compliant and compatible

18  magazines for his firearms that he sells.  He's allowed to

19  render his own opinion under 701 as to why he is unable to

20  obtain that information -- or those products.

21      *THE COURT:*  What do you think is deficient in the

22  foundation?

23      *MS. MORRILL:*  Your Honor, we believe that the basis

24  for this would be his conversations with manufacturers and

25  insight into manufacturers' willingness to produce.  Likely

 1   hearsay.  And it -- as to the 701 proffer, it's not based on

 2   his observations.  It's, fundamentally, the manufacturers'

 3   reasons for having or not having compliant magazines available.

 4        THE COURT:  This witness can testify as to his

 5   perceptions, what he knows and what he thinks.  The areas that

 6   you raise are fertile ground for cross-examination.  I overrule

 7   the objection.

 8        THE WITNESS:  We have tried to obtain such magazines.

 9   The manufacturers make limited amounts of them because there is

10   a limited market for them, and they just are not available

11   routinely.

12   BY MR. COLIN:

13   Q.  So what effect has that had on Rocky Mountain Shooter

14   Supply's ability to sell the firearms that are associated with

15   those magazines?

16   A.  It limits our ability to sell a working firearm that is

17   compliant with current law.

18   Q.  Has Rocky Mountain Shooter Supply been precluded by any

19   manufacturers or distributors from purchasing firearms or

20   magazines?

21   A.  Yes, sir, we have.

22   Q.  Could you describe that experience, please.

23        MS. MORRILL:  Objection to the extent the description

24   calls for hearsay.

25        THE COURT:  Overruled.

```
 1              THE WITNESS:  We have at least three manufacturers
 2   that refuse to ship certain models of their guns into the state
 3   of Colorado.  And things we had ordered in 2012, we were not
 4   able to get moving forward, once the laws went into effect.
 5   BY MR. COLIN:
 6   Q.  I didn't hear the last --
 7   A.  Once the laws went into effect.
 8   Q.  What effect has that had on Rocky Mountain Shooter Supply
 9   business?
10   A.  If I don't have it in the store, I can't sell it.  So items
11   I couldn't receive, I've not been able to sell it.
12   Q.  If I asked you this or if you included it in your answer, I
13   apologize.  I'm not meaning to be repetitive.  Did you identify
14   the specific firearms that fall into the category of firearms
15   for which you cannot obtain Colorado compliant and compatible
16   magazines?
17   A.  Yes.  That would still be the Springfield XDs, XDMs, that
18   list that we went through before.
19   Q.  Smith & Wesson M&P, military and police?
20   A.  Yes, there are several models of M&P.
21   Q.  Those three manufacturers, Smith & Wesson M&P, CZ,
22   Springfield XDMs, were those top sellers for Rocky Mountain
23   Shooter Supply prior to July 1, 2013?
24              MS. MORRILL:  Objection.  Asked and answered.
25              THE COURT:  Overruled.
```

1    *THE WITNESS:*  Yes, those are top selling brands.

2    *BY MR. COLIN:*

3    *Q.*  Thank you.  Does Rocky Mountain Shooter Supply get involved

4    in consignment sales?

5    *A.*  We are.

6    *Q.*  Could you describe how that process works.

7    *A.*  Consignment sale means, the seller brings us a gun, we

8    follow all the same rules as if we were purchasing the gun from

9    an ATF standpoint, as far as logging it in/out of the book.  We

10    put it on the shelf.  When we sell the gun, we keep a

11    percentage of the sale and then pay the original owner his

12    portion that's due.

13    *Q.*  So you -- Rocky Mountain Shooter Supply receives a gun on

14    consignment, does that go into that bound book that you talked

15    about?

16    *A.*  It does.  It follows all the same regulations there.

17    *Q.*  So it becomes part of Rocky Mountain Shooter Supply

18    inventory?

19    *A.*  It becomes -- from an ATF standpoint, it is our inventory.

20    *Q.*  All right.  And then when the -- there is a purchaser for

21    that firearm, does Rocky Mountain Shooter Supply perform the

22    same background check services it would have performed had it

23    sold the gun out of its own inventory?

24    *A.*  It is exactly the same procedure.

25    *Q.*  All right.  And a consignment sale, does the owner of the

1  firearm get to decide how long they want to leave it on the

2  market before they give up?

3  *A.*  We do not put a limit on them.  They are free to retrieve

4  that gun at any point in the future, should they change their

5  mind.

6  *Q.*  All right.  And what are the consequences of their effort

7  to retrieve their own firearm?

8  *A.*  If they want to retrieve their firearm, take it out of

9  their inventory, they must complete the 4473 and undergo a

10  background check.

11  *Q.*  To get their own gun back?

12  *A.*  We charge them the $10 fee that the state charges us for

13  that.

14  *Q.*  Does Rocky Mountain Shooter Supply provide services to

15  customers who engage in temporary loans of firearms?

16  *A.*  We do have customers that purchase guns from us who

17  subsequently loan them out, yes.

18  *Q.*  Have you been personally involved in working with those

19  customers on issues regarding loaned firearms?

20  *A.*  That is one of the duties that I handle exclusively, yes,

21  sir.

22  *Q.*  All right.  Can you identify those customers for whom you

23  have assisted them or worked with them regarding issues

24  associated with loaned firearms.

25  *A.*  I have three different guest ranches that would purchase

1   firearms from us.  They would take possession of those firearms

2   corporately, and then those firearms would be loaned out to

3   their customers and/or guests of their ranches.  And then I

4   have also worked with Colorado Youth Outdoors, who is a local

5   nonprofit who uses them in shooting programs.

6   Q.  Let's talk about the guest ranch situation first.  What

7   difficulties have your customers and you attempted to overcome

8   associated with temporary loaning of firearms?

9   A.  Typically, how that works is, if the corporation is buying

10  the guns to be held corporately, ATF requires an officer of the

11  corporation come to the store, that person fills out the 4473,

12  we do the background check on them, and then they take that gun

13  back to the ranch or their guest location.

14          Under new statute, it has to change, in that not only

15  the corporate head or a corporate officer, but the new statute

16  requires that anybody that handles that gun within their

17  organization on a regular basis would also have to undergo a

18  background check.

19          So in the case of Anschutz Ranches, which are east of

20  us, when they purchase a firearm, I'm going to have to get the

21  corporate officer in and all of their guides.  I believe they

22  currently have six guides that guide for them, who are

23  responsible for handling of those guns.  And I will need to get

24  each of those individuals to do a background check as well.

25          They have -- in their inventory of guns, I believe

 1  they possess around 30, and almost yearly are they replacing

 2  and adding to that.  So this will be an ongoing issue for them

 3  and me both to deal with.

 4  Q.  When you say "ongoing issue," what is the issue?

 5  A.  Each year, each year they're going to have to bring in

 6  their new guides -- be the same thing if they hired a new guide

 7  today and they didn't change firearms.  They'd need to bring

 8  him in -- I don't know how that's going to work, actually.

 9  They bring him in to do a background check, but he's not taking

10  possession of a gun that day.  They already own that gun

11  corporately.

12          I kind of got off on a tangent there that I didn't

13  know was going to exist.

14  Q.  We've confused ourselves.

15  A.  But in the case of purchase of a new gun, they're going to

16  buy a new gun to replace one that is broken or wore out,

17  they're going to need to bring in all of their guides and

18  anybody who is going to physically work with that gun

19  routinely.

20  Q.  You mentioned Colorado Youth Outdoors.  Do you personally

21  work with Colorado Youth Outdoors as a representative of Rocky

22  Mountain Shooter Supply?

23  A.  We handle all of their firearms transfer work that they

24  need done, and have for about six years.

25  Q.  You've indicated --

1   *A.*  Some --

2   *Q.*  Go ahead.

3   *A.*  I was going to say, it's a similar situation.  They

4   purchase the guns corporately.  The director of the corporation

5   comes in in the past and has filled out the paperwork for those

6   guns.  They loan those out at least on a daily basis.  They may

7   have some extended trips too.

8        Moving forward, after this July 1 bill -- we haven't

9   done any for them yet.  They have about a dozen guns in

10  inventory that we do need to deal with for them.  We will have

11  to determine the individuals within their organization that

12  will be handling them on a routine basis.  Each of those

13  individuals, which may be staff and/or volunteers, will need to

14  undergo typical background check.  That could be, in their

15  case, upwards of 20, 30, maybe 40 individuals.

16  *Q.*  Do you -- in addition to customers like Anschutz and

17  Colorado Youth Outdoors, do you regularly have communications,

18  both verbal and written, with individuals who work within the

19  firearms industry in Colorado?

20        *MS. MORRILL:*  Objection.  Hearsay.

21        *THE COURT:*  Calls for a yes or no answer.  Therefore,

22  the objection is overruled.

23        *THE WITNESS:*  I deal with a variety --

24        *THE COURT:*  Sir, it calls for a yes or no answer.

25        *THE WITNESS:*  I'm sorry.

1    Yes, sir.

2    *BY MR. COLIN:*

3    *Q.*  Can you describe the number or the kinds of individuals

4    with whom you have routine communications.

5    *A.*  Yes, I can describe that.  Would you like me to?

6    *Q.*  Please do that.

7    *A.*  I deal with other FFL holders.  I deal with manufacturers'

8    representatives who come to our store to show us their goods,

9    to get us to purchase more guns.  I deal with individuals and

10   the shooting organizations, shooting ranges.  I deal with

11   firearms instructors.  I deal with hunting guides, hunting

12   operators.  My life, my businesses, are all surrounded in that

13   realm.

14   *Q.*  Do you regularly attend meetings at which members of the

15   firearms industry in Colorado are significant participants?

16   *A.*  I do.  At least semiannually, we do buyer shows, which are

17   heavy with Intermountain West FFL holders.  A large percentage

18   of Colorado FFL holders would also attend that.

19   *Q.*  Based on your interaction with these various firearms

20   industry representatives and groups, have you developed an

21   understanding as to whether the issues and problems that you've

22   described as being experienced by Rocky Mountain Shooter Supply

23   are being experienced by other FFLs in the state of Colorado?

24        *MS. MORRILL:*  Objection.  Foundation and hearsay.

25        *MR. COLIN:*  I believe I laid an appropriate

```
 1   foundation.  It's a 701 statement, Your Honor.

 2           THE COURT:  I'm going to sustain the hearsay objection

 3   here, because the foundation that you've laid is based upon

 4   interactions by this witness with other persons who are not

 5   present.  And the only basis on which I can tell, based on this

 6   foundation, that an an understanding could have been formed is

 7   based on comments made by people who are not here, third

 8   parties.  So I sustain the objection.

 9           MR. COLIN:  Thank you.

10           I have no further questions of this witness.

11           THE COURT:  Thank you.

12           Would you like to take a morning recess at this time,

13   or do you want to get started on your cross-examination?

14           MS. MORRILL:  If it's convenient to the Court, I'm

15   fine with the recess now.

16           THE COURT:  All right.  Then we'll take our morning

17   recess at this time.

18           It is 10 minutes before 10:00, and we'll reconvene at

19   5 minutes after the hour.  We'll stand in recess until then.

20           (Recess at 9:51 a.m.)

21           (In open court at 10:08 a.m.)

22           THE COURT:  Cross-examination.

23           MS. MORRILL:  Thank you, Your Honor.

24

25
```

| | |
|---|---|
| 1 | **CROSS—EXAMINATION** |
| 2 | *BY MS. MORRILL:* |
| 3 | *Q.* Good morning, Mr. Brough. |
| 4 | *A.* Good morning. |
| 5 | *Q.* I want to talk to you about the process at your store for |
| 6 | background checks. |
| 7 | *A.* Okay. |
| 8 | *Q.* Okay. And within that category, I just want to quickly |
| 9 | establish how it's done when you're selling a store from your |
| 10 | own inventory, which you would agree, that would be a |
| 11 | profitable sale for you? |
| 12 | *A.* Correct. |
| 13 | *Q.* Okay. So, just generally, the -- your store -- you don't |
| 14 | employ any type of background check specialists; is that |
| 15 | correct? |
| 16 | *A.* That is correct. |
| 17 | *Q.* Okay. Either a sales clerk who would be in the process of |
| 18 | selling the firearm to the customer would also conduct the |
| 19 | background check? |
| 20 | *A.* Generally, that's correct. |
| 21 | *Q.* Okay. And that entails providing the customer with a form |
| 22 | 4473 to fill out? |
| 23 | *A.* Yes. |
| 24 | *Q.* Okay. And then the customer would take care of -- those |
| 25 | portions of the form that -- |

1    A.   The customer has a part of the form that they need to fill

2    out; we have a part of the form that we need to fill out.

3    Q.   Thank you.  And so the customer takes care of his or her

4    own part?

5    A.   Yes, they have to.

6    Q.   You -- your clerk would provide -- check the customer's ID?

7    A.   Correct.

8    Q.   And then input the information from the form and the

9    identification into CBI's InstaCheck system?

10   A.   That is correct.

11   Q.   And, typically, it takes a clerk about three or four

12   minutes to put that information into the computer?

13   A.   To input the existing information into the system, yes.

14   Q.   And then after the information is input into the

15   computerized system, both the customer and the sales clerk wait

16   for a response?

17   A.   Yes.

18   Q.   Okay.  And that wait can be anywhere from 3 minutes to 20

19   minutes, generally?

20   A.   That's pretty typical right now, uh-huh.

21   Q.   So that you would agree that the average of those two

22   numbers is about 11 1/2 minutes?

23   A.   Yes.  I can do the math.

24   Q.   And then CBI -- while your customer and your staff are

25   waiting for a response from CBI, the customer is free to browse

1    your store?

2    A.  Yes.

3         MR. COLIN:  Beyond the scope of direct.

4         THE COURT:  Response.

5         MS. MORRILL:  Your Honor, the -- the plaintiff

6    testified that he cannot perform background checks for private

7    transfers without experiencing a loss to his store, but he did

8    not establish what that process entails and what the cost is to

9    his store in terms of performing those background checks.  And

10   I'm just merely trying to establish that.

11        THE COURT:  All right.  I'm going to interpret the

12   scope of the direct examination broadly, since there were

13   profits and losses that were discussed in the course of that

14   examination.  And, therefore, anything that may affect profits

15   and losses is fair game.

16        MS. MORRILL:  Thank you.

17        THE COURT:  You may answer the question.  Do you need

18   to have it read back?

19        THE WITNESS:  Better repeat the question.

20        THE COURT:  All right.  The question is --

21        (Question read back by the reporter.)

22        THE WITNESS:  They are.

23   BY MS. MORRILL:

24   Q.  And, generally, you would agree, sir, that when an

25   individual is in your store purchasing a gun that requires a

1  background check, they usually also buy some accessories for

2  that firearm?

3  A.  I would say frequently.  I wouldn't say usually.

4  Q.  Frequently, your customers purchase firearms accessories in

5  addition to the firearm itself?

6  A.  They certainly can.

7  Q.  Okay.  And that would include ammunition?

8  A.  Certainly.

9  Q.  And so CBI will issue a response, and that will indicate to

10  your clerk whether the check was approved or denied; is that

11  accurate?

12  A.  Either approved, denied, rejected, or delayed.

13  Q.  And rejection means that -- simply just that something in

14  the form was incorrectly filled out or missing?

15  A.  Correct.  They couldn't make a positive ID on their end.

16  Q.  But unless the customer is denied or the form is rejected,

17  it's an approval?

18  A.  It could also be in the delayed category.

19  Q.  I'm sorry -- I didn't hear that part.

20  A.  It could also be in the delayed category.

21  Q.  Oh, I see.  So an extended period of time is required?

22  A.  Exactly.

23  Q.  I see.  Let's assume that the customer is approved, for the

24  sake of the next question, then your staff completes the sale,

25  and the customer walks out the door; that's correct?

```
 1  A.  Yes.

 2  Q.  Your sales staff are paid an hourly wage, sir?

 3  A.  They're paid hourly.

 4  Q.  And the average hourly wage for a sales clerk is about

 5  $14.50 to $15?

 6  A.  That would be accurate.

 7  Q.  Okay.  So half an hour of your sales clerk time runs about

 8  7.50.

 9  A.  Yeah, but that's not all my costs.

10  Q.  I didn't ask you whether those were all your costs.

11  A.  Yes, ma'am.

12  Q.  Thank you.  Let's talk about your reasons that you

13  testified to for not performing background checks on private

14  transfers pursuant to Colorado's now universal background check

15  law.

16  A.  Okay.

17  Q.  I believe you testified that your store does not conduct

18  such background checks; is that accurate?

19  A.  We do not conduct in-state person-to-person background

20  checks.

21  Q.  Thank you.  And just to date, I want to make sure, nobody

22  from the State of Colorado has showed up and required you to do

23  so?

24  A.  No.

25  Q.  Okay.  So this -- this is your choice?
```

1    *A.*  This is a choice we make, yes.

2    *Q.*  Okay.  And the basis for the choice is because your

3    understanding is that Colorado law only allows Rocky Mountain

4    Shooter Supply to charge a $10 fee for conducting a private

5    transfer background check?

6    *A.*  I believe that's exactly what the statute says.

7    *Q.*  And your understanding of that $10 fee, sir, is that that

8    is a passed-through fee, meaning, you collect it for the

9    Colorado Bureau of Investigation, and it passes through you to

10   the Colorado Bureau of Investigation?

11   *A.*  I don't believe the statute says what I have to do with

12   that fee.  I only know that I receive a bill for $10 for every

13   fee -- every background check that I process.

14   *Q.*  Right.  So you -- so it is correct, then, that you would

15   take the $10 the customer gives you, and then you would turn

16   that over to CBI?

17   *A.*  Sure.

18   *Q.*  Okay.  And just for the record, I'm shortening Colorado

19   Bureau of Investigation to CBI.

20   *A.*  We do it all the time.

21   *Q.*  It is a mouthful.  And you testified that, to perform this

22   service, meaning to change your choice, you would want to

23   collect a total of $50 from the party requesting a background

24   check for a private transfer?

25   *A.*  Correct.

1   Q.  Okay.  And that is the same charge that you require of

2   customers who might purchase a firearm through an out-of-state

3   FFL who then transfers that firearm to you for completion of

4   the background check and finalization of the sale?

5   A.  That would be the same fee, correct.

6   Q.  Okay.  And am I correct in my understanding of the fee in

7   that instance, meaning the $50 fee, where it's an FFL-to-FFL

8   transfer that occurs in your store, that you will waive that

9   fee, sir -- I'm sorry, you will waive the portion of the fee

10  that you would typically keep for Rocky Mountain Shooter Supply

11  if the customer spends more than $75 in your store?

12  A.  That is incorrect.

13  Q.  Okay.  Then I'm sorry.  I thought that was your process.

14       So no matter what, if it's an FFL-to-FFL transfer, you

15  charge $40 to keep for Rocky Mountain Shooter Supply and $10 to

16  pass on to CBI?

17  A.  If we have a gun shipped in from out of state that goes to

18  an in-state resident, we charge $50 all the time.

19  Q.  Okay.  Sir, I want to talk to you about -- there was a

20  great deal of testimony in your direct exam about your sales,

21  and you testified that you are knowledgeable about Rocky

22  Mountain Shooter Supply's gross sales?

23  A.  I am.

24  Q.  Okay.  So you would agree that your store's profit margin

25  on firearms is lower than its profit margin on firearm

```
 1   accessories?
 2   A.  Yes.
 3   Q.  And that would include magazines?
 4   A.  Yes.
 5   Q.  You also would agree that firearm accessories include
 6   ammunition?
 7   A.  Ammunition can be considered an accessory, I guess, yeah.
 8   Q.  And regardless of how you would classify it, as an
 9   accessory or not, you agree, sir, that the profit margin to
10   Rocky Mountain Shooter Supply on ammunition is greater than the
11   profit margin on firearms?
12   A.  Generally -- two classes of ammunition.  One class, they
13   would be higher, that would be our hunting loads, our
14   specialized loads.  And our range ammo and the ammo that we
15   sell in large quantities, the profit margins would be real
16   similar.
17   Q.  I'm trying to establish whether those profit margins for
18   ammunition, regardless of the type of ammunition, are higher --
19   A.  On the average, then, they would be higher.
20   Q.  Higher than for firearms?
21   A.  Higher than firearms on average.
22   Q.  Also higher than magazines?
23   A.  No, lower than magazines.
24   Q.  Okay.  Thank you.  You testified that your store sells
25   firearms over the internet?
```

1   A.  We do not.  Maybe one or two a year.  It's not significant

2   at all.

3   Q.  I didn't ask you about the significance, sir.  Just about

4   the fact of whether your store does or does not.

5   A.  I would sell a gun over the internet.  That is possible.

6   Haven't this year.

7   Q.  Okay.  But when you do so, you use a site like

8   gunbroker.com; is that accurate?

9   A.  Correct.

10  Q.  Or gunsamerica.com?

11  A.  Something similar, uh-huh.

12  Q.  Okay.  I want to talk to you about some of the figures that

13  you gave to the Court on direct exam.  The -- specifically,

14  counsel asked to break down the percentages of gross sales for

15  your company in terms of firearms generally and then certain

16  classes of firearms.  I want to make sure -- go over those and

17  make sure that I understood you correctly.

18        So, rifles account for about 35 percent of your

19  store's gross firearms sales?

20  A.  Correct.

21  Q.  And handguns account for about 40 percent of gross firearm

22  sales?

23  A.  I believe I said earlier today, 50; but I believe 40 is in

24  the depositions, so --

25  Q.  Okay.  So which one do you --

1    *A.*   50 would be more accurate.

2    *Q.*   Okay.

3    *A.*   Because I have looked at my numbers since when I did the

4    depositions.

5    *Q.*   Okay.  So at the time of your deposition, you believed it

6    was 40 percent of gross firearm sales were accounted by

7    handguns, and now you believe it's on 50 percent, based on

8    review of additional information?

9    *A.*   Correct.

10   *Q.*  So using the 50 percent figure, adding that to the

11   35 percent figure for rifles, you'd agree that the remainder is

12   comprised of gross sales of shotguns and revolvers?

13   *A.*   Correct.

14   *Q.*  Okay.  So, talking, then, about the specifically -- oh,

15   just to establish for the record, firearm sales in total

16   account for 60 percent of your store's gross sales for every

17   product that it sells, combined; is that correct?

18   *A.*  About 60 percent of total gross sales, service and retail.

19   *Q.*  Okay.  Does that include the range?

20   *A.*  Yes, ma'am.

21   *Q.*  Okay.  Thank you.

22          So within the category of handguns, you testified that

23   subcompact frames account for about 30 percent of gross handgun

24   sales; is that accurate?

25   *A.*  Yes.

1  Q.  And I believe you also testified that very few firearms

2  that your store sells that fall within the category of

3  subcompact frames are affected by the magazine capacity

4  restriction in Colorado law --

5  A.  Correct.

6  Q.  Was that correct?

7  A.  Correct.

8  Q.  Okay.  And was your testimony that almost no or even none

9  subcompact frame firearms were impacted by the legislation?

10 A.  I don't believe any subcompacts come standard with a

11 magazine that would not -- be non-compliant.

12 Q.  Thank you.  And, then, within the mid-sized or sometimes --

13 sometimes referred to as mid-sized or compact frame firearms, I

14 believe you testified that those account for about 45 percent

15 of gross handgun sales.

16 A.  Correct.

17 Q.  Okay.  I also believe you testified that within that

18 category of mid-sized or compact frames, I believe the words

19 were "very few" are affected by Colorado's magazine capacity

20 restriction law?

21 A.  That is also correct.

22 Q.  So, really, it's the category of large or full-frame

23 handguns that have been most affected by the Colorado's

24 restriction; you would agree?

25 A.  Yes.

1    Q.   Okay.  And of your gross handgun sales, sir, that category

2    of firearm, large or full-frame firearms, account for about

3    25 percent of gross handgun sales?

4    A.   Yes.

5    Q.   Thank you.  Now, sir, you testified about changes in

6    revenue over time, both some circumstances that were occurring

7    in 2012, late 2012, and early 2013, that in your testimony, I

8    believe you thought good for -- good for your sales?

9    A.   In 2000 -- late 2012, early 2013, yes.

10   Q.   And then I believe that your counsel referred to things

11   like the political climate at the time that Colorado's bill was

12   being introduced and -- or bills were being introduced and

13   discussed and debated, that was also a good period for sales?

14   A.   Yes.

15   Q.   Okay.  And it's true that you would agree, then, that the

16   laws at issue in this particular case have increased some sales

17   of guns and accessories to your store, in total.  Not in

18   specific categories, but just generally?

19   A.   In total, up until July, yes.

20   Q.   Okay.  And so that's really what we're trying to focus on

21   now, is the difference between pre-effective date of the

22   magazine restriction and post-effective date of the

23   restriction.

24        So I just want to make sure that I understood your

25   testimony correctly.  You testified that the gains that Rocky

1    Mountain Shooter Supply experienced in gross sales in the six

2    months beginning January 1, 2013, through and including

3    June 30, 2013, those -- first of all, you testified that during

4    that period, you experienced an increase in gross sales; is

5    that accurate?

6    *A.*  That's correct.

7    *Q.*  Okay.  And then you also testified that between the

8    effective date of the law, July 1, 2013, and year end,

9    December 31, 2013, you experienced a decrease in gross sales of

10   everything?

11   *A.*  Gross dollar amount, yes; but not in every category.

12   *Q.*  Okay.  So -- but your testimony is by gross dollar

13   amount -- I'll refer -- am I correct in referring to that as

14   gross sales?  Do we have the same understanding there?

15   *A.*  Yes, as we just described it, gross sales, including

16   service and all retail sales.

17   *Q.*  Includes everything, right?

18   *A.*  Yes.

19   *Q.*  Is it your testimony as you sit here today -- well, first

20   of all, let me back up.  Let me back up.  I need to elicit some

21   different -- some additional testimony before I ask you this

22   question.

23         Rocky Mountain Shooter Supply is on a calendar-year

24   tax basis; is that correct?

25   *A.*  Yes.

1  Q.  And your corporate structure is a limited liability

2  corporation?

3  A.  Yes, ma'am.

4  Q.  Okay.  And as a retailer in Colorado, you are subject to

5  state retail tax; is that correct?

6  A.  Right, uh-huh, yes.

7  Q.  As well as to -- do you have municipal taxes in the

8  location of your store?

9  A.  We have a county tax where I'm located.

10  Q.  Okay.  And your store is located in Fort Collins, Colorado?

11  A.  It's not inside the municipality of Fort Collins.  It's in

12  the County of Larimer.

13  Q.  County of Larimer.  So you have county tax, Larimer County

14  sales tax, and state sales tax; would you agree?

15  A.  Uh-huh.

16  Q.  And those apply to every purchase of any product that your

17  store would sell, with the exception of sales to government

18  entities; is that accurate?

19  A.  And any wholesale sales, if we did those.

20  Q.  Thank you.  So excluding wholesale sales and sales to

21  government entities which are not subject to the sales tax of

22  the county or the state, you're required to pay retail sales

23  tax on any sale of any product; is that correct?

24  A.  That's correct.

25  Q.  Okay.  And to do so, that means that your company files

1  monthly returns with both Larimer County and the state; is that

2  accurate?

3  A.  That's correct.

4  Q.  Okay.  And the year end total of all of those returns would

5  equal your company's gross sales; is that also accurate?

6  A.  Sure.

7  Q.  In addition to these county and state sales tax returns,

8  you also, as a limited liability corporation, are required to

9  file a federal tax return yearly for your company; is that

10  accurate?

11  A.  That is accurate.

12  Q.  Okay.  That would also include your company's gross sales;

13  is that correct?

14  A.  Yes.

15  Q.  Okay.  And it would also include the cost of any inventory?

16  A.  Correct.

17  Q.  It would include certain deductions for expenses of your

18  business?

19  A.  Yes.

20  Q.  Okay.  And it would also have a spot on there for net

21  profit; is that accurate?

22  A.  That is accurate.

23  Q.  Okay.  Because you agree with me, sir -- and I just want to

24  make sure we're on the same page -- that gross sales is not the

25  same thing as net profit?

1   A.  Certainly.

2   Q.  Right.  So when you have gross sales, you have to subtract

3   your total costs for the goods sold; is that accurate?

4   A.  Yes.

5   Q.  Okay.  And then with the difference between those two

6   figures, you, then, have to deduct all of your company's

7   expenses?

8   A.  Correct.

9   Q.  Those are often referred to as overhead?

10  A.  Uh-huh.

11  Q.  Is that right?

12  A.  Yes.

13  Q.  Then once you've deducted the overhead, sir, then that

14  figure that -- the difference, that's your net profit?

15  A.  That is correct.

16  Q.  Okay.  So your -- you agree that 2012 is over.  We've all

17  moved on.

18  A.  I think so, yeah.

19  Q.  Your company would have filed its monthly sales tax returns

20  for every month during 2012, you agree?

21  A.  Yes.

22  Q.  And you have copies of those?

23  A.  Certainly.

24  Q.  Yes.  And your company would have filed its year-end return

25  for 2012, meaning, its federal return?

1    *A.*   Yes.

2    *Q.*   And any state -- is there a state tax on corporations in

3    Colorado?

4    *A.*   Not on an LLC, there is not.

5    *Q.*   Okay.  Thank you.  So just the federal return?

6    *A.*   Just the federal return.

7    *Q.*   You'd also agree with me that 2013 is now over; is that

8    correct?

9    *A.*   It is.

10   *Q.*   Okay.  Your company has filed its 2013 federal income tax

11   return?

12   *A.*   Not yet.

13   *Q.*   Okay.  So you're working on that?

14   *A.*   Got two weeks left.

15   *Q.*   We're counting every day.

16          So -- but you would agree that you're working on that;

17   that's in the works?

18   *A.*   Yes.

19   *Q.*   Okay.  You'd also agree that for every month in 2013, you

20   would have filed with Larimer County and the State of Colorado,

21   state sales tax returns?

22   *A.*   Yes.

23   *Q.*   Okay.  So you -- as you sit here today, sir, you know that

24   your -- you know what your gross sales were for year end 2013.

25   *A.*   Year end 2013.  I think I'm close.  I think I have a number

```
 1  that is close, yes.
 2  Q.  And let's just establish for the record, you haven't
 3  provided any of that to the defendant, have you?
 4  A.  Not for 2013.
 5  Q.  Okay.  Is it your testimony as you sit here today, sir,
 6  that your company's gross sales for all of 2013 was lower than
 7  its gross sales for all of 2012?
 8  A.  No, that is not my testimony.
 9  Q.  And, in fact, it was higher, gross sales --
10  A.  2013, gross sales would be higher than 2012.
11  Q.  Thank you.
12          MS. MORRILL:  May I have one moment, Your Honor?
13          THE COURT:  You may.
14          MS. MORRILL:  Thank you.
15  BY MS. MORRILL:
16  Q.  I want to change topics with you now, sir, and talk to you
17  a little bit about what has and hasn't changed about the way
18  your company works since the large-capacity magazine
19  restriction went into place.  And by large-capacity magazine
20  restriction -- large-capacity magazine, I'm referring to any
21  magazine that holds 16 or more rounds.
22  A.  Okay.
23  Q.  Okay.  So before the restriction went into place, your
24  company sold -- regularly sold magazines that held 15 rounds or
25  less with removable baseplates; is that correct?
```

1    A.    That is correct.

2    Q.    Since the law has gone into effect and the restriction is

3    now law in the state of Colorado, your company has continued to

4    sell 15 round or less magazines with removal baseplates since

5    July 1, 2013?

6    A.    Based on the technical memo from the Governor, yes, ma'am.

7    Q.    Okay.  Before the restriction went into place, your store

8    sold firearms that came standard with magazines that hold 16

9    rounds or more regularly; do you agree?

10   A.    Correct.

11   Q.    Okay.  Since the law has gone into effect, your company

12   continues to sell the same types of firearms, only it does not

13   do so with the factory standard magazine; is that accurate?

14   A.    That is accurate.

15   Q.    I believe you testified that when you're able to obtain a

16   replacement or substitute magazine that is compliant with

17   Colorado's magazine restriction, you offer the firearm for sale

18   to a customer with the compliant magazine; is that accurate?

19   A.    That is accurate.

20   Q.    Okay.  And I just want to be clear that you -- you

21   testified a bit about the difficulty in obtaining compliant

22   magazines.  But I want to be clear that you agree that it's not

23   impossible?

24   A.    Not impossible.

25   Q.    Thank you.  So before the law, your company frequently

```
 1   sold --
 2   A.  Can I go back to --
 3   Q.  Do you need to correct your answer, sir?
 4   A.  Can I go back to my last answer?
 5   Q.  If the purpose is to correct it so it's accurate for the
 6   Court, then please do.
 7   A.  In a given amount of time frame, it can be impossible.  If
 8   I call a manufacturer today, I may not get the magazines I need
 9   today.  If I wait an extended period of time, it will be
10   possible to get that magazine.
11   Q.  Thank you.  I appreciate that.  By impossible, I meant, no
12   such magazines are available, meaning that it's not even
13   possible for you to place the order.
14   A.  With some specific firearms, they do not make a compliant
15   magazine.
16   Q.  So you would agree that that is a narrow subset of firearms
17   that come standard with 16 rounds or more?
18   A.  Sure.  It's a smaller subset for sure.
19   Q.  Okay.  So putting aside that subset, focusing just on the
20   ones where the magazines -- where the manufacturer does in fact
21   produce magazines that are Colorado compliant for that firearm,
22   it is not impossible for you to obtain those magazines to offer
23   your customers?
24   A.  That would be correct.
25   Q.  I believe that you testified you felt that the reason why
```

1   such magazines were sometimes difficult to obtain in any given

2   period is because the demand for such magazines is low?

3   A.  Correct.

4   Q.  But you would agree now that the magazine restriction in

5   Colorado is in place, there is a greater demand by FFLs and

6   customers, alike?

7   A.  By FFLs for sure.  Customers, to a smaller degree.

8   Q.  Okay.  So before the law went into effect, your store sold

9   stand-alone magazines with capacities of 16 rounds or more?

10  A.  Yes.

11  Q.  Since the law went into effect, your company no longer

12  sells those magazines in its Colorado brick and mortar

13  storefront; is that correct?

14  A.  That is correct.

15  Q.  You do, however, still sell those magazines in your Wyoming

16  storefront; is that accurate?

17  A.  We do.  Yes.

18  Q.  And your Wyoming location, sir, is a full-service gun shop;

19  is that accurate?

20  A.  That is also correct.

21  Q.  Meaning that it's not just an outlet that you created for

22  the sole purpose of selling non-compliant large-capacity

23  magazines?

24  A.  That is correct.  We're a full-service shop.

25  Q.  And that full-service shop, the existence of that shop

1 predated Colorado's magazine restriction --

2 A. Did not.

3 Q. Oh, you created -- you opened that store after Colorado?

4 A. That store opened November of 2013.

5 Q. Oh, so right around the time of your deposition?

6 A. Exactly.

7 Q. Okay.  It just wasn't covered, so I had thought it

8 preexisted.  So thank you for clarifying that.

9 And in Wyoming, it is legal to sell large-capacity

10 magazines?

11 A. It is legal in Wyoming.

12 Q. Okay.  You testified that your company sells firearms

13 that -- excuse me if my lingo is not correct -- but AR-15

14 platform firearms?

15 A. Yes, we do.

16 Q. Okay.  As well as AK-47 platform firearms?

17 A. We do, yes.

18 Q. And prior to the magazine restriction in Colorado going

19 into effect, your company would sell the AR-15 and AK-47

20 firearms with large-capacity magazines?

21 A. Yes.

22 Q. Because those firearms come standard from the manufacturer

23 with such magazines?

24 A. Exactly.

25 Q. Okay.  After the law has been in effect, you've continued

 1 | to sell both AR-15 and AK-47 platform firearms?

 2 | *A.* Yes.

 3 | *Q.* The only difference is that you sell them without the

 4 | factory standard magazine?

 5 | *A.* Correct.

 6 | *Q.* Okay. And when available, you include a Colorado compliant

 7 | magazine?

 8 | *A.* That is correct.

 9 | *Q.* Thank you.

10 |        I have no further questions, Your Honor.

11 |        *THE COURT:* Thank you.

12 |        Redirect.

13 | **REDIRECT EXAMINATION**

14 | *BY MR. COLIN:*

15 | *Q.* Very briefly. Ms. Morrill asked you a question in which

16 | she characterized a magazine as an accessory, and you responded

17 | to the question, it didn't involve that characterization. Do

18 | you believe that a magazine is an accessory?

19 | *A.* No, sir.

20 | *Q.* What do you believe a magazine to be?

21 | *A.* It's an integral part of the gun. It -- without it, the

22 | gun is invalid.

23 | *Q.* Thank you. The last series of questions you were asked,

24 | you were asked by Ms. Morrill if you -- if Rocky Mountain

25 | Shooter Supply continued to sell AR and AK-47 platform

 1 | firearms, and you responded that you do?

 2 | A.  We do.

 3 | Q.  Do you sell as many now as you did before July 1 of 2013?

 4 | A.  No, sir.

 5 | Q.  And what would you estimate the decline of sales of those

 6 | two particular firearms to be?

 7 | A.  We're at about 30 percent of volume than we were prior.

 8 |         MR. COLIN:  Thank you.  Nothing else.

 9 |         THE COURT:  Thank you.

10 |         Can this witness step down and be excused?

11 |         MR. COLIN:  I would ask that he be excused.

12 |         MS. MORRILL:  No objection.

13 |         THE COURT:  Thank you, sir.

14 |         You may step down.  You are excused.

15 |         Please call your next witness.

16 |         MR. COLIN:  Thank you.  John Burrud.

17 |         THE COURT:  Please step up and be sworn.

18 |            (**JOHN BURRUD, PLAINTIFFS' WITNESS, SWORN**)

19 |         COURTROOM DEPUTY:  Please be seated.

20 |         Please state your name and spell your first and last

21 | name for the record.

22 |         THE WITNESS:  John Burrud, J-O-H-N, B-U-R-R-U-D.

23 |                        **DIRECT EXAMINATION**

24 | BY MR. COLIN:

25 | Q.  Good morning, Mr. Burrud.

```
 1  A.  Good morning, Mark.

 2           THE COURT:  Sir, in this courtroom we refer to people

 3  by their formal names, not by first names.

 4           THE WITNESS:  Yes, ma'am.

 5           Good morning.

 6  BY MR. COLIN:

 7  Q.  Are you a Colorado resident, sir?

 8  A.  Yes, I am.

 9  Q.  What do you do for a living?

10  A.  I own a gun store in Loveland.

11  Q.  What gun store is that?

12  A.  Jensen Arms.

13  Q.  Can you describe the kind of business in which Jensen Arms

14  is engaged.

15  A.  Selling of firearms and accessories.

16  Q.  Do you have any other operations associated with your

17  business, such as the operation of a range facility?

18  A.  No, sir.

19  Q.  You're a retail store, essentially?

20  A.  Yes.

21  Q.  Can you describe the kind of firearms and accessories that

22  Jensen emphasizes.

23  A.  Well, Jensen Arms is more of a tactical store.  We sell

24  guns to a lot of law enforcement, military, and civilians that

25  are looking for more tactical style guns.
```

1    *Q.*  What's a tactical style?

2    *A.*  Well, tactical style of gun would be guns that are, like,

3    ARs, higher-capacity guns.  A higher-capacity gun would give

4    you a tactical advantage.

5    *Q.*  Does Jensen advertise itself as such?

6    *A.*  I believe we do, yes.

7    *Q.*  Okay.  Well, let's move on to the question that might

8    answer that.  Is Jensen a for-profit corporation?

9    *A.*  Yes, it is.

10   *Q.*  Do you have any other owners or partners or principals in

11   Jensen Arms other than yourself?

12   *A.*  No, I do not.

13   *Q.*  What are your duties and responsibilities as associated

14   with the business operations of Jensen Arms?

15   *A.*  Well, I manage the company.  I oversee the buying of pretty

16   much everything in the store.  I have buyers, but I oversee

17   what they do.  I have really terrific staff, that I oversee

18   them as well.  I'm also trying to look toward the future of the

19   company and build it, to increase our profits, of course.  And

20   that's about it.

21   *Q.*  Are you engaged -- do you oversee or participate in the

22   management of the day-to-day financial operations?

23   *A.*  Yes, I do.

24   *Q.*  Do you keep the books?

25   *A.*  I do not keep the books.  I have a bookkeeper that does

1    that, yes.

2    Q.  Okay.  Are you involved in the bookkeeping aspects of

3    Jensen Arms?  Do you keep track of your inventory, what you

4    sell?

5    A.  I do, yes.

6    Q.  I think you said that Jensen Arms is a brick and mortar

7    store?

8    A.  Yes, it is.

9    Q.  And it's located where?

10   A.  285 East 29th Street in Loveland, Colorado.

11   Q.  Is the entirety of all of Jensen Arms' assets located

12   within Colorado?

13   A.  No.  There are some assets located in Wyoming in an outlet.

14   Q.  Describe what's in Wyoming that is associated with Jensen

15   Arms.

16   A.  Higher-capacity magazines, some optics, some slings, some

17   accessories.

18   Q.  Do you have a brick and mortar store up there?

19   A.  No.

20   Q.  What do you have?

21   A.  My general manager, his uncle has a barn up there, so it's

22   basically inside his barn.

23   Q.  So explain how this business operation works.

24   A.  Well, every first and third Saturday, Michael Rigg goes up,

25   and we open our store.  It's got specific hours.  We post that.

1   And he sells -- I believe it's from 9:00 to 3:00 or 9:00 to

2   4:00, something like that.

3   Q.  I'm sorry, you said it's magazines?

4   A.  Magazines, some optics, some other accessories.

5   Q.  Is there a cost associated with running this Wyoming outlet

6   out of a barn to Jensen?

7   A.  Yes, there is.

8   Q.  Okay.  Probably not a lot of rent; is that fair to say?

9   A.  Not a lot of rent, no.

10  Q.  Okay.

11  A.  But, of course, there is getting the material up there and

12  back.  We've had to install heaters.  It's quite cold there in

13  the barn.  And a porta-potty.  And then there is staffing it

14  the first and third Saturday of the month.

15  Q.  All right.  What -- why did you open up a Wyoming outlet

16  barn?

17  A.  Well, we have a lot of magazines that we can't sell here in

18  Colorado, so that was the main reason.

19  Q.  All right.  Does Jensen do a significant amount of business

20  over the internet?

21  A.  It is fairly significant.  It's probably about 10 percent

22  of our business.

23  Q.  Does Jensen receive firearms from out-of-state firearms

24  dealers for sale to Colorado customers?

25  A.  Yes, we do.

1    *Q.* And does Jensen perform background checks for those sales?

2    *A.* Yes, we do.

3    *Q.* How does the process of performing background checks for

4    sales for out-of-state FFLs selling to a Colorado customer

5    compare to Jensen's Arm's process for selling a firearm out of

6    its inventory to a retail customer who comes into Loveland?

7    *A.* The actual process with regards to the 4473 and taking it

8    into our bound books, or the entire process?

9    *Q.* The entire process.

10    *A.* There is lots of negotiating back and forth. We do this

11    mostly on Gun Broker. And then once the person accepts to buy

12    the gun, we have to make sure that it is in stock. Once it's

13    in stock, we inform them that they've got the gun. And then

14    it's shipped from the FFL to our FFL. And then the process

15    from that point on is fairly identical to receiving guns from a

16    manufacturer, dealer.

17    *Q.* Would you just briefly describe that process. I think

18    we've got a fairly good familiarity.

19    *A.* Yes. The gun comes into the store, it's received, put into

20    our books, serial numbers are checked, we call the customer,

21    let him know that we have received the gun and he can come down

22    and pick it up. He comes down, fills out a 4473. If it is

23    approved and passed, then he can take his gun, pay the fee that

24    we charge and CBI background fee, and then it's taken out of

25    our book. It's --

1   Q.  Okay.  Is there a charge that Jensen Arms imposes for the

2   work that you've just described?

3   A.  There is a $25 processing fee, an initial $10, which is for

4   the CBI background check.

5   Q.  Has this changed since 2013?

6   A.  No, sir.

7   Q.  Do you offer customers who come into your story a discount

8   on the $25 fee?

9   A.  Yes, sir.  We have a policy, whereby, if they come into the

10  store and they spend $75 on anything else in the store, we will

11  waive the $25 fee.

12  Q.  Do you also waive the $10 fee?

13  A.  No, sir.

14  Q.  Why not?

15  A.  That's a fee that goes directly to CBI, pass-through fee.

16  Q.  Has Jensen Arms done background checks for private

17  transfers since July 1, 2013?

18  A.  No, sir.

19  Q.  Why not?

20  A.  Well, because there is costs associated with that and the

21  risks.

22  Q.  Explain your answer, please.

23  A.  Well, there is costs associated with that, what I've just

24  outlined, taking the gun in, we have to receive the gun, check

25  the gun's serial number, if it is going into our bound book,

1   when the customer would come in, we would have to go through

2   the 4473.  And then once they would get the gun, it would have

3   to go out the other side of our bound book.  And on top of

4   that, there is overhead, our insurance, everything else.

5   Q.  Any risks that you are concerned about?

6   A.  Yeah, I believe there are risks.  I believe there is

7   administrative liabilities.  If I mess up on the 4473 or my

8   clerk does, there could be ramifications, which could include

9   taking my FFL away.  There could also be criminal prosecution.

10  Q.  Okay.  You said Jensen was a for-profit enterprise; is that

11  correct?

12  A.  That is correct.

13  Q.  At least hopefully?

14  A.  Trying to be.

15  Q.  How does it make money?  What are your profit centers?

16  A.  Our three main profit centers would be the sale of

17  firearms, first, foremost; the second would be firearm

18  components, which would be ammunition and magazines; and, then,

19  the third would be accessories.  This would be scopes and bags

20  and cleaning kits, holsters.

21  Q.  Prior to July 1 of 2013, did Jensen Arms offer for sale

22  magazines with a capacity of greater than 15 rounds?

23  A.  Yes, we did.

24  Q.  Can you estimate for us in the year prior to July 1 of

25  2013, when the magazine restriction went into effect, what

1   portion of Jensen's gross revenues came from magazine sales?

2           *MS. MORRILL:*  Objection, foundation.

3           *THE COURT:*  Response.

4           *MR. COLIN:*  I'm sorry?

5           *THE COURT:*  Response.

6           *MR. COLIN:*  I apologize.

7           Once again, this witness has testified that he is the

8   operations manager for Jensen Arms, that he's the one who

9   purchases the firearms, magazines, who keeps track of the

10  inventory, and sells them.  I think that's an adequate

11  foundation for his testimony regarding the gross revenues for

12  magazine sales.

13          *THE COURT:*  Thank you.

14          What is deficient in this foundational showing?

15          *MS. MORRILL:*  I believe that the witness testified

16  that he has buyers and other staff who actually do and that he

17  just oversees them.  But I didn't hear testimony about whether

18  he is conversant in the end results or the products.

19          Does he review the actual numbers?

20          *THE COURT:*  Mr. Colin.

21          *MR. COLIN:*  I'd be happy to follow up, Your Honor.

22          *THE COURT:*  Okay.

23  *BY MR. COLIN:*

24  *Q.*  As the operations manager and owner of Jensen Arms, do you

25  have any knowledge regarding the annual gross sales and the

1    sources from which those gross sales are derived?

2    A.   Yes.  I review all of the purchases and approve them.

3    Q.   In addition to the purchases, meaning -- you're referring

4    to the acquisition of firearms, components, and magazines?

5    A.   That is correct.

6    Q.   All right.  Do you also keep track of the sales associated

7    with those firearms and magazines?

8    A.   Yes, I do.

9    Q.   And can you describe your role in that part of the

10   operation, business operations of Jensen Arms, please.

11   A.   Well, I converse with my business affairs VP.  This would

12   be Bree Low, and bookkeeper, and we look at all of our sales,

13   because we have to manage volume versus cost.  So that's almost

14   a daily process with us.

15   Q.   And do you keep track of those figures monthly and annually

16   as well?

17   A.   Yes.

18   Q.   Do you have personal knowledge of the gross annual revenue

19   of Jensen Arms?

20   A.   Yes.

21   Q.   Since you've owned it?

22   A.   Yes.

23   Q.   So the year prior to the magazine restriction going into

24   effect, can you estimate what portion of Jensen Arms' gross

25   revenues came from magazine sales, please?

 1  *A.*  I would say approximately 10 percent.

 2  *Q.*  Now, does that figure include the sale of magazines with a

 3  of greater than 15 as well as less than 15?

 4  *A.*  I'm sorry, I misunderstood.  It would probably be closer to

 5  15 percent, if you included lower than 15 and higher than 16.

 6  *Q.*  All right.  Explain your answer.

 7  *A.*  So between 10 and 15.  About, I'd say, 5 to 7 percent would

 8  be the lower than 15 magazines, and probably 8 to 10 percent

 9  would be the higher than 16 magazines.

10  *Q.*  Thank you.  Does Jensen Arms continue to offer for sale

11  magazines with a capacity of more than 15 rounds?

12  *A.*  No, sir.

13  *Q.*  Are there --

14  *A.*  With the exception of law enforcement and active military.

15  *Q.*  And my understanding is, you testified that that was --

16  those two, the law enforcement community and the military

17  community, were targeted customers for Jensen Arms?

18  *A.*  Correct.

19  *Q.*  So have your sales of magazines with a capacity greater

20  than 15 rounds declined since July 1 of 2013, in light of the

21  fact that you still continue to sell to law enforcement and the

22  military?

23  *A.*  Yes, because, while, law enforcement and military are some

24  of our prime customers, the civilians were the ones that bought

25  most of those.

1   Q.   Okay.  So after July 1 of 2013, was Jensen Arms left with

2   an inventory of magazines that it couldn't sell any longer, in

3   the state of Colorado?

4   A.   Yes.  Thousands of them.

5   Q.   What have you done with those magazines?

6   A.   Well, the majority of those magazines have gone to our

7   Wyoming outlet.  There is a portion of magazines that we've

8   kept inside the store for internet sales, law enforcement, and

9   active military sales within the state of Colorado and outside,

10  with regards to the internet.

11  Q.   After July 1 of 2013, did you attempt to ascertain by

12  conducting an inventory the number of magazines with the

13  capacity greater than 15 rounds that you needed to transfer up

14  to Wyoming or get rid of some other way?

15  A.   Yes.  In fact, in -- in an interrogatory question that we

16  were posed by the Governor, we had to provide a list of both

17  magazines that were 15 and lower rounds and magazines that were

18  16 and higher rounds.

19  Q.   And were you involved in the preparation of that list?

20  A.   I was.

21  Q.   If you could please hand the witness Exhibit Notebook No.

22  5.

23          COURTROOM DEPUTY:  I believe he has it.

24          THE WITNESS:  It is 5, yes.

25  BY MR. COLIN:

1   Q.  If you could turn, please, to tab 88.

2   A.  Yes.

3   Q.  Do you recognize that document?

4   A.  I do.

5   Q.  What is it?

6   A.  It is a list of magazines currently, as of July 1, those

7   magazines of 16 rounds and more that were in our inventory.

8   Q.  How was it prepared?

9   A.  It was prepared by actually going through orders and then

10  going through actually invoices from distributors,

11  manufacturers, and then double-checking that with canceled

12  checks that paid those inventories.  There was also an eyeball

13  inventory too.

14  Q.  So you conducted both a -- an economic valuation based upon

15  statistics as well as a physical inventory of all the magazines

16  in Jensen Arms' possession?

17  A.  That is correct.

18  Q.  Does Exhibit 88 represent a physical listing of all the

19  magazines in Jensen Arms' possession which were rendered

20  non-compliant on July 1, 2013, including the dates of

21  acquisition of those magazines, the cost, essentially, every

22  piece of information that relates to the acquisition and sale

23  of those magazines, if they were sold?

24  A.  Yes, it does.

25          MR. COLIN:  Offer Exhibit 88.

 1          THE COURT:  Voir dire or objection?

 2          MS. MORRILL:  Objection, Your Honor.  Exhibit 88

 3   violates Rule of Evidence 1006, in that the underlying data

 4   from which the summary was created has not been provided to the

 5   defendant at any time prior to today.  That would include the

 6   orders and canceled checks that the witness clearly just

 7   testified to having referred to in creating this summary.  We

 8   have not seen any of that.

 9          Additionally, I will represent to the Court that in an

10   effort to, essentially, do our own analysis of the -- this

11   exact issue, we did issue discovery requests to this plaintiff

12   and asked to identify certain information which is not

13   included, which, you know, makes the reliability of this

14   summary highly questionable, including which is -- we asked for

15   both whole wholesale and retail price --

16          THE COURT:  Counsel, I'm not interested in what you

17   asked for in discovery.

18          MS. MORRILL:  I'm just representing that we didn't

19   receive it.

20          THE COURT:  I'm not interested.  What I am interested

21   in is whether or not the documents upon which this summary was

22   based were supplied.

23          MR. COLIN:  The checks were not supplied, Your Honor.

24   This is a -- this is an inventory -- this is reflective of a

25   hand -- I guess I'm not quite sure how to describe it.

1    Mr. Burrud and his employee did a visual hand-prepared

2    inventory by examining each item in the possession of Jensen

3    Arms after July 1; and this is a reflection of that hand-made

4    inventory list.  The fact that they also compared it to other

5    information to verify its accuracy doesn't render the fact that

6    this hand-held list that was prepared by -- hand-prepared list

7    that was prepared by Mr. Burrud and his bookkeeper is

8    insufficient to establish the appropriate foundation for its

9    introduction.

10           THE COURT:  All right.  Well, the -- the handgun

11   inventory probably covers columns 1, 2, 3, and 4.  Columns 5

12   and 6 probably are not a function of a hand-conducted

13   inventory.

14           MR. COLIN:  I think that's right, Your Honor.

15           THE COURT:  Okay.  So as to columns 5 and 6, what was

16   the source documentation?

17           MR. COLIN:  I can ask the witness, but I suspect it's

18   exactly those documents to which we referred.

19           THE COURT:  Mr. Burrud, what was the source

20   documentation for columns 5 and 6 on Exhibit 88?

21           THE WITNESS:  The invoices and the canceled checks,

22   Your Honor.

23           THE COURT:  Okay.  The invoices, meaning the invoices

24   for purchase of these particular items?

25           THE WITNESS:  Yes, the invoices from the manufacturers

 1    and the dealers for purchase of these magazines.

 2              THE COURT:  Okay.  And the canceled checks were whose

 3    canceled checks?

 4              THE WITNESS:  Canceled checks that we made out to the

 5    manufacturer and the dealers to purchase these.

 6              THE COURT:  And why did you look at the canceled

 7    checks?

 8              THE WITNESS:  To make sure that the invoices were all

 9    paid.

10              THE COURT:  All right.

11         Let me ask counsel for the State, did you have a copy

12    of the invoices?

13              MS. MORRILL:  No, Your Honor.

14         MR. COLIN:  That's correct, she does not have copies

15    of either the invoices or canceled checks.  I would move to

16    strike columns 5 and 6 for this exhibit, and I can prepare a

17    substitution exhibit over the lunch hour.

18              THE COURT:  All right.  Does that take care of your

19    problem?

20              MS. MORRILL:  In part -- in large part, Your Honor.

21    We did also ask for the date of acquisition of the actual

22    product itself.  And, again, not having looked at the invoices

23    from the -- we didn't receive the invoices or the canceled

24    checks, we don't know whether these -- the date in column 1 is

25    a reflection of when the product was ordered by Jensen Arms or

1    when it was received by Jensen Arms.  We just can't ascertain

2    that.  And --

3         *THE COURT:*  Well, that's a discovery issue that should

4    have been dealt with long before trial.  And if it wasn't dealt

5    with, it's waived.

6         *MS. MORRILL:*  I understand that, Your Honor.  But the

7    basis of the objection on that for this is that, in order to --

8    there has been testimony that there are invoices that would

9    show that information.  And under Rule 1006, regardless of

10   whether it's been requested or not, the plaintiff or the

11   person -- the party proffering a 1006 exhibit is required to

12   disclose all underlying data.

13        I will represent to the Court, just by virtue of this

14   exhibit, this was prepared for litigation.  It is not a summary

15   of business records as they exist in original form at Jensen

16   Arms, to my understanding.

17        *THE COURT:*  Your requests deal with discovery issues,

18   not admissibility issues.  It is not the obligation of the

19   party to come forward with all information that you may believe

20   may be pertinent to this.  It is, however, the obligation of

21   the party to supply to you all of the underlying documents that

22   were used for the preparation of the summary.

23        My understanding, based on what has just been

24   represented, is that some of those documents that were used for

25   the preparation of this summary were not supplied to you.  And,

 1 | therefore, the portions of the summary exhibit that are based

 2 | on those documents will not be considered by the Court.  There

 3 | will be a redacted exhibit that will be supplied.  Otherwise,

 4 | your objection is overruled.

 5 |        *MS. MORRILL:*  May I just inform the Court that no

 6 | documents underlying this summary were provided to us, none.

 7 | No actual business records of Jensen Arms were disclosed,

 8 | whether --

 9 |        *THE COURT:*  I understand that.  The representation has

10 | been made that the summary was prepared in columns 1, 2, 3, and

11 | 4 from physical inspection, not from documents.  Therefore,

12 | nothing was required to be supplied to you.

13 |        *MR. COLIN:*  Thank you.

14 |        *THE COURT:*  Now, that does leave open the other

15 | summary that you all were going to address over the morning

16 | recess, and I haven't heard --

17 |        *MR. COLIN:*  I didn't -- I thought I had the discovery

18 | here with me.  If I could have leave to look at it over the

19 | lunch hour, my office is a block away, I'll pull that

20 | information and advise the Court --

21 |        *THE COURT:*  Okay.  So you haven't had a chance to?

22 |        *MR. COLIN:*  No.  I haven't had a chance to get to my

23 | office once I realized I didn't have the document here.

24 |        *THE COURT:*  Okay.  And please tender a corrected

25 | exhibit --

1           MR. COLIN:  I will do that --

2           THE COURT:  -- for 88.  88 is received in a corrected

3    form that excludes the last two columns.

4           (Exhibit 88 admitted.)

5           MR. COLIN:  Thank you.  We'll take care of that at

6    lunch.

7           THE COURT:  Thank you.

8    BY MR. COLIN:

9    Q.  So are the magazines identified in Exhibit 88 in this barn

10   in Wyoming at this point?

11   A.  The majority of them.

12   Q.  And have you been able to sell a substantial number of

13   these magazines out of your Wyoming barn outlet?

14   A.  We have not.

15   Q.  Can you estimate the percentage or the current estimate of

16   total number of 16-plus magazines that remain in Jensen's

17   inventory?

18   A.  Probably about 85, 90 percent.

19   Q.  85, 90 percent of those that have been there since July 1

20   of 2013?

21   A.  Yes, that is correct.

22   Q.  All right.  Are there particular kinds of magazines that

23   you have in your possession that previously used to be top

24   sellers that you can't get rid of at this point?

25   A.  Yes.  I have AK-47 magazines, 30-round magazines, that are

1    huge sellers.  In fact, with regards to the invasion of the

2    Ukraine, most of these Russian-made AK magazines have come from

3    the Ukraine.  They're shipped from the Ukraine.  They would be

4    a hot item if they were in our store, but they're not.  They're

5    up in Wyoming.

6    Q.  Do you sell magazines to out-of-state purchasers -- I'm

7    sorry.  Does Jensen sell magazines to out-of-state purchasers

8    via the internet?

9    A.  Yes.

10   Q.  How has that been going?

11   A.  It's slow, because I'm -- I'm competing with big, high-end

12   internet sales companies that have very little overhead, they

13   don't have a brick and mortar store, and they can undercut me

14   in prices.

15   Q.  Prior to July 1, 2013, did Jensen customers regularly

16   purchase magazines with a capacity greater than 15 rounds?

17   A.  Yes, they did.

18   Q.  For what types of firearms?

19   A.  Numerous firearms.  Semiautomatic pistols, carbines, all of

20   the AK platforms, all of the AR-15 platforms, all of the AR-10

21   platforms, M1A platforms.

22   Q.  Focusing on the firearms, can you estimate the percentage

23   of Jensen's business before July 1 of 2013 that related to

24   firearms designed for use with magazines with a capacity of

25   more than 15 rounds?

1    *A.*   Let's see, that -- probably 30 percent, 35 percent.

2    *Q.*   And has that trend continued after July 1 of 2013?

3    *A.*   No.

4    *Q.*   In what way has it changed?

5    *A.*   Well, it's changed because now that people cannot get the

6    firearms with their higher-capacity magazines, they find other

7    places to get it.

8    *Q.*   Well, do you know what I'm referring to when I use the term

9    compatible compliant magazine?

10   *A.*   Yes.

11   *Q.*   And what do you understand that reference to mean?

12   *A.*   That it's compliant to the new bill that's been passed.

13   *Q.*   And what about the compatible part?

14   *A.*   Maybe you should explain that to me.

15   *Q.*   All right. When we're -- when I'm asking you questions

16   about a compatible compliant magazine, my use of "compatible"

17   refers in my subsequent questions to whether it actually fits

18   in a gun.

19   *A.*   Okay.

20   *Q.*   So if it's -- is there a magazine available that is

21   compatible with an AR platform, for example; meaning, can you

22   get a lower -- 15 round or lower magazine to fit in a

23   particular gun?

24   *A.*   I understand.

25   *Q.*   Okay. That's what I mean by compatible compliant. Has

 1  there been a general trend in Jensen Arms' business since

 2  July 1 of 2013 relating to the sale of compatible compliant

 3  magazines, meaning, can you get them?  Are they selling?

 4  *A.*  There are certain guns that they make no magazine that will

 5  fit in it.  That would be the FN 5.7, which takes a 20-round

 6  magazine.  There is no option for that.  There is a Kel-Tec

 7  PMR-30, which is a .22 magnum, that takes a 30-round magazine.

 8  There is no compliant magazine for that.  There is several SKUs

 9  or models of the Springfield XDM line.  There is several SKUs,

10  models of the CZs.  There is a Sig Sauer TacOps 226 that takes

11  a 20-round magazine.

12  *Q.*  Let me make sure I understand what you just said.  Are

13  those magazines for -- are those firearms for which no

14  compatible compliant magazines are being manufactured at all?

15  *A.*  That is correct.

16  *Q.*  Are there other firearms for which compatible compliant

17  magazines are unavailable?

18  *A.*  Yes, there are.

19  *Q.*  Can you describe those, please.

20  *A.*  Well, because of the California and several other states,

21  there are magazines that are compliant.  They're usually ten

22  rounds.  They're made for Glocks, the Smith & Wesson M&Ps, some

23  SKUs of the Springfields, ARs, AR-10s, and M1As, there are some

24  smaller capacity compliant magazines.

25  *Q.*  So there -- they are being manufactured?

1  │ *A.* They are, yes.

2  │ *Q.* What has your success been in attempting to acquire those

3  │ magazines?

4  │ *A.* Well, because they're only being made for a limited market,

5  │ it's very difficult to find them.  They're back ordered.

6  │         I'll give you an example.  M&P has had some issues

7  │ with their trigger system on their gun.  There has been some

8  │ recalls.  Because of that, they put all of their manufacturing

9  │ into fixing that issue.  And their manufacturer isn't making

10 │ compatible magazines, they're making standard magazines.  So

11 │ it's nearly impossible to find those.

12 │ *Q.* Thanks for the example, that helps.

13 │         So you listed a number of different firearms for which

14 │ you cannot and Jensen Arms cannot obtain compatible compliant

15 │ magazines, either because they're not being made, or there

16 │ simply not enough to go around?

17 │ *A.* That's correct.

18 │ *Q.* Fair?  You also listed the firearms with which those

19 │ magazines are associated, correct?

20 │ *A.* That is correct, yes.

21 │ *Q.* Has the unavailability of compatible compliant magazines

22 │ had an effect on Jensen's sale of the associated firearm?

23 │ *A.* Yes.  I can't sell guns that don't have a compatible

24 │ magazine to fit it.

25 │ *Q.* Can you estimate the reduction in sales experienced by

 1  Jensen Arms as a result of the unavailability, either because

 2  they're not being made or they're not available, of Colorado

 3  compatible compliant magazines?

 4  *A.*  Well, I can tell you that our business is off about

 5  50 percent.  And I would associate about 30 percent of that to

 6  this issue, this specific issue, because we are a tactical

 7  store.  People come in specifically looking for those.

 8  *Q.*  To what other issues do you associate the other 20 percent

 9  reduction?

10  *A.*  Well, I think if people aren't buying those guns, then

11  they're not buying the accessories that go along with those

12  guns.

13  *Q.*  Prior to July 1 of 2013, can you describe generally the

14  popularity of these firearms for which you cannot find

15  compliant compatible magazines.

16  *A.*  Many of them were hugely popular.  In fact, many of these

17  guns, I couldn't keep on the shelf.  In some cases, within the

18  AR platforms, we'd get seven guns in, and we'd get sixty

19  customers in the store wanting those.  So we'd have to do,

20  like, a lottery.  I mean, it was crazy.

21  *Q.*  Jensen orders firearms in advance of their delivery; is

22  that fair?

23  *A.*  That is correct.

24  *Q.*  When does Jensen typically order its firearms?

25  *A.*  Well, the biggest -- the biggest time -- we were ordering

 1  firearms year long, but the biggest time would be September

 2  through January.  September, and then it culminates, January is

 3  the shot show, one of the biggest buying shows in the gun

 4  industry.

 5  Q.  And are the firearms that you order in September, November

 6  generally delivered shortly thereafter?

 7  A.  Sometimes it takes months, even a year.  I just got

 8  delivery of a group of LMT AR-platform guns that were ordered

 9  from the last shot show.

10  Q.  How long ago was that?

11  A.  2012.

12  Q.  All right.  And those fit into the category of firearms you

13  can't sell anymore?

14  A.  I can't sell them with the current magazines that they

15  have, yes.

16  Q.  Okay.  So what do you do?  You now have all of these -- I

17  assume they're pretty expensive.

18  A.  Yes, they are.

19  Q.  All right.  So you now have received a bunch of expensive

20  semiautomatic firearms that you ordered a year and a half ago,

21  almost, that come with magazines that are illegal in this

22  state.

23  A.  Correct.  They come with a standard 30-round magazine.

24  Q.  What do you do with that?  I mean, how do you deal with

25  that situation?

 1   *A.*  Well, the only thing we can do is, we remove the magazine

 2   from the box, and we try and find a replacement magazine.  In

 3   fact, I thought that now, with the law going into effect, I

 4   would be able to order several cases of ten-round magazines

 5   from Magpul, a manufacturer of the magazines.  And I've bought

 6   those magazines, and they're still sitting on my shelf.  So I'm

 7   relegated to simply giving those magazines away when I have to

 8   take a magazine -- a 30-round magazine out of a box.  So A

 9   customer guys buys a gun, and that is their replacement

10   magazine.

11   *Q.*  And you don't charge for the fact that you're giving them a

12   compatible compliant magazine?

13   *A.*  No.  Because I'm actually taking something away and trying

14   to give something back.

15   *Q.*  All right.  So let's talk about that -- the magazine that

16   you take away.  You take away the 30-round magazine out of

17   these firearms that were just delivered recently to Jensen

18   Arms.  What do you do with those extra -- those

19   high-capacity -- or the magazines that come with these

20   30-round -- these guns that are designed to be shot with

21   30-round magazines, what --

22   *A.*  Most of those go up to our Wyoming location.

23   *Q.*  Okay.  So this dead inventory that you had as of July 1,

24   2013, has actually been increasing, because you keep getting

25   guns that you can't sell with the magazines, and those get

1   shipped up to the barn?

2   A.  Yes.

3   Q.  Okay.  Have you asked the manufacturers of these firearms

4   that you ordered for the -- the ones you were just talking

5   about, for example, did you ask them, hey, look, I know I

6   ordered these firearms back in 2012, but I can't sell them with

7   the magazines that you're going to deliver them with.  Can you

8   deliver them with lower-capacity compatible magazines?

9   A.  Yes.

10  Q.  With what result?

11  A.  In most cases, they will not accept return of the magazines

12  or the guns or --

13  Q.  Has that resulted in a loss of revenue to Jensen?

14  A.  Yes, it has.  In fact, Smith & Wesson makes an M&P 9

15  millimeter.  We ordered several of these long before the July 1

16  cut -- break, and we received I think over a dozen of them

17  literally days before this break -- when the law went into

18  effect, rather.  And then we received another 20 of these guns

19  two or three days after the law went into effect.  We called

20  Smith & Wesson, asking them to return the guns because we

21  couldn't sell them, and they basically refused.

22  Q.  You listed a number of firearms for which you cannot find

23  compatible compliant magazines -- Jensen cannot find compatible

24  compliant magazines.  Can you describe whether or not those --

25  the firearms for which you cannot find compatible magazines

1    that are compliant in Colorado's law, can you tell us whether

2    or not those were big sellers for Jensen before July 1?

3    A.  They're huge sellers.  People would give their hind teeth

4    to find one of these PMR-30s.  It's a .22 mag.  It's highly

5    sought after.  The SKUs -- or models, rather, in the CZ line

6    are some of the top selling SKUs.  And the SKUs -- or the

7    models in the Springfield XDM is the top sellers, as is the FN

8    5.7.

9    Q.  So Jensen can't sell, and your customers can't buy them?

10   A.  That's correct.  Not in the state of Colorado.

11   Q.  Do you continue to have such firearms in your inventory?

12   A.  Yes.

13   Q.  Are you able to sell them?

14   A.  It's very slow going.

15   Q.  Why?

16   A.  Because I can't -- I'm a brick and mortar store, as I said.

17   I can't sell them in the state of Colorado.  I have some law

18   enforcement -- specific to law enforcement models that I can

19   sell; but other than that, the civilian versions of those are

20   impossible to sell, except on the internet.  And, again, I'm

21   fighting with these huge internet companies that don't have the

22   same overhead I do; so they undercut me in prices.

23   Q.  Let's talk about when you acquired Jensen.

24   A.  Yes.

25   Q.  Lucky guy.  When did you buy Jensen Arms?

1    *A.*  I bought Jensen Arms in November of 2012.

2    *Q.*  So right before all of this happened?

3    *A.*  Yes.

4    *Q.*  Did Jensen actually receive a boon or a benefit in its

5    sales as a result of the political climate?

6    *A.*  Yes, I think so.

7    *Q.*  Describe that, please.

8    *A.*  Well, right after I bought it, Obama was reelected.  That

9    usually spurs gun sales.  And shortly thereafter, Sandy Hook, a

10    terrible tragedy, took place.  And there was national talks

11    about gun restrictions, gun bans, magazine bans.  And then the

12    state of Colorado started talking about magazine bans.  So I

13    think that spurred a lot of the public to go out and buy stuff

14    before they were banned.

15    *Q.*  All right.  And based upon -- I assume you reviewed the

16    economics of Jensen Arms before you purchased it?

17    *A.*  I did.

18    *Q.*  Would it be fair to say that in the six months after you

19    purchased Jensen Arms, there was a significant increase in the

20    gross sales, as compared to the previous year?

21    *A.*  In some months, significant.  In other months, it was about

22    average for what Jensen does.  Because, you remember, those

23    months, November, December, January, February, March, up until

24    the summer, are the really the highest months, come in.

25    *Q.*  And those months in the end of 2012, the beginning of 2013

 1 │ were even higher than previous years; is that correct?

 2 │ A.  That's correct.  January was especially -- I think January

 3 │ and February were especially high.

 4 │ Q.  So you were happy for at least a short period of time.

 5 │ A.  I was very happy.

 6 │ Q.  All right.  What happened after July 1?

 7 │ A.  Things dropped almost 50 percent.  And I was told by my --

 8 │ I'm nervous, I'm pretty worried about things.  I put my life

 9 │ savings into this company.  I borrowed on my home.  And I

10 │ expressed my concern to other employees.  Many of these

11 │ employees had worked for Bob Jensen.  They had been there for

12 │ many years.  And they said, oh, well, things start to pick up

13 │ in September, October, and then by November, December, you're

14 │ right back where it was, and that didn't happen.

15 │ Q.  Did you experience losses or a diminishment of your gross

16 │ sales of -- of Jensen Arms' gross sales after July 1, 2013?

17 │ A.  Yes, absolutely.

18 │ Q.  Did the profits that were realized above and beyond the

19 │ average monthly gross sales profits for Jensen Arms, did those

20 │ profits offset the losses that Jensen Arms experienced in the

21 │ last six months of 2013?

22 │ A.  They may have offset it for the first three or four months,

23 │ but this process continued on.  And I kept hoping that it would

24 │ get improved, and it has not.

25 │ Q.  So --

1  *A.*  In fact, January was the worst year on record.

2  *Q.*  January was the worst month?

3  *A.*  The worst month, yeah, excuse me.  Sorry.

4  *Q.*  January of 2014?

5  *A.*  '14.

6  *Q.*  And when you say on record, you're talking -- you're

7  referring to the prior --

8  *A.*  The prior January and those years that I had observed in

9  Bob Jensen's paperwork before I bought the company.

10  *Q.*  Now, I want to talk to you a little bit about Jensen Arms'

11  sales of semiautomatic pistols.  We learned earlier that there

12  are, essentially, three different types, if you will, sizes of

13  semiautomatic pistols, subcompact, compact, full frame.  Is

14  that your understanding?

15  *A.*  Yes.

16  *Q.*  What are the most popular -- prior to July 1 of 2013, which

17  were the most popular semiautomatic pistols sold by Jensen

18  Arms?

19  *A.*  Well, that would probably be the higher-capacity magazines,

20  the full frames, and some of the compacts.

21  *Q.*  Can you identify any specific full-frame models that were

22  the most popular --

23  *A.*  Glock 17, probably number one.  Beyond that, you have many

24  SKUs -- or models of the Springfield Armory XD, XDMs, the M&P,

25  Smith & Wesson M&Ps, Berettas.

1    Q.  And aren't those the same firearms for which you're having

2    trouble finding compatible compliant magazines?

3    A.  That is correct.

4    Q.  So the impact -- is it correct to say that the impact of

5    your inability to find compatible compliant magazines has also

6    adversely affected the sale of your most popular semiautomatic

7    pistols?

8    A.  That is correct.

9    Q.  Any particular kinds of semiautomatic pistols that have

10   been most affected?

11   A.  Well, again, the ones that we just mentioned, anything

12   that --

13   Q.  I apologize.  It was an unclear question, and I confused

14   you.  What I'm referring to is the particular caliber or -- are

15   there particular calibers that have been more affected than

16   others?

17   A.  Yes.  Most of the higher-capacity firearms in the semiauto

18   pistols are 9 millimeter, some .40s, and those were definitely

19   affected.  The .22 mag, the PRM-30 was definitely affected.  So

20   9 mils and some .40s., .45s, because the round is so big, that

21   there is not too many guns that have more than 15.

22   Q.  You've given us an estimate of your overall loss of gross

23   annual sales associated -- that you associate with this change

24   that occurred in July of 2013.

25   A.  Yes.

1   *Q.*  Can you tell us or estimate what -- whether your carbine

2   and rifle sales -- Jensen Arms' carbine and rifle sales

3   increased or decreased since July 1?

4   *A.*  Oh, it's definitely decreased.

5   *Q.*  And can you estimate the amount of that decrease?

6   *A.*  Again, being a tactical store, that was one of our primary

7   weapon systems; and now we're probably off probably 30 percent.

8   And I have customers that don't even know if they can buy one.

9        *MR. COLIN:*  I have no further questions of this

10  witness.  Thank you.

11       *THE COURT:*  Thank you.

12       Cross-examination.

13       *MS. MORRILL:*  Yes.  Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15  *BY MS. MORRILL:*

16  *Q.*  Good morning, Mr. Burrud.

17  *A.*  Good morning.

18  *Q.*  Can I ask you to turn to -- well, actually, no.  Maybe

19  we'll start somewhere else.

20       I want to just talk about your -- a little bit more

21  about your background with Jensen Arms.  So I understand

22  that -- based on counsel's questions and your answers, that you

23  purchased the company in November of 2012; is that correct?

24  *A.*  That's correct.

25  *Q.*  Okay.  But Jensen Arms first opened doing business under

1    that name in 1994?

2    A.   That's correct.

3    Q.   Okay.  And from the period of 1994 through 2012, it was run

4    by another owner by the name of Bob Jensen?

5    A.   That's correct.

6    Q.   And, currently, you're the only shareholder of Jensen Arms?

7    A.   Yes.

8    Q.   You also testified that shortly after you purchased the

9    company in November of 2012, you experienced a boon in sales;

10   is that accurate?

11   A.   I didn't use boon, but, yes.

12   Q.   Well, counsel did, so I thought you agreed with him.

13   A.   Yes.

14   Q.   Okay.  So from approximately November of 2012 through and

15   including February of 2013, sales -- gross sales at Jensen Arms

16   were exceptionally high for that period of time?

17   A.   Yes.

18   Q.   Okay.  And I believe in February of 2013, your gross sales

19   were 1.$4 million in that month alone?

20   A.   Yes.

21   Q.   Now, of course, that's including all -- everything you

22   sell, not just --

23   A.   That's correct.

24   Q.   Okay.  And I believe -- and you would agree with me that

25   February 2013 gross sales were an aberration?

1   *A.*  I would say so, yes.

2   *Q.*  Okay.  Meaning that when you reviewed Mr. Jensen's prior

3   bookkeeping for past Februaries and other calendar years before

4   2013, you didn't see any spikes that high?

5   *A.*  No.

6   *Q.*  Okay.  And after February 2013, sales began to decline; is

7   that correct?

8   *A.*  Yes.

9   *Q.*  Okay.  Through and including the year end of December 2013?

10  *A.*  Yes.

11  *Q.*  Okay.  Your company is organized as an S corporation; is

12  that correct?

13  *A.*  That's correct.

14  *Q.*  Okay.  And you employ an in-house bookkeeper by the name of

15  Bree Low?

16  *A.*  That's correct.

17  *Q.*  And by bookkeeper, I'm referring to, she functions as an

18  accountant for you?

19  *A.*  No.  I have an accounting firm, but she is the bookkeeper.

20  *Q.*  Okay.  So she has -- she compiles internal information

21  that, then, you might have an accountant actually --

22  *A.*  Yes.

23  *Q.*  -- fill out returns?

24  *A.*  Yes.

25  *Q.*  Okay.  And Jensen Arms does in fact file federal tax

1   returns of some sort?

2   A.   That's correct.

3   Q.   And that would be some form particular to an S corporation?

4   A.   Yes, that's correct.

5   Q.   And in addition -- I'm sorry, I didn't catch where -- where

6   in Colorado your store is located.

7   A.   285 East 29th Street in Loveland.  It's, basically, the

8   corner of 29th Street and 287.

9   Q.   Okay.  And forgive me, I'm not from Colorado, so what

10  County is Loveland in?

11  A.   Loveland is in Larimer County.

12  Q.   Thank you.  And so in addition to filing federal tax

13  returns for your company, you would also have occasion to file

14  state sales tax returns; is that accurate?

15  A.   Yes, that's correct.

16  Q.   Okay.  And that would be for Colorado state retail tax?

17  A.   Yes.

18  Q.   Okay.  And you would also file Larimer County sales tax

19  returns?

20  A.   That is correct.

21  Q.   Okay.  And each of those particular types of returns would

22  include gross sales for your company for a month-long period?

23  A.   Yes.

24  Q.   Okay.  And then the federal return -- I just want -- I

25  don't know if I asked you this already, and I apologize if I

 1  have, but your company is on a calendar-year basis?

 2  A.  Yes, we are.

 3  Q.  So your federal return would show gross sales for the

 4  entire company for the -- for an entire calendar year?

 5  A.  That is correct.

 6  Q.  Okay.  And for 2012, you filed a -- after 2012, calendar

 7  year 2012 ended, you filed a federal return for your company?

 8  A.  Yes, we did.

 9  Q.  And that was based in part on information that Mr. Jensen

10  provided to you for the first part of the calendar year and

11  also for yours, or was it just yours?

12  A.  It was just mine.

13  Q.  I see.  So he was required to file for whatever period of

14  calendar year 2012 that his ownership covered?

15  A.  That is correct.

16  Q.  Did you have access to that return?

17  A.  I don't believe so.

18  Q.  So your knowledge of Jensen Arms' 2012 year-end gross sales

19  is based on slightly less than two months' worth of ownership

20  of the company?

21  A.  I had three years of prior sales for Jensen Arms.

22  Q.  Okay.  Would those three years have ended with calendar

23  year 2011, and then -- meaning that -- because I'm just trying

24  to establish whether there is a gap in 2012 that you don't have

25  personal knowledge about the performance of the company.

1  | A.  Yes.  I'm not sure, to be honest.

2  | Q.  Okay.  But you do know for certain that when you filed the

3  | return for Jensen Arms as its owner, it was for the two-month

4  | period --

5  | A.  That I do know, yes.

6  | Q.  Thank you.  November and December 2012?

7  | A.  Correct.

8  | Q.  Okay.  And now that calendar year 2013 is over, have you

9  | filed your 2013 federal return?

10 | A.  Not yet.

11 | Q.  Okay.  But that return is in the process of being

12 | completed?

13 | A.  It is.

14 | Q.  Okay.  And for every month in 2013, you would have a

15 | corresponding state sales tax return?

16 | A.  That's correct.

17 | Q.  Okay.  As well as for county sales tax return?

18 | A.  That's correct.

19 | Q.  So as you sit here today, you do know what your year-end --

20 | year-end gross sales for 2013 are?

21 | A.  I discussed it with my accountant, yes.

22 | Q.  Can you say for certain that your year-end 2013 gross sales

23 | for Jensen Arms are lower than your year-end 2012 gross sales

24 | for Jensen Arms?

25 | A.  Yes.

1 │ *Q.*  How do you know that --

2 │ *A.*  I'm sorry, could you repeat the question?

3 │ *Q.*  I'm happy to.  Can you say today that year-end 2013 gross

4 │ sales are lower than year-end 2012 gross sales?

5 │ *A.*  No, they're high, because it's only 12 months of 2012 --

6 │ two months of 2012, rather.  November, December, and then 12

7 │ months of '13.

8 │ *Q.*  Okay.  And so what I'm trying to --

9 │ *A.*  Does that make sense?

10 │ *Q.*  It does make perfect sense to me.  And I think through your

11 │ other testimony we've established that you can't testify based

12 │ on personal knowledge as to what the first ten months of 2012,

13 │ the gross sales for that period was?

14 │ *A.*  Well, I was there, working at the company, so I know

15 │ approximately what his sales were.

16 │ *Q.*  So, then -- I'm not asking you for specific numbers, but

17 │ I'm asking you to do a comparison.

18 │ *A.*  Okay.

19 │ *Q.*  Can you take year-end 2013 gross sales and say for a fact

20 │ that they are lower than year-end 2012 sales for the entire

21 │ year?

22 │ *A.*  I cannot.

23 │ *Q.*  Thank you.  Let's talk about your background check process.

24 │ And counsel walked you through the process, and so I just want

25 │ to go over and -- elicit a few more facts from you about that

 1   process.

 2   A.  Sure.

 3   Q.  But the -- first of all, your company does not employ

 4   background check specialists?

 5   A.  No, we do not.

 6   Q.  Okay.  So when a customer -- let's assume for these

 7   questions that it's just a regular customer who walks in your

 8   door, selects firearm for purchase, and proceeds to cash out

 9   for that firearm and requires a background check to do so.

10   A.  Yes.

11   Q.  So the cashier in your store who rings up the firearm sale,

12   they are the ones who typically perform the background check?

13   A.  That's correct.

14   Q.  Okay.  And the waiting time for background check responses

15   from CBI, you would agree that that time varies?

16   A.  It does.

17   Q.  Okay.  And while your customer and your sales staff are --

18   your cashier, I'm sorry, is waiting for a response, the

19   customer is free to browse your store?

20   A.  Yes, they are.

21   Q.  Okay.  And you would agree that when an individual is, you

22   know, during -- when an individual purchases a firearm from

23   you, that they usually also buy some type of accessory or

24   components for that firearm?

25   A.  Sometimes, yes.

1   Q.  Would you say that that's frequent, when a firearm is sold,

2   additional items that are not firearms are also sold?

3   A.  Well, are you talking about the time that they're browsing

4   between the background check, or before?

5   Q.  Oh, just generally.

6   A.  Just generally?

7   Q.  Yeah.

8   A.  More often than not.

9   Q.  Thank you.  And then, of course, while they are waiting for

10  the background check response, the customer is free to walk

11  about and browse your other merchandise?

12  A.  That's correct.

13  Q.  So each background check performed, you would agree, it

14  would take about, anywhere between 15 and 20 minutes -- not

15  including waiting time, but just the actual processing time in

16  store?

17  A.  Yeah, depending on how fast CBI is running.  Sometimes CBI

18  goes down.  So, yes, about that time.

19  Q.  Right.  I'm trying to be clear for the record that I'm not

20  counting in that 15 to 20 minutes whatever length of time it

21  takes CBI to respond.  I'm merely talking about from the time

22  your cashier hands the customer the form, they fill out the

23  form, your cashier checks it, inputs it into CBI, and then hits

24  send, that period is probably no more than 15 to 20 minutes?

25  A.  It can be longer.

1    *Q.*  But typically?

2    *A.*  I'd say closer to 20 to 30 minutes.

3    *Q.*  Okay, 20 to 30 minutes.  The average hourly wage for one of

4    your cashiers is $12?

5    *A.*  Approximately, yes.

6    *Q.*  Counsel on direct asked you some questions about the

7    various liabilities that -- and risks that you face as a

8    licensed FFL who is required to conduct background checks when

9    you sell a firearm from your inventory.  Do you recall that?

10   *A.*  Yes.

11   *Q.*  Okay.  And I believe you talked about the existence of

12   administrative liabilities?

13   *A.*  Yes.

14   *Q.*  And criminal liabilities?

15   *A.*  Yes.

16   *Q.*  And civil liabilities?

17   *A.*  Yes.

18   *Q.*  By civil, are you speaking specifically to, say, for

19   example, if one of your employees allowed somebody to purchase

20   a firearm and didn't collect any -- didn't conduct any

21   background check, but allowed that firearm to walk out that

22   door without the background check -- when you talk about civil

23   liability, do you mean the risk of being held personally liable

24   for whatever misconduct that individual might perform with that

25   firearm?

1   *A.*   Yes.

2   *Q.*   In the time that you've owned Jensen Arms, you've never

3   been penalized administratively to date for any -- anything

4   related to background check requirements?

5   *A.*   I have not.

6   *Q.*   Okay.   Nor criminally?

7   *A.*   No.

8   *Q.*   Nor civilly?

9   *A.*   No.

10  *Q.*   Okay.   You testified, sir, about the fact that you do not

11  perform -- your store does not perform background checks for

12  private transfers of firearms.

13  *A.*   We do not.

14  *Q.*   Okay.   And to date, no -- no one related with the state of

15  Colorado has required you to do so?

16  *A.*   No, they have not.

17  *Q.*   Okay.   So it has been your choice for your company whether

18  or not to conduct background checks for private transfers?

19  *A.*   That is correct.

20  *Q.*   And the basis for Jensen Arms' refusal to conduct private

21  transfer background checks is because it doesn't want to do

22  Colorado's business for free?

23  *A.*   Yes.

24  *Q.*   And that is based on your -- your belief or your

25  understanding that the only fee that you can charge for a

1    private transfer background check is $10?

2    A.   That's as I understand the statute, yes.

3    Q.   Okay.  And your understanding of that $10 fee is that that

4    has to be collected by Jensen Arms and then passed on directly

5    to the Colorado Bureau of Investigation?

6    A.   That is correct.

7    Q.   Meaning that there is no compensation to your store for

8    performing the background check for a private transfer?

9    A.   That's as I understand it, yes.

10   Q.   Okay.  I want to talk to you about internet sales at Jensen

11   Arms.

12   A.   Yes.

13   Q.   So since -- when you first purchased the company in

14   November of 2012, did Jensen -- I should say, prior to your

15   purchase of the company, do you know whether it sold firearms

16   and related components on the internet?

17   A.   Yes.

18   Q.   Okay.  And since the company has continued under your

19   ownership, have you continued that sales method?

20   A.   Yes.

21   Q.   And you do so, I believe you testified on direct, not only

22   with firearms, but also with magazines.

23   A.   Yes, that's correct.

24   Q.   Meaning, stand-alone magazines?

25   A.   Yes.

1   *Q.*  Okay.  And so one of the methods you used to do that is

2   called gunbroker.com?

3   *A.*  Yes, that's correct.

4   *Q.*  And I believe you said that online sales account for about

5   10 percent of total sales?

6   *A.*  Approximately.

7   *Q.*  Okay.  And when you list a firearm on gunbroker.com, you

8   list it for the same price as it would be listed in your store?

9   *A.*  That's correct.

10  *Q.*  Okay.  And -- meaning it's not -- it's not on a discount?

11  *A.*  It is not on a discount.

12  *Q.*  Okay.  And the same is true of magazines; you sell those on

13  gunbroker.com or any way over the internet, that list price is

14  also the same as if someone were to walk in the store off the

15  street?

16  *A.*  That would be the same with magazines or accessories or

17  scopes or anything else.

18  *Q.*  When you say accessories, sir, what do you mean?

19  *A.*  Cleaning kits, slings, scopes.

20  *Q.*  Does accessories include ammunition?

21  *A.*  No.

22  *Q.*  No?  Is ammunition its own separate stand-alone category of

23  product you sell?

24  *A.*  I believe so.

25  *Q.*  Okay.  And magazines are another?

1   *A.*   Yes.  They would fall under the same category.

2   *Q.*   As ammunition?

3   *A.*   Correct.

4   *Q.*   Okay.  Would you sometimes refer to those as firearm

5   components?

6   *A.*   Correct.

7   *Q.*   Okay.  Thank you.  In addition to selling firearms and

8   magazines over the internet and also the related accessories,

9   Jensen Arms also sells certain products in Wyoming?

10  *A.*   Yes, we do.

11  *Q.*   Okay.  You have, I believe you testified, a magazine

12  outlet?

13  *A.*   Yes.

14  *Q.*   Okay.  And it's -- you sell some other products, but it's

15  mostly dedicated to large-capacity magazines?

16  *A.*   That's correct.

17  *Q.*   By that I mean, magazines that hold 16 or more rounds?

18  *A.*   That's correct.

19  *Q.*   And you opened that in anticipation of Colorado's magazine

20  restriction going into place?

21  *A.*   Yes, we did.

22  *Q.*   And it's been open since that time?

23  *A.*   That's correct.

24  *Q.*   Okay.  I just want to talk to you a little bit about kind

25  of the way you did business before the magazine capacity

1    restriction went into place in Colorado and the way you do

2    business now.

3            So, first of all, before the law went into effect, you

4    frequently -- you regularly sold firearms that come standard

5    from the factory with less than -- I'm sorry, 16 or more

6    rounds?

7    A.   That's correct.

8    Q.   Okay.  And since the law has gone into effect, you've

9    continued to order and receive those same types of firearms in

10   some capacity -- in some amounts.  I'm not saying necessarily

11   the same, but I'm just saying, you continue to order them from

12   manufacturers and receive them in your store.

13   A.   That's correct.

14   Q.   Okay.  In the case of a firearm that comes standard with a

15   large-capacity magazine, if you were to order it after the law

16   went into effect, the purpose of that magazine would be for you

17   to sell it to law enforcement, for example?

18   A.   Correct.

19   Q.   Or to a branch of the armed forces?

20   A.   Correct.

21   Q.   Or over the internet to an out-of-state customer?

22   A.   That is correct.

23   Q.   Or to another FFL as a wholesale sale?

24   A.   Yes.

25   Q.   And you did all of those things -- you made all of those

```
 1   types of sales before the law went into effect; is that

 2   correct?

 3   A.  That's correct.

 4   Q.  And you've made all of those types of sales since the law

 5   has gone into effect?

 6   A.  That's correct.

 7   Q.  Before the law went into effect, you regularly sold

 8   magazines that came standard from the manufacturer with 15

 9   round capacity or less that had removable baseplates; is that

10   right?

11   A.  That is correct.

12   Q.  Okay.  And you continue to regularly sell those same types

13   of magazines since the law has gone into effect?

14   A.  That is correct.

15   Q.  In addition to the firearms that come standard with

16   large-capacity magazines, there are also just stand-alone

17   magazines that have greater than 16 or greater rounds.  And you

18   regularly sold those before the law went into effect?

19   A.  Yes, we did.

20   Q.  Okay.  And since the law has gone into effect, you continue

21   to sell those, but just not to Colorado residents?

22   A.  Yes, that's correct.

23   Q.  And I believe you testified that you continue to sell

24   firearms that come standard with 16 rounds or more from the

25   factory to Colorado residents either without a magazine, or if
```

 1  one is -- a lower-capacity magazine or a Colorado-compliant

 2  magazine is available, with such a magazine, you do that in

 3  your store?

 4  A.  Yes, we do.

 5  Q.  Okay.

 6          MS. MORRILL:  Your Honor, if I may have a moment.

 7          THE COURT:  You may.

 8          MS. MORRILL:  Thank you.

 9  BY MS. MORRILL:

10  Q.  And just for the -- just one more question.  Hopefully, one

11  more question.  That last set of questions I asked you were

12  about the firearms that come from the factory with the

13  large-capacity magazines and how you still sell them now, just

14  not to Colorado residents.

15  A.  Yes.

16  Q.  Unless a compliant magazine is included.  That category

17  would include both rifles and handguns; you agree?

18  A.  Yes.

19  Q.  So you're still able to sell the AK-47 platform since the

20  law has gone into effect?

21  A.  Yes.

22  Q.  As well as the AR-15 platform firearms?

23  A.  Yes.

24  Q.  Okay.

25          I have no further questions.

1          THE COURT:  Thank you.

2          Redirect.

3          MR. COLIN:  No redirect, Your Honor.  I would ask that

4    the witness be excused.

5          THE COURT:  Thank you.

6          Any objection?

7          MS. MORRILL:  No objection, Your Honor.

8          THE COURT:  Thank you, sir.  You may step down.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  You are excused.

11          We're just a few minutes before the noon hour, and I

12    think this might be a convenient time to take our recess.

13          It's 10 minutes before noon.  We'll stand in recess

14    until 1:15.

15          MR. COLIN:  Thank you.

16          (Recess at 11:52 a.m.)

17          (In open court at 1:23 p.m.)

18          MR. WESTFALL:  Your Honor, may I request that Michele

19    Eichler be escorted from the witness room?

20          THE COURT:  You're calling her as your next witness?

21          Mr. Keech will retrieve her.

22          MR. WESTFALL:  And, Your Honor, the plaintiffs' next

23    witness, we'd call Michele Eichler.

24          THE COURT:  Thank you.

25          Please step up and be sworn.

```
 1           (MICHELE EICHLER, PLAINTIFFS' WITNESS, SWORN)

 2           COURTROOM DEPUTY:  Please be seated.

 3           Please state your name and spell your first and last

 4   name for the record.

 5           THE WITNESS:  Michele Eichler, M-I-C-H-E-L-E,

 6   E-I-C-H-L-E-R.

 7           THE COURT:  Thank you.  Please proceed.

 8                      DIRECT EXAMINATION

 9   BY MR. WESTFALL:

10   Q.  Ms. Eichler, where do you live?

11   A.  We live in Gulnare, Colorado.  Our address is actually

12   Aguilar, but we actually live in the little town of Gulnare.

13           THE COURT:  Would you pull your chair around so that

14   you can pull the microphone towards you, please.

15           Thank you.

16   BY MR. WESTFALL:

17   Q.  If you would, Ms. Eichler, please speak slowly for the

18   court reporter, and please speak into the microphone so we can

19   all hear, especially me.

20   A.  Thank you.

21   Q.  Thank you.

22           And so you mentioned the town, and the town of

23   Aguilar.  Where is that relative to a major town that maybe

24   some of us have heard about?

25   A.  It's actually in between Trinidad and, I believe, like,
```

1   Walsenburg, is the town that most people would be familiar

2   with.  And Gulnare is actually eight miles west of the town of

3   Aguilar.

4   Q.  Okay.  What do you do for a living?

5   A.  My husband and I run an outfitting business.  We also have

6   a ranching operation on our ranch.  And then we also produce TV

7   shows on the Sportsman Channel.

8   Q.  Are you a member of the Colorado Farm Bureau?

9   A.  Yes, I am.

10  Q.  Are you a member of the Colorado Outfitters Association?

11  A.  Yes, I am.

12  Q.  Are you offering testimony on both of their behalves today?

13  A.  Yes, sir.

14  Q.  What's your educational background?

15  A.  I have a finance degree from Stetson University.

16  Q.  Describe your operations that you just briefly mentioned.

17  You mentioned ranching, outfitting, your TV shows.  Describe

18  your ranching operation.

19  A.  My husband and I have a ranch in Gulnare.  And we run --

20  right now I believe we have about 62 head of cattle that we

21  raise to sell the calf crop every year.  We also have horses,

22  and we have some chickens.  And so that's part of what we do,

23  as far as the ranching is concerned.

24  Q.  And then the outfitting operation, please describe that.

25  A.  We're, obviously, a member of the Colorado Outfitters

1  Association.  We're a licensed outfitter here in Colorado.  We

2  take between -- it varies each year, but between 100 and 150

3  clients every year for hunts in southern Colorado, where we

4  live.

5  *Q.*  And briefly describe your TV shows.

6  *A.*  We produce two TV shows.  One is Easton Bowhunting TV,

7  which is mainly a bowhunting show.  And then we also produce

8  Predator Nation, which is a mostly firearms hunting show.  And

9  those air on the Sportsman Channel, six months for the

10  bowhunting show and six months for the Predator Nation show.

11  *Q.*  Please describe how historically you have used firearms in

12  your ranching operations.

13  *A.*  Similar to any other ranchers, we would use them for

14  livestock protection.  A lot of times, especially during

15  calving season, coyotes and other predators like to come in.

16  We actually lost a calf last year to predation.  And to protect

17  our chickens -- last year we lost 25 chickens to a bear

18  breaking in, even though we have an electric fence around our

19  chicken coop.  So for livestock protection.  And then also, you

20  know, protection in our home on the ranch.  We live in a remote

21  area; and, you know, my husband travels quite a bit.  So we do

22  have firearms in the house for personal protection, as well as

23  the livestock protection.

24  *Q.*  Please describe how historically you have used firearms in

25  your outfitting business.

1   *A.* In the outfitting business, if a client comes in and --

2   this is, you know, in the past historically -- we would -- if

3   they didn't have a firearm or didn't want to travel with a

4   firearm -- the majority of our clients come from out of state.

5   Once in a while we'll get a client or a couple of clients from

6   overseas. They don't like to travel with their firearms. So

7   we would in the past have no problem loaning them a firearm for

8   use during their hunt or for personal protection.

9   *Q.* Please describe how historically you have used firearms on

10  your TV show.

11  *A.* On the Predator Nation show, a lot of the hunts are with

12  firearms. They could be anything from rifles to handguns, any

13  type of firearm. And, then, also on the bowhunting show, even

14  though it is a bowhunting show, a lot of times we'll carry a

15  handgun for personal protection if it's a dangerous hunt we're

16  on.

17  *Q.* Are you familiar with enacted Bill 1229?

18  *A.* Yes, sir, I am.

19      *MR. WESTFALL:* At this time, may I ask that the

20  witness be given volume 3 of the exhibits.

21      Ms. Eichler, if you will turn to tab 4, Exhibit 4.

22      Is that 1229?

23      *THE WITNESS:* Yes, it looks like it is.

24  *BY MR. WESTFALL:*

25  *Q.* Have you discussed this with your husband as it relates to

1    the operation?

2    A.  Yes, we have.

3    Q.  Have you tried to assess the impact House Bill 1229 would

4    have on your operations?

5    A.  Yes, we have discussed how it would impact us.

6    Q.  Let's start with your ranching operations.  Describe your

7    concerns with regarding 1229's impact on your ranching

8    operations.

9    A.  Well, in the past, when we would -- we travel a lot.  It's

10   because we do a lot of TV shows.  We would very often need to

11   leave a rifle or some sort of handgun on the ranch for either

12   one of our ranch hands or one of our sons to protect the

13   livestock while we're gone, or just to have in the house as

14   protection while the kids are there.

15          And since the law now, in order to do that, I believe

16   we would have to do a background check on our -- transfer --

17   personal transfer background check to any of the ranch hands

18   that we would be leaving for more than 72 hours.  And, then,

19   again, upon our return, we would have to do the same thing.

20   So . . .

21   Q.  Okay.

22   A.  Yes.

23   Q.  Any issues involving ranch vehicles?

24   A.  Well, yeah.  It's very common in the past, we always would

25   have a ranch gun.  Basically, in the -- the hay truck.

1  Basically -- you know, if you go on a ranch, you'll see the

2  rancher driving around in his old beatup truck for the cows.

3  Of course, we have the same thing.  And we would always keep a

4  17 rifle in that truck when we went out to feed cows or would

5  ride around the ranch for predator control.  And we can't do

6  that anymore.

7  Q.  Any issues involving your sons?

8  A.  Yeah.  My husband and I were both married previously.  And

9  when we got married in 2004, we have -- our youngest son is

10 ours together, but our older two boys are not my husband's

11 biological sons, so they are his stepsons.  And, therefore, the

12 family exemption does not apply in that case.  So my husband

13 can't transfer guns to them without a background check.  So I

14 would either have to be the one to transfer one of my guns, or

15 we would have to go get a background check if we were going out

16 of town for a period of time for him to transfer them to him.

17 Q.  Please describe -- now let's turn to your outfitting

18 operations.  Please describe your concerns regarding 1229's

19 impact on your outfitting operations.

20 A.  Well, in the past, we would -- of course, if a client

21 wanted to borrow a gun -- and last turkey season, we actually

22 did loan some shotguns to some Canadian hunters that came down.

23 We wouldn't think twice about loaning them a gun for any kind

24 of hunting situation.  But now there are certain situations

25 that would create an issue for us.

```
 1            We do a lot of -- some remote camps, drop camps, in
 2    wildlife areas that are fairly remote.  And if a client wanted
 3    to borrow a rifle for that type of hunt, where they're not on
 4    our premises on the guided hunts -- the guided hunts are not as
 5    much of an issue when they're right there on our premises; but
 6    on those hunts where they are in the drop camps, it is.
 7    Because if we do loan them a gun for the purposes of hunting,
 8    it could become an issue if they no longer had a valid license,
 9    I believe, for any reason, or also a client that was -- needed
10    a handgun for personal protection.  In those remote camps,
11    bears can be a big problem.  And those clients are bringing
12    food, they're set up in tents, and bears like to come to the
13    food.  So it's very prudent to have a handgun while you're in a
14    remote camp like that for personal protection.
15            So we're kind of stuck in that limbo of, knowing we're
16    putting our client in a situation where they need to have a
17    handgun, and not really, I believe, technically being able to
18    do that for them.
19    Q.  What about the while-hunting exemption that's in 1229?
20    A.  The definition of "while hunting," to me, needs to be
21    clarified for me.  Because I understand maybe -- as you're
22    properly licensed for hunting --
23            MS. SCOVILLE:  Objection, Your Honor.  Irrelevant.
24            THE COURT:  Overruled.
25            THE WITNESS:  I'm sorry.  Could you repeat the
```

1  question?

2  *BY MR. WESTFALL:*

3  *Q.*  Yeah you mentioned -- described some of the impacts that

4  1229 has on your outfitting operations, and this -- your

5  outfitting operation involves hunting, correct?

6  *A.*  Correct.

7  *Q.*  So there is an exception in 1229 -- in fact, if you want to

8  look at it to refresh your recollection of what it actually

9  requires.  There is an exception about "while hunting."

10  *A.*  While hunting.

11  *Q.*  My question is just to find out from you how much that does

12  or does not address your concerns regarding 1229's impacts on

13  your outfitting operations.

14  *A.*  Yes, sir.  In a situation -- most of those hunts are five

15  days, five-day hunts.  And the clients can also on a per diem

16  basis extend their hunt longer than that.  So even if they have

17  a license and we loan them a gun, and they go up into a

18  wilderness area, I believe they would be technically not

19  licensed anymore if, say, they shot their animal on the first

20  or second day, and they're still not coming out of the woods

21  for seven days, or five days.  So that -- during that period of

22  time, they would technically not be licensed to be hunting.

23        Also in a situation for personal protection, that's

24  not while hunting.  It could be a bowhunter that is licensed

25  for archery equipment, but they're not licensed for firearms.

1   But it would be prudent, and it would be, you know, something

2   that we would want to do for our clients to keep them safe, to

3   be able to allow them to have a handgun in camp in a situation

4   like that.  And I don't believe that exemption covers that.

5   *Q.*  Thank you, Ms. Eichler.

6          Is having to do an FFL background check a problem

7   regarding the outfitting business?

8   *A.*  It creates a lot of issues for us, and it is -- it would be

9   a huge burden to have to do that, yes.

10  *Q.*  How would you do a background check, even assuming you

11  could find someone -- actually, let me take a step back.  How

12  do you do background checks?  Is there someone that you have

13  used in the past for doing background checks?

14  *A.*  For our personal use, yes.  We've gone to Big R in

15  Trinidad.

16  *Q.*  So is that who you would use for -- if you -- dealing with

17  a situation where it was a loan of a firearm for more than 72

18  hours as part of your outfitting business, is that who you

19  would turn to, to do a background check?

20  *A.*  I thought that we could do that, but I've been informed by

21  Big R that they will not do those checks.

22          *MS. SCOVILLE:*  Objection, hearsay.

23          *THE COURT:*  I'm not accepting it for the truth of the

24  matter asserted.

25          You may ask your next question.

1    *BY MR. WESTFALL:*

2    *Q.*   Where is Big R, again, relative to your ranch?

3    *A.*   It's in Trinidad.

4    *Q.*   Describe what it would involve with one of your clients

5    coming in from out of town, coming in from the airport -- a

6    typical client of yours, from out of state, about what it would

7    involve to get a background check so that you could transfer a

8    firearm to that client as part of your hunt -- outfitting

9    operation.  Just give us a feeling for that.

10   *A.*   Well, a typical day when we have clients coming in,

11   normally they all arrive on the same day.  Especially for rifle

12   hunts, because the seasons are very specific in Colorado.

13   First rifle season, second rifle season, et cetera.  We ask our

14   clients to be there usually around 1 o'clock in the afternoon.

15   Sometimes planes get delayed, but normally they're there

16   sometime in the afternoon.

17          And a normal camp would be eight to ten hunters at a

18   time, so it's quite a few people coming in.  We do ask -- take

19   them to the rifle range so they can check their rifles, make

20   sure their zeros are on, and kind of go through an orientation.

21   We also have them sign -- go through some paperwork and have

22   them sign a piece of paper that states that any violations of

23   the Colorado Division of Wildlife will be reported and that,

24   basically, they're responsible to comply with the law.

25          So in order for us, then, to, say, have a client that

1    needs to borrow a gun, because the guns are either myself's or

2    my husband's -- Fulldraw does not own any guns -- they would be

3    our personal guns, one of us personally would have to leave the

4    ranch, drive down to wherever we could get the background check

5    done.  And I will have to go -- look and see where the closest

6    place is that would do the check for us now.

7          And filling out the paperwork, I've done it

8    personally, usually takes about 15 minutes to fill out the

9    form.  And then I've had the background check be as quick as 15

10   minutes and as long as over two hours for me, personally.  But

11   one of the issues that I think we will definitely have to deal

12   with, is, during -- first -- say, it's second rifle season.

13   The day before hunting, which is when our clients would come

14   in, those places are very busy with hunters trying to buy

15   licenses, buy ammunition, all types of things like that.  So

16   it's not like you can just walk into a store, and you're going

17   to be the first one served.  He probably will have to wait in

18   line for other people trying to buy licenses and other items.

19   And a $10 background check is not going to be their priority;

20   it's going to be the customers that are buying equipment.

21   Q.  Do you have any 1229 concerns involving your TV show?

22   A.  Only in the case where, say, we would have somebody coming

23   to hunt with us -- we do a lot of target shooting on the show

24   and sighting in.  TV shows also do B-roll.  And B-roll would

25   not be in actual hunting situations, but fill-in footage to

1   help tell the story.  Sometimes that's done before the hunt,

2   and sometimes it's done after the hunt.  Sometimes it's done

3   months after the hunt.  When the editor goes in and is trying

4   to put the whole TV show together, they may say, hey, we need

5   to go out, or we need the hunter that was on the show to go out

6   and actually pretend they were hunting, or something like that.

7   So there is some cloudy issues for us on that, for sure.

8   Q.  What is your understanding of your liability under 1229?

9   A.  That's actually a really big concern that my husband and I

10  have discussed.  We understand that within the 72 hours,

11  they're trying to cover that that's okay.  But there are still

12  several -- there is still liability for us within that 72 hours

13  for any unlawful use of a firearm.  And then beyond that -- the

14  72 hours, it creates -- it creates a liability for us.  It

15  states that it's joint and several.  So even if we are not the

16  one breaking the law, if one of our hunters inadvertently who

17  is borrowing a gun breaks the law for any reason, then we could

18  have a very big problem.

19  Q.  And that would be within -- within the 72-hour time frame?

20  A.  It would be, yes.

21  Q.  Okay.  And then how about if somehow you end up violating

22  1229, what's your understanding of your liability in that

23  context?  In other words, you don't do a background check, and

24  it exceeds 72 hours, and no exception applies, what happens to

25  you then?

1  *A.* I believe that we would not be able to have any firearms

2  for two years; and that would, essentially, put us out of

3  business.

4  *Q.* Have you given any consideration to the insurance

5  implications of 1229 on your operations?

6  *A.* Yes.  Because of the liability that it imposes on us -- I'm

7  not an insurance agent, but I believe that insurance companies

8  would deny any claims if the weapon was used in an unlawful

9  situation.  And this creates that liability for us.

10 *Q.* Is there any other way 1229 has impacted you and your

11 family?

12 *A.* Yes.  On a personal basis, our oldest son, whose name is

13 Jeff, he's 19.  He attends Colorado State University in Fort

14 Collins, which we are very excited about.  My husband was there

15 in his 20s and did a lot of hunting in the area, and there is a

16 lot of great hunting up there.  When we went to orientation, we

17 were excited because we were told that they could go and -- he

18 could store his gun there, his shotgun or his rifle, at the

19 campus police, and that he would have 24-hour access to it.

20         You know, normally on a waterfowl hunt, if you needed

21 your shotgun, you'd get up at 4 o'clock in the morning and head

22 out to wherever the ducks and the geese were, and then he could

23 check it back in with them and be able to, essentially, hunt

24 and possibly with some of our friends that are up there.

25         Since then, we have found out that he can no longer do

 1   that, that the University -- Colorado State University has

 2   suspended that, and they will no longer allow them to store

 3   their guns at the campus police.

 4   Q.  And does that interfere with you and your husband's ability

 5   to hunt with your son and your son's ability to hunt?

 6   A.  Absolutely, it does.  Where we thought he could go hunting

 7   now, he has to leave his shotgun and his rifle at home.  He's

 8   no longer allowed to bring his gun to school and store it at

 9   the campus police.

10          MR. WESTFALL:  I have no further questions of this

11   witness on direct, Your Honor.

12          THE COURT:  Thank you.

13          Cross-examination.

14                      **CROSS-EXAMINATION**

15   BY MS. SCOVILLE:

16   Q.  Good afternoon, Ms. Eichler.

17   A.  Hi.

18   Q.  You mentioned this afternoon that Fulldraw Outfitters loans

19   guns to clients on occasion, correct?

20   A.  On occasion, yes, ma'am.

21   Q.  And some of those loans are for hunting, and some are for

22   personal protection while hunting, right?

23   A.  Yes.  In the past, that's what we have done.

24   Q.  On guided hunts, you have done loans to clients on a daily

25   basis, correct?

1   *A.*  Yes, ma'am.

2   *Q.*  And those loans, then, are covered by the 72-hour exception

3   in 1229, right?

4   *A.*  I believe -- yes, it is covered.  The liability is not,

5   though.

6   *Q.*  And since July 1, 2013, Fulldraw Outfitters has been in the

7   position of having to loan a firearm to a hunter on a daily

8   basis on only one occasion, correct?

9   *A.*  I don't believe it was only one occasion.  I believe there

10  was a couple of times that we loaned guns.

11  *Q.*  Okay.  Well, as of your deposition, which was taken last

12  fall, on November 5, you had had only one occasion to loan a

13  firearm to a hunter on a daily basis, right?

14  *A.*  As -- I -- I'm not sure.  I believe we did it more than

15  once.  Well -- and then also, you were there -- when did I give

16  my deposition?  Because the seasons were continued on after

17  November.  So if -- some of them may have been after that

18  deposition.

19  *Q.*  You also mentioned that you have loaned firearms to clients

20  for personal protection in a drop camp, right?

21  *A.*  In the past, yes, ma'am, we have.

22  *Q.*  But that doesn't happen very often, right?

23  *A.*  Not very often, no.

24  *Q.*  And hunters who are going into drop camps have the

25  appropriate hunting permits, correct?

1  *A.*  Oh, yes, they would have to, or we wouldn't take them.

2  *Q.*  And those permits are good for a certain amount of time,

3  right?

4  *A.*  They're good until they actually tag out, yes, ma'am.

5  *Q.*  And it's my understanding from your testimony today that

6  you believe that the hunting exception in Section 18-12-112,

7  which is House Bill 1229, would not cover loans for personal

8  protection while hunting; is that right?

9  *A.*  No, ma'am, while archery hunting.

10  *Q.*  All right.  Well, why don't you turn to Exhibit No. 4.

11  *A.*  In here?  In this book?

12  *Q.*  Yes.  I hope I gave you the right number.  Do you have

13  House Bill 1229 in front of you?

14  *A.*  Yes, ma'am.

15  *Q.*  Great.  If you could take a look at section (6)(e)(III),

16  please.

17  *A.*  Okay.

18  *Q.*  And I'd like you to look at subsection (B).

19  *A.*  I'm sorry, say that again.

20  *Q.*  Subsection (B).

21  *A.*  B, as in boy?

22  *Q.*  B, as in boy, correct.

23  *A.*  Yes, ma'am.

24  *Q.*  And subsection (B) requires -- indicates that no background

25  check would be required if the unlicensed transferee holds any

1   license or permit required for hunting, fishing, target

2   shooting, or trapping, correct?

3   *A.* Yes.  But it also goes on to say "for such hunting."  And

4   an archery license is not valid for rifle hunting or firearms

5   hunting.

6   *Q.* But an archery hunter would have a permit or a license to

7   do the archery hunting, correct?

8   *A.* For archery equipment only, yes.

9   *Q.* No client has indicated that they will not use Fulldraw

10  Outfitters' services if they cannot be loaned a weapon, right?

11  *A.* That's correct.

12  *Q.* And no client has indicated that they will not use Fulldraw

13  Outfitters' services if they have to go through a background

14  check, right?

15  *A.* That has never come up, so I -- I can say no to that,

16  because nobody's ever asked.

17  *Q.* Fulldraw Outfitters right now has one full-time staff

18  member, correct?

19  *A.* We hired another one since we last talked.

20  *Q.* All right.  So you now have two full-time staff members; is

21  that right?

22  *A.* Correct.

23  *Q.* You mentioned the firearm that is kept in the back of the

24  hay truck this afternoon.  Do you remember that testimony?

25  *A.* Yes, ma'am.

1   Q.  And you mentioned that you can't keep the gun in the back

2   of the hay truck anymore because of Section 18-12-112; did I

3   understand your testimony correctly?

4   A.  It's not kept in the back of the truck.  It's kept in the

5   front -- it was kept on the front seat area.

6   Q.  Okay.  But it's my understanding from your testimony today

7   that you believe that you cannot keep that gun in the truck any

8   longer because of 18-12-112; is that right?

9   A.  I believe so.  That's my understanding.

10  Q.  And there have not been any instances, have there, in which

11  a staff member has had to take the gun from that truck for

12  longer than 72 hours?

13  A.  The gun doesn't -- would not have left the truck.  The gun

14  is now in the gun safe.

15  Q.  Right.

16  A.  So --

17  Q.  Prior to the time when you removed that firearm from the

18  truck, there were never any occasions in which a staff member

19  had to borrow that gun from the truck for longer than 72 hours,

20  right?

21  A.  Well, if my husband and I go out of town and it's longer

22  than 72 hours, my understanding is that, technically, that gun

23  would then be in their possession, as a ranch person driving

24  that truck around for longer than 72 hours, if my husband and I

25  are not on premises.

1  *Q.* All right. So you believe if the staff member drove the

2  truck while you were out of town, the staff member would be in

3  possession of the firearm?

4  *A.* It's on the ranch, and so are they; so to us, there's a

5  question there for us for sure.

6  *Q.* You're not aware, though, of any occasions in which a staff

7  member has had to take the gun out of that ranch truck for

8  greater than 72 hours?

9  *A.* Not for greater than 72 hours, yes, ma'am.

10  *Q.* Do you know whether you would have been civilly liable

11  prior to the passage of Section 18-12-112 if a staff member had

12  borrowed a firearm from Fulldraw Outfitters and done something

13  illegal with that gun, such as killed someone with it?

14  *A.* I don't know the law on that, but I know that probably in

15  that situation, our insurance company would help us out, in

16  that situation. But this -- my understanding is this law makes

17  it very clear that we now are civilly liable for that. And,

18  therefore, I don't believe our insurance companies would cover

19  us under an unlawful use clause.

20  *Q.* All right. Well, let's separate those two things. Let's

21  separate civil liability and the insurance coverage you would

22  have. My question is, do you know whether you would have been

23  civilly liable prior to the passage of 18-12-112 if your staff

24  member had borrowed a firearm from Fulldraw Outfitters and done

25  something unlawful with it, such as killed someone?

 1 │ *A.*  I don't know the answer to that.

 2 │ *Q.*  And do you know whether your insurance company would have

 3 │ refused to provide you coverage in such a situation?

 4 │ *A.*  I don't know that answer.

 5 │ *Q.*  And you haven't had any discussions with your insurance

 6 │ company since the passage of 18–12–112 about your insurance

 7 │ coverage relating to Section 18–12–112, or House Bill 1229,

 8 │ right?

 9 │ *A.*  No, ma'am.  We have the standard outfitter insurance, so

10 │ that possibly has come up, but we have not discussed it with

11 │ them.

12 │ *Q.*  Now, you mentioned that your ranch is near the town of

13 │ Aguilar, right?

14 │ *A.*  It's 8 miles west of there, yes, ma'am.

15 │ *Q.*  Okay.  And are you aware that there are two federally

16 │ licensed firearms dealers in Aguilar?

17 │ *A.*  Not that I know of.

18 │ *Q.*  All right.  I'd like you to turn to Exhibit 26.  And I

19 │ apologize, my binder numbers are different from the binder

20 │ numbers over there, so I can't tell you which binder it is.

21 │        Mr. Keech?

22 │        *THE COURT:*  Mr. Keech, can you locate it?

23 │        *COURTROOM DEPUTY:*  Yes, Your Honor.  Volume 4.

24 │        *THE COURT:*  Thank you.

25 │        *COURTROOM DEPUTY:*  You said 26, correct?

 1          MS. SCOVILLE:  26, please.

 2          THE WITNESS:  Okay.

 3   BY MS. SCOVILLE:

 4   Q.  If you would turn to page 49 of that exhibit, please.  And

 5   I'll represent to you, this is a -- an exhibit that has been

 6   stipulated to and admitted.  And this is a list of all of the

 7   Colorado federal firearms licensees as of March 2014.

 8   A.  Okay.  I apologize, but I don't see page numbers on here.

 9   Q.  Do you have two page numbers at the bottom?

10          MR. WESTFALL:  Your Honor, may I get clarification

11   where we're looking at.

12          THE COURT:  Well, that's what we're trying to do.

13   We're on Exhibit 26.

14          MS. SCOVILLE:  And I've asked the witness to turn to,

15   please, page 49.  There is also a Bates number in the lower

16   right-hand corner that says GOV006048.

17          THE COURT:  Sadly, those have been punched through.

18          MS. SCOVILLE:  I apologize.

19          THE COURT:  So it may be hard to find the right page.

20   Perhaps you can locate it by the number of the line entry on

21   the left-hand side.

22          THE WITNESS:  That, I can do.

23          MS. SCOVILLE:  We are looking at lines 1417 and 1418.

24          THE WITNESS:  Yes, ma'am, I see them.

25   BY MS. SCOVILLE:

1    *Q.*  Thank you.  And this list of Colorado federal firearms

2    licensees indicates at 1417 and 1418 that there are two FFLs

3    located in Aguilar, Colorado, correct?

4    *A.*  It does show that yes, ma'am.

5    *Q.*  You can set Exhibit 26 aside, the binder aside.

6            Now, you mentioned this afternoon that you believe

7    that Section 18-12-112, or House Bill 1229, has an impact on

8    your operations as they relate to your TV shows, right?

9    *A.*  Yes, in a much more minor role than the other two.

10   *Q.*  Okay.  And you are not aware of any instances related to

11   your TV show productions in which you've had to loan a firearm

12   for a greater than 72 hours, correct?

13   *A.*  Not -- no, not now -- not in Colorado.

14   *Q.*  And you also mentioned your son at CSU and that he is no

15   longer able to leave his firearm with the campus police.

16   *A.*  Yes, ma'am.  They -- it's on their website.

17   *Q.*  And I did not understand your testimony as to the

18   relationship between section 18-12-112 and your son's inability

19   to leave his firearm with the campus police.

20   *A.*  I believe Mr. Westfall asked me if it had impacted our

21   family in any other way, and that's a way that it has impacted

22   my son and his ability to hunt.

23   *Q.*  How does Section 18-12-112 impact your son's ability to

24   leave -- not be able to leave his rifle with the campus police?

25   *A.*  On their website, they state that due to the confusion over

 1 │ the law, they have suspended that program.

 2 │ *Q.*  I see.  Fulldraw staff do not usually carry guns with them

 3 │ when guiding hunts, correct?

 4 │ *A.*  The hunts that I am not personally on, I cannot speak to.

 5 │ *Q.*  All right.  Well, the hunts that you have been on, Fulldraw

 6 │ staff do not usually carry firearms with them with guided

 7 │ hunts, correct?

 8 │ *A.*  When I'm on a hunt and I'm guiding, yes, I do.

 9 │ *Q.*  That wasn't my question.  My question was Fulldraw staff.

10 │ *A.*  Ma'am, if I'm not on a hunt with them, I'm sorry, I can't

11 │ speak to that.

12 │ *Q.*  All right.  Do you recall having your deposition taken in

13 │ this action?

14 │ *A.*  Yes.

15 │ *Q.*  All right.

16 │          I'd ask Mr. Keech to hand the witness her deposition,

17 │ please.

18 │          *COURTROOM DEPUTY:*  The regular portion?

19 │          *MS. SCOVILLE:*  Yes, please.  Thank you.

20 │          *COURTROOM DEPUTY:*  I hand the witness her deposition

21 │ taken November 5, 2013.

22 │          *THE COURT:*  Thank you.

23 │ *BY MS. SCOVILLE:*

24 │ *Q.*  Ms. Eichler, would you please turn to page 53.

25 │ *A.*  Yes, ma'am.

 1  *Q.*  Let me first ask you, when you gave a deposition on

 2  November 5, 2013, do you remember being given an oath?

 3  *A.*  Yes, ma'am, I do.

 4  *Q.*  And you swore at that time to tell the truth?

 5  *A.*  Yes, ma'am, I did.

 6  *Q.*  And you did tell the truth during your deposition?

 7  *A.*  Yes, ma'am, I did.

 8  *Q.*  All right.  I'd like you to look at page 53, line 5.

 9  Sorry, pardon me, line 4.

10        Question:  "Okay.  On a guided hunt or a semi-guided

11  hunt, do staff members go out with a firearm?"

12        Answer:  "Not usually."

13        Did I read that correctly?

14  *A.*  Yes, ma'am, you did.

15  *Q.*  Now, when you have been out hunting, you have never been

16  attacked by a predator while hunting, correct?

17  *A.*  Actually attacked?

18  *Q.*  Yes.

19  *A.*  No.  I've been in a threatening situation, but not

20  attacked, no.

21  *Q.*  But you've never had to fire a firearm at a predator while

22  hunting, threatening you in some way?

23  *A.*  While hunting, no, I have not.

24  *Q.*  And you're not aware of any instances in which a Fulldraw

25  client has been attacked by a predator while hunting, right?

```
 1 │ A.  Not attacked by a predator, no, ma'am.
 2 │         MS. SCOVILLE:  If I may have just a moment, Your
 3 │ Honor.
 4 │         THE COURT:  You may.
 5 │         MS. SCOVILLE:  I have no further questions.  Thank
 6 │ you.
 7 │         THE COURT:  Thank you.
 8 │         Redirect.
 9 │                    REDIRECT EXAMINATION
10 │ BY MR. WESTFALL:
11 │ Q.  Now, Ms. Eichler, with regards to Exhibit 26 that you were
12 │ asked some questions about, concerning FFLs in Aguilar, the
13 │ line 1417 refers to a Justin Lee Bird, Diamond J.
14 │ A.  Yes, sir.
15 │ Q.  Do you know him?
16 │ A.  I've never heard of them, no, sir.
17 │ Q.  Is there a storefront that has Diamond J on it in Aguilar
18 │ that is a gun store?
19 │ A.  No, sir, not that I'm aware of at all.
20 │ Q.  There is -- the next one is Patrick C. Blake, Chuck's
21 │ Camping Supplies.  Are you familiar with that at all?
22 │ A.  No, sir, not that I know of.  The only store that sells
23 │ hunting licenses is Ringo's, and they're not an FFL, so I've
24 │ never heard of either of these two.
25 │ Q.  Since you haven't heard of them, you would have no idea
```

 1   whether they're doing transfers -- excuse me, doing background

 2   checks for private transfers?

 3   A.  I have no idea.  I've never heard of them.

 4   Q.  How long have you lived in that area?

 5   A.  We've hunted in that -- I've personally hunted in that area

 6   since 2004.  We actually moved to the ranch from a Trinidad

 7   address in, I believe, 2010.

 8   Q.  Now, you were asked a couple of questions by Ms. Scoville

 9   involving liability.  I'd like to turn your attention back to

10   the (6)(h), 72 hours.  That would be tab 4.

11   A.  I don't have that book anymore.

12   Q.  I'm sorry.

13   A.  I'm sorry.  Where did you want me to turn to?

14   Q.  I want you to turn to page 4 of Exhibit 4, tab 4, and the

15   72 hours.

16   A.  Yes, sir.

17   Q.  And you've testified about this previously.  And I don't

18   want to belabor the point, but I want to focus on the issue of

19   imposition of liability caused by the words "unlawful use."  Do

20   you see that?

21   A.  Say that one more time, please.

22   Q.  Calling your attention to the words, the very last line of

23   page 4 of Exhibit H -- excuse me, subsection (6)(h), that's the

24   72-hour exception.

25   A.  Yes, sir.

1   *Q.*  The very last couple of words there refer to -- and then

2   they go on to the beginning of the next page, top of page 5 --

3   refer to "unlawful use of the firearm"?

4   *A.*  Yes, sir.

5   *Q.*  How easy in the context of your outfitting business is it

6   to have a violation or to have unlawful use?

7   *A.*  It actually could be quite simple.  In the past, the

8   Colorado game laws -- and that is why we actually have our

9   clients sign something saying that they are aware of the game

10  laws and that it's totally their responsibility and that we

11  will actually report any violation.  But a violation of the law

12  could be as simple as not signing your license.  It could be a

13  trespass situation, where an out-of-state hunter may not be

14  familiar with the property lines.  Even though we do try to do

15  a very good job of making sure they don't cross fences or

16  anything like that, on occasion, there is downed fences on a

17  lot of these ranches, and there may not be a clear border.  So

18  if they were trespassing, if they didn't sign their license, if

19  they didn't tag their animal, there is a myriad of unlawful

20  events that could take place based on the Colorado parks and

21  wildlife regulations, yes, sir.

22          *MR. WESTFALL:*  I have no further questions of this

23  witness, and I would ask the witness be excused.

24          *THE COURT:*  Thank you.

25          Any objection?

```
 1              MS. SCOVILLE:  No objection.
 2              THE COURT:  Thank you, ma'am.  You may step down.  You
 3    are excused.
 4              THE WITNESS:  Thank you, ma'am.
 5              THE COURT:  Please call your next witness.
 6              MR. KOPEL:  Your Honor, the plaintiffs would like to
 7    call Major Ronald Abramson, who I believe is in the witness
 8    room.
 9              THE COURT:  Thank you.
10              Please step up and be sworn.
11              (RONALD ABRAMSON, PLAINTIFFS' WITNESS, SWORN)
12              COURTROOM DEPUTY:  Please be seated.
13              Please state your name and spell your first and last
14    name for the record.
15              THE WITNESS:  Ronald Abramson, R-O-N-A-L-D, Abramson
16    is A-B-R-A-M-S-O-N.
17                           DIRECT EXAMINATION
18    BY MR. KOPEL:
19    Q.  Mr. Abramson, do you have a job?
20    A.  I do.
21    Q.  What is that job?
22    A.  I am the chairman and CEO of a renewal energy company in
23    Boulder, Colorado.
24    Q.  Could you tell us the name of that company.
25    A.  It's NexGen Energy Partners.
```

1   *Q.* Do you have a volunteer position with any other

2   organization?

3   *A.* Yes, I do.

4   *Q.* What is that organization?

5   *A.* The Colorado Mounted Rangers.

6   *Q.* What is your position there?

7   *A.* I hold the position of major, and I'm responsible for the

8   office of professional standards.

9   *Q.* Could you please tell us what your responsibilities are as

10  the major in charge of the office of professional standards.

11  *A.* Sure.  We have about 200 sworn rangers across the state of

12  Colorado.  We support roughly 30 law enforcement agencies

13  across the state as -- effectively as their reserves.  I and my

14  office is responsible for ensuring the professionalism and the

15  standards of those rangers for setting the training standards,

16  for ensuring that the training is met, for monitoring ethical

17  behavior of rangers, for reviewing incident reports.  Making

18  recommendations for approval to go through the ranger training

19  program comes through my office and through me as well.

20  Reviewing psychological screening reports.  All rangers have to

21  have psychological screening, the same screening that all law

22  enforcement officers go through.  Reviewing background check

23  information.  So we've got a very comprehensive role within the

24  organization.

25  *Q.* About how many hours per month do you put into your

1    volunteer work as the major at the Colorado Mounted Rangers?

2    *A.*  Boy, anywhere between 50 to 100 hours a month, maybe more.

3    *Q.*  Okay.  How long have you held this position?

4    *A.*  I've been a major for three years, now.

5    *Q.*  Did you have a position with the rangers before that?

6    *A.*  I did.

7    *Q.*  What was that?

8    *A.*  I was a lieutenant of one of the troops, the South Denver

9    troop.

10   *Q.*  What does a lieutenant do?

11   *A.*  I was responsible for similar things within the troop, for

12   ensuring training, professionalism, standards within the troop.

13   The Colorado Mountain Rangers are broken down into six separate

14   troops across the state; and we cover a vast bulk of Colorado,

15   supporting our law enforcement partners.

16   *Q.*  So, in your previous role, you were in charge of one-sixth

17   of the rangers; is that accurate?

18   *A.*  In my role in the office of professional standards, yes.

19   *Q.*  Okay.  Do your responsibilities require that you be

20   familiar with the firearms which are used by the members of the

21   Colorado Mounted Rangers?

22   *A.*  Absolutely.

23   *Q.*  Could you describe how you have that familiarity.

24   *A.*  Well, we set the firearms policy out of our office.  I have

25   received my handgun certification from the Colorado State

1  Patrol Academy as a POST law enforcement firearms instructor in

2  handguns.  I went back to the academy, as well, for my

3  certification as a patrol rifle instructor.

4  Q.  We'll get to your certifications in just a second.  I just

5  want to make sure we cover this.  How do you know what firearms

6  the 200 members of the Colorado Mounted Rangers are carrying,

7  or using in their duties?

8  A.  Okay.  I'm sorry.  So, we set the standards for what

9  firearms are permitted to be carried by the rangers.  Our

10  philosophy is to allow rangers within a certain class of

11  firearms to carry the firearms that best suit their needs,

12  their body mechanics, height, weight, their shooting style,

13  things of that nature.  So we set the general parameters.  We,

14  then -- all the rangers are required to go through our handgun

15  and rifle training programs, if they're going to carry a rifle,

16  as well.  So in that program, they would qualify at the end of

17  the program with the handgun that they carry.  We record that

18  information, including not only the make and model, but also

19  the serial number.  And so we're aware of all the different

20  firearms that our rangers are carrying.

21  Q.  And, then, your responsibilities include reviewing the

22  documents you just said about the different arms that each

23  ranger would be carrying?

24  A.  Yes.

25  Q.  Okay.  Now, let's get to your certifications.  Do you have

1    any certifications as an instructor in the use of force?

2    A.  Yes.  So, as I stated before, I went -- I received my

3    certifications from the state patrol academy in both handgun

4    and patrol rifle.  I'm also a Glock law enforcement instructor.

5    I'm a Glock armorer.  I'm also a master -- I graduated from the

6    master instructor development program from the International

7    Law Enforcement Firearms Instructors Association.

8    Q.  Do you have any -- any others, maybe not firearms, but

9    involving use of force?

10   A.  I do.  So, I'm also an arrest control instructor through

11   PPCT.

12   Q.  What is PPCT?

13   A.  PPCT is pressure point control tactics.  In Colorado, it's

14   the most predominant arrest control technique that's utilized.

15   It's a less aggressive arrest control technique, and it's very

16   defensive in nature.  So I went through their instructor

17   certification program.  I'm also an instructor for -- pepper

18   spray instructor, OC, pepper spray.

19   Q.  And do you have a certification in that?

20   A.  Yes, I do.  Yes.

21   Q.  Who gave you that certification?

22   A.  That is through SABRE, who is the predominant pepper spray

23   provider.

24   Q.  Okay.  Now, you mentioned -- you said you were Glock

25   armorer.  That's not a use of force certification, I don't

```
 1    think.  What kind of certification is that?
 2  A.  The armorer certification allows you to fix and/or modify
 3    and/or order parts directly from Glock.  So you have to be
 4    familiar with their weapons platform -- intimately familiar
 5    with the weapons platform.
 6  Q.  Did you have to take a course to achieve that
 7    certification?
 8  A.  Yes, you have to take a course, and then you have to pass
 9    their final exams.
10  Q.  Okay.  Have you served as an officer of any organization
11    which sets law enforcement standards?
12  A.  Yes.  In 2012, I served as the chairman of the Colorado Law
13    Enforcement Officers Association, training and safety --
14    officer training and safety committee.
15  Q.  Could you tell us what that committee -- what its
16    responsibilities were, the year you were the chairman.
17  A.  The committee was comprised of very well accomplished law
18    enforcement officers in the state of Colorado.  The purpose of
19    the committee was to help assist -- set training standards,
20    provide guidance to agencies that needed that guidance.  We
21    provided written materials to the association, to the entire
22    association, and it was a pretty comprehensive responsibility.
23  Q.  Did the subject of firearms ever come up in that year that
24    you were the chair of the committee?
25  A.  Absolutely.  In fact, we had a firearms subset within our
```

```
 1    committee.
 2    Q.  What sort of issues did that -- did that committee work on
 3    regarding firearms?
 4    A.  Most of the issues involved -- they were focused around
 5    officer safety.  So it was really the safe use of firearms, new
 6    modern techniques in ensuring officer safety.
 7    Q.  Now, I think you mentioned you were -- in your role with
 8    the rangers, you were in charge of training.  Did I hear
 9    that -- understand that correctly?
10    A.  We set the training standards, yes.
11    Q.  Okay.  Do you ever train -- you, personally, do you ever
12    train people other than ranger recruits --
13    A.  Yes.
14    Q.  -- in use of force?
15    A.  Yes.
16    Q.  Could you tell us about that, please.
17    A.  Yes.  I'm also an NRA pistol instructor as well.  So with
18    my certifications I can teach either NRA materials or law
19    enforcement materials, as well.
20    Q.  Have you taught any non-rangers in the past few years?
21    A.  Yes.
22    Q.  About how often?
23    A.  How many?
24    Q.  Yeah.  How many people or how many classes have you taught;
25    do you have a rough guess?
```

1   *A.*  Yeah, I probably train anywhere between 20 to 50 people a

2   year.

3   *Q.*  Okay.  And is the training in -- what specific training is

4   that?  What courses do you teach?

5   *A.*  Focused around the same thing that I do with the rangers,

6   professionalism and safety.  The NRA certification is a little

7   bit different, because it's not law enforcement focused, but

8   it's still an important certification to have.  And for the

9   civilian public, the NRA provides outstanding training and

10  safety programs.  That's part of what I did -- what I do.

11  *Q.*  That's separate from your NRA law enforcement instructor

12  certifications; is that correct?

13  *A.*  Yeah.  My instructor certifications are not through NRA;

14  they're through Colorado.

15  *Q.*  Okay.  Do the Colorado Mounted Rangers have a mission

16  statement?

17  *A.*  Yes.

18  *Q.*  Do you know what it is?

19  *A.*  Yes, paraphrasing it.

20  *Q.*  How did you -- how do you know what it is?

21  *A.*  Well, the Colorado legislature set out our mission

22  statement for us in legislation that was the authorization of

23  the Colorado Mounted Rangers as the state's law enforcement

24  auxiliary.

25  *Q.*  Could you describe that, please.

1   *A.*   Yeah.  So, the mission statement as set forth by the

2   legislature was -- is that the Colorado Mounted Rangers are an

3   auxiliary to law enforcement agencies across the state of

4   Colorado, as well as disaster management, emergency medical

5   services, firefighting, search and rescue, and incident

6   command.

7   *Q.*   Now, when was this -- you mentioned this legislation.  When

8   was this legislation enacted?

9   *A.*   2012.

10  *Q.*   So does that mean that the -- were the rangers created in

11  2012?

12  *A.*   No.  So, the rangers really formed in 1859, when Colorado

13  was still a territory, as a loosely -- a loose band.  It was

14  formalized in 1861 and became Colorado's sole law enforcement

15  agency -- statewide law enforcement agency in the state through

16  the 1920s.  The rangers were de-funded and ultimately disbanded

17  in the 1920s by a governor who ran on the platform that he

18  didn't want statewide law enforcement.  And we -- we still have

19  that today; we still don't have statewide law enforcement.

20       So after the rangers were de-funded, they were brought

21  back into existence in 1941.  And we have operated continuously

22  since 1941.  Governor -- the former governor, Teller Ammons,

23  authorized the rangers as a volunteer law enforcement

24  organization.  And we've operated continuously since '41.

25  We've had bits and pieces in the Colorado state statutes

1 through the years, but the formal reauthorization of the

2 rangers occurred in 2012.

3 *Q.* So how did that -- did that -- could you describe how, if

4 at all, that 2012 legislation changed the ranger status.

5 *A.* Well, it didn't really change the status. What it did,

6 because we're operating so broadly now across the state -- and

7 we really serve as the reserves for roughly 30 law enforcement

8 agencies, with our 200 rangers. And because of that, we felt

9 the need -- because we were being pressed into much more

10 comprehensive duties because of the lack of funding for many of

11 the agencies -- rangers are free labor for them.

12         We're like a volunteer fire department, highly

13 trained, but all volunteer. And so because we were being

14 pressed into so much service in recent years, we thought it was

15 important that the rangers that are providing those services

16 receive the same benefits that their full-time partners, the

17 law enforcement partners, would have, which would be

18 governmental immunity, workers compensation, other things, to

19 the extent that the rangers are involved in any on duty

20 incidents. So that really was the core focus of the

21 legislation.

22 *Q.* So, I guess, since 2012, when the legislature provided

23 workers compensation to the rangers, have any of them had to

24 use it?

25 *A.* No.

1  Q.  How many Colorado Mounted Rangers are there?

2  A.  Roughly 200.

3  Q.  What's the age range?

4  A.  We range in age from 21, which is the minimum requirement

5  to become a ranger, all the way through early 70s.  Most of our

6  rangers are probably in their 40s, 50s, and many of them are

7  retired law enforcement officers.

8  Q.  How many are peace officers?

9  A.  Probably somewhere around 30 to maybe 40 are retired peace

10 officers, or active.  We have many active officers as well.

11 Q.  Okay.  I want to show you a picture, ask if this is an

12 accurate description or an accurate depiction of the rangers.

13 Is that what a ranger looks like?

14 A.  Yes, it is.  The ranger with the campaign hat is -- he's

15 the ranger.  The other gentleman is -- I believe that's a

16 Windsor police officer.

17 Q.  What kind of gun does that ranger have?

18 A.  He's carrying a Glock 17.

19 Q.  Okay.  Thank you.

20       Does being a ranger in itself make a person certified

21 under police officer standards and training?

22 A.  No, it does not.

23 Q.  Could you elaborate -- explain that.

24 A.  So, we are considered peace officers while we're on duty.

25 We work solely at the discretion of and under the command of

 1 │ the police chief or the sheriff who calls us out.  The rangers

 2 │ have -- we have memoranda of understanding with each of the

 3 │ agencies -- all of the agencies that we support.  And while

 4 │ we're on duty, we're peace officers, but we're non-certified

 5 │ peace officers, so we don't fall under the POST board's

 6 │ authority.

 7 │ Q.  Let me see if I'm understanding this correctly.  So when

 8 │ you're called out, then your -- the rangers have a legal status

 9 │ of being peace officers?

10 │ A.  Yes.

11 │ Q.  But when they're not called out, and they're training and

12 │ doing things like that, then they're not peace officers?

13 │ A.  Correct.

14 │ Q.  Is that accurate?

15 │ A.  That's accurate, correct.

16 │ Q.  Do the rangers have geographic divisions?  I think you

17 │ mentioned that you were a regional lieutenant?

18 │ A.  Yes.

19 │ Q.  Could you explain how that works.

20 │ A.  Yes.  So, we're broken into six separate troops, we range

21 │ from Durango to North Denver, which is based out of Fort

22 │ Lupton.  We've got a troop in South Denver, out of Highlands

23 │ Ranch Sheriff's Office.  We have a troop in Colorado Springs,

24 │ in Cañon City, and in Woodland Park.

25 │ Q.  And was there one in the southwest, or did you also mention

1   that?

2   *A.*   Southwest -- well, the most west we are is Durango.

3   *Q.*   Okay.  Has anyone associated with the Colorado Mounted

4   Rangers paid?

5   *A.*   Nobody is paid.

6   *Q.*   Does the organization receive any funding from the state?

7   *A.*   Zero.

8   *Q.*   Do the Colorado Mounted Rangers have a corporate legal

9   status?

10  *A.*   Yes.

11  *Q.*   What would that be?

12  *A.*   We're a 501(c)(3) nonprofit.

13  *Q.*   Do the rangers charge for any services?

14  *A.*   No.

15  *Q.*   Do the rangers have written agreements to provide

16  assistance to law enforcement agencies?

17  *A.*   We do.  So, each of the agencies that we support, we have a

18  memorandum of understanding, which is referenced in the state

19  statutes.  And then those -- those agreements, those MOUs, are

20  then filed with the state through the Department of Homeland

21  Security and Emergency Management.

22  *Q.*   And I think you said you had 30 with different law

23  enforcement agencies?

24  *A.*   Roughly 30, yes.

25  *Q.*   Could you name a few of those that you have arrangements

1  with, memoranda of understanding.

2  *A.*  Sure.  Archuleta County Sheriff's Department, Fremont

3  County Sheriff's Department, Douglas County Sheriff, Weld

4  County Sheriff, Rocky Ford Police Department, Salida PD,

5  Durango PD.

6  *Q.*  Okay.  How about, do you have memoranda of understanding to

7  provide support to any government agencies which are not

8  primarily law enforcement agencies?

9  *A.*  Yes.  So, a few of the towns that we support wanted more

10  comprehensive services than just the law enforcement piece.

11  Because we also do search and rescue, we can assist with

12  wildfires.  Many of our rangers are certified as wildfire

13  firefighters.  So a few towns wanted to -- in order to

14  encompass those additional services that we can support the

15  town with, we signed agreements directly with the towns.

16  *Q.*  All right.  Are all ranger services provided to the

17  communities on a volunteer basis?

18  *A.*  Yes, 100 percent are volunteer.

19  *Q.*  How many hours of volunteer service to government agencies

20  did the rangers provide in the last year for which you had

21  data?

22  *A.*  Somewhere around 50,000 hours of services.

23  *Q.*  Do you have an estimate as to the value of those services?

24  *A.*  Probably on the order of 2 to $3 million.

25  *Q.*  Is that based on -- I presume you have imputed hourly rate

```
 1   for --
 2   A.  Yeah.  If you were to take an hourly rate of 40 to $60 per
 3   hour, which you would pay to a full-time law enforcement
 4   officer with benefits and gear and everything else, probably in
 5   the range.
 6   Q.  Do the Colorado Mounted Rangers train rangers how to use
 7   firearms.
 8   A.  Yes.
 9   Q.  Could you describe the training that is provided.
10   A.  Yes.  So, we have the own training program.  We follow POST
11   firearms requirements.  Our program is taken directly from the
12   Colorado State Patrol Academy, but then it's modified -- none
13   of the program itself is modified.  We just don't need some of
14   the pieces that they have for brand new recruits, things like
15   gun cleaning, how to select a firearm, things of that nature is
16   not part of our formal curriculum.  The actual firearms
17   training itself is verbatim of what the Colorado State Patrol
18   Academy teaches.
19   Q.  That sounds like that's the initial training for a recruit.
20   A.  Yes.
21   Q.  Do the rangers provide any -- or require any subsequent
22   training after the person's gone through the recruit training
23   period?
24   A.  Yes.
25   Q.  Could you describe that, please.
```

1   A.  Well, we have ongoing training courses.  You have to be

2   recertified in your handgun every six months.  But then we have

3   additional courses for rangers, everything from tactical

4   courses to self-defense, and everything in between.  So the

5   rangers are in a constant training rotation on a yearly basis,

6   in addition to the initial up-front training they receive.  It

7   takes about eight to twelve months to become a ranger once

8   you're accepted into our program.

9   Q.  Okay.  Do you work with the Colorado State Patrol?

10  A.  Yes.

11  Q.  Could you describe that, please.

12  A.  Yeah.  We've got a terrific relationship with state patrol.

13  They provide the use of their facility to us for our arrest

14  control training.  Many of us have been through their programs

15  for law enforcement instructor certifications, and they provide

16  many of the materials that we rely upon.  We think -- and I

17  think, personally -- they have an absolutely outstanding

18  training program, so we like to model ourselves off of them.

19  Q.  You mentioned you have certification -- you personally have

20  certifications as a law enforcement firearms instructor.  Do

21  the other Colorado Mounted Rangers instructors also have

22  certifications?

23  A.  Everybody has to receive -- in order to teach firearms, you

24  have to be a law enforcement firearms instructor.  So, yes, all

25  of them are law enforcement firearms instructors.

1    Q.  Do you have any standards for applicants who want to become

2    rangers?

3    A.  Yes.

4    Q.  Could you describe those, please.

5    A.  Yes.  The basic standards are, minimum age of 21, no

6    criminal record that would not allow you to become a full-time

7    peace officer.  We do background investigation -- full

8    background investigation with a professional background

9    investigator, who also does work for many -- most local law

10   enforcement agencies.  We do a full psychological screening

11   with a police psychologist.  We go through nine months to

12   twelve months of training, depending on how long that takes

13   that ranger to get through all of our training.  That includes

14   use of force, arrest control, firearms training, as we talked

15   about.  There is a legal component to our training.  It's a

16   pretty comprehensive program.

17   Q.  How does that compare to the training a person might

18   receive -- the standards that would be applied for someone to

19   go through the peace officer standards and training?

20   A.  Much of it is exactly the same as POST.  In fact, we take

21   many of the POST requirements and utilize them ourselves.

22   Q.  Okay.  Do the Colorado Mounted Rangers, are they required

23   to -- the members required to file incident reports on a

24   regular basis as part of the course of the operations of the

25   rangers?

1    *A.*  Yes.  Any time there is a physical incident or use of a

2    firearm or drawing your firearm, they're -- rangers are

3    required to file a written incident report.  That goes to the

4    troop captain, and then it comes to my office, the office of

5    professional standards.

6    *Q.*  Do you personally have a responsibility to review those

7    incident reports?

8    *A.*  Every one of them, I review personally.

9    *Q.*  Do government entities contact the Colorado Mounted Rangers

10   to request assistance?

11   *A.*  Yes.

12   *Q.*  How do they do that?

13   *A.*  Usually, it will come -- the request will come to the troop

14   captain, where that troop is located.  Generally the captains

15   have very tight relationships with the sheriffs and police

16   departments that we support.  It can come in a phone call, an

17   e-mail, a face-to-face meeting, whatever the case is.  And

18   they'll ask for ranger assistance for a particular community

19   event that they might need help with, if they need help with

20   street patrols, we serve as second officers or cover officers

21   for their full-time officers.

22   *Q.*  Good.  I'd like to ask you about the cover officers a

23   little bit, if we could.  Continue on this sort of survey of

24   the general things they do.

25          Do they -- you said the rangers serve as patrol

 1  officers, I believe?

 2  *A.*  Yes.

 3  *Q.*  Could you explain that.  Is that an extraordinary thing, or

 4  it more routine, or --

 5  *A.*  It's fairly regular for us, depending on the town.  Many of

 6  the towns have extremely small police departments; they might

 7  have five, six, seven officers for an entire town.  And if one

 8  or two officers are sick and three -- you know, three are not

 9  on duty, they might be left very short-handed.  And so in those

10  instances, they'll call the Colorado Mounted Rangers, and

11  they'll ask us to send a second officer to act in a cover

12  capacity for their primary officer.  Sometimes they ask us to

13  do primary street patrol for them, as well.  They'll give us

14  their cars on an overnight shift that they can't cover, and

15  they'll have us do primary street patrol for them as well.  So

16  it really runs the gamut of whatever the need of the agency

17  we're supporting.

18  *Q.*  Do the rangers respond to violent crimes?

19  *A.*  Yes.

20  *Q.*  What sort of violent crimes do they respond to?

21  *A.*  Everything from robbery to attempted murder to knives and

22  guns being displayed in public or brandishing or threatening.

23  *Q.*  Have the rangers ever been called out because of a prison

24  escape?

25  *A.*  Yes.  We were -- there was a prisoner escape, I think, off

1   of memory, roughly two years ago.  It was a significant escape,

2   and they needed up to 100 rangers to assist in rounding up the

3   prisoners who escaped.  So we received an early alert from the

4   inspector general of the prison system to put our rangers on

5   standby.  We started to deploy our rangers, and the prisoners

6   were recaptured before we were able to come on scene.

7   Q.  Okay.  Are the rangers ever called out during natural

8   disasters?

9   A.  Yes.

10   Q.  Could you tell us about that, please.

11   A.  That -- we have a number of primary missions, but,

12   certainly, responding to natural disasters and supporting the

13   communities is one of our primary missions.  We are called out

14   for everything from the fires that occur every year, we were

15   fully deployed for the Black Forest fire, for the Lime Gulch

16   fire, we were called out for the floods.  We supported the

17   towns of Evans and Milliken, who were downstream and who,

18   really, were decimated.  We were on duty there for ten straight

19   days in Milliken.  We did everything from street patrols, to

20   rescues, to community evacuations.

21   Q.  Well, why were you -- do you know whether the towns of

22   Evans and Milliken had enough resources on their own to handle

23   the floods and prevent looting?

24   A.  They did not.  So, the town of Evans -- and Milliken too,

25   for that matter -- have very small police departments.  Evans

```
 1    had significant issues when the floods were occurring.  They

 2    couldn't even get the few officers they have into town.  They

 3    had some, but not many.  And, so, I was deployed initially to

 4    Evans.  In a three-hour round trip around every bridge that was

 5    flooded out, we finally made it to town, and we supported them.

 6           Milliken had the same scenario.  They have a very

 7    small police department, and they just didn't have the

 8    resources to deal with things -- looting, evacuations, rescues,

 9    and just regular community patrolling.

10    Q.  You mentioned looting.  In this flood response, did any

11    rangers encounter any looters?

12    A.  Yes.  In fact, as the floods wore on, probably toward the

13    end of our deployment in Milliken, we started to encounter a

14    significant increase in the amount of looting.  Many of the

15    communities that were most hurt by the floods were trailer park

16    communities, because they sat lowest to the river.  And so in

17    many of those trailer park communities, there were

18    opportunities for the -- for criminals to come in and to enter

19    trailer parks that had been evacuated as a result of the order

20    of the town.

21    Q.  So what did the rangers do when they countered looters?

22    A.  We can do anything from detention, to arrest, to

23    investigation.  In Milliken, we called in a couple of looters

24    to dispatch.  We always have our radios connect directly --

25    either directly to dispatch or through a bridge to dispatch.
```

1  They dispatched one of their officers.  We had two rangers on

2  scene who investigated a potential looter, and he was

3  subsequently detained by the Milliken Police Department.

4  Q.  Do the rangers perform arrests?

5  A.  Yes.

6  Q.  Would that include executing an arrest warrant?

7  A.  Yeah.  I mean, we -- that's not our primary mission, but we

8  have been on occasion asked by local police departments to

9  assist them in executing arrest warrants of known criminals

10 that they may have spotted walking up their streets that had a

11 warrant out for their arrest.  And if there is only one

12 officer, but three or four rangers in town, they will very

13 often ask for our assistance as a matter of safety.

14 Q.  I think you mentioned something called a cover officer.

15 A.  Yes.

16 Q.  What's a cover officer?

17 A.  So, a cover officer, essentially, sits in a second officer

18 capacity.  They'll sit in the front seat with the primary

19 officer, who is the driver.  And they serve in a cover

20 capacity.  So, often in many situations, you want a second

21 officer on scene.  And the ranger often serves as the second

22 officer and allows the local police department to execute a

23 warrant or whatever other thing that they're trying to do,

24 detention, a stop, whatever it is.  It's really an officer

25 safety issue for the primary officer, especially in small

```
 1  │ towns.
 2  │ Q.  Is that something covered by law enforcement standards that
 3  │ they use the cover officers?
 4  │ A.  Yes.
 5  │ Q.  What do they say about it, good idea, bad idea?
 6  │ A.  If you can do it, it's a terrific idea.
 7  │ Q.  During the floods, were the rangers granted arrest
 8  │ authority?
 9  │ A.  Well, we -- as peace officers, we always inherently have
10  │ that authority.  During the floods, we -- to the extent that --
11  │ for instance, in that incident of the looter, we would call in
12  │ to dispatch in order to see how the local PD wanted us to
13  │ handle it.  So, very often, we're asked to perform a primary
14  │ arrest; but more often, we serve in a cover officer capacity
15  │ during an arrest.
16  │ Q.  About how many times in recent years annually has a ranger
17  │ actually arrested or detained someone?
18  │ A.  Well, in either a primary or a cover officer role?
19  │ Q.  Doing -- describe each.
20  │ A.  So, in the primary role, it's less frequent.  Maybe one a
21  │ year, one or two a year.  In a cover officer role, maybe five
22  │ to ten --
23  │ Q.  Okay.
24  │ A.  -- on an annual basis.  It really depends on the year.
25  │ Some years are very quiet for us, and other years are much more
```

 1 | exciting, from that standpoint.

 2 | Q.  You mentioned the flooding situation.  Can you recall any

 3 | other notable arrests or detentions in the recent past?

 4 | A.  Yeah, we've had -- we've had many the past few years,

 5 | actually.  We had a bank robbery that occurred in Rocky Ford.

 6 | There were two or three rangers that were in town on duty.

 7 | They had to -- they worked with the primary officers and

 8 | arrested some suspects.

 9 |      We had an incident in Salida.  We had a group of

10 | three, I believe, folks who were harassing residents in the

11 | town, who were either high or drunk or both, who were taking

12 | bricks and threatening people.  And we had rangers that were in

13 | town.  We have an MOU with Salida.  We performed the primary

14 | arrest in that circumstance.  We turned them over to Salida PD,

15 | and received a commendation because the PD had had trouble

16 | handling those folks.

17 |      We've had incidents in Monument, where we'll be

18 | working a large public event, which is -- often we're called

19 | out for large public events.  A town like Monument has a very

20 | small police department.  If they have a influx for July 4, for

21 | instance -- they'll have an influx of a couple thousand people,

22 | and they just don't have adequate resources from a traffic

23 | patrol standpoint and just patrolling standpoint, so they'll

24 | call the rangers in.  And we've had incidents there, everything

25 | from brandishing and threatening a firearm, we had an arrest

1    for that, we had an arrest for a knife.

2         We had another arrest -- I'm not sure of the town off

3    the top of my head.  But it was a teenager who was threatening

4    people with a gun.  We performed the primary arrest there, one

5    of our troop captains did.  And it turns out it was a pellet

6    gun, but he was threatening everyone in town, nonetheless.

7    *Q.*  Do the rangers ever have to engage in physical

8    altercations?

9    *A.*  Yes.

10   *Q.*  About how many of those per year?

11   *A.*  About the same, roughly five to ten physical altercations

12   per year.

13        *THE COURT:*  Mr. Kopel, we're about ready for a

14   mid-afternoon recess.

15        *MR. KOPEL:*  This sounds like a perfect time.

16        *THE COURT:*  I'd ask you to look at the remainder of

17   your examination and see if you can get to the point you are

18   trying to make.

19        *MR. KOPEL:*  We are almost on the verge, Your Honor.

20   Thank you.

21        *THE COURT:*  Thank you.  We'll stand in recess for 15

22   minutes.

23        (Recess at 2:40 p.m.)

24        (In open court at 2:57 p.m.)

25   *BY MR. KOPEL:*

1    Q.  Major Abramson, let's start talking about guns.  Has any

2    ranger in the last five years discharged a firearm while on

3    duty?

4    A.  No, not while on duty, only in training.

5    Q.  In the last five years, have rangers used their firearms

6    while on duty by drawing or displaying it?

7    A.  Yes.

8    Q.  About how often?

9    A.  Many of the incidents I shared with you earlier about the

10   arrests that we made for knives, threatening with guns, other

11   things of that nature, they all -- in all of those instances

12   the rangers drew their firearms.  So in the last few years,

13   probably on the order of five to ten.

14   Q.  Has a ranger ever been attacked by an animal while

15   deployed?

16   A.  Yes.

17   Q.  Could you describe that.

18   A.  Yeah, we've had two recent incidents when we were on duty.

19   One was with the Fremont County Sheriff's Department, and the

20   other -- I'm not sure -- I believe it was another sheriff's

21   department.  In both instances, rangers were bitten by rattle

22   snakes.  We also had a -- rangers were on a search and rescue

23   mission outside of Durango, and we had a bear come through our

24   camp with our horses, as well.  The bear did not attack the

25   rangers.  The horses were terribly spooked, but the bear did

1   not attack them.

2   *Q.* Do rangers operate in remote areas?

3   *A.* Yes.

4   *Q.* Please describe the details on that.

5   *A.* Well, part of our mission, as I shared with you before, is

6   of a search and rescue nature. So we are called out in many

7   instances by local law enforcement agencies to assist them for

8   lost hikers, lost children, people that just get misguided in

9   the back country. We rescued our -- one of our more well-known

10  rescues, Representative J. Paul Brown, he spoke about it on the

11  House floor two years ago. Rangers had rescued him and his

12  family from a potentially very dangerous evening in cold

13  temperatures.

14  *Q.* When doing the back country operations such as search and

15  rescue, are the rangers in radio communication of civilization?

16  *A.* No.

17  *Q.* Are all rangers required to use firearms to care --

18  firearms by carrying them on duty?

19  *A.* No. Only rangers that are in primary roles. So a primary

20  role would be the cover officer roles, patrol, cover officer,

21  things of that nature. We have some rangers who are generally

22  not as physically capable. They're older, generally, and they

23  don't feel as comfortable any longer carrying a firearm, so

24  they'll perform secondary roles for us. They can do our

25  communication. We have outstanding communications operations.

1  They can do shuttling rangers to locations, things of that

2  nature.

3  *Q.*  What about when you're helping a community with like a fair

4  or a bike race, do rangers have to carry firearms then.

5  *A.*  Yes.

6  *Q.*  Yes.

7  *A.*  Well, if we're in public, and we're wearing badges, and

8  we're acting a peace officer capacity, we're directing traffic,

9  we're patrolling the street, we're keeping the peace, rangers

10  are required in those instances to have a firearm and full duty

11  belt, which would include a less lethal -- or non-lethal

12  implement that they're trained in as well so we don't have to

13  draw the firearm -- hopefully, we don't have to in those

14  instances.  But rangers are peace officers than anyone else.

15  And we don't get distinguished any differently than a Jefferson

16  County Sheriff's deputy or a Colorado State Patrol officer.  We

17  look the same, we act the same, we command the same authority.

18  And rangers have to have the ability, not only to protect

19  themselves, but to protect the general public.

20  *Q.*  What are the rules about what kind of handguns a ranger may

21  carry on duty?

22  *A.*  We have a fairly limited class of handguns.  They have to

23  be in the mid full-size class.  The rounds have to be law

24  enforcement capable rounds.  So we have minimum and maximum

25  standards that --

 1  *Q.*  Could you specify that for us, the inches for the barrel

 2  length and then the calibers.

 3  *A.*  Yes.  So, our barrel length has to be a minimum of 3 1/2

 4  inches, although we have very few rangers with barrel lengths

 5  that small, and can be a maximum of 6.  On both sides of that

 6  spectrum, that really is from the revolver days.  Almost all of

 7  our rangers have transitioned from revolvers into modern

 8  semiautomatic handguns.  So the rangers generally carry

 9  handguns that are in the 4- to 5-inch range, which is standard

10  law enforcement sized handgun.

11  *Q.*  How many rangers carry revolvers?

12  *A.*  Maybe one or two.

13  *Q.*  Okay.  So putting aside the revolvers, what are your

14  permissible calibers for semiautomatic pistols?

15  *A.*  So, outside of revolvers, we only allow three different

16  rounds, 9 millimeter, .40 caliber, and .45.

17  *Q.*  Why is that?

18  *A.*  Because higher than .45 becomes a danger to the community

19  if you engage a suspect in an incident, because that round is

20  so powerful, it's going to travel simply too far and go through

21  too many obstacles.  Less than that poses the same problem from

22  a different standpoint, which is, it really is an officer and

23  public safety issue.  If you don't have a capable round -- when

24  you draw your firearm, you're drawing your firearm with the

25  intention of using it.  Now, in many instances, we don't have

```
 1    to use it; but you're drawing it with the intention of using

 2    it.  And so there are rounds that are less potent, that if you

 3    need to use that round, simply won't do the job.  And the FBI

 4    found that out in the Florida incident, where they shot a

 5    suspect I think 20 or 30 times with low -- low-powered rounds.

 6    Q.  What was the caliber on that?

 7    A.  I think they were using .38 specials at the time, so it was

 8    .38.

 9    Q.  What is the most common handgun that rangers use?

10    A.  The most common by far is the Glock 17.

11    Q.  How many rounds does that hold?

12    A.  That holds 17 rounds of ammunition in the magazine, and one

13    in the chamber.

14    Q.  Do the female rangers usually choose any particular type of

15    firearm?

16    A.  They do.  Almost all of our female rangers choose Glock 17

17    or a 9-millimeter full-sized handgun.

18    Q.  And the Glock 17 is a 9 millimeter?

19    A.  Yes, it is.

20    Q.  Okay.  What are the advantages of a Glock 17?

21    A.  Well, it has outstanding second shot capabilities, because

22    it's a low recoil weapon.  It's not only an actual -- not only

23    actually does it produce less recoil, but also less perceived

24    recoil for the shooter.  Many of our women rangers tend to be

25    smaller and weigh less than their male counterparts.  And there
```

1   is also a strong preference for that firearm by males as well,

2   so it's not a female handgun by any stretch of the imagination.

3   But it has outstanding second shot performance, where you don't

4   have the muzzle coming up too fast or too high so that you can

5   keep your muzzle down on target.  Our qualification course is

6   very rigorous, and you have to have the proficiency in your

7   firearm in order to even pass the firearms qualification.

8   Q.  Could rangers use a compact or a subcompact handgun as

9   their primary sidearm?

10  A.  No, that would not be permissible.

11  Q.  Why not?

12  A.  Well, the primary -- you don't have a long enough sight

13  radius.  Those are not considered law enforcement quality

14  handguns.  So with a low sight radius, you have less

15  opportunity to hit your target.  And in the law enforcement

16  community, we like to use 4- to 5-inch barrel lengths, because

17  that's the perfect compromise between a long enough sight

18  radius and not something too long.

19  Q.  Are there any 9-millimeter guns that comply with your

20  minimum barrel length standards and that also have standard

21  magazines that hold 15 or less?

22          MR. GROVE:  Objection, Your Honor.  Relevance.

23          THE COURT:  Response.

24          MR. KOPEL:  His testimony is about how House Bill 1224

25  takes choices away from the rangers, which we are on the verge

1  of discussing.  And I want to establish what choices they have

2  that meet their standards, while complying with House Bill

3  1224.

4           THE COURT:  Reply.

5           MR. GROVE:  The law enforcement claims have been

6  dismissed in this case, Your Honor.

7           MR. KOPEL:  He's not in the case as a plaintiff.  He's

8  in the case -- he's testifying the same as ordinary citizens

9  who are not law enforcement officials, but what they do as

10  ordinary citizens in their volunteer service.

11           THE COURT:  Well, all of this testimony thus far has

12  been about what the Colorado Mountain Rangers do.  Is it your

13  position that what the Colorado Mountain Rangers do in

14  assisting law enforcement officers is solely in an individual

15  capacity?

16           MR. KOPEL:  Yes, they are -- yes.  Every one of them

17  is training as an individual citizen who has no legal rights to

18  gun ownership other than what every other ordinary citizen in

19  this state does.  They have no ability to buy a gun in a gun

20  store or a magazine or anything like that separate from what

21  any of the rest of us have.

22           THE COURT:  All right.  I'll allow him to answer the

23  question.  But would you please get to the point.

24           MR. KOPEL:  Certainly, Your Honor.

25           THE COURT:  In other words, we don't need to survey --

1   as interesting as it is, we do not need to survey all of the

2   possibilities and information that this gentleman has that he

3   considers in his role as the major in charge of the office of

4   professional standards.  What I need to know is, what

5   information is pertinent to these claims?

6           MR. KOPEL:  Certainly, Your Honor.

7   BY MR. KOPEL:

8   Q.  Would you like the question read back?

9   A.  No, I believe I understand it.  The -- none of the

10  full-sized law enforcement firearms are available to us -- or

11  at least the magazines are no longer available to us any longer

12  as a result of the legislation.

13  Q.  Do rangers use patrol rifles?

14  A.  Yes.

15  Q.  What patrol rifle -- what's the most common patrol rifle

16  that they use?

17  A.  The only one we allow is an AR-15, which is the standard

18  law enforcement patrol rifle.

19  Q.  What size magazines do the rangers carry for their patrol

20  rifle?

21  A.  The standard magazine on that firearm is a 30-round

22  magazine.

23  Q.  Are these ranger patrol rifles and patrol handguns

24  compatible with law enforcement rifles and handguns?

25  A.  Yes.

1   Q.  Is that important to the rangers, to you --

2   A.  It's very important.  We need to train and use the same

3   firearms that our partner agencies are using.

4   Q.  Why?

5   A.  For a couple of reasons.  Number one, it all goes back to

6   the safety of the ranger.  But we have to know how to operate

7   their platform, and they have to know how to operate ours.

8   There are really only a few predominant law enforcement

9   handguns that are utilized.  And so we allow our rangers to

10  choose among that small subset of law enforcement firearms.

11  Q.  Have you read House Bill 1224, which is now codified at

12  Colorado Revised Statute 18-12-301, et seq.?

13  A.  Yes.

14  Q.  Is analyzing the effect of legislation part of your duty to

15  the Colorado Mounted Rangers?

16  A.  Yes.

17  Q.  Has this legislation ad any effect on the Colorado Mounted

18  Rangers?

19  A.  Its had a dramatic effect.

20  Q.  Could you please describe that.

21      MR. GROVE:  Objection.  Calls for improper legal

22  conclusion.

23      THE COURT:  I'm not treating it as such.

24      THE WITNESS:  So, essentially, we've lost an entire

25  class of firearms that are the predominant firearms that our

1   rangers carry, because they can no longer -- they no longer

2   have access to any of the magazines in order to utilize those

3   firearms.

4   *BY MR. KOPEL:*

5   *Q.*  Why not?  I -- maybe if there is a new ranger coming in,

6   but what about your veteran rangers who presumably have their

7   17- or 18- round magazines already, or their 30-round magazines

8   for their ARs, what -- how could that affect them?

9   *A.*  So, I'm a good example.  I'm, perhaps, a normal example

10  among the rangers.  I have a Glock 17, but I only have so many

11  magazines, and they get used and beaten up very heavily in

12  training.  And, so, we're in a constant rotation of replacing

13  magazines, because we train hard, because we're saving our

14  lives and other people's lives.  And so many rangers have had

15  to stop utilizing their Glock 17s, their Springfield XDMs,

16  their Smith & Wesson M&Ps, which are the most common law

17  enforcement firearms, because we don't have access to magazines

18  in excess of 15 rounds.  It's, essentially, banned those guns

19  from our use.

20  *Q.*  So what do those rangers switch to?

21  *A.*  They've been switching to different firearms that don't

22  necessarily suit their requirements, their needs, or their

23  likes.

24  *Q.*  What would it be they were switching -- I guess with your

25  caliber limitations, they would have switched to .40 or

1   .45 caliber?

2   *A.*   Those are the only choices.

3   *Q.*   Aren't there lots of good gun in those calibers?

4   *A.*   There is nothing wrong with .40 and .45 caliber firearms,

5   but philosophically, the law enforcement community, we want

6   people utilizing the firearms that they're the most comfortable

7   and that they can handle the best.  And the 9 millimeter is the

8   most popular firearm there is, common in law enforcement.  So

9   we've taken that entire class away.  So they can utilize other

10  firearms, but they may not be as proficient with the other

11  firearms.  They may not enjoy shooting them, which is an

12  important component.  You can't be scared of the firearm that

13  you're training with.  There is a whole host of other reasons

14  why we don't like people to be stuck in a class of a couple of

15  different firearms without having the full range of options

16  available.

17  *Q.*  Couldn't they switch to a smaller 15-millimeter handgun

18  like -- 9-millimeter handgun like the Glock 19, which has 15 or

19  fewer rounds?

20  *A.*   They could, but now you're not really in a full-sized law

21  enforcement firearm scenario.  So you've got a much shorter

22  barrel.  It does meet our barrel length requirements, but with

23  a shorter sight radius, your accuracy goes down dramatically.

24  *Q.*  Couldn't the rangers who want the 9-millimeter handguns,

25  because you said they're comfortable and proficient, couldn't

```
 1   they just buy a 10-round magazine for those guns?
 2   A.  They could, but it would be like loading your car with a
 3   half a tank of gas.  So, when you're in an engagement -- there
 4   is a reason that those firearms have the rounds that they do.
 5   And when you're in an engagement, every round matters to you.
 6   So you're taking what was a 17-round magazine and reducing it
 7   to 10 rounds.  That's a dramatic difference.
 8   Q.  How about instead of doing that, they just put in a limit
 9   so the magazine, instead of holding 17, holds 15.  Why don't
10   they do that, or could they?
11        MR. GROVE:  Objection, Your Honor.  Calls for expert
12   opinion.
13        MR. KOPEL:  It's not expert opinion.  It's about what
14   the rangers do, which he is in charge of.
15        THE COURT:  This witness can testify as to what he
16   does, but he cannot testify as to what someone else does.
17        THE WITNESS:  I wouldn't do that.  I wouldn't do that,
18   because you're now modifying the factory equipped magazine and
19   creating a risk to yourself and the people around you.
20   BY MR. KOPEL:
21   Q.  I believe you testified you were a Glock armorer.
22   A.  Yes.
23   Q.  Do you know whether putting a limiter into a magazine would
24   affect the Glock warranty based on your experience as a Glock
25   armorer?
```

     1  │  A.  Yes, it would.

     2  │  Q.  What would the effect on the warranty be?

     3  │  A.  Glock won't warrant it any longer.  You've lost the ability

     4  │  to -- not only to warrant it, but you've also lost the ability

     5  │  to clean your gun -- I'm sorry, clean the magazine.  Because if

     6  │  you're blocking it, depending on how you utilize that, you no

     7  │  longer can even clean the magazine, so they become disposable,

     8  │  essentially, once they clog up.

     9  │  Q.  Have you read House Bill 1229, which is codified at

    10  │  Colorado Revised Statutes 18-12-112?

    11  │  A.  Yes.

    12  │  Q.  And was that, again, part of your duties --

    13  │  A.  Yes.

    14  │  Q.  -- in the rangers?

    15  │  A.  Yes.

    16  │  Q.  Does that legislation affect the rangers?

    17  │  A.  It does.

    18  │  Q.  Does the provision about -- that allows firearms loans of

    19  │  up to 72 hours, does that have any impact on the rangers?

    20  │  A.  Yes.

    21  │  Q.  Please describe that.

    22  │  A.  Well, we often train -- we have new rangers that come in,

    23  │  or rangers looking to transition off of different equipment,

    24  │  like the old six shooters, that need to test out different

    25  │  firearms.  So we often are loaning firearms to other rangers

 1  | for training, either here in Colorado, or even out of state.
 2  | It was a very common practice for us so that our rangers could
 3  | be as trained as possible.  And the bill dramatically curtails
 4  | that capability for us.
 5  | *Q.*  Why?
 6  | *A.*  Well, it depends on whether it's under 72 or over 72 hours.
 7  | But under 72 hours, the person loaning the gun -- so if I loan
 8  | a gun to another ranger, I've now taken on liability myself for
 9  | something that that ranger may have done.  And I think a lot of
10  | rangers are very hesitant to take on that liability now for
11  | somebody else.  Over 72 hours, it's just simply not permissible
12  | under the bill.
13  | *Q.*  Is there any actual situation where the 72-hour limit in
14  | practice affects what the rangers do?
15  | *A.*  Yeah, not -- in multiple scenarios.  So, in training, we
16  | have many rangers that train out at Front Sight, right outside
17  | of Las Vegas, Nevada.  And they'll take multi-day trips.  It's
18  | a day to get out there, they'll take a five-day course, out
19  | there, and then they come back.  So they're gone for, you know,
20  | maybe six or seven days.  And we used to very regularly loan
21  | rifles.  If they're not proficient in the AR-15 platform and
22  | they want to take a rifle course and then buy a rifle later if
23  | they're comfortable in it, we would loan rifles to fellow
24  | rangers for training.  We can't do that.
25  |          It also affects our duties.  We're in patrol cars.

1   For instance, in the floods in Milliken, we had one of their

2   patrol vehicles for the entire ten days. And that had a

3   shotgun in the vehicle, that was riding around with our

4   rangers. There is rifles in the trunks. And, again, under

5   these bills, we've lost the ability to even patrol in vehicles

6   that are properly equipped with the gear that they need to

7   have.

8   Q. So you're saying that when law enforcement loans you --

9   gives the rangers a patrol vehicle, they leave the guns in the

10   car?

11   A. Yes. Because the guns are -- they're locked. There is a

12   safety latch on your shotgun in the vehicle, and often there is

13   a rifle in the trunk.

14   Q. Do they give the rangers the keys to the safety latches on

15   rifle or shotgun?

16   A. Yes, because we might need it.

17   Q. How often does it happen that rangers end up with a vehicle

18   with the long guns in it for more than 72 hours?

19   A. I would say it happens most predominantly during disasters,

20   when the agencies are short on capability, and so they need to

21   loan vehicles to us.

22   Q. Did the Colorado Mounted Rangers make any efforts while

23   these two bills were being moved through the legislature to

24   seek amendments to ameliorate their impact?

25   A. Yes, I did, personally.

 1 | Q.  What did you do?

 2 |     MR. GROVE:  Objection to the extent that it duplicates

 3 | the legislative history which is already in the record.

 4 |     MR. KOPEL:  Which it certainly does not.  He's not in

 5 | the legislative record he's about to explain.

 6 |     THE COURT:  Excuse me.  Is that your response?

 7 |     MR. KOPEL:  Yes.  This does not duplicate the

 8 | legislative record, because he's going to explain how he was

 9 | not allowed to testify and what he did.

10 |     THE COURT:  What's the position of Colorado?

11 |     MR. GROVE:  I would alter my position to relevance.

12 |     THE COURT:  Response.

13 |     MR. KOPEL:  Part of the defects of these bills we have

14 | been addressing all week involves, in part, what is in the

15 | legislative record which is the somewhat hasty and careless

16 | manner in which they were produced, and sometimes sloppy

17 | language or sometimes in a manner which the legislative record

18 | does reflect of being indifferent or clueless about the

19 | collateral damage that was being caused.  This is an additional

20 | example of that.

21 |     And as Your Honor considers the basis on which the

22 | legislature passed these bills, Your Honor might want to

23 | consider the care or lack of care that went into them.

24 |     THE COURT:  Mr. Kopel, since when is the care or lack

25 | of care something that is considered in determining the

 1  constitutionality of an enacted statute?

 2          MR. KOPEL:  Perhaps in some Supreme Court decisions or

 3  other precedents that I've read, the decision that sometimes

 4  upholds a bill will talk in detail about the findings that were

 5  made, the legislative hearings that took place, the great care

 6  with which the legislature looked into something.

 7          Conversely, for example, in *United States v.* Lopez,

 8  which struck down the gun-free school zones act in 1995 that

 9  had been previously passed by Congress, the Court looked to the

10  absence of a legislative history about that.  And in that

11  particular issue, regarding the effects on interstate commerce.

12          THE COURT:  And in both of those cases, sir, it was

13  not the care or lack of care that the legislature used; it was

14  an assessment of what information the legislature relied upon.

15  And we have that record that has been admitted by stipulation.

16  There is no need to inquire as to what might have been

17  presented to the legislature.  It either was, or it wasn't.

18          MR. KOPEL:  Okay.  Thank you, Your Honor.  This

19  concludes my examination.

20          THE COURT:  Thank you.

21          Cross-examination.

22          MR. GROVE:  Yes.  Briefly, Your Honor.

23                        **CROSS-EXAMINATION**

24  BY MR. GROVE:

25  Q.  Good afternoon, sir.

1  │ A.   Good afternoon.

2  │ Q.   You mentioned that the rangers have a firearms policy.

3  │ A.   Yes.

4  │ Q.   And it sets minimum standards for what types of handgun a

5  │ ranger can carry?

6  │ A.   Yes, that's correct.

7  │ Q.   And from that policy, firearms can be either a

8  │ double-action revolver or a semiautomatic pistol with a barrel

9  │ length between 3 1/2 and 6 inches?

10 │ A.   Yes, that's correct.

11 │ Q.   And you said there were three different calibers that a

12 │ ranger can choose from?

13 │ A.   In the semiautomatic firearms, yes.

14 │ Q.   And you'd agree that there are a wide variety of

15 │ commercially available handguns that meet the ranger's minimum

16 │ standards?

17 │ A.   Yes.

18 │ Q.   And you'd also agree that many of these guns come standard

19 │ with capacities of less than 15 rounds -- I'm sorry, 15 rounds

20 │ or less?

21 │ A.   Not that are considered law enforcement quality.

22 │ Q.   Let me ask again.  You'd agree that many of the guns that

23 │ are commercially available come standard with capacities of 15

24 │ rounds or less?

25 │ A.   In the mid-sized guns, yes; not in a full-sized.

1    Q.   In fact, you carry a Glock 22, correct?

2    A.   I do.

3    Q.   That's a .40 caliber?

4    A.   Yes.

5    Q.   And that firearm comes standard with a 15-round magazine?

6    A.   Yes.

7    Q.   And you also said you're a Glock armorer; is that right?

8    A.   Yes, that's correct.

9    Q.   So you're generally familiar with what Glock makes, right?

10   A.   I am.

11   Q.   And there are a number of Glock handguns that meet the

12   ranger's standards for barrel length that hold 15 rounds or

13   less, correct?

14   A.   Yes.

15   Q.   So in addition to the Glock 22, those would include the

16   Glock 20?

17   A.   Yes.

18   Q.   The Glock 21?

19   A.   Yes.

20   Q.   The Glock 37?

21   A.   Yes.

22   Q.   The Glock 31?

23   A.   Yes.

24   Q.   And every Glock compact frame holds 15 rounds or fewer,

25   correct?

1  A.  Correct, but compact frames are not permitted.

2  Q.  I thought that what was permitted was -- the only

3  restriction was barrel length.

4  A.  Well, that's true.  But most of the Glock compacts, the

5  Glock 26, for instance, is 3.42 inches, so that would fall

6  underneath of our standards.

7  Q.  Sure.  Okay.  What would you consider a Glock 19 to be?

8  A.  A Glock 19 is a mid-sized firearm.

9  Q.  Okay.  And that would qualify, right?

10 A.  It would.  It's not a duty firearm, but it's a mid-sized

11 firearm that people can carry.

12 Q.  That's a 9-millimeter firearm, right?

13 A.  Yes.

14 Q.  Holds 15 rounds?

15 A.  Yes.

16 Q.  Has an appropriate barrel length?

17 A.  Correct.  But it's not duty quality.  There is a

18 difference.

19 Q.  Glock 23 works too, right?

20 A.  Yes.

21 Q.  Glock 38?

22 A.  Yes.

23 Q.  Glock 32?

24 A.  Yes.

25 Q.  All of those handguns would be permissible under the

```
 1   Colorado Mounted Rangers' firearms policy?
 2   A.  They would be permissible, yes.
 3   Q.  That's just one manufacturer, right?
 4   A.  Correct.
 5   Q.  There are other manufacturers, right?
 6   A.  That's correct.
 7   Q.  You'd expect some of them to have comparable selections?
 8   A.  Some of them do.
 9            MR. GROVE:  That's all I have, Your Honor.
10            THE COURT:  Thank you.
11            Redirect.
12            MR. KOPEL:  No questions on redirect.  And we would
13   ask that the witness could please be excused.
14            THE COURT:  Any objection?
15            MR. GROVE:  No, Your Honor.
16            THE COURT:  Thank you, sir.  You may step down.
17            THE WITNESS:  Thank you, Judge.
18            THE COURT:  You are excused.
19            THE WITNESS:  Thank you.
20            MR. COLIN:  Good afternoon, Your Honor.
21            THE COURT:  Good afternoon.
22            MR. COLIN:  Subject to Dr. Kleck's testimony tomorrow,
23   plaintiffs rest.
24            THE COURT:  Thank you.
25            With that reservation, is the defense ready to
```

```
 1   proceed?

 2           MR. GROVE:  Your Honor, yes.  We have been scrambling

 3   to rearrange our witness schedule, and I can kind of give you

 4   an outline where we are.

 5           THE COURT:  Great.

 6           MR. GROVE:  We have one witness for this afternoon.  I

 7   noted with some dismay this morning that the hearing scheduled

 8   for 4:00 has been moved back to 4:45.

 9           THE COURT:  Actually, it's been moved to 4:55.

10           MR. GROVE:  I'm even more dismayed than I was.

11           So he will -- he's not going to take that long.  And

12   then we've got two witnesses for tomorrow afternoon.  I think

13   tomorrow will be full.  And then we are rearranging for next

14   week.  I suspect that we will be done Wednesday.  There is a

15   possibility it could spill over into Thursday, but I put money

16   on it being done Wednesday.

17           We also had discussed --

18           THE COURT:  I'm not sure that gambling is legal here

19   in the courthouse.

20           MR. GROVE:  I said, if I were going to put money.

21           THE COURT:  I see.

22           MR. GROVE:  We had also discussed -- I don't know if

23   the Court has any interest in entertaining halftime motions.

24   We may want to raise that on the ADA and continuous possession

25   claim.
```

```
 1         THE COURT:  That's your choice.  It's not whether I'm
 2  interested in entertaining them.  You have a right to make them
 3  if you want to make them.  That doesn't mean you'll get a
 4  ruling on them, because under 52, I can take them under
 5  advisement and combine them in the ruling I would ultimately
 6  enter.
 7         MR. GROVE:  Here is what I think we will do:  We will
 8  put on our witness.  If we have time, we will raise the ADA
 9  half-time motion after that.  And if not, we will probably wait
10  until closing.
11         THE COURT:  Okay.  Please call your witness.
12         MS. SPALDING:  Defendant calls Dan Montgomery.
13         THE COURT:  Ma'am, I'm going to ask you to speak into
14  the microphone.
15         MS. SPALDING:  I'll do my best, Your Honor.
16         THE COURT:  Thank you.  This courtroom is a bit of a
17  sound damp, and some people have soft voices.  Mr. Westfall
18  always says that he has old ears, but I don't think that's
19  really true.  I think that, really, it's just that we all can't
20  hear.
21         Please step up and be sworn.
22         (DAN MONTGOMERY, PLAINTIFFS' WITNESS, SWORN)
23         COURTROOM DEPUTY:  Please be seated.
24         THE COURT:  Yes, sir.
25         MR. ABBOTT:  May I just interpose a brief objection,
```

1   Your Honor, before the witness begins testifying.

2           THE COURT:  Could you go to the lectern so we can hear

3   you or speak into a microphone.

4           MR. ABBOTT:  I can.

5           Your Honor, on behalf of all the plaintiffs, I want to

6   make an objection to this witness testifying.  But it doesn't

7   apply only to this witness, it applies to most of the witnesses

8   that the State will be calling.

9           And it really goes to what the Court was addressing

10  briefly just a moment ago, which is, this witness did not

11  testify before the legislature, so the legislature did not have

12  the benefit of what he's going to say.  Because they did not

13  hear him, they could not have considered what he's going to

14  say.  Since they did not, it could not have been part of the

15  basis for their decision.

16          And so it is our view -- as we briefed in our trial

17  brief, it is our view that Your Honor should not consider what

18  he has to say either, because it could not have been by

19  definition part of the legislature's bases for enacting these

20  laws.

21          And as I said, that objection goes not just to this

22  witness, but virtually all of the witnesses that the State is

23  going to call who did not appear before the legislature.

24          THE COURT:  Thank you.  I know you want to make a good

25  record here, so I'm going to take the matter under advisement.

```
 1    I'm going to allow the witness to testify, and I'll address

 2    that issue in my final ruling.  But I'm going to require that

 3    defense counsel identify the testimony that they have that

 4    objection about.

 5             So it's noted for purposes of this witness.  Should

 6    there be any other witnesses that you would like to make that

 7    objection, I would ask you to handle it in exactly the same way

 8    as you just did.

 9             COURTROOM DEPUTY:  Please state your name and spell

10    your first and last name for the record.

11             THE WITNESS:  Dan, D-A-N, and the last name is

12    Montgomery, M-O-N-T-G-O-M-E-R-Y.

13                          DIRECT EXAMINATION

14    BY MS. SPALDING:

15    Q.  Good afternoon, Mr. Montgomery.

16    A.  Good afternoon.

17    Q.  Are you employed, sir?

18    A.  Self-employed, yes.

19    Q.  And what's the nature of your business?

20    A.  I am a police consultant, and the name of my business is

21    Professional Police Consulting, LLC.

22    Q.  And did you begin consulting after you retired?

23    A.  No.  Actually, I started consulting back in 1985 on a

24    part-time basis.

25    Q.  Okay.  And prior to becoming a full-time consultant, what
```

1   were you doing?

2   *A.*   I was a chief of police in the City of Westminster.

3   *Q.*   How long were you a law enforcement officer, sir?

4   *A.*   Well, I started my law enforcement career in 1962 and then

5   retired in 2007 as a peace officer.

6   *Q.*   And in between, could you just give us an idea of the sorts

7   of positions you held and where you held them.

8   *A.*   Sure.  In 1962, I was a part-time campus police officer at

9   San Jose City College in San Jose, California.  I then went to

10  work for the Los Gatos, California Police Department in 1964.

11  Left there in 1971, after achieving the rank of sergeant.  And

12  I got recruited to come to Lakewood, when they first became a

13  department, and went to work for Lakewood in 1971.  I worked

14  for Lakewood for nearly 12 years, attaining the rank of

15  captain.  And then left Lakewood after almost 12 years when I

16  was selected to be the chief of police in Westminster, and that

17  was at the end of 1982.  And I served there almost 25 years.

18         Then after a couple of years of retirement, I was the

19  interim chief of police in Lochbuie, Colorado while they were

20  conducting a search.

21  *Q.*   How long were you interim chief of police in Lochbuie?

22  *A.*   Ten months, just short of a year.

23  *Q.*   What period of time was that?

24  *A.*   That was January through October of 2010.

25  *Q.*   All right.  And is your position in Lochbuie the last time

```
 1    you were engaged as an active law enforcement officer?

 2    A.  Yes, as an employed peace officer, correct.  I maintained

 3    my state certification.  And that expired finally in 2013.

 4    Q.  All right.  Thank you, sir.

 5         Mr. Montgomery, since you retired, have you taken any

 6    measures to ensure your own personal safety?

 7    A.  Sure.

 8    Q.  What kind of measures have you taken?

 9    A.  Well, the main measure, primarily, is having a good alarm

10    system installed at my residence.  I've had two different alarm

11    systems, so I have a good intrusion alarm system established

12    within my residence.  And I practice, as well as I can, some of

13    the essential things that you need to practice as a citizen to

14    be safe and be a hard target rather than a soft target.  And I

15    also have a concealed carry permit, and I do carry a concealed

16    weapon.

17    Q.  All right.  What kind of weapon do you carry concealed?

18    A.  I carry a Glock.  It's referred to as a baby Glock.  I

19    can't remember the model.  It might be a model 27, but I'm not

20    sure.

21    Q.  And does that firearm carry a magazine?

22    A.  Ten-round magazine, yes.

23    Q.  All right.  And when you carry concealed, do you carry

24    additional magazines along with the magazine that is in the

25    firearm?
```

 1  *A.*  No.
 2  *Q.*  All right.  Do you have any other firearms that you use for
 3  self-defense?  Not necessarily just for concealed carry, but
 4  just for home defense as well?
 5  *A.*  Not really.  I own several firearms, but I really don't use
 6  those for self-defense.  Two of them are rifles that belong to
 7  my wife's father.  They're in a storage case in the house.
 8  They've never had a round through them since we've owned them.
 9  And I have three handguns in a safe deposit box.
10  *Q.*  All right.  Now -- so I'm gathering from your testimony
11  that the baby Glock, as you referred to it, is your primary
12  self-defense weapon; is that correct?
13  *A.*  Correct.
14  *Q.*  And why do you carry concealed?
15  *A.*  Well, I think it's naive to think that there aren't
16  potential threats out there in society.  We see examples of
17  that every day.  And because of my training and my experience
18  and my education over the years, with a 53-year career history
19  in law enforcement, I feel better carrying that for my own
20  self-protection, as do most citizens who carry a concealed gun.
21  *Q.*  Have you possessed or -- strike that.  Let me put that a
22  little bit differently.  Have you carried a concealed weapon
23  ever since you retired as police chief in Westminster and then
24  after your stint in Lochbuie as well?
25  *A.*  Yes.

 1   Q.  All right.  Have you carried that same weapon that you just
 2   referred to, that is, the baby Glock with the ten-round?
 3   A.  I really didn't buy that until last year, 2013.
 4   Q.  What weapon did you carry concealed prior to --
 5   A.  Well, prior to that, it was sort of a combination of two
 6   different weapons.  I carried a 9-millimeter Smith & Wesson
 7   that had I think a 15-round magazine.  That became too bulky
 8   and obtrusive for me, personally.  So I went back and carried
 9   my 2-inch Chiefs Special Airweight revolver.  It's a five-shot
10   revolver.  But then I put that in the safe deposit box as well.
11   And the reason I did, it's got some personalized engraving.  It
12   was given to me in 1971 when I left California, and I didn't
13   want to lose it or have something happen to it.  That's why I
14   bought the small Glock, it was sort of an intermediary weapon
15   between the .38 caliber five shot and the 15-round magazine
16   Smith & Wesson.
17   Q.  What factors or considerations did you take into account
18   when you were deciding what weapons to carry for self-defense?
19   A.  Well, I wanted something that was capable of having
20   stopping power in the event that I did need to deploy that
21   weapon, and I wanted something small enough and concealable
22   enough that was very comfortable to carry and the baby Glock,
23   as it's commonly referred to, fit the bill, so to speak.
24   Q.  Did you take into consideration events of which you were
25   aware during the time that you were a law enforcement officer

1   concerning threats that civilians faced?

2   *A.*   I'm sorry, could you say that again?

3   *Q.*   In determining the kind of weapon to carry, did you take

4   into consideration the kinds of threats civilians normally

5   face?

6   *A.*   Oh, of course.

7   *Q.*   Okay.   What kind of threats were you aware of throughout

8   your law enforcement career that civilians commonly face for

9   which they might need a self-defense weapon?

10  *A.*   Well --

11          MR. ABBOTT:  Objection, lacks foundation.

12          THE COURT:  Response.

13          MS. SPALDING:  He's testified that -- well, I can lay

14  a better foundation, Your Honor.

15          THE COURT:  Okay.

16  *BY MS. SPALDING:*

17  *Q.*   Mr. Montgomery, during the time that you were a law

18  enforcement officer at San Jose City College and Los Gatos and

19  Lakewood, what kind of job duties did you have?

20  *A.*   Well, again, in Los Gatos, California, I was a patrol

21  officer, I was a detective, I was a motorcycle traffic officer,

22  and then achieved the rank of sergeant just before I left.   In

23  Lakewood, as a captain, I held the command over the patrol

24  division, the criminal investigation division, the research and

25  development division, and internal affairs and training.   We

1    rotated about every three years, so I had the opportunity to do

2    all of those things.  And then in Westminster when I went there

3    at the end of 1982, I had overall command responsibility for

4    basically everything that occurred in the department.

5    Q.  When you were in Los Gatos, when you were a patrol officer

6    and then promoted to sergeant, did you have knowledge of events

7    that were occurring in the community, crimes that were

8    occurring in the community?

9    A.  Oh, of course.  And during that era, that was the Black

10   Panther party movement in the Bay Area of California, and also

11   all of the Vietnam protests and the violence that we saw in the

12   '60s, and I was involved in a lot of that.

13   Q.  Okay.  Were you aware of -- of threats of violence faced by

14   civilians during that time?

15   A.  Yes.

16   Q.  What kind of -- what kind of crimes commonly did you see

17   during the time that you were in Los Gatos, that involved

18   civilians?

19   A.  Well -- sure.  In Los Gatos, for example, we had maybe one

20   or two homicides that I was involved in, a couple of suicides,

21   threats with weapons.  Certainly, that was the era of time that

22   the Zodiac Killer was committing his crimes in the San

23   Francisco Bay Area, so I was aware of all of that.  That's

24   something police officers come across on a very natural basis.

25   Q.  As a police officer in Los Gatos, did you respond to calls

1   for assistance?

2   *A.*  On occasion, yes.

3   *Q.*  Okay.  For robberies, for instance?

4   *A.*  We had our own share of robberies.  We were a very small

5   department.  Usually larger departments would come and assist

6   us.  They usually didn't call us.

7   *Q.*  All right.  How about in Lakewood, were you aware when you

8   were in Lakewood of the kinds of threats that citizens faced?

9   *A.*  Of course.

10  *Q.*  How did you become aware of those kinds of problems?

11  *A.*  Typically, citizens get involved in these kinds of

12  situations where there is -- typically, where there is alcohol

13  involved, there is drugs involved, there is domestic violence

14  and road rage involved.  They get involved in these situations

15  involving where they're the victim of a crime, someone who is

16  mentally ill, perhaps a serial killer or a mass shooting

17  situation.  These things happen, and we read about them all the

18  time.  And as police officers, we handle them, so we're tuned

19  in to that kind of thing.  And we try to do our training to

20  effectively deal with those situations.

21  *Q.*  All right.  When you were in Lakewood, did you or your

22  officers respond to citizens' calls for assistance?

23  *A.*  Yes.

24  *Q.*  All right.  And you were aware from your own experience of

25  what those calls involved and the kinds of threats that

1   citizens reported to the police?

2   *A.*   Yes.

3   *Q.*   How about when you got to Westminster?  You were first

4   there as chief, right?  You weren't there as an officer,

5   correct?

6   *A.*   Say that again.

7   *Q.*   When you went to Westminster, you went as chief, correct?

8   *A.*   Yes.

9   *Q.*   All right.  And were you aware during the time that you

10   were chief at Westminster of the kinds of threats civilians

11   faced?

12   *A.*   Yes.

13   *Q.*   How did you become aware of those kinds of problems?

14   *A.*   Well, as the chief of police, you were accountable,

15   essentially, for everything that happens in the police

16   department.  So you read reports, you get briefings, you talk

17   to your managers, and that's how you learn that.  And very

18   often you'll respond to the scene of something very serious,

19   which I did many, many times.

20   *Q.*   All right.  So, sir, in deciding what kind of weapon to

21   carry for self-defense, did you take into account the kinds of

22   threats that you knew about as a police officer that civilians

23   faced?

24   *A.*   Yes.

25   *Q.*   When you were in law enforcement, were you aware of any

1    occasion when a civilian was required to fire more than 15

2    rounds in self-defense?

3    A.  In my entire history, I cannot recall of an incident like

4    that.

5    Q.  Are you --

6    A.  You're saying a civilian firing more than 15 rounds in

7    their self-defense?

8    Q.  In their self-defense, yes.

9    A.  I can't think of any.

10    Q.  All right.  Are you aware of any time when a civilian fired

11    multiple rounds in self-defense?

12    A.  I can only recall a couple of incidents where a civilian

13    fired; and as I recall, it was three or less rounds.  And in

14    one of those cases, it was always a question as to whether or

15    not it was a drug deal that went south.  And I can't recall the

16    specifics of the other one.  It's a relatively rare incident.

17    At least, that's been my experience.

18    Q.  All right.  Thank you, sir.

19          In making your decision concerning the kind of

20    firearms you were going to use for self-defense, as a retired

21    officer, did you consider the kinds of threats that law

22    enforcement officers face?  Was that an important consideration

23    to you?

24    A.  Yes.

25    Q.  Tell me why.

1   *A.*  Well, if we look at law enforcement, for example, one of

2   the big differences we see between law enforcement officers and

3   citizens is the fact that, one, law enforcement officers have

4   to proactively go after and take enforcement actions against

5   the bad guys.  But in addition to that, on a reactive basis,

6   they have to respond to calls for service involving the bad

7   guys.  Citizens don't have that responsibility.  They're not on

8   patrol out there where they're chasing the bad guys, and they

9   don't typically respond to calls for service made to the police

10  to handle a situation involving a bad guy.

11  *Q.*  Okay.  So when you say you took that into consideration, I

12  take it to mean that you took that into consideration, knowing

13  that you would not be doing those things as a civilian,

14  correct?

15  *A.*  Yes.

16  *Q.*  All right.  Mr. Montgomery, is it important to you to --

17  for your self-defense to be able to purchase a weapon you feel

18  is necessary for your self-defense?

19  *A.*  Yes.

20  *Q.*  Even from a private party?

21  *A.*  Yes.

22  *Q.*  And since July 1 of 2013, have you been a party to a

23  private transfer of a personal firearm?

24  *A.*  Yes.

25          *MR. ABBOTT:*  I'd like to object.  This is beyond the

```
 1 │ scope of the designation for this testimony -- for this
 2 │ witness, I mean, rather.
 3 │        THE COURT:  Response.
 4 │        MS. SPALDING:  His designation was that he would
 5 │ testify about his concerns for his personal safety as a retired
 6 │ law enforcement officer, as well as the precautions he
 7 │ determined to be sufficient to ensure his safety.  He has
 8 │ testified that it's important for him to be able to purchase
 9 │ whatever firearms he deems necessary for his personal safety.
10 │        THE COURT:  I overrule the objection.
11 │ BY MS. SPALDING:
12 │ Q.  Let me try that again, sir.  You've indicated that since
13 │ July 1, 2013, you have been a party to a private transfer of a
14 │ personal firearm, correct?
15 │ A.  That's correct.
16 │ Q.  All right.  Did you obtain a background check in order to
17 │ complete that transfer?
18 │ A.  Yes.
19 │ Q.  From whom?
20 │ A.  That was at the Bass Pro Shop.
21 │ Q.  All right.  And did you subsequently engage in another
22 │ private firearm transfer after the one at Bass Pro Shops?
23 │ A.  Yes.
24 │ Q.  And did you obtain a background check in order to complete
25 │ that transfer?
```

```
 1   A.   Yes.

 2   Q.   And who from?

 3   A.   Westminster Arms.  They're located in the 6700 block of

 4   Wadsworth Boulevard in Arvada.

 5   Q.   All right.  And how did you go about finding -- strike

 6   that.  I assume that both of those places are FFLs; is that

 7   correct?

 8   A.   Yes.

 9   Q.   All right.  And how did you go about finding an FFL to

10   complete those transfers?

11   A.   Well, the Bass Pro Shop is one of my favorite places to go.

12   It's got a lot of eye candy, and I love the restaurant that

13   they've got there, so I went to the Bass Pro Shop.  They're

14   very large.

15   Q.   Okay.

16   A.   I called them earlier and found out they do those transfers

17   between 10:00 a.m. and 1:00 p.m., Monday through Friday.

18   Q.   Okay.

19   A.   And then on the second transfer, Westminster Arms, I think

20   I passed that shop every day, because it's right in my

21   neighborhood, so that's where I went.

22   Q.   All right.  Thank you, sir.

23            I no more questions for this witness.

24            THE COURT:  Thank you.

25            Cross-examination.
```

1       MR. ABBOTT:  Thank you, Your Honor.

2       May I hand the sealed deposition transcript over?

3       THE COURT:  Thank you.

4                        **CROSS—EXAMINATION**

5    BY MR. ABBOTT:

6    Q.  Good afternoon, Chief.

7    A.  Good afternoon.

8    Q.  And I don't want -- I'm not going to belabor this point at

9    all, but I do just want to be clear.  You did not testify

10   before the General Assembly on behalf of either 1224 or 1229,

11   correct?

12   A.  That is correct.

13   Q.  And you were first contacted about serving as a witness in

14   this case roughly two or three weeks before I took your

15   deposition last October?

16   A.  I think that's correct, yes.

17   Q.  Okay.  Thank you.

18       You're not, I think, obviously, an expert witness

19   today, right?

20   A.  Correct.

21   Q.  Are you being paid for your time to be here?

22   A.  No.

23   Q.  You're not --

24   A.  I received a check from the Attorney General's Office in

25   the amount of $51.50, and I think that was for a witness fee

1   and transportation.

2   Q.  Okay.  You were, however, paid hourly for your time to

3   prepare for your deposition and to be deposed, correct?

4   A.  Correct.

5   Q.  And at that time you informed me you intended to charge the

6   same rate to come here to court, correct?

7   A.  Well, I did initially, until I -- to be quite honest with

8   you, until I got the subpoena.  And my reasoning was, I've been

9   subpoenaed to court, and here is the check for 51.50, so I

10  decided not to charge for the time I'm testifying today.

11  Q.  All right.  You were being asked some questions on direct

12  testimony about the bases for your selection of the firearm

13  that you have chosen for your personal use, and that firearm is

14  currently what we'll call a baby Glock, correct?

15  A.  Correct.

16  Q.  And a lot of the questions and your answers focused on

17  whether or not you considered risks to the public and what the

18  general public may face in your selection of that firearm.  Did

19  I hear that correctly?

20  A.  Yes.

21  Q.  Okay.  And you recall being deposed in this matter?

22  A.  Yes.

23  Q.  Okay.  Could I ask that the witness be handed his

24  deposition transcript.

25          COURTROOM DEPUTY:  I hand the witness his deposition

 1 | taken October 23, 2013.

 2 | *BY MR. ABBOTT:*

 3 | *Q.* And, sir, you were under oath at the time of your

 4 | deposition, correct?

 5 | *A.* Yes.

 6 | *Q.* All right.  Could I ask you to turn to page 50.

 7 | *A.* 50?

 8 | *Q.* Uh-huh.

 9 | *A.* Okay.

10 | *Q.* And right about in the middle of the page -- and I was

11 | asking you about your reasons for purchasing that baby Glock

12 | handgun.  And I asked you this question, starting at line 10 --

13 | *A.* Yes.

14 | *Q.* "Okay.  Tell me the reasons you replaced that gun with the

15 | other gun in March."

16 |         Your answer:  "Smaller, more concealable, and much

17 | easier to clean."

18 |         "Okay.  Anything else?"

19 |         "Not really, no."

20 |         Did I read that correctly?

21 | *A.* Yes.

22 | *Q.* Thank you.

23 |         It's true, is it not -- I just want to be clear --

24 | because you've had a very long career in law enforcement.  I

25 | want to be clear, you do not now feel that you're at any

 1  greater risk by virtue of having been a law enforcement officer

 2  than any member of the general public, correct?

 3  A.  Correct.

 4  Q.  Okay.  You don't feel that you're subject to any threats by

 5  virtue of people you arrested years ago or anything like that,

 6  correct?

 7  A.  No.  I mean, it's always a possibility, but I don't have

 8  anything that makes me feel that way to the extent that it

 9  might be probable.

10  Q.  Okay.  And you've been retired how long now?

11  A.  Seven years -- excuse me, I retired in 2007, so just coming

12  up on seven years, yes.

13  Q.  And prior to retiring, did you also carry a firearm off

14  duty for personal protection, much like you do now?

15  A.  Yes.

16  Q.  Okay.  And for how many years?

17  A.  Well, on and off for years.  I talked earlier about

18  carrying that .38 snubnose Chiefs Special and then going to the

19  Smith & Wesson 9-millimeter semiautomatic.

20  Q.  Okay.

21  A.  And the reason for that is -- let me explain that a little

22  bit.  When I left Los Gatos, California, I was given that .38

23  snubnose as a gift.  When I went to work for Lakewood, that was

24  the first time I'd ever been introduced to a semiautomatic.

25  But I carried the smaller weapon for many years.  When I left

 1  as being the president of the Colorado Association of Chiefs of

 2  Police in 1988, the Smith & Wesson 9 millimeter was given to me

 3  as a going away gift.  And that really became my weapon of

 4  choice.  And I did carry that off duty on occasion, and I

 5  sometimes would go back to the small Smith & Wesson

 6  .38 caliber, until I finally settled on the baby Glock, which

 7  seemed to be a happy medium.

 8  *Q.*  Now, I think you told me last October that you carry your

 9  concealed weapon, not every day, but most of the time; is that

10  still true?

11  *A.*  Yes.

12  *Q.*  Okay.  And "by most of the time," out of 30 days in a

13  month, what are you talking about?

14  *A.*  I couldn't tell you -- I could only speculate.

15  *Q.*  More days than not?

16  *A.*  Yes.

17  *Q.*  Okay.  So in the last -- if we just focus, even, on the

18  time since you retired, in the last seven years, you carried

19  your concealed weapon out of your home 2,000 times, maybe?

20  *A.*  I don't know.

21  *Q.*  Okay.  Now, on direct exam you were asked the same question

22  that everybody -- pretty much everybody who has occupied that

23  chair this week, which is, you've never had to fire your weapon

24  in self-defense, true?

25  *A.*  True.

1   *Q.* So let me ask you this: After seven years of good luck and

2   many, many years before that, where that event has not occurred

3   where you have had to pull that handgun out and use it in

4   self-defense, haven't you concluded by now that you just don't

5   need it at all?

6         *MS. SPALDING:* Objection, Your Honor. Calls for

7   speculation.

8         *THE COURT:* I overrule as to speculation. I sustain,

9   however, and treat the objection as one of being argumentative.

10        *MR. ABBOTT:* Okay.

11  *BY MR. ABBOTT:*

12  *Q.* Sir, have you -- let me ask you this question: After not

13  having to fire your weapon after all of these years, have you

14  considered that you may not need it?

15  *A.* No.

16  *Q.* So although you've not had to use it up until today, and

17  you, I assume, will carry it tomorrow and the next day and the

18  day after that -- fair?

19  *A.* Fair.

20  *Q.* So is it also fair to conclude, then, that whether or not

21  you've actually had to use it is not really related to whether

22  you're still going to carry it.

23  *A.* You better repeat that again.

24  *Q.* You're still going to carry it, despite the fact that

25  you've never had to use it, correct?

1    *A.*  Correct.

2    *Q.*  Is that, to your knowledge, a special rationale that

3    applies only to you?

4    *A.*  I don't know.  I don't know what other people think.

5    *Q.*  Now, I think you said this on direct, it may be obvious,

6    but you carry it because someday you may need it; fair?

7    *A.*  That's fair.

8    *Q.*  Now, as a police officer, you're trained, are you not, sir,

9    that if you should be confronted by someone who is threatening

10   you, to do things other than to shoot, to try to diffuse the

11   situation or avoid the situation; is that not true?

12   *A.*  Well, it depends on the specifics of the situation.

13   *Q.*  But in some situations, that's -- shooting is not your

14   first option; is that true?

15   *A.*  Depends on the situation.

16   *Q.*  Okay.  There are situations where shooting is not your

17   first option, true?

18   *A.*  Under what circumstances?  Could you give me an example?

19   *Q.*  Well, do you recall the example we talked about at your

20   deposition, where I posited a group of five individuals coming

21   at you and your granddaughter at night in Lower Downtown at

22   4:00 in the morning, after the bars had closed?  Do you recall

23   that?

24   *A.*  I do recall that, yes.

25   *Q.*  Do you recall telling me in that situation what you would

1    probably tell your granddaughter to do is run away in a zigzag

2    pattern?

3    *A.*   Yes.

4    *Q.*   Okay.  And I'm just using that as an example.  But in your

5    police training, it's fair to say, is it not, that you are

6    taught as part of your training ways to avoid -- you know,

7    diffuse a situation or avoid having to use force as your first

8    option; is that a fair statement?

9    *A.*   Yeah.  The very first thing that an officer needs to do is

10   engage in good situational assessment and don't become

11   emotionally captured and don't over react, but assess the

12   situation but be smart about what you do.  That's really the

13   key ingredient.

14   *Q.*   Yes.

15   *A.*   So, yes, are there alternatives?  Yes.  In that example

16   during the deposition, I wouldn't be down in LoDo at 4 o'clock

17   in the morning walking with my granddaughter.  But in that

18   scenario that you described, as I recall, you said that all

19   four or five of those individuals suddenly produced a gun, and

20   you asked me what I would do.  And I said, run, make yourself

21   small, zigzag, become a softer target.  Because the greater

22   distance you create, you minimize the probability that you're

23   going to be struck by a round.

24   *Q.*   Okay.  And there are other situations, based on your

25   training, where some other option might be available to you

1  || other than pulling your gun and shooting the attacker, true?

2  || *A.*  There may be options, yes, where you pull your gun, but you

3  || may not have to shoot it, but you're ready to if you have to.

4  || *Q.*  But despite those options and despite your long training as

5  || a police officer, you don't carry an unloaded gun, true?

6  || *A.*  I don't carry an unloaded gun, is that what you said?

7  || *Q.*  Yes.

8  || *A.*  No, it's loaded.

9  || *Q.*  And the reason it's loaded is because someday you may

10 || need -- despite your best efforts, you may need to use it,

11 || correct?

12 ||         *MS. SPALDING:*  Your Honor, asked and answered.

13 ||         *THE COURT:*  He has been asked this, he has answered

14 || this.  He can say it again.

15 ||         *THE WITNESS:*  That is correct.

16 || *BY MR. ABBOTT:*

17 || *Q.*  Okay.  So it's fair to say, though, is it not, sir, that if

18 || that day should come when you've exhausted your other options

19 || and --

20 || *A.*  Where I've exhausted what?

21 || *Q.*  You've exhausted any other options you might have, and you

22 || do -- that day comes when you do have to pull your concealed

23 || weapon and use it, you can't tell us today who your assailant

24 || will be, true?

25 ||         *MS. SPALDING:*  Objection, Your Honor.  Calls for

1    speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  No, I don't know who my assailant would

4    be, if there is going to be an assailant.

5    BY MR. ABBOTT:

6    Q.  Okay.  And in fact, her objection is sort of well taken,

7    isn't it?  It would be asking you to speculate for you to tell

8    us today who might attack you that you might have to use a gun

9    on, fair?

10         MS. SPALDING:  Objection, Your Honor.  This is

11   argumentative.

12         THE COURT:  Sustained.

13   BY MR. ABBOTT:

14   Q.  Are you able to tell us anything about -- if the day should

15   come in the future when you might actually have to use your

16   weapon, can you tell us today any of the circumstances where --

17   when it might happen, where it might happen, whether it's day

18   or night, how many assailants there may be, what weapons they

19   may have?  It's true, is it not, that you are not able to

20   foresee that?

21         MS. SPALDING:  Objection, Your Honor.  Speculation,

22   and it's compound as well.

23         THE COURT:  It's a compound question.  The last part

24   of the question probably is okay.  The first part of the

25   question is speculative.

```
 1            Would you frame a new question, please.
 2   BY MR. ABBOTT:
 3   Q.  It is possible, sir, is it not, that you could face an
 4   assailant when you have to use your weapon in the day or the
 5   night, true?
 6            MS. SPALDING:  Objection.  Calls for speculation.
 7            THE COURT:  Overruled.
 8            THE WITNESS:  True.
 9   BY MR. ABBOTT:
10   Q.  And it is possible that you might face more than one
11   assailant, true?
12   A.  True.
13   Q.  And it is possible, is it not, that those assailants could
14   each have a weapon, true?
15   A.  True.  It's possible, yes.
16   Q.  Okay.  And it is possible that those assailants could have
17   a different variety of weapons, true?
18   A.  That's true.
19   Q.  You could face assailants who have pistols, or you could
20   face assailants who have AR-15 type rifles, true?
21   A.  Potentially, yes.
22   Q.  And those assailants might have a weapon with a capacity of
23   ten rounds, or they might have a weapon that has thirty rounds,
24   true?
25   A.  They could, yes.
```

1    *Q.*  Okay.  And the ten rounds that you've selected since last

2    March to use as your personal handgun when you bought your baby

3    Glock, it's possible that you could face a scenario where

4    that's not enough, true?

5        *MS. SPALDING:*  Objection.  Calls for speculation.

6        *THE COURT:*  Overruled.

7        *THE WITNESS:*  It may not be enough if I elected to

8    draw it and start using it.  But, again, we get back to the

9    situational analysis.  If I'm confronted by three people with a

10   variety of guns, I'm not going to pull my gun.  I'm going to

11   get out of Dodge, make myself small, zigzag, and try to get

12   away, get cover.  And then, potentially, I might draw the

13   weapon if I need it.  It just depends on the situation.  It

14   depends on the dynamics of the situation.

15   *BY MR. ABBOTT:*

16   *Q.*  Correct.  And you've said that several times in your

17   testimony, and that's because it's true, it depends on the

18   situation, correct?

19   *A.*  The dynamics of every encounter or situation are going to

20   be different.

21   *Q.*  Okay.

22   *A.*  You're in a much better position if you create distance.

23   That's one of the cardinal self-defense rules for police

24   officers, for sure; and it should be for citizens as well.

25   Create distance.  That's really, really important.

1  Q.  Tell me, sir -- well, sir, have you -- since you raised

2  that subject, in your career, have you -- when you were being

3  asked quite a bit on direct about your contact with citizens

4  and appreciating the threats they face, have you in your career

5  encountered individuals in wheelchairs?

6  A.  Doing what?

7  Q.  Doing anything.

8  A.  Pardon?

9  Q.  Have you had any opportunity in your career to assess the

10 threats that you were talking about on your direct examination

11 to people who are in wheelchairs?

12 A.  I've dealt with people in wheelchairs.  I can't think of a

13 situation where I've ever dealt with one who physically

14 threatened me.

15 Q.  Oh, I'm sorry, sir.  I must have asked a bad question.  I

16 wasn't suggesting that they were threatening you.

17 A.  Okay.

18 Q.  On direct examination, when you were talking about your

19 bases for selecting the handgun you selected, you said that it

20 was important for you to consider the threats that citizens

21 faced, correct?

22 A.  Potential threats.

23 Q.  Okay.  And I was asking you whether -- my question, which I

24 must have asked poorly, was intended to be, does that include

25 assessing the potential threats to individuals in wheelchairs?

 1  *A.*  Well, it could.

 2  *Q.*  All right.

 3  *A.*  I mean, it doesn't mean because an individual is in a

 4  wheelchair, that they are not armed, that they don't carry

 5  something for self-defense, for example, themselves.

 6  *Q.*  But right before I started asking you that question, you

 7  commented -- you said that one of the most important things to

 8  do is to get distance between yourself and an assailant,

 9  correct?

10  *A.*  If you can, yes, obviously.  If you're limited physically

11  and your mobility is limited, then the answer is, you can't do

12  it.

13  *Q.*  Thank you, sir.

14          Let me ask you this question, sir.  Do you agree with

15  this statement:  You never know how many rounds you might need

16  in any kind of situation.  Do you agree with that, yes or no?

17  *A.*  I would need more information.  If you're purely talking

18  about the number of rounds --

19  *Q.*  I'm just reading you a statement, and I'm asking you if you

20  agree or disagree with it.  Would you like me to read it again?

21  *A.*  Please.

22  *Q.*  Tell me if you recognize the source of the quote.

23  *A.*  Okay.

24  *Q.*  You never know how many rounds you might need in any kind

25  of situation.

1   *A.* I don't know if I agree or disagree. I'd like to see some

2   background with regard to that and what that person may have

3   been talking about.

4   *Q.* All right. Could I ask the witness to look at his

5   deposition again?

6   *A.* Sure.

7   *Q.* Page 24.

8           *THE COURT:* For what purpose is he referring to a

9   deposition?

10          *MR. ABBOTT:* He was asked to refresh his recollection

11  or to be informed of the source of this statement.

12          *THE COURT:* Well, those are different things.

13          *MR. ABBOTT:* Okay.

14          *THE COURT:* So are you using this to refresh his

15  recollection?

16          *MR. ABBOTT:* I -- let me ask you a question, sir.

17  *BY MR. ABBOTT:*

18  *Q.* Do you recall making that statement to me in your

19  deposition, that I just read?

20  *A.* No. I'm just looking at it now.

21  *Q.* Okay. Would it help you to refresh your recollection as to

22  whether or not you made that statement, to look at your

23  deposition?

24          *THE COURT:* Sir, there is a pending question. Would

25  it help you to refresh your recollection to look at your

```
 1   deposition?

 2              THE WITNESS:  Yes.

 3              MR. ABBOTT:  I would ask that the witness be allowed

 4   to look at his deposition.

 5              THE COURT:  He is.

 6              MR. ABBOTT:  On page 24, lines 3 to 5.

 7              THE COURT:  Thank you.

 8              THE WITNESS:  Correct.  But putting it into context --

 9   I did make that statement.  In fact, it's on line 11 on page

10   24.  But down on line 22, I made the comment, "Every situation

11   is unique.  It depends on the circumstances."

12   BY MR. ABBOTT:

13   Q.  Okay.  So you in fact said both things, sir, the quote that

14   I read, and then a few lines later, every situation is unique?

15   A.  Yes, every situation is in fact unique.

16              MR. ABBOTT:  I have no questions, sir.  Thank you.

17              THE COURT:  Redirect?

18                        REDIRECT EXAMINATION

19   BY MS. SPALDING:

20   Q.  Just briefly, Mr. Montgomery.  Do you recall in your

21   deposition after you made the statement that counsel is

22   referring to, providing some kind of context for that?

23              MR. ABBOTT:  Objection.  Ambiguous.

24              THE COURT:  Overruled.

25              THE WITNESS:  I usually do try to provide some
```

1   context.  I may have even mentioned the number of magazines

2   you're allowed to carry.

3   *BY MS. SPALDING:*

4   *Q.*  Okay.  As we're sitting here right now, without referring

5   to that part of your deposition, do you recall what that

6   context was?

7   *A.*  I don't.

8   *Q.*  Would it be helpful for you to look at page 24 of your

9   deposition to refresh your memory?

10  *A.*  That would help.

11  *Q.*  Could you go ahead and do that.  Take a look at lines 12

12  through 22.

13          *THE COURT:*  Sir, I'm going to caution you, when you've

14  read through the applicable portion of your deposition, please

15  put it away.

16          *THE WITNESS:*  Yes, ma'am.

17          *THE COURT:*  Thank you.

18          *THE WITNESS:*  Did you want me to read this aloud?

19  *BY MS. SPALDING:*

20  *Q.*  No.  Just read it to your self just to refresh your memory,

21  and then I'm going to ask you about it.

22  *A.*  Okay.

23  *Q.*  Okay.  Having reviewed your deposition now, sir, do you

24  recall the context of the question and the response that you

25  gave?

1 | *A.*  Yes.

2 | *Q.*  And what was that?

3 | *A.*  We were talking about firefights, where multiple rounds are

4 | being -- are involved.

5 | *Q.*  Okay.  You were talking about police firefights, correct?

6 | *A.*  Correct.

7 | *Q.*  And it was your -- it was your feeling that -- for the

8 | context of this was that, for multiple rounds were required was

9 | entirely situational in police firefights, correct?

10 | *A.*  Correct.

11 | *MS. SPALDING:*  That's all I have, Your Honor.

12 | *THE COURT:*  Thank you.

13 | Can this witness step down and be excused?

14 | *MS. SPALDING:*  Yes.

15 | *THE COURT:*  Any objection?

16 | *MR. ABBOTT:*  No, Your Honor.

17 | *THE COURT:*  Thank you, sir.

18 | *THE WITNESS:*  Thank you.

19 | *THE COURT:*  You may step down.  You are excused.

20 | Do I understand correctly that the State has no more

21 | witnesses to call today?

22 | *MR. GROVE:*  That's correct, Your Honor.

23 | *THE COURT:*  Okay.  Then we will recess for the

24 | afternoon.

25 | *MR. GROVE:*  We were prepared, Your Honor, to offer

 1  argument on the ADA claim since all of the evidence on that --

 2          THE COURT:  I forgot, thank you.

 3          Okay.

 4          MS. MORRILL:  May it please the Court.

 5          Certain plaintiffs have alleged a violation of their

 6  protected interest under Title II of the Americans with

 7  Disabilities Act.  That is claim 5 in the most recent edition

 8  of the Complaint, which I believe is the Fourth Amended

 9  Complaint.

10          The elements of a Title II ADA claim are as follows:

11  A plaintiff must establish, one, he is a qualified individual

12  with a disability; two, due to the disability, he was denied

13  the benefits of government operations; three, there is a

14  reasonable accommodation that could have been made by the

15  governmental entity that would permit him to enjoy such

16  benefits; and, four, that he has sought that accommodation from

17  the governmental entity and has been denied.

18          Authority for that -- those elements, Your Honor, can

19  be found at Grider -- G-R-I-D-E-R -- v. City of Aurora, 2013

20  Westlaw 3927661, a District Court of Colorado decision from

21  July 20, 2013.  And that specific portion of the decision may

22  be found at page 2.

23          The specific plaintiffs that maintain the ADA claim in

24  this case are as follows:  Individual plaintiff Dylan Harrell;

25  individual plaintiff David Bayne; the Colorado State Shooting

 1   Association, as an association and on behalf of its members;

 2   and Outdoor Buddies, also a nonprofit on behalf of its members.

 3            What we perceive the plaintiffs to be -- the fatal

 4   flaw in the plaintiffs' claim, the ADA claim, Your Honor, would

 5   be that this case does not entail the provision of benefits,

 6   services, or programs by the State of Colorado.  Rather, as we

 7   are all well aware, this case involves the enactment of

 8   legislation.  Purely a legislative function.  None of the

 9   plaintiffs can explain with any clarity, nor did they through

10   their testimony, what service they have been denied, what

11   program they have not been allowed to participate, or what

12   activity the state provides for which they are not allowed to

13   participate in.

14            Now, there are case -- I'm sorry, there are circuits

15   and courts out there that have taken a very broad view of what

16   qualifies under Title II of the ADA.  The Tenth Circuit,

17   however, is not one of them.  And *Elwell* -- E-L-W-E-L-L -- *v.*

18   *Oklahoma ex rel. Board of Regents of the University of*

19   *Oklahoma,* citation, 693 F.3d 1303 at 1306, Tenth Circuit case

20   from 2012, the Tenth Circuit explicitly rejected the broad

21   approach of Title II of the ADA, holding, instead, that an

22   agency's services, programs, and activities refer to the output

23   it provides to some public constituency.

24            In doing so, the *Elwell* panel relied on the dictionary

25   and standard rules of statutory interpretation to develop more

1    precise definitions for each category, concluding the

2    following:  Services are acts done for the benefit of another.

3    Programs of the government entity refer to its projects or

4    schemes.  And the placement of the term "activity" suggests an

5    effort to capture all the outputs the public entity provides to

6    the public that it serves.

7            The Tenth Circuit in *Elwell* cautioned and emphasized

8    that the term "activities" could be read very broadly in

9    isolation, but that a better reading would account for context,

10   and thereby ensure it does not rope in everything the public

11   entity does.

12           In addition to the Tenth Circuit in *Elwell*, a variety

13   of other courts have found that -- let me put it this way:  No

14   court, to our knowledge -- have we been able to find has held

15   that a piece of legislation enacted by a state legislature

16   through the democratic process constitutes a service program or

17   activity provided to a disabled individual by a public entity.

18   Not aware of any such authority.

19           Many courts have rejected claims that have come up in

20   similar context, although not exactly the same.  One of those

21   would be *Rosen* -- R-O-S-E-N -- *v. Montgomery County*, citation,

22   121 F.3d 154 at page 157, Fourth Circuit, 1997, rejecting a

23   claim that the act of arrest is a governmental service program

24   or activity.

25           Additionally, in *SG v. Barber County Department of*

1  *Human Resources*, 2013 Westlaw 5861500, an Alabama Civil Appeals

2  Court decision from 2013, the Court found that a proceeding to

3  terminate parental rights is not a governmental service,

4  program or activity under Title II of the ADA.

5        Now, it should be noted that Title II does qualify --

6  in addition to references to -- let me just say what Title II

7  says.  Title II of the ADA provides that, "No disabled person

8  shall, by reason of his disability, be excluded from

9  participation in or be denied the benefits of the services,

10 programs, or activities of a public entity or be subjected to

11 discrimination by any such entity."  The citation for that,

12 Your Honor is 42 U.S.C. Section 12132.

13       So I've addressed already the analysis from the Tenth

14 Circuit on the first clause, which is "denied the benefits of

15 the services, programs, or activities of a public entity."  But

16 the second clause, "or be subjected to discrimination by any

17 such entity," there might be some temptation there to have that

18 clause operate as a catchall that stretches Title II of the

19 ADA's coverage beyond governmental outputs.

20       However, we would urge the Court that, instead, a

21 contextual review of the ADA as a whole, unambiguously

22 demonstrates that Congress intended Title II to be confined to

23 the context of public services.  Authority for that proposition

24 may be found as *Canfield* -- C-A-N-F-I-E-L-D -- *v. Isaacs*,

25 I-S-A-A-C-S, citation, 523 F.Supp. 2d 885 at page 890.  That's

 1    a Northern District of Indiana case from 2007.

 2              Indeed, our position is that the entire impetus of the

 3    ADA is to provide protections for qualified individuals with a

 4    disability, emphasis on the word "qualified."  In order to be a

 5    qualified individual to make a claim under Title II, the person

 6    must meet the essential requirements for the receipt of

 7    services or the participation in programs or activities

 8    provided by a public entity.  The citation for that requirement

 9    is 42 U.S.C. Section 12131 subsection 2.

10              The action words in the statute assume a relationship

11    between a public entity on the one hand and a member of the

12    public on the other.  Authority for that proposition may be

13    found at *Zimmerman* -- Z-I-M-M-E-R-M-A-N -- *v. Oregon DOJ*,

14    citation, 170 F.3d 1169 at page 1176, Ninth Circuit 1999.

15              The former action word provides an output that the

16    latter participates in -- I'm sorry, the former, being the

17    public entity, provides an output that the latter, being the

18    qualified individual, participates in or receives.  The phrase

19    "qualified individual with a disability" makes clear that Title

20    II of the ADA applies only to people who receive the services

21    of or participate in the programs or activities of a public

22    entity.  Again, *Canfield* would be our authority for that.

23    Pinpoint cite is 523 F.Supp. 2d at 890.

24              Therefore, the first clause precludes an agency from

25    discriminatorily excluding or denying benefits to disabled

 1  persons who are eligible for the services, programs or

 2  activities that the agency provides to the public.

 3       The second clause does distinctly additional work by

 4  prohibiting the agency from engaging in other forms of

 5  discrimination against those same individuals.  Citation for

 6  that proposition is *Elwell* from the Tenth Circuit, pinpoint

 7  cite 693 F.3d at 1308.

 8       Under the approach outlined in *Elwell*, the state

 9  contends that the large-capacity magazine restriction does not

10  fall within the scope of Title II of the Americans with

11  Disabilities Act.  Plaintiffs -- plaintiffs have not alleged

12  that the restriction provides or relates to a governmental

13  service, program, or activity.  For good reason; it does not.

14  Rather, the statute simply sets a limit on the capacity of

15  ammunition that a magazine can hold.

16       As a public safety regulation, Colorado's magazine

17  restriction is, at most, a means to deliver the services,

18  programs, and activities of the state or government, meaning,

19  the public safety purpose of government.  But that's at most.

20  And that is, even by standing alone, a stretch.  The magazine

21  restriction is not, itself, a governmental service, program, or

22  activity provided by any state agency.

23       Accordingly, plaintiffs' claim that House Bill -- I'm

24  sorry, the magazine capacity restriction that has been enacted

25  and in operation for nearly a year violates the Americans with

 1   Disabilities Act fails as a matter of law.

 2          If this court wants to reach the factual inquiry in

 3   the event that it concludes differently, that there is a

 4   governmental service, program, or activity, we would -- we

 5   would identify some problems with the plaintiffs' proof at this

 6   stage of the case.

 7          Having rested with respect to the evidence they would

 8   provide on the ADA claim, we would note the first and major

 9   flaw, which is that they have -- their disabled plaintiffs have

10   failed to establish the fourth element required to maintain a

11   Title II ADA claim, and that is the that the plaintiff has

12   sought -- sought an accommodation from the governmental entity

13   and has been denied.

14          During plaintiffs' case in chief, you heard from

15   individual plaintiff Dylan Harrell.  Mr. Harrell did not

16   testify that he has requested an accommodation on either the

17   magazine capacity restriction or the universal background check

18   requirement under Colorado law.  Indeed, he did not make any

19   specific offer of proof or testimony indicating that he has

20   contacted CBI and asked to be exempted from the universal

21   background check requirement, nor has he made any claims that

22   he has contacted his county sheriff to ask that he be allowed

23   to carry firearms with magazines that hold 16 or more rounds or

24   that he be allowed to purchase large-capacity magazines as

25   stand-alone products after the date that the restriction went

 1   into effect.

 2          Mr. Bayne, individual plaintiff David Bayne, faces an

 3   even more substantial hurdle in meeting the fourth element of

 4   the test for -- what a plaintiff must establish in order to

 5   maintain a Title II ADA claim, and that's that he is no longer

 6   a Colorado citizen.  He testified very clearly before this

 7   court that he currently resides in Georgia.  He made no

 8   representations to this court that he intends to return to

 9   Colorado to reside here.  He agreed with me on

10   cross-examination that when he is in Georgia, he is not subject

11   to Colorado's law.  And he did not profess to be in Colorado on

12   any regular basis since he has moved to Georgia, such that he

13   would be subject to Colorado's laws in any way while he was

14   here.

15          Additionally, he also did not -- like Mr. Harrell, did

16   not testify that he has sought an accommodation from any state

17   agency or political subdivision of the state.  Both individual

18   plaintiffs, having failed to meet an essential element of a

19   Title II ADA claim, must have that claim dismissed as to both.

20          Additionally, Colorado State Shooting Association and

21   Outdoor Buddies, also named plaintiffs in this proceeding,

22   allege that the -- that each of those organizational --

23   organizations has among their membership disabled individuals

24   on whose behalf they are asserting the Title II ADA claim.

25   Under *Hunt v. Washington State Apple Advertising Commission*,

1    citation, 432 U.S. 333 at page 342 to -43, U.S. Supreme Court

2    1977, the test for associational standing was laid out by the

3    Supreme Court.

4            The first prong is that the association's members

5    would otherwise have standing to sue in their own right.  What

6    this has been deemed to require is the identification, by name,

7    of at least one member of the organization who meets all of the

8    elements required for any particular claim.  In this case,

9    those would be the four elements I outlined under Title II of

10   the ADA.  Neither organization in their case in chief was able

11   to do so.  And it goes -- and it goes without saying, the

12   failure to even identify at the outset an individual who meets

13   this criteria means that they didn't identify any individual

14   member who also requested an accommodation from the state of

15   Colorado or any of its political subdivisions with respect to

16   either the magazine capacity restriction law or the universal

17   background check requirement.

18           If, for some reason, the Court is able to get past the

19   failure to request an accommodation and the lack of denial of

20   same and reach the true substance of the individual plaintiffs

21   that stand before this court asking for relief under Title II

22   of the ADA, they have still yet to be able to demonstrate any

23   injury in fact to their ability to engage in protected

24   activities under the Second Amendment.

25           I believe -- I was reviewing Mr. Harrell's testimony.

1  He testified very clearly that he -- before the date of the

2  magazine capacity restriction, he owned firearms that came

3  standard with magazines that hold 16 rounds or more, that he

4  had large-capacity magazines for those firearms, that after the

5  date of the magazine capacity restriction, he continued to have

6  the same magazines in his possession.  And, in fact, I believe

7  he testified specifically that he had many large-capacity

8  magazines available to him.

9       He also testified that he, both before and after the

10  magazine capacity restriction went into place, he has carried

11  concealed firearm for the purpose of self-defense.  However, he

12  was clear in his testimony that neither before nor after the

13  magazine capacity restriction went into effect, did he carry a

14  firearm that in fact had a large-capacity magazine for the

15  purpose of self-defense.  He has those available to him at

16  home, but his weapon of choice for the purpose of self-defense

17  in public was a firearm that came -- that held a magazine with

18  15 rounds or less.  Specifically, he testified that he carries

19  a -- one semiautomatic handgun with an eight-round magazine, as

20  well as one backup firearm, which is a five-shot revolver.

21       Mr. Bayne testified along very similar lines.  He

22  testified that before and after the magazine capacity

23  restriction went into place, he owned firearms -- he has owned

24  firearms that have magazines that hold in excess of 16 rounds,

25  and that he has grandfathered magazines that would not be in

1   violation of Colorado's restriction, and that he has continued

2   to possess magazines.  Like Mr. Harrell, he testified that he

3   carries concealed for self-defense while in public.  Like

4   Mr. Harrell, he testified that he does not carry a firearm that

5   holds 16 rounds or more for the purpose of self-defense in

6   public.

7         Both individual plaintiffs have testified that they

8   have never needed to discharge their weapons in self-defense,

9   much less to expend more than 15 rounds to do so.  In fact,

10  neither of them has had to even display their weapon against a

11  two-legged threat in self-defense.

12        Each for his own reasons explained that they found the

13  universal background check requirement imposed by Colorado law

14  to be inconvenient.  However, they did not testify that it was

15  impossible, nor did they testify that the inconvenience was

16  necessarily even related to either of their disabilities.  The

17  major inconvenience seemed to be that the -- it was one

18  additional step in the process of a private sale or temporary

19  transfer that had not been previously required by Colorado law.

20  If that is the standard for holding a statute unconstitutional,

21  the inconvenience that it may cause to individuals, I'm not

22  sure we would have any laws left in this state.

23        Simply put, there are specific requirements separate

24  and apart from the Second Amendment claims in this case that

25  the individual plaintiffs or the organizational plaintiffs on

1   behalf of their members must be able to meet and show to this

2   court's satisfaction to carry the burden on the Second

3   Amendment --  I'm sorry, Title II of the ADA claim.

4        For the reasons I've outlined, the plaintiffs in this

5   case have failed to do so.  The State contends that there has

6   been no injury to them, and certainly has not been the denial

7   of the ability to participate in or receive benefits from any

8   program, activity, or benefit offered by the State of Colorado.

9   For these reasons, we ask that judgment be entered in favor of

10  the defendant on the fifth claim for relief.

11       *THE COURT:*  Thank you.

12       Response.

13       *MR. KOPEL:*  Well, Your Honor, I would note the Court's

14  previously expressed policy that it is difficult to -- for one

15  side to suddenly have to respond to, essentially, someone

16  reading a brief aloud and not have any time to prepare a

17  response.  But as a preliminary matter, may I suggest a few

18  points.

19       Defendant never addresses, apparently -- does not

20  address the cases we cite at pages 55 and 56 of the trial brief

21  which show, including from cases in this circuit, that

22  legislative enactments are, indeed, subject to Title II of the

23  Americans with Disabilities Act, because that word -- that

24  statute does not run out at the word "public services" and so

25  on.  It applies to other discrimination.

  1            We have the cases of *Thompson v. Cooke* from this

  2    district, regarding a state fee on handy -- statutory fee on

  3    handicapped parking permits.  We have the case of *T.E.P. and*

  4    *K.J.C. v. Leavitt* from the district of Utah, permanently

  5    enjoining a state statute against marriage by HIV persons as a

  6    violation of Title II.  We also cited *T.P. v. DuBois* from

  7    Massachusetts, the District of Massachusetts, where a state

  8    statute violated Title II.

  9            And I would point to the -- this Court's own many

 10    decisions in the *Grider* case where an individual who was

 11    disabled and had a pit bull as a service dog wanted an

 12    exemption from the pit bull ban in the City of Aurora, which

 13    was an ordinance that was enacted by the Aurora City Council.

 14    And that case went on, as Your Honor may well remember, for

 15    quite a while.  And Your Honor treated that case as absolutely

 16    involving standing when properly framed -- which certainly not

 17    all the claims were.  But that there was a legitimate ADA Title

 18    II claim to which the individual was entitled to reasonable

 19    accommodation.  And as Your Honor may also remember, the

 20    individual lost the case because Aurora had in fact offered him

 21    a reasonable accommodation.

 22            Defendant's arguments about Mr. Bayne and Mr. Harrell

 23    have never had to shoot anybody is the same as their argument

 24    which they raised in their standing motion under the guise of a

 25    summary judgment motion under the misleading label of a

1    standing motion a few weeks ago.  It's an approach that has

2    been rejected by this court in this case, as we pointed out in

3    our brief.

4         The reason you allowed eleven retiring sheriffs to --

5    imminently retiring sheriffs -- and "imminent" being about 13

6    months in the future -- to participate in this case as

7    plaintiffs was not because they at this moment lacked the

8    magazines they wanted to have or that on January 1, 2015, they

9    would necessarily lack the magazines they wanted to have, but

10   their inability at a date certain to be able to procure new

11   ones or replace ones that wore out was in Your Honor's view

12   imminent enough for them to have standing.  The same issues --

13   same points apply here.

14        It is surprising that after defendant for nearly a

15   year has advocated a home only view of Second Amendment rights,

16   including in the briefing on summary judgment and others, now

17   takes the opposite view, that, apparently, the Second Amendment

18   applies only in public, when they tell you that Mr. Bayne and

19   Mr. Harrell carry in public, magazines of 15 or less.  And it

20   now seems irrelevant that Mr. Bayne and Mr. Harrell have in

21   their home, as they've testified in great detail, magazines of

22   more than 15 for their personal and family defense in the home.

23        The suggestion that it is an inconvenience for Outdoor

24   Buddies to go through the rigmarole required by House Bill

25   1229, 18-12-112, I believe, is really a mischaracterization.

1    And this is precisely what shows, among other things, the

2    disparate impact.

3              As under wrote in the *Grider* case, ADA plaintiffs who

4    allege disparate impact must do far more than show that they

5    are simply disabled and affected by a statute, or an ordinance,

6    in this case, as with the pit bull ordinance.  They must

7    provide data or -- and they must provide additional testimony

8    showing how they are affected in a way that is different from

9    the general public as a whole.

10             We provided you the data on the magazines in our trial

11   brief about how disabled people, according to the United States

12   Department of Justice, are victimized by crime -- by violent

13   crime at a much higher rate than the able-bodied.  We provided

14   extensive and unquestioned testimony from the nation's foremost

15   authority on firearms defense and training, Mr. Ayoob, about

16   the disparate impact of the magazine ban on the disabled.  We

17   provided testimony from Mr. Harrell and Mr. Bayne about how

18   specifically affects -- the magazine ban affects them in ways

19   it would not affect able-bodied people because of issues such

20   as how they can balance when they're in their wheelchairs.

21             And, notably, we provided evidence about -- that shows

22   the difference and the disparate impact about how magazine --

23   House Bill -- the transfer restrictions have an even more

24   catastrophic effect on outdoor buddies than they do on other

25   organizations in this case who also, like Outdoor Buddies,

 1    engage in the lending of firearms for sporting purposes.

 2            When Colorado Youth Outdoors and the Colorado State

 3    Shooting Association with its civilian marksmanship program,

 4    when they are thwarted and, essentially, have to shut down much

 5    or all of their programs to lend firearms to other people to

 6    promote wholesome recreational use of firearms, that's a harm.

 7    And we think it's good enough to be a significant Second

 8    Amendment harm.  But the consequence of that does not make it

 9    impossible for the people they would have loaned their firearms

10    to, to engage in the shooting sports at all.

11            If a family can't be loaned a gun from Outdoor --

12    Colorado Youth Outdoors, the family still has some ability to

13    go buy a firearm on its own and engage in the outdoor sports.

14    Likewise, the target shooting that is promoted in the

15    disability marksmanship program, and people can't get their

16    loaned firearm from the Colorado State Shooting Association,

17    people still have -- the victims of that still have some

18    ability to engage in outdoor -- in target shooting, including

19    by purchasing their own firearm.

20            In contrast, with Outdoor Buddies, the firearms that

21    they are loaning to people and cannot do so because of the

22    72-hour rule on the loan, when the hunting trip itself is 72

23    hours, and the before and after takes a few days as well -- the

24    blind person who can't borrow a firearm from Outdoor Buddies is

25    out of luck and has no other way to participate in hunting,

 1 | because what Outdoor Buddies has is these very unique,

 2 | expensive, and highly specialized firearms.

 3 | You can't go down to the gun store, to Cabela's, and

 4 | buy a firearm that is rigged up so that there is a monitor

 5 | attached to the scope so that a guide can help the blind person

 6 | aim their shot properly and safely.  You can't go to any gun

 7 | store and, likewise, buy the other special firearms with all

 8 | the special fittings that Outdoor Buddies has.  They're

 9 | specifically designed for the disabled.  And so when the -- the

10 | transfer restriction crush and essentially destroy the Outdoor

11 | Buddies program, then the disabled people are disparately

12 | impacted because it's not merely harder for them to participate

13 | in the outdoor sports, it becomes impossible.

14 | The idea that this case fails because the disabled

15 | plaintiffs didn't say, mother, may I have a reasonable

16 | accommodation, as if the Governor would ask -- let me ask right

17 | now.

18 | Will the Governor give our plaintiffs the reasonable

19 | accommodation they seek?

20 | MS. MORRILL:  Plaintiffs have not sought a reasonable

21 | accommodation.

22 | MR. KOPEL:  I'm asking right now, will you give it?

23 | THE COURT:  Folks, this is not an opportunity for you

24 | to have a conversation.

25 | MR. KOPEL:  Okay.  Thank you.

1          *Thompson v. Cooke*, among other cases from this

2     district, on the parking, which enforced the ADA requirement

3     against a statute that said that you can't charge disabled

4     people for the handicapped parking permits that they used in

5     that particular case, there is nothing in this case -- in that

6     case which indicates that the plaintiffs there first engaged in

7     the plainly futile act of asking the Governor or anyone else

8     not to enforce a state statute.  And, indeed, in this case, we

9     have an *a fortiori* example of the futility and absurdity of

10    that.  Because, at least in the state parking permit case,

11    there was one entity which issued those permits and which could

12    have, I suppose, unilaterally violated state law by waiving its

13    fees.

14          But in the examples cited by Ms. Morrill, there is not

15    one person you can go to to ask for an accommodation.  If

16    Mr. Harrell wants an accommodation to be able to buy magazines,

17    it's not as if the sheriff of the county he lives in or even

18    all the police chiefs and all the sheriffs in the county he

19    lives in combined could somehow say, oh, we authorize you to

20    have this -- to be able to buy another 20- or 30-round

21    magazine.  Because when he tries to go down to the gun store,

22    the gun store is not going to sell it to them, because they

23    well know that no sheriff or police chief can waive their

24    obligation to comply with binding state statutory law.

25          And we would request, if Your Honor has further doubts

1    or wishes to consider these -- this surprise oral motion

2    further, that the parties be given the opportunity to develop

3    it in briefing.  Thank you.

4         *THE COURT:*  Thank you.

5              I don't think there is a need for reply right now.

6              Rule 52 of the Federal Rules of Civil Procedure

7    provides in subpart (c) that if a party has been fully heard on

8    an issue during a non-jury trial and the Court finds against

9    the party on that issue, the Court can enter judgment against

10   the party on a claim or defense that under the controlling law

11   cannot be maintained or defeated only with favorable finding on

12   that issue.

13             It requires, for the Court to do so, that the Court

14   makes specific findings of fact, reflected either in an oral

15   ruling or a memorandum of decision that is issued in written

16   form in accordance with Rule 52(a).

17             This subsection goes on and says, however, that the

18   Court may, however, decline to render any judgment until the

19   close of the evidence.  And in exercise of my discretion,

20   having heard a timely brought Rule 52 motion, I defer any

21   ruling until the close of the presentation of evidence.

22             Any need for clarification or further explanation?

23             All right.  Thank you.  That's going to conclude the

24   presentation today.

25             When is our witness going to be here tomorrow for

1   completion of the cross-examination that was interrupted during

2   the plaintiffs' case?

3          MR. KOPEL:  Your Honor, God and the weather willing,

4   Professor Kleck is arriving in Denver shortly before midnight

5   tonight by flight from Tallahassee to Cleveland to Denver, and

6   he will be here bright and early at 8:30 tomorrow morning.

7          THE COURT:  All right.  We will stand in recess in

8   this matter until 8:30 tomorrow morning.

9          I ask, counsel, that you kind of push your materials

10  at counsel table to one side or toward the middle, because we

11  have another hearing that's yet scheduled this afternoon.

12         Thank you.  I'll see you in the morning.

13         (Recess at 4:45 p.m.)

14                              **INDEX**

15  **Item**                                                    **Page**

16

17     TIMOTHY BROUGH
           Direct Examination By Mr. Colin              681
           Cross-examination By Ms. Morrill             729
18         Redirect Examination By Mr. Colin            751
       JOHN BURRUD
19         Direct Examination By Mr. Colin              752
           Cross-examination By Ms. Morrill             784
20     MICHELE EICHLER
           Direct Examination By Mr. Westfall           802
21         Cross-examination By Ms. Scoville    815 Scoville
           Redirect Examination By Mr. Westfall         826
22     RONALD ABRAMSON
           Direct Examination By Mr. Kopel              829
23         Cross-examination By Mr. Grove               870
       DAN MONTGOMERY
24         Direct Examination By Ms. Spalding           878
           Cross-examination By Mr. Abbott              891
25         Redirect Examination By Ms. Spalding         906

1                                    EXHIBITS

2    Exhibit        Offered  Received  Refused  Reserved  Withdrawn

3
     88                        770
4

5                          REPORTER'S CERTIFICATE

6

7        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
8

9        Dated at Denver, Colorado, this 4th day of June, 2014.

10                                    s/Therese Lindblom

11                          _____

12                          Therese Lindblom,CSR,RMR,CRR

13

14

15

16

17

18

19

20

21

22

23

24

25

2859