```
 1                THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 13-CV-1300-MSK-MJW
 3
      COLORADO OUTFITTERS ASSOCIATION,
 4    COLORADO FARM BUREAU,
      NATIONAL SHOOTING SPORTS FOUNDATION,
 5    MAGPUL INDUSTRIES,
      COLORADO YOUTH OUTDOORS,
 6    USA LIBERTY ARMS,
      OUTDOOR BUDDIES, INC.,
 7    WOMEN FOR CONCEALED CARRY,
      COLORADO STATE SHOOTING ASSOCIATION,
 8    HAMILTON FAMILY ENTERPRISES, INC.,
      d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
 9    DAVID STRUMILLO,
      DAVID BAYNE,
10    DYLAN HARRELL,
      ROCKY MOUNTAIN SHOOTERS SUPPLY,
11    2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
      BURRUD ARMS INC. D/B/A JENSEN ARMS,
12    GREEN MOUNTAIN GUNS,
      JERRY'S OUTDOOR SPORTS,
13    SPECIALTY SPORTS & SUPPLY,
      GOODS FOR THE WOODS,
14    JOHN B. COOKE,
      KEN PUTNAM,
15    JAMES FAULL,
      LARRY KUNTZ,
16    FRED JOBE,
      DONALD KRUEGER,
17    STAN HILKEY,
      DAVE STONG,
18    PETER GONZALEZ,
      SUE KURTZ,
19    DOUGLAS N. DARR,

20        Plaintiffs,

21    vs.

22    JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23        Defendant.
      _____
24
                        REPORTER'S TRANSCRIPT
25                    TRIAL TO COURT - DAY SIX
      _____
```

1        Proceedings before the HONORABLE MARCIA S. KRIEGER,

2    Judge, United States District Court for the District of

3    Colorado, continuing at 8:43 a.m., on the 7th day of April,

4    2014, in Courtroom A901, United States Courthouse, Denver,

5    Colorado.

6

7                             **APPEARANCES**

8        RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
     at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9    Denver, Colorado, 80202, appearing for the Plaintiffs.

10       DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
     555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11   for the Plaintiffs.

12       MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
     P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13   appearing for the Plaintiffs.

14       ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
     Street, Castle Rock, Colorado, 80104, appearing for the
15   Plaintiffs.

16       DAVID BENJAMIN KOPEL, Attorney at Law, Independence
     Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17   appearing for the Plaintiffs.

18       MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
     SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19   General, Colorado Attorney General's Office, Ralph L. Carr
     Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20   80203, appearing for the Defendant.

21

22

23

24             THERESE LINDBLOM, Official Reporter
             901 19th Street, Denver, Colorado 80294
25       Proceedings Reported by Mechanical Stenography
          Transcription Produced via Computer

1           **P R O C E E D I N G S**

2           *THE COURT:*  Court is reconvened today in Case No.

3    13-cv-1300.  This is our sixth day of trial.

4           Could I have entries of appearance for today's

5    proceedings.

6           *MR. COLIN:*  Good morning, Your Honor.  Mark Colin on

7    behalf of the licensed firearms dealer plaintiffs.

8           *THE COURT:*  Good morning.

9           *MR. KRUMHOLZ:*  Good morning, Your Honor.  Peter

10   Krumholz on behalf of David Bayne, Dylan Harrell, Outdoor

11   Buddies, Inc., Colorado Outfitters Association, Colorado Farm

12   Bureau, Women for Concealed Carry, and Colorado Youth Outdoors.

13          *THE COURT:*  Good morning.

14          *MR. KOPEL:*  Good morning, Your Honor.  David Kopel on

15   behalf of David Strumillo, John B. Cooke, Ken Putnam, James

16   Faull, Larry Kuntz, Fred Jobe, Donald Kroger, Stan Hilkey, Dave

17   Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

18          *THE COURT:*  Good morning.

19          *MR. FABIAN:*  Good morning, Your Honor.  Anthony Fabian

20   on behalf of Colorado State Shooting Association and Hamilton

21   Family Enterprises.

22          *THE COURT:*  Good morning.

23          *MR. GROVE:*  Good morning.  Matthew Grove on behalf of

24   the defendant.  With me at counsel table are Stephanie

25   Scoville, LeeAnn Morrill, Kathleen Spalding, and Dr. Daniel

 1  Webster.

 2        THE COURT:  Ms. Glover, are our mikes on?  Everyone

 3  seems to be real quiet.

 4        COURTROOM DEPUTY:  They are.

 5        THE COURT:  All right.  Are you all ready to proceed?

 6        MR. COLIN:  Plaintiffs are ready, Your Honor.

 7        MR. GROVE:  Yes, Your Honor.

 8        When we left off on Friday, Director Sloan was on the

 9  stand.  We've had some scheduling moves.  If we could call

10  Daniel Webster first this morning, and then plaintiffs have

11  agreed to continue Director Sloan's cross-examination later

12  this afternoon.

13        THE COURT:  All right.

14        Ms. Glover, I'm going to ask you to have IT come up.

15  It's almost like we've got some mikes on and some mikes off.

16        So first we'll get Mr. Webster to the stand.

17        Mr. Webster, would you please step up and be sworn.

18        Ms. Glover, would you swear him in.

19         (**DANIEL WEBSTER, DEFENDANT'S WITNESS, SWORN**)

20        COURTROOM DEPUTY:  Please be seated.

21        Please state your name and spell your first and last

22  name for the record.

23        THE WITNESS:  My name is Daniel Webster, D-A-N-I-E-L,

24  W-E-B-S-T-E-R.

25        MR. GROVE:  And, Your Honor, I probably should have

1   mentioned this before Dr. Webster took the stand.  But

2   plaintiffs filed a motion in limine last night, and it's going

3   to -- the Court's ruling on it is going to affect the manner in

4   which we present evidence.

5           THE COURT:  I haven't seen it.

6           MR. GROVE:  So maybe I should let Mr. Krumholz raise

7   it.

8           THE COURT:  Okay.

9           You know, it's not real helpful, folks, to file things

10  on Sunday night before a Monday morning hearing at 8:30.  And

11  I'm not being facetious when I say that.  There is no way for

12  me to know, because I don't go and look and see what has been

13  filed in this case before I take the bench.

14          So I'm going to hear this motion orally.  I'll take a

15  chance to read it after I've heard your argument.

16          MR. KRUMHOLZ:  I appreciate that, Your Honor.  And I

17  apologize for the timing.

18          It's a very straightforward motion, Your Honor.  There

19  are a number of exhibits that I believe Mr. Grove intends to

20  introduce through Professor Webster, specifically Exhibits 51

21  through 58.  And then with respect to another expert who is up,

22  as I understand it --

23          THE COURT:  We're not going to deal with another

24  expert right now.

25          MR. KRUMHOLZ:  Okay.  Thank you, Your Honor.

1  　　　　With respect to Professor Webster, Exhibits 51 through

2  58 have been listed in connection with Professor Webster, they

3  were provided for counsel for the plaintiffs on March 24.  And

4  our motion, Your Honor, is premised solely on a -- on the

5  following:

6  　　　　That is, Rule 26(a)(2)(B)(iii) requires that the

7  exhibits be in the expert report.  And, specifically, the

8  section that we are relying upon is -- 26(a)(2)(B)(iii) says,

9  the report must contain, among other things, any exhibits that

10  will be used to summarize or support them.

11  　　　　None of the exhibits identified in connection with

12  Professor Webster, Exhibits 51 through 58, were included in his

13  expert report as required by this rule, and that is the basis

14  for our motion.

15  　　　　*THE COURT:*  Response.

16  　　　　*MR. GROVE:*  Mr. Krumholz is correct, that the exhibits

17  that he's discussing were not included in the report.  Our

18  position is that they are proper supplementation.

19  　　　　Certainly, they are illustrative of the data that

20  Dr. Webster is going to discuss, that the underlying data has

21  all been disclosed, and they're simply graphical

22  representations for the assistance of the finder of fact to

23  understand what he's presenting.

24  　　　　In the alternative, we'd ask that if the Court decides

25  that the exhibits needed to be disclosed as part of the report

1    itself, that Dr. Webster be given the opportunity to draw on

2    the easel to provide a graphical representation of his

3    testimony.

4            THE COURT:  All right.  Thank you.

5            Reply.

6            MR. KRUMHOLZ:  Nothing further, Your Honor.  Thank

7    you.

8            THE COURT:  All right.  I understand these exhibits to

9    be, essentially, demonstrative exhibits; is that correct?

10            MR. GROVE:  Yes, Your Honor.

11            THE COURT:  All right.  In light of the fact that

12   they're demonstrative exhibits, they are simply adjuncts to the

13   testimony that was presented.  And while they may or may not

14   fall within Rule 26 -- I have some doubts that they do, used

15   for this purpose -- I don't understand why, having been

16   presented with them on March 24, some action was not taken by

17   the plaintiffs in order to address them.  Apparently, they've

18   had them for at least since the beginning of this trial.  And

19   as a consequence, I've heard no prejudice being offered.  I

20   will allow them to be used.

21            You may proceed.

22                        **DIRECT EXAMINATION**

23   *BY MR. GROVE:*

24   *Q.*  Dr. Webster, what do you do for a living?

25   *A.*  I'm a professor at Johns Hopkins Bloomberg School of Public

 1  | Health in the Department of Health Policy and Management.  I

 2  | also direct the Center for Gun Policy and Research there, and

 3  | am deputy director of the Center for the Prevention of Youth

 4  | Violence.

 5  | Q.  Do you hold any other --

 6  |       MR. KOPEL:  Your Honor, per your instructions, we

 7  | object to Dr. Webster's testimony on the grounds that he was --

 8  | did not testify before the legislature.

 9  |       THE COURT:  All right.  Thank you.

10  | BY MR. GROVE:

11  | Q.  Do you hold any other academic appointments?

12  | A.  Yes.  In addition to my appointment in the Department of

13  | Health Policy and Management, I have an adjunct professorship

14  | at the Johns Hopkins Division of Public Safety Leadership

15  | within the School of Education.  And I also am a research

16  | fellow with the Police Executive Research Forum.

17  | Q.  Let's talk about your educational background and how you

18  | got to where you are.  What degrees do you hold?

19  | A.  I have a bachelor's in psychology from the University of

20  | Northern Colorado, 1982; 1985, masters of public health degree

21  | from the University of Michigan; and in 1991, I received my

22  | doctor of science degree from the Johns Hopkins School of

23  | Public Health and Hygiene.

24  | Q.  What's your focus of study?

25  | A.  For roughly the past 24 years, my focus has been studying

1   violence and it prevention.  A sub interest within that of

2   great focus through much of my career has been the role of

3   firearms in violence and strategies to reduce gun violence.

4   Q.  And how long have you focused on firearms policy and the

5   prevention of gun violence?

6   A.  Again, roughly 24 years.

7   Q.  Have you published in this field at all?

8   A.  Yes, I have.  I'm the lead author or co-author in I believe

9   it's about 80 scientific journal articles that are peer

10  reviewed by scientific peers.  I've authored many reports and

11  am the lead editor and contributor to a book published last

12  year called *Reducing Gun Violence in America*.

13  Q.  Do you ever present on any of these topics, beyond what

14  you've written?

15  A.  Quite frequently I'm asked to present in a variety of

16  different venues at scientific and professional meetings.

17  Within the past, I think, 14 to 16 months, I've been asked to

18  present at the Institute of Medicine as part of the National

19  Research Council on topics related to violence prevention and

20  gun violence.

21  Q.  Did you serve as a peer reviewer for any scientific

22  journals?

23  A.  A great number of journals, I've served as peer reviewer.

24  I believe roughly 25, probably more.  These include the *New

25  England Journal of Medicine*, *Journal of Interpersonal Violence*,

1    *Journal of Crime and Delinquency.*  A broad range, crossing

2    disciplines within public health, criminology, and other social

3    sciences.

4    *Q.*  And in your capacity as a peer reviewer, do you review

5    articles that have to do with firearms research?

6    *A.*  All too frequently.

7    *Q.*  Do you teach any classes that have any relationship to the

8    topics of your work in this case?

9    *A.*  Yes.  For the past 21 years, I've been the lead instructor

10   on a course called Understanding and Preventing Violence.  I

11   also am the lead instructor for a course called Research and

12   Evaluation Methods for Health Policy.  And I also lead seminars

13   relevant to injury, violence, and public policy.

14   *Q.*  Have you ever served as an expert witness before?

15   *A.*  Yes, I have.

16   *Q.*  How many times?

17   *A.*  I should know this off the top of my head.  I apologize.  I

18   think it's been about --

19            *THE COURT:*  It's not relevant.  Don't worry about it.

20            *THE WITNESS:*  Okay.

21   *BY MR. GROVE:*

22   *Q.*  You mentioned that most of your publications have been

23   related to violence and firearms.  What are you looking for

24   when you're evaluating the impact or potential impact of the

25   regulation of firearms?

1   *A.*  Well, I'm looking to see whether there is any association

2   between firearm policies or other -- I want to underscore that,

3   that I look at a broad range of strategies to address gun

4   violence, not just gun policy.  So whatever intervention,

5   whether it's the policy of police intervention, community

6   initiative, I'm looking for whether there is an association and

7   how strong that association is between the policy or

8   intervention in question and the outcome I'm studying.

9   *Q.*  Have you ever done any work in which you concluded that a

10  particular regulation was unlikely to be effective in reducing

11  firearms injury or violence?

12  *A.*  Quite a number of times, actually, yes.  I, just some

13  examples off the top of my head, published an article in JAMA,

14  *Journal of American Medical Association* in 2004 that examined

15  the relationship between youth-focused firearm restriction laws

16  and adolescent suicide.  While I did find that child access

17  prevention laws, or laws that require gun owners to secure

18  firearms so that they're not accessible to underage youth, were

19  associated with reductions in youth suicides, I found no

20  relationship between, I believe, four, five -- actually, five

21  other policies focused on youth, researching of firearms.

22          That's one example off the top of my head, but there

23  are many others.

24  *Q.*  Are you familiar with the laws that are being challenged in

25  this case?

1  *A.*  Yes, I am.

2  *Q.*  So there are two bills at issue.  There is a limitation on

3  magazine capacity for semiautomatic firearms, and there is also

4  an expansion of background check requirements for private

5  firearms transfers.  Did you look at the potential impact of

6  both of these provisions through your work in this case?

7  *A.*  No.  I limited my contributions to focusing on the

8  background check requirements.

9  *Q.*  And I'll refer to that as 18-12-112, just so we're on the

10  same page.

11  *A.*  Okay.

12  *Q.*  Just for background here, please describe for us how

13  Colorado's expansion of background checks sort of fits in with

14  other types of firearms regulation that have been enacted in

15  various states and cities around the country.

16  *A.*  Sure.  Whether there -- well, there are numerous laws that

17  are designed to reduce the risk of firearm violence.  Many of

18  them focus on probably the most -- what I consider the most

19  important objective, which is keeping firearms out of wrong

20  hands, individuals whose past behavior indicates that they're

21  an increased risk for committing violence.  So there are some

22  policies that focus on that objective.

23          There are other policies that address other

24  objectives.  Some focus on keeping guns out of places where

25  having guns there might be a particular risk.  There are also

1   certain restrictions that focus -- you know, as one of the laws

2   under question here, focus on design, whether they're

3   regulating design to minimize harm associated with firearms.

4        But the central policy in question here with the

5   background checks, again, is what is focused on what I believe

6   to be the overriding and most important objective, which is

7   keeping guns out of wrong hands.

8   Q.  Okay.  Let's talk -- let's discuss background checks sort

9   of in a general way before we get to the specifics of

10  Colorado's law.

11       And maybe the best way to start is with the most basic

12  question I can think of.  What's a background check?

13  A.  Sure.  A background check is something that is done --

14  typically, a person who is interested in purchasing a firearm

15  will complete out a form, putting down their identifying

16  information.  They have to present a government-issued ID.

17  That -- valid ID.  That information is then sent to law

18  enforcement agencies to check their databases, whether that

19  individual fits any of a number of potential disqualifying

20  conditions that would disqualify them from legal purchase and

21  possession of firearms.

22  Q.  Are you familiar with the Gun Control Act of 1968?

23  A.  Yes.

24  Q.  Did that -- did that Act require background checks?

25  A.  No, it did not.  It did identify these prohibiting

1  conditions that I mentioned before, of which characteristics or

2  conditions would disqualify someone from legal possession of

3  firearms.  But it did not require any formal process, like a

4  background check, to verify whether a person met any of those

5  disqualifiers when they went to acquire a firearm.

6  *Q.*  So when did the background check system come about?

7  *A.*  Well, many states have had a background check system for

8  many decades.  At the federal level, effective in 1994 with the

9  Brady law.  The Brady law required all firearm transfers that

10  occur from a federally licensed firearm dealer be contingent

11  upon the recipient of that firearm passing a background check.

12  *Q.*  A moment ago you mentioned firearm prohibitors and

13  prohibited persons.  Can you define those terms for us.

14  *A.*  Sure.  Again, very broadly, these are conditions that would

15  disqualify someone from legal possession of a firearm.  The

16  most common disqualifiers would be someone having been

17  convicted of a felony crime, someone being under the legal age

18  for possession of a firearm, being a fugitive from justice,

19  having been -- with the Lautenberg act, being convicted of a

20  domestic violence misdemeanor crime, and disqualifiers for

21  being under restraining order for domestic violence.  And then

22  another common one is someone who has been adjudicated mentally

23  defective or, you know, mental status is such that there has

24  been an adjudicative process to determine that this person is,

25  in essence, as it relates to firearm policy, too risky to

1  possess firearms.

2  *Q.*  So what is your opinion as to whether prohibitions on

3  acquisition of a firearm are justified by an increased risk of

4  violence by individuals in prohibited categories?

5  *A.*  Well, there might be some categories where there is really

6  not enough data to examine those.  Those are sort of the less

7  common ones.  Whether you're an alien, for example, or

8  something like that, not a naturalized citizen.  But the most

9  common ones, again, felony convictions, convictions for

10  domestic violence misdemeanors, restraining orders, under age

11  requirements, all of those can be justified based upon quite

12  significantly increased risk within those groups as a whole for

13  future commission of violence and crime.

14  *Q.*  Well, let's talk about a couple of those more specifically.

15  Felons, for example, once they're out of prison, they paid

16  their debt to society, presumably.  What additional risks would

17  be associated with allowing them to possess firearms after they

18  served their term?

19  *A.*  Well, unfortunately, there is a fairly high rate of

20  recidivism among felons.  They do have a high risk of

21  reoffending, so that's principally the basis.  There are rules

22  set up where someone can apply for relief from the so-called

23  disability -- ability to purchase or carry firearms that would

24  go through a careful review to see whether this person meets an

25  exception of that broader group that has a quite notably higher

1   risk for reoffending.

2   *Q.* And another term that I've seen in this area is mental

3   defective, which is sort of an archaic term. Can you describe

4   what that means.

5   *A.* Well, what this means in practical terms in the vast

6   majority of cases is that there has been some professional

7   assessment of the individual's mental status, a close

8   examination of their behavior, of acts that they've been

9   engaged in. And most commonly, the professional opinion is

10  that this person's mental status is such that they represent an

11  undue risk to themselves and others, and that's -- that's the

12  basis for this.

13        While the very broad category of people with mental

14  illness do not have that much elevated risk for committing a

15  violent crime, those in this much, much, much smaller

16  subcategory, who have been through this adjudicative process,

17  most definitely do represent a group that is considerably much

18  higher risk for violent acts compared to those who haven't been

19  determined mentally defective. Again, I don't like that

20  terminology, but . . .

21  *Q.* So if we were able to prevent these high propensity

22  individuals from acquiring firearms, in your view, would such a

23  prohibition result in a reduction of firearms violence?

24  *A.* Yes.

25  *Q.* In your view, does the Brady Act in its requirement that

1   FFLs run background check, should it make it more difficult for

2   high-risk individuals such as we've been discussing to acquire

3   firearms from licensed dealers?

4   *A.*  Yes, most definitely.  It's not foolproof, but it

5   definitely provides a mechanism to screen out individuals who

6   shouldn't have firearms.  It occurs every day through this --

7   through this process.

8   *Q.*  You mentioned it's not foolproof.  What do you mean by

9   that?

10  *A.*  Well, of course, there are individuals who won't obey the

11  law.  So there may be licensed gun dealers, for example, who

12  will sell a gun without conducting a background check, just as

13  an example.

14  *Q.*  Are there any errors, say, in the FBI's list of prohibited

15  persons?

16  *A.*  Certainly.  So, the background check system requires

17  records in which to identify these prohibiting conditions.

18  While, as a whole, that system works pretty well, those

19  prohibiting conditions and records representing those

20  prohibiting conditions do get into the background check

21  database, not all do.

22  *Q.*  Are you familiar with Colorado's InstaCheck system?

23  *A.*  Yes.

24  *Q.*  And does InstaCheck do what you're talking about, does it

25  expand the database search at all?

1   *A.*  Sure.  The Colorado system not only checks for prohibiting

2   conditions within the FBI's National Instant Background Check

3   system, the NICS system, it also checks against their own

4   databases within Colorado.  And, generally speaking, those are

5   more complete records, at least, for incidents and occurrences

6   within the state of Colorado.

7   *Q.*  So has the Brady Act had an impact on gun violence by

8   prohibited individuals?

9   *A.*  Honestly, I don't think we know the answer to that

10  question.  There have been some studies.  The most notable one,

11  most commonly cited, conducted by Professors Phillip Cook and

12  Jens Ludwig and published in the *Journal of American Medical*

13  *Association.*  Very briefly, the basis for their assessment of

14  the -- estimates of impact of the Brady law on outcomes like

15  homicide was based on a research designed to contrast what they

16  refer to as Brady states -- these are states that previously

17  did not require these type of background checks -- contrasted

18  against checks that already had those background checks based

19  upon their state laws, and then compared the differences, the

20  change of -- following the Brady law in those two sets of

21  states.

22          A very common, what we refer to as a threat to

23  internal validity of the study, the sort of textbook research

24  design of a variety of potential threats to internal validity

25  to the study, is that the intervention of interest -- in this

 1    case, the Brady law -- ideally would only affect the states

 2    that these researchers referred to as the Brady states.

 3         When that intervention, in this case, the policy,

 4    affects the other control group, you have what is called

 5    contamination bias.  Many of the states that already had

 6    rigorous background check systems and other measures of

 7    accountability to keep guns out of wrong hands, a significant

 8    share of their guns used in crime actually came from the

 9    so-called Brady states with the weaker gun laws.  So it stands

10    to reason that those non-Brady states probably benefited some

11    potentially, anyway, at least theoretically, from the Brady law

12    by reducing gun -- interstate gun trafficking.

13         So I think there is something inherent in the design

14    of the study that makes it very difficult to know the true

15    effects of that law.

16         Sorry, that's a little longer answer than maybe you

17    wanted.

18    Q.  So we've been talking about how the Brady Act requires

19    firearm dealers to conduct background checks.  What regulations

20    under federal law apply to transfers between private

21    individuals?

22    A.  There are minimal regulations or requirements for those

23    private transfers of firearms.  If a private gun owner who is

24    not a licensed dealer wants to sell or transfer a firearm to

25    someone, they may not do so if they have knowledge that

1    individual fits into one of these prohibiting conditions,

2    prohibitive categories.  So if the person who they're

3    transferring the firearm is known to them and known to have had

4    felony convictions or known to be under the legal age for

5    firearm possession, they could be potential liable for being

6    prosecuted for violating the law.

7         But there are no requirements for these -- the person

8    transferring the firearm to do -- get any assurance that a

9    person doesn't meet one of these prohibiting conditions.  There

10   is no background check requirements, so they had no obligation

11   to ask or verify.  And quite often this is done, again, with no

12   questions asked.

13   Q.  You may have answered this in part.  But why is it enough,

14   if it's illegal under federal law, to prohibit someone who

15   is -- well, if someone is prohibited under federal law from

16   buying a firearm, why isn't that enough to ensure that they

17   won't?

18   A.  Well, of course, these individuals are prohibited most

19   commonly because they violated laws.  So we can't, sort of, do

20   this on the honor system, that someone who is a prohibited

21   person will not attempt to receive a firearm.  What, to me, is

22   very common sense, is that we require systems of accountability

23   so firearms sellers don't sell to those individuals.

24   Q.  So I know I've seen that, you know, gun shows and flea

25   markets, that can be sort of a -- I've seen those proposed as

1  problem areas.  Are they, in your experience?

2  *A.*  Well, yes.  There is certainly good evidence that in states

3  that do not regulate private transfers at these gun shows or

4  flea markets, that it's been well documented that a lot of

5  activity goes on that, if not blatantly illegal, are incredibly

6  high-risk types of transactions.  So you can go to gun shows in

7  states, again, where they don't regulate these private

8  transfers, and people are selling assault weapons and other

9  firearms with signs that say, you know, private seller, no

10  questions asked, no background checks.  These occur within a

11  matter of seconds.  Look at the firearm, money changes hands,

12  and these anonymous transactions occur.

13          The ATF's investigation of firearm trafficking cases

14  identify gun shows as an important source in which that

15  trafficking occurs.  That being said, there are many risky

16  firearm transactions that go beyond the gun show environment.

17  And we're in a new day and age now in terms of ability of

18  prospective purchasers to make connections with -- with sellers

19  of firearms, private sellers of firearms.  So it's -- more of

20  this commerce begins in an internet identification of a

21  potential firearm and firearm seller that they, then, meet at

22  another place to, you know, again, transfer money for guns,

23  with no background check or record keeping.

24  *Q.*  Does that mean that we should be suspicious of all firearms

25  transfers between unlicensed individuals?

1   *A.*  Of course not.  Transfers between family members, where one

2   can, I think, reasonably assume, safely assume, that the family

3   members know whether the person who is receiving the firearm is

4   prohibited or not from possessing firearms, those seem to be --

5   not to be particularly high-risk situations.  Someone

6   letting -- you know, if you're on a hunting trip, and your

7   buddy wants to try your gun once or something like that, that

8   seems like a pretty low-risk type of transfer.  So -- and --

9   so, yeah, so there is probably a lot of potential transfers

10  that don't represent potentially high risk.

11  *Q.*  Are you aware of any ways that we can encourage gun owners

12  who wish to transfer their firearms privately to make sure that

13  the people to whom they are transferring the firearms are not

14  prohibited?

15  *A.*  Well, certainly.  Many states have adopted laws like the

16  one in question here in Colorado, that require background

17  checks for these types of transactions.  I believe 15 or more

18  states now have those types of requirements of at least some

19  category of firearms or at least some categories of transfers.

20  Again, quite commonly, there are exceptions for these

21  lower-risk types of transaction that we just discussed.

22  *Q.*  As I understand it, there are two main ways of arranging

23  this system.  Can you describe those.

24  *A.*  Sure.  So, the two most common ways to ensure that

25  prohibited people do not acquire guns or greatly reduce that

1  risk, at least, that states have adopted, one is referred to as

2  permit-to-purchase licensing, or handgun purchaser licensing

3  systems, firearm purchaser licensing systems.

4       The way these commonly work is that the person who is

5  interested in purchasing a firearm will go directly to a law

6  enforcement agency to apply for a permit to do so, and that --

7  and if they pass the background check conducted by that law

8  enforcement agency, they will be issued a permit to purchase a

9  firearm that is good for a limited period of time.  They could

10 then go to someone, a private seller, and do a legal

11 transaction, showing the private seller that they have a valid

12 permit to purchase the firearm.

13      Another way that this is done is more in line with

14 what Colorado has recently adopted, which requires background

15 check go through a federally licensed firearm dealer.  In that

16 case, the individuals doing the transaction would typically,

17 you know, go to a licensed gun dealer, who would go through the

18 same process as they were when they are selling their own

19 firearms, with the proper paperwork, record keeping, and

20 background checks.

21 Q.  I'm going to put you on the spot a bit here.  Which states,

22 to your knowledge, have an arrangement that is similar to

23 Colorado's?

24 A.  Ones that come to mind right now would be California,

25 Maryland, Pennsylvania, New York, Delaware, I believe Rhode

 1 │ Island.  Might be missing one or two there, but those are the
 2 │ ones that come to mind.
 3 │ *Q.*  So how do we know that people won't just ignore a law that
 4 │ requires background checks for private sales?
 5 │ *A.*  Well, of course, you don't know for sure.  Certainly, some
 6 │ will.  That doesn't mean that the law has no utility.  I
 7 │ believe that individuals who have legally acquired a firearm,
 8 │ they went into a gun shop, passed the background check, now
 9 │ they're a firearm owner, and they're going to transfer their
10 │ firearm, you know -- I believe that the vast majority of those
11 │ individuals are law-abiding people.  They want to obey laws.
12 │ They don't -- all the polling that we've done and others have
13 │ done, when gun owners are asked whether they support background
14 │ checks.
15 │         MR. KOPEL:  Objection.  Polling is not relevant in
16 │ this case, in a court of law.
17 │         THE COURT:  Response.
18 │         MR. GROVE:  It's relevant to the question of whether
19 │ gun owners are likely to comply with background check system,
20 │ if they support it.
21 │         THE COURT:  As to relevance, I overrule.
22 │ BY MR. GROVE:
23 │ *Q.*  Please proceed.
24 │ *A.*  So, basically, again, I believe that gun owners are
25 │ generally -- want to comply with laws.  We're generally a

1  population of law-abiding people.  And so the people who have

2  the guns legally, most, I think, will comply.  And you don't

3  have to have 100 percent compliance in order to have a

4  beneficial effect.

5  Q.  We'll get back to that in just a minute.  But with that

6  federal law background in mind, and some more prospective from

7  some other states, what's your understanding of what Colorado's

8  law now requires?

9  A.  What Colorado's law now requires is, if you're going to

10  transfer a firearm to someone who is not an immediate family

11  member and that transfer, you know, goes beyond a short-term

12  loan, 72 hours, that that -- it is incumbent upon the person

13  selling or transferring the firearm to ensure that the person

14  they are selling or transferring the firearm to has passed a

15  background check.  And, again, that is facilitated by a

16  licensed dealers within the state.

17       And similar requirements, legal requirements, are also

18  placed upon those receiving the firearms, to go through that

19  same process.

20  Q.  Let's move on from there.  What effect, if any, does

21  expanding background check requirements to cover private

22  transactions have on the ability of prohibited persons to

23  acquire firearms?

24  A.  Well, it -- it doesn't completely eliminate all of a very

25  large and heterogeneous group of individuals.  And when we talk

1   about prohibited individuals, these run the gamut of someone

2   who, you know, many, many felonies, leader of a gang, a lot of

3   resources, and whatever.  And then we have another spectrum,

4   someone who hasn't sort of led an entire life of crime, but has

5   other conditions that might make it too risky for them to

6   purchase and possess a firearm, someone under restraining order

7   for domestic violence, some of those, underage youth, other

8   individuals who have been involved in crime, but not

9   necessarily part of criminal organizations that, you know, will

10  do anything within their power and resources to acquire guns.

11       So what these background check requirements do is they

12  limit the diversion of guns from the legal commerce into the

13  underground market.  Research that I've done and other

14  researchers have done has shown that the vast majority of

15  criminals who look to acquire guns will only do so from -- have

16  a very strong preference for only conducting that transaction

17  with someone they know and trust.

18       So by putting these background check requirements in

19  place, you limit the ability of -- you know, if I'm a felon and

20  I want to get a buddy of mine to get me a gun, you know, I

21  trust him.  Okay.  And then I'm going to ask him to go in, get

22  a gun, and then violate the law.  A lot of people aren't

23  willing to do that, make that risk.  And, again, these are

24  individuals that have to be legal purchasers in order to do

25  that diversion.

1    So what's critical here is, systems of accountability,

2  legal systems of accountability for those with the potential to

3  do that diversion.  And, generally, these are people, again,

4  who have passed background checks and have generally been law

5  abiding.

6  Q.  So one argument I've heard is that, you know, a prohibited

7  buyer looking for a gun in the situation under Colorado's law,

8  would just keep looking until they can actually find someone to

9  sell them a firearm privately.  Does that accurately reflect

10  the mechanics of the firearm market -- underground firearms

11  market?

12  A.  As I indicated before, this is a very heterogeneous market,

13  I wouldn't question that there are some offenders out there who

14  will be very persistent, not so risk averse, willing to spend a

15  lot of time, money, and risk acquiring a gun.  But the research

16  that is done to date on underground markets suggests that that

17  is not necessarily the case for the vast majority of potential

18  criminal offenders.

19    Just one sort of way to highlight this, I think, is,

20  let's take the case of robbery.  Robbery is a crime that is

21  typically committed by individuals who have been doing crime

22  for a while.  It's not just -- someone just decides after

23  leading a law-abiding life to go out and rob.  All right.

24  Perhaps the most effective way to rob someone is to stick a gun

25  in their face or threaten them with a gun.  In the United

 1   States, a place where we admittedly have a lot of guns, no more

 2   than 40 percent of robberies are committed with firearms.  When

 3   arrestees have been surveyed about their -- these are anonymous

 4   surveys -- questioned about their gun acquisition and ownership

 5   patterns, surprisingly, the majority do not own guns and have

 6   not.

 7        So it's -- it's -- while there are categories who will

 8   find a way around this, that is not always the case.  They have

 9   limited resources, they recognize the risk associated with

10   illegal firearm possession, and so it does matter.

11   Q.  What are some of the risks associated with somebody trying

12   to acquire a firearm in the underground market?

13   A.  There are a number of potential risks.  One, obviously, is

14   that they're going to be in violation of the law.  Particularly

15   if they're a felon, the consequence of that could be quite

16   severe.  But there are other concerns and risks as well.  And

17   this, again, applies to whether you know and trust the person

18   who you're going to do business with in purchasing or acquiring

19   a firearm from.  That individual could rob you, shoot you, the

20   person could be an undercover cop.  The gun may have been used

21   in a prior crime, making it risky for me if I'm receiving that

22   gun to be in possession of a gun that police can through

23   ballistics checks connect to other crimes.  And in other cases,

24   the gun may not work.

25        So, again, that's why, again, these -- when offenders

1    are asked about how this underground market truly functions,

2    trust is so central to that, and it greatly limits the

3    potential of suppliers within this illegal gun market.

4    Q.  One term that I've heard that I think might relate to what

5    you've been saying is that the underground market is thin.  Can

6    you describe what that means?

7    A.  Yes.  Economists use this term of thin or thick markets to

8    describe, basically, how easy is it for someone who wants to

9    acquire the good in that market -- in this case a gun in the

10   underground gun market -- how easy is it?  Are there a number

11   of suppliers?  Is it easy to make connection with those

12   individuals or not?

13          A rather large and thorough study in Chicago found

14   that that market was relatively thin.  There weren't that many

15   potential trusted suppliers.  As a result, there were

16   individuals who could earn compensation serving as a broker to

17   connect these potential purchasers and sellers, thereby

18   significantly increasing the price of firearms in that

19   underground market.

20   Q.  So how do criminals that actually use guns -- and it sounds

21   like it's not all of them -- but how do those that use guns get

22   them?

23   A.  Well, we have to rely upon their surveys of offenders to do

24   this.  So, a common source of information is a survey done by

25   the Department of Justice of a random sample of state --

1   inmates in state prisons.  Through that survey, those who

2   are -- have committed crimes involving firearms are asked how

3   they acquired firearms.  So, just under 40 percent report that

4   their direct transaction in which they got the gun was from a

5   friend or family member.

6           Similar proportion, somewhat slightly lower

7   proportion, acquire the gun through this rather vague,

8   unfortunately -- this is my own frustration that they didn't

9   pin this down -- definitions down more, but on the street or in

10  this underground market.  The other transactions were acquired

11  through licensed gun dealers, and 10 percent through theft.

12  Q.  Are you familiar with the phrase "firearm diversion"?

13  A.  Yes.

14  Q.  What does it mean?

15  A.  It means the guns are moving from the legal market,

16  either -- these are, again, sellers and purchasers who have

17  been vetted and are legal actors in market.  And the diversion

18  means when the product, in this case, a gun, moves from that

19  legal market to an underground or illegal market.

20  Q.  What's the relationship between diversion and trafficking?

21  A.  Well, I think a common understanding of trafficking

22  generally looks at a subset of diversion in which the person

23  involved in the diversion, the seller or supplier, is in --

24  sort of has their own business or enterprise that might involve

25  a large number of guns.

1    There is no -- in my understanding, any clear

2  understanding of what's the dividing line between what makes

3  someone a trafficker versus someone generally involved in

4  diversion of guns to criminals.

5  *Q.*  So why should we care about diversion?

6  *A.*  Oh, well, again, I think it's pretty central to what I

7  consider to be, and many people consider to be, the overriding

8  objectives of our gun laws, which is to keep guns out of the

9  hands of dangerous individuals.  So that is the mechanism by

10  which this becomes possible, is through those diversion --

11  methods of diversion and the reason why laws and policies and

12  enforcement practices appropriately should focus on deterring

13  that initial diversion into the underground market.

14  *Q.*  How is diversion of firearms measured?

15  *A.*  Well, I mentioned the surveys of prisoners.  Unfortunately,

16  those surveys virtually only limit themselves to the direct --

17  most direct way that a person acquired a firearm.  They do

18  not -- it's often not within the ability of the criminal being

19  questioned or surveyed to know the path, in essence, that the

20  gun took to this underground market.

21    So a common way that researchers, including myself,

22  have looked at diversion is through the tracing of guns

23  recovered by law enforcement.

24  *Q.*  And is that -- another phrase that we've heard in this

25  trial is time-to-crime.

1    *A.* Right.  So many law enforcement agencies throughout the

2    country have policies of -- for every firearm that the law

3    enforcement agency recovers, they will submit the information

4    necessary for trace of that firearm to the Bureau of Alcohol,

5    Tobacco, Firearms and Explosives.  That information would

6    include the make, model, serial number, caliber of the firearm,

7    so that they can connect the dots between the initial

8    manufacturer, then transfers down the line, often to a

9    wholesaler, to a retailer, and to the first retail sale.  In

10   some instances, depending on the state systems in place, they

11   might take it beyond the initial retail sale.

12         But the reason these data are particularly important

13   is that, again, it can measure that initial diversion and the

14   very short interval between a firearm's being sold at the

15   retail level and then recovered in crime, most typically from

16   someone who is not the legal purchaser of the gun.  That that

17   has been a way to look at it, in essence, as a surrogate

18   measure of likely diversion.

19   *Q.* So there were some questions that have come up in this

20   trial about the quality and reliability of trace data.  Do you

21   agree that trace data can be problematic?

22   *A.* I agree that firearms trace data should be treated with

23   great care.  One should understand the strengths and

24   limitations of those data.  And that's, basically, the

25   conclusions made by the panel of experts with National Research

1   Council, that they recognize potential selectivity if there is

2   not the universal tracing going on, and that one has to be

3   careful about inferences one makes.  But, generally, law

4   enforcement and researchers have relied upon these indicators

5   of very short time-to-crime as a marker of diversion of guns

6   from legal to illegal markets.

7   Q.  So you mentioned that you have published a work based on

8   trace data, correct?

9   A.  Yes.

10  Q.  So what precautions have you taken in order to filter out

11  any unreliable aspects of it?

12  A.  For when research -- excuse me, when data are available at

13  sort of the gun level data -- this is before some more

14  stringent requirements from -- the Tiahrt Amendment made

15  obtaining that data far more difficult.  You could identify, of

16  course, where the gun was recovered, and, therefore, what law

17  enforcement agency was tracing it.  And what I try to do is two

18  things.  One is, only use data from agencies that do have

19  policies of tracing all guns.  But I also carefully look at

20  observations changing over time with those -- for example, the

21  number of guns traced.  So if there is some dramatic change

22  from one year to the next in the number of guns traced, that

23  seems to have no correlation with actual gun crime.  To me,

24  that's sort of a red flag, and I would omit data from that

25  given city or year.

1 | *Q.* So how do we infer a relationship between the short

2 | time-to-crime and the illegal diversion?

3 | *A.* Well, again, this is -- we're not able to say with each and

4 | every such case of a short time-to-crime type of gun, we know

5 | for certain that this is a trafficked gun. But we know -- just

6 | in terms of thinking about other ways that guns get into the

7 | hands of criminals, the most common thing, other way, would be

8 | through theft. So if you look at the most common age of guns

9 | that are just in homes all around the United States, for

10 | example, the average age of gun last study -- unfortunately,

11 | there is not a lot of studies that gather these type of data.

12 | But the last study estimated about 13 years old is the average

13 | age of a gun. And a relatively small proportion of guns in the

14 | homes of -- throughout the United States are relatively

15 | recently purchased guns by those individuals. In the case of

16 | the study that I was referring to, the 1996 study, I believe

17 | 14 percent were under two years of time-to-crime -- roughly

18 | 14 percent.

19 | *Q.* So have you done any work on -- have you published any

20 | studies that look at the relationship between expanded

21 | background check requirements and short time-to-crime firearms?

22 | *A.* Yes.

23 | *Q.* Would you please describe that work.

24 | *A.* Sure. In a study published in the *Journal of Urban Health*

25 | in 2009, my colleagues and I looked at the association between

1  a rather conservative measure of diversion, that being when

2  guns are recovered less than a year from retail sale from

3  someone other than the legal purchaser.  So we looked at that

4  indicator as a marker for diversion of guns to criminals or

5  into the illicit market.  And then we looked the those

6  indicators across 54 cities -- U.S. cities that had

7  comprehensive trace practices in place.

8       We also looked at a number of state policies

9  regulating firearm sales.  We even -- in cases where the state

10 gave the authority from -- to local or state law enforcement to

11 license, regulate, and oversee gun dealers, we also even did

12 surveys of law enforcement to find out their practices relevant

13 to preventing diversions of guns to criminals.  We looked at

14 other markers that might predict this variability and this

15 indicator of diversion of guns to criminals, such as the

16 proximity of those cities to other states, population in other

17 states, particularly populations in other states with weak gun

18 laws.  And what we found in that 2009 study was that fairly --

19 well, consistently and highly statistically significant

20 associations between private sales regulations that required

21 background check for private transactions and lower levels of

22 diversions of guns to criminals.

23      In a subsequent study that we published in a chapter

24 of the book -- 2013 book that we published last year, we looked

25 at safe firearm sales policies and their association with the

1  diversion of guns to criminals across state lines.  So,

2  interstate types of diversion.  We, again, in that study,

3  looking at a number -- broad range of firearm policies and

4  other control variables, found that having a policy requiring

5  background checks, record keeping for private firearms,

6  particularly, handgun transactions, was associated with less

7  cross-state diversion.  Meaning that if a state had such a

8  policy in place, fewer of its guns were being involved in crime

9  in other states outside that.

10      And then most recently, we also looked at the case

11  of -- many of these policies under question have been in place

12  for a good number of years.  We took advantage of the fact that

13  the state of Missouri repealed its handgun permit-to-purchase

14  law that was its mechanism for ensuring background checks for

15  handgun sales -- for all handgun sales.  And we were able to

16  look at ATF trace data over time and see whether there was

17  association between the repeal of that law and markers of

18  diversion.

19      What we found was really quite striking.  Was,

20  basically, a twofold or more increase in the percentage of guns

21  used in crime with this short time-to-crime indicators.  And,

22  basically, the -- the timing of the repeal lines up perfectly

23  with when these markers of short time-to-crime were changing

24  quite abruptly.

25          *MR. GROVE:*  Could I have just a moment, Your Honor?

1      THE COURT:  You may.

2  BY MR. GROVE:

3  Q.  If you could turn to Exhibit 51, please.

4      COURTROOM DEPUTY:  You want him to have the book?

5      MR. GROVE:  Sure.  You can look at it in stereo.

6  We'll give you the book as well.

7      THE WITNESS:  Whatever --

8      I can see it pretty well right here, so . . .

9  BY MR. GROVE:

10  Q.  Do you recognize this exhibit?

11  A.  Yes.

12  Q.  What is it?

13  A.  This reflects graphing of three different intervals of

14  these short time-to-crime guns, the proportion of firearms

15  recovered by law enforcement in the state of Missouri over the

16  time period 2002 through 2011.

17  Q.  How was it created?

18  A.  This was created based upon data from the Bureau of

19  Alcohol, Tobacco and Firearms.

20  Q.  Was the data used to create this disclosed to the

21  plaintiffs in this case, to your knowledge?

22  A.  Yes.

23      MR. GROVE:  We'd move to admit Exhibit 51, Your Honor.

24      THE COURT:  Is this a demonstrative exhibit, or

25  what -- what are you trying to admit this for?

1    MR. GROVE:  If you're happy with him describing that,

2    we can just do that.  That's fine.

3    THE COURT:  All right.

4    MR. GROVE:  Withdraw that.

5    BY MR. GROVE:

6    Q.  So please tell us what we're looking at here, Dr. Webster.

7    A.  Sure.  Again, we're looking at the -- how over the time

8    span of 2002 through 2011, the percentage of guns recovered by

9    law enforcement in Missouri, that were in one of these three

10   categories of short time-to-crime, the blue bar representing

11   the less-than-three-months interval, the red bar being three to

12   twelve months, and the black bar being one to two years of this

13   interval between retail sale and recovery by law enforcement.

14        Importantly, what you will see here is, 2008 is the

15   first full year in which Missouri no longer has universal

16   background check in a handgun purchaser licensing system.  What

17   you'll see is the blue and red bar, which represents guns that

18   were sold post-repeal, go up quite dramatically, particularly

19   in comparison to the 2003 to 2006 data.  2007 being sort of a

20   transition year, which for the months covered were post-repeal.

21        So you see a very abrupt change in this marker that

22   continues from 2008 through 2011 for guns with a time-to-crime

23   under one year, which, again, was a marker that I've used in

24   other studies.

25        You see that the guns recovered by law enforcement one

1  to two years after retail sale do not change until 2009.  And

2  that is the point, again, where the guns represented in the

3  black bars represent the post-repeal time period within

4  Missouri, where they did not have background checks for all

5  handgun transactions.

6          MR. GROVE:  Your Honor, I think I would like to try to

7  move this in, if -- if we could.

8          THE COURT:  All right.

9          Voir dire or objection?

10          MR. KOPEL:  May I confer a minute, Your Honor, please?

11          THE COURT:  I'm sorry?

12          MR. KOPEL:  May I consult with counsel for a minute?

13          THE COURT:  Sure.

14          (Brief off-the-record discussion between counsel.)

15          MR. KOPEL:  No objection, Your Honor.

16          THE COURT:  Thank you.

17          What's the exhibit number on this?

18          MR. GROVE:  This is 5-1.

19          THE COURT:  Thank you.  Exhibit 5-1 is received.

20          (Exhibit 51 admitted.)

21          MR. GROVE:  51, I don't know why I said that.

22          THE COURT:  Same two numerals.

23  BY MR. GROVE:

24  Q.  So could it be that the twofold increase in short

25  time-to-crime guns here that we see displayed on Exhibit 51

1  could be just a consequence of guns trafficked from other

2  states and therefore have nothing to do with the change in the

3  law?

4  *A.*  Theoretically, that could be one potential mechanism by

5  which this jumped quite abruptly.

6  *Q.*  Is there anything in your work that suggest that that's not

7  the case?

8  *A.*  Yes.  When we tracked the percent of the trace guns that

9  had been initially sold at retail within the state of Missouri

10  versus in other states, we saw that this period in which we see

11  this huge shift in the short time-to-crime guns is precisely

12  the time where you see a very noteworthy shift upward in the

13  percentage of guns used in crime in Missouri that had been

14  initially sold at retail within the state of Missouri.

15  *Q.*  Let's look at Exhibit 52.  Do you recognize this document?

16  *A.*  Yes.

17  *Q.*  And what is it?

18  *A.*  These are data that track over the period of 2002 through

19  2011 the percentage of guns recovered by law enforcement that

20  were traced to retail sales within the state of Missouri versus

21  retail sales in other states.

22  *Q.*  And how was this document created?

23  *A.*  Again, this was data from -- from data provided by the

24  Bureau of Alcohol, Tobacco and Firearms and Explosives.

25  *Q.*  Is it a fair and accurate representation of that data?

1    *A.*   Yes.

2              *MR. GROVE:*   Would move to admit Exhibit 52 as well.

3              *THE COURT:   Voir dire* or objection?

4              *MR. KOPEL:*   No objection, Your Honor.

5              *THE COURT:*   It is received.

6              (Exhibit 52 admitted.)

7    *BY MR. GROVE:*

8    *Q.*  So please tell us what we're looking at here.

9    *A.*   Sure.   Again, we're tracking on the red line here the

10   percent of guns recovered by law enforcement in Missouri that

11   were originally sold at retail level in the state of Missouri

12   in the red line, and the black line is the converse of that.

13   It's the percent of guns -- inverse of that, which is the

14   percentage of guns recovered in Missouri that had initially

15   been sold by -- from retail transactions in other states.

16              What's very clear here is two things I want to point

17   out.   One is how steady and consistent this marker is through

18   the years 2002 to 2006, in particular, even into 2007.   You see

19   a very noteworthy departure of that trend line, consistent

20   trend line, following the repeal of Missouri's

21   permit-to-purchase handgun licensing system.   So it goes

22   roughly from about 55, 56 percent of guns recovered by law

23   enforcement in Missouri, that have been sold in Missouri, to

24   over 71 percent of such guns that have been sold at the retail

25   level in Missouri.

1  Q. And what does that increase suggest to you?

2  A. It suggestion to me two things. It suggestion to me that

3  the greatest likelihood is that the percent -- the twofold

4  increase in these likely diverted guns that we were looking at

5  in the prior exhibit are much more likely to have been coming

6  from within the state than externally. The other thing that it

7  says -- and this is a pattern that you can see more broadly

8  across -- across states, is, on average, within a state, 70,

9  75 percent, sometimes greater, of the guns used in crime in

10  that state originated within that state.

11      It's noteworthy to me that when there was greater

12  accountability for handgun private -- non-private transactions

13  for handguns, that Missouri had a relatively low percentage of

14  their guns that were being used in crime, compared, again, to

15  other states. And what I would infer from this is that it's

16  becoming easier for criminals to acquire guns closer to home.

17      And, again, this connects back to what I was

18  discussing earlier about the importance of trusted sellers. If

19  you have to rely upon sellers who are coming from out of state,

20  that poses greater risks, cost and other things, to people

21  looking for guns on the underground market. But if you can get

22  them locally, again, from maybe a friend or a family member, it

23  becomes much easier, less costly, less risky.

24  Q. Let's look at Exhibit 53. Do you recognize this document?

25  A. Yes.

1  | *Q.* What is it?

2  | *A.* This is a graph that contrasts -- the blue bar represents

3  | the percentage change between the time period 2006 to 2007,

4  | generally, the period in which Missouri had permit-to-purchase

5  | licensing and background checks for all handgun transactions,

6  | versus the most recent years of 2011 to 2012. And what we're

7  | looking at here is the percentage change in the number of guns

8  | that were sold in the state of Missouri and then recovered by

9  | law enforcement in the state of Illinois.

10 | *Q.* What's -- what's the source of this data?

11 | *A.* The source of this data is the Bureau of Alcohol, Tobacco

12 | and Firearms and Explosives trace data that they report on

13 | their website. Because they show the origin -- state of

14 | origins for the guns they recovered in crime and traced.

15 | *Q.* Does this fairly and accurately represent the data -- the

16 | underlying data?

17 | *A.* Yes, it does. So, what you'll see here is roughly

18 | 78 percent increase in these guns -- number of guns coming from

19 | Missouri and later recovered by law enforcement in the state of

20 | Illinois.

21 |      I was interested to see whether there was just more

22 | guns being recovered and traced in the state of Illinois that

23 | might reflect this big proportionate increase coming from

24 | Missouri to Illinois. But what the red bar in this graph

25 | represents is the percentage change in the number of trace guns

 1  in Illinois over that time.  And you see that those numbers of

 2  traced guns increased only 5 percent.

 3          So you see, in essence, a very disproportionate change

 4  in guns coming from Missouri pre and post the background check

 5  requirement and the handgun licensing system in Missouri.

 6          *MR. GROVE:*  Move to admit Exhibit 53, Your Honor.

 7          *THE COURT:*  *Voir dire* or objection?

 8          *MR. KOPEL:*  No objection, Your Honor.

 9          *THE COURT:*  Thank you.  53 is received.

10          (Exhibit 53 admitted.)

11          We're getting close to the 10 o'clock hour.  When

12  there is a convenient stopping point, let me know.

13          *MR. GROVE:*  This might, actually, be a good time.

14          *THE COURT:*  All right.  We'll take our morning recess.

15  The court clock is showing 5 minutes before 10:00, and we'll

16  plan on reconvening until 10:15, 10:20.

17          We'll stand in recess until then.

18          (Recess at 9:57 a.m.)

19          (In open court at 10:25 a.m.)

20          *THE COURT:*  You may proceed.

21  *BY MR. GROVE:*

22  *Q.*  Dr. Webster -- we have more microphone now.

23          What's the take away for us in terms of the connection

24  between background checks and legal diversion?

25  *A.*  Well, again, we've seen in three separate studies,

1    association where background checks were in place for private

2    sales as well as those from licensed dealers, that there is

3    less trafficking. And the inverse is true, obviously. We see

4    it in larger studies, comparisons across states. And we see it

5    quite dramatically when Missouri made its policy change to do

6    away with its background checks and record keeping for private

7    sales.

8    *Q.* So far you've given us opinions on prohibiting factors, how

9    the expansion of background checks can make it more difficult

10    for prohibited persons to acquire guns, and the effect that

11    expanded background checks have on illegal diversion of

12    firearms. Have you done any work on whether the expansion of

13    background checks has any effect on firearms violence?

14    *A.* Yes.

15    *Q.* Please describe that for us.

16    *A.* Sure. We, again, took the example of Missouri as the most

17    reason significant policy change. We were interested because

18    there had been consistent correlations with permit-to-purchase

19    licensing systems, as well as other mechanisms to require

20    background checks and record keeping with lower rates of

21    diversion. We wanted to see whether this policy change led to

22    any significant changes in murders and homicides, the category

23    of violent crime with the highest percentage of firearm

24    involvement.

25        Would you like me to describe what we did and what we

1   found?

2   Q.  Let's go through a couple of these, and you can do it

3   there.

4   A.  Sure.

5   Q.  I'm displaying Exhibit 54.  Do you recognize this document?

6   A.  Yes.

7   Q.  What is it?

8   A.  Here you have a graph of annual murder rates.  The black

9   line represents the United States as a whole, the red line

10  represents murder rates -- annual murder rates for the state of

11  Missouri.

12  Q.  Where does this data come from?

13  A.  This data comes from the FBI's uniform crime report system.

14  Q.  This is a fair and accurate representation of that data in

15  chart form?

16  A.  Yes, it is.

17          MR. GROVE:  We'd move to admit Exhibit 54.

18          THE COURT:  Voir dire or objection?

19          MR. KOPEL:  Mr. Webster, did you in this data --

20          THE COURT:  Mr. Kopel, you need to say for the record

21  what you're doing.

22          MR. KOPEL:  Okay.  My apologies, Your Honor.

23          Mr. Webster --

24          THE COURT:  Mr. Kopel, are you engaging in voir dire?

25          MR. KOPEL:  Yes, I am engaging in voir dire.

1          *THE COURT:*  Thank you.

2          *MR. KOPEL:*  Mr. Webster, would it be correct to say

3   that this number excluded justifiable homicides from the FBI

4   data?

5          *THE WITNESS:*  This is -- this overall murder rate is

6   reported by the FBI crime report system.

7          *MR. KOPEL:*  Do you know whether this chart does or

8   does not include justifiable homicides?

9          *THE WITNESS:*  I don't believe it does.

10         *MR. KOPEL:*  Are you certain about that?

11         *THE WITNESS:*  No.

12         *MR. KOPEL:*  Your Honor, I would move to exclude this

13  as not being reliable.  Murder and justifiable homicide are two

14  entirely different things.

15         *THE COURT:*  Response.

16  BY MR. GROVE:

17  *Q.*  How many justifiable homicides are there every year in the

18  United States?

19         *THE COURT:*  Counsel, do you want to respond to the

20  objection?

21         *MR. GROVE:*  Could I do a little bit of further *voir*

22  *dire*?

23         *THE COURT:*  You may, but we need to be clear on the

24  record what we're doing.  So you're going to ask additional

25  *voir dire* questions?

```
 1         MR. GROVE:  Yes, my apologies.

 2   BY MR. GROVE:

 3   Q.  Dr. Webster, do you know how many justifiable homicides

 4   there are in the United States?

 5   A.  I don't know that number off the top of my head.  It is a

 6   very, very fraction of the overall number of murders.  So

 7   whether this represents justifiable homicides or not in this

 8   data, the general trends would be the same.

 9         MR. GROVE:  No additional questions on voir dire, Your

10   Honor.

11         THE COURT:  Any objection?

12         MR. KOPEL:  May I ask one further question on voir

13   dire?

14         THE COURT:  You may.

15         MR. KOPEL:  I'm now engaging in voir dire.

16         Mr. Webster, do you know if the FBI uniform crime

17   reports separate justifiable homicide from murder in the data

18   they report?

19         THE WITNESS:  I think I just answered that.  I'm not

20   sure.

21         MR. KOPEL:  You don't know?

22         THE WITNESS:  That's correct, yeah.  I think I just

23   answered that.

24         MR. KOPEL:  Your Honor, we would continue to object.

25   The FBI data -- we'd be happy to show it to you on the web or
```

1 │ any other way -- do separate justifiable homicides from

2 │ non-justifiable homicides.  So the potential inclusion here --

3 │ likely inclusion of justifiable homicides makes this report,

4 │ this chart, false and inaccurate.

5 │        *THE COURT:*  Thank you.  That sounds like an area for

6 │ cross-examination.  I overrule the objection to the admission

7 │ of the exhibit, which is used as a demonstrative exhibit, and I

8 │ receive it.

9 │        (Exhibit 54 admitted.)

10 │ *BY MR. GROVE:*

11 │ *Q.*  Tell us what we're looking at here in Exhibit 54, please.

12 │ *A.*  Sure.  Again, we're looking at the annual trends for murder

13 │ rates for Missouri, contrasted with that of the nation as a

14 │ whole.

15 │        What is observable to the naked eye is that there is a

16 │ very substantial noteworthy divergence between those trends for

17 │ Missouri and the United States, whereas, beginning -- in the

18 │ latter part of this graph, during the period following the

19 │ repeal of the permit-to-purchase law.  Whereas, Missouri's

20 │ murder rate goes up, the national rate goes down.

21 │ *Q.*  Where on this graph -- when was Missouri's

22 │ permit-to-purchase law repealed?

23 │ *A.*  Sure.  The law was repealed effective August 28, 2007.  So

24 │ part of 2007 -- 2007 is a transition year, in essence, in which

25 │ four months of the calendar year, there was no background check

1  requirement for handgun transactions for private individuals.

2  Whereas, the first eight months, there was that requirement.

3  Q.  And what does this -- what does the trend line here show

4  with respect to the murder rate in the United States as a whole

5  during this -- the entire period on the X axis here?

6  A.  Sure.  So, you'll see a fair amount of stability in this

7  trend line through roughly 2007.  So if you contrast the mean

8  for 1999 through 2007, generally, as being the period before

9  repeal occurred, you see general stability.  Following that,

10  you see the decline nationally.  Less stability in the state of

11  Missouri over that period of time, but no obvious pre-policy

12  trend observed for the years 1999 through 2006.

13       Where things diverge -- where and when it diverges

14  quite substantially is the first full year there was no handgun

15  licensing system in Missouri, when rates spiked up in a single

16  year, 34 percent -- for firearm homicide, excuse me.

17  Q.  Did you do anything to determine whether Missouri's

18  permit-to-purchase law and its repeal was the cause of this

19  spike in homicides in Missouri?

20  A.  Well, when you're doing policy research, you obviously

21  don't have the luxury of doing a randomized experiment.  So in

22  this type of setting, what one does is try to rule out

23  alternative hypotheses, other things that might explain these

24  divergent trends in Missouri versus the rest of the nation, see

25  whether the effect that we observed is specific to what the

1208
Appellate Case: 14-1290    Document: 01019375757    Date Filed: 01/16/2015    Page: 51

 1 │ policy is directed at or not, and whether that effect is
 2 │ widespread or only localized within the state.  So that's the
 3 │ process we went through to build a case for causal inference.
 4 │ Q.  Well, let's talk about the potential of the localized
 5 │ effect.  This is Exhibit 55.  What is this document?
 6 │ A.  This shows the percent change in the mean between the years
 7 │ 1999 to 2007.  Again, these are generally -- these are the
 8 │ years when the licensing law was in effect, versus 2008 through
 9 │ 2010.  And what we're looking at here is age-adjusted firearm
10 │ homicide rates.  So we're looking at the change in Missouri and
11 │ in the eight states that touch some part of Missouri's border.
12 │ We --
13 │ Q.  Let me stop you right there.
14 │ A.  Sure.
15 │ Q.  What is this graph drawn from, the data?
16 │ A.  The data for this graph comes from vital statistics for the
17 │ Centers for Disease Control death certificate data, where they
18 │ categorize cause of death.  And the cause of death in this case
19 │ is homicide by firearm.
20 │ Q.  Is this a fair and accurate representation of the
21 │ underlying data?
22 │ A.  Yes.
23 │         MR. GROVE:  Move to admit, Your Honor.
24 │         THE COURT:  *Voir dire* or objection?
25 │         MR. KOPEL:  I would like to engage in *voir dire* with

 1   Mr. Webster.

 2           THE COURT:  Please do.

 3           MR. KOPEL:  Mr. Webster, you said this came from the

 4   Centers for Disease Control website.

 5           THE WITNESS:  This comes from -- yes, from the Centers

 6   for Disease Control.  They have two different data systems for

 7   recording this type of information.  One is called WISQARS, one

 8   is called WONDER.

 9           MR. KOPEL:  Which one is this?

10           THE WITNESS:  I believe it's WISQARS, yes.

11           MR. KOPEL:  Just for the record --

12           THE WITNESS:  It's the same data.

13           MR. KOPEL:  If you could spell that for the court

14   reporter.

15           THE WITNESS:  WISQARS stands for something.  It's the

16   Web-Based Injury Surveillance Querying and -- oh, gosh -- I

17   lost it.

18           MR. KOPEL:  Response?

19           THE WITNESS:  No.  Registry is the last one.  I'm not

20   sure, I'm sorry.

21           MR. KOPEL:  Spelled W-I-S-Q-A-R-S?

22           THE WITNESS:  Q-A-R-S, yes.  Pardon me.  It's a system

23   for tracking over each year and across states for different

24   breakdowns of demographic groups, deaths due to injury and

25   violence.

 1          MR. KOPEL:  Does this data separate criminal homicide

 2    from justifiable homicide?

 3          THE WITNESS:  No.

 4          MR. KOPEL:  Thank you.

 5          Your Honor, we would object, again, on the grounds

 6    that it is misleading.  But we would -- if that does not

 7    succeed, we would also -- simply don't object to it as a

 8    demonstrative exhibit.

 9          THE COURT:  That's what I understand it's being

10    admitted as; is that correct?

11          MR. GROVE:  Yes, Your Honor.

12          THE COURT:  All right.  It's received as such.

13          (Exhibit 55 admitted.)

14    BY MR. GROVE:

15    Q.  Before we get into exactly what this says, there is one

16    phrase in here, "age-adjusted gun homicide rate."  Could you

17    explain what age-adjusted means.

18    A.  Sure.  When you're comparing against time and place in an

19    outcome, where the outcome varies by age -- and homicide most

20    definitely varies by age.  Affects younger populations far

21    greater.  So if you're comparing over time and place, in this

22    case, states that have different underlying age structures, you

23    want to, basically, normalize that, so they're, basically, on

24    the same playing field.  So it's -- it uses a standard so that

25    the comparisons are not skewed by differences in age structure

1    of the populations.

2            It's a very common epidemiological technique.  Again,

3    sort of do what we would say fair comparisons across time and

4    place.

5    Q.  So please tell us what we're looking at in this graph.

6    A.  Sure.  So, the red bar reflects the change in the mean

7    between these -- the years 1999 to 2007 for age-adjusted

8    firearm homicide rates compared with the post-repeal years of

9    2008 through 2010.  What you see here with Missouri is nearly a

10   1.2 per 100,000 population per year more firearm homicides in

11   Missouri from that comparison of those time periods.

12           We were interested to know whether the unusual

13   increase in firearm homicides in Missouri compared to the

14   nation as a whole simply might reflect some regional phenomenon

15   that maybe has nothing to do with change in any state policy

16   within Missouri.

17           What you'll see here, if you look at the blue bars for

18   each of the other states is, no large changes in either

19   direction.  The single bar with the biggest increase is for the

20   state of Nebraska, where that increase is less than half of

21   what Missouri experienced and was not statistically

22   significant.  So none of the other states individually had a

23   statistically significant change in its firearm homicide rates

24   over this time period.  So that's basically what this says.

25   Q.  Would the inclusion or exclusion of justifiable homicides

1   make any difference in the way these numbers are calculated?

2   A.  It should have a very minimal effect.  Because, again,

3   those are relatively rare occurrences, justifiable homicides.

4   Q.  Are you aware of any data that indicate whether justifiable

5   homicides occur at similar rates in -- among different states?

6   A.  Well, there is differences across states.  But, again,

7   you're talking about much, much lower numbers than the overall

8   number of homicides recorded.

9   Q.  Fair to say, not enough to affect it in a percentage wise?

10  A.  Not -- nothing that would affect the overall pattern of

11  data, because, again, these are relatively rare instances,

12  compared to other homicides.

13  Q.  So that's what was going on in -- in Missouri's region.

14  Let's talk a little bit about what was going on nationwide

15  during that time.

16  A.  Sure.  So, again, if you look at the nation as an

17  aggregate, or if you look at the bordering states for Missouri

18  and you compare, again, those two time periods, pre and post

19  change in the law in Missouri, what you find is that while the

20  age-adjusted firearm homicide rates for Missouri increased

21  25 percent, nationally, those rates declined by 5 percent.  And

22  a weighted population average for the border states of firearm

23  homicide rates declined 2.2 percent.  That's what is reflected

24  in the data right here, in graphical form.  Whereas, you see

25  the percentage change for the U.S. as a whole, in the black

1   bar, just over 5 percent.  The blue bar, representing the

2   states bordering Missouri, 2.2 percent decline.  And then

3   25 percent increase represented in the red bar for Missouri.

4   *Q.*  And this is Exhibit 56.  What's the source of this

5   document?

6   *A.*  The data are the same data we've been talking about.  These

7   come from death certificate data compiled by the Centers for

8   Disease Control and Prevention through their WISQARS system.

9   *Q.*  Does this fairly and accurately represent the underlying

10  data?

11  *A.*  Yes.

12          *MR. GROVE:*  Move to admit Exhibit 56, Your Honor.

13          *THE COURT:*  *Voir dire* or objection?

14          *MR. KOPEL:*  Yes, objection, Your Honor.  May I engage

15  in *voir dire*?

16          *THE COURT:*  Yes.

17          *MR. KOPEL:*  Mr. Webster, you stated this was, again,

18  from the WISQARS system.  So this would be correct to assume

19  that this also lumps in justifiable homicide with all other

20  homicides?

21          *THE WITNESS:*  Yes.

22          *MR. KOPEL:*  You have a data for the -- do you have a

23  U.S. figure -- these are not state averages, right?  You weight

24  by population.  So California would count much more than

25  Nevada; is that correct?

```
 1              THE WITNESS:  Oh, yes, that's correct.

 2              MR. KOPEL:  Do you omit -- are all 50 states included

 3    in that U.S. figure?

 4              THE WITNESS:  Yes.

 5              MR. KOPEL:  Does this include small population states

 6    where there are fewer than ten homicides per year?  Because I

 7    believe you testified --

 8              THE WITNESS:  Oh, I'm sorry.  Thank you, actually, for

 9    prompting that question.  For reasons that I admit I don't

10    fully understand or agree with, the Centers for Disease Control

11    and Prevention will not record relatively rare events where

12    someone could potentially -- an individual could be identified

13    in the aggregate data.  So there are a subpopulation, I believe

14    about seven small states, that have very few firearm homicides

15    that are excluded from this.

16              MR. KOPEL:  Do you know what those states are?

17              THE WITNESS:  I don't know off the top of my head.

18    It's in my article, though.  I mean, I think I know all of

19    them, but I don't know if we want to get into a guessing game

20    or what.

21              MR. KOPEL:  Your Honor, we would object on the basis

22    that -- besides our other reasons about melding justifiable

23    homicides with criminal ones, its representation of U.S. is not

24    accurate.  It is a representation of only a subset of United

25    States.  And if our objection does not succeed, then we would
```

 1   accept it as a demonstrative exhibit only, similar to all of

 2   Mr. Webster's prior exhibits.

 3           *THE COURT:*  I think it's offered only as a

 4   demonstrative exhibit.

 5           Is that right?

 6           *MR. GROVE:*  Correct, Your Honor.

 7           *THE COURT:*  All right.  I receive it as such.

 8           (Exhibit 56 admitted.)

 9   *BY MR. GROVE:*

10   *Q.*  Since we've already talked about this one, I think we can

11   move on.

12           Did you look to see if there were any localized

13   impacts in Missouri that might have been affecting its homicide

14   rate during this period?

15   *A.*  Yes, we did.  Again, we were constrained for reasons I just

16   explained in responding to Mr. Kopel's question, that when

17   there are subunits where the numbers get small, like, for

18   example, rural counties, they would not record every year of

19   data for those counties.

20           So we were able to look at the large populations

21   jurisdictions within the state of Missouri, those being St.

22   Louis city, St. Louis County, and Jackson County, which is the

23   population where the county where the population is largely

24   metropolitan and where Kansas City, Missouri is located.  We

25   also looked at in aggregate form, counties -- I believe there

1  was a total of nine counties that were classified as urban

2  fringe counties.  These are generally suburban populations near

3  metropolitan areas that have enough population that, again, you

4  can -- you can look at them at least in an aggregate.

5  Q.  And is that analysis displayed here in Exhibit 57?

6  A.  Yes, it is.  Yes.  So you'll see each of those -- the first

7  three jurisdictions that I referred to, these are the -- the

8  urban counties and jurisdictions.  And the darker green bar

9  represents collectively the nine metropolitan fringe counties.

10 Q.  And is this chart a fair and accurate representation of the

11 underlying data?

12 A.  Yes.

13         MR. GROVE:  Move to admit Exhibit 57.

14         THE COURT:  This is a demonstrative exhibit?

15         MR. GROVE:  Again, yes.

16         THE COURT:  Voir dire or objection?

17         MR. KOPEL:  May I engage in voir dire?

18         THE COURT:  You may.

19         MR. KOPEL:  Thank you.

20         Mr. Webster, is this -- would I be right in guessing

21 that this also comes from the same CDC source we were talking

22 about before?

23         THE WITNESS:  That's correct.

24         MR. KOPEL:  We would renew our same objections as

25 before on this, for the same reasons as the previous exhibits.

```
 1              THE COURT:  Thank you.

 2              This is received as a demonstrative exhibit.

 3              (Exhibit 57 admitted.)

 4              MR. GROVE:  It's being offered as that, yes, Your

 5  Honor.

 6              THE COURT:  It's being received as such.

 7              MR. GROVE:  Okay.

 8  BY MR. GROVE:

 9  Q.  So I think you already told us some of what we're looking

10  at here, but why don't you tell us --

11  A.  Yeah, again, what is clear from the data represented in

12  this graph, that in each of the cases of these, first the three

13  urban jurisdictions and then collectively the nine suburban

14  counties, you see greater than 25 percent increase in firearm

15  homicides across the board.  And these represent broad areas

16  across the population of Missouri.

17  Q.  What is the bottom line in terms of the additional annual

18  homicides associated with the repeal of the permit-to-purchase

19  law in Missouri?

20  A.  Well, based upon our regression models and estimates of the

21  effects of this law -- and let me clarify what that means.

22              So, as I indicated before, part of what we're trying

23  to do is look at associations but then also rule out competing

24  hypotheses.  So in fairly standard regression models, looking

25  to explain variation in the outcomes for homicide and murder
```

1   rates -- in the case of homicide, broken down by firearm and

2   non-firearm homicides -- we statistically control for changes

3   in other state policies, in changing per capita, numbers of

4   police officers, across time and place, changes in differences

5   in incarceration rates, unemployment, and poverty rates, as

6   well as burglary rates as a general marker of crime that would

7   not be likely to be directly affected by the policy under

8   examination.

9        So what these models then allowed us to do is to

10   estimate the effect after controlling for all of those other

11   factors.  And we estimated a 23 percent increase in firearm

12   homicide rates through the end of 2010 associated with the

13   repeal of this law.  Looking at a longer period of time with

14   the FBI's data through 2012, we estimate on an overall murder

15   rate of 16 percent reduction in murders.

16        What this translates into is anywhere between 55 to 63

17   additional deaths attributable, or at least associated with the

18   change in this policy.  This -- on a per year basis.

19   Q.  What was going on with non-firearm homicides during this

20   time?

21   A.  In Missouri, they declined somewhat.  But proportionately,

22   very similar to the national trends downward in non-firearm

23   homicides.

24        So using the same methods that I just described,

25   regression methods to control for other factors that explain

1   homicide rates, we found no association between the repeal of

2   this law and non-firearm homicide rates.  The effects were only

3   evident for firearm homicides.

4         And I might add that the associations for changes in

5   overall murder rates and in firearm homicides were very highly

6   statistically significant, with the significance level less

7   than .001.  That would mean that there is less than a 1-in-1000

8   chance that you would see differences, changes in Missouri

9   solely due to statistical fluctuations, common year-to-year

10  fluctuations.

11  Q.  So statistically, your opinion is that expanded background

12  check requirements can have an effect on homicide rates.  Are

13  you aware of any real world examples where background checks

14  such as Colorado's might make a difference?

15  A.  Well, this is very much the real world, the data I just

16  referred to.  So these are -- represent real deaths, real

17  incidents.  But as far as very identifiable cases -- you know,

18  for each of these homicides in -- that occurred in the state of

19  Missouri, as in other states, the data aren't collected in a

20  way that you could know for certainty that any given homicide

21  was a direct result of, you know, if and how an individual

22  acquired a firearm.  But there are cases that come to mind

23  that -- where the set of information does become available.

24        So, one noteworthy example occurred in Wisconsin, in

25  the metropolitan area of Milwaukee, when a woman took out a

1  restraining order against her violent, abusive husband.  And

2  the court issued a restraining order that prohibited him from

3  possessing firearms.  It was my understanding, his firearms

4  actually were recovered by law enforcement connected to that

5  restraining order.  However, Mr. Haughton, in this case was

6  able to go online, identify a private seller who he then met in

7  a parking lot at a McDonald's, and purchased for $500 a

8  handgun, where there is no background check, and then used that

9  gun to murder his estranged wife, along with two of her

10 co-workers, and I believe injury four other individuals in her

11 workplace, and then committed suicide.

12 Q.  Let's focus on Colorado and the bill that is being

13 challenged.  You mentioned you read House Bill 1229, which is

14 now Section 18-12-112, right?

15 A.  Yes.

16 Q.  Is it comparable to the permit-to-purchase law that was

17 repealed in Missouri in 2007?

18 A.  There are some similarities and differences that I think

19 are worth noting.  So, the most important similarity is that

20 both types of laws require background checks and record keeping

21 for private transactions involving handguns.  So that's the

22 most important similarity.

23      There are some dissimilarities.  So, the licensing

24 system in Missouri required purchasers to go in person to a law

25 enforcement agency in order to apply for the permit and have

1   the background check.  I suspect and believe, personally, that

2   that is probably a more rigorous and effective system for doing

3   background checks than leaving the background check system to

4   the oversight of a licensed dealer who is facilitating the

5   background check.  So I think in that way, the Missouri system

6   probably is more rigorous than what is -- Colorado's law that

7   is under question right now.

8          On the other side of Colorado's law might be more

9   effective than Missouri's law, most importantly, in that it

10  covers all firearms transactions.  Meaning, not only handguns,

11  but also -- when I said all, there are exceptions.  And I can

12  talk about those exceptions, low-risk exceptions in a moment.

13         But it -- in terms -- it's not restricted to firearm

14  type.  So in a state like Colorado, where there are a lot of

15  rifles and shotguns in homes, it -- on a year-to-year basis,

16  you know, anywhere from a few homicides with long guns to a

17  dozen or so are committed with those -- with long guns that are

18  covered by the current Colorado law, that were not covered in

19  Missouri's law.

20         So those are the two main distinctions that -- but,

21  again, I think -- in my personal expert opinion, I think the

22  most important common denominator is that there is background

23  checks and record-keeping requirements for the most common type

24  of weapon used in violent crime, that being handguns.

25  *Q.*  In your opinion, will Colorado's expansion of background

1  check requirements to cover private sales make it more

2  difficult for prohibited persons to acquire firearms?

3  *A.*  Yes.

4  *Q.*  Can you summarize for us briefly why that is.

5  *A.*  Well, I -- I mentioned many of these issues in earlier

6  testimony today.  But, generally, people who get firearms later

7  used in crime tend to and prefer to get them from either a

8  licensed dealer or a trusted friend or family member.  The

9  measures in place here prevent or -- are a deterrent against

10  the diversion from those retail transactions between licensed

11  dealers and legal gun purchasers, are a deterrent to diversion

12  to criminals and otherwise in the underground market.  So

13  the -- it should reduce both the number, but, perhaps most

14  importantly, the types of guns that they would most covet.

15  Which, again, is from a trusted source, as opposed to have to

16  rely upon theft or the other unknown sellers in an underground

17  street market.

18  *Q.*  In your opinion, will Colorado's expansion of background

19  check requirements to cover private sales reduce the rate of

20  firearm diversion?

21  *A.*  Yes.

22  *Q.*  Can you explain why.

23  *A.*  Well, again, we've seen consistently in a number of studies

24  precisely that association.  That in places that have measures

25  of accountability for those involved in firearm transactions to

1    prevent diversions, most importantly those being the background

2    check and record-keeping requirements, consistently show a

3    negative relationship, meaning less diversion, when that policy

4    of accountability, such as a background check system, is in

5    place for not only -- not only for the -- only for transactions

6    with licensed gun dealers, but also transactions involving

7    private unlicensed sellers.

8    Q.   In your opinion, will Colorado's expansion of background

9    check requirements to cover private sales have an impact on

10   firearm homicide rates?

11   A.   I think it most likely will.  Again, diversion is key to

12   gun availability.  We see in the case of Missouri, a very

13   strong effect of those measures of accountability being in

14   place.  When they're taken away, that rates of murder are --

15   grow quite substantially.  So I think there is reason to

16   believe, inferring -- based upon other data, much of it my own

17   research, that it would lead to a reduction in gun violence.

18             MR. GROVE:   No further questions, Your Honor.

19             THE COURT:   Thank you.  Cross-examination.

20                       **CROSS-EXAMINATION**

21   BY MR. KOPEL:

22   Q.   Good morning, Dr. Webster.

23   A.   Good morning.

24   Q.   I wanted to clarify a few things at the beginning.

25             Your -- you were mentioning the Missouri research

```
 1   you've done about diversions or trafficking, you sometimes
 2   called it, as well as homicides.  And you were referring to a
 3   change in Missouri law that had taken place in 2007; is that
 4   correct?
 5   A.  Yeah.
 6   Q.  And your study addressed the consequences of that.  And so
 7   that was about the sale of handguns, the change in the law?
 8   A.  That's correct.
 9   Q.  So your study didn't address the related but different
10   issue of loaning firearms; is that true?
11   A.  We examined the change in a policy that pertained to
12   transfers of firearms.  I don't remember right now whether the
13   Missouri law -- how it treated loans in that case.
14   Q.  Would it help you to refresh your recollection of that if
15   you could look at a copy of the law?
16   A.  Sure.
17            THE COURT:  Mr. Kopel, what are you doing, for the
18   record?
19            MR. KOPEL:  For the record, I am providing Mr. Webster
20   with a copy of the Missouri session law, 2007 Missouri
21   Legislative Service, SB41, which was also known as SB62 and 41,
22   West No. 73, which is the Missouri legislative -- bill whose
23   effects he studied.
24            THE COURT:  Have you given a copy to opposing counsel?
25            MR. KOPEL:  Yes, I have, Your Honor.
```

1       *THE COURT:*  All right.  Thank you.

2       You'd like Ms. Glover to provide it to the witness?

3       *MR. KOPEL:*  Yes.

4       *THE COURT:*  Would you please provide it to the

5   witness.

6       *COURTROOM DEPUTY:*  Judge, would you like a copy of it

7   also?

8       *THE COURT:*  I would too.  Thank you.

9       This is for purposes of refreshing recollection; is

10  that correct?

11      *MR. KOPEL:*  Yes, yes.

12      *THE COURT:*  Then perhaps you can direct the witness to

13  the portion you'd like him to review.

14      *MR. KOPEL:*  Okay.

15  *BY MR. KOPEL:*

16  *Q.*  I was wondering, Mr. Webster, if you could turn to the very

17  back, there, to Section 571.090.  And just take us through

18  the --

19      *THE COURT:*  Counsel, my understanding is that this is

20  for refreshing recollection.

21      *MR. KOPEL:*  Okay.

22      I will pass on this, Your Honor, for the moment.

23      *THE COURT:*  Okay.

24  *BY MR. KOPEL:*

25  *Q.*  Did you testify -- Mr. Webster, you mentioned in your

1  direct examination that you had testified previously in some

2  other cases as an expert witness.  Is -- was the case of --

3  known as *Heller* 2 in the District of Columbia this summer one

4  of them?

5  *A.*  Yes.

6  *Q.*  Did you file an expert report in that?

7  *A.*  Yes.

8  *Q.*  And did your report address the D.C. requirement that

9  firearms applicants must apply in person to the police station

10  to be fingerprinted and photographed?

11  *A.*  Yes.

12  *Q.*  And did your report endorse this District of Columbia

13  requirement?

14  *A.*  I provided evidence and opinion indicating the rationale

15  for why that would be beneficial to public safety.

16  *Q.*  Okay.  And did your report cite your Missouri research as

17  evidence in support of the benefits of the D.C. requirement?

18  *A.*  Yes.

19  *Q.*  Did your export report state that prior to the 2007 repeal

20  of the Missouri permit-to-purchase law for handguns, that

21  handgun purchasers in Missouri had to be fingerprinted and had

22  to be photographed by law enforcement?

23  *A.*  Yes, I did.  The fingerprinting part was in error.  There

24  was no fingerprint requirement in Missouri.

25  *Q.*  Okay.  Just to be clear, the D.C. law that you were

1  providing an expert opinion in support of says that in order

2  for a person to buy the gun, they first have to go to the

3  police station --

4  *A.*  That's correct.

5  *Q.*  -- to get permission.  At that deposition, did you state --

6  and I'll read a quote, tell me if it's accurate.  "I think the

7  most relevant thing is they're going to a law enforcement

8  agency to verify that they are who they say they are.  And it's

9  a different process than someone says on a whim or, say, here

10 is a gun shop."  You than you go on to give the example of the

11 rigorous system in D.C.  "You have to go to the police station

12 before you buy the gun, or in Missouri, in the case of a

13 handgun, the sheriff's office" --

14 *A.*  Right.

15 *Q.*  -- "versus where somebody goes to a gun store in Bowie,

16 Maryland.  And it's, like, Oh, I know they're pretty loose, so

17 I feel comfortable doing a straw purchase there."

18         Is that an accurate summary?

19 *A.*  Yes.  As I indicated in my prior testimony, and I believe I

20 actually just mentioned moments ago, that I think it is

21 relevant and important, the direct application process.

22 *Q.*  And in fact, you thought that was -- of all the parts in

23 the Missouri law that changed, you thought that was the most

24 important part, the direct application at the law enforcement

25 office?

1   *A.*  No, I don't think that's necessarily the most important.  I

2   do think it's important, but not necessarily the most.

3   *Q.*  I'm just wondering what -- you did say the most relevant

4   thing.  Is that different from the most important thing?

5   *A.*  I think the most relevant in that case.  What was in

6   consideration was the requirement of in-person transactions.

7   So that's -- that was what was being discussed.  So I think,

8   again -- and I'll underscore what I said just a moment ago, I

9   think both are important.  I think based upon the data, what we

10  see is in cases that don't require that application process

11  directly with law enforcement, we consistently see less

12  diversion of guns to criminals without that in place.

13  *Q.*  Okay.  Just to be clear on this Missouri law, I think

14  you -- Missouri law did not -- did the Missouri law change --

15  the 2007 law we're talking about -- did that change only the

16  law for private sales, or did it also change the law for retail

17  sales of handguns?

18  *A.*  It changed both.

19  *Q.*  And what are more numerous, retail sales or private sales?

20  *A.*  Honestly, it's very difficult to track in a very reliable

21  way.  It could be, in terms of overall transactions, maybe more

22  through a licensed dealer.  What may be most relevant in

23  thinking about shifts in violent crime, I think my own opinion

24  is that what is more relevant is the accountability for the

25  private transactions, because that's where the data suggests

1    the criminals most commonly obtain firearms.

2    *Q.*  Did that -- so the Missouri law eliminated the requirement

3    that a person buying a gun in a gun store from a retailer had

4    to first get a law enforcement permit; is that true?

5    *A.*  For handguns, yes.

6    *Q.*  For handguns.  And did the Missouri law also require that

7    the handgun purchaser, after first going to the sheriff's

8    office, getting permission, then going to a private friend or

9    to a gun store, acquiring the handgun, after that, the

10   purchaser had to then return to the sheriff's office and

11   provide registration information about that particular gun to

12   the sheriff?

13   *A.*  I don't recall a registration process.

14   *Q.*  Okay.  Let's talk some about traces and those kinds of

15   issues.  Are all of the opinions you've offered in this case

16   and the exhibits and all of your testimony about tracing and

17   diversion, are they all based on tracing information from the

18   Bureau of Alcohol, Tobacco, Firearms and Explosives?

19   *A.*  Yes.

20   *Q.*  Did you use -- which we'll call ATF for short.  Did you use

21   ATF state trace data which is available on the ATF website?

22   *A.*  For some of these analyses, yes.

23   *Q.*  Right.  Did you notice that every state report for every

24   year has a warning titled ATF Firearms Trace Data Disclaimer?

25   *A.*  Yes.

Daniel Webster - Cross

1    Q.  Did the disclaimer state, "Law enforcement agencies may

2    request firearms traces for any reason.  The firearms selected

3    do not constitute a random sample and should not be considered

4    representative of the larger universe of all firearms used by

5    criminals or any subset of that universe."

6    A.  I'm sorry, could you -- what's the question there?  You

7    read the disclaimer.

8    Q.  Did the disclaimer -- did what I just said, is that what

9    the disclaimer said?

10   A.  I don't have it in front of me, but I trust that that's

11   accurate.

12   Q.  Would it help you to refresh your recollection by looking

13   at a copy of the disclaimer?

14   A.  No, I don't think it's necessary.  But, thank you.

15   Q.  Okay.  Not necessary because what I said was accurate; is

16   that what you're saying?

17   A.  Yes.

18   Q.  Okay.  Do you know whether the Congressional Research

19   Service has made any statements about the suitability of using

20   trace data to attempt to make claims about gun crime in

21   general?

22   A.  I don't know what the Congressional Research Service said

23   on this.

24   Q.  So you're not familiar with their 1992 study on that

25   subject?

1  *A.*  Well, first of all, if it's a 1992 study, that's very

2  different from a time period beginning 1999, in particular

3  where tracing was far more comprehensive than going back to the

4  '80s or something like that.  So I -- I personally don't think

5  it's all that relevant.

6  *Q.*  Okay.  You had mentioned in your direct testimony the

7  National Research Council.  Could you explain to us a little

8  detail about what that is.

9  *A.*  Sure.  Of course.  The National Research Council is an

10  organization that very commonly on a variety of subject matters

11  convenes experts on different topics to examine research

12  evidence on questions of relevance, commonly to focus on policy

13  issues.  Such a panel was convened to review research and data

14  relevant to firearms and their involvement in violence.  And

15  that group of -- examined data and received testimony from

16  researchers and other experts and noted with cautions potential

17  selectivity in some tracing.  But that, as I indicated before,

18  did not say that they cannot be used in research or are

19  completely unreliable.

20  *Q.*  Did the National Research Council write in their book,

21  quote -- that you just testified about.  "Trace data cannot

22  show whether a firearm has been illegally diverted from

23  legitimate firearms commerce"?

24  *A.*  I don't have the book in front of me.

25  *Q.*  Would it help to refresh your recollection if I could --

 1  *A.*  I'll trust that you read that accurately.  I'll trust that

 2  statement, yeah.  It's fine.

 3  *Q.*  That was a yes answer to my question?

 4  *A.*  Yes.

 5  *Q.*  Okay.  Thank you.

 6  *A.*  Can I -- I'd like to just elaborate for one second to

 7  say --

 8          *THE COURT:*  Sir, you do not add to your testimony.

 9          *THE WITNESS:*  All right.

10          *THE COURT:*  You will have an opportunity to respond to

11  any other questions that are posed.

12          *THE WITNESS:*  Sorry.

13  *BY MR. KOPEL:*

14  *Q.*  Sure.  And you'll -- yes.  Well, would you like to say

15  anything else on that topic?

16  *A.*  Certainly.  As it pertains to the sentence that you just

17  read, sir, it -- I will concede and agree with the statement

18  from the National Research Council panel that any given trace

19  of a gun by -- in and of itself is not proof positive that this

20  was a diverted gun.  So I would concede that.

21          What I -- what is more relevant for research, in my

22  opinion, is whether, generally speaking, differences over time

23  and place are reflective of changes in diversions of guns to

24  criminals.  And I believe that is the case.  And I believe that

25  is the common belief among law enforcement at ATF and at --

 1  among researchers.

 2  *Q.* So I -- tell me if I understood what you said correctly,

 3  and I think we perhaps might agree on this.  That the fact that

 4  a gun was traced doesn't really tell you much one way or the

 5  other about that, was it a criminal gun or anything else?

 6  *A.* Right.  You can do -- and I always do when I had individual

 7  gun level data, determine at a minimum whether the criminal

 8  possessor, in the case of a traced gun, was the same person who

 9  purchased the gun.  And in that case, of course, you say, no,

10  there is no diversion.  They simply purchased the gun, and then

11  subsequently that was recovered by law enforcement.

12  *Q.* Sure.  But I -- would it be also fair -- it seems that --

13  so we're agreeing that the -- the tracing of -- as you said,

14  the tracing of any particular gun doesn't necessarily prove

15  that gun was involved in crime.  But it seems to me you're,

16  perhaps, disagreeing with the National Research Council because

17  they -- when they say trace data analysis, what you've talked

18  about, about trends in trace -- changes in traces over time at

19  the data level, trace data analysis cannot describe the illegal

20  pathways from legal commerce to ultimate recovery by law

21  enforcement.  So would that be, I guess, where you and the

22  National Research Council have a scholarly difference of

23  opinion?

24  *A.* Well, what I think the research council really was

25  examining is, sort of, what can it tell us about the

1  intricacies of how a gun got to an individual?  And, there, I

2  would concur.

3         However, again, what I'm interested in is diversion,

4  this initial diversion from legal to illegal use.  And I

5  believe that it can, and most researchers who study gun

6  trafficking agree with that.

7  *Q.*  Do all researchers?

8  *A.*  Of course, not all researchers.  But there was a recent

9  article, for example, in the *Journal of Urban Health*, published

10  by the leading scholars in looking at illegal gun markets and

11  gun trafficking.  Anthony Braga from Harvard; Duke economist,

12  Phil Cook; Criminologist Glenn Pierce at Northeastern

13  University; Garen Wintemute at U.C. Davis; and current director

14  of the National Institute of Justice, Greg Ridgeway, all fairly

15  emphatically say that -- that you can and should use gun trace

16  data carefully and can learn important things about the

17  diversion of guns to criminals with it.

18  *Q.*  Do you know what percentage of guns seized in Missouri were

19  traced in the years covered by your study?

20  *A.*  The percent that were seized and traced --

21  *Q.*  You're talking about what you call -- you sometimes call a

22  time-to-crime?

23  *A.*  Uh-huh.

24  *Q.*  And you sometimes call a time-to-recovery, and I think

25  you're describing the same thing.

 1  A.  Yes.

 2  Q.  Which is, really, just whenever the police acquire a

 3  firearm for any reason, and then from that subset of firearms,

 4  they've acquired somehow, they initiate a trace.  I'm asking

 5  you if you know the percentage on that from Missouri.

 6  A.  No, because I don't know the denominator of how many guns

 7  were recovered by law enforcement.

 8  Q.  So --

 9  A.  We only know the number that were submitted for tracing.

10  Q.  So you know the enumerator for trace requests, but not the

11  denominator, how large that universe of recovered seized guns

12  is?

13  A.  That's correct.

14  Q.  Okay.  If the gun was traced, does that mean it was used in

15  a crime?

16  A.  Not always.

17  Q.  Could the trace also pertain to a stolen gun that was

18  returned to its lawful owner?

19  A.  I guess it could.  I don't know if that is common practice.

20  Q.  What is the completion rate for traces?

21  A.  Can you define what you mean by "completion rate"?

22  Q.  Well, you probably defined it better than I could.  But I'm

23  thinking of when the police -- local police go to ATF and say,

24  here is a gun, trace it.  How often does ATF come back and say,

25  here is the answer, we can tell you who the first retail seller

1  was?

2  *A.*  The first retail seller, I don't know the exact percentage,

3  but I think it's somewhere in the 60, 70 percent range.

4  *Q.*  Okay.  How many firearms were traced in Missouri in 2009?

5  *A.*  I didn't put that in my memory bank, sorry.

6  *Q.*  Understandable.  Would it refresh your recollection to look

7  at the ATF's website report on that?

8  *A.*  Sure.

9       *MR. KOPEL:*  Your Honor, may I have permission to

10  distribute to Mr. Webster, to the Court, and to defense counsel

11  a printout of the ATF's report from Missouri for 2009?

12       *THE COURT:*  You may give a copy to opposing counsel

13  and to Ms. Glover.

14       You would like Ms. Glover to give that to the witness?

15       *MR. KOPEL:*  Yes, thank you.

16       *THE COURT:*  All right.  She is.

17       Thank you.

18       What would you like the witness to look at?

19  *BY MR. KOPEL:*

20  *Q.*  Have you had a chance to refresh your recollection to

21  answer the question, how many firearms were traced in Missouri

22  in 2009?

23  *A.*  2,754, I believe, based upon the graph that I'm looking at.

24  *Q.*  2,000 -- perhaps I'm confused.  I'm looking at something

25  that says 4,492.

1   *A.* That's the number of guns recovered.

2   *Q.* Okay.

3   *A.* I believe, and traced -- I'm sorry. What I was referring

4   to is -- the 2,754 was from the page that looks at the state of

5   origin for these. So my assumption was, if you knew the source

6   state, you were able to connect it to the first retail sale.

7   *Q.* Let's just --

8   *A.* My assumption was that 2,754 out of 4,492 recovered guns,

9   they could connect to the initial retail sale.

10  *Q.* So you're saying -- if I'm understanding accurately, from

11  the third page, you're saying 4,492 firearms were recovered and

12  a trace attempted in Missouri in calendar year 2009.

13  *A.* Uh-huh.

14  *Q.* And then of those --

15  *A.* Based upon the map of the source states that says under the

16  note, the source state was identified in 2,754 traces.

17  *Q.* So that was the fraction that were successful traces?

18  *A.* Yes.

19  *Q.* Okay. How many of those traces were in connection with a

20  homicide?

21          *MR. GROVE:* Objection, Your Honor. To the extent that

22  the -- Mr. Kopel's asking Dr. Webster to refresh his

23  recollection, it hasn't been established that Dr. Webster ever

24  knew this information in the first place.

25          *THE COURT:* That's true.

1    *BY MR. KOPEL:*

2    *Q.* Dr. Webster, when you did this -- these reports you --

3    studies you're talking about, based on -- were they based on --

4    in part on state reports from Missouri, in particular?

5    *A.* Yes.

6    *Q.* Did you read every -- from 2006 onward, state reports on

7    the ATF website about Missouri?

8    *A.* Yes.

9    *Q.* Do you recall how many homicides there were -- how many

10   guns were traced in connection with a homicide in Missouri in

11   2007?

12   *A.* One hundred fifty.

13   *Q.* And how many traced in connection with any violent crime?

14   *A.* I need to add a little bit, so give me a moment.

15        My count, 577 connected with -- overall between

16   aggravated assaults, homicides, and robberies.

17   *Q.* Okay. Can a gun fall within what you call diverted or

18   sometimes call trafficked if the recipient was not a criminal?

19   *A.* Yes.

20   *Q.* In your study, did you look at the possibility that the

21   repeal of the permit-to-purchase law in Missouri might have led

22   to more gun sales simply because there were fewer procedural

23   obstacles, and this might at least partially explain the

24   increase in the number of relatively new guns in the trace

25   results?

 1  *A.*  That's possible.

 2  *Q.*  Did you study whether firearms sales increased in Missouri

 3  in the year following august 28, 2007?

 4  *A.*  I didn't examine the exact number that were sold, no.

 5  *Q.*  If I told you that the National Instant Criminal Check

 6  system indicated a report an increase of 36,000 on an annual

 7  basis from the previous year to the first year post of the

 8  repeal, would that be credible to you?

 9  *A.*  It may well be the case.  I think that there were large

10  increases across the country occurring at that time.  Very

11  commonly in election years, particularly when gun control is

12  raised as an issue and one side says, in essence, one -- one

13  candidate is going to take your guns, you very commonly see

14  spikes in gun sales.

15  *Q.*  Sure.  I guess we haven't officially established this.  Do

16  you know the date that the new Missouri law went into effect,

17  the precise date?

18  *A.*  It was repealed effective August 28, 2007.

19  *Q.*  Okay.  So the -- perhaps the election year gun sales high

20  might not have been so large, at least in the latter half of

21  2007?

22        *MR. GROVE:*  Objection.  Calls for speculation.

23        *THE COURT:*  Sustained.

24        *THE WITNESS:*  Yeah, I don't know --

25        *THE COURT:*  Sir, I've already ruled on the objection.

 1            THE WITNESS:  I'm sorry.

 2            MR. KOPEL:  That's fine.

 3    BY MR. KOPEL:

 4    Q.  You referred to a variety of times in your direct testimony

 5    to something you sometimes call time-to-recovery or sometimes

 6    time-to-crime.  Do you know of any sources that say that most

 7    firearms recovered in this, whatever you called the intervals

 8    you have of three months or a year, that most of the guns

 9    recovered in this time frame were trafficked?

10    A.  I'm sorry.  Can I ask you to please rephrase -- restate the

11    question.

12    Q.  Sure.  Okay.

13            Do you in your expert opinion state that most guns

14    recovered within 90 days of their first retail sale were

15    trafficked?

16    A.  I don't -- I don't know if they are or aren't.  I'm not

17    sure.

18    Q.  How about guns recovered within six months of their first

19    retail sale?

20    A.  Again, we don't know for certain, because there is not

21    systematic investigations for every recovered firearm.

22    Q.  Same answer for a year?

23    A.  Yes.

24    Q.  And for two years?

25    A.  Yes.

1    Q.  Do you know of any law enforcement reports that state that

2    at least 10 percent of the guns with a time-to-recovery or

3    time-to-crime, as you call it sometimes, were trafficked?

4    A.  No.

5    Q.  Okay.  I wanted to ask about the -- your meaning of the

6    term diversion of guns to criminals.  Suppose a criminal has

7    not been caught yet.

8    A.  Uh-huh.

9    Q.  And so he can -- he buys a gun from a licensed gun dealer.

10   Is that a diversion of a gun to criminals, in your definition?

11   If he has a clean record, passes the background check.

12   A.  No.

13   Q.  Okay.  Does it include the theft of the gun, your term,

14   diversion?

15   A.  Well, it -- it can be a way in which guns move from legal

16   to illegal commerce.  But the reason that I and many others who

17   study diversions of firearms that are most relevant to firearms

18   sales, policies, and regulations is because the overwhelming

19   share of guns that are, you know, in homes, available for

20   theft, had -- you know, their retail sale were a decade or more

21   before.  So the greatest likelihood is that the way in which

22   the gun reached the criminal's hands was through some diversion

23   or transfer that was not theft.

24   Q.  Let me see if I can restate what you're saying.

25   A.  Okay.

1  Q.  See if it's accurate.  There is a lot of guns out there in

2  people's homes.  Maybe a lot are new, it's an election year,

3  but even a lot more are older.  And if you look at the universe

4  of guns that are in these ATF traces you're talking about, they

5  are disproportionately newer, compared to the gun supply as a

6  whole.  And, therefore, you're saying that indicates that most

7  of them are probably not coming from the -- from burglaries,

8  because there is an age difference, one is newer and one is

9  more middle aged.  Is that accurate?

10  A.  I think I would -- a little more caveat to that.

11  Q.  Okay.

12  A.  Is that the subset of guns in my research that I focused on

13  to traffic -- to monitor diversion were these unusually short

14  intervals, less than a year between retail sale and recovery by

15  law enforcement, that those are a good indicator of diversion

16  of guns to criminals.  That's what I would say.  I wouldn't say

17  that the totality of all guns that are recovered by law

18  enforcement, you know, all have the signals of diversion

19  connected to non-death kinds of transaction.

20      What I'm focusing on and wanting to measure is, again,

21  the very short interval between a retail sale and recovery by

22  law enforcement.

23  Q.  So the reason you're saying that you don't think gun theft

24  is that important as a part of crime -- as a part of how

25  criminals acquire guns is because of a study you did; is that

1  correct?

2  *A.*  Well, we did look at -- as I mentioned earlier in my

3  testimony, we did look at how criminals directly obtain

4  firearms.  And those who are using guns in crime, approximately

5  10 percent reported that the gun that they used in crime, they

6  obtained through theft.

7       So it's for that reason that I think that -- I don't

8  want to discount that theft is unimportant.  Theft is

9  important, and I hope that we can do something about that.  But

10  what I've been interested in studying, particularly policies

11  relevant to the regulation of the sale and transfer of

12  firearms, is relative to diversions through non-theft means.

13  And, again, that is why I focus on these very short intervals

14  between retail sale and recovery in crime.

15  *Q.*  Sure.  So 10 percent of the criminals said, I personally

16  stole the gun myself with my own two hands.  What percent said

17  they -- I bought it at a gun store myself?

18  *A.*  A similar percentage.  Slightly more, but similar.

19  *Q.*  And in between those two, was there about 80 percent who

20  said, I got it from somebody else, and maybe I know exactly

21  where that gun originated from?

22  *A.*  Right.

23  *Q.*  Or maybe I don't?

24  *A.*  The most common category of suppliers, source from which

25  they obtain their firearm that they used in crime was someone

1   they referred to as a friend or a family member.  Second behind

2   that was this broader category that, again, I confess as a

3   researcher, rather frustrates me, because there is

4   heterogeneity among the street resources and underground market

5   sources.  But that was the second most common direct way in

6   which criminals said they got their guns.

7   Q.  So on the street was the sort of shorthand for that second

8   category?

9   A.  Yes.

10  Q.  What percent was that?

11  A.  I believe it was around 38 percent.

12  Q.  Okay.

13  A.  I'm rounding.

14  Q.  What was the friends and family gun acquisition?

15  A.  40 percent.

16  Q.  40?

17  A.  Yeah.

18  Q.  So those 38 percent of guns that were bought on the street,

19  as the criminals described them --

20  A.  Right.

21  Q.   -- is it possible that some or even a large amount of them

22  may have originated in a theft?

23  A.  Certainly, some number of them probably originated in

24  theft.  We just don't know how many.

25  Q.  Could be close to all, perhaps?

1  A.  Could it be?  Gosh, I don't really know.  I don't think I'd

2  want to speculate on that.

3  Q.  Okay.  For the friends and family, 40 percent, could have a

4  large number of those also have originated in theft?

5  A.  Again, I'm reluctant to speculate on that.

6  Q.  You had pointed out in one of your slides, I believe it was

7  Exhibit 55 of the -- some local counties, some local Missouri

8  data --

9  A.  Yeah.

10  Q.  -- on increases in homicides after 2007.  Do you recall

11  which of those four categories had the largest crime increase

12  there?

13  A.  My recollection is St. Louis County.

14  Q.  Do you recall that at our deposition, that we talked about

15  the fact that St. Louis County in this period had a 31 percent

16  increase in burglary compared to the 2007 period?

17  A.  I don't recall that, but I don't dispute it.

18  Q.  Okay.  So the Missouri law I think you testified went into

19  effect in -- on August 28, 2007, was in effect for five months

20  of 2007.  What would -- what was the exact age-adjusted

21  homicide rate in Missouri in 2006?

22  A.  I don't remember off the top of my head.

23  Q.  Would it help if you could look at a printout of your data?

24  A.  Of course.

25  Q.  Okay.

```
 1   A.   Thank you.
 2            MR. KOPEL:  Your Honor, may I offer the witness and
 3   defense counsel and the Court a printout of the age-adjusted
 4   all homicides data table for the witness's -- the witness has
 5   provided to me via counsel?
 6            THE COURT:  You may.
 7            Have you completed your review, sir?
 8            THE WITNESS:  Yeah, I'm sorry.
 9   BY MR. KOPEL:
10   Q.   So, now, having had a chance to read the data table --
11   A.   Sure.
12   Q.   -- what was the age-adjusted homicide right in 2006?
13   A.   7.16, rounded.
14   Q.   That's perfect.
15   A.   Yeah.  Per 100,000 population.
16   Q.   Right.  Just to sort of follow, you're reading from the
17   third column from the left?
18            THE COURT:  Counsel, this is refreshing recollection.
19            MR. KOPEL:  Sorry.
20            THE COURT:  This is not reading from a document.
21            MR. KOPEL:  Okay.  Thank you.
22   BY MR. KOPEL:
23   Q.   What was the age-adjusted homicide rate in Missouri in
24   2007?
25   A.   6.60.
```

1  *Q.* What was the age-adjusted homicide rate in Missouri in

2  2008?

3  *A.* 8.33.

4  *Q.* From 2007 to 2008, what percent increase was this,

5  approximately?

6        *MR. GROVE:* Objection, Your Honor, if the witness is

7  reading from it, he should be refreshing.

8        *THE COURT:* That's correct.

9        *MR. KOPEL:* Okay.

10       *THE COURT:* Mr. Kopel, this is not an exhibit. You

11  cannot read from it. It's just to refresh his recollection.

12  *BY MR. KOPEL:*

13  *Q.* Okay. Do you recall what the age-adjusted homicide rate

14  was from Missouri in 2007?

15       *THE COURT:* Sir, I'm going to ask you to hand the

16  exhibit to Ms. Glover.

17       Ms. Glover, you may need to stand next to the witness

18  box. You may need to show it to him again.

19       Thank you.

20       You can answer the question if you can. If you can't

21  remember, just say so. Then he'll offer you the exhibit so you

22  can refresh your recollection, and then you can testify.

23       *THE WITNESS:* Okay. You're asking me for what the

24  rate was. I thought I had already answered that.

25  *BY MR. KOPEL:*

1  Q.  For 2006.  I believe you answered for 2007.

2  A.  In 2008, I answered that as well.

3  Q.  Okay.  So what percentage increase was that?

4  A.  I don't know.  I didn't do the math.  What I did, which I

5  think most researchers would do, is not do single year

6  comparisons, but look at a longer time period.  So --

7  Q.  Okay.

8  A.  Yeah.

9  Q.  What happened -- what happened to the Missouri homicide

10 rate after 2008, the age-adjusted homicide rate?  Did it stay

11 the same, or did it decline, or go up?

12 A.  It did not stay as high as it was in 2008.  It declined

13 somewhat from there.

14 Q.  Why do you think it declined even though the homicide

15 increasing effects, as you see it, of the 2007 law should have

16 still been around?

17 A.  Well, there is a number of factors that can influence

18 homicide rates that we're not willing to measure all of those

19 things.  So, there could be changes in drug markets, there is a

20 variety of a kind of changes in social conditions.

21        What you'll see is that the decline from the peak in

22 2008 was -- was not unusual.  The -- you wouldn't necessarily

23 expect that it would stay precisely at that level, because

24 throughout the country and states surrounding Missouri, they

25 were having noteworthy declines during that time period.  And

1   as my data in the graph that we examined and discussed earlier

2   and in my peer-review research that has been cited and put into

3   record, there is very substantial differences in the trends for

4   Missouri compared to other states.

5   Q.  I guess what I'm confused about, please help me understand

6   this, is in your tracing data, you show -- okay, we have the

7   repeal that is in August of 2007, and then not long after, you

8   start showing what you see as significant changes in

9   percentages of Missouri guns in various categories.  And that

10  continues on, and every year you look at it, you seem to find

11  more and more of it.

12  A.  That's correct.

13  Q.  So more guns being diverted to criminals, as you put it?

14  A.  Right.

15  Q.  And having more and more Missouri guns being diverted to

16  criminals, including in 2009 and 2010.  How come the actual

17  crime rate, the homicide rate, goes down from 2008 to 2010,

18  significantly?

19  A.  Well, you use "significantly."  I think researchers would

20  do more formal statistical tests.  But to answer more of the

21  substantive, underlying question that you're putting forward,

22  is that there are many factors that determine homicide rates

23  beyond availability of guns to high-risk individuals.  So,

24  again, we see that quite evident throughout the nation and

25  regionally, that there were noteworthy declines during the

 1    period of time in question.

 2  Q.  What was Iowa's age-adjusted total homicide rate in 2007?

 3  A.  I don't recall.

 4  Q.  Would it help to refresh your recollection to look at your

 5    data table?

 6  A.  Sure.

 7         MR. KOPEL:  May the witness be shown his data table?

 8         THE COURT:  He may.

 9         MR. KOPEL:  I'm also going to ask about 2008, so

10    perhaps you could look at them both at once.

11         THE COURT:  Ms. Glover.

12         COURTROOM DEPUTY:  Yes, ma'am.

13         THE COURT:  Would you print out, please, the cheat

14    sheets for refreshing recollection.

15         COURTROOM DEPUTY:  Certainly.

16         THE COURT:  And give Mr. Kopel a copy of that.

17         COURTROOM DEPUTY:  Yes, ma'am.

18         MR. KOPEL:  Seems like it would be a useful topic for

19    me to study at lunchtime, Your Honor.

20         THE WITNESS:  So what years were you wanting me to

21    focus on?

22  BY MR. KOPEL:

23  Q.  2007 and then 2008, please.

24  A.  Okay.

25  Q.  And what was the 2007 age-adjusted homicide rate in Iowa?

```
 1    A.   1.77.

 2    Q.   What was the age-adjusted homicide rate in Iowa in 2008?

 3    A.   2.84.

 4    Q.   About what percentage increase was that?

 5    A.   I'm not sure.

 6    Q.   You can -- can you give us an estimate based upon your

 7    mathematical skills, or would you like a calculator?

 8    A.   Sure, if you've got a calculator handy, I'll do it that

 9    way.  I'll make sure that we don't have to worry about my math

10    skills.

11         MR. KOPEL:  Your Honor, may I provide Ms. Glover with

12    a calculator?

13         THE COURT:  You may.

14         Ms. Glover, would you give the calculator to the

15    witness.

16         COURTROOM DEPUTY:  I will.

17         Here you go, sir.

18         THE WITNESS:  Thank you.

19         Okay.  That represents in a single year to year

20    approximately a 60 percent increase for that single year.

21         If you look at Iowa's rates over the study span --

22    BY MR. KOPEL:

23    Q.   Thank you.

24    A.   -- there is a great deal of fluctuation.

25    Q.   Indeed.  Could you, then, also tell us the percentage
```

 1   increase from Missouri in 2007, which you said was 6.6, to

 2   2008, which was 8.33.

 3   A.   26.2 percent increase.

 4   Q.   Did Iowa have a permit-to-purchase law for handguns in 2007

 5   through 2009?

 6   A.   Yes.

 7   Q.   Thank you.

 8          Your Honor, I'm wondering if this might be a good

 9   stopping time.

10          THE COURT:   We can take our noon recess at this time.

11   The Court clock is showing 10 minutes before the noon hour, and

12   we'll plan on reconvening at 1:15.

13          We'll stand in recess until then.

14          (Recess at 11:50 a.m.)

15          (In open court at 1:22 p.m.)

16          THE COURT:   Are you ready to proceed?

17          MR. KOPEL:   Yes, Your Honor.

18          THE COURT:   Thank you.   Please do so.

19   BY MR. KOPEL:

20   Q.   Professor Webster, does your Missouri study, studies, do

21   they include any data on compliance rates with the old law

22   before it's repealed?

23   A.   No.

24   Q.   Do you have any information on that?

25   A.   No.

1    Q.  Do you have any data on how many private handgun transfer

2    applications were approved back when it was required?

3    A.  No.  I'm not even sure that when you apply for a permit,

4    that you have to specify that you're getting a permit for a

5    private transaction.

6    Q.  I'm not -- okay.  Do you know how many private -- putting

7    aside private versus from a retailer, do you know how many

8    handgun applications were approved in general?

9    A.  No.

10    Q.  Do you have any direct evidence that Missouri gun owners

11    knew there was a requirement for a background check when

12    acquiring a firearm from a private person?

13    A.  No.

14    Q.  Does your study include any information about the number of

15    arrests or prosecutions that there were for violating the old

16    law?

17    A.  No.

18    Q.  Now, I think you testified on direct that Missouri's not

19    the only state that -- that some states still have laws like

20    this, even though Missouri didn't.  What were the other states

21    that currently have comparable laws?

22    A.  Well, are you referring to comparable laws with

23    permit-to-purchase licensing systems?

24    Q.  How would you describe it?

25    A.  So there -- I believe there are around ten or so states

1  that have some form of a firearm purchaser licensing system.

2  They vary a little bit from place to place.

3  Q.  Okay.  But all of these tend -- you would say they -- am I

4  accurate in understanding, you're thinking of them as something

5  that doesn't apply only at gun shows and does apply to at least

6  private handgun sales?

7  A.  Yes, sales --

8  Q.  Okay.

9  A.  That's correct.  The permit is required if you're going to

10  do a transfer.  Again, there are exceptions, family member

11  transfers and things of that nature.

12  Q.  Okay.  Could you name those states.

13  A.  That have the permit -- sure.  New York, New Jersey,

14  Massachusetts, North Carolina, Connecticut, Illinois, Iowa,

15  Michigan, Nebraska.

16  Q.  Okay.  Okay.  And in layman's terms, what you did with

17  Missouri partly was a before-and-after study, or what other --

18  the social scientists would call a time series study?

19  A.  That's correct.

20  Q.  Did you do any time series study on any of these other

21  states about the -- the ones you just mentioned about the

22  benefits, perhaps, of their enactment of these laws?

23  A.  No.  There were no recent changes to those laws.  One --

24  one thing that was particularly attractive to me as a

25  researcher to study the case of Missouri is that the change

1   occurred during a period of relative stability in homicide

2   rates in the United States.  During other periods of time,

3   there are very dramatic increases and decreases that were

4   driven by things that are very difficult for researchers to

5   measure.

6        And so an ideal circumstance is to do, as we refer to

7   it, interrupted time series, when there is some stability in

8   outcome.  So relatively speaking, the study period in time was

9   such a period.

10  Q.  Okay.  I think you presented lots of data.  Was that on an

11  annual basis?

12  A.  Yeah, all the records available are -- well, I'm sorry.  We

13  analyzed annual rates, yes, sorry.

14  Q.  Okay.  Did you look at any monthly data?

15  A.  No.

16  Q.  I believe you testified you're familiar with the data

17  that's available on the Centers for Disease Control, WONDER and

18  WISQARS websites?

19  A.  Yes.

20  Q.  Is that available on a monthly basis if you want to look at

21  it that way?

22  A.  I don't remember.

23  Q.  Would it refresh your recollection to see data output on a

24  monthly basis?

25  A.  Sure.

```
 1        MR. KOPEL:  Your Honor, may I refresh the witness's

 2   recollection by providing some examples of monthly data output

 3   for the period he was studying?

 4        THE COURT:  The question that was asked is, "Is that

 5   available on a monthly basis if you want to look at it that

 6   way?"  So he doesn't recall.  If there is something that you

 7   want to hand to him that will refresh whether he recalls that

 8   there is data available on a monthly basis, that's fine.

 9        MR. KOPEL:  Exactly, Your Honor.

10        THE COURT:  All right.  Please give a copy to opposing

11   counsel.  Please give a copy to Ms. Glover.

12   BY MR. KOPEL:

13   Q.  And just tell us if that refreshes your recollection, after

14   you've had time to look at it as long as you would like,

15   please.

16   A.  Okay.

17   Q.  Professor Webster, does this refresh your recollection as

18   to whether monthly data are available from the CDC websites?

19   A.  Yes.

20   Q.  And I believe you testified you did not use monthly data in

21   your study; is that correct?

22   A.  That's correct.

23        MR. KOPEL:  Your Honor, under Rule 104, in terms of

24   Mr. Webster's methodology and reliability of his underlying

25   data, we would like to offer these documents as an exhibit to
```

1    investigate his -- the reliability -- his methodology.

2            *THE COURT:*  Which exhibits?

3            *MR. KOPEL:*  These -- the ones I just handed you, which

4    I would mark as Exhibit 131.

5            *THE COURT:  Voir dire* or objection?

6            *MR. GROVE:*  Plaintiffs didn't file a 702 motion with

7    respect to Dr. Webster.

8            *THE COURT:*  Response.

9            *MR. KOPEL:*  That is true, Your Honor.  However, the

10    702 -- two points.  One is, the Court, of course, has its own

11    independent obligation to evaluate an expert under the Federal

12    Rules of Evidence.

13            And, secondly, the -- Dr. Webster's study was not

14    provided to us.  Although it was requested on October 10, we

15    did not get it until February 10, which was after the

16    January 15 deadline.  We saw preliminary drafts of it, but

17    certainly not the final document from which we could make a

18    determination.

19            *THE COURT:*  Response.

20            *MR. GROVE:*  The underlying data was provided, Your

21    Honor.  The study wasn't completed until mid February.

22    Couldn't have been provided in its final form until it was

23    submitted.

24            *THE COURT:*  All right.  Thank you.  I deny the request

25    to receive these documents.  I do so on two grounds.  First of

1    all, where a party does not make an objection under Rule 702,

2    the Court deems the foundation requirements to be satisfied.

3    That doesn't mean that the Court doesn't review the evidence to

4    determine what weight it's given; but it means there is no

5    objection that can be raised with regard to those foundational

6    issues.

7          Now, with regard to the disclosure of the witness's

8    analysis or complete report, there was an opportunity in

9    February to request relief from this court.  No request was

10    made.  And, instead, the parties proceeded to trial.  It's not

11    appropriate now to use the problem that existed in February to

12    justify relief during the trial, when there was ample time to

13    seek some kind of relief before the trial.

14          Any need for clarification or further explanation?

15          *MR. KOPEL:*  No, Your Honor.

16          May I confer with co-counsel?

17          *THE COURT:*  You sure can.

18          (Off-the-record discussion between counsel.)

19    *BY MR. KOPEL:*

20    *Q.*  Thank you for your patience on all of this, Dr. Webster.

21    *A.*  Sure.

22    *Q.*  I would simply like to ask you now about whether your study

23    is right and the -- take into account the document you have in

24    front of you, which is the monthly data, and whether your

25    yearly conclusions ought to be revised in light of looking at

```
 1   the monthly data.

 2           MR. GROVE:  Same --

 3   BY MR. KOPEL:

 4   Q.  What I've done is, I have prepared a short table which just

 5   summarizes those monthly reports you have in front of you.  And

 6   I wonder if you could take the time to -- as long as you'd

 7   like, just to see if these numbers here are adequate in your

 8   view in matching those printouts from the CDC.

 9           THE COURT:  Counsel, approach.

10           (Hearing commenced at the bench.)

11           THE COURT:  There is an objection you intend to make.

12           MR. GROVE:  Yeah, it's based on the documents not in

13   evidence.

14           THE COURT:  Mr. Kopel.

15           MR. KOPEL:  For impeachment.

16           THE COURT:  Mr. Kopel, I know that trial practice

17   isn't your usual forte.  Teaching constitutional law is.

18   However, the same rules have to apply to everybody.

19           MR. KOPEL:  Certainly.

20           THE COURT:  And I don't think you're familiar enough

21   with the rules of evidence to know what you can and cannot use

22   for purposes of a question.

23           If you are making a record with regard to a particular

24   document, you're going to have to admit the document.  And the

25   fact that you made it doesn't give you the basis for admission.
```

 1          MR. KOPEL:  I'm not asking to admit this.  I'm just

 2    asking -- this is a demonstrative that --

 3          THE COURT:  That's not demonstrative, because in this

 4    record, Mr. Kopel, you're going to ask him a question about

 5    something that will not appear in the record.

 6          Now, how is the Court of Appeals going to know what

 7    he's talking about?

 8          MR. KOPEL:  We will -- as we go through this, he will

 9    explain the numbers, and then that will be orally there for the

10    Court of Appeals to review.

11          THE COURT:  Well, he can't be working from this

12    document, sorry.

13          MR. KOPEL:  Can he be working from those other

14    documents in front of him?

15          THE COURT:  Well, those were used to refresh his

16    recollection.  They were not admitted into evidence, so, no.

17          MR. KOPEL:  Okay.  Thank you.

18          (Hearing continued in open court.)

19    BY MR. KOPEL:

20    Q.  Dr. Webster, you testified that the law went into effect on

21    August 28 of 2007.

22    A.  Yes, that's when it was repealed, yes.

23    Q.  Do you know in the remaining months of 2007 whether

24    homicides in Missouri increased or decreased on a monthly

25    basis?

1    *A.*  No.

2    *Q.*  Do you know whether they increased or decreased on a

3    monthly basis in early 2008?

4    *A.*  On a monthly basis, no.  As I indicated before, I analyzed

5    these on an annual level.

6    *Q.*  Do you know if there was a surge in homicide that began in

7    the early summer, late spring in 2008, over a year after the

8    law went into effect?

9    *A.*  Again, I did not analyze the data on a monthly basis.

10   *Q.*  Do you know whether there was a trend in drive-by shootings

11   in Kansas City going on at this time?

12   *A.*  No.

13   *Q.*  Do you know whether the mayor of Kansas City stated in

14   August 2007, in an article in the *Kansas City Star* that the

15   drive-by shooting rate had tripled in his city since 2004 and

16   that drive-by shootings were out of control.

17          *MR. GROVE:*  Objection.  Hearsay.

18          *MR. KOPEL:*  I'm not asking --

19          *THE COURT:*  Response.

20          *MR. KOPEL:*  I will rephrase the question.

21          *THE COURT:*  Okay.

22   *BY MR. KOPEL:*

23   *Q.*  Did your study take into account an August 22, 2007,

24   article from the *Kansas City Star* in which the mayor of Kansas

25   City said that drive-bys had tripled in his city and were out

1   of control?

2   *A.*  No.  And had I been aware of that information, that would

3   not affect my analysis.  Drive-by shootings reflect a very

4   small percentage of overall homicides.

5   *Q.*  Did your study take into account an August 16, 2000 study

6   from the *Cleveland Plain Dealer* reporting a firearms murder

7   spike of the highest seen since the 1990s in Philadelphia,

8   Cleveland, and Baltimore?

9   *A.*  No.

10  *Q.*  Does the fact that homicide spikes were going on in these

11  three cities at the same time affect your conclusions?

12  *A.*  I don't think it would be very wise to look to see whether

13  some cities are having a homicide spike and some aren't.  That

14  occurs all the time.  Every single year, some cities are going

15  to report a spike, some are not.  What's really -- is the most

16  reliable way to understand what's going on as relates to a

17  policy under the question that we're examining is, overall,

18  what are the homicide trends looking like in the state of

19  Missouri following the change in this policy?  And how does

20  that compare with other states?

21        We've been through this data fairly carefully.  And as

22  I have done in my study, to determine that Missouri was an

23  incredible outlyer in the increases that were occurring in

24  homicides that were specific only to homicide committed with

25  firearms.  And we were able to rule out a number of the top

 1    competing hypotheses that might explain why Missouri was so

 2    unusual in its elevated homicide rates following the repeal of

 3    this law.

 4    Q.   And the way you did that was by doing regressions which

 5    test for other variables; is that correct?

 6    A.   That's correct.  We want to statistically control for

 7    changes in other factors that could conceivably increase or

 8    decrease homicide rates.

 9    Q.   Was poverty one of those things you tested for?

10    A.   I'm sorry, say again.

11    Q.   Poverty?

12    A.   Yes, sir.

13    Q.   And what did you -- how did you test for that?

14    A.   We included as a variable in our regression models the

15    percent of population below the poverty line in each state, in

16    each year under study.

17    Q.   And did you find any statistically significant effects?

18    A.   For poverty?

19    Q.   Yes.

20    A.   Yes.  If I remember correctly.  I don't have my study in

21    front of me, but --

22    Q.   Would it help to refresh your recollection to have your

23    study?

24    A.   Sure.

25            MR. KOPEL:  Your Honor, may I show the witness --

1  offer the witness his study to help refresh his recollection?

2           *THE COURT:*  You may.

3           *THE WITNESS:*  Okay.

4  *BY MR. KOPEL:*

5  *Q.*  And could you please tell us what your study found in

6  regard to poverty.

7  *A.*  Sure.  We found that, after controlling for baseline

8  differences in homicide rates across the states and these other

9  variables, that poverty rates were negatively associated with

10  homicide rates.

11  *Q.*  So, what does a negative association mean?

12  *A.*  That means -- again, we're talking about temporal change

13  here.  As poverty rates went up, which was occurring -- we were

14  having an economic downturn during that time period -- homicide

15  rates went down.

16  *Q.*  So more poverty, less homicide was a statistically

17  significant finding from your study?

18  *A.*  That's right.

19  *Q.*  Is that consistent with other scholarship that has found

20  poverty effects on crime or homicide?

21  *A.*  Most of the scholarship that looks at poverty rates in

22  relation to violent of crime, looks at explaining differences

23  across states.  So if you're trying to explain differences of

24  why one state's homicide rate is higher or lower than another,

25  or one city's is higher or lower than another, or even at the

 1  neighborhood level, which is really where this is most

 2  relevant, you see what maybe most of us would expect.  Which

 3  is, places with higher rates of poverty, particularly

 4  concentrated poverty, have higher rates of homicide and other

 5  violent crime.

 6          However, these studies do not examine changes over

 7  time.  And that is the most critical thing.  What is most

 8  relevant and what's consistently found in a number of studies,

 9  is that it's living in concentrated poverty, where, in essence,

10  poverty has been endemic for a very long period of time,

11  creates a very different set of social conditions than more of

12  a temporary economic downturn, which is what the country was

13  going through.

14  Q.  So does the statistically significant finding you had about

15  the influence of changes in poverty on homicide rate, does that

16  allow you to rule out the possibility of the changes in the

17  poverty rate were in fact the explanation for the changes in

18  homicide?

19  A.  Yes.

20  Q.  Even though the change -- could you explain that a little

21  bit more.  I thought you said the change in poverty was

22  statistically significantly associated with changes in

23  homicide.

24  A.  Yes.  I'm sorry, maybe I'm not answering your question.  If

25  you want to restate, please.

1   Q.  Let's take another variable.  You looked at the burglary

2   rate, and said, does changes in the burglary rate, are they --

3   do we have -- do we find a statistically significant

4   association, 5 percent, all that --

5   A.  Right.

6   Q.  .05.  And you found those two were so independent that

7   burglary wouldn't be the change in homicide; is that correct?

8   A.  Actually, we found that they were statistically associated,

9   that when burglary went up, homicide went up, and the reverse

10  is the case.

11  Q.  So another explanation for the increase in homicide could

12  have been the increase in the burglary rate?

13  A.  But, again, that's statistically controlled.  So we control

14  for the effects of burglary rate in our analyses so that we get

15  the independent effects of the policy change.

16  Q.  And you found, once you did that, no independent effects of

17  burglary on homicide; is that correct?

18  A.  No.  Actually, we did find independent effects of burglary

19  on homicide.

20  Q.  Your study ends in -- at least the data, I believe, in

21  2010?

22  A.  Actually, the data with death certificate data we were able

23  to aggregate by weapon type ends in 2010, because that's the

24  last available data points made available.  We did, however,

25  go -- add two additional years of data by looking at the

1   uniform crime reports data from the FBI.  So some analyses

2   extend through 2012, the end of 2012, and some extend to the

3   end of 2010.

4   Q.  And what did the FBI uniform crime report data show

5   happened to homicide in Missouri in 2011 and 2012, compared to

6   the three-year period before?

7   A.  I don't remember the very specific numbers right now.  But,

8   basically, the model estimates of the association between the

9   change in the policy and murder rates, or homicide rates, were

10  comparable.  They, basically, in each model showed that the law

11  was associated with approximately one additional homicide or

12  murder per year for 100,000 --

13  Q.  Okay.  I guess the question I was asking was, do you

14  remember what the FBI uniform crime reports showed?  Have you

15  ever known that?

16  A.  I'm sorry?

17  Q.  Have you ever known what the FBI uniform crime reports

18  showed about the homicide rate in Missouri in 2011 and 2012?

19  A.  Have I ever known about it?  Of course, I've known about

20  it.  I used the data in my analyses.

21  Q.  Precisely.  So would it refresh your recollection as to

22  what happened with those homicide rates if you could see your

23  data tables?

24  A.  Okay, sure.

25          MR. KOPEL:  Your Honor, may I show the witness his

```
 1   uniform crime report homicide tables to refresh his

 2   recollection?

 3          THE COURT:  He hasn't said he doesn't recollect.

 4   BY MR. KOPEL:

 5   Q.  Do you recall the exact rates for 2011 and 2012?

 6   A.  The exact rates, I do not.

 7   Q.  Would it help refresh your recollection to see the data

 8   tables?

 9   A.  Sure.

10          MR. KOPEL:  Your Honor, may I show him the data

11   tables.

12          THE COURT:  You may.  Present a copy to opposing

13   counsel, and present a copy to Ms. Glover, who he can present a

14   copy to the witness.

15          MR. KOPEL:  Sure.

16          THE WITNESS:  Thank you.

17          Okay.

18   BY MR. KOPEL:

19   Q.  What were the homicide rates -- do you now recall what the

20   homicide rate -- uniform crime report homicide rates were in

21   Missouri in 2011 and 2012?

22   A.  In 2011, they were 6.1 per 100,000 population; and in 2012,

23   6.5.

24   Q.  How does that compare to where they were in 2005 and 2006?

25   A.  I --
```

1    Q.  If you can recall?

2    A.  As I can tell from the information before me, in 2005 it

3    was 6.9, and in 2006 it was 6.3.

4    Q.  Professor Webster, are gun homicide changes more variable

5    than changes in homicide in general?

6    A.  Maybe slightly so.  I don't think they're normally a huge

7    difference.

8    Q.  What is heteroscedasticity?

9    A.  I didn't expect to be asked that.  Heteroscedasticity has

10   to do with, in essence, the constance of the variance between

11   your observations, whether you have very skewed amounts of

12   variance.

13   Q.  Let me ask you if this is a correct understanding.  I think

14   of it a combination of the words "hetero" and "skedaddle,"

15   which may be the same root.  Is that you have -- say, you're

16   studying a large population.  Some groups in that population

17   respond to the stimulus a little, other parts in that

18   population respond to that stimulus a lot, so it is a

19   heteroscedastic population, because some parts of the

20   population skedaddle or change only a little, and other parts

21   of the population skedaddle a lot in response to the same

22   stimulus.  Is that --

23   A.  I don't think necessarily in response to the same stimulus.

24   I think of it more generally in terms of the variability of

25   whatever measure it is that you're studying.

1  Q.  So maybe in 1998, things changed a lot in response to

2  something; and in '99, the same event didn't lead to much

3  change.  Is that --

4  A.  What really -- what is relevant here that relates to data

5  in question has to do with state level murder rates, or

6  homicide rates.  And, generally speaking, states with lower

7  levels of homicide rate, their variance relative to the mean is

8  notably higher than in states that have relatively higher

9  homicide rates but less year-to-year variability.  So it has to

10  do with the comparison of the mean versus the variance.

11  Q.  And you tested for heteroscedasticity, didn't you?

12  A.  We adjusted for that.

13  Q.  What if you hadn't adjusted for heteroscedasticity, would

14  that have made your results less valid?

15  A.  I don't know, honestly.

16  Q.  And where in your calculations could one see how you

17  adjusted for heteroscedasticity?

18  A.  It has to be with adjustments to the standard errors, as we

19  state in our article.  We adjust for the fact that the data are

20  not randomly collected, but clustered by state.  Each state's

21  observation in any year is not independent of a prior

22  observation in that same state.  And also adjust for

23  heteroscedasticity with Eicker-Huber-White adjustments --

24  Q.  I'm just wondering where in your calculations one could

25  find that, where you did the Eicker-White adjustments.

1   *A.* That's part of the statistical software, you make that

2   adjustment in the statistical analyses. I don't have a formula

3   or -- a set that I can crank out for you right now.

4   *Q.* You use this data program --

5   *A.* That's correct.

6   *Q.* And so by the time one sees a regression table come out,

7   one wouldn't see --

8   *A.* Right. Basically, what it does is adjusts the standard

9   errors that help us determine the statistical significance of

10  any association or change.

11  *Q.* If we could talk about something we talked about a little

12  bit on the *voir dire* on your direct examination with the

13  exhibits. What database did you use to measure firearms

14  homicides?

15  *A.* Yeah, I think we went over this. This was the Centers for

16  Disease Control and Prevention's WISQARS data.

17  *Q.* Right. And is it missing Delaware, Hawaii, Montana, South

18  Dakota, North Dakota, New Hampshire, Vermont, and Wyoming?

19  *A.* Yes, for those set of analyses, yes.

20  *Q.* Is firearms homicide data for these states available from

21  the uniform crime reports?

22  *A.* Yes. And they were used in our analysis with the uniform

23  crime reports data. It did not change any of our estimates.

24      *MR. KOPEL:* May I have a moment, Your Honor?

25      *THE COURT:* You may.

1   *BY MR. KOPEL:*

2   *Q.*  Could you please tell me the name of the data table where

3   you used FBI uniform firearms homicide data from the FBI

4   uniform crime reports?

5   *A.*  I apologize.  Maybe I didn't -- we looked at overall murder

6   rates with the UCR FBI data.  We only looked at

7   weapons-specific information for the death certificate data.

8          *MR. GROVE:*  Your Honor, just so the record is clear.

9   I'm wondering if we ought to admit Dr. Webster's study, since

10  there has been a lot of discussion about it, and he's been

11  forced to read from it several times.

12         *THE COURT:*  You'll have the opportunity to offer it on

13  redirect if you'd like.

14  *BY MR. KOPEL:*

15  *Q.*  So you had the -- from the CDC study, you had the 42 states

16  which you reported firearms data for.  And then from the FBI --

17  *A.*  Forty-three.

18  *Q.*  Forty-three, okay.  And you -- on the FBI uniform crime

19  reports, there you had all 50, but you looked at homicides

20  overall, but not firearms homicides?

21  *A.*  Right.

22  *Q.*  Does the FBI make state-level data available about firearms

23  homicides versus just all homicides?

24  *A.*  You can -- you can probably get them.

25  *Q.*  These states that you -- that were omitted in the CDC

 1  version, are they generally states that have low homicide and

 2  relatively little gun control?

 3          MR. GROVE:  Objection, compound.

 4  BY MR. KOPEL:

 5  Q.  Are they states that have relatively little homicide?

 6  A.  Yes.  And that's why they -- the CDC did not include those

 7  data, because of the relative rarity of those events.  If you

 8  look at the collection of the seven states that -- in question,

 9  their overall homicide rates over the study period, and compare

10  those to Missouri's, Missouri's is anywhere from four to five

11  times higher than other states.  So in my professional

12  assessment, they -- A, they don't represent a lot of data to

13  inform the question about -- you know, as a good comparison for

14  Missouri, since Missouri's rates are so completely

15  substantially higher.

16  Q.  But in -- so you're saying that leaving out these seven

17  states, most of them low gun control, low homicide, didn't

18  affect your conclusions?

19          MR. GROVE:  Objection, misstates the testimony.

20          THE COURT:  Noted for the record.

21          THE WITNESS:  I didn't make reference to the gun

22  regulations in place in those states.  What I would say about

23  those states is that, by and large, these are very rural states

24  with not as urban populations.  There is a very large number of

25  differences between these states and Missouri and other states,

1    independent of firearm sales regulations.

2    *BY MR. KOPEL:*

3    *Q.*  Certainly, Hawaii is very special.

4          Are these states generally low in firearms regulation

5    relative to the rest of the country, to your knowledge?

6          *MR. GROVE:*  Objection, vague.

7          *THE COURT:*  The objection is to the form of the

8    question.  Do you care to revise?

9          *MR. KOPEL:*  Yes.

10   *BY MR. KOPEL:*

11   *Q.*  Professor Webster, do you know how -- of common measures

12   for the stringency of gun laws among various states?

13   *A.*  Hawaii has relatively strict gun control laws.  The

14   remaining of the other states have relatively lax gun laws.

15   *Q.*  Would you consider Delaware to be an urban state or a rural

16   state?

17   *A.*  It's got some of both, of course.

18   *Q.*  It does.  Why did you study per capita law enforcement

19   officers as a potential variable?

20   *A.*  Because a number of studies have found that that variable

21   does correlate with violent crime.

22         *MR. KOPEL:*  Your Honor, may I confer a minute, please?

23         *THE COURT:*  Sure.

24         (Off-the-record discussion between counsel.)

25         *MR. KOPEL:*  Thank you for your patience, Professor

```
 1   Webster.

 2              THE WITNESS:  Uh-huh.

 3   BY MR. KOPEL:

 4   Q.  You had testified, I believe, why you thought it was

 5   important to test for per capita that -- law enforcement

 6   officers per capita as a potentially confounding variable?

 7   A.  Yes.

 8   Q.  Did you also test for incarceration?

 9   A.  Yes.

10   Q.  And what was the standard used for that?

11   A.  What were the specific measures?

12   Q.  Yeah, exactly.

13   A.  It was individuals incarcerated for per capita, per

14   population.

15   Q.  What was your data source for that?

16   A.  Bureau of justice statistics.  I don't remember the precise

17   title.

18   Q.  Federal -- the bureau --

19   A.  Yes.

20   Q.  How about for per capita law enforcement officers, what was

21   your source for that?

22   A.  That comes from uniform crime reports data.

23   Q.  I'm sorry, from where?

24   A.  Uniform crime reports data.

25   Q.  Did you do -- to do your research, did you produce one data
```

1  | table or more than one?

2  | A.  So, there were a number of tables for each outcome of

3  | interest.

4  | Q.  So you had -- tell me if I've got this right.  You had what

5  | we'll call table 1, that had 50 states times 12 years for each.

6  | And it had various amounts of information that said 1999, the

7  | unemployment rate was this, the age-adjusted homicide rate was

8  | that, the burglary rate, and so on?

9  | A.  Uh-huh.

10 | Q.  And then you had how many other tables after your first

11 | one?

12 | A.  Well, I mean -- I'm not sure exactly where we're going with

13 | this and what precisely you're --

14 | Q.  How many data tables did you use for your published study

15 | and also the basis for your testimony?

16 | A.  The data are in two tables.

17 | Q.  Two tables?

18 | A.  Yeah.

19 | Q.  Your attorney provided me with four.

20 | A.  I'm looking at two tables here.

21 | Q.  Yes, you've only got two so far.  I have the others --

22 | well, I would represent to you that your attorney actually

23 | provided me with four tables.  Let me ask you about one that

24 | you used -- see if you used it at all.

25 | A.  All right.

1  Q.  You have a table called non-gun -- non-gun AA homicide

2  rate, non-gun age-adjusted homicide rate?

3  A.  Right.

4  Q.  Did you use that in the study at all?

5  A.  Yeah, that is in the second row on table 2.

6  Q.  Well, I'm -- I'm getting a little confused here.  I believe

7  you have -- it was my understanding from your attorney, you

8  have four tables.  You have -- you've looked at something

9  called --

10  A.  May I attempt to clarify?

11  Q.  Absolutely.  Please.

12  A.  Sure.  So, basically, you have four outcomes that were

13  examined.  The first was firearm homicide rates through the end

14  of 2010, the second was non-firearm homicide rates to the year

15  2010, the third was total homicide rates through 2010, and the

16  fourth was murder and negligent manslaughter rates through

17  2012.  These being the UCR data.  So each of those regression

18  analyses on each of those outcomes, yes, produced four separate

19  tables.

20        We, in our article -- in the main text of the article

21  put the estimates of the effect of the repeal of Missouri's law

22  in table 2 and provided a supplement to appendix, the more

23  detailed table for each of these outcomes for other code areas.

24  Perhaps that clarifies.

25  Q.  So that wraps all the four tables --

```
 1  │  A.   Yes.
 2  │  Q.   -- incorporated by reference?
 3  │  A.   That's right.
 4  │  Q.   Okay.  Great.
 5  │          Isn't it true your data tables contradict each other?
 6  │  A.   No.
 7  │  Q.   Would you like to refresh your recollection to see if
 8  │  that's correct?  Because I'm certain that they do.
 9  │          MR. GROVE:  Objection, Your Honor --
10  │          THE WITNESS:  I know my data --
11  │          THE COURT:  Just a minute, sir.  We have an objection.
12  │          MR. GROVE:  Objection, Your Honor.  There has been no
13  │  testimony that he couldn't recall anything.
14  │          THE COURT:  Correct.  I sustain the objection.
15  │  BY MR. KOPEL:
16  │  Q.   Mr. Webster -- Dr. Webster, in your gun homicide rates by
17  │  state, what is the per capita law enforcement number for
18  │  Alabama in 1999.
19  │  A.   I don't know.
20  │          MR. GROVE:  Objection, Your Honor.  Again, this isn't
21  │  in the record --
22  │          THE COURT:  Mr. Kopel, would you like to confer with
23  │  your co-counsel?
24  │          MR. KOPEL:  Certainly.
25  │          THE COURT:  Thank you.
```

```
 1            (Off-the-record discussion between counsel .)
 2    BY MR. KOPEL:
 3    Q.  Dr. Webster, in your four tables, if your study is
 4    accurate, should the information for per capita law enforcement
 5    officers for each state for each given year be the same in each
 6    of the four tables?
 7    A.  If you're asking whether the underlying data, meaning --
 8    let's talk about the per capita law enforcement for any state
 9    and year, yes, it should be the same, regardless of the
10    outcome.  I'm not sure --
11    Q.  Yes, exactly.  I'm not talking the advanced math.  I'm
12    talking purely the numbers, so --
13    A.  Okay.
14    Q.  If the number for Alabama for, say, per capita law
15    enforcement officers was 342, it should be 342 on all four
16    tables; is that correct?
17    A.  For a given state and year?
18    Q.  Exactly.  So if there were differences, that would indicate
19    some serious data errors; would that be correct?  Depending on
20    the magnitude, I suppose?
21    A.  Yeah, exactly, depending on the magnitude.
22    Q.  Is that likewise true for incarceration rates?
23    A.  Sure.
24    Q.  That the data should be consistent from table to table and
25    state by state, year by year, they should be the same?
```

```
 1    A.  Yes.

 2              MR. KOPEL:  Your Honor, for purposes of impeachment, I

 3    would like Professor Webster to be able to take a look at his

 4    tables and compare whether the two tables do or do not have

 5    entirely different numbers for these two variables.

 6              THE COURT:  Are these two tables admitted?

 7              MR. KOPEL:  May I confer, Your Honor?

 8              THE COURT:  Sure.

 9              (Off-the-record discussion between counsel.)

10              MR. KOPEL:  Your Honor, these tables represent

11    Dr. Webster's statements.  They are not admitted.  I would like

12    to mark them as exhibits and use them for impeachment, pursuant

13    to your request that impeachment exhibits be marked even if not

14    for admission.

15              THE COURT:  Response.

16              MR. GROVE:  They appear to go to the 702 challenge

17    which was never raised, Your Honor.  So we'd object on that

18    basis.

19              THE COURT:  Reply.

20              MR. KOPEL:  It's not a 702 challenge to assess the

21    persuasiveness and weight of an expert's testimony.  And,

22    certainly, the accuracy of the data, whether or not the expert

23    is admissible or not, goes to the weight that should be

24    accorded to the expert's opinions.

25              THE COURT:  Then are you seeking to admit these under
```

1  Rule 703 of the Federal Rules of Evidence as being information

2  upon which this expert has relied?

3       *MR. KOPEL:*  Yes, Your Honor.

4       *THE COURT:*  Any objection?

5       *MR. GROVE:*  No, Your Honor.

6       *THE COURT:*  All right.  Let's get them marked as

7  exhibits, and I receive them.

8       *COURTROOM DEPUTY:*  Mr. Kopel, my notes show that the

9  next exhibit would be 132.  Mr. Keech is showing the last Court

10  Exhibit was 131.

11       *MR. KOPEL:*  Okay.

12       And I believe Dr. Webster has some copies at the

13  witness stand, so I'm wondering if we could get those back, and

14  we could get them marked and be on the same stage.

15       *COURTROOM DEPUTY:*  You need to show me what you want

16  marked.

17       *MR. KOPEL:*  Sure.

18       Let's start with UCR, all homicides, and we'll call

19  that 132.  And then we'll -- let's make it -- we need more than

20  one of these, right, to be marked?

21       *COURTROOM DEPUTY:*  Are we marking multiple exhibits

22  with the same number?

23       *THE COURT:*  No.

24       *COURTROOM DEPUTY:*  One is sufficient.

25       *MR. KOPEL:*  And then we have non-gun AA homicide rate,

1    we'll call that 133.

2            Then we have gun homicide rates, state, and we'll make

3    that 134.

4            And then the last one is called is all homicide, and

5    that we'll make 135.

6            (Exhibits 132-135 admitted.)

7    *BY MR. KOPEL:*

8    *Q.*  Professor Webster --

9            *THE COURT:*  Did you give a copy to opposing counsel?

10           *MR. KOPEL:*  I'm sorry.

11   *BY MR. KOPEL:*

12   *Q.*  Professor Webster, have you had a chance to receive those

13   exhibits?

14   *A.*  Yes, I've taken a quick look.

15   *Q.*  Okay.  Could you please take a look at No. 132.  That's the

16   one labeled UCR, all homicides.

17   *A.*  Yes.

18   *Q.*  And then simultaneously take a look at 133, non-gun AA,

19   age-adjusted, homicide rate.

20   *A.*  Okay.

21   *Q.*  For Alabama, 1999, in the 132 -- that's the UCR all

22   homicides -- what is the figure for per capita law enforcement?

23   *A.*  For 132?

24   *Q.*  Yes, on Exhibit 132.

25   *A.*  549.

1  *Q.*  I think that's incarceration --

2  *A.*  I'm sorry, 259.

3  *Q.*  Right.  Now, take a look at table 1 -- Exhibit 133.  And

4  what is the figure there for Alabama 1999 per capita law

5  enforcement officers?

6  *A.*  342.

7  *Q.*  Those should be the same, true?

8  *A.*  Yes.

9  *Q.*  Okay.  I would request you now to simply take a look at

10  these two columns in these two exhibits and tell me if any of

11  the state figures match up under per capita law enforcement.

12       I mean -- I'll stop there.

13  *A.*  No.  I believe that the data for UCR all homicides, the

14  data are off, based upon, I presume, how my research assistant

15  copied in some of the data and based upon the ordering of the

16  states.  So the -- the data in the other tables, Exhibits 133

17  and 134, are the accurate data.

18  *Q.*  If we could stick -- let's stick to 132 and 133, just to

19  keep things simple for the time being.  You said you thought

20  132, the per capita law enforcement, was off -- was incorrect

21  because of some -- whatever -- some kind of production error?

22  *A.*  Yeah.  For some reason, she moved Missouri up front with

23  its -- with its data, in terms of alphabetical order.  Again,

24  I'm not sure why.

25  *Q.*  Sure.  So these are -- that column has 13 years' worth of

```
 1   data for 50 states; is that correct?
 2   A.  Can you say specifically --
 3   Q.  All I'm saying, in table 132, you have -- I'm wrong.  You
 4   have each state is 1999 through 2012?
 5   A.  Correct.
 6   Q.  So each state has 14 years.
 7   A.  Yes.
 8   Q.  Okay.  So 50 states times 14 years would be 900 data
 9   points?
10   A.  Uh-huh.
11   Q.  In each column.
12   A.  Yes.
13   Q.  And so is it true that this table 132 has 900 data errors,
14   all in one single column?
15   A.  That may well be true.  I would have to go through and
16   check each one.
17   Q.  Would you -- well, I'm not asking you to count all 199,
18   but -- did you testify that the entire column is wrong?
19   A.  That's what it appears to be.
20   Q.  Would you like to take more time to ascertain that?
21   A.  Sure, I'll take a minute.
22   Q.  Sure.
23   A.  So, I believe that that column of data is in error.
24   Q.  Okay.  Same question now just for the incarceration column,
25   which is right next to it.
```

1    *A.*  There are some inconsistencies in these two columns.

2    *Q.*  Some inconsistencies, or is -- or all inconsistencies?

3    *A.*  There are some that line up and some that do not.

4    *Q.*  Okay.  Let's move on -- and do you have an estimate for

5    about how many inconsistencies there are in that column?

6    *A.*  No.

7    *Q.*  Okay.  Let's take a look at Exhibits 134 and 135.  And I

8    would ask you the same questions, again, about the per capita

9    law enforcement officer column and then the incarceration

10   column.

11   *A.*  Yes, I think we're looking basically at the same type of

12   error --

13   *Q.*  Exactly.

14   *A.*  -- with moving the data when Missouri was moved up at the

15   top, in the case of Exhibit 135, as in 132.

16   *Q.*  And I believe you said -- so the per capita law enforcement

17   column, that was all -- all wrong.  But you said it --

18   incarceration was a little -- was sometimes right and sometimes

19   wrong.  I'm just wondering, to finish up here, if we take a

20   look at Missouri --

21   *A.*  Okay.

22   *Q.*  -- itself, the -- if you could look at Missouri 1999

23   through 2010 on 13 -- Exhibit 134 versus Missouri 1999 through

24   2010 on Exhibit 135, just looking at the incarceration rates.

25   *A.*  So, again, there are inconsistencies for Missouri.

1  *Q.* Right. If we -- are they all inconsistent, or are there

2  some that are correct in there?

3  *A.* I see incarceration rates, for example, 2002, Missouri 509

4  in both -- both sets of data.

5  *Q.* Okay. Great. Thank you. I appreciate --

6       Thank you all in this courtroom for your patience,

7  thank you, Dr. Webster.

8       *THE COURT:* Thank you, Mr. Kopel.

9       Redirect.

10                    **REDIRECT EXAMINATION**

11  *BY MR. GROVE:*

12  *Q.* Dr. Webster, do those errors that we just discussed change

13  your conclusions in any way?

14  *A.* Very doubtful. I mean, the set of analyses that are based

15  upon the tables where the data do align -- and I don't think

16  that there are errors, because, again, I think this -- from

17  what I can observe, this was simply due to my assistant moving

18  Missouri up, perhaps, because we kept looking at very specific

19  things going on in Missouri. But the rest of the data, I think

20  are accurate and reliable, and our model estimates were

21  incredibly consistent across these different models.

22       What -- in my experience, based upon not only this

23  study, but many other studies that I conducted, the main thing

24  that drives an estimate of a policy effect is virtually always

25  how much things are changing in the state where the policy or

1    the jurisdiction where the policy changed versus places that it

2    did not.

3           We've been through earlier in my testimony, very gross

4    disparities between what occurred in Missouri, as opposed to

5    other states, both nearby and across the country.  So I

6    don't -- I don't believe that the problems points out a moment

7    ago will lead to different conclusions of the association

8    between the change in Missouri's law and homicides.

9    *Q.*  Just a few more questions.  Earlier Mr. Kopel suggested

10   that theft may be why short time-to-crime -- recovery of short

11   time-to-crime guns went up dramatically after the repeal of

12   Missouri's law.  Are you aware of any evidence that would be

13   relevant to that inquiry?

14   *A.*  Yes, I can think of a few things, actually.  So, over the

15   same time period in question, where there was a noteworthy

16   increase in firearm -- background checks for firearms sales in

17   Missouri, similar large increases were going on across the

18   country.  If you look at the average interval between retail

19   sale and recovery by law enforcement, if this is all driven by

20   theft across the country, you should be seeing shorter

21   intervals between retail sale and recovery in crime or by law

22   enforcement.  What you saw, actually, is precisely the

23   opposite.  That nationally there were noteworthy increases in

24   that -- in that interval.

25          But there were other studies that I've conducted, for

 1   example, wholly independent of state firearm policies, where

 2   regulations, oversight, lawsuits, various things that are

 3   directed at the retail sales transaction, the integrity of

 4   those, and I can go specifically through these.

 5          In the case of Chicago and Detroit, law enforcement

 6   did undercover stings, identified a number of problematic gun

 7   dealers who were making illegal sales, brought lawsuits against

 8   those individuals.  In the case of Chicago, prosecuted some of

 9   those individuals as well.  Research that I've conducted and

10   published in peer-reviewed journals show that that led to

11   significant reductions in the same measure of diversion of guns

12   to criminals.  And it's hard to imagine why a crackdown on bad

13   gun dealers would lead to either more gun sales or more gun

14   theft.

15          Similarly, in the case of Milwaukee, there was one

16   problematic dealer in particular that in the late '90s actually

17   was a leading seller of guns later traced to crime, a gun shop

18   named Badger Guns and Ammo.  When, in essence, they were

19   embarrassed by the ATF reviewing their ranking and the

20   contribution they were making to crime guns in Milwaukee, the

21   dealer voluntarily decided to change their firearms sales

22   practices.  And our studies documented a dramatic reduction in

23   the flow of guns to criminals following that.

24          And subsequent to that, when federal law made those

25   same gun trace data, that, in essence, embarrassed the owners

1   of Badger Guns and Ammo, made them not available for release,

2   there was a 200 percent increase in these -- the same precise

3   measure that I used for my other studies, which is a

4   time-to-crime less than one year, shot up 200 percent.

5           Well, case after case after case, it's hard to imagine

6   that in each case these big temporal changes that were seen in

7   this indicator of diversion can all be attributed to theft.

8   *Q.* Earlier Mr. Kopel had you pick out two data points in Iowa,

9   I think it was in 1997 and 1998, and then compare them to the

10  same time period in Missouri.  Are there any dangers associated

11  with picking such an isolated set of information?

12  *A.* Oh, yes.  And I would never do that.  I tutor my students

13  that that's the absolute worst way to try to understand the

14  effect of any intervention, is to look at simply two data

15  points, particularly where you have, in a state like Iowa,

16  where homicides are much less common.  I've already talked

17  about how in such states, the year-to-year variability compared

18  to their mean is much greater.  So it only takes a small number

19  of homicides, whether going up or going down, to be associated

20  with a single year percent change that looks quite dramatic.

21          But when we did what, again, I would tutor my students

22  or any researchers to do, is to look at a number of data

23  points, what we showed and we discussed in our earlier exhibit,

24  when you looked at the firearm homicide rates in Missouri, the

25  change pre, post the repeal, and each of the bordering states,

1  including Iowa, you saw when you combine all of those years,

2  there was a very, very small increase in Iowa that was nowhere

3  near to be statistically significant.

4       So it's -- it's cherrypicking two data points to show

5  one big change, when that's not really the most valid way to

6  understand what is going on.

7  Q.  You also testified earlier that a law enforcement check can

8  have some additional protective effects when compared to a

9  point of sale check by an FFL.  Does that mean a system that

10  utilizes FFLs is likely to be ineffective?

11  A.  Not at all.  In the studies that I led that looked at the

12  association between different firearm sales laws, state-level

13  firearm sales laws, we look at the independent effects of

14  having a licensing system, a permit-to-purchase license system,

15  as was the case in Missouri, independent of the state

16  regulating private handgun transactions.  And what we found

17  consistently is that over and above any protective effects of

18  the permitting process -- again, this principally has to do

19  with direct application with law enforcement, as opposed to

20  through an FFL -- that we consistently saw lower rates of

21  diversion when private sales were regulated with background

22  checks and record keeping.

23  Q.  What about the protective effects of the system where an

24  FFL wasn't involved at all?

25  A.  Can you give me a very specific of what you're talking

1   about, if an FFL is not involved?

2   *Q.* Sure.  For example, in this case, as the plaintiffs have

3   suggested, that two independent individuals who want to sell a

4   firearm or transfer a firearm between themselves should just be

5   able to go to the Colorado Bureau of Investigation website, pay

6   $6.85 for the background check that is provided there, and that

7   would be sufficient protection to achieve the effect that

8   18-12-112 wants to achieve.

9   *A.* I would say that would be a grossly inferior way to address

10  this and far less effective.  I think that overriding principle

11  of -- if you look at a number of studies, it's -- it all has to

12  do with accountability measures.  And the system that you

13  describe in which the individuals involved in the transactions,

14  in essence, are on an honor system, A, that they will do that

15  check, and, B, that they will provide the accurate information

16  for a background check, I -- I would say would not be

17  effective, and it would be very difficult to know whether any

18  such background check that was conducted in that way was truly

19  a valid check.

20         *MR. GROVE:* May I have just a moment, Your Honor?

21         *THE COURT:* You may.

22         *MR. GROVE:* No further questions.  We would ask that

23  Dr. Webster be excused.

24         *THE COURT:* Thank you.

25         And I gather you did not want to admit his report?

```
 1              MR. GROVE:  It might be helpful.  Thank you for the

 2     reminder, Your Honor.

 3              Just so the record is a little more clear, we'd offer

 4     it as Exhibit --

 5              MR. KOPEL:  136, perhaps.

 6              MR. GROVE:  -- 136.

 7              THE COURT:  Any objection?

 8              MR. KOPEL:  No objection, Your Honor.

 9              THE COURT:  136 is received.

10              (Exhibit 136 admitted.)

11              Any objection to this witness being excused?

12              MR. KOPEL:  No objection, Your Honor.

13              THE COURT:  Thank you, sir.  You may step down.  You

14     are excused.

15              THE WITNESS:  Thank you.

16              THE COURT:  Are you prepared to call your next witness

17     at this time?

18              MR. GROVE:  Yes, Your Honor.  Dr. Ernest Moore.

19              THE COURT:  Thank you.

20              Please step up and be sworn.

21               (**ERNEST MOORE, DEFENDANT'S WITNESS, SWORN**)

22              COURTROOM DEPUTY:  Please be seated.

23              Please state your name and spell your first and last

24     name for the record.

25              THE WITNESS:  Ernest Moore, E-R-N-E-S-T, M-O-O-R-E.
```

1    *THE COURT:*  Thank you.  You may proceed.

2    *MR. KRUMHOLZ:*  Your Honor, if I may before

3    Ms. Scoville proceeds.

4    For the record, plaintiffs object to the testimony of

5    this witness, who did not testify before the General Assembly,

6    for the reasons articulated in our trial brief, as well as

7    stated by Mr. Abbott at the beginning of Mr. Montgomery's

8    testimony on Thursday.

9    *THE COURT:*  Thank you.

10    *MR. KRUMHOLZ:*  Thank you.

11    **DIRECT EXAMINATION**

12    *BY MS. SCOVILLE:*

13    *Q.*  Good afternoon, Dr. Moore.

14    *A.*  Hello.

15    *Q.*  Could you please describe your current position at Denver

16    Health to the Court.

17    *A.*  I am currently a trauma surgeon and editor of the *Journal*

18    *of Trauma*.

19    *Q.*  How long have been a trauma surgeon?

20    *A.*  I've been a trauma surgeon since 1976.

21    *Q.*  You were formerly the chief of trauma services at Denver

22    Health; is that right?

23    *A.*  That's correct.  I was chief of trauma for 36 years, and

24    chief of surgery for 26 years.

25    *Q.*  When did you step down from that position?

1  *A.*  In 2012.

2  *Q.*  And did your job duties change after you stepped down as

3  chief?

4  *A.*  My job as a trauma surgeon continued.  My administrative

5  job as chief of the service changed.

6  *Q.*  So what percent of your time right now are you spending in

7  surgery-related duty?

8  *A.*  Well, my trauma duties now consist of 24-hour call once a

9  week.

10  *Q.*  And how often are you -- how much of your time do you spend

11  with patients?

12  *A.*  Well, during that 24-hour period, the majority of it is

13  spent with trauma patients.

14  *Q.*  Before your job duties changed, what percent of your time

15  did you spend treating patients?

16  *A.*  That varied somewhat.  During my first 25 years as chief of

17  trauma services, I managed all the injured patients from

18  6:00 a.m. to 6:00 p.m. Monday through Friday, in addition to my

19  call schedule.  And at that time was closer to six times a

20  month.

21  *Q.*  What level of certification does the trauma center at

22  Denver Health have?

23  *A.*  Denver Health is a Level 1 trauma center.

24  *Q.*  What does it mean to be a Level 1 trauma center?

25  *A.*  That is the trauma center with the highest level of

 1  capability to manage injured patients.

 2  *Q.*  As a trauma surgeon at Denver Health, have you had the

 3  opportunity to treat patients with gunshot wounds?

 4  *A.*  Yes.

 5  *Q.*  About how many gunshot victims would you estimate that

 6  you've treated during your time at Denver Health?

 7  *A.*  Well, I don't have a good estimate; but, literally, in the

 8  thousands.

 9  *Q.*  What percentage of the gunshot wound patients in the City

10  and County of Denver would be transported to Denver Health for

11  treatment?

12  *A.*  Well, in Denver County, because the Denver Health,

13  formerly, Denver General, runs the EMS system for the county,

14  virtually every gunshot wound in Denver is transported to

15  Denver Health.

16  *Q.*  Now, when a gunshot wound victim comes to Denver Health,

17  how is that person's case assigned?

18  *A.*  Well, most gunshot wounds to the torso -- that is, head,

19  neck, chest, or abdomen -- would constitute what would be

20  called a trauma activation.  That is, the full team would be

21  assembled before the patient arrived.  That team would include

22  an attending trauma surgeon, who would be in charge of the team

23  to manage the patient.

24  *Q.*  So do the trauma surgeons at Denver Health, then, do rounds

25  as a group?

1   A.  We do.  Once the patient is admitted, then we as a group

2   manage them.  And in particular, in the intensive care unit, we

3   typically make group rounds so that we are all familiar with

4   the patients.

5   Q.  So would you, then, have personally been involved in most

6   of the gunshot wounds that are serious that come to Denver

7   Health?

8   A.  Yes.

9   Q.  Could you describe for the Court the range of injuries that

10  you have observed that gunshot wounds will cause.

11  A.  Well, gunshot wounds can cause anything from a trivial

12  injury that's tangential to an extremity, to devastating

13  injuries that include injuries to the head, spine, or lethal

14  injuries to blood vessels and chest and abdomen.

15  Q.  How does the seriousness of a gunshot wound compare to the

16  severity of other trauma-induced injuries that you have

17  observed?

18  A.  Well, in general, I would say a central gunshot wound, that

19  is one to the head, neck, chest, or abdomen, is more serious

20  than other types of injuries.

21  Q.  Now, have you personally experienced instances where

22  multiple gunshot victims were hurt in a single incident and

23  were transported to Denver Health for treatment?

24  A.  Yes.

25  Q.  Did you treat any victims from the Columbine shooting?

1  A.  Yes.

2  Q.  And without going into any of -- personally identifying

3  information about those patients, could you describe for us the

4  severity of those injuries.

5  A.  Well, there were several people with -- as everybody knows,

6  who had life-threatening injuries.

7  Q.  In your experience, have you treated patients who have

8  multiple gunshot wounds?

9  A.  Yes.

10 Q.  And what would be the largest number of gunshot wounds that

11 you have observed in any single individual?

12 A.  Well, certainly we've seen double digits, that is, patients

13 with more than ten wounds.

14 Q.  Now, in your personal experience, have you observed any

15 difference over time in the number of gunshot wounds that

16 patients report with?

17 A.  Well, my sense is that over the years, we've seen more

18 patients with multiple wounds.

19 Q.  And in your personal experience, what are the chances that

20 you can save someone with multiple wounds, as opposed to

21 someone who has a single wound?

22 A.  Well, I think that depends, of course, what the bullet

23 strikes.  But, in general, the larger the number of bullet

24 wounds, the more chance there is of that affecting a

25 life-threatening structure.

1   *Q.*  Are you familiar with the mortality rate from gunshot

2   wounds at Denver Health?

3   *A.*  Yes.

4          *MS. SCOVILLE:*  Your Honor, at this point, I would like

5   to move for admission of Exhibit 45.  This is an exhibit to

6   which the parties have agreed is -- meets the standards for

7   authenticity, and it's a business record.  Plaintiffs, however,

8   did not concede its relevance.

9          *THE COURT:  Voir dire* or objection?

10         *MR. KRUMHOLZ:  Voir dire*, if I may, Your Honor.

11         *THE COURT:*  You may.

12         *MR. KRUMHOLZ:*  Thank you.

13         Dr. Moore, with respect to the table, a version of

14   which I believe we looked at at your deposition last fall.

15         *THE WITNESS:*  Right.

16         *MR. KRUMHOLZ:*  Is it your testimony with respect to

17   every one of the patients represented on that table, you

18   personally treated every one of these patients reflected by

19   that table?

20         *THE WITNESS:*  No.

21         *MR. KRUMHOLZ:*  Okay.  Now, as I understand it, that --

22   that table was produced from Denver General's -- I think I

23   should say Denver Health, Dr. Moore, although I know you prefer

24   Denver General.  But just for clarity's sake, we'll say Denver

25   Health.  Is that okay?

1    *THE WITNESS:*  Sure.

2    *MR. KRUMHOLZ:*  Thanks, Doctor.  I believe the trauma

3  registry contains, as I understand it, dozens of data fields,

4  correct?

5    *THE WITNESS:*  That's correct.

6    *MR. KRUMHOLZ:*  And among those data fields is a data

7  field that describes the mechanism of injury.

8    *THE WITNESS:*  That's correct.

9    *MR. KRUMHOLZ:*  And so one mechanism of injury could be

10  gunshot wounds, correct?

11    *THE WITNESS:*  That's right.

12    *MR. KRUMHOLZ:*  Essentially, that's how the table was

13  produced, correct?

14    *THE WITNESS:*  Well, yes, from the trauma registry,

15  correct.

16    *MR. KRUMHOLZ:*  Right.  Now, Doctor, there is no way to

17  know from the information in the table that is produced from

18  the trauma registry, is there, what type of firearm was

19  involved in each case?

20    *THE WITNESS:*  That's correct.

21    *MR. KRUMHOLZ:*  Thank you, Doctor.

22    Your Honor, we did stipulate to the authenticity; but

23  we continue to object, first on grounds of foundation.

24  Dr. Moore is not a designated expert.  He's here to testify

25  about his own personal experiences.  And he lacks the

```
 1   foundation to testify about this information.

 2        THE COURT:  But I thought you stipulated to the

 3   authenticity.

 4        MR. KRUMHOLZ:  Only as to it being a business record,

 5   Your Honor.

 6        THE COURT:  Okay.  What other foundation do you

 7   believe is necessary here?

 8        MR. KRUMHOLZ:  Well, a foundation that he in his

 9   personal experience actually had experience treating all of the

10   patients that are reflected on that chart.

11        THE COURT:  All right.

12        MR. KRUMHOLZ:  The other objection, Your Honor, is

13   relevance, because the information on the table cannot be

14   connected to any particular firearm or category of firearm.

15        THE COURT:  Response.

16        MS. SCOVILLE:  Certainly, Your Honor.

17        THE COURT:  Why don't you start with relevance.

18        MS. SCOVILLE:  Certainly.  The legislative history

19   demonstrates that General Assembly's concern about passing both

20   House Bill 1224 and 1229 was a concern about gun violence.  And

21   they were concerned with the number of casualties and the toll

22   those casualties were taking.  Dr. Moore's testimony is

23   relevant to those views.

24        THE COURT:  All right.  Now address the foundation.

25        MS. SCOVILLE:  Certainly.  If I may voir dire the
```

1    witness for another one or two questions, we might be able to

2    establish the foundation.

3         THE COURT:  You may.

4    BY MS. SCOVILLE:

5    Q.  Dr. Moore, during the time that you were the chief of the

6    trauma services at Denver Health, was the data in the trauma

7    registry prepared under your direction?

8    A.  Yes.

9         MS. SCOVILLE:  So, Your Honor, certainly with regard

10   to all of the data through 2012, the data was prepared under

11   Dr. Moore's direction.  He has also testified that he would

12   have seen the majority of the most serious gunshot wounds which

13   would be contained in that table.

14        THE COURT:  The objection is overruled.  The exhibit

15   is received.

16        (Exhibit 45 admitted.)

17   BY MS. SCOVILLE:

18   Q.  Dr. Moore, could you please turn to Exhibit 45.  And for

19   the deputy clerk -- I'm sorry, I can't tell you off the top of

20   my head which volume that exhibit is contained in.

21        COURTROOM DEPUTY:  I think it's in the one he has.

22        THE COURT:  Volume 5?

23        MS. SCOVILLE:  4-5, yes.

24   BY MS. SCOVILLE:

25   Q.  Dr. Moore, do you have Exhibit 45 in front of you?

 1  A.  Yes.

 2  Q.  All right.  Could you explain to us, first of all, what the

 3  term GSW refers to.

 4  A.  GSW is gunshot wound.

 5  Q.  All right.  So this table shows the number of people

 6  reporting to Denver Health with gunshot wounds from 1996

 7  through 2013; is that correct?

 8  A.  That's correct.

 9  Q.  And what does the column "Died in ED" mean?

10  A.  That means the patient was delivered to the emergency

11  department and died there and was not admitted to the hospital.

12  Q.  Could you explain for us, then, what the column labeled

13  "Gross Mortality" refers to.

14  A.  Gross mortality would include all patients that were

15  delivered to the hospital, whether they died in the emergency

16  department or within the hospital.

17  Q.  Now, these figures do not include anyone who was dead at

18  the scene, correct?

19  A.  That's correct.

20  Q.  And so if we included those numbers, how would that affect

21  the mortality figures here?

22  A.  Well, of course, it would likely go higher.  But we don't

23  know the number, of course.

24  Q.  Did anything about the -- this data in Exhibit 45 surprise

25  you?

1   *A.* Well, it did. As we discussed earlier, what surprised me

2   was the fact that, actually, the mortality rate, that is, the

3   rate of deaths from gunshot wounds, has increased during the

4   period we kept these records. Of which is somewhat of a

5   surprise to me, because our general management of trauma has

6   improved. And so it's a little disappointing to see that our

7   mortality actually increased in gunshot wounds.

8   *Q.* So in your personal experience, how does the trend for

9   mortality for gunshot wounds compare to the mortality rates for

10  other trauma-induced injuries?

11  *A.* Well, it's striking in that it has, if anything, increased;

12  whereas, mortalities from motor vehicle crashes has decreased,

13  for example.

14  *Q.* You can set Exhibit 45 aside, please.

15       Now, have you had the occasion to treat bystanders who

16  were not involved in a shooting directly but were nonetheless

17  injured by a bullet that missed its intended target?

18  *A.* Yes.

19  *Q.* And how common in your experience is that?

20  *A.* Well, that's difficult to say. It's not extremely common,

21  I would say.

22  *Q.* Are there any bystander victims that you've treated that

23  particularly stand out in your mind?

24  *A.* Well, generally, it's the real innocent population that

25  keeps in your mind. And I've seen a number of children shot

1    by -- as bystanders.

2    Q.   In your personal experience, what have you observed about

3    the difference in gunshot wounds in children versus gunshot

4    wounds in adults?

5    A.   Well, I'd say, of course, given the fact that children are

6    relatively small, and you have the same amount of energy from a

7    missile, that the injuries are more severe in children.

8    Q.   So in your personal experience, how does the severity of a

9    firearm -- a gunshot wound in children compare with the

10   severity of a firearm -- sorry, let me withdraw that question

11   and start over, please.

12            In your personal experience, how does the severity of

13   a firearm injury in children compare with the severity of other

14   trauma-induced injuries in children?

15   A.   Well, I would say that the same impression is that gunshot

16   wounds tend to have a higher mortality compared with other

17   modes of injury.

18   Q.   Now, when a patient comes in, can you tell what kind of a

19   bullet has caused the gunshot wound?

20   A.   No.

21   Q.   Does your work sometimes involve extracting the bullets

22   from patients?

23   A.   Yes.

24   Q.   And if you're not extracting a bullet from a patient, do

25   you have other ways that you come to learn which -- which kind

 1 | of bullet would have caused the wound?

 2 | A.  Well, often when the patient arrives, if there are police

 3 | involved, they will divulge what they believe is the weapon.

 4 | Many times that's not observed.  But if they see the weapon,

 5 | then they share that information with us, and we can infer in

 6 | many -- in many situations the relative magnitude of the

 7 | potential for killing, as a bullet -- smaller bullets tend to

 8 | remain within the body, where higher bullets tend to exit the

 9 | body.

10 | Q.  So is it important for your treatment of a patient to know

11 | what kind of bullet it is that caused the injury?

12 | A.  Yes, it's of interest to us, sure.

13 | Q.  And does the type of gun that's used make a difference in

14 | your treatment of a patient?

15 | A.  Yes.

16 | Q.  How so?

17 | A.  Well, again, the higher the energy capacity of the bullet

18 | that is shot, the higher the energy is in part of the tissue,

19 | and the more damage, in general.

20 | Q.  So have you observed over time any difference in the types

21 | of bullets that are causing the gunshot wounds that you see?

22 | A.  Well, again, I think that translates down to the energy

23 | imparted.  And rifles, for example, with larger bullets tend to

24 | impart more energy, as do shotguns, compared to handguns.

25 | Q.  Have you seen any particular trend that you have observed

1    in your practice over time about the types of bullets that

2    cause the gunshot wounds you see?

3    A.  Well, that's more recall.  It's difficult to, I think,

4    really quantitate that, because the data is so fragmented.  But

5    I would say in general what we typically see now are more

6    9-millimeter handguns.

7    Q.  So in your personal experience, are there certain types of

8    firearms that cause particularly lethal injuries?

9    A.  Well, I would say, certainly, rifle injuries, with larger

10   bullets, have the general capacity to do more tissue damage;

11   therefore, higher risk of lethality.

12   Q.  Now, why is it that a rifle bullet would cause more tissue

13   damage?

14   A.  Again, translates down to the amount of energy that is

15   imparted from the bullet.  So a rifle bullet, of course, has

16   more gunpowder and, therefore, greater potential to fire the

17   missile at a higher energy capacity.

18   Q.  Now, in addition to treating victims of gun violence, you

19   have some familiarity with firearms yourself, right?

20   A.  Yes.

21   Q.  All right.  What firearm do you personally own for

22   self-defense?

23   A.  I own a .44 magnum.

24   Q.  And --

25   A.  Revolver.

1  Q.  When you purchased that firearm, did you have the option to

2  choose a firearm with a larger magazine capacity?

3  A.  Yes.

4  Q.  And why did you choose the revolver?

5  A.  Because I didn't personally believe that I needed any more

6  than a limited number of shots.  Hopefully one.

7       MS. SCOVILLE:  I have no further questions.  Thank

8  you.

9       THE COURT:  Thank you.

10       Cross-examination.

11       MR. KRUMHOLZ:  Thank you, Your Honor.

12                      **CROSS-EXAMINATION**

13  BY MR. KRUMHOLZ:

14  Q.  Dr. Moore, it's nice to see you again.

15  A.  Likewise.

16  Q.  I asked you during *voir dire* about the data fields in the

17  trauma registry.  And I just wanted to confirm, there is

18  nothing in the trauma registry which indicates what kind of

19  firearm was used with respect to each patient; is that right?

20  A.  That's correct.

21  Q.  But as you said in your direct testimony, there are

22  individual cases where you might know something about the

23  firearm involved, correct?

24  A.  That's correct.

25  Q.  And that is often based on your discussions with police or

1    paramedics who responded to the scene, correct?

2    A.  Yes.

3    Q.  But even in those cases where you know, for example, that

4    it was a handgun, you might not know that -- whether it was a

5    revolver or a semiautomatic, correct?

6    A.  That's right.

7    Q.  Setting that aside, even though you may not know exactly

8    what type of firearm was involved, in each of the cases shown

9    on this table, Exhibit 45, it's been your experience as a

10   trauma care surgeon that the vast majority of gunshot wounds

11   are caused by handguns, correct?

12   A.  That's correct.

13   Q.  Now, you testified about the firearms you own -- well, one

14   firearm.  And that is for self-defense, correct?

15   A.  That's correct.

16   Q.  The .44 magnum?

17   A.  Yes.

18   Q.  And you once used that revolver to scare away an intruder,

19   correct?

20   A.  That's correct.

21   Q.  An intruder who was climbing in your house through the

22   window, correct?

23   A.  Yes.

24   Q.  And that intruder had a butcher knife, correct?

25   A.  Yes.

 1  *Q.*  And, thankfully, you didn't have to do anything but point

 2  the gun at him, and he was gone, correct?

 3  *A.*  That's right.

 4  *Q.*  Now, if we refer to the table, Exhibit 45 -- do you have

 5  that in front of you?

 6  *A.*  Yes.

 7  *Q.*  You don't know how many gunshot wounds each of these

 8  patients sustained, correct?

 9  *A.*  That's correct.

10  *Q.*  Because the trauma registry simply doesn't have records

11  encoded that way, correct?

12  *A.*  That's right.

13  *Q.*  And there is no surrogate that you could use from the

14  trauma registry that you think would be legitimate, correct?

15  *A.*  That's right.

16  *Q.*  For example, you could look at how many bullets in the

17  neck, chest, and abdomen; but the trouble is that you don't

18  know whether a single bullet went from the chest into the neck,

19  so you wouldn't consider that a safe surrogate, correct?

20  *A.*  That's right.

21  *Q.*  In other words, just because a trauma registry indicates

22  that the patient has a neck wound and a chest wound doesn't

23  mean he or she was shot twice, correct?

24  *A.*  Yes.

25  *Q.*  And as to your theory that the apparent trend that you talk

1   about in this table is due to multiple gunshot wounds, you have

2   no data to prove that theory, correct?

3   A.   That's correct.

4   Q.   In fact, you testified that your theory is based on pure

5   speculation, correct?

6   A.   Yes.

7        MS. SCOVILLE:   Objection, outside the scope.

8        THE COURT:   Overruled.

9   BY MR. KRUMHOLZ:

10  Q.   Dr. Moore, does this table have anything to say -- does it

11  suggest anything about the mortality rate from gunshot wounds

12  that came from guns with ten-round magazines versus

13  fifteen-round magazines?

14  A.   No.

15  Q.   In fact, it doesn't have -- it doesn't suggest anything

16  about mortality rate from -- from magazines of any size,

17  correct?

18  A.   That's correct.

19  Q.   Is there ever a case where you know the magazine size?

20  A.   Yes.

21  Q.   How often is that?

22  A.   Oh, I would say that's not common; but there are occasions

23  when we're told that.

24  Q.   Can you correlate the increased mortality rate that you

25  testified about on direct to any particular magazine size?

```
 1    A.  No.
 2    Q.  Now, you've talked about your own personal perception as a
 3    trauma care surgeon seeing gunshot wound victims coming into
 4    the trauma center, that you have personally observed an
 5    increase in the number of gunshot wound victims who have
 6    suffered multiple gunshot wounds, correct?
 7    A.  Yes.
 8    Q.  Doctor, do you remember a recent article from January
 9    addressing that topic in the Journal of Trauma and Acute Care
10    Surgery?
11    A.  I believe so.  The one from Newark?
12    Q.  Exactly.
13    A.  Yes.
14    Q.  And you are the editor of the Journal of Trauma and Acute
15    Care Surgery, correct?
16    A.  Yes.
17    Q.  As the editor of that journal, you have the final decision
18    on content, right?
19    A.  Publishing, yes.  Not necessarily content, publishing.
20    Q.  Which articles get published in the journal?
21    A.  Exactly.
22    Q.  Thank you for the clarification.  So you're generally
23    familiar with the content of each issue, correct?
24    A.  Yes.
25    Q.  And in the issue from this past January, there appeared in
```

1  your journal an article analyzing gunshot wound patients at a

2  Level 1 trauma center in Newark, New Jersey, correct?

3  *A.*  Yes.

4  *Q.*  And that article included some information on the number of

5  multiple gunshot wounds that had arrived at the trauma center

6  in Newark, correct?

7  *A.*  I don't remember that particular detail, but --

8  　　　　*MR. KRUMHOLZ:*  Your Honor, I have a --

9  *BY MR. KRUMHOLZ:*

10 *Q.*  Dr. Moore, I have a copy of that article.  Would it help

11 you to refresh your recollection if I were able to show it to

12 you?

13 *A.*  Sure.

14 　　　　*MR. KRUMHOLZ:*  Your Honor, may I have handed to

15 Dr. Moore a copy of that article?

16 　　　　*THE COURT:*  Yes, provided you provide opposing counsel

17 with a copy.

18 　　　　*MR. KRUMHOLZ:*  I will do so.  Thank you.

19 　　　　*THE COURT:*  Thank you.

20 　　　　*MR. KRUMHOLZ:*  Your Honor, do we need to mark it as an

21 exhibit?  I'm not intending to offer it.

22 　　　　*THE COURT:*  I understand.  It's probably a good idea

23 to mark it as an exhibit.

24 　　　　*MR. KRUMHOLZ:*  Ms. Glover, what number are we on?

25 　　　　*COURTROOM DEPUTY:*  We are at 137, is the next exhibit.

 1 |         MR. KRUMHOLZ:  Thank you.

 2 | BY MR. KRUMHOLZ:

 3 | Q.  Dr. Moore, I'd like to direct you to a particular page to

 4 | help you refresh your recollection.  If you could turn to page

 5 | 4.  Page 4, beginning with the words -- second full paragraph,

 6 | beginning with the words "There was a significant escalation."

 7 | If you could review that and tell us when you're ready to

 8 | proceed.

 9 | A.  Okay.

10 | Q.  If you could -- Dr. Moore, if you could now set aside that

11 | article, and I'll ask you a few questions.

12 |         Now, does that refresh your recollection that at the

13 | Newark, New Jersey trauma center, the percentage of gunshot

14 | victims with multiple gunshot wounds increased from 10 percent

15 | in 2000 to 23 percent in 2011.

16 | A.  Yes.

17 | Q.  And so it's -- it sounds like that finding in this article

18 | with regard to Newark, New Jersey matches your own personal

19 | perception of what you have seen as a trauma care surgeon here

20 | in Denver, correct?

21 | A.  Yes.

22 | Q.  Doctor, you don't know anything about the status of New

23 | Jersey's gun laws, do you?

24 | A.  No.

25 | Q.  So if I -- if I were to tell you that New Jersey has had a

 1 | magazine limit of ten since 1990, you would have no reason to

 2 | dispute that, correct?

 3 | A.  Sure.

 4 |         MR. KRUMHOLZ:  Thank you, Doctor.  I have nothing

 5 | further.

 6 |         THE COURT:  Thank you.

 7 |         Redirect?

 8 |         MR. KRUMHOLZ:  Your Honor, I'd like to make a

 9 | correction.  I just asked a question of Dr. Moore about the New

10 | Jersey magazine limit, and I suggested it was ten.  And I

11 | apologize, I was incorrect.  It's 15.

12 |         THE COURT:  Thank you.  It's not evidence in the

13 | record right now.

14 |         MR. KRUMHOLZ:  Thank you.

15 |         THE COURT:  Thank you.

16 |                    **REDIRECT EXAMINATION**

17 | BY MS. SCOVILLE:

18 | Q.  Dr. Moore, I'd like to ask you a couple of other questions

19 | about the article in the *Journal of Trauma Care* from

20 | January 2014.  Do you recall what the article's conclusion was

21 | about the correlation between the number of gunshot wounds and

22 | mortality?

23 | A.  Well, as I recall, the -- they suggested there was a

24 | correlation, that is that, with the observation of more gunshot

25 | wounds there was higher injury severity and higher mortality.

1   *Q.*  And was that correlation established to a degree of

2   scientific certainty?

3   *A.*  Statistically, it was, yes.

4   *Q.*  And did that article also indicate that gun violence

5   continues to be a major public health problem in the United

6   States?

7   *A.*  Yes.

8        *MS. SCOVILLE:*  I have no further questions.  Thank

9   you.

10       *THE COURT:*  Thank you.  Can this witness step down and

11  be excused?

12       *MS. SCOVILLE:*  He may.

13       *MR. KRUMHOLZ:*  No objection.

14       *THE COURT:*  Thank you very much.

15       Thank you, sir.  You may step down, and you are

16  excused.

17       I think we'll take our afternoon recess at this time,

18  the court clock is showing just about 3:15, and we'll stand in

19  recess until 3:30.

20       (Recess at 3:12 p.m.)

21       (In open court at 3:32 p.m.)

22       *THE COURT:*  Please call your next witness.

23       *MS. SPALDING:*  The state calls Lorne Kramer.

24       *THE COURT:*  Please step up and be sworn.

25

```
 1              (LORNE KRAMER, DEFENDANT'S WITNESS, SWORN)

 2              COURTROOM DEPUTY:  Please be seated.

 3              Please state your name and spell your first and last

 4    name for the record.

 5              THE WITNESS:  Lorne C. Kramer, K-R-A-M-E-R.

 6                         DIRECT EXAMINATION

 7    BY MS. SPALDING:

 8    Q.  Good afternoon, Mr. Kramer.

 9              THE COURT:  Just a minute.  Before you begin

10    examination, I think there is a record that needs to be made.

11              MR. ABBOTT:  Thank you, Your Honor.

12              The plaintiffs, again, would object to Mr. Kramer's

13    testimony because he didn't testify before the legislature, for

14    the same reasons we stated in our trial brief and before the

15    testimony of Mr. Montgomery.

16              THE COURT:  Thank you.

17    BY MS. SPALDING:

18    Q.  Good afternoon, Mr. Kramer.

19    A.  Good afternoon.

20    Q.  What's your occupation, sir?

21    A.  I'm a managing partner of a consulting firm called KRW

22    Associates.

23    Q.  What kind of work do you do as a consultant?

24    A.  Our primary focus is executive search, although we do some

25    organizational assessments, workshops, strategic planning.
```

 1  | Q.  How long have you been a consultant?

 2  | A.  In June, it will be seven years.

 3  | Q.  All right.  And in your prior life, before you became a

 4  | consultant, were you a law enforcement officer?

 5  | A.  I was.

 6  | Q.  When and where did your law enforcement career begin?

 7  | A.  Started in Los Angeles.  Joined the Los Angeles Police

 8  | Department in 1963.  I was there about 28 years.  Retired from

 9  | there as a commander, and took the job as the police chief in

10  | Colorado Springs.

11  | Q.  And what year did you begin as police chief in Colorado

12  | Springs?

13  | A.  1991.

14  | Q.  And how long did you hold that position?

15  | A.  Eleven years.

16  | Q.  So you left the job as chief in 2002; is that correct?

17  | A.  That's correct.  There was an interim period, I was both

18  | the city manager and the police chief for about six months.

19  | Q.  Okay.  I was about to ask you, did you hold any additional

20  | positions with the City of Colorado Springs?

21  | A.  For two years, while I was the police chief, the last two

22  | years, I was also a deputy city manager in addition to being

23  | police chief.

24  | Q.  All right.  Did you also at one point hold the position of

25  | city manager for Colorado Springs?

1    *A.*   Yes, I did.

2    *Q.*   And from when to when?

3    *A.*   The early part of 2002 to 2007.

4    *Q.*   All right.  Thank you.

5         Sir, when you were police chief in Colorado Springs,

6    were background checks required for the transfer of firearms?

7    *A.*   Only commercial sales from gun dealers at the time.

8    *Q.*   All right.  And that started in about 1994; would that be

9    about right?

10   *A.*   I believe that sounds right, yes.

11   *Q.*   All right.  And initially, anyway, in 1994, do you recall

12   who was prohibited from possessing firearms, pursuant to --

13   pursuant to law?

14   *A.*   Well, my recollection was, certainly, those convicted of a

15   felony, those who were deemed mentally ill, I think

16   undocumented aliens, those were some that come to my mind.

17   *Q.*   Okay.  Also anyone who was under domestic violence

18   retraining order, does that sound familiar?

19         *MR. ABBOTT:*  Objection, leading.

20         *THE COURT:*  Sustained.

21   *BY MS. SPALDING:*

22   *Q.*   Are there any other categories that you can think of, sir,

23   with respect to domestic violence?

24   *A.*   I don't -- my recollection is that domestic violence

25   statutes, prohibitions did not really come until later.  I

 1 | think it was the late '90s.

 2 | Q.  All right.  When you were chief, did the background check

 3 | requirement apply to all gun sales and transfers, or were there

 4 | some that were left out?

 5 | A.  If I understand the question, there -- gun shows were --

 6 |        MR. ABBOTT:  Objection, foundation.

 7 |        THE COURT:  Overruled.

 8 |        THE WITNESS:  At the time --

 9 |        THE COURT:  He can answer if he knows.

10 |        THE WITNESS:  At the time --

11 | BY MS. SPALDING:

12 | Q.  To your knowledge.

13 |        THE COURT:  You can an the question if you know the

14 | answer.

15 |        THE WITNESS:  If I understand the question, the gun

16 | sales -- purchases of guns at gun shows did not require a

17 | background at the time.

18 | BY MS. SPALDING:

19 | Q.  All right.  And did that change at some point?

20 | A.  It did.

21 | Q.  Okay.

22 | A.  There was a state initiative, I believe it was in 2000, as

23 | I recall, that did in fact require background checks at gun

24 | shows.

25 | Q.  All right.  At any time that you were chief, aside from

1    sales at gun shows, were private sales required -- private

2    sales or transfers required to conduct background checks?

3    A.   No.

4    Q.   All right.  Did you feel while you were chief that the

5    background check requirement had any value to law enforcement?

6    A.   Well, I thought the gun -- the legislation that required

7    background checks at gun shows was a positive step; although,

8    it did, in my view, leave the loophole of the sale privately of

9    guns and the transfer of guns.

10   Q.   And what concerns, if any, did you have about the loophole

11   for private sales or transfers?

12   A.   Well, I think that there -- you know, there is a market for

13   people looking to purchase guns who in fact are not legally

14   entitled to have guns.  And so the outlet was, private

15   transfer, private sale of guns.

16   Q.   All right.  And what was the issue in your view with the --

17   with the private sale of guns being left out of the background

18   check requirement?

19   A.   Well, as I stated earlier, I think that the restriction --

20   the requirement for background checks at gun shows was a

21   positive step.  But it did in fact leave a void for gun

22   transactions on the street, between private citizens,

23   particularly transferring guns to people who are not legally

24   entitled or authorized to own them.

25   Q.   All right.  And what was your concern, if any, respect to

1  people possessing firearms who were not legally qualified to

2  possess them?

3  A.  Well, in my view, it was clearly a public safety issue.

4  There was many, many instances where people who are really --

5  were really not authorized or legally entitled to own firearms

6  used them either in the commission of a crime or some other

7  illegal activity, including domestic violence.

8  Q.  Are you aware of any particular instances of individuals in

9  your jurisdiction while you were chief of committing crimes

10  with firearms when they were not legally authorized to possess

11  firearms?

12  A.  Yes.

13  Q.  Can you expand on that.

14  A.  Well, I mean, there were many, many instances.  I can't

15  give you specific dates and times.  But the one thing that in

16  our -- in our jurisdiction that we started to become very

17  concerned about was the lethality of domestic violence cases.

18       And many of those cases, as we started to look into

19  the background of the perpetrator, or the suspect, they were

20  either under a court order or had gone through some trying

21  domestic issue and had obtained a gun illegally from somewhere

22  outside of, you know, the legal ability to do so, such as an

23  FFL dealer or a gun show, where a background would be done.

24  Q.  All right.  Were there instances that you're aware of when

25  you were chief, when a person was assaulted or threatened with

1  a firearm by a partner or spouse who was disqualified from

2  firearm possession under the law?

3  *A.*   Yes.

4  *Q.*   When you were chief, did you take any steps to address this

5  particular issue with respect to domestic violence?

6  *A.*   We did.   We brought together a multi-jurisdictional task

7  force, which included human services representatives, District

8  Attorney's Office, probation department, pretty broad spectrum

9  of service providers, to look at the problem with the -- as I

10  said, the lethality of some cases, the repetitive nature of

11  many of those domestic violence cases, with the intent of

12  trying to divert or to intervene in future episodes.

13         In fact, we studied our calls for service and were

14  able to identify chronic locations where officers had

15  repeatedly responded to domestic violence cases.   And many of

16  those progressively got more violent, some of those involving

17  firearms.

18  *Q.*   Sir, are you familiar with the provisions of HB 1229, which

19  has now been enacted into law as 18-12-112?

20  *A.*   Yes.

21  *Q.*   And what's your understanding of this law?

22         *MR. ABBOTT:*   Ambiguous and overbroad.

23         *THE COURT:*   Sustained.

24  *BY MS. SPALDING:*

25  *Q.*   What's your understanding of the provisions of this law,

1   sir?

2           MR. ABBOTT:  Same objection.

3           THE COURT:  Do you care -- the objection is as to the

4   form of the question.  Do you care to rephrase?

5   BY MS. SPALDING:

6   Q.  What do you understand this law to require, sir?

7   A.  1229, my understanding is, restricts high-capacity

8   magazines after the legislation was enacted.

9   Q.  Okay.  I'm just going to represent to you that we're

10  talking about the background check bill.

11  A.  Is that 1224?

12  Q.  1229 is the background check --

13  A.  I'm sorry.  I had that reversed.  My mistake.

14  Q.  Okay.  We're just talking about the background check bill

15  now.

16  A.  Okay.

17  Q.  Tell me what your understanding is, if you have any, of the

18  requirements of 1229, which is the background check bill.

19  A.  Well, the background check requires background checks to be

20  completed on any purchase of a firearm after, I believe it was

21  beginning of 2013, after the legislation was enacted.

22  Q.  All right.  And did -- do the provisions of this bill, or

23  the requirements of this bill, satisfy your concerns when you

24  were chief about the gap in the requirement that background

25  checks be performed for transfer of firearms?

1  A.  Well, to a degree, yes.  I still think that it's --

2  obviously, it is not the fantasy.  It is not the end of the

3  problem, but I do think it was a positive step in the right

4  direction to require background checks.

5  Q.  Let me switch gears a little bit.  As chief, did you -- as

6  chief and as a law enforcement officer, you had occasion to

7  deal with gun violence, correct?

8  A.  Yes.

9  Q.  And as chief, were you aware of incidents that were -- of

10  circumstances involving the discharge of firearms by civilians?

11  A.  Yes.

12  Q.  How did you become aware of that information, as chief?

13  A.  Well, obviously, from cases that occurred, particularly

14  very violent cases, where shots were fired.  As the chief, I

15  would get a 24-hour report every morning of the more

16  significant issues or crimes that occurred or instances that

17  occurred throughout the day, a 24-hour period.  So I became

18  very aware of cases where shots were fired.  I -- being in the

19  field many times with officers or responding or rolling on

20  calls regarding -- relative to shots being fired.

21  Q.  All right.  And that would include incidents where a

22  shooter had used a large-capacity magazine, correct?

23  A.  Yes.

24  Q.  Can you recall any specific incidents that occurred while

25  you were chief in Colorado Springs, of incidents where a

1   shooter used a large-capacity magazine?

2   *A.*   Well, there were many.  But the one that really pops out to

3   me, or that I recall, was an incident that occurred at a bar in

4   the city of Colorado Springs, at Fillmore and North Nevada.

5   Involved an individual who had been kicked out of a bar, went

6   to his home, got a rifle with numerous rounds of ammunition,

7   had a couple of hand grenades, came back to the bar, went into

8   the bar and started firing.  Killed the bartender.  And as I

9   recall, another person was in fact fatally wounded, died

10  subsequently in the hospital.

11  *Q.*   Okay.  And did the shooter subsequently encounter police

12  officers?

13  *A.*   Yes.

14  *Q.*   And how did the incident conclude?

15  *A.*   The individual came out of the bar, still firing, and went

16  into a parking lot, as I recall, in the -- kind of the

17  northeastern parking lot behind the bar.  He had a vehicle

18  parked there.  And during the time -- our officers responded to

19  the 911 call.  And during the time there was a lull in the

20  firing, one of our officers approached his vehicle and looked

21  over the vehicle.  The suspect was in the process of trying to

22  insert another clip into the rifle, and our officer was able to

23  put the suspect down with a shotgun.

24  *Q.*   And what kind of rifle was the shooter using?

25  *A.*   I'm almost positive it was an AK-47.

 1   Q.  And do you recall the size of the magazines he was using?

 2   A.  Yes, they were 30 rounds, 30-round magazines.

 3   Q.  How many shots were fired by the shooter in that incident?

 4   A.  Well, I know that we recovered well over 100 casings at the

 5   scene.  So how many were fired, I'm not absolutely certain.

 6   Q.  And you indicated the shooter was firing at police outside,

 7   anyway, correct?

 8   A.  He did fire at the officers as he came out of the bar and

 9   went around behind the bar.  Fortunately, our officers had good

10   cover.

11   Q.  Were the rounds fired by the shooter confined to the area

12   where the police were located?

13   A.  No.  In fact, during the subsequent investigation, we found

14   rounds that had hit vehicles and some homes a couple of blocks

15   away.

16   Q.  I'm going to ask you a few questions about your own

17   personal safety.  Since you retired, have you taken any

18   measures for your own self-defense?

19   A.  Sure, yes.

20   Q.  What kind of steps have you taken to ensure your own

21   personal safety?

22   A.  Well, I guess the primary step is, I'm constantly aware of

23   my surroundings.  I do not expose myself to dangerous

24   situations.  I feel very confident about protecting myself and

25   my family.

1   *Q.*  As part of your self-defense measures, do you possess and

2   maintain firearms?

3   *A.*  Yes.

4   *Q.*  What firearms do you have that you regard as self-defense

5   weapons?

6   *A.*  I have a couple of shotguns, a couple of rifles, I think I

7   have 14 or 15 handguns.

8   *Q.*  And which of those firearms, if any, do you use for home

9   self-defense?

10   *A.*  My primary home defense weapon is a shotgun.

11   *Q.*  Why is a shotgun a home self-defense weapon?

12   *A.*  Well, in a very stressful situation, there is a lot of

13   advantages to a shotgun.  Point of fire, it's a weapon that you

14   can intimidate someone with, if they're a threat.

15   *Q.*  How about handguns, do you have handguns that you use for

16   self-defense?

17   *A.*  Yes.

18   *Q.*  What are those?

19   *A.*  I have a Ruger .380 that is a weapon I'm very confident

20   with, and I also have a Ruger 9 millimeter, small handguns.

21   *Q.*  All right.  And what -- do those firearms carry magazines?

22   *A.*  Yes.

23   *Q.*  And what is the magazine capacity, at least as a standard

24   matter, for the Ruger .380?

25   *A.*  Six rounds in the clip and one in the chamber.  Same with

1    the 9 millimeter.

2    *Q.*  Do you -- do you have occasion to carry either one of these

3    weapons concealed?

4    *A.*  Generally, not.  If I'm traveling, I might have a weapon

5    accessible in my vehicle; but as a rule, I don't carry a

6    concealed weapon.

7    *Q.*  But you do have a concealed carry license, don't you?

8    *A.*  I do.

9    *Q.*  All right.  In deciding what kind of weapon and the

10   magazines for the weapon to use for self-defense, what kind of

11   things did you take into consideration?

12   *A.*  I'm sorry, would you repeat the question?

13   *Q.*  Let me ask you a different question.  In deciding what kind

14   of weapons and magazines to use for self-defense, did you take

15   into account the dangers or threats faced by civilians that you

16   learned about as chief of police?

17   *A.*  Uh-huh.

18   *Q.*  And let me take you back to Los Angeles as well.  When you

19   were with the LAPD for -- from '63 to about 1991, did you have

20   occasion to obtain information concerning events when civilians

21   had fired shots in self-defense?

22   *A.*  Yes.

23   *Q.*  And I assume that you had various positions.  I think you

24   said that you left as a command from the LAPD, correct?

25   *A.*  Correct.

1 │ *Q.* So you had various positions within the LAPD?

2 │ *A.* I did.

3 │ *Q.* Can you explain how in the various positions you held with

4 │ the LAPD you learned about incidents in which civilians fired

5 │ weapons in self-defense?

6 │ *A.* Some of those were instances where, as a detective, I had

7 │ handled personally with my partner. Some were as a result --

8 │ as a field officer, responding to calls for service. Some were

9 │ similar to when I was the police chief, reading daily instances

10 │ of events that had occurred throughout the day.

11 │ *Q.* All right. And in -- and in all of those positions -- and

12 │ I'm referring now to the LAPD, the time that you were with the

13 │ LAPD -- would the information that you received have included

14 │ the number of shots fired in self-defense?

15 │ *A.* Yes.

16 │ *Q.* And the same when you were a police chief in Colorado

17 │ Springs, would the information you received then have included

18 │ the number of shots that were fired by a civilian in

19 │ self-defense?

20 │ *A.* Yes.

21 │ *Q.* All right. In the -- in all the time that you've been --

22 │ were a law enforcement officer, sir, between Los Angeles and

23 │ Colorado Springs, was there ever a time that you are aware of

24 │ which citizen fired more than 15 rounds in self-defense?

25 │ *A.* No, I cannot think of an instance like that at all.

1   Q.   How about ten rounds?

2   A.   No.

3   Q.   Five?

4   A.   I think three to five, I can recall some instances where --

5   in a defensive situation, a citizen fired three to five rounds.

6   Q.   All right.  And in determining what kind of firearms you

7   might need for self-defense, did you take into account the fact

8   that throughout your career, you had never heard of occasion

9   when any civilian required more than 15 rounds to defend

10  themselves?

11  A.   Well, my sole purpose for -- if I may answer the question

12  this way:  My sole purpose for having a weapon available is

13  defensive.  And I feel very confident with my own ability to

14  not need multiple rounds to fire in a defensive situation.

15  Q.   All right.

16  A.   I feel very confident with the weapons that I have.  I have

17  weapons that have more than six or seven rounds, but I don't

18  feel a need to carry them.

19  Q.   All right.  In your career as a law enforcement officer,

20  you've been aware, haven't you, of the dangers that law

21  enforcement officers face?

22  A.   Yes.

23  Q.   And in making your choice concerning the weapons that you

24  felt that you needed for self-defense after you retired, did

25  you consider the dangers that police officers face?

1   *A.*  Yes.

2   *Q.*  Can you explain that a little bit.

3   *A.*  Well, I think police officers and their safety, much like

4   citizens, are at much higher risk when someone they're

5   encountering has multiple rounds that they can fire quickly.

6   *Q.*  Do police officers face the same risk as civilians?

7   *A.*  No.

8   *Q.*  Okay.  And what do police officers do that has them

9   encountering risks that civilians do not face?

10  *A.*  Well, police officers are faced with the challenge of

11  arresting people, pursuing people, many of those are very

12  dangerous people.  They take more of an offensive position in

13  enforcing law and encountering those types of people.  In

14  contrast, a citizen is not pursuing criminals, they are not

15  pursuing dangerous people; they're protecting themselves or

16  some other person.

17  *Q.*  And as a retired law enforcement officer, you weren't going

18  to be engaging in the same type of activities that police --

19  that law enforcement officials face on a daily basis, correct?

20  *A.*  That's correct.

21  *Q.*  Sir, do you feel that you have an increased risk of danger

22  beyond the risks faced by civilians who do not serve or have

23  not served in law enforcement capacity?

24  *A.*  I think I do, yes.

25  *Q.*  Okay.  And you feel you've armed yourself accordingly to

1   face whatever risks you may face as a retired law enforcement

2   officer?

3   A.   Yes.

4   Q.   Did you ever consider arming yourself with weapons that

5   carry large-capacity magazines?  And by that I mean, a magazine

6   that carries more than 15 rounds?

7   A.   The only time that I use a weapon with a magazine higher

8   than six or seven rounds is when I go to the firing range to

9   keep my skills.

10          MS. SPALDING:  That's all I have for you, sir.  Thank

11   you very much.

12          THE COURT:  Cross-examination.

13          MR. ABBOTT:  Yes, Your Honor.  Thank you.

14                   **CROSS-EXAMINATION**

15   BY MR. ABBOTT:

16   Q.   Mr. Kramer, let me ask you just a few questions about some

17   things you were asked on direct examination.

18          You talked about this one incident in Colorado Springs

19   where a person was armed with multiple weapons, an AK-47, I

20   think you said?

21   A.   Yes.

22   Q.   AK-47 is a fully automatic weapon, correct?

23   A.   It is, yes.

24   Q.   Okay.  And I apologize, because I couldn't write as fast as

25   you were talking.  He had just one AK-47?

1  *A.* My -- well, I don't recall what he had in his vehicle. He

2  only had one on him. I think he had a sidearm also, but I

3  think he only had one rifle, as I recall.

4  *Q.* And grenades, did you say?

5  *A.* I think there were two grenades, yes.

6  *Q.* And he actually shot at police officers?

7  *A.* As he was coming out of the bar, going around the -- to the

8  back of the bar, there were shots fired when the officers were

9  there, yes.

10  *Q.* Okay. And he was -- he was shot by an officer; is that

11  correct?

12  *A.* Yes. He was.

13  *Q.* But he survived?

14  *A.* He did.

15  *Q.* Okay. And stood trial for what he did, correct?

16  *A.* Yes, sir, he did.

17  *Q.* And was acquitted, correct?

18  *A.* I recall -- I think you're right, he was.

19  *Q.* On the grounds of self-defense, correct?

20  *A.* Yes.

21  *Q.* Thank you.

22  You were asked also about whether you were familiar

23  with the provisions of 1229. And I will refer to it as 1229.

24  It's the background check provision.

25  *A.* Yes.

1   Q.  And you were asked a question, what does -- generally, what

2   does it require?  And you said background checks completed on

3   any transfer.  What do you mean by that?  What -- what is your

4   understanding of what sorts of transactions require a

5   background check under 1229?

6   A.  I know there are some exceptions where the transfer can be

7   on a temporary basis or between family members, et cetera.  But

8   what am referring to is the actual sale or a transaction where

9   you transfer ownership of the weapon to another person.

10  Q.  Okay.  And is that your understanding of -- is that your

11  full understanding as you sit here today of what is required or

12  what circumstances require background checks under 1229?

13  A.  Basically.  I know there are some exceptions where there

14  can be a temporary transfer under certain circumstances between

15  a person who owns a weapon and some other person.

16  Q.  Okay.  But you -- in your prior answer, you used the word

17  "sale."  Do you understand that background checks are required

18  under 1229, setting aside any exceptions.  But when background

19  checks are required, is it your understanding it applies only

20  to sales?

21  A.  Sales are -- as I read the statute -- and I did read it a

22  month or so ago -- is that when you transfer possession,

23  permanent possession of a firearm to someone else -- I don't

24  know if sale is the right word, quite honestly.

25  Q.  Okay.  But a transfer, whether it's for money or something

1    else, it's a transfer of permanent possession, is your

2    understanding?

3    *A.*   Yes.

4    *Q.*   Okay.  Thank you.

5         And, obviously, the lead-in question to that by both

6    me and counsel for the other side was that you're familiar with

7    the provisions of 1229.  Did I hear you to say that you read it

8    for the first time a month ago?

9    *A.*   Maybe a little more than a month, maybe six weeks ago.

10   *Q.*   Okay.  So you had -- you were in favor of the private

11   background checks that were going to be mandated by 1229 before

12   you had read it, correct?

13   *A.*   Yes.

14   *Q.*   Okay.  And so is it fair to say, you were in favor of the

15   provisions -- you were in favor of private background checks,

16   but not familiar until you read it a month or so ago with the

17   exact mechanics of 1229 or what it required or didn't require

18   in detail?

19   *A.*   I was familiar enough with the statute prior to me reading

20   the actual act to be comfortable with what it -- what its

21   intent was.

22   *Q.*   Okay.  You said -- and its intent being, as you just

23   described it, background checks for permanent transfers of

24   firearms?

25   *A.*   Yes, sir.

1   Q.  Okay.  You said when you were talking about the incident in

2   the bar in Colorado Springs and you were asked if -- about

3   events where a civilian fired more than 15 rounds in your

4   career as a police officer -- or I guess, in that sense -- in

5   that instance we were just talking about Colorado Springs.  And

6   you said, quote, There were many, but one sticks out in my

7   mind.  Correct?

8   A.  Yes, sir.

9   Q.  I think I quoted you pretty accurately there.  How many?

10  A.  You know, I would hesitate to guess, because I'm not

11  certain.  It was many.

12  Q.  You don't have a number?

13  A.  No.

14  Q.  And I think you'll agree with me that the event you

15  described today is the same event you described to me when we

16  spoke last fall, correct?

17  A.  Yes, sir.

18  Q.  And at that time I asked you if you could recall any

19  others, and you said you could not, correct?

20  A.  None specific, no.  That's correct.

21  Q.  And is that still true, sir?

22  A.  Yes.

23  Q.  So as -- the Colorado Springs police chief for eleven

24  years, you believe there were many instances where civilians

25  fired more than 15.  But as you sit here today, you can only

 1   recall one; is that correct?

 2   *A.*   I -- I have a recollection of many; but specifics, I cannot

 3   cite them for you.

 4   *Q.*   Okay.  And you were a police chief -- not police chief,

 5   sorry.  You were a police officer in one capacity or another

 6   for 28 years in Los Angeles, correct?

 7   *A.*   Yes, sir.

 8   *Q.*   At the time we spoke last fall, I asked you the same

 9   question related to Los Angeles.  And you described to me one

10   event where an officer was killed.  Do you recall that?

11   *A.*   I do.

12   *Q.*   And the type of weapon used in that event was an Uzi?

13   *A.*   That's correct.

14   *Q.*   And an Uzi is a fully automatic weapon?

15   *A.*   It is.

16   *Q.*   And I asked you a very similar set of circumstances with

17   regard to Los Angeles.  And I take it you'll agree with me that

18   the total number of gun crimes in Los Angeles with which you

19   are familiar is a much larger number in total than the number

20   in Colorado Springs, Colorado?

21   *A.*   Yes, it is.

22   *Q.*   Okay.  And I asked you a similar set of questions about the

23   number of events that you could recall in your career, 28 years

24   in Los Angeles Police Department, of how many times a person

25   fired a weapon with more than 15 rounds or fired more than 15

1  rounds.  And the event you just described to me where a police

2  officer was killed with an Uzi was in fact the one and only one

3  you could recall as well, correct?

4  A.  It was the only one at that time that I could recall

5  specifically, yes.

6  Q.  Are there more you can recall specifically today?

7  A.  Well, going all the way back to 1965, during the Watts

8  riots, I can -- yes, 1967 riots, the Symbionese Liberation

9  Party shootout on 54th Street.  There are -- those are some

10  very, very dramatic instances I recall very specifically.  I

11  think I mentioned to you also at that time that I was a SWAT

12  commander for three years, and I'm very familiar with

13  situations where very armed and dangerous criminals who had

14  fired many rounds were taken into custody.

15  Q.  Okay.  I appreciate that, sir.  But I was trying to get to

16  whether you can give us a specific event where you know from

17  your personal knowledge that a specific individual fired more

18  than 15 rounds.

19  A.  With that specificity, no, I cannot.

20  Q.  Okay.  And that includes even those you described with the

21  Symbionese Liberation Army or anything else, correct?

22  A.  Correct.

23  Q.  So we have with 39 years in your career as a police

24  officer, although you believe there may be more, you can

25  specifically only name two instances where someone fired more

 1   than 15 shots, correct?

 2   *A.*   That's correct.

 3   *Q.*   Okay.  It's true, is it not, sir, that when -- you

 4   understand that House Bill 1224 -- now I'm going to switch

 5   gears for a little bit here.  House Bill 1224, which is the

 6   bill that is the magazine limit --

 7   *A.*   Yes, sir.

 8   *Q.*   Okay.  At the time we spoke last fall, you had not read

 9   that bill either; is that correct?

10   *A.*   Yes.

11   *Q.*   Have you read it since?

12   *A.*   Yes, I have.

13        *MS. SPALDING:*  Objection, beyond the scope.

14        *THE COURT:*  Response.

15        *MR. ABBOTT:*  He was asked a significant number of

16   questions on direct examination about the magazine capacity

17   limit -- the firearms that he carries, what he feels

18   comfortable with, what size magazines he believes are -- you

19   know, use of magazines in other -- by others in crimes, all of

20   that.  I think that opens the door to questioning him about

21   whether or not fifteen rounds or ten rounds or whatever number

22   we'd like to talk about is adequate or not adequate in

23   different situations, particularly since he also said he based

24   his decision on threats faced by civilians and others.

25        *THE COURT:*  Reply.

1         *MS. SPALDING:*  He was not asked about the bill.  He

2  was asked about considerations that -- or things that he took

3  into consideration with respect to arming himself for his own

4  personal safety.

5         *THE COURT:*  Thank you.

6         I sustain in part and overrule in part.  The witness

7  can testify as to his experience, his assessment, and his

8  decisions.  He was not questioned about the effect or

9  interpretation of this particular statute.

10        *MR. ABBOTT:*  Okay.  Thank you, Your Honor.

11 *BY MR. ABBOTT:*

12 *Q.*  Sir, you understand, do you not, that the capacity

13 limitation in the bill is 15 rounds?

14 *A.*  Yes, sir.

15 *Q.*  Okay.  You also understand that in a prior iteration, it

16 was ten rounds before it was amended to fifteen.

17        *MS. SPALDING:*  Same objection, Your Honor.

18        *THE COURT:*  Sustained.

19 *BY MR. ABBOTT:*

20 *Q.*  Sir, it's a fact, is it not, that you, personally, do not

21 consider ten rounds to be an adequate number of rounds?

22 *A.*  I --

23        *MS. SPALDING:*  Objection, Your Honor.  I -- the

24 question is vague.

25        *THE COURT:*  The objection is to the form of the

1  question.  Do you care to revise?

2  *BY MR. ABBOTT:*

3  *Q.*  When considering the number of rounds that you believe is

4  adequate for personal protection, you do not believe that ten

5  rounds is an adequate number of rounds, correct?

6  *A.*  Initially, I thought that ten rounds was overly

7  restrictive; then I thought it would be very difficult to

8  enforce.

9  *Q.*  Because you do not personally believe that ten rounds is an

10  adequate number of rounds for protection, correct?

11  *A.*  No, that's not correct.

12  *Q.*  Okay.

13      Could I ask Ms. Glover to hand Mr. Kramer his

14  deposition.

15      *THE COURT:*  Do you have it?

16      *MR. ABBOTT:*  Do you have it, sir?

17      *THE WITNESS:*  Yes, sir.

18  *BY MR. ABBOTT:*

19  *Q.*  Could I ask you to turn to page 22.

20  *A.*  I have it.

21  *Q.*  Okay.  Let me ask you to turn to page 21 first.

22      Do you see where I asked you starting on line 12, I

23  asked you:  "Did you support HB 1224 in its prior form when it

24  was a ten-round limit before it was passed?"  And you answered,

25  "No," correct?

 1 | *A.*  Yes, sir.

 2 |      *THE COURT:*  I'm sorry, are you saying something?

 3 |      *MS. SPALDING:*  Yes, Your Honor.  Objection, beyond the

 4 | scope.

 5 |      *THE COURT:*  Response.

 6 |      *MR. ABBOTT:*  I can get to the same place.  I mean,

 7 | your Honor, he's testifying about his own personal safety.  The

 8 | questions in the deposition were in the context of 1224, but

 9 | the issue is whether he personally believes that ten rounds is

10 | an adequate number of rounds.

11 |      *THE COURT:*  I assume that you're using this deposition

12 | for impeachment purposes, in which event you must identify the

13 | statement you believe is inconsistent with the witness's

14 | testimony.  What you just read is not inconsistent.

15 |      *MR. ABBOTT:*  Apologize, Your Honor.

16 | *BY MR. ABBOTT:*

17 | *Q.*  Let me go, then, specifically to the question about, you

18 | did not believe ten rounds is an adequate number of rounds.

19 | Okay.

20 |      If I could ask you to look at page 22, lines 12 and

21 | 13.  Do you see there, sir, where you gave the answer, "Ten

22 | rounds is not an adequate number of rounds"?

23 |      *MS. SPALDING:*  Your Honor --

24 |      *THE WITNESS:*  Yes.

25 |      *MS. SPALDING:*  I'm sorry.  I object to the relevance.

 1  │ We don't have a ten-round restriction here.

 2  │         THE COURT:  Overruled.  This is for impeachment

 3  │ purposes.  It's for the purpose of testing this witness's

 4  │ credibility.

 5  │         MS. SPALDING:  Thank you, Your Honor.

 6  │ BY MR. ABBOTT:

 7  │ Q.  It's true, is it not, sir, that --

 8  │         THE COURT:  Counsel, are you finished with the

 9  │ deposition?

10  │         MR. ABBOTT:  Yes, I am.

11  │         THE COURT:  All right.

12  │         Thank you, Ms. Glover.

13  │ BY MR. ABBOTT:

14  │ Q.  You do, however, sir, believe that 15 rounds is adequate,

15  │ correct?

16  │ A.  Yes.

17  │ Q.  But that was not a number that you had come to on your own

18  │ prior to it being the number included in this legislation;

19  │ isn't that true?

20  │         MS. SPALDING:  Objection, Your Honor, beyond the

21  │ scope.

22  │         THE COURT:  Overruled.

23  │         THE WITNESS:  I don't -- I guess my answer would be, I

24  │ don't think before the legislation I had any feelings one way

25  │ or the other.

1  *BY MR. ABBOTT:*

2  *Q.*  Okay.  Is it true, sir, that in your 39 years in law

3  enforcement and your experience with crimes involving firearms

4  in both Los Angeles and Colorado Springs, that as a percent of

5  total crimes, the crimes that use magazines greater than 15

6  rounds is, quote, relatively small?

7  *A.*  I would agree, yes.

8  *Q.*  Can you give me a percentage of how small?

9  *A.*  No.

10  *Q.*  But it's your experience, however, that the typical person,

11  typical criminal, does not carry a weapon with a large-capacity

12  magazine, correct?

13  *A.*  Different types of criminals do.  Typical street criminal

14  does not.

15  *Q.*  In your -- you testified about how you assess risks to

16  citizens as part of your decision making for your own

17  protection and your familiarity with citizens and firearms over

18  39 years in law enforcement.  Let me ask you this:  Have you --

19  did some of that experience include experience with home

20  invasions?

21  *A.*  Yes, sir.

22  *Q.*  And have you had experience where homeowners got in

23  firefights or gunfire was exchanged with home invaders?

24  *A.*  Yes, sir.

25  *Q.*  And that -- did you experience situations where the home

1    invader was in fact injured or killed by the homeowner?

2    A.  Yes, sir.

3    Q.  And is it not true that you cannot name an instance where

4    the opposite is true, where the homeowner was killed?

5    A.  I can't name one.  I'm -- I recall there were some, at

6    least one or two that I can recall.

7    Q.  Can you tell us when those were, where those were, who that

8    was, anything like that?

9    A.  No, I cannot.

10   Q.  Okay.  And is it not also true that in your experience, in

11   39 years, that home invasions often involve, or typically

12   involve, more than one person?

13   A.  That -- I will say that's correct, yes.

14   Q.  And is it not also true that most home invasions involve

15   the perpetrators are armed with some kind of weapon?

16   A.  I don't know if "most" would be the right definition, but

17   many do.

18   Q.  Do you disagree with "most"?

19   A.  I -- "most" to me would be almost all, and I don't know

20   that that's accurate.  I --

21   Q.  More than half?

22   A.  It would be a guess.  And I don't know.

23   Q.  Okay.  So you do disagree with most, most home invaders are

24   armed?

25            MS. SPALDING:  Objection, Your Honor.  Asked and

1   answered.

2        THE COURT:  Response.

3        MR. ABBOTT:  Well, before I go to the trouble of

4   giving him his deposition again, I just wanted to make sure

5   whether he truly does disagree with the characterization that

6   most invaders are armed.

7        THE COURT:  He's defined this based on his definition.

8   He's answered the question.  I sustain the objection.

9        MR. ABBOTT:  Okay.

10  BY MR. ABBOTT:

11  Q.  You -- when we were talking last fall about your support

12  for private background checks, you mentioned as one of the

13  reasons why you thought it was necessary to close the loophole,

14  that 40 percent of guns used in crimes were obtained by some

15  method other than one that required a background check.  Do you

16  recall that?

17  A.  I do, yes.

18  Q.  And you recall that number?

19  A.  Yes, I do.

20  Q.  Now, I can represent to you that in the legislative history

21  of this bill, that number is also used with some frequency.  Do

22  you know where it's from?

23  A.  My recollection is that it came from a Department of

24  Justice -- a U.S. Department of Justice either report or study.

25  That's my recollection.

1   Q.  Do you know what data it's based on?

2   A.  No.  Off the top of my head, I do not.

3   Q.  Have you done anything to verify whether or not that number

4   is a good number or bad number?

5   A.  No, sir.

6   Q.  Or accurate?

7   A.  No, sir.

8   Q.  Are you aware of any other numbers put out by any other

9   source of percentage?

10  A.  Not that I'm aware of, no.

11  Q.  Okay.  So you don't know if the true number is 10 percent

12  or 15 or 40, you don't really know, correct?

13  A.  Correct.

14  Q.  Okay.  Does it matter to you whether that number is

15  accurate, in your view of the necessity of private sale

16  background checks?

17  A.  It's important for me personally to know what the accurate

18  number is.  I've always believed that that was the accurate

19  number, based on some surveys or studies that were done.

20  Q.  Does it matter to you as a citizen whether or not -- what

21  step the legislature took to determine if that number is

22  accurate?

23  A.  Only from a standpoint of, would like to have confidence

24  it's an accurate number.

25  Q.  Okay.  Do you know what, if any, steps the legislature took

1   to determine if that is an accurate number?

2           *MS. SPALDING:*  Objection, foundation.

3           *THE COURT:*  Sustained.

4           *MS. SPALDING:*  And relevance as well.

5           *THE COURT:*  I sustain on foundation.

6   BY MR. ABBOTT:

7   *Q.*  You talked about -- I think you used the word "loophole,"

8   that the private sale background checks were intended to close

9   a loophole.   True?

10  *A.*   Yes.

11  *Q.*  And that loophole was that some percentage of guns obtained

12  by people who were not legally qualified to own guns were

13  acquired by some means that did not require a background check

14  under existing law.   True?

15  *A.*   True.

16  *Q.*  How do you judge -- if you're in favor of that happening,

17  how do you judge the success of that?  How do you judge the

18  success of whether the loophole has been closed?

19  *A.*   Well, I would imagine it would be time and data in future

20  years, particularly of those individuals who do commit crimes

21  with guns and tracing back where they actually received them or

22  purchased them or got them.

23  *Q.*   Okay.  Would that data that you're talking about include

24  whether or not there are in fact an -- whether in fact

25  private -- there is an increase in private background checks

1   for private party transfers?

2   *A.* I'm sorry, I'm not sure I understand.

3   *Q.* Yeah, that was a bad question. Took me too long to ask it.

4        Would part of your evaluation of whether this was a

5   success or not, would logically include, would it not, whether

6   or not there actually were people getting background checks for

7   private sales?

8   *A.* Yes.

9   *Q.* Okay. And have you done anything yourself, asked any

10  questions or anything, to determine whether or not there

11  actually has been some increase in the number of private party

12  background checks?

13       *MS. SPALDING:* Object to the form of the question,

14  Your Honor -- I'm sorry. Object to the form of the question.

15       *THE COURT:* Do you care to rephrase?

16       *MR. ABBOTT:* I can try it again.

17  *BY MR. ABBOTT:*

18  *Q.* Have you, yourself, sir, done anything to investigate

19  whether or not after the passage of this bill, which has now

20  been nine months, roughly, whether there has been some increase

21  in the number of private party background checks?

22  *A.* No, I have not.

23  *Q.* Okay. Now, you talked a bit about your understanding of

24  the scope of 1229 and that it only applied to permanent

25  transfers, correct?

1  *A.*  Yes, sir.

2  *Q.*  And do you remember last fall when we spoke, I asked you

3  about what you thought -- since you were talking about your

4  views of background checks, I asked you what you thought about

5  if the law required a background check for a loan to someone

6  you know, and I get -- do you recall I asked you the -- I

7  posited to you the scenario of loaning it to a ranch hand to go

8  out and guard the sheep from coyotes.  Do you recall that?

9  *A.*  Yes, I do.

10  *Q.*  I asked you if you thought there ought to be a background

11  check in that scenario.  Do you recall that?

12  *A.*  I do.

13  *Q.*  Do you recall what your answer to me was?

14  *A.*  As I recall, my answer was that that just didn't make any

15  common sense to me.

16  *Q.*  Okay.

17      *MR. ABBOTT:*  That's all I have, sir.  Thank you very

18  much.

19      *THE COURT:*  Thank you.

20      Redirect?

21      *MS. SPALDING:*  I have no more questions, Your Honor.

22      *THE COURT:*  Can this witness step down and be excused?

23      *MS. SPALDING:*  Yes, Your Honor.

24      *MR. ABBOTT:*  Yes, Your Honor.

25      *THE COURT:*  Thank you, sir.  You may step down.  You

```
 1   are excused.

 2          Do you care to call another witness?

 3          MS. SCOVILLE:  Your Honor, Director Sloan is here for

 4   the continuation of his cross-examination from last Friday.

 5          THE COURT:  All right.

 6          Please retake the stand.  You remain under oath.

 7          (RONALD SLOAN, DEFENDANT'S WITNESS, SWORN)

 8          CROSS-EXAMINATION CONTINUED

 9   BY MR. KOPEL:

10   Q.  Good afternoon, Mr. Sloan.

11   A.  Good afternoon.

12   Q.  Thank you for coming back.  We will try to move rapidly and

13   get you wrapped up by around 5 o'clock.

14          We were -- when we last talked, you were explaining

15   the particular different databases that CBI checks as part of a

16   gun sale or issuing a concealed carry permit.  So I'd -- if

17   could, I'll just ask about them, if you could describe them,

18   and then we'll go to the next one.  It's called the Colorado

19   Crime Information Center; is that one?

20   A.  Yes.

21   Q.  Okay.  Could you describe what is in that?

22   A.  I can't comprehensively describe what's in the Colorado

23   Crime Information Center.  I can give you examples of what I

24   know is in it, but I can't comprehensively cover everything,

25   because I'm not familiar --
```

1    Q.   Just the best you can, with perfection not required.

2    A.   I know that Colorado Crime Information Center is the portal

3    through which we access the Colorado criminal history records

4    on arrested and convicted individuals in the state of Colorado.

5    There is also -- we access Department of Motor Vehicle files

6    and registration files and driver records, driver's license

7    records, on records systems through that -- through the CCIC

8    system.  We also access information on -- on warrants for

9    individuals' arrests, hot files on stolen property and the

10   like.

11       Also through CCIC, we can access information regarding

12   Colorado sex offender registry, and we can access information

13   from Colorado judicial, in terms of issued protection orders

14   and restraining orders.  There are other similar records that

15   can be accessed through the CCIC.

16   Q.   Okay.  Would CC also have protection orders or restraining

17   orders?

18   A.   Yes, I believe that's one of the things I mentioned.

19   Q.   I'm sorry.  I missed that.  Active warrants?

20   A.   Yes.

21   Q.   And parole or probation clients?

22   A.   Yes.

23   Q.   Okay.  And CBI is in charge of the CCIC; is that correct?

24   A.   Yes, we are the terminal control agency for CCIC.

25   Q.   Okay.  And yesterday -- Friday we talked about the National

1   Crime Information Center run by the FBI.  And you've given a

2   pretty thorough description of that, so we'll move on unless

3   there is anything you wanted to add on that.

4   *A.*  Okay.

5   *Q.*  Okay.  The I.I.I., Interstate Identification Index, can you

6   describe that, please.

7   *A.*  I cannot.  I do know that there is information that we

8   access in triple I, but I would not be the individual that

9   could give you detailed information.  I do not personally

10  utilize triple I.

11  *Q.*  Is I.I.I. an FBI database, to your knowledge?

12  *A.*  It is my understanding is it's maintained by the FBI.

13  *Q.*  Do you know if it's fingerprint based?

14  *A.*  I do not know.

15  *Q.*  Do you know when somebody says, we wanted his rap sheet, if

16  they're typically talking about the I.I.I.?

17  *A.*  Well, I know what is referred to as a rap sheet is criminal

18  history record, basically, is what it is.  And I know that you

19  can access national criminal history records through NCIC.  You

20  may very well be able to access them through I.I.I. with

21  additional information provided through the interstate

22  identification index.

23  *Q.*  Okay.  But you do know that it's -- tell me if I've got

24  this correct:  Do you know one way or another, whether it's

25  directly or through some other federal database, when CBI does

1    a background check on a gun sale or a carry permit, that I.I.I.

2    is asked for information.

3    *A.*   I do know that, yes, sir.

4    *Q.*   Okay.  Great.

5         Okay.  The National Instant Criminal Background Check

6    system, who runs that?

7    *A.*   The FBI runs that.

8    *Q.*   Okay.  Could you describe to the best you can what's in

9    that.

10   *A.*   Again, I am not intimately familiar with what information

11   is contained in the National Instant Background Check system,

12   and that is what the NICS index is.

13   *Q.*   Okay.  Do you know if it has information from immigrations

14   and customs enforcement about illegal aliens?

15   *A.*   I am not intimately familiar with whether or not the

16   immigrations and customs enforcement immigration database or

17   databases are accessed through NICS or whether they're actually

18   accessed separately; but I do know they are accessed for a

19   firearms background check.

20   *Q.*   Okay.  So you know -- one way or another, it's asked, but

21   you're not just not sure whether it's NICS or some other

22   medium?

23   *A.*   I do not know the conduit through which they are accessed.

24   *Q.*   Sure.  Would that, likewise, be true for dishonorable

25   discharges from the military, that you know they're accessed,

1  but you're not sure whether it's NICS or some other mode?

2  A.  That would be correct.

3  Q.  Okay.  Likewise, for people who renounce their citizenship?

4  A.  Well, I know that is through the immigration databases that

5  that is accessed.

6  Q.  Okay.

7  A.  Again, I don't know the exact route that is accessed.

8  Q.  You don't know if they feed into NICS itself or not?

9  A.  Exactly.

10  Q.  What is Colorado PAS?

11  A.  That is the Colorado judicial database system through which

12  InstaCheck checks Colorado judicial files, through the Colorado

13  PAS, what's referred to Colorado PAS.

14  Q.  Does that have juvenile felony adjudications in it?

15  A.  I can't answer that.  I am not sure on that.

16  Q.  If I told you Mr. Spoden said that in deposition, would you

17  believe me?

18  A.  I would definitely believe you.

19  Q.  Misdemeanor crimes, do you know if that's in PAS?

20  A.  I do not know.

21  Q.  Do you know if domestic violence convictions are in PAS?

22  A.  They are.

23  Q.  Okay.  And do you know if mental health adjudications are

24  in there?

25  A.  My understanding is they are accessed through CCIC.  And

1  they may be accessed through Colorado judicial, or PAS.  I'm

2  not sure on that.

3  *Q.*  Have we left out any of the databases which CBI checks on

4  gun sales and on concealed carry permits?

5  *A.*  The only other database is the Department of Motor Vehicles

6  database.

7  *Q.*  Okay.  CBI provides its InstaCheck services both by

8  telephone or by internet; is that correct?

9  *A.*  That's correct.

10  *Q.*  Okay.  And CBI uses the state and federal databases you

11  just described to provide a yes/no answer when an FFL contacts

12  you and says, can I sell a gun to this guy?  Is that correct?

13  *A.*  That's correct.  An approval for the transfer or a denial

14  for the transfer.

15  *Q.*  And so the information is a yes or a no, or a proceed or

16  don't proceed.  It doesn't -- if it's a no, the FFL doesn't

17  learn anything about the buyer, that he had a mental health

18  record or a juvenile conviction or whatever.  It's just don't

19  sell; is that correct?

20  *A.*  That's correct.

21  *Q.*  Okay.  You're not aware of anything which prevents CBI from

22  providing a yes/no answer when an ordinary citizen asks CBI,

23  can I transfer a gun to Mr. Smith?

24        *MS. SCOVILLE:*  Objection, foundation.

25        *THE COURT:*  Response.

1  *BY MR. KOPEL:*

2  *Q.*  Do you know -- do you have an opinion on whether CBI is

3  allowed to do that, to answer citizen's question, may I sell a

4  gun to this person?

5  *A.*  I don't have an opinion.  I do know that we're not

6  authorized by law to do that, to give an approval or a denial

7  of a transfer for a private citizen requesting that.

8  *Q.*  Is the law you're referring to a Colorado state statute?

9  *A.*  I believe it's codified in state statute.  It is also

10  codified in the federal code under -- what is referred to as

11  the Brady law.

12       *MR. KOPEL:*  And, Your Honor, to avoid asking the

13  witness to draw legal conclusions, I would ask that the Court

14  take judicial notice of the federal regulations which provide

15  the conditions under which these federal databases can be

16  accessed for criminal justice purposes, including background

17  checks on firearms.

18       May I list the regulations?

19       *THE COURT:*  Please.

20       *MR. KOPEL:*  28 Code of Federal Regulations 25.6(j)(1),

21  which is the regulations on the national InstaCheck system for

22  the Brady Act.  28 C.F.R. Section 20.21(b), 28 C.F.R. 20.33(a),

23  and then (1) and (5).

24       *THE COURT:*  Any objection?

25       *MS. SCOVILLE:*  None, Your Honor.

1          THE COURT:  Thank you.

2     BY MR. KOPEL:

3     Q.  Okay.  Let's get -- now we're past that topic.

4          You had testified on your direct exam about the --

5     that it was important the legislature setting 72-hour limits

6     for firearms loans because you thought it was important that

7     there not be some sham that people say, I'm loaning you the gun

8     for the next 20 years.  Is that accurate?

9     A.  No, it isn't accurate.  I didn't testify that it would be a

10    sham.

11    Q.  Okay.  That is true, you did not mention -- did you

12    testify -- did you testify in favor of the 72-hour loan limit,

13    as you understood --

14    A.  I believe that what my testimony was, was that I felt that

15    it was appropriate to not leave a loan provision in requiring a

16    background check to an indefinite period of time, that that

17    would be ineffective to leave that type of an opening or a

18    loophole in requiring a background check on a firearms

19    transfer, to leave -- to leave a loan open to an indefinite

20    period of time for the loan.

21    Q.  Do you know that California has a similar law to Colorado's

22    that has a 30-day loan limit?

23    A.  I do not know that.

24    Q.  Do you have an opinion on whether a 30-day loan limit would

25    fulfill the purposes you mentioned in your direct testimony?

```
 1              MS. SCOVILLE:  Objection, speculation.

 2              THE COURT:  Response.

 3              MR. KOPEL:  I will rephrase the question.

 4  BY MR. KOPEL:

 5  Q.  Does a 30-day loan limit take care of that concern of

 6  yours?

 7              MS. SCOVILLE:  Objection, relevance.

 8              THE COURT:  Sustained.

 9  BY MR. KOPEL:

10  Q.  I'll move to another topic.  You testified that CBI

11  provides information and guidance to Colorado federal firearms

12  licensees about how to comply with Colorado firearm sales laws,

13  true?

14  A.  I don't recall testifying to that.

15  Q.  Does CBI do that?

16  A.  Yes, we try to be of assistance and provide as much

17  assistance as we can to the license -- federally licensed

18  firearms dealers, yes.

19  Q.  And you did testify, because this is on page 190, that you

20  were familiar with CBI's role in the -- and 189 to -90 of what

21  FFLs have to go through in order to comply with the new law in

22  House Bill 1229.  So I'm going to ask you a question about

23  that.

24              The House Bill 1229 cross-references Section 12-26-102

25  of Colorado Revised Statutes.  Do you now what that requires?
```

 1  *A.* No, sir. I would have to review that statute.

 2  *Q.* Okay. And you haven't reviewed it recently -- that's fine.

 3         Your Honor, I would like to ask that the Court take

 4  judicial notice of Colorado Revised Statutes 12-26-101 through

 5  103, which are cross -- which are cross-referenced and imposed

 6  as a duty by House Bill 1229.

 7         *THE COURT:* Response.

 8         *MS. SCOVILLE:* I think the relevance of the statute

 9  has not been established.

10         *THE COURT:* Reply.

11         *MR. KOPEL:* In a case in which we are assessing the

12  constitutionality of House Bill 1229, including the various

13  burdens it imposes on people, among them, federal firearms

14  licensees, certainly the requirements for what 1229 requires

15  are of the highest relevance. And this 12-26-101 through 103

16  is among the specific burdens which are imposed.

17         In particular, that it requires record keeping

18  significantly beyond what the federal law requires, such as the

19  occupation of the buyer of the firearm.

20         *THE COURT:* I'll take the matter under advisement.

21  *BY MR. KOPEL:*

22  *Q.* Has CBI provided guidance to anyone about compliance with

23  House Bill 1229, which is codified at 18-12-112?

24         *MS. SCOVILLE:* Objection. Vague, and I believe beyond

25  the scope of direct.

```
 1              THE COURT:  Overrule.

 2              THE WITNESS:  Can you repeat the question for me, sir?

 3   BY MR. KOPEL:

 4   Q.  Sure.  Has CBI provided any guidance to anyone about how to

 5   comply with House Bill 1229, the background check -- the new

 6   background check law?

 7   A.  I'm certain that we have, yes.

 8   Q.  Do you recall any specific guidance you provided to anyone?

 9   A.  Me, personally, sir?

10   Q.  Yes.  Under your name, in an e-mail by you.

11   A.  Yes.

12   Q.  Could you describe that, please.

13   A.  I provided guidance to the law enforcement agencies, the

14   local law enforcement agencies, in the state of Colorado,

15   namely, the chiefs of police and the sheriffs in the state of

16   Colorado.

17   Q.  And what did you -- how did you guide them?  What did that

18   say?

19   A.  I provided guidance in the form of a written memorandum,

20   based upon legal consult and advice from the Attorney General's

21   Office, in order to assist those agencies in the application of

22   transfers of firearms to their POST-certified peace officers.

23   Q.  Did your guidance explain that you thought that the -- in

24   those situations, that going through the 1229 process would be,

25   quote, unnecessary?
```

1        *MS. SCOVILLE:*  Objection, Your Honor, irrelevant.

2        *THE COURT:*  Response.

3        *MR. KOPEL:*  The process in existence of exemptions in

4   House Bill 1229 are also an important part of assessing its

5   burdens and benefits.

6        *THE COURT:*  I'm not tracking.

7        *MR. KOPEL:*  Pardon?

8        *THE COURT:*  Why is it relevant?  Why is it relevant to

9   the issues that you're asking me to determine?

10       *MR. KOPEL:*  That House Bill 1229, we've -- I would

11  suggest has been shown in the last week's testimony to have

12  created a lot of collateral damage.  This is a process by which

13  CBI, which views itself as having the authority to create

14  exemptions from House Bill 1229, has created an exemption which

15  takes care of one type of collateral damage.  And the fact that

16  CBI has chosen to mitigate or eliminate one form of collateral

17  damage and not another form of collateral damage is relevant to

18  the burden that the State, the ultimate defendant, has chosen

19  to impose on the plaintiffs and the public.

20       *THE COURT:*  You can inquire as to what new exemption

21  was created.

22       *MR. KOPEL:*  Thank you.

23  *BY MR. KOPEL:*

24  *Q.*  I think you've -- I believe -- could you describe that

25  exemption.  You've already done it, mostly.  If you could

1    finish that up, please.

2    *A.* If I understand the question, I would testify that CBI did

3    not create an exemption.  I, on behalf of CBI, as the director

4    of CBI, responding to what CBI's statutory role is in support

5    of law enforcement carrying out their mission in this state,

6    and in support and assistance of law enforcement carrying out

7    their mission in this state, provided information for

8    consideration of the police departments and the sheriff's

9    offices in this state for the requirements of transfer of a

10   firearm to a POST-certified peace officer and the necessity of

11   having an FFL-produced background check for that provision of

12   firearms for POST-certified peace officers was not necessary.

13   And that was based upon the legal advice of the Attorney

14   General's Office.

15   *Q.* Great.  Thank you.

16        You testified on direct examination about House Bill

17   1229 attempted to, in your words, close a huge loophole, true?

18   *A.* I'm sorry, would you --

19   *Q.* Did you testify -- on your direct examination on Friday,

20   did you testify that House Bill 1229 was an attempt to close a

21   huge loophole?

22   *A.* I may have testified to that.  I don't recall specifically

23   referring to House Bill 13-1229 intending to close a huge

24   loophole.  But I do believe that House Bill 1229 did address

25   the -- a significant portion of firearms transfers that occur

1    in Colorado.

2    *Q.*   Which previously had not had background checks on them,

3    correct?

4    *A.*   That is --

5    *Q.*   That's what you were talking about?

6    *A.*   That is correct.

7    *Q.*   And so 1229 -- you testified that 1229 was helping to close

8    that loophole or address that situation by requiring more

9    background checks; is that accurate?  Am I characterizing your

10   testimony correctly?

11   *A.*   And I don't recall specifically the testimony on direct.

12   But I -- I would say it was accurate that 1229 addresses the

13   issue of firearms transfers that were not previously addressed

14   requiring a background check to the transferee.

15   *Q.*   And CBI expected that 200,000 additional background checks

16   would be conducted annually due to the new increased background

17   check requirements of this law, true?

18          *MS. SCOVILLE:*  Objection.  This is outside the scope

19   of direct.

20          *THE COURT:*  Sustained.

21          *MR. KOPEL:*  May I confer, Your Honor?

22          *THE COURT:*  You may.

23          (Off-the-record discussion between counsel.)

24   *BY MR. KOPEL:*

25   *Q.*   Mr. Sloan, you testified in support of House Bill 1229 in

 1  the legislature; is that true?

 2          MS. SCOVILLE:  Objection.  This is still outside the

 3  scope.

 4          THE COURT:  Sustained.

 5  BY MR. KOPEL:

 6  Q.  You testified at some length about the number of background

 7  checks that are performed by CBI and the costs of those

 8  background checks and the processes by which CBI conducts them,

 9  how many employees it has, how many -- the fees it charges.

10  Did you expect an increase in background checks after House

11  Bill 1229 was passed?

12          MS. SCOVILLE:  Objection.  Outside the scope.

13          THE COURT:  Sustained.

14          MR. KOPEL:  Then, Your Honor, since the legislative

15  history in this case is unquestionably of relevance to this

16  case, I would ask Your Honor to take judicial notice of a part

17  of the legislative history, which is the five fiscal notes

18  prepared by the legislative counsel, officially part of the

19  legislative history for House Bill 1229, which are on the

20  Colorado General Assembly's website, a repository of government

21  records, whose accuracy cannot reasonably be questioned.  And

22  therein, it will be seen that CBI consistently predicted

23  200,000 additional new background checks as a result of this

24  bill.

25          But regardless of what is in the fiscal notes, I'd ask

1  the Court to take judicial notice under Rule 201(c)(2), of the

2  fiscal notes as part of the legislative history of House Bill

3  1229.

4       THE COURT:  Response.

5       MS. SCOVILLE:  Your Honor, the parties have already

6  stipulated to the legislative history.  It has been admitted as

7  Exhibits 1 and 2.  The fiscal notes are not part of the

8  legislative history that has been stipulated to, and I don't

9  know that the fiscal notes -- certainly -- meet the criteria

10  for the Court to take judicial notice.

11       THE COURT:  How do these meet the criteria for

12  judicial notice?

13       MR. KOPEL:  They are public government records whose

14  accuracy cannot reasonably be questioned.

15       THE COURT:  Wait a minute.  We have lots of government

16  records that we question the accuracy of.  You've done that all

17  the way through this trial.

18       MR. KOPEL:  Yes.  But the -- on the Colorado General

19  Assembly's website, the accuracy that the fiscal notes are what

20  they say they are, that a bill is what it says it is, cannot

21  reasonably be questioned on the official website of the

22  Colorado General Assembly.

23       THE COURT:  I'm not going to go and view a website.

24  If you want to mark exhibits --

25       MR. KOPEL:  We would, Your Honor.

1    *THE COURT:* -- and you want to proffer them as part of

2    this record, then you can seek to admit them.  But websites

3    change.

4         *MR. KOPEL:*  Your Honor, we seek the Court to take

5    judicial notice of a new exhibit, a certified copy of the final

6    fiscal note for House Bill 12-1229, certified and notarized.

7         *THE COURT:*  Okay.  You're offering this as an exhibit,

8    right?

9         *MR. KOPEL:*  Yes, Your Honor.

10        *THE COURT:*  All right.

11             Voir dire or objection?

12        *MS. SCOVILLE:*  Yes, Your Honor.  First of all, defense

13   has not seen any of these fiscal notes, so we would certainly

14   appreciate the chance to view them.

15        *THE COURT:*  Absolutely.

16        *MS. SCOVILLE:*  We also object because fiscal notes are

17   inherently speculative.  They are a projection, and they are

18   not -- they're also not relevant to the proceeding here today.

19        *THE COURT:*  Let me hear -- now I've got a new

20   objection, which is relevance.  Why are the projections

21   relevant?

22        *MR. KOPEL:*  Because heightened scrutiny is by its

23   nature an analysis of the means and the ends.  And the part on

24   the ends is, does this measure actually advance the positive

25   ends that are sought.

```
 1        This bill is the opposite.  It was written and
 2   intended by -- to create 200,000 new background checks
 3   annually.  And as Mr. Spoden's testimony showed on Friday, has
 4   had the opposite effect, that is, at the core of the
 5   consideration of the means prong of the constitutionality of
 6   House Bill 1229.
 7        THE COURT:  Under a heightened scrutiny analysis?
 8        MR. KOPEL:  Including under intermediate scrutiny.  I
 9   would suggest even under rational basis, Your Honor, there at
10   least can be some scrutiny about whether the ends do -- the
11   means do actually move towards the ends.
12        THE COURT:  Tell me, Mr. Kopel, how you think this is
13   relevant when we have a facial challenge to the statute.  We're
14   not looking at whether it was a success or not; it's a facial
15   challenge.
16        MR. KOPEL:  Your Honor, ever since the first
17   Complaint, our -- the position we've taken in our facial
18   challenge has been, we are not opposed in theory to private
19   background checks.  We are opposed to what we said from the
20   first day of the Complaint is a dysfunctional system.  And the
21   dysfunctional system is shown not only by the collateral
22   damage, but in addition, by its failure to achieve -- to make
23   even a small step towards the enormous increase in background
24   checks that were expected.  They went down, when they were
25   supposed to go up by 200,000, according to what the Colorado
```

1  Bureau of Investigation, the Department of Public Safety,

2  supplied to the legislature and became an official part of the

3  legislative history.

4          THE COURT:  Okay.  Why wasn't it included in the

5  legislative history that you stipulated to?

6          MR. KOPEL:  We did not stipulate that the transcripts

7  of house committee -- house and senate committee hearings and

8  floor debates were the end-all of legislative history.  And

9  that would have been impossible for us to do so, because,

10  certainly, at the most core of legislative history are the

11  house and senate journals.  And we did not stipulate -- we did

12  not provide you with copies of the house and senate journals.

13  Nothing is more legislative history-ish than the house and

14  senate journals themselves.  They are not included as well, but

15  it would be impossible to say that they are outside the

16  legislative history.

17          THE COURT:  This seems to be a moving target.  And I

18  think we probably all, since it's the end of the day, need to

19  think about the target.  I'm not going to rule on this now.

20  I'm going to ask you to address this after you've had some time

21  tonight to think about it.  I'm concerned about a

22  representation that I have all of the legislative history and

23  now a representation that there are other items of legislative

24  history that have not been given to me.

25          I'm concerned about a misunderstanding of what a

1  facial challenge to the statute involves.  I'm concerned about

2  straying outside the scope of the examination thus far, even

3  though it has been substantially broader than one might have

4  anticipated for a facial challenge.

5       So let's leave this issue where it is right now.  I'll

6  hear one argument from each side tomorrow morning with regard

7  to whatever documents there are that you want me to receive in

8  evidence.  Be sure to mark those as exhibits so our record is

9  good and clear as to what documents we're talking about.

10      Any need for clarification or further explanation?

11      MR. KOPEL:  Only one question in regard to Mr. Sloan,

12  since this came up at the very end of his testimony.  Does

13  Mr. Sloan need to -- I would ask that he -- unless it's

14  necessary, that Mr. Sloan be excused, because that I was at the

15  end of my redirect examination for him.  So I'm hoping we don't

16  have --

17      THE COURT:  You would be the one to ask more questions

18  of Mr. Sloan, but there is still the possibility of redirect.

19      MR. KOPEL:  Then I withdraw my question.  Thank you.

20      THE COURT:  What's the State's position?

21      MS. SCOVILLE:  Your Honor, I have no redirect.  And

22  given that this is Mr. Sloan's second day, we would ask that he

23  be excused.

24      THE COURT:  All right.

25      Then, Mr. Sloan, thank you for your testimony.  You

 1   may step down.  You are excused.

 2           *MS. SCOVILLE:*  Your Honor, we would also at this point

 3   like to ask that Mr. Spoden be excused.  We had indicated that

 4   we would reserve him subject to recall.  I don't believe that's

 5   necessary at this time.

 6           *THE COURT:*  He's excused as well.  Will you let him

 7   know?

 8           *MS. SCOVILLE:*  Yes, I will, thank you.

 9           *THE COURT:*  Okay.  And with this issue, we'll start

10   tomorrow morning.  Give me an idea what tomorrow looks like as

11   far as your scheduling is concerned.

12           *MS. SCOVILLE:*  Your Honor, we have several witnesses

13   whose schedule is such that we would like to get through them

14   tomorrow.  Following the argument tomorrow morning, we'll have

15   testify from Jennifer Longdon.  We don't anticipate her

16   testimony will be terribly long, probably less than an hour, I

17   would anticipate, on both direct and cross.  Next we will have

18   Roger Salzgerber.  Mr. Salzgerber's testimony is also not

19   anticipated to be terribly long.  Other than that, we have

20   several witnesses who have some flexibility to come and start.

21           We do have Dan Oates, the Aurora chief of police.  His

22   testimony -- he's only available for a very short window, so he

23   will come at 1:30, I believe.  His testimony is also not

24   anticipated to be terribly long.  And among and around those

25   witnesses we have two remaining experts, John Cerar will go

 1   first.  If there is any time left in the day, we would have the

 2   State's expert, Doug Fuchs.

 3         THE COURT:  And there was a pending motion with regard

 4   to Mr. Oates' testimony.  That was published and drew no public

 5   response.  Are you proceeding on it?

 6         MS. SCOVILLE:  No, Your Honor.  We withdraw that

 7   motion.

 8         THE COURT:  Okay.  All right.  Then let's reconvene

 9   tomorrow morning at 8:45 rather than 8:30.  Is there something

10   else we need to address?

11         MS. SCOVILLE:  Your Honor, while we're taking care of

12   housekeeping matters --

13         THE COURT:  Sure.

14         MS. SCOVILLE:  The State did have a motion in limine

15   which has long since been mooted by the testimony of the FFLs,

16   I believe it's Docket No. 144.  The State withdraws that motion

17   as moot.

18         THE COURT:  Okay.

19         MS. SCOVILLE:  And would the Court have time for two

20   other small housekeeping matters?

21         THE COURT:  Sure.

22         MS. SCOVILLE:  As long as we're at it.

23         THE COURT:  Plaintiffs may have some housekeeping

24   matters they want to address, too.  No?

25         MR. COLIN:  No, Your Honor.

 1              *THE COURT:*  Okay.

 2              *MS. SCOVILLE:*  Your Honor, at this time we would move

 3     for the admission of Exhibit 83.  This was a subpoena that was

 4     issued to Bass Pro Shops.  When the subpoena documents were

 5     returned, they came with a certification that is sufficient to

 6     satisfy the requirements of both Rule of Evidence 902(11) and

 7     803(6).  This was not something the parties could come to an

 8     agreement on.  The affidavit is contained in Exhibit 83 with

 9     the subpoenaed documents, and we would move for their

10     admission.

11              *THE COURT:*  Objection?

12              *MR. KOPEL:*  Objections on the grounds of relevance and

13     cumulativeness, in the sense that we have already stipulated

14     that there are many firearms of various types available for

15     sale in Colorado after July 1.

16              *THE COURT:*  Reply.

17              *MS. SCOVILLE:*  Your Honor, this is directly responsive

18     to both the expert testimony of Mr. Shain and the testimony of

19     the FFLs in which they indicated that there were firearms that

20     would be banned by the passage of Section 18-12-302.  This

21     indicates -- these documents indicate the substantial number of

22     firearms and magazines that continue to be legal for sale in

23     Colorado.

24              *THE COURT:*  Can't you just stipulate to this?

25              *MS. SCOVILLE:*  We had requested, Your Honor.

 1          MR. KOPEL:  Your Honor, we have stipulated to exactly

 2   what Ms. Scoville said, which is that there is a large number

 3   of firearms currently available.  The problem of stipulating to

 4   Bass Pro Shops was defendant's refusal to stipulate to a -- a

 5   subpoenaed response they received from Cabela's, which we

 6   wanted to have come in.  And they subpoenaed both Bass Pro

 7   Shops and Cabela's last November.  We wanted to supply those

 8   documents to us.  We wanted the Cabela's documents in.  They

 9   refused to stipulate.  So by parity of reasoning, we did not

10   stipulate to Bass Pro Shops.

11          THE COURT:  So, tit for tat.

12          What I'd like you to do is to stipulate to the facts

13   that are reflected in these documents.  What are the firearms

14   that are for sale after enactment of the statutes?  It's time

15   to get past the game playing.  So I expect that stipulation

16   tomorrow morning.

17          MR. KOPEL:  Your Honor, may I inquire?  Does your

18   instructions apply to both Cabela's and Bass Pro Shops?

19          THE COURT:  I don't know whether the other is being

20   offered.

21          MR. KOPEL:  We would -- we would have offered it

22   previously had it been stipulated -- had we been able to

23   stipulate to it.

24          THE COURT:  Presumptively, these two stores are in

25   competition with each other.  Presumptively, they have most of

1  the same firearms for sale.  Presumptively, they have a small

2  fringe that each of them specializes in.  Can you simply

3  stipulate as to what type of firearms were sold or available

4  for sale after the statute was enacted?

5       MR. KOPEL:  Your Honor, it's even simpler that than

6  that, in terms of that.  There is no need to do a Bass-Cabela's

7  comparison.  The Bass Pro Shops provided a fairly detailed

8  inventory list.  Cabela's provided simply the rule for what

9  type of firearms it will not sell, what it will not do.  We'd

10  like to stipulate to their policy.

11       THE COURT:  No, that's not what this is about.  This

12  is not about policy; it is about what firearms were available

13  for sale.

14       MR. KOPEL:  Yes, Your Honor.  And that policy includes

15  what firearms Cabela's refuses to sell because it believes it

16  is not legally allowed.

17       THE COURT:  It doesn't matter why.  Please stipulate

18  to what firearms were available for sale.  Can I be clearer?

19       MR. KOPEL:  No, Your Honor.  Thank you.

20       THE COURT:  All right.

21       Now, what other items do we have?

22       MS. SCOVILLE:  Your Honor, only one, and that relates

23  to Exhibits 84 and 85.  These are reports from the ATF and the

24  Department of Treasury.  And these also were not stipulated to

25  by the parties.  They are public records.  Following the

1   parties' conferral the week before trial, when plaintiffs

2   indicated they would not stipulate to the admission of these

3   public records, the State has obtained the required

4   certification under 902(11) and 803(6) to establish the

5   foundation for the admission of these documents.  That

6   certification was provided to plaintiffs' counsel last week,

7   and we would move for their admission.

8           THE COURT:  Any objection?

9           MR. KOPEL:  Well, if Your Honor, I'd suggest, if those

10  public records are to be admitted, then certainly our certified

11  public records of the fiscal note would be equally admissible

12  and be far more relevant.

13          I would point out that 84 and 85 are Bureau of

14  Alcohol, Tobacco and Firearms decisions on whether certain long

15  guns are importable into the United States under the sporting

16  purposes test created by the Gun Control Act of 1968.  And that

17  is an issue of little relevance to this case.

18          THE COURT:  What is the relevance?

19          MS. SCOVILLE:  Your Honor, the Department of Treasury

20  study from 1998 bears directly on some of the testimony that

21  we've heard since the trial started.  The ATF has determined

22  that detachable large-capacity-magazine firearms should be

23  added to the list of disqualifying items for importation into

24  the United States.  The report goes on to make a number of

25  other findings, including that large-capacity magazines or

 1  rifles with those magazines are attractive to certain

 2  criminals.

 3      THE COURT:  Is there any disagreement between the

 4  parties as to that statement being contained in these reports?

 5      MR. KOPEL:  In 84.  85 is on shotguns, which are not

 6  at issue.  Your Honor, there is no disagreement about that

 7  statement being contained in the reports.

 8      THE COURT:  Is there anything else in the reports that

 9  you think I should know?

10      MR. KOPEL:  No.  I don't think you should even know

11  that, because I think it's done -- I think ATF's view of

12  sporting purposes is irrelevant to the Second Amendment.

13      THE COURT:  All right.  I can take the relevance under

14  advisement.  Why don't you stipulate that the report says X?

15      MR. KOPEL:  We will do so.

16      THE COURT:  Okay.  That's as to 85?

17      MS. SCOVILLE:  We had moved for --

18      THE COURT:  No, I'm sorry.  That's 84.

19      MS. SCOVILLE:  84 and 85.

20      THE COURT:  Right.

21      MS. SCOVILLE:  You know, at this point, the State will

22  withdraw 85.

23      THE COURT:  Okay.  Then 84, you're going to stipulate

24  as to the pertinent portion that you think is relevant.  I'm

25  going to reserve as to whether it is relevant or not.  Okay.

1           Anything else we need to do housekeeping-wise?

2               *MS. SCOVILLE:*  No, thank you, Your Honor.

3               *MR. KOPEL:*  No.

4               *THE COURT:*  Okay.  Then I'll look forward to seeing

5     you all at 8:45 tomorrow morning.  Have a good evening.  We'll

6     stand in recess.

7               (Recess at 5:10 p.m.)

8                              **INDEX**

9     **Item**                                                      **Page**

10

11        DANIEL WEBSTER
              Direct Examination By Mr. Grove              1165
              Cross-examination By Mr. Kopel               1224
12            Redirect Examination By Mr. Grove            1287
          ERNEST MOORE
13            Direct Examination By Ms. Scoville           1294
              Cross-examination By Mr. Krumholz            1308
14            Redirect Examination By Ms. Scoville         1315
          LORNE KRAMER
15            Direct Examination By Ms. Spalding           1317
              Cross-examination By Mr. Abbott              1333
16        RONALD SLOAN
              Cross-Examination Continued By Mr. Kopel     1352

17

18                             EXHIBITS

19    Exhibit        Offered  Received  Refused  Reserved  Withdrawn

20    45                      1302
      132-135                 1283
21    136                     1293
      51                      1197
22    52                      1199
      53                      1202
23    54                      1207
      55                      1211
24    56                      1216
      57                      1218

25

1                    REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

4

5        Dated at Denver, Colorado, this 14th day of June, 2014.

6                                  s/Therese Lindblom

7        _____

8                        Therese Lindblom,CSR,RMR,CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25