```
 1                 THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 13-CV-1300-MSK-MJW
 3
     COLORADO OUTFITTERS ASSOCIATION,
 4   COLORADO FARM BUREAU,
     NATIONAL SHOOTING SPORTS FOUNDATION,
 5   MAGPUL INDUSTRIES,
     COLORADO YOUTH OUTDOORS,
 6   USA LIBERTY ARMS,
     OUTDOOR BUDDIES, INC.,
 7   WOMEN FOR CONCEALED CARRY,
     COLORADO STATE SHOOTING ASSOCIATION,
 8   HAMILTON FAMILY ENTERPRISES, INC.,
     d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
 9   DAVID STRUMILLO,
     DAVID BAYNE,
10   DYLAN HARRELL,
     ROCKY MOUNTAIN SHOOTERS SUPPLY,
11   2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
     BURRUD ARMS INC. D/B/A JENSEN ARMS,
12   GREEN MOUNTAIN GUNS,
     JERRY'S OUTDOOR SPORTS,
13   SPECIALTY SPORTS & SUPPLY,
     GOODS FOR THE WOODS,
14   JOHN B. COOKE,
     KEN PUTNAM,
15   JAMES FAULL,
     LARRY KUNTZ,
16   FRED JOBE,
     DONALD KRUEGER,
17   STAN HILKEY,
     DAVE STONG,
18   PETER GONZALEZ,
     SUE KURTZ,
19   DOUGLAS N. DARR,

20       Plaintiffs,

21   vs.

22   JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23       Defendant.
     _____
24
                      REPORTER'S TRANSCRIPT
25                  TRIAL TO COURT - DAY SEVEN
     _____
```

1          Proceedings before the HONORABLE MARCIA S. KRIEGER,

2   Judge, United States District Court for the District of

3   Colorado, continuing at 8:58 a.m., on the 8th day of April,

4   2014, in Courtroom A901, United States Courthouse, Denver,

5   Colorado.

6

7                          **APPEARANCES**

8          RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
    at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9   Denver, Colorado, 80202, appearing for the Plaintiffs.

10         DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
    555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11  for the Plaintiffs.

12         MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
    P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13  appearing for the Plaintiffs.

14         ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
    Street, Castle Rock, Colorado, 80104, appearing for the
15  Plaintiffs.

16         DAVID BENJAMIN KOPEL, Attorney at Law, Independence
    Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17  appearing for the Plaintiffs.

18         MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
    SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19  General, Colorado Attorney General's Office, Ralph L. Carr
    Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20  80203, appearing for the Defendant.

21

22

23

24              THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

```
 1              P R O C E E D I N G S

 2          THE COURT:  We are reconvened this morning in Case No.

 3   13-cv-1300, encaptioned Colorado Outfitters Association et al.

 4   v. Hickenlooper.  The case is in its seven day of trial.

 5          Could I have entries of appearance for today's

 6   proceedings.

 7          MR. COLIN:  Good morning, Your Honor.  Mark Colin

 8   appearing on behalf of the licensed firearms dealer plaintiffs.

 9          THE COURT:  Good morning.

10          MR. KRUMHOLZ:  Good morning, Your Honor.  Peter

11   Krumholz on behalf of David Bayne, Dylan Harrell, Outdoor

12   Buddies, Inc., Colorado Outfitters Association, Colorado Farm

13   Bureau, Women for Concealed Carry, and Colorado Youth Outdoors.

14          With me is my partner, Richard Westfall, who we're

15   happy to have back.  And he has quarantined himself at the back

16   table today.

17          THE COURT:  Good morning.  Hope you feel better.

18          MR. KOPEL:  Good morning, Your Honor.  David Kopel on

19   behalf of David Strumillo, John B. Cooke, Ken Putnam, James

20   Faull, Larry Kuntz, Fred Jobe, Donald Kroger, Stan Hilkey, Dave

21   Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

22          THE COURT:  Good morning.

23          MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian

24   on behalf of Colorado State Shooting Association and Hamilton

25   Family Enterprises.
```

 1          *THE COURT:*  Good morning.

 2          *MR. GROVE:*  Good morning.  Matthew Grove, Katherine

 3   Spalding, Stephanie Scoville, and LeeAnn Morrill on behalf of

 4   the defendant.

 5          *THE COURT:*  Good morning.

 6          Are you all ready to go?

 7          *MR. COLIN:*  Plaintiffs are ready.

 8          *MR. GROVE:*  Yes, Your Honor.

 9          *THE COURT:*  I think we have one evidentiary issue we

10   left on the table when we recessed last night.  Shall we deal

11   with that?

12          Mr. Kopel.

13          *MR. KOPEL:*  Certainly, Your Honor.

14          Your Honor, and may it please the Court.  Plaintiffs

15   request you take judicial notice under Federal Rule of Evidence

16   201(c)(2) of the complete legislative history of House Bills

17   1224 and 1229.  Rule 201 requires the Court to take judicial

18   notice if a party requests it and the Court is supplied with

19   necessary information.  And under Rule 201(d) this may be done

20   at any stage of the proceeding.

21          To be judicially noticed, a fact must not be subject

22   to reasonable dispute, because it can be accurately and readily

23   determined from sources whose accuracy cannot reasonably be

24   questioned.

25          The legislative history documents produced by the

1  Colorado General Assembly are such sources.  Defendant

2  stipulates, agrees as to their authenticity.  Their

3  authenticity can be further verified by review of the Colorado

4  General Assembly's website.  There, for each and every bill

5  considered in a given session, a full legislative history for

6  that bill is provided in a single location.

7          In the District of Colorado, in the 2010 case of *SBM*

8  *Site Services v. Severin*, Judge Miller explained, "The facts

9  contained in public records are appropriate subjects of

10 judicial notice."  Also in this district, in the case of *Allen*

11 *v. United Properties* in 2008, Judge Babcock explained that

12 public records and governmental documents are generally

13 considered not to be subject to reasonable dispute.

14 Specifically, this includes public records and government

15 documents available from reliable sources on the internet, he

16 wrote.

17         And, of course, in *Gonzales v. Castle Rock* in the

18 Tenth Circuit in 2002, which was overturned on other grounds in

19 the United States Supreme Court, the court, the Tenth Circuit

20 reminded us that judicial notice may be taken at any stage of

21 the proceedings.  And the legislative history is appropriate

22 for judicial notice.

23         Among the items in -- of which we request you take

24 judicial notice are the fiscal notes for House Bills 1224 and

25 1229.  Fiscal notes are, indeed, more significant as

1  legislative history because they are formal documents created

2  by the legislature itself.  Anyone may testify before a

3  legislative committee, but only the legislative counsel may

4  create a fiscal note.  A fiscal note is a formal document that

5  must be created according to the rules of the Colorado General

6  Assembly.  Fiscal notes are required by Colorado House and

7  Senate joint Rule 22.  This is compliant with Colorado Revised

8  Statutes 2-22-322, which mandates the creation of fiscal notes

9  for all legislation that may have a fiscal impact.

10      Eight other Colorado statutes further specify

11  requirements and details for fiscal notes in various

12  situations.

13      The Colorado Supreme Court, which is an authoritative

14  source on the means of determining Colorado legislative

15  history, has relied on fiscal notes for legislative history.

16  The case, *People v. Winters*, 765 P.2d 1010 from 1988.  The

17  Colorado Court of Appeals has done the same in *Martin v. Union*

18  *Pacific Railroad Company* in 2007.  Both the majority and the

19  dissent in that case cited and discussed the fiscal note in

20  their analysis of the legislative history.

21      Likewise, in *People in the Interest of G.M.* in 1992,

22  the Colorado Court of Appeals again relied on its cite of the

23  fiscal note in analyzing legislative history.

24      The three cases mentioned are sufficient to establish

25  that as a matter of law in Colorado, fiscal notes are

1    indisputably part of the legislative history.  Transcripts of

2    testimony before legislative committees are also part of

3    legislative history.  And the transcripts are already exhibits

4    in this case.  In the transcript at Exhibit 1, page 45, lines 6

5    through 8, the fiscal note is discussed during the questions

6    and answers of CBI Director Sloan's testimony.

7            Courts in sister states in the Tenth Circuit have also

8    cited fiscal notes as they were discussed during legislative

9    testimony, as they were in Director Sloan's testimony.  These

10   cases include *Link v. City of Hays* from the Kansas Supreme

11   Court in 1999; *In re Allen*, 29 Kan. App. 2d 537 from 2001; and

12   the Supreme Court of Utah in the case of *Zissi v. State Tax*

13   *Commission of Utah* in 1992.

14           The second amended joint exhibit list begins with Item

15   1, stipulation, legislative history Section 18-12-112.  This

16   is, indeed -- which contains the transcripts of committee

17   hearings and floor debates.  This is, indeed, legislative

18   history of Section 18-12-112.  It is a transcript of oral

19   testimony and debate in the legislature.  The plaintiffs never

20   stipulated that this was the entire legislative history; and,

21   indeed, it would have been impossible and preposterous to do

22   so.  The core of legislative history is the official records of

23   the legislative body itself.  In this case, this -- in

24   Colorado, this means, most of all, the House Journal and the

25   Senate Journal, as well as other public official documents

1    produced by the General Assembly.

2         At least 19 Colorado Supreme Court or Court of Appeals

3    cases cite the House or Senate Journal as part of their

4    analysis of legislative history.  The most recent cases from

5    the Colorado Supreme Court citing the House or Senate Journal

6    as part of the legislative history are *People v. Norton* from

7    2000 -- from 2003 from the Supreme Court, and Industrial Claims

8    Appeal -- *Industrial Claim Appeals Office v. Orth* from 1998

9    from the Supreme Court.  And then from the Court of Appeals

10   most recently, *Adams v. Corrections Corp. of America* from 2008,

11   and *Sandoval v. Archdiocese of Denver* from 2000.

12        Of course, what use the Court chooses to make of

13   legislative history will depend on the particular facts of the

14   case.  In the instant case, this court has already determined

15   that the legislative history is central to the analysis of

16   whether the statute is constitutional, presumably under

17   whatever form of means and scrutiny the Court determines is

18   appropriate.  Accordingly, the Court should take into

19   consideration the full legislative history of House Bill 1224

20   and House Bill 1229.  This legislative history certainly

21   includes transcripts of hearings and debates.  And,

22   necessarily, it must also include material which is at the core

23   of the legislative history, the House and Senate Journals, the

24   fiscal notes, the committee reports, and the reports of the

25   joint budget committee.

1    The Colorado courts are certainly correct in relying

2  on core legislative history documents when evaluating

3  legislative history.  After all, these are the very documents

4  which the General Assembly itself created and published to

5  provide a formal history of its actions.  Only in special

6  situations are audio records of legislative discussions ever

7  reduced to writing.  Yet, the House and Senate Journals and

8  other formal legislative documents are as old as the

9  territorial legislature.

10    Plaintiffs filed this case on May 17, 2013.  And

11  shortly thereafter, sought a pre-enforcement injunction against

12  two particular clauses they considered to be obviously and

13  facially unconstitutional.  Plaintiffs believe that little

14  factual development was necessary to show the

15  unconstitutionality of these two clauses.

16    In contrast, the complaint about House Bill 1229's

17  application to the actual private sale of firearms made various

18  predictions.  For example, in paragraph 21 of the original

19  Complaint, which remains the same through all the drafts up to

20  the Fourth Amended Complaint, begins, "As a practical matter,

21  it will be impossible for citizens to comply with House Bill

22  1229."

23    Paragraph 22 of the Complaint states, "Many FFLs in

24  Colorado, including FFL plaintiffs, are unwilling to conduct

25  the transfer under such conditions.  Accordingly, it will be

1    extremely difficult, if not impossible, for many Coloradans to

2    find an FFL to conduct the transfers, even if the buyer and

3    seller are both willing to drive long distances to do so."  For

4    this court to ascertain whether plaintiffs' dire predictions

5    have come true, it is necessary for this court to have a

6    foundation about how many private checks would occur in a

7    genuinely functional system.

8         Defendants have argued, as in their redirect

9    examination of Mr.  Spoden, that House Bill 1229 is a success,

10   because after July 1, 2013, the frequency of intrastate private

11   sale checks remained at its historic low level, but declined

12   slightly, which was less than the decline in that same period

13   in private sale checks at gun shows.  It is highly relevant to

14   defendant's argument that the legislative majority intended to

15   create and budgeted for 200,000 additional new checks per year.

16   This shows what the legislature intended to do, and legislative

17   intent is a fundamental part of legislative history.

18        Regarding House Bill 1224, the fiscal notes and the

19   joint budget committee reports indicate that hardly any

20   prosecutions were expected.  Indeed, as far as anyone can tell,

21   there have so far been zero prosecutions.  The fact that few

22   prosecutions were intended -- were expected under House Bill

23   1224 as reflected in these legislative documents are relevant

24   to plaintiffs' claim that House Bill 1224 is unenforceable and

25   that the legislative majority knew so when passing the bill.

1    Whatever use Your Honor chooses to make of the

2  complete legislative history, plaintiffs believe that it

3  legally must be part of this Court's consideration of the case.

4  Accordingly, we respectfully ask the Court to take judicial

5  notice of the entire legislative history.  While all the

6  documents are readily available on the General Assembly's

7  website, we are ready to provide the Court with printed

8  versions, should the Court so wish.

9    Thank you.

10   *THE COURT:*  Thank you.

11   Response.

12   *MS. SCOVILLE:*  Good morning, Your Honor.

13   The State's position is that there is not a reasonable

14  dispute as to whether these documents could be the subject of

15  judicial notice under the appropriate circumstances.  The

16  problem in this case is that the documents are not relevant.

17  And the State also would take issue with plaintiffs' assertion

18  that, as a matter of law, fiscal notes are always part of the

19  legislative history.

20   I did some research last night and was able to find

21  only a handful of cases in which the legislative history ever

22  referenced the fiscal notes.  And in many of those cases, the

23  particular cost of the program at issue was at issue.

24   The real issue, as I said, is whether or not these

25  materials are relevant.  The fiscal notes offer a variety of

1   projections as to what may or may not come to pass in the

2   future.  The fiscal notes offer various assumptions and

3   ballparks for the first year of enactment and in later years as

4   well.  And what the fiscal notes project and the assumptions

5   that they make is just simply not relevant to the question

6   before this court, which is, what does Section 18-12-112 say?

7   And is it constitutional?

8          Certainly, none of the cases that I was able to find

9   last night indicated that fiscal notes were relevant in the way

10  that the plaintiffs are attempting to use them in this

11  circumstance, which is to somehow -- to justify or -- show the

12  lack of justification in the appropriate means/ends analysis.

13  So the State's position is that they're simply not relevant.

14          THE COURT:  Thank you.

15          I am cognizant that this is a facial challenge, not an

16  as-applied challenge.  And I have questions as to the relevance

17  of these documents.  I do not believe judicial notice is the

18  appropriate mechanism by which to include them in the record,

19  however.  Every document that is contained on the website can

20  and will be marked as an exhibit and received by the Court.

21          Any need for clarification or further explanation?

22          MR. KOPEL:  Your Honor, only a mechanical question.

23  Last night Ms. Scoville requested that -- because, apparently,

24  the interface between the General Assembly's website and the

25  Attorney General's computers is not entirely perfect, they were

1  having some trouble printing out the documents, so they

2  requested we print out the documents.  We've done so.  The

3  printer at my office as of 11 o'clock last night also became

4  obstreperous.  So we were wondering if, hopefully after lunch

5  or perhaps tomorrow morning we might be able to provide the

6  court with those documents.

7          THE COURT:  You can do it whenever you'd like.

8          MR. KOPEL:  Okay.

9          THE COURT:  Before the trial is over.  You're not

10  going to have a ruling at the end of the trial.  So any time

11  during the trial, you can give them to Ms. Glover, and she will

12  note for the record that they've been received.

13          MR. KOPEL:  Thank you very much.

14          THE COURT:  Any other issues we need to deal with?

15          MS. SCOVILLE:  Your Honor, the parties had further

16  discussions last night on the other stipulations that we

17  discussed at the end of the day.  And the parties have

18  stipulated to the admission of Exhibit No. 83.

19          THE COURT:  It is received.

20          (Exhibit 83 admitted.)

21          MS. SCOVILLE:  And the parties have further stipulated

22  to the following fact:  After July 1, 2013, Cabela's no longer

23  sells the Kel-Tec KSG and UTS 15.  These are multi-tube

24  shotguns with tubes holding more than 28 cumulative inches of

25  shells.

1    The parties have also had discussions with regard to

2  the ATF document and the Department of Treasury report that was

3  discussed yesterday afternoon.  The latest is that, apparently,

4  we've may be able to reach some agreement, that the plaintiffs

5  are doing some further consideration this morning and ask that

6  we confer again at lunch.

7    THE COURT:  Okay.

8    MR. KOPEL:  Your Honor, if I might inquire regarding

9  the stipulations that Ms. Scoville mentioned about that ATF

10  document.

11    Am I correct in understanding that you don't want to

12  hear from either side as to whether they actually think the

13  content of that document is true?

14    THE COURT:  I have no idea what document you're

15  talking about.

16    MR. KOPEL:  Okay.  This is the document that was

17  discussed partly yesterday afternoon.

18    THE COURT:  Does it have an exhibit number?

19    MR. KOPEL:  It is, I believe, proposed Exhibit 84.

20    THE COURT:  Okay.

21    MR. KOPEL:  The document -- the document itself, which

22  I think is an approximately 80-page decision to bar the import

23  of certain rifles.  And, I believe your Honor was requesting

24  that rather than having the full document submitted, it be

25  condensed to some stipulated quotations.  Is that a correct

1   understanding?

2       *THE COURT:* Sure.

3       *MR. KOPEL:* And is it further a correct understanding

4   that you want the plaintiffs to stipulate -- we should work

5   with defendant to agree to a representative and accurate short

6   selection of quotes, and in doing -- from that longer document.

7   And in doing so, we should not take into consideration whether

8   we think those quotes are actually accurate in reflecting the

9   real world, but simply whether they did appear in the document.

10      *THE COURT:* Let me see if I can be -- restate what my

11  view on this is.

12      The document was going to be offered for the fact that

13  the ATF had recommended X.  So what I want you to stipulate to

14  is not quotations, but that the ATF recommended X.

15      *MR. KOPEL:* Which presumably could be done in a

16  paragraph or so, summarizing what X was.

17      *THE COURT:* Precisely.  And the fact is that the ATF

18  recommended it.

19      *MR. KOPEL:* Certainly.  Thank you.  That's very

20  helpful guidance.  I think we will be able to get that worked

21  out.

22      *THE COURT:* Okay.  Good.

23      Anything else?

24      *MR. COLIN:* Nothing from the plaintiff.

25      *THE COURT:* Okay.  I'm seeing shaking heads on the

```
 1  defense, so I assume there is nothing else there.

 2          MS. MORRILL:  That's correct.

 3          THE COURT:  Would you please call your first witness.

 4          MS. MORRILL:  Thank you, Your Honor.  The defendant

 5  calls Jennifer Longdon.

 6          THE COURT:  Please come up and be sworn.

 7          (JENNIFER LONGDON, DEFENDANT'S WITNESS, SWORN)

 8          COURTROOM DEPUTY:  Please state your name, spelling

 9  your first and last name for the record.

10          THE WITNESS:  My name is Jennifer Longdon, that's

11  L-O-N-G-D-O-N.

12          MR. KRUMHOLZ:  Your Honor, before Ms. Morrill begins.

13  Plaintiffs object to the testimony of this witness, who did not

14  testify before the General Assembly.

15          THE COURT:  Could you speak up, sir, and a little bit

16  slower, please.

17          MR. KRUMHOLZ:  Thank you, Your Honor.

18          Plaintiffs object to the testimony of this witness,

19  who did not testify before the General Assembly, for the

20  reasons articulated in our trial brief, as well as by

21  Mr. Abbott at the beginning of the State's case last Thursday.

22          THE COURT:  Thank you.

23          MR. KRUMHOLZ:  Thank you.

24          THE COURT:  You may proceed.

25
```

1       **DIRECT EXAMINATION**

2    *BY MS. MORRILL:*

3    *Q.*  Good morning, Ms. Longdon.

4    *A.*  Good morning.

5    *Q.*  The first topic I'd like to discuss with you this morning

6    is your disability.  The record can't see you in this case, so

7    I must ask, do you use a wheelchair to get around?

8    *A.*  Yes, I do.

9    *Q.*  How long have you done so?

10   *A.*  It will be ten years this coming November.  I have a spinal

11   cord injury.

12   *Q.*  Please describe for the Court the incident that caused your

13   spinal cord injury.

14   *A.*  On November 15, 2004, my fiance and I were victims of a

15   random attack.  We were driving in his vehicle.  We pulled into

16   a drive-through restaurant.  Another vehicle came along beside

17   us and fired five shots.  And as a result, my fiance was shot

18   three times, one bullet went through his shoulder, another one

19   went through his wrist, and into his brain.  He has a very

20   significant frontal lobe injury.  He was also rendered blind,

21   and his olfactory nerve was severed as well.

22        The very last bullet that was fired hit me in the

23   back.  And as a result, I have a T4 ASIA A spinal cord injury.

24   That means from the middle of my chest down I have no voluntary

25   sensation or motor control.

1  *Q.*  I want to talk to you now about your work after the

2  shooting.  What -- what types of advocacy work do you engage

3  in, Ms. Longdon?

4  *A.*  In terms of advocacy, I do two things.  One I would

5  consider to be disability rights, or awareness on issues

6  impacting people with disabilities, such as access to public

7  buildings and health care, those kind of things.  And the other

8  would be prevention of gun violence.

9  *Q.*  And focusing on your advocacy with respect to disabled

10 rights, could you just give a few examples of what that

11 advocacy and work entails.

12 *A.*  Sure.  Well, I have affiliations with a couple of

13 organizations.  I currently am a member of the Phoenix Mayor's

14 Commission on Disabilities Issues.  I will term out of that

15 very soon.  I am immediate past chair of that Commission.  I

16 served two terms as commissioner.  Again, it's all term

17 limited, so my affiliation as a commissioner will end very

18 soon.

19       I'm a member of the Statewide Independent Living

20 Council, SILC, which is a federally mandated organization in

21 each state and territory.  I'm a gubernatorial appointee to

22 that commission, where I also serve as vice chair, so I'm a

23 member of the executive committee.

24       And I also have an affiliation with the Christopher &

25 Dana Reeve Foundation, which is an advocacy organization for

 1  individuals with spinal cord injury, named after Christopher

 2  Reeve.  And I have a couple of roles there.  I am a peer

 3  mentor, so I work with individuals, as needed, with spinal cord

 4  injuries on -- a peer mentor.  I am a paid blogger for their

 5  website.  And I'm also a member of something called the Person

 6  Impact Panel, PIP, which is a loose, informal organization

 7  within their organization.

 8  Q.  And as a result of your work on disabled rights advocacy,

 9  have you had an opportunity to come into first-hand contact

10  with individuals with a broad array of disabilities?

11  A.  Indeed.

12  Q.  Okay.  And based on your observations, do you agree that

13  all disabled people have the same mobility issues?

14  A.  That all disabled people have the same mobility issues?

15  No.  Disability happens rather on a continuum, so even

16  individuals with spinal cord injuries aren't all identical.

17  Q.  Let's talk briefly now about your advocacy on gun reform

18  issues.  Could you provide the Court with some detail or

19  examples of what that advocacy has included.

20  A.  Sure.  Well, I've done a great deal of personal advocacy

21  before I got involved with any organization in any way; but I

22  do have some formal affiliations.  I was briefly employed by

23  the organization mayors Against Illegal Guns.  When they came

24  to Arizona, the individuals who were awarded that contract for

25  MAIG hired me because I was already doing the work that they

1   needed done, and that was hooking them into a survivor network

2   and media contacts.  I also attended press conferences and

3   spoke at those kind of events for them.

4        And I'm a board member of Arizonians for Gun Safety,

5   which is an organization that was formed many years ago that

6   works on education, certainly advocacy, and creates programs to

7   help reduce gun violence.

8   Q.  And in connection with your gun reform advocacy, have you

9   had the opportunity to take positions on proposed legislation

10  in the past?

11  A.  I have.  I've done it in writing, I've done it in the

12  media, I've done it in my personal blog, and I testified at our

13  state legislature on two occasions.

14  Q.  And just to be clear for the record, you are a resident of

15  Arizona?

16  A.  Yes.  I live in Phoenix.

17  Q.  Okay.  Thank you.

18        I want to talk to you now, Ms. Longdon, about your gun

19  ownership.

20  A.  Yes.

21  Q.  Do you own guns?

22  A.  I do.

23  Q.  How many?

24  A.  I own three.

25  Q.  And what -- could you just describe them.

1    *A.*  Sure.  And I'd like to be clear, they're not in my personal

2    possession at this time.  But I do own a .45 Glock.  I own two

3    long guns that are heirlooms.  They belonged to my grandfather,

4    and I have them through inheritance.  One is a very old

5    shotgun, and the other is his old hunting rifle, which I

6    believe is a .22.  I've never fired either of those weapons,

7    since I've owned them.

8    *Q.*  You haven't fired either of the two long guns since you

9    came into possession of those?

10   *A.*  Correct.  I may have fired them as a child, but not since

11   I've been an adult.

12   *Q.*  And it sounds like you grew up around guns and had

13   experience with this from childhood on?

14   *A.*  Sure.  I grew up in a rural community in Ohio, and hunting

15   and fishing was part of our way of life.

16   *Q.*  Focusing on the Glock handgun you described, Ms. Longdon,

17   what's the capacity of -- first of all, does that gun accept

18   magazines, detachable box magazines?

19   *A.*  Yes.

20   *Q.*  What is the capacity of the standard magazine?

21   *A.*  It came with two ten-round magazines.

22   *Q.*  Do you have any other magazines for that?

23   *A.*  No, I don't.

24   *Q.*  Did you own the Glock hand handgun prior to the shooting?

25   *A.*  Prior to my injury, yes, I did.

1   Q.  What purpose did you use that handgun for?

2   A.  Target shooting.

3   Q.  Did you at any time prior to your injury have a concealed

4   carry permit?

5   A.  No.

6   Q.  So is it correct that you never carried the Glock handgun

7   for self-defense prior to your shooting?

8   A.  No.

9   Q.  Since -- I want to talk to you now about self-defense

10  issues after your injury.

11  A.  Uh-huh.

12  Q.  Do you employ any type of home security system?

13  A.  I have two very large dogs.

14  Q.  How about anything mechanical?

15  A.  No.

16  Q.  Okay.

17  A.  No, I don't have a security system.

18  Q.  Do you live in a home or a high-rise?

19  A.  I live in a home.

20  Q.  Okay.  And could you briefly describe your dogs.

21  A.  Yes.  Both of my dogs are there -- well, one is a service

22  dog in training.  I have a 110-pound Doberman.  Her name is

23  Pearl.  She's my service dog.  And I have a 95-pound ball of

24  something.  His name is Porter, and he's a service dog in

25  training.

1    *Q.*  Did you have Porter or Pearl before your injury?

2    *A.*  No.

3    *Q.*  Okay.  Do you use any of your guns -- well, first of all,

4    you still own all three guns that you described earlier?

5    *A.*  I do own them, but they're not currently in my possession.

6    *Q.*  Okay.  And after your shooting occurred, did you obtain a

7    concealed carry license?

8    *A.*  No.

9    *Q.*  And I -- Arizona does permit citizens to concealed carry?

10   *A.*  Correct.

11   *Q.*  Okay.  And do you rely on any of your guns for self-defense

12   in the home?

13   *A.*  No.

14   *Q.*  Okay.  I want to talk to you about specific incidents in

15   which you may have had to engage in self-defense since your

16   spinal cord injury occurred.  Has there ever been an incident

17   in which your personal safety was threatened in your home after

18   your injury occurred?

19   *A.*  Yes.

20   *Q.*  Please describe that for the Court.

21   *A.*  Inside my home.  A couple of years ago, it was a beautiful

22   day.  I work from home.  I'm a free-lance writer, and I was

23   sitting in my little writing area.  I had the doors open,

24   because that's why we live in Phoenix, and music playing.

25   Pearl was the only dog I had at the time, and she was outside.

 1          I heard my front door open, my screen door open.  And

 2   I assumed that it was either a man that I consider a brother --

 3   we're not actually related -- that it was my brother or my son.

 4   So I zipped around the corner to say hello, and there was a man

 5   standing in my foyer area.  He didn't really speak.  I said

 6   something -- yeah, it wasn't exactly polite.  And he reached

 7   out to touch me, because as I had wheeled -- I still had some

 8   momentum as I came around the corner.  I gave a big push as I

 9   came around the corner because I was expecting to hug one of

10   these two men I expected to see there, so I rolled up closer to

11   him than I intended.  And he sort of reached out.  And as he

12   did, my dog Pearl came out of the backyard and grabbed ahold of

13   his arm and wrestled him to the ground and injured him.

14   Q.  And did his encounter with your Doberman make him leave

15   your property?

16   A.  Oh, certainly.  I heard his bones crunch.  He ran out the

17   door screaming, with Pearl briefly chasing him.  And the police

18   were unable to find him at any emergency room.  So -- pretty

19   certain it was nefarious, that he came in the door.

20   Q.  Now I want to ask you about any specific incidents in which

21   your personal safety has been threatened outside of your home

22   since your spinal cord injury occurred.  Has such an incident

23   ever happened?

24   A.  Yes, ma'am.

25   Q.  Okay.  Please describe that.

1  *A.*  Sure.  Last May I had been out doing some public speaking.

2  I was out later than I had intended to be, so I didn't have my

3  front lights turned on.  At the time, I drove a ramp-enabled

4  van that I had to park in the street so I could lower my ramp

5  and come up the curb, up the driveway, and zigzag into my front

6  door.  It was very dark.  I had been doing a lot of public

7  speaking on matters around gun violence prevention at that

8  time.  And as I came up close to my front door, a man who was

9  dressed in black, black watch cap, black long sleeves, came out

10  of the shadow with a large, dark, realistic-looking squirt gun

11  and shot me with it.  It contained water, fortunately.  And

12  said something to the effect of -- please forgive me for the

13  expletive.

14          *MR. KRUMHOLZ:*  Objection, Your Honor.  Hearsay.

15          *THE COURT:*  Is it being offered for the truth of the

16  matter asserted?

17          *MS. MORRILL:*  I will stipulate that it's not, Your

18  Honor.

19          *THE COURT:*  Thank you.  You may proceed.

20          *THE WITNESS:*  So as he shot me with the water pistol,

21  water gun, he screamed something to the effect of, Don't you

22  wish you had a gun now, bitch?  Ran off, got into a car parked

23  a little further down the street.  I was quite shaken.  I went

24  in the house, dialed 911, and that was the end of that

25  incident.

1  *BY MS. MORRILL:*

2  *Q.*  Did you have a handgun or any type of firearm on you at the

3  time that incident occurred?

4  *A.*  No, I didn't.  And I felt he pretty much proved the point

5  that having one wouldn't have helped me.  I was wheeling a

6  wheelchair.  So someone coming out of the dark, I wouldn't have

7  been able -- if that had been a real shooting, if he had shot

8  me, I would not have been able to have employed a weapon in

9  that instance.

10 *Q.*  And, similarly, with the incident that occurred inside your

11 home, did you have a weapon -- a firearm accessible to you at

12 that time?

13 *A.*  Yes, I did, actually.  There was my -- my Glock was stored

14 in my bedroom at that point in time.  But short of carrying it

15 around the house with me throughout the day, you know, it

16 served no purpose.

17 *Q.*  So it was in your home, but not readily accessible to you?

18 *A.*  Correct.

19 *Q.*  Have you -- in the wake of the home invasion incident, did

20 you have an opportunity to consider what, if anything, you

21 could have achieved had -- based on the firearm being in your

22 home?

23          *MR. KRUMHOLZ:*  Objection, Your Honor.  Speculative.

24          *THE COURT:*  Overruled.  The question asks whether she

25 had the opportunity to consider whether she could have achieved

 1 | anything.  It calls for a yes or no answer.

 2 |          *THE WITNESS:*  Yes, I have.

 3 | *BY MS. MORRILL:*

 4 | *Q.*  And did you -- were you able to -- based on the

 5 | consideration you gave to what a firearm would have allowed you

 6 | to do or not do in that situation, did you make any plan to

 7 | carry or -- a handgun on your person in your home after that

 8 | point in time?

 9 | *A.*  Quite honestly, after thinking about it, I realized that I

10 | had the very best home defense program, that my Doberman

11 | handled that situation just fine.  No one died.  You know, I'm

12 | not going to live with that for the rest of my life.  No random

13 | bullets ended up anywhere else in my neighborhood, and I wasn't

14 | harmed.  That man is not going to be walking in any houses.

15 | *Q.*  Definitely not yours.

16 | *A.*  Not mine.

17 | *Q.*  After the incident occurred outside your home where you

18 | were confronted and shot with a water pistol, did you make any

19 | plans to change your -- your position on concealed carry in

20 | public?

21 | *A.*  I certainly put a lot of thought into it.  And I consulted

22 | with some of the police officers that I know and affiliate

23 | with.  And made a decision that, no, a gun at that moment would

24 | not have helped me.  And I do not see personally how -- how I

25 | would successfully employ a firearm when I'm out on the

 1  | streets.  I would be more comfortable bringing my dogs with me.
 2  | Q.  Earlier in your testimony, Ms. Longdon, you described your
 3  | interaction with members of the disabled community.
 4  | A.  Uh-huh.
 5  | Q.  And based on those interactions, are you personally aware
 6  | of any other disabled individuals who have ever had to
 7  | discharge a firearm 16 or more times in self-defense?
 8  | A.  No.
 9  |      MR. KRUMHOLZ:  Objection, Your Honor.  Calls for
10  | hearsay.
11  |      THE COURT:  It does not call for hearsay.  It calls
12  | for a yes or a no answer.  I overrule the objection.
13  |      MS. MORRILL:  Thank you.
14  | BY MS. MORRILL:
15  | Q.  What was your answer, Ms. Longdon?
16  | A.  No.
17  | Q.  Given that you have considered in the wake of these threats
18  | to your personal safety since your spinal cord injury occurred,
19  | whether or not to engage in concealed carry, and given the fact
20  | that you currently own a firearm, a handgun, do you believe
21  | that you could adequately defend yourself with 15 rounds or
22  | less?
23  | A.  Yes, I do.
24  |      MS. MORRILL:  Your Honor, may I have one moment?
25  |      THE COURT:  You may.

```
 1              MS. MORRILL:  Thank you.

 2              No further questions.

 3              THE COURT:  Cross-examination.

 4              MR. KRUMHOLZ:  Thank you.

 5                      CROSS-EXAMINATION

 6    BY MR. KRUMHOLZ:

 7    Q.  Good morning, Ms. Longdon.

 8    A.  Good morning, sir.  How are you today?

 9    Q.  Good, thank you.  It's nice to see you again.

10    A.  Good to see you.

11    Q.  Ms. Longdon, I wasn't sure it was clear on the record, but

12    you talked about the horrible experience of being shot and

13    ending up having this spinal cord injury.  That was -- that was

14    in Phoenix, correct?

15    A.  Yes, sir.

16    Q.  Okay.  And you also testified about having -- about having

17    testified before the legislature on two occasions, I believe is

18    what you said; is that right?

19    A.  Yes, sir.

20    Q.  And when you're talking about the legislature, you're

21    talking about the Arizona legislature in both cases, correct?

22    A.  Yes, sir.

23    Q.  Those are the only two times you've ever testified in the

24    legislature?

25    A.  Yes, I believe so.
```

1  Q.  Okay.  I want to talk for a moment about your level of

2  injury.  You said your level of injury is at T4?

3  A.  Yes, sir.

4  Q.  And the diagnosis is T4 ASIA A?

5  A.  Yes, sir.

6  Q.  And ASIA A means a complete injury, correct?

7  A.  Correct.

8  Q.  And there are different levels, so you could have ASIA B,

9  ASIA C, et cetera, right?

10  A.  Correct.

11  Q.  And, so, as you testified earlier, someone could have a

12  spinal cord injury at T4, but it might affect them in different

13  ways, correct?

14  A.  Correct.

15  Q.  Depending on whether or not that injury was complete or

16  incomplete, so forth?

17  A.  That would be true.  Another individual with a T4 ASIA A

18  could have some different manifestations than I do.

19  Q.  Right.  And at your level of paralysis and your diagnosis,

20  you -- one of the manifestations of your paralysis is you lack

21  stability in your trunk, correct?

22  A.  Yes, sir.

23  Q.  In other words, you don't have control of your stomach

24  muscles or your back muscles, correct?

25  A.  That's correct, sir.

1  *Q.* And so, obviously, that affects your ability to balance,

2  correct?

3  *A.* Yes, sir.

4  *Q.* Now, I believe when we talked at your deposition and you

5  described on direct the firearms that you own -- correct?

6  *A.* Yes, sir.

7  *Q.* And since your injury in 2004, you have had occasion to go

8  to the shooting range, correct?

9  *A.* I have.

10  *Q.* And that has been fairly recently, last couple of years or

11  so?

12  *A.* It has all occurred in the past year.

13  *Q.* Okay. Thank you. Now, of course, you also testified that

14  even before that, you had experience with firearms, correct?

15  *A.* Yes, sir.

16  *Q.* Dating all the way back to childhood?

17  *A.* Yes, sir.

18  *Q.* Now, when you were at the shooting range, you had occasion

19  to change a magazine, correct?

20  *A.* Yes, sir.

21  *Q.* In other words, to put a fresh magazine into the firearm,

22  correct?

23  *A.* Correct.

24  *Q.* And it's correct, isn't it, Ms. Longdon, that the balance

25  issue that we discussed a moment ago made it more difficult for

1    you to change that magazine, correct?

2    *A.*  Slightly, yes.

3         *MR. KRUMHOLZ:*  Your Honor, may I have one moment?

4         Ms. Longdon, thank you for your time.

5         *THE WITNESS:*  Thank you, sir.

6         *MR. KRUMHOLZ:*  No further questions.

7         *THE COURT:*  Thank you.

8         Redirect.

9         *MS. MORRILL:*  Just briefly, Your Honor.  Thank you.

10                       **REDIRECT EXAMINATION**

11   *BY MS. MORRILL:*

12   *Q.*  Ms. Longdon, I just want to touch briefly on Mr. Krumholz's

13   questions about your target shooting after your spinal cord

14   injury.

15   *A.*  Yes.

16   *Q.*  Have you -- have you recently renewed your enjoyment of

17   target shooting?

18   *A.*  I have.

19   *Q.*  Okay.  And you testified in response to one of his

20   questions that your disability slightly affects your ability to

21   switch out from a spent magazine to a fresh magazine?

22   *A.*  Yes, it does.

23   *Q.*  Okay.  In your experiences target shooting since your

24   injury occurred, have you observed a change in the facility

25   with which you can change out to a fresh magazine at the target

```
 1  || shooting ranges that you've been to?
 2  || A.  I'm sorry, could you rephrase that for me.
 3  || Q.  Sure.  Basically, my question is, have you had an
 4  || opportunity to practice that skill?
 5  || A.  Oh, yes.  And I improve every time I practice that skill.
 6  || Q.  And if you had to estimate, based on your personal
 7  || experiences with changing out from a spent magazine to a fresh
 8  || magazine, how long does that take you?
 9  || A.  It's a matter of seconds.  I mean, it's -- changing it --
10  || the first time, if I may -- the first time, it was all about
11  || learning how to -- you know, where does my center of mass and
12  || this weight that I'm holding, where do we -- how do I do that?
13  || And once I became more comfortable with that, then changing the
14  || magazine becomes quicker.  It becomes quicker every time.  It's
15  || a matter of, yes, my injury and the fact that I haven't done it
16  || in many, many years.
17  ||          MS. MORRILL:  Thank you.  Nothing further.
18  ||          THE COURT:  Thank you.
19  ||          May this witness step down and be excused?
20  ||          MS. MORRILL:  Yes, we would ask that she be.
21  ||          MR. KRUMHOLZ:  We have no objection.
22  ||          THE COURT:  Thank you, ma'am.  You are tree to go.
23  ||          THE WITNESS:  Thank you.
24  ||          THE COURT:  Please call your next witness.
25  ||          MS. SCOVILLE:  The State calls Mr. Roger Salzgeber.
```

```
 1            MR. WESTFALL:  May I ask for a three-minute recess for

 2   personal reason?

 3            THE COURT:  You're free to go.

 4            MR. WESTFALL:  This is my witness.  If I could be

 5   given three minutes, that's all I ask for, Your Honor.

 6            THE COURT:  All right.  We'll stand in recess for

 7   three minutes.

 8            MR. WESTFALL:  Thank you.

 9            (Recess at 9:45 a.m.)

10            (In open court at 9:51 a.m.)

11            MS. SCOVILLE:  The state calls Roger Salzgeber.

12            THE COURT:  Thank you.

13            MR. WESTFALL:  Your Honor, while we're bringing in

14   Mr. Salzgeber, I'd like to the interpose the objections we made

15   at the beginning of the defendant's case that was made by

16   Mr. Abbott, concerning on the basis of our trial brief and also

17   exceeding the scope that this person did not testify.

18            In addition, there is one additional objection that I

19   would like to make to this specific witness, Your Honor.  And

20   that is that the defendant has listed both Mr. Salzgeber, who

21   is being asked to testify now, and Ms. Patricia Maisch.  They

22   are both listed as witnesses.  I took the depositions of both

23   of them.

24            Ms. Maisch in fact testified before the General

25   Assembly.  Mr. Salzgeber did not.  And the version of the
```

```
 1   events that will be given in light of the discovery that we
 2   did, I suspect will be different than Mr. Salzgeber will
 3   testify to involving the magazine change and whether it was the
 4   first magazine that just ran out of bullets, or whether in fact
 5   it was the second magazine that was in, that jammed.  That will
 6   be directly contrary -- that the testimony that Mr. Salzgeber
 7   will be offering will be in fact contrary -- impeachment, if
 8   you will, of the testimony that was offered by Ms. Maisch to
 9   the General Assembly.
10          And I would specifically Court's attention to pages
11   legislative HX 208 and 209 in Volume I.  On that basis, as
12   well, we would object, Your Honor.
13          THE COURT:  Your objection on that ground is
14   overruled.
15          MR. WESTFALL:  Thank you.
16          THE COURT:  Thank you.
17          Please administer the oath.
18          (ROGER SALZGEBER, DEFENDANT'S WITNESS, SWORN)
19          COURTROOM DEPUTY:  Please be seated.
20          Please state your name and spell your first and last
21   name for the record.
22          THE WITNESS:  My name is Roger Dale Salzgeber,
23   R-O-G-E-R, last name spelled S-A-L-Z-G-E-B-E-R.
24          THE COURT:  Please proceed.
25          MS. SCOVILLE:  Thank you.
```

1    **DIRECT EXAMINATION**

2    *BY MS. SCOVILLE:*

3    Q.  Good morning, Mr. Salzgeber.  Where do you live?

4    A.  I live in Tucson, Arizona.

5    Q.  And, sir, I'm just going to remind you as we get going that

6    we do have a microphone here.  And it does help everyone in the

7    courtroom if you could speak into the microphone.

8    A.  Okay.

9    Q.  Thank you.  Are you currently employed?

10   A.  No.

11   Q.  Were you previously employed?

12   A.  I was.

13   Q.  What did you do?

14   A.  I owned a wholesale cactus and succulent nursery in Tucson

15   for 35 years.

16   Q.  When did you retire?

17   A.  Seven years ago.

18   Q.  You were involved in a shooting in Tucson, Arizona,

19   correct?

20   A.  I was.

21   Q.  When did that shooting happen?

22   A.  January 8.

23   Q.  In what year?

24   A.  It was three years ago last January.

25   Q.  All right.  So 2011?

1    *A.*  Yes.

2    *Q.*  And what attempt -- what event were you attending that day?

3    *A.*  I was attending a Congress on Your Corner that was given by

4    Gabrielle Giffords.

5    *Q.*  And why did you go to that particular event?

6    *A.*  Well, I had volunteered, worked, on her campaign.  And the

7    night before, Friday, I had received a phone call from her

8    saying that she hadn't seen me since the victory party, and it

9    would be great if I stopped by and said hello.  So . . .

10   *Q.*  Now, had you volunteered on her campaign?

11   *A.*  I did.

12   *Q.*  What did you do as a volunteer?

13   *A.*  I did everything from data entry, to canvassing

14   neighborhoods, to scheduling other volunteers, a whole host of

15   things.

16   *Q.*  So you mentioned that the shooting happened in Tucson.  But

17   where in Tucson was this event being held?

18   *A.*  It happened on the southeast corner of Oracle and Ina Road

19   in front of the Safeway shopping store.

20   *Q.*  Okay.  And what time of day did the shooting happen?

21   *A.*  The shooting occurred at approximately 12 minutes after

22   10:00.

23   *Q.*  And was there a crowd of people gathered for this event?

24   *A.*  There was.

25   *Q.*  About how many, do you have any idea?

1  *A.*  I would say that there were approximately 30 people in

2  line.  It was hard for me to judge.  I was well up at the front

3  of the line.  My wife and I were fourth and fifth in line.

4  *Q.*  Could you describe for the Court, please, what happened

5  that day.

6  *A.*  Well -- so, the people that worked in Gabby's congressional

7  office had chairs set up along the wall, running between the

8  Safeway, and there was a Walgreens under a cover.  And the

9  first maybe 15, 18 of us had chairs.  She was seated.  The rest

10  of the people were standing.  She arrived just a little bit

11  after 10 o'clock and started right in on meeting her

12  constituents.  They had an Arizona flag and a U.S. flag set up.

13  And you could meet with your congresswoman for about five

14  minutes.  And then there was a photo op, where you could get

15  your picture taken with her.

16         And like I said, we were fourth and fifth in line, so

17  that the first gentleman had come and gone.  The second couple,

18  the Tuckers, were just finishing up talking to her, or just

19  about to get their pictures taken.  And a guy raced across the

20  roadway in front of the Safeway from the parking lot, right

21  past one of the tables that the congresswoman had set up with

22  literature about current bills and such in congress, and ran up

23  within about eight, ten feet of her, and shot her in the head.

24  *Q.*  And did you see that?

25  *A.*  I did.

1   *Q.* What happened after that?

2   *A.* He swung around to his right and just kept firing.

3   Incredibly fast. At first -- the sound sounded like someone

4   had thrown a string of fireworks. I mean, it was just pop,

5   pop, pop, pop, pop, pop. And he shot -- I didn't see that, but

6   he shot Ron Barber, her district manager -- he shot Ron, killed

7   Judge Roll, shot Pam Simon. And as he swung around, he shot

8   Gabe Zimmerman in the head right -- I was -- probably 2 feet

9   from Gabe, talking to him. And Gabe had -- when he heard the

10  sound, he had kind of turned his head toward Gabby, and shot

11  Gabe right through the head right in front of me.

12  *Q.* And what happened after that?

13  *A.* He -- my wife had dived backwards over the set of chairs,

14  thinking that a fold-up chair was going to protect her from a

15  bullet. And I hit the ground. And he just went right down the

16  chairs and the line of people that were standing and just shot

17  them, like, point-blank.

18  *Q.* And then what happened?

19  *A.* He -- I looked up from laying down on the ground, and he

20  was about 6 to 8 feet -- his back was 6 to 8 feet in front of

21  me. And I got up. And this all happened, obviously, very

22  fast. But a gentleman by the name of Bill Badger was near --

23  at the end of the line. And the assailant either ran into or

24  was tackled by Mr. Badger at the same time that I hit him from

25  behind, and he was trying to reload at that time.

1  Q.  So --

2  A.  So there was a momentary pause in the gunfire.

3  Q.  When you tackled him, what happened to the gun?

4  A.  Well, I hit him from behind, and Mr. Badger was kind of

5  crouched down in front.  And the assailant fell on his right

6  side with his -- the gun in his right hand.  And when he hit

7  the ground, the gun squirted out of his hand, fell out of his

8  hand, and slid on the sidewalk about, oh, I would guess, maybe

9  2, 3 feet out of his reach.  He had the next clip he was going

10  to put in, in his left hand; and that fell out also on the

11  ground, in front of the assailant.

12  Q.  And what happened, then, with the second clip that fell out

13  of his hand?

14  A.  A woman by the name of Patricia Maisch scooped up that

15  clip.  And she was up against the wall, the brick wall between

16  the Safeway and the Walgreens, and just, you know, had a grip

17  on that clip, wasn't about to let it go.

18  Q.  And then what did you do after you tackled the gunman?

19  A.  Well, I had my right knee on -- so he was laying on his

20  side, right side, and I had my -- my right knee on the artery

21  that runs up your neck, and I had his left hand wrenched behind

22  his back, like, "say uncle" kind of position.  And Mr. Badger

23  had his hand holding down his head, and his other hand around

24  by his hip.  And I remember Mr. Badger was bleeding from the

25  top of his head.  He had been grazed either by a ricochet or a

1   straight on shot, and he was bleeding down my shoulder -- down

2   my sleeve.

3   Q.  So how much total time passed from when the shooting

4   started to when you tackled the assailant?

5   A.  I'm guessing no more than 15 seconds.

6   Q.  Then focusing just at the end, when you tackled him, how

7   much time do you think there was between when the gunman

8   discharged the last round and the point at which you tackled

9   him?

10  A.  A second.

11  Q.  How long did it take you to subdue the gunman?

12  A.  Another, maybe, couple of seconds.  He did not put up any

13  real resistance.  And if he did, I just wrenched down on his

14  arm all the more.

15  Q.  Did you personally observe the gun that the gunman was

16  using that day?

17  A.  I did.

18  Q.  And what gun was it?

19  A.  It was a Glock 9 millimeter.

20  Q.  How did you know that?

21  A.  I'm a gun owner.

22  Q.  Were you familiar with this particular Glock?

23  A.  Well, I'm -- I don't own that particular model, but I -- I

24  do own a couple of guns, and I do go to a gun range and

25  practice every couple months.  And there is lots of people

 1   around me that have those guns, and I've fired one and am

 2   familiar with it.

 3   Q.  And what was the magazine that was on the Glock that was

 4   used?

 5   A.  It was extending maybe about 3 inches beyond the end of the

 6   grip.  It was an extended clip, 32 or 33 shot.

 7   Q.  When you tackled him, what was -- which clip was in the

 8   gun?

 9   A.  The spent clip.

10   Q.  And how do you know that that clip was spent?

11   A.  Well, on an automatic pistol like that -- or semiautomatic

12   pistol like that, the -- when you fire the last shot, the slide

13   locks back so that you can discharge the empty clip and put a

14   fresh one in.  And then you hit a release button, and the slide

15   slides forward and puts the next bullet in the chamber.  And

16   the slide was locked back, indicating that the last bullet had

17   been fired.

18   Q.  And that's something that you personally observed?

19   A.  I did.

20   Q.  Now, did you see the second clip that was in the gunman's

21   other hand?

22   A.  It was laying on the -- it was laying on the sidewalk, and,

23   you know, Mrs. Maisch scooped it up.

24   Q.  Did you see that clip?

25   A.  Yes.

1   Q.   What was the capacity of that?

2   A.   It was another extended clip.

3   Q.   And was that one empty or full?

4   A.   Full.

5   Q.   Did he ever get that -- did the gunman ever get that second

6   clip into the gun?

7   A.   He did not.

8   Q.   When you tackled the gunman, did anything else fall out of

9   his pockets?

10  A.   Two more clips.

11  Q.   And did you have an opportunity to see those yourself?

12  A.   I did.

13  Q.   After you tackled the gunman, did you see what happened to

14  other people at the scene?

15  A.   Well, I was facing away from the carnage.  It was behind

16  me.  When Mr. Badger and I -- and there was another gentleman

17  that ran out of the Walgreens that jumped on his legs just in

18  case he decided to fight.  And I looked over my shoulder, and I

19  saw a lot of -- a lot of carnage.

20  Q.   All right.  What did you see?

21  A.   Well, you know, you couldn't really tell at that point who

22  was dead and alive.  But there were people either laid out or

23  huddled up against the brick wall between that Safeway and the

24  Walgreens.  And the -- the chairs that they had set out were in

25  total disarray, and the ground was just covered in empty shell

1   casings.

2   Q.  How many people were killed?

3   A.  Six.

4   Q.  And who were they?

5   A.  Judge Roll, Gabe Zimmerman, Christina Taylor-Green, Dorie

6   Stoddard, Dorothy Morris, and Phyllis Schneck.

7   Q.  How old was Christina Green?

8   A.  9.

9   Q.  And how many people were injured?

10  A.  I think there was 13.

11  Q.  And how severe were some of those injuries?

12  A.  Well, do you mind if I get a quick drink of water?

13  Q.  Certainly not.  I apologize we didn't have that for you

14  before.

15  A.  That's all right.

16          Christina was 9.  And the injuries ranged from just --

17  just, some people getting shot in the foot to -- the woman who

18  had brought Christina to this event was shot pretty severely.

19  She was standing right next -- well, there was myself, my wife,

20  Christina, and then the woman that brought Christina to the

21  event.  Ron Barber was shot three times.  Pam Simon, I think

22  once.

23  Q.  If the gunman had been limited to the 15 rounds, how many

24  times would he have been forced to reload before he fired the

25  same number of shots?

1  *A.*  Well, you've got to figure at least twice.

2  *Q.*  And if the gunman had been forced to reload after 15

3  rounds, where would he have been standing when he was forced to

4  reload?

5      *MR. WESTFALL:*  Objection, speculation.

6      *THE COURT:*  Response.

7      *MS. SCOVILLE:*  Your Honor, I think this falls under

8  the category of opinion testimony of a lay witness under Rule

9  701.  It's based on his perception.  It's not requiring any

10  particular skill or expertise.

11      *THE COURT:*  Reply.

12      *MR. WESTFALL:*  I don't think this is lay opinion

13  testimony.  I think she's asking for pure speculation, what if.

14  And I think it's classic speculation, Your Honor.

15      *THE COURT:*  I'll allow the witness to answer and

16  overrule the objection.

17      You may answer sir.

18  *BY MS. SCOVILLE:*

19  *Q.*  Do you need the question read back to you, sir?

20  *A.*  Yes, please.

21      (Question read back by reporter.)

22      *THE WITNESS:*  Very close to me, either -- somewhere in

23  the vicinity of Christina and the woman that had brought her to

24  the event.

25  *BY MS. SCOVILLE:*

1  Q.  This event garnered a good deal of media attention, didn't

2  it?

3  A.  It did.

4  Q.  Have you read some of the media accounts?

5  A.  As time passed, I did.  In the very beginning, I pretty

6  much hunkered down and didn't really want to rehash it.

7  Q.  How accurate was the reporting by the media about this

8  event?

9  A.  Some of it was -- well, they got the names of the people

10  killed and injured correctly.  Some of it was correct, some of

11  it was way off base.

12  Q.  You mentioned earlier that you personally own firearms,

13  correct?

14  A.  I do.

15  Q.  And do you keep any of the firearms that you own for

16  self-defense?

17  A.  I do.

18  Q.  And finally, what is the firearm that you keep for

19  self-defense?

20  A.  I have a Browning 9-millimeter pistol with a 13-shot clip.

21  Q.  In Arizona, would you have the capacity to -- the ability

22  to own a firearm with a larger capacity?

23  A.  I'd do the same thing that the assailant did, go down to

24  Sportsman's Warehouse and buy one.

25  Q.  Do you feel that your choice of a firearm with 13 rounds is

1   sufficient for your self-defense purposes?

2   *A.*   I do.   I must say that I bought this gun years ago.   So at

3   the time, those kinds of clips, I don't even think were

4   available.

5        *MS. SCOVILLE:*   I have no further questions.   Thank

6   you.

7        *THE COURT:*   Cross-examination.

8                        **CROSS-EXAMINATION**

9   *BY MR. WESTFALL:*

10  *Q.*   Good morning, Mr. Salzgeber.

11  *A.*   Good morning.

12  *Q.*   Mr. Salzgeber, you testified that Ms. Maisch was also there

13  on the scene, correct?

14  *A.*   Correct.

15  *Q.*   And did you know that she had given testimony before the

16  Colorado General Assembly on House Bill 1224?

17  *A.*   No.

18        *MS. SCOVILLE:*   Objection, hearsay.

19        *THE COURT:*   Overruled.

20  *BY MR. WESTFALL:*

21  *Q.*   Mr. Salzgeber, Ms. Maisch specifically testified that the

22  firearm that was being -- at the time that the assailant -- you

23  and Mr. Badger tackled him, the second magazine was in the

24  firearm, not the first magazine.   Are you familiar that she has

25  made that statement?

```
 1  A.  No.
 2          MS. SCOVILLE:  Objection, hearsay.
 3          THE COURT:  Overruled.  That does not call for an
 4  out-of-court statement being offered for the truth of the
 5  matter asserted.  It is, in fact, evidence that has not been
 6  presented to this court at all.
 7  BY MR. WESTFALL:
 8  Q.  Mr. Salzgeber, when I took your deposition, I believe I
 9  took Ms. Maisch's deposition right afterwards.  Did you have
10  any conversations with Ms. Maisch either immediately after her
11  deposition there at the court reporter's office or any time
12  afterwards?
13  A.  I have not spoken to Mrs. Maisch since we went to
14  Washington, D.C. together two years ago.
15  Q.  Okay.  But your testimony today is, you are convinced that
16  it was the first magazine that was in the firearm, not the
17  second?
18  A.  I know it was.
19  Q.  And how -- and reason you know that is because the slide
20  was in an open position, correct?
21  A.  It was a locked back position.  And Mrs. Maisch was holding
22  the clip -- the full clip.
23  Q.  But her testimony before the General Assembly that it was
24  the third clip, you would disagree with that?
25  A.  I can't answer to Mrs. Maisch's testimony, but I know what
```

```
 1   I saw.
 2   Q.  Mr. Salzgeber, isn't it possible that one of the things
 3   that will cause a Glock or any other semiautomatic magazine
 4   or -- semiautomatic firearm to have a slide lock back would
 5   also be in a jam situation?
 6           MS. SCOVILLE:  Objection, foundation.
 7           THE COURT:  Sustained.
 8   BY MR. WESTFALL:
 9   Q.  Do you know whether -- have you ever seen a firearm like a
10   Glock semiautomatic handgun in a jam situation?
11   A.  No.
12   Q.  So you have no way of knowing that if it was jammed or just
13   empty when the slide was locked back?
14   A.  Come again.
15   Q.  So you would have no way of knowing for certainty that it
16   was -- that it was either empty or jammed if you saw the
17   assailant's firearm with a slide locked in the back position?
18   A.  It's my understanding with a Glock, that it would not do
19   that.  It's the reason that law enforcement uses Glocks.
20   Q.  What's the basis of your knowledge?
21   A.  Numerous trips to the firing range and repeated
22   conversations with the FBI involving this particular incident.
23   Q.  I just want to make sure it's clear:  You believe it's
24   impossible for a Glock to be in a locked open position, the
25   slide locked open position, in a jam situation?
```

1   | *A.*  That's my understanding.
2   | *Q.*  Okay.  Now, after the assailant stopped firing,
3   | Mr. Salzgeber, you were on the ground, correct, immediately
4   | before tackling him?
5   | *A.*  The --
6   | *Q.*  That was a bad question.  After -- it's my understanding
7   | that the moment that the last round was discharged by the
8   | assailant, you were laying on the ground a few feet away from
9   | the assailant, correct?
10  | *A.*  No.  When he fired the last shot, I was coming up on him
11  | from behind.
12  | *Q.*  But you had been on the ground just immediately before
13  | that?
14  | *A.*  Correct.
15  | *Q.*  Like within a second?
16  | *A.*  Well, a couple.
17  | *Q.*  You could not see his hands at the time that you came up
18  | because you were behind him; isn't that correct?
19  | *A.*  That's correct.
20  |         *MR. WESTFALL:*  A moment, Your Honor?
21  |         *THE COURT:*  Uh-huh.
22  | *BY MR. WESTFALL:*
23  | *Q.*  Now, Mr. Salzgeber, if you couldn't see the assailant's
24  | hands, you also couldn't see the gun at the moment of tackling;
25  | isn't that correct?

1  *A.*  That's correct.

2         *MR. WESTFALL:*  No further questions, Your Honor.

3         *THE COURT:*  Thank you.

4         Redirect?

5         *MS. SCOVILLE:*  None, Your Honor.

6         *THE COURT:*  Thank you.

7         Can this witness step down and be excused?

8         *MS. SCOVILLE:*  He may.  Thank you.

9         *MR. WESTFALL:*  He may, Your Honor.

10        Thank you, Mr. Salzgeber.

11        *THE COURT:*  Thank you, sir.  You are excused.

12        Let's take our morning recess at this time.  The Court

13 clock is showing 10:20.  We'll stand in recess until 10:40.

14        (Recess at 10:20 a.m.)

15        (In open court at 10:47 a.m.)

16        *THE COURT:*  Please call your next witness.

17        *MS. SPALDING:*  The State calls John Cerar.

18        *THE COURT:*  Please step up and be sworn.

19           (**JOHN CERAR, DEFENDANT'S WITNESS, SWORN**)

20        *COURTROOM DEPUTY:*  Please be seated.

21        Please state your name and spell your first and last

22 name for the record.

23        *THE WITNESS:*  John Cerar, J-O-H-N, C-E-R-A-R.

24        *MR. COLIN:*  Your Honor, as with other witnesses, I

25 would like to interpose the objection to the testimony of this

1    witness, who did not testify in front of the General Assembly,

2    for the same reasons we've stated in our trial brief and as

3    stated by Mr. Abbott previously.

4              *THE COURT:*  Thank you.

5              Please proceed.

6                        **DIRECT EXAMINATION**

7    *BY MS. SPALDING:*

8    *Q.*  Good morning, Mr. Cerar.

9    *A.*  Good morning.

10   *Q.*  What's your occupation, sir?

11   *A.*  Right now?

12   *Q.*  Yes.

13   *A.*  A consultant.

14   *Q.*  All right.  And you've been retained as an expert in this

15   case, correct?

16   *A.*  Yes, I have.

17   *Q.*  We'll talk about the opinions you're going to express in a

18   few minutes; but first let's just talk about your background

19   and your qualifications, okay?

20   *A.*  Yes.

21   *Q.*  What's your educational background?

22   *A.*  I have a bachelor of arts in secondary education from St.

23   Johns University.

24   *Q.*  Can you briefly describe your career after you left school.

25   *A.*  I worked in a trucking company, and then I was appointed to

1    the New York City Police Department, where I spent 26 years.

2    Q.  And how -- when did you first start with New York's --

3    A.  1973.

4    Q.  And during the time that you were with the NYPD, if I can

5    use the abbreviation, about how many officers were employed by

6    the NYPD?

7    A.  It was generally 38,000.

8    Q.  And what was the highest rank you achieved?

9    A.  Deputy inspector.

10   Q.  And how does that -- how many deputy inspectors during the

11   time that you were with the NYPD were there?

12   A.  Well, I would -- of the 38,000 police officers, I was in

13   the top 300 in the department.  There were ranks of police

14   officer, sergeant, lieutenant, captain, deputy inspector, and

15   inspector, and then chief.

16   Q.  Let's go back to the beginning, if we could.  Can you

17   describe what your first position was with the NYPD.

18   A.  Well, when I was sworn in as a police officer, I attended

19   the police academy for six months, where I was trained in law,

20   police science, social science, physical education, firearms

21   training, and driver education.

22   Q.  Okay.  So your first position was what?

23   A.  Police officer.

24   Q.  All right.  And how long did you -- did you remain a police

25   officer?

1  A.  For approximately nine years.

2  Q.  All right.  And you were promoted after nine years, I'm

3  assuming?

4  A.  Yes.

5  Q.  And you were promoted to sergeant; is that correct?

6  A.  Yes, I was.

7  Q.  What kind of training did you receive as sergeant?

8  A.  As a sergeant, I was trained in the basic management

9  orientation course.  You were going from a police officer to a

10  supervisory rank, so there were courses dealing with that type

11  of supervision.

12  Q.  Okay.  And you were promoted from sergeant, correct?

13  A.  Yes.

14  Q.  First, how long did you remain a sergeant?

15  A.  I was a sergeant for one year.

16  Q.  And --

17  A.  Being promoted in the New York City Police Department is a

18  civil service exam for sergeant, lieutenant, and then captain.

19  After captain, it's not an exam; it's a board.

20  Q.  All right.  So after a year's being sergeant, you were

21  promoted to lieutenant; is that right?

22  A.  Yes.

23  Q.  Did you receive any particular training as a lieutenant?

24  A.  As a lieutenant, you were trained in the middle management

25  course, specific towards the duties that a lieutenant might

 1 | perform.

 2 | Q. All right.  And what kind of duties would those be,

 3 | generally?

 4 | A.  Basically, a lieutenant was either administrative, as the

 5 | desk officer in a precinct.  He was wearing the white shirt

 6 | when people came in to either explain or ask for assistance.

 7 | And as a lieutenant, I also spent time on patrol.

 8 | Q.  How long did you remain a lieutenant?

 9 | A.  About two years.

10 | Q.  And you were promoted to captain, then, right?

11 | A.  Yes.

12 | Q.  Did you receive any additional training to be a captain or

13 | during the time that you were a captain?

14 | A.  Yes, I did.  There was a duty captain's orientation course,

15 | which, again, it was another supervisory rank, captain being

16 | supervisor of both lieutenants, sergeants, and police officers

17 | now.

18 | Q.  What were your duties as captain?

19 | A.  My duties as a captain -- my first duties were as an

20 | executive officer in a patrol precinct, and then as a

21 | commanding officer in the firearms and tactics section in New

22 | York City.

23 | Q.  Before we get to that, let me go back a little bit.  You

24 | indicated that you were an officer for -- the first nine years

25 | of your career with the NYPD, right?

1   *A.*   That's correct.

2   *Q.*   What were your duties as an officer?

3   *A.*   I first started as a patrol officer in high-crime precincts

4   throughout the city, then was transferred to the New York City

5   Police Academy, where I was an academic instructor in the law

6   department.

7   *Q.*   How long were you an instructor in the law department?

8   *A.*   From 1978 to 1982.

9   *Q.*   What kind of things did you teach as an instructor in the

10  law department?

11  *A.*   As -- basically, a law curriculum that was provided to both

12  recruit officers and then in-service training for sergeants,

13  lieutenants, and captains.

14  *Q.*   Was this general a general law course for police officers?

15  *A.*   Yes, it was -- well, there were specialized -- certain

16  specialized, but there a basic law curriculum that had to be

17  taught to recruit officers.

18  *Q.*   All right.  You described your duties as a captain, I

19  think, and I'm sorry, I cut you off, and we went back.  Could

20  you state again what you did as a captain with the NYPD.

21  *A.*   Okay.  My first duties as a captain was the executive

22  officer in a patrol precinct in Queens.  And then I was

23  transferred and -- to be the commanding officer of the firearms

24  and tactics section.

25  *Q.*   What is the firearms and tactics section?

1  *A.*  As the commanding officer of the firearms and tactics

2  section, it's almost like being a school superintendent.  I had

3  11 indoor ranges, and a 54-acre outdoor range in Rodman's Neck

4  in the Bronx in New York, where I was responsible for the

5  training in firearms and in tactics of 38,000 New York City

6  police officers.

7  *Q.*  In addition to the training that you just described that

8  you were responsible for, what else did your position as

9  commanding officer entail?

10  *A.*  As the commanding officer, I was responsible and oversaw

11  the evaluation and testing of firearms, ammunition, of soft

12  body armor, police equipment, and made decisions as to their

13  appropriateness for the use of the New York City Police

14  Department.  I also was designated by the deputy commissioner

15  of public information to be a spokesperson to the media during

16  high-profile events, where police officers were involved in

17  shootings.

18  *Q.*  During your time in the NYPD, sir, did you have occasion to

19  train civilians in firearms use?

20  *A.*  Well, I would say every recruit that comes into the police

21  academy is a civilian.  And, generally, in those days, we

22  appointed thousands of police officers in each -- so I would

23  say at least 4,000 recruit officers as an academic instructor.

24  And then through the nine years I was at the firearms unit, I

25  would say another 18,000 recruits came through.

1  Q.  All right.  And I think you indicated that in your position

2  as commanding officer of the firearms unit, you were

3  responsible for developing curriculum for those recruits.

4  A.  Yes.  As, again, I was -- in both the academic portion of

5  my duties as a police officer and then as the commanding

6  officer of the firearms unit, I was specifically involved in

7  the training and in what the content was and how it was

8  delivered.

9  Q.  All right.  After you became commanding officer, did you

10  have any position or responsibilities with respect to the

11  NYPD's firearm discharge review board?

12  A.  I did.

13  Q.  What is the firearms discharge review board?

14  A.  The firearms discharge review board is a board where I was

15  a voting member, which consisted of, I think, five -- five high

16  personnel from the New York City Police Department who made

17  recommendations and -- as to the appropriateness of a

18  shooting -- a police-involved shooting in the city of New York.

19  Q.  So as a voting member, what kind of information would

20  you -- would you be voting on?  What kind of information came

21  into the discharge review board?

22  A.  Well, every shooting in the city of New York is quite a

23  large investigation.  Initially, there is, I'd say a 15-page

24  report that is prepared, as well as a form report called a

25  firearms discharge assault report, where things that happened

1   during that situation are codified and quantified, such as

2   distance, amount of shots fired, amount of personnel, police

3   officers involved, amount of civilians, month of the year, time

4   of the year, how cold it was, whether somebody was sitting or

5   standing.  Very, very comprehensive report.

6   Q.  Prior to the time that you were a commanding officer, as

7   you rose up the ranks, did you have occasion to generate those

8   reports yourself or review those reports yourself?

9   A.  I was never involved in a shooting, so, thank God I didn't

10  have to do one of those.  But as a sergeant, there was several

11  times that I would be involved in the preparation and

12  assistance in the making of a report for a police-involved

13  shooting, in all my ranks as a police officer, as a sergeant,

14  as a lieutenant, and as a captain.  Specifically, as a captain,

15  you would have to go to the scene of every police-involved

16  shooting that happens in the area that you're responsible for

17  that day.

18  Q.  And just so we're clear, sir, a police-involved shooting --

19  well, can you describe what that is.

20  A.  Okay.  A police-involved shooting basically involves that

21  the police officer fired his weapon.  The discharge assault

22  report is prepared any time a weapon is used against a police

23  officer or displayed against a police officer or a police

24  officer is assaulted.

25  Q.  All right.  How long were you a member of the firearms

```
 1   discharge review board?
 2   A.  I was a member of the department board from -- about nine
 3   years.  And then when I was transferred from the range --
 4   firearms and tactics section to the range, from the range to
 5   patrol bureau Manhattan South, because of my expertise, I was
 6   on the board for the bureau of patrol bureau Manhattan South.
 7   So any shooting that happened in patrol bureau Manhattan South,
 8   I would look into and make recommendations to the department
 9   board as to what we felt, if it was appropriate or within
10   department guidelines.
11   Q.  Okay.  Let me step back a little bit so I make sure I've
12   got all of that.  You were on the firearms discharge review
13   board for about nine years; is that right?
14   A.  Correct.
15   Q.  And then you were transferred to Manhattan South; is that
16   correct?
17   A.  Correct.
18   Q.  Okay, I think I'm getting you.  When you were transferred
19   to Manhattan South, you were on the review board for Manhattan
20   South; is that correct?
21   A.  Correct.
22   Q.  And in that capacity, you made recommendations to the
23   review board that you had been on before; is that right?
24   A.  That's correct.
25   Q.  Okay.  I think I've got you.  Going back to the review
```

1   board, what kinds of things were you looking for when you were

2   reviewing the incident reports that came to you?

3   A.  Well, the shooting was reviewed as to whether it was

4   appropriate and within what the department guidelines were as

5   far as police officers' use of deadly physical force and the

6   use of their firearm.

7   Q.  And about how many officer-involved shootings did you

8   investigate or were you involved reviewing while you were on

9   the -- a part of the review board?

10  A.  For the -- since -- I reviewed prior shootings to my time

11  at the firearms and tactics section as the commanding officer,

12  thousands of shootings, thousands of police-involved shootings.

13  Q.  Do you have any estimate of how many thousands?

14  A.  I would say close to 5,000.

15  Q.  Now, when you were transferred to Manhattan South, did that

16  involve a promotion, or were you the same rank?

17  A.  I was promoted while I was still at the firearms and

18  tactics section; and subsequently, several years later,

19  transferred to Manhattan South.

20  Q.  Okay.  And when you were promoted, what did your rank

21  become?

22  A.  Promoted from captain to deputy inspector.

23  Q.  How long were you in the role of deputy inspector?

24  A.  From 1994 until I retired in 1999.

25  Q.  And can you -- I understand that the -- that your position

1  as deputy inspector involved duties at various places, but can

2  you describe generally what your duties were as deputy

3  inspector.

4  A.  Well, as a deputy inspector, again, the same duties that I

5  had at the firearms and tactics section, but they were paying

6  me more.  Then when I got promoted to -- I'm sorry, when I got

7  transferred to Manhattan South, my title was administrator.  I

8  was responsible for the administration of ten precincts in

9  Lower Manhattan.  Also in charge of details of police officer,

10  sergeants, and lieutenants, and captains at very many parades,

11  demonstrations, and high-profile events in Manhattan.

12  Generally, if something happened in the city -- in New York, it

13  happened in Manhattan South.

14  Q.  Okay.  That sounds interesting.  After you retired, sir,

15  did you continue to do any work with the NYPD?

16  A.  Yes.

17  Q.  What kind of work did you do?

18  A.  Well, I worked as a consultant in several high-profile

19  shootings in New York City.

20  Q.  Can you give -- can you give us an idea of the kind of

21  consulting you did.

22  A.  In 2000 I worked with the attorneys for the defense in

23  the -- several police officers in the Amadou Diallo case.  In

24  2007, I worked with the attorneys and consulted on the Sean

25  Bell case.  Both of these cases involved plainclothes officers

```
 1  who fired numerous rounds, and, unfortunately, the perpetrator
 2  did not have a firearm.
 3  Q.  Did you provide an expert opinion in those cases?
 4  A.  No.
 5  Q.  And --
 6  A.  But I worked extensively with the attorneys.  And the case
 7  went so well for -- as far as the attorneys felt, that my
 8  testimony would not be necessary.
 9  Q.  All right.  Sir, do you consult with any other entities as
10  a consultant besides the NYPD?
11  A.  I'm currently consulting with the Aurora Police Department
12  on a police-involved shooting.
13  Q.  And have you had experience in the past presenting at
14  conferences?
15  A.  Yes, I have.  I've lectured at several American Society of
16  Law Enforcement Trainers conferences.  I've lectured with the
17  International Association of Law Enforcement Firearms
18  Instructors conferences.  I did some training with the New York
19  State Law Enforcement Directors Association.  And I've
20  networked all around the country with various police
21  departments, federal agencies, and foreign governments.
22  Q.  Tell me the topics that you presented at conferences.
23  A.  Well, one of them was specific to a report that was
24  generated from the city of New York, which was called --
25  previously called an SOP 9, which developed into the firearms
```

1    discharge assault report.  It was, as I said before, an

2    extensive collection of data used by me as a trainer in what

3    content of our training would be for each cycle that we had

4    with the training of our police officers.

5    Q.  Okay.

6    A.  Distance, amount of shots, things like that.

7    Q.  Okay.  Let me just stop you right there, because we haven't

8    talked about that particular form yet.  The SOP 9 is what, now?

9    A.  The SOP 9 is the precursor of the firearms discharge

10   assault report.

11   Q.  And is this a form that is filled out by police officers?

12   A.  It's a form that is filled out during every shooting.  And

13   then I was responsible for the annual report, collecting all of

14   the data, putting those numbers together.  And an annual report

15   was put out under my name for the nine years that I was the CO

16   at the range.

17   Q.  That was my next question.  Are there any other topics that

18   you -- that you presented or discussed at conferences?

19   A.  Yes.  I talked specifically a lot about the transition from

20   a six-shot revolver to a semiautomatic firearm.

21   Q.  That transition occurred during the time that you were with

22   the NYPD, correct?

23   A.  Yes, it did.

24   Q.  Sir, can you give us your understanding of the Colorado law

25   that is at issue here.

1    *A.*  My understanding is that the bill states that you cannot --

2    there is a ban on large-capacity magazines, which are defined

3    in the bill as a magazine that has a capacity of more than 15

4    rounds of ammunition.

5    *Q.*  And do you have an opinion on whether large-capacity

6    magazines -- again, adopting that same definition that you've

7    just recited -- are necessary for self-defense?

8    *A.*  Yes, I have an opinion.

9    *Q.*  And what's your opinion?

10   *A.*  That they're not necessary.

11   *Q.*  How did you reach this opinion?

12   *A.*  Again, through the extensive reports and shootings that I

13   studied throughout the years, 15 rounds is not -- is way more

14   than most shootings that take place.

15   *Q.*  And the shootings that you're talking about are shootings

16   that are police-involved, correct?

17   *A.*  Correct.

18   *Q.*  Would you expect that police-involved shootings might

19   involve more rounds fired than shootings involving civilians?

20   *A.*  Yes, I do.

21        *MR. COLIN:*  Objection.

22        *THE COURT:*  I'm sorry, I didn't hear the objection.

23        *MR. COLIN:*  It's foundation objection.  He hasn't

24   established any knowledge regarding civilian shootings.

25        *THE COURT:*  Thank you.  I sustain the objection.

1  *BY MS. SPALDING:*

2  *Q.* Sir, are you aware of any situation where civilians have

3  fired more than 15 rounds in self-defense?

4  *A.* In all of my networking, media, whatever, I have never

5  heard of a civilian firing more than 15 rounds in self-defense.

6  *Q.* How about ten rounds?

7  *A.* I do recollect ten rounds, but I can't tell you the

8  specifics.

9  *Q.* All right. Now, you've had a chance to review the expert

10 report of Gary Kleck, have you not?

11 *A.* Yes, I have.

12 *Q.* And Mr. Kleck states, doesn't he, that many defensive gun

13 uses -- I think that's his term -- by civilians are likely to

14 require large numbers of rounds. Is that your understanding of

15 one of his opinions?

16 *A.* Yes, it's my understanding. But I don't agree with it.

17 *Q.* Okay. Why don't you agree?

18 *A.* Because I don't think it's necessary that -- if New York

19 City police officers don't need more than 15 rounds, I don't

20 see why civilians would have to use more than 15 rounds.

21 *Q.* Okay.

22 *A.* When --

23 *Q.* I'm sorry, go ahead.

24 *A.* Okay. When we did our studies of the transition from the

25 revolver to the semiautomatic, one of the major concerns we

1   had, what was going to happen to the additional rounds that the

2   police officers were going to have available to them.  Very

3   concerned about innocent persons, injuries to other police

4   officers.

5   Q.  And what was your role in -- in the studies or analyzing

6   the studies that were done for the purpose of determining how

7   or whether to transition from revolvers to semiautomatic

8   weapons?

9   A.  I oversaw the whole process of what -- we looked into -- we

10  even looked into, as we were doing the study, the transition

11  study, we looked into ten-round magazines.  Ten-round magazines

12  weren't even part of the gun world at the time.  But because

13  the New York City Police Department wanted to test them, every

14  gun manufacturer got me a ten-round magazine so I could put it

15  in their gun and test it.

16          We studied the issue for several years.  Again, some

17  police departments, which are much smaller, can do things

18  without affecting 38,000 people.  My major concern, again, was

19  the amount of rounds used.  And if I made a mistake, it wasn't

20  my mistake, it was 38,000.

21  Q.  What was the basis of your concern that -- well, just that,

22  what was the basis of your concern about the transition?  What

23  is it you're worried about?

24  A.  I was worried about the additional ammunition being used

25  and the innocent persons that might be involved.  Once again,

1  the studies -- my studies did with all shootings within the New

2  York City Police Department, most incidents where a police

3  officer fires his gun in New York City, over all the years that

4  I studied, was less than five, in every incident, averaged.

5  Q.  So why was it that you were worried that a transition to a

6  semiautomatic pistol would result in a different result?

7  A.  Well, because a police officer had six rounds in his

8  revolver on duty.  During the times of high crime in the late

9  '80s and what was going on in the criminal world, we first went

10  to speed loaders, which was a little device that took a little

11  time -- less time for an officer to reload his gun if he had

12  to.

13  Q.  His revolver?

14  A.  His revolver, yes.

15  Q.  Okay.

16  A.  Okay.  Then looking into the transition, we had -- we did

17  not have many mechanical problems as far as the weapons went.

18  And, again, this is early on in the 9-millimeter semiautomatic

19  industry for police use.  So we were concerned about mechanical

20  operation, what different types of ammunition would do to the

21  gun.  With a revolver, it was principle of keep it simple,

22  stupid.  The operation -- we did not have mechanical problems

23  where a police officer was involved in a shooting and he didn't

24  have -- he had to use his gun as a hammer because it did not

25  fire.  Very concerned about those different types of things.

```
 1   Q.  Did you have any concerns relative to the number of rounds
 2   that were available -- or that would be available to a police
 3   officer?
 4   A.  Yes.  I mean, we looked into that.  We wanted to ensure
 5   that the mind-set of the police officer was that he was not
 6   being outgunned.  That was the term that was used by a lot of
 7   media at the time, that the criminals were outgunning the
 8   police officers.  And early on, again, the guns that the
 9   criminals were using were more -- even, you know, they used
10   Saturday night specials, and that's a term of a gun that's --
11   that's not high quality manufacture.  And early on, a lot of
12   those highly -- not qualified -- not high quality types of
13   semiautomatics were prevalent in criminal use.
14   Q.  All right.  Is there a difference, sir, in the amount of
15   ammunition a police officer needs versus the amount of
16   ammunition a civilian might need for self-defense?
17   A.  Well, a police officer's job --
18           MR. COLIN:  Again, foundation objection regarding the
19   number of rounds a civilian would use for self-defense.
20           THE COURT:  Response.
21           MS. SPALDING:  Let me rephrase, Your Honor.
22           THE COURT:  Okay.
23   BY MS. SPALDING:
24   Q.  What kind of duties does a police officer normally have,
25   sir?
```

1  *A.*  Okay.  A police officer -- when the alarm rings, the police

2  officer is generally running towards the alarm.  And in a lot

3  of cases, the civilian is going away from the alarm.  Police

4  officers are involved in arrest situations, enforcement.  It's

5  their specific job.  If a robbery happens, that's where you

6  send the police officer.

7  *Q.*  Is the concern -- well, let me start over again.  Was part

8  of the concern in transitioning from revolvers to semiautomatic

9  pistols for police officers, that police should have sufficient

10  rounds to meet those threats that you just described?

11  *A.*  That's correct.

12  *Q.*  And are those activities done by civilians, commonly?

13  *A.*  No, they're not.  Basically, a civilian, if he's going to

14  need a firearm, it would be in a self-defense situation, not in

15  an enforcement type of capacity.  And, generally, if it's a

16  self-defense situation, that civilian would be closer to the

17  perpetrator.  Because if you're going to be robbed, the robber

18  is generally within a couple of feet of you.

19  *Q.*  All right.  Do you know the magazine capacity in the

20  firearms that NYPD officers carry today?

21  *A.*  Yes.  It's 15-round magazines.  Officers are also required

22  on patrol to carry two additional magazines.  So a New York

23  City police officer would have fifteen rounds in a magazine,

24  one round in the chamber, and thirty additional rounds.  So all

25  uniformed police officers are required to carry 46 rounds of

1    ammunition.

2    *Q.*  How do you know this?

3    *A.*  Because that's the law of the New York City Police

4    Department.  It's -- we have a guide, a patrol guide, and

5    different regulations.  It's in the rules and regulations.

6    *Q.*  All right.  While you were with the -- well, you've already

7    described the SOP 9 forms that you reviewed that became the

8    firearms discharge form, correct?

9    *A.*  Yes.

10   *Q.*  Did you, while you were with the NYPD also review any

11   reports related to civilian firearm use?

12   *A.*  As a captain and, certainly, as the deputy inspector in

13   patrol bureau Manhattan South, I received a daily report of two

14   things, two separate reports.  One report would be specific

15   towards, say, patrol bureau Manhattan South when I was there,

16   and then I would receive a city-wide report as to what they

17   call unusual occurrences.

18   *Q.*  What's an unusual occurrence?

19   *A.*  An unusual occurrence is something that is high profile,

20   such as a civilian getting involved in a shooting, a

21   self-defense of a store owner in a robbery situation, injuries

22   to people, shootings in the street, shots fired somewhere.

23   *Q.*  All right.  And for how many years did you get these

24   reports?

25   *A.*  Well, I would be -- from 19 -- when I was -- 1985 to when I

 1   retired in the year 1999.

 2   Q.  Can you estimate how many of these reports you reviewed

 3   over your career?

 4   A.  Well, 365 days in a year, I mean -- and then, certainly,

 5   you know, more than one page to some of them, so --

 6   Q.  A lot?

 7   A.  It was a lot.

 8   Q.  All right.  And you indicated that from your knowledge and

 9   your review of these reports, you were unaware of a time when a

10   civilian was required to fire more than 15 rounds in

11   self-defense; is that correct?

12   A.  That's correct.

13   Q.  Is there any other basis for the opinion that we've

14   discussed, aside from the reports and all the various reports

15   that we've discussed that you reviewed or generated over your

16   lifetime and then your experience with the NYPD?

17   A.  Once again, in my networking with fellow firearms personnel

18   from around the country, there was never an instance that

19   anyone ever told me about where a civilian fired 15 rounds in

20   self-defense.

21   Q.  All right.  Thank you, sir.

22         Mr. Cerar, what do you understand the term "spray and

23   pray" to mean?

24   A.  Spray and pray was one of the things -- a term that came

25   out when the transition was starting, looking at additional

1 capacities with a magazine, with additional ammunition in a
2 magazine. And what it meant was, is that with the more rounds,
3 would the person's mindset be that, oh, I have all of these
4 rounds, so I don't really have to care because I can keep
5 pulling the trigger, and one of these 18, 19 rounds is going to
6 hit something. And that was it. Instead of using gun control
7 and hit potential and looking to hit the target, just spraying
8 around without --
9 Q. Okay. Do you have an opinion on the impact to the public
10 of the use of large-capacity magazines? Again, I'm talking
11 about a magazine with an excess of 15-round capacity, in
12 self-defense situations?
13 A. Would you repeat the question.
14 Q. Yeah, I'm sorry. That wasn't a very good one. Let me try
15 again. Do you have an opinion on the impact of the public on
16 the use of large-capacity magazines in self-defense situations?
17 A. Yes, I do.
18 Q. What is that opinion?
19 A. My opinion would be that 15 rounds is more than necessary
20 for a self-defense situation, and that there would definitely
21 be a danger to innocent persons if -- in a shooting situation,
22 if you don't hit them with the first 15, it's not likely you
23 will hit them with the next 15.
24 Q. Tell me a little bit more about that. What are you
25 thinking about when you say, if you don't hit a target with the

1 | first 15, the next 15 are going to go the same way?

2 | A.  Well, in my studies -- again, what I was concerned about

3 | when we were increasing from the six shots to fifteen, what was

4 | going to happen?  And, again, in my studies -- I've studied a

5 | lot of situations where police officers fired more than 15

6 | rounds.  And in all of those cases, the hit potential didn't

7 | increase because he had additional ammunition.

8 | Q.  In -- have you -- in the course of the work that you do

9 | with respect to the transition from a revolver to a

10 | semiautomatic pistol, did you review any statistical

11 | information that bore on -- on this particular topic, that is,

12 | a concern for the availability of additional rounds that might

13 | go astray?

14 | A.  You're going to have to repeat the question.

15 | Q.  Let me try that one again.

16 |     You've -- did you review any statistical information

17 | related to the transition from revolver to semiautomatic

18 | pistol?

19 | A.  Yes, I did.  I mean, I reviewed what the shootings were in

20 | the city of New York and how many rounds were being fired by

21 | bad guys against police officers, how many rounds were being

22 | returned by the police officers to the bad guys.

23 | Q.  And what did the statistical information tell you?

24 | A.  I would say in most cases, police officers fire more than

25 | the bad guys.  In most cases.  There are some that are

```
 1   different, but there is -- there wasn't a statistical number
 2   that said, oh, gee, you fired three rounds, and the guy goes
 3   down.  I mean that was not the case.  So many variables are
 4   involved in a shooting.  But, basically, we in the New York
 5   City Police Department found that it was going to be okay for
 6   cops to carry 15 rounds in a magazine and be safe.
 7   Q.  And did you have any concerns about the transition yourself
 8   from revolver to semiautomatic pistol?
 9   A.  Yes.  I had a lot of concerns.  It -- the studies probably
10   started in the late '80s, went into the '90s.  Very concerned
11   about the additional ammunition.  I was transferred to
12   Manhattan South.  And within 60 days, the first deputy
13   commissioner called up and had me transferred to the first
14   deputy commissioner's office because four officers went into a
15   large supermarket in the Bronx and fired 123 rounds.  There
16   were serious injuries to tomato ketchup and sauerkraut cans,
17   and none of the rounds hit the person who was perpetrating the
18   crime.
19   Q.  Was that an example of spray and pray, did you think?
20   A.  Oh, yeah.
21   Q.  You've indicated the NYPD ultimately decided -- well,
22   ultimately decided to use a 15-round magazine as a standard
23   magazine, correct?
24   A.  That's correct.
25   Q.  And was there any reason that the NYPD decided not to use a
```

1  larger-capacity magazine?

2  *A.*  Well, basically, when you start with a larger-capacity

3  magazine, it makes the firearm you're using usually general

4  bigger.  And we found that the 15-round magazine firearms were

5  sufficient for all NYPD incoming personnel and whoever was

6  there before.

7  *Q.*  Are you familiar with any incidents where innocent

8  bystanders were hit by police fire?

9  *A.*  Yes.  Unfortunately, I would say there is at least three to

10  five innocent persons hit by gunfire in the city of New York

11  every year.

12  *Q.*  And do you feel that that's a danger when -- the more

13  rounds police officers fire?

14  *A.*  There is no doubt in my mind that the more rounds that are

15  fired, the more the potential is for an innocent person to be

16  hurt or another police officer to be injured because of it.

17  *Q.*  All right.  And is -- you've indicated that you had a

18  substantial role in training police officers, I believe, in

19  your years at the NYPD, correct?

20  *A.*  Yes.

21  *Q.*  And is that part of police officer training, that is, to

22  avoid bystander injury?

23  *A.*  Absolutely.

24  *Q.*  What kind of training do police receive to avoid bystander

25  injury?

1    *A.* Well, their training is that the best time to end the

2    gunfight is with the first round.  If you have to fire your

3    gun, the first several rounds are critical in stopping the

4    actions of the perpetrator.

5    *Q.* How would providing civilians with additional firepower,

6    that is, additional magazine capacity, be different, if there

7    is a difference, between providing police personnel with

8    additional firepower?

9         *MR. COLIN:*  Once again, as to civilians, I don't think

10   there has been a foundation laid for this witness's opinion.

11        *THE COURT:*  Response.

12        *MS. SPALDING:*  I believe he has, Your Honor.  He's

13   testified that he had knowledge of civilian-involved shootings

14   for many years while with the NYPD.

15        *THE COURT:*  Reply.

16        *MR. COLIN:*  I don't believe that was the question.

17   This witness has general knowledge based upon reviewing what I

18   understood to be daily reports that he received in Manhattan

19   South regarding the activities of Manhattan South and New York

20   generally in which civilians were involved in shootings.  I

21   don't think that provides a sufficient foundation for the

22   opinion that has been requested here.

23        *MS. SPALDING:*  Could I add additional comment, Your

24   Honor?

25        *THE COURT:*  You may.

```
 1  ║        MS. SPALDING:  He's also indicated in his testimony
 2  ║ that he was responsible for the training of all new recruits
 3  ║ that came into the NYPD and that they were, essentially,
 4  ║ civilians when they came in.  Well, they were civilians when
 5  ║ they came in.
 6  ║        MR. COLIN:  But, Your Honor, they're not being trained
 7  ║ as civilians.  They're being trained as police.
 8  ║        THE COURT:  Thank you.
 9  ║        I believe sufficient foundation has been laid to
10  ║ express this opinion.  I overrule the objection.  You can
11  ║ answer the question.
12  ║        Would you like to have it read back to you?
13  ║        THE WITNESS:  I certainly would.
14  ║        THE COURT:  All right.
15  ║        Ms. Lindblom, would you please read the question back.
16  ║        (Question read back by the reporter.)
17  ║ BY MS. SPALDING:
18  ║ Q.  Let me try that again, that was so terrible.  How would
19  ║ providing civilians with additional magazine capacity be
20  ║ different than providing the same to police personnel?
21  ║ A.  Well, again, police officers are probably better trained
22  ║ than civilians.  But I would be very concerned in anyone
23  ║ shooting more than 15 rounds in a situation, in a self-defense
24  ║ situation.
25  ║ Q.  Now, you've indicated that at least part of the reason for
```

1  the transition by the NYPD to -- from revolvers had to do with

2  assuring police that they wouldn't be outgunned, as you put it,

3  I think, correct?

4  *A.*  Yes.

5  *Q.*  Would that be a concern with civilians as well?  That is,

6  if they didn't have access to a large-capacity magazine, they

7  would be outgunned?

8  *A.*  I think if a civilian was trained in the weapon that he

9  chose, if he knew about the operation, I don't think he'd need

10  15 -- you know, he would be better when he's utilizing it.

11  *Q.*  Have you spoken with any other officers, former officers,

12  or experts regarding the need for civilians to fire more than

13  15 rounds in self-defense?

14        *MR. COLIN:*  I think we're moving into the hearsay

15  response here, Your Honor.

16        *THE COURT:*  Response.

17        *MS. SPALDING:*  I withdraw the question, Your Honor.

18  BY MS. SPALDING:

19  *Q.*  Sir, do you have experience specifically with civilians'

20  firearms use?

21  *A.*  Once again, I trained thousands of recruits who were

22  civilians just weeks before or days before they put on the

23  uniform.  And although, yes, I was responsible for ultimately

24  making them police officers, believe me, they weren't when they

25  came.

1   Q.  Okay.  And you also reviewed the unusual occurrence

2   reports, I think you referred to earlier, as part of your

3   responsibilities, correct?

4   A.  Yes.

5   Q.  And --

6   A.  I never heard of a civilian using more than 15 rounds in

7   self-defense and not having an additional magazine.

8   Q.  All right.  Sir, do you have an opinion on whether a

9   restriction on magazine capacity such as the one at issue in

10  this case would reduce the efficacy of rifles as a self-defense

11  weapon?

12  A.  Yes, I do.

13  Q.  What is your opinion?

14  A.  My opinion is that a rifle is a military type of weapon,

15  not specific towards self-defense.

16  Q.  Do police carry rifles?

17  A.  Specialized units within the police department carry

18  rifles.  I don't know of any civilians that walk down the

19  street to defend themselves from a street robbery with a rifle.

20  Q.  And in what situations do police use rifles?

21  A.  Excuse me?

22  Q.  In what kind of situations do police use rifles?

23  A.  In maybe in a hostage-type situation, that would be more

24  specific to that.

25  Q.  All right.  And why do you believe a rifle is not a good

 1 | weapon for self-defense?

 2 | A.  Well, number one, because rifles generally have more

 3 | overpenetrative capabilities.  And, specifically, when a

 4 | civilian is defending himself in a home or a type of structure,

 5 | that there is a potential for those rounds that are fired and

 6 | missed, specifically, more than 15, which would generally go

 7 | through walls and ceilings.

 8 | Q.  All right.

 9 | A.  So the potential for a stray round hitting someone in your

10 | family, a neighbor is -- increased.

11 | Q.  All right.  And in the course of your career with the NYPD

12 | did you see instances where rounds strayed from their intended

13 | area, target area?

14 | A.  Yes, I have.

15 | Q.  And with respect to rifle rounds, let's say -- and I'm --

16 | say, the kind of weapon that you had indicated that your

17 | officers might use in specific situations, how far from the

18 | intended target area have those rounds been found?

19 | A.  Well, it's -- using a rifle, depending on what type of

20 | rifle it goes, it could go almost a mile.  If the bullet don't

21 | hit anything, it keeps going.  It's going to hit something.

22 | Q.  And were there times -- were there occasions you reviewed

23 | when you were with the NYPD where you found that rounds had

24 | strayed into adjacent buildings or structures?

25 | A.  Yes, many -- well, I would say, there were enough instances

```
 1   that it was concerning.
 2   Q.  Do you have the same concern with a handgun?
 3   A.  I always have concerns with any type of shooting.  But,
 4   yes, in -- my concern would be, it would be less.  The
 5   potential of overpenetration using a handgun would be less.
 6   Q.  And why is that?
 7   A.  Because the round that is used in the handgun would be of a
 8   lesser than a rifle capability.
 9   Q.  All right.  Sir, do you have an opinion on whether limiting
10   magazine capacity would reduce the number of people killed or
11   injured in mass shooting events?
12   A.  Yes, I do.
13   Q.  What's your opinion?
14   A.  That it has the potential, by limiting the amount of rounds
15   and ammunition, could stop an action such as what happened in
16   Arizona and in Colorado.  In one instance, I believe the person
17   was in the process -- in Arizona, of reloading.  And because of
18   that, people were able to overcome him and stop the actions.
19   And --
20   Q.  Okay.  Let me stop you right there.  What is it about a
21   limitation of magazine capacity that you believe would lead to
22   the reduction in the number of people killed or wounded in that
23   kind of a situation?
24   A.  Well, because the more rounds that are available to that
25   person, he doesn't care what he's shooting at or who he's
```

```
 1   shooting at, he'll just continue to shoot.  In the Colorado
 2   case, I believe he had a 100-round magazine, where he fired at
 3   least 68 before it jammed.  And it was -- it was a good thing
 4   that it jammed, because people were able to get out of harm's
 5   way because of that.
 6   Q.  Okay.  Well let me stop you there.  You're referring, I
 7   believe, to the Aurora theater shooting; is that correct?
 8   A.  Yes.
 9   Q.  Where did you obtain your information concerning the Aurora
10   theater shooting?
11   A.  From media and TV reviews.
12   Q.  And is your concern -- is your -- is your feeling, then,
13   that it's the number of rounds available to individuals that,
14   if limited, would then limit the number of people who are
15   killed or wounded, is that?
16   A.  Yes, I --
17          MR. COLIN:  Objection, leading.
18          THE COURT:  Sustained.
19   BY MS. SPALDING:
20   Q.  Let me try that one again.  You talked about the Arizona
21   event, correct?
22   A.  Yes.
23   Q.  And I believe that you were referring to the shooting of
24   Representative Giffords and the folks who were attending her
25   event that day by the Safeway in Tucson, correct?
```

1   *A.*  Yes.

2   *Q.*  You talked about the shooter being tackled, right?

3   *A.*  Yes.

4   *Q.*  And is it your understanding that the shooter was reloading

5   at the time he was tackled?

6   *A.*  That's correct.

7   *Q.*  Okay.  What is it about the fact that the shooter was

8   reloading at the time he was tackled that leads you to believe

9   that a 15-round -- or a lower-capacity magazine would be

10  beneficial in a mass shooting situation so as to avoid injury

11  or death?

12  *A.*  All right.  Because of the pause in the action -- once

13  there is a pause, even if it's just seconds -- and that's all

14  it could be -- you know, an experienced shooter can reload in

15  seconds -- my belief would be that -- my opinion would be that

16  with that break, and it certainly showed to be true, the perp

17  was able to be overcome in one situation, and in the other,

18  innocent persons were able to flee the area and save their

19  lives.

20  *Q.*  You're speaking of the Aurora theater shooting, right?

21  *A.*  Yes.

22  *Q.*  From what you're saying, is it your understanding that when

23  the shooter in the Aurora theater shooting event paused because

24  there was a malfunction or something occurred with his gun and

25  he attempted to reload, people were able to escape?

```
 1              MR. COLIN:  Once again --
 2              THE WITNESS:  That's right.
 3              MR. COLIN:  Leading.
 4              THE COURT:  Sustained.
 5  BY MS. SPALDING:
 6  Q.  Let me try that again.  With respect to the Aurora theater
 7  shooting, what's your understanding of the events that
 8  occurred?
 9  A.  With the Aurora --
10  Q.  At least relevant to the opinion you're giving here.
11  A.  Okay.  In the Aurora situation, it's my opinion that
12  because the persons -- the weapon he was using at the time
13  jammed, it gave people who were in that theater a chance to
14  flee.
15  Q.  And what correlation do you make, if any, between that
16  event, that pause that allowed people to escape, and the use of
17  a lower-capacity magazine, say, a 15 round or less?
18  A.  Well, he would have only been able to fire 15 rounds,
19  without a malfunction.  If that was the limit, 15 rounds was
20  all he would have been able to fire before he reloaded.  He
21  would have had to reload, and there would be time for people to
22  do something.
23  Q.  All right.
24              MS. SPALDING:  I have no more questions.  Thank you
25  very much, sir.
```

```
 1              THE COURT:  Thank you.  Cross-examination.

 2              MR. COLIN:  Thank you.

 3                       CROSS-EXAMINATION

 4   BY MR. COLIN:

 5   Q.  Good morning.

 6   A.  Morning.

 7   Q.  Mr. Cerar, I'm going to touch -- try to touch upon

 8   everything we've talked about, you've talked about with

 9   Ms. Spalding this morning, but I want to start with some

10   clarification regarding your prior experience as an expert.

11              Am I correct that you have never been accepted by a

12   court of law as an expert in any field?

13   A.  Yes, but I was able to assist the defense in several

14   high-profile cases.

15   Q.  And I appreciate your --

16   A.  And because --

17   Q.  Mr. --

18   A.  -- because the trial was going --

19              THE COURT:  Sir, we have to do it with a question and

20   an answer.

21              THE WITNESS:  Okay.

22              THE COURT:  So what will happen here is, the attorney

23   will ask you a question; say what you're going to say in

24   response to the question; he's going to ask you another one.

25   If you don't think you've gotten a chance to say everything you
```

1  want to say, I'm sure that the State attorney will ask you more

2  questions to give you an opportunity to clarify.

3         THE WITNESS:  Thank you.

4  BY MR. COLIN:

5  Q.  All right.  So my question was, you've never been accepted

6  or qualified by any court as an expert in any field; is that

7  accurate?

8         MS. SPALDING:  Objection, Your Honor.  Relevance.

9         THE COURT:  Sustained.

10 BY MR. COLIN:

11 Q.  Have you ever been retained as an expert or qualified as an

12 expert to testify in a federal court regarding any

13 firearms-related issues specifically?

14        MS. SPALDING:  Objection to relevance, at least as to

15 the part about qualified by any court.

16        THE COURT:  Sustained.

17        MR. COLIN:  Your Honor, we have challenged this

18 expert's qualifications to render several of the opinions which

19 he has offered.  His prior experience, or lack thereof, in

20 terms of expertise in the areas in which he has opined are

21 relevant to whether or not he is qualified.  I can abandon the

22 area; however, I believe the information sought is relevant to

23 the --

24        THE COURT:  You're seeking reconsideration?

25        MR. COLIN:  I am.

1    *THE COURT:*  Is there any further argument you care to

2    make?

3    *MS. SPALDING:*  No, Your Honor.

4    *THE COURT:*  Thank you.

5    I think this falls under what is often called the halo

6    effect, which is where a witness is designated or accepted as

7    an expert in particular cases and, therefore, comes to this

8    court with that as a credential.

9    Rule 702 doesn't concern whether you've testified in

10   prior cases or whether you've been accepted as an expert in

11   prior cases, and I am disinclined to consider the halo effect.

12   Instead, Rule 702, as I read it, requires a close tie between

13   experience, which is the basis of these opinions, and the

14   opinion that is proffered.

15   So, for example, we could have someone who lays tile

16   come forward as an expert witness and testify as to the type of

17   grout that should be used around the tile.  That person may

18   never have set foot in a courtroom before, but that doesn't

19   mean that the witness doesn't know how to lay tile and doesn't

20   know how to assess the benefits and the drawbacks of particular

21   grout.

22   So I deny your motion for reconsideration and suggest

23   that since there are only two or three opinions where you have

24   objected under Rule 702, that you focus on those particular

25   opinions.

```
 1            MR. COLIN:  Which I shall.
 2            THE COURT:  Thank you.
 3            MR. COLIN:  Thank you.
 4    BY MR. COLIN:
 5    Q.  Mr. Cerar, did I understand that your training, background,
 6    and experience is limited to New York Police Department?
 7    A.  My training and experience comes -- again, I think I stated
 8    that I network with police departments all over the United
 9    States.  I forwarded my SOP 9 -- my firearms discharge review
10    reports to many, many police agencies in the United States and
11    abroad.  So I've conferred with a lot of different people.
12    Q.  And I appreciate your answer regarding with whom you've
13    conferred.  But my question is, has the entirety of your
14    training, background, and experience been with the New York
15    Police Department?
16    A.  I experienced things when I went to ASLET conferences, it's
17    police departments from all over the United States.  I -- I say
18    my knowledge is not limited to New York City.
19    Q.  All right.  So do you have experience, training, or
20    background in the policies and procedures of other police
21    departments in the United States?
22    A.  Yes, I do.
23    Q.  And can you describe that, please.
24    A.  Again, in conferring with personnel from other police
25    departments as to what their guidelines are in the use of
```

 1  deadly physical force, what they might have as far as a policy

 2  in shooting at a moving vehicle and things like that, that's

 3  country-wide knowledge.

 4  Q.  All right.  So what you've done is you talked to other

 5  folks who were police officers about various police issues; is

 6  that fair?

 7  A.  Well, again, sir, police officers or persons that were

 8  responsible, as I was, for training.

 9  Q.  All right.

10  A.  Which is, I think, a little different.  Because most police

11  officers have an opinion.

12         THE COURT:  Like most lawyers.

13         MR. COLIN:  We can all attest to that.  Stipulated.

14  BY MR. COLIN:

15  Q.  Let me explore it in a different way.  Have you ever been

16  an instructor at any police department's academy other than New

17  York Police Department?

18  A.  I did -- I did lectures at ASLET, at --

19  Q.  Mr --

20  A.  -- IALEFI.

21  Q.  Is ASLET a police department?

22  A.  It's law enforcement instructors.

23  Q.  Okay.

24  A.  So if you're going to ask me the general -- yes, it is a

25  police department, because it's comprised of law enforcement

```
 1   personnel.
 2   Q.  The fact of the matter is, you have not conducted any
 3   training in any police department in the United States other
 4   than the New York City Police Department; isn't that true?
 5           MS. SPALDING:  Your Honor, I would object.  Asked and
 6   answered, and I think it mischaracterizes --
 7           THE COURT:  Sustained.
 8   BY MR. COLIN:
 9   Q.  Let's talk about other areas that relate to your firearms
10   expertise.  While you were in the New York City Police
11   Department firearms training section -- have I got that right?
12   A.  Yes.
13   Q.  Okay.  Were you an armorer?
14   A.  No.  I was responsible for about 15 of them; but I was not
15   personally banging on guns, no.
16   Q.  Were you a gunsmith?
17   A.  No, but I had about 15 assigned to my staff.
18   Q.  Have you ever been a range master?
19   A.  I had about 30 of those.
20   Q.  So the answer is, no, you've never --
21   A.  No, I haven't.  No.
22   Q.  Have you ever been certified as an instructor?  You
23   rendered an opinion about semiautomatic fire rifles and other
24   kinds of rifles.  Have you ever been certified as an instructor
25   on a semiautomatic carbine?
```

1    A.  Well, I was a certified firearms instructor by the state of

2    New York.  And part of that certification or training dealt

3    with rifles, yes.

4    Q.  And we'll talk about your certification and your efforts as

5    a firearms instructor in a minute.  So it's your testimony

6    today that you are in fact a certified instructor on

7    semiautomatic carbines?

8    A.  Yes.  It would be part of the course, yes.

9    Q.  Are you a certified instructor on rifles?

10   A.  There is a basic course -- okay, the basic course is what I

11   was trained in.  There are certainly specialized courses after

12   the firearms instructor course that would certainly give

13   someone more training capabilities specific to different types

14   of firearms.

15   Q.  Are you a certified instructor in a shotgun?

16   A.  I have learned about the capabilities of a shotgun from my

17   training as a firearms instructor.

18   Q.  Perhaps I didn't ask clearly.  Have you ever been certified

19   as an instructor in shotguns, police?

20   A.  I was trained as a firearms instructor.

21   Q.  All right.  Let's talk about your training as a firearms

22   instructor, then.  You were certified as a firearms instructor

23   by the Municipal Police Training Council; is that accurate?

24   A.  Yes.

25   Q.  And you received your training or your certification by the

 1  Municipal Police Training Council from the New York Police

 2  Department's firearms training unit; is that accurate?

 3  A.  Yes, sir.

 4  Q.  And my understanding of your testimony a minute ago is that

 5  there are different levels of certifications for firearms

 6  trainers; is that accurate?

 7  A.  Yes.

 8  Q.  And can you describe those three levels, please.

 9  A.  Well, when I was the commanding officer of the firearms

10  unit, I incepted a program that my veteran instructors would be

11  recognized.  There was the basic firearms instructor, a senior

12  firearms instructor, and a master firearms instructor, was the

13  top level.

14  Q.  Master firearms instructors can train other instructors to

15  instruct; is that accurate?

16  A.  Correct.

17  Q.  Now, your certification was as a basic firearms instructor;

18  is that correct?

19  A.  Yes.

20  Q.  You're not certified as either a senior or master firearms

21  instructor?

22  A.  No.

23  Q.  And you did not go through the training required for

24  certification for senior or master firearms instructor; is that

25  correct?

1   A.   I was involved in the questioning and what the content of

2   the program was and specific, that -- I was asked the questions

3   first to see how I did with them, see how the other people will

4   do.

5   Q.   Well, I think you just talked about, maybe, a test.  I'm

6   not sure what you're talking about.

7   A.   Well, required to become a master or a senior firearms

8   instructor, required certain -- certain things that the person

9   that was going through the upgrade would have to do.

10  Q.   Okay.

11  A.   And he would have to take an exam, would be one of them.

12  Q.   All right.  I'm sorry.  Maybe I got us both confused.  I

13  was really just asking, is there a course that is associated

14  with becoming a senior firearms instructor, in becoming

15  certified at NYPD?

16  A.   It was more of a test than a course.  I mean, if you were

17  knowledgeable in certain specific areas, it was felt that you

18  were within the parameters of what we felt the senior firearms

19  instructor should be.

20  Q.   So there was never any additional training between a basic

21  firearms instructor and a senior firearms instructor that was

22  required?

23  A.   No.  I mean, there was training also, yes.

24  Q.   Okay.  That's what I'm asking you about.

25  A.   Okay.

1   *Q.* Did you sit through that entire training process for senior

2   firearms instructors?

3   *A.* No, I did not.

4   *Q.* Same question with regard to master firearms instructors,

5   did you sit through the entire training for a master firearms

6   instructor?

7   *A.* No, I did not.

8   *Q.* Let's talk about the circumstances under which your basic

9   firearms training certification was issued. Prior to becoming

10  the commander of the firearms training section of the New York

11  Police Department, you had taught a law curriculum at the

12  police academy; is that accurate?

13  *A.* Yes.

14  *Q.* But you had not been certified to teach any

15  firearms-related instruction?

16  *A.* That's correct.

17  *Q.* And then your certification as a basic firearms instructor,

18  did that occur before you were promoted to the firearms section

19  or after you arrived there?

20  *A.* After I arrived.

21  *Q.* Is it fair to say that the reason that you went through the

22  basic firearms trainer certification was because you were going

23  to be supervising the unit and wanted to see what that training

24  entailed?

25  *A.* Yes, sir.

1    *Q.*  And to obtain your basic certification as a firearms

2    instructor, you were required to take a written test and then

3    fire a weapon on the range; is that accurate?

4    *A.*  Yes, sir.

5    *Q.*  Anything else?

6    *A.*  No.

7    *Q.*  And you took the firing portion of the test with a

8    revolver; isn't that true?

9    *A.*  Yes.

10   *Q.*  So you didn't go through the formal training program for

11   basic firearms instructor, you simply took a test and then went

12   to the range and fired your gun?

13   *A.*  Correct.

14   *Q.*  And once you became a firearms instructor, once you

15   received this basic certification, you have never taught or

16   engaged in any hands-on training of a single police officer,

17   have you?

18   *A.*  I think a responsibility of 38,000 people being trained

19   is --

20   *Q.*  Have you ever engaged in any hands-on instruction of a

21   single police officer at the New York Police Department for

22   firearms?

23   *A.*  Can you describe to me what you mean by hands-on.

24   *Q.*  There are basic firearms instructors in addition to

25   yourself employed by the New York Police Department; is that

1    accurate?

2    A.  Yes.

3    Q.  And those other basic -- the other firearms instructors who

4    have basic certification actually teach recruits how to fire a

5    gun, don't they?

6    A.  Okay.  So I didn't do it.  But was I capable of it?  The

7    answer is yes.

8    Q.  I didn't ask you if you were capable of it.  I asked you if

9    you did it.

10   A.  Okay.  No, I didn't.

11   Q.  Thank you.  From 1973 -- that's when you started at New

12   York Police Department; is that right?

13   A.  Yes, sir.

14   Q.  Until you were appointed the unit commander of the firearms

15   section in 1985, it's true, is it not, that the weapons that

16   you carried were revolvers?

17   A.  Correct.

18   Q.  You carried a Colt MK III and a Colt detective special as a

19   backup gun; is that accurate?

20   A.  Yes, sir.

21   Q.  When you were a patrol officer, the .38-caliber revolver

22   was the only authorized backup or off-duty carry weapon by

23   NYPD; isn't that true?

24   A.  At that time, yes, sir.

25   Q.  Now, while you were at the firearms section of the New York

1    Police Department, in addition to basic senior and master

2    firearms instructors, there were also firearms instructors who

3    were certified as special weapons instructors; is that

4    accurate?

5    A.  Yes, sir.

6    Q.  And you were not one of those, were you?

7    A.  No, sir.

8    Q.  And special weapons instructors trained officers on the use

9    of semiautomatic carbines, rifles, those kinds of things,

10   correct?

11   A.  Yes, sir.

12   Q.  And you did not engage in that kind of training activity,

13   did you?

14   A.  I oversaw it, sir.

15   Q.  I'm sorry?

16   A.  I oversaw the training.

17   Q.  I understand.  And part of the special weapons instruction

18   that was provided during your time in the firearms section --

19   firearms training section was semiautomatic pistols; isn't that

20   right?

21   A.  Yes, sir.  I mean, it -- there came a time between my

22   initial, 1985 was strictly revolvers, to when I left in 1994,

23   the whole department was being transitioned to semiautomatics.

24   Q.  So there were specialized assignments, if you will, within

25   the New York Police Department where officers prior to 1984

```
 1 │ were authorized to carry semiautomatic pistols?
 2 │ A.  Yes, sir.
 3 │        THE COURT:  Mr. Colin, we're almost at noon here.
 4 │ When you reach a convenient stopping point, let me know.
 5 │        MR. COLIN:  Now is perfectly fine, Your Honor.
 6 │        Just as a housekeeping matter, my understanding is
 7 │ that Chief Oates has to testify at 1:30 this afternoon, so I
 8 │ would be more than happy to just defer this witness's
 9 │ cross-examination until after the examination of Chief Oates is
10 │ concluded, if that works.
11 │        THE COURT:  What's the State's preference?
12 │        MS. SPALDING:  Yes, and we appreciate the
13 │ accommodation for his testimony.  We don't expect his testimony
14 │ will last very long.  That's fine with us.
15 │        THE COURT:  We will stand in recess until 1:30, when
16 │ we will continue, and we'll take up with the continued
17 │ cross-examination of this witness after we complete the
18 │ examination of Chief Oates.  We'll stand in recess.
19 │        (Recess at 12:00 p.m.)
20 │        (In open court at 1:36 p.m.)
21 │        THE COURT:  Please call your next witness.
22 │        MS. SPALDING:  We'd call Chief Dan Oates.
23 │        THE COURT:  Thank you.
24 │        Please step up and be sworn.
25 │
```

```
 1              (DANIEL OATES, DEFENDANT'S WITNESS, SWORN)

 2         COURTROOM DEPUTY:  Please be seated.

 3         MR. ABBOTT:  Your Honor, thank you.  Before Chief

 4    Oates begins his testimony, I'd like to interpose the same

 5    objection that we've been interposing for all witnesses.  With

 6    respect to Chief Oates, particularly, the fact that he did not

 7    testify before the legislature on House Bill 1224.  He did on

 8    1229, so I would only object there to any testimony in excess

 9    to his testimony before the legislature.

10         THE COURT:  Thank you.  How will I know what is in

11    excess?

12         MR. ABBOTT:  I guess -- you might have to make that

13    determination later when you read it in the legislative

14    history.  But perhaps they aren't even going to ask him about

15    that today.  But I guess we'll know when we get there.

16         THE COURT:  All right.  Thank you.

17         COURTROOM DEPUTY:  Please state your name and spell

18    your first and last name for the record.

19         THE WITNESS:  Sure.  Daniel Oates, D-A-N-I-E-L,

20    O-A-T-E-S.

21         THE COURT:  You may proceed.

22                        DIRECT EXAMINATION

23    BY MS. SPALDING:

24    Q.  Good afternoon, sir.  What do you do for a living?

25    A.  I'm a police chief in the city of Aurora.
```

```
 1    Q.  How long have you been police chief in Aurora?

 2    A.  Eight and a half years.

 3    Q.  Since 2005, thereabouts?

 4    A.  Since late 2005.

 5    Q.  And how many sworn officers are employed by the Aurora

 6    Police Department?

 7    A.  Six hundred seventy.

 8    Q.  Prior to becoming the police chief in Aurora, were you a

 9    law enforcement officer?

10    A.  Yes.  My most immediate prior job, I was the police chief

11    and manager of safety services in Ann Arbor, Michigan for four

12    years.  And prior to that I was a police officer with the New

13    York City Police Department for 21 years.

14    Q.  All right.  When did you leave the NYPD?

15    A.  July of 2001.

16    Q.  What was your rank when you left?

17    A.  Deputy chief.

18    Q.  Chief, let me turn to the events of the evening of July 19

19    or the morning of July 20, 2012.  This was the evening and

20    morning that an individual fired shots in an Aurora theater,

21    correct?

22    A.  Yes.

23    Q.  Your jurisdiction is the city of Aurora, correct?

24    A.  Correct.

25    Q.  And this incident occurred in the city of Aurora and within
```

```
 1  your jurisdiction?
 2  A.  Yes.
 3  Q.  Was the Aurora Police Department the primary investigating
 4  agency with respect to this incident?
 5  A.  Yes.
 6  Q.  After the shooting -- were you personally involved in the
 7  investigation?
 8  A.  Yes.  I responded to the theater within roughly 40 to 45
 9  minutes, and it was my responsibility to direct the police
10  department's investigation, as the -- as the chief executive.
11  Q.  And by directing the investigation, can you tell me what
12  you did.
13  A.  I managed all resources that the department applied to the
14  investigation.  I was personally involved in direct briefings
15  on the investigation that I called for, for -- there were daily
16  briefings for roughly two weeks, and have been doing that
17  periodically ever since.  All the -- liaison with all the heads
18  of the other agencies that provided support for the event.  The
19  typical things a police chief would do with a major event like
20  that, although I have wonderful staff who works for me and does
21  much of the detail of any investigation.
22  Q.  You mentioned briefings that you had constantly, I think
23  you said for a few weeks after the event?
24  A.  Right.
25  Q.  In those briefings were you relying on the investigation
```

1    that was being performed at the time by your police officers?

2    A.  Well, sure.  I was relying on the staff work of the people

3    who worked for me, as well as quite healthy assistance by a

4    number of other agencies, the FBI, ATF, and some of the other

5    local police agencies, and, of course, the assistance of the

6    District Attorney's Office.

7    Q.  And did you have occasion as chief to give briefings to

8    various governmental officials during the course of the

9    investigation?

10   A.  Yes.

11   Q.  And --

12   A.  At the beginning, quite a bit, with some intensity in the

13   first couple of days, yes.

14   Q.  Can you tell us who you briefed after the event and as time

15   went on.

16   A.  In the first 48, 72 hours, there were any number of

17   meetings with key officials in the city of Aurora and in the

18   state, from the Governor on down.  There were a series of

19   briefings about what had occurred.  And those meetings included

20   discussions about the comprehensive response of the city of

21   Aurora, the federal agencies, and the state.

22   Q.  And after the first few weeks, did you still have occasion

23   to be briefing various state and federal officials?

24   A.  To the extent that there was information that needed to be

25   shared with city officials, my chain of command -- I directly

         1    report to a city manager, who reports for the city council.  So

         2    after the first week or so, any conversations of substance

         3    about the case and its impact on Aurora and how Aurora city

         4    government should deal with issues was largely with the city

         5    manager and other key managers in the city manager's staff.

         6    Q.  All right.  And in giving those briefings, again, were you

         7    relying on the results of the investigation done by your

         8    officers, as you knew it at the time?

         9    A.  Well, I was always relying on all the information that I

        10    had before me.  And as I said, I think I have a very good

        11    staff.

        12    Q.  Do you know how many reports your officers generated in

        13    their investigation --

        14    A.  The number is in the thousands.  The pieces of evidence and

        15    the documentation of this event is in the thousands.

        16    Q.  Do they have a duty to report their findings and

        17    observations in an accurate fashion?

        18    A.  Yes.

        19    Q.  And do you have any information that leads you to believe

        20    that the reports that they have generated are in any way

        21    inaccurate?

        22    A.  No.

        23    Q.  Let's talk about the events of that morning, that evening

        24    and morning.  Where did the shooting occur?

        25    A.  The shooting occurred at the Century 16 Theater in Aurora,

```
 1    in the center of Aurora.

 2    Q.  Is this a complex of movie theaters?

 3    A.  It's a movie theater that is attached to the Aurora Town

 4    Center, which is a 1.2 million square foot mall.  And it's a

 5    theater with eleven or twelve theaters inside it, so it's a

 6    multi-plex.

 7    Q.  How did the shooting begin?

 8          MR. ABBOTT:  Your Honor, I'd like to interpose here an

 9    objection on both hearsay and foundation.  If I could briefly

10    voir dire the witness.

11          THE COURT:  You may not.

12          MR. ABBOTT:  Okay.

13          THE COURT:  So make your objection.

14          MR. ABBOTT:  Stand by my objection, hearsay and

15    foundation as to his knowledge of what happened in the theater.

16          THE COURT:  He can answer if he knows.

17    BY MS. SPALDING:

18    Q.  How did the incident begin, sir?

19    A.  The incident began around 12:38 in the morning, when the

20    suspect, Mr. Holmes, entered the theater from the emergency

21    door to the right of the screen, as you're facing, dressed in

22    black armor and garb and threw a canister of smoke slash tear

23    gas and started firing.

24    Q.  Okay.  Was he carrying weapons?

25          MR. ABBOTT:  I'd like to object again on the basis of
```

1    foundation.  There has not been an adequate foundation laid

2    that he has personal knowledge of these events.

3         THE COURT:  Response.

4         MS. SPALDING:  Let me lay a little bit more

5    foundation, Your Honor, if I could.

6         THE COURT:  All right.  That would be fine.  And I

7    would guess that a number of these facts could be stipulated

8    to.

9         MS. SPALDING:  I'd be happy to do that if --

10        THE COURT:  Why don't you confer with counsel.

11        MS. SPALDING:  Okay.

12        (Off-the-record discussion between counsel.)

13        I'm sorry, Your Honor, could we have a few minutes?

14        THE COURT:  Sure.

15        MS. SPALDING:  I think we're close.

16        THE COURT:  Okay.

17        (Off-the-record discussion between counsel.)

18        MS. SPALDING:  Your Honor, if we can have a minute to

19   confer with the witness, I think we can stipulate to all of the

20   facts.

21        THE COURT:  All right.  I'll ask our witness to step

22   down for a minute, to confer with you at the lectern.

23        MS. SPALDING:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        (Off-the-record discussion between counsel.)

```
 1              MS. SPALDING:  Your Honor, I believe we have a
 2   stipulation as to all facts, including a few that counsel
 3   wanted in, in lieu of questioning, and we have no more
 4   questions for Chief Oaks.
 5              THE COURT:  Either side?
 6              MR. ABBOTT:  No, Your Honor.  He may be excused.
 7              THE COURT:  All right.  Thank you very much.
 8              THE WITNESS:  That's the easiest testimony I've ever
 9   had.
10              THE COURT:  Come to federal court more often.
11              THE WITNESS:  Thank you, Your Honor.
12              MS. SPALDING:  Your Honor, I'm -- the parties will be
13   submitting the stipulations in writing.
14              THE COURT:  Okay.
15              MS. SPALDING:  As an exhibit, I would think, as a
16   stipulated exhibit.
17              THE COURT:  You can do it on the record, you can do it
18   in writing, whatever suits your fancy.
19              MS. SPALDING:  We'll confer after and submit them
20   later.
21              THE COURT:  Okay.
22              MS. SPALDING:  Thank you.
23              THE COURT:  Thank you.
24              MR. COLIN:  Plaintiff would recall John Cerar.
25              THE COURT:  Thank you.
```

```
 1              Please retake the stand.  You remain under oath.
 2           (JOHN CERAR, DEFENDANT'S WITNESS, PREVIOUSLY SWORN)
 3                      CROSS-EXAMINATION CONTINUED
 4   BY MR. COLIN:
 5   Q.  We're back.  Good afternoon.
 6   A.  Good afternoon.
 7   Q.  Mr. Cerar, I'd like to touch upon a couple of points that
 8   you made in your direct before getting back to your
 9   qualifications, if I could.  And, specifically, I'd like to
10   touch upon your involvement in various law enforcement training
11   organizations that you testified to that -- to Ms. Spalding.
12   Okay.
13   A.  Okay.
14   Q.  You said that you were a member of ASLET; is that right?
15   A.  Yes.
16   Q.  And ASLET is the American Society of Law Enforcement
17   Trainers; is that correct?
18   A.  Yes, it is.
19   Q.  And you first became a member of that organization after
20   you were appointed to the position of commander of the firearms
21   training section of the New York Police Department; is that
22   accurate?
23   A.  Yes, sir.
24   Q.  Late '80s, approximately?
25   A.  Yes, sir.
```

1  Q.  And you continue your membership in ASLET until you retired

2  in 1999; is that accurate?

3  A.  Until the organization changed their name, and I don't know

4  what year that was.

5  Q.  All right.  ASLET had a firearms committee, did it not?

6  A.  Yes, it did.

7  Q.  And you were not a member of that firearms committee, were

8  you?

9  A.  No, I was not.

10  Q.  Are you familiar with the International Law Enforcement

11  Trainers Association?

12  A.  Yes.

13  Q.  Are you a member of that organization?

14  A.  Yes, I was a member.

15  Q.  Have you ever presented at an ILETA conference?

16  A.  I'm sorry?

17  Q.  Have you ever presented at one of their conferences?

18  A.  Yes, I have.

19  Q.  ILETA --

20  A.  I thought you were talking about IALEFI.

21  Q.  Yeah, I understood.

22        THE COURT:  Perhaps we should spell these words.

23        MR. COLIN:  Sure.  I'm happy to do that.  The previous

24  reference was to ILETA, which was the International Law

25  Enforcement Trainers Association.  I believe that Mr. Cerar

```
 1  misunderstood and thought I was talking about another

 2  organization called International Association of Law

 3  Enforcement Firearms Trainers.

 4          Is that correct?

 5          THE WITNESS:  Yes.  It's firearms instructors, just to

 6  go along with the letters.

 7  BY MR. COLIN:

 8  Q.  So it's -- I don't even know how to say it.

 9  A.  IA --

10  Q.  So IALEFI.

11          THE COURT:  Why don't we spell that, the acronym.

12          MR. COLIN:  I-A-E-L-E-F-I.

13          THE COURT:  Thank you.

14  BY MR. COLIN:

15  Q.  Okay.  Let's go back to my original question.  You've never

16  been a member of the International Law Enforcement Trainers

17  Association, correct?

18  A.  Correct.

19  Q.  And you have not been a presenter at any of its

20  conferences, correct?

21  A.  Yes.

22  Q.  And you're not a member of the National Law Enforcement

23  Training Center?

24  A.  Correct.

25  Q.  And you have never been to any of its classes or provided
```

1    any instruction in any of its events?

2    *A.* Yes.

3    *Q.* All right.  Now, back to IALEFI.  You are a member -- or

4    were a member of the International Association of Law

5    Enforcement Firearms --

6    *A.* Instructors.

7    *Q.* -- Instructors, thank you.  I want to say trainers so bad.

8    But you were not a member of its firearms board, if you will;

9    is that true?

10   *A.* Yes.

11   *Q.* Okay.  Thank you.  All right.  I want to get back to your

12   earlier testimony regarding your experience and training in

13   guns and gun violence, all right?

14   *A.* Yes.

15   *Q.* Have you authored any books or publications of any kind on

16   the issues of guns or gun violence?

17   *A.* No.

18   *Q.* Other than -- let me back up.  You had talked about a form

19   called an SOP 9?

20   *A.* Yes.

21   *Q.* Correct?  And that was a form that you reviewed in the

22   ordinary course of your duties, at least once you went to

23   Manhattan South?

24   *A.* No, once I went to the firearms unit.

25   *Q.* All right.  So you had been doing that from about 1985

 1  until you retired; is that fair?

 2  *A.*  Yeah.  I might have prepared some of them as a police

 3  officer or a sergeant or a lieutenant or as a captain, but

 4  daily, day-to-day operations, that form was sent to me as the

 5  commanding officer of the firearms unit.

 6  *Q.*  And am I correct you have not read any SOP 9s since leaving

 7  the New York Police Department in 1999?

 8  *A.*  Yes, but I have read segments of the record.  I have not

 9  read the full report.

10  *Q.*  Okay.  And we'll talk about that in a minute.  So from 1999

11  to the present, you haven't reviewed any statistical data from

12  NYPD about either a civilian or officer gun use other than what

13  you may have seen on TV?

14  *A.*  That's correct.

15  *Q.*  My understanding was that -- I think you used the term

16  network, that you network with firearms instructors from around

17  the United States; is that accurate?

18  *A.*  Yes, sir.

19  *Q.*  And you have spoken to them specifically about the issues

20  of spray and pray; is that right?

21  *A.*  Yes.

22  *Q.*  About the issues of magazine capacity, yes?

23  *A.*  Yes.

24  *Q.*  About the issues of whether a revolver is a better choice

25  for law enforcement than a semiautomatic pistol?

 1  | *A.*  Yes, sir.
 2  | *Q.*  Okay.  Can you tell me who you spoke to?  Who were these
 3  | folks upon whose opinions you have relied?
 4  | *A.*  Well, they could have been police chiefs or firearms
 5  | instructors within a certain department.
 6  | *Q.*  And what information, if any, did you research to determine
 7  | whether or not their opinions had validity?
 8  | *A.*  Well, again, at the -- at that time in the late '80s,
 9  | almost every law enforcement agency was looking to transition.
10  | And because of that and the extensive training and -- that was
11  | done with the New York City Police Department, what they --
12  | what their -- what they were looking into, it was a matter of
13  | discussion.
14  | *Q.*  Okay.  Did -- did you do any of your own research,
15  | statistical analysis, data collection on the issue of the
16  | subject of firearms and gun violence?
17  | *A.*  I don't understand the question.
18  | *Q.*  Did you -- other than networking with these folks you've
19  | just described, have you done any statistical analysis, any
20  | data evaluation, have you researched the issues of firearms and
21  | firearms effects on gun violence?
22  | *A.*  Up until last part of the question, I would say yes.
23  | *Q.*  But in light of the last part of the question, the answer
24  | is no?
25  | *A.*  No, but --

```
 1   Q.  Okay.
 2   A.  But that I did statistical analysis, a lot of analysis when
 3   it came to the amount of rounds that were fired, as we talked
 4   about before.
 5   Q.  And that statistical analysis that you're talking about
 6   occurred when you were employed by the New York Police
 7   Department?
 8   A.  That's correct.
 9   Q.  And the documents upon which you relied when you were
10   employed by the NYPD were these SOP 9s that we're talking
11   about?
12   A.  Yes.
13   Q.  Thank you.  You said that in formulating your opinions
14   regarding, for example, what kind of weapons officers carry
15   today off duty, you contacted some firearms instructors.  Would
16   that have been firearms instructors for NYPD?
17   A.  No.
18          MS. SPALDING:  Objection, Your Honor.
19          THE WITNESS:  I mean --
20          MS. SPALDING:  Beyond the scope.  I don't think we had
21   any discussion about what officers carry off duty.
22          THE COURT:  Response.
23          MR. COLIN:  My recollection, Your Honor, is to the
24   contrary.  However, it's not a significant point.  I think the
25   importance here is the sources of information that he relies
```

1    upon now that he's retired in order to formulate his opinions.

2    That's the point, if you will.

3        *THE COURT:*  Thank you.  I'm going to overrule the

4    objection because there was reference in the direct as to

5    firearm instructors.  And the plaintiff has the right to

6    inquire as to which firearm instructors those might have been.

7        *MR. COLIN:*  Thank you.

8    *BY MR. COLIN:*

9    *Q.*  So specifically with regard to any questions that you may

10   have had regarding what kinds of firearms are authorized for

11   New York police officers to carry off duty currently, who did

12   you contact?

13   *A.*  That would be someone in the firearms unit.

14   *Q.*  At the New York Police Department?

15   *A.*  Yes.

16   *Q.*  Did you talk to anyone outside of the NYPD to determine

17   what firearms are authorized for law enforcement officers to

18   carry off duty in other departments around the United States?

19   *A.*  Yes, I did.

20   *Q.*  And who would that have been?

21   *A.*  I contacted a person from the Rockland County Police

22   Academy.

23   *Q.*  Rockland County --

24   *A.*  That's Rockland County, New York.

25   *Q.*  I appreciate that.  Any contacts with anyone who was a

 1   member of a law enforcement agency outside of New York state

 2   regarding authorized carry firearms for off duty?

 3   A.  Well, I had a person in Los Angeles who had a similar

 4   position to myself, as far as collecting data for the Los

 5   Angeles Police Department, that I have been in touch with.

 6   Q.  All right.  And I'm trying to distinguish now -- my

 7   questions now are relating to contacts you've had since you

 8   retired.

 9   A.  Correct.

10   Q.  All right.  So you believe that you contacted somebody at

11   LAPD regarding what kinds of firearms Los Angeles officers are

12   authorized to carry off duty?

13   A.  Yes.

14   Q.  And what was the purpose of that conversation?

15   A.  General -- I mean, we would talk about firearms-related

16   matters.

17   Q.  Did you review -- I'm assuming NYPD has a policy or a list

18   of authorized firearms for off-duty carry?

19   A.  Yes, they do.

20   Q.  And do you know whether LAPD has a similar list?

21   A.  Yes, I -- yes, they do.

22   Q.  Did you review it?

23   A.  No, I didn't.

24   Q.  I'm going back to my earlier question now.  Other than what

25   you've just described, did you conduct any statistical

1  analysis, data compilation, research that you can describe for

2  us today regarding the effect of firearms and magazine capacity

3  on gun violence?

4  A.  No.

5  Q.  When you were asked in your deposition what you relied upon

6  as a source of information since your retirement, you described

7  reviewing and receiving a daily newsletter prepared by a

8  retired sergeant.  Do you recall that?

9  A.  Yes.  Well, that was part of -- I don't think I testified

10  to that today.

11  Q.  No, I know.  I'm asking you whether you recalled testifying

12  to that in your deposition as another source of information

13  upon which you relied.

14  A.  Yes.

15  Q.  And, in fact, that's the only source of information upon

16  which you rely that is some sort of written documentation

17  regarding your opinions concerning the effects of firearms and

18  magazines on gun violence in the last ten years; is that true?

19  A.  Yes.

20  Q.  Your only role in what I'm going to call decisional

21  shooting training, you may know as shoot-don't-shoot

22  training -- your only role in decisional shooting training at

23  NYPD was to supervise the unit.  You didn't provide any

24  hands-on instruction using the description we used earlier

25  today; is that right?

1   A.  Well, I definitely was involved in the early inception of

2   what the FATS system was, the firearms training system.  The

3   original concept has changed drastically from when I first was

4   involved with it.  As a matter of fact, because of some of the

5   recommendations that I have made, that that training has become

6   much better.

7   Q.  Have you ever participated directly as an instructor in the

8   training of police officers in decisional shooting?

9   A.  No.

10  Q.  Now, there is another kind of report that we talked about

11  in your deposition, and I'm not sure if it's the same as the

12  SOP 9.  You testified that you reviewed New York Police

13  Department ballistics reports or ballistic section monthly

14  reports.  Am I close?

15  A.  In my deposition?

16  Q.  Yes.

17  A.  Yes, we talked about ballistics reports, yes.

18  Q.  All right.  And what do those ballistics reports address?

19  A.  They address the type of weapon that was taken off the

20  street and what type of ammunition, how much the firearm held.

21  Q.  So information regarding the type of firearms, the capacity

22  of a magazine, the ammunition utilized would not be in the SOP

23  9s; those would be in these monthly ballistics reports?

24  A.  That's correct, sir.

25  Q.  And you have not seen any monthly ballistics reports from

 1 | NYPD in the past 14 years, have you?

 2 | *A.*  No, I have not.

 3 | *Q.*  Let's talk about the scope of your knowledge regarding

 4 | incidents in which civilians were shot by suspects.  Did I

 5 | understand you correctly that it was after you left the

 6 | firearms training section and went to Manhattan South that you

 7 | would have been receiving daily reports which would have

 8 | contained information about civilians being shot?

 9 | *A.*  That daily report I would have gotten as a captain -- as a

10 | captain.  So as the executive officer when I was first promoted

11 | to captain, I would have received that report, and then,

12 | subsequently, to where I retired in Manhattan South.

13 | *Q.*  And is it correct that you have not received or reviewed

14 | any such report since 1999?

15 | *A.*  Those reports specifically, no.  But everything in New York

16 | is publicized.

17 | *Q.*  So fair to say a lot of your opinions about what has been

18 | going on in the New York City Police -- the New York Police

19 | Department since 1999 have been from the media, either TV,

20 | radio --

21 | *A.*  I still have --

22 | *Q.*   -- newspapers?

23 | *A.*  I understand your question.  A lot of the information I do

24 | get is from the media.  But I also know many of the instructors

25 | that are still assigned to the firearms and tactics section,

 1  who I do converse with at least yearly.

 2  Q.  Okay.  And you don't have any information regarding

 3  civilians being shot by suspects from any other law enforcement

 4  agency in the United States other than what you might have seen

 5  on TV?

 6  A.  I've never heard of it.

 7  Q.  With this networking that you have testified you've been

 8  doing since your retirement, have you kept any notes regarding

 9  the information that you obtained as part of this networking

10  process?

11  A.  No.

12  Q.  Have you made note of who gave you the information, the

13  source of any information that you've relied on for your

14  opinions?

15  A.  No.

16  Q.  And since you retired, am I correct that this networking

17  did not involve your receipt and review of any publications or

18  documents as part of this networking process?

19  A.  Since I've retired, I have seen documents, but it certainly

20  wouldn't be that I was on distribution.

21  Q.  Okay.  I'm not sure I understood your answer.

22  A.  When I was on the police department, I was on distribution

23  to receive the report.

24  Q.  I see.

25  A.  Once I retired, I might have seen some reports, but I

1  wasn't on distribution.

2  Q.  All right.  So you didn't receive reports regularly after

3  your retirement on any issue to which you've opined?

4  A.  I was -- I was aware for many years of the firearms

5  discharge assault report results, the yearly annual report,

6  which I can state emphatically showed the amount of shootings

7  in the city of New York to be at a terrifically low rate from

8  early on in the 1970s, when these statistics were first

9  compiled up to date right now.

10  Q.  And you get those from what source?

11  A.  I would get that information from people from the range,

12  from the firearms and tactics section.

13  Q.  Okay.  Did you get the actual document, or did you just get

14  information about what was contained in the document?

15  A.  In my -- the police department using me as a resource in a

16  lot of different types of shootings that happened within the

17  city, I was given certain documents on the -- from the SOP --

18  from the firearms discharge assault report, but not the whole

19  report.

20  Q.  Okay.

21  A.  So I can tell you -- to follow up?

22  Q.  Sure.

23  A.  I was familiar -- very familiar with the amount of

24  shootings and how they have decreased in the city of New York.

25  Q.  And --

1   *A.* And with the decrease in shootings is a significant

2   decrease in the amount of rounds that are being fired.

3   *Q.* Okay. We'll certainly talk about that in greater detail in

4   a little bit. The reports that you just described, these

5   annual reports --

6   *A.* Yes, sir.

7   *Q.* -- am I right that this report is the predecessor of SOP 9?

8   *A.* No. It was called SOP 9, and then developed into the

9   firearms discharge assault report.

10  *Q.* But it's the same report?

11  *A.* Yes.

12  *Q.* All right. And this is the report that doesn't contain

13  information on the specific firearms used, magazine capacity,

14  type of ammunition. That would be in the ballistics report,

15  correct?

16  *A.* Correct. But part of every shooting, a detailed report was

17  made, investigated of -- investigative report, whether it be

18  the initial report, the final report on that shooting, where I

19  received all that information as part of the investigation into

20  the shooting.

21          So if a police officer was involved with someone who

22  had a 9-millimeter Glock, that information, part of a

23  ballistics report, would be attached to the investigation.

24  *Q.* Thank you. And everything that you've just talked about

25  was pre-1999 retirement, right?

```
 1   A.  Correct.
 2   Q.  And you haven't reviewed any -- any such reports in the
 3   last 14 years that you considered in the formulation of your
 4   opinions in this case; isn't that true?
 5   A.  I don't understand the question.
 6   Q.  Sure.  The reports that you've just been talking about --
 7   I'm sorry, I keep forgetting the name that you're using for the
 8   predecessor of SOP 9.
 9   A.  Right.
10   Q.  But suffice it to say that you didn't review any of these
11   reports and consider them for the purposes of formulating your
12   opinions in this case in the last 14 years?
13   A.  I used the information that I was given that -- from the
14   firearms unit about how many rounds were being fired after I
15   retired; and that is, I'm sure, part of my opinion now.
16   Q.  Okay.  And, specifically, what reports did you review that
17   have formed a basis for any opinion that you have issued in
18   this case?
19   A.  Again, the information came from an SOP 9 report.
20   Q.  All right.  And --
21   A.  Or a firearms discharge assault report.
22   Q.  We're both doing it.  You haven't provided any of those
23   reports to counsel, have you?
24   A.  No.
25   Q.  All right.  I want to talk about civilian defensive gun
```

1   uses for a minute.  We talked about when civilians are shot by

2   suspects.  How about the reverse, civilians shot suspects?

3   When a civilian shot a suspect, that would not be part of the

4   SOP 9 or its predecessor, correct?

5   A.  That is correct.

6   Q.  And you would not as part of your normal duties, other

7   than, if I'm saying this correctly, when you were at Manhattan

8   South, you would get these daily events of significance

9   reports?

10  A.  As a supervisor in the police department -- and, again,

11  once you attain the rank of sergeant -- so I was certainly on

12  the scene of civilian shootings when I was a cop, but became a

13  supervisor as a sergeant.  So there were scenes that I visited

14  as a police supervisor where civilians did take action, and,

15  certainly, in several cases of store owners defending their

16  property.

17  Q.  You weren't involved in those investigations directly,

18  correct?  You just read the reports.

19  A.  No, I was involved in some of those investigations.

20  Q.  Okay.  Now we're talking about --

21  A.  When I was active -- yes.

22  Q.  Finish your statement.

23  A.  While I was an active -- on the NYPD, as a sergeant,

24  several times I know I responded to the scene where a store

25  owner defending his property had fired a weapon.

1    Q.  And that kind of event occurred in the 1970s, when you

2    were --

3    A.  I was a sergeant in the '80s.

4    Q.  All right.  Sorry, I forgot.  Let's talk about since you

5    retired from the police department.  You have received no

6    reports, data, publications, statistics of any kind regarding

7    civilian defensive gun uses, have you?

8    A.  Other than news reports, no, you're correct.

9    Q.  Thank you.  So you have no personal knowledge, statistics,

10   data, information of any kind with regard to civilian gun use

11   or civilian magazine exchanges, magazine capacity, those kinds

12   of things, correct?

13   A.  Correct.

14   Q.  Do you know how to determine how many civilians engaged in

15   defensive gun uses against suspects in the United States in the

16   last ten years?

17   A.  Reported incidents are very, very small.

18   Q.  There has been an expert witness, a guy named Dr. Kleck, in

19   this case, who compiles that kind of data.  Have you ever read

20   any of his books?

21   A.  If it wasn't in his expert report, I didn't read it.

22   Q.  Let me ask you the same question with regard to New York

23   City.  Do you know how many defensive gun uses civilians

24   engaged in against suspects in New York in the last ten years?

25   A.  Very minimal.

 1    Q.   Is that a yes or a no?

 2    A.   Meaning, yes, they're very minimal.  They don't happen that

 3    often.

 4    Q.   And you base that opinion on the media reports that you've

 5    indicated?

 6    A.   Absolutely.

 7    Q.   Anything else?

 8    A.   No, sir.

 9    Q.   Okay.  Let's move on to your role as a basic firearms

10    instructor and your duties at the firearms training section of

11    the New York Police Department.

12              When you were a patrol officer in NYPD -- and I think

13    this is where we left off -- NYPD only authorized its officers,

14    at least its patrol officers, to carry revolvers, correct?

15    A.   Yes, sir.

16    Q.   In fact, they were .38-caliber revolvers; is that accurate?

17    A.   Yes, sir.

18    Q.   That was also the only firearm authorized for either backup

19    or off-duty carry?

20    A.   That's correct.

21    Q.   And that was true from '73 to '85, when you went into the

22    firearms training section?

23    A.   Yes, sir.

24    Q.   And it continued to be true after you became the commander

25    of the firearms training section until the mid 1990s; is that

1   accurate?

2   *A.* Yes, other than specialized units within the police

3   department, every police officer carried a .38 revolver, off

4   duty and on duty.

5   *Q.* Am I correct -- and I'm really asking about some of these

6   specialized assignments. Am I correct that from 1973 until you

7   were assigned as the commander of the firearms training unit

8   section, your only experience was in carrying a revolver?

9   *A.* My only experience in carrying a revolver -- I owned a .25

10  semiautomatic, but just for target use.

11  *Q.* And when you qualified for this basic firearms instructor

12  certification, you used a revolver, didn't you?

13  *A.* That was tested, but we also during the course did fire

14  different types of weapons.

15  *Q.* I understand.

16  *A.* They taught -- again, part of the class on firearms

17  instruction did include semiautomatics also.

18  *Q.* But I understood from your prior testimony that you didn't

19  take that class; you just supervised it?

20  *A.* No, no, we're talking about my instruction as a firearms

21  instructor.

22  *Q.* Yes, the basic firearms instructor certification process, I

23  thought you just took a test and fired at the range. You went

24  to a class?

25  *A.* I went through classes also.

1    *Q.* Okay.

2    *A.* I didn't go through the whole classes, I think that's what

3    you're talking about. But, certainly, I did attend some of the

4    classes, and some of the classes did include other types of

5    weapons.

6    *Q.* Since NYPD authorized its officers to start carrying

7    semiautomatic pistols, did you start carrying a semiautomatic

8    pistol?

9    *A.* No, sir.

10   *Q.* So from 19 -- about 1995 until 1999, you continued to carry

11   a revolver?

12   *A.* Yes, sir. I found it to be sufficient for my self-defense.

13   *Q.* Is it fair to say that at the time that you were assigned

14   as commander of the firearms training section, you had had

15   absolutely no experience whatsoever with semiautomatic pistols?

16   *A.* No. I was in the military, definitely fired different type

17   of semiautomatics, .45s, M16s, M14s, those types of things.

18   *Q.* So you had military experience in the use of semiautomatic

19   pistols?

20   *A.* Yes, I did.

21   *Q.* The folks at the firearms training unit -- let me ask it

22   differently. Which level of instructors in the firearms

23   training unit were authorized to instruct on semiautomatic

24   pistols?

25   *A.* All of them.

1   Q.  Let me be more clear to make sure we're on the same page,

2   okay.  Before NYPD authorized semiautomatic pistols for open

3   carry by its patrol officers, my understanding was that

4   semiautomatic pistols were only allowed for officers in special

5   assignments, and they had to go through a special firearms --

6   specialized firearms training course, correct?

7   A.  You're talking about the police officer in the narcotics

8   unit, in a specialized unit?

9   Q.  Yes.

10  A.  Yes.

11  Q.  Okay.  And the only authorized instructors to teach special

12  weapons at NYPD until the transition were master firearms

13  instructors; isn't that true?

14  A.  Well, they weren't -- the master firearms program probably

15  didn't come in until '90 something.  We had a separate unit --

16  my unit of, say, 300 police officers who were instructors,

17  there were categories of instructors in different types of

18  instruction, recruit instructors, in-service training

19  instructors, special weapons instructors, shotgun instructors.

20  So I had a full gamut of different types of weapons training

21  cadres.

22  Q.  But if I understood you correctly, you didn't perform any

23  of that training yourself?

24  A.  I oversaw all of that training.

25  Q.  You said there were about 38,000 NYPD officers in the early

1  '80s; is that about right?

2  A.  Yes, sir.

3  Q.  How many of those were in the specialized assignments that

4  authorized carry of semiautomatic pistols?

5  A.  I would say less than 500.

6  Q.  You also discussed in your direct examination a transition

7  that occurred, I think after you became the commander of the

8  unit, the firearms training section, where there was a

9  transition from -- to speed loaders?

10  A.  Yes.

11  Q.  Correct?  What was the transition from?

12  A.  Before speed loaders, each police officer had a pouch with

13  a metal type of insert.  Inside that pouch were six loose

14  rounds of .38 special ammunition.  The police officer had two

15  pouches on his belt for additional ammunition, if necessary.

16  Q.  And why were you considering transitioning to a speed

17  loader?

18  A.  Just for the speed of reloading, just in case an officer

19  needed more rounds.

20  Q.  And did you conduct timing tests to determine whether or

21  not reloading with a speed loader was faster than reloading

22  from pouches?

23  A.  Yes, sir.

24  Q.  And what did you learn?

25  A.  That it was faster.

 1  Q.  About five seconds faster?

 2  A.  Well, I wouldn't say five seconds; but it certainly was

 3  faster.  Couple of seconds, at least.

 4  Q.  Do you recall --

 5  A.  Three or four seconds, I think it was.

 6  Q.  Do you recall us discussing this in your deposition?

 7  A.  Yes, I do.

 8  Q.  Do you recall giving the five second estimate?

 9  A.  Okay.

10  Q.  Five seconds in a gunfight is a significant amount of time,

11  isn't it?

12  A.  Absolutely.

13  Q.  Why?

14  A.  Because things happen within seconds.

15  Q.  So is the -- the time necessary for a law enforcement

16  officer to reload important, because during that reloading

17  time, an officer is rendered temporarily defenseless?

18  A.  It could happen, yes.

19  Q.  In fact, officers with revolvers, they can't return fire

20  when they're out of bullets and they're reloading, can they?

21  A.  Well, again, in the day, most police officers carried two

22  revolvers.  So they went from their service gun to where their

23  backup was.

24  Q.  So there would be a transition time rather than a reload

25  time?

1    *A.*  And sometimes that helped.

2    *Q.*  Would you agree that a law enforcement officer can

3    generally empty a six-shot revolver in less than two seconds?

4    *A.*  Yes.

5    *Q.*  So the five seconds required to reload a revolver, a

6    trained law enforcement officer could fire between 12 and 15

7    rounds; is that roughly correct?

8    *A.*  It wasn't a contest of how fast you could shoot; it was how

9    good you could shoot.

10   *Q.*  So you need to fire potentially, both swiftly and

11   accurately; is that what you're --

12   *A.*  Accurately more than swiftly.

13   *Q.*  Let me help -- let me see if I can understand the timing of

14   all of this.  Is it correct that most law enforcement agencies

15   had been using speed loaders for several years before NYPD made

16   the transition?

17   *A.*  I would say there were agencies who had them before the

18   NYPD, yes.

19   *Q.*  Did you consult with these other agencies regarding the

20   benefits of shortening reload time?

21   *A.*  I know I did talk to other agencies about them, yes.

22   *Q.*  And then in the mid 1980s, you were tasked specifically

23   with evaluating a potential transition to semiautomatic pistols

24   for NYPD; am I accurate in that time frame?

25   *A.*  Yes, sir.

1    *Q.* By the time that that request was made of you, there were a

2    number of major law enforcement agencies that had already

3    transitioned to semiautomatic pistols, most notably, LA County

4    Sheriff's Department and some West Coast agencies; isn't that

5    true?

6    *A.* I know -- I don't know what you call a major agency,

7    because the NYPD was bigger than the next state.

8    *Q.* You're the big gorilla on the block.

9    *A.* Yes.

10   *Q.* I understand. Compared to -- do you know how the size of

11   NYPD compared to LA County?

12   *A.* I think LA County only has 5,000. Am I right? I mean,

13   something like that, if they have that many.

14   *Q.* But nonetheless, LA County had already transitioned?

15   *A.* There were -- yes, there were certain agencies that did

16   transition to a semiautomatic before the NYPD.

17   *Q.* And similarly to the process you used in evaluating a move

18   to speed loaders, you sought advice, consultation, whatever,

19   from members of these agencies that had already effected the

20   transition, didn't you?

21   *A.* Yes.

22   *Q.* And you considered the success of these other agencies in

23   the transition when evaluating whether NYPD should make that

24   same transition; is that accurate?

25   *A.* Yes, successes as well as their failures.

1  Q.  I'm sorry?

2  A.  Their successes as well as their failures.

3  Q.  Sure.  You're evaluating it for your own department, so you

4  want to know the pros and cons?

5  A.  Correct.

6  Q.  Did you acquire any data, any information, did you review

7  any publications in the process of making this evaluation?

8  A.  I know I discussed this with people from the National

9  Institute of Justice and other agencies and with weapons

10  manufacturers themselves.

11  Q.  You -- one of the motivating factors behind this

12  contemplated transition was the fact that criminals were

13  already using semiautomatic firearms; isn't that right?

14  A.  Yes.  I think I stated before that the Saturday night

15  specials and whatever were prevalent as the early semiautomatic

16  use of criminals.

17  Q.  And based on --

18  A.  Which were --

19  Q.  I'm sorry.  I didn't mean to interrupt.

20  A.  Which were basically seven-round capacity semiautomatics.

21  Q.  You're talking about the Saturday night specials?

22  A.  Yes.

23  Q.  So they only had one more round than your guys?

24  A.  Correct.

25  Q.  Nonetheless, the concern for NYPD was, just having six

1    rounds might not be enough for NYPD officers; isn't that right?

2    A.   That's what we looked into, sir.

3    Q.   You felt that concern was exaggerated, didn't you?

4    A.   Exaggerated?

5    Q.   Yeah.

6    A.   At the point -- at the time, yes.

7    Q.   You did.  I think you said that you were directed to a

8    particular -- sorry, I'm not a gun guy.  I don't know whether

9    this is a model, a make, a particular type of firearm, meaning,

10   your supervisors directed you to evaluate a potential

11   transition to a 9-millimeter firearm; is that accurate?

12   A.   Yes, that was the first thing we looked into.

13   Q.   So whether it should be a 9 versus a .40 versus a .45?

14   A.   Correct -- well, I mean, basically at that period of time,

15   the higher capacity semiautomatics were probably just .45s --

16   major manufacturer, .45 semiautomatics, and then the 9

17   millimeter, which provided larger magazine capacity.

18   Q.   And one of the problems or concerns about .45s is

19   penetration?

20   A.   Penetration -- well, I feel that a .45 is an excellent

21   antipersonnel round, but it's' not a firearm that is readily

22   adaptable to all 38,000 police officers.

23   Q.   Would you agree that the Glock 17 was one of the most

24   prevalent weapons being carried by law enforcement officers

25   around the United States at the time NYPD began considering

 1 | this transition?

 2 | A.  We had Glock 17s as part of our assessment of the

 3 | 9 millimeters, because that was one of the ones that was being

 4 | manufactured.

 5 | Q.  And your concern was that the Glock 17's magazine capacity

 6 | might offer too many additional rounds for police officers?

 7 | A.  One of the factors, yes, sir.

 8 | Q.  And you were concerned that the officers might not engage

 9 | in what I'll call controlled fire, if given the opportunity to

10 | fire additional rounds; is that accurate?

11 | A.  Yes, sir.

12 | Q.  During the first several years where you were charged with

13 | evaluating a potential transition to semiautomatic pistols, you

14 | recommended against the transition, didn't you?

15 | A.  My initial concerns were what was going to happen with the

16 | additional ammunition available.

17 | Q.  But my question was, you initially recommended against the

18 | transition, didn't you?

19 | A.  Recommended, no.  Once again, I might have been high up in

20 | the New York City Police Department, but there were higher than

21 | me.  And if they told me, test that, I tested it.

22 | Q.  Okay.  I appreciate the clarification.  You ultimately came

23 | around, did you not?  You ultimately determined that

24 | semiautomatic pistols were a good idea for use by NYPD

25 | officers?

1   *A.*   Yes, sir.

2   *Q.*   One of your concerns involved the fact, I think we just

3   talked about, was that you didn't believe that NYPD officers

4   necessarily needed more than the six rounds that were available

5   in their revolver; isn't that right?

6   *A.*   Early on, yes.

7   *Q.*   But ultimately -- I guess -- I don't want to get caught up

8   in "recommended," but, ultimately, NYPD, based upon your

9   evaluation, switched to 15-round-capacity semiautomatics?

10  *A.*   Yes, sir.

11  *Q.*   Am I correct that your concern about officers using more

12  ammunition than they needed was that officers who had been

13  using six-shot revolvers throughout their entire careers might

14  see this additional ammunition as simply an opportunity to

15  continue to fire when they didn't need to?

16  *A.*   Yes, sir.

17  *Q.*   And is that that spray and pray stuff you were talking

18  about before?

19  *A.*   Sure.  Yes, sir.

20  *Q.*   In the -- in the context of spray and pray, you mentioned

21  something called mind-set.

22  *A.*   Yes.

23  *Q.*   And you were concerned about the mind-set of police

24  officers?

25  *A.*   No doubt.

1  Q.  And the mind-set, I think, impacted you in two ways, or

2  your concerns were twofold.  One was, did the officer -- would

3  the officers feel like they were outgunned, and the other had

4  to do with the mind-set associated with, oh, boy, we're getting

5  some more rounds here, let's use them?

6  A.  Very well stated.

7  Q.  Thanks.  Every once in a while --

8  A.  Yes.

9  Q.  Have you done any research or obtained any specialized

10  training regarding the psychological effects of large-capacity

11  magazines on either law enforcement or civilians?

12  A.  I've read different things about that.

13  Q.  What have you read?

14  A.  I couldn't tell you the specific periodical or magazine or

15  the person I talked to, but I certainly -- I certainly did hear

16  about it.  I mean, it's -- in answering -- I don't think you --

17  you're not going towards -- all right.  Just -- I have read

18  different things concerning that matter.

19  Q.  One of your concerns was an officer's ability to keep track

20  of rounds that they fired when the -- after the transition took

21  place; isn't that true?

22  A.  Yes.  In my studies -- as a police supervisor, each time

23  there was a police shooting, a police supervisor would have to

24  go on the scene, and they would check the officer's revolver --

25  we're talking early on.  They would check the officer's

 1  | revolver.  And they would ask the officer how many rounds did
 2  | you fire?  In most instances, the officer would say -- in all
 3  | honesty to himself, he would say, I fired one or three rounds.
 4  | When the cylinder was opened and the rounds were checked, all
 5  | six rounds were gone.
 6  | Q.  So this concern that officers might not be able to keep
 7  | track of rounds exists regardless -- in a violent encounter,
 8  | exists regardless of whether it's a revolver or semiautomatic
 9  | pistol, correct?
10  | A.  Yeah.  But it's when it's six rounds, it's over, for the
11  | most part.
12  | Q.  Unless they transition to their second gun?
13  | A.  Right.
14  | Q.  Okay.  So the issue -- if I'm understanding you correctly,
15  | the issue here is controlled fire, needing to get officers to
16  | understand that just because they have additional rounds in
17  | their gun, they don't need to shoot it?
18  | A.  Correct.  I believe in a -- certainly in a gunfight
19  | situation, it is most critical, the first and second shot fired
20  | by the police officer.
21  | Q.  But the concern that we've just been talking about was
22  | offset or mitigated, if you will, by the fact that
23  | larger-capacity magazines provided more available rounds for
24  | officers to engage suspects without the need to reload; isn't
25  | that right?

1    *A.* Yes.

2    *Q.* And in your networking with other agency representatives

3    who had already made this transition and who had already

4    addressed the concern about spray and pray that you've talked

5    about, you learned that, perhaps, the tendency of an officer

6    who was used to a six-shot revolver to fire additional rounds

7    could be trained out of it, didn't you?

8    *A.* My belief that that could happen. Very difficult, but it

9    could happen, and it would take time.

10    *Q.* I don't want to jump ahead too far. But ultimately, that's

11    what happened in New York, didn't it?

12    *A.* It took a few years and a few officers getting indicted,

13    and it happened.

14    *Q.* Okay. And we'll talk about those incidents in just a

15    minute.

16        Part of your evaluation process included whether or

17    not there was a significant benefit to NYPD officers to have

18    more rounds available without the need to reload. That was

19    part of your evaluation process, correct?

20    *A.* Yes.

21    *Q.* And, of course, the benefit for law enforcement officers in

22    having more rounds available before they have to reload is that

23    in a defensive gun use, in a confrontation with a suspect, the

24    gun would go "bang" rather than "click," correct?

25    *A.* Yes.

```
 1    Q.  And one of the benefits that you determined was that it
 2    would take less time for an officer to reload a semiautomatic
 3    pistol than a revolver; isn't that true?
 4    A.  Yes, sir.
 5    Q.  And in a gunfight, those few seconds, as we talked about
 6    with the revolver, can be crucial, correct?
 7    A.  Potentially, yes, sir.
 8    Q.  If I asked you this before, I apologize.  And the reason
 9    that that's a significant concern is that an officer cannot
10    engage in a defensive gun use when they're in the process of
11    reloading the firearm; isn't that accurate?
12    A.  One of the factors, yes.
13    Q.  Thanks.  So we talked a little bit about your concern about
14    spray and pray and whether or not it could be trained out of an
15    officer.  Probably a formal term for that, but that's the one I
16    came up with.  And, ultimately, you determined, NYPD
17    determined, that the benefits that were garnered from officers
18    having more rounds available without the need to reload
19    outweighed the concerns about spray and pray that you've
20    already testified to; is that correct?
21           MS. SPALDING:  Objection, Your Honor.  Asked and
22    answered.
23           THE COURT:  Sustained.
24           MR. COLIN:  I apologize.
25    BY MR. COLIN:
```

1   Q.  Now, this transition was made notwithstanding the fact that

2   according to you, very few NYPD officers fired more than six

3   rounds in a gunfight; isn't that right?

4   A.  Yes, sir.

5   Q.  So did you implement a training program associated with

6   this transition in order to assist officers who were used to

7   having a six-shot revolver into engaging in controlled fire

8   with semiautomatic pistols.

9   A.  Yes.  The whole curriculum had to be rewritten as far as

10  the -- training with a revolver is certainly a lot different

11  than the training with a semiautomatic.

12  Q.  Would you agree that by the time you left NYPD in 1999, the

13  number of rounds fired by NYPD officers in confrontations such

14  as we've been speaking to had settled down to the point where

15  it was about the same as under revolvers, that officers were

16  shooting about five rounds.  I think you used that estimate?

17  A.  Yes.

18  Q.  All right.  So when officers were using revolvers, the

19  average number of rounds they fired was three to five, I think

20  you said?

21  A.  Yes.

22  Q.  And after they were transitioned to semiautomatic pistols,

23  the average number of rounds they fired was three to five?

24  A.  Not early on.

25  Q.  Okay.  So there may have been a year or two where folks had

```
 1 | to get that trained out of them?
 2 | A.  I would think it was more than a year or two, but --
 3 | Q.  You were out of the unit by then?
 4 | A.  Yes.
 5 | Q.  Let's talk about this concern that bystanders -- innocent
 6 | bystanders or other fellow officers might be injured as a
 7 | result of uncontrolled fire, which was a concern of yours,
 8 | correct?
 9 | A.  Absolutely, yes, sir.
10 | Q.  All right.  And from 1980 to 1989, the average number of
11 | innocent bystanders struck by a round fired by a New York
12 | officer in a gunfight was three to five a year; isn't that
13 | right?
14 | A.  Three to five people?
15 | Q.  Yes.  Three to five innocent bystanders were struck --
16 | A.  I'm talking up until 2000 -- whatever, what is this year?
17 | Up to date.
18 | Q.  We'll get you there, Mr. Cerar.  What I want to talk about
19 | right now are the number of innocent bystanders injured or
20 | fellow police officers injured by missed shots, if you will --
21 | A.  Okay.
22 | Q.  -- from 1980 to 1989.  So before the transition.
23 |         MS. SPALDING:  Objection, Your Honor.  Vague, as to
24 | where the shots came from.
25 |         THE COURT:  The objection is as to the form of the
```

```
 1 │ question.  Do you care to rephrase?
 2 │        MR. COLIN:  Sure.
 3 │ BY MR. COLIN:
 4 │ Q.  Mr. Cerar, is it true that the average number of innocent
 5 │ bystanders or uninvolved officers injured by uncontrolled fire,
 6 │ fired by New York City police officers, from 1980 to 1989 was
 7 │ three to five incidents a year?
 8 │ A.  Yes.
 9 │ Q.  And it is true that in the last ten or fifteen years, since
10 │ 2000, the average number of innocent parties injured by gunfire
11 │ from NYPD officers is still three to five?
12 │ A.  Yes.
13 │ Q.  And it's also true, is it not, that the number of rounds
14 │ fired by NYPD officers on average in the last ten years, using
15 │ semiautomatic pistols, is about the same when most NYPD
16 │ officers were restricted to using revolvers, correct?
17 │ A.  The amount of rounds fired by New York City police officers
18 │ has greatly decreased over the last −− when I say that, I'm
19 │ sorry, I'm talking about an incident where a police officer
20 │ fires his gun.  The incidents have gone down drastically.
21 │ Q.  Thank you.  You talked a little bit about an opinion you
22 │ have about semiautomatic rifles.  Do you remember that?
23 │ A.  Yes, sir.
24 │ Q.  In your direct?  NYPD still doesn't authorize patrol
25 │ carbines for use by its patrol officers, does it?
```

1  A.  That's correct.

2  Q.  The only folks at NYPD that are allowed to us who are

3  authorized to use semiautomatic carbines are folks in what I

4  would call the SWAT unit, but NYPD kinder, gentler calls the

5  emergency services unit; is that accurate?

6  A.  Yes.

7  Q.  And you've never trained an officer to use a patrol

8  carbine, have you?

9  A.  No.  My unit was responsible for that.

10  Q.  And you don't have any background, training, or experience

11  in the use of semiautomatic rifles, do you?

12  A.  Experience, yes.

13  Q.  Your experience is that, every once in a while one of your

14  firearms trainers would get a new gun, and they would say, hey,

15  Cap, look at this?  Is that right?

16  A.  Part of it, yes.

17  Q.  What other parts am I missing?

18  A.  Well, if we were going to utilize or test that type of gun,

19  I might have gone on the range and fired it.

20  Q.  Okay.  Now, I want to get to this SOP 9 just very briefly

21  before we finish.  The SOP 9 was used to determine -- I want to

22  say this right -- hit rate, is that --

23  A.  That's one part of it, yes, sir.

24  Q.  All right.  So you would compare the number of rounds fired

25  to the number of rounds actually hitting the target?

1    *A.*  Yes, sir.

2    *Q.*  And the SOP 9 calculations included, for example, officers

3    who used a gun in a suicide?

4    *A.*  Yes, sir.

5    *Q.*  Officers who used a gun in an animal shooting, shooting a

6    dog, something like that, is that right?

7    *A.*  Yes, sir.

8    *Q.*  So those types of incidents were included in hit rate

9    calculations by NYPD; is that accurate?

10   *A.*  Yes.

11   *Q.*  I want --

12   *A.*  I --

13   *Q.*  I'm going to start jumping around a little bit because I

14   want to try to cover some other points that you made during

15   your direct.  You talked about the firearms discharge review

16   board process.  Do you recall that?

17   *A.*  Yes, sir.

18   *Q.*  And my understanding is, New York prosecutors evaluated

19   whether the officer-involved shooting that was being reviewed

20   by the firearms discharge review board was in conformity with

21   criminal law, right?

22   *A.*  Yes.  That was done before the firearm discharge review

23   board would look into the guidelines and policy of the

24   shooting.

25   *Q.*  So the officer had already been cleared or indicted by the

 1  │ time FDRB got the case?

 2  │ A.  Yes, sir.

 3  │ Q.  All right.  And the role of the FDRB was solely to evaluate

 4  │ whether the officer was in compliance with department policy,

 5  │ yes?

 6  │ A.  Yes.

 7  │ Q.  And whether or not the incident itself gave rise to any

 8  │ training improvements or concerns.

 9  │ A.  Yes, sir.

10  │ Q.  And you were a member of the FDRB board -- you said you

11  │ were a voting member, correct?

12  │ A.  Yes, sir.

13  │ Q.  And there were a number of incidents that you reviewed as

14  │ part of your role as a voting member of the FDRB, where a New

15  │ York officer fired more than 15 rounds in the course of a

16  │ gunfight; isn't that true?

17  │ A.  Yes, sir.

18  │ Q.  And in each of those circumstances, the FDRB found the

19  │ officer to have been within policy; isn't that true?

20  │ A.  During my time at the NYPD, yes.  After I left, no.

21  │ Q.  And I'm only asking while you were on the board.  So while

22  │ you were on the board --

23  │ A.  That's what I'm trying to clarify.  When I was on the

24  │ board, the answer is no.

25  │ Q.  You found those shootings out of policy?

 1  *A.*  No -- okay.  Sorry.

 2  *Q.*  Go ahead.

 3  *A.*  The answer is, we did not, so --

 4  *Q.*  You did not -- let's try this all over again.  When you

 5  were on the FDRB and reviewed several incidents in which NYPD

 6  officers fired more than 15 rounds in a single incident, those

 7  events were found to be in compliance, were they not?

 8  *A.*  Yes, they were.

 9  *Q.*  Thank you.  Okay.  Now, you have opined that a magazine

10  with a capacity of 15 rounds or less is almost always adequate

11  for a civilian who must discharge a firearm in self-defense,

12  right?

13  *A.*  Yes, sir.

14  *Q.*  And you've also opined that a magazine limitation to 15

15  rounds will not negatively impact the self-defense capability

16  of female shooters or people with small hands?

17        *MS. SPALDING:*  Objection, Your Honor.  He did not

18  offer that last opinion.  We did not discuss it.

19        *THE COURT:*  So the objection is that that is not

20  evidence before the Court?

21        *MR. COLIN:*  If it was not offered in direct, I

22  understand.  Thank you.

23  *BY MR. COLIN:*

24  *Q.*  Well, then, let's talk about the first portion of that

25  opinion.  A magazine with a capacity of 15 rounds or less is

 1  almost always adequate.  Okay.

 2  A.  Yes, sir.

 3      MS. SPALDING:  Actually, in addition, Your Honor, I'm

 4  going to object to the characterization.  I don't believe the

 5  statement was "almost always."  And I don't believe that's the

 6  wording in any of the opinion --

 7      MR. COLIN:  I apologize.

 8      THE COURT:  I was going to say, I'm not finding that

 9  in the list of opinions.

10      MR. COLIN:  Let me get it so I quote it exactly.

11  BY MR. COLIN:

12  Q.  Magazines carrying 15 or fewer rounds are sufficient for

13  self-defense.  Is that more accurate?

14  A.  Yes.

15  Q.  And magazines carrying more than 15 rounds are not

16  necessary for self-defense; is that --

17  A.  Yes.

18  Q.  My understanding of the basis for that opinion is that

19  you've never heard of any incidents where civilians were

20  required to fire more than 15 rounds in self-defense?

21  A.  Yes, sir.

22  Q.  Any other facts or data upon which this opinion relies?

23  A.  It relies on the amount of shootings that I studied that

24  did not require 15 rounds to be necessary, plus the fact that

25  this bill includes -- doesn't preclude any civilian in a

1  self-defense situation from carrying additional magazines.

2  *Q.*  Okay.  Let's talk about the study that you undertook.

3  Describe for us the research and the results of the research

4  that you obtained which led you to believe that there have been

5  no incidents in which civilians have fired more than 15 rounds

6  in a defensive gun use.

7  *A.*  No -- in networking and in no news media report, have I

8  heard of one instance where a civilian needed more than 15

9  rounds in a self-defense situation.

10  *Q.*  So the methodology that you utilized to form your opinion

11  was, reading the newspaper, watching television, and listening

12  for events in which civilians were reported to have fired more

13  than 15 rounds; is that accurate?

14       *MS. SPALDING:*  Objection, Your Honor.  Misstates the

15  testimony.

16       *THE COURT:*  Noted for the record.

17  *BY MR. COLIN:*

18  *Q.*  Would you like the question read back for you?

19       *THE COURT:*  Would you like it read back?

20       *THE WITNESS:*  Yes.

21       *THE COURT:*  All right.

22       (Question read back by the reporter.)

23       *THE WITNESS:*  Yes, plus the fact that I received that

24  law enforcement bulletin daily.

25  *BY MR. COLIN:*

1  Q.  Thank you.  You haven't -- you haven't reviewed any books

2  or publications, conducted any personal research into that

3  issue?

4  A.  No, I haven't.

5  Q.  Thank you.

6        MR. COLIN:  If I may have a moment, Your Honor.

7        THE COURT:  You may.

8        MR. COLIN:  Trying to eliminate cumulative questions.

9  BY MR. COLIN:

10  Q.  Do you have any data on the average number of rounds it

11  takes to terminate a threat posed by an armed assailant?

12  A.  There are so many variables, I don't think anybody has that

13  data.

14  Q.  You've seen people shot 18 times and still walk around,

15  haven't you?

16  A.  Could happen.

17  Q.  Well, you've seen it yourself, haven't you?

18  A.  I sure have.

19  Q.  Would you agree that the time required for a magazine

20  exchange could be spent firing more defensive rounds?

21        MS. SPALDING:  Objection, Your Honor.  Calls for

22  speculation.

23        THE COURT:  I treat it as a question based on his

24  experience, and he can answer it.

25        THE WITNESS:  Okay, would you please repeat the

 1   question.
 2          (Question read back by reporter.)
 3          *THE WITNESS:*  Potentially, yes.
 4   *BY MR. COLIN:*
 5   *Q.*  There are -- that's one of the benefits to either a law
 6   enforcement officer or a civilian in not having to reload,
 7   having more rounds available, isn't it?
 8   *A.*  One of them, yes.  I also think that in the time it takes
 9   to reload a magazine, better decisions have been made by police
10   officers as to what their next action would be.  And that would
11   be, not be firing more rounds.
12   *Q.*  Or maybe they need to fire more rounds?  What kind of
13   circumstances --
14   *A.*  I would say -- I would say by being able -- when that time
15   with the magazine change or reloading a revolver, that time
16   sometimes is well spent behind cover.  More people are coming
17   to assist, and the necessity of firing more rounds is not
18   necessary.
19   *Q.*  Sure.  But when it's necessary, you want to have those
20   rounds available; isn't that right?
21   *A.*  The potential -- yes.
22   *Q.*  Okay.  You'd agree, maybe to just get to the point here,
23   that in a defensive gun use environment, in a violent
24   encounter, the fewer number of reloads is always better for
25   everyone, including females and individuals with small hands?

```
 1          MS. SPALDING:  Objection, Your Honor.  Again, we
 2   didn't --
 3          MR. COLIN:  Let me strike the last part of that
 4   question.  I apologize.
 5          THE COURT:  Let's rephrase the question so --
 6          MR. COLIN:  Yes, that's what I was going to do.  Thank
 7   you.
 8   BY MR. COLIN:
 9   Q.  You acknowledge, do you not, that in a defensive gun use
10   situation, the fewer number of reloads, the better?
11   A.  Yes.
12   Q.  You did talk -- even though, apparently, you didn't render
13   an opinion about female shooters, you did talk about problems
14   associated with grip size of a semiautomatic pistol associated
15   with magazine capacity; did you not?
16          MS. SPALDING:  No -- I'm sorry.  Objection, Your
17   Honor.  That was not raised on direct.  It's beyond the scope.
18          MR. COLIN:  Well, I apologize, Your Honor, if it
19   wasn't.  My notes reflect that it was.
20          THE COURT:  It was not.
21          MR. COLIN:  Okay.  Then I'll skip this part of the
22   question.
23   BY MR. COLIN:
24   Q.  A few more follow-up questions, Mr. Cerar.  Did I
25   understand you to say that you disagreed with Dr. Kleck's
```

1   statistical analysis regarding the need for more available

2   rounds in the defensive gun use, based upon your opinion that

3   New York Police Department does not typically need more than 15

4   rounds, so civilians don't need more either?  Did I get that

5   right?

6   A.   I think so.  That's pretty good.

7   Q.   Study any data to help you formulate this opinion?

8   A.   Certainly studied data of the New York Police

9   Department-involved shootings.

10  Q.   Okay.  Poorly phrased question.  In the last 14 years since

11  you retired -- 15 years since you retired, studied any data on

12  that issue?

13  A.   Relying on news reports, media, networking.

14  Q.   Finally, I understood that you offered the Aurora theater

15  shooting as an example of an incident where a magazine exchange

16  gave victims the chance to flee or intervene.  But you've now

17  changed your opinion on that issue; is that accurate?

18        Let me rephrase if you're struggling.

19  A.   Yes.

20  Q.   At the beginning of your testimony on direct, you

21  testified -- you used two examples of events where a magazine

22  exchange allowed civilians to intervene or flee.  You used the

23  Gabby Giffords incident and the Aurora theater incident,

24  correct?

25  A.   There were two separate incidents.  One where it was a

1    magazine exchange that provided time, and the other was a

2    jamming of the firearm that provided time.

3    Q.  And, previously, you had used the Aurora theater shooting

4    as a supporting example for your opinion in your expert report;

5    did you not?

6    A.  Yes, I did.

7    Q.  And you have since learned that it did not involve a

8    magazine exchange, but a gun jam, correct?

9    A.  Yes.

10           MR. COLIN:  Thank you.  I have no further questions.

11           THE COURT:  Thank you.

12           Redirect?

13                    **REDIRECT EXAMINATION**

14   BY MS. SPALDING:

15   Q.  Just a few questions, Mr. Cerar.

16           On direct and a little bit on cross as well, you

17   talked about being the commander officer of the firearms unit,

18   correct?

19   A.   Yes.

20   Q.  And I may have asked you, so forgive me if this is a

21   duplication, but how many employees did you supervise as

22   commanding officer of the firearms unit?

23   A.  About 300.

24   Q.  And those folks, as I understand your testimony, included

25   special weapons instructors?

1   *A.*   Yes.

2   *Q.*   Shotgun instructors?

3   *A.*   Yes.

4   *Q.*   Armorers?

5   *A.*   Yes.

6   *Q.*   Gunsmiths?

7   *A.*   Yes.

8   *Q.*   Master and senior firearms instructors?

9   *A.*   Yes.

10  *Q.*   Firearms experts of all kinds, correct?

11  *A.*   Yes.

12  *Q.*   Now, as I understand your role as commanding officer, you

13  developed policy with respect to all of your employees at the

14  firearm unit; is that correct?

15  *A.*   Yes, I did.

16  *Q.*   And that would include developing training policies and

17  procedures for all employees of the firearms unit, correct?

18  *A.*   Yes.

19  *Q.*   And I think you were asked by counsel about a revision, if

20  you will, of the training for officers with respect to firearms

21  use after the transition from revolvers to semiautomatic

22  handguns, correct?

23  *A.*   Yes.

24  *Q.*   Were you the commander of the firearms unit at that time,

25  at the time the transition was made?

 1  *A.*  Was going on, yes.

 2  *Q.*  And was it your responsibility to see that firearms

 3  training was totally revamped in light of the transition from

 4  revolvers to semiautomatic weapons?

 5  *A.*  Yes, I was, yes.

 6  *Q.*  You were -- you were asked about the number of rounds fired

 7  by officers currently.  And it's my understanding of your

 8  testimony that that number is about the same, more or less, now

 9  as it was when revolvers were in use.  Is that -- is that

10  accurate?

11  *A.*  Statistically, more rounds were fired when -- since we've

12  got the semiautomatics; but it's still under six.

13  *Q.*  All right.  Now, can you tell me what kind of training a

14  police officer has in New York City with respect to firearms

15  use.

16  *A.*  Well, all police officers are trained as recruits.  Part of

17  the six-month academy training is three weeks of intense

18  firearms instruction, tactical instruction, deadly physical

19  force instruction, which is both within the academy curriculum

20  and in the firearms unit curriculum.

21       Yearly, every police officer is required to fire

22  his -- a qualification course.  And, basically, the NYPD,

23  besides the qualification course, once a year, they have

24  another tactical firing course.

25  *Q.*  To your knowledge, sir, is that kind of training available

1  for civilians?

2  *A.* Civilians would have to be whatever that civilian wants.  I

3  mean, think a civilian can buy a gun and doesn't have to have

4  any training.

5        *MS. SPALDING:*  That's all I have.  Thank you, Your

6  Honor.

7        *THE COURT:*  Thank you.

8        Can this witness step down and be excused?

9        *MR. COLIN:*  I have no objection.

10       *MS. SPALDING:*  Yes, Your Honor.  Thank you.

11       *THE COURT:*  Thank you, sir.  You may step down.  You

12  are excused.

13       *THE WITNESS:*  Thank you.

14       *THE COURT:*  What does the rest of the day look like?

15       *MS. SPALDING:*  We have one additional witness waiting,

16  and that's I think it for the afternoon.

17       *THE COURT:*  All right.  Shall we move to that witness?

18  Is that a long witness, short witness?

19       *MS. SPALDING:*  Not short.  I don't know if it's long,

20  but it's not short.

21       *THE COURT:*  All right.  Do you want to take a

22  mid-afternoon recess, then, at this time?

23       *MS. SPALDING:*  I think this would be a good time.

24       *MR. COLIN:*  Your Honor, I need to go back to my

25  office, get some examination notes.  I didn't realize he was

```
 1    maybe going to get to cross.
 2           THE COURT:  How long a recess are you going to you
 3    need --
 4           MR. COLIN:  I can be there and back in 15 minutes.
 5           THE COURT:  We'll take a recess, then, for 20 minutes,
 6    just to give you the extra few minutes.
 7           The court clock is showing five minutes after the
 8    hour, and we'll take a recess until 3:25.  We'll stand in
 9    recess until then.
10           MR. COLIN:  Thank you very much.
11           (Recess at 3:05 p.m.)
12           (In open court at 3:29 p.m.)
13           THE COURT:  Are you ready to proceed?
14           MS. SPALDING:  We are, Your Honor.
15           THE COURT:  Thank you.  Would you call your next
16    witness.
17           MS. SPALDING:  The State calls Douglas Fuchs.
18           THE COURT:  Thank you.
19           Step up and be sworn.
20            (**DOUGLAS FUCHS, DEFENDANT'S WITNESS, SWORN**)
21           COURTROOM DEPUTY:  Please be seated.
22           THE WITNESS:  Good afternoon, Your Honor.
23           COURTROOM DEPUTY:  Please state your name and spell
24    your first and last name for the record.
25           THE WITNESS:  Douglas Fuchs, D-O-U-G-L-A-S, F-U-C-H-S.
```

```
 1              THE COURT:  Thank you.  You may proceed.
 2                        DIRECT EXAMINATION
 3   BY MS. SPALDING:
 4   Q.  Good afternoon, sir.
 5   A.  Good afternoon.
 6   Q.  How do you make a living?
 7   A.  I am the police chief of the town of Redding, Connecticut.
 8   Q.  Chief Fuchs, have you been retained to reach an expert
 9   opinion in this case?
10   A.  I have.
11   Q.  Before we talk about that, let's get into your background a
12   little bit.  Okay?  How long have you been chief of police of
13   Redding?
14   A.  About twelve years now.
15   Q.  And you were a police officer prior to that time, correct?
16   A.  I was.
17   Q.  Where were you a police officer prior to taking the job as
18   chief of Redding?
19   A.  I was a police officer in the town of Ridgefield,
20   Connecticut, which is immediately adjacent to Redding, for
21   about 12 years.  Before that, I was a special in the housing
22   projects in Boston for two years.  And for a four-year period,
23   I was an auxiliary police officer in Wayland, Massachusetts.
24   Q.  What kind of training -- in the various positions you've
25   had as a police officer, what kind of training have you had?
```

1   *A.*  I've had thousands of hours of training, from legal

2   training to defensive tactics training to firearms training,

3   practical skills training.

4   *Q.*  I'm sorry, I didn't --

5   *A.*  Practical skills training.

6   *Q.*  Okay.

7   *A.*  How to be a police officer.

8   *Q.*  With respect to firearms training, can you give me some

9   idea of what that has involved in the course of your career.

10  *A.*  That involves the very basics, from when we were in the

11  academy, teaching you safety, operation of a firearm, whether

12  it's a revolver or a semiautomatic pistol, to the operation of

13  a shotgun, the use of a shotgun, to the operation and use of

14  a -- some kind of a patrol rifle, both in the classroom and

15  also on the range.

16  *Q.*  How many hours of -- well, let me go back.  When you were

17  first trained as a police officer, did you have to go through

18  an academy?

19  *A.*  I did.

20  *Q.*  And did that academy involve or include training with

21  respect to firearms use?

22  *A.*  It did.

23  *Q.*  And was that the kind of basic training that you were just

24  referring to?

25  *A.*  It was.

1    Q.  What amount of time were you trained in firearms use

2    initially at the academy that you attended?

3    A.  We had classroom training, and then we spent an entire week

4    on the range, just for the use of a handgun.  We spent

5    additional time in the use of a shotgun.

6    Q.  And what handgun were you using at that time?

7    A.  Well, I went through multiple academies.  When I was in

8    Boston, I carried a .38 special revolver, I also carried a .357

9    and a .44.  We eventually transitioned over to a Glock

10   9-millimeter semiautomatic.  When I came to Connecticut, we

11   were using a Smith & Wesson semiautomatic handgun.  When I went

12   to Redding, very briefly we were using a Smith & Wesson .45 and

13   now I carry a Glock .40.

14   Q.  And you've had training in all of those weapons; is that

15   correct?

16   A.  I did.

17   Q.  You indicated that you went through several academies.

18   Could you explain how that occurred.

19   A.  When I was a special in the city of Boston, the city of

20   Boston actually put us through a small academy.  When I was an

21   auxiliary for the town of Wayland, Massachusetts, I went to a

22   reserve intermittent police academy, kind of like block

23   training, some states will call it, where I went four hours

24   twice a week for about six months, until I was certified as a

25   reserve or special police officer in Massachusetts.  Then when

1  I came to Connecticut, I went through the full Connecticut

2  state, in quotes, police academy for municipal police officers

3  again.

4  Q.  All right.  And the training that you described for the

5  academy, the class plus a week on the range, was that the

6  Connecticut state academy that you're referring to?

7  A.  It was.

8  Q.  All right.  And so you had additional firearms training

9  with the other academies that you attended as well; is that

10  correct?

11  A.  I did.  And also when I was in Massachusetts, because I was

12  an active patrol officer there, we had many in-service training

13  programs as well, before I ever came to Connecticut.

14  Q.  All right.  In addition to the academy training that you've

15  had, have you also had more advanced training in firearms use?

16  A.  I have.

17  Q.  Can you describe that.

18  A.  We've done some munitions type training, which is more

19  scenario based, every year.  We qualify twice a year with our

20  firearms, currently.  When I was in Ridgefield, we did the same

21  thing.  We have done classroom training, in addition to range

22  time, and that's been that way for the last 24 years, since

23  I've been in Connecticut.

24         In addition to the handgun, I've also been trained in

25  and qualified with a shotgun and trained in and qualified with

1  ║ an AR-15 patrol rifle.

2  ║ Q.  All right.  Has the training you've had with the various

3  ║ weapons you've described included training on changing

4  ║ magazines?

5  ║ A.  It has.

6  ║ Q.  Explain that training that you've had with respect to

7  ║ changing magazines.

8  ║ A.  Sometimes we train to expect the unexpected, if you will.

9  ║ And we shoot until we lock back, so we're not permitted to try

10 ║ and count rounds, we're just firing until we lock back, almost

11 ║ as a surprise, and then we have to very quickly change

12 ║ magazine.  Sometimes we train to tactically reload, so when

13 ║ given the opportunity, we will not expend all of our rounds in

14 ║ a current magazine.  We will change rounds tactically when it's

15 ║ safe to do so from a position of cover and concealment and then

16 ║ continue in whatever training it is we're participating in.

17 ║ Q.  When you talk about changing rounds tactically, could you

18 ║ explain what that means.

19 ║ A.  Sure.  If you shoot to lock back -- it depends on the

20 ║ firearm that you're carrying, but if you shooed to lock back,

21 ║ and you have no rounds left in the weapon, then you're without

22 ║ the ability to fire back or fight back.  If you tactically

23 ║ reload, it means, somewhere in the middle there, you are

24 ║ stopping, you've got one left in the chamber -- now, it depends

25 ║ on what kind of weapon you're carrying, because some weapons

 1    have magazine release safety, if you will, where if you drop
 2    that magazine, the weapon will not fire.  And there are some
 3    weapons that will permit you to fire that shot, if, indeed, you
 4    do choose to do so, then you will be at lock back if you hadn't
 5    yet inserted the other magazine.  So we train, when given the
 6    opportunity, to never shoot to lock back, so that we have the
 7    ability to always return fire, if need be.
 8    Q.  Have you also had training with respect to changing
 9    magazines in the speedy fashion?
10    A.  We have.  The amount of time that it takes you to exchange
11    a magazine is the amount of time when you're kind of out of
12    that firefight, so to speak.  So we train to be able to
13    exchange that magazine without looking at it, hopefully, and in
14    as quick a fashion as is possible.
15    Q.  All right.  Is this a matter of training or practice, that
16    is, the development of the skill to change a magazine quickly?
17    A.  It's really muscle memory, so it's training and practice.
18    So you're able to go into your source, so to speak, as we call
19    it, take a magazine out, know which way the bullets are facing,
20    insert it into the firearm as fast as possible, and get back on
21    target.
22    Q.  The more often you do it, the better you get at it?
23    A.  That's the muscle memory.  A lot of people will say the
24    same thing about our holsters, for example.  We carry security
25    holsters.  And if you don't know what you're doing with a

1   holster, getting your firearm out of that holster can be a

2   complicated process.  So it's all training and muscle memory.

3   Q.  Have you had occasion to testify before a state legislature

4   on firearms legislation?

5   A.  I have.

6   Q.  On what occasion?

7   A.  I testified before the Connecticut legislature when they

8   actually came to Newtown, physically, on firearms, post-Sandy

9   Hook.

10          MR. COLIN:  Your Honor, if I may.  I rushed in, and I

11  didn't make our typical opening objection with this witness.

12  And talking about his legislative testimony reminded me.  If I

13  may assert the objection at this time.

14          Your Honor, I would simply renew our objection that

15  this individual did not testify in front of the General

16  Assembly, and the basis already argued in our trial brief and

17  articulated by Mr. Abbott.

18          THE COURT:  Noted.

19          MR. COLIN:  Thank you.

20  BY MS. SPALDING:

21  Q.  I'm sorry, sir.  I think you indicated that you testified

22  post-Sandy Hook before the legislature, correct?

23  A.  That's correct, a subcommittee that was formed specifically

24  to look at gun violence.

25  Q.  All right.  And was there a particular bill pending that

1   you testified about?

2   *A.*   The senate in Connecticut had a bill pending, they were

3   calling it comprehensive firearm legislation, and I testified

4   on pieces of that.

5   *Q.*  All right.  Is that the only time you've had occasion to

6   testify before the state legislature?

7   *A.*   No.  I've testified before the state legislature at the

8   capitol building on a number of occasions.

9   *Q.*  What was that testimony about?

10  *A.*   It varied.  I was president of the Connecticut Police

11  Chiefs Association, so from time to time I was called on to

12  testify on different legislative points that may relate to law

13  enforcement in general.

14  *Q.*  All right.  As chief of police in Redding, are you involved

15  in police instruction?

16  *A.*   I am.

17  *Q.*  Could you explain that.

18  *A.*   I'm involved in police instruction on a number of different

19  levels.  Level one would be making sure that our new hires are

20  properly trained.  So, in Connecticut, the way it works -- in

21  some states it's different.  In Connecticut, we actually have

22  to hire individuals, swear that individual in before we can get

23  them either into the Connecticut, quote, unquote, state,

24  municipal police academy, if you will, or one of the satellite

25  academies.  They cannot go in as a civilian.  So, essentially,

1  | what we have is a civilian with a badge.  And it's our
2  | responsibility to make sure that they get all of the training
3  | that is necessary while in the academy, and we do it back and
4  | forth at the academy.  And if there's any remedial training
5  | while they're up there, we make sure that's provided.
6  |         Then once they graduate the academy, we have a fairly
7  | comprehensive field training officer, FTO, program that I
8  | supervise as well, to make sure that the officers not only have
9  | the proficiency they were supposed to have coming out of the
10 | academy, but they can now translate that into what they do on
11 | the streets.  So at the end of the day, I'm the one that has to
12 | sign off to make sure that our new hires -- which, again, were
13 | civilians before we put a badge on them -- are properly trained
14 | to be a police officer.  I'm also a certified instructor in the
15 | state of Connecticut.  I used to be a DWI enforcement
16 | instructor, but now that I'm an administrator, I kind of gave
17 | that up.  But I am certified to teach in crisis management and
18 | in fair and impartial policing as well.
19 | Q.  Have you taught or given any seminars on how civilians
20 | should respond to an active shooter situation?
21 | A.  I have.
22 | Q.  Describe those seminars, if you could.
23 | A.  Before Sandy Hook, I taught a course which was known as
24 | workplace violence, which I had taught both on a statewide and
25 | a regional level on a number of indications.  Which basically

1  taught civilians how to defend themselves, protect themselves

2  during any kind of a workplace violence incident, whether it

3  was a mass casualty, a mass shooting type incident, or

4  otherwise.

5       After Sandy Hook, when it became apparent that just

6  simply sheltering or locking down in place and, essentially,

7  praying until law enforcement arrived wasn't really working,

8  we -- I took the workplace violence class, or course, that I

9  had taught and that lesson plan, and I merged it with something

10 that was known as Run, Hide, Fight, which is a program that has

11 been put on, really, across the country.  And I put those two

12 programs together and now have trained both at a local level

13 and also a regional and statewide level, civilians on this new

14 Run, Hide, Fight training and philosophy.

15 Q.  Okay.  We'll talk about that a little bit later.

16      Do you have any experience responding to mass

17 shootings?

18 A.  I do.

19 Q.  And I hope on not one more than one occasion.  What would

20 that be?

21 A.  I responded to -- on December 14 of 2012 to Sandy Hook

22 Elementary School.

23 Q.  All right.  Sir, do you have an opinion on how the use of a

24 large-capacity magazine by a shooter impacts of ability of a

25 civilian to escape or overcome a shooter?

1  *A.*  I do.

2  *Q.*  What is your opinion?

3  *A.*  My opinion is that the more often an armed assailant, mass

4  shooter, active shooter, has to exchange magazines, either

5  because they ran out of ammunition or for whatever reason, that

6  gives civilian and law enforcement the opportunity to take

7  action.  If it's law enforcement, an opportunity to take

8  offensive action; if it's civilian, the opportunity to

9  overpower that active shooter or flee the location.

10  *Q.*  And what do you base this opinion on?

11  *A.*  I base it on personal knowledge from lessons learned from

12  Sandy Hook, and I base it on many instances in history, not so

13  distant history, where individuals have been able to overpower

14  or -- an assailant or flee from an assailant during that

15  magazine exchange or some other pause that was created.

16  *Q.*  Does your training in the use of firearms also play into

17  your opinion in any way?

18  *A.*  It does.

19  *Q.*  In what way?

20  *A.*  Again, I spoke before about the fact that we have -- we

21  trained to tactically reload, to get to a point of cover and

22  concealment, and if possible, not expend all of our rounds

23  before we change magazines.  We train that way, I know that I

24  have seen others train that way, and that is -- that is a way

25  to avoid that pause, if you will.

1  *Q.*  You indicated that you were aware of examples in which

2  individuals had been able to overcome a shooter during the

3  pause that you've just referred to, that is the pause that's

4  created by a reload, correct?

5  *A.*  Yes, ma'am.

6  *Q.*  Let me focus just a little bit on a few of those

7  circumstances that you're aware of.  Just to draw out a few of

8  the examples.  Are you aware -- are you familiar with the

9  circumstances surrounding the Long Island railroad shooting in

10  1993?

11       *MR. COLIN:*  I'm going to object to counsel's leading

12  the witness and suggesting if a witness is responsive.

13       *THE COURT:*  The question is leading.

14  *BY MS. SPALDING:*

15  *Q.*  Sir, can you -- are there some circumstances that you can

16  think of that are examples of events when victims or potential

17  victims were able to overcome a shooter during a pause created

18  by the shooter's having to reload?

19  *A.*  Yes, ma'am, there are.

20  *Q.*  Can you describe one of those examples.

21  *A.*  Sure.  I can describe a few, actually.  The Long Island

22  railroad shooter, which you just mentioned, is one.  That's

23  actually an example where a magazine exchange demonstrated both

24  an opportunity for victims to flee -- because the first time

25  that active shooter exchanged magazines, many people were able

1   to run off the train.  The second time that magazine exchange

2   took place, people were able to overpower the assailant before

3   law enforcement arrived.

4   Q.  Okay.  And do you -- do you recall how many people were

5   killed, if any, in that incident, or injured?

6   A.  I believe in that incident, I think there were five who

7   were killed and sixty who were shot.

8   Q.  And you indicated that people who were on the train, I

9   presume, were able to attack the shooter as he reloaded; is

10  that correct?

11  A.  The second time that the shooter reloaded, that's when

12  civilians were able to overpower the shooter.

13  Q.  And the first time he reloaded, people were able to escape?

14  A.  Yes, ma'am.

15  Q.  Can you think of any other circumstances where individuals

16  were able to overcome a shooter during a pause created by

17  reloading?

18  A.  I can.  In the early '90s, there was an incident in Chapel

19  Hill, North Carolina, where an individual was shooting at an

20  apartment complex.  He was actually using a military -- I

21  believe it was an M1 assault style rifle.  And it was

22  interesting, as I was reading about this.  There was a police

23  officer who had some kind of military background, who

24  recognized the type of weapon that the shooter was using, and

25  knew that he was going to run out of ammunition, I think in

1   eight rounds, because of the way it was fed.  There was a

2   retired marine who was witnessing this happen who also

3   recognized that type of weapon, and realized that he was going

4   to run out of ammunition, I think they said, eight rounds.

5           So not knowing what the other was doing, apparently,

6   the retired marine said, I'm going to overpower this active

7   shooter when he goes to reload.  And the police officer said,

8   I'm going to shoot this active shooter when he goes to reload.

9   And both actually happened.  The police officer fired and was

10  able to strike the active shooter as he was in the process of

11  reloading.  And the civilian, after the police officer fired,

12  actually then subdued and overpowered the assailant until such

13  time as the police officer was able to leave his position and

14  apprehend the suspect.

15  Q.  Are there any other incidents that you can recall where

16  individuals were able to overcome a shooter during the pause

17  that it took for a shooter to reload or attempt to reload?

18  A.  There is.  There was a shooting at the White House, where

19  an individual was, quote, unquote, spraying and praying with

20  some type of rifle.  And during the point when he reloaded, a

21  tourist actually tackled him before the Secret Service got on

22  scene.

23          There was another incident at Penn State, also in the

24  early '90s, when an active shooter in the middle of campus, I

25  believe, shot and killed one person and injured another.  And

1   the 21-year-old student recognized that this individual was

2   reloading and was able to tackle the assailant before law

3   enforcement arrived.

4         There was the incident where Gabby Giffords was shot.

5   Where Loughner was in the process of exchanging magazines, and

6   went to the ground when he mishandled his magazine, and he had

7   a 30- or 31-round magazine at that point.  And one individual

8   actually grabbed that magazine that he was -- the fresh

9   magazine he was trying to put in away from him and was holding

10  it while the other two males, I believe, tackled Loughner and

11  waited for the police to arrive.  And that was done during that

12  magazine exchange.

13        So there is countless examples in history of when an

14  active shooter had to reload, that individuals were able to

15  flee or overpower an assailant.

16  Q.  Are the examples you have given cases that you used to help

17  you form your opinion regarding how large-capacity magazines

18  affect the ability to overcome a mass shooter?

19  A.  They are, and then in conjunction with my personal

20  experience at Sandy Hook.

21  Q.  All right.  We'll talk about Sandy Hook in a minute.

22        Did all the cases you've just talked about, did they

23  all involve the use of a large-capacity magazine?

24  A.  No, not all of them.

25  Q.  And does that alter your opinion at all?

1     A.  It does not, because what a large-capacity magazine does is

2   it means that an active shooter can kill or injure more people

3   before having to actually pause to reload, as opposed to a

4   smaller-capacity magazine that the individual, the active

5   shooter would only be able to kill or injure how many ever

6   bullets they actually have in the magazine.  So if you have a

7   15-round magazine, you're only able to kill or injure 15 people

8   before having to reload; whereas, if you had a 30-round

9   magazine or a 100-round magazine, obviously, you have the

10  ability to kill or injure that many more people before that

11  pause would be created.

12    Q.  In either case, the pause is the same, correct?

13    A.  Yes.  During that reload, the pause would be the same.

14  Yes, ma'am.

15    Q.  You reviewed the report of Gary Kleck; did you not?

16    A.  I did.

17    Q.  Mr. Kleck has asserted that a ban on high-capacity

18  magazines -- and by that he's referring to magazines with a

19  capacity of more than 15 rounds -- would be futile, because

20  people could simply purchase multiple lower-capacity magazines.

21  I think I'm saying that right.  Do you agree with this

22  assessment?

23    A.  No.  That's exactly what I was just stating, that it's that

24  pause -- so if you have ninety rounds of ammunition on you, for

25  example, and you're doing that with ten-round magazines, you

1  need to exchange magazines eight times to fire those ninety

2  rounds.  If you're doing it with 30-round magazines, for

3  example, you only have to exchange magazines twice.  So that

4  pause that is created, whether it's 2 or 3 seconds, is either 4

5  seconds if you've got the 30-round magazines, or it could be --

6  if you were looking at eight or nine exchanges times two or

7  three, it could be twenty some odd seconds.

8  *Q.*  Why is the time exchanging magazines important in the

9  context of stopping -- being able to stop a shooter or escape

10  from a shooter?

11  *A.*  Well, those are --

12          *MR. COLIN:*  Cumulative, Your Honor.

13          *THE COURT:*  I'll allow him to answer.

14          *THE WITNESS:*  It's that pause that gives people the

15  opportunity to overpower or to flee.  So the more pauses that

16  are created, the more opportunities, as cumulative as they may

17  be, one has to escape or to overpower the assailant.

18  *BY MS. SPALDING:*

19  *Q.*  The pause is a time when the shooter is not firing, right?

20  *A.*  Yes, ma'am.

21  *Q.*  Now, you've -- you've talked a little bit, a very little

22  bit, about the seminars that you give, the talks that you give

23  on how civilians should respond to an active shooter situation.

24  *A.*  Yes.

25  *Q.*  Can you describe generally the advice you give in those

 1   seminars.

 2   *A.*   The Run, Hide, Fight theory basically says, if you have

 3   ability to run from an active shooter, you do it.  Again, it

 4   depends.  You have to know what else is going on around you.

 5   We talked about situational awareness and where you're running

 6   to or what you're running from.  But if you have the ability to

 7   run, you do so.  If you have the need to lock down or shelter

 8   in place, you do so.  And we talk about how to best secure

 9   doors, besides locking, and what one can do to better hunker

10   themselves down.

11          But then once you're hunkered down, we're teaching

12   people how to prepare themselves to fight.  We bring in what we

13   call red or blue guns, which are plastic training guns that are

14   the same exact size, shape, and weight of an actual firearm.

15   There are many people who have never handled a firearm, never

16   seen a firearm up close if it wasn't on the hip of a police

17   officer.  So we teach them about the bad end of the gun, for

18   example, and the very, very basics of how a gun would work, to

19   teach them that if they had to fight for their life, this is

20   how you would grab a gun.  This is what you would do to an

21   armed assailant to try to either disarm them or to slow them

22   down.

23          We also teach them about makeshift weapons.  So if

24   you're in a room, and I'll use this room as an example, and

25   someone were to come through the door, there are many things in

1    this room that could be used as a weapon to overpower an

2    assailant coming through the door.  The projector arm, or

3    whatever that is, sitting next to you, for example, would make

4    a great weapon.  A monitor from a computer or the computer

5    itself, or if you're strong enough, even a chair.  So we're

6    teaching individuals to do far more now than to just simply

7    lock down and shelter in place and pray and wait for law

8    enforcement.  We're teaching them that, given the opportunity,

9    you need to fight for your life.

10        And one of the opportunities that we teach them is

11   that pause.  If an individual is actually engaged in reloading,

12   that is a time, that is an opportunity, when you have an

13   opportunity to take that individual out.

14   Q.  All right.  As part of your police officer training, you've

15   been trained on how to neutralize an active shooter?

16   A.  We've been trained, yes, on how to respond to an active

17   shooter scenario.

18   Q.  Respond is better.  Can you describe those tactics you've

19   been taught?

20   A.  Well, when I first became a police officer, we were pretty

21   much taught, train to contain.  That was our buzz phrase, if

22   you will.  And hold an active shooter in place until the big

23   boys, so to speak, the emergency services folks, came in with

24   with more firepower.  You saw that kind of play out in

25   Columbine and prior to Columbine.

```
 1              But after the late '90s, we really rethought the way
 2    we trained in law enforcement.  We now train to go in, locate
 3    that active shooter, as you would say, neutralize that threat.
 4    So whether that's going in, in a pair of officers, we prefer to
 5    go in with three or four, but we are no longer waiting for
 6    emergency services folks to come in.  We are actively engaging
 7    those suspects.
 8    Q.  Is the time a shooter spends reloading important to police
 9    officers?
10    A.  It is.  Because that's an opportunity for police officers,
11    much like I have said before with civilians, to either
12    overpower or flee.  And, obviously, police officers aren't
13    fleeing.  It's an opportunity, though, for us to tactically
14    relocate ourselves or an opportunity for us to exchange rounds
15    in the hopes that we can stop that threat.
16    Q.  All right.  Now, you indicated, I think, that you responded
17    to the shootings at Sandy Hook, correct?
18    A.  Yes, ma'am.
19    Q.  Can you describe your role in responding to that shooting.
20    A.  We heard the call go out over the Newtown radio.  And
21    myself and two other officers, along with an ambulance,
22    responded from Redding to Newtown.  I would estimate we were
23    probably on the ground within probably 25 minutes or so from
24    the time that we first heard Newtown --
25    Q.  Let me -- I'm sorry.  Let me stop you right there for a
```

1   minute.  How far is Redding from Newtown?

2   *A.*  We border each other, but the towns, at least by

3   Connecticut standards, are fairly large.  And Sandy Hook

4   Elementary School is on the far border from the Redding border.

5   *Q.*  All right.  So you responded in about 25 minutes after

6   receiving the call.  Is that right?  I'm sorry.

7   *A.*  It took us about 25 minutes to get there by the time I was

8   able to get the ambulance, able to get my other two officers,

9   and get going and actually arrive on scene.  From our police

10  department is probably a good 15-minute run, best case

11  scenario.  But it's quite a distance.  Newtown is the second

12  largest town geographically in the state of Connecticut.

13  *Q.*  All right.  When you got to the school, what was going on?

14  *A.*  When I got to the school, they had just finished the

15  primary clearing.  The kids were on the way out to the

16  firehouse, which is immediately adjacent, if you will, to the

17  school.

18          I immediately made contact with Newtown's police

19  chief.  And there were I think probably another seven or eight

20  officers with them in the parking lot.  I should probably back

21  up.  On the way to the school, I actually picked up four

22  teachers who fled.  So going back to that philosophy, if you

23  run from an active shooter, that's one of the training -- that

24  wasn't the training they had, they just knew it, they ran out

25  of the back of the building, just ran and ran until they found

1    someone safe to stop for.  Brought them back to the firehouse,

2    because that's where their kids were.  They didn't have any

3    kids in the classroom at that time.  Came back, and then

4    engaged with Newtown in the parking lot.

5        At that point ambulances were starting to set up a

6    triage area.  The Newtown ambulance, anyway.  Our ambulance got

7    into the line for that triage area.  And we discussed what we

8    needed to do, what the next steps were going to be.

9    Q.  Okay.  And this is between you and the chief of Newtown?

10   A.  Yes.

11   Q.  All right.  And did -- did the Newtown chief give you and

12   your officers an assignment?

13   A.  Wouldn't give us so much of a specific assignment.  We

14   decided -- we determined together what needed to be done, and

15   we just got it done.

16   Q.  What did you do for them?

17   A.  Immediately following that, my responsibility -- after we

18   took one individual into custody, who decided he was going to

19   chase the call and showed up very quickly after the Newtown

20   officers did -- actually, in concert with the Newtown

21   officers -- he was kind of running around outside the building.

22   No one knew who he was.  Obviously, given the scenario, he

23   wound up getting into custody.  Once that custody was

24   transferred over to the state police, my responsibility became

25   the reunification process in the firehouse, the Sandy Hook

1  firehouse, where all the children were at that point.

2  Q.  Okay.  And as part of your unification of the kids with

3  parents in the firehouse, did you speak to any of the children?

4  A.  I did speak with some of the children.  Not specifically

5  about all the incident, but we tried to identify for the state

6  police -- because it was apparent at that point that they were

7  going to be conducting the criminal aspect of this

8  investigation -- to identify children or adults from the school

9  who actually were witnesses to some part of the event, versus

10  those -- because that school is fairly large, and it's a

11  square.  So there were people on the far end of the school who

12  maybe heard something, but saw absolutely nothing.  So from an

13  evidentiary standpoint, they didn't have anything to offer.

14  There were also adults and children who saw a lot.  And we

15  tried to identify those individuals for the state police so

16  that they would be able to further interview them.

17  Q.  As part of your role in responding to Sandy Hook, did you

18  become aware of how the students at Sandy Hook responded during

19  the shooting?

20  A.  I did.

21  Q.  And how did you become aware of how students responded to

22  the shooting?

23  A.  I spoke to two parents.

24  Q.  And have you reviewed any additional -- I mean, aside from

25  speaking to the two parents, have you reviewed any

 1 | documentation concerning the shooting?

 2 | *A.*  I did.  I reviewed a witness statement, and I also reviewed

 3 | police reports that were made public.

 4 | *Q.*  All right.  In the course of speaking to the parents and

 5 | reviewing the police reports and the witness report that you

 6 | referenced, were you able to determine if students had been

 7 | able to escape during the time that the shooter was reloading?

 8 |         *MR. COLIN:*  Calls for a hearsay response, Your Honor.

 9 |         *THE COURT:*  Overruled.

10 |         *THE WITNESS:*  I was.

11 | *BY MS. SPALDING:*

12 | *Q.*  And what did you discover?

13 | *A.*  The statement, which was the statement of one of the

14 | parents for one of the children.  We made -- I should probably

15 | explain why this was done that way.

16 | *Q.*  Please.

17 | *A.*  A decision was made that because there was no criminal

18 | prosecution, to interview or reinterview the children,

19 | especially the six who were able to flee from that classroom,

20 | was not in the children's best interests.  It was not going to

21 | further a criminal prosecution.  They were going to be left

22 | alone unless there was a need, based on their own healing

23 | process, to speak with the police about that.

24 |         So there was a statement that was given by a parent

25 | which indicates -- from one of the students who was in the

1   classroom that when that --

2          *MR. COLIN:*  Your Honor, he's again repeating hearsay

3   that he learned from a parent.  What he was told by a parent is

4   hearsay.

5          *THE COURT:*  Is this being offered for the truth of the

6   matter asserted?

7          *MS. SPALDING:*  This is part of his opinion with

8   respect to the effect of large-capacity magazines -- or the

9   limiting of the capacity magazines providing the victims in

10  mass shootings with an opportunity to escape or overcome.

11         *THE COURT:*  Do I understand that you are offering this

12  statement, the statement repeated by this witness, as a rule

13  703 basis for opinion?

14         *MS. SPALDING:*  Yes, Your Honor.

15         *MR. COLIN:*  And under 703, Your Honor, the expert can

16  state the opinion, which is based on hearsay, but not the

17  hearsay statement.  And my understanding was, he was about to

18  recite the statement that was made to him by the parent.

19         *THE COURT:*  This is a trial to the Court.

20         *MR. COLIN:*  Understood.

21         *THE COURT:*  And as such, I will exclude the

22  substantive value of hearsay statements.  However, this witness

23  can testify as to what he relied upon in order to form his

24  opinion.

25         *MR. COLIN:*  Certainly.  Thank you.

```
 1              THE COURT:  Thank you.
 2    BY MS. SPALDING:
 3    Q.  Let me go back a little bit, sir.
 4    A.  Okay.
 5    Q.  You've indicated that you reviewed various reports
 6    concerning the shooting at Sandy Hook, and you spoke with
 7    parents as well; is that correct?
 8    A.  And one statement from a parent, yes, ma'am.
 9    Q.  All right.  Are these reports and conversations, do they
10    form the basis of your opinion in this case?
11    A.  They help to form it, yes.
12    Q.  We were talking, I think, about the statement from the
13    parent of a child, correct?
14    A.  Yes, ma'am.
15    Q.  And did that statement indicate that children had escaped
16    during a time when the shooter was reloading?
17    A.  It did.
18              MR. COLIN:  Leading, Your Honor.
19              THE COURT:  Sustained.
20              MR. COLIN:  Thank you.
21    BY MS. SPALDING:
22    Q.  What did the statement indicate?
23    A.  The statement indicated that there were six children in one
24    of the first grade rooms.  And when the shooter, for whatever
25    reason, stopped, whether it was to tactically reload, whether
```

```
 1  it was to reload, or whether there was a malfunction, one of
 2  those students yelled "run," and those six students ran out of
 3  the school and survived.
 4  Q.  Do you know, sir, what weapons or weapon the shooter at
 5  Sandy Hook used?
 6  A.  I do.  He used a shotgun to breach the window next to the
 7  front door of the school to get in.  He then put that shotgun
 8  back in the car.  He had an AR-15 rifle that he was using to do
 9  the shooting.  He also had on his possession a 10-millimeter
10  Glock, I believe, which is what he utilized to end his own
11  life, and a 9-millimeter Sig, which I don't believe was ever
12  fired.
13  Q.  All right.  So the shooting, as I understand your
14  testimony, that was done that day was done -- inside the
15  school, anyway, with the AR-15; is that right?
16  A.  The only round that would have been fired outside the
17  school would have been the one to breach access into the
18  school, yes, ma'am.
19  Q.  All right.  And do you know what kind of magazines the
20  shooter took with him for that rifle?
21  A.  He had -- I want to say eight 30-round magazines on him,
22  that were used or available to him.
23  Q.  Do you know how many shots were fired inside the school?
24  A.  It was in the 150s, it was 154, 156, somewhere in that
25  neighborhood.
```

```
 1  │  Q.  And individuals were killed, were there not?
 2  │  A.  There were twenty children who were killed, there were six
 3  │  adults who were killed, and there were two individuals --
 4  │  adults who were shot and survived.
 5  │  Q.  And were all of those individuals shot with fire from the
 6  │  AR-15 rifle?
 7  │  A.  Yes, ma'am.
 8  │       MS. SPALDING:  I don't have any more questions for
 9  │  you, sir.  Thank you very much.
10  │       THE WITNESS:  Thank you.
11  │       THE COURT:  Cross-examination.
12  │                 CROSS-EXAMINATION
13  │       MR. COLIN:  Your Honor, if I may have a minute?
14  │       THE COURT:  Sure.
15  │       MR. COLIN:  Thank you.
16  │  BY MR. COLIN:
17  │  Q.  Good afternoon, Chief.
18  │  A.  Good afternoon, sir.
19  │  Q.  I think what I want to do is work backwards in your
20  │  testimony, if we can, talk about Sandy Hook first, and then
21  │  move on to your other opinion after we've gone through Sandy
22  │  Hook.
23  │       Did I understand you to say, sir, in your testimony
24  │  that Sandy Hook represents an incident in which you contend
25  │  that a need for the suspect to reload, replace the magazine in
```

1    the firearm, provided an opportunity for individuals to flee or
2    intervene?
3    *A.*  That's correct, sir.
4    *Q.*  As a result of this conclusion, do you believe that the
5    Sandy Hook incident represents an incident in which smaller
6    magazine capacity required the suspect to reload, which then
7    gave victims a chance to flee?
8    *A.*  I don't believe that's what I stated.
9    *Q.*  That's what I'm trying to explore.  So the suspect had
10   30-round magazines?
11   *A.*  Yes, sir.
12   *Q.*  So it wasn't an issue of a magazine capacity limitation
13   that made a difference in Sandy Hook, correct?
14   *A.*  At Sandy Hook, the shooter was engaged in tactical
15   reloading, so he was reloading after 20 rounds -- he had about
16   a third left in many of the magazines.  Some were expended and
17   some were partially expended.  So he was creating that
18   opportunity.  But when the six children ran out of the school,
19   he stopped shooting, whether it was to reload, whether it was
20   to tactically reload, or whether it was because of a
21   malfunction, that pause was created and gave those kids the
22   opportunity to run out.
23   *Q.*  Well -- all right.  Maybe I misunderstood your first answer
24   to my first question.  I thought you indicated that Sandy Hook
25   represents an incident where a suspect's reloading gave

1  individuals a chance to flee or intervene.  Now I understand

2  you to be saying, it may have been a malfunction.  Do you know?

3  A.  I think that's a better -- more accurate statement.  I

4  don't know.

5  Q.  Okay.

6  A.  And the Connecticut state police looked at it, and the

7  emergency service folks thought there might have been a

8  malfunction.  The lab folks said, no, the firearm was in

9  perfect working order.  So even amongst the investigators, they

10  weren't sure what created that pause; they just knew the pause

11  was created, which gave the kids an opportunity.

12  Q.  If a pause is created by a weapon malfunction, then the

13  Sandy Hook incident would not support your opinion; isn't that

14  true?

15  A.  No, because I'm talking about pause.  Whether that pause

16  was created by a malfunction or whether that pause was created

17  by a need to reload, that pause was created.  And, honestly,

18  with a smaller-capacity magazine, that pause is going to happen

19  far more often.

20  Q.  So your actual opinion is that pauses, for whatever reason,

21  provide victims an opportunity to intervene or flee?

22  A.  By --

23  Q.  Now --

24  A.  I'm sorry.

25  Q.  Not necessarily a pause associated with a reload.

1   *A.*  A reload makes that pause mandatory.  A malfunction makes

2   that pause happenstance, I suppose, one could say.

3   *Q.*  Let's explore the basis of your opinion regarding Sandy

4   Hook that you just offered.

5         What you were told by the parent of the child, or

6   maybe the parents -- help me understand, was it a couple of

7   parents of one child, or two parents of two different kids?

8   *A.*  There were two parents of two different children.

9   *Q.*  All right.  And they told you that the children had

10  reported that the man was playing with his gun, correct?

11  *A.*  Yes, sir.

12  *Q.*  They didn't tell you that the man was reloading?

13  *A.*  The statement that one of the parents gave to the state

14  police used the word "reload."  The conversation which I had

15  with one of the parents used the words "playing with his gun."

16  *Q.*  All right.  And you didn't interview the parent who used

17  the word "reload"?

18  *A.*  I honestly don't know.  Because there were six parents,

19  sets of parents.  And the statement which I have, although it

20  was not released to the general public, was redacted as to all

21  the names.  So I don't know who actually gave that statement.

22  I don't know if the statement that I saw is one of those two

23  parents with whom I spoke or not.

24  *Q.*  All right.  I appreciate your explanation.  I just want to

25  make sure I understand.  So as we sit here today, you're not

1  opining that the Sandy Hook incident represents an event where

2  a reload gave an opportunity to victims to flee or intervene,

3  correct?

4  *A.*  I am stating that one of three things happened:  Either

5  that was a tactical reload, either it was a reload to lock

6  back, or either it was a malfunction which caused that pause,

7  if you will, and gave the students the opportunity.

8  *Q.*  Let talk about one of the other incidents that you

9  mentioned, the Giffords shooting in Arizona.  You agree, do you

10  not, that there are varying versions of that event, meaning,

11  that there are a variety of stories, if you will, about what

12  the suspect was doing when he was tackled?  Would you agree?

13  *A.*  I have read all kinds of accounts in the newspaper.  But

14  then, again, I read all kinds of accounts about Sandy Hook,

15  which also said it didn't happen, so . . .

16  *Q.*  Sure.  What sources of information are you relying on with

17  regard to the version of the Giffords shooting event that you

18  used?

19  *A.*  At the time of my deposition, I was relying on media.

20  *Q.*  By your answer, when you say at the time of your deposition

21  you were relying on media, what do you mean by that?

22  *A.*  It means, subsequent to that, I have had the opportunity to

23  read Pima County police reports and a Pima County news release

24  that was from the police department, not from a media source.

25  *Q.*  And you would agree that even those reports are conflicting

1   with regard to the circumstances under which the suspect was

2   disarmed?

3   *A.*  Not really.  Not the reports that I read.

4   *Q.*  And I'm sorry, you read a police report; is that right?

5   *A.*  I read I believe it was two different police reports from

6   the -- I'm not if I'm pronouncing it correctly -- P-I-M-A

7   County, and I read a news release that that was prepared by

8   them as well.

9   *Q.*  All right.  Is it your understanding that some individuals

10  have claimed that the shooter was tackled before he attempted

11  to effect a magazine exchange?

12  *A.*  I'm sorry, could you repeat that --

13  *Q.*  Sure.

14  *A.*  -- sequence there.

15  *Q.*  Have you reviewed reports in which it is reported by

16  eyewitnesses that the suspect was tackled before he began to

17  effect a magazine exchange?

18  *A.*  I have not seen that, no.

19  *Q.*  You provided a few other examples.  You mentioned the Long

20  Island railroad incident.

21  *A.*  Yes, sir.

22  *Q.*  You had mentioned an incident in the early '90s in which a

23  suspect had been shot, and then you said it happened at the

24  same time where somebody intervened --

25  *A.*  Chapel Hill, North Carolina incident, sir?

1   *Q.*  Is that where it occurred?

2   *A.*  Yeah, I believe so, yes.

3        *MR. COLIN:*  Your Honor, if I may have just a second.

4        *THE COURT:*  You may.

5   *BY MR. COLIN:*

6   *Q.*  And what source did you rely on for your information about

7   the Chapel Hill incident?

8   *A.*  At the time of my deposition, I relied on media accounts.

9   *Q.*  And the media accounts that you relied on at the time of

10  your deposition were, indeed, 46 news article summaries that

11  were provided to you by the Attorney General; isn't that right?

12  Actually, 47.

13  *A.*  News articles summaries?

14  *Q.*  Yes, something from what is called the Westlaw NewsRoom?

15  *A.*  I also read other news accounts.  But, yes, that was the

16  initial list, I guess, would be a good phrase for it.

17  *Q.*  All right.  So you -- you were provided 47 news summaries

18  from Westlaw NewsRoom by the Attorney General's Office.  And at

19  the time of your deposition, that was the source of your

20  opinions on incidents in which a reload allowed individuals to

21  flee or intervene; is that accurate?

22  *A.*  I think that at that point I had read some other media

23  sources, only media sources.

24  *Q.*  Okay.  And it's your testimony that since your

25  deposition -- and would that include your second deposition?

 1  │ A.  Yes, sir.

 2  │ Q.  Since your second deposition, which was just about three

 3  │ weeks ago, you have now undertaken some research; is that

 4  │ accurate?

 5  │ A.  I was able to read some police reports.

 6  │ Q.  Have you provided the results of that additional research

 7  │ to counsel?

 8  │ A.  Have I provided to them?

 9  │ Q.  Have you provided -- well, I know you haven't provided it

10  │ to me.

11  │ A.  Right.

12  │ Q.  I'm asking if you provided it to the office of the Attorney

13  │ General.

14  │ A.  They have a copy of it, yes, sir.

15  │ Q.  They have a copy of what you reviewed since your second

16  │ deposition?

17  │ A.  Yes.

18  │      MR. COLIN:  Your Honor, at this time I'm going to move

19  │ to strike any aspect of this witness's opinions that have not

20  │ been previously disclosed.  We took a second deposition of this

21  │ witness so that we could make sure that we had reviewed and had

22  │ copies of everything that he considered in formulating his

23  │ opinions.  At the time he had only reviewed and considered 47

24  │ articles provided to him by the Attorney General's Office.  Now

25  │ I'm hearing he's undertaken significant additional research,

```
 1   none of which has been disclosed.
 2        THE COURT:  Well, I haven't heard that he's undertaken
 3   significant research.  He has testified that he has reviewed
 4   new articles.  And to the extent that that changes or creates
 5   new opinions, you may inquire as to those.  I'll reserve ruling
 6   on your question as to whether anything needs to be excluded.
 7        MR. COLIN:  Okay.
 8   BY MR. COLIN:
 9   Q.  Mr. Fuchs -- Chief Fuchs, I apologize.  Can you describe
10   what additional research you have undertaken since your second
11   deposition in this case.
12   A.  On some of the cases about which you have spoken from the
13   list of -- the Westlaw list, I have actually read the police
14   reports for those incidents.
15   Q.  And is, in fact, the result of reading these police reports
16   as to some of those incidents, the reason that we have gone
17   from forty-seven examples to five today?
18   A.  No.  Actually, for me to memorize, I would say, 47
19   different examples might be rather prohibitive.
20   Q.  All right.  In the additional research that you've done
21   since your second deposition, have you learned that many of the
22   incidents that you testified about in your original -- in your
23   second deposition did not involve reloads allowing victims to
24   either flee or intervene?
25   A.  I don't believe any of the examples that I used were
```

1    counter -- contradicted by anything that I read subsequent to

2    that deposition, sir.

3    Q.  And I appreciate that.  Those are the five examples that

4    you gave here in court today, you're saying?

5    A.  Yes, sir.

6    Q.  As to the other 42 incidents that you testified about in

7    your second deposition, has your additional research or review

8    of police reports resulted in you eliminating them from your

9    list of examples?

10   A.  No.  There were actually a few more that we didn't talk

11   about today.  And I did not go back and do any additional

12   reading on the vast majority of those -- of those on that list.

13   Q.  Well, let's just talk about the one that you have talked

14   about today, the Chapel Hills one.  The shooter in that case

15   was a gentleman by the name of Wendell Williams; is that right?

16   A.  I believe that was his name, sir.

17   Q.  And there are actually a number of Westlaw NewsRoom

18   articles published regarding that particular incident.  Can you

19   tell us which additional articles you have reviewed since your

20   deposition, your second deposition.

21   A.  I read the Chapel Hills Police report.

22   Q.  Have you provided a copy of that Chapel Hills Police report

23   to counsel?

24   A.  The attorney General's Office does have a copy of that

25   report, yes, sir.

1    MR. COLIN:  Can I have a copy of that, please?

2    BY MR. COLIN:

3    Q.  Your understanding of that event is that the suspect was in

4    the process of a magazine exchange or a reload when someone

5    either fled or intervened; is that right?

6    A.  Both the police officer and the civilian, who was a retired

7    marine, apparently both recognized what type of weapon he was

8    firing, which was an M1.  And that, I believe, has a clip fed

9    capacity of about eight.  And they both recognized that and

10   both made a decision, apparently on their own, that when he

11   expended that eighth round and was in the process of reloading,

12   if you will -- the police officer made the decision that he was

13   going to shoot the suspect, and the retiree made a decision --

14   again, they were not near each other apparently -- that he was

15   going to tackle the suspect.

16        And from the police report, the police officer shot

17   the suspect, didn't kill him, took him down; and the marine

18   tackled him until the police officer closed that gap.

19   Q.  You've -- you mentioned reviewing police reports.  Did

20   those police reports mention that by the time the suspect

21   crumpled to the ground, he had already been shot multiple

22   times?

23   A.  Yeah.  I think I said that the police officer had made that

24   decision that he was going to shoot him when he ran out of

25   rounds, and then the retired marine tackled him.

1   Q.  Well, actually, the suspect had already been shot in the

2   foot, he had already been shot in the calf, and he had already

3   been shot in the shin and his bone broken, and he had collapsed

4   to the ground at the point in which the officer attempted to

5   shoot him; isn't that true?

6   A.  The officer attempted to shoot him, or the retired marine

7   attempted to tackle him?

8   Q.  The retired marine didn't shoot anybody, did he?

9   A.  No, sir.

10  Q.  The retired marine, according to you, decided to intervene

11  when the firearm was about empty and the guy was going to have

12  to reload.  Isn't that your testimony?

13  A.  Not about empty, I think he made the decision when it was

14  empty.

15  Q.  At that point the suspect was lying on the ground, having

16  been shot in the shin and his shin bone shattered; isn't that

17  true?

18  A.  I don't know the extent of his injuries, sir.  I'm sorry.

19  Q.  Well, do you know whether or not he was already crumpled to

20  the ground as a result of having been shot?

21  A.  I'm sure he was, because he was shot.

22  Q.  How is an M1 reloaded?

23  A.  I believe it's a -- like, a clip fed.  It's not a

24  traditional magazine like we see today.

25  Q.  So magazine exchange was not involved?

1  *A.*  It's a different kind of magazine, is my understanding.

2  *Q.*  Not a detachable box magazine?

3  *A.*  No, it's a -- more of a feeding strip, if you will, I

4  believe.

5  *Q.*  Have you ever effected a reload of an M1?

6  *A.*  I have not, sir.

7  *Q.*  You don't know how long it takes?

8  *A.*  I do not, sir.

9  *Q.*  Do you know whether it takes longer or less time than an

10  AR?

11  *A.*  I'm sorry, I do not.

12      *MR. COLIN:*  Your Honor, I apologize.  It's going to

13  take a couple of minutes to go through my notes.  There were

14  six or seven original opinions, and we're down to two.  I need

15  to cut down, if I may.

16      *THE COURT:*  Feel free.

17  *BY MR. COLIN:*

18  *Q.*  Mr. Fuchs -- again, I apologize, Chief Fuchs.  I mean no

19  disrespect.

20  *A.*  It doesn't bother me, sir.

21  *Q.*  I live in a world where it bothers a lot of people that I

22  work for.  I apologize.  You are a chief, and you deserve that

23  respect.

24      Your expert disclosure in this case regards you as an

25  expert in police instruction, firearms use, tactics, and

```
 1  policy.  Do you agree that you're an expert in those fields?
 2  A.  Yes, sir.
 3  Q.  Let's explore a little bit about your background you
 4  testified to on direct.  You became the chief of Redding in
 5  2002?
 6  A.  Yes, sir.
 7  Q.  And prior to 2002, Redding didn't have a police chief, did
 8  it?
 9  A.  No.  It was run by the Connecticut State Police.
10  Q.  So there were police officers in Redding, but they were,
11  essentially, managed by the Connecticut State Police
12  Department?
13  A.  That's an accurate representation.
14  Q.  Might not be exact, but it's close?
15  A.  It's close enough, yes.
16  Q.  All right.  So you were the first chief in Redding?
17  A.  I was.
18  Q.  And when you became the chief of Redding, can you tell us
19  how many sworn officers were employed by Redding?
20  A.  Thirteen.
21  Q.  Did that include you?
22  A.  Yes.  Yes, it did.
23  Q.  Prior to becoming the chief of Redding, I understood you to
24  say that you were the chief of Ridgefield, Connecticut?
25  A.  I was lieutenant in Ridgefield, Connecticut.
```

1    Q.  I apologize.  And you had been from 1990 to 2002?

2    A.  Yes, sir.

3    Q.  There were some gaps in your employment at -- I remember

4    doing this in the deposition --

5    A.  Ridgefield.

6    Q.  Getting Ridgefield and Redding mixed up.  In Ridgefield; is

7    that correct?

8    A.  Yes, sir.

9    Q.  And in fact, you were -- you had been employed by

10   Ridgefield as a patrolman, and then you were -- you and a

11   couple of other officers were laid off?

12   A.  Three of us were laid off in the early '90s.  I actually

13   was a Newtown police officer for about five months, and then a

14   Farmington police officer for the balance of that year, and

15   then was rehired by Ridgefield.

16   Q.  After returning to Ridgefield, you were promoted to

17   sergeant; is that accurate?

18   A.  A couple of years later, yes, sir.

19   Q.  All right.  And then apparently you were promoted to

20   lieutenant before you left; is that also accurate?

21   A.  Yes, sir.

22   Q.  And your duties and responsibilities at Ridgefield, did

23   they include working with the state's municipal police officers

24   training academy?

25   A.  I was a certified DWI enforcement instructor.  So in that

1   respect, yes, sir.

2   *Q.* Did they include -- other than your work as a DWI

3   enforcement instructor, did you work in any areas involving

4   firearms use, firearms operation by law enforcement with the

5   Connecticut state police officers training academy?

6   *A.* I was also -- am also a certified field training officer.

7   So I went out on many occasions to something called practical

8   skills day, which happens three times during each class'

9   academy session.  And during those times, we take them through

10  different scenarios.  We don't actually do live fire, but we

11  take them through different tactical scenarios to teach them

12  what can happen if.

13  *Q.* I think we're on the same page with regard to field

14  training.  This is where a senior officer, essentially, rides

15  with a recruit and over a period of time, transitions the

16  day-to-day duties from doing it themselves, to show the

17  recruit, to watching the recruit at the end of the process; is

18  that a fair summary?

19  *A.* We train -- that's a fair summary.  We transition them out

20  from having to teach them and show them virtually everything,

21  to almost riding in plain clothes so we're not obvious about

22  who we are, and letting them do the job.

23  *Q.* Other than DWAI, did you instruct any courses at the police

24  academy?

25  *A.* I talked about the practical skills day that I went out.

 1  Yes, that was a course.

 2  Q.  And was that part of FTO?

 3  A.  Not really, because field training happened after the

 4  academy.  This is something that happened during the academy.

 5  Q.  I see.  Thank you.

 6        Are you certified to teach any subject in the state of

 7  Connecticut other than DUI enforcement?

 8  A.  I am, sir.

 9  Q.  What would that be?

10  A.  I am certified to teach crisis management and fair and

11  impartial policing.

12  Q.  And were you so certified when your deposition was taken?

13  A.  I don't believe so, no -- actually, the first deposition I

14  was not; the second one, I don't recall.

15  Q.  Have you supplemented your curriculum vitae with this

16  information?

17  A.  I'm not sure I understand the question.

18  Q.  Have you provided the information that you have now

19  obtained additional certifications in two areas of police

20  training since your deposition?

21  A.  I don't know if I've given it to anybody or not, sir.

22  Q.  Have you ever published in the area of police training?

23  A.  I have not.

24  Q.  Have you written any books, magazine articles on firearms

25  use, the effect of firearms on gun violence, anything like

 1 | that?
 2 | A.  I've spoken about it in public.  I have never written
 3 | anything on it.
 4 | Q.  Have you produced any police training videos?
 5 | A.  I actually have.
 6 | Q.  Okay.  Hadn't heard about that before either.  Tell us
 7 | about that.
 8 | A.  Well, not as it relates specifically to firearms.  Years
 9 | ago, when we still had the VHS tape -- that's how long I know
10 | it was -- we did DWI enforcement videos that we put together.
11 | Q.  It wasn't Betamax, though, was it?
12 | A.  I think it was actually VHS.  So that tells you how long
13 | ago it happened.  But we did actually produce a DUI enforcement
14 | instructional video on VHS.
15 | Q.  Do you put on any training seminars for law enforcement
16 | officers either nationally or locally on police training issues
17 | associated with firearms?
18 | A.  I have gone around the country actually speaking about
19 | Sandy Hook and crisis management.  So I would say, yes, I do.
20 | Q.  All right.  So in terms of any national or local speaking
21 | incidents, that's pretty much been focused on the Sandy Hook
22 | incident and your take-away from that incident with regard to
23 | gun violence?
24 | A.  I talk a little bit about the Run, Hide, Fight training
25 | that we do, I talk a little bit about the pause; but it

1  || certainly was out of Sandy Hook, yes, sir.

2  || Q.  Now, my understanding is that the extent of your training

3  || on training, if that makes any sense --

4  || A.  It does, actually.

5  || Q.  All right.  So my understanding is that the extent of your

6  || training on how to train other law enforcement personnel is

7  || that you took a week-long course put on by the FBI; is that

8  || accurate?

9  || A.  The state of Connecticut police academy requires that

10 || one-week course by all instructors, so I had to take that.  But

11 || when they certify you to instruct, they also take into account

12 || your -- your entire instructional history.  So when I became

13 || certified, for example, in the last two areas, I also teach at

14 || Western Connecticut State University, undergrad course in

15 || introduction in criminal justice, so that also is something

16 || that they would have taken into account.

17 || Q.  And your introduction to criminal justice course that you

18 || teach at Western Connecticut State, that -- does that involve

19 || firearms use or the effect of firearms magazines on gun

20 || violence, anything like that?

21 || A.  It talks about all aspects of policing.  I take the kids --

22 || students from the introduction into the criminal justice system

23 || by way of arrest, let's say, all the way through to the time

24 || when they are turned over to court.  So we talk about uses of

25 || force, we talk about different incidents, we show training

 1   videos, we talk about police training, we talk about the police

 2   toolbox.  So while I'm not instructing police officers and

 3   obviously couch what I teach them, we do talk about those

 4   areas.

 5   Q.  Okay.  Are you teaching them how to use firearms or when

 6   it's appropriate for law enforcement to use firearms?

 7   A.  I am talking about when it's appropriate for law

 8   enforcement to use firearms.  Certainly not teaching them to

 9   use firearms.

10   Q.  Okay.  So you're teaching them about deadly force?

11   A.  Yes.

12   Q.  Essentially, when it's appropriate for a police officer or

13   inappropriate to utilize deadly force, what considerations?

14   A.  We talk about all uses of force, yes, sir.

15   Q.  Okay.  At the outset a few moments ago I asked you if you

16   believed yourself to be an expert on firearm use, and you said

17   you did.  Have you ever been a firearms instructor?

18   A.  I have not, sir.

19   Q.  Have you ever been certified to instruct in any area

20   involving firearms use by Connecticut Peace Officer Standards

21   and Training?

22   A.  I have not.

23   Q.  Are you considered to be a subject matter expert on

24   firearms use by Connecticut POST, Peace Officer Standards and

25   Training?

1    A.   The opportunity -- the opportunity never presented itself,

2    so I wouldn't know.

3    Q.   And so I asked you this with regard to policing issues.

4    Have you published any books or articles in the area of

5    firearms use or firearms in general?

6    A.   I have not.

7    Q.   And are you a certified armorer?

8    A.   I am not, sir.

9    Q.   Gunsmith?

10   A.   No, sir.

11   Q.   Manufacturer or licensed firearms dealer?

12   A.   I am not.

13   Q.   Essentially, fair to say that you've been a police officer

14   a long time, you've carried a weapon ever since you started

15   being a police officer, and your familiarity with firearms use

16   comes as a result of that experience and background?

17   A.   I think that's part of it.  But also in my role as a chief,

18   I'm responsible for determining what firearms my officers

19   carry.  I've worked very closely with our firearms instructors,

20   who are also range officers, who are also armorers, one who

21   actually holds a federal firearms license, to determine what

22   the best weapon for our officers to be from a handgun to a

23   shotgun to a patrol rifle.

24   Q.   You talked about this training you've developed recently,

25   and I can't remember the name of it, something about run --

1   *A.*  Run, Hide, Fight.

2   *Q.*  Run, Hide, Fight, yes.  Do you teach civilians any areas

3   associated with firearms use?

4   *A.*  As part of the Run, Hide, Fight training, or we talking

5   more in general?

6   *Q.*  I'm talking in general.  My understanding of Run, Hide,

7   Fight really didn't involve firearms use by the civilian.

8   *A.*  It doesn't.  The Run, Hide, Fight talks about the

9   nomenclature, if you will, of a firearm, if you were confronted

10  with a firearm in close proximity, what you may be able to do

11  to overpower that individual.  So you're right, that's not the

12  affirmative use of a firearm.  That's more of a defensive

13  posture against one.

14          I do from time to time -- well, two issues.  One is

15  the issuance of firearms permits.  So, I have a lot of

16  conversations relative to those kind of things, relating to

17  firearms, because I do issue the permits for all the Redding

18  residents.  But also counsel many of my residents about what

19  firearms might be appropriate for them in the home, if they

20  were looking to carry one, if they were looking to purchase a

21  firearm for their spouse, for example.  So I have a lot of

22  those firearms kind of conversations.  Because, quite honestly,

23  in our community, firearms is very much a part of probably

24  two-thirds or more of the households, because we're a little

25  more rural.  And there are many, many firearms in Redding.

1  *Q.*  Okay.  You attended the same firearms training program as

2  every other Connecticut municipal police officer at the

3  academy, correct?

4  *A.*  Initially, sure, yes.

5  *Q.*  And since then, presumably, at each of the departments for

6  whom you've worked, they have qualification requirements; is

7  that right?

8  *A.*  The state has a qualification requirement of us, and,

9  certainly, every single year I've attended the basic -- minimum

10  qualifications to maintain my certification as a Connecticut

11  police officer.  But in addition, every department, for

12  example, doesn't have shotguns, so I've done shotgun training.

13  Every department doesn't issue patrol rifles, so I've done

14  patrol rifle training.  Every department doesn't use a FATS, or

15  some kind of firearms simulator, and I have on multiple

16  occasions.  Every department doesn't engage in munitions or

17  firearms scenario type training, and we have.  So you've got

18  the very basic level, and then I've attended significantly more

19  than just the very basic level.

20  *Q.*  Okay.  And let's talk about the significantly more

21  training.  All right.  Decisional shooting training, I think

22  you mentioned FATS, that's the Firearms Training System?

23  *A.*  It's one of them.  There is a whole list of them out there

24  now.

25  *Q.*  You've been through the FATS program a few times, maybe

1    many times?

2    *A.*  And others.

3    *Q.*  Have you trained anyone in the use of FATS, or decisional

4    shooting, or just run through the same program your patrolmen

5    do?

6    *A.*  I set the policy.  So when I sit down with our firearms

7    instructors to determine different policy levels that relate to

8    that, but I'm not a firearms instructor, no, sir.

9    *Q.*  So a firearms instructor would have to teach the decisional

10   shooting program?

11   *A.*  I don't know if they have to.  But from my perspective, one

12   of our range officers would be teaching that, because it's

13   simulated firearms use.

14   *Q.*  And you talked about, you trained in shotguns, and not all

15   Connecticut officers carry shotguns or are trained in shotguns.

16   Semiautomatic patrol carbines, is that an appropriate term to

17   use?

18   *A.*  Sure.

19   *Q.*  All right.  And, specifically, other than your training in

20   shotguns, semiautomatic carbines that you've just described,

21   and decisional shooting, help me understand what additional

22   training you've received that every other Connecticut police

23   officer doesn't.

24          *MS. SPALDING:*  Your Honor, objection.  Relevance.

25          *THE COURT:*  Response.

1          *MR. COLIN:*  Sure.  He's -- he has issued -- opined in

2   two areas, one of which is specific to firearms use and a claim

3   that magazine reloads provide benefits to victims and provide

4   problems to suspects.  And the scope and extent of his training

5   and experience and background in firearms use is essential to

6   evaluating whether or not his opinions in this area are

7   credible.

8          *THE COURT:*  I'm going to need a better tie than that.

9          *MR. COLIN:*  I'm not sure I can give you one, to be

10  honest, Your Honor.  I -- this gentleman is opining in the

11  areas of firearms use.  He has testified that he's an expert in

12  firearms use, and I'm simply exploring his training and

13  experience in that area.  So I -- I can't give you any more

14  than that.

15         *THE COURT:*  He's testified as to his training in use

16  of firearms, and it is based on his experience both with

17  firearms and in responding to Sandy Hook and in teaching with

18  regard to active shooter scenarios that he has formed the

19  opinions that he has.

20         I'm not sure what your question is getting at when you

21  ask whether or not he's had different training than that --

22  than the officers that he supervises have had.

23         *MR. COLIN:*  Only to the point, Your Honor, that

24  anybody to -- I mean no disrespect -- anybody can call

25  themselves an expert, and anybody can offer their services to

1   train on particular topics.  But if they aren't more qualified

2   than any other individual in that particular topic area, I

3   think that's an area that I'm entitled to explore.  So that's

4   all I was trying to do.

5           THE COURT:  All right.

6           Reply.

7           MS. SPALDING:  I think the area that we're talking

8   about here is pretty narrow.  We're talking about an

9   opportunity created by a pause in reloading.  And I think

10  someone who has a certain amount of experience with firearms

11  can testify to that, and someone, frankly, who doesn't have

12  near the experience that Chief Fuchs does.  I don't think we

13  need to get into his experience with a shotgun and other

14  firearms.  It's just not relevant to the opinions given here

15  today.

16          MR. COLIN:  I hadn't intended to until he started

17  testifying to those areas on direct, which is why I --

18          THE COURT:  I only heard one opinion.

19          MR. COLIN:  Well -- from this witness, I believe he

20  opined on -- I suppose that it's a sub-opinion.  He opined on

21  Dr. Kleck's -- his disagreement with Dr. Kleck's opinion on the

22  original root opinion that reloads provide additional time for

23  victims -- potential victims to flee or intervene.  So I don't

24  disagree that there is apparently one consolidated opinion on

25  that area.

```
 1              THE COURT:  Is there another opinion on this?

 2              MS. SPALDING:  No, that's it, Your Honor.

 3              THE COURT:  Okay.  You can inquire as to anything that

 4    pertains to that opinion.

 5              MR. COLIN:  Okay.

 6    BY MR. COLIN:

 7    Q.  If I may, then, have a moment to get through my notes and

 8    find the appropriate spot.  I'd appreciate it.  Thank you.

 9              My understanding is, Chief Fuchs, that you believe

10    yourself to be an expert on firearms and the effect of firearms

11    and gun control on violence; is that accurate?

12              MS. SPALDING:  Your Honor, objection.  Relevance.

13              THE COURT:  Sustained.  Under Rule 702, what the

14    witness believes himself to be an expert on is irrelevant.

15              MR. COLIN:  Well, Your Honor, it was just a

16    foundational question to move into my next topic area.

17              THE COURT:  Could we just move into your next topic

18    area.

19              MR. COLIN:  Certainly, Your Honor.  To be candid, it

20    might be more -- I have 30 or more pages of examination on

21    seven different opinions, and we've reduced it down to one.  It

22    may be more efficient to simply start up tomorrow morning and

23    allow me to reorganize my notes so I can be clear, concise, and

24    short.  I would request that the opportunity to take a break

25    today and reevaluate my notes and shorten the examination.
```

1    THE COURT:  Any objection?

2    MS. SPALDING:  Yes, Your Honor.  Chief Fuchs is here.

3  Frankly, he's got a plane tomorrow at 10:30.  We'd like to go

4  as long today as we possibly can.

5    THE COURT:  Well, Mr. Colin, how long is it going to

6  take you to go over your notes?

7    MR. COLIN:  To be candid, I was thinking 15 minutes.

8  That's why I looked at the clock, and I thought, well, 15

9  minutes will run us right up to 5 o'clock.  So I was trying to

10  propose a different alternative.  I understood that Mr. Fuchs

11  was supposed to be testifying tomorrow, so I guess I'm a little

12  surprised to hear that he's now leaving today.

13    THE COURT:  He -- I understood that he's leaving

14  tomorrow.  Tomorrow morning.

15    MR. COLIN:  Okay.  Well, if he's available in the

16  morning, I -- I don't anticipate more than half hour, 45

17  minutes at the most, given the revisions I'm going to be

18  making.

19    MS. SPALDING:  If we could continue as far as we can,

20  it would --

21    THE COURT:  Well, I'm sorry, we can't continue past

22  5:00.  We have a court reporter who has worked long and hard

23  all day today transcribing all of the testimony.  I don't have

24  a backup court reporter to come and relieve her.  And we have a

25  courtroom deputy who has worked all day today in the courtroom,

 1  and I don't have someone to back her up as well.  So I regret

 2  that we are not able to continue past 5 o'clock tonight.

 3          Happy to have you ask any further questions you want

 4  to ask between now and 5 o'clock.  To the extent that this

 5  witness is required to come back tomorrow morning, I express

 6  the Court's thanks and apology for the inconvenience, but

 7  nevertheless, that's what we're faced with.  Reality is, we end

 8  at 5 o'clock.

 9          MR. COLIN:  I appreciate that, Your Honor.

10          It certainly is going to be much more efficient if we

11  just start up again tomorrow morning than to have me try to do

12  this on the fly and narrow down thirty-five pages of notes to

13  two or three pages.  As I said, it could take me 10 or 15

14  minutes to get that done, but that takes us right up to

15  5 o'clock.  I had understood that I was going to be examining

16  Mr. Fuchs all morning tomorrow.  So where this flight issue

17  came in, I don't know.  But that was the original plan.

18          THE COURT:  Thank you.

19          What does tomorrow's presentation look like?

20          MR. COLIN:  Your Honor, my understanding is

21  immediately after Mr. Fuchs is over, Mr. -- Mr., Dr. Zax --

22  again I don't mean any offense -- is going to be testifying.

23  And then there are two very short witnesses.  The anticipation

24  was we would be finished with all evidence by noon or shortly

25  thereafter, my understanding from talking to the Attorney

1    General's Office, but they can certainly pipe in.

2              MR. GROVE:  It will go past noon, Your Honor.  We

3    have -- well, depending on the length of cross of Dr. Zax, and

4    if there are 35 or more pages for Chief Fuchs, we could go well

5    past noon.  In any event, I think we are very likely to go past

6    noon.

7              THE COURT:  We're going to recess for today.  We will

8    reconvene tomorrow at 8:45 tomorrow morning.  Let me alert you

9    that there will be a longer than average noon hour, because it

10   is Wednesday, and that is the day that the judges of the court

11   meet over the noon hour.  And as a consequence, you might want

12   to build that into your framework.

13             MR. GROVE:  Could I mention one more thing, Your

14   Honor?

15             THE COURT:  Sure.

16             MR. GROVE:  We had discussed, in the event that we

17   finish early tomorrow -- that would be the conclusion of our

18   evidence, with the two short witnesses after Dr. Zax -- the

19   possibility of putting closing arguments then on Thursday

20   morning, regardless of when we finish tomorrow, and not

21   starting immediately.  I don't know if the Court has any

22   interest in that, but I think we could be better organized.

23             THE COURT:  Let me ponder that.

24             MR. COLIN:  We had proposed the same thing, Your

25   Honor.  And we just felt our closing arguments would be much

1    more precise.

2            THE COURT:  Would there be a rebuttal presentation?

3            MR. COLIN:  Well, I'm seeing some people nod yes and

4    some people nod no, which is fairly typical of our group.

5            THE COURT:  All right.  Please talk with each other

6    tonight, figure out what the plaintiffs would like to do.

7            MR. COLIN:  We can advise the Court.

8            THE COURT:  And we can take that up tomorrow.

9            MR. COLIN:  Thank you very much.  I appreciate the

10   Court's consideration.

11           THE COURT:  Thank you.  I wish you all a good evening.

12   Thank you, sir.  We'll see you all tomorrow morning, 8:45.

13           (Recess at 4:53 p.m.)

14                    REPORTER'S CERTIFICATE

15

16        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

17

18        Dated at Denver, Colorado, this 16thday of June, 2014.

19                                  s/Therese Lindblom

20                         _____

21                         Therese Lindblom,CSR,RMR,CRR

22

23

24

25

1

**INDEX**

2

**Item**                                                                **Page**

3

JENNIFER LONGDON
4        Direct Examination By Ms. Morrill          1397
         Cross-examination By Mr. Krumholz          1409
5        Redirect Examination By Ms. Morrill        1412
     ROGER SALZGEBER
6        Direct Examination By Ms. Scoville         1416
         Cross-examination By Mr. Westfall          1427
7    JOHN CERAR
         Direct Examination By Ms. Spalding         1432
8        Cross-examination By Mr. Colin             1466
     DANIEL OATES
9        Direct Examination By Ms. Spalding         1480
     JOHN CERAR
10       Cross-Examination Continued By Mr. Colin   1488
         Redirect Examination By Ms. Spalding       1535
11   DOUGLAS FUCHS
         Direct Examination By Ms. Spalding         1540
12       Cross-examination Mr. Colin                1567

13                            EXHIBITS

14   Exhibit      Offered  Received  Refused  Reserved  Withdrawn

15
     83                    1393
16

17

18

19

20

21

22

23

24

25