0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  JUDICIAL COMMITTEE MEETING
4  HELD ON FEBRUARY 12, 2013
5  HOUSE BILL 13-1224
6  -------------------------------------------------
7            REPORTER'S TRANSCRIPT
8  -------------------------------------------------
9
10       This transcript was taken from an audio
11  recording by Angela Smith, Professional Reporter and
12  Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25

0002
1  Attendees:
   Representative Buckner
2  Representative Court
   Representative Gardner
3  Representative Lawrence
   Representative McLachlan
4  Representative Murray
   Representative Pettersen
5  Representative Salazar
   Representative Wright
6  Representative Lee
   Representative Kagan (Chairman)
7

8  PUBLIC SPEAKERS:              PAGE
9  Richard Sweetman          60
10  IN SUPPORT:
   JANE DOUGHERTY               11
11  David Chipman        14
   Michael Doberson        16
12  Bill Kilpatrick      20
   Jessica Watts        31
13  John Buckley         33
   Don Macalady         35
14  Tom Mauser           38
   Charles Jamison      41
15  Gail Valeta          43

16
17
18
19
20
21
22
23
24
25
0003
1  PUBLIC SPEAKERS:  (Continued)        PAGE
2  IN OPPOSITION:
   Doug Smith              48
3  Charles Robles          77
   Gordon Garland          84
4  Leon Green              90
   Robert Parker           93
5  Justin Smith            99
   Bruce Hartman          113
6  Garrett Wiggins        116
   Sam Myrant             123
7  Dave Gill              127
   Michael McPeake        132
8  Michael Bane           134
   Andrew Hamilton        137
9  Bonnie Gabaldon        138
   Bob Edmiston           143
10  John Higgs            146
    Dan Newman            151
11  Steve Martin          152
    Lee Reedy             156
12  Andrew LaFontaine     158
    Edward Irvine         166
13  Justin Hayward        169
    Paul Gresky           172
14
15
16
17
18
19
20
21
22
23
24
25
0004
1          P R O C E E D I N G S
2          *   *   *   *   *
3          THE CHAIRMAN:  The committee will come
4  to order.  The next bill on our agenda is House Bill

5   1224 concerning the large-capacity magazines. And
6   before we get to the presentation of the bill, let
7   me just tell everybody here that we very much
8   appreciate your contribution to this effort to craft
9   public policy for the State of Colorado.
10          Some of you have been here waiting to
11   testify virtually all day, and if you are one of
12   those, we owe you our especially great thanks.  But
13   even if you've just arrived, the fact that you are
14   willing to help us craft this policy is greatly
15   appreciated.
16          We are going to limit witness
17   testimony to two minutes of direct testimony from
18   the witness in each case, except for one witness
19   from the industry who has specifically requested
20   that they have a little longer to explain
21   technicalities about the production of capacity --
22   large-capacity magazines and the such that simply
23   cannot be accomplished in the time of the two-minute
24   limit, and they have asked for a five-minute limit
25   on their direct testimony, and that we have agreed
0005
1   to.
2          But all the proponents of this bill
3   will be limited to two minutes.  All the opponents
4   will be limited to two minutes, and then there will
5   be no limit on the question and answer period for
6   each witness from the members of the committee.
7          With that, I would welcome you back,
8   Representative Fields, to the House Judiciary
9   Committee.  Please tell us about House Bill 1224.
10          REPRESENTATIVE FIELDS:  Thank you,
11   Mr. Chair, and committee members.  I'm pleased to
12   bring to you House Bill 1224.  I can tell you that
13   the motivation behind this bill is based on what
14   happened in Aurora on July 20th.  A shooter killed
15   12 people and he injured 58.  Many of those people
16   are critically injured.  And in 90 seconds, he was
17   able to do that kind of damage.
18          What House Bill 1224 will do, it will
19   prohibit the sale of, the transfer, and the
20   ownership of high-capacity magazines that are
21   capable of holding more than 10 rounds.
22          High-capacity magazines have one
23   purpose and that is the rapid use and to be able to
24   kill a large number of people.  They allow a gunman
25   to fire a large number of rounds.  That round could
0006
1   be 30.  It could be 50.  It could be 100.  But what
2   we do know is that it happens quickly, because what
3   they're trying to do in some of these massacres is
4   they're trying not to reload.
5          So they use these -- these large
6   magazines to be able to kill as many people as they

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

7    possibly can.  These type of high-capacity clips
8    have no place in our community.  They have no place
9    on our streets and they have no place in movie
10   theaters or in our schools.
11          Our schools should be sacred places.
12   Our churches should be sacred places.  And movie
13   theaters are a place where people should be able to
14   enjoy entertainment without being threatened with
15   the possibility of being shot down.
16          Since this horrific event that
17   happened in Aurora, I've been working with my
18   community and with the families who have been
19   impacted by this horrific crime and we've been
20   trying to put the pieces back.  And have seen over
21   and over recent massacres that have happened across
22   our country where they're using these high-capacity
23   magazine clips.  And the only thing that kind of
24   stops the carnage is that the gun jammed.
25          And when the gun jammed, when it
0007
1    happened to James Holmes, we were able to avoid some
2    more devastation that could have happened in that
3    theater.
4           You might recall the situation in
5    Tucson where we had Representative Gabby Giffords.
6    She was just hosting a town hall meeting, and we had
7    a gunman go in there and he killed six people and he
8    wounded 13 others.  His gun jammed too, and he was
9    using a high-capacity magazine clip.
10          These massacres just have to stop.  We
11   have to really stop the bloodshed.  And it's all
12   about these high-capacity magazines and these
13   semi-automatic weapons that allow this equipment to
14   just discharge these high numbers of bullets.
15          And we also know the recent event that
16   happened at Sandy Hook Elementary School.  According
17   to law enforcement officers, as many as half a dozen
18   first graders were reported to have survived the
19   shooting, but far too many lost their precious
20   lives.  In his case also his gun jammed and he
21   wasn't able to reload.
22          We need to do something about the
23   accessibility of these high-capacity magazines so
24   that we can stop the horrific acts before they ever
25   get started.  So by banning high-capacity magazines,
0008
1    it doesn't infringe on the rights of responsible gun
2    owners, but it does restore sensible safeguards that
3    protect our families and our children.
4           So what House Bill 1224 will do, it
5    will prohibit the sale or the transfer of any
6    ammunition feeding device, magazines strips and
7    guns -- drums capable of accepting more than 10
8    rounds.  It will prohibit the magazines that are

LEG HX 000006
3922

9   legally acquired before the bill takes effect.
10          So if this bill is passed, for those
11  who already have these magazines, they can legally
12  keep them in their possession.  And the bill also
13  has penalties in place for those who do not comply
14  with the law.
15          So we have several people who will be
16  testifying in support of this bill, but I'm asking
17  for your support right now to vote yes on House Bill
18  1224.
19          THE CHAIRMAN:  Thank you,
20  Representatives Fields.
21          Are there any questions for the
22  sponsor of House Bill 1224?
23          Seeing none, let's go straight to
24  the -- who would you like to call first --
25          REPRESENTATIVE GARDNER:  Mr. Chair,
0009
1   before we move on -- I'm sorry, I'm sort of waving.
2           THE CHAIRMAN:  Representative
3   Gardner -- (inaudible).
4           REPRESENTATIVE GARDNER:  I did have a
5   question for the sponsor.
6           THE CHAIRMAN:  Representative Gardner,
7   go ahead.
8           REPRESENTATIVE GARDNER:  Thank you.
9   And for the sponsor, I'm trying to figure out how
10  this bill works for a manufacturer, because it seems
11  to me that the way the bill is drafted -- and maybe
12  I just misunderstand this -- it's against the law to
13  possess a magazine if it sort of comes into
14  existence after the passage of the bill, and yet,
15  the bill seems to contemplate that a manufacturer
16  should put -- if there's a manufacturer in Colorado,
17  they should put markings on the bill [sic].
18          So is a manufacturer in violation, and
19  if they're in violation, why do they put a serial
20  number on the magazine.  Can you explain how the
21  bill works?
22          THE CHAIRMAN:  Representative Fields,
23  if you understand the question, please try and
24  answer it.
25          MS. METZGER:  Thank you, Mr. Chair.
0010
1           And thank you, Representative Gardner,
2   for your question.
3           And in the bill -- I'm looking on
4   page 4.  And the bill would require that a
5   manufacturer, after the effective date if this bill
6   pass, put some kind of date upon -- on the
7   manufacturing of any new clips moving forward.  So
8   it would require some kind of identification.
9           Right now in the bill it does request
10  a serial number and a date be placed on that so that

11  we understand that this magazine is a part of a
12  series that has happened after the passing of this
13  bill.
14          THE CHAIRMAN:  Thank you.
15          And are there any further questions
16  for the sponsor of the bill?
17          Seeing none, Representative Fields,
18  would you like the proponents to testify first or
19  the opponents to testify first?
20          REPRESENTATIVE FIELDS:  Oh, the
21  proponents, please.
22          THE CHAIRMAN:  Proponents?
23          REPRESENTATIVE FIELDS:  Yes.
24          THE CHAIRMAN:  Thank you,
25  Representative Fields.  And we have the -- somewhere
0011
 1  a list of proponents who are going to testify.
 2          Jane -- no, that's not the list.
 3  Excuse us.
 4          All right.  I would ask Jane Dougherty
 5  to come forward.
 6          Ms. Dougherty, welcome to the House
 7  Judiciary Committee.  Thank you for coming.  And
 8  please tell us your name, who you represent, if
 9  anyone other than yourself, and present us your
10  testimony.
11          JANE DOUGHERTY:  Good afternoon.  My
12  name is Jane Dougherty, and I represent my family.
13          THE CHAIRMAN:  Thank you.  Please
14  proceed.
15          JANE DOUGHERTY:  I'm here to express
16  my strong support for House Bill 1224 to limit
17  high-capacity magazines to no more than 10 rounds.
18          My sister, Mary Sherlach, was the
19  school psychologist at Sandy Hook Elementary School.
20  Mary lost her life, along with five other educators
21  and 20 children, on December 14, 2012.
22          On the morning of December 14th, a
23  20-year-old man with mental health problems was able
24  to access a number of powerful weapons and a large
25  amount of high-capacity magazines because they were
0012
 1  in his home.  That morning 700 students were in the
 2  school at Sandy Hook.  A new security system had
 3  been installed and the front doors were locked.
 4          Authorities now know that the gunman
 5  used an assault weapon to literally shoot an
 6  entrance into the building.
 7          My sister, Mary Sherlach, was murdered
 8  in the school lobby while running towards the
 9  shooter who was armed with a large amount of
10  high-capacity magazines.  Each magazine held 30
11  rounds.  The shooter made his way into the classroom
12  where he shot and killed four more adults and 20

13  children.
14          The ammunition used at Sandy Hook was
15  meant to cause massive tissue damage.  The damage
16  inflicted on Mary's body was so severe that her own
17  husband was not allowed to say good-bye.  She went
18  to work that morning and she was never seen again.
19          To quote my brother-in-law, Earl
20  Sherlach, simple arithmetic says that a smaller
21  magazine needs to be replaced more often than a
22  larger magazine.  This alone leads to short
23  increments of time when intervention could occur and
24  the body count might be less.
25          In fact, 11 children managed to escape
0013
1  when the shooter stopped to reload and a little boy
2  yelled "run."
3          Events like these are the kinds of
4  experience that you think will never touch you.  But
5  here in Colorado we know all too well that they
6  certainly can.  We have seen firsthand what these
7  weapons and high-capacity magazines are capable of.
8  And these massacres can and will continue to affect
9  us here in Colorado if we do not pass this bill.
10          We cannot wait for yet another
11  massacre to transpire before we take real action.
12  We need to honor my sister, Mary's life, and all the
13  lives lost as a result of gun violence.
14          You are our elected leaders.  Honor
15  your oath of office to protect and defend.  Pass
16  this legislation.
17          THE CHAIRMAN:  Thank you,
18  Ms. Dougherty.  And I know this is painful for you
19  to tell and retell this experience.  And the fact
20  that you've been willing to do it is a mark of
21  courage and we appreciate it very much.
22          Are there any questions for
23  Ms. Dougherty?
24          Thank you, Ms. Dougherty.
25          JANE DOUGHERTY:  Thank you.
0014
1          THE CHAIRMAN:  Please accept our
2  thanks for having been willing to come and share
3  that with us.
4          Mr. David Chipman.  Mr. Chipman,
5  welcome back to the House Judiciary Committee.
6          DAVID CHIPMAN:  Thank you, sir.
7          THE CHAIRMAN:  We're glad to have you
8  here.  Please state your name for the record.  Tell
9  us who you're with and proceed with your testimony.
10          DAVID CHIPMAN:   name is David Chipman
11  and I'm a retired special agent with ATF.
12          Having conducted countless high-risk
13  tactical operations as an ATF agent targeting gun
14  criminals, I have a unique perspective on the

15   capabilities of good guys with guns and bad guys
16   with guns.
17          It is not always clear that a person
18   with a gun possess evil intent until they fire the
19   first round.  But when shooters do intend to kill,
20   they can fire continuously until the moment they run
21   out of ammunition, before even the most seasoned law
22   enforcement professionals or a member of the public
23   can respond.
24          For those of you who have seen file
25   footage of the attempt on President Reagan's life,
0015
1    what do you remember?
2           I remember a mentally ill man with a
3    gun.  I remember the gun he snuck through security
4    fired until there were no more rounds in that gun.
5    I remember Secret Service agents and local police
6    standing tall and holding their positions.  I
7    remember firearms being drawn only after the
8    incident had ended and the President and others were
9    shot.
10          Fortunately, no one was killed during
11   this pivotal moment in our nation's history, but
12   imagine how history might have been different if
13   John Hinckley carried a firearm equipped with a
14   magazine capable of firing 30 rounds instead of a
15   revolver with six.
16          We know that high-capacity magazines
17   place our law enforcement officers directly in
18   harm's way.  According to the Justice Department,
19   high-capacity magazines are used in 14 to 26 percent
20   of gun crimes and in 31 to 41 percent of fatal
21   police shootings, varying across the cities
22   analyzed.
23          As a tactical operator whose job it
24   was to safely apprehend the most dangerous felons in
25   America, the government could have issued me
0016
1    magazines of any capacity.  They chose 15.
2           It is inconceivable to me why any
3    American, during any scenario that anyone could
4    dream up, would require more rounds in a magazine
5    than one of the government's most highly trained
6    operators.
7           A magazine is a piece of equipment
8    meant to be used in self-defense or for sport.  It
9    should not be designed to outgun our law enforcement
10   or murder innocent children.
11          Thank you.
12          THE CHAIRMAN:  Thank you, Mr. Chipman.
13          Are there any questions for this
14   witness?
15          Seeing none, thank you, sir.
16          DAVID CHIPMAN:  Thank you.

LEG HX 000010    3926

17          THE CHAIRMAN: Dr. Doberson.
18  Dr. Doberson, welcome, and thank you for patiently
19  waiting all afternoon to testify on House Bill 1224.
20          Please state your name for the record.
21  Tell us who you are and who you represent, if anyone
22  other than yourself, and proceed to give us your
23  testimony.
24          MICHAEL DOBERSON: My name is Michael
25  Doberson. I'm a physician with a specialty in
0017
1  forensic pathology, and I'm also the coroner and
2  medical examiner for Arapahoe County.
3          I've held that position for
4  approximately 20 years now, and over that time,
5  we've had a number of incidents happen in Arapahoe
6  County, among them the Chuck E Cheese shootings,
7  certainly the Columbine High School shootings, which
8  was not in my jurisdiction but which I participated.
9  And, of course, the Aurora theater shootings.
10          I will tell you that hardly a week
11  goes by that I don't find out what a bullet can do
12  to the human body. And every case in my office is a
13  tragic one, but it's particularly tragic when the
14  victims are young, otherwise healthy individuals.
15  They either die from their own hand or, more
16  tragically, at the hand of another.
17          The most devastating wounds I've seen
18  have been the result of high-velocity rounds. And
19  these are typically fired by semi-automatic weapons
20  such as the AR-15. And these are easily equipped
21  with high-capacity magazines, which, as you know,
22  are readily available. These are basically military
23  weapons which have been introduced into our civilian
24  spaces, our streets, our shopping malls, our
25  workplaces, and above all, our schools.
0018
1          These rounds have devastating effects
2  on the human body, even when only one strikes. Can
3  you imagine what happens when multiple bullets fired
4  from a high-capacity magazine impacts someone?
5  Well, I can. Unfortunately, I can.
6          Obviously, no one bill is going to
7  solve all our problems, but we have to start
8  somewhere. We've got to do something to minimize
9  the violence and minimize the number of grieving
10  families.
11          Please pass this bill. It's only
12  common sense. I'm tired of taking bullets out of
13  kids.
14          THE CHAIRMAN: Dr. Doberson, thank
15  you.
16          Representative Gardner.
17          REPRESENTATIVE GARDNER: Thank you.
18          And thank you for being here, sir. I

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

19  appreciate your interest in this issue.  You know,
20  I've been sort of asking myself about the number of
21  rounds that ought to be in a magazine, as well, and
22  what difference it makes in crimes and so forth.
23        I assume you're aware that we had such
24  a ban nationally from 1994 to 2004.  Are you aware
25  of that National Institute of Justice, which is kind
0019
1  of the think tank for the U.S. Department of
2  Justice, found that there wasn't any particular
3  discernable benefit to the limitation on high
4  capacity -- so-called high-capacity magazines.  I
5  don't know if you're familiar with that research or
6  not.  I'm just wondering.
7        MICHAEL DOBERSON:  No, I'm not
8  familiar with that research, but I -- I'm sure that
9  there are other studies which, as pretty much on
10  every issue, come up with different conclusions.
11        THE CHAIRMAN:  Representative Gardner.
12        REPRESENTATIVE GARDNER:  Yes.  Thank
13  you.
14        Do you know of any other studies, sir?
15        THE CHAIRMAN:  Dr. Doberson.
16        MICHAEL DOBERSON:  Not off the top of
17  my head, no.
18        REPRESENTATIVE GARDNER:  Thank you.
19        THE CHAIRMAN:  Any further questions
20  for Dr. Doberson?
21        Thank you, Doctor, for coming all this
22  way and waiting all this time.
23        MICHAEL DOBERSON:  Thank you.
24        THE CHAIRMAN:  We very much appreciate
25  it.
0020
1        Golden Police Chief Bill Kilpatrick.
2  Chief Kilpatrick, welcome.  Thank you for coming.
3  And please state your name for the record and tell
4  us who you're with and proceed with your testimony.
5        BILL KILPATRICK:  Thank you.  Thank
6  you for having me here this afternoon.  I'm Bill
7  Kilpatrick, police chief in Golden, and I'm
8  representing the Colorado Association of Chiefs of
9  Police.
10        The Colorado Association of Chiefs of
11  Police represents the many police departments
12  throughout the state of Colorado who work every day
13  to keep our community safe and to do our best to
14  protect our citizens from those with ill intent who
15  wish to do us harm.
16        As stated by the U.S. Supreme Court in
17  District of Columbia versus Heller, like most
18  rights, the right secured by the Second Amendment is
19  not unlimited.  "From Blackstone through the 19th
20  century cases, commentators and courts routinely

21  explained that the right was not a right to keep and
22  carry any weapon whatsoever in any manner whatsoever
23  and for whatever purpose."
24          Given this statement from the highest
25  court in the land, that gun rights are not
0021
1  unlimited, the appropriate question for this
2  committee today is, is a limitation on high-capacity
3  magazines an appropriate action for the state of
4  Colorado and will it lead to enhanced public safety
5  while protecting individual rights under the Second
6  Amendment.
7          Surveys show that Americans carry
8  firearms for protection, for target shooting or for
9  hunting.  None of these functions require
10  high-capacity magazines.  High-capacity magazines
11  are designed for weapons of war or to kill and maim
12  large numbers of people in a short amount of time.
13          Protection, target shooting or hunting
14  does not demand the rapid release of large amounts
15  of ammunition.  Large-capacity magazines are
16  frequently used in mass shootings, including those
17  which occurred at Columbine High School, Virginia
18  Tech, Fort Hood, Tucson, Aurora, Oak Creek, and
19  Newtown.
20          As a police chief, I am aware of data
21  suggesting that perhaps as many as one in five
22  officer-involved shootings in the United States
23  involve high-capacity magazines.
24          While a criminal chooses to utilize
25  these weapons and their -- excuse me.  When a
0022
1  criminal chooses to utilize these weapons and their
2  accompanying high-capacity magazines, officers have
3  minimal opportunity to protect themselves and the
4  public.
5          Limitations on large-capacity
6  magazines are often adopted in concert with
7  limitations on assault weapons.  However, the impact
8  of large-capacity magazines limitations should not
9  be restricted to assault weapons.  Large-capacity
10  magazines increase the capacity, and thus the
11  potential lethality of any firearm that can accept a
12  large-capacity magazine, including a firearm that is
13  not an assault weapon.
14          Therefore, a limitation on
15  large-capacity magazines will reduce the capacity
16  and lethality of many more firearms than would a
17  limitation on assault weapons alone.
18          We ask you to help protect the public
19  and to help protect law enforcement officers by
20  supporting such a limitation.  As officers --
21          THE CHAIRMAN:  Chief, I hate to
22  interrupt you, but I'm going to interrupt you and

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

23  ask you to just make your conclusive -- concluding
24  comments because we've busted the two-minute rule,
25  and I don't want to (inaudible).
0023
1         BILL KILPATRICK:  Sure.
2         THE CHAIRMAN:  Thank you.
3         BILL KILPATRICK:  As officers sworn to
4  uphold the law and to protect the Constitution of
5  the United States of America and the state of
6  Colorado, we believe that placing a limitation on
7  high-capacity magazines is a commonsense approach
8  that can serve to protect the public while
9  continuing to grant citizens their Second Amendment
10  right to keep and bear arms, and therefore we urge
11  the passage of HB-1224.
12         THE CHAIRMAN:  Thank you, Chief.  And
13  as I said, sorry that I have to cut you a little
14  short there.
15         Are there any questions for the chief?
16         Represent Wright.
17         REPRESENTATIVE WRIGHT:  Chief, thank
18  you for being here today.  I would ask you -- and
19  I'm going to have to ask Mr. Chair a series of
20  follow-up questions, I'm sure -- what type of
21  weapons or rifles do you train with, and how many
22  rounds do they hold in their magazines?
23         THE CHAIRMAN:  Chief.
24         BILL KILPATRICK:  So to officers,
25  there's certain handguns we're allowed to carry.
0024
1  So, for example, I have a Glock 23.  It has 13 in
2  the magazine.
3         THE CHAIRMAN:  Representative Wright.
4         REPRESENTATIVE WRIGHT:  Thank you.
5  And I'm sure you're aware through your training --
6  much of it's the same training that I've had -- how
7  quickly those magazines can be changed in an active
8  shooting situation, correct?
9         THE CHAIRMAN:  Chief Kilpatrick.
10         BILL KILPATRICK:  Yes.
11         THE CHAIRMAN:  And, Representative
12  Wright.
13         REPRESENTATIVE WRIGHT:  Thank you,
14  Mr. Chair.
15         I was wondering if you would comment
16  on how quickly those magazines can be changed.
17         THE CHAIRMAN:  Chief Kilpatrick.
18         BILL KILPATRICK:  Under a shooting
19  scenario where I'm being fired at, geez, it can be
20  pretty darn quick.  And if I'm under high pressure,
21  I might drop it.  But seconds.
22         THE CHAIRMAN:  Representative Wright.
23         REPRESENTATIVE WRIGHT:  Thank you for
24  that.  You know, that's one of my concerns with this

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

0025
1  simply trained themselves with -- off of YouTube
2  video, quite frankly, could change these magazines
3  very quickly.
4           Regardless of whether there are 5, 7,
5  10, 15 rounds in a magazine, they're going to be
6  able to quickly change those magazines in modern
7  weaponry.  So I'm not sure that this bill
8  accomplishes what it's set out to accomplish.
9           I guess I would also ask this, you
10  mentioned that you are sworn to uphold the
11  Constitution.  I agree.  I take that very seriously,
12  as I'm sure that you do.  There's a number -- there
13  are a number of prior case law precedent that's been
14  set by the U.S. Supreme Court in relation to this.
15  One is McDonald v. Chicago, that states the second
16  amendment limits states to the same extent as the
17  federal government.
18           The second is the District of Columbia
19  versus Heller, which states that the second
20  amendment protects an individual's right to possess
21  a firearm for protection and sport unconnected to
22  military service.
23           In essence, what Heller was deciding
24  is that a weapon in common use at the time.  In
25  common use at the time, meaning a modern weapon is
0026
1  considered a reasonable weapon and it's considered a
2  lawful weapon to possess.
3           So I'm not seeing that this, in fact,
4  is constitutional, sir, to -- to limit this.  And I
5  think it will be challenged as a result.  Do you
6  have any comment on that?
7           THE CHAIRMAN:  Chief Kilpatrick.
8           BILL KILPATRICK:  Sorry.  I would
9  leave that to the constitutional lawyers to debate,
10  sir.
11           THE CHAIRMAN:  Chief Kilpatrick, I
12  have a -- were you through, Representative Wright?
13           Representative Salazar.
14           REPRESENTATIVE SALAZAR:  Thank you,
15  Mr. Vice Chair.
16           Chief, do you know if Adam Lanza had
17  the police training that you do?
18           BILL KILPATRICK:  I do not know that,
19  but I don't believe that he did.
20           REPRESENTATIVE SALAZAR:  How about
21  James Holmes, do you know if he had the police
22  training that you do?
23           BILL KILPATRICK:  I'm certain he did
24  not.
25           REPRESENTATIVE SALAZAR:  And you said
0027

1  that it only takes you maybe seconds to drop your
2  empty magazine, load up a new clip, in order to
3  defend yourself against criminals?
4          BILL KILPATRICK:  That's correct.
5          REPRESENTATIVE SALAZAR:  Okay.  And
6  that being the case, you don't know how many people
7  in the United States would have that kind of
8  specialized training to be able to drop an empty
9  clip, put up a new one, just in a matter of seconds?
10         BILL KILPATRICK:  Well, I know that
11  most people don't have a lot of training that police
12  officers do, but I'm certain there are lots of folks
13  who train pretty regularly.
14         THE CHAIRMAN:  Representative Salazar.
15         REPRESENTATIVE SALAZAR:  I guess the
16  reason why I'm asking this question is because of
17  something Representative Wright said, is that in
18  situations where you might have 10 rounds or a
19  5-round clip, that not many people outside of those
20  who have some type of military or police training
21  are going to be able to drop those clips, load them
22  up within just a matter of seconds; that it might be
23  that perpetrators such as Adam Lanza and James
24  Holmes, it might take them awhile to get those clips
25  in in that kind of a situation.  Whereas, if they
0028
1  have a drum that holds 100, barring any type of --
2  any type of jamming, all they have to do is just
3  pull the trigger.  Is that right?
4          THE CHAIRMAN:  Chief Kilpatrick.
5          BILL KILPATRICK:  I know, according to
6  the preliminary hearing testimony in the Aurora
7  case, that that gentleman was able to fire 65 rounds
8  out of that drum.
9          THE CHAIRMAN:  Representative Wright.
10         REPRESEPTATIVE WRIGHT:  Thank you,
11  Mr. Chair.
12         Chief, I would ask you, do you know
13  who Chris Dorner is, and wouldn't you say that he
14  has the same training that you do?
15         THE CHAIRMAN:  Chief Kilpatrick.
16         BILL KILPATRICK:  I believe he's the
17  LA cop that's being hunted right now.  I imagine he
18  has a lot of training, yes, sir.
19         REPRESEPTATIVE WRIGHT:  Thank you.
20         THE CHAIRMAN:  Chief Kilpatrick, I'd
21  like to ask you a question.  You'd indicated in your
22  initial statement that you were familiar with some
23  of the police research regarding high-capacity
24  magazines.
25         Are you familiar with a 2010 survey by
0029
1  the Police Executive Research Forum that concluded
2  that since the assault weapon ban expired in 2004,

3 that 37 percent of police agencies reported seeing
4 noticeable increase in criminals' use of assault
5 weapons, and that 38 percent reported seeing notable
6 report about increase in criminals' use of
7 semi-automatic firearms with high-capacity
8 magazines?
9          BILL KILPATRICK:  I'm familiar with
10 that study, yes, sir.
11          THE CHAIRMAN:  Could you expand upon
12 that, sir.
13          BILL KILPATRICK:  I've read the study,
14 sir, but I -- do you have specific questions?
15          THE CHAIRMAN:  Is it consistent with
16 your experience that since the assault weapon ban
17 expired, that there's been an increase in the use of
18 high-capacity magazines?
19          BILL KILPATRICK:  Yes, sir, and I'm
20 familiar with a couple other facts I could give you,
21 if you're interested.
22          THE CHAIRMAN:  Please proceed.
23          BILL KILPATRICK:  So for example, I
24 know that the State of Virginia found that since
25 their assault ban expired, that prior to the --
0030
1 while the assault ban was in place, they found that
2 there were less high-capacity magazines found at
3 crime scenes than after the assault ban expired.
4          I am familiar with the fact that since
5 the assault ban expired, that in 2009, 49 officers
6 died by the use of weapons, and that was a 24
7 percent increase from 2008.
8          And in 2010, 61 officers died.  That
9 was a 31 percent -- 7 percent increase.  And in
10 2011, 68 died.  And that was the first year that
11 more officers were killed in 14 years than from auto
12 accidents.
13          THE CHAIRMAN:  So would you conclude
14 from that, Chief Kilpatrick, that high-capacity
15 magazines increase the risk to police officers?
16          BILL KILPATRICK:  I believe they have,
17 yes, sir.
18          THE CHAIRMAN:  Thank you.
19          Are there any further questions for
20 Chief Kilpatrick?
21          If not, we thank you very much for
22 your testimony and appreciate your service to the
23 people of Colorado.
24          BILL KILPATRICK:  Thank you.
25          THE CHAIRMAN:  Is there a Jessica
0031
1 Watts in the audience?  Ms. Watts, would you
2 identify yourself for the record and tell us who
3 you're representing, if anyone.
4          JESSICA WATTS:  My name is Jessica

5  Watts and I'm here representing myself.
6         THE CHAIRMAN:  Thank you.  Please
7  proceed with your testimony.
8         JESSICA WATTS:  I am here to express
9  my strong support for House Bill 1224 to limit
10  high-capacity magazines to no more than 10 rounds.
11  I believe I can speak for all the families here
12  today, whom I've met through this horrific tragedy,
13  that we need legislation to stop the gun violence
14  that has torn our lives apart.
15         I am only 28 years old and my life has
16  been directly impacted four times by gun violence.
17         My husband was a student at Columbine,
18  and on that fateful day he was lucky to make it out
19  alive.  I was the babysitter for teenage victim
20  Emily Keyes, who was shot in the head and murdered
21  in Platte Canyon High School in 2006.
22         But today, I'm hear to talk about what
23  happened at that horrific night on July 20th, when
24  my cousin went to a movie and never came home.
25         The Aurora shooter went to a
0032
1  theater -- theater nine, equipped with more than
2  6,000 rounds of ammunition.  This is more than you
3  would see a soldier carry on the battlefield.  His
4  guns were loaded with high-capacity magazines
5  holding 100 rounds.  In 90 seconds, my cousin,
6  Jonathan Blunk, along with 11 others were murdered,
7  and more than 58 others wounded, in 90 seconds.
8         That massacre occurred in less time
9  than I will be up here testifying today.
10         No one should ever have to get the
11  call like I did on July 20th.  No one should have to
12  run to different hospitals just to face the
13  devastating truth that your loved one will never be
14  coming home.
15         Jonathan Blunk was a hero in his short
16  26 years.  He was a father of two young children,
17  but he was also a soldier.  He fought in the U.S.
18  Navy, serving three deployments.  His hope was to
19  reenlist as a Navy SEAL officer, but his life was
20  cut short.  He served to protect us all, and died
21  trying to protect those in the theater on July 20th.
22         I implore you to pass this bill.
23  Hopefully then, I will not get a fifth call saying
24  that a loved one that I've known has been killed by
25  a gun.
0033
1         THE CHAIRMAN:  Thank you, Ms. Watts.
2         Are there any questions for Ms. --
3  Jessica Watts?
4         Seeing none, we sincerely thank you
5  for coming before us today and providing us with
6  your testimony.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

7    is John Buckley present?  Thank you,
8    Mr. Buckley.  Would you please identify yourself and
9    tell us if you're representing anyone.
10        JOHN BUCKLEY:  Certainly.  My name is
11    John Buckley.  I am representing myself today.
12        I speak to you as a father, as a gun
13    owner, and most importantly for -- for this context,
14    as a former paramedic.  I was a paramedic for over
15    20 years.  I spent four years on Houston's
16    equivalent of Flight for Life.  I worked in the
17    county trauma center, the trauma center associated
18    with -- with the Life Flight program in Houston.  I
19    also spent two years assigned to a SWAT team.  So
20    I've seen a lot of sides of this issue.
21        I'm not sure if the committee is aware
22    that while the testimony for both this bill and 1229
23    have been going on this afternoon, Christopher
24    Dorner has been surrounded in Southern California,
25    and he has shot two police officers, one of them
0034
1    fatally.  I would assume that Mr. Dorner's probably
2    equipped with high-capacity magazines.
3        I certainly have seen many shootings
4    over my career.  I believe you had testimony of a
5    Denver Health physician earlier who mentioned
6    hundreds.  I think mine's probably in the same
7    realm.
8        The helicopters that I've worked in,
9    we had the capacity of loading two patients side by
10    side, and we had clamshell doors in the back so we
11    could load them parallel to each other.
12        On occasions too numerous to count,
13    after unloading our patients and delivering them to
14    the trauma center, I'd have to go back to the
15    helipad and literally take a garden hose and hose
16    out the blood out of the back of my aircraft, get a
17    brush and literally wash the blood off of the tail
18    boom.
19        I have seen this up close.  I wish
20    that I didn't have to.  I wish that I didn't have to
21    tell loved ones that they have just lost family
22    members.  I wish that I didn't have the memories of
23    praying with those families.  But I sincerely wish
24    that this body take some responsible steps in making
25    sure that something like this doesn't happen again.
0035
1        Every time that someone changes the
2    magazine, it is an opportunity to disable them.
3    It's another opportunity for a misfeed of the next
4    round of ammunition.  And I think that it's a
5    rational step towards trying to change a horrific
6    situation in our country, in our state.
7        THE CHAIRMAN:  Thank you, Mr. Buckley.
8        Are there any questions for

LEG HX 000019

3935

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

9  Mr. Buckley:

10          Seeing none, we thank you for your
11  testimony, sir.
12          Is there a Don Macalady in the
13  audience?  Please come forward, take your seat,
14  identify yourself and tell us if you're representing
15  someone.
16          DON MACALADY:  Good afternoon,
17  Chairman, and the members of the judiciary
18  committee.  Thanks for the opportunity to speak to
19  you again.  My name is Donald Macalady and I
20  represent Hunters Against Gun Violence.
21          The statement that defines our
22  organization, endorsed by all of our members, says
23  the following:  We are hunters and cherish the
24  privilege of being able to use firearms to pursue
25  recreation and food for our families.
0036
1          Nevertheless, we do not support the
2  proliferation of guns that have no relationship to
3  or utility for lawful hunting of game animals and
4  varmints, nor do we support the sale of guns and
5  other weapons to persons with a history of violent
6  crimes or mental instability.
7          Accordingly, we support a ban on the
8  sale of semi -- excuse me, semi-automatic weapons
9  that are designed primarily for rapidly killing or
10  incapacitating large numbers of people.
11          We always support a ban on the sale of
12  large magazines of armor-piercing ammunitions for
13  these weapons.  We further support universal
14  background checks for gun purchases made at the
15  expense of the prospective gun buyer.
16          That's our statement.  Large-capacity
17  magazines for pistols and assault weapons are
18  designed to give the weapons they serve a large
19  capacity for rapidly killing people.  They have no
20  relationship to hunting and, in fact, are illegal in
21  most hunting states.
22          So who does need weapons with
23  magazines that can fire 30 to 100 times in a few
24  seconds without reloading?  Certainly the list
25  includes terrorists and mass murderers, but it also
0037
1  includes those fearful of mass attack by neighbors
2  or government.
3          They are certainly not necessary for
4  protection of the family from intruders or robbers.
5          We feel that these high-capacity
6  magazines have no utility for hunters or any other
7  law-abiding American citizens and should be banned.
8          We therefore urge enactment of
9  HB13-1224.
10          THE CHAIRMAN:  Mr. Macalady, thank you

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

11  for that testimony.
12        Are there any questions for this
13  witness?
14        Representative Lee.
15        REPRESENTATIVE LEE:  Sir, are there
16  any circumstances under which a hunter would use a
17  high-capacity magazine?
18        THE CHAIRMAN:  Mr. Macalady.
19        MR. MACALADY:  Thank you.  I'm sure
20  there are, but the question is whether or not that's
21  an appropriate weapon or not.  There are people who
22  use these weapons particularly for varmint hunting,
23  but they're not really the weapon of choice.  If
24  you're out -- designed to have a weapon that's
25  designed for doing that, they're not designed to do
0038
1  that.  They're designed to kill people.
2        So people do use them just for the
3  sake of saying they've used them for hunting, in my
4  opinion.
5        REPRESENTATIVE LEE:  Thank you, sir.
6  Mr. Macalady, thank you so much for coming.  We very
7  much appreciate it.
8        Tom Mauser, please come forward, sir.
9  Welcome back, Mr. Mauser.  We appreciate your
10  contributing to our deliberations here.  Please
11  state your name for the record, say who you
12  represent and proceed with your testimony.
13        TOM MAUSER:  Thank you, Mr. Chairman.
14  My name is Tom Mauser, from Littleton, and this time
15  I'm back as a board member and spokesman for
16  Colorado Cease Fire, an organization that advocates
17  for stronger gun safety laws.
18        I'm the father of Daniel Mauser, who
19  was murdered at Columbine, and I'm here today
20  honoring him, my son, by wearing the shoes he was
21  wearing that tragic day.
22        He was wearing these shoes in the
23  library of Columbine where, like all the others in
24  that library, he was pinned down helplessly under a
25  table as two well-armed teenagers wreaked havoc and
0039
1  murder.
2        Thanks to the killers' arsenal, it was
3  impossible to escape during reloading.  The
4  Columbine killers had high-capacity magazines
5  holding 52, 32, and 28 rounds.
6        We all know why they obtained those
7  magazines, to kill as many people as they could in a
8  short period of time with minimal reloading.
9        For people who work with people who
10  have alcohol and drug problems, you know, there's a
11  time about enabling.  And it seems to me that's what
12  we've done, unfortunately, in this country.  We've

LEG HX 000021    3937

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

13  enabled disturbed people and gang members and
14  terrorists to wreak havoc, injury, and death.
15          These magazines were intended for the
16  battlefield and not for our communities.  That's why
17  other free-world nations don't allow them in the
18  hands of civilians and why they think that we're
19  crazy in America.
20          I've heard people say that the assault
21  weapons ban and a ban on high-capacity magazines in
22  1994 was a failure because of what happened at
23  Columbine.  I want to respond to that.  That's
24  nonsense.  We all know that when that ban was in
25  place, it did not -- it grandfathered in all the
0040
1  existing magazines and assault weapons.
2          When you don't remove them like they
3  did in Australia -- which was a very bold step.
4  When you don't do that, the existing ones stay in
5  place, so that you're in it for a long haul.  You're
6  not going to always have short-term results.
7          I've heard people -- I'm sure you're
8  going to hear arguments today that the problem is
9  mental illness.  Yes, it is.  But, you know, for
10  those people who are making that case, if they were
11  truly interested in keeping guns from the mentally
12  disturbed, they would have long ago supported more
13  mental health funding, broader prohibitions of
14  mentally disturbed people, and the closing of the
15  gun loophole that allowed disturbed people to easily
16  buy guns with no background check.
17          Well, fact is, they didn't support
18  those things, so now their argument is mighty
19  hollow.
20          THE CHAIRMAN:  Mr. Mauser, I have to
21  tell you that we all (inaudible) -- but we will
22  invite questions.
23          TOM MAUSER:  I just ask you to do the
24  right thing.  Let's stop being enablers.
25          THE CHAIRMAN:  Thank you, sir.
0041
1          Are there any questions for
2  Mr. Mauser?
3          Mr. Mauser, thank you so much for
4  coming to help us with this deliberation.  We
5  appreciate it, sir.
6          Jesse Ogus (phonetic), please come
7  forward.  Charles Jamison, please come forward.
8          Mr. Jamison, welcome, sir.  Thank you
9  for coming.  Please give us your name and who you
10  represent and proceed with your testimony.  And if
11  you could keep it to two minutes, that would be very
12  much appreciated, sir.
13          CHARLES JAMISON:  Yes, sir.  Charles
14  Jamison, representing myself.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

15    Columbine, Aurora theater, Sandy Hook
16    were three traumatic events for me.  I found myself
17    on December 14 going to a group at the Denver Vet
18    Center.  Found myself returning there upon learning
19    of that traumatic event.  I spent two extra hours in
20    there sharing that event with a therapist, saying
21    that they were just children.
22          It was traumatic.  I've often said
23    that high-capacity magazines should only be in the
24    hands of those of us who have served, to support and
25    defend the Constitution, of high-capacity magazines,
0042
1    weaponry, those entities that are special ops and
2    police forces or the military, those who serve in
3    special operations.
4          I ask for your yes vote in passage of
5    this bill.
6          THE CHAIRMAN:  Thank you very much,
7    sir.  Are there any questions for Mr. Ogus -- sorry,
8    for Mr. Jamison -- Jamison?
9          Seeing none, please accept our sincere
10    thanks for coming here and giving us your input,
11    Mr. Jamison.
12          Pastor Downing.  That would be the
13    Reverend Eugene Downing.  If you are here, please
14    come forward.
15          In that case, we will go to Kim
16    Littles or Littles.  Kim Littles.
17          In that case, we will go to Trudy
18    Danielson.  Are you here, Ms. Danielson?
19          And let us go back to Mr. Mike
20    McGuire.
21          Karina -- Mare Frazier.  Chuck Sexton.
22          Well, is there anybody further who
23    would like to testify on behalf of House Bill 1224?
24          Madam -- ma'am, please step forward.
25    Are you signed up, ma'am?
0043
1          GAIL VALETA:  I am signed up.
2          THE CHAIRMAN:  Well, it just shows our
3    system isn't working perfectly.  My apologies for
4    not having called your name.
5          GAIL VALETA:  That's all right.
6          THE CHAIRMAN:  Please state your name
7    for the record.
8          GAIL VALETA:  I'm Reverend Gail
9    Erisman Valeta, and I represent Prince of Peace
10    Church of the Brethren.  I live in Denver and my
11    church is in Littleton, Colorado.
12          THE CHAIRMAN:  Thank you, Reverend,
13    and please present us your testimony.
14          GAIL VALETA:  In about to the
15    mid-2000s, we had a young man who drifted into our
16    congregation, and we had never met him before and he

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

17  stayed for about two years and he drifted away.
18  This young man, in December of 2007, used a
19  high-capacity gun with high-capacity ammunition to
20  kill two people at the White Rim in Arvada and
21  killed two people at the New Life Church in Colorado
22  Springs.
23          His statement on the internet was
24  that, Christianity, this is your Columbine.
25          There was nothing that we were able to
0044
1  do at that church to prevent this tragic shooting.
2  But I saved the paper from the Denver Post from
3  2007, and it says this:  A large shipment of
4  ammunition was sent to Murray's post office box in
5  Greenwood Village.  The shipment was delivered to
6  him, but only after authorities had been alerted and
7  determined he could legally possess it.
8          What I'm stating is that the current
9  laws did not prevent this young man from doing this
10  horrible atrocity and killing innocent lives.  We
11  also know that high-capacity ammunition, banning it,
12  limiting it, cannot prevent all gun shootings, but
13  we think that it can prevent some.
14          We know that there are three cases
15  where shooters were tackled while they were
16  reloading.  And I'm reminded of the Oregon school
17  shooting in 1999, the Tucson recent shooting, and
18  the Appalachian College of Law.
19          So I urge that this body do the right
20  thing and vote for this bill.
21          THE CHAIRMAN:  Thank you very much,
22  Reverend.
23          Are there any questions for the
24  Reverend?
25          Seeing none, thank you so much for
0045
1  coming and waiting all this time and testifying.
2          GAIL VALETA:  Thank you.
3          THE CHAIRMAN:  We very much appreciate
4  it.
5          There was a gentleman.  Please come
6  forward, sir, and let me know, did you actually sign
7  up and I missed you?
8          WALTER HEIDENFELDER:  I did right at
9  the (inaudible).
10          THE CHAIRMAN:  My apologies to you,
11  sir, for not having called your name.  I don't know
12  why, but I promise there will be a vigorous
13  investigation and the culprit will be punished --
14          WALTER HEIDENFELDER:  I'm sure they
15  will be.
16          THE CHAIRMAN:  -- by having to attend
17  the entire next committee meeting.
18          WALTER HEIDENFELDER:  Thank you.  And

19   I thank you for allowing me to say a few words this
20   afternoon.  My name is Walter Heidenfelder.  And
21   without their knowledge, I am representing 28
22   elementary school kids that I left this morning.
23          I'm a substitute teacher.  And besides
24   these 28 kids this morning, I have served in three
25   school systems and more than 65 schools in the Metro
0046
1   area, over 300 assignments.  All of those school
2   environments have been, as Representative Shield
3   said, sacred.  I do not want to see those sacred
4   environments diminished by commandos running up and
5   down the halls with AK-47s.
6          That is lunacy, to suggest that that
7   would do anything to make our kids safer, is
8   absolutely nuts.  Because I can only envision those
9   kids being in a crossfire similar to a battlefield.
10  So that is not a solution.
11          The solution for us is to concentrate
12  on elimination of all assault weapons, as well as
13  high-capacity clips.  And those who want to use data
14  that might be available to say that while we had six
15  or seven years where we did not have an assault
16  weapons ban, and say look how things have improved,
17  I say we teach our kids to study and use research
18  that is verifiable, that is valid, and not these
19  kinds of data that cannot be verified.
20          But let me close and say, using data
21  verifiable or not, it's common sense, just common
22  sense to say that if high-capacity magazines and
23  assault weapons were eliminated, we would have fewer
24  kids killed.
25          Thank you very much for letting me
0047
1   testify.
2          THE CHAIRMAN:  Well, thank you very
3   much for testifying, Mr. Heidenfelder.
4          Are there any questions for this
5   witness?
6          Mr. Heidenfelder, please accept our
7   thanks for having taken the time to contribute to
8   our deliberations here.
9          WALTER HEIDENFELDER:  Thank you.
10          THE CHAIRMAN:  Thank you, sir.
11          Are there anybody -- is there anybody
12  else who would like to testify in favor of House
13  Bill 1224?
14          Well, in that case, we will take a
15  short recess.  And the first witness in opposition
16  to high-capacity magazines will be Doug Smith.  And
17  we do look forward to returning after the recess and
18  hearing from the opponents to high-capacity
19  magazines.
20          This committee will stand in recess.

21    (A recess was taken.)
22        THE CHAIRMAN:  We are now at the
23   testimony phase of the -- of House Bill 1224 before
24   the House Judiciary Committee.  We have heard from
25   opponents of the legislation.  We are now going to
0048
 1   hear from -- we have heard from proponents of the
 2   legislation.  We are now about to hear from
 3   opponents of House Bill 1224, beginning with
 4   Mr. Doug Smith.
 5        Mr. Smith, please come forward, tell
 6   us your name for the record, who you represent, if
 7   anyone other than yourself, and please give us your
 8   testimony.
 9        And, Mr. Smith, by previous agreement,
10   we have -- the chair will waive the two-minute rule
11   because there is some degree of complexity to your
12   testimony that cannot really be accommodated within
13   two minutes.  So please proceed, Mr. Smith.
14        DOUG SMITH:  Thank you, Chairman.  My
15   name is Doug Smith.  I'm a Colorado native and the
16   chief operating officer of Magpul Industries Corp.,
17   based in Erie.
18        I'm here today on behalf of 200 people
19   directly employed by Magpul, their families, and
20   approximately 400 other Colorado jobs that are
21   closely tied to the Magpul supply chain.
22        Magpul is a consumer products company
23   founded by a former U.S. Marine dedicated to
24   intelligent design and innovation.  Magpul produces
25   nearly 500 products here in Colorado that are
0049
 1   distributed and sold across the United States and
 2   the world.
 3        The company's first product, the
 4   Magpul, was designed to aid the ability of U.S.
 5   service members to reload their firearms under the
 6   stress of combat.  The product line has expanded to
 7   include high-reliability magazines, firearms
 8   accessories, nylon goods, and consumer electronic
 9   accessories, such as our line of phone cases.
10        Our products are sought after and
11   purchased by the United States and allied military
12   users, law enforcement, and responsible citizens
13   across the U.S.
14        Our products are distributed and sold
15   to American companies with a Colorado presence, such
16   as Cabela's, Bass Pro, Gander Mountain, Sportsman's
17   Warehouse, and many other smaller Colorado
18   businesses.
19        As a company that was founded by a
20   former U.S. Marine, we focus on personal
21   responsibility and accountability in every phase of
22   our business.  Personal and public safety is

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

23  therefore directly tied to our foundation and core
24  values.
25          Based on these principles, we
0050
1  completely agree with the Colorado Sheriff
2  Association's position that a high-capacity magazine
3  ban will not improve public safety, will not reduce
4  crime, and would endanger the lives of Colorado
5  residents by unduly restricting their ability to
6  defend themselves.
7          Arguments to the contrary are based
8  purely on emotion and not fact.
9          In 2004, Magpul had one founder, one
10  employee, a handful of products, and was operating
11  out of a basement in Longmont, Colorado.  Now, our
12  200 direct employees occupy three buildings and over
13  two dozen large subcontractors and suppliers in the
14  greater Denver area.
15          We have intentionally kept our supply
16  chain as locally based as possible, with nearly
17  90 percent of our suppliers located right here in
18  Colorado.  We take tremendous pride in our
19  commitment to Colorado.  In fact, even our business
20  cards proudly carry the slogan, revitalizing
21  American manufacturing, designed in Colorado, made
22  in the USA.
23          Magpul products are sought after
24  because of our innovative design, performance,
25  function and form.  We have numerous testimonials
0051
1  from U.S. and allied service members and law
2  enforcement officers about how our products have
3  saved lives due to superior performance to other
4  options in the marketplace.
5          It is worth reemphasizing that this
6  technological innovation that has so greatly
7  benefited our military, our allies, and our law
8  enforcement community was built only from the hard
9  work and dedication of Magpul and the reinvestment
10  of profits from commercial sales to responsible
11  citizens.
12          Magpul has experienced tremendous
13  growth and development in the past eight years and
14  we have aggressive expansion plans in Colorado over
15  the next five years.  That development has already
16  been halted, due to the political uncertainty
17  generated by bills such as HB-1224.  Our plan to
18  expand our operations in Colorado to a larger
19  built-to-suit facility are currently on hold.
20          If HB-1224 were to be enacted as law
21  in the state, those plans for Colorado expansion
22  would be cancelled.  HB-1224 would be devastating to
23  Magpul and our Colorado-based business partners.  If
24  this bill is passed, we will be unable to continue

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

0052
1   to take our operation and business activity through
2   our subcontractors and suppliers out of the state,
3   taking work that is a projected 2013 Colorado spend
4   of nearly $85 million and additional millions in tax
5   revenue.
6            For the sake of public safety for
7   Colorado residents and to prevent economic damage to
8   the state and to a native Colorado company, Magpul
9   urges you to oppose HB-1224.
10            THE CHAIRMAN:  Thank you, Mr. Smith.
11   Mr. Smith, you say that if House Bill 1224 were to
12   be enacted into law, you will cease production in
13   Colorado, or you would cease to expand in Colorado?
14   Which is it?
15            DOUG SMITH:  Both.  The bill as
16   drafted would not allow us to manufacture products
17   and sell them to foreign military customers, as well
18   as civilian customers outside of the state, which is
19   a substantial portion of our business.
20            THE CHAIRMAN:  Well, I'm very pleased
21   to be able to inform you, Mr. Smith, that your
22   understanding of the bill is completely wrong, and
23   to reassure you that whether or not House Bill 1224
24   passes, you will still be able to manufacture
25   everything that you manufacture now.  None of it
0053
1   will be prohibited for manufacture in the state of
2   Colorado.
3            There will be restrictions on
4   possession of the product by Coloradoans if this
5   bill passes, but there is no restriction on
6   manufacturing high-capacity magazines or anything
7   else in the state of Colorado.
8            We're very glad in the state of
9   Colorado that we have businesses like yours here
10   employing Coloradoans so that they pay taxes.  And
11   it makes -- it's one of the things that makes
12   Colorado great, is that you have the production
13   facilities that you have employing so many people
14   here.
15            And as I have heard, your particular
16   company is renowned as one of the foremost in the
17   production of these kind of -- these kinds of
18   products as accessories to firearms and firearms
19   related to products.
20            But rest assured, Mr. Smith, there
21   will be no ban on production of those products in
22   Colorado, whether this bill passes or not.
23            Are there any questions for Mr. Smith?
24   Representative Court.
25            REPRESENTATIVE COURT:  I think
0054

 1  Representative Gardner was first.
 2          THE CHAIRMAN:  Representative Gardner.
 3          REPRESENTATIVE GARDNER:  Thank you,
 4  Mr. Chairman.  And I guess I'm puzzled by your
 5  comments, and Mr. Smith really isn't the one to ask
 6  this.  I don't know if the drafter is anywhere
 7  abouts, but I read this bill and it seems -- first
 8  of all, I don't really find -- unless I'm missing
 9  it, I don't find any specific exemption for
10  manufacturing.
11          But I'll go ahead and ask Mr. Smith
12  the questions about Magpul and about what they do
13  and so forth while we're waiting on that.
14          Did I understand, Mr. Smith, Magpul's
15  a $400 million company; is that correct?
16          THE CHAIRMAN:  Mr. Smith.
17          DOUG SMITH:  That is correct, in terms
18  of business valuation.  That's correct.
19          THE CHAIRMAN:  Representative Gardner.
20          REPRESENTATIVE GARDNER:  Thank you.
21  And you're doing about $46 million annually and
22  employing something like 200 people and that sort of
23  accounts for 500 people total?
24          THE CHAIRMAN:  Mr. Smith.
25          DOUG SMITH:  Correct.  Our spend in
0055
 1  2012, sir, was 46 million.  Our projected spend is
 2  85 million in 2013.
 3          THE CHAIRMAN:  Representative Gardner.
 4          REPRESENTATIVE GARDNER:  Okay.  Thank
 5  you.  And, Mr. Smith, I appreciate you being here,
 6  and I have some understanding of the business you're
 7  in.  A lot of people don't know this, I have another
 8  job besides this one and that job is representing
 9  companies like yours that do business with the
10  government or sell to the government.  I'm a
11  government contracts attorney.
12          And I notice in this bill that
13  whatever exception there is for manufacturing, or
14  it's sort of unspecific, it's limited to department,
15  agency, political subdivision of the state of
16  Colorado or any other state of the United States
17  government.  But as I understand it, Magpul probably
18  sells to allied governments, as well?
19          THE CHAIRMAN:  Mr. Smith.
20          DOUG SMITH:  That is correct,
21  Representative.  In 2010 we fulfilled a 1 million
22  magazine contract to the British ministry of
23  defense.  And we also support other NATO allies in
24  Europe.
25          THE CHAIRMAN:  Representative Gardner.
0056
 1          REPRESENTATIVE GARDNER:  Thank you.
 2  So as I read this bill -- and I am

3  wondering and I know you're -- well, I don't know
4  that you're not a lawyer.  I assume you're not
5  because you're actually making things instead of --
6  and charging people to do.
7           As I understand this bill, and is your
8  reading of the bill, you couldn't manufacture for
9  those U.S. foreign allies under the terms in the
10 bill; is that correct?
11          THE CHAIRMAN:  Mr. Smith.
12          DOUG SMITH:  That's correct,
13 Representative.  I don't see the exemption for
14 manufacturing for these end-users.  So under this
15 bill, that would be unlawful.
16          THE CHAIRMAN:  Representative Gardner.
17          REPRESENTATIVE GARDNER:  Yes.  Thank
18 you.
19          And in your reading of the bill -- I
20 mean, notwithstanding Sherman Kagan's comments, in
21 your reading of the bill, do you find, sort of, any
22 exception for your employees to possess these things
23 while they're manufacturing them?  And is it going
24 to cause so much uncertainty and difficulty that
25 Magpul really is seriously having to consider
0057
1  leaving the state?
2           THE CHAIRMAN:  Mr. Smith.
3           DOUG SMITH:  That's correct,
4  Representative.  We don't read any provision in the
5  state for transport of these products.  Possessing
6  them by our employees would be a major problem, and
7  our company is uniquely positioned to move the
8  tooling out of the state very quickly.
9           THE CHAIRMAN:  Representative Gardner.
10          REPRESENTATIVE GARDNER:  Yes.  Thank
11 you.
12          Well, you know, you don't --
13 Mr. Smith, don't necessarily need to respond to
14 this, but it seems to me that basically we've
15 engaged in, sort of, national security legislation
16 about who it would be appropriate for you to
17 manufacture for and who it would not be.
18          And frankly, we're prohibiting you
19 from engaging in legitimate foreign military sales
20 for allied nations, which really is astounding to
21 me.
22          The other thing that's puzzling to
23 me -- and I really would look for some clarification
24 of the drafters -- I don't really see any specific
25 exception for a company like yours.  There's
0058
1  reference to manufacturing, but I don't see anything
2  that says all of your employees and everything else.
3  So I share your concern about this bill, and I
4  appreciate you being here to let us know about it.

5   Thank you.
6           THE CHAIRMAN:  Mr. Smith, if you've
7   got any response to what Representative Gardner
8   said, please feel free.
9           Representative Gardner and Mr. Smith,
10  I'm beginning to understand your concerns.
11          What I understand to be the case --
12  and I think I'd like to state publically to the bill
13  sponsor here, what I understand to be your concern
14  is that you will -- although the bill does not
15  prohibit the manufacturer of say a large-capacity
16  magazine, it does prohibit the possession of a
17  large-capacity magazine in the state of Colorado.
18  And it doesn't specifically clarify that your
19  employees cannot be charged with possession.
20          I can tell you that I don't think it's
21  the intent of the bill to prohibit the
22  manufacturer.  I suddenly understand, after
23  listening to the dialogue between you and
24  Representative Gardner, what the -- what the concern
25  is.  And I -- I would urge the sponsor of the
0059
1   bill -- I would ask the sponsor of the bill whether
2   you -- whether you intend, through this bill, to
3   prohibit the manufacture or inhibit the manufacture
4   of large-capacity magazines in Colorado, and if you
5   do not, would you be willing to accommodate the
6   concerns that have been raised here today,
7   Representative Fields.
8           REPRESENTATIVE FIELDS:  Thank you,
9   Mr. Chair.  And the intent of the bill is to not to
10  have an adverse impact on the ability to
11  manufacture.  The way I interpret the bill is that
12  it provides an exception that you can continue to
13  produce and manufacture this type of equipment.
14          But if there needs to be more clarity
15  to the language in the bill, then absolutely I will
16  entertain an amendment to address that.
17          THE CHAIRMAN:  Thank you,
18  Representative Fields.
19          Representative Gardner.
20          REPRESENTATIVE GARDNER:  Yes.  Thank
21  you, Mr. Chair.
22          Well, maybe that's not the intent of
23  the bill -- and I appreciate the sponsor -- the
24  chairman, rather, jumping in and interpreting the
25  legislation for those of us who are not as educated
0060
1   about the English language as others, perhaps,
2   because we were born in Texas.
3           But, you know, it seems to me that if
4   there was an intent to exempt manufacturing, what I
5   would have done was to write something that very
6   clearly says manufacturing is exempt.  And I don't

7   see that here.  In fact, what I see is a great deal
8   of ambiguity about it.
9           If the sponsor -- and, Representative
10  Fields, this question is for you.  Are you
11  willing -- are you willing to draft in this bill a
12  specific exemption for manufacturing?
13          THE CHAIRMAN:  Representative Fields.
14          REPRESENTATIVE FIELDS:  You know, at
15  this point, I would need to get all the stakeholders
16  together to -- before I can make a declaration like
17  that.  If the bill drafter is here, I would like for
18  him to come forward, because he has drafted this
19  language.  We worked on this together, and there
20  seems to be a different interpretation on what's on
21  -- I think it's page 4, items 1 through 4, the top
22  of the bill.  I'd like to have the bill drafter
23  address this.
24          THE CHAIRMAN:  Mr. Sweetman, please
25  state your name, state what you do for a living, and
0061
1   see if you can shed some light on what you believe
2   the language of this bill is -- implies.
3           RICHARD SWEETMAN:  Thank you,
4   Mr. Chair.  My name is Richard Sweetman.  I'm with
5   Legislative Legal Services, and I'm the bill
6   drafter.
7           I'd direct you to the language on
8   page 4, lines 1 through 13.  That language is
9   intended to address the situation that you are
10  discussing.  I understand that there's
11  dissatisfaction with -- to the extent to which that
12  language accomplishes it, and I'd be happy to draft
13  an amendment to address it to your satisfaction.
14          THE CHAIRMAN:  So Mr. Sweetman -- and
15  I will come to you momentarily, Representative
16  Gardner.
17          Mr. Sweetman, your understanding of
18  the language on page 4 is that it is designed to
19  make clear that manufacturing of any capacity
20  magazine would continue to be legal in Colorado, not
21  illegal, but that it must -- the products must have
22  certain markings on them.  Is that what you're
23  saying?
24          RICHARD SWEETMAN:  Mr. Chair, not
25  exactly.  If I could quote the language.  The
0062
1   offense shall not apply to the transfer or
2   possession of a large-capacity magazine that is
3   manufactured for, imported, sold, or transferred to,
4   or possessed by any of the following.  And then
5   there are two classes set forth.  The first is
6   department, agency or political subdivision of the
7   state of Colorado, any other state for the United
8   States government.

9          And the second class is a law
10 enforcement officer employed by any department,
11 agency or political subdivision of the state of
12 Colorado, any other state, or the United States
13 government, including but not limited to a law
14 enforcement officer of a campus of an institution of
15 higher education for use while the officer is on
16 duty or off duty.
17          So the way it's drafted, it applies
18 the immunity to the magazine rather than to
19 particular parties.  And I think that may be the
20 source of the confusion.  The provision can
21 certainly be redrafted to apply to entities such as
22 the manufacturer or anyone else that you want to
23 include.
24          THE CHAIRMAN:  Representative Gardner.
25          REPRESENTATIVE GARDNER:  Yes.  Thank
0063
1 you.
2          Well, Mr. Sweetman, I appreciate that,
3 and I recognize that, more than likely, you drafted
4 exactly what you were asked to draft.  But I keep
5 looking for that rather specific -- given the
6 confusion that a citizen here with a company that's
7 engaged in this activity has, I keep looking for
8 this very specific exemption that says you can make
9 these things in Colorado.
10          I mean, I recognize that by
11 implication, when you talk about, well, if you make
12 them, then you've got to do these things.  But, you
13 know, we have a federal law that says if you sell
14 marijuana you've got to pay taxes on it.  But, oh,
15 by the way, it's also illegal to sell it.
16          So I guess I don't see that specific
17 exemption here.  Did I miss it?
18          THE CHAIRMAN:  Mr. Sweetman.
19          RICHARD SWEETMAN:  Thank you,
20 Mr. Chair.
21          No, sir, you did not.  I'd be happy to
22 draft an amendment for you, if you'd like.
23          REPRESENTATIVE GARDNER:  Thank you.
24 And my comment -- don't take it as a reflection on
25 your fine work, because I know from working with you
0064
1 you draft faithfully to my request, and I assume you
2 do so for other members, as well.  So thank you,
3 Mr. Sweetman.
4          THE CHAIRMAN:  Are there any --
5 Representative Court.
6          REPRESENTATIVE COURT:  Thank you,
7 Mr. Chair.
8          So along the lines of to whom you're
9 allowed to sell and whether or not you're allowed to
10 manufacture, you had said that you felt this would

11 dramatically curtail the work that you would be able
12 to do. So I wondered what portion of your business
13 is government business, whether it's for the state,
14 the federal government, police or whatever.
15         What is the percentage of the work you
16 do that is for public versus for just individual
17 purchase?
18         THE CHAIRMAN: Mr. Smith.
19         DOUG SMITH: That percentage varies
20 based on time period, based on, you know, whether
21 troops -- U.S. troops are deploying and budgets, et
22 cetera, discretionary spending by the U.S. military.
23         That percentage does range between 20
24 and 50 percent of our business, depending on that
25 period of the spending by the U.S. government or
0065
1 periods of contracts that we're fulfilling with
2 foreign allies.
3         THE CHAIRMAN: Representative Court.
4         REPRESENTATIVE COURT: Thank you.
5         So does that include all public, as in
6 the U.S. government, police, foreign governments, if
7 you manufacture for foreign governments? Is that
8 the total, between 20 and 50 percent, of all of
9 those?
10         THE CHAIRMAN: Mr. Smith.
11         DOUG SMITH: Those end-users you just
12 mentioned, the percentage of our total business
13 ranges between 20 and 50 percent.
14         REPRESENTATIVE COURT: Thank you.
15         THE CHAIRMAN: Representative
16 McLachlan.
17         REPRESENTATIVE McLACHLAN: Thank you,
18 Mr. Chairman.
19         Mr. Smith, thank you for coming here
20 today. I'm over here, sir. Mr. Smith, I'm over
21 here. How are you. Thank you for coming here today
22 and letting us know the impact that this proposed
23 legislation would have on you.
24         Is there a National Defense Act or
25 some type of federal act that we could link to this
0066
1 particular statute, which would allow us to define
2 allied nations with which you are authorized to sell
3 weapons to, so that they would also be encompassed
4 within this limitation?
5         THE CHAIRMAN: Mr. Smith.
6         DOUG SMITH: The export of many of our
7 products, including magazines, are controlled by the
8 U.S. State Department. So they determine who we can
9 export product to.
10         The end-user is determined by
11 compatibility of, you know -- with the weapon
12 systems in use. But as a general term, NATO allies

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

13   is a general body of end-users that our potential
14   customers allows.
15              THE CHAIRMAN:  Representative
16   McLachlan.
17              REPRESENTATIVE McLACHLAN:  Thank you,
18   Mr. Chairman.
19              So I just want to make sure I
20   understand this correctly, because I'm in favor of
21   making sure that you are able to sell your materials
22   to governments which are allied with the United
23   States and which are approved by the State
24   Department or the Defense Department.
25              So if there's a term or if there's a
0067
1    National Defense Act, or if we were to use, for
2    example, or approved by the United States
3    government, would that be -- would that be -- would
4    that enable you to sell your product to allied
5    nations?
6              THE CHAIRMAN:  Mr. Smith.
7              DOUG SMITH:  It would allow us to,
8    yes.
9              THE CHAIRMAN:  Thank you,
10   Representative McLachlan.
11              Representative Murray.
12              REPRESENTATIVE MURRAY:  Thank you,
13   Mr. Chair.  It's getting late.
14              Mr. Smith, do you -- I assume that you
15   also sell to gun manufacturers?
16              THE CHAIRMAN:  Mr. Smith.
17              DOUG SMITH:  We do.
18              THE CHAIRMAN:  Representative Murray.
19              REPRESENTATIVE MURRAY:  Thank you.
20              So this bill would not -- no longer
21   permit you to sell your product to gun
22   manufacturers, as it's currently written; is that
23   right?
24              THE CHAIRMAN:  Mr. Smith.
25              DOUG SMITH:  That is correct.
0068
1              THE CHAIRMAN:  Representative Murray.
2              REPRESENTATIVE MURRAY:  Thank you.
3              So we've identified another issue
4    here.
5              Also, I'd like to know about your
6    reaction to the requirement to have a separate
7    serial number and date on each magazine.  Having
8    done some other things with serial numbers, I know
9    that that is not necessarily a very easy thing to
10   do.
11              What is the impact of that on your
12   business?
13              THE CHAIRMAN:  Mr. Smith.
14              DOUG SMITH:  We've been putting dates

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

15  on our magazines since we started manufacturing them
16  in 2007.  The serial number provision would be an
17  undue burden on the business.
18         I'm confused as to the value of the
19  serial number.  But you are correct, it would be a
20  substantial manufacturing burden on the company in
21  the fulfillment of military owners, et cetera.
22         THE CHAIRMAN:  Representative Murray.
23         REPRESENTATIVE MURRAY:  Thank you,
24  Mr. Chair.
25         And I guess I would ask the sponsor,
0069
1  Representative Fields, what is the purpose of having
2  the serial number stamped on the magazines?
3         THE CHAIRMAN:  Representative Fields.
4         REPRESENTATIVE FIELDS:  Thank you,
5  Madam Chair -- I mean, Mr. Chair.  And thank you for
6  the question.
7         Basically, it's just a way to be able
8  to identify the magazine after the passing of the
9  bill, that we would know that this is part of a new
10  issue versus an old stock that someone has already
11  had in their possession.
12         THE CHAIRMAN:  Representative --
13  Mr. Sweetman -- was there somebody else?
14         REPRESENTATIVE MURRAY:  I thought
15  Mr. Smith had his hand up.
16         THE CHAIRMAN:  Oh, right.  Mr. Smith.
17         DOUG SMITH:  This is a question for
18  Ms. Fields.  Wouldn't the date accomplish the same
19  thing?  It would be indicative of (inaudible).
20         THE CHAIRMAN:  Representative Fields.
21         REPRESENTATIVE FIELDS:  Thank you,
22  Mr. Chair.
23         Absolutely, a date would do the same
24  thing.
25         THE CHAIRMAN:  Representative Gardner,
0070
1  then Representative Salazar.
2         REPRESENTATIVE GARDNER:  Yes.  Thank
3  you.
4         And Mr. Smith, Representative
5  McLachlan was asking you about countries you might
6  sell to and so forth.  And I don't know if this is
7  an aspect of your business you're familiar with, you
8  may well be, but it does sort of expose the danger
9  of us trying to legislate in national security
10  matters.
11         My understanding is, under the Arms
12  Export Control Act, you can't send any of these
13  high-capacity magazines to any other country without
14  a license from the United States Department of State
15  under the Arms Export Control Act.  So you'd never
16  be able to send them to a foreign government, unless

LEG HX 000036

3952

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

17  it was sort of on the approved list of foreign
18  governments.
19          Is that true, Mr. Smith?
20          THE CHAIRMAN:  Mr. Smith.
21          DOUG SMITH:  That's correct.
22          THE CHAIRMAN:  Representative Salazar.
23          REPRESENTATIVE SALAZAR:  Thank you,
24  Mr. Chair.
25          Mr. Smith, just really quickly, just
0071
1  give me a procedural explanation of after you're
2  done manufacturing your item, how do you send it?
3          THE CHAIRMAN:  Mr. Smith.
4          DOUG SMITH:  Our parts are
5  distributed, you know, by a variety of resellers
6  across the country, like the ones I mentioned in my
7  testimony, Cabela's, Bass Pro.
8          THE CHAIRMAN:  Representative Salazar.
9          REPRESENTATIVE SALAZAR:  No, I meant
10  like by U.S. mail, FedEx.  How do you send it out?
11          THE CHAIRMAN:  Mr. Smith.
12          DOUG SMITH:  Most of our products are
13  shipped via FedEx or UPS, FedEx Freight, other
14  western truckload shipments.
15          REPRESENTATIVE SALAZAR:  Thank you.
16          THE CHAIRMAN:  Mr. Smith, I have
17  really found this exchange -- and I want to thank
18  particularly Representative Gardner for raising
19  issues.  And I want to thank you for raising this
20  issue.  Because if -- and I haven't determined how
21  I'm going to vote on this bill, but if I vote for
22  this bill, I will only vote for this bill if there
23  is a reasonable prospect that the bill will
24  absolutely protect your manufacturing capacity here
25  in Colorado.
0072
1          And it is not my intention, if I
2  support this bill, to encourage its passage if it's
3  going to impact on manufacturing here in Colorado
4  beyond the requirement of putting certain markings
5  on the magazines.
6          I understand -- and I really do thank
7  you both for having highlighted this.  I understand
8  Representative Gardner's and some of your concerns,
9  that it is not clear enough from this bill.  And if
10  I vote for this bill, it will be only on the
11  understanding that I will work to help get that
12  done.  And if the -- if the sponsor doesn't want to
13  do that, it will probably cost my support.  And I'm
14  quite happy to say that publically.
15          But having said that, Mr. Smith.
16          DOUG SMITH:  Thank you.  Appreciate
17  the dialogue with the committee here on the
18  manufacturing.  However, I did want to make the

LEG HX 000037

3953

19  point that Magpul does oppose the bill on principle.
20  We believe that the bill will unduly restrict access
21  to these magazines to law-abiding citizens in the
22  state of Colorado.
23        As mentioned in my testimony, in
24  accordance with the Colorado Sheriffs Association's
25  policy paper, these firearms, these magazines are
0073
1   commonly used in self-defense situations, and not
2   having access to standard-capacity magazines by
3   civilians in Colorado is a problem for us --
4         THE CHAIRMAN:  Understood --
5         DOUG SMITH:  -- and would ultimately
6   force us to change our --
7         THE CHAIRMAN:  Understood, Mr. Smith.
8   And thank you for taking the time to convey your
9   views and your company's views on this legislation.
10        Representative McLachlan.
11        REPRESENTATIVE McLACHLAN:  Again,
12  thank you, Mr. Chairman.
13        Mr. Smith, I have another question
14  regarding the capacity magazines, which is the issue
15  we're dealing with here today in this committee.
16  What types and what amount of rounds or what
17  capacity magazines do you currently manufacture?
18        THE CHAIRMAN:  Mr. Smith.
19        DOUG SMITH:  The majority of magazines
20  we produce are standard-capacity magazines, 30-round
21  magazines manufactured for the civilian, AR-15
22  platform of rifles, and the military M16 (inaudible)
23  4.
24        REPRESENTATIVE McLACHLAN:  What other
25  magazines do you -- do you manufacture, for example,
0074
1   low-capacity magazines?
2         THE CHAIRMAN:  Mr. Smith.
3         DOUG SMITH:  We currently have a
4   10-round product in development, but it's not
5   available for sale yet.
6         REPRESENTATIVE McLACHLAN:  Excuse me.
7   Thank you, Mr. Chairman.  I'm sorry.
8         THE CHAIRMAN:  You're welcome, sir.
9         REPRESENTATIVE McLACHLAN:  Do your
10  manufacture -- currently manufacture any
11  15-round-capacity magazines?
12        THE CHAIRMAN:  Mr. Smith.
13        DOUG SMITH:  No, sir.  I'm not aware
14  of any rifle magazines that are 15 rounds that are
15  manufactured for the same rifle that we manufacture.
16        THE CHAIRMAN:  Representative
17  McLachlan.
18        REPRESENTATIVE McLACHLAN:  You may
19  have heard the testimony earlier of Mr. Chipman, the
20  former ATF agent.  He indicated that their weapons

21  had a 15-round capacity.  Is that a different type
22  of weapon than you deal with?
23          THE CHAIRMAN:  Mr. Smith.
24          DOUG SMITH:  I'm assuming he was
25  referring to their handgun.
0075
1          REPRESENTATIVE McLACHLAN:  Thank you,
2  Mr. Smith.
3          THE CHAIRMAN:  Representative Salazar.
4          REPRESENTATIVE SALAZAR:  Thank you,
5  Mr. Chair.
6          Mr. Smith, based off of the way that
7  the law is currently written, and given the fact
8  that there may be an amendment to help protect your
9  business and make sure that your business stays here
10  in the state of Colorado, I just want to be -- I
11  just want to make sure about something.
12          Under the current language, if you
13  make more than -- if you make a clip that is more
14  than 10 rounds, it would be considered a
15  large-capacity magazine; is that right?
16          THE CHAIRMAN:  Mr. Smith.
17          DOUG SMITH:  I believe that is
18  correct.
19          THE CHAIRMAN:  Representative Salazar.
20          REPRESENTATIVE SALAZAR:  Thank you
21  very much, Mr. Chair.
22          So then that being the case, anything
23  that you manufacture above the 10, you would be --
24  you understand that you would be protected in being
25  able to make and to transfer, to possess, by this
0076
1  law, if it's amended?
2          THE CHAIRMAN:  Mr. Smith.
3          DOUG SMITH:  I understand, you know,
4  the discussion around the manufacturing and those
5  amendments, but again, I have to restate our
6  opposition to the bill as drafted, based on our
7  belief that citizens of Colorado should have access
8  to the standard-capacity magazines.
9          THE CHAIRMAN:  Representative Salazar.
10          REPRESENTATIVE SALAZAR:
11  Standard-capacity magazines being how many rounds?
12          THE CHAIRMAN:  Mr. Smith.
13          DOUG SMITH:  Thirty rounds.
14          THE CHAIRMAN:  Representative Salazar,
15  thank you.
16          Mr. Smith, you have done us a great
17  service.  Thank you for taking the time to tell us
18  more about what you're doing in Colorado, and thank
19  you for employing so many people in our state and
20  helping the state lead in yet another area of
21  manufacturing.  That's really important to us here
22  in this State of Colorado General Assembly.

23     So thank you, sir.

24     DOUG SMITH:  Thank you, Chairman.

25     THE CHAIRMAN:  Our next witness is --

0077

1  oh, Mr. Sweetman, I'm going to release you, sir,

2  from -- you will have about two hours on parole.  I

3  hope it goes well for you, sir.

4     Mr. Charles Robles.  Are you

5  Mr. Robles?  Great.  Please come forward, state your

6  name, tell us who you represent, and proceed with

7  your testimony.

8     CHARLES ROBLES:  Mr. Chairman, my name

9  is Charles Robles.  I'm a citizen of Colorado,

10  Colorado Springs, Colorado.  I represent myself and

11  countless untold people that have defended

12  themselves with high-capacity magazines.

13     THE CHAIRMAN:  Please proceed.

14     CHARLES ROBLES:  I've heard a bunch of

15  testimony here so far today stating that there's no

16  use for high-capacity magazines, other than these

17  heinous acts that have been committed over the last

18  couple of years.  And I'm here to tell you that's

19  just not true.

20     I would not be here speaking to you, I

21  would not be here giving you testimony had there not

22  been a high-capacity magazine that I was able to

23  use.

24     2002, Memorial Day weekend, I was a

25  small business owner.  I was at my business.  Three

0078

1  men came in under the ruse of conducting normal

2  business.  Now, these three men waited until close

3  of business, while one of them snuck around behind

4  me and opened fire, without any type of letting me

5  be aware of anything.  I had no -- I had no passive

6  compliance given to me.  There was no, give me your

7  money.  There was no anything.

8     Chairman, I was not shot once, I was

9  not shot twice, three times, four times, but I was

10  shot five times.  And I was not attacked by one man

11  or two, but I was attacked by three men.

12     The only thing that saved my life

13  there on that Memorial Day weekend was the fact that

14  I also had a handgun with a high-capacity magazine

15  in it.  I was able to engage these men and I was

16  able to save my life.

17     Not only was I able to save my life,

18  but I was able to stop these -- these criminals in

19  their violent acts.  These criminals had become more

20  violent over the course of several months, and we

21  were one of multiple businesses that were hit, each

22  time becoming more violent.

23     They obviously had no intent for the

24  law for a high-capacity ban or anything like that

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

25   when they had murder on their mind.  They were there

0079
1   for one reason.  They were there to murder me.
2           The only reason why I'm here to give
3   you this testimony, and the only reason I'm able to
4   is because of a high-capacity magazine that I had.
5   I fired 13 rounds in defense of my life in a
6   magazine and a pistol that had 16 rounds.
7           Had I not had that opportunity, had
8   the State taken the opportunity away from me to
9   defend myself with that pistol, had there been a law
10   saying that I was not able to do that, I would not
11   be here with you now, I would be gone.
12           THE CHAIRMAN:  Thank you, Mr. Robles.
13   That's extraordinary and compelling.
14           Are there any questions for
15   Mr. Robles?
16           CHARLES ROBLES:  Could I just say one
17   quick -- very quick thing.
18           THE CHAIRMAN:  Please.
19           CHARLES ROBLES:  The Honorable
20   Representative Court -- and with all due respect --
21   in her defense of the last bill, she had said that
22   she knew that it would not stop the violence, but
23   that if it had saved one person, one person, that it
24   was worth it all.  Well, here I am.  Here I am in
25   living proof that high --

0080
1           (Applause.)
2           THE CHAIRMAN:  I am absolutely
3   serious.  This is not theater.  We don't applaud.
4   We don't boo.  This is a judiciary committee
5   hearing.  We are trying to find good public policy.
6   We are not assisted if members of the public treat
7   this like a political rally or a cheap spectacle.
8           CHARLES ROBLES:  Mr. Chairman, that
9   was not my intent.  I apologize.
10           THE CHAIRMAN:  No.  No.  No.  I'm not
11   talking to you.  I'm just talking to people who are
12   applauding here.
13           Excuse me.  So I would just ask you to
14   desist, members of the audience.
15           Mr. Robles.
16           CHARLES ROBLES:  I just beg this
17   committee, I pray to this committee that they do not
18   pass a law that takes away the rights of citizens to
19   defend themselves against people intent upon murder,
20   citizens that have done nothing but have worked hard
21   their whole lives and contributed to the community.
22           I beg of you that you hold the same
23   standard that Representative Court held on the
24   first.
25           THE CHAIRMAN:  Thank you, Mr. Robles.

0081

LEG HX 000041

3957

1     Are there any questions for
2   Mr. Robles?
3         Representative Lawrence.
4         REPRESENTATIVE LAWRENCE:  Thank you,
5   Mr. Chairman.
6         And thank you so much for being here.
7   That's an extremely compelling story.  My question
8   is, during the attack, did you have a chance to call
9   911?  How long did it take for help to arrive?
10        THE CHAIRMAN:  Mr. Robles.
11        CHARLES ROBLES:  You know, the initial
12  action of the event probably took course -- it
13  seemed like a long time, but it was probably less
14  than 30 seconds.  After -- after everything had
15  quieted down and I was able -- at that point, my
16  body lay in a pool of blood, my legs underneath me
17  not able to work.  I had to crawl across the shop
18  with my arms to get to a cell phone or a telephone.
19  I called -- I think it took them about two or three
20  minutes to arrive on scene.
21        Unfortunately, I had made the mistake
22  of saying that I thought one was still in the
23  building, so they would not enter.  They wouldn't
24  enter.  They had to wait until SWAT got there.  So I
25  laid there bleeding and bleeding and bleeding until
0082
1   they were able to get in.
2         So the whole event took quite a bit
3   longer than -- you know, than what it would have.
4   If it were not for a brave police officer who broke
5   rules, came inside and dragged me out, I, you know,
6   there again, might not be here giving testimony
7   again.
8         So my heartfelt goes out to those in
9   uniform that also serve us.  But they can't always
10  be there.  They can't be there.  And nobody ever
11  says it's just going to be one guy and he's not
12  going to know how to use it.  I was attacked by
13  three men, and they certainly knew how to use them.
14  I was shot five times.
15        THE CHAIRMAN:  Mr. Robles, we want to
16  thank you.  You've been through an ordeal that I
17  can't imagine how it must feel.  And for you to have
18  to come back here and retell it and recount it is
19  not easy, I know that.  Something you would rather
20  not think about.  But you've done it, and you've
21  done it for public-spirited reasons, because you
22  don't want other people to experience the same thing
23  that you have experienced.
24        And in that, I have to tell you we all
25  owe you our thanks.  So thank you very much for your
0083
1   testimony, Mr. Robles, we appreciate it.
2         CHARLES ROBLES:  Thank you, Chairman

3   Kagan.  Thank you.
4          THE CHAIRMAN:  Thank you.
5          Our next witness is Andrew McKinnis.
6   Is Andrew McKinnis here?
7          All right.  Signed up after
8   Mr. McKinnis was a Steve Suppenis (phonetic).  And
9   after Mr. Suppenis was Bishop Acen Phillips.  After
10  Bishop Acen Phillips, we have Mr. Tim Greg.  After
11  Mr. Greg signed up, Leon Green or Leo Green.
12         We'll give Mr. Green a few minutes.
13  He's apparently downstairs taking care of his kids,
14  I understand.  But Mr. Green, if you can hear us,
15  please come up and testify.
16         But in the meantime, I would ask
17  Mr. Kevin Sinclair to come forward, if you are here.
18  Kevin Sinclair.  Erickson Morris.  Erickson Morris.
19  Paul Myersik.  Wayne Benedict.  Mr. Benedict.
20  Gordon Garland.
21         Mr. Garland, welcome to the House
22  Judiciary Committee.  Please come forward and tell
23  us your name, sir, for the record, who you
24  represent, and then please proceed with your
25  testimony.
0084
1          GORDON GARLAND:  Thank you, Mr. Chair.
2   My name is Gordon Garland.  I'm a Colorado native.
3   I was born locally in Holyoke.  I grew up on the
4   Great Plains.  I've been here in Denver for 25
5   years.  I've been in the real estate brokerage and
6   investment business.  And I live in Representative
7   Court's district.  So I'm one of these people that's
8   opposed to this bill.
9          Mr. Robles' testimony just a moment
10  ago, I think, helps us to understand that they're
11  looking for a boogeyman that's going to solve all
12  these problems.  It's just not possible.
13         These are the times we live in, and
14  unfortunately there are people that commit evil
15  acts.  And these people will commit these evil acts
16  irrespective of how much Band-Aids we try put in the
17  law.
18         I was particularly touched by
19  Mr. Gates' testimony a little bit earlier today, but
20  he said his son had fallen under the influence of
21  psychotropic drugs.  He ended up taking his own
22  life.  And I can relate to that because my wife, who
23  became a U.S. citizen after moving here from Canada,
24  we were married about 13 years ago.  And the first
25  real exposure that I had to her family was when I
0085
1   was called to Toronto to -- I didn't think -- I did
2   not think that I'd react that way.
3          Her nephew had taken his own life, as
4   well.  Same reasons.  He bought a gun off the

5  street, and about two months before all this
6  happened, at the family gathering -- they're all
7  Italian, they all talk very loud and very quickly --
8  they said (inaudible) pray for me, because I have
9  voices in my head.
10          It's not the magazine that kills
11 people.  It's not the gun that kills people.  It's
12 the person who pulls the trigger.  And they've made
13 a conscious decision to do that or at least some
14 sort of an informed decision in their mind.
15          THE CHAIRMAN:  Mr. Garland, I think
16 you've given us very compelling testimony.
17          GORDON GARLAND:  Thank you.
18          THE CHAIRMAN:  Again, I would like to
19 ask, are there any questions for Mr. Garland?
20          GORDON GARLAND:  Thank you, Mr. Chair.
21          THE CHAIRMAN:  So we really appreciate
22 it.  Thank you for doing what you've done.
23          Is Mr. Leon Green here yet?  In which
24 case, we will carry on through the list.  Zak Smith.
25          Mr. Smith, welcome, sir.  Thank you
0086
1  for coming to the hearing on House Bill 1224.  We
2  much appreciate it.  Please tell us your name for
3  the record and who you represent and then proceed
4  with your testimony, sir.
5          ZAK SMITH:  Thank you, Mr. Chairman.
6  My name is Zak Smith and I speak for myself, my
7  family, and my friends.
8          THE CHAIRMAN:  Thank you, please
9  proceed.
10          ZAK SMITH:  I live in Fort Collins.
11 I'm a small business owner.  Now, I am in the
12 firearms industry, involved in manufacturing
13 firearms, training and competitive shooting events.
14 I'm here to oppose 1224.
15          I moved to Colorado, started my
16 professional career as an engineer about 15 years
17 ago, and I was immediately impressed by the
18 friendliness of the people and their affinity for
19 freedom and personal responsibility.
20          Colorado has a strong heritage of
21 firearms use in sport hunting, competition, and
22 self-defense.
23          The U.S. Supreme Court has recently
24 ruled in Heller that individuals have a right to
25 possess and use firearms for self-defense,
0087
1  especially those firearms in common use and most
2  suited for self-defense.
3          The guns used by police and citizens
4  for self-defense typically have standard capacities
5  of 15, up to 30 rounds.  Magazine limits would
6  impair the right to self-defense.  Such a limit

7  would also curtail lawful use of firearms that are
8  already in common use, used ubiquitously for
9  self-defense, target shooting, and for other
10  purposes.
11          This would seem to be in direct
12  contraindication to the recent U.S. Supreme Court
13  rulings.  Limitations of these basic rights cannot
14  be made simply to make a symbolic point or because
15  there is a feeling that, quote, something must be
16  done.  Any measure to curtail such rights must
17  undergo the strictest scrutiny and examination.
18          A ban on magazines will do nothing to
19  aid public safety.  However, it will significantly
20  curtail the ability of Colorado citizens to defend
21  themselves.
22          Finally, the Front Range is home to a
23  flourishing ecosystem of firearms-related small
24  businesses, ranging from manufacturing to research
25  and development to self-defense training and
0088
1  competitive shooting events.  My own business is
2  involved in several of these areas.
3          Laws such as the proposed House Bill
4  1224 will create an unfriendly or even untenable
5  environment for these businesses, and they are
6  likely to leave with their revenue, employees, and
7  families.  That would be a shame, because Colorado
8  is a great and beautiful state that I have been
9  proud to call home.
10          Thank you.
11          THE CHAIRMAN:  Thank you, indeed,
12  Mr. Smith.  Thank you.
13          Are there any questions for Mr. Smith?
14          Mr. Smith, we appreciate you taking
15  the trouble to testify.  Oh, there is a question.
16          Representative Lee, my apologies.
17          REPRESENTATIVE LEE:  Thank you,
18  Mr. Chairman.
19          Mr. Smith, could you describe in more
20  detail the nature of your business, firearms, and
21  what exactly does it entail?
22          THE CHAIRMAN:  Mr. Smith.
23          ZAK SMITH:  Sure.  Thank you.  So I'm
24  involved in writing about firearms, how they work,
25  how to shoot effectively.  I'm also involved in
0089
1  training.  A lot of people are interested in
2  self-defense training because we have a concealed
3  carry bill here in Colorado.  And the -- you know,
4  the choice firearm for concealed carry is usually a
5  midsized pistol that holds between, you know, 12 and
6  17 rounds.
7          And a lot of people are interested in
8  learning how to defend their homes with a rifle.

9    And the most common rifle used for self-defense at
10   the home or ranch is an AR-15, which has a standard
11   magazine capacity of 20 or 30 rounds.
12            REPRESENTTIVE LEE:  Thank you.
13            THE CHAIRMAN:  Representative
14   McLachlan.
15            REPRESENTATIVE McLACHLAN:  Yeah.
16   Thank you for coming here today, sir.
17            Thank you, Mr. Chairman.
18            Did I understand that there are a
19   magazine which have a 15-round capacity available on
20   the market today?
21            THE CHAIRMAN:  Mr. Smith.
22            ZAK SMITH:  Thank you.
23            I think the confusion on the whole
24   15-round issue comes from 15 is a pretty standard
25   number for handguns, but to my knowledge, the same
0090
1    as what the Magpul rep said, I don't believe there's
2    any rifle magazines that hold 15 rounds.
3            THE CHAIRMAN:  Representative --
4            REPRESENTATIVE McLACHLAN:  So it's
5    basically a choice between 10 and 20, is what
6    you're -- or 10, 20, and 30?
7            THE CHAIRMAN:  Mr. Smith.
8            ZAK SMITH:  With regard to rifle
9    magazines?
10            THE CHAIRMAN:  Representative
11   McLachlan.
12            REPRESENTATIVE McLACHLAN:  Yes, sir.
13            THE CHAIRMAN:  Mr. Smith.
14            ZAK SMITH:  Those are the most
15   common-sized rifle magazines.
16            REPRESENTATIVE McLACHLAN:  Thank you.
17            THE CHAIRMAN:  So, Mr. Smith, thank
18   you, sir.  And we appreciate your having come.
19            Mr. Leon Green.  Mr. Green, we're glad
20   you could tear yourself away from your children and
21   join us here in the House Judiciary Committee.
22   Please state your name for the record, tell us who
23   you represent, and then proceed with your testimony.
24            LEON GREEN:  Thank you, sir.  My name
25   is Leon Green and I represent my children, my two
0091
1    children in the back, along with my wife.
2            And I -- what concerns me the most is
3    having been a naval officer and been at the Persian
4    Gulf War, the first one, some 20 years or 15 years
5    ago, I think about how we have changed drastically.
6    But also the main concern is that we have not
7    addressed this national debate of psychotropic
8    drugs.
9            The majority of these people who have
10   gone on these binges of insanity have been attached

11 to Luvox, Zoloft. I can just go down the names of
12 the list of the drugs that are attached. And I
13 don't hear any of that in the media.
14          And if these people, both at Columbine
15 and Sandy Hook, are on these drugs, then there needs
16 to be some responsibility and accountability for
17 this. These people should not have this access and
18 I do not think that these people on these deals
19 should have these things. And it disappointments me
20 immensely that nobody's even addressing that issue.
21          Whether I -- and I've shot -- I've
22 taken 18 classes at Front Sight and other places.
23 And because of that, whether I have 10, I have a
24 20-round clip, a magazine, it doesn't matter. It's
25 a matter of how effective they are.
0092
1          So you can go through the
2 incrementalism like I heard at 2:30 this afternoon
3 saying, oh, we'll have 10 now, next year we'll do 8,
4 thereafter we'll do 5. And we'll just get to a
5 point where that one person says, oh, you only need
6 2 or 3, the hunter.
7          And Mr. Robles, who was just up here,
8 he was personally attacked. So -- when I joined the
9 military, my oath as an officer was to protect and
10 preserve and also to -- to protect against all
11 enemies foreign and domestic. And that doesn't
12 cancel, and it does not become null and void when I
13 get out. So regardless of what happens, I am still
14 going to protect my country.
15          Thank you.
16          THE CHAIRMAN: All right. Thank you,
17 Mr. Green.
18          Are there any questions for this
19 witness?
20          Seeing none, we want to tell you how
21 much we appreciate your taking the time to give us
22 your perspective on this bill. Thank you, sir.
23          Robert Parker. Welcome, sir. Thank
24 you for coming and helping us with our
25 deliberations, Mr. Parker. Please state your name,
0093
1 who you're representing, and proceed with your
2 testimony, sir.
3          ROBERT PARKER: Mr. Chairman,
4 distinguished members of the committee, and
5 Representative Fields, thank you for allowing me to
6 speak today.
7          I'm Robert Parker. My wife and I,
8 Karen Parker, own Parker Arms and Gunsmithing in
9 Wheat Ridge, Colorado.
10          I'm concerned that this bill is going
11 to make potential criminals out of my lawful
12 customers who have purchased firearms, over the last

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

13  11 years that I've been in business, that came with
14  high-capacity magazines or they purchased them
15  separately.
16          Most magazine manufacturers do not
17  date their magazines.  So at what point do lawful
18  citizens owning magazines that were made before a
19  ban like this get pulled over by a police officer or
20  stopped at a range, and how do I prove that that
21  magazine was made prior to that bill?  Do I have to
22  have the receipt in my pocket?
23          I am concerned that there will be a
24  lot of people unjustly arrested and detained and
25  require the services of attorneys to prove that they
0094
1  were lawful owners of that magazine before the ban
2  went into effect.
3          I'm also concerned that -- we heard
4  testimony from the chief of police from Golden,
5  Colorado stating that he had a magazine that
6  contained 13 rounds and that he is a highly trained
7  officer.  Would that not make sense that someone who
8  does not have the training that he has deserve at
9  least as much ammunition to defend themselves as
10  that police officer does in a situation where their
11  life is in danger?
12          Excuse me for being a little nervous,
13  but this is my first time.  Thank you for your time.
14          THE CHAIRMAN:  You -- I didn't know
15  you were nervous.  But you were so cool, calm, and
16  collected, it doesn't come across.  I would never
17  have known if you hadn't said it.  Thank you for
18  your testimony.
19          Are there any questions for
20  Mr. Parker?
21          Representative Lee.
22          REPRESENTATIVE LEE:  Thank you,
23  Mr. Chair.
24          Mr. Parker, I'm looking at the bill,
25  and just to clarify the actual terms of the bill,
0095
1  what it says is that a person who possesses a
2  magazine after July 1, 2013, it's a violation.  But
3  there are -- the requirement is on the authorities
4  to establish that -- the prosecution has the burden
5  of proof.  If you say I had it before July 1, they
6  have to prove the contrary.
7          So the burden of proof is not on you,
8  sir.  The burden of proof is on the prosecution.
9  And I think the bill requires that all magazines
10  manufactured thereafter have to be stamped with a
11  date.  So if it doesn't have a date, presumptively,
12  it was produced before July 1, 2013, and the burden
13  would be on the prosecution to prove otherwise.
14          I don't know if that alleviates your

15  concerns, but that's my understanding of it.
16       THE CHAIRMAN:  Mr. Parker.
17       ROBERT PARKER:  My concern is that how
18  long will I be detained to prove that I had that
19  magazine.  I can still be detained.  And the bill
20  only addresses dates on magazines, on magazines
21  manufactured in the state of Colorado.
22       As far as I know, Magpul is our only
23  major manufacturer.  There are hundreds of gun
24  manufacturers across the country, and even more
25  magazine manufacturers, both foreign and domestic,
0096
1  that produce magazines that do not put dates on
2  them.  So how am I -- am I going to be detained
3  until I can show that that magazine that does not
4  carry a date, manufactured by a non-Colorado
5  magazine manufacturer.  And that's my concern.
6       THE CHAIRMAN:  Representative Gardner.
7       REPRESENTATIVE GARDNER:  Yes, thank
8  you.
9       And thank you for being here, and I
10  appreciate your testimony.  I know from our prior
11  discussions you're familiar with the community of
12  those that own firearms, recreationist, hunters, so
13  on and so forth.  If this bill passes, do you think
14  there's going to be a run on the purchase of
15  high-capacity magazines before the effective date of
16  the bill?
17       THE CHAIRMAN:  Mr. Parker.
18       ROBERT PARKER:  Thank you for that
19  question, Representative Gardner.  It's nice to see
20  you again.  There has already been a run on 30-round
21  magazines, just as the talk of this bill has come
22  out.  We have sold out.  Our vendors' warehouses are
23  empty.
24       One of my vendors told me that in a
25  15-minute period, on the Monday after Sandy Hook,
0097
1  they sold over 100,000 Magpul magazines in 15
2  minutes after opening.
3       THE CHAIRMAN:  Representative Gardner.
4       REPRESENTATIVE GARDNER:  Thank you,
5  Mr. Vice Chair.
6       Let me ask you about something also.
7  If you don't feel qualified to answer, it's quite
8  all right.  But I've sort of wondered, since I don't
9  think these things are prohibited for sale or
10  possession in New Mexico, Utah, Wyoming, Kansas, or
11  Texas, whether someone who wants to obtain one of
12  these can simply go to Albuquerque or to Topeka or
13  Salt Lake City, or easier than that, Cheyenne, buy
14  it and just bring it back.
15       Do you foresee that sort of thing
16  happening, and just circumventing the law by, if you

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

17  really want one, drive to Cheyenne and get it and
18  bring it back?
19          THE CHAIRMAN:  Mr. Smith.
20          ROBERT PARKER:  It's Mr. Parker.
21          THE CHAIRMAN:  Parker.  Sorry.
22          ROBERT PARKER:  Thank you, sir.  Yes,
23  it would be very simple to drive just out of state,
24  Sidney, Nebraska.  You could go to Cabela's.  They
25  carry Magpul products, as well as Springfield, Colt
0098
1  and everybody else that makes high-capacity
2  magazines for both handguns and long guns.
3          It would be very simple.  There's no
4  background check required to purchase it,
5  high-capacity magazine in those states.  There's not
6  even an ID required.  So it would be very simple to
7  just drive across the border and purchase magazines
8  in the adjacent state.
9          THE CHAIRMAN:  Representative Gardner.
10          REPRESENTATIVE GARDNER:  And I wish to
11  make clear, neither you nor I would advocate
12  circumventing or violating the law.  But my
13  observation and yours is simply that circumventing
14  or violating the law would be incredibly easy in a
15  state the size of ours, with as many outlets right
16  at the borders that there are.
17          In fact, one begins to wonder if we
18  wouldn't really have a big commerce in those who are
19  traveling out of state to buy high-capacity
20  magazines and those that are traveling in-state to
21  buy marijuana and -- I don't know.  That's all
22  right, sir.
23          THE CHAIRMAN:  Did you want to
24  respond, Mr. Parker?
25          ROBERT PARKER:  Yes, please.
0099
1          Like you said, neither one of us would
2  want to circumvent this law.  The reason I am able
3  to possess a federal firearm's license is because I
4  have been a law-abiding citizen my whole life, and I
5  would not promote or condone circumventing the law,
6  if it were to go into effect.
7          But I don't think that this law is
8  going to have the intended effect.  And I think the
9  unintended consequences would far outweigh any
10  benefit that the law would have.
11          Thank you.
12          THE CHAIRMAN:  Thank you for your
13  testimony, sir.
14          ROBERT PARKER:  Thank you.
15          THE CHAIRMAN:  Appreciate it.
16          I'd like to call Justin Smith.  Is
17  Justin and the contingent of law enforcement
18  officials available?

19      Welcome, gentlemen.  Could you
20  identify yourselves for the record.
21          JUSTIN SMITH:  Yes, Mr. Vice Chair.
22  I'm Justin Smith.  I'm the sheriff of Larimer
23  County, Colorado.  I'm here representing the
24  citizens of my county.  I'm also a board member of
25  the County Sheriffs of Colorado.  So also
0100
1  representing the Sheriffs of Colorado.
2          THE CHAIRMAN:  Thank you, sir.
3          GARRETT WIGGINS:  My name is Garrett
4  Wiggins.  I'm the Rout County sheriff.  I'm also a
5  board member for County Sheriffs of Colorado.
6          BRUCE HARTMAN:  And I'm Bruce Hartman
7  from Gilpin County, board member for County
8  Sheriffs, and representing the people that have put
9  me into office for over 20 years.
10          THE CHAIRMAN:  We're honored to have
11  you all here today.  Thanks very much.
12          BRUCE HARTMAN:  Thank you, sir.
13          THE CHAIRMAN:  Mr. Smith.
14          JUSTIN SMITH:  Yes, Mr. Vice Chair, I
15  would hope we'd have the opportunity for two minutes
16  each during this exchange.
17          THE CHAIRMAN:  Certainly.
18          JUSTIN SMITH:  Thank you.  What I want
19  to explain as a sheriff is a lot of what's going on
20  here today is based on emotion.  And it's
21  understandable.  We're shocked and saddened and
22  appalled by the acts of violence that have occurred
23  in the country in recent years.
24          As a sheriff, I don't have the luxury
25  of working on emotion.  I have to work based on
0101
1  logic.  Officers in the field have to remain
2  logical.
3          The concerns I've got, this bill, is
4  one that's based mostly on emotion.  It's based on
5  this notion that it's the magazines that are the
6  concern and that there's an arbitrary number of 10
7  that's a magic number, good or bad.
8          This bill, to me, is a swiss cheese
9  bill.  It's full of so many holes that -- and a lot
10  of them have already been identified.  And I would
11  say that Representative Gardner brought up what I
12  would call the Cheyenne shuffle.  You're going to
13  see residents from Colorado constantly running up to
14  Cheyenne to make their purchases.  These are
15  law-abiding people who may simply want to be in
16  self-defense.
17          Mr. Robles identified the issues and
18  concerns that he had on being able to defend
19  himself.  I can tell you, when I started in this
20  business 25 years ago, we were issued six-round

21  revolvers and 870 (phonetic) shotguns.  We moved up
22  in technology to semi-automatic handguns and
23  carbines with all patrol cars, means basically the
24  AR-15.  They were referred to earlier.
25          You were deceived when you were told
0102
1  these were all weapons of mass killings.  They're in
2  the hands of police officers, not because we use
3  them as weapons of mass killing, because that's what
4  it can take for an officer, for a deputy on the
5  beat, an hour and a half from backup, to defend
6  himself or herself and get home alive.
7          And I would offer to you in my last
8  seconds, yes, I'm a sheriff.  Yes, I'm a peace
9  officer.  I am no different than any of these
10  citizens sitting out here.  I have no inherent more
11  right to defend myself than these citizens.  And to
12  strip these tools away from citizens and say that a
13  police officer has more rights than citizens to
14  defend themselves, it's wrong.
15          I can tell you as a sheriff it's
16  wrong.  Respect the rights.  Let's look at these
17  issues.  Let's don't be emotional and jump on
18  something that is going to take someone like
19  Mr. Robles, or maybe one of your daughters, your
20  wives, your mothers, and strip away their right to
21  defend themselves against the violent criminals.
22          I would plead with you to vote against
23  this bill.  It may have good intention, but it's bad
24  policy.
25          THE CHAIRMAN:  Thank you, Sheriff
0103
1  Smith.
2          Are there any question for the
3  sheriff?
4          Representative Wright.
5          REPRESENTATIVE WRIGHT:  Thank you,
6  Mr. Vice Chair.
7          Sheriff Smith, I really appreciate
8  your testimony, and it's very potent coming from a
9  man in your position.
10          I would ask you this, and you touched
11  on it briefly, but do you feel that your community,
12  which you've been charged of being watchful and
13  keeping safe, is safer with the passage of this
14  bill?  If this bill were to pass, would your
15  community be safer in any way?
16          JUSTIN SMITH:  I do not.  Essentially,
17  the perpetrators out there, if they actually
18  comply -- let's just pretend for a second they're
19  going to comply with this bill when they're killing
20  people.  They're going to carry a boxful of 10-round
21  magazines.
22          And I know there was testimony earlier

3968

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

23  that somehow it's difficult for someone to learn to
24  drop a magazine and reload.  I've spent hundreds of
25  hours on the range.  I could teach anyone in here
0104
1  within five minutes to be able to do that same
2  thing.  They're going to be able to do it.
3           Who's going to be disadvantaged are
4  going to be our daughters, our mothers, our wives.
5  When that person comes up with a sackful or a
6  pocketful of magazines bent on killing, and that
7  individual -- like concealed handgun permit holders,
8  they don't carry these extra magazines that I carry,
9  that Chief Kilpatrick carries, each of his carrying
10  at least 15 rounds.  He doesn't carry them because
11  he's looking to cause mass murder, because that's
12  what it may take for him to defend his own life.
13           And I can tell you that when we strip
14  that away from citizens, and they have one magazine
15  at seven rounds, there's a darn good chance, in a
16  firefight defending their life, that may not be
17  enough.
18           I plead with you to consider that.  It
19  will not make them safer.
20           THE CHAIRMAN:  Representative Wright.
21           REPRESENTATIVE WRIGHT:  Thank you,
22  Mr. Vice Chair.
23           And Sheriff Smith, I would ask also
24  you, as the highest elected lawman in your area of
25  the state, do you believe that this bill, if it were
0105
1  passed, is constitutional under the Colorado
2  Constitution and the Second Amendment?
3           JUSTIN SMITH:  At this point, I'm
4  going to leave those issues to the scholars to
5  speculate on.  What I can tell you is when it comes
6  to safety, based on my quarter century of
7  experience, based on having buried friends to this
8  kind of violence, it won't help.
9           THE CHAIRMAN:  Thank you, Sheriff
10  Smith.
11           Representative Salazar.
12           REPRESENTATIVE SALAZAR:  Thank you,
13  Vice Chair.
14           Thanks, Sheriffs, for being here.  I
15  just want to be clear.  I'm not giving any value
16  judgment at all, but just based off of your
17  statements.  So, you know, we're all following
18  what's happening in California with Dorner and -- a
19  highly trained individual, both military and also
20  law enforcement.  And you said that civilians should
21  have the same rights to the same amount of rounds as
22  sheriff's officers -- sheriff's deputies and
23  officers.
24           So then if you have access to a

25   100-round drum that you could use in defense of the
0106
1   public, how would you feel if the perpetrator had a
2   100-round drum and is shooting at you?
3          Do you still feel that that person
4   should have that same right to shoot back as many
5   rounds at you as you are them?
6          THE CHAIRMAN:  Sheriff Wiggins --
7   Smith.
8          JUSTIN SMITH:  Representative, that
9   actually brings up -- and I appreciate you brought
10   it up. I'm going to tell you something rather stark
11   right now.  Those 100-round magazines that you hear
12   about, they're junk.  They're junk magazines.
13   And ask -- go out to a range, and the people that
14   know these, and what you heard every time is, these
15   magazines jammed.  Yes, they do.
16          If those were great magazines, do you
17   not believe that law enforcement and military would
18   have adopted them in a heartbeat.  We haven't
19   because they're junk.
20          What I can tell you is I will take a
21   law-abiding citizen with a 100-round magazine any
22   day and meet with them over a criminal with a rock.
23   That's an assault weapon, if they come after me.
24          THE CHAIRMAN:  Representative Salazar.
25          REPRESENTATIVE SALAZAR:  Okay.  And I
0107
1   appreciate that they're junk.  Okay.  What's the
2   largest -- what's the largest magazine clip that you
3   have?
4          THE CHAIRMAN:  Sheriff Smith.
5          JUSTIN SMITH:  We use 30-round
6   magazines in our patrol carbines.  And usually 15 to
7   20 rounds in a handgun, depending on what the deputy
8   will carry.
9          THE CHAIRMAN:  Representative Salazar.
10          REPRESENTATIVE SALAZAR:  Thank you,
11   Mr. Chair.
12          So then, I guess it still goes towards
13   the same question, that would you feel
14   comfortable -- and you keep saying law abiding, but
15   I'm bringing in a non-law-abiding citizen.  A
16   non-law- citizen -- do you think a non-law-abiding
17   citizen should shoot back that same number of
18   rounds, 30 rounds, at you, that you're shooting at
19   them?  Because you said that they should have the
20   same amount of rounds.
21          I'm just trying to get a flavor for
22   your statement.
23          THE CHAIRMAN:  Sheriff Smith.
24          JUSTIN SMITH:  I don't believe I'm in
25   a role to make that judgment on the individual and
0108

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

1  what they have.  If you're going to take it away
2  from one, then take it away from all.
3          I would offer, on that notion, that if
4  it saves one life, we need to take these actions.  I
5  heard that several times today.  If it saves one
6  life, we've got to do something.
7          If you believe this is true, if you
8  believe this is necessary, I would challenge you --
9  and this may run a bit odd.  I would challenge you
10  to not only ban new ones, take them all.  If you
11  believe they're that dangerous, be bold.  Be bold in
12  your gun ban and your magazine ban and actually do
13  it.
14          THE CHAIRMAN:  Representative Salazar.
15          REPRESENTATIVE SALAZAR:  Thank you,
16  Mr. Chair.
17          Okay.  So I appreciate your comment.
18  I'm not one who wants to ban weapons.  I have
19  weapons.  Why do I want to ban them?  I would have
20  to give up my guns at home, both my self-defense
21  weapons, as well as my hunting rifles and shotguns.
22          And -- but I'm -- because of this
23  balancing act that we have to do here on the
24  judiciary, where we have to balance not only public
25  safety but with the rights of the citizens.  When I
0109
1  hear a sheriff saying that a citizen should be just
2  as armed as a police officer, but not all citizens
3  are law abiding, I'm just -- I'm trying to ferret
4  out from you, is that okay with you, for a
5  non-law-abiding citizen to be able to fire the same
6  amount of rounds at you that you're firing at them?
7          THE CHAIRMAN:  Sheriff Smith.
8          JUSTIN SMITH:  Representative Salazar,
9  I appreciate that.  It actually gets to a point -- I
10  did not have the opportunity, because I didn't get
11  to speak earlier -- there's terrible loopholes in
12  the current bills out there for those who are not
13  supposed to have the guns.
14          I heard the testimony of Director
15  Sloan.  What you may be surprised to learn is I have
16  no access to a magical database that tells me who
17  can and can't have the weapons.  I would ask, if
18  you're going to do something for the citizens and do
19  something for the deputies, help create a database
20  that's easily accessible that identifies those who
21  are prohibited from having the weapons.  A deputy in
22  the field does not have access.  It will take him
23  days to determine that.  And that's one of the
24  challenges of the bill that was passed out of here
25  earlier, it doesn't address that.
0110
1          Director Sloan went through a whole
2  list of things that his staff has to do in an office

LEG HX 000055     3971

3    in order to determine that. I would certainly ask,
4    and I would be glad to work with this -- with anyone
5    in this legislature to handle those things. Give us
6    to tools to remove these firearms from dangerous
7    people, whether they're convicted felons or they
8    have mental health conditions. I'd be glad to work
9    with you. I'd plead for that opportunity. I'd work
10   with you.
11          THE CHAIRMAN: Thank you, sir.
12          Representative Buckner.
13          REPRESENTATIVE BUCKNER: Thank you,
14   Mr. Speaker -- just gave you promotion again, didn't
15   I -- Chairman.
16          I appreciate you being here, Chief.
17   And I don't have a law enforcement background, so
18   I'm interested in the information that you can
19   provide me.
20          Tell me why police chiefs and sheriffs
21   are taking such different positions with regard to
22   both of these bills.
23          THE CHAIRMAN: Sheriff Smith.
24          JUSTIN SMITH: I learned a long time
25   ago to be careful about speculating. So for me to
0111
1    speculate about the chiefs, I would let them address
2    why they came to the conclusions they did. What I
3    can tell you is they're appointed by city officials,
4    and I don't know of many police chiefs who
5    publically disagree with their bosses and still have
6    jobs. That's one thing to consider.
7          If a police chief has a public opinion
8    on an issue and spouts it and it's contrary, they're
9    called unemployed.
10          I can tell you with sheriffs. I spent
11   over 20 years as a peace officer working my way
12   through the ranks of the sheriff's office serving
13   the citizens of my county before I sought the
14   opportunity to go out for election. And when I had
15   to answer to 300,000 residents, it gave me a good
16   feel.
17          And I can tell you one of the
18   challenges I've gotten -- this is a good point -- is
19   a lot of my residents may be an hour and a half from
20   the closest deputy going as fast as they can safely
21   to get to them. And we have people up in our
22   mountains that way, as do the other sheriffs here
23   with me. Hour and a half -- we consider ourselves
24   the calvary -- before we get there. And I can tell
25   you it does give me a different perspective.
0112
1          The people who live in my areas very
2    much are people who will take care of themselves.
3    They aren't necessarily looking for a deputy around
4    the corner. They understand it may be hours.

5       And that may give a little difference.
6   Because a police chief may feel confident that they
7   can have an officer there on a 911 call in five
8   minutes or less.  I can easily be an hour and a
9   half.
10          And I just, in good conscious, can't
11  strip my citizens of that ability to defend
12  themselves until we can show up and help them.
13          That is probably my best speculation.
14          THE CHAIRMAN:  Representative Buckner.
15          REPRESENTATIVE BUCKNER:  Thank you.
16          Have you had any conversations at
17  those gatherings where police chiefs and sheriffs
18  are at the same place at the same time, so it's not
19  all speculation?  Surely you've had those
20  conversations at some point in your life.
21          THE CHAIRMAN:  Representative
22  McLachlan.
23          REPRESENTATIVE McLACHLAN:  I thank
24  you.  Representative Buckner asked my question.
25  Thank you.
0113
1           THE CHAIRMAN:  Thank you.
2           Any further questions from the
3   committee for these three public servants?
4           UNKNOWN SPEAKER:  (Inaudible.)
5           THE CHAIRMAN:  Sheriff Hartman.
6           BRUCE HARTMAN:  Yes, sir.
7           THE CHAIRMAN:  Please proceed and give
8   us your testimony.
9           BRUCE HARTMAN:  One of the biggest
10  issues that I have with this bill is the deputy on
11  the street.  We've heard the scenarios of going to
12  Cheyenne to pick up a bunch of what could be banned
13  magazines in this state.  How can he make that
14  determination?
15          Is the State going to prohibit the
16  import of magazines from other states?  If they
17  don't have the date on it, and the guy goes, I've
18  got these 40-, 30-round magazines.  I had them
19  before the bill went into effect.  The deputy's in
20  an awkward situation.
21          I believe the bills here, and everyone
22  here recognizes we have a societal problem with
23  violent people.  We want to work together.
24          In our position paper, the sheriffs
25  asked for no action this year so every person could
0114
1   come to the table so we have a comprehensive plan.
2   That didn't occur, and that's fine, but I think you
3   find that some of the questions -- and term it
4   resistance if you want -- is these aren't going to
5   make us safer.
6           The deputies are going to be in the

7  middle of a heck of a decision-making process. And
8  it's even in here that the prosecution has to prove
9  it.
10          I think there are better ways to
11  address the issue. The problem with the violence
12  didn't occur overnight or at Sandy Hook. It's been
13  decades in building. We can't fix it overnight
14  either. And everybody wants to help address that
15  problem, but I don't believe the bills I've seen are
16  going to be an effective means for that.
17          THE CHAIRMAN: Thank you, Sheriff
18  Hartman.
19          Are there questions for Sheriff
20  Hartman?
21          THE CHAIRMAN: Representative
22  McLachlan.
23          REPRESENTATIVE McLACHLAN: Thank you,
24  Mr. Chairman.
25          Sheriff Hartman, I'm actually going to
0115
1  ask a question that I should have raised earlier
2  when Sheriff Smith was testifying regarding the
3  information available to a deputy on the street.
4  And it's been a long time since I was an assistant
5  district attorney, so I need to be refreshed on
6  this.
7          Are we saying that the sheriffs on the
8  street don't have access to NCIC to determine
9  whether or not someone who's in possession of a
10  rapid shooter should not have that?
11          BRUCE HARTMAN: They do have full -- I
12  apologize.
13          THE CHAIRMAN: It's just easier for
14  the people listening online if they know who's
15  speaking. So please go ahead, Sheriff Hartman.
16  Thank you, sir.
17          BRUCE HARTMAN: Thank you, sir.
18          They do have access to the NCIC, CCI
19  database through dispatch or mobile data terminals
20  in their cars. The problems are dispositions of
21  prior arrests. We can say, yep, it shows an arrest
22  for a felony two or three years ago, six weeks ago,
23  but there's no disposition, so we don't know if they
24  are in fact a prohibited person.
25          And I would second Sheriff Smith's
0116
1  suggestion, let's work with CBI to find a way,
2  whether it's access for our deputies to the
3  Insta-Check system or some way so they know at
4  3 o'clock in the morning that it's a prohibited
5  person.
6          THE CHAIRMAN: Representative
7  McLachlan.
8          REPRESENTATIVE McLACHLAN: Thank you,

9  Mr. Chairman.
10          So just for the audience here that may
11  not be familiar, would you tell us what the NCIC and
12  the CCIC systems are.
13          THE CHAIRMAN:  Sheriff Hartman.
14          BRUCE HARTMAN:  Yes, sir.  It's a
15  Colorado Criminal Computer System in the National
16  Crime Information Computer.  It contains warrants
17  for people, lookouts.  Amber Alerts are in that
18  system.  But it's the database for law enforcement
19  primarily nationwide.
20          THE CHAIRMAN:  Thank you, Sheriff
21  Hartman.  Are there any further questions for
22  Sheriff Hartman before we go to Sheriff Wiggins?
23          Sheriff Wiggins.
24          GARRETT WIGGINS:  Okay.  Kind of hard
25  to follow these two.  They seemed like they covered
0117
1  everything.
2          THE CHAIRMAN:  They are a tough act to
3  follow.
4          GARRETT WIGGINS:  I agree.
5          One of the things that I don't think
6  has been spoken very much of or mentioned very much
7  of is the fact that, you know, these atrocities that
8  keep coming up, these 10 or 12 atrocities where
9  children and babies have died and teachers and
10  defenseless people have died, is the fact that all
11  of these venues were gun-free zones.
12          These people were defenseless.  They
13  had the fish bowl effect.  And I would suggest to
14  say that it wouldn't matter if they had a 10-round
15  magazine or a 30-round magazine, that it wouldn't
16  make much difference in that scenario.  They would
17  have all the time in the world to do a mag exchange
18  when you're in this type of environment.
19          The other thing that I would like to
20  mention is the time that it takes to do a mag
21  exchange.  Coming from a -- as a prior SWAT member
22  and a firearm's instructor, when I'm on my A game, I
23  can do a mag exchange in about a second to a second
24  and a half.  And when I fumble around a lot, I can
25  get it done in about three or four seconds.
0118
1          So I can teach -- as Sheriff Smith
2  indicated, I can take anybody in this room, and
3  after about 5 or 10 minutes of instruction, I can
4  have you doing the same thing.
5          So to reduce the amount of ammo in a
6  magazine, all that is going to do, it's going to
7  have very little effect.  Instead of having two
8  30-round magazines, the individual will have six
9  10-round magazines.  It's the same thing.
10          The time that it takes to do a mag

11 exchange would -- you're talking about just a few
12 seconds.  I don't think it would have had a severe
13 impact in these atrocities that we have -- we keep
14 referring to.
15          The other thing that I would like to
16 mention is the fact that we have millions of
17 law-abiding citizens in this country, absolutely
18 millions of law-abiding citizens.  And for us to
19 penalize or take away their ability to defend
20 themselves or protect themselves and their families
21 for the actions of a few just makes absolutely no
22 sense.
23          I think we've heard some testimony
24 today in regard to people that have had to use more
25 than 10 rounds to defend themselves.  And I think if
0119
1 there was some research done we would find a whole
2 lot more of those.  And they would probably
3 outnumber the number of incidents that we've seen
4 where people have used these weapons in an evil
5 manner.
6          THE CHAIRMAN:  Thank you, Sheriff
7 Wiggins.
8          Representative Murray.
9          REPRESENTATIVE MURRAY:  Thank you,
10 Mr. Chair.
11          I just want to thank you three
12 gentlemen.  And I know that there were some others
13 that were here earlier, but you've been here all
14 day.
15          And I was just thinking about how many
16 countries there are out there where a
17 militaristic-type police force would come in and say
18 they want the people that they're protecting to have
19 guns.  I mean, what a great country we have that you
20 have that kind of confidence in the citizens of our
21 country.
22          And I think you've also pointed out a
23 tension that we have between the rural and the
24 urban.  You know, we're still in the wild west out
25 here.  We have a lot of open spaces, a lot of people
0120
1 that have to defend themselves and their families.
2          So I think there's a built
3 intention -- and I look at the people on this panel,
4 and there's a lot of representation by city people
5 up here.  And this bill sort of represents an
6 attempt to do a one size fits all, when, you know,
7 we have a diversity in our state that is really
8 being damaged by this kind of legislation.
9          So thank you for your service and for
10 your trust in the goodness -- the basic goodness of
11 most of our citizens.
12          THE CHAIRMAN:  Thank you.

LEG HX 000060    3976

13     GARRETT WIGGINS:  You're welcome.
14          THE CHAIRMAN:  Representative Salazar.
15          REPRESENTATIVE SALAZAR:  Thank you,
16  Mr. Chair.
17          Sheriff, a couple things that
18  you've -- and I've heard a couple of you say this,
19  is that you could teach anybody within a matter of
20  five -- or five minutes, I think you said.  You
21  could train them to take out their magazine, put
22  another one in a matter of seconds.
23          But you would agree that it's a fair
24  statement that -- let's say that you're in the
25  course of training somebody and you had someone else
0121
1  shooting at them with a paint ball.  They might
2  react a little bit differently in an actual attack
3  on them in trying to change that magazine, because,
4  well, they're not going to be as carefully trained
5  as you.
6          Wouldn't you agree with that?
7          THE CHAIRMAN:  Sheriff Wiggins.
8          GARRETT WIGGINS:  Yes, I would agree
9  with you on that.  And that goes to prove another
10  point, as well, that when you're put under a lot of
11  stress -- an individual at home trying to protect --
12  a single mother trying to protect her children, when
13  somebody's trying to break her door down and enter
14  her house, those fine motor skills are going out the
15  window.
16          Her ability to make good accurate
17  shots is diminished.  And at that point in time, she
18  may take 5 or 6 rounds, 8 rounds, 10 rounds, for her
19  to even come close to hitting her target.  So that
20  brings up a valid point.
21          THE CHAIRMAN:  Representative Salazar.
22          REPRESENTATIVE SALAZAR:  Thank you,
23  Mr. Chair.
24          And so then that raises the other
25  aspect of it, is that the shooter who's coming in
0122
1  also may not be as trained, if they're being shot
2  at, as well.  Let's say, for example, the individual
3  who shot -- shot at -- I just spaced her name -- the
4  congresswoman out of Arizona -- that in the course
5  of him trying to change out his magazine, which
6  took -- he didn't even get to change it out, because
7  it was taking him so long that he was tackled, that
8  not everybody is going to react the same way in
9  being able to change out a magazine.  I guess that's
10  the point.
11          THE CHAIRMAN:  Sheriff Wiggins.
12          GARRETT WIGGINS:  You make a valid --
13  valid point, and I hate to speculate because I don't
14  know the circumstances around that shooting.  But I

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

15 would suggest to say that even though that
16 individual was -- was shooting or if he was even
17 making a mag exchange, not knowing the circumstances
18 of that individual that took a shooter down,
19 probably had that same ability, due to -- due --
20 while he was shooting.
21      It could have been from behind.  It
22 could have been from the side.  So without knowing
23 all the circumstances -- I mean, we could speculate
24 and we could play that what-ifs forever.  But I
25 understand your point.
0123
1      THE CHAIRMAN:  Sheriffs, thank you so
2 much for your public service to the people of the
3 state of Colorado and for adding to your burdens by
4 coming down here and presenting us with your views.
5 It was public spirited of you and nothing less than
6 we expect.  But we very much appreciate it.  Thank
7 you so much.
8      GARRETT WIGGINS:  Thank you,
9 Mr. Chair.
10      THE CHAIRMAN:  And we'll proceed
11 through our witnesses, if we can.  Let's see.  We
12 have Sam Myrant.  Sam Myrant.
13      Mr. Myrant, welcome.  Please tell us
14 your name, who you represent and proceed with your
15 testimony, sir.
16      SAM MYRANT:  My name is Sammy Myrant,
17 and I represent myself and my family.  And first of
18 all, I'd like to -- I earlier expressed my
19 condolences to Representative Fields on her loss.
20      My loss goes on every day.  The man
21 who committed 16 felony counts of rape, child abuse
22 on this child gets out of prison this year.  So
23 there are times when we're going to need a magazine
24 of high capacity.
25      He's a member of the Aryan
0124
1 Brotherhood, and he gets out of prison this year.
2 And he has sworn to kidnap her and us, rape her
3 again in front of us, then kill us in front of her.
4      And is he going to obey your new law
5 of 10-round capacity.  Because when he gets out, the
6 law is going to be passed.  So is he going to obey
7 the law?  Being a member of the Aryan Brotherhood,
8 do you think he's going to be able to find some sort
9 of weapons illegally?  Yes, he is.
10      So my point is, the only person that
11 can protect my family and myself is myself.  My
12 wife, who had never shot a gun in her life, went out
13 and got a concealed weapons permit and learned how
14 to shoot.  Because how would she feel -- how would
15 any of you feel if your daughters or granddaughters
16 were attacked and you said, oh, it's illegal for me

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

17  to carry this high-capacity gun, so go ahead, kill
18  my granddaughter, kill my daughter.
19          Is that the object for this committee
20  of this law?  Who's going to protect us?  The police
21  can't protect us.  It's a personal responsibility.
22  We are responsible for our own protection.
23          I have many police officer friends.
24  Bruce Vanderjack was a friend of mine.  We worked
25  together as security officers.  There is no one who
0125
1  is responsible for your protection but yourself.
2          So what's going to happen when it
3  comes down to when these animals are going to come
4  get us?  Who's going to protect us?  Are you all
5  going to be there to protect me?
6          Police officers will tell you -- every
7  one of these sheriffs will tell you they cannot be
8  there.  And so if I'm not allowed to protect myself
9  with this high-capacity ammo, what do you guys say,
10  oops?
11          THE CHAIRMAN:  Representative Salazar.
12          REPRESENTATIVE SALAZAR:  I'm so sorry
13  for your loss, and I'm concerned that the gentleman
14  who committed this crime is coming out this year.
15          Just a question for you.  How many --
16  how many rounds do you think that you would need to
17  be able to protect yourself?
18          And I sincerely -- this isn't a
19  sarcastic question.  I really am asking that
20  question.  How many rounds do you think that you
21  need, to be able to protect yourself, in a magazine?
22          THE CHAIRMAN:  Mr. Myrant.
23          SAM MYRANT:  Well, first of all, I am
24  disabled, so I can't put a clip in and out very
25  quickly.  I drop them, even when I'm practicing at
0126
1  the range.  So I want to have as many in my Glock 17
2  that I can have.  And I carry 17 in there all the
3  time.  My wife carries 15 in hers.
4          And I don't want to kill anybody, but
5  I have to be responsible.  I have to be able to
6  protect my family, and so I need that many.
7          THE CHAIRMAN:  Representative Salazar.
8          REPRESENTATIVE SALAZAR:  Okay.  So
9  then that answers my question that, it's not the 10
10  that you think -- or that's written in the
11  legislation right now, that you feel that the 17
12  that you might have might get you there, that you'd
13  feel a little better with that.
14          SAM MYRANT:  That's the capacity --
15  I'm sorry.  That's the capacity.  Or if I feel
16  like -- if I saw him out -- I have a 30-round clip
17  that I can put into my Glock.  If I felt that that's
18  what I needed to carry, I would.

LEG HX 000063          3979

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

19      REPRESENTATIVE SALAZAR:  Thank you.
20          THE CHAIRMAN:  Are there any further
21  questions for Mr. Myrant?
22          Mr. Myrant, I just want to say, as
23  other witness -- as I've said to other witnesses,
24  this is not something you enjoy talking about.  This
25  is not something you want to be thinking about.
0127
1  There is a tragedy that you've endured, and yet
2  you've came here and you've told us about it and
3  you've dwelled on it for the day, and you've done it
4  for the public good.  And we all appreciate that,
5  sir.  Thank you.
6          SAM MYRANT:  As it's every day that we
7  have to live as her --
8          THE CHAIRMAN:  Representative Fields
9  has to live too, indeed.  Thank you, Mr. Myrant.
10          We have some time left, so I will
11  start calling members of the public to testify
12  who -- like Mr. Gill, I think it is -- like Mr. Gill
13  have testified on the previous bill.
14          Mr. Gill, please tell, for the new
15  record, your name, who you represent, and present
16  your testimony, sir.
17          DAVE GILL:  Thank you, Mr. Chairman.
18  My name is Dave Gill.  I am the vice president of
19  the Colorado Shooting Association.
20          I'd like to mention a comment made by
21  Thomas Sole that I think really we have been getting
22  to tonight.  With all the discussion about gun
23  control, I've not heard anybody on any side of this
24  issue mention how many lives are saved by guns every
25  year, which are far more than are lost, even in the
0128
1  mass shootings that get so much media attention.
2  But most of the media never mention the lives saved
3  by guns.
4          My wife and I live in rural Douglas
5  County.  My sheriff was down here to testify earlier
6  and unfortunately couldn't wait and had to leave.
7  But while he was here, I was talking with him and
8  asked him what his response time is to my house.  He
9  said, under best conditions, 15 to 20 minutes.
10  That's 15 to 20 minutes when you're on your own.
11          A few years ago, my wife and I were
12  leaving our property in rural Douglas County, we're
13  on a gravel road.  We saw eight young men who were
14  making a mess, drinking beer, tossing garbage on a
15  neighbor's property.  And we all watch for each
16  other.  I stopped and very politely asked them if
17  they had permission, if not, would they pick up
18  their garbage and leave.
19          I apparently misunderstood who I was
20  talking to.  They were a gang, and they were not

21  amused that I had shown disrespect for them and
22  asked them to leave the private property and pick up
23  their trash.  They came at us in a very clear
24  predatory manner, were attempting to surround us.
25  When I had asked them to please stop, do not come
0129
1  any closer, stay back, show me your hands, they
2  ignored me and kept coming towards me.
3          My wife split off to a flanking
4  position.  I was carrying openly.  We were heading
5  out for a hike in the forest, and I was carrying a
6  pistol with a 15-round magazine in it and had two
7  spare magazines with me.
8          If I didn't have those and hadn't told
9  them, you will stop now or I will shoot, I don't
10  think I'd be here today, and certainly it would have
11  been a very unpleasant situation.
12          So when you ask how many rounds are
13  necessary to resolve a situation to protect
14  yourself, a lot depends on the situation.  In this
15  case, we had eight people, eight young men coming
16  towards us.  And you see me now sitting here with a
17  broken ankle.  I didn't have that broken ankle then,
18  but I had been in an elevator crash in Denver a few
19  years ago.  I can't run.  I'm substantially
20  disabled, even without the broken ankle.
21          So that pistol is what saved me and
22  saved my wife.  All of a sudden, they had respect
23  and decided, yes, we're going to stop.  We will
24  discuss the situation.
25          So I would ask you to please consider
0130
1  that guns are also frequently used as items to
2  defend ourselves.
3          THE CHAIRMAN:  Thank you.  Mr. Gill.
4          Are there any questions?
5          Representative Salazar.
6          REPRESENTATIVE SALAZAR:  Thank you
7  very much for your testimony.  I truly appreciate
8  that perspective.  But do you think that the eight
9  gentlemen were more concerned about the two
10  magazines that you had extra or just that one that
11  was already in the gun?
12          I really am trying to figure out here
13  the number that -- the number of bullets per
14  magazine that you put in your gun.  So that's what
15  I'm trying to narrow it down here.
16          THE CHAIRMAN:  Mr. Gill.
17          DAVE GILL:  I don't think there's any
18  simple answer, because it depends on the situation.
19  In this case, there were eight of them coming
20  towards us.
21          Now, I am fairly proficient with a
22  firearm, and I can shoot quickly and accurately.

23  And it takes me about one second to drop a magazine
24  and put a fresh magazine in.  So not everyone is
25  capable of doing that.  If I'm not in practice, I'm
0131
1  not capable of doing it either.  So there isn't a
2  magic number.
3          But the question is, why would you
4  want to limit it when there's so many different
5  situations we can be in and you don't know what it
6  will be.
7          THE CHAIRMAN:  Mr. Gill, we thank you
8  for testifying.  And we regret what you've been
9  through.  And it's public spirited of you to talk
10  about it here publically, and we thank you.  Thank
11  you, sir.
12          I misspoke before when I said or
13  implied that we'd heard from everybody who signed up
14  to testify except for those who had already
15  testified.  We are running towards -- although we
16  have not arrived at -- our limit that we -- that I
17  mentioned we would impose on both sides in
18  testimony.  But I am going to soldier on for a
19  little while because I think there are more people
20  who want to speak.
21          And so -- and I'm seeing some heads
22  nodding enthusiastically.  And so I'm going to keep
23  calling witnesses, because I know there's a lot that
24  people want to say and I appreciate that.
25          So I am going to call for Michael
0132
1  McPeake.
2          Welcome, Mr. McPeake.
3          MICHAEL McPEAKE:  Mr. Chairman.
4          THE CHAIRMAN:  Thank you for your
5  patience in waiting so long.  Please give us your
6  name for the record and who you represent and
7  proceed.
8          MICHAEL McPEAKE:  My name is Michael
9  McPeak.  I represent myself and my family.  I'm
10  opposed to HB13-1224.
11          I'm retired Special Forces.  I have a
12  90 percent disability rating.  I also serve as a
13  Teller County Sheriff Reserve.  I'm an NRA
14  instructor in five disciplines.
15          I don't own guns simply for hunting.
16  A lot of people bring up the argument for hunting.
17  I don't own guns as self-defense simply from home
18  intrusion.  I own guns because it's my duty to
19  protect the Constitution and the rights therein.
20          A lot of questions have been asked,
21  how many bullets are enough.  If I'm being shot at,
22  if my family's being shot at, there's an adversary,
23  I don't want those bullets to ever stop.  That's my
24  opinion.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

25    There's lots of civilian people,
0133
1    private citizens that think just like me.  There
2    cannot be enough bullets when you need them, period.
3    If you have 10, you will need 11.
4            Another question on the capacity of
5    what is enough is typical law enforcement load.  I
6    carry 45 bullets on my person for my handgun,
7    15-capacity magazine.  In my patrol vehicle, there's
8    an AR-15 shotgun.  I have multiple reloads for
9    those.  There cannot be enough bullets, if you need
10   them.  That's the bottom line.
11           And in Teller County, much like many
12   places in Colorado, the police are not right there.
13   They're not waiting to be on your side.  It is you,
14   and you'll have to make a decision.  I hope that you
15   have adequate supply and resource.
16           THE CHAIRMAN:  Mr. McPeake, thank you,
17   sir, for your testimony.
18           Are there any questions for
19   Mr. McPeake?
20           Thank you, sir.
21           MICHAEL McPEAKE:  Thank you.
22           THE CHAIRMAN:  We appreciate you
23   coming forward.
24           Michael Bane.  Mr. Bane, welcome, sir.
25   You're a patient man.  Thank you for waiting so long
0134
1    and giving us the benefit of your testimony.  Please
2    state your name, tell us who you represent, and then
3    proceed.
4            MICHAEL BANE:  My name is Michael
5    Bane.  It was a lot harder to wait watching you eat
6    the pizza.
7            I live in Nederland, Colorado.  I'm a
8    television producer for Outdoor Channel.  I produce
9    shooting shows, shows on firearms.  And I wanted to
10   come here just to touch on a couple of points that
11   might have been mentioned before, but maybe to
12   clarify them just a little bit.
13           When we talk about a standard capacity
14   in a firearm, I think somewhere between 80 and 90
15   percent of firearms sold in the United States,
16   semi-automatic pistols, all of those come with a
17   greater standard-capacity magazine than 10 rounds.
18           The AR-15 rifle, which is the most
19   popular, and it's the best selling rifle
20   in the United States, over a period of the last five
21   years, comes standard with a 30-round magazine.
22   That's considered the standard capacity of that
23   firearm.
24           When we start talking about these
25   magazines, my best numbers -- and I am in the
0135

1    business. But my best numbers are that there may be
2    a 100 million magazines with a capacity above 10 in
3    the United States, and probably as many as 10
4    million in Colorado.
5         So what I see here is a law that is --
6    at least a proposed law that it doesn't accomplish
7    what you hope to accomplish, because criminals are
8    criminals.  One of the shows that I do -- I spent a
9    lot of time with law enforcement going through
10   large-scale crimes and committing -- and creating
11   simulations for those crimes to see how they run.
12   And the key thing we see, especially with crimes
13   with gangs, with large number of assailants, is they
14   don't pay attention to the law anyway.
15        They're not going to be affected by
16   this.  But they are an awful lot of civilians,
17   law-abiding civilians in Colorado, who will be
18   affected by this.
19        I think it's a law that's not
20   enforceable.  It doesn't appear to accomplish what I
21   think we all want to accomplish, which is making
22   people safe.  But more than that -- I teach, as an
23   instructor myself, in my shows -- I believe that the
24   AR-15 is the finest platform I've seen for
25   self-defense.  It is my choice.
0136
1         I say that it is my choice because
2    like a lot of people, and some of my friends in this
3    room who are out front in this fight, we all
4    routinely receive credible death threats, what the
5    gentleman who spoke here, the sheriffs would term
6    credible death threats.  So we have to choose
7    ourselves the optimum self-defense tool.
8         That is my choice, and I think it
9    should be everybody's choice.  I think this bill
10   makes us less safe, sir.
11        THE CHAIRMAN:  Thank you, Mr. Bane.
12        Are there any questions for Mr. Bane?
13        Mr. Bane, thank for joining us.
14        MICHAEL BANE:  Chair, I thought for
15   sure you were going to offer me a piece of pizza,
16   but . . .
17        THE CHAIRMAN:  I would, Mr. Bane, but
18   unfortunately it's gone.
19        As the clock wears down, I feel more
20   and more distraught on not being able to accommodate
21   everybody who's asked to testify, but I will keep
22   going through the list.
23        Andrew Hamilton.  Mr. Hamilton,
24   welcome, sir.  Please state your name, who you
25   represent, and proceed.
0137
1         ANDREW HAMILTON:  Andrew Wayne
2    Hamilton, representing myself, my family, and my

LEG HX 000068    3984

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

3  friends.
4        I want to thank Sheriff Smith, who was
5  just up here, for touching on something that I've
6  been thinking about as I've sat here all day
7  listening.
8        Back to the Constitution.  The
9  founders and the writers of the Constitution and the
10  Bill of Rights made no distinction between military
11  and civilian weapons.  By the absence of that
12  distinction, they allowed civilians to keep and bear
13  the same level of weapon that the military has.
14  Back then it was muskets was the most powerful
15  thing.  But they didn't make the distinction.
16        Please note that -- I think on page 4
17  of this bill -- would allow such a distinction to be
18  made.  Well, of course, I respect law enforcement
19  officers and the terribly dangerous job that they
20  do.  I emphatically do not agree that we civilians
21  are basically less deserving of the same level of
22  self-protection.
23        We should not be hindered by this
24  proposed legislation in providing protection to our
25  families and ourselves.
0138
1        It was short.
2        THE CHAIRMAN:  That is succinct and to
3  the point.  And we thank you, sir.
4        Are there any questions for
5  Mr. Hamilton?
6        Mr. Hamilton, thank you so much for
7  coming and testifying here today.
8        Art Delcorso.  John Aranet.  Bonnie
9  Gabaldon.  Ms. Gabaldon, welcome.  Please state your
10  name.  I've probably pronounced it wrongly.  It
11  would be great to have --
12        BONNIE GABALDON:  It's Gabaldon.  If
13  you want to say Gabaldon, it's fine.
14        THE CHAIRMAN:  Gabaldon.
15        BONNIE GABALDON:  Yes, it is.  There
16  you go.
17        Mr. Chair, members of the committee,
18  I'm a licensed Colorado attorney.  However, I'm not
19  here to speak regarding just the legal issues here,
20  as much as a citizen who has not been immune to
21  violence in my life.
22        I am very pro any capacity that the
23  citizen needs to protect themselves from violence.
24  I think that any laws that restrict the capacity of
25  a clip diminishes the capacity of the citizen to
0139
1  protect themselves under any and all consequences
2  that they might suffer.
3        I grew up in the murder capital of the
4  United States, southeast, Washington, D.C.  And I

5   won't talk about what my parents experienced or my
6   brother or my sister.  I will just tell you that I
7   have been exposed to violence.  And I have had it
8   seared into my heart the need to be able to defend
9   myself when no one was around to do it for me.
10          I bear three scars on my head from
11  three attacks from seven in which I was brutally
12  beaten.  I survived.  I am not bitter.  I am better.
13  I am stronger.  I am here.
14          When I was supposed to meet my best
15  friend one time at a location we had decided on, I
16  got there and there were a bunch of guys there and I
17  felt very uncomfortable.  And for some reason I
18  turned and I started to walk quickly away, but I
19  began to run.
20          And it wasn't -- I didn't hear from
21  her for weeks.  What I didn't realize was that my
22  friend had gotten there before me.  She was being
23  gang-raped.
24          I was pulled between two row houses
25  one time by three very large guys who attempted to
0140
1   gang-rape me.  And thanks to two of my neighbor
2   friends, they saved me.  There was no guns there,
3   but I'm telling you there was violence.
4           The only gun that appeared was the
5   third time that I came close to being gang-raped.
6   And I want you to know this, these things happened
7   to me before I was 12 years old.
8           I was pulled between two buildings,
9   and there were four guys.  I must have been 10 and
10  they were probably 18, 19 years old, and they were
11  going to rape.  And out of nowhere those guys ran.
12  All I remember was looking up, and there was a old
13  man that lived across the street that saw from his
14  bedroom window what was about to happen and he was
15  standing there with a gun and he told them to leave.
16          We keep talking about -- and I've
17  heard it mentioned here -- and I wasn't sure if I
18  had anything to add to this -- is the fact it is an
19  emotional issue, but it is (inaudible).  I would
20  resent anyone telling me I did not have -- nor my
21  children or anyone -- the right to defend
22  themselves.
23          I have heard testimony of people here
24  today who were in situations where they were
25  confronted with violence and all they could see and
0141
1   thought about was the gun.  But they never
2   thought -- and I thought maybe it's because of where
3   I grew up and how I grew up, I think about defending
4   myself.
5           I didn't see them -- and I remember
6   people that I knew, friends, they didn't grow up in

LEG HX 000070     3986

7   D.C.  They were living out in Maryland and Virginia
8   in very nice peaceful communities.  They had no
9   clue.  And they thought their world was safe.
10          But I'm telling you, it is not a safe
11  world.  And I think we need to allow people to
12  defend themselves.  And I'm here to support defense,
13  defense.  And I think that the citizenry should have
14  everything at their disposal to defend themselves,
15  whatever that is.  And no man has the right to limit
16  that defense.
17          And I think that if we do not learn
18  from history, we are bound to repeat it.  And our
19  constitution was written with that in mind.  And
20  there are greater threats to our security than just
21  rapists and people who want to beat me over the head
22  with pipes and use horrifying weapons against me.
23  If people want to harm you, they will do it with --
24  that are bad people out there.  There aren't bad
25  guns.
0142
1           THE CHAIRMAN:  Thank you,
2   Ms. Gabaldon.
3           Are there any questions for this very
4   courageous witness?
5           Representative Patterson.
6           REPRESENTATIVE PATTERSON:  Thank you,
7   Mr. Chair.
8           And I'm really sorry for your
9   experiences.  You said that you would support any
10  capacity for citizens to be able to protect
11  themselves.  What if that meant having limitations
12  so that we could reduce the lives that are -- that
13  are caused during a mass shooting?
14          THE CHAIRMAN:  Ms. Gabaldon.
15          BONNIE GABALDON:  Yes.  I'm sorry.
16          I think that I do not believe that
17  there should be any limitation imposed on the right
18  of the citizenry to protect themselves.  I believe
19  that there are some crazy people out there who will
20  inflict harm.
21          And, yes, I don't think that it's the
22  large -- because I think that the people are looking
23  at the capacity magazine out there and the person
24  who is inflicting, they're not looking at the
25  criminal.  They're not looking at the person behind
0143
1   that gun, and there are some very crazed people.
2           But what I'm saying is that why wasn't
3   there someone there who could take them out.
4           THE CHAIRMAN:  Are there any further
5   questions of Ms. Gabaldon?
6           And we want to convey to you our
7   thanks for coming here and giving us the benefit of
8   your --

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

9    BONNIE GABALDON:  Thank you for
10   listening.
11         THE CHAIRMAN:  -- of your experience.
12         Well, thank you for sharing that with
13   us.  Thank you.
14         Lillie Williams.  Adam Thompson.
15   Jimmy West.
16         UNKNOWN SPEAKER:  (Inaudible.)
17         THE CHAIRMAN:  That sounds like an
18   excellent idea.  Mr. Shriner, is it you, yourself,
19   who is going to testify?
20         UNKNOWN SPEAKER:  (Inaudible.)
21         THE CHAIRMAN:  Mr. Edmiston.  Welcome
22   back, Mr. Edmiston.  By all means, use Mr. West's
23   two minutes.  And welcome back.
24         BOB EDMISTON:  Thank you, Mr. Chair.
25   (Inaudible) sit this somewhere.
0144
1          THE CHAIRMAN:  Mr. Edmiston, for the
2    record, has given some documents to Ms. Shipley, who
3    is distributing them, one copy each to the members
4    of the committee.
5          And while Ms. Shipley does that,
6    Mr. Edmiston, why don't you tell us who you are, who
7    you represent, and proceed with your testimony, sir.
8          BOB EDMISTON:  Thank you, Mr. Chair,
9    and committee.  I'm Bob Edmiston, with the Firearms
10   Coalition of Colorado, NRA affiliate organization.
11   And I'm a volunteer, not a paid lobbyist.  And I'm
12   here in opposition to a bill that I believe it
13   intentionally handicaps citizens trying to defend
14   against criminal attack.
15         I'm a former U.S. Army officer.  I
16   have a master's degree in psychology, counseling and
17   guidance.
18         As stated in the first handout,
19   information from Dr. Cates and Mr. Mauser indicate
20   that criminals do not obey the law.  This ban will
21   not inconvenience them.  We have a fear that what
22   this ban will likely do is what prohibition did to
23   the use of alcohol in the United States, and I
24   believe that is to create widespread disregard for
25   law and order, to have a corrupting effect on law
0145
1    enforcement, promote the rise of criminal gangs that
2    are in the business of selling the banned product.
3          We all know what happened during
4    prohibition, the speakeasies, the Purple Gang,
5    Al Capone, the whole thing there.  The U.S. repealed
6    prohibition because it didn't work.
7          Your second handout describes the lack
8    of impact of the Clinton era semi-automatic firearms
9    ban that had been discussed somewhat earlier.  By
10   the way, just by record, the M1 carbine does come

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

11 with a 30-round magazine.  The M1 carbine is a World
12 War II vintage firearm that is basically a pistol
13 caliber rifle.
14          In addition to the fact that criminals
15 will not pay attention to this ban, there is an
16 issue with the number of rounds that will be needed
17 in a defensive situation.  As we heard in earlier
18 testimony, what do we do if people are faced with
19 multiple assailants.  How many rounds will it take
20 to stop an attack.
21          In the infamous Dalton Gang raid on
22 Coffeyville, Kansas in 1892, one of the bank
23 robbers, Emmett Dalton, was hit 21 times by law
24 enforcement and armed citizens.  He survived to
25 serve out his prison sentence and go on the road
0146
1 with Frank James.  Talking about the evils of crime.
2          We urge a no vote on this bill.
3          THE CHAIRMAN:  Thank you then,
4 Mr. Edmiston.  Much appreciated, sir.
5          Are there any questions for this
6 witness?
7          Seeing none, thank you so much for
8 your testimony here this evening --
9          BOB EDMISTON:  Thank you, Mr. Chair,
10 and committee.
11          THE CHAIRMAN:  -- for your patience,
12 sir, waiting to deliver it.
13          Roger Thompson.  John Higgs.
14 Mr. Higgs.  Welcome, sir.
15          JOHN HIGGS:  Good evening,
16 Mr. Chairman.
17          THE CHAIRMAN:  Welcome, Mr. Higgs, and
18 good evening to you, sir.  Thank you for your
19 patience.  Please tell us your name, who you
20 represent.
21          JOHN HIGGS:  My name is John Higgs.
22 I'm representing myself and my wife, and I am
23 opposed to this bill.
24          Mr. Chairman, I'm -- I think I'm one
25 of the most fortunate people in the world.  I was
0147
1 born an Englishman and I was able to come here and
2 became an American citizen.  And I want to make two
3 brief points --
4          THE CHAIRMAN:  Same here.
5          JOHN HIGGS:  You too?
6          THE CHAIRMAN:  Yes.
7          JOHN HIGGS:  Great.  High five.
8          I'd like to make two points.  This
9 first one is I'd like to go back and talk just a
10 little bit about the effects of some of the
11 medication that has been discussed earlier that some
12 of these shooters were found to be on.

13        And I did a little bit of research.
14 and I'd just like to give you three very brief
15 examples.  In the case of the Columbine shootings,
16 the two shooters -- and I won't dignify them by
17 mentioning their names -- one of them was taking an
18 antidepressant called Luvox, and the other one's
19 medical records are still sealed.
20        Both shooters had been in anger
21 management classes and had undergone counseling, and
22 one of the shooters was also seeing a psychiatrist.
23 That was Columbine.
24        In 1993, in Chelsea, Michigan, a
25 39-year-old chemistry teacher facing a disciplinary
0148
1 matter at Chelsea High School, shot the
2 superintendent to death, shot the principal in the
3 leg, slightly wounded a journalism teacher.  And he
4 was taking Prozac and he had also been seeing a
5 psychiatrist.
6        And briefly, the third example, this
7 is from Snohomish County, Washington.  In 2011, a
8 15-year-old girl went to Snohomish High School where
9 police allege that she stabbed a girl as many as
10 25 times, just before the start of school, and then
11 stabbed another girl who tried to help her injured
12 friend.
13        Prior to the attack, the girl had been
14 taking medication -- although it's not clear what
15 medication she was on -- and seeing a psychiatrist.
16 Court documents said the girl was being treated for
17 depression.
18        So I would suggest to the committee
19 that it's time we started looking a little bit more
20 about how mental patients are being treated and also
21 reconsidering what kind of protection that privacy
22 has, when we're faced with some of these really
23 serious shootings.  And maybe there's a case where
24 doctors need to be stepping forward and saying, I
25 have someone under my care who's a potential risk to
0149
1 society.
2        So that's my first point.  The other
3 point --
4        THE CHAIRMAN:  I'm afraid that's your
5 last point at this point, Mr. Higgs.
6        But I would invite any member of the
7 committee to submit any question to Mr. Higgs.
8        Representative Lee.
9        REPRESENTATIVE LEE:  Thank you,
10 Mr. Chairman.
11        What's your second point, sir?
12        JOHN HIGGS:  My second point is a
13 short story, but I'll make it as quick as I can.
14 It's a personal story, and it occurred in 1981 when

15    my wife and I were still living in the east end of
16    London, which is pretty much Jack-the-Ripper
17    country -- it's not a very good part of town --
18    there was a riot in our street.
19             And when I say riot, I'm talking about
20    a documented 100 police officers, including four
21    police officers on horseback.  And at the other end
22    of the street, somewhere between 200 to 300 youths,
23    who were basically intent on rioting and causing a
24    lot of distress to the neighborhood.
25             Our house was pretty much halfway down
0150
1     the street, so we had a bird's eye view of both
2     armies.  And at some point, they both charged each
3     other and they met right outside our house.  And I
4     remember standing at the top of our stairs -- my
5     wife and I had already gone into the front bedroom
6     so we could see what was going on -- and the only
7     weapon I had was one of those three-pronged garden
8     forks that you use for turning over the turf in the
9     backyard.
10             I remember distinctly praying for two
11    things, that they wouldn't come through the front
12    door, and if they did, magically, that garden fork
13    would be turned into an AR-15 with a 50-round
14    magazine in it.
15             And fortunately I was able to come
16    here and not have to worry about being in that
17    position again.  So I urge you, don't send this bill
18    forward.  You're going to cause as much trouble in
19    the general community as you think you may be
20    preventing.
21             Thank you.
22             THE CHAIRMAN:  Any further questions
23    for Mr. Higgs?  Mr. Higgs, we value your testimony.
24    We appreciate it, sir.
25             JOHN HIGGS:  Thank you.  Good
0151
1     afternoon.
2             THE CHAIRMAN:  Thank you so much.
3     Brenda Blake.  Dan Newman.  Mr. Newman, thank you
4     for being so patient, waiting so long.  Please give
5     us your testimony, and before you do so, just for
6     the record, identify yourself.
7             DAN NEWMAN:  I'm Dan Newman.  I'm a
8     retired army officer.  I'm also a NRA certified
9     firearms instructor.
10             I grew up in a different time.  Things
11    were simpler.  People, in my opinion, had more
12    personal responsibility.  We didn't have a lot of
13    drugs treating people.  We didn't have the movies
14    and the video games at that point in time, video
15    games which glorify and reward people playing them,
16    mostly youth, for their destruction and blood and

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

17  gore.
18          It's my opinion that we've tried to
19  find the simplest solution to complex problems and
20  to legislate solutions to problems when the problems
21  go much deeper.  And that's basically just my
22  observations.
23          THE CHAIRMAN:  Thank you, Mr. Newman.
24  And we are benefited by hearing them.
25          Any questions for Mr. Newman?
0152
1           Mr. Newman, thank you, sir.
2           DAN NEWMAN:  You're welcome.
3           THE CHAIRMAN:  Members of the public,
4   we've gone past already the two-hour limit that I
5   put on the testimony, but I know there are scores of
6   people who still have not testified.  So we're
7   getting down to the last moment.
8           And, sir, if you'd come forward, as
9   long as you've signed up, I would -- Steve --
10          STEVE MARTIN:  Martin.
11          THE CHAIRMAN:  Steve Martin.
12  Mr. Martin, please take a seat, sir, and give us
13  your name for the record officially, and tell us
14  what you have to say, please.
15          STEVE MARTIN:  Yes, Mr. Chairman, my
16  name is Steve Martin.  I speak for myself.  I'm not
17  a professional lobbyist.
18          Thank you very much for your
19  indulgence.  I would like to raise several legal
20  questions.  I would like to point out, to begin
21  with, very briefly, that I oppose this legislation
22  on moral grounds.  I believe it's a violation of
23  fundamental human rights.  I oppose it's a violation
24  of fundamental human right.  I oppose it on
25  constitutional grounds.
0153
1           That being said, I have deep concerns
2   about the standard of possession for these magazines
3   being the mechanism of punishment.  There are many
4   cases where someone might be in possession of a
5   magazine and not be aware of it.
6           What if my daughter, for example,
7   borrows my car.  I have some of these magazines in
8   the back as part of my range kit, but she's unaware
9   of that, and she gets pulled over.  She's still
10  liable criminally for possession of those items.
11          Another example is, for example,
12  long-haul truckers, over-the-road truckers, and
13  especially truckers who do LTL, what if they're
14  transporting some of these from a warehouse to a
15  Cabela's, for example, but they happen to go across
16  I-25 or I-70, or what have you, they're not aware
17  that that's a prohibited item in this state.
18          They might have 500 magazines in their

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

19  load and not be aware of that. And each one of
20  those is punishable by a year in jail, the way this
21  is written.  I think 500 years in the jail for a
22  trucker who doesn't know what he's carrying is
23  fairly ridiculous.
24          I will be generous and I will assume
25  this is an unintended consequence of the
0154
1  legislation.
2          And in an issue -- I'm from Colorado
3  Springs -- that is near and dear to my heart is
4  army wives.  Military dependents, in general, but
5  army wives in specific.  I have lots of friends who
6  are in the military.  They've got their gear in the
7  back of their mini van.  They have their gear in
8  their SUV, or what have you, their wife doesn't know
9  what their army junk is back there.  They might
10  routinely have 10 or 12 high-capacity magazines or
11  standard-capacity magazines, regular old army-issued
12  30-round magazines.
13          These are not controlled items.  These
14  are disposable items in military parlance.  In
15  Colorado Springs, there are thousands of vehicles
16  driving around like this.  This is potentially an
17  enormous unintended impact.
18          I see that my time is up.  I wanted to
19  raise those issues of possession.  But I believe
20  that this could be a tremendous complication.  It
21  probably wouldn't be enforced, but then you have
22  selective enforcement on a massive scale of this
23  legislation.
24          Thank you for your indulgence.
25          THE CHAIRMAN:  Mr. Martin, don't go
0155
1  anywhere, until and unless members of the committee
2  have any questions for you.
3          STEVE MARTIN:  I'd be happy to take
4  questions.
5          THE CHAIRMAN:  But if none of the
6  members have questions, please accept our thanks for
7  being so patient and waiting so long and for the
8  concise and very interesting testimony.  You've
9  raised questions which need to be raised.
10          STEVE MARTIN:  Thank you very much,
11  Chairman.
12          THE CHAIRMAN:  Thank you, Mr. Martin.
13          Carrying on through, we're coming down to
14  last vestiges.  There was a gentleman here who had
15  been very anxious to testify.  I assume you have
16  signed up, sir?
17          UNKNOWN SPEAKER:  Yes, I have.
18          THE CHAIRMAN:  And then we'll come to
19  those last few.  And it's somewhat -- I know it is
20  really rather imperfect, but I'm afraid I'm just

21  going to take four or five more witnesses and then
22  call the testimony phase complete.  And that's a
23  necessity, I'm afraid.
24          Sir, state your name for the record,
25  please.  Tell us who you represent.
0156
1          LEE REEDY:  My name is Lee Reedy.  I
2  represent my wife and myself.
3          THE CHAIRMAN:  Fantastic.  Welcome,
4  sir.  Thank you for waiting so long.  Please proceed
5  with your testimony.
6          LEE REEDY:  To much of America, a
7  firearm is a symbol that you are a citizen, a
8  responsible person who can be trusted with an
9  instrument of considerable power that enables you to
10  protect yourself, your family, and your property.
11          To the elite, a firearm is a symbol of
12  barbarism and a lack of trust in their fellow
13  citizens and reliance on government.
14          I would agree that violence is rarely
15  the answer, as we've heard before in this testimony,
16  but when it is, it becomes only the answer.  That is
17  to say, at that point, the number one priority is to
18  survive, and the focus has got to be on taking away
19  the attacker's ability to continue and resume -- or
20  continue or resume the attack.
21          I's oppose HB13-1224 for a number of
22  reasons, but I'd like to bring up a couple of things
23  that I haven't heard yet.
24          There's no exemption that I can tell
25  for entities like security companies, who rely on
0157
1  having duty weapons like the Glock 22, Glock 23.
2  They typically have 13 or 15 rounds.
3          There's no exemption for statutorily
4  authorized agencies that are not actually employees.
5  And to this, I refer to the Colorado Mounted
6  Rangers.  They are an all-volunteer organization and
7  yet they are not covered in the exemptions of this
8  bill.
9          There are no exemptions for school
10  resource officers who would be in the most and best
11  place to make the changes or to effect a defense of
12  children.
13          And I don't think the committee really
14  realized it or not, but when you entertained an
15  amendment to okay Magpul as a manufacturer of
16  products, it kind of sounded like what you said was,
17  oh, it's okay to manufacture them here, you just
18  can't have them here.  And that really sounded
19  hypocritical.
20          And, you know, I don't mean it to
21  sound accusatory, but it really kind of sounded like
22  the focus was, oh, we want the taxes and we want the

23   manufacturing and the jobs, but we don't want the
24   magazines, God forbid.
25        THE CHAIRMAN:  Thank you, sir.
0158
 1        Are there any questions for this
 2   witness?
 3        Thank you, sir, for coming and waiting
 4   so long.
 5        LEE REEDY:  Thank you for allowing me
 6   to speak.
 7        THE CHAIRMAN:  I'm sorry we couldn't
 8   give you longer.  And I'm sorry we couldn't get to
 9   more witnesses.
10        What I'm going to do is I'm going to
11   take the next four witnesses on the list, whoever
12   they may be.  And I apologize that I can't take
13   everybody.  I will take the next four witnesses, and
14   then -- we've gone over our time allotted already --
15   and then we will call the testimony closed.
16        William Comakes.  Terry Miller,
17   Richard Ordway.  Steve Dorman.  Andrew Lafontaine.
18   Andrew Lafontaine.  Thank you for being here, sir.
19        ANDREW LaFONTAINE:  Thank you,
20   Mr. Chairman.
21        THE CHAIRMAN:  Welcome.
22        ANDREW LaFONTAINE:  My name is Andrew
23   LaFontaine.  I am from Greenwood Village.
24   Representative Kagan, you and I have not met, but
25   it's nice to finally put a name with a face.
0159
 1        I am not a member of the NRA, nor am I
 2   a member of the Rocky Mountain Gunners Association
 3   or any other gun rights advocacy group.  In fact, I
 4   am a registered Democrat, and I am opposed to the
 5   measures currently under consideration.
 6        I am a licensed attorney, and I know
 7   that we have a number of other licensed attorneys
 8   that are sitting on this committee.  It is, in fact,
 9   the judiciary committee.  We have, so far, not
10   considered the constitutional implications of
11   HB-1224, and I would like to use my time today to do
12   that.
13        Under the District of Columbia versus
14   Heller, the standard for what is constitutionally
15   protected are weapons that are in common use at the
16   time by members of the public for lawful purposes,
17   and those purposes include self-defense.
18        I am speaking directly to other
19   Democrats who, like myself, I believe firmly support
20   the Bill of Rights.  If you are in support of the
21   Bill of Rights, Representative Court, Representative
22   Patterson, Representative Salazar, I believe that
23   you have to support not just the First and the
24   Fourth and the Fifth and Sixth and the Seventh, but

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

25  also the second.

0160

1          I would like the hear from the
2  judiciary committee how they believe that this bill
3  that is currently under consideration is not
4  prima facie unconstitutional.
5          THE CHAIRMAN:  Thank you very much for
6  the question, Mr. LaFontaine.  Thank you for being
7  here.
8          Members of the committee, do you have
9  any questions for Mr. LaFontaine?
10          Representative Wright.
11          REPRESENTATIVE WRIGHT:  Thank you,
12  Mr. LaFontaine.  Appreciate your compelling
13  testimony.  I'm wondering -- you mentioned that you
14  are an attorney.  And you cited Heller, which I also
15  cited in a previous question of another witness
16  testifying today.
17          Tell me what type of law you practice
18  and how you reached this conclusion and if there was
19  a dissenting opinion that we should take into
20  consideration today.
21          THE CHAIRMAN:  Mr. LaFontaine, if
22  you'd like to tackle that.
23          ANDREW LaFONTAINE:  I practice civil
24  litigation.  I do not practice constitutional law.
25  However, I am an owner of several firearms that

0161

1  would be restricted by this particular bill,
2  including a Glock 17, which has a 17-round magazine,
3  an AR-15, which has a 30-round magazine, both of
4  which came from the factory.
5          These two weapons are the same weapons
6  that you will find on the hips and in the patrol
7  cars of every cop in the state.  And they are the
8  same guns that are found in the homes of vast
9  majority of people who support gun rights in the
10  state.
11          And so as the weapon that is most
12  commonly used by those individuals for lawful
13  purpose of self-defense, it would seem to me that
14  under the Heller decision, they are ipso facto
15  constitutional.  And I would like to know from the
16  committee if they believe that this bill will
17  survive a constitutional challenge, because I'm
18  happy to be a plaintiff.
19          THE CHAIRMAN:  Representative Wright.
20          REPRESENTATIVE WRIGHT:  Well, I'll
21  answer your question.  I do not believe that it's
22  constitutional.  I've heard a lot of testimony today
23  that argues that it's not our role to guess what the
24  judiciary might decide.  I wholeheartedly disagree.
25          We are a separate branch of government

0162

1  for a reason, and I think our duty is to create good
2  law that is, in fact, not unconstitutional.
3          We have a framework here laid before
4  us by the Supreme Court, and I think it's a bad move
5  for us to pass this law today.  So I appreciate you
6  bringing that forward in a nonpartisan fashion
7  today.
8          THE CHAIRMAN:  Any further questions?
9          Representative McLachlan.
10          REPRESENTATIVE McLACHLAN:  Thank you,
11  Mr. Chairman.
12          I'm also a Democrat.  So you
13  overlooked me.  I'm sure it was unintentional.
14          ANDREW LaFONTAINE:  I'm sorry,
15  Representative McLachlan.
16          REPRESENTATIVE McLACHLAN:  That's
17  quite all right.  Thank you.
18          I wanted to ask you, do you think
19  there's any limitation that the Constitution imposes
20  on weapons?  And, for example, is there any law that
21  could be constitutional regarding the magazine size?
22  For example, could we have a limitation on magazines
23  over 100 rounds?
24          THE CHAIRMAN:  Mr. LaFontaine.
25          ANDREW LaFONTAINE:  Representative, I
0163
1  do believe that there are constitutional
2  limitations.  I believe that those are set forth in
3  Heller.
4          I will state that as a personal
5  matter, I own a hundred-round drum.  It is a toy for
6  me.  It is fun for taking out to the field and
7  blasting away.  I do not think that that has
8  constitutional protection.  I do not believe that
9  that is commonly used by members of the public for
10  the lawful purpose of self-defense.
11          I believe that that could reasonably
12  be restricted.  I would rather not give mine up, but
13  I do believe that it could be restricted in the
14  police powers of the state.
15          I do not believe that the 30-round
16  magazines that came from the factory with my AR-15
17  would be constitutionally -- would be capable of
18  constitutional prohibition.
19          THE CHAIRMAN:  Representative
20  McLachlan.
21          REPRESENTATIVE McLACHLAN:  Thank you,
22  Mr. Chairman.
23          What about, for example, hand
24  grenades, would that be a reasonable weapon for
25  self-defense?
0164
1          THE CHAIRMAN:  Mr. LaFontaine.
2          ANDREW LaFONTAINE:  I do not believe

3  so.  Again, Heller, I think, sets for the relevant
4  standard that weapons that are specifically designed
5  and used in a military context are not -- do not
6  have constitutional protection.  I do not believe
7  that there is a lawful self-defense purpose for a
8  hand grenade.
9           Again, this is my personal opinion,
10  not practicing constitutional or Second Amendment
11  law.  However, I do not believe that a hand grenade
12  has a legitimate purpose for self-defense.
13          The same cannot be said of a handgun
14  with 17-plus rounds or a rifle with 30-plus rounds.
15          REPRESENTATIVE McLACHLAN:
16  Mr. Chairman.
17          THE CHAIRMAN:  Representative
18  McLachlan.
19          REPRESENTATIVE McLACHLAN:  One final
20  question.  You agree with me, I'm sure you're aware
21  that sub-machine guns have been barred by the
22  federal government.  And the constitutionality of
23  that limitation has been in place since 1930 or
24  somewhere in that area, are you not?
25          THE CHAIRMAN:  Mr. LaFontaine.
0165
1          ANDREW LaFONTAINE:  Representative, I
2  believe that you're incorrect.  They're not barred
3  by the federal government.  They're simply taxed.
4          The National Firearms Act in 1931
5  imposed a $200 transfer tax on machine guns.  And
6  there's really no difference between a machine gun
7  and a sub-machine gun, just the caliber of bullets
8  they use.  But a $200 transfer act was imposed on
9  machine guns.
10          That was upheld, I believe, by
11  United States versus Miller.  Although that case, I
12  think, dealt with a short-barrel shotgun.  The
13  rationale was that machine guns were not lawful --
14  were not used by members of the public commonly for
15  self-defense.  The same being true for a
16  short-barreled shotgun.
17          Again, I do not think that that
18  applies to an AR-15 or to a Glock 17 pistol.
19          REPRESENTATIVE McLACHLAN:  Thank you
20  very much for your answers.
21          THE CHAIRMAN:  Thank you,
22  Mr. LaFontaine.  And seeing no further questions,
23  may we just offer our appreciation for you having
24  waited so long to testify and for giving us the
25  benefit of your thoughts on this.
0166
1          ANDREW LaFONTAINE:  Thank you,
2  Representative Kagan.  I supported you in 2012.  I
3  hope to be able to support you in the next election.
4          THE CHAIRMAN:  Thank you,

5   Mr. Lafontaine.
6         Mark Dunem.  Edward Irvine.
7   Mr. Irvine, thank you for coming down.  Please state
8   your name for the record.
9         EDWARD IRVINE:  Thank you very much.
10  My name is Edward Irvine.  I'd like to speak opposed
11  to the bill.
12        THE CHAIRMAN:  Very good.  Please tell
13  us your reasons.
14        EDWARD IRVINE:  I'd like to start out
15  with an open invitation to the members of the
16  committee who have made statements clearly showing
17  that they're not adept to (inaudible) firearms.  I
18  didn't fire a firearm until about five years ago.  I
19  realized that the terminology can be confusing, but
20  if any of you want to come to the range with me, if
21  anyone would like to come to my house, I'd like to
22  demonstrate certain factors.
23        I was advised that I couldn't bring
24  magazines into the hearings, because I wouldn't be
25  able to get through security.  I'd like to
0167
1   demonstrate why a reduced-capacity magazine is bad.
2         I personally have got (inaudible) gun.
3   It came with a factory standard 15 (inaudible)
4   magazine.  I also bought a reduced-capacity 10-round
5   magazine.  I asked my wife to load the gun or load
6   the two magazines last night.  She could fit 8
7   rounds in the 15-round standard-capacity magazine.
8         As you're aware, when you compress the
9   spring, the force gets higher.  She could fit two
10  rounds in the 10-capacity magazine.
11        If you reduce the people to having a
12  two-capacity magazine, what you're effectively
13  saying is those who are physically strong enough to
14  load the magazine can have 10 rounds.  People like
15  my wife, who physically couldn't feed more rounds in
16  the magazines, are often not offered the same
17  protection by law.
18        I'd like to voice a further opinion on
19  reading the law that says you've taken away my
20  rights to sell and transfer my personal property.
21  Now, I rank these as a violation of my Fourth
22  Amendment rights.  You're telling me that I, as a
23  collector, have 500 to a $1,000 worth of magazines
24  that I now cannot move.  I cannot sell them.  I
25  cannot transfer them.
0168
1         The State, while letting me physically
2   keep the item, has taken away my property rights,
3   and I have not been given due process on this.
4         I'd finally like to finish with the
5   committee, as with other people, and indeed
6   yourself, mention the fact that I was born in the

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

7  United Kingdom. I grew up in England, and when
8  violence is mentioned, I do not associate it with
9  the good.
10          I'd like to tell you the story of one
11  of my best friends growing up who was murdered
12  because he didn't have the right to defend himself.
13  He was beaten so badly by a drug addict, he lay in a
14  coma for three days before he died. He wasn't able
15  to protect himself.
16          I personally have been a victim of
17  violence. I've not once, but twice had my skull
18  stomped on. So I've got a boot print on the side of
19  my face and a fractured skull, because in the United
20  Kingdom, I was not able to defend myself.
21          I beg you to reconsider this bill,
22  because you are putting people's lives at danger.
23          Thank you.
24          THE CHAIRMAN: Thank you for sharing
25  some of your painful experiences with us. It's
0169
1  important to hear these things. And you have the
2  guts to come forward and talk about them, so that's
3  appreciated, sir.
4          So are there any questions for this
5  witness?
6          Thank you.
7          EDWARD IRVINE: Thank you.
8          THE CHAIRMAN: Justin Hayward.
9          UNKNOWN SPEAKER: Sorry, I do not have
10  pizza (inaudible).
11          THE CHAIRMAN: My apologies for not
12  having provided pizza to every member --
13          JUSTIN HAYWARD: Hello. Okay. I have
14  not done this before. Thank you for letting me
15  speak today. My name is Justin Hayward.
16  Mr. Chairman, Rhonda. I come from Bailey, Colorado.
17  I was born and raised in this beautiful state.
18          I'm here to express my thoughts today
19  about some of the proposed legislation regarding
20  guns being talked about today.
21          My parents came from communist Russia
22  and have seen firsthand some of the toll that is
23  caused on society by the over-regulation of arms.
24          Regarding House Bill 1224 discussing
25  large-capacity magazines, I am opposed to this
0170
1  legislation for many reasons. Most importantly, I
2  do not believe you have the right to choose for me
3  and my family how many bullets we need to defend
4  ourselves or our households.
5          Please do not take away the choice
6  that we have made for ourselves in the event of the
7  unforeseeable. Under the Second Amendment, we
8  should have the right to arm ourselves in ways that

9  we are comfortable with and see fit.
10          Second, I believe the existing
11  compromise between civilians and government is
12  reasonable and does not need any change.  The
13  weapons of war that the media and some members of
14  the Democratic Party are talking about are far
15  faster than their ability to shoot than their
16  semi-automatic civilian counterparts.
17          Taking away standard-capacity
18  magazines will do nothing to prevent crime or save
19  lives, but it will take away the ability of all
20  law-abiding citizens to protect themselves.
21          Please remember, if they work for law
22  enforcement, they work for civilians.  Pretty much
23  it.
24          THE CHAIRMAN:  Thank you, sir.  It was
25  short, but clear, concise --
0171
1          JUSTIN HAYWARD:  I try.  I'm a logger
2  for a living.  So I'm not a lawyer.
3          THE CHAIRMAN:  Mr. Hayward, thank you,
4  sir.
5          Are there any questions for
6  Mr. Hayward, before we take testimony from our last
7  witness?
8          Thank you, Mr. Hayward, for coming
9  forward --
10          JUSTIN HAYWARD:  You're welcome.
11  Thank you, Chairman.  And thank you, committee, for
12  letting me speak.
13          THE CHAIRMAN:  Thank you.
14          Allen Rothenbuther.  Christine
15  Martinez.  Vernon Thompson.  Richard Holebar.  Dave
16  Bufflar.
17          I'm sorry, sir?
18          UNKNOWN SPEAKER:  (Inaudible.)
19          THE CHAIRMAN:  I didn't understand
20  what you said.
21          UNKNOWN SPEAKER:  (Inaudible.)
22          THE CHAIRMAN:  The last name was
23  Mr. Dave Bufflar from Denver, Colorado.  Sorry.
24          Brian Lane.  Brian Lane from Lakewood.
25  Randy Fisher.  Karl Schwols, S-c-h-w-o-l-s.  We've
0172
1  heard from Mr. Martin.  Trevor Souther.  Doug Smith.
2  Mr. F. Paul Gresky.  Mr. Gresky, thank you so much
3  for waiting all this time.
4          PAUL GRESKY:  (Inaudible) late.
5          THE CHAIRMAN:  It's getting late, but
6  we're certainly interested to hear what you have to
7  say, and we very much appreciate you waiting to say
8  it.
9          PAUL GRESKY:  Thank you, Mr. Chairman,
10  members of the judiciary.  I'm going to have a

11  little bit of a choppy presentation because most of
12  my points have already been covered before.
13          But I'd like you to know that I am a
14  federally licensed firearms dealer.  I am a state
15  firearms instructor, a national firearms instructor.
16  I've been the president of two Sportsmen's Clubs.  I
17  am a past Colorado State Instructor of the Year.
18          I'm an ex-army captain.  I've been
19  recognized for my work, not only through the
20  National Shooting Sports Foundation, for which I'm a
21  member, but also by the U.S. Congress for my work.
22  The Laramie County Board of Commissioners, and the
23  Colorado Legislature has sent me letters of
24  commendation.
25          And I'm here to speak for my over
0173
1  15,000 students that I have taught in Colorado, not
2  counting the people I train for concealed carry,
3  which curiously are about 50 percent female, which
4  gives you an idea of the state of disrepair of this
5  country.
6          I'm opposed to this bill, and I see no
7  value to it.  It does not do anything to work on
8  criminals.  It tries to criminalize owners of
9  firearms.
10          There's been some questions by
11  Mr. Salazar about how many bullets does it take.  I
12  would share with you, as an army officer, that the
13  caliber .45 automatic Colt pistol was developed in
14  the Philippines Resurrection, in that war, because
15  of .38s wouldn't stop a person who is drunked up.
16  If you have a person that's on hashish or other
17  drugs, they may be dead, but they don't know it and
18  they're still coming.  So you need every cartridge
19  you have in order to handle that.
20          Also, as far as some other comments,
21  since I'm an instructor, I would tell you, if I
22  have -- myself, I will be changing a magazine in two
23  minutes or two seconds.  If I have another person
24  I'm instructing, which I did this past week on three
25  different occasions, three to six seconds.  You need
0174
1  to be able to swap the magazines out.
2          But I really think the oldest part of
3  English common law is what we have as the right of
4  self-defense.  As a safety instructor working
5  through the data from the Center for Health
6  Statistics and the National Shooting Sports
7  Foundation, I will tell you that the average citizen
8  is safe.  And I congratulate all of my students,
9  every class I have, because I value them as the
10  safest group of people I could possibly associate
11  with, and that data's here.  You probably don't have
12  access to it because you're not members.  I am.

13       I would also dare (inaudible) clear to
14  you that in looking at where fatalities occur, and
15  looking at the cities, and thinking about the drug
16  culture, I personally anticipate that the Mexican
17  cartels are going to start selling us AR-15s,
18  30-round magazines, that the Department of Justice
19  furnished to them.
20       I am also concerned that the
21  Department of Homeland Security is also ordering
22  AR-15s for their people, which have collapsable
23  stocks, and curiously enough, full automatic
24  selector switches on the guns.  That's not news.
25  Check with your friend Janet in D.C., you'll find
0175
1  that out.
2       Overall, in my perspective -- and then
3  I'll end, since it's the last -- I'd take a look at
4  where murders are occurring.  If I look at Chicago,
5  and we've talked about that.  If we take a look at
6  Detroit, we can talk about that.
7       Nationally, we only had a little over
8  600 people killed unintentionally in this country,
9  unintentionally.  If we look at Chicago, they had
10  over 500 murders.  They had 411 for Detroit.  Go to
11  Philadelphia.  Take a look at St. Louis.  Take a
12  look at San Francisco.
13       I think, if you try to put bans in,
14  you're going to have more problems than you ever
15  thought you would have, just as the County of
16  Mendocino, California, law enforcement forecast that
17  we're going to be in trouble here in Colorado in
18  three years.
19       My other concern is not going to make
20  you happy at all, because all of these centers for
21  high homicides are all ruled by people in the
22  Democratic Party.
23       THE CHAIRMAN:  Mr. Gresky, thank you
24  for your testimony.
25       Are there any questions for
0176
1  Mr. Gresky?
2       Seeing none, may we thank you, sir,
3  for coming forward.
4       PAUL GRESKY:  Thank you for letting me
5  make my statement.  Thank you very much --
6       THE CHAIRMAN:  We're the better for
7  it --
8       PAUL GRESKY:  Thank you.
9       THE CHAIRMAN:  I regret that we have
10  run out of time.  I do regret it.  And I know it's
11  frustrating, but we have to have some kind of time
12  limits, and this is the place that we're at.  Be
13  assured your views are important.
14       I want to give everybody who has not

LEG HX 000087    4003

15  had the opportunity to testify in opposition to
16  House Bill 1224, the opposition to -- the
17  opportunity to at least register their opposition to
18  the bill so that we may have some sense of the
19  sense of feeling among the public.
20          So I would ask all those who are in
21  opposition to the bill, but have not been able to so
22  state, just please stand so that we know that you
23  can't -- and I note for the record, again, this is a
24  large proportion of the crowd here.
25          So it would be better if we had been
0177
1  able to listen to everybody, but let the record
2  reflect, thank you for coming and thank you for
3  standing and registering your opposition to the
4  bill.
5          UNKNOWN SPEAKER:  Mr. Speaker.
6          THE CHAIRMAN:  You are not recognized,
7  sir.
8          UNKNOWN SPEAKER:  I'm asking to be
9  recognized.
10          THE CHAIRMAN:  And I'm declining to
11  recognize you, sir.
12          Thank you very much for being here.
13  The witness testimony phase is over.  We will take a
14  recess, and we will come back and consider
15  amendments.
16          (A recess was taken.)
17          THE CHAIRMAN:  We are on House Bill
18  1224.  The witness testimony phase is complete.  We
19  are now to the amendment phase of House Bill 1024
20  [sic], and I would ask, are there any amendments?
21          Representative Salazar.
22          REPRESENTATIVE SALAZAR:  Yes.  Thank
23  you, Mr. Chair.  I'm going to be offering an
24  amendment.  L.005.
25          THE CHAIRMAN:  Are you moving that,
0178
1  Representative Salazar?  Are you moving L.005?
2          REPRESENTATIVE SALAZAR:  Yes.  I'm
3  moving L.005.
4          THE CHAIRMAN:  Is there a second to
5  L.005?
6          REPRESENTATIVE COURT:  Second.
7          THE CHAIRMAN:  Seconded by
8  Representative Court.  L.005 does what,
9  Representative Salazar?
10          REPRESENTATIVE SALAZAR:  Yes.  Thank
11  you very much, Mr. Chair.  In terms of listening to
12  today's testimony -- sorry.  I'm just pulling up
13  some information here that I can read off of.
14          After listening to today's testimony,
15  it's painfully clear that a number of individuals
16  here are concerned about the limit on the number

LEG HX 000088    4004

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

17  of -- the limit on the clips being at 10.  And so in
18  listening to the testimony of the police chiefs, as
19  well as a gentleman here who talked about having
20  15-round clips, and I believe he said that he had
21  four 15-round clips around him.
22          And also considering the magnitude of
23  the constitutional question that we have going, I'm
24  offering this amendment that strikes out 10 and
25  substitute 15.  And the reason for that is because I
0179
1  asked a question, and it seems that people
2  misapprehended my question.
3          The question was with the physical
4  clip itself.  I asked the question of how many
5  bullets was enough for the physical clip, not how
6  many you can carry in total.  It's the matter of the
7  physical clip.
8          So you can have a 15-round clip and
9  you could have as many 15-round clips as possible,
10  but it was just the physical clip itself.  And from
11  hearing from the chief from, I believe, Gilpin, he
12  said that he carries a clip on him that holds 14.
13          This other gentleman, who I believe
14  was a reserve officer, said that he has 15-round
15  clips.  And then after taking a look at the website
16  on AR-15s, looks like you can go from a 5-round clip
17  all the way up to quite a bit.
18          And it seems that in terms of trying
19  to strike a balance here, particularly paying
20  attention to the constitutional questions that have
21  been raised, seems like 15 seems to be the number
22  that most people seem to have.  And that's why I'm
23  offering this amendment, is to strike 10 and to
24  substitute 15.
25          THE CHAIRMAN:  Representative
0180
1  McLachlan.
2          REPRESENTATIVE McLACHLAN:  Yes,
3  Mr. Chairman, if it please the committee, at this
4  time I'd like to offer a substitute amendment, House
5  Bill 1224, amendment L.006, and it is different than
6  Representative Salazar's proposal.  And I would ask
7  that it be circulated and read to the committee.
8          REPRESENTATIVE PETTERSEN:  Second.
9          THE CHAIRMAN:  Seconded by
10  Representative Pettersen.
11          So Representative McLachlan, your
12  amendment would be a substitute to Representative
13  Salazar's amendment, which increased the permissible
14  number of rounds from 10 to 15 in a magazine for
15  sale in Colorado and possession in Colorado.
16          In what way does your substitute
17  change Representative Salazar's proposal?
18          REPRESENTATIVE McLACHLAN:  Well, in

LEG HX 000089    4005

19  addition to confirming that the acceptable rounds of
20  ammunition would be 15, I'm also increasing the
21  rounds for shotguns, which is under the current
22  proposed bill, increasing from 5 to 8.  And I'm
23  cleaning up some of the language.
24           And so that's the purpose of this
25  amendment.  And I'd be happy to put forth the
0181
1  additional reasons, if the committee desires.
2           THE CHAIRMAN:  Representative Salazar,
3  your substitute is on the table.  I believe that for
4  technical reasons, I have to move to -- move to
5  amend your substitute.  And I'd -- I'd like to
6  consult with Mr. Sweetman here.
7           Mr. Sweetman, it seems to me, looking
8  at Amendment 4, and then Amendment 6 offered by
9  Representative McLachlan as a substitute, and then
10  looking at Amendment 7, which is intended to be
11  offered, that if Amendment 6 were adopted,
12  Amendment 7 could not be because of the settled
13  question arising from the strike in Amendment 6 of
14  page 3, line 1.
15           And I just wonder if you could shed
16  some light on this, Mr. Sweetman, because that's
17  what I understand might be a technical problem with
18  these three amendments, before we really consider
19  them and vote on them.
20           RICHARD SWEETMAN:  Thank you,
21  Mr. Chair, committee members.
22           Yes, I think there is a potential
23  settled question issue here, specifically in the
24  L.006 offered by Representative McLachlan.  You'll
25  see on line 3 of the amendment there is an amendment
0182
1  made to page 3, line 1.
2           And in Amendment L.007, which has not
3  yet been offered, there is an instruction on line 5
4  that says page 3, lines 1 through 3.
5           So there are ways to resolve this.
6           THE CHAIRMAN:  Thank you.
7           In that case, the -- the question
8  before the committee at the moment is Mr. --
9  Representative McLachlan's substitute amendment to
10  Representative Salazar's amendment.  And I move to
11  amend Representative McLachlan's L.006 by deleting
12  line 3 of L.006.  And I offer that as a conceptual
13  amendment.  Delete line 3 of L.006.
14           Is there a second?
15           REPRESENTATIVE COURT:  Second.
16           THE CHAIRMAN:  Representative Court.
17           Is there any discussion of that?
18           Representative Gardner.
19           REPRESENTATIVE GARDNER:  Yes.  Thank
20  you, Mr. Chair.  Well, I -- perhaps it's just

21 because the hour is late, but I'm -- in anticipation
22 of where you're going with Amendment L.007, to avoid
23 the settled question, I'm not quite sure how to
24 discuss these, but what is it you intended to do
25 with L.007, Mr. Chair, because what I see here in
0183
1 the printed bill is that large-capacity magazine, if
2 you go through there, does not mean something that's
3 been permanently altered, et cetera, and you're
4 striking that.
5         Is it your intention that what you're
6 striking there would continue to be a large-capacity
7 magazine?
8         THE CHAIRMAN:  I did not understand
9 that question, Representative Gardner.
10         REPRESENTATIVE GARDNER:  My apologies,
11 Mr. Chair.  I guess I'm just trying to figure out
12 what the purpose of L.007 -- what you're trying to
13 preserve the right to bring under the rules that
14 I'm -- you, know before I vote on the amendment to
15 L.006, I guess I'd like to understand why I want to
16 preserve that right under the rule.
17         THE CHAIRMAN:  I understand,
18 Representative Gardner, I think.  And the answer to
19 your question is that L.007 will not be a viable
20 option for the technical reasons that Mr. Sweetman
21 has alluded to and drawn our attention to, as an
22 expert on these matters.
23         And we want to be in a position, I
24 suggest to you, to at least consider L.007.  And we
25 cannot consider L.007 in due course if we have
0184
1 already settled the question of the reading of
2 line 1 on page 3.  And that will have been done,
3 unless we amend it out of L.006 and the amendment to
4 L.006.
5         And that's why I offer this conceptual
6 amendment.  And I hope that's entirely clear,
7 Representative Gardner.
8         Is there any more discussion of the
9 Kagan conceptual amendment to Representative
10 McLachlan's L.006?
11         Representative Wright.
12         REPRESENTATIVE WRIGHT:  Thank you,
13 Mr. Chair.  Since the -- since your conceptual
14 substitute amendment includes the language in L.006
15 and L.005, I'm just wondering -- maybe this was
16 already addressed and I missed it.  If I did, I
17 apologize.  But on line 4 and line 5 of the
18 amendment it's changing "a" to "any," in front of
19 person.
20         And I'm wondering why there's that
21 sudden change.  I hadn't heard discussion on that
22 change.

23          THE CHAIRMAN:  Representative Wright,
24  which amendment are you referring to now?
25          REPRESENTATIVE WRIGHT:  Mr. Chairman,
0185
 1  both Amendment L.005 and L.0046 on lines 4 and 5,
 2  page 3, line 10, strike "a" and substitute "any".
 3  That is a person who violates subsection, that would
 4  be changed to any person who violates subsection.
 5          THE CHAIRMAN:  That's correct,
 6  Representative Wright.  And that's a matter which I
 7  think we should discuss, if we get to L.006.  The
 8  matter under discussion right now is the Kagan
 9  amendment to the substitute amendment, L.007, which
10  has been moved as a substitute to L.005.
11          So the only question or the discussion
12  of the moment is whether it is appropriate to
13  amend -- Mr. Sweetman.
14          RICHARD SWEETMAN:  I apologize,
15  Mr. Chair.  I believe you misspoke.  The substitute
16  amendment is L.006.
17          THE CHAIRMAN:  Sorry.  Thank you,
18  Mr. Sweetman, and you've really been correct.
19          The matter before the committee is the
20  Kagan amendment to L.006, which is a substitute
21  amendment offered, moved, and seconded as a
22  substitute to L.005.
23          And so the question before us is not
24  yet, Representative Wright, and it will be, what is
25  the sense or lack of sense in changing the word "a"
0186
 1  to "any," because that is in Amendment 006.  At the
 2  moment we're discussing amending line 3 out of
 3  L.006.
 4          And seeing no further discussion, I
 5  move that Kagan conceptual amendment to L.006 delete
 6  line 3 of L.006.
 7          Ms. Shipley, will you --
 8          UNKNOWN SPEAKER:  Second.
 9          THE CHAIRMAN:  Yes.  That's right.  We
10  didn't -- but is there any objection?
11          Representative Gardner?
12          THE CHAIRMAN:  Ms. Shipley, please
13  take the roll.
14          MS. SHIPLEY:  Representatives.
15  Buckner.
16          REPRESENTATIVE BUCKNER:  Yes.
17          MS. SHIPLEY:  Court.
18          REPRESENTATIVE COURT:  Yes.
19          MS. SHIPLEY:  Gardner.
20          REPRESENTATIVE GARDNER:  No.
21          MS. SHIPLEY:  Lawrence.
22          REPRESENTATIVE LAWRENCE:  No.
23          MS. SHIPLEY:  McLachlan.
24          REPRESENTATIVE McLACHLAN:  Yes.

25        MS. SHIPLEY:  Murray.
0187
1            REPRESENTATIVE MURRAY:  Yes.
2            MS. SHIPLEY:  Pettersen.
3            REPRESENTATIVE PETTERSEN:  Yes.
4            MS. SHIPLEY:  Salazar.
5            REPRESENTATIVE SALAZAR:  Yes.
6            MS. SHIPLEY:  Wright.
7            REPRESENTATIVE WRIGHT:  No.
8            MS. SHIPLEY:  Lee.
9            REPRESENTATIVE LEE:  Yes.
10           MS. SHIPLEY:  Mr. Chair.
11           THE CHAIRMAN:  Yes.
12           And that amendment passes by 8 to 3.
13           We're now to Amendment L.006, which
14  has been moved.  And it is L.006 without line 3,
15  which has been amended out of L.006.
16           And Representative McLachlan, you were
17  the movement.  Is there anything further you'd like
18  to say in explanation of L.006?
19           REPRESENTATIVE McLACHLAN:  Yes.  Thank
20  you, Mr. Chairman.
21           First of all, I think this bill
22  represents a tension between our desire to limit the
23  capacity of mass murders, such as we've experienced
24  in this state on numerous occasions, through the
25  magazine capacity limitation and the rights of gun
0188
1  owners to defend themselves in these circumstances.
2           And giving that tension, I believe,
3  first of all, Representative Fields, with all due
4  respect, I think 10 is an unreasonable limitation,
5  and so I offer 15 as a reasonable amount, which will
6  allow someone to reasonably defend themselves.  And
7  I think it will meet each and every constitutional
8  challenge.
9           I also point out that we had a bulk of
10  testimony from many witnesses, including Mr. Chipman
11  and others, that 15 rounds is sufficient to
12  adequately defend someone under most circumstances.
13  And, of course, as the testimony shows, you can also
14  have more than one magazine in your possession.
15  There's no magazine limitation whatsoever.
16           So for that reason, I offer Amendment
17  006 and think it is good policy and would allow the
18  bill to go forward.  I think the bill still needs
19  some work, which it will receive, I'm sure,
20  subsequent to this committee.  But I offer L.006 for
21  this reason.
22           THE CHAIRMAN:  Are there any further
23  comments on L.006?
24           THE CHAIRMAN:  Representative Gardner.
25           REPRESENTATIVE GARDNER:  Yes,
0189

1  Mr. Chair. I didn't know it was seconded, but I do
2  have a --
3         THE CHAIRMAN:  Representative Gardner,
4  it was seconded before -- before.
5         REPRESENTATIVE GARDNER:  Very well.
6  Mr. Chair, if I may?
7         THE CHAIRMAN:  Certainly,
8  Representative Gardner.
9         REPRESENTATIVE GARDNER:  Yes.  Thank
10  you, Mr. Chair.
11         Well, in the spirit of that, of
12  improving this bill, then I would like to move an
13  amendment to L.006 that is conceptual but very
14  straightforward.
15         On line 2 of L.006, I would like to
16  change the number 15 to 31 and the number 8 to 20.
17         UNKNOWN SPEAKER:  Seconded.
18         THE CHAIRMAN:  Okay.  The amendment to
19  L.0006 has been moved and seconded.  Unless there is
20  any further discussion, Ms. Shipley, will you please
21  take the roll.
22         Representative Gardner?
23         REPRESENTATIVE GARDNER:  Yes.  Thank
24  you.  As I listened to the testimony, I found
25  nothing compelling or magical about 15 rounds or 8
0190
1  rounds.  And, in fact, what I found was there was
2  very little evidence that 10 or 15 -- but, by the
3  way, the willingness to move this thing from 10 to
4  15 simply speaks to the fact that there's not magic
5  to the number 15.
6         And as I've discussed with those in
7  the audience this evening and my constituents, I
8  find that a more workable and acceptable and
9  sensible number is 31 rounds of ammunition or 20
10  rounds of shotgun shells.  So that's the reason for
11  bringing the conceptual amendment.  And I appreciate
12  the chair entertaining it.
13         THE CHAIRMAN:  Representative Gardner,
14  I will entertain it.
15         And I would ask if there's any
16  objection to the conceptual amendment.  There is.
17  So being there is an objection, Ms. Shipley, will
18  you take the roll.  And this is the Gardner
19  conceptual amendment to L.006.
20         And, Ms. Shipley, take the roll,
21  please.
22         MS. SHIPLEY:  Representatives.
23  Buckner.
24         REPRESENTATIVE BUCKNER:  Yes.
25         MS. SHIPLEY:  Court.
0191
1         REPRESENTATIVE COURT:  Yes.
2         MS. SHIPLEY:  Gardner.

3        REPRESENTATIVE GARDNER:  Yes.
4        MS. SHIPLEY:  Lawrence.
5        REPRESENTATIVE LAWRENCE:  Yes.
6        MS. SHIPLEY:  McLachlan.
7        REPRESENTATIVE McLACHLAN:  No.
8        MS. SHIPLEY:  Murray.
9        REPRESENTATIVE MURRAY:  Yes.
10        MS. SHIPLEY:  Pettersen.
11        REPRESENTATIVE PETTERSEN:  No.
12        MS. SHIPLEY:  Salazar.
13        REPRESENTATIVE SALAZAR:  No.
14        MS. SHIPLEY:  Wright.
15        REPRESENTATIVE WRIGHT:  Yes.
16        MS. SHIPLEY:  Lee.
17        REPRESENTATIVE LEE:  No.
18        MS. SHIPLEY:  Mr. Chair.
19        THE CHAIRMAN:  No.
20        That conceptual amendment fails by a
21  vote of 4 to 7.
22        We are back to Amendment L.006 as
23  amended.  Ms. Shipley, will you take the roll -- or
24  Representative Wright, would you like to add further
25  to that.
0192
1        REPRESENTATIVE WRIGHT:  Thank you,
2  Mr. Chairman.
3        I was just again going to ask the
4  question, on lines 3 and line 5 of this amendment,
5  why are we changing the word "a" to "any"?  Since we
6  have Mr. Sweetman in front of us, I was wondering if
7  maybe we can address that.
8        THE CHAIRMAN:  That's -- thank you,
9  Representative Wright, for offering.
10        Mr. Sweetman, why is "a" changed from
11  the word "any" in these amendments?  What is the
12  effect of that?
13        RICHARD SWEETMAN:  Thank you,
14  Mr. Chair.  I do not know and I cannot identify an
15  effect.  I don't know.
16        THE CHAIRMAN:  Representative Gardner.
17        REPRESENTATIVE GARDNER:  Yes.  Thank
18  you.
19        Let me ask Mr. Sweetman, lines 4 and
20  5, if I understood Representative Wright's question,
21  we're striking "a" and substituting "any."  So we're
22  going to say -- instead of saying "a" person who
23  violates this subsection, we're going to say "any"
24  person who violates this subsection.
25        Do you think we're substantively
0193
1  changing the meaning of those two provisions,
2  Mr. Sweetman?
3        THE CHAIRMAN:  Mr. Sweetman.
4        RICHARD SWEETMAN:  Thank you,

5  Mr. Chair.

6           Representative Gardner, I don't

7  believe so, no.

8           REPRESENTATIVE GARDNER:  I'm sorry?

9           RICHARD SWEETMAN:  No, I don't believe

10  so.

11          REPRESENTATIVE GARDNER:  Okay.  Thank

12  you.

13          THE CHAIRMAN:  The question before the

14  committee is whether Amendment L.006 to House Bill

15  1224 as amended shall pass.

16          And before we take the roll,

17  Representative Fields.

18          REPRESENTATIVE FIELDS:  Thank you,

19  Mr. Chair.  And I do want to thank Representative

20  Salazar and Representative McLachlan for their two

21  amendments changing the limit from 10 to 15, and

22  then also changing the rounds to 8.

23          And I do need to say that in drafting

24  this legislation, we put a lot of thought and

25  consideration into that number.  And it is based on

0194

1  the Federal Assault Weapon Ban that was enacted in

2  1994.  And it's my understanding that there are

3  other states that have this limit in place.  It's

4  California, Hawaii, Maryland, and Massachusetts,

5  New Jersey.

6           So I'm not in support of changing the

7  rounds as identified in Amendment L.006.

8           THE CHAIRMAN:  Representative Fields,

9  thank you.

10          Is there anything further before we --

11  Representative Court.

12          REPRESENTATIVE COURT:  Thank you,

13  Mr. Chair.

14          Representative Fields, I deeply

15  respect the work that you've done on this bill, but

16  I do think that the arguments we've heard tonight

17  are somewhat compelling.  So I think that the

18  substitute that -- the amendment change that

19  Representative McLachlan has suggested is fair.

20  Meaning no disrespect to the work that you've done,

21  I think it's probably a good idea.

22          THE CHAIRMAN:  Representative Gardner.

23          REPRESENTATIVE GARDNER:  Yes.  Thank

24  you.  I appreciate your patience, Mr. Chair.

25          I'm sitting here still scratching my

0195

1  head about lines 4 and 5.  If the drafter doesn't

2  know why "a" would become "any," and if -- and we're

3  doing it at all, someone must have requested it.

4           And no, I can't compel them to answer

5  the question.  Could somebody tell me why it was

6  even asked for, because someone must think it means

7  something to change "a" person to "any" person in
8  these two provisions.
9        THE CHAIRMAN:  Representative Gardner,
10  that's an interesting question, and I will certainly
11  ask.
12        Does anybody in the room know who
13  suggested that "a" be substituted for -- sorry,
14  strike "a" and substitute "any"?
15        Representative Fields.
16        REPRESENTATIVE FIELDS:  No, it was not
17  requested on my behalf.
18        THE CHAIRMAN:  Representative Salazar.
19        REPRESENTATIVE SALAZAR:  That was
20  requested on my behalf.  There was a technical
21  change.  Being an attorney, and one who has
22  litigated an awful lot of cases and read an awful
23  lot of statutes, I've cited a number of statutes
24  where the statute cited any person, meaning that it
25  could be more than just a person.  It could be just
0196
1  about anybody.
2        In order to be a little clearer with
3  the statute, that's the reason why I did it.  And if
4  people have a problem -- and as Mr. Sweetman has
5  said, doesn't really change much in terms of between
6  "a" and "any," except for the fact that a person
7  just means one, and any person could mean,
8  certainly, more than one.
9        And that's -- and also -- also, it
10  encompasses just about anybody.  And I'm sure that a
11  person -- an argument could be made that it could
12  encompass at least one person.  Any person, to me,
13  makes it a little bit helpful for the court when
14  taking a look at this statute, if it does become
15  statute.
16        THE CHAIRMAN:  Thank you,
17  Representative Salazar.
18        Representative Gardner.
19        REPRESENTATIVE GARDNER:  Yes.  Thank
20  you.
21        And I appreciate that explanation.  I
22  just -- so many times when a word is changed, there
23  is some implication that it might be substantive,
24  but as I understand, it's just a matter of clarity
25  of drafting, and that's perfectly fine.  But I
0197
1  wanted to clarify that we weren't somehow making a
2  change that five years from now the Colorado Supreme
3  Court will look and say, well, ah-ha, they made a
4  change from "a" to "any," and it carries great
5  weight and meaning.  But apparently it doesn't.  So
6  that's perfectly fine.  Thank you.
7        THE CHAIRMAN:  Representative Gardner,
8  thank you.

9      In that case, I think we are ready,
10   unless anybody objects to my doing so, to take the
11   roll on Amendment L.006 as amended by the Kagan
12   conceptual amendment.
13              Ms. Shipley, please take the roll.
14              MS. SHIPLEY:  Representatives.
15   Buckner.
16              REPRESENTATIVE BUCKNER:  Yes.
17              MS. SHIPLEY:  Court.
18              REPRESENTATIVE COURT:  Yes.
19              MS. SHIPLEY:  Gardner.
20              REPRESENTATIVE GARDNER:  Pass.
21              MS. SHIPLEY:  Lawrence.
22              REPRESENTATIVE LAWRENCE:  No.
23              MS. SHIPLEY:  McLachlan.
24              REPRESENTATIVE McLACHLAN:  Yes.
25              MS. SHIPLEY:  Murray.
0198
1              REPRESENTATIVE MURRAY:  No.
2              MS. SHIPLEY:  Pettersen.
3              REPRESENTATIVE PETTERSEN:  Yes.
4              MS. SHIPLEY:  Salazar.
5              REPRESENTATIVE SALAZAR:  Yes.
6              MS. SHIPLEY:  Wright.
7              REPRESENTATIVE WRIGHT:  No.
8              MS. SHIPLEY:  Gardner.
9              REPRESENTATIVE GARDNER:  No.
10             MS. SHIPLEY:  Lee.
11             REPRESENTATIVE LEE:  Yes.
12             MS. SHIPLEY:  Mr. Chair.
13             THE CHAIRMAN:  Yes.
14             That amendment passes by a vote of 7
15   to 4.  We are now back to the bill and --
16             REPRESENTATIVE SALAZAR:  Mr. Chair.
17             THE CHAIRMAN:  Representative Salazar.
18             REPRESENTATIVE SALAZAR:  Mr. Chair, I
19   don't think that we've closed off amendments as of
20   yet.
21             THE CHAIRMAN:  Sorry.  Say again.
22             REPRESENTATIVE SALAZAR:  We haven't
23   closed off the amendment phase as of yet.
24             THE CHAIRMAN:  Oh, no.  We certainly
25   haven't, Representative Salazar.
0199
1              REPRESENTATIVE SALAZAR:  I'd like to
2    make one more amendment.
3              THE CHAIRMAN:  You're moving an
4    amendment?
5              REPRESENTATIVE SALAZAR:  Yes, sir.  I
6    move L.002.
7              THE CHAIRMAN:  Is there a second for
8    L.002?
9              UNKNOWN SPEAKER:  Second.
10             THE CHAIRMAN:  Tell us about L.002,

LEG HX 000098    4014

11  Representative Salazar.
12          REPRESENTATIVE SALAZAR:  Thank you
13  very much, Mr. Chair.
14          So in terms of looking at this -- this
15  legislation -- and I greatly appreciate the thought
16  that Representatives --
17          UNKNOWN SPEAKER:  I already have it.
18          THE CHAIRMAN:  And Representative
19  Fields -- that they put an awful lot of effort into
20  it, but I noticed something that brought me some
21  concern, and I'm sure that it's brought some concern
22  to the people here, as well, especially after
23  hearing the testimony about -- well, you know, I
24  want to make sure that I'm on level ground with
25  police officers.
0200
1          There's a provision in here that talks
2  about if a person who has a large-capacity magazine,
3  if they commit a crime, a felony or a crime of
4  violence with a high -- a large-capacity magazine,
5  that they're subjected to a Class 6 felony.  But if
6  you take a look at the exceptions, the exceptions
7  would be a law enforcement officer employed by a
8  department, agency or political subdivision of the
9  State of Colorado, any other state or the United
10  States government.
11          And my concern is that, let's say that
12  we have an off-duty or on-duty police officer who
13  decides to take a large-capacity magazine and commit
14  a felony or commit a crime of violence.  Well, then
15  they would not -- the prosecutor would not be able
16  to charge that officer with a Class 6 Felony as they
17  would anybody else.
18          And so what I'm doing is I'm moving
19  language on page 4, line 12, and I'm inserting in
20  there after the word "for" lawful use while the
21  officer is on duty or off duty.  So that way, if a
22  police officer is engaged in unlawful use of a
23  large-capacity magazine while committing a felony or
24  committing a crime of violence, then they could be
25  subjected to a Class 6 Felony, as well.
0201
1          And just as a matter of course, I'll
2  let you know that the Police Chiefs Association has
3  no problems whatsoever with adding the word "lawful"
4  in there.
5          THE CHAIRMAN:  We have amendment
6  L.002.  It's been moved and seconded.  Is there any
7  further discussion on L.002?  Is there any objection
8  to -- Representative Fields.
9          REPRESENTATIVE FIELDS:  Yes,
10  Mr. Chair.  No objection, but I think based on the
11  testimony that we heard today, and in light of
12  recent events that are going on in California, I

13  think this is a good amendment to add.
14          THE CHAIRMAN:  Thank you,
15  Representative Fields.  Is there any objection to
16  L.002?  Seeing none, L.002 is adopted.
17          I move L.007 to House Bill 1224.
18          REPRESENTATIVE LEE:  Second.
19          THE CHAIRMAN:  Representative Lee has
20  seconded Amendment 007.  Members, this is an
21  amendment which would change the exception which
22  currently says that a feeding device -- a .22
23  caliber tube ammunition feeding device does not
24  count as a high -- a high capacity -- large-capacity
25  magazine.
0202
1           And this amendment would change that
2  slightly and specify that a .22 caliber tube
3  ammunition feeding device might qualify as a
4  large-capacity magazine.  But more specifically, if
5  it is an attached tubular device designed and
6  capable of operating only with .22 caliber rimfire
7  ammunition, then it would be exempted from the
8  definition of a large-capacity magazine.  And I
9  therefore urge an aye vote on Amendment L.007.
10          Is there any discussion?
11          Representative Murray?
12          REPRESENTATIVE MURRAY:  Yeah.  I would
13  ask why line 16 has been deleted on page 2, and
14  lines 1 and 2 on page 3.
15          THE CHAIRMAN:  Representative Murray,
16  if we're going to change the -- the type of
17  ammunition feeding device that is exempted from the
18  definition of large-capacity magazine, which appears
19  on line 3, then, as a matter of the sense of it,
20  we -- the drafter, Mr. Sweetman, suggested the most
21  clear-cut way of doing that was to simply delete the
22  Roman numeral I -- page 3, strike lines 1 through
23  3 -- yeah, was to strike those lines and replace it
24  with the language in Amendment L.007.
25          Mr. Sweetman, if you'd care to clarify
0203
1  why.  Why do we have to strike lines 1 through 3 to
2  achieve this objective?
3           RICHARD SWEETMAN:  Thank you,
4  Mr. Chair.
5           The intention of the amendment, as I
6  understood it, was to substitute the provision
7  identified as Roman numeral I in Amendment L.007 for
8  the provisions that now exist in the bill as Roman I
9  and II on lines 16 of page 2 and lines 1 through 3
10  of page 3.
11          So that was the intention, to strike
12  those provisions, I and II in the bill, and replace
13  them with the I in the amendment.
14          But Ms. Shipley has pointed out to me

LEG HX 000100    4016

15    that there is a typo in the amendment on the final
16    line.  It should be page 3, not page 4.  Page 3,
17    line 4, which is a simple conforming amendment to
18    the amendment.
19        THE CHAIRMAN:  Mr. Sweetman, I see the
20    wisdom.  So line 6 -- for this amendment to work as
21    intended, line 6 of the amendment would have to be
22    changed to read page 3, line 4.  Strike 3 and
23    substitute 2.
24        RICHARD SWEETMAN:  Right.
25        THE CHAIRMAN:  Is that what you're
0204
1    talking about?
2        I move to amend L.007 with a
3    conception amendment.  Change line 6 of L.007 from
4    page 4 strike, to page 3, comma, line 4 strike.
5        UNKNOWN SPEAKER:  Second.
6        THE CHAIRMAN:  Thank you.  Is there
7    any objection to the Kagan conceptual amendment to
8    Amendment 007?
9        Representative Gardner.
10        REPRESENTATIVE GARDNER:  I don't know
11    that I have an objection.  I'm not sure what has now
12    happened.  If you bear with me and explain once
13    again what you have done conceptually to amend
14    L.007, Mr. Chair.
15        THE CHAIRMAN:  Representative Gardner,
16    I think I can.  Amendment 007 will delete one of the
17    Roman numeral paragraphs and make paragraphs 2 and 3
18    into -- sorry, will delete one of the Roman numeral
19    paragraphs, and therefore, it is a renumbering
20    exercise to make paragraph Roman numeral III become
21    paragraph Roman numeral II, because it will become
22    the second Roman numeralized subparagraph of II B,
23    1812 301 II B will then have -- after the Amendment
24    L.007, should it pass, will have only two Roman
25    numeral subparagraphs, and therefore we have to
0205
1    change the numeration.
2        Representative Gardner.
3        REPRESENTATIVE GARDNER:  Yes.  Thank
4    you.  Then I think -- I think that brings me back to
5    what was my original question about why we had a
6    conceptual amendment to L.006.  Because if I
7    understand this rather complicated conceptual
8    amending exercise we're engaged in, we have
9    effectively deleted or will have effectively deleted
10    what is in the printed bill a provision that
11    currently in the printed bill says a large-capacity
12    magazine does not mean a feeding device that has
13    been permanently altered so that it cannot
14    accommodate more than -- and the printed bill said
15    10 rounds of ammunition.
16        And I guess what I have always been

17  trying to ask for the past 10 minutes is, why are we
18  deleting that particular provision?  Why is it not
19  now a feeding device that is permanently altered,
20  that it cannot accommodate more than 15 rounds of
21  ammunition?
22          We're deleting a particular item that
23  the printed bill said is not a large-capacity
24  magazine.  And I can see where someone might own
25  what is -- or manufacturers may have manufactured a
0206
1  large-capacity magazine and they want to not scrap
2  everything that they've got on the assembly line.
3          So why are we taking that out?
4          THE CHAIRMAN:  Representative Gardner,
5  I think when we adopted L.006 at that time, L.0006
6  amended printed bill page 2, line 13, which is the
7  operative point for the entire bill, changing the
8  words 10 to 15, because it changed it to accept more
9  than 10 rounds from that to accept more than 15
10  rounds or more than 8 shotgun shells.
11          And when we changed -- in Amendment
12  006, we changed those lines 12 and 13.  When we
13  changed lines 13 and 14, effectively, we had made
14  the change.  This change did not need to be made
15  because the large-capacity magazine, this paragraph
16  B, it's talking about feeding devices.
17          So we've already changed the
18  definition of a magazine with L.006, that's
19  increased it from 10 to 15.  Now, we will talk about
20  .22 caliber tube ammunition feeding devices.  And
21  that can most eloquently be done simply by L.007,
22  the professional opinion of Mr. Sweetman.
23          Representative Gardner.
24          REPRESENTATIVE GARDNER:  Thank you,
25  Mr. Chair.  Well, I'm not going to belabor the
0207
1  point, but it seems to me that we're striking --
2  whether it's 10 rounds or 15 rounds, we're striking
3  a conceptual piece of the bill with L.007, and I've
4  yet to receive any explanation for why we would
5  strike that conceptual piece of the bill.  And
6  perhaps it's just me.
7          But I guess I will wait for the
8  committee report and its inevitable conclusion, but
9  I will oppose L.007 for that reason.
10          THE CHAIRMAN:  Representative Murray.
11          REPRESENTATIVE MURRAY:  Thank you,
12  Mr. Chair.
13          Well, maybe Representative Gardner
14  won't belabor the point, but I will.  I just want to
15  be clear that what we understand that what we have
16  eliminated is a feeding device that has been
17  permanently altered so that it cannot accommodate
18  more than 10 rounds of ammunition.  You want to

19  delete that, correct?
20          THE CHAIRMAN:  That is correct.
21          Representative Murray.
22          REPRESENTATIVE MURRAY:  And so you're
23  saying that you will substitute that to -- that in
24  the amendment that we're now looking at, Amendment
25  007, that it's sufficient to say that it's an
0208
1  attached tubular device designed to accept and
2  capable of operating only with a .22 caliber rim
3  fire ammunition, that that is one and the same item;
4  is that correct?
5          THE CHAIRMAN:  No.
6          Representative Murray.
7          REPRESENTATIVE MURRAY:  So why do you
8  want to eliminate a feeding device that has been
9  permanently altered?
10          THE CHAIRMAN:  Representative Murray,
11  a -- the paragraph B says that a large-capacity
12  magazine that is a prohibited large-capacity
13  magazine under the bill -- a prohibited
14  large-capacity magazine does not mean -- and
15  therefore this is an allowed device, it is an
16  attached tubular device designed to accept and
17  capable of operating only with .22 caliber rimfire
18  ammunition.
19          And that is a -- a -- that is an
20  amendment which makes clear that a .22 caliber
21  rimfire ammunition feeder, which is an attached
22  tubular device, is not considered a large-capacity
23  magazine.
24          Representative Wright.
25          REPRESENTATIVE WRIGHT:  Mr. Chairman,
0209
1  I believe we're talking about two different things,
2  and that's our concern with eliminating subsection
3  Roman numeral I.  What we're taking about -- and I
4  believe maybe the drafter could talk about this --
5  is that a feeding device that has been permanently
6  altered so that it cannot accommodate more than 10
7  rounds of ammunition may not be a tubular device.
8  It may actually be a magazine that can be loaded
9  into a weapon that someone, because of this new law,
10  would be able to change or adapt to accept, in this
11  case now, less -- 15 rounds or less.
12          They may be able to take a 30-round
13  magazine that they already own and convert it to a
14  15-round or less.
15          If we remove this language, they won't
16  be able to adapt the magazine any longer under law.
17          THE CHAIRMAN:  This committee will
18  stand in recess.
19          (A recess was taken.)
20          THE CHAIRMAN:  We are in the amendment

21  phase of House Bill 1224.  We are discussing the
22  merits, or lack thereof, of Amendment L.007.  It has
23  been pointed out by astute members of the committee
24  that perhaps Amendment L.007 deletes a protection in
25  the bill for those who have altered their magazines
0210
1  so that they cannot accommodate more than 10 rounds
2  of ammunition.
3         Of course that must be 15 rounds of
4  ammunition, if amendment L.00 -- L.006, which is the
5  McLachlan substitute amendment, is adopted.
6         I think the committee members are
7  correct who have pointed this out.  Thank you for
8  doing that.  That is what we do here.  And
9  therefore -- oh, that's right.  Yes.  We are on the
10  Amendment 007 amendment to fix the paragraph
11  numbering as a result of L.007.
12         And now, it is suggested -- I beg the
13  committee's indulgence for one minute, because I
14  want to get us out of here and I want to get this
15  done right.  And I think I'm going to be offering a
16  conceptual amendment, but I want to make sure I do
17  this right and don't delay this any longer.
18         I think I'm going to -- let me just
19  tell you where I'm going with this.  I think I'm
20  going to withdraw Amendment L.007.  And I will first
21  withdraw the conceptual amendment to L.007.
22         I will then -- this is what I am
23  thinking of doing -- then withdrawing L.007 itself,
24  assuming the seconds' agree to withdraw their
25  seconds.  And then, if that happens, then positing a
0211
1  conceptual amendment which keeps in the permanently
2  altered saving clause for feeding devices that are
3  permanently altered -- because as honorable members
4  have correctly pointed out, that is an important
5  part of the bill -- which changes the word 10 to 15
6  to reflect the effects of the McLachlan amendment,
7  but which changes paragraph 2, a .22 caliber tube
8  ammunition feeding device to the words, an attached
9  tubular device designed to accept and capable of
10  operating only with .22 caliber rimfire ammunition.
11         And I think that will achieve what I
12  am trying to achieve.
13         So Representative Gardner, I wonder if
14  you think that that might at least get put before
15  the committee what I was trying to get put before
16  the committee with L.007?
17         REPRESENTATIVE GARDNER:  I believe so.
18         THE CHAIRMAN:  Well, I feel much
19  reassured, Representative Gardner.  In that case, I
20  withdraw the Kagan conceptual amendment to --
21  amendment L.007, and ask the second whether the
22  second is willing to withdraw his second.

23      UNKNOWN SPEAKER:  (inaudible.)
24      THE CHAIRMAN:  Noting that he does,
25  that conceptual amendment to L.007 is withdrawn.
0212
1       I also withdraw Amendment L.007, and I
2  ask my second, Representative Lee, whether you agree
3  to withdraw your second to Amendment L.007?
4       REPRESENTATIVE LEE:  I do.
5       THE CHAIRMAN:  Then Amendment L.007 is
6  withdrawn.
7       And now, members, I offer a conceptual
8  amendment, the Kagan second conceptual amendment.
9  The conceptual amendment will do the following:  On
10  page 3, line 1 of the printed bill, delete the word
11  "ten" and replace with the word "fifteen," and
12  delete line 3 of page 3 of the printed bill, and
13  replace with Roman numeral II, an attached tubular
14  device designed to accept, and capable of operating
15  only with .22 caliber rimfire ammunition; 4.  End of
16  conceptual amendment.
17      REPRESENTATIVE COURT:  Second.
18      THE CHAIRMAN:  Seconded by
19  Representative Court.
20      Is there any discussion of the Kagan
21  conceptual amendment?
22      Is there any objection to the Kagan
23  conceptual amendment?
24      Seeing no objection, the ---
25      REPRESENTATIVE MURRAY:  Mr. Speaker.
0213
1       THE CHAIRMAN:  Oh, Representative
2  Murray.  Sorry.  My apologies, Representative
3  Murray.  I was so keen to get over the line.
4       Representative Murray.
5       REPRESENTATIVE MURRAY:  I wanted to
6  object, you know, because I object in principle to
7  the limitation of 15 rounds.
8       REPRESENTATIVE MURRAY:  I understand,
9  Representative Murray.
10      Is there any further discussion of the
11  Kagan conceptual amendment?
12      Hearing none, is there any objection
13  to it?  There is objection.
14      Ms. Shipley, will you please take the
15  roll.
16
17      MS. SHIPLEY:  Representatives.
18      Buckner.
19      REPRESENTATIVE BUCKNER:  Yes.
20      MS. SHIPLEY:  Court.
21      REPRESENTATIVE COURT:  Yes.
22      MS. SHIPLEY:  Gardner.
23      REPRESENTATIVE GARDNER:  Yes.
24      MS. SHIPLEY:  Lawrence.

25      REPRESENTATIVE LAWRENCE: No.
0214
1       MS. SHIPLEY: McLachlan.
2       REPRESENTATIVE McLACHLAN: Yes.
3       MS. SHIPLEY: Murray.
4       REPRESENTATIVE MURRAY: No.
5       MS. SHIPLEY: Pettersen.
6       REPRESENTATIVE PETTERSEN: Yes.
7       MS. SHIPLEY: Salazar.
8       REPRESENTATIVE SALAZAR: Yes.
9       MS. SHIPLEY: Wright.
10      REPRESENTATIVE WRIGHT: No.
11      MS. SHIPLEY: Lee.
12      REPRESENTATIVE LEE: Yes.
13      MS. SHIPLEY: Mr. Chair.
14      THE CHAIRMAN: Yes.
15      And that amendment passes 8 to 3.
16      Are there any further amendments to
17   House Bill 1224?
18      In that case, the amendment phase --
19   Representative Court.
20      REPRESENTATIVE COURT: Is the
21   amendment phase closed?
22      THE CHAIRMAN: The amendment phase is
23   not closed, Representative Court.
24      Are there any further amendments to
25   House Bill 1224?
0215
1       REPRESENTATIVE GARDNER: Mr. Chair.
2       THE CHAIRMAN: Representative Gardner.
3       REPRESENTATIVE GARDNER: I'd like to
4    move a conceptual amendment to strike on page 2,
5    line 1.
6       THE CHAIRMAN: Page 2, line 1.
7       REPRESENTATIVE GARDNER: I withdraw.
8       THE CHAIRMAN: Representative Gardner,
9    that is withdrawn?
10      REPRESENTATIVE GARDNER: I withdraw.
11      THE CHAIRMAN: Thank you,
12   Representative Gardner.
13      That motion fails for a lack of a
14   second, as well. But I am appreciative that you've
15   withdrawn it.
16      The amendment phase is now closed.
17      Representative Court.
18      REPRESENTATIVE COURT: I move House
19   Bill 1224 to --
20      THE CHAIRMAN: To the floor, to the
21   committee of the whole. Representative Court.
22      REPRESENTATIVE COURT: -- to the
23   committee of the whole with a favorable
24   recommendation.
25      Representative Court.
0216

LEG HX 000106   4022

1      REPRESENTATIVE SALAZAR:  Second.
2         THE CHAIRMAN:  Seconded by
3   Representative Salazar.
4         Representative Fields, would you like
5   to offer any wrap-up?
6         REPRESENTATIVE FIELDS:  Mr. Chair and
7   committee members, I want to thank you for your hard
8   work this morning and into the afternoon and into
9   the evening.  We had a very rich debate and a very
10  civil dialogue on this very important topic as it
11  relates to gun safety and reform.  So for that I say
12  thank you, Mr. Chairman, the way you facilitated
13  this discussion with great diplomacy.  I just want
14  to commend you for your service.  And I think it's a
15  great service to serve with all of you.  So I want
16  to thank you.
17        So in closing, the way the bill is
18  amended, it establishes some new limits as it
19  relates to high-capacity ammunition magazines.  We
20  are going to define it, if it passes, to accept not
21  10, but 15 rounds.  And then, on the shotgun shells,
22  we've moved it up from 5 to 8.
23        For all the family members that were
24  here today, and in sharing their stories, I want to
25  thank you for being a part of this process.  And for
0217
1   those who were here expressing their thoughts in
2   reference to their rights as it relates to guns,
3   thank you also for participating in this process.
4         High-capacity magazines have a common
5   thread that's linking to some of the mass shootings
6   that we've seen.  And so I don't want us to forget
7   Newtown, Connecticut.  Remember that on December the
8   14th, 2012, 26 people were killed.  They lost their
9   lives.  And that included 12 -- 20 first-grade
10  children.
11        Let's not forget Oak Creek.  That was
12  August 5th, 2012, six people were wounded.  And that
13  was based on a 19-round magazine clip.
14        Let's not forget what happened in
15  Aurora.  It was early on July 20th when James Holmes
16  allegedly shot and killed 12 people and injured 58
17  people.  He had a high-capacity magazine clip that
18  had 100 rounds of bullets in a magazine clip.  And
19  in 90 seconds, he was able to do that kind of
20  damage.
21        Let's not forget Representative Gabby
22  Giffords, when she was doing her civic duty by
23  holding a town hall meeting in a grocery store, and
24  at that event, 6 people were killed and 13 others
25  were wounded.
0218
1         I could go on and on, and I could talk
2   about Fort Hood and other events, but what all of

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

3   these events have in common is high-capacity
4   magazines clips.
5         So today I ask that we take action and
6   that we do something to prevent tragedies that
7   involve high-capacity magazines clips.  So the time
8   is now and I urge a yes vote.  Thank you.
9         THE CHAIRMAN:  Representative Fields,
10  thank you.
11        Members, the question before the
12  committee is shall House Bill 1224, as amended, pass
13  to the committee of the whole.
14        Any discussion to that question?
15        Representative Gardner.
16        REPRESENTATIVE GARDNER:  Thank you,
17  Mr. Chair.  I'll try to be brief.
18        And thank you, Representative Fields.
19  I know you feel strongly about this issue and I
20  appreciate your commitment to doing what you believe
21  to be the right thing.
22        I commend you, Mr. Chair, for your
23  patience in presiding over two very difficult bills
24  today.
25        As I look at this particular bill, I
0219
1   think it is less about the Second Amendment in one
2   way, and that is that my concerns and objections do
3   not even reach the Second Amendment issue.  The fact
4   is that at the time of 1994 to 2004, when we had a
5   federal high-capacity magazine ban, the Center for
6   Disease Control in 2003 reported on all of these
7   things, ammunition limits, restriction on purchase
8   waiting periods, registration, licensing, with the
9   conclusion that none of these measures
10  demonstratively reduced gun violence, which is what
11  everyone in this room -- absolutely every one of us,
12  I venture to say, would like to do.
13        And so in light of that, I ask myself
14  what is this bill, as I come to vote on it at
15  10 p.m.  Is it good public policy or not.
16        I read it and I consider the
17  testimony.  And I recognize that, first of all, it
18  will be difficult to enforce and be easily
19  circumvented simply by traveling across the state
20  line, purchasing a high-capacity magazine and
21  bringing it back, if one has not already purchased
22  one prior to the effective date of the bill.
23        It will be incredibly difficult to
24  prosecute simply by the assertion by one in
25  possession of a high-capacity magazine that they
0220
1   owned it before the effective date, shifting the
2   burden of proof to the prosecutor to prove
3   otherwise.
4         It is objected to by a large number of

LEG HX 000108   4024

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021213.txt[11/5/2013 7:32:45 AM]

5  citizens in such a way and on such basis and grounds
6  that I believe many citizens question the very
7  legitimacy of this restriction.  And as I've already
8  noted, it is a questionable utility in actually
9  addressing the problem of reducing gun violence,
10  that it may have little or no effect, however one
11  may feel that one is taking action.
12          And in the face of all of that, what
13  we heard this evening is that it will be very
14  damaging to jobs and the economy of our state.
15          This bill asks us to put 700 jobs and
16  $46 million of annual revenue at risk, on the
17  unsupported assertion that we might, just might,
18  increase public safety by reducing gun violence, for
19  which there's no demonstrable evidence.
20          For that reason, and not even reaching
21  the Second Amendment of the Constitution of the
22  United States, I simply say without that, this bill
23  is bad public policy.  And for that reason I will be
24  a no.
25          THE CHAIRMAN:  Is there any further
0221
1  discussion of whether the bill shall pass to the
2  committee of the whole as amended?
3          Representative Murray.
4          REPRESENTATIVE MURRAY:  Thank you,
5  Mr. Chair.
6          I guess there are so many unanswered
7  challenges to this bill.  You know, we haven't heard
8  any response to what about security companies at
9  malls, for example.  Right now -- with this bill,
10  they will be limited in how they can defend -- do
11  their job at a mall.
12          What about SROs in our schools?  They
13  will be limited.  They are not exempted in this bill
14  and that has gone unanswered.
15          What about collectors?  We haven't
16  answered that issue.  And what about a firearms
17  dealer that only deals with commercial -- commercial
18  sales, doesn't deal with retail sales, and they're
19  out of their home.  Someone finds them on a list of
20  dealers and they knock on their door in their
21  neighborhood and say here's the $10, I want you to
22  do a background check because my buddy and I are
23  selling guns.
24          There's just -- there's so many holes
25  in this bill.  And I have such respect for
0222
1  Sponsor Fields and what she is trying to achieve
2  here.  But the elephant in the room is the
3  discussion that we had with Magpul.
4          You know, we have an industry -- we
5  keep saying we're trying to attract industry into
6  the state.  And manufacturing, we're trying to keep

7  it in the United States, and here is a successful
8  business, and basically we're telling them, you
9  know, we don't want you in our state anymore.
10              Regretfully, I'm a no.
11          THE CHAIRMAN:  Thank you.  Are there
12  any further comments before we take the roll?
13          Representative Lawrence.
14          REPRESENTATIVE LAWRENCE:  Thank you,
15  Mr. Chair.
16              And thank you, Representative Fields,
17  for presenting this bill.
18              Today we heard testimony from
19  Mr. Robles describing the attack by three armed men
20  bent on murder.  The fact that he had the use of a
21  personal defense weapon with a standard-capacity
22  magazine was the difference between life and death
23  in his case.
24              These magazine are necessary for the
25  defense of life, and I think that's something that
0223
1  has absolutely been skipped over in all of this
2  discussion.
3              And on that basis, I will be a no vote
4  on this bill.
5          THE CHAIRMAN:  Thank you.
6              Is there any further discussion of
7  House Bill 1224 and the question whether it shall
8  pass as amended to the committee of the whole?
9          Representative Wright.
10          REPRESENTATIVE WRIGHT:  Thank you,
11  Mr. Chair.
12              I would just second the remarks that
13  I, unfortunately, see this as bad public policy for
14  the state of Colorado.  Just hours ago we passed a
15  piece of legislation that's going to cost the
16  taxpayers somewhere to the tune of $3.2 million.
17  And now, we're systematically, with the next piece
18  of legislation, telling a business that brings the
19  state an estimated $47 million annually and employs
20  upwards of close to 700 people that they should
21  leave the state.
22              So this is financial, I think, a
23  double blow to the state and the people of Colorado.
24              Secondly, I don't think that this bill
25  will meet constitutional muster.  I think that we've
0224
1  already seen in Heller that it's been established
2  that weapons used -- common weapons used during the
3  time are allowed under the Constitution of the
4  United States.
5              And I know that there's a young
6  attorney in this room who's very willing to be the
7  plaintiff in that case.  So I think it's passing bad
8  law that won't be upheld in the state of Colorado.

9       So I will be a no vote.
10      THE CHAIRMAN:  The question before the
11  committee is whether House Bill 1224 as amended
12  shall pass to the committee of the whole.
13          Is there any further discussion?
14  Seeing none, Ms. Shipley, will you please take the
15  vote.
16          MS. SHIPLEY:  Representatives.
17          Buckner.
18          REPRESENTATIVE BUCKNER:  Yes.
19          MS. SHIPLEY:  Court.
20          REPRESENTATIVE COURT:  Yes.
21          MS. SHIPLEY:  Gardner.
22          REPRESENTATIVE GARDNER:  No.
23          MS. SHIPLEY:  Lawrence.
24          REPRESENTATIVE LAWRENCE:  No.
25          MS. SHIPLEY:  McLachlan.
0225
1           REPRESENTATIVE McLACHLAN:  Yes.
2           MS. SHIPLEY:  Murray.
3           REPRESENTATIVE MURRAY:  No.
4           MS. SHIPLEY:  Pettersen.
5           REPRESENTATIVE PETTERSEN:  Yes.
6           MS. SHIPLEY:  Salazar.
7           REPRESENTATIVE SALAZAR:  Yes.
8           MS. SHIPLEY:  Wright.
9           REPRESENTATIVE WRIGHT:  No.
10          MS. SHIPLEY:  Lee.
11          REPRESENTATIVE LEE:  Yes.
12          MS. SHIPLEY:  Mr. Chair.
13          THE CHAIRMAN:  Yes.
14          And that bill passes by a vote of 7 to
15  4.
16          Thank you very much, members.
17          Thank you, members of the public, for
18  your patience.
19          This committee is adjourned.
20
21
22
23
24
25
0226
1               CERTIFICATE
2   STATE OF COLORADO        )
                              )ss.
3   CITY AND COUNTY OF DENVER  )
4
5           I, Angela Smith, Professional Reporter
6   and Notary Public for the State of Colorado, do
7   hereby certify that the above-mentioned hearing was
8   taken from an audio recording and reduced to
9   typewritten form; that the foregoing is a true

10   transcript of the proceedings had; that the speakers
11   in this transcript were identified by me to the best
12   of my ability and according to the introductions
13   made.
14          I am not attorney nor counsel nor in
15   any way connected with any attorney or counsel for
16   any of the parties to said action or otherwise
17   interested in its event.
18          IN WITNESS WHEREOF, I have hereunto
19   affixed my hand and notarial seal this 19th day of
20   June 2013.
21          My commission expires January 22,
       2015.
22
23          _____
              Angela Smith
24             Reporter, Notary Public
              Calderwood-Mackelprang, Inc.
25

0001
1  CITY AND COUNTY OF DENVER
   STATE OF COLORADO
2  HOUSE SECOND READING
   HELD ON FEBRUARY 15, 2013
3  HOUSE BILL 13-1224
4  -------------------------------------------------
5            REPORTER'S TRANSCRIPT
6  -------------------------------------------------
7
8       This transcript was taken from an audio
9  recording by Angela Smith, Professional Reporter and
10  Notary Public.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
1  SPEAKERS:                    PAGES
2  Representative Fields     3, 5, 7, 32, 38, 62, 86, 96
   Representative Holbert      4, 5, 20, 27, 46, 59
3  Representative Waller       6, 27, 42, 61, 67
   Representative McNulty       9, 56
4  Representative Salazar      12, 29, 54
   Representative Lawrence          15
5  Representative Murray       16, 22, 26, 52
   Representative Wright        17, 25, 50
6  Representative Pabone            23
   Representative DelGrosso         24
7  Representative Sonnenberg    31, 86
   Representative Gardner       33, 73
8  Representative Hullinghorst      38
   Representative Duran             39
9  Representative Priola            48
   Representative Landgraf          53
10  Representative Conti             85
   Representative Stephens          90
11  Representative McCann            97
12
13
14
15

LEG HX 000113
4029

16
17
18
19
20
21
22
23
24
25
0003
1         P R O C E E D I N G S
2       *   *   *   *   *
3       UNIDENTIFIED SPEAKER:  House Bill 1224
4  by Representative Fields, also Senator Hodge,
5  concerning prohibiting large-capacity magazines.
6       THE CHAIRMAN:  Representative Fields.
7       REPRESENTATIVE FIELDS:  Good morning,
8  Mr. Chair.  It's a pleasure to serve with you.
9       THE CHAIRMAN:  Good morning
10  Representative Fields, and with you.
11       REPRESENTATIVE FIELDS:  I move House
12  Bill 1224 and the Judiciary Committee report.
13       THE CHAIRMAN:  To the committee
14  report, Representative Fields.
15       REPRESENTATIVE FIELDS:  Members, the
16  committee report makes some minor changes.  It
17  changes the establishment for the limitation on
18  ammunition from 15 rounds, from 10 to 15, and it
19  moves the shotgun limit from 5 to 8.
20       It also addresses -- if you look on
21  page 3, line 3, we've substituted some wording to
22  address a .22 caliber rimfire ammunition.  And we've
23  also done some edits and changed some words from "a"
24  to "any."  And then we also put -- on page 4,
25  line 12, we inserted the word "lawful," which holds
0004
1  law enforcement accountable for unlawful use of a
2  high-capacity magazine.
3       THE CHAIRMAN:  Representative Holbert.
4       REPRESENTATIVE HOLBERT:  Thank you,
5  Mr. Chairman.
6       Representative Fields, I wonder if you
7  would please explain the significance of the number
8  15 relative to the number 10.  As we are
9  specifically discussing weapons that are
10  semi-automatic and fire one round per trigger pull,
11  what is the significance of the numbers 10 and 15?
12       THE CHAIRMAN:  Representative Fields.
13       REPRESENTATIVE FIELDS:  Thank you,
14  Mr. Chair.  And thank you Representative Holbert for
15  that question.
16       After listening to the testimony, I
17  thought it would be a better balance, and based on

18    what we heard from our gun owners, to increase that
19    capacity from 10 to 15.
20              I urge a yes vote on the committee
21    report.
22              THE CHAIRMAN:  Are there any more --
23              Representative Holbert.
24              REPRESENTATIVE HOLBERT:  Thank you,
25    Mr. Chairman.
0005
1              Representative Fields, is there any
2    standard capacity in detachable box magazines --
3    metal or plastic objects that hold other objects --
4    is there any number that might mirror standard of
5    these -- of these plastic or metal parts?
6              THE CHAIRMAN:  Representative Fields.
7              REPRESENTATIVE FIELDS:  Thank you,
8    Mr. Chair.
9              And we had some strong testimony from
10    David Chipman, and he said that the standard issue
11    for what we're trying to do here would be 15.
12              So once again, I urge an aye vote on
13    House Bill 12 -- committee report on 1224.
14              THE CHAIRMAN:  Representative Holbert.
15              REPRESENTATIVE HOLBERT:  I just wonder
16    though, Representative Fields, are there any
17    detachable box magazines, plastic, metal parts with
18    a spring in it -- are any of these manufactured in a
19    15-round configuration?
20              I'm somewhat familiar with these, but
21    I -- these objects, but I am not familiar with the
22    significance of either 10 or 15.
23              THE CHAIRMAN:  Representative Fields.
24              REPRESENTATIVE FIELDS:  Mr. Chair, as
25    previously stated, we've heard testimony from
0006
1    David Chipman, who indicated that 15-round mags are
2    a standard-issue equipment.
3              THE CHAIRMAN:  Representative Waller.
4              REPRESENTATIVE WALLER:  Thank you,
5    Mr. Chair.
6              Well, you know, I understand,
7    Representative Fields, that 15 might be
8    standard-issue equipment, but I didn't think that's
9    what this debate was about.  I didn't think that's
10    what we're here to talk about today.
11              I understand the reason you're
12    bringing this bill forward today is because you
13    believe that this bill is going to in some way
14    enhance public safety.  I mean, that's truly what
15    this is about.
16              I don't think we're about -- I'm
17    talking to the committee report.  This -- I don't
18    think that we're discussing whether or not we want
19    to ban a certain capacity magazine just because, for

20  one reason or another, that's what's standard,
21  that's what we have.  Because if that were the
22  discussion, we would be talking about 30, which is a
23  standard-capacity magazine for a rifle.
24          And so I don't think that's what we're
25  talking about.  We're supposed to be talking about
0007
1  public safety here and how this impacts public
2  safety.
3          So I believe the question for you,
4  Representative Fields, is how is it that a
5  10-capacity round -- or a 10-capacity magazine round
6  is going to enhance public safety or a 15-capacity
7  round -- magazine round is going to further enhance
8  public safety or detract from public safety.
9          What is the study that shows banning
10  any capacity is going to have an impact on public
11  safety?
12          THE CHAIRMAN:  Representative Fields.
13          REPRESENTATIVE FIELDS:  Thank you,
14  Mr. Chair.
15          And I -- we're supposed to be talking
16  about the committee report.  If we want to talk
17  about public safety, let's do that.  Let's talk
18  about public safety.  Because I have a report here
19  that shows that over the course of the last four or
20  five years, we've had 34 mass shootings using
21  high-capacity magazines.
22          And so that is the common thread that
23  we see in these massacres, is they're using
24  high-capacity magazines so they can unload as many
25  bullets as they can to kill as many people as they
0008
1  can in our schools, in our theaters, and in our
2  church.
3          Sandy Hook, 26 dead.  Century Theater,
4  Aurora shooting, 12 dead, 58 injured.  Safeway,
5  Arizona, 6 dead, 13 wounded.  Louisiana, 3 dead.
6  ABC, Inc., in Missouri, 4 dead.  Fort Hood, 13 dead,
7  34 wounded.  LA Fitness Center, 4 dead.  American
8  Civic Association in New York, 14 dead, 4 wounded.
9  Alabama, 11 dead.  Virginia Tech -- I can go on and
10  on and on.  Like I said, there's 34.  Virginia Tech,
11  32.  Hunting Camp, 6 dead.
12          So when you talk about public safety
13  and the equation to high-capacity clips, this is
14  what you have in common.  If your goal is to shoot
15  and kill as many people as possible using a
16  high-capacity magazine, it doesn't give an
17  opportunity for someone to intervene.
18          What has saved lives in all these
19  massacres is when they try to unload or when they
20  try to redo their ammo, someone can come in there
21  and rush them and knock them down on the ground.

22   That's what happened in Aurora.
23        In Aurora, his capacity magazine
24   jammed.  He had a hundred-round clip.  And the only
25   reason that we weren't able -- that he wasn't able
0009
 1   to kill more people was because that gun jammed.
 2        In Sandy Hook, he had a 30 magazine.
 3   And when I think about those babies, it just makes
 4   me want to cry.  And they were able to tackle him
 5   once he was done with that 30 magazine.
 6        Now, I would like to talk about the
 7   bill, and let's move beyond this committee report,
 8   so that I can talk about the overall restrictions
 9   and requirements of this bill.  But that's how it
10   relates to public safety.  If we limit it to 15, it
11   gives us an opportunity to increase safety by maybe
12   intervening, if someone wants to harm citizens in
13   the state of Colorado or elsewhere.
14        So, once again, I urge a yes vote on
15   this committee report.
16        THE CHAIRMAN:  Representative McNulty.
17        REPRESENTATIVE McNULTY:  Thank you,
18   Mr. Chairman, and thank you, Representative Fields.
19        And there is no doubt that those
20   unspeakable acts, the horror that happened, should
21   never be forgotten.  And we should learn from those
22   terrible tragedies as much as we can to reduce
23   violence in our communities.
24        It is not just about the tool, it is
25   about the character of this nation and the direction
0010
 1   in which we are heading.  That's what we ought to be
 2   concerned about.
 3        To this committee report, at the
 4   beginning of our House Judiciary -- the House
 5   Judiciary Committee meeting, a magazine that held 11
 6   bullets was a dangerous high-capacity magazine.  And
 7   the argument was made that one that held 10 bullets
 8   was a dangerous high-capacity magazine.
 9        By the time House Judiciary Committee
10   was finished, it was 16 bullets that constituted a
11   dangerous high-capacity magazine.  Now, I don't call
12   into question any of the logic behind that
13   amendment, and I know -- suspect Representative
14   Salazar will be here shortly to explain to us that
15   difference and why a dangerous high-capacity
16   magazine changed on the vote of the members of the
17   House Judiciary Committee.
18        The problem, colleagues, is this, it
19   underlines the basic fallacy behind this amendment
20   and behind this bill.  We are not safer.  We are not
21   safer by limiting the constitutional rights of law
22   abiding firearms owners.  And we do not respect the
23   victims, those who have lost their lives and the

24  families who suffered, by arguing over whether it's
25  11 bullets or 16 bullets.
0011
1           We do them honor and we do our nation
2  and we do our constituents honor when we respect the
3  Constitution and understand that the discussion is
4  much broader than the size of a magazine.
5           The school board members who are here
6  today are on the frontline of this generational
7  shift.  What's happening in our schools, what's
8  happening in our homes, what's happening in our
9  communities that is leading to this change that has
10  happened.
11           It is been drastic and it has been
12  dramatic and it is not because of one tool.
13  Violence is carried out in many forms.  Let's have a
14  conversation about how we bring character, integrity
15  to our families and to our communities.
16           To pull our noses up out of our iPads
17  and iPhones and BlackBerries, to get off of Facebook
18  and get out of our coffee shops and actually have
19  that human interaction again, to have that
20  face-to-face conversation that, yes, causes us to
21  understand each other a little bit better.  Get out
22  of our basements playing video games.  Get out and
23  play kick ball.  That will help reduce violence.
24           Colleagues, it is not the size of the
25  magazine.  It is not 11 bullets.  It is not 16
0012
1  bullets.  It is us.  We have the obligation to root
2  out the true cause of this increase in violence and
3  to do something about it.
4           Thank you, Mr. Chairman.
5           THE CHAIRMAN:  Representative McNulty,
6  thank you.
7           Representative Salazar.
8           And I would remind all members that we
9  are on the committee report of the Judiciary
10  Committee to House Bill 1224.
11           REPRESENTATIVE SALAZAR:  So thank you
12  very much, Mr. Chair.
13           And to speak to the committee report,
14  we moved an amendment -- or I moved an amendment to
15  raise the capacity of the clip itself from 10 to 15
16  to address primarily what Representative McNulty was
17  talking about, which is we have to take into
18  consideration the rights of law-abiding citizens who
19  carry guns.
20           And the reason why we went from 10 to
21  15 is because we heard the people who were there
22  speaking on Tuesday evening.  And I know some of you
23  weren't there the entire time, but we were.  And the
24  question was asked, not on limiting bullets, but it
25  was about the number of bullets a person would feel

LEG HX 000118    4034

1     safe with in a magazine.
2          And I asked people specifically during
3     that debate about their magazines.  Chief of police
4     showed up with their magazines and they had 14.
5     Other individuals talked about having 10, but having
6     multiple magazines around them for their safety.
7          One gentleman talked about walking a
8     trail with his wife and having an open-carried
9     weapon.  And in that open-carried weapon, he had a
10    magazine of 10 in there, but he also had two other
11    extra clips of 10 with him.
12          We heard an individual who was a
13    reserve officer with one of our local jurisdictions,
14    and he said that he carried 15, but he always had
15    multiple clips of 15 on him.
16          So in trying to balance public safety,
17    along with the rights of Americans, and knowing that
18    you can't carry a clip on you that has an infinite
19    number of bullets, it was about a matter of trying
20    to figure out where do people feel safe.
21          People aren't walking around with
22    drums of a hundred on their hips.  In fact, there
23    was laughter from gun supporters that these drums
24    are toys, even though 68 rounds or so were fired off
25    in Aurora.  It was about how safe do you feel,
0014
1     what's that number.  And from what everybody said,
2     it was around 10 to 15.
3          So in trying to make a balance here
4     between public safety and the rights of Americans,
5     that's why I moved to have the bill amended to go
6     from 10 to 15, knowing that Americas can still
7     have -- and that Coloradoans can still have how many
8     number of 15-round clips you want with you, but it's
9     15.
10          Now, you say how does that make
11    anybody safer.  Try telling that to Congresswoman
12    Gabby Giffords.  Where that individual stopped to
13    reload, because he didn't have a drum and he
14    certainly didn't have a clip that held an infinite
15    number of bullets, he stopped to reload, and in that
16    four-second time period he was able -- he was
17    stopped.  People were able to jump upon him.
18          We're trying to take people's rights
19    into consideration, along with the rights of
20    individuals who have the right to life, which is
21    also a constitutional right.
22          That's why we moved it to 15.  That's
23    why the committee report should be passed.
24          THE CHAIRMAN:  Representative
25    Lawrence.
0015
1          REPRESENTATIVE LAWRENCE:  Thank you,

2  Mr. Chair, and thank you for the opportunity to
3  speak to this.
4          I was also one of those members who
5  sits on judiciary, so I heard the testimony.  And
6  the most compelling testimony that I heard came from
7  Mr. Robles, who described a robbery at his business.
8          Three armed men came into his business
9  and they were bent on killing him.  If it hadn't
10  been for the fact that he had a standard-capacity
11  magazine in his gun at that time, he would be dead
12  today.
13          I think that's something that we all
14  need to take pause and think about.  You talk about
15  the ability to have magazines on your hip, well,
16  that's what the bad guys do.  They plan ahead.  They
17  bring extra magazines.  But what about that innocent
18  victim, what about that business owner who's just
19  minding his own business.  He's not thinking that
20  somebody's going to come in and try to murder him
21  that day.  He wasn't anticipating needing multiple
22  magazines on his hip.
23          And the fact that this body thinks
24  that we know what a law-abiding citizen will need in
25  that instance of self-defense, to me, is the height
0016
1  of arrogance.
2          THE CHAIRMAN:  Representative Murray.
3          REPRESENTATIVE MURRAY:  Thank you,
4  Mr. Chair.
5          Yes, I was in that 12-hour committee
6  hearing also with Representative Salazar.  And I
7  would like to point out that those smaller clips
8  that he was referring to are for pistols, not for
9  rifles; that we had person after person, who are
10  shooting enthusiasts, who came and just quietly
11  described how they used their rifles.  And most of
12  them were 20 and 30 magazines.  So a standard
13  magazine within the industry is 30.
14          We have a manufacturer in this state
15  that looked in dismay when somebody said do you make
16  a 15.  They said no.  And do you have plans to make
17  a 15.  Well, no, because a standard magazine is 30.
18  And that's the preponderance of what they make.
19          So let's -- let's get back to the
20  facts about what is real in terms of what's standard
21  and what's high capacity.  And let's put what's
22  standard into the hands of law-abiding people,
23  because we know that the bad guys are definitely
24  going to have the standard no matter what we do with
25  the law.
0017
1          I urge a no vote on this committee
2  report.
3          THE CHAIRMAN:  Representative

LEG HX 000120
4036

4  Sonnenberg -- sorry, Representative Wright.
5      Representative.
6      REPRESENTATIVE WRIGHT:  Thank you,
7  Mr. Chair.
8      And I too serve on the Judiciary
9  Committee and listened to a great deal of testimony
10  from hundreds of individuals who were waiting to
11  testify.  In fact, we went so long that we reached a
12  time limit and the opponents to this bill could not
13  even finish their testimony.
14      And the issue here is -- and I did not
15  hear this in Representative Salazar's statement --
16  when we're talking about the committee report to go
17  from 10 to 15 rounds in these magazines, we heard
18  testimony, person after person, who stated that they
19  use more than 15 rounds in their rifle magazines, as
20  Representative Murray pointed out.
21      In my district, I have a large
22  contingency of sportsmen who hunt with these rifles.
23      Now, when we're talking about going
24  from 10 to 15, are we making our society 5 rounds
25  more safe?  No, we're not.
0018
1      This is an arbitrary -- this is an
2  arbitrary amendment.  It makes no difference to
3  public safety whether there are 10 rounds in a
4  magazine, whether there are 15 rounds in a magazine,
5  or whether there are 30 rounds in a magazine.
6      I'm speaking as a former law
7  enforcement officer.  I've had guns pointed at me,
8  loaded firearms pointed at me, and I would not feel
9  safer in the field as a law enforcement officer
10  whether or not this bill passes.  Because the
11  reality is a well-trained individual, someone who's
12  practiced any small amount, can quickly change these
13  magazines out.
14      You can go on YouTube -- and I would
15  encourage you to do this.  There are videos on
16  YouTube that train you how to quickly change out a
17  magazine.  Any law enforcement officer who's had any
18  small amount of training can quickly change out
19  these magazines.  It doesn't matter if you have
20  three rounds in the magazine.  You can change these
21  magazines out within a matter of seconds.
22      Now, the issue here is, in fact,
23  public safety.  I could not agree more.  The
24  argument is very pertinent, and that is the safety
25  of our children, the safety of our communities.  We
0019
1  have seen so many devastating shootings that I too
2  want to act.  But this is not the solution.
3      Again, I've been in the field.  I've
4  looked into the eyes of evil.  And the eyes of evil
5  are not the weapon that's being used.  They're the

6    person behind the weapon.
7            So, Representative Fields, I too want
8    increased public safety.  It breaks my heart, as
9    much as yours, that we see these tragedies happen.
10   But this is not the solution.  We absolutely have to
11   make our community more safe.  And the way that we
12   do that is by giving the people that need -- that
13   are truly defenseless are our women.
14           Many of the women that we heard
15   testify they can't defend themselves unless they're
16   armed.  Why are we limiting their ability to defend
17   themselves.
18           So I would encourage you, as we look
19   at this committee report and this increase from 10
20   to 15, are we truly five times safer by doing this.
21   And I argue, no, we're not.
22           Thank you.
23           THE CHAIRMAN:  Representative
24   Sonnenberg.
25           Representative Holbert.
0020
1            REPRESENTATIVE HOLBERT:  Thank you,
2    Mr. Chairman.
3            To the committee report and this, in
4    my opinion, arbitrary number of 15, there have been
5    comments, I believe, in the committee hearing and
6    certainly in the conversation in our society around
7    this bill.  And sometimes I hear the question, why
8    would anyone need a magazine that would hold 10 or
9    15, 20 or 30.  Does it take 20 or 30 rounds to shoot
10   a deer?  No.  I teach my sons to be accurate, and
11   they have harvested deer with one shot.
12           But the reason that we, the people,
13   need -- should have access to these inanimate parts,
14   a box, a spring, a follower, a base plate, is the
15   same reason that our law enforcement needs these
16   tools.  Because these tools are not for taking --
17   harvesting deer or elk, they're for defending we,
18   the people, against tyranny.
19           And when I make that comment, some
20   say, oh, he's talking about government or one
21   person.  No.  Tyranny is an uncontrolled exercise of
22   power, murder, rape, assault.  Those are examples of
23   individual tyranny.  And the Second Amendment is our
24   defense.  We, the people, it is our defense against
25   tyranny.  It is that equalizer for people of small
0021
1    stature or gender to stand equal as we, the people.
2            That uncontrolled exercise of power is
3    why we, the people, have the Second Amendment right
4    to these inanimate detachable box magazines.
5            And I would ask for those who
6    understand this technology and are familiar with the
7    terminology, members, it would be so helpful if we

8  could not use the word clip.  That's the wrong word.
9  And when people who understand this technology hear
10  the word clip, they try to understand why are we
11  talking about clip in the conversation about
12  magazine.  It's similar to showing someone a golf
13  ball and talking about a golf shoe.  Same sport,
14  different item.
15          If you would, please, I would be so
16  grateful if we could use the word magazine because
17  that's what we're talking about, small magazines
18  that detach out of the handle, the grip of a pistol,
19  or a detachable box magazine that would come out of
20  the bottom, generally, of a semi-automatic rifle
21  that, again, fires one round per trigger pull.
22          If we have the detachable box
23  magazine -- again to the committee report -- that
24  holds 10 rounds, it would take 10 pulls of the
25  trigger.  If it holds 15 rounds, it takes 15
0022
1  individual conscious decisions to fire those 15
2  rounds.  If it's 20, 20 decisions; 30, 30 decisions.
3          I ask you to take into consideration
4  who comes first in the constitution.  It is we, the
5  people.  It is our job to trust the people we
6  represent more than the people who work for
7  government.  We need to be conscious and concerned
8  about the people for whom government works.
9          I ask for a no vote on the committee
10  report.
11          THE CHAIRMAN:  Representative Murray.
12          REPRESENTATIVE MURRAY:  Thank you,
13  Mr. Chair.
14          One story about the 20 and 30 being in
15  common use.  There's a delightful woman that came
16  and testified, and she's a trainer of teenagers, for
17  the most part, but she does train some adults, and
18  she says it's standard, when they're out on the
19  range, they're using 20- and 30-round magazines.
20          The lawyers in the crowd, when we were
21  discussing the constitutionality of this issue, said
22  that, you know, the ultimate test is common use.
23  And I gleaned from that hearing that common use is
24  not 15 rounds, but it is 30 rounds.
25          So if we're talking constitutionality,
0023
1  let's talk about the facts here and that a standard
2  common use of a magazine is 30 rounds.
3          I urge a no vote on this committee
4  report.
5          THE CHAIRMAN:  Representative Swalm.
6          Representative Pabone.
7          REPRESENTATIVE PABONE:  Thank you,
8  Mr. Chair.
9          And I just want to remind everyone

LEG HX 000123

4039

10    what we're debating about, which is the committee
11    report.  And the committee report changes the 10
12    rounds to 15 rounds and the number of shells from 5
13    to 8.
14            So if you're saying that you want to
15    vote no on the committee report, you are actually
16    arguing to keep the limits at 10 and 5.  That is the
17    natural conclusion of your urging of a no vote.  So
18    I just want to make sure that the members and the
19    body and the audience understands what a no vote on
20    the committee report would mean.
21            If that's where you want to have this
22    argument, we can have this argument.  But it would
23    be my suggestion that we pass the committee report,
24    and if there's further discussion on the number or
25    size that there -- as we know, there's unlimited
0024
1     opportunity to offer amendments.  But a no vote on
2     the committee report is actually reducing the number
3     of rounds and shells available.
4            With that, I ask for an aye vote.
5            THE CHAIRMAN:  Representative
6     DelGrosso.
7            REPRESENTATIVE DelGROSSO:  Thank you,
8     Mr. Chair.
9            And, Representative Pabone, thank you
10    for reminding us that we are on the committee report
11    and we are arguing the arbitrary number of changing
12    10 to 15.
13            We've heard no evidence at all to even
14    support 10 or 15.  We heard testimony -- or we heard
15    comments from Representative Salazar about how
16    everybody came to committee and talked about, well,
17    10 to 15, that would make them feel safe.
18            I was not a member of the committee,
19    but I listened to about two hours of the testimony
20    and I didn't hear one person say that.
21            So we are still talking about the
22    committee report and we still are talking about the
23    arbitrary number of 10 to 15 and if there should be
24    any number at all.
25            So thank you.
0025
1            THE CHAIRMAN:  Representative Wright.
2            REPRESENTATIVE WRIGHT:  Thank you,
3     Mr. Chair.
4            And I would echo Representative
5     DelGrosso's remarks.  We are, in fact, debating the
6     committee report, because we are, in fact, debating
7     whether or not this number is arbitrary, and back to
8     the core of this bill, which I know it is intended
9     for is increased public safety.
10            The core of the argument of going from
11    10 to 15 rounds is have we increased public safety.

12 No, we haven't. We haven't increased public safety
13 by limiting it to 10. And I would argue the public
14 is no more safe with 15.
15          We're talking about rifles that are
16 being used by sportsmen. We're talking about rifles
17 that are being used. And we heard in testimony
18 these rifles are the most commonly used tools for
19 self-defense in the home. All of them accept 30
20 rounds.
21          So are we safer in our homes by
22 limiting these magazines by half. That is not an
23 argument for more public safety.
24          This is like saying to the automobile
25 enthusiast that we're going to limit vehicles to
0026
1 V6s. So you can drive a V4 or a V6. What about the
2 folks who -- what about the folks who want a V8.
3          Because, ladies and gentlemen,
4 automobiles kill more people in this country than
5 guns. So this is the same argument.
6          Thank you.
7          THE CHAIRMAN: Representative Murray.
8          REPRESENTATIVE MURRAY: Thank you,
9 Mr. Chair.
10          I appreciate Representative Pabone's
11 comments about voting no on this particular
12 committee report. And anybody that knows me, I'm in
13 my fifth year now, if I can help make a bad bill
14 better and feel like I can live with that bill at
15 the end of the day, I'm the first person to go to
16 the other side of the aisle and work through those
17 details.
18          But there are some bad bills that just
19 can't be fixed and sometimes you have to stand on
20 principle. And this is one of times that I am
21 standing on the principle that the issue that we're
22 talking about is a constitutional right and common
23 use in our country and our state, and that we should
24 not be abridging that. And I'm not going to dicker
25 around with modifying the numbers.
0027
1          I urge a no vote on this committee
2 report.
3          THE CHAIRMAN: Representative Holbert.
4          REPRESENTATIVE HOLBERT: Thank you,
5 Mr. Chairman.
6          I echo the sentiments, the words of
7 Representative Murray. Fifteen is not somehow less
8 offensive to me. The question here is whether the
9 government that works for me, works for we, the
10 people, will limit access to an inanimate object.
11 And 10 is not somehow more offensive, and 15 somehow
12 less offensive, or 30 half as offensive as that.
13          The question is, as Representative

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

14  Murray pointed out, does this government trust the
15  people for whom it works or not.  And we're
16  negotiating with constitutional rights of
17  law-abiding citizens.  And I'm not interested in
18  negotiating a deal, a number that is somehow more
19  politically comfortable or less offensive to some.
20       I ask for a no vote on the committee
21  report.
22       THE CHAIRMAN:  Representative Waller.
23       REPRESENTATIVE WALLER:  Thank you,
24  Mr. Chair.
25       You know, Representative Salazar, I've
0028
 1  got to tell you, I take a little bit of umbrage with
 2  your comments earlier.  We're talking about the
 3  difference between 10 and 15 and why one arbitrary
 4  number is more appropriate than another arbitrary
 5  number.
 6       And, Representative Salazar, you said
 7  that you ran the amendment to change one arbitrary
 8  number, 10, to another arbitrary number, 15, because
 9  that's what everybody -- quote, everybody in the
10  committee agreed upon.
11       I don't sit on the House Judiciary
12  Committee either, but I spent a tremendous amount of
13  time watching this debate in the House Judiciary
14  Committee, listening to this debate in the House
15  Judiciary Committee, and looking at all of the
16  people that were there to testify in the House
17  Judiciary Committee.
18       And it seems odd to me that a member
19  of this body would say everybody.  Words that were
20  just spoken down in this well a few minutes ago,
21  everybody.  Everybody agreed that 15 was the right
22  number.
23       Representative Salazar, apparently you
24  weren't present in the committee when the hundreds
25  of pro Second Amendment people were there to testify
0029
 1  and say 15's not appropriate.
 2       There isn't an arbitrary number that
 3  is appropriate.  When we're considering this
 4  legislation, when we're considering the issues
 5  that's coming before us, we have to listen to the
 6  testimony of all people.  We have to consider the
 7  opinions of everybody, truly everybody that comes to
 8  testify in the hearing.
 9       And I'm here to tell you, members, not
10  everybody in the House Judiciary Committee said
11  there was a difference between 10 and 15.  In fact,
12  there were hundreds there that said otherwise.
13       THE CHAIRMAN:  Representative Salazar.
14       REPRESENTATIVE SALAZAR:  Thank you,
15  Chair.

LEG HX 000126   4042

16          I'd like to move -- I move an
17  amendment, which is L014, and I ask that it be
18  displayed.
19          THE CHAIRMAN:  Amendment 014 is
20  properly displayed.
21          To the amendment, Representative
22  Salazar.
23          REPRESENTATIVE SALAZAR:  Thank you,
24  Mr. Chair.
25          Also, upon taking the testimony of
0030
1  individuals into consideration, we heard from
2  representatives from a company located here in
3  Colorado called Magpul.  And the way that the
4  original bill was drafted, there was some concerns
5  that there would not be a manufacturer exemption.
6  And so, with speaking with the sponsor, as well as
7  representatives of Magpul, and listening to the very
8  real testimony of individuals who'd be affected if
9  there was an amendment, we drafted one to give
10  Magpul the option to encourage them to keep Colorado
11  jobs in Colorado.
12          And this amendment here will allow
13  them to continue manufacturing of any size clip --
14  any size magazine, excuse me -- since we want to get
15  into that, but that we're going to -- that they
16  could manufacture any size magazine in Colorado for
17  a branch of the armed forces, a department agency or
18  political subdivision of the state of Colorado or
19  any other state, or the United States Government,
20  arms retailer outside the state of Colorado, a
21  foreign national government that has been approved
22  by the United States Government, an out-of-state
23  transferee who may legally possess a large capacity
24  magazine, so any member of the public outside of the
25  state of Colorado.  And it would also protect those
0031
1  employees who either are in the process of helping
2  create those magazines, possessing those magazines
3  for the purpose of selling or transferring to the
4  aforementioned government agencies, as well as
5  people.  And also, it protects those who possess the
6  magazine for the sole purpose of transporting the
7  magazine to an out-of-state entity on behalf of the
8  entity.
9          So this has been vetted.  Seems to be
10  good language for our Colorado companies.  And I ask
11  that we -- I ask for a positive vote on L014.
12          THE CHAIRMAN:  Is there any further
13  discussion on L014?
14          Representative Sonnenberg, to the
15  amendment to the House Judiciary Committee report,
16  Amendment L014?
17          REPRESENTATIVE SONNENBERG:  Thank you,

18  Mr. Chairman.
19           And how ironic.  It's about the money.
20  It's all about the money.  Is that what this
21  argument's about?  We don't care about people
22  anywhere else in the country.  Is that the argument
23  you're making?
24           Members, I believe that this business
25  is important to Colorado.  I believe it's a vital
0032
1  business to Colorado.  The point of the matter is
2  that the amendment here shows the true colors, that
3  this is about keeping a business and doesn't care
4  about the people that are affected.
5           Members, I ask on principle for a no
6  vote on the amendment.  As you've seen the true
7  colors now of the amendment, I have -- I would ask
8  for a no vote on the amendment.  And now that you
9  know what the bill is about, vote no on the bill.
10           THE CHAIRMAN:  Representative Fields.
11           REPRESENTATIVE FIELDS:  Thank you,
12  Mr. Chair.
13           And this is not about the money.  This
14  is about our kids.  It's about protecting their
15  future.  This is what this is about.  High-capacity
16  magazines have no place in our communities.  They
17  have no place in our theaters.  They have no place
18  in our churches.
19           High-capacity magazines only have one
20  purpose.  And they should be in the theater of war.
21  They should be in a theater of war.  What this
22  amendment does -- and I support it, and I'm in favor
23  of it --
24           THE CHAIRMAN:  Representative Fields,
25  we are on Amendment L014 concerning the ability to
0033
1  manufacture in the state of Colorado.  Just a gentle
2  reminder.
3           REPRESENTATIVE FIELDS:  Thank you,
4  Mr. Chair.  I apologize.
5           But this is not about money.  This is
6  about allowing a business to be able to thrive in
7  the state of Colorado and to continue to be able to
8  employ people.
9           This bill is not going to impact their
10  business.  They'll still be able to produce their
11  products in a way that complies with this bill.
12           So I urge an aye vote on Amendment
13  L014.
14           THE CHAIRMAN:  Representative Gardner.
15           REPRESENTATIVE GARDNER:  Thank you,
16  Mr. Chair.
17           Well, members, as we consider this
18  bill and we consider the committee report and to
19  this amendment, a significant issue was addressed

20  about how this bill affected manufacturing in
21  Colorado.  And frankly, there was a lot of -- a lot
22  of scrambling, if you will, to try to figure out --
23  well, we don't want to -- we don't want to put 700
24  jobs at risk.
25          And so there were all of these --
0034
1  there was all this thinking around to have a
2  manufacturer manufacture a product that we -- or
3  some, not me -- some say, well, we shouldn't have
4  that product out on the street, but we're going to
5  have them manufacturing.
6          It's sort of -- it sort of reminded me
7  of a -- of a curious anomaly that I found this past
8  summer when I had occasion as a member of the
9  uniformed law commission to visit Nashville,
10  Tennessee.  And one of the side tours was to the
11  Jack Daniels distillery, which is a big industry
12  there.  And the relevance of this story is that one
13  of the curious things about the Jack Daniels
14  distillery is you can't buy the product in the
15  county in which the product is manufactured.
16          So you can't buy Jack Daniels where
17  the distillery works.  And all of those rationale --
18  all those rationale, very logical lawyers who were
19  on that tour, chuckled and rolled their eyes and
20  said, you know, now, there's some hypocrisy for you.
21  You can -- you can distill it there, you can even
22  hand out little bottles for all the tourist who come
23  by your major industry in your county, but don't be
24  buying that product there.  That product's not good
25  for you.  But, you know, for everybody outside this
0035
1  county, who's going to spend a lot of money and
2  bring it in to us, that'll be good.
3          What this amendment purports to do is
4  allow the manufacture of high-capacity magazines.
5  Because let's not make any bones about it, we have a
6  major small business employer in Colorado that is
7  legitimately manufacturing for military, law
8  enforcement, and the private market.  And there are
9  those who are suddenly finding their assumptions
10  about how good this product is or isn't challenged.
11          As Representative Sonnenberg says,
12  it's about the money, apparently.
13          For those of you who suddenly think
14  this amendment is a good idea, I ask you, how is
15  that different than the distillery, the local
16  distillery, where that product's really bad and you
17  shouldn't be using it and selling it here.  But, you
18  know, for those of you who want to spend your money
19  and sell it to your -- sell it to your citizens, oh,
20  that'll be fine.  And, of course, when it's alcohol,
21  we sort of roll our eyes and think it's hypocritical

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

22    and a bit funny.  But conceptually, it is no
23    different.  And, in fact, in this case, it's a good
24    deal worse.
25           Either you believe -- either you
0036
 1    believe that high-capacity magazines in the private
 2    market are dangerous for children, are dangerous for
 3    citizens, are a danger to public safety and they
 4    ought not be manufactured and sold to our friends in
 5    Kansas, Nebraska, New Mexico, Texas, Wyoming, Utah,
 6    because that would be wrong for us to be sending
 7    that product somewhere else, or you believe the
 8    product should be sold.
 9           And when this product is
10    manufactured -- and I -- make no mistake, I believe
11    that this manufacturer is engaged in a very
12    respectable activity, selling high-capacity
13    magazines for legitimate purposes, for recreational
14    shooters, for those who want to use them for
15    self-defense, frankly, as well as the military and
16    law enforcement market.  So make no mistake about
17    that, as I stand here and speak to this.
18           But I really am asking you to show a
19    little consistency here.  What do you really
20    believe?  Because one of the things that everyone
21    acknowledges about this, if they're the least bit
22    honest is this, these high-capacity magazines will
23    continue to be legal in Nebraska, Kansas, Texas,
24    New Mexico, Arizona, Utah, Wyoming.
25           And -- and I will speak to this at
0037
 1    length later on the bill, but just as a basic matter
 2    to this amendment, what you're really saying is
 3    it'll be okay with you to manufacture these -- we'll
 4    prohibit them in Colorado, but it'll be okay to
 5    manufacture and send them to our neighboring states.
 6           And, oh, by the way, there's no way --
 7    there's no way, that as an effective matter, that --
 8    Representative Salazar, Representative Fields,
 9    there's no way that, as a practical matter, that
10    you're not going to prevent these high-capacity
11    magazines from coming back into Colorado.
12           I mean, unless you want to set up
13    checkpoints and stop every car in and out, as I
14    suggested in the -- in the committee hearing that,
15    you know, maybe we'd have checkpoints on both sides
16    of the border, those for -- those for going out to
17    check on -- on the so-called legal marijuana, and
18    those coming in for high-capacity magazines.  And I
19    don't think we're going to do that, nor should we.
20           But I suggest to you that
21    Representative Sonnenberg's point is very well
22    taken.  If you think these magazines are a bad
23    thing, then the idea that you would vote for an

24  amendment or propose an amendment that allows them
25  manufacture in our state because we're going to make
0038
1  some money, is nothing less than hypocritical.
2          Or if they're really not that bad or
3  they compromise the public safety such that you
4  don't mind them being manufactured and sold in your
5  neighboring states and across the country, then I
6  have to ask you, is this about public safety or is
7  this about appearances?
8          Because the appearance, in my mind, of
9  this amendment is pretty cynical.
10          Thank you.
11      THE CHAIRMAN:  Representative Fields.
12          REPRESENTATIVE FIELDS:  Thank you,
13  Mr. Chair.
14          And I guess I need to explain the bill
15  as it relates to this amendment, because in the
16  bill, we already had crafted language to protect
17  this manufacture.  Because, as I had stated earlier,
18  high-capacity clips should be in war.  And what this
19  company does, as you see on the amendment up there,
20  is that they sell to the United States Government.
21          I want our government to have access
22  to high-capacity clips, magazines -- but I'm going
23  to say clip, magazines.  You know what I'm talking
24  about.  I want them to have the type of weaponry
25  that's needed to defend our company -- our country.
0039
1          So it's not being hypocritical.  It's
2  about the safety of our nation.  It allows them to
3  sell to branches of the armed forces.  This is
4  nothing to do about hypocrisy.
5          So I urge a yes vote on this
6  amendment.
7      THE CHAIRMAN:  Representative
8  Hullinghorst.
9          REPRESENTATIVE HULLINGHORST:  Thank
10  you, Mr. Chair.
11          And I stand in support of this
12  amendment and this bill.
13          To the amendment, I think it's
14  unnecessary to cast dispersions on those of us who
15  support this amendment, in terms of it being only
16  about money, or certainly not about the safety of
17  our children and people in the state of Colorado.
18          I know that all of you sit here
19  today -- all 65 are here because you care very much
20  about the people of Colorado and the businesses and
21  the schools and everything else that is a part of
22  our society.  We're here to make it safer.
23          And my opinion is that this amendment
24  helps a business that primarily sells ammunition to
25  law enforcement and to the federal government, to

4047

1   the defense department to provide for our defense.
2   I support all those things. I support that company.
3           This is an amendment that supports
4   making it possible for that company to operate in
5   the state of Colorado within the parameters that we
6   believe will make the state of Colorado safer for
7   everyone who lives here. And that's why I support
8   the amendment.
9           THE CHAIRMAN: Representative Duran.
10          REPRESENTATIVE DURAN: Thank you,
11  Mr. Chair.
12          And I do rise in support of this
13  amendment. It is offensive that the motives behind
14  this amendment have been questioned down here in the
15  well, an accusation that this amendment is coming
16  forward simply because of money.
17          You know what, down here, what we do
18  in a Democratic process, we take into consideration
19  businesses. We take into consideration the public.
20  We take into consideration a variety of different
21  voices to come up with legislation.
22          And today, in honor of recognizing
23  some of the issues with the bill, this amendment has
24  come forward to address a legitimate concern of a
25  local Colorado company. And in that democracy and
0041
1   in that compromise, we are accused of doing this
2   simply about money. That is -- that is ridiculous.
3   This is what we're down here to do.
4           I want to commend Representative
5   Salazar for bringing this forward and taking in
6   consideration the voices that have been -- that told
7   us that this is going to affect their business. And
8   it is a compromise.
9           And at some point, we need to have a
10  real conversation about what we are going to do
11  about the gun violence that we have in this country.
12          This is not about money. This is
13  about people. This is about kids. These are about
14  kids that have been shot over and over and over
15  again. This is what this debate is about.
16          And the only, only solution that I
17  heard today to some of the situations that we are
18  facing in this country is, well, get people off of
19  Facebook and have them go have coffee. I heard, get
20  people out to go and have them play kick ball.
21          Let me tell you, the issues that we
22  are dealing with are much, much more than we need to
23  have more personal interaction. I am tired of
24  seeing kids die year after year after year after
25  year.
0042
1           This is not about money. This is

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

2    about coming up with solutions to a terrible problem
3    that we have.
4            Thank you.
5            THE CHAIRMAN:  Representative Waller.
6            REPRESENTATIVE WALLER:  Thank you,
7    Mr. Chair.
8            And I'll start my comments with
9    addressing Representative Duran's issues.
10            You know, members, the goal we're
11    trying to accomplish here today, and one of the
12    primary goals we have as a body, is to do our part
13    to enhance public safety.  And make no mistake, this
14    legislation isn't about gun safety, or at least it
15    shouldn't be about gun safety.
16            This legislation, if we really want to
17    save kids' lives, should be about public safety.
18            Republicans, as well as Democrats,
19    want to enhance public safety.  In fact, as a
20    prosecutor, I have ran legislation in this assembly
21    to do that very thing.  I have run legislation to
22    reduce recidivism by changing some of our drug laws.
23    That enhances public safety.  Because that is our
24    goal here.
25            You know what, members, I have two
0043
1    kids in Colorado public schools.  My son goes to
2    Horizon Middle School and my daughter goes to
3    Remington Elementary School, and I drop them off at
4    school when we're not in session.  And like any
5    father, I let them go into the custody and care of
6    that school, and I think about their safety when I
7    do it.  Because public safety is the thing that I am
8    concerned about.
9            And you know what, if I thought
10    putting an arbitrary number on -- on some sort of
11    capacity for bullets would in some way enhance
12    public safety for my children, I'd come to the table
13    and I'd talk about it.  I'd be there.
14            THE CHAIRMAN:  Representative Waller,
15    we're, at the moment, discussing the manufacturing
16    exemption that is in this amendment.  So if you
17    could go more directly to the manufacturing
18    exemption.
19            We very much want to hear your views
20    on those border issues, but perhaps now is not the
21    right time for that.  Perhaps you might direct
22    yourself more directly to the Amendment L014.
23            REPRESENTATIVE WALLER:  We're going to
24    get there, Mr. Chair.  Thank you for that.  And I
25    appreciate the fact that you very much want to hear
0044
1    my opinions on this today.  And they will -- we will
2    get to that point.
3            Well, the discussion, though, is in

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

4  this amendment what we're doing.  We're exempting
5  manufacturers.  And Representative Duran came down
6  here and said she takes umbrage or offense to the
7  fact that -- that this amendment in some way is not
8  going to enhance public safety.
9         And I was merely trying to explain
10  through this discussion that we believe that this
11  amendment is inconsistent with the purpose of this
12  bill.  Not only is it inconsistent, it is wildly
13  inconsistent with the purpose of this bill.
14         I mean, if you think about it,
15  members, this is what this amendment does, the bill
16  is all about let's get rid of high-capacity
17  magazines because it's going to make our kids safe
18  in our public schools.  That's what we heard down
19  here today.  That's what people said.  That's what
20  they said about this very amendment.  It's going to
21  make our kids safer if we get rid of magazines.
22         Well, accept we still want them to be
23  produced.  We don't want them in Colorado, but we
24  want them to be produced.  But we only want them to
25  be produced for military purposes or police
0045
1  protection purposes.
2         And the majority leader came down here
3  and said, you know what, the vast majority of their
4  production is for military purposes, for police
5  purpose, for governmental purposes.
6         Madam Majority Leader, I'd encourage
7  you get out and see Magpul, because that's not
8  accurate.  It's not accurate.  Magpul produces over
9  50 percent of their products for civilian
10  consumption, not for military consumption in any
11  way.  It is for civilian consumption and this
12  amendment prevents them from doing that.  Makes them
13  uncompetitive in the marketplace.
14         Now, Representative Salazar came down
15  here and said that this amendment's been well
16  vetted, that it is supported by the industry.  But I
17  think that the discussion needs to go one step
18  further.
19         This amendment does nothing to keep
20  that manufacturer and those 700 jobs in the state of
21  Colorado.  The company has said, you put in
22  arbitrary limits on magazine capacity, we are
23  leaving the state of Colorado because we can no
24  longer be competitive.  We cannot be competitive in
25  the marketplace if you put this arbitrary number on
0046
1  us.
2         So maybe the amendment's been vetted.
3  I don't know, but it doesn't matter.  It doesn't
4  matter at all, because at the end of the day, it
5  doesn't accomplish anything.  All it does is takes

6  an arbitrary figure and makes it even more arbitrary
7  than it is.
8          THE CHAIRMAN:  Representative Murray.
9          Representative Stephens.
10         Representative Fields -- no
11 Representative Holbert.
12         REPRESENTATIVE HOLBERT:  Thank you,
13 Mr. Chairman.
14         Members, I rise in opposition to this
15 amendment.  I oppose oops 14.
16         Because Representative Duran is right,
17 this isn't just about money.  There are other
18 reasons.  There's political convenience.  Because of
19 the oops amendment, we're recognizing that an
20 inanimate object has been demonized.
21         I've heard magazines referred to as
22 rapid-fire magazines.  Magazines don't fire.  It's a
23 piece of plastic or metal with a spring in it.
24         So now we're running the oops
25 amendment that this inanimate object that has been
0047
1  demonized probably --
2          THE CHAIRMAN:  Excuse me,
3  Representative Holbert, for a moment.
4          Members and guests, the noise level
5  seems to be going up.  Would respectfully request to
6  keep them down so that we can all hear what
7  Representative Holbert has to say.
8          Thank you very much.
9          Representative Holbert.
10         REPRESENTATIVE HOLBERT:  Thank you,
11 Mr. Chairman.
12         These objects have been so demonized.
13 And the political tsunami of opinion was built up so
14 quickly.  And then, probably for some, there was a
15 realization that one of the world's leading
16 manufacturers of these inanimate objects is right
17 here in Colorado.
18         So there's political convenience to
19 say oops, maybe we didn't know that, and step back
20 and avoid that confrontation with a company that
21 directly or indirectly employs a thousand people in
22 this state and generates tax revenue, some of which
23 goes into our schools.
24         I also want to point out for the
25 people in the gallery, the people we represent who
0048
1  are watching via internet or television, the oops
2  amendment is a way for those who support this bill
3  to avoid the oops in New York that law enforcement
4  and the military wasn't exempted.
5          And once again, we, the people, need
6  to stand up and make our voices heard that
7  government shall not trust the people who work for

8  government more than the people for whom government
9  works.
10       This amendment is wrong for multiple
11  reasons.  If we're here for public safety, then
12  let's apply the same standard of public safety to
13  all people in all corners of this state.
14       But it isn't about public safety.
15  It's about a political agenda.  And I ask a no vote
16  on oops 14.
17       THE CHAIRMAN:  Representative Priola.
18       REPRESENTATIVE PRIOLA:   Thank you,
19  Madam -- or Mr. Chair.
20       I am speaking against this amendment
21  because Magpul will not support this bill with the
22  amendment or without the amendment.  They will not
23  support the bill or the amendment or the committee
24  report because of principle.
25       They believe in the Second Amendment,
0049
1  as I do.  And on that principle and on that right,
2  we will not equivocate.  We will not negotiate.
3       The Second Amendment is there for the
4  people, not for the government.  And 10 rounds, 15
5  rounds, 16 and a half rounds, whatever the number,
6  it's equivocation on a right.
7       The Second Amendment right, I, as an
8  American, am very proud we have.  Because we're --
9  for 200-plus years, we've not been in the same spot
10  as our fellow man in North Africa, in the Middle
11  East.  I saw a piece in the Denver Post yesterday of
12  a gentleman in Syria who was using a handmade giant
13  slingshot to lob a grenade at the government that
14  they were trying to overthrow.
15       There's a reason our Founding Fathers
16  saw a wisdom in putting the Second Amendment into
17  law.  They understood history.  They understood what
18  kings and Syrians had struggled with.
19       Magpul will not equivocate on this
20  amendment or any other amendment, as I will not
21  equivocate.
22       I ask you to vote no on this and the
23  bill.  This is bad policy for the state of Colorado.
24       We're a western state.  Our
25  forefathers came here and they needed guns for
0050
1  self-defense, not just for hunting.
2       I know for a lot of the legislators
3  who live in -- live in the city, you probably don't
4  have experience with guns, but that doesn't give you
5  the right to take away a Second Amendment right from
6  other Coloradoans.
7       Please, vote no on the amendment and
8  the bill.
9       THE CHAIRMAN:  Representative Wright.

10          REPRESENTATIVE WRIGHT:  Thank you,
11 Mr. Chair.
12          Representative Salazar, Representative
13 Fields, Representative Duran, I am -- I am not
14 questioning your motives here.  I think that you
15 truly are attempting to establish a compromise.  I
16 believe that.  And I do believe that in your minds
17 this is about public safety.
18          However, I'm concerned that Amendment
19 L014 may be misguided.  And here's why.  My district
20 is 20 miles from the Utah state line, 20 miles.  My
21 home is literally located 20 miles from a state
22 line.  It's important for us to remember we have
23 four sides of this state and four states surrounding
24 us that don't have this law in place.
25          And now we're exempting -- if you look
0051
1 at line 12 and line 17 -- the transfer of these
2 magazines out of state within -- within 75 miles of
3 my home, someone would be able to cross the state
4 line and go buy a magazine that was manufactured in
5 Colorado.
6          Secondly, what message does this send
7 to our small businesses.  We're going to have
8 retailers -- a retailer that's located literally
9 20 miles from the state line in my district who
10 can't sell these magazines, but 50 miles away the
11 retailer across the state line can.  What economic
12 message is that sending at the retail level, not the
13 manufacturing level, but the retail level.  It's
14 going to have an economic impact.
15          And then what message are we sending
16 to the kids that are going to the school 75 miles
17 away from my home in Utah.  Are they safer?  If this
18 truly is about the safety of our children, we're not
19 making our kids safer in the states that surround
20 us, by allowing a manufacturer to continue
21 manufacturing these magazines in our state.
22          If that truly is the argument, if this
23 is truly about public safety, then why are we even
24 looking at this amendment.
25          Thank you.
0052
1          THE CHAIRMAN:  Representative Murray.
2          REPRESENTATIVE MURRAY:  Thank you,
3 Mr. Chair.
4          Members, I'd like to talk about the
5 integrity of this business that we're discussing.
6 My observation of them, they didn't -- in committee,
7 they didn't ask for this amendment.  And in
8 discussions with them, they said, you know, how can
9 we manufacture a product in the state that we can't
10 sell in this state.
11          And it's about their relationship to

4053

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

12  their customers.  There's a lot of talk these days
13  about customer relationships.  There's a premium put
14  on it, that companies understand that they need to
15  have that close relationship with their customers.
16  Their customers are people that want 30-round
17  magazines.
18          So, you know, I'm not going to say
19  whether they're going to leave the state or not,
20  but, you know, they have a real philosophical
21  conflict going on in their company right now as to
22  whether they should stay in the state where they
23  cannot serve their customers directly, that they
24  have to go around state lines to sell to their
25  customers, if that's what ends up happening.
0053
1          So, you know, we shouldn't be
2  demonizing business.  We shouldn't be extolling
3  business.  We should be recognizing the issues that
4  they face every day in a relationship with their
5  customers.  And many of them are retail, they're not
6  just defense.  Many of them are retail customers
7  that they will be able to sell at Cabela's in Utah
8  and in Wyoming and in Kansas and in New Mexico.  But
9  they won't be able to sell their product in my
10  county in Cabela's -- the new Cabela's going in in
11  Lone Tree.
12          So good luck to them, if this bill
13  passes, in making the decisions that they have to
14  make in a state that basically says we want your
15  money, but please, we don't want to see your product
16  in this state.
17          I urge a no vote on principle on this
18  amendment.
19          THE CHAIRMAN:  Representative
20  Landgraf.
21          REPRESENTATIVE LANDGRAF:  Thank you,
22  Mr. Chairman.
23          L014 does not exempt businesses that
24  we haven't already talked about.  And two of those
25  businesses are in my district.  One is Apex Gun
0054
1  Parts.  The other is Arms of America.  One of those
2  businesses is entirely veteran owned.  The other one
3  employs 20 employees.  They have $3.5 million in
4  sales.
5          My concern here is they do not
6  contribute $46 million to the economy, and
7  therefore, they are being overlooked.  They are
8  deemed irrelevant by this amendment.  And that's a
9  travesty.
10          Just last week -- or this week, we had
11  the Economic Development Caucus here.  These are
12  people who are looking to attract businesses to
13  Colorado, businesses that we need badly.  What kind

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

14    of message are we sending businesses wanting to come
15    to Colorado?  We're telling them we want business,
16    but we do not want you.
17            I strongly urge a no vote on L014.
18    Thank you.
19            THE CHAIRMAN:  Representative Salazar.
20            REPRESENTATIVE SALAZAR:  Thank you,
21    Mr. Chair.
22            I'm, once again, asking for a yes vote
23    on L014.  I -- maybe I just remember things
24    differently on what happened on Tuesday night, but
25    we were supposed to take into consideration what
0055
1    people had to say there.
2            Magpul was there, and they said that
3    under the current legislative proposal that it
4    didn't exempt them.
5            And I remember quite clearly that one
6    of our good representatives, Representative Gardner,
7    was concerned about it, just like I was, listening
8    to what they had to say about their business.  And
9    he asked them questions about it, are you exempt,
10    the language of it.  He even talked to Chair Kagan
11    about that, that I don't think that this language
12    exempts them.
13            Well, in listening to them, that's
14    what we have.  Because even Representative Gardner
15    was concerned about it.  And this is what we've
16    developed.  And this is what we've proposed.  And
17    yes, this was ran through Magpul.
18            Now, ultimately, they may be against
19    the bill, but this language here represents what
20    they were looking for in an option to stay, if they
21    decide to do so.
22            It's not about money.  It was about
23    listening to people.  It was about listening to a
24    Colorado company employing Coloradoans who were
25    concerned that they would not be within the confines
0056
1    of the law.
2            This represents us listening to the
3    constituency base.  Now, all of a sudden it's about
4    money.  Well, I'm just trying to figure out which
5    side the bread is buttered on here.  Is it about
6    keeping Colorado jobs here?  Is it about keeping a
7    Colorado company here, or has it now become
8    something different?
9            Let's be consistent in what we're
10    trying to say.  Is it about listening to the people?
11    Is it about listening to Magpul?  Or is it about,
12    all of a sudden, we just want their money?
13            If you were concerned about all --
14    about not having them here, then why ask them the
15    question at all?  Why even express any concern at

16  all in judiciary about them leaving, if we didn't
17  have an exemption?
18        I'm requesting a vote of yes on L014.
19  Thank you.
20        THE CHAIRMAN:  Representative McNulty.
21  I presume this is to Amendment 014?
22        REPRESENTATIVE McNULTY:  Thank you,
23  Mr. Chairman.  You'd be correct, since I raised my
24  hand as we have this debate in front of us.
25        Representative Salazar, I appreciate
0057
1   the fact that you and some of your colleagues are
2   attempting to dig your way out of a pit that you've
3   gotten yourself into.  It is moderately creative,
4   but ultimately, it shows that this bill is lost.
5   This bill is lost.
6         The many amendments that were offered
7   to it in committee, how many amendments must be
8   offered to this bill, watering it down, admittedly,
9   from its additional -- original purpose, watering
10  the bill down until the realization is that you
11  aren't doing anything.  Aren't doing anything.
12        This is an important employer in
13  Colorado, and there's no doubt about it.  These guys
14  came to Colorado, built this from the ground up,
15  bootstrapped it.  Ought to be celebrated, not
16  condemned.
17        And know that this amendment shows
18  very real problem that exists with the bill, these
19  magazines that are built and transported,
20  standard-capacity magazines, by the way.  And at
21  some point, I'm sure that we will have a lesson on
22  the difference between sidearm magazines and rifle
23  magazines, because they are fundamentally different.
24  The amount of rounds that each holds is
25  fundamentally different.
0058
1         But when you look at this amendment,
2   they can be transported to anyone, anyone outside of
3   the state of Colorado who has a legal right to buy
4   them.  But what we also know is that underlying
5   provisions in the bill make it unworkable for anyone
6   to manufacture magazines in the state of Colorado.
7         So sure, you can play your little
8   games with this amendment here, and I appreciate the
9   situation that you found yourself in.  I'm not going
10  to say I haven't been there too, because I have.
11  But it's not going to do anything.
12        So who is next?  Who is next?  What
13  unfavored manufacturer will be next?  Will it be the
14  distillers?  Will it be the winemakers on the
15  Western Slope?  Will it be the niche tobacco
16  manufacturers?  What are we going to decide is
17  unfavorable?  What is next?  What is the next

18  industry that has to leave the state of Colorado
19  because this state legislature has put up the
20  going-out-of-business sign?
21          Colleagues, this is a very sensitive
22  issue, a very important issue and no part of this
23  debate should diminish the fact that this is a very
24  important issue.  But let's not pretend that this is
25  about something else.  Let's not pretend that we're
0059
1  trying to save jobs and save tax revenues, when in
2  reality, what we're doing is driving an important
3  manufacturer out of the state of Colorado and
4  causing questions in the minds of every other
5  manufacturing operation that exists and operates in
6  the state of Colorado.
7          Colleagues, think carefully as you
8  vote on this amendment and on the committee report.
9          THE CHAIRMAN:  Representative Holbert.
10          REPRESENTATIVE HOLBERT:  Thank you,
11  Mr. Chairman.
12          I commit to you this is the last time
13  I'll speak to the amendment, this amendment, oops
14  14.
15          Representative Salazar, if I were on
16  the judiciary committee, I would not have offered
17  this amendment.  I would not have tried to relieve
18  the pain.
19          There are two stimuli that we all
20  respond to, just like Pavlov's dog, pleasure and
21  pain.  And this amendment is an attempt to reduce
22  the pain.  The oops amendment is an attempt to
23  reduce the political pain of killing a thousand jobs
24  in Colorado.  Oops.
25          And it's not my job or the minority's
0060
1  job to help you reduce the pain of the awkward
2  situation that the bill's sponsor and those who
3  support the bill have found themselves in.
4          I ask for a no vote.
5          THE CHAIRMAN:  Representative Murray.
6          REPRESENTATIVE MURRAY:  Thank you,
7  Mr. Chair.
8          I wanted to confirm my sense of where
9  Magpul was in this issue.  And they've been very
10  clear to me and just told me that they do not
11  support this amendment.  And just as I indicated,
12  it's about their relationship with their customers.
13          So I urge a no vote on behalf of a
14  business that wants to maintain their integrity in
15  the state of Colorado.
16          THE CHAIRMAN:  Is there any further
17  discussion on Amendment L014, amending the House
18  Judiciary Committee report on House Bill 1224?
19          Seeing none, the question before the

20 committee of the whole is the adoption of Amendment
21 L014. All those in favor say aye.
22          UNIDENTIFIED VOICES: Aye.
23          THE CHAIRMAN: All those opposed say,
24 no.
25          UNIDENTIFIED VOICES: No.
0061
1          THE CHAIRMAN: The ayes have it.
2 Amendment L014 is adopted.
3          We are to the bill. Are there any
4 further -- sorry, we are back to the -- we are back
5 to the House Judiciary Committee report.
6          Representative Waller.
7          REPRESENTATIVE WALLER: Thank you,
8 Mr. Chair.
9          Well, members, here's where we are, in
10 this discussion. Now that we've passed this
11 amendment, we've created more arbitrary standards
12 that are going to do absolutely nothing to -- no
13 evidence to show us that they're going to enhance
14 public safety in any way.
15          These arbitrary standards that are in
16 this bill were 15, arbitrary; manufacturers'
17 exemption, arbitrary. So with all the arbitrariness
18 we have in this bill, we've done nothing, absolutely
19 nothing to enhance public safety.
20          We'll continue this debate.
21          THE CHAIRMAN: Are there any further
22 comments on the House Judiciary Committee report?
23          Seeing none, the question before the
24 committee of the whole is the adoption of the House
25 Judiciary Committee report to House Bill -- on House
0062
1 Bill 1224. All those in favor of the judiciary
2 committee report being adopted say aye.
3          UNIDENTIFIED VOICES: Aye.
4          THE CHAIRMAN: All those opposed say
5 no.
6          UNIDENTIFIED VOICES: No.
7          THE CHAIRMAN: The Judiciary Committee
8 report is adopted.
9          To the bill, members.
10          Representative Gardner -- oh,
11 Representative Fields.
12          REPRESENTATIVE FIELDS: Thank you,
13 Mr. Chair.
14          High-capacity magazines have one
15 purpose. That purpose is to kill, steal and
16 destroy. High-capacity magazines were designed to
17 have one purpose and that is to kill large numbers
18 of people quickly.
19          In Sandy Hook, the gunman used a
20 high-capacity magazine to steal, kill, and destroy
21 the lives of 60 -- 26 people and their families.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

22  These children and families of that community were
23  robbed.  They were raped of the promising futures of
24  these young people.  These family units, their lives
25  are devastated because of gun violence.
0063
1            I did a look at the ages of the
2  victims that were murdered in Sandy Hook Elementary
3  School.  We had Charlotte Bacon, 6 years old.  And
4  if you think about the average life expectancy being
5  75, then she just lost -- we lost 70 years.
6            Daniel Barden, 7 years old.  Rachel
7  D'Avino, one of the teachers, 29 years old.  Olivia
8  Engel, 6 years old.  Josephine Gay, 7 years old.
9  Ana Greene, 6 years old.  Dylan Hockley, 6 years
10  old.  Madeleine Hsu, 6 years old.  Catherine
11  Hubbard, 6 years old.  Chase Kowalski, 7 years old.
12  Jessie Lewis, 6 years old.  James Mattioli, 6 years
13  old.
14            Grace McDonnell, 7.  Anne Marie
15  Murphy, 52 years old.  Emilie Parker, 6 years old.
16  Jack Pinto, 6.  Noah, 6.  Caroline, 6.  Jessica, 6.
17  Avielle, 6.  Lauren, 30.  Mary, 56.  Victoria, 27.
18  Benjamin Wheeler, 6.  And Allison Wyatt, 6 years
19  old.
20            I've calculated theirs lost years, and
21  it equated to 1,585 years of their life was lost.
22            The shooter in this situation used a
23  30-round magazine that held bullets that were able
24  to kill, steal and destroy the lives of far too
25  many.
0064
1            It has become very clear to me that
2  there is no place in our community for these
3  super-sized magazines in our sacred places like
4  schools, in our churches.  They have no places in
5  our malls.
6            We also had a mass shooting in Aurora.
7  It was on July 20th.  A shooter killed 12 people and
8  injured 58.  In 90 seconds, he was able to do that
9  much damage.  We have learned that James Holmes
10  entered the Aurora theater and he had a
11  hundred-bullet capacity magazine.  That is more than
12  three times the size of a magazine that's given to a
13  soldier in Iraq.
14            High-capacity magazines belong in
15  theaters of war and not in our local movie theaters.
16  Such weaponry have no purpose in civilian hands.
17  Since the horrific act of these shootings, I have
18  been working in the trenches with the families and
19  with our community to try to put their lives back
20  together after this horrific tragedy.
21            We have seen over and over and over
22  again of recent massacres, and the only thing that
23  all of these massacres have in common is a

4059

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

24 high-capacity magazine that is capable of firing
25 these bullets at a rapid pace.
0065
1            We're somewhat fortunate in Aurora
2 that, that night on July 20th, that the gun jammed.
3 But there's no doubt if that gun did not jam, then
4 we would have probably had much more death and loss.
5            Let's talk about what happened in
6 Tucson with Representative Gabby Giffords.  She was
7 hosting a town hall meeting, and we had a gunman go
8 in there and kill 6 people, and he wounded 13
9 others.
10           The only reason that massacre stopped
11 is because an onlooker tackled him down as he was
12 struggling to reload his semi-automatic weapon,
13 after he already discharged 31 rounds.
14           These high-capacity magazines have no
15 purpose in our community.  They're used for war.  We
16 need to do something about the accessibility of
17 these high-capacity magazines so that we can stop
18 the horrific acts before they start.  We can do
19 something.  We've heard about this bill does not do
20 anything.  We can do something and we can do
21 something right now by banning these high-capacity
22 magazines without infringing on the rights of
23 responsible gun owners.
24           In 2012 alone, there have been seven
25 mass shootings.  That's a record amount of
0066
1 casualties.  In fact, I was just told that in the
2 state of Colorado, we have more gun death than we
3 have automobile accidents where someone lost their
4 lives.  We have more gun violence in the state of
5 Colorado.
6            And in the 62 cases where there's been
7 mass shootings, the gunman was stopped by a civilian
8 because he was trying to reload.  That is public
9 safety.
10           Members, what House Bill 1224 will do,
11 it will prohibit the sale or the transfer of any
12 feeding device capable of accepting 15 rounds or 8
13 shotgun.  Large-capacity ammunition feeding devices
14 lawfully possessed on the date of this enactment, if
15 it passes, will still be legal.  You can have those.
16 But you cannot sell them and you cannot transfer
17 them.
18           And there's penalties.  There's
19 penalties associated with noncompliance, which will
20 be a class 2 misdemeanor punished by a fine of
21 $1,000 or up to 12 months in jail.
22           The bill does create some exemptions.
23 You heard about that in the previous amendment that
24 we just offered and it was passed.  The bill also
25 creates a process in which you can keep the weapons

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

1 that you have or the magazine clips that you
2 currently have.
3           In closing, I ask that you join me and
4 62 percent of Colorado voters who support a ban on
5 high-capacity magazines. I ask you to support a
6 national survey that found 72 percent of voters
7 nationwide support banning magazines that hold more
8 than 10 or 15 rounds at a time.
9           I also saw a survey that indicates
10 that 47 percent of NRA members agree with such a
11 ban, and that 59 percent of gun owners also support
12 a ban. So, members, I ask for your support.
13           And I'm reminded of what Gabby
14 Giffords said, and she said we must do something.
15 Doing nothing is no longer an option. This is about
16 having some solutions. This is a solution. And
17 there's several different approaches that we can
18 take to ensure a commonsense approach to gun safety.
19           This is one step that we can take to
20 reduce gun violence, by limiting the capacity of a
21 high-capacity clip to 15.
22           We can do something. We can do
23 better. And it's time for us to do something. It's
24 time we stop the bloodshed. Enough is enough. And
25 I ask you to vote yes on House Bill 1224.
0068
1           THE CHAIRMAN: Representative Waller.
2           REPRESENTATIVE WALLER: Thank you,
3 Mr. Chair.
4           Members, I've got to tell you, it's
5 frustrating being here right now having this
6 discussion. It's frustrating that we're here
7 talking about gun safety, when we should be talking
8 about public safety. Public safety is a discussion
9 we need to have in this chamber.
10           You know, I appreciate Representative
11 Fields coming down here and reading the names of the
12 victims of these horrible tragedies. I do. They're
13 isn't a Republican -- there isn't a person in this
14 chamber, whether it be a voting member, a member of
15 the press corps, somebody that's in the gallery
16 right now who wants to see horrible tragedies like
17 Sandy Hook and like the Aurora theater shooting
18 happen. None of us, not one of us, wants to see
19 something like that ever happen again.
20           And so then we have to start having
21 the discussion, not about gun safety, but about
22 public safety, about what the right approach is to
23 make our children safer in Colorado public schools.
24 The discussion we need to have is about public
25 safety that will make our kids safer when they go to
0069
1 theaters in Colorado.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

2      And it's frustrating to me that we're
3  going to arbitrarily make a decision about how we're
4  going to accomplish that goal.  No study.  No facts.
5  Nothing to say we're going to -- that this piece of
6  legislation is in any way going to enhance public
7  safety.
8          You know, I'm going to talk about it
9  now, Representative Kagan.  I have two kids in
10  Colorado public schools.  Truman goes to Horizon
11  Middle School.  Camile goes to Remington Elementary
12  School.  I drop those kids off.  I want them to be
13  safe when they're in school.  I want them to be
14  well-protected and cared for when they're there.  I
15  worry about them.
16          Camile, in fact, has to send me a text
17  message every day.  She's just turned 10.  We're
18  allowing her to walk home on her own.  She's got to
19  send me a text message every day saying, Dad, I made
20  it home safe, that one and a half blocks.
21          She has to do that because I'm
22  concerned about her.  I'm concerned about her
23  welfare.  And I am concerned about her safety.  I
24  want to make sure she's protected.  I want to make
25  sure all Colorado school children are protected.
0070
1          But you know what, members, here's the
2  difference, here's what we're arguing about.  Does
3  this bill accomplish that goal.  Does this bill in
4  any way enhance public safety.
5          You know what, I think the Governor
6  said it pretty well, after the Aurora theater
7  shooting, when he -- and I'm paraphrasing here, you
8  know, when he effectively said there isn't a piece
9  of gun control legislation that would have prevented
10  this tragedy from happening.
11          And you know what, Representative
12  Fields, there isn't.
13          This bill, this piece of legislation
14  that we're putting forward is not going to prevent
15  tragedies from happening in the future.  It just
16  simply isn't going to do that.
17          So what are we doing here.  We have a
18  company.  We've talked a lot about it so far.  This
19  company's worth $400 million.  Started in a Colorado
20  basement.
21          You know, I hear the Governor
22  consistently talk about the entrepreneurial spirit
23  of Coloradans.  The founder of this company embodies
24  that.  Started this company 10 years ago in his
25  basement with an idea.  Today it's worth
0071
1  $400 million.
2          Their products are produced locally.
3  They're not produced in China and then brought here

4  and shipped out. They're produced locally. Those
5  products are distributed on a global scale.
6          We have a manufacturer right here in
7  our state that distributes -- that exports on a
8  global scale. They directly employ 200 people,
9  indirectly employ 4 to 500 more. And they want to
10  grow. They put $46 million into Colorado's economy
11  every single year.
12          In fact, I was just talking to the
13  owner yesterday. He said, you know, how fortuitous
14  this piece of legislation was, we were a week away
15  from signing a lease on a new production facility,
16  one that expanded our capacity significantly. We're
17  not going to do that now. We're going to hold off
18  to see what happens with this piece of legislation.
19          Well, we've heard it. If it passes,
20  they're gone. They're leaving. It doesn't matter
21  about the amendment that we just passed. That might
22  make some people feel good. Still arbitrary. But
23  they've said it, we are going to leave this state if
24  this bill passes. We don't have a choice. Still
25  have to put a serial number on it. Still have to
0072
1  date stamp it. We don't have the capacity for that.
2  We can go to Wyoming and produce them without having
3  to do that.
4          So what are we doing. What are we
5  doing here? We have no evidence to show that
6  banning these magazines in any way is going to
7  enhance public safety. In fact, I went back and I
8  tried to find some studies on this. And there was
9  some studies done. And they said for the assault
10  weapons ban that expired in 2004, researchers could
11  not credit the ban with a drop in overall gun
12  violence during the same period.
13          No evidence to show that banning these
14  magazines is going to have any appreciable effect on
15  public safety. But we're going to pass it anyway.
16  We want to make ourselves feel better. We want to
17  feel good about what we're doing, and so we're going
18  to pass this piece of legislation for no other
19  reason, none, zero, other than to feel good.
20  Because there's no evidence that it's going to have
21  an appreciable impact on public safety.
22          So when we pass this bill, understand
23  this, members, know what the impact -- because this
24  bill, the reality is, while it's not going to have
25  an impact on public safety, it's going to have a
0073
1  significant impact on Colorado's economy. It's
2  going to have a significant impact on the livelihood
3  of 700 Colorado working families. For what? On a
4  hunch, we're going to put 700 Colorado working
5  families' livelihood in jeopardy on a hunch, on a

6  guess, nothing more than a guess, that this bill is
7  going to have an impact on public safety.
8          I don't think that's the way we should
9  be legislating in this building.  We shouldn't be
10  legislating to a gut reaction, to a guess, to a
11  hunch.  There's too much at stake.  There are too
12  many people's lives who are going to be affected in
13  a negative manner, if we push this piece of
14  legislation on a hunch.
15          Members, we need to -- it is our
16  obligation to vote no on this piece of legislation.
17  Because it's nothing, nothing more than a hunch that
18  it's going to have an impact on public safety.
19          THE CHAIRMAN:  Representative Gardner.
20          REPRESENTATIVE GARDNER:  Thank you,
21  Mr. Chair.  And thank you Representative Waller for
22  that dispassionate evaluation of this legislation.
23          I heard this bill in judiciary, and I
24  tried to weigh exactly the things that you
25  addressed, Representative Waller, the question of
0074
1  will this bill do anything positive for public
2  safety.  Will we, on balance, improve public safety.
3          Now, there are probably a lot of
4  things that we can do legislatively that would
5  improve public safety that we don't do.  We don't
6  do, because there's not a single thing we do that
7  doesn't have some cost and some benefit.  And we
8  engage in the cost-benefit analysis whether we know
9  we're doing that consciously, as do I, or whether we
10  just do it unconsciously.  And I tried to do that
11  analysis as I heard this bill.
12          And as Representative Waller noted, it
13  seemed to me, when we got finished with all the
14  testimony and the presentations by the sponsors,
15  that the primary benefit of this bill was that we
16  would be able to leave here and walk outside this
17  building and say we did something.
18          And that's sort of the popular cry,
19  when horrific things happen, the natural human
20  reaction is do something.  But we ought to do
21  something that matters.
22          The problem with this bill as drafted,
23  as amended, is that these 15-round magazines, these
24  8 shotgun shell magazines are widely available.
25  There's -- one of the things that we heard in
0075
1  testimony was that there's already been a run on
2  them.  You actually can't buy one in the state now.
3  That may be an exaggeration, but that's kind of what
4  I heard was, you can't get one in the state now.  So
5  the first thing is, if not having a lot of them on
6  the street was our goal, just the very introduction
7  of the bill put a lot more of them on the street.

LEG HX 000148     4064

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

8          And it is the natural human reaction
9  that those citizens who might not purchase one or
10  might have just been thinking about it, might have
11  taken a pass or might think, well, whatever -- or
12  even, by the way, those citizens who are very shrewd
13  economically and entrepreneurially may run out and
14  buy those things because they know there's a run on
15  them.  And the value of them on the black market I
16  do not approve, and I am not promoting, but it is a
17  simple fact the value of them on the black market
18  may be double or triple.
19          So just the very introduction of the
20  bill may have been counterproductive.
21          I asked the question of one of the
22  witnesses who said, you know, it's already been a
23  run on these.  I said, well, you're a federal
24  firearms licensee, an FFL, and I know you and I
25  would not violate the law, but how easy would it be
0076
1  to buy a high-capacity magazine and bring it back to
2  Colorado.  And as Representative Wright noted, it's
3  only a few miles from his home to the state line.
4          I almost venture, given the way the
5  tenor of this debate is going, or the timing of this
6  debate, I almost venture I could get myself excused
7  and drive to Cheyenne and buy several of these and
8  be back before we vote on the bill.  It's not that
9  difficult.
10          And we're not, thank goodness, I
11  hope -- and knock on wood, we're not going to stop
12  every car going in -- coming into the state to check
13  for high-capacity magazines.
14          And you can say, well, but it's
15  against the law, and people should obey the law.
16  Well, don't kid yourselves, legislators, just
17  because you said so doesn't mean people do so.  They
18  have to regard what we do as legitimate.
19          I mean, we hear this argument all the
20  time.  We hear it about alcohol.  We hear it about
21  drugs.  Do you think it's any different with respect
22  to firearms, that somehow everybody's going to obey
23  the law with respect to those, when they don't obey
24  it with respect to other things in the law that they
25  don't, sort of at their core, regard as legitimate.
0077
1          And so a person who is bent on having
2  the high-capacity magazine, particularly someone who
3  is a wrongdoer, is going to have the ability to
4  cross the state line and get a high-capacity
5  magazine and bring it back, if they even do that and
6  they even worry about it.  Because there are,
7  apparently, an awful lot of them out there now, a
8  good deal more, because this bill was introduced.
9          Maybe they'll be excess capacity for a

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

10  while. That may be very productive.
11          And I feel I must comment about this
12  notion that this high-capacity magazines have only
13  one purpose.  I mean, to say that, I'm sure it's
14  said in all sincerity, and that that is the belief
15  of the sponsor, but to say that is to say that my
16  friends and neighbors and constituents who own
17  weapons with high-capacity magazines are only
18  interested in killing.
19          I mean, that's what you're really
20  implying, is that the people here, both on the
21  floor, in the gallery, and within the hearing of my
22  voice in Colorado who own these, they must all be
23  bent on killing.  And I know that not to be the
24  case.  Some are recreational shooters.  Some are
25  hunters.  Maybe that's one category.  Many are
0078
1  concerned about self-defense.  But I don't think
2  they're concerned about killing.
3          And to characterize them that way, I
4  must object.  It's strident.  It's emotionally
5  satisfying, but it doesn't really comport with the
6  facts.  Or if it does, then the world is a much more
7  dangerous place than I think it is, and I happen to
8  think it's a fairly dangerous place.  But it's much
9  more dangerous than I think it is, and I probably
10  need to go get a weapon with a high-capacity
11  magazine, which I don't, at the moment, happen to
12  own.
13          But nevertheless, is the world that
14  evil, that the only reason anyone ever owns one of
15  these -- and there are a lot of them sold, hundreds
16  of thousands -- that all those people are bent on
17  killing.  Because that's what the sponsor's argument
18  is, that there's only one purpose for these and
19  that's to kill people.  And that's not so.
20          One of the things that occurred during
21  the Judiciary Committee discussions on this bill was
22  that witnesses in favor of the bill invoked all of
23  the horrific incidents that we're all so familiar
24  with.  Even -- even invoking things like the Murrah
25  Building bombing, which I have yet to figure out how
0079
1  you link that, other than it was a horrific and evil
2  thing to happen in the world.
3          But I think the connection must be
4  this, evil things happen, we must do something, and
5  it doesn't matter if the something doesn't really
6  work.  We can leave this building.  We can stand
7  here.  We can leave the building.  We can go and say
8  I did something.
9          And I don't know -- again, I don't --
10  I don't question the motives.  I'm sure they're
11  sincere, but I would ask, the same as I ask family

12    members, as I've asked my children over the years,
13    as I've asked friends who propose things, I say,
14    will that really address the problem or will you
15    just feel better when you're done.
16            And if it's your own personal action
17    which is otherwise legal, then -- and it makes you
18    feel better, then maybe that's fine, but when you
19    impose it on everyone else, as a legislator, that's
20    called public policy.
21            And maybe others don't feel better.
22    In fact, maybe they feel less safe and less secure
23    and less free.  And the gain will have not been to
24    make them more safe, more secure, and more free.
25            Now, this bill, sort of stripped to
0080
1    its cold realities is this, it is difficult to
2    enforce.  It is easily circumvented by taking a trip
3    to a neighboring state.  It's difficult to
4    prosecute.  Because the way the bill reads, it says,
5    if a person is alleged to have violated the
6    prohibition asserts that he or she is permitted to
7    legally possess a large-capacity magazine, pursuant
8    to Paragraph A, basically, possessed a
9    large-capacity magazine before the effective date of
10    the bill, the prosecution has the burden of proof to
11    refute the assertion.
12            I think what that probably does is,
13    for people in Colorado who want to circumvent this
14    law -- once again, I don't approve.  I don't
15    advocate for -- I just make the observation that
16    what you want to do is buy a large-capacity magazine
17    in Cheyenne or Albuquerque or Topeka or Saint
18    George, at a secondhand or from a dealer who has an
19    older high-capacity magazine manufactured a few
20    years ago.  And that way, all you -- you know, when
21    stopped or when your house is subjected to an
22    illegal search, for some reason, or a legal search,
23    for that matter, all you need to say is my
24    high-capacity magazine, I've owned that forever.  I
25    don't need to prove I owned it forever, I just need
0081
1    to assert that.  You prove otherwise.
2            And I ask myself, if that's what you
3    really want to put a stop to, why do you make it so
4    difficult to prosecute.  It's not that I advocate
5    for the bill, but I wonder if you riddle it with
6    exceptions, when you get done, will you be able to
7    say anything more than I did something, but does the
8    something do anything.
9            The bill is objected to by a large
10    number of citizens in such a way that its legitimacy
11    is in question.  And friends, colleagues, let's be
12    honest with each other, just because we say it's the
13    law, if a large segment of the population does not

14  recognize the law as legitimate, then not only do
15  those who at the core recognize it -- or failed to
16  recognize it as legitimate and are prone to violate
17  it, an even greater segment of the population is
18  very prone not to report it.
19          And it's difficult to prosecute it if
20  it does.  So why would you bother.
21          I think we have addressed at length
22  the fact that this bill is of limited or no utility
23  in actually addressing the problem.  And it is,
24  notwithstanding the amendment, damaging to jobs and
25  the economy in our state.
0082
1          My friend, Representative Landgraf, my
2  fellow El Paso countian, noted two businesses that,
3  notwithstanding the manufacturing exemption, there
4  were small businesses in Colorado that wouldn't get
5  this business because somebody would drive to
6  Cheyenne or Ruidoso.
7          In fact, we might, you know, if we
8  prohibit enough of these things, we might create a
9  thriving economy just across the border for firearms
10  dealers, because that's the reality.
11          This all seems to me to be in the name
12  of doing something.  And, you know, I'll even grant
13  the sincerity and the commitment, however much I
14  disagree with it, of doing something, if I hadn't
15  heard the majority, as is the practice here, on
16  Amendment L014 say, all in favor say aye.  Aye.  All
17  oppose, no, equally loud from where I stood.  The
18  ayes have it.  And put L014 on this bill.
19          And what that amendment does, it says,
20  hey, you know, this really bad thing, the only
21  purpose of which, says the sponsor, the only purpose
22  of which, the sponsor says multiple times, is to
23  kill people.
24          Now, I don't believe that, but I
25  will -- I will take that argument for a moment.  If
0083
1  that's the only purpose, and we buy into that as a
2  reason we ought to vote for it, how in the world can
3  you morally -- how in the world can you morally
4  support L014 for the manufacturing of something that
5  you assert the only purpose in the world is to kill
6  people.  There is no other purpose, says my friend
7  and colleague, the sponsor.
8          Now, I don't believe that.  But I do
9  think that a little consistency might be in order.
10  So if you're going to make inflammatory arguments
11  because you believe them -- and, again, I -- grant
12  you, I think -- I think those who argue that believe
13  that.  But if they do, then they need to believe it.
14  They need to have the courage of their convictions,
15  because the consequence of allowing otherwise is to

16  allow the very reasonable assumption on my part that
17  it's okay -- if the only purpose is killing, it's
18  okay to manufacture killing instruments in Colorado
19  and export them somewhere else.  That's okay.
20      Well, I don't believe the first, so I
21  don't believe the second, and would not support
22  either the first or the second.  But a little
23  consistency, a little intellectual honesty, some
24  ingenuous consistent debate would go a long way.
25      This bill is about doing something.
0084
1   It's not about doing something effective, or it is,
2   in my view, the most hypocritical, cynical, jaded
3   thing that I have seen in the seven sessions I have
4   been here.  Either this bill was right as drafted,
5   and maybe even needed to be stronger than it was,
6   or, as amended, it is nothing less than an exercise
7   in hypocrisy and cynicism.
8      And in an institution where,
9   unfortunately and sadly, from time to time, there's
10  a good deal of that.  I wish otherwise.  I know all
11  of you do as well, but life is what it is and the
12  process will always and was ever thus.
13      But we could rise a little higher
14  today and say to the people of Colorado, we're not
15  going to just do for the sake of doing.  We're going
16  to legislate in a way that is effective.  And we may
17  disagree across the aisle about which thing is the
18  most effective, but we will do something that is
19  consistent, honest, ingenuous, and effective, or we
20  will admit that legislators cannot solve each and
21  every problem, cannot erase each and every thing,
22  and that we should not simply interfere with the
23  safety, security, and freedom of citizens simply for
24  the sake of doing something.
25      Members, search your soul and ask
0085
1   yourself -- I can't answer for you, and I -- if you
2   disagree with me, I don't -- I don't question in any
3   way your motive, but I do ask you to think about
4   this logically and ask yourself if this bill, as
5   amended, is going to do anything at all, other than
6   allow us to leave this building and say, oh, well,
7   we did something.
8      I think the answer to that is that it
9   does nothing, or it does something so cynical that I
10  would not, for my own part, want to be associated
11  with a yes vote on it.  And so I ask for a no vote.
12      THE CHAIRMAN:  Representative Court.
13      REPRESENTATIVE COURT:  (Inaudible.)
14      THE CHAIRMAN:  Representative Conti as
15  well.
16      REPRESENTATIVE CONTI:  Thank you,
17  Mr. Chair.

LEG HX 000153    4069

18     We interrupt this debate for a very
19 important announcement.  Lunch.  For this side of
20 the aisle, it will be available around 12:15 over in
21 Barney Ford.  And for the Republican members of the
22 caucus -- thank you, Mr. Chair -- it will be -- we
23 will be sharing the break room over here.  And we do
24 have a menu planned for those members who are
25 observing a meat fast on Friday.
0086
1     Thank you.
2     THE CHAIRMAN:  Representative Fields.
3     REPRESENTATIVE FIELDS:  Thank you,
4 Mr. Chair.
5     And to my colleague, Representative
6 Gardner, and friends, I can share with you that I'm
7 truly insulted by your comments in reference to how
8 you're questioning my integrity as it relates to
9 this bill by saying it does absolutely nothing.
10     This is a solution to address the gun
11 violence that we are experiencing right now in our
12 nation and in this state.  This does address public
13 safety.  And to question the hypocrisy of it and my
14 integrity as a lawmaker down here is very offensive
15 to me.
16     I believe in this bill.  It took great
17 lengths to draft the content and the language in
18 this bill.  I worked with stakeholders way back in
19 the summer, after the shooting theater.  We pulled
20 together law enforcement.  We pulled together mental
21 health professionals.  We pulled together other
22 organizations that are addressing gun violence, like
23 Cease Fire and Safe Colorado and Mayors Against
24 Illegal Guns.
25     There was a lot of conversation into a
0087
1 debate about this.  And it wasn't to try to do
2 nothing.  And it's not about feeling good.  This
3 bill is a very strategic approach to address
4 violence in our state and our nation.
5     So I'm here to say that I am somewhat
6 offended, because if I'm going to put my name on a
7 bill, it's because I believe in it and I believe
8 that the approach is a good one.
9     And I ask the support of everyone here
10 as an aye vote.
11     THE CHAIRMAN:  Representative
12 Sonnenberg.
13     REPRESENTATIVE SONNENBERG:  Thank you,
14 Mr. Chair.
15     Members, I know Representative
16 Gardner, in his talk and his explanation, was not
17 challenging the integrity of the bill sponsor, as I
18 am not challenging that integrity.
19     The question was, and is raised, will

LEG HX 000154

4070

20 this bill have an effect. Show me the data. Show
21 me somewhere where we have data that says that a
22 magazine with 10 or 12, or for that matter, the
23 amendment, the 15, will have an impact on lives
24 saved.
25          If this is about public safety, show
0088
1 me some results of where we've seen that in effect,
2 where we've seen that happen. Because it makes a
3 difference whether we legislate on facts or
4 legislate just to legislate.
5          With the amendment put on the bill,
6 where now it makes it okay for an organization or a
7 group or a business to sell outside the state of
8 Colorado, what we have now created is the ultimate
9 fireworks stand.
10          There's a number of us, yes, we know
11 there's fireworks and they're illegal to shoot up in
12 the air and those type of things in Colorado. And
13 those of us who live on the border, yeah, we drive
14 to Wyoming and we buy the cool fireworks. And then
15 we're safe when we use them. And what we have done
16 with this bill now with the amendment has created a
17 fireworks stand for our surrounding states to sell
18 high-capacity magazines.
19          The fact of the matter is that I need
20 to correct something. You heard the statement
21 earlier about more people died in car accidents than
22 from gun violence. Oh, I'm sorry. You heard the
23 other way around, that there were more people killed
24 in gun violence than with cars. Understand that
25 that is a skewed number, that 83 percent nationwide
0089
1 of all gun deaths are self-inflicted suicides. So
2 you can't compare apples and oranges and make a
3 logical assertion about those gun deaths.
4          The fact of the matter is that I don't
5 believe limiting the size of a magazine will have
6 any effect, any effect whatsoever, no different than
7 outlawing a Corvette or a piece of farm machinery.
8 Because, as you know, there are more people killed
9 on farms, one of the most riskiest businesses in the
10 country. This would be no different than if we
11 outlawed something like that, something -- a car or
12 farm machinery.
13          Simply because high-capacity magazines
14 will never -- and limits on high-capacity magazines
15 will never, ever keep evil people from doing evil
16 things. And that's what this is about.
17          I don't care how large the size of
18 magazine, if there is a magazine, if there is a
19 single shot, we cannot legislate to keep evil people
20 from doing evil things.
21          What we will do is create an

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

22    opportunity for evil people to find other ways to
23    get the weapons of their choice.  The only impact
24    this will have is on those of us law-abiding
25    citizens.
0090
1            If it's truly about public safety,
2    truly about public safety, this bill doesn't do
3    that.  I wonder if it's truly about public safety,
4    because the amendments that have been added tends to
5    believe that maybe in every other state, except
6    Colorado, we don't care about public safety.  If
7    that's the case, vote yes.
8            If you do care about public safety, do
9    something that's meaningful, vote no on this bill.
10            THE CHAIRMAN:  Representative
11    Stephens.
12            REPRESENTATIVE STEPHENS:  Thank you,
13    Mr. Chair.  Thank you, members.
14            A number of years ago, when one of our
15    first school shootings took place in Paducah,
16    Kentucky, I went to interview the families of the
17    victims.  And I cannot tell you a more
18    heart-wrenching, terrible time than to be with
19    families who have just lost their children to a
20    senseless tragedy.
21            These parents talked glowingly about
22    their children, about how they were completely,
23    obviously, unsuspecting.  They had bright futures
24    ahead of them.  And it probably -- for me, it was
25    the one event that motivated my commitment to school
0091
1    safety.  When I was elected to the legislature, it's
2    one of the first issues that I chose to address.
3            Because all of us, whether it is Sandy
4    Hook or Paducah or Columbine or Virginia Tech, there
5    is that moment where we say, what could we do.  What
6    can we do.  What must be done.
7            And, in fact, as parents, when death
8    happens at a young age, all of us ask that question.
9    We ask it whether they're drinking and driving.  We
10    ask that in a number of situations.
11            We passed a school safety bill that
12    allowed schools to create plans in Colorado in case
13    of an emergency.  And like Representative Waller,
14    with my own son, when he was in school, I would say
15    to him, Nick, if something breaks out at school, if
16    you hear gunshots, what is your exit plan.  My son,
17    my sweet little, at the time, 14-year-old son would
18    look at me, I don't know.  I don't know, Mom, we're
19    kind of talking about it.
20            Isn't it awful we have to talk about
21    it.  But that is the age in which we live.  And so I
22    would work with him on an exit plan, an exit
23    strategy, as school safety and parents want to do.

LEG HX 000156    4072

24     But what this bill does not address,
25  and what has been said is no one's here to challenge
0092
1  the integrity of what must we do.  I mean, what can
2  we do.  It's emotional.
3         Representative Fields, as a mom, I
4  cannot -- how you deal with the things you do and
5  the way you do with dignity at the loss of your son,
6  I don't know.  I don't know that I have that in me
7  like you.  You are amazing.
8         But I can tell you, as we deal with
9  other issues here, we always look at fact-based
10  evidence.  We always look at what are best -- what
11  are we learning here in America, what are we doing.
12         And one thing that I've referred to
13  and I've read with interest is our county sheriffs
14  of Colorado position paper on this issue.  And these
15  are the county sheriffs from Delta, Las Animas,
16  Mesa, Gilpin, Laramie, Pueblo, Elbert, Douglas,
17  Rout.  And what they're saying is gun control does
18  not equate to lower crime rates, which is really
19  what we strive for.
20         Washington, D.C., and Chicago, two
21  cities known for their strict gun control laws, have
22  some of the highest rates of violent crime.
23         In dealing with the ban on
24  high-capacity magazines our Association of Sheriffs
25  say this, law enforcement officers carry
0093
1  high-capacity magazines because there are times when
2  10 rounds might not be enough to end that threat.
3         And by the way, at Virginia, it was
4  10 rounds.  At Columbine, it was rounds of 10, 10
5  rounds.
6         County Sheriffs of Colorado believe
7  the same should hold true for civilians who wish to
8  defend themselves, especially if attacked by
9  multiple assailants.
10         Recently, a young mother in Georgia,
11  defending herself and her two children, as a single
12  mom, needed all six bullets in her .38 caliber
13  handgun to stop an intruder.  She hit him five
14  times.  He was able to get in his car and drive
15  away.  But the young mom prevailed.
16         Had there been more than one
17  assailant, the outcome may not have been the same
18  because she would have been out of ammunition.
19         Also, we know that high pressure and
20  high adrenaline situations, people may not be as
21  accurate with their shots.
22         And the county sheriffs of Colorado
23  who deal in public safety do not want to deny a
24  law-abiding citizen the ability to defend himself
25  and his family, based on an arbitrary limit.  An

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

1  arbitrary limit, not an evidenced-based limit, not
2  any kind of limit based on sound research.  How many
3  bullets should be in one magazine clip.
4          You know, we saw, as Representative
5  Sonnenberg said, when we passed a tax on ag
6  chemicals, we saw a migration to Nebraska, a black
7  market developing, because people ran out of
8  Colorado to get what they needed.  And I would
9  suggest, we will do the same with this.
10          And as Representative Gardner so aptly
11 says, unless we've got some sort of border patrol, I
12 don't know what you think we're going to do, because
13 people will go other places to get what they want.
14 So this will not stop in any way.
15          Our own county sheriffs of Colorado
16 say that this is not going to do the job.
17          And we already have subcontractors
18 from Magpul leaving here.  I just talked to the
19 president of Magpul, they're leaving.  They already
20 see the writing on the wall.  Those subcontractors
21 are gone.  They are gone.
22          Pennsylvania just lost over
23 $70 million in sales or income tax to Pennsylvania
24 because in their gun show, they stopped -- they
25 looked at postponing and stopping the sale of
0095
1  magazine clips.  And you know what, it cost the
2  state of Pennsylvania, I understand it, but not
3  because there was such a need.
4          And school safety, you and I deal with
5  mental health.  And if we really want to talk about
6  what's evidenced-based, if we really want to deal
7  with this -- as I spoke to the parents of this
8  bullied young man who set fire, who started shooting
9  people in Paducah, or the two young men who were
10 bullied at Columbine, then if we really want to talk
11 about mental health, at some point, we're going to
12 talk about the antidepressants and we're going to
13 have to talk about the things that kids are on.
14          Believe me, working at this Capitol,
15 I've had my share of death threats.  I have had my
16 share of creepies following me.  I have had my share
17 of creepy e-mails.  I have had my share, and they
18 are from people that are concerning, people that you
19 and I -- and every one of these people that have
20 shot -- even in high-round capacity, you and I would
21 go, the people around him have said there was
22 something not right.
23          You and I, we have to deal with this
24 mental health issue in a different way.  But this
25 issue on an arbitrary count of magazine is not going
0096
1  to do it.  It's not going to do it.  Our own county

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

2 sheriffs have said so. They are saying this will
3 not protect people. This will not stop this from
4 happening.
5          You will create a black market that
6 goes out of this state. And so that's -- this does
7 nothing. We wish it would do something, but this
8 won't. This will not.
9          Friends, I urge a no vote on this.
10 Our county sheriffs believe it to be a huge risk to
11 Colorado and so do I.
12          THE CHAIRMAN:  Members, for your
13 information, and for the public at large, please be
14 aware that we will be taking a 20-minute recess at
15 noon, in 15 minutes from now. Then I will bring the
16 committee back to order at 12:20 p.m. So 15 minutes
17 from now there will be a brief recess.
18          Representative Fields.
19          REPRESENTATIVE FIELDS:  Thank you,
20 Mr. Chair.
21          Representative Stephens, I just wanted
22 to correct a comment that you made about the
23 Columbine shooting, that there was -- they only used
24 a 10-capacity magazine. In fact, they had 10, 28,
25 32, and 52 were used in Columbine.
0097
1          Thanks.
2          THE CHAIRMAN:  Representative McCann.
3          REPRESENTATIVE McCANN:  Thank you,
4 Mr. Chair.
5          Representative Waller, I am not here
6 for a feel-good purpose supporting this bill. I am
7 here for public safety. I've spent quite a bit of
8 my career in the public safety field and I believe
9 that this bill is designed to increase public
10 safety.
11          You said we don't have facts. Well,
12 Representative Fields gave you some facts, but I'll
13 give you some more.
14          High-capacity magazines are commonly
15 used in gun crimes and in police murders. According
16 to the Department of Justice, high-capacity
17 magazines are used in 14 to 26 percent of gun
18 crimes, and in 31 to 41 percent of fatal police
19 shootings.
20          In addition, many of the high-profile
21 mass shootings identified by Mayors Against Illegal
22 Guns over the last four years involved high-capacity
23 magazines. These shootings include the following,
24 the Sandy Hook massacre, which we have already
25 discussed. Oak Creek, Wisconsin, on August 5 of
0098
1 2012, Wade Michael Page killed six people and
2 wounded three others in a Sikh temple with a
3 semi-automatic handgun and three 19-round magazines.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021513.txt[11/5/2013 7:32:48 AM]

4   Here in our own state, unfortunately,
5   in Aurora, on July 20th, 2012, James Holmes is
6   accused of shooting and killing 12 people and
7   injuring 58 others during a midnight movie
8   screening.  Mr. Holmes used two semi-automatic
9   handguns and a shotgun and an assault weapon
10  equipped with a hundred-round drum magazine.
11          In Tucson, Arizona, Jared Loughner, on
12  January 8th, 2011, shot and killed 6 people and
13  wounded 13 other, including a federal judge who was
14  killed, and wounding U.S. Representative Gabriel
15  Giffords.  Loughner fired all 33 rounds from a
16  semi-automatic handgun with a 33-round magazine.
17          Fort Hood, Texas, on November 5, 2009,
18  Major Nidal Hasan allegedly shot and killed 13
19  people and wounded 34 others during a rampage at the
20  Fort Hood military installation.  Hasan used a
21  semi-automatic handgun and 20- and 30-round
22  magazines.
23          In Binghamton, New York, on April 3,
24  2009, Mr. Wong shot and killed 13 people and injured
25  four others of the American Civic Association,
0099
1   firing 99 rounds from two semi-automatic handguns.
2   At least one 30-round-capacity magazine was found at
3   the scene.
4           So please, don't tell me we don't have
5   the facts and that high-capacity magazines are not
6   used to kill large numbers of people.
7           Evidence also indicates that the
8   expired federal ban on assault weapons and
9   high-capacity magazines did reduce crime.  A 2010
10  survey by the Police Executive Research Forum,
11  certainly not a liberal think tank, reported that
12  since the ban expired in 2004, 37 percent of police
13  agencies reported seeing noticeable increases in
14  criminals' use of assault weapons.  And 38 percent
15  reported seeing noticeable increase in criminals'
16  use of semi-automatic firearms with high-capacity
17  magazines.
18          The ban was associated with a decline
19  in high-capacity magazines recovered with crime guns
20  in Virginia.  According to a Washington Post
21  analysis of Virginia crime gun data, the ban was
22  associated with a 60 percent decline in the share of
23  crime guns with high-capacity magazines recovered in
24  Virginia between 1998 and 2004.
25          After the federal ban expired, the
0100
1   share of crime guns recovered in the state with
2   high-capacity magazines increased each year through
3   2010, more than doubling from the 2004 low.
4           So please, don't tell me we don't have
5   the facts on our side.

LEG HX 000160    4076

6          This bill -- I also want to address
7  another fact.  This bill does not require nor force
8  any company to leave Colorado.  The bill explicitly
9  now indicates that companies can continue to
10  manufacture these and deliver them out of state and
11  to our federal law enforcement and other countries
12  that still allow this type of weapon for their law
13  enforcement.
14          The decision to stay in Colorado or
15  leave Colorado is their choice.  It is not being
16  imposed upon them by this legislature.
17          I also want to address an argument
18  that was made regarding the fact that some people
19  live close to our borders.  That is true.  But this
20  is an issue of the State being able to decide what
21  supports public safety for our citizens.  This is
22  our State saying we have had enough of these mass
23  shootings, and we certainly have, we will restrict
24  magazine capacity to 15.
25          It's a commonsense solution, and it
0101
1  supports the State's right to decide what is
2  appropriate for the state.  There are several states
3  who ban, not only high-capacity magazines, but
4  assault weapons.  This is our right as a state to
5  make this choice for our citizens.
6          Representative Waller -- or Majority
7  Leader Waller has said this is not a public safety
8  issue.  Well, I beg to differ, colleagues.  And I
9  would direct your attention to the fact that our own
10  chiefs of police, who are our law enforcement
11  representatives, support this bill because they know
12  that these high-capacity magazines result in more
13  deaths and more injuries to the members of their
14  police departments.
15          Unfortunately, Colorado is at the
16  forefront of this issue because we have had so many
17  tragedies here in our state.  The nation is looking
18  to us, colleagues, for some guidance and for some
19  leadership and some courageous leadership.  We have
20  that opportunity in this bill.
21          And I just want to read a few comments
22  from petitions that were submitted in support of the
23  legislation.  I won't read too many, but they came
24  from all over our state.  And here's one from David
25  Anuwy (phonetic) from Gunnison, Colorado.  I'm a gun
0102
1  owner, hunter, and have no qualms about the ideas
2  such as restricting high-capacity magazines or some
3  kinds of assault weapons, requiring background
4  checks or similar measures to help reduce the use of
5  guns in crimes of violence.
6          Another one from Ron Stanley in
7  Larkspur, Colorado.  Yes, I am a gun owner residing

8  in rural Colorado, and I do support your efforts.
9  And he put the emphasis on "do."
10         Another one for Alexander Ball in
11  Longmont, Colorado.  As a gun owner, I am strongly
12  in favor of this collection of legislation.  Let's
13  get some useful and fair gun laws passed.
14         From Arvada, Colorado, Kathy Schram,
15  (phonetic), Please support measures to curb gun
16  violence in Colorado.  When my friends and family
17  from out of state hear about each new incident, they
18  think I'm insane to stay here.  Taking action to
19  reduce the number of violent incidents will help
20  show our state in the good light it deserves.
21         From Pueblo West, Colorado, Nancy
22  Rivers.  At first, it might appear -- sorry.  How
23  many more massacres will it take.  Common sense.  If
24  not now, when.
25         From Centennial, Colorado, Kathleen
0103
1  Walker.  I applaud your taking decisive steps
2  towards curbing gun violence.  This isn't a case of
3  government imposing restriction on an individual
4  right.  It's a case of the people as a community
5  pleading for their government to take decisive steps
6  to restore law, order and safety for the good of
7  all.
8         One more from Crestone, Colorado, Tom
9  McMurray.  As a gun owner and former hunter, I know
10  there is absolutely no need for high-capacity
11  magazines.  There is also a great need for universal
12  background checks with no exceptions.
13         And one more from Littleton, Colorado.
14  John Cornly (phonetic).  Please support sensible gun
15  regulation.  I am a lifelong hunter and gun owner,
16  but I support banning assault rifle, high-volume
17  ammunition devices, universal background checks,
18  et cetera.  Our forefathers who developed the Bill
19  of Rights would be incredulous at how the Second
20  Amendment is currently being interpreted.
21         So I won't read more -- well, let me
22  read just one more.
23         From Trinidad, Colorado, from Monty
24  Beaver.  I am a retired law enforcement firearms
25  training officer and an NRA life member.  I fully
0104
1  support this position, and I believe that if one
2  can't hit a target with 10 shots, they should give
3  up gun ownership.  When I joined the NRA, the
4  organization supported mandatory background checks
5  and other sensible firearm laws.
6         So this is not something that's
7  limited to urban areas, colleagues.  These are
8  quotes from people in your districts in rural
9  Colorado who support sensible gun safety laws.

10        This bill is a public-safety bill.  We
11    are in the forefront in this state, and I hope that
12    we have the courage to pass some sensible, common
13    sense gun safety legislation.
14            Thank you.
15            THE CHAIRMAN:  Representative --
16    Madame Majority Leader.
17            MAJORITY LEADER:  Thank you,
18    Mr. Chair.
19            I move that the committee stand in
20    recess until 12:20.  And that's 12:20 promptly.  We
21    will proceed with the discussion then.
22            THE CHAIRMAN:  This committee is in
23    recess.
24            (End of audio file.)
25
0105
1                CERTIFICATE
2    STATE OF COLORADO            )
                                  )ss.
3    CITY AND COUNTY OF DENVER  )
4
5            I, Angela Smith, Professional Reporter
6    and Notary Public for the State of Colorado, do
7    hereby certify that the above-mentioned hearing was
8    taken from an audio recording and reduced to
9    typewritten form; that the foregoing is a true
10    transcript of the proceedings had; that the speakers
11    in this transcript were identified by me to the best
12    of my ability and according to the introductions
13    made.
14            I am not attorney nor counsel nor in
15    any way connected with any attorney or counsel for
16    any of the parties to said action or otherwise
17    interested in its event.
18            IN WITNESS WHEREOF, I have hereunto
19    affixed my hand and notarial seal this 8th day of
20    July 2013.
21            My commission expires January 22,
      2015.
22
23            _____
              Angela Smith
24              Reporter, Notary Public
              Calderwood-Mackelprang, Inc.
25

0001
1  CITY AND COUNTY OF DENVER
   STATE OF COLORADO
2  HOUSE THIRD AND FINAL READING
   HELD ON FEBRUARY 18, 2013
3  HOUSE BILL 13-1224
4  -------------------------------------------------------
5             REPORTER'S TRANSCRIPT
6  -------------------------------------------------------
7
8        This transcript was taken from an audio
9  recording by Angela Smith, Professional Reporter and
10 Notary Public.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0002

1  SPEAKERS:                      PAGES
2  Representative Fields           3, 56
   Representative Holbert          8, 46
3  Representative Murray            42
   Representative Wright            49
4  Representative Sonnenberg          6
   Representative Duran             29
5  Representative Priola            14
   Representative McCann              10
6  Representative Vigil             8
   Representative Joshi             22
7  Representative Buck              28
   Representative Coram             32
8  Representative Rankin            34
   Representative Humphrey            36
9  Representative Saine             39
   Minority Leader                 3, 44
10 The Speaker                     24
11
12
13
14
15
16

LEG HX 000164    4080

17
18
19
20
21
22
23
24
25
0003
1              P R O C E E D I N G S
2              *    *    *    *    *
3              UNIDENTIFIED SPEAKER:  House Bill
4   1224, Representative Fields, Senator Hodge,
5   concerning prohibiting large-capacity magazines.
6              THE CHAIRMAN:  Representative Fields.
7              REPRESENTATIVE FIELDS:  Thank you,
8   Mr. Speaker.
9              And I move House Bill 1224 on the
10  final passage.
11             THE CHAIRMAN:  Mr. Minority Leader.
12             MINORITY LEADER:  Thank you, members.
13             You know, members, we heard a vigorous
14  debate and discussion on this bill on Friday.  We
15  talked about the lack of evidence that this bill is
16  going to do anything to enhance public safety in a
17  meaningful way.
18             We also talked about the impact this
19  piece of legislation is going to have on the people,
20  the state of Colorado.
21             We talked about one business in
22  particular, and then we talked about another.  We
23  talked about the loss of jobs that this piece of
24  legislation is going to cause based on a hunch that
25  this piece of legislation is going to have any
0004
1   impact on public safety.
2              Then there was an amendment run to
3   this bill to try to keep the manufacturer, Magpul,
4   in the state of Colorado.
5              Members, I believe that was
6   inconsistent.  That amendment to this bill was
7   inconsistent to accomplish the bill sponsor's goals.
8   And I'm here to tell you, if you haven't seen it,
9   look in the Denver Post.  The editorial board agrees
10  with me.
11             And I want to read for you part of
12  that discussion in the editorial section of the
13  Denver Post.  It says the amendment -- the one that
14  exempts manufacturers -- the amendment said
15  Representative Daniel Kagan, Democrat, Cherry Hills
16  Village, should make it clear that all manufacturers
17  will be able to still sell and transfer these
18  high-capacity magazines to individuals in other

LEG HX 000165    4081

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

19  states, the U.S. military, and law enforcement
20  personnel.
21         We want them, manufacturers, to stay
22  here in Colorado.  It would be sad to see them
23  leave.  After a lively debate in the House on
24  Friday, the amendment was added and the entire
25  measure was approved.  But Republicans that day
0005
1  raised a fair question, if banning high-capacity
2  magazines is really about public safety, why should
3  Democrats bar Coloradoans from buying them, but
4  meanwhile, give their blessings to Colorado -- to
5  Coloradoans who make the same objects for export to
6  other states.  Surely those voting for the bill
7  would favor other states, and indeed Congress
8  itself, banning high-capacity magazines.
9         To be clear, we don't blame Democrats
10  for trying to save valuable jobs, but they are
11  inconsistent -- but are they inconsistent?
12  Absolutely.  Hypocritical?  Perhaps that too.
13         Members, I'm here to tell you today
14  this bill is now, as it's amended, absolutely
15  inconsistent.  This bill, as it's written today,
16  it's written for the purpose -- we heard people down
17  in this well talk about the purpose of this bill.  I
18  think the bill sponsor said this bill is designed to
19  prevent these instruments of war from getting into
20  citizens' hands.  We don't want that to happen.
21         And then the sponsors of this bill
22  came down and read the names of every person that
23  was impacted by one of these horrific tragedies that
24  happened over the last -- the last year.  Read the
25  names from the victims of the Aurora theater
0006
1  shooting, and then read the names of the victims
2  from the Newtown tragedy.  And then passed this
3  amendment that said, you know what, Coloradoans, you
4  can't have these magazines because they're
5  instruments of war, but folks in Newtown,
6  Connecticut, go right ahead and buy them, because
7  we're going to benefit from the tax revenue we get
8  from the manufacturer.
9         In fact, people in the other 49 states
10  in this great union and people throughout the world,
11  you can go ahead and purchase these magazines
12  because, apparently, they're not instruments of
13  destruction when they're purchased outside the
14  borders of Colorado.  They are only instruments of
15  destruction when purchased within the borders of the
16  state of Colorado.
17         It is completely unfathomable to me
18  that we would pass a piece of legislation with such
19  gross inconsistencies associated with it.
20         THE CHAIRMAN:  Representative

21  Sonnenberg.
22          REPRESENTATIVE SONNENBERG:  Thank you,
23  Mr. Speaker.
24          And, members, Representative Waller
25  hit the nail on the head.  But I want to elaborate
0007
1  on some of the facts that came up Friday.  And I,
2  indeed, asked the same question, what is the goal of
3  this bill.  If the goal of this bill is to reduce
4  horrific events and gun violence, all we have to do
5  is look at other states.
6          Illinois, for example, has a maximum
7  capacity of a magazine at 12.  They're number two in
8  the nation for gun violence.  Maryland has a
9  20-capacity magazine.  Maryland is third in gun
10  violence.  California has a high-capacity magazine
11  limit at 10.  They're fifth.
12          I think it's clear that there is no
13  correlation between the size of a magazine and the
14  amount of gun violence in a state.
15          So what is the purpose and the goal of
16  this bill, especially now that we have an
17  inconsistent amendment as part of that bill?  Is it
18  just to do something because you feel you have to do
19  something?
20          I understand the desire to want to do
21  something.  I understand the desire to fix a
22  problem.  Unfortunately -- unfortunately, this bill
23  won't fix that.  This bill will never keep evil
24  people from doing evil things.
25          Members, I ask you to keep in mind, as
0008
1  you move forward and as we are about to vote, please
2  keep in mind the impact that this has on the people
3  of Colorado.
4          Knowing that the evidence is there
5  that this will have no impact on criminals, I ask
6  for your no vote.
7          THE CHAIRMAN:  Representative Holbert.
8          REPRESENTATIVE HOLBERT:  Thank you,
9  Mr. Speaker.
10          Members, we are negotiating, in my
11  opinion, with the rights of law-abiding citizens.
12  We have all received hundreds, if not thousands of
13  appeals from our constituents of this great state
14  and nation to rethink this course of action.
15          We are prescribing for the people of
16  Colorado that we shall not have access to plastic or
17  metal boxes with a spring and two metal plates, an
18  object that cannot be a deadly weapon, has never
19  murdered anyone.  And we're being told that
20  residents of our state will not have as ready access
21  to these plastic or metal parts, unless they work
22  inside of a building where those parts are made or

23    unless they work for law enforcement.
24           The people who work for government
25    will be allowed access to those metal or plastic
0009
1    objects more readily than the citizens, the people
2    for whom government works.
3           My friend, Representative Fields, I
4    know cares passionately about this bill and has
5    endured an experience in my life that I pray I will
6    not.  I know she cares passionately about this bill.
7    But I care passionately about the United States
8    Constitution and the constitution of this state and
9    the oath that we've taken.
10           And I ask you to please be thoughtful
11    of your vote.  Is this bill going to do what it
12    promises to do, to improve public safety?  No.
13           Is this bill reasonable, as
14    Representative Sonnenberg so rightly pointed out?
15    Have we negotiated some convenient compromise with a
16    manufacturer or manufacturers here in our state to
17    avoid political and economic heat?
18           Is this principally the right thing to
19    do?  Having principal positions is not about winning
20    or losing.  Having principal positions is about
21    doing what is right, regardless of the pressure to
22    compromise.
23           I ask you, friends, please vote no on
24    House Bill 1224.
25           And thank you for your time and
0010
1    consideration.
2           THE CHAIRMAN:  Representative McCann.
3           REPRESENTATIVE McCANN:  Thank you,
4    Mr. Speaker.
5           This obviously is a very challenging
6    issue and a very emotional one for many people.  I
7    would like to, however, address the argument that
8    large-capacity magazines -- limiting the size of
9    large-capacity magazines will not have an impact on
10    public safety.
11           For me, this is a public safety issue
12    for our citizens here in Colorado.  And we have seen
13    that high-capacity magazines have been a common
14    thread linking many of these mass shootings.
15           But in addition, the Department of
16    Justice has found that high-capacity magazines are
17    used in 14 to 26 percent of gun crimes, and more
18    alarming, 31 to 41 percent of fatal police
19    shootings.
20           The chiefs of police of this great
21    state are supporting this bill.  These kinds of
22    magazines are used in attacks on police officers.
23    And as noted, many result in death of police
24    officers across the country.

LEG HX 000168    4084

Many of the high-profile mass
0011
1  shootings did involve high-capacity magazines,
2  including Newtown, Connecticut, when Mr. Lanza used,
3  or is alleged to have used, multiple 30-round
4  magazines.
5           Oak Creek, Wisconsin, when Wade
6  Michael Page killed six people and wounded three
7  others at a Sikh temple with a semi-automatic
8  handgun and three 19-round magazines.
9           In Aurora -- unfortunately, we are all
10  too familiar with the Aurora situation -- Holmes
11  allegedly used two semi-automatic handguns, a
12  shotgun, and an assault weapon equipped with
13  100-round drum magazine.
14           In Tucson, Arizona, Jared Loughner
15  shot and killed 6 people, including a U.S. Federal
16  District Judge, and wounded 13 others, including
17  U.S. Representative Gabby Giffords.  Loughner fired
18  all 33 rounds from a semi-automatic handgun with a
19  33-round magazine.
20           And the thing that's critically
21  important to remember in that case, colleagues, is
22  that the fact that he had to reload is what caused
23  that couple of instant hesitation, when a bystander
24  was able to successfully attack him and take him
25  down.  It was because he was reloading one of those
0012
1  high-capacity magazines that he was prevented from
2  killing additional people.  And we think that is
3  also what happened with respect to Mr. Holmes, his
4  gun jammed, so he was unable to continue his mass
5  murder.
6           Fort Hood, Texas, Major Hasan shot and
7  killed 13 people and wounded 34 others during a
8  rampage at the Fort Hood military installation.  He
9  allegedly used a semi-automatic handgun and 20- and
10  30-round ammunition clips, magazines.
11           And in Binghamton, New York, Mr. Wong
12  shot and killed 13 people and injured four others,
13  firing 99 rounds from two semi-automatic handguns,
14  at least one 30-round-capacity magazine was found at
15  the scene.
16           A 2010 survey by the Police Executive
17  Research Forum, not a liberal think tank, reported
18  that since the ban expired -- this is the assault
19  weapons and high-capacity ban that we had
20  federally -- since it expired in 2004, 37 percent of
21  police agencies report seeing noticeable increases
22  in criminals' use of assault weapons, and 38 percent
23  reported seeing noticeable increases in criminals'
24  use of semi-automatic firearms with high-capacity
25  magazines.
0013

LEG HX 000169    4085

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

1       According to a Washington Post
2  analysis of Virginia crime gun data, the federal ban
3  was associated with a 60 percent decline in the
4  share of crime guns with high-capacity magazines
5  recovered in Virginia between 1998 and 2004.
6       I would also note that the U.S.
7  Supreme Court has stated that the Second Amendment
8  right is not unlimited.
9       And I appreciate Representative
10  Holbert's impassioned plea about the Second
11  Amendment.  This bill will not take away Second
12  Amendment rights.  What it does is impose reasonable
13  constraints on the exercise of that right, just as
14  we do on other constitutional rights.
15       And finally, members, I would say that
16  in response to the argument about Magpul leaving
17  Colorado, every state chooses what they want to do
18  with respect to gun safety.  What we're talking
19  about here is what Colorado is going to do.  If
20  other states continue to allow large-capacity
21  magazines, then they will be able to possess them in
22  those states.  But what we're saying here is that
23  this is a matter of public safety for Colorado.
24       This bill does not require any company
25  to leave Colorado.  It would be their choice.  But
0014
1  what this bill does is provide for a safer
2  environment for all of us here by a reasonable
3  limitation on use of high-capacity magazines.
4       And it really -- it really asks the
5  question of why does someone need more than 15
6  rounds at a time to use in a pistol or a rifle.
7  Fifteen rounds is a lot of rounds.  As many of you
8  have pointed out, it doesn't take very long to
9  reload, but it can cause that hesitation that could
10  save the next 15 lives.
11       So I would ask for a yes vote on this
12  bill.
13       THE CHAIRMAN:  Representative Priola.
14       REPRESENTATIVE PRIOLA:  Thank you,
15  Mr. Speaker.
16       And, members, I have given a lot of
17  thought on what we're doing, what these -- not just
18  this bill, but the other three bills -- mean to our
19  state and our nation.  And I couldn't help but feel
20  like we've been here before.  Somehow, seems like,
21  things like this have happened in the past with
22  politicians and tragedies and so on and so forth.
23       And then I thought back to one -- and
24  I think all of us would agree -- was a knee-jerk
25  reaction by politicians, that if we could go back in
0015
1  time, we would rewrite a wrong and not do what our
2  forefathers did in taking away civil rights and

LEG HX 000170    4086

3 constitutional rights when American men and women
4 were killed and the public's anger was so strong
5 that they asked politicians to do something.  We
6 must do something for public safety.  It's about
7 public safety and we must do something.
8          But after the threat had passed, after
9 time had healed wounds, we reflected on what we had
10 done, had actually taken away freedom from those
11 American citizens.  And with hindsight, we can now
12 be remorseful.
13          What am I speaking of?  Think about
14 it, the Japanese interns.  In 1941 and '42,
15 Americans were asking politicians, this group over
16 here, they're a threat to public safety, we must
17 remove them from the coasts because they'll sabotage
18 ships and they'll blow up our Navy ships and
19 they'll --
20          THE CHAIRMAN:  Representative Priola,
21 can we keep it onto House Bill 1224?
22          REPRESENTATIVE PRIOLA:  Mr. Speaker,
23 this is to the bill and to the other three bills.
24 This is about Second Amendment constitutional rights
25 and the civil rights of Coloradoans and Americans.
0016
1          Just as it was then, just as it is
2 now, our constituents say just do something to make
3 them feel better about the pain and anguish we all
4 feel.  But changing the law will not ever change the
5 heart of men.
6          Every time we pass a law down here to
7 take away freedoms and rights from law-abiding
8 citizens, we all lose a little bit of freedom.
9          Representative McCann brought up a lot
10 of folks who have supported this.  And I say to
11 that, sheriffs in Colorado don't support this, or
12 the other bills, as well.
13          We've seen news stories about how
14 Washington politicians are trying to influence this
15 debate.  And I tell you, there is no coincidence
16 here.  This is about a national dialogue and a
17 national push to take away our Second Amendment
18 rights, to reduce our Second Amendment rights, to
19 take away a little bit of freedom from all of us,
20 like was once done back in the early '40s with our
21 friends, the Japanese interns, who had lived here
22 for generations, who had built businesses and had
23 community structures on the coasts of this country
24 and who were brought here to the Midwest.
25          I actually walked through a building
0017
1 that was on our family's farm, where back then they
2 had a program where you could have Japanese interns
3 come work in the fields, and I thought, hmm, how
4 quaint.  That kind of reminds me of the amendment

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

5    that was dropped on this bill to still allow Magpul
6    to work in the state, even though we don't like what
7    they do as a policy matter.
8              It is about the money.  That's what
9    it's about.
10             And some day my children and
11   grandchildren may not look back at this point in
12   particular, but they'll look back at other points,
13   and they'll say that was a salient time we lost that
14   right.  That was the point.
15             I ask you, members, to seriously look
16   hard at what you're doing and what this means, not
17   just to our constituents in our districts and the
18   papers and the media this year.  Think about the
19   long-term ramifications of this and how we are
20   inevitably changing the dialogue and the meaning of
21   the Constitution of the United States, the important
22   thing that our founders put in place for important
23   reasons.
24             Please vote no on this bill.
25             THE CHAIRMAN:  Representative Vigil.
0018
1              REPRESENTATIVE VIGIL:  Thank you,
2    Mr. Speaker.  And I'm only going to get up here once
3    for all four bills.  So, Mr. Speaker, if you would
4    allow me some latitude to speak to all four of the
5    bills.
6              THE CHAIRMAN:  Yes, Representative
7    Vigil.
8              REPRESENTATIVE VIGIL:  I will not be
9    speaking to them in detail, but I will be referring
10   to them. I'm here to explain why I'm not going to
11   vote yes on any of these bills.  I'm going to vote
12   no against all four bills.  And I'm not here to
13   disparage any motives to the sponsors.  They're dear
14   friends of mine.  I'm not here to cast judgment on
15   anybody who may vote for it or against it.  I am
16   here merely to explain my beliefs.  And I'm here to
17   explain why I think this is not a good thing for
18   Colorado.
19             Colorado has been a western state ever
20   since it has become a state.  My family came here in
21   the early 18 -- mid-1850s -- '40s.  They carried
22   weapons to settle this land, as well as axes and
23   hoes and shovels.  This was part of our heritage.
24   This is part of what it took to settle this land.  I
25   cannot turn my back on that.
0019
1              I feel like I have to defend our
2    Second Amendment.  It is said that it is not being
3    limited, but Colorado has already been a great
4    state.
5              If you look in this House of
6    Representatives, which I am so proud to serve in, if

7  you look above us, you've got Barney Ford, first
8  black man to vote in the state of Colorado.
9          Across the street, the Ralph Carr
10  Center.  He believed, as Representative Priola said,
11  the United States Government did a bad thing in
12  taking this group -- this group of people out and
13  separating -- segregating them.
14          We have our first black speaker of the
15  house.  And our Honorable Mark Ferrandino, first
16  openly gay speaker of the house.  Proud things that
17  we have done in Colorado.
18          I hope that this act that we do on
19  these bills today is not a first for Colorado to go
20  backwards in the progressive way that we have
21  always -- Colorado's always been.
22          The first bill I believe is nothing
23  more than hardware paranoia.  I believe we have to
24  just deal with what really -- the person behind the
25  trigger.  That person is mentally ill.  He has maybe
0020
1  asked for help, hasn't gotten it.  Maybe he's a
2  veteran who has killed himself.  We have an epidemic
3  of self-inflicted gunshot wounds.  Our service
4  people deserve better than that.
5          The other bills -- I'll only mention
6  the background check bill because my best friend, my
7  worse critic, my wife told me, she said, you know,
8  not having background checks is reckless.  And I
9  says, well -- you know, well, maybe I need to
10  explain that just a little bit.
11          I am for background checks.  And I am
12  for initial background checks.  And I am actually
13  for background checks if initially they had some
14  type of mental health adjudication, that if people
15  aren't well and are seeing mental professionals,
16  they should not be had -- or have a gun.  And they
17  shouldn't get one until, perhaps, maybe there's a
18  process, a judge or someone could restore that
19  process back to them.
20          But this private sale stuff, I don't
21  think it's going to work.  There's already laws on
22  the book that says if I sell a gun to a known felon
23  or somebody I know shouldn't have a gun, somebody
24  who's mentally defective, and this person does
25  something wrong with it, I am responsible for it,
0021
1  just myself, for doing such an idiotic thing.
2          And, you know, there's -- so I am for
3  background checks in that capacity, but not for the
4  private sales checks.
5          And how I got to these votes, first --
6  first of all, I vote my conscious.  My conscious is
7  clear that I'm doing the right thing for Colorado
8  and for the people of Colorado.

9       Second is my district, District 62, is
10  rural Coloradoans, a frontier still, communities.
11  They still hunt and fish.  A lot people have
12  assisted living down there and they rely heavily
13  upon what they need to get through the day, and that
14  includes weapons sometimes and high-capacity
15  magazines.  Sometimes it's bow and arrows.
16  Sometimes it's knives.  But it is what it is, and I
17  cannot vote for that.
18          Thirdly, my party.  And I thank my
19  party for being so gracious.  And I think that's
20  what makes our party so diverse and strong.  They've
21  been tolerant with me.  Although we disagree and I
22  disagree with them and I stand against them on this
23  vote, they've been very respectful, and I thank them
24  for that.
25          And the last is my values, rural
0022
1   Colorado values.  I don't believe that I betray
2   anything, in my mind, in my morals, or in my
3   lifestyle by saying no.
4           And secondly, I stand for jobs in
5   Colorado for companies like Magpul and all the
6   people that are affiliated with them.  And I hope --
7   regardless of what happens here, I implore Magpul to
8   try to work with the State of Colorado, if this bill
9   does pass.  And I ask you to please stay in
10  Colorado.  You're a very valuable company, and so
11  are all the subsidiaries that work with you.
12          And I want to thank this body here.
13  It's an honor to serve with every one of you, and
14  I'll continue to work with you.
15          Thank you very much for your time.
16          THE CHAIRMAN:  Representative Joshi.
17          REPRESENTATIVE JOSHI:  Thank you,
18  Mr. Speaker.  And thank you, colleagues.
19          I stand here in opposition of this
20  bill.  And I will explain why.  I'm not going to
21  repeat what we heard Representative Waller has
22  mentioned about the Denver Post editorial page.
23  It's very obvious that this bill is inconsistent and
24  probably hypocritical.
25          We have heard about in particular
0023
1   about the public safety argument, and that's what
2   it's about.  But I also would like to go a little
3   further, and I would like to read the very last line
4   from the same editorial.  It says:  It won't stop
5   the violence, we realize, but it could easily save
6   lives.
7           Members, English was not my first
8   language.  Probably I learned about third or fourth
9   in the line.  To me, even that way isn't the
10  violence that destroys the lives.  And how can we

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

11 save lives when it won't stop violence? Anybody can
12 explain that in plain English to me?
13      And, again, limiting Magpul in
14 Colorado, but not in other states. Do you think
15 that my grandkids are expendable to you, just to
16 save your children? No way. I have nephews and
17 nieces who also live in other states. You would
18 expend them to save your children.
19      And we are focusing on the wrong
20 issues right now. We heard over the weekend the
21 country singer, Cindy McCrady, took her life. How
22 many bullets took her life? One. It wasn't the
23 bullet, it was her mental illness. We know she was
24 in a mental institution for almost 10 days. And she
25 was released, and then she went home and did this.
0024
1      So we are focusing on the wrong thing.
2 We need to take care of our citizens for what the
3 problems they have.
4      So, colleagues, let's do the right
5 thing and take care of what really is the issues and
6 problems here, and don't focus on the wrong things.
7      Thank you, and vote against this bill.
8      MADAME SPEAKER: Mr. Speaker.
9      THE SPEAKER: Thank you, Madam Speaker
10 Pro Tem.
11      And I rise in support of this
12 legislation. And I appreciate the debate we've been
13 having, and I know it will continue with all the
14 people in the well, both Friday and today. It's
15 been a respectful and good debate. And it shows
16 what this body can do. Even though we may disagree
17 on issues, we air those and then come down to a
18 vote.
19      I did want to just finish quoting the
20 Denver Post editorial because, as the minority
21 leader read it, I think you would think that the
22 Denver Post was against this bill. He left off the
23 last section of this bill -- or of the editorial.
24 So I just wanted to read it.
25      On the larger point, though, Democrats
0025
1 continue to have a strong case. In Friday's debate
2 on the overall bill, Republicans made good arguments
3 about the various causes of violence, but they never
4 refuted the fundamental point that a shooter intent
5 on killing as many people as possible will be
6 hampered if he has to change the clips on a regular
7 basis.
8      As Speaker Ferrandino reminded his
9 colleagues, mass murderer Jared Loughner was tackled
10 by bystanders when he was trying to reload. Let's
11 limit the next Loughner to 15-round magazines. It
12 won't stop the violence, we realize, but it could

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

13  easily save lives.
14          That's what this bill is about.  This
15  bill is about trying to save lives.  There's a lot
16  of other debate, a lot of other conversations.  I
17  know there's an argument that this might not save
18  lives.  I think what you see what happened in
19  Arizona, a bill like this will save lives.
20          And while we have to make sure that we
21  are careful in protecting the Second Amendment, we
22  also have to protect life, our Declaration of
23  Independence, life, liberty and the pursuit of
24  happiness.  And that is also fundamental to what we
25  do down here in making sure we protect that.
0026
1           And if we can save lives by passing
2  this legislation -- and I believe we do.  I believe
3  this legislation will help us to save lives in our
4  communities, then it is the right thing to do.  It
5  is a right and reasonable way to look at the Second
6  Amendment with responsible regulation to help
7  protect people's lives.
8           It's not, as I said the other day,
9  going to solve all the violence in our communities.
10  And I think we've heard a lot of talk about mental
11  health, and I think that's very important.  And
12  hopefully -- and I know we will probably see a bill
13  later on in this session to deal with mental health,
14  and I think that is the right thing to do.  We also
15  see it in the bill, coming up in a little while,
16  some more data-sharing on mental health and
17  background checks.
18          Mental health is a big component, but
19  so is this.  And this is one piece of a
20  comprehensive package.  We will not solve this with
21  one piece of legislation.  No one piece of
22  legislation will solve the violence.  No legislation
23  will solve all the violence.  But this is a step in
24  the right direction.  As we see in what happened in
25  Arizona, as we see what's happening in our
0027
1  communities, giving that -- that just split second,
2  the split second when someone's trying to change
3  their magazines, split second for someone to tackle
4  someone, like happened in Arizona, or to flee, to
5  run out of a theater as someone is shooting, that
6  split second can save lives.
7           I know there is strong opposition to
8  this.  I know there are strong feelings on this on
9  both sides of the aisle, and I respect that.  That's
10  what we're supposed to be -- down here, we're
11  supposed to have strong opinions and fight for what
12  we believe.
13          But I do believe that this will save
14  lives.  I really applauded Representative Fields for

LEG HX 000176     4092

15 the work she's done, not just in this legislative
16 body, but what she's done since the murder of her
17 son. She has been a strong advocate for ending and
18 trying to curb the violence in our community she
19 knows firsthand. And this is a step in that
20 direction.
21        As the Denver Post says, it might not
22 stop all of violence, but it will, hopefully, save
23 some lives.
24        That's why I vote yes, and ask you to
25 vote yes, to help save the lives in our communities.
0028
1        MADAME SPEAKER:  Representative Saine.
2        Representative Buck.
3        REPRESENTATIVE BUCK:  Thank you,
4 Madam Speaker, Pro Tem.
5        I do implore you to vote no on House
6 Bill 1324 [sic]. Folks, I bought it before you, and
7 I don't know if it sunk in, but the common thread
8 here are drugs. It's mental illness. It's not the
9 gun. The common thread here is the criminal on
10 drugs.
11        This bill hurts good citizens and it
12 hurts good jobs. And I ask you to help us protect
13 the citizens and protect our constitutional rights.
14        As you know, violence happens in those
15 gun-free zones. You ask for a split second, in a
16 split second, someone with a concealed weapon can
17 take out that shooter. That's what our country is
18 about, is protecting ourselves and taking out the
19 bad person. Why do you think that we have to put
20 more restrictions on our guns?
21        Again, please focus on the drugs and
22 the mental illness and not on the weapon, please.
23 Please vote no on House Bill 13-1224.
24        THE CHAIRMAN:  Representative Duran.
25        REPRESENTATIVE DURAN:  Thank you,
0029
1 Mr. Speaker.
2        I want to thank this -- all the
3 members for a rigorous debate this last Friday. And
4 regardless of whether you're a Democrat or a
5 Republican, this is a tough issue.
6        I rise in support of this bill today.
7 And over the weekend, I did a little bit of
8 research. And many of you may not know that in
9 Colorado, if you are a small game hunter and you
10 want to hunt pheasants, that you can only have three
11 shells in your gun to hunt for pheasants. And what
12 hunters call it is they call it a fair chase, so
13 that when you shoot the gun, the pheasants have a
14 fair shot at getting away in time. And by the time
15 the hunter reloads, those pheasants are already
16 gone.

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

17      Right now in Colorado law, we have
18  more protections for pheasants and small game than
19  we do human beings.  As a six-generation Coloradoan
20  with a family ranch in southern Colorado, it should
21  come as no surprise that hunting is a big part of my
22  family's tradition and heritage.  As long as I can
23  remember, my family and I ate more elk, rabbit, fish
24  and pheasants than we ever ate chicken or beef.  We
25  would make elk with everything, elk burgers, elk

0030
1  green chili, elk spaghetti sauce.  And if you know
2  how to cook it, it doesn't taste the least bit
3  gamey.  And this year, my nephew, who is 10 years
4  old, successfully completed his first hunter safety
5  class.  And you can bet that if I ever have a son or
6  daughter, I'll be the first one to sign them up for
7  a hunter safety class so that they can continue to
8  live on the tradition that we have in Colorado.
9       As a Colorado and a state
10  representative, I am sworn to uphold the
11  Constitution of the United States.  And I could not
12  support any reform that would ignore Colorado's
13  western heritage or unreasonably impair the Second
14  Amendment rights of our citizens.  But I also
15  understand that the right to do so is not unlimited,
16  especially in a time in which our society suffers
17  from such a tragic gun violence epidemic.
18      During the 12-hour gun debate last
19  Friday I said that this is about kids who have been
20  shot over and over and over again, and that I am
21  tired of seeing kids die year after year after year.
22      And although I don't talk about it
23  very much, growing up in Colorado I was not immune
24  to the effects of gun violence.  I remember my high
25  school sweetheart, his best friend was shot in

0031
1  Denver on 33rd and High Street after members of a
2  gang drove up to him and shot him.  And do you want
3  to know why?  Because he was wearing a Denver
4  Broncos jacket that they wanted.
5      I remember a friend of mine who I
6  studied dance with for years and danced in the same
7  dance company as myself, but she told me the story
8  about when she was in the cafeteria at Columbine
9  High School when Eric Harris and Dylan Klebold
10  committed their awful massacre.
11      And in the latest shooting at the
12  Century Movie Theater in Aurora, my mother's cousin,
13  his fiancee and baby were there when James Holmes
14  opened fire on the crowd.  And although they
15  successfully escaped with minor wounds, the shooting
16  had a profound effect on their lives.
17      Perhaps this debate at the Colorado
18  legislature over closing the background loopholes,

LEG HX 000178

4094

19  additional investments in mental health, and
20  commonsense gun safety regulations are not the only
21  answers to the gun violence that we face in this
22  country, but it is a meaningful and necessary step
23  forward.
24          And to not take action and simply say
25  that the problem is too difficult is not taking our
0032
1  oath of office seriously.
2          In order to form a more perfect union,
3  we must work to promote the general welfare, safety,
4  and security of the public.  In order to create a
5  more perfect union, we must establish justice.  And
6  in order to create a more perfect union, we must
7  include domestic tranquility.  And that is why I
8  rise in support of this bill.
9          Thank you, Representative Fields, for
10  your courage for standing up for what so many people
11  before us were fearful of doing.
12          THE CHAIRMAN:  Representative Coram.
13          REPRESENTATIVE CORAM:  Thank you,
14  Mr. Speaker.
15          Members, I rise in opposition of this
16  bill.  We all remember 9/11.  Over 3,000 lives were
17  lost that day.  It will live with us forever.  Not a
18  single shot was fired.
19          The fact is, if you wish to cause
20  death and destruction, an evil mind will figure a
21  way do it.
22          If making laws would stop this, we
23  would not lose the 17,000 lives that is lost each
24  year to heroin and cocaine.  The fact is, it will
25  continue.
0033
1          We're saying we're doing this to save
2  the children.  If passing a law saves the children,
3  Chicago would be a prime example.  Chicago has some
4  of the toughest gun laws in the nation, yet, last
5  year, over 440 school-age children were shot in
6  Chicago.  Approximately 60 of them died.  A law did
7  not change that.
8          It seems that if denying the free
9  access of our Second Amendment rights of law-abiding
10  citizens would stop crime, it's not true.  Criminals
11  will ignore the law.  They will actually be
12  emboldened by the fact that they know that I cannot
13  defend myself on an equal basis.  Your friends and
14  neighbors cannot defend themselves.  Think about
15  what we're doing here.
16          I am a proud Coloradoan, a native of
17  rural Colorado.  And like Representative Vigil, I
18  have rural Colorado values.  And my district's
19  probably 95 percent in favor of us saying let's
20  stop -- let's analyze what the problem is.  It's the

21  mental issues behind those doing evil that we must
22  address.
23          And we can pass this bill, but I
24  assure you, much like the use of heroin and cocaine,
25  those criminals will not care.  They will continue
0034
1  to do harm and take the lives of our children that
2  we must try to protect.
3          We are doing nothing here to save
4  those children's lives.  Thank you.
5          THE CHAIRMAN:  Representative Rankin.
6          REPRESENTATIVE RANKIN:  Thank you,
7  Mr. Speaker.
8          You know, this, in my mind, is a bill
9  based on hope.  And I have hope.  I want to do
10  things for our citizens.  I think it's a bill based
11  on the very best of intentions of people who I've
12  come to deeply respect.  There's no question that
13  the intentions behind this bill are good.
14          But at the bottom line -- and it's
15  also based on the idea that we must do something.
16  And my constituents are telling me that we must do
17  something.  I share that belief very deeply.  But --
18  but this bill is based on a very small premise, when
19  we narrow it down.  And we've heard that come up
20  this morning maybe for the first time, we've heard
21  the term split second.
22          What we're really buying here is a
23  couple of seconds in a situation where a mass
24  murderer is changing magazines.  That might take one
25  second, it might take ten.  And we hope, we hope in
0035
1  that time that someone is courageous enough to run
2  up and tackle this person.  Or more likely what
3  we're hoping is that somebody in the room has a
4  weapon and knows how to use it.  That's what we're
5  buying here.  We're buying just a couple of seconds
6  in these situations, these tragic situations.
7          And I wonder what we'll willing to pay
8  for those few seconds.  Is it really worth it?  Is
9  it really worth it to buy those few seconds in these
10  isolated instances?  Maybe it is.  But are we
11  willing -- are we willing to -- as Representative
12  Vigil so eloquently stated, are we willing to say
13  that the heritage of Colorado is vulnerable, that we
14  can change it?
15          Are we willing to say to our citizens,
16  who feel very deeply about their Second Amendment
17  rights, that we're willing to push on those?  Maybe
18  not take them away.  They're good arguments.
19          I mean, you know, we can say that we
20  have, as legislators, the right to limit their
21  rights in certain ways.  And we do.  But are we
22  willing to do that?  Are we willing to divide our

23 citizens this dramatically to buy a couple of
24 seconds in a situation where we only hope something
25 good will happen?
0036
1            Are we even focusing on the right
2 thing?  Perhaps.  Perhaps.  I would suggest that
3 this bill should apply to the size of magazines in
4 video games.  We're training people to use magazines
5 of unlimited capacity.
6            Maybe violence in the media has
7 something to do with this.  Does anybody believe
8 that?  Maybe we should be focusing on mental illness
9 and identifying those people and treating them.
10           Maybe this is not the best thing to
11 do.  Maybe we're praying so much for this two
12 seconds in isolated situations that we should tell
13 our citizens that we're going to work on the right
14 things, not just something that we hope will happen.
15           Thank you, members.  I urge you to
16 vote no on this bill.
17           THE CHAIRMAN:  Representative
18 Humphrey.
19           REPRESENTATIVE HUMPHREY:  Thank you,
20 Mr. Speaker.
21           Mr. Speaker, a law-abiding citizen can
22 more effectively save lives with a standard-capacity
23 magazine larger than 15 rounds in capacity.
24           This bill will not stop the deranged
25 few.  It will diminish the Second Amendment rights
0037
1 of all.
2            I have an e-mail here from an
3 individual who was addressing the economic impact of
4 House Bill 1224.  He writes the following -- the
5 font's a little bit smaller here.  He states:  I
6 moved to Fort Collins to work in high-tech 15 years
7 ago.  For the last 10 years, the economy has not
8 been great.  Everyone has been struggling to get by
9 for some time.
10           However, there are a few areas of the
11 economy that are growing.  One of those growth
12 sectors is firearms.  The Front Range has a
13 flourishing ecosystem of growing companies in the
14 firearms industry.  In fact, I left my stable
15 high-tech job in 2012 to pursue my own business
16 full-time.
17           I am a small business owner living in
18 Fort Collins.  My companies are involved in
19 competitive targeting shooting events, training for
20 citizens, police and military, and manufacturing.
21 My manufacturing company is 66 percent owned by
22 Fort Collins residents.
23           The four gun bills under consideration
24 1224, 1226, 1228, and 1229, are causing massive

25   disruption to all aspects of our business

0038

1   operations.  Of these, the worst is 1224.

2          I'm sure you've heard of the situation

3   of Magpul based in Erie.  My company has strategic

4   partnership with Magpul.  The economic gains from

5   this relationship are in jeopardy due to these gun

6   bills.

7          If Colorado passes 1224, or 1226, 1228

8   or 1229, we will be forced to relocate our

9   businesses, employees, prosperity, factories,

10   families, and households to other states.

11          Besides the highly publicized 600 jobs

12   that Magpul alone would take out of Colorado,

13   businesses such as mine would easily comprise double

14   that amount.  In these tough economic times,

15   Colorado cannot afford to reject thousands of people

16   who are people who are contributing to economic

17   growth.  Thank you for your time, Zak Smith.  That

18   concludes his e-mail.

19          This bill is arbitrary with this

20   number of 15 rounds.  It has no reasonable evidence

21   basis.  It is a job killer.  It diminishes the

22   freedom and safety of Americans.  So please, please,

23   vote no on this bill.

24          A hunch and good intentions do not

25   warrant a yes vote.  Thank you.

0039

1          THE CHAIRMAN:  Representative Saine.

2          REPRESENTATIVE SAINE:  Thank you,

3   Mr. Speaker.

4          As Representative Sonnenberg said,

5   this bill won't keep evil people from doing evil

6   things.  What it will do is lose law-abiding

7   citizens their jobs.

8          I challenge anyone, can you tell me

9   any area, anyplace where magazine restrictions or

10   gun bans, where they've been enacted, can you tell

11   me, of any of those places, have the murder rates

12   gone down as a result?  And you can't.  Not over any

13   decade.

14          Even island nations that have enacted

15   gun control laws, magazine restrictions or bans,

16   their murder rate has increased.  And they have no

17   neighbor to blame.

18          You've heard from here, Adam Thompson,

19   who pulled other kids to safety from the Columbine

20   shooting, that magazine limits would not have

21   stopped the Columbine killers.  They were planning

22   on killing everyone with propane bombs.  Would they

23   have been hampered by a magazine restriction?  No.

24          Earlier I heard a statement that this

25   is a bill with good intentions -- and it surely

0040

1  is -- and that it had no impact on public safety or
2  no correlation on public safety.  But I disagree
3  respectfully.
4           Again, any area, even Europe -- folks
5  point to Europe as having lower murder rates than
6  the U.S. because of their magazine ban restrictions,
7  gun control laws.  But they used to be lower before
8  the bans.
9           You won't save lives with this
10 legislation.  Because who obeys the laws?
11 Law-abiding citizens.  Who is going to obey gun
12 laws?  Law-abiding citizens.
13          What this bill will do -- what this
14 bill will do is encourage criminals to purchase
15 magazines with more than 30 rounds because nobody
16 else will have them.
17          Representative McCann bought up
18 instances of mass shootings.  Well, what do these
19 mass shootings have in common?  We know from the
20 killers' manifestoes, their notes, that they planned
21 to die at the scene of the crime.  Seventy-five
22 percent of the time mass shooters die at the scene
23 of their crime.  Those that don't couldn't bring
24 themselves to pull the trigger.  And we know this
25 from their communications.
0041
1           Their intent clearly, again, from
2  their communications, is to put their parents, the
3  community, and the world on trial by killing more
4  people than the other mass shooters before them, to
5  outdo the other mass shooters before them.
6           So would any restriction curb this
7  intent?  No.  They can simply now go to Wyoming.
8  They can buy it on the black market, or they can
9  make a magazine.  It's plastic, metal springs.
10          Again, you heard from hero Adam
11 Thompson, would magazine restrictions have stopped
12 the Columbine tragedy, and it wouldn't -- the
13 answer's no.
14          The only thing this bill achieves is
15 more mass murderers and kills the jobs of the law
16 abiding.
17          I urge you to vote no today.  I urge
18 you to keep Magpul in my district, to keep 600 jobs
19 in Colorado.  I urge you, colleagues -- it's an
20 honor to serve with you.  I urge you to vote no.
21 Thank you.
22          THE CHAIRMAN:  Representative Murray.
23          REPRESENTATIVE MURRAY:  Thank you,
24 Mr. Speaker.
25          I'd like to refer to Representative
0042
1  Duran's comments about pheasants.  What we're
2  talking about today, law-abiding citizens are the

3   pheasants. We're not the hunter. We're the hunted.
4   And we're talking about criminals who are shooting
5   at us as pheasants.
6          We're asking that we be given a fair
7   shot at being able to -- no pun intended. We're
8   asking that we be given the opportunity to shoot
9   back, as pheasants are allowed to fight back. So
10  remember, when you're talking about shooting
11  pheasants, who's the hunter and who's the hunted.
12         Many of us have seen the YouTube
13  videos and TV stories about Sandy Hook parents and
14  neighbors who just came out and said, you know,
15  something's wrong with our society. But the guns
16  are not the issue, it's the people using the guns
17  and the issues in society related to those guns.
18         So yes, let's do something. But is
19  what we're doing today the correct thing? And I
20  would say no.
21         I'd like to remind everybody that
22  10-round magazines were used repeatedly in
23  Columbine. And that was a gun-free zone. So, you
24  know, they had free rein to keep using one magazine
25  after another.
0043
1          The question was asked, why do we need
2   more rounds? Well, it's because that criminals have
3   more rounds. So do we think that if we're going to
4   outlaw a larger magazine that the bad guys won't
5   have those magazines. It doesn't work that way.
6   They're going to have the larger magazines and we're
7   not. Again, we're the hunted, and we're just
8   waiting for them to shoot us.
9          I would remind you that our county
10  sheriffs -- I mean, we're a western state. Our
11  county sheriffs have come out unequivocally opposed
12  to the bills that we're seeing today. They want our
13  help as law-abiding citizens. They need us. They
14  say they need us against the bad guys. And they see
15  these bills, particularly the magazine restriction,
16  as something that gets in the way of their
17  preserving our safety.
18         So it's been repeated many times, you
19  know, what the criminals are doing in various
20  situations. We can all come up with our little
21  anecdotal stories. But we're not talking about
22  criminals with this bill and effect on criminals.
23  We're talking about is effects on law-abiding
24  citizens, our friends, our neighbors, ourselves.
25         Vote no on this bill.
0044
1          THE CHAIRMAN: Mr. Minority Leader.
2          MINORITY LEADER: Thank you,
3   Mr. Speaker.
4          You know, I wasn't going to come back

5  up again and talk, but then, Mr. Speaker, you said
6  something that I felt like I had to come and
7  address.  You know, you read the rest of that Denver
8  Post editorial and, you know, I apologize if I in
9  any way tried to infer or my words in any way
10  inferred that the Denver Post editorial board was in
11  opposition to this bill.  That's not the point I was
12  trying to make at all.
13          I was trying to point out the
14  monumental inconsistency associated with creating a
15  manufacturer's exemption in the state of Colorado,
16  yet not allowing Coloradoans to purchase the
17  magazines.
18          We heard it.  And I apologize if that
19  point wasn't clear.  So I'm going to try to
20  articulate it a little bit better this time.
21          We've heard the bill sponsors come
22  down here and say these are tools of war, they
23  belong in the battlefield.  In fact, I think the
24  bill sponsor said these belong in the theater of
25  war, not theaters in Colorado or theaters at home.
0045
1          How can you say they don't belong in
2  theaters at home, but we're going to allow you to
3  purchase them in Arizona.
4          Mr. Speaker, you came down here and
5  talked about Jared Loughner, tragedy that was
6  committed in Arizona.  This bill doesn't do anything
7  to protect him -- or protect the victims in that
8  circumstance.
9          This bill doesn't do anything to
10  protect the victims in Sandy Hook Elementary,
11  because of the monumental inconsistency that was
12  placed in this bill.
13          Representative McCann came down here
14  and said, you know what, each state's free to handle
15  this issue on their own.  Well, Representative
16  McCann, you had a bill that handled the situation.
17  You had a bill that said these things won't be sold,
18  period, at all.  But because we want the tax
19  revenue, and because we want the jobs in the state
20  of Colorado, we were willing to exempt manufacturers
21  to allow these -- as the bill sponsor said, these
22  tools of war to be sold in every theater -- or to be
23  sold in every state in the union, to be sold across
24  the border in Wyoming and then to come back into the
25  state of Colorado.
0046
1          And I only point out this monumental
2  inconsistency and hypocrisy because I believe we all
3  know the consequence of passing this bill.  And that
4  consequence is going to do nothing but make us feel
5  better about ourselves.  It's got going to have an
6  appreciable effect on public safety.  We all know

7   that.  And that's why we're allowing this monumental
8   inconsistency to happen in this piece of
9   legislation.
10          I hope I made it more clear this time
11  than I did last time.  This -- the issue related to
12  this piece of legislation is it's not going to have
13  an impact on public safety, so let's create an
14  exemption for manufacturers and let's create a
15  monumental inconsistency for the rest of the states
16  in this nation.
17          THE CHAIRMAN:  Representative Holbert.
18          REPRESENTATIVE HOLBERT:  Thank you,
19  Mr. Speaker.
20          Second trip.  I want to share a
21  perspective that was e-mailed to me by a gentleman,
22  Robert Montilibono (phonetic).  I hope I pronounced
23  his name correctly.  But he shared with me a
24  perspective of John Adams.  And when Mr. Adams would
25  become passionate about an issue, he would sometimes
0047
1   take his wig off and throw it onto the floor and get
2   up on the table and jump up and down.  I don't have
3   a wig, and I think the Speaker would probably gavel
4   me out of order if I got up on the podium.
5           But I think John Adams probably didn't
6   exist in a time where the media sat and tweeted and
7   talked about how emotional he was.  He probably
8   existed in a time where people cared more about the
9   fundamental issues that were being discussed on the
10  floor at that moment.
11          And I appreciate Representative Vigil.
12  Thank you so much.  What a courageous thing you have
13  done.  And thank you for your words.  And
14  Representative Joshi, and the passion that you had,
15  and to Representative Duran, as well.
16          Yes, these are passionate and
17  important issues for us.  We must be clear about
18  what we're doing.  The Second Amendment is not about
19  hunting.  The Second Amendment is not our defense
20  against pheasants.  The Second Amendment is our
21  defense as free citizens against tyranny.
22          What is tyranny?  Tyranny is an
23  uncontrolled, unrestrained exercise of power.  An
24  individual confronted by a murderer, a mass murderer
25  knows tyranny.  A woman confronted by a rapist knows
0048
1   tyranny.  Anyone who has experienced assault or
2   theft knows tyranny.
3           The Second Amendment allows us this
4   great equalizer.  Men and women, people of large and
5   small stature, we all have the Second Amendment
6   opportunity to defend ourselves against tyranny.
7   And we can't trust, we can't count on government to
8   do that for us.  Because, frankly, we can't carry a

9  law enforcement officer around with us all the time,
10  they're just too doggone heavy and there's not
11  enough of them to go around.
12          The Second Amendment is fundamental to
13  this nation.  It upholds the First.
14          The measure of safety that would be
15  provided in this bill is directly proportional to
16  the distance between the next mass murderer here in
17  Colorado and the state line.  Does anyone here think
18  that the next mass murderer would take pause in
19  thinking, gosh, I have to drive to Wyoming in order
20  to fulfill my devious and dastardly plan?  No.
21          Do you think that this bill would
22  prevent that next mass murderer from breaking into
23  my home or yours to try to obtain those things that
24  he may not be able to buy in 20- or 30-standard
25  round capacity, but would have to go buy it in a
0049
1  15-round capacity?
2          Can you understand the silliness that
3  is presented, that this bill would provide some
4  greater level of public safety?
5          Members, I thank you so much for your
6  time.  I thank you for your thoughtfulness.  I
7  haven't jumped up on the podium, but I have come
8  once more to ask you to please be thoughtful on this
9  bill.
10          Unfortunately, this bill does not
11  accomplish its goal.  It does not improve public
12  safety.  And the right vote is no.  I ask you to
13  join Representative Vigil and I and many others in
14  voting no on House Bill 1224.
15          Thank you.
16          THE CHAIRMAN:  Representative Wright.
17          REPRESENTATIVE WRIGHT:  Thank you,
18  Mr. Speaker.
19          House Bill 1224 does not limit
20  high-capacity magazines.  It limits
21  standard-capacity magazines under the law.  House
22  Bill 1224 will limit rifle magazine capacity of 30
23  rounds that have been considered standard and in
24  common use by sportsmen and in home defense for
25  decades.
0050
1          Yet this bill will do nothing to limit
2  the evil in a man's heart.  This bill will not keep
3  that man from committing atrocious acts like the
4  ones we have seen of late against our society.
5          Even our law enforcement community, a
6  community of men and women dedicated to public
7  safety, a community I was proud to be part of and
8  serve, have pointed out the negative implications of
9  this law.  They have pointed out that this law, in
10  fact, will not make our rural communities

file:///X|/...r/HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-021813.txt[11/5/2013 7:32:50 AM]

11  specifically safer. It will make them less safe
12  where law enforcement response times are great and
13  seconds count.
14          Regardless of my personal experiences,
15  as I addressed you on Friday talking about how I've
16  looked down the wrong end of a loaded gun in the
17  performance of my duties, regardless of all of those
18  personal experiences, I have chosen to defend the
19  right of the people to possess firearms.
20          And I'm here to tell you that this
21  bill will not save lives.  If anything, specifically
22  in rural communities like mine, we're at risk of
23  costing lives.
24          Now, if I believed for one moment that
25  this bill would save the life of one child, of one
0051
1  innocent person, I would vote yes.  But it won't.
2  And I'll be voting no.  This bill places a great
3  deal of burden on the people of the state of
4  Colorado.
5          Friends, let me ask you what happens
6  now when my cousin, a retired lieutenant colonel
7  with the United States Air Force, happens to be
8  driving down the road speeding five miles an hour
9  over, as he's known to, and he gets stopped, and the
10  officer sees that he has his AR15 and his 30-round
11  magazine, which he's owned since he was in the
12  military, for years.  What's the procedure here?
13          I'm here to tell you, as a law
14  enforcement officer, it's one of two things.  That
15  officer acts on the reasonable suspicion that he's
16  been presented and arrests my cousin and makes him
17  go to trial, costing him time, money, and the pain
18  of going through criminal proceedings.  Or law
19  enforcement doesn't act at all because they
20  understand that the burden of proof lies with them,
21  and it's impossible for them to prove that he owned
22  this 10 years ago or he just bought it after the
23  passage of this law.
24          There's potential for abuse here.
25  There's potential for confusion in the law
0052
1  enforcement community.  That is what we are
2  putting -- that's the burden that we're placing on
3  the people of Colorado.
4          As this bill is written, the police,
5  having reasonable suspicion of the ownership of a
6  pre-ban magazine or a post-ban magazine, can now
7  arrest our citizens for simply speeding five miles
8  per hour over the speed limit and having their gun
9  displayed in their car.  You're kidding me.  You're
10  kidding me.
11          Now, we saw an amendment from one of
12  our Democratic colleagues on Friday that sought to

13  correct the many problems with this bill by adding
14  spouses of currently serving military members --
15  adding them as exempted parties.  We see the need
16  for exempted parties, colleagues, because this
17  legislation is flawed.  Well-intended, I understand
18  the intent, but flawed.
19          Now, House Bill 1224 does not limit
20  our Second Amendment rights.  It, in fact, infringes
21  them.  Let me define infringement for you.  A
22  violation as of law, regulation, or agreement of an
23  agreement or a breach, an encroachment as of a right
24  or privilege.  The Second Amendment states, friends,
25  a well-regulated militia necessary to the security
0053
1  of a free state, the right of the people to keep and
2  bear arms shall not be infringed.  And yet, today,
3  we're moving towards an infringement.
4          Article 2, Section 13 of the Colorado
5  Constitution reads:  The right of no person to keep
6  and bear arms in defense of his home, person, and
7  property, or in aid of the civil power when thereto
8  legally summoned shall be called into question.  And
9  yet, here today, we're calling the people's right
10  into question.
11          The bill further limits specific types
12  of firearms for use exclusively by law enforcement
13  and the military.  This is problematic in many ways.
14  The founders of this great nation gave us the Second
15  Amendment to allow us to protect ourselves from two
16  groups, to allow us to defend our families from
17  those who would do us harm.
18          And also, the founders knew that our
19  government, no matter how perfect, arguably the most
20  perfect system in the world, even our government is
21  capable of tyranny against its own people.  Because
22  it's made up of human beings, all of us are
23  imperfect and capable of unthinkable against our
24  own.  Look no further, friends, than the history
25  books for proof of this.
0054
1          Now, this fact was recently upheld by
2  our U.S. Supreme Court, when Justice Scalia wrote:
3  The militia, as defined in the Second Amendment, is
4  compromised of those physically capable of acting in
5  concert for the common defense.  The anti-federalist
6  feared that the federal government would disarm the
7  people in order to disable the citizens militia,
8  enabling a politicized standing army of their own to
9  rule.
10          The response was to deny Congress
11  power to abridge the ancient right -- ancient right
12  of individuals to keep and bear arms so that the
13  idea of a citizens militia would be preserved.
14          This bill does not look towards our

15 state and country's future.  We need to look at our
16 state and country's future survival as a free state
17 and consider it here today towards our citizens'
18 ability to defend themselves from an out-of-control
19 power working no longer for them but against them.
20          Now, I know that seems unbelievable,
21 but didn't it once happen.
22          It may not be 20 years from now, it
23 may not be 100 years from now, but some day, some
24 day in this country's future, our people will be
25 forced into this situation again, where they're
0055
1 making a decision on whether they band together or
2 they remain subject to tyranny.
3          And today, the decision that we make
4 in Colorado will be in the history books and our
5 future generations will remember us for this
6 decision.
7          Friends, this bill will not make us
8 safer.  It will make us less safe.  This law is
9 unenforceable.  I agree with Governor Hickenlooper
10 when he said that he doubted tougher gun laws would
11 have stopped the Aurora shooter.  It likely would
12 have not.
13          I would argue that the criminals in
14 our community are laughing right now.  They're
15 laughing as they watch us move towards taking away a
16 right from people who are honest, who obey the laws
17 that we pass in this room, as we move toward making
18 our community even more of a fish barrel, the
19 innocent, taking away the innocent's ability to
20 protect themselves.
21          I understand the reason for this law.
22 I understand the reason that Representative Fields
23 has brought this, and I respect her for wanting to
24 do something.  But this isn't that something.  The
25 long-term implications for all of us are too great.
0056
1          Thank you for your thoughtfulness.
2 Thank you for your statesmanship.  It's a pleasure
3 to serve along all of you, even with your different
4 ideas.  And I just ask that you consider my thoughts
5 today.  Thank you.
6          THE CHAIRMAN:  Any further
7 conversation?
8          Representative Fields.
9          REPRESENTATIVE FIELDS:  Thank you,
10 Mr. Speaker.
11          You know, I'm reminded of a quote of
12 Shakespeare, and it goes like this:  To be or not to
13 be.  That's the question we have today.
14          We have a responsibility to either
15 lead or not lead.  We can either address gun
16 violence or we cannot address it.  We can either put

17  a limit on high-capacity clips or we can let you
18  have 100, 50 or 30.
19          The question is to be or not to be.
20  It's about being bold and it's about being
21  courageous.
22          This bill is not about a hunch.  This
23  bill is not about feeling good.  This bill is about
24  saving lives.  And this bill is about public safety.
25          Since the Sandy Hook shooting, there's
0057
1  been a loss of lives, 2,045 people have died due to
2  gun violence.  This bill is about making sure our
3  community is less dangerous.  That's what this bill
4  is about.
5          When I think about all of the
6  discussion about Second Amendment rights, this bill
7  does not infringe on anyone's Second Amendment
8  right.  This bill is just a reasonable approach to
9  try to help address gun violence.
10          Would it stop all crime in our state?
11  No.  That's why you're going to see a series of
12  several bills, because we see this as being an
13  implemental approach to address gun violence.  So
14  this is just one measure that I personally believe
15  will save lives.
16          I stand before you today with a clear
17  and good conscience because I know on my side I do
18  have gun-responsible folks who own guns.  They
19  support what I'm doing.
20          I have support from law enforcement.
21  We've heard lots of conversation about the sheriffs
22  and I have support from sheriffs.  Not all of them,
23  but I have support from sheriffs.  I have support
24  from law enforcement.  But most importantly, I have
25  the support of the families that have been impacted
0058
1  by gun violence.
2          After the horrible events that
3  happened in Aurora, I was compelled to do something.
4  It was way before there was the White House
5  initiative to address gun violence.  So this is not
6  something that's based on some kind of White House,
7  Washington influence.  This has been a passion and a
8  commitment that I've had for a very long time.
9          And it's time for all of us to do
10  something, because to do nothing is no longer
11  acceptable, in my view.  When I think about the
12  lives that have been lost over and over and over
13  again, and people saying, you know, well, we can't
14  do anything because the gun lobbyists is too strong
15  or infringed on Second Amendment rights, then I
16  would say not so.  Because it's time that we do
17  something.
18          Thirty-four people die a day because

19  of gun violence.  And we can no longer walk around
20  in our society with these blinders on as if nothing
21  is happening and that we need to remain helpless.
22          Someone said that this bill is about
23  hope.  And I said, yeah, it is about hope, because
24  it can't be about despair.  It's about hope that we
25  can do something differently to make our community
0059
1  and our public places safer communities to be in.
2          I say to you, members, that enough is
3  enough.  I'm sick and tired of the bloodshed.
4  Limiting the high-capacity magazine to 15 will make
5  our community less dangerous, because what we have
6  as a common thread in all of these massacres is a
7  high-capacity magazine.
8          Since 1985, there's been 34 mass
9  shootings, and what they all have in common is a
10  high-capacity magazine.  No one needs to have a
11  100-drum magazine that any can attach to any kind of
12  gun to kill as many people as they can.
13          Our schools are sacred places.  Our
14  malls are sacred places.  Our churches are sacred
15  places.  No one should be able to have these
16  high-capacity magazines to come in to do as much
17  damage as they can.
18          So the question is to be or not to be.
19  It is about doing something.  And so what you've
20  seen on Friday were four measures, and you'll see
21  more, about doing something to make our community
22  less dangerous.
23          This is about public safety and it is
24  about saving lives.  Thank you.
25          THE CHAIRMAN:  Any further
0060
1  conversation?  Seeing none, the question before the
2  house is the passage of House Bill 1224, and third
3  and final passage.
4          Mr. Coler (phonetic), please open the
5  machine.  And, members, proceed to vote.  Close the
6  machine.
7          With 34 aye votes, 31 no votes, zero
8  excused, and zero absent, House Bill 1224 is passed.
9          (End of audio file.)
10
11
12
13
14
15
16
17
18
19
20

21
22
23
24
25
0061
1                    CERTIFICATE
2   STATE OF COLORADO            )
                          )ss.
3   CITY AND COUNTY OF DENVER  )
4
5           I, Angela Smith, Professional Reporter
6   and Notary Public for the State of Colorado, do
7   hereby certify that the above-mentioned hearing was
8   taken from an audio recording and reduced to
9   typewritten form; that the foregoing is a true
10  transcript of the proceedings had; that the speakers
11  in this transcript were identified by me to the best
12  of my ability and according to the introductions
13  made.
14           I am not attorney nor counsel nor in
15  any way connected with any attorney or counsel for
16  any of the parties to said action or otherwise
17  interested in its event.
18           IN WITNESS WHEREOF, I have hereunto
19  affixed my hand and notarial seal this 8th day of
20  July 2013.
21           My commission expires January 22,
    2015.
22
23          _____
                Angela Smith
24               Reporter, Notary Public
                Calderwood-Mackelprang, Inc.
25

0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  JUDICIAL COMMITTEE MEETING
4  Held on March 4, 2013
5  HOUSE BILL 13-1224
6  -------------------------------------------------------
7  REPORTER'S TRANSCRIPT
8  -------------------------------------------------------
9
10          This transcript was taken from an audio
11  recording by Teresa Hart, Registered Professional
12  Reporter and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25

0002
1  PUBLIC SPEAKERS:                    PAGE
   IN SUPPORT:
2  David Chipman                    19
   Patricia Maisch                  29
3  Jane Dougherty                   35
   Theresa Hoover and Dave Hoover            39
4  Tom Mauser                       45
   John Buckley                     47
5  Chief Bill Kilpatrick            50
   Marjorie Sloan                   56
6  Don Macalady                     58
   Jesse Ogas                       60
7  Andy Logan                       66
   Jack Dais                        70
8  Dr. Mark Thrun                   72
   Tom Sullivan                     78
9  Patricia Taylor                  80
   Ron Pierre                       82
10  Professor David Kopel                 84
   Evan Todd                        98
11
   IN OPPOSITION:
12  Richard Fitzpatrick             102
   Libardo Jimenez                 113
13  Jessica Johnson                 117
   Tara Heller                     122

LEG HX 000194    4110

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

14  Rich Dorans                         123
    Michael Shain                       128
15  Kirk Taylor                         138
    Dudley Brown                        145
16  Lily Tang Williams                  146
    Greg Alfred                         152

17
18
19
20
21
22
23
24
25
0003
1              P R O C E E D I N G S
2          *    *    *    *    *
3              UNIDENTIFIED SPEAKER:  Okay.  I'm going
4  to call off the names.  If your name is called, I need
5  you to stand on this corner over here.  We're going to
6  start lining up the witness testimony.  Dave Chipman,
7  Patricia Maisch, Jane Dougherty, Theresa and
8  Dave Hoover -- this is Bill 1224.  Dr. Mike Doberson,
9  Jessica Watts, Tom Mauser, John Buckley,
10  Chief Bill Kilpatrick, Marjorie Sloan, Don Macalady,
11  M. and Teresa Hobbs (phonetic), Jesse Ogas,
12  Dr. Mark Thrun.  If your name is called, we need you to
13  stand against that wall.
14              THE CHAIRWOMAN:  And the names that he
15  called are the expert witnesses for the proponent of
16  the bill.  We also -- before we bring the expert
17  witnesses from the opponent's side, we will also do the
18  same so that we can try to line up people so we don't
19  miss somebody this time around.
20              So, ladies and gentlemen, we're going to
21  resume the judiciary committee's business at hand.
22  We're going to be now taking up House Bill 1224.
23  Senator Hodge, we're going to welcome you.  And please
24  proceed with your bill and introduction of your bill.
25              SENATOR HODGE:  Thank you, Madame Chair.
0004
1  Thank you members of the committee.  Before I begin my
2  presentation, I do need to tell you that there is an
3  amendment coming.
4              THE CHAIRWOMAN:  Okay.
5              SENATOR HODGE:  And I need to tell you
6  what the amendment does because I think it may matter
7  to the people who are testifying afterwards.
8              Number one.  It creates a separate
9  clearer definition for high-capacity magazines for
10  shotguns.  It amends the bill to make sure that future
11  sale to common hunting shotguns with the ability to
12  accept tube extenders are not outlawed by the language

13  of the law.
14          With our amendment, owners can have
15  attachments and six magazines, and manufacturers can
16  still make the same guns they've always made.  But the
17  combination of capacity between the fixed capacity of
18  the firearm and any extender cannot be more than eight.
19          This language clarifies what
20  high-capacity magazines will be banned that are
21  specifically designed to be readily converted to accept
22  more than 15 rounds of ammunition.  This will make
23  clear that it will be illegal to sell magazines that
24  are smaller than 15 rounds, but are designed to stack
25  together like Lego's to make much larger,
0005
1  higher-capacity magazines.
2          Number two.  This portion of the
3  amendment includes retailers that sell directly to the
4  government and law enforcement agencies -- any
5  exception for legal sale of high-capacity magazines in
6  Colorado to government entities and to law enforcement.
7          Number three.  This portion of the
8  amendment clarifies that only manufacturers who are
9  specifically exempt from the penalties of the bill are
10  allowed to transfer high-capacity magazines out of
11  state.
12          And number four.  The identification
13  markings for large capacity magazines, this amendment
14  clarifies that manufacturers of high-capacity magazines
15  in Colorado will not be required to put serial numbers
16  on each high-capacity magazine, but instead, we require
17  to add a permanent stamp or marking that indicates the
18  magazine was manufactured after the effective date of
19  the bill.
20          Manufacturers argued that requiring a
21  different serial number for each magazine would create
22  a significant expense in the manufacturing process.
23  This amendment will make sure that they do not incur
24  those expenses while also ensuring that law enforcement
25  will be able to tell the difference between newly
0006
1  manufactured high-capacity magazines that will be
2  illegal on the streets of Colorado and those previously
3  owned magazines that are grandfathered in.
4          The amendment should be up here shortly.
5  When it is, I will ask that it be passed out.
6          THE CHAIRWOMAN:  Okay.
7          SENATOR HODGE:  And I bring you
8  House Bill 13-1224.  House Bill 1224 prohibits the
9  sale, transfer, or possession of an automatic
10  ammunition feeding device that is capable of accepting
11  or that can easily readily be converted to accept more
12  than 15 rounds of ammunition or more than eight shotgun
13  shells.
14          Those with larger capacity currently in

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

15 one's possession are grandfathered in, but must be kept
16 in the possession of the current owner. Violation of
17 this would be a Class 2 misdemeanor. A second offense
18 would be a Class 1 misdemeanor. And it's a Class 6
19 felony to have a larger than 15-round magazine or eight
20 shotgun shell shotgun in the commission of a felony or
21 any crime of violence.
22          Revision has been made in this
23 legislation to allow the manufacturer of larger
24 capacity magazines for transfer to a branch of the
25 armed forces, government agency, a firearms retailer
0007
1 who sells outside of Colorado, a foreign national
2 government approved by the United States government for
3 such transfers, an out-of-state transferee who may
4 legally possess a large capacity magazine.
5          They may be transferred to the armed
6 forces, like a government agency or other entities on
7 that behalf. A large capacity magazine manufactured on
8 or after July 1 must include a manufactured date or
9 some other indication of when it was manufactured if
10 the amendment is passed. Colorado Bureau of
11 Investigation may promulgate rules necessary for the
12 implementation of this section.
13          High-capacity magazines have one purpose
14 and one purpose only, and that is to quickly kill large
15 numbers of people. Many of these are larger than we
16 currently give our armed forces who are in war.
17          The Department of Justice found them to
18 be used in 14 to 26 percent of crimes, and 31 to
19 41 percent of fatal police shootings, depending on what
20 city you surveyed.
21          Mayors Against Illegal Guns conducted a
22 study of every mass shooting between January 2009 and
23 January 2013 that was identifiable to FBI data and
24 media reports. They found that high-capacity magazines
25 were used in at least 28 percent of those incidents.
0008
1 That's disproportionate to their use in overall crime,
2 which is estimated at about 2 percent.
3          Mass shootings in which they were used
4 resulted in an average of 15.6 total people shot.
5 That's 123 percent more people shot than in other
6 incidents -- 7.0 and 8.3 deaths, 54 percent more deaths
7 than in other incidents.
8          A study in Virginia after the time -- and
9 that is -- you've got passed out to you this little
10 chart -- indicates when the magazine ban was in effect,
11 high-capacity magazines recovered from crime scenes
12 gradually decreased. In 2004 when the ban expired, you
13 can see the high-capacity magazines that were recovered
14 from crime scenes again went up, and that continues to
15 rise.
16          Our current mass shootings: In Newtown,

LEG HX 000197    4113

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

17  30-round magazine; in Oak Creek, 19-round magazine; in
18  Aurora, a hundred-round drum; in Tucson, a 33-round
19  drum; at Fort Hood, 20- and 30-round magazines;
20  Binghamton, a 30-round magazine.
21          This bill is an attempt to reduce the
22  slaughter.  In several cases, the shooter had trouble
23  reloading, which gave others the opportunity to react
24  and interfere.  Many believe that had this ban been in
25  place, there would have been fewer dead in Newtown.
0009
1          Enough.  I ask for your support on this
2  bill.
3          THE CHAIRWOMAN:  Thank you,
4  Senator Hodge.  Are there questions for Senator Hodge?
5  Senator King.
6          SENATOR KING:  Thank you, Madame Chair.
7  Senator Hodge, as a member of the powerful JBC, I'm
8  wondering if evidence-based decision-making versus
9  emotional decision-making, if that is not a better way
10  to make state policy.  Do you have a comment on that,
11  one way or the other?
12          THE CHAIRWOMAN:  Senator Hodge.
13          SENATOR HODGE:  Thank you, Madame Chair.
14          Senator King, I think there's a certain
15  amount of evidence in what I've just read to you, the
16  number of magazines and when people were able to
17  interfere.
18          THE CHAIRWOMAN:  Senator King.
19          SENATOR KING:  Thank you, Madame Chair.
20          Senator Hodge, have you had an
21  opportunity to read the National Institute of Justice
22  under the Obama administration's Department of Justice,
23  their summary of select firearm violence preventative
24  strategies?
25          THE CHAIRWOMAN:  Senator Hodge.
0010
1          SENATOR HODGE:  Thank you, Madame Chair.
2          Senator King, no.
3          THE CHAIRWOMAN:  Senator King.
4          SENATOR KING:  Thank you, Madame Chair.
5          It says that, Any potential to reduce
6  lethality requires the massive reduction in supply.  It
7  says that in five cities studied, (inaudible) found
8  that in criminal use of large-capacity magazines during
9  the 10-year ban had no effect on violent crime.
10          It says, In order to have an impact,
11  large-capacity magazine regulations need to be sharply
12  curtailed, their availability to reduce -- reduce
13  restrictions on imports, manufacturing, sale, and
14  possession.  Any exemption of previously-owned
15  magazines would nearly eliminate any impact on violent
16  crime.
17          The program would need to be coupled with
18  an extensive buy-back of existing large-capacity

19   magazines.  With an exemption, the impact of the
20   restrictions would only be felt when the magazines
21   degrade or when they no longer are compatible with guns
22   in circulation.  This would take decades to realize.
23          We've done this, have we not?
24          THE CHAIRWOMAN:  Senator Hodge.
25          SENATOR HODGE:  We've done what,
0011
1   Senator King?
2          THE CHAIRWOMAN:  Senator King.
3          SENATOR KING:  Thank you, Madame Chair.
4          We have already done high-capacity bans
5   on magazines, and it has reduced violent crime zero,
6   that coming from the Obama administration's Department
7   of Justice.
8          THE CHAIRWOMAN:  Are there other --
9   Senator Hodge.
10          SENATOR HODGE:  Thank you, Madame Chair.
11   Thank you, Senator King.
12          The Virginia study indicates that in the
13   10 years, which is not decades, that the ban was in
14   place, there was a reduction in use of high-capacity
15   magazines in crimes.
16          THE CHAIRWOMAN:  Senator King.
17          SENATOR KING:  Thank you, Madame Chair.
18          Senator Hodge, as part of the 1994
19   assault weapons ban, the production of high-capacity
20   magazines was halted.  A comprehensive study by the
21   Center For Disease Control nine years later looked at
22   51 studies covering the full pathology of gun control
23   measures including this ban, and concluded that none,
24   none could be proven to reduce crime.  In 2005 the
25   American Journal of paleontol -- Preventative Medicine
0012
1   did a similar survey and came up with the same results.
2          THE CHAIRWOMAN:  Senator Ulibarri, and
3   then I'll go to Senator Lundberg.
4          SENATOR ULIBARRI:  Thank you, Madame
5   Chair.
6          I just wanted to note from the same
7   report in referencing the Virginia study that, in fact,
8   the use of high-capacity magazines went down between
9   1999 and 2004, and then the percentage of use of those
10   in crimes doubled between 2004 and 2010 when the
11   magazine ban had expired.
12          So, in fact, the same study that's being
13   cited currently indicates an increased use of
14   large-capacity magazines when the ban was lifted.  So I
15   think the evidence is there.  Thank you very much,
16   Senator Hodge, for bringing this bill.
17          THE CHAIRWOMAN:  Senator Lundberg.
18          SENATOR LUNDBERG:  Thank you, Madame
19   Chair.
20          Senator Hodge, I've got a few questions

21  about how this bill works.  And I'm trying to -- I just
22  got the amendment that I believe is Amendment 23?
23          SENATOR HODGE:  That's correct.
24          SENATOR LUNDBERG:  And first, it appears,
25  from what I'm reading here I believe, that terminology,
0013
1  "Or can be readily converted to accept more than," is
2  still in there or not?
3          THE CHAIRWOMAN:  Senator Hodge.
4          SENATOR HODGE:  Thank you.
5          That terminology is still in there, but
6  it has a limit of how much you could put in if it's
7  readily -- only on the shotgun portion.
8          THE CHAIRWOMAN:  Senator Lundberg.
9          SENATOR LUNDBERG:  Thank you, Madame
10  Chair.
11          So you've made a modification on the
12  shotgun side, but not on the other magazines; is that
13  correct?
14          THE CHAIRWOMAN:  Senator Hodge.
15          SENATOR HODGE:  Thank you.
16          The limitation is still the same, it's
17  eight shotgun shells or 15 rounds in another magazine.
18          THE CHAIRWOMAN:  Senator Lundberg.
19          SENATOR LUNDBERG:  Okay.  Thank you,
20  Madame Chair.
21          Several questions.  One, let's just start
22  with the standard magazine where it's no more than 15.
23  Readily converted, are you aware of how easily
24  convertible most of these -- or many, I don't know
25  about most, but many of the standard magazines are, in
0014
1  that you can add sections to them?
2          Are you suggesting that those should all
3  be remanufactured so that somehow they don't come apart
4  easily or something like that, which makes it very
5  counterproductive, especially when they're produced to
6  military standards where they -- you know, these things
7  need to be field strippable and cleanable in as quick
8  as a fashion as possible.
9          Is that your intention, that the designs
10  that allow you to connect something to it be somehow --
11  I don't even know how, you know, to redo those
12  because -- I'm asking the question because from the way
13  I read this, the readily convertible means a 10-round
14  magazine, in many cases, is readily convertible.  And
15  so you're saying those should be considered high
16  capacity, as well?
17          THE CHAIRWOMAN:  Senator Hodge.
18          SENATOR HODGE:  Thank you.
19          No.  In the military grade, we are
20  suggesting you can continue to manufacture whatever you
21  need for our military.  What we are suggesting are
22  those Lego type that you can put together quickly.

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

23      In a shotgun, if you have seven shells in
24  your shotgun, you can add one and make eight.  If you
25  have a three-shot shotgun, you can add one of those and
0015
1  have eight, you could add five more.
2          THE CHAIRWOMAN:  Senator Lundberg.
3          SENATOR LUNDBERG:  Thank you, Madame
4  Chair.
5          Well, let's move on to the shotguns a
6  little bit.  What do you mean by eight shells?  Is this
7  a specified length?  Are you talking about -- you know,
8  let's talk about a 12-gauge, for example.  Are you
9  talking about a three-and-a-half-inch shell?  Are you
10  talking about a two-and-three-quarter-inch shell?  Are
11  you talking about a one-and-a-half-inch shell?
12          THE CHAIRWOMAN:  Senator Hodge.
13          SENATOR HODGE:  Thank you.
14          I'm talking about the count of eight
15  shells.
16          THE CHAIRWOMAN:  Senator Lundberg.
17          SENATOR LUNDBERG:  Thank you, Madame
18  Chair.
19          Well, since one-and-a-half-inch is the
20  way it works -- and shotgun shells go in the -- you
21  know, the holder for the shells, it's a tube.  It
22  doesn't have individual slots, it's a tube.  You put it
23  in there, and so there's a length.
24          And therefore, what you're talking about
25  here, and I want people to understand that it may say
0016
1  eight, but it's going to work out this way:  Since
2  there's a one-and-a-half-inch shell that is
3  manufactured, it's a load for competition shooting
4  rather than bird hunting, for example, but nonetheless,
5  it fits in the same gun, one-and-a-half-inch means
6  12 inches is eight.
7          Now, that translated into a whopping
8  three three-and-a-half-inch shells.  So is that really
9  what we're talking about here or are we talking
10  about -- you know, this terminology of number of shells
11  is a bit absurd when we have different lengths which
12  accommodate, therefore, different numbers of shells.
13          Tell me why the rationale or -- you know,
14  why it's put together in such a way as to use this
15  nonsensical measurement when, you know, it's not going
16  to apply in most of the cases.
17          THE CHAIRWOMAN:  Senator Hodge.
18          SENATOR HODGE:  Thank you.
19          I believe that eight shells means eight
20  shells no matter the length.  We do have a specialist
21  that will be able to help you further if you have
22  further questions on that.
23          THE CHAIRWOMAN:  Senator Lundberg --
24          SENATOR LUNDBERG:  Thank you, Madame

0017
1            Well, I'll be anxious to hear,
2  particularly on the side of those who think this is a
3  good idea, how this technically works out to anything
4  more than three shells for a three-and-a-half-inch
5  12-gauge shell when eight obviously means no more than
6  12 inches length to put in eight one-and-a-half-inch
7  shells.
8            THE CHAIRWOMAN:  Thank you.  Any further
9  questions?  We have about three minutes before the
10  (inaudible).  Go ahead, Senator King.
11            SENATOR KING:  Thank you, Madame Chair.
12            Senator Hodge, in your opening you said
13  high-capacity magazines were designed for one thing and
14  one thing only, killing large numbers of people
15  quickly.  Can you think of any circumstance where
16  high-capacity magazines were designed for one thing and
17  one thing only, saving large numbers of people?
18            THE CHAIRWOMAN:  Senator Hodge.
19            SENATOR HODGE:  Thank you, Madame Chair.
20            Thank you, Senator King.  I'm sure that
21  that has happened.  I believe our police have that
22  capability.
23            SENATOR KING:  Thank you.
24            THE CHAIRWOMAN:  Members, (inaudible) we
25  have two more minutes before the 20 minutes
0018
1  (inaudible).  Senator Lundberg.
2            SENATOR LUNDBERG:  Thank you, Madame
3  Chair.
4            Let me ask one other question.  And that
5  is, this reloading period that apparently is this great
6  protection, do you know how long it -- Senator Hodge,
7  how long it actually takes to reload a magazine by,
8  well, the average competent person?
9            THE CHAIRWOMAN:  Senator Hodge.
10            SENATOR HODGE:  Thank you, Madame Chair.
11            Thank you, Senator Lundberg.  It's very
12  quickly done if you're a competent person.  But all the
13  people who have been involved in these mass shootings
14  were not necessarily competent shooters.
15            THE CHAIRWOMAN:  Our first 20 minutes is
16  up.  Senator Lundberg, did you want to ask more?
17            SENATOR LUNDBERG:  No, we'll get into it.
18            THE CHAIRWOMAN:  All right.  Our first
19  20 minutes is up, and so we are going to move to the
20  testimony phase.  The sponsor has asked first that we
21  hear from the proponents.  And again, those who have
22  been brought in as expert witnesses will not be timed.
23            Once the expert witnesses for both the
24  proponents and the opponents have spoken, I mean, on
25  either side, once they have finished, then the other
0019

1   witnesses will be given three minutes. But we're going
2   to start with the proponents.
3          And the first person to call forward is
4   David Chipman. Good afternoon, Mr. Chipman. Please
5   introduce yourself and proceed with your testimony.
6          MR. CHIPMAN: Sure. My name is
7   David Chipman.
8          THE CHAIRWOMAN: I beg your pardon?
9          MR. CHIPMAN: Excuse me?
10         THE CHAIRWOMAN: Oh, I'm sorry, Chipman,
11  yeah. Okay.
12         MR. CHIPMAN: In May of last year, I
13  retired after 25 years as a special agent with the
14  Bureau of Alcohol, Tobacco, Firearms, and Explosives.
15  I maintain a unique perspective as to the capabilities
16  of good guys with guns and bad guys with guns.
17         It is not always clear that a person with
18  a firearm possesses evil intent until they fire the
19  first round. Criminals can shoot continuously until
20  the moment they run out of ammunition before even the
21  most seasoned law enforcement professionals, or as was
22  the case in Tucson, a member of the public can respond.
23         For those of you who have seen file
24  footage of the attempt on President Reagan's life, what
25  do you remember? I remember Secret Service agents and
0020
1   local police standing tall and holding their positions.
2   I remember firearms being drawn only after the incident
3   had ended and the president and others were shot.
4          John Hinckley fired six rounds from a
5   22-caliber revolver in less than two seconds. Imagine
6   how history might have been different if Hinckley had
7   used a firearm equipped with a magazine capable of
8   firing 30 rounds.
9          A lot has changed since 1981. 30 years
10  later in Tucson, Arizona -- later in Tucson, Arizona,
11  Jared Loughner used a 9-millimeter handgun and 33-round
12  magazine to murder 6 and wound 13, including
13  congressman Gabby Giffords.
14         At a movie theatre in Aurora, Colorado,
15  James Holmes used an assault rifle with a hundred-round
16  drum magazine and other firearms to murder 12 and wound
17  58.
18         At the Sandy Hook Elementary School,
19  Adam Lanza used an assault rifle with 30-round
20  magazines to slaughter 20 children and 6 teachers.
21         Today's killers are no different than
22  failed assassins 30 years ago. The only difference is
23  that today's killers had easy access to far more lethal
24  firearms with the ability to accept high-capacity
25  ammunition magazines.
0021
1          So will limits to the capacity of
2   magazines prevent determined shooters from doing harm?

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

3    Of course not. But they may prevent a would-be killer
4    from becoming a killing machine. High-capacity
5    magazines place our law enforcement officers directly
6    in harm's way. These magazines are commonly used in
7    gun crimes and in police murders.
8              According to the Department of Justice,
9    high-capacity magazines are used in 14 to 26 percent of
10   gun crimes and in 31 to 41 percent of fatal police
11   shootings. A 2010 survey by the Police Executive
12   Research Forum reported that since regulation of
13   magazine capacity expired in 2004, 38 percent of police
14   agencies reported seeing increases in the use of
15   high-capacity magazines by criminals.
16             According to the Washington Post,
17   magazine limits were associated with a 60-percent
18   decline in the share of crime guns with high-capacity
19   magazines recovered in Virginia between 1998 and 2004.
20             After the federal law expired, the share
21   of crime guns recovered in this state with
22   high-capacity magazines increased each year through
23   2010, more than doubling from the 2004 low.
24             During my career as a member of ATF's
25   version of SWAT, I performed countless high-risk
0022
1    tactical operations. Early during my career I was
2    issued a six-shot 357-magnum revolver. Later I carried
3    a 9-millimeter, and then a 40-caliber semiautomatic
4    pistol.
5              As a tactical operator whose job it was
6    to safely apprehend the most dangerous felons in
7    America, the government could have issued me magazines
8    of any capacity, they chose 15.
9              It is inconceivable to me why any
10   American during any scenario that anyone could dream up
11   would require more rounds in a magazine than one of the
12   government's most highly-trained operators.
13             A magazine is a piece of equipment meant
14   to be used in self-defense or for sport and should not
15   be designed to render our law enforcement outgunned,
16   nor for the opportunity for mass murderers to slaughter
17   our neighbors and to extinguish the unmet potential of
18   innocent children. Thank you.
19             THE CHAIRWOMAN: Thank you, Mr. Chipman.
20             Are there questions? Senator King.
21             SENATOR KING: Thank you, Madame Chair.
22             Mr. Chipman, have you ever shot anybody?
23             THE CHAIRWOMAN: Mr. Chipman.
24             MR. CHIPMAN: I have not.
25             THE CHAIRWOMAN: Senator King.
0023
1              SENATOR KING: It's true you've been shot
2    at.
3              THE CHAIRWOMAN: Mr. Chipman.
4              MR. CHIPMAN: I have not.

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

5      THE CHAIRWOMAN:  Senator King.
6      SENATOR KING:  So you've never been
7  involved in a critical incident involving a firearm.
8      THE CHAIRWOMAN:  Mr. Chipman.
9      MR. CHIPMAN:  I have been involved in
10  dozens.
11      THE CHAIRWOMAN:  Senator King.
12      SENATOR KING:  So, Mr. Chipman, you said
13  that these magazines are commonly used in murder.  Can
14  you tell me how many murders in Colorado in 2011 these
15  magazines were involved with?
16      THE CHAIRWOMAN:  Mr. Chipman.
17      MR. CHIPMAN:  No.
18      THE CHAIRWOMAN:  Senator King.
19      SENATOR KING:  It was three.
20      THE CHAIRWOMAN:  Senator King.
21      SENATOR KING:  Mr. Chipman, can you tell
22  me how many murders this caused in 2011?
23      THE CHAIRWOMAN:  Mr. Chipman.
24      MR. CHIPMAN:  I would hope that hammer
25  wasn't used in a murder.
0024
1      THE CHAIRWOMAN:  Senator King.
2      SENATOR KING:  22.  Mr. Chipman, did you
3  help write this legislation?
4      THE CHAIRWOMAN:  Mr. Chipman.
5      MR. CHIPMAN:  No, sir.
6      THE CHAIRWOMAN:  Senator King.
7      SENATOR KING:  Thank you, Madame Chair.
8      THE CHAIRWOMAN:  Senator Lundberg.
9      SENATOR LUNDBERG:  Thank you, Madame
10  Chair.
11      My question has -- still has to do with
12  the capacity of a shotgun.  In your estimation, how
13  many shells -- if a one-and-half-inch load for a
14  12-gauge is a readily available load, how long does an
15  eight-shell magazine or tube constitute?
16      THE CHAIRWOMAN:  Mr. Chipman.
17      MR. CHIPMAN:  Again, my math would be no
18  different than what you exhibited during the past
19  questioning.
20      THE CHAIRWOMAN:  Senator Lundberg.
21      SENATOR LUNDBERG:  Thank you, Madame
22  Chair.
23      Can you give me a better metric?  I mean,
24  you represent yourself as being quite familiar with
25  firearms and how these things work, can you give me a
0025
1  better way to measure this?  Because I don't think it
2  makes any sense.  I don't think number of shells makes
3  sense when there's a wide range of length of shells.
4      Is there any way to reasonably capture a
5  definable limit other than the smallest possibility,
6  and therefore, 12 equals three three-and-half-inch

LEG HX 000205    4121

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

8          THE CHAIRWOMAN:  Mr. Chipman.
9          MR. CHIPMAN:  I don't have an opinion
10 about that, sir.
11          SENATOR LUNDBERG:  I see.  Okay.  Thank
12 you.
13          THE CHAIRWOMAN:  (Inaudible) Senator --
14 I'm only calling upon those members of the judiciary
15 committee today, Senator Baumgardner.
16          SENATOR BAUMGARDNER:  Thank you, Madame
17 Chair.
18          THE CHAIRWOMAN:  Are there any other
19 questions?
20          Thank you for being here today.
21 Patricia Maisch.  Oh, I'm sorry, just a moment,
22 Mr. Chipman, I think Senator King --
23          SENATOR KING:  Don't go away so quick,
24 Mr. Chipman.
25          Thank you, Madame Chair.
0026
1          Mr. Chipman, have you had the opportunity
2 to read the National Institute of Justice's
3 presentation on extended magazines?
4          THE CHAIRWOMAN:  Mr. Chipman.
5          MR. CHIPMAN:  No, but I did listen to you
6 read it.
7          THE CHAIRWOMAN:  Senator King.
8          SENATOR KING:  And so you're aware that
9 in five cities which were studied, they found that that
10 had no decrease in violent crime related to those
11 magazines?
12          THE CHAIRWOMAN:  Mr. Chipman.
13          MR. CHIPMAN:  Again, what I was pointing
14 out in my testimony, and I don't know specifically how
15 they measured crime, was the fact that although crime
16 might not be prevented in every case, the capacity of a
17 shooter to kill multiple people may be reduced.  So
18 what I'm not sure about in that study, were they
19 measuring criminal incidents or the numbers of people
20 harmed, and that, I don't know.
21          SENATOR KING:  Thank you.
22          THE CHAIRWOMAN:  Senator Lundberg.
23          SENATOR LUNDBERG:  Thank you.  I do have
24 one more question.  And that's -- well, actually, a
25 couple of questions around this subject of access
0027
1 availability of high-capacity magazines.  Do you know
2 how many high-capacity magazines are out there right
3 now?
4          THE CHAIRWOMAN:  Mr. Chipman.
5          MR. CHIPMAN:  I do not.
6          THE CHAIRWOMAN:  Senator Lundberg.
7          SENATOR LUNDBERG:  Okay.  This is kind of
8 hard.  I'm -- I was looking for some expert information

LEG HX 000206   4122

9  here. Do you -- can you tell me what the likely
10  scenario is of this law going into effect in Colorado
11  in affecting criminals' access to high-capacity
12  magazines?  Or is this just designed to make sure that
13  the law-abiding citizen is held back?
14          THE CHAIRWOMAN:  Mr. Chipman.
15          MR. CHIPMAN:  My prediction would be that
16  it would have a similar impact as we've seen in other
17  places.  I described, and I believe the senator
18  described, what the experience was in Virginia.  And
19  what I would imagine is over time, and not immediately,
20  but over a length of years you would see reductions in
21  their use and seeing them in crimes.
22          SENATOR LUNDBERG:  Okay.  Thank you.
23          THE CHAIRWOMAN:  Thank you.
24  Senator King.
25          SENATOR KING:  Thank you, Madame Chair.
0028
1          Mr. Chipman, can you tell me, do you know
2  the most popular personal safety firearm in the United
3  States?
4          THE CHAIRWOMAN:  Mr. Chipman.
5          MR. CHIPMAN:  No.
6          THE CHAIRWOMAN:  Senator King.
7          SENATOR KING:  It's a Glock 17.  Do you
8  know why it has 17 in its name?
9          THE CHAIRWOMAN:  Mr. Chipman.
10          MR. CHIPMAN:  One thing I would ask you
11  is I don't know that that's -- what you're saying is
12  correct, I don't know that.  But I will take it that
13  you believe that the Glock 17 is the most popular.  And
14  I would imagine it's called a 17 because it has a
15  capacity of 17 rounds.
16          SENATOR KING:  Correct.
17          THE CHAIRWOMAN:  Senator King.
18          SENATOR KING:  I'm done.
19          THE CHAIRWOMAN:  Okay.  Any other
20  questions?
21          Mr. Chipman, thank you for being here
22  today.
23          MR. CHIPMAN:  Thank you.
24          THE CHAIRWOMAN:  Patricia Maisch?  Oh,
25  Mr. Chipman, could you sign a slip outside so that we
0029
1  know that you were here today?  Thank you.
2          Welcome, Ms. Maisch.  Please introduce
3  yourself and proceed with your testimony.
4          MS. MAISCH:  I'm Patricia Maisch from
5  Tucson, Arizona.  My sister Mickey Zay is a 40-year
6  resident of Colorado Springs, and she is here with me
7  today and stands by my word to you.  We are asking you
8  to support your House Bill 1224 to limit magazine
9  capacity to 15 rounds.
10          Thank you, distinguished members of this

LEG HX 000207    4123

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

11  committee, for allowing me to speak with you today on
12  this very important legislation.  I'm wondering how
13  many of you might have witnessed a mass shooting or any
14  shooting where a murder has been committed.
15          Unfortunately, I have.  And I want to
16  share that experience with you today in the hope that
17  it will give you some clarity and resolve in this
18  effort to reduce gun violence.
19          THE CHAIRWOMAN:  And, Ms. Maisch, may I
20  ask you just to speak up just a little bit more so we
21  can hear your good voice.
22          MS. MAISCH:  I'm a survivor of the active
23  shooting tragedy in Tucson on January 8th, 2011, that
24  took the lives of Dorothy Morris, Phyllis Schneck,
25  Dorwin Stoddard, Judge John Roll, Gabe Zimmerman, and
0030
1  beautiful little Christina Taylor Green, just 9 years
2  old.
3          You might think the number of rounds in a
4  magazine doesn't matter much.  If so, you are mistaken.
5  Without a doubt, it definitely does matter.  Maybe
6  you'd believe that the seconds it takes to change a
7  magazine doesn't make much difference in saving lives,
8  they most certainly can.
9          You have likely been bombarded with
10  numbers and statistics, but I want you to think about
11  numbers that mean a great deal to me and the other
12  Tucson survivors.  33 is the number of bullets
13  discharged into the crowd from a single extended
14  magazine.  13 is the number of innocent people who lay
15  on the cold sidewalk that day with physical wounds,
16  many, life threatening.
17          Six is the number of innocents who were
18  brutally slaughtered on that same cold sidewalk in
19  front of the Safeway.  19, 19 is the number of seconds
20  it took that young man with a gun to slaughter 6,
21  physically wound 13, and emotionally wound countless
22  others.
23          When those 19 seconds of rapid fire
24  turned to the 20th second, with a momentary pause in
25  the firing, two brave men, Richard -- Roger Salzgeber
0031
1  and Bill Badger tackled that deranged young man with
2  the gun.  The killing spree stopped.  19 seconds and 33
3  bullets.
4          Consider this:  If the Tucson shooter had
5  gone to Wal-Mart that morning, and by law, could
6  purchase only a magazine with 15 rounds, this
7  afternoon, as I speak to you, Christina Taylor Green
8  might be jumping off the school bus, blowing kisses to
9  her mom or waving to her friends, but she is not.  She
10  was killed by bullets from a gun held by the hand of a
11  young man.
12          High-capacity magazines definitely make a

13 difference in a mass shooting. Our shooter was stopped
14 not by a good guy with a gun, but by two ordinary
15 citizens without a gun. The gunman was reloading with
16 a second 33-round magazine that failed.
17        When Roger and Bill brought him down on
18 the sidewalk right next to me, their heroism gave me
19 the opportunity to grab a third magazine from the
20 shooter. Their heroism stopped the killing.
21        That young man with the gun was ready,
22 willing, and nearly able to continue his murderous
23 rampage and to slaughter the innocents had he not been
24 stopped at that very moment when he changed his
25 magazine.
0032
1        I shudder to think of the consequences if
2 he had a magazine of 50 rounds or a hundred rounds like
3 the shooter in Aurora. That high-capacity magazine,
4 coupled with a semiautomatic weapon, gave horrific
5 killing capacity to a shooter.
6        The destruction those bullets caused our
7 slain friends and family is not what appears so very
8 sanitized on movie screens and television programs, not
9 pink, not clean, and not peaceful. The destruction of
10 a human body hit by bullets is sadly, incredibly
11 grotesque, from pink, to blue, to gray in a matter of
12 seconds, with hands curling up, pools of blood, gaping
13 mouths, and eyes wide open.
14        One Tucson survivor reports her hair
15 covered in blood from her husband's wounds and gray
16 brain matter from one of those murdered. Another
17 reports splinters of skull bones from one of the
18 brutally murdered men imbedded in his face.
19        The children and teachers at Newtown
20 murdered by a young man with semiautomatics were
21 riddled with bullets, some with as many as 11 bullets.
22 Slaughtered with wounds so grievous and gruesome that
23 some parents could not bear to physically identify
24 their beautiful children.
25        No need for me to remind you of the
0033
1 brutality and suffering in this very state at Columbine
2 High School and at the movie theatre in Aurora.
3        We hear lots of numbers and statistics in
4 this important debate, including ones that I have
5 shared with you. Here are a few more horrible numbers
6 for you. In the two and a half months since the
7 murders in Newtown, more than 2,400 people have been
8 brutally murdered with guns.
9        Such numbers are just numbers until it's
10 your child or your husband or your wife or your mother
11 or your father or your sister or your brother or your
12 friend, until it's your turn to get the call.
13        When deciding how to vote on this
14 life-saving, incredibly important legislation,

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

15   put your child or your grandchild or any 9-year-old's
16   name that you love and cherish in the place of
17   Christina Taylor Green's name or in the place of
18   Veronica Moser-Sullivan's name.
19          We owe it to all those little children.
20   We owe it to all those murdered, all those taken from
21   us in Tucson, taken in Aurora, taken in Newtown, taken
22   on our streets, and taken in our neighborhoods to pass
23   this bill.
24          And although I do believe statistical
25   information is important, as Senator King said, we
0034
1    should let the emotion out of this?  I think
2    Senator King needs to rethink that and to consider both
3    statistical information and the emotional damage these
4    high-capacity magazines cause.
5          THE CHAIRWOMAN:  Thank you for being
6    here.  And just for future reference, we don't mention
7    individual names.  But we are happy that you're here
8    today.
9          Are there any questions or comments?
10   Thank you for being here.
11          MS. MAISCH:  Thank you.  And I'm sorry, I
12   didn't know that rule.
13          THE CHAIRWOMAN:  That's all right.  Thank
14   you.
15          Jane Dougherty.
16          SENATOR LUNDBERG:  Madame Chair?
17          THE CHAIRWOMAN:  Yes, Senator Lundberg.
18          SENATOR LUNDBERG:  An important order on
19   one element, and that is, citizens have every right to
20   mention individual legislators' names.  We've had --
21   tried to enforce that rule on the senate floor among
22   senators, but I would not want to repress the opinions
23   and the statements on the part of citizens speaking to
24   the legislature in any way.
25          THE CHAIRWOMAN:  Thank you, Senator
0035
1    Lundberg.  I'm very much, though, wanting to keep the
2    protocol going much like what we experience on the
3    senate floor.
4          Thank you for being here today,
5    Ms. Dougherty.  Please introduce yourself and proceed
6    with your testimony.
7          MS. DOUGHERTY:  Good afternoon.  My name
8    is Jane Dougherty, and I've lived in Colorado for the
9    past 21 years.  I'm here to express my strong support
10   for House Bill 1224 to limit high-capacity magazines to
11   no more than 15 rounds.
12          My sister Mary Sherlach was the school
13   psychologist at Sandy Hook Elementary School.  Mary
14   lost her life along with five other educators and
15   20 children on December 14th, 2012.
16          On that morning, a 20-year-old man with

LEG HX 000210    4126

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

17   mental health problems was able to access a number of
18   powerful weapons and a large amount of high-capacity
19   magazines because they were in his home.
20            That morning, 700 students were in the
21   school at Sandy Hook.  A new security system had been
22   installed, and the front doors were locked.
23   Authorities now know that the gunman used the assault
24   weapon to literally shoot an entrance into the
25   building.
0036
1            Upon hearing the loud gunfire, Principal
2   Dawn Hochsprung and School Psychologist Mary Sherlach
3   went out to confront this gunman.  My sister Mary and
4   Dawn were murdered in the school lobby while running
5   towards the shooter, who was armed with a large amount
6   of high-capacity magazines.  Each magazine held
7   30 rounds.
8            The shooter made his way into two
9   classrooms, where he shot and killed four more adults
10   and 20 little children.  The ammunition used at
11   Sandy Hook was meant to cause massive tissue damage.
12            The damage inflicted on my sister Mary's
13   body was so severe, that her own husband was not
14   allowed to say good-bye.  Mary had to be identified by
15   her school ID.  She went to work that morning, and he
16   never saw her again.
17            To quote my brother-in-law,
18   Bill Sherlach, Simple arithmetic says that a smaller
19   magazine needs to be replaced more often than a larger
20   magazine.  This alone leads to short increments of time
21   when intervention could occur and the body count might
22   be less.  In fact, at Sandy Hook 11 children managed to
23   escape the shooter when he stopped to reload and a
24   small child yelled, Run.
25            Events like these are the kinds of
0037
1   experiences that you think will never touch you.  But
2   here in Colorado, we know all too well that they
3   certainly can.  We have seen firsthand what these
4   weapons and high-capacity magazines are capable of, and
5   that these massacres can and will continue to affect us
6   here in Colorado if we do not pass this bill.
7            We cannot wait for yet another massacre
8   to transpire before we take real action.  We need to
9   honor my sister Mary's life and all the lives lost as a
10   result of gun violence.  You are our elected leaders.
11   Honor your oath of office, to protect and defend.  Pass
12   this legislation.  Thank you.
13            THE CHAIRWOMAN:  Thank you.  Are there
14   any questions?
15            Senator Lundberg.
16            SENATOR LUNDBERG:  Thank you, Madame
17   Chair.
18            It's not a question, but it is a comment.

19  And that is, I'm deeply sorry for your loss.  That was
20  a shooting that I think every American with any common
21  sense of decency hurt deeply over.
22          And the comment is this:  That we're not
23  fighting over whether that was -- should be prevented.
24  We all desperately want to find a prevention.  But
25  limiting the ability of individual citizens to defend
0038
1   themselves, and that's what each one of these pieces of
2   legislation, and this one, in particular, in many ways
3   does, I should hope that we can find some common ground
4   of agreement that these awful tragedies should be
5   prevented, but there's a real deep disagreement as to
6   how we get there, so ...
7           THE CHAIRWOMAN:  Thank you, Senator
8   Lundberg.
9           Any others?  Senator King.
10          SENATOR KING:  Thank you, Madame Chair.
11          I also am sorry for your loss.  Is not
12  the real question here, the real issue here mental
13  health issues, mental health protocols, mental health
14  best practices, not only in Colorado, but in the
15  United States?  And should that not be the number-one
16  priority?
17          THE CHAIRWOMAN:  Ms. Dougherty.
18          MS. DOUGHERTY:  I certainly believe
19  mental health is a factor in all of these situations,
20  but not every one of them.  My sister was an advocate
21  for mental health.  And I truly believe that young man
22  did not get the help that he needed.
23          But the large-capacity magazine that he
24  held was the same type of weapon that we use in war.
25  And he had enough fire power to act as a platoon to
0039
1   slaughter these babies, helpless children in
2   classrooms.  We need to reduce the number of rounds in
3   these ammunitions, it will save lives.
4           SENATOR KING:  Thank you.
5           THE CHAIRWOMAN:  Thank you very much for
6   being here.
7           MS. DOUGHERTY:  Thank you.
8           THE CHAIRWOMAN:  Theresa Hoover and
9   Dave Hoover.  Good afternoon, thank you for being here.
10          MR. HOOVER:  Thank you for having us.
11          THE CHAIRWOMAN:  Please introduce
12  yourselves and proceed with your testimony.
13          MR. HOOVER:  My name is Dave Hoover.
14          MS. HOOVER:  I am Theresa Hoover, the
15  mother of AJ Boik.  He was murdered in the Aurora
16  theatre shooting on July 20th.
17          MR. HOOVER:  My nephew, AJ, was murdered
18  in the Century 16 theatre on July 20th of last year.  I
19  have been directly affected by gun violence and have
20  been the victim of gun violence during my life.

21    I'm one of five children, my parents have
22  18 grandchildren.  My father is a true American hero.
23  The man served one tour in Korea, two tours in Vietnam.
24          The worst day of our lives growing up was
25  the day that we found out he'd been shot down over
0040
1  Vietnam.  They sent him home, he spent 10 days at home,
2  and then sent him back to Vietnam to serve out his
3  tour.
4          The man is dedicated.  He couldn't be
5  here today, he's helping a family friend in Arizona, my
6  mother, and he supports this bill, as well, as do our
7  family.  He understands the battlefield.
8          We learned to hunt, we learned to shoot
9  here in Colorado.  We've been here since the '60s when
10  my father bought land here.  And then we finally ended
11  up here in '9 -- or 1972 -- '76, excuse me, '76.  I
12  finished college here, got my degree, and I'm currently
13  working as a sergeant for a police department.
14          I've been in law enforcement 29 years.
15  I'm not here on behalf of my department.  I don't speak
16  for my department, I speak for myself.  I'm here as
17  AJ's uncle.  I am and many of our family members are
18  republicans, we vote.
19          We can't get a majority of the people in
20  this country to vote, yet, pay attention to what's
21  going on and have a say, we know that.  I believe in
22  the majority of the conservative ideas that are
23  pontificated upon by conservative leadership.  I work
24  in a field that holds conservative views.
25          Many, a vast majority of the people that
0041
1  I work with support a ban on high-capacity magazines.
2  It protects lives, it saves lives because it limits the
3  number of rounds that you can put downrange.
4          When you reload, you've got to take time
5  to change the magazine.  And when you're protecting a
6  family, you can certainly protect yourself by
7  exchanging magazines, a 15-round clip, but it gives you
8  the opportunity for those who are in the battle at the
9  time to take action.
10          Doing -- I have some words of advice for
11  our senators who worry about doing the right thing.
12  Your children, friends, or families could have been at
13  Columbine High School or watching a movie in Aurora.
14  Do the right thing, be true to yourselves and all of
15  those that you represent in your district, you
16  represent republicans and you represent democrats, as
17  well.
18          Many people are tired of our legislators
19  because they only represent one side and don't listen
20  to both.  All that I ask is that you demonstrate the
21  integrity that people expect.
22          I was at Columbine that year, and that

LEG HX 000213        4129

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

23  year the NRA felt it was important to make a statement
24  by holding a gun rally, rather than sit at a table and
25  discuss the issue.
0042
1         Preventing the purchase of high-capacity
2  magazines will limit the number of rounds that can be
3  used against your constituents at any given time and
4  will allow those in the battle to take action.  The
5  best way to protect yourself, obviously, is to vote if
6  you are worried about a tyrannical government.  It's
7  time to restore the faith in our elected officials,
8  it's time to do the right thing.
9         I want to leave you with this:  Obviously
10  I have a personal connection to this issue.  July 20th
11  at 2:37 my wife and I received a phone call from an
12  hysterical woman that didn't know where her son was.  I
13  love my sister, and she has had to raise two boys
14  alone.  My parents were with them daily as they grew
15  up, and AJ was truly a renaissance man.
16         (Inaudible) viola for four years at
17  Gateway High School.  He loved doing the things that
18  many young men love doing, ceramics, he was a catcher
19  for the baseball team.  He wanted to be an art teacher
20  when he graduated from the Rocky Mountain College of
21  Art and Design.
22         My daughter, Amanda, was born
23  three months before AJ -- sorry, Theresa -- and those
24  two were very close, more best friends than cousins.
25  AJ took Amanda, her friends from college, and his
0043
1  girlfriend (inaudible) camping the weekend before he
2  was murdered.
3         I watched this man walking towards his
4  '89 Honda, which was a piece of crap, sorry, filled
5  with those wonderful girls.  I told him to take care of
6  them.  He stopped, turned around, came back, gave me a
7  hug.  He said, Don't worry, Uncle David, I will, it's
8  going to be okay.
9         That's the kind of man my nephew was.
10  The day he was going to watch a midnight premier with
11  his girlfriend, the love of his life, he was at our
12  house, mowing our yard to earn money.  I got home to
13  this surprise, it was wonderful for my wife, and was
14  more surprised when she told me that she had paid him
15  $40 to mow our yard.  At that rate, he'd be over every
16  week and I'd be broke.  He loaded up the recyclables
17  and pulled weeds, also, so I gave him a pass on that.
18         She bought him, my daughter, and friends
19  pizza before he left.  One slice left, and when AJ was
20  offered it, he said, That's okay, I'll leave the scraps
21  for Uncle David, he'll be hungry when he gets home from
22  work.  I'd eaten before getting home and didn't eat
23  that pizza, and it still sits in our freezer.  I can't
24  bring myself to throw it away.

LEG HX 000214     4130

25
0044
1  very special people that were murdered that night and
2  58 others that were wounded.  They deserve better.  And
3  those victims in the future deserve better, as well.
4          We need to take a real and responsible
5  look at the number of rounds that these people have at
6  any given time to send downrange.  We need to give our
7  constituents, your constituents an opportunity to
8  survive.  Thank you.  Please support this bill.
9          THE CHAIRWOMAN:  Ms. Hoover, did you want
10 to say anything?
11         MS. HOOVER:  He speaks for me.  I'd make
12 you all cry if I'd sit up here and talk, so ...
13         MR. HOOVER:  It's okay, you make me cry
14 every day, Theresa.
15         MS. HOOVER:  I hope you understand the
16 importance of this and how you can affect and change
17 lives and save lives, frankly, because those few
18 seconds in between having to reload can make a
19 difference, as you've just heard.
20         THE CHAIRWOMAN:  Thank you.  Are there
21 any questions for the Hoovers?  We want to thank you
22 for being here.
23         MS. HOOVER:  Thank you very much.
24         MR. HOOVER:  Thank you.
25         THE CHAIRWOMAN:  Tom Mauser.  Hi,
0045
1  Mr. Mauser, welcome.  Good to see you.  Please
2  introduce yourself and proceed with your testimony.
3          MR. MAUSER:  Sure, thank you.  Thank you,
4  Madame Chair.
5          My name is Tom Mauser.  I am a board
6  member and spokesman for Colorado Ceasefire, an
7  organization that advocates for stronger gun safety
8  laws.  I'm also the father of Daniel Mauser, who was
9  killed at Columbine.
10         And I'm here today honoring my son, in
11 fact, by wearing the shoes he was wearing that tragic
12 day at Columbine.  My son was in the library at
13 Columbine, where like all the others, he was pinned
14 down under a table as two well-armed teenagers wreaked
15 havoc and murder.  Thanks to a killer's high-capacity
16 magazine, it was impossible to escape during reloading.
17         I'm really bothered that I hear a
18 number -- I've heard a number of people say that the
19 assault weapons -- the ban against assault weapons and
20 high-capacity magazines at a national level obviously
21 didn't work because one was used at Columbine.
22         But I think the people who say that know
23 doggoned well that all of the existing magazines and
24 assault weapons were grandfathered in, that's why it
25 was a problem.  It's a long-term fix, not a short-term
0046

1  fix.

2         Over these years I've been nagged with
3  the question of why this country does nothing to limit
4  these magazines.  We are clearly enabling, enabling
5  disturbed people and gang members and terrorists to
6  wreak havoc, injury, and death.

7         No, we can't stop all people who want to
8  repeat what my son's killers did, but do we have to
9  make it so doggoned easy for them?  We know there are
10  more of these disturbed people out there.  I know that
11  because I get messages from people who claim to be
12  admirers of the Columbine killers.  We know they're out
13  there, so why do we make it so easy for them to mow
14  people down?  I don't think we should.

15         We've heard the issue come up here in
16  hearing this morning of emotions.  And I want to
17  address that.  Yes, there are emotions involved.  We
18  have told emotional stories, how can we not.  But you
19  know, they're not -- emotions and evidence-based
20  materials are not mutually exclusive things.

21         I was able to grieve and think at the
22  same time, yes.  And, in fact, sometimes you get a
23  pretty clear mind when you've been through what I've
24  been through.  And you see things a lot more clearly
25  and you become more dedicated and you do read the
0047
1  facts.  The fact is that you need to -- emotions are
2  real.

3         You know, I read a lot of emotion in the
4  letters to the editor in the newspaper, anger.  We hear
5  emotions out here on the street here today.  Those are
6  emotions.  It's what makes us human.  And I think as
7  humans, let's do the right thing.  Let's stop being
8  enablers.  Let's not pretend these magazines make us
9  safer and don't cause irreparable harm.

10         The eyes of the nation are on us to see
11  how we react to this in Colorado.  Please do the right
12  thing.  We've had far, far too many lives, too many
13  people mowed down.  Please do the right thing.  Thank
14  you.

15         THE CHAIRWOMAN:  Thank you very much.
16  Are there any questions for Mr. Mauser?  Any comments?
17  Seeing none, thank you very much for being here.

18         MR. MAUSER:  Thank you, appreciate it.

19         THE CHAIRWOMAN:  I'm going to call John
20  Buckley.  Good afternoon.  Please introduce yourself
21  and proceed with your testimony.

22         MR. BUCKLEY:  Thank you, Madame Chair,
23  members of the committee.

24         My name is John Buckley.  I'm a gun
25  owner, I'm a father, I'm a husband.  But more
0048
1  importantly in this context, I had a unique experience,
2  in that I was a paramedic for over 20 years.  I was

3    also a member of a SWAT team for two years.
4          Over my 20-plus years of experience, I've
5    cared for over hundreds of gunshot victims.  I've cared
6    for them.  I've told their families that their loved
7    ones weren't coming home.  I've prayed with those
8    families.  And over those 20 years, I've literally
9    washed gallons of blood out of the back of my ambulance
10    or my helicopter.
11          My wife is a nurse.  She works at
12    Children's Hospital.  And she cared for one of the
13    Aurora shooting victims.  As a member of a SWAT team,
14    I've faced armed suspects who had more ammunition on
15    them than I had.
16          There has to be a sensible, logical
17    solution to this.  And I think that the reasonable
18    solution here is the bill that's before you today, to
19    limit the magazine capacities to 15 rounds.  There's no
20    reason that the armed suspect with evil intentions
21    should have more ammunition at their disposal than I
22    did as a tactical operator.  I believe members of the
23    committee have law enforcement experience.  There's
24    just no reason that they should be outarming us and
25    outgunning us.
0049
1          If I could take a moment, I would like to
2    address a couple of questions that have been before
3    other witnesses before the committee prior to me.
4    There was a discussion of the logic of the number of
5    shells in a shotgun.
6          And while I certainly don't profess to be
7    a firearms expert by any stretch, I certainly have
8    trained on shotgun use in the tactical setting, and I
9    believe that the number of shells that you are
10    attempting to limit, that the length of the magazine or
11    the tube that the shotgun shells are carried in is not
12    the issue so much as the number of targets that an
13    individual could engage with that firearm before
14    they're reloading.  I think that's what we're talking
15    about here.
16          I certainly have trained myself in
17    reloading my firearm.  I know the muscle memory
18    argument.  I know that someone who has extensive
19    experience in firearms can change their magazine in a
20    very short amount of time, but I don't believe that
21    there is much evidence before the committee to suggest
22    that the majority of shooters in these situations where
23    they have used high-capacity magazines have had that
24    experience, that they have been trained to change a
25    high-capacity magazine or a low-capacity magazine in a
0050
1    brief amount of time.
2          I think that's all I have to say.  Thank
3    you.
4          THE CHAIRWOMAN:  Thank you, Mr. Buckley.

5  Any questions or comments?  Senator King.
6          SENATOR KING:  Thank you, Madame Chair.
7          Can you speak to the idea that if you
8  outlaw high-capacity magazines, the only person who
9  will have high-capacity magazines is the criminal?
10         MR. BUCKLEY:  No.
11         THE CHAIRWOMAN:  Mr. Buckley.
12         MR. BUCKLEY:  My apologies.
13         Senator King, I believe that given that
14  you are planning to grandfather all existing magazines,
15  that that argument is false.
16         SENATOR KING:  Thank you.
17         THE CHAIRWOMAN:  Thank you, Mr. Buckley,
18  for being here.
19         MR. BUCKLEY:  Thank you.
20         THE CHAIRWOMAN:  Chief Bill Kilpatrick.
21  Good afternoon, Chief, welcome.  Please introduce
22  yourself and proceed with your testimony.
23         MR. KILPATRICK:  Good afternoon.  My name
24  is Bill Kilpatrick.  I am a police chief of the City of
25  Golden.  And I am here representing the Colorado
0051
1  Association of (inaudible).
2          As stated by the Supreme Court in the
3  Heller case, like most rights, the rights secured by
4  the Second Amendment is not unlimited.  The right is
5  not a right to keep and carry any weapon whatsoever in
6  any manner whatsoever and for whatever purpose.
7          Given this statement from the highest
8  court in the land that gun rights are not unlimited,
9  the appropriate question for this committee today is:
10  Is a limitation on high-capacity magazines an
11  appropriate action for the state of Colorado and will
12  it lead to enhance public safety while protecting
13  individual rights under the Second Amendment.
14         Surveys show that Americans carry
15  firearms for protection, for target shooting, or for
16  hunting.  None of these functions require a
17  high-capacity magazine.  High-capacity magazines were
18  designed for combat to kill large numbers of people in
19  a short amount of time.  Protection, target shooting,
20  and hunting do not demand the rapid release of large
21  amounts of ammunition.
22         High-capacity magazines are frequently
23  used in mass shootings, like those which occurred at
24  Columbine, Virginia Tech, Fort Hood, Tucson, Aurora,
25  Oak Creek, and Newtown.
0052
1          As a police chief, I am aware of data
2  suggesting that perhaps as many as one in five
3  officer-involved shootings in the United States
4  involved high-capacity magazines.
5          When a criminal chooses to utilize these
6  weapons and their accompanying high-capacity magazines,

LEG HX 000218     4134

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

7   officers have minimal opportunity to protect the public
8   or themselves.  Limitations on high-capacity magazines
9   are often adopted in concert with limitations on
10  assault weapons.
11          High-capacity magazine limitations should
12  not be restricted to assault weapons because they
13  increase the capacity, and thus, the potential
14  lethality of any firearm that can accept a
15  high-capacity magazine, including a firearm that is not
16  an assault weapon.  Therefore, a limitation on
17  high-capacity magazines can reduce the lethality of
18  many more firearms than a limitation on assault weapons
19  alone.
20          As officers sworn to uphold the law and
21  to protect the Constitution of the United States and
22  the state of Colorado, we believe that placing a
23  limitation on high-capacity magazines is a commonsense
24  approach that can serve to protect the public and law
25  enforcement officers while continuing to grant citizens
0053
1   their Second Amendment right to keep and bear arms, and
2   therefore, we support the passage of House Bill 1224.
3          THE CHAIRWOMAN:  Thank you, Chief.
4          Are there any questions?  Senator
5   Lundberg.
6          SENATOR LUNDBERG:  Thank you, Madame
7   Chair.
8          Chief, I appreciate you bringing up the
9   question of where the legal limits are.  I think we're
10  going past those limits of the Colorado Constitution,
11  that a pertinent part of Section 13 says, "The right of
12  no person to keep and bear arms in defense of his home,
13  person and property, or in aid of the civil power when
14  thereto legally summoned, shall be called in question."
15          If it's not calling that right into
16  question by limiting -- and remember one other thing,
17  too.  It isn't just banning high-capacity magazines,
18  it's defining them as any magazine that can be readily
19  converted to.  So it's banning, you know, a lot of the
20  designs of magazines that are out there today, so it's
21  limiting that severely.
22          Where is the line?  Where do we cross the
23  line where we are actually, by Colorado Constitutional
24  standards, calling into question or, you know, walking
25  over that right to bear arms in defense of your home,
0054
1   person, and property?
2          THE CHAIRWOMAN:  Chief.
3          MR. KILPATRICK:  Well, Senator, I think
4   ultimately, that's the decision of the courts to
5   determine.  But I believe the Supreme Court, and the
6   courts in general, have ruled that reasonable
7   determinations can be made, and magazine capacities
8   have been determined to be reasonable.

9            THE CHAIRWOMAN:  Senator Lundberg.
10           SENATOR LUNDBERG:  Thank you, Madame
11  Chair.
12               I would have just accepted the answer.
13  But I must tell you that I don't believe the courts are
14  the sole arbiters of what is right and wrong.  I should
15  hope that you would at least give the legislature some
16  of that responsibility, as well.  If not, maybe we
17  should just scrap this and turn to the courts and say,
18  Where do we go?  But that's a bit of an aside.
19               So basically, you're going to give a pass
20  on it and say, I don't know.  But this isn't it, I
21  guess; is that correct?
22           THE CHAIRWOMAN:  Chief Fitzpatrick.
23           MR. KILPATRICK:  Kilpatrick.
24           THE CHAIRWOMAN:  Kilpatrick, I'm sorry.
25           MR. KILPATRICK:  Well, sir, I think the
0055
1  legislature makes the law, and the courts decide
2  whether they're legal or not, constitutional or not,
3  yes, sir.
4            UNIDENTIFIED SPEAKER:  (Inaudible.)
5            THE CHAIRWOMAN:  Senator King.
6            SENATOR KING:  Thank you, Madame Chair.
7               Chief, in personal protection, in
8  self-defense of your family and friends, how many
9  rounds do the chiefs of police think is enough?
10           THE CHAIRWOMAN:  Chief Kilpatrick.
11           MR. KILPATRICK:  I think the chiefs of
12  police didn't have a specific discussion about that in
13  terms of ultimate numbers.  I think the chiefs think
14  that the limitation on magazines and the fact that
15  15 -- well, whether it was 10 or whether it was 15,
16  that the ability to switch out magazines is a -- that
17  some number is reasonable, and that an ability to
18  switch magazines makes sense.
19           THE CHAIRWOMAN:  Senator King.
20           SENATOR KING:  Thank you, Madame Chair.
21               Chief, do you think that the chiefs of
22  police would think that one more round than the bad guy
23  is enough?
24           THE CHAIRWOMAN:  Chief Kilpatrick.
25           MR. KILPATRICK:  I'm not sure I know how
0056
1  to answer that.  I think when you're attempting to
2  protect yourself, you're going to use as many as you
3  think is reasonable.
4            SENATOR KING:  Thank you.
5            THE CHAIRWOMAN:  Okay.  Seeing no others,
6  thank you very much for being here,
7  Chief Kilpatrick.
8            MR. KILPATRICK:  Thank you.
9            THE CHAIRWOMAN:  Marjory Sloan.  Good
10  afternoon, Ms. Sloan, I should say Mayor Sloan,

11 welcome.  Please introduce yourself and proceed with
12 your testimony.
13          MS. SLOAN:  Thank you, Madame Chair.  And
14 the (inaudible) committee, I appreciate the chance to
15 be here today.
16          I am Marjorie Sloan.  I'm the mayor of
17 Golden.  And I'm a member of Mayors Against Illegal
18 Guns, a national bipartisan coalition of about
19 800 mayors, actually.
20          Like Colorado's senators, mayors are in
21 continuous contact with our residents and voters as
22 they go about their daily lives.  In October 2012,
23 Golden city council passed a resolution calling on our
24 state leaders to take active steps to curb gun
25 violence.
0057
 1          I applaud your caring, your courage, and
 2 your respect for the legislative process in beginning
 3 this conversation.  And to help you with that duty, I
 4 can tell you unequivocally that the vast majority of
 5 residents who talk to me on the streets, stores, and
 6 gathering places, support the Constitutional
 7 commonsense restrictions on high-capacity magazines
 8 proposed in this bill.
 9          Why?  Newtown, Oak Creek, Tucson, Aurora,
10 those used to be names of places where people went
11 about their work and they lived.  Now they stand for
12 places where people died, died because of high-capacity
13 magazines.  Golden doesn't want that to happen to any
14 other place in Colorado or in our country.
15          These weapons were originally designed
16 and specifically designed to kill a large number of
17 people in a short period of time.  And they've made it
18 possible for mass shooters in recent incidents to kill
19 or injure from 9 to 70 people in a single incident.
20          Here an enforceable legislation will save
21 lives by taking these magazines off the street.  I do
22 ask you to vote in favor of House Bill 1224.  It
23 respects the Second Amendment, it's logical, and it has
24 widespread support.  So I encourage you to vote in
25 favor of the proposed bill.
0058
 1          THE CHAIRWOMAN:  Thank you, Mayor Sloan.
 2          Are there any questions for Mayor Sloan?
 3 No comments?
 4          Thank you for being here.  We appreciate
 5 it.
 6          MS. SLOAN:  Thank you for the
 7 opportunity.
 8          THE CHAIRWOMAN:  Don Macalady.  Thank you
 9 for being here.  Please introduce yourself and proceed
10 with your testimony.
11          MR. MACALADY:  Senator Guzman, members of
12 the judiciary committee, thank you very much for the

LEG HX 000221    4137

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

13 opportunity to speak to you today. My name is
14 Donald Macalady, and I represent an organization called
15 Hunters Against Gun Violence.
16          The statement that defines our
17 organization, which is endorsed by all of our members,
18 says the following: We are hunters and cherish the
19 privilege of being able to use firearms to pursue
20 recreation and food for our families.
21          Nevertheless, we cannot support the
22 proliferation of guns that have no relationship to or
23 utility for lawful hunting of game animals and
24 varmints; nor do we support the sale of guns and other
25 weapons to persons with a history of violent crime or
0059
1 mental instability.
2          Accordingly, we support a ban on the sale
3 of semiautomatic weapons that are designed primarily
4 for rapidly killing or incapacitating large numbers of
5 people. We also support a ban on the sale of large
6 magazines or armor-piercing ammunition for these
7 weapons. We further support universal background
8 checks for gun purchases made at the expense of the gun
9 buyer.
10          We are a growing group of hunters,
11 including hunters varying in age from 20 to 75. We are
12 in strong support of House Bill 1224. Arguments
13 against this bill and similar bills proposed in other
14 states are largely based on a supposed infringement of
15 the Second Amendment rights.
16          There's nothing in this statement, this
17 amendment, nor in the subsequent Supreme Court
18 interpretations that supports this allegation.
19 Large-capacity magazines for pistols and assault
20 weapons are designed to give the weapons they serve a
21 large capacity for rapidly killing people. They have
22 no relationship to hunting. And in fact, are illegal
23 for hunting in many states.
24          So who needs weapons with magazines that
25 can fire 30 to a hundred times in a few seconds without
0060
1 reloading? The list includes terrorists, mass
2 murderers, and those fearful of a mass attack by their
3 neighbors or their government. They are certainly not
4 necessary for protection of a family from intruders or
5 robbers.
6          We feel that these high-capacity
7 magazines have no utility for hunters or any other
8 law-abiding American citizen, and should be banned. We
9 therefore urge the enactment of Bill HB 1224.
10          THE CHAIRWOMAN: Thank you very much.
11          Any questions? Seeing none, thank you
12 very much for being here. Amad Cou (phonetic) and
13 Teresa Shone (phonetic). All right. Jesse Ogas.
14 Please introduce yourself and proceed with your

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

15  testimony.  Thank you for being here.
16          MR. OGAS:  Thank you.  Thank you
17  Chairman, Madame Chairman.
18          Hola, hello, I'm Jesse Ogas.  I'm here
19  today as a private citizen, a father, a grandfather, a
20  community leader, a hunter, and a gun owner.  I come
21  from a long line of gun owners and hunters.
22          As a gun owner and a former NRA member, I
23  believe in the Second Amendment.  I believe it is
24  important that we need to ensure that it is preserved.
25  With that said, it is also my responsibility to be part
0061
1  of the conversations that have been avoided for the
2  past 25 years.
3          Some of the most powerful corporate
4  dollars are in the pockets of many of our politicians
5  and organizations that have built a powerful lobby
6  machine.  Sadly, it's not just about our precious
7  Second Amendment rights, it's about money.
8          As an avid hunter I will tell you that if
9  I take a high-velocity assault weapon with a magazine
10  that holds 30 rounds or more and proceed to shoot an
11  elk, I would be picking lead out of remaining burger
12  meat that it would be -- that would be left, and it
13  would be a silly argument for me to make, as a hunter,
14  for the need of this type of weapon.  Most hunters in
15  our nation will tell you this.
16          So let's have the true conversation on
17  why these weapons of mass destruction are being made
18  accessible to anyone across this mighty nation.  We
19  have those who will tell you that removing these
20  weapons will be the first step in taking away our
21  rights to hunt and to protect ourselves.
22          There are those who will tell you that we
23  need to ban all weapons and we should only have them in
24  the hands of our law enforcement.  I believe that there
25  is a middle ground here and that we need to come to the
0062
1  table and be part of the conversation.
2          But as long as we have politicians,
3  organizations, and others who refuse to see the need
4  for sensible conversation and actions, and continue to
5  have pockets lined by powerful lobbyists and
6  corporations, we cannot move forward with a positive
7  result.
8          Limiting magazine capacity to 15 rounds
9  is one of the most reasonable approaches that strike a
10  balance between preserving the rights of hunters,
11  sportsmen, and responsible gun owners; and protecting
12  the safety of our children and of our family.
13          I strongly urge you to support this bill.
14  I'm only one voice, and my voice, alone, will not bring
15  change or create open and honest dialogue.  But my
16  voice, with the voices of others, can make a difference

LEG HX 000223     4139

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

17  and work to bring change in our crisis of gun violence
18  across our mighty nation.  Thank you.
19          THE CHAIRWOMAN:  Thank you.
20          Senator King.
21          SENATOR KING:  Thank you, Madame Chair.
22          Thank you, sir, for testifying.  I guess
23  my question would be the same as I've asked earlier.
24  When it comes to your protection, when it comes to
25  protection of your family, how many rounds is enough?
0063
1           THE CHAIRWOMAN:  Mr. Ogas.
2           MR. OGAS:  Thank you, Madame Chairman.
3           Senator, I would think that that -- it
4   depends on what kind of a shot that you are.  For my
5   own personal, what I believe is I have my rifle and I
6   have a handgun.  I don't think I need 15 rounds to kill
7   an intruder.
8           THE CHAIRWOMAN:  Senator King.
9           SENATOR KING:  How about a group of
10  intruders?  How about a home invasion?  How about a
11  gang that has set upon your family?
12          THE CHAIRWOMAN:  Mr. Ogas.
13          MR. OGAS:  Thank you, Madame.
14          Well, I would hope that that would not
15  come, that I would not have to live through that kind
16  of an experience.  But in the event that I did --
17          SENATOR KING:  (Inaudible) don't think
18  you would.
19          MR. OGAS:  Well, I would hope not.  But
20  in the event that I did, I would say, you know what,
21  I'd give it my best shot.
22          SENATOR KING:  Thank you.
23          MR. OGAS:  Thank you.
24          THE CHAIRWOMAN:  Senator Lundberg.
25          SENATOR LUNDBERG:  Thank you, Madame
0064
1   Chair.
2           Sir, I think you bring up some
3   interesting points that we need to look a little deeper
4   into.  That is, the real discussion on why we're really
5   here, what we're trying to accomplish.
6           The first question I would have for you
7   is:  Is the Second Amendment -- or I should say, was
8   the Second Amendment written, and Section 13 of
9   Article II in the Colorado Bill of Rights that says,
10  "The right of no person to keep and bear arms in
11  defense of his home, person and property, or in aid of
12  the civil power when thereto legally summoned, shall be
13  called in question," does that have anything to do with
14  duck hunting?
15          THE CHAIRWOMAN:  Mr. Ogas.
16          MR. OGAS:  Senator, I'm here as a hunter.
17  I'm here -- you know, from my perspective, I vote to
18  elect you and all the other senators here to guide and

19  to hopefully make sure that our laws are fair.
20          What I would say to you, that all voices
21  need to be at this table, and that we all need to have
22  those open and honest conversations that we have a
23  tendency to avoid.
24          I would say there's two extremes, one on
25  the right and one on the left.  And I would say there's
0065
1  a wonderful opportunity for dialogue to all come to the
2  middle and figure out how we can control our babies
3  that are creating murderers throughout our communities.
4          THE CHAIRWOMAN:  Senator Lundberg.
5          SENATOR LUNDBERG:  Thank you, Madame
6  Chair.
7          I take that as a no on the duck hunting
8  part.  But let me be a little more to the point and put
9  it on the table.  And that is -- and you tell me if I'm
10  right or wrong on this.
11          MR. OGAS:  Okay.
12          SENATOR LUNDBERG:  The Second Amendment
13  was written so that the citizens of this great nation
14  can defend themselves and their family and their
15  property from invasion from without and invasion from
16  within, from the personal intruder to, quite frankly,
17  the government that's out of control.  That's why they
18  wrote it in 1787; is that not so?
19          THE CHAIRWOMAN:  Mr. Ogas.
20          MR. OGAS:  Thank you, Madame.
21          Yes, sir, that is correct.
22          SENATOR LUNDBERG:  Good.
23          THE CHAIRWOMAN:  Thank you very much for
24  being here today.
25          MR. OGAS:  Thank you.
0066
1          THE CHAIRWOMAN:  Andy Logan.  Thank you
2  for being here, Mr. Logan.  Please introduce yourself
3  and proceed with your testimony.
4          MR. LOGAN:  Thank you, Madame Chair.
5          My name is Andy Logan, and I'm here
6  representing the group Hunters Against Gun Violence.
7  And thank you to the members of the committee for
8  letting me speak.
9          I'm a father of two, two young children,
10  a young boy and a younger girl.  I'm 41 years old.
11  I've been hunting since I was 11.  I'm a former member
12  of the NRA, and I'm currently in the market to buy some
13  new guns.  I'm looking to buy a 20-gauge, a new
14  12-gauge, and I'd like to get a 243 autoloader,
15  actually.
16          Hunting is a huge part of me and my life.
17  I've spent the last 15 years on the plains of Colorado
18  and in the mountains where I bow hunt, rifle hunt, I
19  duck hunt, everything in between.  Just two weeks ago I
20  returned from a successful wild boar hunt in Texas, and

21    I'd be happy to share that story with you if you're
22    interested.
23            It's going to seem ironic to some of you,
24    and many in this room, that I come here actually to
25    support House Bill 1224 in order to preserve and
0067
1     protect my Second Amendment rights.  So, you know, I
2     can hear some giggles behind me, how can you really
3     rectify those two positions?
4             And to simplify, let's first kind of
5     remove ourself from the moral argument that's part of
6     this conversation, or at least should be.  And I know
7     that everyone in this room wants to avoid these
8     tragedies like we saw at Sandy Hook and other places.
9             So let's just ignore the fact that people
10    in the United States are far more likely to be victims
11    of gun violence here than in other countries where
12    firearms are a part of the culture.  Let's also pretend
13    that these numbers, these deaths and injuries are just
14    the cost of our freedom and let's wash our hands of
15    that responsibility.
16            But now, let's consider the fact that the
17    country is starting to move in a direction where
18    they're favoring gun control more and more as a result
19    of the mass shootings that flash across our TVs and
20    come out of our radios.
21            33 percent of American households own
22    guns.  That means that 67 percent do not.  So when do
23    the 67 percent decide that enough is enough and move to
24    drastically curtail our Second Amendment rights?
25            It's to prevent this latter scenario that
0068
1     I'm here and that I'm supporting this reasonable gun
2     control in the form of House Bill 1224.  We need to get
3     a plan in place that's a model for the entire country,
4     lead by example, and move our society away from gun
5     violence and allow us law-abiding citizens to continue
6     to own and use firearms.
7             That's the reason why I'm here before you
8     today and why I support all of you to support this
9     bill.  And I'm also happy to hear the senator here's
10    earlier comments about the amendments to the bill,
11    because I did look at Senator Brophy's comments on the
12    TV, and I think he has a very valid point.
13            I think that, you know, everyone in this
14    room -- well, that's not true.  The people on the
15    committee understand the intent of the law.  And the
16    senator beside me here specified her intent was not to
17    make commonly-owned shotguns illegal.
18            And there are solutions to a lot of the
19    questions that I've heard the committee members raise
20    today, such as magazine capacity and length of magazine
21    tubes, et cetera.
22            So I think by getting the voice to the

23  table and, you know, people actually trying to find a
24  solution that works for all of us, you know, for the
25  67 percent without guns, but also people like me who
0069
1  like guns, who own guns, would like to own more guns,
2  and enjoy shooting in all of its forms, there are
3  solutions that we can find if we work together.  Thank
4  you.
5            THE CHAIRWOMAN:  Thank you.
6            Senator Lundberg.
7            SENATOR LUNDBERG:  Thank you, Madame
8  Chair.
9            Thank you for coming.  Can you tell me a
10  little bit more about your group, Hunters Against Gun
11  Violence?  How long have you been around?  How many
12  members do you have?  Where are they from?
13            MR. LOGAN:  Yes.  We're --
14            THE CHAIRWOMAN:  Mr. Logan.
15            MR. LOGAN:  Sorry, Madame Chair.
16            We're a fledgling group.  The idea
17  started after Columbine, and we actually marched in the
18  protest outside of the NRA's convention shortly after
19  Columbine.  We wore our blaze orange, and had some
20  national coverage.  Unfortunately, we're all full-time
21  employed, or at that time we were, husbands and dads,
22  and we weren't able to continue with it.
23            But, you know, after Sandy Hook, we've
24  gotten together and -- gotten together with Mayors
25  Against Illegal Guns and, you know, we're beginning to
0070
1  grow.  So I don't know what the exact numbers are, but
2  I think in a few months from now, they'll be a lot
3  larger than they are today.
4            THE CHAIRWOMAN:  Senator Lundberg.
5            SENATOR LUNDBERG:  Thank you.  Maybe I
6  didn't hear, how many members do you have?
7            THE CHAIRWOMAN:  Mr. Logan.
8            MR. LOGAN:  I'm not sure of the exact
9  number.
10            SENATOR KING:  Can you give me a range?
11            MR. LOGAN:  I think it's 75.
12            SENATOR KING:  Thank you.
13            THE CHAIRWOMAN:  Any other questions?
14  Thank you, Mr. Logan, for being here.
15            MR. LOGAN:  Thank you.
16            THE CHAIRWOMAN:  Jack Dais.  Welcome.
17  Please introduce yourself and proceed with your
18  testimony.
19            MR. DAIS:  Chairwoman Guzman, members of
20  the judiciary committee, thank you for the opportunity
21  to speak to you today.  My name is Jack Dais.  I
22  represent the organization Hunters Against Gun
23  Violence, with I think maybe around 40 people or so
24  right now.

0071
1  words.  I'm here today because I'm saddened by the
2  large and increasing gun violence in Colorado and
3  around the United States.  I have read House Bill 1224
4  and believe that I largely understand it.
5          Because I believe that restrictions on
6  magazine size will help reduce gun violence, I urge the
7  senate to pass the bill, and I hope that Governor
8  Hickenlooper will sign it into law.
9          I've hunted pheasant, quail, and rabbits
10  for more than 60 years; deer and elk for more than
11  50 years; and have lived in Colorado for the last
12  33 years.  Wandering around Colorado's farms, ranches,
13  and public lands helps me stay connected to my rural
14  roots and spend quality time with my son, my friends,
15  and my German short hair pointer.  And my wife and I
16  love the meat.
17          As hunters, we are limited to three
18  rounds in our shotguns and six rounds in our rifles.
19  My main message to you today is that in all these
20  years, I have not once heard a hunter complain about
21  these three- and six-round limits, not once that I can
22  recall.  In fact, some of the better hunters tell me
23  that one round is all I should need.
24          Again, I urge you to pass the bill.  And
25  I hope that the 10- and 15-round limits in the bill
0072
1  will not in a big way hamper the enjoyment of
2  law-abiding folks who use large numbers of rounds in
3  lawful ways that I do not now understand.  Thank you
4  for having me.
5          THE CHAIRWOMAN:  Thank you.  Any
6  questions?  Seeing none, thank you very much for being
7  here.
8          MR. DAIS:  Thank you.
9          THE CHAIRWOMAN:  Dr. Mark Thrun.
10  Welcome, Dr. Thrun.  Please introduce yourself and
11  proceed with your testimony.
12          DR. THRUN:  Thank you, Madame Chair.
13          My name is Mark Thrun.  I'm a public
14  health physician here in Denver.  I serve on the board
15  of directors of the Colorado Public Health Association.
16  I'm here today representing this organization in
17  support of House Bill 1224.
18          The Colorado Public Health Association,
19  affiliated with the American Public Health Association,
20  is comprised of hundreds of members who serve the state
21  of Colorado as public health officials or have general
22  interest in community well-being and health.
23          There are few public health issues that
24  impact the community, our community in such a tragic
25  and horrendous manner as the violence of one person
0073

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

1  using a firearm against another person.
2            In medicine we measure response times in
3  matters of seconds.  Within just a few seconds, lives
4  can be saved, within the time it takes to change a
5  magazine.  As firearm regulation is a public health
6  issue, and as this body has proven, it can impact the
7  public's health through the development of lives and
8  fair laws such as the one proposed here today, we urge
9  you to vote in support of this bill.
10           As it has with other matters of public
11  health, from hospital infection data reporting to
12  establishing speed limits on highways, this body has
13  the authority, both legally and morally, to promote the
14  common welfare to protect the public's health.
15           We urge you to limit opportunities in
16  which mass killings can occur.  We urge you to limit
17  magazine capacity.  We urge you to vote for
18  House Bill 1224.
19           THE CHAIRWOMAN:  Thank you.  Are there
20  any questions for ...  Senator King.
21           SENATOR KING:  Thank you, Madame Chair.
22           Doctor, in a list of priorities, magazine
23  capacity, concealed carry, carrying on college
24  campuses, background checks, and best practices in the
25  United States for mental health for -- best practices
0074
1  for mental health protocol, where are you, in the list
2  of priorities, rate that?
3            THE CHAIRWOMAN:  Dr. Thrun.
4            DR. THRUN:  Thank you, Madame Chair.
5  Thank you, Senator King.
6            In all matters related to health, the
7  answer isn't always as easy as prioritizing one versus
8  another.  And in my opinion and in the opinion of many
9  public health officials, we need to address many
10  different health issues from a variety of means.  And
11  indeed, if possible, I would prioritize almost
12  everything that you've mentioned.
13           THE CHAIRWOMAN:  Senator King.
14           SENATOR KING:  Thank you, Madame Chair.
15           I guess in trying to maybe hold your feet
16  to the fire a little bit more, isn't the real issue
17  that we're talking about here today is mental health
18  and keeping weapons out of the hands of unstable
19  people?  And should that not be the priority of this
20  legislature?
21           THE CHAIRWOMAN:  Dr. Thrun.
22           DR. THRUN:  Thank you, Madame Chair.
23           Absolutely mental health needs to be
24  addressed.  But should that be a sole priority?
25  Absolutely not.  And there are many ways to address
0075
1  health issues.  Just as to address diabetes, one
2  doesn't just educate somebody to eat better.  In fact,

3   it takes exercise, eating more healthily, it takes
4   medications at times.
5            And so yes, of course, we should
6   prioritize mental issues, but that does not mean that
7   limiting high-capacity magazines or expanding
8   background checks should not also be prioritized.
9            THE CHAIRWOMAN:  Senator King.
10           SENATOR KING:  Thank you, Madame Chair.
11   And I'm not saying it shouldn't be prioritized.  What
12   I'm saying is that the problem is people.  And should
13   it not be the best practices, the best protocols, the
14   best way of dealing with mentally ill people be the
15   number-one priority?
16           THE CHAIRWOMAN:  Dr. Thrun.
17           DR. THRUN:  Thank you, Madame Chair.
18           With all due respect, Senator, indeed, I
19   think you're right, but the problem is not solely with
20   people.  Indeed, we don't try to convince people to
21   drive their cars more slowly.  We don't try to convince
22   people to wear a seat belt.  We don't try to convince
23   people to stop going through a stop sign, as I did this
24   morning, late, taking my kids to school.
25           We have laws that establish limits on
0076
1   what is allowable and what is not allowable to protect
2   the general health.  And we, as a society, have chosen
3   to abide by those laws in the interest of the common
4   welfare, and I don't think this is very different.
5            THE CHAIRWOMAN:  Senator King.
6            SENATOR KING:  Thank you, Madame Chair.
7            Well, Doctor, 33 people a day are
8   murdered by drunk drivers, a hundred thousand people a
9   year, but we're not banning cars.  It's the people that
10   are the problem that are driving those cars.  And just
11   like with drunk drivers, the mental health of people
12   having access to weapons is the number-one key issue,
13   and quite frankly, the number-one issue the State
14   should be addressing.
15           THE CHAIRWOMAN:  Dr. Thrun.  Oh, I'm
16   sorry.
17           SENATOR KING:  Do you disagree?
18           DR. THRUN:  Senator King, of course I
19   don't disagree.  I've worked in healthcare for all of
20   my life.  And indeed, you are right, we do not
21   prioritize mental health services as we should.
22           That said, it's my understanding there
23   are not bills being proposed that would ban guns akin
24   to the car analogy, and so -- yet, we do accept, as a
25   society, limits upon our ability to be able to utilize
0077
1   that car, from an age limit, to how fast we can use it,
2   to all kinds of different things that we, as a society,
3   that you all, as a legislature, choose to ask us to do.
4   And we do that in the interest of health.

5        So no, Senator, I don't disagree with you
6    at all. I think that mental health should absolutely
7    be prioritized, but so, too, should a myriad of other
8    things.
9        THE CHAIRWOMAN: Senator King.
10        SENATOR KING: Doctor, thank you. That
11    was a great exchange. I appreciate your testimony.
12        THE CHAIRWOMAN: Other questions for
13    Dr. Thrun? Seeing none, thank you very much for being
14    here today.
15        DR. THRUN: Thank you, Madame Chair.
16        THE CHAIRWOMAN: (Inaudible) minutes
17    left. That concludes the expert testimony. And we're
18    going to move as much as we can to -- having a few
19    extra people, I'm going to call this young man right
20    here to come up and testify. Oh, no, you're on the
21    other side, sorry. You could go ahead. Senator Hodge,
22    do you mind if I bring him up? Sorry. Sorry, sorry,
23    sorry.
24        Okay. So we have -- okay, I need to go
25    on to ... Okay. Let's see. Janet Hartman, is she
0078
1    here? Carol Bell? Tom Sullivan? Yes, sir, would you
2    come forward. And after Tom Sullivan, is there a
3    Patricia Taylor? Is there a Ron Pierre? And if
4    there's a Doug Smith, we might be able to get those
5    three.
6        So welcome. Please introduce yourself
7    and proceed with your testimony.
8        MR. SULLIVAN: My name is Tom Sullivan.
9    I'm the father of Alex Sullivan, who was murdered in
10    the Aurora Theatre massacre on July 20th, 2012. I come
11    before you today to speak in favor of House Bill 1224,
12    preventing large-capacity ammunition magazines in
13    Colorado.
14        7 months, 12 days ago, while Alex went to
15    the movies to celebrate his birthday, just as he had
16    done countless times before with me, his mother Terri,
17    and his sister Megan, this night he was senselessly
18    murdered by a man who walked into that theatre with a
19    weapon equipped with a hundred-round magazine. He
20    opened fire, killing 12, including my son Alex, and
21    injuring physically 58 others.
22        The emotional injuries sustained by the
23    so-called survivors will be a burden that not only they
24    will endure for the rest of their lives, but injuries
25    that will be felt by the community they live in.
0079
1        Alex was seated in the 12th row, center
2    of the theatre. Perfect place to watch a movie of one
3    of his favorite super heroes. But sadly this night, he
4    was in the middle of the kill zone. Alex was enjoying
5    a movie on his birthday one second, and the next
6    second, he was dead.

LEG HX 000231    4147

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

7   He never had a chance to move from his
8   seat for cover or protect himself in any way.  A
9   100-round magazine spraying the theatre with bullets
10  took any chance he had away from him, and that's why my
11  son Alex is dead.
12          I am not here today to advocate to take
13  anything away from anyone.  I'm only asking that in the
14  future, when a massacre like the one Alex was in at the
15  Aurora theatre, and we will have another unless we, as
16  a community, do something about this, that in the
17  future, someone else may have the time to get to safety
18  or somehow protect themselves when someone opens fire.
19          I am not a gun owner, nor do I hunt for
20  food or sport, nor have I ever taken any target
21  practice, so I would rely on the stories I have heard
22  from those that do about the amount of time it would
23  take to change out a 15-round magazine, and how that
24  somehow hinders their fun at the range or puts them in
25  some kind of threatening position.
0080
1           I heard here at the capitol when it was
2   debated in the House how Vietnam vets taped magazines
3   together to give them more fire power in war.  And I
4   was told in the elevator ride to the gallery by one
5   gentleman that he could switch a magazine in less than
6   three seconds.
7           I come before you today to ask for that
8   three seconds of added life for my son Alex.  I know
9   that as I stand here today, that time will never be
10  added to Alex's short 27-year life.  But I ask that you
11  add that three seconds of life to all of the citizens
12  of Colorado.
13          In the event that we ever are thrust into
14  an event like we witnessed on 20 July, 2012, I ask that
15  we give all those involved that extra three seconds,
16  that they might have enough time to get to safety or
17  someone will have that time to take that shooter to the
18  ground and save lives of Coloradans.
19          THE CHAIRWOMAN:  Thank you, Mr. Sullivan.
20  Are there any questions?  Thank you very much for being
21  here.
22          And we have time for probably one more.
23  Oh, we have six minutes.  All right, please come
24  forward.  Are you Carol Bell?
25          MS. TAYLOR:  I'm Patricia Taylor.
0081
1  (Inaudible.)
2           THE CHAIRWOMAN:  Okay.  You're Patricia
3  Taylor.  All right.  Thank you, Ms. Taylor.  Please
4  introduce yourself and proceed with your testimony.
5  You have three minutes.
6           MS. TAYLOR:  Thank you.  My name is
7  Patricia Taylor.  Thank you, Madame Chair and members
8  of the committee, for listening to my very brief

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

9  testimony.
10         I'm here in support of House Bill 1224,
11  and I encourage you all to support it, as well.  I'm
12  here as a mother, the grandmother of 11, a registered
13  nurse, and a mental health professional.  I also grew
14  up in Bethel, Connecticut, right next to Newtown.  I
15  have a dear friend whose grandson is a student there,
16  and I knew three of the families who lost children.
17         I don't think there's anything left to
18  say.  I believe that this is common sense.  Common
19  sense needs to rule here.  I am not here to take away
20  anybody's guns.  I do not feel that private citizens
21  need high-capacity ammunition magazines any more than
22  we need drones, chemical weapons, anthrax spores, or
23  any other weapons that are used in military settings.
24         That's really all I have to say.  I just
25  want to encourage you all to support this, to protect
0082
1  the citizens of this state.  I feel that other people's
2  life end where safety starts for the rest of us.
3         And the one thing I just want to add is
4  this:  I've given this a lot of thought since my friend
5  called me the day that her grandson's school was blown
6  apart.  And I believe if the founding fathers could
7  come back for one hour, that they would tell us that
8  this is not the intent of the Second Amendment, to give
9  every weapon to everybody.  Thank you very much.
10         THE CHAIRWOMAN:  Thank you.  Are there
11  any questions?  Seeing none, thank you very much for
12  being here.
13         MS. TAYLOR:  Thank you.
14         THE CHAIRWOMAN:  Okay.  I think I called
15  Ron Pierre, is he here?
16         MR. PIERRE:  I am.
17         THE CHAIRWOMAN:  All right.  Great.
18  Thank you.  You have -- thank you for being here.
19  Please introduce yourself and proceed.  You have
20  three minutes.
21         MR. PIERRE:  Thank you, Madame Chair, for
22  having me.
23         My name is Ron Pierre, and I presently
24  live in Canada and work in Canada.  However, I have
25  immediate family who are here in the state of Colorado,
0083
1  so I'm a frequent visitor of Colorado.
2         Unfortunately, I was visiting in Denver
3  when the Aurora shooting happened last summer.  To all
4  those who were directly impacted by this tragedy allow
5  me to say, I'm very deeply sorry.
6         We're all here because we recognize we
7  all have a serious problem and that something needs to
8  be done.  I'm speaking here as a father, as a brother,
9  and as a police officer.  We have to draw the line
10  somewhere.  The question is:  Where do we start?  And

11  that's why I'm here today to support the passage of
12  Bill 1224.
13          Though it's a step, a small step,
14  nevertheless, it's a step in the right direction,
15  because the limit of the amount of rounds in a magazine
16  and the exchange of magazines can surely save lives.
17  And I hope you will give that a thought.  Even though
18  it's a small step, they have a great impact in
19  somebody's life.  Thank you for having me.
20          THE CHAIRWOMAN:  Thank you.  Are there
21  any questions?
22          Thank you very much for being here.
23          MR. PIERRE:  Thank you.
24          THE CHAIRWOMAN:  So (inaudible), that
25  concludes the testimony on the proponents' side.  We're
0084
1  going to continue now with the opponents.
2          Mr. Sargent, Mr. Sargent, I want to call
3  out the names of the preferred witnesses.  And just as
4  you helped get the opponent ones, we hope that you all
5  could sort of round these folks up.
6          One would be David Kopel, Evan Todd --
7  and if you're in the room, will you please sort of move
8  in this direction so we can have you --
9  Richard Fitzpatrick, Libardo Jimenez, Jessica Johnson,
10  Tara Heller, Harold Byers, Greg Alfred, Michael Shain,
11  Justin Otis, Robert Parker, Sheriff Kirk Taylor,
12  Charles Rogeless (phonetic), Dudley Brown,
13  Daniel Carey, and Laura Carnot.
14          If you need my list, Mr. Sargent, you can
15  use this.  You need to -- oh, I see, Mr. Kopel is here,
16  he's number one, so we could probably start there.  But
17  it would be helpful to begin to find those folks and
18  round them up and get them here.
19          Hi, Mr. Kopel.  Please come forward and
20  introduce yourself.  You are a -- one of our special
21  preferred witnesses, so there's no time limit on your
22  presentation.
23          MR. KOPEL:  Thank you, Madame Chair.
24  Nevertheless, I will try to be succinct and brief.  I
25  am David Kopel.  I'm an adjunct professor of
0085
1  Constitutional law at Denver University's Sturm College
2  of Law.  Also the research director of the Independence
3  Institute located just a few blocks from here.  But as
4  always, all scholars from DU or the Independence
5  Institute testify on their own behalf only.
6          Let me start with two of the technical
7  issues that have come up on this bill.  The first one
8  is about the fact that in the attempt to say, the
9  maximum capacity of a shotgun is eight rounds, there is
10  the problem that not all shotgun rounds are of the same
11  size.  Some are three and a half inches long, some are
12  one and a half inches long.

13     And so a magazine -- if someone has a
14  magazine for which he -- a 12-gauge shotgun that holds
15  eight rounds for the purposes he typically uses it for,
16  but that -- and he never thinks of it as holding more
17  than eight rounds, and that's all the experience he
18  has, but he could be charged under this bill because
19  the magazine which holds eight three-and-a-half-inch
20  shells certainly has the ability to hold a larger
21  number of shorter shells, shotgun-length shells, as
22  other senators have explained, are not all of a single
23  length.
24          So I was thinking about this while the
25  proponents were speaking, and there actually is a
0086
1  fairly straightforward solution to this.  And that is,
2  if you say eight rounds, three-and-a-half-inch shells,
3  that's 28 inches on the magazine tube.
4          Just make that the rule, the magazine
5  tube can't be more than 28 inches.  And then you have
6  eight rounds for the three-and-a-half that the person
7  might use, and yes, you could have -- and that could
8  hold more for shorter rounds, but then we have
9  something that's very definite so a person knows
10  exactly what the law is and is not and what he can do,
11  and doesn't have to worry about whether his magazine is
12  illegal because somebody else could put shorter shells
13  in it which he never uses.
14          That seems like a straightforward thing
15  and actually gets the law closer to being something
16  that even though people may disagree with it, pro or
17  con, at least provides a clearly identifiable standard
18  for citizens to obey and for law enforcement to know
19  what to enforce.
20          A second concern is on this readily
21  convertible issue for handguns and rifles.  These
22  magazines are basically rectangular boxes or they might
23  be slightly curved.  The way they work is, the
24  magazines are pushed up by a spring that's on the
25  bottom of the magazine.  And the spring doesn't touch
0087
1  the bullets, the rounds of ammunition directly, there's
2  sort of a flat plate called the follower that is in
3  between the spring and the ammunition.
4          The problem with readily convertible is,
5  if you have, say, a 15-round magazine, you can open it
6  up, that's not a hard thing to do, and snip the spring.
7  The spring will then be shorter and compress further,
8  and then you could put 16 rounds in there.
9          Now, would I ever advise anybody to do
10  that?  Definitely not, because that magazine was made
11  to have a spring of a certain size to properly push
12  each round of ammunition up so you'd be more likely to
13  cause a misfeed, a failure of the magazine.
14          But the danger of the readily convertible

15 language is, in those cases where there's a police
16 officer or a prosecutor who has it in for somebody, it
17 makes it possible to bring the charge against that
18 person who had properly, legally a 15-round magazine.
19          Now, obviously if you do snip the spring
20 and put in six -- so that it can put in 16, then you've
21 got a 16-round magazine. That's an actual 16-round
22 magazine under this bill, so no problem with the
23 prosecution under that.
24          The problem is that 15s and sometimes
25 even small -- even a 13, you snip the magazine enough,
0088
1 you could -- it could physically hold 16 or 17. It
2 wouldn't function as well, but it could do that. So I
3 would suggest that as technical corrections, which are
4 still very -- both of those consistent with the spirit
5 and the intent of this bill.
6          There was also discussion early on about
7 the -- what the research has shown. And let me see if
8 I can -- and there was a bunch of different studies
9 that came in. Let me see if I can clarify what that --
10 what they say.
11          When the 1994 federal ban was passed
12 which banned magazines over 10, part of the compromise
13 to pass that was that it would have a 10-year sunset,
14 and that over the course of the 10 years, there would
15 be a federally directed study of the effectiveness of
16 that law, and then congress, at that point in 2004 at
17 the sunset time, could decide whether to renew the ban
18 or not, taking into account partly what the study said.
19          The organization chosen to perform the
20 study was the Urban Institute, which is a well
21 respected, left-leaning think tank in Washington, D.C.
22 It was Janet Reno's Department of Justice that chose
23 the Urban Institute. And I don't think anybody has
24 ever accused Attorney General Reno's Department of
25 Justice of being excessively biased in any pro-gun
0089
1 direction.
2          There were several interim studies, and
3 then the final study was published in 2004 based on the
4 nine years of data nationwide up through 2003. They
5 found -- and I'm talking specifically about the
6 magazine ban in there. They found no statistically
7 discernible evidence that this had saved any lives.
8          And notably, they also found no
9 statistically discernable evidence that it had any
10 effect on gunfights, such as, you know, maybe the
11 average number of rounds of ammunition fired in a
12 gunfight might have decreased. They looked for that
13 and couldn't find any statistically significant
14 evidence to that effect.
15          That's one of the reasons that this
16 January another analysis by the National Institute of

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

17  Justice, which is the research arm of the
18  U.S. Department of Justice, which was -- this was
19  supposed to have been kept secret, but it got leaked,
20  and it said, The magazine ban isn't going to do any
21  good unless you make a major effort to, as they said,
22  buy back the existing supply of magazines, which is to
23  say, we'll have mandatory confiscation and pay people
24  something for their magazines.
25          And I think Senator Hodge and most of
0090
1  Colorado public opinion recognizes what an absolute
2  catastrophe that would be, to try to force confiscation
3  at this point.  So the question is, what -- is it
4  realistic, based on what the National Institute of
5  Justice has said, to say that this really will be
6  something that will make a difference in saving lives.
7          People have talked about various
8  atrocious crimes and the use of different sized
9  magazines in that.  But let's take a look at -- and
10  there was a study from Michael Bloomberg's group that
11  began -- the first data point was January 2009, which,
12  of course, is a rather selective and interesting data
13  point because that's just the right time to avoid
14  Virginia Tech, which happened in 2008.
15          Virginia Tech was the worst.  We had, I
16  believe, 32 people murdered there, more than any of the
17  others.  There the murderer had only a 15-round Glock
18  magazine and a 10-round magazine for his Walther
19  pistol.  So you could have Virginia Tech here with
20  magazines that remain legal under this bill.
21          I'm not sure it's really realistic to say
22  that you're going to reduce the death toll when
23  Virginia Tech suggests the opposite.  And really, what
24  the studies -- I will say I'm not a spokesman for the
25  county sheriffs of Colorado, but I did represent them
0091
1  in the Colorado Supreme Court in the CU carry case, and
2  the brief we presented certainly said that the most
3  important thing in reducing the death toll in these
4  attempted mass murders is the response time, how long
5  does it take 'til there's someone who can start
6  fighting back with a firearm.
7          And when it's 20 minutes as in Newtown or
8  longer than that, because the building doors were
9  chained shut at Virginia Tech, then ammunition and
10  firearm type issues become a lot less important than
11  the excessive length of the response time.
12          I also would like to, very quickly -- I
13  know many of you sincerely respect the Second Amendment
14  and (inaudible) the Supreme Court said about this.  I
15  was on the oral argument team in front of the Supreme
16  Court in District of Columbia versus Heller, and the
17  Court did not say that the Second Amendment is absolute
18  in all respects, just as hardly anything else in the

19  Constitution is absolute in all respects.
20          And it did call out some identifiable
21  types of legitimate constitutional gun control.  And at
22  the same time, said that other kinds of gun control
23  were not legitimate.
24          What the DC case was about, of course,
25  was a handgun ban.  And we've had witnesses come in and
0092
1  say that in certain crimes, magazines of particular
2  sizes were used, absolutely true.  But if you wanted to
3  have a hearing on a handgun ban, you could have
4  witnesses who would come in and talk about that, and
5  the line would be a thousand times longer.
6          Handguns are -- as a class are vastly
7  more used for bad purposes in crimes, including mass
8  murders, the magazines of any particular capacity.
9  Handguns are used in over half the homicides in the
10  United States, the large majority of handgun homicides,
11  and then you add in armed robberies and other handgun
12  crimes, you're into the hundreds of thousands.
13          And knowing all that -- so the total
14  damage of handguns in criminal hands is orders of
15  magnitude larger than that of particular sized
16  magazines.  And yet, the Supreme Court said, You can't
17  ban handguns.  Because the Court was saying, You don't
18  look only at the misuse of something because there is a
19  right to arms in the Constitution.
20          And that's the point of that, is you take
21  some of the legislative discretion away because we're
22  making a permanent rule that some things are just off
23  limits for how far you can go in restricting people's
24  rights.  And so the Court said you can't --
25  notwithstanding the large criminal misuse of handguns,
0093
1  you can't ban handguns because they are the type of
2  firearm that is overwhelmingly chosen by law-abiding
3  citizens for the lawful purpose of self-defense in the
4  home.
5          And more broadly, explaining why in the
6  Court's view the Supreme Court was right in 1939 to
7  have held a ban on sawed-off shotguns, that there's a
8  distinction between what the line is for what kind of
9  arms, and this would include accessories, as well, are
10  or are not within the scope of arms that are protected
11  by the Second Amendment is those that are typically
12  used by law-abiding citizens for lawful purposes.
13          And I'd suggest that the shift in this
14  bill from 10 to 15 made a lot of progress in that
15  direction in complying with the Supreme Court's
16  interpretation, but there's still some room to go.  If
17  you look -- 82 percent of new handguns manufactured in
18  this country are semiautomatics.
19          A very large number of them, a large
20  percentage have magazines in that 11 to 20 range.  And