0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  Judicial Committee Meeting
4  Held on February 12, 2013
5  HOUSE BILL 13-1229
6  ------------------------------------------------------------
7  REPORTER'S TRANSCRIPT
8  ------------------------------------------------------------
9
10        This transcript was taken from an audio
11  recording by Elissa Steen, Registered Professional Reporter
12  and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25

0002
1  PUBLIC SPEAKERS:
2  IN SUPPORT:
   Ron Sloan                        29
3  David Chipman                    50
   Tom Mauser                       65
4  Katie Lyles                      68
   Chief John Jackson               72
5  John Head                        79
   Marjorie Sloan                   83
6  Karina Vargas                    88
   Don Macalady                     90
7  Amy Miller                       92
   Ted Pascoe                       96
8  Debbie Kaller                    101
   Michael McGuire                  101
9  Chuck Saxton                     103
   Jessica Watts                    105
10 Stu Fraser                       106
   Jennifer Hope                    110
11 Dr. Vince Markovchick            111
   Terry Crook                      114
12 Reverend Timothy Tyler           116
13 IN OPPOSITION:
   Daniel Carey                     124
14 Dudley Brown                     145
   Anthony Racz                     146

15  Dave Gill                        150
    Douglas Howell                   155
16  Terry McGuire                    158
    Aubrey Allmond                   161
17  Patrick Thai                     165
    Charles Yates                    166
18  Sean Verhoeff                    166
    Ronald Dietz                     170
19  James Winchester                 173
    Ian Jaeger                   188
20  Alicia Perez                     190
    James Durden                     194
21  Jared Wolfe                      196
    Toni Winchester                  197
22  Michael Billingsley              213
    Robert Edminston                 214
23  David Whiteaker                  216
    Robert Wareham                   218
24
25
0003
 1             P R O C E E D I N G S
 2           *   *   *   *   *
 3             P R O C E E D I N G S
 4         THE CHAIRMAN:  The committee will come to
 5  order.
 6         We have three bills on the agenda for this
 7  afternoon.  We have House Bill 1126 concerning seven-day
 8  court time intervals.  That will be the first bill up.
 9         We have House Bill 1229, background checks for
10  gun transfers.  That will be the second bill up.
11         And we have House Bill 1224, prohibiting
12  large-capacity ammunition magazines.  That will be the
13  third bill up.
14         Before we start dealing with these bills, let me
15  just tell everybody here how much we appreciate you being
16  involved in the process of helping us craft good public
17  policy.
18         Your contribution, your willingness to come
19  down here and give us your views is very much appreciated,
20  regardless of which side of the issue you are on.  You are
21  performing a public service, and we are grateful.
22         Just a few points of procedure here just so that
23  we can actually get these bills properly heard.
24         The first thing that I'd like everyone to know
25  is that this is a policy -- a policy-making procedure.
0004
 1  It's not a political rally.  So if I ask you not to engage
 2  in applause when somebody says something you agree with or
 3  any other expressions of opinion through public
 4  proclamation, that would be much appreciated, because we
 5  want to just simply get the input of the public into these
 6  measures so that we can craft the best public policy that
 7  we can in Colorado.

LEG HX 000477    4392

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

8 · · · So thank you for your restraint in that regard.
9 · Much appreciated.
10 · · · · · As far as timing is concerned, there are a huge
11 · number of people who have asked to testify in support of at
12 · least the second two bills that we're -- second and third
13 · bill that we are hearing, and not as many who are here to
14 · testify on Representative Wright's bill concerning
15 · seven-day time intervals.
16 · · · · · But in order to make sure that as many opinions
17 · and as many points are made for the benefit of this body, I
18 · will be restricting the amount of direct testimony to two
19 · minutes for each witness.  I'm sorry that it can't be
20 · longer, but the sheer numbers make it impossible to be
21 · longer.
22 · · · · · I will not be restricting questioning of the
23 · witnesses by members of the committee.  And so if the -- if
24 · you come forward and the committee members wish to ask you
25 · questions to elucidate your position, you will have time to
0005
1 · answer those, and committee members will have time to ask
2 · those questions.
3 · · · · · Overall I am going to give on House Bill -- on
4 · House Bill -- each of the two house bills following
5 · Representative Wright's seven-day time intervals, House
6 · Bills 1229 and 1224, overall I will give two hours total
7 · for testimony and questions and answers from the committee
8 · to each side.
9 · · · · · I will try and make sure that this is as even as
10 · possible.  There may be a few-minutes variation on one side
11 · or the other, but the goal is to give two hours for
12 · proponents on the first bill, two hours for opponents on
13 · the first bill, and then we will move to the amendment
14 · phase on the first bill, and we will then, having voted on
15 · amendments, vote on the bill itself, and then we will
16 · proceed to the second bill which, likewise, will be two
17 · hours for each side for all of their witness testimony and
18 · questioning of witnesses overall.
19 · · · · · This may mean that some people do not get to
20 · testify at all, and that is regretful.  But what I will do
21 · is I'll make sure that everybody has an opportunity -- if
22 · they don't get to testify, they will have an opportunity to
23 · show whether they were here in support or here in
24 · opposition to the bill, and that opportunity will be made
25 · available at the close of the witness phase of each bill.
0006
1 · · · · · There are many, many people here who cannot
2 · unfortunately be seated in the Supreme Court chambers, and
3 · there are many of you who are standing at the back.  I
4 · would like you to know that there is an overflow room in
5 · the basement which will have the -- the testimony and the
6 · audio fed down to there; that if you are signed up to
7 · testify and you are in the basement, we will be calling you
8 · by name from the basement, and we will give you advance
9 · warning as to when your testimony is coming up.

10    will be calling the names of the next three or
11  four witnesses at a time to give those who are in the
12  basement adequate time to make their way up here so that
13  they can testify.
14          And so please feel free, if you'd like a little
15  more comfort.  You will still hear the proceedings.  You
16  will still be able to testify if you choose to go to the
17  overflow room, which is in House Conference Room 112.
18  House Conference Room 112 downstairs.  And it's the normal
19  committee room for the Judiciary Committee when we are not
20  as crowded as we are today.
21          So with that, I want to just reiterate again
22  how much we value your input and your -- your willingness
23  to come here and help us make sure that whatever public
24  policy we craft here today is the best we can possibly
25  create.  That is very much appreciated.  Thank you for
0007
1   being here.
2           And I will ask Representative Wright.
3           UNIDENTIFIED SPEAKER:  You should call the roll.
4           THE CHAIRMAN:  Oh, I should call the roll.
5   That's a very good suggestion.
6           Ms. Shipley, please call the roll.
7           MS. SHIPLEY:  Representatives Buckner?
8           REPRESENTATIVE BUCKNER:  Here.
9           MS. SHIPLEY:  Court?
10          REPRESENTATIVE COURT:  Here.
11          MS. SHIPLEY:  Gardner?
12          REPRESENTATIVE GARDNER:  Here.
13          MS. SHIPLEY:  Lawrence?
14          REPRESENTATIVE LAWRENCE:  Here.
15          MS. SHIPLEY:  McLachlan?
16          REPRESENTATIVE McLACHLAN:  Here.
17          MS. SHIPLEY:  Murray?
18          THE CHAIRMAN:  Excused.
19          MS. SHIPLEY:  Pettersen?
20          REPRESENTATIVE PETTERSEN:  Here.
21          MS. SHIPLEY:  Salazar?
22          REPRESENTATIVE SALAZAR:  Present.
23          MS. SHIPLEY:  Wright?
24          REPRESENTATIVE WRIGHT:  Here.
25          MS. SHIPLEY:  Lee?
0008
1           REPRESENTATIVE LEE:  Here.
2           MS. SHIPLEY:  Mr. Chair?
3           THE CHAIRMAN:  Here.
4           And, Representative Wright, thank you.  Please
5   tell us about House Bill 1126.
6           (Break in requested transcription portion.)
7           THE CHAIRMAN:  Our next bill up is House Bill
8   1229.  That's by -- that's being carried by Representatives
9   Fields and McCann.
10          And before we hear about House Bill 1229, I
11  would like to just add one procedural point that I forget

LEG HX 000479    4394

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

12  to make in my introduction before the last bill, which is
13  that we are giving each witness two minutes to present
14  their direct testimony and no time limitation on the
15  questions from members of the committee or the answers of
16  the witness.
17          I would like to, A, ask witnesses who are going
18  to testify to listen to the testimony of other witnesses
19  and make sure that if your point has been made already, you
20  might like to not come up and make the same point again,
21  because in my experience, members of this committee are
22  rarely persuaded more by hearing the same point several
23  times than they are hearing it the first time.
24          So I just submit that to you, members of the
25  committee, as -- as a thought to consider when deciding
0009
1  whether to testify.
2          The second thing is that with the agreement of
3  my esteemed colleague, the ranking member of the Judiciary
4  Committee, Representative Gardner, we have agreed that the
5  first two witnesses from both sides, the first two
6  witnesses proposing the measure and the first two witnesses
7  opposing the measure, will have extra time so that they can
8  lay out the basic facts.
9          They will have three or four minutes rather than
10  the two, and that is going to be applied to both sides,
11  proponents and opponents equally, but from then on we will
12  go to standard two minutes per witness.
13          Representative Fields, do we know where --
14          REPRESENTATIVE FIELDS:  She's on her way.  She's
15  downstairs.  So we can proceed, and she will join us when
16  she can.
17          UNIDENTIFIED SPEAKER:  She's on her way.
18          REPRESENTATIVE FIELDS:  Oh, she's on her way?
19  Okay.
20          THE CHAIRMAN:  She is?  Okay.
21          We'll wait a couple of minutes.
22          THE CHAIRMAN:  Members of the public,
23  Representative Fields, we'll wait for a couple of minutes
24  and --
25          REPRESENTATIVE FIELDS:  If not, I can proceed.
0010
1          THE CHAIRMAN:  And then if -- if Representative
2  McCann is delayed longer than that, you'd like to
3  proceed --
4          REPRESENTATIVE FIELDS:  Yes.
5          THE CHAIRMAN:  -- in her absence?
6          REPRESENTATIVE FIELDS:  Yes, please.
7          THE CHAIRMAN:  Very good, Representative
8  Fields.
9          THE CHAIRMAN:  Welcome, Representative McCann.
10          REPRESENTATIVE McCANN:  Thank you.
11          THE CHAIRMAN:  And, Representative Fields,
12  welcome to the Judiciary Committee.
13          REPRESENTATIVE FIELDS:  Thank you.

LEG HX 000480

4395

14        THE CHAIRMAN:  Thank you for coming here.
15        Representatives Fields and McCann, please tell
16 us about House Bill 1229.
17        REPRESENTATIVE FIELDS:  Thank you, Mr. Chair,
18 and members of the Judiciary Committee.
19        And also thank you for providing the opportunity
20 to present to you House Bill 1229, which will require
21 background checks on all guns transferred in the state of
22 Colorado.
23        Members, I ask that you join me, along with 80
24 percent of all the people in Colorado, who have said that
25 we need to close this gun show -- this gun loophole today.
0011
1        It is estimated that 40 precent of all guns
2 purchased occur with a background check -- without a
3 background check.  This allows hundreds of thousands of
4 guns to get in the hands of criminals each year.  A recent
5 undercover investigation showed that 62 percent of private
6 sellers on the Internet are willing to sell to someone
7 who's actually admitted that they could not pass a
8 background check.
9        According to a national survey of incarcerated
10 individuals, 80 percent of those who use a handgun in a
11 crime acquired it from a private seller.
12        The private-sale loophole is just a way for
13 criminals to skirt around our current background check, and
14 it contributes to the murders of 34 Americans every single
15 day.
16        Background checks are the only systematic way to
17 stop felons, domestic abusers, and the seriously mentally
18 ill and other dangerous people from buying firearms.
19        In 2000, after Columbine in Colorado, we voted
20 to close the gun show loophole by a 70 percent margin.
21 Before any transfer of a gun originating at a gun show, the
22 buyer must first pass a CBI background check.
23        We also know that states that have closed the
24 private state loopholes have lower rates of domestic
25 violence, killings, and suicides committed with a firearm.
0012
1 In states that require a background check for every handgun
2 sale, 30 percent or fewer women are shot because of this
3 requirement of having a background check.
4        House Bill 1229 will require private sellers to
5 perform a background check before a sale is completed.
6 House Bill 1229 will require that a background check be
7 conducted through a licensed dealer.  House Bill 1229 does
8 provide exemptions for certain situations, like temporarily
9 loaning a firearm during hunting and sporting events,
10 provides exceptions for gifts to the immediate family.  It
11 also provides an exception for the transfer of a firearm
12 due to self defense.  House Bill 1229 also has penalties
13 associated with not being in compliance with the law if it
14 passes.
15        So, Mr. Chair, I do have several witnesses

16  available to provide testimony in support of this bill,
17  which will require background checks on all gun transfers
18  in the state of Colorado.
19       THE CHAIRMAN:  Representative McCann.
20       REPRESENTATIVE McCANN:  Thank you, Mr. Chair.
21       And I join with my colleague, Representative
22  Fields, in presenting this bill to you today to close what
23  is a pretty obvious and distressing loophole in our gun
24  show background check law.
25       Just think about it for a minute.  If you were
0013
1  -- if you wanted to get a gun and you knew you wouldn't be
2  able to pass the background check that we currently
3  require, either because of conviction or a domestic
4  violence incident or some adjudication of mental
5  deficiency, what would you do?  You would go to a private
6  seller.  You would either go on the Internet, or you would
7  find a private seller through an advertisement, through a
8  magazine.  You would go to the private seller or the
9  Internet, and you would get your gun.
10       So what's the point of having the background
11  check if we have this enormous loophole through which those
12  who cannot pass a background check can jump?
13       As Representative Fields has noted, in states
14  that have background -- complete background checks, there
15  are fewer deaths by firearm.  The whole point of the
16  background check is to prevent those who should not have a
17  gun from obtaining one.
18       Many people here today are responsible gun
19  owners who have purchased their guns through licensed
20  dealers or at a gun show, who went through a background
21  check willingly and obtained their weapon.  And they tell
22  you that they do not object -- or they support responsible
23  gun ownership, and that's what we are supporting here
24  today, members of the committee.
25       We are saying those who can pass the background
0014
1  check are entitled to possess a gun.  And what you will be
2  able to do here today is say to our community we value
3  public safety such that we will make sure that everyone who
4  purchases a gun has to go through a background check, not
5  just the ones who choose to buy through a licensed dealer
6  or at a gun show.  Because believe me, people who know they
7  can't pass a background check are going to seek other
8  methods of getting their guns.  And the harder we make that
9  for them to do, the more we are supporting public safety.
10       It is our obligation as legislators to support
11  the safety of your communities.  What this bill does is
12  simply say, if you are responsible, if you don't have
13  convictions, if you haven't been involved in domestic
14  violence, or haven't been adjudicated mentally defective,
15  you can purchase a gun, but you have to go through the
16  background check like everyone else does.
17       So what we want to do is make sure those who

18    purchase guns have the ability to do so based on the
19    current background checks that we have, extending that to
20    any sale of guns here in Colorado.  It's a public safety
21    issue.
22          Thank you.
23          THE CHAIRMAN:  Thank you, Representative
24    McCann.
25          Are there any questions for the proponents of
0015
 1    the bill from members of the committee?
 2          Representative Lee.
 3          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
 4          Representative McCann or Fields, can you tell
 5    us how many guns are sold in the state of Colorado and what
 6    percentage of those are acquired through -- through gun
 7    shows and through private sellers?  Do we have information?
 8          THE CHAIRMAN:  Representative Fields.
 9          REPRESENTATIVE FIELDS:  Thank you, Mr. Chair,
10    and thank you, Representative Lee.
11          I have some here that says 40 percent of guns
12    that are sold nationally are sold by a private seller.  So
13    that's not a local statistic, that's just a national
14    figure.
15          THE CHAIRMAN:  Any other questions for the
16    proponents?
17          Representative Lee.
18          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
19          And do we know of those guns that are used in
20    crimes?  Can you elaborate on the statistics with respect
21    to the acquisition of guns used in crimes?
22          REPRESENTATIVE FIELDS:  I don't have --
23          THE CHAIRMAN:  Representative Fields.
24          REPRESENTATIVE FIELDS:  Thank you, Mr. Chair.
25          I'm sorry, Representative Lee.  I do not have
0016
 1    those statistics, but we may have a witness here that can
 2    provide that kind of data.
 3          THE CHAIRMAN:  Very good.
 4          Seeing no further -- oh, Representative Wright.
 5          REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.
 6          Representatives, I was wondering if you could
 7    tell us -- I have a twofold question.
 8          Have you looked at data from other states that
 9    have established universal background checks, and is there
10    a corresponding decrease in violent crime?
11          And secondly, because each of us has taken an
12    oath to uphold the constitution of the state of Colorado, I
13    was wondering if you had read Article 2, Section 13, of the
14    Colorado Constitution in which it says, "The right of no
15    person" -- N-O person -- "to keep and bear arms in defense
16    of his home, person, and property or in aid of a civil
17    power when thereto legally summoned shall be called into
18    question, but nothing herein contained shall be construed
19    to justify the practice of carrying concealed weapons."

20      The only exception there I see is concealed
21  carry.  So can you tell me how you believe this to be
22  constitutional?
23          Thank you.
24          THE CHAIRMAN:  Representative Fields or McCann,
25  if you'd like to answer that, please feel free.  If you'd
0017
1  like to wait for a lawyer to testify, that's fine as well.
2  Whichever -- however you would like to proceed.
3          Repetitive Fields.
4          REPRESENTATIVE FIELDS:  Thank you, Mr. Chair.
5          And Representative McCann is going to do Part 2,
6  and I'm going to do Part 1.
7          Do you want to go with Part 2 first?
8          THE CHAIRMAN:  Representative McCann.
9          REPRESENTATIVE McCANN:  Thank you.
10          Thank you, Representative Wright.
11          It's my belief that reasonable restrictions can
12  be placed on constitutional rights, and that has -- that
13  has been upheld through several court cases, including the
14  more recent Heller case by the United States Supreme Court.
15          Constitution rights not -- constitutional rights
16  can be limited by reasonable restrictions by government
17  action.
18          THE CHAIRMAN:  Representative Gardner.
19          REPRESENTATIVE GARDNER:  Yes.  Thank you.
20          So -- just so we are clear, Representative
21  McCann, this is a restriction in your mind upon the
22  exercise of one's Second Amendment right; is that correct?
23          THE CHAIRMAN:  Representative --
24          REPRESENTATIVE McCANN:  It's a reasonable
25  regulation of the exercise of the Second Amendment.
0018
1          THE CHAIRMAN:  Representative Gardner.
2          REPRESENTATIVE GARDNER:  Yes.
3          Thank you, Representative McCann.  And you and I
4  are both lawyers, so we can do this back and forth.
5          Let me ask you:  Whether or not it's
6  reasonable, I think you and I can disagree, but is this or
7  is this not a restriction upon the exercise of one's Second
8  Amendment right?
9          REPRESENTATIVE McCANN:  It's a reasonable
10  regulation, just as our current background checks are.
11          THE CHAIRMAN:  Okay.  Members of the audience,
12  we are trying to have a policy-making discussion here that
13  educates, enlightens, elucidates everybody's views.  It is
14  not helped at all if it starts to be treated like a
15  theatrical performance.  It is not.  Please don't do that.
16          Representative McCann.
17          REPRESENTATIVE McCANN:  Thank you, Mr. Chair.
18          It is a reasonable regulation, just as our
19  current backgrounds checks have been upheld as being a
20  reasonable regulation on the ability of people to own
21  firearms.

LEG HX 000484

4399

22        THE CHAIRMAN:  Thank you.
23        And Representative Wright -- Gardner.
24        REPRESENTATIVE GARDNER:  Thank you, Mr. Chair.
25        And let me -- let me echo your admonition to
0019
1   those in the audience that I understand the emotions run
2   high, and I appreciate your asking people to observe the
3   dignity of this -- of this hearing.
4        So thank you, Mr. Chair, and I -- I echo your
5   request.  And those who might agree with me, you do not
6   help me by encouraging me on vocally.  But let me just
7   close, and you can respond or not respond.
8        I don't agree with you that it is a reasonable
9   regulation or restriction.  And I think you conceded in
10  your -- in your response that it is nevertheless a
11  restriction.  Whether or not it's reasonable I think is for
12  courts to decide.
13       THE CHAIRMAN:  Representative Salazar.
14       REPRESENTATIVE SALAZAR:  I know that -- thank
15  you, Mr. Chair.
16       I know that Representative Wright did ask the
17  question by reading the constitution, and just in terms of
18  maybe providing a buffer for both is that the Colorado
19  Supreme Court back in 1979 said very specifically that
20  there is no absolute right to bear arms, that there can be
21  a restriction by the state's valid exercise of its police
22  powers.  That's what the Supreme Court said.
23       So the question here today is:  Is this
24  reasonable?  So with what Ms. -- with what Representative
25  McCann had said, is that there is no absolute right to bear
0020
1   arms, which is supported by what the Supreme Court has
2   said.  It's just that today is about the reasonable
3   restriction of it, and that's what this debate is all
4   about, and that's what this bill is about.
5        And that's -- so if we can all agree on that
6   principle, that the Supreme Court has already said it is
7   not an absolute right, that it can be reasonably
8   restricted, then I think we can probably move on this on a
9   little bit -- a little bit more smoothly.
10       Thank you, Mr. Chair.
11       THE CHAIRMAN:  Thank you, Representative
12  Salazar.
13       Let me just state that I think there is a right
14  in the First Amendment to freedom of speech, but it is well
15  known that that does not give you the right to shout fire
16  in a crowded theater.  There is a right of assembly,
17  freedom of assembly, but that does not give everyone the
18  right to assemble wherever and whenever they choose without
19  a permit in a way that is considered against the public
20  interest.
21       With all constitutional rights, there are --
22  none of them are absolute.  They are subject to reasonable
23  restrictions of time, place, and manner, and I think that

LEG HX 000485    4400

24  is true of all constitutional rights.  The question isn't
25  one of absolutism, but it is absolute reasonableness.  And
0021
1  any restrictions on any rights must be reasonable, and
2  that's my understanding of the law.  And I'd just like to
3  state that for the record.
4          Representative Gardner.
5          REPRESENTATIVE GARDNER:  Yes.  Thank you,
6  Mr. Chair.
7          Well, that's an interesting observation you
8  make in analyzing to the First Amendment and reasonable
9  restrictions of time, place, and manner, which causes me to
10  think -- and I wonder if Representative McCann or yourself
11  might want to consider and respond to the question of the
12  fact that under the First Amendment -- since it's been
13  raised here.  I didn't raise it -- courts are very
14  reluctant to approve prior restraint.
15          In other words, to tell people they can't speak
16  until they've spoken.  And I wonder if my analogy it's not
17  the same here because what we are doing is imposing a prior
18  restraint upon one's right to keep an bear arms.
19          So that whereas, in order to speak, I can -- I
20  can speak anywhere, and unless there's something
21  particularly compelling, I'm not restrained.  You know, I
22  might be punished afterwards.
23          So isn't a background check, in essence, a
24  prior restraint upon my right to keep and bear arms,
25  assuming I'm a law abiding citizen?
0022
1          THE CHAIRMAN:  Representative McCann, if you'd
2  like to answer and continue to debate the First Amendment
3  now.  We've moved from the Second to the First.  If you'd
4  like to continue to discuss the First Amendment, please
5  feel free, but if you'd like to proceed to witnesses on
6  this particular bill, I think that might be the best thing
7  to do.
8          REPRESENTATIVE McCANN:  Just very briefly.
9  Thank you, Mr. Chair.
10          I think it's important to remember that, as the
11  Chair has pointed out, with respect to the amendment there
12  is the ability to put reasonable regulations on them, just
13  as, for example, when people want to have a rally or march,
14  they have to get a permit to do that.  That is a lawful
15  exercise of government power that does touch on First
16  Amendment right for assembly.
17          It's a public safety issue, and the government
18  is entitled to say, You can march, but you have to stay
19  within this particular area, you have to have a permit.  We
20  already have a requirement that people get permits to carry
21  concealed weapons.  Again, a reasonable restriction, if you
22  want to call it that, reasonable regulation on the exercise
23  of the Second Amendment.
24          And we already have background checks here in
25  Colorado for licensed firearm dealers and gun shows.  All

1  this bill is doing is saying those reasonable background
2  checks, which have already been upheld, will be extended to
3  all gun sales, including private sales, not just those at a
4  gun show or among a licensed dealer.
5          So we're not really creating any new
6  restrictions.  This is -- these are regulations we already
7  have in our law here in Colorado.  So we're simply
8  expanding that to include private sales.
9          THE CHAIRMAN:  Thank you, Representative McCann.
10          And, Representative Gardner or Representative
11  Wright, if it's directly to the provisions of the bill.  I
12  think we should really stick to that because otherwise we
13  really will be here not only all day, but all night and
14  tomorrow as well.  So I would ask you to stick to the
15  provisions of the bill, if you would, sir.
16          Thank you.
17          Representative Gardner.
18          REPRESENTATIVE GARDNER:  Mr. Chair, I will
19  comment, and then I -- I will move on.
20          I think we ought to stick to the provisions of
21  the bill.  The sponsors and, in fact, the Chair, with all
22  due respect --
23          THE CHAIRMAN:  Yes.
24          REPRESENTATIVE GARDNER:  -- took us down the
25  road of the First Amendment and the comparison.  And if you
0024
1  want to make the comparison, then I would make the
2  comparison that, indeed, when I speak in my home, when I
3  speak on the street, I'm not subject to a prior restraint,
4  nor do I need a license to do so or do I need a background
5  check to do so.
6          If -- if I'm willing to entertain some
7  restrictions for concealed weapons and so forth, that may
8  be, and that may be angulous to getting a parade permit.
9          But I would submit to you that this bill and the
10  provisions of this bill run a good deal deeper than that.
11  But since you want to go to the provisions of the bill, let
12  me -- let me go to the provisions of the bill,
13  Representative Fields and McCann, and talk about perhaps
14  what is the elephant in the room.
15          We had a terrible tragedy in Sandy Hook,
16  Connecticut, and we had a terrible tragedy in Aurora.  And
17  I'm looking at your bill, and I'm thinking about rules of
18  reasonableness and whether or not it furthers public safety
19  and so forth and -- and I must ask:  Would this bill have
20  prevented either one of those perpetrators, alleged
21  perpetrators, either of them from -- under the
22  circumstances and facts as we know them, would it have
23  prevented them from getting those weapons?
24          THE CHAIRMAN:  Representative Fields.
25          REPRESENTATIVE FIELDS:  Thank you, Mr. Chair
0025
1  and Representative Gardner.

2        You know, it's hard to talk about what should
3  have, could have happened.  You know, the focus of this
4  bill is trying to keep guns out of the hands of dangerous
5  people who may be domestic abusers, who may be mentally
6  ill.  So this is designed to close a loophole because we
7  know that if you are a convicted felon, the way to get
8  around that -- that process, that background check, is to
9  go buy a gun from a private seller.
10        So this bill is about closing a loophole to
11  protect women, to protect those that are in violent
12  relationships, and also to keep guns out of the hands of
13  folks who may be mentally ill.  So this is not to address
14  the -- the situations that had happened in Aurora or Sandy
15  Hook, but I think this is designed to save lives, because
16  we know that backgrounds checks will present a denial for
17  people if they don't meet the qualifications to be able to
18  have a gun.
19        So this is about saving lives, and it's about
20  closing a loophole to prevent those who shouldn't have guns
21  getting access to guns.
22        THE CHAIRMAN:  Representative Gardner.
23        REPRESENTATIVE GARDNER:  Yes.  And thank you.
24  And, Mr. Chair, I am addressing the provisions of the bill.
25        And I'm -- I asked a fairly direct question that
0026
1  I was looking for a fairly honest yes or no about.  Those
2  -- those facts and circumstances of those two issues that
3  if anyone seriously says doesn't -- hasn't driven this
4  debate, I think that's disingenuous.  I hope that's not
5  what someone is saying because it certainly has driven the
6  debate.
7        But I don't see where the facts, as they are
8  commonly known of either of those incidents, would have
9  prevented -- that this bill would have prevented either one
10  of those perpetrators from having access to firearms under
11  the circumstances as they were.
12        THE CHAIRMAN:  Representative Wright.
13        REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.
14        And I apologize.  Prior to going down the rabbit
15  hole of the First Amendment discussion, I did have a
16  two-part question.  With due respect, I was waiting for the
17  answer to the second part of my question from
18  Representative Fields.
19        And, Representative Fields, I will just make
20  this comment:  My fear here is that you may be well
21  intentioned with this legislation; however, the loophole
22  that exists is in the heart of man, and that is a loophole
23  that we're never going to be able, as a government body, to
24  fill or close.
25        I would hope that you could answer my second
0027
1  question with statistical data.
2        Thank you.
3        REPRESENTATIVE FIELDS:  Can he restate the

4  question?
5        THE CHAIRMAN:  Representative Fields.
6        REPRESENTATIVE FIELDS:  Thank you, Mr. Chair.
7  Can you restate your question?
8        REPRESENTATIVE WRIGHT:  Yes.  Thank you,
9  Representative Fields.
10        I was asking if you could tell me what the
11  statistical data was that would support this legislation
12  when comparing with other states that have passed universal
13  background checks.
14        THE CHAIRMAN:  Representative Fields.
15        REPRESENTATIVE FIELDS:  Mr. Chair.
16        What I'm going to refer to is to when we closed
17  the gun show loophole.  When we closed the gun show
18  loophole in Colorado, we ranked 17th as the largest source
19  of guns that were later found at a crime scene in other
20  states.
21        After closing the gun show loophole, we ranked
22  27th, and by 2009 we ranked 32nd.  And then by 2009, we
23  ranked 32nd.
24        So when you look at the trend here, because we
25  closed that loophole and made sure that if you bought a gun
0028
1  at a gun show, you had to have a check, it kind of closed
2  that loophole for guns being used in crimes out of state.
3  So that gives direct evidence that by closing the loophole
4  for gun shows did have an impact on guns being used at the
5  scene in other states.
6        THE CHAIRMAN:  Thank you, Representative
7  Fields.
8        Representative Wright for a follow up and --
9        REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.
10        And I was just wondering, Representative
11  Fields, if you could tell me where you got that data?  Are
12  there any handouts in front of us now that might have that
13  information?
14        REPRESENTATIVE FIELDS:  I can get --
15        THE CHAIRMAN:  Representative Fields.
16        REPRESENTATIVE FIELDS:  Thank you, Mr. Chair.
17  Sorry about that.
18        I can get you that source.  I'll look for it and
19  get it to you.
20        REPRESENTATIVE WRIGHT:  Thank you.
21        THE CHAIRMAN:  We will now proceed to the
22  witness testimony phase.  And as I mentioned at the outset,
23  we will allow the first two witnesses, both proponents and
24  opponents, a few more minutes than the two than we will
25  allow generally.
0029
1        So as I understand it, Representatives McCann
2  and Fields, you would like to hear from Director Sloan of
3  the CBI?
4        REPRESENTATIVE McCANN:  Yes.
5        THE CHAIRMAN:  I would ask Director Sloan to

6 come forward, if you would, sir.
7        Welcome, Mr. Director.
8        DIRECTOR SLOAN:  Thank you, Mr. Chair.
9        THE CHAIRMAN:  Please state your name for the
10 record, who you are, and proceed with your testimony, sir.
11        DIRECTOR SLOAN:  Thank you, Mr. Chair, and
12 members of the Judiciary Committee.
13        My name is Ron Sloan.  I'm the director of the
14 Colorado Bureau of Investigation, and I am present here
15 today to provide support on behalf of the Colorado
16 Department of Public Safety and the Colorado Bureau of
17 Investigation with regards to House Bill 1229.
18        And I will really briefly summerize some
19 issues.  And I know that there are time constraints and
20 there is a lot of testimony that you are going to take
21 today.
22        But if you would bear with me, what I thought
23 might be helpful for the committee again is to hear just a
24 brief overview on what CBI does with respect to the current
25 law and how this particular bill and the requirements in
0030
1 this bill would -- in our opinion would advance the goal of
2 preventing individuals who are prohibited by law to possess
3 a firearm from receiving a firearm through the transfer of
4 a firearm.
5        Currently all transfers that are done through a
6 licensed dealer, licensed firearm dealers -- and I'll refer
7 to them as FFLs.  That's federal firearms licensees -- and
8 at gun shows in Colorado require a background check on the
9 transferee, the individual receiving the firearm or
10 firearms.  And that background check attempts to determine
11 whether they are legally prohibited -- again, lawfully and
12 legally prohibited from processing a firearm.  That's what
13 the current law does.
14        In the prior calendar year, in calendar year
15 2012, 342,302 transfers -- and that isn't firearms.  That's
16 transfers.  In a number of those transfers, there's
17 multiple firearms that are being transferred -- were run
18 through the background process that currently exists at CBI
19 InstaCheck.
20        The databases that are checked in order to try
21 to determine whether there are prohibitors for the
22 individual transferee to possess a firearm in Colorado --
23 and nationwide motor vehicle files to verify
24 identification, Colorado Crime Information Center, the
25 court's Colorado Judicial Database PAS, and those are
0031
1 unique to Colorado.  Colorado InstaCheck checks those.
2        And then there are four other databases that
3 FBI NCIC checks, and we also check those.  That's the
4 National Crime Information Center; the Interstate
5 Identification Index, referred to as triple I; the NCIC
6 index; and the ICE database, the Immigration and Custom
7 Enforcement database.

LEG HX 000490

4405

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

8        The firearm prohibitors that we are looking for
9   when we check those currently with FFLs and at gun shows --
10  and I won't read through all of them.  There are about 15
11  items in law, either in federal code or in Colorado
12  statute, that prohibit an individual from possessing a
13  firearm.
14        And again, I won't take your time.  If you have
15  questions about them, I can run through what those are.
16  But there are in-statute prohibitors for folks to possess a
17  firearm.
18        In Colorado InstaCheck, by checking other
19  databases other than NCIC, there are firearm prohibitors
20  that we pick up that FBI NCIC doesn't.  And some of the
21  examples of that are protection orders, domestic protection
22  orders that are not in the National Crime Information
23  Center, felony juvenile adjudications, which are not in the
24  National Crime Information Center, domestic violence
25  convictions that are not in NCIC, fugitives of justice that
0032
1   are not in NCIC, and felony convictions that are not in
2   NCIC.  That's currently the process that's used.
3        House Bill 1229 would, in fact, require that
4   all firearms transfers, whether they are through an FFL or
5   a gun show or through private sales or over the Internet,
6   would undergo the identical background check on the
7   transferee, the individual receiving the firearm or
8   firearms.
9        This is accomplished in the bill through those
10  private sales to have to be done through a federally
11  licensed firearms dealer.  It's an identical process.  Then
12  the FFL would make the request to CBI InstaCheck for the
13  background check.
14        It -- it's a technical process that occurs right
15  now at gun shows.  Private sales at gun shows work this
16  exact same process as articulated in House Bill 1229.  This
17  would just extend that process, working through on FFL for
18  the backgrounds check.
19        It will add value.  Currently in Colorado our
20  experience is, in the last years, that between 2 to 2.3
21  percent -- 2.5 percent of all firearms transactions
22  currently in the last three years indicate lawfully
23  deniable prohibitors, factors, for individuals accepting
24  the transfer of a firearm through FFLs or gun shows.
25        We believe that universal background checks of
0033
1   all gun sales will at least approximate that, if not
2   exceed, the number of identified prohibited individuals
3   that are proceeding to receive a firearm as a transferee.
4        Very important in House Bill 1229 are the
5   provisions that encourage compliance, if you will.  There
6   are sanctions and consequences if compliance is not
7   undertaken.  There's civil liability that's articulated in
8   the bill.  Class 1 misdemeanor if an lawful transfer takes
9   place without going through the background process, and a

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10 conviction for that Class 1 misdemeanor would make that
11 transferee and also the transferor, if they had knowledge
12 of it and were convicted of it, would be prohibited for two
13 years from possessing a firearm.
14       Also in the bill is a very important provision
15 as it relates to mental health adjudications.  Currently
16 mental heath adjudications -- it's referred to under the
17 Federal Code as mental deficiency -- are prohibited from
18 possessing a firearm.
19       Currently we do get that information.
20 Problematically CBI InstaCheck and FBI NCIC from Colorado
21 and elsewhere throughout the United States gets that
22 information six months delayed.  It is batch processed and
23 sent to FBI NCIC, uploaded to FBI NCIC, and then it is
24 accessible.
25       So there's a six-month delay from a possible
0034
1 total of six-month delay from the time of the adjudication
2 as a mentally deficient under federal law, mental health
3 adjudication under our law.
4       This bill would allow -- make it permissible for
5 that information to be transmitted electronically realtime
6 soon after that adjudication is done in the judicial
7 process directly to CBI.  So we would know in realtime
8 whether or not that individual was prohibited to possess a
9 firearm again by law.
10       It also builds into the process of mental health
11 adjudication a restoration-of-rights provision, so that if
12 an individual has been adjudicated mentally ill, they have
13 a process they can go through with the court system here in
14 Colorado and get that prohibitor removed, lawfully removed,
15 and then realtime transmission of that information to CBI
16 so it's no longer a prohibitor for those individuals to
17 possess a firearm.
18       So that's -- that's the gist of the testimony I
19 wanted to provide as to how the technical process would
20 occur, and I would be willing to take any questions.
21       THE CHAIRMAN:  Thank you, Director Sloan.
22 Representative Lee.
23       REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
24 And thank you, Director Sloan, for giving us an
25 overview of how the Colorado system works.  It's -- it
0035
1 seems like a fairly comprehensive regulatory scheme applied
2 to people who are attempting to buy weapons.  I want to
3 make sure I understand it correctly.
4       Is it your testimony, sir, that prohibitions
5 under federal law would also be prohibitions against a
6 purchase under Colorado law?
7       THE CHAIRMAN:  Director Sloan.
8       DIRECTOR SLOAN:  Mr. Chair, thank you.
9       Representative Lee, that's correct.
10 Prohibitions under federal law are codified under the
11 statutes in the Colorado Revised Statutes to identify them

12   as prohibitors to possess a firearm in Colorado also.
13       THE CHAIRMAN:  Representative Lee.
14       REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
15       So it's my understanding, then, that a person
16   who is an unlawful user or addicted to a controlled
17   substance, which is prohibited to purchase a firearm under
18   federal law, would be prohibited under Colorado law as
19   well?
20       DIRECTOR SLOAN:  I believe that's -- I'm sorry.
21       THE CHAIRMAN:  Director Sloan.
22       DIRECTOR SLOAN:  I believe that's true.  Let me
23   take a quick look.
24       Yes.  An unlawful user of or addicted to any
25   controlled substance is -- is articulated in the U.S. Code.
0036
1        THE CHAIRMAN:  Representative Lee.
2        REPRESENTATIVE LEE:  I have a couple of others
3    I'd like to ask the witness if I may, Mr. Chairman.
4        THE CHAIRMAN:  Representative Lee, go ahead.
5        REPRESENTATIVE LEE:  How about a person who is
6    a fugitive from justice?
7        THE CHAIRMAN:  Director Sloan.
8        DIRECTOR SLOAN:  Yes.
9        REPRESENTATIVE LEE:  How about a person who has
10   been adjudicated has a mental defective or committed to a
11   mental institution?
12       THE CHAIRMAN:  Director Sloan.
13       DIRECTOR SLOAN:  Mr. Chair.
14       Yes.
15       REPRESENTATIVE LEE:  How about --
16       THE CHAIRMAN:  Representative Lee.
17       REPRESENTATIVE LEE:  Thank you, sir.
18       How about a person who has been illegally or is
19   unlawfully in the United States?
20       THE CHAIRMAN:  Director Sloan.
21       DIRECTOR SLOAN:  Yes.
22       THE CHAIRMAN:  Representative Lee.
23       REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
24       How about a person who has been discharged from
25   the United States Army under dishonorable conditions?
0037
1    Would that person be prohibited from obtaining a firearm in
2    Colorado under this bill?
3        THE CHAIRMAN:  Director Sloan.
4        DIRECTOR SLOAN:  Yes, Representative Lee.
5        THE CHAIRMAN:  Representative Lee.
6        REPRESENTATIVE LEE:  Thank you, sir.
7        And how about a person who is subject to a
8    court order that restrains that person from harassing,
9    stalking, or threatening an intimate partner or a child of
10   such intimate partner, would that person be prohibited
11   under this law from obtaining a firearm?
12       THE CHAIRMAN:  Director Sloan.
13       DIRECTOR SLOAN:  Yes.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

14          REPRESENTATIVE LEE:  And --
15          THE CHAIRMAN:  Representative Lee.
16          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
17          And how about a person who has been convicted
18  in a court of a misdemeanor crime of domestic violence?
19  Would that person also be prohibited?
20          THE CHAIRMAN:  Director Sloan.
21          DIRECTOR SLOAN:  Yes.
22          REPRESENTATIVE LEE:  And one more, if I may.
23          THE CHAIRMAN:  Representative Lee.
24          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
25          How about a juvenile who has been adjudicated a
0038
 1  delinquent for a crime, which if committed by an adult
 2  would be a felony?
 3          THE CHAIRMAN:  Director Sloan.
 4          DIRECTOR SLOAN:  Mr. Chair.
 5          As just a clarification on that, it could be an
 6  adult who was adjudicated when they were a juvenile.  But
 7  the answer to that -- the short answer is yes.  A felony
 8  adjudication as a juvenile would be a prohibitor to possess
 9  a firearm.
10          REPRESENTATIVE LEE:  Thank you, Director Sloan.
11          THE CHAIRMAN:  Representative McLachlan.
12          Sorry.  Actually, Representative Gardner, had
13  you asked for the -- to be recognized earlier?
14          REPRESENTATIVE GARDNER:  I have questions for
15  the director whenever my term comes, Mr. Chair.
16          THE CHAIRMAN:  Very good.
17          Representative McLachlan.
18          REPRESENTATIVE McLACHLAN:  Thank you,
19  Mr. Chairman.
20          Director Sloan, would this background check,
21  which is purposed by this legislation, bar the possession
22  of a weapon by a law-abiding citizen?
23          THE CHAIRMAN:  Director Sloan.
24          DIRECTOR SLOAN:  Thank you, Mr. Chair.
25          If the citizen did not qualify for a denial as
0039
 1  a prohibited individual to possess the firearm, the answer
 2  is yes.
 3          REPRESENTATIVE McLACHLAN:  Thank you.
 4          THE CHAIRMAN:  Representative Gardner, and then
 5  we will go to Representative Lawrence.
 6          Representative Gardner.
 7          REPRESENTATIVE GARDNER:  Thank you, Mr. Chair.
 8          Director Sloan, thank you so much for your work
 9  on behalf of the people of Colorado.  As I said in
10  committee before, I think there's no one in Colorado more
11  dedicated to public safety and the well-being of our
12  citizens than yourself.
13          Since you are going to administer this bill and
14  this legislation if it is passed, I wanted to make sure
15  that we had a common understanding and also get on the

16  record what -- what the provisions of this bill actually
17  require.
18        And I'm looking at pages 4 and 5 of the bill
19  where there are exceptions as to who has to get a
20  background check and when transfers -- when there are
21  exceptions.  And it's interesting to me on the one hand
22  that there are exceptions because if -- if a background
23  check is a really, really good thing, then it seems like we
24  probably ought to do them all the time, and if there are
25  reasons for exceptions, then there ought to be exceptions
0040
 1  that don't sacrifice public safety, and they ought to be
 2  reasonable and rational.
 3        And the one I'm looking at is on page 5 under
 4  subparagraph B, a transfer that's a bona fide gift between
 5  immediate family, which are limited to spouses, parents,
 6  children, siblings grandparents, grandchildren.
 7        First of all, the bona fide gift provision --
 8  and just kind of follow through with me here.  You know, my
 9  -- my brother lives in Texas, a state which has wholly a
10  different attitude toward firearms apparently than our own
11  state.  And he has -- he has a fair number of weapons.  He
12  is a collector, and some of his weapons are worth a good
13  deal of money, and from time to time I've looked at them.
14        Assuming he lived here in Colorado and had this
15  collection, which would be perfectly legal, if -- if I were
16  to trade him one of my firearms for one of his firearms,
17  would I need to do a background check?
18        THE CHAIRMAN:  Director Sloan.
19        DIRECTOR SLOAN:  Thank you, Mr. Chair.
20        If I understand correctly the way that you posed
21  the question, if House Bill 1229 were in effect, you would
22  need to effect that transfer through an FFL.
23        THE CHAIRMAN:  Representative Gardner.
24        REPRESENTATIVE GARDNER:  Okay.  On the other
25  hand, if one day he said, Let me give you a gift, Bob, and
0041
 1  he handed me that firearm and a week later I said, Oh, by
 2  the way, I have a gift for you, and I hand him another
 3  firearm, would we need background checks for that transfer?
 4        THE CHAIRMAN:  Director Sloan.
 5        DIRECTOR SLOAN:  Mr. Chair.
 6        I would have to go through the circumstances
 7  that you articulated.  To begin with, if you're saying that
 8  he is still a resident in Texas --
 9        REPRESENTATIVE GARDNER:  Well, assuming he's in
10  Colorado.
11        DIRECTOR SLOAN:  Okay.  That's why I asked the
12  question.  I don't know exactly what the circumstances
13  would be.
14        Again, as it relates to House Bill 1229, if this
15  was in effect, if he was your brother and he resided here
16  in Colorado, if that's what you're saying --
17        REPRESENTATIVE GARDNER:  Uh-huh.

LEG HX 000495    4410

18        DIRECTOR SLOAN:  and it was given as a bona
19  fide gift, then it would be an exception under House Bill
20  1229.
21        THE CHAIRMAN:  Representative -- Representative
22  Gardner.
23        REPRESENTATIVE GARDNER:  Yes.  Thank you.  And
24  I have several follow ups for the director, Mr. Chair.  So
25  I appreciate your indulgence.
0042
1        So it seems to me that it would be very
2  important for us to never swap our firearms but to always
3  gift them to each other.
4        Let me -- let me raise another hypothetical.
5  You know, I have -- I have friends that I consider as close
6  as anybody in my family and about whose safety and security
7  I am concerned.  And I have watched the news over the past
8  several years in places like New Orleans where there's been
9  basically a breakdown of civil law and order as a result of
10  disasters.
11        I watched in Connecticut the past few days when
12  the power went out.  And, frankly, I have to say, when the
13  power goes out, it is only a matter of time, because there
14  aren't enough police.  There isn't enough security, and
15  even if there were, they couldn't reach anyone.
16        So I -- I can see myself having concern for a
17  close friend in my community who doesn't have a firearm.
18  And as I turn on the news, I see that a huge snowstorm is
19  coming or that -- or that we just had an earthquake, and
20  they live a few doors down from me.
21        If I transferred that firearm to them, if I
22  said, you know, you may need this in the next few days to
23  ward off the looting that could happen -- pray God it
24  doesn't -- and I handed that weapon to them and they took
25  it to their home three doors down, I think I would have
0043
1  violated this legislation that is proposed.
2        Don't you agree?
3        THE CHAIRMAN:  Director Sloan.
4        DIRECTOR SLOAN:  Yes.
5        THE CHAIRMAN:  Representative Wright.
6        REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.
7        Director Sloan, I was wondering if I could ask
8  you, while we have you up here, on the costs associated to
9  your department that would be caused by passage of this
10  legislation.
11        I'm looking at the Department of Public Safety
12  on the fiscal note, and they certainly seem to be
13  substantial with an increase from the general fund of over
14  $1 million, and I'm assuming that's all to your department,
15  and creating 24.9, it says here, new full-time government
16  employee positions.
17        That's the first part of my question, is if you
18  could go in depth and on record describe the increased cost
19  of state government if this legislation was passed.

20      Secondly, I would wonder if you would --

21         THE CHAIRMAN:  Let's get an answer to -- let's

22  get an answer to Question 1 first, Representative Wright.

23         REPRESENTATIVE WRIGHT:  As long as I can -- I'm

24  hoping I can follow up, Mr. Chair.

25         THE CHAIRMAN:  Yeah, yeah.  And then we will go

0044

1   to the second to avoid confusion, Representative Wright.

2          Director Sloan.

3          DIRECTOR SLOAN:  Thank you, Mr. Chair.

4          Representative Wright, that is correct.  In

5   order to appropriately address the goals of Colorado

6   InstaCheck at CBI, and that is to conduct these checks, do

7   the background checks effectively and efficiently to keep

8   firearms out of the hands of prohibited individuals and to

9   do them efficiently and to provide good customer service to

10  those individuals who are wanting to transfer firearms

11  within a short period of time, we have to be appropriately

12  resourced, and that's the additional resource that you see

13  identified in the fiscal note that you're referring to.

14         Now, those resources are projections, if you

15  will, of the expectation that there will be increased

16  volume.  We don't know exactly how much.  We've seen the

17  same data in terms of estimates of up to 40 percent of all

18  firearms transfers are done through private transfers.

19         And so the calculations that we have added in

20  for what we would expect the volume would be, we've done

21  calculations as to how many transactions we feel that a

22  technician can do during the course of a day and over the

23  course of a week, and we've added in all of those

24  calculations in order to try to determine how we can meet

25  those two goals and effectively and efficiently carry out

0045

1   our statutory duty.

2          THE CHAIRMAN:  Representative Wright, your

3   second question.

4          REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.

5          Director Sloan, my second question is:  I'm

6   looking at the information in this fiscal note, and it

7   estimates 200,000, 33 percent increase, and I understand

8   you are saying possibly upwards of a 40 percent increase.

9          Can you tell us, in terms of now or this past

10  year, how many background checks you've processed, how many

11  of those checks have been appealed, and how many of those

12  appeals have been upheld?

13         THE CHAIRMAN:  Director Sloan.

14         DIRECTOR SLOAN:  What I can -- okay.  There's

15  several -- I'm sorry.

16         Thank you, Mr. Chair.

17         I'm not quite sure what the question is, if you

18  want to know how many denials there were in the last year,

19  how many appeals of those denials there were, and how many

20  were reversed?

21         REPRESENTATIVE WRIGHT:  Thank you for

22  clarification on that.
23          THE CHAIRMAN:  Representative Wright.
24          REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.
25          Yes, Director Sloan, that's correct.
0046
1           THE CHAIRMAN:  Director Sloan.
2           DIRECTOR SLOAN:  Thank you, Mr. Chair.
3           In 2012, calendar year 2012, there were 343,302
4   background checks conducted.  There were a total of 7,362
5   denials, which represents 2.1 percent of that 343,302.  Of
6   those denials, 1,915 of those denials were denials that
7   would not have been caught by FBI NCIC.
8           And then of those 7,362 denials, 54 percent
9   filed appeals in the appeal process.  It's -- under
10  Colorado law it was codified in House Bill 1411 in 2010.
11  And of those, 54 percent of the 7,362, 56 percent of those
12  were reversed, and 44 percent roughly were upheld for
13  denial.
14          THE CHAIRMAN:  Thank you, Director Sloan.
15          Representative Wright.
16          REPRESENTATIVE WRIGHT:  Thank you, Mr. Chair.
17  Very brief follow up.
18          I'm hearing more than half, then, were reversed.
19  Was there a common denominator there for the reason for
20  reversal?
21          THE CHAIRMAN:  Director Sloan.
22          DIRECTOR SLOAN:  Thank you, Mr. Chair.
23          First of all, more than half of those who
24  appealed, not half of the denials, more than half of those
25  that appealed were, in fact, reversed.
0047
1           And I don't have specific data on those
2   reversals.  I can tell you that there are a number of
3   reasons that reversals are done.  One of the primary
4   reasons are a denial that was done because of a prohibitive
5   arrest without a matching disposition in the criminal
6   history, whether it's in Colorado or elsewhere in the
7   United States.
8           Since the year 2000, the lack of matching
9   dispositions in Colorado has become less and less of a
10  problem.  We're able to find matching dispositions at a 95
11  percent rate upon the initial check.
12          So many of those are out-of-state arrests or
13  military arrests or federal arrests where we are doing
14  research to determine whether or not there was a
15  conviction.  So many of those reversals are the
16  determination that there was not a conviction through a lot
17  of investigative work.
18          Many of those reversals come off of an initial
19  denial because someone is identified as having a
20  prohibitive arrest and a conviction by the personal
21  identifiers that are given upon the attempt to the purchase
22  of a firearm.
23          The individual will claim that's not me.  That's

24  someone else that has the same name and other identifiers,
25  and if we cannot distinguish or determine whether it's them
0048
1   or it's not them, there will be a denial in Colorado.
2   And if they appeal that, there is a process,
3   records-challenge process, where they can physically come
4   into CBI, present us with ten prints, fingerprints, and we
5   can do a comparison against the arrest record, if it's a
6   Colorado arrest record, or if we can get the information
7   from the out-of-state arrest and conviction record.  And we
8   can then verify biometrically whether it's that individual
9   or not.
10          A number of reversals are verification that it's
11  someone else with identical personal identifiers, but it's
12  not the individual who goes through the biometric check for
13  their identification.  Those are just a couple of examples
14  of the types of reversals that are done.
15          THE CHAIRMAN:  Representative Lee.
16          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
17          I wonder if you heard the previous question
18  from Representative Wright about the effectiveness of
19  backgrounds checks?  He asked something to the effect of,
20  are there statistics to indicate that background checks
21  are, in fact, effective in reducing crime?
22          If you heard the question and have an answer to
23  the question, I would be interested in your response, sir.
24          THE CHAIRMAN:  Director Sloan.
25          DIRECTOR SLOAN:  Thank you, Mr. Chair.
0049
1           Representative Lee, I don't have specific data
2   or research that I can cite.  In terms of criminal conduct
3   and criminal activity around the country through uniform
4   crime reporting, I don't know what kind of comprehensive
5   research has been done that would be correlational to
6   background checks.  We do background checks in a number of
7   different areas.
8           To be able to collect the data to determine
9   whether or not background checks prevented criminal
10  behavior is next to impossible.  Measuring prevention is
11  one of the most difficult things we do in this business.
12          We try to do correlations between background
13  checks, police strategies, law enforcement actions.  Making
14  those correlations is very difficult to do.  It -- we try
15  to take steps which are logical and reasonable which would
16  cause someone with extensive knowledge of criminal justice
17  behavior and law enforcement strategies, which are designed
18  to prevent crime and to prevent tragedy and violence.
19          Making those correlations is something I don't
20  have a great deal of data on.  So I guess the answer to --
21  the short answer is:  I don't have that data.
22          THE CHAIRMAN:  Representative Lee.
23          REPRESENTATIVE LEE:  Thank you, Mr. Chair.
24          Director Sloan, I wonder, then, if you are
25  aware of the U.S. Department of Justice FBI supplemental

LEG HX 000499    4414

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

0050

1  homicide report in 2011 indicating that states requiring a
2  background check for handgun sales, that there were 38
3  percent fewer women shot to death by intimate partners.  In
4  contrast, that the nonfirearm homicide rates of women
5  killed by partners was nearly identical in all of those
6  states.
7           What sort of conclusion would you draw from
8  that?
9           THE CHAIRMAN:  Director Sloan.
10          DIRECTOR SLOAN:  Thank you, Mr. Chair.
11          I have not specifically read that data, but it
12  would seem to suggest, that if I understand what you --
13  what you quoted there correctly, is those states that do
14  background checks on firearms have a lower rate of the use
15  of firearms in domestic violence situations, and that would
16  seem to suggest some correlation, that it's preventing the
17  use of firearms in domestic violence situations.
18          THE CHAIRMAN:  Thank you so much, Director
19  Sloan.  We appreciate you taking the time to come and tell
20  us more about your experience and how it relates to this
21  measure.
22          Thank you.
23          Our next witness is Mr. David Chipman.
24          Mr. Chipman.
25          Welcome, Mr. Chipman.  Please tell us your name
0051
1  for the record, who you represent, and proceed to give us
2  your testimony, if you would, sir.
3           MR. CHIPMAN:  My name is David Chipman.  And
4  thank you very much for having me here today.
5           On December 14, 2012, I watched in horror as
6  the gruesome details of the massacre at Sandy Hook
7  Elementary unfolded on national TV.  It was only 145 days
8  after a similar tragedy struck the community of Aurora, not
9  too far from us here today.
10          This past May I retired as a special agent from
11  the Bureau of Alcohol, Tobacco, Firearms & Explosives.  I
12  served this nation for 25 years in a variety of roles
13  across the country.  As a SWAT team member in Washington
14  and Los Angeles, I apprehended some of the most heavily
15  armed and violent criminals in America.  As a bomb-scene
16  expert in Oklahoma City and at the Word Trade Center, I dug
17  bodies out of the rubble and witnessed the horrifying
18  capacity of madmen driven by hate.
19          Later, as the leader of ATF's firearms programs
20  division, the Attorney General tasked me with the most
21  challenging assignment of my career:  developing a
22  comprehensive strategy to prevent gun violence in 15
23  targeted cities.
24          During my service at ATF, I learned firsthand
25  about which policing efforts work and which do not.  I
0052
1  appreciate the value of prevention and proactive

2 intelligence-led policing rather than any strategy aimed at
3 apprehending offenders in response to violent crimes that
4 have already left a trail of victims.  I was an operator
5 who not only advised strategies and tactics, I actually
6 enforced the laws in the books.
7        I became an ATF agent in response to a calling
8 from Robert F. Kennedy.  He said that Americans needed a
9 system of justice to serve as a shield for the weak and the
10 powerless.
11       I come before you today to confirm what many of
12 you already know:  Our shield is not sufficient.
13 Background checks work.  They will strengthen our shield.
14 And we have seen the positive impact to public safety of
15 stronger regulations involving gun sales in Colorado and
16 across the nation.
17       After the mass shooting at Columbine, 70 percent
18 of Coloradans voted to require unlicensed sellers at gun
19 shows to conduct criminal background checks.  And since
20 closing the gun show loophole, Colorado has exported
21 significantly fewer crime guns to other states.
22       In 2000 the state was the 17th largest exporter
23 of guns later found at crime scenes in other states.  A
24 year after the law was passed, Colorado ranked 27th, and by
25 2009 it ranked 32nd.
0053
1        According to a 2009 Johns Hopkins analysis of
2 gun trafficking in 53 U.S. cities, intrastate gun
3 trafficking is 48 percent lower where private gun sales are
4 regulated.        According to Mayors Against Illegal
5 Guns analysis of FBI and Florida Department of Law
6 Enforcement data, the number of women killed with a firearm
7 by an intimate partner is 38 percent lower in states that
8 have closed the private-sale loophole for handguns than in
9 states that do not regulate such sales.
10       The firearms suicide rate in states that
11 require a background check before every handgun sale is 49
12 percent lower than in states that do not require one, even
13 though the nonfirearms suicide rates of these groups of
14 states are nearly identical.
15       As an ATF agent, I know criminals acquire many
16 of their guns through unregulated private sales.
17 Researchers confirm this fact.  A national survey of
18 inmates found that nearly 80 percent of those who used a
19 handgun in a crime acquired it in a private transfer.
20       From all of these numbers and figures, we can
21 arrive at an obvious conclusion:  Requiring background
22 checks for gun sales will prevent violent crimes.  Lives
23 will be saved, plain and simple.
24       After my service with ATF, I thought I had seen
25 it all.  Three weeks I spent digging out the bodies of 168
0054
1 Americans in Oklahoma City, 19 of them children.  Like the
2 rest of you, on 9-11 I watched the towers of the World
3 Trade Center crumble to the earth.

LEG HX 000501

4416

4        After these horrific acts, our government acted
5   with urgency and committed to ensuring that terrorists,
6   foreign or domestic, would never take down our buildings or
7   victimize our citizens ever again.  The strategy was
8   aggressive, and although not perfect, it has worked.
9        Neither our federal government nor our states
10  have chosen to act with similar urgency to prevent future
11  acts of gun violence.  33 Americans continue to be murdered
12  with guns each and every day in this country, a nation
13  where everyone is guaranteed the right to life, liberty,
14  and the pursuit of happiness.
15       Half measures have availed us nothing.  We need
16  to act comprehensively, and we need to do so now.  The
17  Brady Bill requires background checks be conducted only at
18  federally licensed firearm dealers, but an estimated 40
19  percent of gun transfers and sales in the U.S. are
20  conducted by individuals who are not licensed and not
21  required to conduct federal checks.
22       The Brady Bill operates similarly to a flawed
23  airport security system that ensures only 60 percent of
24  travelers are free of dangerous weapons through screening
25  while allowing 40 percent of travelers to board the plane
0055
1   unchecked.  In Colorado the same holds true.
2        In response to the massacre at Columbine that
3   shook this state to its core, Coloradans closed the gun
4   show loophole only to allow the Internet to continue to
5   thrive as a vast marketplace where prohibited persons could
6   easily purchase scores of weapons with no paperwork and no
7   questions asked.
8        Online private gun sales play a prominent role
9   in fueling violent crime.  In October of 2012, for example,
10  Radcliffe Haughton, who is federally prohibited from buying
11  a gun due to the restraining order that his estranged wife
12  had against him, purchased a gun from a private seller
13  through Arms List where no background check was conducted.
14  The next day he went to the spa where his wife worked in
15  Brookfield, Wisconsin, and killed her and two other people
16  and injured four others before taking his own life.  Why do
17  we continue to make attempts to prevent an attack as
18  opposed to predicting where we will be attacked next and
19  shore up that vulnerability?
20       The ease with which a high school senior can go
21  on the Internet and arrange to purchase an array of
22  firearms renders all gun laws meaningless.  The fact that
23  this state and this government continues to allow the sale
24  of guns without a backgrounds check is not only reckless,
25  not only irresponsible, it is downright dangerous.
0056
1        A system that requires a background check for
2   every gun sale is common sense, and it works.  It is a
3   system supported by 92 percent of Americans and including
4   74 percent of NRA members.  Will criminals attempt to
5   thwart this regulation?  Of course.  That's what criminals

6 do. But as criminals and the severely mentally ill make
7 these attempts, their efforts will necessarily become more
8 complex. Mistakes will be made, and law enforcement will
9 be there.
10      Investigators will follow leads and make efforts
11 to apprehend unlawful possessors before they use their
12 illegal guns in crime. Will law enforcement prevent all
13 crime? Unfortunately no, but this new law will give them
14 an additional tool to crack down on gun traffickers who
15 sell guns on the black market. It will also help law
16 enforcement trace guns recovered in violent crimes by
17 requiring dealers to keep the same records they kept for
18 licensed sales for over 40 years.
19      This system protects the privacy of gun owners,
20 ensures that there is no registry of gun owners, and at the
21 same time, helps law enforcement solve crimes.
22      After Oklahoma City I thought, Never again;
23 after Virginia Tech I thought, Never again; after Tucson I
24 thought, Never again; after Aurora I thought, Never again;
25 but after Sandy Hook, I shuttered as I thought to myself,
0057
1 because this is going to happen again, and it will unless
2 we act now.
3      On December 16 of 2012, sources close to the
4 Newtown investigation revealed to me the description of the
5 three firearms carried in the school during the massacre:
6 a Bushmaster assault-style rifle, a 10-millimeter Glock
7 pistol, and a 9-millimeter Sig Sauer handgun.
8      I searched Armslist.com, a renowned online Web
9 site that caters to gun buyers who desire animosity and
10 easily arrange with private sellers to purchase guns
11 without a background check over the Internet. Within 15
12 minutes, I was able to find a city where I could have
13 purchased each of the firearms used at Sandy Hook without
14 identification and without a criminal backgrounds check.
15 That city was Denver, where we sit here today.
16      I'm not a Coloradan, but I am an American and
17 will not sit idly by as 33 of my follow citizens are being
18 murdered with guns every day. We have the right to live in
19 a country that puts our safety first, and above all, we
20 have the right to live outside the shadows of fear.
21      There has been too much bloodshed in our
22 streets, too much bloodshed in our schools, and too much
23 bloodshed across this great land. I urge you today to act
24 now to help save lives.
25      And thank you.
0058
1      THE CHAIRMAN: Thank you, Mr. Chipman.
2      Representative Gardner.
3      REPRESENTATIVE GARDNER: Yes. Thank you.
4      And thank you, sir, and thank you for your
5 service to our country. And I -- I appreciate your
6 passionate advocacy on behalf of this issue.
7      I'm -- you told us about your training, and you

8  probably don't know I'm trained as lawyer, so I'm -- when I
9  hear advocacy, I try to ensure that it's material and
10  relevant to the matter at hand.  So -- and I try to
11  understand where the witness is coming from.
12        So, first of all, let me ask you:  You mentioned
13  that you had been tasked by the Attorney General of the
14  United States with some important task.  Which Attorney
15  General was that?
16        THE CHAIRMAN:  Mr. Chipman.
17        MR. CHIPMAN:  That would have been -- geeze,
18  now you've embarrassed me because I don't recollect.  It
19  would have been during the Bush Administration.  And I'm
20  sorry, I should know that name.
21        THE CHAIRMAN:  Representative Gardner.
22        REPRESENTATIVE GARDNER:  Thank you.
23        Well, you know, as I get older, my memory fades
24  on things, but I'm really struggling with your references
25  to the Murrah building, which was horrific.  I remember
0059
1  that day very well, actually.
2        And I guess I'm puzzled.  I don't think there
3  were any firearms directly involved in the Murrah building.
4  I think it was a fertilizer bomb.  Are you suggesting that
5  we need to amend this bill to have a background check for
6  transfers of fertilizer, or is it just a discussion about
7  the horrors of violence, sir?
8        THE CHAIRMAN:  Mr. Chipman.
9        MR. CHIPMAN:  I believe the point that I was
10  trying to make is that for law enforcement, it's imperative
11  that we prevent crimes before they ever happen.  And as
12  you've seen recently, even gun crimes are getting close to
13  the scale of what we used to see in bombings.
14        You're right, not yet have we gotten to that
15  scale, but that was the point I was trying to make.
16        THE CHAIRMAN:  Representative Gardner.
17        REPRESENTATIVE GARDNER:  Yes.  Thank you.
18        So there's nothing about this bill that would
19  have prevented the bombing of the Murrah building, is
20  there?
21        THE CHAIRMAN:  Mr. Chipman.
22        MR. CHIPMAN:  I don't believe that there's
23  anything in this bill that would prevent a bombing.  What I
24  do believe is that there are things in this bill that might
25  prevent the next mass shooting.
0060
1        THE CHAIRMAN:  Representative Gardner.
2        REPRESENTATIVE GARDNER:  Well, yes.  Thank you.
3  And I appreciate you going to that, because that goes to my
4  next question.
5        As I understand the events at Sandy Hook, which
6  you, in your opening sentence referenced -- I think they're
7  pretty well known in the press.  The individual there
8  obtained the firearms from his mother, who tragically was
9  the first victim, I think, and I think she legally obtained

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10   those firearms, but let's just kind of take her situation
11   to here in Colorado.
12         There's nothing in this bill that would have
13   prevented that lady from obtaining firearms, is there?
14         THE CHAIRMAN:  Mr. Chipman.
15         MR. CHIPMAN:  My understanding is that the
16   woman, Mrs. Lanza, was not prohibited, and so she would
17   have been able to pass a background check on this -- on
18   this law.  I believe the story of Newtown is that she
19   didn't properly secure her firearm from someone who was
20   potentially -- had a severe mental disorder.
21         THE CHAIRMAN:  Representative Gardner.
22         REPRESENTATIVE GARDNER:  So -- so this bill
23   wouldn't -- in similar circumstances, had they occurred in
24   Colorado, this bill wouldn't have prevented that, would it?
25         THE CHAIRMAN:  Mr. Chipman.
0061
1         MR. CHIPMAN:  I don't believe so.
2         REPRESENTATIVE GARDNER:  And let's --
3         THE CHAIRMAN:  Representative Gardner.
4         REPRESENTATIVE GARDNER:  Thank you.  Thank you,
5   Mr. Chair.
6         And let's go to Aurora.  I -- you know, that's
7   a pending court case, but all I know is what I've heard in
8   the media.
9         It seems that the individual there had some
10   mental health issues, but they, as I understand, were
11   probably not reported.  So there would have been nothing in
12   this bill that would have prevented him from obtaining
13   firearms if this bill is passed, is there?
14         THE CHAIRMAN:  Mr. Chipman.
15         MR. CHIPMAN:  I believe, on the Aurora
16   incident, that there's nothing specifically in this bill
17   that would have prevented it, but there is a lot of
18   dialogue that we're having today about how we can better
19   prevent people with severe mental illness from acquiring
20   firearms.
21         THE CHAIRMAN:  Representative Gardner.
22         REPRESENTATIVE GARDNER:  Yes.
23         And I -- I think that mental health dialogue is
24   really important, sir.  But there's nothing in this bill
25   that would have prevented that individual from obtaining
0062
1   firearms, is there?
2         THE CHAIRMAN:  Mr. Chipman.
3         MR. CHIPMAN:  I don't believe so.
4         REPRESENTATIVE GARDNER:  Thank you.
5         THE CHAIRMAN:  Representative Salazar.
6         REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
7         I want to go back to something that
8   Representative Gardner had said earlier, and I wanted to
9   ask you this question because I spoke to the public here
10   about the issue of reasonable restriction of ownership of
11   firearms.

12          And as I was taking a look at this bill after
13   what Representative Gardner said, can you please tell me
14   how it's a reasonable restriction to prohibit me and my
15   brother, say, from exchanging our shotguns with each other
16   when he decides he wants to go hunting for quail and I want
17   to go hunting for goose?  And how is that a reasonable
18   restriction?
19          THE CHAIRMAN:  Mr. Chipman.
20          MR. CHIPMAN:  I'm trying to understand your
21   question.
22          I believe that in this bill there are exceptions
23   and which direct family members can transfer firearms.  The
24   reason that I believe that that is reasonable is because
25   the law already is very serious if you knowingly transfer a
0063
1   firearm to someone you know you are prohibited.
2          I would imagine that most brothers know if their
3   brother has spent time in prison.  So I think that that's
4   why I would think it was reasonable.
5          THE CHAIRMAN:  Representative Salazar.
6          REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
7          I think Director Sloan said that would be a
8   prohibition for me to lend my weapon to my brother.  I have
9   a 20-gage.  You know, I go for smaller birds.  My brother
10   has a 12-gage, and, you know, we use that for goose
11   hunting.  I like to goose hunt.  He likes to go for smaller
12   birds, so we have issues with our guns.
13          It seems to me that what Director Sloan had
14   said was that I would not be able to lend my gun to him,
15   that it would have to be gifted to him, and that's what the
16   language says.
17          So if I'm reading that wrong, could someone
18   please clarify that for me?
19          THE CHAIRMAN:  Representative Salazar, I would
20   just draw your attention to the -- page 5 of the bill,
21   which provides the temporary transfer of possession which
22   takes place at a shooting range or a target firearm
23   shooting range or while hunting, fishing, or trapping is --
24   is -- is completely permissible under this bill.
25          Representative McCann.
0064
1          REPRESENTATIVE McCANN:  That's my understanding
2   as well.
3          THE CHAIRMAN:  Representative Salazar.
4          REPRESENTATIVE SALAZAR:  So the way that I read
5   this language here is that -- is that the temporary
6   transfer would take place while hunting.  But what if I'm
7   not with my brother at that time?  He has my gun, and he's
8   hunting on his own or with somebody else and I decide to
9   stay at home because I don't like going after my birds.  I
10   like sitting in a hole and usually falling asleep goose
11   hunting.
12          But this language in here, it doesn't seem to
13   lend for that, or does it?

14          THE CHAIRMAN:  Representative McCann.
15          REPRESENTATIVE McCANN:  I think our intent was
16  to allow for a temporary transfer between an unlicensed
17  person if the purpose is for hunting, fishing, or trapping.
18  So I think, if we need to clarify that, we can -- we can do
19  that.
20          THE CHAIRMAN:  Thank you.
21          Mr. Chipman, seeing no further questions, may I
22  thank you for coming all this way and giving us the benefit
23  of your insight -- input onto this bill.
24          MR. CHIPMAN:  Thank you.
25          THE CHAIRMAN:  That concludes the less
0065
1  restricted time of witnesses.  And just to reiterate for
2  the benefit of members of the public who are here, the same
3  lax time restrictions will be placed on the first two
4  witnesses in opposition to this House Bill 1229.
5          We will now proceed with our next witnesses.
6  First will be Tom Mauser.  And after Tom Mauser, we will be
7  hearing from Katie Lyles, and then we will be hearing from
8  Chief John Jackson of the Greenwood Village Police
9  Department.
10          So, Mr. Mauser, welcome to the Judiciary
11  Committee.  Thank you for coming and taking your time to
12  give us your input.
13          MR. MAUSER:  Thank you, Mr. Chairman.
14          THE CHAIRMAN:  Please state your name for the
15  record and tell us your testimony.
16          MR. MAUSER:  Sure.
17          My name is Tom Mauser from Littleton, Colorado.
18  I'm the father of Daniel Mauser, who was murdered in the
19  massacre at Columbine High School in 1999.
20          Two weeks before my son's death, he asked me the
21  question at the dinner table, Dad, did you know that there
22  are loopholes in the Brady Bill?  I shrugged off this
23  question, and then two weeks later he was shot in the face
24  as he was pinned down helplessly under a table in the
25  library at Columbine.
0066
1          He was killed with a gun purchased through one
2  of those loopholes.  That's why I became dedicated to close
3  those loopholes.  And we did that, as you've heard already
4  in testimony, by closing the gun show loophole.
5          And one question I heard a lot from my opponents
6  back then was, well, you know, if they -- if those killers
7  didn't get the guns at the gun show, they would have gotten
8  them someplace else.  And I said, Well, thank you for
9  making a case for -- for universal background checks.  I
10  appreciate that, but that's not what we are doing now.  Now
11  we're back to it.
12          I know there's been discussion here of the
13  pathology of the various crimes that have upset people, but
14  the fact is we are dealing with, as was mentioned, 33
15  people every day.  It's that we are trying to deal with,

16   keeping guns away from the wrong people in that way.
17          So I'd like to -- like to mention a few things
18   that haven't been touched on yet.
19          One is, again, when you go to the airport, we
20   all have to undergo that -- that metal detector.  What
21   would you think if we had 40 percent of those people were
22   able to bypass that simply because of who they bought the
23   ticket from or what their last name was?  You'd be
24   outraged, but that's what we're doing in Colorado.
25          I'm sure we are going to hear a lot of
0067
1    testimony today also that, well, you know, you can't stop
2    criminals from doing what they are going to do.  You just
3    can't stop it.
4          Well, I ask you:  If you have teenagers, do you
5    let them drink alcohol?  No.  I would suspect most of you
6    don't.  Well, you know, teenagers are going to get alcohol
7    anyhow, so why do we prohibit it at our stores?
8          THE CHAIRMAN:  Mr. Mauser, I'm going to ask you
9    to wrap up, if you would, sir.
10         MR. MAUSER:  Sure.
11         Of course we don't allow them to do that.
12   That's why we pass laws and it's public policy, so they
13   can't buy it at stores, because we do everything we can for
14   prevention.  We do not know who is a criminal, so I think
15   it's important for gun sellers, law-abiding citizens, to be
16   able to know whether the person they are selling their gun
17   to is a criminal or not because we don't wear labels on our
18   heads that says law-abiding citizen, I'm not a criminal.
19   We do background checks.
20         THE CHAIRMAN:  Mr. Mauser, thank you so much.
21         Mr. Mauser, when you were talking about the
22   analogy to 40 percent of folks not being checked before
23   they get on the plane and 60 percent being checked, are you
24   referring to in our gun laws that 60 percent of people are
25   checked for background to make sure that they're legally
0068
1    permitted to own the firearm and 40 percent just are
2    completely not required to have their background checked?
3          Is that the analogy you are trying to draw?
4          MR. MAUSER:  Yes, that's right, just like the
5    Columbine killers purposefully sought out a private seller
6    at the gun show because they didn't want to have to do the
7    paperwork, didn't want to be creating a trail.
8          THE CHAIRMAN:  So the way you get into the 40
9    percent is instead of buying it from a firearms dealer, you
10   buy it from your next door neighbor or over the Internet,
11   and then you don't -- you aren't required and nobody checks
12   your background?
13         MR. MAUSER:  That's correct.
14         THE CHAIRMAN:  I just wanted to understand that
15   more fully.
16         Are there any other questions for Mr. Mauser?
17         Mr. Mauser, we deeply regret your loss and

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

18  deeply appreciate your activism over several years to
19  increase the safety of --
20          MR. MAUSER:  Thank you.
21          THE CHAIRMAN:  -- Coloradans.
22          Thank you.
23          Katie Lyles.
24          Ms. Lyles, please state your name for the
25  record and tell us who you represent and proceed with your
0069
1  testimony.
2          MS. LYLES:  I'm Katie Lyles, and I'm a teacher
3  and a Columbine survivor.  I'm representing myself and my
4  students today.
5          So thank you, Chairman Kagan and the members of
6  the House Judiciary Committee.
7          I'm here to express my support of HB-1229 that
8  requires anyone who wants to buy a gun to undergo a
9  background check.  This bill is a step towards the
10  comprehensive solution that we need to ensure the safety of
11  students at -- our students at schools, as well as the
12  safety for the people of Colorado.
13          I speak as a teacher and also as a survivor of
14  the school violence that occurred at Columbine High School.
15  I felt compelled to speak today in the aftermath of the
16  ever increasing violence that plagues our society.
17          I have never spoken publicly about my experience
18  at Columbine, but after the murders at Sandy Hook, I know
19  that something must be done, and I want to be part of the
20  solution.
21          On the morning of April 20, 1999, I headed to
22  Columbine High School worried about my tenth grade math
23  test that I was supposed to take that day and my upcoming
24  track meet.  That math test was never finished due to the
25  tragic events that unfolded at my school leaving 13 dead
0070
1  and countless others wounded and all of our innocence
2  shattered.
3          The shooters at my school obtained their guns
4  illegally through private sales and straw purchases.  Today
5  they could easily go online and buy these same weapons
6  without a background check, and what is to stop the next
7  person who chooses from doing just that?
8          Now I am a teacher -- or I have been a teacher
9  for eight years, and I consider every day that I go to work
10  a privilege to be with my students.  I cherish their joy
11  and enthusiasm and, most importantly, their innocence.  I
12  believe that is our job as a society, to protect these
13  virtues in our young people, and I want them to be worried
14  about math tests and track meets and about the science
15  fairs and student council elections.  That is the normal
16  school stuff that builds character.  But we are creating a
17  school culture that is instead worrying about safety of --
18  our safety and our intruders, something that no student
19  should be aware of.

LEG HX 000509    4424

20    This became even more apparent to me about a
21  year ago as I was sitting in complete silence in the inky
22  black dark of my classroom's storage room.  I was surround
23  by 24 second graders who crouched on the floor with me.  I
24  whispered to my students that they were doing such a
25  respectful job hiding, and then a quiet hand found mine, as
0071
1  Anthony, a seven-year-old boy, was crammed next to me, and
2  he was searching for comfort during such an unnatural
3  scenario.
4         We were conducting our monthly emergency drill
5  -- in this case a lockdown -- and my heart broke for
6  Anthony and his classmates, that they have to learn these
7  types of drills at such a young age and if at all.  And I
8  thought to myself, This is the result of the Columbine
9  shootings, and this is my reality, and now it is theirs
10  too.
11         THE CHAIRMAN:  Ms. Lyles, I'm going to have to
12  ask you to come right to the final point.
13         MS. LYLES:  Okay.
14         I ask today that we have the power to work
15  together as a society to create a safer world for our
16  schools, and that starts today with the passage of HB-1229.
17  Learn from my experience and do not wait until you have to
18  experience it firsthand to realize that action needs to
19  happen.
20         Thank you.
21         THE CHAIRMAN:  Thank you, Ms. Lyles.
22         Are there any questions for Ms. Lyles?
23         Thank you, Ms. Lyles.
24         MS. LYLES:  Thank you.
25         THE CHAIRMAN:  And I'm sorry we couldn't give
0072
1  you more time.
2         Chief John Jackson, we will be glad to hear
3  from you.
4         After Ms. -- after Chief Jackson, we will be
5  hearing from John Head, Marjorie Sloan, Don Macalady, and
6  then Amy Miller, just for your information.
7         Chief Jackson, welcome.
8         Please tell us your name for the record and who
9  you represent and give us your testimony.
10         MR. JACKSON:  Mr. Chair, members of the
11  committee, my name is John Jackson.
12         I'm here on behalf today of the Colorado
13  Association of Chiefs of Police.  The Colorado Association
14  of Chiefs of Police represents the many police departments
15  throughout the state of Colorado who work every day to keep
16  our communities safe and to do our best to protect our
17  citizens from those with ill intent, who wish to do someone
18  else harm.
19         In 2000 the citizens of Colorado voted 70
20  percent to 30 percent to support closing the gun show
21  loophole in Colorado.  The passage of Amendment 22 requires

4425

22  that Colorado verify that a person purchasing a gun at a
23  gun show is not a criminal act and has not been adjudicated
24  mentally ill.
25          This is a common sense measure that those who
0073
1  talk about law-abiding citizens possessing firearms should
2  not have a disagreement with, and yet our existing law has
3  a much bigger loophole than one closed by Amendment 22.
4  Currently it is legal for any individual to sell a firearm
5  to another individual with no background check.
6          As law enforcement we regularly see the
7  consequences of this loophole.  As previously stated many
8  times, 40 percent of all gun purchases are through private
9  sales by which it is legal to sell a gun without a
10  background check.
11          Our current system allows criminals and
12  dangerously mentally ill to legally buy and possess these
13  weapons.  Criminals are using the background check loophole
14  to purchase their weapons because they know they would not
15  be able to pass the background check.
16          The ability of background checks to reduce
17  homicides and gun violence is significantly diminished by
18  this giant loophole for private firearms sales that
19  criminals and traffickers are exploiting.
20          Recently the Colorado Association of Chiefs of
21  Police held a meeting to talk about the many legislative
22  matters currently before you, responsible gun policy and
23  legislation being some of them.  There were more than 90
24  Colorado chiefs and commanders present to discuss these
25  issues from their community's perspectives.
0074
1          With respect to the background check gun bill
2  language, the vote taken in the room was unanimous that the
3  Colorado Association of Chiefs of Police support background
4  checks for the purchase of all firearms.
5          THE CHAIRMAN:  Thank you, Chief Jackson.  I'm
6  going to have to ask you to -- to hold it there.
7          Representative Lawrence.
8          REPRESENTATIVE LAWRENCE:  Thank you, Mr. Chair.
9          Okay.  I think it's working.
10          Thank you, Mr. Chairman, and thank you, Chief,
11  for coming in to testify.
12          My question is regarding criminals getting
13  guns.  My understanding of this bill is that it's going to
14  affect law-abiding citizens and their ability to obtain
15  defensive weapons.
16          How is this going to keep a criminal from
17  getting a gun because they're not going to go through a
18  background check?
19          THE CHAIRMAN:  Chief Jackson.
20          MR. JACKSON:  Mr. Chair.
21          Representative, that's a very good question.
22  And we do believe that we need incremental steps.  We don't
23  believe this will be unreasonable for a law-abiding

24  citizen.  We believe that it could prevent a person in the
25  future from committing a crime.  There is no way to say any
0075
1  one of these measures will be exclusively right that will
2  fix the problem.
3         I think we all understand this is a
4  multi-faceted problem that's going to take a lot of
5  incremental steps forward to make a difference.  And we
6  believe that by simply putting in place the ability to have
7  a background check done on people, some of those people who
8  shouldn't have guns won't be able to get them, and that's
9  proactive instead of reactive.
10        THE CHAIRMAN:  Representative Wright.
11        REPRESENTATIVE WRIGHT:  Thank you, Chief.
12        THE CHAIRMAN:  I'm sorry, Representative
13  Lawrence.
14        REPRESENTATIVE LAWRENCE:  Yes.
15        THE CHAIRMAN:  You want to follow up there?
16        REPRESENTATIVE Lawrence:  Thank you,
17  Mr. Chairman.
18        I guess my question will go back to something
19  that Director Sloan had brought up, is that a lot of these
20  law-abiding citizens that are going through background
21  checks currently are being caught up in denials that are
22  then overturned at a later time.  So it is impending the
23  ability of law-abiding citizens to exercise their Second
24  Amendment rights.
25        And I also -- just a second question is:  Part
0076
1  of this bill requires that a seller act with a licensed
2  firearms dealer to run the background checks.
3        THE CHAIRMAN:  Chief Jackson.
4        REPRESENTATIVE LAWRENCE:  What if there isn't a
5  licensed firearm dealer within two hours of two people who
6  want to transfer a weapon?
7        THE CHAIRMAN:  Chief Jackson.
8        MR. JACKSON:  Mr. Chair.
9        Thank you, Representative.
10        I do believe that they would find a way to
11  legally sell that gun if they are law-abiding citizens.
12  The chiefs of police are not interested in creating undue
13  burden.  What we are trying to create and work with is
14  within the public safety realms of what's reasonable, and I
15  don't think that restrictions in legislation are going to
16  be that burdensome to where someone couldn't legally sell a
17  gun should they choose to do so.
18        THE CHAIRMAN:  Representative Wright.
19        REPRESENTATIVE WRIGHT:  Thank you, Chief.
20        I would like to ask you first:  You've taken an
21  oath to uphold the constitution of the state of Colorado
22  and the United States.  I'm wondering if you feel that this
23  is constitutional, should it be passed, under Article 2,
24  Section 13, of the Colorado constitution.
25        And secondly, if you do believe it's

1 constitutional, where do you break paths with many of the
2 sheriffs in the state of Colorado, who I'm sure you have
3 heard are opposed to this measure and will do everything
4 that they can to make sure that it's not enforced within
5 their jurisdictions?
6       THE CHAIRMAN: Chief Wright -- sorry, Chief
7 Jackson.
8       MR. JACKSON: Mr. Chair.
9       I would not depart from the federal
10 constitution. I do believe that it allows for reasonable
11 restriction as previously stated, and I think these are
12 that.
13       With regard to the sheriffs, it's very difficult
14 for me to qualify or quantify what their position is. I
15 know that they're neutral on this particular position.
16       But we see it differently and similar in some
17 regards, but this is a matter of public safety, and we
18 believe as chiefs it's responsible for us to get out and
19 make our position known, that we are for enhancing public
20 safety when we can legally do so.
21       THE CHAIRMAN: Representative Wright.
22       REPRESENTATIVE WRIGHT: Thank you, Chief.
23       And admittedly in your testimony you said that
24 you don't believe that this is the be-all solution for
25 public safety. You said that you saw this as an
0078
1 incremental step.
2       I might ask you: What is this an incremental
3 step towards? Greater regulation, greater restrictions,
4 and what are those restrictions?
5       THE CHAIRMAN: Chief Jackson.
6       MR. JACKSON: Mr. Chair.
7       Representative Wright, I don't want to make any
8 inference that this is an incremental step to take away
9 someone's Second Amendment rights or encroach in that way.
10 I truly do believe that we live in a three-dimensional
11 world, and there is no one-dimensional lens that is going
12 to solve this problem.
13       We're going to have to look and take many small
14 steps forward. This could be one of those before we can
15 probably see the incremental steps in public safety that we
16 saw when we closed the gun show loophole. You saw the
17 percentages and the numbers of where our state rank just
18 dropped through the floor, and that's the way I think we
19 are going to fix this. It has to be something that is
20 incremental, and it's not going to be just one -- pardon
21 the pun or phrase -- but magic bullet that fixes this.
22       Director Sloan also testified to how difficult
23 it is to prevent something, to pick someone that looks like
24 they might have been a crime (sic). A day before any one
25 of these tragedies, this person could have been legally a
0079
1 law-abiding citizen and could have possessed all the guns

2  that they wanted.
3       But there's a point in time where someone snaps,
4  and then, all of a sudden, society has a problem, and it's
5  a major public safety health issue for everyone either in
6  that theater, mall, school.  I truly believe this is a
7  matter of public health, and it's going to have looked at
8  it in that manner from a very wide, broad scope before we
9  can effect some serious change and see serious results or
10  positive outcomes.
11       THE CHAIRMAN:  Thank you, Chief Jackson, very
12  much for your time and contributing to our deliberations.
13       MR. JACKSON:  Mr. Chair, thank you.  And we
14  strongly urge your support in moving this on to the house
15  for a full vote.
16       THE CHAIRMAN:  Thank you, Chief.
17       John Head.
18       Mr. Head, welcome to the House Judiciary
19  Committee, sir.  We are glad to have you.
20       Please state your name for the record and tell
21  us who you represent and proceed with your testimony, sir.
22  And if you could keep your testimony to two minutes, we
23  would be grateful.
24       MR. HEAD:  I'll try.
25       Thank you, Mr. Chairman, and ladies and
0080
1  gentlemen of the committee.
2       My name is John Head.  I am copresident of the
3  Safe Colorado.  Safe Colorado was organized 12 years ago as
4  a strictly bipartisan organization to promote public safety
5  by reducing gun violence.
6       Back in 2000 we came before this -- this
7  legislature to advocate five measures recommended by a
8  commission organized by Governor Owens in the aftermath of
9  the Columbine shooting.  None of these measure made it out
10  of the committees to which they were assigned.
11       After we were turned away, we announced that we
12  would take one of our measures, an initiative to close the
13  gun show loophole that you heard a lot about today, to the
14  ballot in the 2000 general election, and we did that.
15       Over the spring, summer, and fall of 2000, Safe
16  Colorado, with an entirely volunteer force, out of a
17  membership of some 7,000 Colorado citizens had gathered
18  over 110,000 signatures on a petition, and we didn't spend
19  ten cents doing it.
20       That petition, known as Amendment 22, closed the
21  gun show loophole with 70 percent of the vote at the
22  general election in November of that year.  And
23  incidentally, we beat George Bush by 20 points.
24       Background checks do work.  And you heard this
25  -- all this information from Ron Sloan from the CBI, so I
0081
1  won't repeat any of it, except that I will note that these
2  denials that he mentioned are based upon records which
3  include homicides, assaults, kidnapping, sexual assaults,

4  and restraining orders, and thus it seems rather obvious
5  that if one wants to limit the possession of guns to
6  law-abiding citizens, an effective and efficient system of
7  background checks would be an obvious place to start.
8         Not only do background checks work, they are met
9  with overwhelming approval by the public, and you've heard
10  some of this today.  Over 70 percent of the voters in
11  Colorado in 2000 think that a statute requiring background
12  checks was a reasonable common sense measure to prevent the
13  wrong people from having easy access to guns, the public
14  opinions -- the public attitudes today are even more
15  positive.
16         Every one of the polls taken since the shooting
17  in Aurora shows this to be the case.  For example, the
18  Denver Post reported last month --
19         THE CHAIRMAN:  I'm afraid we don't have any
20  time for those examples unless --
21         MR. HEAD:  Then let me --
22         THE CHAIRMAN:  Members of the committee -- yes,
23  sir?
24         MR. HEAD:  If I could have one more paragraph.
25         THE CHAIRMAN:  Certainly, sir.
0082
1         MR. HEAD:  All right.
2         What these measures of public opinion tell you
3  is that there's a big difference between the people here
4  advocating on behalf of the gun lobby and the citizens of
5  Colorado.  And you have a judgment to make, and who are you
6  going to listen to?  Are you going to listen to the
7  citizens of Colorado, or are you going to hear -- listen to
8  paid lobbyists who want to have more guns in more hands of
9  more people with no restrictions whatsoever?
10         And I can assure you that with the track record
11  that I have established, taking Amendment 22 to the voters
12  and getting 22 percent of the voters to approve it, I know
13  how that judgment is made by the public.
14         I thank you for your attention.  I entertain any
15  questions you might have.
16         THE CHAIRMAN:  Thank you, Mr. Head.
17         And are there any questions for Mr. Head?
18         Representative (inaudible).
19         UNIDENTIFIED SPEAKER:  Do you have percentages
20  of recent polls with regard to closing the loophole and
21  requiring checks for private sales?
22         MR. HEAD:  Yes.
23         THE CHAIRMAN:  Mr. Head.
24         MR. HEAD:  Yes, thank you.
25         Yes.  Frank Luntz, who's a well known
0083
1  Republican pollster, did a poll last summer, and he found
2  that 74 percent of the members of the National Rifle
3  Association support the background checks conducted by
4  everyone who buys a gun.  He also found that 87 percent of
5  non-NRA gun owners support background checks of people who

6  buy a gun.
7          UNIDENTIFIED SPEAKER:  Thank you.
8          THE CHAIRMAN:  Thank you.  Mr. Head, I want to
9  tell you I thank you for coming here, sir, and I'm sorry we
10  couldn't give you longer to present your testimony.
11          MR. HEAD:  I understand.  Thank you very much
12  for your courtesy and --
13          THE CHAIRMAN:  Thank you, sir.
14          MR. HEAD:  -- listening to me.  Thank you.
15          THE CHAIRMAN:  Thank you, sir.
16          Marjorie Sloan, please come forward.
17          And just so witnesses know where we are,
18  Marjorie Sloan is going to be followed by Don Macalady, Amy
19  Miller, and then Ted Pascoe.
20          Ms. Sloan, welcome.  Please tell us who you are
21  and who you represent and present your testimony.
22          MS. SLOAN:  Thank you, Mr. Chair, members of the
23  committee.
24          I am Marjorie Sloan, mayor of Golden.  And I'm
25  here today representing Golden City Council and also
0084
1  speaking as a member of the National Bipartisan Coalition
2  of Mayors Against Illegal Guns.  Both organizations support
3  universal background checks.
4          On this issue I'm often asked if Golden has a
5  gun violence policy -- or problem, and the answer is:  Gun
6  violence menaces all of Colorado communities:  urban,
7  suburban, and rural.  Golden is no different from Aurora or
8  Newtown or Tucson.  Colorado School of Mines is no
9  different from Virginia Tech.
10          The steady stream of shootings in our country
11  has shocked all of us out of our trust in the safety of our
12  homes, streets, schools, shopping areas, and gathering
13  places.
14          The facts are these:  62 percent of private gun
15  sellers on the Internet agreed to sell a firearm to buyers
16  who said they probably couldn't pass a background check.
17  80 percent of criminals who used a gun in their crimes
18  obtained one through a private sale.
19          We've heard testimony demonstrating that
20  background checks work to solve this problem.  Colorado is
21  a can-do state.  If there is a hole in the fence, we want
22  to fix it.
23          At least 83 percent of Coloradans, including a
24  large majority of NRA gun owners, want to fix the loophole.
25  They recognize the value of background checks on all gun
0085
1  sales.  Please listen to them and vote yes on HB-1229.
2          THE CHAIRMAN:  Mayor, thank you very much.
3          Are there any questions for the witness?
4          Representative Wright.
5          REPRESENTATIVE WRIGHT:  Thank you, ma'am, for
6  your testimony.
7          I would -- I would ask you this:  You're stating

8   some statistics there.  Are you aware of the statistic that
9   when we closed the alleged gun show loophole in 2000 that
10  we actually saw a spike in the murder rate in Colorado
11  between 2000 and 2004?  And are you also aware of
12  statistics from the U.K., where some of the most
13  restrictive gun laws have been passed, far beyond simply
14  background checks, in 1997, and the subsequent rise in the
15  murder rate there from 13,874 annually in 1997 to 21,521
16  gun-related murders in 2006?
17          Are you aware of those statistics, ma'am?
18          THE CHAIRMAN:  Mayor Sloan, go ahead.
19          MS. SLOAN:  Excuse me.
20          THE CHAIRMAN:  Yeah.
21          MS. SLOAN:  Yes.  Representative, I have been
22  reading everything I can on this issue, and I understand
23  that there are conflicting interpretations by
24  statisticians.
25          I also understand that the London -- or the
0086
1   England statistics include the subway bombings they had,
2   which will throw the statics off in a lot of ways.
3           I heard today Mr. Sloan, who I am not related to
4   but I respect, you know, explain that background checks do
5   work and that in St. Louis, when they actually -- Missouri
6   -- took away the background check provision, the area was
7   flooded with guns.
8           So I don't think we're going to come to a
9   resolution about this, unless you and I sit down and we can
10  go through all the studies, and maybe we can do it.
11          UNIDENTIFIED SPEAKER:  Something to drink.
12          THE CHAIRMAN:  Mayor Sloan -- Representative
13  Wright for a follow up.
14          REPRESENTATIVE WRIGHT:  Thank you for that.
15          And I actually would -- I would enjoy getting
16  together.  This -- this is from the British Journal of
17  Criminology, peer-reviewed journal, and it shows only
18  firearms-related crimes.  And the rise in crime from 1997,
19  again, from 13,874 to 21,521 firearms-related.  And this is
20  far, far beyond a simple background check.
21          My concern here is, again, that we're putting
22  our best foot forward allegedly with this legislation, but
23  we are not going to solve the problem.
24          Thank you for your testimony.
25          THE CHAIRMAN:  Mayor Sloan, thank you so much
0087
1   for your time and giving us your views.
2           MS. SLOAN:  Thank you.
3           THE CHAIRMAN:  Don Macalady.  I hope I haven't
4   mispronounced that.
5           REPRESENTATIVE McCANN:  Mr. Chair.
6           THE CHAIRMAN:  Sorry, yes.  Representative
7   McCann.
8           REPRESENTATIVE McCANN:  Thank you.
9           Both Representative Fields and I are needed

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10  downstairs to vote on a bill.  So could we have a very
11  brief recess to allow us to head down, and we'll come right
12  back?
13          THE CHAIRMAN:  Absolutely, Representative
14  McCann and Representative Fields.  Please do your civil
15  duty.
16          REPRESENTATIVE McCANN:  Thank you.
17          THE CHAIRMAN:  And we will stand in brief
18  recess until you've had the opportunity to vote.
19          (A recess was taken at this time.)
20          THE CHAIRMAN:  The House Judiciary Committee
21  will come to order.
22          On next witness will be Karina Varga (sic), and
23  she will be followed by Don Macalady, Amy Miller, and then
24  Ted Pascoe.
25          Karina Varga, please -- tell us your name for
0088
1  the record and who you represent, if anyone other than
2  yourself, and proceed to give us your testimony.
3          Welcome to the House Judiciary Committee.
4  Thank you for being here.
5          MS. VARGAS:  Thank you for having me.
6          My name is Karina Vargas, and I am a youth
7  leader with Together Colorado.
8          About two years ago, on December 6 of 2010, what
9  seemed to be a regular day ended up being the worst day of
10  my life.
11          No one ever thinks it will happen to them, and
12  then it happened to me.  That year my life changed.
13  Someone so carelessly took my will to walk.  If it wouldn't
14  have been for my friends that took my life in their hands
15  and rushed me to the hospital, I wouldn't be speaking to
16  you guys today.  My 16th year of life nearly ended.
17          Nothing would ever be the same.  Even sleeping
18  isn't the same.  Everyone loves that good morning stretch
19  when all their bones pop.  I don't even get that anymore.
20  Even when I'm exhausted from pushing myself in my
21  wheelchair all day, I still have to lift my body and lay
22  myself in bed.
23          After the shooting I had a fear of going back to
24  school because I felt like somebody was after me.  That day
25  not only changed my life -- my physical life, it literally
0089
1  changed everything.  I was left with nothing.  My friends
2  abandoned me.  I was left alone.  Never would I wish this
3  on anybody because it's no fun.
4          Until this day there's not one second that
5  passes by that I don't wish that I could walk.  It's a
6  journey I'm willing to take, and I won't give up until I
7  do.
8          If this -- if this law had not been -- if this
9  law had been in place, I wouldn't be in the situation I am
10  in now.  My goals will be completely different, but I
11  believe that God could move mountains, and he'll help me

12  through this.  I'm here today to share my story and bring
13  awareness to what gun violence causes to innocent people in
14  our communities.
15       For those who oppose this bill and don't think
16  it's a problem because they haven't experience gun
17  violence, you take your kids to school thinking they will
18  be safe and the unthinkable happens.
19       Thank you.
20       THE CHAIRMAN:  Thank you, Ms. Vargas.  Thank
21  you for sharing your experience with us here today.
22       Are there any questions for this witness?
23       Thank you so much.
24       MS. VARGAS:  Thank you.
25       THE CHAIRMAN:  Thank you.
0090
1        Mr. Don Macalady, please.  Come forward, sir.
2        Please state your name for the record.  Tell us
3   who you represent, if anybody other than yourself, and
4   proceed to give us your testimony.
5        MR. MACALADY:  Chairman Kagan, members of the
6   Judiciary Committee, thank you so much for this opportunity
7   to speak to you today.
8        My name is Donald Macalady, and I represent an
9   organization called Hunters Against Gun Violence.
10       Our group was established several weeks ago to
11  put to rest the notion all gun owners, specifically
12  hunters, are opposed to reasonable legislation concerning
13  firearms.  We are a growing group of hunters and include
14  hunters varying in age from 20 to 75, and we strongly
15  support House Bill 13-1229.
16       As a young man, I joined the NRA to learn gun
17  safety and to participate in their educational programs.  I
18  left the NRA many years ago as it moved primarily from a
19  gun-safety organization to a gun organization.
20       I have lived in Colorado for the past 30 years.
21  I've lived and hunted in Colorado.  All my children are
22  hunters.  My family and the members of our organization are
23  testimony to the fact that many, if not most, gun owners do
24  not oppose sensible gun legislation.
25       As hunters we understand that gun ownership
0091
1   means responsibility.  We all believe in and support the
2   Second Amendment.  This is, in fact, one reason that we
3   urge the passage of HB13-1229.  It actually protects our
4   Second Amendment right by making sure that guns do not fall
5   into the wrong hands, the hands of those who are not able
6   or willing to handle the serious responsibility of gun
7   ownership.
8        Despite the makeup of the people in this
9   chamber, polls in Colorado and other similar states, in
10  fact, show that over 85 percent of voters support universal
11  background checks.  Even among NRA members a recent
12  national survey showed that 75 percent of NRA members
13  support universal background checks.

4434

14      So take comfort in the fact that the voters in
15  Colorado know what is in their best interest, something the
16  NRA does not know, and about which it shows little or no
17  concern.
18          Thank you for your attention.
19          THE CHAIRMAN:  Thank you very much,
20  Mr. Macalady.
21          Are there any questions for this witness?
22          Sir, has your organization had a chance to
23  consider the exceptions that are made for hunters and the
24  temporary transfers that take place in this bill, and are
25  they satisfactory to your organization?
0092
 1          MR. MACALADY:  Yes, we have.  As a matter of
 2  fact, part of my testimony that I scratched off because of
 3  the time limit had to do with that very -- that very
 4  stipulation.  I'm very happy that this bill takes that into
 5  account in a very constructive and I think in a very
 6  complete way.
 7          THE CHAIRMAN:  Thank you very much.
 8          Are there any other questions for Mr. Macalady?
 9          Thank you, sir.
10          MR. MACALADY:  Thank you very much.
11          THE CHAIRMAN:  Our next witness is Amy Miller.
12          Please come forward.
13          Ms. Miller, please tell is your name for the
14  record.  Welcome to the House Judiciary Committee.  We are
15  glad to have you.
16          Tell us who you represent, if anyone other than
17  yourself, and proceed with your testimony.  And if you
18  could keep it to two minutes, plus questions, we would be
19  grateful.
20          MS. MILLER:  Thank you, Mr. Chair and members
21  of the committee.
22          My name is Amy Miller.  I represent the Colorado
23  Coalition Against Domestic Violence.  We're a statewide
24  nonpartisan, nonprofit organization representing the
25  domestic violence organizations around the state of
0093
 1  Colorado who serve thousands of women and children and men
 2  who are victims of domestic violence each year.
 3          On December 8 of last year, just a few days
 4  after the tragedy in Newtown, there was another mass
 5  shooting in Longmont, Colorado.  It was a domestic violence
 6  shooting in which three victims were murdered followed by
 7  the perpetrator's suicide.
 8          The domestic violence offender, Daniel Sanchez,
 9  had just been released six hours prior from an overnight
10  stay in jail for holding his ex-girlfriend hostage for
11  several hours, assaulting her, stealing her cell phone, and
12  sending threatening text messages to her new boyfriend.
13          Sanchez was released at 10:00 p.m. Monday night,
14  and at 4:00 a.m. he shot and killed his ex-girlfriend,
15  Beatrice Sentora-Silva, age 25; her sister, age 22; and her

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

16  brother-in-law, age 29, with a .45-caliber Glock handgun.
17       Under federal law, individuals who have been
18  convicted of a qualifying misdemeanor conviction for
19  domestic violence or who are subject to a qualifying
20  protection order for domestic violence, like Sanchez was,
21  can't legally buy or possess firearms, but an estimated 30
22  to 40 percent of guns are purchased without background
23  checks making thorough enforcement of the law all but
24  impossible and creating a loophole through which domestic
25  abusers obtain guns.
0094
1        Here in Colorado in 2011, the most recent year
2  for which data is available, at least 13 of the 34 domestic
3  violence deaths in our state occurred in cases where the
4  domestic violence offender used a firearm despite being
5  prohibited under the law from purchasing or possessing
6  firearms.
7        Studies reveal that the presence of firearms
8  significantly increase the lethality of domestic violence
9  incidents.  According to one of these studies, domestic
10  violence assaults involving a firearm are 23 times more
11  likely to result in death than those involving other
12  weapons or bodily force.  Another such study found that
13  abused women are five times more likely to be killed by
14  their abuser if their abuser is in possession of a firearm.
15        According to Department of Justice statistics in
16  states that require background checks for every handgun
17  sale, 38 percent fewer women are shot to death by intimate
18  partners.  38 percent fewer woman.
19        We know existing background checks keep guns
20  out of the hands of domestic abusers and that lives will be
21  saved in this state by keeping guns out of the hands of even
22  more of those abusers.
23        Please take this opportunity to keep Colorado's
24  women and children safe.  I urge your vote in favor of
25  House Bill 1229.  The coalition is strongly in support of
0095
1  this legislation.
2        Thank you.
3        MR. CHAIRMAN:  Ms. Miller, thank you for taking
4  the time to come and help us make this decision today.
5        Representative Lee.
6        REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
7        Ms. Miller, was it your testimony that the 34
8  cases of domestic violence murders in Colorado were by
9  individuals who would have been prohibited from getting a
10  firearm had this law been in effect?  Is that a fair
11  interpretation?
12        THE CHAIRMAN:  Ms. Miller.
13        MS. MILLER:  Thank you, Mr. Chair.
14        Representative Lee, there were 34 deaths due to
15  domestic violence in 2011, and 13 of those, I believe,
16  according to news accounts, could have been prohibited had
17  this law been in effect.

18      REPRESENTATIVE LEE:  Thank you for the
19  clarification.
20      THE CHAIRMAN:  Thank you so much, Ms. Miller,
21  for coming forward today.  We appreciate it.  Thank you.
22      MS. MILLER:  Thank you for your time.
23      THE CHAIRMAN:  We're glad to have you here and
24  glad to have your perspective, Ms. Miller.
25      Mr. Ted Pascoe.  And Mr. Pascoe will be
0096
1  followed by Reverend Anastos (phonetic) and then Sheriff
2  Grayson Robinson.
3      So, Mr. Pascoe, please tell us your name for the
4  record and who you represent, and proceed to give us your
5  testimony.  If you could keep it to two minutes, that would
6  be much appreciated, sir.
7      MR. PASCOE:  Thank you very much.
8      My name is Ted Pascoe, and I'm testifying on
9  behalf of Colorado Cease Fire, which is an organization
10  that has been fighting for stronger gun laws in Colorado
11  for 14 years.  We are here to voice our enthusiastic
12  support for HB-1229.
13      I'll skip the parts that have been covered by
14  other witnesses and just mention a few things that I don't
15  think have really been touched on yet.
16      Backgrounds checks prior to all gun sales would
17  preserve public safety and provide peace of mind to the
18  seller, assuring him he's not selling to a criminal.
19  Private gun sellers have a competitive advantage over
20  licensed dealers because dealers must subject all buyers to
21  background checks.  This legislation will level the playing
22  field for responsible licensed gun dealers.
23      To those opponents of this legislation who
24  would invoke the Second Amendment, let's turn to the
25  landmark 2008 Heller decision in which the U.S. Supreme
0097
1  Court found background checks to be reasonable and
2  constitutional.
3      The majority -- the majority opinion written by
4  Justice Scalia reads, quote, "Like most rights, the Second
5  Amendment is not unlimited.  The Court's opinion should not
6  cast doubt on longstanding prohibitions on the possession
7  of firearms by felons and the mentally ill or laws imposing
8  conditions and qualifications on the sale of firearms," end
9  quote.
10      In a recent poll by Keating Research, 80 percent
11  of Coloradans favor background checks prior to all gun
12  sales.  In another recent poll by the Denver Post, the
13  response in favor to the same question was 83 percent.
14      There is overwhelming public support for
15  background checks prior to all gun sales.  On behalf of
16  Colorado Cease Fire, I ask for a yes vote on HB-1229.
17      Thank you.
18      THE CHAIRMAN:  Mr. Pascoe, thank you very much
19  for your testimony.

21        REPRESENTATIVE WRIGHT:  Thank you, Mr. Pascoe.
22  I appreciate you testimony.
23        What I'm hearing from you and other members that
24  are testifying today is that there is overwhelming support
25  for this from the people of the state of Colorado.
0098
1         I would ask you this:  If there is indeed
2  overwhelming support, why has your organization, who has
3  been operating in this state for the past 14 years, not
4  promulgated a referendum and sent this to a vote of the
5  people?
6         THE CHAIRMAN:  Mr. Pascoe.
7         MR. PASCOE:  Well, a coalition of organizations
8  concerned about passing stronger gun laws and preventing
9  gun violence did, in fact, pass a referendum requiring
10  background checks at gun shows in 2000.
11        THE CHAIRMAN:  Thank you, Mr. -- Representative
12  Wright.
13        REPRESENTATIVE WRIGHT:  And I thank you, and I
14  would both note that in that referendum, person-to-person
15  transfers were not included, correct?
16        THE CHAIRMAN:  Mr. Pascoe.
17        MR. PASCOE:  That's correct.
18        THE CHAIRMAN:  Representative Court.
19        REPRESENTATIVE COURT:  Thank you, Mr. Chair.
20        Please say hello to your mother for me,
21  Mr. Pascoe.
22        MR. PASCOE:  Thank you.
23        REPRESENTATIVE COURT:  To the comment about
24  whether or not you have gone to the ballot, it is my
25  recollection that the reason that the gun show loophole was
0099
1  closed after Columbine was that this body -- I wasn't a
2  member yet -- refused to act as representatives of the
3  people and therefore the group that felt strongly about
4  closing the gun show loophole felt forced to go to the
5  ballot.
6         I am correct?
7         THE CHAIRMAN:  Mr. Pascoe.
8         MR. PASCOE:  That's correct.  There was a bill
9  sponsored by Senator Ken Gordon that failed in committee
10  which would have required background checks for all sales
11  at gun shows, and also the guns acquired at Columbine were
12  acquired at a gun show.  So I think those were the two
13  motivating factors for those of us who worked very hard to
14  get that on the ballot.
15        THE CHAIRMAN:  Representative Court.
16        REPRESENTATIVE COURT:  Thank you, Mr. Chair.
17        So now we have another opportunity for this body
18  to act as representatives of the people, which we are
19  elected to do, and pass this law, which would then prevent
20  the need for you to go to the ballot.
21        Am I correct?

22      THE CHAIRMAN:  Mr. Pascoe.

23      MR. PASCOE:  That's correct.  40 percent -- as

24  we've heard today, 40 percent of all gun sales are not

25  subject to background checks.  So that's the reason why

0100

1  we're here today and trying to ask the state legislature to

2  address that issue.

3      THE CHAIRMAN:  Mr. Pascoe, thank you for coming

4  today.  We appreciate your testimony and you having taken

5  the time.

6      MR. PASCOE:  Thank you.

7      THE CHAIRMAN:  The next witness is Reverend

8  George Anastos.  And as Mr. Anastos comes forward, I

9  understand that the sheriff of Arapahoe County, Sheriff

10  Robinson, who wants to be next, after that -- that first

11  witness, would like to be accompanied by some other members

12  of the -- other sheriffs.

13      So Representative Fields.

14      REPRESENTATIVE FIELDS:  Thank you, Mr. Chair.

15      And our sheriff of Arapahoe County had to leave

16  early, so he will not be testifying today.

17      THE CHAIRMAN:  Thank you, Representative

18  Fields.  That frees up one testimony slot, unless the other

19  sheriffs that he was going to testify with as a group would

20  like to be after Reverend Anastos.

21      Reverend Anastos, would you please come forward.

22      Reverend Anastos is absent.

23      Are the sheriffs that were going to testify as a

24  group available to testify?

25      Well, if they are not, we will carry on to Deb

0101

1  McGuire and Mike McGuire, who I understand want to testify

2  together.  Please come forward.

3      Ms. McGuire, Mr. McGuire, please state your --

4      MS. McGUIRE:  Thank you.  Actually --

5      THE CHAIRMAN:  Tell us who you represent, if

6  anybody other than yourselves --

7      MS. McGUIRE:  Okay.

8      THE CHAIRMAN:  -- and proceed with your

9  testimony.

10      MS. McGUIRE:  Actually, Michael McGuire is my

11  husband, and I usually go by my own name, which is Debbie

12  Kaller, but I also go by McGuire.

13      Chairman Kagan and other House Judiciary

14  Members, we are here to represent our own point of view, by

15  the way.  I think everyone here shares a belief in our

16  First Amendment right.  We thank you for this opportunity

17  to share our values.  We also wish to thank the sponsors

18  for bringing this bill.

19      As passionate gun violence control advocates, we

20  both strongly support HB-1229, background checks for

21  private transfers.  We are very concerned for our safety,

22  as well as the safety of our loved ones, and of all

23  Colorado citizens.

24       We see no legitimate reason why anyone should be
25   able to purchase or transfer firearms without first being
0102
1   subject to a thorough background check.
2        MR. McGUIRE:  As indicated earlier, random
3   polls show that even among gun owners there is overwhelming
4   support for gun -- the gun control measures that are
5   included in this bill, and there is also even more
6   overwhelming support among nongun owners.
7        We do not believe that House Bill 1229 violates
8   Second Amendment rights, as interpreted by the U.S. Supreme
9   Court.  In fact, we believe that this bill certainly shows
10  respect for Second Amendment rights.
11       We believe that the legacy of this legislature
12  can be safer communities for all our citizens in Colorado.
13  We believe that this bill is part of that legacy and
14  encourage you to vote yes for that future.
15       Thank you.
16       THE CHAIRMAN:  Thank you both.
17       Are there any questions for these witnesses?
18       We very much appreciate you taking the time.
19  Thank you for being here.
20       Our next witness is going to be Chuck Saxton
21  (phonetic).
22       Is Mr. Chuck Saxton here?
23       UNIDENTIFIED SPEAKER:  He left.
24       THE CHAIRMAN:  In that case -- oh, Mr. Saxton.
25  Welcome, sir.
0103
1        Welcome to the Judiciary Committee.  Thank you
2   for being here.  Please give us your name for the record.
3   Tell us who you represent, if anyone other than yourself,
4   and proceed with your testimony.
5        MR. SAXTON:  Thank you.
6        My name is Chuck Saxton.  I do represent myself.
7   I'm a Colorado resident and a Colorado voter, a member of
8   Pheasants Forever, of Ducks Unlimited, a gun owner, a
9   hunter, a father, and a grandfather.
10       I began carrying a single-shot 28-gage shotgun
11  when I was five years old.  It was empty.  When I was eight
12  years old, I started hunting pheasants.  Since then I've
13  hunted big game and numerous small game.
14       Some of my deepest and most treasured memories
15  are of hunting with my father and with my -- and with my
16  brothers.  I would give all that up right now if that would
17  bring back the children from Newtown, Connecticut.  It
18  can't, of course.
19       I would also give all that up right now if that
20  were necessary to save my children's lives or any of the
21  children of any of the parents in this room.  I have a hard
22  time imagining anyone in this room feels differently.
23       But I don't think we need to treat this gun
24  control debate as an either/or situation, as an
25  all-or-nothing conversation.  I think it is entirely

1  reasonable for us to give up some gun rights because I
2  believe there is a much more profound right of our children
3  and our grandchildren to have a life.
4          I understand that no amount of guns or gun
5  restrictions can save all lives, but I refuse to accept the
6  notion that there is nothing we can do about gun control to
7  save many lives.
8          I believe giving up rapid-fire shooting is part
9  of an increasingly -- is part of an appropriate response to
10  the carnage we are seeing inflicted upon our children.
11  High-capacity magazines, as some fantasize, certainly are
12  not going to help my neighbors and me either assist or
13  resist the U.S. military, and such magazines most certainly
14  are not necessary for shooting targets for hunting.
15          I was taught to aim carefully and make my shot
16  count.  I recall my father only once ever used more than
17  one rifle shot.  Limiting our shots will make us better
18  hunters and a safer society.
19          I support background checks on all family -- on
20  all but family gun transfers.  I encourage fees to support
21  those backgrounds checks, and I support restricting all
22  firearm capacities to two or three bullets.
23          Thank you.
24          THE CHAIRMAN:  Now, please.  I've -- I've
25  really asked if you agree with something the witness says
0105
1  or if you disagree with something the witnesses says,
2  please tell the press, tell your friends, or tell us here
3  when you testify, but don't applaud.  Don't boo.  This is
4  not theater.  This is not a political rally.  This is a
5  hearing to determine public policy.  So I would ask people
6  to treat it with appropriate respect.  And if -- those who
7  can't, I will ask to leave.
8          Thank you, Mr. Saxton.
9          Are there any questions for this witness?
10          THE CHAIRMAN:  Thank you very much, sir, for
11  coming and giving us your views.
12          MR. SAXTON:  Thank you.
13          THE CHAIRMAN:  The next -- we have only a few
14  more witnesses that we have time for, so I will keep going
15  through the list.
16          We have Jessica Watts, if she is here.
17          Jessica Watts, welcome.
18          Please tell us your name, Ms. Watts.  We
19  appreciate your being here, and tell you us who you
20  represent and present -- give us your testimony.
21          MS. WATTS:  My name is Jessica Watts, and I'm
22  here today in support of proposals to curb gun violence.  I
23  am personally affected four times since 1999 with gun
24  violence, each being in the state of Colorado.  Most
25  recently was my cousin Jonathan Blunk, and he was murdered
0106
1  in Aurora, Colorado.

LEG HX 000526     4441

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

2      Um, I believe that we need common sense
3  solutions to stop families like mine from being forced to
4  live with pain and suffering.  Background checks will help
5  prevent guns from getting into the hands of the wrong
6  people.
7          Having to start somewhere, I think it is the
8  least that we can do is asking you guys to start by making
9  changes to prevent this from happening because no one is
10  immune.  And, you know, I'm here directly for my cousin
11  Jonathan, because not only was he in the Navy, but his
12  dream was to be a Navy Seal, and he never got that chance
13  because he was affected by gun violence.
14          THE CHAIRMAN:  Ms. Watts, thank you so much for
15  coming here today.
16          Are there any questions for Ms. Watts from
17  members of the committee?
18          We appreciate you sharing your experience.  We
19  know it's not easy, and thank you.
20          The next witness that I'm going to call forward
21  is Stu Fraser.  And after Mr. Fraser, if the following
22  witnesses could -- if you're in the overflow room, come
23  here because we are going to be calling you.  It's going to
24  be Dave McCally, Vince Markovchick, and Jennifer Hope, and
25  -- and Steven Wewier (phonetic).
0107
1          Mr. -- yes, Representative Fields.
2          REPRESENTATIVE FIELDS:  Thank you.
3          And we also have a representative here for --
4  from 1 Million Moms Against Gun Violence.  I would like to
5  make sure she gets an opportunity to speak.
6          THE CHAIRMAN:  We would be glad to make her the
7  witness directly following Mr. Fraser.
8          Mr. Fraser, welcome.  Please give us your name
9  and who you represent and present your testimony.  Thank
10  you for being here.
11          MR. FRASER:  Mr. Chairman and members of the
12  committee, my name is Stuart Fraser.  I'm the mayor of
13  Telluride.  I'm here representing the National Coalition
14  of Mayors Against Illegal Guns and the town council of
15  Telluride.
16          Gun violence impacts all of us.  Every day
17  across the United States, 33 or 34 -- I've heard both
18  numbers today -- people are murdered with guns.  That one
19  extra person matters.
20          Gun violence isn't just a tragic drama that
21  unfolds on television when individuals decide to commit
22  mass murder.  Gun violence is common, and it is easy to let
23  it fade into the background when it happens so often.  One
24  thing is certain:  For those it does impact, it will never
25  be forgotten.  If they live, they will live with trauma for
0108
1  the rest of their lives.  If they don't live, then their
2  loved ones will carry that heartbreak to their graves.
3          There are more than 300 million guns in the

LEG HX 000527    4442

4  private marketplace in the United States. My focus is to
5  underscore the need for law enforcement tools that can be
6  used to keep guns out of the hands of criminals and
7  individuals with mental health issues in an environment
8  where weapons proliferation is a serious concern.
9        Background checks are the most effective method
10  for reducing and preventing gun crime. Criminals actually
11  do submit to background checks. In 2010 the FBI denied
12  76,000 prohibited purchasers, the majority of whom were
13  felons, a firearm.
14        But even if dangerous people don't submit to
15  background checks, the law would still be effective. Some
16  laws act as deterrents, others are punitive, and some are
17  both. Rape laws don't stop all rapes, but we still have
18  them and punish them, those who violate that law.
19        In concluding, Mayors Against Illegal Guns is
20  not a gun-control organization. We are a crime-control
21  organization. Our purpose is not to deprive people of
22  their rights. It is to ensure that everyone's rights are
23  protected, whether we choose to carry a gun or not.
24        Rights as defined in the Declaration of
25  Independence. This document enshrines three basic rights:
0109
1  the rights to life, liberty, and the pursuit of happiness.
2  The right to life is the only fundamental right from which
3  all other rights are derived.
4        Background checks are a major step in the
5  direction of allowing all of us to have our rights
6  protected. We believe this bill will have an enormous
7  impact on public safety, and I ask you to please vote yes
8  on HB-1229.
9        Thank you.
10        THE CHAIRMAN: Thank you very much, Mayor
11  Fraser.
12        Are there any questions for the mayor?
13        Thank you, Mr. Mayor. We really appreciate you
14  being here.
15        Oh, Representative Court.
16        REPRESENTATIVE COURT: Thank you, Mr. Chair.
17        Thanks for being here, Mayor.
18        Can you tell me how many mayors, how many
19  cities, are involved in the organization you represent?
20        THE CHAIRMAN: Mr. Fraser.
21        MR. FRASER: I didn't bring that sheet up, but
22  there are over 850 mayors across the nation. There are a
23  variety of towns. There are 65 million people that are
24  represented by those 850 mayors.
25        REPRESENTATIVE COURT: Thank you.
0110
1        THE CHAIRMAN: Thank you, Mayor Fraser. And
2  thank you for testifying here today.
3        MR. FRASER: Thank you for having this hearing.
4        THE CHAIRMAN: Thank you, Mr. Mayor.
5        Representative Fields, the next witness that

LEG HX 000528   4443

 6  you wanted to bring forward was?
 7          REPRESENTATIVE FIELDS:  Mr. Chair, Jennifer
 8  Hope.
 9          THE CHAIRMAN:  Jennifer Hope.  Thank you.
10          Jennifer Hope, please come forward.  State your
11  name, tell us who you represent, if anyone other than
12  yourself, and give us your testimony.
13          MS. HOPE:  Thank you for having me here today.
14  My name is Jennifer Hope, and I'm with the 1 Million Moms
15  for Gun Control, the Denver chapter, but I'm here today
16  mostly just as a mom -- and as a native of Colorado.  As of
17  this year, I will have lived here for 50 years, and what we
18  do here matters to me.
19          With my oldest four children, I lived through
20  the horrors of Columbine and waiting and worrying all those
21  long hours while we waited to see if their friends and
22  neighbors had survived that.
23          Now, with my younger four children, that I've
24  adopted in the last few years, my job is not only to love
25  and take care of them, but to protect them.  And I feel
0111
 1  that this bill can help me do that job.  I can't protect
 2  them if -- if people who are not supposed to have guns are
 3  allowed to have them or if they are able to get them.  I'm
 4  powerless against that.  I can't do anything.  This bill
 5  would help me to do that job better, my job better.
 6          THE CHAIRMAN:  Thank you, Ms. Hope.
 7          Are there any questions for this witness?
 8          Ms. Hope, thank you for taking the time to come
 9  and testify here today.  We appreciate it.
10          Our next witness -- we are getting close to
11  running out of time because we are allotting the same two
12  hours of actual witness testimony time and question and
13  answer to both sides, and we are actually running out on
14  the side of the proponents.  But we do have time for Vince
15  Markovchick, if he is here.
16          Dr. Markovchick, welcome.
17          DR. MARKOVCHICK:  Thank you.
18          THE CHAIRMAN:  Please state your name and tell
19  us your -- what you have to say.
20          DR. MARKOVCHICK:  My name is Vince Markovchick.
21  I'm an emergency medicine physician for the past 39 years,
22  and I'm here on behalf of myself.
23          I've worked at Denver Health in the emergency
24  department for 32 years and was director of emergency
25  medical services there for 20 years, completing that time
0112
 1  in 2009.  I have personally seen up close and personal
 2  hundreds of gunshot wound victims, since we are the Level 1
 3  trauma center for Denver.
 4          I have seen the personal tragedy and heartache
 5  from the victims, as well as their families.  I am here to
 6  support common sense gun legislation, that if it keeps just
 7  a few people who should not have access to weapons, and far

8  too many people have easy access to weapons, and -- and
9  decreases at all the gun violence, I think that's a very
10  positive step.
11          I also need to remind everybody here that the
12  statistics that were all cited so far have been fatalities
13  from gunshot wounds.  The vast majority of gunshot wounds
14  do not die because of excellent trauma care.  They survive,
15  but they live with these wounds for the rest of their life.
16          Thank you.
17          THE CHAIRMAN:  Dr. Markovchick, thank you so
18  much for your testimony.
19          Representative Lee.
20          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
21          Doctor, do you have any idea the number of
22  people who are afflicted by gunshot wounds in the course of
23  a year, five years, ten years?
24          THE CHAIRMAN:  Dr. Markovchick, go ahead.
25          DR. MARKOVCHICK:  Those statistics are very
0113
1  difficult to come by because of research that's been
2  prohibited on the -- at a national level by some former
3  legislation.  The numbers I can come by is there is well
4  over 10,000 persons a year who are victims of gunshot wound
5  violence.
6          THE CHAIRMAN:  Representative Lee.
7          REPRESENTATIVE LEE:  In Colorado, sir?
8          MR. MARKOVCHICK:  In Colorado, I do not know
9  that I have those statistics.  At Denver Health I believe
10  we would average about 200 victims a year.
11          REPRESENTATIVE LEE:  Thank you, sir.
12          THE CHAIRMAN:  Dr. Markovchick, thank you so
13  much for coming to testify here today.
14          DR. MARKOVCHICK:  Thank you.
15          THE CHAIRMAN:  We appreciate it.
16          Is Dave McCally here?
17          Dave McCally, please come forward.
18          Oh, we did?  Okay.
19          Steven Wewier, please come forward and give us
20  your testimony.
21          Is Steven Wewier here, who has requested to
22  testify?
23          Amy Moore.
24          Are there any others with us here to testify in
25  support of House Bill 1229 and who have not yet had the
0114
1  opportunity to testify?
2          Please come forward, ma'am.
3          You are welcome.  Your testimony is appreciated.
4  Are you signed up to testify?
5          MS. CROOK:  Yes, I did sign up.  I'm not sure
6  where it is, but I signed up.
7          THE CHAIRMAN:  Well, thank you --
8          MS. CROOK:  My name is Terry Crook.
9          THE CHAIRMAN:  Terry Crook.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10      MS. CROOK:  I'm from Boulder, Colorado.
11      THE CHAIRMAN:  And who do you represent, if
12  anyone other than yourself?
13      MS. CROOK:  I represent my parents and my
14  family.  My parents were victims of gun violence.
15      THE CHAIRMAN:  Thank you, Ms. Crook.  Please
16  proceed.
17      MS. CROOK:  Okay.  On March 29, 1990, my
18  daughter Katie was born.  Ten days later I was flying to
19  Ohio for the funeral of my mom and my dad.  They never saw
20  her.
21  They were murdered by my mom's uncle, who said -- who shot
22  them, and also he shot himself.
23      After -- weeks after the murder or right after
24  the murders, I saw an article in the newspaper, and the
25  police were quoted as saying, Well, we had many encounters
0115
1  with him.  We could see he was getting crazier and crazier.
2  We thought he might shoot himself, but we never thought
3  he'd shoot someone else.
4      My mom's uncle was mentally ill and -- but had
5  been a gun owner all of his life, and so he had a lot of
6  guns.  But then, when he became older -- he was almost 70
7  and mentally ill -- then, of course, he had these guns.
8      So -- but if for some reason -- if there were
9  background checks in that case, my parents would have been
10  alive because my -- might have still been alive if the
11  police would have checked and made sure that this person
12  did not have guns through some sort of system that they
13  might have, if there were records.  And anyway -- or if the
14  police had more power to report the mentally ill.  But at
15  the very least, background checks for everyone.
16      So no one did anything to take away the guns of
17  a mentally ill person, and my parents were dead because of
18  it.  And they lost their right to life.  And I hear a lot
19  of people who want their rights to own a gun, but what
20  about the people who lose their right to life?  I mean,
21  that's your first life.
22      You can't help but thinking after something like
23  this happens:  What is the cost of a bullet?  Is it a
24  dollar?  Is that the price of a life, a dollar?  You know,
25  it makes no sense.  And my daughter never saw her
0116
1  grandparents.  It's senseless, and anything you can do to
2  stop it, please do.
3      And 10-round magazines, that's a no-brainer.  We
4  don't need those.  They kill way too many people.
5      THE CHAIRMAN:  Thank you, ma'am.  We really
6  appreciate -- if you'll just stay -- stay with us in case
7  there are any questions for this witness.
8      No.  Thank you so much.  Thank you for giving
9  us the benefit of your experience and insight.
10      Representative Fields.
11      REPRESENTATIVE FIELDS:  Thank you, Mr. Chair.

12    I invited my pastor to come forward.  This is
13    Reverend Timothy Tyler.
14         THE CHAIRMAN:  Thank you, Representative
15    Fields.
16         Representative (sic) Tyler, welcome.
17         DR. TYLER:  Thank you.
18         THE CHAIRMAN:  Please state your name for the
19    record, and let us know what you have to say, and who you
20    represent as well.
21         DR. TYLER:  I'm Dr. Timothy Tyler, and I am the
22    pastor of Shorter Community African Methodist Episcopal
23    Church here in Denver, Colorado, the oldest African
24    American church in the state of Colorado.  And I represent
25    my church, and I represent my community.
0117
1         THE CHAIRMAN:  Thank you, Reverend.
2         MR. TYLER:  I want to thank you for the
3    opportunity to speak to this issue, the issue of gun
4    violence and the need for sensible laws to protect the
5    welfare of all of our citizens.
6         When I was asked to appear today, I called my
7    17-year-old son, and I asked him what I should say.  First
8    he said, Dad, tell them about girl, and when he said, Tell
9    them about the girl, I understood what he was talking
10    about.
11         He was talking about events that happened after
12    July 20, 2012, when the theater was shot up.  We -- my son
13    and I went down to the high school where the families were
14    waiting for word on who had lived and who had died in the
15    theater.
16         While there, we met a girl.  She was in tears.
17    She was in distress.  She had said to us that while in the
18    theater, her boyfriend shielded her from the bullets and
19    pushed her under the seat and she had not seen him since.
20    So she did not know whether he was dead or alive, and she
21    was in great distress.
22         So I asked her if she wanted us to pray with
23    her, and she hesitated and really didn't want prayer.
24    Then I said, Well, can we hug you?  And she allowed me to
25    hug her.  We had a group hug.  My son was there, and I
0118
1    could tell just by looking at him that it had affected him
2    -- it had affected him greatly.  As I watched my son
3    participate in this group hug, I could tell that he was
4    visibly shaken by the scene of people in pain and helpless.
5         On the Saturday after the shooting, the young
6    people who are members of my church met to talk about the
7    shootings.  My son was a part of that gathering.  The young
8    people wept about their friends and relatives who were in
9    the theater, and they struggled to make sense out of a
10    culture and community that fails to protect innocent
11    people.
12         The next week I was asked to officiate at one of
13    the funerals of the persons who died in that Aurora

14  shooting. My son was not at the funeral, but there were
15  hundreds of teenagers and young people there. I saw their
16  faces, and when I saw their faces, I saw my son's face.
17         I'm here today because my 17 -- I'm here today
18  because of my 17-year-old son. Our street have become
19  increasingly violent, and they have been violent long
20  before Aurora or Connecticut, but this is the time and the
21  place to take action so that our children can have a
22  future.
23         Urban gun violence in Chicago, New York, and Los
24  Angeles, and even in Park Hill and northeast Denver, has
25  become a day-to-day reality, and I believe that this is
0119
1   your opportunity to help us to begin the process of
2   stopping the violence.
3          THE CHAIRMAN: Thank you, Reverend. We
4   appreciate that. I'm going -- I'm going to have to ask you
5   to --
6          DR. TYLER: Sure.
7          THE CHAIRMAN: -- hold it there, and ask if
8   there are any questions for Reverend --
9          Representative Wright.
10         REPRESENTATIVE WRIGHT: Thank you, Mr. Chair.
11         Pastor, I appreciate your conviction, and
12  that's a great story. I -- I want to ask you this, though:
13  Because of the fact that you're extremely well-spoken and
14  moving, and you remind me of one of my heroes, which is
15  Martin Luther King, Jr. --
16         MR. TYLER: That's a great compliment, sir.
17         REPRESENTATIVE WRIGHT: I would just ask you
18  this, though: Looking at Martin Luther King, Jr.'s, life
19  and the fact that he was outspoken about civil rights and
20  fought for what he believed in, he was threatened numerous
21  times.
22         MR. TYLER: Sure.
23         REPRESENTATIVE WRIGHT: He was compelled to the
24  point to protect his family that he himself sought a
25  concealed weapons permit in the 1950s. He had armed
0120
1   individuals around him protecting him. The fact that he
2   had been arrested himself numerous times because of his
3   civil disobedience under this law, it's very likely that
4   his arrest would have prevented him from protecting
5   himself.
6          Would you agree that that is a potential problem
7   for people in the future that will be speaking out for what
8   they believe is right?
9          THE CHAIRMAN: Reverend THAI.
10         MR. TYLER: Though some of what you say may be
11  true, I would -- I could never image Reverend Dr. Martin
12  Luther King saying that people need to protect themselves
13  with high-powered ammunition weapons. I would never -- I
14  could never imagine the Reverend Dr. Martin Luther King
15  advocating that people should not -- that everyone should

LEG HX 000533    4448

16   not have to deal with gun checks.
17        It's like going to the airport and seeing two
18   lines: one is with security, and one is without.  Which
19   one do you think the thieves would go to or the crooks
20   would go to or the criminals would go to?
21        So I think that Dr. Martin Luther King would
22   have been at that funeral that I attended.  I think that
23   Martin Luther King would have wept at what happened in
24   Aurora.  I think he would weep at what's happening in
25   Chicago, Los Angeles, and I think he would have fought for
0121
1    the rights of people, but I also believe that he would
2    speak up to the urban communities that are dying because
3    we, as legislators and leaders, have not done what we
4    should do to secure and make people safe in our
5    communities.
6        THE CHAIRMAN:  Reverend THAI, thank you.
7        Reverend (sic) Lawrence -- Representative
8    Lawrence.
9        MR. TYLER:  I can be the representative, and
10   they can be the reverend today.
11        THE CHAIRMAN:  Representative Lawrence.
12        REPRESENTATIVE LAWRENCE:  Thank you,
13   Mr. Chairman.
14        Reverend, thank you so much for coming down.
15        MR. TYLER:  My pleasure.
16        REPRESENTATIVE LAWRENCE:  And you do have a
17   compelling story, and I'm sure that was an extremely
18   emotional day.
19        MR. TYLER:  It was.
20        REPRESENTATIVE LAWRENCE:  You raise the issue
21   of Chicago and LA, who I believe have some of the most
22   restrictive gun laws in the country and yet they have some
23   of the highest murder rates in the country.  I don't think
24   that equates to saying that backgrounds checks and
25   restrictive gun laws are doing anything to prevent the
0122
1    violence.
2        THE CHAIRMAN:  Reverend Tyler, would you like
3    to respond?
4        MR. TYLER:  I would argue that Chicago -- in
5    fact, I listened to the news conference from Chicago's
6    chief yesterday.  And what he said was it is a fallacy to
7    say that Chicago or Illinois has one of the most
8    restrictive set of -- has the most restrictive set of gun
9    laws.  He says that's just not true.  And I'll have to --
10   I'll have to yield to the police chief on that.
11        But I don't think it's one thing or the other.
12   I think that the places where there are laws and
13   restrictive laws, then I think something needs to happen in
14   the community in terms of going into the urban communities
15   and -- and putting in place the initiatives that would cut
16   out the gun violence.
17        I think in the places like Colorado and Denver

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

18  where we don't have the laws, then we need to put the laws
19  in place that will partner with the community initiatives.
20  I don't think it's going to be one or the other.  I think
21  we've got to -- in all places, whether it's Chicago, LA, or
22  Denver, we've got to work together in the community
23  initiatives, such as jobs and giving people hope and giving
24  people a way out like many times in Chicago and LA and New
25  York they don't feel, but on the other hand, the
0123
 1  legislature is going to have to support the notion that the
 2  laws are going to have to be in place.
 3         And I believe it's not one or the other, it's
 4  all of this working together so that we can stop dying and
 5  allow our young people and our citizens a chance to live
 6  and live without fear.
 7         THE CHAIRMAN:  Reverend -- thank you very much,
 8  Reverend THAI.
 9         Are there any more questions for this witness?
10         Seeing none, we thank you for being here today.
11         And that concludes our testimony on behalf of
12  the proponents.
13         Thank you, sir.
14         MR. TYLER:  Thank you.
15         THE CHAIRMAN:  That concludes the testimony of
16  the proponents for this bill.  This committee will stand in
17  recess for literately five minutes.
18         (A recess was taken at this time.)
19         THE CHAIRMAN:  The House Judiciary Committee
20  will come to order.
21         We are on House Bill 1229 by Fields and McCann
22  concerning criminal background checks performed pursuant to
23  the transfer of a firearm.  We have heard from the
24  proponents of the bill, and we now will hear from the
25  opponents to the measure.
0124
 1         As I mentioned at the outset, it is my intention
 2  to regretfully limit the time that the witnesses testify to
 3  two minutes, except in the case of the first two witnesses,
 4  who, by agreement between both sides, have agreed that it
 5  would be good to have two witnesses with less restrictions
 6  on time if they have particular expertise that needs
 7  elaboration, and so we have -- we are going to hear from
 8  those two witnesses first.
 9         I will not put restrictions on the questions by
10  -- proposed by the members to the witnesses, but I will
11  regretfully have to bring the testimony phase to a close
12  after two hours of witness testimony for the opponents, as
13  I did with the proponents.
14         And with that, I would call the first witness
15  forward, who is Mr. Daniel Carey.
16         Mr. Carey, please come forward.
17         Mr. Carey, please state your name for the
18  record, tell us who you represent, and give us your
19  testimony.  And please accept our thanks for coming here to

20   the House Judiciary Committee and giving us your
21   perspective.
22          MR. CAREY:  Absolutely.  Thank you for having
23   me.
24          My name is Daniel Carey.  I am the state
25   lobbyist for the National Rifle Association, and I'm here
0125
1    to testify on behalf of House Bill 1229.
2           I have some documents here that I would like to
3    pass out to the committee, if I could.  (Inaudible.)
4           House Bill 1229, as it may seem to some
5    proponents of this bill, is an inoculant enough piece of
6    legislation, but it unnecessarily looks to make criminals
7    out of family members and law-abiding citizens.  And
8    specifically to this bill, it would make criminals out of
9    what you-all just passed into the civil unions because it
10   did not make an allowance for those individuals.
11          This bill would place an unjust burden on
12   law-abiding citizens who may live miles, you know, two
13   hours, from the nearest gun dealer, where they would have
14   to go and register with an FFL or go through and do the
15   background check procedure.
16          House Bill 1229 is going to do nothing to curb
17   criminal activities because plainly enough, criminals do
18   not obey the law and will not submit to a background check,
19   and this will not overlap with those individuals.
20          To require a background check for private
21   transfers is not a real solution.  And as you'll see from
22   some of the information I've given to you related to
23   California, it is a failed policy that has no qualitative
24   effect for a positive trend when it relates to violent
25   crimes and murder.
0126
1           House Bill 1229 is very similar to the
2    background check laws currently in place in California.
3    This is some of the information I've given to the
4    governors's office and other members in your caucus prior
5    to being here today that outlined the comparison between
6    California, Colorado, and the national average as it
7    relates to crime and murder rates.
8           A comparison of California, Colorado, and the
9    national average as it relates to crime and murder rates
10   from 1960 to 2011 illiterates one main and overriding
11   trend:  Crime and murder rates the last two decades have
12   continued to decline at similar rates, in California,
13   Colorado, and nationally, on the average, with California
14   consistently maintaining a higher than average than both
15   Colorado and nationally.
16          I'd also like to point out that we have to the
17   take into consideration that when comparing these violent
18   crime rates that California is only one of two states in
19   the nation who actually implements such a universal
20   background check and that this national average, as it
21   holds lower than California, does not have this between the

22  48 states that they have.
23      As I mentioned earlier, most criminals do not
24  acquire their firearms through legal purchases.  In 1991
25  the Bureau of Alcohol, Tobacco, and Firearms reported that
0127
1  37 percent of armed criminals obtain firearms from street
2  sales, 34 percent from criminal acts and associates, 8
3  percent from relatives, and only 7 percent from dealers,
4  and 6 percent from flea markets and gun shows.
5      More recently, in a 2001 Bureau of Justice
6  Statistics survey of state prison inmates convicted of
7  firearms crimes, found that 79 percent acquired their
8  firearms from street or illegal sources or friends and
9  family.  This includes theft from firearms, black market
10  purchases of stolen firearms, and straw purchases.
11      The survey also found that 12 percent obtain
12  their firearms from firearms dealers.  These are gun stores
13  and pawn shops, while only 1.7 percent obtained their
14  firearms from anyone, dealer or nondealer, at a gun show or
15  flea market.
16      As I reiterated earlier, criminals will not
17  submit to background checks.  We are creating a system
18  where we would belabor the ability of law-abiding citizens
19  to sell off potentially their old hunting shotgun, as
20  Representative Salazar had mentioned with his brother, or
21  to their neighbor after they had legally purchased a new
22  gun.
23      Now, I've heard the 40 percent fact that's been
24  mentioned here quite a few times by those who are with
25  Michael Bloomberg's group, Mayors Against Illegal Guns, and
0128
1  I was looking forward to setting the record straight,
2  because I'm looking at the same information that they're
3  pulling from.
4      Mayor Bloomberg and his group, Mayors Against
5  Illegal Guns, along with many other gun control advocates
6  and even the president of the United States, claimed that
7  as many as 40 percent of guns are purchased without a
8  background check.  This is not only misleading, it's
9  factually inaccurate and came from the Police Foundation
10  survey taken in 1994.
11      The survey is frequently misquoted by gun
12  control advocates, which was taken actually of 251
13  individuals -- or gun owners I should say -- found that
14  only 4 percent of gun owners acquired their guns from gun
15  shows and flea markets, from dealers and private sellers
16  combined.
17      More than three-quarters of the survey's
18  respondents covered the sales act before the Brady Act took
19  place, which instituted a mandatory federal background
20  check on February 28, 1994.
21      This means that three-quarters of the
22  respondents to this survey could have actually made a
23  purchase from a licensed dealer, someone who held an FFL,

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

24    as the director of CBI mentioned earlier, and it would have
25    been beyond their knowledge.
0129
1            Let me also state the fact that Obama had
2    stated 1.5 million criminals were stopped by background
3    checks.  In 2010, 94 percent of these people who were
4    stopped from background checks were overtuned -- were
5    overturned -- I'm sorry.
6            62 people or .1 percent involved in this type of
7    background check who had their purchase stopped were -- had
8    enough evidence to prosecute, and only 13, 13 of these
9    individuals, were convicted or pled guilty to this.
10            Legal transfers for law-abiding citizens will
11   only become more difficult.  The Colorado Bureau of
12   Investigation's, CBI, InstaCheck has been so overburdened
13   with background checks since late last year that the recent
14   wait stands at nearly seven days and has gone upwards of
15   ten with almost 10,000 people at times waiting in the queue
16   to have their Second Amendment rights exercised in the
17   purchase of a legal and lawful firearm.
18            CBI also stands as one of the state system's
19   highest rate of denials, as was mentioned earlier.  It also
20   stands as one of the highest rate of appeals in those
21   denials.  This means that the law-abiding citizens are
22   unnecessarily being denied their right to exercise their
23   Second Amendment rights in the purchase of a firearm.
24            By adding hundreds of thousands of unnecessary
25   checks to be placed in the queue by this struggling system,
0130
1    we are setting up law-abiding Coloradans the opportunity to
2    be unnecessarily victimized by potential criminals because
3    they have not been able to go out and potentially purchase
4    a firearm for self-protection.
5            Private transfer of a firearm is a
6    constitutional right.  I know that some of you here have
7    talked about the First Amendment today and how there are
8    restrictions on some constitutional rights and nothing is
9    absolute.  Our belief is that this bill here today would be
10   an unjust burden on Colorado citizens and is
11   unconstitutional for that reason.
12            Thank you very much.
13            THE CHAIRMAN:  Mr. Carey, thank you so much.
14   Are there any questions for Mr. Carey?
15            Representative Lee.
16            REPRESENTATIVE LEE:  Thank you, sir.
17            Can you share with us some of your ideas as to
18   how we might address the problem of gun violence?
19            MR. CAREY:  Absolutely.
20            THE CHAIRMAN:  Mr. Carey.
21            MR. CAREY:  Mr. Chairman, thank you.
22            Representative Lee, some of the things that
23   we've been advocating, not only on a national level, but
24   something that we would like to advocate here in Colorado,
25   is making sure that we're prosecuting all of these crimes

1  that are currently taking place related to firearms crimes
2  or deaths as it's related.
3          THE CHAIRMAN:  Representative Murray.
4          REPRESENTATIVE MURRAY:  Thank you, Mr. Chair.
5          And thank you, sir, for your testimony.
6          Earlier in some testimony we were told about
7  Chicago, the issues related to handguns in Chicago.  And I
8  understand that while handguns were banned for a while in
9  Chicago, violent crime with guns went up during that period
10  of time.  Since then, that -- that ruling has been struck
11  down and basically Chicago now has laws that make it so
12  difficult to get a permit that it's almost like a ban; and
13  that there were over 500 homicides in Chicago last year
14  despite these strict measures.  So they have tried to come
15  up with the strictest measures they possibly can and still
16  have 500 homicides in the city.
17          Do you have anything to add to that?
18          THE CHAIRMAN:  Mr. Carey.
19          MR. CAREY:  I'm sorry, Mr. Chairman.
20          THE CHAIRMAN:  That's all right.
21          MR. CAREY:  Representative, I think what I would
22  like to add is it goes back to the point that criminals
23  don't abide by the law.  That's what makes them criminals.
24  So by instituting these laws, you're only affecting the
25  law-abiding citizens.
0132
1          THE CHAIRMAN:  Mr. Carey, I think what the
2  proponents of this bill are hoping to do is to keep those
3  who are prohibited from possessing firearms because of
4  their past, their criminal history, their mental condition
5  or whatever reason it is that they are by law prohibited
6  from having a firearm, I think proponents are trying to
7  make it more consistent that those folks do not get the
8  firearm.  And one of the ways that those folks get the
9  firearm is by buying it in a private sale.
10          It's not the only way they get them, but it's
11  one of the ways they get them.  And I think the point that
12  you've made is that it is burdensome to require law-abiding
13  citizens who are qualified to demonstrate that they are
14  qualified through a background check, and that's
15  burdensome.
16          Um, I -- I, as I sit here as legislator
17  legislature, can't help but agree that it is a burden.  It
18  is burdensome to demonstrate that one is qualified to
19  exercise that right, just as it is burdensome to stand in
20  line to vote, and I see that.
21          Are there any burdens that you think are
22  justified in trying to keep weapons out of the hands of
23  people who are not legally required to possess them?  Is
24  there any burden light enough to be worth undertaking, or
25  is it just wrong to undertake the effort?
0133
1          MR. CAREY:  Mr. Chairman, I appreciate the

LEG HX 000539        4454

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

2    question.
3        I think that I would get back to the point that
4    I just made earlier, which is if we continue to prosecute
5    these criminals, those who continue to use firearms
6    illegally or continue to misuse firearms, because I see
7    behind me there are many individuals here today who are
8    opposed to this, who support what I'm here saying today.
9    And I would say, of the people that we have here today,
10   they would find it not only a burden, but they do not plan
11   on committing these crimes.  They will not be those who are
12   going to be considered a criminal.  So I think that our
13   difference is that you see this as a just burden, where I
14   see it as an unjust burden.
15       So getting back to prosecuting criminals, my
16   advice or my -- what I would advocate on behalf of is
17   making sure that those individuals who are committing these
18   crimes that are using firearms or misusing firearms should
19   be locked away and shouldn't have the opportunity to get
20   out and use them again.
21       THE CHAIRMAN:  Thank you for that, Mr. Carey,
22   and I appreciate it.
23       But are you saying that there is no -- even if
24   this process where almost completely relieved of burden, if
25   it could be done with -- without requiring people to travel
0134
1    to a FFL, if it could be done very, very quickly, if it
2    could be done free of charge, if it could be done in -- in
3    an almost completely burdenless, if that's a word, way,
4    would -- would you support that?
5        MR. CAREY:  As it relates to this bill here
6    today, I could not support this bill.  I could not support
7    the initiatives or the efforts that it's trying to move
8    forward with.  No, sir.
9        I would be more than happy to see any language,
10   but as far as the bill that we are talking about here
11   today, no, sir, I could not support that.
12       THE CHAIRMAN:  So it doesn't matter how light
13   that burden is made, you don't think this is worth
14   undertaking?
15       MR. CAREY:  If it relates to the burden of
16   criminalizing law-abiding citizens through the use of a
17   private transfer, as it relates to this bill here that we
18   are talking about, no, sir, I would not support that.
19       THE CHAIRMAN:  Representative Buckner.
20       REPRESENTATIVE BUCKNER:  So your position is
21   that there should be no background checks for gun ownership
22   regardless of how little burden it places on the gun
23   purchaser?  Is that what I'm hearing you say?
24       THE CHAIRMAN:  Mr. Carey.
25       MR. CAREY:  Mr. Chairman, Representative
0135
1    Buckner.
2        I think that, as you'll see from our history, we
3    have supported background checks as far as they were done

4    on the NCIC system.  So, no, we think that there are
5    individuals -- as a gun owner, I don't believe that there
6    should be criminals, violent criminals or whatever the
7    prohibitor may be, who should be in possession.
8         So we're not asking to repeal anything.  What I
9    am saying here today that as this bill stands in its
10   effort, no, we do not support this bill.
11        THE CHAIRMAN:  So, Mr. Carey, you are in favor
12   of backgrounds checks for the 60 percent but not for the
13   remaining 40 percent?
14        MR. CAREY:  Well, again I would like to go back
15   to the statistics.  And you have there in front of you, and
16   I would happy to provide you a copy of the poll that had
17   come out.
18        It is not 40 percent, but as the background
19   checks exist today through the NCIC system, yes, we do
20   support that, but, no, we do not support that here today,
21   what you are talking about, the private transfer.
22        If you look back at the Gun Control Act of 1968,
23   it was lined out for the specific purchases that these
24   private transfers should be held differently from those
25   that have to go through a licensed dealer, and I still
0136
1    support that here today.
2         THE CHAIRMAN:  Thank you, Mr. Carey.
3         Are there any further question for Mr. Carey?
4         Representative Court.
5         REPRESENTATIVE COURT:  Thank you, Mr. Chair.
6         Mr. Carey, if I remember correctly, because we
7    talked a little bit ago about closing the gun show loophole
8    through a citizen initiative, if I remember correctly, the
9    NRA hotly contested that citizen initiative.
10        Am I correct in my memory?
11        THE CHAIRMAN:  Mr. Carey.
12        MR. CAREY:  Mr. Chairman.
13        Representative, I was not here at the time as a
14   representative of the NRA, but I believe from history that
15   we did oppose that initiative.  Yes, ma'am.
16        REPRESENTATIVE COURT:  Okay.
17        THE CHAIRMAN:  Representative Court.
18        REPRESENTATIVE COURT:  Thank you, Mr. Chair.
19        And then about 70 percent I think is what
20   Representative Fields said of Coloradans supported closing
21   that gun show loophole by voting for that citizen
22   initiative because the legislature had failed to act.
23        And so I guess where I want to go with this is
24   recognizing the passion with which people voted in favor of
25   closing the gun show loophole, why would you think that
0137
1    people today would still favor leaving this extra loophole
2    available?
3         THE CHAIRMAN:  Mr. Carey.
4         MR. CAREY:  Mr. Chairman, Representative.
5         Thank you for the question.  I think it's a

6  good question, but I think the problem is. One, let me
7  talk about the statistics of who I represent.  I represent
8  our members, our almost 5 million members of the National
9  Rifle Association.  And I've heard a number thrown out
10  today that 70 percent or 72 percent or 74 percent of NRA
11  members support a so-called universal background check.
12       That's absolutely factually inaccurate, and
13  it's inaccurate for a couple reasons.  One, there are, from
14  recent statistics, almost 30 million people who identify
15  themselves as NRA members one way or the other.
16       Now, would we like to have 30 million members?
17  Absolutely.  In reality we have closer to 5 million
18  due-paying members, and those members are not assessable to
19  any group, whether it be Mayor Bloomberg's group MAG or
20  President Obama.
21       So when they talk about the statistics of NRA
22  members who support a universal background check, 92
23  percent of the people that we reached out to, 1,000 across
24  the country, NRA members that only we have access to, 92
25  percent of them said that they oppose this initiative.
0138
1       REPRESENTATIVE COURT:  Mr. Chair.
2       THE CHAIRMAN:  Representative Court.
3       REPRESENTATIVE court:  Thank you, Mr. Chair.
4       No, I'm not talking about NRA members.  I'm
5  talking about the fact that the people of Colorado, 70
6  percent of the people of Colorado, voted to close the
7  background check loophole, so why would you think now the
8  people of Colorado, not NRA members, but the people in
9  general wouldn't want this other loophole closed?  Why
10  would that not be logical to think that the people again,
11  not just the NRA members, but the entire population of
12  Colorado who voted so overwhelming to close the gun show
13  loophole would not now want this other loophole closed?
14       THE CHAIRMAN:  Mr. Carey.
15       MR. CAREY:  Mr. Chairman.
16       Representative, thank you for the question.
17       Again, I'm here representing members of the NRA
18  and those who are advocates for gun rights and the Second
19  Amendment.
20       That was in 2000.  That was for a different
21  bill.  That was for a different initiative, and I agree, it
22  was, I believe, 70 percent.  I haven't seen the specific
23  statistics, but I'm not going to quibble with you over it.
24       But I think that what we are talking about here
25  today is something wholly different.  And again, I think
0139
1  that we're advocating because we see it as an unjust burden
2  and a constitutional burden on us as NRA members and
3  supporters of the Second Amendment.
4       THE CHAIRMAN:  Representative Court.
5       REPRESENTATIVE COURT:  Thank you, Mr. Chair.
6       Well, we'll just have to agree to disagree
7  because I think it's a very, very similar issue.  It's a

8  different loophole, but it's still a loophole.  And when we
9  asked gun show people to deal with the background check,
10  they figured out how to do it, and people are buying --
11  have been buying guns at gun shows ever since.
12       So I think this is a very similar issue, and I
13  believe from the response I've had from my constituents,
14  that there is comparable support for closing this loophole
15  as there was a decade ago.  So I guess we'll just have to
16  agree to disagree on this one.
17       Thank you.
18       THE CHAIRMAN:  Representative Salazar.
19       REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
20       As I take a look at the law -- and I don't want
21  my words to be mistaken here -- I don't think that you
22  quite understand where I'm coming from, that on the private
23  sales, these private sales I have concerns that background
24  checks aren't being done.
25       I don't know you, you don't know me, you want to
0140
1  purchase a gun that I'm selling.  I don't know what you are
2  going to do with it.  It could be that you go hunting with
3  it just like I go hunting with it.  It could be that you
4  use it for home defense like I use it for home defense, or
5  it could be that you're a criminal and I'm just giving it
6  to somebody that's going to go and commit a crime.
7       For me it's about the exceptions, and that's --
8  that's what I'm most concerned about, is that, you know,
9  that I have family members that I may want to give a gun to
10  so they can go hunt or that I just may want to give it to
11  them, and they may not be a brother or sister, but they may
12  be my first cousin, right?  Those are the areas that I'm
13  concerned with.
14       Make no doubt about it, I'm concerned about the
15  individuals who sell their guns to other individuals that
16  they don't know, and that's the loophole that should be
17  closed.  And do I figure that's an unreasonable burden?  I
18  don't think that's an unreasonable burden.  I think that
19  that's something that we have to address as this
20  legislature and as a people.  That's something that we have
21  to address because that's a loophole there that maybe a lot
22  of people jump through.  And I just want to make my
23  position clear on that.
24       THE CHAIRMAN:  Representative Murray.
25       REPRESENTATIVE MURRAY:  Thank you, Mr. Chair.
0141
1       With all due respect to Representative Court,
2  whenever we are talking about our constitutional rights, if
3  there are two people in the room that feel that their
4  constitutional rights are be abridged, I think all of us
5  need to be paying attention to that.  This isn't a matter
6  of, you know, who has the majority or minority on any one
7  issue.  This is about constitutional rights.  And when it
8  comes to that, I think it's a whole different conversation.
9       THE CHAIRMAN:  Representative McLachlan.

LEG HX 000543    4458

10      REPRESENTATIVE McLACHLAN:  Thank you,
11  Mr. Chairman.
12          I think one of the critical issues we need to
13  examine when we talk about constitutional rights is what
14  the ruling of the courts are and what the courts have
15  stated on the issue of background checks.  And it's
16  previously been testified here the United States Supreme
17  Court per Justice Scalia, upheld the constitutionality of
18  background checks.
19          So we can't live in a parallel universe.  We
20  have to deal with the rule of law, and the rule of law says
21  background checks, when applied appropriately, are
22  constitutional.  So if we are going to attack this
23  legislation, we have to do it on other grounds besides
24  constitutionality.
25          THE CHAIRMAN:  Representative Gardner, and then
0142
1   Representative Wright.
2          REPRESENTATIVE GARDNER:  Well, thank you,
3   Mr. Chair.
4          And just I suppose if -- if members of the
5   committee are going to advocate and pontificate, let me
6   just say that just because something in context has been
7   held unconstitutional, I don't know whether the transfer of
8   a firearm from myself to a family member in a private sale
9   is necessarily constitutional, and it's not something that
10  I know of that the United States Supreme Court has looked
11  at.
12          So I think to try to criticise other members of
13  the committee or foreclose that discussion and just say,
14  well, it's -- it's all settled so we ought to do something
15  else, with all due respect, I think that's probably not
16  appropriate, but others can decide otherwise.
17          Mr. Carey, my -- my observation with respect to
18  some of the questions that have been asked of you and
19  people citing what their constituents have said about this,
20  it's very clear that my constituents overwhelming are
21  opposed to this legislation.
22          There may be differences between Metro Denver
23  and rural Colorado or El Paso County and the City and
24  County of Denver and Boulder County.  So I represent a set
25  of constituents who think that this is not going to
0143
1   contribute to public safety but rather is going to be an
2   imposition upon their ability to do some things I addressed
3   earlier, which was as simple as handing a firearm to a
4   close friend who may need some protection.
5          So you can respond or not as you wish.  Thank
6   you.
7          THE CHAIRMAN:  Mr. Carey, if you care to
8   respond, please do.
9          MR. CAREY:  Sure, Mr. Chairman.
10          Representative, I appreciate the comments, as it
11  relates to the constitutionality of it and as you were

12 relating to the rest of the committee as we've spoken on
13 this.
14         Again, I would like to relate back to that there
15 is no constitutional right that is allowed to be executed
16 without any -- some type of restriction, as we've seen with
17 the First.
18         But again, I think, when you place an unjust
19 burden, which we see this initiative as, on law-abiding
20 citizens to exercise that right, we see it as
21 unconstitutional, and we can't stand by and let them try
22 and pass these types of initiatives because we do not agree
23 with it.
24         THE CHAIRMAN:  Mr. Carey, thank you.
25         Representative Wright.
0144
1         REPRESENTATIVE WRIGHT:  Thank you, Mr. Carey.
2         And you likely have testified to this or at
3 least have those sorts of statistic in hand.
4         Can you tell me:  Has the NRA located any
5 statistic that supports states that have taken this
6 universal background check approach that would show that,
7 in fact, it is beneficial to decreasing violent crimes?
8 And I would specifically, I guess, look back at the
9 statistic that there was an increase or spike in the murder
10 rate in Colorado immediately following closing the gun --
11 the gun show loophole.
12         Can you comment on that as well?
13         THE CHAIRMAN:  Mr. Carey.
14         MR. CAREY:  Mr. Chairman.
15         Representative Wright, I appreciate the comment
16 and the question.
17         I think that if you look at the information that
18 I've provided to the committee as it pertains to not only
19 the model as it is in California, which is similar to
20 what's being proposed here today, that, one, it has had no
21 positive effect that can be measured as it relates to crime
22 and murder rates.
23         So what are we doing here today with this
24 legislation if we cannot attribute it to a positive effect
25 on these things that we're trying to curb?
0145
1         Secondly, if you could refresh my memory.  I
2 apologize.  What was the second portion of your question as
3 it relates to 2000 to 2004?  Was that -- if you look again
4 at the data that you had before you when 70 percent of
5 Coloradans passed the so-called gun show loophole by vote,
6 you'll see that there was an increase in violent crime
7 rates here in Colorado.
8         So again, I don't see the correlation between
9 initiating this type of check and reducing the amount of
10 crime the state.
11         THE CHAIRMAN:  If there are no further
12 questions for Mr. Carey, may I -- please accept our thanks
13 on behalf of the committee for giving us your perspective.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

14  It's been very helpful.  Thank you, sir, for testifying
15  here today.
16        MR. CAREY:  Thank you all very much.
17        THE CHAIRMAN:  Is Mr. Dudley Brown here?
18        Mr. Brown, welcome to the -- back to the
19  Judiciary Committee.  We're always glad to see you.
20        MR. BROWN:  Thank you, Mr. Chairman.
21        THE CHAIRMAN:  And please tell us your name,
22  who you represent, and proceed with your testimony.
23        MR. BROWN:  Mr. Chairman, members of the
24  committee, my name is Dudley Brown.  This is my 21st year
25  representing gun owners in this state.  I'm the executive
0146
1  director of Rocky Mountain Gun Owners and also the CEO of
2  the National Association for Gun Rights.
3        I represent gun owners all around the country
4  in congress, and I want to encourage you, before you vote
5  on any of this, this particular bill, to read Article 2,
6  Section 13, and see if this really does call in question
7  the right to keep and bear arms.  I submit to you that it
8  does call in question your First Amendment rights, if you
9  put people through Brady checks prior to practicing your
10  First Amendment rights.
11        I think every member of the press here would
12  agree to that.  That is exactly what this bill does to
13  private sales.  And if you took the oath of the
14  constitution seriously, and I believe most of you do -- you
15  certainly say you do -- you have to justify that.
16        I'd like to concede my time, though, to a
17  personal story to a member and let him -- let him speak.
18  And he's signed up to speak.  His name is Mr. Anthony Racz.
19  He's from -- his family is from Hungary.  If that's
20  permissible by the Chairman.
21        THE CHAIRMAN:  That would be fine, Mr. Brown.
22        And then let's hear from Mr. Racz, is it?
23        MR. BROWN:  Yes.
24        THE CHAIRMAN:  You're Mr. Racz?
25        MR. RACZ:  Yes, I'm Anthony Racz.  I'm a
0147
1  Hungarian immigrant.  Our family came here in 1956 to
2  escape the Russian invasion of Hungary, and my perspective
3  of these gun issues is very personal.  It's not as a
4  bystander.  It's not philosophical.
5        My family escaped because my grandfather was
6  arrested by the Soviets when they came in and removed him
7  from his position in charge of the police in Budapest
8  because he would not give up the gun registry.  He knew
9  what the result would be.  And we know history.  We see
10  there was a result, a bloody result.  Many of my past
11  countrymen died in that.
12        So I'm particularly sensitive to anything that
13  is going to incrementally increase restrictions and
14  eventually end up in lists or registries or whatever term
15  you want to use for them.

16          I know that's not probably the intent of the
17  current bill, but I know that that does come about.  I'm
18  also a concealed carry holder, so I'm on a list, lists that
19  are periodically published that achieve no result in
20  reducing crime.  They only serve to punish and penalize
21  those that are gun proponents.  They've also resulted in
22  danger to people that are on that list, such as our law
23  enforcement officers that are retired, judges, and so on.
24  So I'm particularly sensitive to registration and
25  incrementally increasing controls.
0148
1          Sometimes we hear the truth pop out.  We heard
2  that word incremental come out and then quickly back
3  peddled because we know where that can lead.
4          So I have a great deal of sympathy for all of
5  the people who have suffered.  We've heard horrendous
6  stories today of what has happened, but in none of those
7  instances would this bill have made any change.
8          The mother in the school incident had not -- if
9  she had not been murdered, this bill would have allowed her
10  to give a weapon to her son.  No impact whatsoever on
11  reducing that.  Any one of the other incidents you pick,
12  you're going to see the same situation, that this bill
13  would have made no impact whatsoever.
14          My concern is that I took an oath as a citizen,
15  just as you all have, our law enforcement or military.
16  Oaths that vary, but in every single one of them, we took
17  an oath that we would uphold the constitution and defend it
18  against all enemies, foreign and domestic.
19          My family risked their life to come here for
20  those freedoms, and I take that seriously.  And I think
21  that's one of the things that we have to look at here.  I
22  want to see effective reduction in crime.  This isn't going
23  to do it.
24          We must legislate from a position of logic and
25  one eye on the constitution and law at all times.  We must
0149
1  not legislate based on hysteria and emotion.  And what is
2  considered reasonable, that's a sliding window, and that's
3  where the danger comes in.
4          So I very much appreciate the opportunity to
5  speak before you, and I speak from my heart.  I don't have
6  a speech prepared.  I'm not a public speaker, but I speak
7  from my heart, and that's where all of this comes.
8          THE CHAIRMAN:  And you speak very articulately
9  and very persuasively and very well, sir.
10          MR. RACZ:  Thank you.  And hopefully with not
11  much of an accent.
12          THE CHAIRMAN:  Are there any questions for
13  Mr. Racz?
14          Representative Murray.
15          REPRESENTATIVE MURRAY:  Thank you, Mr. Chair.
16          Thank you so much for your testimony, sir.
17          I appreciate hearing the international nature of

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

18  your comments because I think that's very important and
19  instructive of what's happened in other countries with gun
20  restrictions.
21       A Harvard study recently pointed out that
22  nations with stringent anti-gun laws generally have
23  substantially higher murder rates than those who do not.
24  And, in fact, Russia has all but eradicated gun ownership,
25  and they have a murder rate that exceeds four times that of
0150
1  the United States.  So thank you for bringing -- bringing
2  that thought to my mind from some research that I had done.
3       Thank you.
4       MR. RACZ:  Thank you as well.
5       THE CHAIRMAN:  Mr. Racz, thank you so much for
6  testifying before us today.
7       MR. RACZ:  Thank you, Mr. Chairman.  Appreciate
8  it.
9       THE CHAIRMAN:  We now move to the part of the
10  witness testimony phase which is somewhat too much close to
11  speed dating for my liking, but none the less, as a matter
12  of practicality, we are going to restrict the witness's
13  direct testimony to two minutes, as we did the proponents.
14       And the first witness to come forward, Mr. Dave
15  Gill, please.
16       And as Mr. Gill is preparing to testify, may I
17  just mention the names of some of those witnesses who will
18  be following Mr. Gill so that they can come up, if they are
19  in the overflow room, and if they are not, at least they
20  will know that they are going to be testifying shortly.
21       They are Mr. Patrick Smitwick (phonetic) or
22  Smitwick.  I suspect that's Smitwick.  Douglas Howell,
23  Terry McGuire, and Aubrey -- Aubrey of Littleton.  Aubrey
24  Allmond I think it is.
25       But if you recognize yourself from Littleton,
0151
1  maybe you'll give us the correct way to pronounce your
2  name.
3       So Mr. Gill.
4       MR. GILL:  Thank you, Mr. Chairman.
5       My name is Dave Gill.  I'm the vice president of
6  the Colorado State Shooting Association, which was
7  established in 1926, and I suspect, therefore, is probably
8  the oldest civil rights group in this state.  I am
9  testifying on behalf of our members in opposition to this
10  bill.
11       First and foremost, there has been no factual
12  demonstration that anything in this bill would do anything
13  to reduce crime.  The statement that a number of our
14  criminals do not buy their weapons through normal process
15  is not at all surprising, nor does it imply that this bill
16  would do anything to change their behavior or to make them
17  honest citizens.
18       What it would do, on the other hand, is make
19  many honest citizens criminal.  Several examples:  One, a

20  friend of mine last year, lives in a rural part of Douglas
21  County, and he had is life very directly threatened by a
22  person who did not appear rational.  He didn't have a
23  weapon of any kind in his house.  He hadn't seen the need
24  to have one.  After his life was threatened, he began to
25  see things a little differently.  I leant him a handgun and
0152
1  gave him instructions on how to use it.
2       If I had not been able to do that, would he have
3  been able to protect himself?  Was the ability that he had
4  to protect himself significant in deterring the individual
5  who had threatened his life?  Could well have been.  But
6  this bill would have made me a criminal for lending this
7  person a firearm.  He wasn't a relative.  He was just a
8  friend of the last 10, 15 years that I know very well.
9       There is a nephew of mine who will probably be
10  receiving most of my firearms.  This would not allow me to
11  give them to him without him going through and extensive
12  background check.  And once again, this infringement, this
13  inconvenience, as it has been referred, would do nothing to
14  reduce crime.  So if our goal is to reduce crime, then
15  maybe this isn't the approach we should take.
16       CSAA has a program where we lend firearms to
17  competitive shooters.  And as you probably know, the
18  standard firearm today is the AR rifle for competitive
19  shooting.  This bill, as I understand it, would prevent us
20  from lending these rifles to citizens who are competing in
21  matches and national matches.
22       THE CHAIRMAN:  Mr. Gill, I'm going to have to
23  ask you to hold it there.  But you've raised some very
24  interesting points.
25       And I would like to just tell you that this bill
0153
1  does allow without a background check the transfer -- a
2  temporary transfer of a firearm to somebody within the
3  home of the transferee.  So you are allowed to temporarily
4  lend a friend your firearm, should you think that
5  appropriate, and that might be a good thing to do in the
6  situation that you had with your friend who decided he
7  would really like to have a firearm.  Until such time as he
8  can acquire his own, you could lend him his (sic), as long
9  as you did so in his home.
10       And also in the bill there are -- there are
11  provisions to allow a transfer of firearms, if it's done at
12  a -- at a shooting competition or while hunting or fishing
13  or trapping or -- yeah.  There are provisions.
14       But I think you raise important points, and I do
15  think that if this bill moves forward from here, those
16  points may require clarification, but they are to deal with
17  exactly the situation you talked about.
18       As far as the transfer of a firearm to your
19  nephew, you're right, there would have to be a background
20  check done if the bill were passed in unamended formed and
21  enacted into law.  But we really appreciate you bringing

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

22  your perspective, and thank you for your testimony, sir.
23      Are there any questions for Mr. Gill?
24      Representative Lee.
25      REPRESENTATIVE LEE:  Thank you.
0154
1      Again thank you for your testimony, and thank
2  you for giving us your thoughts on this bill.  More in the
3  nature of a comment than a question because I -- I keep
4  hearing repetitive statements to the effect that there --
5  criminals won't go through legal means to acquire weapons.
6  But we have information to the effect that in 2010 the FBI
7  denied 76,000 prohibited purchasers, the majority of whom
8  were felons or domestic abusers, from obtaining weapons.
9  And those weren't all of the attempted acquisitions of
10  weapons, that there's an estimate that 150,000 criminals
11  and domestic abusers, felons, attempted to acquire weapons
12  and that the background checks in effect at the federal
13  level presented those transfers.
14      So I just wanted to put those statements out
15  there because we keep hearing that that's not the case,
16  that felons will not be stopped from getting weapons.  And
17  factually 76,000 documented and 150,000 others have been
18  stopped from getting weapons by background checks.
19      THE CHAIRMAN:  Mr. Gill.
20      MR. GILL:  Thank you, sir.
21      I'm not saying that background checks do not
22  have a benefit or might not.  I am saying this particular
23  bill and this particular expansion would not be likely to
24  have a beneficial effect, and there has been no
25  demonstration that this particular bill would also have any
0155
1  decrease in crime.
2      And, Mr. Chairman, also the way that we lend our
3  rifles out, we're not actually at the range and say, Here
4  it is and hand it to them.  They pick it up.  They sign it
5  out from us, and that is their rifle to use for a year or
6  two years, that they will carry home, that they will take
7  to matches while they're shooting, while they are learning,
8  while they decide what it is they want to have as their
9  personal target rifle.
10      THE CHAIRMAN:  Thank you, Mr. Gill.  That's an
11  important distinction to make, and it's very helpful that
12  you made it.
13      There are no further question for Mr. Gill.
14      So thank you, sir, for giving us your
15  perspective on this matter.
16      MR. GILL:  Thank you very much for the
17  opportunity.
18      THE CHAIRMAN:  We appreciate -- we appreciate
19  your testimony, sir.
20      Next up we have Mr. Patrick Smitwick, if he's
21  here.
22      And Mr. Smitwick is not here apparently, so we
23  will go to Mr. Douglas Howell, please.

24    MR. CAMPBELL:  What's the last name again?
25         UNIDENTIFIED SPEAKER:  Howell.
0156
1         THE CHAIRMAN:  Howell, Douglas Howell.
2         MR. CAMPBELL: It's not Campbell?
3         THE CHAIRMAN:  Not at this point, Mr. Howell --
4    Mr. Campbell.  Not yet.  We are looking for Douglas Howell.
5         Are you Mr. Howell?
6         Excellent.  Please come forward, sir.
7         We are very grateful that you came and agreed
8    to give us your perspective on House Bill 1229.  Thank you
9    for doing that, sir.
10         Please state your name for the record.  Tell us
11    who you represent, if anyone other than yourself, and then
12    proceed with your testimony.
13         MR. HOWELL:  Thank you, Chairman.
14         My name is Douglas Howell.  I've served the
15    United States for 19 and a half years from the military,
16    military and nuclear weaponry.  So I have a -- a gripe
17    about this.
18         First thing I want to say is:  I hear the
19    amount of 33 people every day are killed by guns.  I don't
20    know, is that Colorado?  Is that national?  I don't know.
21         Next thing, bill writers right now are being run
22    by emotions, not by facts.  Drunken drivers and pot-smoking
23    drivers kill more people than guns in this country.  So if
24    you want to outlaw something, all right, go after
25    automobiles, get rid of automobiles, if you want to try.
0157
1    That will save more people than guns will, and see how long
2    that lasts.
3         Government has gone back to the tyranny that
4    was fought for in the Revolutionary War.  Government keeps
5    extending their power and taking away our rights.  Every
6    time you meet, you put in more legislation and more laws.
7    And because of this right now, I am being taxed out of my
8    house because of the state of Colorado.
9         Okay.  I've had guns since I was 16 years old,
10    and not one of them has gotten up and shot anybody.
11    They've all stayed right where they were.
12         I was in the Strategic Air Command, and the
13    motto there was peace through deterrent, and that won the
14    Cold War.  We had bigger and a better nuclear force than
15    Russia had, so they backed down.  So if homeowners have the
16    privilege of having guns in their own house, people will
17    think twice or even three or four times about trying to
18    enter those houses.
19         THE CHAIRMAN:  Mr. Howell, thank for your
20    service, and thank you for your testimony.
21         Are there any questions for Mr. Howell?
22         Thank you, sir.
23         MR. HOWELL:  Can I just close with one real
24    quick thing?
25         THE CHAIRMAN:  All right, Mr. Howell.

1  Certainly.
2        MR. HOWELL:  Switzerland mandates that all homes
3  have at least one assault weapon.  People in Switzerland
4  live in the happiest country in the world.  Our government
5  has stressed our population to its breaking point.  That's
6  why we are having more and more people get upset.  But
7  Switzerland has a gun in every house, and it is mandated to
8  do that.
9        THE CHAIRMAN:  Thank you, sir.  And that's a
10  very interesting question, which I'm sure we will hear more
11  about.  And thank you for raising it, sir.
12        MR. HOWELL:  Okay.  Thank you for letting me
13  speak.
14        THE CHAIRMAN:  I am pleased that you came.
15        Mr. Howell, thanks.
16        Our next witness is Terry McGuire, who will be
17  followed by -- if you'll come forward please, Terry McGuire
18  -- who will be followed by Aubrey Allmond and then Paul
19  Myersick, and then Brian Lane, and then Patrick Thai.
20        So welcome, Mr. McGuire.
21        MR. McGUIRE:  Thank you, sir.  Thank you --
22  thank you, Chairman, Representatives, Citizens of Colorado.
23  I appreciate the opportunity to speak before you this
24  morning.
25        I'm reminded of a passage in the Bible, in the
0159
1  scriptures, where Peter, it records, knew not what to say,
2  therefore he spake.  I think sometimes we do that with
3  legislation.  I think sometimes more than a -- a critical
4  evaluation of what the problem is and what it is we are
5  trying to do, we have a gut reaction.
6        It's amazing to me that our nation survived very
7  well for over 200 years without the legislation we are
8  considering today.
9        My concern is that this added legislation puts
10  an added layer or regulation upon a constitutional right.
11  Could you imagine if anyone took the First Amendment and
12  said that you have to go through a process of government
13  approval?  And I'm sure it could come to that someday in
14  America, as it has in other nations.
15        My concern is that we're adding regulation upon
16  regulation.  The average waiting period, when the
17  background check was instituted through CBI, was about
18  three minutes.  Now it's over a week, and who knows what it
19  will become if it goes beyond what we're proposing today.
20        My concern is that, as a family member tries to
21  transfer a firearm to another family member -- we've done
22  that for over 200 years with very limited problems.  And
23  I'm just -- I think we're -- it's not a characteristic of a
24  great society that piles laws upon laws.  It's a
25  characteristic of a great society that men's hearts are in
0160
1  tune with what's right, and there's a minimum of laws.

2       I forget which great Roman orator said that, but
3   nevertheless, I believe it's true.  So I would -- I would
4   ask for an overturn on the extensive background checks.
5       THE CHAIRMAN:  Thank you, sir.  And you are the
6   first witness to have come to a halt at exactly two
7   minutes.  And I -- I am most impressed by that and by your
8   argument.  But that is particularly impressive.
9       MR. McGUIRE:  I would say I'm a Baptist
10  preacher, so you'll never see me do this again in my life.
11      THE CHAIRMAN:  Are there any questions for this
12  witness?
13      Representative Murray.
14      REPRESENTATIVE MURRAY:  Thank you, Mr. Chair.
15      And welcome to my constituent, Mr. McGuire.
16  Thank you for coming.
17      I really appreciate that phrase men's heats are
18  right, because one of the things that many of us talk
19  about, and we haven't brought it up today, is what's going
20  on in our society that there is some trigger that is
21  causing people to do things that maybe we are not
22  accustomed to seeing happen in our society.  So it is not
23  the gun's fault that this is happening.  We have to look in
24  our own hearts and see what is changed.
25      I saw on TV a mother of a child that was killed
0161
1   in the massacre in Connecticut, and -- you know, she wasn't
2   a mother.  She was a neighbor to the shooter.  And she had
3   indicated that the neighbors had sort of not been around
4   this family very purposefully, had not extended themselves
5   and their hearts to them and that she felt very guilty that
6   -- she felt that somehow, if they had had some extension of
7   love from their neighbors, which, you know, in the old days
8   we all used to extend ourselves to our neighbors, and it's
9   like we don't do that anymore.  That's an issue that we
10  need to be dealing with in our society.
11      So I appreciate that phrase, and thank you for
12  bringing that to us.
13      THE CHAIRMAN:  Further questions for
14  Mr. McGuire?
15      Seeing none, thank you very much, Mr. McGuire,
16  for helping us make this difficult decision.
17      MR. McGUIRE:  Thank you, sir.  Thank you all.
18      THE CHAIRMAN:  Thank you.
19      Aubrey Allmond, Paul Miesick, Brian Lane,
20  Patrick Thai.
21      Mr. Thai, please come forward, sir.
22      Oh, sorry, Mr. Thai.  I over -- I was a little
23  too enthusiastic there.
24      We have Mr. Allmond?
25      MR. ALLMOND:  Yes.
0162
1       THE CHAIRMAN:  Please, welcome.  Thank you for
2   coming.  And please state your name properly, because I
3   probably haven't, and tell us who you represent, and give

4   us your testimony.

5        MR. ALLMOND:  Thank you.  And thank you for

6   allowing me to be here today.

7        My name's Aubrey Allmond.  I live in Littleton,

8   and I represent myself and the security of my family.

9        Bill 1229 permits the state to tell a private

10  citizen when and if they can sell a personal possession.

11  This is similar to asking for permission from the state if

12  you can sell a car or a pocketknife or a baseball bat.

13       The state should not have the power to dictate

14  to what its citizens -- if they can sell personal

15  possessions.  1229 allows the state to overstep its bounds

16  and responsibilities to the personal lives of its citizens.

17       CBI recently requested an additional half a

18  million dollars in order to keep up with the increased

19  demand for background checks.  The request was denied.

20       Denver Post, January 12, 2013, Ronald Sloan, CBI

21  director, told the Denver Post on Wednesday that proposed

22  legislation would increase the volume of gun background

23  checks incredibly.

24       Without additional resources, the already long

25  Colorado wait times would lengthen.  These extremely long

0163

1   wait times could mean life or death to someone that needs

2   to protect themselves, and HB-1229 places undue hardship on

3   state resources and its citizens.

4        This bill is also unenforceable.  No one would

5   know if a firearm was sold or gifted to a friend or

6   relative unless they intentionally sought a licensed

7   firearm dealer and followed the process.

8        This bill also does nothing to prevent the

9   transfer from happening in other states with the firearm

10  eventually residing in Colorado.  You will never know the

11  numbers of private sales of guns, baseball bats, or kitchen

12  tables.

13       I submit to you read the text of Deadly Lessons,

14  Understanding Lethal School Violence written by the

15  National Research Counsel.  I plead for you to vote no on

16  1229.

17       Thank you.

18       THE CHAIRMAN:  Mr. Allmond, thank you.

19       And are there any questions for Mr. Allmond?

20       Mr. Allmond, I just want to mention:  I think

21  that you're right, that this bill would probit the sale of

22  a firearm to a family member without first getting a

23  background check, but it would not prohibit the gift of a

24  firearm to a family member.  If they were a member of the

25  immediate family, there would be no background check

0164

1   required even under this bill.  So just for clarification

2   purposes.

3        MR. ALLMOND:  There's no definition of will

4   either.

5        THE CHAIRMAN:  Sorry?

LEG HX 000554

4469

6        MR. ALLMOND:  There's no definition of will.  So
7   if I were to receive within my father's will a firearm
8   collection and he's out of the state, there's nothing to
9   address that transfer.
10        THE CHAIRMAN:  Well, just for purposes of
11   clarification, the language of the bill says that a
12   transfer that is a bona fide gift between immediate family
13   members, which are limited to spouses, parents, children,
14   siblings, grandparents, and grandchildren is -- is exempt
15   from the requirement.
16        So that's -- that's the way that the bill is
17   written.  I just want you to know that that's the way the
18   bill is at the moment.  But your point is nevertheless well
19   taken.  That is presumably not a big enough exception to
20   satisfy you, and we -- we note that.  And it's very helpful
21   that you came and explained your position to us here in the
22   House Judiciary Committee.  It will help us make a decision
23   properly.
24        MR. ALLMOND:  Thank you.
25        THE CHAIRMAN:  Thank you very much,
0165
1   Mr. Allmond.
2        Mr. Patrick Thai.
3        Welcome, sir.  Thank you for coming.
4        MR. THAI:  Thank you, sir.
5        THE CHAIRMAN:  Please give us your name.
6        MR. THAI:  My name is Patrick Thai.
7        THE CHAIRMAN:  Please tell us who you represent,
8   if anyone other than yourself.
9        MR. THAI:  I'm just representing myself, sir.
10        THE CHAIRMAN:  Please give us your testimony.
11   Thank you, sir.
12        MR. THAI:  I'm going to keep it brief.  The
13   last witness covered most of what I had to say regarding
14   enforceability.
15        My issue with that is I've sold firearms to
16   private sellers before.  Whenever I do so, I always make
17   sure and verify that they've got a Colorado driver's
18   license, make sure they are not an out-of-state buyer,
19   because that would be a violation of the law.
20        But if this law is passed into place and if I
21   wanted to do -- and if I wanted to do that, I would have to
22   go through a dealer.  But if there was a criminal who, you
23   know, thought ahead, didn't try to go to a dealer, which
24   some clearly don't, as Representative Lee had stated
25   before, if they don't want to go to dealer, there's no way
0166
1   to catch them until they are caught in a crime with the
2   weapon, if at all.
3        And that's the only point I had to make on this
4   issue, sir.
5        THE CHAIRMAN:  Thank you, Mr. Thai.
6        Are there any questions for Mr. Thai?
7        Mr. Thai, thank you for coming and making that

8   point to so clearly and concisely.  I appreciate it.
9        MR. THAI:  Thank you, sir.
10       THE CHAIRMAN:  We now would ask Daniel Carey to
11  come forward.  I already heard -- oh, I already heard from
12  Daniel Carey.  We already heard from Daniel Carey, so I
13  would not ask for Daniel Carey to come forward.
14       Mr. Dave McCally, please.  Step forward and give
15  us your testimony with regard to House Bill 1229.
16       Um, failing that, Charles Yates.
17       Charles Yates, I hear you are here.  Good,
18  excellent, superb, Mr. Yates.
19       And so that the next witnesses can be ready, let
20  me just tell you that following Mr. Yates, we will have
21  Mr. Sean Verhoeff, right?  Okay.
22       Sean Verhoeff after Mr. Yates.  Then Mr. Ronald
23  Dietz, Mr. James Winchester, and Alicia Perez.
24       Mr. Yates, correct?
25       MR. YATES:  Yes, sir.  Thank you.
0167
1        THE CHAIRMAN:  Mr. Yates, thank you for being
2   here.
3        MR. YATES:  My name is Charles Yates.  I'm from
4   Colorado Springs.
5        I'm a normal citizen.  I have a normal job.  I
6   do a normal daily thing.  I'm a law-abiding citizen.  And
7   my problem with this bill, as stated here, is it does not
8   -- I'm sorry for the representation.  It does not address
9   the criminals that are going after the weapons.  It doesn't
10  address the punishment or the criminals that are stealing
11  guns out of homes, stealing guns out of cars, stealing guns
12  at home invasions, and going in and doing what they will.
13       It is a burden on people to go through the
14  background.  And we've heard stated it could take up to 10,
15  could go up 12, could go up to 30 days with the amount of
16  background checks that are going to have to be performed if
17  you continue down this road.
18       The background process is apparently a very
19  costly process when it comes to the government checking
20  everybody's background.  I've had background checks done.
21  I don't -- I didn't mind having a background check done
22  because I'm a law-abiding citizen.  I don't have to look
23  for other ways to go about in getting weapons, but the
24  criminals won't have to do that, and they won't do that.
25  They are just going to go into people's houses.
0168
1        What are the possibilities of this law actually
2   causing an uptick in criminal activity?  Because they are
3   now not even going to go through any kind of background
4   check.  They are just going to go ahead and go illegally
5   obtain their weapon and cross the border into Mexico, get
6   back in here.  There's so many possibilities that this bill
7   just does not affect.
8        And that's what I'm here to state.
9        THE CHAIRMAN:  Well, thank you for coming here

10    and being patient and saying it, sir.  We appreciate the
11    input.
12             Are there any questions for Mr. Yates?
13             Seeing none, please take -- accept our thanks.
14             Mr. Sean Ver -- Sean?
15             Sir, please come forward.
16             Please state your name, tell us who you
17    represent, and proceed with your testimony.
18             MR. VERHOEFF:  My name is Sean Verhoeff.  I'm
19    representing myself, as well as the voices of southeastern
20    Colorado.
21             THE CHAIRMAN:  Welcome.
22             MR. VERHOEFF:  Thank you.
23             THE CHAIRMAN:  Carry on.
24             MR. VERHOEFF:  I've got a couple issues with --
25    with the current legislation.  One of the things is the
0169
1     inherent -- is what happens if somebody who owns rifles and
2     firearms passes away, what would be the -- what would
3     happen to their stockpile of guns?  You know, there's --
4     there's many gun owners who have anywhere from 1 to 30
5     guns, 50 guns to hundreds of guns.
6              One of my cousins, for instance, died a couple
7     years ago, and he had several hundred guns.  And under this
8     bill, it would not allow family members like myself to
9     receive guns from his stockpile of weapons.
10             THE CHAIRMAN:  That's a very interesting
11    question, and maybe the bill sponsor would like to answer.
12             Representative McCann.
13             REPRESENTATIVE McCANN:  Thank you, Mr. Chair.
14             There is an exception in the bill for a
15    transfer that occurs by operation of law.  And so I believe
16    that if someone is -- if a will has been -- if something is
17    included in a will, it will pass by operation of the
18    probate law.
19             So I believe that -- and this is something we
20    can perhaps get clarification from the drafter if we need
21    to, but I believe that property would be passed by law
22    through a will through the probate court.
23             THE CHAIRMAN:  Thank you.
24             MS. McCANN:  So you would be able to inherit
25    guns from a family -- from someone by operation of law.
0170
1              THE CHAIRMAN:  Thank you, Representative
2     McCann.
3              MR. VERHOEFF:  I have also another issue that
4     the fact of this bill also would restrict my Second
5     Amendment Right.  I'm 19 years old, and if -- if -- it's
6     not just this bill that comes down the pipe, but it's the
7     next bill and the next bill and the next bill.
8              What is the state of Colorado going to do to
9     protect my gun rights?  I would -- I've been shooting since
10    I've been ten years -- since I was ten years old.  I love
11    shooting.  It's a fun sport to do.  It's also for the

12  production of myself and for the protection of my family.
13        So what is the state of Colorado going to do
14  next?  If we take this step, what are they going to do for
15  the next step?
16        THE CHAIRMAN:  Thank you very much, Mr. --
17  please tell me your last name again.
18        MR. VERHOEFF:  Verhoeff.
19        THE CHAIRMAN:  Mr. Verhoeff.
20        Are there any questions for Mr. Verhoeff?
21        Mr. Verhoeff, you make the point very clearly,
22  and we appreciate you having done so.
23        MR. VERHOEFF:  Thank you.
24        THE CHAIRMAN:  Thank you for coming.
25        Mr. Ronald Dietz, who will be followed by --
0171
1  welcome Mr. Dietz -- by James Winchester, then Alicia
2  Perez, and Ian Jaeger, and then James Durden.
3        Mr. Dietz, welcome to the House Judiciary
4  Committee.  Welcome back if you've been here before.
5  Please give us your name, tell us who you represent, and
6  proceed with your testimony.
7        MR. DIETZ:  Thank you, Mr. Chairman.
8        My name is Ronald Dietz, and I am representing
9  myself.
10        THE CHAIRMAN:  Please proceed, sir.
11        MR. DIETZ:  Okay.  Thank you.
12        I am going to direct my testimony to who has
13  not been dressed at any of these meetings and by any of
14  these bills, and that is the real cause of why someone
15  would want to go in and shoot up a school or a mall or a
16  theater.
17        And I want to start this testimony by showing
18  everybody a picture.  This is a picture of the memorial
19  plaque on my son's headstone.  My son died for the same
20  reason that those children in Newtown did and Columbine and
21  the theater, and that reason is psychiatric drugs.
22        Like Adam Lanza, my son had Asperser's syndrome.
23  Like Adam Lanza, he could not function socially, and like
24  all of the shooters and mall shooters, when I went to get
25  him help, they put him on anti-depressant drugs.
0172
1  Every school shooter, every mall shooter has been on these
2  drugs.  There has never been a school shooter or a mall
3  shooter who has not.  Before these drugs came on the
4  market, there were no school shootings.  There were plenty
5  of semi-automatic automatic weapons that could have done
6  the job.  And as I saw my son on these drugs go downhill,
7  he became more suicidal, and he became violent.  He became
8  wanting to hurt people and attack people.
9        One day, for example, he came to me, and he
10  said, At school I was standing in a line, and I suddenly
11  had this urge to attack everybody in front of me.  He said,
12  Why?  Why do I need to do that?
13        We went to the psychiatrist who was treating

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

14  him, and they refused to accept that as a symptom of the
15  drug.  They refused to get him another treatment, and they
16  said he had to stay on these drugs forever, for the rest of
17  his life.
18          Seeing the way things were going -- and my son
19  also realized this problem, because he came to me and
20  talked to me a lot -- we had to get ourselves off the drug
21  against the doctor's advice.  After that he got better but
22  never got quite well, and he committed suicide when he was
23  20 years old.
24          After my son died, I assumed that things just
25  couldn't get any worse, but then other people started
0173
1  coming and telling me, friends at work, other people I
2  knew, forums I was on on the Web, where they had seen the
3  same thing done to their loved ones.  And I suddenly
4  realized, yes, it can get a lot worse:  My son could have
5  done what Adam Lanza did, and I would have had to endure
6  even greater pain and suffering.
7          These bills do nothing to address this problem.
8  We're overmedicating our kids.  We're putting everybody on
9  the drugs that they can, and these side effects, they are
10  very serious.  These drugs are very dangerous.  They are
11  killer drugs.  They turn people into killers, and it's
12  unacceptable that we continue to allow this to happen.
13          THE CHAIRMAN:  Mr. Dietz, you've shared a very
14  painful story with us, and it takes a lot for you to do
15  that, and we appreciate it.  We know you are just trying to
16  advance our state's public policy.
17          Are there any questions for Mr. Dietz?
18          Thank you, sir, for coming today.
19          MR. DIETZ:  Okay.  Thank you.
20          THE CHAIRMAN:  Mr. James Winchester, please
21  come forward.
22          Mr. Winchester, welcome to the House Judiciary
23  Committee.  Please tell us your name.  Tell us who you
24  represent, not in your capacity as attorney at law.  We
25  don't want to hear your entire client list, but who you
0174
1  represent in your testimony and proceed to give us your
2  testimony.
3          MR. WINCHESTER:  Thank you, Representative
4  Kagan.
5          Before I start, may these be passed out?  It
6  will be -- there are two pages.  I didn't staple them
7  together.  I hope I have enough for everyone.
8          My name's James Winchester.  I'm an attorney,
9  retired.  I spent 27 years with the United States
10  Department of Justice doing some criminal cases.  I also
11  spent a great deal of time on the Denver police reserve
12  doing law enforcement work.  But perhaps most
13  significantly, I was the legislative director of the
14  Colorado State Shooting Association when John Head and I
15  crafted the current bill.

LEG HX 000559    4474

16    I have to say that I don't think either
17  Mr. Head, nor could I foresee what was going to happen with
18  this bill.  Let me give you the history.
19        In the 1990s a grand plan was establish to let
20  CBI do background checks instead of the FBI.  The firearms
21  community had great concerns about this, but the carrot
22  that was held out to us was the CBI checks would remain
23  free, as are the FBI checks.
24        Second, the InstaCheck program would be
25  InstaCheck.  Somehow I think we've strayed a bit from that.
0175
1        And the third carrot was that the program would
2  be adequately funded to present day.
3        We agreed to this, and we made a mistake.  The
4  mistake we made -- there are two.  We should have insisted
5  on a sunset so that there would -- this legislative body
6  would be forced to review their competence and efficiency
7  in the administration of the program.
8        And the second error was that we did not have an
9  oversight board appointed so they would be accountable to
10  someone other than the executive branch of the state
11  government, because I think they -- they need to be.
12        So everyone in the state knows that CBI is
13  many, many days behind.  My understanding is it's seven or
14  eight days, and this is far from what was ever intended.
15  Mr. Head and I spoke before this meeting.  We did not
16  intend that this would ever become the problem as it has.
17        About three weeks ago, I advised the governor
18  that CBI was operating illegally, and essentially nothing
19  was done.  I advised the Post that CBI was operating
20  illegally, and something was done.  CBI then said they are
21  going to consult with the Attorney General.
22        THE CHAIRMAN:  Mr. Winchester, since we've
23  reached two minutes, I'm going to ask you to stop, but I
24  can't -- I think it would be unfair not to ask you to
25  explain in what respect the CBI has been operating the
0176
1  InstaCheck illegally in your view.
2        MR. WINCHESTER:  Thank you, sir.
3        The handout, the first handout, is 18 United
4  States Code, 922, Subsection T-1.  And this is essentially
5  the Brady National Check System.  And the pertinent part is
6  that it says a dealer cannot transfer to any person not
7  licensed -- that means a gun buyer -- unless -- and if you
8  look at double I down there, it says three business days,
9  meaning a date on which state offices are open, have
10  elapsed since the licensee contacted the system.  That's
11  critical language.
12        Now, if you looked at the other page I gave
13  you, you will see what CBI said they're doing.  They have a
14  very novel interpretation of that statute.
15        What they are saying basically is they don't
16  count the three days when the dealer initiates the check.
17  They count the three days when they get around to doing it.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

18   In my opinion, it's flagrantly illegal.  Nobody has spoken
19   about it, and I think it is a very serious problem.
20        I don't know why the committee or anyone in this
21   legislature would expect gun owners to trust a system that
22   is basically corrupt the way it's going now.  My opinion as
23   a lawyer is that is operating outside the law.
24        People are very concerned about their gun
25   rights, and they are justifiably concerned because of this
0177
1   kind of problem.  Laying a huge additional burden on the
2   CBI for additional background checks when they cannot get
3   it right now.  And this is just not this year.  We've had
4   years of problems where they have taken hours and hours and
5   hours, the medium wait time.  I got the documents in
6   (inaudible).
7        It's not a new problem, and my request is that
8   you simply PI this bill until you get an answer on how CBI
9   is going to fix this problem and why it is violating the
10   law.  I -- I recommend you have a hearing on it because I
11   think it needs to have some answers.
12        That's my testimony, sir.
13        THE CHAIRMAN:  Mr. Winchester, the speed of the
14   InstaCheck system, has been, especially in recent weeks,
15   been less than instant.  You're absolutely right.  The time
16   for the turnaround has gone from minutes to hours and now
17   days.  The demand on the system has gone from steady to
18   massive, and I think that's a result of a spike of huge
19   proportions in the number of people conducting firearms
20   transactions in the state of Colorado.
21        One can speculate as to why there has been such
22   a rush of firearm transactions, and I don't want to do
23   that.  I'm not in the firearms business.  But I know that
24   there has been a massive rush of firearm transactions.  The
25   system has, therefore, slowed because of this catastrophic
0178
1   -- not catastrophic, but this massive rush of activity.
2        But I think it would be wrong for the people of
3   Colorado to conclude that once the spike is over and things
4   settle back down the normal level of transactions, that the
5   InstaCheck system will not be able to turn around the
6   background checks in a very speedy fashion.  And that's
7   certainly my hope as a legislator here, that this is a
8   temporary spike and this is not going to be the continual
9   situation.  And if it is, and if this background check
10   carries on being this way, I certainly think there will be
11   strong, strong pressure to provide additional resources and
12   to -- to get those waiting periods down.
13        So Representative Wright.
14        REPRESENTATIVE WRIGHT:  Thank you,
15   Mr. Winchester, for your testimony.
16        You have a particularly interesting background.
17   I think I'd like to ask you this question specifically --
18   you this question.
19        Can you -- earlier we had testimony from the

20  CBI director regarding appeals to people that were turned
21  down, essentially, to purchased a weapon through
22  InstaCheck.
23          In that testimony we heard that 56 percent of
24  those appeals were overturned.  And I wonder if you have
25  done any research into that or if you might be able to
0179
1  speak to a lack of competency there possibly, or if there's
2  something else going on.
3          MR. WINCHESTER:  Well --
4          THE CHAIRMAN:  Mr. Winchester.
5          MR. WINCHESTER:  Thank you, sir.
6          It's an interesting subject.  CBI developed a
7  program called Denial on Arrest.  Now, the National
8  InstaCheck System allows denial only for conviction.  CBI
9  developed a policy of denial on arrest.
10          And basically what they said was your name is in
11  the database as having been arrested.  We do not have a
12  disposition, therefore you are denied until you come back
13  and prove to us that you're either not that person or there
14  was a dismissal or a plea of such a nature as not to be a
15  disqualifier.
16          That was an enormous paper chase for some
17  people.  That's why a significant number of people get
18  these reversed, is because they're wrongly denied.
19          And I'd like to make a point, if you wouldn't
20  mind, sir.
21          Represent Kagan made a very interesting
22  analogy, which I think really sums up the problem.  He said
23  that getting a background check is like waiting in line to
24  vote.  It's not.  It's not even close.  It's like waiting
25  in line to vote, bringing your photo identification to
0180
1  prove who you are, having your background criminally
2  investigated, waiting for hours, maybe days, to go exercise
3  your right to vote.  You would never accept this with
4  voting conditions, but you're okay with it with these
5  background checks.
6          I think, as this system is currently being used
7  with these delays, that it is unconstitutional because it's
8  going beyond calling people's right into question.  It
9  literally is calling a right into question, but it's also
10  making people wait prolonged periods of time.
11          I cannot agree with you, Representative Kagan,
12  that this is going to be remedied quickly.  If I may
13  explain why I say that.
14          THE CHAIRMAN:  Please.
15          MR. WINCHESTER:  The United States of America
16  is panicked.  Firearms owners nationally are sucking the
17  system dry of ammunition and firearms.  You can't find
18  them.
19          What will happen will be we will see a dip
20  briefly because there's the giant black hole sucking the
21  inventory out of the system.  The demand is not going away.

22  The products will then work their way back, and the demand
23  will peak, and the load on the system I expect will return.
24  It might not be as bad as it is now.
25          But I have no reason to believe, particularly if
0181
1   we add private sale checks, that there is not going to be
2   an enormous additional load and that CBI, as presently
3   funded or even if they get the extra $1 million, may have a
4   very bad time catching up.
5          That's somewhat speculative.  I don't know.  But
6   we've seen this before, where there's been basically a
7   panic and everybody -- and I'm an NRA instructor.
8   Everybody who wants a gun who has been procrastinating on
9   it for years has now rushed to their dealer to buy the gun,
10  the ammunition, whatever, and if they can't get it, that
11  demand is not going to go away.  It's just going to be
12  deferred for a while.
13          THE CHAIRMAN:  Representative Salazar.
14          REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
15          And thank you for being here and giving us your
16  testimony.
17          Your statement just now, though, doesn't that
18  contradict your claim that background checks are
19  unconstitutionally burdensome?  Because if you are saying
20  that by enacting this law here that it's going to be
21  burdensome on people, but yet you just said that it's going
22  to cause people to go and buy their firearms and going to
23  be this huge spike, then that contradicts what you are
24  saying about -- about the background checks, doesn't it?
25          THE CHAIRMAN:  Mr. Winchester.
0182
1          MR. WINCHESTER:  Well, I don't think so.  What
2   I said was, as I think I recall it, was that there will be
3   a temporary dip in the number of checks, and then it will
4   spike back up.  Then we go back into the problem that we
5   have now, which is not hours, as it has been for years, not
6   days, but where it is now over a week.  I think that's a
7   very long time for somebody to wait who needs a firearm for
8   self-defense.
9          And, you know, I really want to keep the
10  committee's feet to the fire on this.  If this was voting
11  rights, how would you feel about this?  If this was the
12  right to counsel, how would you feel about this?  Okay,
13  we're going to delay your right to counsel, even when you
14  ask for it, by four hours or five hours while we proceed to
15  do what used to be done before the Supreme Court said there
16  was a right to counsel, as you detain people and sometimes
17  beat them.  Okay?
18          When you start chipping away at rights, it can
19  become a slippery slope where you stop.  Because, keep in
20  mind, the reason people didn't get counsel and they didn't
21  get their warning, their Fifth Amendment warning, was
22  because the police believed they were criminals and,
23  therefore, to capture and convict the criminals, you didn't

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

24  want them to have any rights.  So until the Supreme Court
25  said that there was that right, there wasn't.  And as those
0183
1  of you from the minority group know, it was really bad.
2          I worked in Washington, D.C., under a very
3  famous judge who is a partner of Thurgood Marshall, Judge
4  Brian.  So I got to see this, and it was oppressive.  So
5  you have to be very careful when you start chipping at
6  rights because somehow they can go away.
7          And I'd like to -- since (inaudible) voting, I'd
8  like to make one more point, if I can.
9          THE CHAIRMAN:  You're really pushing the
10  envelope here.
11          MR. WINCHESTER:  I am indeed.
12          In another committee, the equivalent --
13          UNIDENTIFIED SPEAKER:  Yeah.
14          MR. WINCHESTER:  Of a poll tax is being
15  proposed.  You now have to pay to exercise your right.  I
16  think it is pretty serious problems.
17          That's all I have to say.  Thank you.
18          THE CHAIRMAN:  Thank you, sir.
19          Are there any further questions for --
20  Representative Murray.
21          REPRESENTATIVE MURRAY:  Thank you, Mr. Chair.
22  I appreciate that.
23          Mr. Winchester, thank you so much.  You know, I
24  -- I sense some ire there against the CBI.  I would say
25  that you need to direct some of that ire to this
0184
1  legislature.  We have the power of the purse, and we have
2  not provided the resources to the CBI that they need to
3  process these applications.  So let's look at who really is
4  at fault in this.  This legislature needs to come forward
5  and provide those resources as soon as possible.  Then the
6  problem goes away.
7          And I also really appreciated the fact that you
8  brought up the poll tax, because when you first started
9  speaking, I thought you were going to be talking about the
10  fee.  And I'm surprised that it hasn't come up before now,
11  that no one would tolerate having to pay before they vote,
12  and that is exactly what we have here is a fee.
13          And there's been a lot of discussion in the
14  past, you know, the gun shows and all of the other
15  background checks about whether that should come from the
16  general fund or whether it should be a fee that someone
17  pays.
18          To my feeling, if this is a constitutional
19  right, we need to be taking it out of the general fund of
20  the state and not charging people for that.  It is not like
21  a motor vehicle driver's license.  A driver's license is a
22  privilege.  It's not a right.
23          Thank you.
24          THE CHAIRMAN:  Other -- Representative Salazar,
25  and then we'll come to Representative Lee.

LEG HX 000564    4479

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

1          REPRESENTATIVE SALAZAR:  Let me -- let me just
2  -- thank you very much, Mr. Chair.  I appreciate your
3  comments.
4          Let me just push back a little bit, as a
5  constitutional attorney who teaches us constitutional
6  rights at -- at our local universities.
7          And let's -- let's not try to compare a
8  background check and a $10 background check with a poll
9  tax.  Poll taxes were used quite specifically for a
10  discriminatory purpose, to target a particular race of
11  individuals, and that's not what we have here with
12  background checks.
13          It appears to be a general rule of applicability
14  that appears to all individuals regardless of what their
15  race is.  So let's not do that.  Let's not jump into the
16  realm of trying to elicit some type of sympathy because of
17  past discrimination that has occurred to a particular group
18  and compare it to what this bill doesn't do, which is to
19  discriminate against a particular racial group.
20          THE CHAIRMAN:  Mr. Winchester, if you care to
21  respond --
22          MR. WINCHESTER:  Very briefly.
23          THE CHAIRMAN:  -- please feel free to.
24          MR. WINCHESTER:  I could not disagree with you
25  more.  You are correct, it's not directed against a
0186
1  distinct racial group.  It is directed against another
2  distinct and discrete group:  Firearms owners, who have a
3  civil right.
4          So I -- I don't accept your statement.  I think
5  it is very analogous to the civil right problems that we
6  have had in the past where a group of people, who are hated
7  and disliked and despised by, let's say, a minority or a
8  large majority, whatever -- doesn't matter -- whose rights
9  are attacked because of who they are.  And that's what my
10  concern is.
11          THE CHAIRMAN:  Representative -- Okay.
12  Representative Lee.
13          REPRESENTATIVE LEE:  Thank you.
14          My question is actually more to the Chair than
15  to -- to Mr. Winchester.
16          I'd like -- some questions were raised about
17  CBI's addressing the background -- or addressing the
18  backlog of cases, and I'd like to hear from the director of
19  CBI about how they're going to address that problem, how
20  they are going to get rid of the backlog, how long it's
21  going to take and whether we can reduce the amount of time
22  it takes for these background checks to be fulfilled.
23          So I would just request that maybe toward the
24  end of the hearing, we could hear from the CBI director
25  again.
0187
1          THE CHAIRMAN:  Representative Lee, I think if

2  the sponsors of the bill are amenable, I would certainly
3  entertain that possibility.
4         REPRESENTATIVE McCANN:  We would be amenable.
5  I don't know if Director Sloan is still present but --
6         THE CHAIRMAN:  Right.  That's an interesting
7  suggestion, and I think it might help to hear what the CBI
8  has to say at the points that the witnesses have raised.  I
9  think it's an important question and one we would be not
10  remiss if we didn't follow it up.
11         Representative Court.
12         REPRESENTATIVE COURT:  Thank you, Mr. Chair.
13         I just want to point out that the Denver Post
14  had a really excellent editorial on Saturday about the
15  devil in the details on background checks and the backlog.
16  So there was a lot of information in the Denver Post on
17  Saturday about the issue you've raised.
18         But what really provoked me to raise my hand,
19  sir, was your comment comparing racial discrimination to
20  gun owners or gun purchasers.  And I will submit to you,
21  sir, that when someone decides to buy a gun, it's a choice,
22  and people who are black have no choice.  So I think your
23  analogy is far off the mark.
24         THE CHAIRMAN:  We think we have a disagreement.
25         MR. WINCHESTER:  I accept -- I accept her
0188
1  disagreement.
2         THE CHAIRMAN:  Yep.
3         MR. WINCHESTER:  And may I be excused?
4         THE CHAIRMAN:  All right.  Certainly,
5  Mr. Winchester.  Thank you so much.  And thank you so much
6  for contributing to our discussion here and helping --
7  helping us decide how best to frame our public policy here
8  in Colorado.  Thank you, sir.
9         Our next witness is, if he or she is here,
10  Mr. Ian Jaeger.  Mr. Jaeger.
11         Welcome, sir.  Mr. Jaeger, just please tell us
12  your name for the record, who you represent, and give us
13  your testimony.
14         MR. JAEGER:  Thank you, Mr. Chairman.
15         My name is Ian Jaeger, and thank you for
16  pronouncing it correctly.  Most people don't get that right
17  on the first one.  I'm representing myself here.  I'm a new
18  resident here in Denver.  I moved here just a little while
19  ago to attend grad stool and basically start a business
20  here.
21         One of the things that I had ready was a nice
22  little commentary, and I'm going to go completely off scrip
23  because of most of the things that I had ready to say have
24  been pretty much beaten like a dead horse at this point.
25         I did want to raise two points, though.  The
0189
1  first one is that when we talk about the unchecked sales,
2  when somebody sells a firearm to somebody that they may or
3  may not know, we don't have to make that sale.

4        A lot of times, if we publish the fact that we
5   have an ad for a gun that I'd like to sell, if somebody
6   comes up to me and says, I would like to buy this weapon,
7   and the person obviously shouldn't have this weapon, I
8   don't have to sell to that person.  So this is just adding
9   another layer or regulation to those of us who normally
10  would be following the law.
11          The other part of it is that a lot of these
12  laws -- and I'm talking both about 1224 and 1229 now -- are
13  really targeted against making trades and purchases and
14  things like that that some of us, like grad students, don't
15  have a lot of money, and we like to buy and sell and trade
16  off of the main market.  And this would absolutely
17  eliminate most of that because now we are adding extra
18  expenses and things.
19          That's not going to have any effect whatsoever
20  on the illegal side of what we are talking about right now.
21  Where it is going to have an effect is on the people like
22  me, the future leaders, CEOs hopefully, leaders of the
23  bench, and things like that, where now we have extra
24  burdens on us that really are going to start affecting our
25  activities, our hobbies, and the things that we love to do.
0190
1          THE CHAIRMAN:  Mr. Jaeger, thank you.
2          Are there any questions for Mr. Jaeger?
3          Thank you for coming forward, sir, and giving
4   us your input.  We appreciate it.
5          Alicia Perez.  And after Ms. Perez we will be
6   going to James Durden, Jared Wolfe, and Tony Winchester.
7          Welcome, Ms. Perez.  Please give us your name,
8   who you represent, and your testimony.
9          MS. PEREZ:  I'm Alicia Perez, and I am a mom.  I
10  home school four bays, and I am not a public speaker, so
11  I'm sorry.
12          I just have -- I was trying to read through
13  this long bill, and I am not a lawyer, so I had some
14  questions about some of it.
15          It talks about, you know, the exceptions for
16  being at the shooting range and that kind of thing being
17  okay.  Sometimes we have friends come over, and we just go
18  out in our back field -- and actually it's not even ours.
19  It's our neighbor's, and we have permission to go there.
20          And, you know, when we're out there, sometimes
21  we switch and trade just to try new things.  And it sounds
22  like that could be illegal under this new bill, the way
23  it's worded, if I read it right.
24          THE CHAIRMAN:  That's a very good question, and
25  I don't know if Representative McCann would like to answer
0191
1   it.  I can certainly give you my understanding.
2          Or, Representative McCann, if you'd like to
3   address the matter.
4          REPRESENTATIVE McCANN:  Well, the bill does
5   provide an exception for a temporary transfer while in the

6  home of the transferee as long as the unlicensed transferee
7  is not prohibited and as long as the transferee reasonably
8  believes that the possession of the firearm -- that's a
9  different -- I'm sorry, it's necessary to prevent imminent
10  danger.
11       It also provides for temporary transfer if it
12  occurs at shooting range, at a target shooting competition,
13  while hunting, fishing, or trapping.  So if -- if the
14  witness is talking about simply transferring a gun to
15  someone in the home for purposes other than hunting,
16  fishing, or trapping, I think the bill would probit that.
17       THE CHAIRMAN:  Um, and, Ms. Perez, I think you
18  -- you bring up a very interesting point.  This is one of
19  the purposes of these hearings, is to acquaint the
20  committee with possible unintended consequences and
21  unintended probations.  Yours may well be one of them.
22       And if this bill should go forward, I think that
23  this particular matter is one that the sponsors of the bill
24  may want to look at, as will be many other matters that
25  have been raised in committee.  But it's particularly
0192
1  valuable that you raise these kind of questions, and we
2  thank you for doing it because sometimes these bills can be
3  improved and often are improved as a result of public
4  testimony from folks who say, Do you realize your bill does
5  this?  And sometimes we don't, and quite often we can
6  accommodate those concerns.
7       So thank you for that.
8       But you haven't used up your entire two
9  minutes, so please carry on.
10       MS. PEREZ:  I do have another concern.  Today I
11  heard the words "incremental steps" and "taking steps
12  forward."  I was just -- you know, without knowing all
13  kinds of legal stuff, is there a guarantee that this bill
14  wouldn't be the first step in gun registration?
15       UNIDENTIFIED SPEAKER:  What did he ask?
16       THE CHAIRMAN:  Ms. Perez, this bill is not the
17  first step to gun registration, but whether or not future
18  general assemblies will choose to do A, B, or C, I, of
19  course, have no idea.  And -- but I can only tell you that
20  we don't know what future general assemblies will do.  This
21  bill does nothing toward requiring registration.  And what
22  future general assemblies will do, I really can't say.  But
23  Representative Salazar can answer the question.
24       REPRESENTATIVE SALAZAR:  I feel like
25  (inaudible) the Magnificat.
0193
1       Let me ask a question.  Where -- did you mention
2  you and your friends going out and target practicing?  Is
3  that -- is that what you are talking about?
4       MS. PEREZ:  Yes.
5       REPRESENTATIVE SALAZAR:  Okay.  That's all I
6  need to know.  Thank you.
7       THE CHAIRMAN:  Representative Buckner.

LEG HX 000568    4483

8         REPRESENTATIVE BUCKNER:  When you said in your
9    backyard, I assume that you don't live close to my
10   backyard.
11        MS. PEREZ:  Yes.  We have --
12        REPRESENTATIVE BUCKNER:  You are somewhere it's
13   safe to shoot a gun in the backyard?
14        MS. PEREZ:  Yes.
15        REPRESENTATIVE BUCKNER:  Thank you.
16        THE CHAIRMAN:  Are there any questions further?
17        Representative Murray.
18        REPRESENTATIVE MURRAY:  Thank you, Mr. Chair.
19        Just to comment:  So glad to see a female here
20   testifying.  I know there are a lot of women shooters, and,
21   in fact, we're pretty good.  And so thank -- thank you for
22   being here, and I would encourage any other women in the
23   audience to please feel free to participate.
24        Thank you.
25        THE CHAIRMAN:  Thank you, Representative
0194
1    Murray.
2         And I will remember the fact that you're a good
3    shooter next time I'm deciding whether to let you speak.
4         Thank you very much, Ms. Perez.  Thank you for
5    being here.
6         James Durden.  Thank you, sir.
7         Please come forward.
8         Mr. Durden, please state your name for the
9    record, tell us who you represent, and give us your
10   testimony.
11        MR. DURDEN:  I'm James Durden of Park Hill,
12   Denver.  Nice to meet you.  I don't agree with you on this
13   one, but, you know, we don't have to be disagreeable,
14   right?
15        I originally -- originally I was for background
16   checks, universal checks, as a responsible gun owner, and
17   even if this dies in committee or goes later, if I transfer
18   my firearms to somebody else, I'm going to go ahead and get
19   a background check anyway if it's just someone that I don't
20   know.
21        I don't think I should be criminalized for
22   selling to someone that I do know very well, family,
23   anywhere else like that.  I don't think that should be a
24   part of this -- you know, of the United States as it is.
25        You know, I just think it's kind of far
0195
1    reaching, and I -- and I -- if you can't guarantee that
2    this isn't the first step in legislation -- I mean, I
3    registration, then I think it should be stopped in
4    committee and floor and thrown under the table and stomped
5    on a couple times.
6         But the -- you know, I was concerned about the
7    registration comment, with all due respect, Representative
8    McCann.
9         I heard her use the phrase -- when she was

LEG HX 000569

4484

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10  mentioning something about licensed persons, it kind of
11  skipped around, and we don't really have licensed persons
12  as of yet in this nation as far as -- unless you are
13  licensed to carry as far as, like, a law enforcement
14  officer, but she was referring to just average citizens
15  being a licensed person.
16      And I -- I don't really want to be a part of a
17  -- of that, you know.  I have a carry permit, and I -- you
18  know, I didn't have one in Colorado until after the theater
19  shooting, and I realized that I need to be responsible for
20  my own defense and give myself a chance to -- you know,
21  while help is on the way.  Being looked at as a licensed
22  person I think means you can regulate me in many other
23  different ways, and I think I would be opposed to that, and
24  I stand in opposition to this.
25      THE CHAIRMAN:  Thank you, Mr. Durden, for
0196
1  coming and testifying here today.
2      Are there any questions for Mr. Durden?
3      Sir, please accept our thanks.
4      MR. DURDEN:  Thank you.
5      THE CHAIRMAN:  And I will now move -- because
6  we are getting short of time, and we want to get as many
7  witnesses in as possible.  I'm chagrined that we won't be
8  able to get to everybody, but we can get to Mr. -- Mr. or
9  Mrs. Wolfe.  I think it is Janet (sic) Wolfe, or I can't
10  read the first name.  It begins with a J, and last name is
11  Wolfe.
12      Are you Mr. Wolfe?
13      Welcome, sir, and thank you for coming to
14  testify here today.
15      Please tell us your name.
16      MR. WOLFE:  My name is Jared Wolfe.
17      THE CHAIRMAN:  Jared Wolfe.  Thank you for
18  coming, and please proceed with your testimony.
19      MR. WOLFE:  First, I want to kind of explain my
20  understanding of the current background check and the one
21  proposed.
22      I believe the current background check is
23  necessary because it allows for a business to regulate
24  where their guns go without discriminating based on
25  personal characteristics; however, the proposed background
0197
1  check kind of takes that away from the individual, and I
2  believe that it's the individual's responsibility to be
3  able to judge a person's character and do it responsibly.
4  Having that said, there are also ways to check a person's
5  background without it being legally mandated.
6      Um, also I wanted to point out that if the
7  proposed background check on private sales is enforced,
8  there is no real way to check on people, whether they are
9  actually checking other people's background.  There's
10  nobody watching over your shoulder to make sure you're
11  doing that.

LEG HX 000570
4485

12      So if there's a law saying that you have to do
13 that and then people aren't doing that, the next step to
14 enforce that law is to have somebody looking over your
15 shoulder, is to have gun registration.  There's no other
16 way to enforce that law.
17      THE CHAIRMAN:  Um, Mr. Wolfe, thank you for
18 giving us your view.
19      Are there any questions for Mr. Wolfe?
20      Thank you, sir, for coming forwarded.  We
21 appreciate it.
22      Toni Winchester, who will be followed by Robin
23 Grattet and then Michael Billingsley, and then David
24 Whiteaker, assuming we have time.  But for now, we are with
25 Toni Winchester.
0198
1      Thank you for coming.
2      MS. WINCHESTER:  Thank you, Chairman and
3 representatives.
4      My name is Toni Winchester.  I've been a
5 shooter for 21 years, and I am currently an NRA instructor.
6      I see the purpose behind this bill, but it
7 really concerns me because I see a lot of definitions in
8 here transferring fire guns -- firearms.  What constitutes
9 family?  Families are so blended.  I may have a
10 guardianship over someone for six months.  Is that
11 considered family?  Can I transfer a firearm?  I feel that
12 there are a lot of regulations being put on the average law
13 abiding citizen who enjoys the sport of shooting because we
14 do not want to break the law.
15      And this is very frightening to me because we
16 see this today.  If I take my students out to my property
17 in the mountains and we shoot and I hand them a gun to use
18 on the street and it's in my house and they take it home,
19 what are the implications that can come back on me?  So I'm
20 very fearful of this law because it's requiring too much
21 for the individual person who wants to enjoy the sport of
22 shooting.
23      THE CHAIRMAN:  Thank you, Ms. Winchester.  We
24 appreciate your coming.
25      Representative Pettersen.
0199
1      REPRESENTATIVE PETTERSEN:  Thank you, Mr. Chair.
2      On page 5, line 3 through 6, this identifies
3 that it is relative to immediate family.  So your kids,
4 your husband, your parents is defined on page 5.
5      MS. WINCHESTER:  A second cousin?
6      REPRESENTATIVE PETTERSEN:  No, only immediate
7 family.
8      THE CHAIRMAN:  No.  That is something that's in
9 the bill, and it's, I think, a valid question.  But the
10 answer is, no, it is restricted.  The exemption is
11 restricted in the bill to bona fide gift made between
12 immediate family members, meaning limited to spouses,
13 parents, children, siblings, grandparents, and

15      Are there any -- Representative Court.
16      REPRESENTATIVE COURT:  Thank you, Mr. Chair.
17      So obviously that's been one of the issues that
18  various witnesses have struggled with, and I know the
19  sponsors and members of the committee are struggling with
20  that as well, as far as to whom we make or on whom we make
21  the restrictions.
22      But what I want to ask is:  Are you in favor of
23  extending the background check if we can work that piece
24  out?
25      THE CHAIRMAN:  Ms. Winchester.
0200
1      MS. WINCHESTER:  Generally speaking, no,
2  because I feel that if the background check is done, I am
3  off the hook.  Well, if I'm going to sell -- no, I said
4  that incorrectly.
5      I would go through an FFL to sell the gun.  He
6  would do the background check, so nothing could come back
7  on me, that it was my gun ten years ago.
8      THE CHAIRMAN:  Right, right.
9      Representative Court.
10      REPRESENTATIVE COURT:  Thank you, Mr. Chair.
11      Okay.  Now I'm confused.
12      MS. WINCHESTER:  Okay.
13      REPRESENTATIVE COURT:  So the point -- the
14  overarching point of this bill is to close that last
15  loophole of where people can get guns, and to say that in
16  individual purchases and exchanges we want to close that
17  loophole.
18      So -- and your point, I think, is well taken,
19  and we've heard that.  So addressing the issue of to whom
20  guns can be given, you know, what that circle is, that
21  needs to be addressed, I think.  I think you have a valid
22  point for us to consider.
23      But I didn't understand your -- your answer when
24  I asked what about closing that loophole totally, in
25  general, if we could fix that.  You said you weren't, but I
0201
1  couldn't understand why you said that.
2      MS. WINCHESTER:  I understand your question.  I
3  do hesitate because I feel, because this is an issue about
4  guns, is that we are being overregulated, and the criminals
5  will find those guns in such creative ways.  No matter what
6  law we pass, they will find the guns.
7      And my concern is no matter what we do today or
8  in two years or another four years, they are still going to
9  get those guns, and then our rights are going to be taken
10  away.
11      THE CHAIRMAN:  Representative Court.
12      REPRESENTATIVE COURT:  Thank you, Mr. Chair.
13      Okay.  So I want to push back on that, because
14  I don't see how your rights are being taken away if you
15  simply go through a background check and get it.  You are

LEG HX 000572    4487

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

16  currently able to get guns at a gun show or at a gun shop,
17  and you have no right being taken away.  You go and make
18  those purchases.
19          So why would closing this last loophole remove a
20  right that isn't removed in those other circumstances?
21          MS. WINCHESTER:  Because if --
22          THE CHAIRMAN:  Ms. Winchester.
23          MS. WINCHESTER:  Thank you, sir.
24          If we close the loophole, criminals will still
25  find ways to get guns, and the criminal check is not -- the
0202
1  criminal check is not going to check the heart of a man or
2  their intent to do something illegal.
3          And if we close that loophole, criminals still
4  have the ability to get firearms, society is still going to
5  be in an uproar, and then I fear that all guns are going to
6  be banned.
7          THE CHAIRMAN:  Representative Salazar.
8          REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
9          So I think you're absolutely right, that
10  criminals will find a way to get guns.  That's the nature
11  of a criminal.  But by closing this loophole, that gives
12  them one less method of obtaining a gun, meaning that if
13  they know that they have to try to purchase it from someone
14  instead of breaking into a house and stealing it, if they
15  have to purchase it from someone that they don't know, and
16  that person is like, I'm going to run a background check on
17  you, then that criminal might think twice about going to
18  someone to purchase a gun, whereas they could just go and
19  steal it.
20          I mean, there's nothing that's going to stop a
21  criminal from obtaining a gun illegally, but this is
22  closing one of those things, making it a requirement for
23  the purchase or the -- the selling of a weapon, and that
24  closes that option for them.
25          I mean, do you agree with that -- that premiss?
0203
1          THE CHAIRMAN:  Ms. Winchester.
2          MS. WINCHESTER:  Yes, it does close that one
3  option to them.
4          THE CHAIRMAN:  And, Ms. Winchester,
5  Representative Lee has a question for you.
6          REPRESENTATIVE LEE:  Thank you, Mr. Chairman.
7          Let me thank you for coming here, because one
8  of the purposes of these hearings is to help us understand,
9  as the Chairman said, unintended consequences, and our goal
10  is not to create difficulties for people legally, lawfully
11  engaged in the types of activities that you are describing.
12          And as you were describing your situation
13  earlier, you were saying taking someone out to your
14  property to engage in shooting at a shooting range, would
15  it be illegal for you to lend them a firearm to use, and I
16  want to know if the exception we have in the bill covers
17  that situation.

4488

18        And it says, "The transfer is a temporary
19  transfer of possession without transfer of ownership or
20  title to ownership, which transfer takes place at a
21  shooting range located in or on premises owned or occupied
22  by a duly incorporated organization organized for
23  conversation purposes or to foster proficiency in
24  firearms."
25        Would that cover the situation you've described?
0204
1        THE CHAIRMAN:  Ms. Winchester.
2        MS. WINCHESTER:  No.  This is my private
3  property, and we go out and shoot and have fun.  So we're
4  not an organization; we're not an official shooting range.
5        REPRESENTATIVE LEE:  Okay.  That's helpful.
6  Thanks very much.
7        THE CHAIRMAN:  Thank you, Ms. Winchester, for
8  coming here today.
9        MS. WINCHESTER:  Thank you.
10        THE CHAIRMAN:  Um, we have a group of six
11  county sheriffs who would like to testify, and I would ask
12  the county sheriffs to come forward and give us your names,
13  please, who you represent, and present your testimony.
14        MR. WIGGINGS:  Thank you, Mr. Chairman, and
15  thank you members of the Judiciary Committee.
16        My name is Garrett Wiggings.  I'm here for Routt
17  County.  I'm also an executive board member for the County
18  Sheriffs of Colorado.
19        With me today I have Sheriff Smith, Sheriff
20  Heap, Sheriff Cook, Sheriff Becker, and Sheriff Hartman.
21        I have spent approximately 25 years in the law
22  enforcement profession, working for municipal police
23  departments, as well as rural sheriffs offices in both
24  Colorado and Florida.
25        I believe it's very important for all of us here
0205
1  today to recognize that not only Colorado but America has a
2  serious problem with violence in society.  This issue is a
3  serious problem that is going to take all of us -- and "us"
4  I mean being the people of Colorado and the people of this
5  great nation to correct.
6        Whether you're here as an elected official,
7  department head, community leader, we should not and cannot
8  afford to politicize this issue.
9        As with any investigation, we must gather the
10  facts, process and analyze the evidence, identify those
11  responsible, and take corrective action.  This is not time
12  for division between Democrats, Republicans, or
13  Independents, and if ever there was an issue that demanded
14  a unified approach, it is the issue of violence and evil in
15  our society.
16        And in the many years I have served as a law
17  enforcement professional, I have personally investigated
18  and supervised many crimes of violence where a firearm was
19  used in its commission.  I, like many officers of the law

20  testifying here today, have direct evidence based knowledge
21  regarding human initiated acts of violence.  I put emphasis
22  on the selection of my wording when I say "human initiated
23  acts of violence" because the common denominator behind
24  every evil act is humans.
25          I want to point out just a few facts here.
0206
1   The first fact is the majority of firearm-related crimes
2   are not -- and let me repeat -- not committed using guns
3   with high-capacity magazines or what some refer to as
4   assault rifles.
5           History indicates that the firearm of choice,
6   one in the majority -- in the majority of violent crimes
7   are revolvers, otherwise known as Saturday-night specials
8   or cheap handguns with a capacity to hold less than seven
9   to ten rounds.  These proposed bills penalize only
10  law-abiding citizens who possess the type of firearms for
11  lawful reasons.
12          This bill will have very little to no effect in
13  reducing overall crime rates involving firearms.  We all
14  know criminals, and anyone intent on committing homicide or
15  other crimes, are going to ignore law regardless of whether
16  it is old or newly legislated.  Criminals and delusional
17  people see laws as nothing more but ink on a piece of
18  paper.
19          The next fact I want to point out is I want to
20  mention a few cities, such as Chicago, New York,
21  Washington, D.C.  They have the strictest gun laws in our
22  nation, but yet they have the highest rates of gun crime in
23  our nation.
24          The question must be asked, Why is this?  If
25  the fact that the cities with the most stringent gun laws
0207
1   in our nation are responsible for the highest gun violence,
2   then why would anyone suggest or believe that having more
3   gun laws would have a positive impact?
4           The third fact is let's examine the most recent
5   gun-related events, and I think these have been talked --
6   mentioned some here today, so I apologize in advance for
7   any reiteration.
8           But most recent events around our nation have
9   occurred -- or most or these atrocities have occurred in
10  gun-free zones.  Again, the question must be asked:  Why?
11          The fact is that these incidents are continually
12  occurring in gun-free zones proves that criminals and
13  mentally unstable seek out these areas to commit acts of
14  violence as these cowards -- and I call them "cowards"
15  because that's exactly what they are -- know that these are
16  target-rich en -- are a target-rich environment of
17  completely defenseless victims.  And I think it was touched
18  on a little bit here today, and I think we need to expound
19  on it a little bit.
20          The fourth is that all of these individual
21  suspects in these most recent atrocities have histories of

22  mental illness. I think we all agree that no one in their
23  right mind could commit the kinds of evil acts that we have
24  witnessed in Aurora, Connecticut, and other places around
25  our nation.
0208
1          These individuals were known to have severe
2  mental illness by family members, schools, physicians, and
3  the public, but yet they were still able to legally
4  purchase firearms without out any delay.
5          THE CHAIRMAN:  Sheriff, may I just say how much
6  we appreciate you being here, but we would like to see if
7  the committee has any questions for you at this stage.
8          Thank you very much for coming and -- oh, I've
9  got two questions.  I've got --
10          Representative Court, do you have a question?
11          REPRESENTATIVE COURT:  I did.
12          THE CHAIRMAN:  Representative Court.
13          REPRESENTATIVE COURT:  Thank you, Mr. Chair.
14          I want to know, because I represent Denver, if
15  the Denver sheriff is in your group.
16          MR. WIGGINS:  Not at this time, no.
17          REPRESENTATIVE COURT:  Thank you.
18          THE CHAIRMAN:  Thank you, Sheriff.  I'm sorry to
19  cut you off, but we are ruthless on the House Judiciary
20  Committee.
21          MR. WIGGINGS:  I understand.  I -- I had a lot
22  of points here to make, and some of them would have been
23  redundant, so I was trying to expedite.
24          THE CHAIRMAN:  I really -- we appreciate you
25  taking the trouble to come and give us the views of -- and
0209
1  you know what goes on out there, so it's particularly
2  valuable and helpful.
3          Thank you so much.
4          MR. WIGGINS:  You're welcome.
5          THE CHAIRMAN:  Oh.  Representative McLachlan.
6          REPRESENTATIVE McLACHLAN:  Thank you,
7  Mr. Chairman.
8          Sheriff, would you tell us the counties from
9  which your people represent?  I heard Routt County, but I
10  wanted to know the other counties too, please.
11          MR. WIGGINS:  Okay.  We have Routt County,
12  Larimer County, Elbert County.  Help me out here a little
13  bit.
14          UNIDENTIFIED SPEAKER:  Fremont.
15          MR. WIGGINS:  Fremont and -- Weld and Gilpin.
16          UNIDENTIFIED SPEAKER:  Gilpin.
17          REPRESENTATIVE McLACHLAN:  Thank you.
18          MR. WIGGINS:  Out of the six of us, five of us
19  are county -- are board members of the County Sheriffs of
20  Colorado.
21          THE CHAIRMAN:  Thank you.  And I must say
22  you've all come a long way, so that's doubly appreciated.
23  We want to make the right decision here, and you are -- you

24    are helping us.
25        Thank you so much.
0210
1        MR. WIGGINS:  Thank you.
2        THE CHAIRMAN:  We have very little time
3    remaining, but we -- I'm going to take -- I'm going to take
4    one, two, three, four more witnesses.  And I wish we could
5    take everybody's testimony, but we're simply running
6    against the clock here.
7        So we'll hear from Robin Grattet, then Michael
8    Billingsley, David Whiteaker, and Robert Wareham.
9        Ms. Grattet, welcome.
10        MS. GRATTET:  It's actually Grattet.
11        THE CHAIRMAN:  Sorry.
12        MS. GRATTET:  It's all right.
13        THE CHAIRMAN:  Ms. Grattet, welcome.
14        MS. GRATTET:  Thank you, Chairman, and thank
15    you other members.
16        My name is Robin Grattet, and I'm here
17    representing myself and my four children who are standing
18    on the back -- in the back and have been enjoying the
19    proceedings today.
20        THE CHAIRMAN:  Thank you.
21        MS. GRATTET:  I didn't come prepared to speak
22    today, so I hope that you will forgive me if I -- as I
23    express some disjointed observations.  I'm not a gun owner.
24    I'm not a member of any rifle or gun association, so you
25    might think it's a little odd that I'm sitting on this side
0211
1    of the fence.
2        But I'm coming here because, one, I believe it
3    is the citizen's responsibility to stand firm against any
4    government encroachment on any right even if the government
5    purports that that restriction is for our own good.  That's
6    one observation I have.
7        But a more important observation is I believe
8    that we are all here with a common goal, and some of us
9    just disagree with our attempts to reach that goal.  I
10    believe that our goal is to have a safer society to raise
11    our children in.  Our goal is so that we can be safe.
12        When I go into Costco with my children, I don't
13    have to constantly be looking for exits if somebody is
14    going to do something that they shouldn't, and it might not
15    necessarily be someone with a gun.
16        Our goal I don't believe can be reached through
17    the avenue we are trying to take here today.  I believe the
18    avenue we are taking today is placing burdens, burdens of
19    proof, on law-abiding citizen.  If I want to purchase a
20    gun, I have to prove that I'm not a criminal.  And while
21    that may seem expedient, I don't believe it's morale,
22    ethical, or what the fathers of constitution intended.
23        Our major concerns are the problem of violence
24    in our society.  We've talked a lot about gun violence
25    today, and that's a myth.  As previous testifiers have

1  said, guns do not commit violence, people do. And in order
2  to change that, making more stringent gun laws isn't going
3  to make a difference. We're wasting our time; we're
4  wasting our money; we're wasting the depth of our thinking;
5  we're wasting all of our resources here trying to, as my
6  grandmother would say, shut the barn door after the horse
7  got out.
8        THE CHAIRMAN: Right.
9        MS. GRATTET: The problem that we have here is
10  our society. We have -- oh, my goodness, my notes. We've
11  created a culture that glories in death and violence, the
12  video games, the movies.
13        My husband tried to rent a video the other night
14  from -- I can't remember. It was Hudo or one of those
15  places. We couldn't find anything that wasn't dangerous,
16  that was putting dangerous violent thoughts into the heads
17  of our children.
18        We -- these are the things we need to look at,
19  not at gun control, but we need to look at changing the
20  hearts and preventing our young people from become
21  disenfranchised, teaching everyone the value of life,
22  protecting our mentally ill from causing harm to themselves
23  and to others. And I would really like to see my state of
24  Colorado put our resources toward that.
25        Thank you so much for allowing me the time to
0213
1  speak today.
2        THE CHAIRMAN: Well, thank you for coming and
3  waiting so patiently and giving us the benefit of your
4  input.
5        Are there any questions for Ms. Grattet?
6        Ms. Grattet, thank you.
7        MS. GRATTET: Thank you.
8        And if I may say one more thing, I have to say
9  that I appreciate that as Americans we can all come here
10  and stand on different sides of a fence and work toward a
11  common goal together, and I hope that we are successful in
12  that.
13        Thank you.
14        THE CHAIRMAN: Thank you, Ms. Grattet.
15        Michael Billingsley.
16        Mr. Billingsley.
17        Please state your name, tell us who you
18  represent, and go for it.
19        MR. BILLINGSLEY: Okay. My name is Michael
20  Billingsley. I represent myself, family, and friends. I
21  am an NRA member, an RMGO member, but I am also a citizen
22  of Colorado.
23        Now, I did prepare some things to say to you
24  today, but I feel that many of my points have already been
25  made, and I would like to seed my time to Bob Edminston of
0214
1  the Firearms Coalition of Colorado, who has some more to

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

2  say.
3        Can I give my time to --
4        THE CHAIRMAN:  Oh, to Bob Edminston, yes.
5  Sorry.  I was momentarily districted there, Mr. --
6        MR. BILLINGSLEY:  No problem.
7        THE CHAIRMAN:  -- Mr. Billingsley.
8        Yes.  Please do that.
9        MR. EDMINSTON:  Thank you, Mr. Billingsly.
10       Thank you, Mr. Chair and committee.
11       THE CHAIRMAN:  Mr. Edminston, welcome.
12       Let the record reflect that Mr. Edminston has
13  given some pieces of writing to Ms. Shipley, which she is
14  distributing to the members of the committee.
15       And while she does that, Mr. Edminston, why
16  don't you tell us your name and tell us who you represent,
17  if anyone other than yourself, and proceed with testimony.
18       MR. EDMINSTON:  Thank you, Mr. Chair, and
19  committee.
20       My name is Robert Edminston, and I'm
21  representing the Firearms Coalition of Colorado.  We are an
22  NRA affiliated organization.  I am a volunteer lobbyist and
23  a NRA member who is speaking in opposition to this bill.
24  I'm am former U.S. Army officer.  I have a master's degree
25  in psychology, counseling, and guidance.
0215
1        When an evil or deranged individual commits an
2  act of violence, everybody wants to do something to prevent
3  another incident.  We do not believe that this bill will
4  have an effect on violence and that it will make it harder
5  for honest citizens to defend themselves.
6        Please refer to your handout, the 2003 study
7  done by the Centers for Disease Control, could find not
8  significant evidence that any gun control law reduces
9  crime.  National Academy of the Sciences study and the U.N.
10  affiliated small arms survey indicate that there's no
11  cause-and-effect relationship between gun ownership and
12  crime.
13       Research by Cleek, Lott, and Mustered and
14  Wright and Rossi indicates that gun ownership in civilian
15  hands detours tears criminals and their significant numbers
16  of defensive gun uses every year documented by Dr. Cleek up
17  to 2.5 million defensive uses per year.
18       Research indicates that this bill is unlikely
19  to do any good.  Worst, this bill has what I believe to be
20  a constitutional problem in that it does not apply to
21  prohibited persons.
22       According to the U.S. Supreme Court case U.S.
23  V. Haines, prohibited persons cannot be prosecuted for
24  failing to self-incrimate.  Haines was a gun-registration
25  case that I believe would apply to background checks.  I'll
0216
1  quote very briefly from the opinion here.
2        "We hold that a proper claim of the
3  constitutional privilege against self-incrimination

4    provides a full defense to prosecutions either for failure
5    to register a firearm or for possession of unregistered
6    firearm."
7         We believe this bill only affects honest
8    citizens and not the prohibited persons against who the
9    bill is supposed to be directed.
10        As a young man, who was a gang member in east
11   Denver, said one time, If are you going to smoke somebody,
12   you don't need any paperwork.  We urge a note vote on the
13   bill.
14        Thank you very much.
15        THE CHAIRMAN:  Thank you, Mr. Edminston.
16        Are there any questions for Mr. Edminston?
17        Seeing none, thank you, sir, for coming and --
18        MR. EDMINSTON:  Thank you very much, Mr. Chair
19   and committee.
20        THE CHAIRMAN:  Thank you.
21        David Whiteaker, please come forward.
22        Mr. Whiteaker, welcome to the House Judiciary
23   Committee.  Thank you for being here.  Please tell us your
24   name for the record and who you represent, and then tell
25   us --
0217
1         MR. WHITEAKER:  My name is David Whiteaker.  I
2    represent myself as a sovereign citizen of the state of
3    Colorado.
4         THE CHAIRMAN:  Thank you, sir.  Please proceed.
5         MR. WHITEAKER:  Thank you, Chair and committee.
6         I have a two -- two issues with this bill.
7    Number one is I've had firearms since I was about nine
8    years old.  I have bought many, sold many, given many away.
9    A lot of those are registered -- or were bought in my name
10   through the proper thing, fill out the proper forms.  Some
11   of those I no longer own.  What happens if one of those
12   turns up somewhere in a crime because I can't prove that I
13   sold it?  That's one of the questions.
14        The other is:  You say that this has nothing to
15   do with registration.  I don't see how you are going to
16   enforce any of this thing without registration.  I don't
17   see that.  You may have a mechanism, but I don't understand
18   it.
19        Other -- two other points I would make that are
20   not with this bill, but I would say the gun-free zones are
21   virtually an invitation for some kook to come in.  If they
22   want to shoot somebody, where are they going?
23        And the other is:  You tell the lady that's
24   protecting her kids against some -- maybe a couple of guys
25   that are high on meth that she can only have six, seven, or
0218
1    eight bullets in her gun.  Those guys are known for being
2    almost unstoppable.
3         And with that, I'm done.
4         THE CHAIRMAN:  Thank you, Mr. Whiteaker.
5         Are there any questions or Mr. Whiteaker?

6        Sir, thank you for coming.
7        MR. WHITEAKER:  Thank you.
8        THE CHAIRMAN:  For waiting patiently and giving
9   us you thoughts.
10       And I'm afraid that the last witness that we
11  have time for before -- in fact, we've already overrun, but
12  I did state that we would be hearing from, so I would ask
13  Mr. Robert Wareham to come forward.
14       Mr. Wareham, welcome.  Thank you.
15       MR. WAREHAM:  Thank you, Mr. Chairman.
16       THE CHAIRMAN:  Please state --
17       MR. WAREHAM:  My name is Robert Wareham.  I'm an
18  attorney here in Colorado.  I specialize in domestic
19  relation law.
20       And I thought the testimony this afternoon was
21  very helpful in pointing out that this bill should not be
22  enacted.  It was thrown together in a hurry, in a knee-jerk
23  reaction, and it hasn't been clearly thought out.
24       I tend to look at the unintended consequences.
25  We deal with them every day in the trial courts.  We look
0219
1   at it, and we go, well, we see you're well intentioned,
2   members of the legislature, but did you anticipate this
3   would be the result?
4        An example that I would bring to mind in this
5   bill is that there are provisions for judicial review.
6   Ladies and gentlemen of the committee, I will tell you that
7   if you file for a divorce in Douglas County today and you
8   don't settle, you will not have a hearing for 18 months.
9        Where is the urgency in this bill?  Where have
10  the authors provided for expedient judicial review?  If
11  there's going to be judicial review, it's meaningless if it
12  doesn't take place for months or years, and I think
13  everybody here has conceded that we are dealing with a
14  fundamental right here.  Justice delayed is justice denied.
15       I met yesterday with a woman who's been the
16  victim of domestic violence and sexual abuse for almost 20
17  years.  She showed me her protection order.  I reminded her
18  that that's just a piece of paper, that unfortunately we
19  live in a world where we have to be prepared to take
20  responsibility for our own families and for ourselves.
21       To tell that woman that she has to have a delay
22  of even a few days in acquiring a firearm and training to
23  defend herself is to make that woman a victim all over
24  again.
25       Our jobs and our oaths were to uphold the
0220
1   constitution and protect our citizenry.  While well
2   intentioned, this statute -- or this bill is misguided.
3        Thank you, Mr. Chairman.
4        THE CHAIRMAN:  Thank you, Mr. Wareham.
5        Representative Salazar.
6        REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
7        Just a question for you, because I was looking

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

8 at the -- the Bill itself, when you said it, about the
9 petition for relief.
10         Having language that says that the hearing would
11 be held at its earliest practical time, do you think that
12 that would address at least that part of your concern?
13         THE CHAIRMAN:  Mr. Wareham.
14         MR. WAREHAM:  Thank you very much,
15 Representative Salazar.
16         In domestic relations law, we have several
17 saying at the earliest practical time.  Unfortunately, with
18 the staffing in the judicial branch these days, that still
19 could be a matter of weeks.  We do have some limited ones
20 involving the safety of children where the legislation
21 later has said the Court must hear this within seven days.
22         I think, if you're going to do that, it needs to
23 be done in that fashion.  We've joked about the InstaCheck
24 and what nobody foresaw.  Nobody would ever define an
25 InstaCheck as taking ten days.  And so having general
0221
1 language I think is inappropriate.
2         I think what needs to come back here is really
3 look at this and say we've heard it isn't going to drop
4 the crime rate, it's going to affect law-abiding citizens,
5 and it may actually engage law-abiding citizens.
6         THE CHAIRMAN:  Representative Salazar.
7         REPRESENTATIVE SALAZAR:  Thank you.
8         And I understand that you have multiple aspects
9 or multiple facets or your argument, but I'm just trying to
10 pin down the -- the issue of the time.  As we enter, like,
11 open records act, you do earliest practical time.  It's
12 usually within about ten days and -- or would you rather
13 see, instead of earliest practical time, would you rather
14 see an actual time frame established, like within seven
15 days of the petition for relief?
16         THE CHAIRMAN:  Mr. Wareham.
17         MR. WAREHAM:  Representative Gardner brought it
18 up this morning.  When you heard rule of sevens, if it had
19 the rule of sevens, that's certainly a more specific time
20 than as soon as practical.  If a petition for review was
21 done within seven days, that's certainly better than open
22 ended.
23         But I appreciate, yes.  That's -- specifically I
24 think it should be a specific one, and seven days seems
25 like a good period of time.
0222
1         REPRESENTATIVE SALAZAR:  Thank you, sir.
2         THE CHAIRMAN:  Representative Petterson.
3         Representative PETTERSEN:  Thank you, Mr. Chair.
4         This situation that you described was a woman
5 who had been raped and you were worried about her safety?
6         MR. WAREHAM:  That's correct.
7         REPRESENTATIVE PETTERSEN:  Wouldn't you want to
8 make sure that that very woman that the person who raped
9 her didn't have access to gaining a weapon?

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10      THE CHAIRMAN:  Mr. Wareham.
11      MR. WAREHAM:  I do have concerns about him
12 having access to a weapon, but he's going to have access to
13 weapons either way.
14      REPRESENTATIVE PETTERSEN:  Thank you.
15      Wouldn't we want to make sure we sure reduce
16 that probability?
17      MR. WAREHAM:  I don't think that this bill does
18 anything to reduce that probability, with all due respect.
19 It really doesn't.  With the number of firearms already out
20 there, I don't think it will have that effect.
21      REPRESENTATIVE PETTERSEN:  Thank you.
22      THE CHAIRMAN:  Representative Pettersen.
23      REPRESENTATIVE PETTERSEN:  And thank you also
24 for bringing attention to worrying about the backlog and
25 people who are in immediate danger and having to wait for a
0223
1 gun.
2      On page 5, line 3 through -- sorry -- page 5,
3 line 15 through 17, the exemption is that if somebody is in
4 immediate danger, that you can lawfully give them a gun to
5 protect themselves.
6      I think that maybe clarity on what immediate
7 danger means would be important, but there is that
8 exemption there.
9      MR. WAREHAM:  Well, unfortunately --
10      THE CHAIRMAN:  Mr. Wareham.
11      MR. WAREHAM:  I'm sorry.
12      THE CHAIRMAN:  It's all right.
13      MR. WAREHAM:  Unfortunately some of these
14 immediate exemptions come up after someone's had to pay my
15 firm $10,000 to put forth an affirmative defense in a court
16 of law, and that can be unduly burdensome and have a
17 chilling effect on someone as well.
18      It's great to put this language in there, but
19 when you're faced with having to hire an attorney or a law
20 firm and pay them $10,000 or $15,000 to prove you were
21 right, then it does become a burden on a constitutional
22 right.
23      REPRESENTATIVE PETTERSEN:  Great.  Thank you
24 very much.
25      MR. WAREHAM:  Thank you very much.
0224
1      THE CHAIRMAN:  Thank you, Mr. Wareham.
2      And Representative McLachlan.
3      REPRESENTATIVE McLACHLAN:  Thank you,
4 Mr. Chairman.
5      Mr. Wareham, you're focusing on the due process
6 protections which are contained within the statute.  And
7 again, I realize in a domestic relations law you don't deal
8 with constitutional issues on a daily basis.
9      But let me ask you this question:  Assuming for
10 the sake of discussion that we could craft a constitutional
11 statute here, that it could be done, or assuming that it

LEG HX 000583   4498

12 could not be done, wouldn't the courts of Colorado be
13 available for immediate injunctive relief in the event that
14 the statute was unconstitutional, and couldn't the courts
15 of Colorado grant relief that would stay the execution of
16 this statute if it was unconstitutional, without -- without
17 reference to the due process protections in the statute?
18        THE CHAIRMAN:  Well, Mr. Wareham.
19        MR. WAREHAM:  I brought up the -- the
20 objections that I thought I was uniquely qualified, and
21 I've been here all day listening to the testimony.  So I
22 was trying not to be duplicative.
23        That's not the only problem I see with it.  But
24 again, when we get into going and getting injunctive relief
25 from the courts, now all of a sudden, we've dropped
0225
1 exercising rights into the class of people who can afford
2 to pay attorneys to do these things.
3        In an ideal world, yes, we could call up, and
4 I'd say, you know, I'm not busy today.  I'll be happy to
5 take your case pro bono, but that's not the reality.
6 Taking a case to court like that and getting injunctive
7 relief after the fact is -- is a proposition of a thousand,
8 if not tens of thousands of dollars and takes time.  It
9 really does take time.
10        And -- and while I appreciate having a hearing
11 within seven days, one of the problems of having a hearing
12 within seven days is it kind of turns this into MASH
13 surgeons in the courtroom because we literally don't have
14 the opportunity to prepare our cases as well as we would
15 like, and it becomes kind of meatball surgery.  But we do
16 it, and we do it every day to the best of our ability.
17        But I think that creates another problem with
18 the injunctive relief and just the necessity of hiring
19 legal counsel to exercise what is a fundamental right.
20        THE CHAIRMAN:  Thank you, Mr. Wareham.  Thank
21 you so much --
22        MR. WAREHAM:  Thank you.
23        THE CHAIRMAN:  -- for coming here and giving us
24 your views and input.
25        The witness testimony phase is now closed.
0226
1        And I would like to thank all those who have
2 testified here today, what you've done is you've
3 taken time out of a busy schedule.  You've come in some
4 cases from a long way away, and you've done it simply to
5 help make sure that we craft the best possible public
6 policy for Colorado, and there's almost no higher public
7 service than that.  Jury service, testifying in these
8 committees, these are the things that we depend on citizens
9 to do to keep us representing you properly, and it's very
10 much appreciated.
11        Now, there have been some witnesses who signed
12 up to testify in opposition to -- to House Bill -- I don't
13 know what the number is.

LEG HX 000584    4499

14       UNIDENTIFIED SPEAKER:  1229 --
15       THE CHAIRMAN:  -- 1229 that did not have the
16  opportunity to do so.  And I wish to give you the
17  opportunity to register your opposition, if you'd like to.
18  So I would like to ask all of those who came to testify
19  against House Bill 1229 to register your opposition by
20  standing now, and accept my apologies for not having been
21  able to get to everybody.
22       And I note for the record a large number of
23  people who sadly were not able to testify, but it should be
24  noted for the record a large number of people who would
25  have testified in opposition to this bill had they had the
0227
1  opportunity.
2       And I want to thank you as well for coming here,
3  and your opposition is duly noted.  Thank you very much for
4  that.
5       We will take a very brief recess, literally five
6  minutes, and we will proceed to the amendment phase of
7  House Bill 1229.  This committee will stand in recess.
8       (A recess was taken at this time.)
9       THE CHAIRMAN:  We are at the amendment phase of
10  House Bill 1229, by Representatives Fields and McCann.  And
11  I would ask if there are any amendments that are to be
12  offered.  Oh.
13       (Inaudible.)
14       THE CHAIRMAN:  Huh?
15       REPRESENTATIVE FIELDS:  If he's here to offer
16  his amendment.
17       THE CHAIRMAN:  I'm going to be pretty indulgent
18  of late arrivals, Representative Fields, given my own
19  record in --
20       REPRESENTATIVE FIELDS:  Thank you,
21  Mr. Chair.
22       THE CHAIRMAN:  Given my own record in that
23  department.
24       Representative Gardner, welcome.
25       REPRESENTATIVE GARDNER:  For -- for amendments,
0228
1  Mr. Chair?
2       THE CHAIRMAN:  We're here for amendments,
3  Mr. -- Representative Gardner, yes.
4       REPRESENTATIVE GARDNER:  Okay.  Thank you,
5  Mr. Chair.
6       Mr. Chair, I would move L.001.
7       REPRESENTATIVE WRIGHT:  Second.
8       THE CHAIRMAN:  The amendment L.001 has been
9  moved by Representative Gardner and seconded by
10  Representative Wright.
11       Represent Gardner, tell us about Amendment
12  L.001.
13       REPRESENTATIVE GARDNER:  Thank you,
14  Mr. Chair.
15       Mr. Chair, L.001 is a very straightforward

LEG HX 000585

4500

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

16   amendment. I had a concern brought to me by some licensed
17   -- a particular licensed gun dealer, and perhaps more than
18   one, that was concerned that because the legislation talks
19   extensively about the requirement for the performance of a
20   background check, that would be an expectation or an
21   implied requirement that any licensed gun dealer in
22   Colorado would be required to run these background checks
23   for the particular fee when, in fact, there are many
24   dealers that may not wish to sort of be in that business,
25   if you will, and would not want to do so.
0229
1        So the amendment basically says nothing in the
2   section shall be construed to require a licensed gun dealer
3   to obtain a background check upon their request of a
4   prospective firearm transfer.  So they could simply choose
5   not to do it.
6        And I think one of things that militates in
7   favor of this is simply the fact that there may be those
8   that they know or suspect are not -- are not permitted to
9   do the transfer, and they would prefer not to deal with
10  them, and they just want to protect their right not to deal
11  with someone if they wish to pursue that course.
12       THE CHAIRMAN:  Representative Gardner, thank
13  you.  Are there any comments by members of the committee on
14  the subject of L.001?
15       Representative Fields.
16       REPRESENTATIVE FIELDS:  Mr. Chair, I oppose
17  this amendment.  This is an unfriendly amendment.  It would
18  create an unstandared practice in our state.  So I think it
19  would gut the bill, so I urge a no vote on this amendment,
20  L.001.
21       THE CHAIRMAN:  Representative Gardner.
22       REPRESENTATIVE GARDNER:  Yes, thank you.
23       That is unfortunate that it's an unfriendly
24  amendment because it seems to me that it puts the licensed
25  gun dealer in a particular situation where they may have to
0230
1   deal with people or there is an implication they may have
2   to deal with those that they may very well suspect are not
3   permitted to transfer firearms or that it might be an undue
4   burden on their particular business.  Maybe they're really
5   not sort of in the business of doing private transfers.
6        I suspect, if this bill passes, there will be a
7   large number of dealers who do the private transfer
8   background check and would be willing to do so.  But we
9   ought to guarantee the right of someone not to do so and
10  so.
11       I would urge an aye vote on this amendment.
12       THE CHAIRMAN:  And I would urge a no vote on
13  this amendment, members.
14       I think it -- it's -- if we are going to pass
15  this bill, and I don't know that we are, but if we do pass
16  this bill and we require people to obtain these background
17  checks from licensed dealers, then we certainly don't want

LEG HX 000586

4501

18  to undermine the entire effort which -- which the bill
19  envisages will be necessary for people to undertake.
20          That would be very burdensome on firearm owners
21  if -- if they started to be unable to comply with the law
22  and unable to get their transfers registered.  So that
23  would be very damaging to the entire effort, if indeed it
24  is enacted into law that these transfers -- these
25  background checks are required.  We must make sure that we
0231
 1  don't require somebody to do something that really -- and
 2  find it more difficult to do rather than easier to do.
 3          So I'm going to -- Representative Gardner.
 4          REPRESENTATIVE GARDNER:  Yes, thank you.
 5          Then -- then am I to understand -- and I wonder
 6  if this is the sponsor's intent of the bill -- that the
 7  intent and the implication is that a licensed gun dealer,
 8  someone who is a federal firearms licensed dealer, would,
 9  in fact, under this bill by implication be required to
10  perform these backgrounds checks even if they did not wish
11  to do so.
12          Is that the sponsor's position?
13          THE CHAIRMAN:  Representative Fields.
14          REPRESENTATIVE FIELDS:  Mr. Chair.
15          It's just like any other laws.  You can't
16  decide not to follow a law.  I mean, we have laws that you
17  can't commit murder.  You can't opt in and out.  So I would
18  like to make sure we have consistent practice.  So if this
19  does become law and we're asking private sellers to go to a
20  licensed dealer for a background check, then they need to
21  be able to go to a place of business to get that done.
22          I think it puts a burden on the seller not
23  knowing, you know, if this person is going to do it or not.
24  So I think that we need to have a common standard and
25  practice to avoid any confusion.  So, yes, it would be a
0232
 1  requirement.
 2          THE CHAIRMAN:  Representative Gardner, I don't
 3  know whether it would be a requirement because this is
 4  going to be subject to rule making, which will go through
 5  the normal rule making procedures, if this bill becomes
 6  law, and that will all be subject to public comment.  And
 7  in the normal rulemaking process, nothing is going to be
 8  done hastily.
 9          And I can't imagine -- I can't imagine that we
10  -- the general tenants of law are clear in the bill, and I
11  must say that I can't predict exactly the definitions of
12  the rules.
13          I don't think it's a good idea, though, to start
14  putting big constraints in the rules, and that's why I'm
15  urging a no on the amendment.
16          Yes, Representative Gardner.
17          REPRESENTATIVE GARDNER:  Yes, thank you.
18          You know, I'm, frankly, astounded.  When the
19  particular proponent brought the amendment to me, I

LEG HX 000587

4502

20  actually sort of scoffed, and I said that that could hardly
21  be necessary, and the response from this particular
22  stakeholder was, Well, you know, I don't think so, but I'm
23  a little concerned about it.  And now, after we've argued
24  the amendment, I'm firmly, absolutely convinced that this
25  amendment is necessary because there is language and
0233
1  discussion here that makes it sound like we're going to
2  impose a duty upon FFLs to perform these private background
3  checks and do so for $10, and that strikes me as an
4  interference with constitutional rights as well.
5          And so I appreciate the discussion on this, and
6  I'm glad I've brought the amendment and urge an aye vote on
7  it.
8          THE CHAIRMAN:  All right.  Is there any further
9  discussion of L-00 -- L.001?
10         All right.  Ms. Shipley, will you please take
11 the roll.
12         MS. SHIPLEY:  Representatives, Buckner?
13         REPRESENTATIVE BUCKNER:  No.
14         MS. SHIPLEY:  Court?
15         REPRESENTATIVE COURT:  No.
16         MS. SHIPLEY:  Gardner?
17         REPRESENTATIVE GARDNER:  Yes.
18         MS. SHIPLEY:  Lawrence?
19         REPRESENTATIVE LAWRENCE:  Yes.
20         MS. SHIPLEY:  McLachlan?
21         REPRESENTATIVE McLACHLAN:  No.
22         MS. SHIPLEY:  Murray?
23         REPRESENTATIVE MURRAY:  Yes.
24         MS. SHIPLEY:  Pettersen.
25         REPRESENTATIVE PETTERSEN:  No.
0234
1          MS. SHIPLEY:  Salazar.
2          REPRESENTATIVE SALAZAR:  No.
3          MS. SHIPLEY:  Wright?
4          REPRESENTATIVE WRIGHT:  Yes.
5          MS. SHIPLEY:  Lee?
6          REPRESENTATIVE LEE:  No.
7          MS. SHIPLEY:  Mr. Chair?
8          THE CHAIRMAN:  No.
9          And that amendment fails by a vote of --
10         UNIDENTIFIED SPEAKER:  Three to eight.
11         THE CHAIRMAN:  -- three to eight.
12         Are there any further amendments to House Bill
13 1229?
14         Are there any further --
15         (Inaudible.)
16         THE CHAIRMAN:  Let the record reflect that
17 amendment failed by a vote of four to seven, not by a vote
18 of three to eight as previously announced.  The amendment
19 failed by a vote of four to seven.
20         There are no further amendments before the
21 committee, so I would invite the sponsors, if you would

22    like, to conduct a wrap up.
23         Would you like to do that?
24         Representative Fields.
25         REPRESENTATIVE FIELDS:  Thank you, Mr. Chair,
0235
 1   and committee members.  Thank you so very much for your
 2   patience this afternoon.
 3         Today we are here addressing solutions.  You've
 4   heard the NRA say some things like this bill doesn't
 5   address the real problem.  And so what I would like to do
 6   is to recite the facts that I mentioned earlier in my
 7   opening remarks.
 8         And it just goes to show that when we closed the
 9   gun show loophole in Colorado, we were the 17th largest
10   source of guns that were later found at the scene in other
11   states.
12         A year later after closing the gun show
13   loophole, we ranked 27th, and then, in 2009 we ranked 32nd.
14   By 2009 we ranked 32nd.  So this just goes to show that
15   closing that loophole does make a difference.
16         I believe that background checks can save lives,
17   because what we're trying to do is we're trying to keep
18   guns out of the hands of dangerous people, those who have
19   been known to be domestic violence abusers, those who may
20   be mentally ill, or those who are felons.
21         Now, if you are a felon, it's just well known
22   that you can go on the Internet and you can buy a gun, all
23   kinds of guns.  This is just one way to keep our community
24   safe by closing the loophole.
25         We heard some testimony in reference to how this
0236
 1   bill will help those who are -- are a part of domestic
 2   violence murders.  We've heard some cases recently in the
 3   state of Colorado.  If we can close that loophole denying
 4   access to someone getting a gun so they can later go in and
 5   commit murder because of an intimate relationship that they
 6   have with someone by using a gun, then that is a good
 7   thing.  So closing the background check does save lives.
 8         We also have some statistics here that talks
 9   about fewer crimes.  We would have fewer crimes in the
10   state of Colorado.  We can just close that loophole.
11         So today I'm asking that you vote yes on House
12   Bill 1229 so that we can update our laws as it relates to
13   private sales.  It's a loophole.  We should close it, and
14   we should keep our community safe.
15         Thank you.
16         THE CHAIRMAN:  Representative McCann.
17         REPRESENTATIVE McCANN:  Thank you very much.
18         And thank you, members of the committee, for
19   your patience today.
20         I would simply say that we are not imposing a
21   new requirement for the purchase of a gun.  We are simply
22   extending the current requirements to all purchases of
23   guns.  We are saying wherever you buy a gun in the state of

LEG HX 000589
4504

24  Colorado, you must be free from those disqualifying
25  factors.  So we're simply making sure that everyone who
0237
1  purchases a gun has to comply with what we already require
2  in our law for purchases of guns.
3          So with that, I would ask for an aye vote on the
4  bill.  Thank you.
5          THE CHAIRMAN:  Thank you.
6          And before we take a vote on House Bill 1229, is
7  there any member who wishes to make any comment?
8          Seeing none, Representative Court.
9          REPRESENTATIVE COURT:  Thank you, Mr. Chair.
10          I -- I just want to acknowledge that a lot of
11  people have said that this isn't going to keep gun
12  violence from happening.  Yep, that's right.  It's not
13  going to.  Just like every stop sign doesn't stop people
14  from having traffic accidents, just like saying that murder
15  is wrong doesn't stop murder, but if this bill stops one
16  criminal from getting a gun and killing somebody who
17  shouldn't be killed, because who should be, then this bill
18  is a good bill.
19          We, in a civil society, pass laws to make
20  statements about our values, and I don't think anybody in
21  this room disagrees that we do not want criminals having
22  guns and killing innocent people.
23          So as I said, if this bill can keep one criminal
24  from getting a gun and killing one innocent person, it's
25  worth it to me.  So I will be a yes vote.
0238
1          Thank you.
2          THE CHAIRMAN:  Thank you.
3          Representative Salazar.
4          REPRESENTATIVE SALAZAR:  Thank you, Mr. Chair.
5          And thank you, Representative McCann and
6  Representative Fields, for bringing this bill.
7          I think I made a statement a little while ago
8  that -- to one of the witnesses, and I asked the question
9  of, you know, if by closing this loophole we could stop one
10  criminal from gaining access to a weapon, because we know
11  they can gain access in multiple ways, but with this one
12  right here, would that be acceptable, and that witness
13  agreed with that proposition in itself.
14          I don't think that this is an unduly burdensome
15  law on the constitutional right of individuals.  Instead it
16  is targeted to making sure that criminals have one less
17  place where they can go to get a weapon.
18          I'm from the San Luis Valley, and I grew up in
19  Thornton, and I've had guns given to me by family members,
20  and I anticipate that I'll be giving guns to family members
21  in the future, maybe my daughters, maybe my grandsons, or
22  grandchildren, or maybe some cousins.
23          It's not so much that this bill shouldn't be
24  brought, because it should be, it's about the exceptions
25  and it's about language of the exceptions that seem to need

4505

1  some working on. I think that we've heard the young ladies
2  back there talking about target practicing on their own
3  property. That's not covered here, and I think that that's
4  something that should be covered.
5        But I think that this bill is so important and
6  must be brought, that it be heard too, and that there's
7  going to be a way to work on this language so that many of
8  the things, many of the concerns that we've heard here
9  today will be address. And I'm looking forward to working
10  with Representative McCann and Representative Fields and
11  addressing those issues as I vote yes on this bill.
12        THE CHAIRMAN: Thank you.
13        And Representative Wright and then
14  Representative Lee.
15        REPRESENTATIVE WRIGHT: Thank you, Mr. Chair.
16        As a law enforcement official, I'm speaking
17  from personal experience. In the performance of my duties,
18  I've had loaded guns pointed at me. And I can tell you
19  also from that same personal experience and having made
20  untold arrests in crimes involving firearms, that I am
21  certain that while well intentioned, this bill will do
22  nothing to make the citizens of the state of Colorado
23  safer.
24        And worst yet, while not making them safer, it's
25  going to cost us somewhere to the tune of $3.2 million in
0240
1  the next two years, creating more bureaucracy, and it will
2  fundamentally restrict the civil rights of the citizens of
3  this state.
4        I am a wholehearted no vote on this bill.
5        THE CHAIRMAN: Representative Lee.
6        REPRESENTATIVE LEE: Thank you, Mr. Chairman.
7        And I'd like to thank Representatives McCann and
8  Fields for bringing this bill to us.
9        We all came to this legislative session with a
10  responsibility significantly to try to promote public
11  safety and to try to ensure that our family, our wives, our
12  children, our friends are kept safe, and this bill was
13  brought with that responsibility in mind.
14        Doing so, though, we are not unmindful of our
15  oath to uphold the Second Amendment. We have that
16  responsibility, and we take it seriously. As we have
17  discussed, though, the Supreme Court has told us that no
18  rights under our constitution or statutes are absolute
19  except maybe the right to life and liberty and the persist
20  of happiness that were granted in our declaration of
21  independence.
22        The balancing that we have to do to protect our
23  amendment rights while promoting our public safety rights
24  is the challenging task that we have as representatives.
25        What we need to do is to prevent people who
0241
1  want to do us violence from obtaining weapons, and that, I

2    am persuaded, is what this bill is all about. This bill
3    will screen out convicted felons. It will screen out drug
4    addicts. It will screen out people who are dangerously
5    mental ill -- mentally ill and prevent them from obtaining
6    weapons, and that's what this bill is designed to do.
7        As David Chipman, from the Alcohol, Tobacco,
8    and Firearms division told us, it will be a shield to
9    improve the protection against violence.
10       As our bill sponsors have told us, most weapons
11   that are obtained for criminal use are obtained through
12   private sales. So we need to ensure the safety of our
13   citizens by ensuring that private sales are subject to the
14   same restrictions and limitations that gun shows sales are
15   subjected to.
16       I'm also persuaded by John Jackson, representing
17   the chiefs of police, and telling that they -- these law
18   enforcement officers -- are in unanimous support of this.
19   So I will be a yes vote.
20       Thank you.
21       THE CHAIRMAN:  Representative Gardner and then
22   Representative Buckner.
23       REPRESENTATIVE GARDNER:  Thank you. Thank you,
24   Mr. Chair.
25       Representatives Fields and McCann, no doubt
0242
1    this bill is well intentioned. I know you both to be good
2    legislators, good representatives, and people who care
3    deeply about your community. I hope you grant those of us
4    who vote no on the bill the same.
5        Many asertations are made in my six years, and
6    now my seventh year, about what differences are going to be
7    made about a piece of legislation, and I think often
8    sponsors think that things will -- legislation will
9    accomplish things that, at the end of the day, they may
10   not.
11       My friend Representative Lee said something to
12   the effect of most criminals obtain their gun by private
13   sales. I think if they are criminals, I think they will
14   continue to obtain their guns by private sales. On the
15   street corner probably in exchange for drugs, and they're
16   probably not going to go to an FFL and have a background
17   check run because they probably will have a prior felony.
18   They will just obtain their weapon the way they always
19   have.
20       But we will impose a requirement that I find
21   out, at the end of the day, that dealers who may not want
22   to do this, will be criminalize to do. We will criminalize
23   activities where honest citizens transfer a firearm to
24   another honest and law-abiding citizen for legitimate
25   purposes of self protection.
0243
1        And at the end of the day, the things that some
2    of our witnesses talked about earlier, the horrific
3    incidents, are not going to be prevented. And so we will

4  have infringed a constitutional, will not have gained a
5  whole lot in public safety in my view.
6      I know you disagree with that, and I respect
7  that, but I think we'll not have the gains in public
8  safety.  And we'll be back here -- well, I won't be back
9  here.  Maybe not you either, but someone will be back here,
10  some set of legislators, no doubt, sometime in the future
11  to enact some further restriction upon the Second Amendment
12  rights of citizens somehow to -- on the premiss that it's
13  going to gain something in public safety when it will not,
14  in my view.
15      And so I will be a no.  I appreciate your
16  bringing this in the sense of I appreciate the efforts of
17  -- good faith efforts of all legislators, but I believe
18  this is a piece of legislation, while well meaning, that it
19  will not accomplish anything by way of public safety that
20  is intended to accomplish.
21      Thank you.
22      THE CHAIRMAN:  Representative Buckner.
23      REPRESENTATIVE BUCKNER:  Thank you, Mr. Chair.
24      Representative McCann and Representative
25  Fields, I appreciate you bringing a bill and your efforts.
0244
1      I'm going to vote yes on your bill because I
2  think it contributes to public safety that we are all
3  charged with trying to put in place.  And so with that in
4  mind and knowing that we don't have a perfect way to solve
5  all of these problems, I think we have to keep contributing
6  to the public safety and keep that as a goal for us.
7      So I will be voting yes.  And I appreciate you
8  bringing the bill on behalf of citizens of Colorado.
9      THE CHAIRMAN:  Representative McLachlan.
10      REPRESENTATIVE McLACHLAN:  Thank you,
11  Mr. Chairman.
12      As a United States Marine, I take the Second
13  Amendment rights extremely seriously.  I appreciate the
14  testimony of all the gun owners and the people of the state
15  of Colorado, and I want you to know that I fully respect
16  your gun rights.
17      I also will -- and I go on the record here
18  today.  I will never support registration of guns.  I have
19  severe constitutional problems and political and
20  philosophical problems with banning certain types of
21  weapons, but I believe this bill is the reasonable purpose
22  which promotes the public safety and welfare.
23      I realize it is an owner's responsibility put on
24  the licensed owner; however, I believe that it will promote
25  the public safety, and it is not the beginning of the
0245
1  slippery slope.  As long as I'm in this house, this is not
2  the beginning of the slippery slope.  This is simply a bill
3  designed to promote the public safety and ensure that the
4  people of the state of Colorado have a safer state than we
5  have today.

6      And I thank McCann -- Representative McCann and
7  Representative Fields for bringing this to our attention,
8  and I will vote for this bill.
9          THE CHAIRMAN:  I think that the opponents of
10  this bill have said it won't do any good, it won't make any
11  difference.  If you do background checks on 60 percent of
12  those that are good people trying to buy firearms and they
13  extend it to private sales, it won't make any difference at
14  all.  The criminals will still get their guns, you will
15  have passed a law imposing a burden on legitimate gun
16  buyers to absolutely no purpose.
17          I don't share that view.  I think that's unduly
18  pessimistic.  I think this will do some good.  I think it
19  will reduce the availability of firearms to some people who
20  we all agree should not have access to them.  It will not
21  be a dead letter; it will not be a waste of time; it will
22  not be a burden imposed on the law-abiding public for
23  absolutely no reason.
24          And so the question then becomes:  Is it a
25  burden that we, as citizens, are willing and should be
0246
1  willing to bear this requirement that we get a check done
2  on the person to whom we sell a firearm?  I think it's a
3  burden that -- is a burden.  There's no question about it.
4  But I think it's a burden that we ought, as a society, to
5  take on.
6          I think just as we take on other burdens that
7  are -- that are an imposition, in order to increase our
8  collective public safety, this is burden that we should
9  take on.  It's worth the effort.  It's worth the effort,
10  and I'm going to be a yes vote for that reason.
11          Ms. Shipley, please take the roll.
12          Oh, we need a motion.
13          Representative Court.
14          REPRESENTATIVE COURT:  I move House Bill 1229 to
15  the full house with a favorable recommendation.
16          UNIDENTIFIED SPEAKER:  Second.
17          REPRESENTATIVE COURT:  It doesn't say
18  (inaudible).
19          Oh, it goes to approps.  Sorry.
20          I -- I revise my motion.  I move House Bill 1229
21  to the committee on appropriations with a recommendation.
22          THE CHAIRMAN:  House Bill 12 --
23          REPRESENTATIVE BUCKNER:  Second.
24          THE CHAIRMAN:  Seconded by Representative
25  Buckner.
0247
1          The question before the committee is whether
2  House Bill 1229 shall pass to the committee of
3  appropriates.
4          Ms. Shipley, would you please take the roll.
5          MS. SHIPLEY:  Representatives, Buckner?
6          REPRESENTATIVE BUCKNER:  Yes.
7          MS. SHIPLEY:  Court?

LEG HX 000594

4509

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

8        REPRESENTATIVE COURT:  Yes.
9        MS. SHIPLEY:  Gardner?
10       REPRESENTATIVE GARDNER:  No.
11       MS. SHIPLEY:  Lawrence?
12       REPRESENTATIVE LAWRENCE:  No.
13       MS. SHIPLEY:  McLachlan?
14       REPRESENTATIVE McLACHLAN:  Yes.
15       MS. SHIPLEY:  Murray?
16       REPRESENTATIVE MURRAY:  No.
17       MS. SHIPLEY:  Pettersen?
18       REPRESENTATIVE PETTERSEN:  Yes.
19       MS. SHIPLEY:  Salazar?
20       REPRESENTATIVE SALAZAR:  Yes.
21       MS. SHIPLEY:  Wright?
22       REPRESENTATIVE WRIGHT:  No.
23       MS. SHIPLEY:  Lee?
24       REPRESENTATIVE LEE:  Yes.
25       MS. SHIPLEY:  Mr. Chair?
0248
1        THE CHAIRMAN:  Yes.
2        And that vote -- that bill passes by a vote of
3  seven to four.
4        Thank you, and this committee will be in brief
5  recess.
6        Oh, yes.  Is there another motion?
7        No, no, we don't need another motion.
8        (Inaudible.)
9        THE CHAIRMAN:  No.  We don't need another
10  motion.
11        This committee will stand in recess.
12        MS. FIELDS:  Thank you.  I appreciate your
13  support.
14        THE CHAIRMAN:  Thank you.
15        (Whereupon, the recording was concluded.)
16
17
18
19
20
21
22
23
24
25
0249
1            CERTIFICATE
2  STATE OF COLORADO          )
3  CITY AND COUNTY OF DENVER      )   ss.
4
5        I, Elissa Steen, Registered Professional
6  Reporter and Notary Public in and for the State of
7  Colorado, do hereby certify that this transcript was taken
8  in shorthand by me from an audio recording and was reduced
9  to typewritten form by computer-aided transcription; that

LEG HX 000595    4510

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

10  the speakers in this transcript were identified by me to
11  the best of my ability and according to the introductions
12  made and written materials provided; that the foregoing is
13  a true transcript of the proceedings had; that I am not
14  attorney, nor counsel, nor in any way connected with any
15  attorney or counsel for any of the parties to said action
16  or otherwise interested in its event.
17         IN WITNESS WHEREOF, I have hereunto affixed
18  my hand and notarial seal this 24th day of June, 2013.
19
20
21
        _____
22              Registered Professional Reporter
                           and
23                    Notary Public
24
25

LEG HX 000596    4511

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021213.txt[11/12/2013 10:57:40 AM]

0001
1   CITY AND COUNTY OF DENVER
2   STATE OF COLORADO
3   Judicial Committee Meeting
4   Held on February 14, 2013
5   HOUSE BILL 13-1229
6   -----------------------------------------------------------
7   REPORTER'S TRANSCRIPT
8   -----------------------------------------------------------
9
10          This transcript was taken from an audio
11  recording by Elissa Steen, Registered Professional Reporter
12  and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
1           P R O C E E D I N G S
2               *   *   *   *   *
3           THE CHAIRWOMAN:  Committee, we do have another
4   bill, House Bill 1229.  It is 9:50.  They are waiting for
5   us on the floor.  I do want to allow questions to be
6   answered, but it is my prerogative to limit the time we
7   spend, and if questions are repetitive, I will cut those
8   questions off.
9           I just -- I'm not going to establish a time
10  limit right now because I do think we need to get into the
11  bill, but at the point where the questions become
12  repetitive and just dragging this out, I will cut them off,
13  and we can resume discussion on the floor.
14          Thank you for being with us this morning,
15  Representative Fields and Representative McCann.  Please
16  tell us about House Bill 1229.
17          REPRESENTATIVE FIELDS:  Thank you, Mr. Chair --
18  Ms. --
19          THE CHAIRWOMAN:  Madam.
20          REPRESENTATIVE FIELDS:  Thank you.
21          THE CHAIRWOMAN:  I am --
22          REPRESENTATIVE FIELDS:  Basically this bill
23  creates an opportunity for us to close a loophole as it
24  relates to the transfer of a private gun.
25          And so what you see here is the funds that it
0003

1  will take to implement a --
2       THE CHAIRWOMAN:  Representative Duran.
3       REPRESENTATIVE DURAN:  Thank you, Madam Chair.
4  I move J-003.
5       REPRESENTATIVE LABUDA:  Second.
6       THE CHAIRWOMAN:  Second by Representative
7  Labuda.
8       Is there any objection to J-003?
9       Members, this is the appropriations clause which
10  sets up an alternative that if House Bill 1228 becomes law,
11  then Section 9 of the appropriations clause will not be
12  become effective, and Section 10 will be in effect.
13       THE CHAIRWOMAN:  Representative Sonnenberg.
14
15       REPRESENTATIVE SONNENBERG:  I'm objecting,
16  Madam Chair.
17       THE CHAIRWOMAN:  Pardon me?
18       REPRESENTATIVE SONNENBERG:  I'm objecting.
19       THE CHAIRWOMAN:  Okay.
20       Then, Mr. Harper, would you please call the
21  roll.
22       MR. HARPER:  Representative DelGrosso?
23       REPRESENTATIVE DelGROSSO:  No.
24       MR. HARPER:  Representative Dore?
25       REPRESENTATIVE DORE:  No.
0004
1       MR. HARPER:  Representative Gardner?
2       REPRESENTATIVE GARDNER:  Pass.
3       MR. HARPER:  Representative Gerou?
4       REPRESENTATIVE GEROU:  Pass.
5       MR. HARPER:  Representative Hamner?
6       REPRESENTATIVE HAMNER:  Yes.
7       MR. HARPER:  Representative Labuda?
8       REPRESENTATIVE LABUDA:  Yes.
9       MR. HARPER:  Representative Pabon?
10       REPRESENTATIVE PABON:  Yes.
11       MR. HARPER:  Representative Singer?
12       REPRESENTATIVE SINGER:  Yes.
13       MR. HARPER:  Representative Sonnenberg?
14       REPRESENTATIVE SONNENBERG:  No.
15       MR. HARPER:  Representative Tyler?
16       REPRESENTATIVE TYLER:  Yes.
17       MR. HARPER:  Representative Young?
18       REPRESENTATIVE YOUNG:  Yes.
19       MR. HARPER:  Representative Gardner?
20       REPRESENTATIVE GARDNER:  No.
21       MR. HARPER:  Representative Gerou?
22       REPRESENTATIVE GEROU:  No.
23       MR. HARPER:  Representative Duran?
24       REPRESENTATIVE DURAN:  Yes.
25       MR. HARPER:  Madam Chair?
0005
1       THE CHAIRWOMAN:  Yes.
2       So J-003 passes on a vote of eight to five.

3      And a motion would be in order.
4      Representative Pabon.
5      REPRESENTATIVE PABON:  Thank you, Madam Chair.
6      I move House Bill 1229 to the (inaudible) with a
7  favorable recommendation.
8      REPRESENTATIVE DURAN:  Second.
9      THE CHAIRWOMAN:  Moved by Representative Pabon.
10  Seconded by Representative Duran.
11      Representative Sonnenberg.
12      REPRESENTATIVE SONNENBERG:  Thank you, Madam
13  Chair.
14      I don't know how to do this without talking
15  about another bill, but the previous bill includes a $10
16  fee.  How will that work with this if this bill is passed?
17      THE CHAIRWOMAN:  Representative Sonnenberg, I
18  appreciate your sensitivity to that issue, and I do think
19  the two are intertwined by virtue of the appropriations
20  clause, so I will allow that question.
21      Representative McCann.
22      REPRESENTATIVE SONNENBERG:  Thank you.
23      REPRESENTATIVE McCANN:  Thank you, Madam Chair.
24      Representative Sonneberg, as you can see in
25  J-003, there are two different appropriations clauses.  So
0006
1  if 1228 passes, then Section 10 of the appropriations
2  clause will apply and the funding for the private-sale
3  background checks will be recovered through the fee that
4  was discussed in 1228.  So it will come from the cash fund
5  that's established by 1228.
6      If 1228 does not pass, then Section 9 of the
7  appropriations clause will apply, and there will be an
8  appropriation out of the general fund.
9      THE CHAIRWOMAN:  Representative Sonnenberg.
10      REPRESENTATIVE SONNENBERG:  Okay.  Thank you,
11  Madam Chair.
12      Then, if I give my -- give a couple of my guns
13  to my son-in-law, which is not direct family, if I
14  understand this correctly, how will that money be collected
15  or paid for?
16      THE CHAIRWOMAN:  Representative McCann.
17      REPRESENTATIVE McCANN:  The transfer of a
18  private -- a private sale of a firearm will have to be done
19  through a federally licensed dealer.  So you go to a
20  federally licensed dealer, and the dealer, as was discussed
21  previously, will actually collect the fee if 1228 passes.
22      If not, it will -- the background check would be
23  done through the federally licensed dealer and the fee
24  would be paid from the general fund.
25      THE CHAIRWOMAN:  Representative Sonnenberg.
0007
1      REPRESENTATIVE SONNENBERG:  One last question.
2      Is there a difference between a federally
3  licensed dealer or -- let me say it this way:  Are all gun
4  dealers federally licensed dealers?

5         THE CHAIRWOMAN:  Representative McCann.
6         REPRESENTATIVE McCANN:  I -- I think they are,
7   but honestly, I'm not absolutely sure.
8         Do you know, Representative Fields?
9         THE CHAIRWOMAN:  Representative Fields.
10        REPRESENTATIVE FIELDS:  I believe so.
11        REPRESENTATIVE SONNENBERG:  Thank you.
12        THE CHAIRWOMAN:  Representative Gardner.
13        REPRESENTATIVE GARDNER:  Thank you, Madam
14   Chair.
15        And I want to formulate this carefully, so
16   please bear with me.
17        Representative Fields, I heard on several
18   occasions in the committee the other evening, and I heard
19   you again this morning refer to this as the closing of a
20   loophole, and that's sort of a vernacular term that is used
21   a lot.  It sort of implies that somehow there's an
22   unintended way that someone might do something that's used
23   in the tax code and so forth, are using the concept.
24        But right now this is not a misunderstanding in
25   the law.  There, heretofore, has been a conscious decision,
0008
1   or at least a legislative decision, not to impose a
2   requirement for background checks on private transfers.  So
3   it's not like somebody is kind of doing something shady
4   right now when they do a private transfer.  At least maybe
5   you don't intend that at all, but "loophole" sort of
6   imparts the notion that somebody is doing something shady.
7        It's not shady at all right now if I go and hand
8   my next-door neighbor a gun for him to go hunting with or
9   to protect himself.  They are not doing anything shady
10   right now, are they?
11        THE CHAIRWOMAN:  Representative Fields.
12        REPRESENTATIVE FIELDS:  Thank you, Madam Chair.
13        Representative Gardner, no.  In the scenario
14   you just described, that would not be anything shady, but I
15   just got -- shared some results that showed that we had
16   over 968 felons, fugitives, domestic violation abusers.
17   Close to 1,000 were denied access to a gun.
18        And so what criminals do is they skirt sometimes
19   around the rules of law to access guns.  So the loophole
20   that I am trying to close is for those who are felons, for
21   those who may be involved in domestic violence where they
22   have restraining orders.  And they can bypass our
23   background system by just going on the Internet buying a
24   gun, or they can just look in a classified ad, or they can
25   buy from their neighbor, because right now it's legal to
0009
1   buy a gun from a private seller, and you don't have to
2   perform a background check.
3        So felons know that, and they are skirting
4   around that.  So this would close that loophole and save
5   lives.
6        THE CHAIRWOMAN:  And so, Representative Fields,

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021413.txt[11/12/2013 10:57:44 AM]

7   I think what Representative Gardner was concerned about is
8   that the term loophole, which he did note we use in the
9   vernacular, that implied that maybe somebody was doing
10  something to try to get around the law, but I think what
11  you've pointed out is that there is -- it's a gap in the
12  law.
13          The law currently does not cover private sales
14  and requiring background checks and your -- and using
15  loopholes, whether they are tax loopholes or any other, is
16  perfectly legal, but there is a gap in the coverage of the
17  background checks.  Your bill would close that gap so that
18  private sales would be covered subject to the exceptions in
19  your bill.
20          And are there other questions about the
21  appropriations for this bill?
22          Representative DelGrosso.
23          REPRESENTATIVE DelGROSSO:  Thank you, Madam
24  Chair.
25          And since we are talking about money here, I'm
0010
1   looking at this bill, and on page 3 it talks about a person
2   who manufacturers a large-capacity magazine in Colorado
3   commits a Class 2 misdemeanor, and they are punishable by
4   law.
5           Currently we have some companies in Colorado
6   that produce these magazines, and some significantly large
7   ones.  One does over $400 million sales to people around
8   the world.  They employ over 700 Coloradoans -- we're
9   talking about 700 families here -- and bring in about $46
10  million into Colorado's economy.  So --
11          THE CHAIRWOMAN:  Excuse me.  Representative
12  DelGross, are you talking about House Bill 1229?
13          UNIDENTIFIED SPEAKER:  Uh-huh.
14          REPRESENTATIVE DelGROSSO:  Oh, am I in the
15  wrong one?
16          UNIDENTIFIED SPEAKER:  That was a great speech,
17  though.
18          UNIDENTIFIED SPEAKER:  I think --
19          REPRESENTATIVE DelGROSSO:  I pulled up the
20  wrong one on my folder.
21          UNIDENTIFIED SPEAKER:  Keep it going.  You had
22  me -- captivated me.
23          THE CHAIRWOMAN:  I think you want to make that
24  speech -- thank you for a purview of coming attractions.
25  We'll look forward to the rest of that speech when we
0011
1   address House Bill 1224.
2           Representative Gardner, yes, I can see you.
3           REPRESENTATIVE GARDNER:  Thank you, Madam
4   Chair.
5           I have questions about this bill, although I
6   can understand why one would be confused.  We spent 12
7   hours the other evening, but I don't think we exhausted all
8   of the questions that we had.  There are so many around

4516

9   this and about the appropriation or about the money.
10          One of the things I heard the other evening
11  that's really caused me a great deal of concern is that the
12  fee that is imposed or that an FFL is entitled to impose is
13  limited at $10.  And I think that's a good thing, on the
14  one hand, but there -- there was some implication in that
15  an FFL operating in the state of Colorado would then be
16  required, if someone went to him or her with a private
17  transaction, to do the background check on that, that FFL
18  would, by virtue of operating in Colorado, be required to
19  perform a background check.
20          And the concern caused me to introduce an
21  amendment that was rejected, which caused me even more
22  alarm because it sounded to me like we have, in essence,
23  turned FFLs in Colorado into public utilities in that
24  they're required to provide a service even if they do not
25  wish to.
0012
1           And I've had many, many people say that this $10
2   fee was not -- if you were not selling, if you were not the
3   dealer, so that it was an accommodation to your customer,
4   but rather that I and my neighbor would have to go down to
5   -- to the corner gun store and ask our local FFL before I
6   loaned the weapon to my -- to my neighbor so he could go
7   hunting with his brother-in-law; that we'd have to, you
8   know, pay $10, but that that would not be enough.
9           So is there -- is there some intent that FFLs
10  are going to be required to do this, or are you willing to
11  state that that is absolutely not the intent of this bill?
12  And if so, why is there such resistance to an amendment to
13  say so?
14          THE CHAIRWOMAN:  Representative McCann.
15          REPRESENTATIVE McCANN:  Thank you, Madam Chair.
16          Representative Gardner, there is nothing in
17  this bill that requires a specific FFL to perform a
18  background check for -- in a private-sale situation.  That
19  would be completely up to FFL.
20          The private buyer and seller do have to get --
21  get it done through an FFL, but there's nothing in the bill
22  that would require a specific FFL to provide that service.
23          THE CHAIRWOMAN:  And, members, I am going to
24  call for a vote at the hour of 10:16.  That allows -- by
25  the clock there, I'm looking at about 11 more minutes of
0013
1   questioning.
2           And so I would ask the committee members to
3   please try to make your questions a little more concise so
4   that if you are actually interested in getting an answer to
5   the question, you and the other committee members can have
6   the benefit of that answer.
7           And so at 10:15 I will call for the vote.  And
8   so -- just so the committee is aware of that.
9           Representative Sonnenberg.
10          REPRESENTATIVE SONNENBERG:  Thank you, Madam

LEG HX 000602    4517

11    Chair.
12          And my question goes to page 1 of the canary
13    sheet where it talks about if House Bill 1228 is enacted,
14    the $1,612,006 in cash fund from the instant criminal
15    background check cash fund.
16          I'm curious as to -- this may be someone from
17    the fiscal step.  Are they assuming, then, that there will
18    be 161,200 transfers?  Is that -- is that how they came up
19    with that number?  And if so, how did they end up with
20    6-odd dollars in a $10 fee?
21          UNIDENTIFIED SPEAKER:  Private transfers.  It's
22    just the money for the staff handle --
23          REPRESENTATIVE SONNENBERG:  JBC thing.
24          THE CHAIRWOMAN:  Okay.  They forgot to carry
25    the 1, Representative Sonnenberg.
0014
1          Representative McCann.
2          REPRESENTATIVE McCANN:  Thank you.
3          And the fiscal analyst has assisted me.  The
4    number is based on an estimate of 200,000 transactions,
5    private transactions.
6          Over what time period?  A year?
7          One year.
8          So that's based on the projected purchases that
9    will go through the private sale.
10          THE CHAIRWOMAN:  Representative Sonnenberg.
11          REPRESENTATIVE SONNENBERG:  Thank you.
12          And that includes the criminals that are
13    currently illegally getting guns paying $10 as well, then?
14          THE CHAIRWOMAN:  Representative McCann.
15          REPRESENTATIVE McCANN:  It will include
16    everyone who attempts to purchase a gun through a private
17    sale.
18          THE CHAIRWOMAN:  Representative Gerou.
19          REPRESENTATIVE Gerou:  Thank you, Madam Chair.
20          And I don't know if it does anything, but I did
21    notice that on the fiscal note the difference between page
22    1, when it talks about the 1,612,006 number, is different
23    than the 1,000,007 number on the fiscal note, but that
24    doesn't matter.
25          What I was curious about, ladies -- and I
0015
1    appreciate your time here this morning because -- and I
2    don't want to talk about a previous bill, but we are
3    talking about the FTEs, in reference to the FTEs on this.
4          When we were talking to the director of the
5    department, he was talking about the amount of full-time
6    and part-time staff that are required in order to provide
7    the background checks for the gun shows and all the
8    different gun sales that take place in the state.
9          So my first question to you is if you could give
10    me a breakdown of what you anticipate, how much of the FTEs
11    you are anticipating being overtime rather than regular
12    time.  Because my concern in -- in -- this bill is

13 attempting to solve a problem with the background checks, I
14 believe.  I'm going to take it at that, face value.  But --
15 so I want to know what percentage of full-time, part-time,
16 and overtime employees you expect to see within the FTEs.
17       My second question is:  Just by way explanation,
18 I don't want to take up time that I know is important.  But
19 I grew up in a -- in a ranching family.  I'm from Wyoming.
20 Guns are a part of my past.  It's part of the culture.  I'm
21 actually more heavily armed than my husband, which
22 sometimes scares him; sometimes doesn't.
23       But I have guns that I've inherited from family
24 members that are intact.  I have guns that are not quite
25 restored yet.  For instance, I have a gun stock that is not
0016
1 complete.  And -- and what my goal is, because those were
2 inherited from family members that I very much care about
3 and I want to make sure that I pass those on to my
4 children, because they want them and it's part of the
5 heritage of our family.  And -- and that's what a lot of
6 people in Colorado and in Wyoming feel, is that guns are a
7 part of our heritage.
8       So when I take those pieces and parts of my guns
9 to a gunsmith and ask him to create a gun out of the pieces
10 and parts that I have, will it be -- will he have to do a
11 background check on me before he hands the gun over to me,
12 or do I do a background check on him because he's touching
13 my guns?  I -- what -- how does this all work together?
14 And if you could answer the FTE question and then my second
15 question, I would appreciate it.
16       THE CHAIRWOMAN:  Representative McCann.
17       REPRESENTATIVE McCANN:  I think we would ask
18 that Director Sloan come back for the first part of the
19 question regarding part time and overtime and full time, if
20 he's still here.
21       He is here.
22       THE CHAIRWOMAN:  We can certainly do that,
23 Committee.  We do have five more minutes left on this bill.
24       Director Sloan, you're welcome to come forward.
25       Representative McCann -- or Gerou, it was the
0017
1 other bill that actually created the mechanism to pay for
2 this bill and --
3       UNIDENTIFIED SPEAKER:  But we don't want to talk
4 about another bill.
5       THE CHAIRWOMAN:  Right.  But there are FTEs in
6 this.  I think it's going to be up to Director Sloan to
7 manage his staff within the resources that are allowed
8 under this bill.
9       But, Director Sloan, if you could answer
10 Representative Gerou's question.
11       DIRECTOR SLOAN:  Thank you, madam.
12       Thank you, Madam Chair.
13       And to be very succinct, the staffing
14 calculations in this bill do not contemplate overtime.

15    They contemplate appropriately staffing to handle the
16    anticipated value contemplated in this bill in fiscal '14
17    and fiscal year '15 -- I believe there are two-year figures
18    there -- to handle that without an extended queue and to
19    meet our -- our strategic goal of 15 minutes average per
20    transaction.
21        THE CHAIRWOMAN:  Okay.
22        And, Representative McCann, did you have an
23    answer to the question of Representative Gerou's --
24        REPRESENTATIVE McCANN:  Yes.
25        THE CHAIRWOMAN:  -- gun parts and whether
0018
1    assembling them would require a background check.
2        REPRESENTATIVE McCANN:  Yeah.
3        There's nothing in the bill that would require
4    either you or the dealer -- or the gunsmith to get a
5    background check if you are putting together parts of an
6    antique gun.
7        The bill also allows for transfer of firearms by
8    operation of law, which would include passing through the
9    will for family members.  So if you want to leave those to
10   your children, you will be able to do that even if this
11   bill passes.
12       THE CHAIRWOMAN:  Representative Gerou.
13       REPRESENTATIVE Gerou:  Thank you, Madam Chair.
14       Director Sloan, so in getting back to your --
15       And thank you, Representative McCann.  I
16   appreciate that answer.
17       Director Sloan, so when you were talking about
18   this bill does not anticipate any overtime, so what I can't
19   remember is -- is the FTE count consistent with what you've
20   come to the joint budget committee with at times when
21   you've sought relief for the -- for the background check,
22   the numbers that we haven't accomplished?
23       For instance, in this last joint budget
24   committee hearing this year, I don't recall what the amount
25   was as far as your preferred amount to elevate the backlog
0019
1    and the background check.
2        Is this consistent with that number?
3        THE CHAIRWOMAN:  And, Representative Gerou, I
4    believe you know this as well as I do, that what we've
5    talked about at the joint budget committee has been
6    backlogs in this fiscal year.  This bill pertains to future
7    background checks and the personnel it takes to conduct
8    those background checks.
9        Representative Sloan -- or Mr. Sloan.
10       DIRECTOR SLOAN:  Thank you, Madam Chair.
11       The same formulas for calculation were done
12   there.  It's correct that when we presented the JVC, we
13   were trying to address a 12,000 backlog queue in the
14   current scenario.
15       What this anticipates is what the anticipated or
16   projected growth in volume would be, both on sales through

4520

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021413.txt[11/12/2013 10:57:44 AM]

17  FFLs and with universal background checks with private
18  sales.
19          THE CHAIRWOMAN:  All right.  And we have time
20  for one more question.
21          Representative Gardner.
22          REPRESENTATIVE GARDNER:  Thank you, Madam
23  Chair.
24          And, Director Sloan, as I always say, but I
25  haven't had the opportunity to say in this committee, in
0020
1   this audience, how much I appreciate your work on behalf of
2   the people of Colorado.
3           And notwithstanding my questions about a very
4   legitimate and serious disagreement concerning public
5   policy, I very much appreciate your commitment to the
6   people of Colorado and the public safety in Colorado.  It
7   means a great deal to me, and I have a lot of confidence,
8   as we deal with these issues, that you have nothing but the
9   best interest of the people of Colorado.
10          Um, I have been asked since -- in the course of
11  the hearing by some constituents who are sort of amateur --
12  if that's even the right word -- gunsmiths about this
13  universal background concept.  And as you can imagine,
14  these people, as Representatives Gerou alludes to, has
15  pieces and parts, and they love firearms, and they love
16  recreation.  And for them it's the -- they love the making
17  of the firearms.
18          And it's not clear to me, and maybe you could
19  tell me.  Maybe there's a federal law; maybe there's a
20  state law.  When I take some hunks of metal and some wood
21  and some plastic and some various things, and as I -- as I
22  do that, I can see instances where someone takes a firing
23  mechanism, but it doesn't have a barrel.  They might have a
24  stock and a barrel.  They might have a sight.
25          And all those pieces are laying there on the
0021
1   table, and maybe they get half done and they decide that
2   they want to transfer that to someone who's not an
3   immediate family member.  As they go through all of that,
4   they --
5           THE CHAIRWOMAN:  Representative Gardner --
6           REPRESENTATIVE GARDNER:  I'm sorry, Madam Chair?
7           THE CHAIRWOMAN:  Representative Gardner, if you
8   have a question, ask your question, but your time is up for
9   making speeches.  Get to the question, and Mr. Sloan can
10  answer it.  Otherwise I will cut you off, and we will vote.
11          REPRESENTATIVE GARDNER:  Madam Chair, I was
12  asking my question.  I was trying to lay out a fairly
13  complex hypothetical, and I apologize if it's complex, but
14  what it is is a matter of concern to one of my constituents
15  who asked me about this, Madam Chair, and I'm trying to lay
16  it out and --
17          THE CHAIRWOMAN:  I've asked you to please ask
18  the question or I will gavel you out of order.

LEG HX 000606
4521

19        REPRESENTATIVE GARDNER:  Madam Chair, I'm
20 trying to get to the question but I -- please.
21        So, Representative Sloan -- or Director Sloan,
22 what I'm trying to get to is:  When does that set of parts
23 become a firearm by definition, and how would someone
24 determine that so that they would know they needed to
25 comply with the universal background check law?
0022
1        THE CHAIRWOMAN:  Mr. Sloan.
2        DIRECTOR SLOAN:  Thank you, Madam Chair.
3        Representative Gardner, I'm not qualified to
4 answer that.  I'm not an armor and -- I am just not
5 qualified to answer that question as to when it becomes
6 officially a firearm.
7        THE CHAIRWOMAN:  Okay.  Thank you, Mr. Sloan.
8        And, members, we have a motion on the table.
9 The motion has been seconded.
10        Mr. Harper, please call the roll.
11        MR. HARPER:  Representative DelGrosso.
12        REPRESENTATIVE DelGROSSO:  I just want to thank
13 the sponsors for bringing this bill today.  I mean, I -- I
14 get what you're -- you're trying to address a problem and
15 -- and I -- I know you guys have been working hard on this
16 bill.
17        But I can't support this bill today because,
18 when I read through this and I look at how it's going to be
19 -- try to be implemented, I don't see how it's enforceable.
20        Let's say we're two guys out hunting and a game
21 warden sees us swap guns.  Are you guys selling these guns?
22 How are you going to be able to prove who owned what gun?
23        There's -- this is not enforceable.  I think
24 that this could have severe impacts with the appropriations
25 committee.  I think that we're not factoring in the amount
0023
1 of lawsuits that we could see as a result of this as far as
2 people trying to prove who owns what.  I think this is just
3 opening us up for a lot of litigation.
4        So with that, I'll be a no.
5        MR. HARPER:  Representative Dore.
6        REPRESENTATIVE Dore:  Sponsors, thanks for
7 bringing this legislation.  I -- I commend you for trying
8 to address problems that we do have in our state.
9        But I think this -- this legislation gives me a
10 lot of anxiety.  I feel it's a burden on law-abiding
11 citizens, it's unnecessary and insignificant, and I will be
12 a no vote.
13        MR. HARPER:  Representative Gardner.
14        REPRESENTATIVE GARDNER:  I'm -- I'm having
15 trouble with the microphone here.
16        THE CHAIRWOMAN:  And, Representative Gardner,
17 you will have one minute to state your -- to announce your
18 vote.
19        REPRESENTATIVE GARDNER:  Thank you, Madam
20 Chair.

LEG HX 000607

4522

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021413.txt[11/12/2013 10:57:44 AM]

21    And that minute, I will say that I -- I,
22 frankly, am concerned and upset that this debate has been
23 curtailed. Many of you know of my work in former Soviet
24 block countries where it's been hard to reach democracy,
25 and one of the things that happens there and continues to
0024
1 happen as really an impediment to democracy is the ruling
2 party shutting off debate altogether, finding ways to
3 silence people. And I feel that's what happened here this
4 morning by shutting it off.
5       As a consequence, it is incredibly unfortunate
6 that we are going to have to have a debate that will not be
7 best on the floor, but we will do so. And so for that
8 reason, among others of public policy, I vote no.
9       THE CHAIRWOMAN: Okay. With four seconds to
10 spare, very good.
11       MR. HARPER: Representative Gerou.
12       REPRESENTATIVE GEROU: Representatives, I
13 appreciate your work. I -- I think you care very much
14 about the people in Colorado, and I do too.
15       A lot of what we do in the legislature when we
16 run bills, my biggest fear is unintended consequences. And
17 during the short time of our conversation this morning,
18 there is a very glaring unintended consequence of this
19 legislation.
20       I don't think it will serve the end result that
21 you want it to serve. I think, if it were constructed
22 differently, I would feel differently about it, but with
23 respect, I'm a no.
24       MR. HARPER: Representative Hamner?
25       REPRESENTATIVE HAMNER: Yes.
0025
1       MR. HARPER: Representative LABUDA?
2       REPRESENTATIVE LABUDA: Yes.
3       MR. HARPER: Representative Pabon.
4       REPRESENTATIVE PABON: This bill naturally
5 engenders vigorous debate, and it should, and I look
6 forward to standing shoulder to shoulder with the sponsors
7 to defend this bill on the floor.
8       Yes.
9       MR. HARPER: Representative Singer?
10       REPRESENTATIVE SINGER: Yes.
11       MR. HARPER: Representative Sonnenberg?
12       REPRESENTATIVE SONNENBERG: I struggle with the
13 fiscal note here. I don't know how we make the assertion
14 that there will be 200,000 private sales. I don't know
15 what the number of people that have guns in Colorado are.
16 I know that is a small number if 10 percent probably sell a
17 gun.
18       My bigger concern, however, is that the only
19 people that will comply with this are law-abiding citizens.
20 You had stated earlier the criminals aren't going to -- or
21 you are trying to keep criminals -- or guns out of
22 criminals' hands, and I appreciate that, but I don't see a

4523

23    criminal going to a federal gun dealer and paying his 10
24    bucks to register.  I appreciate your intent, but this
25    doesn't get us anywhere close.
0026
1             So I have to be a no.
2             MR. HARPER:  Representative Tyler.
3             REPRESENTATIVE TYLER:  Yes.
4             MR. HARPER:  Representative Young?
5             REPRESENTATIVE YOUNG:  Yes.
6             MR. HARPER:  Representative Duran?
7             REPRESENTATIVE DURAN:  You know, I love being a
8     legislator in the state of Colorado because every bill that
9     is introduced gets a hearing, and we've taken many, many
10    hours to look at this issue.  There's no smoke-filed
11    backroom deals that are being made.  We do everything in
12    the eye of the public.
13            And I want to thank the members of the committee
14    this morning who respected the process and made sure that
15    their questions were to the fiscal issues, as this
16    committee is deemed with working on.
17            And I will be a yes.  I do believe that this is
18    necessary and look forward to having further debate with
19    you on the floor concerning the substance of the bill.
20            MR. HARPER:  Madam Chair.
21            THE CHAIRWOMAN:  And the Chair votes yes.
22            That bill passes on a vote of eight to five.
23            Committee, we are adjourned.  We will be back
24    here at 7:30 tomorrow morning for the rest -- for the
25    agenda of bills that are already on the calendar, and they
0027
1     are expecting us on the floor.
2             Representative Sonnenberg.
3             REPRESENTATIVE SONNENBERG:  That was a
4     question?
5             THE CHAIRWOMAN:  Yes.
6             REPRESENTATIVE SONNENBERG:  We are going to the
7     floor?
8             THE CHAIRWOMAN:  We are going to the floor.
9     Thank you.
10            UNIDENTIFIED SPEAKER:  Thank you.
11            (Whereupon, the recording was concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24

LEG HX 000609    4524

25
0028

```
 1              CERTIFICATE
 2 STATE OF COLORADO            )
 3 CITY AND COUNTY OF DENVER    )    ss.
 4
 5         I, Elissa Steen, Registered Professional
 6 Reporter and Notary Public in and for the State of
 7 Colorado, do hereby certify that this transcript was taken
 8 in shorthand by me from an audio recording and was reduced
 9 to typewritten form by computer-aided transcription; that
10 the speakers in this transcript were identified by me to
11 the best of my ability and according to the introductions
12 made and written materials provided; that the foregoing is
13 a true transcript of the proceedings had; that I am not
14 attorney, nor counsel, nor in any way connected with any
15 attorney or counsel for any of the parties to said action
16 or otherwise interested in its event.
17         IN WITNESS WHEREOF, I have hereunto affixed
18 my hand and notarial seal this 21st day of June, 2013.
19
20
21
        _____
22          Registered Professional Reporter
                     and
23              Notary Public
24
25
```

LEG HX 000610   4525

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021413.txt[11/12/2013 10:57:44 AM]

0001
1   CITY AND COUNTY OF DENVER
2   STATE OF COLORADO
3   JUDICIAL COMMITTEE MEETING
4   Taken on February 15, 2013
5   HOUSE BILL 13-1229
6   _____
7          REPORTER'S TRANSCRIPT
8   _____
9
10         This transcript was taken from an audio
11  recording by Jana Mackelprang, Certified Realtime
12  Reporter, Registered Professional Reporter, and
13  Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
0002
1          P R O C E E D I N G S
2             *    *    *    *    *
3          THE CHAIRMAN:  Representative McCann.
4          REPRESENTATIVE McCANN:  Thank you,
5   Mr. Chair.
6          I move House Bill 1229 and the committee
7   report from appropriations.
8          THE CHAIRMAN:  Representative McCann to
9   the committee report, please.
10         REPRESENTATIVE McCANN:  Thank you,
11  Mr. Chair.
12         The committee report is an appropriation
13  that has two different appropriation possibilities.  As
14  you can see, there's a Section 9.  And Section 9 will
15  apply only if House Bill 1228 does not become law, so
16  that the funding for the background checks would come
17  from general funds.
18         If House Bill 1228 becomes law, Section 10
19  of the appropriation clause will be effective, so that
20  the payment for the background checks comes from cash
21  funds that will be as a result of the collection of the
22  charge for the background check.
23         So that is the extent of the committee
24  report.
25         THE CHAIRMAN:  Thank you, Representative
0003

1  McCann, to the bill.
2        Oh, there's a further discussion on the
3  committee report.  Representative Gardner.
4        REPRESENTATIVE GARDNER:  Thank you,
5  Mr. Chair.  It was just enjoyable to see that moment of
6  hope across the faces of the sponsors.
7        Members, this bill is so-called uniform
8  background checks, universal background checks.  The
9  fact of the matter is that I hope, I sincerely hope,
10  that each of you have taken a very good and close
11  reading of this bill and of the committee report.  The
12  committee report has -- is an appropriation.  And the
13  appropriation is associated with what this is going to
14  cost the people of Colorado, and yet it's tied with
15  another bill.  And it makes it very difficult for us to
16  talk about them separately, because if you do universal
17  background checks, there is a cost that goes with it.
18        And we talked about this in appropriations
19  quite a bit yesterday, not as much as we needed to, but
20  quite a bit.  And it is problematic as to dealing with
21  the appropriation under House Bill 1229.
22        I was not satisfied.  The debate in
23  appropriations was curtailed.  But suffice it to say
24  that what the appropriation report does is really kind
25  of set a contingency in case the bill, which is sort of
0004
1  a companion, is not passed to pay for this.
2        I'm going to defer because I think people
3  have been -- not intentionally, but somewhat loose with
4  talking to the committee report versus the bill and
5  simply saying that this appropriation, absent the
6  passage of another bill, which should not pass, is an
7  appropriation that is unnecessary.
8        It does not promote public safety, and
9  that goes to the merits of the bill.  So I will stop
10  with that and ask for another vote.
11        THE CHAIRMAN:  Is there any further
12  comment on the committee report?
13        Seeing none, the question before us is the
14  adoption of the appropriations committee report.  All in
15  favor say aye.
16        UNIDENTIFIED SPEAKERS:  Aye.
17        THE CHAIRMAN:  Opposed.
18        UNIDENTIFIED SPEAKERS:  No.
19        THE CHAIRMAN:  The committee report is
20  adopted.
21        Representative Fields to the bill.
22        REPRESENTATIVE FIELDS:  Thank you,
23  Mr. Chair.
24        Members, currently right now in the state
25  of Colorado, private sales are unregulated.  Basically
0005
1  what House Bill 1229 will do, it will require a
2  background check on all gun transfers in the state of

3  Colorado.  Currently, our laws only require a background
4  check if you go to a licensed dealer -- that would be a
5  new place to buy a gun -- or if you go to a gunshow in
6  the state of Colorado, you have to complete a background
7  check.  So we're halfway there.
8          What I'm trying to do at this point is to
9  close the circle, close that loophole so that if you
10  want to buy a gun from a private seller, then you also
11  would have to complete a background check.
12          It is estimated that 40 percent of all
13  guns purchased occur without a background check.  That
14  allows hundreds and thousands of guns to get in the
15  hands of criminals each year.
16          A recent undercover investigation showed
17  that 62 percent of private sellers on the Internet were
18  willing to sell to someone who actually admitted that
19  they couldn't pass a background check due to a prior
20  felony.
21          Also, according to a national survey of
22  incarcerated individuals, 80 percent of those who used a
23  handgun in a crime acquired it from a private seller.
24  The private sales loophole is a way for criminals to
25  skirt around our background check system so they can get
0006
1  access to guns.
2          Just to remind you, it was in 2000, after
3  Columbine in Colorado, we voted to close the gunshow
4  loophole.  That vote was 70 percent to a 30 percent
5  margin, which meant that before any gun could transfer
6  at a gunshow, the buyer had to pass a background check.
7          So we know in order to close this
8  loophole, we need to make sure that everyone who wants
9  to buy a gun from a private seller has to complete a
10  background check.
11          Facts about it:  States who require a
12  background check for every handgun sale means that fewer
13  women will be shot by an intimate partner because they
14  will be restricted from buying that handgun, or whatever
15  gun it is, from a classified ad or from the Internet,
16  because if you are considered a domestic, violent
17  abuser, they just skirt around our system, look on the
18  Internet, and they buy a handgun.
19          You may recall the situation that happened
20  in Arizona.  This person, this gunman, had a restraining
21  order on him.  He advertised in the paper he was looking
22  for a gun.  He had $300, and he would buy a gun.  He
23  bought the gun, went into an Arizona salon and shot his
24  wife and two other employees at that salon.  So
25  background checks do save lives.
0007
1          I'm going to be sharing some statistics
2  that relates to the number of denials that we have in
3  the state of Colorado as it relates to CBI InstaCheck.
4  And I'll put this over there for you all to look at.

5  But just in one month alone -- and this will be January
6  of 2013 -- 956 denials.  We were able to keep those guns
7  out of 956 people who were denied access to a gun.  And
8  this is with people trying to access the gun legally,
9  through a gunshow or through licensed dealers.
10         The kind of people who were trying to get
11  guns in the month of January, 42 restraining orders.  We
12  had some that were fugitives, sexual assaults, robbery,
13  burglary, larceny.
14         So what House Bill 1229 will do, it will
15  require private sellers to perform a background check
16  before the sale is completed.  It will require that the
17  seller goes to a licensed dealer to get that background
18  check.
19         It does provide for several exemptions in
20  the bill for those who might want to give it as a gift
21  to a family member, for those who might want to transfer
22  the gun if they're hunting or fishing or those kinds of
23  things.  And so we did provide lots of exceptions -- not
24  a lot, but some that maybe would address some concerns
25  that you might have.
0008
1         It also includes penalties for those who
2  are not compliant with performing a background check
3  before the gun is sold.
4         So I will conclude my remarks by just
5  asking for a yes vote on House Bill 1229.
6         THE CHAIRMAN:  Thank you, Representative
7  Fields.
8         Representative McCann.
9         REPRESENTATIVE McCANN:  Thank you,
10  Mr. Chair.
11         And I also rise in support of this bill.
12  This truly is a public safety issue.  It's another bill
13  that we're considering that is directly related to
14  public safety.
15         So think to yourself:  What would you do
16  if you wanted to get a gun and you thought you wouldn't
17  pass a background check?  You would go to the Internet.
18  You would go to a private person and try to purchase
19  your gun that way.  And you would be able to do that,
20  even if you could not pass a background check in
21  Colorado today.  A convicted felon, someone who has a
22  temporary restraining order against them, any of these
23  folks can legally purchase a gun right now through the
24  Internet or through a private seller.
25         This bill is simply closing a loophole
0009
1  that we currently have in our background check law.  And
2  many of you know that here in Colorado, after the
3  Columbine shooting, the public voted 70 percent to close
4  the gunshow loophole.
5         It's a common-sense requirement -- or we
6  continue to hear that responsible gun owners do not

LEG HX 000614

4529

7  commit crimes.  So it's hard for me to understand how
8  responsible gun owners would have any objection to this
9  bill.  All it's doing is requiring everyone to go
10  through the same background check that those who do it
11  now go through.  All of those people who purchase from
12  licensed gun dealers or in a gunshow go through a
13  background check.  What this bill does is say anyone who
14  wants to purchase a gun in Colorado has to go through
15  that same background check.
16          And I also want to cite a recent poll in
17  January of 2013 that reflected that 80 percent of
18  Colorado voters support requiring criminal background
19  checks for all gun sales.  86 percent of NRA members
20  nationwide believe that all gun buyers should be
21  required to pass a background check.
22          We're talking about ensuring that every
23  sale is subject to the same background check.  We're not
24  imposing any new requirements.  They're the same
25  prohibitions against purchasing a gun that apply
0010
1  currently to those who purchase their guns legally.
2          What we are doing -- and this bill
3  directly goes to trying to prevent criminals from
4  getting guns.  That's what we have heard here today,
5  that it's not the responsible gun owners; it's the
6  criminals.  Criminals currently can go and purchase guns
7  on the Internet.  They can purchase guns from private
8  sellers with no background check.  So this bill is
9  clearly directed toward preventing criminals, those with
10  domestic violence, fugitives from justice, those
11  juveniles who have felonies, from purchasing a gun.
12          I also want to comment briefly on the
13  impact this has on domestic violence victims.  We know
14  now that about 30 to 40 percent of guns are purchased
15  currently without a background check.
16          Studies reveal that the presence of
17  firearms significantly increases the lethality of
18  domestic violence incidents.  According to one study,
19  domestic violence assaults involving a firearm are 23
20  times more likely to result in death than those
21  involving other weapons or bodily force.
22          Another study found that abused women are
23  five times more likely to be killed by their abuser if
24  the abuser owns a firearm.
25          According to justice -- Department of
0011
1  Justice statistics, in states that require background
2  checks for every handgun sale, 38 percent fewer women
3  are shot to death by intimate partners.
4          In 2011, the most recent year for which
5  data is available, at least 13 of the 34 domestic
6  violence deaths in Colorado in one year occurred in
7  cases where the domestic violence offender used a
8  firearm despite being prohibited under the law from

LEG HX 000615

4530

9    purchasing or possessing firearms.
10           We know that existing background check
11   requirements keep guns out of the hands of domestic
12   abusers because currently our background checks capture
13   these people when they try to purchase them at gunshows
14   or from licensed dealers.  They are not captured when
15   they purchase on the Internet or through private sales.
16           We know that passing this bill will save
17   lives in Colorado by keeping guns out of the hands of
18   even more abusers.
19           So what we're asking you to do here today,
20   Colleagues, is to provide safety for our citizens by
21   saying it's perfectly fine to purchase a gun as long as
22   you can pass that background check, the same background
23   check that those of you here in the gallery who own
24   weapons go through.
25           It's hard for me to understand why you
0012
1    wouldn't want everyone to go through the same background
2    check that you had to go through, or that those
3    responsible gun owners have to go through.  It's simply
4    a matter of fairness and equity and safety.
5            I do have one amendment, however, to offer
6    to the bill, Amendment L.016.  If that could be
7    displayed on the screen, please.
8            THE CHAIRMAN:  Amendment L.016 is properly
9    displayed.  Please proceed.
10           REPRESENTATIVE McCANN:  Thank you,
11   Mr. Chair.
12           During the hearing in the judiciary
13   committee, we heard from a woman who was concerned about
14   the fact that she target practices in her backyard,
15   which is perfectly legal.  But she was concerned that if
16   she transferred her gun temporarily to her friend that
17   was also there with her target practicing, that it might
18   come under this bill -- she might be limited under this
19   bill.
20           So this amendment will make it very clear
21   by amending page 5, line 27, inserting that a temporary
22   transfer of possession of a weapon can take place under
23   this bill while hunting, fishing, trapping, or target
24   shooting.  The same amendment -- or the same lines -- or
25   the same language would be included on page 6, line 1,
0013
1    and page 6, line 4.
2            Therefore, if someone is target shooting
3    on their property, they would be able to exchange guns
4    so they could try out different kinds of guns and each
5    other's guns.
6            So I would ask for the adoption of
7    Amendment L.016 to House Bill 1229 to address the issue
8    that was raised by the woman who testified in the
9    committee.
10           THE CHAIRMAN:  Thank you, Representative

12          Is there any further discussion on the
13 amendment?  Representative Gardner.
14          Hold for Representative McCann.
15          REPRESENTATIVE McCANN:  Thank you,
16 Mr. Chair.
17          I just want to make sure that I did move
18 Amendment 016.
19          THE CHAIRMAN:  Amendment 016 is properly
20 moved to the amendment.  Representative Gardner.
21          REPRESENTATIVE GARDNER:  Yes, thank you,
22 Mr. Chair and Representative McCann.  I appreciate you
23 bringing this amendment.  However, it sort of highlights
24 what is problematic here, because, as I read this
25 exception -- and we will visit these exceptions later on
0014
1 the bill in some detail because people's criminal
2 liability will be riding on how they understand these
3 exceptions -- this particular exception will then read,
4 while -- what it will do is read:  The transfer -- well,
5 the exception will read -- and you'll start at line
6 11 -- it will say:  A transfer that is temporary and
7 occurs while in the home of the unlicensed transferee
8 if -- and then you go to D at line 18 -- the transfer is
9 a temporary transfer or possession without transfer of
10 ownership or a title to ownership, which transfer takes
11 place while hunting, fishing, target shooting, or
12 trapping, if the hunting, fishing, target shooting, or
13 trapping is legal in all places where the unlicensed
14 transferee possesses the firearm and the unlicensed
15 transferee holds any license or permit that's required
16 for such hunting, fishing -- I assume target shooting or
17 trapping.
18          What's so interesting to me about this is
19 that the poor, average citizen will now realize that if
20 their next-door neighbor says, "Can I borrow your
21 shotgun, I don't own one, but can I borrow your shotgun
22 to go target shooting?" and you transfer the weapon to
23 them temporarily in your living room, and that person
24 goes the next day with another friend to target shoot,
25 this exception will not apply to them.  It doesn't
0015
1 apply.
2          It really seems to me, if read
3 literally -- and you're supposed to read these
4 exceptions, I think, narrowly, not broadly -- I think
5 this exception only occurs if you go with someone and
6 they drive to the location.  And once they get there --
7 and it has to be a legal location -- God help you that
8 you didn't accidentally trespass because you didn't know
9 and you got on the wrong place, because it has to be
10 legal.  And then, since you're not target shooting yet,
11 it will only be when you go out on the firing line that
12 you can transfer this weapon.

13      Now, you may scoff over there or not, I
14 don't know, but I can almost imagine that there would be
15 those that would scoff and say, "Well, Representative
16 Gardner, that's just absurd." But that's what it says.
17 It doesn't say, "for the purpose of." It doesn't say,
18 "in anticipation of." It doesn't say any of that. It's
19 written very narrowly, and I think that's what's
20 intended. But that makes this exception for all of
21 these other things in target shooting so narrow that you
22 couldn't -- you couldn't borrow a weapon from your
23 brother-in-law or your father-in-law or your son-in-law.
24 We'll get to all of those, why I say in-laws and not
25 "others" later. You couldn't borrow a shotgun from your
0016
1 father-in-law, who may be at a stage in life that he
2 doesn't want to go target shooting with you and your
3 brother-in-law or your best friend. That's not the
4 exception.
5      Now, if I'm reading that wrong, I would
6 invite you to explain to me why those words say
7 something other than what I say. And I think this
8 exception, as amended or as written, either way, is very
9 dangerous for the average citizen.
10      THE CHAIRMAN: Representative McCann.
11      REPRESENTATIVE McCANN: Thank you,
12 Mr. Chair.
13      Yes, Representative Gardner, the amendment
14 does state that the transfer is legal while hunting,
15 fishing, trapping, or target shooting. And the purpose
16 for that is so that anyone who is stopped doesn't simply
17 claim, "Well, I am on my way to go hunting, fishing,
18 target shooting."
19      The purpose of the amendment is to make it
20 clear that if you are engaged in a legal activity with a
21 weapon, with a gun, you can do a temporary transfer
22 among friends or among relatives so that you can use
23 each other's guns for hunting, fishing, trapping, and
24 target shooting while you're engaged in that activity.
25      So I would ask for an aye vote. All this
0017
1 amendment does is add target shooting to the other three
2 items that are listed. So I would ask for a yes vote on
3 Amendment 016.
4      THE CHAIRMAN: Is there further discussion
5 on the amendment? Representative Gardner.
6      REPRESENTATIVE GARDNER: Thank you,
7 Mr. Chair.
8      Well, the problem is that this amendment
9 to the provision that says you can transfer while
10 trapping doesn't really -- or target shooting -- doesn't
11 -- it just doesn't go far enough. That's my concern
12 with this exception and this amendment.
13      For instance, if you were, say, a senator
14 who worked with the boy scouts and you gathered weapons

15  so the boy scouts could learn to target shoot, and you
16  transferred those weapons to them in anticipation, or
17  you loaned some weapons for the boy scouts to go, you
18  would have violated this exception.  And that is my
19  objection.  This exception, even as amended, does not go
20  far enough.
21          I would urge a no vote on the amendment
22  simply because it doesn't do what it needs to do.
23          THE CHAIRMAN:  Further discussion on the
24  amendment?  Representative Holbert.
25          REPRESENTATIVE HOLBERT:  Thank you, Mr.
0018
1  Chairman.  Honor to serve with you, sir.
2          THE CHAIRMAN:  And an honor to serve with
3  you as well.
4          REPRESENTATIVE HOLBERT:  Thank you very
5  much.
6          Representative McCann, I have a legitimate
7  question, and I would ask, though not required, but I
8  would very much like to understand the answer to this
9  question.
10          My sons and I hunt together.  And as they
11  get older, they grow out of weapons, rifles that I
12  purchased for them when they were youth, and now they're
13  starting use weapons that I have because of their now --
14  my older son is taller than I am.  What I wonder, as my
15  older son now, who is 18, as he starts to venture out
16  over the next few years and maybe go out on a hunting
17  trip of his own, under this bill, would I be allowed to
18  loan him, allow him to take one of my hunting rifles,
19  say, out into the national forest for a week or 10 days?
20          If I was not there and I am the legal
21  owner of that weapon, could I let my son go out on that
22  hunting trip and use one of my weapons, or would I have
23  to go to a gun dealer and go through that transfer to
24  allow him to take that weapon for a week or so, or 10
25  days, if I wasn't there?
0019
1          THE CHAIRMAN:  Thank you, Representative
2  Holbert.
3          Representative McCann.
4          REPRESENTATIVE McCANN:  Thank you,
5  Mr. Chair.
6          Representative Holbert, I appreciate the
7  question.  The way I read this bill, you would be able
8  to make a gift of your gun to your son with no
9  consequence under this bill.
10          THE CHAIRMAN:  Representative Holbert.
11          REPRESENTATIVE HOLBERT:  Thank you,
12  Mr. Chair.
13          And, Representative McCann, as you say
14  gift, does that mean permanent or temporary?
15          THE CHAIRMAN:  Representative McCann.
16          REPRESENTATIVE McCANN:  Thank you,

LEG HX 000619                    4534

17   Mr. Chair.
18        I think under this bill, that can be
19   either a permanent or temporary gift.  So if it's an
20   immediate family member, like your son, you would be
21   able to transfer your weapon to him so he could use it
22   for hunting.
23        THE CHAIRMAN:  Representative Holbert.
24        REPRESENTATIVE HOLBERT:  Thank you,
25   Mr. Chair.
0020
1        So I appreciate that perspective.  How
2   immediate does the family member need to be?  If -- I
3   have neighbors who we converse about guns.  And if a
4   neighbor came and asked, "Could I borrow your hunting
5   rifle for 10 days," but I'm not related, could I make
6   that gift legally and have protection?
7        THE CHAIRMAN:  Representative McCann.
8        REPRESENTATIVE McCANN:  Thank you,
9   Representative Holbert, and thank you, Mr. Chair.
10        No, you could not transfer to a neighbor
11   under the bill without -- you can transfer to immediate
12   family members, which includes spouses, parents,
13   children, siblings, grandparents, and grandchildren.
14   You could make a temporary transfer to your neighbor if
15   the neighbor was going to go hunting, fishing, trapping,
16   or target shooting, but only while they're actually
17   doing it.  So you would need to be with them while they
18   were doing that activity.
19        THE CHAIRMAN:  Representative Lawrence to
20   the amendment.
21        REPRESENTATIVE LAWRENCE:  Well, I get to
22   play with the fun toys.  Thank you, Mr. Chair.
23        I guess I'm still a little confused on the
24   amendment.  If -- as an example, we own a gravel pit,
25   and sometimes we have people who like to go down there
0021
1   because it's a safe place to set up targets and shoot,
2   and we would loan our weapons.  But this says we have to
3   loan them in our home and we have to be with them?  So
4   we couldn't loan them to a friend or a neighbor to go
5   down to our private property?
6        THE CHAIRMAN:  Representative McCann.
7   Excuse me.  Representative McCann.
8        REPRESENTATIVE McCANN:  Thank you,
9   Mr. Chair.
10        And, Representative Lawrence, you could --
11   you do not have to transfer them in your home.  That's
12   Section D, which is the transfer that occurs while in
13   the home, if the person needs protection.  But you can
14   do a temporary transfer for other people to use your
15   weapons for hunting, target shooting, et cetera, but you
16   do have to be with them.
17        So if you were going to have them target
18   shoot in your gravel pit, you would need to be with them

LEG HX 000620
4535

19  when they need your gun.
20          THE CHAIRMAN:  Representative Lawrence.
21          REPRESENTATIVE LAWRENCE:  Okay.  Still
22  confusion because we're dealing with my private
23  property, which is my firearm on my private property,
24  which is my gravel pit, which I no longer have any
25  control over.  And, you know, there are instances when I
0022
1  might be going out of town, and as much as I would like
2  to go down and target shoot, I'm not available to do
3  that.  But I have a friend who would like to try out one
4  of my guns.  This would make me a criminal if I did
5  that.  Am I reading that correctly?
6          THE CHAIRMAN:  Representative McCann.
7          REPRESENTATIVE McCANN:  Thank you,
8  Mr. Chair.
9          Under the bill, you cannot transfer one of
10  your guns for someone else to use on your -- for target
11  shooting unless you are present.
12          THE CHAIRMAN:  Is there any further
13  discussion on Amendment L.016?
14          Seeing none, the question before us is the
15  adoption of Amendment L.016 to the bill.  Those in favor
16  say aye.
17          UNIDENTIFIED SPEAKERS:  Aye.
18          THE CHAIRMAN:  Opposed, no.
19          UNIDENTIFIED SPEAKERS:  No.
20          THE CHAIRMAN:  The amendment passes.
21          I need a lesson from former Speaker
22  McNulty on gable slamming.
23          (Laughter.)
24          (Inaudible discussion.)
25          THE CHAIRMAN:  To the bill Representative
0023
1  Fields.
2          REPRESENTATIVE FIELDS:  Thank you,
3  Mr. Chair.
4          I'd like to move Amendment L.008.
5          THE CHAIRMAN:  The amendment is properly
6  displayed -- will be properly displayed.  Is about to be
7  properly displayed.
8          Amendment L.008 is properly displayed.
9  Please proceed.
10          REPRESENTATIVE FIELDS:  Thank you,
11  Mr. Chair.
12          And basically this amendment will allow a
13  transfer of a firearm that could go to a gunsmith.  So
14  if you had a gun that needed to have repairs, you could
15  make that transfer.  The gunsmith can then work on this
16  gun, have possession of the gun, and it can be
17  transferred back to the owner.
18          This was an idea that I need to contribute
19  to Representative Gerou.  She made my strong bill
20  stronger.

LEG HX 000621

4536

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

21        And so that's what L.008 is all about.  I
22  urge an aye vote.
23            THE CHAIRMAN:  Is there any further
24  discussion on the amendment?
25            Representative Gerou.
0024
 1            REPRESENTATIVE GEROU:  Thank you,
 2  Mr. Chair.
 3            Members, this is not at all what I was
 4  talking about in appropriations.  This is -- this is not
 5  at all what we were talking about in appropriations.  So
 6  I -- as much as I appreciate Representative Fields
 7  calling me out like this, as if I need this today, thank
 8  you very much, this has absolutely nothing to do with my
 9  argument in appropriations.  I will talk to you about my
10  problem when we get to the bill, but I deny any
11  attribution to this amendment.
12            THE CHAIRMAN:  Any further discussion on
13  Amendment L.008?
14            Seeing none, the question before us is the
15  adoption of L.008 to the bill.  Those in favor say aye.
16            UNIDENTIFIED SPEAKERS:  Aye.
17            THE CHAIRMAN:  Opposed, no.
18            UNIDENTIFIED SPEAKERS:  No.
19            THE CHAIRMAN:  The amendment passes.
20            Representative Fields to the bill.
21            REPRESENTATIVE FIELDS:  Thank you,
22  Mr. Chair.
23            Members, background checks are the only
24  systematic way to stop felons, domestic abusers, and
25  people who are seriously ill from obtaining and buying
0025
 1  firearms from private sellers.  I'm going to share some
 2  statistics with you.
 3            After the mass shooting at Columbine, an
 4  overwhelming number of Coloradans voted to close the
 5  gunshow loophole.  And since closing that loophole,
 6  Colorado has escorted significantly fewer crime guns to
 7  other states.
 8            In 2000, the state was the 17th largest
 9  exporter of guns later found at crime scenes in other
10  states.  A year after the law was passed, in 2009, it
11  was reduced then to the 27th range.  So that just shows
12  that closing that loophole as it related to gunshows did
13  prevent guns from being exported where crimes were being
14  committed in other states.
15            So, once again, I urge you to an aye vote
16  that would close the private sales of guns without
17  making sure that a background check is completed.
18  Thanks.
19            THE CHAIRMAN:  Is there any further
20  discussion on the bill?  Representative DelGrosso.
21            REPRESENTATIVE DelGROSSO:  Thank you,
22  Mr. Chair, and representative's question.

23   What is defined a transfer of ownership?
24   So if I'm out with, you know, Representative Gerou and I
25   talk to her about: What did you guys do -- or what did
0026
1   you do this weekend? And I say, "Oh, I got this
2   brand-new handgun that I bought." And we're out there,
3   and she goes, "Oh, can I see it?" If I just set it in
4   her hands, is that a transfer of ownership, if she
5   wanted to look at it?
6           THE CHAIRMAN: Representative Fields.
7           REPRESENTATIVE FIELDS: Thank you,
8   Mr. Chair.
9           Absolutely not. If you just want to
10   transfer a gun in your home and there's no sales that's
11   associated with it, you're just letting the person see
12   that firearm, then that's not a violation of this bill.
13          THE CHAIRMAN: Representative DelGrosso.
14          REPRESENTATIVE DelGROSSO: Thank you,
15   Mr. Chair.
16          But, no, I'm talking about not in my home.
17   Let's say we're out in the parking lot. We're out in
18   the parking lot, and a police officer or someone else
19   sees me place that gun in Representative Gerou's hands.
20   How does he not know -- is that considered a transfer of
21   ownership if I'm putting that in her hands and she's
22   looking at that? How would I prove -- I mean, would
23   that be considered a transfer of ownership?
24          THE CHAIRMAN: Representative Fields.
25          REPRESENTATIVE FIELDS: Thank you,
0027
1   Mr. Chair.
2           You know, you're kind of highlighting
3   scenarios that I just have a hard time picturing how
4   realistic that would be, where an officer would just be
5   kind of hanging out watching you as you're transferring
6   a gun in the parking lot. And what would be the
7   intention of that transfer? If it's going to be a sale,
8   then you are going to need to complete a background
9   check before that transfer of that gun is considered
10   legal.
11          THE CHAIRMAN: Representative DelGrosso.
12          REPRESENTATIVE DelGROSSO: But I think
13   that happens all the time. Let's say I don't have a gun
14   and I've got a bag of pills, and I place those bag of
15   bills -- or bag of pills in Representative Gerou's
16   hands. And then -- now the police officer observes
17   that. That would be, I think, grounds for me
18   distributing an illegal activity. So I think that is a
19   legitimate scenario to where, if an officer does not
20   know me and Representative Gerou are colleagues, they
21   could assume that maybe we are engaging in this illegal
22   activity of me handing her my weapon.
23          THE CHAIRMAN: Representative DelGrosso.
24          REPRESENTATIVE DelGROSSO: Thank you,

25   Mr. Chair.

0028

1                And I guess that goes back to my next
2    question, which is how is this bill actually going to be
3    enforced?  At what point -- how would the officer even
4    know that the weapon that I'm giving to her is even
5    mine, and that when she actually drives away, that that
6    actually wasn't her weapon and that I was actually
7    looking at it?  So how would they know when she drove
8    away and then they pulled her over and they say, "You
9    know what?  I saw Representative DelGrosso hand you that
10   weapon.  Did you guys perform a background check?"  She
11   can be like:  That was my weapon in the first place, and
12   I was letting him look at it.  How would they ever prove
13   what weapon belonged to who, if that belonged to her or
14   if it belonged to me?
15               So, to me, the only way you can possibly
16   know that is if somehow there was some markings on the
17   gun, and then somehow they are able to go back and look
18   at these markings and say, "By these markings, this was
19   a gun that belonged to Representative DelGrosso."
20               I guess I'm trying to figure out how that
21   would work.
22               THE CHAIRMAN:  Representative McCann.
23               REPRESENTATIVE McCANN:  Thank you,
24   Mr. Chair.
25               When people go through a background check,

0029

1    they will be able to show that they have been through a
2    background check.  So if you have legitimately purchased
3    the gun, the CBI can verify with the law enforcement
4    officer that it is in fact your gun because you legally
5    went through a background check.
6                So I think that scenario could be handled
7    quite easily by law enforcement.
8                THE CHAIRMAN:  Is there further
9    discussion?  Representative DelGrosso.
10               REPRESENTATIVE DelGROSSO:  Thank you,
11   Mr. Chair.
12               And it's my recollection that when you go
13   through a background check, it does not say what weapon
14   it is that you got the background check for.  So I might
15   have a paper or something that says that I performed a
16   background check, but they would not know what firearm
17   that background check was for.
18               So, there again, it leads me back to my
19   original line of questioning of:  There's no way to
20   prove who owns what gun and if you actually did a change
21   of possession with a private sale.
22               THE CHAIRMAN:  Representative McCann.
23               REPRESENTATIVE McCANN:  Thank you,
24   Mr. Chair.
25               Representative DelGrosso, if you are

0030

1 charged with a crime, you would have the ability to
2 defend yourself by showing that you had legally
3 purchased your weapon and gotten a background check,
4 just like people do now.
5       All this bill does is say those who
6 purchase from private sellers have to do the same thing
7 that those who purchase from licensed dealers or
8 gunshows do.
9       It's difficult for me to understand the
10 opposition to this because those people who go through a
11 background check, I would think they would want everyone
12 to have to go through a background check.  It would make
13 all of us safer.  I mean, that's the whole point of the
14 background check.  And we have this big, huge area where
15 people can get around the need for a background check.
16       So if you want to purchase a gun, you go
17 to a licensed dealer, you submit to a background check,
18 you get clearance, you buy your gun.
19       To me, it seems as though you wouldn't
20 want to have someone who has a felony conviction or a
21 restraining order against them able to avoid what you
22 yourself had to go through in order to get a gun, simply
23 by going through the Internet.
24       It's not -- this bill is not that
25 complicated.  We're just saying people who purchase guns
0031
1 need to have background checks so we can all be assured
2 that they aren't felons, that they don't have domestic
3 violence convictions, and that they can responsibly
4 handle a weapon.  It's really a safety for you, the
5 legitimate gun owners, as much as it is for everyone
6 else.
7       THE CHAIRMAN:  Representative Wright.
8       REPRESENTATIVE WRIGHT:  Thank you,
9 Mr. Chair.
10       Representative McCann, you speak to the
11 fact that you feel everyone is safer if this background
12 check goes through.  The issue I have with that argument
13 is that we place these labels on people.  We say you're
14 a criminal or you're a law-abiding citizen or you're a
15 felon or -- but these are not static in time events.
16 These are ever changing in a human being's life.  We're
17 going to have a human being who, one day, possibly wakes
18 up as a law-abiding citizen, gets upset, loses his or
19 her temper, has a mental health care crisis -- who knows
20 what -- and they suddenly become a criminal in our
21 minds.
22       So this isn't a:  You are always a
23 criminal; and, therefore, this background check is going
24 to solve all of our public safety problems.  We need to
25 look no further than I think the example that just
0032
1 occurred in Los Angeles with Chris Dorner.  This was far
2 more, Representative McCann, than a background check.

LEG HX 000625      4540

3   This was a psychological evaluation that he took, the
4   same psychological evaluation that I have taken, and
5   some may argue didn't take, but the same psychological
6   evaluation that I went through.  This was far more than
7   a background check.  And look what he did.  He caused
8   untold loss of life.
9          So I guess I'm not seeing what's -- how is
10  this making us safer when you could go to the gun store
11  and transfer your weapon to another individual one
12  morning and that evening become the criminal, as we are
13  labeling it?
14         THE CHAIRMAN:  Representative McCann.
15         REPRESENTATIVE McCANN:  Thank you,
16  Mr. Chair, and thank you, Representative Wright.
17         This bill only says that everyone has to
18  go through the same process.  Someone doesn't become a
19  criminal by having an episode in the morning.  That's if
20  they get a conviction.  And the law currently says
21  you're not supposed to purchase a weapon or possess a
22  weapon or purchase a weapon if you are a convicted
23  felon.
24         So if you're a convicted felon today,
25  where are you going to go to get your gun?  You're going
0033
1   to go to the Internet so you can get a gun without
2   having to go through the background check.  So it's just
3   really common sense.
4          But to directly respond to you in how this
5   is going to make us safer, I do have some research that
6   was done regarding some incidents that occurred where
7   people were killed who would not have been able to
8   purchase a gun had they -- had this bill been in effect.
9          There was a shooting at the ESL Company in
10  California where a former employee, Richard Farley,
11  gunned down seven people at his former workplace.  He's
12  now on death row.  He is a person who had been involved
13  in stalking someone in the past, and she had a temporary
14  restraining order against him.  Before he was fired, he
15  was ordered to undergo psychological counseling.
16         Now, his restraining order would have been
17  picked up by a background check, if it had been in
18  effect.  And he used two semiautomatic handguns, two
19  revolvers, two shotguns, and one assault weapon, killed
20  seven people.
21         In Kentucky, in Louisville, Kentucky,
22  Joseph Wesbecker gunned down eight people at his former
23  workplace before committing suicide.  Prior to shooting,
24  he had voluntarily checked into hospitals for mental
25  problems.  So his prior psychiatric hospitalization
0034
1   would have prevented him from purchasing a gun had he
2   had to go through a background check.  He used a
3   semiautomatic handgun, a revolver, and three assault
4   weapons.

4541

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

5   In Royal Oak, Michigan, a laid-off postal
6   worker opened fire at his former workplace before he
7   committed suicide.  And it turned out his CCW permit had
8   been revoked for mental health issues.
9           Another one was in Watkins Glen, New York,
10  where John Miller killed four child-support workers in a
11  county office building before he killed himself.  He had
12  a prior felony conviction and also a domestic violence
13  report.  I don't know if he actually had a temporary
14  restraining order, so that might not have been picked
15  up, but the felony would have been.  He used a
16  semiautomatic handgun.
17          In Connecticut, lottery worker Matthew
18  Beck gunned down four bosses over a salary dispute
19  before committing suicide.  He had also been
20  hospitalized previously and used a semiautomatic
21  handgun.  So his prior psychiatric hospitalization would
22  have prevented him from purchasing a gun.
23          In Melrose Park, Illinois, a fired
24  employee William Baker opened fire before he committed
25  suicide at his workplace.  He had a child abuse
0035
1   conviction, a sexual assault conviction, which would
2   have prevented him from purchasing guns.  He used a
3   revolver, a shotgun, and two assault weapons.
4           Another one was discharged from the
5   military on mental health grounds, and I actually don't
6   think that would have been picked up because I don't
7   think currently that's a disqualification.  But in the
8   Virginia Tech massacre, the individual there did have an
9   official history of mental illness.  I don't know if
10  he'd actually been hospitalized, which is what our
11  current law requires, that you actually have a
12  hospitalization, but he certainly had psychiatric
13  problems.
14          In Northern Illinois University in 2008, a
15  young man opened fire in a lecture hall, then shot and
16  killed himself.  He had been hospitalized prior to the
17  shooting for psychiatric reasons and discharged from the
18  military on mental health grounds.
19          So will this bill make us safer?
20  Absolutely.  It will prevent people who have psychiatric
21  hospitalizations, who have felony convictions, who have
22  restraining orders against them from purchasing weapons.
23  It just makes sense.
24          We don't want these people to be able to
25  purchase weapons.  I don't think you would want them to
0036
1   be purchasing weapons.  So all we're saying is, because
2   everybody else has to go through a background check, why
3   shouldn't someone who's buying privately have the same
4   responsibility?  Makes sense to me.
5           THE CHAIRMAN:  Representative Gerou.
6           REPRESENTATIVE GEROU:  Thank you,

LEG HX 000627    4542

7   Mr. Chair.
8           Members, you know when we're talking about
9   all these statistics, I think sometimes you get so
10  passionate about coming up with proof and reasons for
11  your bill that you forget that these statistics actually
12  represent people.  And the amount of lose of life that
13  we've been talking about just over the course of the day
14  is, to me, staggering and truly depressing.  It makes me
15  think of my family.
16          I have a son and a daughter.  My son lives
17  here in Denver.  My daughter lives in Chicago.  And it's
18  important to me that they stay safe and that their
19  families stay safe.  Then we all have an opportunity to
20  live a full and productive life.
21          In order to put this bill into context, I
22  need to talk a little bit about when this bill was
23  before appropriations.  I was telling the sponsors that
24  I grew up in a very rural setting.  I had four brothers.
25  I grew up in a ranching family.  As the only girl, we
0037
1   didn't do anything that really involved girl things.  We
2   did a lot of hunting.  We did a lot of shooting.  We
3   used to -- although the -- my father's family, it was a
4   sheep ranch.  My mother's family, it was a cattle ranch.
5   So we -- we actually spent -- every fall, we would go
6   out and hunt for the food that we would eat that winter.
7           We prided ourselves in being law-abiding
8   citizens.  My parents took great pride in their
9   children, and they took great pride in making sure that
10  their children were taught gun safety and the importance
11  and the respect that you need to have for firearm.  It
12  was very important to us.
13          When Representative McCann was listing
14  those statistics, the one point she didn't make that I
15  didn't hear was where those individuals that committed
16  those crimes got their weapons.  She didn't say they got
17  them from private sources.  She just said they got
18  weapons.
19          So to go back to my story, when -- I have
20  an aunt and an uncle that did not have children, and I
21  became their caregivers at their end of life.  If this
22  bill were in effect at the time that I lost my uncle, it
23  would be creating a problem because my uncle left me all
24  of his firearms.  I'm actually more heavily armed than
25  my husband.  And I respect those firearms and I value
0038
1   the heritage that my family passed them down to me with.
2   And it's my intent to give these firearms to my children
3   when they want them and when they're ready for them, and
4   they do want them, eventually.
5           The problem I have with the bill right
6   now, the way it's written, is it makes a supposition.
7   And the supposition with this bill is that you are
8   guilty until you're proven innocent.  When the joint

9   budget committee was asked whether or not they wanted to
10  give more money to the CBI background check so that we
11  could make sure that we kept Colorado citizens safe, I
12  was one of two legislators -- Representative Duran was
13  the other legislator who had voted with me to give more
14  money for the CBI background check.
15          I appreciate the system we have in place,
16  and it's valuable to me.  And, unfortunately, we lost
17  that vote because we were in the minority.  But the idea
18  that this bill assumes that we are guilty until you are
19  proved innocent is bothering to me.  It's bothering to
20  me because, had this bill been law at the time that I
21  inherited my uncle's guns, I couldn't have inherited his
22  guns without a background check.
23          I now own pieces and parts of rifles that
24  my uncle was working on restoring.  And if the bill had
25  been in place when my uncle had passed or before he had
0039
1   passed, in order to get those guns restored and built, I
2   would have to undergo a background check in order to
3   receive those guns.
4           And, Representative Kagan, I see you
5   shaking your head no.  And please, dear sir, I respect
6   you; I would ask the same.
7           So what I'm saying, Members, is that this
8   bill is going to impact families.  This bill does not
9   allow my uncle to give me the guns in our family that is
10  his right to give them to me.  If the bill -- if I have
11  pieces and parts of guns, and I take them in and have
12  them built into a gun, I will have to have a background
13  check in order to receive the guns that were made from
14  the pieces and parts that I own.
15           There have been a lot of conversations
16  today about where I am on these gun bills and there's
17  been a lot of rumors running rampant.  You know, I -- I
18  respect the people of Colorado.  I want to keep them
19  safe.  But this won't keep them safe.  If we can enforce
20  the laws that we have right now, if he can fund CBI and
21  let CBI do the background checks that we need to right
22  now, if we can take care of the backlog of background
23  checks that are out there sitting right now, that will
24  help people in Colorado stay safe.
25           With all due respect, Sponsors -- and
0040
1   please do not attribute any other amendment to me.  With
2   all due respect, I am -- I am not worthy of your
3   attribution.
4           I ask for a no vote.
5           THE CHAIRMAN:  Representative Fields.
6           REPRESENTATIVE FIELDS:  Thank you,
7   Mr. Chair.
8           Representative Gerou, if you look on
9   page 5 of the bill, line 7 through 10, it identifies the
10  operation of law where a family member can will you, and

11  you can pass those items down to your family members.
12          THE CHAIRMAN:  Representative Gardner.
13          REPRESENTATIVE GARDNER:  Thank you,
14  Mr. Chair.
15          Well, Representative Fields, I had not
16  planned to address this until later, when I went through
17  all of these particular exceptions, but since my friend
18  Representative Gerou made such a compelling statement
19  about how this affects family relations, the situation
20  she described, while one that is very common in terms of
21  family relations and how firearms may be passed from
22  uncles to nephews and nieces, from fathers-in-law to
23  sons-in-law -- and they might happen on the death bed;
24  they may happen at the last illness.
25          In fact, as a boy growing up in Texas --
0041
1  you say, "Well, how often does that happen?"
2  Representative McCann just doesn't know about all these
3  things happening.  She said she didn't understand; and I
4  believe that's true.  I recognize that she doesn't
5  understand because her cultural experience is so vastly
6  different from mine.
7          I know of multiple instances as I was
8  growing up that a firearm was passed in someone's last
9  illness.  Well, that's not a transfer that occurs
10  because of operation of law or because of the death of
11  the person for whom the prospective transferor is an
12  executor or administrator.  That's a gift.  That takes
13  you back to the other exception.  And that person is not
14  a spouse or parent, a child, a sibling, a grandparent,
15  or a grandchild.
16          I will come back and discuss this later at
17  great length, but the situation that my friend
18  Representative Gerou describes is not, clearly not
19  covered by that exception, by any stretch of the
20  imagination.  So I don't want the sponsor to be under
21  some misapprehension or misguided instruction from those
22  who are passionate about getting this into hand, that
23  these exceptions are very broad because they are not
24  that.  They are incredibly narrow, and don't in any way
25  cover some of the most common situations that occur in
0042
1  rural areas throughout Colorado and, indeed, in our
2  suburban and other areas, and certainly in my community.
3  So let's not be under any illusions just because it says
4  "by operation of law."  That particular, very touching,
5  gift and understanding that representative engineer row
6  talks about is not covered at all by this bill.
7          THE CHAIRMAN:  Representative Sonnenberg.
8          REPRESENTATIVE SONNENBERG:  Thank you,
9  Mr. Chair.
10          Members, as we talk about background
11  checks and trying to keep people safe in Colorado and
12  keep guns out of those that intend to do harm, all this

LEG HX 000630

4545

13    bill does is make us law-abiding citizens go through
14    another hoop.
15          It doesn't stop criminals.  Those that
16    can't pass a background check, those that are felons, it
17    doesn't stop them from breaking into my house and
18    stealing my guns.  It doesn't stop them from meeting the
19    guy down the street and buying the gun there,
20    although you would like to have them, I know, do a
21    background check, but I have a stinking suspicion that
22    that gun sale in the alley between two hoodlums will
23    never make it to the CBI.
24          It comes back again to what do we want to
25    do to law-abiding citizens, because the fact of the
0043
1    matter is what you're doing will have no impact on those
2    criminals intent to do harm.  We cannot keep evil people
3    from doing evil things, unless we lock them up.  And the
4    fact of the matter is, we need to lock them up and keep
5    them locked up.  And those are the ways we make people
6    safer in Colorado.
7          This bill doesn't do it.  This bill adds
8    another hoop for legal citizens like me to jump through.
9    If I want to hand my gun to my son-in-law or my
10    neighbor, it makes me jump through that hoop.  But rest
11    assured, those intent on hurting me and hurting you or
12    hurting our families, this bill will not deter them.
13          I ask for your help in defeating this
14    bill.  I ask for a no vote.
15          THE CHAIRMAN:  Thank you, Representative
16    Sonnenberg.
17          Representative Saine.
18          REPRESENTATIVE SAINE:  Thank you,
19    Mr. Chair.
20          I keep hearing this figure -- and I
21    believe Representative Fields had said something about
22    it -- 40 percent of guns are transferred without a
23    background check.  Well, that seems like a pretty
24    impressive figure, doesn't it?  And I've heard President
25    Obama say this several times.  But if you consider that
0044
1    this 40 percent came from a 251-person survey, that's
2    not a very large survey.  251 people from two decades
3    ago.  A 40 percent figure that came from a survey from
4    two decades ago with 251 people.
5          Well -- and if you consider, on top of
6    that, that survey was conducted with more than
7    three-quarters of that survey conducted before the Brady
8    Act.  Well, part of the fallacy of the survey is that
9    the survey asked buyers if they thought they were buying
10    firearms from licensed dealers.  But all FFLs do
11    background checks.  And they thought that the only FFLs
12    that counted were the brick and mortar stores.
13          So out of this 251 people, if we look at
14    two decades later, you'll find that actually 85 percent

15  of them went through FFLs and that 15 percent were
16  transferred without a background check.
17          Now, we don't sell guns today like we did
18  two decades ago.  And because of increasing regulation
19  and costs, most of these small dealers are out of
20  business.  So there are less than half of FFLs as there
21  were small, small dealers that operated out of their
22  home than there were two decades ago.  Most of them are
23  now brick and mortar stores.
24          So if you consider these transfers
25  actually occurred, the remaining 15 percent, from family
0045
1   members or inheritances, from a survey from two decades
2   ago, that figure falls to 11.5 percent.
3           I can't believe today, two decades later,
4   that especially with less than half of the FFLs than
5   there were two decades ago, we would have anything over
6   single-digit figures for transfers without background
7   checks.  So I just wanted to bring this to your
8   attention, that this is a myth, this 40 percent or
9   anything higher than that.  And, again, this is another
10  bill that will not do anything to increase public
11  safety, but decrease -- it will decrease public safety.
12          I urge a no vote.  Thank you.
13          THE CHAIRMAN:  Representative Holbert.
14          REPRESENTATIVE HOLBERT:  Thank you,
15  Mr. Chairman.
16          Members, I do rise in opposition to House
17  Bill 1229.  Probably not a great surprise, but I do see
18  a fundamental problem with the bill.  And Representative
19  DelGrosso touched on this before.
20          These universal background checks, one
21  thing, will not be universal.  There's a very
22  significant class of people in our society who will not
23  undergo background checks.  And we see that time after
24  time in places like the United Kingdom, in Australia, in
25  Washington, D.C., in Chicago.  Where people are not
0046
1   allowed certain types of weapons, violence tends to go
2   up.  Where guns are outlawed, only outlaws have guns.
3   Some might say, "Oh, that's a cliché," and chuckle at
4   that.
5           The United Kingdom experienced a
6   40 percent increase in gun violence after guns were
7   outlawed in the United Kingdom.  And that was
8   confiscation.  This bill is not confiscation, but I use
9   those as examples to point to the unfortunate reality
10  that criminals will not be prevented from obtaining
11  guns.  That won't happen.  That's fiction.
12          When this bill takes place, and when
13  universal -- more background checks are conducted and
14  more law-abiding citizens undergo background checks, it
15  will continually put pressure on the market, the black
16  market, for criminals to break into homes and steal

LEG HX 000632

4547

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

17  guns, to obtain them in illegal ways, to break into gun
18  stores and steal guns.
19          This won't prevent criminals from
20  obtaining guns.  That's fiction.
21          The next step -- and this is the
22  fundamental problem with the bill -- this is an
23  incremental step towards registration.  Some people
24  might say, "Oh, there's no claim that registration is
25  the next step.  This bill has nothing to do with this."
0047
1          Functionally, that will be the next step
2  because, as Representative DelGrosso pointed out, if I
3  go to a private party, if I go to Representative Priola
4  and I want to buy a gun from him, and we do one
5  background check for one gun, and then we transfer
6  ownership of 10 or 100 guns, there's only one background
7  check.
8          So until we can track, or those who would
9  want to track every gun, this really doesn't do
10  anything.  This creates a greater need for universal
11  registration of every firearm.  And I believe there are
12  plenty of people in this chamber who would say that's a
13  great idea.  But for those in the gallery, listening
14  online, watching on Channel 165, this is the problem:
15  This bill will not prevent criminals from getting guns.
16  This bill will not prevent crime.  It will encourage
17  more criminals to come find you and your guns in your
18  home and take them.
19          It will encourage criminals to set up
20  black market operations and sell guns that are not
21  available in legal ways to people who want to use them
22  for the worst purposes.  And, ultimately, this will lead
23  to universal registration.
24          I ask us to please be thoughtful before we
25  support 1229.  I ask for a no vote.
0048
1          THE CHAIRMAN:  Thank you, Representative
2  Holbert.
3          Representative Waller.
4          REPRESENTATIVE WALLER:  Mr. Minority
5  Leader, thank you, Mr. Chair.
6          Well, Members, here we are again.  And I
7  would at least like to thank the bill sponsors for
8  actually bringing some data on this one.  That's good to
9  actually have some data on the piece of legislation as
10  we're considering it.
11          You know, Members, we've heard a lot of
12  discussion.  And, once again, this comes down to public
13  safety.  What we want to do -- and I know that it's in
14  Representative McCann's heart, Representative Fields'
15  heart, to increase -- to do what they think is right to
16  increase public safety.
17          Once again, here we are.  These bills are
18  going to do nothing, nothing to increase public safety.

4548

19  Once again, a feel-good measure so we can
20  walk out of here and say to our constituents that we've
21  done something.  Well, something is not better than
22  nothing when something is bad.
23          You know, Members, I'm a prosecutor in my
24  off time.  And over the years, I have charged a
25  significant number of criminal cases.  I've had the
0049
1  opportunity to charge all different kinds of crime,
2  murder, all the way down to the lowest level felonies.
3          But, Members, I'm here to tell you, a lot
4  of times, you know, the cases that I've charged have
5  involved violence with firearms.  It happens from
6  criminals.
7          It is no secret that criminals use
8  firearms to commit crimes.  Well, guess what?  Any time
9  we've been able to track down where that criminal got
10  that gun from, you know what?  They didn't go to the
11  store to buy it.  Didn't go to the licensed federal
12  firearms dealer to buy it.  Most times, trading drugs
13  for guns.  That's what the criminals do.  They don't
14  even use cash most of the times.  Trading something for
15  the gun.  That's how they get it.  That's what they do
16  when they commit crime.
17          And I can tell you the last thing on their
18  mind is:  Oh, boy, I'm going to get in trouble if I
19  don't go down to the federally licensed firearm dealer
20  and complete this transaction with a federally licensed
21  firearms dealer before I use this gun to go out and
22  commit a crime.  They don't think about that.  That's
23  not a consideration.  When they're trading drugs for
24  guns, that's absolutely not one of their considerations.
25          So what does this bill do?  Penalizes the
0050
1  law-abiding citizen.  Does nothing more than that.
2  Going to cost -- well, I guess it's not going to cost
3  the taxpayers a significant amount of money because
4  we're going to put that burden back on individuals to
5  exercise their constitutional right.
6          But don't be under the misconception that
7  doing this is going to enhance public safety.  It's not.
8  Criminals get guns.  They don't get guns legally.  They
9  get guns however they can get guns.  And then they use
10  those guns for their purpose, which is to commit a
11  crime.
12          Background checks don't help us accomplish
13  that.  Background checks don't get us to the point of
14  enhancing our public safety.
15          Now, maybe we could hear from
16  Representative McCann or Representative Fields, because
17  there's a lot of exceptions in this piece of
18  legislation.  It's going to grandfather all of us that
19  have gotten firearms somewhere else down the road.
20  Those aren't going to be tracked.  Those aren't going to

21  be covered in this piece of legislation.  It's going to
22  grandfather -- or it's going to give an exemption for
23  transitioning between family members, and it's going to
24  give exemptions for this and give exemptions for that.
25          Completely unenforceable.  As this bill is
0051
1  written under current Colorado law, this piece of
2  legislation is just "feel good" because it's completely
3  unenforceable.
4          And I'd like to know:  What's the plan?
5  Now, I could potentially see an argument somebody might
6  make to say, This works, if we create a registry.  Is
7  that what we're looking to do, Representative McCann?
8  Do you want to create a registry for Colorado guns?
9          Representative Fields, maybe you could
10  answer that question for us.  Is that the goal here?  Do
11  we want to create an opportunity for every Colorado
12  citizen to have to let public officials or government
13  officials know that they have a gun?  Is that where this
14  is headed?  Because as the bill is written, completely,
15  totally unenforceable.
16          We need to be a no on this bill.
17          THE CHAIRMAN:  Representative McCann.
18          REPRESENTATIVE McCANN:  Thank you,
19  Mr. Chair, and Representative -- or Majority Leader
20  Waller --
21          THE CHAIRMAN:  That was the minority
22  leader.
23          REPRESENTATIVE McCANN:  Minority leader.
24  Oh, it's late in the day.
25          Mr. Minority Leader, there is nothing in
0052
1  this bill that requires registration of guns.  And what
2  the bill does is simply extend the current background
3  check requirement to people who purchase from private
4  sales.  It's not changing the procedure that CBI goes
5  through now to check people's backgrounds.  It simply
6  adds those who purchase their guns through private
7  sales.
8          And I need to wait because I have some
9  more data for you.  Ready for some more data?  All
10  right.
11          Recent state and industry data indicate
12  that private transfers remain a large and growing share
13  of total gun transfers.  I need to wait until I have
14  someone's attention.
15          Okay.  All right.  Michigan is one of 13
16  states that regulate private handgun transfers through a
17  permit-to-purchase system.  The Michigan State Police
18  recently disclosed that 48 percent of handgun transfers
19  in the state were conducted between private citizens.
20          In 2010, the National Sports Shooting
21  Foundation conducted an online survey of 7,000 assault
22  weapon owners.  Only 45 percent of them bought their

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

23  guns at stores where background checks were required.
24  So this is a problem nationwide and here in our state as
25  well.
0053
1            We do need to make sure that everyone who
2  purchases a gun does so with a background check, to make
3  sure they aren't felons and they don't have domestic
4  violence restraining orders against them.
5            So thank you.
6            THE CHAIRMAN:  Thank you, Representative
7  McCann.
8            Representative Salazar.
9            REPRESENTATIVE SALAZAR:  Thank you,
10 Mr. Chair.
11            So I -- sitting on judiciary and listening
12 to the ample conversation that we had, both proponents
13 for this bill and opponents for this bill, some of you
14 had heard me express quite directly that I had concerns
15 for the bill.  But I wanted to have the debate.  And
16 that's why I voted to have this bill move forward, so
17 that way this committee, as a whole, could listen in on
18 it.
19            I had some concerns about the exceptions
20 and about family members and things of that nature.  I
21 also had concerns about language involving hunting and
22 fishing and trapping.  But I wanted to have the debate,
23 because this is important.  And it's important because
24 we know that 82 percent of gun owners, 74 percent of NRA
25 members, support criminal background checks for anyone
0054
1  purchasing a gun.  We know -- well, that in of itself
2  right there is July 2012.  They want to have this
3  debate.  But I walked away because I was still a little
4  concerned about this bill.
5            The next morning I come in and my aide
6  says to me, "You've got to listen to this message."  I'm
7  going to read this message.  It's right on my phone.
8  It's right on my phone.  You can go upstairs and listen
9  to it, if you want.  And this is what it says -- and
10 I'll do my best to take out the expletives, but it's
11 riddled with expletives, so there's going to be just a
12 long beep.
13            It says, Hey, Salazar, you (expletive)
14 fascist.  You want to outlaw magazines.  Come and
15 (expletive) take them.  You willing to kill the
16 (expletive) outlaw magazines, because you will
17 (expletive) die.
18            I started thinking to myself:  Boy, I sure
19 would want that guy to go through a universal background
20 check.
21            The reason why I wanted this bill to move
22 forward wasn't just because of this.  And, yes, you're
23 right -- and this is what I said on judiciary -- I said:
24 A criminal will do anything to try to get a gun.  And

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

25  they'll even go through a private seller, because we

0055

1  don't have data on how many criminals got a gun through
2  a private seller because that data doesn't exist.
3          And that's what this bill is about.  It's
4  created.  Let's move the tool away from them.  Yes, they
5  will find a way to get a gun.  They will.  But this is
6  one less option for them.
7          I sure wish he would have left me his
8  number because I'd like to have a conversation with him,
9  but he didn't.
10          Thank you.  I support this bill.  Let's
11  get to it.
12          THE CHAIRMAN:  Thank you, Representative
13  Salazar.
14          Representative Murray.
15          REPRESENTATIVE MURRAY:  Well, thank you,
16  Mr. Chair.
17          How fortunate, Representative Salazar,
18  that you asked for some data about criminals and how
19  they bought their guns.
20          I have here -- this is 1997, by the U.S.
21  Justice Department.  And there are a lot of small
22  numbers here, until you get to 39.2 percent through an
23  illegal or street source.  And we would say, as
24  Representative Waller pointed out, I guarantee you that
25  they're not going to be volunteering for a background

0056

1  check during that exchange between someone that has
2  drugs and exchanging it for a gun.
3          39.6 percent got their guns through family
4  or friends.  So, you know, if we want to know where
5  criminals -- and these were criminals that were in
6  prison and used a firearm during their offense.
7          But that was not the main thing I wanted
8  to talk about.  I wanted to chat about something that we
9  haven't even dealt with yet.  And that's the fact that
10  this is a government mandate on retailers or private
11  business people in order to perform an administrative
12  process for government.  So the government is telling
13  someone in private business that even though there is no
14  sale going on with a product that is under some control
15  of the government in that shop, that you have to do our
16  bookwork for us.
17          I would expect that when we see a proposal
18  like this, that it is a sign to some sort of a
19  government department.  This should be associated with
20  an office, like a motor vehicle department, a real
21  estate recording office, a health department.  We should
22  find some government office that manages this function
23  for government because it's for government's purposes.
24          And to say $10 is what we're going to
25  allow them to charge -- I can guess that there are many

0057

4552

```
 1  people that haven't been in a mom and pop gun shop.  If
 2  you'd been in a mom and pop gun shop on a weekend, it is
 3  a very busy place.  There's a lot of guns being shown to
 4  people.  They're trying to keep up with their business.
 5  They're trying to make some sales.  And now we're saying
 6  that we're allowing -- or we're requiring them to accept
 7  these requests for these background checks from a line
 8  of people that are wanting to come into their business
 9  and not buying anything from them.  I'm having a hard
10  time picturing how this works.
11          Furthermore, there are many gun shops that
12  are out of their homes.  And I've had a couple of them
13  say, you know, I don't want people that are not wanting
14  to buy product from me coming and knocking on my door,
15  saying here is my $10, would you help me with my
16  background check?
17          So aside from the fact that I don't think
18  that this function is going to work in the way that
19  we're hoping for public safety, it's also a drastic
20  imposition on a group of business owners that are being
21  mandated by government to do -- to perform a function, a
22  compliance function, that has nothing to do with the
23  product that they're selling to that person.
24          I urge a no vote on this bill.
25          THE CHAIRMAN:  Thank you, Representative
0058
 1  Murray.
 2          Representative Saine.
 3          REPRESENTATIVE SAINE:  Thank you,
 4  Mr. Chair.
 5          I had a thought considering this bill,
 6  along with the last one, but I'll stick with this bill.
 7          What Representative Waller said about this
 8  is a back door to background checks -- just imagine some
 9  of the unintended consequences of this bill, where
10  you're stopped in a routine traffic stop or, you know,
11  police are called to your home for some reason.  They
12  saw a gun laying out, and they asked, "Did you get a
13  background check on that?"  How much would it cost you
14  to prove it?  How much in lawyer time?  Would your guns
15  be taken from you?
16          These are questions I'd like to ask
17  representative Fields, if you can answer those questions
18  for me.
19          Sorry, I'll ask the question again.
20          Would your guns be taken if you're stopped
21  in a routine traffic stop?  How much would it cost to
22  prove that you did own the weapon?  Is this a precursor
23  to a background check?  Those are just questions that
24  I'd like to ask.
25          THE CHAIRMAN:  Representative Fields.
0059
 1          REPRESENTATIVE FIELDS:  Thank you,
 2  Mr. Chair, and thank you for your question.
```

3        So in the scenario that you're describing,
4   as long as you have already completed a background
5   check, then there shouldn't be any problems at all with
6   you having possession of that gun.
7        THE CHAIRMAN:  Representative Saine.
8        REPRESENTATIVE SAINE:  Thank you,
9   Mr. Chair.
10       Representative Fields, again, what if a
11  background check -- how would they prove that they had
12  owned the gun before this law had passed?
13       THE CHAIRMAN:  Representative McCann --
14  Representative Fields.
15       REPRESENTATIVE FIELDS:  Because you would
16  have had to already have completed a background check.
17  If you were to have bought your gun at a gunshow or at a
18  new Wal-Mart or something like that, a new dealer, then
19  you would have to go through a background check already
20  to have occupation of that gun, to have that gun in your
21  possession.
22       THE CHAIRMAN:  Representative Saine.
23       REPRESENTATIVE SAINE:  Thank you,
24  Mr. Chair.
25       Representative Fields, again, I'm just
0060
1   confused because, again, if someone were stopped and the
2   police asked, "Did you comply with this law after it was
3   passed" -- I guess I'm confused -- how would the police
4   know if you complied with the law or not?
5        THE CHAIRMAN:  Representative McCann.
6        REPRESENTATIVE McCANN:  Thank you and
7   thank you, Representative Saine.
8        It's the same way they do now.  If someone
9   is stopped with a gun in their car, the police contact
10  CBI, and there is a record of whether or not that person
11  has a legitimate background check on record.  So the law
12  enforcement officer would have the responsibility of
13  determining what your situation was.
14       So it doesn't change what we already do.
15  It simply adds additional people to what we already do.
16  It's the situation we have currently.
17       REPRESENTATIVE SAINE:  Mr. Chairman.
18       THE CHAIRMAN:  Representative Saine.
19       REPRESENTATIVE SAINE:  I guess I'm still
20  confused.  I'm sorry.  Maybe I'm not understanding.
21       How would they determine if somebody
22  willfully is not complying with the law or not?  Because
23  they could say, "Well, Mr. Officer, I have obtained this
24  gun before this law has passed; therefore, I did not
25  need a background check."
0061
1        THE CHAIRMAN:  Representative McCann.
2        REPRESENTATIVE McCANN:  They would handle
3   it just as they handle it now.
4        REPRESENTATIVE SAINE:  Which is . . .

5          REPRESENTATIVE McCANN:  The law
6   enforcement officer has the responsibility to find out
7   if you have a legal possession of your gun.
8          THE CHAIRMAN:  Representative Saine.
9          REPRESENTATIVE McCANN:  And if you're
10  charged with an offense, you have the ability to come to
11  court and say, "I legally possess this weapon."  It's --
12  we're not changing anything.
13         REPRESENTATIVE SAINE:  Mr. Chair.
14         THE CHAIRMAN:  Representative Saine.
15         REPRESENTATIVE SAINE:  I'm sorry, I'm
16  still further confused.  I just don't see how this law
17  is enforceable.  Who's determining if they've complied
18  with the law or not?  If the person says, "I obtained
19  this weapon before this law passed," are you allowing
20  the police officer to make that determination or the
21  Court?
22         THE CHAIRMAN:  Representative McCann.
23         REPRESENTATIVE McCANN:  Thank you.
24         Representative Saine, I don't really have
25  any further -- I think I've answered your questions
0062
1   several times.  And I'm sorry that you're not
2   understanding it, but right now, an officer stops
3   someone for probable cause for some offense.  And if
4   there's a gun in plain view, the officer has the right
5   to determine whether or not you lawfully possess the
6   weapon.  And that would be the same if this bill passes.
7          REPRESENTATIVE SAINE:  Okay.  So the --
8          THE CHAIRMAN:  Representative Saine.
9          REPRESENTATIVE SAINE:  Thank you,
10  Mr. Chair.
11         So the officer would determine whether to
12  take your gun or not at that point in time?
13         THE CHAIRMAN:  Representative McCann.
14         REPRESENTATIVE McCANN:  This is up to the
15  officer.  I'm sorry if you don't understand it, but it's
16  what we do now.  I can't -- I have no further answer for
17  you.
18         REPRESENTATIVE SAINE:  Okay.  Thank you,
19  Mr. Chair.  Having not personally been in that
20  situation, that's why I'm asking.  Thank you.
21         THE CHAIRMAN:  Representative Wright.
22         REPRESENTATIVE WRIGHT:  Thank you,
23  Mr. Chair.
24         Well, since we are talking about facts and
25  statistics on this bill today, I thought that I would
0063
1   point out some statistics from the Bureau of Alcohol,
2   Tobacco and Firearms.  And I think this is important and
3   pertinent to this argument.
4          The BATF reported that 37 percent of armed
5   career criminals obtained firearms from street sales,
6   34 percent from criminal acts and associates, 8 percent

LEG HX 000640

4555

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

7 from relatives, and only 7 percent from dealers.
8 6 percent from flea markets and gunshows.
9           Now, this was in 2001. So as you'll
10 notice, we see 6 percent from flea markets and gunshows,
11 and only 7 percent from dealers, both of which are
12 requiring background checks. So what you see here is a
13 shift away from methods where background checks are
14 performed. The criminals always go for the illegal
15 method, the method by which they can hide. And that's
16 what we're going to see here.
17           I don't understand, and I don't think I
18 ever will, how this bill makes our community safer
19 without some method of enforcement. Are we -- what is
20 our next step?
21           Sitting on judiciary, we heard a police
22 chief testify that this was a slow, methodical,
23 systematic approach toward limiting our Second Amendment
24 rights. Slow, systematic, methodical approach. And
25 that is the only way I see any form of enforcement being
0064
1 accomplished here, is if there -- the next step is
2 registry. The next step is a gun registry. And I
3 believe that my constituents certainly, and I believe
4 the people of Colorado, are strongly against a registry.
5           So I guess I would ask you: What's our
6 next step? When we hear our own chiefs of police
7 admitting that this is unenforceable without a next
8 step, what is that next step?
9           Now, we talk about a loophole in the law.
10 And, apparently, our predecessors saw one of those
11 loopholes as being gunshows. Now, when we closed the
12 so-called gunshow loophole in 2000, for the next four
13 years between 2000 and 2004, we saw a systematic murder
14 rate increase in the state of Colorado from 3.1 to 3.6,
15 to 4.0, to 4.1, to 4.4, year over year, an increase to
16 the same extent in violent crime.
17           So tell me where are the facts -- how are
18 the facts there supporting that this loophole is somehow
19 a real problem?
20           Comparing to other states -- let's talk
21 about some more facts and statistics -- HB 1229 is
22 similar to the background check laws that are currently
23 in place for private transfers in the state of
24 California. California has failed to show conclusively
25 any benefit to infringing upon the rights of law-abiding
0065
1 citizens.
2           Now, comparing to Colorado, California and
3 the national average as it relates to violent crime and
4 murder rates from 1960 through 2011 illustrates one main
5 overriding trend. Crime and murder in the last two
6 decades have continued to decline at a similar rate in
7 California as in Colorado, and nationally on average,
8 with California consistently maintaining a higher

LEG HX 000641

4556

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

9  average than both Colorado and nationally.  And
10  California already has this law in place.
11       So I, too -- I can't overemphasize -- and
12  I don't want this to be lost on the fact that I'm
13  arguing against this bill -- that I care about public
14  safety.  I've committed the last six years of my life to
15  public safety.  But when I see fellow law men on both
16  sides of this issue, I have to question whether we're
17  moving in the right direction.
18       We heard testimony in judiciary from
19  county sheriffs from across the state, many of them in
20  rural areas like mine, who are opposed to this bill and
21  who see no benefit to public safety.
22       And I guess let's cut to the chase here,
23  since we heard a chief of police himself say that this
24  is a systematic approach, that this law itself is not
25  perfect and it will take more strict laws to be passed
0066
1  to reach a solution for public safety in the state of
2  Colorado -- this is about gun control.  And it will take
3  a registry to enforce this law.
4       So let's talk about the states -- or
5  countries, for that matter -- that have established some
6  of the most strict gun control laws in the world.  Let's
7  look at England.
8       In 1997, Great Britain established and
9  adopted one of the most stringent gun control measures
10  in the world, that made ownership of almost all pistols
11  and semiautomatic rifles illegal.
12       Now, since the passage of that law, crimes
13  involving firearms have increased from 13,874 in 1997
14  to, in 2006, 21,521.  That's a 55 percent increase in
15  firearms-related crimes after the passage of this total
16  gun control law.
17       This is enforceable, ladies and gentlemen.
18  These were guns that were rounded up from the
19  individuals, the citizens of this country, taken
20  forcibly and destroyed, and their violent gun crime rate
21  went up.
22       Once again, data.  So we see data,
23  apparently, on both sides of this issue.  I'm not
24  compelled that this is a solution to our public safety
25  needs in the state of Colorado.
0067
1       And then the crescendo here to the people
2  of Colorado is the fact that we just passed a law
3  moments ago, on second reading, that essentially drove
4  out a $46 million business -- my understanding is
5  they're packing their bags -- 600 jobs lost, $46 million
6  a year to the State of Colorado --
7       THE CHAIRMAN:  Representative Wright,
8  would you deal with the background check bill, please.
9       REPRESENTATIVE WRIGHT:  Yes, thank you,
10  Mr. Chair.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

11       House Bill 1229 will cost the people of
12  Colorado $1.6 million in fiscal year 2013 through 2014
13  and another $1.6 million in 2014, 2015.  That's
14  $3.2 million over the next two fiscal years.
15           Oh, that's right, back to the bill very
16  quickly:  But we have a bill coming up after this one
17  that's shifting those costs to the individuals who are
18  buying the firearms.  How is that constitutional?
19  Regardless, these costs are falling on the people of the
20  state of Colorado.
21           We're creating 25 new full-time positions
22  just this year in the CBI and another 30 the next fiscal
23  year.  We're growing a state bureaucracy that has proven
24  to me in testimony and committee that they are already
25  experiencing problems in their management practices when
0068
1  I hear facts like these from the CBI director.
2           56 percent of all appeals are sustained.
3  56 percent.  That's more than half of the people that
4  appeal their purchase is legitimate, and that they can
5  actually take possession of a weapon, are first denied.
6  These individuals are forced to appeal, go through a
7  waiting process, an overly bureaucratic waiting process.
8  And then, oh, you know what?  You're right, you can have
9  your weapon; we were wrong.
10           How is that right?  And if you think that
11  this is not going to increase, this statistic is not
12  going to increase with requiring the CBI to perform more
13  background checks, I think we're mistaken.
14           So I ask you this:  How is this good
15  public policy?  How is this good public policy?  The CBI
16  director then told me:  Oh, I forgot, just to make sure
17  you're clear, this is 56 percent of only the appeals
18  that are being overturned, as if I'm supposed to rest
19  easy with that statistic.  I would argue that that
20  makes that statistic likely worse because there are
21  people that are being denied these transfers that may
22  just give up and say, "You know what?  I'm not even
23  going to bother," that may legitimately be able to take
24  possession of a firearm.
25           So we already have problems within the
0069
1  CBI.  We heard testimony from an individual named James
2  Winchester, who himself worked on the first InstaCheck
3  system as an attorney.  He helped establish this policy
4  for the state of Colorado, who testified to us that CBI
5  is now well -- operating well beyond its legal scope and
6  has become overly bureaucratic.
7           So we're asking an agency of state
8  government that is already experiencing problems to
9  increase its burden of checks by, some say, 30 --
10  somewhere between 30 and 40 percent on private
11  transfers.  This is -- ladies and gentlemen, this is
12  just poor public policy for the state of Colorado from a

LEG HX 000643

4558

13  financial sense, from an economic sense, from a revenue
14  sense to the state, from a constitutional sense.
15          I just don't buy it.  I rise as a no vote.
16  Big surprise.
17          THE CHAIRMAN:  Thank you, Representative
18  Wright.
19          Representative Priola.
20          REPRESENTATIVE PRIOLA:  Thank you,
21  Mr. Chair.
22          Representative Court, it's been a while
23  since you brought up those statistics for Michigan, but,
24  you know, I'm glad you did because I'm going to plan my
25  next trip to Detroit.  I haven't read that much about
0070
1  it, but it seems like a wonderful place to visit because
2  apparently they have solved all the ills of the world.
3          I did have -- reading through the bill,
4  came to mind, it looks like the penalty is a
5  misdemeanor.  But where are the bill sponsors?
6          Representative Fields.  I don't see
7  Representative Fields.
8          No one is here.  The bill sponsors are not
9  here.  Where'd they go?  Don't they know this is what
10  we're supposed to do, is discuss legislation?
11          THE CHAIRMAN:  To the bill, Representative
12  Priola.
13          REPRESENTATIVE PRIOLA:  I have a question
14  for the sponsors, and neither of the sponsors -- you
15  would assume that if there are two sponsors on a house
16  bill, that at least one of them would be in the well to
17  answer questions concerning the bill.  I don't think --
18  the chair cannot answer questions to the bill.  Can the
19  chair?  I don't think that's in the rules.
20          I do have a question to the bill, but I
21  would at least like to have one of the sponsors here,
22  but apparently the sponsors have lost interest in their
23  own bill.  Maybe that's a good sign.  Maybe that's a
24  good sign.  They finally realized, you know, this really
25  isn't good policy of the state of Colorado and only
0071
1  law-abiding citizens are going to follow this.
2          Well, I'll throw my question out there and
3  maybe they'll show up soon.
4          Say you have a situation of someone is
5  trading drugs for a stolen gun.  Which person is charged
6  with the misdemeanor for not doing a background check?
7  Is it the person that is offering the payment or the
8  person selling the stolen gun?  It's not clear in this
9  bill if both of them or one of them can be charged with
10  that misdemeanor.
11          So I really would like either of the bill
12  sponsors to be down here to answer that question.  But
13  maybe someone could inform them -- maybe they're
14  listening someplace else to this debate and could answer

15    that question.

16          Also, on page 3, line 20, I have a
17    question concerning recordkeeping, but, again, neither
18    of the bill sponsors are here in the chambers to answer
19    the question.  So maybe I'll just have to come back up
20    when they're down here to answer that question.
21          And then I had a further question on the
22    definition of Class 1 misdemeanor, but I'll just wait.
23          THE CHAIRMAN:  Thank you, Representative
24    Priola.
25          Representative Levy.
0072
1          REPRESENTATIVE LEVY:  Thank you,
2    Mr. Chair.
3          I really just have one -- one thing to
4    say, and it harkens back to our other bill.  You know --
5    what it goes to is:  What is the solution to this
6    problem?  When I listen to the national debate about gun
7    violence and gun safety, what I hear from the
8    proponents, the so-called gun rights people, is that we
9    have to do more to keep guns out of the hands of
10    criminals.  That's the problem; it's criminals.
11          So Representative McCann and
12    Representative Fields propose a bill, the only legal
13    tool I think we really have to keep guns out of the
14    hands of criminals; and the answer from this side of the
15    aisle is no.
16          And I guess what I'm having a problem with
17    is, if we -- if there are too many gun deaths -- and I
18    hope there isn't any dispute that 30,000 gun deaths a
19    year is a problem -- if there are too many gun deaths,
20    and the assertion is that the problem is not law-abiding
21    people, the problem is criminals, and they have proposed
22    using the tools at our disposal to keep guns out of the
23    hands of criminals, and this is not the solution, and
24    you're going to spend the next several hours telling us
25    why it's not the solution -- I am still waiting for
0073
1    something more constructive, more helpful than what
2    we've seen so far this session, which is let's have more
3    guns.
4          This is a good bill.  I urge a yes vote.
5          THE CHAIRMAN:  Thank you, Representative
6    Levy.
7          Representative Lawrence.
8          REPRESENTATIVE LAWRENCE:  Thank you,
9    Mr. Chair.
10          One of the issues that I have with this
11    bill is that, per CBI policy, once they've approved a
12    background check, the name and information of that
13    person is deleted from their records within 24 hours.
14    So should there be a stop, the police don't have any
15    information to go back to, unless this is a registration
16    bill, which my understanding is that it is not.

17          So, really, the police don't have
18  information saying that they were successful going
19  through a background check.  They would only have
20  information if the gun had been reported stolen, or if
21  that person had failed a background check.
22          So I think parts of this bill have been
23  misrepresented.  And maybe there's a misunderstanding on
24  the policy of the CBI, but my understanding, after being
25  briefed by Director Sloan, was that any approved
0074
1  background check, all data is deleted from their
2  database within 24 hours.
3          I see this as a fatal flaw for this bill
4  and enforcement, and I would ask for a no vote.
5          THE CHAIRMAN:  Thank you, Representative
6  Lawrence.
7          Representative Coram.
8          REPRESENTATIVE CORAM:  Thank you very
9  much, Mr. Chairman.
10          And perhaps the bill sponsor could answer
11  this because I do not believe that all states have a
12  background check in these situations.  Is that correct?
13          THE CHAIRMAN:  Representative Fields.
14          REPRESENTATIVE FIELDS:  Thank you,
15  Mr. Chair.
16          That's correct, not all states require a
17  background check.
18          THE CHAIRMAN:  Representative Coram.
19          REPRESENTATIVE CORAM:  Thank you very
20  much, Mr. Chairman.
21          Okay.  This creates a bit of a problem for
22  me because I go to another state, I buy a weapon, I
23  bring it back across the Colorado line.  I might have a
24  heavy foot.  I'm stopped.  It's laying in the seat.  How
25  do I prove to that officer that I have a right to have
0075
1  this weapon in my possession?  Is that possible without
2  a registry?
3          Could I get the sponsor to respond to
4  that, please?
5          THE CHAIRMAN:  Is there further discussion
6  on House Bill 1229?  Representative Coram.
7          REPRESENTATIVE CORAM:  Thank you,
8  Mr. Chairman.
9          I didn't hear an answer to my question.
10  Am I entitled to an answer, or is that out of order?
11          THE CHAIRMAN:  Is there any further
12  discussion on House Bill 1229?
13          Representative Stephens.
14          REPRESENTATIVE STEPHENS:  Thank you,
15  Mr. Chair.  Thank you, Members.
16          In reviewing this bill and the fiscal
17  note, I was -- I was intrigued because I think that we
18  are going to see this bill cost Colorado -- even though

19  we're told that we have a semi, kind of, fiscal answer
20  to it in terms of attacks on it, on a background check
21  or fee on a background check, it says, This fiscal note
22  should be considered preliminary.  And I know, as it
23  went through appropriations, that we were looking at the
24  basic -- at full-time positions, 24 and 29,
25  respectively, and 14 and 15.

0076
1           But I was very struck as I was going
2  through the fiscal note about the departmental
3  differences, because not all departments have weighed
4  in.  So we really don't know what this bill is going to
5  cost the general fund.  And the Department of Public
6  Safety made several assumptions concerning the number of
7  private gun transfer background checks.  And what struck
8  me is that now they're saying:  Well, you know, we may
9  have to modernize our system because we're going to have
10  to know the court record search process.  We may have to
11  line up and we may have to modernize that.
12           And the bill would require $3,471,000 from
13  general fund and 49 full-time people and 56 full time,
14  if we have to go in that direction.
15           And so my question, I guess, was:  Okay,
16  well, why would you put this in?  I mean, we don't
17  really know.  And I always look at this as kind of a
18  cover yourself because you can pretty much be assured
19  it's coming.  Pretty much be assured that this bill is
20  going to cost us, I think, a whole lot more than what is
21  said.  It's going to cost a whole lot more than the fee
22  or tax that are going to be put on law-abiding citizens
23  to have this done, to try to pay for their right to
24  Second Amendment freedom.
25           And the other thing that strikes me is

0077
1  that, for so many years, we have tried to deal with the
2  drunk-driving issue, tried to get the penalties up.  I
3  know Representative Waller has tried.  And yet here,
4  here in revenue and fines, you could have up to six to
5  18 months imprisonment in a county jail.  So this is an
6  unfunded mandate on our counties.  Our counties are
7  going to be on the hook for this, fines, imprisonment, a
8  fine of $500 to $5,000 or both.
9           Folks, our counties are so burdened
10  enough.  The rights of law-abiding citizens to be able
11  to hold and carry and have their guns and transfer as
12  they see fit -- to me this is crazy.  And I'm telling
13  you, when anyone puts that in that fiscal and they say,
14  "Oh, just by the way, we may have to modernize this
15  system; and, by the way, we may need about 49 or 50 more
16  full-time employees of the state to do it," I take note,
17  because you can be sure -- maybe not today, but next
18  year, we'll be hearing that, indeed, they need to
19  modernize the system and they'll need a number of people
20  to be able to do this.

21      Folks, this bill is fraught with some
22 problems.  I urge a no vote.
23      THE CHAIRMAN:  Thank you, Representative
24 Stephens.
25      Representative Humphrey -- Wilson.  I
0078
1 apologize.  Representative Wilson.
2      REPRESENTATIVE WILSON:  Thank you,
3 Mr. Chair.
4      I was up here earlier talking about I
5 really didn't have experience doing this, but I'm
6 gaining a lot of experience, I see.
7      I'm very much concerned, and I need to ask
8 some questions, because all the people that have been
9 talking about the people that have high-capacity
10 magazines, that have semiautomatics, that have shotguns,
11 that would be me.  And not only do I need answers for
12 myself, but I need it for my constituents.  And I think
13 we owe it to our constituents to be able to tell them
14 how this might be enforced.
15      For those of you who have seen me in
16 committee, you know that I played a game of "just
17 suppose."  So I'd like to play that game of "just
18 suppose," if I could.
19      If I've been to the Chaffee County
20 shooting range with my family and I'm stopped for
21 speeding like Representative Coram indicated, and there
22 are six weapons in the vehicle, how do I prove that
23 those weapons were legal before this bill?  How do we
24 answer that?  Representative McCann, Representative
25 Fields?
0079
1      If there is no answer, I have to answer my
2 constituents that we have no way of enforcing this,
3 therefore, good luck.  How do we enforce it?
4      THE CHAIRMAN:  Representative McCann.
5      REPRESENTATIVE McCANN:  Thank you,
6 Representative Wilson.  I think I've already answered
7 that question several times, but thank you.
8      REPRESENTATIVE WILSON:  Well,
9 Representative McCann -- oh, Mr. Chair.
10      THE CHAIRMAN:  Representative Wilson.
11      REPRESENTATIVE WILSON:  The response was
12 that it's up to the officer.  So the officer says,
13 "Mr. Wilson, do you have evidence?"  And I say, "I don't
14 need it."  If the burden of proof lies on me, then
15 that's against my constitutional right of being assumed
16 innocent until proven guilty, and I think that that's
17 wrong.
18      The other piece to that would be the only
19 way to prove that is with registration.  I know that
20 some of the conversation has moved towards:  Well, this
21 really isn't registration.  I would ask the bill
22 sponsors:  What all information is required on the 4473

23  form at the time that you have to pass the background
24  check?
25          REPRESENTATIVE McCANN:  Representative
0080
1   Wilson, we already have a background requirement in our
2   law.  And this will continue to be enforced, just as it
3   is now, by law enforcement.  I don't have any further
4   answer.  It will be enforced as it currently is by law
5   enforcement.  Thank you.
6           THE CHAIRMAN:  Thank you, Representative
7   McCann.
8           Representative Wilson.
9           REPRESENTATIVE WILSON:  Thank you,
10  Mr. Chair.
11          The question was actually:  What's on the
12  form?  The form that's required at that point is full
13  information, name, address, height, weight, date of
14  birth, type of firearm, serial number, make, model, and
15  caliber.  That information is kept on file for 20 years
16  by the FFL, and the duty-bound book that you're required
17  to keep is then turned over to the ATF.  So there is a
18  registration of every firearm.
19          And just to give us a little bit more to
20  discuss at a later time, the FFL 4473 prohibits anyone
21  who uses marijuana from owning a firearm.  That might be
22  an interesting debate coming up later in this house.
23          Thank you.
24          THE CHAIRMAN:  Thank you, Representative
25  Wilson.
0081
1           Representative Gardner.
2           REPRESENTATIVE GARDNER:  Thank you,
3   Mr. Chair.
4           Well, as I think everyone in this body
5   knows, I was admonished yesterday in appropriations that
6   there would be plenty of time for my questions on the
7   floor of the house.  Now, I'm not at all sure that I can
8   get my questions answered here because the witnesses
9   from the executive branch aren't here on the floor of
10  the house with me to answer those questions, but I
11  suppose, being a person who accepts admonishment so
12  well, I will make that attempt and hope that the
13  sponsors and others will address my questions and
14  concerns about this bill.
15          And so -- I know that all of you have read
16  it carefully.  Have every confidence that you have.  And
17  you have your bill with you.  I would just ask that if
18  you're interested in following along in this discussion,
19  that you turn to page 3 of the bill.
20          And one of the first questions I have, in
21  no particular order of the things that have come up
22  during the debate here, is something that I asked of
23  Director Sloan of the CBI yesterday.  And the origin of
24  that question really kind of came from my friend

25  Representative Geroll, who was talking about having been
0082
1   given various pieces and parts and having received those
2   as a gift, and her assumption or belief that she would
3   need to have a background check to receive those, or
4   whether she would or not. And it raises the question
5   of: At what point does something become a firearm?
6           And, actually, I've had an opportunity
7   since yesterday to take a look at that issue, but I
8   don't have a good answer. In fact, it's sort of
9   astounding to me that as much time and as much energy
10  and effort and discussion and in anticipation that there
11  would be many of us who were opposed to this that I
12  don't -- I don't know that there's any good guidance on
13  this. In fact, I asked Director Sloan yesterday. And
14  this is the director of the organization that will be
15  responsible for background checks and all of this
16  program. I laid out this hypothetical, although I was
17  interrupted a couple of times because there were those
18  who, I guess -- I don't know -- thought that somehow
19  laying out what was a serious set of facts not an
20  appropriate way to approach that.
21          The question I put to Director Sloan was:
22  I've got pieces of a firearm. I've got a firing
23  mechanism. I've got a barrel. I've got a stock. I've
24  got a trigger. I want to hand those over to somebody.
25  Or another possibility is I take a weapon apart. There
0083
1   are people in this room, I know, who know how to do
2   that, as do I. And pieces of it are transferred. And
3   so a question that I would like to ask the sponsors is:
4   What is a firearm and when does a set of parts become a
5   firearm?
6           Mr. Chairman, may I continue?
7           THE CHAIRMAN: You may, Representative
8   Gardner.
9           REPRESENTATIVE GARDNER: I -- I am met
10  with silence. I am met with silence, members of this
11  body, because I was told yesterday in committee I would
12  have plenty of time and I would receive my answers. But
13  I am met with silence when I ask the question that I
14  asked in committee. When will a person have a set of
15  parts constructed -- because this is a serious question.
16          You say, oh, Representative Gardner,
17  you're just making things up. No, this is a serious
18  question. I have amateur gunsmiths. I have hobbyists.
19  I have people who want to know: When will I be liable
20  for a crime? And yet I am met with silence.
21          Is there no answer to when is a firearm a
22  firearm? In fact, there's no answer to what is a
23  firearm, in this bill?
24          In federal law, kind of ironically under
25  the federal definition, a firearm doesn't actually
0084

LEG HX 000650    4565

1  include a revolver or pistol.  That's a different
2  definition.
3            And there is a definition of a firearm
4  over in another title and article in a Colorado Revised
5  Statute.  But it isn't clear at all to me that that's
6  what applies here.
7            So what is a firearm and when are a set of
8  components a firearm?  Perhaps I do have an answer now.
9            Finally, Mr. Chair, if I have to
10  ultimately raise my voice, as regrettably -- as
11  regrettably as I have to do so, maybe perhaps there is
12  an answer to when is a firearm a firearm?
13            THE CHAIRMAN:  Representative Fields.
14            REPRESENTATIVE FIELDS:  Mr. Chair, thank
15  you.  And, Representative Gardner, it's not necessary
16  for you to raise your voice just to get a response to
17  your question.
18            But when is a firearm a firearm?  I'm
19  thinking if you have bits and pieces of equipment that's
20  not assembled, then it's not considered a firearm.  So
21  if you can't operate and use the firearm, then I would
22  say it's not one.  If you have bits and pieces, I would
23  say it's not a legitimate firearm.  But I'm going to
24  look in the statutes to see if I can find the definition
25  of a firearm, but, in my belief, if you have bits and
0085
1  pieces and it's not assembled, and it's not functional
2  and it's not operational, then it's not considered a
3  firearm.
4            THE CHAIRMAN:  Representative LaBouda.
5            REPRESENTATIVE LaBOUDA:  Thank you,
6  Mr. Chair.
7            Representative Gardner, I was in the
8  committee yesterday, and I recall when Director Bob
9  Sloan, who's head of the Colorado Bureau of
10  Investigation, came back to answer that question.  And
11  you posed it to him.  And he said:  No, it is not a
12  firearm if it's in pieces.  He answered that very
13  clearly.
14            THE CHAIRMAN:  Representative Gardner.
15            REPRESENTATIVE GARDNER:  Representative
16  LaBouda, I would admonish you -- perhaps he answered
17  that off the record to you, but I would admonish you and
18  ask you to listen to the record.  What Representative
19  (sic) Sloan said to me is:  I don't know, Representative
20  Gardner.  I'm not an armorer.
21            But I am pleased to hear Representative
22  Fields' answer when a firearm is not a firearm.  So
23  that, if I understand it clearly, if you want to
24  transfer -- if you want to break your weapon down, you
25  want to remove the firing mechanism and you want -- you
0086
1  want to transfer it, that will be a pretty
2  straightforward thing.  You can take out the cylinder.

LEG HX 000651     4566

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

3   You can take out -- you can take the barrel off. It
4   will no longer be a firearm. And I'm pleased to know
5   that.
6           Let me move on. Another concern I have
7   about this bill is one that was raised by the many, many
8   federal firearms licensed dealers in the state. Some of
9   these people have large outlets, and many of them have a
10  license and they work out of their home. They're very
11  small dealers. They want to be able to deal in firearms
12  and they want to do so legitimately. And it's a side
13  business for them, or even a hobby, but they have an FFL
14  as a hobby.
15          Now, if you look at this bill, what you
16  see is that we're going to expect all of those dealers
17  to do background checks and go through all of this
18  process with all of these private transfers for $10.
19  We're going to expect them to engage in all of that
20  activity.
21          Now, we're going to hear another bill
22  later that's sort of part and parcel to this bill. And
23  I don't want to debate the merits of that bill at the
24  moment, but we're going to hear a bill about -- you
25  know, paying the State for its cost of doing this, but
0087
1   we are only going to allow the private FFL and the
2   transferor to collect $10. Now, that's what they're
3   getting now. But, you know, if you're doing a transfer
4   and you're doing a sale, or you're running a gunshow and
5   you're engaged in a sale, $10 may just kind of be the
6   cost of doing business. But if you're doing private
7   transfers, that may not be what you want to do.
8           Now, I was concerned, and I asked during
9   judiciary committee about this. And, in fact, I tried
10  to address the concern, because the concern is this:
11  That FFLs operating in this state, even at the smallest
12  level, will be concerned that they have to do this when
13  requested. And you know what? The people who came to
14  me and asked me to carry that amendment, I kind of -- I
15  was kind of inclined to say: Well, that seems rather
16  unnecessary. Surely that wouldn't be what the
17  understanding was. But if you're -- if you're concerned
18  about that, I guess I kind of understand.
19          And so I carried an amendment during
20  judiciary committee that did exactly that, that said you
21  don't have to do this. If you're an FFL in Colorado,
22  you do not have to do a private transfer. You can turn
23  it away. You don't have to accommodate people.
24          And you know what happened is the
25  discussion of that amendment -- there were comments from
0088
1   those on the committee who gave me pause because it
2   began to appear as if what really needed to happen was
3   we needed to have this amendment. There were those on
4   the committee whose comments and remarks made me think

5   that what an FFL in Colorado will be after this bill is
6   like a public utility.  They'll have to service
7   everybody just by their existence here, and they will
8   have to do so for $10.
9          Now, when I offered the amendment,
10  everybody said:  No, no, no, unnecessary, we don't need
11  to do that.  But the remarks by members of the committee
12  were of the genre of:  Well, you know what?  If we have
13  all these people out there and we need to do this, maybe
14  they will have to do it.
15         So for that reason, Members, I come to you
16  once again and I offer L.009 and I move L.009 and ask
17  that it be displayed.
18         THE CHAIRMAN:  The amendment is properly
19  displayed to the amendment.
20         Representative Gardner.
21         REPRESENTATIVE GARDNER:  Yes, thank you,
22  Members.
23         Members, this is an amendment that very
24  clearly just says that nothing in this section shall be
25  construed to require a licensed gun dealer to obtain a
0089
1   background check upon their request of a prospective
2   firearm transferor.
3          You know, I hope people will do this, but
4   I don't think that we should impose the duty and the
5   obligation upon small FFLs to do this, people who work
6   out of their homes, people who have a small shop where
7   it's not economic for them to do it.  And I wouldn't
8   have thought that this amendment would be necessary to
9   say what ought to be the law, but what I see is that
10  this has become so regulated that we better make this
11  clear, because the legislative record so far makes it
12  pretty unclear.
13         And so for that reason, I ask for a very
14  straightforward amendment.  A very straightforward
15  provision in this statute is that small gun dealer does
16  not have to do private transfers.  Nothing can make them
17  do it.  If they want to do it for $10, they can do it
18  for $10.  If they want to do it for free, they can do it
19  for free, but they do not have to do it.
20         And I ask for an aye vote.
21         THE CHAIRMAN:  Representative Fields.
22         REPRESENTATIVE FIELDS:  Thank you,
23  Mr. Chair, and thank you, Representative Gardner, for
24  bringing this amendment back up again, but just like in
25  committee, I did not support the amendment.  So today on
0090
1   the floor, I cannot support this amendment as well.  So
2   I urge a no vote on this amendment.
3          THE CHAIRMAN:  Representative Gardner.
4          REPRESENTATIVE GARDNER:  Thank you,
5   Mr. Chair.
6          Well, Representative Fields, is it your

7  position, then, that the small dealers must or somehow
8  should be required or might well be required to conduct
9  these background checks for these private transferors
10  for which they're not the seller, they're not the buyer?
11  And yet because they're a gun dealer here in Colorado
12  and operate under Colorado laws as well as federal laws,
13  that they should be required to do them?  Is that your
14  position?  Because I can't think of any reason you would
15  oppose this amendment unless that is your position.
16        THE CHAIRMAN:  Representative McCann.
17        REPRESENTATIVE McCANN:  Thank you,
18  Mr. Chair.
19        There is nothing in the bill that requires
20  that a licensed firearm dealer do a particular
21  transaction.  So this amendment is unneeded.
22        THE CHAIRMAN:  Representative Gardner.
23        REPRESENTATIVE GARDNER:  And that being
24  the case, Representative McCann, what's the problem with
25  the amendment, to make it very clear so that it's never
0091
1  construed that way?  Because there were comments in the
2  committee that made it very clear.  And I have to tell
3  you, I fear that this will become a problem, because at
4  $10 a pop, I don't think that there are going to be a
5  lot of people out there wanting to engage in this
6  activity.
7        The State is going to be getting -- I
8  don't know how much -- I would bet you it will be 25,
9  30, or $40 that the State will be getting for this
10  activity pretty quickly.  And I will suspect that FFLs
11  are not going to want to do this when they are not part
12  of the transaction.  And they have people who are coming
13  through for background checks just to loan their weapon
14  to their brother-in-law so he can go hunting.  They're
15  not going to want to do it.  And I don't blame them.
16        So let's make it clear and let's not leave
17  it unclear.  It's not enough -- there is a concern about
18  this.  It was brought to me, and it got to be a larger
19  concern whenever I heard comments from the committee,
20  which was:  Well, maybe.  Maybe.
21        This is going to be a problem.  And I ask
22  you, if it's not required and that is not your intention
23  to leave this open, then there is no reason not to have
24  this amendment, other than some surreptitious thought
25  that perhaps we will want to do this later.  Either that
0092
1  or just -- substantively, if that's your intention, this
2  is all that this does, is say that you don't have to do
3  it.
4        THE CHAIRMAN:  Representative Murray.
5        REPRESENTATIVE MURRAY:  Thank you,
6  Mr. Chair.
7        Yes, in committee, it was very clear to
8  me, whenever we were looking at this amendment or one

9   similar to it, that the opposition said:  No, we want
10  everyone to do this background check.  So I'm amazed to
11  hear that nothing in the bill requires someone to
12  perform these background checks when they have not been
13  responsible for the sale of the firearm.
14          So if that is true, I would agree with
15  Representative Gardner, that everyone should fully
16  support this, because this is an important understanding
17  that we need to have for this bill.
18          I urge an aye vote on this amendment.
19          THE CHAIRMAN:  Representative Salazar.
20          REPRESENTATIVE SALAZAR:  Thank you,
21  Mr. Chair.
22          So I guess we could dance and prance as
23  much as we want instead of actually getting to the vote
24  on this bill.  But, Representative Gardner, on page 3,
25  line 15 through 17, it says:  A prospective firearms
0093
1   transferor who is not a licensed gun dealer shall
2   arrange for a licensed gun dealer to obtain the
3   background check required by this section.
4           That meaning that a prospective firearm
5   transferor will go to somebody who is willing to do it.
6   It doesn't mean that they go to somebody and they're
7   required to do it.  It says that they can arrange for
8   it.  This amendment is unnecessary because there is
9   nothing in the language of this bill that requires a
10  licensed gun dealer to say, "Oh, you've come to me, so
11  now I must do it."  There's nothing in here for that.
12          Let's move on.  Let's vote on this thing.
13          THE CHAIRMAN:  Representative Gardner.
14          REPRESENTATIVE GARDNER:  Well, yes, thank
15  you, Representative Salazar.  And I didn't think that
16  this was prancing and dancing to avoid voting on the
17  bill.  This was a serious amendment brought in
18  judiciary, and it's a serious amendment brought here.
19  It became even more serious in terms of its need when,
20  in fact, as Representative Murray attested to and
21  supports, we heard members of the committee actually
22  indicate that it was their belief that, yes, indeed,
23  these gun dealers might well be required to do this.
24  These gun dealers ought to be doing this, and they --
25  this was a duty.
0094
1           Now, Representative Salazar, with due
2   respect, I would have initially read this the way you
3   did, but I had -- I had constituents who were FFLs who
4   were concerned, and I brought the amendment.  I said:
5   Really?  You think?  And they said:  You know, the way
6   this is going and the way it seems and our small FFLs,
7   this is a problem.  So I offered it.  I offered it, and
8   I found out that they were right.  They were right.
9   There are those members of this body who hold the view
10  that that's what we're doing.

LEG HX 000655

4570

11      And when that's the case, it's simple
12  enough -- it's simple enough, Representative Salazar, we
13  can get right to voting on this bill, after we answer my
14  other questions that didn't get answered in committee,
15  we can get right to that.  We can pass this amendment,
16  and we can move on.
17      So I ask for an aye vote.
18      THE CHAIRMAN:  Representative Salazar.
19      REPRESENTATIVE SALAZAR:  Thank you,
20  Mr. Chair.
21      And, Representative Gardner, I hear what
22  you're saying about your constituents, I really do, that
23  there's some concern about this bill.  If it said in
24  there that a prospective firearms transferor who is not
25  a licensed gun dealer shall arrange for a licensed gun
0095
1  dealer to obtain the background check required by this
2  section, and the licensed gun dealer must perform the
3  background check, well, then, I think that people would
4  definitely want to take a look at your amendment.  But
5  it doesn't say that.
6      It just says that it will arrange for a
7  licensed gun dealer, which means that they're going to
8  go to somebody who will say, Yeah, you know what?  I
9  don't want to do that.  Go to somebody else.  And
10  they'll go do it with somebody else.  And they will
11  eventually find somebody who will actually perform the
12  background check.
13      There's nothing in here that creates a
14  duty for a licensed gun dealer to do the background
15  check.  You're reading much too much into this
16  amendment -- into this bill.  I appreciate your concern,
17  but you know that that doesn't say that.
18      THE CHAIRMAN:  Representative Murray.
19      REPRESENTATIVE MURRAY:  Thank you,
20  Mr. Chair.
21      Then, Representative Salazar, why don't
22  you support the amendment?  If you agree with the
23  thinking that's contained in the amendment, why are you
24  disagreeing?  Now you're walking away because you're not
25  wanting to support this amendment, and yet you're saying
0096
1  that you agree with what it says.  So you either agree
2  with what it says and support it or you say, Well, no,
3  we would rather leave it vague so that, at some point,
4  we can say to these gun dealers:  You have to do it.
5      Why leave it vague?
6      THE CHAIRMAN:  Representative Holbert.
7      REPRESENTATIVE HOLBERT:  Thank you,
8  Mr. Chairman.
9      Members, I support this amendment, and I
10  believe that it is true, that there's nothing in this
11  bill that compels the dealer to do this, but let's make
12  that clear.

LEG HX 000656      4571

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

13  I equate this to automobile dealers. And
14  having, back in the '80s, worked at a dealership, people
15  would come in often and say, "Appraise my car. You're a
16  car dealer. Appraise my car." And car dealers are
17  compelled to offer that service for free, and they can
18  choose to do it. But there's an expectation among the
19  public that a dealer would do that.
20         And I'm concerned with these background
21  checks that we effectively change the role of that
22  licensed firearm dealer from a private company that
23  makes its own decisions as to what services it will or
24  will not offer and the products that it carries to an
25  expectation that the public would come in and say, "I'm
0097
1  required to do this; so, therefore, you are required to
2  do this business with me."
3         I think that, with this amendment, we
4  allow firearm dealers in Colorado to make that decision
5  for themselves. If, for some reason, they don't want to
6  be involved in private transfers -- for instance, maybe
7  they don't want to have any liability associated with
8  something that could go wrong with the item or the
9  people, the individuals, because we're doing a
10  background check on the purchaser; we're not doing a
11  background check on the seller. And maybe there's
12  something wrong in that transaction and all of a sudden
13  that retailer, that firearms dealer, is caught in a
14  lawsuit.
15         I can certainly understand why the gun
16  shop in Parker might say: We don't want to be involved
17  in that, or we at least want to be able to refuse
18  business when we think it's right for us to do this.
19  And with this amendment, that could happen. But without
20  this amendment, I think that Representative Gardner has
21  hit on a factual concern.
22         I don't see any political motivation. I
23  don't see this as any sort of poison pill. I don't see
24  this as any sort of sabotage to the bill. If the
25  problem isn't in the bill, then there's no problem with
0098
1  this amendment, and I urge you to please vote for L.009.
2         THE CHAIRMAN: Representative Lawrence.
3         REPRESENTATIVE LAWRENCE: Thank you,
4  Mr. Chair.
5         I, too, rise in support of this amendment.
6  I've been approached by several small FFL dealers who
7  are one-man operations. They work out of their home.
8  They don't want people they don't know knocking on their
9  door saying, "Hey, you need to run a background check so
10  that I can sell this gun." That's intrusive on their
11  private life.
12         They have this -- they have their FFL
13  designation, but not because they're selling guns. They
14  might be collecting. They might be sampling. It might

15  just be for their own personal use.  And they don't run
16  these background checks.  And they have told me -- I've
17  been contacted by many -- they do not want people
18  knocking on their door because this law says that it has
19  to be a licensed dealer who's going to run this
20  background check.
21           So I would ask you to please support this
22  amendment.
23           THE CHAIRMAN:  Is there any further
24  discussion on Amendment L.009?
25           A division has been called for.  Would any
0099
1  who are not permitted in the chamber, please take their
2  seats.
3           (Inaudible discussion.)
4           THE CHAIRMAN:  The question is the
5  adoption of Amendment L.009 to House Bill 1229.  A
6  division has been requested of all those in chamber not
7  entitled to vote.  Please be seated.
8           All those in favor of L.009 please stand
9  and remain standing in one place until the count is
10  taken.
11           You may be seated.
12           All those opposed please stand and remain
13  standing in one place until the count is taken.
14           You may be seated.
15           The amendment is lost.
16           Representative Gardner to the bill.
17           REPRESENTATIVE GARDNER:  Thank you,
18  Mr. Chair.
19           Well, Members, if you recall, before we
20  dealt with the amendment, we were talking about the
21  various provisions of the bill about which there were
22  many questions.  One that did not really get discussed
23  as it should have been during committee is on page 4,
24  lines 22 through 25.
25           Says a person who transfers a firearm in
0100
1  violation of the provisions of this section may be
2  jointly and severally liable for any civil damages
3  proximally caused by the transferee's subsequent use of
4  the firearm.
5           So here's the problem:  I'm sure -- I
6  don't want to assume too much, but I think it's kind of
7  safe to assume that the proponents of the bill think
8  that if you illegally transfer a firearm, it's nothing
9  but right that you be jointly and severally liable for
10  anything that happens thereafter.  But, you know, it's
11  not as if every one of these transfers is going to be
12  because of a really bad actor.
13           The really bad actors, as Representative
14  Waller talked about earlier today, the really bad actors
15  are going to do these transfers on the street corner in
16  exchange for drugs.  And, by the way, they're not going

17  to have a lot of assets in the bank to be jointly and
18  severally liable against.
19        But if someone loans a firearm and they
20  don't exactly meet one of these exceptions -- and we're
21  not even talking about prosecutions now.  We're talking
22  about somebody who has -- who loans a firearm and
23  they're not exactly within these exceptions, and there's
24  a hunting accident or a shooting accident -- there are
25  accidents in that activity like there are in rock
0101
1  climbing, in motorcycling, and almost any other
2  activity -- there's an accident.  Guess what?  The
3  person who loaned that firearm and loaned it before the
4  person borrowing it went hunting, instead of going
5  hunting with them -- that person is going to be jointly
6  and severally liable for anything that happens after
7  that.
8        And by the way, I think a pretty good
9  trial lawyer -- and there are many -- would have a
10  pretty good time saying:  Well, you violated the statute
11  when you loaned that firearm to your neighbor.  And in
12  the skeet shooting, somebody got injured.  And now
13  you're jointly and severally liable.
14        And I don't really have a question about
15  this.  I don't have a question about this because this
16  is a fact.
17        And if the sponsors want to come and
18  disagree with me, I welcome them doing so, but I can
19  tell you that I can make that case and I could write
20  that pleading right now.  I could write that pleading
21  for that case in between my colleagues coming and asking
22  other questions and having it displayed as an exhibit
23  here because it wouldn't take me but about half an hour.
24        So we're going to expose innocent
25  citizens, those who do something as a favor for a
0102
1  friend, to a liability for something over which they had
2  no control.
3        Now, Members, one of the things that I
4  find most objectionable in discussion of this bill --
5  and people can describe things however they wish; they
6  can use whatever language they would like to to
7  characterize things -- but one of the things I find most
8  objectionable is the notion that this bill is to close a
9  loophole.  We've got a loophole in the law.  There's a
10  loophole.  A loophole is somehow a nefarious,
11  underhanded, tricky, devious thing.
12        There's not a loophole in the law
13  presently, Colleagues.  There was a public policy
14  judgment made by the people of Colorado and those
15  running a ballot issue to ask the people to require
16  background checks at gunshows, but not for private
17  transfers, because they most surely could have done so.
18  And subsequent legislators most surely could have

19  required this.
20      This is not a loophole.  What people are
21  doing today when they loan a firearm to a neighbor, when
22  they have a private sale, they are following the law.
23  They are obeying the law.
24      What we are discussing is whether or not
25  we're going to change the law of Colorado, not somehow
0103
1  close some inadvertent exception that the people or
2  prior legislators didn't make a public policy judgment
3  was going to be the law.  It's not like:  Oh, my
4  goodness, when this ballot issue for gunshow background
5  checks went up, those people just didn't think about it,
6  they just weren't that smart, it just got by them.
7  Well, subsequent legislators aren't as smart as all of
8  us and just couldn't figure it out.  And, oh, my
9  goodness, they woke up the next day and they said:  Oh,
10  we forgot all about private transfers.
11      No, Members, this represents a public
12  policy judgment.  And you say:  Well, why would they do
13  such a thing?  And the proponents of this bill say:
14  Well, there's all this gun violence.  And I recognize
15  there have been horrific events, and that even more to
16  the point, there are 30,000 gun-related deaths in the
17  United States every year, and that many on our highways
18  and all sorts of accidental deaths, and on and on.
19      So why did we have this public policy that
20  we would not require background checks for private
21  transfers?  Well, I suggest to you that it was
22  intrusive, it was unworkable, it was unenforceable, and
23  it really didn't get to the problem.
24      Let me show you what I mean by unworkable.
25  On page 5, we start the exceptions.  Actually, at the
0104
1  bottom of page 4.  The provisions of this section do not
2  apply to a transfer of an antique firearm as defined by
3  18 USC 921(a)(16), as amended, or a curio or relic as
4  defined by 27 CFR 478.11, as amended.  I'm not even
5  going to go down that road this evening, to have 18 USC
6  921(a)(16) displayed on the board and discuss the finer
7  points of what is an antique firearm or a curio or a
8  relic under 27 Code of Federal Regulations 478.11, as
9  amended, although that might be fun.
10      Suffice it to say that someone who has one
11  of those weapons is probably going to need a law degree
12  to find those and figure that out.
13      The next exception, except as prohibited
14  by Section 18-12-111 -- that's of the CRS -- a transfer
15  that is a bona fide gift between immediate family
16  members, which are limited to spouses, children,
17  siblings, grandparents, and grandchildren.
18      So the first example:  You have a fiancee.
19  She lives in an apartment building where there have been
20  some problems.  You'd like to loan her a firearm.  And,

21 by the way, since you regulated no target shooting
22 together under the other exception here, and you never,
23 never loan that weapon to her except when you're out on
24 the range, because you wouldn't want to violate the
25 law -- guess what? You can't loan that weapon to your
0105
1 fiancee. That seems absurd.
2         Your father-in-law who considers you just
3 like one of his own wants to give you a weapon for
4 Christmas. Can't do that. Got to have a background
5 check. Don't be wrapping up that bow on Christmas.
6 Don't be opening that package on Christmas Day.
7         That's absurd, Members. That's why this
8 hasn't been the law of the state of Colorado. This is
9 not a loophole. This was bad public policy.
10        It has to be a bona fide gift. You know,
11 I asked Director Sloan during the testimony on this, I
12 said, Well, you know, my brother -- and not withstanding
13 the fact my brother lives in Texas -- let's assume he
14 got tired of the August heat and came to Colorado with
15 his gun collection -- if he gives me one of his Colt
16 revolvers, that's okay. If I swap him, if you will,
17 trade him my 9 millimeter for one of the Colt revolvers,
18 we better do a background check, because that isn't a
19 bona fide gift. That's called an exchange. That's
20 called a sale, in fact.
21        Oh, and, by the way, the State of Colorado
22 would like to have sales tax on that, once they value
23 the weapon, but we won't go down that rabbit trail.
24        Now, some of you were raised in blended
25 families, I would expect. So you may have a stepbrother
0106
1 or a stepson or stepdaughter, and you might want to give
2 them a weapon, or, you know, your parent that raised you
3 both passes away and there's nothing in the will --
4 we'll get to operation of the law later and discuss that
5 in some detail, what operation of law means, because I
6 know inquiring minds wish to know, because we are voting
7 on this and we ought to understand what we are voting
8 on. But, you know, this doesn't allow you to make a
9 gift to your stepbrother or your stepparent. It doesn't
10 allow your uncle, on his death bed or in his last
11 illness, to call you over to the house and say, "You
12 know, there's something I really want you to have."
13        And, oh, by the way, if you accidentally
14 hurt yourself with a weapon later, he would be jointly
15 and severally liable. And if he passed away, you could
16 go after his estate. And I think, if I can stand down
17 here and do that, I think some smart trial lawyer can
18 figure that one out as well.
19        Something else you can't do under this
20 exception -- you've got to make a complete gift. So you
21 can't loan your brother or your sister a weapon. Now,
22 you could say, "Well, is the law going to do that? Are

23  they going to go after that?
24         You know what?  We make assumptions here
25  all the time that people are honest and tell the truth.
0107
1   And I like to believe that.  So if that person is honest
2   and tells the truth and says, "No, it wasn't a gift; I
3   loaned it to them" -- you should have had a background
4   check.
5          Now, I don't know if these were intended;
6   I don't know if all of these very common hypothetical
7   but real fact patterns were intended.  I kind of think
8   they were.  I mean, I kind of think that these
9   exceptions were intended to be window dressing, not very
10  broad.  We've got to have them.  We've got to have them
11  because people say, "You mean, I can't -- I can't give
12  my son a .22 rifle for Christmas without doing a
13  background check?"
14         Well, let's go to the next exception, C,
15  on page 5.  A transfer that occurs by operation of law
16  or because of the death of a person for whom the
17  prospective transferor is an executor or an
18  administrator of an estate or a trustee of a trust
19  created in a will.
20         Well, setting aside that the uniform
21  probate code refers to personal representatives and not
22  executors anymore -- so I'm kind of wondering about why
23  we're using the word "executive" -- or "executor" --
24  this seems like it ought to take care of Representative
25  Gerou's situation, but it doesn't.  You know, if my mom
0108
1   has my dad's -- really, my grandfather's rifle, and she
2   wants to make a gift of it to me, but it's not really
3   hers because my brother, who is the personal
4   representative, and is fully cognizant and aware of what
5   she's doing, is the personal representative or executor,
6   then my mom will have violated the law, because she
7   didn't -- she's not one of these people.
8          Oh, then we get to temporary transfers
9   that occur while in the home of the unlicensed
10  transferee.  So don't -- don't invite someone to your
11  home to hold and use and sort of enjoy handling and
12  understanding about that weapon, because that's not the
13  home of the unlicensed transferee.  That's the home of
14  the transferor.  And, besides, the unlicensed transferee
15  has to reasonably believe that the possession of the
16  firearm is necessary to prevent imminent death or
17  serious bodily injury to the unlicensed transferee.
18         Well, so I should be able to loan my
19  single personal -- or administrative assistant a
20  firearm, if she lives alone and she's had some problem?
21  Well, no.  No.  She has to call me whenever the person
22  is at her door.  And then I can rush over because then
23  she's in imminent bodily danger, et cetera.  This is not
24  very broad either.

LEG HX 000662  4577

0109
1  how it works, Members, because the transfer has to be
2  temporary and has to occur in the home of the unlicensed
3  transferee.  So if you're in my home and somebody is
4  breaking in, I can't hand you a weapon, even though
5  maybe I'm lying in bed with a broken leg, because that's
6  my home, not your home.  And, of course, if you shoot
7  somebody who's trying to break in, even though "Make My
8  Day" might save you -- I don't know -- you might be
9  jointly and severally liable because I couldn't transfer
10  to you.
11          And so the bad guy gets to sue you.  And
12  if you think that doesn't happen, I read the newspapers
13  as well as any of you, and you know it does.
14          We talked earlier about transfers that
15  take place when someone goes target shooting and so
16  forth.  It wouldn't be okay for the scout leader to
17  borrow some weapons or have those 16-year-old Explorer
18  scouts borrow a weapon and take it with them as you go
19  out for supervised target shooting.  Everybody who loans
20  that weapon has to take it with them.
21          Now, these exceptions, they only work a
22  little bit, and they only work on their circumstances
23  and their facts.  And if you don't get them right, you
24  commit a Class 1 misdemeanor and you shall be punished.
25  And you won't be able to possess a firearm for two years
0110
1  beginning on the date of your conviction.  And, of
2  course, you can't possess a firearm while you're under
3  charges, so give yourself another six months.
4          Members, as I said yesterday, you can
5  choose to trivialize my argument, if you wish.  That may
6  be the easiest thing for you to do.  But the fact of the
7  matter is, those are not far-fetched examples that I
8  use.  We all have blended families, many of us.  It's
9  very common.  We couldn't transfer to a stepbrother or
10  stepsister, a stepparent, a stepchild, half-inlaw.  We
11  couldn't loan the weapon for legitimate purposes.  We
12  would have to go along.
13          So Representative Lawrence, who was
14  planning on going target shooting tonight with her
15  family, couldn't loan that weapon because she's stuck on
16  the floor of the house.  My point about that is things
17  happen in life.
18          Members, this is -- with respect, I truly
19  believe the sponsors are well intended and believe that
20  this bill is good public policy.  I sincerely respect
21  and believe that that is their belief.  But what this
22  bill is is ill-considered public policy.  It is -- the
23  exceptions are ill-considered.
24          The idea that FFLs are going to want to
25  deal with every one of these private transfers for $10
0111

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

1  is ill-considered. I think it's going to expose them to
2  a regulatory finding that if they're a regulated dealer
3  in Colorado, they have to do this.  Why do I think that?
4  Because the sponsors are unwilling to have a very simple
5  amendment that says they don't have to.  And I scratch
6  my head and I say, Why is that?  Why is that?  It's
7  pretty simple.  It doesn't change what they intended.
8  They tell me they didn't intend that, but they won't do
9  it.
10           And then I begin to wonder if really we're
11  not on our way to a whole system of firearm registry,
12  because the way to enforce is to create the system and
13  require the background check and require the dealers to
14  do it.
15           And so I hope, during your evening dinner
16  hour, as we've discussed this bill, you may have had a
17  moment to consider that the exceptions are not nearly
18  broad enough, that the utility of the bill, when you
19  think about the fact that really bad actors don't get
20  background checks; they just trade guns for drugs on the
21  street corner, that this will be an imposition, it will
22  be a prior restraint upon law-abiding citizens with no
23  correlative gain in public safety.  And so I ask for a
24  no vote.
25           THE CHAIRMAN:  Representative Saine.
0112
1           REPRESENTATIVE SAINE:  Thank you,
2  Mr. Chair.
3           Colleagues, Representative McCann, if
4  you're here, I had the privilege of talking to some
5  members over at Fein (phonetic) Colorado Law
6  Enforcement.  And they have some concerns that if 1229
7  would pass in conjunction with a bill that, say,
8  redefines an unloaded gun is a deadly weapon, and these
9  members made a routine traffic stop or a potential
10  domestic violence call because some neighbors called 911
11  because some other neighbors had their voices raised a
12  little too loud, and a cell phone was thrown and
13  destroyed.  And while investigating this, the officer or
14  sheriff sees a 30-round magazine and an unloaded weapon
15  in the home -- and, nowadays, a domestic violence call,
16  police must arrest both the parties in a dispute.  And
17  an unloaded weapon and a magazine gives reasonable
18  suspicion, so the gun is confiscated.
19           So the owner, male or female, even after a
20  favorable adjudication, which is often the case, must
21  now go to a court of law to prove they have obtained the
22  weapon legally.
23           Law enforcement tells me the only way to
24  mitigate the backlog this would create or for the owner
25  to avoid costly court fees would be to have a gun
0113
1  registration program.
2           So Representative McCann or Representative

4579

3    Fields, if she would be available to answer a couple
4    questions -- I have two -- are the consequences rendered
5    by this bill intended to pave the way for gun
6    registration, or is it really intended for a gun buyback
7    program without the buyback?  Or, my second question is,
8    is this an unintended consequence rendered by this bill?
9         THE CHAIRMAN:  Is there any further
10   discussion?
11        REPRESENTATIVE SAINE:  I need an answer
12   from the sponsors, if I could, Mr. Chair.
13        THE CHAIRMAN:  They need not.
14        Is there any further discussion?
15        Representative Szabo.
16        REPRESENTATIVE SZABO:  Thank you,
17   Mr. Chair.
18        We've spent many hours debating 1229 and
19   the bill before it.  And I would like to just bring it
20   back to the original assertion.  And that is, if we can
21   just save one life.  Well, you know, that's been the
22   talk this week, about one life.  There was a bill
23   brought last Wednesday that can save many lives.  It was
24   Jessica's Law.  But it was sent immediately to the kill
25   committee.  Are we really worried about saving one life,
0114
1    or are we not?
2         THE CHAIRMAN:  To the bill.
3         REPRESENTATIVE SZABO:  I want to know, are
4    we really willing to talk about the true issue, to save
5    one life?  These gun violence issues are not the only
6    way we can save one life.  And Jessica's Law was a way
7    we can save many lives.
8         THE CHAIRMAN:  Representative Szabo, would
9    you talk to the bill, about the background.
10        REPRESENTATIVE SZABO:  Thank you,
11   Mr. Chair.
12        THE CHAIRMAN:  Representative Saine.
13        REPRESENTATIVE SAINE:  Thank you,
14   Mr. Chair.
15        I have a rationale for some of the
16   questions I asked earlier.  And one is, in The Denver
17   Post, it says the CBI is facing questions over its
18   inability to meet the three-day federal background
19   check.  It also has an appeals process where they
20   received 300 -- 3,814 and reversed 2,183, reversed.  And
21   that takes some time.
22        There was a discussion earlier about
23   women, and do more guns really solve any problems?
24   Well, it's been proven nationwide that women, in an
25   assault situation, are much more likely to be hurt
0115
1    without a firearm.  They are smaller than the man is.
2    If those women were armed, maybe so many of them
3    wouldn't be killed by a domestic partner.
4         And if -- again, I ask, is this bill

5  paving the way for gun registration?  And if it is, or
6  if it isn't, with the CBI process in place, those women
7  who may be arrested even for throwing a cell phone are
8  entered into the criminal justice system and can't
9  obtain a weapon because they're in that system.  They go
10  back home to the situation and they are defenseless.
11          I have some real questions about this
12  bill.  I do not believe this is going to save lives, but
13  may endanger more women in domestic violence situations.
14  Thank you.
15          THE CHAIRMAN:  Representative Moreno.
16          REPRESENTATIVE MORENO:  Thank you,
17  Mr. Chair.
18          Members, I wasn't planning to come to the
19  well today on this bill, but I would just like to point
20  out that I do have cupcakes.  Now that you've all had
21  your dinner, please stop by my office -- my desk.  We
22  have birthday cupcakes in honor of my birthday this
23  weekend.  It is a passionate debate, but I would
24  encourage you not to use your cupcake as a deadly
25  weapon.
0116
1          So thank you, Members, and feel free to
2  come grab a cupcake.
3          THE CHAIRMAN:  Representative Scott.
4          REPRESENTATIVE SCOTT:  Thank you,
5  Mr. Chair, and happy birthday, Representative Moreno.
6  No capitol choir for you, buddy.
7          I do have a clarification that I would ask
8  for from my little sponsor or one of the proponents of
9  the bill.
10          On page 5, lines 21 through 23, when it
11  talks in respect to gun ranges, I would like some help
12  understanding real quickly -- it says, basically, at a
13  shooting range located in or on premises owned or
14  occupied by a duly incorporated organization organized
15  for conservation purposes or to foster proficiency in
16  firearms.  I have no idea what the conservation purpose
17  of a firing range is.  I'm hoping that one of the
18  proponents of the bill can maybe answer that for me.
19          THE CHAIRMAN:  Is there any further
20  discussion?  Is there any further discussion on House
21  Bill 1229?
22          Seeing none, the question before us is --
23  Representative Priola, under the wire.
24          REPRESENTATIVE PRIOLA:  Thank you,
25  Mr. Chair.  And, Members, I am back here to give some of
0117
1  my other questions a shot for the sponsors.  Let me find
2  my notes.
3          And in the time between that, actually
4  another question came to mind.  What if you're out
5  hiking with your buddy or your family and you find a
6  firearm?  This bill, as far as I can tell, doesn't

7     address anything about time period.  As soon as you pick
8     up that firearm, you are technically breaking the law.
9     It might take you a day or two to get back to your
10    vehicle.  It might take you a couple days to get into
11    town to actually find someone to run a background check
12    on yourself for a firearm that you found, because it
13    fell out of someone's rucksack up in the mountains or
14    so.
15            So I would really like to have that
16    component of the bill addressed as well as my previous
17    questions, but I really don't think it's going to get
18    addressed because the sponsors are not here.  I don't
19    know where they're at.
20            Actually, one is right back there.
21    Representative McCann.
22            UNIDENTIFIED SPEAKER:  They're talking to
23    Joe Biden.
24            REPRESENTATIVE PRIOLA:  They're talking to
25    Joe Biden, okay.
0118
1             Representative McCann?
2             I saw Representative Fields leave out the
3     back.
4             I would really appreciate having that
5     question and others addressed.
6             THE CHAIRMAN:  Is there any further
7     discussion?
8             Seeing none, the question before us is the
9     passage of House Bill 1229.  All in favor say aye.
10            UNIDENTIFIED SPEAKERS:  Aye.
11            THE CHAIRMAN:  Those opposed, no.
12            UNIDENTIFIED SPEAKERS:  No.
13            THE CHAIRMAN:  House Bill 1229 passes.
14            (WHEREUPON, the audio recording was
15    concluded.)
16
17
18
19
20
21
22
23
24
25
0119
1                   CERTIFICATE
2     STATE OF COLORADO         )
                          )ss.
3     CITY AND COUNTY OF DENVER  )
4             I, Jana Mackelprang, Certified Realtime
5     Reporter, Registered Professional Reporter, and Notary
6     Public for the State of Colorado, do hereby certify
7     that this transcript was taken in shorthand by me from

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021513.txt[11/12/2013 10:57:45 AM]

8  an audio recording and was reduced to typewritten form
9  by computer-aided transcription; that the speakers in
10  this transcript were identified by me to the best of
11  my ability and according to the introductions made and
12  the information provided; that the foregoing is a true
13  transcript of the conversations; that I am not an
14  attorney nor counsel nor in any way connected with any
15  attorney or counsel for any of the parties to said
16  action or otherwise interested in its event.
17          IN WITNESS WHEREOF, I hereunto affix my
18  hand and notarial seal this 27th day of June, 2013.  My
19  commission expires January 24, 2016.
20
21          _____
           Jana Mackelprang
22           CRR, RPR, Notary Public
           Calderwood-Mackelprang, Inc.
23
24
25

LEG HX 000668    4583

0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  Judicial Committee Meeting
4  Held on February 18, 2013
5  HOUSE BILL 13-1229
6  --------------------------------------------------------
7  REPORTER'S TRANSCRIPT
8  --------------------------------------------------------
9
10       This transcript was taken from an audio
11  recording by Elissa Steen, Registered Professional
12  Reporter and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
1        P R O C E E D I N G S
2        *   *   *   *   *
3        THE CLERK:  -- Representatives
4  Fields and McCann, also Senator Carroll,
5  concerning criminal background checks
6  performed pursuant to the transfer of
7  firearms, in connection there with making an
8  appropriation.
9        SPEAKER OF THE HOUSE: Representative
10  Fields.
11        REPRESENTATIVE FIELDS:  Mr. Speaker,
12  I move House Bill 1229 on third reading and
13  final passage.
14        SPEAKER OF THE HOUSE:  Is there any
15  discussion?
16        Representative Gardner.
17        REPRESENTATIVE GARDNER:  Thank you,
18  Mr. Speaker.
19        Members, colleagues, by the time we
20  reach our third reading vote on a bill,
21  there's seldom, if anything, to be said that
22  might change any member's vote.  That clearly
23  is the case this morning.
24        And so, as I speak to you, this
25  principal audience from my remarks are not
0003

1  those of you in this chamber, but rather the
2  citizens of Colorado, thousands of whom have
3  communicated with all of us over the past
4  several days.  In fact, more than on any
5  issue that I have received in seven sessions.
6  And overwhelmingly those voices have been in
7  opposition to these bills.  And some of these
8  may -- in fact did -- take me to task for not
9  having compelled others of you to vote no on
10  these bills.
11        The e-mails, letters, phone calls
12  cited various facts and arguments against
13  this and the other bills.
14        But citizens, Coloradans, as you
15  watch these votes this morning, you should
16  understand very clearly, those facts do not
17  matter.  Those arguments have little
18  persuasive power, because the underlying fact
19  is that there are, when we face a bill of
20  this sort and its companions, two basic world
21  views that are in competition.
22        Now, one could write a whole
23  doctoral thesis on the differences and the
24  sociological reasons why one may hold those
25  world views, but for the moment, suffice it
0004
1  to say, and I will say, as evenly as I
2  possibly can, that with respect to these
3  bills, the one view is that greater
4  government control -- greater government
5  control of firearms -- will be both
6  successful and make us safer and more secure,
7  and that any loss or infringement of rights
8  or liberty is offset by that security.
9        The other view, held by myself and
10  others, is that greater gun control will not
11  promote public safety, but rather make us
12  less safe, less secure, and most assuredly
13  less free.
14        Once you subscribe to one view or
15  the other, facts can be disputed.  Competing
16  facts are easily presented.  Arguments made,
17  arguments dismissed, all based on one's world
18  view.
19        And perhaps a member of the other
20  side of the aisle will come to you, even on a
21  Friday evening late, and say you were very
22  compelling.  And I might say, And it changed
23  your vote?  And the answer would be, Well, of
24  course not, but you were compelling, because
25  there are two competing world views on this
0005
1  issue.
2        So people of Colorado, citizens,

3   there is only one debate and one argument
4   that has mattered on this bill and its
5   companions.  That debate was done and
6   complete on November 6, 2012.  Now, the facts
7   do not matter, and the politics are very
8   simple.
9         Coloradans, I want to speak to you,
10  each of you, as personally as I can from this
11  chamber and in this venue.  Citizen, if you
12  voted for one set of candidates on that
13  election day, you effectively voted to
14  support these bills --
15        SPEAKER OF THE HOUSE:
16  Representative Gardner, can you keep to the
17  topic of the bills?
18        REPRESENTATIVE GARDNER:  Indeed,
19  Mr. Speaker.  And if my argument is too
20  subtle, I apologize, because this is on the
21  bills and why these bills are being voted on
22  as they are and will have the outcome that
23  they do.
24        Notwithstanding any small numbers of
25  the majority party that may vote against one
0006
1   or all of these bills, it is the world view
2   that controls the vote of these bills.  One
3   being that greater control of firearms by
4   government, and even perhaps in the future
5   registration of weapons, for which this bill
6   and the others set this stage, that greater
7   control, greater public supervision, greater
8   government supervision, is not only
9   necessary, but it is the right thing to do
10  for our citizens.  And if you voted
11  otherwise, then you voted in opposition to
12  these bills, citizen.
13        But, there were not enough.  Not
14  enough of you, not enough of us here in this
15  chamber, and not enough, I believe,
16  understanding of what is at stake here, for
17  it is nothing less at stake on this bill and
18  the others than our liberty.
19        Our founders knew that the majority
20  was not always right.  The Bill of Rights was
21  written and adopted to prevent the tyranny of
22  the majority.  And the Second Amendment, no
23  less than the First or the Fourth or the
24  Fifth, was adopted to protect the safety and
25  security of those who find themselves in the
0007
1   minority of opinion.
2         This bill and the others are no less
3   a part of that greater debate, that battle
4   between those competing world views.  This

4586

5   right is no less than the right of free
6   speech, or the right of privacy in one's
7   home, or the safety and security of one's
8   person and effects.
9           It is the question of the power of
10  government versus the power -- the
11  individual.  And I know not what end, if any,
12  that larger debate may reach, as it seems to
13  be so stark in our country today.
14          I know that however well-intentioned
15  -- I do indeed believe that the sponsor and
16  those voting for this bill are
17  well-intentioned -- but no matter how
18  well-intentioned, this bill is an
19  infringement.  A court may call it a
20  reasonable infringement.  A court may call it
21  a necessary infringement.  A court -- and
22  courts can be wrong, as you well know -- may
23  say that it's an infringement that can be
24  done, but it is, nevertheless, an
25  infringement, and it will bring less safety,
0008
1   less security, and surely less freedom.
2           And so to our colleagues in the
3   Senate who have yet to hear this bill, I
4   would ask you to consider what is at stake.
5           And to our Governor, who has
6   recognized that such bills may well bring
7   little, if any, public safety, I ask you to
8   consider the infringement and our safety and
9   our security that will be lost by that
10  infringement.
11          And, to my fellow citizens and
12  Coloradans, no matter the outcome, I ask you
13  to consider in the next and ultimate battle,
14  whether to stand with liberty and to know
15  that when you do so, you stand with our
16  founders for the rights that they understood
17  so clearly and fought for so dearly.  For
18  this bill, and each like it, places liberty
19  in opposition to the power of the state, and
20  that is what, in the larger sense, this bill
21  brings to us, the decision that we make
22  today, as we do something, do something, for
23  liberty.
24          Thank you.
25          SPEAKER OF THE HOUSE: Representative
0009
1   McCann.
2           REPRESENTATIVE McCANN:  Thank you,
3   Mr. Speaker.
4           This bill is really about a level
5   playing field for everyone who wants to
6   purchase a gun in Colorado.  We already

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021813.txt[11/12/2013 10:57:47 AM]

7  require background checks. And the reason we
8  do that is because we don't want people who
9  have felony convictions, who have domestic
10  violence convictions, who have restraining
11  orders against them to purchase guns here in
12  our state of Colorado. And this is a public
13  safety issue.
14        So -- and we know people do fail the
15  background checks. Just in January we had
16  56,000 background checks run here in
17  Colorado. Of that amount, almost a thousand
18  were denied. So background checks do prevent
19  people who shouldn't have guns from buying
20  guns.
21        All this bill is doing is saying, we
22  are not going to let someone who fails a
23  background check through a licensed firearm
24  dealer go a different route because they
25  can't legally possess a firearm. We're not
0010
1  going to let them go on the Internet and buy
2  a gun from someone out of state, from someone
3  in state. We're not going to let them buy
4  from a private seller. Because the whole
5  point of the bill -- the whole point of
6  background checks -- is to prevent people who
7  shouldn't have guns from having them.
8        And that's an argument that we have
9  heard from several of you today, about why
10  don't we do something about keeping people
11  from getting guns who shouldn't have guns.
12  Well, that's what this bill does. This bill
13  says, if you have the things that are already
14  in our law that say you should not possess a
15  gun, then you should not be able to buy a gun
16  here in Colorado.
17        During the debate on Friday, I went
18  through some of the situations where there
19  have been shootings by people who would not
20  have passed a background check under our --
21  the background check requirements here in
22  Colorado. I won't go through those again,
23  but, suffice it to say, there are several.
24        Many of these mass shootings, where
25  people who would not have passed a background
0011
1  check under this law in Colorado, were able
2  to -- to obtain guns and use them for
3  horrific crimes.
4        And the other thing that really
5  concerns me a lot, having worked with
6  domestic violence victims, is access to guns
7  by those who have restraining orders or those
8  who've been involved in domestic violence.

9       And we know that people who get into
10  emotional situations in domestic violence
11  situations often end up using a weapon
12  against their -- their loved one, their
13  partner, their spouse, and then often against
14  themselves as well.  These are people who
15  should not have access to weapons here in
16  Colorado.
17      As I mentioned before, 13 women were
18  murdered last year by those who had been in
19  relationships with them, even though they had
20  restraining orders.
21      What this bill will do is say to
22  those people you cannot purchase a weapon if
23  you have a restraining order against you or
24  if you have a domestic violence conviction.
25      It's a very, very sad situation for
0012
1  people who are living in fear every day from
2  someone that they have been in a relationship
3  with, and this bill will increase their
4  safety.
5      As I mentioned previously, I
6  find I -- I don't really understand the
7  objection to this bill because those of you
8  who have purchased your guns legally went
9  through a background check.  I don't
10  understand why you wouldn't want everyone to
11  have to go through a background check just
12  like you did so that we don't have people
13  getting these weapons who should not possess
14  them.
15      So I would ask for a yes vote on
16  this bill.  It clearly is a matter of public
17  safety.  It clearly will make our state safer
18  and will result in less death and less
19  suicide by gun here in our state of Colorado.
20      Thank you.
21      SPEAKER OF THE HOUSE: Representative
22  Gerou.
23      REPRESENTATIVE GEROU:  Thank you,
24  Mr. Speaker.
25      And I think we're all pretty clear
0013
1  about you're either one way or you're --
2  you're the other way on this bill and all the
3  bills probably today.  I don't think anybody
4  is sitting on the fence.  And -- and I'm
5  not -- I'm not going to assume that -- that I
6  can change a mind today, but I would like to
7  address what this bill means to me
8  personally.
9      Representative McCann just told us
10  that what the bill does is it creates a level

LEG HX 000674    4589

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021813.txt[11/12/2013 10:57:47 AM]

11  playing field.  And with all due respect, it
12  does not.  What it does is it completely
13  changes the playing field.
14        During the course of our debate on
15  the bill on Friday, I mentioned the fact that
16  I had received firearms from my uncle when he
17  passed away.  And -- and I was concerned
18  because had this bill been in effect when my
19  uncle passed away, I would not have been able
20  to receive those firearms without going for a
21  background check.  And a lot of people might
22  say, who cares?  I mean, so it's a background
23  check.  If you've got nothing to hide, you've
24  got nothing to be worried about.
25        I bring up again the supposition of
0014
1   this bill is that you are guilty until proven
2   innocent.  And that's not what we do in this
3   country.  That's not the way we live.  That's
4   not the way we were raised.
5         I think you've heard me say before
6   in the past that I'm -- I'm from Wyoming.  I
7   grew up in a ranching family.  I grew up with
8   four brothers.  I have two brothers that are
9   surviving.  One of my brothers that I lost
10  about -- oh gosh, I think it's probably been
11  about seven years ago -- has two sons.  And
12  it's very important to my sister-in-law,
13  their mother, that they not lose their ties
14  to our family.
15        My parents have set up a trust such
16  that when they're gone, the family ranch is
17  split evenly among the children, those
18  surviving and those not, which is pretty
19  incredible because in Wyoming girls don't
20  normally inherit.
21        I mean, there's a reason why I am so
22  stubborn, crusty and definite about
23  everything.  If you grew up with my four
24  brothers, you'd be the same way I am.  You
25  might be worse.  But I'm also grateful for
0015
1   that background because what it does is it
2   helps me come down here and make decisions.
3   Sometimes I'm on this side of the aisle;
4   sometimes I'm on that side of the aisle.
5         But as Representative Vigil so
6   eloquently put it, I believe in the same
7   thing he does:  Vote your conscience, vote
8   your district, vote your party.  And by the
9   time I get through those first two, I really
10  have a hard time deciding.  The third, the
11  party, is usually one of the last things that
12  I look at.

13        So let's talk about what this bill
14  will do.  What this bill will do is -- I am
15  struggling because I have multiple firearms
16  that my uncle gave to me.  My uncle gave them
17  to one child out of five.  And I have a --
18  two nephews:  Chris is a senior -- well,
19  he's -- he's in his last year of -- he's
20  getting his doctorate in neuroscience
21  engineering, and he's at Berkeley.
22        It's really important to Chris to
23  maintain his -- his connections to Wyoming.
24  It really is.  I mean, he doesn't live there.
25  He hasn't lived there.  He grew up in
0016
1  Colorado until they moved to Kentucky.  He
2  hasn't been in Wyoming at all, but that --
3  that heritage -- that heritage is important.
4        So if I make a transfer of the guns,
5  I can't do it in Colorado.  He was born in
6  this state.  I can't do it in Colorado
7  without a background check.  What kind of a
8  message am I sending to my nephew?  I love
9  you.  I miss your father.  He was my -- my
10  best friend.  But you can't have anything
11  that has to do with the heritage of the men
12  in your family that has to do with a firearm
13  unless you go through a background check.
14  That's what I'm telling him.
15        His younger brother, Peter, all
16  Peter wants to do is finish college and teach
17  high school.  Same thing, what am I telling
18  him?  And you might think, oh, well, she's
19  just whining, this is just family.  But you
20  know what?  This is family.  This is our
21  heritage.
22        And I know I'm not going to change
23  your minds, but what I would like you to
24  remember is that when you vote yes on this
25  bill, you're killing a part of the heritage
0017
1  of our state, and you're killing part of the
2  liberties of our state.
3        Thank you.
4        SPEAKER OF THE HOUSE:  Representative
5  Stephens.
6        REPRESENTATIVE STEPHENS:  Thank you,
7  Mr. Speaker.
8        Members, this bill and its companion
9  bill, as I think in our second reading
10  debates and now today, we kept talking about
11  what does this really do?
12        I understand Representative McCann's
13  concern and certainly understand that through
14  this people that would -- that have domestic

15 violence records are now on some level -- the
16 belief is that they be identified; however,
17 I'm of the belief that -- and we have seen
18 that when evil's intent on doing evil, evil
19 wins.
20      But what concerns me most -- and I
21 know some have said, Well, this creates a gun
22 registry, that this can move on to something
23 far beyond what we thought, and, you know,
24 normally I might say not so sure about that.
25      But, you know, I brought up this
0018
1 fiscal note, and I'm going to bring it up
2 again because this fiscal talks about 24
3 people to 29 people, and then we move on to
4 the part that -- that really wasn't
5 announced, and that's 56 more people on top
6 of those 24 and 29 people, for a supposed
7 system update.
8      Folks, we don't -- we don't have
9 50-something people even right now doing
10 background checks.  If this doesn't concern
11 you, I don't know what will.  I -- I -- so
12 now we'll be at somewhere between 70- to
13 80-something people.
14      And -- and because this wasn't
15 brought out in the front part of the fiscal,
16 it says, well, he might ask for it at budget
17 time.  We'll -- we'll ask for it at budget
18 time later.  The reason this is brought up is
19 because it will be.  It will be.  Mark my
20 words.  I've seen this one too many times,
21 that this absolutely will be brought up.
22      Why?  79-80 people?  Do we have that
23 many transfers?  I mean, do we have that many
24 things that will be going on to close the
25 loophole that we're going to require that
0019
1 many people?
2      Folks, I have a very big concern
3 about this and about where it goes.  And in
4 other states that -- that look and talk about
5 this, I just have to say, you know, I know
6 we're at the front edge of this, and I -- I
7 understand that.
8      And I think what's happening today
9 is historic, and I think we should be very
10 somber about it.  I think we should be very
11 somber about this and very somber about the
12 other things, the other bills coming up
13 before us.
14      But I have to say, if this isn't
15 registry and we are not doing what we should
16 do in a very quick manner -- I know we have

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021813.txt[11/12/2013 10:57:47 AM]

17  some backups here, but not for
18  80-something-plus people.  We're creating new
19  departments in and of themselves, and that to
20  me is a pause for concern.
21      So with that, I do not support House
22  Bill 1229 or any of the other four bills.
23      Thank you.
24      SPEAKER OF THE HOUSE: Representative
25  DelGrosso.
0020
1      REPRESENTATIVE DELGROSSO:  Thank
2  you, Mr. Speaker.
3      And Representative Stephens took a
4  little bit of my thunder, but I will try to
5  expand on what she was trying to hint at and
6  the fact that we brought this up the other
7  day on second reading, and we still never
8  heard how is this bill going to be enforced.
9      You can enforce the up-front gun
10  registration, when I go into the local dealer
11  or if I go to the gun -- gun -- to the gun
12  show.  But you know who owns the weapon at
13  that point, and so you can say we're
14  transferring that.
15      But if there's two guys out in the
16  woods, they're hunting, and Representative
17  Gerou has one of the guns that she inherited
18  from her uncle and she's out there with us
19  too and she shows me this awesome gun that
20  she inherited, and I was like, you know,
21  Representative Gerou, I'd really love to have
22  that.  And somehow, whether through a trade
23  or a purchase or whatever it is, I acquire
24  that weapon, but there is no -- nothing out
25  there that shows that she owns those weapons.
0021
1  And when I take possession of that, that I
2  own the weapon.
3      And so there is -- the only way this
4  bill can be enforced is through a registry.
5  You have to know who owns the weapon to be
6  able to get this fiscal note to know who's
7  breaking the law and who's transferred a
8  weapon from one person to the other.
9      So let's not kid ourselves when we
10  think that this is only black helicopter
11  stuff, that that's a registry.  That's the
12  only way this bill can be enforced.
13      I urge a no vote on House Bill 1229.
14      SPEAKER OF THE HOUSE: Representative
15  Lawrence.
16      REPRESENTATIVE LAWRENCE:  Thank you,
17  Mr. Speaker.
18      I rise in opposition to this bill

19  for numerous reasons really. I have some
20  information in front of me. There was a CDC
21  panel review, 51 studies regarding the
22  effectiveness of gun control laws. Based on
23  that review, they could not say that gun laws
24  prevented a single crime.
25       The survey included, among other
0022
 1  issues, studies of the effectiveness of gun
 2  and ammunition bans, licensing and
 3  registration laws, child access laws, and
 4  waiting periods.
 5       There was some slight evidence that
 6  a waiting period to purchase a firearm may
 7  reduce gun suicide rate in older persons,
 8  while not affecting the overall suicide rate.
 9       And again, I have to go back to what
10  Representative Stephens and Representative
11  DelGrosso brought up. If this is not gun
12  registration, how is a transfer of arms going
13  to be verified?
14       The CBI has stated that once you go
15  through a background check, that information,
16  once you are approved for that sale, that
17  information is deleted from their database in
18  24 hours. So if you're stopped by a police
19  officer and you say, I have a weapon in the
20  car, how is he going to be able to check to
21  see whether you went through a background
22  check unless this is registration?
23       And I've been told over and over
24  again by the sponsors that's not what it is,
25  but I also just heard from Representative
0023
 1  Fields that these are all incremental steps,
 2  and we're not done with this yet. That
 3  certainly gives me pause on all four of these
 4  bills.
 5       There are issues in this bill that
 6  are just unclear and unenforceable.
 7       The transfer of a family item from
 8  one generation to the next. This bill only
 9  allows for a direct transfer to direct family
10  members. Well, what about blended families,
11  aunts and uncles, cousins, nephews? I think
12  it's unreasonable to ask a member of my
13  family to go through a background check to be
14  given something that was owned by a member of
15  their own family.
16       But ultimately this law is
17  unenforceable. If, as Director Sloan of the
18  CBI stated several times, background check
19  information is deleted after 24 hours, this
20  law is unenforceable, and it is just a bad

21 law. We don't need to add layer upon layer
22 of things that are unenforceable in this
23 state.
24      I urge a no vote on this bill.
25      SPEAKER OF THE HOUSE: Representative

0024
1 Saine?
2      Representative Holbert.
3      REPRESENTATIVE HOLBERT:  Thank you,
4 Mr. Speaker.
5      Members, I rise in opposition to
6 House Bill 1229.
7      As Representative Stephens and
8 Representative Lawrence have both accurately
9 pointed out, this system cannot work without
10 some future move towards registration.  You
11 cannot account for these objects -- rifles,
12 handguns.  You can't account for them unless
13 you have some registration database.
14      And I believe Representative
15 Stephens is absolutely right, to have that
16 many people coming online, that many
17 full-time equivalents into our state payroll,
18 there's got to be something bigger.  Maybe we
19 haven't seen all the bills.  Maybe that's yet
20 to come this -- this session.  I -- I don't
21 know.  Maybe that's some time off in the
22 future, but this is designed obsolescence.
23 This is designed failure.  This bill can't
24 work.
25      It troubles me that sometimes I --
0025
1 I'm left with the impression that people who
2 have never purchased a gun, never gone
3 through that background check, are attempting
4 to regulate and modify that process.
5      This process, if this bill becomes
6 law, could provide greater protection for
7 firearms dealers because they keep the
8 documentation.  But if you've ever purchased
9 a firearm, I would be shocked to know that
10 you actually have a copy of that form that
11 you fill out or any sort of receipt that
12 shows that you actually passed that
13 background check, because it's not for your
14 security, it's not for the purchaser's
15 security, it's for the firearms dealer, that
16 they cannot conduct this transaction without
17 going through that background check.
18      So now two private citizens will
19 walk into a firearms dealer, and we had the
20 conversation on second reading as to whether
21 the firearms dealer would be required to
22 provide this service, and we were assured no,

9 here. Do you -- can you tell me what the likely
10 scenario is of this law going into effect in Colorado
11 in affecting criminals' access to high-capacity
12 magazines? Or is this just designed to make sure that
13 the law-abiding citizen is held back?
14          THE CHAIRWOMAN: Mr. Chipman.
15          MR. CHIPMAN: My prediction would be that
16 it would have a similar impact as we've seen in other
17 places. I described, and I believe the senator
18 described, what the experience was in Virginia. And
19 what I would imagine is over time, and not immediately,
20 but over a length of years you would see reductions in
21 their use and seeing them in crimes.
22          SENATOR LUNDBERG: Okay. Thank you.
23          THE CHAIRWOMAN: Thank you.
24 Senator King.
25          SENATOR KING: Thank you, Madame Chair.
0028
1          Mr. Chipman, can you tell me, do you know
2 the most popular personal safety firearm in the United
3 States?
4          THE CHAIRWOMAN: Mr. Chipman.
5          MR. CHIPMAN: No.
6          THE CHAIRWOMAN: Senator King.
7          SENATOR KING: It's a Glock 17. Do you
8 know why it has 17 in its name?
9          THE CHAIRWOMAN: Mr. Chipman.
10          MR. CHIPMAN: One thing I would ask you
11 is I don't know that that's -- what you're saying is
12 correct, I don't know that. But I will take it that
13 you believe that the Glock 17 is the most popular. And
14 I would imagine it's called a 17 because it has a
15 capacity of 17 rounds.
16          SENATOR KING: Correct.
17          THE CHAIRWOMAN: Senator King.
18          SENATOR KING: I'm done.
19          THE CHAIRWOMAN: Okay. Any other
20 questions?
21          Mr. Chipman, thank you for being here
22 today.
23          MR. CHIPMAN: Thank you.
24          THE CHAIRWOMAN: Patricia Maisch? Oh,
25 Mr. Chipman, could you sign a slip outside so that we
0029
1 know that you were here today? Thank you.
2          Welcome, Ms. Maisch. Please introduce
3 yourself and proceed with your testimony.
4          MS. MAISCH: I'm Patricia Maisch from
5 Tucson, Arizona. My sister Mickey Zay is a 40-year
6 resident of Colorado Springs, and she is here with me
7 today and stands by my word to you. We are asking you
8 to support your House Bill 1224 to limit magazine
9 capacity to 15 rounds.
10          Thank you, distinguished members of this

LEG HX 000681   4596

file:///X|/.../HB%201224%20and%201229/HB%201224/Transcripts%20of%20legislative%20history/House%20Bill%2013-1224-030413.txt[10/31/2013 2:57:31 PM]

23  but again, an amendment to clarify that was
24  defeated.
25       But that firearms dealer doesn't
0026
1  give the purchaser or the seller
2  documentation to show that that transaction
3  was conducted legally.  The firearms dealer
4  maintains that documentation for him or
5  herself, for their own protection.  So it's
6  been pointed out over and over again, if
7  you're driving down the street with a firearm
8  in your car, which, by the way, in Colorado
9  is legal, now it may not be unless you can
10  prove how you came into possession of that
11  firearm, and you can't without registration.
12       How can you tell where that handgun
13  with that serial number came from?  If you
14  can show that you bought a particular model
15  handgun, how can you prove that it's that
16  one?
17       You can't.  It is impossible.  And
18  given that impossibility, it is clear that
19  this bill is either totally misguided and the
20  people do not understand what they're doing,
21  or it's completely intentional, and it leads
22  to registration.  That's not -- that's not
23  black helicopters, as was mentioned earlier,
24  that's blatantly obvious.  And the people of
25  Colorado know it.
0027
1       Look at the e-mails that you've
2  received.  Listen to those phone messages.
3  The voters understand what we're doing here.
4       And I ask for a no vote on 1229.
5       SPEAKER OF THE HOUSE: Representative
6  Kagan.
7       REPRESENTATIVE KAGAN:  Thank you,
8  Mr. Speaker.
9       I ask, members, is there no middle
10  ground?  Is there nothing in the area of
11  public safety on which we can agree, not even
12  these modest steps?  I suggest there is.  I
13  suggest there should be.
14       This bill asks that when people
15  transfer a firearm, they should be careful.
16  They should do it with care.  They should
17  know to whom they are giving a gun.  And this
18  bill suggests is that we will all look out
19  for each other.
20       That is a modest step on which I
21  would have hoped that we could agree, because
22  I think there should be a middle ground, and
23  a middle ground is this:  Let's look out for
24  each other and make sure that we're all

25  careful for the good of all of us when we
0028
1   transfer a firearm.  Let's make sure that we
2   do not give firearms, sell firearms, transfer
3   firearms to people who none of us want to
4   have them.  Let's cover for each other.
5   Let's work together.  Let's stand together.
6           And for that reason, let's vote yes
7   on House Bill 1229.
8           SPEAKER OF THE HOUSE: Representative
9   Saine.
10          REPRESENTATIVE SAINE:  Thank you,
11  Mr. Chair.
12          Esteemed colleagues, I stand before
13  you today in opposition of this bill because
14  I do not believe this bill will prevent
15  criminals from buying guns.  It will just
16  keep criminals from buying them from a
17  certain avenue.
18          Sponsor, Representative McCann, said
19  that she didn't understand the objections to
20  bill.  So let me see if I can explain.
21          CBI has been criticized for the
22  length of time it takes over a federal
23  background check.  I'll explain a little bit
24  more on that in just a moment.
25          But I want to express that I know
0029
1   that if you hear a thousand negative stories
2   about something, it's hard to change your
3   paradigm.
4           There's been a lot of hypotheticals
5   here as far as what could happen in a certain
6   scenario without a background check.  So
7   allow me to run a few nonhypotheticals past
8   you.
9           For example, in Clearwater, Florida,
10  at 1:05 in the morning, a man started banging
11  on a patio door, beat on the family's truck,
12  and then opened that patio door.  And after
13  numerous shouted warnings to stop, to stop, a
14  single -- a 16-year-old boy fired a single
15  rifle shot, wounding the attacker.
16          Columbia, South Carolina, two gas
17  station employees had just left work after
18  midnight, and two men attempted to rob them,
19  beating them about the head and neck with a
20  shovel handle.  The male employee broke away
21  long enough to draw a handgun from his pocket
22  and shoot his attacker.
23          Detroit, Michigan, a mentally
24  disturbed man yelled that the President was
25  going to have him killed and started firing
0030

1  at people in passing cars. A man at the
2  scene had a permit to carry a concealed
3  handgun and fired shots that forced the
4  attacker to run away.
5       I'll give you just a couple more.
6       What if you had an ex-boyfriend or
7  abusive spouse that broke in your door?  What
8  do you expect those women to do while they're
9  waiting on a background check?  Throw a
10 kitchen knife?  Throw a shoe?
11      Well, let me tell you about what
12 happened in Columbia Falls, Montana.  This
13 indeed happened.  An ex-boyfriend broke into
14 a woman's home to sexually assault her.  She
15 got away long enough to get her pistol and
16 hold her attacker at gunpoint until the
17 police arrived.
18      There are 40 such stories, where
19 folks used handguns or guns or rifles
20 defensively, 40 of these stories in a
21 two-week period.
22      The two-week period was between
23 March 11-17 of 2001, and July 22-28, 2001.
24      It may shock you to know that guns
25 are actually used 1.5 to 3.4 million times a
0031
1  year, defensively used.  So why don't we hear
2  about this more often?  You don't seem to
3  hear about these stories because probably
4  nothing, you know, nothing bad happened or
5  something bad or worse was avoided.
6       There are many surveys where people
7  are asked if they were victims of a gun
8  incident.  Often that survey is a little bit
9  skewed because they're not going to answer
10 that they were victims, some of these folks.
11 They're not going to answer that they're
12 victims of a crime because simply they
13 weren't because they had a gun to defend
14 themselves and quickly.
15      Background checks would not have
16 stopped the killers at Newtown.  There were
17 three instances the week that Newtown
18 happened.  We had Newtown, we had a shooting
19 in the Clackamas Mall in Washington State,
20 and we had a theater shooting down in San
21 Antonio.
22      Consider, again, folks, that we know
23 the killers intend to die at the scene.
24 Consider that when equal force showed up, the
25 shooting stopped.  Either a concealed-carry
0032
1  weapon holder showed up, pointed his weapon,
2  and the shooter took his own life, or the

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021813.txt[11/12/2013 10:57:47 AM]

3  police showed and shot the shooter.  Killers
4  are cowards.  They're stopped only when equal
5  force shows up or the threat of equal force
6  shows up.
7       And criminals agree that they prefer
8  unarmed victims.  And this background check
9  on transfers is certain to create more
10  victims.
11      Consider this:  The wait time for a
12  background check of a woman seeking to
13  protect herself against an abusive partner;
14  an employee who switched to evening shift
15  suddenly and finds himself in a dangerous
16  situation, how long shall they wait?  How
17  long shall these women wait?
18      Or a college student who decides
19  they need to take night classes, and they
20  have to walk on campus alone, there's no call
21  boxes.  How long shall they wait?  How long
22  should they wait to defend themselves when we
23  know that only the law-abiding will abide
24  with these gun laws?  Criminals will never,
25  ever abide by these gun laws.  They will not
0033
1  be caught by background checks, and if they
2  are, they'll just simply buy them someplace
3  else.
4       I urge a no vote, colleagues.  I
5  urge a no vote on this bill.  Don't let them
6  wait.  Don't let them wait.
7       Thank you.
8       SPEAKER OF THE HOUSE:  Representative
9  Wilson.
10      REPRESENTATIVE WILSON:  Thank you,
11  Mr. Speaker.
12      It's an interesting situation I find
13  myself in.  Because of my age, I'm one of the
14  more senior members here on the floor, but
15  because of my experience, I'm a newbie.  So
16  it's a rather unique experience.
17      In the short time I've been here,
18  there's three things that I've learned, and I
19  think they are important things to consider
20  as we talk about these bills.
21      Number one, I'm amazed at the
22  collective wisdom of this body.  It's -- it's
23  truly humbling and -- and an honor to serve
24  with you.  It's just amazing to me the -- the
25  collective wisdom that's -- that's here.
0034
1       I've also been amazed that both
2  sides tend to dig in their heels, and I must
3  have missed that part in anatomy class in
4  college, where it said when you dig in your

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021813.txt[11/12/2013 10:57:47 AM]

5    heels, it automatically shuts off your
6    hearing because I've noticed that,
7    unfortunately, these impassioned speeches
8    that we make up here oftentimes fall on deaf
9    ears, and that's a shame.
10         For example, Representative Fields,
11   I passionately believe in the same things
12   that you do, and I -- I fully understand what
13   you're -- what you're working on and what
14   you're trying to do.  I also passionately
15   disagree with how you're trying to do it.
16         But that's the way it is, and that's
17   why I think we need to listen to both groups
18   and try to find that common ground, because
19   that's what's going to make the difference.
20         The third thing I've learned is that
21   our best-intentioned legislation that we are
22   passing or trying to pass in this body,
23   oftentimes, the unintentioned (sic)
24   consequences make it bad legislation.  And
25   I've had some of my bill ideas fall prey to
0035
1    that, essentially because my best intentions
2    didn't work out that well.
3         1229, 1229.  It's not bad
4    legislation in its intent, but the
5    enforcement of 1229 makes it bad legislation
6    in its function.
7         This last Friday evening I asked one
8    of the bill's cosponsors, Representative
9    McCann, if I were stopped by law enforcement,
10   how would I prove that the weapons in my
11   backseat were owned legally before this
12   legislation went through?
13         The first response was, You'll have
14   a background check.  No, I won't, because I
15   owned these weapons before this went into
16   effect, and part of them were passed down.
17   The second answer, Well, you'll have a
18   receipt.  No, I won't, because my parents are
19   dead, my grandparents are dead, and some of
20   those weapons that I now possess were
21   acquired 10, 20, even 30 years ago.  Third
22   answer, then the police will decide.
23         That's when the lights went off.
24   The police would decide my guilt or
25   innocence.  Am I really innocent until proven
0036
1    guilty?  You see, we've been talking about
2    infringement on Second Amendment rights, I
3    think this is larger than that.
4         That tramples, ladies and gentlemen,
5    on my fundamental right to be innocent until
6    proven guilty.  It should not be on my

LEG HX 000686     4601

7  shoulders to prove my innocence in that
8  situation.
9         In fact, in one of the other bills
10  during that debate in front of our committee,
11  the statement was made, you should be happy
12  to prove your innocence.  No, I am happy that
13  I am innocent until proven guilty.  In this
14  country that assumes that right, ladies and
15  gentlemen, the fact remains, even the most
16  heinous of crimes, they are presumed innocent
17  until proven guilty.  That famous word,
18  alleged, that we hear on the news channels
19  each and every day.
20         Colleagues, this bill presents a
21  quagmire of presumed guilt.  A quagmire of
22  presumed guilt.  I find it unbelievable that
23  we would even consider a bill that would open
24  myself and the law-abiding citizens of
25  Colorado to the assumption of guilt in any
0037
1  degree.
2         I urge a no vote on 1229.
3         SPEAKER OF THE HOUSE:  Madame
4  Majority Leader.
5         REPRESENTATIVE HULLINGHORST:  Thank
6  you, Mr. Speaker.
7         I stand in support of this bill, and
8  I thank the sponsors for bringing it.  It is
9  a very reasonable bill.  It's a bill that
10  protects public safety.
11         There are all kinds of facts and
12  figures that show that that happens with the
13  current legislation about background checks,
14  the current law that we all abide by in this
15  state.
16         This is a -- an expansion of that.
17  This closes a loophole.  This will keep us
18  safer.  And I hear from my constituents that
19  they think that this is a very good approach.
20  It's a very important approach that we should
21  pursue.  That's why I support it so strongly.
22  This will keep people safer.
23         I resent the implication that unless
24  we all arm ourselves, we will not be
25  adequately protected.  I hope that there are
0038
1  people that really don't believe that.  I
2  certainly don't believe that.  I resent the
3  implication that I should arm myself to
4  protect myself.
5         Now, I know some of you think I'm
6  slightly petite and small, but I feel like I
7  can protect myself pretty well.  But guess
8  what?  What the chips are down, I want to be

9   able to rely on a good government.  I want to
10  be able to rely on the law enforcement people
11  that we rely on and that we hire as a
12  government and a people to protect us.
13       There are situations where I cannot
14  protect myself, and I will not pretend that
15  buying a gun will solve that problem.  But I
16  do want to know that we do things here that
17  make us safer, and this bill will make me
18  feel safer because I know that we will
19  prevent additional people who should not own
20  guns from having guns.
21       The people in this state want us to
22  do this.  I believe it's the right thing to
23  do, and I ask for a yes vote.
24       SPEAKER OF THE HOUSE: Representative
25  Murray.
0039
1        REPRESENTATIVE MURRAY:  Thank you,
2   Mr. Speaker.
3        In addition to many of the arguments
4   that have been brought in opposition to this
5   bill, I would like to add my questioning
6   of -- of the procedures that have been set
7   up.
8        Basically we are asking people who
9   are not selling the product that they're
10  having to perform a background check for, for
11  $10, to perform a government function.
12       If any of you've been in a
13  mom-and-pop gun shop on a weekend, it's a
14  very busy place, and people are looking at
15  guns, you know, and so they generally have
16  employees that are -- are helping customers.
17  And I'm just picturing a line of people out
18  the door that -- that have just, you know,
19  been willed a gun or have privately bought
20  and sold a gun, and literally lined up at the
21  door, you know, getting impatient like at the
22  post office, why aren't these people helping
23  me to get my background check for this
24  transaction?
25       That's not a reasonable expectation
0040
1   of government to have of a retail operation.
2        So I would say that, you know,
3   when -- when this procedure was structured,
4   it should have been through government, if
5   that's government's desire, rather than
6   forcing it upon retailers for a $10 fee, for
7   Pete's sake.  They're going to have to hire
8   additional employees to effect this bill.
9        And so I think what we'll see next
10  is, they'll be coming to us saying we need

11    more money for this. Well, so then we're
12    charging more for a Second Amendment right
13    that we shouldn't be charging anything for.
14          So I -- I take to heart
15    Representative Fields' comments that this is
16    just a first of many bills, or this group is
17    a first of many bills. And it saddens my
18    heart, because, you know, what we're seeing
19    is the beginning of the end of some freedoms
20    that we've always enjoyed here in the West.
21          And I urge -- I urge a no vote on
22    this bill.
23          SPEAKER OF THE HOUSE: Representative
24    Salazar.
25          REPRESENTATIVE SALAZAR:  Thank you,
0041
1    Mr. Speaker.
2          So I spoke here in the well on
3    Friday, and I said that I had some concerns
4    about this bill. I thought that this bill
5    didn't take into consideration, I think what
6    Representative Lawrence had indicated,
7    blended families. I certainly didn't feel
8    that the definition of immediate family in
9    this bill took into consideration how Latino
10    families are.
11          I have a cousin who is raised with
12    us, and I call him my brother, I don't even
13    call him my cousin. And he's younger than
14    me, so he's my little brother, even though
15    he's much larger than I am. And I was
16    concerned that I wouldn't be able to -- to
17    just give him my guns if I so decided to do
18    so.
19          But I had some -- I had dinner with
20    him last night, and I said, man, I said this
21    bill is just killing me because it just
22    doesn't take into consideration some factors,
23    particularly when it comes to family.
24          And he looked at me, and he goes,
25    Dang Brother, I've already passed one
0042
1    background check, I can always pass another
2    one. Why do I care?
3          And I just looked at him, and I was
4    like, Well, yes, but it's the imposition of
5    it all.
6          And he says, Well, when you go
7    purchase a weapon, that's already there. If
8    you're going to give me the gun, I'm fine to
9    go through another background check. And I
10    said, Are you sure about that? He said,
11    Yeah. What's the problem?
12          And that clarified an awful lot of

13    things for me.  And that's why I'm going to
14    urge a yes vote on this bill.  Because, as I
15    indicated during our Judiciary Committee
16    meeting, I wanted to see this bill move
17    forward, and I wanted to see this bill move
18    forward because, if it takes one tool away
19    from a criminal in being able to purchase a
20    weapon from a private seller, then that's
21    what we should be doing.
22         I have to agree with Representative
23    Kagan, I really don't see what's wrong with
24    this bill.  There's nothing wrong with it at
25    all.

0043
1         So I urge a yes vote.
2         SPEAKER OF THE HOUSE: Representative
3    Szabo.
4         REPRESENTATIVE SZABO:  Thank you,
5    Mr. Speaker.
6         And to acknowledge Representative
7    Hullinghorst, I am small in stature also.
8    And I am standing up.
9         But you know what?  Maybe I don't
10    have the confidence of Representative
11    Hullinghorst.  If a 200-pound, six-four man
12    comes after me, I want equal force.  That's
13    all I want.  I don't want more force.  I want
14    equal force to know that I have a chance to
15    become a grandmother, to play with my
16    grandchildren whenever they come.
17         I don't want to have to choose
18    whether I walk in the streets, go about my
19    community alone.  I don't want to have to be
20    fearful if I choose not to be.  I want every
21    tool that would be at my disposal.
22         I believe that this bill gives
23    empowerment to the criminals.
24         Representative Kagan mentioned
25    common ground.  Common ground is equal force.

0044
1    It's not someone being stronger or bigger
2    than you.
3         So many of the bills we bring here
4    highlight the criminal's rights.  And there
5    are two opinions on that.  The question is:
6    Who am -- who are we obligated to protect,
7    our children, our law-abiding citizens, or
8    the criminal?
9         Thank you for your time.
10         SPEAKER OF THE HOUSE: Representative
11    Schafer.
12         REPRESENTATIVE SCHAFER:  Thank you,
13    Mr. Speaker.
14         Members, I want to make a general

15  comment about all these bills.  And that's a
16  comment I've heard many times, that there's
17  nothing we can do, we can't prevent gun
18  violence.
19       If you would think back about 30
20  years ago, do you remember when we said
21  there's nothing we can do about sexual
22  assault.  People are just going to get raped,
23  harassed?  Do you remember when we said
24  there's nothing we can do about drunk
25  driving?  People have a right to drive, they
0045
1  have a right to drink?  How about there's
2  nothing we can do about smoking?  There's
3  nothing we can do today about gun violence,
4  right?
5       Well, I urge you to think back on
6  what we have done over the last 30 years for
7  dangerous, violent practices that were
8  killing millions of people, shattering the
9  lives of their families, and costing the
10  government millions of dollars.
11       I refuse to stand here or to sit
12  here and vote for doing nothing.
13       Will these things we vote for
14  eliminate gun violence?  Of course not.  The
15  previous bills we've passed did not eliminate
16  rape, sexual harassment, smoking, drunk
17  driving.  Did they significantly reduce these
18  dangerous, violent practices against us,
19  against our family members, against our
20  citizens?  They certainly did.
21       And, therefore, I ask for your
22  support on this bill, 1229, and the other
23  bills.
24       Thank you.
25       SPEAKER OF THE HOUSE: Representative
0046
1  Saine.
2       REPRESENTATIVE SAINE:  Colleagues,
3  we've heard there's nothing we can do about
4  gun violence.  Well, I think there is
5  something we can do.  We can sure -- make
6  sure that more law-abiding citizens have guns
7  to protect themselves.
8       Consider the Aurora Theater
9  shooting.  There -- there would have been
10  numerous theaters around the Aurora Theater
11  that was chosen, but the killer didn't go to
12  the one that was the largest theater.  He
13  didn't go to the closest theater.  He had to
14  drive past several theaters, in fact, the one
15  that advertises itself as being the largest
16  theater in Colorado.  He went to the only one

17    that had a sign posted. No conceal-carry
18    weapons are allowed.
19        So, Representative Salazar, I
20    disagree. Let's not give criminals another
21    tool because if you only delay the
22    law-abiding citizens from getting guns, you
23    give an advantage to the criminal.
24        And let me tell you something about
25    being a woman having been attacked by a man
0047
1    much larger than myself. It's not equal
2    force, even in hand-to-hand situations.
3        And if you're in a rural area, the
4    police can be up to 30 minutes away. And a
5    kitchen knife just doesn't -- that just
6    doesn't cut it. It just -- it just really
7    doesn't.
8        And if we're going to rely on
9    government, even in the urban areas, the
10   reason I want a concealed-carry is it's too
11   hard to carry a policeman around.
12       And let's consider one more thing.
13   Background checks, restrictions on gun
14   ownership, actually hurt the people,
15   particularly poor blacks in urban areas where
16   there is high crime, statistically because
17   they cannot protect themselves.
18       If there are background checks in
19   the transfer of weapons, you will only slow
20   down the law-abiding citizens and give
21   another tool to aid the criminal.
22       I urge a no vote.
23       Thank you.
24       SPEAKER OF THE HOUSE: Representative
25   Fields.
0048
1    REPRESENTATIVE FIELDS: Thank you,
2    Mr. Speaker.
3        And I -- I -- I guess I first need
4    to respond to Representative Saine's comment
5    about the -- the shooter in Aurora because
6    that did happen in my district. And where he
7    lived, you know, that theater was right in
8    the neighborhood, was right in the community.
9    He did not have to pass other theaters to get
10   there. That theater was the closest theater
11   to his residence. Okay.
12       This bill is not about equal force.
13   This bill is about addressing private sales
14   because right now, in the State of Colorado,
15   private sales are unregulated.
16       We've been hearing some comments
17   about, you know, these bills do absolutely
18   nothing. This bill will not do anything.

19  And I can tell you that 80 percent of the
20  voters in Colorado believe that a background
21  check is a reasonable thing to do before a
22  gun is transferred.
23       40 percent of all guns are purchased
24  privately.  And convicted felons know that if
25  they want to buy a gun, simply go on the
0049
1  Internet or simply look at a classified ad.
2  And if you see someone advertising a gun,
3  all's you have to do is call them up, and
4  that gun will be transferred.
5       Currently the CBI system works.  I
6  have a chart here that says that 956 people
7  were denied access to a gun based on
8  completing a CBI check.  956, that's close to
9  a thousand.
10      What this bill does, it expands our
11  current system, which is proven to work.
12  It -- it proved that 956 people in the month
13  of January should not have a gun.  Why?  And
14  this is from CBI InstaCheck, because they had
15  committed homicide, because 22 of them had
16  sexually assaulted someone.  Some of them had
17  robbery, some of them had burglary and
18  dangerous drugs and other situations.  So it
19  works.
20      We had -- we heard conversation
21  about evil.  If people are intending on doing
22  evil, they will just do evil.  Well, I will
23  tell you evil cannot prevail in the presence
24  of right.  And I believe this bill is doing
25  the right thing, because we are our brother's
0050
1  keepers, and we need to make sure that before
2  a gun is transferred, if that person doesn't
3  meet the disqualifiers, to keep that person
4  from having a gun.
5       This bill is widely supported by a
6  whole host of people.  This bill is supported
7  by law enforcement.  This bill is
8  supported -- I mean, there's just a whole
9  list of organizations that support background
10  checks before a transfer of a gun.
11      This should be a bill that -- where
12  we should have some common ground.  We should
13  all be able to agree that we don't want to
14  see someone who doesn't meet the criteria to
15  owning a gun, which means if you're a
16  convicted felon or if you are mentally ill
17  and you're not supposed to have access to a
18  gun, then you shouldn't have one.
19      And that's what this bill does.
20  It's going to keep the hand -- the guns out

21  of the hands of people who are dangerous and
22  for people who should not have them.
23      So, members, I urge you to join me
24  and 80 percent of the Colorado voters in
25  supporting background checks for the transfer
0051
1  of guns.
2      Thank you.
3      SPEAKER OF THE HOUSE: Representative
4  McCann.
5      REPRESENTATIVE McCANN:  Thank you,
6  Mr. Speaker.
7      I'd like to address some of the
8  points that were made.
9      First, actually, Representative
10  Saine, Representative Hullinghorst, this bill
11  actually will make you safer because that
12  large man that you described will not be able
13  to have a gun if he has a record, if he is a
14  criminal.  This is the point of this bill, is
15  that those who should not have weapons will
16  not be able to purchase them.
17      So the bill is not about taking away
18  Representative Saine's right to have a gun or
19  any of -- anyone in this chambers right to
20  have a gun -- as long as they can pass a
21  background check.
22      So arguments about being overpowered
23  aren't really relevant to the issue of this
24  bill, which is that it will require
25  background checks by everyone.
0052
1      And that is currently our situation
2  with respect to people who buy them from
3  licensed dealers or at gun shows.
4      The arguments that are being made
5  would argue against background checks at all.
6  Delays in waiting for the background check to
7  clear, things of that sort, would argue
8  against what is already in our law, and that
9  is that we do require background checks.  The
10  $10 fee is already in our law.  The fact that
11  the dealers must keep the record of a sale is
12  already in our law.  The fact that if the
13  purchaser requests a copy of the background
14  check clearance, that's already in our law.
15      And, Representative Wilson, I have
16  wanted to speak directly to you because we
17  did have this conversation.
18      This is -- this is the way the law
19  is now for background checks.  So if you have
20  guns in your car that you have obtained
21  through a background check, that's the way
22  the law is now.  There's no requirement that

23 you show the police something.
24      What happens is it's the transfer of
25 the weapon that's illegal.  So if you were
0053
1 ever charged with something like that, your
2 dealer has a record of that, and that is our
3 current law.
4      So it's -- we're not changing
5 anything of that proof requirement or any
6 enforcement requirement in this bill.  All
7 we're doing is extending our current law to
8 people who purchase the guns privately or
9 through the Internet.
10      We're not changing enforcement
11 requirements.  We're not changing any of
12 that.  It's really a very simple bill to
13 expand that the -- the fact that everyone who
14 purchases a gun needs to have a background
15 check.  It's common sense.  It's
16 reasonable -- it's a reasonable requirement,
17 and it is supported by the vast majority of
18 our constituents.
19      I would remind our colleagues that
20 in 2000 -- in 2000, the people of Colorado
21 voted 70 percent to 30 percent to require
22 background checks in gun shows.  That's
23 already in our statute.  And the way this
24 bill would apply does not change any of that,
25 does not change enforcement, does not change
0054
1 the way we do the business.  It simply
2 expands it to private sales, clearly
3 supported by the majority of Colorado
4 residents.
5      And just -- I just want to also
6 mention that -- respond to this idea that you
7 can't will a gun to your -- your child.  The
8 law -- the bill allows for transfer to family
9 members and also by operation of law.  So
10 Representative Gerou will be able to leave
11 her firearms to her children under this bill.
12      And, finally, I want to just point
13 out again a few statistics because of the
14 need for data.
15      According to Department of Justice
16 statistics, in states that require background
17 checks for every handgun sale, 38 percent
18 fewer women are shot to death by intimate
19 partners.
20      In 2011 the most -- the year for
21 which most recent data is available, at least
22 13 of the 34 domestic violence deaths in
23 Colorado occurred in cases where the domestic
24 violence offender used a firearm despite

25  being prohibited under the law from

0055
1  purchasing or possessing firearms.  So this
2  bill will directly address those situations
3  where a domestic violence offender is able to
4  purchase a firearm.
5       We also know that -- well, according
6  to one study, domestic violence assaults
7  involving a firearm are 23 times more likely
8  to result in death than those involving other
9  weapons or bodily force.
10       Another study found that abused
11  women are five times more likely to be killed
12  by their abuser if the abuser owns a firearm.
13       This bill is a common-sense response
14  to require everyone, not just those of you
15  seated here, but everyone who wants to
16  purchase a firearm to -- to go through a
17  background check.  It's a safety issue.  It
18  will provide a safer environment for all of
19  us here in Colorado.
20       And I urge a yes vote.
21       SPEAKER OF THE HOUSE:  Any further
22  discussion?
23       Seeing none, the question before the
24  House is the passage of House Bill 1229 on
25  third reading and final passage.
0056
1       Mr. Kolar, please open the machine.
2       And, members, proceed to vote.
3       Close the machine.
4       With 36 aye votes, 29 no votes, zero
5  excused, and zero absent, House Bill 1229 is
6  passed.
7       Cosponsors, closed --
8       (Whereupon, the recording was concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0057

LEG HX 000696    4611

```
 1              CERTIFICATE
 2   STATE OF COLORADO          )
 3   CITY AND COUNTY OF DENVER          )   ss.
 4
 5        I, Elissa Steen, Registered
 6   Professional Reporter and Notary Public in and for
 7   the State of Colorado, do hereby certify that this
 8   transcript was taken in shorthand by me from an
 9   audio recording and was reduced to typewritten form
10   by computer-aided transcription; that the speakers
11   in this transcript were identified by me to the best
12   of my ability and according to the introductions
13   made and written materials provided; that the
14   foregoing is a true transcript of the proceedings
15   had; that I am not attorney, nor counsel, nor in any
16   way connected with any attorney or counsel for any
17   of the parties to said action or otherwise
18   interested in its event.
19        IN WITNESS WHEREOF, I have hereunto
20   affixed my hand and notarial seal this 21st day of
21   June, 2013.
22
          _____
23           Registered Professional Reporter
                        and
24              Notary Public
25
```

LEG HX 000697   4612

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-021813.txt[11/12/2013 10:57:47 AM]

0001
1 CITY AND COUNTY OF DENVER
2 STATE OF COLORADO
3 JUDICIAL COMMITTEE MEETING
4 Taken on March 4, 2013
5 HOUSE BILL 13-1229
6 _____
7             REPORTER'S TRANSCRIPT
8 _____
9
10         This transcript was taken from an audio
11 recording by Jana Mackelprang, Certified Realtime
12 Reporter, Registered Professional Reporter, and
13 Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
0002
1 PUBLIC SPEAKERS:
2 IN SUPPORT:
3 Ron Sloan                    Page 8
   Mark Kelly                  Page 19
4 Dan Oates                    Page 29
   David Chipman               Page 33
5 Jane Dougherty               Page 38
   Del Phillips                Page 41
6 Karina Vargas                Page 43
   Dave Hoover                 Page 51
7 David Moses                  Page 52
   Katie Lyles                 Page 54
8 Marjorie Sloan               Page 57
   Tom Mauser                  Page 60
9 Donald Macalady              Page 65
   Alan Franklin               Page 68
10 Mark Thrun                  Page 75
   Jack Dais                   Page 77
11 Amy Miller                  Page 80
12

   IN OPPOSITION:
13
   Krista Ceresa               Page 86
14 John Cooke                  Page 94
   Tom Grounder                Page 104
15 Doug Hamilton               Page 108

LEG HX 000698    4613

Gene Pearcey                    Page 111
16  David Kopel                  Page 117
     Adam Thompson               Page 129
17  Dudley Brown                 Page 134
     Daniel Carey                Page 141
18  Terry Maketa                 Page 144
19
20
21
22
23
24
25
0003
 1              P R O C E E D I N G S
 2              *   *   *   *   *
 3          THE CHAIRWOMAN:  Welcome to the
 4  presentation on 1229.
 5          SENATOR CARROLL:  Thank you, Madam Chair.
 6  Thank you, Committee.
 7          I'm here today to present House Bill 1229
 8  for your consideration.  And intense -- intense issue
 9  though it is, I wanted to start with -- I do think
10  everyone agrees that law-abiding citizens should be able
11  to own firearms and that guns should be kept out of the
12  hands of dangerous criminals.
13          As we all know, it is illegal for someone
14  convicted of certain crimes to own or possess a firearm,
15  but how do we enforce that?  The only way we have to
16  know whether or not someone is a law-abiding citizen or
17  dangerous criminal is through a background check.
18          House Bill 1229 simply requires the exact
19  same background check before the private purchase of a
20  gun that we already use when a gun is purchased from a
21  licensed dealer or at a gunshow.
22          I'm hearing this bill because gun violence
23  has become an epidemic.  And while 34 Americans die on
24  average every day as a result of gun violence, this
25  issue hit personally home for me when 70 people were
0004
 1  shot down in the Aurora Century Movie Theater in my
 2  district this summer, fatally injuring 12 people.
 3          It's true a background check may not have
 4  stopped his first killing spree, but at least he
 5  couldn't pass a background check and legally purchase
 6  guns for a second one.
 7          We have been performing background checks
 8  for licensed gun sellers since 1993 and for gunshows in
 9  Colorado since 2002.  But times have changed.  And in
10  the modern reality as we know, right now approximately
11  40 percent of all the guns that are being sold are
12  happening in private transactions.  So at one point,
13  your licensed firearms dealers and your gunshows were
14  really where most people were making their purchases,

LEG HX 000699    4614

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

15  and that of course has made sense.
16          Yet, if we leave 40 percent of the
17  purchases without any screening mechanism of any kind,
18  again to draw the line between law-abiding people who
19  are fully entitled to the purchase and people who, under
20  current Colorado law, convicted felons, who are not.
21          This matters, this loophole matters when
22  we do realize that 80 percent of the handguns that are
23  found at crime scenes were actually purchased through
24  private sellers.  And if you think about it, that makes
25  sense.  If you are a criminal and you know you can't
0005
1  pass a background check, why would you go to a licensed
2  gun dealer or a gunshow where you know they're going to
3  run a background check?
4          Now, that said, many do.  And we've caught
5  a good number of people who are ineligible under
6  Colorado law through that mechanism.  Yet, right now, by
7  leaving this loophole, it is an exception that threatens
8  to swallow the norm.  And if we don't close it, it
9  really begs leave to the effectiveness of running
10  background checks in the other 60 percent when it is so
11  easy to circumvent.
12          Under the current law, 100 percent of
13  criminals could purchase their guns through private
14  sellers.  Every criminal in the state of Colorado could
15  simply evade a background check.
16          We have data to tell us that background
17  checks do work.  And I'll be the first to acknowledge
18  that nothing is perfect.  This mechanism has, in fact,
19  detected in block sales of over 700,000 sales nationally
20  of guns that would have gone to criminals but for the
21  background check.  In 2012, in Colorado alone, 5,607
22  applicants were denied because background checks
23  revealed ineligible criminal purchasers.
24          So why are background checks a good idea?
25  In states that require a background check for every
0006
1  handgun sale, there are 38 percent fewer women who are
2  shot to death by intimate partners, according to the
3  Department of Justice.  Data also shows that after
4  Colorado closed the gunshow loophole, Colorado went from
5  the 17th largest source of guns found at crime scenes in
6  other states, down to 32nd by 2009.
7          The rate of suicide with a firearm in
8  states with background checks on every gun sale is
9  49 percent lower than on states that don't.  And to be
10  clear, the attempts are equivalent across states, of
11  49 percent fewer suicide fatalities in the states that
12  do the universal background.
13          The overwhelming majority of the public,
14  including NRA members polled, support background checks
15  and closing loopholes for private sales, according to
16  three separate polls, the most recent of which was

17   actually conflicted February 21st to 24th.
18          That's not why we do what we do.  At the
19   end of the day, this is a difficult issue to approach,
20   but the background check is the one and only way we have
21   as a society to filter between making sure that
22   law-abiding citizens can enjoy 100 percent of their
23   rights to purchase the firearms of their choosing, but
24   make sure that, at the same time, we keep guns out of
25   the hands of dangerous criminals or convicted felons.
0007
1          I ask for your support on House Bill 1229.
2   In my view, it is time to modernize Colorado's gun laws
3   so that no one can purchase a firearm without a
4   background check.  Thank you.
5          THE CHAIRWOMAN:  Let me turn that on.
6          Thank you so much, Senator Carroll.
7          So I'll open it up to any of the committee
8   members who might have a question for the sponsor, also
9   reminding all of us here that we want to hear as many --
10   as much of the public on these bills as possible.
11          Is there any questions from committee
12   members?
13          See none.
14          I think we have a list of -- of your
15   expert witnesses.  So I can first call your first
16   witness, Ron Sloan.
17          And, Ron, as you're walking up, I'll let
18   everybody know that what I'll ask is that when you get
19   up to the mic, that you would introduce yourself and who
20   you're representing, if anybody.  But there are a lot of
21   individuals that aren't able to be here today that are
22   listening, so we want to be as clear.
23          And, also, as a communication for all of
24   us, the norm that we have is that we come through the
25   chair.  And then we identify -- so I can identify who's
0008
1   speaking for our listening audience.
2          Go ahead, Mr. Sloan.
3          MR. SLOAN:  Thank you, Madam Chair.
4          My name is Ron Sloan, and I am the
5   director of the Colorado Bureau of Investigation.  And I
6   am here today representing the Colorado Department of
7   Public Safety and the Colorado Bureau of Investigation
8   in support of House Bill 1229.
9          What I thought I might do is briefly go
10   through the process that is currently in place and has
11   been in place since Colorado InstaCheck was reinstated,
12   if you will, in 1999.
13          Currently, all firearms transfers by
14   licensed firearms dealers that we refer to as FFLs,
15   those federally -- federal firearms licensees, and at
16   gunshows require a background check on the transferee,
17   the individual who will be receiving the firearm in the
18   transfer.  And what that background check is intended to

19 do is try to determine whether or not that transferee,
20 the individual receiving the firearm, can legally
21 possess a firearm by federal law and Colorado law.
22          In calendar year 2012, just to give you an
23 idea of the volume that we've been experiencing through
24 Colorado InstaCheck, we processed 343,302 transfer
25 requests. Of those 343,302, we denied transfer on 7,362
0009
1 of those transfers. That's about 2.1 percent. The
2 numbers of denials have been running at that rate for
3 about three years now, at the 2 to 2.5 percent denials.
4          In Colorado, those denials are based upon
5 firearms prohibitors, factors that would require that
6 the transfer be denied because there is a prohibitor to
7 that individual being transferred the firearm to possess
8 a firearm, to legally possess it. And by my count, I
9 believe there are 11 different prohibitors that we
10 utilize.
11          In order to attempt to determine that, we
12 check seven different databases. Four of those
13 databases are the same databases that FBI NICS checks.
14 That's the National Crime Information Center, the FBI
15 NICS database, the FBI III, Interstate Identification
16 Index, and immigration databases. And then in Colorado,
17 we check three more databases. Colorado Division of
18 Motor Vehicles and, nationally, the Division of Motor
19 Vehicles to verify ID, the Colorado Crime Information
20 Center, and the Colorado judicial database, PAS, P-A-S.
21          Those are unique to Colorado. And because
22 of our checking of those three unique databases, we were
23 able to identify 1915 of those 7,362 denials that would
24 not have been caught by FBI NICS checks alone.
25          The types of things that we're able to see
0010
1 in those three databases that the FBI would not see in
2 FBI NICS are issues such as protection orders that are
3 not in the National Crime Information Center, felony
4 juvenile adjudications -- in other words, an individual
5 has been adjudicated as a juvenile for an offense that
6 would be considered a felony if that individual were an
7 adult -- domestic violence convictions not contained in
8 the National Crime Information Center, fugitives of
9 justice, individuals who have active warrants for their
10 arrests, and felony convictions that are not contained
11 in the National Crime Information Center.
12          House Bill 1229 would require that all
13 firearms transfers undergo the same background check of
14 the transferee; and that's the key here. It's the
15 individual who would be receiving the transfer of the
16 firearm. That would be accomplished through federally
17 licensed firearms dealers, through FFLs. And it's an
18 identical process that we would use within CBI
19 InstaCheck to do those background checks as those
20 firearms are taken into the inventory technically of an

21  FFL.    And the FFL would complete the Alcohol, Tobacco
22  and Firearms Form 4473 for the transaction and the
23  request for the transfer.  And they would send that
24  information to CBI, either electronically via the Net --
25  we have a secure Internet connection with the FFLs -- or
0011
1   telephonically to CBI.
2           Truly we believe this would add value by
3   preventing transfer of firearms to prohibited
4   individuals who are prohibited by law, by existing law,
5   to possess a firearm.
6           Important in the bill are the issues that
7   are -- the components that are built in that would
8   attempt to assure compliance with private firearms
9   transfers.  And those are the civil -- the civil
10  liability provisions of the criminal offense of a class
11  1 misdemeanor for failing to comply with those
12  provisions, and upon conviction for that class 1
13  misdemeanor an individual would be prohibited, again, to
14  possess a firearm for two years, if they were convicted
15  of not complying with the provisions of this particular
16  bill, should it become law.
17          Additionally, in House Bill 1229 are the
18  components of CBI InstaCheck being able to receive
19  information and data on mental health adjudications in
20  real-time, electronically, from Colorado Judicial.
21  Currently, we do receive that information; however,
22  there is a delay in that information, and it can be
23  delayed up to six months' time.
24          That information currently is
25  batch-processed on a CD by Colorado Judicial, is
0012
1   directly sent to FBI NICS, and entered into the FBI NICS
2   system.  And that's entered in on an every-six-month
3   basis by FBI NICS.  So when Colorado InstaCheck checks
4   that database, you can have as much as a six-month delay
5   in accessing that information, if someone has been
6   adjudicated mentally ill and prohibited to possess a
7   firearm.
8           Also in that provision in House Bill 1229
9   are the provisions for the restoration of rights for
10  those individuals who would be adjudicated as mentally
11  ill and prohibited to possess a firearm.  And the
12  restoration of rights is a very important piece of House
13  Bill 1229.
14          That's the extent of the technical
15  testimony that I wanted to provide for all of you.  And
16  I would be happy to answer any questions Madam Chair or
17  any members of the committee might have.
18          THE CHAIRWOMAN:  Thank you, Mr. Sloan.  So
19  I would ask -- thank you, and thank you, Mr. Sloan.
20          So is there any questions from the
21  committee?  Senator Crowder.
22          SENATOR CROWDER:  Thank you, Madam Chair.

LEG HX 000703    4618

23      Mr. Sloan, welcome to the capitol today.
24      I was curious, you said out of the 343,000
25 that were checked, there's roughly 2.1 percent that were
0013
1 caught as being an illegal purchaser of firearms.  Do you
2 have some type of a conviction rate on that?  If these
3 individuals -- if there's 2.1 percent that are caught,
4 what is your conviction ratio to that 2.1 percent?
5      THE CHAIRWOMAN:  Mr. Sloan.
6      MR. SLOAN:  Madam Chair.
7      Senator Crowder, the denial of transfer of
8 a firearm is not a criminal charge.  So none of those
9 individuals would be convicted, per se, for the simple
10 act of denying the transfer of a firearm.
11      THE CHAIRWOMAN:  Thank you.  Senator
12 Harvey.
13      SENATOR HARVEY:  Thank you, Madam Chair.
14      I wanted to follow up on that question,
15 before I got to my real question.  Thank you for being
16 here.
17      Of that 2.1 percent that were denied, how
18 many -- was that completely denied, or was that on the
19 initial denial and then they came back and proved
20 something other than what they got caught on and then
21 were able to purchase the gun, do you know?
22      THE CHAIRWOMAN:  Mr. Sloan.
23      MR. SLOAN:  Madam Chair, thank you.
24      Senator Harvey, of the 7,362 that were
25 denied, 54 percent of those individuals availed
0014
1 themselves to the appeal process that is available for
2 anyone who is denied the transfer of a firearm.  Of that
3 54 percent -- and I have the numbers here I can go to --
4 of that 54 percent, 56 percent of that 54 percent -- so
5 you're getting down to about 30 percent, 31 percent --
6 actually, their denials were reversed.
7      Now, I need to bring it to your attention
8 that those 7,362 denials were all lawful denials by
9 factors that would indicate they are prohibited to
10 possess.  When an individual appeals, pursuant to House
11 Bill 1411, House Bill 10-1411, the onus is now on CBI to
12 do the research for the appellate to determine whether
13 or not that denial should stand or be overturned.  And
14 that is the work that we do in our appeals section of
15 InstaCheck.
16      THE CHAIRWOMAN:  Senator Harvey, continue.
17      SENATOR HARVEY:  But what I'm trying to
18 get to, that 2.1 percent denied is not the number of
19 individuals who should not have been buying guns; it's
20 the number of denials.  So if you actually got down to
21 the total number of individuals who actually should have
22 been denied the purchase of a gun, that was probably
23 down to about one and a half percent, if I do my numbers
24 correct.  What are your thoughts?  Isn't that right?

Appellate Case: 14-1290    Document: 01019371763    Date Filed: 01/16/2015    Page: 230

0015
1           MR. SLOAN:  Madam Chair.
2           Senator Harvey, the numbers would be
3 pretty close to that.  And I bring your attention to the
4 fact that those denials were lawful denials, but there
5 are issues that come up with the denial of any firearm
6 transfer in terms of being able to determine whether or
7 not there are factors that also exist that would reverse
8 that denial, whether it's done through Colorado
9 InstaCheck or whether it's done through FBI NICS, as it
10 is in other states.
11          SENATOR HARVEY:  I understand that.
12          THE CHAIRWOMAN:  Senator Harvey
13 continuing.
14          SENATOR HARVEY:  Should I ask my real
15 question?  My biggest concern with this bill is the
16 definition of a transfer, because we're getting into a
17 point where I can't leave town and give my wife
18 permission to use my gun to protect herself if I haven't
19 done a background check on that, with my reading of the
20 bill.  And I think that's an unnecessary burden to put
21 on the citizens of Colorado, but I think it's an
22 unnecessary burden to put on you to have to have a
23 background check on every transfer of lending of a gun
24 to somebody when they -- whatever the circumstances may
25 be.  It's not a sale of a gun; it's the transfer of a
0016
1 gun, the way the bill is written.  What are your
2 thoughts about that?
3           THE CHAIRWOMAN:  Mr. Sloan.
4           MR. SLOAN:  Thank you, Madam Chair.
5           I believe that there are a number of
6 exceptions that are built into the bill, one of which is
7 the transfer of a firearm to an immediate family member
8 as long as they are not prohibited to possess.  And
9 there are a number of other provisions that would be an
10 exception to having to go through the transfer process.
11          THE CHAIRWOMAN:  Senator Harvey.
12          SENATOR HARVEY:  You're halfway correct.
13 That is, if I'm giving the gun to somebody, a family
14 member, the bill has an exception for that.  If I'm just
15 lending the gun to somebody, there is no exception to
16 that.  So if I'm leaving town, my wife is left
17 unprotected.  I'd have to do a background check on her
18 to lend her the gun, the way the bill is written, for
19 her to be able to utilize my gun, or I will have a
20 misdemeanor charge that could put me in jail for 18
21 months.
22          Do you believe that's appropriate?
23          THE CHAIRWOMAN:  Mr. Sloan, you may answer
24 that, if you wish.
25          MR. SLOAN:  Madam Chair, thank you.
0017

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

1    I'm not in a position really to interpret
2 what the exceptions are at this point.  And if you were
3 ever in a position where you had to do the
4 interpretation of whether or not that was a temporary
5 transfer of a firearm to an immediate family member,
6 then you would be put in the position of deciding
7 whether or not that person was prohibited to possess
8 that firearm under those circumstances.
9        THE CHAIRWOMAN:  Senator Harvey.
10       SENATOR HARVEY:  So I'm trying to
11 understand what you just said.  It's up to me to
12 determine whether it's appropriate to give my wife the
13 gun or not when I leave town to protect herself.  Under
14 this rule, under this bill, the way it's written, a
15 transfer is a transfer, but the exception is if I'm
16 giving it to my wife.  So if I'm just loaning it to my
17 wife when I leave town, that is an illegal transfer.
18       I'm asking the department for whom you are
19 speaking for, if you think that's an appropriate use of
20 your time and of the citizen's right to self-protection.
21       THE CHAIRWOMAN:  Mr. Sloan.
22       MR. SLOAN:  Thank you, Madam Chair.
23       If you transferred it to your wife, and
24 you felt it didn't comply with the provision that's
25 currently in the bill, if this becomes law, and you were
0018
1 to take that firearm to an FFL and do the transfer
2 check, we would do our job and carry it through and do
3 that, do that transfer background, if you chose to
4 interpret it that way, that you needed to do that.
5       And as long as your wife was not
6 prohibited to possess a firearm, we do that just like
7 any check that we do.
8       THE CHAIRWOMAN:  I'm going to give you one
9 more question, just so we can try to get through.
10       SENATOR HARVEY:  I appreciate that.
11       This is the key part for me.  I'm asking
12 the department who is coming here to testify in support
13 of this bill, if you think that it's appropriate for me
14 to have to do an FFL on my wife when I leave town so
15 that she can protect herself.  Yes or no?
16       THE CHAIRWOMAN:  Mr. Sloan, again, we
17 don't want to give the impression that you're under
18 cross-examination, so you're either welcome to answer
19 that or not.  Mr. Sloan.
20       MR. SLOAN:  Thank you, Madam Chair.
21       If you choose to call it other than a bona
22 fide gift to your wife, then she would be required to go
23 through this transfer, yes, process.
24       SENATOR HARVEY:  Yes, you think that's
25 appropriate?
0019
1       MR. SLOAN:  It would be appropriate under
2 the law, yes.

3    THE CHAIRWOMAN:  Try to go through the
4   chair as well, I remind our committee members.
5        Thank you, Mr. Sloan.  Any other
6   questions?
7        Thank you, I appreciate it.
8        Our next witness is Mr. Mark Kelly.  Is
9   Mr. Mark Kelly . . .
10       MR. KELLY:  Hello.
11       THE CHAIRWOMAN:  Welcome, Mr. Kelly.  Go
12  ahead and identify yourself for our listening audience
13  and who you're representing today, and welcome.
14       MR. KELLY:  Well, my name is Mark Kelly.
15  I'm a retired Navy captain, retired astronaut, husband
16  of Congresswoman Gabrielle Giffords, and also am part of
17  an organization called Americans for Responsible
18  Solutions, which is looking for a common-sense gun law
19  legislation.
20       THE CHAIRWOMAN:  Great.  Thank you,
21  welcome, and go ahead and proceed with your testimony.
22       MR. KELLY:  Thank you, Madam Chair.
23       Thank you for inviting me here today.
24  Arizona and Colorado don't just share a border; we share
25  strong traditions of gun ownership and sportsmanship.
0020
1   With that tradition has always come an abiding
2   commitment to the responsible exercise of our Second
3   Amendment rights.  That responsibility will be the focus
4   of my remarks today.
5        As you know, my family has been
6   immeasurably affected by gun violence.  Gabby's gift for
7   speech is a distant memory.  She struggles to walk and
8   she's partially blind.  And a year ago, she left a job
9   she loved, serving the people of Arizona.  But in the
10  past two years, we have watched Gabby's determination,
11  spirit, and intellect conquer her disabilities.
12       We don't come to the debate on gun
13  violence as victims.  We offer our voices as Americans.
14  We're a lot like many of your fellow citizens, following
15  this debate about gun violence here in Colorado.  We're
16  moderates.  Gabby was a Republican long before she was a
17  Democrat.  We're both gun owners, and we take that right
18  and the responsibilities that come with it very
19  seriously.  And our hearts break every time the TV news
20  breaks to yet another shooting.  After 20 kids and six
21  of their teachers were gunned down in their classroom at
22  Sandy Hook, we said, This time must be different;
23  something needs to be done.  We're simply two reasonable
24  Americans who have said:  Enough.
25       On January 8 of 2011, a young man walked
0021
1   up to Gabby at her constituent event in Tucson, leveled
2   his gun, and shot her through the head.  He then turned
3   down the line and continued firing.  In 15 seconds, he
4   emptied his magazine.  It contained 33 bullets and there

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

5  were 33 wounds.  As the shooter attempted to reload, he
6  fumbled.  A woman named Patricia Maisch, who is here at
7  the state capitol today, grabbed the next magazine,
8  others restrained him, and the carnage ended.
9          The killer in the Tucson shooting suffered
10  from severe mental illness, but even after being deemed
11  unqualified for service in the Army and expulsion from
12  Pima County College, he was never reported to mental
13  health services.
14          On November 30th of 2010, he walked into a
15  sporting good store, passed a background check, and
16  walked out with a semiautomatic handgun.  He had never
17  been legally adjudicated as mentally ill.  And even if
18  he had, Arizona at the time had over 121,000 records of
19  disqualifying mental illness that had not been submitted
20  into the system.
21          Looking back, we can't say with certainty,
22  only if we had done, this wouldn't have happened.  There
23  wasn't just one thing that would have prevented the
24  Tucson shooting from being written into the history
25  books.
0022
1          You know, Gabby is one of roughly of
2  100,000 victims of gun violence in America each and
3  every year.  Behind every victim lays a matrix of
4  failure and inadequacy, in our families, in our
5  communities, in our values, in our society's approach to
6  poverty, violence, and mental illness, and, yes, also in
7  our politics and in our gun laws.
8          We have a simple message:  The breadth and
9  complexity of gun violence is great, but that is not an
10  excuse for inaction.
11          There's another side to our story as well.
12  Gabby is a gun owner, and I'm a gun owner.  We have our
13  firearms for the same reasons that millions of Americans
14  just like us have guns, to defend ourselves, to go
15  hunting or target shooting.  We believe wholly and
16  completely in the Second Amendment and that it confirms
17  the power on all Americans the right to own a firearm
18  for protection, collection, and recreation.  We take
19  that right very seriously, and we would never, ever give
20  it up, just like Gabby would never relinquish her gun
21  and I would never relinquish mine.
22          But rights demand responsibility.  And
23  this right does not extend to criminals.  And it does
24  not extend to the mentally ill.  When dangerous people
25  get guns, we are all vulnerable.  At the movies, at
0023
1  church, conducting our everyday business, meeting with
2  the government official, and time after time after time,
3  at school, on our campuses, and in our children's
4  classrooms.
5          When dangerous people command the
6  lethality of 33 or 100 round magazines, we are all the

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

7   more vulnerable.  Dangerous people with weapons
8   specifically designed to kill quickly and efficiently
9   have turned every single corner of our society into
10  places of carnage and gross human loss.
11          Gabby and I are pro gun ownership.  We are
12  anti-gun violence.  And we believe that in this debate,
13  our leaders should look not towards special interests
14  and ideology, which would push us further apart, but
15  towards compromise, which brings us together.
16          80 percent of Coloradans support requiring
17  all private sales to go through a licensed dealer and
18  subject to a background check.  92 percent of Americans
19  want universal background checks, democrats and
20  republicans and gun owners and NRA members and everybody
21  else.
22          We believe whether you call yourself pro
23  gun or anti-gun violence or both, that we can all work
24  together to pass sensible laws and save lives.
25          Thank you.
0024
1           THE CHAIRWOMAN:  Thank you, Mr. Kelly.
2   Appreciate that.
3           We have a question from a couple committee
4   members.  So Senator Crowder.
5           SENATOR CROWDER:  Thank you for being
6   here, Mr. Kelly.  My condolences.  I know it's an
7   unfortunate situation you've been through.
8           What I have heard you tell us is that the
9   gentleman who did the shooting did go through a
10  background check, but it was the mental -- the mental
11  illness was what was not adhered to.  Don't you think
12  we'd be a little more apt to go after mental illness if
13  we would background check?
14          You indicated several issues about
15  compromise.  And I can tell you I'm not an NRA
16  cardholder, but I am very, very pro Constitution.  And
17  my stand on this particular deal so far is that it is an
18  infringement on gun rights, and that's where I stand.
19          But what I'm asking you is:  Would we not
20  be far better off going after a mental illness type
21  situation than we would for background checks, because
22  the background check, as you described it, was followed
23  by the letter of the law, yet there was a shooting?
24          THE CHAIRWOMAN:  Mr. Kelly.
25          MR. KELLY:  Well, I believe the most
0025
1   common-sense thing we can do, that most Americans
2   support, is to provide for universal background check.
3           To address your question about
4   specifically what happened in Arizona, yes, he passed a
5   background check.  He should not have passed a
6   background check.  I mean, he was clearly mentally ill.
7   The Army knew that he was an admitted heavy drug user.
8   Those records should have been in the system.  If they

9  weren't -- if they would have been in the system, he
10 would have failed the background check at the gun store.
11 But he had another option.  I suppose if that happened
12 that day, he would have went down the street to the
13 gunshow or bought his gun through a private sale on the
14 Internet.  That should not be an option for criminals.
15           Since 1999, 1.7 million criminals have
16 failed a background check.  Why do we give them the
17 option to go to a gunshow or the Internet to get their
18 gun?  How many lives would we have saved if over --
19 since 1999, a criminal couldn't get a gun without
20 passing a background check?  I'm sure it's probably
21 thousands.
22           So the most common-sense thing we can do
23 right now is to close the gunshow loophole, to close the
24 private seller loophole to prevent criminals from
25 getting a gun.
0026
1           THE CHAIRWOMAN:  Again, I'm going to let
2  people -- we have a couple questions because we were
3  taking a lot of time, I think, from the public that
4  they're not going to get.  So, Senator Crowder, go
5  ahead.
6           SENATOR CROWDER:  I guess the point I'm
7  trying to make, when the gentleman bought the gun, he
8  did pass the background, he was not a criminal.  He
9  didn't turn criminal until after he bought the gun.
10          THE CHAIRWOMAN:  Yes, Mr. Kelly.
11          MR. KELLY:  When he bought the gun, he was
12 conspiring to assassinate a member of Congress.  He
13 wasn't a convicted criminal.  But, by any measure, by
14 any common-sense measure, this is somebody who should
15 not have had a gun.  And if the record of his mental
16 illness and his record from the U.S. Army was included
17 in the system, he would have never passed that
18 background check.  So that's certainly something that
19 needs to be fixed.
20          I mean, in some cases, the background
21 check needs to be better.  But we can't give criminals
22 and the mentally ill the option of walking down the
23 street to a gunshow and buying a gun without a
24 background check.  I mean, it doesn't make any sense.
25 It's like having the two lines at the airport.  Here's
0027
1  the one where you have to go through security and here's
2  the one with no security.  Which one is the terrorist
3  going to choose?
4           THE CHAIRWOMAN:  Senator Carroll.
5           SENATOR CARROLL:  Thank you, Madam Chair.
6           I also just wanted to point to one of the
7  important parts of the bill that isn't going to get as
8  much attention is the fact that it moves us to
9  real-time, live-time mental health upload and download
10 of information.  So that will move from every six months

4625

11  to at least simultaneous, but with information in and
12  out.  And it's not a very talked-about provision of the
13  bill, but to your point on properly detecting the mental
14  health stuff, that is one of the upgrades in the bill.
15         THE CHAIRWOMAN:  Thank you, Senator
16  Carroll.
17         I'll now move to Senator Harvey.
18         SENATOR HARVEY:  Thank you.  And thank
19  you, Mr. Kelly, for being here.  You're an American hero
20  and one of mine.  I appreciate your service to the
21  country and your efforts in the astronaut program.  I'm
22  jealous.  But you're also an incredible husband to step
23  aside from that incredible career to be by your wife's
24  side, and that is commendable.
25         Throughout your testimony, you talked
0028
1   about private sales, and you said, I think it was,
2   92 percent -- is that your figure? -- that respondents
3   in polls said that they supported background checks on
4   private sales.  But that's not what this bill is, as you
5   heard my previous questions.  This bill is specifically
6   talking about transfers of guns.
7          I'm not sure the public would think
8   92 percent in favor of saying I can't give my wife my
9   gun when I leave town to protect herself.  Can you
10  clarify where you come down on the transfer part or the
11  private sales part?
12         THE CHAIRWOMAN:  Mr. Kelly.
13         MR. KELLY:  Well, I certainly -- you know,
14  both Gabby and I are strong supporters of universal
15  background checks.  And before the transfer of ownership
16  of a gun is made, there should be a background check
17  with that.
18         I bought a gun in October -- it was
19  October or November -- a hunting rifle at Wal-Mart.  I
20  went through a five-minute background check.  It took
21  something less than five minutes.  I think it's a small
22  price to pay to keep all of us a little bit safer, is
23  where everybody is required to do a background check,
24  like most responsible gun owners do now.
25         With regards to the specifics about the
0029
1   Colorado bill, I'm not an expert on the specifics of the
2   legislation, so I can't answer that question directly.
3   But both Gabby and I are strong supporters of making
4   sure criminals and the mentally ill do not have easy
5   access to firearms.
6          THE CHAIRWOMAN:  Thank you, Mr. Kelly.  So
7   I think we'll go ahead -- thank you for being here, and
8   I certainly would echo all of what Senator Harvey
9   said -- I know your name -- and thank you for being here
10  and certainly send our regards to your wife.
11         MR. KELLY:  You're very welcome.  Thank
12  you for the opportunity to testify in front of the

LEG HX 000711

4626

13  committee. Thank you.
14          THE CHAIRWOMAN:  And so I think the
15  next -- we have a video from Dan Oates, the Aurora
16  police chief.
17          MR. OATES:  Good afternoon.  I want to
18  thank Chairman Giron and all the members of the state
19  affairs committee for this opportunity to testify by
20  video and not appear in person.
21          I am testifying today wearing two hats.
22  First, I represent the City of Aurora and the city
23  council.  We all know that Aurora has had its share of
24  gun violence recently.  Council feels strongly that
25  House Bill 1229 will make Aurora safer.
0030
1          Second, I represent the Colorado
2  Association of Chiefs of Police, the 115 executives who
3  work every day throughout Colorado to keep people safe
4  and to reduce gun violence.
5          The challenge against gun violence in
6  Aurora and in Colorado and in America is broad and
7  multifaceted.  There is no easy solution.  There is no
8  one bill that does it all.  We need to do many smart
9  things at once.  House Bill 1229 won't stop all our
10  problems, but it will stop some, and it will do so
11  simply and smartly.
12          We need to be better at enforcing existing
13  laws.  Everyone says they agree on this, including the
14  NRA, the gun lobby, and those who are passionate about
15  the Second Amendment.  While we have admitting rules,
16  state and federal, that say felons can't possess guns,
17  the same is true with persons convicted of domestic
18  violence and persons adjudicated under the EO
19  (phonetic).
20          These rules mean nothing without
21  background checks on all gun sales.  Today, 40 percent
22  of gun sales are transfers that occur without a
23  background check, and this is madness.
24          Whoever says a convicted felon cannot
25  possess a gun means nothing if the felon can buy the gun
0031
1  from someone who doesn't know or doesn't want to know
2  that he is a felon.  A rule that says a man that's been
3  convicted of abusing his partner cannot have a gun means
4  nothing if the same man can buy a gun from a private
5  dealer without a background check.
6          Police chiefs are all too fully aware of
7  the tragedies that have occurred, and will continue to
8  occur, because members who should not have access to a
9  gun can get a gun without a background check and kill
10  their partner in a deranged moment.
11          In 2000, the citizens of Colorado voted by
12  70 percent to support closing the gunshow loophole.  The
13  passage of Amendment 22 requires that Colorado verify
14  that a person purchasing a gun at a gunshow is not a

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

15  criminal or has not been adjudicated mentally ill.  This
16  is a common-sense measure that those who talk about
17  law-abiding citizens possessing firearms should not have
18  a disagreement with.  Still, our existing law has a much
19  bigger loophole than the one closed by Amendment 22.
20          Today it is certainly legal for someone to
21  sell firearms to another individual with no background
22  check.  We police chiefs know the tragic consequences of
23  this loophole.  Our officers routinely recover weapons
24  from convicted felons.  Why?  Because they obtain them
25  through this loophole.  Sometimes our (inaudible) are
0032
1   too late and a horrible and violent crime has already
2   occurred.
3           According to a recent John Hopkins report,
4   nearly 80 percent of inmates could have used a handgun
5   in a crime, had acquired it through a transaction with
6   an individual who was not a licensed gun dealer.
7           Colorado's current system allows criminals
8   and dangerously mentally ill persons to legally buy and
9   possess these weapons through a private sale, with no
10  background check.  Again, this is madness.
11          You have the power in your hands today to
12  correct this.  It's true that this bill will not solve
13  all the gun crime in Colorado, but this is not a reason
14  to deny its passage.  It will solve some of our
15  problems.  House Bill 1229 will reduce gun crime and
16  violence in Colorado.
17          For the safety of all Coloradans, I urge
18  you to pass this bill.  Thank you.
19          THE CHAIRWOMAN:  Thank you.  And so since
20  we are not able to ask any questions -- that's
21  (inaudible), Senator Harvey.
22          SENATOR HARVEY:  He said everything that I
23  wanted to say about sales.
24          THE CHAIRWOMAN:  Great.
25          So our next witness is David Chipman.
0033
1   Welcome, Mr. Chipman.  Go ahead and introduce yourself
2   and who you represent today.
3           MR. CHIPMAN:  My name is David Chipman,
4   and I served as a special agent with ATF for 25 years.
5   So I'm going to share my experience through that.  I'm
6   also a consultant with Mayors Against Illegal Guns.
7           This past May, I retired as a special
8   agent from the Drug and Alcohol, Tobacco, Firearms and
9   Explosives following 25 years of service.  As a SWAT
10  team member, I apprehended some of the most heavily
11  armed and violent criminals in America.
12          As a leader of ATF's firearms programs
13  division, the attorney general tasked me with developing
14  a comprehensive strategy to prevent gun violence in 15
15  targeted cities.  During my tenure at ATF, I learned
16  firsthand which policing efforts work and which do not.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

17  I actually enforced the laws on the books.
18          Robert F. Kennedy said that Americans
19  needed a system of justice to serve as a shield for the
20  weak and the powerless.  I'm here today to confirm what
21  many of us already know.  Our shield is not sufficient.
22  Background checks work.  They will strengthen our
23  shield.  We have seen the positive impact of public
24  safety, of stronger regulations involving gun sales in
25  Colorado and across the nation.
0034
1          After the shooting at Columbine,
2  70 percent of Coloradans voted to require unlicensed
3  sellers at gunshows to conduct criminal background
4  checks.  In 2000, this state was the 17th largest
5  exporter of guns later found at crime scenes in other
6  states.  A year after the law was passed, Colorado
7  ranked 27th.
8          The number of women killed with a firearm
9  by an intimate partner is 38 percent lower in states
10  that have closed the private sale loophole for handguns
11  than in states that do not regulate such sales.  The
12  firearms suicide rates in states that require a
13  background check before every handgun sale is 49 percent
14  lower than in states where it is not required.
15          As an ATF agent, I know criminals acquire
16  many of their guns through unregulated private sales.
17  Researchers confirm nearly 80 percent of inmates who
18  used a handgun obtained it through a private transfer.
19  Through all of these numbers and figures, we can arrive
20  at an obvious conclusion.  Requiring background checks
21  for gun sales will prevent violent crimes.  Lives will
22  be saved, plain and simple.
23          Following the 9/11 attacks, our government
24  acted with urgency and committed to ensuring that
25  terrorists would never victimize our citizens again.
0035
1  The strategy was aggressive and, although not perfect,
2  it has worked.
3          Our government has failed to respond with
4  similar urgency to prevent future acts of gun violence.
5  Thirty-three Americans continue to be murdered with guns
6  every day in this country.  That's over 2400 people
7  murdered with a firearm since Sandy Hook.
8          We need to act comprehensively.  The Brady
9  Bill requires background checks only at licensed
10  firearms dealers, while an estimated 40 percent of gun
11  sales are made by unlicensed persons not required to
12  conduct a check.  The Brady Bill operates like a flawed
13  airport security system that ensures only 60 percent of
14  travelers are free of dangerous weapons through
15  screening, while allowing 40 percent of travelers to
16  board the plane unchecked.
17          In Colorado, the same holds true.
18  Coloradans closed the gunshow loophole only to allow the

LEG HX 000714

4629

19    Internet to continue to thrive as a vast marketplace
20    where prohibited persons can easily purchase firearms
21    with no paperwork and no questions asked.
22            Why do we continue to make attempts to
23    prevent the last attack as opposed to predicting where
24    we will be attacked next and shore up that
25    vulnerability?  The fact that this state and our
0036
1    government continues to allow the sale of guns without a
2    background check is reckless, irresponsible, and
3    downright dangerous.
4            Will criminals continue to thwart this
5    regulation?  Of course.  That's what criminals do.  Will
6    law enforcement prevent all crime?  Unfortunately, no.
7    But this new law will help police crack down on gun
8    traffickers and trace guns recovered in violent crimes
9    by requiring dealers to maintain the same records
10    they've kept for license sales for 40 years.
11            This system ensures that there's no
12    registry of gun owners and at the same time helps law
13    enforcement solve crimes.
14            After Aurora, I thought:  Never again.
15    But after Sandy Hook, I think this is going to happen
16    again, and it will until we act.  A system that requires
17    a background check for every gun sale is common sense.
18    It works, and it's supported by 92 percent of Americans.
19            Let's do our best to stop the next attack
20    and let's do it today.  Thank you for your time.
21            THE CHAIRWOMAN:  Thank you, Mr. Chipman.
22            Are there any questions?  Question from
23    Senator Harvey.
24            SENATOR HARVEY:  Thank you.
25            If you'll go back a couple pages in your
0037
1    speech there, you mentioned a percentage of suicides and
2    murders with handguns in states that have background
3    checks.  Do you remember those statistics?
4            MR. CHIPMAN:  Sure, I do.
5            SENATOR HARVEY:  Are those in states that
6    have universal background checks on handguns, or just
7    like in Colorado where you have handgun sales at gun
8    stores?
9            THE CHAIRWOMAN:  Mr. Chipman.
10            MR. CHIPMAN:  I think it's a variety of
11    systems that get background checks beyond what is
12    traditionally just in the gun stores.  So different
13    aspects of the private commerce is regulated.
14            THE CHAIRWOMAN:  Senator Harvey.
15            SENATOR HARVEY:  I don't know this
16    question, so hopefully you can answer it.  How many
17    states have universal background checks on sales?
18            THE CHAIRWOMAN:  Mr. Chipman.
19            MR. CHIPMAN:  It's less than a dozen.  I
20    don't know specifically.  What we do know, though, is

21  that there's one state, Missouri, who actually had
22  background checks on handgun sales.  And through intense
23  lobbying, they did away with that process.  And
24  immediately after that law was thrown out and no more
25  background checks were conducted, gun homicides went up
0038
1   by 25 percent in Missouri.
2            So that's another way to look at how these
3   background checks impact things and how they don't work
4   if they're removed.
5            THE CHAIRWOMAN:  Thank you.
6            A quick question from Senator Harvey.
7            SENATOR HARVEY:  Did they outlaw the
8   transfer of guns without a background check, or was it
9   just the sale of guns without the background check?
10           THE CHAIRWOMAN:  Mr. Chipman.
11           MR. CHIPMAN:  That's a good question that
12  I do not know.
13           THE CHAIRWOMAN:  Thank you.
14           And seeing no other questions, thank you
15  so much for your testimony.
16           And so Jane Dougherty.
17           Thank you, Mrs. Dougherty.  Go ahead and
18  introduce yourself and who you represent today.
19           MS. DOUGHERTY:  My name is Jane Dougherty
20  and I represent my family.
21           I'm from Littleton, Colorado, and I'm here
22  to support House Bill 1229 background checks for all gun
23  sales.  We are all sitting here in this room because of
24  one horrific tragedy, the massacre at Sandy Hook
25  Elementary.  It was the tipping point for our country,
0039
1   the point at which we had finally said:  Enough to gun
2   violence.
3            Sitting here in this room are gun control
4   supporters as well as those who oppose gun legislation.
5   We have different viewpoints, opinions, and goals.
6            On December 14th, 20 children and six
7   women lost their lives at Sandy Hook Elementary School.
8   One of those women was my sister, Mary Sherlach.  The
9   murder of my sister has had a profound impact on me.  I
10  am now deeply involved in this issue, and I have been
11  educating myself to the facts.
12           I have heard that the gun rights
13  extremists feel that a background check is somehow a
14  burden, that requiring a background check on every gun
15  sale, including private sales, is too much of a burden
16  to law-abiding gun owners.  In that case, I would like
17  to speak directly to all law-abiding gun owners.  I
18  would like to tell you what is truly a burden.
19           A burden is hearing about a mass shooting
20  in Connecticut, working with your family through the
21  chaos, trying to confirm it is your sister's school.  A
22  burden is getting a call from your niece telling you,

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

23    "We lost her, that your sister is gone, and having to
24    call your own children to tell them that their aunt has
25    been killed.  A burden is everything that comes after
0040
1    this horrific news, explaining a mass shooting to your
2    10-year-old son, trying to get 15 family members across
3    the country the week before Christmas, walking into your
4    sister's house and seeing your devastated brother-in-law
5    and nieces, then standing in a wake line for four hours,
6    listening and comforting more than 800 mourners who have
7    come to pay their respect to your sister, Mary.
8    Touching the small wood box that holds your sister's
9    remains and trying to hold yourself up during her
10    funeral mass.
11        A true burden is waking up every day with
12    the realization that you will never see your sister
13    again.
14        A background check is not a burden.  It is
15    a process that will save lives.  It will help prevent
16    guns from getting into the hands of those that will do
17    harm.  It may even save the lives of your family, your
18    children, your sister.
19        If you are truly a law-abiding gun owner,
20    you should support background checks for all gun sales.
21        Thank you.
22        THE CHAIRWOMAN:  Thank you so much.
23    Appreciate your being here today and being able to give
24    that powerful testimony, as difficult as it was, I'm
25    sure, and continues to be.
0041
1        So is there any questions from the
2    committee?  Thank you so much.
3        MS. DOUGHERTY:  Thank you.
4        THE CHAIRWOMAN:  So we have some others
5    that are -- and I think we'll go to a three-minute timer
6    phase.  And Julia is going to go ahead and keep that for
7    us.
8        Our first witness on that is Del Phillips.
9        Welcome, Pastor Phillips.  Go ahead and
10    introduce yourself and who you represent today.  Thanks
11    for being here.
12        PASTOR PHILLIPS:  Thank you very much.
13    I'm Pastor Del Phillips.  I'm pastor of
14    The House Worship Center here in Denver, Colorado.  I
15    also serve as the vice president of the Greater Metro
16    Denver Ministerial Alliance.  I pastor a congregation
17    that is multicultural and diverse in its membership.  We
18    have a congregation that's filled with Hispanic members,
19    African Americans, messianic Jewish members, all
20    worshipping together in one house.
21        I'm here today to share my voice as a
22    pastor representing a diverse membership that's a part
23    of our community.  I'm here today to represent the
24    ministerial alliance that represents more than 100

25    churches all across our metro Denver community.  I'm
0042
 1    also here simply to represent myself as a citizen of our
 2    community.
 3            And I want to be on record in support of
 4    background checks for those private citizens who own
 5    guns here in our community.  And I want to make it clear
 6    that I am not against a gun owner's second right, Second
 7    Amendment rights to own a gun.
 8            I am actually in favor of making sure that
 9    all of the citizens of our community have a right -- a
10    right to safety, a right to make sure that, as a nongun
11    owner or as a gun owner, that I have a safe environment
12    to take my children to school and a safe environment for
13    my teenagers to go to a movie theater, that I have a
14    safe environment for politicians to leave their
15    community and not to have their life threatened.
16            And I'm concerned that, as a community,
17    that we are open to the requirements for having
18    background checks for simpler things such as to get a
19    credit card to open up a bank account, to be able to
20    have employment here in our community.  We have
21    employers that will pursue background checks.
22            We don't allow our children to go to
23    certain places for childcare without having background
24    checks.  And, more importantly, government officials
25    won't be employed without having background checks.  So
0043
 1    my greater question is:  Why would we not want to make
 2    sure that a person who is carrying a weapon who has the
 3    potential to take the life of another individual would
 4    not have a background check to make sure that they are
 5    fit, to make sure that they are stable, and to ensure
 6    that the safety of other citizens in our community is
 7    protected?
 8            So I would encourage our leaders that are
 9    present here today to support this issue for background
10    checks.  You've heard statistics already throughout the
11    day.  I won't renew -- I won't renumerate those
12    statistics, but I encourage you to simply consider the
13    necessity of background checks for something that is
14    this vital.
15            THE CHAIRWOMAN:  Thank you so much, and
16    thank you so much for sticking within our time frame.
17            So any questions from the committee?
18            Seeing none, thank you so much for being
19    here, and thank you for the work that you do.
20            Our next witness is Karina Vargas.
21            Welcome, Ms. Vargas.  Go ahead and
22    introduce yourself, who you're representing today, and
23    welcome.
24            MS. VARGAS:  My name is Karina Sartidine,
25    and I am a youth leader with Together Colorado.
0044

1       December 6th of 2010 was the date that my
2  life changed completely.  Like a regular junior in high
3  school, we loved hanging out with our friends after
4  school, but that day was different.  Someone so
5  carelessly took my ability to walk by shooting that gun.
6  If it wouldn't have been for my friends that took my
7  life in their hands, I wouldn't be speaking to you guys
8  today.  My 16th year of life was nearly ended.  Nothing
9  would ever be the same.  Even sleeping wasn't the same.
10         Everyone loves that good morning stretch
11  when all their bones pop.  I don't even get that
12  anymore.
13         I remember always getting ready in the
14  morning for school, changing like a million times
15  because it was so easy and effortless.  Now, it's a
16  workout to even get dressed once.  Even when I'm
17  exhausted from pushing myself in my wheelchair all day,
18  I still have to lift my body just to get in bed.
19         After the shooting, I had a fear of going
20  back because I felt like someone was following me, like
21  people were going to look and stare and feel bad for me,
22  and I didn't want nobody's pity.
23         That day not only changed my physical
24  life, it literally changed everything.  I was left with
25  nothing.  My friends abandoned me.  My school dropped
0045
1  me.  I was left alone.  I was lucky enough to have my
2  family to help me through this because nobody else was
3  around.
4         Never would I wish this on anybody because
5  it's no picnic.  Until this day, there's not one second
6  that goes by that I don't wish that I could walk.  I
7  will never give up until the day that I do, and it's a
8  journey that I'm ready to overcome.
9         If God can move mountains, then I believe
10  that he can help me through this.  If that guy didn't
11  have that gun, my goals would be completely different.
12         I lost a couple of years of my teen years
13  that I will never get back.  You take your kids to
14  school thinking that they will be safe, and then the
15  unexpected happens.
16         Our families have to live in fear because
17  you don't know what can happen anymore.  If this bill
18  would have been put in place two years ago, I would be
19  on my feet today.  Those who have lost loved ones would
20  be at home with them.
21         For those who oppose this bill, don't
22  think it's a problem because they haven't been victims.
23  You haven't lost anyone due to this problem.  Step in
24  our shoes and you will see that it's not easy.
25         I'm here today to share my story and bring
0046
1  awareness to what gun violence does to innocent people
2  in our communities.  Thank you.

3         THE CHAIRWOMAN:  Thank you so much.  I
4 really appreciate how articulate and your willingness to
5 be with us here today and what an advocate you are.  So
6 thank you.
7         Are there any questions?
8         Senator Harvey.
9         SENATOR HARVEY:  Just one.  I didn't get
10 your name.
11         MS. VARGAS:  Karina Sartidine Vargas.
12         SENATOR HARVEY:  I'll just put Karina
13 down.
14         MS. VARGAS:  Just put Karina Vargas.  It's
15 easy.
16         SENATOR HARVEY:  Thank you.
17         THE CHAIRWOMAN:  Thank you so much for
18 being here.
19         The next witness we have are Theresa and
20 Doug Hoover -- Dave.  Sorry.  Theresa and Dave Hoover.
21         Good morning and welcome.  I'll go ahead
22 and have you introduce yourself and who you represent
23 today, and each of you will get three minutes, and
24 however you want to proceed.
25         MR. HOOVER:  Good.
0047
1         Good morning.  My name is Dave Hoover.
2 This is my sister Theresa.  My nephew, her son, was AJ
3 Boik, who was killed in the theater last year,
4 July 20th, 2013.
5         THE CHAIRWOMAN:  '12.
6         MR. HOOVER:  2012.  Sorry.
7         I've been directly affected by gun
8 violence and have been the victim of gun violence during
9 my life.  I'm one of five children.  My parents have 18
10 grandchildren.  My father is a true American hero who
11 served one tour in Korea, two tours in Vietnam.
12         The worst day of our life growing up as
13 young children was the day we found out that he was shot
14 down over Vietnam.  He couldn't be here today.  He spent
15 eight days at home when we lived in Ohio and was sent
16 back to Vietnam to finish out his tour.  He supports
17 this bill.  He supports all these bills, to be honest
18 with you.  He knows the battlefield.  That's a man who
19 understands the responsibility that comes with the right
20 of owning a firearm.  He and my mother are in Arizona
21 right now taking care of a long friend -- a long-term
22 friend.
23         I'm a police sergeant and have been in law
24 enforcement for over 29 years.  I do not speak for the
25 department I work for, but I can tell you the vast
0048
1 majority of men and women I work with support this bill.
2 We want to see change.
3         You're going to hear that we need to
4 enforce the laws that we currently have on the books.

5 Let me reassure you this is happening every day in
6 Colorado.  We are, and the laws are being enforced in
7 this state.  These words of wisdom were given to me when
8 I first started, and I passed them on to those who
9 worked for me:  You can't put them all in jail forever,
10 and it's only a 72-hour mental health hold.
11          Our society gives people the opportunity
12 to change.  Some take advantage of this, and many do
13 not.
14          These children that were killed in our
15 Aurora theater, these children that were killed in Sandy
16 Hook, these children that were killed in Columbine were
17 children of republicans; they were children of
18 democrats.  I'm a republican.  My family are
19 republicans.
20          Many of us understand the importance --
21 and so what? -- to have some reasonableness applied to
22 our state right now.  We've had two major shootings in
23 our state, Columbine and now the Aurora theater
24 shooting.  It's time for us to make a difference.  Many
25 men and women that I work with and am friends with want
0049
1 to see a difference.
2          And I'm going to take some of my sister's
3 time, just so you know.
4          We want to see a difference made in the
5 state, and we want to see our republican representatives
6 do the right thing.  Vote -- these could be your
7 children next -- vote for universal background check.
8 If somebody is not willing to take a background check or
9 go through a background check, then they probably
10 shouldn't own a gun.
11          Finally, I want to leave you with this:
12 On July 20th, at 2:37 a.m. -- my wife and I loved AJ --
13 received a phone call from a historical woman that
14 didn't know where her son was.  I love my sister and she
15 has had to raise two boys alone.  My parents were with
16 them daily as they grew up.
17          AJ was a renaissance man who was
18 first-chair viola at Gateway High School.  He loved
19 doing ceramics.  He was a catcher on the baseball team,
20 and wanted to be an art teacher when he graduated from
21 the Rocky Mountain College of Art and Design.
22          My daughter Amanda was born three months
23 before AJ.  They were very close, more best friends than
24 cousins.
25          AJ took Amanda, her friends from college,
0050
1 and his girlfriend, Lasamoa, who was the love of his
2 life at the time -- he said he wanted to marry her --
3 camping the weekend before he was murdered.  I watched
4 this young man walking towards his '89 Honda, which was
5 a really bad car, by the way, filled with these
6 wonderful girls, and I told him, "Take care of them."

LEG HX 000721

4636

```
7          He stopped, turned around, came back, and
8    gave me a hug.  He said, I love you, Uncle David."  That
9    was the last time I saw him.  I hold on to that every
10   day.
11          The day he was going to watch a midnight
12   premier with his girlfriend, he was at our house mowing
13   our yard to earn money.  I got home to the surprise from
14   my wife, and was more surprised when she told me that
15   she had paid him $40 to mow our yard.  He also helped
16   load the recyclables and pull some weeds.  She said,
17   "Stop, he's your nephew.  He's taking his girlfriend to
18   the movie."  She bought him, my daughter and friend
19   pizza.  There was one slice left.  When AJ was offered,
20   he said, "That's okay, I'll leave the scraps for Uncle
21   David.  He'll be hungry when he gets home."
22          I'd eaten before getting home and didn't
23   touch that piece of pizza.  I can't bring myself to get
24   rid of it; it's still in the freezer.
25          AJ was a very special young man.  There
0051
1    were very special people that day that were killed in
2    the theater, 11 of them, and 58 others that were
3    wounded.  They deserve better than this.  They deserve
4    to have some reasonableness.  They deserve to have you,
5    as our elected representatives, do the right thing, not
6    just for our families -- it's too late -- but possibly
7    for your families and everybody else's in Colorado.
8    It's time for us to make a difference.
9          Thank you.
10          THE CHAIRWOMAN:  Thank you so much,
11   Mr. Hoover.
12          Theresa, would you like to say something?
13          MS. HOOVER:  It's really difficult for me
14   to be here today, but I just pray that this does not
15   happen to anybody else's families.  This is something
16   that you should never -- you should never have to bury
17   your child.  And I just want you to keep that in mind
18   and realize how important that this one thing -- what a
19   big difference it can make, a huge difference.  You can
20   save somebody else's life.  That's what it comes down
21   to.  Thank you.
22          THE CHAIRWOMAN:  Thank you, Theresa.
23   Thank you, Dave.  And, of course, we have no idea, but
24   our condolences go out to you, what it would be like to
25   experience what you all are having to experience every
0052
1    day.
2          MR. HOOVER:  Thank you.
3          MS. HOOVER:  Thank you.
4          THE CHAIRWOMAN:  Thank you for being
5    willing to share your story with us.
6          Our next witness is Dave Moses.
7          So, Mr. Moses, go ahead and introduce
8    yourself and who you represent today.  And thank you for
```

LEG HX 000722    4637

9    being here.
10          MR. MOSES:  Hello.  My name is David
11   Moses, and I'm representing myself and my family.
12          One of the reasons that I'm testifying
13   today is that my brother Steven Moses was murdered with
14   a gun in 1986.
15          My brother was a 23-year-old, talented
16   artist who was winning his battle against the genetic
17   disease cystic fibrosis when he was killed.  He was not
18   part of a mass shooting with any notoriety.  He was like
19   most of the 11,000 Americans that are killed every year
20   in a homicide with gun violence.  He was shot once to
21   the head from behind, on a street in San Francisco, by a
22   complete stranger in a random act of violence.
23          Though this happened 26 years ago, I think
24   about my brother every day and still grieve over his
25   murder.  While it is difficult to describe my own pain
0053
1    over my brother's murder and the continued impact on my
2    life, my children and my sister and her family, the
3    effect on my mom is truly indescribable.  She was, and
4    is, absolutely destroyed by my brother's murder.  And
5    each time she hears of a murder on the news, and of
6    course each time there's a mass shooting, it is like
7    pouring salt in her open wounds that have not healed
8    over the course of 26-plus years.
9          The common-sense legislation that is
10   before you likely could have prevented my brother's
11   murder.  My brother's murderer could not have passed a
12   background check.
13          It boggles my mind that, in Colorado,
14   where we have enough common sense and enough pain after
15   the Columbine massacre to close the gunshow loophole,
16   that we have not long ago closed the gun sale loophole.
17   It is self-evident to me and I would think all
18   law-abiding Coloradans that making someone undergo a
19   background check prior to obtaining a gun is a good and
20   necessary thing that does not infringe on anyone's
21   rights.
22          It is incomprehensible to me that private
23   gun sales, which account for 40 percent of all gun
24   sales, do not require background checks.  The purchasers
25   in these private sales are still buying a gun that could
0054
1    be used to kill someone like my innocent brother.
2          Closing the private gun sale loophole is
3    common sense and is the right thing to do.
4          THE CHAIRWOMAN:  Thank you so much.  And,
5    certainly, I can imagine 26 years still doesn't heal
6    that.  So thank you for being here today.
7          Is there any questions from the committee?
8    I see none.
9          Thank you so much.
10          Katie Lyles.  Welcome so much and go ahead

11  and proceed to introduce yourself and who you represent
12  today.  Thank you.
13          MS. LYLES:  Thank you.  My name is Katie
14  Lyles, and I'm here to express my support of House Bill
15  1229.  I represent myself.
16          This bill is a step towards the
17  comprehensive solution we need to help ensure the safety
18  of our student at schools as well as the safety of the
19  people of Colorado.  I speak as a teacher and also as a
20  survivor of the school violence that occurred at
21  Columbine High School.
22          As a sophomore at Columbine when the
23  shootings happened, and after Columbine, the people of
24  Colorado chose to close the gunshow loophole, but we
25  cannot stop there.  It's time to take the next step to
0055
1  close this major loophole in our gun laws.
2          On the morning of April 20th, 1999, I
3  headed to Columbine High School, worried about my tenth
4  grade math test that I was supposed to take that day and
5  my upcoming track meet.  That math test was never
6  finished due to the tragic events that unfolded at my
7  school, leaving 13 dead and countless others wounded,
8  and all of our innocence shattered.
9          The shooters at my school obtained their
10  guns illegally through private sales and straw
11  purchases.  Today they could easily go online and buy
12  these same weapons without a background check.  What is
13  to stop the next person who chooses from doing just
14  that?
15          Now as a teacher of eight years, I
16  consider every day that I go to work a privilege to be
17  with my students.  I cherish their joy and enthusiasm
18  and, most importantly, their innocence.  I believe it is
19  our job as a society to protect these virtues in our
20  young people.  I want them to be worried about math
21  tests and track meets and about science fairs and
22  student council elections.  That is the normal stuff
23  that builds character.
24          But we are creating a school culture that
25  is instead worried about safety and intruders, something
0056
1  that no student should be aware of.
2          This became even more apparent about a
3  year ago when I was sitting in complete silence in inky
4  black dark of my classroom storage room.  I was
5  surrounded by 24 second-graders who crouched on the
6  floor with me.  I whispered to my students that they
7  were doing such a respectful job hiding, and a quiet
8  hand found mine as Anthony, a seven-year-old boy that
9  was crammed next to me, searched for comfort from such
10  an unnatural scenario.
11          We were conducting our monthly emergency
12  drill.  In this case, a lockdown.  My heart broke for

LEG HX 000724    4639

13  Anthony and his classmates, that they would have to
14  learn these types of drills at such a young age, if at
15  all.  And I thought to myself:  This is the result of
16  the Columbine shootings, and this is my reality, and now
17  it is theirs, too.
18          This is the reality that we live in, and
19  it is a sad one, but I dare say not a helpless one.  And
20  that is why we need your help.
21          I ask you today to pass House Bill 1229 to
22  ensure the safety of our students.  We have the power to
23  work together as a society to create a safer world for
24  our schools, and that starts today with the passage of
25  HB 1229.  Learn from my experience and do not wait until
0057
 1  you have to experience it firsthand to realize that
 2  action needs to happen.
 3          This bill still allows the Second
 4  Amendment to thrive while also allowing our young people
 5  to be safe and also thrive.  This is a reasonable
 6  restriction.
 7          Thank you for your time and
 8  open-mindedness.
 9          THE CHAIRWOMAN:  Thank you so much, and
10  right under the time frame here.
11          Is there any questions for Ms. Lyles?
12          Doesn't look like it.  Thank you so much
13  for being here and for your service to your students.
14          MS. LYLES:  Thank you.
15          THE CHAIRWOMAN:  Amy Miller.  Maybe I'm
16  looking at not the revised one.  Maybe there's a
17  revised.
18          Who do you have?  Oh, Marjorie Sloan.  I
19  must have -- Marjorie, I'm so sorry.
20          MS. SLOAN:  (Inaudible.)
21          THE CHAIRWOMAN:  Well, I apologize.  I
22  certainly don't want to miss you.
23          Mrs. Sloan, go ahead and introduce
24  yourself and who you represent today.
25          MS. SLOAN:  Thank you so much.
0058
 1          THE CHAIRWOMAN:  My apologies.
 2          MS. SLOAN:  Madam Chair and the committee,
 3  I am Marjorie Sloan.  I'm the mayor of Golden.  I'm here
 4  today to represent Golden City Council, which, in
 5  October 2012, unanimously passed a resolution in support
 6  of a background check on all gun sales.  I'm also
 7  speaking as a member of the national bipartisan
 8  coalition of Mayors Against Illegal Guns.  It too
 9  supports closing the private sales loophole.
10          When discussing this issue, I've often
11  asked if Golden has a gun violence problem.  The answer
12  is:  Gun violence menaces all communities in Colorado,
13  whether urban, suburban, or rural.  The steady stream of
14  shootings in our country has shocked all of us out of

15  our trust and the safety in our communities.  We have a
16  problem.  And HB 1229 will help solve the problem.
17          As the NRA says, criminals obtain guns
18  through theft, black market transactions, and straw
19  purchases.  The private sale loophole is part of the
20  market for trafficking illegal guns.
21          The facts are these:  62 percent of
22  private gun sale sellers on the Internet agree to sell
23  firearms to buyers who, frankly, admitted they probably
24  couldn't pass a background check.
25          80 percent of criminals who use the gun in
0059
1  their crimes obtain one through a private sale.
2          Background checks are the only systematic
3  way to stop felons, domestic abusers, and the
4  dangerously mentally ill from buying guns.  We can't
5  prevent every gun crime, but conducting a background
6  check on all private transactions will sharply reduce
7  gun violence across the state.
8          Background checks work.  Last year in
9  Colorado alone, background checks stopped 5,832
10  prohibited purchasers from obtaining a gun.  It's
11  difficult to estimate or even imagine the number of guns
12  that slipped through the private sales loophole and
13  found their way into criminal hands.
14          It's time to take action to fix this
15  loophole.  Colorado is a can-do state.  At least
16  83 percent of Coloradans, including a large majority of
17  NRA gun owners, recognize the value of background checks
18  on all gun sales.  Please listen to them, like the rest
19  of Colorado, and fix the hole in the fence.  Do it and
20  vote yes on HB 1229.
21          Thank you.
22          THE CHAIRWOMAN:  Thank you so much, Mayor
23  Sloan.  I appreciate you being here.
24          Is there any questions from the committee?
25  Thank you.
0060
1          MS. SLOAN:  Thank you.
2          THE CHAIRWOMAN:  Now we can have Amy
3  Miller, if she's in the room.
4          Well, Amy might come a little bit later.
5          I'm going to go ahead and go to Tom
6  Mauser.
7          Mr. Mauser, welcome.  Go ahead and
8  introduce yourself and who you represent today.
9          MR. MAUSER:  Thank you, thank you, Madam
10  Chair.
11          My name is Tom Mauser.  I'm the father of
12  Daniel Mauser, who was one of the victims at Columbine
13  High School.  I'm here today honoring him by wearing the
14  shoes he was wearing that tragic day.  And I'm here
15  asking for your support of 1229.
16          My son was a member of the debate team at

17  Columbine.  And one night he asked me a question at the
18  dinner table:  Dad, did you know there are loopholes in
19  the Brady Bill?  Two weeks later he was killed with a
20  gun purchased through one of those loopholes by two
21  teenagers who knew they wouldn't have to face a
22  background check or leave a paper trail if they bought
23  from a private seller.  So I dedicated myself to closing
24  those loopholes.
25            In 2000, I was spokesman for the Amendment
0061
1  22 ballot initiative that closed that gunshow loophole
2  in Colorado by an overwhelming vote of 70 percent to
3  30 percent.
4            Now, opponents of Amendment 22 predicted
5  the demise of private sellers at gunshows and even the
6  death of the gunshows themselves if Amendment 22 passed.
7  Well, that didn't happen.  And you'll no doubt hear the
8  same kind of dire predictions here today.  Opponents
9  will say that criminals will always be able to get
10  firearms.  Well, they will if you're going to make it
11  easy for them with loopholes.  So let's not make it
12  easy.  Let's put in a measure of prevention.
13            I'm sure you've all been flooded with an
14  awful lot of calls and e-mails on this issue, but I ask
15  you to keep in mind that polls show over 85 percent of
16  Coloradans support background checks.  So I urge you,
17  listen to the voices of the main streamists, not the
18  extremists.
19            Finally, the eyes of the nation are upon
20  Colorado.  They're looking to see how we respond to
21  these tragedies.  Will it be with disregard or concern?
22  With denial or change?  With hopelessness or hope?
23            I'm proud of the choice that Colorado
24  voters made in 2000, and I urge you to make that same
25  choice and make Colorado proud again.  Thank you.
0062
1            THE CHAIRWOMAN:  Thank you so much,
2  Mr. Mauser.
3            I have a question from Senator Crowder.
4            SENATOR CROWDER:  Yes, thank you for being
5  here today.  I was just curious:  On your 85 percent
6  mark, what do you base that on?
7            MR. MAUSER:  That was a Denver Post poll.
8            SENATOR CROWDER:  A Denver Post poll?
9            MR. MAUSER:  Yes.
10            THE CHAIRWOMAN:  I'm going to go ahead and
11  have us continue to stay and go through the chair.
12            MR. MAUSER:  I'm sorry.
13            THE CHAIRWOMAN:  That's fine.  We're all
14  trying to follow our rules up here, too.
15            SENATOR CROWDER:  Thank you, Madam Chair.
16            THE CHAIRWOMAN:  Thanks.
17            Is there any other questions?
18            Thank you so much.

LEG HX 000727    4642

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

19          MR. MAUSER:  Thank you.
20          SENATOR CROWDER:  Nice shoes.
21          THE CHAIRWOMAN:  I'll go ahead and ask for
22  Amy Miller.  No.
23          Okay, we're going to go to Ted Pascoe.
24          Thank you, Mr. Pascoe.  Welcome.  Go ahead
25  and introduce yourself and who you represent.
0063
1          MR. PASCOE:  Thank you very much.
2          My name is Ted Pascoe, and I'm testifying
3  on behalf of Colorado Ceasefire, which is an
4  organization that has been fighting for stronger gun
5  laws for 14 years here in Colorado.  We are here to
6  voice our enthusiastic support for House Bill 1229.
7          The current law requires licensed gun
8  dealers to subject gun buyers to background checks.
9  However, if you are not a licensed gun dealer, you can
10  sell your gun freely without having to bother with the
11  check.  In Colorado, this means that anyone can easily
12  acquire a gun through armslist.com, for instance,
13  without having to pass a background check.
14          A study by the National Institute of
15  Justice found that, due to this loophole in the law,
16  40 percent of all gun sales are not subject to
17  background checks.
18          It is through this enormous loophole that
19  felons and other prohibited purchasers are easily able
20  to get guns.  A national survey of inmates revealed that
21  80 percent of those who had used a handgun in a crime
22  acquired it in this fashion.
23          The cavalier way in which we currently
24  sell guns in this country is tantamount to making
25  passing through airport security prior to flying
0064
1  optional.  Background checks prior to all gun sales will
2  preserve public safety and provide peace of mind to the
3  seller, assuring him he's not selling to a criminal.
4          Private gun sellers have a competitive
5  advantage over licensed dealers because dealers must
6  subject all buyers to background checks.  The private
7  seller can mark up his prices significantly because the
8  buyer is not subject to a background check.
9          This legislation will level the playing
10  field for responsible, licensed gun dealers.
11          To those opponents of this legislation who
12  would invoke the Second Amendment, let's turn to the
13  landmark 2008 Heller decision in which the U.S. Supreme
14  Court found background checks to be reasonable and
15  constitutional.  The majority opinion written by Justice
16  Scalia reads, quote:  Like most rights, the Second
17  Amendment is not unlimited.  The Court's opinion should
18  not cast doubt on longstanding prohibitions on the
19  possession of firearms by felons and the mentally ill or
20  laws imposing conditions and qualifications on the sale

21  of arms, quote.
22          In a recent poll by Keating Research,
23  80 percent of Coloradans favor background checks prior
24  to all gun sales.  In another recent poll by The Denver
25  Post, the response in favor to the same question was
0065
1  83 percent.
2          There's overwhelming public support for
3  background checks prior to all gun sales.
4          On behalf of Colorado Ceasefire, I ask for
5  a yes vote on HB 1229.  Thank you.
6          THE CHAIRWOMAN:  Thank you.  Perfect
7  timing.  Appreciate it, Mr. Pascoe.
8          Any questions from the committee?
9          Thank you so much.
10          MR. PASCOE:  Thank you.
11          THE CHAIRWOMAN:  Don Macalady.
12          MR. MACALADY:  Madam Chairman --
13          THE CHAIRWOMAN:  Thank you.  Welcome,
14  Mr. Macalady.  Go ahead and introduce yourself and who
15  you represent today.
16          MR. MACALADY:  Thank you for the
17  opportunity to speak to you today.
18          My name is Donald Macalady, and I live in
19  Golden, Colorado, and I represent an organization called
20  Hunters Against Gun Violence.  My group was established
21  to put to rest the notion that all gun owners,
22  specifically hunters, are opposed to reasonable
23  legislation concerning firearms.  We are a growing group
24  of hunters, including hunters varying in age from 20 to
25  75.  We are in strong support of House Bill 13-229.
0066
1          As a young man, I joined the National
2  Rifle Association to learn gun safety and to participate
3  in their educational programs concerning guns.  The
4  hunting rifle that I use to this day is a modified gun
5  purchased through an NRA program to sell surplus
6  military weapons.  I left the NRA many years ago as it
7  moved from primarily promoting gun safety to primarily
8  promoting guns.
9          I have lived and hunted in Colorado for
10  the past 30 years.  All of my children are hunters, and
11  they all grew up helping to provide meat for our family
12  through our hunting activities.  They are all gun owners
13  and have a healthy respect for guns and their safe use.
14          My family and the members of our
15  organization are testimony to the fact that many, if not
16  most, gun owners are in favor of sensible gun
17  legislation.  As hunters, we understand that gun
18  ownership means responsibility.
19          We urge all -- we all believe and support
20  the Second Amendment.  It is, in fact, one reason we
21  urge passage of this bill.  It actually protects our
22  Second Amendment rights to make sure that guns do not

LEG HX 000729    4644

23  fall into the wrong hands, the hands of those who are
24  not able or willing to handle the serious responsibility
25  of gun ownership.
0067
 1          Background checks, of course, are no
 2  panacea for gun violence, but they are a necessary and
 3  desirable step to move us toward a society less plagued
 4  by senseless gun crimes.  Many such crimes are committed
 5  by persons who have no right to own or use or
 6  otherwise -- own them or use otherwise legal weapons.
 7  There are, of course, questions about the costs and the
 8  administration of the system HB 13-229 starts.
 9          The legislation itself does not
10  effectively deal with the questions.  And in proclaiming
11  our support for this bill, we assume that you will
12  tackle these difficult issues in a manner that does not
13  represent a large burden for taxpayers of Colorado.
14          Opponents to universal background checks
15  cite the difficulties for certain types of transfer of
16  gun ownership.  We are impressed with the fact that HB
17  13-229 does not ignore these difficulties and attempts
18  to deal with them in a fair and unobtrusive manner.
19          Thank you for your attention.
20          THE CHAIRWOMAN:  Thank you.
21          I'm just so impressed with how everybody
22  is able to stick with these three minutes.  Thank you,
23  Mr. Macalady.
24          Is there any questions from the committee?
25  Senator Crowder.
0068
 1          SENATOR CROWDER:  Thank you, Madam Chair.
 2          In your delivery here, you talked a lot
 3  about what you support and, you know, the individuals
 4  who are a criminal element.  Could you give me an
 5  opinion on what you think about the vast -- the
 6  99 percent of the American people who are not involved
 7  in a situation where they would do something illegal?
 8  Do you think this would not be an imposition on them, on
 9  their ability as a free people to have to adhere to
10  this?
11          Thank you.
12          THE CHAIRWOMAN:  Mr. Macalady.
13          MR. MACALADY:  No, I don't think so.  I
14  think most of us, most hunters, most gun owners, would
15  be perfectly willing to submit to the minor
16  inconvenience of a background check in order to promote
17  gun safety.
18          THE CHAIRWOMAN:  Thank you so much.  Thank
19  you.
20          I'm going to go to Alan Franklin.
21          Welcome, Mr. Franklin.  Go ahead and
22  introduce yourself and who you're representing today.
23          MR. FRANKLIN:  Good afternoon, and thank
24  you for giving me the opportunity.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

0069
1  political director of Progress Now Colorado.  We are the
2  state's largest online progressive advocacy
3  organization, originally founded in 2003 as the Rocky
4  Mountain Progressive Network.
5          There are many ways to evaluate my
6  organization's effectiveness in Colorado politics.  One
7  the committee might find useful is this:  Our
8  preliminary information indicates some 73,000 Progress
9  Now Colorado members voted in the 2012 elections.
10         I am here today to ask gun lobbyists and
11 republican legislators to stop misleading and inciting
12 the public about proposed gun safety legislation.  We
13 could have chosen any of the gun safety bills now up for
14 debate in the Colorado Senate, but the case of House
15 Bill 1229 is one of such clear deception on the part of
16 the gun lobby that the rebuttal to the campaign against
17 common-sense gun safety legislation must begin here.
18         Closing the background check loophole is
19 supported by an overwhelming majority of voters.  One
20 CBS New York Times poll in January found that over
21 90 percent of respondents favor background check for all
22 gun buyers.  The percentage varies in studies, but
23 without a doubt a substantial number of gun sales in
24 Colorado today are unregulated transactions where no
25 background check of the buyer takes place.
0070
1          Rocky Mountain Gun Owners, the same,
2  quote/unquote, nonprofit group organizing protests
3  against legislators in this body runs a paid access
4  website called the Colorado Gun Market, which makes
5  bypassing background checks and buying guns as a
6  criminal simple.
7          This is critical to understand.  The group
8  leading the fight against this bill is profiting from
9  keeping the background check loophole open and may
10 itself even be facilitating the sale of guns to
11 criminals.  The fact is, the public overwhelmingly
12 supports closing this loophole.  That's why the gun
13 lobby has resorted to outright lies, claiming that the
14 bill would criminalize and prohibit the private transfer
15 of firearms.  It's not true.
16         All this bill requires is that buyers of
17 guns, including private transfers, which undeniably
18 results in guns being acquired by criminals today,
19 complete the same background check required at retail
20 stores and gunshows.
21         The arguments against House Bill 1229 run
22 the gamut from misinformed and nonsensical.  Closing the
23 background check loophole will not require the
24 registration of guns any more than the background checks
25 the CBI performs today.  And the CBI supports this bill.
0071

1     And while it's true that criminals will
2   still be criminals, break laws such as this one, that's
3   no excuse for failing to pass a law that will stop some
4   criminals who would otherwise be able to buy a gun
5   today.
6             The provisions in this bill exempt
7   immediate family members and other specific
8   circumstances that are appropriate.
9             Now, in conclusion, it is not enough for
10  me to tell members of this committee on behalf of the
11  thousands of Colorado progressives that I speak for that
12  we urge a yes vote on 1229.
13            On behalf of every Coloradoan who is
14  disgusted by the right wing's unreasonable opposition to
15  common-sense reform --
16            THE CHAIRWOMAN:  Mr. Franklin.
17            MR. FRANKLIN:  -- and willingness to
18  misrepresent --
19            THE CHAIRWOMAN:  Mr. Franklin.
20  Mr. Franklin, your time is up.  I'm sorry.  Your time is
21  up.
22            MR. FRANKLIN:  Any questions?
23            SENATOR CROWDER:  Yes, I have one.
24            THE CHAIRWOMAN:  I'll go ahead and ask for
25  questions.
0072
1             So, Mr. Crowder, Senator Crowder.
2             SENATOR CROWDER:  Well, thank you, Madam
3   Chair.
4             I guess I would start by saying, you know,
5   it's interesting to hear you talk, but I really don't
6   agree with that.  As a republican myself, I do not
7   follow the line of the NRA.  I do not follow the line of
8   what you speak of.  What I follow is the laws of this
9   country.
10            We have a Second Amendment right, and we
11  also have -- we have a right in this country to
12  basically believe what we want without being intimidated
13  by anybody.  And as a republican, I assure you that we
14  are not intimidated by anyone.
15            But as far as your -- I have received over
16  5,000 e-mails on this subject alone.  And I dispute very
17  dramatically that the overwhelmingly people do support
18  this, because what I have done on the 5,000 e-mails I
19  have received this past week, 2 or 3 percent are in
20  favor of this.  The rest of the state is opposed to it.
21            So when you say that the republicans are
22  the right wing inciters of this -- what we're looking
23  for is actual laws that we as men can live by.  We do
24  not -- we do not fall into the trap of inciting one side
25  against the other.  What we want is reasonable.  And I'm
0073
1   talking about reasonable laws that people can live by.
2             But I also believe that we are a free

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

3   nation. And, indeed, if we are a free nation, we should
4   be looking at ways to reduce the amount of restrictions,
5   not expanding it, you know.
6              And, you know, I appreciate what you do,
7   and I'm sure you adhere to your beliefs very much, but
8   these are your beliefs, not the rest of the people of
9   the state of Colorado.
10             We have to -- I don't want to go on too
11  long, but we need to realize that there are more than
12  just one view on this subject matter than the
13  progressive that you adhere to.  But I do somewhat
14  resent the idea that, as a republican, I'm going with
15  some kind of right-wing issue, because it's not that way
16  at all.  But I thank you for your time.
17             MR. FRANKLIN:  Well, thank you.
18             THE CHAIRWOMAN:  Thank you.  I'm going to
19  go ahead and -- because we still have some other people
20  and we're running out of time and there's still people
21  -- thank you so much.
22             MR. FRANKLIN:  I look forward to
23  responding to you via e-mail, Senator.  Thank you.
24             Will I get the opportunity to respond to
25  any of these responses?
0074
1              THE CHAIRWOMAN:  You know, not in this
2   format.  I apologize that we don't have that
3   opportunity.  And I --
4              MR. FRANKLIN:  Well, I've got their
5   e-mail.  That's fine.  Go ahead.
6              THE CHAIRWOMAN:  Thank you.  We're not
7   going to ask any questions.  I'm going to go to the
8   next --
9              UNIDENTIFIED SPEAKER:  Can I make a
10  response?  I'm not going to ask a question.  I just need
11  to clarify something that was said.
12             THE CHAIRWOMAN:  Well, what I'll do is go
13  ahead and extend the time, then, because I still have
14  some more witnesses, if that's comfortable.
15             UNIDENTIFIED SPEAKER:  That's fine.
16             THE CHAIRWOMAN:  Okay, go ahead.
17             UNIDENTIFIED SPEAKER:  I was out of the
18  room.  I apologize.  I didn't get to hear your
19  testimony, but I was told that it was said that these
20  gun groups are making a profit off of gun sales.  And I
21  just want to clarify for the record that the NRA does
22  not sell guns and RMGO does not sell guns.  They do not
23  make any profit on the --
24             MR. FRANKLIN:  My comment was in reference
25  to the Colorado e-market website, which is operated by
0075
1   the RMGO.
2              THE CHAIRWOMAN:  Mr. Franklin, I
3   appreciate that.  I'm going to go ahead and excuse you,
4   and we'll --

5      MR. FRANKLIN:  Thank you for your time,
6    members of the committee.
7           THE CHAIRWOMAN:  Thank you so much.
8           So our next person signed up is Amy
9    Miller.  Amy is -- okay, I will call the next witness.
10          Mark Thurn -- or Thrun, I guess.
11          Thank you.  Go ahead and introduce
12    yourself and who you represent today.  Thank you.
13          MR. THRUN:  Thank you, Madam Chair.
14          My name is Mark Thrun.  I'm a public
15    health physician here in Denver.  I serve on the board
16    of directors of the Colorado Public Health Association,
17    and I'm here today representing this organization in
18    support of House Bill 1229.
19          The Colorado Public Health Association,
20    affiliated with the American Public Health Association,
21    is comprised of members who serve the state of Colorado
22    as public health officials or have general interest in
23    community well-being and health.
24          There are few public health issues that
25    impact the community, our community, in such a tragic
0076
1    and horrendous manner as the violence of one person
2    using a firearm against another person.
3           As firearm regulation is a public health
4    issue, and as this body has proven it can impact the
5    public's health through the development of wise and fair
6    laws, such as the one proposed here today, we urge you
7    to vote in support of this bill.
8           As it has with other matters of public
9    health from hospital infection data reporting to
10    establishing speed limits on highways, this body has the
11    authority, both legally and morally, to promote the
12    common welfare, to protect the public's health.
13          We urge you to keep guns out of the hands
14    of those unfit to own them.  We urge you to expand
15    background checks.  We urge you to vote for House Bill
16    1229.
17          THE CHAIRWOMAN:  Thank you so much,
18    Dr. Thrun.
19          Is there any questions from the committee?
20    Thank you.
21          MR. THRUN:  Thank you, Madam Chair.
22          THE CHAIRWOMAN:  And I'm wondering if Amy
23    Miller is in the room at this point.  Yes?  No.
24          I'm going to go ahead and go to the next
25    witness, Jack Dais.
0077
1           Mr. Dais, welcome.  Go ahead and introduce
2    yourself and who you represent today.
3           MR. DAIS:  Chairman Giron, members of the
4    committee, thank you for the opportunity to be here.
5           My name is Jack Dais, and I represent the
6    organization Hunters Against Gun Violence.  I'll be

7  brief and just provide a few remarks.
8       I've hunted pheasant, quail, and rabbits
9  for more than 60 years, and deer and elk for more than
10  50 years.  So I do own some guns.
11       I'm a Colorado resident for 33 years, and
12  I'm here today because I'm saddened by the large and
13  increasing gun violence in Colorado and around the
14  United States.
15       I have read House Bill 1229 and believe
16  that I largely understand it.  Because I believe that
17  closing the private sale background check loophole will
18  help reduce gun violence, I urge the senate to pass the
19  bill.
20       The various provisions in Section 1 do not
21  appear burdensome and seem to make good sense.  For an
22  aging gun owner like me, the bill provides
23  understandable options for gun transfers through private
24  sales, gifts to family members, or post-death means.
25       Thank you for having me.
0078
1       THE CHAIRWOMAN:  Thank you so much.
2       Is there any questions?  Senator Crowder.
3       SENATOR CROWDER:  Thank you, Madam Chair.
4       Thank you for being here today.
5       Do you think that the guns of which you
6  own now, that the people within your family that you
7  give those guns to should have a background check for
8  those guns before you can give them to them?
9       THE CHAIRWOMAN:  Mr. Dais.
10       MR. DAIS:  No, I don't think that they
11  should.  And let's say I also understand that, as the
12  bill provides, I can gift these to my kids without that.
13  But, however, I'd have no objection to their undergoing
14  a background check.
15       THE CHAIRWOMAN:  Thank you.
16       SENATOR CROWDER:  One more question.
17       THE CHAIRWOMAN:  One quick question,
18  Senator Crowder.
19       SENATOR CROWDER:  If, in fact, you were a
20  gun collector where you collected guns, which some
21  people do, do you think that each gun that you bought,
22  you should have to have a background check as a gun
23  collector?
24       THE CHAIRWOMAN:  Mr. Dais.
25       MR. DAIS:  Could I ask, are these guns
0079
1  that I already own?
2       SENATOR CROWDER:  No, sir.  You, as a gun
3  collector -- this is a little bit off your topic, but
4  you said you are a hunter and you have several guns --
5  but, if in fact -- there are people that do purchase
6  guns for various reasons, collection or whatever, but as
7  a -- if you were to be that person that bought these
8  guns as a collector, and let's say that you wanted to

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

9    buy 30, 40 guns, do you think that you should have to
10   have a background check on each and every gun that you
11   buy --
12              THE CHAIRWOMAN:  Mr. Dais.
13              SENATOR CROWDER:  -- under that
14   circumstance?
15              MR. DAIS:  Good question.  Anyway, I think
16   that I should have to have a background check.  I'm not
17   sure that I should have to do 30 of them, if I purchase
18   all of these in a week.
19              THE CHAIRWOMAN:  Senator Crowder.
20              SENATOR CROWDER:  Thank you, Madam Chair.
21              That was kind of the question I was
22   getting at.
23              THE CHAIRWOMAN:  Okay.  Senator Jones.
24              SENATOR JONES:  Thank you, Madam Chair.
25              So if you were doing a background -- if
0080
1    you were purchasing guns through time, if a person was,
2    and it had been a year and they collected a new gun, and
3    things could have happened, this person could have
4    committed a crime.  Do you think they need a background
5    check?
6              THE CHAIRWOMAN:  Mr. Dais.
7              MR. DAIS:  I'm not totally sure I
8    understand the question, but if a year goes by between a
9    person's gun purchases, and if it's possible that they
10   could have committed a crime in that -- I hadn't thought
11   about that, but, yeah, it seems to me to be reasonable,
12   if a year's time has lapsed, to go through another
13   background check, it would seem to be reasonable.
14             THE CHAIRWOMAN:  Thank you so much for
15   being here.  And we will have one more witness.
16   Ms. Miller is here.  And then that's our last witness
17   for the people in support.
18             Welcome, Mrs. Miller.  Appreciate your
19   being here.
20             Go ahead, introduce yourself and who you
21   represent.
22             MS. MILLER:  Thank you, Madam Chair,
23   members of the committee.
24             My name is Amy Miller, and I represent the
25   Colorado Coalition Against Domestic Violence.  We are a
0081
1    statewide nonprofit organization, and we are here to
2    speak on behalf of the domestic violence organizations
3    in the state who serve thousands of victims every year.
4              We're in support of House Bill 1229.  Let
5    me tell you a story that illustrates why we support this
6    bill.
7              On December 18th of last year, just a few
8    days after the tragedy in Newtown, there was another
9    mass shooting here in Colorado, in Longmont, Colorado.
10   It was a domestic violence shooting in which three

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

11  victims were murdered, followed by the perpetrator's
12  suicide.  The domestic violence offender, Daniel
13  Sanchez, had just been released six hours prior from an
14  overnight stay in jail for holding his ex-girlfriend
15  hostage for several hours, assaulting her, stealing her
16  cell phone, and sending threatening text messages to her
17  new boyfriend.
18          Sanchez was released at 10 p.m. Monday
19  night.  And at 4 a.m., he shot and killed his
20  ex-girlfriend, Beatriz Cintora-Silva, age 25; and her
21  sister, age 22; and her brother-in-law, age 29, with a
22  .45 caliber Glock handgun.
23          He did not possess that firearm before he
24  was released from jail.  He should not have been able to
25  obtain that firearm, given what he had just been
0082
1  through.
2          Under federal law, individuals who have
3  been convicted of a qualifying misdemeanor domestic
4  violence offense or who are subject to a qualifying
5  domestic violence protection order, like Sanchez was,
6  can't legally buy or possess firearms.  But an estimated
7  30 to 40 percent of firearms are purchased without a
8  background check, making thorough enforcement of the law
9  all but impossible and creating a loophole through which
10  domestic abusers obtain guns.
11          Here in Colorado, in 2011, the most recent
12  year for which data is available, at least 13 of the 34
13  domestic violence deaths in our state occurred in cases
14  where the domestic violence offender used a firearm
15  despite being prohibited under the law from purchasing
16  or possessing firearms.
17          Studies reveal that the presence of
18  firearms significantly increases the lethality of
19  domestic violence incidents.  According to one such
20  study, domestic violence assaults involving a firearm
21  are 23 times more likely to result in death than those
22  involving other bodily -- other weapons or bodily force.
23          A similar study found that abused women
24  are five times more likely to be killed by their abuser
25  if the abuser owns a firearm.  According to Department
0083
1  of Justice statistics, in states that require background
2  checks for every handgun sale, 38 percent fewer women
3  are shot to death by their intimate partners.
4          We know existing background checks keep
5  guns out of the hands of domestic abusers and that lives
6  will be saved in this state by keeping guns out of the
7  hands of even more abusers.
8          Please take this opportunity to keep
9  Colorado's women and children safe.  I urge your vote in
10  favor of House Bill 1229.  Thank you.
11          THE CHAIRWOMAN:  Thank you so much.
12          We have a question from Senator Harvey.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

13        SENATOR HARVEY:  Thank you, Mrs. Miller --
14 Ms. Miller, for being here.
15        Go back to the case that you brought up
16 that he didn't have a gun prior to committing that
17 crime.  How did he get that gun, do you know?
18        THE CHAIRWOMAN:  Mrs. Miller.
19        MS. MILLER:  Thank you, Madam Chair,
20 Senator Harvey.
21        I don't know exactly the details of that,
22 but he would have been prohibited under even state law
23 for an arrest -- because we do have a law that addresses
24 that, even -- would have been prohibited from being able
25 to lawfully purchase a firearm.  So must have obtained
0084
1 it through unlawful means.
2        THE CHAIRWOMAN:  Senator Harvey.
3        SENATOR HARVEY:  That's my point.  He was
4 already -- it was already against the law for him to
5 have a gun, and I doubt he got it through
6 a family member that transferred it to him.  And this
7 bill wouldn't have applied to that.  And it's already
8 against the law to murder somebody.  So he broke that
9 law as well.
10        I understand your -- your rationale, but I
11 don't agree with your nexus because I don't agree that
12 had this bill been in place, that it would have stopped
13 the murders that you talked about.
14        And so I want to make sure we all
15 understand -- we need to have a nexus between the
16 legislation that we're passing and the things we're
17 trying to stop.  And that's what makes good public
18 policy, if you can tie that nexus together.
19        And I don't believe that in that certain
20 circumstance that that was said -- and that was your
21 example -- and I want all of us to think rationally
22 about what we're doing with these kinds of public
23 policies.  Thank you very much.
24        MS. MILLER:  Thank you so much.
25        THE CHAIRWOMAN:  Thank you, Mrs. Miller.
0085
1 Appreciate it.
2        MS. MILLER:  Thank you.
3        THE CHAIRWOMAN:  So that is the amount of
4 time we have.  We actually did have some more people
5 sign up.  I apologize that we're not going to be able to
6 hear from any more of those in support, because of the
7 time now.
8        SENATOR CROWDER:  Madam Chair, may I ask a
9 question?
10        THE CHAIRWOMAN:  Yeah, let me go ahead and
11 finish my sentence.
12        SENATOR CROWDER:  I'm sorry.
13        THE CHAIRWOMAN:  That's okay.
14        We're going to move to the people in

15    opposition, and I do have a list of them as well.
16        Senator Crowder.
17        SENATOR CROWDER:  Well, I was just curious
18  as to the amount of people that are left to testify on
19  that.  Is there a particular number that you have?
20        THE CHAIRWOMAN:  No.  I went through my
21  list and there was some more.  So what I want to do is
22  be able to move through here so we can get going.
23        Kris -- our first witness, Krista --
24  Krista, is that -- we're going to go ahead and get our
25  first witness.
0086
1        And just for anybody who's new in the
2  room, we're doing 90 minutes to those in support, 90
3  minutes in opposition.  And I'll kind of get the clue
4  when we're going from expert public testimony, which
5  does not have a time limit.  So when I get that, we'll
6  do that, but it's still the same 90 minutes.  After that
7  we'll go into the timing, as you notice.  But if you
8  weren't here at the beginning, we did have some people
9  that were not limited by time.
10        Thank you.  Okay, great.
11        So, Krista, you're here with the State
12  testifying.  You have some support people, but I
13  understand they're not going to be testifying.
14        MS. CERESA:  That's correct.
15        THE CHAIRWOMAN:  I appreciate you being
16  here, and go ahead and introduce yourself and who you
17  represent.
18        MS. CERESA:  My name is Krista Ceresa.  I
19  grew up and I currently reside in District 29, and I'm
20  represented by Senator Morgan Carroll.
21        I'm here today on behalf of my family as
22  well as a large number of people from my community who
23  are so familiar with the tragedy I'm going to share with
24  you.
25        And to explain to you, I am so opposed to
0087
1  all gun control legislation presented today.  The last
2  man executed in the state of Colorado was the man who
3  killed my mom.  July 21st, 1986, Gary Davis kidnapped,
4  raped, and murdered my mother, Ginny May.  Gary Davis
5  had a history of predatory sexual behavior, raping over
6  15 women, had convictions of grand larceny, burglary,
7  menacing, was jailed on sexual assault in Colorado only
8  four years prior to my mother's murder.  A man who
9  should have never been released from prison was released
10  early in 1985.
11        My mother met Gary Davis and his wife,
12  Becky, at church.  He stalked my mother until killing
13  her one year later.  He was a criminal.  It was against
14  the law for him to have a gun.  He had no respect for my
15  mother, my family, and he certainly had no respect for
16  the law.

17          If I had it to do over again -- this is
18  often the phrase we throw around -- on reflecting on how
19  we could have done things differently, whether it
20  relates to our career or maybe raising our children, I
21  was speaking with my dad and he said to me:  If I had it
22  to do over again, I would have made sure your mother had
23  a gun, that she could have had a chance to protect
24  herself and you kids.
25          In this case, we are talking about saving
0088
 1  someone's life and keeping the family intact.  I know he
 2  struggles daily with the fact that he wasn't able to
 3  protect her on that day.  The reality is these sick
 4  individuals, they prey on those who are considered least
 5  likely to be able to protect themselves, women and
 6  children in places we falsely label as safe zones,
 7  gun-free zones.
 8          If my mother had been armed with a gun, my
 9  story might be much different.  She was approached by
10  two assailants that day.  She was outnumbered.  If any
11  of you are parents, maybe you can imagine what might
12  have went through her mind as the lives of her two young
13  children would now be forever changed because of the
14  premeditated acts of these sick individuals.
15          I'm a mother myself now.  And I think back
16  daily on that terrible moment when I saw Gary Davis
17  physically force my mom from our front yard, as I was
18  held restrained by his wife on the front steps of our
19  country home.  I'll never forget the last time that I
20  saw my mother.
21          Excuse me.
22          My efforts must be focused now on my
23  children and what I can do to ensure that their last
24  memories of their mother are never the same as what I
25  have of mine.
0089
 1          As a concealed carry permit holder, I
 2  exercise my right to carry daily.  As carrying a firearm
 3  might seem unnecessary to some, those who know my story
 4  understand the heartbreaking reality that evil can
 5  approach without warning.
 6          It is because of the Second Amendment that
 7  I do not have to worry about what others think is
 8  necessary or unnecessary as it relates to the protection
 9  of my family and myself.  I'm thankful for that right,
10  and I choose to exercise that right quietly and
11  carefully when I'm at church or visiting my cousin,
12  Becky, for lunch at the college campus that she works
13  at.  She, too, is a mother and legally exercises her
14  right to carry.
15          We know better than anyone that the moment
16  we are unprepared might be a moment we live or may not
17  live to regret.  I've seen firsthand how quickly a
18  situation like this can occur.

19    As many of our law enforcement officers
20  are outstanding public servants, there simply may not be
21  enough time.  I understand more than most that my
22  protection is ultimately my responsibility.
23          So I ask you to consider the consequences
24  of imposing more regulations upon law-abiding citizens.
25  Please remember who those laws will really restrict, how
0090
1  by deluding these rights, you will only make people like
2  myself, a daughter, a wife, and a mother, an easier
3  target.
4          These regulations will not affect those
5  whose intent is to ultimately break the law by obtaining
6  a gun.  Statistics have shown that many of these people
7  committing these heinous crimes had illegally obtained a
8  gun in the first place.  And stricter gun control will
9  not stop another sick-minded Gary Davis from killing
10  someone else's mother.
11          In fact, if you pass these legislation --
12  regulations, it is more likely that you will ensure that
13  it will happen again.  I promise there are other Gary
14  Davises out there today looking for their next victim.
15          My stance, along with my entire family, is
16  to oppose these measures for gun control, and we will
17  oppose any lawmaker who authors the votes, authors or
18  votes in favor of any legislation that infringes upon
19  the Second Amendment.
20          The government was never intended to
21  regulate my needs as it relates to protecting myself.  I
22  follow the law, and have every right to protect our
23  family from danger with the highest measure of security
24  we see fit.
25          I'm standing before you today having just
0091
1  shared a story I've never spoken publicly about.  This
2  is because I've never felt more passionately for a cause
3  as I do about this.  And I understand firsthand the
4  consequences this legislation presents.  These
5  restrictions will not only make my world less safe,
6  leaving law-abiding citizens outgunned by criminals who
7  have no respect for the law.
8          I'm speaking out today because you have to
9  be out of your mind to believe that someone with a plan
10  to kill will not get their hands on a gun, that any
11  measure to put restrictions on the Second Amendment will
12  keep firearms of any capacity out of the hands of
13  criminals, nor will it influence where they will choose
14  to use them.  And I certainly know that these measures
15  will not take away the malicious intent of those with
16  evil in their hearts.
17          Thank you for hearing me today.  I pray
18  that God guides you as you cast your very powerful vote
19  on this very dangerous legislation.
20          THE CHAIRWOMAN:  Thank you so much, and

LEG HX 000741

4656

21  thank you for your willingness to come here today and
22  share your story and your life.
23        A couple questions from Senator Harvey.
24        SENATOR HARVEY:  Thank you, Madam Chair.
25        Not so much a question but just a comment.
0092
1  Thank you for being here.  Thank you all for being here.
2        Can you introduce your husband really
3  quick, and your cousin.
4        MS. CERESA:  This is my husband, Mark
5  Ceresa.  This is my cousin Becky Kleeman (phonetic).
6        SENATOR HARVEY:  Thank you.
7        THE CHAIRWOMAN:  Senator Harvey, continue.
8        SENATOR HARVEY:  Madam Chair, if I could,
9  I wanted to add a little bit more to Krista's story.
10        The murderer actually went to Becky's
11  house first, which is next door, and a ranch hand was at
12  the house.  So the murderer and his wife left and went
13  next door to Krista's house.  Krista was four years old
14  when this happened.  And Mr. Davis was the last person
15  we've ever put to death on death row in Colorado.
16  Krista and her family have never spoken publicly about
17  this event outside of the courtroom.  So this was a
18  huge, huge thing for her to be here, to have her
19  comments made today.  And for her dad and her brother,
20  this was a huge thing for them as well.
21        So I just wanted to thank you for your
22  courage to come here today and represent your family and
23  the citizens of Colorado.  God bless you.
24        THE CHAIRWOMAN:  Thank you for being here.
25        Senator Crowder.
0093
1        SENATOR CROWDER:  Two questions, if I
2  could.
3        Would you say that there is an evil in the
4  world?
5        MS. CERESA:  Absolutely.
6        SENATOR CROWDER:  Thank you.
7        THE CHAIRWOMAN:  Senator Crowder.
8        SENATOR CROWDER:  Would you also say that
9  any erosion of our Second Amendment rights, even with
10  the intent -- the well intention of -- of helping
11  people, that that erosion of the Second Amendment rights
12  could also cause a great deal more harm than good?
13        MS. CERESA:  I know that it would.
14        THE CHAIRWOMAN:  Krista.  I'm just
15  recognizing you would come through --
16        MS. CERESA:  Sorry.
17        SENATOR CROWDER:  Thank you very much.
18        THE CHAIRWOMAN:  Thank you so much.
19        Any other questions?
20        Seeing none, thank you.  I really
21  appreciate your willingness to share your story.
22        MS. CERESA:  Thank you for having me, too.

LEG HX 000742        4657

23          THE CHAIRWOMAN:  The next witness we have
24  listed is going to be moved, Dan Kopel is going to be
25  moved later, when he gets here.  He's a little late.  He
0094
 1  has an event.
 2          So I'm going to go next to Sheriff John
 3  Cooke.
 4          Welcome, Sheriff Cooke.  Go ahead and
 5  introduce yourself and who you're representing today.
 6          MR. COOKE:  Okay.  Thank you so much.  I'd
 7  like to thank the committee.
 8          My name is Sheriff John Cooke, and I'm
 9  representing myself and my constituents from Weld
10  County.
11          But, first off, I'd like to say that I
12  stand by the County Sheriffs Of Colorado's position
13  paper.  This position paper states, in part, that the
14  County Sheriffs Of Colorado are adamantly opposed to any
15  restrictions on a person's right to privately sell
16  firearms to another person because of a technicality
17  regarding the opposition -- or the operation of the
18  CSOC's legislative committee.
19          The legislative committee is staying
20  neutral on this bill, but not the overwhelming number of
21  sheriffs in this state.  In our recent conference in
22  January, where approximately 57 elected sheriffs
23  attended, there was no disagreement regarding our
24  opposition to the universal background checks.
25          As chief law enforcement officer of the
0095
 1  county, I'm telling you this law is unenforceable.  This
 2  bill is a case of elected officials feeling the need to
 3  do something, anything, whether or not the law is
 4  enforceable.
 5          The chiefs' association testified that
 6  they are in favor of this bill, but I have yet to hear
 7  one chief explain how they plan on enforcing it, if it
 8  becomes law.
 9          To quote again from the CSOC position
10  paper:  Local law enforcement does not have the
11  resources to stop private sales of firearms, nor to
12  investigate such transactions.
13          This bill is unenforceable because
14  criminals do not get background checks.  One criminal
15  doesn't say to another criminal:  Hey, before I sell you
16  this stolen gun, we need to go get a background.
17          No doubt you heard from CBI about how many
18  gun sales they have prevented because of background
19  checks.  Let's be honest, does anyone really believe
20  that just because a criminal was denied a gun through a
21  background check that he or she will stop there?  The
22  true criminal who is intent on getting a gun will find
23  any other means necessary to get one.
24          In a U.S. Department Justice report

LEG HX 000743   4658

25  conducted in 1997 in which they surveyed state and

0096

1  federal inmates convicted of crimes involving guns, they
2  found that 40 percent of inmates obtained guns through
3  illegal sources such as theft, burglary, drug dealer's
4  offense or the black market.  40 percent bought or
5  borrowed the gun from friends or family, and 14 percent
6  obtained the gun legally before becoming felons.
7         This bill would not have prevented any of
8  these criminals from obtaining a gun.
9         The numbers that CBI gave you would lead
10  people to believe that the ones denied access to buying
11  guns are hardened criminals, but this is simply not the
12  case.
13         About two years ago, a 75-year-old man
14  came in my office wanting to know what to do because he
15  was denied the purchase of a firearm from a gun store.
16  He told me that in 1956, he was 17 or 18 years old, got
17  drunk and ran over someone.  He pled guilty to a felony,
18  to have the case over with.  Since that time, he had
19  absolutely no other contact with law enforcement
20  throughout his life.  He bought many firearms and hunted
21  and had recreational sports, and he still owned quite a
22  few to that day.
23         Yes, it would have been illegal to sell a
24  gun to this gentleman because of his felony conviction
25  in 1956, but he's not exactly the picture one has of the

0097

1  hardened criminal attempting to get a gun for illegal
2  purposes.  And I suspect that the background checks only
3  stopping these types of people from ever buying a
4  firearm and not the true criminal who will obtain a gun
5  through any means possible.
6         This bill is also unenforceable because
7  there's absolutely no way for you or me to prevent two
8  people from my county driving a few miles north,
9  conducting a private transaction at the truck stop right
10  across the Wyoming border, and then returning home.
11         This law is simply unenforceable and would
12  do little, if anything, for public safety; and I
13  encourage the committee to vote no.
14         THE CHAIRWOMAN:  Thank you so much,
15  Sheriff.
16         Is there any questions from the committee?
17         Senator Harvey.
18         Does anyone else have a question while
19  Senator Harvey finishes his chewing?
20         SENATOR HARVEY:  Thank you, Sheriff Cooke,
21  for being here and to all the other sheriffs for being
22  here.  God bless you for taking the time to come hear
23  this bill.
24         My concern is not so much the background
25  checks for transfers of guns, though that's huge because

0098

1  it's not only the sale of guns, but the transfer of
2  guns.  But it's really how this bill will be impacting
3  law-abiding citizens who are driving down the streets
4  who may have a gun in their car, and you see that they
5  have a gun in their car, especially out in Weld County,
6  where there are a lot of guys driving around with guns
7  on their gun racks -- how will you be able to know
8  whether that gun is a legal firearm that has been
9  purchased with a background check, and how will you be
10  able to determine if it was done with a background
11  check, and what will you do if you can't determine it?
12         THE CHAIRWOMAN:  Sheriff.
13         MR. COOKE:  Oh, I'm sorry.
14         First off, there's no way we'd know if one
15  of my deputies pulled over a person in that situation,
16  he would not know whether that gun was bought through a
17  background check or not.  So, therefore, since there's
18  nothing we can do, we'd write them a ticket or give them
19  a warning and let them go on because there's nothing we
20  could enforce on that.
21         THE CHAIRWOMAN:  Senator Harvey.
22         SENATOR HARVEY:  Well, might you
23  confiscate it because they cannot prove to you it was
24  purchased with a background check?  And, therefore, if
25  they can't prove that, that gun is an illegally owned
0099
1  gun and you are required to confiscate it, until they
2  can prove that.  And how long will it take you, then, to
3  prove it?
4         We are going down a road where the
5  citizens will want to have a database to prove that they
6  had that gun purchased with a background check so that
7  you won't harass them.  No offense.
8         MR. COOKE:  None taken.
9         THE CHAIRWOMAN:  Sheriff Cooke, if you'd
10  like to respond.
11         MR. COOKE:  Yes, ma'am.  Thank you.
12         This is one of the reasons why County
13  Sheriffs Of Colorado, again, is adamantly opposed to
14  this, most of the sheriffs, because we believe it is a
15  first step towards gun registration.
16         Now, as far as confiscating the gun, I
17  didn't see that part in the bill.  It might be there,
18  and I don't know.  But I would hope that none of my
19  deputies would do that.  It would be very detrimental to
20  their career if they did.
21         THE CHAIRWOMAN:  I'll go ahead in just a
22  minute, Senator Crowder, just for Senator Harvey -- and
23  I'll look for it in the bill, but it does say that it
24  would be upon law enforcement to have to prove that, in
25  fact, that was not -- that firearm was not purchased
0100
1  through -- with a background check.  So they would have
2  to prove that before they could confiscate that, just

3  for clarification.
4           Senator Crowder.
5           SENATOR CROWDER:  Thank you, Madam Chair.
6  That kind of relates to my question.
7           THE CHAIRWOMAN:  Go ahead, Senator
8  Crowder.
9           SENATOR CROWDER:  I've never had a
10  background check because, at my age --
11          THE CHAIRWOMAN:  Oh, couldn't get a
12  background check right now.
13          (Laughter.)
14          SENATOR CROWDER:  Well, that was my
15  question.
16          If, in fact, I'm in an automobile accident
17  which is my fault, possibly, and I have a weapon and I
18  cannot prove to you that this is through a background
19  check, without future gun registration, I don't know how
20  we could enforce the issue to begin with.
21          THE CHAIRWOMAN:  The way that I understand
22  it, Senator Crowder, is that they'd have to prove that
23  you did not get one.
24          SENATOR CROWDER:  Madam Chair, but my
25  question is, why should I have to prove ownership of
0101
1  something -- unless it's registered, there should not be
2  an issue.
3           THE CHAIRWOMAN:  We're out of the case
4  with the ownership, but I don't think it's very good for
5  us to --
6           SENATOR CROWDER:  I do have a question.
7           THE CHAIRWOMAN:  Okay, Senator Crowder.
8           SENATOR CROWDER:  We've seen a video here
9  recently -- if you don't want to answer this, that's
10  fine, because I know you were not here -- we've seen a
11  video of a city policeman out of Aurora implying that he
12  was in favor of this.  And I'm aware that the sheriff
13  departments throughout the state are opposed to it.
14          Can you give me a brief reasoning that one
15  law enforcement agency as opposed to another law
16  enforcement would have a differing view on that?
17          THE CHAIRWOMAN:  Sheriff Cooke.
18          SENATOR CROWDER:  And I realize you didn't
19  see it, so you don't have to answer it if you don't want
20  to.
21          MR. COOKE:  No, I don't mind.
22          THE CHAIRWOMAN:  Sheriff Cooke, you can go
23  ahead now.
24          MR. COOKE:  Thank you.
25          We're elected.  And so just like you are,
0102
1  we are out on the campaign trail and we are in tune, I
2  think, more so with our constituents and our public.  We
3  speak for ourselves.
4           The police chiefs work for a mayor or city

5  council for a city manager.  So, therefore, they have to
6  represent some of those views as opposed to their own.
7  This is not supported by all police chiefs or police
8  officers throughout the state.
9        I know the chief up in Greeley is
10  adamantly opposed to these bills, as are most of the
11  chiefs up in Weld County and throughout the state.
12  There's quite a few.  It seems to be mostly a Denver
13  metro centric, the chiefs that are in support of this.
14        At the cell (phonetic) debate that I
15  attended recently, two line-level Denver police officers
16  walked up to me and said:  Hey, we want to thank you
17  guys, thank the sheriffs, for your position paper.  We
18  wholeheartedly support it.  (Inaudible) and keep that
19  kind of quiet.  But that's unofficial.
20        So we know there are a lot of line-level
21  police officers and chiefs throughout the state that do
22  not support these bills.
23        THE CHAIRWOMAN:  Senator Jones.
24        SENATOR JONES:  Thank you, Madam Chair.
25        Just for point of clarification, you
0103
1  weren't here to see the video, but my recollection was
2  that the police chief was representing the Aurora City
3  Council.  So those elected officials, at least, feel
4  that way, and I guess it's a divided opinion on this
5  thing.
6        THE CHAIRWOMAN:  Thank you.
7        Any other questions?
8        Thank you so much, and thank you all the
9  sheriffs, including my own, that are here today.
10        MR. COOKE:  I would like to thank the
11  committee.  Thank you.
12        (Applause.)
13        THE CHAIRWOMAN:  There's our sergeants.
14  Go ahead --
15        SENATOR HARVEY:  No applause.
16        THE CHAIRWOMAN:  -- Senator Harvey.
17        SENATOR HARVEY:  People who are in the
18  audience, please do not applaud.  Please do not clap.
19  This is a public hearing.  And we are to treat the chair
20  with respect.  When she gables the gable, that means
21  stop talking or clapping.  Do not clap.  Treat the chair
22  with respect, please.
23        THE CHAIRWOMAN:  Thank you, Senator
24  Harvey.  Those are our rules.  And I'm sure most of you
25  weren't aware of that.
0104
1        Senator Jones.
2        SENATOR JONES:  Senator Harvey reminded me
3  that the police chief was also representing the Police
4  Chiefs Of Colorado.  Thank you.  I thank; we thank.
5        THE CHAIRWOMAN:  Thank you so much.
6        And so I'm going to go -- Tom Grounder.

7    And Buddy Myers might also join him at the table.
8             Thank you.  Go ahead.  Welcome.  Go ahead
9    and introduce yourself and who you're representing
10   today.
11            MR. GROUNDER:  My name is Tom Grounder.
12   I'm out of Colorado Springs.  I am an NRA certified
13   instructor.  I own my own business.  I do full-time
14   training in all the NRA aspects, plus concealed carry
15   training -- concealed carry training for those wishing
16   to seek their permit.
17            As a retired Army and former law
18   enforcement officer and a strong patriot of this
19   country, I take deep exception to the bill that directly
20   impacts gun rights of law-abiding citizens.  The
21   opposition to the firearms and the desire that is
22   ultimately -- to be ultimately eliminated from those in
23   the hands that are well within their rights to own them
24   is driven by a personal loss and grief that is the basis
25   of this bill.
0105
1             As a result, they're using positions to
2    push a personal agenda to institute new laws that would
3    entice the vast majority of all law-abiding, legal gun
4    owners to become criminals.  The passing of this bill
5    would force actions by those who would normally not
6    break the law to do so.
7             In terms of criminal actions, the desire
8    to obtain firearms will drive a market much like illegal
9    drug trafficking of today.  It will be tougher to get,
10   but the payoff would be worth it.
11            As far as the time certified -- as a
12   full-time certified firearms trainer, it is my passion
13   to instill a strong sense of safety and responsibility
14   to those to learn about and wish to introduce firearms
15   in their lives and their homes, along with those seeking
16   to advance their training.
17            Since the election of our current
18   presidential administration, and in light of past
19   events, along with the push towards more restrictive gun
20   control regulations, the nation has seen an
21   unprecedented surge in the purchase of firearms.  As a
22   trainer, I can confirm that, in Colorado, the
23   applications for concealed carry permits has reached
24   levels unheard of before.
25            There is no gun owner I know that doesn't
0106
1    feel the pain and the loss of the innocent lives in the
2    recent tragedies.  Regardless, it is the law-abiding
3    citizens that are buying up the handguns, rifles,
4    shotguns, and subsequently ammunition.
5             Why is this not addressed?  Do you not
6    understand, or do you simply choose to ignore the
7    actions of the governed people?
8             The nation and the state is telling you

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

9    what is wrong with the drive to place more restrictive
10   and misguided firearms regulations on the shoulders of
11   law-abiding citizens.  It will do nothing to curve the
12   violence against citizens by those that are determined
13   to inflict it.
14              As with all of the Constitution, the
15   Second Amendment is not, and should not, be a negotiable
16   subject.  It is a huge source of frustration to me when
17   those in the elected office use the Constitution
18   verbatim when it suits their purposes, yet push their
19   own personal interpretations of it when it does not, or
20   simply disregard it.
21              Our way of life here was created for us by
22   our founding fathers.  It is unlike any nation on the
23   planet.  It is a free nation.
24              Does that mean it's perfect?  Certainly
25   not, but a free society is sometimes messy.  But free it
0107
1    is and free it must remain.
2              The tragedies of Sandy Hook and Aurora
3    will never be prevented in the future by laws or
4    regulations such as these.  What is certain is that
5    those determined to do harm will do so.  Holding
6    manufacturers and firearms (inaudible) responsible for
7    their actions doesn't do a thing.
8              Adding these restrictions on to transfers,
9    as Senator Harvey has tried to allude to many times,
10   seems to be just passed over.  The term "transfer" is
11   crucial here.  There is no difference in these actions.
12              Please do not ignore or negate your
13   responsibility to the elected office which you defend --
14   to defend the Constitution.  This is your duty.  In this
15   decision, do what is right and defend the founding
16   principles of this nation, the Constitution.  I believe
17   if we do so, we're going to be on a slippery slope.
18              We are trading liberty and freedoms for a
19   perception of a temporary safety and security.  If we
20   allow this, we were warned by Benjamin Franklin that we
21   deserve none of it.
22              Thank you for your time.
23              THE CHAIRMAN:  Thank you, Mr. Grounder.
24              Any questions for Mr. Grounder?
25              Seeing none, thanks very much for being
0108
1    here.
2              MR. GROUNDER:  Thank you, sir.
3              THE CHAIRMAN:  Doug Hamilton.
4              MR. HAMILTON:  Good morning.
5              THE CHAIRMAN:  Good morning.
6              MR. HAMILTON:  My name is Doug Hamilton.
7    I am the owner-operator of the Family Shooting Center at
8    Cherry Creek State Park.  We do a lot of training and
9    such out there.
10              I have to say up front here, I think my

LEG HX 000749

4664