11    testimony is going to pale compared to what I've already
12    heard here today.  So I will be brief in this bill.
13            I should say this:  No one wants guns in
14    the hands of the bad guys.  I think we all are on common
15    ground there.
16            I believe the problem with these bills
17    that are introduced, specifically this one on the
18    additional criminal background check in the private
19    sector as opposed to an FFL, it's unenforceable.  Your
20    county sheriffs have already described that to you.
21            In my world, in how guns are transferred,
22    I will say this:  The law-abiding citizen -- there's
23    already law on the books that says a person, at best,
24    not transfer a gun to somebody that they do not know is
25    legally allowed to have a firearm.  It puts the onus on
0109
 1    the seller.  Should something happen post-sale, that
 2    person selling the gun, if they did not do due
 3    diligence, is going to be in a lot of trouble.  The
 4    people I know very carefully, therefore, identify whom
 5    they sell a gun to.
 6            Now, what it all means is that the bad
 7    guys are going to continue to get the guns irrespective
 8    of what this law does.
 9            If the law is unenforceable, why put it on
10    the books?  It makes no sense.
11            Two things I'd like to say real quick:
12    Sandy Hook was mentioned a couple times.  I want to
13    point out that the perpetrator in that murder, that
14    massacre, didn't go through a background check.  Why?
15    Because he killed the owner of the guns, then took them
16    to the school to do his deed.  A background check was
17    not required.
18            Another item:  The Virginia Tech massacre,
19    I believe 2004, April 16, the perp there legally
20    purchased two handguns.  Later, I believe about two
21    months is when he did his deed.  Now, he went through
22    the background check.
23            What happened there is the mental health
24    system in Virginia failed.  Somewhere in the system, the
25    fact that he had a history of mental illness and
0110
 1    treatment from the age of three was missed by the
 2    system.  We don't know a lot; I don't know a lot about
 3    the situation, but what I have read about it stems from
 4    primarily not being able to obtain the privacy records.
 5    A background check was done.  Their database to which
 6    they do a check was incomplete.
 7            That's what happened at Sandy Hook -- or
 8    at Virginia Tech.  Virginia has changed their rules a
 9    bit.  But you should consider, you should consider what
10    is happening in our society with the privacy laws, where
11    the general public does not know -- does not have the
12    information regarding these menaces to society, the

13 people who have proven themselves to be anti-society who
14 are willing to do the damage to our citizens.  Those
15 people should be identified.
16          Let's make a law that does some good.
17 Let's make a law that will help the situation.  And what
18 are we trying to do?  We're going to keep our populous
19 safe, keep guns out of the hands of the criminals.  And
20 I think you can do that.  But there are other laws you
21 can implement which can enhance the safety of the
22 public.  This one is not one of them.
23          I guess -- let me end my comments there.
24 If there are any questions, I'd be glad to answer.
25          THE CHAIRWOMAN:  Thank you so much.
0111
1          Is there any questions from the community
2 for our witness?
3          I see none.
4          Thank you so much.
5          MR. HAMILTON:  Thank you.
6          THE CHAIRWOMAN:  So our next witness is
7 Gene Pearcey.
8          Welcome, Mr. Pearcey.
9          MR. PEARCEY:  Thank you.
10          THE CHAIRWOMAN:  Go ahead and join us at
11 the table.  Go ahead and introduce yourself and who you
12 represent today, and then proceed with your testimony.
13          MR. PEARCEY:  Okay.  My name is Gene
14 Pearcey.  I'm from Durango, Colorado.  I have a company
15 that distributes earth-sheltered house building systems
16 all over the United States and a shooting company.  I'm
17 here to voice opposition to this bill.
18          I have a shooting school, like I said.
19 I'm a 25-time combined world and national champion.
20 I've taught all over the United States and several
21 foreign countries.  People come from all over the world,
22 actually, to train with me.  I teach sports shooting and
23 some cop training, concealed carry, general firearms
24 training.  I'm a regular on the Outdoor Channel as a
25 firearms expert and an FFL dealer.
0112
1          I am considering moving my companies out
2 of Colorado -- excuse me -- because of all these
3 anti-gun laws, and I've been there 30 years.
4          I've got some things I would just like to
5 present to you, if I could.
6          THE CHAIRWOMAN:  Please.
7          MR. PEARCEY:  This bill simply will not
8 work.  75 percent of crimes are committed by repeat
9 offenders.  They're not going to be affected by this
10 law.  Only 2 percent of firearms used in violent crimes
11 are obtained from nonrecorded sales.  That would be
12 gunshows, private sales, whatever.  So, again, it's not
13 going to have much effect.
14          Cities such as Chicago and New York City

15  have very rough gun laws on the books.  In fact,
16  probably tougher than some of this stuff.  They have
17  close to 500 murders a year each.  It has no effect.
18  None.  Zero.
19          There's no study which suggests that full
20  background checks will prevent a single crime.  More
21  ineffective anti-gun laws will drive many, many people
22  from Colorado.
23          I just got back from a national shooting
24  contest in Phoenix, Arizona, a thousand people,
25  (inaudible) a person.  Every single person I talked to
0113
1   is not coming here to hunt, to fish, to visit Durango.
2   Nothing.  They are totally offended by this mass of laws
3   that you guys are considering.  I think you will totally
4   underestimate the effect it will have on towns,
5   especially like Durango.  Hunting is a big season for
6   us.  But we're also not talking about people who are
7   just hunting.  They're just terribly offended.
8           Part of the reason for these bills is
9   combat perceived crime wave with assault weapons.  There
10  actually is no crime wave with assault weapons.
11          In all of 2011, there were three rifle
12  murders, period.  Not assault weapons, but three rifle
13  murders.  In 2010, there were none.  That's a normal
14  year.
15          In 2012, we had a terrible tragedy that
16  could have been prevented by one person with a firearm.
17  He was in a gun-free zone, of course.
18          In all cases, the mass murders that I know
19  of, this bill wouldn't have affected the perpetrator
20  from getting guns at all.  I can't think of one.  I've
21  read a lot of cases, and I'm sure you have too, but
22  there's not a single case where a background check, more
23  background checks would have prevented this.
24          This bill is very, very tough on
25  low-income people.  You've got the cost for the firearm.
0114
1   This bill allows for a $10 transfer fee from a dealer.
2   I'm a dealer.  I'm not doing it for 10 bucks.  It's
3   going to cost 30 to 50 bucks.
4           The State, with bill, I think, 228, is
5   considering charging for the background check.  So
6   that's going to add to it, if that passes.  That is
7   going to cost, they say, a fee that's determined by
8   direct and indirect costs.  Indirect costs can be
9   anything.  That can be a part of the new governor's
10  airplane; it can be anything.
11          It's not unreasonable to think that you
12  couldn't add $100 to the cost of a firearm in the
13  future.  It could be whatever you guys want it to be.
14  And that would, of course, prevent people from buying
15  firearms, which I think is the purpose to start with.
16  But you could have $200 a firearm; you could have

17  whatever you want it to be.  And that's not a good
18  thing.
19          The bill unenforceable without full gun
20  registration, which has been against the law, by federal
21  law, since 1986.  I don't see how in the world you can
22  enforce it.
23          In 2010, 14 million background checks
24  resulted in 13 convictions, 13.  And so if you add a
25  bunch more background checks, what's it going to do?
0115
 1  It's going to do nothing.
 2          It's already a crime to sell, loan, or
 3  give a firearm to anyone you know is going to use it in
 4  a crime.  That's where many felons get their firearms
 5  anyway.
 6          This bill does not affect the total number
 7  of murders, as firearms are not used in all murders.  In
 8  2011, in Colorado, you had 147 murders.  Firearms were
 9  used in 73 cases.  Hands, fists, knives, clubs, 74.  So,
10  at the very best, you're only working on half the
11  murders to start with.
12          Then with full background checks will be
13  in effect, it will be just another hurdle for honest
14  citizens because most crimes are by felons who already
15  committed crimes who don't abide by the law.  The only
16  people affected by this bill don't commit violent
17  crimes.  That's people like me.  People like you.
18          The only sure way to reduce crime, if
19  that's all you were interested in, is to lock up the
20  people who do the crime and keep them in jail.  They do
21  most of the crime anyway, and nothing you do is going to
22  prevent them from doing that.  It's just proven facts.
23          The intent of this bill, of course, is
24  just more gun control.  And that's the only
25  justification for it that I can see, and many other
0116
 1  people.
 2          THE CHAIRWOMAN:  Thank you.
 3          We have a question from Senator Harvey.
 4          SENATOR HARVEY:  Thank you for being here.
 5  I appreciated all your statistics.  I want you to give
 6  them to me before you leave, too.
 7          The previous witness said that you can buy
 8  guns online without doing a background check in
 9  Colorado, and I don't believe that's the case.
10          MR. PEARCEY:  That's a lie.
11          THE CHAIRWOMAN:  We're going to go ahead
12  and go through the --
13          SENATOR HARVEY:  Go through her.
14          THE CHAIRWOMAN:  Complete your question.
15          SENATOR HARVEY:  That completes my first
16  question.
17          THE CHAIRWOMAN:  Okay, go ahead.
18          MR. PEARCEY:  That would be a lie.  I'm a

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

19  federal firearms dealer.  I do sell a lot of guns.  We
20  sell mostly cowboy guns or cowboy action shooters, but
21  we do sell some modern guns.
22          If you're in Nevada, if you're in Denver,
23  if you're anywhere and you buy a gun from me, you can
24  pay me, but I have to ship that gun to a local dealer in
25  your area who has to transfer it per your state law.
0117
 1  It's totally illegal for an FFL dealer to do that.  And
 2  granted, yes, you can by that law, but if he gets the
 3  gun, you don't pass the background check, you don't get
 4  the gun.  Too bad.
 5          But that's an absolute lie, and it's also
 6  a common misconception.  It's not true.
 7          THE CHAIRWOMAN:  Thank you.
 8          Any other questions?
 9          Thanks so much.
10          MR. PEARCEY:  Thank you.  Appreciate it.
11          THE CHAIRWOMAN:  So one of our witnesses,
12  Mr. Kopel, is here.  I'm going to ask him to come up.
13  Go ahead.
14          I'm just going to remind all of us here --
15  and I did fail short of my duties, I wasn't listening to
16  one of the witnesses we had before -- but we really
17  don't want to prescribe motives of either any committee
18  members or our sponsors.  We just want to remind us all,
19  if you come in and testify.  Thank you.
20          Mr. Kopel, go ahead and introduce yourself
21  and who you represent today.
22          MR. KOPEL:  Thank you, Senator Giron.
23          I'm David Kopel, and I'm an adjunct
24  professor of advanced constitutional law at Denver
25  University, Sturm College of Law, research director of
0118
 1  the Independence Institute -- just a few blocks from
 2  here -- that is, always professors from DU as well as
 3  Independence Institute scholars speak on their own
 4  behalf and not for any organization.
 5          A report -- a study by the National
 6  Institute of Justice that was conducted in December --
 7  and the National Institute of Justice is the research
 8  arm of the United States Department of Justice -- and
 9  they did a report on a variety of gun control proposals
10  that were in the air.  The NIJ report was kept secret,
11  but has been leaked and is now available to the public.
12          The NIJ report, regarding universal
13  background checks, said they are unenforceable unless
14  you have universal gun registration; that as a practical
15  matter, if Senator Harvey sells me a gun, how is anybody
16  ever going to find out or know or anybody gets in
17  trouble for doing that, even if we evaded the background
18  check -- of course, he's such a law-abiding guy, that
19  would never happen, but in this hypothetical -- unless
20  there's a government database of all firearms.

LEG HX 000754    4669

21      As I'm sure all of you know, registration
22  is very fiercely opposed by gun owners because it has
23  historically, in New York City and in other countries,
24  been used for gun confiscation.
25          Canada attempted to impose universal gun
0119
1   registration in the 1990s.  It ended up costing
2   literally a hundred times more than it was supposed to
3   and was finally repealed in 2012 by the parliament
4   there.
5           What Captain Kelly and others have
6   testified about is a much more limited concept than what
7   this bill is.  Let's say this is the amount of firearm
8   sales that take place in Colorado.  And there's some
9   fraction of them that are not from firearms retailers.
10  Now, this 40 percent figure that's thrown out, that's
11  not really true, but let's say we know for sure it's
12  more than 1 percent.  There's some tangible amount of
13  firearm sales that are in this smaller category of
14  nonretail sales.  And that's what this bill has public
15  support for in addressing.  When you ask people about
16  universal background checks, they're talking about
17  addressing whatever this is, this 1 in 40 percent
18  amount.
19          The problem is, this bill, which is what
20  you're going to be voting on, not answering a poll
21  question about the concept, is about this:  It's about
22  firearm transfers.
23          I have never sold a gun in my life, and I
24  hope I never will because I like all my guns and I want
25  to keep them.  But I have engaged in probably hundreds
0120
1   of firearms transfers, as this bill defines them.  The
2   definition of transfer is so broad, and it's written --
3   it's a copy of a federal bill written by Michael
4   Bloomberg's lobby.  It's so hugely overbroad compared to
5   what the issue of actual sales is.
6           The Colorado Supreme Court, in Lakewood
7   versus Pillow, unanimously, under Colorado's
8   constitutional right to arms, in 1971, threw out a
9   Lakewood ordinance that restricted gun transportation.
10  And the Court said unanimously:  But, of course,
11  Lakewood can enact laws, safety laws, about the
12  transportation of guns.  But what you have done here is
13  so overbroad compared to the legitimate problem that
14  could be addressed.
15          This is a law that says I can give my wife
16  a gun for Christmas -- so it's not part of the War on
17  Christmas -- but it says when I'm out of town and she
18  wants to use my gun, she's got to go through a
19  background check.  In fact, she can't go through a
20  background check because I'm out of town and we both
21  have to show up at the firearms dealer.  And then when I
22  come back to town, we've got to go through the

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

23  background check again so she can hand the gun back to
24  me.
25          It's a bill that says that I, as an NRA
0121
1  certified firearms instructor, when I'm -- sorry.
2          (Laughter.)
3          MR. KOPEL:  Karl Rove just won't leave me
4  alone.
5          (Laughter.)
6          MR. KOPEL:  It's when I say -- when I
7  teach a firearms safety class, not at a shooting
8  range -- because I typically don't -- you go to the
9  range later, as the last part for the live fire
10  practice -- when I'm teaching in a classroom, following
11  the NRA protocol for handgun safety instruction, which
12  we're going to -- Senator Trauchou's bill will help get
13  us back to that for licensed carry -- but when I hand
14  somebody -- I'm supposed to bring in firearms unloaded
15  for the students to handle.
16          The rule is absolutely no ammunition in
17  the room, not even my own.  And we have dummy practice
18  ammunition, orange inert things with which the students
19  practice loading and unloading the guns, pressing the
20  trigger, things like that.  And over the course of that,
21  you may have four or five different guns that get handed
22  around.
23          Every one of those is a transfer and is
24  supposed to go, under this bill, supposed to go to a
25  federal firearms licensee, do the background check that
0122
1  takes between three minutes and nine days, depending on
2  what time of year it is, and pay this $20 thing.  It
3  makes teaching quite impracticable.
4          The provision for giving somebody a gun in
5  an emergency is written so that it only applies when you
6  could shoot somebody.  And, of course, by then, it's too
7  late.  So if I have a neighbor who wants to borrow a gun
8  one night because there have been a lot of burglaries in
9  the neighborhood -- and this is on page 5, line 15 -- if
10  the neighbor wants to borrow -- asks to borrow my gun
11  because she's a single woman with some small children
12  and there's been a lot of burglaries in the
13  neighborhood, can she borrow one of my guns for a couple
14  nights, until she can go to the store on Monday and
15  maybe buy one of her own?
16          A, I can't lend it to her unless I go over
17  to her house, which seems kind of crazy that she has to
18  come to my house, but, B, more importantly, I can't
19  transfer it to her unless she is in imminent fear of
20  death or serious bodily injury.
21          Now, that's the point at which she could
22  shoot somebody.  So if you've got somebody stalking her
23  and making harassing phone calls, that doesn't mean that
24  if she sees them in a shopping center, she gets to shoot

25  them right away, but it does give her good cause for

0123
1  wanting to have that firearm in her home temporarily in
2  an emergency.  And that's prohibited.
3          It's likewise, by the way, it's also --
4  this D.C./New York crafted bill doesn't even take into
5  account that there's other circumstances in which the
6  use of a firearm for self-defense is lawful in Colorado
7  in the home, the so-called Make My Day law allows
8  defensive gun use in the home in situations other than
9  imminent death or serious bodily injury.  It's against
10  any violent intruder in the home under Colorado law.  So
11  even someone who could lawfully use the gun right in
12  that instant still can't get it under this law.
13          This phrase you see in line 15 which
14  appears in a variety of places, "unlicensed transferee,"
15  makes no sense in Colorado law.  We have licenses to
16  carry guns, but this isn't about carry; this is about
17  possession.  Unlicensed transferee would only make sense
18  if we had a law that you had to have a license to own a
19  gun in the first place in Colorado.
20          So I looked for where this came from, and
21  it's from the House -- the U.S. House of Representatives
22  bill that is the Michael Bloomberg flagship bill.  The
23  language was cut and pasted into here, and it was a
24  transplantation that doesn't really work.  It doesn't
25  fit from one to the other.  It made sense in the context

0124
1  as it was used in the other bill.  It doesn't here.
2          The core problem is that it's not just
3  about sales.  It's about the transfers in general.  I've
4  outlined just a couple of the problems.  There are many,
5  many, many more.
6          A thing that you could do that would
7  significantly improve it is in E, line 19.  The transfer
8  is a temporary transfer of possession without transfer
9  of ownership or title to ownership -- and then just cut
10  it there and remove the rest of E.  Then you make the
11  bill just about all -- about temporary transfers, rather
12  than the way this E is written is temporary transfers in
13  a -- when you're actually at a target shooting range or
14  you're actually in the field while engaged in hunting.
15          That would certainly solve a great deal of
16  the problems with the bill, but what I would really
17  suggest is that, don't vote on this bill today.  Take a
18  day or two -- and we'll move as fast as you want -- to
19  sit down with myself, with the sheriffs, with other
20  legal experts who know and understand Colorado firearms
21  law, and we can work with you to produce a bill that
22  accomplishes everything the sponsors have promoted as
23  the good part of this bill, which is sales between
24  people who don't know each other and not going through a
25  licensed firearms dealer.

0125

1      Now, at the end of the day, there may
2  be -- excuse me -- philosophical disagreements about
3  that bill, but that will be a bill that accomplishes
4  what it intends to accomplish.  Because if it goes
5  through the way it is, what you're doing is, because
6  this definition of transfers is so broad, that you will,
7  in effect, criminalize virtually the entire gun-owning
8  population.
9          It means that when I sit down with my son
10  at the dining room table and say, "Here's my gun.
11  Here's how to use it.  It's unloaded, but I'd like you
12  to handle it and use it" -- that's supposed to be a
13  transfer here, too.  There are so many things -- the
14  normal ways that people own their guns is to have
15  temporary transfers, or your friend comes over and says,
16  "Oh, you got a new gun.  Can I take a look at it?"
17          "Sure."  And I hand it to my friend and he
18  looks at it for five minutes and hands it back.  That's
19  a transfer here, too.
20          And you're turning all these people into
21  criminals and saying:  Well, the DAs would be too smart
22  to enforce that.  Hopefully, yes, but one -- those of us
23  who remember Don Milky from the olden days might know
24  you can't always count on DAs always having good
25  judgment about what to prosecute.  And this is a bill
0126
1  that's being -- written to be obeyed.  We want people to
2  obey the laws in Colorado.
3          You don't want to create in Colorado a
4  culture of saying:  Oh, well, what are the gun laws?  I
5  just moved here from Oklahoma.  What are the gun laws?
6          Oh, well, there's this gun law that says
7  that you can't even carry a gun in public.  That gun law
8  really counts.  You better get a carry permit.
9          This gun law says this is when you can
10  transfer a gun.  Oh, yeah, that's ridiculous, they
11  didn't know what they were talking about when they
12  passed it.  That's way overbroad.  Nobody enforces that
13  one.
14          Let's have all the laws be fair,
15  well-written ones that can be enforced.  And I ask you
16  to do this in the spirit of my father, as a state
17  representative in the '70s, before I'd convinced him
18  that the Second Amendment of the right to arms were
19  important civil rights, when he would have voted for any
20  gun -- and did -- gun control bill on a conceptual
21  basis, but would also insist that any law that he voted
22  for, especially any criminal law, had to be fairly
23  written, properly drafted, and something that the people
24  of Colorado could, in a fair and legitimate way, be
25  expected to obey.
0127
1          Thank you.
2          THE CHAIRWOMAN:  My microphone was off.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

3    Thank you so much.
4            Is there any questions from the committee?
5            Senator Crowder.  You're so inquisitive
6    today.
7            SENATOR CROWDER:  You mentioned several
8    times the Bloomberg effect on this bill here.  Is that
9    written into any New York law that you're aware of, or
10   any law in any state for that matter.
11           THE CHAIRWOMAN:  Mr. Kopel.
12           MR. KOPEL:  Oh, well, yeah.  For example,
13   this New Jersey thing about like when your friend comes
14   over, and can he hold your gun?  That's illegal in
15   New Jersey, for example.
16           SENATOR CROWDER:  Thank you.
17           THE CHAIRWOMAN:  Any other questions?
18           Senator Harvey.
19           SENATOR HARVEY:  Thank you, Madam Chair.
20           Not a question, but, David, I appreciate
21   your comments on the transfer part because we had -- I
22   don't know -- eight, nine, ten witnesses come in and
23   testify for the bill.  Every one of them spoke to the
24   private sale of firearms.  And whenever I brought up the
25   question of the transfer to a person that I asked it to,
0128
1    they said:  I have not read the bill, but we're against
2    the private sale.
3            So I'm glad that you were able to speak to
4    those specific issues about the transfer and what a
5    conundrum that might be.  So thank you.
6            MR. KOPEL:  Thank you.
7            THE CHAIRWOMAN:  Any other questions?
8            See none.  Thank you so much.
9            MR. KOPEL:  Thank you very much, Madam
10   Chair.
11           THE CHAIRWOMAN:  You have a nice lunch.
12           SENATOR CROWDER:  Madam Chair, why is it
13   that I have to call him Mr. Kopel and Mr. Harvey can
14   call him Dave?
15           THE CHAIRWOMAN:  You know what?  I bet you
16   could call him whatever you'd like.
17           UNIDENTIFIED SPEAKER:  That's right.
18           THE CHAIRWOMAN:  I didn't mean to open it
19   that way, but he affirmed that you could call him
20   anything you want.
21           Oh, got to find my list here.
22           So now we're back to Adam Thompson.  Is
23   Adam Thompson in the room?  Adam Thompson is who I have
24   signed up according to this list.
25           (Inaudible discussion.)
0129
1            THE CHAIRWOMAN:  Oh, great.  Thank you,
2    Mr. Thompson.  I appreciate you rushing in here.  Go
3    ahead and take your breath.
4            MR. THOMPSON:  Thank you.

LEG HX 000759     4674

5      THE CHAIRWOMAN:  And proceed when you're
6  ready.  Go ahead and introduce yourself and who you
7  represent today.
8           MR. THOMPSON:  All right.  My name is Adam
9  Thompson.  I believe I had a packet that came around to
10  all of you.  I represent Lindsay Cole, Julie Vargo,
11  Lewis Johnson, Larry Smart, and Mark Doucette
12  (phonetic), as well as myself and my fiancee.  We are
13  all Columbine survivors.
14           Basically I'm here today to speak about
15  using sound judgment of actual information when deciding
16  the proper courses of action to deal with violence
17  instead of using emotions to make those decisions.  This
18  bill, as well as all the other bills that you're hearing
19  today that are being presented, have the intent of
20  providing safety, but after reviewing them, they don't
21  actually do that.  They do the opposite.
22           On April 20th, 1999, I was 17 years old
23  and a junior in high school.  On that day, fellow
24  classmates committed one of the worse shooting -- school
25  shootings that this country has seen.
0130
1           I am a Columbine survivor.  And on that
2  day, I lost friends, classmates, and my innocence as a
3  child.  On that day, there was legislation that failed
4  to do what it was intended to do, to keep me and my
5  fellow classmates safe.  It did not matter that there
6  was a magazine capacity limit.  It did not matter that
7  it was a gun-free zone.  It did not matter that they
8  received their firearms illegally.
9           One of the shooters carried a 10 round --
10  or thirteen ten-round magazines.  In order to do this,
11  he modified his clothing so that he would be able to
12  carry all of them.  The point is that the magazine
13  capacity didn't matter.
14           The perpetrators committing these acts
15  aren't listening to the laws.  Instead, this law would
16  only limit me in being able to defend myself, my
17  fiancee, or my roommate.  If this gets passed, it puts
18  me and my roommate and my fiancee at risk for
19  transferring a firearm in order to provide safety for
20  ourselves.  If I'm away on business and my fiancee takes
21  up arms to defend herself against an intruder, I would
22  be held liable, so would she, for the illegal transfer.
23           My next-door neighbor is a lawyer.  She
24  has told me repeatedly that, in her profession, she has
25  received death threats and has gotten police involved
0131
1  and we've had police on our street.  However, we've
2  also -- when the police are not there, we've had plenty
3  of people come by in looking for her, which she has told
4  me what to look for and who they are.  I let her know
5  that I do own firearms and that I would be willing to
6  train her and provide them to her for her safety for

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

7     temporary use, until she was able to get her own.
8          Under this law, it would be illegal to do
9     so.  She would be, and I would be, held responsible for
10    allowing her to protect herself with my firearm.
11          I've struggled for 12 years dealing with
12    survivor guilt and that I was put in a position where I
13    was defenseless.  And so were the people who were around
14    me who were supposed to be there to keep me safe.  I
15    never want to be defenseless again, and I never want any
16    of my friends, family, loved ones, or neighbors to be
17    defenseless again.
18          I have also learned that our police and
19    our emergency personnel are not truly the first
20    responders.  The public is actually involved.  The
21    people there are the first responders.
22          Those first actions that they take are
23    what save people's lives.  Waiting for a background
24    check to come back would put my fiancee, again, in
25    harm's way, or my roommate in harm's way.
0132
1          I have taken it upon myself to educate and
2     get educated on firearms, and to take classes on them.
3     Obviously, I've let you know that I've become a firearms
4     owner, and I believe deeply in the Constitution.
5          This bill that's before you, once again,
6     would not have stopped Columbine from happening.  It
7     would not have stopped Sandy Hook from happening.
8          Unfortunately, I am using -- I am seeing
9     people use emotions to put law in a legislation forward
10    instead of using facts and sound judgment on what the
11    root cause of the situation is.
12          The root cause is not the guns or the lack
13    of the background check.  The root cause is a failure of
14    responsibility as a society to teach what human life is
15    all about.  I'm sorry.
16          SENATOR CROWDER:  That's all right, buddy.
17          MR. THOMPSON:  Unfortunately, you can't
18    legislate responsibility upon the people.  The people
19    have to take responsibility themselves and learn.  Our
20    parents, our teachers need to start teaching again what
21    it is to be a responsible citizen, how to respect life
22    instead of just looking at it as something that comes
23    and goes.
24          UNIDENTIFIED SPEAKER:  (Inaudible.)
25          MR. THOMPSON:  That's okay.
0133
1          Well, thank you very much.
2          I'm getting a little flustered here, so I
3     apologize.
4          THE CHAIRWOMAN:  No, you're doing just
5     fine.
6          MR. THOMPSON:  I'll go ahead and close
7     this.
8          Basically, all this legislation, to me,

LEG HX 000761     4676

9   is, if it gets passed, is to ask me to be a potential
10  victim once again.  It asks my roommate to be a
11  potential victim.  It asks my fiancee to be a potential
12  victim again, by not allowing them to take up arms that
13  are available to them at the time, if there was someone
14  who came in.
15          I'm against this bill, as well as all
16  other pieces of legislation today that are limiting my
17  right to self-defense, my neighbor's right to
18  self-defense, and my roommate's and my fiancee's right
19  to self-defense, as well as the people that I'm
20  representing here today that have written testimony that
21  I've handed to you.  Please read that and learn from
22  what they have written to say.
23          UNIDENTIFIED SPEAKER:  (Inaudible.)
24          MR. THOMPSON:  Yes, I gave one to them,
25  and I'll give you one as well.
0134
1           So please don't ask me or any other
2   survivor to be a potential victim again.
3           Thank you for allowing me to be heard.
4           THE CHAIRWOMAN:  Adam, thank you so much
5   for being here and sharing your story and bringing a
6   story of others.
7           Is there any question from the committee?
8           I see none.  Thank you.
9           Mr. Dudley Brown.
10          Welcome, Mr. Brown.  Go ahead and
11  introduce yourself and who you represent today.
12          MR. BROWN:  Thank you, Madam Chairman and
13  members of the committee.  My name is Dudley Brown.
14          I think for most of you who know me --
15  Senator Harvey and I went to college together.  And I've
16  actually been skiing with Senator Jones.  So, yes -- and
17  that's a funny connection, isn't it?
18          (Laughter.)
19          MR. BROWN:  Yes.  I know, it's all done,
20  Senator.
21          I represent Rocky Mountain Gun Owners.
22  We're the largest gun (inaudible) group based here in
23  Colorado.  And we are the (inaudible) gun owners here in
24  this state.  This is my 21st year being -- representing
25  gun owners at the state capitol here.  And prior to
0135
1   that, I actually worked for many legislators here.
2           I want to address 1229.  I heard
3   Mr. Kopel's and some of the other good testimony about
4   the very specifics, but I do want to challenge the
5   members of this committee -- I know this is impolitic to
6   suggest this -- but to read our state constitution.
7   Read Article II, Section 13, and tell me if you think
8   that that prohibition in there, if we required these
9   members of the press to file and ask government
10  permission prior to airing their stories tonight, every

11  time they aired a story, would you call that a violation
12  of their First Amendment rights?
13          I think you would.  I think I would.  I
14  know they would, and they file against that all the
15  time.  Yet, our state constitution is even more
16  stringent.  So the right of no person to keep and bear
17  arms, defense of home, person and property shall be
18  called in question.
19          But what do you call checking someone's
20  background prior to actually letting them practice what
21  is a constitutional right?  It's a clear violation of
22  Article II, Section 13.  And we believe, for that reason
23  alone, that this bill does not stand.
24          There are obviously many implementation
25  problems with the bill.  And we could go into details,
0136
1   but I think much of that testimony has already been
2   covered, and there will certainly be more.
3           But I've got to tell you that years ago
4   when I was single, I used to go to a lot of gunshows.
5   And I remember watching legislators, not just
6   republicans, but democrats, come into the gunshows,
7   prior to the 2000 ballot initiative, to purchase
8   firearms there, privately.  Lobbyists from this
9   building, not necessarily of the conservative bent.  And
10  I was friends with them; I'd known them for many years.
11  And I always chuckled with them and said:  Why are you
12  here?  And they said, Oh, because I want to buy a gun.
13  I just don't want government to know I have it.
14          So that kind of fear of government knowing
15  that you have a firearm is ingrained in many people, not
16  just of the right or the left.  I think that many people
17  are concerned about government knowing that you have a
18  firearm.  And the only way you know is through this
19  system that Brady has implemented.
20          Now, if you look at the Brady campaign's
21  actual grades by state and say, What are their violence
22  rates in those states and what's their rating? -- this
23  is a correlation of that data.  It shows on one axis the
24  violent crime rates in each state and on the other axis
25  how they give them a grade.  There's no correlation.
0137
1   There's absolutely no testimony here to any correlation
2   that the more stringent their gun laws or the more
3   stringent their Brady checks are, the less likely
4   they'll have violence in their state.  In fact, if
5   anything, you might be able to come up with a negative
6   correlation.
7           So for that reason alone, I don't believe
8   that we can expand this, essentially stopping private
9   sales in Colorado.  If this bill passes, that is what it
10  will do, is stop private sales.
11          Our organization sponsors a website only
12  in response to the 2000 ballot initiative.  And when the

LEG HX 000763

4678

13  newspaper stopped taking private sale ads and we -- it's
14  a marketplace for people to meet, and there are
15  literally hundreds of transactions a week going on
16  there.  And to our knowledge, there's never been a crime
17  committed by any of -- by anyone involved in those
18  transactions.  And we're careful to police it to make
19  sure that those sales are legal inasmuch as we can.
20         It's a meeting place, but we don't believe
21  actually that government has the right to stop us.
22  Otherwise, we might as well just call it a privilege.  I
23  don't think anybody of any bent in this room probably,
24  not many, anyway, would call it -- would call it a
25  privilege.  It's a right.
0138
1          And that's why you hear horns honking and
2  people upset, because they really think it's tearing a
3  right that they have right now.
4          With that, I'm happy to take any
5  questions.
6          THE CHAIRWOMAN:  Thank you, Mr. Brown.
7          Is there any questions from the committee?
8          I think Senator Harvey has a question.
9          SENATOR HARVEY:  Thank you, Madam Chair.
10         MR. BROWN:  Uh-oh.
11         SENATOR HARVEY:  Mr. Brown, there was a
12  previous Columbine student, survivor, who is now a
13  teacher who testified in favor of this bill who said
14  that you could buy online.  Could you clarify what your
15  site does?
16         And, also, there was another person who
17  said that you generate revenue personally from that, and
18  that's why you are against these bills, specifically
19  because you generate revenue from your gun site.  Can
20  you explain exactly what your gun site does?
21         THE CHAIRWOMAN:  Mr. Brown.
22         MR. BROWN:  Madam Chairman.
23         Well, I was downstairs most of that time,
24  so I didn't hear most of that testimony.
25         Colorado Gun Market is owned by Rocky
0139
1  Mountain Gun Owners, and it's a nonprofit.  It's a
2  service given to members.  So if you're a member of our
3  organization, (inaudible), but people who buy there are
4  not necessarily members.  It's basically like a meeting
5  place.
6          So, no, I don't generate any personal
7  revenue from it.  Happy to have that debate with some
8  people.
9          But, nevertheless, the question about
10  transferring firearms online -- and I know there's a
11  lot -- been a lot of discussion in the media about this;
12  I've tried to clarify it in the interviews I've given,
13  but let me make this clear:  The 1968 gun control act
14  absolutely stopped mail sales.  In America, it was very

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

15    common to sell via a catalog. In fact, J.C. Penney's
16    and many of what we would normally call the original
17    retailers in our country sold firearms, and in fact
18    machine guns prior to 1934, via mail. And that stopped
19    in 1968, when it was made illegal to transfer a firearm.
20          So, therefore, if today I wanted to sell a
21    firearm to someone in the state of Colorado, and the
22    person, the buyer of that firearm -- let's say we met up
23    via a newspaper ad in, let's say, Thrifty Nickel --
24    that's still legal -- or someplace like that, or the
25    website Colorado Gun Market, or even Armslist is
0140
1    nationwide, but if we went and agreed to buy at a
2    certain price, and we e-mail back and forth, we could
3    meet privately somewhere, but we couldn't exchange or
4    transfer that firearm via mail. We can't mail the
5    firearm via -- and transfer the firearm. You can mail a
6    firearm to yourself. Let's say you moved and you didn't
7    want it in your car when you moved, but you cannot
8    transfer.
9          So -- in fact, it's even difficult
10    sometimes to mail firearm. Many places don't actually
11    do that. FedEx does on a limited fashion. But it's a
12    federal offense to transfer a firearm via mail. And it
13    is a federal offense to transfer a firearm to someone
14    from another state privately. You cannot do that.
15    You've got to go through a dealer.
16          So if it's a private sale, and you want to
17    sell to your cousin in Nebraska, technically that's
18    illegal. And there are some -- there are some questions
19    there about family heirlooms and transferring from your
20    grandpa to your son across state lines, too.
21          That fully answers the question, Senator.
22          THE CHAIRWOMAN: Is there any other
23    questions of Mr. Brown?
24          I see none. Thank you so much for being
25    here.
0141
1          The next person I have signed up is Daniel
2    Carey.
3          Thank you, Mr. Carey. Go ahead and
4    introduce yourself and who you represent, and then
5    proceed with your testimony.
6          MR. CAREY: Madam Chairman, thank you very
7    much.
8          My name is Daniel Carey. I'm a registered
9    lobbyist here from the National Rifle Association. I'm
10    here in opposition of House Bill 1229.
11          A lot of the stuff that I wanted to talk
12    about has been touched upon, especially by Mr. Kopel's
13    testimony. I think he did an excellent job of
14    explaining the transfer aspect of it.
15          I think what I wanted to touch upon and
16    what I handed out to you, one of the two handouts, was

LEG HX 000765    4680

17 the letter he mentioned, the Department of Justice
18 and I gave that to you as well -- is what I want to
19 reference here as it relates to California.  I know
20 Mr. Kopel mentioned that the legislation we're
21 discussing here today was done on a federal level, or at
22 least introduced on a federal level.
23       I think that we took, in comparison, what
24 has been done on a state level, which is California and
25 Rhode Island, two of the only states that have initiated
0142
1 a statewide so-called universal background check, and we
2 took the criminal records as far as violent crime
3 related to murder and death and firearms from 1960 to
4 2011, and compared those from California to Colorado,
5 and then to the national average.
6       And if you look at the handout that I gave
7 to you there, it shows the state of California without
8 any real positive impact as it relates to having
9 universal background checks.  Did nothing.  There's no
10 attributable benefit to having this in California.
11       When you look at a comparison of
12 California, Colorado, and the national average as it
13 relates to the crime and murder rates from 1960 to 2011,
14 it shows that we did continue to decline in these murder
15 rates, but nothing was attributable to these universal
16 background checks as they've been instituted.
17       We also have to take into consideration,
18 if you look at these numbers, that at the same time
19 while Colorado was declining in its violent crime rates
20 and while the nation was declining in its violent crime
21 rates, these so-called universal background checks
22 didn't exist.  So what can we attribute that to?  It's
23 not this type of legislation that we have here.
24       The other thing that I wanted to touch
25 upon is the process by which -- that these background
0143
1 checks are going to have to go through.  And that's
2 through the Colorado Bureau of Investigation InstaCheck
3 program.  As has been seen in the papers, and as we've
4 discussed in other testimony here, it's been highly
5 problematic.  I mean, folks have had to wait upwards of
6 10 days to exercise their Second Amendment rights, when,
7 on a federal level, they're only asked to wait three
8 days.
9       So would you say that their rights have
10 been violated?  I would say yes.
11       So now we're going to take a group of
12 individuals who are not in this transfer process in
13 through the CBI InstaCheck, and now throw them into a
14 system that can't currently keep up with the amount of
15 background checks that we're doing to date.
16       So how is this going to make the system
17 any better?  How are we benefiting law-abiding citizens
18 in exercising their Second Amendment rights?  By

19  throwing them into the system, I feel it's only going to
20  be more burdensome.
21         I think the thing I touched upon in my
22  previous testimony when this bill was up before the
23  House that again I'd like to touch upon today, because I
24  think it is so pertinent, is that when you place an
25  unjust burden on a law-abiding citizen to exercise their
0144
1   right, a constitutional right, whether it be the First
2   Amendment or the Second Amendment, the Third or the
3   Fourth, if you place that undue burden on them in
4   exercising that right, it then becomes unconstitutional.
5          And I truly feel, and we truly feel as an
6   organization, that this type of legislation is
7   unconstitutional due to that and is not going to be a
8   benefit to anyone other than the criminals because
9   criminals are not, by their nature, going to go through
10  the law-abiding steps to get a background check.
11  They're criminals by nature.
12         So with that I would like to stand for any
13  questions the committee may have.
14         THE CHAIRWOMAN:  Thank you so much.
15         Are there any questions for our witness?
16         I see none.  You got off easy.
17         MR. CAREY:  That was easy.  Thank you very
18  much.  I appreciate it.
19         THE CHAIRWOMAN:  Thanks so much.
20         Terry Maketa.  Welcome, Mr. Maketa.
21         Go ahead and introduce yourself, who you
22  represent, and then proceed with your testimony.
23         MR. MAKETA:  Thank you, Madam Chair.
24         I'm Terry Maketa, sheriff of El Paso
25  County.  And I am here speaking on behalf of all of
0145
1   Colorado's law-abiding citizens as well as a member of
2   law enforcement, a member of the sheriffs of Colorado.
3   And I also bring a unique perspective that I am the only
4   law enforcement official, local law enforcement
5   official, that serves on the FBI CJIS working board.
6   Not only that, I have been elected and serving on the
7   director of the FBI's advisory policy board.  So I bring
8   a little bit different perspective than maybe what you
9   heard from Director Sloan and others who have provided
10  testimony.
11         The first thing that I would like to say
12  is when this bill, I think, was first conceptualized,
13  and maybe not even introduced, but proposed, I started
14  getting citizens calling, asking what my stance was.
15  And my initial response was:  We already have a
16  background.  I haven't seen the bill, but if it's a
17  background check system that targets criminals and
18  prohibits their access or interferes, I don't have a
19  problem with it.
20         Now I made that statement publicly several

21   times, both radio, TV, in print, and that was under the
22   assumption that what we had in place, it could not be
23   much more dramatic than that.
24          To be honest, I was quite surprised when I
25   did finally get a copy of the bill and read the bill and
0146
1    saw some of the provisions and expectations that I think
2    creates a false belief in those people that are
3    supporting this.  And I think we've heard great
4    testimony on both sides of this issue this morning, but
5    the one or two elements that I see that run throughout,
6    those that are in support of it, is a misunderstanding
7    of what this does.  And I think any law that creates the
8    potential for law-abiding citizens intending to follow
9    the law creates -- or criminalizes them is the biggest
10   tragedy of all of this.
11          And when we start talking about my father
12   holding on to firearms to pass on to his grandchildren,
13   that potentially being a crime if he doesn't conduct a
14   background check, number one, because he wouldn't be
15   familiar with the laws in Colorado -- he's an Alaska
16   resident, with property in Colorado -- number two, my
17   21-year-old son not knowing every aspect other than he
18   believes, in order to buy a firearm, you have to
19   conduct -- or have a background check done.  But the
20   passing from one family member to the other, or the
21   scenario where my father, who owns a house in my
22   neighborhood, spends half his time in Colorado, half in
23   Alaska, leaves a firearm in his house, but while he's
24   gone, says, "Terry, will you keep my firearm in your
25   safe?  I don't want to leave it in the house."  And now
0147
1    he may be subjected to criminal activity.
2           Then my son comes to me and says, "Dad,
3    I'm going to the range.  Can I fire Grandpop's handgun?"
4           "Sure, go ahead and take that."  Now he is
5    facing potential criminal charges.
6           The intent of laws shouldn't be to
7    criminalize law-abiding citizens.  It should be to
8    protect citizens and hold those who willfully violate
9    our laws accountable for their actions.
10          Some of the provisions that cause me the
11   greatest concern was the expectation or the claim that
12   there will be audits to ensure information is going from
13   our various judicial districts into the Colorado
14   InstaCheck, as well as the national InstaCheck, system.
15   The fact is the information that is supplied now is not
16   reliable and it's not valid.
17          The insinuation in this bill that dictates
18   what the NICS system -- NICS being the National
19   InstaCheck System -- will accept and not accept or how
20   it will deal with appeals is really invalid.  We all
21   know state government cannot mandate federal government
22   to anything.

23    I sit on, as I mentioned, and am the past
24  vice chairman of the western working group for the FBI
25  Criminal Justice Information System.  Essentially what
0148
1  that means is that I am the local law enforcement rep of
2  all of the western United States for policies and
3  proposals that are made with regard to all Criminal
4  Justice Information Systems at the FBI level.
5          From that board, we're actually elected to
6  serve on the directors' advisory policy process board.
7  I have served on that board for approximately four
8  years, on the working group for approximately seven
9  years.
10          There is a process by which changes are
11  made to all the FBI information -- Criminal Justice
12  Information Systems.  A state merely saying, "You're
13  going to accept this information, you're going to handle
14  this this way," doesn't work.  The system is designed to
15  fit the needs of all 50 states and U.S. territories, not
16  because one state decides that they want this done this
17  way.
18          Now, in the past couple years, it's
19  actually been proposed that the Colorado InstaCheck
20  system be taken off-line because it's a duplication of
21  effort and we should simply rely -- and I know there has
22  been proposed legislation, especially during difficult
23  budget years.
24          The testimony to keep the Colorado
25  InstaCheck system in place is because we can't rely on
0149
1  the NICS system because it does not have timely
2  information as it pertains to restraining orders,
3  whether they be permanent or temporary, or the status of
4  mentally ill.  And I can tell you in the last four or
5  five years, the CJIS group at the Federal Bureau of
6  Investigations has struggled with what information to
7  accept and what not to accept because it can't be vetted
8  and validated, especially when you're talking about
9  mentally ill.  There's a very high reluctance on that,
10  as well as there's a reluctance and an extreme caution
11  used when deciding what information that can even be
12  validated or vetted through a process and be relied on.
13          It's something that we constantly struggle
14  with, so that an innocent citizen doesn't get mislabeled
15  and prevented from exercising the purchase of property
16  in a lawful fashion, or a misidentification, especially
17  in a time where identity theft is common.  And the
18  Internet has made that very simple.
19          I think we all agree we want to do what we
20  can to save lives.  We all agree we want to keep
21  firearms out of the hands of those that intend to cause
22  harm to others.  And I think we all agree that we should
23  not criminalize law-abiding citizens that do not realize
24  they may be in violation of the law by passing family

LEG HX 000769    4684

25  heirlooms or gifts from one family member to the next,

0150

1  or asking one family member to hold something because
2  they're out of town, or another family member to borrow
3  a firearm so they can maybe go out and target shoot and
4  then determine if it's a firearm they want to own.
5          Our Colorado InstaCheck system has already
6  shown evidence of it being overloaded.  We haven't even
7  begun including private sales in there, and already,
8  just up to two and a half weeks ago, the Colorado
9  InstaCheck system was backlogged 18 days.  I looked on a
10  computer at the CBI website and saw it for myself.
11  Backlogged 18 days with just the parameters that it's
12  currently searching.
13          The concealed handgun background checks
14  exceeded 90 days for 101 of my residents in El Paso
15  County just on Friday.
16          What makes us think that CBI -- and I have
17  tremendous confidence -- I consider them my friends,
18  both Director Sloan and his staff -- but what makes us
19  think they can handle this increased volume with the
20  accuracy that's going to make a difference in saving
21  lives?  The fact is, the data tells us it won't make a
22  difference.
23          1.4 million firearms were stolen from
24  citizens between 2005 and 2010.  That's an average of
25  240,000 firearms a year.  If we carry that through from

0151

1  2011, '12, and on into '13, we're looking at 2 million
2  firearms illegally circulating in this country.
3          This background check makes people
4  believe, or this bill makes people or leads them to
5  believe that they will be safer and these firearms will
6  be stopped and bad guys won't get them anymore.  It
7  gives the false perception of safety.  And the fact is
8  it will not.  There will still be 2 million firearms
9  circulating in this country illegally.  And those
10  individuals that are operating outside the rules set by
11  society, they won't be inconvenienced by this because
12  they will just buy it underground.  I think the worst
13  thing we can do as elected officials, as leaders in our
14  community, is pass laws that give a false sense of
15  safety.
16          I think that in and of itself is a
17  tragedy.  I think that's why we have so many sheriffs
18  standing here today feeling so passionate about this.
19  If we knew that the data supported that this bill would
20  make our community safer, would prevent a Columbine,
21  would prevent an Aurora theater shooting, we would be
22  onboard.  But the fact is, we, like you, answer to our
23  constituents.  And there's not one of us who can look us
24  in the eye and say, "This bill will make you safer."
25          It will create an inconvenience.  And I

0152

4685

1  feel -- I hear most that innocent people are going to be
2  labeled criminals because they're inadvertently going to
3  transfer a weapon, with good intent, to family members
4  and friends, and they're going to have to learn what our
5  legal system is all about.
6          I think if we want to do something right,
7  if we do share a passion to protect our citizens --
8  Sheriff Justin Smith from up in Larimer County had a
9  great idea:  Why don't we quit talking about running
10  people through systems to see if they match up to a
11  criminal record.  Why don't we in Colorado take a
12  leadership role in this country and create a database
13  that lists the people we know should not have firearms.
14  Let's put that out to the public.  Let's get public
15  (inaudible) and its community policing and partnering
16  with the public, that the crime that we've seen in the
17  last 15 years is partnering with them.  Let's create a
18  database at CBI that we load in the people we know
19  cannot have one.  It would be very timely.
20          The search on that database would be much
21  quicker and less cumbersome than a search searching all
22  of the criminal databases and the other civil databases
23  maintained by Colorado and the national -- and the FBI
24  Criminal Justice Information System.
25          Citizens could access it via the Internet
0153
1  and check and see:  Can that neighbor have a firearm?
2  Can my brother have a firearm?  Can this guy who called
3  me and heard I had one and that I want to sell, let's
4  see if he's on that list.
5          That would not impede on the rights of
6  individuals to purchase firearms, especially those
7  law-abiding citizens.  It would target the criminals who
8  seem to protect and keep them in darkness.  I mean, it's
9  not open to the public who cannot have a weapon.  It's
10  only open to the criminal justice entities in the state
11  or by a specific request.
12          I would ask this committee and this
13  legislature to join those in law enforcement that truly
14  want to make our community safer and let's come up with
15  legislation that targets those people that are most
16  probable to commit this crime, and not criminalize those
17  that never have an intent to commit a crime, and let's
18  do something that is measurable and will have
19  evidence -- base data to show that it has made a
20  difference.
21          Thank you and I'll entertain any questions
22  with your permission.
23          THE CHAIRWOMAN:  Thank you.  We do have
24  some time for questions, but I want to let the committee
25  members know the 90 minutes has expired for those in
0154
1  opposition, but we have time for questions.
2          Senator Crowder.

4686

3        SENATOR CROWDER:  Thank you for coming
4   here, Sheriff.  I have just a quick question.
5        As a law enforcement official, were you or
6   any of your associates consulted on this particular
7   bill, by any chance, prior to the writing of it?
8        MR. MAKETA:  I --
9        THE CHAIRWOMAN:  Sheriff Maketa.
10       MR. MAKETA:  I'm sorry.
11       THE CHAIRWOMAN:  That's okay.
12       MR. MAKETA:  To answer the question, I was
13  not consulted in any way.  I'd have to ask my fellow
14  sheriffs.  I don't believe they were.  And I feel that,
15  if we were, the version that is being heard today would
16  not be in existence.
17       SENATOR CROWDER:  Thank you.
18       THE CHAIRWOMAN:  Is there any other
19  questions?
20       Seeing none, thanks.
21       MR. MAKETA:  Madam Chair, I do have one
22  comment.  This question was asked much earlier by
23  Senator Crowder, and I have the answer to it, if I may.
24       The question is surrounding how many
25  prosecutions occurred from those denials of purchases
0155
1   with your first speaker, which I believe was Director
2   Sloan.  Out of the couple hundred thousand that has been
3   turned down by the NICS, the National InstaCheck System,
4   they vetted through and selected 76,000 that were
5   forwarded to the Bureau of Alcohol, Tobacco and
6   Firearms.  Out of that 76,000, 13 cases received a plea
7   of guilty or a verdict of guilty.
8        I hope that answered your question.
9        SENATOR CROWDER:  Madam Chair.
10       THE CHAIRWOMAN:  Senator Crowder.
11       SENATOR CROWDER:  It does.  You know, the
12  individual that answered it, there was just denials.
13  But the thing about it, if you have a law, there should
14  be criminal intent, there should be a fine, and there
15  should be a conviction.  That's why I asked the
16  question.  Thank you very much for your information.
17       THE CHAIRWOMAN:  Thank you.
18       The time is up, and I just want to thank
19  again all the sheriffs and my own sheriff there for
20  being here, and thanks for your service, but no
21  clapping.  That doesn't mean we didn't think it deserved
22  applause.  We're just trying to run our meeting.
23       Senator Harvey has something to say before
24  everyone takes off.
25       SENATOR HARVEY:  I just wanted to ask a
0156
1   quick question.  Does that mean that all of the other
2   ones were negatives, or these were just the ones that
3   were positive that we know about?
4        MR. MAKETA:  I'm sorry, I'm not sure I

5  understood the question.
6        THE CHAIRWOMAN:  Senator Harvey.
7        SENATOR HARVEY:  You said there were only
8  13 convictions of those that were drawn.  Does that mean
9  all the other ones were not criminal offenses, so they
10 couldn't be prosecuted, or these were just the ones that
11 we did prosecute?
12       THE CHAIRWOMAN:  Sheriff Maketa.
13       MR. MAKETA:  I'm not sure how many they
14 prosecuted.  I pulled this data off the Federal -- the
15 Bureau of Justice statistics, with regard to the success
16 of the NICS system.  And the cases that the FBI comes
17 across, they don't take those.  They refer them over to
18 the Bureau of Alcohol, Tobacco and Firearms.  Out of the
19 76,000, it only resulted in 13 cases.  They didn't
20 provide any additional information.  But I'm actually
21 leaving today at 7:30 from DIA to fly to my next
22 meeting, and I will see if I can't get you that answer
23 because I'll be meeting with those folks then.
24       THE CHAIRWOMAN:  Thanks so much.  Thanks
25 again, everybody.
0157
1        (Inaudible discussion.)
2        THE CHAIRWOMAN:  What I think might be a
3  great idea, because I'm sure that there are people who
4  have traveled here that didn't get to testify either in
5  opposition or support, but since those, I think, are in
6  the room -- because we're on those in opposing -- if
7  you -- I guess I'm offering a little piece, that if
8  you'd like to stand in opposition to Senate Bill 1229,
9  that you didn't get to testify, you're welcome to do
10 that.  So go ahead.  It gives us a sense, an idea.
11       Thank you so much.  Thanks for being here.
12       I went with my colleagues, and they gave
13 me the list and they used the time in that way.  Our
14 sponsor used the time to actually bring it down to three
15 minutes.  So I apologize, that's what was given to me by
16 those who are in opposition.
17       (Inaudible discussion.)
18       THE CHAIRWOMAN:  Yes, we'll go ahead and
19 do that, and Julia will take that.
20       Thank you so much and thank you for all
21 your patience and your understanding of our process
22 here.
23       So I am going to go ahead and close public
24 testimony and turn it over to our --
25       (Inaudible discussion.)
0158
1        THE CHAIRWOMAN:  Sir, I'm sorry -- that's
2  not what we do here.  I don't know if there's a -- we
3  don't do (inaudible) from the audience there.  I'm
4  sorry.
5        (Inaudible discussion.)
6        THE CHAIRWOMAN:  You sure can.  Again, I

7  know this is a new process to so many people, and we're
8  glad to have people from all over the state come up here
9  and testify, but there is a process and an order to make
10 sure that we actually can get business and procedures
11 done here.  So thank you, and again I apologize.  That
12 was the way that I think those who were in opposition
13 wanted to utilize their time.  So that was a choice
14 there.
15         So as I did, I went ahead and closed
16 public testimony.  I will go ahead and turn it back over
17 to our sponsor.  I don't know if you have any
18 amendments.
19         SENATOR CARROLL:  Thank you, Madam Chair
20 and the committee.
21         I do have some amendments.  I don't know
22 if you want to do those prior to wrap-up.  I do think
23 some of the amendments are going to be responsive to
24 some of the points that have been raised up here today.
25 So your choice as to whether you want to do wrap-up or
0159
1  amendments first.
2          THE CHAIRWOMAN:  I think we'll go ahead
3  and do amendments, but I may want to wait -- I might
4  take a senatorial five until we have Senator Harvey come
5  back.
6          SENATOR CARROLL:  And then we'll need --
7          THE CHAIRWOMAN:  Yeah, and then we're
8  going to need Senator Hudak to be able to begin here to
9  vote, too.  So why don't we do that.  Senatorial five.
10         (A recess was taken.)
11         THE CHAIRWOMAN:  I'm going to go ahead and
12 call us back to order.  And I just wanted to make a
13 quick announcement.
14         As you might have noticed, in the
15 testimony that we had previously, people did talk in
16 general, and I allowed, I think through my authority,
17 for people to speak to maybe some other bills that were
18 before the Senate.  And so if you were -- if you're
19 signed up to testify on another bill and you want to
20 talk about 1229, feel free to do that.
21         We really do apologize.  I think all of us
22 up here want to hear as much as we can from especially
23 those who drove from a distance to be here.  So we're
24 trying to make those accommodations.
25         And then I think I also might announce now
0160
1  Senator Heath, who is carrying the next two bills that
2  we will be hearing.  There is a lot of testimony on the
3  bill that we were scheduled to hear third.  So I'm going
4  to look at those numbers.  I'm not very good with
5  numbers.
6          (Inaudible discussion.)
7          THE CHAIRWOMAN:  So we'll probably hear
8  1226 first, thinking that they'll have more people for

9  that testimony -- no, we have an objection to that.
10         UNIDENTIFIED SPEAKER:  I have people
11  coming back at 6:30 or so on a request I asked --
12         THE CHAIRWOMAN:  Right.  We were just
13  thinking of the storm, and maybe that changed.  Okay.  I
14  did, I think I was the one who said that to you.  So we
15  will -- we won't make adjustments for the weather.
16         So, again, to remind you, if you didn't
17  get an opportunity to testify on 1229, you will have an
18  opportunity in the other two bills, if you would like to
19  take that opportunity.  So I'm going to turn it back
20  over to Senator Carroll, but you may be wanting me to do
21  my deal.
22         SENATOR CARROLL:  Thank you, Madam Chair.
23         Now we're moving into the amendment phase,
24  and I think starting with the amendment that you're
25  offering, if you wouldn't mind, maybe we begin there, if
0161
1  you would go ahead and move it and explain that one.
2         THE CHAIRWOMAN:  Great.  Thank you.  So I
3  do move L.028.  And it has been distributed.  And I
4  guess I want to say -- everybody has a copy; is that
5  right?  L.028.
6         I keep hearing something.
7         I first want to thank Senator Carroll for,
8  one, for carrying this bill; and then, two, prepared to
9  listen to some concerns that I had in talking to my
10  constituents, and certainly listening to the testimony
11  here today.  And I really believe that some of the
12  issues that were talked about were issues that I brought
13  as I came today.  And I can believe this is a friendly
14  amendment.  Senator Carroll can say that later.  But I'm
15  going to go ahead and explain the amendment to the
16  committee.
17         So on the first part of the amendment, on
18  page 4, line 2, after "transferor," I've inserted -- had
19  "transferee" inserted.  And this requires that the
20  federally licensed firearm dealer, or the FFL, upon
21  completion of the background check, to give a copy of
22  the results both to the party of the transaction and not
23  just to the transferor or the seller.  So that's that
24  first part.
25         And then the second part, on page 5, line
0162
1  3 through 6, we have talked a lot, I think, today about
2  being able to transfer that to family members.  And so
3  there's a piece in here where, based on the constituents
4  that I've talked to, that we wanted to expand that.  So
5  the language that I'm having inserted is that the
6  transfer -- that it's a bona fide gift, that they really
7  are giving that gift between immediate family members.
8  I'm just expanding the family members not only to
9  include spouses, parents, children, siblings,
10  grandparents, and grandchildren, but also recommending

4690

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

11  that we include nieces, nephews, first cousins, aunts,
12  and uncles.
13          And then there's a technical piece.  On
14  page 6, line 7, we're striking "or."  It's just a
15  technical.
16          And then No. 4 is really what we have --
17  or the fourth part of my amendment is what we've had
18  numerous conversations here today.  And so it's talking
19  about -- and on the bill, it's page 6, line 11 -- we're
20  striking line 11 and substituting.  We're talking about
21  temporary transfers here.  So this piece expands that
22  type of temporary transfer that can be conducted without
23  a background check.  So the first part of the amendment,
24  you can always -- and I went, myself, went to a shooting
25  range with some constituents upon that invitation, and
0163
 1  they allowed me to -- because I didn't have my own
 2  weapon, so they allowed me to use theirs.  And this
 3  would allow that there.  The owner of the gun, they're
 4  in my presence, that I'd be able to use that without
 5  violating any laws.
 6          The second part of that is that the
 7  amendment would allow for a 72-hour transfer period.  So
 8  that's a temporary transfer of 72 hours.  And so some of
 9  the situations that have come up, things Senator Harvey
10  talked about, but I'll use my own example.  I'm the
11  firearm owner.  I wanted to lend it to my husband so he
12  could feel protected, and didn't have a firearm himself,
13  I could leave him that, be gone for the weekend, and he
14  would feel confident to be able to protect himself; and
15  that would be a transfer that would be acceptable under
16  this bill, if this amendment is adopted.
17          So that is, I think, the substantive part
18  of my amendment.
19          And Senator Harvey is looking at me funny.
20  Would you like to address the amendment, Senator Harvey?
21          SENATOR HARVEY:  Well, thank you, Madam
22  Chair.
23          I'm not looking at you funny.  I'm looking
24  at the amendment funny.  I find the amendment silly.  If
25  I'm out of town for a week, my wife only has the
0164
 1  temporary transfer for 72 hours.  What is the magic
 2  number of 72 hours?  If she's my wife, she's my wife.
 3  That kind of goes to the silliness of the entire bill,
 4  in my opinion.  You can't enforce it.  You can't say
 5  we're going to allow law-abiding citizens to have a gun
 6  for 24 hours or 72 hours and put -- and government say
 7  what is an appropriate time limit for you to be able to
 8  defend yourself.
 9          So we're going to say you can defend
10  yourself for 72 hours, but, Senator Giron, if you leave
11  town for more than 72 hours, your husband doesn't have
12  the constitutional right to defend himself.

13        THE CHAIRWOMAN:  Thank you, Senator
14  Harvey.
15            I guess I didn't really think there was a
16  magic number, but, actually, upon testimony, and I think
17  more than one witness said, is that then an individual
18  would have that time to be able to go themselves and get
19  a firearm to protect themselves.  So that's where the 72
20  hours is that magic number that you were looking for.
21            Senator Harvey.
22            SENATOR HARVEY:  Well, I don't know about
23  your household, Senator Giron, but in my household, I
24  don't have enough money for my wife to go buy a $500 gun
25  to defend herself and exercise her Second Amendment
0165
1  rights.
2            I have a gun, the family has, that's in my
3  name.  I purchased it.  But in your amendment, because
4  I'm poor, my wife has to be defenseless after 72 hours;
5  but if I were in your household that's not poor, then
6  you could defend yourself more than 72 hours because you
7  have the wherewithal to buy a second gun.  That doesn't
8  sound very equitable to me.
9            But you're telling me that my wife has to
10  be unarmed after 72 hours, if I'm gone for more than 72
11  hours, because the government, in its ultimate wisdom,
12  has chosen to say 72 hours is the limit that law-abiding
13  citizens can defend themselves.  I think that's
14  inappropriate for the government to say, especially in
15  light of the Constitution that we've all taken a pledge
16  to uphold.
17            THE CHAIRWOMAN:  I very appreciate your
18  thoughts on that matter.  I guess I -- I had a thought,
19  and I just lost it, so let me think about that.  Let me
20  see if there are any other comments on the amendment.
21            And Senator Carroll.
22            SENATOR CARROLL:  Thank you, Madam Chair.
23  And I'm not sure we actually moved it yet.
24            THE CHAIRWOMAN:  I did move it.
25            SENATOR CARROLL:  I didn't quite hear
0166
1  that.
2            So this may not do everything that you're
3  wanting, but if you're wanting fewer situations, here's
4  the thing:  For anyone who's having some concerns with
5  the bill as drafted because of the possession issues,
6  this actually moves closer towards a direction of
7  removing more of those potential situations.  So I
8  wouldn't necessarily contemplate that it necessarily
9  addresses them, but if anyone has concerns with the bill
10  because -- first of all, as a sponsor, I'll tell you the
11  pieces of this that I think are good and why I would
12  actually consider this a friendly amendment.
13            As a logistical matter and the bill was
14  introduced on the first part -- we need to make sure

15  both the buyer and seller get a copy of their paperwork.
16  I mean, that's just a logistical issue.
17          The request to have an expanded definition
18  of family is one that does come based on testimony.  So,
19  again, by expanding the definition of family, you're
20  extending, under subsection B on 5, those could be
21  included in a bona fide gift.
22          I guess part of the issue that was coming
23  up in how it's written is folks will see a whole series
24  of exceptions, you know, that start on page 4, which is
25  exempting certain antiques, going through an exemption
0167
1  for immediate family, gifts, the wills and inheritance
2  situation.
3          The other thing that I thought was
4  relevant to what had come up before that I think also
5  applies to the spouse situation is a transfer that's
6  temporary under subsection D and occurs while in the
7  home, as long as you're not basically doing it -- like
8  if your wife is not a convicted felon.  So that's in
9  addition to subsection B, is also subsection D, which is
10  other folks that might be in the home.
11          The issue that we've come into, as you can
12  imagine -- I mean, the exceptions go on to say, you
13  know, for temporary use with shooting ranges and kind of
14  contemplating some of those appropriate gun safety
15  classes or target shooting, competitions, hunting,
16  fishing, you know, for firearms repairs.
17          The problem with not adopting this
18  amendment is that there's the potential for all kinds of
19  totally appropriate, lawful activity that could be
20  happening within a temporary period of time.  And
21  without putting in a catchall exception of lawful
22  activity on the transfer here, you're leaving it to sort
23  of one hypothetical at a time.
24          And I may not change your mind on the
25  amendment, but the amendment does move closer, instead
0168
1  of trying to necessarily list every single thing that
2  can be used, because there may be others that we haven't
3  contemplated yet, that this is basically then for any
4  lawful purpose on a loan.  It contemplates a loan for
5  any lawful purpose to someone who is not criminally
6  ineligible.
7          THE CHAIRWOMAN:  Thank you, Senator
8  Carroll.
9          And I did remember my thought.  Can I show
10  you my thought?
11          SENATOR HARVEY:  I'm dying to hear it.
12          THE CHAIRWOMAN:  Now that you said that --
13  I'm trying to think about that 72 hours -- oh, that
14  there is no perfect time frame.  But I think we open it
15  up so much that we would just be able to let anyone
16  borrow it.  And I think that there has to be a limit.

LEG HX 000778    4693

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

17    So I think that really is -- if you don't put any time
18    on to it, you may not want this amendment or want the
19    bill for sure, but I do think that that's reasonable, 72
20    hours, because when I was talking to the constituents in
21    my district, they were really talking about weekends
22    where they were hunting and those kinds of sporting
23    events, or they wanted to go to a shooting range, they
24    wanted to try out a gun for a short period of time
25    before they purchased it.
0169
 1         So that was just trying to put my arms
 2    around a period of time that seemed to make sense.  And
 3    maybe there isn't a perfect time.
 4         Senator Harvey.
 5         SENATOR HARVEY:  Thank you.
 6         And I appreciate that, but that's what
 7    we're getting to here, is when government tries to set
 8    up exceptions to the laws that they already -- that they
 9    are putting in place, to deny law-abiding citizens the
10    right to self-protection in this case.
11         We are saying we're going to deny the
12    right to legal, lawful citizens the right to defend
13    themselves with this bill, but we're going to make these
14    exceptions, because this bill isn't denying -- this bill
15    won't stop bad people from getting guns.  They already
16    do.
17         Look at Chicago.  It's the highest murder
18    rate in the world, and they already have so many
19    restrictions on guns that nobody should have guns there.
20    But they do.  And more people have died in Chicago in
21    the last 10 years than Americans have in Afghanistan.
22    That doesn't mean that it's going to stop illegals -- or
23    criminals from getting illegal guns.
24         But you are -- we already have on the
25    books that it is illegal to give a gun to somebody you
0170
 1    know or should have known shouldn't have a gun.  That
 2    law is already on the books.  So what we're saying is,
 3    to Senator Carroll's comments about this amendment, if
 4    we follow paragraph B and say a transfer that is a bona
 5    fide gift between immediate family members, that that
 6    deals with the wife being, or the husband being, left at
 7    home for more than 72 hours.  I can gift my wife, you
 8    can gift your husband your gun while you're gone.  And
 9    then he can gift it back to you and he won't have to
10    abide by the rules of this bill.
11         That's the protection, is if you gift it
12    to them.  So are we going to write down a contract that
13    says we gifted it to them?  Because if we don't write
14    that contract down and we just, under paragraph H, line
15    13, then we are violating the 72-hour rule.  And if
16    something bad happens -- where who knows what might
17    happen -- and we don't have that contract to say that I
18    gifted it to them, then we're both in violation of this

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

19  statute.
20           We are tying ourselves in knots to try to
21  get out of the unintended consequences of a bill that
22  all of the sheriffs in the state of Colorado stood up
23  here and said they can't enforce in the first place.  It
24  is the unintended consequence of all of these amendments
25  and all of these -- and this bill that is so concerning
0171
1  to most law-abiding people in the state of Colorado.
2           THE CHAIRWOMAN:  And the last thing I
3  would say on this is that, as we had witnesses testify,
4  that -- I heard anywhere between 88 and 92 percent of
5  Coloradans support background checks for everyone.  And
6  that can be disputed.  But what I heard some people say
7  was that, if they understood that they couldn't give it
8  to their first cousin, then maybe they would have not
9  said they were in support of that.
10           I do think that with this -- my belief
11  definitely is that universal or background checks for
12  everybody, citizens are in favor of that, and what we're
13  just trying to do is to not to make it burdensome on our
14  law-abiding citizens.  And I think that this amendment
15  helps to do that, and I stand by that.
16           Senator Harvey, our last comment.
17           SENATOR HARVEY:  Every poll that was
18  referenced today talked about the sale, not transfer,
19  the sale.  This amendment talks about transfers, about
20  how to limit law-abiding citizens' abilities to transfer
21  firearms amongst family members.  That's what this
22  amendment does.  I don't think any poll has been taken
23  about, should you be denied the ability to transfer or
24  be restricted in the way you transfer amongst family
25  members or friends, for that matter?
0172
1           THE CHAIRWOMAN:  So I have moved the
2  bill -- or the amendment.  And so is there any
3  objections to the amendment?
4           SENATOR CROWDER:  Oh, yeah.
5           THE CHAIRWOMAN:  In that case, we'll go
6  ahead and do a roll call.  Thanks, Julia.
7           JULIA:  Senator Crowder.
8           SENATOR CROWDER:  No.
9           JULIA:  Senator Harvey.
10           SENATOR HARVEY:  No.
11           JULIA:  Senator Hudak.
12           SENATOR HUDAK:  Aye.
13           JULIA:  Senator Jones.
14           SENATOR JONES:  Yes.
15           JULIA:  Madam Chair.
16           THE CHAIRWOMAN:  Aye.
17           JULIA:  Three to two.
18           THE CHAIRWOMAN:  That amendment is
19  adopted.  And I'll turn it back over to Senator Carroll.
20           SENATOR CARROLL:  Thank you, Madam Chair.

21       I would ask that someone move Amendment
22  L.023, I believe, and then I can explain it.
23            THE CHAIRWOMAN:  Senator Jones.
24            SENATOR JONES:  Madam Chair, I move
25  Senate -- or Amendment L.023.
0173
1            THE CHAIRWOMAN:  For motions, Senator
2  Carroll, do you want to talk to us about --
3            SENATOR CARROLL:  Thank you.
4            Members, this is basically a technical
5  amendment from the judicial department that does three
6  things.  In the first version of the bill, you'll see
7  referred to as clerks of the district courts.  This
8  swaps out the state court administrator in that role,
9  which is how we currently send information to the CBI.
10  So that is making sure that we are referencing the
11  correct -- the state court administrators, what that
12  should be.
13            Also, we have on this, like at the
14  appellate level, one of the provisions of the bill that
15  we didn't spend as much time talking about is there's a
16  couple of restoration-of-rights provisions in here, both
17  for people who get on the list for court-ordered mental
18  health stuff as well as other things.  So the bill adds
19  due process on restoration of rights for how someone can
20  get off the list that is currently on there right now.
21            In the earlier version of the bill, this
22  is just -- typically, appellate court judges don't take
23  new information.  What this does is clean up the
24  language where they can accept it.  They don't have to,
25  but it is usually -- they don't do what's called a de
0174
1  novo review on appeal.  They're stuck with a record.
2  And if a gun owner feels like there's new information
3  that needs to be presented outside of the original
4  proceedings, that we're giving the Colorado Court of
5  Appeals the discretion to be able to do that.
6            Then the third part of what it does, on a
7  technical cleanup here, is that it's clarifying we're
8  sending the new misdemeanor information to CBI rather
9  than to both CBI and the NIC system, which is the
10  federal system.  And the reason for that is that -- we
11  don't do that now.  The way we do it now is we give it
12  to CBI, and then NICS gets it from us.  So this is
13  conforming the process of this bill to how we actually
14  do it in other background check areas.  So that's L.023.
15            SENATOR HARVEY:  Madam Chair.
16            THE CHAIRWOMAN:  Senator Harvey.
17            SENATOR HARVEY:  Thank you, Madam Chair.
18            I would ask that the chair rule this
19  amendment is out of order.  It's a multipage amendment
20  that wasn't given to us until just now.  Under the rules
21  of this committee, if I understand correctly, we have to
22  be given a 24-hour rule -- advance on all multipage

LEG HX 000781

4696

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

23  amendments.
24           THE CHAIRWOMAN:  And that is a rule -- I
25  saw this as almost -- it wasn't substantive, but, I
0175
1  mean, do you see a good amount of substantive nature to
2  this that isn't something that we could understand in
3  that period of time?
4           Senator Harvey.
5           SENATOR HARVEY:  Well, multiple things.
6  If we are going to be offering amendments to the bill
7  to, quote, make it better, I think it would be
8  advantageous to us to be talking to the experts in the
9  State, David Kopel and other law enforcement people,
10  about these amendments.  David Kopel is probably the
11  foremost expert in the nation on gun laws, and he's
12  right here two blocks away from this building.  And he
13  said that he wasn't contacted about the writing of this
14  bill and offered amendments, to make suggestions to what
15  he thought would be appropriate ways to deal with the
16  transfers and the background checks.  He was never
17  asked, and neither were the sheriffs.  At least Sheriff
18  Maketa from Colorado Springs was never asked.  And this
19  is a multipage amendment.  And that's going against the
20  rules of this committee.
21           And if we're going to be amending the
22  bill, I think we should be asking those who understand
23  the law better than we do, what amendments would work
24  well with Colorado statute.  As David Kopel pointed out
25  appropriately, that many places in this bill talking
0176
1  about transfers was taken directly from a federal bill
2  written by Michael Bloomberg that did not accurately
3  reflect how it would interact with Colorado statute,
4  since Michael Bloomberg is not from Colorado.  He's the
5  mayor of New York City.  And if we're going to be
6  amending the bill to make it apply correctly to Colorado
7  statute and not to federal statute, written by a mayor
8  from New York City, perhaps we should talk to the
9  experts who know about it.
10           THE CHAIRWOMAN:  Well, I might object
11  to -- I don't believe it was written by someone from
12  outside the state, mayor or otherwise.
13           But, Senator Hudak, do you have a
14  question?
15           SENATOR HUDAK:  No comment.  It seems to
16  me all this bill does is change --
17           THE CHAIRWOMAN:  This amendment.
18           SENATOR HUDAK:  This amendment.  Excuse
19  me.  Thank you for clarification.  That all Amendment 23
20  does is change "clerk of the court" to "court
21  administrator" 12 times.  I don't think it would take me
22  24 hours in advance to figure that out.  And so I think
23  it is entirely appropriate for us to consider this
24  amendment.

Appellate Case: 14-1290    Document: 01019371764    Date Filed: 01/16/2015    Page: 34

1          SENATOR CROWDER:  Thank you, Madam Chair.
2          I beg to differ.  This denial in the
3  appeal process, if you are so deemed not capable of --
4  deemed (inaudible) incompetent, the process there is
5  giving complete jurisdiction to the clerk of the court
6  and the state court administrator.
7          Just looking at this, I do believe that
8  the appeal process for someone that's deemed incompetent
9  is not in any way in the best interest of the person who
10  is found incompetent.  And I've worked a lot with this
11  in some of the VA.  But there's medical people involved;
12  there's all kinds of other people involved.  But to give
13  that entire discretion to the clerk of the court, I do
14  find to be somewhat troubling, without medical personnel
15  in this.
16          THE CHAIRWOMAN:  Thank you.
17          If we want to go ahead and take a
18  senatorial five, a little discussion off-line here, I
19  would appreciate that.
20          (A recess was taken.)
21          THE CHAIRWOMAN:  I'll go ahead -- well,
22  we're already back in order.  We just had our senatorial
23  five.
24          As I looked and continued to have a
25  conversation with Senator Carroll, I think it was the
0178
1  conversation we were having at the beginning, that as I
2  saw it -- and I just wanted clarification -- that it was
3  a -- it really is a very technical amendment.  And when
4  I look at 13-9-129, if anything, that little piece that
5  I think is more substantive, what it's doing is
6  expanding it to be able to send electronically.  So I
7  think that this certainly, in what we're trying to do
8  with the bill and that the bill sponsor is trying to be
9  amenable, that this is something that enhances what I
10  think the testimony had to say.
11          Senator Carroll.
12          SENATOR CARROLL:  Thank you, Madam Chair.
13          I just wanted to add that one of the
14  pieces that's getting cleaned up here is sometimes there
15  are false flags from stale information.  And some of the
16  other testimony we heard, as particularly on the mental
17  health orders, that's maybe as much as six months late.
18  So the benefit, in effect, of what's on page 2 of the
19  bill on here is this means a lifetime electronic
20  transfer within 48 hours.
21          So you may have people who, for example,
22  by way of a deferred judgment, at some point of
23  application, may have been ineligible and they become
24  eligible.  So the longer that data takes, the more you
25  actually do have people who are legally eligible to be
0179

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

1   purchasing guns, that by way of a state or outdated
2   database, would be waiting longer.
3            So with this -- part of what this does is
4   give us lifetime, within 48 hours, update of the data,
5   which I think -- I don't know how many people that
6   affects, but it does affect some people who might have
7   previously been ineligible that could become reeligible
8   to purchase.
9            THE CHAIRWOMAN:  Thank you.
10            I'm not sure -- do we have any questions
11  from the committee members?
12            No questions.
13            I guess I'll go ahead and recognize
14  Senator Marble as a question.
15            SENATOR MARBLE:  Thank you, Madam Chair.
16            I'm just going back into testimony from
17  the experts, and I'm going to rely a lot on what David
18  Kopel had said regarding this bill.  And I have a
19  question.  Because he definitely stated this had the
20  Bloomberg effect on this law -- and this law is in
21  New Jersey -- regarding the transfer or holding of
22  firearms by a friend or visitor.  And it criminalizes
23  virtually all gun owners in Colorado in that it is not
24  properly drafted.
25            So what my question would be:  How would
0180
1   these amendments fix that?
2            THE CHAIRWOMAN:  So Senator Carroll.
3            SENATOR CARROLL:  Thank you, Madam Chair.
4            So this bill has been drafted in this
5   state.  This comes from judicial as far as making sure
6   that we're referring to the state court administrators
7   or the clerks.
8            I mean, this particular amendment is very
9   administerial in nature as far as making it work.  It
10  deals with the 48-hour lifetime transfer of data and
11  ensuring that could be done electronically, and it
12  allows the Colorado Court of Appeals to accept
13  additional information.
14            This is Colorado's system.  I don't know
15  what any other state does.  But this is a
16  restoration-of-rights process.  We're doing and frankly
17  expanding here in Colorado under this bill.
18            THE CHAIRWOMAN:  Thank you, Senator
19  Carroll.
20            So --
21            SENATOR MARBLE:  One quick question.
22  According to the 62 sheriffs who wrote the statement
23  regarding this law is unenforceable and we will not
24  enforce it, because of its unconstitutional value with
25  our state constitution, how does this then, you know, go
0181
1   into effect when it's not in line with our state
2   constitution?

3          THE CHAIRWOMAN:  Senator Marble, we are on
4  the amendment.  So I'm going to go ahead and --
5          SENATOR MARBLE:  That amendment, how would
6  that amendment make that --
7          SENATOR HUDAK:  (Inaudible) Madam Chair, I
8  just -- I'm questioning why people who are not on this
9  committee are getting to participate in -- they're not
10  substituting for a member.  And I'm -- it's not
11  generally done here where additional people, additional
12  legislators, get to also act as a member of the
13  committee.
14          One of the benefits or privileges of being
15  assigned to the committee is that we get to hold the
16  hearing.  And other members serve on other committees,
17  but not ours.  And so I would ask for a senatorial five
18  to discuss this.
19          THE CHAIRWOMAN:  I appreciate everything
20  that you had to say, Senator Hudak.  I do recognize that
21  it was out of the ordinary to be able to do that, but it
22  is at the chair's discretion.  And so I went ahead and
23  allowed Senator Marble to ask a couple of questions.
24          Senator Harvey.
25          SENATOR HARVEY:  It is not unusual.  We've
0182
1  done it for the 12 years that I've been down here.  They
2  cannot vote.  That is the privilege of being on this
3  committee, is the right to vote.  The privilege of being
4  on this committee is you were elected by 51 --
5  50 percent plus one vote to be able to sit on this
6  committee and ask questions during the committee hearing
7  that you would not otherwise be able to ask questions on
8  because you aren't sitting on the committee.  This is
9  done on a regular basis.  You just are not allowed to
10  vote.
11          Just because you have not seen it in the
12  two years that you have been here --
13          SENATOR HUDAK:  Four.
14          SENATOR HARVEY:  -- does not mean that it
15  has not happened.  But she did sit through the entire
16  committee.
17          THE CHAIRWOMAN:  Well, thank you, Senator
18  Harvey.  And since I went ahead and allowed that, I
19  appreciate that feedback.
20          And so I think that we are on to the
21  amendment, L.023.  I'm believing there are some
22  objections, so we'll go ahead and take roll.
23          JULIA:  Senator Crowder.
24          SENATOR CROWDER:  No.
25          JULIA:  Senator Harvey.
0183
1          SENATOR HARVEY:  No.
2          JULIA:  Senator Hudak.
3          SENATOR HUDAK:  Aye.
4          JULIA:  Senator Jones.

5           SENATOR JONES:  Yes.
6           JULIA:  Madam Chair.
7           THE CHAIRWOMAN:  Aye.
8           So L.023 passes.
9           And is there any other amendments?
10  Senator Carroll.
11          SENATOR CARROLL:  Thank you, Madam Chair.
12          The final amendment that I have is L.026.
13  I'm going to ask somebody to offer that.
14          One of the potential loopholes that came
15  up, I believe was brought up in Howe's (phonetic)
16  testimony, is that all someone would need to get around
17  the private background check is basically do the check
18  in the name of a trust and effectively doing a
19  pass-through, which would create yet another loophole.
20  So Amendment 26 tightens the definition of transferee,
21  so you basically can't -- a criminal can't gain the
22  background check by pretending to be a trust and then do
23  firearms trafficking that way.
24          THE CHAIRWOMAN:  Thank you.
25          Senator Jones.
0184
1           SENATOR JONES:  Thank you, Madam Chair.
2           I move L.026.
3           THE CHAIRWOMAN:  That's a proper motion.
4   Is there any objection to L.026?
5           Seeing none -- oh, yes.  So, Julia, will
6   you take a roll call.
7           JULIA:  Senator Crowder.
8           SENATOR CROWDER:  No.
9           JULIA:  Senator Harvey.
10          SENATOR HARVEY:  No.
11          JULIA:  Senator Hudak.
12          SENATOR HUDAK:  Aye.
13          JULIA:  Senator Jones.
14          SENATOR JONES:  Yes.
15          JULIA:  Madam Chair.
16          THE CHAIRWOMAN:  Aye.
17          JULIA:  Is that a four-to-one?
18          THE CHAIRWOMAN:  That's three to two.
19  That's adopted at a three-to-two vote.
20          Senator Jones.
21          SENATOR JONES:  Thank you, Madam Chair.
22          I move House Bill 1229 to the
23  appropriations committee.
24          THE CHAIRWOMAN:  That's an appropriate
25  motion.
0185
1           Senator Jones.
2           SENATOR JONES:  Yeah, just to follow up,
3   I'm supporting this bill.  I've tried hard to listen to
4   people, and I really, really appreciate people taking
5   the time to talk to me and e-mail me.
6           Emotions run high on this issue on both

7  sides. I think we saw that today. And a lot of people
8  tried to cut through that and get to the facts. Some
9  people just kept on the emotional thing, and I think you
10 can see how ineffective it can be. And I don't think it
11 helps anybody's cause to go there, quite frankly.
12         And the other thing is -- a lot of people
13 say this about the Second Amendment, and I respect
14 that -- that it's a constitutional right. We should be
15 very careful about those. At a townhall I had, people
16 said, "Well, you ought to go read the court decisions."
17 I did. I think the Heller decision says for reasonable
18 reasons, you can do gun banishment laws. And we have a
19 lot of examples of that.
20         And then you get into this data back and
21 forth. Everybody has got this number, that number, this
22 number and that number, and it's hard to sort through.
23 And everybody makes great cases. But, for me, what it
24 comes down to is there's a fundamental number that I
25 keep looking at when I kind of try to sort this out. Of
0186
1  the 344,000 purchases -- I believe it was last year's
2  numbers -- 5,000 of those were blocked. And we talked
3  about how some of them got reinstated. But we should
4  think about the things that they're blocked for. Here
5  are just two examples: 420 for restraining orders, 31
6  for accused or convicted homicides.
7         So, no, this is not going to solve all our
8  problems. And this logic that seems to go on that says
9  criminals will get guns. So we should not keep
10 criminals from getting guns when we can, doesn't make
11 much sense to me. Yeah, they're going to get guns. But
12 we ought to do what we can to stop that from happening.
13 And that's what motivates me on this.
14         And, again, I appreciate everybody taking
15 the time to talk to me. I think people have strong
16 feelings on both sides of this. But that number, I keep
17 coming back to that. And, for me, I think, through
18 time, it's going to save lives. And so everybody talks
19 about the frequency; it's a real small number. Well,
20 the severity, the other side of that equation, is
21 extraordinarily severe. And you heard it today. And so
22 that's the balancing act, and that's where I come down.
23         And thanks, everybody, for sitting through
24 all of this and being part of this. I appreciate your
25 participation.
0187
1         THE CHAIRWOMAN: Thank you, Senator Jones.
2         Is there any other discussion?
3         Senator Hudak.
4         SENATOR HUDAK: Thank you, Madam Chair.
5         I'm sorry I wasn't here for a lot of the
6  testimony. I was in the other committee, presenting a
7  bill, but I have received e-mails and have had e-mail
8  conversations with a number of people, particularly my

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

9  constituents, whose opinions range the gamut on this
10 issue.  And I want to say that in even the
11 legislating -- the magazine that we receive as
12 legislators, there is a lot of very good information
13 about how effective background checks are, and the
14 thousands of people that are screened out who shouldn't
15 have a gun because they get a background check.
16          And then I also got a packet of letters
17 from fifth graders in my district, Arvada K-8, and many
18 of them said -- they urged me to vote for background
19 checks because it scares them -- my biggest wish is that
20 I want to be safe.  And I just want to say that I hope
21 we're smarter than -- as smart as fifth graders.
22          THE CHAIRWOMAN:  So I'm going to go ahead
23 and do one more comment from Senator Crowder, and then
24 I'm going to go to the close for Senator Carroll.
25          Why don't we go ahead before -- because I
0188
1  neglected to do -- let Senator Carroll do a wrap-up.
2          Senator Carroll.
3          SENATOR CARROLL:  Thank you, Madam Chair.
4          I suspect there will be final comments in
5  closing.
6          I just wanted to address a couple of
7  things because I was listening and taking notes with
8  everything that was there.  First of all, I was
9  impressed with the caliber of testimony on both sides of
10 this issue.  This is not a superficial, light issue.  I
11 think we heard really good and important feedback.
12          My wrap-up, I want to hit a few things
13 just because there's some differences -- I think it's
14 important to talk about in a way what the bill doesn't
15 do when we're closing.  Even if we pass House Bill 1229,
16 every single law-abiding citizen in Colorado can still
17 own and buy as many guns as they want, and possess.
18 That does not change if we pass House Bill 1229.
19 Nothing about having a background check in advance of a
20 prior sale does anything to change Colorado's law about
21 self-defense.
22          I, too, share the importance -- I mean,
23 obviously, we would not be interested in doing anything
24 that would weaken the right of self-defense.  And so I
25 think some of the testimony was geared towards, you
0189
1  know, does making someone go through a background check
2  before a private transfer in any way change our rights
3  of self-defense?  It doesn't.
4          I think it's important to note that
5  Colorado's concealed carry laws, which I also support,
6  remain 100 percent in effect.  So passage of this bill
7  doesn't change the rights for concealed carry.
8          On the Second Amendment, both by text and
9  by the Supreme Court, background checks have explicitly
10 been upheld as constitutional with regard to the Second

11    Amendment:
12          The registration idea came up.  And I
13    think David Kopel brought up a good point in what he was
14    talking about, which is it would be easier to enforce a
15    bill like this if we had a registration.  I don't
16    support a registration.  And that's just where I come
17    down on something like this.  This bill isn't
18    registration.
19          Part of why the record-keepers are the
20    private FFLs is because we don't have a government
21    database.  So once someone is run through the system,
22    basically purged on that as well.
23          Senator Harvey, it was probably you who
24    brought up on the unlicensed -- the use of the word
25    "unlicensed" in here.  What that means in Colorado --
0190
1    what we're referring to as licensed are the FFLs.  So we
2    have replaced -- you see the word "unlicensed," it's
3    just clarification that we're not talking -- these
4    provisions don't provide -- they don't really apply to
5    FFLs because those guys are regulated and licensed
6    elsewhere.
7          I think we did go through and hit some of
8    the exceptions.  I think, overall, I just really want to
9    hit on closing that we've been using background checks
10    with success for a long time.  It is really that one
11    thin, fine line -- you know that fine line between how
12    do we make sure that we are protecting the rights of
13    law-abiding citizens and how are we keeping guns out of
14    the hands of convicted felons?
15          If we basically eliminate or fail to make
16    meaningful background checks, then we are really erasing
17    the difference and saying we think convicted felons, as
18    a practical matter, ought to have just as easy access.
19          I do agree with some of the point that
20    there's no doubt some committed criminals who will try
21    really hard to work their way around this.  So like any
22    other law we pass, we are not going to see perfect
23    compliance with it.  None of us have ever passed a bill
24    in the history of the legislature with perfect
25    compliance.  But I do think that we are plugging into a
0191
1    system to make sure we at least have the exact same
2    background checks, the exact same constitutional
3    background checks that any other lawful purchaser does.
4          So the people who are disadvantaged by
5    this bill -- here's who it affects at the end of the
6    day:  If you are a convicted felon, if under current
7    Colorado law, you're not allowed to buy or possess a
8    firearm, then your odds are much higher you're going to
9    be blocked, if this passes.  That's who the burden is
10    on.
11          Otherwise -- we've had lawful, law-abiding
12    people making their purchases at FFLs or at gunshows for

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

13 a white.  And this basically is that fine line between
14 how we even detect who is or isn't eligible under
15 current law for doing that.
16          These amendments, in part, I think, help
17 expand, you know, some of these scenarios with immediate
18 family, with the temporary loan kind of situations.  And
19 so they were offered in the spirit of that, in hearing
20 some of those examples that were brought up.
21          So I think -- you know, I'm sure there's
22 more.  I guess, Senator Harvey, you also brought up the
23 online point.  And I agree that online sales -- I think
24 one of the places where you have online facilitation, in
25 a way, where you're kind of a third-party facilitator
0192
1 between private transactions -- that right now is not
2 covered by background checks.  And that would be the
3 distinction in my view, anyway.
4          I think that's it.
5          THE CHAIRWOMAN:  Thank you, Senator
6 Carroll.
7          Senator Harvey has a question.
8          SENATOR HARVEY:  The question -- I didn't
9 even think about that by reading the bill.
10          The facilitator in this bill -- Rocky
11 Mountain Gun Owners has a website that allows two
12 individuals to meet each other to sell, just like The
13 Denver Post used to, or the Thrifty Nickel still does,
14 or things like that, Craig's list.  Under this bill, are
15 they facilitating that mutual meet-up, and are they
16 liable because of that under this bill?
17          THE CHAIRWOMAN:  Senator Carroll.
18          SENATOR CARROLL:  Thank you, Madam Chair.
19          So the buyer or seller, whether they're
20 doing it in person or whether they're using kind of a
21 third-party facilitator, they are the ones that are
22 responsible.  The third-party facilitator on this bill
23 is not.
24          THE CHAIRWOMAN:  Any other question -- any
25 other questions or comments?
0193
1          Senator Crowder.
2          SENATOR CROWDER:  Thank you.  Thank you,
3 Ms. Carroll.
4          I'm glad that you and I agree on one
5 thing.  The registration, you're opposed to
6 registration.  And I firmly believe that the only way
7 that this can be enforced would lead to a registration.
8          I need to oppose this bill due to the fact
9 that southern Colorado, which is my district, from Wolf
10 Creek Pass through Pueblo and all the way to Kansas,
11 would -- they have indicated their opposition to this.
12 So what I have to do is I have to -- I have to not only
13 vote the constitution, I need to vote my district.  And
14 they have indicated opposition to this.  So -- but

LEG HX 000790

4705

15    nothing personal, mind you, but I would have to go that
16    way.
17         Thank you.
18         THE CHAIRWOMAN:  Any other comments?
19         Just a quick comment for me.  As I was not
20    very aware of the issues around gun culture in my own
21    upbringing in Pueblo, so I really felt like I put a lot
22    of time and effort trying to get -- to understand a part
23    of a culture that I wasn't aware of, and have learned a
24    lot.
25         And, you know, even though some of the
0194
1    e-mails or phone calls that I've gotten that started to
2    help creating some kind of image of gun owners in my
3    mind and stereotypes -- those were being created, but
4    then when I went out and reached out to people who were
5    responsible gun owners and have been contacted by many
6    responsible gun owners, I understood that a person who
7    is an owner of a gun is really no different than me, and
8    they use it for a lot of reasons.  And the gun owners
9    that I've talked to, or many of the gun owners that I've
10    talked to, had no problem with this piece of legislation
11    as far as background checks for everyone.
12         And, certainly, I think as you said,
13    Senator Carroll, we shouldn't let the perfect get in the
14    way of the good.  And for me personally, that's an issue
15    for me.  A lot of times I always want everything to be
16    perfect, and that's the only way I think it's something
17    good.  And in this case, I don't really think that
18    that's appropriate.
19         And I'll diverge a little bit:  We do
20    create laws -- I mean, we can talk about speed limits.
21    And we don't say because nobody follows them -- and I
22    would be the first one who doesn't follow them; I hope
23    there's no state patrol people in here -- that we
24    shouldn't have them.  It still puts some constraints,
25    even on a speedy driver like myself.
0195
1         So I think this is a start.  It's not
2    going to solve all of our problems.
3         And one of the most compelling statistics
4    that I heard today was what happened in Missouri.  So,
5    in 2007, when they repealed their requirement for
6    background checks for everybody, that they -- that the
7    crime with regard to guns went up by 30 percent.  And I
8    do think that that is -- from the gun owners that I've
9    talked to, I don't think it hurts, and they're willing
10    to do that, anything to be able to reduce some crime.
11    We've got to figure this out, the violence.  And it's
12    certainly a comprehensive, big, huge issue.  This is a
13    tiny, little piece of it.
14         So I thank you.  And I will be supporting
15    with this amendment.  And I appreciate that.
16         So, Julia, go ahead and take roll call.

LEG HX 000791    4706

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

17        JULIA:  Senator Crowder.
18        SENATOR CROWDER:  No.
19        JULIA:  Senator Harvey.
20        SENATOR HARVEY:  I'm going to take a
21  minute to explain my vote.
22        I understand the emotion behind this bill.
23  I understand the emotion behind all of these bills.  But
24  the public policy should not be based on emotion.  The
25  public policy should be based on logic.  What will be
0196
1  readily able to limit people who want to create evil
2  from accessing weapons of destruction?
3        Mark Kelly was here, testified in behalf
4  of the bill.  Even if this bill was in place in Arizona,
5  it wouldn't have stopped the shooter from getting the
6  gun, and he admitted this.  Even if this was in place in
7  Arizona, the shooter that shot at his wife would not
8  have been -- it would not have stopped the person from
9  getting the gun.  But it would infringe on other
10  people's ability to protect themselves.
11        Jane Dougherty, whose sister was killed at
12  Sandy Hook, was here representing her sister who was
13  killed.  This bill would not have stopped that shooter
14  from killing all of those innocent people.  But they
15  were denied their right to self-protection because of
16  the law that said that school will be a gun-free zone.
17        Karina, who was at the Aurora shooting,
18  the 16-year-old girl who was in the wheelchair, God
19  bless her.  I understand the passion and the emotions.
20  But this bill would have done nothing, nothing, to stop
21  that situation.
22        Dave (sic) Mauser, I believe those
23  shooters at Aurora -- I mean at Columbine; Katie Kyles
24  (sic), I believe the shooters at Columbine; Dave Moses,
25  I believe the shooters at Columbine would have gotten
0197
1  those guns regardless of this bill.
2        So, yes, there is a lot of emotion behind
3  these bills and the desire, honest desire, to help
4  people and to stop these atrocious acts of evil.  But in
5  the process, I don't want to do what I believe would
6  happen, because it might leave honest, law-abiding
7  citizens from being able to defend themselves when they
8  need to, despite the 72-hour limit that the sheriff put
9  in there to allow them to have a gun.  I believe we are
10  limiting people's abilities to defend themselves, in all
11  good intentions.  But those good intentions are going to
12  cause more people to be hurt.
13        Just like gun-free zones cause more people
14  to be hurt, I believe this bill, as well intentioned as
15  it is, is going to cause more people to be hurt, not
16  less.  And so because of that, I will be a no vote.
17        JULIA:  Senator Hudak.
18        SENATOR HUDAK:  Aye.

19           JULIA:  Senator Jones.
20           SENATOR JONES:  Yes.
21           JULIA:  Madam Chair.
22           THE CHAIRWOMAN:  So Senator Harvey just
23   reminded me of something else of why I'm voting yes on
24   this bill.  And for those committee members who know me
25   and other people in the Senate, I can have an
0198
1   overemphasis of empathy.  But when I really looked at
2   this, it really wasn't even -- and I don't know if that
3   was the impetus of this bill, because of the tragedies
4   that we had.  I think it does bring it to our
5   consciousness more here in Colorado.  But I'm looking at
6   the gun violence that happens every day.  And when we
7   ignore that, and we just look at the tragedies, yeah,
8   then we are just being emotional about it.
9           But, to me, this is about every single day
10   that gun violence happens.  And that's why I'm voting on
11   this.  And it has nothing to do with the emotional
12   testimony that we had, as hard as it was to hear it.
13   And even to hear Krista, who braved that and came out
14   and spoke about that, this law wouldn't affect -- just
15   as you talked about the people who were proponents of
16   the bill, this -- her mother could have had a conceal
17   carry weapon.  This would not have affected her mother
18   from getting that.
19           So I -- I think it's about the longer and
20   everyday violence that happens with guns.  It's not
21   about these horrible tragedies that everybody in this
22   room and everybody in this country is brokenhearted and
23   crushed about.  But it's about every day that we,
24   because of guns and irresponsible people -- that's why
25   this bill is really important to me.  So I'm an aye
0199
1   vote.
2           So I should remember my responsibilities,
3   that passes on a three-to-two.  Thank you so much.
4           UNIDENTIFIED SPEAKER:  Thank you.  And the
5   motion was to appropriations, right?
6           THE CHAIRWOMAN:  Yes.
7           UNIDENTIFIED SPEAKER:  And thank you,
8   committee, and to all the witnesses.
9           (WHEREUPON, the audio recording was
10   concluded.)
11
12
13
14
15
16
17
18
19
20

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030413.txt[11/12/2013 10:57:49 AM]

21
22
23
24
25
0200
1                              CERTIFICATE
2  STATE OF COLORADO            )
                               )ss.
3  CITY AND COUNTY OF DENVER  )
4           I, Jana Mackelprang, Certified Realtime
5  Reporter, Registered Professional Reporter, and Notary
6  Public for the State of Colorado, do hereby certify that
7  this transcript was taken in shorthand by me from an
8  audio recording and was reduced to typewritten form by
9  computer-aided transcription; that the speakers in this
10  transcript were identified by me to the best of my
11  ability and according to the introductions made and the
12  information provided; that the foregoing is a true
13  transcript of the conversations; that I am not an
14  attorney nor counsel nor in any way connected with any
15  attorney or counsel for any of the parties to said
16  action or otherwise interested in its event.
17           IN WITNESS WHEREOF, I hereunto affix my
18  hand and notarial seal this 24th day of June, 2013.  My
19  commission expires January 24, 2016.
20
21         _____
           Jana Mackelprang
22          CRR, RPR, Notary Public
           Calderwood-Mackelprang, Inc.
23
24
25

LEG HX 000794    4709

0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  Senate Meeting
4  Held on March 8, 2013
5  HOUSE BILL 13-1229
6  -----------------------------------------------------------
7  REPORTER'S TRANSCRIPT
8  -----------------------------------------------------------
9
10      This transcript was taken from an audio
11  recording by Elissa Steen, Registered Professional Reporter
12  and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
1          P R O C E E D I N G S
2          *   *   *   *   *
3      MR. MAJORS:  House Bill 1229 by
4  Representatives Fields and McCann and Senator
5  Carroll, concerning criminal background checks
6  performed pursuant to the transfer of a firearm, and
7  in connection therewith, making an appropriation.
8      THE PRESIDENT OF THE SENATE:  Majority
9  Leader Carroll.
10      MAJORITY LEADER CARROLL:  Thank you,
11  Mr. Chair.
12      I move House Bill 1229, the State,
13  Veteran, Military Affairs Committee report, and the
14  Appropriation's Committee report.
15      THE PRESIDENT OF THE SENATE:  To the
16  committee report, Senator --
17      MAJORITY LEADER CARROLL:  Thank you,
18  Mr. Chair.
19      In the State, Veterans, Military Affairs
20  Committee on this, let me walk through the committee
21  report.  A few changes were made there in response
22  to some points that had been raised in testimony and
23  from the public.
24      The first thing, on page 1 of the
25  committee report, if you look at it, some folks were
0003

LEG HX 000795    4710

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

1  concerned about the potential for a new loophole on
2  getting around it by yet again if a criminal -- some
3  of the criminal gun traffickers could use a trust to
4  essentially do a purchase, one version of a
5  strawman, if you will, to get around it.  So this is
6  just tightening that up to make sure that that
7  loophole would not be in here.
8        The second thing we do is that when a
9  member goes on the FFL, we are clarifying that it is
10  both the buyer and seller who would get a copy of
11  sort of the receipt of approval or denial for their
12  records, should they choose to keep it in addition
13  to the FFL.
14        The third thing we did is that we expanded
15  the definition of immediate family.  This is in a
16  provision that is an exception to the bill, if you
17  will.  Anytime anyone is transferring a firearm to a
18  family member, they obviously don't have to go
19  through a background check.
20        And this is expanding the definition of
21  immediate family beyond the original, which includes
22  nieces, nephews, aunts, uncles, and first cousins,
23  that were not in the first draft.
24        The next and probably the most significant
25  substantive changes that were made in response to
0004
1  many examples that had been raised by people, it
2  adds to catch-all the provisions.  And this will
3  make a little bit more sense when we get into the
4  content of the bill proper.  But much of the prior
5  discussion and debate and testimony included coming
6  up with some hypothetical and real examples of where
7  totally appropriate, legitimate transfers may be
8  going where a background check does not make sense.
9        The first of these catch-all exceptions is
10  that a person who is basically selling or
11  transferring a firearm can do that to anyone they
12  want, really, as long as they're -- they remain in
13  the presence of the firearm.  And all of these are
14  subject -- of course you can't transfer to someone
15  who's a convicted felon or otherwise prohibited.
16  But whatever that transfer is, this is one catch-all
17  scenario where the owner can remain with the gun and
18  loan it to whoever they want, as long as it's not
19  illegal.
20        And the second catch-all transfer really
21  allows you to loan outside of your presence to
22  anyone you want for up to 72 hours, as long as,
23  again, you're not handing it over to someone who is
24  a convicted criminal.
25        These are two important catch-all sections
0005
1  that were offered because there's a variety of
2  legitimate sort of temporary-transfer situations

LEG HX 000796     4711

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

3  where a background situation would not make sense.
4      The next thing that we did, these are
5  really in the vein of a technical clean-up with the
6  judicial department.  You will notice that it is
7  changing the clerk of the court with the state court
8  administrator because that's how the current
9  background check system works.  And in the context
10  of the bill, that is where the data transfer's
11  happening.  So that is making sure that we are
12  identifying the correct source of data transfer on
13  that.
14      The other thing we're doing, one of the
15  improvements that's happening in the bill, some of
16  you may have recognized one of the criticisms to
17  some of the current system can be staleness of data
18  upload and download, which can either lead to a
19  false allowance of somebody who is criminally
20  ineligible to purchase a gun being able to do so, or
21  conversely, someone who has had their rights
22  restored, is no longer prohibited, and basically a
23  false denial on that situation.
24      So this has a transfer of data within 48
25  hours of when that happens.
0006
1      One of the smaller changes of what was
2  happening in the -- to the original section of the
3  bill, you will have noticed that there are two
4  restoration of rights sections that actually add to
5  the current due process for restoration of rights on
6  that.  And within that there is a technical
7  amendment that clarifies that the appellate court
8  has discretion to receive additional information, if
9  necessary, for a review.
10      I do that walk-through because it may
11  impact -- those are substantive policy changes from
12  the original version of the bill.  Those were the
13  amendments that we did in the judiciary -- or
14  judiciary committee -- in the State, Veterans,
15  Military Affairs Committee.
16      And I would ask for an aye vote on the
17  committee report.
18      THE CHAIRWOMAN:  Is there any discussion
19  on the committee report?
20      Seeing none, the motion before you is to
21  accept the State, Veterans, and Military Affairs
22  Committee report.
23      All those in favor say aye.
24      All those opposed, no.
25      Committee report is adopted.
0007
1      To Appropriation's Committee report.
2      MAJORITY LEADER CARROLL:  Thank you,
3  Madame Chair.
4      I -- on the Appropriation's Committee

LEG HX 000797    4712

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

5  report, the appropriation's clause, you will have
6  noticed, was a contingent clause, one cash-funded,
7  one general-funded.  The change that was done in
8  appropriations was front load the funding such that
9  the Colorado Bureau of Investigations could be ready
10  to come into compliance in an important way to make
11  sure that we weren't causing any kind of delays with
12  implementation or for people who are seeking a
13  background check for their purchase.
14      And I would ask for an aye on the
15  Appropriation's Committee report.
16      THE CHAIRWOMAN:  Any discussion on the
17  Appropriation's Committee report?
18      You've heard the motion.  All those in
19  favor say aye -- oh, I'm sorry, Senator Harvey.
20  This is on the appropriations?
21      SENATOR HARVEY:  No.
22      THE CHAIRWOMAN:  Okay.  On the
23  Appropriation's Committee report approval?
24      So all those in favor say aye.
25      All those in opposed, no.
0008
1      The committee report is accepted -- is
2  adopted.
3      To the bill.
4      MAJORITY LEADER CARROLL:  Thank you,
5  Madame Chair.
6      THE CHAIRWOMAN:  No, I'm -- I'm sorry.
7  Senator Carroll, there is an amendment on the -- on
8  the 30 -- Amendment 30.
9      Mr. Majors, could you please read the
10  Amendment 30?  Sorry about that.
11      THE READING CLERK:  Amendment L.030 to the
12  House Bill 1229 by Senator Carroll, amend the State
13  and Senate State, Veterans, Military Affairs
14  Committee report dated March 4, 2013, page, 2, after
15  line 4, insert --
16      THE CHAIRWOMAN:  Senator Carroll.
17      MAJORITY LEADER CARROLL:  Thank you,
18  Madame Chair.
19      Members, I move Amendment 30.
20      And this is a technical amendment that was
21  brought to me by the drafter.  This is a grammatical
22  adjustment in light of the substantive changes we
23  had made in the others that was caught this morning.
24      I had it distributed to your desks so you
25  could see for yourself the grammatical clean-up
0009
1  nature of the amendment.
2      And I would just ask for an aye vote on
3  Amendment 30.
4      THE CHAIRWOMAN:  Is there any discussion
5  on Amendment 30?
6      Seeing none, the motion is for the

LEG HX 000798    4713

7    adoption of Amendment 30.

8        All those in favor say aye.

9        All those opposed, no.

10      The amendment is adopted.

11      There is another amendment on the desk,

12   Amendment 31.

13      Senator Harvey.

14      Mr. Majors, would you please read the

15   Amendment 31.

16      MR. MAJORS:  Amendment L.031 by -- the

17   House Bill 1229 by Senator Harvey to strike the

18   Senate Appropriation's Committee reported dated

19   March 6th --

20      THE CHAIRWOMAN:  Senator Harvey.

21      SENATOR HARVEY:  Thank you, Madame Chair.

22      This is in -- thank you, Madame Chair.  I

23   move Amendment 031, and it is in accordance with a

24   previous amendment that had been offered on this

25   floor by the chairman of the Joint Budget Committee.

0010

1        And because of the amendments that we just

2    passed in State Affairs, where we have taken out

3    some of the transfers, and there really is no known

4    amount of transfers that is will be going on with

5    this bill, because who knows how many people will be

6    transferring between family members and -- and

7    non-family members.  It's almost impossible for us

8    to know that.

9        Historically, when the total number of

10   background check requests has exceeded the Bureau's

11   ability to process them in a timely manner, the

12   Bureau was able to shift resources from elsewhere to

13   meet the temporary increase in demand without

14   requiring any additional spending or hiring

15   authority.  And remember, this bill has a 2.4

16   million dollar fiscal note.  I don't understand why

17   that is the case.

18      So in light of the uncertain fiscal impact

19   of requiring additional background checks on

20   firearms sales and transfers, it is the intent of

21   the General Assembly that any resulting increase in

22   the national instant criminal background check

23   program workload will be offset through regular

24   supplemental appropriations processes.

25      Therefore, the General Assembly has

0011

1    determined that this Act can be implemented within

2    existing appropriation; and therefore, no separate

3    appropriations of state monies is necessary to carry

4    out the purpose of this act.

5        There is impact of this bill on the

6    citizens of the State of Colorado.  There is no

7    impact to the citizens of the State of Colorado for

8    the state to be requiring them to do a background

LEG HX 000799    4714

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

9    check to transfer between husband and wife, or any
10   other way.  If this is an important statewide
11   concern, we should be doing it out of the state
12   budget and doing it within a current appropriations.
13   This amendment simply says that is the way we've
14   done it in the past and that's the way we'll do it
15   in the future.
16        I'd ask for an aye vote.
17        THE CHAIRWOMAN:  Any discussion on the
18   amendment?
19        Senator Carroll.
20        MAJORITY LEADER CARROLL:  Thank you,
21   Madame Chair.
22        I want to thank Senator Harvey for helping
23   get the fiscal note off my bill.  I really
24   appreciate that.
25        Oh, not -- some well-esteemed Senator from
0012
1    Douglas County.  So my apologies on that.
2         The reality, though, is if we could do
3    this within existing means, I think it would
4    actually be an unfair burden to gun owners
5    everywhere because it would probably take three
6    years to get your background check.  That's a little
7    long.
8         And so while I do appreciate the spirit in
9    which this is offered, and I wish we could do it
10   within existing means, I would respectfully ask for
11   a no vote on this amendment.
12        THE CHAIRWOMAN:  Further discussion on
13   Amendment 31?
14        Seeing none, the motion before you is to
15   adopt Amendment 31.
16        All those in favor say aye.
17        All those opposed, no.
18        And that motion fails.
19        One more.  There is an amendment on the
20   desk.
21        And, Mr. Majors, would you please read
22   Amendment 33.
23        MR. MAJORS:  Amendment L.033 to House Bill
24   1229 by Senator Carroll, amend the Appropriation's
25   Committee report dated March 6th --
0013
1         THE CHAIRWOMAN:  Senator Carroll.  Senator
2    Carroll.
3         MAJORITY LEADER CARROLL:  Oh, thank you,
4    Madame Chair.
5         Members, I move L.033.
6         This is another technical amendment.
7    There was some language that was left off on the
8    Appropriation's Committee report.  I have also asked
9    that it be distributed to you so you can see the
10   language it is of what should have been included and

11  wasn't.
12      This too is a technical cleanup amendment,
13  and I would just ask for an aye vote.
14      THE CHAIRWOMAN:  Any discussion on
15  Amendment 33?
16      Seeing none, the motion before us is to
17  adopt Amendment 33.
18      All those in favor say aye.
19      All those opposed, no.
20      And the amendment is adopted.
21      Senator Carroll.
22      MAJORITY LEADER CARROLL:  Thank you,
23  Madame Chair.
24      Members, I'm very proud to be here today
25  to bring you House Bill 1229.  I know and respect
0014
1  how intense, obviously, the issues are around these
2  issues, and where everyone is coming from, where I
3  think we all believe we are defending deeply held
4  principles.  And for that, I thank everybody for
5  participating in this.
6      I do think everyone agrees that
7  law-abiding citizens should be able to own firearms,
8  and that guns should be kept out of the hands of
9  dangerous criminals.
10      As we all know, it is currently illegal
11  for someone convicted of certain crimes to own or
12  possess a firearm.  That's illegal right now under
13  state law.  It's illegal under federal law.
14      How would we ever know when we buy or sell
15  a gun whether someone is a dangerous, convicted
16  felon but for a background check?  There is zero
17  other way to know.  We can't know unless we do a
18  background check.
19      If we don't have a meaningful background
20  check system, we are essentially giving a nod and a
21  wink to the prohibition that keeps guns out of the
22  hands of the folks who are convicted murders,
23  convicted rapists, or those convicted of domestic
24  violence.  But for the background check, there is
25  zero way for us to ever enforce the state or federal
0015
1  law prohibiting those folks, not the law-abiding
2  folks, prohibiting those folks from being able to
3  purchase or possess.
4      House Bill 1229 simply requires the exact
5  same background check before a private purchase of a
6  gun that we use when a gun is purchased from a
7  licensed dealer or a gun show.
8      Back when we were first implementing the
9  background check for licensed gun dealers and for
10  gun show folks, at that time the Internet was still
11  in its infancy.  And what was maybe a rare and novel
12  mechanism for how guns, for example, on online

13  posting boards are really a modern phenomenon that
14  our prior laws really weren't drafted to contemplate
15  and keep up.
16      Why am I carrying this bill?  I'm carrying
17  this bill because gun violence has become an
18  epidemic.  And while 34 Americans die on average
19  every day as a result of guns, this issue hit home
20  personally for me on July 20, 2012, when 70 people
21  were shot down at the Aurora Century 16 Theater in
22  my district this summer, fatally injuring 12 people.
23      And just when I couldn't imagine how it
24  could get any worse, on December 14, 2012, 20
25  children were shot and killed, along with six adults
0016
1  at Sandy Hook Elementary School.
2      There are 310 million guns in America, and
3  314 million people in America.
4      America still has one of the highest
5  homicide rates amongst any of the developed
6  countries, at 4.7 murders for every 100,000 people.
7  72 percent of all homicides in this country involve
8  guns.  And every year, guns are responsible for
9  8,583 homicides, 19,392 suicides, and 606 accidents.
10      There are more gun deaths each year in the
11  United States than total war casualties in Iraq and
12  Afghanistan over a 12-year period of time.
13      Enough is enough.  Closing the
14  private-sale loophole is a meaningful way to keep
15  guns out of the hands of dangerous people, because a
16  high percentage of killers were known to have had
17  a -- 71 percent -- had a prior arrest record,
18  42 percent a prior conviction that would have
19  triggered a denial of a gun purchase at any licensed
20  dealer, any gun show, and with passage of this bill,
21  at any private transaction.
22      These -- those folks are not the
23  law-abiding folks, and those are the folks whose
24  hands we need to keep guns out of so that everybody
25  else is free to continue to enjoy their Second
0017
1  Amendment rights, but not those who are dangerous
2  criminals.
3      As you probably know by now, we've been
4  requiring background checks at licensed gun dealers
5  since 1993, and for purchases at gun shows in
6  Colorado, by way of ballots since 2002, making
7  effective use of FFLs.
8      This bill builds on the exact same
9  existing infrastructure to use in order to reduce
10  arms trafficking and help keep guns out of the hands
11  of convicted felons and those who are dangerously
12  mentally ill.
13      Here's what the bill does:  The bill
14  closes the private sale and transfer loopholes to

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

15  the current laws on background checks by using the
16  exact same FFL system that we use on all other
17  background checks.
18      The bill updates the accuracy of the data
19  within the background check process to be virtually
20  near live-time transfer to better ensure that we are
21  both blocking illegal purchases to criminals but
22  also by making sure that we are not inappropriately
23  blocking purchases to law-abiding citizens.
24      The bill, as amended, provides a copy of
25  either an approval or a denial to both the buyer and
0018
1   seller, should they wish to keep it for their
2   records.  They do not have to.  The official record
3   is kept, not by the government, but by the FFL, just
4   like they do in all other background checks
5   currently.
6       The bill makes exceptions for private
7   sales or transfers.  And I think this is important
8   just to keep up because this has been amended.  The
9   exceptions to the requirement of a background check
10  for private sales or transfers include if it's a
11  gift to a family member; if it is inherited by will
12  or estate; if it occurs in the home for need -- for
13  purpose of self-defense; for use at a shooting
14  range; at a shooting competition; if it's dropped
15  off for repair; for hunting; fishing; target
16  shooting, at any lawful location, so long as it's
17  not transferred to a convicted felon or a person who
18  is currently federally or by state law prohibited
19  from owning or possessing a firearm.
20      The bill adds enhanced due process to the
21  restoration of rights section for people who were
22  previously prohibited from purchasing guns, either
23  for criminal reasons or for serious mental health
24  reasons, who become eligible for lawful purpose.
25  This adds appellate rights and due-process rights
0019
1   and evidentiary rights and timeliness rights for
2   law-abiding citizens, who, at one point may have
3   been denied who should, in a more expeditious and
4   fair way, get restored in their Second Amendment
5   right to purchase a firearm.
6       So why support background checks?  Why
7   support closing the loophole on private
8   transactions?  This measure is absolutely essential
9   if we believe, as a matter of public policy, that we
10  do need to keep guns out of the hands of convicted
11  felons and the dangerously mentally ill, yet, at the
12  same time, allow law-abiding citizens to proceed
13  with their purchases.
14      Approximately 40 percent of all guns are
15  sold in private transactions.  This loophole, if
16  left unclosed, is so large so as to make it easy,

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

17  and, in fact, perhaps inviting, for any and every
18  convicted criminal in Colorado, who would otherwise
19  currently be prohibited from buying or owning a gun,
20  to simply skirt the laws with open flagrancy by
21  simply making their purchases privately or on online
22  sales boards.
23      For lawful, law-abiding gun owners, who
24  are seeking to sell or transfer their firearms, a
25  law-abiding gun owner has no way of knowing when
0020
1  they, in good faith and in the good conscience, have
2  every right to sale their -- sell their firearm, but
3  that law-abiding seller has no way to know that
4  they're not selling their firearm to a convicted
5  felon, a convicted murderer, a convicted rapist, or
6  someone convicted of domestic violence, but for that
7  background check.
8      I believe this protects the law-abiding
9  seller as well as the public at large.
10      So why?  80 percent of handguns found at
11  crime scenes were acquired through private sellers.
12  Under current law as mentioned, 100 percent of all
13  criminals in Colorado could purchase guns through
14  private sellers without a background check.  In
15  fact, most criminals, who know they can't pass a
16  background check, would do just that.  And yet you'd
17  think, well, why would any criminal then actually go
18  through a process where they're subjected to a
19  background check?  Why even do that?
20      We do have data to tell us that background
21  checks work.  And while nothing is perfect, and I'll
22  be the first to concede that, this mechanism has
23  detected, even under current law, we have detected
24  and blocked sales of over 700,000 prohibited gun
25  sales that would have gone to criminal, but for the
0021
1  background check.  In 2012, Colorado alone, 5,607
2  applicants were denied because of background checks
3  revealing ineligible, criminal purchasers.
4      Why do this?  We have data that tells us
5  that violent incidents go down in states that
6  require a background check for every handgun sale.
7  Thirty-eight percent fewer women are shot to death
8  by their intimate partners in states that close this
9  loophole.
10      We export fewer guns in the criminal gun
11  trafficking market when we close this loophole.
12  Data show us that after Colorado closed the gun-show
13  loophole, Colorado went from the 17th largest source
14  of guns found at crime scenes in other states down
15  to 32nd by 2009.
16      Why close this loophole?  We know from
17  data that the rate of suicide with a firearm in
18  states with background checks on every gun sale is

LEG HX 000804

4719

19  in fact 49 percent lower than in states that don't
20  require it.
21      The overwhelming majority of the public,
22  including poled NRA members, support background
23  checks and closing loopholes for private sales,
24  according to three separate polls.
25      In some ways, I know all of these bills
0022
1  and conversations are charged, but we just have to
2  have one public policy question of do we or don't we
3  believe that we need some mechanism to detect, at
4  any point of purchase or transfer, whether or not
5  we're transferring to someone who is a dangerous or
6  convicted criminal.
7      In the context of many of these bills, it
8  has been almost as important to talk about what the
9  bill does not do.  The bill will not prohibit any
10  law-abiding citizen from buying or purchasing (sic)
11  any firearm of their choosing.  And I think that
12  bears repeating.  This bill will not prohibit a
13  single law-abiding citizen from buying or possessing
14  a firearm of their choosing.  The people it
15  prohibits are people who are criminally ineligible
16  under state or federal law now.
17      The bill does not violate the Second
18  Amendment.  And, in fact, background checks were
19  explicitly upheld by the Supreme Court in the case
20  of D.C. v. Heller.
21      The bill does not prohibit anyone from
22  using a firearm for self-defense.  The bill does not
23  limit family members from giving weapons to other
24  family members, long-term, or loaning, or for the
25  short-term.
0023
1      It does not prohibit hunting, target
2  practice, or competitive shooting.
3      And this is a significant point.  This
4  bill does not create a registry.  I do not support a
5  registry.  There is no registry in this bill.
6      You may hear that this bill is
7  unenforceable, but it is enforceable.  Within the
8  bill, there is both a civil and criminal remedy.
9  And failure to comply with this measure may be
10  detected or reported by a buyer, a seller, an FFL, a
11  member of law enforcement, or a whistleblower.
12      No law any of us have ever passed in our
13  history of the General Assembly, in any of our time
14  here, has ever had 100 percent compliance.  And if
15  perfect, 100 percent compliance was the standard for
16  any law, I think we could easily go home and realize
17  there was no need for a single law, ever.
18      But we do have data that we know this
19  works because of what we've seen in Colorado and in
20  other states that have chosen to close these

21  loopholes.  And this important loophole being closed
22  actually does reduce the number of criminals,
23  substantially, who with purchase guns.
24       You may hear that running background
25  checks on private sales somehow violates the Second
0024
1  Amendment.  It doesn't.  And I read from the
2  decision, the Supreme Court decision, on the Second
3  Amendment, "like most rights, the right secured by
4  the Second Amendment is not unlimited.  From
5  Blackstone through the 19th century cases,
6  commentators and courts routinely explain that the
7  right was not a right to keep and carry any weapon,
8  whatsoever, for any purpose, whatsoever.  Nothing
9  in our opinion should be taken to cast doubt on a
10  longstanding prohibitions on the profession -- on
11  the possession -- of firearms by felons and the
12  mentally ill."
13       That is an explicit upholding of what we
14  are doing today in House Bill 1229, and by a
15  conservative Supreme Court justice, I might add.
16       You may hear that there are variety of ad
17  hoc situations where one would want to buy, sell, or
18  transfer a gun without a background check.  We have
19  amended the bill to ensure that anyone can loan a
20  weapon to anyone they want for up to 72 hours
21  without a background check, so long as they're not
22  loaning it to a convicted felon or someone who is
23  otherwise criminally prohibited from owning or
24  possessing a gun.
25       What this bill does do is it ensures that
0025
1  there will be a criminal background check on the
2  sale of all guns in Colorado to ensure that we do
3  allow law-abiding citizens to purchase guns of their
4  choosing, yet prevent criminals and the dangerously
5  mentally ill, from buying and possessing firearms.
6  It's actually quite simple.
7       As a member of the Aurora community that
8  has been directly and repeatedly impacted by
9  senseless gun violence, I can tell you it is time to
10  modernize Colorado's gun laws so that no one can buy
11  a gun without a basic, common-sense requirement of a
12  background check.
13       THE CHAIRWOMAN:  Thank you.
14       Senator Balmer.
15       SENATOR BALMER:  Thank you, Madame Chair.
16       Members, good afternoon.  We each
17  represent 143,000 Coloradans.  We each have in our
18  district babies, little tiny infants that are either
19  sleeping right now or crying to be changed or fed,
20  and they have no idea what we're discussing today,
21  but we will affect their lives today.  We will
22  affect their rights today, from sleeping babies to

4721

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

23  the oldest citizens that we have in our districts.
24      I've received many e-mails from elderly
25  people in my district, and they are just shaking
0026
1  their heads because they moved here -- they moved to
2  a Colorado decades ago, and the Colorado that they
3  moved to would have never considered bills like the
4  bills that we are discussing today.
5      So we represent 143,000 Coloradans, and
6  each one of those Coloradans has the honor of also
7  being an American.  So I think it's important that
8  we discuss this bill under the context of our U.S.
9  Constitution.
10      Now, foundational to any bill that we
11  discuss is the U.S. Constitution and our State
12  Constitution.  We each took an oath on our first
13  day.  We had our families here.  We took pictures.
14  And we each took an oath to defend our Constitution.
15      So it's incredibly important that when we
16  discuss these bills today, and specifically this
17  bill, that we talk about the Constitution and how
18  does it affect this bill, and more importantly, how
19  does this bill infringe on our constitutional
20  rights.
21      So let's first talk about the Second
22  Amendment.  Now, why do we have the Second
23  Amendment?  It's very important understand that.
24  Those who don't know this are going to accidentally
25  or intentionally infringe on Second Amendment
0027
1  rights.
2      So why do we have the Second Amendment?
3  Well, it's critical that you understand history.  In
4  April, 1775, British General Thomas Gage's spies
5  alerted him that the American patriots were
6  stockpiling weapons in Concord, Massachusetts.
7  Determined to disarm the rebels, General Gage
8  ordered Major John Pitcairn, a British Major, and
9  700 British soldiers to march on Concord and seize
10  and destroy the patriot arms.  That's a quote from
11  the (inaudible) order.
12      Well, a silversmith named Paul Revere rode
13  on horseback all night long to warn patriots the
14  British were coming.
15      When Major Pitcairn marched into
16  Lexington, his force came across a small and
17  determined group of militia.  Pitcairn demanded that
18  the group disarm.  Pitcairn said, and I quote,
19  "Disperse ye rebels, damn you.  Throw down your arms
20  and disperse."
21      I apologize for swearing, I'm just quoting
22  him.
23      The militia's refusal to disarm resulted
24  in the shot heard round the world, which began the

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

25 Revolutionary War. In the aftermath of the battles,
0028
1  General Gage would attempt to disarm the entire city
2  of Boston.
3      Well, as you know, our founders fought a
4  long war, not a short war, but a long Revolutionary
5  War to gain our independence.  That war was not
6  fought on a faraway land, it was fought right here,
7  in the United States of America.  Their homes were
8  burned.  Their families were killed.  And if they
9  had not succeeded, they all would have been killed.
10      So when they won the war, our founders
11  were not casual about the rights that they wanted to
12  protect as sacred.  No, the founders were determined
13  to put into their Constitution certain rights that
14  had been very much infringed by the British
15  government.  They wanted to make sure that the new
16  American government would not allow the infringing
17  of these sacred rights.  So they debated, and they
18  debated.
19      You can read the federalist papers if you
20  wanted to read the debates.  It's very interesting
21  reading.  Our founders were passing a Constitution
22  that not just for the 1700's.  Our founders knew
23  that they were passing a Constitution that would
24  live many decades, many centuries into the future.
25  They thought about the future, and they said, these
0029
1  are the rights that we're going to protect in this
2  Constitution.
3      As I've heard it said many times, well,
4  that was just passed because it was in the 1700's.
5  I think that we are selling our founders short with
6  that kind of thinking.  Our founders knew by the
7  time that they were finished writing the
8  Constitution that they had written a truly unique
9  model for government, a model that has been copied
10  by every freedom-loving people in the world ever
11  since.
12      Indeed, we are blessed in this country to
13  have the best written Constitution in the history of
14  the world, the best form of government in the
15  history of the world.
16      So why did the founders protect certain
17  rights as sacred?  There's two main reasons.
18      First, they wanted to protect the
19  individual American from an overreaching government,
20  from a tyrannical government.  Our founders wanted
21  to put rights in the Constitution that would protect
22  individual Americans from their government.
23      Secondly, our founders wanted to put
24  rights in the Constitution to protect individual
25  Americans from an overreaching majority.  How many
0030

4723

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

1  times have you heard it said, oh, well, majority
2  rules?  Well, let me tell you something, majority
3  does not rule in America.  We are unique.  We
4  protect the rights of minorities in America.  We do
5  not allow a steamrolling majority to just roll over
6  the rights of the minority in America.  Isn't that
7  great that we have that in our Constitution?
8       I'm sure there's certain things that each
9  of you love the most about the rights that you have
10  as Americans, and isn't it great that those rights
11  are preserved and protected by your Constitution?
12       So I'll just give you one example.
13  There's many, many examples.  The Japanese
14  internment, which happened in our state.
15       THE CHAIRWOMAN:  Senator Balmer, could you
16  please stick to the bill?
17       REPRESENTATIVE BALMER:  Thank you, Madame
18  Chair.  I appreciate that.
19       When you talk about the Second Amendment,
20  when you talk about how important the Second
21  Amendment is, you have to think about can we or
22  should we allow the rights of a minority to be so
23  infringed?
24       Now, one thing that a lot of people have
25  misunderstood about the first ten amendments to our
0031
1  U.S. Constitution, and we're talking about a bill in
2  this body, we've got to make sure -- we have to make
3  sure -- that it's constitutional.  So let's talk
4  about that.
5       The first ten amendments are not in a
6  random order.  The first ten amendments to the U.S.
7  Constitution were deliberately written by our
8  founders to be interconnected and to ride on top of
9  the foundation of the First Amendment and the Second
10  Amendment.
11       The First Amendment right to free speech
12  is built on top of the Second Amendment.
13       Do you think that they had free speech
14  rights in Nazi Germany?  No, they didn't.  It's also
15  because they didn't have any Second Amendment
16  rights.
17       Do they have free-speech rights in
18  Communist Russia?  No, because they didn't have any
19  Second Amendment rights in Communist Russia.
20       Well, let's talk specifically about this
21  bill.  This bill definitely, definitely, infringes
22  on our Second Amendment rights.
23       Now, what if we passed a bill that --
24  basically, what this bill does is, is it says, well,
25  you can have Second Amendment rights, but in certain
0032
1  categories you can't have Second Amendment rights.
2  Is that what the Constitution says?  No.  The

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

3    Constitution says that we shall not infringe on
4    Second Amendment rights, period.  There's no
5    footnote, one, two, three, four, except in these
6    categories you can infringe.  No.
7         What if we passed a bill that said that
8    you can infringe -- you cannot infringe on freedom
9    of speech except for this subject you can infringe
10   on?  What if we passed a bill on freedom of
11   religion, except for this religion?  That's what
12   we're doing here today.  We're saying that you can
13   have the right to bear arms except that we're going
14   to take it away in certain situations.
15        What if we passed a bill on the Fourth
16   Amendment that took away your right to be safe from
17   search and seizure?
18        These rights are all sacred.  We must
19   protect them all.  We can't just have your favorite
20   rights in the Bill of Rights.  All of us are charged
21   when we take that oath to protect all the rights,
22   not just the ones that we particularly like.
23        Why is this so important?  Why should we
24   take so seriously protecting these rights?  Well,
25   let me tell you why.  Because there's a lot of
0033
1    people over the years that have protected these
2    rights.  They haven't just protected these rights
3    with their words, they've protected their rights --
4    these rights -- with their lives.
5         There were men and women during the
6    American Revolution that fought for our country
7    because they wanted to see a Second Amendment right
8    in the U.S. Constitution.  There were men and women
9    who fought during the War Between the States to
10   protect Second Amendment rights.
11        Interestingly, while we're on the war
12   between the states, it's interesting to notice that
13   General Grant allowed the -- right after the
14   surrender -- of course there's a lot of people in
15   this South that don't acknowledge they surrendered,
16   but anyway that is an aside -- General Grant allowed
17   a lot of Confederate troops to return home with
18   their weapons.  Why?  Well, because it never even
19   occurred to the commanding general of the U.S. Army
20   that he would take away the Confederate's right to
21   bear arms.  Now, he'd just been fighting them for
22   four and a half years, but he let them have their
23   weapons, because everyone in America knew that that
24   was a sacred right.
25        Let me read you about one particular
0034
1    American who sacrificed greatly to protect these
2    sacred rights.  This is a letter you've probably
3    heard before, but it's -- it's just worth reading.
4    It's -- it's poetic.  This is a letter from Abraham

5 Lincoln. It's written on November 21, 1864 to
6 Ms. Bixby in Boston, Massachusetts.
7       It reads:  "Dear Madame.  I have been
8 shown in the files of the war department a
9 statement of the Adjutant General of Massachusetts
10 that you are the mother of five sons who have died
11 gloriously on the field of battle.
12       "I feel how weak and fruitless must be
13 any words of mine which should attempt to beguile
14 you from the grief of a loss so overwhelming.  I
15 cannot refrain from tendering you the consolation
16 that may be found in the thanks of a Republic they
17 died to save.
18       "I pray that our Heavenly Father may
19 assuage the anguish of your bereavement and leave
20 only the cherished memory of the loved and lost,
21 and the solemn pride that must be yours to have
22 laid so costly a sacrifice upon the alter of
23 freedom.
24       "Yours, very sincerely and respectfully.
25 Abraham Lincoln."
0035
1       There were many Americans who fought
2 gloriously and bravely to defend these sacred rights
3 in World War I.  There were many Americans who
4 fought courageously to protect these rights in World
5 War II.  There are many souls at the bottom of the
6 harbor in Pearl Harbor.
7       I had last year the opportunity to go to
8 the American Sector Battlefield Cemetery in
9 Normandy, France.  It's actually a part of the
10 United States.  The French government actually gave
11 the land where our American cemetery is to the
12 United States of America.
13       If you walk down the rows of American
14 graves in Normandy, it will fill up your heart, and
15 you will understand, once again, how important it is
16 that we protect these precious rights that our
17 founders made.
18       There's many people that gave their life
19 in World War II, Korea, Vietnam.
20       If you ever have an opportunity to thank a
21 Vietnam veteran, I hope you'll take it, because they
22 didn't get thanked enough when they came home.
23       There's more than 3,000 people that burned
24 to death in the Twin Towers.  Not their choice, but
25 that's where they were.
0036
1       And one of my friends in Afghanistan, who
2 I was in the bible study with, died.  His son has
3 his father's flag in a triangle-shaped shadow box.
4 His father believed deeply in the Second Amendment.
5 His father believed deeply in the freedoms that we
6 hold sacred in America.

7        Let me tell you how great America is.
8    This -- his son who was a little boy when his dad
9    was shot in Afghanistan, the son is now starting
10   college, and he's in Army R.O.T.C.  And from
11   generation to generation, to generation, we have the
12   noble duty to protect these rights.
13       So I just wanted to talk about the Second
14   Amendment today because I feel like we get so much
15   into the weeds that we forget what these bills are
16   actually doing.
17       Madame Chair, I ask for a no vote.  Thank
18   you.
19       THE CHAIRWOMAN:  Thank you.
20       Senator Harvey.
21       SENATOR HARVEY:  Thank you, Madame Chair.
22       And thank you, Senator Balmer, for giving
23   us a history lesson on why America is great and why
24   America is free.
25       You talked about how we have it to defend
0037
1    ourselves against a tyrannical government, that
2    being the Second Amendment, but we also have it to
3    defend ourselves and our family from evil.
4        And no government has the authority to
5    take away somebody's inalienable right to defend
6    themselves and their family.  No government has the
7    right to say we will disarm you and tell you that
8    you have to be helpless.  That is what this debate
9    all day long will be about.  What is the role of
10   government when it comes to the right of
11   self-defense?
12       You all received an e-mail from a young
13   lady who most of us have forgotten about.  Most of
14   us were kids when her story was on the front page of
15   every paper in the country.  I read that e-mail, and
16   I asked her to come testify in committee on Monday
17   as one of my, quote/unquote, expert witnesses.  Many
18   of you weren't in that -- many of you weren't in
19   that chamber in that committee room when Krista
20   Ceresa gave her testimony.  Do you know the name?
21   Do you remember her story?
22       Let me read her testimony:  "My name is
23   Krista Ceresa.  I grew up and currently reside in
24   District 29 and am represented by Senator Morgan
25   Carroll.
0038
1        "I am here today on behalf of my family,
2    as well as a large number of people from my
3    community who are so familiar with the tragedy I'm
4    going to share with you today.
5        "The last man executed in the State of
6    Colorado was the man who killed my mom.
7        "July 21, 1986, Gary Davis kidnapped,
8    raped, and murdered my mom -- my mother, Genie May.

9  Gary Davis had a history of predatory sexual
10 behavior, raping 15 woman, and convicted -- and
11 convictions of grand larceny, burglary, menacing,
12 and jailed on sexual assault in Colorado.
13     "Four years prior to my mother's murder,
14 a man who should have never been released from
15 prison was released early.
16     "In 1985 my mother met Gary Davis and his
17 wife Becky at church.  He stalked my mother until
18 killing her one year later.  He was a criminal, and
19 it was against the law for him to have a gun.  He
20 had no respect for my mother, my family, and he
21 certainly had no respect for the law.
22     "If I had to do it over again, this is
23 often a phrase we throw around when reflecting on
24 how we could have done things differently, whether
25 it relates to our careers or maybe raising our
0039
1  children.  I was speaking with my dad.  He said to
2  me, 'If I had to do it over again, I would have
3  made sure your mother had a gun.  If she could have
4  had a chance to protect herself and you kids.
5      "In this case -- in this case we were
6  talking about saving someone's life and keeping a
7  family in tact.
8      "I know my father struggles daily with
9  the fact that he was unable to protect my mother on
10 that day.  The reality is these sick individuals
11 prey on those who are considered least likely to be
12 able to protect themselves, woman and children, in
13 places we falsely label as safe zones, gun-free
14 zones.
15     "If my mother had been armed with a gun,
16 my story might be much different.  She was
17 approached by two assailants that day."
18     Listen to this, members.
19     "She was approached by two assailants
20 that day, not just one.  She was outnumbered.
21     "If any of you are parents, maybe you can
22 imagine what might have went through her mind as
23 the lives of her two young children would now be
24 forever changed because of the premeditated acts of
25 this -- of these sick individuals.
0040
1      "I am a mother now, and I think back
2  daily on that terrible moment when I saw Gary Davis
3  physically force my mom from our front yard as I
4  was held -- as I was held by his wife on the front
5  steps of our country home.  I will never forget the
6  last time -- the last time I saw my mom.  I was
7  four years old."
8      And she was held by this man's wife as
9  he -- as he threw her mother into a truck.
10     "My efforts must be focused now on my

LEG HX 000813

11  children and what I can do to ensure that their
12  lives, that their last memories of their mother are
13  never the same as what I have of mine.
14       "As a concealed-carry permit holder, I
15  exercise my right to carry daily.  As carrying a
16  firearm may seem unnecessary, those who know my
17  story understand the heartbreaking reality that
18  evil, evil can approach without warning.  It is
19  because of the Second Amendment that I do not have
20  to worry about what others think is necessary or
21  unnecessary as it relates to the protection of my
22  family and myself.
23       "I am thankful for that right and choose
24  to exercise that right quietly and carefully,
25  whether I am at church or visiting my cousin for
0041
1  lunch at the college campus at UNC, where she
2  works.
3       "She too is a mother and legally
4  exercises her right to carry.  We know better than
5  anyone that the moment we are unprepared might be a
6  moment we live or may not live to regret.
7       "I have seen firsthand how quickly a
8  situation like this can occur, and as many of our
9  law enforcement officers are outstanding public
10  servants, there simply may not be enough time.  I
11  understand more than most, my protection is
12  ultimately my responsibility.
13       "So as I ask you to consider the
14  consequences of imposing more regulations upon
15  law-abiding citizens, please remember whom these
16  laws will really restrict.  How, by diluting these
17  rights, my rights, you will only make people like
18  myself, a daughter, a wife, a mother, an easy
19  target.
20       "These regulations will not affect those
21  whose intent is to ultimately break the law by
22  obtaining a gun, not getting a background check.
23  Statistics have shown that many of these people
24  committing these heinous crimes had illegally
25  obtained a gun in the first place.  Stricter gun
0042
1  control will not stop another sick-minded Gary
2  Davis from killing somebody else's mother.  In
3  fact, if you pass these regulations, it is more
4  likely that you will ensure that it will happen
5  again.
6       "My stance, along with my entire family,
7  is to oppose any measures for gun control.  And we
8  will oppose any lawmaker who authors or votes in
9  favor of any legislation that infringes on the
10  Second Amendment and my right to self-protection.
11       "The government was never intended to
12  regulate my needs as it relates to protecting

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

13  myself.

14       "We follow the law, and have every right
15  to protect our family from danger with the highest
16  measure of security we see fit.
17       "I am standing before you today having
18  just shared a story I have never spoken publicly
19  about."
20       Never, until Monday, when she came into
21  the State Affairs Committee to tell her story.  She
22  has never spoken publicly since she was four years
23  old.  Her dad has never spoken publicly since she
24  was four years old.  Her brother, who is three years
25  older than she is, has never spoken publicly since
0043
1   she was four years old, until she walked through the
2   doors of that committee room upstairs to tell you
3   this story.
4        "This is because I have never felt more
5   passionate for a cause as I do about this and
6   understand first hand the consequences this
7   legislation presents.  These restrictions will only
8   make my world less safe, leaving law-abiding
9   citizens out-gunned by criminals who have no
10  respect for the law.
11       "I'm speaking out today because you have
12  to be out of your mind to believe someone with a
13  plan to kill will not get their hands on a gun,
14  that any measure to put restrictions on the Second
15  Amendment will keep firearms of any capacity out of
16  the hands of criminals, nor will it influence where
17  they will choose to use them.  And I certainly know
18  that these measures will not take a way the
19  malicious intent of those with evil in their
20  hearts.
21       "Thank you for hearing me today.  I pray
22  that God guides you as you cast your very powerful
23  vote on this dangerous piece of legislation."
24       She finishes with a quote from Thomas
25  Jefferson:
0044
1        "No free man shall ever be debarred the
2   use of arms.  The strongest reason for the people
3   to retain the right to keep and bear arms is at a
4   last resort to protect themselves against tyranny
5   of government."
6        Members, thank you for listening to that.
7   I think that's what we are talking about on all of
8   these bills that we have coming before us.  How
9   profound is it that this family chose to go public
10  about their horrific story to tell you how important
11  this is for them and their family?
12       I wrote them -- I wrote Krista and asked
13  her to be here today.
14       She said, "Senator Harvey, I would love

15  to be your guest on Friday.  I have already
16  arranged for a sitter.  The irony of all of this, I
17  can only think how nervous I will be walking alone
18  from my car to the capital, knowing that I'll have
19  to leave my .38 in the car, or, according to your
20  Senate colleagues, my false sense of security.
21       "I am so glad you felt it was worth --
22  was worth it.  I just wish I could make everyone
23  who questions my position understand my reality
24  without -- without experiencing my tragedy.
25  Impossible.  So I will -- so I will continue to
0045
1  carry around my false sense of security while
2  people, your colleagues, carry around their false
3  sense of reality."
4        She took me up on my offer.  She's in the
5  chamber today.  Thank you, Krista, for being here.
6        Vote no on this bill.
7        THE CHAIRWOMAN:  Senator King.
8        SENATOR KING:  Thank you, Madame Chair.
9        Well, the Bloomberg dysfunctional hit
10  parade just keeps coming.
11        Let's talk about self-defense.  Let's talk
12  about personal safety.  Let's talk about one
13  exception which covers a temporary transfer to a
14  person faced with imminent death or bodily harm.  It
15  has to be in the transferee's home.
16        So if my neighbor, whom I've known for 30
17  years, comes to my home to borrow a gun because a
18  criminal has just broken into hers, I can't give her
19  that gun in my house.  I have to go back to her
20  house before I can hand her the gun.
21        If someone is getting calls from a stalker
22  but the stalker's not shown up at that person's
23  home, I can't loan the targeted victim a gun.  That
24  would be a crime under this bill.  The reason is
25  that that transfer to a person being threatened by
0046
1  criminals are allowed only when the threat is so
2  imminent that the victim would be justified in
3  shooting the threatening person at that very
4  instant.
5        Another exception is for temporary
6  transfer of possession is permitted at a shooting
7  range of specific charter:  at a target, firearms
8  shooting is completed, it is under the auspices of
9  the state agency or non-profit organization while
10  hunting or fishing under those prescribed terms.
11        Another exception allows a temporary
12  transfer up to 72 hours.  This is a good exception,
13  but it's flawed.  The transfer -- the transfer or --
14  is justly and severely liable for anyone who is
15  injured by the use of that transferred gun.
16        Notably, liability is for use.  Liability

4731

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

17  is for use, not unlawful use.  So if I loan my gun
18  to my brother-in-law and he's going to take it out
19  hunting, and my brother-in-law is attacked by a
20  violent criminal, and my brother-in-law, in
21  defending himself and his life, shoots the criminal
22  in self-defense, ladies and gentlemen, that criminal
23  can sue me.
24      This is a day of dysfunctionallism.
25      THE CHAIRWOMAN:  Senator Baumgardner.
0047
1      SENATOR BAUMGARDNER:  Thank you, Madame
2  Chair.
3      Thank you, members.
4      Heard a lot of talk this morning.  Let's
5  go back about an hour.  Let's talk about law-abiding
6  citizens.  That, in itself, is a statement,
7  law-abiding citizens, which means law-abiding
8  citizens play by the rules.  And I think that every
9  law-abiding citizen that is in the State of Colorado
10  does play by the rules.
11      What makes us think that if we pass this
12  piece of legislation it's going to stop criminals
13  from getting guns?  There's nothing that will ever
14  stop someone that is mean, someone that is a
15  criminal, from getting a weapon to carry out
16  whatever they want to carry out.
17      We heard about closing loopholes.  I've
18  been to gun shows.  I've been to gun shops.  You
19  have to apply, you have to pass a background check
20  to receive a firearm from these places.
21      Does the criminal go in and say, hey, I
22  want to buy in a .357 magnum right there and, oh, by
23  the way, I want to fill out this background check?
24  Most generally, you won't find -- well, probably 100
25  percent of the time you won't find a criminal in a
0048
1  gun shop or at a gun show buying a piece of --
2  buying a handgun or buying a rifle or whatever,
3  because they know they have to pass a background
4  check.
5      The loophole.  Again, we've heard from all
6  of our constituents, and a lot of people seem to
7  think that to close this loophole, especially on
8  private sales, is to just make sure that it's known
9  who owns a gun, who's got the gun, where the gun is,
10  to where, not only in this state, but all over this
11  nation, there's a national directory on who owns a
12  gun.
13      The Constitution says we have the right to
14  keep and bear arms.  Can you imagine when we went to
15  war, when these guys left their homes in defense of
16  this country, in defense of the tyranny that we had
17  when England was over us, that they'd say, you know,
18  we'd like for you to take that gun and go over there

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

19  and fight, but we have to check you out to make sure
20  that you didn't steal something or you didn't do
21  something.  Law-abiding citizens goes through the
22  process.
23      The Constitution gives us that right to
24  keep and bear arms, and it also says those rights
25  will not be infringed.  This bill infringes those
0049
1  rights.
2      When a licensed firearm dealer elects to
3  pursue the business of selling new and used
4  firearms, he or she does so under the constraints
5  already in place under the provisions of federal
6  law.  He or she agrees to abide by that law, in the
7  place, at the time, and any subsequent laws that may
8  be related to the licensed business.
9      Now, private individuals, private
10  individuals own and possess firearms under the
11  provisions of the U.S. Constitution, which, to my
12  understanding, usurping federal, state, or local
13  law, because those firearms, possessed under the
14  provisions of the United States Constitution, are
15  not registered or otherwise tagged by a private or
16  governmental agency or entity, the availability to
17  enforce firearm background legislation that attempts
18  to control the transfer of ownership of private
19  sales, is impossible.
20      The bill defines transfers very broadly.
21  It includes temporary changes in possession that has
22  nothing to do with ownership.  We're talking about
23  swapping arms, giving somebody a firearm.  You know,
24  one of the problems I see, you know, we talk about
25  72 hours here so -- and this may have already been
0050
1  spoken about, and if it is, I apologize to make you
2  sit through it again -- but if I leave town and I
3  give my firearms to one of my esteemed colleagues
4  and say I'm going to be back if four days, if he
5  doesn't clear a background check, he's a criminal.
6      It becomes a Class 1 misdemeanor for any
7  person to accept even a temporary loan of a gun,
8  except in very limited exemptions.
9      Even if the actual sentence for this
10  misdemeanor is 60-day probation and a $50 fine, the
11  fact that the potential punishment of this crime is
12  more than a year in jail, means that violating this
13  definition of a temporary transfer, even once, will
14  lead to the loss of the ability to legally own a gun
15  under federal law.  That's what this bill does.  We
16  talked -- we keep talking about, we're just trying
17  to get in line with -- with the federal law.
18      This bill, as written, could lead to gun
19  confiscations in Colorado in various circumstances.
20  In Denver, in a traffic stop, the police can

LEG HX 000818    4733

21  confiscate a gun if the person possessing legal
22  ownership of the gun cannot prove to that officer
23  that the gun belongs to them.
24      How's the officer to know, unless he's got
25  a gun registration that I bought this gun, this is
0051
1   when I bought it, here's the paperwork, it is my
2   gun.
3       When a driver's stopped by police, you
4   know, on a traffic infraction, any infraction, and
5   he can't show a vehicle registration to prove
6   ownership, that officer may decide he has probable
7   cause to impound that vehicle.  Are we moving
8   towards the same thing with guns that law-abiding
9   citizens own, have the right to possess, that our
10  Constitution says you have that right?  And just
11  because I can't prove it, I lose that right.
12      There's none of us in here that wants guns
13  in the hands of criminals.  There's none of us in
14  here that wants hands -- or guns in the hands of
15  people that are mentally ill, but doing a national
16  background check on every citizen, law-abiding
17  citizen, on any type of firearm transfer, especially
18  on private transfers, is just unconscionable, that
19  we, as one of the senators spoke earlier, we all
20  stood down here, we raised our right hand and we
21  swore an oath to uphold the Constitution of the
22  United States and the Constitution of the State of
23  Colorado.  The Constitution I swore an oath to tells
24  me that I have the right to keep and bear arms
25  without a universal background check.
0052
1       THE CHAIRWOMAN:  Thank you.
2       There is an amendment on the desk.
3   Mr. Majors, would you please read Amendment 34?
4       MR. MAJORS:  Amend L.034 to House Bill
5   1229 by Senator Carroll, amend the --
6       THE CHAIRWOMAN:  Thank you.
7       Senator Carroll.
8       MAJORITY LEADER CARROLL:  Thank you,
9   Madame Chair.
10      I move Amendment L.034.
11      Members, to a point raised earlier by a
12  colleague, maybe the easiest way to look at this is
13  on page 2 of the State, Veterans, and Military
14  Affairs report.  Amendment 34 inserts the word
15  unlawful before the word use of firearm.
16      And to put this into context, this is one
17  of the two catch-all provisions that says you can
18  loan any firearm to anyone you want for up to 72
19  hours without a background check, as long as they're
20  not a convicted felon or prohibited.
21      But the point was also made that as far as
22  being responsible for the subsequent use, what this

LEG HX 000819

4734

23  amendment does, is it adds the word for the
24  subsequent unlawful use.  One word, I think an
25  important word, raised by a colleague, which is
0053
1  consistent -- more consistent, actually, with my
2  intent of the bill.
3          So I would just ask for an aye vote on
4  Amendment 34.
5          THE CHAIRWOMAN:  A discussion on Amendment
6  34?
7          The motion is -- yes, I'm sorry, Senator
8  Brophy.
9          SENATOR BROPHY:  Thank you, Madame Chair.
10         And -- and this amendment will be an
11  important improvement to the bill, but it still
12  doesn't solve all of the problems with regard to
13  assuming liability for things that happened that are
14  completely beyond your control.  And we're going to
15  discuss another bill today that deals with that
16  extensively also.  But that -- that still remains in
17  this bill, you're -- you can be held liable for
18  things that are completely beyond your control.
19         We don't do that very often in very many
20  areas.  This is -- this is -- this is a huge step to
21  place you in a position where you're responsible for
22  things that happen that are clearly, way beyond your
23  control.
24         THE CHAIRWOMAN:  Senator Carroll.
25         MAJORITY LEADER CARROLL:  Thank you,
0054
1  Madame Chair.
2          And just to be clear, it's joint and
3  several liability, it's not strict liability.  So if
4  anything's out of your control, it's not strict
5  liability, you wouldn't be held liable.  It's the
6  ordinary negligence standard.
7          And I would just ask for an aye vote as
8  far as clarifying the use of the word unlawful.
9          THE CHAIRWOMAN:  Thank you.
10         The motion before us is to adopt Amendment
11  34.
12         All those in favor say aye.
13         All those opposed, no.
14         And that amendment is adopted.
15         Next, we have Senator Scheffel.
16         SENATOR SCHEFFEL:  Thank you, Madame
17  Chair.
18         Members, if we go back and just recall
19  ever so slightly the events of Monday, when these
20  were heard in committee.  I remember being on the
21  way down here and received a phone call, a friend of
22  a gentleman that I did not know.  I believe his name
23  was Rick.
24         And he indicated -- asked me -- indicated

LEG HX 000820    4735

25  he was going to come down here and testify.  He was
0055
1  concerned in particular about the package of bills,
2  but in particular this bill.  And I gave him the
3  outline of the procedures and how to come down here
4  and warned him about the parking, whatnot, and then
5  I was able to bump into him when he was actually
6  down here.  He left before he could testify.
7       He had tried to attempt to circumvent the
8  process that day, and suffice it to say, and we all
9  know that this place was very, very busy, very
10  crowded, and unfortunately a lot of folks could not
11  testify.
12       To this particular gentleman, I apologized
13  on behalf of the process and the fact that it had
14  turned unfortunately against his ability to speak
15  that day, and I said as best as I can do, I will
16  speak for you, given the opportunity.  And so,
17  relevant to this particular bill, I'd like to -- to
18  read into the record Rick's words.
19       Concerning the requirement -- and relevant
20  to the discussion, I appreciate the sponsor's
21  amendment, and it maybe addresses some of things
22  here, and we can --
23       THE CHAIRWOMAN:  Senator Scheffel, could I
24  ask you -- I just want to confirm:  This is
25  testimony on this particular bill that was supposed
0056
1  to be read?
2       SENATOR SCHEFFEL:  It is, Madame Chair.
3       THE CHAIRWOMAN:  Okay.  Thank you.
4       SENATOR SCHEFFEL:  He indicated that
5  concerning the requirement that loans of firearms
6  must go through a background check, the bottom line
7  is that such a requirement would be complicated,
8  impractical, and unenforceable.  My hope is that
9  once your colleagues understand what would be
10  involved that they will drop this idea.
11       He writes:  "I'm a certified instructor.
12  I mostly teach woman and young adults, especially
13  young adults belonging to a chartered national
14  organization.  Except for very few certain
15  circumstances, I do all of this training at my
16  expense.
17       "When I work with women, I take them to
18  various shops to see different firearms.  I do this
19  so that they might learn about them, about their
20  differences, and to find one that would suit them.
21  This process prevents people from buying a firearm
22  that they don't really need, which will end up
23  stuck in a drawer somewhere.
24       "As part of this educational process, I
25  take them to the range so they can try some
0057

1   different types of firearms.  And as I don't own
2   all the different models and types I might use for
3   this purpose, I have to borrow them.  I generally
4   have to get two or three friends involved, so no
5   single one of my friends owns all the types I might
6   want to demonstrate.  Right now, they loan them to
7   me, and then I go to the range with the person I'm
8   instructing, and then I return them to the owners
9   afterward.
10          "If I'm teaching my youth group, I use
11   simple .22 rifles, however, I don't own enough to
12   cover my needs for even a small group, so I have to
13   involve several friends there as well.
14          "However, if this proposed requirement
15   for transfers on loans between friends and families
16   become law, the whole process would grind to a
17   halt, at least for me.  I would have to have each
18   of my friends accompany me to an FFL holder.  I
19   would then fill out the federal form and transfer
20   the FFL, run a background check.  I have to do all
21   that with every firearm from every friend.  And I
22   have to pay the fee for the FFL holder charges at
23   the time.  And if the state passes its own fee, I
24   would also have to pay that.
25          "After that, the firearms are technically
0058
1   mine and not the property of the owner, as they
2   have been transferred to me.  Add to that, the time
3   I it takes more me to wait for the background check
4   to clear, depending on how much the CBI is backed
5   up, and the process becomes even worse.
6          "Then I go to the training.  Hopefully,
7   handling a firearm to -- handing a firearm to
8   someone in the range is not a transfer.  And once
9   the training is finished, I have to drag each of my
10   friend's back, fill out the forms again and go
11   through the CBI background check again with the
12   accompanies fees and wait times.  Only then, could
13   they take possession of their firearms as I return
14   them.
15          "Note that there is no such thing that
16   I'm aware of, of any sort of batch processing, if
17   that's what anyone thinks happens in this
18   circumstance.  Each firearm requires its own
19   paperwork, and each firearm requires a separate
20   background check.  Each check requires time in the
21   CBI system and separates the fees.
22          "All of this to serve no useful purpose.
23   It clogs the CBI system, and it's a monetary
24   hardship on people like me who teach for free.  It
25   would keep my friends from participating in
0059
1   responsible training.  In fact, the whole idea is
2   ultimately counterproductive to government's goals,

3  because it hinders safe firearms education and
4  could actually put more firearms into the hands of
5  the public.  I would have to buy firearms I don't
6  really need in order to give this training, or some
7  people would buy firearms they don't really need or
8  that they couldn't use properly.
9       "Some of the young people I've taught
10  over the years were headed into the military.  I
11  taught them shooting fundamentals that helped them
12  master the necessary military skills.  I know this
13  from my own experience.  I learned to shoot with
14  the Boy Scouts, then shot expert for the military
15  police training during the Vietnam era, even though
16  I had no prior experience with the military
17  firearms.
18       "You say you don't want inexperienced
19  people to own firearms, but when training is made
20  this difficult, that's what you'll get.
21       "The requirement is time consuming,
22  expensive, we don't know what the state wants to
23  charge yet, and it's obnoxious.  I guarantee most
24  shooters will just ignore it, as it is, frankly,
25  unenforceable.  I would hope that elected officials
0060
1  would not knowingly put an unenforceable law in the
2  books.  That would be irresponsible, and
3  ultimately, such actions undermine the rule of
4  law."
5       Rick, I appreciate you taking the time to
6  get in touch with me.  I enjoyed meeting you.  And I
7  hope in some small way this makes up for your
8  failure to be able to testify the day these were
9  heard.  People are listening now, as I've related
10  this.  Your arguments resonate with me.
11       And, for that reason, I will be a no vote
12  on this bill.
13       THE CHAIRWOMAN:  Thank you.
14       Senator Brophy.
15       SENATOR BROPHY:  Thank you, Madame Chair.
16       Colleagues, I'm going to ask obviously for
17  a no vote on this bill.  It is interesting in that
18  it will yield absurd results.  It is absolutely
19  unnecessary, will not improve state of the one iota,
20  and will ultimately lead us down a dangerous path
21  that I think we ought not start our way down.
22       I appreciate some of the other stories
23  that we heard about the absurdity of this, the
24  notion that you would have to go and get a
25  background check every time you borrow a few
0061
1  firearms from some friends to take other friends to
2  the shooting range so that everybody would have, you
3  know, an assortment of firearms to experiment with
4  so they could figure out what it is that they like,

LEG HX 000823

4738

5    what suits them, what becomes the best firearm that
6    they can use for their own personal safety.
7         And I guess these stories of absurdity
8    shouldn't shock anybody in here, when the real
9    proponents of the bill appear not to reside in the
10   State of Colorado and have Colorado values.
11        If you lived here in Colorado, you might
12   know a little about our Colorado values.
13        I -- I commend to the story that Curtis
14   Lee wrote in the Denver Post last Sunday, a fabulous
15   story talking about the rural culture, which
16   encompasses almost all of the area that most of you
17   folks are unfamiliar with, with the population
18   growth here on the Front Range.  Only four of us, I
19   think, represent the -- the rural edges of the State
20   of Colorado at this day.
21        Another story of absurdity under this bill
22   -- and again, I wouldn't expect folks from New York
23   to understand this, but when you go elk hunting in
24   the state of Colorado, which is a great past time of
25   mine, especially as a youth, and members of my
0062
1    family and extended family, my neighbors, and
2    friends all engage in this activity.  It's a --
3    it's -- it truly was always the highlight of my
4    Fall, since I wasn't big enough to play football.
5    You go for a week.
6         Now, a lot of our friends, distant
7    cousins, neighbors, will take their kids hunting for
8    the first time, and maybe they haven't -- haven't
9    gotten around to purchasing the first hunting rifle
10   for that -- for that new hunter, and they want to
11   come to me and -- and borrow one of mine.
12        Under this bill, we either have to make an
13   appointment with one of the two FFL dealers that I
14   know in -- in my hometown.  They don't have
15   storefronts.  You have to make an appointment with
16   them, go down and pay for all the background checks,
17   just to loan a hunting rifle to a person who you've
18   known maybe your whole life.  You probably know he
19   has a .22 rifle because almost everybody does out
20   there.  So I know he understands firearms.
21        He can -- he can have a firearm, but I
22   have to get a background check on him, or both of us
23   go to jail for 18 months because it exceeds the
24   arbitrary 72-hour period placed upon the loaning of
25   a firearm to somebody established in the Judiciary
0063
1    Committee.
2         I think, and you may hear from everybody
3    on my side of the aisle, another story of absurdity.
4    Hopefully, that one will do it, because I just think
5    that is absolutely ludicrous.
6         I say it's unnecessary, because if you

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

7  look at the existing statute, it's 18-12-111. It
8  says that it is unlawful to purchase a firearm for
9  or transfer a firearm to someone who you know or
10  reasonably should know cannot legally possess the
11  firearm.  That's what it says, 18-12-111.
12        Now, what does that mean?  Well, if you
13  know they can't own -- own or possess the firearm,
14  you got that.  But what -- what does reasonably
15  should know?  Well, the case law is fairly clear on
16  that.  Florida courts, for instance, have construed
17  this standard to require proof that quote, the
18  circumstances of the transaction were sufficiently
19  suspicious to put a person of ordinary intelligence
20  and caution on inquiry.
21        So if somebody is insisting to buy a
22  firearm from you and you don't know them, it's not a
23  neighbor that you've gone forever, which, by the way
24  would -- is not allowed under this bill, so
25  neighbors that I've known forever, I can't sell them
0064
1  a firearm privately, it has to be a public
2  transaction, loss of privacy.  But someone you don't
3  know, you can and you probably should, ask them to
4  do a background check.  And if they say, yes, no
5  problem.  If they say, no, hum?  Why?  Would that
6  put a reasonable person on caution?  I think so.
7  And I think for that reason the bill is absolutely
8  unnecessary.
9        And as the county sheriffs tell us, it's
10  absolutely unenforceable because there's no way to
11  know if the firearm that anybody has, has ever --
12  was purchased or obtained with a background check.
13  There is no way to know, and that's part of why this
14  bill is so dangerous.
15        I also said that the bill won't improve
16  safety at all.  And how do I know that?  Well, the
17  National Institutes of Justice tells us that.  Eric
18  Holder's Department of Justice did a study on
19  various gun control proposals, and they studied
20  specifically universal background checks.
21        And to really understand this study,
22  you -- you probably ought to look at the history of
23  crime associated with firearms and how those
24  firearms were attained -- obtained, and you should
25  note then that half of them are obtained through
0065
1  straw purchase.
2        Now, a straw purchase is when you use a
3  friend who can legally possess and purchase a
4  firearm to go and obtain that firearm on your
5  behalf.  It's illegal, but half of the firearms
6  currently used in crimes are obtained through this
7  manner, a quarter are stolen, but 20 percent truly
8  were purchased from a private seller.  So this bill

9   would be dealing with that 20 percent.
10       And then you say, okay, well, what if
11   then -- if we stop that 20 percent, it would
12   probably be worth it, wouldn't it?  And the answer
13   is, yes, if we stopped that 20 percent, but we
14   won't.  We won't come anywhere near stopping that 20
15   percent, because if you read a little bit further in
16   the National Institute of Justice study, what you
17   will find is they say -- and this is, again, from
18   Eric Holder's Department of Justice -- looking at
19   this proposal, they said it will have no affect
20   because it will just force criminals to use other
21   methods to obtain their firearms.
22       So you won't really get at that 20
23   percent, you will just force those people who want
24   firearms into other avenues, more straw purchases,
25   more stolen weapons, creating more crime.  All that,
0066
1   all that, no improvement on safety, merely imposing
2   upon law-abiding citizens a pretty significant
3   inconvenience, coupled with other bills, a fairly
4   expensive inconvenience, and taking away from the
5   citizens of Colorado, the law-abiding citizens of
6   Colorado, the opportunity to engage in a private
7   transaction because some of us actually believe it's
8   smart to own a handful of firearms for which there
9   is no government record.
10       And I'll tell you the bill is dangerous,
11   and it's dangerous just because it is unenforceable,
12   as one of the other senators said.  And I wrote this
13   in the Denver Post op-ed the other day.  I mean,
14   I -- I am rural.  And again, this goes back to rural
15   culture.  It is highly likely that at any given time
16   when I hop in my pickup to head out to the farm from
17   my home in Wray there will be one or two firearms in
18   that vehicle.
19       One of them, which we'll probably be
20   discussing later today, is -- is effectively the
21   utility rifle of all farmers and ranchers because
22   it's perfect for the job.  And, let's just say for
23   instance that I fail to use my turn single when I
24   pull onto the highway to head north of town to my
25   farm, because heck, everybody in Wray knows where
0067
1   I'm going anyway, I really don't need a turn signal.
2       But let's say we have a new police officer
3   who doesn't know where I'm headed, and he pulls me
4   over and says, Mr. Brophy, I pulled you over because
5   you failed to use your turn signal, and -- and, you
6   know, while we're sitting here, I'd like to see
7   your -- your driver's license, your registration,
8   and your proof of insurance.
9       Happens all the time, even though I have tags on
10   the back of the pickup that says it is registered by -- of

11  having the appropriate color of year, which I think is red
12  now.  And then he looks in there and he notices in the gun
13  rack -- because I have a gun rack in my pick up, I am rural
14  -- and he sees the firearm and he says, Mr. Brophy, did you
15  obtain that firearm with a background check?  Well,
16  dependent upon which one it is, the answer is yes, maybe,
17  no.  I got my first rifle when I was nine years old, it's a
18  .22.  I got my second one when I was 13.  And by the time I
19  was 18, I had a few more than that.  And I didn't have a
20  background check on any of them, my mother did.  And the
21  rest of the story is, is that there no longer exists any
22  paperwork at all on those firearms, because, and again,
23  unless you really look into this and know this, you
24  wouldn't know that the form 4473 that you fill out now to
25  obtain a background check -- all noes and one yes, if I
0068
1  remember right -- the FFL, the dealer, who got that firearm
2  from a distributor and sold it to you, is required to keep
3  that piece of paper that says you passed the background
4  check with some identification for the particular firearm
5  or firearms associated with that background, and sometimes
6  it's more than one.
7          They're required to keep it in a file cabinet for
8  20 years.  After 20 years, they can do one or two things --
9  actually, they can do three things: they continue to keep
10  it, they can turn it over to ATF, or they can shred it,
11  which is what most of them do, God bless them.
12          So now a portion of the firearms that I
13  own, there is no way an God's green earth for me to
14  prove that I legally obtained them.  Then what
15  happens?  Do I get to keep it?  I can't get an
16  affidavit from my mother.  She passed away on
17  May 19, 2003.  What do we do?
18          There's only one answer.  There's only one
19  answer.  You have to register all of them.  And
20  that's what so insidious about this bill, is that
21  after a handful of law-abiding gun owners have their
22  guns held or taken away from them by the
23  authorities, the law-abiding gun owners seeking
24  relief very well may suggest that a centralized
25  registry database would protect them from the
0069
1  authorities, and maybe they'll be asking for it
2  themselves.  And that, everybody knows, is very
3  dangerous.
4          Members, I'm going to urge a no vote on
5  this bill.  I hope, I hope, that some of you were
6  listening and that it went to your hearts.  It is
7  absurd, the outcomes of this bill.  It's
8  unnecessary, doesn't improve safety, and it's
9  ultimately very, very dangerous.
10          I ask for a no vote.
11          THE CHAIRWOMAN:  Thank you.
12          Senator Marble.

13        SENATOR MARBLE:  Thank you, Madame Chair.
14        I rise in opposition to House Bill 1229
15   for more reasons than I can count, and for more
16   reasons than we have days to address this issue.
17        During testimony on Monday, I was
18   privileged to sit in, in the State Affairs Committee
19   and listen to some of the most incredible, marvelous
20   testimony I have ever heard.  I doubt that history
21   will ever give me that chance again.
22        We had sheriffs of Colorado come in and
23   testify regarding the fact that not only was this
24   bill not properly drafted, but also unenforceable,
25   the unintended consequence of burden that we are now
0070
1   forcing upon our law enforcement.
2        Besides that fact El Paso County Sheriff,
3   Terry Maketa, gave us some pretty good statistics
4   regarding firearms, stolen, between 2005 and 2010.
5   It was 1.4 million firearms.  That's 240,000 a year.
6   Don't you think that's where the black market really
7   begins?  Do you really think that criminals are
8   going through and getting a background check when
9   there is such a black market available for them?
10        Terry Maketa also testified to the fact
11   that this is not only unenforceable, but it will
12   create an inconvenience and more innocent criminals.
13        I think that we have enough laws directing
14   law enforcement to the overcriminalization of
15   America.  Right now the State of Colorado has one of
16   the lowest firearm crime rates in the nation,
17   1.9 percent per 100,000.  Less than half of the
18   national average.  And what are we doing?  We're
19   punishing them.  We're punishing good citizens for
20   what?
21        I want to read you a quote, which I'm
22   sure you're all very, very aware of.  And I bet you
23   will know exactly who it came from.  It says,
24   "Nothing we're going to do is going to
25   fundamentally alter or eliminate the possibility of
0071
1   another mass shooting or guarantee that we will
2   bring gun deaths down do a thousand a year from
3   what it is now.  Vice President Joe Biden."
4        What's the real reason behind these gun
5   bills?  What are we really trying to prove?  Who are
6   we trying to punish?  And who are we making promises
7   to?
8        I want to take a minute and address that
9   40-percent rate that has been bantered about, saying
10   that 40 percent of gun sales never go through a
11   background check.
12        I'm going to read from (sic) you, a piece
13   from the National Review that was actually written
14   by John Fund.

LEG HX 000828    4743

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

15     One of the reasons for the high number is
16 that 250 people back during the Clinton
17 Administration were all that were considered for the
18 study when it came to that 40-percent rate.  250
19 people.  And that was before the Brady Bill was even
20 enacted.  Before we even had background checks.
21        He says:  "Most advocates of gun control
22 believe the loopholes in federal law are the rule
23 and not the exception when it comes to gun
24 purchases.
25        "A 2011 study by the Office of New York
0072
1 Mayor Michael Bloomberg claimed that 40 percent of
2 guns are sold through private sellers.  His study
3 went on to say, these sales, which take place in
4 many venues, including gun shows and increasingly
5 on the Internet, fuel the black market for illegal
6 guns."
7        The dubious statistic of guns that avoided
8 background checks, which is actually around
9 36 percent, comes from a small 251-person survey on
10 gun sales two decades ago, very early in the Clinton
11 Administration, which I explained to you.  Most of
12 the survey covered sales before the Brady Act
13 instituted mandatory federal background checks in
14 early 1994.
15        If that alone didn't make the number
16 invalid, the federal survey simply asks buyers if
17 they thought they were buying from a licensed
18 firearms dealer?  While all federal firearm
19 licensees do background checks, only those perceived
20 as being FFL's were counted.  Yet there is much
21 evidence that survey respondents, who went to the
22 smallest FFL's, especially the kitchen-table types,
23 had no idea that the dealer was actually licensed.
24 Many buyers seem to think that only the
25 brick-and-mortal stores were license dealers, and so
0073
1 the survey underestimating the number of sales
2 covered by checks.
3        And another reason for the high number is
4 that it includes gun transfers as inherited or as
5 gifts from family members.  Even President Obama's
6 background proposal excludes almost all of those
7 transfers.
8        We have another study by John Lott that
9 says his research suggests that expanding background
10 checks might actually contribute to a slight net
11 increase in violent crime, particularly rapes.
12 Before we expand background checks, he suggests we
13 focus on the real world statistics, not Obama's
14 magical number, and recognize that criminals are
15 seldom burdened by background checks because they
16 buy weapons on the black market.

17       As for gun bans, they do little to combat
18 crime.  When guns were banned in Washington, D.C.,
19 or Chicago, the rate of violent crime went up.  Even
20 in islands nations, such as Great Britain, Ireland,
21 and Jamaica, murder rates went up after the gun bans
22 were put in place.
23       When you look between 1965 and 2010, in
24 Colorado, there has been no change in crime with
25 background checks.  None at all.  So the purpose of
0074
1 this bill is for what?  To punish law-abiding
2 citizens who have carried Colorado to the lowest
3 gun-crime late in the nation?  To make us an example
4 of the overuse and abuse of power?  Bad legislation?
5 What are we telling -- what are we telling the
6 people of the world about our Constitution?
7       This bill does not reflect the Colorado
8 Constitution, nor the federal -- nor our federal
9 Constitution.  It reflects New York politics,
10 Bloomberg agenda, and New Jersey's handprints are
11 all over it.
12       Before we go any further, let's take a
13 look at who we really serve.  We serve the people of
14 Colorado.  We are elected by the people of Colorado,
15 and we answer to the people of Colorado, not to any
16 other administration, not to any other state.
17       And I am here to speak for the people who
18 elected me.  Don't punish us.
19       I will never advocate for criminals by
20 taking away the gun rights of law-abiding citizens,
21 and I'm hoping that you will follow suit.
22       Thank you for your time.  And I really, I
23 beg you, vote no on this bill.
24    SENATE PRESIDENT:  Majority Leader
25 Carroll.
0075
1    MAJORITY LEADER CARROLL:  Thank you,
2 Mr. Chair.
3       Members, just a couple of things for the
4 record.  I'm a second generation Colorado native.  I
5 come from the community of Aurora in eastern
6 Arapahoe County.  That is who I am representing here
7 today on this bill.
8       There have been a lot of very legitimately
9 absurd examples given of what things that other
10 folks are suggesting could happen here.  And, I
11 guess I with just say that the good news is, is that
12 if you look on page 2, lines 7 through 18 on the
13 committee report of what was already amended, and
14 then look at the actual text of the bill, whether it
15 was shooting instruction classes, loaning to a
16 neighbor, or self-defense, none of those folks have
17 to go through a background check.  And the only
18 prohibition is just making sure that you comply with

19  current law, as was mentioned that you are not
20  supposed to be transferring to someone who is a
21  convicted felon.
22       I do think those stories would be
23  problematic.  You will look to the text to find that
24  some of them in early versions of the bill actually
25  could have come about.  It's the importance of the
0076
1  amendments in the bill taken as a whole on the
2  total.  And so, hopefully, it should be the relief
3  to some that whether it's hunting or training or
4  self-defense, you will find in this text of the
5  bill, as amended, that those situations are
6  exempt -- are exempted.
7       The people who are harmed by this bill
8  would be people who can't pass a background check.
9  And those are people who are already criminally
10  ineligible to own or possess a firearm.
11       SENATE PRESIDENT:  Thank you, Majority
12  Leader Carroll.
13       Now that I'm back up here, I just want to
14  re-emphasize the rules of decorum and not imputing
15  the motives of others.  Thank you for stating your
16  motives and intentions clearly with this bill.  And,
17  again, if comments are made to the contrary, they
18  will be called out of order.
19       There is an amendment on the desk.
20       Mr. Majors, would you please read
21  Amendment L.035?
22       THE CLERK:  Amendment L.035 to House Bill
23  1229 by Senator Balmer, amend the State, Veterans
24  and Military Affairs Committee report dated March 4,
25  2013: page 2, line 9, strike "or"; page 2, line 14,
0077
1  strike "firearm" and substitute "firearm or"; page
2  2, after line 14, insert Subsection I: A transfer of
3  a firearm from a person serving in the armed forces
4  of the United States who will deployed outside of
5  the United States within the next 30 days to any
6  family member or friend of the person.
7       SENATE PRESIDENT:  Senator Balmer.
8       REPRESENTATIVE BALMER:  Thank you,
9  Mr. Chairman.
10       And thank you, Reading Clerk, for reading
11  it.
12       I think that sometimes it's important that
13  we do read the amendments out loud, because, you
14  know, those who are following at home can't tell
15  what we're doing otherwise.
16       This is simply an amendment to allow for a
17  service member, military personnel, who has got a
18  deployment order getting ready to go overseas to
19  defend our country, this allows them to transfer to
20  a family member or a friend.

LEG HX 000831

4746

21       Now, currently underneath the bill, if
22  they want to transfer it to their family, it's got
23  to be a permanent gift.  They actually, they have to
24  give it to their mom or dad.  And as you know,
25  that -- that has a lot of -- I mean, you don't want
0078
1  to do that.  What you would want to do is just what
2  you currently could do in Colorado, at least for
3  today, at least right now, you can do this.
4       You can -- if you're getting deployed
5  overseas, you can leave your privately owned weapon
6  with your parents.  You're probably going to leave
7  your car at your -- at your parents' house.  A lot
8  of these young Americans are 18, 19, 20 years old,
9  and the way that they handle these situations is
10  they leave their car at their parents' house, and
11  they leave their weapons with their mom and dad.
12       They -- and -- and this would also allow
13  them, if they didn't have a mom and dad or if
14  they're in a situation where their mom and dad is
15  several states away, they could say well, we're
16  going to leave it with my trusted friend.
17       Well, that friend would be doing them a
18  great favor to safeguard their weapon for them while
19  they're gone, but underneath our -- the -- the way
20  the law is going be changed with this bill, we would
21  be penalizing that -- that American, that Coloradan,
22  for safeguarding a weapon of a deployed soldier.
23       So I apologize, Senator Carroll, for not
24  giving you a lot of notice on this, but I just
25  thought of it.  And I think it's important that we
0079
1  safeguard our military personnel.  When they're
2  getting ready to be deployed, they have a lot things
3  on their mind, and we should make it easy for them
4  to take care of their personal things.
5       Thank you, Mr. Chairman.
6       SENATE PRESIDENT:  Majority Leader
7  Carroll.
8       MAJORITY LEADER CARROLL:  Thank you,
9  Mr. Chair.
10       Members, I actually may be open and
11  receptive to this.  My understanding of the reading
12  is that this, like any other provisions, would still
13  have kind of that generic, as long as you're not
14  transferring it to a convicted felon and someone
15  who's already criminally ineligible.  And I think
16  where you've inserted it, that umbrella still
17  applies.
18       So more time would have been good, but
19  I -- I believe that the circumstances approached
20  here are reasonable, where you may not want to do a
21  permanent transfer, and 72 hours may not cover it.
22  So at this point, I'm not going to oppose this

23    amendment.
24        SENATE PRESIDENT:  Is there any further
25    discussion on L.035?
0080
1        Seeing none, the motion before the body is
2    the adoption of Amendment L.035.
3        All those in favor say aye.
4        Those opposed, no.
5        The ayes have it.
6        And the amendment is adopted.
7        Back to the bill.  I have Senator King.
8        SENATOR KING:  Thank you, Mr. Chair.
9        I got -- I have received a very good book
10    called the Second Amendment:  Preserving the
11    Inalienable Rights of Individual Self-Protection.
12    Got it from a good friend.
13        In it, "A free people ought to be armed."
14    George Washington, President of the United States,
15    signer of the Constitution.
16        How can that be prevented?  How can a free
17    people be prevented from being armed?  House Bill
18    1228 (sic) imposes two fees, on the applicant, a $10
19    fee by the dealer processing the application --
20        SENATE PRESIDENT:  Senator King, we're
21    speaking to House Bill 1229 at this point.  You
22    addressed your comments to House Bill 1228.  You
23    just referenced House Bill 1228.
24        SENATOR KING:  Yes, Mr. Chair, thank you.
25        SENATE PRESIDENT:  Please proceed.
0081
1        SENATOR KING:  Right now, in Denver -- and
2    this is not a hypothetical -- the police department
3    has a 90-day waiting period for the mere acceptance
4    of an application for a concealed-carry permit.  The
5    total waiting period in Denver is now five months.
6    The idea that -- I pass.
7        Thank you, Mr. Chair.
8        SENATE PRESIDENT:  Next, I have Senator
9    Lundberg.
10        SENATOR LUNDBERG:  Thank you, Mr. Chair.
11        Members, as I look at this bill, it -- it
12    troubles me.  And I just had a discussion with --
13    with my county sheriff, Justin Smith, Larimer
14    County, and he concurred with me that -- that any --
15    any time we are trying to put in place a universal
16    system for background checks, it -- it becomes
17    practically impossible to stand on its own.  It --
18    it begs the policy of universal registration in
19    order to facilitate the process.
20        As a county sheriff, he -- he says, you
21    know, there's no way he can deal with this without
22    having that set of data.  And he understands that to
23    be -- well, he's concerned that it's the next step,
24    and so am I.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

25
0082

1  unreasonable circumstances where it just doesn't
2  work and it will be ignored, and we will essentially
3  criminalize a great deal of the law-abiding citizens
4  in the State of Colorado, whose only desire is to be
5  able to defend themselves and their family and their
6  property.
7       And world history is replete with the
8  examples of when you register, you eventually
9  confiscate. So whenever I see that concept of
10 registration for firearms, I mean I am a student of
11 history, that's the next step. It may not be this
12 legislature, maybe ten years from now, when no one
13 sitting here today will be there. A new group may
14 look at it, and they're like, well, okay, now we
15 know where they are, let's go get them. That's the
16 concern, the major concern I have with this piece of
17 legislation.
18      And if I lay that up against our Colorado
19 Constitution's right to bear arms, it makes no sense
20 whatsoever. There's been several references to --
21 to this section, but I'm not sure that we've
22 actually looked at it word for word here today.
23      You may not have been familiar with this
24 in this past, but I think you're becoming fast
25 familiar with -- it's part of our Bill of Rights,
0083
1  which is Article II. It's Section Number 13, Right
2  to Bear Arms. And the pertinent parts of it read
3  like this:
4       "The right of no person to keep and bear
5  arms in defense of his home, person, and property,
6  or in aid of the civil power when thereto legally
7  summoned, shall be called in question."
8       Now, if I were constructing something to
9  state clear defense of the citizens to defend
10 themselves, their home, their property, their
11 families, I would seek for this kind of language,
12 not something that just sort of says it or it could
13 be questioned to some degree or another. No, I'd
14 say it clearly. And that's what they've done. It
15 shall not be called in question.
16      This bill calls it into question. It sets
17 up an unreasonable standard for the honest citizen
18 to comply with at all times. It sets up an
19 expectation that we don't trust the citizens of the
20 State of Colorado, and so we're going to run them
21 through that many more hoops before they can legally
22 possess and bear firearms. It puts in concepts that
23 are contrary to the Constitution. How many times do
24 we have to remind ourselves of this? Shouldn't it
25 take but one time? Remember the oath of office we
0084

1  all took when we took our office?
2      Some of us who have been here for many
3  years have taken that oath again and again.  It's
4  the same.  I take that as job number one when I'm
5  down here, and there are some elements within the
6  Colorado constitution that I -- I have some
7  heartburn over, but I have no question as to where
8  my allegiance lies, because I took that oath of
9  office to follow that Constitution.
10      I would like the sponsor to clearly defend
11  how this comports with not only the letter but the
12  spirit of Article II, Section 13.  I believe the
13  people of Colorado deserve nothing less.  And I'm
14  pretty sure I'm going to be down at this mike later
15  today with other mayors that call into question the
16  citizen's right to defend themselves, to possess, to
17  control, to bear those arms.
18      Now, oftentimes, I'm chided or derided
19  because I have this notion that the Constitution is
20  where we need to start.  I got that because it is
21  our job.  It is our solemn oath and commitment.
22      Let me read it to you again:
23      "The right of no person to keep and bare
24  arms in defense of his home, person, and property,
25  or in aid of the civil power when thereto legally
0085
1  summoned, shall be called in question."
2      Answer that question before you vote on
3  this bill and the entire agenda before us today.
4      SENATE PRESIDENT:  Is there any further
5  discussion?
6      Senator Hill.
7      SENATOR HILL:  Thank you, Mr. Chair.
8      Mr. Chair, I too had some friends come
9  up -- constituents come up -- wanted to testify on
10  this bill.  I see some of them up in the gallery
11  today, and thank you all for coming.
12      I would like to read some of their
13  testimony as well.  They were unable to because of
14  time, but I would like to honor their desires as
15  well as represent them, as we have --
16      Phil writes:  "While I can understand the
17  intent of this bill, it is entirely unenforceable.
18  Unless every firearm in the state was registered
19  into a database, the transfer of ownership cannot
20  be identified unless through licensed firearm's
21  dealers or by volunteered participation or mandate.
22      "Obviously, the criminal or mentally
23  impaired have to -- have no incentive to
24  participate.  The state would get better results if
25  it could get all criminals to register with the CBI
0086
1  and constantly monitor their whereabouts.
2      "Again, this bill is an example of a

LEG HX 000835     4750

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

3 make the public feel good law that cannot be
4 enforced and will be totally ineffective in solving
5 the violent crime problem.  It will successfully
6 alienate the law-abiding citizens."
7        Again, that's from Phil.
8        From Quinten (phonetic), he writes:
9        "Like House Bill 1224, this bill can
10 never be enforced against the people of Colorado
11 unless one of two things happens: the State would
12 either have to start an illegal gun registry
13 database, or they would have to violate our Fourth
14 Amendment rights and inventory every home in
15 Colorado to document what weapons are owned by each
16 person.  The fact that these are only two possible
17 methods of enforcement of this law, it betrays the
18 true intentions of the author."
19        And that's from Quinton.
20        Nick is Navy retired.  A good man.
21        "More bureaucratic paperwork and tax
22 money from the poor people, which won't stop one
23 bad guy from doing what he or she decides he or she
24 wants to do.
25        "As I recall, the State of Colorado
0087
1 hasn't done a very good job on keeping drugs from
2 entering the state over the past few years, so why
3 would anyone, in their right mind, think this bill
4 will keep the bad guys from obtaining and bringing
5 unregistered firearms into our state?"
6        And, finally, Matt writes: "I'm struck by
7 the attitude of many advocates of this bill who
8 accept the notion that it's permissible to
9 restrict -- restrict the rights of law-abiding
10 citizens on the off chance that they may at some
11 future date commit a crime.
12        "In legal terms, this is known as prior
13 restraint, which is generally impermissible.  Our
14 system of governance and law, rule of law, rejects
15 this concept.
16        "In common language, this reminds us of
17 the film Minority Report.  A dystopian vision of
18 the future of people arrested for pre-crime.  This
19 bill will make pre-criminals of tens, hundreds of
20 thousands of Coloradans.  The Colorado Constitution
21 makes it explicit that such prior restraint on the
22 right to keep and bear arms is not permissible."
23        And he quotes here the Constitution.
24        "The right of no person to keep and bear
25 arms in defense of his home, person or property, or
0088
1 in aid of the civil power with thereto legally
2 summoned, shall not -- shall be called into
3 question."
4        What does this bill seek to do but to

5  call into question the right of law-abiding
6  citizens to exercise a fundamental constitutional
7  right?
8       "A key issue" -- and I continue to quote
9  this letter -- "a key issue in this bill is the
10  concept of reasonableness.  The threshold should be
11  set very high to infringe or call into question a
12  fundamental constitutional right.  Is it reasonable
13  to require private citizens, not dealers, to obtain
14  government permission to engage in lawful commerce
15  of legal goods?
16       "Should private citizens -- is it
17  reasonable to require private citizens to invest
18  time and money to find, locate, travel to a
19  licensed firearm dealer?  Is it reasonable to
20  require private citizens to self-register ownership
21  of firearms?  Is it reasonable to require intrusion
22  into all aspects of owning firearms?  Is it
23  reasonable to require private citizens to suggest
24  themselves to vague, undefined regulations, subject
25  to whim of law enforcement?"
0089
1       And he leaves here as a note that the
2  40-percent private sale figure is a myth and has
3  been debunked from the 1994 survey.  The state came
4  from a single survey of 251 people, two decades ago,
5  before the national instant check system passed.
6  And he links here to an article in the Washington
7  Post.
8       Friends, I want to say I appreciate all of
9  you who have brought in testimony and who've been a
10  part of this process.  Thank you for participating,
11  and hopefully we can represent you well here.
12       But to that, I would add a few of my
13  comments and questions as well.
14       I grew up in Blacksburg, Virginia, at
15  Virginia Tech, which was tragically part of the
16  shooting several years ago.  My -- many dear
17  friends, actually, were personally involved in -- in
18  that day, and then in also celebrating the lives
19  that were lost that day as well.
20       And -- and my question comes back to this.
21  The testimony in support of this law -- and
22  Mr. Chair, I will address this question to you --
23  but I would appreciate maybe understanding, would
24  this bill -- Columbine, Aurora, Newtown were given
25  in examples of why this law is important.  And my
0090
1  question is -- would any one of those, Virginia
2  Tech, Columbine, Newtown, Aurora, would any of those
3  have been prevented had this law been in place?
4       SENATE PRESIDENT:  Senator Grantham.
5       SENATOR GRANTHAM:  Thank you, Mr. Chair.
6       We did have many constituents that wanted

LEG HX 000837

4752

7  to be able to voice their concerns with each of
8  these bills, and for whatever reason, they were not
9  afforded that opportunity.  But they had other means
10  of expressing themselves to us, and I'm sure
11  regardless of the divide in the aisle here, we all
12  received many pieces of input into this process.
13       I've just got a couple here I'd like to
14  share in regard specifically to this bill.  First
15  one comes from a fellow by the name of Kevin.  And,
16  no, that's not why I picked this one.
17       But, it says:
18       "Requiring a background check for all
19  firearms transfers is an idea that's been tossed
20  around for some time now.  However, the hastily
21  written bill that is currently being considered was
22  not drafted with enough care.
23       For starters, this bill would criminalize
24  common instances in which a law-abiding friend
25  loans another law- abiding friend a firearm for an
0091
1  unspecified amount of time.
2       By way of example, you few years back, I
3  loaned one of my guns to my girlfriend for four
4  months as she had taken a Colorado POST law
5  enforcement academy.  Such an act would be
6  prohibited under this proposed law.
7       If you aren't involved in shooting
8  sports, you might be surprised how often such
9  activities also occur for hunting trips, shooting
10  competitions, and other lawful activities.
11       I personally borrowed a friend's rifle
12  for a hunting trip that my friend wasn't attending.
13  And a couple of my friends have borrowed rifles
14  that I've owned for similar purposes.
15       There's no need or justifiable benefit to
16  restricting our citizens in such a manner.
17       Furthermore, the current bill will create
18  undo hardship on rural citizens, who wish to
19  actually transfer ownership of their firearms to
20  other citizens.
21       Gun shops are not very accessible in all
22  parts of our great state, and not all gun shops
23  will be willing to perform such a transfer for two
24  private parties.
25       As such, it may prove very difficult for
0092
1  many law-abiding citizens to sell privately owned
2  firearms in private transactions.
3       I do realize that this is a contentious
4  issue, and each of you has probably been
5  overwhelmed with letters both for and against these
6  measures.  If you've made it this far," in the
7  letter he says, "I thank you for taking the time to
8  read my letter.  I do hope that I can count on your

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%202013-1229-030813.txt[11/12/2013 10:57:52 AM]

9   support in this matter.
10      And the second one, colleagues, is really
11  kind of to the point that the previous letter was
12  about and the transference and the -- the creation
13  of illegal transfers through this bill, and what
14  would normally be legal activity.
15      "Like all Americans, Colorado's federally
16  licensed firearms retailers are deeply saddened by
17  tragic events that took place over the last few
18  months in Aurora, Colorado, and Newtown,
19  Connecticut.
20      "Our thoughts and prayers go out to all
21  the victims and families of these horrible
22  tragedies.
23      "We share the goal of all Coloradans in
24  wanting to find real and effective solutions that
25  will make our children and communities safer, while
0093
1   at the same time respecting and safeguarding our
2   constitutional rights.
3       "We believe the gun control measures
4   currently proposed by the Colorado legislature,
5   while well-intentioned, will not achieve our shared
6   goal, and instead will burden law-abiding citizens.
7   The unfortunate reality is that none of the
8   proposed laws will stop a madman determined to
9   pursue evil.  Law enforcement agencies agree,
10  notably including Colorado County Sheriffs.
11      "The so-called universal background
12  check, 1229, is one of the bills of particular
13  concern to Colorado's firearms retailers, most of
14  whom are hard-working, tax-paying, jobs-creating
15  small businesses.  1229 requires federally licensed
16  firearms retailers to perform background checks for
17  the private transfers of firearms unrelated to our
18  businesses.
19      "This legislation will not deter
20  criminals who are determined to obtain firearms.
21  For example, most guns used in crime are stolen.
22      "We are deeply concerned, however, about
23  the significant financial and regulatory burdens
24  and legal consequences this bill will have on our
25  businesses.  It is clear the legislature never
0094
1   bothered to ask us retailers how this proposal
2   would impact our businesses or they were wholly
3   indifferent to our concerns.
4       "Requiring retailers to conduct
5   background checks will have a significant impact on
6   our ability to service our actual customers.  I can
7   think of no other government mandate which requires
8   a business to provide a service on behalf of a
9   non-paying individual.  By definition, these
10  private transferors are not entering our stores

LEG HX 000839    4754

11    interested in buying our products.  They will only
12    be in our stores to take advantage of our
13    designation as a federally licensed dealer.
14            "While the bill allows for a $10 fee to
15    be charged for the background check, this hardly
16    equates to the value of the lost time with actual
17    customers that will taken to conduct private sale
18    background checks.
19            "Based on the experience of licensed
20    firearms retailers in the few states that require
21    retailers to conduct background checks on the
22    private transfer of firearms between individuals,
23    we know requiring universal background checks will
24    impose on federally licensed retailers significant
25    increased regulatory burdens, tremendous additional
0095
1    cost, logistical nightmares, unacceptably lengthy
2    delays and processing (inaudible) checks,
3    unprecedented liability exposure, and other
4    additional unintended consequences.
5            "Further, if universal background checks
6    become law, it would be difficult to measure
7    compliance without mandatory national firearm
8    registration, a policy broadly opposed by
9    law-abiding citizens and retailers.
10            "Increased cost to businesses.  Before
11    any retailer mandate is enacted, please consider
12    the following:  The universal background check is a
13    pure cost to the retailer, and most of us are small
14    mom-and-pop businesses.
15            "As retailers, we would lose a
16    significant amount of money generating the legally
17    required recordkeeping entries, maintaining those
18    records for decades for law enforcement, and
19    performing the background check on a firearm we are
20    not selling, and for which we realize no profit.
21            "Licensed retailers would be forced to
22    use paid staff hours or to hire additional staff
23    and pay for additional infrastructure to
24    accommodate such transactions, including, but not
25    limited to, additional surveillance equipment to
0096
1    secure firearm storage, parking, I.T.
2    infrastructure, and acquisition and distribution of
3    records.
4            "Staff conducting background checks on
5    private party transfers will not be able to serve
6    paying customers, many of whom will leave our
7    stores rather than wait, resulting in lost sales.
8            "The liability risk.  In addition to the
9    cost of providing this government function, the
10    liability a retailer has in such transactions, for
11    example, retaining additional ATF form 4473,
12    subject to inspections and litigation for 20 years.

LEG HX 000840

4755

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:55 AM]

13  Maintaining the (inaudible) records for life of the
14  business, would require a significant increase in
15  compliance efforts.  Any errors would be cited as
16  violations by ATF against the retailers.  A single
17  violation of the Gun Control Act or the ATF
18  regulations is sufficient to revoke our license.
19  Imagine losing your livelihood for a recordkeeping
20  error for a product you didn't even sell?
21      "We would be forced to handle firearms
22  that we are not familiar with because we do not
23  stock them.  It would no longer be the case that
24  every firearm we now acquire, whether new or used,
25  is a firearm that we want to acquire.  Some used
0097
1  firearms in commerce may have been modified by
2  their owners, may have been missing markings,
3  making proper firearm acquisition and disposition
4  records difficult for retailers to achieve a
5  compliant transfer.  The licensed retailer would
6  also be subject to product liability and other
7  lawsuits if the transferred firearm is alleged to
8  be defective.
9      "Insurance coverage in those cases will
10  likely be unavailable to us, since we did not sell
11  the firearm.  Imagine being sued over an accident
12  involving a firearm you didn't sell, and having no
13  insurance coverage.
14      "Federal law requires us as licensed
15  retailers to provide a secure gun storage or safety
16  device, typically a gun lock, when we transfer any
17  handgun.  Who will pay for the cost of that gun
18  lock in these private transfers?
19      "If the firearm being transferred is in a
20  retailer's possession, custody and control while a
21  delayed NIX response is being resolved, up to three
22  business days, the retailer would face additional
23  liability over claims that the firearm was altered
24  or damaged while in the retailer's possession.
25      "There are significant safety concerns
0098
1  presented by a massive influx of private-party
2  firearms entering a carefully controlled retail
3  establishment.  For example, in California, persons
4  have entered large retailers with a firearm, walked
5  through the store, for example, passed the shoe
6  department to get to the sporting goods in order to
7  conduct a private-party background check.
8      "About what the logistical nightmare of
9  this?  In the event a buyer is denied based on the
10  background check results, it is now unclear how the
11  transaction should be handled.  Would we then be
12  required to run a background check on the seller
13  before returning the firearm back to the seller?
14  If the firearm is maintained overnight by the

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

15 licensed retailer, federal law would require for
16 retailer to conduct a background check and have
17 them complete a form 4473 in order to return the
18 firearm to the private-party seller.
19     "What is a licensed retailer to do in the
20 event of a double denial?  Both the private party
21 is denied and the potential seller is denied.  This
22 has happened.  It's happened in California.  How
23 would such a transaction be noted on the ATF 4473?
24     "As a point of contact state, Colorado is
25 already overwhelmed with retail transactions.
0099
1 Colorado CBI is already overwhelmed, and at one
2 point was eight days behind in processing these
3 background checks.  Adding a massive influx in
4 transactions would further tax the system to the
5 point of potential collapse.
6     "Additionally, there remains uncertainty
7 about how to best handle temporary transactions,
8 such as the loan of a firearm for a hunting trip or
9 at the shooting range.
10     "All of these concerns aside, the
11 firearms industry contributes over $590 million in
12 economic activity to Colorado, creating 4,800 jobs,
13 paying $43 million in state taxes in these
14 difficult economic times.  This industry is one of
15 the few industries that continues to create jobs.
16     "We ask you to oppose this so-called
17 universal background check, 1229, because it places
18 costly and unreasonable burdens on Colorado's
19 retailers, infringes upon our Second Amendment
20 rights, while failing to make Colorado safer.  It
21 cannot be effective without mandatory universal
22 firearms registration, a policy universally opposed
23 by firearms owners."
24     Sincerely, Lucas Galeb, Michael Shane,
25 Matt Solomon, John Devoe, Jeffry Ray, John Burred,
0100
1 Patrick Blake, Douglas Craft, Brent Hoffbauer, Lisa
2 Cohen, Randy Terbush, Chris Camp, William Comegys,
3 Keith Martin, Glenn Rocovich, Tyler and Tracy Hoff,
4 Bryce Meretti, Robert Parker, Phillip Collins, Roy
5 Rutz, Brue Baredicas, Jr., Perry McDonald, Matthew
6 Paskowitz, Derrick Dercoli, Steve Gettle, Celvin
7 Boyer, Diane Mestis, Victor Gabriela, and Kitt
8 Robertson.
9     Colleagues, please vote no.
10     SENATE PRESIDENT:  Senator Scheffel.
11     SENATOR SCHEFFEL:  Thank you,
12 Mr. Chairman.
13     Colleagues, I wanted to take a minute to
14 thank Angel, who contacted me and said:  "Yes, I
15 woke up last Monday at 6:00 a.m. to arrive at the
16 capital early and sign up to testify, and after nine

17   hours seated in a closed room listening to the
18   process for two bills, not eat anything all day, I
19   can't testify, of course so angry and frustrated, I
20   drive, come back home for two hours."
21       Unfortunately, his conclusion was that
22   after watching the process, "Honestly, lost my faith
23   in the process."
24       If he had been given the opportunity to
25   testify -- and I won't read all of it, I'll just
0101
1    read the relevant portions as applied to 1229 here.
2        "My name is Angel.  I'm a resident of
3    Colorado Springs.  I'm from Puerto Rico.  Last year
4    I decided to move to a nice, safe, and free state,
5    and after a lot of research and friend's
6    recommendations, I choose Colorado and moved here.
7        "My wife and me are in love with this
8    state, but now I find that Colorado will no longer
9    free and safe in the future and with this
10   anti-constitutionals bands.
11       "Why I said this?  Because my experience
12   living in Puerto Rico has taught me this."
13       I'll just highlight, but he then relates:
14   "While I was in Puerto Rico, which seemed to be
15   fairly onerous and describes a litany of costs and
16   fees and registrations and background checks.  He
17   concludes, that anyone can see that more gun
18   control in a state equals higher crime, and on the
19   other hand, less gun control, like Colorado, until
20   now, equals less crime.  I moved to this beautiful
21   state looking for a better place to live for me and
22   my family, and it will make me really sad that you
23   are choosing the path that Puerto Rico choose and
24   that it has been proven to be a failure."  Angel.
25       Steven writes:  "I write to you today to
0102
1    express my deep concern about the extreme proposals
2    being brought forward in the state legislature
3    regarding gun control.  To me, this is a knee-jerk
4    reaction to the actions of a few mentally unstable
5    persons.
6        "These legislative proposals are absurd.
7    We all know that gun control laws are obeyed only
8    by law-abiding citizens.  Criminals, will, by
9    definition, ignore any new and current gun control
10   laws.  Taking lawful guns off the streets won't
11   make the problem better, in fact, they will make it
12   worse.
13       "I strongly oppose limitations and urge
14   rejection of redundant background checks that are
15   nothing more than a new tax and burden.  Enforce
16   the current laws and rescind redundant burdens on
17   the lawful.  Sincerely, Steven."
18       To Steven and Angel, I want to thank you

19 for not giving up on our process. I'm sorry that
20 you were not able to come here and testify. But it
21 has been the theme here, your arguments resonate
22 with me. They resonate in this building.
23     We know that this particular bill is an
24 overreach. It cannot successfully accomplished and
25 will without what is tantamount to registration. I
0103
1 cannot support that. Your words resonate with me.
2 I thank you for taking the time to contact us here,
3 and I will be a no vote on this bill.
4     THE CHAIRWOMAN: Senator Crowder.
5     SENATOR CROWDER: Thank you, Madame
6 Chair.
7     I'd just like to talk a little bit about
8 the things I've been hearing in here. I'd like to
9 start out by kind of reading a short blurb of a
10 letter I got from the American Legion.
11     "From the 35,000 members of the American
12 Legion family in Colorado, I'm asking you to vote
13 no on the subject bills of Friday, March 8, 2013.
14 By doing so, you'll be sending the message to all
15 citizens of our great state that you believe in the
16 Second Amendment and the right of your constituents
17 to bear arms freely and without prejudice."
18     And that's all I'll read of that.
19     The slippery slope in which we talk
20 about, we -- if we could just go back a little bit
21 and look at it, I come from an era where, if you
22 wanted a weapon, you get a catalog or however you
23 want to do it, and you order that weapon, and it
24 comes in the mail.
25     The slippery slope in which we've already
0104
1 come down to this point, we have gun laws in place,
2 but now we see the mass murders going on. The laws
3 in which we have placed is part of that slippery
4 slope to registration.
5     I'm not sure that I would agree with any
6 additional laws would -- would refrain that from
7 happening again. I'm of the opinion that -- I'm
8 basically of the opinion that if -- the one thing
9 that's not been talked about today is our freedom.
10 If indeed we are a free nation, we should be
11 looking in the opposite direction. Instead of
12 restricting our rights, we should be expanding our
13 rights.
14     There was a enormous amount of -- of gun
15 sales in this country, but I think the -- the laws
16 in which we have placed today is not necessarily
17 what has kept the -- the homicide rates down, I
18 think it's the gun ownership rights that have kept
19 that down.
20     So I -- again, if we're -- if we're going

21  to talk about being a free nation without
22  additional regulation, that's almost a -- an issue
23  that cannot be compromised.  So I'm opposed to this
24  bill.  You know, I -- I do not believe additional
25  regulation for the best of intent is -- in the
0105
 1  direction to go.
 2      I -- until this -- until today, I had an
 3  argument with veterans over the last 40 years that
 4  I was adamant that I was right.  And that argument
 5  has been -- I'm a Vietnam veteran -- that argument
 6  has been in the past I do not believe there's ever
 7  been an American veteran who has died in vain for
 8  this country.
 9      I'm a very, very firm believer that every
10  American death in service had a purpose, and that
11  purpose was to promote the freedom of this nation,
12  not restrict it.  I do believe adamantly that
13  freedoms can be attained, but it has to be worked
14  for and fought for.  That's what, you know, the
15  letter I just read was from 35,000 American
16  Legions.
17      We have roughly two million veterans in
18  this state, and I think that, that in itself -- the
19  veterans understand exactly what it means to the --
20  the Second Amendment and the right to bear arms,
21  and those rights shall not be infringed upon.
22      So I -- and I normally -- what I normally
23  do is just represent my district.
24      And in my district right now, the Pueblo
25  Chieftain had an article the other day, their poll,
0106
 1  and it wasn't scientific by no means, but they --
 2  they indicated 60 percent of the people in Pueblo,
 3  which is out of my district, but it's within my
 4  boundaries, but 60 percent of the people were
 5  opposed to this gun bill.
 6      I do believe in my district, which
 7  surrounds Pueblo, which is predominantly rural,
 8  St. Luis Valley and ten counties east, would be
 9  considerably higher than 60 percent.  I would not
10  make a judgment, but I do believe it would be close
11  to 80 percent.  Of the 5,000 e-mails I've -- I've
12  received, it's well over 80 percent.
13      So I would -- you know, I would really
14  look at the slippery slope that we're going down as
15  one to registration.
16      There is -- there is one thing that I
17  would never do.  I'm a fifth-generation Coloradan,
18  and I will never leave this state.  I will continue
19  to stay here and fight for what I believe is right
20  for the State of Colorado and its people.
21      But I would really urge a no vote on --
22  on, you know, these existing gun bills.  And I would

23     ask for your support on that.
24         And thank you very much.
25         THE CHAIRWOMAN:  Thank you.
0107
1      Senator Cadman.
2          SENATOR CADMAN:  Thank you, Madame
3  Chairman.
4          I want to share a letter that was sent to
5  one of my colleagues.  Trying to maintain decorum, I
6  won't mention his name, but he is from Grand
7  Junction, and his hair is perfect.  I'm 0-2 there.
8          "Dear Senator.  I met you yesterday after
9  the so-called public hearings on the anti-gun
10  bills.
11         "As I mentioned, I am an executive
12  producer for Outdoor Channel.  I currently have
13  four series in production, including Gun Stories,
14  the top show on the Outdoor Channel, with several
15  additional series in development.  My series focus
16  on guns, hunting, shooting, and the outdoors."
17         It sounds like a pretty good fit for
18  Colorado, doesn't it?
19         "This morning, I met with my three
20  producers, and we made the decision that if these
21  anti-gun bills become law, we will be moving all of
22  our production out of Colorado.  We've already
23  canceled a scheduled filming session for late this
24  month.
25         "Obviously, part of this is due to our
0108
1  own commitment to the right to keep and bear arms
2  it also reflects" -- listen to this -- "this also
3  reflects three lawyers' opinions that these laws
4  are so poorly drafted and so designed to trap
5  otherwise legal citizens into a crime, one of our
6  attorneys referred to them as flypaper laws, that
7  it is simply too dangerous for us to film here."
8          That's a pretty strong message.  Three
9  lawyers' opinions.
10         "I can give you chapter and verse on the
11  legal implications if you need, but suffice it to
12  say that the first legal opinion was so scary we
13  went out and got two others, all three attorneys
14  agreed."
15         The first legal opinion was so scary that
16  we went out and got two others.
17         I think this really confirms the
18  assertion that I have made in this building, and
19  probably at this microphone.  Have you ever been in
20  a situation where you had one attorney and two more
21  attorneys made it better?  No.
22         I'd say forgive me to the all the
23  attorneys here, but you know it's true.
24         "We are relatively small potatoes in

LEG HX 000846     4761

25  television, but our relocation of production will
0109
1   cost Colorado just under one million dollars in
2   2013.
3       "Secondly, we have proudly promoted
4   Colorado in our productions, and have been moving
5   more and more production into the State.  Now we
6   will do exactly the opposite.
7       "What does this mean for Colorado?  The
8   community of television producers is a small one.
9   Last week, I had lunch with a major network
10  producer who is looking to locate his new reality
11  series here in Colorado.  That producer is also a
12  shooter, and the new reality series will now be
13  based out of Phoenix.  That lunch cost Colorado
14  over a million dollars in economic impact."
15      That's an expensive lunch.  That's an
16  expensive lunch even before Amendment 41 kicked in.
17  A million dollars, another production company gone.
18      "Thirdly, according to numbers I received
19  from the National Shooting Sports Foundation" --
20  for whom he used to work -- "hunting had an almost
21  $800 million impact on Colorado in 2012."
22      You heard mentioned up here earlier that
23  firearms specifically were 400 million, so if you
24  add to that all of the other peripheral components
25  into hunting, it doubles that.  Citing nearly 8,330
0110
1   jobs.
2       "Next month, I will be in Texas meeting
3   with most of the top outdoor hunting producers.
4   And the number one agenda item will be Colorado.
5       "Already hunting organizations and
6   statewide hunting clubs around the country are
7   pulling out of Colorado, and we expect this trend
8   to accelerate rapidly.
9       "The message we will take to our viewers
10  and listeners is that these proposed laws are so
11  dangerous -- these laws are dangerous to hunters
12  and any other person, be she a fisherman or a skier
13  who brings a handgun into the state for
14  self-defense, that we cannot recommend hunting,
15  fishing, or visiting Colorado.
16      "We reach millions of people, and quite
17  frankly, we have a credibility that the Colorado
18  government officials can no longer match.
19      "Colorado Division of Wildlife is already
20  running ads trying to bring more out-of-state
21  hunters to Colorado in light of the flood of
22  negative publicity about these proposed laws.  I
23  can assure you, those ads will fail."
24      Sounds like we have two situations
25  coming:  One, we can probably expect to see our
0111

1  former Senator -- former colleague Senator White
2  over here asking for more money to promote Colorado
3  to counter these; or frankly, since we probably
4  can't, once this tidal wave gets rolling, we ought
5  to ask them for the $15 to $20 million back.  How
6  do you think that will go over?
7       He goes on. "We estimate that as many as
8  one-quarter to one-third of out-of-state hunters
9  will desert Colorado in the next 18 to 24 months,
10  which will, quite frankly, be a disaster for the
11  hunting industry here and have a devastating affect
12  on our western and northern communities, certainly
13  like Grand Junction.
14       "This is not a boycott in the traditional
15  sense of a centralized, organized operation,
16  rather, it is a more grassroots decision on where
17  shooters, hunters, and other sportsmen are willing
18  to spend their money.
19       Look at the collapse of the Eastern
20  Sports and Outdoor Show in February.  That
21  venerable, multimillion dollar trade show chose to
22  ban modern sporting rifles and standard capacity
23  magazines.  And within three weeks, it collapsed,
24  as all vendors and sponsors pulled out.
25       "Colorado is going to pay a huge price
0112
1  for laws that will do nothing to increase public
2  safety.
3       Thank you for your support.  As one of
4  the top gun guys in the America, I personally reach
5  more than a million people a week.  If there's
6  anything I can do to help in this fight, I would be
7  glad to help you in any way."
8       You know, a few years ago, we had an
9  opportunity at the end of the session each year to
10  go to a conference up in Craig, and I know my
11  colleagues, I think some of them may have stepped
12  out of the room, but one of my colleagues I served
13  in the House with Adams County would attend, my
14  other colleague from Jefferson County would attend.
15       And what really struck me about my time
16  up there was all these big beautiful hotels in
17  Craig.  Anybody been to Craig?  It's a ways from
18  everything.  And what I found out sustained these
19  hotels and why they were continuing to add to them
20  and build more, was mostly for the hunting
21  industry.
22       And I found out that major celebrities
23  buy up entire wings of some of these -- or rent up
24  the entire wings of some of these hotels during
25  hunting season for two, three, four, six, eight
0113
1  weeks at a time.  It is a -- it is the lifeblood,
2  the lifeblood of these communities, hunting season.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

3       Obviously, this will have a significant
4  impact -- affect on a whole lot of rural communities
5  in Colorado.
6       I'm sure Senator White is listening right
7  now wondering what our next move will be.  I don't
8  see myself supporting more money for him to try to
9  make up for this loss.  Frankly, how could we
10  even -- how could we even put a figure to this?
11  Somebody has a million -- a reach of a million
12  people a week and he says don't come here.
13       Remember the old adage, good news stays
14  quiet, bad news travels fast?  This bad news is
15  traveling very fast.
16       I would ask for a no vote.
17       THE CHAIRWOMAN:  Thank you.
18       And now the Senator from Grand Junction
19  with the perfect hair, Senator King.  Your minority
20  leader said it, I didn't.  Then Senator Renfroe.
21       Oh, Senator Harvey.  Okay.
22       SENATOR HARVEY:  The Senator from Douglas
23  County with no hair.
24       THE CHAIRWOMAN:  Yes.
25       SENATOR HARVEY:  Thank you, Madame Chair.
0114
1       I'd like to take a minute to talk about
2  another business here in Colorado, who is concerned
3  about the impacts of this legislation, not on them,
4  but on the freedoms of all Coloradoans.  This is a
5  company that is a significant employer here in
6  Colorado that is going to be expanding -- was
7  planning on expanding substantially here in 2013.
8       I'm -- I assume that you all got this
9  letter, and I wanted to read it to you as well.
10  It's -- it says:  "Dear Fellow Coloradan" --
11       THE CHAIRWOMAN:  And -- and Senator
12  Harvey, this is pertaining to 1229?
13       SENATOR HARVEY:  Yes.
14       THE CHAIRWOMAN:  Okay.  Thank you.
15       SENATOR HARVEY:  That's why I'm up here.
16  And all other bills, as well.  I might come up for
17  every bill and read this.
18       "Our state legislature is embroiled in a
19  gun control debate that is precipitating a malaise
20  in our citizens and tolls ominous consequences for
21  local businesses like ours.
22       "My name is Mark Butler, and I'm the CEO
23  and co-founder of J.R. Butler, Inc.  We are an
24  engineering and manufacturing firm, specializing in
25  commercial glass industry.  We are located in the
0115
1  heart of Denver, at 6th and I-25, and employing 104
2  local men and women.  We serve on numerous local
3  boards of directors.  Our employees donate hundreds
4  of thousands of dollars to charities -- I'm

5  sorry -- our employees donate hundreds of
6  charitable hours annually and donate hundreds of
7  thousands of dollars.  We are the City and County
8  of Denver.  We are Colorado.
9       "Our company is considering a two-fold
10  expansion in our operations, which demands a
11  facility and a number of employees twice the size
12  of our current one.  Naturally, our original plans
13  included building locally and deepening our
14  Colorado roots.  Due to the recent action in our
15  state, however, we are looking instead to move our
16  operations out of Colorado, potentially to Texas.
17  We are currently in the process of reaching out to
18  their EDC's, while you're in the process of
19  considering these egregious gun bills.
20       "J.R. Butler is a vehement defender of
21  the U.S. Constitution and the Second Amendment.  We
22  will not abide the loss of our liberties.  We will
23  not allow our rights to be tread upon.  If these
24  egregious bills are signed into law, we will move
25  all of our jobs, charitable activities, and tax
0116
1  base away from the State of Colorado.
2       "We know that you will directly consider
3  these statements, as we have.  I believe I am one
4  of the many CEO's that will see the legislative
5  actions that you are taking in the same light.
6  Colorado cannot endure the loss of so many leaders.
7  God's speed, Mark Butler, CEO."
8       Just one more example of how these bills
9  are going to have a detrimental impact, not only on
10  our economy, but also on the perception of who we
11  are as Coloradoans, and what our state has become.
12       I remember a couple of decades ago when
13  Amendment 2 was passed on the ballot, and we had
14  film industry experts leaving the state; we had
15  companies leaving the state; we have people saying
16  we weren't going to come back to Colorado because
17  Colorado was quote, a hate state.
18       What do we hate today?  Freedom, liberty,
19  the right of self-protection?
20       I ask for a no vote.
21       THE CHAIRWOMAN:  Thank you.  Senator
22  Renfroe.
23       SENATOR RENFROE:  Thank you, Madame Chair.
24       Members, you've heard some amazing letters
25  from companies that call Colorado home.  Now, you
0117
1  might think that, well, this is a gun bill, what are
2  we doing about -- talking about companies?  Well,
3  every bill that we face down here has a lot of sides
4  to it, obviously.  One of them is a economic impact;
5  one of them is a safety impact; hopefully, one of
6  them is a constitutional impact.

7     I think this bill is one of those that we
8  could look at all three levels as reasons why to
9  vote no on this bill.
10       You heard stares just now. List to that.
11  The Outdoor Channel.  You don't think they don't
12  reach every hunter and fisherman in the country, in
13  the world?
14       In fact, I did get an e-mail from a man
15  that lives in Switzerland, that calls Colorado his
16  summer home.  And I think he sent that to quite a
17  few of you, too.  And within that, I think he said
18  that he was almost ashamed of us and was probably
19  looking for a different place to call his
20  Colorado -- his summer home rather than Colorado,
21  because of the freedoms that we were taking away
22  with these bills, and this bill in particular.
23       That is amazing with the Outdoor Channel.
24  What Senator Cadman read, I don't think -- I think
25  is -- deserves to be repeated in a few highlights.
0118
1       Number one, the executive producer met
2  with his other three producers, and they have a
3  decision -- made the decision to move out of state
4  if these anti-gun bills become law, moving all of
5  their production out of Colorado.  What do you think
6  that will do to hunting and fishing?
7       But they just didn't say that because
8  they're pro-Second Amendment.  They actually hired
9  some attorneys to look at the legislation, to see if
10  it stands up to one of the other pillars, our
11  Constitution, see how it stands there.  And their
12  lawyers' opinions said they are so poorly drafted
13  and designed to trap otherwise legal citizens into a
14  crime.
15       I don't think anybody could have said
16  anything better about this bill.  That's truly what
17  I believe this bill does.  There are so many
18  examples, many that have been shared, many that
19  unfortunately we're going to find out through the
20  newspaper of stories of people being trapped by them
21  in the future, if this passes.
22       It is too -- simply too dangerous for us
23  to film here.  Wow.  Wow.  Too dangerous to film
24  here.  They have proudly promoted Colorado and have
25  been moving more and more production into our state.
0119
1  Now we will do exactly the opposite.  The message we
2  will take to your viewers and listeners is that
3  these proposed laws are so dangerous to hunters and
4  any other person, be she a fisherman or a skier who
5  brings a handgun into the state for self-defense,
6  that we cannot recommend hunting, fishing, or
7  visiting Colorado.
8       When you look at the Governor's office and

9     his economic development department, they've given
10    documents to our JBC staff.  And here's a little
11    backgrounder of -- of their goals and what they
12    stand for.
13         "The Colorado Office of Economic
14    Development" --
15         THE CHAIRWOMAN:  Senator Renfroe --
16         SENATOR RENFROE:  -- "and International
17    Trade" --
18         THE CHAIRWOMAN:  -- would be willing to
19    stick to the bill, please?
20         SENATOR RENFROE:  This is exactly to the
21    bill, Madame Chairman, because this is talking about
22    the economics of what this policy -- this bill -- is
23    going to do to the State of Colorado.
24         THE CHAIRWOMAN:  Thank you.  Let's stick
25    to that.
0120
1          SENATOR RENFROE:  And so I'm talking about
2     one of the other branches of government, the
3     Governor's Office of Economic Development and
4     International Trade, and what they have said about
5     what their goals are, are for our state, when it
6     comes to economic development.
7          I think the last letter from the outdoor
8     channel shows what the problems will be, that there
9     will be great economic impact to our state.  And so
10    I just want to share with the -- with the body and
11    with you what their goals actually are and what
12    they're tasked with, if I may.
13         May I do that, Madame Chair?
14         THE CHAIRWOMAN:  Yes.
15         SENATOR RENFROE:  Thank you, Madame Chair.
16         The governor's office -- The Colorado
17    Office of Economic Development and International
18    Trade is tasked with assisting and creating a
19    positive business climate, encouraging economic
20    development, and building sustainable job growth
21    across the state.  They're focused on retention and
22    growth in 14 key industries.  They will not meet
23    their goals.  They cannot with this bill.  This bill
24    is absolutely against what we're funding another
25    part of government to promote.
0121
1          The third part I talked about within the
2     bill that we need to look at is -- is the safety
3     aspect.
4          The Senator from Fort Collins talked about
5     some data early on that the -- the sponsor of the
6     bill referenced, and frankly that the President of
7     the United States has referenced in regards to this
8     matter.  And I would have questions for the sponsor
9     and for the Chair, Madame Chairman.
10         Where did the 40 percent number come from,

11    when we're talking about the so-called loophole?
12    Could you please tell me where that number came
13    from?  I think I know where it came from.  So if I'm
14    wrong, I would love to be corrected with the -- the
15    proper data on this and the proper facts.  Because
16    I'd hate for us to mess up the statistics and the
17    facts on a bill that we're hearing on guns.
18         That 40 percent number, which actually I
19    think in the study that it was supposedly using out
20    of is actually 36 percent, but we can round up and
21    say that.  But, it's a study that was conducted with
22    only 251 people during the Clinton Administration,
23    which was from, I think, a '91 to '96 period of
24    time.
25         But the thing you have to remember,
0122
1    colleagues, is that we did not require background
2    checks until I think it was '94.  So the question
3    that was put during this so-called loophole study
4    was before we even required a background check at
5    all.  So how can we say 40 percent of people are in
6    this loophole that we're trying to fix with this
7    bill?
8         So I would love, Madame Chair, for an
9    answer to these questions and some -- some
10    statistics to show the need and where that
11    40 percent comes from.
12         And you could even go a little further
13    into digging into what the questions of that 1994
14    survey was, and actually what the survey simply
15    asked was if they thought they were buying from a
16    licensed dealer, so it didn't even actually ask the
17    right questions within that.
18         So is there really proper data that we've
19    been told about on this bill?  I would love that
20    answer, Madame Chair.
21         Another question I would have, when you
22    look at background checks and you question
23    40 percent out there that we've allegedly been told
24    is what the loophole is we're trying to protect,
25    okay, well then, the other side of that is, how
0123
1    about the people that we've been told failed a
2    background check and the number that they are, what
3    percentage of those really actually failed the test?
4         8 percent of background checks are
5    initially denied, but actually 94 percent of that
6    eight percent is found to be a false positive, in
7    that they just had a name was similar or the same as
8    somebody else that was on the list, and they had to
9    go through a few steps to get there.
10         So in reality, what this bill, in my
11    opinion, really does from a safety issue, and there
12    are researchers that actually have came to this same

4768

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

13 conclusion, is that this bill, by expanding
14 background checks, might actually contribute to an
15 increase in violent crime because of the time it
16 would take people to wait for this to happen, the
17 people that actually do need the right to protect
18 themselves, and they will be waiting for that right.
19        This is a very, very bad bill, a bad
20 package of bills.  And I would ask for a no vote.
21        THE CHAIRWOMAN:  Members, we have been
22 joined by Secretary of State Gessler, and we should
23 acknowledge his presence in the room.
24        Senator Baumgardner.
25        SENATOR BAUMGARDENER:  Thank you, Madame
0124
 1 Chair.
 2        We just heard from one of our colleagues
 3 that talked about key industries here in the State
 4 of Colorado and reports that we had from other
 5 branches of our legislative body that talked about
 6 the amount and percentage of money that comes into
 7 our state from people coming into the state, jobs
 8 that are here in the state.
 9        And one of the most important pieces of
10 this, I believe, is the tourism industry that brings
11 as tremendous amount of money into the state.
12        This is just one of the components in the
13 Governor's Blueprint to make our state one of the
14 best in the nation, along with outdoor recreation
15 and natural resources and energy.
16        Madame Chair, if I may, I -- I have some
17 letters from constituents and from members of -- or
18 the citizens of the State of Colorado, just a
19 couple.  If I may, if I could read those?
20        THE CHAIRWOMAN:  Are they pertaining to
21 House Bill 1229?
22        SENATOR BAUMGARDENER:  Yes, Madame Chair,
23 they are.
24        THE CHAIRWOMAN:  Yes, sir.
25        SENATOR BAUMGARDENER:  Thank you.
0125
 1        Understand these were not my words.  These
 2 are words of a citizen in the State of Colorado.
 3 These are boycott letters.
 4        It says:
 5        "I am a registered Democrat and a
 6 lifelong Colorado citizen.  I need to let you know
 7 that I'm strongly against the current gun laws
 8 being proposed.  A vote for these laws will do
 9 nothing to prevent any of the current tragedies
10 that have happened.  In fact, some will actually
11 weaken the law-abiding Colorado citizens from being
12 able to protect themselves, their loved ones, and
13 others if when they -- when some sick individual
14 tried to copycat what has already happened.  They

15 are not common-sense approaches to deal with
16 criminal forces, as the criminals already do not
17 follow the laws we have.
18    More effort is needed to place -- to
19 enforce our current gun laws.  It is already
20 illegal to knowingly sell or give a gun to a felon
21 or an individual that you know who will commit a
22 crime.  Most of these individuals have long
23 histories or a background of criminal behavior, and
24 many are repeat offenders, and they're being let
25 back out on to the streets."
0126
1    And he cites an example:
2    "A couple of years ago, I was broken into
3 by two individuals that among things stolen were
4 three guns.  They were arrested later that day and
5 had in their possession some of my property, but of
6 course none of the guns.  When arrested, they had
7 several bags of pot, a large amount of cash, and
8 some -- and both were high on drugs.  Most likely,
9 they had swapped or sold my guns in some dope deal.
10    "During the interrogation or the
11 questioning by the police, they both admitted and
12 pointed a finger at each other on the break-in and
13 on other break-ins they had committed that same
14 night.
15    "The owner of the car was the only one
16 since the property was in the possession of the
17 car, the other one he was the only one that was
18 charged because he had possession of the property.
19 The other one was released, even though he had a
20 prior warrant.
21    "The owner was convicted of a felon.  He
22 was out on parole from another county in Colorado
23 with a same, similar of offense.
24    "Again, criminals do not go in and have a
25 background check done.  They don't go in to gun
0127
1 dealers and buy a firearm that can be registered.
2 They don't go to a gun show where you have to
3 register a firearm.  They break in, they steal, or
4 they get it from another criminal.
5    "During the plea deal, I asked, what had
6 been done to find out what they had done with my
7 guns.  They informed me that there was no -- there
8 had been no warrants, and it had not been an issue
9 on any of their other locations.  I also asked were
10 they pressing him to divulge what they did with the
11 guns, and what was going to be -- if that was going
12 to be part of the plea agreement to where he could
13 be let off if he plead, and they said no."
14    He also adds:  "Now, in we're going to be
15 serious about keeping guns out of the hands of
16 these type of people and off the streets," he

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

17    asked, "What kind of law enforcement is that? What
18  kind of laws do we need?  What type of laws do we
19  have on the books?  Do we not need to enforce the
20  laws we have on the books without adding more
21  laws?"
22        And he would like your opinions.  He
23  says:
24        "I'm a very proud Coloradan, and I resent
25  outside forces like the Bloombergs trying to push
0128
1  their money into Colorado to try to add legislation
2  that will not solve anything.  It will weaken the
3  law-abiding citizen's gun rights and turn us into
4  New York or California.  Keep Colorado proud and
5  maintain our western heritage.
6        "If gun restrictions and laws like this
7  work, then why do Chicago, Washington, D.C., and
8  New York have some of the highest crime rights and
9  have some of the most restrictive laws on the
10  books?"
11        He asks for you to vote against House
12  Bill 1229.
13        Madame Chair --
14        THE CHAIRWOMAN:  Yes, Senator.
15        SENATOR BAUMGARDENER:  -- may I proceed
16  with this last letter?
17        THE CHAIRWOMAN:  As long as it pertains
18  to 1229, yes.
19        SENATOR BAUMGARDENER:  Thank you, Madame
20  Chair.
21        This gentleman spends a lot of time in
22  Colorado.  He doesn't live here.  He's from Kansas.
23        "Dear Colorado Senators, it is our
24  understanding that a representative from Denver,
25  who put forth these bills, which would disarm
0129
1  responsible citizens in Colorado has a past --
2        THE CHAIRWOMAN:  Senator --
3        SENATOR BAUMGARDENER:  -- "while we
4  respect" --
5        THE CHAIRWOMAN: -- is this about 1229?
6        SENATOR BAUMGARDENER:  Yes, Madame Chair,
7  it is.  I did not mention any names.  It's not --
8  these are not my words.  This is someone that --
9  thank you -- it is about the bill, thank you.
10        Thank you, Madame Chair, may I continue?
11        THE CHAIRWOMAN:  Yes.
12        SENATOR BAUMGARDENER:  Thank you, Madame
13  Chair.
14        "I urge you to vote against all gun
15  control bills,"  House Bill 1229 and other bills
16  that I can't mention in the bills that we've
17  already heard.
18        "These bills will do nothing to improve

LEG HX 000856    4771

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-030813.txt[11/12/2013 10:57:52 AM]

19  safety or reduce crime, and will only serve to
20  further abridge the fundamental rights of
21  responsible Colorado citizens.
22      "Although I am not a resident of
23  Colorado, I and my family travel and spend leisure
24  money in your state that will seize, should any new
25  gun-legislation related bills pass.
0130
1      "I am also actively contacting everyone I
2  know who travels to and spends recreational dollars
3  in Colorado to consider boycotting your state,
4  should any of these erroneous bills be passed."
5      Madame Chair, there's more to this, but I
6  think I will reserve the right to come back later
7  and read it, since it pertains to another piece of
8  legislation.
9      THE CHAIRWOMAN:  Well, thank you, sir.
10      SENATOR BAUMGARDENER:  I would just ask
11  that we consider House Bill 1229 as a piece of
12  legislation that's going to affect economic
13  development in Colorado to the effect that tourism
14  dollars will be lost because people will not come to
15  the state, and this is part of our bottom-up or the
16  Blueprint piece of our economic development.  These
17  bills are going to affect that.  So let's be very
18  careful.
19      And I would ask for a no vote on 1229.
20      THE CHAIRWOMAN:  Thank you.
21      Senator Lundberg.
22      SENATOR LUNDBERG:  Thank you, Madame
23  Chair.
24      Jobs, jobs, jobs.  House Bill 1229 is not
25  about jobs, it's about getting rid of jobs.  No,
0131
1  that isn't the specific language that you'll read in
2  the bill, but as you've heard the recent discussion,
3  that is in fact the affect you'll see from the bill,
4  along with all of these other bills.
5      Let me talk to the people in the gallery
6  as well as the Senate, because it's your jobs, it's
7  your economic future, it's your life we're talking
8  about.
9      This bill is a part of a package of bills
10  that are clearly seen by the -- not just the people
11  of Colorado -- but the people of this nation as a--
12  as an anti-Second Amendment package.  It -- from my
13  understanding, is predicated upon the assumption
14  that the fewer guns we have anywhere, the better off
15  we all are.
16      Never mind the fact that the Constitution
17  is very, very clear on that one specific point, both
18  the U.S. Constitution and the State Constitution.
19  Never mind the fact that the people of Colorado have
20  spoken very clearly.

LEG HX 000857

4772

21    It would be interesting to hear one
22  Senator come down to this microphone and say the
23  overwhelming number of constituents who have
24  contacted me through e-mail and phone calls and
25  personal conversations are urging me to pass this
0132
1  legislation.  Is there one of you out here who can
2  attest to that?
3        For my part, I've received thousands of
4  e-mails, thousands.  And they are overwhelming.  You
5  know, let's say like 90-something percent,
6  95 percent, 99 percent opposed to this legislation.
7        And those from outside of the state very
8  often will add that little note, you know I used to
9  go elk hunting in your state, never again if you
10  cross the line.  I don't blame them.  If another
11  state were to take this action, I would take that as
12  a you're not welcome sign and take my business
13  elsewhere.
14        Now, I'll leave the podium here with this
15  one final point to the people of Colorado, and that
16  is:  Don't give up on this.  Don't give up on us.
17  Don't give up on our state.  I, for one, commit to
18  you that any anti-Second Amendment legislation
19  that's passed by this legislature, I will do
20  everything within my power to repeal.
21        And there are many of us, not only on the
22  floor here, but maybe up in the gallery or maybe
23  watching elsewhere, who can come down and join our
24  ranks and make that difference and put Colorado back
25  on the track we need to be, because bills like House
0133
1  Bill 1229 do not deserve to be in the statutes of
2  the State of Colorado, not this land of liberty, not
3  this land of freedom, not this land of opportunity.
4        And even as our founding fathers
5  understood that one of the key elements to the
6  opportunity is that ability to defend yourself, and
7  your family, and your property, and your community,
8  and to have that freedom as an individual.
9        It's so clearly stated in our
10  constitutions, in our -- the -- the warp and the
11  weave of the fabric of our laws from the very
12  founding.  All of this contributes to that general
13  direction of -- of personal responsibility rather
14  than the government saying no, we'll take care of it
15  and we'll take care of you too.
16        No, that's not what this nation was
17  founded on.  That's not what this state of Colorado
18  is all about.  That is definitely what the people of
19  Colorado are calling for.  I urge each and every
20  Senator to look their constituents in the eye and
21  follow their lead.
22        Vote no on 1229.

23     THE CHAIRWOMAN: Senator King.
24     SENATOR KING:  Thank you, Madame Chair.
25     Well said, Senator.
0134
1      I'm asked why today is a day of
2  dysfunction at the capital.  So let's take a look a
3  this.
4      All studies show that the vast majority of
5  guns used in crime are obtained either through theft
6  or straw purchases, neither of which will be
7  affected by this bill.  Criminals, and their use of
8  firearms will not be deterred by this bill.
9      And crazy people, I'm sorry, but I'm
10  convinced that the only thing that stops a crazy
11  person with a weapon from violence is a sane person
12  with a better sight picture.
13      All we are doing with this proposal, with
14  1229, is imposing costs and burdens on law-abiding
15  citizens and not making them safer.
16      Vote no on 1229.
17     THE CHAIRWOMAN:  Any further discussion on
18  Senate -- on House Bill 1229?
19     Senator Tochtrop.
20     SENATOR TOCHTROP:  Thank you, Madame
21  Chair.
22      And I wasn't going to get up and talk on
23  any of these bills, but when Senator Cadman brought
24  up Craig, Colorado, and I will tell you I used to
25  live up there, and our son still lives up there, and
0135
1  he is right, they have gorgeous hotels, and hunting
2  is -- other than energy, hunting is one of the main
3  economies in the northwest part of the state.
4      They've got prized -- prized game that
5  everybody goes after, and in particular your
6  out-of-state hunters who come up.  And every year
7  you've got the group that go to the same motels and
8  rent the rooms.  In fact, when they had the oil boom
9  a couple years ago, it was interesting because the
10  motels made sure that those rooms, even though they
11  had a lot of the oil people staying at the motels,
12  they had to make sure that they were vacant for
13  their yearly hunters that came up every year.  I
14  would venture to say that about 20 percent of sales
15  tax that the City of Craig receives is from hunting
16  season.
17      And it was really kind of ironic, it is a
18  rural area, but when we lived up there, our kids
19  were in high school.  And my one son, who is living
20  up there now, had a pickup truck.  And he would get
21  up in the morning, and he would go deer hunting when
22  it was both seasons, and then go off to school with
23  his rifle on the gun rack, along with many, many of
24  the other students in his school, get off of school

25  and then go hunting again because the deer -- you

0136
1  like to hunt them dawn and dusk, those of you that
2  are hunters.
3        So, you know, I guess, again, I wasn't
4  going to say this, but if -- if this bill affects
5  some of the parts of the state that really rely on
6  hunting, I am concerned about it because even though
7  I don't represent that area, I think we need to look
8  very carefully of how we impact the entire state of
9  Colorado.
10       And, anyway, I just wanted to make a
11  comment about the hunting -- how hunting is
12  important in many parts of the State of Colorado.
13       THE CHAIRWOMAN:  Senator Carroll.
14       MAJORITY LEADER CARROLL:  Thank you,
15  Madame Chair.
16       I agree, hunting is important.  So
17  everyone who owns a gun can obviously continue to
18  hunt just as they do in Colorado.
19       And, in fact, I'll just remind you there's
20  an exception written in there that even if it's --
21  if it's not your gun, if it's borrowed, again, as
22  long as you're not a convicted felon, you can use
23  your own gun, you can borrow a gun, but hunting is
24  one of the explicit exemptions in the bill.
25       Thank you.
0137
1        THE CHAIRWOMAN:  Senator Brophy.
2        SENATOR BROPHY:  Well, thank you Madame
3  Chair.
4        And as I said in my first time that I came
5  up here -- and I thank the previous senator speaking
6  about the importance of -- of hunting up in the
7  Craig area -- this does impact hunting, because as I
8  mentioned earlier, most hunting trips are for longer
9  than 72 hours.  So this bill still has a cast of
10  negative impact upon hunting.
11       And -- and we're -- we're all getting
12  e-mails from all over the country.  People that come
13  to the state to -- to -- for tourist activities
14  swearing they're going to Wyoming and Montana if we
15  pass this package of bills.  They're paying
16  attention to all of them, and specifically to -- to
17  this bill, the constitutionally of the ability of a
18  police officer to call into question your right to
19  possess a firearm because you may or may not be able
20  to prove that you legally obtained a background
21  check on it.
22       Which brings me to a communication that I
23  had from a friend of mine up in Longmont asking very
24  clearly, Why are checks tied to guns?  Shouldn't
25  they be tied to people?  Why aren't the bad guys
0138

 1  being watched instead of the good guys being
 2  watched?  Why can't the police officers check to see
 3  if the person that they have pulled over is a felon
 4  and not allowed to own a gun.  That's the solution
 5  that the people of Colorado like.
 6          And they're paying attention outside of
 7  the state and inside of this state.  You have seen
 8  all of the e-mails that you received.  I just
 9  distributed to each and every one of you a poll
10  result memo.  It looks like this, Public Opinion
11  Strategies.
12          And they polled specifically about all the
13  bills as a package, and this one, and especially the
14  one that we're going to take up in a couple of
15  bills.  This is important.  Two-thirds of likely
16  voters say that they are very or fairly closely
17  watching the progress of these bills as they move
18  through the legislature.  Two-thirds of the people
19  of Colorado either oppose them outright or think
20  that they go too far.  Like this bill does.  It goes
21  too far.
22          It was supposed to be about background
23  checks, but it doesn't even allow you to loan a
24  firearm to a friend for more than three days.  It
25  calls into question whether or not anybody wants to
0139
 1  bring a firearm to the State of Colorado.
 2          What if law enforcement start -- starts
 3  harassing out-of-state hunters who don't even know
 4  about this law?  Well, that's not likely, because
 5  this is the -- did you guys see the Outdoor Life
 6  Channel letter?  Colorado is the number one topic at
 7  a director's meeting they're having in Texas later
 8  this month.
 9          The eyes of the nation are upon us.  What
10  we do here today matters to everybody, just like it
11  matters to a former constituent of mine, now she's
12  in senate district 35, because you guys stole her
13  from me.  A brand new county commissioner from
14  Prowers County, who, along with about 49 other
15  people from La Mar, drove all the way up here last
16  Monday to have their voices heard on the bills that
17  they believe are unconstitutional, like this one.
18          "Hi.  I am Wendy Buxton-Andrade."  She
19  had -- she had prepared a statement that she wanted
20  to give us to everybody.
21          "I'm a county commissioner in Prowers
22  County just as you are.  I'm an elected official
23  and sworn to uphold the Constitution of the United
24  States and the Second Amendment that upholds the
25  rights of all American citizens to bear arms.
0140
 1          "As we are all elected officials, I am
 2  asking you to uphold our American rights set forth

LEG HX 000861

4776

3 by our forefathers.  Passing any bills that limit
4 our ability to bare arms is against our
5 Constitution and the rights of law-abiding
6 citizens."
7       The eyes of the entire nation are upon
8 Colorado.  All of your constituents are watching
9 what we do here today, and a large majority of
10 them, nearly two-thirds, oppose the things that you
11 are imposing upon them.
12       Vote no on 1229.
13       THE CHAIRWOMAN:  Thank you.
14       Senator Crowder.
15       SENATOR CROWDER:  Thank you, Madame Chair.
16       I -- I just had a quick question for the
17 sponsor and anybody who supports this bill.  We've
18 heard from the people that oppose this about the
19 bill -- the businesses that are leaving the state of
20 Colorado.  What I was wondering if you could tell us
21 of any businesses wanting to locate in Colorado due
22 to this bill?
23       Thank you.
24       THE CHAIRWOMAN:  Any further discussion on House
25 Bill 1229?
0141
1       Seeing none, the motion before you is to adopt
2 House Bill 1229.
3       All those in favor say aye.
4       All those opposed, no.
5       The ayes have it, and it is adopted.
6       (Whereupon, the recording was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0142
1            CERTIFICATE
2 STATE OF COLORADO            )
3 CITY AND COUNTY OF DENVER        )   ss.
4

5      I, Elissa Steen, Registered Professional
6  Reporter and Notary Public in and for the State of
7  Colorado, do hereby certify that this transcript was taken
8  in shorthand by me from an audio recording and was reduced
9  to typewritten form by computer-aided transcription; that
10  the speakers in this transcript were identified by me to
11  the best of my ability and according to the introductions
12  made and written materials provided; that the foregoing is
13  a true transcript of the proceedings had; that I am not
14  attorney, nor counsel, nor in any way connected with any
15  attorney or counsel for any of the parties to said action
16  or otherwise interested in its event.
17         IN WITNESS WHEREOF, I have hereunto affixed
18  my hand and notarial seal this 21st day of June, 2013.
19
20
21
                    _____
22                  Registered Professional Reporter
                              and
23                        Notary Public
24
25

LEG HX 000863    4778

```
0001
 1  CITY AND COUNTY OF DENVER
 2  STATE OF COLORADO
 3  SENATE MEETING
 4  Held on March 11, 2013
 5  HOUSE BILL 13-1229
 6  ------------------------------------------------------------
 7  REPORTER'S TRANSCRIPT
 8  ------------------------------------------------------------
 9
10        This transcript was taken from an audio
11  recording by Elissa Steen, Registered Professional Reporter
12  and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
 1          P R O C E E D I N G S
 2            *   *   *   *   *
 3        THE CHAIRMAN:  Mr. Majors, would you
 4  please read the title to House Bill 1229 by Majority
 5  Leader Carroll.
 6        MR. MAJORS:  House Bill 1229 by
 7  Representatives Fields and McCann and Senator
 8  Carroll, concerning criminal background checks
 9  performed pursuant to the transfer of a firearm, and
10  in connection therewith, making an appropriation.
11        THE CHAIRMAN:  Majority Leader Carroll.
12        MAJORITY LEADER CARROLL:  Thank you,
13  Mr. President.
14        I move House Bill 1229 on third reading,
15  final passage, and ask for an aye vote.
16        THE CHAIRMAN:  Majority Leader Carroll, I
17  have an amendment on the desk.
18        Mr. Majors, would you please read
19  Amendment L.39 by Senator Carroll?
20        And so, actually, Senator Carroll, first.
21        Majority Leader Carroll.
22        MAJORITY LEADER CARROLL:  Thank you,
23  Mr. President.
24        Members, I ask for permission to offer a
25  third reading amendment on House Bill 1229.
0003
```

LEG HX 000864    4779

1      THE CHAIRMAN:  Would you please explain
2  what you're thinking and what?
3      MAJORITY LEADER CARROLL:  Yes, I'd be
4  happy to.
5      So as far as why permission, it will go
6  into the substance of the amendment a little bit.
7      You'll recall one of the exceptions of not
8  requiring a background check is in the case of being
9  repaired.  And there's some potential ambiguity
10  about the way it's worded, where you might almost
11  need a background check to prove that you're
12  eligible for the exemption of a background check.
13      So this is basically for the repair
14  owners, you know, they can reasonably rely on the
15  information they're given, and it's to make the
16  intended exception work the way we meant so that you
17  don't need a background check to prove you don't
18  need a background check.  That would be why I would
19  be asking permission, 'cause I think it is tighter
20  language around that exception.
21      And I'd ask for an aye vote.
22      THE CHAIRMAN:  Okay.  The motion before --
23  the question before the body is whether to grant
24  Majority Leader Carroll permission for a third
25  reading amendment.
0004
1      All those in favor say aye.
2      Opposed, no.
3      The ayes have it.  Permission has been
4  granted.
5      Mr. Majors, would you please read
6  Amendment 39 to House Bill 1229 by Majority Leader
7  Carroll.
8      MR. MAJORS:  Amendment L.039 --
9      THE CHAIRMAN:  Majority Leader Carroll.
10      MAJORITY LEADER CARROLL:  Thank you,
11  Mr. President.
12      I move Amendment L.039.
13      Members you've heard this described.
14      Again, this is to make the exception to a
15  requirement of a background check for the case of
16  having your firearm repaired, to make sure that the
17  repair owner doesn't need to go through a background
18  check to prove they don't need a background check.
19      And I would just ask for an aye vote on
20  the amendment.
21      THE CHAIRMAN:  Discussion?
22      Senator Renfroe.
23      SENATOR RENFROE:  Thank you,
24  Mr. President.
25      Members, I -- I just want to make an
0005
1  over-arching question, pose it to Mr. President and
2  the body with an amendment like this.

3        So what we're doing with this bill is
4   we're saying that we will trust a person when he
5   tells someone that's going to fix his gun that it's
6   okay, and that he's legal, but we won't trust a
7   person when he wants to give it to his neighbor that
8   he's know for 30 years that wants to go and do
9   something with the gun?
10       That's what this amendment allows, and
11   that's what this bill does.
12       THE CHAIRMAN:  Further discussion?
13   Senator Lundberg.
14       SENATOR LUNDBERG:  Thank you,
15   Mr. President.
16       I'm inclined to support this amendment and
17   would note that it underscores the severity of the
18   bill, but it at least creates a -- one reasonable
19   exception, and for that reason, as I say, I think
20   the amendment's good; good amendment for a bad bill.
21       THE CHAIRMAN:  Further discussion?
22       Seeing none, the motion before the body is
23   the adoption of Amendment 39 to House Bill 1229.
24       Are there any no votes?
25       With a vote of 35 ayes, zero noes, zero
0006
1   absent, and zero excused, the amendment is adopted.
2       To the bill.
3       Senator Lundberg.
4       SENATOR LUNDBERG:  Thank you,
5   Mr. President.
6       Members, I just noted that we amended this
7   bill in a way that created one little tiny island of
8   sanity to a measure that I believe lacks much of
9   that rationality for the rest of its policies.  And
10   this amendment, again, underscores the severity of
11   this legislation.
12       Background checks are one thing; universal
13   background checks are entirely another.  Because the
14   background check system that has been in place,
15   bureaucratic, and tiresome, and expensive, and
16   troubling as it has been -- I mean, how many people
17   have talked to in the last couple of months who have
18   been very frustrated by the length of time it has
19   taken to simply purchase, legally purchase, a
20   firearm?
21       And, of course, much of this is because
22   Colorado policy creates its own little unique
23   background check system, never mind the fact that
24   the FBI has been doing it for no cost and with a
25   system large enough to handle the volume, but now
0007
1   we're going to expand this to the universal
2   background check idea, which means we don't trust
3   anybody, except, of course, this amendment that we
4   put in place.

LEG HX 000866    4781

5    We don't trust anybody else to -- to
6    have -- have the -- the ability to understand how
7    this free exchange of if you're selling privately to
8    somebody or -- or you're loaning, and that's --
9    that's the -- you know, the most glaring shortcoming
10   in this bill, is to simply loan your firearm to
11   somebody for more than an extended period of time or
12   more than a very limited circumstance, such as
13   you're in a firing range, but not just any old
14   firing range, no, one that has specific parameters
15   and definitions.
16        In my part of Larimer County, about every
17   neighbor has a firing range, and every weekend you
18   can hear them out there tuning up their -- their
19   rifle.  Not a bad idea.  But that wouldn't qualify,
20   of course, because that's not the specified legal,
21   you know, definition of -- of a firing range.  And
22   so it's -- it's -- it's -- it's just filled with so
23   much bureaucratic, dare I say it, nonsense, that it
24   really boils down to an impression, at least that I
25   get, that we don't trust the people of Colorado to
0008
1    have good common sense when it has -- comes to
2    exercising their constitutional rights to own and
3    use their firearms.
4        And part of that use can be the most
5    practical application of -- of your neighborhood has
6    a reason for -- for needing to borrow a hammer, you
7    give them a hammer, you know, get it back to me next
8    week.  But if it has to do with that firearm, oh,
9    you can't do that without going through a background
10   check.
11        Now, that's one concern I have, is just
12   the bureaucratic nonsense that this puts in place
13   for the people of Colorado.  And I can deduce no
14   other reason for it, other than we must not trust
15   the people of Colorado to have good reasonable
16   common sense.  These are the law-abiding citizens of
17   our state.  And, no, no, no, we won't trust you
18   further than we can throw you.
19        That's one problem.  The other dilemma we
20   have is the practical reality of how you're going to
21   enforce such a system, because I can see it very
22   clearly, oh, today, it's -- it's -- it's the
23   assurances.  This is all it is.  This is just what
24   we're going to do.
25        But next year, when we get the reports of
0009
1    law enforcement, who have -- who have told us
2    repeatedly right now, we can't enforce this.
3    There's no way we can -- we can really plug this in
4    and make it a functional part of the -- of the legal
5    process here in the state unless we do one
6    particular thing, and that is register every firearm

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

7   in the state.  Register every firearm in the state.
8        When I see universal background check, I
9   can put A and B and C together and draw the line
10   between, and it -- B is:  We register your guns, and
11   that is a very, very troubling notion.
12        History is replete with examples of
13   country after country that simply says, Well, we
14   just want to know where it's at so we can look after
15   things properly and legally.  You know, maybe it's
16   for background checks; maybe it's for some other
17   reason.
18        But when you register the guns, the next
19   step is, somewhere down the line, you confiscate
20   them.
21        That's what I see when I read the
22   particulars in House Bill 1229.  That's why the
23   people in my district have been very, very, very
24   clear on House Bill 1229.  Kill it.  Vote no.  Don't
25   allow this to become a part of the Colorado legal
0010
1   requirements for the citizens of Colorado.
2        I've received thousands of responses from
3   people, thousands, and maybe a handful saying it's a
4   good idea, but the other thousands are saying,
5   absolutely not, this is a violation of our
6   constitutional rights.  This is a -- an alarming
7   piece of legislation where the path is clear.  The
8   trajectory is headed right in that direction.
9        Some people have talked of the arc of
10   history.  Well, this arc is leading towards tyranny,
11   and it is clear.
12        THE CHAIRMAN:  Majority Leader Carroll.
13        MAJORITY LEADER CARROLL:  Thank you,
14   Mr. President.
15        You know, I've heard -- it's interesting.
16   I've watched different iterations through this bill,
17   and I've heard a lot of descriptions of what people
18   think the bill does, and if some of the assertions
19   overall that globally I've heard were true, I think
20   I'd be pretty alarmed too.  So what I want to do is
21   create a factual record based on what the bill
22   actually does and -- and really what it does not do.
23        The bill trusts that law-abiding citizens
24   will pass a background check and can go on to buy
25   the weapon of their choice, or as many weapons of
0011
1   their choice as they want.  People can continue to
2   own or possess any firearm of their choosing, so
3   long as they're not a convicted felon and otherwise
4   prohibited under current law.
5        We have, as a matter of public policy,
6   before said that when people commit certain crimes,
7   you lose certain rights, and the right to purchase
8   or own a firearm is one of those rights you lose

LEG HX 000868

4783

9  after you have a serious conviction, whether that's
10  for homicide, for rape, for kidnapping, for
11  burglary.  That is one of the consequences of what
12  happens.
13      Yet without a background check, any and
14  every single convicted felon in the State of
15  Colorado can easily access a gun, or as many as they
16  want, any type they want.
17      We have had incredible -- you know, on the
18  experience we've had before the -- the Internet made
19  it too easy for third-party postings.  We have, in
20  fact, had experience with the background check
21  mechanism.  That's your gatekeeper.  That's what it
22  is.  And what it does is it makes sure every
23  law-abiding citizen walks through that gate to go on
24  to exercise 100 percent of their Second Amendment
25  rights, for whatever purpose they see fit, whether
0012
1  it's hunting, fishing, self-defense, competitive
2  shooting, whatever.
3      But the other side of the gate is that
4  everyone who is prohibited under law, who is not
5  supposed to, dangerous people, dangerous convicts,
6  who are not supposed to have access to a weapon,
7  there is no way other than a background check to
8  make sure that those folks don't access firearms.
9      It will be true that there are going to be
10  some people who continue to circumvent the law.
11  Murder is illegal now, and people go on to murder.
12  It is against the law to drive drunk.  And it's
13  true, we do have people who drive drunk, but that
14  doesn't mean that we shouldn't, as a matter of
15  public policy, say that that shouldn't happen.  And
16  because something less than 100 percent of people
17  may be caught doesn't mean we shouldn't do it.
18      The facts are that this is the gate that
19  lets law-abiding people walk through and stops
20  criminals from acquiring more guns.  What it does is
21  basically extends to private sales an
22  ever-increasing share of the gun sale market, the
23  exact same background check we use at FFLs and
24  background checks.  Same process.
25      If we fail to close this loophole, we are
0013
1  saying that the difference between law-abiding
2  citizens and criminals isn't worth making and that
3  we might as well just go ahead and let anybody --
4  convicted felon, those under court order for being
5  dangerously mentally ill or not -- go ahead and have
6  it.  Let's go ahead and skip that process.
7      That renders current law prohibiting
8  ownership and possession by convicted felons
9  meaningless because without the background check,
10  there's no factual way for determine.

LEG HX 000869    4784

11  Colorado's process on our background check
12  does tap into three additional databases, which
13  helps increase the accurate detection of people who
14  are not supposed to have access and makes it more
15  likely that we do.
16      The other thing the bill does, besides
17  being that gatekeeper, is it actually does some
18  things for gun owners to make sure that the data is
19  more accurate and more timely, in terms of what is
20  uploaded and downloaded.  Why?  Because false
21  positives and false negatives, either way, are a
22  problem.
23      So by having transfer within 48 hours,
24  this means that we are more likely, with passage of
25  this bill, to make sure that law-abiding citizens,
0014
1  in fact, don't get a false flag to go through, nor
2  do we fail to capture people convicted of domestic
3  violence or other felonies, who may have just
4  recently been convicted yet escaped the background
5  check.
6      I've handed out a page that kind of goes
7  over the exceptions.  There is no registration in
8  this bill.  There is no confiscation in this bill.
9  Everyone can hunt.  Everyone can fish.  You can loan
10  it to your family.  You can leave it on deployment.
11  You can have it repaired.  You can inherit a weapon.
12  You can use it at Boy Scouts.  I mean, there's a lot
13  of examples, and you will see for yourself that
14  those have been explicitly contemplated, plus two
15  additional catch-all.  And I think there has been
16  some confusion among the exceptions.
17      In addition to everything that's
18  explicitly numerated, those other exceptions don't
19  have any 72-hour limit on them.  That's just
20  temporary.  It means something other than that
21  permanent.  Those are exempted.
22      There is an additional exception for a
23  72-hour catch-all, as long as you're not giving it
24  to somebody who's a convicted felon or under court
25  order for mental health reasons, prohibited from
0015
1  having a firearm.  That is in case there's some
2  other scenario that we hadn't contemplated.  But the
3  72 hours doesn't apply to all the exceptions.  So
4  when you go through and you look at that, realize
5  that that only applies to the one.  These are all
6  ors.  Meaning, you don't have to satisfy all of
7  these.  If you satisfy any of these, it's an
8  exception.
9      At the end of the day, it's just everybody
10  who's buying a gun gets a background check.  You can
11  loan it, basically, to whoever you want, as long as
12  they're not a convicted felon.

LEG HX 000870     4785

13       And that is the gist of what has been done
14  to change the bill while it's there.
15       I think, at the end of the day, what I
16  find balanced about this, if I just look at the
17  public policy, is you don't want a bill that
18  prevents law-abiding people from having access to
19  firearms, nor do you want a public policy that fails
20  to differentiate dangerous and convicted people that
21  allows them to do it.  This bill really actually
22  just does that.  It's the gatekeeper.  If you're law
23  abiding, you go through the gate; if you're not, you
24  don't.
25       The real agenda here that I've heard
0016
1  questioned is that I'm an Auroran that comes from a
2  community that has been wracked by senseless and
3  very painful gun violence.  And while we can't get
4  that to zero, if we fail to do a common-sense
5  measure, the one thing that the data tells us
6  actually works to block many, many, many ineligible
7  criminals from buying and transferring weapons, then
8  shame on us.
9       I'm proud to be carrying House Bill 1229.
10  I'm proud to be here to do something that does that
11  exact balance of letting law-abiding citizens walk
12  through that gate and hopefully stops a lot more of
13  the criminals from getting through and increasing
14  their access.
15       I appreciate your time, respect, and
16  attention, and respectfully ask for an aye vote.
17       THE CHAIRMAN:  Senator Brophy.
18       SENATOR BROPHY:  Thank you, Mr. President,
19  and good morning to you.
20       And on a side note, I'd like to mention
21  that today is the last day that you can buy a
22  20-ounce Mountain Dew in New York City.  And I
23  think --
24       THE CHAIRMAN:  New York city?
25       SENATOR BROPHY:  I think one of us
0017
1  probably hopes that value doesn't work its way to
2  Colorado soon.
3       Mr. President, I ask for a no vote on
4  House Bill 1229.  In -- in all of the discussion
5  that we just heard about 1229, we barely heard a
6  mention about safety.  So I will bring that up.
7       This bill will do absolutely nothing to
8  improve the safety of the citizens of Colorado.
9  Absolutely nothing.  Now, you don't have to take my
10  word for that, you can ask the President.
11       United States Department of Justice
12  studied this proposal, universal background checks,
13  and their discovery was that universal background
14  checks would do absolutely nothing -- their words,

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

15  not mine -- to improve safety unless coupled with
16  universal registration of firearms, something the
17  proponents say isn't in this bill and isn't sought
18  through this bill.
19       Well, to me that sends a very clear
20  message.  This bill does nothing to improve safety,
21  and we ought to then spike the bill because the bill
22  does produce some absurd results.
23       Under this bill, if one of my life-long
24  friends decides he's going on a week-long
25  backpacking trip down the Colorado Trail, for
0018
1  instance, and he doesn't have the appropriate
2  firearm to -- to pack on a backpacking trip and he
3  wants to borrow one of mine, I can't loan him one of
4  mine without meeting him somewhere and arranging for
5  a background check and paying for it, and maybe
6  waiting up to three days for the check to clear.
7       Which one of you thinks that isn't an
8  absurd result?  And that's in the bill because the
9  exemptions that have been steadily added to this
10  bill every time we point out how foolish the bill
11  is, only allows a temporary transfer to a friend for
12  a maximum of 72 hours, and a week-long camping trip
13  is longer than 72 hours.  That's absurd.
14       And it's an absurdity that doesn't do
15  anyone any good because it doesn't improve safety,
16  unless and until you're willing to take the step of
17  registering all firearms.
18       Vote no.
19       THE CHAIRMAN:  Senator Baumgardner.
20       SENATOR BAUMGARDNER:  Thank you,
21  Mr. Sec -- sorry -- Mr. President.  Thank you,
22  Mr. President.
23       We've heard about citizens of the state of
24  Colorado that will do things legal, law-abiding
25  citizens.  This bill, if it were to pass, will make
0019
1  law-abiding citizens not law-abiding citizens
2  anymore.  That reason being, if a neighbor wants to
3  sell a firearm or give a firearm to the neighbor,
4  unless they go and have a background check done at a
5  federal firearms licensed dealership and wait for
6  that to come back, that check to come back, that
7  makes you a criminal.
8       So is it right that although our
9  Constitution says that you have the right to have
10  that firearm, is it right that you can't have it if
11  you don't pass a background check?  Do we here in
12  the state, if we guarantee that law-abiding citizens
13  have to have a background check to swap, possess,
14  buy, and again, law-abiding citizens are going to
15  adhere to the law, criminals will never adhere to
16  the law.

17 And if we honestly believe in the State of

18 Colorado that if we pass this, this is going to have

19 any affect, whatsoever, on the criminal element in

20 this state or any other state in the nation, I think

21 that we need to come to the reality that this will

22 have nothing to do with criminals getting their

23 hands on any firearm they want to get it on.

24      The other thing, with this universal

25 background check, and this has been spoken about

0020

1 before, what this will do, if every law-abiding

2 citizen or any private transfers, if they go and

3 register this firearm, or when they go and register

4 this firearm, because they are law-abiding citizens,

5 then there is a record, a national directory, as it

6 were, of anybody in the state, anybody in the

7 nation, that possesses a firearm.

8      Law-abiding citizens, they're going to do

9 the right thing. They've always done the right

10 thing. If this bill passes, that mandates that

11 someone purchases a firearm and then they don't

12 register it makes them a criminal. Makes them a

13 criminal.

14      Is that what we want to do in the United

15 States, is to pass laws that will make law-abiding

16 citizens criminals? I think not.

17      Consider what we're doing here with this

18 piece of legislation today. We want -- we want

19 people to do the right thing. People in the state,

20 people in the country, are afraid. They're scared

21 that their right, given to them by the Constitution,

22 is slowly being taken away. Let's not do that.

23 Let's do what we promised to do when we upheld our

24 right hands down here and swore an oath to uphold

25 the Constitution. Let's prove to the people of

0021

1 Colorado that our word, my word -- my word means

2 something.

3      I would ask for a no vote on House Bill

4 1229.

5      THE CHAIRMAN: Senator Harvey.

6      SENATOR HARVEY: Thank you, Mr. President.

7      Thank you, members, for the discussion on

8 this. We have heard why this bill is important. We

9 have heard the sponsor say that this will stop

10 private sales of guns to those that should not get

11 guns. You've heard the arguments say that every

12 convicted felon can get a gun today because of the

13 loophole for private sales, but that's not just what

14 this bill is about. You've heard the polls that say

15 the public wants to tighten up this loophole

16 regarding private sales, but that's not what this

17 bill is about.

18      This bill is also talking about transfers

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

19 between family members. There is an exception in
20 the bill that says if you leave town for 72 hours,
21 you can loan -- I can loan my wife my .45 so that
22 she can protect herself. The sponsor of that
23 amendment said -- when I asked that, I said, okay,
24 so if it goes more than 72 hours, then what happens?
25 My wife is going to have to illegally protect
0022
1 herself and my two kids?
2        And the sponsor of the amendment said,
3 well, that's giving time so that you're wife can go
4 buy a gun. I'm not joking. So if I go out of town
5 for a week and I am as poor as my family and I are,
6 then we can't go buy a gun, then my wife has to
7 violate the law and defend herself and her kids.
8        Or the statute says I can give her the
9 gun, but if I give her the gun, then when I come
10 back, she has to give it back to me and we have to
11 do, I believe, the legal paperwork showing that that
12 gun is in her legal possession because if by chance
13 she uses that gun when I am out of the house over
14 that 72-hour period, under the pretense of Make My
15 Day, will she really be protected under make my day
16 because she used a gun that she lawfully should not
17 have had?
18        So I will write a contract to her and say,
19 okay, she now owns it the gun legally under this
20 bill, and I put it in her hands and say you legally
21 have the right to protect yourself in your house
22 when I'm gone for more than 72 hours, and if
23 something happens where she actually does and
24 utilizes the make-my-day provisions of current
25 statutes, she can do that legally and not be called
0023
1 into question. And then, when I come back, she can
2 sign the gun back to me. Is that ludicrous? Is
3 that ludicrous? We're talking about keeping guns
4 out of the hands of criminals.
5        Let's talk about out of the hands of
6 criminals. Those who can't have a gun right now are
7 felons, additionally persons awaiting a trial on
8 felony charges who are prohibited from receiving
9 firearms.
10        This is all in federal statute, Section
11 18 -- or -- or Section 18, 922 of the U.S. Code: A
12 drug user or addict, an alien -- an illegal alien,
13 is subject to a domestic retraining order, has a
14 prior conviction of domestic assault, fugitive from
15 justice, dishonorably charged from the military.
16        How many of you all are married? How many
17 of you all know or should have known that your
18 spouse falls under one of these categories? Do you
19 all know or should have known that your spouse would
20 have fallen under one of these categories? Most

LEG HX 000874     4789

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

21   likely you do.
22          And under current federal statute,
23   knowingly sell, give, or otherwise dispose of any
24   firearm or ammunition to any person who falls within
25   one of the above categories shall not have a gun.
0024
1          So the paternalistic message that we are
2   sending to the citizens of the State of Colorado is
3   we don't think you know whether your spouse falls
4   under one of these categories, so we are going to
5   require you to sell your gun to your spouse if
6   you're going to be gone for 72 hours or your spouse
7   will have to go do a background check and buy a gun,
8   which many Coloradoans can't afford to do, or you
9   are going to be in violation of this law, and if you
10   are charged under this law for violating this law by
11   transferring a gun to somebody you already should
12   know or knowingly know doesn't fall under one of
13   these categories, you will be charged with a
14   misdemeanor of up to 18 months in prison.
15          Most likely that won't happen, but simply
16   by being charged, you will never, ever, ever be
17   allowed to own a gun, ever again, as long as you
18   live.  How ridiculous is that?
19          The sentiment is, well, if you are not a
20   felon, you should not have to worry about it.  You
21   should not have to worry about this bill.  Well, I'm
22   worried about this bill.  Do I want to be charged
23   with not selling my gun to my wife when I leave town
24   and somebody breaks in and she uses it and I
25   violated this law?  Are you?  Are you -- can you
0025
1   honestly say you will -- that raised your hand in
2   here -- if you leave town for more than 72 hours,
3   you're going to abide by this law?  Honestly,
4   honestly, can you look me in the eye and say you
5   will?
6          I ask for a no vote.
7          THE CHAIRMAN:  Majority Leader Carroll.
8          MAJORITY LEADER CARROLL:  Thank you,
9   Mr. President.
10          Members, I want to clear up something
11   that's really central to what you're hearing.  There
12   is no 72-hour limit on the exception for immediate
13   family or for self-defense.  I know that there have
14   been amendments, and they may be difficult to go
15   through.  When you go through the list of
16   exceptions, one of the exceptions is sort of a
17   catch-all for 72 hours, as long as you're not giving
18   it to someone who's a convicted felon or otherwise
19   prohibited.  There is no 72-hour exception on
20   gifting to your family, or using for self-defense,
21   or for hunting.
22          Grammar in this case matters.  If you read

23   that to apply to all of the exceptions, then go on
24   and many of the hypothetical scenarios that carry
25   out, and you carry that all the way out to a
0026
1   different conclusion.
2        There is no 72-hour limit on the other
3   exceptions.  Therefore, you're not going to be
4   getting a background check on your wife, you're not
5   going to be getting a background check when you're
6   going hunting.
7        And as a practical matter, for all of --
8   for everybody who is a law-abiding citizen, and
9   before you give your firearm to someone else, this
10   just makes sure that you know, as a responsible gun
11   owner, that you're not handing it over to somebody
12   who is actually a convicted felon or otherwise
13   dangerous.  And I would argue you'd be hard-pressed
14   to find any responsible gun owner who would want to
15   loan their gun to somebody who is ineligible.
16        But the most important correction before
17   we go any further down this debate, the 72 hours is
18   an addition.  It does not apply to the other
19   exceptions.  That doesn't mean you're going to like
20   the bill, but I do think we need to at least be
21   accurate about what the bill does.
22        THE CHAIRMAN:  Senator Harvey, for your
23   second time.
24        SENATOR HARVEY:  Thank you, Mr. President.
25        And with all due respect, I disagree.
0027
1   This semantics of what was just said is talking
2   about gifting, and I'm not talking about gifting.
3   I'm talking about if you leave town for more than 72
4   hours and you want to transfer/loan your gun for
5   more than 72 hours, that is what the limit is.  If
6   that is not the case, if we're not talking about
7   transferring of weapons, we're just talking about
8   the sale of weapons, then let's have a bill that
9   talks about the sale of weapons.
10        But what we are sitting here talking with
11   is saying we are going to outlaw this transfer of
12   weapons to people that we already know or should
13   have known is not able to own a gun, or own a gun,
14   or possess a gun.  That is what we are talking about
15   here.  If you want to do a bill on the sale of
16   firearms, private sales of firearms, let's have that
17   discussion, but you are having to run around the
18   semantics of what is a transfer and what is not a
19   transfer and say, if you do not know or should not
20   have known, then you have to do a background check.
21        When you transfer a gun, when you go out
22   to Senator Brophy's property to do a watermelon
23   shoot, or when you go on a hunt with a friend, or if
24   you want to go on a hunt like I did this fall, went

25    on a deer hunt with a friend's deer rifle, I

0028

1    guarantee you my best friend knows or should have
2    known that I can or cannot carry a weapon, but under
3    this law, I am the criminal, and my friend is the
4    criminal.
5         I should say my best friend is
6    Representative Chris Holbert.  We're both going to
7    jail.
8         This is a ridiculous bill.  Vote no.
9         THE CHAIRMAN:  Senator Lundberg, for your
10   second time.
11        SENATOR LUNDBERG:  Thank you,
12   Mr. President.
13        Members of the Senate, citizens of
14   Colorado, I think it's quite obvious from the debate
15   we've been listening to that this bill is fraught
16   with -- with details that are difficult for any of
17   us to -- to capture and comprehend fully, and it
18   will provide a great deal of fodder for the courts
19   and trouble for the citizens.  That's one problem.
20        Another problem is it puts additional
21   costs on the people of Colorado.  I recognize
22   there's another bill that actually places costs on
23   background checks for the Colorado Bureau of
24   Investigation, but this bill authorizes the gun
25   dealer that you go to for the background check to

0029

1    process it to charge you another 10 bucks.  So
2    that's another problem.
3         I want to get to the main point, though,
4    because, as dysfunctional as this bill is, it's also
5    just a very bad idea that's offensive to the
6    freedoms of the people of Colorado.
7         Mr. President, the Second Amendment was
8    not written to protect duck hunting.  The Second
9    Amendment was written to protect the citizens of
10   this country.  And in Article II, Section 13 of the
11   Colorado Constitution, that right for the citizens
12   of Colorado is spoken of in even more clear terms.
13   It was written to allow the citizens the protections
14   that they have as inalienable rights as human
15   beings, to protect themselves, to protect their
16   families, to protect their property, to be a part of
17   the protection of their community when they are
18   called to do so.
19        Now, let me bring you back to the bill
20   itself, on page 3, before we get into all the
21   confusing exceptions and particulars that I'm not
22   sure anybody's ever going to fully sort out.  But
23   there's one point that's very clear, and that is
24   it's not just a background check that you take, but
25   it's require that a background check be conducted of

0030

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

1   the prospective transferee; and, not or, and obtain
2   approval of a transfer from the bureau.
3        Now, where in the Bill of Rights does it
4   say the government must be consulted for permission
5   before you exercise your God-given inalienable
6   rights?  But that's what a background check is all
7   about, is going to the government and saying,
8   Mother, may I?
9        The sponsor said we need this for balance.
10  I submit to you that we have more than enough
11  balance in this area by the requirement of a
12  background check when going to a licensed firearms
13  dealer.  Under those circumstances we have tolerated
14  this compromise of our Second Amendment rights by
15  requiring a background check for purchase of a
16  firearm from a licensed dealer.  That is the
17  balance.
18       House Bill 1229 is throwing the balance
19  completely to the one side of government control,
20  and it states it very clearly here in the bill.  In
21  order to even transfer, not just sell but just to
22  loan for an extended period of time for a great
23  number of people, you have to ask permission from
24  the government.  Mother, may I?
25       And a little footnote:  If you go through
0031
1   that process, the only way you're going to get that
2   loan (sic) back is if you go through the same
3   process because it's a new transfer.  That's very
4   clear.
5        But let me get back to the point.  1229
6   requires that the citizens of this state go to the
7   state for permission for approval.  And the intent,
8   if I might speculate in that area, is to capture as
9   many of those transfers as possibly can be.  That's
10  part of the reason where, no, there's no
11  registration written into this bill, but if you can
12  read between the lines and be a good student of
13  history or just a practical legal scholar, you'll
14  recognize that you can't enforce this.  You can't
15  really put any teeth to what this is doing, without
16  knowing whose got what where.
17       That's called gun registration, or I've
18  heard a creative alternative that some have
19  suggested, which I think is equally abhorrent, and
20  that is:  Let's not register the guns, let's just
21  register the gun owners.  Wow.  One or the other is
22  going to be the practical outgrowth of the
23  application of this bill, if it is -- if it becomes
24  law, and if those of us, myself included, are not
25  able to repeal it as soon as we possibly can.
0032
1        But again, let me leave you with the
2   point.  1229 is not a bill of balance.  1229 is a

3  tightening of the noose of government control of
4  private ownership of firearms for the people of
5  Colorado.  It's squeezing that down so that the only
6  way you can exercise your right of ownership of
7  allowing someone else the use of your firearm is to
8  ask permission from the state.  Is that really what
9  the people of Colorado are expecting from this
10  legislature?
11      You know the answer.  You've received it
12  thousands of times over in the last couple of weeks,
13  in your e-mail box, on your phones, I'm sure in
14  private conversations.  If you attended any of the
15  committee hearings, you know that to be the case.
16      The people of Colorado know better.  They
17  should not have to ask permission each and every
18  time they choose to exercise their right of
19  ownership by allowing the use of some, you know,
20  somebody else to use that firearm.  That's not
21  balance.  That's full government control.  That's
22  completely inappropriate for the freedoms, for the
23  liberty, for the principles that our nation and our
24  state are founded upon, and particularly when it
25  comes to -- to firearms because it's underscored in
0033
1  the Second Amendment.  It's underscored in the
2  Colorado Constitution.  It is so crystal clear.
3      Those acknowledgements of our God-given,
4  inalienable rights to defend ourselves were not
5  written for duck hunting.  They were written to
6  protect the citizen, to protect them from any
7  threat, and those who wrote the Second Amendment had
8  clear memory of the threat being the very government
9  that exercised control over them.2they wrote that to
10  keep the balance in check.
11      1229 is not balance.  1229 is the heavy
12  hand of government taking over the lives of its
13  citizens in defiance of our constitutional rights.
14      Vote no.
15      THE CHAIRMAN:  Senators Marble, Renfroe,
16  Scheffel.
17      Senator Marble.
18      SENATOR MARBLE:  Thank you, Mr. President.
19      I'm here to express a very, very
20  resounding no on 1229, and that is coming from every
21  e-mail I have received over the weekend to please do
22  not stop our efforts to kill this bill.
23      When a government infringes on the rights
24  of law-abiding citizens, criminals are thankful to
25  those who pass such legislation.  In trying to
0034
1  curtail criminal activity, this bill does just the
2  opposite.  It has no effect on where criminals
3  really go to purchase weapons, and that is the black
4  market.

5    240,000 guns are stolen every year.  This
6  bill does not address that.  And this is where the
7  criminal activity thrives, and this bill encourages
8  it.  No amendment can make a bad bill an acceptable
9  bill.
10       Law enforcement, the real professionals,
11  they are the ones who came forth and said this is
12  unenforceable.
13       This is a poorly written bill, and it will
14  only criminalize law-abiding citizens.  And another
15  way to say that -- and you have to admit, when
16  criminals find that out, they're going to love you
17  for passing this bill.
18       Vote no on 1229 because you cannot
19  criminalize law-abiding citizens.
20       THE CHAIRMAN:  Senator Renfroe.
21       SENATOR RENFROE:  Thank you,
22  Mr. President.
23       I also rise in opposition to this bill.
24  We heard a lot of testimony on this bill in
25  committee.  We heard a lot of testimony on Friday on
0035
1  this bill, but I would like to remind this body
2  again that there are a lot of people that didn't get
3  to testify on this bill, and it was a shame, in my
4  opinion, the process that we went through, the
5  people that came to this capital and did not have
6  their voices heard, the sheriffs that came and had
7  to choose one to speak on their behalf.
8       That's a sad day when we -- only 62 days
9  or whatever we are into our session, that we felt it
10  too unimportant to listen and to let the people have
11  their voice.  And I think that's what this process
12  had when you look at all the bills together the way
13  they've went through, the way we've passed bills,
14  the way this one's come through.
15       Look at the questions that are even coming
16  up today on this bill that still have loopholes.
17  Loopholes.  I thought this bill was to fix all the
18  loopholes.  In my opinion this bill creates more
19  loopholes than the ones that allegedly is trying to
20  fix.
21       The one that, honestly, the data that was
22  used by our President of the United States, the
23  40 percent data, and that the sponsors used --
24  didn't use today, but used on Friday -- that data is
25  incomplete, inaccurate.  That statistic comes before
0036
1  background checks were even required.  So how could
2  it have been a truthful reason to do this bill?
3       One of the major concerns I have with this
4  bill, we could start with the divide to where I
5  think half the people in the state or the country
6  would look at these answers or concerns and say,

LEG HX 000880

4795

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

7    yeah, I -- I agree, the other half probably times
8    out and doesn't even hear when we would mention
9    inalienable rights.
10        In my opinion, this is what happens.  Or
11   if we mention or constitutional Second Amendment
12   rights, or if we go and we talk about our Colorado
13   Constitution in the Article II, Section 13 and what
14   it says:  The right of no person to keep and bear
15   arms in defense of his home, person, and property,
16   shall be called into question.
17        This bill is, what, 30 -- 25 pages long.
18   How does that fit into that one little sentence?  It
19   doesn't, in my opinion.  And you may not listen to
20   those type of arguments, and that might not -- that
21   may not be what drives you.  Honestly, there are a
22   lot of people in this world that that does.  And for
23   those reasons alone, that's where they are.
24        You've heard people get up here today and
25   talk about Second Amendment rights and that that is
0037
1    the reason to do this, and I believe strongly in
2    those rights, the inalienable rights, and as a
3    reason to vote no on this bill.
4        But we could also go back -- and this will
5    gloss over a few too -- and talk about what did our
6    founders think?  Did they think that our
7    Constitution should change over time or should it
8    stay still?  Is it a living document as some like to
9    say?  I don't believe it's a living document in the
10   way a lot of people like to modify it, but I do
11   think our founders believed that things do change
12   over time, and there is a way to amend our
13   Constitution.  And that's what our founders said we
14   should do.
15        Let me just read briefly out of this
16   little book on the Second Amendment.  It says,
17   "The founders made it clear that when the meaning and thus
18   the application of any part Constitution was to be altered,
19   it was to be at the hands of the people."
20        I believe that's the people that we didn't
21   let testify last week.
22        "Not at the feet of the court or through the
23   encroachment of the legislative body.  For this reason,
24   Article V was placed in the Constitution to establish the
25   proper means whereby the people might adjust their
0038
1    government."
2        That's what we're trying to do with this
3    slew of bills.  We're trying to adjust our
4    government, saying that there's loopholes and
5    there's problems, but they can't -- we can't
6    reconcile these problems if you read the language of
7    our Second Amendment and Article II, Section 13 of
8    our Constitution.  How do you get there?  I don't

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

9  think you can. I don't think you can.
10 Another problem I have with this bill -- and I have great
11 concerns about this part of it too -- is on page 5,
12 sentence -- lines 5 through 8. I want to read this part to
13 you.
14        It says, "a person who transfers a firearm in
15 violation of the provisions of this section may be jointly
16 and severally liable for the civil damages -- for any civil
17 damages proximately caused by the transferee's subsequent
18 use of the firearm."
19        Okay. So if I violate these provisions --
20 I've sold many firearms in my life. I've bought
21 many, and some of them have been through -- with
22 background checks, many, a majority of them, have
23 been privately. All the ones that I bought through
24 a background check and sold, how -- what if that's
25 used in a crime in the future or somehow used in
0039
1  violation of this? How do I protect myself if they
2  were to trace that gun back to me?
3        I think this is -- that's the same type of
4  circular logic of why there was another bill that
5  didn't go forward. How do I protect myself from
6  that part right there with -- with what I've done
7  over the past 10, 15 years? Is that section of the
8  bill making me a potential criminal for something
9  that I did years ago? I would love an answer to
10 that question within this.
11        Another part of the bill, if we continue
12 on into the sections that don't apply, and we've had
13 some discussion about this, the Senator from
14 Highlands Ranch, I thought, brought up some very,
15 very valid points that English does matter, and we
16 need to look at what the language does say.
17        On line 13 under -- of page 5 -- it talks
18 about a bona fide gift. So for a family member, I'd
19 have to give it to them, gift it to them, then they
20 could do whatever they want with it. Maybe I don't
21 want to give my high school junior my guns when my
22 wife and I go out of a town for a conference for my
23 job. Is that what I'd have to do for them to be
24 able to protect themselves under this, under that
25 part? Could they take it out of the home? How does
0040
1  that apply within that section?
2        Or you go down further under -- under Part
3  D, under Section D of this, or Pren. D, a temporary
4  transfer. How long is temporary? Is that another
5  loophole that we're creating within this bill?
6  Temporary. It says a transfer that is temporary and
7  occurs while in the home of the unlicensed
8  transferee. Who is an unlicensed transferee?
9        I think we talked about that being
10 language that's nowhere else in our statutes, of the

11    testimony we had that came straight out of Mayor
12    Bloomberg's bill to Congress.
13        But that temporary transfer, how long is
14    temporary?  That's not in this part.  It's not 72
15    hours.  I don't know.  For me temporary might mean a
16    lot longer than what you think it is, but, of course
17    it's going to be the -- the police officer or the
18    sheriff that shows up at the door, or whenever it's
19    at, that that temporary -- and then the judge.
20    That's going to be who's going to decide that.
21        Why -- why are we allowing that?  Why are
22    we passing legislation, if we say it's good
23    legislation, to allow that within this?  And this
24    transfer has to be within the home.
25        THE CHAIRMAN:  Senator Renfroe, 30
0041
1    seconds.
2        SENATOR RENFROE:  Thank you.  I would like
3    to continue, if I may, then?
4        THE CHAIRMAN:  So you're asking for your
5    second crack too?  Is that what you're saying?
6        SENATOR RENFROE:  Yes, please --
7        THE CHAIRMAN:  Okay.  Granted.
8        SENATOR RENFROE:  -- Mr. President.
9        So think of that.  The temporary transfer
10    in the home.  So -- so the sponsor says, it's okay,
11    we -- we've covered it.  Your -- your family can
12    have -- have the gun.  I go out of town for a week.
13    What if she wants to have the gun in the car while
14    she goes to visit one of the college campuses with
15    my junior daughter?  I don't think she can.
16        If I'm reading that wrong, please come up
17    and correct that because -- because that's a concern
18    that, of the way I look at the bill, I would have.
19        And then, on top of all of those other
20    reasons that I just talked about, obviously some
21    don't care, in my opinion, about the Constitution,
22    about inalienable rights, but a lot of people care
23    about safety.  I think everybody cares about safety.
24    And the Senator from Wray I think said it best, this
25    bill is not about safety.
0042
1        The U.S. Department of Justice, the
2    National Institute of -- of Justice, the arm -- the
3    research arm, clearly said without gun registration,
4    checks are unenforceable and do not improve safety.
5        So what are we doing here?  What loopholes
6    are we trying to fix?  Or are we just creating new
7    loopholes because our English and our words actually
8    mean things that are creating more loopholes, in my
9    opinion?  More loopholes.  That's what this bill is.
10    This isn't about safety.  If it was about safety, I
11    would look at it.
12        But since it does even infringe on our

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

13 constitutional rights, in my opinion, I think we
14 need to go with what our founders said, and it needs
15 to be by constitutional amendment to fix it.
16      For those reasons, I would ask for you to
17 vote no on this bill.
18      THE CHAIRMAN:  Senator Scheffel.
19      SENATOR SCHEFFEL:  Thank you,
20 Mr. President.
21      Colleagues, this bill has been debated
22 extensively in committee, on the floor.  And as I
23 think about it, I feel confident that our minority
24 leader talks about this aisle disappearing.
25      One of the things I feel very confident
0043
1 about, where this aisle literally would disappear,
2 something that we all agree on, for to come to a
3 vote that would be 35-nothing, and that's that
4 criminals have deeply hurt our community, our state,
5 and our nation.
6      As we debate this here, there are families
7 out there -- probably some listening, maybe some up
8 in the gallery -- who even today and forever will
9 feel unspeakable hurt, as they've had family members
10 that have been wounded, killed.  Their lives were
11 forever changed by Aurora, Columbine, the shootings
12 back East.  And while those are the big ones that
13 make the news, there's actually little ones that go
14 on all the time that affect people and change their
15 lives forever.
16      And as we debate this topic, that's
17 something I know none of us would ever want to lose
18 sight of, because there is such a tangibly strong
19 desire, an ache, to do something.
20      Add to that the pressure that people elect
21 us to come to this building to do something.  We're
22 expected to, and so bills like this result.
23      And so I think for all of us there's been
24 careful and detailed deliberation.  I certainly hope
25 so for myself, and I believe so for my colleagues.
0044
1 That is what the public expects of us, that we will
2 carefully consider these things.  And having done
3 so, and with the template of the deep, deep hurt
4 that I know exists out there, because nobody would
5 like to see the things that had happened happen to
6 society, I'm persuaded that 1229 is not the right
7 answer for a number of reasons.
8      As much as I wish it were different, as
9 much as I wish I could come to a different
10 conclusion, I am persuaded by the evidence that says
11 that public safety will not be increased by the
12 passage of 1229.  We so strongly desire for there to
13 be a nexus, but the evidence indicates otherwise.
14      And so I'm persuaded that this is not the

LEG HX 000884

4799

15  right answer. In fact, I -- I -- at the risk of
16  sending a false sense of security and indicating a
17  -- sending a message to the public that, hey, we are
18  going to do something, it -- it -- it seems clear
19  that it simply does not.
20      I believe that our work here is not done.
21  This may pass. I think the bottom line is there are
22  areas we need to look at. There's other things we
23  need to do, and -- and our work is not going to be
24  finished here.
25      In fact, with the passage of this, I'm
0045
1  concerned, and my colleagues have alluded to it, and
2  so I -- I -- I will spare the detail, but -- but I
3  am concerned with the complexity of this bill and
4  the number of issues that have been raised.
5      I mean, here we are in third reading,
6  and -- and there's this -- this ongoing theme and
7  drum beat of discussion that says, what does this
8  mean? If I give it to my family, give it my wife,
9  I'm leaving town. Can I be gone for a week or just
10  72 hours? Is my wife and kids going to be able to
11  be protected? Is safety going to be compromised
12  because of this?
13      My fear with 1229 is that the only people,
14  if we're sitting here on third reading trying to
15  ferret this out and trying to discern the
16  complexities of it, the criminals are not going to
17  be doing this. Those are not the folks that are
18  going to be calling up the hotlines or hiring an
19  attorney saying, hey, I -- I need to figure out this
20  bill.
21      It's the law-abiding citizens that are
22  going to be doing it. It's going to be the people
23  in this room. It's going to be our constituency.
24  It's going to be the law-abiding citizens that are
25  going to try to figure this out. And based on what
0046
1  I've heard, based on the testimony, based on the
2  discussion, my fear is that they, we, will fail.
3      And so now we're introducing a whole new
4  class of criminals, law-abiding citizens, trying
5  desperately to comply with the complex law and
6  failing. And we know the road that takes us down,
7  arbitrary enforcement.
8      And all of a sudden, we've read about
9  these in the papers, the purported good guy or gal
10  who finds themselves on the wrong side because,
11  oops, they did something, didn't mean to do it.
12  They left town for that extra day or whatever the
13  situation is with respect to this law, and they find
14  themselves on the wrong side of a prosecution --
15  prosecutorial discretion in a case. And none of us
16  would wish that on any our colleagues or any of our

17  constituencies that are law-abiding citizens.
18      The only people that will try to ferret
19  through this and figure it out are law-abiding
20  citizens.  The criminals will ignore this.  They
21  will not try to abide with this.  They will
22  continue, I believe, in what they do now, which is
23  obtain weapons by clandestine means, and this will
24  not deter that.  I fear for the chilling effect this
25  bill will have on law-abiding citizens.
0047
1       And finally, for me all things complex
2  ultimately become simple.  Like all of us, in
3  various forms, we're students of the Constitution.
4  We've read it; we're familiar with it; it's included
5  in our curriculum in schools.
6       I vividly remember the day I walked into
7  these chambers as a freshman, second row, second
8  seat over.  Sat next to a gentleman senator, who is
9  no longer here, named Mike Kopp.  I'd known Mike by
10  serving in this body would get to know him in much
11  more detail.  He was sitting in that corner spot and
12  he leaned over to me, and he handed me this pocket
13  Constitution.  He said, Here, you're going to need
14  this.
15       At that time it was all shiny and new.  If
16  you look at it now, before coming up on five years
17  later, it's pretty tattered.  I've marked it up and
18  highlighted different things.  Whenever I see him, I
19  thank him for giving that to me.  It wasn't my first
20  copy of the Constitution, but it seemed kind of
21  special that he gave it to me that day.
22       And we all know, it states in Amendment II
23  that the right of the people to keep and bear arms
24  shall not be infringed.  I believe 1229 is an
25  infringement.  Fairly simple for me.  And,
0048
1  therefore, I'm a no vote and would ask you to do the
2  same.
3       THE CHAIRMAN:  Senator Cadman.
4       SENATOR CADMAN:  Thank you, Mr. President.
5       I'm trying to remember back 13 years ago
6  when I was shiny and new here.  I was.
7       So when I first heard this bill coming, I
8  thought, you know, this is really just an extension
9  of background checks beyond the current requirement,
10  beyond federally licensed firearms dealers, and
11  obviously, since the gun show initiative passed, to
12  include sales of firearms to each other, but as I
13  sat through committee and heard the bill presented,
14  it apparently became significantly greater than had
15  been purported.
16       It's more than just sales.  This literally
17  has determined a new requirement for virtually any
18  type of transfers, any time you hand off a weapon to

19 another person. So then we get this bill that, as
20 was mentioned, is fairly lengthy. And why is it so
21 lengthy? Because it is well beyond what was being
22 reported initially, to close the private sales
23 loophole, which even in the fiscal note asserts that
24 38 percent of all sales in Colorado are private.
25        I'm still trying to figure out how they
0049
1 came up with that number because we couldn't come up
2 with any number to estimate on another bill why the
3 drop-off in sales and the effect that it would have
4 on the departments that use revenues off of those
5 sales and hunting and fishing. But we have this
6 number, 38 percent private sales in Colorado,
7 private sales.
8        But this bill went so far beyond that that
9 now we have exemptions. Good. We have
10 exceptions -- exemptions. What the fiscal note
11 doesn't supply is the new office that we're going to
12 need in DORA or the Department of Public Safety, the
13 new office of exemptions to interpret what we meant
14 or what we should have included in that.
15        And I think after we heard the sheriffs
16 testify against this bill and saying how
17 unenforceable it was because it's so confusing and
18 so convoluted, chances are they're just going glean
19 over those additional pages in the Red Books. We
20 started getting amendments or exemptions.
21        Maybe what we should call them are, oops,
22 how about this? Oops, how about that? My colleague
23 from Douglas County was accurate to use that word,
24 oops. That should be our new acronym for
25 amendments.
0050
1        So we talk about the oops exception for an
2 issue that was brought up in the committee, and I
3 also believe on the floor, for getting folks trained
4 in the Scouts. I believe the bill sponsor mentioned
5 that as well, and I think it was also articulated on
6 the handout that she provided.
7        But where's the oops of the oops? What's
8 not included in there is the transportation of those
9 weapons. It talks about having the use of those
10 weapons for Boy Scouts at a facility, but they don't
11 just show up. Really, as much as some people think
12 they do, they don't just fall out of the sky into
13 people's hands, including criminals and law-abiding
14 citizens.
15        So how do those weapons get to those
16 facilities? There is no provision in here for
17 transportation. None. So as our troop has done
18 over the years, we collect them from each other.
19 Somebody's responsible for every one of them, just
20 like we used to do in the army. When you were in

4802

21 charge of all the weapons, that was your job. You
22 even slept with them.
23        Colonel, is that accurate?
24        UNIDENTIFIED SPEAKER:  (Inaudible.)
25        SENATOR CADMAN:  Yeah.  That means yes to
0051
1 all you civilians.
2        You are in charge of those weapons.  They
3 were never out of your possession, ever, day or
4 night.  Same thing that we do in the Scouts.
5        Somebody takes charge of those.  They
6 become the arsenal quarter master.  You're
7 responsible for them.  And sometimes it's 5, 10, 15,
8 20 shotguns at a time.  It's kind of cool.  Some of
9 these are pretty nice weapons.  No provision in here
10 for transporting weapons to these now exempted,
11 authorized activities.  Oops.  Oops.
12        How about this one?  I have some friends
13 that spend three weeks every year going to Canada.
14 They're not allowed to take their weapons there.
15 And so they want to leave them with someone you-all
16 know.  I'm not going to name names, but he has a gun
17 safe.  He takes possession of about half a dozen of
18 these, puts them in his gun safe, and off they go to
19 Canada for three weeks.
20        Under this bill, I believe if that person
21 that took possession of these, they would have to
22 get a background check, and I think you have to get
23 one for each, or maybe you can get two under one.
24        But half a dozen weapons for a few weeks
25 means that person's got to get a background check.
0052
1 And then, when they come back, they actually would
2 have to go to a background -- get a background check
3 to get their own weapons back, unless that person
4 becomes a weapon's blacksmith or a maintenance
5 facility as under the new exemption, under the other
6 oops.
7        How many more oops have we forgot?  How
8 many more exemptions have we forgotten?  How many
9 more -- because we've already -- now we have just
10 created two scenarios where multiple people will be
11 committing a misdemeanor, at least a misdemeanor.
12 It's only 18 months.  It's only 500 or $5,000.  A
13 misdemeanor for an oops.  We really should have the
14 office of unintended consequences to highlight the
15 oops factor.
16        I think the sheriffs knew what this meant.
17 The sheriffs, who are responsible to enforce this,
18 understood that this was a problem.  There's
19 probably a bigger list than we can go get to.  We've
20 picked up a few.  I'm pretty sure we haven't caught
21 them all.
22        So what do we have now?  We have a

23  situation where we don't have enough exemptions.  So
24  now we're going to have innocent, law-abiding people
25  that are no longer law-abiding people.  Though, in
0053
1   their minds, they're probably still innocent, though
2   the law says different.  How are we going to get the
3   word out to them?  How are they going to understand
4   that what they've been doing for 5, 10, 15, 20, 25
5   years is now a misdemeanor?  How do we do that?  Is
6   that fair?  It's not.  It's not right.
7        I think the final parting shot of this
8   bill, which is egregious, is that component of
9   another bill that we don't have here today, to hold
10  somebody liable, to hold somebody liable if they use
11  a weapon illegally.
12        You know the global problem with this
13  whole concept is we keep referring to these items,
14  these weapons, these firearms, and those licensed to
15  use them.  And I know those are the FFL's, and the
16  rest of us are unlicensed.  Licensed for what?  What
17  does that mean?  We're talking about items that have
18  no title.  We've referring to an item as if it is a
19  vehicle.
20        You can track the sale, the use, the
21  ownership of a motor vehicle all along its lifetime,
22  from the first dealer -- get the Carfax -- all the
23  way to the salvage yard.  We have absolutely no way
24  to ensure title on any of these things.  When you
25  buy one now, you don't get a title to it, you get a
0054
1   receipt.  You're not required -- I don't want you
2   guys to think this is an oops for you -- but you're
3   not required to laminate that receipt and wear it on
4   a chain around your neck to show I've got title to
5   this weapon.
6        They don't exist.  They don't exist.  Does
7   anybody have a title to their weapon?  Show me the
8   Gunfax.
9        THE CHAIRMAN:  Senator Cadman, you've got
10  30 seconds.
11        SENATOR CADMAN:  Unworkable,
12  unenforceable, convoluted, confusing.  Makes our
13  citizens, our neighbors, our friends criminals
14  overnight.  Bad policy.  Bad law.  Vote no.
15        THE CHAIRMAN:  Further discussion?
16        Senator Aguilar.
17        SENATOR AGUILAR:  As you know, I'm pretty
18  new to politics, and one of the fun new experiences
19  I've had is that of reading court cases.  And -- and
20  so when I got all these e-mails saying that I was
21  infringing on people's constitutional rights, I did
22  some research, and I found that, in fact, the
23  Supreme Court has stated that, like most rights, the
24  rights secured by the Second Amendment is not

4804

25  unlimited.  And so I really reject the argument that

0055

1   I am violating people's constitutional right.
2          More importantly than that, in 2000,
3   Colorado passed a ballot measure to close the gun
4   show loophole, but as you know, since 2000, the use
5   of the Internet has become a major source of sales
6   for people.  In fact, you don't have to pay state
7   taxes on the Internet.
8          So House Bill 1229 is set out to help
9   close that loophole by letting our law-abiding
10  citizens, setting a standard for them, of asking
11  them to please do background checks on people to
12  whom they sell weapons.
13         And interestingly enough, a national
14  survey done by the Department of Justice of inmates
15  found that nearly 80 percent of those who used a
16  handgun in a crime acquired it in a private
17  transfer.
18         There was an underground investigation
19  done by people who looked on the Internet to see
20  where they could find weapons and called people up
21  and actually met in person five times and were able
22  to secure five weapons without any questions at all
23  about their criminal history.  And so I think that
24  this law is important to the safety of our state,
25  and I'm proud to vote for it today.

0056

1          THE CHAIRMAN:  Further discussion?
2          Senator Brophy, for your second crack.
3          SENATOR BROPHY:  Thank you, Mr. President.
4          And I'm aware that this is my second time
5   at the microphone, so I'll cover a lot fairly
6   quickly.  Listen fast.
7          First, with regard to Internet sales.  No
8   secret, I'm a gunny and so I look at stuff on the
9   Internet a lot, and here's how it works.  You can
10  buy a firearm on GunBroker.com if you want, but any
11  time the firearm is shipped through any of the
12  services, postal service, FedEx, whatever it is, it
13  has to ship from an FFL to an FFL.
14         So if you purchase a gun from someone on
15  GunBroker.com, if you're a private individual
16  selling it, you have to -- once the -- once the bid
17  is set -- it's like eBay, only it's eBay for cool
18  stuff like guns -- you -- you cut the deal, the
19  money comes in, you take the firearm to a licensed
20  dealer, and the licensed dealer ships it to another
21  licensed dealer, and the person who purchased it
22  goes to that licensed dealer, does a background
23  check, picks the gun up.  This bill doesn't cover
24  that.  It's already covered.
25         I think it's important again to let me

0057

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

1  reiterate that the bill does absolutely nothing to
2  improve the safety of the citizens of the State of
3  Colorado, so says the Department of Justice and
4  their study, unless, of course, you want to go ahead
5  and go all the way in, go all in, shove them all in,
6  and say we're going to do full-on registration of
7  all firearms.  Then this bill would actually reduce
8  the amount of guns that go into the hands of
9  criminals, but only that way, and not by very much,
10  because we still have the problem of theft and straw
11  purchases.
12      And speaking of straw purchases, when we
13  talk about opportunities to close the aisle down
14  here, if you wanted to work on -- and I offered this
15  to the Governor on January 17th, I believe, Monday
16  morning when I met with him -- if you want to work
17  on closing the -- the straw purchase loophole in
18  that know or should-have-known standard, we could
19  work on that together.  That actually makes some
20  sense, but this bill doesn't do that either.
21      And then, finally, I want to talk about
22  the constitutionality of the bill.  And I -- and
23  I've said this, you know, publicly before.  I -- I
24  think arguing constitutionality in this room is --
25  is somewhat like Evangelicals and Buddhists arguing
0058
1  matters of faith.  It's just not very productive.
2      The arguments for constitutionality should
3  be held in the courtroom in front of a judge.  But I
4  want to establish something for future arguments in
5  the courtrooms, and that is this:  That this bill
6  sets up opportunity for law enforcement officers to
7  question whether or not you can legally possess a
8  firearm that you have.  It sets up a scenario where
9  they can call into question your right to possess a
10  firearm because it gives them the opportunity to ask
11  you if you have received a background check on that
12  firearm.
13      Okay.  So for the courts, and for the
14  record, I have a problem with that.
15      Now, let's deal with the absurdity.  More
16  stories of absurdity that you get from this bill.
17  This bill has nine exceptions to the rule where you
18  have to have a background check for a transfer, any
19  transfer.  One of those, of course, is a -- related
20  to an antique firearm that the fed's defined.
21  That's fine.
22      Another one of those transfers is for a
23  bona fide gift between family members, and that's
24  been expanded since we've been pointing out the
25  absurdities of this to include more people than it
0059
1  had when it originally came out of the house, but
2  that's a bona fide gift.  That means you are

4806

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

3   relinquishing title of that firearm to somebody
4   else.  It's theirs.  There's no guarantee that
5   they're going to give it back.
6        It's like Toy Story, if you can imagine.
7   That's whether the new owner gets to scratch your
8   name off the bottom of the firearm and write their
9   name.  It's theirs.  Scratch Andy off and write
10  Greg.  It's mine now.  He gave it to me.  That's one
11  of the exceptions.
12       Another one is through a will.  So if
13  you -- if you pass away, you can give your guns to
14  just about anybody, and you won't have to go to
15  prison for that.  That's mighty fortunate.
16       Temporary transfer that occurs while in
17  the home of the unlicensed transferee.  Now, this is
18  the part about self-protection.  So if you want to
19  loan a firearm to somebody so that they can protect
20  themselves, you can do that, and there is no
21  limitation on that.  Okay?  As long as they stay in
22  their home, but they can't come over to your house
23  and borrow it from you to take back to their house
24  for their own self-protection, because the law is
25  very specific, you have to do it in the home of the
0060
1   unlicensed transferee.
2        Another one of the great exceptions to
3   this -- and this one's fairly lengthy and this goes
4   to hunting, et cetera, target shooting.  Those
5   exceptions are only good while you're in the field.
6   So my example of loaning a firearm to a friend of
7   mine from my home, who is going to take it on a long
8   hunting trip, isn't covered.  We have to arrange for
9   a background check.
10       Now, I -- I've been in this body for about
11  ten years -- a little over that.  And I know that
12  the laws that show up in those Red Books aren't what
13  you think these bills say, it's what these bills
14  actually say.  And this bill says I cannot loan a
15  firearm to a long-time friend of mine for him to
16  take it hunting if he's going to be gone for more
17  than 72 hours, period.
18       The only way it can go longer than 72
19  hours is if I go with him on the hunting trip, then
20  it's unlimited as to the amount of time.  I can loan
21  it to someone, as long as I'm with them, for almost
22  any instance.  That's G.  And then you get to the
23  72-hour one, and it's clear, 72 hours.  Once you
24  exceed 72 hours, you have a problem.
25       So then it brings up another absurdity.
0061
1   This bill very well could criminalize legislative
2   spouses.  Those of us who don't live in the Denver
3   metro area leave home on Monday morning and come up
4   here and leave our firearms in possession of our

4807

5 family members back at home. Can't bring a bunch of
6 them up here with me because Denver bans some of
7 them that I own.
8       And under the two types of exemptions that
9 cover that, the one for -- unless it's a bona fide
10 gift -- if I want to gift them every week when I
11 leave and trust that they will gift them back to me
12 when I get home so I can use them over the weekend,
13 we could do that. The other one is the self-defense
14 in the home. So as long as Mrs. Brophy only uses
15 the firearms in the home, she's covered. We
16 haven't, either one of us, broken the law.
17      But what happens if on Thursday, I've been
18 gone for 72 hours and my dad, who lives at the farm
19 still, calls her up and says, Hey, we have a
20 rattlesnake out here bothering the livestock and I
21 can't get ahold of Greg's sister. Can you bring a
22 shotgun out and dispatch this rattlesnake to protect
23 our livestock? If she does that on Thursday, that's
24 an illegal transfer because we're outside the
25 72-hour period.
0062
1       There are nine exemptions in this bill.
2 They keep getting added when we point out how absurd
3 this is, but we don't have them all covered yet.
4       Again, we could have tightened up the
5 biggest problem that we have, which is straw
6 purchases, but instead we go down this path that
7 results in utter absurdities in the day-to-day lives
8 of law-abiding Coloradoans.
9       Vote no.
10      THE CHAIRMAN: Senator Aguilar, for your
11 second crack.
12      SENATOR AGUILAR: Thank you,
13 Mr. President.
14      I want to clarify the Internet sales to
15 which I referred took place in person, and I've
16 purchased things from Craigslist, where I just went
17 to somebody's home and we traded goods.
18      And, secondly, I want to read the language
19 here because it says a temporary transfer of
20 possession without transfer of ownership or title to
21 ownership, which transfer takes place -- this is
22 page 6, if you go down to line 9 -- while hunting,
23 fishing, target shooting, or trapping, if this is
24 occurring where it's legal and where and as long as
25 the unlicensed transferee holds a license or permit
0063
1 for hunting, fishing, target shooting or trapping.
2 There is no referral to a 72-hour limit. So Senator
3 Brophy's friend can take his gun on his trip.
4      THE CHAIRMAN: Further discussion?
5      Seeing none, the motion before the body is
6 the adoption of House Bill 1229. A roll call --

7  okay, sorry.  Senator Lambert would like to speak.
8      Senator Lambert.
9      SENATOR LAMBERT:  Thank you,
10  Mr. President.  Sorry for my --
11      THE CHAIRMAN:  Hitch in your get-along?
12      SENATOR LAMBERT:  -- hitch in my get-along
13  here.
14      I'm -- I'm really confused now.  I guess I
15  am one of those legislators that Senator Brophy just
16  talked about.  We had our last election on
17  November 6th.  I moved into my apartment on
18  November 8th, and I promptly went to the airport,
19  left for about three weeks to go to my mother's
20  funeral, came back right after Thanksgiving.  And
21  I -- I didn't go home during the week.
22      And this weekend was the last -- a good
23  example of why.  I couldn't get up my hill because
24  it was too icy.  Plus it is difficult for me to load
25  my car.  My wife's been sick for about three weeks.
0064
1  So, you know, I'm -- I'm not sure if this is a
2  temporary transfer, if so, is it limited by 72
3  hours?  Then I guess that's a new misdemeanor every
4  week for my wife.  If it's a gift, then do I have to
5  pay the IRS every year for every week that I
6  transfer my weapon, all my weapons to my wife, that
7  total cost?
8      And then she has to transfer those all
9  back to me?  Is that taxable?  This is just raising
10  a lot more questions than we've heard answers to.
11      And I'm just an example of that.  There
12  are other people who have to do their business out
13  of state, who have to do their business coming back
14  and forth to different parts of our state.  Even our
15  state employees sometimes go out for days at a time.
16  And it just creates a -- a dilemma, a legal dilemma,
17  of how to interpret this, that we -- we just don't
18  need in law.
19      Now, I -- I said one time some of these
20  bills were a matter of trust.  I trust my wife to do
21  the right thing.  We were both diplomats overseas.
22  We were both trained by the State Department to
23  defend ourselves.
24      My wife actually thought it was really fun
25  going out to the shooting range with the Foreign
0065
1  Protective Service in Washington, D.C., and shooting
2  the kinds of weapons that we might have to have to
3  defend ourselves in overseas environment, all the
4  inventory of our marine security guards at U.S.
5  embassies, including things like Uzis.  She thought
6  that was particularly fun to shoot.
7      And yet what's the impact here on people
8  who are trained with firearms on our veterans, on

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

9   other people going overseas, over unforeseen
10  circumstances?
11         I didn't know it was going to be snowing
12  this week.  It wouldn't have made any difference,
13  because I was here longer than 72 hours anyway.  But
14  it just puts more complications into the law.  What
15  do I have to do?  Every Monday go down and do a
16  background check?  If my wife's out of town, do I
17  have to leave them with somebody else and check
18  them?  You know, I may have to ask for -- to be
19  excused every Monday so I can go down to some gun
20  shop because they're probably not open on Sunday.
21         Maybe -- you know, maybe I could do it
22  every Saturday in advance of coming up to the
23  capital every Monday, and then maybe get off early
24  on every Friday so I can go back and get my guns
25  back so that I can go back and on Saturday
0066
1   retransfer them to somebody else.
2          It just -- there's so many scenarios we
3   just don't know about in this bill.  And I think
4   people of Colorado are listening.  They're having
5   the same questions.  How do we do this?  How do we
6   enforce this?  Why would anybody want to enforce
7   this?
8          So I'd ask for a no vote on House Bill
9   1229.
10         THE CHAIRMAN:  Further discussion?
11         Seeing none, the motion before the body is
12  the adoption of House Bill 1229.  A roll call has
13  been requested.
14         Mr. Majors, would you please poll the
15  Senators?
16         MR. MAJORS:  Aguilar?
17         SENATOR AGUILAR:  Aye.
18         MR. MAJORS:  Aguilar, aye.
19         Balmer?
20         SENATOR BALMER:  No.
21         MR. MAJORS:  Balmer, no.
22         Baumgardner?
23         SENATOR BAUMGARDNER:  No.
24         MR. MAJORS:  Baumgardner, no.
25         Brophy?
0067
1          SENATOR BROPHY:  No.
2          MR. MAJORS:  Brophy, no.
3          Cadman?
4          SENATOR CADMAN:  No.
5          MR. MAJORS:  Cadman, no.
6          Carroll?
7          MAJORITY LEADER CARROLL:  Aye.
8          MR. MAJORS:  Carroll, aye.
9          Crowder?
10         SENATOR CROWDER:  No.

LEG HX 000895

4810

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031113.txt[11/12/2013 10:57:54 AM]

11    MR. MAJORS: Crowder, no.
12    Giron?
13    SENATOR GIRON: Aye.
14    MR. MAJORS: Giron, aye.
15    Grantham?
16    SENATOR GRANTHAM: No.
17    MR. MAJORS: Grantham, no.
18    Guzman?
19    SENATOR GUZMAN: Aye.
20    MR. MAJORS: Guzman, aye.
21    Harvey?
22    SENATOR HARVEY: No.
23    MR. MAJORS: Harvey, no.
24    Heath?
25    SENATOR HEATH: Aye.
0068
1    MR. MAJORS: Heath, aye.
2    Hill?
3    SENATOR HILL: No.
4    MR. MAJORS: Hill, no.
5    Hodge?
6    SENATOR HODGE: Aye.
7    MR. MAJORS: Hodge, aye.
8    Hudak?
9    SENATOR HUDAK: Aye.
10    MR. MAJORS: Hudak, aye.
11    Jahn?
12    SENATOR JAHN: Aye.
13    MR. MAJORS: Jahn, aye.
14    Johnston?
15    SENATOR JAHNSTON: Aye.
16    MR. MAJORS: Johnston, aye.
17    Jones?
18    SENATOR JONES: Aye.
19    MR. MAJORS: Jones, aye.
20    Kefalas?
21    SENATOR KEFALAS: Aye.
22    MR. MAJORS: Kefalas, aye.
23    Kerr?
24    SENATOR KERR: Aye.
25    MR. MAJORS: Kerr, aye.
0069
1    King?
2    SENATOR KING: No.
3    MR. MAJORS: King, no.
4    Lambert?
5    SENATOR LAMBERT: No.
6    MR. MAJORS: Lambert, no.
7    Lundberg?
8    SENATOR LUNDBERG: No.
9    MR. MAJORS: Lundberg, no.
10    Marble?
11    SENATOR MARBLE: No.
12    MR. MAJORS: Marble, no.

13    Newell?
14    SENATOR NEWELL:  Aye.
15    MR. MAJORS:  Newell, aye.
16    Nicholson?
17    SENATOR NICHOLSON:  Aye.
18    MR. MAJORS:  Nicholson, aye.
19    Renfroe?
20    SENATOR RENFROE:  No.
21    MR. MAJORS:  Renfroe, no.
22    Roberts?
23    SENATOR ROBERTS:  No.
24    MR. MAJORS:  Roberts, no.
25    Scheffel?
0070
1    SENATOR SCHEFFEL:  No.
2    MR. MAJORS:  Scheffel, no.
3    Schwartz?
4    SENATOR SCHWARTZ:  Aye.
5    MR. MAJORS:  Schwartz, aye.
6    Steadman?
7    SENATOR STEADMAN:  Aye.
8    MR. MAJORS:  Steadman, aye.
9    Tochtrop?
10    SENATOR TOCHTROP:  No.
11    MR. MAJORS:  Tochtrop, no.
12    Todd?
13    SENATOR TODD:  Aye.
14    MR. MAJORS:  Todd, aye.
15    Ulibarri?
16    SENATOR ULIBARRI:  Aye.
17    MR. MAJORS:  Ulibarri, aye.
18    Mr. President?
19    THE CHAIRMAN:  Aye.
20    MR. MAJORS:  Mr. President, aye.
21    THE CHAIRMAN:  With a vote of 19 ayes, 16
22 noes, zero absent, zero excused, House Bill 1229 is
23 adopted.
24    Cosponsors:  Senator Ulibarri, Senator
25 Aguilar, Senator Kerr, Senator Hudak, Senator Giron,
0071
1 Senator Jones, Senator Heath -- sorry, Mr. Majors --
2 Senator Nicholson, Senator Todd, Senator Steadman,
3 Senator Guzman, Senator Hodge.  Please add the
4 President.  Senator Johnston, Senator Newell.
5    Majority Leader Carroll.
6    MAJORITY LEADER CARROLL:  Thank you,
7 Mr. President.
8    I move that the Senate stand in recess until
9 1:30, where we'll come back and finish third reading.
10    (Whereupon, the recording was concluded.)
11
12
13
14

```
15
16
17
18
19
20
21
22
23
24
25
0072
 1                    CERTIFICATE
 2   STATE OF COLORADO              )
 3   CITY AND COUNTY OF DENVER           )    ss.
 4
 5        I, Elissa Steen, Registered Professional
 6   Reporter and Notary Public in and for the State of
 7   Colorado, do hereby certify that this transcript was taken
 8   in shorthand by me from an audio recording and was reduced
 9   to typewritten form by computer-aided transcription; that
10   the speakers in this transcript were identified by me to
11   the best of my ability and according to the introductions
12   made and written materials provided; that the foregoing is
13   a true transcript of the proceedings had; that I am not
14   attorney, nor counsel, nor in any way connected with any
15   attorney or counsel for any of the parties to said action
16   or otherwise interested in its event.
17         IN WITNESS WHEREOF, I have hereunto affixed
18   my hand and notarial seal this 21st day of June, 2013.
19
20
21
                 _____
22                 Registered Professional Reporter
                                and
23                         Notary Public
24
25
```

0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  JUDICIAL COMMITTEE MEETING
4  Held on March 13, 2013
5  HOUSE BILL 13-1229
6  _____
7             REPORTER'S TRANSCRIPT
   _____

8
9       This transcript was taken from an audio
10  recording by Elissa Steen, Registered Professional
11  Reporter and Notary Public.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
1           P R O C E E D I N G S
2            *    *    *    *    *
3       UNIDENTIFIED SPEAKER:  -- buys guns for
4  the use at that range, does everybody that has an
5  interest in that shooting, in -- in -- in that
6  shooting club or range, do they have to go through
7  a background check?  Do they have to pay for a
8  background check for everybody that goes through
9  that, if it's a 200-, 300-member -- help -- help me
10  understand this.  I don't understand exactly what
11  that says.
12       Is that what that means?
13       MR. SPEAKER:  Representative McCann.
14       REPRESENTATIVE MCCANN:  Thank you,
15  Mr. Speaker.
16       This section is designed to prevent
17  people setting up corporations to purchase firearms
18  rather than having them purchased by individuals.
19  So if a corporation is buying guns, yes, the
20  members of the corporation have to go through a
21  background check.
22       MR. SPEAKER:  Representative Sonnenberg.
23       REPRESENTATIVE SONNENBERG:  -- only
24  two --
25       MR. SPEAKER:  Yes.

1      REPRESENTATIVE SONNENBERG:  Okay.  Thank
2  you, Mr. Speaker.
3      And I guess this will be the last time
4  I'm -- I talk on this by rule.
5      So the example would be that my family
6  corporation that I'm in with my parents, my
7  siblings, and our children, in order for them to
8  continue to collect guns or artifacts that are
9  guns, every one of those members, we would have to
10  pay for a background check, even though we already
11  are a corporation, we already do these type of
12  things.
13      If I understand this correctly, then,
14  every single one, every time we buy a gun, we have
15  to go through 23 background checks.  The way -- the
16  way I understand this, the way it reads, on line
17  22, each member, partner, officer, or other person,
18  that's what I'm trying to understand.  If each
19  person, part of that corporation has to go through
20  a background check, that means 23 or 24 different
21  background checks for that -- for my family farm
22  corporation to buy a gun.
23      I'd ask for a no vote on concurrence.
24      MR. SPEAKER:  Any further discussion?
25      Representative Gerou.
0004
1      REPRESENTATIVE GEROU:  Thank you,
2  Mr. Chair.
3      And I -- I just have another question for
4  the bill sponsors.  Those of you that are
5  familiar -- familiar with different state laws know
6  that in California, most -- most couples set up a
7  trust that they don't -- even their bank accounts
8  are in -- in a trust, they don't hold anything
9  personally just because of the laws of the state.
10      So, Representative McCann, if you could
11  tell me, if -- if I have -- and I have a family
12  trust that I set up for my children so if I get hit
13  by the bus, they don't have to worry about
14  transferring things that I have inherited, and
15  this -- they're not guns, but other things that
16  I've inherited that they -- they automatically --
17  it's one transfer.
18      So the family trust, if I -- if I have a
19  family trust that holds guns, if that's part of
20  what is named in the family trust, then my family
21  members will have to go through the background
22  check because it's -- it's actually held in the
23  trust?
24      I'll wait until you're done talking.  I
25  would be curious because that one -- that's going
0005
1  to be problematic for a lot of families that --

2  well, she's not listening.
3      MR. SPEAKER:  Representative Gerou,
actually Representative McCann can't speak again on
5  this motion --
6      REPRESENTATIVE GEROU:  Okay.
7      MR. SPEAKER:  -- under the rules, so --
8      REPRESENTATIVE GEROU:  Oh, thank you,
9  Mr. Chair -- or Mr. Speaker.  I apologize.
10      Well, then, it sounds to me like this
11  isn't quite solved yet.  And I'll support the
12  Minority Leader's suggestion that we vote for this.
13  But it sounds to me like we may have opened
14  Pandora's box with this.  This is going to be very
15  problematic.
16      MR. SPEAKER:  Representative McNulty.
17      REPRESENTATIVE MCNULTY:  Thank you,
18  Mr. Speaker.
19      I think with Representative Gerou and
20  Representative Sonnenberg having the same
21  questions, I understand while Representative McCann
22  is limited by the rules from answering those
23  questions, Representative Fields is the maker of
24  the motion and can speak to this issue as often as
25  she likes.  And I -- I hope that -- that these
0006
1  questions can be answered, and perhaps they'll be
2  answered in a way that provides clarity to the
3  Republican members who have questions.
4      This is -- these are Senate amendments.
5  This is new to us, new information to us.  And so
6  making sure that the House is comfortable with what
7  the Senate did is an appropriate use of this time,
8  Mr. Speaker.
9      MR. SPEAKER:  I agree, Representative
10  McNulty.
11      Representative Fields.
12      REPRESENTATIVE FIELDS:  Thank you,
13  Mr. Speaker.
14      And as we look at page 3 in the bill, if
15  you are a corporation, you will be required to do a
16  background check.
17      MR. SPEAKER:  Any further discussion?
18      Representative Holbert.
19      REPRESENTATIVE HOLBERT:  Members, I'm
20  inclined to vote yes on concurrence.
21      Representative Sonnenberg has brought up
22  an issue that I had not considered, and I think
23  it's another opportunity for us to -- though this
24  side of the aisle would clearly be in the minority
25  -- to form a conference committee and resolve this
0007
1  issue, the idea of 20-some background checks for a
2  club, is that what you intend?
3      And if it isn't, is there any harm in

4 stepping back and saying, wait a minute, maybe we
5 can -- maybe we can fix this before we -- we just
6 pile onto the people of Colorado with these
7 unnecessary requirements?  Is that really what you
8 intended?  And if it is, I -- I -- I can't
9 understand why you would do that kind of -- put
10 that kind of a requirement on Representative
11 Sonnenberg's constituents.  Why would we do that?
12        Now, I understand there is a reluctance
13 to call a conference committee to form that and go
14 beyond the scope and fix these issues, but that is
15 something I think that the minority, we could
16 certainly support and say wait a minute, even if
17 we're not going to support this bill, don't be so
18 heavy-handed with the people of Colorado.  Please
19 be thoughtful.  Please take a moment and reconsider
20 that.
21        MR. SPEAKER:  Any further -- any further
22 discussion?
23        Representative Dore.
24        REPRESENTATIVE DORE:  Thank you,
25 Mr. Speaker.
0008
1        I have many concerns about this
2 legislation.  But now hearing the fact that a gun
3 club, a shooting club, of which there are many in
4 my district, and they serve members outside of my
5 district as well -- many will come from Denver down
6 to Elbert County, for instance -- that they would
7 have to because the club buys a gun that they want
8 others to try and use that they would not buy on
9 their own, would have to go through background
10 checks, I think goes far beyond what we're trying
11 to do here.
12        I mean, these are individuals who are
13 doing it for the sport.  They're highly trained, if
14 you will, because they've been shooting for so
15 long.  And this is not the individuals that we're
16 worried about.  And then having to go through a
17 secondary hoop, which I think will -- will not only
18 hurt individual's ability to have an opportunity to
19 shoot guns, but it will really hurt these clubs to
20 stay in existence.  And I know that's not the
21 intent of the legislation, to put clubs out of
22 business as well.
23        So I would ask for some clarity or some
24 hope that we could get to a point to where we can
25 get this part cured in the legislation.
0009
1        MR. SPEAKER:  Mr. Assistant Majority
2 Leader.
3        ASSISTANT MAJORITY LEADER PABON:  Thank
4 you, Mr. Speaker.
5        And this argument is a red herring.  The

LEG HX 000902    4817

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031313.txt[11/12/2013 10:57:56 AM]

6   intent on this amendment has to do with the
7   recognition that the State of Colorado has, and
8   frankly, the United States of America has, that of
9   corporate personhood.
10      And what the fear was, and I think this
11  is a just and -- and correct fear, is that an
12  entity, to get around the sale of these weapons
13  without a background check, would be set up a
14  corporate entity, and that would be the transferor
15  involved in these transfers.  That is why you need
16  this protection to guard against this corporate
17  loophole.  Because as jurisprudence and as we well
18  know, a corporate entity is treated as a person for
19  a lot of elements of the law, including this one.
20      So this doesn't deal with the gun clubs.
21  This isn't saying that those entities that are not
22  corporate entities or that they're corporate
23  entities and there's members of those corporate
24  entities, which is a term of art, they will not
25  have to engage in these background checks, but it's
0010
1   for the purpose of preventing the straw purchase.
2   The strawman is what we generally call it, but in
3   this case it would be the straw corporation, to
4   avoid these background checks.
5       That's the intention of the amendment.
6       And with that, I ask for a no vote on
7   going to conference committee and a yes vote on
8   concurrence.
9       MR. SPEAKER:  Representative McNulty.
10      REPRESENTATIVE MCNULTY:  Thank you,
11  Mr. Speaker.
12      And, Representative Pabon, you can just
13  stand down a little bit.  This isn't a red herring.
14  These are sincere questions that are being brought
15  from members of our side of the aisle who have
16  these particular circumstances that I understand
17  may not be familiar to everybody in the chamber,
18  and that -- myself included.
19      Rural Colorado is different than Denver,
20  and for those members who represent the eastern
21  plains, that's different from the western slope.
22  And so these are sincere questions based upon
23  fact-specific situations that we want to make sure
24  are either addressed with these Senate amendments
25  or aren't obstructed by the Senate amendments.
0011
1       I suspect that the vote on the final bill
2   isn't going to be the same, but we're not
3   discussing the bill, we're discussing Senate
4   amendments.  And so having clarity on what these
5   Senate amendments do is important.
6       And it's also important to recognize that
7   you and Representative Fields have given two

LEG HX 000903      4818

8  different answers.  Representative Fields answered
9  Representative Sonnenberg's question in the
10  affirmative, that he would have to have background
11  checks for everybody and that the same would apply
12  when Representative Dore came up to the situation
13  that his constituents face.  And then, you --
14  you -- you come to us and give us a different
15  answer.
16      So there is clearly a need for not only
17  clarity on our side of the aisle, but some level of
18  clarity from -- from the bill's proponents.  And I
19  understand that we're in a situation here where we
20  are limited in the -- in the types of debate and
21  the times that we can speak, so it makes it more
22  difficult.  But having conflicting information from
23  the bill's proponents does -- I think does lend us
24  to a situation where we may not know what the
25  Senate amendments do and how these Senate
0012
1  amendments apply to these specific situations that
2  some of our state representatives -- the
3  constituents of some of our state representatives
4  face.
5      MR. SPEAKER:  Representative Scott.
6      REPRESENTATIVE SCOTT:  Thank you,
7  Mr. Speaker.
8      As you all know, I come from western
9  Colorado, where it's been well publicized that guns
10  are a way of life, and I think we all understand
11  that better than most on the eastern slope.
12      One of the questions that we also have
13  for the sponsors, we, in western Colorado, have a
14  lot of tournament-type shooting events, where
15  people from other states, other regions, other
16  countries, actually come to these shooting
17  tournaments to shoot either sporting clays or to
18  shoot in target-shooting events.
19      The question being:  Will all of these
20  individuals that fly in from, let's just say
21  France, for an example, for a shooting tournament,
22  have to pass a background check prior to being able
23  to participate in this tournament?
24      We're not seeing that in the language of
25  the bill.  And again, I think it's something that
0013
1  we should sit down and discuss before we make a
2  mistake and have to redo something or end up in
3  court with something that we shouldn't have done in
4  the first place.
5      Thank you.
6      MR. SPEAKER:  Representative Fields, do
7  you want to address this point?
8      REPRESENTATIVE FIELDS:  Thank you,
9  Mr. Speaker.

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031313.txt[11/12/2013 10:57:56 AM]

10      And then -- the bill does allow for a
11  transfer for the scenario that you just described.
12  If you look at the amendments made by the Senate,
13  it does allow for that transfer to take place.
14      MR. SPEAKER:  Representative Landgraf.
15      REPRESENTATIVE LANDGRAF:  Thank you,
16  Mr. Speaker.
17      I have a question I'm trying to get
18  answered for a constituent who owns a pawnshop.
19  It's a legitimate question.  His concern is:  He
20  takes in guns, and he gives those guns back to
21  people who have pawned them, and he also sells
22  guns.  So his concern is that when the gun comes
23  in, does he have to have a background check?  When
24  it goes back to the owner, does the owner have to
25  have a background check?
0014
1       The purchaser would have to have a
2  background check, but I'm trying to figure out
3  about the owner who pawned the gun.  Do they have
4  to then have a background check?  And I'm just
5  wondering if somebody who can speak on that could
6  give me an answer?  And I'm -- I'm guessing he
7  doesn't need one when he takes it in because he's
8  covered under whatever rules apply.
9       MR. SPEAKER:  Representative Fields.
10      REPRESENTATIVE FIELDS:  Thank you,
11  Mr. Speaker.
12      And if you look in the bill, on page 7
13  the Senate did make some amendments.  And it says
14  here that an owner, manager, or an employee of a
15  business that repairs or maintains a firearm may
16  transfer that firearm.
17      MR. SPEAKER:  Representative Coram.
18      REPRESENTATIVE CORAM:  Thank you,
19  Mr. Speaker.
20      I will not speak on what happens in -- in
21  the metro Denver, I-25 corridor, or the eastern
22  plains, but I can assure you that in rural, western
23  Colorado, probably 90 percent of our farms and
24  ranches are either corporations or LLC's.
25      And if the LLC were to buy a weapon, and
0015
1  there's maybe 25, 30 members of this limited
2  liability corporation, that weapon is used for
3  predator control.  It doesn't stay in one location.
4  It -- it goes around with different members of the
5  LLC.  So, therefore, they would have to get a
6  background check each time that changes; is that
7  correct?
8       MR. SPEAKER:  Representative Fields.
9       REPRESENTATIVE FIELDS:  Thank you,
10  Mr. Speaker.
11      And I think there's -- there may be some

12  confusion regarding corporations as it relates to
13  family members, 'cause the bill does have outlines
14  and exceptions that you can make a transfer to your
15  immediate family member.  But, if you are a
16  corporation, you will be required to have a
17  background check.  So if you are a family member,
18  you can make that transfer to your uncle, your
19  niece, your nephew, your cousin, the mother,
20  everything that we've already identified as
21  immediate family member.
22        MR. SPEAKER:  Representative Priola.
23        REPRESENTATIVE PRIOLA:  Thank you,
24  Mr. Speaker.
25        Representative Fields, I think
0016
1  Representative Coram's question was:  If your ranch
2  is incorporated, your Bar-K ranch, let's say, and
3  your 20 or 30 ranch hands that patrol the
4  perimeter, fix a fence so on and so forth, they
5  don't all work at the same time, but they hop on
6  the ATV -- yes, I did say ATV -- and they also take
7  a weapon with them, how does that relate to the
8  requirements of the background checks?
9        Do they have to have a one-time
10  background check as an employee of the entire
11  corporation or LLC, or do they have to have
12  background checks, assuming that they will or won't
13  have it within the 72-hour window?
14        MR. SPEAKER:  Representative Fields.
15        REPRESENTATIVE FIELDS:  Thank you,
16  Mr. Speaker.
17        And the bill does already allow for a
18  temporary transfer for 72 hours.  And it's my
19  understanding that there would only be a one-time
20  background check if these folks are employed with
21  this corporation.
22        MR. SPEAKER:  Representative Kagan.
23        REPRESENTATIVE KAGAN:  Thank you.
24        And I'd just like to add that my
25  understanding of the bill, Representative Coram, is
0017
1  that if the corporation has bought it, the
2  corporation is the owner, and all the members of
3  the corporation have to have the background check,
4  then it is a piece of corporate property, and any
5  member of the corporation who has had the
6  background check can pass it between themselves
7  because it is a piece of corporate property and
8  there is no transfer taking place, as long as a
9  member of the corporation themselves has it.
10        So I think that if the situation that
11  Representative Coram averted to were to take place,
12  no, there would not be a need for subsequent
13  background check every time somebody passed it from

LEG HX 000906

4821

14  one member of the corporation to another, one
15  farmhand member to another.  I -- I think that it's
16  corporate property at that point.
17       MR. SPEAKER:  Representative Priola.
18       REPRESENTATIVE PRIOLA:  Thank you,
19  Mr. Speaker.
20       This also leads to another question
21  concerning ranch ownership, corporation.  Let's
22  say, for instance, that a member of the family that
23  lives in Oregon and comes out to the family ranch
24  every few years or so but really is a silent
25  partner in the business, would that resident of
0018
1  Oregon have to go through a background check as a
2  member of the corporation, even though they -- him
3  or her -- may never even actually come in contact
4  of -- with the weapon?
5       MR. SPEAKER:  The House will stand in a brief
6  recess.
7       (A recess was taken at this time.)
8       MR. SPEAKER:  The House will come back to
9  order.
10       Madame Majority Leader.
11       MAJORITY LEADER HULLINGHORST:  Thank you,
12  Mr. Speaker.
13       I move to lay over House Bill 1229 one
14  bill.
15       MR. SPEAKER:  Seeing no objection, and
16  just to be clear with Members, when we come back to
17  this bill, Members who have spoken twice will still
18  not be allowed to speak under the rules.  I just
19  want to make that clear.
20       House Bill 1229 will be laid over one bill.
21       (House Bill 1229 continued.)
22       REPRESENTATIVE FIELDS:  -- find a very
23  legitimate issue in one of the amendments that the
24  Senate adopted regarding background checks for
25  corporations.  So I thank them for raising this
0019
1  important issue and -- and helping us to make this
2  bill better.
3       I'm very confident that we can address
4  this issue while still ensuring that corporations
5  are not used to make straw purchases for those
6  individuals who cannot pass background checks.
7       MR. SPEAKER:  Representative McCann.
8       REPRESENTATIVE MCCANN:  I concur with
9  Representative Fields' recommendation that we
10  reject the Senate amendments.
11       MR. SPEAKER:  Representative Sonnenberg.
12       REPRESENTATIVE SONNENBERG:  Thank you,
13  Mr. Speaker.
14       And, Members, I would also urge that you
15  adopt this motion.  Vote yes to go to conference

16    committee so we can indeed address those issues
17    that were talked about earlier.
18        So thank you.
19        MR. SPEAKER:  The question before the
20    House is to reject Senate amendments and appoint a
21    conference committee on House Bill 1229.
22        Mr. Kolar, please open the machine, and
23    Members proceed to vote.
24        Representatives Court, Rosenthal, Ryden.
25        Close the machine.
0020
1        With 64 aye votes, zero no votes, one
2    excused, and zero absent, the House rejects said
3    amendments to House Bill 1229 and requests a
4    conference committee be formed.
5        The conferees are Representatives
6    Sonnenberg, McCann, Fields, Chair.
7        Madame Majority Leader.
8        MAJORITY LEADER HULLINGHORST:  Thank you,
9    Mr. Speaker.
10        I move to lay over the balance of the
11    calendar until Thursday, March 14.
12        MR. SPEAKER:  Seeing no objection, the
13    balance of the calendar will be laid over as
14    requested by the Majority Leader.
15        (Announcements and introductions.)
16        MR. SPEAKER:  And just to make sure there's
17    notice, the conference committee on House Bill 1229 will
18    be meeting tomorrow.  So just everyone knows that.
19        Seeing no objection, the House will stand in
20    recess until 2:30 today.
21        (Whereupon, the recording was concluded.)
22
23
24
25
0021
1            CERTIFICATE
2    STATE OF COLORADO            )
3    CITY AND COUNTY OF DENVER        )    ss.
4
5        I, Elissa Steen, Professional Shorthand
6    Reporter and Notary Public in and for the State of
7    Colorado, do hereby certify that this transcript was taken
8    in shorthand by me from an audio recording and was reduced
9    to typewritten form by computer-aided transcription; that
10    the speakers in this transcript were identified by me to
11    the best of my ability and according to the introductions
12    made; that the foregoing is a true transcript of the
13    proceedings had; that I am not attorney, nor counsel, nor
14    in any way connected with any attorney or counsel for any
15    of the parties to said action or otherwise interested in
16    its event.
17        IN WITNESS WHEREOF, I have hereunto affixed

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031313.txt[11/12/2013 10:57:56 AM]

18    my hand and notarial seal this 5th day of August, 2013.
19
20
21
22    _____
         Registered Professional Reporter
23                        and
              Notary Public
24
25

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031313.txt[11/12/2013 10:57:56 AM]

```
0001
 1  CITY AND COUNTY OF DENVER
 2  STATE OF COLORADO
 3  JUDICIAL COMMITTEE MEETING
 4  Held on March 14, 2013
 5  HOUSE BILL 13-1229
 6  _____
 7          REPORTER'S TRANSCRIPT
    _____
 8
 9      This transcript was taken from an audio
10  recording by Elissa Steen, Registered Professional
11  Reporter and Notary Public.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
 1          P R O C E E D I N G S
 2          *   *   *   *   *
 3      COMMITTEE CHAIR REP. FIELDS:  Good morning.
 4  Calling together the conference committee for House
 5  Bill 1229.
 6      Ms. Shipley, please call the roll.
 7      THE CLERK:  Representative McCann.
 8      REPRESENTATIVE MCCANN:  Here.
 9      THE CLERK:  Senator Ulibarri.
10      SENATOR ULIBARRI:  Here.
11      THE CLERK:  Representative Sonnenberg.
12      REPRESENTATIVE SONNENBERG:  Here.
13      THE CLERK:  Senator Brophy.
14      SENATOR BROPHY:  Here.
15      THE CLERK:  Senator Carroll.
16      SENATOR CARROLL:  Here.
17      THE CLERK:  Madame Chair.
18      COMMITTEE CHAIR REP. FIELDS:  Here.
19      REPRESENTATIVE FIELDS:  We're here to
20  discuss the -- the merits of the bill and the reason
21  (inaudible) specifically treats corporations, and how
22  they're used to make straw purchases for individuals
23  who cannot pass a background check.  So that's going
24  to be the -- the scope of our discussion today.
25      Senator Carroll.
```

1        SENATOR CARROLL:  Thank you, Madame Chair.
2        I can start our discussion with -- move
3  conference committee report Amendment Q for the
4  first report on the first conference committee.  And
5  folks may know that this (inaudible), I had actually
6  started with an amendment in the Senate that was
7  trying to deal with --
8        (Inaudible speakers.)
9        COMMITTEE CHAIR REP. FIELDS:  Who seconded?
10       REPRESENTATIVE MCCANN:  I did.
11       COMMITTEE CHAIR REP. FIELDS:  Seconded by
12  Representative McCann.  Okay.  Thank you.
13       Senator Carroll.
14       SENATOR CARROLL:  Thank you, Madame Chair.
15  Sorry about that.
16       So in the amendment that I had put on in
17  the House, we were trying to deal with, and we were
18  alerted to the fact that anyone could (inaudible)
19  any criminal avert a background check by basically
20  doing it through a straw purchase (inaudible).
21       And I think you guys helped highlight
22  yesterday -- and some of the language specifically,
23  for example, looking at anyone with a beneficial
24  interest could be incorporated to include
25  shareholders and all kinds of people who may never,
0004
1  in fact, come into possession with any firearm.  And
2  so what 2 does, is this -- so it's conforming the
3  definition of a transferee.  But specifically the
4  way it fixes the problem and what's there is it
5  narrows it only to natural persons who come into
6  actual possession.
7        So in the shareholder situation, if you
8  had a corporation or a trust or -- but somebody
9  who's never going to see this firearm, in this case,
10  it's only natural people who would come into actual
11  possession.  And so that is meant to narrow the
12  point of the (inaudible) on that.
13       COMMITTEE CHAIR REP. FIELDS:  Further
14  discussion?
15       Representative Sonnenberg.
16       REPRESENTATIVE SONNENBERG:  Thank you,
17  Madame Chair.
18       And I am -- for the purpose of discussion,
19  I am going to move to substitute 4 --
20       SENATOR BROPHY:  Second.
21       REPRESENTATIVE SONNENBERG:  -- and ask that
22  we discuss that as well, because the provisions in 4
23  and -- and understand that even though you made the
24  statement this is solely to deal with the corporate,
25  we can still deal with any of the Senate amendments in
0005
1  the conference committee.

LEG HX 000911
4826

2    And those amendments also address, I think,
3    the -- the husband-wife issue that is a part of 4 as
4    well.  And so I would ask at least to have that
5    discussion on 4, as I think those are -- those are
6    things that needed to be added as well.
7        COMMITTEE CHAIR REP. FIELDS:  4 has been
8    moved and seconded.
9        Can we have discussion?
10        Representative Brophy -- Senator.
11        SENATOR BROPHY:  Thank you, Madame Chair.
12        And looking at -- looking at the -- the
13    first amendment and comparing it to the second
14    amendment, I see that we have zeroed in on a -- on
15    one of the same flaws in 1229, one of the many
16    absurdities that exist in this bill, where, for
17    instance, if you had a security corporation, every
18    shareholder would have to be background checked
19    under 1229 on the re-revised bill.  And I think both
20    Amendment 2 and Amendment 4 address that.
21        I think that the -- the language in
22    Amendment 2 appears to be more elegant, but I think
23    it misses a couple of things that are picked up in
24    the language in Amendment 4 on the first page, where
25    we include it -- the -- I think it's a
0006
1    subparagraph -- or -- or, well, we don't have lines
2    on this, but down where the last A in parentheses
3    is, in regards to whether the transferee of the --
4    of the transfer is a member of the corporation,
5    association, partnership, or limited liability
6    company.
7        That would actually catch those security
8    guards, who are employees of the security
9    corporation, for instance, if the corporation
10    happens to purchase some of the firearms used for
11    the security purposes.  And I -- I believe that
12    your -- your amendment misses that.  And I think we
13    could make the language more elegant like yours is,
14    but I think -- I think Amendment 4 catches other
15    (inaudible) people who would have reason to possess
16    a firearm.
17        And further, on the second page of
18    Amendment 4, Representative Sonnenberg also
19    discovered that we could, under that same difference
20    between the House and the Senate, ensure that the
21    transferee does not include a member of a youth
22    organization whose participation in shooting sports
23    if they take temporary possession of a firearm.
24        And, you know, for instance, on a 4-H
25    shooting sport, when we're trying to reach out to --
0007
1    to kids in -- in the 4-H community, sometimes
2    you'll -- you'll find young people who come from a
3    household where they may not possess, for instance,

4    a shotgun for -- for a shooting sports purposes, and
5    they may need to take temporary possession of the
6    shotgun through their 4-H participation.  It goes
7    well beyond the 72-hours.  They may need to
8    take possession (inaudible) -- I mean, they may need
9    to take possession of that shotgun for the entire
10   length of the shooting sport season, which runs from
11   sometime early in the spring until either the county
12   fair, or if they're so lucky as to achieve it, the
13   state fair at the end of August, where they have the
14   final shooting competition -- trap-shooting
15   competition.
16          And so, on the top of page 2, Roman
17   numeral III takes that into account, and I think
18   fixes that absurdity that resulted from the
19   re-revised version of House Bill 1229.
20          And then further down on page 2, where we
21   amend the build, that re-revised bill, on page 5,
22   line 13, if you want to go to that part.
23          What we're talking about there, this is
24   where you have the -- the -- the bona fide gift
25   section, which again, created the absurdity that,
0008
1    for instance, when I leave home on Monday morning,
2    unless I do a bona fide gifting over to my wife on
3    day four of the -- of my absence, she can no longer
4    take a firearm out of the house for any purpose
5    without being in violation of the illegal transfer
6    part of this bill.
7          Another absurdity that -- that -- that
8    we're trying to fix here with -- with the inclusion
9    of loan besides bona fide gift to immediate family
10   members, as expressed in that section of the bill.
11          And then, finally, further down on page 2,
12   where we say -- where we're amending -- actually, on
13   page 2 of the amendment, go to page 7 of the bill,
14   after line 6, this is where we expand the definition
15   of immediate family members to include step
16   relations.
17          So, for instance, if you have a stepson or
18   a stepdaughter, you would be able to do the bona
19   fide gift or loan to your stepchildren, partners of
20   civil unions, and domestic partnership, and then
21   finally, the dreaded mother-in-law.
22          COMMITTEE CHAIR REP. FIELDS:  Further
23   discussion on L.004?
24          Senator Morgan Carroll.
25          SENATOR CARROLL:  Thank you, Madame Chair.
0009
1          So I guess just a couple of different
2    thoughts on some of the different components on --
3    on what's here.
4          As to closing, like, the shareholder
5    issue, I -- I -- I do think that I have preference

LEG HX 000913

4828

6  for the language that's in 0.
7       As to the additional issues that you
8  raised in yours, some comments on feedback, I would
9  believe a member in a youth organization is already
10  covered under the 72-hour section.  I actually like
11  the -- I think the addition (inaudible) next section
12  of making a gift or loan may make some sense,
13  because they're still subject to, as long as you're
14  not a convicted felon and all that other stuff.
15       And I -- I'm -- the definition on family,
16  this is broader than the scope of either the House
17  or Senate version on the definition of family.  So
18  despite different reaction to the different
19  components of what you have in here, and cutting and
20  pasting isn't the easiest thing of what we do, but I
21  think the last part is broader than what we did in
22  either the House or the Senate.
23       COMMITTEE CHAIR REP. FIELDS:  Representative
24  McCann.
25       REPRESENTATIVE MCCANN:  Thank you, Madame
0010
1  Chair.
2       So I had a question about the boarding,
3  the (inaudible) club boarding kind of situation.
4  Because it seems to me that if the way it would work
5  that the 4-H, or the person that's running the 4-H
6  club, would be the one that would actually get the
7  gun, and then -- or do the guns get transferred to
8  the parent of the person that's -- I mean, because
9  you're not going to give the gun to a 14-year-old, I
10  assume.  I mean, you could -- you have to have
11  somebody supervising the person.
12       So it -- what I'm getting at is that, if
13  the director of the 4-H group takes possession of
14  the gun and has a background check, then presumably
15  the gun would be used in his or her presence.  So I
16  don't know that we need to add that in here.  It
17  seems like it's already covered through other
18  provisions that are exceptions.
19       COMMITTEE CHAIR REP. FIELDS:  Representative
20  Sonnenberg.
21       REPRESENTATIVE SONNENBERG:  Thank you,
22  Madame Chair.
23       And actually I'll address your question
24  first, and then I'll go back to Senator Carroll's
25  question.
0011
1       The way it typically works in -- in youth
2  sports, those youth shooting sports, is that you
3  will have someone that wants to learn about guns and
4  then they have the opportunity to take guns apart,
5  to clean them.  And this is done over a longer
6  period of time than 72 hours.
7       What happens is, is you find someone

LEG HX 000914    4829

8   that's supportive within the community that will
9   allow them to borrow a gun, whether it be a simple
10  22 or a shotgun, whatever type of shooting sport
11  they're using at that time, and they will loan that
12  gun to actually the child, and the child -- I
13  believe they have already gone through the
14  hunting -- hunter's safety course to be able to
15  participate in the shooting sports, but I'm not sure
16  of that -- but what happens is, is that they are
17  then allowed to keep that gun and utilize that gun
18  on their own without a -- a leader there.
19         That's the purpose for them to continue
20  to -- to work on that project and learn about that
21  gun without the leader there.  And so I don't
22  believe it would fall under the 72 hours.  Many of
23  those are -- sometimes a project can be completed in
24  30-45 days.
25         As Senator Brophy said, oftentimes they're
0012
1   given in the spring to be utilized until the county
2   fair or the state fair, when the project's
3   completed.  So it can be three, four months.
4          With regard to Senator Carroll and talking
5   about the -- the potential of the last portion being
6   outside of the scope, I would argue that the top of
7   page 7, where we are talking about family, and the
8   Senate indeed added the provisions and then tried to
9   define what is family as a spare -- a spouse, a
10  parent, a child, but this indeed would be part of
11  that scope as we figure out indeed what a family
12  member is, as we try to figure that solution.  So I
13  would argue that it indeed fits within the scope of
14  this committee.
15         COMMITTEE CHAIR REP. FIELDS:  Further
16  discussion?
17         Senator Ulibarri.
18         SENATOR ULIBARRI:  So I want to keep to one
19  of the provisions of that line.  Page 5, line 13,
20  after difficult, insert or loan.
21         I guess in terms of property in common
22  between spouses, I don't understand why you would have
23  to loan property that's held commonly between spouses
24  if that property is -- is essentially owned by two
25  married couples.  I say that for me, a perspective of
0013
1   someone who is not yet in a civil union or has any
2   legal recognition in my relationship.  I understand
3   what is mine is mine under law.  But for married
4   couples, what is hers is also his, and vice versa.
5   And so saying that there must be a loan or bona fide
6   gift belies the fact that the property that's held in
7   a marriage is property that's jointly held.  So I
8   guess I'm confused about why that would be necessary.
9          COMMITTEE CHAIR REP. FIELDS:  Senator

LEG HX 000915

4830

10  Carroll.
11      SENATOR CARROLL:  Thank you, Madame Chair.
12      It -- it's actually an interesting point
13  because as respect to spouses, as you guys know, any
14  property that's acquired subsequent to marriage is
15  joint property by law.
16      COMMITTEE CHAIR REP. FIELDS:  Senator
17  Brophy.
18      SENATOR BROPHY:  Thank you, Madame Chair.
19      And I thought about that.  The problem is
20  that the specifics in this bill, with regard to
21  firearms and transfers, would override that general
22  rule because the legislature got specific in here
23  dealing with bona fide gifts, and then potentially
24  loans.  So that specific, then, suggests that the
25  spouse would have to either be gifted the firearm or
0014
1  go get a background check in order to qualify for
2  the handling of it.
3      I would suggest that your -- your joint
4  property ownership rule would apply if they have a
5  divorce and you have to take into account the value,
6  the monetary value, of the firearms.  But because
7  1229 gets specific about background checks and
8  transfers, the transfer rule still applies, even
9  between spouses.
10      COMMITTEE CHAIR REP. FIELDS:  Representative
11  Sonnenberg.
12      REPRESENTATIVE SONNENBERG:  Thank you,
13  Madame Chair.
14      And if I would -- could add to that, I
15  would also say that, that many of my guns, I've had
16  for years before I was married.  And for my wife to
17  be able to access those guns, that would be a
18  violation.
19      COMMITTEE CHAIR REP. FIELDS:  Representative
20  McCann.
21      REPRESENTATIVE MCCANN:  Personally, I don't
22  have any problem adding loan in there because, um, I
23  think the idea of gifting a (inaudible) Representative
24  Sonnenberg doesn't want to give all his guns to his
25  wife --
0015
1      REPRESENTATIVE SONNENBERG:  She won't give
2  them back.
3      REPRESENTATIVE MCCANN:  See, that's a part
4  of the problem with the way that it's worded, is that
5  if you give it to somebody, technically they don't
6  have to give it back.
7      So, I mean, I think that's the spirit of
8  what we were trying to say is that you can loan your
9  gun to your child to go hunting without having to
10  gift it or have to (inaudible) background check.
11      And I -- I would like a little more

12  discussion on the expansion of the family members,
13  actually, because, um, you know, if you have a
14  stepson, not (inaudible) or a son or a daughter, and
15  I think we do want to be expand it to partners of
16  civil unions and domestic partnerships.  Inlaws, I
17  don't know, maybe.  I think we have to be careful
18  about that, because I'm not sure what that
19  encompasses, maybe father-in-law, mother-in-law, but
20  inlaws of nieces and nephews and cousins and aunts
21  and uncles and all of that, I don't -- I don't think
22  we want to deal with.  Maybe a brother-in-law or a
23  sister-in-law, mother-in-law, father-in-law, I
24  wouldn't have any problem with that, something more
25  limited.
0016
 1        COMMITTEE CHAIR REP. FIELDS:  Senator
 2  Brophy.
 3        SENATOR BROPHY:  Thank you, Madame Chair.
 4        And, Representative, thank you for your --
 5  your -- your thoughtful reception on all of the
 6  first part of -- of this latter part of Amendment 4.
 7        I'd like to specifically address the --
 8  the in-law question.  I think it's -- I think it's
 9  fairly important if we -- if we keep the -- the
10  in-law relationship very similar to what was amended
11  in -- in the Senate to include, you know, your --
12  you can have a -- a brother-in-law, you know, who's
13  a -- who's an avid hunter who maybe is trying a
14  different type of game than he's ever hunted before,
15  who would like to borrow one of my specific rifles
16  that would be, you know, the appropriate size for
17  that, he isn't covered under this bill.  It's
18  another one of the absurdities in this bill.  So I
19  think that it would be appropriate to add them at
20  that relationship level.  And -- and I think that's
21  what this really does grasp, and I'm not sure about
22  the niece and nephew.  I also have, you know, when a
23  -- you know, if you're from a multi-generation
24  farming family in a community, you end up with
25  great-nieces and great-nephews and, you know -- I
0017
 1  have -- I have -- I have a great-nephew who's
 2  actually older than my son, but pretty much a
 3  contemporary, and I've contemplated that I can loan
 4  him a shotgun, you know, when he -- when he goes to
 5  the farm to stay with my dad, you know, his
 6  great-grandpa.
 7        You know, and I -- and I think that -- we
 8  should catch that type of relationship.  And again,
 9  if they are not legally allowed to possess or
10  purchase a firearm, you're still not covered, you
11  know, it's not a blanket -- it's not a blanket
12  get-out-of-jail-free card here.  It -- it's -- it's
13  just recognizing that, you know, just so many absurd

14  results from trying to require every single transfer
15  have a background check, even -- you know, even to
16  the extent which we're sort of working on but still
17  not covered, if you're out camping but not target
18  shooting, and only one of you brings a handgun, the
19  other can't possess it without a background check.
20      COMMITTEE CHAIR REP. FIELDS:  So I believe
21  L.004, on page 2, the paragraph that we're discussing
22  right now, which would be immediate family members, is
23  beyond the scope of differences.  So I don't -- I
24  don't think that we can expand the scope.
25      Senator Carroll.
0018
1      SENATOR CARROLL:  Thank you, Madame Chair.
2      You know, for the committee, just one
3  thought is -- because we're an a substitute motion
4  here, and I think the committee members might have
5  slightly different thoughts about the components of
6  what's been brought on 4.
7      So one thought, I think, is that we could
8  take -- we could start with the narrower question of
9  just lending it to natural persons on transfer here,
10  and then maybe take up portions of this committee
11  report separately.
12      Because I am sensing -- you know, I agree
13  with Representative McCann, you know, for example,
14  on the provision of adding or loan, gift or loan,
15  under the immediate family section.  And so rather
16  than doing it all, I think right now in order to get
17  the underlying motion, we could either withdraw or,
18  frankly, I'd be -- if it's all or nothing, I'd be
19  inclined to vote that down or if we do it
20  (inaudible), but I think if we could accept the
21  natural language stuff here and then maybe take up
22  components of your proposed changes on one issue at
23  a time would be (inaudible).
24      COMMITTEE CHAIR REP. FIELDS:  Representative
25  Sonnenberg.
0019
1      REPRESENTATIVE SONNENBERG:  Thank you,
2  Madame Chair.
3      My concern with the natural person
4  language in 002, for example, the Haxton Gun Club is
5  a corporation, and it's a shooting club with 104
6  members.
7      Under the way this is written, if they
8  purchased the gun, in order for anyone in that
9  corporation to use that gun, according to this
10  language, all 104 would have to have done a
11  background check, if I read that correctly.
12      Under my provision, and the first page,
13  that takes care of that and allows them to use that
14  gun on the range there within that 72-hour period.
15      COMMITTEE CHAIR REP. FIELDS:  Senator

16  Ulibarri

17      SENATOR ULIBARRI:  So I think procedurally
18  we're at a point in discussing whether or not to
19  substitute 4 for L.002, right?  So speaking to 2 is
20  definitely speaking to 4.  And I understand there's a
21  difference in what it's saying.
22      I guess for me, I understand that folks
23  who use guns that are owned or purchased by a
24  corporation have the ability, that 72-hour period,
25  but for a gun club, there would be, in my opinion,
0020
1  ability for someone to come and use that gun
2  underneath the guise of that club, and would still
3  be subject to a background check if they're going
4  through the club for a pheasant hunt or something
5  else.
6      And so I guess I see the language,
7  definitely, but I think the motion before us is
8  whether or not this substitutes L.004 for 2, and
9  then we can go back to (inaudible) 2 versus 4.
10      COMMITTEE CHAIR REP. FIELDS:  Senator
11  Brophy.
12      SENATOR BROPHY:  Thank you, Madame Chair.
13      And -- and once again, Senator, the
14  problem is:  The specific overrules the general when
15  the courts look at things -- questions like that.
16      But the 72-hour rule applies or does the
17  corporate rule apply because there was a specific
18  rule directed at corporate relationship, that
19  specific rule will apply and overrule this
20  general -- especially since the 72-hour rule has
21  been characterized as a general catch-all by the
22  sponsor of the bill.  So we have to fix that part.
23      The 72-hour rule can no longer overrule
24  the specific exemptions laid out in the bill.  It is
25  a catch-all general, and the courts will look at the
0021
1  specifics and say that they rule over the general.
2      So we have no -- well, if we want to make
3  it right.  If we want to make it so that everyone
4  doesn't have to get a background check by sense of
5  being a member of the corporation, then we have to
6  accept that language.
7      We can't try to rely on the general
8  72-hour catch-all rule because the courts will not
9  go along with that.  They will follow the specifics.
10      COMMITTEE CHAIR REP. FIELDS:  Senator --
11  Representative McCann.
12      REPRESENTATIVE MCCANN:  Thank you, Madame
13  Chair.
14      I don't -- I don't know if that's correct.
15  I mean, I think an argument can be made both ways.
16  But in general, the specifics would overrule the
17  general, but that's usually if they're different

18  statutes.
19      In that statute, because we have
20  exemptions that are outlined, and then this section
21  comes later.  I'm not sure that you -- that that's
22  the way a court would rule.  I mean, I think you
23  could make arguments both ways.
24      COMMITTEE CHAIR REP. FIELDS:  And I -- I
25  agree with Representative McCann because the way I
0022
1  read the bill, when I look at page 5, the transfer
2  of -- the transfer is a temporary transfer of
3  possession without transferring of ownership, and it
4  then identifies organizations, it identifies shooting
5  ranges, it identifies that it can do that without
6  having to be restricted to a 72-hour hold.  So I
7  believe that that is already covered in the original
8  intent of the bill.
9      Representative Sonnenberg.
10      REPRESENTATIVE SONNENBERG:  Thank you,
11  Madame Chair.
12      And let's -- let's assume that you are
13  correct, that that's the way the court would see it.
14  As this is written, for any of the members of the
15  gun club to take possession of that gun, to utilize
16  it according to this, they would have to have a
17  background check.  So every one of the 104.
18      I don't believe that fits under the
19  72-hours.  Are you -- are you saying to me that you
20  believe it does?
21      COMMITTEE CHAIR REP. FIELDS:  Senator
22  Carroll.
23      SENATOR CARROLL:  Thank you, Madame Chair.
24      First of all, I don't think if you're a
25  member of a club that you are receiving it as an
0023
1  entity.  I think you're receiving it as an
2  individual.
3      So you'll recall, when we go through the
4  whole structure of the exception, (inaudible), you
5  can meet any one of these exceptions.  So if I'm a
6  member of a club, I'm still a person.  And there's,
7  yes, the 72-hour catch-all, and you can do basically
8  whatever, as long as you stay in possession, you're
9  not giving it to a felon.
10      But there's actually multiple -- you don't
11  lose your status as an individual, you don't become
12  an entity because you're a member of a club.  So
13  the -- we are focusing on the, like, trust and the
14  straw corporation, but the fact is, is that if I
15  belong to a club, and I'm either buying or
16  transferring a weapon, and I'm still doing that as
17  an individual, natural person.
18      And so you'll see, for example, the
19  exceptions about at a shooting range where it's

20  located or at a firearms shooting competition.
21  There's existing language in there about
22  organization organized for conservation purposes or
23  to foster proficiency in firearms.
24      I think there's up to four different
25  exceptions explicitly spelled out that would satisfy
0024
1  the facts that you're talking about.  You could pick
2  any number of them, but I believe under the current
3  bill, none -- that -- that scenario, those -- would
4  not have to go through a background check, under a
5  number of existing exemptions.
6      COMMITTEE CHAIR REP. FIELDS:  Senator
7  Brophy.
8      SENATOR BROPHY:  Thank you.
9      Well, the problem is:  We have so many
10  specifics in here.  For instance, the -- the
11  temporary transfer or possession without transfer of
12  ownership, which I have on page 6, at the top of
13  page 6, in the re-revised bill, which should be the
14  latest version.  That -- that is limited.
15      Then, E, specifically E, is limited then
16  by Roman numerals I, II, and III; and then III is
17  limited by I think that's subparagraph A and B.
18      And so -- so that's -- what that all talks
19  about in that case is, is those -- are those
20  temporary transfers that -- that happen while you're
21  all together as a group doing some kind of group
22  activity, hunting together, because it says while in
23  the field and while hunting, so while engaging in
24  that activity, at -- at the shooting range.
25      So I'm still afraid that we have to
0025
1  address the -- the unintended consequences of -- of
2  drawing in everybody who may not be there but are
3  specifically listed as -- as members of a
4  corporation.
5      Again, go back to the security company
6  example that -- that may be publicly held.  Every
7  shareholder has to get a background check if we
8  don't -- if we don't fix this.  And they won't ever
9  even see that aspect of the security company, namely
10  a firearm purchased for security purposes, but they
11  have to get a background check.
12      And I think it's important that we -- that
13  we fix that and that we recognize that when you
14  start getting specific like this, you've got to
15  follow the specifics because the general wouldn't
16  apply.
17      COMMITTEE CHAIR REP. FIELDS:  Representative
18  McCann.
19      REPRESENTATIVE MCCANN:  Thank you, Madame
20  Chair.
21      Well, the way I read Amendment 02, even

4836

22  though I know we're talking about the substitute
23  (inaudible), the background check is only required
24  for the person who's actually going to take
25  possession of the weapon.  It's not every member of
0026
1  the club.
2        If -- you know, if you go into a club --
3  the way I understand it is that most people take
4  their own guns to the club.  But if somebody doesn't
5  have a gun or a new person that wants to show
6  someone else how to use a gun and they don't have --
7  actually, maybe the club has purchased some guns
8  that people can rent or borrow, I think they would
9  be exempted under the 72-hour, myself.  But, also, I
10  think even if they're not exempted under the
11  72-hour, it's only the people who actually -- it's
12  only the person that's going to use the gun that
13  would -- would need to get a background check.
14        Most of your members who bring their own
15  guns are never going to need to lend a gun or own --
16  take a gun from the gun club.
17        COMMITTEE CHAIR REP. FIELDS:  Representative
18  Sonnenberg.
19        REPRESENTATIVE SONNENBERG:  Thank you,
20  Madame Chair.
21        And that is very true.  The scenario in
22  which this creates a problem is:  If a gun club buys
23  a gun and it's put in its gun case and then one of
24  the members comes to utilize -- and he brings his
25  own gun, but he brings someone else that needs a gun
0027
1  -- and they want to utilize that gun, according to
2  this, every -- he would have had to have had a
3  background check before he could utilize that gun or
4  loan it under the 72 hours to someone else.
5        And since you don't know which one of the
6  other 103 are going to bring somebody and need to
7  use that gun, they will all need to have that
8  background check according to the language in 2.
9        And, Madame Chair, thank you for allowing
10  us to -- to have a discussion on 2 as part of the
11  discussion with 4.  I appreciate being able to
12  openly discuss this.
13        COMMITTEE CHAIR REP. FIELDS:  Representative
14  McCann.
15        REPRESENTATIVE MCCANN:  Thank you.
16        And thank you, Representative Sonnenberg.
17        But to me, the way I read this is that a
18  person who comes with someone else to the club to
19  use the gun would come under the temporary transfer
20  of not more than 72 hours.  So I don't -- that would
21  be the first line of defense, if you will.
22        And then, secondly, I think that the way
23  this is written, it is the person who will actually

24    possess the firearm.
25        So, I mean, I would argue that the
0028
1    temporary transfer covers a member of the club who
2    uses the club's gun or someone who comes with the
3    member of the club who uses the club's gun.
4        COMMITTEE CHAIR REP. FIELDS:  So I'd like to
5    call for a vote, then, on L.004.
6        THE CLERK:  Representative McCann.
7        REPRESENTATIVE MCCANN:  No.
8        THE CLERK:  Senator Ulibarri.
9        SENATOR ULIBARRI:  No.
10        THE CLERK:  Representative Sonnenberg.
11        REPRESENTATIVE SONNENBERG:  Yes.
12        THE CLERK:  Senator Brophy.
13        SENATOR BROPHY:  Aye.
14        THE CLERK:  Senator Carroll.
15        SENATOR CARROLL:  No.
16        THE CLERK:  Madame Chair.
17        COMMITTEE CHAIR REP. FIELDS:  No.
18        THE CLERK:  That amendment fails, 2-4, 4-2.
19        COMMITTEE CHAIR REP. FIELDS:  Back to
20    Amendment L.002.
21        Senator Carroll.
22        SENATOR CARROLL:  Thank you, Madame Chair.
23        You know, (inaudible) if we want to, as a
24    committee, adopt any portions of what was here, we
25    can amend it to this one before final adoption of
0029
1    002.
2        And people have different thoughts on
3    different sections, and I probably agree with the
4    Chair about strictly the scope issue on the family.
5        I don't think on page 2 Subsection 2 is
6    needed because I think there's actually up to four
7    exemptions that already cover that.  But I -- I -- I
8    did wonder if you did want to have some discussion
9    on the gift or loan or any of the other portions
10    that were in 4 before we take action on 2?
11        COMMITTEE CHAIR REP. FIELDS:  Representative
12    McCann.
13        REPRESENTATIVE MCCANN:  Well, I would make a
14    motion -- see, I don't know how we do this.  But I
15    would like to add (inaudible) as outlined in 004, on
16    page 5, line 13 after gift, I would like to insert or
17    loan.  I don't know if I need to make a motion to
18    amend --
19        UNIDENTIFIED SPEAKER:  Yes.
20        REPRESENTATIVE MCCANN:  So I would make a
21    motion to amend 002 to add page 5, line 13, and after
22    gift insert or loan.
23        SENATOR CARROLL:  Second.
24        COMMITTEE CHAIR REP. FIELDS:  Seconded by
25    Senator Carroll.

0030
1       THE CLERK:  Representative McCann.
2       REPRESENTATIVE MCCANN:  Yes.
3       THE CLERK:  Representative Ulibarri.
4       SENATOR ULIBARRI:  Aye.
5       THE CLERK:  Representative Sonnenberg.
6       REPRESENTATIVE SONNENBERG:  Yes.
7       THE CLERK:  Senator Brophy.
8       SENATOR BROPHY:  Voting for Ms. Brophy, aye.
9       THE CLERK:  Senator Carroll.
10      SENATOR CARROLL:  Aye.
11      THE CLERK:  Madame Chair.
12      COMMITTEE CHAIR REP. FIELDS:  Yes.
13      THE CLERK:  That passes, 6-0.
14      COMMITTEE CHAIR REP. FIELDS:  Any other
15  adoptions to L.002?
16      Senator -- Representative Sonnenberg.
17      REPRESENTATIVE SONNENBERG:  Thank you for
18  the demotion.  I appreciate that, Madame Chair.
19      And I am going to go ahead and make the
20  motion that we include Roman numeral II at the top
21  of page 2 on 4 so I can actually get a better
22  understanding of where you think that is already
23  covered within the four exemptions.
24      And that's respectfully asked for a
25  second.
0031
1       SENATOR BROPHY:  Second.
2       COMMITTEE CHAIR REP. FIELDS:  So it has been
3  moved and seconded by Senator Brophy.  If you'll then
4  call -- Senator Carroll.
5       SENATOR CARROLL:  Thank you, Madame Chair.
6       Sorry, I didn't mean to drag this out a
7  little bit.  But I do think (inaudible) to where
8  specifically I think it's covered, and if you start
9  on page 5, on there -- in fact, I'm on page 6.  I
10  believe line 3, at a shooting range located in or on
11  the premises owned or occupied by a duly
12  incorporated organization organized for conservation
13  purposes or to foster proficiency in firearms.  That
14  is not 72-hour limited.  That covers the scenario
15  that we were talking about in one way.
16      I think under subsection 2, a shooting
17  competition, in fact, may be narrower, but in some
18  cases that may apply.
19      Also, for any lawful, you know, hunting,
20  fishing, less relevant, as long as they're, you
21  know, doing it on lawful land or with a permit.
22  That may be one of those youth activities.  That is
23  possibly another exemption.
24      If an adult is staying there, hopefully,
25  to supervise children with firearms, then the
0032
1  temporary transfer that occurs in the present may

LEG HX 000924

4839

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031413.txt[11/12/2013 10:57:56 AM]

2  also apply.
3      And then, finally, the catch-all 72 hours
4  would apply.  And so I believe that that fact
5  pattern is covered by (inaudible) exemptions.
6      COMMITTEE CHAIR REP. FIELDS:  You have a
7  question, Senator Brophy?
8      SENATOR BROPHY:  Yeah.  Unfortunately, it --
9  it doesn't quite cover it.  And again here's why:
10  Because these -- these programs last for several
11  months, and part of what is so great about 4-H is you
12  actually make the participants responsible for the
13  entire project.
14      If it's a steer, they have to buy them, feed
15  them, water them, care for them.  If it's a firearm,
16  in this case they have to be responsible for it.  They
17  don't only use it at the shooting range, and they --
18  they actually are expected, then, to take it home
19  and -- and care for it and clean it and do all of the
20  things that you would normally do with a firearm.
21      And again, it takes, you know, it's a three-
22  or four-month project.  And if you want the kid to,
23  you know, to hit 25 out of 25 at the state shooting
24  competition, they got to practice more than just once
25  a week, when the organized classes occur that are
0033
1  covered under E in the bill.
2      So I -- I do.  I think it's an unintended
3  consequence of the bill that the kid wouldn't be
4  allowed -- actually they're teenagers -- they wouldn't
5  be allowed to take full responsibility and fully
6  participate in the 4-H program without the background
7  check.
8      And again, remember in -- in many, many,
9  many of these rural communities where this is
10  occurring, there's no store where you can walk into
11  and get a background check.
12      COMMITTEE CHAIR REP. FIELDS:  I believe
13  that -- I agree with Senator Carroll that the scenario
14  that you-all are -- are describing is covered on page
15  6, because it also talks about fostering proficiency
16  in firearms.  And so that doesn't necessarily mean to
17  be at a specific area, shooting range, those kind of
18  things.  I believe it encompasses it.
19      Representative McCann.
20      REPRESENTATIVE MCCANN:  No, I -- I think
21  there might be a (inaudible) here.  I mean, we don't
22  have problems with 4-H kids shooting people.  I mean,
23  I don't think we want to cover -- I don't think we
24  want any -- any confusion or any unintended
25  consequence that, you know, a 4-H kid can't use
0034
1  somebody else's gun.  I mean, I'm -- I'm -- I'd like
2  to ask a question, though.
3      Don't most of these kids have -- their --

4  their parents have guns or they have their own guns?
5       COMMITTEE CHAIR REP. FIELDS:  Representative
6  Sonnenberg.
7       REPRESENTATIVE SONNENBERG:  You know, I
8  would say probably many do.  But what -- what we tried
9  to reach out to is youth shooting sports, if
10 (inaudible) that hasn't had that education at home.
11 Give them an opportunity because their parents aren't
12 interested in guns and they are interested in
13 shooting.
14      And so I would also say that many of them
15 don't.  Many of them have never had that opportunity.
16 Their parents wouldn't (inaudible) the first idea on
17 how to help them, and that's why they become part of
18 the shooting course within the 4-H club.
19      COMMITTEE CHAIR REP. FIELDS:  Senator
20 Ulibarri.
21      SENATOR ULIBARRI:  Thank you, Madame Chair.
22      I just want to say:  I think that
23 the current exemptions do apply, and one of the
24 reasons why I think that the current exemptions
25 should remain in tact that we don't -- we don't need
0035
1  a change to take place is that the exemptions that
2  exist include a component of supervision.
3       So to give a, you know, 13-year-old,
4  14-year-old a gun for three or four weeks without
5  having a background check in the house or of the
6  person supervising, I think goes against what we've
7  said, is that we want to make sure that there's
8  consistency under the law, that there's --
9  especially when folks are using firearms, that
10 there's an understanding that there is consistency
11 or supervision, and the person who is responsible
12 for the supervision, whether it's a non-profit
13 organization or the firing range, they have to go
14 through that process, and the exemptions currently
15 allow for that use.
16      To put a gun in a household for three or
17 four months and with an adult maybe we don't know
18 who's supervising who wouldn't pass a background
19 check, I think, the supervision piece, as the
20 exemptions currently exist, are important because it
21 makes sure that there is a responsible party, 4-H,
22 that non-profit that's already outlined in the
23 exemption, will still have a continuing relationship
24 or -- or supervision with the young person who's
25 learning how to shoot, which I think is an important
0036
1  component.
2       To say that a person could give a gun to a
3  13-year-old for four weeks and put it a household
4  where someone may not be responsible I think is
5  concerning.  So to have the supervision piece with

6 the exemptions as they currently, I think, balances
7 what I think is an important part of someone
8 being -- to learn how to shoot, but still having it
9 under a responsible party, a shooting range, a
10 non-profit organization or other entity that can
11 help ensure that that person knows how to use
12 that -- that weapon responsibly.
13     COMMITTEE CHAIR REP. FIELDS:  Senator
14 Brophy.
15     SENATOR BROPHY:  Senator, I'm not sure I
16 followed.  At first you started off saying you thought
17 it was covered by the exemptions, and then you -- I
18 think you then morphed into an argument where
19 everybody in the household from which the 4-H shooting
20 sport attendant comes -- should have a background
21 check.
22     Could you clarify your position?  Do you
23 believe that we -- that it's already covered, that
24 they can take it home for four months, or do you
25 believe that we need to expand the background check
0037
1 to include everybody in the household from which
2 they come?
3     COMMITTEE CHAIR REP. FIELDS:  Senator
4 Ulibarri.
5     SENATOR ULIBARRI:  Thank you.
6     I think the way the -- the multiple
7 exceptions allow for someone to take possession of a
8 weapon with supervision related to that, so we
9 talked about at a target firearm shooting
10 competition under the auspices of an non-profit
11 organization, state agency.
12     You know, I think the pieces here speak to
13 continual supervision.  That's why I think these
14 pieces need to stay in place.
15     I probably shouldn't have said anything
16 further there, but saying that supervision is
17 essential and that there is a responsible entity
18 that's connected to this exemption.  So I think
19 that's an important piece for me in understanding as
20 the law currently exists.  That's why I don't think
21 Number 2 is necessary.
22     COMMITTEE CHAIR REP. FIELDS:  And so I think
23 what we have on the table right now -- and it's been
24 moved and seconded -- is if we should include Roman
25 number II, page 2, of L.004, as a part of L.002.
0038
1     Senator Brophy.
2     SENATOR BROPHY:  Thank you, Madame Chair.
3     So let me be clear, then.  You do not
4 think the 4-H kids should be allowed to take the
5 shotgun home from the shooting range so that they
6 can become responsible for it and clean it and take
7 care of it under the -- the way 4-H has worked for

LEG HX 000927    4842

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031413.txt[11/12/2013 10:57:56 AM]

8    -- for years.  Because I think that's what you said.
9    I think -- I'd -- I'd like to have you clarify that.
10        Because the supervision that exists at the
11   shooting range is the -- is the 4-H instructor who
12   goes back to his home after it's over, and
13   traditionally, then, the participant, the 4-H kid,
14   who's never once been involved in any kind of
15   incident or accident, takes the firearm home then,
16   away from the shooting range and away from the
17   direct supervision of the shooting sports instructor
18   so that they can properly care for and clean the
19   weapon in their home environment.
20        So I -- I need to be clear.  Either -- I
21   don't see how it's covered in the bill.  And you can
22   show me how it's cover in the bill, that allows them
23   to take it home for the four or five months that the
24   program lasts, or you can make the statement that
25   you don't think they should be allowed to take it
0039
1    home?
2        COMMITTEE CHAIR REP. FIELDS:  It's clear to
3    me.  And what I've heard the Senator say did not say
4    he does not believe that you cannot have that young
5    person take that firearm home.  And I believe that
6    that is the direct on page 6 of the bill, as it
7    relates to temporary transfers, as it relates to the
8    proficiency of firearms.
9        So, Ms. Shipley, I'd like to call for the
10   vote.
11        SENATOR BROPHY:  Madame Chair, a
12   clarification question.
13        COMMITTEE CHAIR REP. FIELDS:  Senator
14   Brophy.
15        SENATOR BROPHY:  Um, I see the -- I see the
16   proficiency in firearms, but that's under the -- the
17   part about where it says it's at a shooting range to
18   foster proficiency in firearms.  I still don't see how
19   it allows that -- that participant in 4-H to take it
20   away from the shooting range for care.
21        COMMITTEE CHAIR REP. FIELDS:  Senator
22   Ulibarri.
23        SENATOR ULIBARRI:  Thank you, Madame Chair.
24        I think, looking at the totality of the
25   exceptions, including the 72-hour transfer, as I
0040
1    understand how 4-H works, you have weekly or
2    semi-frequent meetings where you meet with your
3    instructors and talk with folks, you're coming back
4    working on the skill with your -- your person more
5    than once a week.
6        And so maybe that's -- that's how I
7    understand that you would have continual contact
8    with bringing the weapon back and forth in between
9    the shooting competition, where you would have

4843

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031413.txt[11/12/2013 10:57:56 AM]

10  someone there who could then transfer the weapon
11  again to you during the course of that competition,
12  where you could take that home for up to 72 hours
13  and have the ability to use it while you're at
14  the -- at the firing range or under the auspice of a
15  shooting competition, which means during the course
16  of those four or five months with the person
17  learning the skill, the totality of the exceptions
18  would -- would allow that person to keep and retain
19  that firearm, but there is a level of supervision
20  that I think is important.
21       COMMITTEE CHAIR REP. FIELDS:  Senator
22  Brophy.
23       SENATOR BROPHY:  Thank you, Madame Chair.
24       And -- and, Senator, I appreciate that.
25  So they could do it if they had a practice every
0041
1  three days, let's say under 72 hours, and
2  re-establish the 72-hour rule.  But the reality is,
3  is that 4-H shooting sports practices on Sunday
4  afternoon, once a week.  So the 72 -- we -- we
5  clearly go beyond the 72-hour rule.
6       That's -- that's just how they do it.
7  They -- they don't get together once every three
8  days, which, on average, would be 2.1 times a week.
9  They get together once a week.  And I really think
10  that it's important.  Unless you just want to
11  cripple the shooting sports program that 4-H puts
12  together, I think we have to vote for Representative
13  Sonnenberg's motion.
14       COMMITTEE CHAIR REP. FIELDS:  Representative
15  McCann.
16       REPRESENTATIVE MCCANN:  No.  I think that
17  we're saying it's available under other exemptions.
18  So why not just make it clear?  I mean, I really don't
19  think our intention in this bill is to say we don't
20  want kids who are learning how to handle a gun
21  responsibly not to be able to take it home, if that's
22  the way the 4-H program works.
23       I was never in 4-H, but I can see the
24  benefit of having the kid learn how to clean and take
25  the gun apart so they can handle it safely.  I mean, I
0042
1  think that our goal here is to make sure that we're
2  safe, our communities are safe.  And, I mean, it seems
3  to me that if it -- if we're having this much trouble
4  figuring out if it covers or it doesn't, and some of
5  us want to allow them to take it home and some don't,
6  I don't see any harm personally in putting this in the
7  bill.
8       I -- I don't think our intention is to say
9  to a 4-H kid you can't take the gun home when -- I'm
10  not aware of any problems we've had with 4-H kids
11  using guns inappropriately, but --

12    COMMITTEE CHAIR REP. FIELDS:  I don't want
13  to do that, but I -- I do believe the bill is clear.
14        Senator Carroll.
15        SENATOR CARROLL:  Thank you, Madame Chair.
16        I have two points:  One a drafting point
17  and then one kind of a conceptual point.
18        Let me first bring up that this exception
19  isn't written like the others as an exemption.  This
20  is written as an exception to a definition we didn't
21  adopt.  So us this language that a transferee does
22  not include.  So the transferee language here is
23  talking about an entity, and I don't think anyone is
24  thinking that kids are entities.
25        If what -- the whole -- the discussion
0043
1   we've had would make a little bit more sense to me
2   if it were written straight up as an exception to
3   just requiring a background check.  But the way this
4   is written, it's as an exception to basically
5   whether or not kids are entities, which they're not
6   an entity.  If they're a member of a club, they're
7   still acting in their individual capacity.
8         So I think even -- wherever anybody thinks
9   about the actual scenarios, this is drafted to be an
10  exception to a definition, not an exception to a
11  background check, like the other lists of
12  exceptions.
13        So I would just want to make that point.
14        And overall I -- I think it's fair to say
15  that, you know, to Representative McCann's point, I
16  don't think anyone thinks that 4-H kids are a
17  problem.  I think we know overall that the
18  overwhelming majority of people, in fact, are
19  law-abiding people.  But, this is the one way we
20  know any time a gun changes hands, we either do or
21  don't find out whether we're transferring it over
22  the long-term to somebody who is not prohibited
23  under law from checking (inaudible).
24        So I have sort of a narrow drafting point,
25  which adopting this doesn't make sense in the
0044
1   context of the other exceptions, as an exception to
2   a transferee.  And because ut really was written to
3   go with subsection 1, when the approach was how do
4   you define a transferor, which is not what we're
5   doing.
6         But the other issue is, is that, you know,
7   somebody -- whoever the person who's getting
8   transferred -- whoever is receiving the firearm as a
9   point of a transfer, you know, at the end of the
10  day, the whole purpose of the bill is to make sure
11  we're not transferring it to someone where it's
12  prohibited.  And you will find 95 percent of these
13  are going to places where they are perfectly allowed

14  to transfer, and some percentage of the time where
15  they're not.
16        So I guess I would just make those two
17  points about this section.  And even if you wanted
18  to address this, I don't think you would address it
19  with this language.
20        COMMITTEE CHAIR REP. FIELDS:  Ms. Shipley,
21  take a vote.
22        THE CLERK:  Representative McCann.
23        REPRESENTATIVE MCCANN:  Yes.
24        THE CLERK:  Senator Ulibarri.
25        SENATOR ULIBARRI:  No.
0045
1        THE CLERK:  Representative Sonnenberg.
2        REPRESENTATIVE SONNENBERG:  Yes.
3        THE CLERK:  Senator Brophy.
4        SENATOR BROPHY:  Aye.
5        THE CLERK:  Senator Carroll.
6        MR. CARRIGAN:  No.
7        THE CLERK:  Madame Chair.
8        COMMITTEE CHAIR REP. FIELDS:  No.
9        THE CLERK:  That motion fails, 3 to 3.
10        COMMITTEE CHAIR REP. FIELDS:  So back to our
11  discussion on L.002, which it was amended to include
12  page 5, line 13, after gift insert or loan.
13        Senator Brophy.
14        SENATOR BROPHY:  Thank you, Madame Chair.
15        I -- I move an amendment to Amendment 2
16  that includes that part of 4, where it says,
17  starting on page 7, after line 6, insert this
18  Section 7.
19        UNIDENTIFIED SPEAKER:  Second.
20        COMMITTEE CHAIR REP. FIELDS:  So it has been
21  moved and seconded by Senator Brophy (sic).
22        Senator McCann.
23        REPRESENTATIVE MCCANN:  I think you ruled
24  this is beyond the scope.  Didn't you already rule
25  that?
0046
1        COMMITTEE CHAIR REP. FIELDS:  Yes, it's
2  already been ruled.
3        Representative Sonnenberg.
4        REPRESENTATIVE SONNENBERG:  Thank you,
5  Madame Chair.
6        And clearly -- and although I made the
7  argument on how I think that fits within the
8  definition that the Senate puts in there, perhaps
9  what needs to be done, then, is we need to dissolve
10  this conference committee and -- and go and ask for
11  a second conference committee that goes beyond the
12  scope so we can actually fix these things.
13        COMMITTEE CHAIR REP. FIELDS:  Further
14  discussion on that?
15        Senator Brophy.

LEG HX 000931

4846

file:///X|/...B%201224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031413.txt[11/12/2013 10:57:56 AM]

16      SENATOR BROPHY:  Thank you, Madame Chair.
17      I think Representative Sonnenberg really
18 hit on the important point.  We sit here discussing
19 a bill that has so far passed two chambers without a
20 single solitarily Republican vote.  It's a bill that
21 has so far only garnered bipartisan opposition.
22      If, on the other hand, as a -- as a
23 conference committee we come out of here and go to
24 the floor of our respective chambers and ask to
25 dissolve this conference committee and form a new
0047
1 conference committee that goes beyond the scope of
2 differences, we might just be able to craft a brand
3 new bill that would garner bipartisan support and
4 start acting like the traditional Colorado
5 legislature as opposed to the dysfunctional
6 Washington, D.C., congress.
7      The purpose of the bill is to make sure
8 that we aren't transferring to people who shouldn't
9 have firearms.  I think everybody agrees with that
10 goal.  And to that end, I think what we could do is
11 come back in a new conference committee that's going
12 beyond the scope, put in a -- an addition to
13 18-12-111, a stranger-danger rule, which says that
14 it shall be considered unlawful to sell a firearm to
15 somebody whom you don't have a prior relationship
16 with, and we'd do away with all of the exemptions.
17 No more unintended consequences of who is left out
18 and who isn't.
19      But instead recognize that if you know the
20 person, then you should know whether or not they can
21 legally purchase or possess a firearm.  So that's
22 the should-have-known clause.  If you don't know
23 them, it's the stranger-danger rule, that you ought
24 to be more cautious, that you should have known not
25 to sell that firearm to somebody with whom you do
0048
1 not have a prior relationship.
2      And then we do away with all of the
3 exemptions and all of the unintended consequences of
4 who is left out.  We pass a bill that can earn
5 bipartisan support, the way the Colorado legislature
6 usually works when we identify a problem.
7      Madame Chair, Madame Vice Chair, that's
8 what I recommend that we do, that we go back to our
9 body, stand side by side at the podium, and say
10 let's (inaudible).  Let's put some Colorado values
11 back to work here, find a bipartisan solution to a
12 problem that's been identified.
13      COMMITTEE CHAIR REP. FIELDS:  Our Colorado
14 values are hard at work in this committee.
15      Senator Carroll.
16      SENATOR CARROLL:  Thank you, Madame Chair.
17      I guess I have two points.  I -- I would

LEG HX 000932     4847

18  love to see a bipartisan version of this bill. I
19  think we're gaining support for that at the federal
20  level. We have made probably over a dozen changes
21  to this bill, not because we had to, but because we
22  have been reaching out, listening and responding,
23  maybe not to a hundred percent of what's been
24  raised, but the majority of what you see's changed
25  on this bill on the way through is actually
0049
1  listening and responding to what you've said. So we
2  are, in fact, responding, and none of it has changed
3  anyone's position so far to date. I would love to
4  see a bipartisan bill.
5      My thought on the stranger-danger rule,
6  and, Senator Brophy, I think that's a totally
7  legitimate public-policy question. The problem is,
8  is that criminals know each other. And in firearms
9  trafficking situations, you also have gun
10  trafficking that's going on with people who know
11  each other. And so that's in some ways the heart of
12  what we're actually trying to get at. And you can
13  have two convicted felons who know each other well
14  and thereby evade a background check. And obviously
15  that's beyond the scope, and this isn't what we have
16  permission to be here anyway.
17      But I do think it's important to note that
18  relationships among the criminal underground, in
19  fact, are often with each other, and -- and while
20  may be strangers to us, they're certainly no
21  stranger to each other.
22      COMMITTEE CHAIR REP. FIELDS: Ms. Shipley,
23  let's call for the vote on L.002 as amended.
24      THE CLERK: Representative McCann.
25      REPRESENTATIVE MCCANN: Yes.
0050
1      THE CLERK: Senator Ulibarri.
2      SENATOR ULIBARRI: (Indiscernible).
3      THE CLERK: Representative Sonnenberg.
4      REPRESENTATIVE SONNENBERG: I'm not sure.
5      I'm disappointed that you won't allow the
6  discussion to continue to have the discussion.
7  Senator Brophy clearly wanted to make a statement.
8  And -- and quite frankly, I'd like to make a statement
9  as well.
10      The example that Senator Carroll brought
11  up, felons are already illegal to have guns. We
12  haven't stopped them from having guns, and
13  background checks still around are going to stop
14  them from having guns.
15      But rather than belabor the point and
16  disrespect the Chair, it's not my intent to
17  disrespect the Chair, I will simply vote no and save
18  my comments for later.
19      THE CLERK: Senator Brophy.

20    SENATOR BROPHY:  No.
21    THE CLERK:  Senator Carroll.
22    SENATOR CARROLL:  Let me make a quick
23  comment too.
24    Um, I could vote no here too, and we could
25  go back with, you know, where we were on the
0051
1  differences and try and go back.  Each of these
2  things that we've adopted has come at your
3  suggestion.  So even though you didn't get
4  everything you wanted, I think it's unfortunate that
5  we, in good faith, heard, made changes, again at
6  your suggestion, and yet you'll vote no on your own
7  suggested changes.
8    But I am an aye vote.
9    THE CLERK:  Madame Chair.
10    COMMITTEE CHAIR REP. FIELDS:  Yes.
11    THE CLERK:  So that's 4 to 2.
12    COMMITTEE CHAIR REP. FIELDS:  We're adjourned.
13    (Whereupon, the recording was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25
0052
1              CERTIFICATE
2  STATE OF COLORADO            )
3  CITY AND COUNTY OF DENVER         )    ss.
4
5        I, Elissa Steen, Professional Shorthand
6  Reporter and Notary Public in and for the State of
7  Colorado, do hereby certify that this transcript was taken
8  in shorthand by me from an audio recording and was reduced
9  to typewritten form by computer-aided transcription; that
10  the speakers in this transcript were identified by me to
11  the best of my ability and according to the introductions
12  made; that the foregoing is a true transcript of the
13  proceedings had; that I am not attorney, nor counsel, nor
14  in any way connected with any attorney or counsel for any
15  of the parties to said action or otherwise interested in
16  its event.
17        IN WITNESS WHEREOF, I have hereunto affixed
18  my hand and notarial seal this 5th day of August, 2013.
19
20
21

22

23          Registered Professional Reporter
                          and
24                  Notary Public

25

LEG HX 000935    4850

0001
 1  CITY AND COUNTY OF DENVER
 2  STATE OF COLORADO
 3  JUDICIAL COMMITTEE MEETING
 4  Held on March 15, 2013
 5  HOUSE BILL 13-1229
 6  _____
 7            REPORTER'S TRANSCRIPT
 8  _____
 9
10        This transcript was taken from an audio
11  recording by Jana Mackelprang, Certified Realtime
12  Reporter, Registered Professional Reporter, and
13  Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
0002
 1            P R O C E E D I N G S
 2            *   *   *   *   *
 3        MR. SPEAKER:  . . . appropriations.
 4        Representative Fields.
 5        REPRESENTATIVE FIELDS:  Thank you,
 6  Mr. Speaker.
 7        I move that the House adopt the first
 8  conference report of the first conference committee on
 9  House Bill 13-1229, the majority report.
10        MR. SPEAKER:  Okay.  Please proceed,
11  Representative Fields.
12        REPRESENTATIVE FIELDS:  Thank you,
13  Mr. Speaker.
14        And, Committee Members, we had a very
15  thoughtful dialogue.  And basically the conference
16  report talks about -- it refers to some grammar that we
17  changed and we put some clarity around a couple of
18  things.  Let me explain.
19        It clearly identifies the transferees.
20  They are not a natural person, but they're entities like
21  a corporation.  It makes clear that when an entity buys
22  a gun, not every person with a beneficial interest, like
23  shareholders, have to get a background check, but
24  requires only the people who are authorized to use that
25  gun have to get a background check before they can use
0003

1  the gun.
2          Also, it clarifies the exemption for
3  family members.  In the introduced bill, family
4  exemptions only addressed bona fide gifts between family
5  members.  And in the conference committee, we made it
6  clear that you can also loan between family members.  So
7  that was also an exception that we included in the
8  conference committee.
9          I urge an aye vote on the conference
10  committee report.
11          MR. SPEAKER:  Further discussion.
12          Representative Sonnenberg.
13          REPRESENTATIVE SONNENBERG:  Thank you,
14  Mr. Speaker.
15          Unfortunately, that still doesn't address
16  the issues that need addressed.  The gun club example we
17  talked about, every member of that gun club that wanted
18  to use that gun will have to go through a background
19  check if that gun club buys a gun.  The 4-H kids, the
20  shooting sports, those kids that have guns that are
21  donated to them for longer than the 72 hours would be
22  illegal.  We're making criminals out of 4-H kids.
23          We're also, as part of the discussion, we
24  excluded stepkids.  So my wife could not give, or
25  somebody's wife could not give, their stepchildren in
0004
1  the house that gun or loan that gun to them because they
2  are excluded.
3          What we have seen, ladies and gentlemen,
4  is, in this bill, we have a whole bunch of unintended
5  consequences that didn't get dealt with.  That's why,
6  Mr. Speaker, I move we dissolve the first conference
7  committee and move that a new conference committee be
8  appointed to go beyond the scope, so we can actually fix
9  a bill and do something that actually does some good and
10  prevents gun violence.
11          MR. SPEAKER:  Representative Sonnenberg.
12  Well, I guess the question before the House now is to
13  dissolve the first conference committee and go into a
14  second conference committee, with hours to go beyond the
15  scope.  Any discussion on that motion?
16          Representative Holbert.
17          REPRESENTATIVE HOLBERT:  Thank you,
18  Mr. Speaker.  Representative Sonnenberg, thank you so
19  much for making this substitute motion.
20          This bill goes beyond, I believe, the
21  intended purpose.  This bill starts to touch 4-H
22  families.  I understand there was a comment made, a
23  questioning why a 4-H member would loan another member a
24  firearm, say a shotgun.  And these youth who participate
25  in these clubs, they're growing boys and girls.  And if
0005
1  you go out and buy a youth-sized shotgun, for instance,
2  for a child and they outgrow that, the question is

3 raised: Well, why would that child loan his or her
4 shotgun to another child?  Well, because they've
5 outgrown it and they're not giving it away.
6         The 4-H clubs share those weapons, the
7 shotguns between kids as they grow.  It's like skis or
8 anything else that they would outgrow.  These are not
9 "one size fits all."  And we don't have -- we don't have
10 crimes associated with this.
11         When we approach a problem, the first
12 question we should ask ourselves with any legislation
13 is:  What's the problem you're trying to solve?  Is the
14 problem we're trying to solve with House Bill 1229
15 violence among 4-H members?  No.  No.
16         So why are we pushing through another
17 bill?  Why are we shoving this bill over to the
18 governor's desk knowing that there's problems here that
19 are outside the intent of this bill?  Why wouldn't we
20 take a few hours a day and fix this?  Why?  There's no
21 reason.
22         Again, as I pointed out on a different
23 bill, the effective date, I believe, is July 1st.  We
24 have until May 8th.  The governor is downstairs.  We can
25 fix this.  We can remove Representative Sonnenberg's
0006
1 legitimate concerns that, again, are beyond the scope of
2 this bill.  I ask for an aye vote.
3         MR. SPEAKER:  Representative Sonnenberg.
4 Representative McNulty.
5         REPRESENTATIVE McNULTY:  Thank you,
6 Mr. Chairman.
7         Representatives Fields and McCann, the
8 purpose for going to the conference committee was to
9 help -- understanding that our votes probably aren't
10 going to change on this, but to try and address some of
11 the real issues, the consequences of this bill that
12 really weren't intended.
13         And one of the issues that has been
14 brought up that I don't believe is addressed in the work
15 of the conference committee is the situation where you
16 have a farm, a corporation, an agricultural corporation,
17 farm, ranch.  A ranch hand checks out one of the
18 corporation's rifles, goes out, comes back, checks that
19 back in.  Three days later, checks the rifle back out,
20 goes back out into the field.
21         Every time that rifle is checked out, that
22 does -- does the conference committee address the issue
23 that every time that rifle is checked out, the bill
24 would require a background check to be done?  Does the
25 conference committee report address the situation where,
0007
1 if he takes a background check the first time, if he has
2 a background check the first time, how often does he
3 have to have a background check?  How often does she
4 have to have the background check?  Is it every time the

5   rifle is checked out, or -- checked out so that he or
6   she goes out in the field, or is it at the beginning?
7   When does that happen?
8           These are the real world situations that
9   people in rural Colorado have to address.  And I hope
10  that you're able to tell me that the conference
11  committee addresses that situation.
12          MR. SPEAKER:  Representative Landgraf.
13          REPRESENTATIVE LANDGRAF:  Thank you,
14  Mr. Speaker.
15          I rise in support of Representative
16  Sonnenberg's motion.  Today I got confirmation that a
17  man who moved to Fountain, brought his family, spent
18  months getting his daughter into the blind and deaf
19  school, started a pawn shop, is shutting down his shop
20  because we cannot get clarification on how this bill
21  will affect him.  So I strongly support the motion so
22  that we can figure out some of these other details.
23  Thank you.
24          MR. SPEAKER:  Representative Gardner.
25          REPRESENTATIVE GARDNER:  Thank you,
0008
1   Mr. Speaker.
2           My friend Representative McNulty is
3   absolutely correct.  When I read the conference
4   committee report, I asked myself immediately:  Well, how
5   often do you have to get a background check?  And this
6   doesn't really solve the security company that has armed
7   security guards in which they're required to check their
8   weapons in and out, the farm or ranch operation where
9   they may check out one weapon, carry it back in -- it's
10  going to require that now, with this background check
11  regime.
12          There was a way to do this.  It was with
13  weapons custodians, and there are models to do this.  I
14  was sort of amazed that it came back from committee and
15  didn't address that at all because it only has more
16  unintended consequences than we started with when it
17  went to conference committee.  So I support this motion.
18          MR. SPEAKER:  Representative McCann.
19          REPRESENTATIVE McCANN:  Thank you,
20  Mr. Speaker.
21          And I would urge a no vote on this motion
22  to dissolve the report of the conference committee and
23  convene another one.  I think our colleagues raised some
24  legitimate questions when we were debating this bill a
25  couple days ago about the amendment that was done in the
0009
1   Senate regarding corporations and partnerships and so
2   forth, and would all the shareholders have to get a
3   background check and members of a gun club have to get a
4   background check?
5           So what the conference committee did was
6   address that legitimate concern by narrowing the

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

7   definition of the transferee so that a transferee -- if
8   the transferee is not a natural person, in other words,
9   if it's a corporation or a partnership, then only the
10  person who's actually going to take possession of the
11  weapon would need the background check.
12          So, for example, if you have an
13  incorporated family farm and the farm buys a gun by the
14  corporation, only the person who's going to actually use
15  the gun on the property would need a background check.
16  And that's a legitimate requirement, because we want
17  people who have possession of guns to go through a
18  background check.
19          So if you have an employee who will be
20  using the gun as part of the work on the farm, they
21  would need one background check, and then they can use
22  that weapon.
23          The other shareholders who have an
24  interest in the farm don't need to get a background
25  check.  For example, if it's a family-owned farm and
0010
1   some of the members of your family live in another
2   state, or don't even live -- or live somewhere else in
3   Colorado, they're not going to use the guns, they don't
4   need a background check.  It's only the people who are
5   actually going to possess the firearm that need the
6   background check, and it's only one background check.
7           Another issue that was raised actually
8   during the conference call -- or conference itself was
9   the fact that the exemption for a transfer between
10  family members is limited to a gift.  And the suggestion
11  was that should be expanded to a loan, so that not -- if
12  you want to allow your child to use your gun, you don't
13  have to gift them the gun.  We accepted their amendment
14  to add it as a loan.  So you can loan your child the use
15  of your gun under the conference amendment.
16          So I want to address a couple other points
17  that have been raised by the -- by my colleagues on the
18  other side of the aisle.  The gun club question has come
19  up.  The way the amendment reads now, based on the
20  conference committee report, is that, if you go to a gun
21  club and you bring your own gun, obviously you don't
22  have to go through a background check.  If the gun club
23  purchases guns and then uses those to loan out, there is
24  an exemption already in the bill for a 72-hour transfer
25  of the gun.  So that can occur without a background
0011
1   check.
2           So gun club members do not have to get a
3   background check because they're not -- they don't have
4   to get a background check as a member of the corporation
5   or a member of the club because they're not members of
6   the club.  They simply pay a fee to go and use the club
7   premises.  And the bill does allow for that transfer.
8   So somebody can use the gun to go out and hunt on a gun

10            With respect to the pawn shop question,
11    that is addressed on page 7 of the bill with the
12    amendment that specifically says that an owner, manager,
13    or an employee of a business that repairs or maintains
14    firearms can rely on the transferor's statement that he
15    or she may legally possess a firearm, unless they have
16    actual knowledge to the contrary.  So the owner or
17    manager of a pawn shop can possess weapons that are
18    given to them as long as they have a statement from the
19    transferor that they are legitimately able to possess,
20    legally possess a weapon, unless they have knowledge
21    otherwise, which makes sense.
22            And with respect to the security officer,
23    security officers get background checks anyway, just to
24    get hired as security officers.  So they've already been
25    through background checks.  So they would -- if they are
0012
1    issued -- most security officers, as I understand it,
2    actually purchase their own guns.  So they have their
3    own gun, which they would have gone through a background
4    check for.  If the security company has guns available,
5    which I don't think happens, but if they do, yes, that
6    person would have to go through a background check if
7    they're actually going to possess the weapon, which is
8    the whole point of this bill, which is the people who
9    are going to possess and use firearms need to have a
10    background check.
11            And with respect to the 4-H club, if the
12    gun is going to the home of a child, yes, if the parents
13    are going to be using the gun, the parent would need to
14    get the background check.  Again, we want people who are
15    in possession of weapons and use them to have background
16    checks.
17            So this report of the conference
18    committee, the majority report addresses those issues
19    that were raised by our colleagues, and I think it
20    addresses them well and takes away the ambiguity that
21    was rightfully pointed out previously.
22            So I would ask for a no vote on
23    reconvening another conference committee.  Thank you.
24            MR. SPEAKER:  Representative Holbert.
25            REPRESENTATIVE HOLBERT:  Thank you,
0013
1    Mr. Speaker.
2            Representative McCann, I wanted to say
3    thank you.  We offer a lot of words at this podium, at
4    this microphone, and sometimes we can become numb to the
5    conversation.  I describe it to constituents who ask,
6    it's like learning how to drive a car and listen to the
7    radio and do all the things we have to do at the same
8    time.  But occasionally there's something said that
9    really matters.  And I just want to reach out to my
10    friend Representative McCann for jumping up and coming

LEG HX 000941

4856

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

11 over and having a conversation away from this spotlight
12 and fixing the problems that you have fixed.  I think
13 that there is more that can be done.  And that kind of
14 cooperation that we saw yesterday and this morning, I
15 think we need more of that.  So thank you for what
16 you've done.  Thank you for addressing the multiple
17 background check question.
18        I remain concerned about the effect on the
19 4-H families.  And there were some words -- I didn't --
20 I wasn't there, I didn't hear them, but there are 4-H
21 families who are quite upset about the representation
22 that was made about them.  And I think this is an
23 opportunity to just take a moment longer and go a step
24 further.  And I'd ask your consideration of that, but it
25 shouldn't go without -- we shouldn't go any further
0014
1 without just offering our thanks for addressing a
2 legitimate concern that Representative Sonnenberg
3 raised.  Thank you again.
4        MR. SPEAKER:  Representative McNulty.
5        REPRESENTATIVE McNULTY:  Thank you,
6 Mr. Speaker.  And, Representative McCann, thank you for
7 your answer to that question.  But then we circle back
8 around to where we were before the conference committee
9 was authorized, and that is, whose responsibility is it
10 to maintain the records for those background checks?
11 How long are those background checks valid?  How many
12 times -- under what schedule do those employees need to
13 revisit this?  If they have one background check done,
14 does that authorize them to use any of the rifles that
15 are in the stock for the purpose of going out into the
16 field?
17        These questions are -- with your answer,
18 we're back around to these other questions, which --
19 which I know our friends who are in agriculture, who
20 farm, who ranch, who spend a great deal of time out in
21 the country, weeks at a time, sometimes months at a
22 time, if you have a sheep camp, and are going to be
23 dealing with the real world consequences of this bill --
24 so then who -- who is to maintain that?  How often do
25 they have to have a background check done?
0015
1        Once they have a background check done, is
2 it valid indefinitely, so that ranch hand won't have to
3 have another background check?  How do we answer these
4 questions for our friends in rural Colorado that -- that
5 will encounter these challenges?
6        MR. SPEAKER:  Representative Scott.
7        REPRESENTATIVE SCOTT:  Thank you,
8 Mr. Speaker.
9        You know, I kind of feel like I'm on an
10 island here this afternoon, being basically the only one
11 left from the Western Slope that is apparently willing
12 to stand up and talk about the western part of Colorado.

LEG HX 000942    4857

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

13    I've gotten tons of e-mails about this 4-H
14    issue, tons of e-mails about this gun tournament issue
15    where they have multiple days of shooting and they loan
16    guns back and forth.
17          A lot of my constituents are very upset at
18    the fact that we are writing a bill for the metro areas.
19    They understand that.  They understand there are issues
20    within the cities of Denver, Boulder, Fort Collins,
21    Colorado Springs, for example, that don't affect us.
22    They are completely perplexed at the idea that one brush
23    stroke fits all.  They are very, very concerned that the
24    impact on their families, their 4-H clubs, their gun
25    clubs, their shooting tournaments -- is going to have an
0016
1    economic impact and an impact on what they can do
2    legally.  And they're very concerned because this law
3    sounds as if it's getting -- it's all over the place in
4    the weeds.
5          It needs more clarification, that they're
6    going to be accused or possibly convicted of something
7    where the intent was not wrong.  They were simply just
8    trying to do the right thing.  And I don't believe
9    that's the intent of what this law was developed to do.
10    If it's truly developed or was designed to stop
11    criminals, it's gone way too far, way too far.  And I
12    would highly support Representative Sonnenberg for a
13    call or his call for a new conference committee, to try
14    to get this right.
15          We've got one shot at this, folks.  Let's
16    just get it right.  It won't take that long.  It won't
17    be that painful.  But give some consideration to other
18    parts of the state of Colorado.
19          MADAM SPEAKER:  Representative Landgraf.
20          REPRESENTATIVE LANDGRAF:  Thank you, Madam
21    Speaker Pro Tem.  And thank you, Representative McCann,
22    for that explanation.  I still don't see that it
23    explains or helps resolve the problem of my friendly
24    pawn shop owner, because he doesn't take in a gun and
25    strip it down or repair it before he gives it back.  He
0017
1    takes it in, he holds it, and then he returns it.  And
2    my concern is -- Fountain is a small town and he's a
3    small business.  It's not a huge economic loss to our
4    state, but how many of these small businesses are we
5    going to see leave our state and close because of this
6    confusion?
7          So I again rise in strong support of
8    Representative Sonnenberg's motion.
9          MADAM SPEAKER:  Representative Everett.
10          REPRESENTATIVE EVERETT:  Thank you, Madam
11    Speaker Pro Tem.
12          I think there's another business that
13    we're not looking at that this bill doesn't cover, and
14    that's moving companies.  Let's illustrate this by an

15  example.
16            Let's say Gabby Giffords' husband, who was
17  here, I believe, last week, wants to move to Colorado
18  because why wouldn't he?  Because we have this great
19  weather as we're having today.  So he decides to move
20  here and they pack up everything and it gets -- all
21  their stuff gets put on the truck, including their
22  brand-new AR that he just bought, and the moving truck
23  arrives here in Colorado.  However, their house isn't
24  ready.  So the moving company has taken possession of
25  that firearm and they have it here in Colorado for more
0018
1   than 72 hours.  In fact, they may have it for maybe a
2   few weeks before they're ready to move into this home.
3            So does an officer or an employee of the
4   moving company have to go through a background check, or
5   are they criminally liable?  I think that's just a
6   common scenario that's going to happen with families
7   moving here to Colorado that I believe this bill doesn't
8   address.  So that's why I rise in support of going back
9   to another conference committee.  Thank you.
10            MADAM SPEAKER:  Representative Sonnenberg.
11            REPRESENTATIVE SONNENBERG:  Thank you,
12  Madam Speaker Pro Tem.
13            Let me just give you some examples, as
14  you've heard the discussion.  Let me start with the gun
15  club situation.
16            Haxtun Gun Club has 104 members.  They
17  have a shoot Mondays and Fridays.  If you have a shoot
18  Mondays and Fridays, they show up and you borrow a gun
19  on Monday and you're allowed to keep it, go home, clean
20  it, and you come back Friday.  You've broken the law
21  because that's beyond the 72 hours.
22            Now, some might argue there's a statement
23  in there that says maintenance, if you maintain a gun,
24  that it doesn't apply.  Obviously, there's confusion
25  about that, which leads me again to say we need to clear
0019
1   up that confusion.
2            And I applaud -- Representative McCann has
3   been phenomenal.  When we had the discussion yesterday,
4   she listened, she understood that there could be some
5   problems, there was confusion.  As we have seen in this
6   bill, there is confusion.  We still don't know all the
7   ramifications.
8            That's just one example of how the 72
9   hours and the gun club in northeastern Colorado would be
10  affected.
11            Now let me tell you how the real world
12  works with youth groups and kids in 4-H.  Oftentimes --
13  and it's wonderful, quite frankly; Parks and Wildlife
14  does this, many of our hunting organizations, the bow
15  hunters, the deer folks -- they promote youth activities
16  as well, and where they will take a young kid, teach him

LEG HX 000944    4859

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

17 how to take care of a gun, teach him how to handle a
18 gun, and then go camping for a week and hunt for a week.
19 I guess now they will limit it to 72 hours so they can
20 still accomplish what they need to accomplish.
21        But what happens in 4-H as well is, when
22 you sign up for a 4-H project, oftentimes the kids that
23 sign up are curious because their parents have never
24 been with guns.  They've never had that experience.  And
25 so wisely they put them with somebody to teach them how
0020
1 to take care of guns.  And they may have a class or two,
2 and they talk about gun safety and how to handle a gun
3 and all those things.  And then when the instructor or
4 the class leader believes they're ready -- many of them
5 don't have a gun, so they have members in the community
6 that will donate guns.  They will offer to loan them
7 guns for the length of their project.  Their project may
8 take only 30 days to complete.  It may take four or five
9 months, because when this starts in the spring and the
10 weather is good and after they've gone through their
11 training and they send that kid home with that gun to
12 learn about the gun, to practice with the gun, to clean
13 the gun, to do all of those responsible things that are
14 important with understanding how firearms work, they
15 oftentimes then take two, three, four months until the
16 county fair, until the competition at the county fair.
17 And then some of them are even lucky enough to go to the
18 state fair, so they add on another three or four weeks.
19 Obviously, that's past the 72 hours.
20        Ladies and gentlemen, this bill, as it's
21 written, creates criminals out of 4-H kids.  There is
22 confusion on how we need to deal with these specific
23 scenarios.
24        Let me address just a couple of other
25 things that were brought up.  We have talked about the
0021
1 family exemptions.  And I appreciate the work that was
2 done with regard to family exemptions, but I mentioned
3 stepkids were left out of the mix.  And you know that
4 over 50 percent of the marriages come -- are multiple
5 marriages.  Many of those have kids, which makes them
6 stepkids.  And the inability to move guns to your
7 stepchildren or, heaven forbid, my in-laws, if they came
8 to watch my kids for a week, the inability for a
9 mother-in-law or a father-in-law to utilize the guns in
10 my home to protect the kids while I'm here -- Members,
11 it just goes to the example that there are more issues
12 here that we haven't addressed, the problem of not
13 knowing basically how guns work, and we've created a
14 bill.  We have created a bill that has created more
15 confusion, basically created an unenforceable law which
16 makes law-abiding citizens criminals.
17        So, Members, that's why I ask:  Let's do
18 away with the first conference committee report, let's

19 create a new conference committee, and let's come
20 together and see if we can find some real-time solutions
21 that prevent gun violence.
22          And how do we do that? Members, it's a
23 simple question. The truth is, if you don't like what
24 we come up with, we reject the committee report and we
25 go back to what we had. We offer -- we lose nothing by
0022
1 going to another conference committee to go beyond the
2 scope and try and figure out these issues that now have
3 huge ramifications.
4          The question on whether or not I have to
5 have a background check every time someone comes to
6 utilize a gun, a valid issue. Another part of the
7 confusion.
8          Members, I would ask for your support so
9 we can do the right thing and get this right. Support
10 the motion to dissolve the conference committee and go
11 to a conference committee beyond the scope so we can
12 actually work on solving a problem. Thank you.
13          MR. SPEAKER: Representative Rankin.
14          REPRESENTATIVE RANKIN: Thank you,
15 Mr. Speaker.
16          I've stood before you, Members, on this
17 issue before, but I honestly believe that I will be in
18 front of you next year asking you to repeal this and the
19 other bills because we will have lost about 25 percent
20 of a vital industry in this state. And that's what it's
21 all about. It should be all about for us, is jobs and
22 the economy.
23          And I want to address one more segment of
24 confusion. The outfitters and guides in western
25 Colorado are booking trips now. They're trying to line
0023
1 up their summer. And these trips are typically more
2 than 72 hours. Guests come in from all over the
3 country. Sometimes they bring their hunting rifle with
4 them, but there are a lot of -- and they're seasonal
5 employees who work as hunting guides. These people
6 often trade their rifles around to try different
7 calibers, different scopes, and that sort of thing. And
8 often the guides will actually provide a hunting rifle
9 for the people who come out.
10          There is no answer -- I'm being asked by
11 these people: Now, how will this affect me? How do I
12 make sure that I'm not violating the law by setting up
13 these trips? And, ladies and gentlemen, this is a big
14 industry. This is estimated around $800 million in a
15 year. So we're talking about leaving questions open for
16 people who have fulfilled a vital part of our economy.
17 We have to answer these questions. It's worth going
18 back into a committee, raising all the questions we can,
19 taking all the time we can. If we're going to pass this
20 bill, let's make it workable. Let's not cripple this

LEG HX 000946

4861

21  vital industry of sportsmen and hunting in our state
22  just because we don't take the time to get it right.
23          I urge you to send us back to committee.
24          MR. SPEAKER:  Representative Wilson.
25  Representative Everett.
0024
1           REPRESENTATIVE EVERETT:  Thank you,
2   Mr. Speaker.
3           Another scenario that I'd be concerned
4   with with this bill is -- let's say you are taking a
5   hunting trip to Texas and you fly through DIA.  What
6   happens if, as we know -- even on this 76- or 75-degree
7   weather day, you could still have a 4-foot snowstorm
8   here in Colorado.  And you get a three- or four-day
9   layover that's beyond the 72-hour waiting -- or transfer
10  period.  So what happens then?  Does the baggage
11  handler, United Airlines, are they going to be required
12  to get a background check?  How do we deal with that
13  scenario?
14          This is just part of what I think is an
15  unenforceable law right now.  I think it's something --
16  it's just another piece of the puzzle that we need to go
17  back to conference committee, and another problem that
18  we need to solve, or we can just kill the bill.
19          So I urge us to go back to conference
20  committee.  Thank you very much.
21          MR. SPEAKER:  Representative Wilson.
22          REPRESENTATIVE WILSON:  Thank you,
23  Mr. Speaker.
24          Representative McCann, I wanted to go back
25  to what Representative Landgraf brought forward in terms
0025
1   of the pawn shop and how they would deal with that.  And
2   I appreciate -- I appreciate your answer, but this is
3   just another one of those things that are in the bill
4   that we really don't know the answers to because the --
5   what you have in the situation with the pawn shop is you
6   actually have an FFL dealer.  They don't repair and
7   maintain them.  It's a totally different process there.
8   So this bill convolutes that.  And it's just another one
9   of those pitfalls that's in it.  I mean, as I say, I
10  appreciate your attention at explaining how that would
11  work, but that doesn't work that way with an FFL.
12          And in this whole process of this,
13  Colleagues, is -- I commend all the work we've been
14  trying to do on this.  I commend the committee.  I
15  commend the Senate.  I hate to do that, but I commend
16  the Senate on trying to correct many of the shortcomings
17  in this bill.  There are many shortcomings in it.  And
18  in trying to correct some of those -- in fact, some of
19  those, Representative McCann, that we talked about on
20  the floor, when the bill was originally on the floor,
21  are addressed.
22          But this is just the tip of the iceberg,

23  folks. There are so many issues hidden in this bill.
24  When we were debating it on the floor originally, no one
25  had thought about the 4-H. And it's a major issue. No
0026
1  one has thought about the Olympic shooting sports. No
2  one has thought about all these pitfalls. What we are
3  seeing here are the pitfalls that are involved in
4  hurry-up legislation.
5          We are trying to create a statute to fix a
6  problem, and we're trying to push it through in a rapid
7  manner. We need to specifically identify what we want
8  to fix and specifically address those issues. This bill
9  does not do that.
10         I'll tell you, folks, I did well in math
11  in public schools. So I can do the math on a second
12  conference committee. I know where the votes are going
13  to be. I don't see a danger in that. It will take some
14  time. It will take less time than we are spending here
15  spinning our wheels on this thing and discovering more
16  pitfalls.
17         So I guess I ask my colleagues on this
18  side of the aisle: What do we have to lose by spending
19  a little more time looking for some of these obvious
20  pitfalls that are there?
21          This issue is an emotional one in all of
22  our districts, all of our districts, not just rural.
23  It's an emotional issue in every one of our 65
24  districts. We owe it to all of our constituents, all of
25  our constituents to get it as right as possible. And
0027
1  I'm not under the delusion that we're going to fix it
2  all in this one, but to get as right as possible.
3          Our state is speaking loud and clear on
4  this issue on both sides of the aisle. We're going to
5  be held accountable for what we do on it. So let's take
6  the time to get it as close to right as possible. Let's
7  use a second conference committee to find the pitfalls
8  before we fall face first into another one, whether that
9  be 4-H, whether that be pawn shops, whether that be --
10  fill in the blanks. They are there and they are real
11  pitfalls. We've seen those in the conference committee
12  report, and we've seen them in the amendments coming
13  over from the Senate.
14          The majority in both houses is not going
15  to change, folks, but I think we can change the number
16  of problems in this bill by going to a second conference
17  committee. And I would urge an aye vote on that. Thank
18  you.
19         MR. SPEAKER: Representative Fields.
20         REPRESENTATIVE FIELDS: Thank you,
21  Mr. Speaker.
22          And I urge everyone to vote no on a second
23  conference committee. What the bill does is it clearly
24  outlines 10 different exceptions to address many of the

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

25 things that we're talking about here today. There's

0028

1  five permanent exceptions and there's five temporary
2  exceptions. And if you follow along with me, you can
3  see where they are.
4          There is a permanent exception regarding
5  the transfer of an antique firearm. There's another
6  permanent exception as it relates to the transfer
7  amongst family members. And in conference committee,
8  and when it came back to the Senate, we expanded that.
9  And in that expansion, we added nephews, first cousins,
10  uncles and aunts, and those kinds of things. You can
11  find that on page 5, line 13 through 16.
12          We also identify as a permanent exception
13  the transfer due to inheritance. That's on page 5, line
14  17 through 20.
15          Also, we identify as a permanent exception
16  a transfer for maintenance and repairs of guns.
17          Also another, the final permanent
18  exception we have, is those of military and the
19  deployment to family members. The temporary exceptions
20  include a temporary transfer to anyone who legally can
21  possess a gun, which means they cannot be someone who
22  has domestic violence and those kinds of things in their
23  background, for up to 72 hours. So that's kind of a
24  catchall in some situations. You can transfer that gun
25  up to 72 hours. That's on page 6, line 23 to 27.

0029

1          There's also a temporary transfer that
2  occurs in the presence of owners. So you've been
3  hearing a lot about the -- the 4-H clubs and those kinds
4  of things. If the owner is there, they have a temporary
5  ability to transfer that gun and they can use it. If
6  they're out on a shooting range or they're at a 4-H club
7  or whatever, they can do that.
8          And there's also the temporary transfer
9  for self-defense. And there's a temporary transfer at a
10  shooting range or a shooting competition. That's on
11  page 6, line 3 to 8.
12          Also there's -- I mentioned this already,
13  but there's a temporary transfer while fishing, hunting,
14  or trapping.
15          So the bill does already have in place 10
16  exceptions where you will not be required to have a
17  background check.
18          As it relates to the 4-H scenario that
19  we've heard where a child is given a gun and they go
20  home and they're with another adult -- I'm quite sure
21  they're not giving that gun to an -- that child is being
22  supervised by an adult. And so that has to be
23  addressed. And in situations like that, that adult who
24  is supervising that child while he has that gun will
25  require a background check.

0030

1      MR. SPEAKER:  Representative Saine.
2      REPRESENTATIVE SAINE:  Thank you,
3  Mr. Speaker.
4      Representative Fields, I very much
5  appreciate the exceptions that were made, however, what
6  I don't understand is I can give -- transfer a weapon to
7  a child that's born of me, my child.  If I get
8  remarried, I can't do this to my stepchild.  I thought
9  we had a lot of conversations that family is family.  So
10  I urge us to take another look at this, please.  If
11  family is family, let's make that so and let's make it
12  inclusive.  Thank you.
13      MR. SPEAKER:  Representative Rankin.
14      REPRESENTATIVE RANKIN:  Thank you,
15  Mr. Speaker, and thank you, Representative Fields, for
16  clarifying those exemptions.
17      I'm afraid this still doesn't solve my
18  problem for hunting trips.  As I understand it, the
19  temporary exemptions are all 72 hours.  Most of these
20  trips are a week or longer.  And you might argue that --
21  you know what I would like to see, Representative
22  McCann, if we go back to conference committee, is -- for
23  example, let's exempt hunters who are hunting in a unit
24  where they have a valid license.  But we haven't done
25  that because these issues keep coming up.  And that's
0031
1  the reason that we need to be more careful and clarify
2  some of these issues.
3      You might say it doesn't make any
4  difference, you know, the guys that go out hunting
5  aren't really going to pay much attention because the
6  likelihood of a game warden coming out and checking on
7  them is not great.  But we're talking about perception,
8  the perception that a hunter who comes out for two weeks
9  really can't -- doesn't qualify to borrow somebody
10  else's weapon or use another hunting rifle.  But the
11  very perception is causing people not to book their
12  trip.  And that's what I'm concerned about.  I'm
13  concerned about the economic impact of the perception of
14  this requirement.
15      So these are things that need to be
16  clarified to support our businesses and our people.  So
17  I ask for this conference committee.
18      MR. SPEAKER:  Any further --
19  Representative Sonnenberg.
20      REPRESENTATIVE SONNENBERG:  Thank you,
21  Mr. Speaker, for my last two minutes.
22      Representative Fields, you highlighted the
23  exceptions, except they didn't address any of the
24  questions we had.  It doesn't count to any of those that
25  we brought forward, the five days, the hunting trips --
0032
1  yes, hunting for a day, yes.  Hunting for 72 hours, yes,
2  that's included, where we backpack into the hills, where

LEG HX 000950
4865

3  the kids like the firearm home -- and, yes, it's given
4  to the kids.  But, quite frankly, 4-H kids haven't been
5  the subject of gun violence.  So why would we
6  criminalize them?  Allow them to learn so they can
7  handle guns safely.  We're taking that away.  It needs
8  addressed.
9         Quite frankly, many of the parents of some
10  of those kids, I'm not sure I want supervising them
11  because many of those kids in 4-H programs are looking
12  for a place to go to get that leadership and that
13  direction that they may not be getting at home.  I want
14  them to have a chance.  I want them to have a chance.
15         I want to fix the bill.  I want to help.
16  And the way we do that is go back to committee.  We
17  stand nothing to lose.  If you don't like what the
18  committee comes up with, and the committee can't agree,
19  we are no worse off than we are now.
20         I ask for a yes vote.
21         MR. SPEAKER:  Representative Humphrey.
22         REPRESENTATIVE HUMPHREY:  Thank you,
23  Mr. Speak.
24         I'd just like to bring back up the issue
25  of movers having possession of firearms for more than
0033
1  the 72 hours and also the issue of a layover at DIA and
2  the issues of liability there.  I think those still
3  aren't addressed.  And we'd like to hear answers to
4  those as well.  And we'd appreciate that.  Thank you.
5         MR. SPEAKER:  Representative Gardner.
6         REPRESENTATIVE GARDNER:  Thank you,
7  Mr. Speaker.
8         Representative McCann, Members, I was
9  amazed and disappointed at this first conference
10  committee report, because I truly expected when the
11  issues were raised on the floor that I would see a
12  comprehensive program that would deal with
13  organizational entities, whether they be corporations or
14  nonprofits, hunting clubs -- all sorts of things.  In
15  fact, I offered to some stakeholders some ideas about
16  how to deal with that.
17         And one of them -- and I hesitate to say
18  this in the well because I am not one who favors a lot
19  of government regulation, but, unfortunately, a
20  regulation as draconian as this begets a comprehensive
21  rulemaking.  And there isn't an authority in the
22  committee report or the bill, as drafted and as passed
23  out of the House and back from the Senate, that really
24  permits any kind of a rulemaking to deal with what are a
25  thousand, thousand special kinds of cases, special
0034
1  issues.  And I suspect we haven't thought of all of them
2  yet.  That's why there's a rulemaking process to deal
3  with these kinds of issues.
4         Make no mistake, my preference is that we

5  not have this bill, but if we must, then let's not put
6  ranches out of business or their employees at risk.
7  Let's not put security companies that do have armed
8  security guards out of business or at risk.  Let's not
9  make it difficult for hunters, outfitters, and all of
10  those organizations, entities, clubs, nonprofits, boy
11  scouts, girl scouts, all of the myriad of entities
12  that -- some of which we haven't even thought of,
13  situations that we haven't even addressed.
14          And we sent this to conference committee
15  to get those things addressed, and we get four or five
16  lines back, frankly.  And I'm not sure why that was.  I
17  wasn't on the conference committee.  But to put this
18  into law with as many issues that have been raised,
19  without the authority for DPS or an appropriate body of
20  the executive branch to engage in a comprehensive
21  rulemaking, and to take testimony from the public about
22  how it's going to work and how it's going to affect
23  them, is to disregard the citizens' needs.
24          Now, I think underlying this is that
25  somehow firearms are inherently evil, so we just have to
0035
1  keep them out of everybody's hands.  But what comes into
2  stark focus, very sharp focus, as we have this
3  discussion is that these are tools.  They're items of
4  protection.  They're instruments of recreation.  There
5  are many, many more legitimate uses of firearms in our
6  communities than there are the illegitimate criminal
7  uses, and that there are many, many, many more citizens
8  out there who possess and use firearms for self-defense,
9  for recreation, for safety and security than there are
10  those who use them illegally.
11          And the irony is, and in particular with
12  this first conference committee report, is that those
13  who would violate the law, those who would use firearms
14  for criminal purposes are not the least bit concerned
15  with anything that we're doing here today.
16          It is only those who would obey the law,
17  it is only those legitimate entities that need firearms
18  for safety, security, and recreation that are going to
19  be concerned at all.  And instead of making that better
20  at the conference committee, we've raised, as my friend
21  Representative McNulty points out, we've raised still
22  more questions, still more problems, still more
23  uncertainty, as Representative Rankin points out, the
24  kinds of uncertainty that we'll lose jobs, hurt the
25  economy, and make it difficult for farms and ranches,
0036
1  corporations and nonprofits to do business and exist in
2  Colorado.
3          Now, I think there's a tendency, as
4  Representative Sonnenberg makes this motion to dissolve
5  the first conference committee and go to a second
6  conference committee and go beyond the scope, to resist

LEG HX 000952    4867

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

7  and defend. But we need to get this right for the
8  people of Colorado. Everybody says we want to get this
9  right. I hope no one says we want to get this wrong.
10  But we're just asking, we're just asking for an
11  opportunity to get this right. And if that means that
12  we need the conference committee to have language about
13  rulemaking, that we need a conference committee to
14  address the myriad of organizations, entities, and
15  situations that use firearms, then let's do that, let's
16  do it right. Let's not have to come back here next year
17  and fix it five times over and do it time after time
18  after time to try to tweak it.
19         I support this motion. Let's support it.
20  Let's not, for the sake of obstinance or principle or
21  simple desire to move this bill on because we've said
22  we're going to move it on -- for heaven's sake, let's do
23  it right.
24         We need to get this right. And I defy
25  anyone over here to my left to tell me that it's okay to
0037
1  get it wrong or to create more unintended consequences
2  than we solve, when we could simply go to a conference
3  committee, go to a conference committee this afternoon,
4  on Monday afternoon.
5         This is not day 118 or 19 of the session.
6  This is day 66. And this bill is almost done. And
7  we're pretty close to done, whether I'm happy with that
8  or not. But I would like to get it right. And I have a
9  lot of ideas about what a good regulatory regime would
10  look like.
11         Again, my friend and colleague
12  representative McNulty raised important issues that are
13  present on the face of the conference committee report.
14  And, frankly, they're easily enough fixed. There are
15  models out there to do it, models of weapon custodians,
16  background checks --
17         MR. SPEAKER: Representative Gardner, your
18  time has expired.
19         REPRESENTATIVE GARDNER: Thank you,
20  Mr. Speaker. Vote yes on this motion.
21         MR. SPEAKER: Representative Saine.
22         REPRESENTATIVE SAINE: Thank you,
23  Mr. Speaker.
24         Since we were talking about being
25  inclusive earlier, I want to bring up a note that I just
0038
1  received from my constituent, and he says that he lives
2  with his partner, but they're unmarried. And what if
3  that partner has access to his weapons and she uses it
4  to defend herself against a home invasion, a burglary.
5  Are they both going to jail under this bill? So I do
6  have a suggestion. Since we talked about stepchildren
7  and family is family, maybe there could be some
8  exception for a homestead as well. And that may clear

4868

9   up this part of the bill.  So just consider that in the
10  committee.  Thank you.
11          MR. SPEAKER:  Any further discussion on
12  this motion?
13          Seeing none, the question . . .
14          UNIDENTIFIED SPEAKERS:  (Inaudible.)
15          MR. SPEAKER:  The House will stay in a
16  brief recess while we wait for the marijuana task force,
17  the joint marijuana committee, to -- yes, I know -- to
18  come back and see if they have any comments, and then
19  we'll vote on this.
20          (A recess was taken.)
21          MR. SPEAKER:  The House will come back to
22  order.
23          Is there any further discussion on the
24  amendment or the motion to dissolve the first conference
25  committee and form a second conference committee?
0039
1           Representative Wilson.
2           REPRESENTATIVE WILSON:  Thank you,
3   Mr. Speaker.
4           And, Representative Campbell, I've
5   switched hats now.  I'm going to put on my HD-60 hat and
6   follow up on what Representative Rankin was talking
7   about with the outfitters.
8           We face a tremendous challenge with the
9   outfitters and with the sportsmen and women that visit
10  Colorado annually.  The word is rapidly getting out that
11  Colorado is not hunter friendly.
12          My question for you would be,
13  Representative McCann, is it possible, as we look at
14  those people who come to Colorado, that an exception be
15  made because, as Representative Fields pointed out,
16  we've got some exceptions in there -- so that we could
17  have an exception for licensed hunters, which, through
18  the DOW, they have their license, they receive their
19  license -- they're a valid hunter coming for a valid
20  season -- that we could exempt them for the length of
21  that season so that they wouldn't be looking at the
22  background check issue, because, Colleagues, let's not
23  shoot ourself in the foot -- and that pun is intended --
24  as we do this.
25          And if we don't make some exception for
0040
1   those sportsmen, then economically it's really going to
2   hurt us.  The Outdoor Channel is already starting to run
3   information that Colorado is not hunter friendly.  And
4   as we look at the DOW, the enforcement piece of this is
5   horrendous because now an officer, if they make contact
6   with me in Unit 82, they see that I have a weapon,
7   they're going to have to check to see if I've got a
8   background check to have that weapon.  So we're adding
9   that work to them.
10          We are also in that situation -- then we

11  come across as harassing our tourists because not only
12  do they get checked for the background check, but also
13  they have to get checked for their license and all the
14  other multiple things that we have.  And what we're
15  essentially doing is hurting our economy.  As we're
16  looking to protect our citizens, we're hurting our
17  economy.  And I think we can protect both in this
18  situation.
19          Visiting sportsmen and women are not the
20  problem that we're trying to deal with.  And they're
21  important to our economy and they're important to HD-60.
22  So I think if we can come up with an exception for those
23  who are in the sporting field -- and that doesn't just
24  include the shooting sports, because I've met plenty of
25  mountain bikers in HD-60 that were carrying a weapon,
0041
1  and they would fall under the same situation.
2          So I think that if we couple this
3  legislation with some exceptions, we can cover that.  If
4  not, we are sending the word that Colorado is not hunter
5  friendly.  So I would urge that we go back to conference
6  committee and address these issues.  Thank you.
7          MR. SPEAKER:  Representative Fields.
8          REPRESENTATIVE FIELDS:  Thank you,
9  Mr. Speaker.
10          And, Representative Wilson, if you look on
11  page 6, the bill celebrates hunting and fishing and
12  those kinds of things in our state.  So there is no time
13  limit at all.  So the 72 rule does not apply while
14  you're hunting and fishing.  So if you're coming to the
15  state of Colorado, you're welcome to do so.  There is
16  not a time limit associated with hunting in the state of
17  Colorado with this bill.
18          MR. SPEAKER:  Representative Scott.
19          REPRESENTATIVE SCOTT:  Thank you,
20  Mr. Speaker, I appreciate it.
21          The concern about the hunting and fishing
22  industry, I think we really, really have to think about
23  this.  There's several representatives in this room that
24  our districts are going to be impacted tremendously.  I
25  know Representative Vigil, Representative McLachlan,
0042
1  myself, Representative Wright, Representative Coram --
2  wherever you are -- this is a huge impact to our
3  districts, huge.
4          I don't know -- and, again, I'm going to
5  throw out things that you may not know -- but just
6  recently in the Field and Stream Magazine, Grand
7  Junction, Colorado, was rated No. 6 in the United States
8  for hunting and fishing opportunities.  That's a big
9  deal for us.  That's a huge deal for us.  We cannot
10  afford to lose any revenue stream, perceived or
11  otherwise, from that industry.
12          We have hunters that come in from all over

13  the world, literally all over the world, that spend tens
14  of thousands of dollars on their hunting adventures.  If
15  they, for one second, believe that there's going to
16  be -- something is problematic about them coming to
17  Colorado, there's a lot of places they can go.  And for
18  us to take maybe 24 more hours to take one more look
19  with a new conference committee just seems crazy that we
20  would not do that.
21          So I'd ask Representative McCann and
22  Representative Fields to really, really consider the
23  impact that they may have, unintended, of course -- I
24  know they don't intend to do that because they don't
25  live over there -- but we are talking billions of
0043
 1  dollars in revenue for the state of Colorado that goes
 2  to all kinds of programs and helps all kinds of people.
 3          So I would just ask that we just take a
 4  few more -- a few more hours, if you will, to make sure
 5  we don't damage this incredibly important industry in
 6  the state of Colorado.  Thank you.
 7          MR. SPEAKER:  Representative McCann.
 8          REPRESENTATIVE McCANN:  Thank you,
 9  Mr. Speaker.
10          Colleagues, hunting is excepted in this
11  bill.  If you look on page 6, lines 9 through 13, the
12  bill specifically makes an exception for a temporary
13  transfer of possession without transfer of ownership,
14  which takes place while hunting, fishing, or target
15  shooting or trapping, as long as that's legal in the
16  places where it's taking place.  So your concern about
17  the hunting camp is totally misplaced.  This bill makes
18  a specific exception for that.  And it's very clear on
19  page 6, lines 9 through 13.
20          So if you have -- are running a hunting
21  camp and you have people flying in to hunt and you want
22  to be able to have them use your guns, all you have to
23  do is do a temporary transfer.  There's no requirement
24  for a background check.  The person can use the gun as
25  long as they want to, hunting, and there's no problem.
0044
 1  So this is totally a red herring.  This is not an issue
 2  in this bill.  Hunting will continue.  We have no
 3  intention of preventing outriggers or hunting camps from
 4  operating.  There's no problem here.
 5          Also, with respect to the idea that
 6  Wildlife would be checking hunters for their background
 7  checks, Wildlife doesn't enforce the criminal laws.
 8  They enforce the regulatory laws.  So they'll be
 9  checking the guns to make sure they only have three
10  rounds, which is a rule of Wildlife.  So they will
11  continue to do their job just as they currently have.
12  But as far as hunters being able to come in from out of
13  state and hunt and use guns that they don't bring in
14  with them, there's no problem.

15       If they bring the guns in, there's no
16  problem there either, because they purchased them
17  outside of the state.  So you guys aren't listening, but
18  I'm explaining why this is not an issue.
19       So if you look on page 6, lines 9 through
20  13, you will see that hunting -- the hunting camp is not
21  an issue under this bill.  There's a clear exception for
22  a temporary transfer while somebody is hunting, and
23  there's no time limitation on it.
24       And while I'm up here, because I can only
25  speak twice, let me just address a little bit the 4-H
0045
1  issue as well.  If there is a temporary transfer of a
2  weapon to a young person -- I presume the adults in the
3  family will be supervising the handling of the gun.  So,
4  yes, the adult will be required to get a background
5  check, because we don't want guns in the homes of people
6  who don't have background checks.  That's the whole
7  point.  So the parent will get the background check
8  because the parent will be supervising the child while
9  the gun is being used or handled in the house.  So that
10  should cover the 4-H situation.  Or the other way it
11  could be done is the transfer of the gun could take
12  place at the shooting range, which is, again, on page 6,
13  lines 3 through 8.  The temporary transfer from one
14  family to another can take place at the shooting range
15  or at a target firearm shooting competition.
16       So if the temporary transfer takes place
17  at that location, there would not be the necessity for a
18  background check.
19       MR. SPEAKER:  Representative McCann, your
20  time has expired.
21       REPRESENTATIVE McCANN:  All right.  Thank
22  you very much.  Vote no.
23       MR. SPEAKER:  Representative Gerou.
24       REPRESENTATIVE GEROU:  Thank you,
25  Mr. Speaker.
0046
1       And, Members, I'm sorry, we were across
2  the street spending your money for K through 12, and
3  we're doing a good job.
4       When I came back over, I was asked by one
5  of the members how much money we spend in wildlife
6  expenditures.  And let me -- I don't get to read from
7  the appropriation committee's report or the
8  appropriations report much, the bill, so I will do that.
9       The wildlife subdivision manages the
10  state's 960 game and nongame wildlife species by issuing
11  fishing and hunting licenses, enforcing wildlife
12  regulations, protecting habitat and native wildlife
13  populations, and managing approximately 1.4 million
14  acres, including 352 state wildlife areas.
15       And the reason I'm coming down here today
16  is I have a very strong interest in maintaining our wild

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

17  lands. They are very, very important to me. And I
18  think they're all important to everybody here in the
19  room.
20          Funding for the wildlife subdivision is a
21  mixture of cash funds from license fees, federal funds,
22  Great Outdoors Colorado funds, and various other
23  sources.
24          Hunting and fishing license sales,
25  approximately 2.3 million in fiscal year '11/'12,
0047
1  provide more than half of the funding for Wildlife.  So
2  when Representative Scott was saying that he was
3  concerned about making sure that we protect our hunting
4  in Colorado, it is with good reason, because it's a huge
5  amount of dollars.
6          So approximately 65.4 percent of total
7  hunting and fishing license sales are from big game
8  species.  And I don't know if the sponsors are
9  listening, but this is mainly from elk and deer.  And
10  about half of all revenues from hunting and fishing
11  license sales come from the sale of nonresident big game
12  hunting licenses.  The total amount of money that we
13  take in from big game hunting for '12/'13 is estimated
14  to be at $52 million.  $52 million.  And those dollars,
15  the whole Wildlife revenue budget is 121 million.
16          So, basically, Representative Scott's
17  concern about going back and examining this to make sure
18  that we aren't going to be putting those dollars at risk
19  makes sense, because if you're talking about just under
20  half of $121 billion budget item, it does give you cause
21  for concern.
22          I think we need to go back and reexamine
23  this.  I support a new committee -- conference
24  committee.  Thank you.
25          MR. SPEAKER:  Representative Scott.
0048
1          REPRESENTATIVE SCOTT:  No.
2          MR. SPEAKER:  Representative Murray.
3          REPRESENTATIVE MURRAY:  Thank you,
4  Mr. Speaker.
5          As I've been listening, it just seems like
6  there's a long list that we're ticking off of issues
7  that still are unanswered regarding farm family
8  operations, youth organizations, 4-H kids, stepkids,
9  stepchildren, pawn shops.  And I can't believe that
10  we're not going to be given the opportunity to talk
11  about these important issues before we send this to the
12  governor's desk.  I mean, are we going to send something
13  to the governor with this many holes in it?  I guess I
14  would -- you know, if somebody in the governor's office
15  is listening, we need your leadership here.  We need you
16  to call down and say, Hold on, we need to talk about
17  these very real issues.
18          You know, we're talking about a pawn shop

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

19  in south Colorado that doesn't know whether he's going
20  to go out of business or not because we really can't get
21  a good answer about whether what he is doing now
22  currently is going to be acceptable under this law.  The
23  farm family operations and someone within -- if it's a
24  corporation and the use of the gun in that situation.
25  Our youth organizations, our 4-H kids.  And that was
0049
1  offered in a minority report that we have not even
2  gotten to today to handle that, and yet that was
3  rejected in the conference committee.
4          So I would say -- I understand there's
5  been some polling done, and maybe citizens support the
6  concept of this bill, but I don't think the citizens of
7  our state intend for us to be putting people out of
8  business and telling our 4-H kids that they can't
9  participate in shooting sports.  So let's take a deep
10  breath here and make sure that we're plugging as many
11  holes as we possibly can before we send this to the
12  governor's desk.
13          I really encourage you to consider going
14  to another conference committee.  Thank you.
15          MR. SPEAKER:  Representative Nordberg.
16          Representative DelGrosso.
17          REPRESENTATIVE DelGROSSO:  Thank you,
18  Mr. Speaker.
19          And, Members, I apologize, I kind of -- we
20  missed the first part of this debate.  So I won't try to
21  go through a whole long list of stuff because I'm pretty
22  sure that my colleagues already did a pretty good job of
23  arguing a lot of the points.  In talking with them, it
24  does sound that the first conference committee -- I was
25  able to go to that first conference committee, and there
0050
1  was some headway and some things that were able to get
2  talked about and hashed out, and there are some things
3  that have gotten better with this bill.  But I don't see
4  what the hurry is.
5          What is it going to be if we take one more
6  day to send this back just one more time and say, Okay,
7  here's the other list of questions.  Here are some other
8  issues that are there.  We take this into a new
9  conference committee.  So that way, when the bill
10  actually comes out, it's passed.  And if the governor
11  decides to sign it and it goes out to the people, I
12  mean, I think everybody in this chamber, whether you
13  support it or not, can legitimately say we had -- we at
14  least sent it back to that conference committee several
15  times.  We talked about the issues.  We tried to fill
16  all the different holes that were there, instead of
17  trying to rush this thing through.
18          I don't see what one more day with sending
19  this back to a conference committee, how that's going to
20  harm anybody and why just that extra day, why we won't

21  just take that extra little step to address -- you know,
22  the hunting thing definitely is a huge issue.  Now, we
23  hear there is language in there that, well, we think
24  this covers it, but it's not 100 percent for sure.
25          We heard from Representative Gerou talk
0051
1  about the millions of dollars that the industry brings
2  into the state of Colorado.  I mean, you've got Montana.
3  You've got Wyoming, Arizona, New Mexico -- there are
4  several other states right around here that, when
5  somebody is booking from Germany or some other country
6  around the world where they're thinking about coming
7  here, and now we've got several different hoops that
8  they have to jump through to come here -- I mean, when
9  they're spending the kind of money that they're spending
10  to come here and they can go to another state around
11  here where they don't have to do any hoops, why would
12  they not go to some other state?  What incentive are we
13  giving them to come here by putting these extra burdens
14  into place?
15          So I think it is a hundred percent
16  appropriate that we go back to that conference committee
17  one last time, try to address these few issues that are
18  still lingering out there.  And then I would think that
19  you guys could go back with a straight face to your
20  constituents and say, Hey, we sent this thing back to a
21  conference committee a couple of times.  We hashed out
22  all the issues that those crazy republicans kept
23  bringing up, and we talked about all of that stuff.  So
24  I urge that we support sending this back to a conference
25  committee again.
0052
1          MR. SPEAKER:  Representative Nordberg.
2          REPRESENTATIVE NORDBERG:  Thank you,
3  Mr. Speaker.
4          Members, we've heard about 4-H, hunting
5  and fishing -- there's just a lot of holes that still
6  need to be patched up.  And one that I will continue to
7  bring up because I'm not sure if it's been addressed or
8  discussed properly, but moving companies.  When people
9  come into our state, you know, it's very well
10  reasonable, it's not within the realm of impossibility
11  that a moving company might have a gun for 72 hours or
12  more.  Are we going to criminalize them?
13          Representative DelGrosso brought up the
14  fact of hunting.  We're in the four states here; some of
15  the best hunting in the world.  We have stiff
16  competition from our neighboring states.
17          So I just ask that we go back to
18  conference committee, address some of these issues.
19  Thank you.
20          MR. SPEAKER:  Representative Humphrey.
21          REPRESENTATIVE HUMPHREY:  Thank you,
22  Mr. Speaker.  Thank you to the majority party for

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

23 indulging us here. It's after 3 o'clock now.
24      I just want to bring back this issue with
25 the airports, DIA, airlines. What's going on there?
0053
1 Seventy-two hours, layover, snowstorm, how does that get
2 dealt with? I think that's an important issue. I'm
3 sure they'd like to have that answered.
4      And as a gun owner, as a hunter, I just
5 think about people coming here for tourism, for hunting.
6 And if they have to come here and deal with these
7 transfer issues, I'm afraid that we could lose business,
8 that that could hurt our state. Why not exempt them
9 during hunting season? We need to address that.
10      And I'd really appreciate some answers to
11 that and would like to call for that conference
12 committee to deal with those issues. Thank you.
13      MR. SPEAKER: And, Representative
14 Humphrey, both Representative McCann and Representative
15 Fields have talked twice on this motion, so they cannot
16 speak again.
17      Is there any further discussion?
18      Representative Priola. Please be in the
19 well if you want to discuss something.
20      REPRESENTATIVE PRIOLA: Thank you,
21 Mr. Speaker.
22      I rise in support of the motion to send
23 this to another conference committee. Members, this
24 bill, in my opinion, was poorly conceived in the
25 beginning and continues to be poorly written. The fact
0054
1 that the lion's share of folks that have worked on this
2 and voted on this have little or no experience with
3 firearms, with hunting, have never been to the wilds of
4 this state during hunting season. And understand --
5      MR. SPEAKER: Representative Priola,
6 please talk about the bill, not about the members.
7      REPRESENTATIVE PRIOLA: Thank you,
8 Mr. Speaker. This is to the functionality of the --
9      MR. SPEAKER: And please talk about the
10 bill, Representative Priola.
11      REPRESENTATIVE PRIOLA: This bill, as it
12 is currently written and currently conceived, will have
13 very bad ramifications for the hunting industry as well
14 as the Second Amendment rights of Coloradans. I have
15 been hunting -- we don't hunt there any longer because
16 of the change with the Division of Wildlife on the
17 herds, but for about 10 years, I hunted in northwest
18 Colorado. And the Division changed the rules on price
19 of out-of-state tags. That drastically cut back the
20 number of out-of-state hunters.
21      I submit to you that this bill, especially
22 with the current language of it, will be yet another
23 item that will affect folks' decisions from out of
24 state, out of country, on coming to the state of

LEG HX 000961

4876

Appellate Case: 14-1290    Document: 01019371764    Date Filed: 01/16/2015    Page: 213

0055
1  the aisle. But this is bad policy from the get-go, and
2  I support sending it to another conference committee.
3        MR. SPEAKER: Seeing no further
4  discussion, the question before the House is to dissolve
5  the first conference committee and form a second
6  conference committee to go beyond the scope of
7  differences.
8        Mr. Kolar, please open the machine and
9  members proceed to vote.
10        Representative Scott, you're fined $2 for
11  not having your jacket.
12        Representatives Buckner, Duran, Fields,
13  Gardner, Gerou, Lebsock, Stephens.
14        Representatives Gerou, Lebsock, you're
15  excused.
16        Close the machine. With 27 aye votes, 34
17  no votes, four excused, and zero absent, the motion to
18  dissolve the first conference committee report and to
19  proceed to a second conference committee report is lost.
20        Representative McNulty.
21        REPRESENTATIVE McNULTY: Thank you,
22  Mr. Speaker. And that's unfortunate. There was a time,
23  oh, yesterday or the day before, whenever it was, that
24  the majority allowed this bill to go to conference to
25  address the issues that were present. The conference
0056
1  committee report that we received didn't address those
2  issues, so I don't know why we went through the
3  conference committee. I mean, it's all well and good and
4  fine for the majority to tell us that we'll address --
5  we recognize your concerns, we'll address your concerns,
6  let's go to a conference committee. Isn't this great?
7  Those of the conference committee railroads the minority
8  party, comes back with a committee report that doesn't
9  address the issues that were present.
10        So now we have in front of us a bill with
11  the same problems that it had before it went to
12  conference committee. We have tried to send this to
13  another conference committee to address those issues.
14  My fear is that when this bill is passed, when it is put
15  into the books and when law enforcement goes out to --
16        MR. SPEAKER: Representative McNulty --
17        REPRESENTATIVE McNULTY: -- make sure --
18        MR. SPEAKER: Representative McNulty, we
19  are talking about the conference committee report.
20  Please keep your remarks to the conference committee
21  report and what is contained within it.
22        REPRESENTATIVE McNULTY: And make sure --
23        MR. SPEAKER: Representative McNulty.
24        REPRESENTATIVE McNULTY: Thank you,
25  Mr. Speaker.
0057

1    And make sure that the provisions are
2  enforced, that they will find it confusing, that they
3  will find it difficult to implement.  And so when I say
4  that we missed an opportunity, we really did.  And when
5  I say that our votes weren't likely to change, but we
6  have an obligation to provide clear direction and to
7  provide clear legislation, we do.
8         MR. SPEAKER:  Representative McNulty, we
9  can debate the issues of the conference committee report
10  on the bill, but the question before the House is the
11  adoption of the conference committee report and what is
12  contained within the conference committee report.
13  Please keep your remarks to that topic.
14         REPRESENTATIVE McNULTY:  But this
15  conference committee report doesn't do it.  This
16  conference committee report does not provide the clarity
17  that was intended when we all voted to send this to
18  conference.  So what have we accomplished?  What have we
19  accomplished in the pursuit to provide clarity, in the
20  pursuit to draft a bill that is understandable by not
21  only law enforcement, but understandable by the people
22  that will now be asked to live under it?
23         We had hoped, I had hoped, that when we
24  sent this bill to conference that you would at least
25  address the issues that were present.  Even though we
0058
1  disagree on the fundamental -- underlying fundamentals
2  of the issue, that you would at least fix the bill
3  through this conference committee report so that normal
4  people wouldn't be hurt.  And particularly and
5  unfortunately, the problems are focused in rural
6  Colorado.  The challenges are focused in rural Colorado.
7  And this committee report does nothing to address those
8  issues.  And I believe that to be unfortunate.
9         I'm not going to vote for this committee
10  report.  Vote your conscience.
11         MR. SPEAKER:  Any further discussion on
12  the committee report?
13         Representative Waller, senate minority
14  leader.
15         REPRESENTATIVE WALLER:  Thank you,
16  Mr. Speaker.
17         And while I would like to adopt most of
18  the comments made by Representative McNulty, I do have
19  one slight disagreement.  I think we should adopt this
20  conference committee report because, while it didn't do
21  everything we wanted to do -- and we appreciate the
22  majority party recognizing that there were some problems
23  associated with the bill, and appreciate the ability to
24  go back to the conference committee to fix those
25  problems -- we didn't quite get there.  We didn't quite
0059
1  get to do the things that we had hoped would happen in
2  that conference committee.  Some more things were

LEG HX 000963      4878

3  identified later on down the road that we just had a
4  pretty significant debate about.
5          However, this conference committee did
6  do -- the things that it did, while they were not
7  enough, did do good things.  The things that they did
8  were right and just and proper.  It addressed the issue
9  of the family farm corporation purchasing a gun and not
10  having to go through all of the checks for every single
11  family member.  It addressed those issues.  It addressed
12  some of those other corporate issues, the gun club being
13  able to purchase the guns and not having to have every
14  single member of the gun club then go through a
15  background check in order for the gun club to purchase
16  its own weapons.
17          And so it did do some good stuff.  I mean,
18  I wish it had done more, I wish it had gone further, but
19  it did do some good stuff.  So I would ask that we vote
20  yes on this conference committee report and still no on
21  the bill.
22          MR. SPEAKER:  Representative Murray.
23          REPRESENTATIVE MURRAY:  Thank you,
24  Mr. Speaker, and I appreciate the minority leader's
25  comments about the good things that were included in the
0060
1  report, but in the minority report, there are a couple
2  of additional things that I just can't understand why
3  they're not in there.  One is members of youth
4  organizations, that we clarify the use of the firearms
5  in those shooting kinds.  Are we trying to stop shooting
6  sports with our children's organizations, with 4-H?  Is
7  that what we're trying to do with this bill?
8          Also, clarifying what family members are.
9  Why would we not further clarify family members to
10  include spouses, parents, children, siblings,
11  grandparents, grandchildren, nieces, nephews, first
12  cousins, aunts and uncles, step relations, partners of
13  civil unions or domestic partnerships and in-laws?  Why
14  would we not include that definition in this conference
15  report?
16          Vote yes, but realize that we've left out
17  some important points that need to be included in this
18  bill.
19          MR. SPEAKER:  Representative Holbert.
20          REPRESENTATIVE HOLBERT:  Thank you,
21  Mr. Speaker.
22          Members, I join in the Colorado for an aye
23  vote on the conference committee report.  I am
24  frustrated that there wasn't more done, but I do
25  appreciate, again, the concerns that Representative
0061
1  Sonnenberg brought up about the gun club.  And as I said
2  earlier, I think Representatives McCann and Fields
3  deserve our thanks for addressing that issue.
4          It does continue to seem to be

5  frustrating.  If you look out on social media, you can
6  see the questions start to arise.  One of the problems
7  that we have here with the conference committee report
8  is that the loaning now of a firearm to an immediate
9  family member, say a father to a son, that would be
10  permitted.  However, it isn't permitted from a father to
11  a stepson.  And with the number of blended families we
12  have in our culture, it just seems shortsighted and
13  unnecessary that we would put families in that kind of
14  position and effectively create sort of second-class
15  children.  And I just think that's unnecessary.
16          In my neighborhood, we have several
17  blended families, and we consider those kids just to be
18  part of the family, part of the neighborhood.  And I
19  have to believe that it's an unintended consequence, but
20  that is one of the things that keeps popping up, the
21  questions that I start getting in e-mail and phone calls
22  and Twitter and Facebook and people asking, Well, what
23  about this?
24          And I'm sure that the bill will never be
25  in a perfect form, but, you know, it's a frustrating,
0062
1  awkward situation to say, Thank you, can't we do better?
2  And I suppose that is a subtle question.  We, I guess at
3  this point, can't go to a conference committee.  It
4  would have been so -- so nice to be able to fix some of
5  those problems.
6          I remain a yes on the conference committee
7  report.  I'll be a no on the bill.  But also to the
8  question, the subject that I spoke of earlier, the 4-H
9  families, something over 100,000 kids in Colorado
10  participate in 4-H.  And those who are in the shooting
11  program -- you know, I certainly appreciate that
12  Representative Salazar, thank you, sir, had some
13  questions about that.  It is encouraging when folks from
14  the other side of the aisle start taking up those
15  conversations and, you know, what is this problem,
16  really?  But it does seem that we had the opportunity to
17  do a better job, but something is better than nothing.
18          So I ask for an aye vote on the committee
19  report because at least it did address partially the
20  concerns raised by my friend Representative Sonnenberg.
21          MR. SPEAKER:  Representative Sonnenberg.
22          REPRESENTATIVE SONNENBERG:  Thank you,
23  Mr. Speaker and Members.
24          I'm going to ask for a yes vote as well.
25  I appreciate -- I appreciate the opportunity to go to a
0063
1  conference committee.  Although I was a little
2  disappointed in the conference committee and
3  disappointed that some of the discussion was shut off
4  and not allowed to happen, this does make it a little
5  better.  It allows for the ability for my wife to grab a
6  gun 72 hours after I leave the house, and if I've got a

7   skunk of a rattlesnake, to deal with that. I appreciate
8   that.
9         I also appreciate the attempt to try and
10  address the corporate. Even though we didn't get where
11  I think we needed to go for other situations, I
12  appreciate the effort. The others, however, I think we
13  fall short. That's why I'll still be a no on the bill.
14  And I'll talk about that in a moment, but I would urge
15  you to vote yes on the conference committee report.
16        MR. SPEAKER: Seeing no further
17  discussion, the question before the House is the
18  adoption of the first report of the first conference
19  committee on House Bill 1229.
20        Mr. Kolar, please open the machine and
21  members proceed to vote.
22        Representatives DelGrosso, Dore, Duran,
23  Pabon, Rankin.
24        DelGrosso excused.
25        Close the machine.
0064
1         With 55 aye votes, six no votes, four
2  excused, and zero absent, the first report of the first
3  conference committee to House Bill 1229 is adopted.
4        To the bill.
5        UNIDENTIFIED SPEAKER: (Inaudible.)
6        MR. SPEAKER: Actually, yes -- Madam --
7        UNIDENTIFIED SPEAKER: (Inaudible.)
8        MR. SPEAKER: Representative Fields.
9        REPRESENTATIVE FIELDS: Thank you,
10  Mr. Speaker. And I move for the repassage of House Bill
11  1222.
12        MR. SPEAKER: Seeing no -- okay, yeah.
13        (Laughter.)
14        REPRESENTATIVE FIELDS: 1229.
15        MR. SPEAKER: 1229. She changed the bill
16  number. Is there still a discussion? Okay, I guess so.
17        Representative Sonnenberg.
18        REPRESENTATIVE SONNENBERG: Thank you,
19  Mr. Speaker.
20        Members, we still have confusion. We
21  still have misunderstandings on what this bill does or
22  does not do. I have stepchildren. Actually, I don't
23  have stepchildren; my wife has stepchildren. My wife
24  could not allow -- the way this is now, my wife could
25  not give my son or my daughters a gun, unless they get a
0065
1  background check. But their brothers, she can.
2        My in-laws cannot come over to the house
3  and watch the kids or the grandkids and have access to
4  my guns without a background check.
5        Is that really, really what you're after?
6  Are you after my in-laws? I mean, Lord knows the
7  definition -- and I tell this story -- the definition of
8  mixed emotions is watching my mother-in-law drive off a

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

9  cliff in my new pickup.  That being said, I love my
10  mother-in-law and I love her to watch my kids, but she
11  doesn't have access with this bill.  Now she has to have
12  a background check to protect my children and
13  grandchildren when she is at my house.
14        The holes that we have created here of
15  law-abiding citizens, of those that we're not worried
16  about, quite frankly, because we know for a fact that
17  whatever law we pass, criminals don't care.  That's what
18  makes them criminals.  Criminals don't care that we pass
19  a background check when they're doing the back-alley
20  deals.  Those that cause the damage, do you really think
21  that they will get a federal licensed dealer to do the
22  background check?  You know the answer to that.  I know
23  the answer to that.  This bill does nothing to help
24  prevent gun violence.
25        All you have done is made 4-H kids,
0066
1  stepchildren, and in-laws criminals.  For that, I urge a
2  no vote.
3        MR. SPEAKER:  Representative Dore.
4        REPRESENTATIVE DORE:  Thank you,
5  Mr. Speaker.
6        Members, we are called and tasked down
7  here to make legislation.  I know to get to perfect is
8  tough, but we need to work to get there as close as we
9  can.  And I appreciate the conference committee and the
10  process, the attempt, but we're farther from perfect
11  than we are towards perfect.  And when we do that, we
12  have those gray areas.  And those gray areas will be
13  family members in this case.  The gray areas will be
14  pawn shops, small business owners, and tourists who are
15  coming to Colorado to enjoy what we have to offer.  And
16  because those haven't been addressed, I'll be a no vote.
17  And when we don't address those areas, what it means is
18  we lose tourism money to Colorado, we lose jobs in
19  Colorado, and that is bad for Colorado.
20        So I thank you for the efforts.  We aren't
21  there.  I wish we had taken more time to come to the
22  place where we could to make this better.  And because
23  we haven't, I will be a no vote.  Thank you.
24        MR. SPEAKER:  Representative Rankin.
25        REPRESENTATIVE RANKIN:  Thank you,
0067
1  Mr. Speaker.
2        Representative McCann, thank you for
3  clarifying the hunting issue.  I'm sorry that I was
4  confused over the 72-hour limit on loaning a gun in a
5  hunting situation, but unintended consequences point out
6  that if I was confused, what about my hunting guides and
7  the hunters in Colorado?  The uncertainty, the
8  uncertainty in this bill creates -- uncertainty is a
9  killer of business and the economy.  It always is.  And,
10  you know, that is what I am concerned about.

11   And I realize we're probably going to
12   pass -- but I want to make you a promise.  I want to
13   make you a promise.  Next year I'm going to be back up
14   here, hopefully here, if I can get it out of committee,
15   I'm going to be here talking about a bill, to either
16   repeal or to dramatically clarify this background check
17   bill.  Background checks are not that unpopular, if we
18   do them right.  A lot of NRA members, a lot of hunters,
19   a lot of people would go for a really good background
20   check bill.  But this bill has so much uncertainty -- I
21   want to make you a promise that when I come down here
22   with a bill to either repeal or clarify this, I'm going
23   to bring with me a report on how many jobs were lost,
24   how many jobs were lost in the hunting community, how
25   many in tourism.  It's going to be detailed.  And I'm
0068
 1   going to do it by county.  I'm going to point out your
 2   counties and how many jobs were lost because of this
 3   bill.
 4         MR. SPEAKER:  Representative Rankin, if
 5   you'll hold on --
 6         REPRESENTATIVE RANKIN:  You can count on
 7   it.
 8         MR. SPEAKER:  Representative Rankin, hold
 9   on one second.
10         Members, we are sitting as a house.  Can
11   you please not have outside conversations and return to
12   your desks.  Thank you.
13         Representative Rankin, please continue.
14         REPRESENTATIVE RANKIN:  Mr. Speaker, I'll
15   just repeat, since everybody was talking, I will be here
16   with a report on the jobs lost because of the
17   uncertainty created by this bill.  Thank you,
18   Mr. Speaker.
19         MR. SPEAKER:  Representative Saine.
20         REPRESENTATIVE SAINE:  Thank you,
21   Mr. Speaker.
22         Well, Colleagues, we've had some
23   discussion on some of the unintended consequences of
24   this bill, including folks that live together that may
25   have access to firearms.  And especially women are the
0069
 1   most vulnerable in the case of a burglary or a break-in.
 2   And if she uses those firearms, is she now liable for
 3   protecting herself because she didn't go through a
 4   background check?
 5         In general, background checks, there's a
 6   lot of myth.  There's a lot of myth about background
 7   checks, that they stop criminals.  Well, in 2010,
 8   Senator Chuck Schumer said that we stopped 1.7 million
 9   people from obtaining firearms.  However, what he didn't
10   mention was almost 95 percent of those were dropped in
11   initial denial.
12         Consider Senator Ted Kennedy was stopped

13  from going on a plane five times because his name keeps
14  popping up on a list. Well, that didn't stop five
15  criminals or five terrorists from flying on the plane.
16  There are a lot of folks out there named Ted Kennedy
17  that apparently had some kind of issue with the law.
18          Background checks, especially a transfer
19  between family members, stepchildren, members of a
20  household, shouldn't be considered a crime. Again, most
21  background checks are dropped, and only .1 percent
22  involve strong enough evidence for a consideration for
23  prosecution. .01 percent, I mean, that's a very small
24  number. Because, again, Representative Sonnenberg had
25  mentioned, criminals don't follow the law because
0070
1  they're criminals. That's why they're criminals. They
2  can transfer to each other as much as they want, and
3  they're probably doing it laughing, thinking about the
4  folks that have to go through background checks to be
5  legal.
6          So I urge careful consideration of this
7  bill, urge a no vote. This will not increase public
8  safety, and it certainly sounds like it's going to hurt
9  our 4-H kids and some of these other hunters that come
10  in, and we're certainly losing some of these industries
11  that have vowed not to come to Colorado because we're
12  not friendly to them. We are not friendly to their
13  values. We're not friendly to their family values or to
14  their western heritage. I urge a no vote. Thank you.
15          MR. SPEAKER: Representative Holbert.
16          REPRESENTATIVE HOLBERT: Thank you,
17  Mr. Speaker. And I appreciate your patience in this
18  long day. These are important topics for me and a lot
19  of us, all of us in the chamber, and I do appreciate
20  your patience.
21          Members, I do ask for a no vote once again
22  on House Bill 1229. Have we created law? Will this law
23  make a positive effect, have a positive effect,
24  influence in our society? If this law was on the books
25  in Connecticut, would it have prevented, in any way
0071
1  helped prevent the tragedy at Sandy Hook? No. A young
2  man murdered his mother and stole guns and committed a
3  just unspeakable tragedy. This bill, these requirements
4  would not have affected that tragedy.
5          How about Aurora, the theater shooting?
6  Have we done anything to prevent that from happening
7  again? No. As I understand, the shooter there passed a
8  background check.
9          Columbine -- what tragedy, what shooting
10  event would have been prevented, deterred by this law?
11  I can't find one.
12          What we have created are requirements for
13  law-abiding citizens, people who follow the rules,
14  follow the law, will now get more background checks.

LEG HX 000969

4884

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

15  We've heard declarations both in the building and
16  outside from people who have said they just won't
17  comply.  But it does put those people under greater
18  burden.
19          Why do we do that as a legislature?  Why
20  do we pass laws that put greater burden on the people
21  who follow the law, pay the money?  We
22  do that because that's all that we can do.  Simply, we
23  can't legislate morality.  We can't put words on a piece
24  of paper and next year have them in a set of statute
25  books back here in the bookcase.  We can't put words in
0072
1  those books next year that will make bad people not do
2  bad things.  We don't have that ability.
3          So what we do have the ability to do is
4  put words in those books that require business people to
5  follow new rules and pay fines, law-abiding citizens to
6  go through -- jump through more hoops to stay within the
7  law and not do anything wrong.  We do it because that's
8  all we can do.
9          It's frustrating that we have this bill in
10  a package of legislation that was brought, I believe,
11  for all the right intentions.  What can we do as 65
12  elected leaders in this state, what can we do to
13  encourage, to motivate, to be examples to the 5 million
14  plus people who live in this state?  What can we do that
15  might encourage fewer tragedies to occur in our state?
16  Because we've had more than our share, I agree.
17          What we do is we fail to provide
18  leadership and we pile on words in the books that will
19  be printed and put on those shelves.  We make laws and
20  rules more confusing and burdensome and more expensive,
21  because sadly that's all we can do.
22          Oh, but we could pull back from this slate
23  of bills and start over again.  But I fear that's not to
24  happen.  We're about to take the final, final, final
25  vote on House Bill 1229 and probably send it downstairs.
0073
1  Social media will light up once again, as it has with
2  another bill that's gone downstairs, with people asking:
3  Why didn't they think of this?  And a whole new series
4  of e-mails will start dropping into our e-mail boxes.
5  Why didn't you fix this?  Didn't you talk to each other?
6  Didn't you listen to each other?  Why didn't you take
7  the opportunity to get this right?
8          Once again, I'll be -- my aide will be
9  answering:  Well, we did have that conversation.  And I
10  promise you, we will take the opportunity to say thank
11  you, that at least there was one example of where the
12  majority stopped and listened and made an effective
13  change, but that was it.
14          And people will ask:  Well, don't you
15  understand that this will only make my life more
16  difficult, that you're giving me more rules and more

4885

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

17   cost and more of a burden?  I'm a law-abiding citizen.
18   Why are you picking on me?  Why do I have to take the
19   blame for doing nothing wrong?
20          And we'll say, Yes, we understand.  We
21   tried, but the answer was no.  We're going to do this
22   because this is all we can do.  And I think we're better
23   than that.  The people of Colorado deserve better from
24   us.  And I ask for a no vote on House Bill 1229.
25          MR. SPEAKER:  Representative McCann.
0074
1          REPRESENTATIVE McCANN:  Thank you,
2   Mr. Speaker.
3          And, Colleagues, this is an important
4   bill.  And I think -- it's still hard for me to
5   understand the opposition to universal background
6   checks.  This is something that I think the majority of
7   Americans support and the majority of Coloradans
8   support.
9          It isn't right that those of us who are
10   law-abiding, responsible citizens have to get background
11   checks before we can purchase weapons, but someone who
12   couldn't pass a background check can easily go on the
13   Internet and purchase one.  You can look at these sites.
14   I think it's armslist.com.  You can purchase a gun on
15   those Internet sites without any information about who
16   you are or your background.
17          And some folks have said, Well,
18   criminals -- criminals won't go through the process.
19   Well, actually they do.  Just in January alone, our CBI
20   statistics showed that they denied 956 background check
21   applications for firearms purchases.  That was just in
22   one month.  So I think it was -- I know it was Governor
23   Hickenlooper, at the debate that they were doing on gun
24   issues, said some of the criminals are stupid.  And I
25   guess he's right, because they do go and try to get guns
0075
1   through the background check.
2          And if you go on the Internet and you try
3   to purchase a weapon, and the person that's selling you
4   the weapon knows that there has to be a background
5   check, they're not going to sell you that weapon without
6   one, because this is enforceable.  The police can go on
7   the Internet and attempt to purchase weapons and see if
8   in fact background checks are required.  So this is an
9   enforceable public safety issue for us.
10          And I know other people say, Well, it's
11   not going to stop anyone.  The criminals are still going
12   to get guns.  Well, you can say that about any of the
13   criminal laws we pass down here.  I mean, we have murder
14   laws.  Do people still commit murder?  Yes.  Are they
15   going to get punished and caught if we have a law
16   against it?  Yes, or at least it's more likely they'll
17   be punished and held responsible if there's a law
18   against it.

4886

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

19      So I worked with a psychologist a while
20  ago who used to do the police evaluations for the Denver
21  Police Department.  I don't know if he still does them.
22  It's Dr. John Nicoletti.  Let me be very clear that I've
23  not talked to him about these gun bills, so I have no
24  idea what his position is there.  But he used to talk
25  about workplace violence.  And what he would say is the
0076
1  more barriers that you can put in people's way as they
2  begin to escalate, the less likely they are to actually
3  commit the violence.  And that's kind of the way that I
4  look at this bill.
5          Are we going to stop all criminals from
6  getting guns?  No, but are we going to put a barrier
7  there, make it more difficult for them?  Yes.  And
8  that's going to stop some of them from getting guns.
9  And that's going to save lives.  And that's going to
10  stop crimes.  And that's really all this bill is about.
11  It's about requiring everyone who purchases a weapon,
12  not just those who buy at gunshows or those who buy from
13  dealers, to pass a background check.  It's a
14  common-sense, well-supported solution to this problem of
15  so many guns in the hands of people who shouldn't have
16  them.
17          And I've given you the statistics before,
18  so I'm not going to go through them again, but we do
19  show that criminals do try to background -- buy guns
20  even when they have to get background checks.  So they
21  will continue to do that.  We will stop more of them
22  from getting guns.  We will save more lives.
23          I think we've addressed the hunting issue.
24  And I think we probably do need to have a public
25  education effort because, obviously, there's confusion.
0077
1  But this bill does not have any effect on our hunting
2  clubs and their ability to have people come from out of
3  state, hunt on their property, use guns that are
4  possessed by the hunting club or bring their own guns.
5  It's going to have no impact on that.
6          So this bill is a good bill.  It will help
7  our public safety in this state, and I would ask for a
8  yes vote.  Thank you.
9          MR. SPEAKER:  Representative Fields.
10          REPRESENTATIVE FIELDS:  Thank you,
11  Mr. Speaker.  And I want to thank everyone for their
12  attention and the thoughtful dialogue that we've had on
13  House Bill 1229.
14          Members, I truly believe that background
15  checks save lives.  It has already done so.  When you
16  think about, we already have it in place for new gun
17  sales, we have it in place for gunshows -- this
18  background check program is already in existence.  It's
19  proven to work.  And so what this bill does is it just
20  extends a program that has already proven to be

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

21 effective. And we're closing that loophole as it
22 relates to private gun sales. 40 percent of all guns
23 that are transferred are done in the private market.
24 And this is going to close that loophole.
25        And you might say, Well, how is it going
0078
1 to save lives? I can tell you one example, and that's
2 with children and women. If you were involved --
3 involved in a relationship where there is some abuse
4 going on, and that intimate partner wants to buy a gun
5 and he knows that he can't, all he has to do is to
6 advertise to buy one or he can go online and purchase
7 that gun.
8        So this bill will save lives. So I say
9 vote yes on House Bill 1229.
10        MR. SPEAKER: Seeing no further
11 discussion, the question for the House is the repassage
12 of House Bill 1229.
13        Mr. Kolar, please open the machine and
14 members proceed to vote.
15        Close the machine.
16        With 36 aye votes, 27 no votes, two
17 excused, and zero absent, House Bill 1229 is repassed.
18        Co-sponsors. Close the machine.
19        Madam Majority Leader.
20        MADAM MAJORITY LEADER: Thank you,
21 Mr. Speaker.
22        I move to lay over the balance of the
23 calendar until Monday, March 18th.
24        MR. SPEAKER: Seeing no objection, the
25 balance of the calendar will be laid over as requested
0079
1 by the majority leader.
2        Announcement and introductions.
3        Representative Schafer.
4        REPRESENTATIVE SCHAFER: Thank you,
5 Mr. Speaker.
6        We have a very important birthday today,
7 so I'm going to ask the capitol choir to please come
8 down very quickly. Three birthdays. I know one is for
9 Representative Hamner, our choir director.
10        REPRESENTATIVE HAMNER: Thank you,
11 Mr. Speaker. And also, Colleagues, there are three of
12 us who share the same birthday tomorrow, Representative
13 Landgraf and also Representative Fischer and me. So
14 thank you.
15        (People sing happy birthday. Applause.)
16        MR. SPEAKER: Representative Hamner.
17        REPRESENTATIVE HAMNER: Thank you,
18 Mr. Speaker.
19        And, Colleagues, I forgot about my
20 birthday tomorrow, but, anyway, thanks for reminding me
21 that I'm getting older. But I did want to remind -- the
22 house education committee meeting, that we have one

23  extra bill added to our calendar on Monday, at 1:30.
24  We'll be hearing Senate Bill 138, sponsored by Senator
25  King and Representative Garcia.  It's on school resource
0080
1  officers.
2          MR. SPEAKER:  Representative Sonnenberg
3  and Fischer together?
4          UNIDENTIFIED SPEAKER:  Yes, in harmony.
5          MR. SPEAKER:  Sing that.  Which one is
6  ebony, which one is ivory?
7          UNIDENTIFIED SPEAKER:  Thank you,
8  Mr. Speaker.
9          Members, we just wanted to come down and
10  remind you that next week is a very special week for one
11  of the major industries in our state, and that would be
12  agriculture.  It's National Agriculture Week.  And to
13  commemorate that, there's a number of events going on
14  here at the capitol and around the area.  So,
15  Representative Sonnenberg, would you like to describe
16  some of those?
17          MR. SPEAKER:  Representative Sonnenberg.
18          REPRESENTATIVE SONNENBERG:  Thank you,
19  Mr. Speaker.
20          Members, make sure that, the 19th, you do
21  not plan anything for lunch.  We have wonderful chefs
22  coming up, teaming up, with legislators and farmers and
23  ranchers and preparing Colorado-grown food for you for
24  lunch.  And if any of you were here last year, you will
25  know that it is a phenomenal event, with some of the
0081
1  best food you'll ever want to taste.  So feel free to
2  join us next Tuesday.  We'll remind you again Monday.
3  But make sure that you put agriculture on your schedule
4  to be thankful for next week.
5          Members, have a great weekend.
6          MR. SPEAKER:  Representative Fischer.
7          REPRESENTATIVE FISCHER:  Thank you,
8  Mr. Speaker.
9          And just one thing I wanted to announce.
10  Representative Ginal brought to my attention that
11  there's a 40-acre, probably -- maybe larger by now --
12  wildfire burning in Lory State Park, just west of Fort
13  Collins.  And for those -- I could see -- I can see Lory
14  State Park from my backyard.  And last year during the
15  Hyde Park fire, there were flames burning there, there
16  were homes threatened and some lost in that same area.
17  So, unfortunately, we have another situation with high
18  winds fanning the flames of the wildfire in Lory State
19  Park.  So please keep those folks in your thoughts over
20  the weekend, and hopefully it will be contained soon.
21  And, again, it's perhaps timely that Representative Levy
22  has brought her bill forward for us to consider today.
23          MR. SPEAKER:  Further announcements or
24  introductions?

LEG HX 000974

4889

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

0082
1          MADAM MAJORITY LEADER:  Thank you,
2    Mr. Speaker.
3              I'll move that the House stand in recess
4    until 4:15 p.m, that approximate time.  We will adjourn
5    until March 18th, next Monday, at 10 o'clock.
6          MR. SPEAKER:  Seeing no objection, the
7    House will stand in recess until 4:15.
8              (WHEREUPON, the audio recording was
9    concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0083
1                    CERTIFICATE
2    STATE OF COLORADO          )
                               )ss.
3    CITY AND COUNTY OF DENVER  )
4              I, Jana Mackelprang, Certified Realtime
5    Reporter, Registered Professional Reporter, and Notary
6    Public for the State of Colorado, do hereby certify
7    that this transcript was taken in shorthand by me from
8    an audio recording and was reduced to typewritten form
9    by computer-aided transcription; that the speakers in
10   this transcript were identified by me to the best of
11   my ability and according to the introductions made and
12   the information provided; that the foregoing is a true
13   transcript of the conversations; that I am not an
14   attorney nor counsel nor in any way connected with any
15   attorney or counsel for any of the parties to said
16   action or otherwise interested in its event.
17              IN WITNESS WHEREOF, I hereunto affix my
18   hand and notarial seal this 31st day of July, 2013.  My
19   commission expires January 24, 2016.
20
21        _____
          Jana Mackelprang
22         CRR, RPR, Notary Public
          Calderwood-Mackelprang, Inc.
23

LEG HX 000975    4890

LEG HX 000976     4891

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(House).txt[11/12/2013 10:57:58 AM]

0001
1  CITY AND COUNTY OF DENVER
2  STATE OF COLORADO
3  SENATE HEARING
4  Held on March 15, 2013
5  HOUSE BILL 13-1229
6  _____
7          REPORTER'S TRANSCRIPT
   _____

8
9        This transcript was taken from an audio
10  recording by Elissa Steen, Registered Professional
11  Reporter and Notary Public.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0002
1          P R O C E E D I N G S
2            *   *   *   *   *
3        THE CLERK:  House Bill 1229 by
4  Representatives Fields and McCann and Senator
5  Carroll concerning criminal background checks
6  performed pursuant to the transfer of a firearm, and
7  in connection therewith, making an appropriation.
8        SENATE PRESIDENT:  Majority Leader.
9        MAJORITY LEADER CARROLL:  Thank you,
10  Mr. President.
11        I move that the Senate adopt the first --
12  report of the first conference committee on House
13  Bill 1229.
14        SENATE PRESIDENT:  And, Majority Leader
15  Carroll, by that you mean the first majority report?
16        MAJORITY LEADER CARROLL:  Yes, thank you,
17  Mr. President, the first majority report of the
18  first conference committee on 1229.
19        SENATE PRESIDENT:  Would you like to
20  describe what the conference committee did?
21        MAJORITY LEADER CARROLL:  Yeah.  Thank
22  you, Mr. President.
23        So, Members, an issue was raised when this
24  was getting debated in the House that I think was
25  legitimate, and warranted going back and working on

1  the language.
2         You will recall that one of the amendments
3  we put on in the Senate was addressing a loophole
4  that some gun advocates had pointed out that a
5  criminal could simply set up a trust, do strawman
6  purchases, get around the whole bill on background
7  checks.
8         We introduced an amendment to close the
9  strawman, sort of entity purchase loophole, in the
10  Senate.  But the language that we had originally
11  adopted was brought to the point where, for -- it --
12  it included language, for example, of anyone with a
13  beneficial interest.
14         And in -- for example, in the corporate
15  setup, there could include all kinds of
16  shareholders.  The gist of the problem is that you
17  could have all kinds of people who would never even
18  come into possession of a firearm that, under an
19  interpretation, would then be going through
20  background checks, which doesn't make sense and
21  wasn't the intention of what we did.
22         So with that, we agreed to go back to
23  conference committee to get that language correct.
24         All of you have the committee report on
25  what has -- what we adopted, and I will walk through
0004
1  very briefly what it is.
2         In a conference committee, we -- we
3  narrowed to specify that we're only talking about
4  once an actual, natural person comes into possession
5  of a firearm would that background check be needed.
6         So all of the other people who might
7  legally own something, who are never going to see a
8  firearm, aren't going to have to go through a
9  background check.
10         So the narrowing language is that only
11  natural people who, in fact, will take actual
12  possession would undergo a background check.  That
13  is what we meant the first time; that is not what we
14  said the first time.  So we needed that.
15         The other thing that we did is we inserted
16  the word "or loan."  So you'll remember in the
17  family section of the exemption of gifting to
18  immediate family members, there was some discussion
19  about gift or loan, does it have to be permanent,
20  can you temporarily give it to any number of family
21  members.  And so we adopted the insertion of the
22  word "gift," and we added "or loan" into the
23  immediate family members section in the bill.
24         And that's what we did in the majority
25  report in the conference committee.  And would ask
0005
1  for an aye vote on that committee report.

LEG HX 000978    4893

2    SENATE PRESIDENT:  Discussion?  Senator
3  Brophy.
4        SENATOR BROPHY:  Thank you, Mr. President.
5        And -- and at this point, I will offer a
6  substitute motion of sorts -- that's how we do it on
7  conference committee reports -- to move.  So I move
8  the minority report of the first conference
9  committee on House Bill 1229.
10        SENATE PRESIDENT:  You want to explain
11  what it did?
12        SENATOR BROPHY:  Thank you, Mr. President.
13        So what the minority report does, and --
14  and -- and please listen because the minority report
15  actually enjoyed bipartisan support in the
16  conference committee.  The minority report does
17  everything that the Majority Leader explained was
18  part of the majority report.
19        And then, in addition to it -- and this is
20  the important part -- it also eliminates the
21  discrimination that exists in House Bill 1229
22  against stepchildren, for instance.  Because in --
23  in House Bill 29 (sic), there still exists -- there
24  still exists a blatant discrimination again your
25  stepson or your stepdaughter, for instance.
0006
1        You won't be able to loan or gift to your
2  stepson or stepdaughter, under 1229, a -- a firearm
3  without making them go through a background check,
4  and the minority report fixes that.  It allows for
5  step-relations to count under the bona fide gift and
6  loan provision exception in the rule, and it also
7  includes your in-laws.
8        So, for instance, under -- under 1229, if
9  we don't adopt this minority report, I can't loan a
10  hunting rifle to my brother-in-law to take on a
11  week-long hunting trip if -- if he needs the kind of
12  rifle that I have without getting a background check
13  on my brother-in-law.
14        Of course, if you knew my
15  brother-in-law -- oh, and then -- and then -- he is
16  a Democrat -- and then the -- the -- actually, he's
17  unaffiliated.  You should see the mail he gets
18  because he lives in Jefferson County, but that's a
19  side note.
20        The other thing that we fixed with the
21  minority part -- and listen, this is really
22  important for you rural folks.  Right now, the --
23  the 4-H shooting sports, kids that participate, if
24  they don't have their own shotgun or a family
25  shotgun that they can bring to the -- to the summer
0007
1  that they participate in 4-H shooting sports, for
2  instance, a lot of times other -- other 4-H members
3  and other community leaders will -- will loan those

LEG HX 000979    4894

4  kids a shotgun for the -- for their -- for their use
5  over the -- for the entire course of the summer, and
6  there's no exemption in 1229 that allows for that
7  without forcing that 4-H kid to obtain and pay for
8  the background check.
9        So, you know, these kids that are just --
10  just trying to participate in 4-H shooting sports
11  are now hit by House Bill 1229, and the minority
12  report fixes that.  It at least allows these --
13  these 4-H kids to borrow a shotgun for the course of
14  the entire summer, and -- and use it at the -- at
15  the -- at the practice and then take it home so they
16  can learn the proper way to -- to clean and maintain
17  their shotgun or -- or their .22 rifle -- that's
18  part of shooting sports -- in a -- in a -- you know,
19  in a clean environment at their -- at their own
20  home.
21        So that's why the minority report actually
22  earned bipartisan support in the conference
23  committee.
24        And I will ask for you today to vote in
25  favor of the minority report of the first conference
0008
1  committee of House Bill 1229.
2        SENATE PRESIDENT:  Majority Leader
3  Carroll.
4        MAJORITY LEADER CARROLL:  Thank you,
5  Mr. President.
6        Members, this was actually -- it was a
7  very good discussion on all the points that were
8  raised here.
9        The -- there's four other exceptions that
10  exist now that I believe cover the fact pattern,
11  basically, that's been identified here.  But more
12  significantly, there were two places in this
13  minority report that brought in new amendments that
14  were in neither the House version nor the Senate
15  version.
16        And so I'm going to ask for a ruling that
17  is beyond the scope, because two -- at least two of
18  the pieces that are in here within neither the House
19  or the Senate version, and the -- and the Chair had
20  also believed were outside the scope.
21        SENATE PRESIDENT:  We'll take a Senatorial
22  five.
23        (A recess was taken.)
24        SENATE PRESIDENT:  Senate will come back
25  to order.
0009
1        I -- I rule that the minority report
2  exceeds the scope of the differences and, therefore,
3  is out of order.  So we are back to the majority
4  conference, first conference committee report.
5        Further discussion, Majority Leader

7        MAJORITY LEADER CARROLL:  Thank you,
8  Mr. President.
9        And I do know there is other discussion.
10       But let me just say that even if there
11  are -- even with the heartfelt desire for this to
12  include more issues than it did, each of the issues
13  that we, in fact, do take up here are ones that have
14  been -- points that have been raised by republicans
15  in both chambers to address.  So it may not be the
16  complete package, but it does move the bill closer
17  in the direction.  And so I know we'll have a motion
18  to re-adopt the bill, where we can redebate the
19  bill.
20       But the debate on this particular
21  conference committee is, one, do we narrow the
22  strawman entity loophole exception to avoid an
23  unintended consequence of having people who never
24  possess a firearm arguably having to go through a
25  background check?  So we are tightening it to
0010
1  natural people who come into possession, which was
2  always the intent.
3        So do we or don't we tighten that?  And do
4  we or don't we add the words "or loan" to the family
5  member?  And people may wish and want a lot beyond
6  that, but your vote on this majority report is
7  whether you want to, in fact, adopt those changes at
8  this point.
9        I think both of those made sense.  I think
10  good cases were made for both.  Those were passed in
11  the conference committee report.  I think it makes
12  it a better bill and would ask for an aye vote on
13  the majority report on the first conference
14  committee.
15       SENATE PRESIDENT:  Senator Harvey.
16       And keep in mind we are debating the
17  conference committee report, so please keep your
18  remarks there, and then we'll get to the re-adoption
19  later.
20       SENATOR HARVEY:  Thank you, Mr. President,
21  for that reminder.
22       I move that we reject the conference
23  committee report and that a second conference
24  committee be re-appointed to go beyond the scope to
25  deal with the issues that the President just ruled
0011
1  were outside the scope of the conference committee.
2        SENATE PRESIDENT:  Okay.  So that is a
3  proper motion that is now the motion on the table.
4        Majority Leader Carroll.
5        MAJORITY LEADER CARROLL:  Thank you,
6  Mr. President.
7        I would respectfully ask for a no vote.

LEG HX 000981

4896

8       SENATE PRESIDENT:  So this is on the
9  motion to reject and set up a new conference
10  committee.
11       Senator Brophy.
12       SENATOR BROPHY:  Thank you -- thank you,
13  Mr. President.
14       And, Members, I would ask for an aye vote
15  on this motion to reject this conference committee
16  report, ask that we form a new conference committee,
17  and ask that it be allowed to go beyond the scope of
18  differences and, actually, for more important
19  reasons than just the -- the discrimination that is
20  pointed out related to stepchildren.
21       Members, we have an opportunity with this
22  bill to -- to do something together, to stop acting
23  like the dysfunctional Congress in Washington, D.C.,
24  where things are --are so hyper-partisan, as these
25  gun control -- extreme gun control -- bills have
0012
1  become here in Colorado.
2       We have the opportunity, if we want to
3  form a conference committee and allow it to go
4  beyond the scope of differences, to craft a
5  bipartisan solution to a problem that's identified,
6  the -- the -- the very real possibility that -- that
7  a gang -- that a gang member can now, under 1229,
8  hand a firearm to another gang member for up to 72
9  hours to use in crime sprees without a background
10  check, without being penalized additionally for
11  failing to -- to get a background check, for
12  flaunting the law for purposefully handing a firearm
13  to someone who ought not be in possession of the
14  firearm.  That 72-hour rule exists now in 1229, and
15  it ought to go away.
16       But more importantly, we could do
17  something that -- that I've been thinking about
18  quite a bit with a conference committee that goes
19  beyond the scope, and that is this:  Institute the
20  stranger-danger rule.  Stop with the silly
21  exceptions that result in unintended consequences,
22  criminalizing you giving a -- a hunting rifle to
23  your brother-in-law, for instance, but instead, let
24  the people of Colorado know that.  If you're going
25  to sell a firearm to somebody with which you have no
0013
1  prior relationship, you should get a background
2  check on it.  Otherwise you should have known that
3  it was -- that it's too dangerous to do that.  The
4  stranger-danger rule.  We could do that.
5       We could modify it by including the -- the
6  right to do the private transfer if the person that
7  you're selling to already has a CCW permit.  For
8  crying out loud, they've had a very extensive
9  background check.  You can see that if you go

10  through that process yourself.
11      We have an opportunity.  We have an
12  opportunity to bring the desks together, to reach
13  across the aisle, to form a bipartisan coalition to
14  address that problem here in Colorado.  But -- but
15  only, only if you vote to allow a conference
16  committee to go beyond the scope of differences and
17  actually start working together, like the Colorado
18  legislatures of old, where we -- where we solved
19  problems in a bipartisan manner with Colorado values
20  instead of these Washington, D.C. values and
21  hyper-partisanship, and just used the power of the
22  majority to ram your agenda all the way home.
23      Vote yes to dissolve this conference
24  committee and go beyond the scope of differences
25  with a new conference committee that represents
0014
1  Colorado values.
2      SENATE PRESIDENT:  Majority Leader
3  Carroll.
4      MAJORITY LEADER CARROLL:  Thank you,
5  Mr. President.
6      Members, a couple of things since it was
7  brought up.  One of my frustrations has been that we
8  have -- if we excepted no amendments on this bill,
9  you know, we have been criticized for refusing to
10  work with the other side and just ramming an agenda
11  through, but the facts are that despite over a dozen
12  changes that came at the urging of Republicans, not
13  one of them brought any of your support with it, yet
14  we took it anyway.
15      So the facts on the process of this bill
16  is:  We've listened, we took many of your ideas and
17  input, which I think were valuable, and haven't had
18  any indication that there's any amendment in any
19  form or any stripe of anything we can do on this
20  bill that in Colorado, sadly, would bring bipartisan
21  support.
22      And I think that is very unfortunate, but
23  they are actually having a bipartisan conversation
24  in D.C.  And when D.C. becomes more functional than
25  we are, that's sad.  You know, this is -- this is
0015
1  part of a national conversation to have.
2      That said, even though none of the changes
3  to date can or have earned the support, I'm still
4  grateful for you bringing them up as a matter of
5  making better public policy despite the fact that it
6  hasn't and probably can't earn any bipartisan
7  support of what's there.
8      So let me just say that I would love this
9  to be a bipartisan bill.
10      The most immediate point to bring up is
11  that on the motion to go form a new conference

12  committee, Members, you need to know that we
13  actually already took this up in the first
14  conference committee.  This isn't new.  These were
15  all points that were raised the first time when we
16  went through, considered, and rejected it.  So it
17  would simply be Ground Hog Day to repeat and extend,
18  you know, what has already been a five-month debate
19  on this issue.
20          So I would just mention in the most
21  immediate sense that we have already considered
22  taking this up and would just simply ask for a no
23  vote on creating a new conference committee.
24          SENATE PRESIDENT:  Senator Lundberg.
25          SENATOR LUNDBERG:  Thank you,
0016
1  Mr. President.
2          Members, the arguments that we've just
3  heard about how we just can't come to terms, I must
4  break down a party line always, made by the Majority
5  Leader, I think were very good argument for passing
6  this motion to reject the conference committee
7  report and form a new conference that can go beyond
8  the scope, because that's the only way we were going
9  to get to any concurrence.
10          And -- and I would note that the minority
11  report that was ruled to be beyond the scope, if you
12  still have that on your desk, I would invite you to
13  look at that and ask yourself:  Are these issues
14  that are inappropriate for this bill or not?
15          I believe it brings up some very valid
16  concerns on what the first conference committee did
17  come to deal with, you know, for example, what of a,
18  you know, a 4-H club simply trying to -- to provide
19  a -- a setting to teach good, responsible handling
20  of firearms and marksmanship and the, you know,
21  other skills for a sportsman that are necessary to
22  have the -- have the rifles there to work with.
23  It -- the -- the law creates such a cumbersome
24  problem that that just won't happen.
25          And when it comes to -- to defining
0017
1  immediate family members, let me read to you what --
2  what apparently goes beyond the scope but is still
3  good policy to put in this bill:  spouses, parents,
4  children, siblings, grandparents, grandchildren,
5  nieces, nephews, first cousins, aunts and uncles.
6  Who in there shouldn't be included as immediate
7  family members goes on:  B, step relations; C,
8  partners of civil unions or domestic partnerships;
9  and D, inlaws.
10          Now, if -- if policy is defining families,
11  okay, let's not divide it up.  I'm not going any
12  further, anybody, who I can't mention anybody's name
13  here.  It's unfortunate.

LEG HX 000984     4899

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

14    But it it's, you know, I look at my own
15 situation.  I live a couple of hundred yards away
16 from my inlaws, and to distinguish between who can
17 transfer to myself or transfer to my wife, is -- is
18 an artificial distinction that the law shouldn't --
19 shouldn't have a part in.
20        You know, it's -- it's not me loaning to
21 my brother-in-law, it's me borrowing from my
22 brother-in-law.  He -- he has the -- the better set,
23 and he can do that to his sister, my wife, but not
24 to me.  He can do that to his sister, my wife, but
25 not to our children.  That doesn't make sense.  It
0018
1 just doesn't make sense at all.
2        I believe, finally, if we want to talk
3 about a bipartisan spirit, well, here's your chance.
4 This conference committee was signed by four
5 Democrats.  The minority report was signed by the
6 two Republicans.  You know how the vote was
7 initially on the bill.  It rings hallow to me for
8 the claim that we just can't get there if the same
9 person who's claiming it is insisting that we
10 continue to vote in a -- in a party-line fashion.
11        Let's reject this party-line vote for the
12 first conference committee and see if we can't at
13 least get a conference committee to put this
14 together as a team.  Can we find some concurrence or
15 not?  Is there any degree of compromise that can be
16 found at least in the process?  Because right now
17 it's strict party line.  That's it.
18        And it -- and your vote doesn't -- you
19 know, the fate of the bill doesn't hinge on your
20 vote on the conference committee, but the fate of
21 the process does.  So if you want to make it party
22 line, then you'll follow the lead and simply reject
23 the motion, but if you want to find some common
24 ground somewhere, somehow, let's start right here,
25 right now.
0019
1        I appeal to each one of you Senators on
2 this side of the aisle, on this side of the aisle,
3 Mr. President, and I'm -- and I apologize, I should
4 be speaking to you directly, so I will directly --
5 Mr. President, I appeal to you to -- to support this
6 measure and show some bipartisan spirit to tackle
7 this one, one more time.
8        We've already spent, over the course of
9 committee time and floor time, over 30 hours on this
10 issue in general, and much of it on this bill in
11 particular.  Is it not worth one more conference
12 committee that can -- that has the authority to deal
13 with all of the details, go beyond the scope?
14        Sure, it may have been discussed in
15 committee, but if the answer was it goes beyond the

16  scope and we don't have the authority; well, there's
17  your fatal flaw to the first conference in the first
18  place.  What's it going to hurt to give it one more
19  shot?
20        I believe this is an opportunity for
21  bipartisan action, at least within the process.  And
22  if we can't find it within the process, where in the
23  world are we going to find it within the policy
24  itself?
25        I urge each and every one of you, all 34
0020
1  Senators -- because I'm going to support this, I
2  know that -- please consider the same for yourself.
3  Don't lock down.  Don't show the dysfunction of 21st
4  Century legislative systems.  Break the mold.  Take
5  the courage.  Do it right.  Vote yes.
6        SENATE PRESIDENT:  Senator Cadman.
7        SENATOR CADMAN:  Thank you, Mr. President.
8        You know, when I ran for office, I -- I
9  kind of had the -- I kind of had the belief that all
10  the predecessors that had come through this process
11  and become members of the legislature are just up
12  here throwing these laws together and tossing them
13  out and that it was pretty easy.  I thought creating
14  laws was easy.  And I actually ran against creating
15  laws.  I ran on the eraser platform of we ought to
16  issue legislators these erasers -- which I still
17  have 14 years now -- we ought to spend more time
18  getting rid of what's in here than adding to it,
19  because I thought they were just being added.
20        But I have come to find out, as you all
21  know, and even those of you who have been here 65
22  days or whatever it is -- it feels like 165 -- that
23  it takes a lot to get something in these books.  I
24  mean, it is a heck of a process.  I have a lot of
25  respect for what it takes to actually create a law.
0021
1        It's hard.  It takes a lot of work,
2  obviously, on the controversial stuff, a lot of
3  debate.  I'm sure none of us wants to spend another
4  six hours here on this bill.  Anybody interested in
5  that on a Friday?  Any day?  Especially a Friday.
6        To that point, though, they're even harder
7  to fix.  We need to get this stuff right the first
8  time, especially on something that's significant
9  like this.  Let's get it right the first time.
10        And the Majority Leader mentioned the
11  concessions made over the last few days and the last
12  week or so to the Republicans, to the Republicans,
13  to the Republicans.  These aren't laws just for
14  Republicans.  These are the laws that the people of
15  the state, the 5-plus million people are going to
16  live by.
17        These aren't concessions to Republicans.

LEG HX 000986

4901

18   These amendments were made to a bill that had flaws
19   from the very first day.  A bill that was so
20   sweeping that we had to create exemptions to our new
21   prohibitions.  That's good government speak, isn't
22   it?  Exemptions to prohibitions.  It's like trying
23   to understand -- understand tax credits.  Nobody
24   gets it, but everybody wants them.
25           It's important that we get this right.
0022
1   It's important.
2           So in the conference committee, we did
3   find agreement on some of these points, and then
4   when it got to the contention of is it beyond the
5   scope, that's where the differences were set aside.
6   And the -- actually, that's where the differences
7   came into play -- and the agreement was set aside.
8   Does that really make sense when we actually found a
9   place in conference committee where people
10   understood that some of these problems in this bill
11   weren't being fixed and that others were being
12   identified and also weren't going to be fixed?  And
13   now, it's being rejected.
14           That makes as much sense as hanging
15   somebody even though you found out that they're no
16   longer guilty because of DNA, but it's too late
17   because you already bought the rope.  Can't stop
18   now, we bought the rope.  They're not guilty, but
19   shoot, we can't let this rope and 13 knots go to
20   waste.  Does that make any sense to you?
21           Absolutely not.  Get it right.  It's
22   important that we get it right.
23           And, frankly, what I heard in the
24   committee were ideas that I believe does shrink the
25   space in the aisle, that does bring us together.
0023
1   And I think the concept of stranger danger is
2   something we could all support.  I know I could.  If
3   this were really about keeping guns out of the hands
4   of criminals, specifically and exclusively, how
5   would we not support that?  Because as someone who
6   is legally allowed to carry a gun and legally owns
7   guns, I hope I never have to use those legal guns to
8   defend myself against somebody else that has a gun
9   in any manner, especially, obviously, a criminal.
10           We do have a chance to get it right.  It
11   doesn't make sense to reject that opportunity.  It
12   certainly doesn't make sense to me.  I'm fairly sure
13   it doesn't make sense to the 5.3 million people who
14   are paying attention to this.
15           I would ask for you to vote yes on this
16   motion.
17           We were this close to having something
18   that would shrink the aisle.  And I would make this
19   commitment to the Majority Leader specifically, as

LEG HX 000987    4902

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

20  the sponsor of the bill, that if we could get to
21  that concept that was alluded to earlier, this isn't
22  about amendments, it's not about concessions to the
23  Republicans, it's about completing the task of
24  governing and doing it right for the people that
25  expect us to get it right the first time.

0024
1       We don't need to go oops after this is
2  signed.  Nobody wants to hear that, and nobody wants
3  to answer those questions that will be raised when
4  the problems start coming in.  We don't need a
5  flypaper bill that's designed to entrap law-abiding
6  citizens and turn our neighbors, our friends, our
7  families, our 4-H members, our Boy Scouts, the pack
8  leaders, the troop leaders, do we really want to
9  turn them into criminals?  I sure hope we don't.  I
10  sure hope we don't.
11       I would ask for an aye vote.
12       SENATE PRESIDENT:  Senator Harvey.
13       SENATOR HARVEY:  Thank you, Mr. President.
14       I -- Senator Cadman hit most of my points,
15  but I -- I wanted to put a Ted Harvey spin on them.
16       The reason the argument given against the
17  minority report, when Senator Brophy offered the
18  minority report, was these are outside of the scope,
19  and the chairman of the committee ruled that they
20  were outside of the scope, and therefore we don't
21  need to hear the minority report because we had a
22  ruling from this Chair, President, saying that
23  they're outside of the scope.
24       So then, when I make the motion to say,
25  okay, if the Chair in the committee ruled that they

0025
1  were outside of the scope, and the President rules
2  that it's outside of the scope, then let's have a
3  new committee hearing and go outside of the scope.
4  And then the argument that you hear is:  We already
5  heard this in committee, and it's going to be
6  rejected in committee, so there's no reason to go
7  back and repeat it again.  Well, which is it?  Did
8  you hear it the first committee, or was it ruled
9  outside of the scope?
10       And if it was ruled outside of the scope,
11  then let's have the discussion.
12       Do we want to try to fix the ludicrous
13  issues in this bill that say you can't give your gun
14  to your stepson or you can't go and -- and -- and
15  have 4-H kids being able to use guns that are
16  borrowed from other members, and on and on and on
17  and on?  Why are we afraid to fix this bill?  Are we
18  so wed to this bill that we cannot go and fix this
19  problem?
20       And then, concessions.  The argument was
21  we've already given so many concessions to the

LEG HX 000988

4903

22  Republicans yet they don't come on.  I don't know
23  if a Republican is offered a single amendment that
24  has been accepted.  I know that there were a number
25  of issues that were brought up in the State Affairs
0026
1  Committee, and the Chair of the State Affairs
2  Committee offered her amendment, but those were
3  issues that were brought up by the citizens of the
4  State of Colorado that came in and talked.  There
5  was not one Republican amendment that was accepted.
6        We spoke for 12 hours on Friday.  We
7  didn't have hardly any Democrat come out and discuss
8  the bill, much less accept a Republican amendment.
9  And the amendments that were offered, were offered
10  to fix issues like can I give my wife my gun when I
11  leave town?  Can my wife protect herself and my
12  family when I leave town?
13        And the issue that was accepted was, for
14  72 hours.  For 72 hours.  For 72 hours.  Any
15  temporary transfer that occurs while in contiguous
16  presence of the owner of the firearm, the temporary
17  transfer, for not more than 72 hours, a person who
18  transfers a firearm pursuant to this paragraph, may
19  be jointly and severally liable for damages
20  proximately caused by the transferee's subsequent
21  use of the firearms.
22        Nothing in Subsection 6 of this section
23  shall be interpreted to limit or otherwise alter the
24  applicability of Section 8, concurring the unlawful
25  purchase of transferee's of a firearms.
0027
1        There is no Republican amendments to this
2  bill.  These are Democrat-Republican amendments.  So
3  if the break -- I mean, these are Democrat-offered
4  amendments -- so if the breakdown is here that
5  you're not getting bipartisan support in support of
6  your bill, and we don't want to look bad to -- to
7  Washington, D.C., well, it was a bipartisan no on
8  the bill.  It was a bipartisan no.
9        I wish we had more of those in Washington,
10  D.C.  I wish Washington, D.C., would start following
11  us.  But, actually, I hope that they would start
12  killing some bills in Washington, D.C., and I wish
13  we would here in Colorado as well, particularly this
14  unfortunate piece of legislation.
15        Again, I renew my motion to resolve the
16  conference committee and go to a new conference
17  committee and go beyond the scope so we can solve
18  some of those unfortunate issues.
19        SENATE PRESIDENT:  Motion before the body
20  is the rejection of the majority committee report
21  and the formulation of a second conference
22  committee.  Are there any -- okay, roll call has
23  been requested.

24    Mr. Majors, would you please poll the
25    Senators.
0028
1    THE CLERK: Aguilar.
2    SENATOR AGUILAR: No.
3    THE CLERK: Aguilar, no.
4    Balmer.
5    SENATOR BALMER: Yes.
6    THE CLERK: Balmer, aye.
7    Baumgardner.
8    SENATOR BAUMGARDNER: Yes.
9    THE CLERK: Baumgardner, aye.
10    Brophy.
11    SENATOR BROPHY: Aye.
12    THE CLERK: Brophy, aye.
13    Cadman.
14    SENATOR CADMAN: Aye.
15    THE CLERK: Cadman, aye.
16    Carroll.
17    SENATOR CARROLL: No.
18    THE CLERK: Carroll, no.
19    Crowder.
20    SENATOR CROWDER: Yes.
21    THE CLERK: Crowder, aye.
22    Giron.
23    SENATOR GIRON: No.
24    THE CLERK: Giron, no.
25    Grantham.
0029
1    SENATOR GRANTHAM: Aye.
2    THE CLERK: Grantham, aye.
3    Guzman.
4    SENATOR GUZMAN: No.
5    THE CLERK: Guzman, no.
6    Harvey.
7    SENATOR HARVEY: Yes.
8    THE CLERK: Harvey, aye.
9    Heath.
10    SENATOR HEATH: No.
11    THE CLERK: Heath, no.
12    Hill, excused.
13    Hodge.
14    SENATOR HODGE: No.
15    THE CLERK: Hodge, no.
16    Hudak.
17    SENATOR HUDAK: No.
18    THE CLERK: Hudak, no.
19    Jahn.
20    SENATOR JAHN: No.
21    THE CLERK: John, no.
22    Johnston.
23    SENATOR JOHNSTON: No.
24    THE CLERK: Johnston, no.
25    Jones.

0030
1     SENATOR JONES:  No.
2     THE CLERK:  Jones, no.
3     Kefalas.
4     SENATOR KEFALAS:  No.
5     THE CLERK:  Kefalas, no.
6     Kerr.
7     SENATOR KERR:  No.
8     THE CLERK:  Kerr, no.
9     King, excused.
10     Lambert.
11     SENATOR LAMBERT:  Aye.
12     THE CLERK:  Lambert, aye.
13     Lundberg.
14     SENATOR LUNDBERG:  Aye.
15     THE CLERK:  Lundberg, aye.
16     Marble.
17     SENATOR MARBLE:  Aye.
18     THE CLERK:  Marble, aye.
19     Newell.
20     SENATOR NEWELL:  No.
21     THE CLERK:  Newell, no.
22     Nicholson.
23     SENATOR NICHOLSON:  No.
24     THE CLERK:  Nicholson, no.
25     Renfroe.
0031
1     SENATOR RENFROE:  Aye.
2     THE CLERK:  Renfroe, aye.
3     Roberts.
4     SENATOR ROBERTS:  Aye.
5     THE CLERK:  Roberts, aye.
6     Scheffel.
7     SENATOR SCHEFFEL:  Aye.
8     THE CLERK:  Scheffel, aye.
9     Schwartz.
10     SENATOR SCHWARTZ:  No.
11     THE CLERK:  Schwartz, no.
12     Steadman.
13     SENATOR STEADMAN:  (No audible answer.)
14     THE CLERK:  Tochtrop.
15     SENATOR TOCHTROP:  No.
16     THE CLERK:  Tochtrop, no.
17     Todd.
18     SENATOR TODD:  No.
19     THE CLERK:  Todd, no.
20     Ulibarri.
21     SENATOR ULIBARRI:  No.
22     THE CLERK:  Ulibarri, no.
23     Steadman.
24     SENATOR STEADMAN:  No.
25     THE CLERK:  Steadman, no.
0032
1     Mr. President.

2     SENATE PRESIDENT: No.
3         THE CLERK: Mr. President, no.
4         SENATE PRESIDENT: With 13 ayes, 20 noes,
5     zero absent, and two excused, that motion fails.
6         Back to the motion of adopting the
7     majority committee report to the conference
8     committee report on 1229.
9         Are there any no votes?
10        Senator Balmer, Senator Lundberg, Senator
11    Marble.
12        So this is the committee -- the conference
13    committee report.  A rejecting -- so a no vote is
14    rejecting it, where adopting -- the motion is to
15    adopt the majority conference committee report.
16        So are there any no votes?
17        So Senator Balmer -- okay Senator Balmer
18    wants to be an aye -- no, Senator Balmer is a no.
19    Senator Crowder is a no.  Senator Lundberg is a no.
20    Senator Marble.  Senator Renfroe.
21        So with a vote of 28 ayes, 5 noes, zero
22    absent, and two excused, the conference committee
23    report is adopted.
24        Majority Leader Carroll.
25        MAJORITY LEADER CARROLL:  Thank you,
0033
1     Mr. President.
2         I move for the re-adoption of House Bill
3     1229.
4         SENATE PRESIDENT:  The motion is for the
5     re-adoption of the bill.
6         Discussion?
7         Senator Brophy.
8         SENATOR BROPHY:  Thank you, Mr. President.
9         And, Members, I'll ask for a no vote.
10        The bill contains now something like nine
11    exemptions.  One of them, again, that allows gang
12    members to swap guns around for up to 72 hours
13    without a penalty for breaking the -- the background
14    check rule, still denies people the ability to loan
15    a hunting rifle to their brother-in-law or their
16    next-door neighbor to take on a week-long hunting
17    trip, still makes it illegal for someone to loan a
18    handgun to a friend or neighbor who's going on a
19    week-long backpacking trip.
20        And the Obama justice department tells us
21    that it does absolutely nothing to improve safety.
22    Nothing.  It won't help anything, and it makes
23    common, everyday actions amongst friends and
24    neighbors something that's now illegal in the State
25    of Colorado.
0034
1         When asking for your support to form a new
2     conference committee to go beyond the scope of -- of
3     differences, I -- I mentioned the unintended

4  consequences.
5        Now, I'm going to tell you that they
6  are -- that they are absurdities.  It is absurd that
7  I can't loan a handgun to a neighbor who's going on
8  a week-long backpacking trip.  That's absurd.  It's
9  ridiculous that I can't loan the appropriate hunting
10  rifle to my neighbor to take on a week-long elk
11  hunting trip.
12        The -- the list of absurdities goes on and
13  on and on, and all for what?  For what?  We get no
14  improvement at all in safety.  We take a step
15  towards registration of all firearms and ownership
16  of all firearms.  Again, treating law-abiding
17  citizens like they're doing something wrong instead
18  of taking it to the criminals.
19        Why would you support something like that?
20  Those aren't Colorado values.  We don't assume that
21  law-abiding citizens are up to something they
22  shouldn't be up to in a -- in a great libertarian
23  western state like this.  We don't do that.
24        Vote against this bill.
25        SENATE PRESIDENT:  Further discussion?
0035
1        Seeing none, the motion before the -- oh,
2  sorry.
3        Do you want -- so Majority Leader Carroll.
4        MAJORITY LEADER CARROLL:  Thank you,
5  Members.
6        So we're obviously back to the passage of
7  the bill.  And I do think that there's room for
8  obviously legitimate differences of opinion about
9  whether or not someone should go through a
10  background check so that law-abiding people go on
11  with their purchases and possession, and people who
12  are convicted felons are dangerously mentally ill
13  don't.  I get that there's a difference of opinion
14  on that.
15        What does concern me some are really two
16  points that I want to be clear for the record:
17        There were many, many, many, many changes
18  made to this bill in good faith, listening.  None of
19  them brought any difference to a partisan divide,
20  and frankly, they didn't have to be accepted.  So
21  we're listening.  I'm grateful for the suggestions
22  that were made.  They aren't just concessions.  That
23  is the sponsor working in good faith, listening to
24  members in both chambers on ideas on the bill.
25        And so you get criticized kind of both
0036
1  ways, like, hey, you won't work with us.  Oh, wait a
2  minute, you took all our ideas, but because you took
3  all our ideas, it must be a flawed bill because, you
4  know, now you've accepted these amendments.
5        And so it's -- it's kind of a catch-22 in

6 the sense that by working in good faith to actually
7 respond and address many of the issues that
8 colleagues brought up, we're being told that that's
9 proof it's a flawed bill.  And every bill goes
10 through its -- its own process, and many bills get
11 amended.
12       But I want to say, just as a matter of
13 process, that the changes that have been offered, I
14 think reflect the fact that, from my perspective, I
15 would have hoped that some of these might have
16 brought on some bipartisan support, and I'm sorry it
17 didn't, but I understand that.
18       What does bother me, though, is while
19 people can differ between whether or not you think
20 there should be a background check to keep guns out
21 of the hands of convicted felons, I get that; but I
22 do want to be clear for the record, because there's
23 enough confusion about that the bill does that we at
24 least shouldn't contribute to it.  So I want to be
25 very clear here for the record.
0037
1       There is no 72-hour limitation on the
2 hunting trip example.  Among these exceptions, and I
3 put out a fact sheet so that we can all put out,
4 whether you like the bill or not, accurate
5 information to the people we represent.
6       There is no 72-hour on the immediate
7 family exemption.  Those are not time-limited.  Out
8 of the exceptions we put in place, only two of them
9 have time limits.
10       So to be clear, there isn't a time limit
11 on the hunting exception.  And there is one, so your
12 brother-in-law may not be defined as a
13 brother-in-law in the family section, but if your
14 brother-in-law is, you know, borrowing a gun for
15 hunting, it doesn't matter who you're loaning it to
16 for hunting, as long as they're not a convicted
17 felon.  We know in the bill there's a hunting
18 exception for this.
19       The 72-hour provision does not qualify
20 just as a grammatical issue to be very clear about
21 what the bill does.  It does extend to all of the
22 other exceptions.  It is a stand-alone alternative.
23 All of these exceptions are written in alternative.
24 You may satisfy one, you may satisfy more than one.
25       So I just want to be factually clear that,
0038
1 you know, your family member exception, that's not
2 72-hour limited.  Your hunting, that's exempted, nor
3 is that limited to a 72-hour exemption.  There is no
4 registration in the bill.  There's no confiscation
5 in the bill.
6       So I think the -- the policy discussion is
7 what you think about whether or not there should be

LEG HX 000994

4909

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

8  a criminal background check before you purchase or
9  possess a firearm.  And I go right back to the
10  original point of the bill, which is:  We do have
11  data that says this makes a difference.
12      And while no law has a hundred percent
13  compliance, we, in fact, do detect dangerous
14  convicted felons in the process of this, even under
15  our current system, even given the glaring loophole
16  of up to 40 percent of transactions that are
17  completely escaping background checks as a result of
18  this loophole.
19      And we can use Colorado data to see that
20  our current system, in fact, detects people who are
21  criminally ineligible to purchase or possess.  But
22  we also have the benefit of data from other states
23  that tells us that we, in fact, do keep guns out of
24  the hands of many, not all, of many, though, of
25  people who are convicted felons or dangerously
0039
1  mentally ill, who, in fact, are trying to purchase
2  or possess.
3      So we know it works, and I think, you
4  know, the honest difference of opinion is whether
5  that background check is unfairly burdensome to
6  those who are law-abiding people who pass through
7  that gate, who have every reason and right to buy
8  the firearm of their choosing.  Is it an unfair,
9  undue burden on them to go through the background
10  check system?
11      And what's interesting to me is, given the
12  background check system we currently do, I
13  personally haven't heard anyone who's buying from an
14  FFL or from a gun show say that it was unduly
15  burdensome.  I do think the state has a
16  responsibility to try and keep the wait to a
17  minimum, because there are scenarios where delay, I
18  think, is a legitimate point that would be an unfair
19  burden.  And so I do think as we go into
20  implementation, we need to make sure that we're not
21  unfairly holding anyone up.
22      But at the end of the day, we have already
23  said, as a matter of public policy, that people who
24  are convicted of murder, rape, kidnapping, larceny,
25  you name it, that they're already prohibited from
0040
1  purchasing or possessing.  And if we fail to pass
2  this bill, each and every convicted felon in the
3  state of Colorado, who our current law says isn't
4  supposed to have or purchase this, in reality can.
5  And we don't even have a mechanism.
6      So we might as well just delete those laws
7  and say, you know what, we don't care if convicted
8  felons, or murderers, or rapists, or burglars, or
9  whoever else has access to these, because we refuse

10    to put in an enforcement mechanism. The background
11    check is the enforcement mechanism. And it is
12    imperfect.
13        You know, we have -- you can point to any
14    law we've got on the books, and you'll find someone
15    who hasn't complied with it and people who may try
16    harder not to.
17        But the fact is, is that the data tell us
18    in Colorado and elsewhere, that it actually
19    substantially works, even if imperfectly.
20        So I'm proud of actually having made some
21    of these changes in good faith, listening to
22    Republican colleagues through both chambers. I
23    think we did the right thing with that.
24        But at the end of the day, if we actually
25    believe that certain people that are criminally
0041
1    prohibited from owning or possessing now, in fact,
2    shouldn't possess, if we mean it, we need to pass
3    this and close this ridiculous loophole. And if we
4    don't mean it, let's repeal it and decide that we
5    really don't care anymore on any limits, on anyone
6    owning a firearm, regardless of their criminal
7    history or regardless of even a severely dangerously
8    mentally ill, dangerous person under court order.
9        And if we decide that those folks, we
10    don't want to get in their way, and we really don't
11    have any means or interests or ability to be able to
12    enforce that section, then we might as well reappeal
13    all background checks and get rid of the prohibition
14    on them holding them because without us, we have
15    zero mechanism to differentiate between those who
16    are law-abiding and those who aren't.
17        And with that, I would just respectfully
18    request an aye vote on re-adoption of 1229.
19        SENATE PRESIDENT: Senator Harvey.
20        SENATOR HARVEY: Thank you, Mr. President.
21        Ridiculous loopholes, that's the argument
22    for this bill. Ridiculous loopholes.
23        Are we saying that somebody giving their
24    stepson a gun and not doing a background check on
25    them is a ridiculous loophole?
0042
1        Are we saying that 4-H members who are
2    young and want to shoot a .410 and their parents
3    haven't bought one for them yet because they're just
4    seeing if they want to participate in 4-H shooting
5    and that we're doing that now without doing a
6    background check on them is a -- is a ridiculous
7    loophole in state law?
8        Is it ridiculous that if my wife wants to
9    use my gun to protect our home, or when they go --
10    she goes on a trip outside of the house with a gun,
11    that she can't use my gun for fear of being in

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

12   violation of this law and putting me and her at risk
13   of being prohibited from owning a gun ever again?
14           Do you think that's a ridiculous loophole
15   that needs to be closed?  Well, if you do, vote for
16   this bill.  Vote for this bill, because that's
17   exactly what this bill does.
18           If this bill was talking about closing the
19   loophole for people buying guns outside of the
20   stores and outside of the gun shows, but through
21   private sales, that might be a loophole that the
22   majority of the public would agree with, but that's
23   not what this bill is.
24           The sponsor says we're talking about
25   what -- doing background checks the same way we've
0043
1   done in gun shows and stores, and there's no undue
2   burden.  Ask the 4-H clubs if they think it's an
3   undue burden to have to do a background check on
4   every one of their kids that want borrow a gun.  I
5   would argue they would say that's an undue burden.
6   Ask the family members who are having to do
7   background checks on their stepkids.  Is that an
8   undue burden?
9           Remember, it is already against federal
10   law to give a gun to somebody that you know or
11   should know is a felon.  I would hope that we would
12   know whether our kids, our stepkids, are felons or
13   not.  This is an undue burden.
14           The reason why this was amended because
15   the drafting of this bill was so poorly done -- not
16   by our staff here in Colorado, I don't believe
17   that's where it was done -- that there was so many
18   ridiculous things in this bill that the -- it was
19   embarrassing.  We had to make changes to this bill
20   because it was so poorly drafted in New York City,
21   or Washington, D.C., or wherever it was drafted.
22   That's why there was so many amendments brought to
23   this bill to fix it in the first place.
24           And why is that?  Was it written by
25   somebody who understands gun policy, who understands
0044
1   gun law here in Colorado?  I don't think so.  I
2   think it was written by somebody with irrational
3   fear of firearms, because they have no experience
4   with firearms, and they wrote a bill thinking
5   firearms are terrible, the sky is falling, and
6   therefore we must come forward and outlaw firearms
7   as much as we possibly can and as far as we can get
8   today.
9           Irrational fear.  Irrational fear of 4-H
10   kids shooting guns.  We've got to do background
11   checks and fix that loophole.  Is that what we're
12   afraid of?
13           Bipartisan support.  I have bipartisan

14  support for my position.  My position is vote no.  I
15  have bipartisan support of that.  Can I get one
16  more?  I ask for a no vote.
17       SENATE PRESIDENT:  Senator Lundberg.
18       SENATOR LUNDBERG:  Thank you,
19  Mr. President.
20       Members, I come up here again because it's
21  that important that we look at this one more time.
22  This is the final vote on this bill, and I urge a no
23  vote.  No surprise there.
24       I should hope, though, that you dig a
25  little deeper than just yes or no to the why, to the
0045
 1  what are we doing.  Just the discussion we've heard
 2  this morning establishes several things in my mind
 3  as to what this bill will do if it becomes law.
 4       I find it -- if you just look at all the
 5  discussion on who's exempted and who's not exempted,
 6  can anyone in this room, after all of this time,
 7  stand up and just recite exactly who is and who
 8  isn't?  Is it possible, even now as it's fresh in
 9  our minds, without looking back and trying to figure
10  it out and, you know, kind of do the math?
11       Well, imagine what it's going to be like
12  for the people of Colorado to figure out where the
13  exemptions are and where the exemptions aren't.
14  We've made a dysfunctional mess of -- of these
15  exceptions, to try to put some rational function to
16  this concept of universal background checks, for not
17  only the sale but the transfer, that means the
18  loaning, that means just handing it off.
19       You know, if I were to transfer this pen
20  and just give it to somebody and they -- then they
21  hold it, that's a transfer.  Now, the basic point of
22  this bill is to say that's illegal without a
23  background check.  And then there are some
24  exceptions that are put in.
25       But no one, practically speaking, will be
0046
 1  able to get their arms around it.  So, to the
 2  average citizen in Colorado, here's the takeaway:
 3  Transfers aren't allowed without background checks,
 4  and you better check pretty carefully if you want to
 5  cross that line.  Oh, just go ahead and get the
 6  background check.
 7       Oh, by the way, don't forget, there's
 8  another bill coming that will put a fee on it.  And
 9  if you look in this bill that we're voting on right
10  now, there's another fee on it.  This is where the
11  dealers are allowed to put up to a $10 fee.  And I
12  can kind of see how this will all work its way out.
13       You know, maybe a $10 fee here, a $10 fee
14  for the CBI.  I hope it's no more than that, but
15  it's unlimited.  Now it's 20 bucks to take and

LEG HX 000998

4913

16    transfer it over from one person to the next.  And
17    then, if it's truly a loan, and they went through
18    the background check for the first half of that
19    loan, the returning of the firearm will require the
20    same.
21         So that's the takeaway that the citizens
22    of Colorado have as far as this little complicated,
23    let's call it unintended consequence, that, as our
24    debate and discussion earlier today proved, there is
25    no willingness on a partisan line to go back and try
0047
1    to fix some of those problems.  No, this has been
2    locked in.  And -- and as much as the sponsor wants
3    you to -- to think that this is a -- a product of a
4    bipartisan effort, that is the furthest from the
5    truth of just about any legislation I've ever seen.
6    This is the plan from the majority party, and they
7    own it, unless, of course, a few of you decide, and
8    it doesn't take many, but a few of you decide that
9    this is not good policy.
10         Shoot, just decide it's not good politics,
11    that will give you good policy, by the way, if you
12    just vote no.  And that's what I'm urging you to do,
13    partially because it's dysfunctional.
14         It's not just for sales, it's for
15    transfers, and that happens all the time.  And yet
16    no one will know what that means; hence, you'll find
17    this -- you know, this -- this chilling effect on
18    what should be a very legitimate process of the
19    private property owned by a -- a legal, law-abiding
20    citizen for the State of Colorado will have a fear
21    of breaking some law and being held accountable, you
22    know.
23         And I think the very best example is -- is
24    when it comes to these 4-H groups or -- or some sort
25    of a Scout program or -- or maybe it's a -- it's a
0048
1    program within some church where they're trying to
2    show the proper handling and management of a firearm
3    and pass it on to not only their kids, but, you
4    know, the group of kids in their charge there.  They
5    dare not go down there because it would be absurd.
6         It would be absurd to, you know, assemble
7    ten shotguns, and then go through the background
8    check on all of those, and then have to go through
9    the background check just to get it back to the
10    rightful owners.  But that's what this bill will
11    require.  It's a bad idea, a very bad idea.
12         But let me go on to where I think the
13    worst ideas are for this law.  The sponsor said this
14    is not registration, this is not confiscation.  I
15    agree.  The language in this bill is not
16    registration, and the language in this bill is not
17    confiscation.  But my own sheriff has told me, we

LEG HX 000999

4914

18   cannot enforce this without registration, we don't
19   know how to figure this out.
20         And it makes perfect sense, especially
21   when, you know, when it's -- when it's bisecting
22   which family members are appropriate to loan to and
23   which are not without a background check.  Well, you
24   come into some circumstances where somebody was in
25   possession of a firearm, and somebody else says, But
0049
1   that wasn't my firearm, that was my
2   brother-in-law's.  And the brother-in-law says, no,
3   that wasn't mine, that was his.  And the law
4   enforcement are looking at this and saying, you
5   know, he said, he said.  We don't know.
6         It boils down to they're not going to be
7   able to enforce much of this law without
8   registration.  And I'm going to fight that one more
9   than I'm fighting this one, and I'm fighting this
10   one with about all I've got because the one leads to
11   the other.
12         And now, let's -- let's take on that
13   registration issue with just a little more focus and
14   -- and look at other countries throughout history
15   who have decided that registration of firearms is
16   necessary.
17         In far, far too many examples, after they
18   register, they start figuring out who they want to
19   hold firearms or who they don't want to hold
20   firearms.  And sure, we can give the worst examples
21   out there of -- of Hitler's Germany, who in 19, I
22   think it was 35, in that -- I believe it was 1935,
23   when announced the registration requirement, and
24   then the confiscation followed shortly thereafter,
25   but you don't have to go down those worst-case
0050
1   scenarios to see the absurdity of it.
2         I had a constituent of mine just a few
3   weeks ago describe to me the problem he was having
4   with a shotgun that his father owned, who lived in
5   Spain.
6         Now, it's curious how this worked out, and
7   I think it's -- it's important to -- to consider
8   this in the context of this legislation that we're
9   about to vote on.  His dad has this shotgun, and
10   apparently it was very important to both of them,
11   and a fairly expensive firearm.  He owns it.  He
12   lives in Spain.
13         Spanish law requires that shotguns not
14   only be registered, but be held at the local police
15   station, and that with your registration or your
16   license, essentially, that you have to be in good
17   health.
18         Well, this guy's dad had a heart problem,
19   so the Spanish government told him you can't own

LEG HX 001000

4915

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

20  this anymore and you can't give it to your son
21  because of the mechanisms between Spain and the U.S.
22  on all of that.
23        And he was just expressing his extreme
24  frustration on how just the bureaucracy of not
25  necessarily the most tyrannical government in the
0051
1  world, but just the bureaucracy that literally was
2  going to force the -- the destruction of this
3  firearm that was highly valued by this family
4  because the guy flipped over just an odd nuance of
5  it, and that is his doctor said you've got a heart
6  problem, so now you can't own it and we can't -- you
7  can't give it away; we're going to have to destroy
8  it.
9        Now, I'll go back to what the sponsor said
10  that I agree this is not confiscation, this is not
11  registration, but what it is is the first step and a
12  very clear step.  And the sponsor may not be
13  thinking that's -- that's where she's headed with
14  this, but I can find multiple advocates for
15  registration and confiscation, and law enforcement
16  today that insists that you pass this bill and you
17  set that course in action -- in -- in place.
18        This is a bill that's dysfunctional for
19  the average citizen who does own a firearm, if they
20  ever want to loan it to somebody, they have no idea
21  except they're probably breaking the law and
22  jeopardizing both they and themselves in the
23  process, you know, themselves and the person to whom
24  they want to loan the firearm.  That's one.
25        Secondly, this puts a fee in place of $10
0052
1  per transfer, to be charged by the dealer who
2  administers that.  Also it does put an undue burden
3  on far too many people.  And I've had too many
4  people talk to me about the undue burden the current
5  system has in place over the last few months with
6  its, you know, they say three to seven days.  Well,
7  it's two weeks plus is what I've been shown.
8        It leads to a system of regulation that
9  violates the Second Amendment of the U.S.
10  Constitution.  It violates the Colorado Constitution
11  very clearly because of all of the bureaucratic and
12  expensive processes put in place for simply
13  possessing and bearing arms here in Colorado.
14        This is one of the worst bills we've seen
15  this year, and that's why we've spent so many hours
16  on it, and that's why I trust we're going to spend a
17  few more hours on it, so that the people of Colorado
18  will be at least assured that some people are
19  looking after their constitutional rights, and just
20  the practical realities of ownership within the
21  State of Colorado.

22    vote no.
23        SENATE PRESIDENT:  Senator Marble.
24        SENATOR MARBLE:  Thank you, Mr. President.
25        If this bill was so crystal clear and so
0053
 1  well-written, we wouldn't be having this debate.
 2  And what I really fear, and what we all fear,
 3  especially the citizens of this great state, is that
 4  here we're asking law enforcement to enforce a law
 5  that, one, they don't support, and two, they don't
 6  even believe it to be enforceable, and that's the
 7  problem.
 8        When we have the Constitution, it gives
 9  us the reason why we are a country.  Our Bill of
10  Rights gives us the outline of how to keep us a
11  country, and then the Federalist Papers are there so
12  we know the intent behind all -- all of these great
13  documents.
14        When we see the package of gun bills that
15  have gone through, you know, it would have been in
16  hopes, I think, from the people that I represent,
17  and also all the people in the State of Colorado,
18  those law-abiding citizens, that there would have
19  been bills come through focusing on the real
20  problem, and that is the criminal.
21        This bill doesn't increase penalties for a
22  felon or a criminal, who's going out to purchase a
23  gun or who has possession of a gun.  There's nothing
24  that will actually make them think twice about going
25  through with the transaction, and that bothers a lot
0054
 1  of people because all this is doing is focusing on
 2  regular -- regular citizens.
 3        What about the criminals that we're trying
 4  to trap and really get, you know, ahold of and get
 5  that gun away from?  There's no mention.  This is
 6  just focusing on an inanimate object.  And people,
 7  millions of people, who own these guns, who are
 8  law-abiding, are the ones that are going to get
 9  caught in the crossfire.  That's where the real
10  battle is.  It's the innocent people caught in the
11  crossfire of this debate.
12        I can't support this bill.  I can support
13  criminalizing criminals more.  You know, taking time
14  to really look at how are we going to get them to
15  pay for the actions that they do, and all this bill
16  does is exactly the opposite.  It makes law-abiding
17  citizens pay for the actions that they have done all
18  their lives with no consequence because it was
19  never -- it was never unlawful.
20        I know none of us want to over-criminalize
21  America, and I know that you're saying we have to do
22  something, but why this?  There are other ways and
23  other avenues that haven't been looked at, and it

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

24  has to be fair.  We always talk about being fair,
25  being fair in our schools, be fair in our education,
0055
1   be fair in our taxation, be fair and do this and do
2   that, and fair, fair, fair, and then we come up with
3   this.
4         The implications that this have are
5   devastating, and it is not a shining star of what
6   we've done to curtail crime.  This has indeed
7   increased crime and criminalized the wrong people.
8         Let's get a bill that really focuses on
9   crime and the true people who are intent on creating
10  crime and death and destruction, who are intent on
11  getting their names in the media to outdo the other
12  and to kill more than the last person.
13        We all know about the underground black
14  markets.  We all know that this is where people are
15  going to go and they can go and they will go.  This
16  bill doesn't address that.  None of the bills do.
17        I would just like to see something focus
18  on criminals, penalties for those criminals, just to
19  make sure they do not do this, and if they do, they
20  will pay.
21        But I'm not into asking anybody who is a
22  law-abiding citizen to pay for something that they
23  haven't done wrong.  And this is exactly what this
24  bill does.  The intent of the bill you say doesn't,
25  but the outcome of the bill, actually it does.  It
0056
1   is overcriminalizing, and it's asking our law
2   enforcement to actually interpret and enforce a law
3   they don't support or believe in and were not
4   consulted about when they wrote it -- when it -- not
5   when they wrote it, when it was written and drafted
6   by the Democratic side of the aisle, and we have to
7   stop this.
8         When you look at all these bills, all --
9   the main theme that I hear, it's the deamionization
10  of law-abiding citizens and of guns.  It's not guns;
11  it is the people -- it is criminals.  It is the
12  people who decide to do evil that are -- that are
13  the demons, the horrible portion of our society that
14  we're trying to get control of.  And we're not doing
15  that.  We aren't controlling criminals through these
16  bills.
17        And so that gives people -- it makes them
18  give pause to thinking, do they even care about the
19  criminals, or is it just control?  Because that's
20  all these bills do, is control.  Control who?
21  Law-abiding citizens.  For what?  Nothing.  It
22  doesn't make sense.  There's no reason to focus the
23  way that these bills do on law-abiding citizens.  It
24  would have been nice to focus on the crime and the
25  criminals who really perpetrate these horrible acts.

LEG HX 001003    4918

1       And I urge a no vote.
2       And let's really get together and see what
3   we can do to focus on that small portion of our
4   society that we need to focus on and get a handle on
5   and really make penalties for what they do so stiff
6   and so -- you know, so written in their minds that
7   they will lose everything, perhaps even their life,
8   if they go through with it and mean it.  The
9   catch-and-release system that we have encourages
10  crime, and this is going to overcriminalize the
11  wrong people.  Vote no.
12      SENATE PRESIDENT:  Senator Baumgardner.
13      SENATOR BAUMGARDNER:  Thank you,
14  Mr. President.
15      One of the things that has not been talked
16  about a lot, and at times has been talked about, is
17  the cost to the state of this one piece of
18  legislation, about $1.7 million, and the increase of
19  about 28 full-time employees.
20      Now, the reason for this increase is they
21  say that we need to do this to relieve the federal
22  background check system.  So CBI's going to do part
23  of this.  Well, again, the feds are already doing
24  this.
25      And I understand that it's been said that
0058
1   this is not a way to make a database on who has a
2   firearm and who doesn't have a firearm.
3       And I also heard this bill was not about
4   registration or -- or anybody is going to keep track
5   or a database of who has a firearm, but it says
6   right here that reporting and updating of records on
7   which background checks are based.  So updating of
8   reports.  Are we not at that point making a database
9   on who has a firearm?
10      It was also said that, you know, we talked
11  about 4-H projects, we talked about, you know, the
12  Scout's projects on shootings and things like that,
13  and it was mentioned that well, you can borrow your
14  shotgun or whatever from your parents -- your
15  parents, probably.  And in most rural areas, the
16  parents do have guns.
17      But you know what?  Those shotguns doesn't
18  fit those kids; those kids are smaller, so they have
19  to borrow a shotgun or get a shotgun from somewhere
20  else, from another child.  Is that a transfer?
21  Absolutely.  And if they keep that for the entire
22  time of that program, is that over 72 hours that
23  that person has the possession of that firearm?
24  Absolutely.
25      And we talked about the responsible
0059
1   person, the parent, that will be now in charge of

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

2  that child with that shotgun or firearm that was
3  loaned to them.
4        So, now, do we not only have to do a
5  background checked on the child but now the parents
6  of that child because they are in possession of that
7  firearm for over 72 hours?  And if they are the
8  parent or guardian of that child, are they not
9  responsible for that child?
10        Again, this is another piece of
11 legislation that turns law-abiding citizens into
12 criminals.  Criminals will never, ever, whether they
13 buy a firearm -- they can't buy a firearm at a gun
14 show.  Why would they?  Why would they go to an FFL
15 dealer and buy a firearm?  They're not going to
16 because they know they have to go through a
17 background check.
18        A law-abiding citizen that goes to buy a
19 firearm, they don't mind going through that
20 background check, but to transfer a weapon to use on
21 a hunting trip or to take a vacation and leave that
22 gun with someone makes absolutely no sense.
23        And, I, see that it does generate money
24 for the state.  I do see that.  It's right here.
25 And I do see that, you know, that, you know what, it
0060
1  does have to do with jobs, because you know what?
2  We are going to supply 25 more government jobs.
3        We've talked, we've asked.  And we have,
4  we've worked, we've worked, and we've asked for
5  help, and there's been some relief given, and there
6  has been amendments on this, but still, it's not
7  where we need to be.  It's not where we should be.
8        This is just another piece of legislation
9  in a packet of legislation that's going through the
10 process to make sure that we can, through law,
11 through statute, make sure that, one, criminals
12 can't have -- and again, this bill does absolutely
13 nothing to address that issue -- but just another
14 avenue that a law-abiding citizen cannot possess a
15 firearm.
16        This is our last chance to address several
17 of the issues that have been brought up on this
18 piece of legislation that is flawed.  And I'm sure
19 I'm not going to be the last one to speak on this.
20 And you may hear many of the same things over and
21 over and over again, because we have to make the
22 point that this is just another attempt to restrict
23 your constitutional right to take -- to hang on to
24 your firearms.
25        Vote no on House Bill 1229.  Show the
0061
1  people of the State of Colorado that we are
2  listening, that we really do care, because I think,
3  from what I said the other day and what you might

4   hear later today, and -- is that the people of the
5   State of Colorado are listening.  Through e-mails,
6   through phone calls, they're pleading with their
7   representatives to please listen to us.  And I
8   guarantee you, I'm listening to mine.  And I hope
9   everybody here today is listening to theirs.
10       Please vote no on House Bill 1229.
11       Thank you, Mr. President, Members.
12       SENATE PRESIDENT:  Senator Brophy.
13       SENATOR BROPHY:  Thank you, Mr. President.
14       I -- I want to come up and give you guys a
15  handful of other just bizarre consequences of
16  passing this bill.  And -- and in starting with this
17  one, I want to call to your attention today's Denver
18  Post, a little story by Ryan Parker, where he
19  mentions that a lot of firearms dealers will be
20  refusing to perform these background checks for
21  walk-ins off of the street.
22       And again, the problem here is, is that
23  the bill was not crafted by people who have an in
24  depth knowledge of how firearms transactions
25  actually occur, because the bill limits an FFL,
0062
1   dealer, to only charge $10 to perform these
2   background checks for people who walk in off of the
3   street into their -- into their gun shop, if they
4   have one, or -- or call them up to arrange for the
5   meeting, as you'll have to do in Wrey, Colorado.
6        What you don't realize -- and that's why
7   this story is important in the Denver Post -- is
8   that the typical dealer, when performing a
9   background check for an individual who isn't one of
10  his customers, charges $25, not 10.
11       So your bill cuts their -- their cost,
12  their charges by well over 50 percent.  You --
13  you -- you're making them donate their time to do
14  this as opposed to paying them for what they -- what
15  they actually have to do on behalf of the people of
16  the State of Colorado.
17       I have purchased firearms that have been
18  delivered through the mail, and you -- you pay
19  your -- your dealer who handles that transaction for
20  you and the background check for you $25, not $10.
21  It's just bizarre that no one thought to ask someone
22  that question.
23       Let me give you another one that is --
24  it's just ludicrous.  If there's a -- a friend or
25  neighbor of -- of ours in Wrey who is going through
0063
1   a really contentious divorce, and she feels
2   threatened and feels like she ought to have a
3   shotgun or a handgun in her home to protect herself
4   and her family.
5        She can't -- under this bill -- she can't

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

6   come over to our house to borrow a gun unless we do
7   a background check on her.  She can't.  The bill
8   only allows that type of transfer if it occurs while
9   in the home of the person who feels threatened.  So
10   she can't come to my house to borrow one.  I have to
11   take it over to her house to give it to her.
12        Oh, and it's also limited by Roman numeral
13   II.  She has to reasonably believe that possession
14   of the firearm is necessary to prevent imminent
15   death.  So I guess we have to wait until the person
16   she's afraid on is banging on the door, and then we
17   can make the transfer.
18        Absurd, grotesque, preposterous.
19        I'll give you the other example, the
20   hunting example.  And two members, who are
21   proponents of this bill, have said my hunting
22   example is not accurate.  Well, yes, it is.  I said
23   a friend or neighbor, who's going elk hunting on a
24   week-long trip, cannot come to my house and borrow
25   the appropriate rifle to take elk hunting on his
0064
1   trip under this bill unless we get a background
2   check.  That is absurd, and it's accurate.  If you
3   don't understand that that is accurate, then I would
4   ask you to read the bill.
5        Why don't we just do it together.  Pull it
6   out.  It's the re-revised bill.  It's on page 6.
7   Starting at the top of page 6, exemption E, small E.
8   You got to read and understand these bills because
9   it's important policy.
10        A temporary transfer of possession without
11   transfer of ownership or title to ownership, which
12   transfer takes place, semicolon, while hunting.
13   While hunting.
14        My friend or neighbor is not hunting for
15   elk in my living room where we make the transfer.
16   We don't have any elk in my living room.  We don't
17   have any elk in Wrey.  He's taking the firearm
18   somewhere to the Western Slope.  We are not engaged
19   in hunting.  That transfer does not occur while
20   hunting.
21        So he cannot come and borrow a .300
22   Winchester Magnum because he doesn't think
23   his .243 is big enough to take elk hunting for his
24   traditional week-long elk-hunting trip.  Please,
25   page 6.  Read the bill, then vote no.
0065
1        SENATE PRESIDENT:  Further discussion?
2        Senator Cadman.
3        SENATOR CADMAN:  Thank you, Mr. President.
4        We keep hearing that background check for
5   purchasing guns outside of the current requirement
6   is all that this bill is about, but it's not.  It's
7   not all that this bill is about.  It's virtually

LEG HX 001007

4922

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

8    about, as you have heard, handling, touching, using,
9    transporting guns, which we are now calling
10   transfers.  Virtually every possessive part of a gun
11   is going to be called a transfer.
12         But when it keeps getting back to keeping
13   guns out of criminals' hands, of course none of us
14   want guns in criminals' hand -- in their hands.
15   There is no opposition to that.  Nobody wants
16   criminals to obtain guns, period.
17         But this bill is so broad, it's been
18   called flypaper law.  We've used that before, but
19   it's worth reiterating.  It's been called -- it's
20   been a flypaper law by an attorney for the Outdoor
21   Channel, because it is encompassing, it is so broad,
22   they're afraid to even record for the Outdoor
23   Channel here now.  They're afraid to encourage
24   hunters, sports people, skiers even, from coming to
25   Colorado, people who might want to protect
0066
1    themselves with the legal use of a firearm.
2          And it doesn't make us safer.
3          We talked about amendments being the
4    corrections for oops.  And the Majority Leader is
5    right, that's part of the process.  Good ideas
6    aren't great ideas until we all have a shot to put
7    an amendment on them.
8          But what was never answered here, and what
9    is yet to be answered, was how many other oops are
10   missing.  How many other amendments should we have
11   gotten added to the bill that we did not get on.
12         I mentioned to the Majority Leader after
13   the discussion, either on Friday or Monday, how do
14   we do our normal Scout trip?  How do we do our
15   normal trip, where one person collects 10, 15, 20
16   shotguns or .22's, loads them in a car, takes the
17   day or two-day drive to camp, and then helps do the
18   Scout training?
19         And her response was, Can they get there
20   in 72 hours?  Okay.  Hopefully they do.  But now
21   they're a criminal if it takes 73 hours, or 72 hours
22   and two minutes, or 72 hours and seven minutes, or
23   74 hours, or four days, or nine days, or it takes
24   two days to get there and they don't do the training
25   for two days.  So now I'm illegally possessing guns
0067
1    that I've been loaned by others to take to a
2    training.
3          I have a friend that goes on a mission
4    trip every year, and they don't want to leave their
5    weapons in their house.  I offer them storage.
6    Under this bill, when I'm trying to protect them and
7    their interests, and frankly others from accessing
8    their weapons in their home, under this bill I guess
9    I won't comply either because I will store their

LEG HX 001008                4923

10  firearms, and I don't envision myself getting a
11  background check to protect them and the public from
12  the six weapons that they own when we store them in
13  our safe, because under this bill I would have to
14  get a background check to store their weapons, and
15  then when they return, they would have to get a
16  background check to get them back.
17        Oops, oops.  Is that when we intended?  Is
18  that really what we intended?
19        We are creating a new title slash transfer
20  component to items that virtually have no titles.
21  Remember get the gunfax?  We don't have them.  We're
22  creating a lot of grey area in the law.
23        And I think, when our laws turn common
24  citizens into criminals, that is not government of
25  the people and by the people and for the people,
0068
 1  that's tyranny.  That's tyranny.
 2        Thomas Jefferson wrote -- you remember
 3  him.  He's our party patriarch, at least on this
 4  side he is.
 5        "Rightful liberty is unobstructed action
 6  according to our will within limits, drawn around us
 7  by the equal rights of others."
 8        Our rights stop where your rights begin.
 9        He goes on to say, "I do not add 'within
10  the limits of the law,' because law is often but the
11  tyrant's will, and also so when it violates the
12  rights of the individual."
13        And that's what we're talking about here.
14  Oops.  How many amendments.  Oops.  How many things
15  have we forgot?  How many exceptions to the
16  prohibitions were left out?  How many rights of the
17  individual -- of the individuals are we violating
18  with this bill?  More than we can count so far.
19  And, you know, the really sad part, we're reading
20  this stuff, we're getting exposed to this.
21        Most of us aren't the ones that are going
22  to be saying oops.  It's the Colorado citizen or the
23  visitor to Colorado who's going to be trapped and
24  entrapped, the flypaper, and they're going to be
25  making that phone call after going through the
0069
 1  attorney pages and saying, I don't know what I did.
 2  I'm not sure what I did wrong, but I'm pretty sure I
 3  need your help.  I'm going to court.  I'm being
 4  charged for a crime.  I'm being charged for a crime.
 5        I've done this every year for 40 years.
 6  I'm being charged for a crime for something I've
 7  never -- that -- that I've always done, and I
 8  answered truthfully when the police man pulled me
 9  over and said, where did you get these, who do they
10  belong to, where are you going?  And I told him, and
11  now I'm a criminal.  So what, should he have lied?

12  Should he have lied to protect himself from the
13  tyranny of this legislation?
14         Here's my son in a Boy Scout uniform
15  shooting a shotgun.  How many Boy Scouts do we have
16  to arrest before we feel safer?  How many Boy Scouts
17  do we have to lock up before we feel safer?  How
18  many 4-H members do we have to put in jail before we
19  feel safer?  All of them?  Do we want them all in
20  jail?  I hear we have excess capacity in the
21  prisons.  How many kids are we going to lock up?
22         It was suggested yesterday by one of your
23  colleagues in committee that the 4-H'ers should turn
24  in their guns, or actually he said have a supervisor
25  stop by their home or return to their supervisor
0070
1  every 72 hours under that program so that we would
2  feel safer.
3         It was also suggested -- it was also
4  suggested by one of our colleagues in that committee
5  yesterday that everyone in the household of that 4-H
6  member should get a background check.  Sheriff, you
7  got one gun, four people?  Background check,
8  background check, background check.  Is that what's
9  going to make us any safer?  No.
10         This is the full-employment act for
11  defense lawyers.  And we're doing this to our
12  citizens.  We're doing this to our neighbors.  We're
13  doing this to our families.  Defense lawyers against
14  the tyranny of the Colorado government.
15         I hope I don't need bail money for my son
16  this year.  Vote no.
17         SENATE PRESIDENT:  Further discussion?
18         Senator Renfroe.
19         SENATOR RENFROE:  Thank you,
20  Mr. President.
21         Members, I'd also rise, and, Mr.
22  President, I'd rise and ask for a no vote on this
23  bill.
24         Nine different sections of exemptions are
25  put in this bill for things that we've found wrong
0071
1  that we can't fix or that we have to exempt because
2  it wouldn't be reasonable or -- or common sense to
3  have the law apply to them.
4         Today we've even brought up more.  But
5  yet, on the 66th day of this session, we don't care
6  that we've found more problems with this bill.
7  We've listened is what the sponsor of this bill has
8  said.  We obviously didn't debate the bill, we just
9  listened.
10         We've heard several additional things that
11  should be exempted in this bill today, but yet the
12  majority is going to pass this bill, send it to the
13  Governor, and put the people in Colorado in a

4925

file:///X|/...224%20and%20201229/HB%20201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

14   position of do I -- how do I comply with the law, is
15   going to be the question that they have to ask.
16        In my seven years here, I've seen a lot of
17   bills that have been pushed through this process on
18   a fast pace without debate.  Every single time there
19   has been unintended consequences of things that
20   we've found that have come back to haunt and to have
21   to be tried to be fixed in the -- in the future
22   years.
23        We've already got them here on this bill,
24   and we haven't even got it out of this chamber.  Is
25   that really representing the people of Colorado, to
0072
1   pass a bill that you know has problems that are
2   going to put legal, law-abiding citizens in the
3   position of breaking the law?  And that's what this
4   bill does.
5        So vote no on this bill.  I'm ashamed at
6   this chamber for what we're doing today.
7        SENATE PRESIDENT:  Senator Grantham.
8        SENATOR GRANTHAM:  Thank you,
9   Mr. President.
10        We have a choice before us.  Do the right
11   thing and send this bill into the dustbin of
12   history.
13        This is -- you know, we -- we've talked
14   about the process.  We've talked about one side
15   apparently listening and making changes, as if
16   acquiescing to -- to us.
17        You know, we often refer to this process
18   down here as the sausage factory and making sausage.
19   If you actually saw it, you would probably never eat
20   it again, and those that are watching this may have
21   the same taste in their mouth over this process over
22   the last couple of weeks.
23        Folks, I don't think we're coming out with
24   sausage on the tail end of this, I think we're
25   coming out with a moldy block of Swiss cheese.  It's
0073
1   full of holes.  It's full of oops.  It's full of,
2   oh, yeah, what about this?  Oops, we have one more
3   thing we need to change.  Oh, yeah, there's also
4   that -- the 4-H thing.  Oh, yeah, there's also that
5   hunting thing.  Oops.  Holes.  More Swiss cheese.
6        Someone once wrote, "If the laws be so
7   voluminous that they cannot be read, or so
8   incoherent that they cannot be understood; if they
9   were to be repealed or revised before they are
10   promulgated, or undergo such incessant changes that
11   no man, who knows what the law is today, can guess
12   what it will be tomorrow.  Law is defined to be the
13   rule of action, but how can that be a rule, which is
14   little known, and less fixed?"
15        It's kind of where we're at.  And we look

LEG HX 001011

4926

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

16 at this bill when we have so much that we're
17 apparently trying to fix, but we still don't know
18 the -- if we actually did fix anything, and which I
19 don't think we did.  And then we have all these
20 holes in here that, yeah, but what about this?  What
21 about this?
22      We're putting our -- our law-abiding
23 citizens in jeopardy, who are today doing something
24 completely fine, completely legal, and now,
25 tomorrow, when, if this is passed, and -- and if
0074
1 this goes all the way through to the Governor's
2 desk, we will make them criminals.  We turn our
3 citizens into criminals.
4      That quote said:  Law is defined to be a
5 rule of action.  How can that be a rule which is
6 little known or less fixed?
7      We look at the details of this bill, and
8 we're still questioning whether or not some of these
9 things are doing what they're supposed to be doing.
10 We talk about collaboration and talking and
11 listening on this.  When did that start?
12      You know, I -- I look at this quote again,
13 and I -- I wonder if this person has been watching
14 us from the -- from the lobby or -- or from the
15 gallery, or maybe online.  It's almost as if they --
16 they knew that this would be happening this week.
17      That quote comes from Federalist 62, from
18 James Madison:  So many laws, so voluminous that
19 they cannot be read, they cannot be understood.  And
20 that's just within this one bill, folks.  Just
21 within this one bill.
22      We had an opportunity to go back and at
23 least fix a couple of the absurdities that an
24 earlier Senator mentioned.  These are absurdities:
25 the hunting, the 4-H, the simple transfers.  We
0075
1 could fix these absurdities if we had gone back to a
2 second conference.  We don't have that opportunity
3 now.  Maybe we still do.
4      Will the majority acquiesce?  Will they
5 thunder on and take the rights away from our
6 citizens, turn our citizens, the citizens of the
7 districts that we represent, normal, law-abiding,
8 everyday Joes, everyday Janes, and turn them into
9 criminals?  Turn us -- turn us into criminals?
10 That's what we're doing here.
11      We are not -- we are not taking on the law
12 breakers.  We are not taking on the criminal element
13 with this bill, folks.  We are attacking our own
14 law-abiding citizens, and putting them through the
15 -- a bureaucratic nightmare of trying to decipher
16 what they can and cannot do because of this bill.
17      Please vote no.  Vote no.

18   MADAME PRESIDENT:  Senator Crowder.
19        SENATOR CROWDER:  I guess what I need to
20   say on this bill is what I thought it was -- what I
21   thought it meant to represent people, what I thought
22   it meant to go with the majority of your district.
23   I still believe that very strongly.  But I do not
24   realize, and I do not understand, since you had such
25   an overwhelming dissension upon the -- the people of
0076
1    the State of Colorado, why people would continue to
2    do this.
3         This is, in my opinion, this whole gun
4    deal is not about legislation at all, it's about
5    agenda.  That's why I ran.  I got tired of agendas.
6    And I -- you know, I'm going to tell you something.
7    This is an important item to the state of -- the
8    people of the State of Colorado.  And look at us
9    right now, we're not even paying attention to what
10   the -- the business of the people is about.  And I
11   think it's high time that we realize that the people
12   of the State of Colorado deserve better.  They
13   deserve more.
14        I think the agendas are a thing of the
15   past, and I think they ought to stay in the past.
16   You know, I -- I think we ought to pay attention to
17   this and get this right.
18        I'm going to oppose this bill.  There's no
19   doubt in my mind that this will pass.
20        But I will tell you this:  The people of
21   the State of Colorado deserve better than this.
22   It's not about safety, it's about agenda.  And I
23   think it's time we got to the point where we can
24   start dealing as people on a bipartisan level.  I
25   have no problem representing my district, but I do
0077
1    have a problem that people represent agendas over
2    their districts.
3         Vote no on this.  Thank you.
4    MADAME PRESIDENT:  Mr. Scheffel.
5         SENATOR SCHEFFEL:  Thank you, Madame
6    President.
7         Colleagues, as we discuss really what will
8    probably be the final time this bill and vote for
9    the final time on this, I wanted to again discuss it
10   briefly and reflect on my own position with this.  I
11   will not be supporting this bill.
12        There's been a lot of discussion about the
13   genesis and origin of this bill, some of which is
14   unfortunate.
15        For sake of discussion, I would assume,
16   going back to the basics, and I know when I first
17   saw this legislation and when I began to read it and
18   go over it and go over the testimony in -- in
19   committee and whatnot and -- and reflect on it, I

20  assume that the goal was to increase public safety,
21  to somehow inhibit the -- the activities of bad
22  people that intend to do harm on our citizenry, on
23  the people we represent.  That is not what this bill
24  does.
25      Somebody mentioned we've debated this for
0078
1  well over 30 hours.  That could be conservative.  I
2  know we've all been in here a long time and that
3  there's been much discussion about this, and most of
4  the discussion, or at least a good part of it, has
5  been on trying to figure out what this bill says.
6      It's had many labels put on it:
7  grotesque, ludicrous, absurd, preposterous.  None of
8  those seem to be hyperbole.  The one that resonates
9  with me the most, however, assuming the best of
10  motives for people that come into this room, is
11  unintended consequences.
12      What a strong and inappropriate indictment
13  on this body if something we do here in the
14  purported name of good ends up with unintended,
15  negative consequences.  The fact that we've spent so
16  much time here talking about some of our best and
17  our brightest, the 4-H, the different kids' groups,
18  the Boy Scouts, and how harm may come to them as a
19  result of this.  Those are chilling effects,
20  chilling consequences of a law that's intended to do
21  good, of a law that's intended to inhibit crime.
22      As I reflect on the testimony and all the
23  discussion that's taken place, I must reiterate for
24  myself in my own mind, and that's that there's been
25  no what I see as -- as legitimate proof that this
0079
1  will increase public safety.  It seems the very
2  opposite; it will have a chilling effect on
3  law-abiding citizens.
4      And as we've heard scenario after scenario
5  and the specifics of the bill laid out before us, as
6  we've read and considered this, that resonates with
7  me, and it seems to me that's going to be the
8  result.
9      We've heard letter after letter of -- of
10  people that are concerned now about coming to
11  Colorado.
12      I was someplace and -- and a citizen, a
13  constituent, actually, said, what are we doing to
14  the reputation of our state?  We've always been
15  known as this healthy living, outdoors, attractive
16  state that -- that prides itself on our tourism, on
17  our industries that bring people in, that we have so
18  much to offer here that we want to share it with
19  outsiders, and so many people take us up on that
20  bargain.  And yet now we're hearing that people are
21  chilled, afraid, disquieted, discomforted by coming

22  to our state, because they don't know the
23  consequences that will be waiting for them here.
24       The possibility, as one of my colleagues
25  raised, that a perfect, law-abiding citizen could
0080
1  come here, do something that they've done for many,
2  many years, and yet be held criminally accountable
3  for that.  I fear that what will happen will be a
4  chilling effect, a closing in, a drawing inside, so
5  that activities that have been perfectly legal and
6  normal will seize to operate; that our Scouts will
7  not have the same opportunity as Scouts in other
8  states; that our 4-H people, which is a foundation
9  of our society here in Colorado -- so many of -- of
10  people in this room have come out of that system --
11  that they will not be able to pursue the interests
12  that they have done in the past because of this.
13       Because of that, because of the lack of --
14  of evidence that public safety will be increased --
15  there's no disagreement, criminals do bad things.
16  They've used weapons to do bad things.  And we've
17  talked about this, but unspeakable harm and hurt has
18  been -- has been put on our society because of
19  criminals, but this is not going to help it.
20  Criminals are going to be the least interested.
21       As we sit around this place, and as we
22  opine and reason and debate and -- and try to
23  wrangle over this and figure out, we will do that,
24  law-abiding citizens will do that, the criminals
25  will not.  They won't give this law a second
0081
1  thought.  They won't waste a bit of time.  They'll
2  simply maneuver in, around, and about it.  They
3  won't skip a beat in their day because of this, but
4  law-abiding citizens will.  And the chilling effect
5  we've talked about, those are the folks that are
6  going to get caught up in this.
7       They're going to find themselves on the
8  wrong side of the law.
9       It's been talked about, and I just want to
10  reiterate, the criminalization of law-abiding
11  citizens is awful for our society.  We should be
12  truly sobered by the fact that that can happen with
13  this law:  public safety not being increased, the
14  unintended consequences of criminalizing law-abiding
15  citizens, that they will be caught in the net of
16  unintended consequences of this law.
17       It will be our volunteers that will be hit
18  hardest by this.  Some of the very people we value
19  most.  We talk about the -- the underpinnings of our
20  society, and -- and -- and our, what makes us, us,
21  the specialness and the uniqueness of our state and
22  our nation is in many ways based on our volunteer
23  core.  They're going to be the most confused, the

4930

24  most hurt, the most affected by this, I fear.
25      All that sums up for me, and the
0082
1  conclusion I've come to and continue to come to,
2  that this represents an inappropriate infringement
3  on the Second Amendment; therefore, should not move
4  forward from this body.
5      Therefore, I will be voting no, again, and
6  encourage you to do so as well.
7      SENATE PRESIDENT:  Is there any further
8  discussion?
9      Seeing none, Majority Leader Carroll --
10  well, I'm sorry --
11      MAJORITY LEADER CARROLL:  Thank you,
12  Mr. President.
13      SENATE PRESIDENT:  -- so -- so come on
14  down, Senator Lundberg.
15      SENATOR LUNDBERG:  Thank you,
16  Mr. President.
17      The good Senator from Wrey admonished us
18  to read the bill.  A novel idea.  You might as well
19  get it out and read it.  You've got time.
20      I dug a little bit deeper into it and
21  discovered one corner of it that -- that I found --
22  didn't realize was there.  And -- and that's, so
23  what if some law-abiding citizen, or at least they
24  think they're law-abiding citizens, endeavors to --
25  and we've heard so many examples of people who want
0083
1  to store their, you know, somebody else's weapons
2  when they're out of town, or -- or somebody's in
3  charge of looking after the shotguns for the local
4  Boy Scout troop that's -- that's going to have
5  some -- some in-the-field training on the proper use
6  and handling of -- of a -- of a rifle or a shotgun;
7  or you didn't realize that your brother, you could
8  loan that gun to, but your brother-in-law, you
9  couldn't; or a step situation; or my father-in-law.
10  You didn't realize that you broke the law, and then
11  somebody turned you in, and so you're guilty.
12      Now, it's a Class I misdemeanor, and --
13  and judges have prerogative on how they a can apply
14  that.  It's -- it can -- it can mean a lot of
15  serious jail time.  I trust it won't for most people
16  in a situation like that, where it was obvious that
17  there was just an honest mistake because we made it
18  so complicated.
19      But let us read on.  Sometimes it's good
20  to read the bill.  Page 7.  Let's see, this is the
21  re-revised version.  Under line 27 -- well, let's
22  start at line 25.  We've got time.
23      A person who violates a provision of this
24  section commits a Class I misdemeanor and shall be
25  punished in accordance with Section 18-1.3-501,

LEG HX 001016

4931

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

1    period. Ah, but it goes on. The person shall, not
2    maybe, shall. So there's no prerogative here. The
3    judge can't say, well, it could be this, could be
4    that. No, the judge shall -- the person shall also
5    be prohibited from possessing a firearm for two
6    years, beginning on the date of his or conviction.
7         Furthermore, when a person is convicted of
8    violating a provision of this section, the state
9    court administrator shall report the conviction to
10   the bureau and to the National Instant Criminal
11   Background Check System, created by the Federal
12   Brady Handgun Violence Prevention Act, publication
13   L. 103-159, the relevant portion of which is
14   codified at 18 USC Section 922(t).
15        The report shall include information
16   indicating that the person is prohibited from
17   possessing a firearm for two years beginning on the
18   date of his or her conviction.
19        So let's see what happens here. A simple
20   mistake. Somebody turns them in. They're
21   convicted. Maybe the judge realizes this is not
22   that big a deal. I mean, surely, the legislature
23   didn't intend on making every honest scout master
24   who didn't quite figure out the -- the precise
25   detail of the law, that they'd return them in 75
0085
1    hours or whatever. But then the judge shall have to
2    enforce not only a prohibition for two years, but
3    secondly, they turn you over to the -- to the -- to
4    all of the background check lists. And I don't see
5    anything in here that says, and that goes away in
6    two years. What I strongly suspect is that becomes
7    a permanent part of your record.
8         Now, if we were talking about the core
9    essence of this legislation, which everybody out
10   there thinks is the point, you know, you hear the
11   news reports: universal background check will be
12   required for all gun purchases. Then, if you
13   violate that, you sort of knew you did that, and
14   maybe you're, you know, one of the -- one of the bad
15   guys at that point.
16        But we have spent much of the time
17   wrestling over all of the exceptions that are so
18   necessary for that other side to this bill that says
19   not just a background check for a sale, but for a
20   simple transfer. Remember the pen?
21        A simple transfer. Oh, this one's loaded.
22   Just a simple transfer, which means a loan, which
23   happens all the time under a variety of very
24   legitimate, proper, and necessary circumstances.
25   Well, we've made some of them necessarily too
0086
1    complicated by saying you need to get this

2   background check both coming and going, and we're
3   putting on a $10 fee here, and we're putting on
4   hopefully no more than a $10 fee for the CBI, so
5   it's 20 bucks per transfer.
6        So let's see, if I loan my firearm to
7   somebody, and it's one of those areas that isn't
8   covered under the -- the exceptions, then just
9   the -- not to mention the trouble -- just the cost
10  is probably 40 bucks.
11        I'm not sure that anybody who might be
12  supporting this bill cares, but let me talk to you
13  folks back out in -- in the State of Colorado,
14  hopefully, the State of reality.  I'm not sure we
15  have that hear all the time.  But -- but,
16  nonetheless, that's a $40 fee for a simple loaning
17  of your shotgun to your neighbor because they want
18  to go hunting, unless, of course, you're in the
19  field.  But, no, that's not the way the law works.
20        And when we tried to -- and have tried
21  innumerably, many, many times, to amend and correct
22  some of these problems, what did we find?  Just a
23  brick wall.  Just a brick wall.
24        So we're left with our final debate and
25  discussion here on House Bill 1229, up or down vote,
0087
1   no changes, no amendments, no nothing, just up or
2   down.  And the honest, law-abiding citizen will find
3   themselves in a spot of either, if you own firearms,
4   you better keep them because you can't loan them to
5   anybody or they may get you.
6        It may be one of those gotcha moments,
7   where this is illegal, and then you go to court, and
8   then you do the time or you pay the fine, or, maybe
9   the judge just says, you know, I understand.  But
10  then the judge says, oh, by the way, do you have any
11  other weapons?  We want them now for two years, and
12  then we'll put you on the list nationally for having
13  broken the law.
14        Is that really what we're trying to
15  accomplish for the citizens in the State of
16  Colorado?  Is that really what we're trying to do
17  here today?
18        Well, let me leave you with you this final
19  point.  No, we don't have to.  You can't vote no.
20  And I'll bet, I'll just bet, that this idea won't go
21  away, because the proponents seem rather determined.
22  But maybe they'll fix those problems.  If all you're
23  concerned with is -- is the unintended consequence
24  that we've pointed out again and again and again, we
25  could fix it.  Vote no today.
0088
1        What are we, day 64, 65, something like
2   that?  Plenty of time left.  55 days left in this
3   session.

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

4      A vote -- vote no today can make better
5   law, even if you think this -- the essence of this
6   is a good idea.  Don't lock down.  Don't display
7   more of the my-way-or-the-highway, party-line vote
8   that we've seen again and again and again and again
9   and again and again and again this session.  We can
10  break that mold.  You can vote no.  You can send
11  this back to get it cleaned up at the minimum.
12        You know the people of Colorado have
13  spoken very clearly.  They have done all they can.
14        I -- I got an e-mail from somebody
15  yesterday over -- there was another bill, and I
16  won't discuss what the bill was, it was just, in my
17  opinion, a very bad bill, and a lot of other
18  people -- but there was no one testifying against
19  the bill.  And when I noted that, I got a response
20  of, we're tired; we have been fighting these
21  gun-control bills to the best of our ability.  And
22  you know that's the case.  You've received, I'm
23  sure, the thousands of e-mails that I've received.
24        Must we end with the same strident,
25  partisan, rigid, doctrinaire vote?  Doesn't take
0089
1   everybody, but it takes enough to add up to a no
2   vote on 1229.  I implore you, I plead with you, make
3   better law than what we have before us today.  Vote
4   no on House Bill 1229.
5        SENATE PRESIDENT:  Senator Renfroe.
6        SENATOR RENFROE:  Thank you,
7   Mr. President.
8        I'd like to thank my good friend and
9   colleague from Larimer County for his words, but I
10  want to correct him and the body a little bit there
11  on his lockdown of the bill and -- and the
12  partisanship of this.  It is bipartisan opposition
13  of this bill.  So we are working together to end
14  this taking of our freedoms.
15        You know, we talked earlier -- I talked
16  earlier -- about loopholes.  We've talked about that
17  a lot, and how what we just keep trying and trying
18  to do is just fix all the loopholes and how we seem
19  to be listening so that we can fix the loopholes.
20  We're never going to get them all, let's be honest,
21  because this bill is so poorly written that you
22  can't get there.
23        You're going to entrap legal citizens,
24  law-abiding citizens, and cause them to break the
25  law just because of the way this is.  There's no
0090
1   other way around it.
2        And, of course, then we will have to have
3   a second step.  How far will that go?
4        But on this bill, just sitting here while
5   we're debating today, let me bring another example.

LEG HX 001019

4934

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%202013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

6   We have nine provisions that this section does not
7   apply to.  And -- and the esteemed sponsor of the
8   bill gave us a -- a printout sheet that kind of
9   summarizes that for us also and goes through
10  transfer of an antique firearm, transfer amongst
11  family members, due to inheritance a transfer, the
12  maintenance or repair.
13      And these are permanent ones:  a transfer
14  by a member in the military with a 30-day
15  employment; temporary ones for a 72-hour transfer; a
16  transfer that occurs in the continual presence; a
17  transfer for self-defense; a transfer at a shooting
18  range or competition or while hunting or trapping.
19  So those are the ones that the sponsor even admits
20  that what we had to find ways to let this still
21  happen legally.
22      Well, let me -- let me give you another
23  example, even though we've already had a couple up
24  here today.  And here's another one that this I
25  don't think covers and will make illegal in
0091
1   Colorado.
2       Say -- say you live in another state,
3   and -- and you want to move to this state.  So
4   you -- you hire, you know, Ten Broke Students or
5   whatever moving company, ABC Moving, and they pack
6   up all your possessions, and they move them to
7   Colorado here.  And then, with your job, you're not
8   ready to come yet, and so they store your stuff for
9   you.  Uh-oh is right.  Say you're someone that --
10  that loves the direction, the progressive movement
11  of our state and what we're doing with these bills,
12  and say you even come and you testify on bills here,
13  and you're from Arizona or someplace, and your
14  name's Mark Kelly.  And say he wants to move here.
15      You know, he recently just purchased an
16  AR-15.  And so if he wanted to move here, even
17  though he testified against the magazine bill, and
18  he wanted to move here, and he wanted to -- have a
19  moving company move his stuff and that moving
20  company stores that, his equipment, his -- his --
21  all of his furniture -- until he is able to move
22  here, and say they store it more than 72 hours, that
23  moving company is in violation of the law.
24      How do you fix that one?  We're apparently
25  not going to go beyond the scope and -- and try to
0092
1   look into more areas and more things that come up.
2   How is someone from another state going to know the
3   specifics of our law, or how is every moving company
4   from across the nation going to know the specifics?
5   You know, you have those companies now that you can
6   fill a -- a cargo trailer that they dump at your
7   door, and then they come back and pick it up and

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

8    move it wherever you want. Is that really still
9    in your possession, or is that in their possession?
10   I don't know.
11         This is a -- a bill that is filled with
12   problems that we are unwilling to fix. And that is
13   a shame. Shame on you. Shame on us. Vote no on
14   this bill.
15         SENATE PRESIDENT: Further discussion?
16   Seeing none, the motion before the body is the
17   adoption of -- the re-adoption, I'm sorry -- of
18   House Bill 1229. A roll-call vote has been
19   requested.
20         Mr. Majors, would you please poll the
21   Senators?
22         THE CLERK: Aguilar.
23         SENATOR AGUILAR: (No audible response.)
24         THE CLERK: Balmer -- Aguilar, aye.
25         Balmer.
0093
1          SENATOR BALMER: No.
2          THE CLERK: Balmer, no.
3          Baumgardner.
4          SENATOR BAUMGARDNER: No.
5          THE CLERK: Baumgardner, no.
6          Brophy.
7          SENATOR BROPHY: No.
8          THE CLERK: Brophy, no.
9          Cadman.
10         SENATOR CADMAN: No.
11         THE CLERK: Cadman, no.
12         Carroll.
13         SENATOR CARROLL: Aye.
14         THE CLERK: Carroll, aye.
15         Crowder.
16         SENATOR CROWDER: No.
17         THE CLERK: Crowder, no.
18         Giron.
19         SENATOR GIRON: Aye.
20         THE CLERK: Giron, aye.
21         Grantham.
22         SENATOR GRANTHAM: No.
23         THE CLERK: Grantham, no.
24         Guzman.
25         SENATOR GUZMAN: Aye.
0094
1          THE CLERK: Guzman, aye.
2          Harvey.
3          SENATOR HARVEY: No.
4          THE CLERK: Harvey, no.
5          Heath.
6          SENATOR HEATH: Aye.
7          THE CLERK: Heath, aye.
8          Hill, excused.
9          Hodge.

LEG HX 001021    4936

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]

| | |
|---|---|
| 10 | SENATOR HODGE:  Aye. |
| 11 | THE CLERK:  Hodge, aye. |
| 12 | Hudak. |
| 13 | SENATOR HUDAK:  Aye. |
| 14 | THE CLERK:  Hudak, aye. |
| 15 | Jahn. |
| 16 | SENATOR JAHN:  Aye. |
| 17 | THE CLERK:  Jahn, aye. |
| 18 | Johnston. |
| 19 | SENATOR JOHNSTON:  Aye. |
| 20 | THE CLERK:  Johnston, aye. |
| 21 | Jones. |
| 22 | SENATOR JONES:  Aye. |
| 23 | THE CLERK:  Jones, aye. |
| 24 | Kefalas. |
| 25 | SENATOR KEFALAS:  Aye. |

0095

| | |
|---|---|
| 1 | THE CLERK:  Kefalas, aye. |
| 2 | Kerr. |
| 3 | SENATOR KERR:  Aye. |
| 4 | THE CLERK:  Kerr, aye. |
| 5 | King, excused. |
| 6 | Lambert. |
| 7 | SENATOR LAMBERT:  No. |
| 8 | THE CLERK:  Lambert, no. |
| 9 | Lundberg. |
| 10 | SENATOR LUNDBERG:  No. |
| 11 | THE CLERK:  Lundberg, no. |
| 12 | Marble. |
| 13 | SENATOR MARBLE:  No. |
| 14 | THE CLERK:  Marble, no. |
| 15 | Newell. |
| 16 | SENATOR NEWELL:  Aye. |
| 17 | THE CLERK:  Newell, aye. |
| 18 | Nicholson. |
| 19 | SENATOR NICHOLSON:  Aye. |
| 20 | THE CLERK:  Nicholson, aye. |
| 21 | Renfroe. |
| 22 | SENATOR RENFROE:  No. |
| 23 | THE CLERK:  Renfroe, no. |
| 24 | Roberts. |
| 25 | SENATOR ROBERTS:  No. |

0096

| | |
|---|---|
| 1 | THE CLERK:  Roberts, no. |
| 2 | Scheffel. |
| 3 | SENATOR SCHEFFEL:  No. |
| 4 | THE CLERK:  Scheffel, no. |
| 5 | Schwartz. |
| 6 | SENATOR SCHWARTZ:  (No audible answer.) |
| 7 | THE CLERK:  Schwartz, aye. |
| 8 | Steadman. |
| 9 | SENATOR STEADMAN:  Aye. |
| 10 | THE CLERK:  Steadman, aye. |
| 11 | Tochtrop. |

12    SENATOR TOCHTROP:  No.

13    THE CLERK:  Tochtrop, no.

14    Todd.

15    SENATOR TODD:  Aye.

16    THE CLERK:  Todd, aye.

17    Ulibarri.

18    SENATOR ULIBARRI:  Aye.

19    THE CLERK:  Ulibarri, aye.

20    Mr. President.

21    SENATE PRESIDENT:  Aye.

22    THE CLERK:  Mr. President, aye.

23    SENATE PRESIDENT:  With a vote of 19 ayes,

24  14 noes, zero absent, and two excused, House Bill

25  1229 is re-adopted.

0097

1    Cosponsors, we've got you if you did it

2  the first time.

3    (Whereupon, the recording was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0098

1         CERTIFICATE

2  STATE OF COLORADO         )

3  CITY AND COUNTY OF DENVER    )   ss.

4

5     I, Elissa Steen, Professional Shorthand

6  Reporter and Notary Public in and for the State of

7  Colorado, do hereby certify that this transcript was taken

8  in shorthand by me from an audio recording and was reduced

9  to typewritten form by computer-aided transcription; that

10  the speakers in this transcript were identified by me to

11  the best of my ability and according to the introductions

12  made; that the foregoing is a true transcript of the

13  proceedings had; that I am not attorney, nor counsel, nor

4938

14   in any way connected with any attorney or counsel for any
15   of the parties to said action or otherwise interested in
16   its event.
17          IN WITNESS WHEREOF, I have hereunto affixed
18   my hand and notarial seal this 5th day of August, 2013.
19
20
21
22          _____
             Registered Professional Reporter
23                        and
                    Notary Public
24
25

LEG HX 001024    4939

file:///X|/...224%20and%201229/HB%201229/Transcripts%20of%20legislative%20history/House%20Bill%2013-1229-031513(Senate).txt[11/12/2013 10:57:59 AM]