IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| COLORADO OUTFITTERS ASSOCIATION, *et al.,* | ) ) ) | |
| Appellants, | ) ) | Nos. 14-1290 |
| v. | ) ) | |
| JOHN W. HICKENLOOPER, | ) ) | |
| Appellee. | ) ) | |

---

On Appeal from the United States District Court for the District of Colorado
The Honorable Chief Judge Marcia S. Krieger
Case No. 13-CV-1300-MSK

---

**OPENING BRIEF OF APPELLANTS NONPROFIT ORGANIZATIONS,
DISABLED FIREARMS OWNERS AND FIREARMS MANUFACTURERS
AND DEALERS**

---

Respectfully submitted,

Richard A. Westfall*
Peter J. Krumholz
HALE WESTFALL, LLP
1600 Stout St., Suite 500
Denver, CO 80202
(720) 904-6010

*additional counsel listed on the next page

Oral Argument Is Requested
District Court Order Attached

January 16, 2015

Marc F. Colin
BRUNO COLIN & LOWE PC
1999 Broadway, Suite 4300
Denver, CO 80202-5731
Phone: (303) 831-1099
mcolin@brunolawyers.com

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
fabianlaw@qwestoffice.net

Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8000
dabbott@hollandhart.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the Appellants in No. 14-1290 state that the parent corporation of Appellant Magpul Industries is MIC Holding, LLC. No other Appellant has any unidentified parent corporations, nor is any Appellant a publicly held corporation.

s/Peter J. Krumholz
Peter J. Krumholz

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION..................................................................3

STATEMENT OF THE ISSUES.......................................................................4

STATEMENT OF THE CASE...........................................................................5

      A.     Pretrial Proceedings................................................................5

      B.     Trial and the Trial Court's Decision ....................................9

           1. HB1229 ............................................................................10

           2. HB1224 ............................................................................15

           3. Vagueness and ADA .......................................................19

SUMMARY OF ARGUMENT ........................................................................20

ARGUMENT ...................................................................................................21

I.      SEVERAL RECENT FEDERAL COURT DECISIONS HAVE APPLIED
      RIGOROUS LEVELS OF SCRUTINY TO FIREARMS LAWS
      APPLICABLE TO LAW-ABIDING CITIZENS .......................................21

II.     PLAINTIFFS ASSERTED AS-APPLIED CHALLENGES TO THE
      STATUTES ...............................................................................23

III.    A HIGHER LEVEL OF SCRUTINY IS REQUIRED THAN THE
      DEFERENTIAL REVIEW APPLIED BY THE TRIAL COURT ..............25

      A.     Strict Scrutiny Is the Appropriate Standard .......................26

      B.     Even Under Intermediate Scrutiny, a Statute Must Advance the State's
      Interest in "a Direct and Material Way".......................................28

IV.  THE TRIAL COURT ERRED IN CONCLUDING THAT HB1229
     DOES NOT VIOLATE THE SECOND AMENDMENT ...........................29

     A.   HA 1229 Burdens Second Amendment Rights...................................29

          1. HB1229 burdens the acquisition of firearms ..................................30

          2. HB1229 burdens the ability of non-profit organizations and their
     members to acquire firearms ........................................................................31

          3. HB1229 inconveniences citizens in ways that other courts have
     viewed as Second Amendment burdens .......................................................33

          4. HB1229 disincentivizes FFLs from doing private background
     checks, further adding to the burden ...........................................................33

          5. The trial court implicitly held that HB1229 burdens citizens when it
     gave a Fifth Amendment instruction to one of Plaintiffs' witnesses ............35

     B.   The State Failed to Carry Its Burden on the Second Step of the *Reese
     Analysis* ....................................................................................................36

          1. The trial court's analysis of the State's purported objective mirrored
     the State's defective evidence on that point ..................................................36

          2. HB1229 does not advance the State's interest "in a direct and
     material way"................................................................................................38

          3. Less burdensome alternatives were available .................................41

     C.   Conclusion.........................................................................................42

V.   THE TRIAL COURT ERRED IN HOLDING THAT HB1224 DOES NOT
     VIOLATE THE SECOND AND FOURTEENTH AMENDMENTS..........42

     A.   The State Failed to Prove that HB1224 Serves a Public Interest........43

B.      The FFLs Have Standing....................................................45

C.      HB1224 Is Unconstitutionally Vague ...............................48

VI.   THE TRIAL COURT ERRED IN DISMISSING PLAINTIFFS' ADA
      CLAIM..............................................................................................50

      A.      Plaintiffs Have Standing and Are Qualified Individuals with a
      Disability.........................................................................................51

      B.      Title II of the ADA Applies to Statutes and Plaintiffs Have Suffered
      Title II Discrimination ...................................................................52

              1. Case law holds that Title II applies to statutes................................53

              2. The trial court's holding that Title II does not apply to statutes was
      based on a misreading of a recent Tenth Circuit decision.............................54

      C.      In Rejecting Plaintiffs' Disparate Impact Claim, the Trial Court
      Ignored Evidence that Was Directly on Point .................................55

      D.      The Trial Court Failed to Rule on Plaintiffs' Intentional
      Discrimination Claim........................................................................57

      E.      Plaintiffs Are Entitled to a Reasonable Modification ........................58

VII.  THE TRIAL COURT ERRED IN CONSIDERING JUSTIFICATIONS
      THAT WERE NOT INCLUDED IN THE LEGISLATIVE RECORD .......60

VIII. THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO
      PROVIDE ANY ANALYSIS OF THE PARTIES' *DAUBERT* MOTIONS 61

CONCLUSION. ...................................................................................63

STATEMENT REGARDING ORAL ARGUMENT ...........................................64

FED. R. APP. P. 32(A)(7)(C) CERTIFICATE OF COMPLIANCE. ....................64

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Adolph Coors Co. v. Brady*, 944 F.2d 1543, (10th Cir. 1991) .................... 40

*Ainscough v. Owens*, 90 P.3d 851 (Colo. 2004) .......................................... 46

*American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985) ....... 48

*American Civil Liberties Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ......................................................................................................... 24

*Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1067 (9th Cir. 2010) .......... 53

*Barabin v. AstenJohnson, Inc.*, 700 F.3d 428 (9th Cir. 2012) .................... 61

*Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222 (10th Cir. 2009) ................................................................................................... 53, 58

*Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917 (10th Cir. 2012) ............................................................ 53, 55, 59

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) ........... 23

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ................. 42

*City of Richmond v. Croson*, 488 U.S. 469 (1989) ...................................... 61

*Concrete Works of Colorado v. City & County of Denver*, 36 F.3d 1513 (10th Cir. 1994) ........................................................................... 40, 60

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) .................................. 54

*Davidson v. Am. Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003) .................. 59

*Davidson v. Sandstrom*, 83 P.3d 648 (Colo. 2004) ..................................... 49

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................. 5, 21, 27, 40

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .................... 24

*Edenfield v. Fane*, 507 U.S. 761 (1993) ......................................... 28, 29, 40

*Elwell v. Oklahoma ex rel. Bd. of Regents of University of Oklahoma*, 693 F.3d 1303 (10th Cir. 2012) .................................................... 54

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ....................... *passim*

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167 (2000) ........................................................................ 46

*Grider v. City & County of Denver*, 2012 WL 1079466 (D. Colo. Mar. 30, 2012) (Krieger, J.) ................................................................ 54

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ............. 60

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) ................................................................ 47

*James v. City of Costa Mesa*, 684 F.3d 825 (9th Cir. 2012) ....................... 54

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) .............. 27

*Kolendar v. Lawson*, 461 U.S. 352 (1983) ................................... 48

*Mary Jo C. v. New York State & Local Retirement Systems*, 707 F.3d 144, 163 (2d Cir. 2013) ................................................................ 54

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................. 5, 27

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) ..... 61

*National Alliance for Mentally Ill v. Board of County Commissioners*, 376 F.3d 1292 (11th Cir. 2004) .................................................... 52

*Olson v. City of Golden*, 541 Fed. Appx. 824 (10th Cir. 2013) .................. 24

*People ex rel. Tooley v. Dist. Court*, 549 P.2d 774 (Colo. 1976) ............... 49

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ........... 22, 27

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1976) ............................... 48

*Reinhart v. Lincoln County*, 482 F.3d 1225 (10th Cir. 2007) ..................... 55

*Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185 (10th Cir. 2007) ................................................................................................. 59

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) .................................... 29

*Schrader v. New Mexico*, 361 Fed.Appx. 971 (10th Cir. 2010) ................. 46

*Silvester v. Harris*, -- F. Supp. 2d --, 2014 WL 4209563 (E.D. Cal. Aug. 25, 2014) ........................................................................ 23, 28, 29, 30

*Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51 (1st Cir. 2013) .......... 61

*S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227 (10th Cir. 2010) ...................................46-47

*Sportsmen's Wildlife Defense Fund v. U.S. Dep't of the Interior*, 949 F. Supp. 1510 (D. Colo. 1996) .................................................................. 46

*T.E.P.& K.J.C. v. Leavitt*, 840 F. Supp. 110 (D. Utah 1993) ..................... 54

*Thompson v. Cooke*, 2007 WL 891364 (D. Colo. Mar. 22, 2007) ............. 54

*Tsombanidis v. West Haven Fire Dep't.*, 352 F.3d 565 (2d Cir. 2003) ................................................................................................55, 57-58

*Turner Broadcasting Sys. v. FCC*, 512 U.S. 622 (1994) ............................ 60

*Tyler v. Hillsdale County Sheriff's Dep't*, -- F.3d --, 2014 WL
7181334 (6th Cir. Dec. 18, 2014) ......................................... 22, 26, 27, 28, 36

*United States v. Carel*, 668 F.3d 1211 (10th Cir. 2011) .............................. 23

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) .............. 26

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) .......................... 25, 28

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ...................................26-27

*Wis. Community Servs. v. City of Milwauke*e, 465 F.3d 737, 753 (7th
Cir. 2006) ...................................................................................... 57

## Statutes & Other Authorities:

28 C.F.R. § 35.130(g) ........................................................................ 52

28 U.S.C § 1291 ................................................................................. 3

42 U.S.C. § 12102(1)(A) .................................................................. 51

42 U.S.C. § 12131(2) ........................................................................ 51

42 U.S.C. § 12133 ............................................................................. 50

Cal. Penal Code § 27885.................................................................... 41

C.R.S. § 18-12-112 ................................................................... 1, 5, 10

C.R.S. § 18-12-203, -205 .................................................................. 41

C.R.S. § 18-12-302 .............................................................................. 1

Mass. Gen. Laws ch. 140, § 128A ................................................... 41

BARBARA T. LINDEMANN & PAUL GROSSMAN, EMPLOYMENT
DISCRIMINATION LAW 953 (4th ed. 2007) ..................................................... 55

David B. Kopel, *The First Amendment Guide to the Second
Amendment*, 81 TENN. L. REV. 417, 427-32 (2014)...................................... 21

Gillian E. Metzger, *Facial and As-Applied Challenges Under the
Roberts Court*, 36 FORDHAM URB. L.J. 773, 785 (2009) ............................. 25

## STATEMENT OF RELATED CASES

This appeal has been consolidated with No. 14-1292. These appeals arise

from the district court's decision in 13-CV-1300. Appellants in 14-1290 adopt and

incorporate the arguments set forth in the brief of the Sheriffs and David Strumillo.

## INDEX OF EXHIBITS

Exhibit 1 ...................................................District Court Order entered Jun. 26, 2014

Exhibit 2 ......................................................................................House Bill 13-1224

Exhibit 3 ......................................................................................House Bill 13-1229

Exhibit 4 ............................................................................................Trial Exhibit 24

## <u>INTRODUCTION</u>

This case involves two criminal statutes enacted by the Colorado General Assembly in 2013. House Bill 13-1224 (HB1224), codified at C.R.S. § 18-12-112 and attached hereto as Exhibit 2, generally prohibits firearm magazines capable of holding 16 rounds or more (hereinafter "sixteen-plus magazines"). House Bill 13-1229 (HB1229), codified at C.R.S. § 18-12-302 and attached hereto as Exhibit 3, dramatically expands firearms background checks to private sales and most temporary loans exceeding 72 hours, and requires that all such checks be conducted in-person at a gun store.

Both bills violate the Second and Fourteenth Amendments to the United States Constitution as well as the Americans with Disabilities Act (ADA). HB1224's purported justification for banning historically legal and popular arms used for core Second Amendment protection of hearth and home is based upon speculation that the statute would in fact enhance public safety. Criminalizing routine, non-sale transfers of firearms conducted without in-store processing, as HB1229 does, imposes a dramatic burden on the Second Amendment right to acquire a firearm with virtually no justification in the record for such a burden. Indeed, the record shows that HB1229 is so ineffective that it accomplishes the reverse of its purported objectives.

1

The applicable standards for assessing alleged violations of the Second Amendment are well-established. A court must first assess the burden a law places on Second Amendment rights. If the law burdens Second Amendment rights, then the government must satisfy, at a minimum, intermediate scrutiny and demonstrate the law advances the government's stated interest, and that the law is narrowly tailored.

Plaintiffs introduced evidence how HB1229 criminalizes routine firearm acquisition and how HB1224's ban on the use of sixteen-plus magazines in semiautomatic firearms (something that hundreds of thousands of Coloradans did routinely prior to its enactment) harmed lawful self-defense with no corresponding benefit to the public. The trial court discounted this evidence and upheld both measures – going so far as to question whether any party had standing to challenge either measure.

Plaintiffs respectfully submit that the trial court erred in both minimizing the burden on Second Amendment rights, and in failing to require the Defendant to meet his burden to justify infringing those rights. The trial court also erred by not requiring the Defendant to show that the stated objectives of these statutes cannot be achieved through less restrictive means. The trial court engaged in something akin to Justice Bryer's interest-balancing test expressly rejected in *Heller*, with the

corresponding inappropriate deference to the Colorado legislature and the Defendant. The trial court also completely misapplied the applicable ADA precedent, mishandled legislative history, and erred in addressing Plaintiffs' Fed. R. Evid. 702 motion.

Plaintiffs respectfully submit that the record below provides the basis for this Court to hold that both statutes violate the Second Amendment, either facially or as-applied.

## STATEMENT OF JURISDICTION

On June 26, 2014, the United States District Court for the District of Colorado entered a final judgment against Appellants and in favor of Defendant John W. Hickenlooper.  (Findings of Fact, Conclusions of Law, and Order[1]) Appellants filed a timely Notice of Appeal on July 28, 2014. (JA.7:1802) This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] The trial court's opinion is attached hereto as Exhibit 1. Citations to the opinion appear as "Op." followed by the page number. Citations to the Joint Appendix will appear as "JA" followed by the volume number and page number.

## <u>STATEMENT OF THE ISSUES</u>

1.      Did the trial court err in holding that HB1229 – which mandates full in-store processing for all private firearm transfers, including temporary transfers of more than 72 hours – does not violate the Second and Fourteenth Amendments?

2.      Did the trial court err in holding that HB1224 – which bans all magazines capable of holding more than 15 rounds – does not violate the Second and Fourteenth Amendments to the United States Constitution?

3.      Did the trial court err in holding that HB1224 and HB1229 do not violate Title II of the Americans with Disabilities Act?

4.      Did the trial court err in failing to rule on Plaintiffs' Joint Motion to Strike Expert Testimony pursuant to Fed. R. Evid. 702, where such failure has denied this Court the opportunity to gauge whether the District Court adequately performed its gatekeeping function?

5.      Did the trial court err in its application of constitutional scrutiny by considering evidence that was not presented to the legislature before it enacted the challenged statutes?

## STATEMENT OF THE CASE

On March 15, 2013, the Colorado General Assembly passed HB1224, which bans sixteen-plus magazines, with some limited exceptions. On March 18, 2013, the General Assembly passed HB1229, which requires that non-commercial sales of firearms, as well as loans lasting more than 72 hours and the return of loaned firearms, be conducted only after an in-store check where a gun store processes the transfer as if the store were selling the firearm from its own inventory.[2] Defendant signed both bills and they became effective on July 1, 2013.[3]

### A.    Pretrial Proceedings

Plaintiffs challenged both statutes as violating the Second Amendment as interpreted by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Plaintiffs also challenged HB1224's "grandfather clause" (permitting ownership of sixteen-plus

---

[2] The exceptions include antique firearms, transfers among immediate family members (but not in-laws or persons in the household including stepchildren), transfers by operation of law (*e.g.*, bequests), transfers that occur at a shooting range or at a shooting competition, "while hunting," and temporary transfers for firearms maintenance. (C.R.S. § 18-12-112(6)) Violation of HB1229 is punishable as a Class 1 misdemeanor and the person violating the statute is banned from possessing any firearm for two years.

[3] This Statement of the Case supports both this brief and the one filed in the companion appeal, No. 14-1292.

5

magazines so long as "continuous possession" is maintained) as unconstitutionally vague, and challenged both statutes under the ADA. (JA.1:43)

Plaintiffs included 55 of 62 Colorado Sheriffs, the Colorado Farm Bureau (over 23,000 members), the National Shooting Sports Foundation (a firearms trade association with over 11,000 members nationwide and over 400 in Colorado), citizens with physical disabilities, Outdoor Buddies (a nonprofit dedicated to giving disabled citizens access to the outdoors), licensed firearm dealers, the Colorado State Shooting Association, retired law enforcement officers, Magpul Industries (a magazine manufacturer), the Colorado Outfitters Association, Women for Concealed Carry, and Colorado Youth Outdoors (a nonprofit devoted to strengthening family relationships by teaching youth and families about outdoorsmanship and firearms).

In the wake of the legislation, the Attorney General (counsel for the Defendant) issued two "Technical Guidances." (JA.23:4964, 4967) They attempted to address obvious legal problems with the legislation. The Attorney General released the first one the day this lawsuit was filed. HB1224 not only bans sixteen-plus magazines but also magazines with a capacity of 15 or fewer rounds that are "designed to be readily converted" to sixteen-plus magazines. The import of this provision is to ban all magazines with a removable base plate because the potential

6

to remove the base plate and add an extender makes almost all magazines "readily convertible." The first Technical Guidance also attempted to clarify the grandfather clause that requires "continuous possession" of all sixteen-plus magazines owned pre-July 1, 2013, to maintain lawful ownership of them.

Plaintiffs moved for a preliminary injunction challenging the "designed to be readily converted" provision and the "continuous possession" mandate as violating the Second Amendment, despite the Attorney General's attempt to clarify the statute. (JA.1:227) The night before the scheduled hearing on July 10, 2013, Plaintiffs and Defendant agreed to additional language (originally proposed as a stipulation for court approval) and Plaintiffs agreed to withdraw their motion. (JA.9:556, 1859)

At the hearing, the trial court surprised both sides by declining to enter the stipulated order. (JA.9:1859) As a result, the parties agreed the proposed stipulated language would be included in the Attorney General's second Technical Guidance (JA.9:1873), which was released later that day.[4]

Defendant moved to dismiss the plaintiff Sheriffs in their official capacity and challenged the standing of all Plaintiffs to assert vagueness challenges to HB1224's "designed to be readily converted" language and "continuous

---

[4] The second Technical Guidance also has major flaws, particularly given that it contradicts the first Technical Guidance, which was not rescinded.

7

possession" requirement. (JA.3:639) The trial court granted Defendant's motion as to the "designed to be readily converted" language, finding that the Technical Guidances eliminated any genuine threat of prosecution for violating this provision, but denied Defendant's motion as to the "continuous possession" requirement, finding that any plaintiff who would be prevented from lending sixteen-plus magazines to family members had sufficient standing to assert the vagueness challenge. (JA.5:1041-48) The trial court granted Defendant's motion challenging the Sheriffs' standing in their official capacity. The court completely dismissed them from the case, even though the complaint had stated that all Sheriffs were suing in both their individual and official capacities, and Defendant had expressly disclaimed any challenge to individual capacity standing.[5] (JA.5:1048-55)

The trial court conducted a hearing on December 19, 2013, at which it allowed 11 Sheriffs to re-enter the case in their individual capacities by filing an amended complaint. (JA.9:1876, 1885-86) These Sheriffs were either term limited and/or had already announced that they would retire and thereby lose their partial law enforcement exemption under HB1224. Of note, counsel for the Defendant, in

---

[5] Plaintiffs challenged Defendant's reliance upon the Technical Guidances as a vehicle for "clarifying" the legislation to correct legal defects. Inter alia, they are not formally published and could be revoked by a new Attorney General.

arguing for allowing additional dispositive motions, acknowledged that a finding that magazines were "arms" under the Second Amendment, and were in "common use," would mean that "we probably lose, frankly." (JA.9:1896)

In the final pretrial conference (JA.9:1911), the trial court addressed the Defendant raising yet again the question of the Plaintiffs' standing. The court allowed Defendant to file another brief on the issue, but expressed skepticism at raising the issue again on the eve of trial. (JA.9:1915-16)[6]

### B.    Trial and the Trial Court's Decision

Trial was held March 31 through April 10, 2014. (JA.8:1838-54) Most of Plaintiffs' case focused on meeting Plaintiffs' burden to establish the statutes' impact on Second Amendment rights as outlined in Plaintiffs' pretrial brief. Much of this evidence was not addressed by the trial court's decision – especially evidence related to HB1229's requirement for in-store processing for temporary transfers exceeding 72 hours – including the return of such firearm.

The parties stipulated to the admission of the legislative history related to both bills. (JA.22:4665, 5530-5629) Plaintiffs argued that the Defendant could not rely on evidence outside the legislative history to meet his burden to establish the

---

[6] The trial court's decision and its discussion of standing were, to say the least, a surprise to Plaintiffs – especially in light of the December 19 ruling on the 11 Sheriffs and the bases for their being allowed in the case.

state interests to be achieved and the necessary fit between the statutes and those interests. The trial court agreed with limiting the stated interests to the legislative history, but allowed the Defendant to rely on evidence introduced at trial that the legislation advanced those interests. Thus, almost none of the State's evidence had been considered by the General Assembly.

### 1.    HB1229

Before HB1229, full background checks (in-person, in-gunstore, completion of extensive forms, and approval from the Colorado Bureau of Investigations prior to consummation of sale) were required for firearms purchased commercially and for firearms purchased at gun shows. HB1229 expanded in-store processing to not just private sales, but to every temporary transfer of a firearm exceeding 72 hours (with narrow exceptions). C.R.S. § 18-12-112(1) to -112(5) Under HB1229, routine loans of firearms to friends and participants in an array of shooting programs and activities must go through in-store processing first, ***and*** the same in-store processing is required when these firearms are returned to their original owners. *Id.* At trial Plaintiffs demonstrated the burden this places on acquiring a firearm for lawful purposes. The trial court disregarded this evidence to such an extent that it questioned whether any Plaintiff had standing to challenge HB1229.

(Op.19) A brief summary of the evidence related to just two organizations demonstrates otherwise.

Bob Hewson, the Executive Director of Colorado Youth Outdoors (CYO), testified that CYO routinely loans firearms to youths and their parents to teach them safety and proficiency in firearm use, while also providing instruction and events for novices. CYO serves over 10,000 youth and family members each year. (JA.10:1966)

HB1229 threatens CYO and Hewson individually in a number of specific ways. First, firearms are routinely transferred among staff and volunteers. (JA.10:1974) HB1229's requirement for full in-store checks before firearms are transferred among CYO staff and volunteers (and upon return) imposes a huge, needless burden which has already threatened the organization. (JA.10:1991) CYO operates two "core-curriculum" shooting programs, one based in Loveland and the other in Colorado Springs. (JA.10:1965) In the wake of HB1229's effective date, CYO attempted to transfer firearms from Loveland to Colorado Springs. (JA.10:1974-76) Upon discovering exposure under HB1229, CYO contacted the El Paso County Sheriff who instructed the Colorado Springs instructor to attempt to obtain an in-store check. (JA.10:1976) CYO could not find a licensed gun store to

perform the necessary background check to transfer the firearms from one CYO program to the other. (JA.10:1975-82)

Second, CYO "owns" 22 shotguns and 14 rifles. (JA.10:1958) Under HB1229, it is unclear whether Hewson is the "transferor" or the "transferee" for firearms acquired by CYO under HB1229. (JA.10:1962-63) In-store processing requires the naming of an individual for purposes of filling out the necessary forms, yet the owner of the firearms is CYO. At the time of trial, a shipment of firearms was being held by the gun store with which Hewson and CYO routinely dealt because of concerns about who the "transferee" would be under HB1229 for firearms that belonged to CYO. (JA.10:1963)  That gun store, moreover, will not even perform in-store processing for private, non-sale transfers.  (JA.10:1976)

Third, HB1229 has effectively halted CYO's sharing of its firearms with other firearms-related organizations.  In one situation, CYO loaned firearms to the Loveland Police Department. (JA.10:1991-94) When it came time to return the firearms to CYO, it became apparent that HB1229 probably required a background check,[7] which was resolved only when the Chief of Police and District Attorney

---

[7] As described in Part V.A.2 of the Sheriffs' brief, HB1229 has no exemption allowing for the acquisition or transfer of firearms by law enforcement (even temporarily in the line of duty), triggering the same mandatory in-store check on the police officers as with any private individual.

expressly declined to prosecute any violations. (JA.10:1993-94) Fourth, firearms are routinely loaned to CYO's program participants.   While the transfers sometimes fall within the exceptions to obtaining a full in-store check, the exceptions often do not apply.  (JA.10:1967-72)

On cross-examination, Hewson was asked questions about transfers related to CYO's programs, and the trial court advised Hewson about a potential self-incrimination risk related to his answers. (JA.10:2018-20, 2031)[8]

Farmers and ranchers represented by the Colorado Farm Bureau (CFB) are also adversely impacted by HB1229. CFB testified through Nick Colglazier, a farmer who testified about his personal experience and as CFB's Director of Public Policy, State Affairs.

Firearms are routinely transferred among workers on farms and ranches as part of normal operations.[9] (JA.12:2552-61) In order for a farmer or rancher to

---

[8] The trial court felt compelled to ensure that Hewson understood the potential consequences of testifying about potential violations. (JA.10:2019) Yet, the trial court disregarded the obvious burden the statute imposed on him.

[9] In footnote 14 of its opinion, the trial court opined that there was no testimony by any organization involving firearm acquisition by its members.  This is incorrect. Colglazier's testimony involving farmers and ranchers (JA.10:2252-61), Dahlberg's testimony about Women for Concealed Carry members (JA.11:2221), and Hewson's testimony about CYO participants (JA.10:1974-76), all relate to individual members acquiring a firearm, not the organizations themselves. Similarly, in footnote 13, the trial court questions whether the Second Amendment

13

lend a firearm to an employee, both of them must travel to a gun store willing to provide in-store processing for private transfers. The same process must be repeated when the employee returns the firearm. Most farming and ranching operations require long hours just to perform the necessary work, and they are an hour or more away from the nearest town and gun store. Significantly, in many rural areas of Colorado, there are no gun stores even willing to process private temporary transfers. (JA.12:2562-64)[10] The exceptions in HB1229 do not ameliorate the burdens it places on Colorado's farmers and ranchers. (JA.12:2563-68)[11]

The record lacks any evidence justifying the burden placed on private *transfers* as opposed to private *sales*. The trial court relied only on evidence

---

protects "the right of an owner of a firearm to lend" a firearm. However, the thrust of Plaintiffs' case on HB1229 is plainly about both loaning and acquiring firearms.

[10] Two Plaintiff FFLs testified to the negative impact HB1229 has on their operations – especially HB1229's $10 cap on the amount a federally licensed gun store can charge for performing a private background check. (JA.13:2633-37, 2688-89)

[11] Colglazier also testified how the Colorado Bureau of Investigation's (CBI's) electronic background check system could be expanded to make background checks for private sales less burdensome – a less restrictive alternative.

related to private *sales*. (Op.39) There is no evidence to support the imposition of the burden caused by background checks for any transfer over 72 hours.[12]

### 2. HB1224

HB1224 prohibits acquisition of sixteen-plus magazines after July 1, 2013, with exceptions for certain classes and a grandfather provision that allows existing owners to possess them if they maintain "continuous possession."[13] The following facts were stipulated to and undisputed:

> 10. . . . Although the total number is not known, the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions.

> 19. Semi-automatic firearms equipped with detachable box magazines with a capacity greater than 15 rounds *are used for multiple lawful purposes*, including recreational target shooting,

---

[12] The trial court stated: "Ronald Sloan, the Director of the Colorado Bureau of Investigation, testified that background checks on private *transfers* are denied at a rate as high, if not higher than, the denial rate of sales at retail or gun shows." (Op.39 (emphasis added)). In fact, the trial court appears to have referred to the wrong witness. The only evidence that could support such a statement came from James Spoden. However, his testimony and exhibits do not break down background check data for the type of temporary transfers at issue that Plaintiffs challenge here. Indeed, Spoden acknowledged that he was not aware of any such data. (JA.14:3037) Defendant relied upon one national expert (Webster) to try to establish the importance of background checks on private sales. He did not address temporary transfers. (*See, e.g.,* JA.15:3153-54)

[13] The principal arguments involving HB1224 are in the Sheriffs' brief. This section of the statement of the case is included so that the Court has one statement of the case involving both related appeals.

competition shooting, collecting, hunting, and ***are kept for home defense and defense outside the home***.

22.     ***Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15*** . . . .

(JA.6:1502-04) (emphasis added)

In addition, three witnesses testified who use sixteen-plus magazines for the core Second Amendment right of self-defense in their homes. Plaintiffs Dylan Harrell and David Bayne are paraplegics who use wheelchairs. Both testified that they use standard, factory-supplied sixteen-plus magazines for defense of themselves and their families.[14] Harrell testified that he would be at a significant disadvantage confronting one or more home intruders because he cannot flee; because of muscle weakness, he must lay a firearm in his lap in order to change a magazine. (JA.11:2248-49) He keeps an AR-type semiautomatic rifle in a gun safe next to his front door with a 40-round magazine, and a standard 17-round handgun in a safe in his bedroom. (JA.11:2245-47) Being forced to change magazines while in his wheelchair would render him defenseless. (JA.11:2250-51)[15] Bayne offered similar testimony. (JA.12:2587)[16]

---

[14] Bayne moved from Colorado before trial. This does not diminish his testimony about HB1224's impact on persons with disabilities.

[15] Harrell testified as an individual plaintiff and as an officer of Outdoor Buddies. He testified about the impact HB1229 would have on Outdoor Buddies' highly

16

Elisa Dahlberg testified on behalf of Women for Concealed Carry. She became proficient with firearms as an Air Force M.P. and with the Aurora Police Department. (JA.11:2212) She uses a Smith & Wesson M&P 9 millimeter, a semiautomatic handgun that came with three standard 17-round magazines. (JA.11:2214) She uses it for self-defense in her home, and keeps it in a safe next to her bed. *(Id.)* She also uses two Smith & Wesson AR-type firearms with 30-round magazines for home defense. (JA.11:2212-17)[17]

Most of the remaining testimony on HB1224 was from experts. Plaintiffs' expert Michael Shain demonstrated that magazines are an integral part of semiautomatic firearms, and Massad Ayoob testified about the importance of sixteen-plus magazines in defensive gun use – especially for persons with physical

---

specialized firearms used for persons with disabilities, and the need to transfer them for more than 72 hours. (JA.11:2239-41) He also testified about his personal experience having difficulty locating an FFL willing to process his in-person/in-store check so that he could sell a firearm to another individual. (JA.11:2244)

[16] Expert witnesses for both sides acknowledged that a potential victim is defenseless during the time it takes to change a magazine. (JA.11:2289-90, 2292-94; JA.16:3475, 3486; JA.17:3553, 3555)

[17] Dahlberg testified that the 17-round magazines are important to her because they were made by the manufacturer and are extremely reliable, making her safer in a self-defense situation. (JA.11:2216) She could not obtain HB1224-compliant magazines from the manufacturer because of consistent unavailability (JA.11:2217) – contrary to the trial court's assertion. (Op.28) The trial court found that Dahlberg/Women for Concealed Carry was the one person/organization with standing to challenge HB1224. (Op.12-13)

17

disabilities. He explained why this is so even though firing 16 or more shots is rare. (JA.11:2314)

Defendants relied primarily upon expert testimony to defend HB1224. John Cerar (a consultant and former N.Y.P.D. officer) opined that sixteen-plus magazines were not "necessary" for self-defense. (*See* JA.16:3375) Douglas Fuchs (Police Chief in Redding, Connecticut) opined "that the more often an armed assailant, mass shooter, active shooter, has to exchange magazines . . . that gives civilian and law enforcement the opportunity to take action." (JA.16:3480)[18]

Jeffrey Zax, an economist, opined that banning sixteen-plus magazines would reduce their availability by making them "more costly to acquire," (JA.17:3589) and introduced a statistical analysis he performed involving confiscated magazines of more than 10 rounds in Virginia. He testified that in most "violent interactions," a firearm's reserve capacity is very important, even though people rarely fire all the shots they could. (JA.17:3657-60)

Despite HB1224's ban of magazines that traditionally have been both legal and preferred by millions nationwide, the trial court found that HB1224 imposed very little burden on Second Amendment rights. The court acknowledged that

---

[18] The trial court did not expressly address Plaintiffs' 702 objections, making it impossible to determine whether evidence was admissible or not. Accordingly, there is an inadequate record on which to base an appellate challenge.

HB1224 "affect[s] the use of firearms that are both widespread and commonly used for self-defense," but concluded that "people can [still] adequately defend themselves" and therefore the burden on Second Amendment rights "is not severe." (Op.27-28) The trial court found that there was "no showing of a severe impact on the defensive shooter" caused by HB1224.

The trial court found that HB1224's ban on sixteen-plus magazines was substantially, and equally, related to reducing the number of shots fired by criminals and by lawful defenders. (Op.28) The court also credited Fuchs' and Cerar's testimony that a "critical pause" could give potential victims an opportunity to act or escape, or to allow law enforcement to act.[19]

The trial court rejected Plaintiffs' evidence and argument that HB1224 would do more harm than whatever evidence of good Defendant had mustered. (Op.35)

3.    **Vagueness and ADA**

---

[19] The trial court did not specifically find that banning sixteen-plus magazines would in fact lead to more "critical pauses." Indeed, in rejecting Plaintiff's evidence related to impact on the ***defensive*** use of sixteen-plus magazines, the trial court observed: "there are too many external variables to permit a conclusion that pauses effectively compelled on both sides are necessarily better or worse than having no such pauses on either side." (Op.34) As shown below, the evidence on "critical pauses" introduced by the Defendant was discredited at trial.

The trial court rejected Plaintiffs' vagueness and ADA claims. On vagueness, the trial court required Plaintiffs to show that "continuous possession" was unconstitutionally vague in all applications and held that Plaintiffs failed to meet that test. Plaintiffs in closing argument had stated that "continuous possession," if construed according to the second Technical Guidance (while ignoring the first Technical Guidance) was not vague in some applications (magazine rentals at a firing range) and was vague in other applications (long-term family sharing).

As for the ADA, the trial court rejected Plaintiffs' disparate impact claim that relied upon the impact on disabled shooters such as Dylan Harrell, David Bayne, and Outdoor Buddies' members. The court rejected as a matter of law that HB1224, a statute, could be challenged under the ADA, and characterized Plaintiffs' evidence as insufficient.

## SUMMARY OF ARGUMENT

HB1229 and HB1224 are unconstitutional under the Second and Fourteenth Amendments. The Defendant failed to establish the theoretical benefits purportedly advanced by either statute. The Defendant also failed to demonstrate that the means chosen to achieve those theoretical benefits actually work to achieve those

benefits – whether this Court applies strict scrutiny, intermediate scrutiny (properly defined) or something in between.

The trial court erred in other material ways. It failed to perform the necessary gate-keeping function under Fed. R. Evid. 702 and admitted speculative evidence, including and especially evidence that supported the Defendant's claim about the benefit of a "pause" and its significance to HB1224. The trial court also erred in finding Plaintiff Federally Licensed Firearms Dealers (FFLs) lacked standing, applied an incorrect test to Plaintiffs' ADA Title II claim, and misapplied the test for assessing legislative history when a fundamental right is at issue.

## ARGUMENT

## I. SEVERAL RECENT FEDERAL COURT DECISIONS HAVE APPLIED RIGOROUS LEVELS OF SCRUTINY TO FIREARMS LAWS APPLICABLE TO LAW-ABIDING CITIZENS

Since *Heller* and *McDonald*, federal courts have almost universally adopted a First Amendment framework for analyzing Second Amendment rights, based in part on *Heller* itself. *E.g.,* 554 U.S. at 634-35; David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 TENN. L. REV. 417, 427-32 (2014).

Several recent decisions in other circuits describe the rigor with which courts should examine laws that burden the arms-bearing rights of law-abiding citizens.

21

Most recently, the Sixth Circuit applied strict scrutiny to determine whether a federal statute prohibiting the possession of firearms by individuals who have been committed to a mental institution violated the Second Amendment, as applied to an individual who had had no problems since a brief suicidal episode decades earlier. *Tyler v. Hillsdale County Sheriff's Dep't*, -- F.3d --, 2014 WL 7181334 (6th Cir. Dec. 18, 2014).

In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Seventh Circuit invalidated a Chicago ordinance that banned shooting ranges. The court required "a more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny.'" *Id.* at 708.

The Ninth Circuit in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), addressed the county's interpretation of the State's "good cause" requirement for obtaining a concealed carry permit. The county rejected all permit applicants whose "good cause" was the mere desire for self-defense, without some showing of a specific threat. *Id.* at 1148. In invalidating the county's interpretation, the court concluded that the Second Amendment protects the right of responsible, law-abiding citizens to bear arms outside the home for self-defense. *Id.* at 1173. The Ninth Circuit's opinion contains a critique of other circuits (in particular, the Second, Third, and Fourth Circuits) whose Second Amendment analyses have

22

adopted exactly the approach advocated by Justice Breyer's *Heller* dissenting opinion, but rejected by the *Heller* majority:

> All three courts referenced, and ultimately relied upon, the state legislatures' determinations weighing the government's interest in public safety against an individual's interest in his Second Amendment rights to bear arms. . . . [S]uch an approach ignores the *Heller* court's admonition that "the very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."

*Id.* at 1176-77 (quoting *Heller*, 554 U.S. at 634).

Finally, the Eastern District of California recently held that a statute imposing a 10-day waiting period between purchase and delivery of a firearm violated the Second Amendment as applied to the plaintiffs. *Silvester v. Harris*, -- F. Supp. 2d --, 2014 WL 4209563 (E.D. Cal. Aug. 25, 2014), *appeal docketed*, No. 14-16840 (9th Cir. Sept. 25, 2014). The court addressed at length the Second Amendment burdens imposed upon the plaintiffs, *id.* at *10, 27-28, and the court's discussion of those burdens is instructive for the purposes of evaluating the burdens imposed in the instant case, which are described in Section IV.A, *infra*.

## II.    PLAINTIFFS ASSERTED AS-APPLIED CHALLENGES TO THE STATUTES

The trial court assumed that Plaintiffs assert only facial challenges to HB1229 and HB1224 (Op.8 n.8, 38), but that assumption is belied by case law and Plaintiffs' complaint. First, this Court has recognized that constitutional claims can

contain both as-applied and facial challenges. *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011).

Second, in *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010), the Court stated that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Id.* at 331. Thus, this Court has "recognized that for both facial and as-applied challenges, 'the relevant constitutional test . . . remains the proper inquiry.'" *Olson v. City of Golden*, 541 Fed. Appx. 824, 830 (10th Cir. 2013) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012)).

Third, the complaint makes plain that, with respect to HB1229, Plaintiffs asserted an as-applied challenge. Paragraph 197 of the Fourth Amended Complaint alleges that "[t]he prohibition of non-commercial, ***temporary transfers*** is an infringement of the Second Amendment." (Emphasis added.) And as the trial court acknowledged, Plaintiffs "focus their challenge on the effect of the statute on *temporary* transfers, when ownership of the firearm does not change." (Op.36) This underscores that the challenge is, in part, as-applied. Plaintiffs challenged the portion of HB1229 that, in light of their particular circumstances, burdens their ability to acquire firearms via temporary transfers.

Fourth, an individual need not violate the law and risk prosecution in order to challenge it. *Ezell,* 651 F.3d at 695. This is true whether the challenge is as-applied or facial. *E.g., American Civil Liberties Union v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) (allowing as-applied pre-enforcement challenge); *see also* Gillian E. Metzger, *Facial and As-Applied Challenges Under the Roberts Court*, 36 FORDHAM URB. L.J. 773, 785 (2009) (the Roberts Court has employed "a quite broad understanding of what constitutes an as-applied challenge," and has allowed challenges to be brought pre-enforcement).

There is always some uncertainty in a pre-enforcement challenge, but that uncertainty only precludes such a challenge if it undermines the credible threat of prosecution. *Alvarez*, 679 F.3d at 594. In this case, the district court demonstrated there was a credible threat of prosecution when it advised counsel to instruct a witness of his Fifth Amendment rights in response to a question about CYO's transfer of firearms to class participants off the organization's property. (JA.10:2018-19)[20]

## III.    A HIGHER LEVEL OF SCRUTINY IS REQUIRED THAN THE DEFERENTIAL REVIEW APPLIED BY THE TRIAL COURT

---

[20] At a minimum, and on this record, CYO is entitled to as-applied relief for the routine transfers it makes as part of its ongoing programs (most especially intra-organizational transfers), and Outdoor Buddies is entitled to as-applied relief for the transfer of its specialized firearms for members and participants.

25

The Tenth Circuit follows the two-step analysis most circuits have adopted for Second Amendment challenges. This Court must first consider whether the law burdens Second Amendment rights. *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010). "If it does, the court must evaluate the law under some form of means-end scrutiny." *Id.* The trial court purported to apply intermediate scrutiny, but did not follow its requirements.

### A.    Strict Scrutiny Is the Appropriate Standard

There are several reasons to apply a higher level of scrutiny in this case. First, unlike other firearms laws this Court has examined, HB1229 and HB1224 are laws of general applicability that apply to every law-abiding citizen. *See, e.g., Reese*, 627 F.3d at 800-01 (persons subject to domestic protection orders); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1165 (10th Cir. 2012) (illegal aliens). Where a statute burdens the rights of law-abiding citizens,[21] it is closer to the core of the Second Amendment right and therefore deserving of a higher level of scrutiny. *See Tyler*, 2014 WL 7181334, at *24-25 (cases in which the challenged laws concern non-law-abiding citizens are "one step removed from the core constitutional right"); *Ezell*, 651 F.3d at 703 ("plaintiffs *are* . . . 'law-abiding,

---

[21] The Second Amendment protects a personal right to keep and bear arms, but the right is not limited only to self-defense. *McDonald*, 561 U.S. at 780 ("Second Amendment protects a personal right to keep and bear arms…***most notably*** for self-defense within the home").

responsible citizens' . . . and their claim comes much closer to implicating the core of the Second Amendment right" (emphasis in original)).

Second, the Supreme Court has indicated that there is a presumption in favor of strict scrutiny when a fundamental right is involved. *E.g., Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *Tyler*, 2014 WL 7181334, at *15. Because the Second Amendment right is fundamental, *McDonald*, 561 U.S. at 778, and the statute in this case implicates law-abiding citizens, strict scrutiny is appropriate.

Third, in assessing the fit between a challenged firearms law and its purported objectives, courts applying intermediate scrutiny tend to unduly defer to the judgments of the legislature. *E.g., Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (deferring to state legislature's "belief" that regulation of handgun possession would have "an appreciable impact on public safety and crime prevention"). However, as the Ninth Circuit pointed out in *Peruta*, 742 F.3d 1144, such an interest-balancing approach "is near identical to the freestanding 'interest-balancing inquiry' that Justice Breyer proposed – and that the majority explicitly rejected – in *Heller*." *Id.* at 1176; *see Heller*, 554 U.S. at 636 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table").

Even if this Court deems strict scrutiny inapplicable to HB1229 and HB1224, intermediate scrutiny is not the only remaining option. In *Ezell*, for example, the Seventh Circuit applied a standard it deemed "not quite strict scrutiny." 651 F.3d at 708.[22] Under that standard, the court inquired whether there was a "close fit" between the statute and the actual public interests it serves. *Id.* at 709; *see also Tyler*, 2014 WL 7181334, at *11 ("intermediate and strict scrutiny are not binary poles in the area of heightened scrutiny").

## B. Even Under Intermediate Scrutiny, a Statute Must Advance the State's Interest in "a Direct and Material Way"

Although strict scrutiny is the appropriate test, the same result obtains under intermediate scrutiny. Intermediate scrutiny requires the government to prove an important governmental objective and a "substantial relationship" between that objective and the restriction at issue. *Reese*, 627 F.3d at 802. Other courts have stated that the government's stated objective must be "significant, substantial, or important," and that there must be a "reasonable fit" between the challenged regulation and the asserted objective. *Id.* at 803-04.

Although intermediate scrutiny only requires the fit to be "reasonable," not "perfect," it still demands that the government show that the regulation will

---

[22] *Ezell* involved prohibitions on firing ranges. The regulations/prohibitions at issue here much more directly impact core Second Amendment rights.

alleviate the asserted harms "to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993), quoted in *Silvester*, 2014 WL 4209563, at *27. In other words, the challenged regulation must advance the Government's interest in "a direct and material way." *Edenfield*, 507 U.S. at 771; *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995).

Under the intermediate scrutiny standard, then, a restriction "may not be sustained if it provides ***only ineffective or remote support*** for the government's purpose." *Edenfield*, 507 U.S. at 770 (emphasis added); *see also Silvester*, 2014 WL 4209563, at *27 (applying *Edenfield* in Second Amendment challenge).

As discussed in Section IV.B.2., the record in this case established that HB1229 is so ineffective that it actually accomplished the reverse of the General Assembly's purported objective in passing the law; background checks decreased. With respect to HB1224, as explained in the Sheriffs' opening brief and below, it is far too sweeping to reasonably fit the State's asserted objectives.

## IV.    THE COURT ERRED IN CONCLUDING THAT HB1229 DOES NOT VIOLATE THE SECOND AMENDMENT

### A.    HB 1229 Burdens Second Amendment Rights

HB1229 is very broad, requiring every law-abiding citizen who acquires a firearm for more than 72 hours to travel with the owner and together obtain a formal background check in the presence of an FFL gun store. The store has no

legal obligation to process the transaction, and if it does, it may charge no more than a $10 fee. When the firearm is returned, everyone must repeat the process.

Requiring background checks in such a broad, all-encompassing manner is absurd and cannot survive even intermediate scrutiny. *Ezell*, 651 F.3d at 703.

### 1.    HB1229 burdens the acquisition of firearms

The trial court expressed "grave doubt" about whether HB1229 implicates the Second Amendment at all, perhaps based on the premise that Plaintiffs only intend to loan firearms. (Op.37) Plaintiffs proved, however, that HB1229 impacts citizens' ability to ***acquire*** firearms in a myriad of circumstances.[23] Every transfer involves someone acquiring a firearm: for example, a farmhand acquiring a rifle to protect a farm (JA.12:2552), or a woman obtaining a loaned handgun to protect herself in a domestic violence situation (JA.11:2221). The ability to acquire firearms is at the core of the Second Amendment right: "One cannot exercise the right to keep and bear arms without actually possessing a firearm." *Silvester*, 2014 WL 4209563, at *27; *see also Ezell*, 651 F.3d at 704 (the right to possess arms for protection implies a corresponding right to acquire them).

---

[23] *See also, e.g.*, JA.10:1962-63 (discussing CYO's difficulties with acquiring new firearms due to HB1229); JA.11:2239-40 (discussing impact of HB1229 on the ability of individuals to acquire firearms modified to accommodate disabilities).

30

The trial court also incorrectly concluded that HB1229 made it no more difficult to acquire firearms in private transfers than to acquire them in commercial sales. (Op.37) In the case of a commercial purchaser of a firearm, a buyer is in the presence of the retailer, who is happy to fill out the various required federal forms and records, conduct the background check and include the costs in the purchase price. Thus, the paperwork and background check are completed in the same place where the transaction itself takes place. However, a temporary transfer is unlikely to take place anywhere near a gun store that can conduct a background check – even if the nearest gun store were willing to perform it.[24] HB1229 thus imposes additional burdens that are not present in commercial transactions.

### 2.    HB1229 burdens the ability of non-profit organizations and their members to acquire firearms

Several Plaintiffs are non-profit organizations dedicated to teaching firearms safety and facilitating access to hunting and shooting sports in general. HB1229 does far more harm than simply imposing an administrative burden on these organizations. It threatens their ability to carry out their missions, and therefore has significant societal impacts.

---

[24] Plaintiffs' evidence at trial that large numbers of FFLs in Colorado are refusing to perform background checks for private transfers was not rebutted. (JA.12:2562-64; JA.13:2633-37, 2688-89) Gun store owner Tim Brough testified: "I don't believe any FFLs, including Cabelas, the box stores, mom and pop shops, I don't think anybody is doing private party background checks." (JA.13:2637)

Plaintiff Harrell testified that Outdoor Buddies owns very specialized and modified firearms that allow disabled individuals to engage in recreational activities such as hunting and target shooting. (JA.11:2239) For example, Outdoor Buddies has firearms modified to allow amputees or quadriplegics to aim and fire using a breath-activated trigger. (JA.11:2240) Such modified firearms frequently change hands for more than 72 hours, which triggers the in-store processing requirement in virtually every instance. (*Id.*) The burden of requiring in-store processing for each transfer is significant, particularly for a non-profit organization. Moreover, HB1229 burdens not just the organization, but also its members, whose ability to ***acquire*** the modified firearms is hampered by the need to accompany the transferor to a gun store.

Another aspect of HB1229 further burdens non-profit organizations. Subsection 1(b) requires that the transfer of a firearm to a corporate entity requires in-store processing for every individual who ***may*** possess the firearm. In the case of CYO, the universe of officers, employees, and class participants who may come into possession of a CYO firearm is large – each requiring separate in-store processing. (JA.10:1962) At the time of trial, CYO had paid for firearms which it still had not taken possession of, because of the concerns with HB1229. (JA.10:1963) HB1229 harms the right of nonprofit organizations, including CYO,

32

to acquire firearms – thereby impacting Colorado youth who will have fewer opportunities to learn the skills necessary to responsibly handle firearms.

### 3.    HB1229 inconveniences citizens in ways that other courts have viewed as Second Amendment burdens

When two participants to a private firearm transaction – many of whom live in rural areas – must wander off together in search of a gun store willing to conduct a private background check, it imposes significant costs. (JA.12:2563) Other courts have found such costs to constitute a Second Amendment burden: "The multiple trips required to complete a transaction can cause disruptions in work and personal schedules, extra fuel expense, and wear and tear on a car depending upon where a firearm or a firearms dealer is located in relation to the purchaser." *Silvester*, 2014 WL 4209563, at *10.

### 4.    HB1229 disincentivizes FFLs from doing private background checks, further adding to the burden

Nothing in HB1229 *requires* an FFL to conduct an in-store check. Two FFL Plaintiffs testified that their gun stores would not do checks for private sales, loans, or returns of loans because the $10 fee cap is less than the cost to provide such services. (JA.13:2633-37,  2688-89) Processing requires logging the firearm into an Acquisition and Disposition record book, supervising the recipient filling out of

17 questions and multi-item fields in ATF Form 4473, then him- or herself filling out at least 13 fields in the same form. After the FFL contacts the CBI by phone or internet and, after waiting, receives approval to go ahead with the transfer, the FFL must then log the disposition in the Acquisition and Disposition record book. Beyond the federal requirements, the dealer must also keep records of the buyer's "occupation," and or the gun's caliber and finish.  C.R.S. §§ 12-26-102, 18-12-112(2)(b) The labor costs of all this are considerably more than the $10 statutory cap, and a mistake by the FFL could result in non-renewal of its license. (JA.13:2633-37, 2688-89)

The record shows that large numbers of FFLs are refusing to process private transfers. Hewson, for example, encountered two FFLs who refused to do the checks for a transfer between CYO's Loveland facility and its Colorado Springs location. (JA.10:1975-76) Plaintiff Harrell testified it took three weeks to conclude a sale because the first two FFLs he approached refused to do the required check. (JA.11:2244) Michele Eichler, who owns and operates an outfitting business, testified that the firearms retailer in Trinidad, Colorado, from which her business regularly purchases firearms, refused to process private transfers. (JA.13:2740)

Defendant did not rebut this testimony. Indeed, Ronald Sloan, the head of CBI, which runs the State's background check system, admitted that his office had

34

received complaints from citizens who were having difficulty finding FFL's to process private transfers. (JA.14:3076)

The trial court disregarded this evidence, concluding that more than 600 FFL's were "actively performing" private background checks. (Op.38) The record does not support this finding. CBI's James Spoden testified that 635 FFL's reported running a private background check "of any type" between July 2013 and February 2014. (JA.14:3014-15; JA.24:5108) Spoden conceded, however, that the 635 figure included "private sales at gun shows, private sales at non-gun shows, private sales between two individuals, [and] private sales interstate." (JA.14:3014) Spoden readily admitted that there was no way to tell how many of those 635 FFL's had processed private transfers now mandated by HB1229 (intrastate private sales or loans, not taking place at a gun show), and no way of finding out. (JA.14:3037)

> **5.    The trial court implicitly held that HB1229 burdens citizens when it gave a Fifth Amendment instruction to one of Plaintiffs' witnesses**

Finally, the burden of HB1229 on law-aiding citizens was demonstrated by the trial court's instruction to counsel to advise Hewson of his Fifth Amendment rights in connection with a question about whether CYO made loans of firearms to class participants off of CYO property. (JA.10:2018-19) Hewson's potential

35

criminal exposure manifests HB1229's burden on his Second Amendment rights. *See Reese*, 627 F.3d at 801 ("there is little doubt" that the challenged law burdened Second Amendment conduct by criminalizing the possession of otherwise legal firearms).

### B.    The State Failed to Carry Its Burden on the Second Step of the *Reese* Analysis

The trial court's analysis of the second step was flawed. First, the court found the legislature had engaged in "reasoned analysis" in concluding that it was necessary and beneficial to require in-store processing for private *transfers* – although the evidence considered by the legislature and produced by Defendant exclusively involved private *sales*. Second, the trial court concluded that Defendant had carried his burden of showing a reasonable fit between the statute and its asserted objective – even though the statute actually accomplished the opposite of its purported objective.

#### 1.    The trial court's analysis of the State's purported objective mirrored the State's defective evidence on that point

Under heightened scrutiny, the first step is to assess whether the State has identified an "important" or "compelling" governmental interest that the statute addresses. The important/compelling distinction is less relevant in the Second Amendment context, because the government's stated interest almost always has

something to do with preventing violent crime, injury, or death. *Tyler*, 2014 WL

7181334, at *18.

Yet, even on this point, the trial court's assessment was flawed. The trial

court devoted a single paragraph to HB1229's purported objective:

> The Court first looks to Colorado's asserted objective in passing § 18-12-112. Colorado asserts that the objective in passing the statute was to ensure public safety and aid in crime prevention by closing a loophole in the background check statutes applicable to gun sales by dealers and at gun shows. The General Assembly considered evidence that almost 40% of **gun purchases** are made through **private sales** in person or over the internet; 62% of **private sellers** on the internet agree to **sell to buyers** who are known not to be able to pass a background check; and 80% of criminals whose use guns in crime acquired one through a **private sale**. The General Assembly also considered evidence that a high percentage of gun crimes are committed by individuals with prior arrests or convictions, which would trigger a denial in a background check, and that closure of the loophole would reduce the number of firearms that are easily passed into the trafficking market and made more accessible for use in crime. The Court finds that the General Assembly used **reasoned analysis** in concluding that it was **necessary and beneficial** to require background checks for **private transfers** of firearms to help prevent crime and improve public safety, both important governmental interests.

(Op.38-39 (emphases added)) The trial court relied upon evidence concerning

private **sales** – the only kind adduced by Defendant[25] – and leapt to the conclusion

---

[25] Regarding actual private sales, the only evidence that restrictions on them really do advance a state interest came from Webster. (Op.39-40) All of his evidence was seriously flawed. Inter alia, Webster admitted at trial that his data tables contained hundreds of errors, because his assistant had transposed some columns, resulting in the wrong numbers being attached to the wrong states. (JA.13:3213-17;

that the State engaged in "reasoned analysis" that it was "necessary and proper" to

extend in-store processing to all private *transfers* without evidentiary support.

### 2. HB1229 does not advance the State's interest "in a direct and material way"

The State has not carried its burden of showing a close or reasonable fit

between the statute and the public interests it was intended to serve. First, as

demonstrated above, the only evidence in the legislative history or adduced at trial

related to private sales, not private transfers. Accordingly, Defendant failed to meet

his burden under the second step as related to private transfers.

---

JA.26:5459-5512) (Webster data tables, showing that some begin with Alabama, some begin with Missouri, and that data were transposed between the two, with Missouri data thus being associated with Alabama; Alabama data being associated with Alaska, and so on).

Webster had also studied firearms trace reports from the Bureau of Alcohol, Tobacco, Firearms & Explosives. His use of the traces to draw broad conclusions about the patterns of how criminals acquire guns was contrary to a congressionally-mandated warning that appears on the cover of every ATF trace report: "Law enforcement agencies may request firearms traces for any reason. The firearms selected do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals or any subset of that universe. Law enforcement agencies may request firearms traces for any reason. Firearms are normally traced to the first retail seller, and the sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime." (JA.13:3160-61; Pub. L. No. 113-6, Consolidated and Further Continuing Appropriations Act, 2013, § 514)

Second, HB1229 was premised on closing a supposed loophole in the State's background check system for private sales of firearms. Presumably, HB1229 should result in a large increase in private background checks once private sales and transfers are added. According to evidence cited by the trial court, HB1229 should have resulted in a 67% increase in background checks, just taking actual *sales* into account. (Op.39) HB1229's inclusion of an unknown quantity of temporary transfers should have increased background checks by vastly more than 67%. The evidence shows, however, that HB1229 resulted in a decrease in the number of background checks.

Trial exhibit 24 (attached hereto as Exhibit 4) is a monthly breakdown of private background checks in Colorado between July 2012 through December 2013. (JA.14:3022) Exhibit 24 contains two rows: one row of data for gun show private background checks, and another row for non-gun show private background checks. Prior to HB1229, non-gun-show private checks would have included only private interstate sales which (ever since the Gun Control Act of 1968) must be conducted by an FFL. (JA.14:3022, 3029) HB1229 became effective on July 1, 2013, so any resulting increases in private background checks would show up in the months between July 2013 and December 2013.

Exhibit 24, however, shows that there was a net *decrease* in the number of private background checks in the six months after the implementation of HB1229. The legislature planned and budgeted that HB1229 would cause 200,000 additional checks (JA.28:5603-04), but instead the number of checks fell. This is the opposite of a constitutional "fit." *Edenfield*, 507 U.S. at 770-71 (a statute may not be sustained if it provides only ineffective support for the government's purpose, and therefore fails to advance the government's interest "in a direct and material way").

The trial court dismissed this evidence, stating that "arguments about whether the statute has been successful are not relevant." (Op.40) However, if a law fails to materially advance its intended purpose, and provides ineffective support for (or in this case, actually harms) the government's purpose, then it cannot be "substantially related" to that purpose. "[P]ost-enactment evidence, if carefully scrutinized for its accuracy, will often prove useful in evaluating the remedial effects or shortcomings" of a constitutionally questionable program. *Concrete Works of Colorado v. City & County of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994); *see also Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1551 (10th Cir. 1991) ("we cannot simply assume that particular means will accomplish certain ends because the legislature presumed they would and enacted them into law"). The trial court's conclusion that HB1229's ineffectiveness is immaterial

40

would be appropriate in rational basis review, which was rejected in *Heller*. *See* 554 U.S. at 628 n.27.[26]

### 3.    Less burdensome alternatives were available

A CFB witness testified about obtaining a background check without having to go to an FFL. (JA.12:2574-75) Massachusetts is implementing a program in which participants in a private sale can directly contact the state government for authorization, without their having to simultaneously travel to a gun store. Mass. Gen. Laws ch. 140, § 128A. Or, as Plaintiffs' counsel pointed out in closing argument, HB1229 could have provided an exemption for persons who have already passed a much more rigorous background check: the biometric, fingerprint-based check required to obtain a concealed handgun carry permit – which also requires safety training – and a Sheriff's determination that the applicant is not a danger to himself or others. C.R.S. § 18-12-203, -205. Another less burdensome alternative would simply be to adopt California's approach, and allow loans to up

---

[26] As further evidence that the trial court could have more rigorously examined the fit between HB1229 and its purported objectives, the trial court noted testimony from Daniel Webster that most firearms used in crimes are obtained from a dishonest licensed firearms dealer, a trusted friend or family member. (Op.39) First, as regarding family members, HB1229 contains an exemption for loans and gifts among them. Second, as for the trial court's statement regarding dealers and trusted friends (as well as family members), Webster was referring to permanent transfers via sales, not temporary transfers. (JA.15:3152-53)

to 30 days when the borrower is personally known to the lender. Cal. Penal Code § 27885.

Every alternative would have been far less burdensome, and most of these alternatives would have resulted in a far greater participation by private transferors. The less burdensome alternatives, therefore, were actually superior in advancing the allegedly legitimate governmental objective. The trial court dismissed these less restrictive alternatives, and erred in doing so. (Op.40) "A regulation need not be 'absolutely the least severe that will achieve the desired end,' but if there are obvious and less-burdensome alternatives to the restriction . . . that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 n.13 (1993).

### C. Conclusion

In sum, the trial court erred both in assessing the burdens HB1229 placed on Colorado citizens' ability to acquire firearms, and in not requiring Defendant to justify these burdens.

## V. THE TRIAL COURT ERRED IN HOLDING THAT HB1224 DOES NOT VIOLATE THE SECOND AND FOURTEENTH AMENDMENTS

Plaintiffs adopt and incorporate the arguments contained in the Sheriffs' Opening Brief concerning the unconstitutionality of HB1224. Plaintiffs make the following additional arguments concerning HB1224.

## A.    The State Failed to Prove that HB1224 Serves a Public Interest

The Defendant failed to establish a compelling state interest (or a significantly important governmental interest) that is advanced by HB1224. This record demonstrates that the purported interests (principally, reducing the number of "large capacity magazines" in mass shootings and forcing magazine changes to effectuate a "critical pause" in such shootings) are based on little more than speculation.

Defendant proffered Douglas Fuchs, a police chief from Connecticut, who opined that HB1224 provides victims in mass shootings with an opportunity to escape or overcome the shooter because of the shooter's need to change magazines.[27]

---

[27] As an initial matter, his opinion was the subject of a motion to strike on three of the four grounds articulated in FRE 702. The basis for his claimed expertise was his experience with the Sandy Hook shooting and subsequent research into magazine capacity, but his law enforcement responsibility at Sandy Hook turned out to be tangential at best. (JA.16:3489, 3492; JA.17:3542-43). The trial court did

Based upon his conversation with a parent at the Sandy Hook shooting who was told by a child that the suspect was "playing with his gun" when the children fled, Fuchs concluded that the suspect was performing a magazine exchange and the associated "pause" allowed some children to flee. (JA.16:3492-93, 3497-98)

Subsequent separate investigations by the Connecticut State's Attorney and the Connecticut State Police determined that the assailant's weapon had malfunctioned and that the malfunction rather than a magazine exchange, was the reason for the pause. These investigations also determined that the suspect had performed seven magazine exchanges during which no one was able to escape or overcome the shooter. (JA.17:3544-45, 3547-78) Fuchs admitted that he did not know if the pause at Sandy Hook was caused by a magazine exchange or by a malfunction. (JA.16:3498-99, 3501)

Fuchs later modified his opinion to state that a pause *for whatever reason* – whether due to a malfunction, a tactical reload or the need for a magazine exchange – benefitted the public. (JA.16:3495-96) The trial court essentially adopted this opinion in its order. (Op.34 (in incidents cited by Defendant, "the pause was created either by the shooter reloading the weapon *or there being a malfunction of the firearm*")). Not all "pauses" are the same. There is no evidence

---

not rule on these objections, which, as discussed below, constituted reversible error.

that the "pause" of changing magazines on a functional firearm lasts as long as the "pause" of restoring a malfunctioning firearm to operability.

Pauses associated with anything other than a magazine exchange are irrelevant to HB1224 because the statute only attempts to create the need for a magazine exchange after expending 15 rounds. Despite claiming that there are "[c]ountless examples" (JA.16:3484), when pressed, Fuchs cited only five other incidents as examples of events which supported his opinion.[28] The evidence, however, showed that *none* of these other incidents involved a magazine exchange. (JA.16:3508-09; JA.17:3535-36, 3537, 3539)

Indeed, Defendant's evidence actually proved HB1224 would make law-abiding gun owners less safe in defensive situations. Fuchs and another defense expert, John Cerar, admitted that the pauses associated with compelled magazine exchanges render victims "temporarily defenseless," placing defensive gun users at greater risk. (JA.16:3475, 3486; JA.17:3553, 3555)

## B.    The FFLs Have Standing

---

[28] Indeed, approximately one month before trial, Defendant's counsel provided Fuchs with news articles regarding 47 incidents in which Defendant contended that a pause associated with a magazine exchange had enabled potential victims to flee or intervene. (JA.16:3503) At trial, after reading the police reports associated with some of these 47 incidents, Fuchs testified to only five of the 47. (JA.16:3503-04, 3505-06)

The trial court ruled that Plaintiff FFLs lack standing. *See* JA.5:1043-47. At the time trial commenced, Plaintiff FFLs asserted Second Amendment challenges to HB1224's magazine ban and "designed to be readily converted clause," and HB1229's fee-capped requirements on private transfers.

To establish standing, a plaintiff must show that: (1) he or she has suffered an "injury in fact" that is concrete and particularized, and actual or imminent (not merely conjectural or hypothetical); (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180-81 (2000). Each of these elements has been satisfied. First, the record shows that Plaintiff FFL's have suffered from the continuing injury of lost profits and sales. (JA.13:2627-29, 2681-82, 2704-05, 2708-09, 2711-12, 2714) Economic injury is the paradigmatic form of an injury-in-fact. *E.g., Schrader v. New Mexico*, 361 Fed.Appx. 971, 974 (10th Cir. 2010).

Second, Defendant is the state's chief executive, charged with ensuring that Colorado laws are faithfully executed. *See Ainscough v. Owens*, 90 P.3d 851, 858 (Colo. 2004). Plaintiff FFLs' injuries are traceable to him. *See Sportsmen's Wildlife Defense Fund v. U.S. Dep't of the Interior*, 949 F. Supp. 1510, 1514-15

46

(D. Colo. 1996) (finding plaintiff's injury is fairly traceable to the Governor and he is a proper party).

Third, the Tenth Circuit has stated that the "requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010). The trial court found "that the Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute." *Id.*

The trial court found that Plaintiff Women for Concealed Carry had established "associational standing" to challenge HB1224, and therefore did not evaluate the standing of the FFL Plaintiffs. (Op.11-13) With respect to HB1229, the trial court found that no individual Plaintiff had standing to challenge its constitutionality (Op.14-15) and expressed doubt, without actually so holding, that the entity Plaintiffs (including the FFL's) had standing to bring a Second Amendment challenge.

However, in *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014), the court explained that the plaintiff association of firearms retailers had standing (derivative of the standing that a member firearms retailer would have) to raise Second Amendment claims. *Id.* at 931 n.3. Certainly

47

such "derivative" standing could not exist if the member FFLs as firearms sellers, did not each have standing on their own. In *Ezell v. City of Chicago*, 651 F. 3d 684, 696 (7th Cir. 2011), the Seventh Circuit found that "a supplier of firing range facilities is harmed by the firing range ban and is permitted to act as an advocate of the rights of third parties who seek access to its services." *Id.* at 696.

Here, the trial court, in not allowing firearms sellers such as Jensen Arms and Rocky Mountain Shooter's Supply to be heard, divested them of their right to challenge a statute which adversely affected their own businesses[29] and the second Amendment rights of their customers.

### C.    HB1224 Is Unconstitutionally Vague

The trial court held that HB1224 is not unconstitutionally vague, in part based on two Technical Guidance letters issued by the Colorado Attorney General, which supposedly clarified confusing aspects of HB1224. The trial court erred in so holding.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and

---

[29] Precedents involving other constitutional rights show that businesses that provide constitutionally related services have standing in their own right to challenge statutes that injure them. *Planned Parenthood v. Danforth*, 428 U.S. 52 (1976); *American Booksellers Ass'n v. Hudnut*, 771 F.2d 323 (7th Cir. 1985).

discriminatory enforcement." *Kolendar v. Lawson*, 461 U.S. 352, 357-58 (1983). The Technical Guidances do not solve the vagueness problem because they conflict with one another. For example, the first Technical Guidance allows sharing of grandfathered magazines only if the magazine remains in the owner's "continuous physical presence" along with "the expectation that it will be promptly returned." The second Technical Guidance says that "continuous possession" is only lost by the voluntary relinquishment of "dominion and control," allowing leaving a magazine for repair at a repair shop or long-term loaning or storing of magazines with friends or family, when the owner is not present.

Likewise, the first Technical Guidance says that small magazines which are "designed to be readily converted" are illegal based on unspecified characteristics which facilitate conversion. The second Technical Guidance says that ***nothing*** is "designed to be readily converted" unless it actually has been converted. Contrary to the statute, the second Technical Guidance takes the unfounded position that nothing is "designed" for conversion until the conversion has in fact been accomplished. The purported simultaneous validity of both Technical Guidances is

facially vague, and is aggravated by the fact that both contradict the statute they purportedly interpret.[30]

Finally, the trial court's opinion itself demonstrated the vagueness. According to the court, applying dictionary definitions, "An owner who loaned out his or her magazine to another after July 1, 2013, would clearly not have maintained 'possession' of it." (Op.44) Yet the second Technical Guidance says that "'continuous possession' is only lost by a voluntary relinquishment of dominion and control" – that is, surrendering ownership rights ("dominion"). So loans are illegal under the statutory language, as interpreted by the court, and they are legal by the Attorney General's second Technical Guidance, which the trial court said controlled the enforcement. (Op.45-46) Loans are illegal (Op.44, statute and dictionary), and they are legal (Op.45-46, second Technical Guidance). No one knows what the law requires.

---

[30] The Governor has no law enforcement responsibility with respect to HB1224, as he repeatedly insisted in refusing to respond to discovery. (JA.5:1201) Meanwhile, the State's District Attorneys are not bound by the Attorney General's interpretation. *Davidson v. Sandstrom*, 83 P.3d 648, 656 (Colo. 2004) (district attorneys answer only to the voters of their district); *People ex rel. Tooley v. Dist. Court*, 549 P.2d 774, 777 (Colo. 1976) (the Attorney General is not authorized to prosecute crimes in the absence of a command from the General Assembly or the Governor). As a matter of law, the non-binding and self-contradictory "guidances" cannot solve HB1224's vagueness problem.

## VI.  THE TRIAL COURT ERRED IN DISMISSING PLAINTIFFS' ADA CLAIM

Title II of the Americans with Disabilities Act requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The remedies include injunctive and declaratory relief. *Id.* § 12133.

Plaintiffs brought ADA Title II claims against HB1224 (because magazine bans disproportionately harm disabled persons' ability to defend themselves) and against HB1229 (because the bill has unnecessarily harmed Outdoor Buddies' program for persons with disabilities). The trial court's denial of Plaintiffs' Title II claim was reversible error.

### A.  Plaintiffs Have Standing and Are Qualified Individuals with a Disability

To prevail, plaintiffs must prove: (1) they are qualified individuals with a disability; (2) they have been discriminated against by reason of such disabilities; and (3) by a public entity. Items (1) and (3) are not at issue.

Plaintiffs Harrell and Bayne, and many members of Outdoor Buddies, are paraplegics who must use wheelchairs. Parapalegia is within the ADA's definition of a "disability": a "physical or mental impairment that substantially limits one or

more of the major life activities." 42 U.S.C. § 12102(1)(A). Plaintiffs are also "qualified individuals" because they "meet the essential eligibility requirements." 42 U.S.C. § 12131(2). They are law-abiding citizens qualified to possess and use firearms. Likewise, the members of Outdoor Buddies are qualified individuals, because they have been issued the requisite hunting permits, under the hunting programs administered by the Colorado Division of Parks and Wildlife. (JA.11:2255)

Congress expressly gave organizations which provide services to persons with disabilities direct standing to bring Title II claims; they do not need to rely on associational standing based on members with disabilities. 28 C.F.R. § 35.130(g). Thus, Outdoor Buddies itself has Title II standing.

Of course, to have direct standing for a Title II challenge under the ADA, an organization must show that it has suffered some injury. *National Alliance for Mentally Ill v. Board of County Commissioners*, 376 F.3d 1292, 1295-96 (11th Cir. 2004). In the instant case, Outdoor Buddies did so: HB1229 has needlessly harmed Outdoor Buddies' program of loaning specialized firearms to persons with disabilities for use in guided hunting trips. *See* Section IV.A.2, *supra*.

Besides having direct standing, Outdoor Buddies also has associational standing to bring ADA claims, based on their individual members, such as Harrell and Bayne.

## B.    Title II of the ADA Applies to Statutes and Plaintiffs Have Suffered Title II Discrimination

In closing, Defendant acknowledged that Title II applies to statutes, but argued that it only applies to statutes that expressly discriminate against disabled individuals. (JA.18:3897-3900) The trial court, however, announced a novel rule that Title II ***never*** applies to statutes (Op.49), and erred in doing so.

### 1.    Case law holds that Title II applies to statutes

In *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222 (10th Cir. 2009), this Court considered on the merits a claim against a facially neutral state statute, on the basis of section 504 of the Rehabilitation Act (and thus, necessarily, also on Title II[31]). The statute in question restricted who may supervise a minor driver with an instruction permit. This Court held that plaintiffs' claim for refusal to grant her

---

[31] *Barber* had been brought under both the ADA and the Rehabilitation Act. As the Ninth Circuit has explained, Title II extends the anti-discrimination prohibition in section 504 to all actions of state and local governments. *See* 562 F.3d at 1231-32 & n.2*; see also Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1067 (9th Cir. 2010).

preferred reasonable accommodation failed because the State had offered her a different, but also reasonable, accommodation. Likewise, this Court ruled on the merits of a Title II claim challenging municipal zoning ordinances, in *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917 (10th Cir. 2012).

Other circuits which have considered whether ADA Title II applies to statutes have answered in the affirmative. The Second Circuit provided the most detailed explanation, in a decision involving whether there should be a reasonable modification of a facially neutral state statute about retirement eligibility benefits:

> Congress clearly meant Title II to sweep broadly. If all state laws were insulated from Title II's reasonable modification requirement solely because they were state laws, state law [would serve as] an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting Title II. Far from providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, the ADA would be powerless to work any reasonable modification in any requirement imposed by state law, no matter how trivial the requirement and no matter how minimal the costs of doing so.

*Mary Jo C. v. New York State & Local Retirement Systems*, 707 F.3d 144, 163 (2d Cir. 2013) (internal quotations omitted). In support, the Second Circuit cited this Court's *Barber* decision. *See also Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996); *James v. City of Costa Mesa*, 684 F.3d 825 (9th Cir. 2012).[32]

---

[32] District courts in the Tenth Circuit also have applied Title II to state statutes. *See Thompson v. Cooke*, 2007 WL 891364 at *5 (D. Colo. Mar. 22, 2007); *T.E.P. &*

2.    **The trial court's holding that Title II does not apply to statutes was based on a misreading of a recent Tenth Circuit decision**

The trial court relied upon *Elwell v. Oklahoma ex rel. Bd. of Regents of University of Oklahoma*, 693 F.3d 1303 (10th Cir. 2012). In that case, a disgruntled employee sued a state university, and attempted to bring the claim under Title II. This Court rejected the claim, holding that Title II covers government "output," but does not cover all internal government operations, nor "everything the public entity does." *Id*. at 1307. *Elwell* does not overrule or disagree with *Cinnamon Hills* or *Barber*.[33] As these cases collectively show, Title I is for state employees, and Title II is for state (or local) laws.

C.    **In Rejecting Plaintiffs' Disparate Impact Claim, the Trial Court Ignored Evidence that Was Directly on Point**

An ADA plaintiff may prove discrimination by proving disparate impact. *Cinnamon Hills*, 685 F.3d at 922. "To prove a case of disparate impact discrimination, the plaintiff must show that 'a specific policy caused a significant

---

*K.J.C. v. Leavitt*, 840 F. Supp. 110, 111 (D. Utah 1993);  *Grider v. City & County of Denver*, 2012 WL 1079466 (D. Colo. Mar. 30, 2012) (Krieger, J.).

[33] Notably, in the *Mary Jo C.* decision, which relied upon this Circuit's decision in *Barber*, the Second Circuit clearly did not consider *Barber* to have been overruled by this Court's decision in *Elwell*.

55

disparate effect on a protected group.'" *Id.* (quoting *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007)).

While disparate impact is frequently shown by statistical evidence, it can be shown by "qualitative" evidence as well. *Tsombanidis v. West Haven Fire Dep't.*, 352 F.3d 565, 574, 577 (2d Cir. 2003) (municipal fire code). The rule that statistical evidence is not the only possible evidence for disparate impact is sensible, because "[o]ften, there may be little or no statistical data to measure the impact of a procedure on any 'class' of people with a particular disability compared to people without disabilities." BARBARA T. LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 953 (4th ed. 2007).

The record shows that disabled persons are disproportionately victimized by violent crime. According to the U.S. Department of Justice, Bureau of Justice Statistics:

- In 2011, the average annual age-adjusted rate of serious violent victimization for persons with disabilities (22 per 1,000) was more than three times higher than that for persons without disabilities (6 per 1,000).

- The rate of violent victimization for males with disabilities was 42 per 1,000 in 2011, compared to 22 per 1,000 for males without disabilities.

- For females with disabilities, the rate of violent victimization (serious and lesser) was 53 per 1,000 in 2011, compared to 17 per 1,000 for females without disabilities.

(JA.7:1707).

Massad Ayoob, a leading firearms trainer, has trained many individuals with disabilities.  Ayoob testified about the problems a disabled shooter encounters having to change magazines in a defensive situation. (JA.11:2292-2313) Forcing a magazine change on a disabled person unquestionably harms that person's ability to defend him or herself.

Plaintiffs Harrell and Bayne explained that in case of a home invasion, they will be unable to retreat to a safe position where they can change a magazine. Thus, the only ammunition they will be able to use in a self-defense emergency is the ammunition in a single magazine. (JA.11:2248-51; JA.12:2587)

In addition to the disparate impacts of HB1224, Harrell, an officer of Outdoor Buddies, explained that HB1229 has threatened Outdoor Buddies' program of loaning specially-adapted firearms to persons with disabilities for guided hunting trips.

Outdoor Buddies' guns have very expensive modifications and are not otherwise readily available for loan or purchase. (JA.11:2239-40) Imposing the in-store processing requirement on transfers between program participants who can *only* use a firearm with the modifications precludes disabled hunters from participating in shooting sports.

57

The trial court ruled alternately that Plaintiffs submitted "anecdotal evidence[, which] in the absence of meaningful statistical analysis comparing the effect of the statute on the Plaintiffs and able-bodied comparators is insufficient to carry the Plaintiffs' burden of demonstrating that the statutes cause any disparate effect." (Op. 48-49) This conclusion is belied by the record, as described above.

### D.   The Trial Court Failed to Rule on Plaintiffs' Intentional Discrimination Claim

In addition to disparate impact, a plaintiff may pursue intentional discrimination as a ground for relief under Title II. *See, e.g., Wis. Community Servs. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006); *Tsombanidis*, 352 F.3d at 573. Plaintiffs pursued relief from intentional discrimination, which the trial court failed to rule upon.

In the Tenth Circuit, discriminatory intent is present when there is a showing of "deliberate indifference." *Barber*, 562 F.3d at 1228-29 ("[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."). The legislative record, which was made part of the record before the trial court, shows deliberate indifference. At the February 12, 2013, hearing of the House Judiciary Committee, Sammy Myrant testified:

> I am disabled, so I can't put a clip in and out very quickly. I drop them, even when I'm practicing at the range. . . . [t]he man who committed 16 felony counts of rape, child abuse on this child gets out of prison this year. So there are times when we're going to need a magazine of high capacity. He's a member of the Aryan Brotherhood, and he gets out of prison this year. And he has sworn to kidnap her and us, rape her again in front of us, then kill us in front of her.

(JA.19:3978-79). Asked how many rounds he would want for self-defense, he responded "30." (*Id.*) The General Assembly intentionally rejected Myrant's need for an accommodation.

### E.    Plaintiffs Are Entitled to a Reasonable Modification

Even without proof of intentional or disparate impact discrimination, a separate remedy available for ADA Title II litigants is a "reasonable modification."[34] *Cinnamon Hills*, 685 F.3d at 922-23; *Robertson v Las Animas County Sheriff's Dep't*, 500 F.3d 1185 (10th Cir. 2007); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188-89 (10th Cir. 2003).

HB1224's exemptions recognize that in certain situations, magazines of more than 15 rounds may be necessary for self-defense. C.R.S. § 18-12-302(3)(b). Based on Ayoob's uncontradicted and unchallenged testimony, persons with upper body or mobility disabilities have a particularly great need for full capacity

---

[34] "Reasonable modification" is the term of art for Title II; for Title I's employment law, the term of art is "reasonable accommodation." The terms are often used interchangeably.

magazines for self-defense. Accordingly, they are entitled to a reasonable modification.[35]

## VII. THE TRIAL COURT ERRED IN CONSIDERING JUSTIFICATIONS THAT WERE NOT INCLUDED IN THE LEGISLATIVE RECORD

Of the 11 witnesses who testified at trial on behalf of Defendant, only one had testified before the legislature at the time that HB1224 and HB1229 were being considered. The testimony of the remaining ten witnesses constituted post hoc evidence not presented to the legislature. The trial court erred in relying upon such evidence, as discussed below and in the *amicus* brief filed by the Attorney General of Utah.

In the context of constitutional challenges involving fundamental rights, the predictive judgments of a legislature are not insulated from review, because a court "must assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622 (1994); *see also Hutchins v. District of Columbia*, 188 F.3d

---

[35] The trial court did not address the merits of Plaintiffs' request for a reasonable modification. In a footnote, the court asserted that the request had been waived because of failure to include the request in the final pretrial order. (Op.46, n.31) In the final pretrial order, Defendant conceded that Plaintiffs were in fact seeking a reasonable modification. (JA.6:1499) Moreover, Plaintiffs asserted the claim in their Pretrial Brief. (JA.7:1709-11) It was error for the trial court to deem the claim for reasonable modification waived.

531, 567 (D.C. Cir. 1999) ("The Supreme Court has repeatedly demonstrated that . . . it will not tolerate a severe burden on a fundamental right simply because a legislature has concluded that the law is necessary. Rather, the Court has independently examined the evidence before the legislature to determine whether an adequate foundation justified the challenged burdens."). Here, the Colorado legislature could not have drawn a reasonable inference based on evidence it never considered. Thus, this Court cannot assure the reasonableness of inferences by resorting to evidence marshaled by counsel after the fact in response to, and in creative defense of, litigation.

The trial court cited *Concrete Works,* 36 F.3d at 1521, in support of the proposition that it was not limited to the legislative history in determining whether a substantial relation exists between the statute and Colorado's asserted purpose. (Op.33, n.28) The trial court's reliance upon *Concrete Works* was misplaced. That decision states that post-enactment evidence can be considered for the purpose of evaluating whether an affirmative action program complies with *City of Richmond v. Croson*, 488 U.S. 469 (1989). This case says nothing about legislative history in a context such as this where a court is evaluating whether a government satisfies its burden to justify imposition on fundamental rights under a heightened level of scrutiny.

61

## VIII. THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO PROVIDE ANY ANALYSIS OF THE PARTIES' *DAUBERT* MOTIONS

While a court of appeals may give a district court latitude in determining how to measure the reliability of the proposed expert testimony and whether it is reliable, in a bench trial, the district court must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function. *E.g., Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 65 (1st Cir. 2013). This Court has not yet expressly adopted this approach, but another circuit applies this standard. *See Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 433 (9th Cir. 2012).

Here, at the pre-trial conference, the trial court advised the parties for the first time that it would not be ruling on the parties' joint motion[36] to strike experts:

> This is a trial to the bench. I will not be ruling on those 702 motions. I will be taking your objections in mind when I make the final determination on the issues. . . . Since it's a trial to the bench . . . to the extent I agree with an objection, I'll disregard the evidence.

(JA.9:1921)

---

[36] The trial court's procedures require the parties to assert their objections to the competing experts in a single joint motion. Because the court's procedures contemplate a hearing, argument is not permitted in the motion.

At trial, the Parties Joint Motion to Strike Expert Opinions remained pending. In its final opinion, the court advised that its "findings of fact and conclusions of law set forth herein implicitly adjudicate the Rule 702 motion and the court will not address it separately." (Op.3, n.4) This statement constitutes the entirety of the lower court's Rule 702 analysis.

The trial court's approach effectively precludes this Court from being able to determine "whether the lower court adequately performed its gate keeping function" and applied the *Daubert* and *Kumho Tire* framework, and renders impossible a *de novo* review. This was an abuse of discretion, and warrants a new trial.

## <u>CONCLUSION</u>

For the foregoing reasons, the trial court's decision should be reversed or remanded.

Dated this 16th day of January 2015.

HALE WESTFALL LLP

*s/*Richard A. Westfall
Richard A. Westfall
1600 Stout St., Suite 500
Denver, CO 80202
Tel:   720-904-6010
Fax:   720-904-6020
rwestfall@halewestfall.com

## STATEMENT REGARDING ORAL ARGUMENT

Appellants believe that oral argument would materially assist this Court in the determination of this appeal. Accordingly, they request oral argument.

## FED. R. APP. P. 32(A)(7)(C) CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 13,861 words. I relied on Microsoft Word 2010 to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

By:    s/Peter J. Krumholz

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Supplemental Opening Brief was served via ECF on the following:

| | |
|---|---|
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| David B. Kopel | david@i2i.org |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

Virus scan certification:  the digital form of this pleading submitted to the Court was scanned for viruses using Symantec Endpoint Protection software, version 12.0.1001.95 (most recent virus definition created on January 16, 2015), and according to the program, the document is virus free.

ECF Submission: undersigned certifies that this ECF submission is an exact duplicate of the seven hard copies delivered to the clerk's officer pursuant to 10th Cir. R. 31.5.

Privacy redactions: privacy redactions were required at pages 870, and 937-38 in volume 4 of the Joint Appendix.

s/Peter Krumholz
Peter Krumholz