# UNITED STATES CIRCUIT COURT OF APPEALS

# FOR THE TENTH CIRCUIT

No. 14-1292

JIM BEICKER, et al.,

*Plaintiffs-Appellants* v.

JOHN HICKENLOOPER,

*Defendant-Appellee*

On Appeal from the United States District Court for the

District of Colorado, the Honorable Chief Judge Marcia S. Krieger

## OPENING BRIEF OF SHERIFFS AND DAVID STRUMILLO

David B. Kopel

*Counsel of record*

INDEPENDENCE INSTITUTE

727 East 16th Ave.

Denver, Colorado 80203

(303) 279-6536

*Counsel for* Sheriffs and David Strumillo

District Court Orders are attached. Oral argument is requested

Jan. 16, 2015

# CERTIFICATE OF INTERESTED PARTIES AND CORPORATE

# DISCLOSURE STATEMENT

None of the parties to this appeal are corporations.

s/David B. Kopel

David B. Kopel

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ............................................................... ii
TABLE OF CONTENTS ..................................................................... iii
TABLE OF AUTHORITIES ................................................................ v
STATEMENT OF RELATED CASES ................................................. x
JURISDICTIONAL STATEMENT ..................................................... 1
STATEMENT OF ISSUES PRESENTED FOR REVIEW ............................. 2
STATEMENT OF THE CASE ............................................................ 3
SUMMARY OF ARGUMENT ............................................................ 5
ARGUMENT ................................................................................ 7

I. STANDARDS AND METHODS OF SCRUTINY ........................................ 7
    A.   The standard of review is de novo. ...................................... 7
    B.   The Court should follow *Heller*, *McDonald*, and *Reese*. ..................... 8
    C.   Courts may not decide whether "preferred," "common" arms are "necessary for self-defense." ................................................. 12

II. THE MAGAZINE BAN IS A SEVERE BURDEN ON SECOND AMENDMENT RIGHTS ............................................................... 19
    A.   Magazines holding more than 15 rounds predate the Second Amendment and have been common since at least 1866 ......................... 19
    B.   The burden is particularly severe because it applies in the home. . 23
    C.   The lower court's conclusion that the burden is small was erroneous. ......................................................................................24
        1. Constitutional protection is not contingent on how often the trigger is pulled .................................................................... 25
        2. Citizens choose standard capacity magazines because reserve capacity is important. ............................................................ 25
        3. The magazine ban has forced official law enforcement auxiliaries to shift to less suitable arms. .................................................... 28
    D.   Statewide prohibition, including in the home, is not a "time, place, or manner" regulation. ................................................................ 30

III. THE MAGAZINE BAN ADVANCES NO LEGITIMATE STATE INTEREST, AND FAILS HEIGHTENED SCRUTINY ............................... 32

    A.    Criminal use of arms does not justify prohibition for the law-abiding. ............................................................................................................. 33

    B.    There is no legitimate state interest in magazine prohibition. ....... 34

    C.    Prohibition fails narrow tailoring, under either intermediate or strict scrutiny. ................................................................................................. 37

        1. The *McCullen* standard for narrow tailoring .................................. 38

        2. That prohibition is theoretically simpler to enforce than  regulation does not mean that prohibition is narrowly tailored. .......................... 41

    D.    Magazine prohibition does not materially advance an important state interest, nor is it necessary to a compelling state interest. ...................... 44

        1. Preventing ordinary criminals from acquiring magazines. ............ 46

        2. Reduction of magazine use by mass killers ...................................... 50

IV. SHERIFFS' STANDING ........................................................................... 55

    A.    Under the Political Subdivision Doctrine, the Sheriffs have standing because they have "a personal stake." ....................................................... 55

        1. The Oath of Office is a Personal Stake ............................................. 57

        2. Criminalization of Sheriffs by HB1229 is a personal stake. ........... 58

        3. Criminalization of Sheriffs by HB1224 is a personal stake. ........... 62

    B.    Removing the Sheriffs in their individual capacities, and then refusing to correct the mistake, was an abuse of discretion. ..................... 64

    C.    The errors were not harmless. .......................................................... 68

CONCLUSION ............................................................................................. 72

STATEMENT REGARDING ORAL ARGUMENT ......................................... 73

CERTIFICATE OF COMPLIANCE ............................................................... 75

CERTIFICATE OF SERVICE ....................................................................... 76

STATUTES EXHIBIT ................................................................................... 78

    House Bill 1224. Magazine ban. ................................................................ 78

    House Bill 1229. Private loans and sales. ................................................. 81

# TABLE OF AUTHORITIES

## U.S. Supreme Court Cases

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .............................. 44

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................. 3, 6, 66, 67

*Baker v. Carr*, 369 U.S. 186 (1962) ..................................................... 56

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................... 3, 6, 66, 67

*Board of Education v. Allen*, 392 U.S. 236 (1968)........................... 6, 56, 57, 58

*Bose v. Consumers Union*, 466 U.S. 485 (1984) ................................................. 7

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)........................... 41

*City of Los Angeles v. Alameda Books*, 535 U.S. 425 (2002)........................... 45

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...9, 10, 11, 12, 13, 15, 16, 17, 19, 23, 24, 25, 26, 30, 31, 33, 34, 37, 43, 46, 47, 50, 53, 54

*Edenfield v. Fane*, 507 U.S. 761 (1993)................................................. 17, 45, 46

*Employment Division v. Smith*, 494 U.S. 872 (1990)...................................... 17

*Inwood Labs. v. Ives Labs.*, 456 U.S. 844 (1982) ................................................. 7

*Kovacs v. Cooper*, 336 U.S. 77 (1949)................................................................. 30

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ................................ 44, 46

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014)................................... 38, 40, 41, 43

*McDonald v. Chicago*, 561 U.S. 742 (2010)...8, 9, 11, 12, 14, 15, 16, 17, 37, 53, 54, 55

*Miller v. Fenton*, 474 U.S. 104 (1985) ................................................................. 7

*NAACP v. Alabama*, 377 U.S. 288 (1964)......................................................... 39

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) ...................................................................... 17

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997)................................. 31

*Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991) ........................................... 7

*Schall v. Martin*, 467 U.S. 253 (1984) .............................................................. 34

*Shelton v. Tucker*, 364 U.S. 479 (1960) ............................................................. 40

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ...................... 41

*Spence v. State of Washington*, 418 U.S. 405 (1974) ........................................ 31

*Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622 (1994)(*Turner I*) ................... 45, 46

*Turner Broad. Sys. v. F.C.C.*, 520 U.S. 180 (1997)(*Turner II*) ....................... 45

*United States v. Ballard*, 322 U.S. 78 (1944) .................................................. 17

*United States v. Grace*, 461 U.S. 171 (1983) ................................................... 30

*United States v. Olana*, 507 U.S. 725 (1993) .................................................. 68

*United States v. Virginia*, 518 U.S. 515 (1996) ............................................... 33

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982) .............................................................................. 37

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................. 38, 41, 43

## Tenth Circuit Cases

*Cillo v. City of Greenwood Village*, 739 F.3d 451 (10th Cir. 2013) ................. 14

*City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011) ........................... 57, 58

*Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) ... 11, 17

*Commonwealth Prop. Advocates v. Mortgage Elec. Registration Sys.*, 680 F.3d 1194 (10th Cir. 2011) .................................................................................... 56

*Dias v. City & Cnty. of Denver*, 567 F.3d 1169 (10th Cir. 2009) .................... 56

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .................... 31, 32

*Doe v. Shurtleff*, 628 F.3d 1217 (10th Cir. 2010) ............................................ 39

*Golan v. Holder*, 609 F.3d 1076 (10th Cir. 2010) *aff'd*, 132 S. Ct. 873 (2012) 39

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) .................................. 45, 46

*Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209 (10th Cir. 2010) ................. 68

*Mid-Continent Cas. Co. v. Vill. at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977 (10th Cir. 2012) ...................................................................................... 67

*Opala v. Watt*, 454 F.3d 1154 (10th Cir. 2006) .............................................. 55

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) ..................................... 9

*Phelps v. Hamilton*, 122 F.3d 1309 (10th Cir. 1997)................................. 65, 67

*United States v. Friday*, 525 F.3d 938 (10th Cir. 2008).................................... 7

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)................. 10

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ............................... 9

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).......................... 9, 33, 44

## Other Federal Cases

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..................................... 10

*Fotoudis v. Honolulu*, 2014 WL 4662385 (D. Haw. 2014) .............................. 43

*Frank v. United States*, 78 F.3d 815 (2d Cir. 1996) ........................................ 57

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)(*Heller II*) 16, 33

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .......................... 10, 25, 46, 49

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)....................... 24

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014)...... 10, 25, 39, 45

*Tyler v. Hillsdale County Sheriff's Dep't*, 2014 WL 7181334 (6th Cir. 2014) . 10

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) .................................. 44

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ................................ 44

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009)............................... 46

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) .................. 10, 30, 39

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) ......................... 24

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007)........................................ 41

## State Cases

*Board of Education v. Allen*, 51 Misc.2d 297 (Sup. Ct., Albany Cnty., N.Y. 1966) ............................................................................................................. 58

*City of Junction City v. Mevis*, 601 P.2d 1145 (Kan. 1979) ............................ 40

*City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972) ................................... 40

*City of Princeton v. Buckner*, 377 S.E.2d 139 (W.Va. 1988) ............................ 40

*In re Moyer*, 85 P. 190 (Colo. 1904) ................................................... 70

*People* v. *Persce*, 204 N.Y. 397 (1912) ............................................... 15

*Rinzler v. Carson*, 262 So.2d 661 (Fla. 1972) ..................................... 15

*State v. DeCiccio*, 315 Conn. 79 (2014) ................................... 23, 33, 46

*State v. Kessler*, 614 P.2d 94 (Or. 1980) ............................................ 15

*Winters v. Concentra Health Services, Inc.*, 2008 WL 803134 (Conn. Super. 2008) .......................................................................................... 40


## Federal Statutes, Regulation, and Rules

18 U.S.C. §922 ................................................................. 48, 59, 61

18 U.S.C. §923 ............................................................................ 60

27 C.F.R. §478.100 ..................................................................... 60

ATF Proc. 2013-1 (Mar. 15, 2013) ................................................ 60

F.R.C.P. 12 ............................................................................ 3, 55

F.R.C.P. 59 ............................................................................ 2, 65

F.R.C.P. 61 ................................................................................ 68

F.R.E. 1006 ................................................................................ 72


## Colorado Laws

C.R.S. §§18-12-301 −303 (HB1224) .........................................passim

C.R.S. §18-12-112 (HB1229) ....................................................passim

C.R.S. §18-12-202 ........................................................................ 42

C.R.S. §18-12-203 ........................................................................ 42

C.R.S. §18-12-205 ........................................................................ 42

C.R.S. §18-12-206 ........................................................................ 43

C.R.S. §24-33.5-424 ..................................................................... 42

COLO. CONST., art. XII, §8 ................................................................ 57

**Other States' Laws**

2014 Ohio Laws File 165 (Am. Sub. H.B. 234) ................................ 42

MASS. GEN.L. ch.140, §121 ........................................................... 42

OHIO REV. CODE ANN. §2923.11(E) .............................................. 42

OHIO REV. CODE ANN. §2923.17 ................................................... 42

**Other Authorities**

District of Columbia v. Heller, oral argument transcript................................ 32

District of Columbia v. Heller, United States amicus br., 2008 WL 157201.. 13

FBI, CRIME IN THE UNITED STATES 2013 ....................................... 43

Fournier, David, *Firearm Notification Laws Put Concealed Carriers in Law Enforcement's Sights*, 44 U. TOL. L.REV. 179 (2012) .................................... 42

GUN DIGEST 2014 (Jerry Lee ed. 2013) ...................................... 21, 22

Kopel, David B., *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L.REV. 515 (2009) ................................................................ 43

Kopel, David B., *The History of Firearms Magazines and of Magazine Prohibition*, 88 ALBANY L.REV. (forthcoming 2015), http://ssrn.com/abstract=2473224 ........................................... 19, 33

Kopel, David B., *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J.CRIM. L. & CRIMINOL. 761 (2015).............................................................................. 70

OXFORD ENGLISH DICTIONARY....................................................... 64

Rostron, Allen, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L.REV. 703 (2012)........................................... 16

## STATEMENT OF RELATED CASES

This case and 14-1290 are appeals from 13-CV-1300. This appeal is brought by plaintiff Sheriffs and retired police officer David Strumillo. Appeal 14-1290 is brought by all other plaintiffs. Appellants herein agree with and adopt all arguments presented in the 14-1290 brief.

# JURISDICTIONAL STATEMENT

Appellants adopt the Jurisdictional Statement in 14-1290.

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

Appellants adopt the Statement of Issues in 14-1290, and also state:

1. Does Colorado H.B. 13-1224, codified at C.R.S. §§18-12-301 -303 (a ban on some firearms magazines) in whole or in part violate the Second and Fourteenth Amendments, facially or as applied?

2. Was the district court correct as a matter of law that the Political Subdivision Doctrine precludes the Sheriffs' standing in their official capacity?

3. Did the district court abuse err as a matter of law by *sua sponte* dismissing the Sheriffs in their individual capacities, and abuse its discretion by denying Plaintiffs' F.R.C.P. 59(e) motion to alter/amend?

4. Did the district court abuse its discretion in allowing only 11 Sheriffs to re-enter the case in their individual capacities?

## STATEMENT OF THE CASE

Appellants adopt the Statement of the Case in 14-1290. Additionally:

Defendant filed a motion to dismiss the Sheriff plaintiffs "in their official capacities"; he expressly did *not* seek to dismiss the Sheriffs in their individual capacities. JA.3:639, 653, 5:1001, 1018. The Sheriffs' individual capacity claims were based on their status as citizens with individual rights. JA.3:484, 500, 502, 511, 523, 528, 531, 533.

On November 27, 2013, the district court granted Defendant's motion to dismiss the Sheriffs in their official capacities, and *sua sponte* dismissed the Sheriffs in *all* capacities. The trial court stated that it would allow the Sheriffs to file an amended Complaint for individual capacity claims. JA.5:1055. All Plaintiffs filed an unopposed motion to alter/amend the court's order, pointing out that the Sheriffs had already stated individual capacity claims. JA.5:1057-62.

The district court denied the motion to alter/amend, holding without elaboration that the Sheriffs' pleading in the Second Amended Complaint (filed July 1, 2013) did not satisfy *Iqbal/Twombly*. JA.6:1267.

Subsequently, all 55 Sheriffs sought to (re)enter the case in their individual capacities; but the trial court allowed only 11 who had a definite retirement

3

date of January 2015 to do so. The district court's Dec. 19, 2013, decision held that the 11 had standing because they faced an "imminent enough" threat of prosecution regarding the magazine ban, since the retiring Sheriffs would no longer be protected by the government employee exemption. JA.9:1886-90.

4

# SUMMARY OF ARGUMENT

*McDonald v. Chicago* makes it clear that lower courts should not make their own decisions about what arms are "necessary for self-defense." The opinion below pervasively violated this principle. Even if courts were to decide the issue, the district court ignored extensive evidence in the record about why magazines with more than 15 rounds are important for self-defense by law enforcement and by citizens—even though firing more than 15 shots is rare.

The opinion below did not follow the straightforward rules of decision provided by the Court in *Heller* and *McDonald*. Instead, the trial court engaged in complicated interest-balancing, of the type advocated by Justice Breyer in his *Heller/McDonald* dissents.

*McDonald* instructs that the Second Amendment must not be "singled out for special—and specially unfavorable—treatment," and that the Second Amendment is not "a second-class right." Yet the district court did not apply the ordinary requirements of heightened scrutiny, such as the requirement that a statute be "narrowly tailored." Moreover, Defendant's evidence fell far short of carrying his burden of proof on the other elements of heightened scrutiny.

Under the Political Subdivision Doctrine, officials of a state's political subdivision (e.g., a Sheriff's Office) have official capacity standing if they have a "personal stake," such as adherence to their oath of office. The trial court's denial of the Sheriffs' standing based on their oaths was the result of a misreading of the Supreme Court's controlling case, *Board of Education v. Allen*. The trial court's mistake was based on a misreading of the names of the parties in the *Allen* case. Further, the Sheriffs are personally criminalized by HB1224 and 1229, and being criminalized is a personal stake.

The district court's denial of individual capacity standing for most of the Sheriffs was an unrequested decision based on a misapprehension of the movant's position. The refusal to correct the error was an abuse of discretion, and contrary to *Iqbal/Twombly*.

6

# ARGUMENT

## I. STANDARDS AND METHODS OF SCRUTINY

### A. The standard of review is de novo.

The issues in Parts I-III of this brief are questions of law, which are reviewed de novo. *Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991). "Regarding certain largely factual questions in some areas of law, the stakes—in terms of impact on future cases and future conduct—are too great to entrust them finally to the judgment of the trier of fact." *Bose v. Consumers Union*, 466 U.S. 485, 501 n.17 (1984); *see also Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 855 n.15 (1982). Examples include whether a libel defendant had "actual malice," or whether particular speech constitutes "[l]ibelous speech," "fighting words," "incitement to riot," "obscenity," or "child pornography." *Bose* at 503-04, 513. The same is true for whether a confession was voluntary. *Miller v. Fenton*, 474 U.S. 104, 112 (1985); *see also United States v. Friday*, 525 F.3d 938, 949-50 (10th Cir. 2008)(listing numerous cases requiring "independent examination" by appellate courts of "constitutional facts").

Like "actual malice" or "incitement" in a First Amendment context, a trial court's Second Amendment ruling about how severely a law burdens Second Amendment rights is partly factual and is also deeply embedded in the legal

7

meaning of the right itself. Accordingly, it should be reviewed *de novo*. The same is true for a district court's ruling about what arms are "necessary" for self-defense, although, for reasons detailed below, Plaintiffs argue that this matter is not properly one for courts to decide at all.

## B. The Court should follow *Heller*, *McDonald*, and *Reese*.

*District of Columbia v. Heller* held two ordinances unconstitutional: a handgun ban, and a ban on using any firearm for home defense. 554 U.S. 570, 574-75, 629-30 (2008). *McDonald v. Chicago* held that the Second Amendment is incorporated by the Fourteenth Amendment. 561 U.S. 742 (2010).

The Court said much more in dicta, including:

- That certain "longstanding" gun controls are "presumptively lawful." *Heller* at 626-27.

- Because the Second Amendment is not a "second-class right" which can be "singled out for special—and specially unfavorable— treatment," the right is governed by the same "body of rules" as "the other Bill of Rights guarantees" that have been incorporated. *McDonald* at 778-80.

- Handgun prohibition fails "any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller* at 628-29.

- Courts should not engage in "interest-balancing." *Id.* at 634; *McDonald* at 785, 790-91. The Court expressly rejected Justice Breyer's urging that courts must consider "costs and benefits," which included (in Justice Breyer's view) deciding which arms are "necessary" for self-defense. *McDonald* at 790-91; *id.* at 922-23 (Breyer, J., dissenting).

8

- Applying the principle that "costs and benefits" analysis has no role in Second Amendment analysis, the *Heller* and *McDonald* opinions included no data or studies about the costs or benefits of arms or of arms prohibition; by contrast, such information was examined in Justice Breyer's dissents. *Heller* at 693-713 (Breyer, J., dissenting); *McDonald* at 942-44 (Breyer, J., dissenting).

Lower courts are bound by the Supreme Court's dicta, specifically in Second Amendment cases. *Peterson v. Martinez*, 707 F.3d 1197, 1210 (10th Cir. 2013); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)(Tymkovich, J., concurring)("Supreme Court dicta binds us almost as firmly as...the Court's outright holdings...This is particularly so where, as here, the dictum is recent and not enfeebled by later statements")(internal quotations omitted).

In *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010), the Tenth Circuit set forth a two-step test for analyzing Second Amendment cases:

Step one: Is the activity part of the Second Amendment right as traditionally understood? Conversely, is the statute in question a type of the "longstanding" laws that do not infringe the right?

Step two: If the Second Amendment right is implicated, apply heightened scrutiny.

The type of heightened scrutiny depends on the type of statute. Laws applying only to persons who are not "law-abiding citizens" typically receive intermediate scrutiny. *E.g.*, *Reese* at 802 (subject of domestic violence

9

protective order); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)(illegal aliens). The same is true for damaging a firearm in a manner whose purpose is obviously to facilitate crime. *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010)(obliterating serial number).

As with the First Amendment and other fundamental rights, the usual form of Second Amendment review, absent some specific doctrinal exception for a lower standard, should be strict scrutiny. *Tyler v. Hillsdale County Sheriff's Dep't*, 2014 WL 7181334, at *14-15 (6th Cir. 2014). However, some other standard might be used, depending on how close the law comes to the Second Amendment's core of self-defense. *Ezell v. City of Chicago*, 651 F.3d 684, 708-09 (7th Cir. 2011)("not quite 'strict scrutiny'" for municipal ban on target ranges).

The most severe laws—prohibitions on law-abiding citizens—are categorically unconstitutional, without need to delve into the multi-part tests of strict or intermediate scrutiny. *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014)(ban on carrying defensive arms in public places); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)(same).

As for prohibitions on Second Amendment arms, *Heller* established a categorical rule against prohibition. The arms protected by the Second

10

Amendment are those "in common use"; they are "typically possessed by law-abiding citizens for lawful purposes." *Heller* at 624-25, 627. Applying the Second Amendment to handguns was easy after the Court established that the Second Amendment's core was arms for self-defense: handguns are preferred and commonly used by law-abiding citizens, so prohibition was unconstitutional. *Id.* at 628-29; *McDonald* at 744-45; *cf. Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008)(violations of most Establishment Clause rules "are unconstitutional without further inquiry" into a strict scrutiny test).

Significantly, *Heller* and *McDonald* eschewed discussion of the vast empirical evidence about the costs/benefits of handgun prohibition, the frequency of defensive handgun use, the adequacy of long guns as alternatives to handguns, and whether handguns are necessary for self-defense. In contrast, Justice Breyer's dissent carefully analyzed the data about the thousands of murders perpetrated with handguns, and handguns' very disproportionate use in violent crime, compared to long guns. *Heller* at 695-98 (Breyer, J., dissenting).

11

Thus, if the magazines at issue in this case (16-20 rounds for handguns, 16-30 for rifles) are Second Amendment arms, then HB1224 is categorically unconstitutional.

However, this brief will also explain why the magazine prohibition fails strict or intermediate scrutiny, should this Court employ those standards.

## C. Courts may not decide whether "preferred," "common" arms are "necessary for self-defense."

The Supreme Court has made it clear that lower courts *are not* to decide what arms are "necessary for self-defense." In *McDonald*, Justice Breyer's dissent worried that judges deciding Second Amendment cases would need to be "finding answers to complex empirically based questions." Examples included "What sorts of guns are necessary for self-defense?" or whether social science "studies justify a ban." *McDonald* at 922-23 (Breyer, J., dissenting).

Justice Alito's opinion for the Court responded: "Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions….[W]hile his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *McDonald* at 790-91. Lower courts must follow the Supreme Court, and decide Second Amendment cases without deciding "complex empirically based questions," such as what arms are "necessary for self-defense."

12

Yet the district court conducted its own analysis of what arms are necessary for self-defense. Op.30-32.

In contrast, the *Heller* Court had simply listed some of the reasons why Americans "may prefer" handguns; for example, a defender can dial a phone with one hand while holding the gun with the other hand. *Heller* at 629. The *Heller* Court offered no data about defensive handgun use—such as whether anyone has ever actually dialed a phone with one hand while holding a handgun in the other. Instead, the *Heller* Court concluded: "*Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Id.* (emphasis added).

The Court did not adopt the Solicitor General's request for a remand to examine whether long guns are adequate defensive substitutes for handguns. *See* United States amicus br., 2008 WL 157201 at 31 ("whether the firearms that are lawfully available to respondent are significantly less suited to the identified lawful purpose (self-defense in the home) than the type of firearm (i.e., a handgun) that D.C. law bars respondent from possessing"). The district

court's opinion in *Colorado Outfitters* was consistent with the Solicitor General's methodology, but not with the Supreme Court's.[1]

No particular arm, or type of arms, is *necessary* for self-defense. As Justice Stevens observed in *McDonald*, the plaintiffs had not even argued that the Chicago handgun ban "unduly burdened" self-defense, since long guns were still allowed. *McDonald* at 3106-07 (Stevens, J., dissenting). If legislative bodies can decide what is "necessary," then the D.C. and Chicago bans would have been upheld.

*McDonald* explained why *Heller* had ruled against the handgun ban:

> [W]e found that this right applies to handguns because they are the most preferred firearm in the nation to keep and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense.

*McDonald* at 744-45. Because handguns are "preferred," they "must be permitted."

---

[1] *Cf. Cillo v. City of Greenwood Village*, 739 F.3d 451, 462 n.19 (10th Cir. 2013)("Instead of relying on the well established legal rules...the district court applied a 'modified analytical' framework.").

14

Under *Heller/McDonald*, judges defer to the people. The people decide which arms they prefer for self-defense, based on the many variables from home to home and family to family.

Of course *Heller* allows prohibition of arms which are "dangerous and unusual." By definition, these are weapons which are not "in common use" and not "typically used by law-abiding citizens for lawful purposes." *Heller* at 624-25, 627. *Heller*'s standard was not novel. *See Rinzler v. Carson*, 262 So.2d 661, 666 (Fla. 1972)(right extends to arms "commonly kept and used by law-abiding people for hunting purposes or for the protection of their persons and property, such as semi-automatic shotguns, semi-automatic pistols and rifles," not "weapons which are ordinarily used for criminal and improper purposes"); *State v. Kessler*, 614 P.2d 94, 98 (Or. 1980)("hand-carried weapons for defense," not "cannon or other heavy ordnance"); *People* v. *Persce*, 204 N.Y. 397, 403 (1912)("ordinary legitimate weapons for defense," not "instruments which are ordinarily used for criminal and improper purposes").

Contrary to *Heller*, every court which has upheld a magazine ban, starting with a divided D.C. Circuit panel in *Heller II*, has engaged in interest-balancing and decided what arms are necessary for self-defense. *Heller v.*

15

*District of Columbia*, 670 F.3d 1244, 1263-64 (D.C. Cir. 2011)(*Heller II*).[2] Yet *Heller/McDonald* proscribed interest-balancing, for the Second Amendment itself is the "very product of an interest-balancing by the people." *Heller* at 634-35; *McDonald* at 790-91 (re-iterating rejection of judicial interest-balancing).

Judge Kavanaugh's dissent in *Heller II* faithfully followed the categorical rule from the Supreme Court; he pointed out that the D.C. Circuit's methodology in *Heller II* would lead to the wrong result in *Heller* itself. 670 F.3d at 359. The same is true of the opinion below.

Plaintiffs here brought a narrow case, arguing only for Second Amendment protection for magazines of 20 rounds or less for handguns, and 30 rounds or less for rifles. These are, by stipulation, common arms, typically possessed for lawful purposes: "[T]he number of large capacity magazines is in the tens of millions." They "are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home." JA.6:1503-04. By stipulation, the

---

[2] Indeed, many lower federal court cases have followed the approach of Justice Breyer's *Heller* dissent, rather than the opinion of the *Heller* Court. *See* Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L.REV. 703 (2012).

16

banned magazines are the standard magazine for many popular handguns and rifles. *Id.*

The *McDonald / Heller* principle against courts and legislatures deciding the necessity of particular defensive arms is like the rule that courts and legislatures may not enter the "forbidden domain" of deciding the "truth or falsity" of religious claims. *United States v. Ballard*, 322 U.S. 78, 87 (1944). Nor the "importance" or "centrality" of particular religious doctrines. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969); *Employment Division v. Smith*, 494 U.S. 872, 887-88 (1990); *see also Colorado Christian*, 534 F.3d at 1256, 1262 (state program may not "entail intrusive governmental judgments regarding matters of religious belief and practice" or "decide how religious beliefs are derived"). The *Heller / McDonald* principle is also like "the general rule…that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

Government officials have no greater ability than other citizens to discern religious truths, or how "important" some speech is, or which common arms are "necessary" for self-defense. The First and Second Amendments reserve certain intensely personal decisions for individuals and families.

The district court's decision about what is "necessary" for self-defense was apparently influenced by the court's view about persons who wish to own the banned magazines:

> [T]he less competent or confident the user, the greater the number of rounds the user perceives he or she needs. One wonders how these perceptions are affected by exposure to military grade weaponry in news and entertainment.

Op.30-31, n.25.

The record contradicts this view. Elbert County Sheriff Shayne Heap testified that he has received extensive training in defensive firearms use, and is a SWAT-certified expert marksman. JA.10:2159-61. When he was off-duty, at home at night with his family, and intruders began breaking into his wife's automobile, he chose to carry a 17-round magazine when he went outside. JA.10:2161-63. Likewise, Elisa Dahlberg, a member of Women for Concealed Carry, chose to carry a 17-round magazine in light of her seven years of experience as a police officer. JA.11:2211-12.

## II. THE MAGAZINE BAN IS A SEVERE BURDEN ON SECOND AMENDMENT RIGHTS

### A. Magazines holding more than 15 rounds predate the Second Amendment and have been common since at least 1866.

Like First Amendment technology (e.g., televisions, websites), Second Amendment technology is not limited to what existed in 1791. The *Heller* Court described such an asserted limit as "bordering on the frivolous." *Heller* at 582. The Second Amendment applies to arms "that were not in existence at the time of the founding." *Id.*

But even if that were the standard, magazines of more than fifteen rounds are far older than the United States. The first such magazine was manufactured around 1580-90.[3] When the Second Amendment was ratified, the state of the art was the Girandoni air rifle, with a 20- or 22-shot magazine. Merriweather Lewis carried one on the Lewis & Clark expedition, since it was powerful enough to take an elk.

---

[3] The history in Part II.A. was presented with extensive footnotes in Plaintiffs' Trial Brief. JA.7:1674-88; *see also* Kopel, *The History of Firearms Magazines and of Magazine Prohibition*, 88 ALBANY L.REV. (forthcoming 2015), http://ssrn.com/abstract=2473224.

19

The first half of the 19th Century saw the development of numerous multi-shot firearms, including a few multi-barreled "pepperbox" handguns with more than 15 rounds and a larger number of rifles that held 16 or more rounds.

Thereafter, Winchester produced a series of popular rifles—the Model 1866, Model 1873 ("The gun that won the West"), and the Model 1890—whose magazines held 16 or 17 rounds. The Evans Repeating Rifle had 25, 28, or 34 rounds.

The globally popular semi-automatic Mauser and Luger pistols were introduced in the 1890s, with optional 20- or 32-round magazines.

Early in the 20th century, Remington and other companies began making .22 caliber rifles whose magazines held 16 or more rounds. Over 20 models were made in the succeeding decades by classic American manufacturers such as Marlin, Mossberg, Remington, Savage, Stevens, and Winchester. They were often a boy's first gun.

The semi-automatic Auto-Ordnance rifles were introduced in 1927, are still in production today, with magazines over 15. Starting in 1963, the U.S. government's Civilian Marksmanship Program put nearly a quarter-million surplus M-1 carbines into the hands of law-abiding citizens. Commercial

20

manufacturers produced over 200,000 more. The standard magazines are 15 and 30 rounds.

Introduced in 1963, the most popular rifle in American history is the AR-15[4] platform, whose standard magazines are 20 or 30 rounds. Defendant has stipulated that "Several million AR-15 platform rifles…are used for lawful purposes…by law enforcement officers…[and] by private citizens." As of 2011, these "rifles accounted for approximately 18% of all rifles made in the United States for the domestic market." JA.6:1502. Competitors include Springfield Armory's M1A (1974, 20 rounds) and Ruger's Mini-14 (1975, 5-, 10-, or 20-rounds).

At least 45 modern rifles come with standard magazines of at least 16 rounds; manufacturers include venerable companies such as Colt, Marlin, Ruger, and Smith & Wesson, as well as many newer ones.[5]

As for handguns, the Plainfield Machine Company's 30-round pistol (1964) was American-made, and the imported Beretta model 92, a 9mm pistol with a

---

[4] "AR" stands for "ArmaLite Rifle," named for the company that did the initial design.
[5] GUN DIGEST 2014 at 416-22, 456-62, 490-95, 497 (Jerry Lee ed. 2013).

16-round magazine, has been one of the most popular guns since its 1976 introduction.

There are at least 49 currently-manufactured handguns with standard magazines of at least 16 rounds, from companies such as Beretta, Glock, Ruger, Smith & Wesson, and others.[6] About 25% of handgun shooters at the largest public target range in Colorado use magazines over 15. JA.11:2368.

Plaintiffs' expert Massad Ayoob, who has 42 years of experience training law enforcement officers and citizens, testified that three of the most popular handguns for self-defense training are the full-sized (i.e., not compact or subcompact) 9mm firearms from Smith & Wesson, Glock, and Springfield, all with standard magazines of at least 16.[7] JA.11:2268-70, 2280-81, 2291, 2294-96; *see also* JA.6:1504 (stipulating that the 17-round Glock "is one of the most popular handguns" and "often used by law enforcement personnel").

By stipulation, tens of millions of 16-30 round magazines "are used for multiple lawful purposes." JA.6:1503-04. Arms which have been "in common

---

[6] GUN DIGEST 2014, at 383-84, 387-88, 390-91, 393, 395-97, 403, 412, 414, 418-19, 422-23, 426, 428-29.

[7] HB1224 is a de facto ban on the Springfields, because there are no smaller magazines made for it. The same is true for popular handguns from other manufacturers. JA.13:2703, 2708-08.

22

use" and "typically possessed by law-abiding citizens for lawful purposes" for a century and a half have not suddenly become "dangerous and unusual" in the 21st century. *See Heller* at 624-25, 627. Moreover, "widespread acceptance…within the law enforcement community also supports the conclusion that they are not so dangerous or unusual as to fall outside the purview of the second amendment." *State v. DeCiccio*, 315 Conn. 79, *20 (2014)(police batons).

The district court pointed out that such magazines are sometimes used in crime, including notorious mass murders. Op.2, 33-34. This is true; and it is much more true for handguns, which are used in about half of all murders, far more often than other types of firearms. *Heller* at 698 (Breyer, J. dissenting): JA.24:5095 (mass shootings). Yet, *Heller* stated that handgun bans fail every level of heightened scrutiny. *Heller* at 628-29.

## B. The burden is particularly severe because it applies in the home.

The home is "where the need for defense of self, family, and property is most acute." *Id.* at 628. "[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates *above all other interests* the right of law-abiding,

23

responsible citizens to use arms in defense of hearth and home." *Id*. at 635 (emphasis added).

Thus, "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). The amicus brief of the California Rifle & Pistol Association explicates additional precedent on strict scrutiny.

## C. The lower court's conclusion that the burden is small was erroneous.

The trial court concluded that the burden of HB1224 is small, because law-abiding citizens can use smaller magazines instead, and people rarely fire more than 15 shots in self-defense. Op.28-32.

*Heller* precludes such detailed analysis of self-defense situations. *Heller* does not discuss whether anyone has ever actually fired a handgun in self-defense, nor whether long guns could be used instead. Giving deference to individual choices, the Court simply pointed out that handguns are the most popular defensive arm. *Heller* at 629. As the decision affirmed by *Heller* declared, justifying a ban on some arms because "residents still have access to hundreds more" types of arms is "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd Heller* at 636.

24

## 1. Constitutional protection is not contingent on how often the trigger is pulled.

None of the law enforcement officers testified that he or she has ever fired a shot in self-defense.[8] Under *Heller*, constitutional protection is not contingent on whether guns are fired. Unfired firearms are protected by the Second Amendment just as unread books are protected by the First. Analogously, other Circuits have upheld the Second Amendment right of law-abiding citizens to obtain handgun carry licenses, without any consideration of how often carried handguns are used for self-defense. *Peruta*, 742 F.3d 1144; *Moore*, 702 F.3d 933.

## 2. Citizens choose standard capacity magazines because reserve capacity is important.

A defender becomes especially vulnerable during reloading—with her hands occupied and the gun incapable of firing. JA.10:2096-99 (expert Shain). "[E]very second the defender cannot fire is a second of absolute helplessness."

---

[8] The trial court stated, "Of the many law enforcement officials called to testify, none were able to identify a single instance in which they were involved where a single civilian fired more than 15 shots in self-defense." Op.29. This is not entirely correct, nor is it a relevant consideration under *Heller*. A former Colorado Springs Police Chief testified about an incident in which a citizen fired more than 15 rounds, was prosecuted, and acquitted on grounds of self-defense. JA.15:3256-57, 3263-64.

JA.11:2289-90, 2292-94 (expert Ayoob). While reloading, the defender does not have what the Second Amendment guarantees: an "operable" firearm. *Heller* at 576, 628, 630, 635 (striking law that required guns in the home be kept locked or disassembled). Magazine changes are theoretically possible while under attack, but it would be reckless to count on being able to perform one quickly enough while under assault. JA.11:2216-17 (former Air Force M.P. Elisa Dalhberg).

As the trial court accurately noted, in most situations, the mere display of a firearm, or firing one or two shots, ends the attack. Op.30. Other times, more rounds are needed. Even highly-trained N.Y.P.D. officers only hit the attacker about a third of the time, and attackers are often not stopped by a single hit, especially if they are under the influence of drugs. JA.11:2321-23 (Ayoob); JA.16:3461 (18 hits and criminal was still walking)(Defendant's expert Cerrar). The ordinary citizen, without the benefit of hundreds of hours of government-supplied training and supervised practice, would presumably be even more challenged in delivering a fight-stopping hit.[9]

---

[9] Defensive issues are elaborated in the Western State Sheriffs' Association amicus brief.

Defendant's expert Jeffery Zax explained that in a "violent interaction," events "evolve in ways that are unexpected." So a person might

> want to keep six rounds in reserve because I don't know who is coming around the corner, I don't know how I'm going to make my escape, I don't know all of those things….With a smaller magazine, the opportunity cost of each round is greater….The objective is to accomplish your objective while holding enough fire power in reserve to protect yourself if things go bad. So as an economic matter, you would never expect anyone to go into these kinds of interactions with the intent of exhausting their magazine.

JA.17: 3657-60. Thus, HB1224 "would be effective in reducing the number of discharges issued by anyone carrying a firearm." JA.17:3732.[10]

Zax's hypothetical was about a criminal, but it applies with more force to the surprised victim. For victims, the "violent interaction" is far more unpredictable than it is for criminals, since the criminals choose the time, place, manner, and targets for their attack. The number of rounds available to repel an attack, or buy time until help arrives, will often be the number of

---

[10] The district court wrote that the firearms trainers on both sides characterized defensive shooters with "high capacity" firearms as needing to be trained out of the temptation to "spray and pray"—to "fire all of their rounds in the hope that at least one shot will hit the intended target." Op.33-34. Actually, both witnesses testified that this is a training issue only for some persons who had previously carried revolvers, and were transitioning to semi-automatics. JA.11:2279, 16:3382-83.

rounds in the magazine in the gun, because a victim is unlikely to be carrying a spare magazine when the surprise attack begins. JA.11:2272-80 (Ayoob).

Reserve capacity is especially important when there are multiple attackers. In 2008 there were 800,000 violent crimes in which the victim was attacked by at least two criminals—17% of total violent crimes. JA.12:2489-90 (expert Kleck). Defendant's witness Lorne Kramer, former Police Chief of Colorado Springs, testified that based on his 39 years of experience, most home invasions involve more than one attacker. JA.15:3276.

## 3. The magazine ban has forced official law enforcement auxiliaries to shift to less suitable arms.

Unmentioned in the district court's opinion is the direct evidence of harm caused by the magazine ban. The Colorado Mounted Rangers (CMR) is a volunteer organization of 200 citizens which provides assistance pursuant to formal agreements with over 30 Colorado Sheriffs' Offices, Police Departments, and other local governments. Many Rangers are retired law enforcement officers. JA.13:2760, 2768-69, 2771-72. In 2013, they provided 50,000 hours of services to local governments. JA.13:2772-73. They train to the same high standards as the Colorado State Patrol. JA.13:2773-75. They respond to violent crimes, prison escapes, natural disasters, backcountry search and rescue, and everything else that enforcement officers do. JA.13:2777-86.

28

The CMR volunteers are not government employees, and so have no exemption from the magazine ban. Because they train frequently and hard, their magazines are often damaged or worn out by training. They cannot replace such magazines. JA.13:2792-94. The full-size Springfield 9mm pistol preferred by many Rangers is not available in Colorado, because there is no magazine of under 16 rounds for the firearm. JA.10:2090 (expert Shain).

Many Rangers have stopped using their preferred handguns—medium-powered 9mm Springfield, Smith & Wesson, or Glock pistols with a standard capacity of 16-20 rounds. They have shifted to higher caliber .40 or .45 handguns with standard magazines of 15 or fewer. These handguns are higher-recoil and more difficult to control than the 9mm pistols the Rangers have been compelled to replace. HB1224 forced many Rangers to stop using the arms that were the best fit for them. JA.13:2788-95.[11]

_____

[11] HB1229 harms the ability of Rangers to use law enforcement office rifles or shotguns kept in patrol cars (particularly during natural disasters lasting more than 72 hours), and to loan firearms for training, especially during their multi-day (more than 72 hours) rifle training. JA.13:2796-98.

29

## D. Statewide prohibition, including in the home, is not a "time, place, or manner" regulation.

The trial court suggested an analogy to time, place, and manner regulations under the First Amendment. Op.23, n.19. This is not an apt analogy for arms prohibition. By definition, time/place/manner regulations only limit time or place or manner. "Additional restrictions *such as an absolute prohibition on a particular type of expression*" are subject to strict scrutiny. *United States v. Grace*, 461 U.S. 171, 177 (1983)(emphasis added); *see also Heller* at 629 (citing with approval state court cases which struck bans on gun carrying; these laws did not merely regulate the manner, such as by requiring that carrying be open rather than concealed).

A "time, place, or manner" restriction limits an activity in some situations—such as restricting soundtrucks on public streets, but not in parks or open spaces. *Kovacs v. Cooper*, 336 U.S. 77 (1949). Or it may prohibit altering otherwise-lawful firearms in a manner whose only purpose is to facilitate crime (by obliterating the serial number). *Marzzarella*, 614 F.3d at 95.

HB1224 absolutely prohibits possession of the magazines at all times, in all places, and in all manners.

If the government carries its burden of proving that a statute is a reasonable time/place/manner regulation, the government must then prove that there are

30

sufficient "alternative channels." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1134-35 (10th Cir. 2012).

A government does not meet its burden merely by pointing out that there are many alternative ways to exercise the right. *Spence v. State of Washington*, 418 U.S. 405, 411 n.4 (1974)(rejecting lower court conclusion that a burden on speech was "minuscule and trifling" because there were "thousands of other means available . . . for the dissemination of his personal views."); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 879-80 (1997)(rejecting similar argument as "equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books").

The First Amendment point in *Reno* was repeated in the Second Amendment context of *Heller*: "It is no answer to say…that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller* at 629. At oral argument, Chief Justice Roberts rejected the District's argument that long guns were alternatives to handguns:

"So if you have a law that prohibits the possession of books, it's all right if you allow the possession of newspapers?" *Heller* Tr. at 18-19.[12]

In the Tenth Circuit, a court "generally will not strike down a governmental action" for inadequate alternative channels "unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." *Albuquerque*, 667 F.3d at 1136 (internal quotation marks omitted). Here, the prohibition is statewide, and reaches into the home.

The alternative channels doctrine has never been used to justify the criminalization of in-home possession of First Amendment items. The alternative channels doctrine may support limits on distributing leaflets at the county fair, but not criminalizing the ownership of leaflets in one's home.

## III. THE MAGAZINE BAN ADVANCES NO LEGITIMATE STATE INTEREST, AND FAILS HEIGHTENED SCRUTINY

This Part III will discuss strict and intermediate scrutiny in parallel. Because HB1224 fails intermediate scrutiny, *a fortiori* it fails strict scrutiny.

---

[12] http://www.supremecourt.gov/oral_arguments/argument_transcripts/07-290.pdf

Under intermediate scrutiny, "The burden of justification is demanding and it rests entirely on the State." The state's explanation must be "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *State v. DeCiccio*, 315 Conn. at *25 (quoting *U.S. v. Virginia* in Second Amendment intermediate scrutiny); *see also Reese*, 627 F.3d at 802 (under Second Amendment intermediate scrutiny, "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective")(internal quotation omitted).

The district court did not assert that magazine bans are "longstanding" laws of the type which *Heller* called "presumptively lawful." *Heller* at 626-27. This was historically correct. *See* Kopel, ALBANY L. REV. at 11-14 (no magazine bans when Second and Fourteenth Amendments were ratified; two-state level bans in Alcohol Prohibition era, which were later repealed); *Heller II*, 670 F.3d at 1260 (magazine bans are not longstanding and have no presumption of validity).

## A. Criminal use of arms does not justify prohibition for the law-abiding.

Justice Breyer's *Heller* dissent accurately stated that handguns, besides being preferred by law-abiding citizens, "are the overwhelmingly favorite

33

weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). This is because "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous." *Id.* at 711.

Yet according to the *Heller* majority, a handgun ban "would fail constitutional muster" under any form of heightened scrutiny. *Heller* at 629. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* at 636. As described in Part II.A., magazines of 16-30 rounds are protected arms, being "in common use," "typically possessed by law-abiding citizens for lawful purposes," and have been so for at least a century and a half. Thus, prohibition of such magazines is "off the table."

Moreover, examination of HB1224's exemptions, and its sponsors' rationale, shows that there is no legitimate government interest in *prohibition* (rather than regulation). Because the burdens of the prohibition fall on the law-abiding, HB1224 also fails narrow tailoring, because there are less burdensome alternatives, such as licensing or background checks.

## B. There is no legitimate state interest in magazine prohibition.

"The legitimate and compelling state interest in protecting the community from crime cannot be doubted." *Schall v. Martin*, 467 U.S. 253, 264 (1984).

Preventing criminals from acquiring firearms, ammunition, or magazines is a legitimate state interest.

As the Colorado General Assembly has recognized, firearms can be used for good or for ill. Thus, the legislature has created background check and licensing systems to allow acquisition and carrying by the law-abiding, while attempting to impede criminals.

The sponsors of HB1224 explained their rationale for prohibition, rather than licensing and regulation. HB1224's prime sponsor stated: "High-capacity magazines have one purpose. That purpose is to kill, steal and destroy. High-capacity magazines were designed to have one purpose and that is to kill large numbers of people quickly." JA.19:4058. This theme was repeated throughout the debate. JA.19:3921 (twice); 19:4044, 4059-60; JA.20:4388. It was repeated by the lead sponsor in the Senate. JA.19:4113. This sweeping characterization was never challenged by any legislator who voted in favor of the bill.

Yet, we have the unusual situation in which Defendant has stipulated that the premise of the legislation is false: "Semi-automatic firearms equipped with detachable box magazines with a capacity greater than 15 rounds are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense

35

outside the home." JA.6:1503. The legislation provides no room for these concededly lawful uses.

Moreover, the exemptions are inconsistent with the HB1224's rationale. Most notably, HB1224 allows Colorado manufacturers to produce and export such magazines to other states. C.R.S. §18-12-302(3)(a)(III) & (V), (3)(c). If mass murder were a magazine's only purpose, there could be no legitimate government interest in sanctioning production of items for mass murder in other states. Clearly, magazines of 16-30 rounds have, as Defendant stipulated, legitimate purposes; but the opposite view so colored the enactment of HB1224 that the resulting prohibition is a very poor fit to the legitimate interest of protecting public safety.

To emphasize: Plaintiffs have made no argument against screening persons for acquisition of magazines. The question in this case is not whether there might be a legitimate, important, or compelling state interest in a screening system. The issue is whether there is a state interest in prohibition for the law-abiding—especially when the prohibition's loopholes demonstrate the falsity and irrationality of the rationale for prohibition.

## C. Prohibition fails narrow tailoring, under either intermediate or strict scrutiny.

The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, at 780. The Second Amendment must not be "singled out for special—and specially unfavorable—treatment." *Id*. at 778-79. Rather, it is subject to the same "body of rules" as "the other Bill of Rights guarantees" that have been incorporated. *Id.* at 780. *Cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 484 (1982)("we know of no principled basis on which to create a hierarchy of constitutional values"). However, the district court declined to consider narrow tailoring. Op.24, n.20.[13]

-------------------------------------------------

[13] The court noted that cases involving prohibited persons (recipients of domestic violence restraining orders, or illegal aliens) had not examined narrow tailoring. But narrow tailoring was irrelevant to a ban on individuals who have been identified as unsuitable to possess firearms, based on their behavior.

Handgun prohibition fails intermediate scrutiny, because it fails "any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller* at 628-29. Yet reducing handgun crime is an "important" government interest, and there was a large body of (disputed) social science evidence indicating that prohibition was effective. The only possible reason for why handgun prohibition for the law-abiding fails intermediate scrutiny is that it is not narrowly tailored.

The amicus brief of California Rifle & Pistol Association elucidates the doctrinal errors in the district court's omission of narrow tailoring.

37

Whether a case involves the First or Second Amendments, application of heightened scrutiny must consider narrow tailoring. The trial court's failure to do so treated the Second Amendment as a second-class right.

## 1. The *McCullen* standard for narrow tailoring

The Supreme Court's most recent articulation of the narrow tailoring prong of intermediate scrutiny is *McCullen v. Coakley*, 134 S.Ct. 2518 (2014). The case involved restrictions on abortion clinic picketing.

Chief Justice Roberts' opinion explained that for a law to pass intermediate scrutiny, it "must be narrowly tailored to serve a significant government interest." *McCullen* at 2529. "[T]o be narrowly tailored, it must not burden substantially more speech than necessary to further the government's legitimate interests." *Id.* at 2535 (internal quotation omitted).

So "to meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *Id.* at 2540. The alternative measure "need not be the least restrictive or least intrusive means of' serving the government's interests." *Id.* at 2535 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). "But the government still 'may not regulate expression in such a manner that *a substantial portion of the burden on speech*

*does not serve to advance its goals.*'" *Id.* (quoting *Ward* at 799-800)(emphasis added).

The Tenth Circuit adheres to this standard. *Golan v. Holder*, 609 F.3d 1076, 1083 (10th Cir. 2010) *aff'd*, 132 S. Ct. 873 (2012)(must "not burden substantially more speech than necessary to further those interests"); *Doe v. Shurtleff*, 628 F.3d 1217, 1233 (10th Cir. 2010) (must be "'narrowly drawn' to serve that interest 'without unnecessarily interfering with First Amendment freedoms'"). Other Circuits in Second Amendment cases concur. *See Peruta*, 742 F.3d at 1177 (a "reasonable fit" means that the regulation is not substantially broader than necessary to achieve the government's interest); *Marzzarella*, 614 F.3d at 98.

As the Supreme Court wrote in *NAACP v. Alabama*, "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." 377 U.S. 288, 307 (1964). The Court explained that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 307-08 (quoting *Shelton v. Tucker*, 364 U.S. 479, 488

39

(1960)). The Colorado Supreme Court, quoting the above, applied this principle in a right-to-arms case, declaring unconstitutional an overly-restrictive municipal ordinance on firearms transportation. *City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972). Other states have favorably cited *Pillow*.[14]

Under *McCullen*, the decisive question is whether "a substantial portion of the burden on speech does not serve to advance its goals." 134 S.Ct. at 2535. Virtually all of the burden of HB1224 falls on the law-abiding. The prohibition applies equally to criminals and to law-abiding citizens—including those with the greatest self-defense needs, such as persons with disabilities, retired law enforcement, and women.

As with the D.C. handgun ban, the number of law-abiding citizens who are deprived of their preferred arms is vastly larger than the number of criminals affected. This is the opposite of narrow tailoring.

---

[14] *E.g.*, *Winters v. Concentra Health Servs.*, 2008 WL 803134 *3 (Conn. Super. 2008)(right to carry); *City of Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979)(same); *City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W.Va. 1988)(same).

40

## 2. That prohibition is theoretically simpler to enforce than regulation does not mean that prohibition is narrowly tailored.

Banning all lawful use to prevent criminal misuse is unconstitutional in the context of enumerated rights. *E.g.*, *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808–09 (1984)(city cannot ban handbilling just because some people litter); *Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007)(citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)(city cannot ban spray paint and markers by young people just because some people criminally graffiti).

"To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S.Ct. at 2540. A broad ban that does not accommodate lawful activity is not narrowly tailored. *Ward*, 491 U.S. at 800.

Defendant never offered evidence that alternatives short of prohibition would fail to achieve the government's legitimate interests.

An Ohio statute (repealed in December 2014) used to require a special license for buying a semi-automatic firearm with a magazine of 32 or more

rounds. OHIO REV. CODE ANN. §§2923.11(E); 2923.17.[15] Massachusetts has a licensing system for gun ownership in general; anyone with the standard license may acquire "large" magazines. MASS. GEN.L. ch.140, §121, 131(a).

Or, like firearms, magazine purchases could be subject to Colorado's existing background check system. *See* C.R.S. §24-33.5-424.

Or the purchase of magazines could be restricted to persons who have passed an especially rigorous check: the issuance of a concealed carry permit. In Colorado, this requires a biometric check (fingerprints) by both the FBI and the Colorado Bureau of Investigation; plus safety training, some of which must be conducted in-person (allowing the trainer to observe the applicant's fitness). If a concealed carry applicant passes these tests, the Sheriff can still veto the applicant, if the Sheriff has reason to believe that the applicant would be a danger to self or others. C.R.S. §§18-12-202, 203, 205. Not surprisingly, the crime rate of persons who are issued concealed carry permits is very, very low, including in Colorado.[16]

---

[15] 2014 Ohio Laws File 165 §2 (Am. Sub. H.B. 234)(repealing relevant definition statute, and taking effect Mar. 22, 2015).
[16] Fournier, *Firearm Notification Laws Put Concealed Carriers in Law Enforcement's Sights*, 44 U. TOL. L.REV. 179, 198 n.177 (2012)(Michigan's major crime rate for concealed handgun permitees is 1/75th of that for the non-

The district court's opinion did not address the existence of reasonable alternatives, even though *McCullen* and its predecessors require consideration of narrow tailoring.

The Supreme Court has rejected the notion that arms bans for the law-abiding are justified to prevent unlawful use by criminals. *Heller* at 636; *id.* at 712 (Breyer, J., dissenting)(arguing that lawfully-owned handguns could be stolen by criminals); *cf. Fotoudis v. Honolulu*, 2014 WL 4662385 at *5 (D. Haw. 2014)(prohibition of gun ownership by lawful permanent resident aliens is not "narrowly tailored," because it applies "regardless of whether they are otherwise qualified to acquire firearms, and regardless of whether they might pose a threat to others").

---

licensed population); Kopel, *Pretend "Gun-Free" School Zones: A Deadly Legal Fiction*, 42 CONN. L.REV. 515, 564-69 (2009)(similar data from Minnesota, Michigan, Ohio, Louisiana, Texas, Florida).

Colorado data are reported annually to the legislature. C.R.S. §18-12-206(4). The reports are available on the website of County Sheriffs of Colorado, www.csoc.org. In 2009-2013, there were 154,434 permits. There were 1,390 permit revocations in this period, including 931 for an arrest. Contrast this with the arrests of over 200,000 Colorado adults in 2013 alone. FBI, CRIME IN THE UNITED STATES 2013, table 69, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-69/table_69_arrest_by_state_2013.xls.

If prohibition for the law-abiding were construed to pass narrow tailoring, then the D.C. handgun ban would have been upheld.

### D. Magazine prohibition does not materially advance an important state interest, nor is it necessary to a compelling state interest.

Under intermediate scrutiny, "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Reese*, 627 F.3d at 802.

Defendant bears the burden of proving a "reasonable fit" or a "substantial relationship" between the ban and a "significant, substantial, or important" government objective. *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013)(citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)). This requires a demonstration that the law is likely to advance that interest "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).

The government's "burden is not satisfied by mere speculation or conjecture"; instead, it "must demonstrate that the harms it recites are real and that its restriction *will in fact alleviate them.*" *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)(emphasis added). Defendant must prove with

"*substantial* evidence" that the statute "*will* alleviate" the identified harm "*in a material way.*" *Turner Broad. Sys. v. F.C.C.*, 520 U.S. 180, 195 (1997)(*Turner II*)(emphasis added); *Edenfield*, 507 U.S. at 770-71 ("will in fact alleviate them to a material degree").[17]

In intermediate scrutiny, courts "must accord substantial deference to the predictive judgments" of legislatures. *Turner II* at 195 (quoting *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 665 (1994)(*Turner I*)).[18] The deference does not mean that the government is thereby "insulated from meaningful judicial review." *Turner I*, 512 U.S. at 666 (plurality opinion). The court must "assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner II*, 520 U.S. at 195; *Turner I*, at 666.

The word "deference" is not a talisman that lets the government "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 438 (2002)(plurality). "Speculation" and "conjecture" fail intermediate

---

[17] The deference is only for the government's articulated interest; there is no deference in reviewing "the fit between the asserted interests and the means chosen to advance them." *Peruta*, 742 F.3d at 1177.

[18] This deference exists only for intermediate scrutiny, not strict scrutiny. *Kitchen v. Herbert*, 755 F.3d 1193, 1223 n.10 (10th Cir. 2014).

scrutiny. *Edenfield*, 507 U.S. at 770-71; *Lorillard Tobacco*, 533 U.S. at 528. So do "illogical" or "implausible" arguments. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

"Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Kitchen*, 755 F.3d at 1223 (quoting *Turner I*, 512 U.S. at 622). At the same time, the "mere possibility" that a gun control law will save lives is not enough. *Moore*, 702 F.3d at 939. If it were, "Heller would have been decided the other way." *Id*.

Applying intermediate scrutiny in a Second Amendment case, the Connecticut Supreme Court summarized that "three interrelated concepts must be considered: the factual premises [that] prompted the legislative enactment, the logical connection between the remedy and those factual premises, and the breadth of the remedy chosen." *DeCiccio*, 315 Conn. at *25 (citations and internal quotations omitted). All three concepts demonstrate that the magazine ban fails either form of heightened scrutiny.

## 1. Preventing ordinary criminals from acquiring magazines.

"[T]he very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous." *Heller* at 711

46

(Breyer, J., dissenting). So too with magazines. Criminals, defenders, and law enforcement rarely fire more than 10 shots in a given encounter, let alone 15. Even so, for both offense and defense, reserve ammunition in the magazine is very helpful, for the reasons described in Part II.C.2.

Thus, inhibiting possession of magazines more than 15 rounds by criminals is a legitimate government interest. A special punishment, such as enhanced sentencing, for possession of such magazines by convicted felons would be "presumptively lawful." *Heller* at 626-27 n.26. HB1224 did not take the "presumptively lawful" path.

The evidence at trial indicated that magazine prohibition for everyone is a poor fit for reducing criminal use of magazines. The U.S. Department of Justice commissioned a study on the 1994 federal statute prohibiting magazines of more than 10 rounds. The 2004 report was issued in the summer of 2004, shortly before the federal ban was scheduled to sunset. Using national and city-level data, the report found no evidence that the statute had reduced criminal use of such magazines. JA.23:5042-53, 5056-71.

Defendant, however, offered testimony from University of Colorado economist Zax, who studied magazine seizures by law enforcement in Virginia from 1994 to 2004. Because he had not testified before the legislature,

47

Plaintiffs objected to his testimony as being outside the scope of evidence considered by the legislature. JA.17:3575.

Plaintiffs also filed a motion in limine against Zax's Virginia testimony, which was disclosed after the close of discovery; and to which Plaintiffs were not allowed to offer rebuttal testimony. JA.17:3564-74, 3749-51; *cf.* Op.35 (charactering his testimony as "unrebutted").

According to Zax, in Virginia, magazines above ten rounds as a percentage of magazines seized by law enforcement rose, and later fell. JA.17:3609.

His methodology and conclusions were flawed. His model made the assumption (for which he provided no evidence) that demand for "large" magazines (more than 10 rounds) was flat from 1993-2002, and then increased after that. JA.17:3605. A quarter of the data were missing, but Zax assumed this had no effect, although he did not know which agencies had failed to report data. JA.17:3597-98.

Zax's data showed a decline in magazine seizures starting in 1997. JA.9:3607. In 1997, the U.S. Attorney for the District of Richmond initiated Project Exile, prioritizing prosecution of federal gun crimes. The possession of such a magazine over 10 rounds was a separate offense, for which a criminal could be federally charged. 18 U.S.C. §922(w)(repealed Sept. 13, 2004). Zax

48

admitted that his study had not accounted for Project Exile. Indeed, he had never heard of it. JA.17:3698-99.

As for whether magazine bans affect how often criminals shoot, the only empirical evidence was to the contrary. Defendant's witness Dr. Ernest Moore (editor of the *Journal of Trauma and Acute Care Surgery*), testified about a January 2014 article in his *Journal*; the article reported that at the Newark, N.J., trauma center, the number of gunshot victims who had more than one wound has more than doubled—in a state which has had a 15-round magazine limit since 1990. JA.15:3242-45.

The district court and the legislature erred in relying on data that 31-41% of fatal shootings of police officers involve "large" magazines. Op. 32-33. That study was about magazines over 10 rounds, not 15 rounds. JA.23:4992. Moreover, magazines over 10 rounds comprise about 47% of magazines sold in the last quarter century. *See* Western State Sheriffs' Association amicus brief. Thus, they are disproportionately *less* likely to be used in shootings of police. They are also less likely to be used in general crime, since the larger magazine size comes at the expense of concealability. As Defendant's witness Lorne Kramer testified, the "Typical street criminal does not" carry a firearm with a magazine over 15 rounds. JA.15:3275.

49

However, handguns *are* disproportionately used in murders of police—87%. *Heller* at 695 (Breyer, J., dissenting). This fact was considered by the *Heller* Court to be of no constitutional significance when the Court rejected interest-balancing and declared that the handgun ban failed every level of heightened scrutiny.

## 2. Reduction of magazine use by mass killers.

An oft-stated rationale for HB1224 was to reduce harm from mass attacks because the short interval required to change magazines might allow people to escape or fight back.

Whether HB1224 has a "substantial relationship" to furthering that interest involves two predictions: First, that HB1224 will reduce use of the banned magazines by mass murderers. Second, that if the first prediction comes true, it will reduce harm. This Court must give substantial deference to predictive judgments of the legislature, while not allowing rationales that are speculative or implausible. As always in heightened scrutiny, the burden of proof is on the government.

Zax presented no study, nor any other empirical evidence. Rather, he relied on the elementary economic principle of a demand curve: when the price rises, the demand falls. As he said more than once, "even addicts" respond to price

50

increases. JA.17:3792. Because HB1224 means that acquiring a magazine over 15 rounds requires a trip to Cheyenne, Goodland, Farmington, Raton, Sidney, or someplace further, the cost of acquiring such a magazine is increased.

However, sociopaths who plan a one-time mass murder are not "addicts." An addict is someone who frequently, compulsively, and at many different times repeats a behavior (e.g., gambling) or consumes something (e.g., cigarettes, alcohol, heroin). Magazines are not consumables. They are a one-time or infrequent purchase. For the mass murderer, they are for a one-time event. Platitudes about addicts have *no* relevance in proving that a Colorado-only ban would have any effect in reducing magazine use by mass killers. The uncontradicted testimony of expert Gary Kleck is that mass murders are planned over a long period of time. JA.12:2486-87. Zax agreed that they engage in "meticulous planning." JA.17:3727.

Instead of Zax's implausible speculations, this court can instead consider real-world experience. Has the need to change magazines helped thwart a criminal? Yes, but so rarely that it cannot provide constitutional support for prohibition.

As described by Professor Kleck, at a 1998 attack at a high school in Springfield, Oregon, the criminal was tackled while changing a magazine.

51

JA.12:2471-72. The same thing may have happened during a 1993 Long Island Rail Road attack, although details are murkier. JA.12:2473-74, 16:3481-82, 17:3535-36.

It is notable that the legislature never considered either of these incidents. Legislative supporters of HB1224 did mention Newtown, Aurora, and Tucson. But in these three incidents, the criminal's gun malfunctioned and jammed. According to Defendant's witness Fuchs, the Newtown criminal changed magazines at least seven times, and dropped magazines which were not empty. JA.16:3498, 17:3547-48. Fuchs admitted that he did not know whether victims had escaped because of a jam or because of a reload, and he acknowledged that the Connecticut State Police emergency services unit had determined that the cause may have been a malfunction. JA.16:3498-3501, 17:3535, 3544-46. Thus, no-one escaped during a magazine change, and several people escaped during a malfunction—which makes sense, because clearing a malfunction necessarily takes longer than changing a magazine, and there is no evidence in the record that they take the same amount of time.[19] Similarly, it was stipulated that a

_____

[19] Clearing a malfunction typically involves both steps of a magazine change (remove the magazine; later, insert a magazine), plus the intermediate step of

52

gun jam in Aurora allowed people to escape. JA.17:3638. Regarding Tucson, Defendant's witness insisted that the criminal's gun had not jammed, but his only reason for believing so was his certainty that Glock pistols never jam. JA.16:3358-60. The parties later stipulated that Glock pistols can jam. JA.18:3763.

If one or two isolated instances of a benefit were enough to pass intermediate or strict scrutiny, then the D.C. handgun ban would have easily been upheld, considering the numerous handgun murders, and handguns' very disproportionate use in violent crime, compared to long guns. *Heller* at 695-98 (Breyer, J., dissenting). Unlike in the instant case, the *Heller* and *McDonald* Courts had before them research studies arguing that the D.C. and Chicago handgun bans had saved many lives. *Heller* at 703-04 (Breyer, J., dissenting); *McDonald* at 943 (Breyer, J., dissenting).

The trial record had four anecdotes of citizen defenders firing more than 15 rounds in self-defense. (Three from Plaintiffs' expert Ayoob, Op.28-29; one from Defendant's witness, former Colorado Springs Chief Kramer. JA.15:3256-57,

---

correcting whatever was causing the malfunction. Fixing something that is broken takes a while.

3263-64.) Which is more than the number of verified anecdotes about magazine changes thwarting a criminal.

But that is not the point. *Heller* did not attempt to quantify criminal uses vs. lawful uses of handguns.

Moreover, the harm to self-defense is impossible to quantify, since, as discussed in Part II.C.2., lay testimony and expert opinion on both sides concur that the most typical defensive benefit of a magazine of more than 15 rounds is the presence of reserve capacity. Nor can anyone quantify the public safety damage when Sheriffs and their deputies cannot obtain standard handgun and rifle magazines—because HB1224 allows them to possess magazines, but forbids manufacturers from outside Colorado to supply such magazines to law enforcement. (*See* Part IV.C.)

The costs and benefits are beyond anyone's ability to ascertain. That is one practical reason why *McDonald* and *Heller* reject the "costs and benefits" approach favored by Justice Breyer and the district court. *McDonald* at 790-91.

The Second Amendment "is not the only constitutional amendment that has controversial public safety implications. All constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall

54

into the same category." *Id.* at 783. The exclusion of illegally seized evidence under the Fourth Amendment and of involuntary confessions under the Fifth and Sixth Amendments returns killers and rapists to the street to repeat their crimes. *Id.*

The public safety issues are simpler in the instant case. Plaintiffs are asserting only the interests of law-abiding citizens. As with firearms, narrowly tailored laws that screen magazine purchasers may be employed.

## IV. SHERIFFS' STANDING

Plaintiffs carry the burden of demonstrating standing. *Opala v. Watt*, 454 F.3d 1154, 1157 (10th Cir. 2006). All issues related to standing are questions of law, to be reviewed de novo.[20]

### A. Under the Political Subdivision Doctrine, the Sheriffs have standing because they have "a personal stake."

Review of a district court's grant of a Rule 12(b)(6) motion to dismiss is de novo. *Commonwealth Prop. Advocates v. Mortgage Elec. Registration Sys.*, 680

---

[20] Plaintiffs are not appealing the trial court's ruling that John Cooke does not have standing to challenge HB1229. Op.14. According to the trial court's earlier ruling, he had been allowed into the case only to challenge HB1224. JA.9:1886-90.

F.3d 1194, 1201 (10th Cir. 2011). "Granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

Under the Political Subdivision Doctrine, officers of political subdivisions usually do not have standing to sue a parent state regarding constitutional rights. However, standing in an official capacity exists when the officer has a "personal stake in the outcome of the litigation." In *Board of Education v. Allen*, 392 U.S. 236 (1968), two school districts and two towns sued the State of New York, bringing a First and Fourteenth Amendment challenge to a state statute requiring school boards to provide free textbooks to private school students.

All Justices agreed about standing, with the majority stating:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation. *Baker v. Carr*, 369 U.S. 186, 204 (1962).

392 U.S. at 242 n.5.

56

The Tenth Circuit's most recent case on the Political Subdivision Doctrine distinguished *Allen*: "This passage makes clear that the situation in *Allen* is very different from the situation here. In *Allen*, standing was based on the individual board members' personal stake in losing their jobs." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011). The officers of the political subdivisions in *Hugo* had no "personal stake" in that case, which involved water rights of various government entities.

## 1. The Oath of Office is a Personal Stake

Like the Petitioners in *Allen*, the Sheriffs are required to take an oath "to support the constitution of the United States." COLO. CONST., art. XII, §8. For the Rule of Law to exist, constitutional officers must be rigorously scrupulous about their oaths. *See Frank v. United States*, 78 F.3d 815, 823 (2d Cir. 1996)(standing existed because the Sheriff was forced to enforce a background check statute he believed to be unconstitutional). As detailed in the then-operative Second Amended Complaint, the Sheriffs believe that HB1224 and 1229 violate the Constitution of the United States. JA.3:500-03, 519-40.

The district court recognized that the Sheriffs' oath is a "personal stake," yet the court ruled against the Sheriffs' oath-based official capacity. The district court wrote that in *Hugo*:

57

The Tenth Circuit explained that in *Allen*, standing was based on the individual board members' personal stake in losing their jobs. 656 F.3d at 1260. *In other words, the board members were asserting individual claims, rather than "official capacity" claims.* Thus, even if members of the Board of Education in *Allen* did not have standing to bring an official capacity claim, its members could bring a claim as individuals who were at risk of losing their jobs if they adhered to the oath they took.

JA.5:1052-53 (emphasis added).

This is mistaken. There were *no* individual plaintiffs in *Allen*. The Supreme Court opinion just lists the first plaintiff, but the full list is provided in a lower court decision. The plaintiffs were the Boards of Education of the Central School District no. 1 and of Union Free District no. 3, and the towns of North Hempstead and Oyster Bay. *Board of Education v. Allen*, 51 Misc.2d 297 (Sup. Ct., Albany Cnty., N.Y. 1966). Because the individual officers had a "personal stake," the political subdivisions themselves had standing. Thus, no plaintiffs brought "a claim as individuals." *Allen* and *Hugo* show that the Sheriffs have standing in their official capacities because they have a personal stake. That personal stake does not convert their official capacity claim to an individual capacity claim.

## 2. Criminalization of Sheriffs by HB1229 is a personal stake.

*Allen* holds that an officer's risk of losing a job is sufficient for a political subdivision to have standing. *A fortiori*, a political subdivision officer has

58

standing to challenge a statute which criminalizes remaining in one's present job. HB1229 criminalizes firearms transfers in the regular performance of law enforcement duties.

HB1224 (magazines) and HB1229 (transfer restrictions) both had the same sponsor in their house of origin. Unlike the magazine ban, HB1229 has no exemption for government agencies.

The criminalization issue was not addressed in the district court's order granting the motion to dismiss the Sheriffs in their official capacities. JA.5:1048-55.

Sheriffs transfer firearms frequently during the course of their normal duties. Yet HB1229 demands that temporary or permanent transfers must be conducted by a licensed firearms dealer, who must "comply with all state and federal laws, including 18 U.S.C. sec. 922, as if he or she were transferring the firearm from his or her inventory to the prospective transferee." C.R.S. §18-12-112(2)(b). Federal law requires that when a licensed gun dealer ("FFL" or Federal Firearms Licensee) performs a transfer between private parties, both private parties must be physically present at the FFL's business premises. The FFL must take physical custody of the gun, log it and the serial number into his Acquisition and Disposition record book, record the serial number in the

59

record book, and then log the disposition to the transferee. ATF Proc. 2013-1, JA.24:5102-05. As with retail sales, the transferee and the FFL must also complete the 36 fields (with many subfields) in ATF Form 4473. *Id.*; JA.24:5199-201 (sample form).

It would be a federal felony for an FFL to perform this service at a Sheriff's Office. FFLs may only conduct firearms transfers at the single business premises specified on their license, or at a gun show. 18 U.S.C. §923(d)(E) & (j); 27 C.F.R. §478.100.

The following typical Sheriff's Office activities are crimes under HB1229.

- Returning a lost or stolen firearm to its rightful owner.

- Taking a firearm from the scene of an auto accident, and later returning the firearm to the victim.

- Taking a firearm as evidence from the scene of a crime, or from a criminal suspect.

- Transferring a firearm to the Office's evidence custodian, to a new evidence custodian, or to a temporary custodian when the regular custodian is absent.

- Transferring firearms to or from regional crime labs.

- Transferring firearms from the Office armory to deputies for long-term use.

- Taking custody of a deputy's personally-owned duty firearm, when the deputy is involved in a shooting, and later returning the firearm to the deputy.

60

- Taking custody of all Office-owned firearms whenever a deputy is under investigation.

JA727-32.

The above crimes may not normally be prosecution priorities by District Attorneys, but Sheriffs must be a model of law-abiding behavior, an example for the general public. Criminalization of the performance of one's job is an especially serious injury for a chief law enforcement officer.

Two months after this lawsuit was filed, the Colorado Bureau of Investigation sent an email attachment with no letterhead to Police Chiefs and Sheriffs; it purported to invent a new exception to HB1229 for *some* of the above law enforcement activities, namely providing Office arms to deputies. Since deputies were background-checked before they were hired, "*CBI believes that it is unnecessary* for a Law Enforcement Agency to conduct an additional NICS[21] background check by an FFL before transferring a firearm to a POST Certified Peace Officer employed by the agency for official use. As always, *agencies may wish to seek guidance from their legal advisor*." (Emphasis

---

[21] National Instant Criminal Background Check System. 18 U.S.C. §922(t).

added.) JA.4:805 (full text quoted in Sheriffs' response brief on motion to dismiss); JA.15:3292-94 (CBI Director Sloan).

The informal expression of an unpublished, non-binding belief by a bureau without enforcement authority is small comfort to the Sheriffs. Nor does CBI's expressions of what it "believes" is "unnecessary" address many of the situations described above.

Law enforcement officers have a personal stake in challenging a statute which criminalizes their ordinary law enforcement activities.

## 3. Criminalization of Sheriffs by HB1224 is a personal stake.

Unlike the firearms transfer restrictions (HB1229), the magazine ban has a limited exemption for law enforcement. However, the magazine ban still criminalizes the Sheriffs personally for two activities:

- Upon retirement from law enforcement, continuing to own magazines which were acquired after July 1, 2013.

- At present, adding an extender to a magazine. (It was stipulated that some handgun owners use extenders. JA.6:1504.)

Criminalization item 1: The first section of the magazine ban criminally punishes anyone who "possesses" a "large capacity magazine." C.R.S. §18-12-302(1)(a). There is an exemption for a person who "owns the large-capacity magazine on the effective date of this section" (July 1, 2013). C.R.S. §18-12-

62

302(2)(a)(I). There is a separate exemption for government employees. C.R.S.
§18-12-302(2)(b)("An employee of any of the following agencies who bears a
firearm in the course of his or her official duties:… A department, agency, or
political subdivision of the State of Colorado."). Thus, the plaintiff Sheriffs are
allowed to acquire magazines after July 1, 2013.

However, the moment that a Sheriff retires from law enforcement (January
12, 2015, for some of them), he or she is instantly criminalized. They are no
longer covered by the government employee exemption. The magazines which
they acquired after July 1, 2013, are not covered by the grandfather clause,
which only applies to earlier magazines.

Criminalization for all plaintiffs, including Sheriffs, is aggravated by the
undisputed fact that some magazines which are labeled as holding 15 rounds
will actually hold 16 rounds, due to differences in manufacturing tolerances.
JA.10:2075-78, 2108, 2144-46 (Shain expert testimony). Significantly, the
magazine ban has no *mens rea* requirement.

Criminalization item 2: House Bill 1224 has two sections: 18-12-302
(punishing anyone who "sells, transfers, or possesses") and 18-12-303
(requiring marking for manufacturing a "large capacity magazine" in
Colorado). The first section (18-12-302) has a law enforcement exemption

63

which applies only to "this section." C.R.S. §18-12-302(3). The other section (18-12-303) has no exemption for law enforcement.

Under section 303, "A large-capacity magazine that is manufactured in Colorado" must have a conspicuous, permanent date stamp. The section provides criminal penalties for violations. Some Sheriffs put extenders on their magazines, such as by adding a one or two-round extender to a 15 round magazine—thus "manufacturing" a magazine which can accept more than 15 rounds. *See* JA.6:1504 (stipulating that people use extenders); JA.10:2157, 2162-63 (Sheriff Heap uses extenders); Oxford English Dictionary, www.oed.com ("manufacture" defn. 2a, "to work up as or *convert into a specified product*")(emphasis added).

## B. Removing the Sheriffs in their individual capacities, and then refusing to correct the mistake, was an abuse of discretion.

The district court recognized that the Sheriffs could have standing based on their individual rights as American citizens, but did not recognize that the Sheriffs had already asserted individual capacity claims. JA.5:1049-50, 1053. Thus, the Sheriffs were dismissed from the case entirely. JA.5:1055. The court allowed the Sheriffs to ask to join the case in their individual capacities. *Id.*

64

The court thus decided a question which had not been raised, and in fact was expressly disclaimed by the parties. Defendant's reply brief for his motion "To Dismiss Sheriffs As Plaintiffs Acting In Their Official Capacity" avowed that "Defendant has not moved to dismiss Sheriffs through their individual capacities." JA.5:1001, 1018.

The District Court had previously granted Plaintiffs' unopposed motion to file a Second Amended Complaint, which motion was "to further state the Sheriffs' individual rights and interests." JA.3:484, 566.

The above was presented to the District Court in a FRCP 59(e) motion to alter/amend. JA.5:1057-62. A 59(e) motion should be granted when a court has misunderstood the party's position. *Phelps v. Hamilton*, 122 F.3d 1309 (10th Cir. 1997). The district court plainly did misunderstand; the court's opinion stated:

> Here, the Court understands the parties to agree that the claims asserted by the Sheriffs in the Second Amended Complaint are all intended to be brought as official capacity claims. *See generally* Docket # 70 (repeatedly arguing that the "Sheriffs have standing, in their official capacity," in various respects, but never contending that the Sheriffs have standing "in their individual capacity").

JA.5:1049-50.

In response to the Rule 59(e) motion, the District Court stated without elaboration that the Sheriffs' individual capacity claims in the Second

65

Amended Complaint did not state any "plausible claim" as required by *Iqbal/Twombly*. JA.6:1267. If so, the District Court should not have granted the motion to file the Second Amended Complaint, since the change made in the Seconded Amended Complaint was to amplify the Sheriffs' individual capacity claims; the motion for leave to file the Second Amended Complaint expressly said so. JA.3:484, 566.

The Second Amended Complaint satisfied *Iqbal/Twombly*. The key paragraph stated:

> As described in paragraphs 95, 137, 158, 187, 207, 214, 217, and 231, the Sheriffs, like all Plaintiffs, are *injured by the infringements of their individual rights under the Second and Fourteenth Amendments.* The infringements of the Sheriffs' rights are particularly harmful because of the heightened danger that the Sheriffs and their families presently face and will continue to face after retirement as the result of the Sheriffs' public service.

JA.3:502 (emphasis added).

This incorporated by reference the following allegations elsewhere in the complaint:

- That the Sheriffs personally own banned magazines.

- That the ban on magazines which are "designed to be readily converted" forces Sheriffs to guess about which magazines are lawful.

- That HB1224 interferes with Sheriffs' ability to hunt wild boar, and to defend themselves from "bears, mountain lions, other large predators, or criminals."

66

- That part of the magazine ban was vague, including as applied to the Uberti replica of the 1875 Colt Lightning Rifle.

- That "Firearms with magazines larger than 15 rounds are in common use for exercising the fundamental right of self-defense, the 'central component' of Plaintiffs' Second Amendment rights."

- That "Plaintiffs will be unable to legally replace magazines that they owned prior to the effective date of HB1224, as those magazines wear out, break, or are damaged."

JA.3:500, 511, 523, 528, 531, 533.

This exceeds *Iqbal*'s standard that "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All of the alleged harms flow from HB1224, and in Colorado the Governor is the proper defendant for a lawsuit involving the constitutionality of state statutes. Rather than simply alleging the general elements of a claim, the Sheriffs alleged specific facts which, if true, could plausibly prove a violation of the Second Amendment. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-58 (2007).

A district court's ruling on a Fed.R.Civ.P. 59(e) motion is reviewed for abuse of discretion. *Phelps*, 122 F.3d at 1324. The district court's refusal to correct its error was "a manifestly unreasonable judgment." *Mid-Continent Cas. Co. v. Vill. at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 981 (10th Cir. 2012).

67

The district court had "no rational basis in the evidence for its ruling," which was "a legal error." *Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1213 (10th Cir. 2010).

When all 55 Sheriffs sought to re-enter the case by filing an amended complaint, the district court allowed only 11 retiring Sheriffs to do so, since they faced an "imminent enough" risk of prosecution; after retirement, they would no longer have the government employee exemption from HB1224. JA.9:1886-90. This was accurate in regards to the possession ban in C.R.S. §18-12-302, which exempts some government employees. But it overlooked the fact that the *manufacturing* ban (e.g., putting an extender on a magazine) has no exemptions, so all Sheriffs are just as much at risk of imminent prosecution as every other citizen. C.R.S. §18-12-303. (*See* Part IV.A.3.)

## C. The errors were not harmless.

If a party demonstrates a preserved and nontechnical error, the other party bears the burden of proving harmlessness. *United States v. Olana*, 507 U.S. 725, 734 (1993). The error must "affect any party's substantial rights." Fed. R. Civ. P. 61.

The exclusion of all 55 Sheriffs in their official capacities affected their rights to challenge statutes which criminalize their daily activities.

Had the Sheriffs been allowed to participate in their official capacity, they would have testified that HB1224 has made it difficult or impossible for them and their deputies to obtain magazines of more than 15 rounds for use on duty.

HB1224 bans of all "transfers," and exempts transfers from retailers to government agencies. C.R.S. §18-12-302(1)(a) & (3)(a)(II). But who can transfer a magazine *to* a retailer? Only Colorado manufacturers. C.R.S. §18-12-302(3)(a). There is no exemption for out-of-state magazine manufacturers to sell to Colorado retailers, or directly to exempted Colorado individuals. Thus, plaintiff Magpul's in-state sales of its AR-15 rifle magazines are allowed for only as long as Magpul is in Colorado.[22] HB1224 leaves the Sheriffs and their deputies unable to purchase magazines for handguns, or for rifles other than the AR-15. Garfield County Sheriff Lou Vallario, among others, would have testified about how this problem has affected his office. JA.4:818-21 (Sheriffs' response brief to motion to dismiss).

Nor was it harmless error to eliminate consideration of similar harm to Sheriffs' *posse comitatus.* Sheriffs have the common law power to summon

_____

[22] The discrimination against out-of-state manufacturers violates the Dormant Commerce Clause, but the issue was not raised below.

69

armed citizens to aid in keeping the peace.[23] The Offices of 18 plaintiff Sheriffs
have used posses in emergencies (e.g., the 2013 floods, to deter looting in
isolated towns), or have on-going, trained posses—deployed for county fair
security, for weather emergencies, for hostage situations, and many other
needs.[24] Sheriffs' posses thwarted the escape of Ted Bundy in 1977 and of the
murderers of Rio Blanco Sheriff Roger Coursey in 1994. Besides formal posses,
there is also citizen assistance whenever the need arises. Many Sheriffs have
relied on informal posses for assistance in pursuit of fleeing violent felons, in
clearing buildings, and in other law enforcement situations.[25]

   As the district court noted when granting the Motion to Dismiss, the
Sheriffs had detailed the posse and citizen assistance issues in their response

---

[23] *E.g.*, *In re Moyer*, 85 P. 190, 193 (Colo. 1904) ("the sheriff of a county, aided
by his deputies or posse comitatus in suppressing a riot").

[24] Adams, Alamosa, Baca, Custer, Elbert, Grand, Hinsdale, Jackson, Kiowa,
Larimer, Lincoln, Logan, Mesa, Montezuma, Morgan, Prowers, Rio Blanco,
and Weld County Sheriffs' Offices. *See*, *e.g.*, Sheriffs' interrogatory responses,
JA.4:838-40, 847-48, 855-57, 865, 871-72, 879-81, 887-88, 895, 903-04, 922, 947
 (exhibits for Sheriffs' response brief to motion to dismiss).

[25] Much more information about the history and present operation of the *posse
comitatus*, from Anglo-Saxon England to today's Colorado, is available in
Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens
Summoned to the Aid of Law Enforcement*, 104 J.Crim. L. & Criminol. 761
(2015).

brief to the Motion to Dismiss. JA.4:793-800, 5:1053-54. The issues had also been raised in the Second Amended Complaint. JA.3:502-03.

The opinion below was based on a determination that magazines over 15 rounds are not necessary for self-defense. The elimination of Sheriffs in their official capacity prevented consideration of the needs of plaintiffs whom Defendant and the statute itself concede *do* need magazines of more than 15 rounds. Further, the Sheriffs in their official capacities could have presented evidence about law enforcement defensive arms uses where more than 15 shots were necessary, and which involved situations that also may be faced by citizens—e.g., the time that it took deputies 29 shots to stop an aggressive bear.

Further, the district court's dismissal of "all claims asserted by the Sheriffs in the Second Amended Complaint," JA.5:1054, was a predicate for the Court's statement in its merits opinion that "officers of the numerous state and federal law enforcement agencies all successfully use magazines with 15 or fewer rounds." Op.35-36. However, there are many Sheriffs' Offices where deputies use handgun or rifle magazines of more than 15 rounds, as the Sheriffs could have detailed with a F.R.E. 1006 report, as well as with testimony from individual Sheriffs about Office operations, demonstrating the needs of many law enforcement officers for magazines of 16-30 rounds.

71

Excluding 44 Sheriffs in their individual capacities aggravated the harm of the official capacity exclusion. For almost all of the Sheriffs, the firearms and magazines they use on duty are personally owned, and intended for continuing possession and use after retirement. Had all 55 Sheriffs (not just 11) been allowed to continue as individual capacity plaintiffs, they could have introduced F.R.E. 1006 evidence about their personal ownership. Such evidence would have further refuted the trial court's mistaken view that magazines over 15 rounds are desired only by people with inferior firearms skills who have been influenced by "entertainment." See Part I.C.

Law enforcement officers' ability to defend themselves and the citizenry deserves judicial consideration. Plaintiff Sheriffs are entitled to a trial on the merits about statutes which criminalize, obstruct, and endanger them and their deputies, and impede their ability to protect the public.

## CONCLUSION

The decision of the district court should be reversed or remanded.

72

## STATEMENT REGARDING ORAL ARGUMENT

This case involves issues of first impression dealing with the scope of a fundamental right. The case affects important public interests, including the safe operation of Sheriffs' Offices. The case also involves substantial legal issues, including:

- The bases on which judges should or should not decide Second Amendment cases—such as "What sorts of guns are necessary for self-defense" and other "complex empirically based questions."

- Whether heightened scrutiny for Second Amendment issues requires courts to examine narrow tailoring.

- The scope of the "personal stake" exception to the "political subdivision" limit on standing.

Although some Circuits will likely address the first two issues before the Tenth Circuit decides them, the Tenth Circuit's own determination of these issues would provide important guidance nationally.

Appellants respectfully suggest that 30 minutes per side would be an appropriate amount of time for oral argument.

73

Respectfully submitted,

David B. Kopel

*Counsel of record*

INDEPENDENCE INSTITUTE

727 East 16th Ave.

Denver, Colorado 80203

(303) 279-6536

*Counsel for* Sheriffs and David Strumillo

## CERTIFICATE OF COMPLIANCE

I certify pursuant to the Federal Rules of Appellate Procedure 28(a)(11) and 32(a)(7)(c) that the foregoing brief is in 13-point, proportionately spaced Century Schoolbook font. According to the word processing software used to prepare this brief (Microsoft Word), the word count of the brief is exactly 13,991, excluding the cover, corporate disclosure statement, table of contents, table of authorities, statement regarding oral argument, certificate of service, and this certificate of compliance.

s/David B. Kopel

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2015, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Tenth Circuit, which will distribute the brief to all attorneys of record in this case and in the related case of 14-1290:

| | |
|---|---|
| Matthew Grove | matt.grove@state.co.us |
| John T. Lee | jtlee@state.co.us |
| Molly Moats | Molly.Moats@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |
| Richard Westfall | RWestfall@halewestfall.com |
| Peter Krumholz | PKrumholz@halewestfall.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

76

In addition, printed copies of this brief will be hand-delivered to the Tenth Circuit Court of Appeals on Wednesday, January 21, 2015.

Virus scan certification: the digital form of this pleading submitted to the Court was scanned for viruses using Microsoft Security Essentials, antivirus versions 1.191.2472.0 (most recent virus definition downloaded on January 15, 2015), and according to the program, the document is virus free.

Privacy redactions were required at pages 870, and 937-38 in volume 4 of the Joint Appendix.

I certify that this ECF submission is an exact duplicate of the seven hard copies delivered to the clerk's office pursuant to 10th Cir. R. 31.5.

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Ave.
Denver, Colorado 80203
(303) 279-6536
*Counsel for* Sheriffs and David Strumillo

# STATUTES EXHIBIT

# House Bill 1224. Magazine ban.

**C.R.S. § 18-12-301. Definitions**
As used in this part 3, unless the context otherwise requires:
(1) "Bureau" means the Colorado bureau of investigation created and existing pursuant to section 24-33.5-401, C.R.S.

(2)(a) "Large-capacity magazine" means:
    (I) A fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition;
    (II) A fixed, tubular shotgun magazine that holds more than twenty-eight inches of shotgun shells, including any extension device that is attached to the magazine and holds additional shotgun shells; or
    (III) A nontubular, detachable magazine, box, drum, feed strip, or similar device that is capable of accepting more than eight shotgun shells when combined with a fixed magazine.
(b) "Large-capacity magazine" does not mean:
    (I) A feeding device that has been permanently altered so that it cannot accommodate more than fifteen rounds of ammunition;
    (II) An attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; or
    (III) A tubular magazine that is contained in a lever-action firearm.

**§ 18-12-302. Large-capacity magazines prohibited--penalties--exceptions**
(1)(a) Except as otherwise provided in this section, on and after July 1, 2013, a person who sells, transfers, or possesses a large-capacity magazine commits a class 2 misdemeanor.

(b) Any person who violates this subsection (1) after having been convicted of a prior violation of said subsection (1) commits a class 1 misdemeanor.

78

(c) Any person who violates this subsection (1) commits a class 6 felony if the person possessed a large-capacity magazine during the commission of a felony or any crime of violence, as defined in section 18-1.3-406.

(2)(a) A person may possess a large-capacity magazine if he or she:
    (I) Owns the large-capacity magazine on July 1, 2013; and
    (II) Maintains continuous possession of the large-capacity magazine.

(b) If a person who is alleged to have violated subsection (1) of this section asserts that he or she is permitted to legally possess a large-capacity magazine pursuant to paragraph (a) of this subsection (2), the prosecution has the burden of proof to refute the assertion.

(3) The offense described in subsection (1) of this section shall not apply to:
(a) An entity, or any employee thereof engaged in his or her employment duties, that manufactures large-capacity magazines within Colorado exclusively for transfer to, or any licensed gun dealer, as defined in section 12-26.1-106(6), C.R.S., or any employee thereof engaged in his or her official employment duties, that sells large-capacity magazines exclusively to:
    (I) A branch of the armed forces of the United States;
    (II) A department, agency, or political subdivision of the state of Colorado, or of any other state, or of the United States government;
    (III) A firearms retailer for the purpose of firearms sales conducted outside the state;
    (IV) A foreign national government that has been approved for such transfers by the United States government; or
    (V) An out-of-state transferee who may legally possess a large-capacity magazine; or

(b) An employee of any of the following agencies who bears a firearm in the course of his or her official duties:
    (I) A branch of the armed forces of the United States; or
    (II) A department, agency, or political subdivision of the state of Colorado, or of any other state, or of the United States government; or

(c) A person who possesses the magazine for the sole purpose of transporting the magazine to an out-of-state entity on behalf of a manufacturer of large-capacity magazines within Colorado.

## § 18-12-303. Identification markings for large-capacity magazines--rules

(1) A large-capacity magazine that is manufactured in Colorado on or after July 1, 2013, must include a permanent stamp or marking indicating that the large-capacity magazine was manufactured or assembled after July 1, 2013. The stamp or marking must be legibly and conspicuously engraved or cast upon the outer surface of the large-capacity magazine.

(2) The bureau may promulgate such rules as may be necessary for the implementation of this section, including but not limited to rules requiring a large-capacity magazine that is manufactured on or after July 1, 2013, to bear identifying information in addition to the identifying information described in subsection (1) of this section.

(3) A person who manufactures a large-capacity magazine in Colorado in violation of subsection (1) of this section commits a class 2 misdemeanor and shall be punished in accordance with section 18-1.3-501.

# House Bill 1229. Private loans and sales.

### § 18-12-112. Private firearms transfers--background check required--penalty--definitions

(1)(a) On and after July 1, 2013, except as described in subsection (6) of this section, before any person who is not a licensed gun dealer, as defined in section 12-26.1-106(6), C.R.S., transfers or attempts to transfer possession of a firearm to a transferee, he or she shall:

> (I) Require that a background check, in accordance with section 24-33.5-424, C.R.S., be conducted of the prospective transferee; and
> (II) Obtain approval of a transfer from the bureau after a background check has been requested by a licensed gun dealer, in accordance with section 24-33.5-424, C.R.S.

(b) As used in this section, unless the context requires otherwise, "transferee" means a person who desires to receive or acquire a firearm from a transferor. If a transferee is not a natural person, then each natural person who is authorized by the transferee to possess the firearm after the transfer shall undergo a background check, as described in paragraph (a) of this subsection (1), before taking possession of the firearm.

(2)(a) A prospective firearm transferor who is not a licensed gun dealer shall arrange for a licensed gun dealer to obtain the background check required by this section.

(b) A licensed gun dealer who obtains a background check on a prospective transferee shall record the transfer, as provided in section 12-26-102, C.R.S., and retain the records, as provided in section 12-26-103, C.R.S., in the same manner as when conducting a sale, rental, or exchange at retail. The licensed gun dealer shall comply with all state and federal laws, including 18 U.S.C. sec. 922, as if he or she were transferring the firearm from his or her inventory to the prospective transferee.

(c) A licensed gun dealer who obtains a background check for a prospective firearm transferor pursuant to this section shall provide the firearm transferor and transferee a copy of the results of the background check, including the bureau's approval or disapproval of the transfer.

81

(d) A licensed gun dealer may charge a fee for services rendered pursuant to this section, which fee shall not exceed ten dollars.

(3)(a) A prospective firearm transferee under this section shall not accept possession of the firearm unless the prospective firearm transferor has obtained approval of the transfer from the bureau after a background check has been requested by a licensed gun dealer, as described in paragraph (b) of subsection (1) of this section.

(b) A prospective firearm transferee shall not knowingly provide false information to a prospective firearm transferor or to a licensed gun dealer for the purpose of acquiring a firearm.

(4) If the bureau approves a transfer of a firearm pursuant to this section, the approval shall be valid for thirty calendar days, during which time the transferor and transferee may complete the transfer.

(5) A person who transfers a firearm in violation of the provisions of this section may be jointly and severally liable for any civil damages proximately caused by the transferee's subsequent use of the firearm.

(6) The provisions of this section do not apply to:
(a) A transfer of an antique firearm, as defined in 18 U.S.C. sec. 921(a)(16), as amended, or a curio or relic, as defined in 27 CFR 478.11, as amended;

(b) A transfer that is a bona fide gift or loan between immediate family members, which are limited to spouses, parents, children, siblings, grandparents, grandchildren, nieces, nephews, first cousins, aunts, and uncles;

(c) A transfer that occurs by operation of law or because of the death of a person for whom the prospective transferor is an executor or administrator of an estate or a trustee of a trust created in a will;

(d) A transfer that is temporary and occurs while in the home of the unlicensed transferee if:
> (I) The unlicensed transferee is not prohibited from possessing firearms; and

(II) The unlicensed transferee reasonably believes that possession of the firearm is necessary to prevent imminent death or serious bodily injury to the unlicensed transferee;

(e) A temporary transfer of possession without transfer of ownership or a title to ownership, which transfer takes place:

(I) At a shooting range located in or on premises owned or occupied by a duly incorporated organization organized for conservation purposes or to foster proficiency in firearms;

(II) At a target firearm shooting competition under the auspices of, or approved by, a state agency or a nonprofit organization; or

(III) While hunting, fishing, target shooting, or trapping if:

(A) The hunting, fishing, target shooting, or trapping is legal in all places where the unlicensed transferee possesses the firearm; and

(B) The unlicensed transferee holds any license or permit that is required for such hunting, fishing, target shooting, or trapping;

(f) A transfer of a firearm that is made to facilitate the repair or maintenance of the firearm; except that this paragraph (f) does not apply unless all parties who possess the firearm as a result of the transfer may legally possess a firearm;

(g) Any temporary transfer that occurs while in the continuous presence of the owner of the firearm;

(h) A temporary transfer for not more than seventy-two hours. A person who transfers a firearm pursuant to this paragraph (h) may be jointly and severally liable for damages proximately caused by the transferee's subsequent unlawful use of the firearm; or

(i) A transfer of a firearm from a person serving in the armed forces of the United States who will be deployed outside of the United States within the next thirty days to any immediate family member, which is limited to a spouse, parent, child, sibling, grandparent, grandchild, niece, nephew, first cousin, aunt, and uncle of the person.

(7) For purposes of paragraph (f) of subsection (6) of this section:

83

(a) An owner, manager, or employee of a business that repairs or maintains firearms may rely upon a transferor's statement that he or she may legally possess a firearm unless the owner, manager, or employee has actual knowledge to the contrary and may return possession of the firearm to the transferor upon completion of the repairs or maintenance without a background check;

(b) Unless a transferor of a firearm has actual knowledge to the contrary, the transferor may rely upon the statement of an owner, manager, or employee of a business that repairs or maintains firearms that no owner, manager, or employee of the business is prohibited from possessing a firearm.

(8) Nothing in subsection (6) of this section shall be interpreted to limit or otherwise alter the applicability of section 18-12-111 concerning the unlawful purchase or transfer of firearms.

(9)(a) A person who violates a provision of this section commits a class 1 misdemeanor and shall be punished in accordance with section 18-1.3-501. The person shall also be prohibited from possessing a firearm for two years, beginning on the date of his or her conviction.

(b) When a person is convicted of violating a provision of this section, the state court administrator shall report the conviction to the bureau and to the national instant criminal background check system created by the federal "Brady Handgun Violence Prevention Act", Pub.L. 103-159, the relevant portion of which is codified at 18 U.S.C. sec. 922(t). The report shall include information indicating that the person is prohibited from possessing a firearm for two years, beginning on the date of his or her conviction.