IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| COLORADO OUTFITTERS ASSOCIATION, *et al.,* | ) ) ) | |
| Appellants, | ) ) | No. 14-1290 |
| v. | ) ) | |
| JOHN W. HICKENLOOPER, | ) ) | |
| Appellee. | ) ) | |

On Appeal from the United States District Court for the District of Colorado
The Honorable Chief Judge Marcia S. Krieger
Case No. 13-CV-1300-MSK

**REPLY BRIEF OF APPELLANTS NONPROFIT ORGANIZATIONS, DISABLED FIREARMS OWNERS AND FIREARMS MANUFACTURERS AND DEALERS**

Respectfully submitted,

Richard A. Westfall*
Peter J. Krumholz
HALE WESTFALL, LLP
1600 Stout St., Suite 500
Denver, CO 80202
(720) 904-6010

*additional counsel listed on the next page

May 29, 2015

Marc F. Colin
BRUNO COLIN & LOWE PC
1999 Broadway, Suite 4300
Denver, CO 80202-5731
Phone: (303) 831-1099
mcolin@brunolawyers.com

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
fabianlaw@qwestoffice.net

Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
dabbott@hollandhart.com

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................3

I.      DEFENDANT HAS NOT MET HIS BURDEN TO SHOW THAT HB1229
        DOES NOT VIOLATE SECOND AMENDMENT RIGHTS FOR
        FIREARMS SALES, LOANS AND RETURNS ..........................................3

        A.      Defendant Bears the Burden of Proof .....................................................3

        B.      HB1229 Harms the Core Second Amendment Right to Acquire
                Firearms, and Plaintiffs Have Standing .................................................3

                1.      The record demonstrates a burden to core Second Amendment
                        rights .................................................................................................3

                2.      Plaintiffs have standing to challenge HB1229.........................13

                3.      Historical precedent does not save HB1229.............................13

                4.      Colorado is extreme compared to other States .........................15

        C.      HB1229 Fails Any Level of Heightened Scrutiny ..............................16

                1.      There is nothing in the record to justify HB1229's severe
                        restrictions on firearms loans .............................................17

                2.      HB1229 has no fit with increasing background checks on
                        private sales or loans .........................................................19

                3.      There are substantially less infringing alternatives .................21

II.     THE FFLS AND MAGPUL HAVE STANDING TO CHALLENGE
        HB1224..........................................................................................22

III.    THE TRIAL COURT ERRED IN DISMISSING PLAINTIFFS' ADA
        CLAIMS ..................................................................................................25

        A.    Title II of the ADA Applies to the Statutes at Issue Here...................25

        B.    Plaintiffs Proved Discrimination........................................................27

              1.    The qualitative evidence proved disparate impact.......................27

              2.    The record proves disparate impact ............................................28

        C.    Defendant's Argument on Accommodation is Meritless...................29

        D.    No Fundamental Alteration of the Statute Would Have Been
              Required .............................................................................................30

IV.    THE TRIAL COURT'S FAILURE TO RULE ON THE PARTIES' RULE
       702 MOTIONS WAS NOT HARMLESS ...................................................32

        A.    Defendant's Waiver Argument Is Frivolous ......................................32

        B.    The Trial Court's Failure to Rule on the 702 Motions Results in This
              Court's Inability to Provide Meaningful Review ...........................32

CONCLUSION. ....................................................................................................35

# TABLE OF AUTHORITIES

**Cases:**

*Aid for Women v. Foulston*, 441 F.3d 1101, 1111 (10th Cir. 2006) .......................24

*Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 431-33 (9th Cir. 2012) ..................34

*Bateman v. Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) ..............................8

*Bay Area Addiction Research & Treatment v. City of Antioch*, 179 F.3d 725, 736 (9th Cir. 1999) ............................................................................................................31

*Candlehouse, Inc. v. Town of Vestal, N.Y.*, 2013 WL 1867114, at *13 (N.D.N.Y. May 3, 2013) ............................................................................................................27

*City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 n.13 (1993) .............21

*Craig v. Boren,* 429 U.S. 190, 191 (1976) .............................................................23

*Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) ....................................30

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ..........................................4, 13

*Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla*, 693 F.3d 1303 (10th Cir. 2012) ........................................................................................................................26

*Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) ................3, 4, 7, 24

*Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1088-89 (10th Cir. 2000) ........................................................................................................................33

*Grider v. City & County of Denver*, 2012 WL 1079466, at *3 (D. Colo. Mar. 30, 2012) ........................................................................................................................27

*Guttman v. Khalsa*, 669 F.3d 1101, 1124 (10th Cir. 2012) ....................................31

*Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1360 (10th Cir. 1981) ....................24

*Illinois Ass'n of Firearms Retailers ("IAFR") v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. 2014) ...........................................................................6

*Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997) ...........................................................................26

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) .......................................33

*Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365-66 (1977) .................30

*Kinser v. Gehl Co.*, 184 F.3d 1259 (10th Cir. 1999) ................................34

*Kole v. Village of Norridge*, 941 F. Supp. 2d 933 (N.D. Ill. 2013) ........................24

*McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) ...........................4, 14, 16

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) ...............33

*Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) ......................33

*Quad Enterprises Co., LLC v. Town of Southold*, 369 F. App'x 202, 206-07 (2d Cir. 2010) ...........................................................................27

*Regional Econ. Community Action Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) ...........................................................................25

*Rodriguez v. Bear Stearns Cos.*, 2009 WL 5184702, at *16 (D. Conn. Dec. 22, 2009) ...........................................................................27

*Roy v. Bd. of Cnty. Comm'rs*, 607 F. Supp. 2d 1297, 1309 (N.D. Fla. 2009) ........27

*Silvester v. Harris*, 41 F. Supp. 3d 927, 962 (E.D. Cal. 2014) .................................4

*Smith v. Dorchester Real Estate*, 732 F.3d 51, 64 (1st Cir. 2013) ..................33, 34

*Teixeira v County of Alameda*, 2013 WL 4804756 (N.D.Cal Sep. 29, 2013) ........25

*Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 575-77 (2d Cir. 2003) .....27

*Turner Broadcasting Sys. v. FCC*, 512 U.S. 622 (1994) ...........................................19

*Ungar v. New York City Hous. Auth.*, 2009 WL 125236, at *16 (S.D.N.Y. Jan. 14, 2009) ..................................................................................................27

*United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008) .............................................................................29

*United States v. Boote*, 2014 WL 1343084, at *6 (D. Mont. Apr. 3, 2014) ...........27

*United States v Chafin*, 423 F. App'x 342, 344 (4th Cir 2011) .............................25

*United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) ...................................3

*United States v. Reese*, 627 F.3d 1164 (10th Cir. 2012) .....................................3, 21

*United States v. Skoien*, 614 F.3d 638, 643-44 (7th Cir. 2010) .............................29

*United States v. Tamman*, 782 F.3d 543, 553 (9th Cir. 2015) ...............................29

## Statutes & Regulations:

28 CFR § 35.130(b)(7) ...........................................................................................31

28 CFR §35.150(a)(3) ............................................................................................31

1923 N.D. Laws, 379, 381 .....................................................................................15

2013 Ct. ALS 3 .......................................................................................................16

2013 Del. Laws Ch. 20 (H.B.35) ...........................................................................16

2013 NY ALS 1 .......................................................................................................16

42 U.S.C. § 12132 ...................................................................................................26

Cal. Penal Code § 27880 ........................................................................................15

Conn. Gen. Stat. §§ 29-33(c), 29-36.*l*(f), 29-37a(e) .................................. 15-16, 21

C.R.S. § 18-12-112(1)(b) ..........................................................................5

D.C.Code § 7-2505.02 ...........................................................................16

Del. Code Ann. tit. 11, § 1448B(b)(2) ....................................................16

Mass. Gen.L. ch. 140, §§ 128A, 131E.....................................................21

N.Y. Gen. Bus. Law § 898........................................................................15

Or. Rev. Stat. § 166.436...........................................................................22

R.I. Gen. Laws §§ 11-47-35, 35.2............................................................16

**Other Authorities:**

ATF, Permanent Brady Permit Chart (June 10, 2014)
(https://www.atf.gov/content/firearms/firearms-industry/permanent-brady-permit-
chart) ......................................................................................................22

Thomas Cooley, *Constitutional Limitations* (1868) .................................5

## INDEX OF EXHIBITS

Attachment A ................................................................FFL Map Explanation

Attachment B ...................................................................................CBI Data

## **INTRODUCTION**

Plaintiffs agree with Defendant Governor Hickenlooper's statement that their Second Amendment challenge hinges on the degree to which HB1229 burdens "legal firearm acquisition." Answer Br. 33. The record proves that HB1229 imposes a severe burden on "legal firearm acquisition": it burdens routine, day-to-day, transfers of firearms by requiring the transferor and the transferee to meet at a gun store for in-person background checks; in the case of a loan, it requires the same in-person processing when the firearm is later returned to the owner; and, with respect to loans, it does so with no evidence in the record to justify the burden. Furthermore, for some organizations like Colorado Youth Outdoors ("CYO"), it makes the purchase of firearms nearly impossible.[1]

Plaintiffs' evidence demonstrated the consequences of HB1229's severe restrictions on private sales, on loans, and on returns. Defendant responded with evidence related only to firearm sales. Defendant did not address the distinction between sales and temporary transfers to friends, to farm and ranch employees, or to nonprofit program staff and participants. Non-sale transfers involve temporarily

---

[1] As with the opening briefs, the respective plaintiffs in No. 14-1290 and 14-1292 have coordinated to avoid duplication of argument in their reply briefs. Plaintiffs in this brief will focus mainly on HB1229, while the Plaintiffs in No. 14-1292 will focus mainly on HB1224 (the magazine ban). This brief agrees with and adopts the arguments in the reply brief filed in 14-1292.

transferring a firearm to someone personally known to the lender. A transfer, for example, in which a farmer lends a firearm to a farmhand to protect livestock and for self-defense involves core Second Amendment activity. Requiring the farmer and farmhand to spend hours travelling to a town with a gun store (assuming the town has a store willing to process the transfer for HB1229's $10 fee cap) and repeating the procedure when the firearm is returned, imposes an unconstitutional burden on Second Amendment conduct. Furthermore, most communities in rural Colorado have *no* gun-store (known as a Federal Firearm Licensee ("FFL")), or none willing to perform in-store processing for private transfers.

HB1229 is draconian by comparison to laws in other States. Very few States regulate temporary loans and returns, and those that do are far less restrictive than Colorado's statute. Moreover, there are alternatives that involve substantially less infringement on the rights of law-abiding citizens. Several States have procedures for private-sale background checks that do not require the buyer and seller to travel to a gun store. Defendant's arguments on the remaining issues on appeal are also flawed, as demonstrated below.

## ARGUMENT

### I. DEFENDANT HAS NOT MET HIS BURDEN TO SHOW THAT HB1229 DOES NOT VIOLATE SECOND AMENDMENT RIGHTS FOR FIREARMS SALES, LOANS AND RETURNS

#### A. Defendant Bears the Burden of Proof

Defendant bears the burden of proof in both steps of the applicable test set forth in *United States v. Reese*, 627 F.3d 792, 800-02 (10th Cir. 2010): (1) that HB1229 does not burden Second Amendment rights as traditionally understood, and (2) that the government's objective "is advanced by means substantially related to that objective." *Id.* at 802 (emphasis added); *see also, e.g., United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011).

#### B. HB1229 Harms the Core Second Amendment Right to Acquire Firearms, and Plaintiffs Have Standing

Defendant has not met his burden on the first step. He has offered no evidence that HB1229 does not burden Second Amendment rights.

##### 1. The record demonstrates a burden to core Second Amendment rights

HB1229 burdens the right to acquire a firearm in many situations where compliance is difficult or nearly impossible. For example, previously legal routine

3

loans and returns cannot be accomplished lawfully because of HB1229.[2] HB1229 injures-in-fact numerous Plaintiffs; Defendant's standing argument is erroneous.

The "central holding in [*District of Columbia v. Heller,* 554 U.S. 570 (2008)] [is] that the Second Amendment protects a personal right to keep and bear arms ***for lawful purposes***, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (emphasis added). The Second Amendment encompasses all lawful purposes, not solely self-defense. It necessarily includes the ability to acquire and possess a firearm, and to practice. *Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies ***a corresponding right to acquire*** and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." (emphasis added)); *Silvester v. Harris*, 41 F. Supp. 3d 927, 962 (E.D. Cal. 2014) ("One cannot exercise the right to keep and bear arms without actually possessing a firearm.").

As detailed in the Opening Brief, training in the responsible use of firearms is a core part of the mission of CYO.[3] HB1229 harms CYO and its mission

---

[2] The trial court correctly characterized HB1229 as "restricting" the ability of law-abiding citizens to acquire firearms via temporary loans. Op.36.

[3] Expanding on its opinion that the Second Amendment encompasses "a corresponding right to acquire and maintain proficiency," *Ezell* referred to *Heller's*

4

because it makes it prohibitively expensive, time-consuming, and difficult for CYO to transfer its firearms among employees, staff, and program participants. HB1229 requires that anyone to whom CYO temporarily transfers a CYO firearm must first be processed in-person at a FFL. C.R.S. § 18-12-112(1)(b). As CYO transfers firearms among its staff and program participants constantly, this requirement would cause CYO's operations to grind to a halt if HB1229 were followed to the letter.[4]

Although HB1229 exempts temporary transfers of less than 72 hours, many of CYO's routine transfers are for much longer. For example, CYO often transfers firearms from its Loveland location to its Colorado Springs location, and back again. CYO's Executive Director testified that after HB1229 became effective, he needed to transfer CYO firearms from Loveland to Colorado Springs for program

---

numerous favorable citations to Thomas Cooley's 1868 treatise on *Constitutional Limitations*: "[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . .; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." 651 F.3d at 704 (internal quotations omitted). The similarities with CYO's mission, *see* Second Am. Comp. ¶167 (JA.3:611), are striking.

[4] Defendant argues that CYO's difficulties acquiring new firearms is irrelevant because CYO did not argue that HB1229 is unconstitutionally vague. Answer Br. 37 n.7. CYO made no vagueness claim because the statute is clear that everyone who will handle a non-profit's firearm must undergo in-store processing: "If a transferee is not a natural person, then each natural person who is authorized. . .to possess the firearm after the transfer shall undergo a background check. . . ." C.R.S. § 18-12-112(1)(b).

purposes. He contacted the El Paso County Sheriff for guidance and was instructed to try to obtain the necessary background check. Two national chain stores refused to do such a check.[5] (JA.10:1974-82)

In referencing the burdens placed upon CYO, Defendant states that he "does not contest that [HB1229] imposes *some* burden on the Second Amendment including not only the inconvenience that Plaintiffs identify but also the potential criminal liability for noncompliance." Answer Br. 37 n.8 (emphasis in original). Defendant, however, produced no evidence to justify the burden on temporary transfers he now acknowledges.[6]

A Colorado Farm Bureau witness illustrated the scope of the burden when he testified that Colorado farming and ranching has always involved the routine transfer of firearms. Many farms and ranches are considerable distances from towns with gun stores. HB1229 imposes onerous burdens on farmers and ranchers

---

[5] As noted in the Opening Brief at pages 11-13, HB1229 burdens most facets of CYO's Firearms Curriculum, raising questions so serious that when the Executive Director was asked on cross-examination whether CYO made loans of firearms to class participants off CYO property, the trial court admonished counsel to advise him of his Fifth Amendment rights. (JA.10:2018-19)

[6] *See Illinois Ass'n of Firearms Retailers ("IAFR") v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. 2014) (holding unconstitutional a city ordinance that banned "gun sales and transfers").

(JA.12:2561-64), burdens exacerbated by the fact that the $10 fee cap discourages many gun stores from performing the required processing.

HB1229's in-person processing requirement, combined with its fee cap, burden the rights of all law-abiding Colorado gun owners, especially rural gun owners, by making mandatory services difficult to obtain. *Ezell*, 651 F.3d at 711 (striking down ordinance that mandated fire-range training for gun owners, yet banned firing ranges in the city). Michelle Eichler, an outfitter in rural Colorado, testified that the gun store with which she does business refuses to do background checks mandated by HB1229. (JA.13:2740)

The record demonstrates the breadth of the problems described by Ms. Eichler. Since the federal Gun Control Act of 1968, anyone who wishes to make a private interstate firearm purchase has been required to use a FFL as an intermediary. Many Colorado FFLs provide this service, and charge whatever fees they wish. However, HB1229 requires FFL processing for ***intra***state private sales (and loans and returns), and imposes a $10 price cap on the FFL fee. Few FFLs will undertake the service for $10 because it costs more than that to conduct the processing. (JA.13:2633-37,2688-89)

At trial, Defendant introduced evidence that 635 Colorado FFLs had processed at least one private transfer. (JA.14:3014-15; JA.24:5108) A Colorado

Bureau of Investigation ("CBI") witness admitted that he had no idea which, if any, of those FFLs had performed an *intra*state transfer. (JA.14:3037) Thus, the trial court erred in asserting that "more than 600 firearms dealers in Colorado…are actively performing private checks." Op.38. The trial court cited no evidence, for there was none, about how many of those dealers were conducting *intra*state checks. Defendant does not even attempt to defend the trial court's assertion.

Defendant's amicus Everytown inadvertently demonstrated the paucity of available FFLs for intrastate transfers. Using data from Gunbroker.com, the major national website on which FFLs advertise their services, Everytown claims that based on postings on Gunbroker.com, 485 Colorado FFLs say they will process private sales. From this, Everytown concludes that 94.8% of Colorado residents live within 10 miles of a FFL willing to process private sales. Everytown Br. 26.

But Everytown omits a crucial fact: most FFLs are unwilling to process the sales for the $10 fee mandated by HB1229. Thus, if a rural Coloradan wants to purchase a firearm from someone in North Dakota, many FFLs are willing to process the transaction. But if that same rural Coloradan wants to buy or borrow a firearm from a neighbor, likely no FFLs within a reasonable distance will process the transfer. (JA.13:2633-37,2688-89) *See Bateman v. Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) ("although the statutes do not *directly* regulate the

possession of firearms within the home, they effectively prohibit law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense" (emphasis in original)).

The map on the following page shows each Colorado FFL advertising on Gunbroker.com who will perform HB1229 checks.[7] (These FFLs were identified by looking at their respective fees posted on Gunbroker.com to see if they are within the $10 fee cap.) Each dot is a ten-mile radius representing a single FFL willing to do HB1229 checks. The lighter dots represent FFLs that have no street address listed on the Gunbroker.com pages or on their own websites. These FFLs do not appear to be available to walk-in customers.

---

[7] Counsel generated each of the following two maps using data described in Attachment A.



The problem is worse than the above map suggests. Many of the FFLs who will do HB1229 processing are home-based businesses (as determined by checking each FFL's Gunbroker.com posting and by viewing the location and neighborhood on Google Maps). Many home-based businesses do not maintain regular business hours, nor are they visible to the general public. The next map shows the FFLs with retail stores who will conduct HB1229 checks.



The lighter dots are retailers that are not firearms or sporting goods stores. Rather, they are tractor stores and the like; it may not be obvious to gun-owners that a tractor store performs gun dealer services. The dots made out of a gradient represent pawn shops, which also may not be apparent to gun-owners as offering such services.

Because so few FFLs will conduct HB1229 processing, even people along Colorado's Front Range have difficulty completing a transfer. For example, Dylan Harrell, who lives in Frederick, was turned down by two FFLs over a three-week

11

period before finding a gunsmith friend who processed the transfer as a favor. (JA.11:2244-45) Defendant dismissively suggests that because Harrell finally completed the transaction, there was no Second Amendment burden. Answer Br. 35. But courts have found unconstitutional burdens for much less. Chicago's ban on gun stores forced residents to travel to the suburbs. The suburban stores were open to the public, and nobody suggested that finding one was difficult. But a federal court ruled this travel burden of a few miles to be unconstitutional. *See IAFR*, 961 F. Supp. 2d at 947 (applying strict scrutiny to ordinance that banned "gun sales and transfers," and finding that travel to the suburbs for firearms commerce was unconstitutionally burdensome).

Even when willing FFLs are nearby, HB1229 has prevented firearm possession and use. Michelle Eichler testified about the impact of HB1229 on her son at Colorado State University ("CSU") in Fort Collins. (JA.13:2744) CSU's policy formerly allowed students to store their hunting rifles or shotguns with campus police. (*Id.*) Because of HB1229, CSU no longer allows students to do so. (*Id.*2745) CSU cannot send campus police to the gun store every time a student stores a hunting rifle, nor can they do so every time a student retrieves it. HB1229 mandates in-store processing, and has no law enforcement exemption; campus police officers must be background-checked every time they receive a firearm.

12

### 2.    Plaintiffs have standing to challenge HB1229

Defendant takes issue with the trial court's finding of standing as to HB1229, arguing that no Plaintiff demonstrated that HB1229 imposed a burden on conduct falling within the scope of the Second Amendment's guarantees. Yet, as detailed above, several Plaintiffs presented evidence that HB1229 imposed a significant burden on their ability to lawfully acquire firearms and to transfer possession of firearms on a temporary basis. Multiple plaintiffs testified that they had previously engaged in conduct HB1229 now makes nearly impossible.

### 3.    Historical precedent does not save HB1229

Under *Heller*, "laws imposing conditions and qualifications on the **commercial** sale of arms" are presumptively lawful, as are laws "prohibit[ing] . . . the possession of firearm[s] by felons and the mentally ill."  554 U.S. at 626-27 (emphasis added). Defendant and amici have argued that HB1229 does not implicate the Second Amendment because it fits within these two *Heller* safe harbors.

Plaintiffs have not challenged the constitutionality of laws against prohibited persons possessing firearms. The clear constitutionality of these ends, however, does not exempt the means from judicial review – especially when the means are an extreme outlier among States.

13

Substantial burdens on non-commercial sales, and non-commercial, temporary loans are not presumptively lawful. Had the *Heller* majority intended to identify them as such, it would not have used the words "commercial" or "sales." As Defendant has observed: "Given the importance of the *Heller* decision, one must assume that the majority selected its language carefully." (JA.7:1628)

Amicus Everytown attempts to impose a historical gloss on HB1229's dealer processing mandate. First, Everytown's historical comparison starts with state laws of the early 20th century. There were earlier statutes, however, requiring government permission to acquire a firearm under any circumstances – namely, the statutes of unreconstructed ex-confederate States. Congress repeatedly acted to abolish these laws, and not solely because of their racist pedigree. The Second Freemen's Bureau Act, the Civil Rights Act, and finally the Fourteenth Amendment were enacted to block these laws. *See McDonald*, 561 U.S. at 771 (Mississippi statute requiring that freedmen may not possess arms without a license). Laws that oppressively limit the acquisition of firearms are not exempted from judicial review under the Fourteenth Amendment and the incorporated Second Amendment. Indeed, they are one reason the Fourteenth Amendment was enacted. *Id*.

14

Second, Everytown lists various state laws from the first half of the 20th century that are supposedly similar to HB1229. In fact, the differences are stark. Overwhelmingly, these laws are about ***handgun sales***, not the sales of firearms in general, and not about firearms loans.

As Everytown notes, many of the statutes were based on a model law written by the United States Revolver Association. Adopting the model, the States allowed private handgun sales, with no government recordkeeping or permission, when the buyer was "personally known" to the seller. To the limited extent that some statutes applied to more than sales, they typically included the model language exempting a transferee who was "personally known" to the transferor.[8]

### 4.    Colorado is extreme compared to other States

Defendant and his amici list current state laws, which they say are similar to HB1229. The Brady Center's amicus accurately states that only five States and the District of Columbia equal Colorado in the breadth of restrictions on private firearm sales. Brady Br. 20. None of the Brady States' restrictions on temporary loans is nearly as severe as Colorado's restrictions on temporary loans. *See* Cal. Penal Code § 27880 (loans up to 30 days allowed);  N.Y. Gen. Bus. Law § 898 (applicable only to "sale, exchange, or disposal"); Conn. Gen. Stat. §§ 29-33(c),

---

[8] *E.g.*, 1923 N.D. Laws 379, 381.

29-36.*l*(f), 29-37a(e) (parties can conduct a check on-line or by telephone, without having to travel to a FFL); Del. Code Ann. tit. 11, § 1448B(b)(2) (loans of 14 days or less allowed "to a person known personally to him or her"), *id.* (6) (loans allowed if purchaser or transferee holds a concealed carry permit); R.I. Gen. Laws §§ 11-47-35 (applicable only to handgun sales); 11-47-35.2 (applicable only to purchaser and seller of long guns).[9] Three of the five state statutes, moreover, date only from 2013.[10] As noted by Justice Thomas in *McDonald*, "[W]hat is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here . . . ." *McDonald*, 561 U.S. at 787 (Thomas, J., concurring).

Finally, all statutes cited by Everytown and Brady Center exempt transfers involving law enforcement officers in the course of their official duties. As far as Plaintiffs are aware, HB1229 is *sui generis* in lacking a law enforcement exemption.

### C.    HB1229 Fails Any Level of Heightened Scrutiny

On the second step of the analysis, Defendant is mistaken on each of his points. First, this Circuit has not "settled" on intermediate scrutiny as the

---

[9] Only the District of Columbia matches the breadth of the Colorado statute. D.C.Code § 7-2505.02. The District of Columbia, however, does not have vast rural expanses where transfers are both necessary and commonplace, or long distances to travel to reach a willing FFL.

[10] 2013 NY ALS 1; 2013 Ct. ALS 3; 2013 Del. Laws Ch. 20 (H.B.35).

applicable standard in all Second Amendment cases. Second, the watered-down version of intermediate scrutiny, which Defendant prefers, is contrary to *Heller*. Third, even under Defendant's watered-down standard, he still has not produced "substantial evidence" to support mandatory store-based processing background checks on private, temporary loans and returns. Indeed, Defendant has produced no supporting evidence. Concerning the first two points, Plaintiffs rely on the Sheriffs' reply. Plaintiffs here will address the third point.

**1.    There is nothing in the record to justify HB1229's severe restrictions on firearms loans**

Defendant's trial evidence had nothing to do with private, non-sale loans and returns. There is no evidence to support criminalizing such routine transactions.

The trial court's review of the legislative history revealed no assertion of a government interest in restricting loans and returns. At trial, Defendant produced no evidence to support such restrictions. Indeed, during the examination of Defendant's key expert concerning expansion of background checks, Defendant's counsel carefully avoided asking whether there was justification for restricting loans:

- "In your opinion, will Colorado's expansion of background check requirements to cover private sales make it more difficult for prohibited persons to acquire firearms?" (JA.15:3152-53)

- "In your opinion, will Colorado's expansion of background check requirements to cover private sales reduce the rate of firearm diversion?" (*Id.*3153)

- "In your opinion, will Colorado's expansion of background check requirements to cover private sales have an impact on firearm homicide rates?" (*Id.*3154)

Counsel's questions underscore that there is no data concerning temporary loans. Defendant's amici argue at length about the benefits of background checks on private sales, but none of them offers data on loans.[11]

---

[11] Plaintiffs have never argued that checks on private sales are per se unconstitutional. Instead, Plaintiffs focused on the burdens and ineffectiveness of the peculiar system imposed by HB1229. Even so, Defendant has failed to carry his burden of showing that private sale background checks advance a substantial government interest. As detailed in the Opening Brief, the expert report of Professor Daniel Webster contained hundreds of errors, and he used trace reports in a way that is directly contrary to the instructions of Congress. Op.Br. 37-38 n.25. Defendant and his amici make much of Webster's prisoner study showing 80% of prisoners obtained their crime gun from someone else. However, Webster admitted he did not know how many guns in that 80% had been stolen. (JA.15:3174-75) No reasonable person expects that gun thieves will participate in background checks when they fence a gun.

18

### 2.     HB1229 has no fit with increasing background checks on private sales or loans

Defendant relies upon language from *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622 (1994), about deference to the "predictive judgments" of legislatures. Such deference cannot endure after the prediction has been proven false. As Defendant and his amici state at length, HB1229 is based on the premise that private sales comprise 40% of total gun sales. Therefore, in a typical month, private sales would amount to about two-thirds of FFL inventory sales. (Because 40% is two-thirds of 60%.)

The fiscal notes for HB1229 budgeted for an additional 200,000 private sales background checks annually. (JA.28:5603-04,5608-09,5613-14) Defendant's amici write much about why background checks for private sales are important. If they are, HB1229 is a failure, as the following chart demonstrates. After HB1229 took effect on July 1, 2013, private checks should have risen dramatically.



The chart above is based on CBI data from July 2012 to December 2013, which were admitted into evidence. (JA.24:5107) The 2014 data are from Everytown's amicus brief, which Everytown says come from CBI. The complete data table for the entire period is in Attachment B. The gap between the middle line of private sales, and the bottom line of private checks, shows that HB1229 has very poor "fit."[12]

Plaintiffs' initial complaint said that HB1229 would necessarily fail. (JA.1:80,91) Unlike private-sale laws in almost all other States, HB1229 mandates

---

[12] Amicus Everytown argues that HB1229 has resulted in a total of 198 denials, suggesting that because of HB1229, 198 prohibited individuals were prevented from acquiring a firearm. However, it is undisputed that more than half of denials are appealed, and more than half of the appeals result in reversal. (JA.14:3040)

that the buyer and seller simultaneously go to a FFL. HB1229's fee cap ensures that hardly any FFLs will provide the service. The final complaint, filed almost half a year after HB1229 had taken effect, reiterates the problem. (JA.6:1413-14)

Under *Reese*, "the government has the burden of demonstrating . . . its objective is advanced by means substantially related to that objective." 627 F.3d at 802. Defendant failed to do so.

### 3.    There are substantially less infringing alternatives

"[I]f there are obvious and less-burdensome alternatives to the restriction…that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 n.13 (1993). The less-burdensome alternatives described in Plaintiffs' Opening Brief would not only be less burdensome, but far more effective. Op.Br. 41-42.

Massachusetts and Connecticut have systems for private sellers and buyers to contact the state police directly for a check, by telephone or Internet. Mass. Gen. Laws ch. 140, § 128A;[13] Conn. Gen. Stat. §§ 29-33(c), 29-36.*l*(f), 29-37a(e)

---

[13] The Brady Center brief at page 21 asserts that private sales in Massachusetts still require the purchaser to previously have obtained a permit to purchase. This is only true for handguns, and only if the handgun purchaser does not have a carry permit. Mass. Gen. Laws ch. 140, §§ 128A, 131E; *cf id.* § 121 (defining "firearm" to

(parties can conduct a check on-line or by telephone, without having to travel to a FFL); Or. Rev. Stat. § 166.436 (private sellers at gun shows may telephone state police for background checks). Telephone or internet alternatives could substantially increase checks for private sales.

Twenty-two states provide that buyers who display a concealed carry permit need not undergo a further background check. ATF, Permanent Brady Permit Chart (June 10, 2014) (https://www.atf.gov/content/firearms/firearms-industry/perm-anent-brady-permit-chart).[14]

Both alternatives would be readily available statewide – in contrast to the few stores that provide HB1229 services.

## II.    THE FFLS AND MAGPUL HAVE STANDING TO CHALLENGE HB1224

The trial court found no individual Plaintiff had standing to challenge the constitutionality of HB1224 (Op.9-10), and expressed doubt that the institutional Plaintiffs "can have standing to bring a Second Amendment challenge." (Op.15) The court held that "rights granted under the Second Amendment are *individual* rights premised upon an inherent natural right of self-defense. Although businesses

---

include handguns, but not long guns, unless the long gun barrel is abnormally short).

[14] During the term a Colorado permit is valid, Sheriffs revoke the permit if a permittee is arrested or otherwise becomes ineligible. *See* Sheriffs Op.Br. 42.

such as these might have standing to challenge a statute under some other constitutional theory, it does not appear that they are protected by the Second Amendment." (Op.15-16 (emphasis in original))  There are two problems with this analysis.

First, the trial court improperly conflated the question of standing with the question of the merits. Whether the FFLs or Magpul, for example, have Second Amendment rights is a separate question from the threshold issue of whether they have Article III standing. As detailed in the Opening Brief, HB1224 resulted in economic harm to Plaintiff FFLs and Magpul, which harm would be redressed by an injunction. (Op.Br. 46)

Second, even if the merits were intertwined with the standing question, institutional plaintiffs can assert constitutional rights on behalf of their customers. In *Craig v. Boren*, the Supreme Court addressed derivative standing with respect to beer vendors. 429 U.S. 190, 192-93 (1976). The Court held that vendors have been "uniformly permitted" to resist state efforts to restrict their operations by acting as advocates of the rights of third parties. *Id.* at 195. The Court noted the statute created legal duties in the vendors and that the constitutional rights of males aged 18-21, would be "diluted or adversely effected" if the vendor's claim failed. *Id.* at 194-95.

23

Applying *Craig*, the Seventh Circuit held in *Ezell* that "a supplier of firing range facilities is harmed by the [city's] firing range ban and is also permitted to act as an advocate of the rights of third parties who seek access to its services." 651 F.3d at 696 (brackets and quotation marks omitted). Similarly, in *Kole v. Village of Norridge*, 941 F. Supp. 2d 933 (N.D. Ill. 2013), the court noted that "[e]ven if the Second Amendment does not protect the sale of firearms directly, [firearms dealers] can still pursue a claim" on behalf of their customers' Second Amendment rights. *Id.* at 945.

Although this Circuit has not directly addressed this issue, many of its decisions establish that in lawsuits involving other constitutional rights, businesses providing constitutionally related services have standing in their own right to challenge statutes that injure them, as well as derivative standing to challenge statutes that adversely affect their customers' ability to exercise those rights. *See Aid for Women v. Foulston*, 441 F.3d 1101, 1111-12 (10th Cir. 2006) (physicians had derivative standing to bring action on behalf of minor patients); *Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1360 (10th Cir. 1981) (vendors had derivative standing to assert the due process claims of potential purchasers in challenge to

state statute). Thus, the weight of case law indicates that Plaintiffs have standing to pursue their claims.[15]

## III.   THE TRIAL COURT ERRED IN DISMISSING PLAINTIFFS' ADA CLAIMS

### A.   Title II of the ADA Applies to the Statutes at Issue Here

Defendant contends that ADA Title II does not cover the statutes in this case. Answer Br. 89-92. Yet he cites (for a different issue) *Regional Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002). That case addresses the standard for proving ADA discrimination and it explains that generally-applicable laws are within the scope of Title II: "a handicapped person might challenge a zoning law that prohibits elevators in residential dwellings. That neutral law might have a disproportionate impact on such a plaintiff and others with similar disabilities, depriving them of an equal opportunity to use and enjoy dwellings there." *Id.* at 53.

Title II states that disabled persons may not be denied "the benefits of the services, programs, or activities of a public entity, ***or be subjected to***

---

[15] The trial court cited to an unpublished Fourth Circuit opinion and a decision by the Northern District of California. *See United States v Chafin*, 423 F. App'x 342, 344 (4th Cir 2011); *Teixeira v County of Alameda*, 2013 WL 4804756 (N.D.Cal Sep. 29, 2013). In *Teixeira*, however, the court actually assumed (correctly) that gun store owners had standing to represent their prospective costumers' interests, but ruled against them on the merits. *Id.* at *8.

*discrimination by any such entity*." 42 U.S.C. § 12132 (emphasis added). As the Second Circuit noted, "the language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of the City." *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997). Limiting Title II to programs, services, or activities would render the disjunctive phrase "or be subjected to discrimination" superfluous.

Moreover, as this Court stated in *Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla*, 693 F.3d 1303 (10th Cir. 2012), Title II covers government "outputs" – *i.e.*, the things it provides some public constituency. *Id.* at 1306. Title II does not cover the "inputs" – *i.e.*, the employees needed to produce the government's outputs. *Id.* As *Elwell* further observed, the use of the phrase "activities of a public entity" is intended "to capture all the outputs the public entity provides the public it serves." *Id.* And, the most universal of all government "outputs" are statewide laws.

Defendant nonetheless argues that Title II only applies to a government "program, service, or activity," and that criminal laws do not qualify. Under Defendant's theory, a state legislature could forbid disabled persons from possessing firearms. This cannot be a valid interpretation of the ADA.

26

## B.    Plaintiffs Proved Discrimination

### 1.    The qualitative evidence proved disparate impact

Defendant accurately quoted a leading ADA case, *Tsombanidis v. West Haven Fire Dep't*, for the proposition that ADA disparate impact "is generally shown" by solid statistical evidence. 352 F.3d 565, 575-77 (2d Cir. 2003); Answer Br. 95. But he elided the *Tsombanidis* rule recognizing "qualitatively disproportionate impact." *Id.* at 577. Other courts have adopted the *Tsombanidis* principle about qualitative evidence, including the trial court in this case. *See*, *e.g.*, *Grider v. City & County of Denver*, 2012 WL 1079466, at *3 (D. Colo. Mar. 30, 2012) (Krieger, C.J.) ("*Tsombanidis* also acknowledges that the second element of a disparate impact claim can be satisfied by a qualitative showing instead."); *Quad Enterprises Co. v. Town of Southold*, 369 F. App'x 202, 206-07 (2d Cir. 2010); *United States v. Boote*, 2014 WL 1343084, at *6 (D. Mont. Apr. 3, 2014); *Candlehouse, Inc. v. Town of Vestal*, 2013 WL 1867114, at *13 (N.D.N.Y. May 3, 2013); *Rodriguez v. Bear Stearns Cos.*, 2009 WL 5184702, at *16 (D. Conn. Dec. 22, 2009); *Ungar v. New York City Hous. Auth.*, 2009 WL 125236, at *16 (S.D.N.Y. Jan. 14, 2009); *Roy v. Bd. of Cnty. Comm'rs*, 607 F. Supp. 2d 1297, 1309 (N.D. Fla. 2009).

## 2.    The record proves disparate impact

Massad Ayoob has trained tens of thousands of law enforcement officers and civilians, including many people with disabilities. He testified, without cross-examination, on the impact that reloading has on the ability of a disabled person to defend him- or herself. (JA.11:2294-2315) Whether the person has an upper-body disability that makes magazine changes very slow, or a lower body disability that prevents the person from fleeing, in a wide range of situations disabled shooters have a greater chance of successfully defending themselves with larger capacity magazines as compared to able-bodied persons.

Contending that there is no disparate impact on disabled individuals, Defendant notes that expert Massad Ayoob testified "when the gun comes out, the fight is over," Answer Br. 97 (citing JA.11:2327), suggesting the confrontation ends before a single shot is fired. Defendant chops the quote. Mr. Ayoob said that this happens "the great majority of the time." (*Id.*) More precisely, as Professor Kleck testified based on his national survey of defensive gun use, about 5/6 of the time defensive gun use does not involve firing any shots. (JA.12:2434) Defendant fails to address situations where defensive fire is necessary and where persons with disabilities find it impossible to retreat or reload.

Defendant also argues that Plaintiffs' Department of Justice statistics about disabled persons being disproportionately victimized by violent crime were not introduced as evidence but were cited in the trial brief. Answer Br. 95-96. Because this matter was tried to the bench, the trial court had sufficient notice of those statistics. *E.g., United States v. Tamman*, 782 F.3d 543, 553 (9th Cir. 2015) (in a bench trial, court had discretion to consider applicable ethical standards presented in trial brief instead of through testimony); *see also United States v. Skoien*, 614 F.3d 638, 643-44 (7th Cir. 2010) (en banc) (citing extensive social science evidence); *id.* at 651 (Sykes, J., dissenting) (noting most of the data relied upon by majority "has been supplied by the court"). In addition, "[j]udicial notice is appropriate for records and reports of administrative bodies." *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008) (internal quotations omitted). Accordingly, because the cited statistics came from a Department of Justice study (*see* JA.7:1707), this Court may take judicial notice of them.

## C.    Defendant's Argument On Accommodation Is Meritless

Defendant argues that Plaintiffs' ADA claim should be rejected because they did not request an accommodation. Defendant's argument fails for two reasons. First, Plaintiffs did ask for an accommodation below.  (JA.3:494 (Second Am.

29

Compl. ¶ 18 ("all persons with relevant disabilities are entitled to an accommodation"); *see also* JA.2:293G (Civil Scheduling Order noting request for "reasonable accommodation")).

Second, this Court held the ADA does not require a "futile gesture." *Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365-66 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.")).

The Complaint and Answer contain Plaintiffs' demand for an ADA accommodation, and Defendant's denial. Even at this late date, he could moot the issue by granting an accommodation. Defendant's continuing instance that the disabled Plaintiffs have no ADA claim perpetuates his denial of their request for accommodation, and demonstrates the futility of any hypothetical alternative form of a request for accommodation.

## D.    No Fundamental Alteration of the Statute Would Have Been Required

As an affirmative defense, Defendant asserts that a public entity must make reasonable modifications, "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or

activity." 28 CFR § 35.130(b)(7). Defendant bore the burden of proof for this defense. *Id.* § 35.150(a)(3).

One reason to deny a proposed reasonable modification or accommodation is that it would pose a significant risk to the health or safety of the community. *Guttman v. Khalsa*, 669 F.3d 1101, 1124 (10th Cir. 2012) ("Title II does not require a state to license a professional who poses a significant risk to the health or safety of others . . .") (internal quotation marks omitted)). To assess whether there is a significant risk, a court may consider the nature, duration, severity, and probability of the harm actually taking place. *Bay Area Addiction Research & Treatment v. City of Antioch*, 179 F.3d 725, 736 (9th Cir. 1999). Safety concerns may not be based merely on stereotypes or generalized fears, and mere hypotheticals are insufficient. *Id.* at 737.

Defendant claims that "[c]arving out an exception for disabled individuals would increase the avenues for illegal acquisition by non-disabled individuals, thereby fundamentally altering the nature and effectiveness of the restriction." Answer Br. 100. This is speculation, divorced from the parties seeking accommodation. For example, a reasonable modification could except Outdoor Buddies from HB1229, for transfers of their specialized hunting firearms to program participants.

31

## IV.   THE TRIAL COURT'S FAILURE TO RULE ON THE PARTIES' RULE 702 MOTIONS WAS NOT HARMLESS

### A.   Defendant's Waiver Argument Is Frivolous

Curiously, Defendant argues that Plaintiffs waived their right to appeal the trial court's failure to address the pending Rule 702 motions at trial, because Plaintiffs did not object to the challenged testimony when proffered at trial. This argument was foreclosed by an exchange between the trial court and Defendant's counsel at the final pretrial conference.

During that conference, counsel for Defendant sought direction from the court regarding how the court intended to deal with then-pending Rule 702 motions, and the court stated: "You've made your objections. Since it's a trial to the bench, there is no need for going through that exercise, because to the extent that I agree with an objection, I'll disregard the evidence." (JA 9:1921).

In light of the trial court's explicit instruction that the objections tendered in the parties' joint motion challenging expert testimony under F.R.E. 702 were preserved for trial, Defendant's claim of waiver should be rejected.

### B.   The Trial Court's Failure to Rule on the 702 Motions Results in This Court's Inability to Provide Meaningful Review

In determining when a *Daubert* analysis must be applied in a bench trial, a judge may hear the evidence and make reliability determinations during, rather

than in advance of, trial – so long as the reliability standard of Rule 702 is not diminished and the court's analysis is contained in the record. *E.g., In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *cf. Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1088-89 (10th Cir. 2000). Here, the trial court made no reliability determinations.

In *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010), the trial court provided a conclusory statement finding the expert testimony reliable rather than recording its *Daubert* analysis. *Id.* at 760. On appeal, the reviewing court held that "the court must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *Id.* In this Circuit, "[w]ithout specific findings or discussion on the record, it is impossible on appeal to determine whether the district court carefully and meticulously reviewed the proffered scientific evidence or simply made an off-the-cuff decision to admit the expert testimony." *Goebel*, 215 F.3d at 1088-89 (internal citations omitted); *see also Smith v. Dorchester Real Estate*, 732 F.3d 51, 64-65 (1st Cir. 2013) (reversing damage award because *Daubert* analysis was not established in the record); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (trial court's conclusory assertion that witness had sufficient expertise to assist the jury was insufficient to show an adequate *Daubert* analysis);

*Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 431-33 (9th Cir. 2012) (admission of expert testimony without *Daubert* analysis was abuse of discretion requiring new trial).

Defendant contends the trial court's failure here was harmless, but the majority of appellate courts have held that, in the context of a bench trial, the absence in the record of a *Daubert* analysis constituted an abuse of discretion.[16] *E.g., Smith*, 732 F.3d at 64-65; *Barabin*, 700 F.3d at 433. The trial court's failure here prevents this Court from providing meaningful review.

---

[16] Defendant cites *Kinser v. Gehl Co.*, 184 F.3d 1259 (10th Cir. 1999), in support of his harmless error argument. In *Kinser*, however, this Court did not hold that the failure to conduct a *Daubert* analysis was "harmless." Instead, this Court undertook its own analysis of the record to evaluate the reliability of the proffered expert opinions. *Id.* at 1271-72. By citing *Kinser*, Defendant essentially invites this Court to undertake its own analysis of six challenged opinions by defense witness John Cerar, four challenged opinions proffered by Plaintiffs' expert Massad Ayoob, nine challenged opinions proffered by Plaintiffs' expert Gary Kleck, and six challenged opinions proffered by Plaintiffs' expert Michael Shain (who notably is not mentioned anywhere in the trial court's Findings of Fact and Conclusions of Law). (JA.6:1467)

## **CONCLUSION**

For the foregoing reasons and the reasons set forth in the Opening Brief, the trial court's decision should be reversed or remanded.

Dated this 29th day of May 2015.

> HALE WESTFALL LLP
>
> *s/*Richard A. Westfall
> Richard A. Westfall
> Peter J. Krumholz
> 1600 Stout St., Suite 500
> Denver, CO 80202
> Tel:   720-904-6010
> Fax:   720-904-6020
> rwestfall@halewestfall.com

## <u>FED. R. APP. P. 32(A)(7)(C) CERTIFICATE OF COMPLIANCE</u>

As required by Fed. R. App. P. 32(a)(7)(c), I certify that this brief is proportionally spaced and contains 6,926 words.  I relied on Microsoft Word 2010 to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

By:  <u>s/Peter J. Krumholz    </u>

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Reply Brief was served via ECF on the following:

Matthew Grove                  matt.grove@state.co.us

Kathleen Spalding              kit.spalding@state.co.us

Stephanie Scoville             stephanie.scoville@state.co.us

LeeAnn Morrill                 leeann.morrill@state.co.us

David B. Kopel                 david@i2i.org

Douglas Abbott                 dabbott@hollandhart.com

Marc F. Colin                  mcolin@bcjlpc.com

Anthony J. Fabian              fabianlaw@qwestoffice.net

Virus scan certification:  the digital form of this pleading submitted to the Court was scanned for viruses using McAfee Security Scan Plus software (most recent virus definition created on May 29, 2015), and according to the program, the document is virus free.

ECF Submission: undersigned certifies that this ECF submission is an exact duplicate of the seven hard copies delivered to the clerk's officer pursuant to 10th Cir. R. 31.5.

Privacy redactions: No privacy redactions were required.

s/Peter Krumholz
Peter Krumholz

37